within the CHHR, in the rings between 1 and 10 km from the CHHR, and in the rings between 11 and 35 km from the CHHR (Figure L-18). The results indicate that while on forays (i.e., in rings 1–35) bighorn sheep are more likely to spend time outside of mapped source habitat than they are while within the CHHR.



**Figure L-18. Observed herd-level preferences for connectivity area and non-habitat, relative to source habitat.**

Based on the findings, modelers used the habitat selection preferences observed for animals in rings 1–35 to model the behavior of bighorn sheep in the foray analysis. While on forays, bighorn sheep in the Hells Canyon herds prefer source habitat to connectivity areas and prefer both source habitat and connectivity areas to non-habitat. Relative to a preference of 1.00 for source habitat, bighorn sheep showed a preference of 0.177 for connectivity areas and a preference of 0.029 for non-habitat. In other words, within the 35-km-wide ring surrounding a CHHR, bighorn sheep were 5.6 times more likely to be found in a given square-kilometer of source habitat than in a square-kilometer of connectivity area, and 35 times more likely to be found in source habitat than in non-habitat.

Next, modelers used the preferences and distribution of habitat within each ring surrounding a CHHR to calculate the probability that a bighorn sheep that reaches a ring would intersect the ring in an allotment using Equation L-4:

$$P(\text{Intersect allotment}_{\text{Ring\_k}} \mid \text{Animal reaches ring k}) = \frac{\sum_h (\text{Area}_h \text{ in allotments w/in ring k}) \times (\text{Pref}_h)}{\sum_h (\text{Area}_h \text{ in ring k}) \times (\text{Pref}_h)}$$

Where:

$\text{Ring}_k$ = the ring $k$ kilometers from the CHHR
$\text{Area}_h$ = the area of habitat type$_h$ in that ring

**Equation L-4. Probability that a bighorn sheep that reaches a ring will intersect an allotment in that ring.**

BLM_0049586

Equation L-4 implies that in a ring of homogeneous habitat, the probability of intersecting an allotment is simply proportional to the allotment's size. If, on the other hand, the habitat composition of the allotment is less (or more) favorable to bighorns than the composition of the ring as a whole, bighorns will be correspondingly less (or more) likely to intersect the allotment.

Finally, modelers used Equation L-4 to complete the calculation of Equation L-2 for each of the 35 rings surrounding the CHHR. Equation L-2 expresses the annual probability that a bighorn sheep will go on a foray, reach a ring at a given distance from the CHHR, and intersect that ring within an active allotment.

Going from the probability of intersecting with individual rings to the overall probability of intersection is complicated by the fact that ring-level probabilities are not independent (i.e., a bighorn whose foray intersects a large allotment in ring 17 is also likely to have intersected parts of the allotment lying in rings 16 or 15 on the same foray). As a result, the ring level probabilities cannot simply be added together to determine the overall risk. Although the approach is somewhat conservative (underestimating the probability of intersection), the modelers took the overall probability of intersection with an allotment to be the maximum value found for any one of the rings as shown in Equation L-5:

$$P(\text{Intersect allotment}) = \max_{k} P(\text{Intersect allotment}_{\text{Ring\_k}})$$

**Equation L-5. Probability of a bighorn sheep on a foray intersecting an allotment**

A sample foray probability map is shown in Figure L-19.

BLM_0049587



**Figure L-19. Map foray probability for the Main Salmon/South Fork Herd**

BLM_0049588

BLM_0049589

### 3.1.3    Probability of Contact with another Bighorn Herd

Following infection of one herd in a metapopulation of bighorn sheep, respiratory disease has often been observed to spread between herds (Onderka and Wishart 1984; Cassirer et al. 1996; George et al. 2008). In the disease model, the probability of disease transmission from contact with infected bighorn sheep herds was calculated in much the same way as the probability of disease transmission from domestic sheep. For pairs of herds with overlapping home ranges, the probability of cohabitation was set at 100%; for all other herd pairs, the annual probability of cohabitation was given by the probability of a foray occurring from one herd to the other as described above. Given that cohabitation occurred, the probability of disease transmission and a subsequent outbreak of disease was set at 75%.

# 4.0   DISEASE MODEL

Modeling population dynamics of large herbivores at the individual level requires estimating numerous parameters, from adult and juvenile survival rates to age at sexual maturity, fecundity, and lamb survival (Gaillard et al. 2000). In addition, the average values for each of those life-history parameters may be modified by interacting impacts of density dependence, weather, forage availability, and predation. Properly estimating these parameters would require extensive age- and class-specific population data, ideally from the populations being modeled.

Accurate individual-level modeling of the impacts of disease events is even more difficult since the dynamics of respiratory disease in the wild are only partly known. An individual-based model would require understanding many factors, such as the incubation period and active infection durations, probability and rate of recovery from disease, rate of effective contact between individuals within the herd, and possible role of persistently infected individuals in harboring and spreading the disease. Variations in the resistance to disease of individual bighorn sheep and in the virulence of the disease-causing organisms themselves can also affect population dynamics.

Rather than attempting to create a complicated individual-based model that incorporated all of the parameters above, researchers built a population dynamics model using a "top-down" approach in which population size was the primary state variable. A simpler model may appear to have limited accuracy or realism but actually has several advantages for estimating the variables of greatest interest—projections of population size, volatility, and persistence. First, a simpler model requires estimating fewer and more easily estimated parameters. Population size is easier to estimate than individual mortality and fecundity rates that affect it. Likewise, the population-level impacts of respiratory disease outbreaks are better understood than the details of bacterial shedding, within-herd effective contact rates, and individual variation in disease susceptibility that determine the course of individual epidemics. A second important advantage of "top-down" models is that they have fewer moving and interacting parts and so are more interpretable, transparent, and accessible to scrutiny.

## 4.1    Model Organization

Researchers constructed a disease model with three components. The first component modeled the probability that an animal that was determined by the foray analysis to have reached an occupied allotment would subsequently contract respiratory disease and initiate an outbreak in its home herd. The second component modeled population growth in a healthy herd. Annual

BLM_0049590

population growth in the disease model depends on the current disease status of the herd (disease-free or infected), current population size, and an estimate of the maximum sustainable herd size for each herd. In the absence of disease, herd numbers increase (unless they have fewer than 30 individuals). The third component modeled the magnitude and duration of impacts caused by an outbreak of respiratory disease in a bighorn herd. In the first year of a disease outbreak, herds suffer an all-age die-off, followed by a variable number of years of depressed lamb recruitment. Eventually, herds that survive are considered to be fully recovered from (although still susceptible to further outbreaks of) the disease outbreak.

Figures al-20 and L-21 provide an overview of the disease model structure. Figure L-30 illustrates the first step of the annual cycle in which the disease status of each herd is determined. Figure L-21 illustrates the consequences of current herd size and disease status on next year's population size.

**Figure L-20. Disease transmission and recovery sub-model**

1) Does the herd harbor an ongoing infection?

- **YES** →     go to the Population Dynamics Sub-Model
- **NO** →      go to the next step

2) Does the herd contract respiratory disease this year? (Use the risk model to determine the probability of disease transmission into the herd from contact with either domestic sheep or infected bighorn sheep.)

- **YES** →     determine the number of years that the herd will suffer from depressed recruitment, and go to the Population Dynamics Sub-model
- **NO** →      go to the Population Dynamics Sub-model

**Figure L-21. Population dynamics sub-model**

1) Is the population size less than the minimum viable population size (30 animals)?

- **YES** →     the population declines by 16 percent
- **NO** →      go to the next step

2) Is the population free of respiratory disease?

- **YES** →     the population grows by an amount determined by the logistic growth equation
- **NO** →      go to the next step

3) Was the population just infected this year?

- **YES** →     the population experiences an all-age die-off
- **NO** →      the population experiences increased mortality of juvenile bighorns

BLM_0049591

### 4.1.1    Probability of Effective Contact and Subsequent Herd-level Die-off Given Co-habitation of Bighorn Sheep and Domestic Sheep in an Allotment

Although organisms that cause respiratory disease may be endemic in some bighorn sheep herds (Hobbs and Miller 1992), the current model is designed to assess the impact of disease transmitted from domestic sheep, so all outbreaks ultimately originate from contact with domestic sheep. The foray analysis estimates the probability that a bighorn sheep will reach an allotment occupied by domestic sheep (cohabitation), but it does not address the probability of the additional steps needed for an outbreak to occur. Once a bighorn sheep reaches an occupied allotment, the bighorn sheep must (4) come into contact with domestic sheep in the allotment and (5) contract the disease from the domestic sheep. Finally, for an outbreak to affect the animal's home herd, the infected bighorn sheep must (6) make its way back to the CHHR and (7) transmit the disease to other members of the herd (steps 4 through 7 from the Risk of Contact section).

Assumptions governing the probability that a bighorn sheep that reaches an occupied allotment will contract disease from the domestic sheep are problematic. For a similar model applied to populations of endangered Sierra Nevada bighorn sheep (Clifford et al. 2009), researchers assumed that any cohabitation with domestic sheep was equivalent to contact between the two species, citing the attraction of bighorn sheep (particularly rams) to domestic sheep and past observations of stray domestic sheep associating with bighorn sheep. They estimated that the subsequent probability of disease transmission (effective contact) given such physical contact was between 50% and 100%, based on numerous pen studies that have shown that nearly 100% of bighorn sheep co-housed with apparently healthy domestic sheep develop respiratory disease (e.g., Onderka and Wishart 1988, Foreyt 1989, Foreyt 1990, Lawrence et al. Forthcoming). Less information is available about the probability that a diseased animal will return to its CHHR and initiate an outbreak.

Together, the four steps described above determine the overall probability of an outbreak happening given that an individual bighorn sheep, whose movements were modeled by the foray analysis, reaches an open allotment. Because so much uncertainty surrounding this parameter exists, and essentially no research exists that would allow its estimation, the disease model was run with a range of probabilities of effective contact (a contact resulting in a disease transmission) and a subsequent herd-level outbreak, given cohabitation of a bighorn sheep and domestic sheep in an open allotment. The values used were 5%, 10%, 25%, 50%, 75%, and 100%.

Each individual in a herd has the potential to make a foray that will bring disease back from a contact with domestic sheep. The annual probability that any individual animal will make a foray that results in disease transmission is the product of steps 1–3 (given in Equation L-5) and the probabilities of steps 4–7 (described above). Expressed as an equation (Equation L-6), the composite probability is as follows:

$$P(\text{Outbreak})_{\text{individual}} = P(\text{Outbreak} \,|\, \text{Intersect allotment}) \bullet P(\text{Intersect allotment})$$

**Equation L-6. Probability that a bighorn sheep on a foray will lead to an outbreak of disease in its herd**

BLM_0049592

Equation L-6 is used to calculate two individual-level probabilities for each herd—one for ewes (P(Outbreak)$_{ewe}$) and one for rams (P(Outbreak)$_{ram}$). The annual probability that a herd will experience a die-off due to contact by one of its members with sheep in an active allotment depends on these two probabilities and also on the number of ewes and rams in the herd. The herd-level probability of contact is given by Equation L-7:

$$P(\text{Outbreak})_{herd} = 1 - (1 - P(\text{Outbreak})_{ewe})^{\#ewes} \bullet (1 - P(\text{Outbreak})_{ram})^{\#rams}$$

**Equation L-7. The annual probability that a herd will experience an outbreak due to contact with and allotment**

## 4.1.2    *Population Growth in a Healthy Herd: Density Dependence and the Logistic Growth Model*

Bighorn sheep populations, like those of other large herbivores, are subject to density-dependent population growth regulation (Monello et al. 2001; Bonenfant et al. 2009). Even in the absence of disease, a population of bighorn sheep will not grow without bound; as the number of animals in an area increases, the rate of further growth eventually begins to slow. The dynamics by which that slowing occurs can be complicated and are not completely understood. Jorgenson et al. (1997) and Portier et al. (1998) analyzed a long-term mark–recapture study of two populations of Rocky Mountain bighorn sheep in Alberta, Canada, for evidence of density dependence. They found the main demographic response to large population size was a decrease in lamb survivorship. Yearling ewes also suffered some mortality increases when populations were high. Other researchers have also detected a decrease in the rate of recruitment with increasing density (with relatively little response in adult survival) (McCarty and Miller 1998), a pattern that is characteristic of many large ungulates (Gaillard et al. 1998, Bonenfant et al. 2009).

To incorporate density dependence into the disease model, researchers used the logistic equation, a common ecological model of population growth (Gotelli 2008). In the logistic growth model, the maximum per capita growth rate (*r*, with units of new individuals per individual per year) is only achieved when the population size is quite small. As the population increases toward its maximum sustainable size (*K*), the number of surviving offspring per female steadily decreases and the rate of population growth slows. The logistic growth model is defined in Equation L-8:

$$\frac{dN}{dt} = rN\left(1 - \frac{N}{K}\right)$$

Where:

    *dN/dt* = yearly change in population size
    N = current herd size
    r = maximum herd growth rate
    K = maximum sustainable population.

**Equation L-8. Logistic growth model for the rate of population increase in a healthy herd**

*K* is usually known as the "carrying capacity;" in this model it is referred to as the "interim herd level" (IHL) to emphasize that it should not be interpreted as either a goal or a limit to the number of bighorn sheep that might be supported by any given herd.

The following three sections describe how modelers estimated the values of *N*, *r*, and *K* that were used by the disease model.

BLM_0049593

### 4.1.2.1 Estimating *N*—Current Herd Size

Population estimates for the 15 herds (Table L-6) were taken from survey data collected by the IDFG, ODFG, Washington Department of Fish and Wildlife (WDFW), and SRBSP (administered by the Nez Perce Tribe) (Table L-6). For each herd, we used data from the most recent survey available. Estimates of current herd sizes ranged from 10 to 210 and totaled 1,148 for all 15 herds.

One "area of concern," Little Salmon, was not treated as a fully independent population in our model. The Little Salmon has not been regularly surveyed for the presence of bighorn sheep, so a population estimate of four animals in the Little Salmon drainage was made on the basis of incidental observations of bighorn sheep within the last 3 years (Figure L-22 and Table L-6). In the disease model, the Little Salmon area of concern is linked to and effectively treated as a satellite population of the Main Salmon/South Fork Herd. Its CHHR extends 3.25 km around each known observation, and like any other bighorn sheep in the model, each animal in the Little Salmon has a fixed probability of making a foray in any given year. If an outbreak occurs in the Little Salmon, it is spread to the Main Salmon/South Fork Herd, and vice versa. Finally, in the model, the population size of the Little Salmon is tied to that of the Main Salmon/South Fork Herd, with the number in the Little Salmon staying in a constant proportion to the number in the Main Salmon/South Fork Herd. One consequence of this is that when the population of the Main Salmon/South Fork Herd is extirpated in the model, so are the animals in the Little Salmon area of concern.

The proportion of rams and ewes in each herd was determined by analyzing demographic data collected by the Oregon Department of Fish and Wildlife and the Washington Department of Fish and Wildlife. In 200 herd-years of data collected from six herds in Oregon (Muir, Sheep Mountain, Wenaha, Fox Creek, Imnaha, and Lostine), an average of 35.4% of adults were rams. In 141 herd-years of data collected from five herds in Washington (Asotin, Black Butte, Mountain View, Tucannon, and Wenaha), an average of 35.2% of adult animals were rams. In both states, the ram-to-ewe ratio varied from year to year, but the average ratios were consistent among herds. The values calculated here are consistent with those reported by in the Hells Canyon Bighorn Sheep Restoration Plan (Hells Canyon Initiative, 1997), which found an average ram:ewe ratio of 52:100 (i.e. 34% rams) in twelve herds. Accordingly, in both the disease and foray models, the percentage of rams among adult animals was set at 35%.

BLM_0049594



**Figure L-22. Little Salmon Area of Concern**

BLM_0049595

**Table L-6. Population estimates and interim herd levels (IHLs) for 15 Herds and 1 area of concern from survey data collected by the Idaho Department of Fish and Game (IDFG), Oregon Department of Fish and Game (ODFG), Washington Department of Fish and Wildlife (WDFW), and Salmon River Bighorn Sheep Project (SRBSP)**

| Herd | Estimated Population ($N$) | Date of Estimate | Data Source | IHL ($K$) |
|---|---|---|---|---|
| **Hells Canyon** | | | | |
| Asotin | 84 | 2009 | WDFW | 172 |
| Big Canyon | 20 | 2008 | IDFG | 96 |
| Black Butte | 47 | 2009 | WDFW | 461 |
| Imnaha | 135 | 2008 | ODFW | 407 |
| Lostine | 65 | 2008 | ODFW | 110 |
| Mountain View | 13 | 2009 | WDFW | 178 |
| Muir Creek | 30 | 2008 | ODFW | 86 |
| Myers Creek | 10 | 2008 | IDFG | 34 |
| Redbird | 115 | 2008 | IDFG | 322 |
| Sheep Mountain | 11 | 2008 | ODFW | 187 |
| Upper Hells Canyon | 45 | 2009 | IDFG | 279 |
| Wenaha | 90 | 2008 | ODFW | 279 |
| **Salmon River** | | | | |
| Big Creek | 186 | 2006 | IDFG | 479 |
| Main Salmon/South Fork | 210 | 2009 | SRBSP | 413 |
| Upper Salmon | 87 | 2006–07 | IDFG | 975 |
| **Area of Concern** | | | | |
| Little Salmon | 4 | 2007–09 | Various | NA |

## 4.1.2.2    Estimating *r*—Maximum Herd Growth Rate

Estimates of the maximum growth rate *r* (also known as the intrinsic or exponential growth rate) were taken from published literature. McCarty and Miller (1998) estimated *r* for 16 translocated populations of Rocky Mountain bighorn sheep in Colorado. They based their estimates on herd growth rates observed during the first few years after successful translocations, applying a correction to account for the skewed sex ratio of the translocated animals. Maximum growth rates for the 16 herds ranged between 0.051 and 0.26 (i.e., 5–26% annual increase in population size). In the disease model, a maximum growth rate for each herd was sampled from a normal distribution (mean = 0.136, standard deviation = 0.057) fitted to the estimates of McCarty and Miller (1998).

## 4.1.2.3    Estimating *K*—Interim Herd Level

Although historical reports indicate that bighorn sheep were once very abundant in Hells Canyon (Bailey 1936), we do not have accurate estimates of the current maximum potential population sizes of the herds found on or near the Payette National Forest. Even when studies are carried out to measure the actual carrying capacity of a population, directly measuring it in the field can be difficult or even impossible (Coulson et al. 2008); in any case, such studies have not been conducted for bighorn sheep in our area.

BLM_0049596

However, some form of density dependence needs to be introduced to simulate likely future herd dynamics, which means some estimate of $K$ needed to be included in the logistic growth model. Modelers named $K$ the IHL to emphasize that the number should not be construed as a Forest Service management goal or a strong estimate of actual carrying capacity of the herd home ranges.

In the absence of better information, modelers estimated IHL on the past maximum number of animals observed for each herd. For the Salmon River herds, IHLs were estimated to be 175% of the highest population estimate from the past 30 years. For Hells Canyon herds, IHLs were estimated to be 175% of the highest population estimate from the past 40 years.

#### 4.1.2.4    Nonviable herd numbers

The minimum population size, referred to as the nonviable herd number (NVN), is the threshold below which a population will not continue to grow at a disease-free rate and will, in fact, decline. The model used 30 individuals as the NVN for all herds except Big Canyon, Muir Creek, and Myers Creek—because these herds overlap, they were treated as a single herd with a combined NVN of 30.

Theory and observation have shown that extinction becomes more likely for populations that fall below some threshold of small size (Traill et al. 2010). Small populations become increasingly vulnerable to fluctuations driven by environmental and demographic stochasticity (Melbourne and Hastings 2008), single catastrophic events, and the deleterious effects of inbreeding (O'Grady et al. 2006). In bighorn sheep there is also some evidence that individuals in small groups (less than 10 individuals) need to spend more time on the look-out for predators, and as a consequence may forage less efficiently (Risenhoover and Bailey 1985; Berger and Cunningham 1988) than larger groups.

The existence of clear thresholds or minimum viable population sizes in bighorn sheep has been a matter of contention. Berger (Berger 1990) analyzed 122 bighorn sheep populations in California, Colorado, Nevada, and New Mexico and found that 100% of populations that fell below 50 animals went extinct within 50 years. Subsequently, other biologists (Krausman et al. 1993, Wehausen 1999) analyzed additional populations and noted that extinction of herds dropping below 50 animals, while quite likely, is not inevitable. Berger (Berger 1999) and (McCarty and Miller 1998) argued that, thanks to modern management recommendations and practices (including separation of bighorn and domestic sheep), small populations are now more likely to survive than they were in the past.

Singer et al. (2000a) examined 100 translocations of bighorn sheep and found only one population that fell below 30 animals ever later grew above that number. Based on that finding, Singer et al. (2001) defined quasi-extirpation as a decline of a bighorn sheep population below 30 animals, a size from which they deemed population recovery unlikely.

Other researchers have proposed different minimum sizes necessary for persistence. Based on genetic considerations, Singer and Gudorf (1999) recommended against attempting reintroduction to sites capable of supporting fewer than 100–125 animals, for which they argued that the probability of persistence was low. In their population model, Clifford et al. (2009) defined quasi-extinction as ensuing when the number of ewes in a population dropped below five. They cited the high likelihood that such small populations would be driven to extinction by

BLM_0049597

a single stochastic event, as well as evidence mentioned above, that small groups forage less efficiently (Berger 1978).

While there is no single threshold below which extinction of a herd is absolutely inevitable, it seems clear that as populations of bighorn sheep decline below 50 animals, they become increasingly vulnerable to extinction. In the present disease model, following Singer et al. (2001), a minimum population size, referred to as the NVN was set at 30 animals. The NVN is the threshold below which a population will not continue to grow at a disease-free rate and will, in fact, decline to eventual extinction. Because, in reality, extinction of herds with fewer than 30 animals is only likely, rather than certain, herds in the model that drop below 30 animals are referred to in this document as having suffered "quasi-extirpation" or "quasi-extinction". The NVN of 30 individuals applied to all herds except Big Canyon, Muir Creek, and Myers Creek—because these herds overlap, they were treated as a single herd with a combined NVN of 30.

### 4.1.2.5    Population impacts of disease

Disease-caused declines in bighorn sheep populations typically consist of an initial all-age die-off event followed by several years of low lamb survival. Ewes that survive the initial die-off may give birth, but after a period of weeks to months, their lambs develop pneumonia and die. The disease model includes both of these impacts of disease outbreaks; in the first year, infected herds suffer an all-age die-off followed by several years of slower decline due to elevated lamb mortality. The following sections describe how the population impacts of both types of disease-related mortality were modeled.

### 4.1.2.6    Initial All-age Die-off

Disease outbreak impact was measured as the product of the herd size and proportion of impact. This parameter was estimated using data from documented outbreaks in the Hells Canyon area. In 1983, an outbreak of pneumonia killed 60% of the animals in the Granite–Three Creeks area of Idaho (HCBSRC 1997). An outbreak of pneumonia in the Lostine Herd in 1986–87 killed 66% of the herd (Coggins 1988). A 1995–96 outbreak affected several herds, with herd-level mortality amounting to 33%, 50%, 65%, 69%, and 75% (Cassirer et al. 1996). The lowest mortality rate (33%) occurred in the smallest herd (Upper Joseph Creek, with 30 animals); the highest mortality rate (75%) occurred in the largest herd (Black Butte, with 220 animals). In 1999, a disease outbreak resulted in the death of 59% of the McGraw Herd and 53% of the Sheep Mountain Herd in the first year, followed by subsequent declines in both herds and eventual extirpation of the McGraw Herd. In the model, herd-level mortality during the first year of an outbreak was sampled from the distribution of values observed in the previous Hells Canyon outbreaks described above, with an equal probability of mortality of 33%, 50%, 53%, 55%, 65%, 66%, 69%, and 75%.

### 4.1.2.7    Chronic Lamb Mortality

The significant impact of the all-age die-off that occurs during the first year of an epidemic is compounded by pneumonia and septicemia in young lambs that frequently suppresses recruitment for several additional years (Cassirer et al. 2001, Miller 2001, George et al. 2008). The duration of this chronic mortality of lambs is variable, but in almost all cases lasts for at

BLM_0049598

least 2 years[2]. In some cases, poor lamb recruitment has continued for as long as 8 years (Enk et al. 2001) or 9 years (George et al. 2008) post-outbreak. Several Hells Canyon herds have had poor lamb recruitment for 6 or more years (Wenaha, Muir Creek, Upper Hells Canyon, and Sheep Mountain); in the Sheep Mountain Herd, lamb survival has still not recovered 10 years after a 1999 disease outbreak. In the disease model, herds affected by disease suffer poor lamb recruitment for between 2 and 10 years following the all-age die-off with the duration randomly selected.

The adult survival rate for healthy populations of bighorn sheep (i.e., the percentage of adults surviving from one year to the next) is around 90% (Jorgenson et al. 1997). Therefore, in the complete absence of recruitment, populations will decline an average of 10% per year. In herds with depressed recruitment, the percentage of ewes with surviving lambs ranges from 0% to 25%, which translates to an annual population change of between –10% and 2.5%. Therefore, for modeled herds suffering from disease-related lamb mortality, the annual population change was randomly selected from between –10% and 2.5%.

### 4.1.2.8    Extended Infectious Duration

When a simulated herd becomes infected, animals in the herd remain infectious for a variable length of time, generally more than 1 year. The duration of infectiousness ranges from 1 to 4 years and follows a uniform distribution.

## 4.1.3    Model Implementation

The disease model described above and in Figures L-20 and L-21 was implemented using @RISK, a commercially available Excel spreadsheet add-in (Palisade Corporation 2009). The @RISK add-in permits the model to include components of uncertainty and variability, thereby expanding it from a deterministic model to a stochastic (probabilistic) one. As such, multiple runs, or iterations, may be performed to evaluate the range of outcomes that may arise from selecting various actions.

Examples of the simulated individual herd populations for different outbreak results over 100 years are presented in Figure L-23. Different outbreak results are presented to illustrate the stochastic nature of the model—each time the model is run, the results are different. These outputs were chosen because they show the range of possible outcomes that might result from a single management scenario.

The disease model was used to perform 1,000 simulations of each proposed alternative, with and without cumulative effects. Each simulation began with all bighorn sheep herds uninfected and at their current population size and was run for 100 years. Results, including the number of herds suffering pseudoextirpation in each simulation, were collected and summarized for use in the Environmental Consequences section of the FSEIS (USDA Forest Service 2010).

---

[2] Many studies reporting post-epidemic lamb mortality have been published in the second or third year after an outbreak, and in such cases, lamb recruitment was almost invariably still low at the time of the last reported observation (Onderka and Wishart 1984; Spraker et al. 1984; Schwantje 1986; Festa-Bianchet 1988; Foreyt 1990; Ryder et al. 1992; Aune et al. 1998).

BLM_0049599

Case No. 1:20-cv-02484-MSK Document 41-8 filed 04/27/21 USDC Colorado pg 15 of 180

**Figure L-23. Four Examples of the Outputs Possible from the Disease Model for a Single Management Scenario**

BLM_0049600



# 5.0 REFERENCES

Aune, K., N. Anderson, D. Worley, L. Stackhouse, J. Henderson, and J. Daniel. 1998. A comparison of population and health histories among seven Montana bighorn sheep populations. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 11, ed. F. Moore, 46–69.

Bailey, V. 1936. The mammals and life zones of Oregon. North American fauna no. 55. Washington, D.C. U.S. Department of Agriculture, Bureau of Biological Survey.

Berger, J. 1978. Group-size, foraging, and antipredator ploys - analysis of bighorn sheep decisions. *Behavioral Ecology and Sociobiology* 4:91–99.

Berger, J. 1990. Persistence of different-sized populations—an empirical-assessment of rapid extinctions in bighorn sheep. *Conservation Biology* 4:91–98.

Berger, J. 1999. Intervention and persistence in small populations of bighorn sheep. *Conservation Biology* 13:432-435.

Berger, J. and C. Cunningham. 1988. Size-related effects on search times in North-American grassland female ungulates. *Ecology* 69:177-183.

Beyer, H. L. 2004. Hawth's analysis tools for ArcGIS. Available at: http://www.spatialecology.com/htools.

Bonenfant, C., J. M. Gaillard, T. Coulson, M. Festa-Bianchet, A. Loison, M. Garel, L. E. Loe, P. Blanchard, N. Pettorelli, N. Owen-Smith, J. Du Toit, and P. Duncan. 2009. Empirical evidence of density-dependence in populations of large herbivores. In: Advances in ecological research, vol. 41, ed. H. Caswell, 313–357.

Boyce, M. S., P. R. Vernier, S. E. Nielsen, and F. K. A. Schmiegelow. 2002. Evaluating resource selection functions. *Ecological Modeling* 157:281–300.

Cassirer, E. F., L. E. Oldenburg, V. L. Coggins, P. Fowler, K. Rudolph, D. L. Hunter, and W. J. Foreyt. 1996. Overview and preliminary analysis of a bighorn sheep die-off, Hells Canyon 1995–96. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 10, eds. K. Hurley, D. Reed, and N. Wild, 78–86.

Cassirer, E. F., K. M. Rudolph, P. Fowler, V. L. Coggins, D. L. Hunter, and M. W. Miller. 2001. Evaluation of ewe vaccination as a tool for increasing bighorn lamb survival following pasteurellosis epizootics. *Journal of Wildlife Diseases* 37:49–57.

Clifford, D. L., B. A. Schumaker, T. R. Stephenson, V. C. Bleich, M. Leonard-Cahn, B. J. Gonzalez, W. M. Boyce, and J. A. K. Mazet. 2007. Modeling risks of disease transmission from domestic sheep to bighorn sheep: Implications for the persistence and restoration of an endangered endemic ungulate. Final report. Davis, CA: U.C. Davis Wildlife Health Center, Department of Fish and Game Resource Assessment Program.

BLM_0049601

Clifford, D. L., B. A. Schumaker, T. R. Stephenson, V. C. Bleich, M. L. Cahn, B. J. Gonzales, W. M. Boyce, and J. A. K. Mazet. 2009. Assessing disease risk at the wildlife-livestock interface: a study of Sierra Nevada bighorn sheep. *Biological Conservation* 142:2559–2568.

Coggins, V. L. 1988. The Lostine Rocky Mountain bighorn sheep die off and domestic sheep. Biennial Symposium of the Northern Wild Sheep and Goat Council 6:57–64.

Copeland, J. P., K. S. McKelvey, K. B. Aubry, A. Landa, J. Persson, R. M. Inman, J. Krebs, E. Lofroth, H. Golden, J. R. Squires, A. Magoun, M. K. Schwartz, J. Wilmot, C. L. Copeland, R. E. Yates, I. Kojola, and R. May. 2010. The bioclimatic envelope of the wolverine (*Gulo gulo*): do climatic constraints limit its geographic distribution? Canadian Journal of Zoology-Revue Canadienne De Zoologie 88:233-246.

Coulson, T., T. H. G. Ezard, F. Pelletier, G. Tavecchia, N. C. Stenseth, D. Z. Childs, J. G. Pilkington, J. M. Pemberton, L. E. B. Kruuk, T. H. Clutton-Brock, and M. J. Crawley. 2008. Estimating the functional form for the density dependence from life history data. *Ecology* 89:1661–1674.

DeCesare, N. J., and D. H. Pletscher. 2006. Movements, connectivity, and resource selection of Rocky Mountain bighorn sheep. *Journal of Mammalogy* 87:531–538.

Enk, T. A., H. D. Picton, and J. S. Williams. 2001. Factors limiting a bighorn sheep population in Montana following a dieoff. *Northwest Science* 75:280–291.

Festa-Bianchet, M. 1986. Site fidelity and seasonal range use by bighorn rams. *Canadian Journal of Zoology* 64:2126–2132.

Festa-Bianchet, M. 1988. A pneumonia epizootic in bighorn sheep, with comments on preventive management. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 6, 66–76.

Foreyt, W. J. 1989. Fatal Pasteurella haemolytica pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. *American Journal of Veterinary Research* 50:341–344.

Foreyt, W. J. 1990. Pneumonia in bighorn sheep: Effects of Pasteurella haemolytica from domestic sheep and effects on survival and long-term reproduction. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 7, 92–101.

Gaillard, J. M., M. Festa-Bianchet, and N. G. Yoccoz. 1998. Population dynamics of large herbivores: variable recruitment with constant adult survival. *Trends in Ecology and Evolution* 13:58–63.

Gaillard, J.-M., M. Festa-Bianchet, N. G. Yoccoz, A. Loison, and C. Toïgo. 2000. Temporal variation in fitness components and population dynamics of large herbivores. *Annual Review of Ecology and Systematics* 31:367-393.

George, J. L., D. L. Martin, P. M. Lukacs, and M. W. Miller. 2008. Epidemic Pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep. *Journal of Wildlife Diseases* 44:388–403.

BLM_0049602

Gotelli, N. J. 2008. A Primer of Ecology, 4th edition. Sunderland, MA: Sinauer Associates, Inc.

Gross, J. E., F. J. Singer, and M. E. Moses. 2000. Effects of disease, dispersal, and area on bighorn sheep restoration. *Restoration Ecology* 8:25–37.

Gudorf, M., Sweanor, P., and F. Singer. 1996. Bighorn sheep habitat assessment of the greater bighorn canyon national recreation area. U.S. Department of Interior, National Biological Services, National Park Service.

Hells Canyon Bighorn Sheep Restoration Committee (HCBSRC). 1997. Restoration of bighorn sheep to Hells Canyon: The Hells Canyon Initiative. Unpublished manuscript. Lewiston, ID: Idaho Department of Fish and Game. 59 pp.

Hobbs, N. T., and M. W. Miller. 1992. Interactions between pathogens and hosts: Simulation of pasteurellosis epizootics in bighorn sheep populations. In: Wildlife 2001: populations. D. R. McCullough and R. H. Barrett, editors. London: Elsevier Science Publishers, Ltd. p. 997–1007

Jorgenson, J. T., M. Festa-Bianchet, J. M. Gaillard, and W. D. Wishart. 1997. Effects of age, sex, disease, and density on survival of bighorn sheep. *Ecology* 78:1019–1032.

Krausman, P. R., R. C. Etchberger, and R. M. Lee. 1993. Persistence of mountain sheep. *Conservation Biology* 7:219-219.

Lawrence, P.K., .S. Shanthalingam, R. P. Dassanayake, R. Subramaniam, C. N. Herndon, D. P. Knowles, F. R. Rurangirwa, W. J. Foreyt, G. Wayman, A. M. Marciel, S. K. Highlander, and S. Srikumaran. Forthcoming. Transmission of Mannheimia haemolytica from domestic sheep (*Ovis aries*) to bighorn sheep (*Ovis canadensis*): 8 unequivocal demonstration with green fluorescent 9 protein-tagged organisms. *Journal of Wildlife Diseases.*

Manly, B. F., L. McDonald, and D. L. Thomas. 1993. Resource selection by animals: Statistical design and analysis of field studies. London: Chapman & Hall. p. 177.

Melbourne, B. A. and A. Hastings. 2008. Extinction risk depends strongly on factors contributing to stochasticity. *Nature* 454:100-103.

McCarty, C. W., and M. W. Miller. 1998. Modeling the population dynamics of bighorn sheep: A synthesis of literature. Denver, CO: Colorado Division of Wildlife.

Miller, M. W. 2001. Pasteurellosis. In: Infectious diseases of wild mammals, eds. E. S. Williams and I. K. Barker, 330–337. Ames, IA: Iowa State University Press.

Monello, R. J., D. L. Murray, and E. F. Cassirer. 2001. Ecological correlates of pneumonia epizootics in bighorn sheep herds. *Canadian Journal of Zoology-Revue Canadienne De Zoologie* 79:1423–1432.

O'Grady, J. J., B. W. Brook, D. H. Reed, J. D. Ballou, D. W. Tonkyn, and R. Frankham. 2006. Realistic levels of inbreeding depression strongly affect extinction risk in wild populations. *Biological Conservation* 133:42–51.

BLM_0049603

Onderka, D. K., and W. D. Wishart. 1984. A major bighorn sheep die-off from pneumonia in southern Alberta. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 4, 356–363.

Onderka, D. K., and W. D. Wishart. 1988. Experimental contact transmission of *Pasteurella haemolytica* from clinically normal domestic sheep cuasing pneumonia in Rocky Mountain bighorn sheep. *Journal of Wildlife Diseases* 24(4):663–667.

Palisade Corporation. 2009. @Risk. 5.5. Ithaca, NY: Palisade Academic Software.

Portier, C., M. Festa-Bianchet, J.-M. Gaillard, J. T. Jorgenson, and N. G. Yoccoz. 1998. Effects of density and weather on survival of bighorn sheep lambs (Ovis canadensis). *Journal of Zoology* 245:271–278.

Risenhoover, K. L. and J. A. Bailey. 1985. Foraging ecology of mountain sheep - implications for habitat management. *Journal of Wildlife Management* 49:797–804.

Rodgers, A. R., A. P. Carr, H. L. Beyer, L. Smith, and J. G. Kie. 2007. HRT: Home range tools for ArcGIS. Ontario, Canada: Ontario Ministry of Natural Resources, Centre for Northern Forest Ecosystem Research, Thunder Bay.

Ryder, R. J., E. S. Williams, K. W. Mills, K. H. Bowles, and E. T. Thorne. 1992. Effect of pneumonia on population size and lamb recruitment in Whiskey Mountain bighorn sheep. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 8,136–146.

Sappington, J. M., K. M. Longshore, and D. B. Thomson. 2007. Quantifying landscape ruggedness for animal habitat analysis: A case study using bighorn sheep in the Mojave Desert. *Journal of Wildlife Management* 71(5): 1419–1426.

Schirokauer, D. 1996. The effects of 55 years of vegetative change on bighorn sheep habitat in the Sun River area of Montana. M.S. thesis. Missoula, MT: University of Montana.

Schwantje, H. M. 1986. A comparative study of bighorn sheep herds in southeastern British Columbia. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 5, 231–252.

Singer, F. J., E. Williams, M. W. Miller, and L. C. Zeigenfuss. 2000a. Population growth, fecundity, and survivorship in recovering populations of bighorn sheep. *Restoration Ecology* 8:75–84.

Singer, F. J., M. E. Moses, S. Bellew, and W. Sloan. 2000b. Correlates to colonizations of new patches by translocated populations of bighorn sheep. *Restoration Ecology* 8:66–74.

Singer, F. J., and M. A. Gudorf. 1999. Restoration of bighorn sheep metapopulations in and near 15 national parks: Conservation of a severely fragmented species. Fort Collins, CO: Midcontinent Ecological Science Center. U.S. Geological Survey Open File Report 99-102.

Singer, F. J., L. C. Zeigenfuss, and L. Spicer. 2001. Role of patch size, disease, and movement in rapid extinction of bighorn sheep. *Conservation Biology* 15:1347–1354.

BLM_0049604

Smith, T. S., J. T. Flinders, and D. S. Winn. 1991. A habitat evaluation procedure for Rocky Mountain bighorn sheep in the intermountain west. *Great Basin Naturalist* 51:205–225.

Spraker, T. R., C. P. Hibler, G. G. Schoonveld, and W. S. Adney. 1984. Pathologic changes and microorganisms found in bighorn sheep during a stress-related die-off. *Journal of Wildlife Diseases* 20:319–327.

Traill, L. W., B. W. Brook, R. R. Frankham, and C. J. A. Bradshaw. 2010. Pragmatic population viability targets in a rapidly changing world. *Biological Conservation* 143:28–34.

LANDFIRE 2006. The national map LANDFIRE: LANDFIRE national existing vegetation type layer. Washington, D.C.: U.S. Department of Interior, Geological Survey. Available at: http://gisdata.usgs.net/website/landfire/ (accessed February 8, 2007).

USDA Forest Service. 2003a. Payette National Forest land and resource management plans final environmental impact statement. Ogden, UT: USDA Forest Service, Intermountain Region.

USDA Forest Service. 2003b. Payette National Forest land and resource management plan. Odgen, UT: USDA Forest Service, Intermountain Region.

USDA Forest Service. 2008. Southwest Idaho Ecogroup land and resource management plans: draft supplemental environmental impact statement. Ogden, UT: USDA Forest Service, Intermountain Region, Payette National Forest.

USDA Forest Service. 2010. Southwest Idaho Ecogroup land and resource management plans: final supplemental environmental impact statement. Ogden, UT: USDA Forest Service, Intermountain Region, Payette National Forest.

Wehausen, J. D. 1999. Rapid extinction of mountain sheep populations revisited. *Conservation Biology* 13:378-384.

Wisdom, M. J., R. S. Holthausen, B. C. Wales, C. D. Hargis, V. A. Saab, D. C. Lee, W. J. Hann, T. D. Rich, M. M. Rowland, W. J. Murphy, and M. R. Eames. 2000. Source habitats for terrestrial vertebrates of focus in the Interior Columbia Basin: Broad-scale trends and management implications. Portland, OR: USDA Forest Service, Pacific Northwest Research Station. General Technical Report PNW-GTR-485.

Worton, B. J. 1995 Using Monte Carlo simulation to evaluate kernel-based home range estimators. *J. Wildl. Manage.* 59, 794–800.

BLM_0049605

# Appendix M

# Occupancy, Risk, and the Potential for Contact Report

BLM_0049606

BLM_0049607

# Table of Contents

Introduction .............................................................................................................................. 1

"Occupied" Habitat and the Chief's Remand ....................................................................... 1

Habitat Occupancy and Bighorn Sheep ............................................................................... 3

    Source Habitat Assessment........................................................................................... 5

    Contact Assessment ..................................................................................................... 7

Summary ............................................................................................................................... 9

Literature Cited .................................................................................................................. 10

# List of Figures

Figure 1. Summer source habitats for bighorn sheep on and adjacent to the Payette National Forest, with telemetry locations of radiocollared bighorn sheep .................................................................................................................6

Figure 2. Maximum distance of ram summer forays beyond the core home range and proportion of ram summer forays reaching each ring. (Source: USDA Forest Service 2010) ...............................................................................7

Figure 3. Example of probability of contact in the Upper Hells Canyon herd, where dark blue is the highest probability and light yellow is the lowest probability, based on source habitats in 1-kilometer rings outside of core herd home ranges (from 1 to 35 kilometers) and domestic sheep grazing allotments ................................................8

BLM_0049608

BLM_0049609

# Introduction

In 2003, the Payette National Forest (Payette NF) released its revised *Payette National Forest Land and Resource Management Plan* (Forest Plan) (USDA Forest Service 2003), which included direction on the management of bighorn sheep (*Ovis canadensis*) in Management Area (MA) #1 (Hells Canyon). The Forest Plan was appealed, in part due to the allegation that it violated the National Forest Management Act and the Hells Canyon National Recreation Area (HCNRA) Act by allowing domestic sheep (*Ovis aires*) grazing "within or near the range of bighorn sheep, thus threatening the viability of bighorn sheep through disease transmission" (USDA Forest Service 2005).

The Forest Plan includes one guideline for MA #1, which states: "Within bighorn habitat emphasis areas, close sheep allotments as they become vacant, or convert them to cattle where appropriate, to eliminate the risk of disease transmission from domestic to wild sheep. Do not convert cattle allotments to sheep allotments within occupied bighorn sheep habitat" (USDA Forest Service 2003).

The Chief of the Forest Service's (Chief's) remand to the Regional Forest states in part: "The Regional Forester is instructed to do an analysis of bighorn sheep viability in the Payette NF commensurate with the concerns and questions discussed above, and amend the SW Idaho Ecogroup Final Environmental Impact Statement (FEIS) accordingly. Changes to the management direction of the Payette NF LRMP for MA #1 (Hells Canyon) and adjacent areas shall be evaluated, and adopted as necessary to ensure bighorn sheep viability. The analysis and evaluation must be extensive enough to support determinations of compliance with applicable law and regulation, specifically the Hells Canyon NRA Act, 36 CFR 219.19, and 36 CFR 292.48" (USDA Forest Service 2005).[1] The Chief's remand for analyzing bighorn sheep viability is linked to the likelihood of contact and disease transmission between domestic and bighorn sheep.

# "Occupied" Habitat and the Chief's Remand

The concept of bighorn sheep occupied habitat is referenced in the Chief's remand relative to the potential for contact and disease transmission between domestic sheep and bighorn sheep on five occasions, all in the "Discussion" section of the remand. Emphasis has been added in the following excerpts:

1) The Payette NF LRMP includes a Rangeland Resource 'Guideline' for Hells Canyon MA #1 that reads:

   "Within bighorn habitat emphasis areas, close sheep allotments as they become vacant, or convert them to cattle where appropriate, to eliminate the risk of disease transmission from domestic to wild sheep. Do not convert cattle allotments to sheep allotments within **occupied** bighorn sheep habitat" (USDA Forest Service 2003 and 2005, p. 12).

---

[1] For a detailed account of the rationale and remand decision, see *Decision for the Appeal of the Payette National Forest Land and Resource Management Plan* (USDA Forest Service 2005).

BLM_0049610

This reference cites guidance from Forest Plan Guideline MA #1 (Hells Canyon) and refers to the Forest's use of the term "occupied habitat" in the Forest Plan.

2) "Payette NF LRMP direction pertaining to bighorn sheep in the Hells Canyon MA was described above. It is limited to a coordination objective, and a guideline for closing domestic sheep allotments should they become vacant. 'Guideline' is defined as 'a preferred or advisable course of action generally expected to be carried out' (Payette LRMP, p. GL-17). The Payette LRMP does not contain any direction for protecting or maintaining bighorn sheep or their habitat in the Hells Canyon MA, in particular for the protection of bighorn sheep from the documented current and likely future threat of disease transmission from domestic sheep. By permitting the presence of domestic sheep within **occupied** bighorn sheep range, the Payette NF does not appear to be managing the habitat to maintain viable populations of bighorn sheep" (USDA Forest Service 2005, pp. 13–14).

The focus of this discussion is on Forest Plan direction and the charge that the Forest Plan does not contain direction for protecting bighorn sheep from contact and disease transmission. The specific focus of this section is on MA #1 (Hells Canyon). The inference is that "occupied habitats" in Hells Canyon are needed to support viable populations of bighorn sheep per 36 CFR 219.19. No specific guidance is given for defining "occupied" habitats.

3) "Based on the above analysis, the viability of bighorn sheep populations within the Hells Canyon area, and across the Payette NF, appears to be threatened by allowing continued grazing of domestic sheep in or near **occupied** bighorn sheep habitat. As documented in the FEIS and relevant scientific literature, without immediate removal of domestic sheep from **occupied** bighorn sheep habitat, bighorn sheep within that habitat are likely at risk of extirpation. Bighorn sheep habitat is contiguous between the Payette NF and NFS lands to the north, east and south, and bighorn sheep appear to move between the two identified habitat areas (Hells Canyon and Snake River) within the Payette NF (FEIS Appendix A, letter #53; NOA #0021, Attachment A). Transmission of disease to bighorn sheep on the Payette NF that are part of the Hells Canyon population will place the entire Payette NF population at substantial risk". (USDA Forest Service 2005, p. 14).

In this section, the discussion is expanded from MA #1 to include the remainder of the Payette NF. The impetus is on removing domestic sheep from occupied bighorn sheep habitat, though the attributes for defining occupied habitat are not specified. The emphasis is on the risks of disease transmission from domestic sheep to bighorn sheep, specific to bighorn sheep population viability.

4) "While the Hells Canyon MA is thus not specifically included within the Hells Canyon NRA Act, it is clear that by permitting the presence of domestic sheep within adjacent **occupied** bighorn sheep range, and with the documented movement of bighorn sheep between the NRA and the Payette NF (see discussion above, and the specific citations in NOA #0018, p. 37), the Payette NF is not managing livestock grazing in the Hells Canyon MA in a manner compatible with the protection and maintenance of bighorn sheep or their habitat within the Hells Canyon NRA" (USDA Forest Service 2005, p. 14).

BLM_0049611

The use of occupied habitat in the above quote is specific to the Hells Canyon NRA and alleges that the Forest Service is not managing grazing in bighorn sheep habitat in a manner compatible with Hells Canyon NRA Act. No effort is made to define occupied habitat.

5) "Another appellant contends that '[t]he Forest Plans propose reviewing only 5% of projects within known **occupied** habitat to determine whether Forest management actions are affecting species habitats. This monitoring effort is insufficient to accurately monitor populations with any statistical certainty' (NOA #0018, p. 11). This is a reference to the first of two monitoring requirements for management indicator species (MIS) (Payette NF LRMP, p. IV-11). However, the monitoring frequency is stated as 'up to 25 percent' so this contention is incorrect. In addition, this item is for monitoring changes to habitat: the second MIS requirement is for monitoring population trends". (USDA Forest Service 2005, p. 26).

This section cites an appellant's contention with Forest Plan monitoring. No specific criteria are used to define occupied habitat.

In summary, the primary focus of the Chief's remand is to provide management direction that will provide habitats that support viable populations of bighorn sheep on the Payette NF per regulatory direction in 36 CFR 219.19. The emphasis on "occupied" habitat is viewed in light of this direction relative to implications of disease transmission between domestic sheep and bighorn sheep. No effort is made in the Chief's remand to provide specific direction that defines occupied habitat.

# Habitat Occupancy and Bighorn Sheep

The delineation of occupied habitat is an important concept used by managers and researchers in understanding the distributions of species on landscapes and the implications of natural and anthropogenic perturbations on those species and their habitats. Researchers and managers also have a long history of developing models that infer habitat suitability based on species' habitat requisites and the potential for species to occur in, or occupy, these suitable habitats. Considerable effort has been placed on monitoring species and their habitats to this end. However, there is a great difference between identifying suitable habitat and inferring that such habitat is occupied. Relative to this issue on Forest Service administered lands, guidance from the 1982 planning regulations (36 CFR 219.19) state that "Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area."

MacKenzie (2005) summarizes the long-standing issue of presence (occupied habitat) and absence of species on landscapes beginning with the well-known assertion that whereas presence can be confirmed, absence cannot. There have been numerous sampling schemes for the detection/non-detection of species, most of which include modeling efforts that assess the probability of detection or the estimation of occupied habitat patches (e.g., Johnson 1980; Gu and Swihart 2003; Manley et al. 2005; Stanley and Royel 2005; Hirzel et al. 2006; Vaughan and Ormerod 2006; Hockey and Curtis 2008; Long et al. 2009; Nichols et al. 2008). In the absence of specific modeling or sampling, and when data are limiting, Delphi (expert opinion) methodologies have also been used to assess the quantity and quality of habitats and even species occupancy (e.g., Johnson and Gillingham 2004; Seone et al. 2005).

BLM_0049612

Documenting bighorn sheep occupied habitat on the Payette NF has several challenges, and the availability of suitable habitat does not infer occupied habitat for a number of reasons. Substantial declines of bighorn sheep populations, contractions in the species geographical distribution, translocations for the recovery of bighorn sheep, population depressions as a result of disease epizootics, and bighorn sheep behavior all influence the likelihood that suitable habitats are occupied. These factors also influence the rate at which habitats are acquired and occupied and the likelihood of persistence once occupied.

Historically, bighorn sheep occupied suitable habitats over much of the western United States. Steep population declines followed Euro-American settlement from the mid-1800s through the early 1900s and were attributed to overharvest, habitat loss, forage competition with domestic livestock, and disease (Goodson 1982; Valdez and Krausman 1999). Currently, bighorn sheep are estimated at approximately 10% of historic numbers, occupying 30% of historic distribution patterns, and mostly occurring in small disjunct herds of less than 100 animals (Berger et al. 1990; Singer et al. 2000d).

The influences of disease epizootics on the geographic distribution and abundance of bighorn sheep has long been a significant factor influencing the occupation (and reoccupation) of historic habitats. An extensive body of scientific literature has accumulated on the effects of disease on bighorn sheep populations. The literature indicates the following: 1) numerous examples of bighorn dieoffs due to disease have been documented; 2) bighorn die-offs were documented as early as the mid-1800s and have been documented in every state in the western United States; 3) bighorn die-offs typically follow known or suspected contact with domestic sheep; 4) under experimental conditions, clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep; 5) a variety of diseases and pathogens have been implicated in die-offs, but most commonly the disease implicated in the die-off is bacterial pneumonia (Pasteurellosis) caused by *Mannheimia haemolytica* (formerly *Pasteurella haemolytica*) or other species of closely related *Pasteurella* bacteria; 6) there is consensus among wildlife biologists and veterinarians experienced in bighorn sheep management that domestic sheep and bighorn sheep must be kept separate in order to maintain healthy bighorn sheep populations (e.g., Foreyt and Jessup 1982; Goodson 1982; Onderka et al. 1988; Foreyt 1989; Desert Bighorn Council Technical Staff 1990; Callan et al. 1991; Cassirer et al. 1996; Martin et al. 1996; USDI BLM 1998; Bunch et al. 1999; Singer et al. 2000a, 2000b, 2000c, 2000d; Monello et al. 2001; Schommer and Woolever 2001; Singer et al. 2001; Dubay et al. 2002; Garde et al. 2005; Cassirer and Sinclair 2007; Clifford et al. 2009; George et al. 2008).

In Idaho's Hells Canyon, bighorn sheep populations were extirpated by 1945 (Cassirer 2004). Since 1971, reintroductions into Hells Canyon have resulted in the establishment of several herds in and adjacent to Hells Canyon (Cassirer 2004). Limited recolonization of historic habitats and expansion of bighorn sheep populations in Hells Canyon are largely influenced by recurring disease epizootics that impact adult survivability and lamb recruitment (Cassirer 2004; Cassirer and Sinclair 2007). Cassirer and Sinclair (2007) identify pneumonia as the primary factor limiting bighorn sheep population growth in eight Hells Canyon populations.

Bighorn sheep that have persisted above Riggins, Idaho, along the Salmon River, are Idaho's only native bighorn sheep population. There have been no transplants or augmentation of bighorn sheep originating outside of the Salmon River population into this population. Hence, these sheep represent a unique genetic and population base. Historic disease epizootics are documented in this population going back to

BLM_0049613

the 1870s (Smith 1954). As with the Hells Canyon population, disease epizootics have likely influenced both the abundance and distribution of bighorn sheep populations in the Salmon River drainage. Historically, source habitats likely connected the Salmon River and Snake River populations.

The analysis of suitable habitat, and the inference that suitable habitats are an accurate proxy for occupied habitats, is not useful in assessing the persistence of bighorn sheep populations. The distribution and abundance of bighorn sheep have been significantly reduced from presettlement conditions. Because disease epizootics are an integral factor in bighorn sheep persistence, analyses need to incorporate factors that contribute to the potential risk of these epizootics and address factors such as the availability and connectivity of suitable bighorn sheep habitats, bighorn sheep behavior and movement patterns, proximity of bighorn sheep to domestic sheep, likelihood of contact between the species, risk of disease transmission in contact events, and the perturbations in bighorn sheep populations as a result of disease transmission.

Clifford et al. (2009) utilized a contact and disease transmission model to assess potential implications of various grazing management strategies on the persistence of a Sierra Nevada bighorn sheep (*O. c. sierrae*) population. Building on concepts in that analysis, the Payette NF is conducting a similar analysis to assess the risks of contact and disease transmission between domestic sheep and bighorn sheep on the Payette NF. Per the Chief's remand, the primary purpose of this analysis is to provide a basis for the management of bighorn sheep habitats on the Payette NF such that habitats are maintained to support viable populations of bighorn sheep (36 CFR 219.19). A risk assessment approach that incorporates the species life requisites, the potential for contact between domestic sheep and bighorn sheep, and the influences of transmitted diseases on population dynamics provides a much better framework for management recommendations that will provide habitats to support viable populations of bighorn sheep.

The Payette NF built upon concepts in Clifford et al. (2009) to: 1) model bighorn sheep habitat suitability (source habitats assessment); 2) model the risks of contact between bighorn sheep and domestic sheep given bighorn sheep movement patterns and proximity to domestic sheep allotments (contact assessment); 3) infer disease transmission likelihood and rates; and 4) model the potential effects of diseases on bighorn sheep herd persistence (disease transmission assessment).

## SOURCE HABITAT ASSESSMENT

Source habitats are those characteristics of macrovegetation (cover types and structural stages) that contribute to stationary or positive population growth for a species within its distributional range (Wisdom et al. 2000; Raphael et al. 2001). Further, source habitats contribute to source environments, which represent the composite of all environmental conditions that result in stationary or positive population growth in a specified area and within a specified time range (Wisdom et al. 2000; Raphael et al. 2001).

Source habitat by itself does not provide a meaningful metric for evaluating the impacts of domestic sheep on bighorn sheep viability. It does however provide a framework for assessing the potential for contact, and hence allows researchers to model the potential effects of disease transmission between domestic and bighorn sheep. This portion of the analysis focused primarily on the delineation of source habitats. The implications of contact with domestic sheep, disease transmission, and perturbations in

BLM_0049614

bighorn sheep populations are addressed in the contact assessment section below. Together these form the basis for source environment analyses.

For the Payette NF, source habitats for bighorn sheep were delineated utilizing LANDFIRE data (Keane et al. 2002) and incorporated other biophysical data considered important in bighorn sheep habitat selection and use from the literature (USDA Forest Service 2010). Figure 1 displays summer source habitats for bighorn sheep in the Snake River and Salmon River drainages on and adjacent to the Payette NF. Bighorn sheep source habitats in central Idaho are associated with large riverine systems and are thus well connected.  A large telemetry data set (approximately 52,000 points from radio-collared bighorn sheep over 20 years) was used to assess the relationship between known sheep locations and modeled source habitats. The bighorn sheep data points and modeled source habitats show a strong correlation, as 92% of bighorn sheep telemetry points fall within identified source habitats.  However, not all source habitats are occupied by bighorn sheep.  Large areas of source habitat exist where bighorn sheep have not been detected, at least in recent years. Per previous discussion, this may be due to many reasons.  Specific to Hells Canyon and the Salmon River, some possibilities are: 1) bighorn sheep may not have occupied historical habitats due to disease transmission events, 2) populations may need to increase before source habitats are more fully occupied, 3) exploration of transplanted bighorn sheep into adjacent unoccupied historic habitats may not have occurred.



**Figure 1. Summer source habitats for bighorn sheep on and adjacent to the Payette National Forest, with telemetry locations of radiocollared bighorn sheep**

BLM_0049615

## CONTACT ASSESSMENT

Assessing the potential for contact between bighorn sheep and domestic sheep involved a large telemetry data set (approximately 51,000 points). Data were used to develop individual home ranges within herds using a home range extension model developed for ArcView (Rogers et al. 2007). Individual home range models were coalesced into core herd home ranges for various bighorn sheep populations in Hells Canyon and the Salmon River drainage. The 95% isopleth was the outer boundary for bighorn sheep core herd home ranges. When a bighorn sheep herd 95% isopleth overlapped with domestic sheep allotment boundaries, researchers inferred a probability of interspecies contact at 100%. When analyzed for summer forays, 95.4% of the telemetry locations were within core herd home ranges. Of the 4.6% of the telemetry points outside of the core herd home ranges (forays), 4.4% were by rams.

Consistent with the bighorn sheep literature, bighorn sheep in Hells Canyon are capable of long-distance forays outside of core herd home ranges. This life history trait can put bighorn sheep at risk of contact with domestic sheep, particularly when suitable habitats are well connected and overlap with domestic sheep use areas (Gross et al. 2000; Singer et al. 2000d). The risk of contact between dispersing bighorn sheep (mostly rams) and domestic sheep is ostensibly related to bighorn sheep source habitats, the proximity of domestic sheep use areas (allotments), distance of bighorn sheep forays outside of core herd home ranges, and frequency of bighorn sheep forays outside of core herd home ranges.

Figure 2 displays the maximum distance of ram forays for the data set outside of core herd home range areas (95% isopleth) and the proportion of rams with forays from 0 to 35 kilometers (km) from core herd home range areas. All but one bighorn sheep telemetered forays were between 0 and 26 km. One ram had a foray documented at 35 km from its core herd home range. Foray distances were stratified into 1-km concentric rings emanating out from core herd home range areas and used as a basis for calculating the probability of contact. Along with the source habitats, foray distances allowed the analysis of potential contact with domestic sheep allotments.



**Figure 2. Maximum distance of ram summer forays beyond the core home range and proportion of ram summer forays reaching each ring. (Source: USDA Forest Service 2010)**

BLM_0049616

The likelihood of contact for each kilometer ring outside of the core herd home range area can be expressed by the following equation (USDA Forest Service 2010):

$$P(\text{Contact}_{\text{Ring\_k}}) = P(\text{Foray}) \times P(\text{Animal reaches ring k} \mid \text{Foray}) \times P(\text{Intersect allotment} \mid \text{Animal reaches ring k})$$

The overall probability of contact for each individual is:

$$P(\text{Contact}) = \max_{k} P(\text{Contact}_{\text{Ring\_k}})$$

The probability of a bighorn sheep foray contacting domestic sheep was based on the size and pattern of the domestic sheep allotment relative to the distance of the foray ring (1–35 km) and the quality of habitat based on the source habitat map in those respective rings.

$$P(\text{Intersect allotment} \mid \text{Animal reaches ring k}) = \frac{\sum_{h} (\text{Area}_h \text{ in allotments w/in ring k}) \times (\text{Pref}_h)}{\sum_{h} (\text{Area}_h \text{ in ring k}) \times (\text{Pref}_h)}$$



**Figure 3. Example of probability of contact in the Upper Hells Canyon herd, where dark blue is the highest probability and light yellow is the lowest probability, based on source habitats in 1-kilometer rings outside of core herd home ranges (from 1 to 35 kilometers) and domestic sheep grazing allotments**

The analysis allows for the integration of bighorn sheep source habitats, bighorn sheep behavior, and the proximity of domestic sheep allotments to determine the probability for contact between these species

BLM_0049617

(Figure 3). The probability of contact between these species is considered the key variable in determining the potential and extent of disease transmission. Relative to bighorn sheep, the use of source habitats are modified by these factors to reflect the potential effects of domestic sheep grazing on bighorn sheep. The contact assessment provides a foundation for assessing the potential for disease transmission between domestic sheep and bighorn sheep and the persistence of bighorn sheep populations within these source habitats.

# Summary

In 2005, the Chief remanded the Forest Plan because management direction in the plan did not ensure that habitat management would maintain viable populations of bighorn sheep. The primary concern was the potential for contact, and disease transmission, between domestic sheep and bighorn sheep that would affect the distribution and viability of bighorn sheep populations on the Payette NF. The Chief instructed the Payette NF to conduct a bighorn sheep viability analysis that would lead to management direction compliant with agency regulation (e.g., 36 CFR 219.19). Since disease is likely the most significant factor influencing bighorn sheep habitat acquisition and occupancy, factors germane to this issue were a primary focus of the viability analysis.

The concept of occupied habitat is important in defining and delineating the distribution of species across landscapes and is often used as the basis for articulating how management will alter the abundance and distribution of species. Such analyses utilize species' habitat relationships to describe historic, current, and potential habitats and the implications of management on habitat requisites that potentially affect species.

Relative to bighorn sheep, there are problematic issues in defining occupied habitat on the basis of habitat suitability. Bighorn sheep currently occupy only an estimated 30% of historic habitats at population levels significantly diminished from pre–Euro-American settlement (approximately 10%). Source environments, and source habitats, should be components used in addressing "suitable habitats to support viable populations," but habitat alone does not equate to "population viability" for this species. Any viability assessment, and resulting management guidance for bighorn sheep, needs to address the potential for contact between domestic sheep and bighorn sheep and the implications for disease transmission between the species. This requires an understanding of bighorn sheep life requisites, how bighorn sheep move through and utilize habitats, and domestic sheep management (i.e., timing, location, densities, season of use, proximity of domestic sheep to bighorn sheep). Recent literature (e.g., Clifford et al. 2009) focuses on risk assessments that incorporate these principles into viability analyses.

The process being used by the Payette NF offers a risk analysis approach that couples a significant telemetry database with habitat analyses to provide a reasonable basis for analyzing the likelihood of contact between bighorn sheep and domestic sheep. This basis is used as a key construct in modeling the potential outcomes of such contact on the persistence of bighorn sheep populations.

BLM_0049618

# Literature Cited

Berger, J. 1990. Persistence of different sized populations: an empirical assessment of rapid extinctions in bighorn sheep. Conservation Biology 4:91–98.

Bunch, T. D., W. M. Boyce, C. P. Hibler, W. R. Lance, T. R. Spraker, and E. S. Williams. 1999. Diseases of North American wild sheep. Pages 209–237 in R. Valdez and P. R. Krausman, Editors, Mountain Sheep of North America. Tucson: AZ; University of Arizona Press.

Callan, R. J., T. D. Bunch, G. W. Workman, and R. E. Mock. 1991. Development of pneumonia in desert bighorn sheep after exposure to a flock of exotic wild and domestic sheep. Journal of the American Veterinary Medical Association 198:1052–1056.

Cassirer, E. F. 2004. Hells Canyon bighorn sheep—Study I: Hells Canyon bighorn sheep restoration plan. Progress report. Boise, ID: Idaho Dept. Fish and Game. Project W-160-R-31.

Cassirer, E. F. and A. R. E. Sinclair. 2007. Dynamics of pneumonia in a bighorn sheep metapopulation. Journal of Wildlife Management 71(4):1080–1088.

Cassirer, E. F., L. E. Oldenburg, V. L. Coggins, P. Fowler, K. Rudolph, D. L. Hunter, W. J. Foreyt. 1996. Overview and preliminary analysis of a bighorn sheep dieoff, Hells Canyon 1995–96. Pages 78-86 in Proceedings of the Tenth Biennial Symposium Northern Wild Sheep and Goat Council.

Clifford, D. L., B. A. Schumaker, T. R. Stephenson, V. C. Bleich, M. L. Cahn, B. J. Gonzales, W. M. Boyce, and J. A. K. Mazet. 2009. Assessing disease risk at the wildlife-livestock interface: A study of Sierra Nevada bighorn sheep. *Biol. Conserv.* 142:2559–2568.

Desert Bighorn Council Technical Staff. 1990. Guidelines for management of domestic sheep in the vicinity of bighorn habitat. Desert Bighorn Council Transactions 34:33–35.

Dubay, S., H. Schwantje, J. DeVos, T. McKinney. 2002. Bighorn sheep (*Ovis canadensis*) diseases: a brief literature review and risk assessment for translocation. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 13:134–152.

Foreyt, W. J. 1989. Fatal *Pasteurella haemolytica* pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. American Journal of Veterinary Research 50:341–344.

Foreyt, W. J., and D. A. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. *J. Wildl. Dis.* 18:163–168.

Garde, E., S. Kutz, H. Schwantje, A. Veitch, E. Jenkins, and B. Elkin. 2005. Examining the risk of disease transmission between wild Dall's sheep and mountain goats, and introduced domestic sheep, goats, and llamas in the Northwest Territories. , Canada: The Northwest Territories Agricultural Policy Framework and Environment and Natural Resources, Government of the Northwest Territories. 139 pp.

BLM_0049619

George, J. L. , D. J. Martin, P. M. Lukacs, and M. W. Miller . 2008. Epidemic pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep. *J. Wildl. Dis.* 44(2):388–403.

Goodson, N. J. 1982. Effects of domestic sheep grazing on bighorn sheep populations: a review. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 3:287–313.

Gross, J. E., F. J. Singer, and M. E. Moses. 2000. Effects of disease, dispersal, and area on bighorn sheep restoration. Restoration Ecology 8:25–37.

Gu, W. and R. K. Swihart. 2003. Absent or undetected? Effects of non-detection of species occurrence on wildlife-habitat models. *Biol. Conserv.* 116:195–203.

Hirzel, A. H., G. Lelay, V. Helfer, C. Randin, and A. Guisan. 2006. Evaluating the ability of habitat suitability models to predict species presences. *Ecol. Model.* 199:142–152.

Hockey, P. A. R. and O.E. Curtis. 2008. Use of basic biological information for rapid prediction of the response of species to habitat loss. *Conserv. Biol.* 23(1):64–71.

Johnson, C. J. and M. P. Gillingham. 2004. Mapping uncertainty: sensitivity of wildlife habitat ratings to expert opinion. *J. Appl. Ecol.* 41:1032–1041.

Johnson, D. H. 1980. The comparison of usage and availability measurements for evaluating resource preference. *Ecology* 61(1):65–71.

Long, R. A., J. D. Muir, J. L. Rachlow, and J. G. Kie. 2009. A comparison of two modeling approaches for evaluating wildlife–habitat relationships. *J. Wildl. Manage.* 73(2):294–302.

Keane, Robert E., M.G. Rollins, C.H. McNicoll, and R.A. Parsons. 2002. Integrating ecosystem sampling, gradient modeling, remote sensing, and ecosystem simulation to create spatially explicit landscape inventories. RMRS-GTR-92. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, 61 p.

MacKenzie, D. I. 2005. What are the issues with presence-absence data for wildlife managers? *J. Wildl. Manage.* 69(3):849–860.

Manley, P.N., M.D. Schesinger, J.K. Roth, B. Van Horne. 2005. A field-based evaluation of a presence-absence protocol for monitoring ecoregional-scale biodiversity. *J. Wildl. Manage.* 69(3):950–966.

Martin, K. D., T. Schommer, and V. L. Coggins. 1996. Literature review regarding compatibility between bighorn and domestic sheep. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 10:72–77.

Monello, R. J., D. L. Murray, and E. Frances Cassirer. 2001. Ecological correlates of pneumonia epizootics in bighorn sheep herds. Canadian Journal of Zoology 79:1423–1432.

BLM_0049620

Nichols, J. D., L.L. Bailey, A.F. O'Connell Jr., N.W. Talancy, E.H. Campbell Grant, A.T. Gilbert, E.M. Annand, T.P. Husband and J.E. Hines. 2008. Multi-scale occupancy estimation and modeling using multiple detection methods. *J. Appl. Ecol.* 45:1321–1329.

Onderka, D. K., S. A. Rawluk, and W. D. Wishart. 1988. Susceptibility of Rocky Mountain bighorn sheep and domestic sheep to pneumonia induced by bighorn and domestic livestock strains of *Pasteurella haemolytica.* Canadian Journal of Veterinary Research 52:439–444.

Raphael, M. G., M. J. Wisdom, M. M Rowland, R. S. Holthausen, B. C. Wales, B. G. Marcot and T. D. Rich. 2001. Status and trend of terrestrial vertebrates in relation to land management in the interior Columbia river basin. *For. Ecol. Manage.* 153:63–88.

Rodgers, A. R., A. P. Carr, H. L. Beyer, L. Smith, and J. G. Kie. 2007. HRT: Home Range Tools for ArcGIS. Version 1.1. Ontario, Canada: Ontario Ministry of Natural Resources, Centre for Northern Forest Ecosystem Research, Thunder Bay.

Schommer, T.J., and M. Woolever. 2001. A process for finding management solutions to the incompatibility between domestic and bighorn sheep. USDA, Forest Service, Wallowa-Whitman National Forest. 40 pp.

Seoane, J., J. Bustamante, and R. Diaz-Delgado. 2005. Effect of expert opinion on predictive ability of environmental models of bird distribution. *Conserv. Biol.* 19(2):512–522.

Singer, F. J., L. C. Zeigenfuss, and L. Spicer. 2001. Role of patch size, disease, and movement in rapid extinction of bighorn sheep. *Conserv. Biol.* 15(5):1347–1354.

Singer, F. J., V. C. Bleich, and M. A. Gudorf. 2000a. Restoration of bighorn sheep populations in and near western national parks. Restoration Ecology 8:14–24.

Singer, F. J., C. M. Papouchis, and K. K. Symonds. 2000b. Translocations as a tool for restoring populations of bighorn sheep. Restoration Ecology 8:6–13.

Singer, F. J., M. E. Moses, S. Bellew, and W. Sloan. 2000c. Correlates to colonizations of new patches by translocated populations of bighorn sheep. Restoration Ecology 8:66–74.

Singer, F. J., E. Williams, M. W. Miller, and L. C. Zeigenfuss. 2000d. Population growth, fecundity, and survivorship in recovering populations of bighorn sheep. Restoration Ecology 8:75–84.

Smith, D. R. 1954. The Bighorn Sheep in Idaho Its Status Life History and Management. Boise, ID: Idaho Department of Fish and Game.

Stanley, T. R. and J. A. Royle. 2005. Estimating site occupancy and abundance using indirect detection indices. *J. Wildl. Manage.* 69(3):874–883.

USDA Forest Service. 2003. Payette National Forest Land and Resource Management Plans Final Environmental Impact Statement. Ogden, UT: USDA Forest Service, Intermountain Region.

BLM_0049621

USDA Forest Service. 2005. Decision for Appeal of the Payette National Forest Land and Resource Management Plan Revision. Washington, DC: USDA Forest Service, Washington Office.

USDA Forest Service. 2010. Bighorn sheep supplemental environmental impact statement analysis: Modeling technical report. Ogden, UT: USDA Forest Service, Intermountain Region, Payette National Forest.

USDI Bureau of Land Management. 1998. Revised guidelines for management of domestic sheep and goats in native wild sheep habitats. Instruction Memorandum No. 98-140. Washington, D.C. 3 pp. plus attachment.

Valdez, R., and P. R. Krausman. 1999. Description, distribution, and abundance of mountain sheep in North America. Pages 3–22 in R. Valdez and P. R. Krausman, editors, Mountain sheep of North America. Tucson, AZ: University of Arizona Press

Vaughan, I. P. and S. J. Ormerod. 2005. The continuing challenges of testing species distribution models. *J. Appl. Ecol.* 42:720–730.

Wisdom, M. J., R. S. Holthausen, B. C. Wales, C. D. Hargis, V. A. Saab, D. C. Lee, W. J. Hann, T. D. Rich, M. M. Rowland, W. J. Murphy, and M. R. Eames. 2000. Source habitats for terrestrial vertebrates of focus in the interior Columbia basin: broad-scale trends and management implications. Gen. Tech. Rep. PNW-GTR-485. Portland, OR; USDA, Forest Service, Pacific NW Research Sta..

BLM_0049622

BLM_0049623

# Appendix N

# Hells Canyon National Recreation Area Compliance

BLM_0049624

BLM_0049625

File Code:   2370/2600                                           Date:   January 6, 2010

Subject:   Payette Forest Plan SEIS Compatibility with HCNRA Act

To:   Suzanne Rainville, Forest Supervisor, Payette National Forest

As you requested, the following is an evaluation of the alternatives you have selected for the final Payette National Forest Supplemental Environmental Impact Statement for compatibility with the Hells Canyon National Recreation Area (HCNRA) Act.

**BACKGROUND**

The Hells Canyon National Recreation Area Act (P.L. 94-199) was signed into law on December 31, 1975. The following sections of the Act are applicable when considering whether or not to graze domestic livestock in the HCNRA:

Section 7.(3)   preservation, especially in the area generally known as Hells Canyon, of all features and peculiarities believed to be biologically unique including, but not limited to, rare and endemic plant species, rare combinations of aquatic, terrestrial, and atmospheric habitats, and the rare combinations of outstanding

and diverse ecosystems and parts of ecosystems associated therewith;

(4)   protection and maintenance of fish and wildlife habitat;

(7)   such management, utilization, and disposal of natural resources on federally owned lands, including, but not limited to, timber harvesting by selective cutting, mining and grazing and the continuation of such existing uses and developments as are compatible with the provisions of this Act.

Section 13.   Ranching, grazing, farming, timber harvesting, and the occupation of homes and lands associated therewith, as they exist on the date of enactment of this Act, are recognized as traditional and valid uses of the recreation area.

Further, regulations governing the use of public lands in the HCNRA were promulgated on

July 19, 1994.  HCNRA Public Lands Use Regulations at 36 CFR §292.48:

"The following standards and guidelines apply only to domestic livestock grazing activities on Other Lands, Wild and Scenic Rivers, and Wilderness Lands in the HCNRA:

> (b)  Where domestic livestock grazing is incompatible with the protection, restoration, or maintenance of fish and wildlife or their habitats; public outdoor recreation; conservation of scenic, wilderness, and scientific values; rare combinations of outstanding ecosystems, or the protection and enhancement of the values for which a wild and scenic river was designated, the livestock use shall be modified as necessary to eliminate or avoid the incompatibility.  In the event in incompatibility persists after modification or modification is not feasible, livestock use shall be terminated."

**HCNRA Comprehensive Management Plan (CMP)**

The Revised CMP was signed in 2003.  It includes a new standard and guide:

"Wld-S8: Prevent the spread of diseases from domestic sheep to wild sheep by maintaining separation of the two species.  Vacant allotments will not be stocked with domestic sheep unless a vaccine or other technique is found that eliminates the incompatibility."

**FINDING**

Several bighorn sheep herds utilize HCNRA and move freely back and forth to other National Forest and BLM lands including the Payette NF.  Bighorn sheep habitat is extensive and interconnected throughout the canyonland area and up into the high elevation mountain peaks of the Seven Devils Area and into the Salmon River drainage (see maps in EIS).  Starting in 1994, a sample of bighorn sheep in the HCNRA have been fitted with telemetry radio collars and monitored bi-weekly.  Utilizing this information, herd home range modeling has been completed for each of these 16 herd populations (see maps in EIS).  This modeling demonstrates the inter-connectivity between the herd units and the extent at which bighorn sheep currently move across the landscape.  In addition, bighorn sheep foray in and out of domestic sheep allotments located on the Payette NF, often returning to the HCNRA.  Permitted domestic sheep grazing allotments on the Payette lie in and immediately adjacent to the HCNRA and inside the herd home range of the Upper Hells Canyon herd.

The Payette NF has developed several alternatives for consideration in their EIS.  Alternatives 346, 1257, 7K, and 7L allow domestic sheep grazing in the Payette National Forest System lands within the boundary of the HCNRA or within modeled bighorn sheep herd home range outside the HCNRA boundary.  Herd home range is where 95 percent of the bighorn sheep locations from radio telemetry data have occurred in the recent past (see maps in EIS).  Enough separation between the two species is

BLM_0049627

needed to maintain bighorn sheep on the HCNRA (Schommer and Woolever, 2001).  Probabilities of contact between bighorn sheep herds and domestic sheep allotments have been calculated for the Payette NF.  Allotments lying within herd home range have a 100% probability of a bighorn sheep making contact with that allotment (EIS).  The Smith Mountain Allotment is within and adjacent to the HCNRA.  The majority of this allotment is within herd home range, which represents a very high risk of disease transmission to bighorn sheep.  The risk will be higher when and if the bighorn sheep population increases.  All of these alternatives are felt to not be in compliance with the compatibility requirements of the HCNRA Act.

Alternatives 7M, 7N, 7O, and 7P eliminate domestic sheep grazing from the Payette National Forest System lands within the boundary of the (HCNRA) and within modeled bighorn sheep herd home range. The EIS modeling results indicate a 4 percent or less risk rating for each of the alternatives.  This indicates mixing of the two species would occur once every 25 years or less, which is considered a low risk of disease transmission.  Elimination of domestic sheep grazing in HCNRA and surrounding area is compatible with the HCNRA Act and its implementing regulations by providing for the protection, restoration, and maintenance of bighorn sheep and their habitat.  All four alternatives are in compliance with the Hells Canyon National Recreation Area Comprehensive Management Plan by maintaining a separation between bighorn and domestic sheep that is likely to keep the two species apart at current population levels.  In all four alternatives, grazing would continue within 2 miles of the modeled bighorn sheep herd home range.  If that grazing continues near herd home range, we recommend some effective monitoring both inside and outside of herd home ranges to help detect bighorn sheep before contact is made.

*/s/ Steven A. Ellis*
STEVEN A. ELLIS

Forest Supervisor

cc:  Mary C DeAguero

Patricia H Anderson Soucek

Mark A Penninger

BLM_0049629

# Appendix O

# Forest Plan Amendment

BLM_0049630

BLM_0049631

United States
Department of
Agriculture

Forest Service

Intermountain
Region



July
2010

# Payette

## National Forest



# Amendment
## to the
# Land and Resource
# Management Plan

BLM_0049632

Photos by David Ede

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, sex, religion, age, disability, political beliefs, sexual orientation, or marital or family status.  (Not all prohibited bases apply to all programs).  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audio tape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326 - W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice and TDD).  USDA is an equal opportunity provider and employer.

BLM_0049633

# Table of Contents

Chapter III. Management Direction ..................................................................................III-1

   Forest-Wide Management Direction...........................................................................III-1

      Wildlife Resources ..................................................................................................III-1

      Non-Native Plants ..................................................................................................III-2

      Rangeland Resources ............................................................................................III-2

Chapter IV. Implementation of the Forest Plan ..............................................................IV-1

   Monitoring and Evaluation ..........................................................................................IV-1

      Monitoring and Evaluation Strategy ......................................................................IV-1

Appendix E. Wildlife and Fish ........................................................................................E-1

   Changes in Source Habitat for Selected Species ........................................................E-1

   Big Horn Sheep Telemetry and Observations ............................................................E-3

   Bighorn Sheep Monitoring .........................................................................................E-4

Appendix H. Legal Requirements and Administrative Framework for Forest Planning and
Resource Management....................................................................................................H-1

   Legal and Administrative Framework by Resource ......................................................H-1

      Wildlife Resources ................................................................................................H-1

# List of Tables

Table IV-2.  Monitoring Elements...........................................................................................2

# List of Figures

Figure E-0.  Bighorn Sheep Summer Source Habitat ............................................................E-1

Figure E-4.  Core Herd Home Ranges of Bighorn Sheep that Overlap the Payette National
Forest, two scales ................................................................................................................E-2

Figure E-5.  Big Horn Sheep Telemetry and Observations in and Adjacent to the Payette
National Forest......................................................................................................................E-3

BLM_0049634

BLM_0049635

# Chapter III.
# Management Direction

## FOREST-WIDE MANAGEMENT DIRECTION

Consistent with 36 CFR §219.20(a), the following table will supplement the Wildlife Resources section, pages III-26 through III-28, of Chapter III, Management Direction, of the 2003 Payette National Forest Land and Resource Management Plan.

## Wildlife Resources

| Management Direction for Wildlife Resources | | |
|---|---|---|
| **Type** | **Number** | **Direction Description** |
| **Objectives** | | **Region 4 Sensitive and Management Indicator Species** |
| | WIOB13 | Maintain separation between bighorn sheep on or adjacent to the Payette National Forest and domestic sheep and goats permitted to graze on the Payette National Forest. |
| | WIOB14 | Assess changes in bighorn sheep habitat use and, if needed, reanalyze the Core Herd Home Range (CHHR) and contact risk using appropriate analysis tools such as those utilized in this SEIS effort. Refer to Figure E-0 in Appendix E for habitat map. |
| | WIOB15 | Evaluate landscape changes on the Payette National Forest, such as large-scale fire events, that could affect bighorn sheep source habitat, and determine if a need to change existing management strategies exists. |
| | WIOB16 | Provide opportunities for bighorn sheep restoration and expansion across source habitat. |
| | WIOB17 | Expand or enhance hunting opportunities, per Executive Order #13443, through management of wildlife habitat on the Payette National Forest. |
| | WIOB18 | Re-evaluate the need for separation between bighorn sheep and domestic sheep or goats when advances in science such as an effective vaccine become available for either bighorn sheep or domestic sheep that ensures a zero disease transmission risk. |
| | WIOB19 | When bighorn sheep populations in Hells Canyon expand habitat usage on the Payette National Forest, reassess compliance with the Hells Canyon National Recreation Area Act. |
| **Standards** | | **Region 4 Sensitive and Management Indicator Species** |
| | WIST08 | To allow for restoration of the species, reassess the risk for contact when bighorn sheep are located within previously undocumented areas or new herd units are documented. Refer to Appendix E, Figure E-4 for CHHR maps and Figure E-5 for current bighorn sheep locations. |
| | WIST09 | Monitor for the presence of bighorn sheep in identified high risk areas when domestic sheep or goats are present on adjacent or nearby permitted allotments. Refer to Appendix E for maps of current high risk areas to monitor. |
| **Guidelines** | | **Region 4 Sensitive and Management Indicator Species** |
| | WIGU15 | Follow appropriate science, analysis, and modeling procedures (such as those utilized in the bighorn sheep viability analysis for the SEIS) to recalculate and remap the bighorn sheep CHHR, contact risk, and high risk |

BLM_0049636

| Management Direction for Wildlife Resources | | |
|---|---|---|
| **Type** | **Number** | **Direction Description** |
| | | areas. |
| | WIGU16 | Recalculate the need for separation utilizing appropriate science methods if advances in science such as an effective vaccine becomes available for either bighorn sheep or domestic sheep that ensures a zero disease transmission risk. |

Consistent with 36 CFR §219.20(a), the following table will supplement the Non-native Plants section, page III-37, of Chapter III, Management Direction, of the 2003 Payette National Forest Land and Resource Management Plan.

## Non-Native Plants

| Management Direction for Non-native Plants | | |
|---|---|---|
| **Type** | **Number** | **Direction Description** |
| **Standards** | NPST13 | Domestic sheep or goats shall not be utilized as a management tool for weed control where domestic sheep grazing is not suitable or where contact with bighorn sheep is possible. |

Consistent with 36 CFR §219.20(a), the following table will supplement the Rangeland Resources section, page III-44 through III-45, of Chapter III, Management Direction, of the 2003 Payette National Forest Land and Resource Management Plan.

## Rangeland Resources

| Management Direction for Rangeland Resources | | |
|---|---|---|
| **Type** | **Number** | **Direction Description** |
| **Goals** | RAGO07 | Manage domestic sheep and goat allotments to maintain separation and lack of contact between bighorn sheep and domestic sheep and goats. |
| | RAGO08 | Manage domestic sheep and goat allotments to eliminate straying. |
| **Objectives** | RAOB04 | Incorporate adaptive management strategies designed to prevent contact between bighorn sheep and domestic sheep and goats into domestic sheep and goat Allotment Management Plans and/or Annual Operating Instructions. |
| **Standards** | RAST10 | Implement emergency actions when bighorn sheep presence is detected within 10 kilometers of active domestic sheep or goat grazing or trailing. Actions will be taken to ensure separation between bighorn sheep and domestic sheep or goats. |
| | RAST11 | Domestic sheep and goat grazing may only be permitted where separation from bighorn sheep can be maintained. If separation cannot be maintained, permitted domestic sheep and goat grazing shall be prohibited. |
| | RAST12 | Domestic sheep and goat grazing may only be permitted when identified monitoring for bighorn sheep presence is conducted. If monitoring cannot be conducted, permitted domestic sheep and goat grazing shall be prohibited. |

BLM_0049637

| Management Direction for Rangeland Resources | | |
|---|---|---|
| **Type** | **Number** | **Direction Description** |
| Guidelines | RAGU11 | Rangeland Management Specialists will work with permittees so their on-the-ground employees (i.e., herders/camp tenders/foremen) are able to make best use of their ability to detect any bighorn sheep that may come close to domestic sheep. The Payette National Forest will provide any bighorn sheep locations that they have to the applicable permittee and update permittees with available population data. Rangeland Management Specialists will strategize with the permittees to make the best us of their ability to reduce the likelihood of stray domestic sheep. The Payette National Forest will inform the permittees immediately of any known stray domestic sheep or goats to be removed from the Payette National Forest within 24 hours by the Permittee. In addition, new information and new technology will be provided to the permittees as it becomes available to assist them with bighorn sheep and stray domestic sheep detection. |
| | RAGU12 | Rangeland Management Specialists will maintain a high level of verbal contact with the domestic sheep and goat permittees to assist employees with band locations throughout the grazing season. |
| | RAGU13 | To maintain separation, when bighorn sheep are found within 10 kilometers of an active domestic sheep and goat allotment, implementation of emergency actions for domestic sheep and goat grazing could include:<br><br>1. Moving domestic sheep back to an identified ridgeline within the allotment;<br><br>2. Notifying the Idaho Department of Fish and Game of the bighorn location;<br><br>3. Removing domestic sheep and goats from the allotment; or<br><br>4. Not authorizing domestic sheep or goats on an allotment or driveway for the current grazing season. |

BLM_0049638

BLM_0049639

# Chapter IV.
# Implementation of the Forest Plan

Consistent with 36 CFR §219.20(a), the following text and figures will supplement the Monitoring and Evaluation Strategy section, page IV-4, of Chapter IV, Implementation of the Forest Plan, of the 2003 Payette National Forest Land and Resource Management Plan.

## MONITORING AND EVALUATION

### Monitoring and Evaluation Strategy

Survey risk areas for bighorn sheep presence to determine if there is a need to reduce contact potential with active domestic sheep or goat grazing allotments and to assist the Payette National Forest in reassessing risk for contact and remodeling the core herd home range (CHHR). Currently mapped monitoring areas are displayed in Appendix E and may include the following:

- Areas within the mapped CHHR and, in particular, areas near active domestic sheep and goat grazing;

- Areas that are important for bighorn sheep lambing and rearing;

- Areas outside the CHHR where large areas of contiguous habitat exists; and

- Areas where suspected pioneering by bighorn sheep is occurring.

Surveys to monitor for the presence of bighorn sheep or stray domestic sheep and goats will include the following methods:

- On-the-ground or aerial survey of bighorn sheep source habitat on and near active allotments prior to domestic sheep arrival;
- Surveys of the risk areas during the authorized grazing season;
- Use of fire lookout personnel across the Payette National Forest to monitor for the presence of bighorn sheep and straying domestic sheep and goats;
- Increased collaring of bighorn sheep will be encouraged throughout the Payette National Forest;
- Rangeland Management Specialists will work with permittees so they are able to make best use of their ability to detect any bighorn sheep that may come close to domestic sheep. The Payette National Forest will provide any bighorn sheep locations that are within proximity of the active domestic sheep grazing areas;
- Rangeland Management Specialists will strategize annually with the permittees to make the best use of their ability to reduce the likelihood of stray domestic sheep;
- The Payette National Forest will inform the permittees immediately of any known stray domestic sheep;
- New information and new technology will be provided to the permittees as it becomes available to assist them with bighorn sheep and stray domestic sheep detection;
- Monitor domestic sheep bands and scan for bighorn sheep. Focus efforts in areas of greatest risk—based on foray and habitat models and radio telemetry data; and

BLM_0049640

- To assist with location of domestic sheep bands, place at least one tracking device in each band of domestic sheep on active sheep and goat allotments.

> Consistent with 36 CFR §219.20(a), the following table will supplement Table IV-2 of the Monitoring Elements section, pages IV-6 through IV-15, in Chapter IV, Implementation of the Forest Plan, of the 2003 Payette National Forest Land and Resource Management Plan.

**Table IV-2.  Monitoring Elements**

| Activity, Practice, Or Effect To Be Measured | Monitoring Question | Indicator | Data Reliability | Measuring Frequency and Recommended Method | Report Period |
|---|---|---|---|---|---|
| Terrestrial sensitive species —bighorn sheep | Are bighorn sheep present in areas of risk? | Sighting or telemetry location in a risk area | Low to moderate | Annually, via survey of selected areas | Annually |
| Terrestrial sensitive species —bighorn sheep | Are bighorn sheep present in or near active domestic sheep and goat allotments? | Presence of bighorn sheep and presence of domestic sheep or goat bands | Low | Annually, via survey of selected areas and active domestic sheep and goat allotments | Annually |
| Terrestrial sensitive species —bighorn sheep | Is separation between bighorn sheep and domestic sheep and goats maintained? | Presence of bighorn sheep and presence of domestic sheep or goat bands | Low to moderate | Annually, via survey of all active domestic sheep and goat allotments | Annually |
| Rangeland Resources—stray domestic sheep | Are domestic sheep straying from permitted grazing allotments | Are domestic sheep grazing on areas identified as not suited for domestic sheep grazing | Low to High | Annually track the location of domestic sheep by following radio telemetry collared ewes or by keeping close contact with the permittees and the bands. | Annually |

BLM_0049641

# Appendix E.
# Wildlife and Fish

Consistent with 36 CFR §219.20(a), these figures will be added to the Changes in Source Habitat for Selected Species section, pages E-4 through E-9, of Appendix E in the 2003 Payette National Forest Land and Resource Management Plan.

## CHANGES IN SOURCE HABITAT FOR SELECTED SPECIES

**Figure E-0.  Bighorn Sheep Summer Source Habitat**



BLM_0049642

*Appendix E*                                                    *Wildlife and Fish*

## CORE HERD HOME RANGE FOR BIGHORN SHEEP

**Figure E-4. Core Herd Home Ranges of Bighorn Sheep that Overlap the Payette National Forest, two scales**



Core Herd Home Range with in Hells Canyon and The Salmon River Canyon



Core Herd Home Range on the Payette National Forest

*E-2*

BLM_0049643

## BIG HORN SHEEP TELEMETRY AND OBSERVATIONS

**Figure E-5.  Big Horn Sheep Telemetry and Observations in and Adjacent to the Payette National Forest**



BLM_0049644

*Appendix E*  *Wildlife and Fish*

## BIGHORN SHEEP MONITORING

**Figure E-6.  Westside monitoring areas**



BLM_0049645

*Wildlife and Fish*                                                                                    *Appendix E*

**Figure E-7. Eastside monitoring areas**



BLM_0049646

BLM_0049647

Case No. 1:20-cv-02484-MSK   Document 41-8   filed 04/27/21   USDC Colorado   pg 63 of 180

# Appendix H.
# Legal Requirements and Administrative Framework for Forest Planning and Resource Management

> Consistent with 36 CFR §219.20(a), this page will supplement the Legal and Administrative Framework by Resource section, page H-13, of Appendix H in the 2003 Payette National Forest Land and Resource Management Plan.

## LEGAL AND ADMINISTRATIVE FRAMEWORK BY RESOURCE

### Wildlife Resources

*Facilitation of Hunting Heritage and Wildlife Conservation, Executive Order #13443—*
Directs the agency to evaluate trends in hunting participation and implement actions that expand and enhance hunting opportunities for the public; establish short- and long-term goals to conserve wildlife and manage wildlife habitat to ensure healthy and productive populations of game animals in a manner that respects state management authority over wildlife resources and values private property rights; and seek the advice of state fish and wildlife agencies and, as appropriate, consult with the Sporting Conservation Council (SCC) in regard to Federal activities to recognize and promote the economic and recreational values of hunting and wildlife conservation.

BLM_0049648

BLM_0049649

Consistent with 36 CFR §219.20(a), the following page will supplement the References section, pages R-1 through R-6, of the 2003 Payette National Forest Land and Resource Management Plan.

# References

**USDA Forest Service,** 2003, *Southwest Idaho Ecogroup Land and Resource Management Plans: Final Environmental Impact Statement.* Ogden, Utah: USDA Forest Service, Intermountain Region

BLM_0049650

BLM_0049651



United States Department of Agriculture

Forest Service

United States Department of Interior

Bureau of Land Management

Office of Surface Mining Reclamation Enforcement

**November 2011**



# Environmental Assessment

## Federal Coal Lease Modifications COC-1362 & COC-67232

**Paonia Ranger District, Grand Mesa, Uncompahgre and Gunnison National Forests**

**Uncompahgre Field Office Bureau of Land Management**

**Western Region Office of Surface Mining Reclamation and Enforcement**

**Gunnison County, Colorado**

**Sections 10, 11, 13, 14, 22, 23 T14S, R 90W, 6th PM**



The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).   To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, DC 20250-9410, or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

**Federal Coal Lease Modifications COC-1362 & COC 67232**

**Environmental Assessment**

**Gunnison County, Colorado**

| | |
|---|---|
| **Lead Agency:** | **USDA Forest Service** |
| **Cooperating Agencies:** | **Bureau of Land Management** |
| | **Office of Surface Mining Reclamation Enforcement** |
| **Responsible Official:** | **Charles S. Richmond, Forest Supervisor**<br>**2250 HWY 50**<br>**Delta, CO  81416** |
| **For Information Contact:** | **Niccole Mortenson, NEPA Specialist**<br>**2250 HWY 50**<br>**Delta, CO  81416**<br>**970-874-6616**<br>**nmortenson@fs.fed.us** |
| | **Ryan Taylor, District Minerals Specialist**<br>**PO Box 1030**<br>**Paonia, CO  81428**<br>**970-527-4131**<br>**rztaylor@fs.fed.us** |
| | **Desty Dyer, Mining Engineer**<br>**2505 S. Townsend**<br>**Montrose, CO  81401**<br>**970-240-5302**<br>**Desty_Dyer@blm.gov** |

i

BLM_0049654

# SUMMARY

The Grand Mesa, Uncompahgre and Gunnison National Forests and the Bureau of Land Management have analyzed the effects of modifying ArkLand's existing federal coal leases COC-1362 and COC-61209 by adding 800 and 921 additional acres (respectively) to them. The coal lease modification areas lie in portions of sections 10, 11, 13, 14, 22 and 23 of T.14S, R. 90W, 6th PM in Gunnison County, Colorado. The modification areas include National Forest System surface lands. The coal estate is administered by the Bureau of Land Management (BLM). This action is needed, to ensure that compliant and super-compliant coal reserves are recovered and not bypassed.

Consideration of this leasing action does not authorize mining activities or surface uses; these would be handled in separate permitting processes at a later time by other state and federal agencies after the coal is under lease.

The Notice of Opportunity to Comment was published in *the Grand Junction Daily Sentinel* (newspaper of record) and in the *Delta County Independent* on April 21, 2010. The Notice of Opportunity to Comment asked for public comment on the proposed lease modifications from April 21-May 21, 2010. In addition, as part of the public involvement process, the agencies sent out approximately 120 letters to state, federal, local agencies, tribes, environmental groups, and interested individuals; posted scoping materials to the GMUG's website; and posted to the Forest Service's Schedule of Proposed Actions. During the comment period, approximately 32,002 versions of email form letters were received from environmental groups; 576 hardcopy/faxed form letters were received from local community members in four counties in support of mining in this area; 78 (mostly slightly modified form letters) were received in response to this scoping effort. Issues ranged from support to opposition of coal mining, effects to Inventoried Roadless Areas, and global climate change. Most concerns dealt with post-leasing development.

These issues led the agencies to develop the Proposed Action which has lease stipulations to protect surface resources including: cultural/paleontological resources, threatened/endangered species, Canada Lynx, raptors, big game winter range, water depletions, breeding birds, geological hazards, riparian/wetlands, subsidence, roadless, methane flaring/capture/use and visual resources

Based upon the effects of the alternatives, the Authorized Officer for the Forest Service will decide whether or not to <u>consent</u> to the BLM modifying the subject coal leases, and prescribe stipulations for protection of surface resources; the BLM will decide whether or not to modify coal leases, and include other stipulations for protection of mineral or other resources.

BLM_0049655

# TABLE OF CONTENTS

Summary ............................................................................................................................ ii

Table of Contents ............................................................................................................. iii

Chapter 1. Purpose of and Need for Action ..................................................................... 1

1.0 Document Structure .................................................................................................... 1

1.1 Process to Modify a Federal Coal Lease on National Forest System Lands ....................... 1

1.2 Background of these Lease Modifications .......................................................................... 2

1.3 Purpose and Need for Action ........................................................................................... 4

1.4 Proposed Action ............................................................................................................... 4

1.5 Decision Framework ......................................................................................................... 4

Forest Service ........................................................................................................................ 4

BLM ....................................................................................................................................... 4

OSM ...................................................................................................................................... 5

1.6 Authorizing Actions .......................................................................................................... 5

Mining and Minerals Policy Act of 1970 and Mineral Leasing Act of 1920, as amended ............... 5

Surface Mining Control and Reclamation Act of 1977 ................................................................. 5

Energy Policy Act of 2005 ......................................................................................................... 6

1.7 Conformance with Land Use Plans ..................................................................................... 6

1.8 Public Involvement ............................................................................................................ 7

1.9 Issues ............................................................................................................................... 7

Significant Issues (Carried Forward in the Analysis) .................................................................... 7

Non-significant Issues ............................................................................................................... 9

1.10 Related Analysis .............................................................................................................. 9

Chapter 2. Alternatives, Including the proposed action ...................................................... 11

2.0 Introduction ...................................................................................................................... 11

2.1 Alternatives Considered in Detail ....................................................................................... 11

No Action Alternative ............................................................................................................... 11

Proposed Action Alternative ..................................................................................................... 11

2.2 Alternatives Considered but Eliminated from Detailed Study .............................................. 27

Reduce the potential greenhouse gas emissions of the project through methane flaring or methane capture. .................................................................................................................... 27

Reduce the potential greenhouse gas emissions of the project through the use of Ventilation Air Methane (VAM) ....................................................................................................................... 27

Prevent all future disturbances from road construction, methane drainage well pads and the like in Roadless Areas. ................................................................................................................... 28

Prohibit road construction within the lease modification areas but allow the use of equipment transported by helicopters and directional drilling ....................................................................... 28

BLM_0049656

Shrink the boundaries of the lease to conform to the area where the coal will be mined underground ................................................................................................................. 28

Reject one application and place stipulations on the other ......................................... 28

Protect values of the area by using this set of stipulations for the Proposed Action ................. 29

2.3 Comparison of Alternatives ................................................................................ 30

**Chapter 3. Affected Environment and Environmental Effects** ................................................. 35

3.0 Introduction ..................................................................................................... 35

Short-term and Long-term Effects ........................................................................... 35

Direct and Indirect Effects ...................................................................................... 35

Cumulative Effects ................................................................................................. 35

3.1 Ongoing Activities ........................................................................................... 35

General Background ............................................................................................... 35

West Elk Mine........................................................................................................ 35

Wildlife Past 20 years, Present and Future............................................................... 36

Range use/ improvements Past 100 years ............................................................... 36

Recreation Past 20 years, Present and Future ......................................................... 37

Inventoried Roadless Areas 1979 to present ............................................................ 37

Road and Trail System Past 30 years and Present .................................................... 37

Natural Gas Development Future............................................................................. 37

Methane Emissions Past 5 years (Air Quality) .......................................................... 37

3.2 Reasonably Foreseeable Future Development ................................................... 37

Reasonably Foreseeable Mine Plan (RFMP).............................................................. 38

Reasonably Foreseeable Surface Use and Disturbances .......................................... 38

Direct Effects Common to All Resources .................................................................. 41

3.3 Air Quality, Greenhouse Gases & Climate Change ........................................... 41

Affected Environment ............................................................................................ 41

GHG Possible Mitigations for All Alternatives .......................................................... 47

No Action Alternative Environmental Effects............................................................ 49

Proposed Action Alternative Environmental Effects.................................................. 49

Cumulative Effects & Climate Change ...................................................................... 51

Consistency with Forest Plan and Other Laws .......................................................... 58

3.4 Topographic & Physiographic Environment ...................................................... 58

Affected Environment ............................................................................................ 58

No Action Alternative Environmental Effects............................................................ 60

Proposed Action Alternative Environmental Effects.................................................. 60

Cumulative Impacts ............................................................................................... 61

Consistency with Forest Plan and Other Laws .......................................................... 61

3.5 Geology............................................................................................................ 61

BLM_0049657

Affected Environment ............................................................................................... 61

No Action Alternative Environmental Effects................................................................ 62

Proposed Action Alternative Environmental Effects..................................................... 62

Cumulative Impacts .................................................................................................... 63

Consistency with Forest Plan and Other Laws ........................................................... 64

3.6 Soils ............................................................................................................................64

Affected Environment ................................................................................................. 64

Proposed Action Alternative Environmental Effects..................................................... 66

Proposed Action Alternative Environmental Effects..................................................... 66

Cumulative Impacts .................................................................................................... 67

Consistency with Forest Plan and Other Laws ........................................................... 67

3.7 Watershed ...................................................................................................................68

Affected Environment ................................................................................................. 68

No Action Alternative Environmental Effects................................................................ 72

Proposed Action Alternative Environmental Effects..................................................... 72

Cumulative Impacts .................................................................................................... 74

Consistency with Forest Plan and Other Laws ........................................................... 74

3.8 Vegetation...................................................................................................................75

Affected Environment ................................................................................................. 75

No Action Alternative Environmental Effects................................................................ 78

Proposed Action Alternative Environmental Effects..................................................... 78

Cumulative Effects ..................................................................................................... 79

Consistency with Forest Plan and Other Laws ........................................................... 79

3.9 Threatened & Endangered Species ................................................................... 80

3.10 Canada lynx..............................................................................................................81

Methodology for Analysis ........................................................................................... 81

Affected Environment ................................................................................................. 81

No Action Alternative Environmental Effects................................................................ 82

Proposed Action Alternative Environmental Effects..................................................... 82

Cumulative Effects ..................................................................................................... 84

Consistency with Forest Plan and Other Regulations................................................. 86

3.11 Sensitive Species ......................................................................................................86

General Sensitive Species Affected Environment........................................................ 87

No Action Alternative Environmental Effects All Sensitive Species ............................. 87

All Sensitive Species Consistency with Forest Plan and Other Regulations ............................. 87

3.12 American marten ........................................................................................................88

Affected Environment ................................................................................................. 88

No Action Alternative Environmental Effects................................................................ 88

BLM_0049658

Proposed Action Alternative Environmental Effects ......................................................... 88

Cumulative Effects ..................................................................................................... 89

3.13 Pygmy shrew ........................................................................................................... 89

Affected Environment ................................................................................................. 89

No Action Alternative Environmental Effects ............................................................ 89

Proposed Action Alternative Environmental Effects ................................................. 89

Cumulative Effects ..................................................................................................... 90

3.14 Northern goshawk .................................................................................................... 90

Affected Environment ................................................................................................. 90

No Action Alternative Environmental Effects ............................................................ 91

Proposed Action Alternative Environmental Effects ................................................. 91

Cumulative Effects ..................................................................................................... 92

3.15 Boreal owl ................................................................................................................ 92

Affected Environment ................................................................................................. 92

No Action Alternative Environmental Effects ............................................................ 92

Proposed Action Alternative Environmental Effects ................................................. 92

Cumulative Effects ..................................................................................................... 93

3.16 Olive-sided flycatcher .............................................................................................. 93

Affected Environment ................................................................................................. 93

No Action Alternative Environmental Effects ............................................................ 93

Proposed Action Alternative Environmental Effects ................................................. 93

Cumulative Effects ..................................................................................................... 94

3.17 Flammulated owl ...................................................................................................... 94

Affected Environment ................................................................................................. 94

No Action Alternative Environmental Effects ............................................................ 94

Proposed Action Alternative Environmental Effects ................................................. 94

Cumulative Effects ..................................................................................................... 95

3.18 American three-toed woodpecker ............................................................................ 95

Affected Environment ................................................................................................. 95

No Action Alternative Environmental Effects ............................................................ 95

Proposed Action Alternative Environmental Effects ................................................. 95

Cumulative Effects ..................................................................................................... 96

3.19 Northern leopard frog ............................................................................................... 96

Affected Environment ................................................................................................. 96

No Action Alternative Environmental Effects ............................................................ 96

Proposed Action Alternative Environmental Effects ................................................. 96

Cumulative Effects ..................................................................................................... 97

3.20 Purple martin ........................................................................................................... 97

BLM_0049659

Affected Environment ........................................................................................................ 97

No Action Alternative Environmental Effects............................................................... 97

Proposed Action Alternative Environmental Effects.................................................... 97

Cumulative Effects ........................................................................................................ 98

3.21 Sensitive Plants ................................................................................................ 98

Affected Environment ................................................................................................... 98

No Action Alternative Environmental Effects............................................................... 98

Proposed Action Alternative Environmental Effects.................................................... 99

Cumulative Effects ........................................................................................................ 99

3.22 Management Indicator Species ........................................................................ 99

No Action Alternative Environmental Effects All MIS Species .................................... 99

MIS Consistency with Forest Plan and Other Regulations ...................................... 100

3.23 Elk .................................................................................................................. 100

Affected Environment ................................................................................................. 100

No Action Alternative Environmental Effects............................................................. 100

Proposed Action Alternative Environmental Effects.................................................. 100

Cumulative Effects ...................................................................................................... 101

3.24 Merriam's wild turkey .................................................................................... 102

Affected Environment ................................................................................................. 102

No Action Alternative Environmental Effects............................................................. 102

Proposed Action Alternative Environmental Effects.................................................. 102

Cumulative Effects ...................................................................................................... 102

3.25 Red-naped sapsucker...................................................................................... 103

Affected Environment ................................................................................................. 103

No Action Alternative Environmental Effects............................................................. 103

Proposed Action Alternative Environmental Effects.................................................. 103

Cumulative Effects ...................................................................................................... 104

3.26 Migratory Birds.............................................................................................. 104

Affected Environment ................................................................................................. 104

No Action Alternative Environmental Effects............................................................. 105

Proposed Action Alternative Environmental Effects.................................................. 105

Cumulative Effects ...................................................................................................... 105

Consistency with Forest Plan and Other Regulations............................................... 105

3.27 Range Resources ........................................................................................... 105

Affected Environment ................................................................................................. 105

No Action Alternative Environmental Effects............................................................. 106

Proposed Action Alternative Environmental Effects.................................................. 106

Cumulative Effects ...................................................................................................... 108

BLM_0049660

Consistency with Forest Plan and Other Laws .................................................................... 108

3.28 Recreation ................................................................................................................ 108

Affected Environment ...................................................................................................... 108

No Action Alternative Environmental Effects.................................................................... 108

Proposed Action Alternative Environmental Effects......................................................... 108

Cumulative Effects .......................................................................................................... 109

Consistency with Forest Plan and Other Laws ................................................................ 109

3.29 Transportation System & Roadless ......................................................................... 109

Affected Environment ...................................................................................................... 109

No Action Alternative Environmental Effects.................................................................... 114

Proposed Action Alternative Environmental Effects......................................................... 114

Cumulative Effects .......................................................................................................... 114

Consistency with Forest Plan and Other Laws ................................................................ 115

3.30 Heritage Resources ................................................................................................. 115

Affected Environment ...................................................................................................... 115

No Action Alternative Environmental Effects.................................................................... 115

Proposed Action Alternative Environmental Effects......................................................... 115

Cumulative Effects .......................................................................................................... 116

Consistency with Forest Plan and Other Regulations...................................................... 116

3.31 Visuals .................................................................................................................... 116

Affected Environment ...................................................................................................... 116

No Action Alternative Environmental Effects.................................................................... 117

Proposed Action Alternative Environmental Effects......................................................... 117

Cumulative Effects .......................................................................................................... 118

Consistency with Forest Plan and Other Regulations...................................................... 118

3.32 Socioeconomics....................................................................................................... 118

Affected Environment ...................................................................................................... 118

No Action Alternative Environmental Effects.................................................................... 121

Proposed Action Alternative Environmental Effects......................................................... 121

Cumulative Effects .......................................................................................................... 121

Consistency with Forest Plan and Other Laws ................................................................ 122

3.33 Short-term Uses and Long-term Productivity ........................................................... 122

3.34 Unavoidable Adverse Effects .................................................................................. 122

3.35 Irreversible and Irretrievable Commitments of Resources ....................................... 122

3.36 Cumulative Effects .................................................................................................. 123

3.37 Other Required Disclosures ..................................................................................... 123

**Chapter 4. Consultation and Coordination............................................................................ 125**

4.0 Preparers and Contributors ....................................................................................... 125

BLM_0049661

ID Team Members:................................................................................................................. 125

Federal, State, and Local Agencies: ..................................................................................... 125

Tribes:.................................................................................................................................. 125

4.1 Distribution of the Environmental Assessment ................................................................. 125

**Index** ......................................................................................................................................... **127**

**References Cited** ..................................................................................................................... **131**

Air Quality, Greenhouse Gases & Climate Change ................................................................ 131

Geology, Watershed, Soils ..................................................................................................... 131

Threatened and Endangered Species ..................................................................................... 132

Sensitive Species/MIS ............................................................................................................ 133

Socioeconomics ...................................................................................................................... 134

**Appendix A. GER/MER** .......................................................................................................... **137**

Combined Geologic and Engineering Report (GER) and Maximum Economic Recovery Report (MER) for Coal Lease Modifications (COC1362 & COC67232).............................................. 137

Legal Description .................................................................................................................... 137

Location ................................................................................................................................. 138

Lease Status .......................................................................................................................... 138

Stratigraphy & Geology........................................................................................................... 138

General ............................................................................................................................. 138

Coal Quality ........................................................................................................................... 139

Mining Factors ....................................................................................................................... 139

Method Constraints ........................................................................................................... 139

Production Factors.................................................................................................................. 139

Current............................................................................................................................... 140

Projected ........................................................................................................................... 140

Surface Facilities ................................................................................................................... 140

Transportation........................................................................................................................ 140

Estimated Recovery................................................................................................................ 140

Potential Markets ................................................................................................................... 140

Maximum Economic Recovery Determination......................................................................... 140

**Appendix B. Unsuitability Analysis and Report for Federal Coal Lease COC-1362, Modification 3 & Federal Coal Lease COC-67232, Modification 1** .............................................................. **141**

Description of the Federal Lands Involved ............................................................................... 141

Analysis of the Unsuitability Criteria ....................................................................................... 142

Criterion 1 ......................................................................................................................... 142

Criterion 2 ......................................................................................................................... 142

Criterion 3 ......................................................................................................................... 143

Criterion 4 ......................................................................................................................... 143

ix

BLM_0049662

Criterion 5 ............................................................................................................................ 143

Criterion 6 ............................................................................................................................ 143

Criterion 7 ............................................................................................................................ 144

Criterion 8 ............................................................................................................................ 144

Criterion 9 ............................................................................................................................ 144

Criterion 10 .......................................................................................................................... 146

Criterion 11 .......................................................................................................................... 146

Criterion 12 .......................................................................................................................... 147

Criterion 13 .......................................................................................................................... 147

Criterion 14 .......................................................................................................................... 147

Criterion 15 .......................................................................................................................... 148

Criterion 16 .......................................................................................................................... 148

Criterion 17 .......................................................................................................................... 149

Criterion 18 .......................................................................................................................... 149

Criterion 19 .......................................................................................................................... 149

Criterion 20 .......................................................................................................................... 150

REFERENCES ..................................................................................................................... 150

CONSULTATION AND COORDINATION ............................................................................. 150

Federal Agencies ............................................................................................................. 150

Colorado State Agencies .................................................................................................. 150

**Appendix C. Response to Public Comment & Non-significant Issues................................. 151**

**Appendix D. MCC's Air Permit................................................................................................ 168**

## List of Tables and Figures

Table 1.1 Process to Modify a Federal Coal Lease. ........................................................................ 1

Table 1.2. Coal Lease Modification Legal Descriptions ................................................................. 3

Table 1.9.  Significant Issues. ........................................................................................................ 8

Figure 2.1.  Proposed Lease Modifications. ................................................................................. 12

Table 2.1a. Stipulations for Protection of Non-Mineral (Surface) Resources. ............................. 14

Table 2.1b. BLM Lease Addendums for Protection of Non-Mineral (Surface) Resources. .......... 24

Table 2.3.  Comparison of Alternatives. ....................................................................................... 30

Figure 3.2 Projected subsidence. ................................................................................................ 40

Table 3.2.  Reasonably Foreseeable Surface Disturbance. ......................................................... 41

Table 3.3a.  NAAQS, CQQQS and Monitoring Concentrations for New Sources. ........................ 43

Table  3.3b.  Temperature  and  Precipitation  Climate  Change  Scenarios  for  2050  developed  by  Barsugli  and Mearns for the Gunnison Basin. ........................................................................... 53

Table 3.3c.  Projected Climate Changes to the GMUG. ............................................................... 55

Figure 3.4. Lease Modification Topography. ................................................................................ 59

Table 3.6. Summary of Soil Resources in the Proposed Lease Modifications Area. ..................... 65

BLM_0049663

Figure 3.7.  Water resources. ..................................................................................................................70

Figure 3.8.  Lease Modification & Cumulative Effects Area Vegetation Data......................................................76

Table 3.8a.  Lease Modification& Cumulative Effects Area Vegetation Data......................................................77

Table 3.8b.  Vegetation Structural Stages, lease modification area (All vegetation types) ..................................77

Table 3.8c.  Vegetation management within the cumulative effects area since 2000. ..........................................79

Table 3.9.  Federally Threatened and Endangered or Candidate Species considered for this project. ...............80

Table 3.10a.  Mount Gunnison Lynx Analysis Unit Existing Condition (rounded to nearest acre).........................81

Table 3.10b.  Vegetation Management within the Mount Gunnison LAU since 2000 ...........................................85

Table 3.14.  Potentially suitable goshawk habitat on the GMUG by vegetation cover type and habitat structural stage....................................................................................................................................................................90

Table 3.24.  Turkey habitat on the GMUG NF based on habitat parameters and quality...................................103

Table 3.26.  Bird Species of Conservation Concern (BOCC)..............................................................................104

Table 3.27a.  Range Improvements....................................................................................................................106

Table 3.27b.  Summary of range impacts from post-lease development ..............................................................106

Figure 3.29a.  Road system in vicinity of lease modifications. ............................................................................110

Figure 3.29b.  Roadless Area Boundaries. .........................................................................................................113

Table 3.32.  Population by Category, 2000 and 2009, Delta and Gunnison Counties and the State of Colorado. ...........................................................................................................................................................................119

BLM_0049664

# CHAPTER 1. PURPOSE OF AND NEED FOR ACTION

## 1.0 Document Structure

The Forest Service, Bureau of Land Management (BLM) and the Office of Surface Mining Reclamation and Enforcement (OSM) have prepared this Environmental Assessment (EA) in compliance with the National Environmental Policy Act (NEPA) and other relevant Federal and State laws and regulations. This EA discloses the direct, indirect, and cumulative environmental impacts that would result from the proposed action and alternatives. The document is organized into four chapters:

*Chapter 1. Purpose and Need for Action:* The chapter includes information on the history of the project proposal, the purpose of and need for the project, and the agencies' proposal for achieving that purpose and need. This section also details how the agencies informed the public of the proposal and how the public responded.

*Chapter 2. Alternatives, including the Proposed Action:* This chapter provides a more detailed description of the proposed action as well as alternative methods for achieving the stated purpose. These alternatives were developed based on significant issues raised by the public and other agencies. This discussion also includes mitigation measures. Finally, this section provides a summary table of the environmental consequences associated with each alternative.

*Chapter 3. Affected Environment and Environmental Effects*: This chapter describes the environmental effects of implementing the proposed action and other alternatives. This analysis is organized by resource area.

*Chapter 4. Consultation and Coordination:* This chapter provides a list of preparers and agencies consulted during the development of EA.

*Index:* The index provides page numbers by document topic.

*Appendices:* The appendices provide more detailed information to support the analyses presented in the EA.

Additional documentation, including more detailed analyses of project-area resources, may be found in the project planning record located at Paonia Ranger District Office, Paonia Colorado or the Uncompahgre Field Office in Montrose, Colorado.

## 1.1 Process to Modify a Federal Coal Lease on National Forest System Lands

The process to modify a federal coal lease is complicated and includes the involvement of many different agencies.  The table below briefly describes the process and which entity is responsible for each step.

**Table 1.1 Process to Modify a Federal Coal Lease.**

| Leasing Step | Entity Responsible | Reference/Authority |
|---|---|---|
| *No mining or surface disturbing activities are authorized during leasing.* | | |
| Submit Application to Bureau of Land Management (BLM) | Mining Company | Mineral Leasing Act of 1920 as amended by the Federal Coal Leasing Amendments Act of 1976 (as amended), the Energy Policy Act of 2005 and 43 CFR 3432. |
| Notify Surface Land Management Agency of nominated lands | Bureau of Land Management-State | Mineral Leasing Act of 1920 as amended by Federal Coal Leasing |

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

| Leasing Step | Entity Responsible | Reference/Authority |
|---|---|---|
| | Office | Amendments Act of 1976 (as amended), the Energy Policy Act of 2005 and 43 CFR 3432.3(d), and National level BLM/FS MOU and Interagency Agreement for Mineral Leasing. |
| The Surface Land Management Agency reviews the land in question and determines whether or not the lands applied for are Unsuitable for Mining | Forest Service – Forest level | 43 CFR 3461 and National Level BLM/FS MOU for Coordination of Activities Pursuant to the Federal Coal Program, GMUG Forest Plan. |
| Surface Land Management Agency determines whether or not to consent to BLM to lease lands applied for and prescribes stipulations for the protection of surface resources (for a lease modification generally those that apply to the parent lease). | Forest Service-Forest level | Mineral Leasing Act of 1920 (as amended), Federal Land Policy and Management Act of 1976, Coal Leasing Amendments Act of 1976 (as amended), the Energy Policy Act of 2005 and 43 CFR 3432.3(d), and NEPA |
| BLM considers Forest Service consent and makes determination whether or not to modify the leases | BLM-Field Office/State Office, | Mineral Leasing Act of 1920 (as amended), Federal Land Policy and Management Act of 1976, Surface Mining Control and Reclamation Act of 1977, Federal Coal Leasing Amendments Act of 1976 (as amended), the Energy Policy Act of 2005, and 43 CFR 3432 |
| Lease acreage is added to lease | BLM- State Office | 43 CFR 3432 |

## *1.2 Background of these Lease Modifications* _____

The Bureau of Land Management Colorado State Office (BLM) notified the Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) that ArkLand Company applied to modify existing federal coal leases, COC-1362 and COC-67232, by adding about 800 and 922 acres, respectively, to them. Coal in the existing leases is mined by Mountain Coal Company (MCC) from their West Elk Mine near Somerset, Colorado. The applications were made to prevent bypass of federal coal reserves. The lease modification applications will be processed according to procedures set forth in 43 CFR 3432.

The coal lease modification areas lie in portions of sections 10, 11, 14, 15, 22 and 23 of T. 14S., R. 90W., 6th PM in Gunnison County, Colorado. The modification areas include National Forest System (NFS) surface lands managed by the GMUG. The coal estate is administered by the BLM Uncompahgre Field Office. Both lease modifications are shown on a map in Chapter 2.

2

BLM_0049666

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

**Table 1.2. Coal Lease Modification Legal Descriptions**

| Lease Modification Tract | Location | Acreage |
|---|---|---|
| COC-1362 | T. 14 S., R. 90 W., 6th P.M.<br>• Sec. 10: SE, NESW;<br>• Sec. 11: SW, S2NW;<br>• Sec. 14: NWNW, NENW, W2SENW, SWNW, NWSW, W2NWSW;<br>• Sec. 15: E2NE, N2SE; | 800 acres more or less. |
| COC-67232 | T. 14 S., R. 90 W., 6th P.M.<br>• Sec. 11: SWNE,W2SE;SESE<br>• Sec. 14: E2SENW, NE, SE, S2SW, E2NESW;<br>• Sec. 15: SESE;<br>• Sec. 22: E2NE;<br>• Sec. 23: NW, NWNE; | 922 acres more or less. |

The BLM is required, by law, to consider leasing Federally-owned minerals for economic recovery. With respect to lands managed by the Forest Service, the agency considers consenting to the BLM leasing coal reserves underlying lands under its jurisdiction, and prescribes stipulations for the protection of non-mineral resources. In this instance, the Forest Service is considering consenting to BLM modifying ArkLand's existing federal coal leases COC-1362 and COC-67232 by adding 1,722 cumulative acres to them. The FS will also identify any needed stipulations to protect non-coal (surface) resources. If FS consent is given, the BLM would offer the modifications by non-competitive bid.

If the lease modifications occur, the coal in this area would be accessed and recovered by underground longwall mining methods from the existing West Elk Mine. The coal would be transported using MCC's existing coal transportation system and surface facilities. At the leasing stage, the federal agencies evaluate the effects of subsidence (i.e. the land surface lowered as a result of mining) on surface resources, and identify where surface resources may require specific protection from subsidence or foreseeable surface uses. Under a foreseeable mine plan scenario, surface uses on these modifications may include methane drainage wells (MDWs) and associated access roads required to safely mine the coal resources. Specific locations of the MDWs and roads are not known at the leasing stage, and will not be known until the time specific mine plans are approved by the State, BLM, MSHA and the federal Office of Surface Mining during the subsequent permitting process. However, the surface uses are reasonably projected for cumulative effects analysis purposes in the NEPA at the leasing stage.

Approximately 1,450 acres of the modification areas are within the West Elk Inventoried Roadless Area. The lease modifications have been reviewed by USDA's Office of the Secretary, which informed the Forest Service to begin environmental analysis.

If the lease modifications are approved, temporary roads and timber cutting may be needed to construct, operate and maintain MDWs. This leasing action itself does not authorize actual mining or any surface disturbing activities; however it does evaluate the need for stipulations for subsequent use of the land surface. In this case, stipulations on the existing leases would apply to the modifications, and include a stipulation for activities in roadless areas, which states that "…lands in the leases may be subject to all future rules and regulations of the Secretary of Agriculture concerning management of roadless areas including restrictions on road-building."

BLM_0049667

## *1.3 Purpose and Need for Action*

The GMUG and BLM have identified the need to consider issuing two coal lease modifications for federal coal lands immediately adjacent to exiting federal coal leases COC-1362 and COC-67232. The purpose of the lease modifications is to ensure that compliant and super-compliant coal reserves are recovered.

The BLM, charged with administration of the mineral estate on these Federal lands, is required, by law, to consider leasing Federally-owned minerals for economic recovery. The USDA-Forest Service (FS), as the surface management agency, considers consenting to the BLM leasing reserves underlying lands under its jurisdiction, and prescribes stipulations for the protection of non-mineral resources. Under 43 CFR 3432 (as amended by the Energy Policy Act of 2005), the holder of a federal coal lease may apply to modify a lease by adding up to 960 acres. The federal agencies are responding to applications to modify existing leases.

The USDI- Office of Surface Mining Reclamation and Enforcement, Western Region will participate as a cooperating agency as it is responsible for the preparation of mining plans and oversees the subsequent permitting process.

The proposed action conforms to the overall guidance given in the GMUG Land and Resource Management Plan, as amended (Forest Plan, 1991) which encourages environmentally sound energy and mineral development, and the BLM Uncompahgre Basin Resource Management Plan (RMP, 1989).

## *1.4 Proposed Action*

The proposed action is to modify MCC's existing federal coal leases COC-1362 and COC-61209 by adding 800 and 922 additional acres (respectively) to ensure that compliant and super-compliant coal reserves are recovered and not bypassed. Details of the Proposed Action and alternatives can be found in Chapter 2.

## *1.5 Decision Framework*

### Forest Service

The GMUG Forest Supervisor is the Authorized Officer for this discretionary consent decision on these coal lease modifications. Given the purpose and need, the Authorized Officer will review the proposed action, the other alternatives, and the environmental consequences in order to decide the following:

- Whether or not to consent to the BLM modifying existing Federal Coal Lease COC-1362 by adding 800 acres according to the Federal Coal Leasing Amendments Act of 1976;

- Whether or not to consent to the BLM modifying existing Federal Coal Lease COC-67232 by adding 922 acres according to the Federal Coal Leasing Amendments Act of 1976;

- Prescribe stipulations needed for the protection of non-mineral resources by determining if the existing stipulations on the parent lease are sufficient.  If they are not sufficient, prescribe additional stipulations that will provide for the protection of non-mineral resources.

The Forest Service Authorized Officer will determine if the activity is consistent with the GMUG Forest Plan.

The Forest Service decision will be made based on the analysis relative to the No Action and Proposed Action Alternatives.

### BLM

The BLM Colorado State Director is the Authorized Officer for the BLM, and will decide whether or not to modify the existing coal lease under the Mineral Leasing Act, as amended, and the federal regulations under 43 CFR 3400.  The Uncompahgre Field Office Manager is responsible for providing the State Director with briefings and recommendations.  Specifically, the BLM will decide whether to:

BLM_0049668

- Adopt the No-Action Alternative (no leasing);
- Adopt the proposed action (lease the coal as applied for by the applicants);
- Adopt an alternative with features of both of the alternatives; or
- Adopt the action alternative with additional mitigation measures.

BLM cannot issue leases without the consent of the surface managing agency.

## OSM

OSM is a cooperating agency and may prepare a mining plan modification related to the subsequent permitting of these lease modifications.

## 1.6 Authorizing Actions _____

## Mining and Minerals Policy Act of 1970 and Mineral Leasing Act of 1920, as amended

The Forest Service and BLM manage their minerals programs under guidance given in the Mining and Minerals Policy Act of 1970 which states in part that it is the "continuing policy of the federal government in the national interest to foster and encourage private enterprise in…(t)he development of economically sound and stable domestic mining minerals and mineral reclamation industries…(and) the orderly and economic development of domestic mineral resources…." Further, federal mineral leasing follows the Mineral Leasing Act of 1920 as amended by the Federal Coal Leasing Amendments Act of 1976 (MLA), and specific procedures set forth in 43 CFR 3400.

Federal coal leasing follows the Mineral Leasing Act of 1920 (MLA), as amended by the Federal Coal Leasing Amendments Act of 1976, and specific procedures set forth in 43 CFR 3400.

These lease modification applications are being processed according to procedures set forth in 43 CFR 3432. Lease modifications may be non-competitive leasing actions. In this case, ArkLand applied for these modifications to add acreage to existing leases and no other coal company could obtain the rights to the coal if it is approved; therefore, this is a non-competitive leasing action.

Subsequent permitting actions to allow mining and changing of the approved mine permit boundary to include the modification areas would be evaluated by the Colorado Division of Reclamation Mining Safety (DRMS) under procedures set forth in 30 CFR PART 906.30 Appendix B and the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining. These modifications may also require approval from the USDI through the Office of Surface Mining, Reclamation and Enforcement (OSM).

## Surface Mining Control and Reclamation Act of 1977

The Surface Mining Control and Reclamation Act of 1977, as amended, (SMCRA) gives OSM primary responsibility to administer programs that regulate surface coal mining operations and the surface effects of underground coal mining operations in the United States. Pursuant to Section 503 of SMCRA, DRMS developed, and the Secretary of the Interior approved, Colorado's permanent regulatory program authorizing DRMS to regulate surface coal mining operations and the surface effects of underground coal mining on private and State lands within the State of Colorado.

In September 1982, under Section 523(c) of SMCRA, DRMS entered into a cooperative agreement with the Secretary of the Interior authorizing DRMS to regulate surface coal mining operations and the surface effects of underground coal mining on Federal lands within the State.

Based on the cooperative agreement, Federal coal lease holders in Colorado must submit a permit application package to OSM and DRMS for proposed mining and reclamation operations on Federal lands in the State. DRMS reviews the package to ensure that the permit application complies with the permitting requirements and that the coal mining operation will meet the approved permanent program's

BLM_0049669

performance standards. If it does comply, DRMS issues the applicant a permit to conduct coal mining operations. OSM, BLM, the Forest Service, and other Federal agencies review the permit application package to ensure that it contains the necessary information for compliance with the coal lease, the MLA, NEPA and other applicable Federal laws and their attendant regulations. Before the mining plan can be approved, OSM consults with BLM and the Federal land management agency if applicable. If needed, OSM then recommends either approval, approval with conditions, or disapproval of the mining plan to the Assistant Secretary of the Interior, Land and Minerals Management

DRMS enforces the performance standards and permit requirements during the mine's operation and has primary authority in environmental emergencies. OSM retains oversight responsibility for this enforcement. BLM and the surface management agency (in the case the Forest Service) have authority in emergency situations in which DRMS or OSM inspectors cannot act before environmental harm or damage occurs.

### *Energy Policy Act of 2005*

The purpose of the Energy Policy Act of 2005 was to ensure jobs for the future with secure, affordable, and reliable energy.

This Act Amends 30 U.S.C. 203(c)(4)(A) to ``secure modifications of the original coal lease by including additional coal lands or coal deposits contiguous or cornering to those embraced in the lease...(3) In no case shall the total area added by modifications to an existing coal lease under paragraph (1)--(A) exceed 960 acres; or (B) add acreage larger than that in the original lease."

## *1.7 Conformance with Land Use Plans*

The amended Land and Resource Management Plan (LRMP or Forest Plan) dated September 1991, for the GMUG National Forests made provisions for coal leasing subject to the application of the coal unsuitability criteria established in 43 CFR 3461(Appendix B-*Unsuitability Analysis Report*). The LRMP also provided for applicable stipulations to be utilized for protection of specific surface resources as addressed in Section III, General Direction, pages 63-69 of the LRMP.

The Forest Plan guides all natural resource management activities and establishes management standards and guidelines for the GMUG. Management directions described in the Forest Plan are a result of public issues, management concerns, and management opportunities. Multiple use management area prescriptions as designated in the Forest Plan for the lands bounded by the proposed lease tracts are summarized below:

- 6B –Livestock grazing. Emphasis is on optimizing forage capability for livestock grazing. Other resource activities may occur, but should harmonize and blend with the natural setting.
- 5A – Big Game winter range in non-forested areas. Winter range is managed to produce wildlife habitat capability greater than or equal to 90 % of potential for a mid-seral or better condition. Compatible resource activities may occur.
- 9A–Riparian / Aquatic Ecosystems. Emphasis is on the management of all the components of aquatic/riparian ecosystems to provide healthy, self-perpetuating plant communities, acceptable water quality standards, and habitats for viable populations of fish and wildlife, and stable stream channels and still water body shorelines. Mineral activities may occur but must minimize disturbance to riparian areas and initiate timely and effective rehabilitation of disturbed areas and restore them to a state of productivity comparable to that before disturbance.

The proposed action conforms to the overall guidance given in the LRMP, as amended (1991), which encourages environmentally sound energy and mineral development. In compliance with the GMUG Forest Plan, the Unsuitability Criteria for coal mining in 43 CFR 3461 was applied to the coal lease modification areas. None of the lands were found to be unsuitable based on the criteria. No additional restrictions or need for stipulations were identified as a result of applying the criteria (Appendix A).

Leasing is also consistent with the BLM Uncompahgre Basin Resource Management Plan (RMP, 1989). This RMP determined that the areas subject to the lease applications and exploration license applications

were to be managed for both existing and potential coal development. The area is acceptable for coal development and coal production, and such coal activities could occur without conflicting with other land uses as described in the RMP.

Upon receipt of the lease applications, BLM completed tract delineation. The assessment of coal unsuitability criteria has been completed for the proposed lease modification. The criteria have also been reviewed for implications with the other alternatives in this analysis. The unsuitability criteria published in 43 CFR 3461 were used. This coal unsuitability analysis report is included in this EA document as *Appendix D-Unsuitability Analysis Report.* In addition, data adequacy standards were reviewed and determined to be adequate.

The RMP was amended to address the standards for land health (i.e., Standards and Guidelines). The land analyzed in the EA project area is within the North Fork landscape unit. Briefly, Colorado BLM's Standards are:

- Ensure health of upland soils;
- Protect and improve riparian systems;
- Maintain healthy, productive plant and animal communities;
- Maintain or increase populations of threatened and endangered species in suitable habitat; and
- Ensure water quality meets minimum Colorado standards.

## 1.8 Public Involvement

The Notice of Opportunity to Comment was published in *the Grand Junction Daily Sentinel* (newspaper of record) and in the *Delta County Independent* on April 21, 2010. The Notice of Opportunity to Comment asked for public comment on the proposed lease modifications from April 21-May 21, 2010.  In addition, as part of the public involvement process, the agency sent out approximately 120 letters to state, federal, local agencies, tribes, environmental groups, and interested individuals; posted scoping materials to the GMUG's website; and posted to the Forest Service's Schedule of Proposed Actions.

During the comment period, approximately 684 versions of email form letters were received from Wild Earth Guardians supporters;1900 versions of email form letters were received from Defenders of Wildlife supporters; 23,771 versions of email form letters were received from supporters of Natural Resources Defense Council; 5647 versions of email form letters were received from supporters of Earth Justice; 576 hardcopy/faxed form letters were received from local community members in four counties in support of mining in this area; 74 original or somewhat original comments were received; and 4 original comments with attachments were received in response to this scoping effort.

Using the comments from the public, environmental groups, other agencies, and those developed internally, the interdisciplinary team developed a list of issues to address (see *Issues* section).

## 1.9 Issues

The agencies have separated the issues into two groups: significant and non-significant issues.

## Significant Issues (Carried Forward in the Analysis)

Significant issues were defined as those directly or indirectly caused by implementing the proposed action.

Issues relating to the proposed lease modifications were identified and based on the comments received during the public scoping process.  These issues, along with issues raised by the Interdisciplinary Team (IDT), will be carried forward in the analysis:

BLM_0049671

## Table 1.9.  Significant Issues.

| Topic | Issue | Where Addressed |
|---|---|---|
| Cumulative Effects | Surface disturbance other than from mining (subsidence) may occur as a result of mining. | Chapter 3 |
| | Reasonably foreseeable impacts to the surface and other resources may occur as a result of mining. | Chapter 3 |
| Mitigation Measures | Forest Service must evaluate the effectiveness of proposed mitigation measures. | As stated by the commenter, CEQ requires that mitigation measures should "be identified even they are outside the jurisdiction of the lead agency" and any measures that are "adopted" explained and committed.   In this document stipulations are included as part of the Proposed Action in the form of Lease stipulations and are thus analyzed in detail. |
| Air Quality | Effects of the proposed action may occur on air quality including ambient ozone, PM$_{2.5}$, PM$_{10}$, VOCs, Class I areas in compliance with the Clean Air Act. | Chapter 3 |
| | Cumulative effects to air quality associated with coal burning may occur as a result of the Proposed Action. | Chapter 3 Air Quality, Cumulative Effects |
| Roadless Character | Roadless character in the West Elk Roadless Area may be affected either indirectly or cumulatively through consenting to lease. | Chapter 3 |
| Methane | Alternatives to venting including flaring, capture and use, or destroying ventilation air (VAM) methane must be analyzed in detail. | Chapter 3 –Air Quality.  These are discussed as possible mitigations available to MCC. |
| Coal Reserve | Address the effects of adding coal reserves on coal resource recovery | Chapter 3, GER/MER-Appendix A |
| Socioeconomics | Coal mining activities are vital to the local and regional economies. | Chapter 3-Socio-economics |
| | Coal from the North Fork Valley helps fuel clean coal technology and provide the USA with low-cost, reliable energy. | Chapter 3-Socio-economics |
| Visual Resources | Removal of vegetation, ground disturbance and structures related to future surface facilities needed to | Chapter 3-Visuals |

| Topic | Issue | Where Addressed |
|---|---|---|
| | manage methane may negatively impact visuals. | |
| Wildlife | Removal of vegetation related to future surface facilities needed to manage methane may negatively impact Canada lynx. | Chapter 3, Biological Assessment, USFWS consultation |
| Subsidence | Subsidence may affect water resources including local water quality and quantity. | Chapter 3 |
| | Subsidence may affect wildlife habitat, including effects to riparian habitat. | Chapter 3 |
| | Subsidence may affect cultural resources. | Chapter 3 |
| | Subsidence may affect other land uses, including range improvements, cattle trails and other multiple uses of the land. | Chapter 3 |
| Climate Change | Effects on climate change may occur from mining coal which stem from the release of methane through the mine ventilation system, release of methane through any gob vent boreholes and release of $CO_2$ caused by the burning of coal that is mined. | Chapter 3-Air Quality |

## Non-significant Issues

Non-significant issues were identified as those: 1) outside the scope of the proposed action; 2) already decided by law, regulation, Forest Plan, or other higher level decision; 3) irrelevant to the decision to be made; or 4) conjectural and not supported by scientific or factual evidence. The Council on Environmental Quality (CEQ) NEPA regulations explain this delineation in Sec. 1501.7, "…identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (Sec. 1506.3)…" A list of non-significant issues and reasons regarding their categorization as non-significant is found in Appendix C.

## 1.10 Related Analysis

Per 40 CFR Part 1502 § 1502.20 and § 1502.21, this EA tiers to incorporates by reference previous analysis and litigation conducted in the vicinity of the project area related to parent leases. Any and all materials related to this previous analysis may be further relied upon in the event of appeals or litigation.

1) Box Canyon Federal Coal Lease EA and DN, 1995.

2) Raven Gulch Coal Exploration License Environmental Assessment (EA) and Decision Notice and Finding of No Significant Impact (DN/FONSI), 1998.

3) "North Fork Coal" EIS and Record of Decision, 2000.

4) Coal Lease Modifications for Federal Coal Leases C-1362 and COC-56447 EA and DN, 2001.

BLM_0049673

5) Coal Methane Drainage Project NEPA analyses and related decisions: Decision Memos from 2001; Panel 15 Methane Drainage Wells EA and DN/FONSI, 2001; Panels 16 to 24 EA and DN/FONSI, 2002; Sylvester Road Temporary Road Construction and Box Canyon Methane Drainage Wells EA and DN/FONSI, 2003.

6) West Flatiron Federal Coal Lease EA and DN/FONSI, 2003.

7) Mountain Coal Company Geotechnical Boreholes Decision Memo, 2006

8) E-seam Development Methane Drainage Wells Decision Memo, July 2005

9) Box Canyon Methane Drainage Wells Decision Memo, 2005

10) Dry Fork Coal Lease-by-Application Final EIS, 2005 and Record of Decision, 2006.

11) Sylvester Gulch/Long Draw Supplemental EA and DN/FONSI, 2006.

12) Mountain Coal Company, Mining and Reclamation Plan for the West Elk Mine (MCC 2007a), including various consultants' reports on subsidence, vegetation, riparian resources, ground water, and Annual Hydrologic Reports on water monitoring (MCC 2007b).

13) USGS and Colorado Geological Survey reports on the local area.

14) Deer Creek Shaft and E Seam Methane Drainage Wells Project FEIS August 2007 Records of Decision August 2007 (Shaft), November 2007, March 2008 and Errata January 2008.

15)  Civil Action No. 08-cv-02167-MSK,  WILDEARTH GUARDIANS, a not-for-profit corporation, Plaintiff, v. UNITED STATES FOREST SERVICE, a federal agency within the U.S. Department of Agriculture; CHARLES S. RICHMOND, in his official capacity as Supervisor of the Grand Mesa, Uncompahgre, Gunnison National Forest; UNITED STATES DEPARTMENT OF THE INTERIOR, a federal agency; WILMA LEWIS, in her official capacity as Assistant Secretary, Land and Minerals Management, U.S. Department of the Interior, Defendants, and MOUNTAIN COAL COMPANY, Intervenor-Defendant. OPINION AND ORDER AFFIRMING AGENCY ACTION, October 31, 2011.

BLM_0049674

# CHAPTER 2. ALTERNATIVES, INCLUDING THE PROPOSED ACTION

## *2.0 Introduction*

This chapter describes and compares the alternatives considered for the lease modifications. It includes a description and map of the action alternative considered. This section also presents the alternatives in comparative form, sharply defining the differences between each alternative and providing a clear basis for choice among options by the decision makers. Information used to compare the alternatives is based upon the environmental, social and economic consequences of implementing each alternative.

## *2.1 Alternatives Considered in Detail*

The Forest Service developed two alternatives, the No Action and Proposed Action alternative, in response to issues raised by the public.

### No Action Alternative

Analysis of the No Action alternative is required by CEQ 40 CFR Part 1502.14(d). Under the no action alternative, the lease modifications would not be approved, and no mining would occur in these specific areas. Impacts from mining coal under these areas would not occur on these lands, and the effects from on-going land uses could continue including coal mining activities such as exploration and monitoring related to mine activities, as well as continued recreation and grazing. The land would continue to be managed according to Forest Plan standards, goals and guidelines.

### Proposed Action Alternative

Within the jurisdiction of the Forest Service, the proposed action is to consent to BLM modifying MCC's existing federal coal leases COC-1362 and COC- 67232 by adding 800 and 922 additional acres (respectively) to ensure that compliant and super-compliant coal reserves are recovered and not bypassed, and to identify stipulations for the protection of non-mineral (i.e. surface) resources.

The proposed lease modifications are located in Gunnison County, Colorado as described in Chapter 1, Background of these Lease Modifications.

The proposed action deals primarily with underground mining. It is assumed that longwall mining practices would be used. Only minor surface disturbing activities would occur on Forest Service lands as a result of subsidence. A Reasonably Foreseeable Mine Plan (RFMP) has been developed to address potential environmental effects and is detailed to the extent possible in Chapter 3.

BLM_0049675

**Figure 2.1.  Proposed Lease Modifications.**



### Stipulations for Action Alternative

As part of the Proposed Action alternative the GMUG Forest Supervisor must decide if the existing stipulations on the existing parent leases are sufficient for the protection of non-mineral (i.e. surface) resources.  If not, additional stipulations that will provide for the protection of non-mineral resources must be prescribed. The table below shows the stipulations on the parent leases, and their applicability to the lease modifications.

In accordance with Forest Service Manual (FSM) 2820, the Standard Notice for Lands under the Jurisdiction of Agriculture is part of the parent leases, and hence would apply to the lease modifications. This Standard Notice includes requirements for Cultural and Paleontological Resources, and Threatened and Endangered Species as noted in Table 2.1.  Further, the Standard Notice contains the following language: "The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of Interior in the permit.  The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy of the NFS not authorized by the permit/operation approved by the Secretary of the Interior."

BLM_0049677

Table 2.1a. Stipulations for Protection of Non-Mineral (Surface) Resources.

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| Cultural and Paleontological Resources | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures.  Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:<br><br>• Contact the FS to determine if a site specific cultural resource inventory is required.  If a survey is required then:<br><br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance.  The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations.  An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted.<br><br>• Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values.  Mitigation may include relocation of proposed facilities, | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures.  Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:<br><br>• Contact the FS to determine if a site specific cultural resource inventory is required.  If a survey is required then:<br><br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance.  The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations.  An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted.<br><br>• Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values.  Mitigation may include relocation of proposed facilities, | Use language from parent leases from required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |

BLM_0049678

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate.<br><br>• The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest discovered as a result of surface operations under this license, and shall leave such discoveries intact until directed to proceed by FS and BLM. | testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate.<br><br>• The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest discovered as a result of surface operations under this license, and shall leave such discoveries intact until directed to proceed by FS and BLM. | |
| Endangered or Threatened Species | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.<br><br>The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.<br><br>The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |

BLM_0049679

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resource specialist approved by the FS. An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resource specialist approved by the FS. An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | |
| | If there is reason to believe that Forest Service Sensitive species, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted. The inventory shall include species or groups of species identified by the FS, and will be conducted to by a qualified specialist. A report of findings will be prepared and provided to the FS. A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance consistent with the Forest Plan. The cost of conducting such inventory, preparing reports and carrying out mitigation measures shall be borne by the Lessee/Operator. | If there is reason to believe that Sensitive, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted. The inventory shall be conducted by a qualified specialist, and a report of findings prepared. A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance. The cost of conducting such inventory, preparing reports and carrying out mitigation measures shall be borne by the Lessee/Operator. | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |
| Canada Lynx | To comply with the USDA Forest Service Conservation Agreement with Fish and Wildlife Service, to follow the conservation measures in the Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000), the following special constraints will apply if | To comply with the Canada Lynx Assessment and Strategy (Ruediger *et al.* 2000), the following special constraints will apply if post-lease surface use is proposed in lynx habitat:<br><br>• Winter access will be limited to | To comply with the GMUG Forest Plan 2008 amendment, the following special constraints will apply if surface use on the lease is proposed in lynx habitat:<br><br>• Winter access will be limited |

BLM_0049680

*Environmental Assessment*      *Federal Coal Lease Modifications COC-1362 & COC-67232*

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | surface use on the lease is proposed in lynx habitat:<br><br>• Winter access will be limited to designated routes.<br>• Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances:<br>• Remote monitoring of the development sites and facilities may be required to reduce snow compaction.<br>• A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required.<br>• Public motorized use on new roads constructed for project-specific purposes will be restricted.<br>• Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers. | designated routes.<br><br>Further, should post-lease operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances:<br><br>• Remote monitoring of the development sites and facilities may be required to reduce snow compaction.<br>• A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required.<br>• Public motorized use on new roads constructed for project-specific purposes will be restricted.<br>• Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers.<br>• If post lease surface use occurs in lynx habitat, the Lessee will be required to submit an annual report to the USDA-FS and | to designated routes.<br><br>Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances:<br><br>• Remote monitoring of the development sites and facilities may be required to reduce snow compaction.<br>• A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required.<br>• Public motorized use on new roads constructed for project-specific purposes **will** be restricted unless otherwise authorized by the District Ranger.<br>• Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, **if possible,** or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers, if possible. |

17

BLM_0049681

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | USFWS of all activities having occurred in lynx habitat. | |
| **Raptors** | For raptors (except American kestrel) the Lessee will be required to: <br> • Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and <br> • No surface activities will be allowed within ¼ mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. <br> • No surface activities will be allowed within 1-mile radius of active bald eagle or peregrine falcon nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. | For raptors (except American kestrel) the Lessee will be required to: <br> • Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and <br> • No surface activities will be allowed within ½-mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. | Use language from COC-67232. |
| **Big game winter range** | In order to protect big game wintering areas, elk calving areas, and other key wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year.  Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | In order to protect big game wintering areas, elk calving areas, and other key wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year.  Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | Use language from parent leases |

BLM_0049682

*Environmental Assessment*                    **Federal Coal Lease Modifications COC-1362 & COC-67232**

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Water depletions** | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | Use language from parent leases |
| **Breeding birds** | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance as prescribed by the Forest Service. | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance. | Use language from COC-1362 parent lease. |
| **Geologic hazards** | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential, or on slopes which exceed 60%. | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential. | Use language from COC-67232. |
| | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. | Use language from parent leases. |

BLM_0049683

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Baseline Information** | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources.  Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology.  Baseline studies are critical to the success of future observation and assessment of mining related effects on resources. | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources.  Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology.  Baseline studies are critical to the success of future observation and assessment of mining related effects on resources in the Dry Fork lease tract. | Use language from parent leases |
| **Monitoring Program** | The operator/lessee would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts.   The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and hydrology identified in the baseline assessment to mining activities on the lease area.  The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | The operator/lessee of the lease tract would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts.   The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and hydrology identified in the baseline assessment to mining activities in the lease tract area.   The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | Use language from parent leases |
| **Riparian, wetland or floodplain** | Surface use or disturbances (except for surface subsidence and resource monitoring  purposes defined in the approved mining permit) will avoid riparian, wetland or floodplain areas, and a buffer zone surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent  with that defined in the | Surface use or disturbances (except for surface subsidence and resource monitoring purposes defined in the approved mining permit) will not be permitted in riparian, wetland or floodplain areas, or within a buffer zone surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent  with that | Use language from parent leases |

BLM_0049684

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | defined in the Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | |
| **Subsidence** | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | Use language from parent leases |
| | The Lessee/Operator shall be responsible for monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation, if needed, would be performed at the Lessee's expense. These requirements will be coordinated with the District Ranger and the Special Use Permittee. | The Lessee/Operator shall be required to perform the following with respect to monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation will be performed at the Lessee's expense. The Lessee may request variations on timing for surveys, monitoring and reporting. Approving such requests would be at the discretion of the District Ranger.

a. Baseline condition surveys of existing facilities will be completed the Fall following award of lease. Reports of this | As parent lease for COC-67232 deals specifically with the ditch, use language from COC-1362 on lease modifications. |

21

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | survey will be deliverable to the Forest Service by December 1 of that same year.<br>b. In consultation with the Special Use Permittee and the Forest Service, install equipment to monitor flow on water conveyance facilities during the Fall following award of lease. Flow monitoring shall commence the following spring and continue until one year post mining. Flow data shall be provided to the Forest Service annually by December 1.<br>c. A Surface Facility Monitoring and Mitigation Plan (Plan) will be submitted to the Forest Service for review and approval not later than 12 months prior to scheduled undermining. The Plan will detail measures to be taken to monitor, repair and mitigate subsidence effects of the facilities during actual mining and for one year. | |
| Roadless | The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of Interior in the permit. The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy | All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease.<br><br>Legal descriptions are approximate. Locations of any proposed surface use would be verified for relationship to IRA boundaries using site-specific maps if/when surface operations are proposed. | All or parts of the following lands encompassed in this lease are in an Inventoried Roadless Area. These lands shall be subject to all future rules and regulations of the Secretary of Agriculture concerning management of roadless areas including restrictions on road building. |

BLM_0049686

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | of the NFS not authorized by the permit/operation approved by the Secretary of the Interior.<br><br>Federal Coal Lease C-1362, as modified October 2001<br><br>All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease.<br><br>Legal descriptions are approximate. Locations of any proposed surface use would be verified for relationship to IRA boundaries using site-specific maps if/when surface operations are proposed. | | |
| Visuals | n/a | n/a | Within the lease modification area, the lessee will work with the District Ranger and his/her representative to see that all mine operations are situated on the ground in such a manner that reasonably minimizes impacts to the scenic integrity of that landscape, as prescribed in the Forest Plan. |

The parent leases also contain lease terms from BLM regarding coal mine methane.  These are addressed as lease addendum as described in Table 3.1b.

23

BLM_0049687

**Table 2.1b. BLM Lease Addendums for Protection of Non-Mineral (Surface) Resources.**

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Addendum Specific to Lease Modifications |
|---|---|---|---|
| Methane Flaring, Capture/Use or other alternatives to venting | Sec. 3. Notwithstanding the language in Sec.2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.<br><br>Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal miners or coal mining | Sec. 3. Notwithstanding the language in Sec.2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.<br><br>Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal miners or coal mining | This stipulation (lease addendum) has been developed in response to direction from the Secretary of Interior, and is a negotiated addendum between the Department of Interior (BLM) and the lessee. Use language from parent leases. |

BLM_0049688

activities. In the event of a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.

Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES- Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" shall not include and the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable reporting and gas measurement now or hereinafter in effect

SEVERABILITY- In the event any

BLM_0049689

provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation.

provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation.

BLM_0049690

## 2.2 Alternatives Considered but Eliminated from Detailed Study

Federal agencies are required by NEPA to rigorously explore and objectively evaluate all reasonable alternatives and to briefly discuss the reasons for eliminating any alternatives that were not developed in detail (40 CFR 1502.14). Public comments received in response to the Proposed Action provided suggestions for alternative methods for achieving the purpose and need. Some of these alternatives may have been outside the scope of considering consenting to the issuance of the lease modifications, duplicative of the alternatives considered in detail, or determined to be components that would cause unnecessary environmental harm. Therefore, a number of alternatives were considered, but dismissed from detailed consideration for reasons summarized below.

### Reduce the potential greenhouse gas emissions of the project through methane flaring or methane capture.

Alternatives that address flaring and methane capture are duplicative of the Proposed Action as these are possible mitigation measures that may be implemented by MCC if the coal is mined in this particular area. CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

Lease addendums have been added to the parent leases and would be carried forward to the lease modifications that address these possible mitigation measures (see Stipulations for Proposed Action). Either of these methods to reduce the effects of greenhouse gases on climate change may be designed by MCC and further approved by the regulatory agencies as part of the mine/ventilation plan approval process so long as the lives of miners are demonstrated to be adequately protected. This is an alternative that is outside of the jurisdiction of the lead and cooperating agencies as methane is a safety item addressed by the Department of Labor, Mine Health and Safety Administration on a case-by-case basis to ensure the safety of miners and greenhouse gases/compliance with the Clean Air Act are regulated by the EPA and through their agent, the Colorado Department of Public Health and Environment, in the permitting process. See discussion in Chapter 3.

### Reduce the potential greenhouse gas emissions of the project through the use of Ventilation Air Methane (VAM)

Methane is an explosive gas that is a hazard to underground miners. To ensure mine safety, fresh air is circulated through underground coal mines using ventilation systems to dilute in-mine concentrations of methane to levels well below explosive levels. Mine safety authorities in each country regulate these concentrations. Typically, methane concentrations in ventilation air range from 0.1% to 1.0 %. Ventilation air methane (also known as VAM) refers to the very dilute methane that is released from underground mine ventilation shafts. VAM represents over half of all coal mining emissions in the United States and worldwide. With few exceptions, it is simply released to the atmosphere (http://www.epa.gov/cmop/basic.html#vam).

Alternatives that address VAM destruction are duplicative of the Proposed Action as this is a possible mitigation measure that may be implemented by MCC if the coal is mined in this particular area. CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

Lease addendums have been added to the parent leases and would be carried forward to the lease modifications that address this possible mitigation measure (see Stipulations for Proposed Action). This method to reduce the effects of greenhouse gasses on climate change may be designed by MCC (who has been coordinating with EPA in their Coalbed Methane Outreach Program (CMOP)) and further approved by the regulatory agencies as part of the mine/ventilation plan approval process so long as the lives of miners are demonstrated to be adequately protected. This is an alternative that is outside of the jurisdiction of the lead and cooperating agencies as ventilation air is a safety item addressed by the Department of Labor, Mine Safety and Health Administration (MSHA) on a case-by-case to ensure the safety of miners. Greenhouse gases/compliance with the Clean Air Act is regulated by the EPA and

BLM_0049691

through their agent, the Colorado Department of Public Health and Environment, in the permitting process.

MCC's ventilation air flow quantity is much higher than anything that has to date been demonstrated as effective with this technology (World Coal 2010). The agencies involved in this analysis do not know if VAM destroyers on the market are compatible with the specific design of MCC's MSHA-approved ventilation system (EPA 2010). Further, MCC does not believe this is economically viable at this time due to the low percentage of methane in their ventilation air.  If the capacity, design and feasibility of a VAM system were addressed by permitting agencies, there would still be a concern that this technology would require large acres of disturbance for surface facilities including roads and utilities. CEQ NEPA regulations also describe this situation as having components that would cause unnecessary environmental harm including long-term, high-acreage disturbance and structures in the West Elk Roadless Area.  See additional discussion in Chapter 3.

## Prevent all future disturbances from road construction, methane drainage well pads and the like in Roadless Areas.

The environmental consequences from an alternative that considers prevention of future surface disturbance is already covered by consideration of the No Action Alternative and the Proposed Action. Lease notices had previously been added to the parent leases and will be carried forward to the lease modifications as a stipulation that addresses development scenarios for Roadless Areas (see Stipulations for Proposed Action). CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

## Prohibit road construction within the lease modification areas but allow the use of equipment transported by helicopters and directional drilling

The environmental consequences from an alternative that considers prohibiting road construction within the lease modification areas but allowing the use of equipment transported by helicopters and directional drilling is already covered by consideration of the Proposed Action.  Lease notices had previously been added to the parent leases and will be carried forward as a stipulation that addresses development scenarios for Roadless Areas (see Stipulations for Proposed Action). CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).  This has previously been addressed in the E Seam EIS.

## Shrink the boundaries of the lease to conform to the area where the coal will be mined underground

This alternative is inconsistent with direction that the lease must encompass an area where projected impacts including subsidence will occur.  This allows the DRMS to bond for surface reclamation. CEQ NEPA regulations describe this situation as having components that would cause unnecessary environmental harm including inability to reclaim land consistent with lease terms.

## Reject one application and place stipulations on the other

The environmental consequences from an alternative that considers rejecting one application and placing stipulations on the other is already covered by consideration of the No Action Alternative and the Proposed Action and by the Decision Framework of having to make a decision on each lease parcel. CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

BLM_0049692

## *Protect values of the area by using this set of stipulations for the Proposed Action*

Protect a number of values by adopting the following no surface occupancy (NSO) stipulations (*proposed stipulation* is followed by response):

- *NSO stipulations prohibiting road and MDW well pad construction within ¼ mile of the hiking route known as "Sunset Trail," which traverses the lease modification, to protect recreational values.*

GMUG Forest Plan indicates (III-68) coal mining is prohibited on trails on the National System of Trails in "Further Planning Areas" (i.e., areas identified in the Rare II inventory for wilderness designation). The West Elk Roadless area is not a further planning area and the Sunset Trail is not on the National System of Trails (examples on the GMUG include Crag Crest Trail, Continental Divide National Scenic Trail, etc), it is simply a forest non-motorized trail that is mostly overgrown with minimal use by the public. Recreational values according to the Forest Plan for this management area could range from semi-primitive non-motorized to roaded natural or rural. Further, the Proposed Action includes a stipulation that addresses development scenarios for Roadless Areas. Without rationale tied to Forest Plan, land status classification, or other standards, addition of this stipulation would appear to be arbitrary and capricious.

- *NSO stipulations prohibiting road and MDW well pad construction for all areas within ¼ mile of: (a) all lynx denning habitat; (b) all lynx winter foraging habitat; and (c) all lynx foraging habitat which is adjacent to lynx denning habitat.*

Appropriate stipulations specific to Lynx and related to Threatened and Endangered species are in the Proposed Action. Lynx stipulations included are consistent with the GMUG Forest Plan 2008 amendment, Southern Rockies Lynx Amendment and the Endangered Species Act. Further, the Forest Service has consulted with the USFWS regarding Canada lynx. CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

- *NSO stipulations prohibiting road and MDW well pad construction for all areas within ¼ mile of a water influence zone (WIZ).*

The GMUG's Water Influence Zone is defined as: The land next to water bodies where vegetation plays a major role in sustaining long-term integrity of aquatic systems. It includes the geomorphic floodplain (valley bottom), riparian ecosystem, and inner gorge. Its minimum horizontal width (from top of each bank) is 100 feet or the mean height of mature dominant late-seral vegetation, whichever is most. The Watershed Conservation Practices Handbook 12.1 Management Measure (3) states in the WIZ "allow only those actions that maintain or improve long-term stream health and riparian ecosystem condition." Lease stipulations addressed in the Proposed Action address the concern of activities in the WIZ. Without rationale tied to Forest Plan or other standards, addition of this stipulation which buffers the WIZ (a buffer area in itself) would appear to be arbitrary and capricious.

- *NSO stipulations prohibiting road and MDW well pad construction for all areas within ½ mile of the West Elk Wilderness boundary, to protect roadless, wildlife, scenic, and other values.*

The West Elk Roadless area was not brought forward as a further planning area during the RARE II wilderness inventory. Unlike Oil, Gas and Geothermal development (Forest Pan III-54), coal leasing does not provide any conditions that would warrant the issuance of an NSO buffer stipulation in this area (III-66). Further, the Proposed Action includes a stipulation that addresses development scenarios for Roadless Areas. Recreational values according to the Forest Plan for this management area could range from semi-primitive non-motorized to roaded natural or rural. Without rationale tied to Forest Plan, land status classification, or other standards, addition of this stipulation would appear to be arbitrary and capricious.

- *NSO stipulations prohibiting road and MDW well pad construction within ¼ mile of any old growth forest to prevent fragmentation.*

BLM_0049693

Should old growth be present if and where surface disturbing activities are proposed in mature/over-mature classes, the GMUG Forest Plan (page II-9a, II-9b) allows for removal of 70-80% of these stands assuming residual patch sizes are met.  If the RFMP were implemented, it is estimated that up to 61 acres of mature/over-mature aspen (0.3% of vegetation unit), and 7 acres of mature/over-mature spruce-fir (0.09% of vegetation unit) may be disturbed.  These are both only a tiny fraction of that allowed to be removed under forest plan standards to protect structural diversity related to old growth.  No old growth has been defined in the lease modifications.  Without rationale tied to Forest Plan or other standards, addition of this stipulation would appear to be arbitrary and capricious.

- *NSO stipulations prohibiting road and MDW well pad construction within ½ mile of any raptor nest site.*

There is no need for an NSO stipulation related to raptor nest sites as it is covered by survey and timing limitations requirements in the Proposed Action for sensitive raptors in Colorado as identified by R2 list. CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

- *NSO stipulations prohibiting road and MDW well pad construction on slopes greater than 40% to protect soils and prevent erosion.*

A stipulation that requires no surface occupancy be allowed in "areas of high geologic hazard or high erosion potential, or on slopes which exceed 60%" and a stipulation that requires "special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 %…the interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer" already exist as part of the Proposed Action.  These stipulations are required by the Forest Plan and supported by the Watershed Conservation Practices Handbook (FSH 2509.25).  CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

## *2.3 Comparison of Alternatives*

This section provides a summary of the effects of implementing each alternative. Information in the table is focused on activities and effects where different levels of effects or outputs can be distinguished quantitatively or qualitatively among alternatives.

**Table 2.3.  Comparison of Alternatives.**

| Resource Area | No Action Alternative | Forest Service Proposed Action Alternative |
|---|---|---|
| Air Quality, Greenhouse Gases & Climate Change | No exceedances of Air Quality Standards.<br><br>Greenhouse gases:<br><br>- Methane 383,250- 574,875 tonnes of $CO_2$ equivalent released per year based on on-going mine activities.<br>- $CO_2$ release continued at current rates. | Particulates & Gaseous emissions: Comparable to current activities. No exceedances of Air Quality Standards.<br><br>Class I Airshed-No effect.<br><br>Greenhouse gases:<br><br>- Methane 383,250- tonnes of $CO_2$ equivalent released per year<br>- $CO_2$ extends 0.67% of US coal power generation emissions by 1.6 years.<br>- Lease stipulations allow lessee to minimize greenhouse gases if it is economically feasible for them to do so. |

BLM_0049694

| Resource Area | No Action Alternative | Forest Service Proposed Action Alternative |
|---|---|---|
| Topographic & Physiographic Environment | No change. | Subsequent mining may result in surface subsidence of up to 8 feet. |
| Geology | Geologic instabilities would continue at historic magnitudes. | Subsidence may aggravate existing geologic hazards, create surface cracks, and cause localized seismic events. Lease stipulations should minimize effects. |
| | | Mining of coal would also reduce future recoverability of oil and gas resources. |
| Soils | No change from current condition. | Cracks and other self-healing surface expressions of subsidence. Approximately 72 acres may see some soil loss and reduced productivity due to post-lease surface disturbance. Lease stipulations and best management practices should minimize effects. |
| Water | No mining induced effects on water resources in the lease modification area. | Subsidence may alter surface and groundwater hydrology by altering groundwater regimes, surface water drainages, seeps and stock ponds. Water quality may be impacted by sedimentation or water derived from mining activities. Monitoring, best management practices, permitting and lease stipulations should ensure that impacts are minimized. |
| Vegetation | Ongoing management activities and Sudden Aspen Decline will continue to impact vegetation in the lease modification area. | Subsidence is expected to have minimal disturbance on vegetation (~1 acre). Post-lease surface disturbance is expected to remove vegetation from up to 72 acres. Reclamation requirements will ensure that appropriate species are used to revegetate the area and return it to productivity. |
| Threatened & Endangered Species | No change over existing conditions and management. | Canada lynx-may affect, but is not likely to adversely affect. |
| | | Four Big River Endangered Fish-fish not present but water depletions may affect these species. Water depletion is consistent with Forest's Programmatic Biological Opinion. |
| Sensitive Species | No change over existing conditions and management activities. | American marten, pygmy shrew, northern goshawk, boreal owl, olive-sided flycatcher, flammulated owl, American three-toed woodpecker, northern leopard frog, and purple martin-"may adversely impact |

BLM_0049695

| Resource Area | No Action Alternative | Forest Service Proposed Action Alternative |
|---|---|---|
| | | individuals, but is not likely to result in a loss of viability in the planning area nor cause a trend toward federal listing." |
| | | Colorado tansy aster-no effect. |
| | | Rocky Mountain thistle-not known to date in lease modification area, but habitat may be enhanced from disturbance associated with post-lease development. |
| Management Indicator Species | No change over existing conditions and management activities. | Elk, Merriam's wild turkey, and red-naped sapsucker-negative effects are of short duration and magnitude and do not result in a forest-wide decrease in trends or deter from meeting the MIS objectives in the Forest Plan. (Other MIS species are addressed as Sensitive Species) |
| Migratory Birds | No change over existing conditions and management activities. | Stipulations requiring breeding bird surveys and including timing restrictions where needed for specific species, may mitigate impacts to migratory birds. However, some bird habitat will be altered in the short term as a result of post-leasing development resulting in a type-conversion of 73 acres, and that is likely to impact individual migratory birds, especially passerines and other birds which utilize aspen, spruce-fir, and oak for nesting. |
| Range Resources | No change over existing conditions and management activities. | Post-lease development may result in forage loss, subsidence related damage to stock ponds, fences being altered, cattle guards filling in, grazing management/ distribution problems, cattle drift onto private land and noxious weeds. Following best management practices and coordination with Range Conservationist/ permittees when post lease development is proposed will minimize these effects. |
| Recreation | No impact. | No change to recreation opportunities available. Subsidence cracks may form on trail #780 but would be expected to be minor. Post-leasing development may improve access on NFSR 710 and cause big game to temporarily move out of the area. |

BLM_0049696

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

| Resource Area | No Action Alternative | Forest Service Proposed Action Alternative |
|---|---|---|
| Transportation System & Roadless | No change over existing uses. | No subsidence-related damage to system roads would occur from mining coal in the lease modifications.<br><br>Post-lease development traffic on NFSR 711 and 710 in the lease would be consistent with current activities.<br><br>New post-lease roads would not be open to the public consistent with recent Travel Management Plan.<br><br>Roadless would be protected by a stipulation that addresses development scenarios for Roadless Areas or by Forest Plan direction if no restrictions were in place. |
| Heritage Resources | No impact. | No potential to affect cultural resources. On-the-ground surveys will be needed for site-specific ground-disturbing activities and is enforced by the lease stipulation. |
| Visuals | No change over existing conditions and management activities | No major impacts to visual resources are expected from subsidence or subsidence-related events. Post-leasing development is not likely to be seen from public travelways, but topographic and vegetative screening will also prevent visual intrusion |
| Socioeconomics | No change over current conditions. | Rents, royalties, payments to counties would be proportionately extended based on the quantity of coal mined as would the mining sector. Operations would be extended approximately 1.6 years. |

BLM_0049697

(Intentionally left blank)

BLM_0049698

# CHAPTER 3. AFFECTED ENVIRONMENT AND ENVIRONMENTAL EFFECTS

## *3.0 Introduction*


This Chapter summarizes the physical, biological, social, and economic environments of the project area and the environmental effects of implementing each alternative on that environment. It also presents the scientific and analytical basis for the comparison of alternatives presented in the alternatives chapter.

### *Short-term and Long-term Effects*

Unless otherwise specified, short-term is the life of the project. Long-term effects are defined as those that would occur after coal is mined.

### *Direct and Indirect Effects*

Direct effects are caused by the action and occur at the same time and place as the action. Indirect effects are caused by the action and occur later in time or farther removed in distance, but are still reasonably foreseeable. Direct and indirect effects analysis for each alternative and each resource are based on description of the alternatives provided in Chapter 2, including conditions of approval and assumes that all stipulations would be implemented as described.

### *Cumulative Effects*

Cumulative impacts are impacts on the environment that result from incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.

## *3.1 Ongoing Activities*

The following are descriptions of past, present and reasonably foreseeable future actions for use in the cumulative effects analysis. Individual cumulative effects environments are described in each of the resource analyses later in this chapter.

### *General Background*

Coal mining has been one of the dominant land uses in the North Fork of the Gunnison River area. Underground mining has occurred in this area for the past 100 years. Coal mining has occurred on both private and public lands in the general area. There are currently three operating coal mines in the North Fork Valley. These are the Bowie No. 2 Mine, the Elk Creek Mine, and the West Elk Mine.

### *West Elk Mine*

#### *1981 to present*

The mine has been operating for 29 years and holds about 14,395 acres of federal coal leases and 3656 acres of fee coal lands. Subsidence on NFS lands has occurred north of the proposed COC-1362 and COC-67232 lease modifications. Minor surface tension cracks are visible in places on the surface. Topography has lowered between two and ten feet across the existing subsided areas. MCC is in the process of mining E-Seam reserves in existing portions of COC-1362 and COC-67232 leases.

Surface facilities including office, warehouse, shop, coal handling facilities are located about 6 miles north of the proposed modifications. These existing facilities would also be used for mining the proposed modifications.

BLM_0049699

### Coal Exploration Drilling 1990s- 2000s

Eleven exploration holes (6 north of and 5 west of the modification areas) are within ½ mile of the modification tracts; most were drilled in the 1990s to early 2000s. Some access roads are still visible. Reclamation success has returned lands to prescribed uses. Road closures and/or obliteration are inhibiting traffic. Portions of old drill roads and some pads are currently being used for a methane drainage project.

### Geophysical Exploration since 1999

A shallow seismic survey was performed along Deep Creek in 1999. Shallow shot holes were drilled and then reclaimed. A field survey in September 2004 showed no visible residual effects. A shallow seismic survey was approved for Box Canyon in 2005, about 3 miles north of the lease modifications. It was a short-term survey; no residual effects after reclamation were realized.

### Methane Drainage Wells 2008 to present in vicinity

In 2008, MCC was approved to install 168 methane drainage wells (MDWs) from 146 locations over existing leases north of the proposed modifications.  Fifty (50) approved methane drainage drill locations lie within a one-mile area north of the project area (both developed and undeveloped).   The only development and reclamation that has occurred within a one mile radius of the proposed modifications is the development of the E4-68 well pad and its access road (roughly 2950 feet long) on the west side of Deep Creek and the access (roughly 1800 feet long) to the E4-80.5/81.5/83 MDW pad and the pad itself on the east side of Deep Creek.  These access roads and pads have had interim reclamation until future use is needed in 2011 and 2012.

There are 118 proposed methane drainage wells that lie within a two mile radius of the proposed lease modification area.  Of these 118 wells to date, 27 have been developed, drilled and have had interim reclamation in the E1-E3 panels.  Another 8 wells on the west end of the E3 panel will be drilled summer 2011.

Within the past 3 years, MDWs and associated access activity in MCC's nearby lease holdings and permit area have been approved to disturb approximately 204 acres.  About 65 acres have been disturbed to date and MDW locations not in active use have had interim reclamation completed awaiting their future use.

### Next 10 years

Previously approved mining would continue including the related activities related to mine ventilation such as installation of MDWs and roads to access them in the parent lease areas of these modifications for at least the next decade. Mining sequence will continue in a north to south manner then west onto fee lands. Mine life is currently projected for 11-12 additional years of federal coal reserves with perhaps as much as 2 additional years on fee reserves.  There may be a continued need for post-lease surface use related to maintaining mine seals, continued reclamation activities, etc. in any of West Elk's lease holdings.

## Wildlife Past 20 years, Present and Future

A 600-acre prescribed burn occurred in a mountain shrub area about one mile northeast of the modifications in 1992 for wildlife improvements. The area has been effectively revegetated in mountain shrub and oak.

## Range use/ improvements Past 100 years

NFS lands have been grazed for many years and are currently managed under a deferred rotational strategy. MCC also leases private land for grazing. No changes in the grazing system are planned. Existing range features and improvements include stock trails, fences, and several small stock ponds.

In 2010, a 585 acre prescribed burn occurred in a mountain shrub area about 3 miles west of the proposed modifications.

BLM_0049700

## Recreation Past 20 years, Present and Future

The lease modifications area has no developed recreation sites. Dispersed recreation includes camping, use of all-terrain vehicles (ATVs), and horseback riding on a limited basis. Occasionally, National Forest System Road (NFSR) 710 is used for dirt bikes and mountain cyclists. Primary use occurs during hunting seasons. No recreation developments are planned. A non-motorized system trail, the Sunset Trail, cuts through the lease modifications. It is not often used and is difficult to navigate through the project area. There are no system trails in the lease modification area that access the West Elk Wilderness. Numerous stock, range improvement and wildlife trails cross the lease nomination areas.

## Inventoried Roadless Areas 1979 to present

The majority of the lease modifications are located in the West Elk IRA, inventoried in 1979 as part of Roadless Area Review and Evaluation (RARE II), but was not carried forward for wilderness designation. The IRA was not designated for management as roadless in GMUG Forest Plan or as further planning area. A 1993 evaluation determined that the West Elk IRA had compromised roadless character and was reevaluated in the 2002 EA for Methane Drainage, as well as the 2008 EIS for E-Seam development.

The Sunset Trail Roadless area is a small subset of the West Elk Roadless that came about in the Draft Forest Plan Revision, a plan that has been rescinded because of litigation around the Planning Rule(s). Various documents describe this parcel in different ways. Much of the West Elk Roadless Area (current Forest Plan designation) has compromised character due to management activities before and after 1979 including roads, ditches, reservoirs, full-size trails, etc. Forest Plan prescriptions have guided the management of the area from the date of the Plan and intermittently when the Roadless Rule is in effect. Road construction or reconstruction in the IRA is subject to rules or directives in place at the time activities are proposed on the parent leases and a stipulation that addresses development scenarios for Roadless Areas is included in the Proposed Action. The Forest Plan allows for road building in this area.

## Road and Trail System Past 30 years and Present

CR 710/NFSR 710 is the primary access used by forest visitors, range/special use permittees, and MCC into lands near the lease modification area and private coal reserves. The road is low standard and maintained for travel in high clearance vehicles. MCC has performed maintenance in the past 10 years on portions of this road. Other temporary roads on forest have been constructed and reclaimed in the past 15 years for coal exploration or other drilling purposes and many more on private/fee land.

## Natural Gas Development Future

This area was made available for oil and gas leasing in the 1993 GMUG Oil and Gas Leasing EIS ROD. There has been interest in obtaining gas leases to use the methane resource although no gas leases cover lands within the lease modifications. The BLM has officially designated mineral resources to be primarily managed for coal. There are no gas pipelines in the area.

MCC and BLM are currently working on potential strategies for gas utilization. MCC is also working with the Environmental Protection Agency in EPA's CMOP program.

## Methane Emissions Past 5 years (Air Quality)

MCC began draining methane from the underground mine via methane drainage wells in 2001. Monitoring since then shows current MDWs in the E Seam have an average active life of about 1-3 months. Approximately 2 or 3 MDWs are actively draining methane at any time. See Section 3.3 for further discussion.

## 3.2 Reasonably Foreseeable Future Development 

Because leasing itself does not involve any mineral development or surface disturbance, it is necessary to project the amount of surface use or activity that may result during lease development in order to

BLM_0049701

disclose potential effects and inform decision-making. To facilitate analyzing potential surface impacts due to underground mine subsidence, this analysis assumes a reasonably foreseeable mine plan (RFMP) for this leasing decision.  In order to effectively analyze potential cumulative impacts, and potential post-lease activities on the land surface, the analysis also assumes a scenario of potential surface use.  It must be noted however, that decisions pertaining to surface use and disturbance, with the exception of subsidence impacts, are not made at the leasing stage. Rather, the decisions related to permit-related surface activities are made when and if site-specific surface uses are proposed, and are evaluated through the State permitting process based on their own merits.

## *Reasonably Foreseeable Mine Plan (RFMP)*

The lease modifications for COC-1362 and COC-67232 contain an estimated 10.1 million tons of federal coal reserves in the E coal seam.  For this analysis, it is assumed that the coal would be recovered using the longwall method of underground coal mining. The tracts are bounded on the north by currently leased federal coal, on the east by inferred unmineable coal (unleased) (BLM, 2004), on the west by private land, and on the south by wilderness. Therefore, it is assumed that access to the coal reserves in the lease modifications would most easily be achieved from the existing underground workings at the West Elk Mine and surface facilities near Somerset, Colorado.

Production from the existing West Elk Mine approximates 6.5 million tons per year (tpy) using the longwall mining method, and is capable of peaking at a 7.0 million tpy rate.  It is assumed for this analysis that the coal would be extracted at a 6.5 million tpy. No increase in coal production is assumed, and it is assumed that the coal would be transported to market using the existing coal handling facilities and existing spur rail line.

The RFMP for the lease modifications assumes the coal in the E seam would be extracted from portions of five longwall panels trending northwest-southeast.  The panels in the lease modifications would include the start lines and the first few thousand feet of five panels that would extend west off the FS lands and into coal reserves under MCC's private land.  The mining would "retreat" to the main entries of the mine. The continuous miner would be used to drive development entries for the longwall panels, with the primary coal production being achieved using the longwall equipment.

The E seam coal in the lease modifications would be mined over a period of approximately 3 years; however, E seam coal reserves in the modifications represent about 1.6 years of additional coal reserves based on the rate of mining currently employed at the West Elk Mine.  Some variations to these timeframes may occur based on time needed for permitting, unforeseen mining/geologic circumstances, coal contract variability, etc.

## *Reasonably Foreseeable Surface Use and Disturbances*

### *MDWs*

In recent years, the coal mines operating in the Somerset Coalfield have experienced the build-up of methane gas in the underground workings after the rock strata have subsided into the mine void (called the gob).  Under Mining, Safety and Health Administration (MSHA) regulations, mines are required to hold the methane levels well below the lowest explosive concentration of 4% in the active working areas of the mine to ensure worker safety underground.  Typically, the mine ventilation system cannot effectively keep methane levels within safe working range, therefore additional methane liberation methods had to be employed.

West Elk Mine leaseholds have used a system of methane drainage wells (MDWs) to assist in liberating methane from the underground mine.  These MDWs are drilled from the land surface into the mine workings, and use an exhausting blower to pull gas and air from the mine.  Drilling these MDWs requires construction of drill pads and temporary roads on the land surface.  Current MDWs are on the landscape for 2-3 years with an active life of 1-3 months, after which they are decommissioned, the land surface reclaimed and returned to pre-mining land uses.

For the lease modifications, it is anticipated that MDWs will also be needed. Other post-leasing surface disturbance that could be reasonably anticipated includes:    exploration drilling, seismic exploration,

BLM_0049702

ground water monitoring well installation, subsidence and hydrology monitoring facilities, and access roads needed for these facilities. For the purposes of the cumulative effects analysis in this document, it is assumed based on current mining practices, that about 73 total acres of surface disturbance would occur over the life of the lease modifications (expected to be about 25 years from lease issuance to lease relinquishment and final bond release). Site-specific locations of anticipated disturbance cannot be identified at the leasing stage due to the fact that a final mine plan has not been approved.

For the purposes of this analysis, it is assumed that approximately 48 MDWs would be needed over the life of the lease modifications, corresponding to an estimated 48 acres of disturbance (assuming about 1 acre of disturbance per MDW pad). Associated temporary road building associated with MDWs is estimated to be about 6.5 miles, corresponding to about 24 acres of disturbance assuming a 30-foot wide average disturbance width for a temporary road with a 14-foot running surface. It is assumed that any if any exploration drilling, staging areas, and ground water monitoring drill pads and access road construction are needed, they would utilize the same locations as those used for MDWs.

If any future exploration of this area is required, surface disturbance would be coincident (in same locations) with that expected for methane drainage. Therefore, no additional surface beyond that assumed above for MDWs will be analyzed in this document.

### Subsidence

The most common subsidence related impacts are likely to be surface tension fractures, which will be more evident on hard-competent sandstone outcroppings, although tension fractures may also extend into colluvium, alluvium, and weathered bedrock. The majority of movement associated with subsidence over panels is usually complete within 12 months after longwall mining.

Within the lease modification areas, the average mining height of coal is expected to be 11 feet. As a general rule of thumb, through the mining process the overburden is subsided 70% of the mining height. So in the modification area, expect the land to be subsided up to 8 ft. The effect on topography is also related to the amount of overburden (more cover, less subsidence), and the modification area ranges in overburden from 800 ft – 2,200 ft (avg. 1200 ft).

Other than lowering the land surface, the long-term effects of subsidence on surface topography would be minimal, and even unnoticeable to most casual observers. Overall, the topography above subsided longwall mining workings would be similar to the pre-mining topography, albeit lower in elevation.

BLM_0049703

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

**Figure 3.2 Projected subsidence.**



BLM_0049704

Past observations have shown that surface tension cracks caused by subsidence would most likely occur on ridges and steeper slopes, particularly cliff / outcrop areas, where cracks might open on the order of a few inches to possibly one foot wide and 25 to 50 feet deep. Fewer cracks would occur in drainage areas than on ridges because the drainage areas are more stable and any alluvial/colluvial materials found in these areas tend to be more yieldable than some of the brittle bedrock found on the ridges. Subsidence from longwall mining could aggravate the movement of existing landslides and rock falls.

Subsidence and hydrology monitoring may require placement of monitoring devices on the land surface. These may include small subsidence monuments and survey markers. Access to the facilities may require motorized vehicles that would use the system of existing roads or trails.

At the leasing stage, it is not possible to locate site-specific areas where potential surface uses may occur as there is no approved mining plan for the area at this time; therefore, the above surface use and disturbance estimations will be used to aid the cumulative impact analysis discussed in each resource section. If surface uses are proposed during the life of the lease (if it is issued), then the site-specific proposals will be evaluated under the State mine permitting regulations, under their own merits at the time they are proposed.

**Table 3.2. Reasonably Foreseeable Surface Disturbance.**

| Reasonably Foreseeable Surface Disturbance | Disturbance Acreage | Estimated Duration of Disturbance |
|---|---|---|
| MDWs (48 at 1 acre each) | 48 acres | 2-3 years |
| Temporary roads (6.5 miles) for MDWs, exploration, seismic, monitoring wells, etc | 24 acres | 2-6 years, perhaps longer if required for post-mining monitoring |
| Incidental surface disturbance related to subsidence | Up to 1 acre | Generally close on their own fairly quickly. |
| **Total** | **73 acres** | |

## Direct Effects Common to All Resources

Lease issuance by the BLM vests with the lessee a non-exclusive right to future exploration and an exclusive right to produce and use the coal resources within the lease modifications area, subject to existing laws, regulations, and the terms, conditions and stipulations in, or attached to, the lease (BLM, 2008). Lease issuance alone does not authorize or result in any mineral resource recovery or ground-disturbing activities. Thus, issuance of a lease modification has no direct effects on the environment; however, it is a commitment of the resource for potential exploration, mining and development, and reclamation, subject to further review and permitting actions.

## 3.3 Air Quality, Greenhouse Gases & Climate Change _____

## Affected Environment

Air quality in the study area is affected by activities currently conducted within the area. The study area for indirect, and cumulative effects is defined here as the County of Gunnison (approximately a 40-mile radius around the County of Gunnison-which is the general area of nearest Class II sensitive viewshed). Activities occurring within the study area that affect air quality include fixed facilities such as coal mining and subsequent coal mining operations (e.g., loading), concrete mix plants, gravel pits, lime storage facilities, natural-gas fired electrical generating plants, natural gas dehydration facilities, landfills, and crematoriums, etc. Portable source examples include facilities such as gravel crushers, associated processing equipment, and asphalt plants. Smoke from grass and forest fires from late spring through early fall can affect air quality depending on the year.

Comparative information, such as ambient air quality, atmospheric conditions, and existing air emission sources, were derived from databases maintained by the United States Environmental Protection Agency (U.S. EPA 2006a) and Colorado Department of Public Health and Environment (CAPCC 2006). Regulatory standards for air quality (e.g., criteria pollutants) were obtained from U.S. EPA (U.S.EPA 2006b) and Colorado Department of Public Health and the Environment Air Pollution Control Commission (CAPCC) (CAPCC 2006).

## Area Air Quality

The federal government and CAPCC have established ambient air quality standards for criteria air pollutants. The criteria pollutants are carbon monoxide (CO), lead (Pb), sulfur dioxide ($SO_2$), particulate matter smaller than 10 microns ($PM_{10}$), ozone ($O_3$), and nitrogen dioxide ($NO_2$). Ambient air quality standards must not be exceeded in areas where the general public has access. Table 3.3a lists federal and state air quality standards. National primary standards are levels of air quality necessary, with an adequate margin of safety, to protect public health. National secondary standards are levels of air quality necessary to protect public welfare from known or anticipated adverse effects of a regulated air pollutant. The attainment status for pollutants in the project area is determined by monitoring levels of criteria pollutants (CO, Pb, $SO_2$, $PM_{10}$, $O_3$, and $NO_2$) for which National Ambient Air Quality Standards (NAAQS) and Colorado Ambient Air Quality Standards (CAAQS) apply. The study area is designated as attainment for all criteria pollutants. The attainment designation means that no violations of Colorado or national air quality standards have been documented in the area. In 1997, the EPA revised the federal primary and secondary particulate matter standards by establishing annual and 24-hour standards for particulate 2.5 micrometers in diameter or smaller ($PM_{2.5}$). $PM_{2.5}$ will not be addressed more than general discussion of particulates in this analysis as Colorado is in attainment status with the U.S. EPA standard which has no regulatory requirements unless the state enters nonattainment status. If nonattainment designations take effect, the state will have three years to develop implementation plans outlining how areas will attain and maintain the standards by reducing air pollutant emissions contributing to fine particle (PM2.5) concentrations.

Ozone is a secondary pollutant which is chemically formed in the atmosphere via interactions of oxides of nitrogen ($NO_x$) and volatile organic compounds (VOCs) in the presence of sunlight and under certain meteorological conditions. Ozone is not emitted directly from a source; rather, its formation is complex, generally results from a combination of emissions from various sources, and is considered a regional pollutant with the potential to be transported across long ranges. Prediction of potential ozone formation is a complex process, involving analysis of significant quantities of VOCs and $NO_x$ emissions from various sources within a region and their interactions within the atmosphere and the associated meteorological conditions. Therefore, it is typically not appropriate to assess potential ozone impacts of a single project on potential regional ozone formation and transport. The State assesses potential ozone impacts from its authorized activities on a regional basis, when an adequate amount of data is available and where such analysis has been deemed appropriate. For this reason (inappropriate scale of analysis), ozone will not be further addressed in this document. However, ozone is regulated through State permitting of one of its precursors, $NO_x$, at the West Elk Mine. Additionally, most volatile organic compounds (VOCs) regulated by the EPA originate from burning fossil fuels or evaporation of household or industrial chemicals. VOCs may form chemical reactions that produce ground-level ozone. Information on other potential gaseous emissions (VOCs such as ethane, propane, pentane, hexane, alkenes, aldehydes, and benzene/benzene derivatives) is not available for the West Elk Mine because the concentrations are either non-existent or immeasurable where air samples are collected at the mine and will not be further discussed in this document. However, when or if the information becomes available, effects would be analyzed under an air permit modification by CDPHE if the levels generated make a permit modification necessary.

A detailed air quality assessment, including modeling, was conducted as part of the environmental analysis for the Dry Fork Coal Lease-by-Application Final EIS Deer Creek Shaft and E Seam Methane Drainage Wells Project FEIS. The air quality analysis conducted for the original mine included an emissions inventory and modeling analysis. That emissions inventory quantifies PM10, NOx, and SO2 emissions. The modeling analysis also includes a visibility impacts assessment in the West Elk Wilderness Area (Class I Area) as well as an atmospheric deposition impacts assessment. The equipment used for the lease modification will be the same equipment that is being used in the current mining operations. Therefore, the air quality impacts associated with the proposed mine expansion can

42

be presumed to be equal to, or less than, impacts predicted in the original air quality impact assessment due to more stringent regulations.

As related to railway emissions, due to more stringent regulations since the North Fork Coal EIS was written, the EPA predicted that, on a nationwide average, $NO_x$ emissions from locomotives in the year 2010 would be about 40 percent less than emissions compared to 1999 levels (North Fork Coal EIS, page 3-7). The North Fork Coal EIS air quality impact analysis, which relied on emissions factors for 1999, determined $NO_x$ emissions to be insignificant; therefore, it can be presumed that $NO_x$ emissions associated with current use of trains is actually lower than previously modeled levels.

## PSD Classification

The area surrounding the study area is designated a Class II area, as defined by the Federal Prevention of Significant Deterioration (PSD) provision of the Clean Air Act. The PSD Class II designation allows for moderate growth or degradation of air quality within certain limits above baseline air quality. Industrial emission sources proposing construction or modifications must demonstrate that the proposed emissions will not cause significant deterioration of air quality in all areas. The standards for significant deterioration are more stringent for Class I areas than for Class II. Federal/State Mandatory Class I Areas located in the project area include West Elk Wilderness at approximately 1-3 miles south-southeast and Black Canyon of the Gunnison National Park approximately 25 miles southwest of Somerset, Colorado.  Due to the nature of the project (i.e., mobile equipment), no specific permit requirements apply to gaseous emissions. However, construction will be required to comply with fugitive dust provisions under Regulation 1 (5CCR 1001-3) which requires that precautions be taken to control fugitive emissions (e.g., airborne particulate matter) to levels below percent opacity. The West Elk Mine currently operates under air emission discharge permits obtained from the State of Colorado. Activities under the proposed action are not anticipated to require a modification of existing or application for new permits.

**Table 3.3a.  NAAQS, CQQQS and Monitoring Concentrations for New Sources.**

| Pollutant | Averaging Times | Primary NAAQS | Secondary NAAQS | CAAQS (Additional Standards) | PSD Significant Monitoring Concentration |
|---|---|---|---|---|---|
| Carbon monoxide (CO) | 1 hour | 35 ppm (40,000 $\mu g/m^3$P) | NA | NA | NA |
| | 8 hours | 9 ppm (10,000 $\mu g/m^3$P) | NA | NA | 575 $\mu g/m^3$P |
| Lead | Quarterly Average | 1.5 $\mu g/m^3$P | 1.5 $\mu g/mP^3$ | NA | 0.1 $\mu g/m^3$P |
| | Rolling 3 month | 0.15 $\mu g/m^3$P | 0.15 $\mu g/mP^3$ | NA | NA |
| Nitrogen dioxide ($NO_2$) | 1 hour | 0.100 ppm | NA | NA | NA |
| | Annual | 0.053 ppm (100 $\mu g/m^3$P) | 0.053 ppm (100 $\mu g/m^3$P) | NA | 14 $\mu g/m^3$P |
| $PM_{10}$ | 24 hours | 150 $\mu g/m^3$P | 150 $\mu g/m^3$P | NA | 10 $\mu g/m^3$P |
| $PM_{2.5}$ | 24 hours | 35 $\mu g/m^3$P | 35 $\mu g/m^3$P | NA | NA |
| | Annual | 15 $\mu g/m^3$P | 15 $\mu g/m^3$P | NA | |
| Ozone | 8 hours | 0.08 ppm | 0.08 ppm | NA | 100 tpy VOCs or $NOR_x$ |
| Sulfur dioxide | 3 hours | NA | 0.5 ppm (1300 $\mu g/m^3$ P) | 700 $\mu g/mP^3$ | NA |
| | 24 hours | 0.14 ppm (365 $\mu g/m^3$ P) | NA | NA | 13 $\mu g/mP^3$ |
| | Annual | 0.03 ppm (80 $\mu g/m^3$ P) | NA | NA | NA |
| Fluorides | 24 hours | NA | NA | NA | 0.25 $\mu g/m^3$P |
| Total reduced sulfur | 1 hour | NA | NA | NA | 10 $\mu g/m^3$P |
| Hydrogen sulfide | 1 hour | NA | NA | NA | 0.2 $\mu g/m^3$P |

43

| Pollutant | Averaging Times | Primary NAAQS | Secondary NAAQS | CAAQS (Additional Standards) | PSD Significant Monitoring Concentration |
|---|---|---|---|---|---|
| Reduced sulfur compounds | 1 hour | NA | NA | NA | 10 µg/m³P |

₁ ppm = parts per million; µg/m³ = micrograms per cubic meter
₂ P = primary standard (health-based); S = secondary standard (welfare-based)
Source: 40 CFR, Part 50

## Combustion

Historically, the coal mined in Colorado has been used as one of the sources of fuel to generate electricity in power plants located throughout the US and shipped overseas. The mines in Colorado have sold, and are expected to sell, coal into the open coal market. The mine's ability to sell coal in this market is determined by the annual production rates at that mine. Coal sales are made on short term contracts or sold on a spot market. This market is very dynamic and competitive. It is uncertain and speculative to predict who might purchase future Colorado coal, how it would be used, and where the coal might be transported to. Moreover, the restrictions and control measures vary by the location in which the coal is burned.

Coal-burning power plants currently supply about 50% of the electric power generated in the U.S. The demand for power is increasing in the U.S. and throughout the world. According to a recent report by the North American Electric Reliability Corporation, peak demand for electricity in the U.S. is expected to double in the next 22 years (Associated Press 2007). Many developing countries, including China and India, are also relying heavily on coal to meet their rapidly increasing power demands as coal is more economical and more available than other sources of electrical generation. The regulatory mechanisms proposed under the Climate Security Act of 2008, as well as the past regulation of pollutants under the CAA, are imposed at the point when coal is burned and converted to electric energy. A percentage of coal produced in Colorado is sold in an open market where coal is purchased on short term contracts or spot prices based on a coal feed stock that is suitable for each buyer's power generating facility. Coal production at any one mine is not tied in any predictable way over a period of time to any one power plant; however, because nearly 94% of all coal consumed in the US during 2009 was used in the generation of electric power (US Energy Information Administration 2009), it can reasonably be assumed that the coal will be shipped to a coal-fired power plant. It would be possible to provide a quantification of GHG emissions associated with the burning of the mined coal at a specific facility; however, the types and location of the facilities the coal might be processed in is speculative and not foreseeable. The terms of the agreements between the coal combustion facilities and the coal company are not within the regulatory authority of the Forest Service and BLM are outside the scope of this analysis, The EPA and state governments where the coal is burned provide the regulatory emissions standards for the combustion of the coal. Different emissions control devices on a power plant could greatly affect the amount of carbon dioxide that is released into the atmosphere. For example, a power plant that practices $CO_2$ capture would ultimately release a much smaller quantity of $CO_2$ than a traditional power plant that is 50 years old)

In order to calculate the true $CO_2$ equivalent emissions from coal, the following information would be needed: the number of tons of coal produced per year from a mine; the heat content of that coal in BTUs per ton; and the facility in which the coal is slated to be burned. Even though the BLM cannot reasonably predict the destination of where the coal will be burned, it is still possible to do emissions calculation if the number of tons of coal produced is known for the proposed lease tract. However since the type of facility the coal might be processed in (i.e., the control efficiency of the facility) is speculative; calculations were made using average numbers in U.S. facilities.

Most power plants in the country use clean coal technology (coal washing, wet scrubbers, low-$NO_x$, electrostatic precipitators, gasification, etc.) to reduce harmful environmental effects of coal and contain emissions. Arch Coal (MCC's parent company) has pledged $8 million for research geared toward developing and testing clean coal technologies—including carbon capture, utilization and storage. Between 1970 and 2008 coal-related energy production tripled; however, emissions of criteria air pollutants (defined by the Clean Air Act) declined by more than 60% during that same time period,

44

according to the U.S. EPA, and due to improved technology $SO_x$ and $NO_x$ emissions are expected to continue to decrease an additional 50% between 2007 and 2020. EPA is also regulating mercury emissions.  Arch Coal has invested in-and works closely with-ADA-ES to develop and enhance mercury control technologies. These technologies enable coal fueled power plants to improve existing air pollution control equipment and operating efficiencies in cooperation with the U.S. Department of Energy's National Energy Technology Laboratory.

## Greenhouse gases (GHGs)

In its *Endangerment and Cause or Contribute Findings for Greenhouse Gases* under Section 202(a) of the *Clean Air Act*, the EPA determined that GHGs are air pollutants subject to regulation under the CAA. The EPA is in the early stages of determining how to regulate carbon dioxide, methane, nitrous oxide, sulfur hexafluoride, hydrofluorocarbons, and perfluorocarbons.

No data is available regarding current ambient methane concentrations in air, because methane is not yet a regulated constituent. As of February 2011, the EPA had not set GHG emission limits for stationary sources (such as compressor stations); however, the EPA is gathering detailed GHG emission data from thousands of facilities throughout the U.S., and will use the data in order to develop an improved national GHG inventory, as well as, to establish future GHG emission control regulations.  Beginning in 2011, GHG emissions from some facilities will become subject to Federal air quality permitting programs, such as the Title V Operating Permit Program and the Prevention of Significant Deterioration (PSD) Program. Historically, GHG emissions were not measured by facilities under these programs, and air quality permits did not address greenhouse gases. However, the EPA, as well as State and local air quality permitting agencies, will begin reviewing GHG emissions under these programs in accordance with the EPA's "Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule." Based largely upon GHG emission data submitted under the Mandatory Reporting Rule, the EPA plans to develop stationary source GHG emissions reduction rules that could mandate substantial reductions in US greenhouse gas emissions. As of June, 2010 (and effective in 2011 for coal mines), EPA requires mandatory reporting of greenhouse gas emissions, but does not require control of greenhouse gases, rather it requires only that sources above certain threshold levels monitor and report emissions.  Information that MCC currently supplies to MSHA for safety reasons will be reported to EPA starting 2011 for this program.  However, the values used to estimate methane emissions included in the analysis were based on values associated with 2009-2010 averages reported to EPA and MSHA.

Alternatively, Congress may develop cap-and-trade legislation as another means to reduce GHG emissions. Consequently, a GHG emissions calculation for coal burned at a power plant is likely to be increasingly regulated in the near future. The first EPA regulation to limit emissions of GHGs imposed carbon dioxide emission standards on light-duty vehicles, including passenger cars and light trucks (GPO 2010e).

Potential impacts may occur from reasonably foreseeable activities related to subsequent development on the lease modifications and future use of coal such as from methane drainage wells (MDWs), coal fired power plants and coal transportation. It is estimated for this analysis that 1 to 2 MDWs would be turned on as needed or in operation at any given time in the E Seam and life of an MDW varies from one to three months depending on placement in the panel. At the time of anticipated mining in these lease modifications, it is assumed that MDWs in the B Seam related to post-mining activities would be reclaimed. Baseline information in the study area was derived from approved adjacent and other coal mines in the area. Baseline information includes data such as area impacted by construction activities (e.g., drill pad areas, length of roads, etc.) equipment type, and duration of construction and the project. Approximately 7.4% of US emissions of methane come from coal mining and approximately 75% (or 5.6% of US methane emissions) of that comes from underground coal mining activities. Methane associated with coal seams and the surrounding rock would be liberated during the mining process, as well as during the subsequent fracturing of the overburden, which occurs as the gob area (the portion of coal panels that have already been mined) is allowed to collapse. In order to protect the health and safety of miners working underground, explosive gases would be removed from the mine via the existing ventilation system as well as through MDWs drilled into the gob area on the parent lease. MDWs would be drilled to about 10 to 50 feet above the target coal seam about a year before mining operations begin. As the longwall mining passes under the MDW, the strata around the MDWs would fracture and liberate

BLM_0049709

methane. MDWs would actively pump mine atmosphere (including methane) to the surface. The process of fracturing and liberation of methane would continue as the mined area collapses behind the mining operation, and the MDWs continue to pump methane from the gob. Both the ventilation system and the MDWs would release methane directly into the atmosphere. This would result in varying levels of methane release, based upon the relative concentration of methane in the mine air.

Methane is over 20 times more effective in trapping heat in the atmosphere than $CO_2$ over a 100-year period. Methane emissions, from an air permit perspective, are not regulated by the State of Colorado. Preliminary modeling results using EPA's SCREEN3 air model indicate that methane concentrations from existing methane drainage wells may result in an increase of breathing zone methane concentrations in air which would still be below the Mine Safety and Health Administration (MSHA) level of one percent. No new methane drainage wells would be needed for mining this lease modification area.

Coal fired power plants and coal transportation systems (trains, trucks, etc.) release $CO_2$ which contributes to global climate change.

## Black Carbon

Black carbon ("soot" and/or "smoke") is formed from the incomplete combustion of fossil fuels, biofuels and biomass. It warms the earth's atmosphere by reducing the ability to reflect sunlight (albedo) and is the second highest contributor to global warming. It is very short-lived, staying in the atmosphere only a few days to a few weeks. Reduction of black carbon emissions could keep the earth's climate from reaching critical tipping points such as significant sea-level rise. Conversely, black carbon is also a contributor to soil fertility in tropical regions. While black carbon is of global concern and easily treatable, it is not of concern for this project for the following reasons:

- Black carbon is not emitted from the coal when it is being mined but rather at the facility where the coal is being burned. US power plants using coal (such as from these lease modifications) utilize clean coal technology which eliminates black carbon emissions in accordance with the Clean Air Act and other laws dating to the 1950s.

- Most black carbon emissions come from developing countries in Asia, Latin America and Africa with India and China accounting for 25-35% of emissions. Emission trends in those countries are expected to increase due to lack of regulation, not lack of technology.

- Largest sources of black carbon emissions come from: biomass (forest and savanna) burning, residential biofuel (firewood) burning, diesel engines for transportation and industrial use (EPA regulates diesel fuel quality to minimize this in the US), industrial processes and power generation (usually in small boilers) and residential coal burning.

For the reasons above, black carbon emissions will not be further addressed for this project. Additional information and references on black carbon emissions can be found at: http://en.wikipedia.org/wiki/Black_carbon.

## Climate Change

According to the U.S. Global Change Research Program (2009), global warming is unequivocal, and the global warming that has occurred over the past 50 years is primarily human-caused. Standardized protocols designed to measure factors that may contribute to climate change, and to quantify climatic impacts, are presently unavailable. As a consequence, impact assessment of specific impacts related to anthropogenic activities on global climate change cannot be accurately estimated. Moreover, specific levels of significance have not yet been established by regulatory agencies. Therefore, climate change analysis for the purpose of this environmental assessment is limited to accounting for GHG emissions changes that would contribute incrementally to climate change. Qualitative and quantitative evaluations of potential contributing factors are included where appropriate and practicable. Climate change effects are addressed in the cumulative effects section.

BLM_0049710

## *GHG Possible Mitigations for All Alternatives*

A lease addendum has been added to the parent leases by BLM which allows MCC to consider these methods if it is *economically* feasible for them to do so. This lease addendum would be carried forward to the lease modifications. Direct mitigation of the release of methane through either flaring or capturing methane and putting to beneficial use would be very effective in reducing greenhouse gas emissions.

Further, since methane is not regulated, nor have any standards been promulgated by EPA, the federal agencies (BLM, FS, OSM, MSHA, MMS and EPA) and state agencies with delegated authority (DRMS and CDPHE) operating within their jurisdiction in the federal coal program cannot currently require flaring or capture as a mitigation measure. This situation is currently under review by many State and Federal Agencies.

### *Flaring*

Flaring of methane gas was brought forward as a way to mitigate venting of methane, a potent green house gas, to the atmosphere. It is acknowledged that flaring may be used to reduce green house gas emissions in an approved system. Flaring can be performed in either open or enclosed systems, and the technique is similar to that deployed in the oil and gas industries. This method of methane disposal is relatively inexpensive when compared to all the extra costs incurred in developing power generation infrastructure or incorporating recovered methane into a region's natural gas pipeline network. Flaring is driven by economic concerns such as carbon credits available if capture and use is not readily available because of the distance to a pipeline. Systems that use methane flaring (including abandoned mines, gas production wells and landfills) around the world still capture the gas using pipelines and other infrastructure and flare from a controlled system. When methane is burned or flared the resulting compounds are water and $CO_2$. It is estimated that the $CO_2$ equivalent of methane may be reduced by as much as 87% through flaring assuming a concentration of 90% methane (based on a report by Shell Coal in Australia (http://www.greenhouse.gov.au/challenge/members/shell.html)). If flaring is approved for lease modification area, flaring may result in final $CO_2$ equivalent emissions of approximately 49,823-74,733 tonnes $CO_2$ equivalent released depending on the efficiency of the flaring system approved.

There are additional factors which may come into play, while flaring pure, or nearly pure, concentrations of methane results in a large greenhouse gas emission reduction, other inert constituents in the gas flared can become criteria pollutants. For this project, inert constituents are estimated to be between 6 and 77% (based on methane concentrations in the North Fork) which when flared with the methane result in nitrogen oxides and carbon monoxide which are criteria pollutants. The resulting $CO_2$ emissions still present a challenge in terms of combating climate change and flaring is therefore not regarded as the most efficient nor environmentally friendly of the end use options available. It is unknown due to the fluctuating nature of the gas constituents what effects this might have on Colorado and National Ambient Air Quality Standards and Permitting and would also require site-specific emissions monitoring if flaring is ever approved to determine air permit requirements. To the best we are able to tell from literature, flaring in an active gob (where the longwall miner is working) in the US has not yet been approved by MSHA.

### *Capture & Use*

Capture and use of methane gas was also brought forward as a way to mitigate venting of methane. This method would require further studies to evaluate the economic feasibility from this mine and additional infrastructure including gas processing plant and pipelines through roadless to implement. The relatively low levels of methane released by this mine may make this cost prohibitive. Also, there are no gas pipelines nearby.

The Forest Service and BLM estimate that approximately 50% of the cost of the stream of processed gas would be used up in the processing to make it pipeline quality not counting the cost of infrastructure. Pipeline quality gas would have to be less than 2% inert gases. If direct electricity production were the objective, there would be greater efficiency by burning the methane from lower quality gas on site because the processing step would be removed. It is estimated that the $CO_2$ equivalent of methane may be reduced by 87% (to 49,823-74,733 tonnes $CO_2$ equivalent released) through burning for electrical generation. Assuming 20-95% efficiency of combustion of natural gas (compressed methane), depending

47

on end use, may result in a similar % reduction of $CO_2$ equivalent of methane (28,744-306,600 tonnes $CO_2$ equivalent released).

Capture and use presents a regional socio-economic concern.  The three North Fork Coal mines use up to 33% of the electricity sold by Delta Montrose Electric Association (DMEA) with the West Elk Mine being the largest user of the three.  The mines total approximately 20% of the revenue generated by DMEA (personal communication T. Prendergast and R. Taylor). If the West Elk Mine and other mines were to generate their own power this could impact citizens including low income and minority individuals in multiple counties because they may bear the cost difference of existing contracts for electrical supply. Electricity costs in these rural communities could theoretically increase by 20% ($0.097/kwh to $0.116/kwh) for residential and business customers.

The likelihood of flaring or methane capture occurring is low as the coal lessee has recently submitted a feasibility study (R2P2) to BLM for review of its current and proposed operations.

### Ventilation Air Methane (VAM) Capture

Typically, methane concentrations in ventilation air range from 0.1 % to 1.0 %.  Ventilation air methane (VAM) refers to the very dilute methane that is released from underground mine ventilation shafts. VAM represents over half of all coal mining emissions in the United States and worldwide. With few exceptions, it is simply released to the atmosphere (http://www.epa.gov/cmop/basic.html#vam), but can also be destroyed.

Although both VAM and gob gas provide much lower methane concentrations than methane recovered from unmined coal seams, there are power generation technologies available today that can harness the energy production potential of these resources. VAM can not only be used for combustion dilution and cooling purposes in standard gas turbines, but also as a primary fuel in a number of 'lean-burn' gas turbine systems. These systems can utilize VAM with methane concentrations as low as 1% (hence the term lean-burn) and therefore can harness the energy potential of high percentages of the VAM recovered from working mines. The current technology requires that at least 0.9-1% concentrations be present; therefore, MCC would have to have facilities that concentrate (treat) the gas before it could be destroyed also requiring surface disturbance.

VAM's potential as an energy source can also be harnessed by a number of oxidation systems available on the market today. Methane can be converted to $CO_2$ by the process of oxidation, thus reducing its global warming potential. This process also creates energy which can be used to generate heat or power. Oxidation systems can utilize VAM with methane concentration levels of less than 1%. These systems are often deployed on-site to provide auxiliary heat and power to the mine (http://www.worldcoal.org/coal/coal-seam-methane/coal-mine-methane/).

A large commercial-size installation (180,000 cfm) on a single typical mine ventilation bleeder fan would reduce methane emissions by the $C0_2$ equivalent of 183,000 to 366,000 metric tonnes carbon dioxide (http://www.epa.gov/cmop/docs/vam_capture.pdf).  While the oxidation of methane may be up to 95%, this system is limited by the capacity of the installation.

MCC's ventilation air flow quantity is much higher than anything that has to date been demonstrated as effective with this technology (World Coal 2010). The agencies involved in this analysis do not know if VAM destroyers on the market are compatible with the specific design of MCC's MSHA-approved ventilation system (EPA 2010). Further, MCC does not believe this is economically viable at this time due to the low percentage of methane in their ventilation air.  If the capacity, design and feasibility of a VAM system were addressed by permitting agencies, there would still be a concern that this technology would require large acres of disturbance for surface facilities including roads and utilities. Under a best case scenario using this technology, 17,250-208,875 tonnes $CO_2$ equivalent would still be released to the atmosphere each year. Further, according to a recent MSHA report (US EPA 2010), this mine is not potentially attractive for VAM technologies.

VAM technologies also present a regional socio-economic concern.  The three North Fork Coal mines use up to 33% of the electricity sold by Delta Montrose Electric Association (DMEA) with the West Elk Mine being the largest user of the three.  The mines total approximately 20% of the revenue generated by DMEA (personal communication T. Prendergast and R. Taylor). If the West Elk Mine and other mines

BLM_0049712

were to generate their own power this could impact citizens including low income and minority individuals in multiple counties because they may bear the cost difference of existing contracts for electrical supply. Electricity costs in these rural communities could theoretically increase by 20% ($0.097/kwh to $0.116/kwh) for residential and business customers.

### Carbon Credits/Off-set Mitigations

It was suggested that MCC would be required to purchase carbon credits as mitigation for methane. Generally, one carbon credit is equal to one tonne (metric ton) of carbon dioxide or carbon dioxide equivalent gases. The goal of carbon credits is to allow market mechanisms to drive industrial and commercial endeavors where carbon emissions are constrained; they are to date not constrained in the US. Since GHG mitigation projects generate carbon credits, the sale can be used to finance carbon reduction projects between trading partners around the world. Purchasing of carbon credits is a voluntary financial investment that MCC may choose to entertain for business reasons. The federal agencies are not involved in any financial investment decisions that MCC makes as a corporation.

Other specific off-set (or off-site) mitigations have not been brought forward for consideration related to this project.

## No Action Alternative Environmental Effects

### Particulate and Gaseous Emissions

Under the No Action Alternative, gaseous and fugitive (e.g., particulate matter) emissions in the area would remain at currently permitted levels because methane drainage and road construction is occurring at the West Elk Mine due to previously approved projects.

Coal fired power plants and coal transportation systems (trains, trucks, etc.) will continue to release $NO_x$ and $SO_2$ which are criteria pollutants at the current rates.

### Class I Airshed

There would be no exceedances to air quality standards.

### Greenhouse gases

An estimated 383,250-574,875 tonnes of $CO_2$ equivalent (based on 2010 values submitted to BLM by MCC) would continue to be released to the atmosphere each year in the form of methane as the result of MDW venting and continued mining at West Elk mine. The lower range of values would be achieved when all B Seam MDWs which are servicing mine seals in previously mined areas are decommissioned and only E Seam MDWs are operating.

Coal fired power plants and coal transportation systems (trains, trucks, etc.) will continue to release $CO_2$ which contribute to global climate change at the current rates.

## Proposed Action Alternative Environmental Effects

Leasing actions would have no direct impact on air quality as the lease does not authorize any mining activities. However, if underground mining is subsequently approved, indirect/cumulative effects on air quality would be similar to those described for No Action Alternative except under the reasonably foreseeable development scenario these effects would be extended for approximately 1 year 7 months due to extending the life of the mine with the coal reserves in the lease modifications.

### Particulate Emissions

Analysis for particulates is tiered to that from the Deer Creek Shaft and E Seam Methane Drainage Wells Project FEIS (2007) which also included a description of $PM_{2.5}$ (a concern expressed by environmental groups for these lease modifications). Potential sources of particulate such as smoke, soot, dust, and vehicle and industrial emissions ($PM_{10}$, $PM_{2.5}$) used during reasonably foreseeable development such as the construction and operations and maintenance of the access roads, methane drainage wells. These emissions would include fugitive dust from vehicles traveling on dirt roads and engine emissions. As no

49

surface activities are proposed at this time, no estimates on hours of operation of vehicles or pounds of dust per year are able to be calculated, however they are anticipated to be comparable to MCC's current activities and consistent with MCC's 2010 air quality permit. Dust abatement could further reduce particulates. Fugitive dust emissions would further decrease once construction and reclamation of reasonably foreseeable development was complete.

## Gaseous Emissions

Potential sources of gaseous emissions ($NO_2$, $SO_2$, and CO) would come from equipment used during the construction of the reasonably foreseeable access roads and methane drainage wells. Emissions would be from engines and would decrease in quantity when reasonably foreseeable construction and reclamation activities were complete. Because there is no increase in coal production levels anticipated, only an extension of the duration of reserves, gaseous emissions are anticipated to be comparable to MCC's current activities and would fall within the requirements of MCC's existing air permit (Appendix D) which ensures compliance with NAAQS and CAAQS.

Operations and maintenance of potential methane drainage wells, and roads would contribute gaseous emission of $NO_2$, $SO_2$, and CO although at about half the pounds per year as construction activities (USDA FS 2007).

It is impossible to quantify exact emissions related to coal that is burned at coal fired power plants with regard to the coal in the lease modification as it will be mixed with other less compliant coals all over the United States to meet specific air quality standards of the power plant. It is assumed that coal fired power plants will continue to release $NO_x$ and $SO_2$ at the current rates.

## Class I Airshed

The Class I airshed (West Elk Wilderness) is <1 from portions of the project area and there would be no effects on the Class I airshed from reasonably foreseeable activities as particulates would have settled out of air before hitting the wilderness due to vegetation screening and topography or most likely blown away from the wilderness area due to topography and prevailing wind.

Because there is not an increase in annual coal production planned for the West Elk Mine just an increase in duration of reserves and hence no increased transportation needs (no new infrastructure or frequency of trains), there would be no change to Class I Airsheds over current conditions from gaseous emissions and would fall within the requirements of MCC's existing air permit (Appendix D) which ensures compliance with NAAQS and CAAQS.

## Greenhouse Gases

To date methane and carbon dioxide are unregulated.   Therefore, no significance level has been established relating to either NAAQS or CAAQS.

### Methane

Gaseous emissions in the form of methane from methane drainage wells and other ventilation activities would occur during the project from all systems including: vertical wells/gob vent boreholes (MDWs) and main mine fans. Methane is over 20 times more effective in trapping heat in the atmosphere than $CO_2$ over a 100-year period. Methane emissions, from an air permit perspective, are not regulated by the State of Colorado. Preliminary modeling results using EPA's SCREEN3 air model indicate that methane concentrations from the reasonably foreseeable methane drainage wells may result in an increase of breathing zone methane concentrations in air which would still be below the Mine Safety and Health Administration (MSHA) level of one percent.

An estimated 383,250 tonnes of $CO_2$ equivalent methane (based on 2010 values submitted to BLM by MCC) would continue to be released to the atmosphere each year as the result of MDW venting and continued mining West Elk Mine (assuming no additional GHG mitigations are employed).  This also represents approximately a 66% decrease in methane emissions at the West Elk Mine over conditions 3 years ago which is triple Colorado Governor Ritter's interim goal of a 20% reduction in greenhouse gases from 2005 levels by 2025 (Colorado Executive Order D00408). This amount is the lower value of the No Action Alternative because if the lease modifications were to be mined it is assumed that all post-mining

MDWs on B Seam seals would be reclaimed prior to entering this area. It is assumed that mining activities would be extended for 1 year 7 months over current conditions based on the increase in coal quantity in the lease modifications. Typical air gas components have been determined for the fan system which is close in composition to typical air with oxygen at approximately 21% and nitrogen near 78%, the vertical degas system (MDWs) methane levels range from 35-94% with oxygen and nitrogen making up the remaining air and increasing as methane levels decrease in the mine (MCC values submitted to BLM).   Because these lease modifications are in the same coal seam as current operations, these numbers are consistent with current levels and would only impact the duration of emissions.

A comment was received asking for meaningful equivalents of the greenhouse gases released.  For comparison with this amount of coal mined, each person exhales about 0.36 tonnes of $CO_2$ per year and an average automobile releases about 5 to 8 tonnes of $CO_2$ equivalent per year. The amount of $CO_2$ emissions from sending 32,002 email form letters on this project based on average energy (generated by coal) used by computers (and assuming their owners only had their computer on for 1 hour) and the agencies having to access, file and make them part of the project record is anywhere from 9-66 tonnes of $CO_2$ released.  However we know this is unrealistic, most of us have the computer on for 8 hours per day, up to 365 days per year.  This would result in $CO_2$ emissions from these 32,002 individuals of 26,280-192,720 tonnes per year.  We'll also assume that these people drive to work or have at least one vehicle per household for another 160,000-256,016 tonnes per year and that they are in fact breathing for another 11,521 tonnes per year.   These individuals have released 171,521-460,257 tonnes of $CO_2$ emissions in a year which is more than the methane equivalent of mining coal in the E Seam for the same period of time.

*Carbon Dioxide*

Coal fired power plants and coal transportation systems (trains, trucks, etc.) will continue to release $CO_2$ which contributes to global climate change at the current rates. This will not change whether this project is approved or not, but may change the source of the coal that power plants use. It is impossible to quantify exact GHG emissions related to coal that is burned at coal fired power plants with regard to the coal in the lease modification as it will be mixed with other less compliant coals all over the United States. However, it is anticipated that 10.1 million tons of coal would be produced from the lease modifications which, when burned, would release approximately 2791-5685 lbs of $CO_2$ per ton of coal depending on mix with other coals (12.7 million to 25.8 million tonnes of $CO_2$ equivalent).  The emissions from this quantity of coal represent the equivalent of approximately 0.67% of annual $CO_2$ emissions from coal fired power plants in the US.  While the lease modifications add an additional 1.6 years to the life the mine, this coal would be mined interspersed with existing leased coal and would therefore spread emissions from coal mined and sold to power plants over multiple years further reducing the equivalent percentage of annual $CO_2$ emissions from coal fired power plants in the US to as low as 0.22% from this quantity of coal (or the annual $CO_2$ emissions of approximately 1 of the 495 EPA regulated coal fired power plants in the US).  This is a very small fraction of just one source of $CO_2$ in the US and would be exponentially reduced when compared to all anthropogenic sources (limited to 2 broad categories: fossil fuel combustion and industrial processes/product uses…ironically anthropogenic sources does not include humans) of $CO_2$ emissions (http://www.epa.gov/climatechange/emissions/co2_human.html).   According to EPA's 2006 data from anthropogenic sources just for the US this might look like:  (0.22% equivalent percentage of annual $CO_2$ emissions from coal fired power plants) X (47% $CO_2$ attributed to fossil fuel combustion) X (41% $CO_2$ attributed to fossil fuel combustion for electrical generation) X (27% fossil fuel combustion attributed to coal for electrical generation) X (84.8% $CO_2$ as the portion of emissions released) = 0.000097% of US anthropogenic emissions in these two categories.

# Cumulative Effects & Climate Change

Based upon the "Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2008" (EPA Publication 430-R-10-006, April 15, 2010) total U.S. coal mining related methane emissions in 2008 were 6.76 teragrams (tg) (1 tg = one million tonnes), and total GHG emissions were 6,956.8 tg $CO_2$ equivalent. Continuation of mining at West Elk Mine will release an average of 383,250-574,875 tonnes of CO2 equivalent/year depending upon the depth of coal mined or 0.008% of the total calculated $CO_2$ equivalent GHG coal mining related emissions for the U.S. in 2008. Based upon this analysis (limited to GHG

BLM_0049715

emissions), the calculated GHG emissions associated with continued mining in the North Fork are negligible relative to any potential impacts on the global scale. If the calculated GHG emissions were compared with the global figures (2005 CO2 equivalent emissions of 26,544tg, "World Development Report 2010: Development and Climate Change, World Bank, 2010), the relative significance of the impact to the global climate would further decrease. Regardless of the accuracy of emission estimates, predicting the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time. As such, the controversy is to what extent GHG emissions resulting from continued mining may contribute to global climate change, as well as the accompanying changes to natural systems cannot be specifically quantified or predicted. The degree to which any observable changes can, or would be, attributable to the lease modification and continued coal mining in the North Fork cannot be reasonably predicted at this time; however, generalized impacts are provided.

For all discussion related to climate change, most of the text was copied directly from government (EPA and State of Colorado) prepared documents that are available to the public. Effects from GHGs may not be measurable for decades or centuries and modeling is very expensive and relies on assumptions. The Forest Service and BLM are not experts in global or state-wide modeling interpretation. Effects are presented in a general manner which we believe consistent with EPA's April 22, 2010 direction to the Rio Grande Field Office of the BLM (Project file, Earth Justice Comments Exhibit). Local effects are from the Draft Watershed Vulnerability Assessment Pilot Project, Case Study: Grand Mesa, Uncompahgre and Gunnison National Forests (April 2011).

## Particulate and Gaseous Emissions

Short-term impacts from the proposed action would contribute cumulative effects in the form of short-term particulate and gaseous emissions resulting from construction activities. Ongoing, existing activities discussed in the Affected Environment will continue to affect air quality, and emissions and particulate contributed by the Lease Modifications would likely not be noticeable or measurable within the study area and would not exceed any established air quality standards. All alternatives would contribute additional greenhouse gases, along with those produced from the other North Fork coal mines, and emissions from other man-made and natural source of greenhouse gas. See Greenhouse Gases & climate change sections for more discussion.

## GHG Emissions

An average of 15 million cubic meters per year (5.5 billion cubic feet per year) or 2,215,749 tonnes $CO_2$ equivalent/year has been released from previous coal mining activities in the North Fork Valley in the last 5-7 years. Methane data from the past year indicates a reduction to 2,041,484 tonnes $CO_2$ equivalent/year. When the previously mined B Seam MDWs which vent mine seals are all reclaimed at the West Elk Mine, methane release is estimated to drop down to approximately 1,849,859 tonnes $CO_2$ equivalent/year. These steady decreases in methane released will reduce global warming potential in the long run compared to previous and existing conditions. Therefore, when the national and local trend is a decrease in GHG emissions, it would be presumptive of US coal opponents to call continuing an existing condition a significant impact when the trend is more beneficial than the existing condition. However, worldwide coal consumption is projected to increase 48% by 2030 (http://en.wikipedia.org/wiki/Coal); this will continue to impact global GHG emissions.

## Average Temperatures

Accumulation of greenhouse gases (including carbon dioxide) in the atmosphere is *very likely* the cause of most of the increase in global average temperatures (IPCC AR4 WGI 2007). In North America, temperatures have increased by 2°F in the last 30 years, and "human-induced warming has *likely* caused much of the average temperature increase over the past fifty years" (CCSP SAP 3.3 2008, p. 3). Climate models show a 1°F warming in the Western US over the last 30 years in response to greenhouse gas emissions from human activities (anthropogenic). However, no studies have specifically investigated whether the detected trends in Colorado can be attributed to anthropogenic greenhouse gases (http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/).

BLM_0049716

The Intergovernmental Panel on Climate Change (IPCC) estimates it has warmed 1.2 to 1.4°F (0.7 to 0.8ºC) over the past century and projects a further 3 to 7°F (2 to 4ºC) over the 21st century. The increases may appear minor compared to short-term weather changes from night to day and winter to summer. In global climate terms, however, warming at this rate would be much larger and faster than any of the climate changes over at least the past 10,000 years (IPCC Climate Change 2007: The Physical Science Basis).  Multiple independent measurements confirm widespread warming in the western United States. In Colorado, temperatures have increased about 2°F in the past 30 years (1977-2006). All regions examined within the state warmed during the last 30 years, except the far southeast corner, in which there was a slight cooling trend.  Climate models project that Colorado will warm 2.5°F (+1.5 to +3.5°F) by 2025 relative to the 1950-1999 baseline and 4°F (+2.5 to +5.5°F) by 2050 with summers showing the larger                              temperature                              increase (http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/).            Locally,      the temperature is expected to increase by approximately 2-3 °C (3.6-5.4 °F) by 2050 (Table 3.3b).

**Table 3.3b. Temperature and Precipitation Climate Change Scenarios for 2050 developed by Barsugli and Mearns for the Gunnison Basin.**

|  | Precipitation (%) | | Temperature (°C) | |
| --- | --- | --- | --- | --- |
|  | Moderate Scenario | More Extreme Scenario | Moderate Scenario | More Extreme Scenario |
| Annual | ~0.0 | -10.0 | +2.0 to +3.0 | +3.0 |
| Winter | +15.0 | ~0.0 | +2.0 | +3.0 |
| Spring | -12.0 | -15.0 | +2.5 | +3.0 |
| Summer | -15.0 | -20.0 | +3.0 | +4.0 |
| Fall | +4.0 | -10.0 | +2.5 | +3.0 |

## Extreme Temperature

Most scientists think that a warming climate will alter the frequency and severity of extreme temperature events. In general, they expect increases in heat waves and decreases in cold spells. These effects will vary from place to place (IPCC Climate Change and EPA Climate Change Effects, Extreme Events). In Colorado, winter projections show fewer extreme cold months, more extreme warm months, and more strings of consecutive warm winters. Typical projected winter monthly temperatures are between the 10th and 90th percentiles of the historical record. Between today and 2050, typical January temperatures of the Eastern Plains of Colorado are expected to shift northward by approximately 150 miles. In all seasons, the climate of the mountains is projected to migrate upward in elevation, and the climate of the Desert    Southwest    to    progress    up    into    the    valleys    of    the    Western    Slope (http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/).    Locally,   there  are expected to be fewer extreme cold months, more frequent extreme warm months, and more consecutive warm winters (Table 3.3c).

## Extreme Weather Events

Because warm sea surface temperatures energize hurricanes, a warming climate is likely to make hurricanes more intense. Hurricanes in the future will probably have stronger peak winds and increased rainfall. The relationship between sea surface temperatures and the frequency of hurricanes is less clear. There is currently no scientific consensus on how a warming climate is likely to affect the frequency of hurricanes, but research continues (IPCC Climate Change and EPA Climate Change Effects, Extreme Events).

In a warming climate, extreme events like floods and droughts are likely to become more frequent. More frequent floods and droughts will affect water quality and availability. For example, increases in drought in some areas may increase the frequency of water shortages and lead to more restrictions on water usage. An overall increase in precipitation may increase water availability in some regions, but also create greater flood potential (IPCC Climate Change and EPA Climate Change Effects, Water).

BLM_0049717

### Hydrology & Precipitation

Rising temperatures will intensify the Earth's water cycle. Increased evaporation will make more water available in the air for storms, but contribute to drying over some land areas. As a result, storm-affected areas are likely to experience increases in precipitation and increased risk of flooding. But areas located far away from storm tracks are likely to experience less precipitation and increased risk of drought. In the U.S., warming is expected to cause a northward shift in storm tracks, resulting in decreases in precipitation in areas such as the Southwest U.S. but increases in many areas to the north and east. However, these changes will vary by season and depend on weather fluctuations (IPCC Climate Change and EPA Climate Change Science, Future Precipitation ).

Sea levels are rising worldwide and along much of the U.S. coast. Tide gauge measurements and satellite altimetry suggest that sea level has risen worldwide approximately 4.8-8.8 inches (0.12-0.22 m) during the last century. A significant amount of sea level rise has likely resulted from the observed warming of the atmosphere and the oceans. The primary factors driving current sea level rise include the expansion of ocean water caused by warmer ocean temperatures (warmer water is less dense), melting of mountain glaciers and small ice caps (resulting in more water in the oceans and less on land), and - to a lesser extent - the melting of the Greenland Ice Sheet and the Antarctic Ice Sheet. The Intergovernmental Panel on Climate Change (IPCC) projects a six-inch to two-foot (0.18-0.59 m) rise in sea level during the 21st century. Sea level rise may be greater if there are sudden increases in ice sheet melt. Such increases have already been observed but their effects have not yet been incorporated into current projections of sea level rise. The stability of the West Antarctic Ice Sheet is of particular concern. A sudden collapse of the ice sheet could raise sea levels 16 to 20 feet (5-6 m). The IPCC is unable to estimate the likelihood or timing of such a collapse, however, due to incomplete understanding of all the processes affecting this ice sheet (IPCC Climate Change 2007: Impacts, Adaptation and Vulnerability and EPA Climate Change Effects, Coastal Zones and Sea Level Rise).

Polar regions are expected to warm more than any other parts of the world. In part, this is because ice has greater reflectivity (also known as albedo) than ocean or land. Melting of highly reflective snow and ice reveals darker land and ocean surfaces, which increases absorption of the sun's heat and further warms the planet, especially in those regions. Polar ice sheets (such as those on Greenland and Antarctica) are some of the largest surface features on our planet. Any changes to them, however small, could have far-reaching effects. Polar ice sheets potentially will accumulate more snow and ice because of an increase in precipitation. However, overall melting due to global warming is expected to reduce the size and extent of the polar ice sheets. Melting of polar ice and land-based glaciers is expected to contribute to sea level rise. In addition to the ice sheets, sea ice is also melting. Though the melting of floating sea ice that covers part of the Arctic Ocean does not affect sea level, sea ice is important for wildlife and for keeping the region cool by reflecting sunlight back to space. If the Arctic loses the reflective surface of ice and then the dark Arctic Ocean absorbs more heat, the northern regions may warm even more rapidly (IPCC Climate Change and EPA Climate Change Effects, Polar Regions).

Coastal areas may be impacted by sea level rise and an increase in storm intensity. Rising seas may contribute to enhanced coastal erosion, coastal flooding, loss of coastal wetlands, and increased risk of property loss from storm surges (IPCC Climate Change  and EPA Climate Change Effects, Coastal Zones and Sea Level Rise).

Increasing temperatures are projected to affect state water resources. In Colorado, no consistent long-term trends in annual precipitation have been detected. Variability is high, which makes detection of trends difficult. Climate model projections do not agree whether annual mean precipitation will increase or decrease by 2050. The multi-model average projection shows little change in annual mean precipitation, although a seasonal shift in precipitation does emerge.   Widespread and large increase in the proportion of precipitation falling as rain rather than snow, and reduction in snow water equivalent (SWE) have been observed elsewhere in the West. In Colorado, however, these changes are smaller and not as significant. Most of the reduction in snowpack in the Western US has occurred below about 8200 ft.  However, most of Colorado's snowpack is above this elevation, where winter temperatures remain well below freezing. Projections show a precipitous decline in lower-elevation (below 8200 ft) snowpack across the West by the mid-21[st] century. Modest declines are projected (10–20%) for Colorado's high-elevation snowpack (above 8200 ft) within the same timeframe. Between 1978 and 2004, the spring pulse (the onset of

BLM_0049718

streamflows from melting snow) in Colorado has shifted earlier by two weeks. Several studies suggest that shifts in timing and intensity of streamflows are related to warming spring temperatures. The timing of runoff is projected to shift earlier in the spring, and late-summer flows may be reduced. These changes are projected to occur regardless of changes in precipitation. Recent hydrology projections suggest declining runoff for most of Colorado's river basins in the 21st century. However, the impact of climate change on runoff in the Rio Grande, Platte, and Arkansas Basins has not been studied as extensively as the Colorado River Basin. The lowest five-year period of Colorado River natural flow since records began in the late 1800s occurred in 2000 to 2004 (9.9 million acre feet per year). Recent hydrologic studies of the Upper Colorado River Basin project multi-model average decreases in runoff ranging from 6% to 20% by 2050 compared to the 20th century average, although one statistical streamflow model projects a 45% decline by 2050. The range of individual model projections within a single study can include both increasing and decreasing runoff due to the range of climate model output used to drive the hydrology models. Ongoing studies are attempting to resolve methodological differences in order to reduce the range of uncertainty in runoff projections. Throughout the West, less frequent and less severe drought conditions have occurred during the 20th century than revealed in the paleoclimate records over the last 1000 years. Precipitation variations are the main driver of drought in Colorado and low Lake Powell inflows, including the recent drought of 2000–07, and these variations are consistent with the natural variability observed in long-term and paleoclimate records However, warming temperatures may have increased the severity of droughts and exacerbated drought impacts (http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/). Locally, under a moderate scenario, no substantial change in annual precipitation, but an increase in cool season precipitation and a decrease in warm season precipitation is expected. And under a more extreme scenario, a 10% decrease in annual precipitation, with greater decreases in warm season precipitation. Under a moderate scenario, a decrease in annual natural stream flows of 5 to 10% is expected due to increased temperature, even if annual precipitation remains the same. And under a more extreme scenario, a decrease in precipitation and increase in temperature both act to reduce annual stream flow totals in the range of 20 to 25%. Warming temperatures lead to a later accumulation of snow in the fall, and earlier snowmelt in the spring. However, because of the increased precipitation in winter, and the generally cold, high-elevation nature of the upper Gunnison basin, the mid-winter snowpack may be similar to the present under a moderate scenario. And under a more extreme scenario, this likely represents a hot/dry scenario for much of the west, the potential exists for more frequent dust deposition events, which also may lead to an earlier melt and to reduced water yield from the snowpack. Under a moderate scenario, snowmelt-driven stream flow will occur earlier in the spring by about a week on average. (Note: this shift is due to warming and does not include the effects of dust-on snow, which can result in an even earlier shift in snowmelt. And under a more extreme scenario, snowmelt-driven stream flow will peak about two or more weeks earlier in the spring, though this effect may be less if dust effects on snowmelt are strong. The combined effects of dust and temperature on snowmelt timing tend to be dominated by the dust effects. For more local effects see Table 3.3c.

**Table 3.3c.  Projected Climate Changes to the GMUG.**

| Projected Climate Change | Anticipated Hydrologic Response | Potential Consequences to Resource Values |
|---|---|---|
| Warmer Winter/Spring Temperatures Average daily winter/spring temperature expected to increase > 3°C by 2050. | • Fewer extreme cold months, more frequent extreme warm months, more consecutive warm winters<br>• Later accumulation of snowpack.<br>• Earlier onset of snowpack runoff (1-3 weeks)<br>• Higher winter stream flows<br>• Increased water temperature<br>• Winter precipitation more often rain than snow below 8200 feet<br>• Snowline to move up in elevation. | • Reduced duration of winter snow cover.<br>• Longer period of saturated roadbeds vs frozen roadbeds.<br>• Increased demand for water storage.<br>• Earlier demand for irrigation water.<br>• Decreased summer stream flows.<br>• Potential change to aquatic species reproductive triggers or success.<br>• Increased risk to channel |

BLM_0049719

| Projected Climate Change | Anticipated Hydrologic Response | Potential Consequences to Resource Values |
|---|---|---|
| | | • and floodplain infrastructure from higher runoff.<br>• Increased risk to riparian habitat/floodplains from higher flows.<br>• Changes to winter habitat, winter recreation and plant communities. |
| Warmer Summer Temperatures<br>Average daily summer temperature expected to increase > 3°C by 2050. | • Increased evapotranspiration<br>• Decreased soil moisture<br>• Reduced summer stream flows<br>• Increased water temperature | • Increased demand for irrigation water.<br>• Shifts in cold water habitat to higher elevations.<br>• Increases in warm water habitat.<br>• Decreased dissolved oxygen in lower elevation streams during the summer.<br>• Aquatic biota mortality and even loss of populations.<br>• Loss of summer stream flow. |
| Changes in Precipitation<br>At higher elevations may be slightly greater precipitation during the winter, but likely less total precipitation, especially during warmer months. | • May see higher peak flows associated with snowmelt, earlier in the year.<br>• Lower summer and fall baseflows<br>• Increased soil moisture during spring at lower elevations | • Decreased water availability during irrigation season.<br>• Increased risk to channel and floodplain infrastructure.<br>• Reduced riparian vegetation health and vigor.<br>• Increased landslides and slumps on geologically unstable areas.<br>• Increased potential damage to saturated roadbeds.<br>• Reduced aquatic habitat in summer and fall. |
| More intense storms<br>Warmer atmosphere has potential for increase in frequency and magnitude of big storms | • Localized flooding<br>• Increased debris flows<br>• Increased hillslope and channel erosion | • Increased risk to channel and floodplain infrastructure from sediment and high flows.<br>• Increased concern for public safety.<br>• Increased selenium load in streams where Mancos Shale exposure is significant. |
| More frequent and longer periods of drought | • Less soil moisture<br>• Reduced groundwater recharge<br>• Lower summer and fall baseflow | • Increased erosion associated with natural disturbances associated with drought (e.g. fire).<br>• Increased plant stress and susceptibility to insect and disease mortality.<br>• Reduced groundwater contribution to baseflows<br>• Reduced discharge from springs<br>• Reduced wetland/riparian function. |

BLM_0049720

| Projected Climate Change | Anticipated Hydrologic Response | Potential Consequences to Resource Values |
|---|---|---|
| Increase winter dust deposition on snowpack | • Accentuate changes to snowpack melt | • Similar to warmer winter consequences. |

### Habitats & Species

Some ecosystems have already been affected by changes in climate. As the climate continues to warm, major changes may occur in ecosystem structure and function, species' ecological interactions, and species' geographic ranges, with predominantly negative consequences for biodiversity. Warmer temperatures and precipitation changes will likely affect the habitats and migratory patterns of many types of wildlife. The range and distribution of many species will change, and some species that cannot move or adapt may face extinction. In addition, climate changes such as increased floods and droughts are predicted to increase the risk of extinction for some plant and animal species, many of which are already at-risk due to other non-climate related factors (IPCC Climate Change and EPA Climate Change Effects, Ecosystems and Biodiversity). For local effects see Table 3.3c.

### Health

A warming climate will have both positive and negative impacts. Local impacts are the most difficult to predict, making it a challenge to know exactly who or what will be harmed or benefit. Generally, the risk of negative impacts from climate change increases the faster it warms. More rapid climate change makes adapting to change more difficult and costly. This is especially true for vulnerable groups (such as the poor, the very young and older adults) and fragile ecosystems which may struggle to adapt to even small changes. The Intergovernmental Panel on Climate Change (IPCC) suggests that temperature increases above the range of 3.5 to 5.5°F (2 to 3ºC) over the next 100 years would dramatically increase the negative impacts of climate change. So a major aim of climate action is to reduce the risk and likelihood of large, rapid warming (IPCC Climate Change 2007: Impacts, Adaptation and Vulnerability). Longer, more intense and frequent heat waves may cause more heat-related death and illness. There is virtual certainty of declining air quality in cities since greater heat can also worsen air pollution such as ozone or smog. Insect-borne illnesses are also likely to increase as insect ranges expand. Climate change health effects are especially serious for the very young, very old, or for those with heart and respiratory problems. Conversely, warmer winter temperatures may reduce the negative health impacts from cold weather (IPCC Climate Change 2007: Impacts, Adaptation and Vulnerability and EPA Climate Change Effects, Health). For local effects see Table 3.3c.

### Food Availability

The supply and cost of food may change as farmers and the food industry adapt to new climate patterns. A small amount of warming coupled with increasing $CO_2$ may benefit certain crops, plants, and forests, although the impacts of vegetation depend also on the availability of water and nutrients. For warming of more than a few degrees, the effects are expected to become increasingly negative, especially for vegetation near the warm end of its suitable range (IPCC Climate Change and EPA Climate Change Effects, Agriculture and Food Supply). For local effects see Table 3.3c.

### Costs

Warmer temperatures may result in higher energy bills for air conditioning in summer, and lower bills for heating in winter. Energy usage is also connected to water needs. Energy is needed for irrigation, which will most likely increase due to climate change. Also, energy is generated by hydropower in some regions, which will also be impacted by changing precipitation patterns (IPCC Climate Change and EPA Climate Change Effects, Energy Production and Use). For local effects see Table 3.3c.

### Recreation

Outdoor recreation activities may benefit from longer periods of warm weather. However, many other outdoor activities could be compromised by increased beach erosion, increased heat waves, decreased snowfall, retreating glaciers, reduced biodiversity, and changing wildlife habitats (IPCC Climate Change and EPA Climate Change Effects, Public Lands, Recreational Opportunities, and Natural Resources ). For local effects see Table 3.3c.

BLM_0049721

## Consistency with Forest Plan and Other Laws

Proposed Action would be consistent with air quality and fugitive dust provisions required by the CAAQS and NAAQS and PSD increments as well as alternative gaseous emissions regulated by MSHA and EPA. The proposed action is also consistent with Forest Service Manual 2580-Air Resource Management and the 1991 GMUG Forest Plan.

## 3.4 Topographic & Physiographic Environment _____

### Affected Environment

The analysis area encompasses the lands within and immediately surrounding the lease modification area. Topography of the general area ranges greatly from steep to relatively flat (Figure. 3.4).

The elevations in the lease modification area range from about 8,200 feet to around 9,800 feet. The Proposed lease modifications are drained by Lick Creek, South Prong Creek, and Horse Creek, all which drains into the East Fork of Minnesota Creek. These drainages eventually empty into the North Fork of the Gunnison River. The topography of the area has been greatly influenced by a wide range of mass movement landforms and historic geologic processes (e.g., erosion, faulting, and the intrusion of the West Elk Mountains).

The area in and around the lease modifications contain localized landslides and rock falls (both natural and mining induced). Landslides/earth movements in this region are usually preceded, accompanied, and followed by perceptible creep along the surface of the slide or within the slide mass.

BLM_0049722

**Figure 3.4. Lease Modification Topography.**



BLM_0049723

## No Action Alternative Environmental Effects

If the No-Action Alternative is selected, coal would not be mined in the lease tracts. The coal resource and the topography of the proposed lease modifications would remain unchanged except for natural processes. Natural processes would continue shape the landscape.

## Proposed Action Alternative Environmental Effects

The actual leasing of the proposed lease modifications would impose no topographic change on the tracts. If the tracts are leased, subsequent underground longwall mining would cause subsidence.

Subsidence occurs in areas above and adjacent to longwall mining. The amount of mining-induced subsidence, physical lowering of the land surface, triggered by longwall mining depends on the thickness of coal extracted. Other surface expressions of subsidence such as cracks, slope failure, etc., depend on many factors including mine plans, geologic strata, and overburden depth. As a general rule, the greater the overburden thickness, the less the surface expressions other than ground lowering there will be. Surface expression (other than physical lowering of the land surface) is most noticeable on ridges and steeper slopes, particularly cliffs, where cracks might appear. Based on annual field subsidence observations conducted by MCC, maximum crack depth in areas with slope <30% is 5-15 feet; in areas with slopes >30% cracks are 10-35 feet deep (WWE, 2010). Fewer cracks appear in the valleys than on ridges because the alluvial material is fine-grained sand and clay material that can yield without cracking or bulging as it deformed by the subsidence process (WWE, 2010).

Previous mining (subsidence) in the general vicinity has created landslides and rockfalls on the edges of ridges and cliffs. Some of these geologic instabilities are small scale features, affecting less than 100 cubic yards, but others can be large scale, affecting thousands of cubic yards of material. Because of the more subtle topography in the proposed modifications, large scale rock fall events are not anticipated.

Other natural factors may cause an acceleration of earth movement, which may mimic mine-induced instability. For example, during an extremely wet spring, the moisture from snowmelt and spring rains could cause natural landslides and rock falls to move and shift. Therefore, to an outside observer it is sometimes difficult to assess whether a mass movement is occurring due to subsidence or other naturally occurring processes.

As mentioned previously, the thickness of coal mined and overburden thickness influences the total amount of subsidence. For example, assuming a coal extraction thickness of 11 feet for the E-seam in the adjoining leases, and a overburden for the E-seam ranging from 400-1,425 ft, surface subsidence would be expected to be anywhere from 4 ft to 8ft.

Topographic changes caused by subsidence with longwall mining are often unnoticeable to the untrained eye. Subsidence at any given point on the surface begins when the longwall face is beneath that point and is generally 90 % complete when the longwall face has passed at 1.2 to 1.4 times the overburden depth beyond the point of mining. For example for a an area where there is 500 feet of over-burden, subsidence from longwall mining would be 90% complete within about a month when the longwall face (active mining area) is 600 to 700 feet beyond that point on the surface.

Other than lowering the land surface, the long-term effects of subsidence on surface topography would be minimal, and even unnoticeable to most casual observers. Some residual cracks may remain in the more brittle bedrock material on ridges or cliffs. Overall, the topography above subsided longwall mining workings would be similar to the pre-mining topography, albeit lower in elevation. Subsidence from underground mining could initiate, aggravate, and perhaps even accelerate, the existing landslides and rock falls in the area.

There are no anticipated indirect long-term topographic impacts expected for surface facility disturbances supporting underground mining activities. These areas would be re-graded and re-contoured following mining closure and removal of structures in such a manner that the area would blend into the surrounding undisturbed terrain.

Currently, subsidence monitoring is a requirement of the mine permit issued by the Colorado DRMS. If surface cracks occur that affect other uses (roads, trails, etc.), the surface management agencies have

BLM_0049724

authority to require timely on-site mitigation per the two subsidence stipulations identified in Chapter 2. Therefore, no additional stipulations are recommended beyond those in the parent lease.

## Cumulative Impacts

The North Fork Valley region east of the town of Paonia has numerous existing natural landslide and other unstable areas. These natural features when combined with subsidence from existing and future coal mining would continue to contribute to future changes in the topography of the area. Disturbances associated with future foreseeable (roads, drill pads) also will create areas free of vegetation and increase soil erosion capability. In addition, if landslides and rockfalls are initiated or accelerated due to subsidence, increased sedimentation and erosion is likely to occur in those areas.

## Consistency with Forest Plan and Other Laws

The Proposed Action is consistent with Forest Plan standards for geology which establishes limits on ground-disturbing activity on unstable slopes and highly erodible sites. Other impacts to the geologic resource that may occur as a result of mining, including landslides and erosion, must be mitigated to stabilize the surface and return the land to an approved post-mining land use.

## 3.5 Geology

## Affected Environment

### General Geology

The Proposed lease modifications lie in the Paonia-Somerset coal field. The main coal beds within this area are found in the Upper Cretaceous Mesa Verde Formation. The coal bearing sedimentary strata of the Mesa Verde Formation are relatively flat lying with a regional dip of approximately five degrees to the north/northeast. Local dips can vary. The principal mineable coal seam in the proposed lease modifications is the "E" seam. Other seams within the tract (A, B, C, and D), are either considered too thin (less than 6 feet) or are too discontinuous to mine.

The Tertiary Wasatch Formation, Upper Cretaceous Mesa Verde Formation, and Quaternary deposits outcrop within the area. The Cretaceous Mancos Shale does not outcrop on the lease tracts but lies below the Mesa Verde Formation. The following is a brief overview of the geologic units in the area:

- *Quaternary Deposits:* The Quaternary deposits are an unsorted mixture of soil and rock formed by various mass-wasting processes such as landslides, earth flows, soil creep, and debris avalanches. These deposits also include slope colluvium and Quaternary unconsolidated deposits derived from the Wasatch Formation.

- *Wasatch Formation (Tertiary):* The Wasatch formation overlies the Mesa Verde Formation. It consists of red and buff shales and red sandstones in the upper part of the formation, and red to gray conglomerates in the lower portion. The Ohio Creek conglomerate, which is the basal conglomerate unit, is a regional marker and commonly referenced geologic mapping datum.

- *Mesa Verde Formation* (Cretaceous): The Mesa Verde Formation is the primary coal bearing formation in this region and conformably overlies the Mancos Shale Formation. It consists of approximately 2,300 feet of interbedded coal seams, sandstones, shales, and siltstones. The Mesa Verde Formation consists of the Barren Member, Paonia Member, Bowie Member, and Rollins Sandstone Member. The Barren Member is approximately 1,600 feet in thickness and contains no coal seams. The Paonia Member ranges from approximately 300 to 500 feet and is composed of shales and interbedded sandstone. The Paonia Member contains the D and E coal seams. The Bowie Member ranges from 270 to 350 feet thick and consists primarily of grey shales, interbedded lenticular sandstones, and coal seams. The Bowie Member contains the A, B, and C coal seams. The Rollins Sandstone ranges from 120 to 200 feet in thickness. It is a massive, cross-bedded medium to coarse grained, buff to white sandstone unit. The Rollins

Sandstone lies conformably on the underlying Mancos Shale and is relatively continuous throughout the area, thus serving as a common marker bed.

- *Mancos Shale (Cretaceous):* The Mancos Shale is a regionally extensive bed of marine shales ranging up to 4,000 feet in thickness. In the lease tracts, it underlies the exposed geologic sequence. West of the town of Somerset, the North Fork of the Gunnison River has cut through the upper portion of the Mancos Shale, exposing the grey marine shales which are prominent with this formation.

Geologic faults in the area have been observed to have steep dips (ranging from about 75 degrees to vertical) and throws varying from 0-10 feet.

### Geologic Hazards

Land within and surrounding the modification area has numerous existing natural landslide areas and other unstable slopes.

Geologic hazards have been mapped in accordance C.R.S. 1973, 24-65.1-101, et. seq. Geologic hazards, which are a normal dynamic process, can be intensified or lessened by human activity. Most of the geologic hazards observed in area are historic in nature. However, during periods of high precipitation there is increased movement of existing landslides and development of new landslides on unstable slopes.

Previous mining in the general vicinity has initiated landslides and rockfalls on steep terrain, and on edges of ridges and cliffs. Some of these geologic instabilities are small scale features, affecting less than 100 cubic yards, but others can be large scale, affecting 1000s of cubic yards of material.

### Other Geologic Resources

The lands in the area have been rated as having high potential for oil and gas (GMUG Final Oil and Gas Leasing EIS). The project area is near the edge of the productive natural gas basin The Oil and gas resources under the modification area have not been leased.

Methane found in the coal seams and surrounding sandstones is released through the mining process ("coal mine methane") as a by-product of the coal. See Air Quality Section for further discussion on methane released from mining activity.

Other than the E-seam, other coal seams in the project area are not considered economically recoverable.

## No Action Alternative Environmental Effects

If the No Action Alternative is selected, coal would not be mined in the lease tracts. The coal resource and the structural and lithologic integrity of the Proposed Lease modification area would remain in-place. The potential to recover the coal resource at some time in the future would remain. Geologic instabilities, such as landslides and rockfalls would continue at historic natural magnitudes.

## Proposed Action Alternative Environmental Effects

### General Geology & Geologic Hazards

If leasing and subsequent mining proceeds on the proposed lease modifications, coal would be removed and the overlying overburden material would be altered through subsidence. The coal would be extracted via longwall methods as under the proposed action.

The overburden (including existing geologic structure and lithologic continuity) would be altered by subsidence due to the collapse of material into the void caused by extraction of coal. However, due to the thickness of the overburden in the lease tract, and the absence of bedrock cliffs, it is anticipated that evidence of subsidence would not be easily seen by casual observers.

Previous mining has demonstrated the potential for mining subsidence to aggravate existing landslides and other geologic hazards. As subsidence causes tension zones near the edges of steep ridges and/or

BLM_0049726

existing unstable features, this force can induce shearing and movement within the rock formations, thereby initiating mass movement.  There are a number of landslides and other unstable slopes in the region. Subsidence beneath such steep slopes could contribute or aggravate landslide movements, but this determination is difficult to quantify given the natural (pre-mining) geologic instability of the local area.

Other natural factors may cause an acceleration of impacts, which may mimic mine-induced instability. For example, in an extremely wet spring, moisture from snowmelt and spring rains could cause an increase in natural landslides and rock falls.  That said, it is sometimes difficult to assess whether a mass movement is occurring due to mine operations or naturally occurring processes.

Mining induced seismic events as a result of longwall mining may occur. Based on existing information, these events are not expected to cause damage to surface resources or overlying structures. MCC is currently participating with the National Institute of Occupational Safety and Health (NIOSH), and is part of the North Fork Valley Seismic Network.  MCC manages 6 seismic stations as part of this network, and seismicity reports are generated quarterly (see project file for further information).

### Other Geologic Resources

Mining of the coal seam(s) could result in methane loss within the coal bed. Recoverability of any oil and gas resource present in geologic formations above and/or below the coal seams could be reduced due to the evacuation of gas through mine ventilation, see the Air Quality section for details.

Any oil and gas resources in the extracted coal seam would be lost. Recoverability of any oil and gas resources present in geologic formations above and below the coal seams could be reduced.  However, due to the fracturing of the rock from mining, the potential also exists for future recoverable gas resources to be enhanced due to increased porosity and permeability.

Currently, subsidence monitoring is a requirement of the mine permit issued by the Colorado DRMS. If surface cracks or mass movements occur that affect other uses (roads, trails, etc.), the surface management agencies have authority to require timely on-site mitigation.  The Colorado DRMS requires detailed information, monitoring, and repair of subsidence impacts as set forth in Section 2.05.6(6), Subsidence Survey, Subsidence Monitoring, and Subsidence Control Plan, of the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining. These regulations have been in force for Colorado since 1980.

In addition, with respect to steep slopes and geologically unstable areas, the parent lease contains stipulations that preclude surface occupancy within these areas.  These stipulations will be carried forward to the modifications.

Therefore, no additional stipulations are recommended beyond those in the parent lease for this resource area.

## Cumulative Impacts

Historically, a considerable amount of the area north of the lease modifications has been, or will be mined.  Both natural and mine induced mass movements are likely to continue in the vicinity of the lease modification area.  In addition, if landslides and rockfalls are initiated or accelerated due to mine operations, increased sedimentation and erosion is likely to occur in those areas.  Due to the naturally occurring mass movements, and natural sedimentation loads and erosion rates, it would be difficult to quantify natural vs. mine induced changes.

With respect to future surface operations within the lease modifications (e.g. methane drainage), construction and use of access roads and drill pads in steep slopes or areas of geologic instability could increase the impacts associated with these features.  Historically areas of geologic instability have been avoided, and methane drainage has been accommodated in this type of terrain using directional drilling techniques on a limited basis.

Gas production, in a conventional sense, would likely not occur until coal mining ceases in this area.

BLM_0049727

## Consistency with Forest Plan and Other Laws

The Proposed Action is consistent with Forest Plan standards for geology which establishes limits on ground-disturbing activity on unstable slopes and highly erodible sites, Other impacts to the geologic resource that may occur as a result of mining, including landslides and erosion, must be mitigated to stabilize the surface and return the land to an approved post-mining land use.

## 3.6 Soils

## Affected Environment

Authorities specifically governing Forest Service soil management include the Multiple-Use Sustained Yield Act of 1960 and the Forest and Rangelands Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 (NFMA). The GMUG Forest Plan authorizes and governs management of mineral resources and surface uses over them. With respect to soils management, the GMUG Forest Plan establishes limits on ground-disturbing activity on unstable slopes and highly erodible sites. The Forest Plan further directs using site preparation methods to keep fertile topsoil intact, revegetating areas disturbed during road construction, and design mitigations and restoration to ensure that 80 % original ground cover occurs within 5 years after disturbance.

Regulations adopted pursuant to the Surface Mining Control and Reclamation Act of 1977 and the State of Colorado's OSM-approved permanent program for coal mining per the Colorado Surface Coal Mining Reclamation Act as administered by the CDMG with oversight from the OSM, govern all direct effects of coal mining, including those that may impact soils. These acts and attendant regulations require that topsoil be removed, stockpiled, and replaced on reclaimed surfaces associated with construction or mining disturbance. Other impacts to the soil resource that may occur as a result of mining, including landslides and erosion, must be mitigated to stabilize the surface and return the land to an approved post-mining land use.

Soils information and technical data were taken from the following soil survey completed for the project area:  An Order III soil survey, entitled Soil Survey of Grand Mesa-West Elk Area (Cryer and Hughes, 1997) was used to characterize and describe the soils overlying that portion of the project area administered by the Forest Service.  This survey each contains soil maps depicting the aerial extent of the soils delineated as well as map unit descriptions, typical pedon descriptions, and interpretation tables which were used to develop the text below.   No site-specific soil baseline studies were conducted for the modification area as a part of this project.

Soils in the project area have developed from a combination of residual, colluvial, and alluvial materials derived from local bedrock. The soil survey identified and described six map units within the tract. The map unit name, percentage coverage within the modification area, dominant soil series and attendant percent map unit composition, relative depth, hazard classifications (water erosion, shrink swell, and mass movement), and considerations as described in the soil survey are shown in Table 3.6.

Project area soils are generally deep, fine textured and well suited for vegetative production with steep slopes being the primary limitation on use. Erosion and mass movement are potential hazards associated with most soils in the area, due to fine textures. Soils on steeper slopes have slower infiltration rates, resulting in more surface flow and erosion. Mass movement on steep slopes is also a potential hazard, with Wetopa and Wesdy soil types having the highest potential hazard rating within the tract (Table 3.6). Fine textures and high activity clays result in a moderate to high shrink swell hazard ratings for most soil types. At the leasing stage, the locations of surface uses are not known; therefore more detailed soil information at the sites proposed for disturbance, potential salvage depths, and volumes cannot be estimated. Location-specific soil resource data will be reviewed in more detail following if and when post-leasing surface use is proposed.

BLM_0049728

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

**Table 3.6. Summary of Soil Resources in the Proposed Lease Modifications Area.**

| Map Unit Name | Percent of Area | Dominant Soil Series | Depth | Hazard | | | Considerations For Use |
|---|---|---|---|---|---|---|---|
| | | | | Water Erosion | Shrink Swell | Mass-Movement | |
| Cryoboralfs, Cryochrepts, and Rubble land, 5 to 65 percent slopes | 4 | Cryoboralfs soil and similar soils | S - VD | L - H | L | L - M | None noted. |
| | | Cryochrepts soil and similar soils | S - D | L - H | L | M | None noted. |
| | | rubble land | | | | | Large exposures of loose rock. |
| Herm - Fughes - Kolob Family Complex; 25-40% slopes | 3 | Herm soil and similar soils | VD | L - H | H | L - M | Steep slopes in some areas; high shrink-swell potential; slow permeability; high soil erosion hazard in steeper areas; moderate mass movement potential in steeper areas; clayey subsurface soil textures. |
| | | Fughes soil and similar soils | D | M - H | H | L - M | |
| | | Kolob Family and similar soils | VD | L - H | M | L - M | Steep slopes in some areas; moderate shrink swell potential; slow permeability; high soil erosion hazard in the steeper areas; subsurface rock fragments; clayey surface soil textures; clayey subsurface soil textures; moderate mass movement potential in the steeper areas. |
| Needleton - Scout families complex, 5 to 40 percent slopes | 5 | Needleton soil | VD | L – M | L | L | Steep slopes in some areas, moderate soil erosion hazard in the steeper areas, subsurface rock fragments, (Needleton family - moderate mass movement potential on slump block benches) |
| | | Scout Family soils | VD | L – M | L | L | |
| Scout - Needleton families complex, 40 to 65 percent slopes | 15 | Scout Family soils | VD | M – H | L | L | Subsurface rock fragments, steep slopes in some areas, high soil erosion hazard in the steeper areas, (Scout family – limited available water capacity) |
| | | Needleton soil | VD | H | L | L | |
| Shawa - Sandia family - Kolob family complex, 5 to 40 percent | 1 | Shawa soil | VD | L - H | L | L | Steep slopes in some areas, high soil erosion hazard in the steeper areas (Sandia family - subsurface rock fragments and slow permeability) |
| | | Sandia family soil | D | H | L | L-M | |

BLM_0049729

| Map Unit Name | Percent of Area | Dominant Soil Series | Depth | Hazard | | | Considerations For Use |
| | | | | Water Erosion | Shrink Swell | Mass-Movement | |
|---|---|---|---|---|---|---|---|
| slopes | | Kolob family soil | VD | L -M | M | L - M | Steep slopes, high soil erosion hazard, clayey subsurface soil textures, subsurface rock fragments, moderate shrink-swell potential, high mass movement potential in the steeper areas |
| Taterheap-Papaspila Complex, 5-40 percent slopes | 13 | Taterheap and similar soils | VD | L - H | M | L | Elevated erosion hazard in steep slope areas. Moderately slow permeability. |
| | | Papaspila soil and similar soils | VD | L - H | L | L | Subsurface rock fragments in Papaspila soils. |
| Wetopa - Wesdy Complex, 5-65 percent slopes | 56 | Wetopa soil and similar soils | VD | L - H | H | L - H | Slow permeability; high erosion hazard and mass movement potential on steep slopes; shrink-swell potential. |
| | | Wesdy and similar soils | VD | L - H | M | L - H | Subsurface rock fragments in Wesdy soils. |
| Coberly – Falcon, dry complex, 0-15% slopes | 3 | Coberly and similar soils | MD | L | L | L | Shallow bedrock; low water-holding capacity. Root limiting layer in Falcon dry soils. |

Depth Classes:  S = Shallow; D = Deep; VD = Very Deep Hazard Ratings:  L = Low; M = Medium; H = High

Source: Cryer and Hughes 1997

# *Proposed Action Alternative Environmental Effects*

The Proposed modifications would not be leased and no mining would occur; therefore, soil conditions would exist in their current state without effects from mining and associated activities. Ongoing natural processes and other existing land uses would continue.

# *Proposed Action Alternative Environmental Effects*

Disturbances resulting from subsidence versus that from potential post-leasing surface use are expected to have notably different impacts. Assuming the RFMP (Section 3.2), impacts to the soil resource due to subsidence would include cracks and other surface manifestations in areas of shallow overburden, where surface rocks are brittle, or where soils are shallow over bedrock. Soil cracking is most likely to occur at the ends of individual longwall panels and over the gate roads where the land surface is left in a tensional state after mining. Subsidence cracks that might develop in soil or colluvium tend to self-heal due to sloughing and natural filling by soil material. This type of disturbance to soils at the surface are likely to heal a few years after mining is complete. Subsidence has potential to affect surface channels and basins and could result in increased rates of erosion. Soil erosion within drainage basins and resultant sediment loading may be increased until ground movements associated with subsidence stabilize relative to natural conditions.

Post-lease surface use of approximately 72 acres could occur over the life of the lease modifications as a result of access roads, methane drainage, and related activities and another acre of related surface disturbance of subsidence may be expected. Site specific locations of potential surface activities are

unknown, but are expected to be distributed throughout the lease modification area. Effects of post-leasing activities will be evaluated on their own merits if/when activities are specifically proposed.

Post-lease activities would be conducted in accordance with regulations administered by the CDMG. These regulations require detailed surface use plans that ensure the soil resource is salvaged prior to surface use and replaced as part of the reclamation processes. Measures would be developed and required as necessary to amend nutrient levels, control erosion, alleviate compaction, and mitigate other soil resource impacts, including those resulting from subsidence. However, even with implementation of these management practices, some soil loss may occur and disturbed soils may temporarily or permanently exhibit reduced productivity.

With respect to previous surface disturbances on nearby leases, revegetation has been observed to be generally successful between two and five years after reclamation work is completed. Activities resulting in disturbance on steep or unstable slopes of soil types with high erosion or mass movement hazard may result in increased erosion or trigger landslides. These hazards and related effects of disturbance are more likely to be present where existing geologic hazards and steep slopes are present. Disturbances on these slopes may also prove more difficult to revegetate and stabilize during reclamation. The GMUG Forest Plan calls for limiting ground-disturbing activities on unstable slopes and highly erosive areas. Further, the Forest Plan recognizes special leasing stipulations may be required to prohibit occupancy on steep or highly erosive slopes; these types of stipulations are proposed to be carried forward from the parent lease.

No additional stipulations are recommended for soils other than those addressed in the parent leases. Proper soil management and reclamation measures are required by the surface management agencies on disturbed sites. Colorado DRMS would also require proper soil management procedures as part of their mine permits.

## Cumulative Impacts

Soils in the modification area, adjacent federal leases, and private lands, could be affected by construction of exploration drill pads and temporary road construction from exploration activities (Sections 3.1 and 3.2). The areas would be reclaimed at the completion of use. Future methane drainage could also occur in these areas.

Mining and subsidence would occur within the modification area and adjacent federal leases and private lands, lowering the land surface. Surface-tension cracks may form at isolated locations within these areas. Additional surface facilities and temporary roads may be proposed and approved on lands in and surrounding the proposed lease tracts. These additional surface disturbing activities would affect the soil resource by displacing soils at specific locations. The topsoil and subsoil is stockpiled and reserved for reclamation. Contemporaneous reclamation techniques would be used, thus replacing the soils on the site as soon as the location is no longer needed.

Few adverse impacts to soils have been observed during subsidence monitoring at nearby mines. Reclamation of surface use sites, including methane drainage drill sites, exploration drill sites and associated temporary roads, has been generally successful in three to five years following reclamation. Reclamation typically includes regrading the surface to approximate original contour and revegetating with a specified seed mix. The area of surface disturbance in the region will temporarily increase during construction, returning to conditions similar to pre-disturbance following reclamation.

The area within and adjacent to the lease modification area contains numerous existing natural landslides and other unstable areas. These natural features when combined with surface disturbing activities and subsidence from existing and future coal mining would continue to contribute to localized increased sedimentation. In addition, if landslides and rockfalls are initiated or accelerated due to subsidence, increased sedimentation and erosion is likely to occur in those areas.

## Consistency with Forest Plan and Other Laws

The Proposed Action is consistent with Forest Plan and FSM 2880 standards for geology which establishes limits on ground-disturbing activity on unstable slopes and highly erodible sites. Other impacts

BLM_0049731

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

to the geologic resource that may occur as a result of mining, including landslides and erosion, must be mitigated to stabilize the surface and return the land to an approved post-mining land use.

## *3.7 Watershed*

## *Affected Environment*

The study area required to address the impacts to water resources from the proposed lease modifications is defined by the watershed boundaries of the local drainages (Figure 3.7), and the area directly impacted by subsidence.   The following sections include discussion of the regional hydrologic setting, flow characteristics within the surface drainage system, groundwater systems, analysis of surface water quality, water rights, and environmental consequences with leasing and the cumulative impacts on water resources. The following information sources were used for this evaluation:

- ▪ Surface water and groundwater quality and quantity data for regional hydrology from the USGS;
- ▪ Review of MCC data, including annual hydrology reports, permit applications, and other reports related to surface water and groundwater hydrology.

The proposed lease modifications are located within the North Fork of the Gunnison River basin.

### *Surface Water Resources*

The East Fork of Minnesota Creek, just west of the lease modification area, and Deep Creek, just northeast of the modification area, drains to the North Fork of the Gunnison River. The North Fork of the Gunnison River joins the Gunnison River downstream of Hotchkiss.  There are two USGS monitoring locations along this reach: North Fork of the Gunnison River near Somerset, Colorado (Station No. 09132500), and North Fork of the Gunnison River below Leroux Creek, near Hotchkiss, Colorado (Station No. 09135950).  Stream flow has been monitored at the station near Somerset since October 1933. The drainage area at the Somerset station is 526 square miles.

Surface water quality in the North Fork of the Gunnison River in the vicinity of Paonia is good with low concentrations of TDS, nitrate, nitrite, and metals. The water is of calcium bicarbonate type.

### *Project Area Surface Water Hydrology*

Figure 3.7 shows the watershed areas that encompass the coal lease modifications.  The Sunset lease modifications are drained by Lick Creek, South Prong Creek, and Horse Creek, all of which drain into the East Fork of Minnesota Creek, west of the lease modifications.  A small portion of the lease modification (~60 acres) drains to the northeast into Deep Creek.  These drainages eventually empty into the North Fork of the Gunnison River.

Lick Creek is an intermittent drainage.  Flows within this channel are influenced mostly by spring runoff conditions with a measure peak flow of around 3 cfs (HYDROGEO, 2009), with zero flow conditions typically occurring August-March.  South Prong Creek and Horse Creek, as reported by MCC data, are ephemeral and flow only in response to spring runoff conditions and storm events.

### *Surface Water Quality*

Baseline water quality and flow data for the West Elk Mine has been collected for several years.  The existing West Elk hydrologic monitoring program which the lease modification could influence  include continuous flow monitoring at the  Lick Creek Flume, and the Upper Deep Creek Flume, and the Upper Minnesota Creek (USFS gauging station).  These gauging stations are sampled three times per annum for field water quality parameters (pH, EC, and temperature), and sampled once per year for laboratory water quality analysis. In addition to these stream gauging stations, the spring and seep monitoring program monitors flow, field water quality, and laboratory water quality from several springs in the area immediately west of the proposed lease modifications (Figure 3.7).  Further information can be obtained from project and district files or from the mine in their Annual Hydrology Reports.

From previous management activities (Section 3.2) effects to surface water quality and quantity have been minimal.

BLM_0049732

### Seasonal Trends in Surface Water Quality

General seasonal trends in surface water quality were not obvious in reviewing the MCC water quality data. The relatively short period of record (approximately 10 years) likely explains the lack of significant trends.  In general spring run-off from snow-melt significantly increases the sediment load and transport within the surface water system.  Flows also increase dramatically during this period from March – June.

The Forest Service does not have any water resource allocations modification area.  USFS and MCC records also identify 6 ponds created for livestock use within the modification area.

### Influence of Past Mining on Surface Water

Various National Pollution Discharge and Elimination System (NPDES) permits granted to MCC regulate impacts of current and historical mining on local streams.

Monitoring on the North Fork of the Gunnison River shows little impact to the water quality from current or historical mining. Subsidence impacts from past mining have been observed in several areas where overburden is less than 500 feet thick. Although subsidence was observed in the form of cracks in the weathered bedrock and colluvium from 15 to 100 feet above the stream channel, there were no cracks observed in saturated alluvium underlying the stream. There was also no evidence of loss of flow observed.

BLM_0049733

**Figure 3.7.  Water resources.**



BLM_0049734

### Groundwater Resources

Shallow groundwater resources in the lease modification area are limited due to geomorphologic controls imparted from the relatively steep gradients and stream profiles of drainages in the area, resulting in relatively thin alluvial/colluvial deposits confined to the bottoms of drainages. Groundwater that surfaces as springs and seeps in the tracts is associated with these shallow alluvial/colluvial deposits and does not appear to be hydrologically connected with deeper bedrock aquifers. There are no alluvial/colluvial monitoring wells in the area that are currently monitored as part of the West Elk hydrologic program.

Bedrock groundwater resources in the area are limited to isolated perched lenses and fracture/fault zones. Age-dating chemical analyses from the West Elk monitoring program have shown that bedrock groundwater resources in the vicinity of the mine are part of a deep inactive system that is not in direct contact with near-surface water (USDA Forest Service 2003).

Groundwater may also be present to a limited extent within coal seams. Bedrock and associated coal seams dip to the northeast, with the upper most strata outcropping along the North Fork valley. The occurrence of groundwater springs in the North Fork outcrops of the Mesa Verde formation is rare. The BLM and MCC report that the coal seams in the West Elk Mine area are typically dry, with average moisture content of 5 %. Groundwater discharges from faults intercepted by longwall panels in the West Elk Mine typically experience an initial high volume discharge periods followed diminishing to negligible flow within a short time period. Mine under-drain and mine inflow sites are currently monitored for flow and water quality by the West Elk hydrologic program. The total inflow for the West Elk Mine is approximately 200 acre-feet per year (HydroGeo, 2003). It is assumed for this analysis that any water bearing faults that are intercepted by the proposed longwall panels in the lease modifications would flow 1,000 gallons per minute (gpm) or less when encountered then decreasing to negligible flows (Koontz 2003). Any groundwater encountered would be handled by the existing system in the MCC underground operation. Discharge water would be required to meet the NPDES and Colorado Discharge Permit System (CDPS) surface water quality goals.

Springs in the area typically show the same seasonality as the stream system.

There are no known perennial springs, and only two intermittent springs inventoried for the lease modification area (Figure 3.7). Just west and north of the modification area, MCC currently maintains data on several additional springs and 2 hydrographs (Lick Creek, and Upper Deep Creek; see Figure 3.7).

### Influence of Past Mining on Groundwater

A summary of water quality data is presented in MCC's Annual Hydrology Report and Annual Mine Inflow Report located in the project file. Review of MCC's water quality data from monitoring wells and springs does reveal small changes in general seasonal trends in groundwater quality at the study area. Some springs can show slightly elevated TDS/TSS, iron, and conductivity values; however, this was attributed to higher spring runoff values (HYDROGEO, 2009).

Past and current mining activities have affected groundwater quantity and quality. For example, historic mining activities at the King Mine in the drainages below the Bowie No. 2 Mine have impacted the local alluvial groundwater quality. Seepage from the King Mine has caused high sulfate and other trace constituent levels in groundwater at the down gradient alluvial monitoring wells. At the West Elk Mine, small changes in groundwater quality have been noted after mining has occurred in certain areas. As noted in the Annual Hydrology reports, these impacts have been slight changes in pH, or slightly elevated iron, manganese, and/or conductivity measurements (HYDROGEO, 2009).

Past and current activities other than mining have also affected groundwater quality. Livestock grazing causes minor impacts to springs and seeps due to erosion, sedimentation, and water quality (i.e. fecal coliform). Unauthorized off-road vehicle use also causes erosion and sedimentation that effect spring areas. Individual domestic water wells and community water wells have had limited impact on groundwater quantity.

BLM_0049735

### Groundwater Use

Water rights and well records from the Colorado Division of Water Resources were reviewed for the area of the proposed coal lease modification area. There are no water rights or diversions associated with springs or streams in the lease modification area.

There are no known decreed springs in the immediate vicinity of the lease modifications.

## No Action Alternative Environmental Effects

Under the No Action alternative, there would be no mining-induced effects on water resources in the modification area. Current ongoing activities in the watershed as well as natural variation in spring, seep, and stream flow would continue to occur based on climatic variations.

## Proposed Action Alternative Environmental Effects

### Surface Water

Subsidence resulting from longwall mining can be expected anywhere above or within the angle of draw of fully extracted longwall panels. Measurable subsidence effects for the modification area are expected to attenuate within 250 feet from the edge of the longwall panels (assuming a 25 degree angle of draw).

Based on subsidence studies and observations from the West Elk Mine measured subsidence values in the North Fork Valley are typically less than predicted subsidence magnitudes (Agapito 2005).

Subsidence may affect escarpments or marginally stable formations by inducing movement, tilt, or fracturing possibly resulting in rockfall and debris flows, or landslides. The West Elk Mine is currently using pre-mining survey data to assess this potential. Other natural factors separate from subsidence, such as periods of intense precipitation or runoff due to rapid snowmelt, may trigger or accelerate mass wasting events in the lease modification area.

Subsidence may alter surface water and groundwater hydrology by altering groundwater flow regimes, surface water drainages, seeps, and ponds. Subsidence in surface water drainages could result in changes in channel morphology and gradient thereby affect water quality by inducing minor cutting, pooling, soil erosion, and sedimentation. Surface tension cracks have the potential to develop within the surrounding surface drainages resulting in an initial period of erosion and sedimentation after during the initial periods of runoff after subsidence occurs. However, the potential for surface fractures to develop in drainages where unconsolidated materials occur will be partially mitigated by the ductile nature of the unconsolidated alluvium/colluvium (Agapito 2005).

Surface tension cracks in areas of bedrock cover may also intercept precipitation. It is expected that the crack would temporarily divert precipitation away from the drainage, but that given the limited depth of tension cracks the flow would remain in the drainage (USDA Forest Service 2003). In addition, surface and groundwater resources may be temporarily interrupted related to drainage into fractures that develop, however these fractures tend to be short lived, terminate at a shallow depth, and quickly fill with sediment. Given the ephemeral and seasonal nature of the surface drainages as well as their steep gradient, and influences of the natural geologic instability of the area (landslide potential and high erosion rate/sediment load) of the area, subsidence would have minimal long term impact on channel morphology. Surface and groundwater impacts will diminish rapidly and uniform longwall retreat, as cracks associated with the longwall face will tend to closed after the face passes and open surface cracks that remain are normally not significant conduits to surface water to the fact that they tend to die out a depth (maximum 200 feet) due to the location of the neutral surface and crack intersection with soft material (Agapito 2005).

Cattle stock ponds could potentially be affected by mining–induced subsidence; however the potential for fractures developing underneath the stock ponds and the irrigation ditch will likely be mitigated by the pliant characteristics of surrounding soil (Agapito 2005). Any damage to stock ponds or irrigation ditch would likely be localized and readily repairable.

Water usage from the National Forest for mining would be relatively minor and quantities would fall below the Forest's Biological Opinion for water depletions.

BLM_0049736

Water discharge from the mine to surface streams could impact the quality of water in the receiving streams. Mine effluent would be regulated, and any discharge to receiving streams would have to meet permitted effluent requirements. Concentrations of TDS, iron, manganese, and sulfate could be constituents likely to increase.

### Ground water

Subsidence induced impacts to groundwater resources were calculated from the reasonably foreseeable development scenarios and generalized overburden strata characteristics for the lease modification area. It was also assumed that coal would be extracted using longwall mining techniques so that subsidence occurred within the limits of the lease modification boundary.

During expansion of the West Elk Mine into the lease modifications, groundwater within the Mesa Verde formation may be encountered in faults and coals seams. After completion of mining, groundwater may infiltrate into voids and collapse features and affect water quality. However, no discernable effects to local groundwater quality have been observed at the West Elk Mine nor are expected (HydroGeo 2003).

It is difficult to assess mining related effects of groundwater interception and withdrawal on regional water supply due to on-going drought conditions in the region. Climatological data from the West Elk Mine 2002 Annual Hydrology Report (HydroGeo 2003) also indicate corresponding low averages over the period of record for annual precipitation and annual snow water equivalent for the North Fork watershed. Chemical analyses from the West Elk monitoring program have shown that deep groundwater resources in the vicinity of the mine are part of a deep inactive system that is not in direct contact with near-surface water, thereby limiting any potential effects to surface water flow.

Groundwater inflow from faults intercepted by longwall panels in the West Elk Mine typically experience an initial high volume discharge periods followed diminishing to negligible flow within a short time period. The total inflow for the West Elk Mine in water year 2009 was 34.26 acre-feet (HydroGeo 2009).

There are several springs inventoried in the modification area. Shallow groundwater in the modification area is limited due to geomorphologic controls from the relatively steep gradients and stream profiles of drainages, resulting in thin alluvial/colluvial deposits confined to the drainage bottoms. Groundwater that surfaces as springs and seeps in the area is associated with these shallow alluvial/colluvial deposits and does not appear to be hydrologically connected with deeper bedrock aquifers. Static water levels in bedrock aquifers in the West Elk Mine area are many hundreds of feet below ground surface and show no connection to surface water sources. There is low risk of alluvial/colluvial springs being intercepted by subsidence-induced tension fractures. The lowering of the land surface may cause springs to migrate a few feet, but no discernable loss of water is anticipated.

Groundwater may also be present to a limited extent within coal seams. Bedrock and associated coal seams dip to the northeast, with the uppermost strata outcropping along the North Fork Valley. The occurrence of groundwater springs in the North Fork outcrops of the Mesa Verde formation is rare. Groundwater discharges from faults intercepted by longwall panels in the mine have experienced initially high volume discharge periods followed diminishing to negligible flow within a short time period.

No effects to surface water resources have been documented from interception of water-bearing faults underground. Not all faults encountered during mining have contained water. Mine under-drain and mine inflow sites are currently monitored for flow and water quality by the West Elk Mine hydrologic program.

Any groundwater encountered would be handled by the existing system in the underground operation. Discharge water would be required to meet the NPDES and Colorado Discharge Permit System (CDPS) surface water quality standards. It is difficult to assess mining-related effects of groundwater interception and withdrawal on regional water supply due to ongoing drought conditions in the region. Yearly decreases in annual stream flow in both East Fork of Minnesota Creek and the North Fork of the Gunnison River during the period between 2001 and 2009 document ongoing drought conditions.

Longwall mining development of lease modification would induce subsidence of the overlying ground surface. The extent, severity, and potential impact to groundwater due to subsidence is dependent on the thickness, composition, and geotechnical properties of the overburden, thickness of the mined coal, and mining plans. Figure 3.2 illustrates the potential areas of mining induced subsidence impacts to water resources.

BLM_0049737

Longwall mining development in the E seam of the lease modification would induce subsidence of the overlying ground surface and temporarily dewater the strata adjacent to the coal seam. Mined areas would likely refill with water to approximate pre-mining levels after mining operations cease which could impact groundwater quality through exposure to collapsed and abandoned mine workings. No subsurface water rights are located in the areas of potential impacts.

Subsidence could potentially disrupt or alter springs, seeps, ponds, and change local groundwater levels directly above the underground mine and within the angle of draw.

The potential for indirect groundwater impacts in the study area is expected to be minimal. In adjacent lands private domestic wells would be drilled and septic systems would be installed. Appropriate state and county regulations would have to be followed, minimizing impacts to groundwater quantity and quality.

Stipulations Other than the water depletion which will be addressed in the Threatened and Endangered Species Section, no new stipulations other than those listed in the parent leases are recommended.

## Cumulative Impacts

Leasing the coal in the modification area would extend the life of the West Elk Mine, thereby increasing the potential for indirect impacts to surface water quality due to longwall mining related subsidence under intermittent and ephemeral drainages and to springs/seeps within the area.  However, current mining activity at the West Elk Mine has had no discernable localized effects to stream morphology, erosion rate, or suspended sediment load. High flows in intermittent and ephemeral surface water resources in smaller tributary drainages are limited to spring runoff and very large thunderstorm events; therefore, subsidence-induced impacts in these drainages would be minimal.

Due to the overriding influence of continued drought in the North Fork basin and the fact that creek flow is unlikely to be affected by subsidence or mine operations; it is unlikely that water resource allocations for the greater watershed will be impacted.

Potential post-lease surface use (exploration drilling, methane drainage) has the potential to affect surface water through surface disturbance related to drill pad and road construction on both federal coal leases and on adjacent private lands.  Depending on location of these activities, construction could have impacts on sedimentation in stream channels; however, these effects are able to be mitigated through use of best management practices, including sediment control.  The strata are not uniformly saturated, so there is little concern for inter-aquifer communication for installing methane drainage wells or exploration wells as they would be of small diameter and would cause little disturbance to the geologic strata. Methane release from coal mines would not be expected to impact domestic water wells because the wells are below the coal seams to be mined.

Accidental fuel or solvent spills from post-lease activities could impact shallow groundwater locally and surface water.   Any proposed post-lease activities would be analyzed under a separate NEPA analysis if/when activities are proposed.

Agriculture is an important and significant activity in the North Fork of the Gunnison Valley.  Cumulative effects to surface water quality would be minimal in the North Fork of the Gunnison River Valley.

Minimal logging is anticipated in this area in the future.  Based on experience in the area, impacts to surface water would not be expected from small timber sales.  Recreation is fairly limited in the area due to the lack of developed recreational facilities.   Hunting is the primary recreational activity in this area, and impacts to streams from four-wheeling activity can result in increased sedimentation and damage to drainage channels.

## Consistency with Forest Plan and Other Laws

This quantity of water for reasonably foreseeable future development is within the GMUG's blanket consultation with USFWS for depletion associated with the Upper Colorado River System.  The proposed Action is consistent with the Clean Water Act and Forest Plan standards for water resources, and the FS Region 2 Water Conservation Practices Handbook and Ground Water Management FSM 2880.

BLM_0049738

## 3.8 Vegetation

### Affected Environment

R2Veg GIS data as of 04 Feb 2010 was used in this analysis to describe existing vegetation within the project area. Due to the extent of aspen decline in the area, the aspen components of the R2VEG model are suspected to be outdated and may not reflect current actual conditions in aspen stands impacted by the project.  It is anticipated that additional aspen will decline in 2011 and beyond.  The cumulative effects analysis area for vegetation is coincident with the Mount Gunnison Lynx Analysis Unit boundary (described in more detail in Section 3.10) and totals 47,904 acres of NFS lands. Existing vegetation at the two potential analysis scales (lease modification area and NEPA cumulative effects area), is shown in Table 3.8a.  Table 3.8b shows vegetation structural stages within the lease modification area.  Figure 3.8 shows the vegetation in the lease modifications area.

BLM_0049739

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

**Figure 3.8.  Lease Modification & Cumulative Effects Area Vegetation Data**



BLM_0049740

**Table 3.8a.  Lease Modification& Cumulative Effects Area Vegetation Data**

| Primary Vegetation Type (R2Veg Cover Type) | Acres within lease modification area | Acres in cumulative effects area (Mount Gunnison LAU) |
|---|---|---|
| Forb | | 168.7 |
| Grass | 7.3 | 726.6 |
| Bare ground | 4.9 | 3333.5 |
| Gambel oak (shrub) | 157.0 | 15210.2 |
| Mountain shrub | <0.1 | 2013.6 |
| Mountain mahogany | | 54.5 |
| Willow (shrub) | | 348.5 |
| Aspen | 1393.3 | 17,183.5 |
| Cottonwood | | 16.1 |
| Douglas fir | | 31.2 |
| Pinyon-juniper | | 624.0 |
| Ponderosa pine | | 109.4 |
| Spruce-fir | 156.4 | 8016.4 |
| Water | | 68.0 |
| **Total** | **1718.9** | **47,904.3** |

**Table 3.8b.  Vegetation Structural Stages, lease modification area (All vegetation types)**

| Vegetation Structural Stage | Potential Treatment Area (acres) rounded to nearest acre |
|---|---|
| Natural meadow | 4 |
| Natural shrubland | 162 |
| Grass/forb to sapling/pole cover <40% | 22 |
| Sapling/pole cover 40-70% | 5 |
| Sapling/pole cover >70% | 0 |
| Mature/overmature, cover <40% | 30 |
| Mature/overmature, cover 40-70% | 6 |
| Mature/overmature, cover >70% | 1486 |

Vegetation communities in the proposed lease modification area are primarily aspen or mixed aspen/spruce-fir stands, with spruce-fir at higher elevations and Gambel oak at lower elevations, with smaller inclusions of grass, mountain shrub mix, and bare ground within the area.   Riparian areas, including seasonal slump wetlands, ponds, and permanent wetlands, occur in and near the project area. For the purposes of this analysis, as the road and pad locations have not yet been determined, the impacts of those surface activities are assumed to be proportional to the available surface vegetation proportions on the landscape for the three major types (Gambel oak/shrub, aspen, and spruce-fir).  Lease stipulations and Best Management Practices (BMPs) prevent pads and roads in wetlands except for crossing of drainages for access.  Actual surface activity may be different than that analyzed; further analysis may be needed to compensate for changes when the surface operations may be proposed. However, at this time, and based on previous experience with these types of activities on the district, it is not anticipated that changes in actual surface disturbance would impart major changes.

BLM_0049741

## No Action Alternative Environmental Effects

No direct or indirect human-caused change in existing condition of current vegetation and habitat is anticipated if no action is undertaken for this project. Conditions will continue as they currently exist, modified as per the other actions given in the cumulative effects contributions described herein and existing natural processes. Within the last five years (2005-2010) the aspen within the Paonia district has suffered substantial declines. Statewide, surveys have documented the decline on approximately 17% of the aspen in the state of Colorado, as of 2008 (http://www.fs.fed.us/r2/fhm/downloads/sad_faqs.pdf). These processes are expected to continue into the future.

## Proposed Action Alternative Environmental Effects

The lease modification carries no direct effects with it. It does, however, commit the lands in within the modification area to potential future mining, and that mining may result in subsidence of surface topography as coal is removed from below. This subsidence has resulted in minor landslides and other surface changes on unstable and steep slopes in other portions of the Forest in which such mining has occurred that have affected vegetation. Such disturbance, however, has been limited to steep and unstable ground and has not been widespread in undermined areas. Most surface subsidence has been relatively uniform across the landscape and in most areas does not visibly alter surface features or vegetation.

The area of impact would therefore include all 1722 acres of various habitats. However, the likelihood of this is minimal, and only small areas (approximately 1 acre) of subsidence in unstable areas are anticipated. If no vegetative habitat is lost due to subsidence, which is the expected outcome, then the lease modification and associated underground mining would have no effect on the habitat at the surface and there would be no effect as a result of subsidence.

However, underground mining may require surface facilities for safety, specifically methane drainage wells (MDWs). The RFMP provides information on potential surface activities associated with the underground mining within the lease modification area, including the number of MDWs required in this area and the approximate mileages of temporary roads required to access and construct these MDWs, as well as information on the longevity and rehabilitation of surface disturbance. This plan is described at the beginning of this chapter and is being analyzed concurrently for the purposes of this evaluation.

The plan does not have specific locations for the MDWs and associated roads which comprise the surface disturbance. It does, however, indicate the expected acreage of disturbance required to operate the mine, approximately 73 total acres. Without knowing exactly where the MDWs and roads will be placed, it is reasonable to assume that the proportion of loss of habitat associated with this activity is equal to the proportion of existing habitats within the lease modification area (Table 3.8a). The resulting habitat loss would therefore equate to approximately 7 acres of oak, 61 acres of aspen, and 7 acres of spruce-fir, with approximately 1 acre of other surface types.

The roads and well pads will result in complete loss of existing vegetation community within the footprint of same (pads of approximately 1 acre in size and road widths averaging 30') for the life of the project. MDW pads and roads are not expected to be built all at one time. Activity on the parent leases has been to construct pads and associated access roads in advance of the longwall position, and then rehabilitate once the mining has moved past that point. In effect, the construction proceeds in rows of MDWs. After the mining is complete, these areas will be re-contoured and revegetated with grasses and forbs for erosion control in the short term, and are expected to revegetate to types consistent with their pre-disturbance condition in the long term. This project will therefore not remove habitat permanently from the landscape, but will remove it in the short- and mid-term.

Lease stipulations will mitigate impacts due to creation of roads and pads within the area and vegetative changes. The stipulations are shown in Chapter 2.

BLM_0049742

*Environmental Assessment*                          *Federal Coal Lease Modifications COC-1362 & COC-67232*

## Cumulative Effects

The FACTS (Forest Service Activity Tracking System) database was used to determine past federal actions in the area which may have impacted wildlife habitat. Previous MDW and road construction activities are beneath the resolution of the system and are not reflected therein. Within the past ten years, a total of 2550 acres of other habitat alteration has occurred within the larger cumulative effects area, associated primarily with big game wildlife habitat improvement projects, with the majority occurring in oak and juniper habitats. These acres reflect some re-treatment of areas due to multiple entries for a single project, as well, so that less than 2550 acres of the landscape have been actually treated. Table 3.8c shows the individual actions which have occurred within the area in that time frame. There has been no timber harvest in this area within the last ten years, and any prior activity is incorporated into baseline habitat values for the area.

**Table 3.8c.  Vegetation management within the cumulative effects area since 2000.**

| Type of Treatment | Acres | Year |
|---|---|---|
| Deer Creek Shaft and E Seam MDW projects (minerals) | >54 proposed | 2007-current |
| Sylvester Gulch and Box Canyon projects, Dry Fork coal lease project (minerals) | >71 proposed | 2004-current |
| Lamborn Wildlife Habitat Improvement (Rollerchop) | 116 | 2009 |
| BearPaw Rx Burn | 983 (not all actually done) | 2008 |
| Lone Cabin Mechanical (hydro-axe) | 78 | 2007 |
| BearPaw Rx Burn | 561 | 2004 |
| Wooten Mesa Roller Chop | 158 | 2003 |
| unnamed rollerchop | 26 | 2003 |
| Sams Divide Rx Burn | 628 | 2002 |
| **Total** | **2550** | |

Other federal actions which have occurred in the past and are expected to occur in the future which impact vegetation include additional wildlife habitat improvement projects (BearPaw Rx Burn and Lamborn Wildlife habitat improvement projects in oak and similar habitats), permitted livestock (currently cattle) grazing and permitted outfitter/guided hunting. Road and trail maintenance is expected to continue within the area. Travel management activities including closing existing roads and trails may occur in the near future which restores vegetation. Non-federal actions occurring in the area within the last ten years include dispersed camping primarily associated with hunting (approximately 70 known sites), and nonspecific dispersed recreation. Water development (reservoirs, ditches) occurs on both federal and private lands in the area, including three irrigation reservoirs totaling 68 surface acres. On private lands, single family habitation, ranching including hay production, mining activities, and livestock grazing are the primary uses within the area.

## Consistency with Forest Plan and Other Laws

Proposed Action would is consistent with the 1991 GMUG Forest Plan.

BLM_0049743

## 3.9 Threatened & Endangered Species

A Forest species list was provided by the US Fish and Wildlife Service on 9 May 2008 (USDI 2008b). There is only one federally listed species that has the potential to be found in the project area, the Canada lynx. Other species considered are shown in Table 3.9.  As these species do not occur in the project area and no habitat for them will be impacted by the project, these species were not further analyzed in this document.  These species would all have no effect determinations.

**Table 3.9.   Federally Threatened and Endangered or Candidate Species considered for this project.**

| Species | Scientific Name | Habitat Description and Requirements | Habitat in Project Area? |
|---|---|---|---|
| Canada Lynx | *Lynx canadensis* | Spruce/fir, mixed conifer, lodgepole pine forest (primary), or mixed deciduous/conifer (secondary). | Yes |
| Mexican spotted owl | *Strix occidentalis lucida* | Desert canyons, ponderosa forests. Not known or expected to occur on the Paonia RD. | No |
| Uncompahgre fritillary butterfly | *Boloria acrocnema* | Above treeline, closely associated with larval host, snow willow.  Not known or expected to occur on the Paonia RD. | No |
| Debeque Phacelia (candidate) | *Phacelia submutica* | Specific clay-based soils of the Wasatch Formation in Piceance Basin, CO.  Not known or expected to occur on the Paonia RD | No |
| Greenback cutthroat trout | *Oncorhynchus clarki stomias* | Headwater streams and lakes, isolated headwater reaches with less than 30 cfs, gradients > 4%, above 7,500. Require year round stream flows to survive.   Not expected in  analysis area due to lack of perennial water. | No |
| Bonytail Chub | *Gila elegans* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Colorado Pikeminnow | *Ptychocheilus lucius* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Humpback Chub | *Gila cypha* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Razorback Sucker | *Xyrauchen texanus* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Uinta Basin Hookless Cactus | *Sclerocactus glaucus* | Coarse rocky soils above the current flood plains of the Colorado, Gunnison, and Green River drainages in western Colorado and northeastern Utah.  Not known or expected to occur on the Paonia RD. | No |

BLM_0049744

*Habitat not present, but consultation has occurred with USFWS regarding depletions associated with RFMP for post-leasing activities.

## 3.10 Canada lynx

## Methodology for Analysis

The Forest Service vegetation database (R2Veg) data as of 04 Feb 2010 was used in this analysis to describe existing vegetation and habitats within the project area. Sudden Aspen Deciine (SAD) is impacting mature aspen stands across the district, and declining stands have been identified in the immediate project area and across the analysis area. The current state of these stands is not reflected in R2Veg due to the rapid change in vegetation condition. It is anticipated that additional aspen stands will decline in 2010 and beyond, and that the affected aspen stands may constitute a much larger portion of the analysis area than they do currently.

## Affected Environment

The analysis area for the Biologicai Assessment is the Mount Gunnison Lynx Analysis Unit, comprising 47,904 acres (Table 3.8a). Other scales of analysis may be used for other species Existing vegetation at two potential analysis scales (Lease modification area and LAU) is shown in Table 3.8a. Table 3.8b shows vegetation structurai stages within the lease modification area. Acreages within the iease modification area in this analysis (1718.9) are slightly less than in the proposed action provided through the BLM office (1721) and represent differences in mapping versus information provided from outside the agency.

### Environmental Baseline

The Canada Lynx was listed as threatened in March 2000. In August 2004, the Second Edition of the Canada Lynx Conservation Assessment and Strategy (LCAS) was released, to provide a consistent and effective approach to conserve Canada lynx on federal lands. The Canada Lynx Conservation Agreement (USDA 2005) identifies the Science Report (Ruggiero et al. 2000) and the LCAS (Ruediger et al. 2000) as including the best available science on habitat and conservation measures. Both of these documents, along with local information were to be used for project analyses.

Following release of the LCAS, the Forest mapped lynx analysis units (LAUs) and habitat within them, based on Regional direction. Habitat was mapped based on existing vegetation information, including vegetation type, canopy closure and size of trees. Areas outside of mapped LAUs are not considered to be lynx habitat, even though they may contain habitat components or stand similar to those within LAUs. The GMUG Forest Plan includes direction about limiting the amount of currently unsuitable habitat within a LAU to less than 30%. Currently, 0.5% of lynx habitat within the LAU is unsuitable. The project is within the Mount Gunnison LAU, and potential impacts of the project to lynx are limited to that LAU. Existing conditions of the Mount Gunnison LAU are displayed in Table 3.10a.

**Table 3.10a.  Mount Gunnison Lynx Analysis Unit Existing Condition (rounded to nearest acre)**

| LAU Name | Total Acreage | Suitable Habitat | Acres Currently Unsuitable Habitat (% of lynx habitat) | Acres Non Habitat (% of LAU) |
|---|---|---|---|---|
| Mount Gunnison LAU | 47904 | 22614 | 0 (0)* | 25290 (52.8) |
| Previous Actions* | | | 125 (0.5%) | |
| Lease Modification Area | 1718 | 1436 | 0 | 282 |
| Reasonably Foreseeable Actions (surface acres affected) | 73 | ≤73 | | |

*Previous mining-related loss of habitat is beneath the scale of R2VEG and does not show up in the current GIS information.

BLM_0049745

Lynx breed in March and April in the north, and kittens are born in May and June in the Yukon (Ruediger et al. 2000). Den surveys in May and June 2005 in Colorado found kittens in the dens at that time (CDOW 2005a.)   All of the 2005 dens were scattered throughout the high elevation areas of Colorado, south of I-70. Most of the dens were in spruce/fir forests in areas of extensive downfall. Elevations ranged from 10,226 to 11,765 feet for 2005 dens (CDOW 2005a) with a mean elevation of 3354 meters (11,001 feet) for all dens prior to 2009 (CDOW 2009). However, the project area is all below the elevation where denning has occurred in Colorado.

Lynx have been described as being generally tolerant of humans, including moderate levels of snowmobile traffic (Ruediger et al. 2000). In a lightly roaded study area in northcentral Washington, logging roads did not appear to affect habitat use by lynx. In contrast, a study in the southern Canadian Rocky Mountains found that lynx crossed highways within their home range less than would be expected (Ruediger et al. 2000).

Lynx have been reintroduced to southwestern Colorado, beginning in 1999. Tracking of these lynx indicate that lynx are using or moving through the Forest, but only a few of the relocations lie within or adjacent to the project area (CDOW 2005). Of the total 218 adult lynx that have been released in Colorado, there are 115 known mortalities (CDOW 2009). The cause of death is unknown for a third of these, but the two leading known causes of mortality are starvation and being hit by a vehicle. Speed has been identified as the primary factor contributing to vehicle-wildlife collisions (Gunther et al. 1998). Neither is considered to be a factor for this project due to the lack of suitable habitat in the project area. There are no landscape linkage areas in or near the project area or any travel routes associated with the project.

The Recovery Outline (USDI FWS 2005) identifies core areas, secondary areas and peripheral areas, based on historical and current occurrence records, as well as confirmed breeding. The Southern Rockies (Colorado and Wyoming) were identified as a Provisional Core Area. This designation was identified because this area contains a reintroduced population. Reproduction has been documented but it is too early to determine whether a self-sustaining population will result. A total of 37 dens and 116 kittens had been located in Colorado prior to the 2009 breeding season (CDOW 2009).

In November 2005, the FWS proposed critical habitat for lynx (USDI FWS 2005a). In 2006 Critical Habitat for the lynx was designated, with none occurring in the Southern Rockies (USDI 2006).  A revised critical habitat designation which does not include lands within Colorado has been proposed (USDI 2008).

Extensive stands of pure aspen may not provide quality hare (primary prey) habitat due to deficiencies in winter habitat characteristics. However, when mixed with spruce/fir, aspen (especially younger stands) may substantially contribute to prey productivity (Ruediger et al. 2000). Lynx transplanted into Colorado were frequently located in well developed riparian and valley wetland shrub habitats of the upper montane and subalpine zones. These ecotones may provide quality foraging habitat for lynx.

Lynx Standards and Guidelines from the GMUG Forest Plan are shown in Table 6 of the Biological Assessment found in the Project File.

## *No Action Alternative Environmental Effects*

The direct and indirect impacts of the "no action" alternative would not change current habitat or population conditions of Canada lynx in the short term.   Long-term changes would continue to be dependent on existing conditions, current succession of vegetative types, and other actions within the project area, as indicated in the cumulative effects tables and discussions in this analysis.  The ongoing aspen decline may result in both short- and long-term loss of aspen at a landscape scale in this area.

## *Proposed Action Alternative Environmental Effects*

For this analysis, all lease stipulations as described in Proposed Action in Chapter 2 are considered to be in effect.

The lease modification carries no direct effects with it.  It does, however, authorize underground coal mining within the modification area, and that mining may result in subsidence of surface topography as

BLM_0049746

coal is removed from below ground. This subsidence has resulted in landslides and other surface changes on unstable and steep slopes in other portions of the Forest in which such mining has occurred. Such disturbance, however, has been limited to steep and unstable ground and has not been widespread in undermined areas. Most surface subsidence has been relatively uniform across the landscape and in most areas does not visibly alter surface features or vegetation.

The area of impact would therefore include 1436 acres of lynx habitat, that being the portion of the lease modification currently suitable. These values are based on the R2VEG GIS coverage for this area and may not reflect recent impacts to aspen stands due to SAD.

If no habitat is lost due to subsidence, which is the expected outcome, then the lease modifications and associated underground mining would have no effect on the habitat suitability at the surface and there would be no effect to lynx as a result of the modification.

However, underground mining requires surface facilities for safety, specifically MDWs. There is a Reasonably Foreseeable Mine Plan which accompanied the request for lease modification, which at a gross level provides information on surface activities associated with the underground mining within the lease modification area, including the number of MDWs required in this area and the approximate mileage of temporary roads required to access and construct these MDWs, as well as information on the longevity and rehabilitation of surface disturbance. This plan is described in the proposed action above and is being analyzed concurrently.

The plan does not have specific locations for the MDWs and associated roads which comprise the surface disturbance. It does, however, indicate the expected acreage of disturbance required to operate the mine, approximately 73 total acres. Without knowing exactly where the MDWs and roads will be placed, it is reasonable to assume that the proportion of loss of habitat associated with this activity is equal to the proportion of such habitat within the lease modification area (83.5%), or a total disturbance of 63 acres. However, it is possible that the entirety of the surface disturbance will occur within suitable habitat, for a total direct loss of 73 acres of habitat.

The roads and well pads will result in complete loss of habitat within the footprint of same (pads of approximately 1 acre in size and road widths averaging 30') for the life of the project. After the mining is complete, these areas will be re-contoured and revegetated with grasses and forbs for erosion control in the short term, and are expected to revegetate to types consistent with their pre-disturbance condition in the long term. This project will therefore not remove habitat permanently from the landscape, but will remove it in the short- and mid-term, certainly within lifetimes of both lynx and their primary prey.

Lease stipulations will mitigate impacts due to creation of roads and pads within the area, winter access, and vegetative changes. The stipulations are shown in section III of the BA (Project File) and their application to specific Forest Plan objectives and guidelines for human uses project such as the proposed action are indicated in Appendix 1 of the BA (Project File).

The following potential effects to lynx may include:

- Short-term direct effects of habitat loss / alteration
- Short-term direct effects from disturbance to denning or foraging
- Short-term direct effects of mortality from traffic or shooting
- Impacts from changes in winter access (competition and disturbance)
- Long-term direct effects as a result of changes in vegetation, which provides denning and foraging habitat

If the proposed action is implemented, 73 acres of suitable habitat could be directly lost through creation of roads and well pads within the LAU (0.3%). Past and current activities may result in the loss of 125 acres of habitat within the LAU, for a total of 200 acres of habitat lost within the LAU within the last ten years (0.8% of lynx habitat within the LAU).

If all of the lease modification area subsides to the extent that surface habitat is damaged or destroyed, an additional 1360.5 acres of habitat would be lost within the LAU, for a total of 1560.5 acres (6.2% of

BLM_0049747

lynx habitat within the LAU).  None of the other past, present, or reasonably foreseeable future activities within the LAU are anticipated to result in lost habitat or habitat effectiveness.

Disturbance to denning or foraging is possible if lynx are present in the area.  This is not anticipated to be a substantial impact as the lease area is at lower elevation than denning has occurred in Colorado, there is abundant lynx habitat outside of the affected area, and lease stipulations for this project follow guidelines as noted in Appendix A of the BA (Project File).

Traffic is not anticipated to be a substantial impact.  Roads used for this project will be low-speed routes and public use would be restricted.  Roads will also be decommissioned after they are no longer needed, as noted in the lease stipulations.  Winter access is not anticipated to be substantially increased over current levels as the area receives little recreational over-the-snow use and maintenance activities should be minimal.

### Determination

Implementation of the project **"may affect, but is not likely to adversely affect"** the Canada lynx.  The "may affect" is based primarily on the loss of suitable habitat in the project.  Other impacts such as disturbance during denning or increased mortality risk are insignificant and discountable due to the distance of the project from typical Colorado denning habitat, and the low probability of loss of lynx from traffic or incidental shooting as a result of this project.

## Cumulative Effects

### Cumulative effects under NEPA

A new habitat model is proposed for the GMUG.  Under that model, this project would alter 73 acres of the 22,614 (assumes no currently unsuitable habitat) acres of lynx habitat within the LAU (0.3%).  Added to the 125 acres (0.5%) of habitat impacted under previous and ongoing actions, this would result in 0.8% of the suitable habitat in the LAU being rendered unsuitable.

Although future subsidence in not expected to affect surface vegetation, a worst case analysis would assume that all acres of habitat within the lease mod would be impacted by subsidence.  In this event, a total of 1436 acres of suitable habitat (proposed habitat model) (6.4%) within the LAU will be lost in the short term but would be expected to regenerate.

At this time, no acres of the lynx habitat within this LAU are typed as currently unsuitable.  However, previous and ongoing minerals activities within this LAU have been determined to render unsuitable 125 acres (0.5%) of habitat within the LAU (USFWS 2007).  These changes (road prisms and MDW pads) are beneath the resolution of the R2VEG layer and do not show up on it.

The FACTS (Forest Service Activity Tracking System) database was also used to determine past federal actions in the area which may have impacted lynx habitat.  Again, MDW and road construction for mining activity does not show up in this system.  Within the past ten years, a total of 2550 acres of other habitat alteration has occurred within the LAU, associated primarily with big game wildlife habitat improvement projects, and none of it in lynx habitat.  These acres reflect some re-treatment of areas due to multiple entries for a single project, as well, so that less than 2550 acres of the landscape have been actually treated.  Table 5 shows the individual actions which have occurred within the LAU in that time frame. There has been no timber harvest in this LAU within the last ten years, and any prior activity is incorporated into baseline habitat values for the LAU.

BLM_0049748

**Table 3.10b.  Vegetation Management within the Mount Gunnison LAU since 2000**

| Type of Treatment | FACTS ID | Acres | Date |
|---|---|---|---|
| Deer Creek Shaft and E Seam MDW projects (minerals) | N/A | 54 (within lynx habitat) | 2007-current |
| Sylvester Gulch and Box Canyon projects, Dry Fork coal lease project (minerals) | N/A | 71 (within lynx habitat) | 2004-current |
| Lamborn Wildlife Habitat Improvement (Rollerchop) | 5807021001 | 116 | 2009 |
| BearPaw Rx Burn | 1102031002 | 983 (not all actually done) | 2008 |
| Lone Cabin Mechanical (hydro-axe) | 1017331001 | 78 | 2007 |
| BearPaw Rx Burn | 1102031002 | 561 | 2004 |
| Wooten Mesa Roller Chop | N/A (not in FACTS) | 158 | 2003 |
| unnamed rollerchop | 1017311001 | 26 | 2003 |
| Sams Divide Rx Burn | 1102031001 | 628 | 2002 |
| **Total** | | **2550** | |

Other federal actions which have occurred in the past and are expected to occur in the future include additional wildlife habitat improvement projects (BearPaw Rx Burn and Lamborn Wildlife habitat improvement projects in oak and similar habitats, which are not lynx habitat), permitted livestock (currently cattle) grazing and permitted outfitter/guided hunting. Road and trail maintenance is expected to continue within the LAU.  Travel management activities including closing existing roads and trails may occur in the near future (NEPA pending).  Non-federal actions occurring in the area within the last ten years include recreational hunting , mountain biking and ATV use on existing roads and trails, dispersed camping primarily associated with hunting (approximately 70 known sites), and nonspecific dispersed recreation.  Water development (reservoirs, ditches) occurs on both federal and private lands in the area, including three irrigation reservoirs totaling 68 surface acres.  On private lands, single family habitation, ranching including hay production, mining activities, and livestock grazing are the primary uses within the LAU.

### Cumulative effects under ESA

Cumulative effects for the Endangered Species Act include future non-federal actions which may impact this species.  Past actions are included in the existing conditions described in the BA (project file) and the beginning of Chapter 3.  Mining activities may occur on private lands adjacent to the lease modification, and may include MDWs and grazing in this area which may contribute to vegetation changes on private lands in the area.  However, those lands are already modified through long-term human use, and continued grazing is not likely to alter the suitability of lynx habitat in this area from current conditions. Water development in this area (reservoirs and ditches) already exists, and future actions will continue use of existing facilities.  Grazing and outfitting impacts are the same as above.  Within the past ten years, a total of 2550 acres of vegetation management has occurred in the LAU, with a total of 125 acres of habitat rendered or planned to be rendered unsuitable.  Other actions are either of insignificant and discountable impacts to lynx or their habitat (road and trail maintenance) or occur on already disturbed sites (special use permits).  Recreational activities are not expected to be substantially altered by this project.

BLM_0049749

## Consistency with Forest Plan and Other Regulations

The NFMA and the ESA require the Forest Service to manage wildlife habitat to maintain viable populations of native and desirable non-native wildlife species and conservation of listed threatened or endangered species populations (36 CFR 219.19). Additional guidance is found in FSM direction which states: *Identify and prescribe measures to prevent adverse modifications or destruction of critical habitat and other habitats essential for the conservation of endangered, threatened, and proposed species* (FSM 2670.31[6]). The ESA requires the Forest Service to manage for recovery of threatened, endangered, and proposed species and the ecosystems upon which they depend. A Biological Assessment has been completed and assesses the impacts of the proposed action on threatened and endangered species. The Forest initiated consultation with the FWS in 2010 and concurrence was received in June 2010.

## 3.11 Sensitive Species

For this project, federally threatened and endangered species were separated and are discussed in a separate Biological Assessment prepared in compliance with the Endangered Species Act, which can be found in the project record and summarized in the Threatened and Endangered Species section of this document. Forest Service policy also requires that a review of programs and activities, through an effects analysis document (referred to in current Forest Service policy as a biological evaluation or BE), be conducted to determine their potential effect on threatened and endangered species, species proposed for listing, and Regional Forester-designated sensitive species (FSM 2670.3). A BE may be used to satisfy the ESA requirement to prepare a Biological Assessment. Preparation of a Biological Evaluation as part of the NEPA process ensures that TEPS species receive full consideration in the decision-making process. A copy of the BE prepared can be found in the project record.

The Reasonably Foreseeable Mining Plan at the beginning of this chapter was considered in order to effectively analyze potential cumulative impacts, and potential post-lease activities on the land surface, the analysis also assumes a scenario of potential surface use.

Methodology for Analysis: Portions of the area have been surveyed previously for this project, by Monarch and Associates, a biological consulting firm and by Forest Service personnel. Aerial photographs, vegetation typing, and results of those surveys were used to determine preliminary species which may be impacted by the project, as well as species which may have needed further examination. Reviews were conducted to determine which species are known from the area or have suitable habitat present and could potentially occur. Primary sources included district wildlife sightings records, NRIS FAUNA corporate data, and information from species assessments prepared for Sensitive Species in Region 2 (USDA 2010b). Surveys for some species will be conducted subsequent to this analysis but prior to implementation, and if actual results of those surveys differ substantially from predicted values, additional analysis may be required, or specific design criteria or mitigations may need to be implemented to protect species.

The analysis area used for direct, indirect, and cumulative effects is the 1719-acre lease modification area and a 47,904-acre surrounding landscape area coincident with the Mount Gunnison Lynx Analysis unit, which incorporates the watersheds surrounding the project on FS lands. This area is used to provide data consistency across disciplines. Vegetation and activity information for areas outside of the Forest are of substantially lower quality than on Forest Service lands and may not be considered here due to the lack of data specificity. Indirect effects of this project to the species analyzed herein will likely be restricted to the immediate lease modification area. However, but the action is anticipated to include some road construction off of the lease modification area, and is connected to previously analyzed actions within the original lease areas, which are included in the larger landscape area. In addition, some species are impacted by road densities, disturbance, or changes in vegetation over larger scales. The analysis includes changes in vegetation cover types, as this proposed action would alter existing vegetation within the proposed road and pad locations in both the short and long-term.

HABCAP (Habitat Capability) modeling was not used for this analysis. It was developed as a comparative tool to model differences in habitat capabilities between alternatives by calculating changes in habitat types and structural stages. A Habitat Capability Index (HCI) for each species is determined from the relative amounts of particular habitat types within the analysis area, based on the species' uses of that

habitat for various functions and at various times of the year. Other factors, such as road density, are included for some species such as elk. It estimates capability at a single point in time, and does not simulate change over time. Long-term changes in habitat are addressed in the discussion within this document. However, HABCAP is useful only for larger scale vegetation management projects such as timber sales, and impacts of this project at watershed scales would show insignificant changes in the model. HABCAP may show effects of this project due to road construction, but these roads will not be constructed and used at the same time, will only be open for a short time frame, and their effects, as driving routes, would be restricted to that time frame when each route is in use. The model is unable to clearly show this type of activity and was not deemed useful for that purpose.

Assumptions: For this analysis, all lease stipulations for the parent leases (See Chapter 2 Proposed Action), with slight modifications to reflect current management direction, were considered as part of the proposed action, and all BMPs outlined in the Watershed Conservation Practices Handbook are assumed to be used as needed for the project.

## General Sensitive Species Affected Environment

See Vegetation Section in this document for a description of the existing habitats and acreages affected.

There are several sensitive species that are or are potentially present in the project area. Information on distribution, dispersal capability, abundance, population trends, habitat trends, habitat vulnerability, and risks based on life history and demographics has been reviewed for USFS R2 Sensitive Species, and is available on Region 2's website (www.fs.fed.us/r2/projects/scp). This information has been incorporated where relevant, but extensive life histories of species are not described herein. The list of species reviewed for this project was taken from the Region 2 Sensitive Species Matrix (USDA 2010). This excluded R2 Sensitive Species which were not known or expected to occur on the GMUG. A list of all possible sensitive species on the Forest is given in Appendix 1. Numerous species which may occur on the GMUG NF, but are not known or expected to occur in the project area, due to absence of habitats or range limitations, were not carried forward for analysis, and will not be affected by the project. None of the sensitive plant species on the GMUG are known or expected to occur in the project area and will not be affected by the project. Fish species are addressed in a separate document.

## No Action Alternative Environmental Effects All Sensitive Species

The direct and indirect impacts of the "no action" alternative would not change current habitat or population conditions of any Forest Service sensitive species in the short term. Long-term changes would continue to be dependent on existing conditions, current succession of vegetative types, and other actions within the project area, as indicated in the cumulative effects tables and discussions in this analysis. The ongoing aspen decline may result in both short- and long-term loss of aspen at a landscape scale in this area.

## All Sensitive Species Consistency with Forest Plan and Other Regulations

The FSM directs the Regional Forester to identify sensitive species for each National Forest where species viability may be a concern. National forests are then required to monitor sensitive species populations and prevent declines that could require listing under ESA (FSM 2670.32 (4)). The direction requires the Forest Service to manage the habitat of the species listed in the Regional Sensitive Species List to prevent further declines in populations, which could lead to Federal listing under the ESA. The alternatives discussed in this EIS would not result in a decline or reduction of viability of the populations of sensitive species identified to occur on the GMUG National Forests. A Biological Evaluation has been completed to assess the impacts of the alternatives on sensitive species. The Biological Evaluation is located in the project file.

BLM_0049751

## *3.12 American marten*

### *Affected Environment*

The American marten is known to occur on the Forest and evidence of its presence has been seen in the project area (Monarch 2010). Suitable habitat is present at higher elevations within the lease modification area and at similar elevations throughout the cumulative effects area. Martens show close association with mesic, dense coniferous forests with complex physical structure. Maternal dens and winter resting sites are associated with large snags, large logs, large live spruce/fir trees and squirrel middens. Timber harvest, and reduction of snags and logs, has altered landscape patterns and reduced habitat quality (USDA 2005a). A marten survey was conducted on the Grand Mesa during the winter of 1993-94 for presence/absence and habitat types in which marten were found. Marten were documented in all suitable habitats surveyed (mature spruce-fir) with track plates, and habitat conditions averaged 70% canopy cover and tree age of 150 years old. See 2005 Management Indicator Species Assessment for more information on populations and trends (http://www.fs.fed.us/r2/gmug/policy/).

### *No Action Alternative Environmental Effects*

See Section 3.11.

### *Proposed Action Alternative Environmental Effects*

Actions with the potential for effects to this species include:

- Short-term effects of disturbance during construction
- Long-term changes to habitat

Marten tend to be shy but occasionally appear fearless of humans and may approach closely (Ruggiero et al. 1994). They are active at various times of the day and night and appear to be flexible in their activity patterns. Activities associated with this project may cause avoidance or may result in changes in activity patterns.

Studies of home range size of male martens shows a range 16 km$^2$ (Minnesota) to 0.8 km$^2$ in Montana (Ruggiero et al. 1994). Overall, marten home ranges are large by mammalian standards. Female home ranges are smaller and home range size also varies based on prey abundance. Assuming a mid-range home range size (8 km$^2$), that would be a home range size of approximately 3 square miles. Because this species appears to be generally tolerant of disturbance (they are commonly observed in ski areas and at cabin sites), and they would have abundant habitat outside of the disturbed area within their territory, disturbance is not an issue for this species.

Denning habitat includes natal dens and maternal dens. Young are born in March and April in natal dens, but may be moved to other dens by their mother. They leave dens at about 50 days (Ruggiero et al. 1994). Young born in late April would leave dens around mid-June. Suitable marten denning habitat is present in the project area and will likely be impacted by the project, with a complete loss of habitat suitability at road and pad locations in spruce-fir habitats, with a total impacted area in these habitats of approximately 7 acres. Lease stipulations associated with Canada lynx require replanting of spruce-fir as part of rehabilitation, so in the long term, this habitat will be regenerated which also benefit marten. Much of this area is snowbound until late May or early June and most construction activities would occur outside of the denning period for this species, reducing the risk of incidental direct mortality to denning individuals or immobile young.

Marten make little use of early successional types as they lack overhead cover, high volumes of coarse woody debris, small-scale complex vegetation patterns and result in a conversion to a moist cool site to a warm, dry site (and changes in prey densities) (Ruggiero et al. 1994). Martens will generally avoid forest openings, but studies have found them crossing openings of 10m (Spencer et al. 1983), to 40 m (Simon 1980) to 100 m (Koehler and Hornocker 1977) (in Ruggiero et al. 1994). They are routinely seen on the

BLM_0049752

district crossing roadways (D. Garrison pers. obs.). Road openings created for this project will be approximately 10 meters wide, within the range of tolerance noted above.

Starting in 1997, as a result of Amendment 14 that outlaws traps and snares, there has been no legal recreational trapping for any furbearer species in Colorado. In 2001, the CDOW looked at opening certain furbearer species to box and cage trapping. Several species may now be legally trapped, but this does not include marten. Effects of changes in access to trappers and resultant effects on vulnerability of marten to trapping will not be analyzed further.

### Determination

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing". This is based on known presence of marten within the project area, the anticipated loss of suitable habitat by the project, and the slight possibility of mortality or disturbance to marten denning or foraging as a result of the project. The negative effects from this project are of short duration and magnitude and do not result in a Forest-wide decrease in trends or deter from meeting the MIS objectives in the Forest Plan.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. No other activities, with the exception of recreational hunting and livestock grazing, occur within suitable habitat in the analysis area. None of the ongoing or reasonably foreseeable actions reduce the quantity or quality of denning or foraging habitats for this species in this area. Disturbance from these activities will remain similar to current and past levels.

## 3.13 Pygmy shrew

## Affected Environment

The subspecies *Sorex hoyi montanus* may occur on the GMUG National Forest. In the Rocky Mountain Region, they appear to be strictly boreal. In addition, moist boreal habitats such as bogs and marshes appear to be preferred (Beauvais and McCumber 2006). According to Beauvais and McCumber, the literature addressing habitat use by montane pygmy shrews is decidedly sparse, it does present a consistent theme of "wet conifer forest" as the primary occupied landscape. In the Southern Rocky Mountains, all known capture sites are in upper montane or subalpine landscapes dominated by conifer forest and dense stream networks that interact with various bogs, marshes, and other wetlands. This type of habitat occurs on the eastern edge of the project area and extends eastward from there through a system of slump ponds at the base of Mount Gunnison. The shrews' den may be a burrow or shelter under a log, or may be located in the roots of old stumps. Females generally produce one litter per year, of typically 3-7 young (Beauvais and McCumber 2006). They may be present in the project area, but no small mammal surveys were conducted for this project and none are planned.

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Actions with the potential to affect this species or habitat include:

Short-term potential for loss of individuals during construction

Long-term changes to habitat

Spruce-fir habitat suitable for the montane subspecies of pygmy shrew is present within the project area, and would be converted to road and pad surfaces in the short term. This habitat should regenerate after project completion and reforestation.

BLM_0049753

*Environmental Assessment*                    *Federal Coal Lease Modifications COC-1362 & COC-67232*

Heavy equipment could easily kill or injure individual shrews during construction, and small mammals such as shrews are susceptible to road kill. Because only a very small proportion of the shrew's habitat may be affected by this project over the short-term, and the species' high reproductive rates, direct and indirect effects are anticipated to be low and insignificant.

**Determination**

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing". This is because this species is at risk for direct mortality during construction, and habitat would be affected over the short-term, offset by the abundance of habitat in the area and the species' high reproductive ability to replace lost individuals.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. None of the ongoing or reasonably foreseeable actions substantially reduce the quantity or quality of denning or foraging habitats for this species in this area at the landscape scale, and few of them have occurred in suitable habitats. Disturbance from these activities will remain similar to current and past levels.

## *3.14 Northern goshawk*

## Affected Environment

This species occurs on the GMUG. Nesting occurs in mature forest types (spruce-fir, lodgepole pine, ponderosa pine and aspen). Foraging habitat may include younger or more open canopy forests. The goshawk may be vulnerable to nest abandonment due to disturbance within the area. Alternate nests are commonly used, but nest tree fidelity was stronger in uncut forests compared to treated forests (USDA 2005a).

**Table 3.14.   Potentially suitable goshawk habitat on the GMUG by vegetation cover type and habitat structural stage.**

| Cover Type | 1 | 2 | 3A | 3B | 3C | 4A | 4B | 4C/5 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Aspen | | 4743 | 55301 | 211399 | 41446 | 23567 | 227148 | 176278 | 739881 |
| Cottonwood Riparian | | | 248 | 100 | | 2530 | 1532 | 42 | 4452 |
| Gambel oak | | 291383 | 472 | 82 | | 416 | | | 292353 |
| Mountain shrub | | 165073 | | | | | | | 165073 |
| Sagebrush | | 101838 | | | | | | | 101838 |
| Wet meadow | 4573 | | | | | | | | 4573 |
| High elevation riparian (blue spruce) | | | 101 | 242 | 560 | 234 | 597 | 836 | 2570 |
| Douglas fir | | | 3396 | 8226 | 2416 | 8848 | 16192 | 6590 | 45668 |
| Lodgepole pine | | 758 | 7100 | 124674 | 54741 | 4658 | 49472 | 38887 | 280290 |
| Pinyon-juniper | | | 28542 | 37131 | 625 | 29956 | 39064 | 1554 | 136862 |
| Ponderosa pine | | 251 | 10530 | 13060 | 94 | 42180 | 44102 | 965 | 111182 |
| Spruce-fir | | 269 | 38910 | 99888 | 11933 | 72923 | 322729 | 201388 | 748040 |
| Total acres | 4573 | 564315 | 144600 | 494792 | 111815 | 185312 | 700836 | 426540 | 2632782 |

BLM_0049754

| Cover Type | 1 | 2 | 3A | 3B | 3C | 4A | 4B | 4C/5 | Total |
|---|---|---|---|---|---|---|---|---|---|

**1** – Open grassland; **2** - Shrub-seedling, **3A** - Sapling-Pole, Crown cover percent < 40; **3B** - Sapling-Pole, Crown cover percent ≥ 40 and < 70; **3C** - Sapling-Pole, Crown cover percent ≥ 70; **4A** - Mature and over mature, crown cover percent < 40; **4B** - Mature and over mature, crown cover percent ≥ 40 and < 70; **4C/5** - Mature and over mature, crown cover percent ≥ 70.

\* Potentially suitable habitat derived from HABCAP modeling based on Hoover and Wills, 1984.

Based on actual known locations of nest sites, suspected breeding territories, and sightings, the northern goshawk appears to be well distributed throughout the GMUG in suitable habitat. Records of known goshawk nest activity on the GMUG show that numbers of breeding goshawks and nest success has remained relatively stable, although low over a 17-year period (USDA 2001). Breeding Bird Survey data show a slight increasing trend for this species in Colorado from 1980-2006 (Sauer et al. 2008).

The primary threat to goshawk populations is alteration of its preferred habitat from timber management practices. Although the goshawk uses a wide range of forest communities during the breeding season, it prefers mature and old growth forest for nesting and hunting. Although there is some evidence goshawks are resilient to forest fragmentation and can re-establish when cleared areas are reforested, the thresholds for population persistence have not been identified. Issues related to habitat alteration include forest fragmentation, creation of even-aged, monotypic stands, potential increase in area of younger age class, and loss of tree species diversity (Kennedy 2003).

There is one known territory in the proposed lease modifications and goshawks have been seen repeatedly in the upper Deep Creek drainage (J. Monarch, pers. comm. and D. Garrison, pers. obs.) and nests have been found in and near the COC-67232 lease modification.  However, additional monitoring will be needed to determine whether or not these nests are active prior to any proposed surface disturbance.  The area at the eastern edge of the proposed lease modification and the area immediately to the east of that are relatively flat and contain numerous openings and wetlands, and are similar to other occupied territories on the district.   Much of the remainder of the lease modification area is suitable habitat, but less likely to contain a goshawk nest than the area described above, due to steeper terrain and lack of surface water.   Surveys for goshawk are planned prior to initiation of surface activities. If goshawks are located in this area, the project will be implemented in accordance with the lease stipulations for this project, which are in compliance with standards and guidelines from the Forest Plan, specific to Northern goshawk.

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Actions with the potential for effects to this species include:

- Short-term effects of disturbance during construction
- Short-term potential for loss of young during construction
- Long-term changes to habitat

Human disturbances to goshawk nests have been a suspected cause of nest abandonment (Reynolds et al. 1992). Alternate nests are used commonly, but Crocker-Bedford found yearly nest tree fidelity remained at 67% in uncut forests, while treated units dropped to 15-20%, even with no-cut buffers around the nests (USDA 2005a).

Braun et al. (1996) reviewed existing goshawk management guidelines. They found no studies of human disturbance on breeding goshawks, but felt that the recommendation to minimize human activities in the nest area during the breeding season was a reasonable, conservative approach.

BLM_0049755

Goshawks are known to occur in the vicinity of the project, but an active nest location(s) has yet to be determined.

Additional raptor surveys specific to goshawk are planned for this project. Lease stipulations provide protection to known nest sites, should one be located. This design feature would help reduce the potential for loss of young during nesting as a result of nest abandonment due to disturbance.

Implementation of the project is expected to result in the loss of 61 acres of mature aspen habitats in various stages of decline, which are currently suitable for goshawk foraging and nesting, if currently unoccupied. This is .01% of the total aspen habitat for the GMUG. An additional loss of 7 acres of spruce-fir habitat is also anticipated.

### Determination

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing". This is based on the loss of 68 acres of suitable nesting and foraging habitat, mitigated by lease stipulations for timing restrictions if goshawks are located in the project area. The negative effects from this project are of short duration and magnitude and do not result in a Forest-wide decrease in trends or deter from meeting the MIS objectives in the Forest Plan.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. HABCAP modeling was not used to determine the impacts of this habitat alteration within the cumulative effects area, as the projected habitat losses are insignificant changes at this scale. If the aspen does regenerate in these areas, long-term suitability of the treated stands would return, however, as the stands matured.

The GMUG did an analysis of habitat trends on the Forest; aspen have stayed the same in the 1983 to 2000 period (USDA Forest Service 2005c). A current trend for aspen has not been done at the forest level. However, much of the aspen is in decline in the project area, and 13% of the aspen state-wide has declined since 2005. On the Paonia District, flights in 2007 showed aspen decline on 20,733 acres of 297,938 surveyed (Region 2 Forest Health GIS data). Of the area flown, approximately 122,000 acres was in aspen type (R2Veg, October 2007), thus approximately 17% of the aspen on the flown portion of the district was in decline at that time. The cumulative effects area currently contains more than 17,000 acres of aspen and 8,000 acres of spruce-fir (Table 3.8a).

## 3.15 Boreal owl

## Affected Environment

This species is known to occur on the Forest. Boreal owls in this portion of the state are closely associated with dense coniferous forests, especially spruce-fir. This habitat occurs on the upper elevations of the lease modification area and in inclusions within aspen stands at lower elevations. There have been no owl surveys conducted on the project to date, and due to the inaccessible nature of the project area and snow conditions during optimal survey periods, surveys may not be physically possible to safely conduct prior to project implementation.

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Actions with the potential for effects to this species include:

- Short-term effects of disturbance during construction

- Short-term potential for loss of young during construction
- Long-term changes to habitat

This species is associated with spruce/fir habitats, similar to martens. As a result, approximately 7 acres of suitable habitat may be lost as a result of this project, and will not regenerate until replanted conifers mature. The low amount of habitat loss represents only a few individual territories. There is a risk that occupied nesting habitat may also be impacted, with resultant loss of young. However, the species may utilize other habitats for foraging, and may use the newly created openings of the pads and roads for this purpose. Creation of these openings would therefore benefit this species.

***Determination***

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing" for the boreal owl. This is due to the possible loss of approximately 7 acres of suitable habitat, and potential of loss of young during project activities, offset by increased foraging opportunities in the created forest openings.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. This area contains over 8,000 acres of spruce-fir habitats suitable for this species, and portions of the remaining area are also suitable for foraging. None of the ongoing or reasonably foreseeable activities within this area, when combined with the proposed action, are likely to contribute to long-term cumulative impacts to this species.

## *3.16 Olive-sided flycatcher*

## Affected Environment

This species is known to occur on the Forest. They primarily breed in spruce/fir forest, but use the forest-opening ecotone and are a colonizer of post-disturbance habitats. Openings, conifers, snags and an abundant insect food source are the crucial elements (USDA 2005a). They occur less regularly and less abundantly in deciduous or mixed aspen/conifer forests (Kingery 1998). This species shows a relatively stable trend in Colorado (Sauer et al. 2008). Olive-sided flycatchers are occasionally seen and/or heard on the district, in a variety of habitats, usually near water or large openings while foraging (D Garrison, pers. obs.). This species has been observed near the project area during surveys for other coal-related projects in these watersheds (Monarch 2009).

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Actions with the potential for effects to this species include:

- Short-term effects of disturbance during construction
- Short-term potential for loss of young during construction
- Long-term changes to habitat

The nest-building through fledging period runs from about June 5 through August 2 for this species (Kingery 1998).

This species is associated with spruce/fir habitats, similar to martens. As a result, approximately 7 acres of suitable habitat may be lost as a result of this project, and will not regenerate until replanted conifers mature. The low amount of habitat loss represents only a few individual territories. There is a risk that occupied nesting habitat may also be impacted, with resultant loss of young. However, the species may

BLM_0049757

utilize other habitats for foraging, and may use the newly created openings of the pads and roads for this purpose. Creation of these openings would therefore benefit this species.

### Determination

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing" for the olive-sided flycatcher. This is due to the possible loss of approximately 7 acres of suitable habitat, and potential of loss of young during project activities, offset by increased foraging opportunities in the created forest openings.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. This area contains over 8,000 acres of spruce-fir habitats suitable for this species, and the remaining area is also suitable for foraging. None of the ongoing or reasonably foreseeable activities within this area, when combined with the proposed action, are likely to contribute to long-term cumulative impacts to this species.

## 3.17 Flammulated owl

## Affected Environment

This species is known to occur on the Forest. Flammulated owls have a strong association with ponderosa pine, but also use aspen forests in the montane life zone. Locally, ponderosa pine is widely scattered and most known owl locations are in aspen. This species is migratory, but shows high site tenacity by adults. As an insectivore, they can occur at relatively high densities compared to other owls (Hayward and Verner 1994, USDA 2005). These owls depend on cavities for nesting, open forests for catching insects, and brush or dense foliage for roosting (Kingery 1998).

Flammulated owls are documented on other portions of the GMUG NF, utilizing next boxes (NRIS FAUNA database). No Breeding Bird Survey information is available for this species. There have been no owl surveys conducted on the project to date, and due to the inaccessible nature of the project area, surveys may not be physically possible to safely conduct prior to project implementation.

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Actions with the potential for effects to this species include:

- Short-term effects of disturbance during construction
- Short-term potential for loss of young during construction
- Long-term changes to habitat

These owls are very tolerant of humans, nesting close to occupied areas and tolerating observation by flashlight at night. The effects of mechanical disturbance have not been assessed, but moderate disturbance may not have an adverse impact on the species (Hayward and Verner 1994).

The territory occupancy begins in late April or early May, with fledging in mid to late July (Hayward and Verner 1994). Project activities, including removal of suitable habitat, are likely to occur during the nesting period, and may result in loss of nests and young. Implementation of the proposed action would result in the loss of 61 acres of suitable nesting and foraging habitat for this species (mature aspen). Regeneration discussion and assumptions are the same as for goshawk noted above. Avoidance of known sites, if possible, would reduce risks to this species in this area.

BLM_0049758

*Determination*

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing" for the flammulated owl. This is due to the loss of 61 acres of mature aspen habitat, and the potential for loss of nest sites and young during project activities.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. None of the ongoing or reasonably foreseeable activities within this area, when combined with the proposed action, are likely to contribute to long-term cumulative impacts to this species.

See the goshawk analysis above concerning trends in aspen in the analysis area and on the Forest.

## 3.18 American three-toed woodpecker

## Affected Environment

This species is known to occur on the Forest, and while uncommonly observed, is present and breeds and forages in spruce-fir forests at elevations of 8-11,000 feet on the district (D. Garrison, pers. obs.). This species has not been detected in surveys for other coal projects in these watersheds, but little bird survey work has been done at higher elevations in this area to date. Breeding bird survey information for this species is relatively scarce, and shows a slight downward trend in Colorado from 1966-2007. Recent large-scale beetle kills in other parts of the Rocky Mountains may influence overall numbers of this species in the coming years.

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Actions with the potential for effects to this species include:

- Short-term effects of disturbance during construction
- Short-term potential for loss of young during construction
- Long-term changes to habitat

This species is associated with spruce/fir habitats, similar to martens. As a result, approximately 7 acres of suitable habitat may be lost as a result of this project, and will not regenerate until replanted conifers mature. The low amount of habitat loss represents only a few individual territories. There is a risk that occupied nesting habitat may also be impacted, with resultant loss of young. However, the species may utilize other habitats for foraging, and may use the newly created openings of the pads and roads for this purpose. Creation of these openings would therefore benefit this species.

*Determination*

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing" for the American three-toed woodpecker. This is due to the possible loss of approximately 7 acres of suitable habitat, and potential of loss of young during project activities, offset by increased foraging opportunities in the created forest openings.

BLM_0049759

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. This area contains over 8,000 acres of spruce-fir habitats suitable for this species. None of the ongoing or reasonably foreseeable activities within this area, when combined with the proposed action, are likely to contribute to long-term cumulative impacts to this species.

## 3.19 Northern leopard frog

### Affected Environment

This species is widespread and is known to occur on the Forest. Population trends are expected to be downward throughout much of their range. The formerly abundant northern leopard frog has become scarce in many areas of Colorado due at least in part to changes in habitat. The species is also susceptible to fungal infections which have been known to impact amphibian populations. Typical habitats include wet meadows, and the banks and shallows of marshes, ponds, glacial kettle ponds, beaver ponds, lakes, reservoirs, streams and irrigation ditches (Hammerson 1999). Local habitats include stock ponds, reservoirs, slump ponds, seeps, and other riparian areas (D. Garrison, pers. obs.). During the wet season, leopard frogs disperse along aquatic and riparian corridors (USDA 2005a).

There are records of northern leopard frogs in Garfield, Mesa, Delta and Gunnison counties (Colorado Herpetological Society website). Leopard frogs are known to occur in the Minnesota Creek area (district records) and in other portions of the North Fork Valley. There are seventeen identified potential amphibian sites within the lease modification area, and more than 250 sites within the cumulative effects analysis area, in addition to permanent streams. Leopard frogs are known to occur at many of the sites within the cumulative effects area but surveys have not been conducted within the lease modification area itself. Surveys will be conducted in before surface disturbing activities are authorized, to determine frog presence/absence in the project area.

### No Action Alternative Environmental Effects

See Section 3.11.

### Proposed Action Alternative Environmental Effects

The following potential effects to northern leopard frogs include:

- Short-term direct effects from construction (loss of individual adults, egg masses or juveniles)
- Impacts to water quality during and after construction

The northern leopard frog is known to occur in this watershed. During spring and early summer, egg masses and juveniles potentially residing in area streams or ponds may be subject to mortality through impacts to wetlands such as siltation or fuel spills. However, lease stipulations implemented in these types of projects make this unlikely. Adults may be killed through the action of heavy equipment during road and pad construction, or from traffic along roads leading to and from the project area. There is also a possibility that movement of tadpoles or adult frogs may be curtailed by placement of culverts at stream crossings. Breeding habitat for this species will not be lost as a result of this project.

*Determination*

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing" for the northern leopard frog. This is based on the possibility of individual mortality by vehicles or heavy equipment during construction, a low likelihood of water quality impacts, the presence of suitable habitat near the project area, and the lack of aquatic habitat loss associated with the project.

BLM_0049760

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. Activities in this area which may impact leopard frogs include grazing management, surface activities associated with mining, motorized travel, and water depletions. Grazing can result in loss of riparian vegetation (foraging habitat and cover) and trampling of egg masses. However, frog populations have been located on the forest in areas with livestock concentrations (D. Garrison pers. obs.) and many of the suitable habitat features on the landscape, especially in this watershed, were created for and are managed for livestock use.

Water depletion can reduce habitat availability at breeding sites (ponds and riparian areas). However, seasonal drying of wetlands and breeding ponds is a common occurrence for this species. Additionally, the project area receives substantial amounts of precipitation and has abundant surface water at higher elevations. Surface activities associated with mining can result in runoff effects as noted above, but these are unlikely and have not, to date, shown any noticeable impacts to this species in this area. Motorized travel of all types may result in mortality to individuals moving from wetlands into upland areas. These impacts, however, all occur in this watershed and have for several years, and frog populations appear to be healthy. This project is therefore unlikely to contribute significantly to cumulative impacts for this species.

## 3.20 Purple martin

## Affected Environment

This species is known to occur on the Forest and is primarily associated with patches of mature to decadent aspen. Nest site availability may be a key limiting factor to populations in R2 (USDA 2005a). The preferred habitat of purple martins in the Rocky Mountains is mature aspen forest with nearby meadows and open water. Martins nest in cavities in live aspen trees (Wiggins 2005). This species shows an upward population trend in Colorado but is relatively stable to slightly decreasing across the US (Sauer et al. 2008). Numerous colonies of purple martins are known on the district and martins are known to nest at lower elevations near the project area. Additional bird surveys will be conducted in this area prior to project implementation and any nest sites located near proposed surface disturbance activities would be avoided if possible.

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Actions with the potential for effects to this species include:

- Short-term effects of disturbance during construction
- Short-term potential for loss of young during construction
- Long-term changes to habitat

The nest-building through fledging period runs from about June 6 through July 31 for this species (Kingery 1998). This species uses aspen habitats, similar to flammulated owls. Project activities, including removal of suitable habitat, are likely to occur during the nesting period, and may result in loss of nests and young. Implementation of the proposed action would result in the loss of 61 acres of suitable nesting and foraging habitat for this species (mature aspen). Regeneration discussion and assumptions are the same as for goshawk noted above. Avoidance of known sites, if possible, would reduce risks to this species in this area.

BLM_0049761

*Determination*

Implementation of the proposed action "may adversely impact individuals, but is not likely to result in a loss of viability in the planning area, nor cause a trend towards federal listing" for the purple martin. This is based on the loss of 61 acres of suitable nesting habitat in the project area and the quantity of aspen habitat remaining in the cumulative effects area.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities. None of the ongoing or reasonably foreseeable activities within this area, when combined with the proposed action, are likely to contribute to long-term cumulative impacts to this species. See the goshawk analysis above concerning trends in aspen in the analysis area and on the Forest.

## *3.21 Sensitive Plants*

## Affected Environment

According to Paonia Ranger District Range Management Specialist, two Forest Service sensitive plant species, Rocky Mountain thistle (*Cirsium perplexans*) and Colorado tansy-aster (*Machaeranthera coloradoensis*) are known or likely to occur on or near the Paonia Ranger District. Species that are not known or not likely to occur in the project area will not be affected by the proposed action; therefore, they will not be discussed further.

Rocky Mountain thistle (*Cirsium perplexans*) is a western Colorado endemic found in dry, sparsely vegetated or disturbed areas associated with sagebrush, mountain shrub, Gambel oak/serviceberry, and saltbush shrubland vegetation types at elevations of 5,700 feet to 7,560 feet. It occurs adjacent to drainages and dry washes and along roads (Spackman *et al.* 2002). Rocky Mountain thistle loosely resembles the noxious weed Canada thistle (*Cirsium arvense*). Its primary threat is the use of biological control and herbicides in the management of non-native *Cirsium* spp. (Panjabi and Anderson 2004). Currently, there is insufficient evidence for Federal listing. Panjabi and Anderson (2004) documented an occurrence on the Paonia Ranger District on Land's End Mountain in 1997 (approximately 18 miles southwest of the project area). This species has been found at lower elevations on BLM land in the "Redtop Peak area" about 6 miles northwest of the project area. In addition, the Paonia District Rangeland Management Specialist has located numerous populations on the BLM Oak Ridge area and the GMUG NF Sam's Divide area 6 miles to the west of the project area. All known populations on or near the Paonia Ranger District have been found below 7,700 feet. This species has not been documented in the project area; however, habitat of this type likely occurs there.

Colorado tansy-aster (*Machaeranthera coloradoensis*) is a south-central Wyoming, and central, west-central and western Colorado endemic found in sparsely vegetated gravelly, exposed soils of sedimentary or volcanic origin (Beatty and others 2004). In Colorado, it is associated with dry grassland communities ranging from ponderosa pine (*Pinus ponderosa*) to alpine fellfields and meadows at elevations from 7,675 feet to 12,940 feet. The primary threats to this species are direct and indirect effects of motorized and non-motorized recreation, and trail and road construction and maintenance (Beatty and others 2004). Three occurrences were documented in Gunnison County in 1950, 1997, and 1999 (Beatty and others 2004, USDI BLM 2000). Occurrences of this species have not been documented in the project area but its habitat is likely to occur.

## No Action Alternative Environmental Effects

See Section 3.11.

## Proposed Action Alternative Environmental Effects

Under the Proposed Action, there would be no direct effects to sensitive species.  Indirect effects from surface disturbance related to new road construction and MDW installation could affect sensitive plants if it happens to occur in the same location as a plant population. At time surface activities might be proposed, appropriate populations or habitats will be surveyed on a site-specific basis prior to ground disturbance.

Colorado tansy-aster has not been documented in the project area, and if encountered would not be impacted by the proposed action. If populations were encountered they would be avoided or have other mitigation implemented to avoid effects on plants or populations, where possible.

Rocky Mountain thistle may benefit from MDW and other associated surface disturbance by the creation of suitable habitat (Panjabi and Anderson 2004). If the species is present near an area of disturbance, it may be able to colonize newly disturbed areas. While this species may be adversely affected by off-road vehicle use or inadvertent targeting of the species as part of a noxious weed control program, these impacts are not likely to occur as a result any future proposed disturbance would require surveys in likely habitats before disturbance occurs and populations would be avoided or have other mitigation implemented to avoid effects on plants or populations, if possible. If surveys are required for future disturbances, any occurrence of Rocky Mountain thistle would be flagged and mapped to avoid inadvertent herbicide application during weed treatments and species identification information provided to the weed control agent to further decrease the likelihood of species misidentification.  For these reasons, there will likely be a beneficial impact to this species in the creation of possible disturbance areas suitable for propagation.

## Cumulative Effects

There is not anticipated to be any negative cumulative impacts from leasing or subsequent development on these species within the lease nomination area.  Disturbances may increase potential habitat for Rocky Mountain thistle Existing activities outside the analysis area may continue to effect habitat and individuals of these species.

## 3.22 Management Indicator Species _____

The 1982 Planning Rule 36 CFR 219.19(a)(6) related to Management Indicator Species (MIS) requires the Forest Service to produce a unique list of species to represent Forest communities or ecosystems. These species and the ecosystems in which they represent must be considered for each project to evaluate consistency with the Forest Plan. The 2005 Forest Plan Amendment modified this list.

A complete table of all of the GMUG Management Indicator (MIS) species is presented in Appendix 2 of the Biological Evaluation in the Project File.  The northern goshawk and American marten are also sensitive species and are discussed as such above. The Abert's squirrel is a ponderosa pine obligate, is not known or expected to occur in this area, and will not be discussed.  The Brewer's sparrow is closely associated with sage habitats, which are not present in the immediate lease modification vicinity, and will not be discussed.  As there are only intermittent streams in the analysis area there are no MIS fish with suitable habitat present and therefore will not be discussed.

Additional methodology is discussed in Section 3.11 Sensitive Species.

## No Action Alternative Environmental Effects All MIS Species

The direct and indirect impacts of the "no action" alternative would not change current habitat or population conditions of management indicator species in the short term.  Long-term changes would continue to be dependent on existing conditions, current succession of vegetative types, and other actions within the project area, as indicated in the cumulative effects tables and discussions in this analysis.  The ongoing aspen decline may result in both short- and long-term loss of aspen at a landscape scale in this area.

BLM_0049763

## MIS Consistency with Forest Plan and Other Regulations

Management Indicator Species and Other Wildlife All alternatives are consistent with the Forest Plan, NFMA, ESA, RPA, Executive Order 13186, the Bald and Golden Eagle Protection Act, Forest Service Manual (FSM) and Handbook (FSH) direction. All alternatives are consistent with the recent Management Indicator Species Amendment, Forest Plan Amendment 2005-01. This amendment was approved in May 2005. The amendment revises language in Forest Direction and Standards and guidelines for Management Areas, and the Monitoring Plan (see pages A-1 through A-17 of Management Indicator Species Forest Plan Amendment EA, Appendix A). Management direction will be further assessed at the next phase of NEPA.

## 3.23 Elk

## Affected Environment

Elk are widespread and disperse readily across landscapes, with few habitat-related limitations. Populations are abundant (and stable or increasing) on the Forests in R2 and the GMUG. Value of habitats on Forests is increasing as habitat on adjacent private lands is lost to human development. Females are sensitive to disturbance during calving season and herds are sensitive to disturbance in the winter (USDA 2005b).

Elk use a combination of open meadows for foraging and woodlands for cover, calving and thermal regulation. The elk herds in the analysis area are migratory, using higher elevation forests and meadows during the summer. The analysis area lies in elk summer range, but not within a mapped calving area or winter range (Figure 2).  The proposed activities lie within the Colorado Division of Wildlife's (CDOW) Game Management Unit (GMU) 53, which is part of elk Data Analysis Unit (DAU) E-52. The elk population estimate for this DAU, based on 2008 post- hunting surveys, was 3890 elk (CDOW 2010a), within the objective population.  CDOW estimated that during the 2008 hunting season (the last for which data is currently available) for GMU 53 there were 2,379 total hunters, who harvested 478 elk, a 20% success rate. (CDOW 2010).

The primary issues affecting elk distribution are lack of habitat security due to motorized and non-motorized travel and recreation activities (USDA 2005c).

## No Action Alternative Environmental Effects

See Section 3.22.

## Proposed Action Alternative Environmental Effects

The following potential effects to elk include:

- Short-term direct effects during construction (visual or auditory disturbance or displacement of individuals from machinery, vehicles and humans)
- Long-term direct effects as a result of changes in forage and cover
- Long-term indirect effects as a result of changes in human use in the area

Declines in elk use of habitat adjacent to forest roads have been documented in many studies (Lyon 1979; Rowland et al. 2000). A study of elk in relation to logging disturbances found that there was a buffer zone of 500 to 1,000 meters (1640-3280 feet) separating areas of high elk use from areas of disturbance (Edge and Marcum 1985). Another study looked at reproductive success of elk following disturbance by humans during calving season (Phillips and Alldredge 2000). They found that elk subjected to human-induced disturbance through a 3-4 week period during calving season over two years showed lower calf survival. Generally, habitats provide more effective security the further they are from roads. Considering documented road avoidance by elk, the minimum distance between secure habitats and an open road is ½ mile (Hillis et al. 1991).

BLM_0049764

None of the proposed activities are within mapped elk production areas.  However, elk may calve at any location on and off the Forest. Therefore, if activities occur during calving season, elk may be displaced by project activities. Numerous studies have shown that elk will move back into an area once the disturbance is over and the displacement will be temporary.

The entire analysis area, and surrounding landscape, is considered as summer resident habitat.

Currently, little summer recreational use is known to occur in the area. Motorized use is limited to existing roads and trails, which are absent in the lease modification area.   Access roads used would be closed to the public after construction is complete, and no increase in motorized use of the area after construction, other than minimal entries for monitoring, are anticipated. The analysis area contains no open motorized routes at this time.

Project activities may occur into the fall hunting seasons.   Disturbance to both local elk populations, and to hunters whose camps are no longer accessible or desirable due to project activities and/or traffic, is anticipated.  As a result, changes to elk hunting pressure in both the immediate analysis vicinity and other portions of GMU 53 are expected.  Due to the small scale of the disturbance and the size of the GMU, it is not anticipated that harvest will change measurably across the GMU.

None of the analysis area is considered to be elk winter range, due primarily to elevation.  Connected actions such as motorized travel on roads in the valley bottom may occur in winter range.

Because elk are very adaptable, and use a wide variety of habitats, the conversion of existing vegetation to a grass/forb, then young seral stages of disturbed habitats once roads and pads are reclaimed, is unlikely to have any measurable effects to elk at the population scale. Forage availability in this area is likely to increase once reclamation occurs, and elk may use roads for travel prior to this, especially as roads will not be open to public motorized travel.  Summer range is not a limiting factor for elk in the North Fork Gunnison area (K. Madariaga, pers. comm.), and thus alteration of summer habitat is unlikely to cause noticeable population changes.  Vulnerability to hunters could increase in the new road prisms and pads for several years, but abundant cover is currently found throughout the analysis area and is likely to be immediately available to elk during hunting seasons.  Elk habitat in this and surrounding areas is anticipated to be much more substantially impacted by the ongoing aspen decline than by this small-scale project.

**Summary and Conclusion**

The negative effects from this project are of short duration and magnitude and do not result in a Forest-wide decrease in trends or deter from meeting the MIS objectives in the Forest Plan.

## Cumulative Effects

The cumulative effects analysis area for this species is the 47,904-acre area surrounding the proposed treatments and activities.  HABCAP modeling was not used to determine the impacts of this habitat alteration within the cumulative effects area, as alterations at the scale anticipated would result in insignificant changes in this model.  Because elk are very adaptable, and use a wide variety of habitats, the conversion of this small area of mature aspen and spruce/fir to a young aspen, spruce, or mountain shrub cover type would not have any substantial effects.  Actions taken in this project are unlikely to interact substantially with other recreational, grazing, or special use actions as described in the cumulative effects table.  In addition, elk populations in this and other areas on the forest are much more likely to be directly influenced through management of hunting seasons by the Division of Wildlife than from habitat changes at minor scales.

Travel management in the cumulative effects area is under analysis at this time and may result in long-term changes in open road or trail use within the analysis area, depending upon that decision.   It is anticipated that overall mileage of open road and motorized trails within the analysis area will decrease once travel management is implemented.  Motorized routes created for this project will not be open to the public and will be reclaimed within a short time frame.

BLM_0049765