In this analysis, the Ivy Creek Pasture has the lowest Total Herd Contact Rate (0.18) with contact on the pasture expected every 5.6 years with a potential disease interval of every 22 years. This pasture contains the least amount of ground that is suitable for domestic sheep grazing and the least amount of source bighorn sheep habitat. The majority of the pasture is heavily timbered and is within a narrow drainage (Ivy Creek). Even at this contact rate, a disease transmission event at this interval is not expected to maintain herd viability over time.

The Fisher Mountain Pasture has a Total Herd Contact Rate of 0.72. This pasture contains a large amount of ground that is both suitable for domestic sheep grazing and suitable source habitat for bighorn sheep. Contact in this pasture is expected every 1.4 years the pasture is grazed with a potential disease interval of every 5.6 years. A disease transmission event at this interval is not expected to maintain herd viability over time.

The Buck Park Pasture is a relatively large park that has a similar amount of acres suitable for domestic sheep grazing and source bighorn sheep habitat. Buck Park very likely either provides or will provide connectivity between the Core Herd Home Range and the large area of source bighorn sheep habitat on Fisher Mountain. The Total Herd Contact Rate for Buck Park is 0.37 with contact expected every 2.7 years the pasture is grazed with a potential disease interval of every 11 years. A disease transmission event at this interval is not expected to maintain herd viability over time.

The Fisher Creek, Ivy Basin, and Goose Lake Pastures all contain relatively large amounts of source bighorn sheep habitat and are at least partially within the Core Herd Home Range. The Fisher Creek and Ivy Basin Pastures contain little ground suitable for domestic sheep grazing. The Goose Lake Pasture provides a relatively large amount of suitable ground for domestic sheep. The Total Herd Contact Rate for all three of these pastures is over 1.0. A rate of over 1.0 suggests that contact is expected in these pastures every year they are grazed. A potential disease event could occur approximately every 4 years. A disease transmission event at this interval is not expected to maintain herd viability over time. The Beautiful Mountain Pasture is a large and open mountain top with a tremendous amount of source bighorn sheep habitat and a relatively large amount of ground suitable for domestic sheep grazing. The Total Herd Contact Rate is over 1.0 which equates to contact every year the pasture is grazed with a potential subsequent disease event occurring every 4 years. A disease transmission event at this interval is not expected to maintain herd viability over time.



Goose Lake Pasture

Within the Core Herd Home Range

The allotment as a whole has a risk of contact of 1.0+. This rating suggests that not only is contact expected every year the allotment is grazed but most likely by more than one bighorn every year. The population may be continually exposed to ongoing disease transmission and resultant outbreaks which could result in eventual extirpation over time Photo: Ivy Ridge looking to the north. The trail and general area is used by bighorn and domestic sheep. Fisher Mountain is in the far background.

30



Figure 9: Fisher-Ivy/Goose Lake Sheep Allotment Pasture Map.

31

BLM_0050323



Figure 10: Graph of BHS Contact Rate per Pasture. The Fisher Creek, Ivy Basin, Goose Lake and Beautiful Pastures are all at least partially within the Core Herd Home Range and have contact rates of over 1.0.

Disease-caused declines in bighorn populations, typically consists of an initial all-age die-off event followed by years of low lamb survival. Ewes that survive the initial die-off may give birth, but after a period of weeks to months, their lambs develop pneumonia and die.

The risk of the Weminuche Bighorn Herd eventually becoming extirpated as a result of consistent exposure to interspecies contact on the Fisher-Ivy/Goose Lake Sheep Allotment is High.



BLM_0050324

Other Herds

On the RGNF, several herds are still suffering from low lamb recruitment resulting from past disease events dating back to the mid 1990's, including the S36-Bellows Creek Herd, S55-Carnero Creek Herd, S10 Trickle Mountain Herd and the S29-Alamosa Canyon Herd.

These herds are briefly discussed to demonstrate the potential severe and long lasting effects of disease transmission.

S36 Bellows Creek: The Bellows Creek Herd experienced a *pasteurella* outbreak in 1993 presumably due to contact with domestic sheep. The population was reduced from an estimated high of 125 animals to a low of 30 by 2001. The numbers in this herd have slowly increased since 2001 and appear to be on a slow upward trend to an estimated 60 animals today. Monitoring has shown that numerous lambs are present in the herd in June and July but their



numbers are greatly diminished by late August. This type of lamb die-off is typical of herds still experiencing impacts of past disease events. In this herd instance, it has taken approximately 20 years for the herd to slowly recover and expand.

Left: Healthy lambs in the Bellows Creek Herd December of 2011. Right: Sickly lamb in the Bellows Creek Herd 6/2012.



S55 Carnero Creek: The Carnero Creek Herd (Natural Arch) experienced a die-off in 1993 or 1994 which reduced the herd from an estimated 100 to less than two dozen by 2005. The disease outbreak is suspected to come from contact from a diseased bighorn from the Bellows Creek Herd, approximately 15 miles away. The herd today remains stagnant at two dozen animals with very low lamb recruitment. Continued herd persistence is unlikely. In this herd, lamb recruitment rate does not appear to be keeping up with herd mortality rate after approximately 20 years. The Carnero Creek herd illustrates how disease events can spread between relatively separated bighorn sheep herds once introduced into the population.

S10 Trickle Mountain: This herd once numbered between 400-500 bighorn and was considered to be one of the state's premier bighorn herds. This herd was a source for transplants into other areas from 1971 to 1980. The herd suffered a catastrophic die-off in 1993-1994 from an unknown source. The herd today is estimated at 50 animals. The herd has exhibited very low lamb recruitment. In this herd, after 20 years, lamb recruitment remains poor and the herd is considered to be at risk.

S29 Alamosa Canyon: It is believe that this herd reached a high count of approximately 80 animals. Around 1991, a bighorn die-off caused by *pasteurella* occurred in the herd reducing the herd to an estimated 35 by 2004 where it remains today. It is suspected that a source of contact was transferred to the herd from a domestic sheep herd below Terrace Reservoir. After 20 years, the disease appears to be persisting in the population and has resulted in low recruitment since that time. The herd is at high risk of extirpation (USDA Forest Service 2010a).

BLM_0050325

## ALTERNATIVE SUMMARY

**Alternative 1**

| Pasture | Total BHS Herd Contact Rate | Risk Rating | Estimated Disease Interval |
|---------|------------------------------|-------------|-----------------------------|
| Ivy Creek | 0 | No Risk | There will be 0% chance of contact between domestic and bighorn sheep and potential disease transmission on the Fisher-Ivy/Goose Lake Sheep Allotment. The allotment would become vacant under Alternative 1. |
| Fisher Mtn | 0 | No Risk | |
| Buck Park | 0 | No Risk | |
| Fisher Creek | 0 | No Risk | |
| Ivy Basin | 0 | No Risk | |
| Goose Lake | 0 | No Risk | |
| Beautiful Mtn | 0 | No Risk | |
| ALLOTMENT | 0 | No Risk | |

Table 8: The table displays for Alternative 1, the herd contact rate, risk rating and estimated disease interval.

Alternative 1 – There would be no contact between the two species on the allotment due to lack of overlap between areas grazed by domestic sheep and bighorn CHHR. The Fisher-Ivy/Goose Lake Sheep Allotment would no longer provide a risk regarding a source of contact and potential subsequent disease transmission for the Weminuche Bighorn Herd. The herd is expected to remain viable well into the future and has a high probability of population persistence.



34

**Alternative 2**

| Pasture | Total BHS Herd Contact Rate | Risk Rating | Estimated Disease Interval |
|---|---|---|---|
| Ivy Creek | 0.18 | High Risk | A disease event could potentially occur every 22 years the pasture is grazed. |
| Fisher Mtn | 0.72 | High Risk | A disease event could potentially occur every 5.6 years the pasture is grazed. |
| Buck Park | 0.37 | High Risk | A disease event could potentially occur every 11 years the pasture is grazed. |
| Fisher Creek | 1.0+ | High Risk | Within the Core Herd Home Range. A potential disease event could occur approximately every 4 years. |
| Ivy Basin | 1.0+ | High Risk | Within the Core Herd Home Range. A potential disease event could occur approximately every 4 years. |
| Goose Lake | 1.0+ | High Risk | Within the Core Herd Home Range. A potential disease event could occur approximately every 4 years. |
| Beautiful Mountain | 1.0+ | High Risk | Within the Core Herd Home Range. A potential disease event could occur approximately every 4years. |
| ALLOTMENT | 1.0+ | High Risk | Within the Core Herd Home Range.  A potential disease event could occur approximately every 4 years. Bighorn sheep could potentially be exposed to disease on a continued basis. |

Table 9: The table displays for Alternative 2, the herd contact rate, risk rating and estimated disease interval.

Alternative 2 - Contact is expected every year the allotment is grazed due to direct overlap between areas grazed by domestic sheep and bighorn sheep CHHR. Even without direct overlap, high contact rates exist from the short foray distance to each pasture. The Fisher-Ivy/Goose Lake Sheep Allotment will continue to a pose a high degree of risk for contact and potential subsequent disease transmission for the S15 subpopulation. As evidenced from the Carnero Creek herd (S55) die-off, this may result in a high risk of disease transmission for the Weminuche Herd as a whole.

The future viability of the herd will be at risk due to the population being continually exposed to ongoing potential disease transmission and resultant outbreaks.  This alternative has a low probability of population persistence for this bighorn herd into the future. The population would likely be extirpated at some point in time as a result of consistent exposure to interspecies contact.

35

<u>The Risk of Contact between Bighorn Sheep and Domestic Sheep on the Fisher-Ivy/Goose Allotment is rated as HIGH for Alternative 2 based on the following factors:</u>

- ✓ The allotment is within the Weminuche Bighorn Core Herd's Home Range (S15 subpopulation).

- ✓ All pastures within the FIG Allotment have herd contact rates suggesting potential disease intervals of less than every 25 years. Disease intervals of less than every 25 years may result in unacceptable disease return intervals and may impact long-term herd viability.

- ✓ The FIG Allotment as a whole has a herd contact rate of 1.0+ suggesting that contact between bighorn and domestic sheep would occur every year the allotment is grazed. The herd could potentially be exposed to a disease event on a continuous basis, which would lead to herd extirpation.

- ✓ There is no spatial or temporal separation between the two species during the summer grazing season. Although unknown, the recent mortality of nearly all spruce trees from bark beetles in and beyond the allotment area may enhance BHS movements across the landscape where is was previously restricted.

- ✓ A relatively large amount of connectivity exists between areas of the CHHR and unoccupied source habitat on the east side of Beautiful Mountain and Fisher Mountain.

- ✓ The current bighorn herd is estimated at 460 animals, is increasing, and is expected to continue to increase and expand into currently unoccupied suitable/source habitat.

Habitat along the Continental Divide serves as a natural linkage that facilitates interaction of bighorn sheep between S15, S16 and to S28, all of which comprise the Weminuche Bighorn Sheep Herd RBS-20.

36

BLM_0050328

## LITERATURE CITED

Beecham, J.J., C.P. Collins, and T.D. Reynolds 2007.  Rocky Mountain bighorn sheep (*Ovis Canadensis*): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region.

Besser et al. 2012a. Survival of Bighorn Sheep (*Ovis Canadensis*) Commingled with Domestic Sheep (*Ovis aries*) in the Absence of *Mycoplasma ovipneumoniae*. Journal of Wildlife Diseases 48(1), 2012, pp. 168-172.

Besser et. al. 2012b. Causes of pneumonia epizootics among Bighorn Sheep, Western United States, 2008-2010. Emerging Infectious Diseases. Vol. 18, No. 3, March 2012.

Colorado Parks and Wildlife. 2012.  Bighorn Sheep Management Plan for RBS-20, Weminuche Bighorn Sheep Herd  (Data Analysis Unit 20 and Game Management Units S15, S16 and S28.

Foreyt, W.J. 1990. Pneumonia in bighorn sheep: Effects of *Pasteurella haemolytica* from domestic sheep and the effects on survival and long-term reproduction. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, Vol. 7, pp. 92-101.

George, J. L., D.J. Martin, P.M. Lukacs and M.W. Miller.  2008.  Epidemic Pasteurellosis in a Bighorn Sheep Population Coinciding with the Appearance of a Domestic Sheep. Journal of Wildlife Diseases. 44:388-403

George, J. L., R. Kahn, M.W. Miller, and B. Watkins. 2009. Colorado Bighorn Sheep Management Plan 2009 – 2019. Colorado Division of Wildlife Special Report. 88 pp.

Lawrence, P.K., et. al. Transmission of *Mannheimia Haemolytica* from Domestic Sheep (*Ovis Aries)* to Bighorn Sheep (*Ovis Canadensis*); Unequivocal Demostrtion with Green Fluorescent Protein-tagged Organisms. Journal of Wildlife Diseases. 46:706-717.

Singer, F.J.,L.C. Zeigenfuss, and L. Spicer. 2001. Role of patch size, disease, and movement in rapid extinction of bighorn sheep. Conserv. Biol. 15(5): 1347-1354.

USDA Forest Service.  2007. Forest Service Manual 2600: Chapter 2670, Threatened, Endangered and Sensitive Plants and Animals, Supplement Number 2600-2007-1, June 8, 2007.

USDA Forest Service. 2010a. Supplemental to the Forest Plan Biological Evaluation and Conservation Assessment for the Rocky Mountain Bighorn Sheep. Rio Grande National Forest.

USDA Forest Service. 2011a. USDA Forest Service, Bighorn Sheep Analysis for NEPA Documents letter R-1, 2, 3, 4, 5 and 6. Joel D. Holtrop, Deputy Chief, Washington Office, Washington D.C. (August).

USDA Forest Service. 2011b. USDA Forest Service, Bighorn Sheep Analysis for NEPA Documents letter, Glenn Casamassa, Action Deputy Regional Forester, Rocky Mountain Region, Denver, CO. (September).

USDA Forest Service.  2013. Bighorn Sheep Risk of Contact Model.  USDA Forest Service, Intermountain Region.  Prepared by USDA FS Bighorn Sheep Working Group and Critigen.

Wild Sheep Working Group, 2012. Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat. Western Association of Fish and Wildlife Agencies.

BLM_0050329



United States Department of Agriculture

Forest Service

United States Department of Interior

Bureau of Land Management

Office of Surface Mining Reclamation Enforcement

State of Colorado

Division of Reclamation Mining and Safety

**August 2017**



# Supplemental Final Environmental Impact Statement

## Federal Coal Lease Modifications COC-1362 & COC-67232 (including on-lease exploration plan)

**Paonia Ranger District, Grand Mesa, Uncompahgre and Gunnison National Forests; Gunnison County, Colorado**

**Sections 10, 11, 14, 15, 22, 23 T14S; R 90W, 6th PM**

Cooperating Agencies:

Uncompahgre Field Office, Bureau of Land Management

Colorado State Office, Bureau of Land Management

**Western Region, Office of Surface Mining Reclamation and Enforcement**

**Colorado Division of Reclamation Mining and Safety**



BLM_0050330

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

## Federal Coal Lease Modifications COC-1362 & COC-67232
## Supplemental Final Environmental Impact Statement
## Gunnison County, Colorado

| | |
|---|---|
| **Lead Agency:** | USDA Forest Service |
| **Cooperating Agencies:** | Bureau of Land Management-Uncompahgre Field Office |
| | Bureau of Land Management, Southwest District Office |
| | Bureau of Land Management, Colorado State Office |
| | Office of Surface Mining Reclamation and Enforcement |
| | Colorado Division of Reclamation Mining and Safety |
| **Responsible Officials:** | Scott G. Armentrout, Forest Supervisor |
| | 2250 South Main Street |
| | Delta, CO 81416 |
| | State Director |
| | BLM Colorado State Office |
| | 2850 Youngfield St. |
| | Lakewood, CO 80215 |
| **For Information Contact:** | Niccole Mortenson, NEPA Specialist |
| | 406-329-3163 |
| | nmortenson@fs.fed.us |
| | Levi Broyles, District Ranger |
| | 970-527-4131 |
| | lbroyles@fs.fed.us |
| | Desty Dyer, BLM Mining Engineer |
| | 970-240-5302 |
| | Desty_Dyer@blm.gov |

**Abstract:** The proposed action is to modify existing federal coal leases COC-1362 and COC-67232 by adding 800 and 920 additional acres (respectively) to ensure that 10.1 million tons of compliant and super-compliant federal coal is recovered and not bypassed and to prescribe stipulations for the protection of resources. In 2012, during the preparation of the Draft Environmental Impact Statement (DEIS), the 2001 Roadless Area Conservation Rule was in effect; this represents Alternative 2 in the DEIS. On July 3, 2012 the Colorado Roadless Rule became effective; this represents Alternative 3 (Proposed Action) in the analysis. Alternative 2 was removed from the Supplemental Draft Environmental Impact Statement (SDEIS). Alternative 4 was brought forward for detailed consideration based on comments in the DEIS. Alternative 4 only considers consenting to and leasing the COC-1362 lease. Assuming lease modification(s) are approved, on-lease exploration will be used to delineate coal reserves prior to State regulatory agency mining approval. This Supplemental Final Environmental Impact Statement (FEIS) has been prepared to address Court-identified deficiencies and to provide general updates since 2012.

BLM_0050332

(Intentionally left blank)

BLM_0050333

# Executive Summary

The Forest Service and Bureau of Land Management (BLM) have prepared this Supplemental Environmental Impact Statement (SEIS) to address Court-identified deficiencies in the Final EIS and BLM's Exploration Plan Environmental Assessment. *See High Country Conservation Advocates et al. v United States Forest Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014). The Office of Surface Mining Reclamation and Enforcement (OSMRE) and Colorado Division of Reclamation Mining and Safety (DRMS) have participated as cooperating agencies. This SEIS discloses the direct, indirect, and cumulative environmental impacts that would result from the proposed action and alternatives.

Forest Service and BLM have analyzed the effects of modifying federal coal lease COC-67232 (held by Ark Land LLC (Ark)) and federal coal lease COC-1362 (held by Mountain Coal Company, LLC (MCC)) containing 800 and 920[1] additional acres respectively. DRMS has reviewed and commented on portions of the analysis dealing with the permitting processes and to coordinate with federal agencies for the State permitting processes. The coal lease modification areas lie in portions of sections 10, 11, 14, 15, 22 and 23 of T. 14S, R. 90W, 6th PM in Gunnison County, Colorado. The modification areas include only National Forest System surface lands. The coal estate is administered by the BLM.  These federal agency actions are needed to respond to applications submitted by Ark and MCC to ensure that compliant and super-compliant coal reserves are recovered and not bypassed.

The Authorized Officer for the Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) is considering whether or not to consent to BLM modifying the Federal Coal Leases COC-1362 and COC-67232 by adding 800 and 920 acres, respectively, to them.  If the Authorized Officer does consent to lease coal reserves underlying the lands, he will prescribe conditions (as stipulations) for the protection of non-mineral resources.  BLM's Authorized Officer will, in turn, decide whether or not to grant lease modifications and will further decide, if leased, whether or not to authorize on-lease exploration consistent with lease terms.

Consideration of the leasing portion of this action does not authorize mining activities or related surface uses.  Post- lease authorizations would be handled in separate permitting processes at a later time by the appropriate state and federal agencies after the leases are modified. However, should the BLM approve exploration, this authorization could lead directly to construction of temporary roads and well pads.

Office of Surface Mining Reclamation and Enforcement (OSMRE) will review whether a subsequent mine plan modification is warranted and, if so, would recommend that the U.S. Department of the Interior Assistant Secretary for Lands and Minerals Management approve, approve with conditions, or not approve the federal mining plan modification. The Colorado Division Reclamation of Mining and Safety (DRMS) would be responsible for subsequent permitting of mining.

Extensive public involvement occurred during the preparation of an Environmental Assessment leading to this SEIS. During that comment period (April-May 2010), approximately 32,002 versions of email form letters were received from environmental groups (more detailed description in subsequent sections); 576 hardcopy/faxed form letters were received from local community members in four counties in support of mining in this area; 78 (mostly modified form letters) were received in response to this scoping effort. Issues ranged

---

[1] Certificates from Cadastral Land Description Reviews on 3/29/2012 and 5/10/2016 have revised this to 920 acres down from 922 acres.

BLM_0050334

from support to opposition of coal mining, effects to Inventoried Roadless Areas, and global climate change. Most concerns dealt with post-leasing development. These issues led the agencies to develop the Proposed Action which has lease stipulations to protect surface resources including: cultural/paleontological resources, threatened/endangered species, Canada Lynx, raptors, big game winter range, water depletions, breeding birds, geological hazards, riparian/wetlands, subsidence, lease notices for presence of roadless areas, lease addendums for methane flaring/capture/use and new lease stipulations for visual resources. The decision was remanded to the forest over stipulations in February of 2012.

In late 2011 and early 2012 Colorado was in the middle of transitioning to new state-wide roadless area regulations, Environmental Protection Agency was considering greenhouse gas regulations, Council on Environmental Quality was considering significance thresholds for analysis of greenhouse gases and BLM was preparing their own leasing analysis for these modifications. All of these combined contributed to the decision to prepare an Environmental Impact Statement (EIS).

The Forest Service[2] published a Notice of Intent to Prepare an EIS in the *Federal Register* on April 25, 2012. Approximately 830 copies of letters/emails informing interested parties (including state, federal, local agencies, tribes, environmental groups, and interested parties) of this intent were also sent out on April 25, 2012 inviting additional comments throughout the process. Additional notification was sent out with the Draft EIS to approximately 768 individuals; additional legal notices were published in the *Grand Junction Daily Sentinel* and *Delta County Independent*.

Approximately 24,680 comment letters were received on the Draft EIS. Of those, 67 were original comments. Responses to comments received during the 30 day period following the printing of the NOI and the 45 day comment period on the DEIS and other comments specifically included by reference can be found in Appendix I. Comments received during this time can be viewed in entirety in Appendix I (Volume II) of the 2012 Final EIS.

Previous GMUG and BLM decisions (available at: https://www.fs.usda.gov/project/?project=32459) were vacated by U.S. District Court for Colorado (1:13-cv-01723-RBJ) on September 11, 2014. A Supplemental EIS is being prepared to correct Court-identified deficiencies and to update analysis, as needed, since the Final EIS in 2012 and BLM's Environmental Assessment (EA) for exploration in 2013. The leasing and exploration analyses have been combined into a single document for agency and public convenience.

Over 9,800 additional submissions (primarily form letters, groups of form letters and petitions) were received on the Notice of Intent to Prepare a Supplemental Environmental Impact Statement in 2016-2017 which was not an official comment period. Comments and responses can be found in Appendix J.

During the official comment period (June 2, 2017-July 24, 2017) on the Supplemental Draft Environmental Impact Statement we received approximately 127, 250 expressions of interest or comment letters. Issue topics are consistent with those raised in previous comment periods. Summarized substantive comments and responses are included in Appendix K.

---

[2] Other agencies were still included as cooperating agencies.

BLM_0050335

# Supplemental Environmental Impact Statement

Previous Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) and Bureau of Land Management (BLM) decisions were vacated by U.S. District Court for Colorado (1:13–cv– 01723–RBJ) on September 11, 2014. This Supplemental Environmental Impact Statement (EIS) has been prepared to correct Court-identified deficiencies and to update analysis, as needed, since the Final EIS in 2012 and BLM's Exploration Environmental Assessment (EA) in 2013. The leasing and exploration analyses are combined into a single document for agency and public convenience.

## Document Changes between Supplemental Draft and Supplemental Final Environmental Impact Statements

General edits and clarifications have occurred throughout the document.

Visuals section was updated and a map included.

Hydrology map was updated.

Subsidence maps were added and acres were updated throughout.

Responses to comments received on SDEIS were summarized and included in Appendix K.

BLM_0050336

(Intentionally left blank)

BLM_0050337

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

# Table of Contents

Executive Summary...................................................................................................................... iii

Supplemental Environmental Impact Statement ......................................................................... v

Document Changes between Supplemental Draft and Supplemental Final Environmental Impact Statements ................................................................................................................................. v

Acronyms ................................................................................................................................ xix

Chapter 1. Purpose of and Need for Action............................................................................... 1

1.1     Document Structure ................................................................................................... 1

1.2     Process to Modify a Federal Coal Lease and Authorize On-lease Exploration on National Forest System Lands ........................................................................................................ 1

1.3     Background ................................................................................................................ 2

1.3.1     Leasing ............................................................................................................. 2

1.3.2     Exploration ....................................................................................................... 6

1.4     Purpose and Need for Action....................................................................................... 6

1.4.1     Lease Modifications .......................................................................................... 6

1.4.2     Exploration Plan ............................................................................................... 7

1.5     Proposed Action........................................................................................................ 7

1.6     Decision Framework .................................................................................................. 9

1.6.1     Forest Service.................................................................................................. 9

1.6.2     BLM ................................................................................................................ 9

1.6.3     OSMRE ........................................................................................................... 10

1.6.4     DRMS.............................................................................................................. 10

1.7     Authorizing Actions................................................................................................... 11

1.7.1     Mining and Minerals Policy Act of 1970 and Mineral Leasing Act of 1920, as amended 11

1.7.2     Surface Mining Control and Reclamation Act of 1977 (SMCRA).................................. 11

1.7.3     Energy Policy Act of 2005................................................................................. 12

1.8     Conformance with Land Use Plans .............................................................................. 12

1.8.1     Leasing ........................................................................................................... 12

1.8.2     Exploration ...................................................................................................... 14

1.9     Public Involvement .................................................................................................... 14

1.10    Issues....................................................................................................................... 16

1.11    Related Analysis and Documents.................................................................................. 18

Chapter 2. Alternatives to the Proposed Action ......................................................................... 20

2.1     Introduction .............................................................................................................. 20

2.2     Alternatives Considered in Detail ................................................................................ 20

2.2.1     Alternative 1-No Action (Environmentally Preferred Alternative) .............................. 20

2.2.2     Common to Action Alternatives........................................................................... 21

2.2.3     Alternative 3- Consent to and modify the leases (Agencies' Preferred Alternative and Proposed Action)................................................................................................... 39

BLM_0050338

2.2.4    Alternative 4-Consent to and modify only COC-1362 lease ........................................ 47

2.2.5    Other Actions/Permits/Plans may be required ............................................................ 51

2.3    Alternatives Considered but Eliminated from Detailed Study.................................................51

2.3.1    Alternative 2............................................................................................................... 51

2.3.2    Helicopter drill MDWs in roadless areas.................................................................... 52

2.3.3    MDWs using horizontal boreholes or directional drilling technology ........................ 52

2.3.4    Other mining methods should be considered ............................................................ 53

2.3.5    Mitigate the potential greenhouse gas emissions of the project by requiring MCC to use MDW ventilation air methane.................................................................................................... 53

2.3.6    Mitigate the potential greenhouse gas emissions of the project by requiring MCC to purchase of carbon credits or do off-set mitigations.................................................................. 55

2.3.7    Mitigate the potential greenhouse gas emissions of the project by requiring MCC to use other potential methane mitigation measures ...................................................................... 55

2.3.8    Prevent all future disturbances from road construction, methane drainage well pads and the like in Roadless Areas....................................................................................................... 61

2.3.9    Shrink the boundaries of the lease to conform to the area where the coal will be mined underground ................................................................................................................................. 61

2.3.10    Protect values of the area by using this set of stipulations for the Proposed Action . 61

2.3.11    For Exploration, do not consider redundant access .................................................... 64

2.3.12    For Exploration, analyze only the holes proposed to be drilled during the first field season   64

2.4    Comparison of Alternatives ................................................................................................65

Chapter 3. Affected Environment and Environmental Effects ...........................................................75

3.1    Introduction ...........................................................................................................................75

3.1.1    Short-term and Long-term Effects ............................................................................. 75

3.1.2    Direct and Indirect Effects .......................................................................................... 75

3.1.3    Cumulative Effects ...................................................................................................... 75

3.2    Ongoing and Proposed Activities...........................................................................................75

3.2.1    General Background..................................................................................................... 75

3.2.2    West Elk Mine ............................................................................................................. 75

3.2.3    Wildlife Past 20 years, Present and Future................................................................. 82

3.2.4    Range use/ improvements Past 100 years.................................................................. 82

3.2.5    Recreation Past 20 years, Present and Future............................................................ 82

3.2.6    Inventoried Roadless Areas (IRA) 1979 to 2012 ........................................................ 82

3.2.7    Colorado Roadless Areas (CRA) 2012-Present ........................................................... 82

3.2.8    Road and Trail System Past 30 years and Present ...................................................... 83

3.2.9    Natural Gas Development Future ................................................................................ 83

3.2.10    Methane Emissions Past 5 years (Air Quality) ............................................................ 83

3.2.11    Other Actions Known or Proposed in the Vicinity with Potential Cumulative Effects. 83

3.3    Reasonably Foreseeable Mine Plan ........................................................................................84

BLM_0050339

3.3.1   Information Relevant to Reasonably Foreseeable Mine Plan Scenarios for Action Alternatives ........................................................................................................... 85

3.3.2   Alternative 3 (Proposed Action) Reasonably Foreseeable Mine Plan (RFMP)............ 90

3.3.3   Alternative 4 Reasonably Foreseeable Mine Plan (RFMP)........................................ 91

3.4   Air Quality, Greenhouse Gases & Climate Change ............................................................93

3.4.1   Affected Environment............................................................................................... 93

3.4.2   Alternative 1 (No Action) Environmental Effects....................................................... 105

3.4.3   Alternative 3 (Proposed Action) Environmental Effects ............................................ 111

3.4.4   Alternative 4 Environmental Effects .......................................................................... 112

3.4.5   Cumulative Effects & Climate Change ....................................................................... 113

3.4.6   Consistency with Forest Plan and Other Laws ........................................................... 130

3.5   Topographic & Physiographic Environment .....................................................................130

3.5.1   Affected Environment............................................................................................... 130

3.5.2   Alternative 1 (No Action) Environmental Effects....................................................... 132

3.5.3   Alternative 3 (Proposed Action) Environmental Effects ............................................ 132

3.5.4   Alternative 4 Environmental Effects .......................................................................... 133

3.5.5   Cumulative Impacts ................................................................................................. 135

3.5.6   Consistency with Forest Plan and Other Laws ........................................................... 135

3.6   Geology ...........................................................................................................................135

3.6.1   Affected Environment............................................................................................... 135

3.6.2   Alternative 1 (No Action) Environmental Effects....................................................... 139

3.6.3   Alternative 3 (Proposed Action) Environmental Effects ............................................ 139

3.6.4   Alternative 4 Environmental Effects .......................................................................... 141

3.6.5   Cumulative Impacts ................................................................................................. 142

3.6.6   Consistency with Forest Plan and Other Laws ........................................................... 143

3.7   Soils ................................................................................................................................143

3.7.1   Affected Environment............................................................................................... 143

3.7.2   Alternative 1 (No Action) Environmental Effects....................................................... 145

3.7.3   Alternative 3 (Proposed Action) Environmental Effects ............................................ 146

3.7.4   Alternative 4 Environmental Effects .......................................................................... 149

3.7.5   Cumulative Impacts & Climate Change...................................................................... 151

3.7.6   Consistency with Forest Plan and Other Laws ........................................................... 151

3.8   Watershed........................................................................................................................152

3.8.1   Affected Environment............................................................................................... 152

3.8.2   Alternative 1 (No Action) Environmental Effects....................................................... 156

3.8.3   Alternative 3 (Proposed Action) Environmental Effects ............................................ 156

3.8.4   Alternative 4 Environmental Effects .......................................................................... 160

3.8.5   Cumulative Impacts & Climate Change...................................................................... 164

3.8.6   Consistency with Forest Plan and Other Laws ........................................................... 168

3.9   Vegetation........................................................................................................................168

BLM_0050340

3.9.1  Affected Environment ............................................................................................... 168

3.9.2  Alternative 1 (No Action) Environmental Effects ...................................................... 171

3.9.3  Effects Common to Action Alternatives .................................................................... 171

3.9.4  Alternative 3 (Proposed Action) Environmental Effects ........................................... 174

3.9.5  Alternative 4 Environmental Effects ........................................................................ 178

3.9.6  Cumulative Effects & Climate Change ...................................................................... 181

3.9.7  Consistency with Forest Plan and Other Laws .......................................................... 184

3.10  Threatened & Endangered Species ................................................................................ 184

3.10.1  Canada lynx .......................................................................................................... 186

3.11  Sensitive Species ........................................................................................................... 194

3.11.1  General Sensitive Species Affected Environment ..................................................... 196

3.11.2  All Sensitive Species Environmental Effects Alternatives 3 & 4 for Exploration ........ 196

3.11.3  All Sensitive Species Climate Change ...................................................................... 197

3.11.4  All Sensitive Species Consistency with Forest Plan and Other Regulations ............... 197

3.11.5  American marten ................................................................................................... 197

3.11.6  Pygmy shrew ........................................................................................................ 199

3.11.7  Northern goshawk ................................................................................................. 201

3.11.8  Boreal owl ............................................................................................................ 204

3.11.9  Olive-sided flycatcher ........................................................................................... 205

3.11.10  American three-toed woodpecker ........................................................................ 207

3.11.11  Flammulated owl ................................................................................................ 208

3.11.12  Hoary bat ........................................................................................................... 210

3.11.13  Northern leopard frog ......................................................................................... 211

3.11.14  Purple martin ..................................................................................................... 213

3.11.15  Alternative 3 (Proposed Action) Environmental Effects ........................................ 213

3.11.16  Monarch butterfly .............................................................................................. 214

3.11.17  Western bumblebee ............................................................................................ 215

3.12  Sensitive Plants ............................................................................................................ 216

3.12.1  Affected Environment ........................................................................................... 216

3.12.2  Alternative 1 (No Action) Environmental Effects ..................................................... 217

3.12.3  Alternative 3 (Proposed Action) Environmental Effects .......................................... 217

3.12.4  Alternative 4 Environmental Effects ...................................................................... 217

3.12.5  Cumulative Effects & Climate Change ..................................................................... 217

3.13  Management Indicator Species ...................................................................................... 218

3.13.1  MIS (All Species) Cumulative Effects & Climate Change ........................................... 218

3.13.2  MIS (All Species) Consistency with Forest Plan and Other Regulations ..................... 218

3.13.3  Elk ....................................................................................................................... 219

3.13.4  Merriam's wild turkey ........................................................................................... 222

3.13.5  Red-naped sapsucker ............................................................................................ 224

3.14  Migratory Birds ............................................................................................................. 226

BLM_0050341

3.14.1    Affected Environment ............................................................................................ 226

3.14.2    Alternative 1 (No Action) Environmental Effects ..................................................... 227

3.14.3    Alternative 3 (Proposed Action) Environmental Effects .......................................... 227

3.14.4    Alternative 4 Environmental Effects ...................................................................... 228

3.14.5    Cumulative Effects & Climate Change .................................................................... 228

3.14.6    Consistency with Forest Plan and Other Regulations ............................................. 228

3.15    Range Resources ........................................................................................................ 229

3.15.1    Affected Environment ............................................................................................ 229

3.15.2    Alternative1 Environmental Effects ....................................................................... 229

3.15.3    Environmental Effects Common to Action Alternatives ........................................... 229

3.15.4    Alternative 3 (Proposed Action) Environmental Effects .......................................... 231

3.15.5    Alternative 4 Environmental Effects ...................................................................... 232

3.15.6    Cumulative Effects & Climate Change .................................................................... 232

3.15.7    Consistency with Forest Plan and Other Laws ........................................................ 233

3.16    Recreation ................................................................................................................. 233

3.16.1    Affected Environment ............................................................................................ 233

3.16.2    Alternative 1 (No Action) Environmental Effects ..................................................... 236

3.16.3    Alternative 3 (Proposed Action) Environmental Effects .......................................... 236

3.16.4    Alternative 4 Environmental Effects ...................................................................... 237

3.16.5    Cumulative Effects & Climate Change .................................................................... 238

3.16.6    Consistency with Forest Plan and Other Laws ........................................................ 239

3.17    Transportation System ............................................................................................... 239

3.17.1    Alternative 1 (No Action) Environmental Effects ..................................................... 242

3.17.2    Alternative 3 (Proposed Action) Environmental Effects .......................................... 242

3.17.3    Alternative 4 Environmental Effects ...................................................................... 242

3.17.4    Cumulative Effects & Climate Change .................................................................... 243

3.17.5    Consistency with Forest Plan and Other Laws ........................................................ 243

3.18    Roadless .................................................................................................................... 243

3.18.1    Roadless Inventory ............................................................................................... 244

3.18.2    Regulatory Framework ........................................................................................... 244

3.18.3    Affected Environment ............................................................................................ 244

3.18.4    Environmental Effects ........................................................................................... 252

3.18.5    Cumulative Effects & Climate Change .................................................................... 261

3.18.6    Consistency with Forest Plan and Other Laws ........................................................ 262

3.19    Heritage Resources .................................................................................................... 262

3.19.1    Affected Environment ............................................................................................ 262

3.19.2    Alternative 1 (No Action) Environmental Effects ..................................................... 262

3.19.3    Action Alternatives Environmental Effects ............................................................. 262

3.19.4    Cumulative Effects ............................................................................................... 262

3.19.5    Consistency with Forest Plan and Other Regulations ............................................. 263

BLM_0050342

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

3.20    Visuals ........................................................................................................................ 263
    3.20.1    Affected Environment ......................................................................................... 263
    3.20.2    Alternative 1 (No Action) Environmental Effects .................................................... 269
    3.20.3    Alternative 3 (Proposed Action) Environmental Effects .......................................... 269
    3.20.4    Alternative 4 Environmental Effects ..................................................................... 270
    3.20.5    Cumulative Effects ............................................................................................. 270
    3.20.6    Consistency with Forest Plan and Other Regulations .............................................. 271
3.21    Socioeconomics .......................................................................................................... 271
    3.21.1    Affected Environment ......................................................................................... 271
    3.21.2    Economic Impact Analysis ................................................................................... 275
    3.21.3    Environmental Effects ......................................................................................... 279
    3.21.4    Alternative 1 (No Action) Environmental Effects .................................................... 284
    3.21.5    Action Alternatives Environmental Effects ............................................................. 285
    3.21.6    Cumulative Effects & Climate Change .................................................................... 286
    3.21.7    Consistency with Forest Plan and Other Laws ......................................................... 287
3.22    Short-term Uses and Long-term Productivity .................................................................. 287
3.23    Unavoidable Adverse Effects ......................................................................................... 288
3.24    Irreversible and Irretrievable Commitments of Resources ................................................. 288
3.25    Cumulative Effects ...................................................................................................... 289
3.26    Other Required Disclosures .......................................................................................... 289
Chapter 4. Consultation and Coordination ................................................................................ 290
4.1    Preparers and Contributors ........................................................................................... 290
    4.1.1    ID Team Members ............................................................................................... 290
    4.1.2    Contributors (in no particular order) ..................................................................... 291
    4.1.3    Federal, State, and Local Agencies Consulted ......................................................... 293
    4.1.4    Tribes ............................................................................................................... 293
    4.1.5    Others .............................................................................................................. 293
4.2    Distribution of the FEIS/SEIS ........................................................................................ 294
References Cited .................................................................................................................. 302
    Chapter 1 ....................................................................................................................... 302
    Chapter 2 ....................................................................................................................... 302
    Chapter 3 ....................................................................................................................... 302
    Air Quality, Greenhouse Gases & Climate Change .................................................................. 302
    Topography, Geology, Watershed, Soils .............................................................................. 303
    Vegetation ...................................................................................................................... 304
    Threatened and Endangered Species ................................................................................... 307
    Sensitive Species/MIS ....................................................................................................... 309
    Visuals ........................................................................................................................... 312
    Socioeconomics ............................................................................................................... 312
    Exploration ..................................................................................................................... 315

BLM_0050343

Appendix A. West Elk Mine E Seam Gas Economic Evaluation Report.................................................318

Appendix B. Unsuitability Analysis and Report for Federal Coal Lease COC-1362, Modification 2 & Federal Coal Lease COC-67232, Modification 1..................................................................................536

Description of the Federal Lands Involved ....................................................................................536

Analysis of the Unsuitability Criteria ............................................................................................537

Criterion 1.................................................................................................................................537

Criterion 2.................................................................................................................................538

Criterion 3.................................................................................................................................538

Criterion 4.................................................................................................................................538

Criterion 5.................................................................................................................................539

Criterion 6.................................................................................................................................539

Criterion 7.................................................................................................................................539

Criterion 8.................................................................................................................................539

Criterion 9.................................................................................................................................539

Criterion 10...............................................................................................................................542

Criterion 11...............................................................................................................................543

Criterion 12...............................................................................................................................543

Criterion 13...............................................................................................................................543

Criterion 14...............................................................................................................................544

Criterion 15...............................................................................................................................545

Criterion 16...............................................................................................................................545

Criterion 17...............................................................................................................................545

Criterion 18...............................................................................................................................546

Criterion 19...............................................................................................................................546

Criterion 20...............................................................................................................................546

Secretary's Determination.............................................................................................................547

References ......................................................................................................................................547

Consultation and Coordination .....................................................................................................547

Federal Agencies ......................................................................................................................547

Colorado State Agencies ..........................................................................................................547

Appendix C. Roles and Responsibilities of Regulatory Agencies in the Federal Coal Program in Colorado ........................................................................................................................................549

Exploration.....................................................................................................................................549

Authorities.................................................................................................................................549

Roles ..........................................................................................................................................549

Leasing ...........................................................................................................................................550

Authorities.................................................................................................................................550

Roles ..........................................................................................................................................550

Permitting/Operations ..................................................................................................................551

Authorities.................................................................................................................................551

BLM_0050344

Roles ...................................................................................................................................... 551

Additional Permits Required ...................................................................................................552

Other  552

Appendix D. Sunset Roadless Evaluation.........................................................................................553

Appendix E. Forest Plan Unsuitability Assessment........................................................................555

Appendix F. MCC's Air Permit .........................................................................................................567

Appendix G. Example Calculations for Air Resources ....................................................................591

Horsepower-hour Calculations for Underground Mobile Sources...............................................591

Known Parameters ...................................................................................................................591

Conclusions...............................................................................................................................592

Appendix H. B Seam Estimates On Parent Leases ..........................................................................595

Pad Disturbance........................................................................................................................595

Road Disturbance .....................................................................................................................595

CRA Road Disturbance.........................................................................................................595

Roadless Disturbance Outside CRAs ...................................................................................595

Appendix I. Response to Comments Received on DEIS (2012)........................................................597

Appendix J. Comments Received on Supplemental EIS NOI 2016-2017 (No Official Comment Period)..............................................................................................................................................765

Appendix K. Response to Comments Received on SDEIS ................................................................945

Forest Plan ................................................................................................................................945

Proposed Action and Decision..................................................................................................945

Public Involvement ...................................................................................................................947

Laws  947

Alternatives...............................................................................................................................956

Air Quality & Emissions............................................................................................................979

Non-substantive comments (358 comments)......................................................................979

Particulate Matter (comment 52) .......................................................................................979

Potential VOC Emissions (comment 51)...............................................................................979

Methane Emissions and Climate Change (comments 4, 28, 47, and multiple non-substantive comments) ............................................................................................................................980

Flaring (comments 5, 6 & 8) ................................................................................................982

Social Cost of Carbon/Greenhouse Gas emissions Comment and Responses.............................982

Climate Change..........................................................................................................................988

Soils    989

Water and Other Resources ......................................................................................................989

Vegetation ................................................................................................................................992

Wildlife......................................................................................................................................993

Recreation .................................................................................................................................997

Roads  997

Roadless.....................................................................................................................................998

BLM_0050345

Cultural ........................................................................................................................................1006

Visuals 1007

Socioeconomics .............................................................................................................................1008

    Local Economy................................................................................................................... 1008

    Energy Market and Economic Sustainability...................................................................... 1009

    Royalties and Other Fiscal and Financial Considerations..................................................... 1010

    Social Impacts .................................................................................................................. 1010

Multiple Resource.........................................................................................................................1011

Environmental Justice...................................................................................................................1013

Economic Impact Analysis ............................................................................................................1013

Public Health................................................................................................................................1015

Cumulative Effects........................................................................................................................1015

Irreversible and Irretrievable.........................................................................................................1019

Technical .....................................................................................................................................1020

### *List of Tables*

Table 1-1. Process to Modify a Federal Coal Lease and Approve Exploration ......................................2

Table 1-2. Coal Lease Modification Legal Descriptions.............................................................................3

Table 1-3. Issues................................................................................................................................. 16

Table 2-1. Stipulations for Protection of Non-Mineral (Surface) Resources ...................................... 23

Table 2-2. BLM-specific Lease Stipulations for Protection of Non-Mineral (Surface) Resources........ 36

Table 2-3. Proposed exploration disturbance acres Alternative 3 ..................................................... 41

Table 2-4. Paonia Ranger District Seed Mix........................................................................................ 47

Table 2-5. Estimated Exploration Disturbances Alternative 4 ............................................................ 49

Table 2-6. Comparison of Alternatives ............................................................................................... 66

Table 3-1. Estimated production at West Elk Mine for Alternatives .................................................... 92

Table 3-2. Summary for estimated post-lease disturbance, coal tonnage mined for Action Alternatives ................................................................................................................................. 92

Table 3-3. Summary table for estimated subsidence ......................................................................... 93

Table 3-4. National Ambient Air Quality Standards............................................................................ 96

Table 3-5. Ambient Air Quality Monitoring Data Trends .................................................................... 97

Table 3-6. NEI Data for Area Counties (tons)..................................................................................... 99

Table 3-7. West Elk Emissions (max tons per year) .......................................................................... 103

Table 3-8. Maximum Predicted $PM_{10}$ Impacts Due to West Elk Mine and Oxbow Mines................. 106

Table 3-9. MDW Development Emissions (tons) ............................................................................... 108

Table 3-10. Coal Combustion GHG Emissions (MMtons).................................................................. 111

Table 3-11. Exploration Emissions (max tons per year)..................................................................... 112

Table 3-12. Coal Combustion Emissions (MMtons) .......................................................................... 112

Table 3-13. Coal Combustion GHG Emissions (MMtons).................................................................. 113

Table 3-14. Maximum Source Group Contributions .......................................................................... 118

BLM_0050346

Table 3-15. Maximum Source Group Contributions ........................................................................ 120

Table 3-16. Temperature and Precipitation Climate Change Scenarios for 2050 developed by Barsugli and Mearns for the Gunnison Basin ............................................................................................... 125

Table 3-17. Projected Climate Changes to the GMUG................................................................... 126

Table 3-18. Summary of Soil Resources in the Proposed Lease Modifications Area........................ 144

Table 3-19. Acres of National Forest Disturbance by Soil Type and Characteristic for Exploration Activities......................................................................................................................................... 145

Table 3-20. Climate change related water issues in Colorado........................................................ 167

Table 3-21. Lease Modification & Cumulative Effects Area Vegetation Data ................................. 169

Table 3-22. Vegetation Structural Stages, lease modification area (All vegetation types) .............. 169

Table 3-23. Alternative 3 Vegetation Types in Disturbed Area for Exploration ............................. 176

Table 3-24. Alternative 4 Projected Vegetation Types in Disturbed Area for Exploration............... 179

Table 3-25. Vegetation management within the cumulative effects area since 2000...................... 181

Table 3-26. Federally Threatened and Endangered or Candidate Species considered for this project ....................................................................................................................................................... 185

Table 3-27. Mount Gunnison Lynx Analysis Unit Existing Condition (rounded to nearest acre)....... 188

Table 3-28. Vegetation Management within the Mount Gunnison LAU since 2000......................... 192

Table 3-29. Potentially suitable goshawk habitat on the GMUG by vegetation cover type and habitat structural stage ............................................................................................................................. 201

Table 3-30. Turkey habitat on the GMUG NF based on habitat parameters and quality.................. 224

Table 3-31. Bird Species of Conservation Concern (BOCC)............................................................. 227

Table 3-32. Range Improvements ................................................................................................. 229

Table 3-33. Summary of range impacts from post-lease development ............................................ 230

Table 3-34. Alternative 1 impacts ................................................................................................. 253

Table 3-35. Alternative 3 impacts ................................................................................................. 254

Table 3-36. Alternative 4 impacts ................................................................................................. 257

Table 3-37. Crosswalk of Visual Quality Objectives and Scenic Integrity Objectives........................ 268

Table 3-38. Population, Minority, and Poverty Estimates, Delta and Gunnison Counties and the State of Colorado for 2015 ....................................................................................................................... 272

Table 3-39. Coal production parameters used in economic impact model....................................... 278

Table 3-40. Multi-Regional Input-Output Modeling Results (Estimated Average Annual Economic Impacts) ........................................................................................................................................ 282

Table 3-41. Raw Coal Production - North Fork Valley - BLM-UFO ................................................... 286

Table B-1. Federally Threatened and Endangered or Candidate Species considered for this project ....................................................................................................................................................... 540

Table G-1. Direct Criteria and GHG Emissions from Stationary and Mobile Sources in Tons (2011) 593

Table G-2. EPA Nonroad Emissions Factors (g/hp-hr) ................................................................... 594

## *List of Figures*

Figure 1-1. Vicinity Map.................................................................................................................5

Figure 1-2. Proposed Lease Modifications.......................................................................................8

BLM_0050347

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

Figure 2-1. Lease Modifications with Roadless Boundaries.................................................................. 40

Figure 2-2. Location of Exploration Activities Alternative 3 ............................................................... 43

Figure 2-3. Approximated Location of Exploration Activities Alternative 4 ....................................... 50

Figure 3-1. MDWs and disturbance within one mile of lease modifications....................................... 77

Figure 3-2. MDWs and disturbance within two miles of lease modifications ..................................... 79

Figure 3-3. West Elk Mine E Seam Development and Reclamation .................................................... 81

Figure 3-4. Alternative 3 Projected Subsidence.................................................................................. 88

Figure 3-5. Alternative 4 Projected Subsidence.................................................................................. 89

Figure 3-6. Total Nitrogen Deposition Trends ................................................................................... 101

Figure 3-7. Methane vs. Production at West Elk Mine ...................................................................... 107

Figure 3-8. CARMMS Mining Results ................................................................................................. 115

Figure 3-9. CARMMS 2021 UFO High Oil and Gas Scenario Emissions ............................................. 116

Figure 3-10. CARMMS UFO Oil and Gas Results ............................................................................... 117

Figure 3-11. CARMMS BLM CO Cumulative Oil and Gas Tracking (federal) ..................................... 118

Figure 3-12. CARMMS BLM CO Results (federal)............................................................................... 119

Figure 3-13. CARMMS Cumulative "one atmosphere" Results ......................................................... 120

Figure 3-14. CARMMS Cumulative Changes (future minus base)...................................................... 121

Figure 3-15. RCP Scenario Data......................................................................................................... 123

Figure 3-16. Lease Modification Topography .................................................................................... 131

Figure 3-17. Newly Discovered Geologic Faults................................................................................ 138

Figure 3-18. Soils affected by exploration Alternative 3................................................................... 148

Figure 3-19. Soils projected to be affected by exploration Alternative 4.......................................... 150

Figure 3-20. Water resources ........................................................................................................... 154

Figure 3-21. Vegetation in area ........................................................................................................ 173

Figure 3-22. Alternative 3 Vegetation and Exploration Disturbance................................................ 177

Figure 3-23. Alternative 4 Vegetation and Projected Exploration Disturbance ............................... 180

Figure 3-24. ROS Map of lease modification areas ........................................................................... 235

Figure 3-25. Road system in vicinity of lease modifications ............................................................. 240

Figure 3-26. West Elk IRA and Sunset CRA........................................................................................ 248

Figure 3-27. Existing and Approved developments in and near the Sunset CRA .............................. 251

Figure 3-28. Portion of road in southwest corner of Section 14 constructed as part of the Sherwood Trails range project (D. Gray, 2011)................................................................................................... 252

Figure 3-29. Typical MDW pad and access road at the West Elk Mine just after interim reclamation (2 images)............................................................................................................................................... 259

Figure 3-30. Typical operating MDW (same pad as that on right in Figure 3.32d) at the West Elk Mine with exhaust fan ............................................................................................................................... 259

Figure 3-31. MDW pad at the West Elk Mine during final reclamation (re-contoured and spreading topsoil)............................................................................................................................................... 260

Figure 3-32. Typical MDW pads and road at the West Elk Mine approximately 3 to 4 years after final reclamation; oak brush is already moving back in (2 images) ......................................................... 260

BLM_0050348

Figure 3-33. Image of 1983 Era VQO Mylar Overlay on 1979 Quad Map, (Quad map Edits/Additions dated 2001) with Lease Modifications Boundary Approximated in Gold Highlight .......................... 266

Figure 3-34. Estimated and forecasted population totals for the study area, 2000–2040 ............... 273

xviii

# Acronyms

| | |
|---|---|
| **2001 Rule** | 2001 Roadless Area Conservation Rule |
| **Ark** | Ark Land LLC |
| **BLM** | Bureau of Land Management |
| **CAA** | Clean Air Act |
| **CDPHE** | Colorado Department Public Health and Environment |
| **CEQ** | Council of Environmental Quality |
| **CMM** | Coal Mine Methane |
| **CRA** | Colorado Roadless Area |
| **CRR** | Colorado Roadless Rule |
| **DN** | Decision Notice |
| **DOE** | Department of Energy |
| **DRMS** | Colorado Division of Reclamation Mining and Safety |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **EPA** | Environmental Protection Agency |
| **FLPMA** | Federal Land Policy and Management Act |
| **FONSI** | Finding of No Significant Impact |
| **FSM** | Forest Service Manual |
| **GHG** | Green House Gases |
| **GMUG** | Grand Mesa, Uncompahgre, Gunnison National Forests |
| **HUC** | Hydrologic Unit Code |
| **IDT** | Interdisciplinary Team |
| **IRA** | Inventoried Roadless Area |
| **LRMP** | Land and Resource Management Plan |
| **MCC** | Mountain Coal Company, LLC |
| **MDW** | Methane Drainage Well |
| **MLA** | Mineral Leasing Act |
| **MOU** | Memorandum of Understanding |
| **MSHA** | Mine Safety and Health Administration |
| **NEPA** | National Environmental Policy Act |
| **NFS** | National Forest System |
| **NFSR** | National Forest System Road |
| **NOI** | Notice of Intent |
| **NSO** | No Surface Occupancy |
| **OSMRE** | Office of Surface Mining Reclamation and Enforcement |
| **PM** | Principal Meridian |
| **PRs** | Permit Revisions |
| **R2P2** | Resource Recovery and Protection Plan |
| **RFMP** | Reasonably Foreseeable Mine Plan |
| **RICE** | Reciprocating internal combustion engines |
| **RMP** | Resource Management Plan |
| **RTO** | Regenerative thermal oxidation |

| | |
|---|---|
| **2001 Rule** | 2001 Roadless Area Conservation Rule |
| **SBEADMR** | Spruce Beetle Epidemic and Aspen Decline Management Response |
| **USFWS** | United States Fish and Wildlife Service |
| **VAM** | Ventilation Air Methane |
| **WIZ** | Water Influence Zone |

xx

BLM_0050351

# Chapter 1. Purpose of and Need for Action

## 1.1 Document Structure

The Forest Service and Bureau of Land Management (BLM) have prepared this Supplemental Environmental Impact Statement (SEIS) in compliance with the National Environmental Policy Act (NEPA) and other relevant Federal and State laws and regulations to address Court-identified deficiencies in the Final EIS and BLM's Exploration Plan Environmental Assessment. See *High Country Conservation Advocates et al. v U.S. Forest Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014). The Office of Surface Mining Reclamation and Enforcement (OSMRE) and Colorado Division of Reclamation Mining and Safety (DRMS) have participated as cooperating agencies. This SEIS discloses the direct, indirect, and cumulative environmental impacts that would result from the proposed action and alternatives. The document is organized into four chapters:

*Chapter 1. Purpose and Need for Action:* The chapter includes information on the history of the project proposal, the purpose of and need for the project, and the agencies' proposal for achieving that purpose and need. This section also details how the agencies informed the public of the proposal and how the public responded.

*Chapter 2. Alternatives, including the Proposed Action:* This chapter provides a more detailed description of the proposed action (Alternative 3) as well as alternative methods for achieving the stated purpose. These alternatives were developed based on significant issues raised by the public and other agencies. This section also provides a summary table of the environmental consequences associated with each alternative.

*Chapter 3. Affected Environment and Environmental Effects*: This chapter describes the direct, indirect and cumulative impacts of implementing the proposed action (Alternative 3) and other alternatives. This analysis is organized by resource area.

*Chapter 4. Consultation and Coordination:* This chapter provides a list of preparers and agencies consulted during the development of EIS.

*Index:* The index provides page numbers by document topic.

*Appendices:* The appendices provide more detailed information to support the analyses presented in the EIS.

Additional documentation, including more detailed analyses of project-area resources, may be found in the project planning record located at Paonia Ranger District Office, Paonia Colorado or the Uncompahgre Field Office in Montrose, Colorado.

## 1.2 Process to Modify a Federal Coal Lease and Authorize On-lease Exploration on National Forest System Lands

The process to modify a federal coal lease is complicated and includes the involvement of many different agencies. The table below briefly describes the process and which entity is responsible for each step.

BLM_0050352

**Table 1-1. Process to Modify a Federal Coal Lease and Approve Exploration**

| Leasing Step | Entity Responsible | Reference/Authority |
|---|---|---|
| No mining or surface disturbing activities are authorized during leasing. | | |
| Submit Application to BLM (BLM) | Mining Company | Mineral Leasing Act of 1920 as amended by the Federal Coal Leasing Amendments Act of 1976 and the Energy Policy Act of 2005; 43 CFR 3432. |
| Notify Surface Management Agency of application | BLM -State Office | Mineral Leasing Act of 1920 as amended by Federal Coal Leasing Amendments Act of 1976, the Energy Policy Act of 2005; 43 CFR 3432.3(d); and the National level BLM/FS MOU and Interagency Agreement for Mineral Leasing. |
| The Surface Management Agency reviews the land in the application and reviews the Unsuitability Criteria[3] under 43 CFR 3461, and makes a recommendation to the Secretary of Interior who determines whether there are no significant recreational, timber, economic, or other values which may be incompatible with the lease (43 CFR 3461.5(a)(2)(i)). | Forest Service- Forest level, BLM | 43 CFR 3461; and National Level BLM/FS MOU for Coordination of Activities Pursuant to the Federal Coal Program; GMUG Land Management Plan. |
| Surface Management Agency determines whether or not to consent to BLM to modify lease lands applied for and prescribes stipulations for the protection of non-mineral resources (for the lease modification generally those stipulations from the parent lease are brought forward for the modification area, among others as needed). | Forest Service-Forest level | Mineral Leasing Act of 1920, as amended by the Coal Leasing Amendments Act of 1976; 43 CFR 3432.3(d); NEPA; and the Land Management Plan. |
| Based on the Forest Service recommendation the Secretary of Interior (represented by the BLM State Director) makes the determination on whether there are no significant recreation, timber, economic, or other values which may be incompatible with leasing the lands in question, and whether or not to modify the leases | BLM- State Director | Mineral Leasing Act of 1920 as amended by Federal Coal Leasing Amendments Act of 1976 (as amended), the Energy Policy Act of 2005, and 43 CFR 3432, 43 CFR 3461. |
| Acreage is added to lease | BLM- State Office | 43 CFR 3432 |
| Possible on-lease exploration[1] | BLM State Office | 43 CFR 3482.1(a) |

[1] On-lease exploration will result in surface impacts; however, mining is still not authorized. Surface impacts of exploration may be the same as those that may later be proposed for mining or may be different.

## 1.3 Background

### 1.3.1   Leasing

The Bureau of Land Management Colorado State Office (BLM) notified the Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) that Ark Land LLC applied to modify existing federal coal leases, COC-1362 (held by Mountain Coal Company, LLC (MCC)) and COC-67232 (held by Ark Land LLC (Ark)) by adding about 800 and 920 acres, respectively, to them.

---

[3] The Surface Mining Control and Reclamation Act of 1977 (SMCRA) principally regulates coal mine permitting actions (see Section 1.6). To the extent SMCRA applies at the coal leasing stage, it is the basis for the Unsuitability Assessment (Appendix B) codified in BLM regulations at 43 CFR 3461 that is applicable at the leasing stage.

BLM_0050353

On January 26, 2009, the GMUG received a request from the BLM to analyze a proposed modification and stipulations to COC-67232, containing about 920 acres. On January 26, 2009, the GMUG also received a separate request from the BLM to analyze a proposed modification and stipulations to COC-1362 containing about 800 acres. Coal in the existing leases is mined by MCC from their West Elk Mine near Somerset, Colorado. The applications were made to prevent bypass of federal coal reserves. The lease modification applications were processed according to procedures set forth in 43 CFR 3432.

These lease modifications were previously issued in 2012 from decisions issued by Forest Service and BLM. In 2013, these decisions and BLM's subsequent on-lease exploration decision were litigated. On September 11, 2014, Judge Jackson vacated these three agency decisions. *High Country Conservation Advocates et al. v U.S. Forest Service,* 52 F. Supp. 3d 1174 (D. Colo. 2014). The court ruled that the lease modification FEIS inadequately disclosed the economic effects of methane emissions from the development of the lease modifications. The judge ruled BLM failed to take a hard look at effects on recreational interests. The judge also vacated the Colorado Roadless Rule's North Fork Coal Mining Area exception upon which the lease modifications would rely for post-leasing mining surface uses.

Because decisions were vacated, the leases themselves were cancelled by BLM. Applications for lease modification were resubmitted to BLM on January 30, 2015 and sent to the Forest Service for consent to lease.

The coal lease modification areas lie in portions of sections 10, 11, 14, 15, 22 and 23 of T. 14S., R. 90W., 6th PM in Gunnison County, Colorado. See vicinity map Figure 1-1 below. The modification areas include National Forest System (NFS) surface lands managed by the GMUG. The coal estate is administered by the BLM Uncompahgre Field Office. Both lease modifications are shown on a map Figure 1-2 and Figure 2-1 in Chapter 2.

Table 1-2. Coal Lease Modification Legal Descriptions

| Lease Modification Tract | Location | Acreage |
|---|---|---|
| COC-1362 | T. 14 S., R. 90 W., 6th P.M.<br>Sec. 10: SE, NESW;<br>Sec. 11: SW, S2NW;<br>Sec. 14: NWNW, NENW, W2SENW, SWNW, NWSW, W2NESW;<br>Sec. 15: E2NE, N2SE | 800 acres more or less. |
| COC-67232 | T. 14 S., R. 90 W., 6th P.M.<br>Sec. 11: SWNE, W2SE, SESE<br>Sec. 14: E2SENW, NE, SE, S2SW, E2NESW;<br>Sec. 15: SESE;<br>Sec. 22: E2NE;<br>Sec. 23: NW, NWNE | 920 acres more or less. |

The BLM is required, by law, to consider leasing Federally-owned minerals for economic recovery. With respect to lands managed by the Forest Service, the agency has consent authority to the BLM leasing coal reserves underlying lands under its jurisdiction, and has authority to prescribe conditions for the use and protection of the non-mineral interests in the lands. In this instance, the Forest Service is considering consenting to the BLM modifying existing federal coal lease COC-1362 by adding 800 acres, and COC-67232 by adding 920 acres. The FS will also prescribe any needed stipulations use and to protect the non-mineral

3

interests in the specific lands. Based on Forest Service recommends to the Secretary of Interior (represented by the Deputy State Director-Energy, Lands and Minerals) who makes the determination if there are no significant recreation, timber, economic, or other values which may be incompatible with leasing the lands in question, and whether or not to modify the leases. BLM could then modify the existing leases, which is a non-competitive leasing action (43 CFR Part 3430).

To evaluate the effects of leasing, the federal agencies project reasonable development scenarios based on a reasonably foreseeable mine plan (RFMP) (Section 3.2). Agencies rely on the RFMP in their NEPA analysis and to identify needed non-mineral resource protections (as stipulations; see Tables 2-1 and 2-2) because specific locations of the MDWs and roads will not be known until specific mine plans are approved by the State, BLM, MSHA, and the OSMRE during their subsequent permitting processes. RFMP is also used to develop stipulations to protect non-mineral resources, The RFMP is analyzed for each resource area and alternative in Chapter 3.

As a matter of policy, the Forest Service includes the 'Standard Notice for Lands Under the Jurisdiction of the Secretary of Agriculture' on all leases, which serves to notify the lessee that lands in the leased area are subject to the rules and regulations of the Secretary of Agriculture set forth in 36 CFR Chapter II.

Of note, this includes the FS regulations for Special Area at 36 CFR 294, which are the regulations for management of roadless areas. The Colorado Roadless Rule is codified at Subpart D. Approximately 1,701 acres of the modification areas are within the Sunset Roadless Area; the remaining 19 acres are not within roadless areas. Because Colorado Roadless Areas are part of this process, the State is also a cooperating agency under the Colorado Roadless Rule with a required briefing process during the NEPA process.

Mining requires review and authorization in a separate permitting process to be evaluated under the Colorado mine permitting regulations.

BLM_0050355



**Figure 1-1. Vicinity Map**

BLM_0050356

## 1.3.2   Exploration

The lease modification action described above does not authorize mining activities or surface uses, including exploration drilling.  If lease modifications are issued, on-lease exploration may be authorized by BLM.

On April 3, 2013, Ark submitted a coal exploration plan on behalf of MCC to the BLM Colorado State Office per 43 CFR 3482.1(a) based on rights granted their lease agreements under Part 1, Section 2, including the right to drill for coal deposits in the lease. The plan addressed exploration to evaluate the coal reserves and quality of coal seams. The BLM reviewed the exploration plan, and deemed it complete on April 23, 2013. BLM prepared an EA and issued a decision. The decision approving the on-lease exploration was vacated by the Court in 2014 based on recreation analysis deficiencies.

Ark's Exploration Plan was resubmitted to BLM and was sent to the Forest Service for concurrence on December 5, 2016. If lease modifications are reissued, on-lease exploration may be authorized by BLM.

This portion of the analysis considers site-specific surface disturbance associated with the proposed on-lease exploration plan, including access roads, drill pads, and reclamation. See Section 2.2 and Chapter 3 for more details. These on-lease activities assume that Forest Service consent to leasing and BLM leasing takes place.

Current reserves at the West Elk Mine are estimated to last up to about 11 years with lease modifications analyzed in this document. Exploration according to the plan would provide additional data regarding the amount and quality of coal on the federal leases.  The data obtained would be used to determine whether any mineable reserves as anticipated in the leasing decision, in fact, exist within the modification areas of federal coal leases COC-1362 and COC-67232.

## 1.4  Purpose and Need for Action

### 1.4.1   Lease Modifications

Under 43 CFR 3432 (as amended by the Energy Policy Act of 2005), the holder of a federal coal lease may apply to modify a lease by adding up to 960 acres.  The federal agencies are responding to applications to modify two existing leases.  The GMUG and BLM have identified the need to consider issuing two coal lease modifications for federal coal lands immediately adjacent to existing federal coal leases COC-1362 and COC-67232.  The purpose of the federal agencies' actions is to facilitate recovery of federal coal resources in an environmentally sound manner (30 U.S.C. 1265(b)(1), 43 CFR 3400, and Mining and Minerals Policy Act of 1970). Further, the purpose of the lease modifications is to ensure that compliant and super-compliant[4] coal reserves are recovered and not bypassed. The agencies' proposed action responds to the federal government's overall policy to foster and encourage private enterprise in the development of economically sound and stable industries, to help assure satisfaction of industrial, security and environmental needs (Mining and Minerals Policy Act of 1970).

---

[4] Compliant and super-compliant coal refer to specific amounts of sulfur dioxide defined under the Energy Policy Act of 2005 at Sec. 437(2) " (A) the term ``compliant coal'' means coal that contains not less than 1.0 and not more than 1.2 pounds of sulfur dioxide per million BTU; and (B) the term ``super-compliant coal'' means coal that produces less than 1.0 pounds of sulfur dioxide per million BTU." To clarify "compliant" and "super-compliant" only refer to sulfur dioxide, and more specifically, emissions at combustion.

The BLM, charged with administration of the mineral estate on these Federal lands, is required, by law, to consider leasing Federally-owned minerals for economic recovery.

The USDA-Forest Service (FS), as the surface management agency, considers consenting to the BLM leasing reserves underlying lands under its jurisdiction and prescribes stipulations for the protection of non-mineral resources. Based on Forest Service consent and recommendations on the findings below, the Secretary of Interior (represented by the BLM Deputy State Director for Energy, Lands and Minerals) makes the determination on whether there are no significant recreation, timber, economic, or other values which may be incompatible with leasing (see unsuitability criteria in Appendix B) the lands in question, and whether or not to modify the leases. BLM could then modify the existing leases, which is a non-competitive leasing action (43 CFR Part 3430).

## 1.4.2   Exploration Plan

The BLM's purpose is to decide whether to approve the on-lease exploration plan (submitted on December 5, 2016) and allow the activities to occur on the proposed modified coal leases, consistent with lease rights, if granted, in the manner described in the plan; disapprove the plan with a statement of conformity; or approve the plan with additional conditions (43 CFR 3482.2(a)(1)), if needed, to minimize impacts. As the surface management agency, the GMUG's purpose and need is to carry out Forest Service policy for minerals management, which would include fulfilling the regulatory obligation to respond to BLM if it (GMUG) concurs with the exploration plan approval terms, determine the adequacy of the reclamation bond(s).

The BLM's need is to respond to an application to explore the coal deposits in accordance with the federal lease agreements, if issued; NEPA; the Mineral Leasing Act, as amended by the Federal Coal Leasing Amendments Act of 1976; and the Federal Land Policy and Management Act of 1976. The BLM would also be fulfilling management obligations regarding the federal coal resource by obtaining information which allows the BLM to verify the recoverable reserves.

The OSMRE and DRMS will participate as cooperating agencies as they are responsible for the reviewing of mining plans and oversee the subsequent permitting process.

## 1.5 Proposed Action

Together the agencies proposed actions are to modify MCC's COC-1362 and Ark's COC-67232 existing federal coal leases by adding 800 and 920 additional acres respectively. See Figure 1-2. The Forest Service proposes to consent to the BLM modifying the coal leases, with conditions for use and protection of non-mineral interests. Based on Forest Service consent, the BLM proposes to modify the leases. If lease modifications are issued, then on-lease exploration may be authorized by BLM. Details of the Proposed Action and alternatives can be found in Chapter 2 (Section 2.2)

BLM_0050358



Figure 1-2. Proposed Lease Modifications

8

BLM_0050359

# 1.6 Decision Framework

## 1.6.1   Forest Service

### 1.6.1.1   Leasing

The GMUG Forest Supervisor is the Authorized Officer for this discretionary consent decision on these coal lease modifications (FSM 2822.04c, R2 Supplement). Given the purpose and need, the Authorized Officer will review the proposed action, the other alternatives, and the environmental consequences in order to decide the following:

- Whether or not to consent to the BLM modifying existing Federal Coal Lease COC-1362 by adding 800 acres, and whether or not to consent to the BLM modifying existing Federal Coal Lease COC-67232 by adding 920 acres according to the Mineral Leasing Act of 1920 (MLA); as amended by the Federal Coal Leasing Amendments Act of 1976 and Energy Policy Act of 2005;

- If consent to modify the leases is given, prescribe stipulations needed for the protection of non-mineral surface resources by determining if the existing stipulations on the parent lease are sufficient. If the parent lease stipulations are not sufficient, the Forest Service will prescribe additional stipulations that will provide for the protection of non-mineral interests in the lands.

The Forest Service Authorized Officer will determine if the activity, with the addition of stipulations, provides for protection of non-mineral resources related to his authorities consistent with the GMUG Forest Plan, and other applicable laws, regulations and policies. A subsequent decision will be made based on the analysis relative to the No Action, Proposed Action (Alternative 3), or other action alternative(s).

### 1.6.1.2   Exploration

The GMUG is a cooperating agency to the BLM for exploration plan analysis. Although the Forest Service is the surface management agency, it does not have a NEPA decision to make for the exploration plan. Rather, the Forest Service role is limited to providing concurrence to the BLM with the approval terms of the exploration plan (43 CFR 3482.2(a)(1)). In addition, the regulations also provide opportunity for the Forest Service to determine the adequacy of the reclamation bond amount to be held by DRMS.

If the approval terms of exploration plan are acceptable, the Forest Service will provide concurrence and will review the reclamation bond amount to determine its adequacy. Under Forest Service regulations, a concurrence is not a NEPA "decision" subject to objection (36 CFR 218.1).

## 1.6.2   BLM

### 1.6.2.1   Leasing

The BLM is a cooperating agency for the leasing portion of this EIS to respond directly to their role in the Federal coal leasing process which is tied to the mineral (not surface) estate. The BLM's Deputy State Director for Energy, Lands and Minerals is the Authorized Officer for the BLM, and will decide, if the Forest Service consents, whether or not to modify the existing coal lease(s) under the Mineral Leasing Act, as amended, and the federal regulations under 43 CFR 3400.  The Uncompahgre Field Office Manager/Southwest District Manager is responsible for

BLM_0050360

providing the State Director with briefings and recommendations.  Specifically, the BLM will decide whether to:

- Adopt the No Action Alternative (no leasing);

- Adopt the lease modification(s) as described in either Alternative 3 or 4 with the stipulations proposed by the Forest Service and BLM; or

- Adopt the coal lease modification(s) as applied for by the applicants (these would not have updated stipulations as described in Table 2-1 or Table 2-2);

BLM cannot issue lease modifications without the <u>consent</u> of the surface managing agency.

### 1.6.2.2   Exploration

BLM is the lead agency for on-lease exploration plan analysis and must decide whether or not to:

- Approve the exploration plan and allow the activities to occur on the coal leases, consistent with lease rights (if granted); or

- Approve the exploration plan with additional conditions (43 CFR 3482.2(a)(1)), if needed, to minimize impacts.

BLM's Deputy State Director for Energy, Lands and Minerals, the Authorized Officer, must have surface management agency's (Forest Service's) <u>concurrence</u> to approve the exploration plan. Forest Service concurrence is not a "decision" subject to agency's objection process (36 CFR 218.1).

## 1.6.3   OSMRE

Office of Surface Mining Reclamation and Enforcement (OSMRE) is a cooperating agency in preparing this EIS.  If the leases are modified, OSMRE will determine if there is a need for a federal mining plan modification at the time the actual permitting process is underway.  If a federal mining plan modification is needed, OSMRE is the agency responsible for making a recommendation to the DOI's Assistant Secretary for Lands and Minerals (ASLM) to approve, disapprove, or approve with conditions the proposed mining plan modification. The ASLM will then decide whether the mining plan modification is approved, disapproved, or approved with conditions. OSMRE implements its responsibilities for the MLA and SMCRA under regulations at CFR Title 30 - Mineral Resources, Chapter VII - OSMRE, Department of the Interior, Subchapters A-T, Parts 700-955.

## 1.6.4   DRMS

In Colorado, the Division of Reclamation Mining and Safety (DRMS) operates under an OSMRE-approved program for administering coal mining operations in the state, as codified by the Colorado Surface Coal Mining Reclamation Act (CRS 34-33-101) and attendant regulations which are consistent with the overarching federal regulations (30 CFR Part 906, Appendix B). Any applications submitted to the State of Colorado to revise the state mining and reclamation permit, including applications to allow mining and its related surface disturbances, reclamation, and the changing of the approved mine permit boundary to include the modification area, would be reviewed by the DRMS. Reclamation bonding is required by the State of Colorado and is subject to adequacy review by the Forest Service on NFS lands.

BLM_0050361

## 1.7 Authorizing Actions

### 1.7.1 Mining and Minerals Policy Act of 1970 and Mineral Leasing Act of 1920, as amended

The Forest Service and BLM manage their minerals programs under guidance given in the Mining and Minerals Policy Act of 1970 which states in part that it is the "continuing policy of the federal government in the national interest to foster and encourage private enterprise in…(t)he development of economically sound and stable domestic mining minerals and mineral reclamation industries…(and) the orderly and economic development of domestic mineral resources…." Further, federal mineral leasing follows the Mineral Leasing Act of 1920 as amended by the Federal Coal Leasing Amendments Act of 1976 (MLA), and specific procedures set forth in 43 CFR 3400.

The MLA and the Federal Coal Leasing Amendments Act specify that "leases covering lands the surface of which is under the jurisdiction of any federal agency other than the [USDI] may be issued only upon the consent of the other Federal agency and upon such conditions as it may prescribe with respect to the use and protection of the non-mineral interests in those lands". Thus, the Forest Service is responsible for protecting the surface resources.

These lease modification applications are being processed according to procedures set forth in 43 CFR 3432. Lease modifications are non-competitive leasing actions. In this case, Ark Land and MCC applied for these modifications to add acreage to existing leases, thus no other coal company could obtain the rights to the coal if it is approved; therefore, this is a non-competitive leasing action.

In compliance with MLA and other laws, the BLM must respond to an application to explore the coal deposits in accordance with the federal lease agreements. The BLM also needs to fulfill management obligations regarding the federal coal resource by obtaining information which allows the BLM to verify the recoverable reserves. This process is codified at 43 CFR 3482.2(a)(1).

The MLA as amended by the Federal Coal Leasing Amendments Act requires an operation and reclamation plan for leased federal coal. The requirements for this plan are codified in OSMRE's regulations at 30 CFR Part 700 et seq. The need for such a plan would be reviewed as part of the SMCRA permitting process described below.

### 1.7.2 Surface Mining Control and Reclamation Act of 1977 (SMCRA)

The Surface Mining Control and Reclamation Act (SMCRA) principally applies to coal permitting. SMCRA balances the need to protect the environment from the adverse effects of surface coal mining with the Nation's need for coal as an essential energy source. It ensures that coal mining operations are conducted in an environmentally responsible manner and that the land is adequately reclaimed during and following the mining process. Most coal-mining states now have the primary responsibility to regulate surface coal mining on lands within their jurisdiction, with OSMRE performing an oversight role. SMCRA requires that all coal mining be conducted under a permit approved by the designated regulatory authority. The Colorado Division of Reclamation Mining and Safety is the regulatory authority for coal mining in the state.

Any applications submitted to the State of Colorado to revise the state mining and reclamation permit, including applications to allow mining and its related surface disturbances, reclamation, and the changing of the approved mine permit boundary to include the modification areas, would

BLM_0050362

be reviewed by the Colorado Division of Reclamation, Mining and Safety (DRMS). This review would be conducted by DRMS as set forth in the Colorado Surface Coal Mining Reclamation Act (34-33-101 et seq., C.R.S. 1973 as amended) and the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining (2 CCR 407-2, August 30, 1980 as revised). Coordination between DRMS and appropriate federal agencies of the review of any applications for Permit Revisions (PRs) that may be submitted by MCC in conjunction with these lease modifications will be overseen by DRMS in accordance with the Colorado Surface Coal Mining Reclamation Act, the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, and, as applicable, 30 CFR 906.30. These State permitting actions may also require issuance or modification of a federal mine plan (or plans) by the USDI through the OSMRE under the MLA.

The extent to which SMCRA directly applies at the leasing stage is related to the need for the Forest Service and/or BLM to conduct the Unsuitability Assessment under Section 522(e) of SMCRA. For the purposes of the unsuitability assessment conducted at the leasing stage, the procedure is codified at 43 CFR 3461. Unsuitability Analysis is found in Appendix B. Based upon review of the Unsuitability Analysis, the Forest Service Authorized Officer will make a recommendation to the BLM; however, the Secretary of Interior, or his designee, will actually make the unsuitability determination (43 CFR 3461.5(a)(2)(i) and 30 U.S.C. Chapter 25, Section 1272-4(e)(2), 30 CFR Subchapter F- 761.11, Surface Mining Control Reclamation Act Section 522 (2))

### 1.7.3   Energy Policy Act of 2005

The purpose of the Energy Policy Act of 2005 was to ensure jobs for the future with secure, affordable, and reliable energy.

This Act Amends 30 U.S.C. 203(c)(4)(A) to ``secure modifications of the original coal lease by including additional coal lands or coal deposits contiguous or cornering to those embraced in the lease…(3) In no case shall the total area added by modifications to an existing coal lease under paragraph (1)(A) exceed 960 acres; or (B) add acreage larger than that in the original lease.''

## 1.8 Conformance with Land Use Plans

### 1.8.1   Leasing

The amended Land and Resource Management Plan (LRMP or Forest Plan) dated September 1991, for the GMUG National Forests made provisions for coal leasing subject to the application of the coal unsuitability criteria established in 43 CFR 3461 (Appendix E). Per those requirements, the FS will make a recommendation whether there are no significant recreational, timber, economic, or other values which may be incompatible with the lease (43 CFR 3461.5(a)(2)(i)). The LRMP also provided for applicable stipulations to be utilized for protection of specific surface resources as addressed in Section III, General Direction, pages 63-69 of the LRMP.

The Forest Plan guides all natural resource management activities and establishes management standards and guidelines for the GMUG. Management directions described in the Forest Plan are a result of public issues, management concerns, and management opportunities. Multiple use management area prescriptions as designated in the Forest Plan for the lands bounded by the proposed lease modification areas are summarized below:

- 6B –Livestock grazing. Emphasis is on optimizing forage capability for livestock grazing. Other resource activities may occur, but should harmonize and blend with the natural setting.

12

- 5A – Big Game winter range in non-forested areas. Winter range is managed to produce wildlife habitat capability greater than or equal to 90 % of potential for a mid-seral or better condition. Compatible resource activities may occur.

- 9A–Riparian / Aquatic Ecosystems. Emphasis is on the management of all the components of aquatic/riparian ecosystems to provide healthy, self-perpetuating plant communities, acceptable water quality standards, and habitats for viable populations of fish and wildlife, and stable stream channels and still water body shorelines. Mineral activities may occur but must minimize disturbance to riparian areas and initiate timely and effective rehabilitation of disturbed areas and restore them to a state of productivity comparable to that before disturbance.

The proposed action conforms to the overall guidance given in the LRMP, as amended (1991), which encourages environmentally sound energy and mineral development. None of the lands were found to be unsuitable based on the criteria. No additional restrictions or need for stipulations were identified as a result of applying the criteria (Appendix A).

Leasing is also consistent with the current BLM Uncompahgre Basin Resource Management Plan (RMP, 1989). This RMP determined that the areas subject to the lease modification applications and exploration plan application were to be managed for both existing and potential coal development. The area is acceptable for coal development and coal production, and such coal activities could occur without conflicting with other land uses as described in the RMP.

Upon receipt of the lease modification applications, BLM completed tract delineation based on recommendations of Forest Service and Ark Land/MCC. In addition, as established in 43 CFR 3461.2-1(b)(1) and 3461.3-1(b)(1), the specific lands in the lease modifications were reviewed for unsuitability by the Forest Service and a recommendation will be made to the Secretary of Interior (or his representative which is the BLM Deputy State Director For Energy, Lands, Minerals) will be made who will determine whether there are no significant recreational, timber, economic, or other values which may be incompatible with the lease (43 CFR 3461.5(a)(2)(i)). This recommendation is included in this document as Appendix B. The criteria have also been reviewed for implications with all alternatives in this analysis. The unsuitability criteria published in 43 CFR 3461 were used. Under 43 CFR 3400.3-3 (as well as 30 CFR 761), the Secretary of Interior may issue leases that authorize coal mining operations on Federal lands within the National Forest System, provided that such leases may not be issued on lands within a national forest unless the tract is assessed to be acceptable for all or certain stipulated methods of surface coal mining operations under the provisions of Criterion No. 1 in 43 CFR 3461.1. This states that (i)A lease may be issued within the boundaries of any National Forest if the Secretary of Interior finds no significant recreational, timber, economic or other values which may be incompatible with the lease; and (A) surface operations and impacts are incident to an underground coal mine. This documentation is provided by the BLM prior to lease issuance per 30 U.S.C. Chapter 25, Section 1272-4(e)(2), 30 CFR Subchapter F- 761.11, Surface Mining Control Reclamation Act Section 522 (2) and 43 CFR 3461.5.

The RMP was amended to address the standards for land health (i.e., Standards and Guidelines). The land analyzed in the EIS project area is within the North Fork landscape unit. Briefly, Colorado BLM's Standards are:

- Ensure health of upland soils;

- Protect and improve riparian systems;

- Maintain healthy, productive plant and animal communities;

13

BLM_0050364

- Maintain or increase populations of threatened and endangered species in suitable habitat; and

- Ensure water quality meets minimum Colorado standards.

The RMP made provisions for coal leasing subject to the application of the 20 Coal Unsuitability Criteria (as established in 43 CFR 3461). Federal coal lands not meeting the standards required by each criterion are determined to be unsuitable for coal leasing. A number of criteria have exemptions and exceptions, and the application of these exemptions and exceptions may allow certain types of coal mining.

The Proposed Action is subject to, and has been reviewed for, conformance with the BLM Uncompahgre Basin RMP (43 CFR 1610.5-3, 1617.3) as amended (BLM, 1989). The Standards for Public Land Health were adopted by BLM Colorado State Office in 1997 and amended the Uncompahgre Field Office RMP (and all others).

<u>Decision Number/Page</u>:  ROD, page 9.

<u>Decision Language</u>: Standard Management Direction is that "Federal Coal Estate will be identified as acceptable for further leasing consideration".

<u>Decision Number/Page</u>:  Management Unit 7, pg. 21.

<u>Decision Language</u>:  Management Unit 7 "The management unit will be managed for both existing and potential coal development.  Development of existing coal leases will continue and non-leased federal coal will be identified as acceptable for further coal leasing consideration with a minimum of multiple-use restrictions.  Activities and land uses that are consistent with maintaining existing coal operations and the potential for coal development will be permitted."

The Proposed Action is consistent with current land management planning.

## 1.8.2   Exploration

Exploration activities are consistent with the stipulations in this document and would also be consistent with the Forest Plan and LRMP.

This on-lease activity is also consistent with the Gunnison National Forest Travel Management Plan (USFS, 2010) and Forest Service Handbook (FSH) 2800.

## 1.9  Public Involvement

The Notice of Opportunity to Comment on the Environmental Assessment (EA) initially prepared for this project was published in *the Grand Junction Daily Sentinel* (newspaper of record) and in the *Delta County Independent* on April 21, 2010. The Notice of Opportunity to Comment asked for public comment on the proposed lease modifications from April 21-May 21, 2010.  In addition, as part of the public involvement process, the agency sent out approximately 120 letters to state, federal, local agencies, tribes, environmental groups, and interested individuals; posted scoping materials to the GMUG's website; and posted to the Forest Service's Schedule of Proposed Actions.

During that initial comment period, approximately 684 versions of email form letters were received from Wild Earth Guardians supporters; 1900 versions of email form letters were received from

BLM_0050365

Defenders of Wildlife supporters; 23,771 versions of email form letters were received from supporters of Natural Resources Defense Council; 5647 versions of email form letters were received from supporters of Earth Justice; 576 hardcopy/faxed various form letters were received from local community members in four counties in support of mining in this area; 74 original or somewhat original comments were received; and 4 original comments with attachments were received in response to this scoping effort.

Using the comments from the public, environmental groups, other agencies, and those developed internally, the interdisciplinary team developed a list of issues to address (see *Issues* section). Other comments were responded to in the EA.

The decision on that EA was issued in November 2011, was appealed December 2011 and was reversed in February 2012.

Notice of Intent (NOI) to prepare an Environmental Impact Statement was published in the *Federal Register* on April 25, 2012. Approximately 830 copies of letters/emails informing interested parties (including state, federal, local agencies, tribes, environmental groups, and individuals expressing desire to remain on mailing lists) of this intent were also sent out on April 25, 2012 inviting additional comments throughout the process but reminding them that to be eligible for appeal they must comment on Draft EIS when it became available. Additional notification was not sent out to those who submitted form letters through other groups' clearinghouse websites on the previously prepared EA except for those who submitted original or somewhat original comments. Forest Service's Schedule of Proposed Actions was also updated. Additional notification was sent out with the Draft EIS to approximately 768 individuals, additional legal notices were published in the *Grand Junction Daily Sentinel* and *Delta County Independent*.

Approximately 24,680 comment letters were received on the Draft EIS. Of those, 67 were original or somewhat original comments. Responses to comments received during the 30 day period following the printing of the NOI and the 45 day comment period on the DEIS and other comments specifically included by reference can be found in Appendix I. Comments received during this time can be viewed in entirety in Appendix I (Volume II) of the FEIS or at:

https://cara.ecosystem-management.org/Public//ReadingRoom?Project=32459

On June 2, 2017, the notice of availability for the Supplemental Draft EIS was published in the *Federal Register* and legal notice of opportunity to comment was published in the *Grand Junction Daily Sentinel* (with a courtesy copy in the *Delta County Independent* on May 30, 2017). Email or hardcopies notifications were sent to those who had previously commented. During the 45-day official comment period we received approximately 127,257 expressions of interest or comments as follows: 1083 unique letters; 35,134 form and form plus letters from environmental groups' members directly; 262 hardcopy variations of form letters supporting lease modifications; 6,000 WildEarth Guardians petitioners: 35,088 Sierra Club form and form plus letters; 47,710 Earth Justice form letters (12,050 of these were form plus) and 1980 duplicate form letters. Issue topics are consistent with those raised in previous comment periods. Summarized comments are responded to in Appendix K and throughout the SFEIS as appropriate. Comments received during this time can also be read in their entirety at:

https://cara.ecosystem-management.org/Public//ReadingRoom?Project=32459

BLM_0050366

## 1.10  Issues

Issues carried forward in this analysis are defined as those directly or indirectly caused by implementing the proposed action.  Issues relating to the proposed lease modifications were identified based on the comments received during the public scoping and comment process. These issues, along with issues raised by the Interdisciplinary Team (IDT), are addressed in the analysis. These issues have previously been addressed in the Final EIS (Table 1.9) and will be carried forward in this analysis.  It is believed that new issues will arise during the SEIS process. While it was believed that new issues may arise during the SEIS process, they have not. However, we did see numerous iterations on methodology, continued requests for additional analysis of the same issues/alternatives, and an array of variations on existing alternatives and alternatives considered but eliminated from detailed study.

**Table 1-3. Issues**

| Topic | Issue | Where Addressed |
|---|---|---|
| Alternatives | Exploration plan contains a redundant access road that should be removed. | Redundant route has been removed from both Alternatives 3 and 4 exploration plan analysis. |
| Cumulative Effects | Surface disturbance other than from mining (subsidence) may occur as a result of mining. | Chapter 3 |
| | Reasonably foreseeable impacts to the surface and other resources may occur as a result of mining. | Chapter 3 |
| Mitigation Measures | Agencies must evaluate the effectiveness of proposed mitigation measures. | As stated by the commenter, CEQ requires that mitigation measures should "be identified even they are outside the jurisdiction of the lead agency" and any measures that are "adopted" explained and committed.  In this document stipulations are included as part of the Action Alternatives in the form of Lease stipulations and are thus analyzed in detail. |
| Air Quality | Effects may occur as a result of mining on air quality including ambient ozone, $PM_{2.5}$, $PM_{10}$, VOCs, Class I areas in compliance with the Clean Air Act. | Chapter 3, Section 3.4 |
| | Include a stipulation related to particulate matter. | A stipulation was considered in DEIS (DEIS Chapter 2, Table 2.1a) from another mine's analysis, but removed in FEIS due to implementation concerns raised during comments specific to the West Elk Mine. (Appendix I) |
| | Cumulative effects to air quality associated with coal burning may occur as a result of mining. | Chapter 3, Section 3.4 |
| Roadless Characteristics | Roadless characteristics  in the West Elk Roadless (and Sunset Roadless) Area may be affected either indirectly or cumulatively through consent to or modifying the leases. | Chapter 3, Section 3.18 |

BLM_0050367

| Topic | Issue | Where Addressed |
|-------|-------|-----------------|
| Methane | Alternatives to venting including flaring, capture and use, or destroying ventilation air (VAM) methane must be analyzed in detail. | Chapter 2, Section 2.3 |
| | BLM lease addendum should be re-negotiated with Lessee to allow for flexibility related to addressing changes in law, regulation or policy as it relates to methane capture at the West Elk Mine.   For example, if CDHPE determines that the Tailoring Rule applies to the West Elk Mine, additional mitigations may be required. | This comment originated from EPA's comment on their preliminary review of the DEIS. This was considered in the DEIS (DEIS, Table 2.1b). As of July 1, 2012, an application was submitted with the State regulatory agencies under Title V of the Clean Air Act (Tailoring Rule) for this mine. EPA's concern was reviewed again in relation to comments received by others on the DEIS and determined to already be covered by standard lease terms that require compliance with State and Federal law.  Therefore, this has been removed from consideration in Table 2.1b in the FEIS. Additionally as of January 2017, the lease addenda language is part of BLM's IM 2017-037 |
| Coal Reserve | Address the effects of adding coal reserves on coal resource recovery. | FEIS Chapter 3, Section 3.35, DEIS Appendix A (GER/MER), SDEIS/SFEIS Section 3.21 |
| Socioeconomics | Coal mining activities are vital to the local and regional economies. | Chapter 3, Section 3.21 |
| | Coal from the North Fork Valley helps fuel clean coal technology and provide the USA with low-cost, reliable energy. | Chapter 3, Section 3.21 |
| | Commenters suggest Social Cost of Carbon, Methane and Nitrous Oxides should be calculated for project. | Rationale is included in Chapter 3, Section 3.4 for why this analysis was not undertaken. |
| Visual Resources | Removal of vegetation, ground disturbance and structures related to future surface facilities needed to manage methane may negatively impact visuals. | Chapter 3, Section 3.20 |
| Wildlife | Removal of vegetation related to future surface facilities needed to manage methane may negatively impact Canada lynx. | Chapter 3, Biological Assessment, and USFWS consultation |
| Recreation | Commenters identify that recreation effects for  exploration plan was not considered in BLM's previous EA. | Recreation is addressed in section 3.16 |
| Subsidence | Subsidence may affect water resources including local water quality and quantity. | Chapter 3, Section 3.8 |
| | Subsidence may affect wildlife habitat, including effects to riparian habitat. | Chapter 3, Sections 3.10 and 3.12 to 3.14 |
| | Subsidence may affect cultural resources. | Chapter 3, Section 3.19 |

BLM_0050368

| Topic | Issue | Where Addressed |
|---|---|---|
| | Subsidence may affect other land uses, including range improvements, cattle trails and other multiple uses of the land. | Chapter 3, Section 3.15 to 3.17 |
| Climate Change | Effects on climate change may occur from mining coal which stem from the release of methane through the mine ventilation system, release of methane through any gob vent boreholes and release of $CO_2$ caused by the burning of coal that is mined. | Chapter 3, Section 3.4 and other relevant sections throughout Chapter 3. |

Non-significant issues are identified as those: 1) outside the scope of the proposed action; 2) already decided by law, regulation, Forest Plan, or other higher level decision; 3) irrelevant to the decision to be made; or 4) conjectural and not supported by scientific or factual evidence. The Council on Environmental Quality (CEQ) NEPA regulations explain this delineation in Sec. 1501.7, "…identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (Sec. 1506.3)…" To the extent received, these have been evaluated based on comments received during the comment period for the DEIS and documented in Response to Comments in Appendix I, on the Notice of Intent to prepare a SEIS in Appendix J, and during the official comment period on the SDEIS in Appendix K.

## 1.11 Related Analysis and Documents

Per 40 CFR Part 1502 § 1502.21, this EIS tiers to and/or incorporates by reference previous analysis conducted in the vicinity of the project area related to parent leases. Materials related to this previous analysis may be further relied upon in the event of appeals or litigation.

1. Deer Creek Shaft and E Seam Methane Drainage Wells Project FEIS August 2007 Records of Decision August 2007 (Shaft), November 2007, March 2008 and Errata January 2008. Documents relate to cumulative effects, methane capture and existing condition of the affected parent leases.

2. Federal Coal Lease Modifications COC-1362 and COC-67232 EA November 2011. And appeal of same. This EIS relies on this analysis, appeal points, and decision reversal and the comments received on this project are needed to satisfy the scoping requirements of this EIS.

3. Elk Creek East Tract Coal Lease COC-70615 EA DOI-BLM-CO-150-2008-53, 2010. Document relates to cumulative effects particularly for air quality (methane baseline).

4. Colorado Roadless Rule FEIS (2012) and Final Rule (July 3, 2012)

5. Rulemaking for Colorado Roadless Areas Supplemental Final Environmental Impact Statement. (November 2016) and associated final rulemaking "Roadless Area Conservation; National Forest System Lands in Colorado," that was published in the Federal Register at 81 FR 91811 on December 19, 2016, reinstating the North Fork Coal Mining Area (NFCMA) exception to the Colorado Roadless Rule and became effective April 17, 2017. Reinstatement of the NFCMA allows for temporary road building and surface disturbance within the lease modifications Colorado Roadless Areas. Numerous comments submitted on these lease modifications actually were submitted on the rulemaking effort.

BLM_0050369

(Intentionally left blank)

BLM_0050370

# Chapter 2. Alternatives to the Proposed Action

## 2.1 Introduction

This chapter describes and compares the alternatives considered for the lease modifications. It includes a description and map of the action alternatives considered. This section also presents the alternatives in comparative form, sharply defining the differences between each alternative and providing a clear basis for choice among options by the decision makers. Information used to compare the alternatives is based upon the environmental, social and economic consequences of implementing each alternative. To clarify, this is the leasing (and on lease exploration, if leased) stage of a multi-staged process.

## 2.2 Alternatives Considered in Detail

The alternatives developed in response to issues raised by the public include Alternative 1-No Action, Alternative 3 (Proposed Action)[5] Consent to modifying the leases (Agency Preferred Alternative), and Alternative 4 Consent to modifying only the COC-1362 lease.  Ark Land LLC (Ark) applied to modify existing Federal coal leases at the West Elk Mine. The action, as proposed and modified by Federal Agencies and applicant, is to add approximately 800 acres to lease COC-1362 and approximately 920 acres to lease COC-67232 for a total of approximately 1,720 acres (43 CFR 3400).  In addition an exploration plan was submitted.  This is considered under both action alternatives if lease modifications are issued.

### 2.2.1   Alternative 1-No Action (Environmentally Preferred Alternative)

#### 2.2.1.1   Leasing

Analysis of the No Action alternative is required by CEQ 40 CFR Part 1502.14(d).  Under the no action alternative, consent to modify the leases would not be granted by the Forest Service, precluding approvals of the lease modifications  by BLM, and thus no mining would occur in these specific areas.  Impacts from mining coal under these areas would not occur on these lands; and the effects from on-going land uses could continue including coal mining activities such as exploration and monitoring related to mine activities on existing leases, continued recreation and grazing.  The land would continue to be managed according to Forest Plan standards, goals and guidelines.  Selection of the No Action Alternative would not preclude MCC from applying again for these or other lease modifications or off-lease exploration.

#### 2.2.1.2   Exploration (on-lease)

Under the No Action Alternative, on-lease exploration would not be approved by BLM. Based on MCC's assessment, not exploring the coal condition would result in an inability to acquire the information necessary to develop a sufficient mine plan addressing the additional leased area and; therefore, it is highly unlikely that mining would occur in these specific areas. For the purposes of the analysis, no action would result in no mining on the lease modification areas. Under no action, current reserves at the mine would be depleted in approximately 8.2[6] years,

---

[5] Alternative 2-Consent to modifying the leases under the provisions of 2001 Roadless Area Conservation Rule was included in DEIS/FEIS but removed from detailed consideration in this Supplemental EIS as it is no longer in effect in Colorado.

[6] 53.3 million tons in reserve/ assumed mining rate or 6.5 million tons per year   Note not all reserves or production would be on NFS lands.

followed by mine closure. The mine life would not be extended approximately 2.6 -2.7 years. The leases provide the right for MCC to conduct exploration, therefore, no action would be inconsistent with lease rights, if lease modifications were granted.

On-going land uses would continue including continued recreation and grazing. The land would continue to be managed according to the amended Land and Resource Management Plan (USFS, 1983) standards, goals, and guidelines.

## 2.2.2   Common to Action Alternatives

### 2.2.2.1   Leasing

The proposed action is for the Forest Service to consent to and prescribe stipulations for the protection of non-mineral (i.e. surface) resources and for BLM to modify MCC's existing federal coal lease(s) to ensure that compliant and super-compliant coal reserves are recovered and not bypassed. The proposed lease modifications are located in Gunnison County, Colorado as described in Chapter 1, Background of these Lease Modifications. See Figure 2-1.

Methane drainage well construction is essential for operating longwall operations in the North Fork Valley. Normal mine ventilation alone does not allow for safe longwall mining in the North Fork Valley. Without MDWs methane builds up quickly in the underground mine during the longwall mining process. The current uses of MDWs are necessary to mitigate methane safety hazards making mine-air compliant with MSHA standards. For the West Elk Mine, MDWs are a required part of their MSHA approved ventilation Plan (see project record). Because a leasing decision itself does not involve any mineral development or surface disturbance, it is necessary to project the amount of surface use or activity that would likely result during lease development in order to disclose potential effects and inform decision-making. The Reasonably Foreseeable Mine Plans (RFMP), which describes the likely post-lease activity for the alternatives are described in Section 3.3.

An Unsuitability Analysis has been conducted for these lease modifications and is included in Appendix B.

**Stipulations**

As part of the proposed action and alternatives the GMUG Forest Supervisor must decide if the existing stipulations on the parent leases are sufficient for the protection of non-mineral (i.e. surface) resources. If not, additional stipulations that would provide for the protection of non-mineral resources must be prescribed. The table below shows the stipulations on the parent leases and their applicability to the lease modifications, as well as, proposed modifications and changes.

In accordance with Forest Service Manual (FSM) 2820, the Standard Notice for Lands under the Jurisdiction of Agriculture is part of the parent leases, and hence would apply to the lease modifications. This Standard Notice includes requirements for Cultural and Paleontological Resources, and Threatened and Endangered Species (see Table 2-1). Further, the Standard Notice contains the following language: "The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of Interior in the permit. The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing

21

BLM_0050372

improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy of the NFS not authorized by the permit/operation approved by the Secretary of the Interior.

Stipulations from parent leases have been reviewed, revised, or new stipulations included for action alternatives are listed in Table 2-1 and Table 2-2 below. "

BLM_0050373

**Table 2-1. Stipulations for Protection of Non-Mineral (Surface) Resources**

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Cultural and Paleontological Resources** | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures. Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:<br><br>• Contact the FS to determine if a site specific cultural resource inventory is required. If a survey is required then:<br><br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance. The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations. An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted. | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures. Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:<br><br>• Contact the FS to determine if a site specific cultural resource inventory is required. If a survey is required then:<br><br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance. The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations. An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted. | Use language from parent leases (required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture.) |

BLM_0050374

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | • Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate.  •  The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest discovered as a result of surface operations under this license, and shall leave such discoveries intact until directed to proceed by FS and BLM. | • Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate.  •  The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest discovered as a result of surface operations under this license, and shall leave such discoveries intact until directed to proceed by FS and BLM. | |
| **Endangered or Threatened Species** | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |

24

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.<br><br>The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost.  This examination must be done by or under the supervision of a qualified resource specialist approved by the FS.  An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.<br><br>The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost.  This examination must be done by or under the supervision of a qualified resource specialist approved by the FS.  An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | |
| | If there is reason to believe that Forest Service Sensitive species, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted.   The inventory shall include species or groups of species identified by the FS, and will be conducted to by a qualified specialist. A report of findings will be prepared and provided to the FS.  A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance consistent with the Forest Plan.    The cost of conducting such inventory, preparing reports and carrying | If there is reason to believe that Sensitive, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted.  The inventory shall be conducted by a qualified specialist, and a report of findings prepared.  A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance.   The cost of conducting such inventory, preparing reports and carrying out mitigation measures shall be borne by the Lessee/Operator. | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |

25

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | out mitigation measures shall be borne by the Lessee/Operator. | | |
| Canada Lynx | To comply with the USDA Forest Service Conservation Agreement with Fish and Wildlife Service, to follow the conservation measures in the Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000), the following special constraints will apply if surface use on the lease is proposed in lynx habitat: <br><br> • Winter access will be limited to designated routes. <br> • Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances: <br> • Remote monitoring of the development sites and facilities may be required to reduce snow compaction. <br> • A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required. <br> • Public motorized use on new roads constructed for project-specific purposes will be restricted. | To comply with the Canada Lynx Assessment and Strategy (Ruediger et al. 2000), the following special constraints will apply if post-lease surface use is proposed in lynx habitat: <br><br> • Winter access will be limited to designated routes. <br><br> Further, should post-lease operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances: <br> • Remote monitoring of the development sites and facilities may be required to reduce snow compaction. <br> • A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required. <br> • Public motorized use on new roads constructed for project-specific purposes will be restricted. <br> • Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer | To comply with the GMUG Forest Plan 2008 amendment, the following special constraints will apply if surface use on the lease is proposed in lynx habitat: <br><br> • Winter access will be limited to designated routes. <br><br> Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints will apply: <br> • Remote monitoring of the development sites and facilities will be required to reduce snow compaction. <br> • A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat will be required. <br> • Public motorized use on new roads constructed for project-specific purposes will be restricted. <br> • Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project |

BLM_0050377

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | • Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers. | needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers.<br>• If post lease surface use occurs in lynx habitat, the Lessee will be required to submit an annual report to the USDA-FS and USFWS of all activities having occurred in lynx habitat. | completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, if possible, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers, if possible. |
| **Raptors** | For raptors (except American kestrel) the Lessee will be required to:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ¼ mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>• No surface activities will be allowed within 1-mile radius of active bald eagle or peregrine falcon nest sites between the dates of February 1 and August 15, unless authorized by the | For raptors (except American kestrel) the Lessee will be required to:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ½-mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. | Use combined language from COC-67232 and COC-1362 which reflects Forest Plan standards as well as guidelines from the Biological Evaluation for this project:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ½-mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>• No surface activities will be allowed within 1-mile radius of active bald eagle or peregrine falcon nest sites * between the |

BLM_0050378

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | Forest Service on a site-specific basis. | | dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. (* No bald eagle or peregrine falcon nest site habitat has been identified within the lease modifications as indicated in the Biological Evaluation prepared for this analysis.) |
| **Big game winter range** | In order to protect big game wintering areas, elk calving areas, and other key wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year. Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | In order to protect big game wintering areas, elk calving areas, and other key wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year. Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | Use language from parent leases. |
| **Water depletions** | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | Based on the CRR Section 7 consultation effort for the CRR's NFCMA in 2016, the Forest Service took on the responsibility for reinitiating consultation if minor water depletion caps were exceeded. The Forest Service wants to ensure the lessee provides the necessary information from monitoring and reporting to determine if minor water depletion caps are exceeded, and, in the highly unlikely event that the depletion caps were exceeded, the lessee would meet any additional conservation measures the USFWS might require. This updated stipulation provides clarification to the process |

28

BLM_0050379

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | | that has been occurring on the parent leases regarding water depletion. Changes to stipulation are in italics. In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, *the surface management agency* must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. *The lessee shall monitor and report all depletions to the Forest Service. Notwithstanding the fact that the surface management agency has the obligation to consult, the Lessee has the obligation to comply with all appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin in the event the depletion threshold is exceeded and additional reasonable and prudent actions are requi*red. |
| Breeding birds | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance as prescribed by the Forest Service. | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance. | Use language from COC-1362 parent lease on both modifications. |

BLM_0050380

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Geologic hazards** | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential, or on slopes which exceed 60%. | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential. | Use language from parent lease COC-1362 on both modifications. |
| | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. | Use language from parent leases. |
| **Baseline Information** | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources. Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology. Baseline studies are critical to the success of future observation and assessment of mining related effects on resources. | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources. Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology. Baseline studies are critical to the success of future observation and assessment of mining related effects on resources in the Dry Fork lease tract. | Use language from parent leases. |
| **Monitoring Program** | The operator/lessee would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts. The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and hydrology identified in | The operator/lessee of the lease tract would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts. The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and | Use language from parent leases. |

30

BLM_0050381

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | the baseline assessment to mining activities on the lease area. The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | hydrology identified in the baseline assessment to mining activities in the lease tract area. The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | |
| Riparian, wetland or floodplain | Surface use or disturbances (except for surface subsidence and resource monitoring purposes defined in the approved mining permit) will avoid riparian, wetland or floodplain areas, and a buffer zone surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent with that defined in the Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | Surface use or disturbances (except for surface subsidence and resource monitoring purposes defined in the approved mining permit) will not be permitted in riparian, wetland or floodplain areas, or within a buffer surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent with that defined in the Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | Use language from parent leases. |
| Subsidence | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | Use language from parent leases. |

BLM_0050382

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | The Lessee/Operator shall be responsible for monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation, if needed, would be performed at the Lessee's expense. These requirements will be coordinated with the District Ranger and the Special Use Permittee. | The Lessee/Operator shall be required to perform the following with respect to monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation will be performed at the Lessee's expense. The Lessee may request variations on timing for surveys, monitoring and reporting. Approving such requests would be at the discretion of the District Ranger.<br><br>a. Baseline condition surveys of existing facilities will be completed the Fall following award of lease. Reports of this survey will be deliverable to the Forest Service by December 1 of that same year.<br>b. In consultation with the Special Use Permittee and the Forest Service, install equipment to monitor flow on water conveyance facilities during the Fall following award of lease. Flow monitoring shall commence the following spring and continue until one year post mining. Flow data shall be provided to the Forest Service annually by December 1.<br>c. A Surface Facility Monitoring and Mitigation Plan (Plan) will be submitted to the Forest Service for review and approval not later than 12 months prior to scheduled undermining. The Plan will detail measures to be taken to monitor, repair and mitigate subsidence effects of the facilities during actual mining and for one year. | As parent lease for COC-67232 deals specifically with an irrigation ditch on that lease, use language from COC-1362 on both lease modifications. |
| Roadless | The permittee/lessee must comply with all the rules and regulations of the | All or parts of the following lands encompassed in this lease are in the | On the following lands within the Sunset CRA, surface operations |

32

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of Interior in the permit.  The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy of the NFS not authorized by the permit/operation approved by the Secretary of the Interior.<br><br>Federal Coal Lease C-1362, as modified October 2001<br><br>All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease.<br><br>Legal descriptions are approximate. Locations of any proposed surface use would be verified for relationship to IRA boundaries using site-specific maps if/when surface operations are proposed. | West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease.<br><br>All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease. | incident to underground coal mining are subject to regulations in 36 CFR 294, subpart D:<br><br>• All roads that may be constructed must be temporary.<br>• All temporary road construction must be consistent with applicable land management plan direction<br>• Road construction may only occur if motorized access has been deemed infeasible by the responsible official; unless a temporary road is needed to protect public health and safety in cases of an imminent threat of flood, fire or other catastrophic event that, without intervention, would cause the loss of life or property<br>• Temporary road construction must be completed in a manner that reduces effects on surface resources, and prevents unnecessary or unreasonable surface disturbance<br>• All temporary roads must be decommissioned and affected landscapes restored when it is determined that the road is no longer needed for the established purpose<br>• All temporary roads must prohibit public motorized |

BLM_0050384

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | | vehicles (including off-highway vehicles) except:<br>I. Where specifically used for the purpose for which the road was established; or<br>II. Motor vehicle use that is specifically authorized under a Federal law or regulation.<br><br>For any linear construction zone (LCZ) over 50 inches wide used to install pipelines, the Regional Forester must determine that they are needed, and the responsible official must determine that motorized access without a linear construction zone is not feasible.<br><br>• Construction and use of linear construction zones must be consistent with the GMUG Forest Land and Resource Management Plan, and may be no wider than their respective intended uses.<br>• Installation of linear construction zones will be done in a manner that minimizes ground disturbance.<br>• Reclamation of a linear construction zone will not diminish, over the long-term, roadless area characteristics. All authorizations approving the installation of linear facilities |

BLM_0050385

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | | through the use of a linear construction zone shall include a responsible official approved reclamation plan for reclaiming the affected landscape while conserving roadless area characteristics over the long-term. Upon completion of the installation of a linear facility via the use of a linear construction zone, all areas of surface disturbance shall be reclaimed as prescribed in the authorization and the approved reclamation plan and may not be waived. |
| Visuals | n/a | n/a | Within the lease modification areas, the lessee will work with the District Ranger and his/her representative to see that all mine operations are situated on the ground in such a manner that reasonably minimizes impacts to the scenic integrity of that landscape as prescribed in the Forest Plan. |
| Methane use | n/a | n/a | If flaring or other combustion is prescribed as part of any future mitigation measure, lessee will be required to submit a fire prevention and protection plan subject to responsible Forest Service official for approval. |

The parent leases also contain lease terms from BLM regarding coal mine methane.  These are addressed as a lease addenda and stipulations as described in Table 2-2.

BLM_0050386

**Table 2-2. BLM-specific Lease Stipulations for Protection of Non-Mineral (Surface) Resources**

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| Methane Flaring, Capture/Use or other alternatives to venting | Sec. 3. Notwithstanding the language in Sec. 2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.

Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal miners or coal mining activities. In the event of | Sec. 3. Notwithstanding the language in Sec. 2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.

Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal miners or coal mining activities. In the event of | "Section 3.   Notwithstanding the language in Section 2 of the lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the waste mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "waste mine methane" means any combustible methane gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations and that must be vented to protect the health and safety of the mine workers.

Section 4.   Notwithstanding any other provision of this lease, nothing herein waives, alters, or amends lessee's right to vent, discharge or otherwise dispose of waste mine methane as necessary for mine safety or lessee's obligation to mine the coal deposits consistent with Federal and state law and regulation and with safety requirements contained in permits applicable to underground mining operations subject to this lease. Lessee is not obligated or required to capture for use or sale waste mine methane that would otherwise be vented or discharged if the capture of waste mine methane, independent of the activities related to mining coal, is |

BLM_0050387

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| | a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.<br><br>Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES- Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" shall not include and the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable | a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.<br><br>Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES- Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" shall not include and the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable | not economically feasible, or if the waste mine methane must be vented in order to abate the potential hazard to the health or safety of the miners or mining activities. In the event of a dispute between the lessor and the lessee as to the economic or technical feasibility of capturing the waste mine methane for use or sale, lessor's remedy as a prevailing party is limited to recovery of compensatory royalties on the waste mine methane not captured for use or sale by the lessee. Lessee retains the right to continue all mining activities under the lease, including venting waste mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.<br><br>PART II. TERMS AND CONDITIONS (c) WASTE MINE METHANE OPERATIONS AND ROYALTY – Notwithstanding the language in Part II, Sec. 2(a) of this lease, the royalty will be 12.5 percent of the value of any waste mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" does not include, and the royalty will not apply to, waste mine methane that is vented, or otherwise discharged and not captured, for the economic feasibility or safety reasons described in Part I, Section 4 of this lease. Lessee will have no obligation to pay royalties on any waste mine methane that is used on or for the benefit of mineral extraction at the (insert mine name here) coal mine. When not |

37

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| | reporting and gas measurement now or hereinafter in effect<br><br>SEVERABILITY- In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation. | reporting and gas measurement now or hereinafter in effect<br><br>SEVERABILITY- In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation. | inconsistent with any express provision of this lease, this lease is subject to all the rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and the lessor's rules, regulations, notices, and orders related to applicable reporting and gas measurement now or hereinafter in effect.<br><br>SEVERABILITY – In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable, or illegal in any respect, the validity, legality, and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove, or otherwise process and dispose of the coal deposits in, upon, or under the lands described in this lease, including the right to vent or otherwise discharge waste mine methane for safety purposes as required by applicable laws and regulations. |
| | | | West Elk Mine shall provide to BLM an updated report on the economic feasibility of capturing or flaring the mine's mine methane for beneficial use or abatement, and should provide it to BLM no later than 1 year after the modification is approved. |

38

## 2.2.3  Alternative 3- Consent to and modify the leases (Agencies' Preferred Alternative and Proposed Action)

### 2.2.3.1  Leasing

The proposed action is for the Forest Service to consent to and for the BLM to modify existing federal coal leases COC-1362 and COC- 67232 by adding 800 and 920 additional acres (respectively) to ensure that compliant and super-compliant coal reserves are recovered and not bypassed.  As part of its consent, the Forest Service will prescribe stipulations for the protection of non-mineral (i.e. surface) resources.  BLM would modify the leases with all stipulations/notices/addenda in Table 2-1 and Table 2-2 above.

The lease modifications assume underground mining in compliance with regulation. It is assumed that longwall mining practices would be used.  Minor surface disturbance would occur on National Forest System (NFS) lands as a result of subsidence (slight lowering of the land surface and possible soil cracking along the outside edges) as the coal is removed.  In the event that post-lease surface activities are proposed and authorized, other vegetation removal and soil disturbance would occur due to temporary road construction and well pad construction for drilling of methane drainage wells (MDWs) which are needed for safety of miners underground.  Drilling MDWs without roads was considered (Sections 2.3.1 and 2.3.2), and determined to be infeasible at this time.

Because leasing itself does not approve any mineral development or surface disturbance, it is necessary to project the amount of surface use or activity that may result during lease development in order to disclose potential effects and inform decision-making. A Reasonably Foreseeable Mine Plan (RFMP) has been developed to address potential environmental effects and is detailed to the extent necessary without being pre-decisional. A RFMP has previously been developed for this alternative and is included in the Final EIS (Section 3.3). It must be noted that decisions pertaining to surface use and disturbance, with the exception of subsidence impacts, are not made at the leasing stage. Rather, the decisions related to permit-related surface activities are made when and if site-specific surface uses are proposed, and are evaluated through the BLM's on-lease exploration plan (detailed below) or through State permitting process for mining. The environmental effects analysis of post-lease surface use and disturbance associated with this alternative will include subsidence and MDW pads and their associated access. It should be noted that approval of these lease modifications may extend the life of the existing West Elk Mine by approximately 1.4[7] years and provides underground access/favorable economics to existing privately-owned (fee) and other federal coal reserves (on parent leases) which could extend the life of the mine by an additional 1.3 years (total of 2.7 years); it would not approve a new mine nor is it anticipated to change current production rates (assumed here to be an average of 6.5 million tons/year) at the West Elk Mine.

Alternative 3 is analyzed under the framework of the Colorado Roadless Rule (CRR).  This rule went into effect on July 3, 2012.  The CRR contains an exception to the prohibitions for road construction and reconstruction in a geographic area known as the North Fork Coal Mining Area (NFCMA). The NFCMA exemption to the CRR was reinstated on December 19, 2016, and became effective on April 18, 2017, after Court vacatur in 2014. Just over 1700 acres of the NFS lands in the lease modifications are within the NFCMA. The exception facilitates access to federal coal resources in the NFCMA by allowing for the construction or reconstruction of temporary roads for coal exploration and development activities such as installation of methane drainage wells, monitoring locations or other purposes.  Colorado Roadless Areas cover 786 acres of the COC-1362 lease modification and 915 acres of the COC-67232 lease modification. Final Colorado Roadless boundaries within the lease modifications vary slightly from the 2001 Roadless Area boundaries as displayed in Figure 2-1 below.

---

[7] GER/MER was updated in 2016.  Timeframes have been updated based on coal mined since then and reserves adjusted due to geologic faulting that is further discussed in Section 3.4.

BLM_0050390



**Figure 2-1. Lease Modifications with Roadless Boundaries**

BLM_0050391

## 2.2.3.2    Exploration

If lease modifications were issued under the proposed action (Alternative 3), BLM would propose to approve the exploration plan to conduct on-lease coal exploration activities. The exploration plan was submitted by Ark on behalf of MCC. Exploration consists of drilling, obtaining e-logs down-hole, and collecting core samples for testing.

Table 2-3 identifies the sites, locations, temporary access road lengths, and estimated disturbed acreage of the 10 exploration sites proposed. The area would be within existing coal leases held by MCC (COC-1362) and Ark (COC-67232). Drilling locations and access are shown on Figure 2-2.

Exploration activities would be scheduled to be completed within two field seasons. Exploration and reclamation activities would be completed by October 31 each year. Total disturbance on NFS lands would be 22.7 acres (includes 0.32 acres on parent lease for access road).

Access road upgrades and new construction should begin one to two weeks prior to moving the drill rig onto the site. The construction, drilling, and reclamation activities would take an average of 16 days per hole.

Roads[8] needed for access will generally have a travel width of 14 feet wide. For the analysis, an average of 30 feet was used, which would disturb 3.63 acres per mile. Drill pads would, at a maximum, disturb 0.5 acres per pad (Table 2-3).

**Table 2-3. Proposed exploration disturbance acres Alternative 3**

| Drill Site | Year | Drillhole Location (Township, Range, Section) | Feet of Road on National Forest | Acres of Road Disturbance on National Forest | Maximum Acres of Pad Disturbance on National Forest |
|---|---|---|---|---|---|
| SST-1 (Road from intersection with SST-6/4) | 2 | T.14S., R.90W., NE1/4 SE1/4 Sec. 10 | 2102 | 1.45 | 0.5 |
| SST-2 (Road from private to SST-2) | 1 | T.14S., R.90W., SE1/4 NE1/4 Sec. 15 | 652 | 0.45 | 0.5 |
| SST-3 (Road SST-8 to SST-3) | 2 | T.14S., R.90W., SE1/4 NW1/4 Sec. 14 | 1751 | 1.21 | 0.5 |
| SST-4 (Road SST-6 to SST4) | 1 | T.13S., R.90W., NW1/4 NW1/4 Sec. 14 | 2998 | 2.06 | 0.5 |
| SST-5 (Road N/A) | 1 | T.14S., R.90W., SE1/4 SW1/4 Sec. 11 | 0 | 0 | 0.5 |
| SST-6 (Road parent lease to SST-6) | 1 | T.14S., R.90W., NE1/4 SW1/4 Sec. 11 | 3656 | 2.52 | 0.5 |
| SST-7 (Road from private to SST-7) | 2 | T.14S., R.90W., NE1/4 SW1/4 Sec. 14 | 3314 | 2.18 | 0.5 |
| SST-8 | 2 | T.14S., R.90W., NW1/4 NE1/4 Sec. 14 | 3167 | | 0.5 |

---

[8] Note an access road connects to access road on parent lease. See Figure 2.1b.

BLM_0050392

| Drill Site | Year | Drillhole Location (Township, Range, Section) | Feet of Road on National Forest | Acres of Road Disturbance on National Forest | Maximum Acres of Pad Disturbance on National Forest |
|---|---|---|---|---|---|
| (SST-9 to SST-8) | | | | | |
| SST-9 (Road SST-6 to SST9) | 2 | T.14S., R.90W., SE1/4 SE1/4 Sec. 11 | 5227 | 3.60 | 0.5 |
| SST-10 (Road from SST-8 to SST-10) | 2 | T.14S., R.90W., NW1/4 SE1/4 Sec. 14 | 2784 | 1.92 | 0.50 |
| Totals | | | 25,651 | 17.67 | 5.0 |
| Total National Forest Disturbance Acres | | | | ~22.7 | |

BLM_0050393



**Figure 2-2. Location of Exploration Activities Alternative 3**

43

BLM_0050394

Drilling activities such as pad construction, road grading, or watering, would not be scheduled on opening weekend of big game hunting seasons to avoid user conflicts.

There would be no stationary fuel storage on site. Fuel would be brought to the equipment by truck. If left on-site, the fuel truck would be parked on a prepared drill pad where drainage is contained on the pad and mud pit.

Exploration activities would follow any required stipulations attached to the leases and lease modifications (ROD) (USFS, 2012b). See Table 2-1.

### First Field Season Exploration Drilling Program

Four exploration drill holes (SST-2, SST-4, SST-5, and SST-6) are planned to be drilled in the first field season (see Figure 2-2). These four holes are within the lease modification area of COC-1362. Temporary roads and drill sites would be developed. Upon completion of the first field season and subsequent data review, West Elk Mine would determine if completion of the exploration plan with the remaining six exploration drill holes is warranted for the next year. If West Elk Mine determines further exploration drilling is not warranted, unless the drill sites and access roads would be used as future methane drainage well (MDW) locations, they would then be reclaimed. If further exploration is warranted, the edges of temporary roads would be reclaimed to a maximum 14 foot width running surface. Per USFS lease stipulations which would become conditions of approval, waterbars and stormwater control devices would be placed at the end of the field season, even if the road would be used again in the next season. Culverts would be removed to allow unhindered natural flow events over the winter and spring. Site SST-6 may be kept open as a staging area for second season activities.

### Second Field Season Exploration Drilling Program

If the results of the coal resource exploration from the first season are favorable, exploration activities would continue during an additional field season at sites SST-1, SST-3, and SST-7 through SST-10.

Drainage control on temporary roads used for the previous year's exploration program would be reestablished.

### Pre-drilling Activities

On-site inspection of proposed drill sites and access routes was conducted with representatives from appropriate regulatory agencies to discuss site-specific concerns. A road was relocated to improve stream crossings and avoid steep slopes.

State, Forest Service, and BLM regulatory personnel would be notified at least 48 hours before any construction or drilling equipment is mobilized. An authorized representative of Ark would supervise all construction and drilling activities. A copy of the exploration permit and all pertinent permit documents would be available from the Ark representative for inspection. Any proposed changes in the exploration plan after permit approval would be reviewed and approved by the appropriate regulatory agencies before changes take effect.

### Road Construction

Existing roads would be used whenever possible and movement of equipment across undisturbed land would be kept to a minimum. New roads would be constructed only when necessary and only as the drilling program progresses. A projected maximum 14-foot road running width would be employed except in locations such as curves, where more width would be needed for the drill rig. The analysis uses an average of 30 feet of disturbance width.

BLM_0050395

The drill sites have been located so temporary roads are as short and disturb as little ground as possible and still provide reasonable access and appropriate coal data. Topsoil would be stockpiled and redistributed at reclamation. Erosion control structures such as water bars would be installed as required and would be constructed in accordance with regulations and stipulations. Any culverts placed would be removed at the completion of the project.

## Drill Site Construction

Drill sites would be 0.50 acres of disturbance or smaller. Drill site sizes and dimensions were reviewed and field fitted to topography with the aid of Forest Service representatives.

A bulldozer (typically D-7 or equivalent) would clear brush and small trees from the drill pad. Topsoil would be removed and stockpiled on the upslope side of the drill pad and remain undisturbed during drilling. Up to one foot of topsoil thickness would be salvaged and stockpiled at the disturbance site with a "TOPSOIL" sign clearly marking the pile. Drill sites would be leveled by grading.

Slurry (mud) pits would be made on the drill pad. One or two pits would be excavated at each site depending upon depth of drill hole and projected water requirements. The mud pit(s) would be approximately 10 feet wide, 30 feet long, and 6 feet deep. Subsoil and rock materials would be stockpiled within the drill pad clearing and used to refill the mud pits at reclamation.

Erosion and transportation of sediment would be minimized through stormwater controls. Using the existing roads would minimize disturbance. Where possible, the existing vegetation would be left to reduce the need for sediment control. Using existing level areas for drill pads would minimize surface disturbance.

Salvaged soils would be placed adjacent to the drill pad with appropriate sediment control devices surrounding the down slope portion of the soil stockpile. A similar sediment control device would be placed on the downslope side of the subsoil/rock stockpiles from the slurry (mud) pits.

## Methods and Equipment for Drilling

Rotary drilling and coring on each site would be completed using a rubber-tired, truck-mounted drilling rig. To aid in the reduction of surface disturbances, Ark would use the smallest possible drill rig that can be used safely and successfully. Support equipment may consist of one or two water trucks, one rig-up truck, a pipe truck, flatbed trailer, one or more air compressors and/or boosters, a supply trailer, and three 4-wheel drive pickups.

Water sources for drilling operations would be nearby streams, where MCC owns the water rights, or stock watering ponds. Water from streams would be either pumped or trucked to the sites. If pumped, pipes (1-inch polyvinylchloride or 2 to 3-inch hose) would be laid alongside the roads and undisturbed ground surface. If trucked, about two 4,000-gallon water truck trips would be needed per site. The use of these water sources would be approved by the agency or party owning the water rights. In the event stock ponds are used, minimum water levels would be established to ensure sufficient water is left for stock and wildlife. Removal of sediments and other maintenance of stock watering ponds within proximity to the exploration sites would provide improved water storage for drilling operations and long term use for wildlife and livestock. Sediments removed from ponds would be placed on the pond embankment, wheel-rolled, and seeded. Water consumption is estimated at 5,500 to 8,500 gallons per drill hole (0.017-0.026 acre feet). No water storage tanks would be needed.

Overland flow of the drill fluids would be directed into the slurry pit as would most precipitation runoff.

Upon drillhole completion, one truck mounted geophysical logging (recording) unit would be used at each hole location.

BLM_0050396

**Modification of Drill Holes to Surveillance for Water Levels**

Exploration hole SST-2 may be converted to an E-Seam water monitoring site if a mineable thickness of E-Seam coal is present. Construction of the water monitoring well would be delayed until a determination on mineability of the coal is made. The necessary well permit would then be obtained from the Colorado Division of Reclamation, Mining and Safety (CDRMS) for the well installation.

It is not anticipated that significant water-bearing bedrock or aquifers would be encountered. The Mesa Verde Formation is known to contain limited water bearing sandstones, and no known bedrock aquifers exist. If significant quantities of water are encountered, the appropriate regulatory officials would be notified and if directed, the hole may be completed as an additional water monitoring well.

**Drill Hole Abandonment Methods**

The hole plugging method described in 43 CFR 3484.1(a), states that each open hole would be plugged with cement from bottom to 50 feet above the uppermost thick coal seam and from 50 feet below to 50 feet above any aquifers encountered in the hole. The remainder of the hole is to be filled with an approved completion mud, gel, cuttings, or cement to within 10 feet of the surface. A 10 foot cement surface plug would be set, and an appropriately labeled monument marker to be cemented into the surface plug. For monitoring wells, the surface casing would be cut off at or below the level of the soil surface. Ark may elect to fill the hole in its entirety with cement.

**Access**

Primary routes used to access the exploration area are Highway 133 to the West Elk Mine entrance and the private and National Forest administrative road through Sylvester Gulch to National Forest System Road (NFSR) 711. Approximately 0.4 miles of NFSR 711 would be used to connect the Sylvester Gulch Road to the lease modifications area.

Access from NFSR/Gunnison County Road 710, 711.2A or 711.2c to existing gated private road network may also be used to access SST-2 and SST-7 locations. Refer to Map 2.1 for road identification.

NFSR 711 has been maintained by MCC as an access road to exploration drill holes and methane drainage well sites for 17 years. Upgrades and improvements to the road include gravel base, culverts, ditches, gates, and drainage control structures. Ongoing maintenance is a condition of MCC's Road Use Permit.

**Reclamation Plan**

Final reclamation activities would follow the completion of the hole as soon as possible. Upon completion of all drilling activities at each site; debris, trash, and drilling equipment would be removed. Mud pit(s), once sufficiently dry, would be filled with stored subsoil and compacted. Remaining subsoil would be redistributed on and around the drill pad to the original contour. Stored topsoil would be distributed evenly over the disturbed pad area.

The entire drill pad area would be re-seeded using the following seed mix (Table 2-4).

BLM_0050397

**Table 2-4. Paonia Ranger District Seed Mix**

| Habitat Type | Grass Species Mix | Seeds/ Pound | Pounds/ Acre |
|---|---|---|---|
| Mountain Shrub | Mountain Brome | 90,000 | 5 |
| | Prairie Junegrass | 2,315,400 | 4 |
| | Western Wheatgrass | 126,000 | 6 |
| | Indian Ricegrass | 188,000 | 4 |
| | Cicer Milkvetch | 145,000 | 1 |
| | Total | | 20 |
| Aspen/ Spruce/ Fir | Slender Wheatgrass | 160,000 | 3 |
| | Mountain Brome | 90,000 | 6 |
| | Canby Bluegrass | 926,000 | 3 |
| | Idaho Fescue | 450,000 | 2 |
| | Total | | 14 |

Note: This seed would be 99 percent pure live seed (PLS) and hand broadcast.

After seeding, the cleared vegetation would be redistributed over the drill pad area to act as natural mulch. This method has proven successful for the revegetation of previous drill sites.

Sediment control measures may include: slash, silt fence, erosion control blankets, or straw wattles. Reclamation of temporary roads would include grading to the original contour as closely as possible, sediment control where necessary, and re-seeding.

The drill pad and access roads reclamation procedure outlined above would apply only to newly disturbed areas. Existing National Forest System Roads (NFSRs), as identified in the Gunnison National Forest's Travel Management Plan (USFS, 2010), would be left in a condition equal to or better than that observed upon Ark's entry into the area.

After reclamation, newly constructed access roads to certain drill sites may be blocked and closed to vehicle entry at the GMUG or surface owner's request. Alternate road closure methods may be employed where practical after review with the Forest Service representative.

## 2.2.4   Alternative 4-Consent to and modify only COC-1362 lease

### 2.2.4.1   Leasing

Many commenters expressed concerns regarding roadless area effects due to potential post-lease development. Similarly, some commenters suggested an alternative requesting agencies' consent/leasing for proposed modification to COC-1362 only, while not consenting to proposed modification to lease COC-67232. In response to those comments Alternative 4 was brought forward for further analysis from alternatives Considered but Eliminated from Detailed Study in the DEIS into the FEIS/SDEIS/SFEIS.  As part of the analysis of this alternative, the Forest Service requested an additional review from BLM to make determinations of mineable resources (Project File).

Alternative 4 analyzed the effects of post-lease surface activities under the Colorado Roadless Rule including temporary road construction in the Sunset Colorado Roadless Area, as described in Alternative 3 above. An RFMP was developed (Section 3.3) to address indirect and cumulative effects specific to the COC-1362 modification.

### 2.2.4.2   Exploration

The on-lease exploration activities would remain similar to Alternative 3 except roads would be truncated at the lease modification boundary.  This may result in a reduction of two or more exploration drill holes and a reduction of approximately one mile of temporary road compared to exploration under the Proposed Action.

BLM_0050398

Because an exploration plan specific to this alternative has not been submitted, the maps in this section are the Forest Service's projection of roads and pads based on topography and other local knowledge. It is estimated that approximately 18 acres (where 0.15 acres would be on private land and 0.32 acres on parent leases[9]) of disturbance may occur with exploration under this alternative (Table 2-5).

---

[9] Access roads would need to connect to existing roads on private and on parent leases.

BLM_0050399

**Table 2-5. Estimated Exploration Disturbances Alternative 4**

| Drill Site | Year | Drillhole Location (Township, Range, Section) | Feet of Road on National Forest | Acres of Road Disturbance on National Forest | Maximum Acres of Pad Disturbance on National Forest |
|---|---|---|---|---|---|
| SST-1 (Road from intersection with SST-6/4) | 2 | T.14S., R.90W., NE1/4 SE1/4 Sec. 10 | 2102 | 1.45 | 0.5 |
| SST-2 (Road from private to SST-2) | 1 | T.14S., R.90W., SE1/4 NE1/4 Sec. 15 | 652 | 0.45 | 0.5 |
| SST-3 (Road SST-7 to SST-3) | 2 | T.14S., R.90W., SE1/4 NW1/4 Sec. 14 | 3195 | 2.20 | 0.5 |
| SST-4 (Road SST-6 to SST4) | 1 | T.13S., R.90W., NW1/4 NW1/4 Sec. 14 | 2998 | 2.06 | 0.5 |
| SST-5 (Road N/A) | 1 | T.14S., R.90W., SE1/4 SW1/4 Sec. 11 | 0 | 0 | 0.5 |
| SST-6 (Road parent lease to SST-6) | 1 | T.14S., R.90W., NE1/4 SW1/4 Sec. 11 | 3656 | 2.52 | 0.5 |
| SST-7 (Re-routed road from private to SST-7) | 2 | T.14S., R.90W., NE1/4 SW1/4 Sec. 14 | 5648 | 3.89 | 0.5 |
| SST-9 (Truncated road SST-6 to SST9) | 2 | T.14S., R.90W., SE1/4 Sw1/4 Sec. 11 | 2132 | 1.47 | 0.5 |
| Totals | | | 20,383 | 14.03 | 4.0 |
| Total National Forest Disturbance Acres | | | 18.09 | | |

BLM_0050400



**Figure 2-3. Approximated Location of Exploration Activities Alternative 4**

BLM_0050401

## 2.2.5   Other Actions/Permits/Plans may be required

Appendix C details roles, other actions and permits that may be required to mine the lease modifications. At this time, no specific proposals have been made to mine this coal. If this coal is leased, any subsequent proposals would be reviewed by DRMS and/or OSMRE and would include any additional permits that would be required to be obtained by MCC or Ark for regulatory purposes.

## 2.3 Alternatives Considered but Eliminated from Detailed Study

An alternative may be considered during the environmental analysis process, but not analyzed in detail. The agency must identify those alternatives and briefly explain why they were eliminated from detailed analysis (40 CFR 1502.14). An alternative may be eliminated from detailed study if:

- It is ineffective (does not respond to the purpose and need for the proposed action);
- It is technically or economically infeasible (considering whether implementation of the alternative is likely, given past and current practice and technology);
- It is inconsistent with the basic policy objectives for the management of the area (such as, not in conformance with the Resource Management Plan (RMP));
- Its implementation is remote or speculative;
- It is substantially similar in design to an alternative that is analyzed; or
- It would result in substantially similar impacts to an alternative that is analyzed.

Alternatives specific to this analysis that were considered, but that would not be analyzed in detail, are discussed below.

### 2.3.1   Alternative 2

Under Alternative 2, the Forest Service would consent to and BLM would modify the leases with stipulations/notices/addendums above listed for the Action Alternatives. However, under the provisions of 2001 Roadless Area Conservation Rule, road construction or reconstruction was prohibited in the lease modification areas. At the time of this EIS, the 2001 Roadless Area Conservation Rule is no longer in effect in Colorado. It has been replaced with the 2012 Colorado Roadless Rule (36 CFR §294.40-294.49) and the roadless area boundaries have changed. Additionally, the provisions of the 2001 Roadless Rule did not prevent the agencies from consenting to lease or leasing, nor did it prevent the construction of drill pads. Although mining without construction of temporary roads may be physically possible, it may be limited by safety, technology, productivity, and expense. For example, walking-in equipment would require cutting brush and trees to create paths for equipment to move overland without creating actual roads. Such access routes are untested for the expected equipment, would likely violate standards for safe operations due to unconsolidated topsoil as a running surface and even gentle slopes causing off-camber equipment instability. Rutting of native soils would be anticipated in times of moderate-high soil moisture, and operational seasons and times would, therefore, be severely limited and subject to immediate shutdown due to much higher potential for rutting and topsoil erosion than engineered temporary roads. Cross-country travel to construct well pads for exploration and methane drainage is infeasible due to it being largely untested, less safe and more prone to resource damage compared to the standard practice of constructing temporary roads, which may be completed within the NFCMA in accordance with the CRR. This alternative has therefore been eliminated from detailed study.

BLM_0050402

## 2.3.2    Helicopter drill MDWs in roadless areas

Regardless of how they are accessed, drill pads still need to be constructed and large-diameter boreholes would still need to be completed to achieve effective methane drainage. Drill pad construction would require the use of heavy equipment such as a tracked dozer and a backhoe to dig mud pits. Depending on the terrain, a tracked backhoe may also be needed.

Various heli-portable drill rigs are available and have become commonplace in some areas of the world, but most are set up for smaller diameter exploration activities. These types of holes have been tested for MDWs at the West Elk Mine on the Dry Fork Lease (COC-67232), but they were not successful in adequately venting methane. Large (12") diameter drill-holes cannot be drilled by the drill rigs typically flown in by helicopter. Such rigs are normally used for drilling exploration by an entirely different drilling method than the air-foam rotary used to drill large-diameter holes. Large-diameter holes are necessary for the effective removal of methane as the vacuum exhausters used to accomplish degasification would not operate given the increased resistance of smaller (4-6") diameter holes. Methane drainage wells, compared to conventional coal exploration holes or water wells, are large diameter boreholes that require steel casing throughout their entire length. This requires a drill rig with high horsepower, high torque, and high lifting capacity.

Typical vertical and directional MDW drilling is accomplished via truck-mounted drill rigs. These truck-mounted rigs, weighing between 80,000 and 130,000 lbs have the torque, horsepower, and lifting capacity required to drill the large diameter holes to the depths needed for methane ventilation (see project file).

The most powerful commercially available helicopters are limited to 16,000 to 25,000 lb payloads, although it is likely these would be reduced due to the altitudes in the area (see project file). Due to this limitation, it is impossible to drill MDWs using heli-portable rig systems.

There are larger heli-portable rigs that are used to drill deep oil and gas wells, which have the appropriate specifications to drill MDWs. However, they are not currently available in the contiguous United States; they are currently only available in Canada and Alaskan North Slope oil/gas operations. Even if these larger heli-portable rigs were available it would be very expensive to utilize these rigs for MDW drilling (Nabors Drilling, personal communication 2012). Typically large heli-portable rigs are set up to drill deep (>12,000 ft) holes. They take a long time to mobilize and demobilize through many trips with a helicopter. Because of the shallow nature of the MDWs (~2,200 ft max) the rig would only need to be on a drill location a short period of time (less than 2 weeks) before needing to be moved to the next location. Because of short drilling time, and the amount of helicopter time/trips needed for rig moves for the expected 48 MDWs, currently it would be prohibitively costly to use these large heli-portable rigs used internationally in the oil/gas industry to drill MDWs. In addition, because of lack of access roads, heavy equipment needed to construct pad locations would have to be tracked in cross country without roads. A typical Caterpillar D-6 or equivalent, needed for safe and effective pad construction typically weighs in excess of 30,000 pounds (a D-7 as proposed is heavier). This would mean that even if helicopters could be used for drill rigs, cross-country travel, and its resultant effects would be virtually the same as outlined above in Section 2.3.1.

For reasons outlined above, helicopter drilling is not considered reasonable, and this alternative has therefore been eliminated from detailed study.

## 2.3.3    MDWs using horizontal boreholes or directional drilling technology

Use of directional drilling with no road construction is discussed for technological capabilities relative to this mine. These post-lease development scenarios of installing Methane Drainage Wells (MDWs) have been addressed in the E Seam EIS (http://www.fs.fed.us/nepa/fs-usda-pop.php/?project=19510) for this mine and updates have been added to the project record to document additional findings since that document was prepared.

BLM_0050403

### 2.3.3.1    Directionally Drill MDWs from Outside Roadless

Mine Ventilation Plans including design of ventilation system are approved by MSHA from submittals and measurements made by MCC. MCC has analyzed the use of directional drilling to achieve degasification goals from sites outside roadless and has noted the following:

The agencies have considered MCC's expertise on this issue at the West Elk Mine given the activity is under their state permit. It has been MCC's experience drilling directionally in the B seam that directional holes must be drilled such that the producing part of the well above the seam is vertical. This vertical distance is projected to be 150 feet minimum in the E seam methane drainage wells. If such holes fail to achieve vertical in this portion of the well, they are subject to collapse and are ineffective as degas holes. The maximum safe angle of drilling (above this minimum vertical section) that can be achieved by the drilling equipment available is 45 degrees. The drill mast is set at 45 degrees to begin the holes. This angle must be gradually corrected to vertical during the drilling process. The maximum allowable dog-leg in directional drilling is 4 percent, in order to be able to successfully install casing in the hole.

Given the parameters of overburden depth, as it relates to physical constraints of directional drilling, MCC is unable to reach the required methane drainage targets from outside the roadless boundary.

### 2.3.3.2    Use Horizontal Boreholes or Longhole Horizontal Boreholes

MCC expended a tremendous effort over a three-year period in an attempt to find a means to successfully accomplish degas drainage using the in-mine horizontal drilling system.  These holes were drilled in the gateroads of the 14-17 panels and connected to a massive collection system to exhaust the gases from the mine. The conclusion of this effort was that the holes could not be drilled large enough, or stay open long enough, to allow safe mining of the coal (due to resulting high methane concentrations). They were simply very inefficient collectors of minimal quality gas, due to the limits of the drilling equipment in this application and the location of the gas producing zones within the overlying strata. In MCC's previous experience in the B Seam approximately 13 percent of total mine methane was able to be vented horizontally (extracted from BLM analysis, 2007). Any attempt to degas the E seam via the horizontal drilling system has the same issues and possibly more due to constraints of the overlying strata.

Directional drilling is limited by the thickness of overburden (or amount of rock) overlying the coal E seam. This limited thickness of overburden precludes the ability to drill exclusively from outside the CRA boundaries and hit the MDW targets needed in the ventilation plan.

## 2.3.4    Other mining methods should be considered

The BLM has made the determination in the GER/MER (project file) that longwall mining is the most efficient and safest method for mining at the West Elk Mine.  Other coal mining methodologies such as room and pillar via continuous miners, or longwall mining at a slower pace, would be uneconomic for these reserves.

## 2.3.5    Mitigate the potential greenhouse gas emissions of the project by requiring MCC to use MDW ventilation air methane

In the geological process, methane and coal are formed together. In many coal-bearing formations, the methane can be trapped within the coal seams and/or within the surrounding rock strata. The process of longwall mining redistributes established stratigraphic pressures by removing coal and fracturing both the remaining coal and surrounding rock strata, thereby releasing the methane. In underground coal mining, methane is released into the mine during extraction. MSHA regulations require methane to be diluted in the ventilation air and then vented to the atmosphere, known as VAM, for the safety of the mine workers.

BLM_0050404

With respect to the VAM, no technology currently exists that has been demonstrated to have the capability of handling the volume of ventilation air and dilute concentrations of methane at the West Elk Mine to make capture economically feasible. In 2009, the DOE released the results of a study to simulate VAM capture using a non-producing mine (see U.S. Department of Energy Cooperative Agreement DE-FC26-02NT41620, available on the Internet at: http://www.epa.gov/cmop/_docs/vam_executive-summary.pdf). The project demonstrated continued advancements and a viable solution for coal mine VAM control. The DOE, however, stated that the, "system is only economically feasible when there is value for GHG emission reduction." This implies carbon credits, cap-and-trade, or another market or regulatory-based incentivized system for reducing GHGs. (The DOE assessment included carbon credits in their economic feasibility model, which provided a cost basis for controlling VAM up to 180k cfm).

In relation to the coal lease modifications, MCC commissioned an analysis (*Appendix A*) for capturing and/or conditioning the MDW methane for use onsite as fuel for a co-generation facility in order to produce electricity for sale to the grid, or for sale as pipeline quality natural gas. The study evaluated the gas characteristics and potential quantities of methane that would be realistically produced based upon existing well data and testing. This information was then used to engineer a collections system, including options for pipelines and screw compressor configurations for pressure management; and dehydration units, control systems, values, and metering. Options for energy generation equipment included reciprocating internal combustion engines (RICE) and combustion turbines. Additional gas processing equipment options for rendering natural gas from the CMM were also presented. The analysis covered multiple scenarios for multiple configurations of equipment. The analysis for the production of natural gas from CMM indicated that the levels of contaminants in the gas (including carbon dioxide, oxygen, and nitrogen) were treatable, but that the cost of treatment of the gas, the cost of gas compression, and the distance to access available existing pipeline systems were prohibitive for delivery of the gas as a saleable product. This mining project would be an addition to an existing mine; therefore, uninterrupted mining would need to take place in order for this project to be economically viable.

Total methane released in 2016 at the West Elk Mine is approximately a 73% reduction compared to 2010 levels which we would also assume means a reduction in VAM (ventilation air volume remains relatively constant with current vent system; however it too has declined from 2010-2016) would also be reduced by similar levels--by simple mathematical extrapolation from the range provided by commenter to a concentration of 0.04 to 0.08 % (less than half of what is required for even the EPA's reported TFRR technology of 0.2%)--would make this even less economical than previously analyzed when having to treat and transport gas (treating and transportation of gas to a gas pipeline is central to all of the examples cited and there is no existing infrastructure proximate to the lease modifications as the lease modifications are 6-7 miles from the mine portal along the highway). "Treating some" of the VAM as commenter suggests would make this even less feasible.

$CO_2$ would need to be removed (i.e., treated) to make pipeline quality (or saleable) gas because $CO_2$ at room temperature (similar to mine temperature), as a product of combustion, is not flammable. Other criteria pollutants would also need to be removed to make saleable gas.

An alternative for methane capture, with the required infrastructure, would likely include more miles of road construction connecting to a capture facility (probably centralized to operations) and pipeline construction (even though pipelines may occur near or in roads) and surface disturbance than would Alternatives 3 or 4, which would also produce additional impacts across multiple resource areas including air resources and roadless areas from construction. Recent reductions in necessity for methane venting add to the costs and challenges of construction and distance from a pipeline. All the above factors suggest it is unreasonable that this would be a viable mitigation measure at this time.

BLM_0050405

## 2.3.6   Mitigate the potential greenhouse gas emissions of the project by requiring MCC to purchase of carbon credits or do off-set mitigations

It was suggested that MCC be required to purchase carbon credits as mitigation for methane.  Congress may develop cap-and-trade legislation as a means to reduce greenhouse gas emissions. Under "cap-and-trade," the government sets a limit or a *cap* on the amount of a pollutant that may be emitted. The limit or cap is allocated or sold to businesses in the form of emissions permits, which then represent the right to emit or discharge a specific volume of the specified pollutant. Under this type of legislation, businesses are required to hold a number of permits (or "carbon credits") equivalent to their emissions. Generally, one carbon credit is equal to one tonne (metric ton) of carbon dioxide or carbon dioxide equivalent gases. The total number of carbon credits cannot exceed the established cap, limiting total emissions to that level. Businesses that need to increase their carbon credits must buy from those who require fewer carbon credits ("trade"). The goal of cap-and-trade legislation is to allow market mechanisms to drive industrial and commercial endeavors where carbon emissions are constrained (or limited); to date they are not constrained in the US. Since GHG mitigation projects (such as those listed for flaring or capture below) generate carbon credits, the sale can be used to finance carbon reduction projects between trading partners around the world.  Currently, purchasing carbon credits is a voluntary financial investment that MCC may choose to entertain for business reasons.  The federal agencies are not involved in any financial investment decisions that MCC makes as a corporation.  Since no cap has been established, there is no need to require purchase of carbon credits as mitigation measure for this leasing analysis. This is outside the scope of the project because we are not setting policy for coal production in the United States.

While other specific off-set (or off-site) mitigations may be possible (i.e., reforestation of marginal agricultural land or investing in solar), these particular off-site mitigations have not been brought forward for consideration related to this leasing analysis beyond those addressed immediately below related to direct mitigation of methane at the West Elk Mine.

## 2.3.7   Mitigate the potential greenhouse gas emissions of the project by requiring MCC to use other potential methane mitigation measures

The following methane mitigation measures may be adopted by MCC in the future if they meet lease stipulations.  The first in a series of staged agency decisions is Forest Service consent to lease with lease stipulations. Second, BLM must lease the lands giving MCC the right to mine. Lease stipulations (Table 2-1 and Table 2-2 herein) allow for methane mitigation to occur. Exploration activities may be authorized by BLM after leasing occurs. Consideration of all these potential methane mitigation measures relies on site-specific exploration data yet to be authorized based on this analysis, data collected and resultant engineering designs for: 1) mining, 2) safety and finally 3) mitigation technology possibilities. These engineering designs would become part of the subsequent State or OSMRE mine permitting processes and MSHA ventilation plan process.  Followed by other agencies issuing permits to mine. While opponents to this project would say we "can't kick the can down the road" because of global climate change concerns, the staged process under several authorizing agencies, with defined roles and permitting stages, does not lend itself well to prescribing specific mitigation measures for activities that have not been proposed yet. Consideration of these measures is further complicated by federal policy on coal, current climate policy under "Presidential Executive Order on Promoting Energy Independence and Economic Growth" and that a regulatory significance threshold under EPA's endangerment finding has not been established for methane to date.  While tons of greenhouse gas (GHG) equivalents mitigated may be quantified by possible reductions based on technology, effects from these emissions to wildlife, recreation, and other resources from emissions associated with these lease modifications cannot be determined. It is highly unlikely that one of these technologies would be applied until such time as mine-specific operational parameters are known for the lease modifications such as could occur after lease modifications are issued; therefore, lease stipulation about MCC analyzing this situation may prove useful in the determination of these measures.

BLM_0050406

These technologies for mitigating the release of methane from coal mines can be used under limited circumstances. In January, 2009 the BLM and MCC signed a lease addendum for all parent leases at the West Elk Mine that authorizes MCC to "drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane" if it is economically feasible.[10] As a result of the lease addendums, the BLM Colorado State Office, Deputy State Director, Energy, Lands, and Minerals requested that MCC prepare an economic evaluation report to supplement its existing Resource Recovery and Protection Plan (R2P2) to address coal mine methane (CMM) management options at the West Elk Mine.[11] To support an independent analysis of alternatives for methane management, MCC retained several consultants to explore potential options that might be used to mitigate methane releases. The BLM requires the R2P2 report to be periodically updated to evaluate the changing technical and economic parameters that can either enable or create barriers to the implementation or adoption of a particular methane control strategy. Periodic evaluations capture the current state of technology developments applicable to the mine's operational parameters, fluctuations in energy prices that affect the short and long term economic feasibility of adoption, and the status of the carbon offset markets (credits and potential financial incentives provided to verifiable projects that reduce their GHG emissions).

The West Elk Mine is taking steps to reduce methane emissions outside of the mitigation measures described in this EIS. MCC is a participant in EPA's Coalbed Methane Outreach Program, which is a voluntary program with the goal to reduce methane emissions from coal mining activities (http://www.epa.gov/cmop/). By working cooperatively with coal companies and related industries, the program helps to address barriers to using coalbed methane instead of emitting it to the atmosphere. In turn, these actions mitigate climate change, improve mine safety and productivity, and generate revenues and cost savings. The West Elk Mine began recovering methane in 2003 from sealed gob area of the mine to heat mine ventilation air on site during the winter months. In 2006, the EPA estimated that the mine recovered and used approximately 170 mmcf of methane, although the exact amount was not measured (*Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002-2006* https://www.epa.gov/sites/production/files/2016-03/documents/profiles_2008_final.pdf ). Methane used to heat the mine is taken from a sealed portion of the mine and does not pose the same hazards as methane that is released during active mining. West Elk Mine does use some methane liberated from the mine to heat air at surface openings of the mine to prevent ice build-up. This is consistent with current case law (Vessels Coal Gas, Inc., 175 IBLA 8 (2008)) regarding methane use at coal mines. This use is not intended as mitigation for methane released (rather the mine using a byproduct of mining for mine efficiency purposes), but does also serve the purpose of reducing methane emissions slightly. This is quantified in Chapter 3 Air Quality analysis.

Currently, the now-closed Elk Creek Mine, operated by Oxbow Mining, LLC and located approximately half a mile from the West Elk Mine, has engaged in developing a CMM electrical generation project. This does not preclude Oxbow from working on developing other post-mining CMM electrical projects, but it has recently pulled its permit applications from the State. There are critical differences between the Oxbow and West Elk mines that affect the feasibility of a similar project at West Elk. The Elk Creek mine has unique geologic fracture features that result in an extremely high concentration of methane unlike West Elk's. Additionally, the Oxbow CMM electrical generation project is a result of the North Fork Energy, LLC (a partnership formed between Oxbow, Gunnison Energy Corporation, and Vessels Coal Gas, Inc.) brokering a premium energy contract (i.e. guaranteed revenues in excess of current electricity market value) with Holy Cross Energy and Aspen Ski Company that provided the economic feasibility to allow the project to move forward. Aspen Ski Company was able to offset all or a portion of its GHG emissions and Holy Cross Energy

---

[10] Coal Lease Addendum for Coal Leases C-1362, COC-56447, COC-67011, C-0117192, D-044569, COC-54558, COC-67232. January 14, 2009.

[11] *West Elk E-Seam Gas Economic Evaluation Report*, Mountain Coal Company, LLC, September 24, 2009.

BLM_0050407

was able to meet its renewable energy generation mandate. Additionally, this activity would only occur in previously mined areas, not where active mining is occurring.

Pursuant to BLM's lease stipulations, the following mitigation measures may be applied if determined to be feasible and economic.  Nothing in this analysis would prevent MCC from voluntarily implementing any potential methane control option provided that all regulatory requirements are adhered to.

Colorado Energy Office has also commissioned a Coal Mine Methane in Colorado Market Research Report (Ruby Canyon Engineering, 2016) that identifies opportunities at West Elk Mine as those items already being done. Further the report identifies that about 50% of the drainage gas from the in-mine efforts was brought to the surface at a single location (presumably Deer Creek Shaft) and methane from drainage was used to power exhausters at the MDWs.  Based on the coal mine methane (CMM) being emitted to the atmosphere, the total electric power generating potential for the West Elk Mine would be about 27 MW with the gas drainage portion (i.e., MDWs/MVBs not VAM) offering the greatest CMM recovery and use opportunities (10 MW or approximately 10,511 households per year). Most of the additional opportunities described by the Colorado Energy Office relate to CMM in abandoned mines not in active areas of the mine and identifies project barriers as: direct access to large populations; areas where electrical costs are high unlike the West Elk Mine's location; costs such as capital cost such as equipment, operation, maintenance, fixed costs such as electricity grid interconnect fees, power supply agreements, stand-by fees; and safety needs to maintaining reliable electricity supply at the mine itself.  Additional conclusions include, "Including the cost of the VAM oxidation equipment, the installed cost for power generation is five times that of using high methane content drainage CMM with IC engines rendering it uneconomic at this time…For CMM at active mines, it may be technically feasible to capture 25 percent to 75 percent of the emissions [from MDWs]. The largest obstacle is often gathering the gas from dozens of surface wells (sometimes with short two-to-five-year lives) through difficult terrain in western Colorado. Other operational challenges include U.S. BLM land approvals, moving temporary pipelines and operating equipment in harsh winter conditions. In general, there is a large degree of uncertainty in assessing [abandoned mine methane (AMM)] potential. The decline curve estimation approach applied for this study contains uncertainties of about +25 percent. Moreover, approximately one-third of all underground coal mines eventually become flooded, thus negating their methane liberation potential. "

### 2.3.7.1    Methane Capture to Power On-Site Heaters

West Elk mine utilizes mine methane gas from permanently sealed and abandoned mined out areas of the mine. The methane is pumped from the mine through three wells (that had formerly been utilized as active mine methane drainage wells) to heater banks in front of each of the three mine ventilation fans. The heater banks warm the mine ventilation air going into the mine during the cold weather months. This prevents freezing of the mine waterlines and improves equipment and personnel performance. Each of the three banks of heaters consists of eight small venture heaters and each heater is capable of producing up to 4MM BTU per hour, or up to 32MM BTU per hour at each ventilation fan.

The amount of heat generated is thermostatically controlled utilizing PLC controlled VFD positive displacement pumps. Each heater bank has manual and automatic safety valves to control the operation and various aspects of operation are measured, monitored and recorded to ensure safe operation.  As far as we are aware, MCC plans to continue this practice at the West Elk Mine. MCC is also working to reduce the amount of sequestered methane utilized for mine air heat in order to also reduce contributions of CO2 from methane destruction that would not otherwise be ventilated (pers. com. N. Mortenson with K. Welt 8/15/2017).  Since this activity is already occurring and is not precluded by stipulations, we feel this has been adequately addressed in the permitting process.

BLM_0050408

### 2.3.7.2    Methane Drainage Well Emissions Capture

CMM is captured by drilling ahead of mining from underground workings, inserting a pipe and installing a pump on the other end of the pipe that drains the gas ahead of mining.  This gas is pumped, collected and compressed for use as a fuel to be used in a burner or it can be used as a fuel to run a combustion engine that runs a generator to produce electricity.  A detailed assessment of the options for capture and centralized collection of methane drainage well (MDW) methane is presented in the 2009 Economic Feasibility Report provided to BLM from MCC.[12]   Specific uses for recovered CMM depend on the gas quality, especially the concentration of methane and the presence of other contaminants in the drained gas. CMM has a variety of uses and typically include power generation, boiler fuel, or it is sold to natural gas pipeline systems (EPA December 2010, Coal Mine Methane Country Profiles).

The BLM is under the assumption that potential methane capture for sale would occur in one of the two ways analyzed in detail in the 2009 Economic Feasibility Report—either capturing and/or conditioning the drainage well methane for use on site as fuel for a cogeneration facility (i.e., to produce electricity for sale to the grid),[13] or for sale as pipeline quality natural gas.[14] The study evaluated the gas characteristics and potential quantities of methane that would be realistically produced based on existing well data and testing. This information was then used to preliminarily engineer a collection system that included options for pipelines, screw compressor configurations for pressure management and gas transport, dehydration units, control systems, values, and metering.

Potential aspects of any drainage well methane capture infrastructure could include more miles of road and additional land disturbance for pipeline construction than would occur under current operational practices. As an alternative, if the most direct connections cannot be utilized to install the drainage infrastructure (i.e. any proposal would be based on current roads for pipeline routes), then additional capital costs may be encountered for additional lengths of pipeline and adequate compression capacity if required.

### 2.3.7.3    MDW Capture, Electricity Production

Options for onsite electrical generation from the captured CMM included evaluating reciprocating internal combustion engines (RICE) and combustion turbines. The evaluation in the 2009 Economic Feasibility Report provided sufficient detail to explore multiple scenarios for various configurations of equipment.[15] For energy production, the RICE proved to be the most viable candidate for any onsite energy generation.  It is currently unknown whether the geologic structure of the modification areas would have the potential for the level of methane release that would facilitate electrical generation.  Additionally, it is unknown if there would be a future opportunity for sale of any energy generated.

The on-lease pipeline network that would be necessary to transport methane from the individual MDWs to a centralized collection facility would be subject to the Forest Service stipulation under the Colorado Roadless Rule that regulates the location of pipeline.

For additional information on the original R2P2 submittal regarding the capture and energy generation from CMM, see appendix A.

---

[12] *West Elk E-Seam Gas Economic Evaluation Report Exhibit F,* Mountain Coal Company, LLC, September 24, 2009.
[13] *Id.,* Exhibit G.
[14] *Id.,* Exhibit F.
[15] *Id.*

BLM_0050409

## 2.3.7.4    MDW Capture, Sale Gas

The 2009 Economic Feasibility Report studied the methane released at the West Elk Mine for potential production of salable gas from CMM drainage wells. This study indicated that the levels of contaminants in the gas (including carbon dioxide, oxygen, and nitrogen) were treatable. The BLM assumes that the additional gas processing equipment options for rendering natural gas (i.e. pipeline specifications), and transport options (i.e. connection to existing pipelines) considered in the 2009 Economic Feasibility Report are representative of any future development that would occur in conjunction CMM capture and commercial sale via existing pipeline.[16]

The cost of connecting with any existing gathering lines varies considerably (depending on terrain and/or right of way access) and is a significant factor in determining the economic viability of a CMM treatment and sale project. Additionally, existing pipelines may have limited capacity for transporting additional gas supplies or operational pressures may require additional compression capacity to access existing pipelines. There are currently two existing pipelines in the general area that are discussed in the 2009 Economic Feasibility Report;[17] however, it is unknown if a connection would be possible and the associated surface disturbance cannot be determined at this time.

Notwithstanding the capital and operating costs, the potential revenue realized from sales gas is possibly the single biggest hurdle to overcome in making this alternative economically viable.  Recent declines in natural gas prices since the submittal of the R2P2 report make the economics of selling CMM difficult. For additional information on the original R2P2 submittal regarding the capture and sale of CMM, see appendix A.

The on-lease pipeline network that would be necessary to transport methane from the individual MDWs to a centralized pipeline would be subject to the FOREST SERVICE stipulation under the Colorado Roadless Rule that regulates the location of pipeline.

## 2.3.7.5    Flaring (MDW Emissions)

The 2009 Economic Feasibility Report also studied the potential for flaring methane from the drainage wells via a centralized collection system. Flaring the methane would convert it to carbon dioxide, and could potentially reduce the total global warming potential of the gas by approx. 87% (on a CO2e basis). Flares can combust methane in air with fluctuating concentrations between 30 to 100 percent by volume. Portable flares are also commercially available, and could provide flexibility to move to different MDWs. Any flaring option considered for potential mitigation on NFS lands would need to be considered related to ignition and fires on NFS lands, consistent with lease stipulation in Table 2-1 stating "If flaring or other combustion is prescribed as part of any future mitigation measure, lessee will be required to submit a fire prevention and protection plan subject to responsible Forest Service official for approval."

Currently there are no flaring operations or proposed test operations at active (i.e., the area where active mining is occurring as opposed to sealed portions of the mine) coal mines in the United States. The technology is in limited use in other countries, such as the United Kingdom, Ukraine, Australia, and South Africa. The MDW gas assumptions (percent methane content) used in the collection system analysis do not preclude the use of a centralized enclosed flare as a potential mitigation option. The effectiveness of a portable flare used at an individual MDW would be subject to the wells' gas composition, which can vary over time. On an individual basis, and potentially for a conceptualized centralized collection system, a flare may need to be supplemented with fuel to achieve complete combustion of the MDW gas when required gas volume conditions do not meet the minimum requirements. The probability of needing to provide supplemental fuel, or allow for the bypass of the flare is not known at this time, and therefore the portable

---

[16] *Id.*, Exhibit G.

[17] *Id.*

BLM_0050410

flare mitigation effectiveness is uncertain. It is unlikely that supplemental fuel would be supplied to a portable flare located at an individual MDW, given the potential additional cost and additional safety considerations that would need to be realized.

A flare use proposal would need to be submitted. The use of a flare would have to be proposed to and approved by the Mine Safety and Health Administration (MSHA), which has the regulatory authority to approve proposed flaring systems intended for use at coal mines in the U.S. MSHA would need to conduct a thorough review of a proposed flaring system in order to establish the requirements for the system to ensure underground miner safety underground. To date, MSHA has not approved or disapproved any flaring proposals because it has never been presented with an application.  However, the agency has a process in place to analyze the safety aspects of any designs within an application. MSHA has authorized a flare for a trona mine degasification system that was commissioned in August 2010 and is now operating at Solvay's underground trona mine near Green River, Wyoming. According to EPA, trona mines have similar characteristics to underground coal mines in terms of their methane gas production and degasification technologies. While trona and coal mining may appear similar in methane production and technology, the combustibility of coal and non-combustibility of trona (and resulting threat to coal miner safety in coal mines) is a significant difference that results in the inability to apply specific flaring technologies in place at a trona mine to the West Elk coal mine.

For additional information on the original R2P2 submittal regarding flaring, see Appendix A.

## 2.3.7.6    Thermal Oxidation (VAM & MDW Emissions)

Another option for methane emission mitigation would be to oxidize the ventilation air methane via a catalytic or regenerative thermal oxidation (RTO) unit, which is capable of controlling dilute levels of ventilation air methane associated with typical underground mining applications (typically down to 0.2%). The West Elk Mine predicts the E-seam exhaust configuration emits VAM with a methane concentration between 0.15% and 0.31%. An RTO is inherently efficient, incorporating two or more ceramic media beds or zones to store heat from the combusted methane entrained within a mine's ventilation air. Periodically, the flow of incoming gas between the ceramic media is reversed to recover the stored heat from one of the zones to preheat incoming combustion gases to within a fraction of the gases' combustion temperature or to fully self-sustaining reaction temperatures depending on the design. The process repeats the alternating heating and recovery cycles as the design dictates. Certain RTO designs may require the addition of make-up fuel for complete combustion of the dilute VAM (i.e. below 0.2% or lower).  A potential option for the make-up fuel would be to pipe more concentrated MDW gas to the RTO to boost the overall concentration of methane within the RTO intake stream and boost the efficiency of the unit to limit the need for additional fuels. Additionally, many units have air flow limitations individually which may not meet the needs of a particular application. Others have modular designs and may be 'stacked' to meet air flow requirements. The design of such units may ultimately be ineffective for total VAM oxidation if space is an issue, or if vent configuration is not conducive to efficient engineering standards.

The technology is also being developed to take advantage of the 'waste heat' to enable additional energy production. Several possibilities and configurations exist to utilize the waste heat to produce hot air, hot water, or steam for electricity production (all via high efficiency heat exchangers). What is unknown and unforeseeable is what those scenarios might look like at the West Elk mine or more specifically if they would be economically beneficial to the mine or the greater public. The mine itself has two main ventilation shafts, which could provide additional opportunity or barriers for implementing a technical or economically feasible mitigation option for the mine's specific engineering parameters. For additional information on the original R2P2 submittal regarding RTO, see Appendix A.

Ultimately, no matter what type of mitigation configuration is engineered, complete capture and oxidation of the VAM and MDW gas could emit potentially significant quantities of criteria pollutants along with $CO_2$ (the desired byproduct). The effectiveness of the mitigation would also depend on the engineering configuration,

BLM_0050411

but the greatest effectiveness would be realized if all of the VAM emissions and MDW gases are oxidized. Based on a 100% oxidation, a theoretical VAM concentration range of 0.15 to 0.31%, and 87% maximum reduction efficiency ($CO_2$e basis, regardless of technology (i.e. RTO, Energy Production, Sales gas, which assumes combustion eventually)), the mine would be projected to emit anywhere from 104,233 to 215,416 tons of $CO_2$ annually.  The calculation also assumes the vent shafts are running at the maximum allowed combined ventilation rate under the mine's Air Pollution Emissions Permit authorized by CDPHE (approx. 3,000,000 cfm).

## 2.3.8   Prevent all future disturbances from road construction, methane drainage well pads and the like in Roadless Areas

The environmental consequences from an alternative that considers prevention of future surface disturbance is already covered by consideration of Alternative 1.  Therefore, CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

## 2.3.9   Shrink the boundaries of the lease to conform to the area where the coal will be mined underground

The proposed lease modification boundaries were defined by the BLM during tract delineation, and the agencies have not found reasons for shrinking the tracts due to surface resource concerns or results of the unsuitability assessment (see Appendix B).  The mine plan is approved in a later permitting process by DRMS and OSMRE.  The longwall panels foreseen by MCC are based on current, yet limited knowledge of the geology.  As panels are developed, they could be longer or shorter, depending upon conditions found during development.  If the area to be mined is limited, it could cause bypass of mineable coal. Therefore, where actual subsidence or mining may occur is not known at this time. The estimated subsidence, derived from the RFMP for each alternative is described in Section 3.3. Altering the boundaries of the leases at this time to align with subsidence may forgo mineable reserves or affect subsequent mine plans and panel layout.

## 2.3.10  Protect values of the area by using this set of stipulations for the Proposed Action

Protect a number of values by adopting the following no surface occupancy (NSO) stipulations (*proposed stipulation* is followed by response):

### 2.3.10.1  NSO stipulations prohibiting road and MDW well pad construction within ¼ mile of the hiking route known as "Sunset Trail," which traverses the lease modification, to protect recreational values.

GMUG Forest Plan indicates (III-68) coal mining is prohibited on trails on the National System of Trails in "Further Planning Areas" (i.e., areas identified in the Rare II inventory for wilderness designation).  The Sunset CRA (and previously West Elk IRA) is not a further planning area and the Sunset Trail is not on the National System of Trails (examples on the GMUG include Crag Crest Trail, Continental Divide National Scenic Trail, etc.), it is simply a non-system, non-motorized trail that is mostly overgrown with minimal use by the public. It is not maintained by the Forest Service nor encouraged for use.   Recreational values according to the Forest Plan for this management area could range from semi-primitive non-motorized to roaded natural or rural.  Effects on recreation are covered in Section 3.16.

BLM_0050412

### 2.3.10.2 NSO stipulations prohibiting road and MDW well pad construction for all areas within ¼ mile of: (a) all lynx denning habitat; (b) all lynx winter foraging habitat; and (c) all lynx foraging habitat which is adjacent to lynx denning habitat.

Appropriate stipulations specific to Lynx and related to Threatened and Endangered species are included in Alternatives 3 & 4. Lynx stipulations included are consistent with the GMUG Forest Plan 2008 amendment, Southern Rockies Lynx Amendment and the Endangered Species Act. Further, the Forest Service has consulted with the USFWS regarding Canada lynx both at the project level (USDI FWS, 2010) and for the entire Lynx Analysis Unit (LAU) which would allow over 6,400 acres of habitat removal within the LAU before reaching a conservation threshold (USDA Forest Service, 2016). CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1502.20).

### 2.3.10.3 NSO stipulations prohibiting road and MDW well pad construction for all areas within ¼ mile of a water influence zone (WIZ).

The GMUG's WIZ is defined as: The land next to water bodies where vegetation plays a major role in sustaining integrity of aquatic systems. It includes the geomorphic floodplain (valley bottom), riparian ecosystem, and inner gorge. Its minimum horizontal width (from top of each bank) is 100 feet or the mean height of mature dominant late-seral vegetation, whichever is most. The Watershed Conservation Practices Handbook 12.1 Management Measure (3) states in the WIZ "allow only those actions that maintain or improve long-term stream health and riparian ecosystem condition." Lease stipulations addressed in the Alternatives 3 & 4 address the concern of activities in the WIZ.

### 2.3.10.4 NSO stipulations prohibiting road and MDW well pad construction for all areas within ½ mile of the West Elk Wilderness boundary, to protect roadless, wildlife, scenic, and other values.

The West Elk IRA was not brought forward as a further planning area during the RARE II wilderness inventory. Unlike Oil, Gas and Geothermal development (Forest Plan III-54), coal leasing does not provide any conditions that would warrant the issuance of an NSO buffer stipulation in this area (Forest Plan III-66). Recreational values according to the Forest Plan for this management area could range from semi-primitive non-motorized to roaded natural or rural. There is no wilderness within the lease modification areas. Furthermore, provisions of the Colorado Wilderness Act (specific to the West Elk Wilderness) do not allow for the prevention of activities outside wilderness "Congress does not intend that designation of wilderness areas in the State of Colorado lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that nonwilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area" (96-560, Sec. 110). CEQ NEPA regulations describe this situation as having been covered by law.

### 2.3.10.5 NSO stipulations prohibiting road and MDW well pad construction within ¼ mile of any old growth forest to prevent fragmentation.

Old growth stands have not been identified in the lease modification areas. There are 3 stands which may or may not be old growth outside the lease modification area within the affected 6th level hydrologic unit code (HUC) (same acreage as the 4th level watersheds described in early old growth definitions) that meet the first screening criteria (large diameter trees) for old growth using Mehl's definitions (Mehl 1992). One is a spruce-fir stand located in the West Elk Wilderness; one is a cottonwood stand located primarily on private land; the last is a spruce-fir stand over a mile west of the lease modifications. None of these stands would be impacted directly or cumulatively by post-leasing surface impacts. However, assuming post-lease surface disturbing activities would occur in mature/over-mature classes (which may provide some of the same habitat components as old growth), the GMUG Forest Plan (page III-9a, III-9b) allows for removal of 70-80% of these stands assuming residual patch sizes are met. If the RFMP were implemented in

62

Alternative 3, it is estimated that up to 61 acres of mature/over-mature aspen (0.3% of vegetation unit), and 7 acres of mature/over-mature spruce-fir (0.09% of vegetation unit) may be disturbed. These are both only a tiny fraction of that allowed to be removed under forest plan standards to protect structural diversity. Alternative 4 would be even less.

### 2.3.10.6   Until the Forest Plan is amended to address new information about the threat of climate change, the GMUG should protect existing mature forest through an NSO stipulation.

Effects on spruce and aspen dependent species are disclosed in Chapter 3. Specific global or local climate effects, as a result of the proposed action, cannot be determined. An NSO for mature forests in the lease modifications is not based on science related to affected species, GMUG forest conditions or climate resiliency as described below.

Spruce-fir and aspen stands are not uncommon on the GMUG or within the lease modifications. Spruce-fir forests are approximately 100-200+ years old and aspen stands are 80-100 years old and near the end of their physiological life span on the GMUG. 2016 Spruce Beetle Epidemic and Aspen Decline Management Response (SBEADMR) analysis indicated that 66% of the spruce-fir, spruce-fir-aspen and stands in the North Fork zone are in seral stages most susceptible to spruce beetle infestation. Silvicultural objectives to protect against climate effects include maintaining green stands and regenerating spruce beetle infested stands and habitat; regenerating aspen before advanced decline either by fire or mechanical removal, increasing landscape resilience of aspen by ensuring that there are significant patches of young aspen and provide for aspen establishment; and to shift toward drought-tolerant early seral species where appropriate. Removal of trees and reclamation in the lease modifications is consistent with silvicultural objectives.

These stands are lynx habitat which constrains activities more than the Forest Plan did for the more-general old-growth NSO in the previous request (immediately above). SBEADMR BA and USFWS BO documents that within the Mt Gunnison LAU there would be a balance of 6,440 acres of suitable lynx habitat (spruce and aspen in mature/over-mature condition) that could be removed before exceeding the 30% conservation threshold for lynx within the LAU. USFWS has agreed with the forest's determinations in their SBEADMR BO. Other constraints would apply for other resources and specific stand classes. No conservation thresholds are close to being approached in the LAU as only 163 acres is currently in unsuitable habitat condition. Desired forest conditions are a range of seral desirable for long-term persistence of lynx. Reclamation success has been good at the West Elk Mine, trees are expected to grow. Within 25-30 years, early-seral stage trees that provide habitat (i.e., germinated spruce reaching a height of 6-10 feet above average snow depth) for lynx prey species are expected to revegetate the lease mod disturbance areas. While cutting trees in the short term may remove habitat in the lease modifications, habitat is not lost forever and actions won't jeopardize lynx.

GMUG is in the process of starting implementation of the SBEADMR project which would commercially or non-commercially treat forest-wide up to 120,000 acres of spruce-fir-aspen habitat (up to 30% of the lynx habitat within individual LAUs) of similar stands over the next decade in hopes of regenerating (even if by planting) or converting them to earlier seral stages and to have multi-storied stands that are more resistant to climate change effects. Further SBEADMR proposes to burn other areas releasing $CO_2$ which can also contribute to climate change, but also help certain forest types regenerate. The first of these SBEADMR treatments is under contract. The only thing protecting thousands more acres of dead and dying trees from similar treatments on the GMUG is special status areas including Colorado Roadless Areas. Application of an NSO would appear arbitrary in light of increased forest management efforts that do not rely on a Forest Plan Revision to combat effects of climate change.

BLM_0050414

### 2.3.10.7  NSO stipulations prohibiting road and MDW well pad construction within ½ mile of any raptor nest site.

There is no need for an NSO stipulation related to raptor nest sites as it is covered by survey and timing limitations requirements (Lease Stipulations) in Alternatives 3 & 4 for sensitive raptors in Colorado as identified by Region 2 list.  CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1502.20).

### 2.3.10.8  NSO stipulations prohibiting road and MDW well pad construction on slopes greater than 40% to protect soils and prevent erosion.

A stipulation that requires restrictions for no surface occupancy to be allowed in "areas of high geologic hazard or high erosion potential, or on slopes which exceed 60%" and a stipulation that requires "special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 %…the interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer" already exists as part of the Alternatives 3 and 4  These stipulations are required by the Forest Plan and supported by the Watershed Conservation Practices Handbook (FSH 2509.25).  CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

### 2.3.10.9  For Exploration, use helicopters to transport drill rig

An alternative analyzing drilling using a drill rig that can be placed on site by a helicopter drill rig to avoid construction of access roads was considered; however, this alternative was not carried forward for detailed analysis because it is ineffective and technically infeasible.  The geology of the exploration area is such that the aggregate material is not structurally sound; therefore, the drill hole must be cased.  In order for the holes to be properly cased, the initial diameter must be wide enough to allow for casing and core extraction. This is not necessarily the drill rig used for MDW holes as described above in Section 2.3.2.  However, this is not feasible to do with a drill rig that can be transported by helicopter because they are still too small and not powerful enough to drill the cased holes.  Furthermore, this alternative would not fulfill the purpose and need for the proposed action because it would not allow the exploration to be accomplished if the holes collapse before the core sample can be obtained.

## 2.3.11  For Exploration, do not consider redundant access

Redundant route has been removed from consideration under action alternatives in this EIS.  CEQ NEPA regulations describe this situation as having been covered by prior environmental review (Sec. 1506.3).

### 2.3.12  For Exploration, analyze only the holes proposed to be drilled during the first field season

An alternative was suggested by Wild Earth Guardians that would include only the four holes that MCC proposes to drill during the first field season on lease COC-1632 (see Figure 2-2 and Table 2-3) to minimize impacts to roadless areas. This alternative was not carried forward for detailed analysis because it is ineffective as it would not provide the necessary information on the extent of mineable coal. Likewise, under the proposed action it would not yield any information on lease modification COC-67232. This alternative would not meet the purpose and need of the proposed action because it would not effectively explore the coal leases consistent with lease rights, if granted, under either Alternative 3 or Alternative 4.

BLM_0050415

## 2.4 Comparison of Alternatives

This section provides a summary of the effects of implementing each alternative. Information in the table is focused on activities and effects where different levels of effects or outputs can be distinguished quantitatively or qualitatively among alternatives.

BLM_0050416

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

**Table 2-6. Comparison of Alternatives**

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| Air Quality, Greenhouse Gases & Climate Change | The maximum predicted concentration of $PM_{10}$ due to the mines and other background sources was 148 $\mu g/m^3$, which is below the primary ambient air quality standard. These results indicate that the area around the mine can be expected to remain within ambient air quality standards for $PM_{10}$. There are no other criteria pollutant emissions from stationary sources at the mine that are in excess of CDPHE's minor source permitting thresholds, and therefore the permit does not contain any limits other than those for particulate matter. By extension, no other criteria pollutant emissions associated with the mine's stationary sources would be considered to be significant with respect to their potential to degrade area air quality.<br><br>Methane released from VAM and MDWs does not correlate with coal production and has been declining from 2010-2016. No threshold of significance has been established by EPA.<br><br>Greenhouse gases from combustion:<br><br>• $CO_2$ 137.11 million tons<br>• $CH_4$ 0.016 million tons<br>• $N_2O$ 0.002 million tons<br>• $CO_2e$ 138.22 million tons | As there would be no change in mine production rate influencing emissions, effects to air quality would be the same as Alternative 1 except the duration would be extended approximately 1.6 years directly (and 2.7 years cumulatively).<br><br>Greenhouse gases from combustion:<br><br>• $CO_2$ 182.22 million tons<br>• $CH_4$ 0.021 million tons<br>• $N_2O$ 0.003 million tons<br>• $CO_2e$ 183.69 million tons<br><br>Emissions related to exploration plan would occur related to vehicles and drilling. The construction-related emissions are relatively small and are not expected to contribute significantly to localized or regional air quality degradation. | As there would be no change in mine production rate influencing emissions, effects to air quality would be the same as Alternative 1 except the duration would be extended approximately 1.4 years directly (and 2.6 years cumulatively).<br><br>Greenhouse gases from combustion:<br><br>• $CO_2$ 180.17 million tons<br>• $CH_4$ 0.021 million tons<br>• $N_2O$ 0.003 million tons<br>• $CO_2e$ 181.62 million tons<br><br>Emissions related to exploration plan would occur related to vehicles and drilling. The construction-related emissions are relatively small and are not expected to contribute significantly to localized or regional air quality degradation. |
| Topographic & Physiographic Environment | No change. | Subsequent mining may result in surface subsidence of up to 8 feet and 1077 acres (includes ~357 acres on private and adjacent parent leases). | Subsequent mining may result in surface subsidence of up to 8 feet and 930 acres (includes ~335 acres on private and adjacent parent leases). |

66

BLM_0050417

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| | | Exploration would have no effect on topography. | Exploration would have no effect on topography. |
| Geology | Geologic instabilities would continue at historic magnitudes. | Subsidence may aggravate existing geologic hazards, create surface cracks, and cause localized seismic events. Lease stipulations should minimize effects.<br><br>Mining of coal would also reduce future recoverability of oil and gas resources.<br><br>Effects would be limited to the subsidence area.<br><br>Exploration would have no effect on geology, but would help delineate the coal resource. | Similar to Alternative 3 but slightly reduced in area since only COC-1362 modification would be affected,<br><br>Exploration would have no effect on geology, but would help delineate the coal resource. |
| Soils | No change from current condition. | Cracks and other self-healing surface expressions of subsidence. Approximately 72 acres may see some soil loss and reduced productivity due to post-lease surface disturbance. Lease stipulations and best management practices should minimize effects. Additionally, approximately 63 acres of soils may be disturbed on parent leases and adjacent private lands because of the COC-1362 lease.<br><br>Exploration may impact 22.7 acres (including 0.2 acres on parent leases) of soils. Lease stipulations and best management practices should minimize effects. | Effects would be similar to Alternative 3 if roads are authorized, but only on 66 acres (including 22 acres of temporary access road) on the lease modifications.<br><br>Exploration projected may impact 18.09 acres (including 032 acres on parent leases and 0.15 acres on private land) of soils. Lease stipulations and best management practices should minimize effects. |
| Water | No mining induced effects on water resources in the lease modification area. | Subsidence may alter surface and groundwater hydrology by altering groundwater regimes, surface water drainages, seeps and stock ponds. Water quality may be impacted in up to 11.3 miles of streams from sedimentation or water derived from mining | Effects would be similar to Alternative 3 if roads are authorized, but only to a slightly lesser extent.<br><br>Exploration activities may have 5 crossings primarily of intermittent streams. . |

BLM_0050418

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| | | activities. Monitoring, best management practices, permitting and lease stipulations should ensure that impacts are minimized.<br><br>Exploration activities may have 7 crossings primarily of intermittent streams. | |
| Vegetation | Ongoing management activities and Sudden Aspen Decline will continue to impact vegetation in the lease modification area. | Subsidence is expected to have minimal disturbance on vegetation.  Post-lease surface disturbance is expected to remove vegetation from up to 72 acres.  Reclamation requirements will ensure that appropriate species are used to revegetate the area and return it to productivity.  Additionally, approximately 63 acres of vegetation may be removed on parent leases and adjacent private lands because of the COC-1362 lease modification.<br><br>Exploration activities may impact 22.7 acres of vegetation. | Effects would be similar to Alternative 3 except approximately 66 acres of vegetation may be disturbed on the lease modifications. Additionally, approximately 63 acres of vegetation may be removed on parent leases and adjacent private lands because of the COC-1362 lease modification.<br><br>Exploration activities may impact 18.09 acres of vegetation. |
| Threatened & Endangered Species | No change over existing conditions and management. | Canada lynx-may affect, but is not likely to adversely affect.<br><br>Four Big River Endangered Fish-fish not present but water depletions of approximately 4.5 acre feet total for MDWs may affect these species.  Water depletion is consistent with existing Programmatic Biological Opinions. Additional MDWs on parent leases and private lands as a result of COC-1362 modification may deplete an additional approximately 4.2 acre-feet of water.<br><br>Exploration:<br><br>• May impact 21.16 acres of habitat for Canada lynx (includes acreage | The effects would be similar to Alternative 3 but slightly reduced in scale.<br><br>Four Big River Endangered Fish-fish not present but water depletions of approximately 4.1 acre feet total for MDWs may affect these species.  Water depletion is consistent wih existing Programmatic Biological Opinions. Additional MDWs on parent leases and private lands as a result of COC-1362 modification may deplete an additional approximately 4.2 acre-feet of water.<br><br>Exploration:<br><br>• May impact 17.28 acres of habitat for Canada lynx (includes acreage |

BLM_0050419

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| | | on parent lease). This is tiny fraction of habitat that may be removed and still meet the conservation threshold .in the Lynx Analysis Unit.<br>• Is expected to result in up to 0.17-0.26 acre-feet of water depletion consistent with existing Programmatic Biological Opinions. | on parent lease and private lands). This is tiny fraction of habitat that may be removed and still meet the conservation threshold .in the Lynx Analysis Unit.<br>• Exploration is expected to result in up to 0.14-0.21 acre-feet of water depletion consistent with existing Programmatic Biological Opinion. |
| Sensitive Species | No change over existing conditions and management activities. | American marten, pygmy shrew, northern goshawk, boreal owl, olive-sided flycatcher, flammulated owl, Hoary bat, Monarch butterfly, western bumble bee, American three-toed woodpecker, northern leopard frog, and purple martin-"may adversely impact individuals, but is not likely to result in a loss of viability in the planning area nor cause a trend toward federal listing."<br><br>Colorado tansy aster-no effect.<br><br>Rocky Mountain thistle-not known to date in lease modification area, but habitat may be enhanced from disturbance associated with post-lease development. | The effects would be similar to but slightly less than Alternative 3 since less acres would be affected. Each species may experience different effects due to specific location and extent of disturbance. |
| Management Indicator Species | No change over existing conditions and management activities. | Elk, Merriam's wild turkey, and red-naped sapsucker–negative effects are of short duration and magnitude and do not result in a forest-wide decrease in trends or deter from meeting the MIS objectives in the Forest Plan. (Other MIS species are addressed as Sensitive Species) | The effects would be similar to but slightly less than Alternative 3 since less acres would be affected |

BLM_0050420

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| Migratory Birds | No change over existing conditions and management activities. | Lease stipulations requiring breeding bird surveys and including timing restrictions where needed for specific species, may mitigate impacts to migratory birds. However, some bird habitat will be altered in the short term as a result of post-leasing development resulting in a type-conversion of 72 acres, and that is likely to impact individual migratory birds, especially passerines and other birds which utilize aspen, spruce-fir, and oak for nesting. Additionally, approximately 63 acres of predominantly oakbrush and aspen may be removed on parent leases and adjacent private lands because of the COC-1362 lease modification. | The effects would be similar to but slightly less than Alternative 3 since less acres (66) would be affected.  Each species may experience different effects due to specific location and extent of disturbance. Additionally, approximately 63 acres of predominantly oakbrush and aspen may be removed on parent leases and adjacent private lands because of the COC-1362 lease modification. |
| Range Resources | No change over existing conditions and management activities. | Post-lease development may result in short term forage loss, subsidence(1077 acres) related damage to stock ponds, fences being altered, cattle guards filling in, grazing management/ distribution problems, cattle drift onto private land and noxious weeds.  Following best management practices and coordination with Range Conservationist/ permittees when post lease development is proposed will minimize these effects.<br><br>Forage will be removed in the short term form approximately 72 acres of the lease modifications, but conversion to forbs will enhance grazing once reclaimed. Additional acres (63 acres) of predominantly oakbrush and aspen may be removed from parent leases and adjacent private lands because of the COC-1362 lease modification. | The effects would be similar to Alternative 3 but slightly reduced in scale because of reduction in subsidence acres to 930 and fewer acres (66) of forage disturbed in the short-term on lease modifications.<br><br>Exploration, as post-lease development, would remove ~18 acres of vegetation. |

BLM_0050421

*Supplemental Final Environmental Impact Statement* │ Federal Coal Lease Modifications COC-1362 & COC-67232

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| | | Exploration, as post-lease development, would remove 22.7 acres of vegetation. | |
| Recreation | No impact. | No change to recreation opportunities available. Subsidence cracks may form on a non-motorized, non-system trail but would be expected to be minor. Post-leasing development may improve access on NFSR 710 and cause big game to temporarily move out of the area.<br><br>Exploration could affect recreational users' experience through traffic on public roads, noise, big game movement, primitive experience/solitude altered. | The effects would be similar to Alternative 3. |
| Transportation System | No change over existing uses | No subsidence-related damage to system roads would occur from mining coal in the lease modifications.<br><br>Post-lease development traffic on NFSR 711 and 710 in the lease would be consistent with current activities.<br><br>New post-lease roads would not be open to the public consistent with recent Travel Management Plan. | The effects would be similar to Alternative 3. |
| Roadless | No change over existing use's impacts. | Roadless character and values will be managed consistent with Colorado Roadless Rule. Short- term impacts to Sunset CRA will occur, but return to baseline conditions (i.e., roadless) after well pad and temporary road reclamation. Post-lease activities may disturb up to 72 acres on lease modifications within Sunset roadless and an additional ~28 acres on parent leases in Sunset CRA. | Same as Alternative 3 in lease modification COC-1632; no impacts would occur in COC-67232. Post-lease activities may disturb up to 66 acres on lease modifications within Sunset roadless and an additional ~28 acres on parent leases in Sunset CRA.<br><br>Exploration would impact ~17.94 acres (includes parent leases) of the Sunset CRA. |

71

BLM_0050422

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| | | Exploration would impact ~22.7 acres (includes parent leases) of the Sunset CRA. | |
| Heritage Resources | No impact. | No potential to affect cultural resources. On-the-ground surveys will be needed for site-specific ground-disturbing activities and is enforced by the Forest Service standard lease stipulation<br><br>Surveys for exploration have been completed with no potential to affect cultural resources. | No potential to affect cultural resources. On-the-ground surveys will be needed for site-specific ground-disturbing activities and is enforced by the Forest Service standard lease stipulation.<br><br>Because this is only a projection of exploration activities for Alternative 4 based on topography, most areas have been surveyed where duplicative of Alternative 3 and would have no potential to affect; however, if selected this alternative would require additional surveys for relocated access roads to SST-7 and SST-3 and pad SST-3. |
| Visuals | No change over existing conditions and management activities | No major impacts to visual resources are expected from subsidence or subsidence-related events. Post-leasing development is not likely to be seen from public travelways, but topographic and vegetative screening will also prevent visual intrusion | The effects would be similar to Alternatives 3 but the impacts would be limited to COC-1632 lease modification area. |
| Socioeconomics | Rents, royalties, payments to counties would not be collected on the quantity of coal that would be bypassed. Effects extend beyond the Forest boundary to fee coal reserves that also would be lost.<br><br>For coal produced under this alternative, cumulative royalties would be $186.6 million with approximately $91.5 million going to the State of Colorado. | The mining sector and associated rents, royalties, and payments to states/counties would be extended in proportion to the quantity of federal coal mined. Operations would be extended approximately 1.4 years directly (and 2.7 years cumulatively which includes fee reserves).<br><br>A total of $255.8 million in royalty revenue would be collected by the Federal government over the 10.9 years of coal production, which is $69.2 million more than what would be | Similar to Alternative 3 but with only 2.6 years of cumulative coal production.<br><br>Approximately $253.4 million in royalty revenue would be collected by the Federal government over the 10.8 years of coal production, which is $66.8 million more than what the government would collect under the No Action Alternative. |

72

BLM_0050423

| Resource Area | Alternative 1 (No Action) | Alternative 3 (Colorado Roadless) | Alternative 4 (COC-1362 only) |
|---|---|---|---|
| | | collected under the No Action Alternative. | |

BLM_0050424

(Intentionally left blank)

BLM_0050425

# Chapter 3. Affected Environment and Environmental Effects

## 3.1 Introduction

This Chapter summarizes the physical, biological, social, and economic environments of the project area and the environmental effects of implementing each alternative on that environment. It also presents the scientific and analytical basis for the comparison of alternatives presented in the alternatives chapter.

Lease issuance by the BLM vests with the lessee a non-exclusive right to future exploration and an exclusive right to produce and use the coal resources within the lease modifications area, subject to existing laws, regulations, and the terms, conditions and stipulations in, or attached to, the lease (USDI BLM, 2008). Lease issuance alone does not authorize or result in any mineral resource recovery or ground-disturbing activities. Thus, issuance of a lease modification has no direct effects on the environment; however, it is a commitment of the resource for potential exploration, mining and development, and reclamation, subject to further review and permitting actions.

### 3.1.1    Short-term and Long-term Effects

Unless otherwise specified, short-term is the life of the project. Long-term effects are defined as those that would occur after coal is mined.

### 3.1.2    Direct and Indirect Effects

Direct effects are caused by the action and occur at the same time and place as the action. Indirect effects are caused by the action and occur later in time or farther removed in distance, but are still reasonably foreseeable. Direct and indirect effects analysis for each alternative and each resource are based on description of the alternatives provided in Chapter 2, including conditions of approval and assumes that all stipulations would be implemented as described throughout this chapter.

### 3.1.3    Cumulative Effects

Cumulative impacts are impacts on the environment that result from incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.

## 3.2 Ongoing and Proposed Activities

The following are descriptions of past, present and reasonably foreseeable future actions for use in the cumulative effects analysis. Individual cumulative effects environments are described in each of the resource analyses later in this chapter.  These are included, where applicable, in the No Action Alternative.

### 3.2.1    General Background

Coal mining has been one of the dominant land uses in the North Fork of the Gunnison River area. Underground mining has occurred in this area for the past 100 years. Coal mining has occurred on both private and public lands in the general area. There is currently one operating coal mine in the North Fork Valley, the West Elk Mine.

### 3.2.2    West Elk Mine

#### 3.2.2.1    1981 to present

The mine has been operating for 29 years and holds about 14,395 acres of federal coal leases and 3,656 acres of fee coal lands. Subsidence on NFS lands has occurred north of the proposed COC-1362 and COC-

BLM_0050426

67232 lease modifications. Minor surface tension cracks are visible in places on the surface. Topography has lowered between two and ten feet across the existing subsided areas. MCC is in the process of mining E-Seam reserves in existing portions of COC-1362 and COC-67232 leases.

Surface facilities including office, warehouse, shop, coal handling facilities are located about 6 miles north of the proposed modifications. These existing facilities would also be used for mining the proposed modifications.

According to MCC's 2011 reclamation report, approximately 477 acres have been disturbed at the West Elk Mine; of that, approximately 71 acres have been reclaimed (regraded and reseeded).

## 3.2.2.2    Coal Exploration Drilling 1990s-2000s

Eleven exploration holes (6 north of and 5 west of the modification areas) are within ½ mile of the modification tracts; most were drilled in the 1990s to early 2000s. Some access roads are still visible. Reclamation success has returned lands post-mining consistent with Forest Plan Standards. Road closures and/or obliteration are preventing unauthorized vehicle use. Portions of old drill roads and some pads are currently being used for a methane drainage project.

## 3.2.2.3    Geophysical Exploration since 1999

A shallow seismic survey was performed along Deep Creek in 1999. Shallow shot holes were drilled and then reclaimed. A field survey in September 2004 showed no visible residual effects. A shallow seismic survey was approved for Box Canyon in 2005, about 3 miles north of the lease modifications. It was a short-term survey; no residual effects after reclamation were realized.

## 3.2.2.4    Methane Drainage Wells 2008 to present in vicinity

In 2008, MCC was approved to install 168 methane drainage wells (MDWs) from 146 locations over existing leases north of the proposed modifications on parent and other leases.

Fifty-eight (58) approved methane drainage wells on 46 drill pads lie within a one-mile area north of the project area (both developed and undeveloped). To date, 27 MDWs have been drilled in the E4 through E6 panels from 20 well pads within a one-mile radius, and another 17 wells are likely to be drilled in the E7 and E8 panels during the 2017 and 2018 seasons. Within a one-mile radius of the proposed modifications, four (4) well pads have been reclaimed and two (2) well pad access roads, and four (4) methane drainage wells have been plugged and abandoned. During the 2017 season, MCC will reclaim another two (2) well pads on the E5 panel, reclaim two well pad access roads, and plug and abandon four (4) more methane drainage wells.

BLM_0050427



**Figure 3-1. MDWs and disturbance within one mile of lease modifications**

BLM_0050428

There are 133 proposed MDWs (126 on Forest, 7 on private land), that lie within a two-mile radius of the proposed lease modification area.  Of these 133 MDWs, 89 have been developed to date in the E1 through E6 panels.  During the 2017 season, MCC will construct all of the 11 well pads for the E7 panel and drill all 12 of the MDWs.  During the 2018 season it is likely that MCC will build all five (5) well pads on the E8 panel and drill all six (6) wells and potentially do some construction and drilling on the E9 through E12 panels. Beyond 2018 MCC would continue to develop the well pads and methane drainage wells on the E9 through E12 panels in preparation for mining.

Reclamation associated with the E Seam Methane Drainage Wells Project is following close behind development.  Of the 82 well pads constructed in the E1 through E6 panels, 47 have been reclaimed to date and another two (2) are scheduled for the 2017 season.  Of the 102 methane drainage wells drilled on these pads, 65 wells have been plugged and abandoned and four (4) more wells are scheduled for plugging and abandonment in 2017.  MCC plugged and abandoned seven (7) water monitoring wells during 2016 and will begin reclamation on the E5 panel well pads and wells during the 2017 season.

BLM_0050429



**Figure 3-2. MDWs and disturbance within two miles of lease modifications**

## 3.2.2.5    Next 10 years

This section does not include the MDWs on lease modifications which are being analyzed in this SFEIS. Previously approved mining would continue including the activities related to mine ventilation such as installation of MDWs and roads to access them in the parent lease areas of these modifications for at least the next decade.  Mining sequence will continue developing mains in a north to south/southeast manner across fee coal lands then developing and mining longwall blocks to the east across federal coal under USFS lands.  Mine life is currently projected to be about 8.2 additional years, with about 55.3 million tons to come from federal coal reserves and about 2.3 million tons from fee reserves.  There may be a continued need for post-lease surface use related to maintaining mine seals, continued reclamation activities, etc. in any of West Elk's lease holdings.

West Elk Mine may enter previously leased areas in the B Seam. It is currently undetermined whether this would be in lieu of the lease modifications or subsequent to them and depends on economic conditions of the coal market and/or cost of development of the seam, etc. MCC was approved by DRMS (in May 2015) to drive rock slopes from the E seam into the B seam coal reserves, underneath the coal reserves they have completed mining.  These B seam reserves roughly underlie the E1 through E4 E seam panels which are dominated primarily by Gambel's oak and aspen cover types.  The mining of these B seam reserves would require the drilling of additional MDWs.  It is estimated that approximately 77 MDWs on 69 pads may be necessary (one pad may be shared with previously approved development for E Seam; pad size is estimated at ½ acre); use of previously approved access related to E Seam development; construction of approximately 8.8 miles of new access road (assumes 30 foot disturbance width with 14 foot running surface; 1.4 miles of which may be on top of existing ATV trails) and reconstruction of an approximate additional 1.8 miles of previously reclaimed road in Deep Creek. Estimated new disturbance for B Seam operations is 65.5 acres and re-disturbance is estimated at 6.5 acres.  Roughly six (6) methane drainage wells would be within a one-mile radius of the lease modifications and forty-seven (47) within a two-mile radius.  As the area is already under lease for all coal seams, the approval of the MDWs is in the purview of the state under the SMCRA permitting action.  The FS and BLM act in their regulatory roles in the state process.

80



Figure 3-3. West Elk Mine E Seam Development and Reclamation

BLM_0050432

### 3.2.3    Wildlife Past 20 years, Present and Future

A 600-acre prescribed burn occurred in a mountain shrub area about one mile northeast of the modifications in 1992 for wildlife (including big game) improvements. The area has been effectively revegetated in mountain shrub and oak.

In 2010, a 585-acre prescribed burn occurred in a mountain shrub area about 3 miles west of the proposed modifications.

### 3.2.4    Range use/ improvements Past 100 years

NFS lands have been grazed for many years and are currently managed under a rotational deferment strategy. MCC also leases private land for grazing. No changes in the grazing system are planned. Existing range features and improvements include stock trails, fences, and several small stock ponds.

### 3.2.5    Recreation Past 20 years, Present and Future

The lease modification areas have no developed recreation sites. Dispersed recreation includes camping, use of all-terrain vehicles (ATVs), and horseback riding on a limited basis. Occasionally, National Forest System Road (NFSR) 711 is used for dirt bikes and mountain cyclists. Primary use occurs during hunting seasons. No recreation developments are planned.  Approximately 1/2 mile of the non-motorized non-system trail, the Sunset Trail, lies within the lease modifications and is cleared to disperse livestock by cattle permittees.  It is not often used for recreation purposes and is difficult to navigate through the project area.  There are no system trails in the lease modification area. Numerous non-system stock, range improvement and wildlife trails cross the lease modification areas.

### 3.2.6    Inventoried Roadless Areas (IRA) 1979 to 2012

The majority of the lease modifications were located in the West Elk IRA, inventoried in 1979 as part of Roadless Area Review and Evaluation (RARE II), but was not carried forward for wilderness designation. The IRA was designated for management as roaded natural in GMUG Forest Plan and was not designated as a further planning area. A 1993 evaluation determined that the West Elk IRA had compromised roadless character and was reevaluated in the 2002 EA for Methane Drainage, as well as the 2008 EIS for E-Seam development.

Much of the West Elk Roadless Area (current Forest Plan designation) has compromised character due to management activities before and after 1979 including roads, ditches, reservoirs, full-size trails, etc. Forest Plan prescriptions have guided the management of the area from the date of the Plan and intermittently when the 2001 Roadless Rule had not been in effect.  This rule is no longer in effect in Colorado. The Forest Plan allows for road building in this area. Disturbance related to coal mine temporary access and MDWs has occurred in the West Elk IRA and is depicted in Figure-3-27.

### 3.2.7    Colorado Roadless Areas (CRA) 2012-Present

The original Sunset Trail roadless area is a small subset of the West Elk Inventoried Roadless Area (above) that came about in the GMUG Draft Forest Plan Revision, a plan that was not finalized because of litigation over the Planning Rule(s). "Sunset Colorado Roadless Area" (Sunset CRA) is also the designation for this general area used in the Colorado Roadless Rule FEIS, as promulgated in Federal Register on July 3, 2012.  Although the area carries the same name, several boundary adjustments exist between the documents and each describe this parcel in different ways.  With respect to this document, it refers to the Sunset Colorado Roadless Area as defined in the Colorado Roadless Rule.  NFCMA was reinstated on December 19, 2016, and became effective April 18, 2017, and a few boundary adjustments were made to CRAs within the NFCMA. There are no boundary adjustments to the Sunset CRA within

BLM_0050433

the proposed lease modifications. Disturbance related to temporary roads and MDWs has occurred and was authorized in a portion of what is now the Sunset CRA in the E Seam ROD in 2008; this did not preclude extending CRA boundaries to include more area that had authorized disturbance in 2012 CRR. These temporary roads and MDWs are depicted in Figures 3-1, 3-2 and specifically within the Sunset CRA in Figure 3-27.

## 3.2.8    Road and Trail System Past 30 years and Present

CR 710/NFSR 711 is the primary access used by forest visitors, range/special use permittees, and MCC into lands near the lease modification area and private coal reserves. The road is low standard and maintained for travel in high clearance vehicles. MCC has performed maintenance in the past 10 years on portions of this road. Other temporary roads on forest have been constructed and reclaimed in the past 15 years for coal exploration or other drilling purposes and many more on private/fee land.

## 3.2.9    Natural Gas Development Future

This area was made available for oil and gas leasing in the 1993 GMUG Oil and Gas Leasing EIS ROD. There has been interest in obtaining gas leases to use the methane resource although no gas leases have been issued for lands within the lease modifications. The BLM has officially designated mineral resources in this area to be primarily managed for coal. There are no gas pipelines in the area.

MCC and BLM are have worked on potential strategies for gas utilization. MCC also continues working with the Environmental Protection Agency in EPA's Coalbed Methane Outreach Program (CMOP) (see Sections 2.2, 3.4).

## 3.2.10   Methane Emissions Past 5 years (Air Quality)

MCC began draining methane from the underground mine via methane drainage wells in 2001. Monitoring since then shows current MDWs in the E Seam have an average active life of about 1-3 months. Approximately 2 or 3 MDWs are actively draining methane at any time.  See Section 3.4 for further discussion.

## 3.2.11   Other Actions Known or Proposed in the Vicinity with Potential Cumulative Effects

The following projects are in the general North Fork area.  They are included because cumulative effects of these projects may combine with those of the lease modifications. Specific nature of cumulative effects are identified in the bullets below.

- Continued mining at West Elk Mine on existing federal leases and fee coal reserves will contribute cumulative effects on the natural and physical environment in the immediate vicinity of the lease mods. Air emissions are represented in the No Action Alternative.

- Oxbow Mining LLC's Coal Mine has been closed.  Some surface reclamation efforts will continue. Minor methane releases will continue from surface cracks and previously mined areas. Air emissions are represented in the No Action Alternative. There are no pending Forest Service NEPA actions.

- Bowie No. 2 Coal Mine will extend air quality and methane impacts consistent with existing (background) levels. This mine is currently idled. Air emissions are represented in the No Action Alternative. There are no pending Forest Service NEPA actions.

- West Elk Mine may enter previously leased areas in the B Seam.  An estimated 65 acres of surface disturbance may occur primarily in oak and aspen habitats. There is no Forest Service

83

NEPA action to approve these activities as the area is already under lease. Any air emissions would not occur at the same time as lease modifications.

- Bull Mountain Unit Master Development Plan (SG Interests) proposal is to drill up to 150 oil/gas wells. Record of Decision is waiting final approval by BLM. Cumulative effects would be expected as they relate to criteria air pollutants and visibility within the airshed. To date only one Application for Permit to Drill (APD) or Surface Use Plans of Operation (SUPO) has been submitted; approval of which by BLM would authorize cumulative effects (overlapping in time and space with the lease modifications) as they relate to criteria air pollutants and visibility within the airshed. BLM's air analysis considers drilling gas 27 wells annually over 6 years even though this number of wells being drilled is highly unlikely due to lack of APDs in the lease modification timeframe. Additional wells on private may continue to be drilled. Air emissions are represented in the No Action Alternative.

- Gunnison Energy's North Fork Mancos Master Development Plan is being analyzed which includes up to 35 wells on 4 pads. To date only one APD/SUPO has been submitted for preliminary agency review (May 2017); approval of which would authorize cumulative effects as they relate to criteria air pollutants and visibility within the airshed. The NEPA process has just started for this project; completion of which is needed to approve APD/SUPO submitted. It is unknown at this time whether or not impacts will overlap in space and time with lease modifications.

- SG Interests and Gunnison Energy's 2015 "5 Pad EA" has 10 approved APDs. Cumulative effects (overlapping in time and space with the lease modifications) would be expected as they relate to criteria air pollutants and visibility within the airshed for the number of approved APDs. Of the approved APDs, one Gunnison Energy well pad is constructed with one well partially drilled. Air emissions are represented in the No Action Alternative.

- Four additional APDs are pending (two SG Interests and two Petrox) that, depending on timing of NEPA analysis/approval, may contribute cumulative effects as they relate to criteria air pollutants and visibility within the airshed. It is unknown whether these wells would overlap in space or time with lease modifications. However they are included in the analysis of the No Action Alternative.

These air impacts are considered as part of the existing condition in Section 3.4. Ground disturbances are considered in applicable cumulative effects analysis sections. The following analysis generally uses watershed and/or animal home ranges where effects can be measured. Therefore, cumulative effects boundaries do not extend into the "Muddy Country" where oil and gas impacts to the ground surface would occur.

## 3.3 Reasonably Foreseeable Mine Plan

Because a leasing decision itself does not involve any mineral development or surface disturbance, it is necessary to project the amount of surface use or activity that will likely result during lease development in order to disclose potential effects and inform decision-making. To obtain general estimates of potential surface impacts due to underground mine subsidence and normal mine operations, this analysis assumes a reasonably foreseeable mine plan (RFMP) for the various action alternatives. This mine plan assumes a scenario of potential surface use and potential post-lease activities in order to effectively analyze potential indirect and cumulative impacts.

Within this EIS there are two action alternatives: Alternative 3 (Proposed Action)- consenting to and modifying both leases under the provisions of Colorado Roadless Rule (CRR) framework, and Alternative 4-consenting to and modifying only COC-1362 lease under the provisions of CRR framework.

It must be noted however, that decisions pertaining to surface use and disturbance, with the exception of subsidence impacts, are not made at the leasing stage. Rather, the decisions related to permit-related

BLM_0050435

surface activities (e.g. MDWs) are made when and if site-specific surface uses are proposed, and are evaluated through the State permitting process based on their own merits.

## 3.3.1   Information Relevant to Reasonably Foreseeable Mine Plan Scenarios for Action Alternatives

The lease modifications for COC-1362 and COC-67232 contain an estimated 10.1 million tons of recoverable federal coal reserves in the E coal seam (9,541,000 tons and 559,000 tons respectively). For this analysis, it is assumed that the coal would be recovered using the longwall method of underground coal mining. The tracts are bounded on the north by currently leased federal coal, of which an estimated additional 3.3 million tons of Federal coal could be recovered if at least the COC-1362 modification is authorized.  The parcels are bounded on the east by inferred unmineable coal (unleased and known geologic faults/intrusions) and on the west by private land which contains an estimated 4.2 million tons of mineable coal, and on the south by wilderness. Therefore, it is assumed that access to the coal reserves in the lease modifications would most easily be achieved from underground workings at the West Elk Mine and surface facilities near Somerset, Colorado.

Production from the existing West Elk Mine approximates 6.5 million tons per year (tpy) using the longwall mining method, and is capable of peaking at a 7.0 million tpy rate.  It is assumed for this analysis that the coal would be extracted at a 6.5 million tpy. No increase in coal production is assumed, and it is assumed that the coal would be transported to market using the existing coal handling facilities and existing spur rail line.

This RFMP for the lease modifications assumes the coal in the E seam would be extracted from portions of five longwall panels trending northwest-southeast.  The panels in the lease modifications would include the start lines and the first few thousand feet of five panels that would extend west off the NFS lands and into coal reserves under  private land (i.e., mining in a southeast to northwest direction).  The mining would "retreat" to the main entries of the mine.  The continuous miner would be used to drive development entries for the longwall panels, with the primary coal production being achieved using the longwall equipment.

### 3.3.1.1   MDWs

In recent years, the coal mines operating in the Somerset coal field have experienced the build-up of methane gas in the underground workings after the overlying rock strata have subsided into the mine void (called the gob).  Under Mining, Safety and Health Administration (MSHA) regulations, mines are required to hold the methane levels below a concentration of 1% in the active working areas of the mine to ensure worker safety underground.

Typically, the in-mine ventilation system cannot effectively keep methane levels within safe working range, therefore additional methane liberation methods have to be employed.  Existing operations at the West Elk Mine, as well other mines in the North Fork Valley, have used a system of methane drainage wells (MDWs) to assist in liberating methane from underground mine workings.  These MDWs are drilled from the land surface into the strata overlying the coal, and use an exhausting blower to pull gas from the rock formation, and subsequently air from the mine.  At the West Elk Mine, MDWs are most efficient if located on the northern 1/3 of each longwall panel, directly above where the coal is to be mined.  This is required because in these locations (positive pressure side) the in-mine ventilation aids in the evacuation of methane to the well bore.  MDWs, as part of the mine ventilation plan, fall under the regulation and approval of MSHA.  Due to the large amount of methane found in the West Elk Mine, the agency requires MDWs to be placed every 750 to 1,000 ft. along the longwall panel (for additional information refer to the 2008 E-seam FEIS). Methane drainage well construction is essential for operating longwall operations in the North Fork Valley.

BLM_0050436

The drilling technology used to drill holes the diameter and depth needed for MDWs also requires construction of drill pads and the use of heavy equipment to access these locations.  Current MDWs are on the landscape an average of 2-3 years with an active life of 1-3 months[18], after which they are decommissioned, the land surface is reclaimed and returned to pre-mining land uses.

For the lease modifications, it is anticipated that MDWs will be needed in order to mine the coal. Other post-leasing surface activities that could be reasonably anticipated includes: exploration drilling, seismic exploration, ground water monitoring well installation, subsidence and hydrology monitoring sites, and access needed for these facilities.  Other than hydrologic monitoring sites, which usually do not require any disturbance, the disturbance footprint of these additional activities would most likely share the footprint of MDW access and pads, and not add additional cumulative disturbances to what is estimated below.

Based on information from Mountain Coal Company, the maximum sound level of an exhauster[19] on an MDW is 100 db(A) (A-weighted decibels) at 1 meter.  Using 100 db(A) as a baseline, sound levels of a MDW exhausters operating at the maximum sound level would dissipate to about 70 db(A) 105 feet away. This equates to the sound level of a typical business office.  If the area around the MWD pad is forested, sounds levels would dissipate to about 54 – 59 db(A) 210 feet away which equates to the sound level of conversational speech, and 48 – 53 db(A) 420 feet away which equates to the sound level of a library. (MPCA, 1999).  These sound level estimates are based on the following assumptions:

- When the distance is doubled from a point source, the sound level decreases by six dBA (MPCA, 1999).

- The effect of vegetation would reduce sound levels by 5 dBA to 10 dBA through deflection (NPS, 2000).

These estimates were based on the maximum sound level exhausters produce running at 1,800 RPMs and exhausters are typically ran at about 1,400 RPMs.  Beyond approximately 420 feet, noise would be dissipated to a level that is not noticeable by the typical person.

### 3.3.1.2   Subsidence

The most common subsidence related impacts are changes in topography. In addition to the lowering of the land surface, there are likely to be surface tension fractures. Tension fractures are more evident on hard-competent sandstone outcroppings, although tension fractures may also extend into colluvium, alluvium, and weathered bedrock. The majority of movement and changing stresses associated with subsidence over panels is usually completed within 12 months after longwall mining.

Within the lease modification areas, the average mining height of coal is expected to be 11 feet. As a general rule of thumb, through the mining process the overburden is subsided 70% of the mining height. So in mined portions of the modification area, expect the land to be subsided up to 8 ft (see Figure 3-4 for expected area of subsidence). The effect on topography is also related to the amount of overburden (more cover, less subsidence), and the modification area ranges in overburden from 800 ft – 2,200 ft (avg. 1200 ft).

Projected subsidence associated with authorizing the lease modifications under Alternative 3 (Figure 3-4) is expected to affect a maximum of about 1,077 acres (includes ~618 acres on COC-1362 modification, ~103 acres on COC-67232 modification, and ~262 acres of additional adjacent reserves on private and ~95 acres on federal lands made accessible via lease modifications). Projected subsidence under

---

[18] MCC reports that MDWs have not been used or needed at all from June-August, 2017.

[19] Cummings Engine Performance Data, GTA8.3SLB (FR92280), 175 BHP (130 kW) @ 1800 RRPM, Noise emissions

BLM_0050437

Alternative 4 (Figure 3-5) is approximately 930 acres (includes ~595 acres on COC-1362 modification; approximately 0.8 acres on COC-67232, ~240 acres of additional adjacent reserves on private and ~95 acres on federal lands made accessible via lease modifications). See Table 3-3. Other than lowering the land surface, the long-term effects of subsidence on surface topography would be minimal, and even unnoticeable to most casual observers. Overall, the topography above subsided longwall mining workings would be similar to the pre-mining topography, albeit lower in elevation.

Past observations have shown that surface tension cracks caused by subsidence would most likely occur on ridges and steeper slopes, particularly cliff / outcrop areas, where cracks might open on the order of a few inches to possibly one foot wide and 25 to 50 feet deep. Fewer cracks would occur in drainage areas than on ridges because the drainage areas are more stable and any alluvial/colluvial materials found in these areas tend to be more pliable than some of the brittle bedrock found on the ridges. Subsidence from longwall mining could aggravate the movement of existing landslides and rock falls. Subsidence and hydrology monitoring may require placement of monitoring devices on the land surface. These may include small subsidence monuments and survey markers. Access to the facilities may require motorized vehicles that would use the system of existing roads or trails.  Subsidence will only occur in areas for which the mine has a right to create such subsidence, which will be defined by their permit boundary.

BLM_0050438



**Figure 3-4. Alternative 3 Projected Subsidence**

BLM_0050439



**Figure 3-5. Alternative 4 Projected Subsidence**

BLM_0050440

## 3.3.2   Alternative 3 (Proposed Action) Reasonably Foreseeable Mine Plan (RFMP)

In the Reasonably Foreseeable Mine Plan (RFMP) under Alternative 3, consenting to both lease modifications would occur and temporary road construction could be allowed under the NFCMA exception in the Colorado Roadless Rule.  Surface uses (e.g. MDW pad construction) could take place for mine operations and construction of conventional access roads to those locations could be authorized.

The E seam coal in the lease modifications would be mined over a period of approximately 3 years; however, E seam coal reserves in the modifications represent about 1.6 years of additional coal reserves based on the assumed mining rate of 6.5 million tons/year.  In addition, it has been indicated, that the leasing and development of the lease modifications also allow for the production of 4.2 million tons of fee coal on adjacent lands (project record), as well as an additional 3.3 million tons from existing adjacent federal coal reserves to the north.  Thus, the lease modifications, if authorized, would extend the life of the West Elk Mine by approximately 2.7 years. See Table 3-1 and Table 3-2.

Some variations to these timeframes could occur based on time needed for permitting, unforeseen mining/geologic circumstances, coal contract variability, etc.

### 3.3.2.1   Reasonably Foreseeable Surface Use and Disturbances

At the leasing stage, it is not possible to locate site-specific areas where potential surface uses may occur as there is no approved mining plan for the area at this time; therefore, the above surface use and disturbance estimations will be used to aid the cumulative impact analysis discussed in each resource section.  If surface uses are proposed during the life of the leases (if they are issued), then the site-specific proposals will be evaluated under the State mine permitting regulations, under their own merits at the time they are proposed.

### 3.3.2.2   MDWs

For the purposes of the cumulative effects analysis in this alternative, it is assumed based on current mining practices, that about 72 total acres of surface disturbance would occur from mine operations over the life of the lease modifications (expected to be about 25 years from lease issuance to lease relinquishment and final bond release).  Site-specific locations of anticipated disturbance cannot be identified at the leasing stage due to the fact that a final mine plan has not been approved.

For the purposes of this alternative, it is assumed that approximately 48 MDWs would be needed over the life of the lease modifications (44 on COC-1362, and 4 on COC-67232), corresponding to an estimated 48 acres of disturbance (making a conservative estimate requiring about 1 acre of disturbance per MDW pad; historically most MDW pads are 0.5 acres or less).  Access roads associated with MDWs is estimated to be about 6.5 miles, corresponding to about 24 acres of disturbance assuming a 30-foot wide average disturbance width. See Table 3-2.

It is unlikely that all 48 MDWs would be constructed and or venting at the same time.  Similar to what has been seen recently in other West Elk Mine operations, it is estimated that 2 to 3 MDWs would be in operation at any given time and life of an MDW varies from one to three years, although the MDW is only actively venting for an average of three months, depending on placement in the panel.  Typically, in a given summer, the MDWs for the next year's operations are drilled, and the MDWs from the panel mined two years previous are reclaimed.  However, since the mine plan is not yet known, the exact number of wells that will be operational, constructed, or reclaimed each year is unknown.

It is common practice, and therefore assumed that any if any exploration drilling, staging areas, and ground water monitoring drill pads and access road construction are needed, they would utilize the same

BLM_0050441

locations as those used for MDWs. Therefore, no additional surface use beyond that assumed above for MDWs will be analyzed in this document.

If surface uses are proposed during the life of the lease modification(s) (if issued), then the site-specific proposals will be evaluated under the State mine permitting regulations, under their own merits at the time they are proposed.

## 3.3.3   Alternative 4 Reasonably Foreseeable Mine Plan (RFMP)

In the Reasonably Foreseeable Mine Plan (RFMP) under Alternative 4, only consenting to modifying COC-1362 would occur. Under this alternative, post leasing surface disturbance could occur consistent with the Colorado Roadless Rule framework.

Because the Forest Service and BLM actions under this alternative would be limited to COC-1362, the estimated amount of coal to be leased is reduced to approximately 9,265,000 tons (See Table 3-2). The E seam coal in the lease modifications would be mined over a period of approximately 3 years; however, E seam coal reserves in the modification represent about 1.4 years of additional coal reserves based the assumed mining rate of 6.5 million tons/year. Similar to the proposed action, the leasing and development of this lease modification would also likely allow for the production of 4.2 million tons of fee coal on adjacent lands (see project record), as well as an additional 3.3 million tons from existing adjacent federal coal reserves to the north. Thus the COC-1362 lease modification, if authorized, would extend the life of the West Elk Mine by approximately 2.6 years. See Table 3-1 and Table 3-2.

Some variations to these timeframes could occur based on time needed for permitting, unforeseen mining/geologic circumstances, coal contract variability, etc.

### 3.3.3.1   Alternative 4 Reasonably Foreseeable Surface Use and Disturbances

At the leasing stage, it is not possible to locate site-specific areas where potential surface uses may occur as there is no approved mining plan for the area at this time; therefore, the surface use and disturbance estimations will be used to aid the cumulative impact analysis discussed in each resource section. If surface uses are proposed during the life of the lease (if it is issued), then the site-specific proposals will be evaluated under the State mine permitting regulations, under their own merits at the time they are proposed.

Since less coal tonnage (~835,000 tons less than Alternative 3) to be leased under this alternative, the need for post-leasing surface is also reduced. For the purposes of the cumulative effects analysis in this alternative, it is assumed based on current mining practices, about 66 acres of surface disturbance would occur from mine operations over the life of the lease modification (expected to be about 25 years from lease issuance to lease relinquishment and final bond release). Site-specific locations of anticipated disturbance cannot be identified at the leasing stage due to the fact that a final mine plan has not been approved.

For the purposes of this alternative, it is assumed that approximately 44 MDWs would be needed over the life of the lease modification, corresponding to an estimated 44 acres of disturbance (making a conservative estimate requiring about 1 acre of disturbance per MDW pad; historically most MDW pads are 0.5 acres or less). Access to MDWs is estimated to be about 22 acres on COC-1362 for this alternative this could be approx. 6 miles of access roads developed on the lease modification. See Table 3-2.

Under this alternative, temporary road construction could occur under the NFCMA exception to the Colorado Roadless Rule. See the RFMP for Alternative 3 for the explanation of how the estimated 66 acres of disturbance under this alternative would be generated.

BLM_0050442

**Table 3-1. Estimated production at West Elk Mine for Alternatives**

| Production | Alternative 1 (No Action) | Alternative 3 (Proposed Action) | Alternative 4 |
|---|---|---|---|
| Reserves available to mine (million tons) | 53.5[1] | 17.6[2] (Cumulatively 71.1) | 16.8[2] (Cumulatively 70.3) |
| Years of production[3] | 8.2 | 2.7 (Cumulatively 10.9) | 2.6 (Cumulatively 10.8) |
| Annual average production rate (million tons/yr)[4] | 6.5 | 6.5 | 6.5 |

1 Reserves under lease without reserves made accessible/feasible by lease modifications as of approximately January, 2017

2 Includes existing leases (3.3 million tons) and private lands (4.2 million tons) made accessible/feasible by lease modifications

3 Note No Action Alternative reserves would be mined interspersed with lease modifications and Alternatives 3 or 4 are additive to the No Action Alternative

4 Uses a typical production average at West Elk Mine; however, this is controlled by market conditions and may be lower to slightly higher up to the air permit maximum production levels

**Table 3-2. Summary for estimated post-lease disturbance, coal tonnage mined for Action Alternatives**

| Alternative | RFD and Recovery | CRA | Total |
|---|---|---|---|
| Alternative 3 (Proposed Action) | Pads (acres) | 48 | 48 |
| | Temp Roads (CRA) or other disturbance (IRA)(acres) | 24 | 24 |
| | Coal (COC-1362) | 9,541,000 | 9,541,000 |
| | Coal (COC-67232) | 559,000 | 559,000 |
| | **Total Coal (tons) in lease modifications** | **10,100, 000** | **10,100,00** |
| Not subject to leasing decision | Coal (tons) accessible because of modifications* | 3,300,000 (federal land only) | 7,500, 000 |
| | Projected disturbances (acres) on parent lease and private land accessible because of accessible reserves* | ~28 | 63 |
| Alternative 4 (COC-1362 only) | Pads (acres) | 44 | 44 |
| | Temp Roads (CRA) or other disturbance (IRA)(acres) | 22 | 22 |
| | **Coal (COC-1362)**\*\* | **9,265,000** | **9,265,000** |
| Not subject to leasing decision | Coal (tons) accessible because of lease modification COC-1362s* | 3,300,000 (federal land only) | 7,500, 000 |
| | Projected disturbances (acres) on parent lease and private land accessible because of accessible reserves* | ~28 | 63 |

*Forest Service & BLM decisions do not apply to these lands as they are already under lease, and exploration has already occurred.

\*\*Some coal would be lost because of projected panel alignment

BLM_0050443

**Table 3-3. Summary table for estimated subsidence**

| Reasonably Foreseeable Surface Disturbance from Subsidence | Disturbance Acreage | Estimated Duration of Disturbance |
|---|---|---|
| Incidental surface lowering/disturbance related directly to subsidence | Approx. 1,077* acres under Alternative 3.<br><br>Approx. 930** acres under Alternative 4. | Movement 90% complete when the longwall face has passed at 1.2 to 1.4 times the overburden depth. Usually 100% complete within 12 months. |

*Includes ~357 acres on adjacent private land and existing parent leases

** Includes ~336 acres on adjacent private land and existing parent leases

# 3.4 Air Quality, Greenhouse Gases & Climate Change

This section discloses the affected environment and environmental consequences to air quality, account for greenhouse gases and discuss climate effects as it relates to this analysis that would result from implementing the different alternatives under consideration. The discussion below details laws and regulations related to air quality, the current status of air resources in the area, and potential impacts to air quality that may result from extending the lifetime of the West Elk Mine if the lease modifications occur.

## 3.4.1    Affected Environment

Air quality for any region is influenced by the amount of pollutants that are released within the vicinity and up wind of the region, and can be highly dependent upon the contaminants chemical and physical properties.  Additionally, an area's topography or terrain (mountains and valleys) and weather, such as wind speed and direction, temperature, air pressure (the resulting turbulence), rainfall, and cloud cover can all have a direct influence on how pollutants accumulate, form, or disperse in the local environment.  Transportation is another important consideration, as some pollutants can be transported far from their origin (ex: ozone, secondary $PM_{2.5}$, mercury).

The West Elk Mine is located in Section 16, Township 13 South, Range 90 West, one mile east of Somerset Colorado on State Highway 133, in Gunnison County, Colorado. The affected area for the air quality analysis of the alternatives includes northern Delta and Gunnison counties, although the majority of air quality impacts will be limited to the immediate vicinity of the mine itself within the North Fork Valley.

The Clean Air Act (CAA) and the Federal Land Policy and Management Act of 1976 (FLPMA) require BLM and other federal agencies to ensure actions taken by the agency comply with federal, state, tribal, and local air quality standards and regulations.  FLPMA further directs the Secretary of the Interior to take any action necessary to prevent unnecessary or undue degradation of the lands [Section 302 (b)], and to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" [Section 102 (a)(8)].

### 3.4.1.1    Criteria Air Pollutants

The U.S. Environmental Protection Agency (EPA) has established National Ambient Air Quality Standards (NAAQS) for criteria pollutants, which include carbon monoxide (CO), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$), and lead (Pb).  Exposure to air pollutant concentrations greater than the NAAQS has been shown to have a detrimental impact on human health and the environment, and thus ambient air quality standards must not be violated in areas where the general public has access.  All of the criteria pollutants are directly emitted from a variety of source

93

types, with the exception of ozone and the secondary formation of condensable particulate matter ($PM_{2.5}$).

Ozone is chemically formed in the atmosphere via interactions of oxides of nitrogen ($NO_X$) and volatile organic compounds (VOCs) in the presence of sunlight and under certain meteorological conditions ($NO_X$ and VOCs are ozone precursors). In general, ozone concentrations in the lower atmosphere are highest during warmer months and lower in the cooler months. The chemical reactions that form ozone are complicated and nonlinear, making it difficult to predict ozone concentrations that will result from increasing the amount of precursor emissions in a given area. Some parts of the western U.S. (including Western CO), have recorded elevated winter-time ozone events that have exceeded the NAAQS. All of these events have taken place in areas of significant precursor emissions and during prolonged atmospheric inversions. The resultant stagnation of shallow pooled air and significant snow cover is thought to have provided these compresses boundary layer areas with a double dose of UV radiation (via albedo reflection), which is required to form ozone. Absent any diurnal or pressure system based fumigation, these naturally occurring meteorological events provided an ideal system for ground levels of ozone to spike. The last occurrence of such an event in Colorado was back in 2013, around Rangely, CO, which lays about 100 miles northwest of Somerset, CO. Despite several years of sufficient cold temperatures and snow cover in these areas since 2013, the precise meteorological conditions that lend to the ozone formation reactions and the resulting spikes in monitored values have not been observed. Exceedances by themselves do not mean that the area will be designated as nonattainment (i.e. not attaining the NAAQS). The form of the NAAQS must be considered along with the monitored value(s), and then the area's status would be determined by CDPHE and EPA. Compared to the regions where wintertime ozone has occurred, the proposed action area has significantly less precursor pollutant emissions (see NEI data below), and would not be expected to have high winter-time ozone concentrations regardless of whether atmospheric inversions would occur.

Secondary $PM_{2.5}$ (also known as condensable particulate matter) forms when certain products of combustion ($SO_2$ and $NO_X$) cool sufficiently enough to condense and form a solid or aerosol that can then be measured via traditional monitoring methods. Condensable particulate matter is primarily formed via reactions with any available gaseous ammonium to form ammonium sulfate and ammonium nitrate. Secondary $PM_{2.5}$ is a component of total $PM_{2.5}$, which is chiefly comprised of five mass types: organic mass, elemental carbon (also known as soot or black carbon), ammonium sulfates, ammonium nitrates, and crustal materials (i.e., soil). Primary fine particulate emissions result from combustion processes (including fossil fuel combustion and biomass combustion that occurs in wild fires) and include black carbon. In general, however, black carbon and crustal materials comprise a relatively small proportion of the fine particulate mass suspended in the atmosphere. The largest constituents of fine particulate in the western U.S. are usually organic mass, ammonium nitrates, and ammonium sulfates.

Due to the nature of their formation in the atmosphere (i.e. complex chemical reactions that are spatially and temporally dependent), ozone and secondary $PM_{2.5}$ are typically not assessed for project scale analyses. The current technological approach for analyzing these pollutants requires significant time and resources to develop photo-chemical grid model simulations involving the entirety of Earth's atmosphere (photo-chemical models are one-atmosphere models), and are beyond the scope of this analysis. Therefore, ozone and secondary $PM_{2.5}$ formations will not be addressed further beyond a general discussion of the precursor emissions from the mine and a disclosure of cumulative impacts where sufficient data and analysis exists. Additionally, the current state of the science modeling practices has yet to yield a scientifically valid method to evaluate wintertime ozone formation, and thus no further discussion of wintertime ozone potential will be discussed.

The CAA established two types of NAAQS:

- **Primary** standards set limits in order to protect public health, including the health of "sensitive" populations (such as asthmatics, children, and the elderly).

BLM_0050445

- **Secondary** standards set limits in order to protect public welfare, including protection against decreased visibility, and damage to animals, crops, vegetation, and buildings.

The EPA regularly reviews the NAAQS (every five years) to ensure that the latest science on health effects, risk assessment, and observable data such as hospital admissions are evaluated, and can revise any NAAQS if the data supports a revision. The Colorado Air Pollution Control Commission, by means of an approved State Implementation Plan (SIP), can establish state ambient air quality standards for a criteria pollutant that is at least as stringent as, or more so, than the NAAQS. Ambient air quality standards must not be exceeded in areas where the public has access. Table 3-4 lists the federal and state ambient air quality standards applicable to the project area.

95

BLM_0050446

**Table 3-4. National Ambient Air Quality Standards**

| Pollutant | | Standard | Averaging Period | Level | Form |
|---|---|---|---|---|---|
| Carbon Monoxide | | Primary | 1-hour | 35 ppm (40,000 µg/m$^3$) | Not to be exceeded more than once per year |
| | | | 8-hour | 9 ppm (10,000 µg/m$^3$) | |
| Lead | | Primary and Secondary | Rolling 3-month average | 0.15 µg/m$^3$ | Not to be exceeded |
| Nitrogen Dioxide | | Primary | 1-hour | 100 ppb (189 µg/m$^3$) | 98th percentile, averaged over 3 years |
| | | Primary and Secondary | Annual | 53 ppb (100 µg/m$^3$) | Annual mean |
| Ozone | | Primary and Secondary | 8-hour | 0.070 ppm (140 µg/m$^3$) | Annual fourth-highest daily maximum 8-hr concentration, averaged over 3 years |
| Particulate Matter | PM$_{2.5}$ | Primary and secondary | 24-hour | 35 µg/m$^3$ | 98th percentile, averaged over 3 years |
| | | Primary | Annual | 12 µg/m$^3$ | Annual mean, averaged over 3 years |
| | | Secondary | Annual | 15 µg/m$^3$ | Annual mean, averaged over 3 years |
| | PM$_{10}$ | Primary and secondary | Annual | 150 µg/m$^3$ | Not to be exceeded more than once per year on average over 3 years |
| Sulfur Dioxide | | Primary | 1-hour | 75 ppb (196 µg/m$^3$) | 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | Secondary | 3-hour | 0.5 ppm (1,300 µg/m$^3$) | Not to be exceeded more than once per year |

Source: National – 40 CFR 50, Colorado – 5 Code of Colorado Regulations (CCR) 1001-14.  Notes: µg/m$^3$ = micrograms per cubic meter, ppb = parts per billion, PM$_{2.5}$ = particulate matter emissions that are less than 2.5 microns in diameter; PM$_{10}$ = particulate matter emissions that are less than 10 microns in diameter; ppm = parts per million.

The overall health of any region's air quality is determined by monitoring for a pollutant at ground level and determining if the measured concentration is below the applicable standard's design value.  Areas where pollutant concentrations are below the applicable standard are considered to be in attainment with the NAAQS.  Areas that currently violate a standard are designated as nonattainment.  Two additional subset categories of attainment exist for those areas where a formal designation has not been made, i.e. Attainment/Unclassifiable (generally rural or natural areas where no monitoring data exists), and for areas

BLM_0050447

where previous violations of the NAAQS have been documented, but the pollutant(s) concentration no longer exceeds the NAAQS design value(s), i.e. Attainment/Maintenance areas.

Colorado maintains a network of monitors that track compliance with ambient air quality standards. A majority of the monitors in Colorado are located in the eastern half of the state, particularly along the densely populated Front Range corridor. Western Colorado, by comparison, is relatively sparsely populated, and has fewer monitoring stations. There are no monitors in the immediate vicinity of the West Elk Mine. Moreover, monitoring data tends to be limited (due to the expense of maintaining the network), and all pollutants are not monitored at all monitoring locations, thus data for a particular pollutant may not be available for all portions of the affected environment. The primary pollutant of concern from the proposed action is fugitive particulate matter (as determined from the emissions inventory presented below, and based upon CDPHE issued permits for the facility). Table 3-5 shows recent ambient air quality monitor data for potential pollutants of concern from monitors located nearby the affected area. The area monitors also show that ozone levels are relatively close to the new standard promulgated by EPA in 2015. All of the monitoring data is from the EPA's AQS Data Mart, and excludes exceptional events. Exceptional events are defined as "unusual or naturally occurring events that can affect air quality but are not reasonably controllable using techniques that tribal, state or local air agencies may implement in order to attain and maintain the National Ambient Air Quality Standards" (http://www.epa.gov/ttn/analysis/exevents.htm). Exceptional events are excluded from NAAQS compliance calculations. The database contains ambient air pollution data collected by EPA, state, local, and tribal air pollution control agencies, and from various federal land managers from thousands of monitors. The data shows that air quality within the region is generally considered good, and the area is currently in attainment status for all criteria pollutants.

Table 3-5. Ambient Air Quality Monitoring Data Trends

| County | Pollutant (Standard) | 2011 | 2012 | 2013 | 2014 | 2015 | Percent of NAAQS |
|---|---|---|---|---|---|---|---|
| Gunnison | $O_3$ (8 hour - ppm) | 0.066 | 0.070 | 0.066 | 0.062 | 0.065 | 94% |
| Mesa | $O_3$ (8 hour - ppm) | 0.064 | 0.066 | 0.064 | 0.063 | 0.068 | 93% |
| Delta | $PM_{10}$ (annual - $\mu g/m^3$) | 48 | 58 | 44 | 49 | 54 | 34% |
| Gunnison | $PM_{10}$ (annual - $\mu g/m^3$) | 74 | 48 | 61 | 97 | 76 | 47% |
| Mesa | $PM_{10}$ (annual - $\mu g/m^3$) | 54 | 143 | 56 | 45 | 34 | 44% |
| Mesa | $PM_{2.5}$ (annual - $\mu g/m^3$) | 7.1 | 7.3 | 8.8 | 7.4 | 6.2 | 61% |
| Mesa | $PM_{2.5}$ (24 hour - $\mu g/m^3$) | 22 | 24 | 40 | 21 | 21 | 73% |

Note: Where multiple monitors for single pollutant exist within the same county, the monitor with the highest values is presented to the reader for the purposes of this EA.  Percent NAAQS is the average of the available 5 year monitoring history.

## 3.4.1.2   Hazardous Air Pollutants

Other common pollutants include air toxics, otherwise known as hazardous air pollutants (HAPs).  HAPs are chemicals or compounds that are known or suspected to cause cancer or other serious health effects, such as compromises to immune and reproductive systems, birth defects, developmental disorders, or adverse environmental effects and may result from either chronic (long-term) and/or acute (short-term) exposure.  CAA Sections 111 and 112 establish mechanisms for controlling HAPs from stationary sources, and the EPA is required to control emissions of 187 HAPs.  Ambient air quality standards do not exist for HAPs, however mass based emissions limits and risk based exposure thresholds have been established as significance criteria to require maximum achievable control technologies (MACT) under

the EPA promulgated National Emissions Standards for Hazardous Air Pollutants (NESHAPs) for 96 industrial source classes. The majority of the HAPs emitted from the West Elk Mine's operations are the result of the off-road heavy equipment use. The largest component of HAPs emissions from these sources (diesel engines) is typically benzene compounds. These pollutants are not expected to be emitted in quantities greater than 0.1 tons per year (based on typical emissions factors), and thus no further analysis of HAPs will be discussed in this document.

### 3.4.1.3   Greenhouse Gases

Another group of emissions that are commonly emitted are the Greenhouse Gases (GHGs). These gases include carbon dioxide ($CO_2$), methane ($CH_4$), Nitrous Oxide ($N_2O$), and several fluorinated species of gases such as hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. Carbon dioxide is emitted from the combustion of fossil fuels (oil, natural gas, and coal), solid waste, trees and wood products, and also as a result of other chemical reactions (e.g., manufacture of cement). Methane is emitted during the production and transport of coal, natural gas, and oil. Methane also results from livestock and other agricultural practices and by the decay of organic waste in the natural environment and in municipal solid waste landfills. Nitrous oxide is emitted during agricultural and industrial activities, as well as during combustion of fossil fuels and solid waste.

All of the different greenhouse gases have various capacities to trap heat in the atmosphere, which are known as global warming potentials (GWPs). GWPs can be expressed for several different time horizons to fully account for the gases ability to absorb infrared radiation (heat) over their atmospheric lifetime. This analysis uses the 100 year time interval since most of the climate change impacts derived from the available climate modeling studies is expressed toward the end of the century. Carbon dioxide has a GWP of 1, and so for the purposes of analysis a GHGs GWP is generally standardized to a carbon dioxide equivalent ($CO_2e$), or the equivalent amount of $CO_2$ mass the GHG would represent. Methane has a current GWP estimated to be between 28 (gas alone) and 36 (with climate feedbacks), and Nitrous Oxide has a GWP of 298. As with the HAPs, ambient air quality standards do not exist for GHGs.

The West Elk mine has typical combustion sources of GHG emissions, including heavy equipment, heating equipment, and emergency power units, that are common throughout every segment of the economy. The mine is also a large source of methane (coal mine methane, CMM), which is liberated during various coal production processes. The mine must exhaust the CMM to comply with the Mine Safety and Health Administration's (MSHA) standards, which limit concentrations of methane in the underground environment of coal mines in order to establish and maintain a safe atmosphere (i.e., one that is far below lower flammability and explosive limits). The mine accomplishes this objective by two primary means; the main mine vent shaft(s), and by drilling mine ventilation boreholes, or as they have been more commonly referred to, methane drainage wells[20] (MDWs). These wells are drilled on the surface over active longwall panel sections to vent "free" methane in the subsurface strata. The main vent shaft fans provide a constant positive pressure in the mine to push in make-up air and forcefully exhaust the mines atmosphere to the surface where the entrained methane (ventilation air methane, VAM) is rendered harmless from a mine safety perspective. The MDWs prevent substrata methane from migrating toward, and infiltrating into the mine's cavity (the substrata methane can reach considerably higher pressures than the mine cavity, and thus migration to the lower pressure cavity is likely absent the MDWs). Considering the gaseousness nature of the coal seems in this region, any significant migration of substrata methane toward the cavity could potentially overwhelm the ventilation system at localized points in the mine and cause methane concentrations to spike to potentially unsafe levels (i.e. above 1%). In theory, this would shut down mining, and thus the MDW's are an integral part of the mine's ventilation system design.

---

[20]MCC reports that MDWs have not been used or needed at all from the period of June-August, 2017.

BLM_0050449

Emissions of air pollutants in the region surrounding the mine result from industrial sources, smoke from prescribed and wildfire, mobile sources such as trains and vehicles, off-road vehicles, wind-blown dust from areas of exposed soil such as fields and unpaved roads, road construction, and other activities. All of these sources contribute to the monitored regional values shown in Table 3-5 above. In general, sources in close proximity to a monitor would provide for a larger signal (i.e. the contribution to a monitored value), than those located further from the monitor. Other considerations for signal strength contribution at a monitor include the type of pollutant being emitted as well as the sources physical parameters. The EPA's National Emissions Inventory (NEI) data provides a loose correlation of regional emissions loading that could be considered to contribute to the regional monitor observations. Table 3-6 provides the 2011 and 2014 NEI data as a reference for regional emissions loading within the affected environment area. By default, this data includes all of the West Elk Mine's emissions, as well as those of the Elk Creek and Bowie mines.

**Table 3-6. NEI Data for Area Counties (tons)**

| County | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_X$ | CO | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ | HAPs |
|---|---|---|---|---|---|---|---|---|---|---|
| **2011** | | | | | | | | | | |
| Delta | 1,179 | 445 | 13,330 | 1,403 | 8,838 | 92 | 211,468 | 27 | 7 | 1,734 |
| Gunnison | 2,524 | 1,234 | 28,007 | 1,224 | 18,901 | 88 | 254,800 | 483 | 4 | 2,564 |
| **2014** | | | | | | | | | | |
| Delta | 5,907 | 1,081 | 12,972 | 1,314 | 6,714 | 9 | 185,414 | 25 | 6 | 2,036 |
| Gunnison | 2,676 | 470 | 23,858 | 1,286 | 8,062 | 4 | 157,147 | 27 | 4 | 2,729 |

*Note:* GHG data is for wildfires and mobile sources only.

## 3.4.1.4    Airshed Classes and the Prevention of Significant Deterioration

All geographical regions in the U.S. are assigned an air quality priority Class (I, II, or III) which describes how much degradation to the existing air quality is allowed to occur within the area under the Prevention of Significant Deterioration (PSD) permitting rules.  Class I areas are areas of special national or regional natural, scenic, recreational, or historic value, and essentially allow very little degradation in air quality, while Class II areas allow for reasonable industrial/economic expansion.  There are currently no Class III areas defined in the U.S.

Although the PSD rule is only applicable to major stationary sources of air pollution, a PSD increment analysis can provide a useful measure to determine how likely a new source of pollution (major or minor) could have a significant impact on regional air quality.  A PSD increment is the amount of pollution an area is allowed to increase while preventing air quality in the airshed from deteriorating to the level set by the NAAQS.  The NAAQS is a maximum allowable concentration "ceiling", while a PSD increment is the maximum allowable increase in concentration that is allowed to occur above a baseline concentration for a pollutant within the PSD area boundary.  The baseline concentration for a pollutant is defined as the ambient concentration existing at the time that the first complete PSD permit application affecting the boundary is submitted.  PSD applicable sources are required to provide an analysis to ensure their emissions in conjunction with other applicable emissions increases and decreases within an area will not cause or contribute to a violation of any applicable NAAQS or PSD increment.  Significant deterioration is said to occur when the amount of new pollution would exceed the applicable PSD increment.  An official PSD increment analysis is the sole responsibility of the APCD, any subsequent analysis performed for NEPA purposes will be used for informational purposes only.

The closest Class I areas to the mine are the Black Canyon of the Gunnison National Park, roughly 24 miles away to the west, and the West Elk Wilderness which is about 6 miles to the east from the mine.

The analysis required for PSD permitting must include an assessment of impacts to surface waters, soils, vegetation (i.e. deposition, ozone), and visibility, also known as Air Quality Related Values

BLM_0050450

(AQRVs). Measuring AQRVs is particularly important at federally mandated Class I lands, which include areas such as national parks, national wilderness areas, and national monuments. Class I areas are granted special air quality protections under Section 162(a) of the federal Clean Air Act, and the federal land manager for any such area is responsible for reviewing PSD actions to ensure their goals for undue degradation to the resources are not impeded.

Deposition is the process by which pollutants are removed from the atmosphere via mechanical and chemical processes. When air pollutants such as sulfur and nitrogen are deposited into ecosystems, they may cause acidification, or enrichment of soils and surface waters. Atmospheric nitrogen and sulfur deposition may affect water chemistry (acidification), resulting in impacts to aquatic vegetation, invertebrate communities, amphibians, and fish. Deposition can also cause chemical changes in soils that alter soil microorganisms, plants, and trees. Although nitrogen is an essential plant nutrient, excess nitrogen from atmospheric deposition can stress ecosystems by favoring some plant species and inhibiting the growth of others. These excess inputs of nitrogen can disrupt the natural flora and fauna by allowing certain species that would not naturally occur in abundance to out-compete those that thrive in pristine nitrogen-limited systems. The end result is an unnatural shift in species composition for sensitive species, which may have a subsequent impact on other components of the ecosystem. Deposition processes are measured via wet and dry deposition monitors. The National Atmospheric Deposition Program (NADP) is a conglomerate of various wet chemistry monitoring networks designed to measure wet atmospheric deposition and study its effects on the environment. The network currently operates approximately 250 sites, many since the early 1980's. The Clean Air Status and Trends Network (CASTNET) is a national air quality monitoring network designed to provide data to assess trends in air quality, dry atmospheric deposition, and ecological effects due to changes in air pollutant emissions. CASTNET began collecting data in 1991 with the incorporation of 50 sites from the National Dry Deposition Network. CASTNET provides long-term monitoring of air quality in rural areas to determine trends in regional atmospheric nitrogen, sulfur, and ozone concentrations and deposition fluxes of sulfur and nitrogen pollutants. The federal land managers (FLMs) use a deposition data analysis threshold (DAT) of 0.005 kg/ha-yr to determine the potential significance of any given project in the western U.S. as defined under the FLM Air Quality Related Values Work Group guidance (FLAG 2010). Additionally, cumulative thresholds, known as critical loads have been established for Colorado's Class I areas by the National Park Service (NPS 2015) for total nitrogen (2.3 kg/ha-yr) and sulfur (3.0 kg/ha-yr) deposition (note: the NPS recommends a critical load of not more than 1.5 kg/ha-yr at Rocky Mountain NP, due to the sensitivity of the resource). Maps of interpolated deposition estimates for total and individual species for nitrogen and sulfur deposition produced by NADP and the USEPA can be found at http://nadp.isws.illinois.edu/committees/tdep/tdepmaps/preview.aspx#n_td . The West Elk Mine is not a significant source of sulfur and by extension potential sulfur loading (see emissions inventories below) and therefore sulfur deposition will not be discussed further in this document. The nearest deposition monitors to the West Elk Mine are located near Gothic, CO (NADP - CO10, CASTNET - GTH161). Figure 3-6 shows a trend plot of total nitrogen deposition as measured by the Gothic monitors (where complete year data exists). The trends suggest that concentrations on average are less in the 2000's compared to the 1990's. The overall level of nitrogen deposition is approximately 2.02 kg/ha-yr over the entire monitoring period, but is averaging closer to 1.8 kg/ha-yr since the year 2000.

BLM_0050451



Figure 3-6. Total Nitrogen Deposition Trends

Visibility impairment or haze is caused when sunlight encounters tiny pollution particles in the atmosphere, and is either absorbed or scattered which reduces the clarity and color of what can be seen. The ability of a pollutant to cause various degrees of visibility impacts is primarily a function of its physical size, and chemical composition and properties. Visibility can be expressed in terms of deciviews (dv) or standard visual range (km).  A change of one dv is approximately a 10% change in the light extinction coefficient (i.e. light that is scattered or absorbed and does not reach the observer), which is a small, but usually perceptible scenic change. The FLMs use a data analysis threshold (DAT) of 0.5 dv for projects that contribute to a visibility problem and a value of 1.0 dv for projects that cause visibility issues (FLAG 2010). The Interagency Monitoring of Protected Visual Environments (IMPROVE) is a monitoring network program that was established to measure atmospheric particulate concentrations near Class I areas in order to meet the goals of EPA's Regional Haze Rule. The Rule requires states to develop and implement plans to improve visibility in Class I areas in order to achieve "natural" visibility levels within a 60-year period.

The State of Colorado prepared a state implementation plan for visibility as required under the Regional Haze Rule that documents the steps the state will take in order to meet the national goal of achieving natural visibility conditions in its Class I areas by 2064 (*Colorado Visibility and Regional Haze State Implementation Plan for the Twelve Mandatory Class I Federal Areas in Colorado*, Colorado Air Pollution Control Division, January 7, 2011, http://www.cdphe.state.co.us/ap/regionalhaze.html). The state examined the West Elk Mine's emissions due to its proximity to the West Elk Wilderness and concluded that it would not have a significant impact on visibility in the wilderness. For this reason, the state determined that it would not be necessary to require additional emissions controls on the mine to meet the visibility goals for the wilderness during this planning period (personal communication between Debra Miller, USFS, and Lisa Clarke, Colorado Air Pollution Control Division, April 18, 2012).

The plan also included the results of detailed modeling analyses that examined the impacts of regional emissions sources, including those in Colorado, to visibility in all Class I areas in the state. The state developed emissions inventories that examined current emissions (as of 2002) as well as projected

emissions through 2018 to evaluate the progress that would be made by 2018 toward the visibility goal. The inventories used in the modeling analysis included the emissions from the West Elk Mine at its permitted rate and projected rates using economic growth analyses. The plan was accompanied by individual technical support documents that examined impacts to each of the Class I areas in detail, including the West Elk Wilderness and Black Canyon of the Gunnison. The state will re-examine visibility progress in five year intervals and determine whether additional steps are needed to meet visibility progress goals. Because the annual coal processing rate under any alternative will not exceed the rates analyzed in Colorado's study, no additional visibility analysis was conducted for this EIS.

### 3.4.1.5    Emissions Source Classifications and Regulatory Status

Emissions sources are generally regulated according to their type and classification.  Essentially all emissions sources fall into two broad categories, stationary and mobile.

Stationary sources are non-moving, fixed-site producers of pollution such as power plants, petro-chemical refineries, manufacturing facilities, and other industrial sites such as oil and gas production pads.  Stationary facilities emit air pollutants via process vents or stacks (point sources) or by fugitive releases (emissions that do not pass through a process vent or stack).  Stationary sources are also classified as either major or minor.  A major source is one that emits, or has the potential to emit, a regulated air pollutant in quantities above a defined threshold.  Stationary sources that are not major are considered minor or area sources.  A stationary source that takes federally enforceable limits on production, consumptions rates, or emissions to avoid major source status are called synthetic minors. The Colorado Department of Health and Environment, Air Pollution Control Division (APCD), has authority under their EPA approved State Implementation Plan (SIP) to regulate and issue Air Permits for stationary sources of pollution in Colorado.

The West Elk mine is classified as a synthetic minor source, and has been issued APCD permits for its surface facility operations (see Table 3-7 below). Most emissions of criteria pollutants resulting from stationary sources at the mine are in the form of particulate matter. Sources of particulate matter include various coal handling equipment such as conveyors and transfers, coal storage silos and feeders, coal storage and refuse piles, coal mine ventilation shafts, a coal preparation plant, coal hauling operations, an emergency generator, and miscellaneous exempt sources (such as heating equipment and fuel storage tanks). The APCD permits limit emissions of particulate matter by limiting the total amount of coal that can be processed in a year to 8.5 million tons of coal per year. The mine's primary   permit (09GU1382) also limits the sizes of different coal stockpiles that are allowed, the hours of operation of various maintenance activities, the total quantity of refuse material from the coal preparation plant and the and the amount of coal that can be processed by the coal preparation plant. This permit also contains a requirement for the operator to follow a fugitive dust control plan which applies to all of the coal processing, handling, and management activities.  In addition, the Colorado Division of Reclamation, Mining, and Safety (CDRMS) Mining and Reclamation plan includes general air pollution control requirements. These include applying water to any active unpaved roadways, parking areas, and refuse disposal area to control dust emissions from these areas, and could include compacting and spraying of coal stockpiles when necessary to eliminate particulate emissions created during coal handling operations.  In addition to regular watering of the regularly travelled gravel roads on the mine site, these roads are treated at least once a year with magnesium chloride for dust suppression.

As discussed above, the mine would be required to drill and operate methane drainage wells over the life of its operations at points on the surface above active panel mining to avoid potentially unsafe accumulations of methane within the mines underground environment.  The drilling technology used to drill holes the diameter and depth needed for MDWs also requires construction of drill pads and the use of heavy equipment to access these locations. MDWs are on the landscape an average of 2-3 years with an active life of 1-3 months, after which they are decommissioned and the land surface is reclaimed and returned to pre-mining land uses.

BLM_0050453

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

Mobile sources include any air pollution that is emitted by motor vehicles, engines, and equipment that can be moved from one location to another.  Due to the large number of sources, which includes cars, trucks, buses, construction equipment, lawn and garden equipment, aircraft, watercraft, motorcycles, etc., and their ability to move from one location to another, mobile sources are regulated differently than stationary sources.  In general EPA and other federal entities retain authority to set emissions standards for these sources depending on their type (on-road, off-road, and non-road), classification (light duty, heavy duty, horse power rating, weight, fuel types, etc.), and the year of manufacture or in some circumstances their reconditioning.  Mobile sources are not regulated by the state unless they are covered under an applicable SIP (usually as part of an inspection and maintenance program).

Mobile sources at the West Elk mine consist primarily of heavy equipment (loaders and bulldozers, source classification code 2270002000) for surface operations and specialized underground mining equipment (source classification code 2270009000). There are also on-road trucks used to ferry personnel and smaller equipment and tools around the facility as well. Mobile source emissions estimates were developed from the mines annual diesel fuel use, utilizing area specific (county level) emissions factors from EPA's NONROAD 2008a model (http://www.epa.gov/otaq/nonrdmdl.htm).

Table 3-7. West Elk Emissions (max tons per year)

| Source | Permit[1,2] | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_X$ | CO | $SO_X$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Multiple - Point | 09GU1382 | 60.3 | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Multiple - Fugitive | 09GU1382 | 27.9 | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Emergency Generator | 10GU1130 | --- | --- | --- | 12.36 | 15.23 | --- | --- | --- | --- | --- |
| Rock Dust Silo | 13GU1462 | 0.05 | 0.05 | --- | --- | --- | --- | --- | --- | --- | --- |
| Mobile - Underground | NA | 10.39 | 10.08 | 15.92 | 73.02 | 61.47 | 0.99 | 4,615 | 0.24 | 0.04 | 4,636 |
| Mobile - Surface | NA | 1.53 | 1.48 | 1.86 | 21.14 | 9.89 | 0.33 | 1,538 | 0.03 | 0.01 | 1,542 |
| Misc. Heaters[3] | NA | 2.04 | 2.05 | 1.47 | 27.49 | 22.08 | 0.67 | 32,682 | 0.61 | 0.58 | 32,877 |
| Fuel Tanks[4] | NA | --- | --- | 1.99 | --- | --- | --- | --- | --- | --- | --- |
| VAM[5] | NA | --- | --- | --- | --- | --- | --- | --- | 15,566 | --- | 560,376 |
| MDWs[5] | NA | --- | --- | --- | --- | --- | --- | --- | 10,483 | --- | 377,388 |
| **Totals** | | 102.21 | 13.67 | 21.24 | 134.01 | 108.67 | 1.99 | 38,835 | 26,049 | 0.63 | 976,818 |

[1] All permitted source emissions are based on the permit limits which have a corresponding production of 8.5 MMtons/yr.
[2] Non-permitted source emissions are based on the maximum analyzed annual production of 6.5 MMtons/yr, which is higher than the current 5 year average production rate.
[3] Miscellaneous heater data is estimated from 2015 GREET data & 2016 CMM Market Research Report (Appendix A)
[4] VOC data is based on maximum APEN exemption amount of 2 tons per year.
[5] Max methane is disclosed for a similar coal production year (2014 – 6.28 tons). $CH_4$ liberation rates generally follow production levels over the GHG reporting period (2011-2015), but are neither linear or consistent from year to year with respect to production to form a reasonable correlation that would enable an accurate prediction of future liberation potential.

## 3.4.1.6    Climate Baselines

Somerset Colorado is located in the North Fork Gunnison River Valley and rests at approximately 6,040 feet above sea level. The area is rural, has mountainous terrain, and supports a population of approximately 526 residents (http://2010.census.gov/2010census/). The normal temperatures (minimum and maximum) for the area range from 14.7 to 38.5 °F in January to 56.7 to 90.1 °F in July. The average annual precipitation amounts to approximately 15.07 inches, which according to historical records is

BLM_0050454

relatively evenly distributed throughout the year. Average annual wind resultants are generally from the southeast at a speed of approximately 7.1 mph. The area enjoys sunshine for approximately 70% of the time and has an annual average sky cover of around 52%.

Best available science indicates at combination of factors are combining to change the chemical composition of Earth's atmosphere. Activities such as fossil fuel combustion, industrialization, deforestation, and other changes in land use are resulting in the accumulation of trace greenhouse gases (GHGs) such as carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and several industrial gases in the Earth's atmosphere. The following synopsis of current climate change baseline information has been summarized from the [Intergovernmental Panel on Climate Change's (IPCC)](), 5th Assessment Report (AR5). The IPCC is the leading international scientific body under the auspice of the United Nations charged with reviewing and assessing the most recent scientific, technical and socio-economic information produced worldwide relevant to the understanding of climate change. IPCC assessments provide rigorous and balanced scientific information that reflect a range of views and expertise to ensure an objective and complete assessment of current information.

Between 1750 and 2011, cumulative $CO_2$ emissions emitted to the atmosphere were approximately 2040 ± 310 $GtCO_2$ above the baseline About 43% of these emissions have remained in the atmosphere (880 ± 35 $GtCO_2$); the rest was removed from the atmosphere and stored in natural terrestrial ecosystems (plants and soils – 29%) and in the oceans (28%). Although $CO_2$ levels in the atmosphere have varied perpetually throughout Earth's history (along with corresponding variations in climatic conditions), $CO_2$ concentrations have increased measurably, from approximately 280 ppm in 1750 to 400 ppm in 2015 which also corresponds with industrialization and the burning of carbon based fossil fuel sources. The rate of change has also been increasing. This fact is demonstrated by data from the Mauna Loa $CO_2$ monitor in Hawaii that documents atmospheric concentrations of $CO_2$ going back to 1960, at which point the average annual concentration was recorded at approximately 317 ppm. The record shows that approximately 70% of the increases in atmospheric $CO_2$ concentration since 1750 have occurred within the last 55 years. The trend corresponds to an increasing population and rising standards of living and modernization around the globe. From 1750 to present, emissions from fossil fuel combustion and cement production have released 375 [345 to 405] GtC to the atmosphere (68%), while deforestation and other land use change are estimated to have released 180 [100 to 260] GtC (32%). Concentrations of $CO_2$, $CH_4$, and $N_2O$ now substantially exceed the highest concentrations recorded in ice cores during the past 800,000 years. Since 1750 the estimated concentrations of $CH_4$ have more than doubled (722ppb to 1,803ppb), while $N_2O$ concentrations have increased by a fifth (270ppb to 324ppb).

Scientists believe that increases in atmospheric GHG concentrations results in an increase in the earth's average surface temperature, primarily by trapping and thus decreasing the amount of heat energy radiated by the Earth back into space. The phenomenon is commonly referred to as global warming. Global warming is expected, in turn, to affect weather patterns, average sea level, ocean acidification, chemical reaction rates, and precipitation rates, all of which is collectively referred to as climate change.

Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over time spans of decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen. Each of the last three decades has been successively warmer at the Earth's surface than any preceding decade since 1850. In the Northern Hemisphere, 1983–2012 was likely the warmest 30-year period of the last 1400 years (medium confidence). The globally averaged combined land and ocean surface temperature data as calculated by a linear trend, show warming of 0.85 [0.65 to 1.06] °C, over the period 1880 to 2012.

Ocean warming has dominated the increase in energy stored in the climate system, accounting for more than 90% of the energy accumulated between 1971 and 2010 (high confidence). On a global scale, the

ocean warming is largest near the surface, and the upper 75 m warmed by 0.11 [0.09 to 0.13] °C per decade over the period of 1971 to 2010.  More than 60% of the net energy increase in the climate system is stored in the upper ocean (0–700 m), and about 30% is stored in the ocean below 700 m (40-year period from 1971 to 2010).  The rate of sea level rise since the mid-19th century has been larger than the mean rate during the previous two millennia (high confidence).  Over the period 1901 to 2010, global mean sea level rose by 0.19 [0.17 to 0.21] m.  It is very likely that the mean rate of global average sea level rise was 1.7 [1.5 to 1.9] mm yr$^{-1}$ between 1901 and 2010, 2.0 [1.7 to 2.3] mm yr$^{-1}$ between 1971 and 2010, and 3.2 [2.8 to 3.6] mm yr$^{-1}$ between 1993 and 2010, a trend that is increasing.

The driver for the buildup in heat within the climate system is best described in terms of radiative forcing (RF).  The term describes the energy balance that will occur (i.e. heating (+) or cooling (-)) in units of W m$^{-2}$.  The total anthropogenic RF for 2011 relative to 1750 was 2.29 [1.13 to 3.33] W m$^{-2}$ (includes both heating and cooling parameter estimates).  For well mixed GHG's the total positive forcing is estimated to be 2.83 [2.54 to 3.12] W m$^{-2}$.  The largest contribution to total radiative forcing since 1750 is caused by the increase in the atmospheric concentration of $CO_2$.  Emissions of $CO_2$ alone caused an RF of 1.82 [± 0.19] W m$^{-2}$ (64%), while $CH_4$ caused an RF of 0.48 [± 0.05] W m$^{-2}$ (17%).  The data highlights methane's important role as a potent greenhouse gas, given its RF value in relation to its atmospheric loading trend, approximately 556 Tg (or million netric tons) yr$^{-1}$ (64% anthropogenic, 36% natural) and relatively short atmospheric lifetime (12 years).  $N_2O$ has the third largest forcing of the anthropogenic gases, at 0.17 [± 0.03] W m$^{-2}$ (6%).  Collectively the three GHG's of concern account for approximately 87% of the positive forcing within the climate system.

According to the 2014 Climate Change in Colorado synthesis report (prepared by the Colorado Department of Natural resources, Water Conservation Board), statewide annual average temperatures have increased by 2.0° F and 2.5° F over the past 30 and 50 years respectively.  Warming trends have been observed over this period in most parts of the state, and show that daily minimum temperatures have warmed more than daily maximum temperatures.  Additionally, temperature increases have occurred in all seasons.  No long-term trends in average annual precipitation (30-50 years) have been detected across Colorado, although since 2000 the state has experienced below-average annual precipitation and snow pack.  The warming trends have contributed to an earlier shift in snowmelt and peak runoff timing in spring by approximately 1 to 4 weeks.

## 3.4.2   Alternative 1 (No Action) Environmental Effects

### 3.4.2.1   Direct Effects

Under the no action alternative, consent to modify the leases would not be granted, and no mining would occur in these specific areas. Impacts from mining coal under these areas would not occur, but it is anticipated that mining operations will continue on existing leases. The mine life is currently projected to last an additional 8 years on existing federal coal reserves, with perhaps as much as an additional 2 years on non-federal minerals (fee reserves). Additionally, other activities currently authorized at the site including coal processing and venting of gases would also continue in accordance with the permits and site operations plans that are currently active. The intensities of these activities and the resulting emissions would not exceed the levels disclosed in Table 3-7 above. In conjunction with the estimated production rate of 6.5 million tons per year, the mine is estimated to have approximately 53.5 million tons of coal that could be mined.

The application for the primary permit (09GU1382) was accompanied by a dispersion modeling analysis (*PM-10 Dispersion Modeling Study, Coal Prep Plant Modification, West Elk Mine: Gunnison County, Colorado*, prepared by Air Resource Specialists, Inc., February 25, 2010) as required by CDPHE. This analysis was completed to support the mine's permit modification request, which included a proposal to build the coal preparation plant mentioned above. West Elk's air permit is included in Appendix F. The analysis examined the potential particulate matter emissions that would occur from the new facility, as

BLM_0050456

well as other facilities at the mine (which included PM emissions generated by mobile source activities). The dispersion modeling analysis also included sources from the nearby Elk Creek mine, and included a background particulate matter concentration to account for other sources of particulate matter not associated with either mine. The analysis estimated the maximum direct impact to $PM_{10}$ concentrations due to the West Elk and Elk Creek mines, as well as the resulting ambient air concentrations due to other sources (i.e., the two mines plus the background). The analysis used conservative assumptions in order to ensure that the analysis would not underestimate the particulate matter emissions (which also included slightly higher emissions levels than those currently permitted). The results are shown in Table 3-8. The maximum predicted concentration of $PM_{10}$ due to the mines and other background sources was 148 $\mu g/m^3$, which is below the primary ambient air quality standard. These results indicate that the area around the mine can be expected to remain within ambient air quality standards for $PM_{10}$. Further, these results are likely overstated now that the Elk Creek mine has been permanently shuttered.

**Table 3-8. Maximum Predicted $PM_{10}$ Impacts Due to West Elk Mine and Oxbow Mines**

| Averaging Period | $PM_{10}$ Modelled Impact ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total $PM_{10}$ Impact ($\mu g/m^3$) | % NAAQS |
|---|---|---|---|---|
| 24-Hour (1st High) | 118.89 | 29.0 | 147.89 | 98.6 |
| Annual Average (1st High)[1] | 16.99 | 16.0 | 32.99 | 65.9 |

[1] Annual $PM_{10}$ NAAQS standard has since been rescinded

At the time the mine's primary permit modification request was submitted, the state did not require reporting for $PM_{2.5}$ as was allowable under the EPA's "surrogate policy". This policy allowed regulatory authorities to use $PM_{10}$ emissions as a surrogate for $PM_{2.5}$ due to technical difficulties that existed in analyzing $PM_{2.5}$ emissions (http://www.epa.gov/NSR/documents/20100204repealfs.pdf). As a result, the permit itself does not contain emissions limits for $PM_{2.5}$.

There are no other criteria pollutant emissions from stationary sources at the mine that are in excess of CDPHE's minor source permitting thresholds, and therefore the permit does not contain any limits other than those for particulate matter. By extension, no other criteria pollutant emissions associated with the mine's stationary sources would be considered to be significant with respect to their potential to degrade area air quality.

As discussed above it is inappropriate to assess potential ozone formation from the precursor emissions of a single project. However, we analyzed all of the mines that produce federal minerals in Colorado cumulatively, via the Colorado Air Resources Management Modeling study (CARMMS). The CARMMS model, the analysis scenarios, and results are all described in the cumulative impacts section below. The CARMMS model was also used to assess $PM_{2.5}$ impacts from the mines producing federal minerals in Colorado.

To provide context for the West Elk mine's potential nitrogen deposition impacts, the agencies compare emissions to the Bull Mountain Unit (a nearby oil and gas project) that was recently modeled for AQRV impacts utilizing the CALPUFF air quality model and local meteorology. The project analyzed significantly more nitrogen dioxide emissions (approximately 50 tpy more) than those generated by the West Elk mine and was able to show that total nitrogen deposition would be below the DAT of 0.005 kg/ha-yr. The Bull Mountain impacts were estimated to be the highest at the West Elk Wilderness area. Given that the mine is slightly farther removed from the West Elk Wilderness Class I area, and has about a third of the emissions of the Bull Mountain Unit, it is reasonable to conclude that the $NO_X$ emissions from the mine would also be below the deposition DAT and would not significantly impact the West Elk Wilderness Area. This same logic would apply to the Black Canyon of the Gunnison National Park, which is west of the mine. The estimated nitrogen deposition at the Park from the Bull Mountain analysis was 0.0003 kg/ha-

BLM_0050457

yr. Although the mine is slightly closer to the Class I area (by approximately 8 miles), the Bull Mountain results are so far below the DAT that it is very unlikely the West Elk mine would significantly impact on the Park. The Bull Mountain analysis is publically available for review at https://eplanning.blm.gov/epl-front-office/projects/nepa/66641/81769/95992/Bull_Mtn_DEIS_Jan2015 _reduced_web.pdf.

The amount of methane released by the West Elk Mine has varied considerably over the life of the mine, and is not well correlated with production levels. In general, the amount of methane released has decreased as the mining operations have progressed into a shallower seam, but there is no clear relationship that would make it possible to accurately predict the amount of methane that will be released to the atmosphere during future mining operations. Figure 3-7 shows the general trends for annual VAM and MDW methane releases vs. production. For the purposes of this analysis we simply assume that the total methane emissions from ventilation system (main vent(s) and bore vents) is the same as shown in Table 3-7 above, and will continue as such for future mining years.



**Figure 3-7. Methane vs. Production at West Elk Mine**

Source: EPA FLIGHT, Colorado Department of Natural Resources, Division of Mine Reclamation and Safety

In order to effectively vent methane from the mine and provide for a safe work environment, the West Elk mine will need to develop MDWs. This will require the construction of roads and well pads over active mine panels in order to move heavy equipment in to the area to bore the holes and maintain the methane pumps when active. The agencies estimated the emissions associated with the MDW development activities using a spreadsheet developed from EPA's document AP-42, Compilation of Air Pollutant Emission Factors (http://www.epa.gov/ttnchie1/ap42/), and the EPA NONROAD 2008a model. The construction and drilling of roads and vent boring is contracted out by the mining company, so the exact mix of equipment may vary slightly from the equipment assumed in this analysis. The analysis took into account dust and tailpipe emissions of typical road construction equipment (including a blade, backhoe and roller), one truck mounted drill rig, support vehicles (such as a water truck), and pickup trucks used

BLM_0050458

by site personnel to access the bore sites. It also included wind erosion of exposed road and well pad surfaces. Average emission factors were taken from AP-42 and conservative estimates were used for the amount of time needed to construct well pads and roads. The analysis did not include any assumptions regarding control of fugitive dust emissions from exposed surfaces on roads or drill pads, although the mining company does water these surfaces periodically to suppress fugitive dust emissions in accordance with its permit requirements. Actual windblown dust emissions are therefore expected to be less than those assumed in this analysis. The analysis assumes that the maximum number of MDWs the mine could develop in any single year would be 12, although the average is probably closer to 6 to 8. The data is summarized in Table 3-9, and as can be seen the construction-related emissions are relatively small and are not expected to contribute significantly to localized or regional air quality degradation.

**Table 3-9. MDW Development Emissions (tons)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | $SO_2$ | CO | VOC | HAPs | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|
| Road / Well Pad Construction & Reclaimation - Fugitive Dust | 3.192 | 0.319 | --- | --- | --- | --- | --- | --- | --- | --- |
| Heavy Equipment Combustive Emissions | 0.154 | 0.150 | 2.084 | 0.050 | 0.758 | 0.181 | 0.018 | 237.279 | 0.003 | 0.003 |
| Wind Erosion | 0.556 | 0.083 | --- | --- | --- | --- | --- | --- | --- | --- |
| Commuting Vehicles - Crew Trips | 5.823 | 0.582 | 0.057 | 0.000 | 0.332 | 0.019 | 0.002 | 18.624 | 0.001 | 0.003 |
| Totals | 9.726 | 1.135 | 2.141 | 0.051 | 1.090 | 0.200 | 0.020 | 255.903 | 0.004 | 0.006 |

In addition to methane, other organic gases are released through the mine ventilation boreholes in small quantities. The previous FEIS contained data that showed the compositional analysis from two CMM spot samples obtained from two MDWs. The samples were used to support a technical and economic feasibility assessment prepared by the mine at the request of the BLM (made in response to the leasing addendum placed on the original lease, described in Table 2-2). The purpose of the study was to determine if the methane could be captured for beneficial use or otherwise destroyed and not to determine the composition of the gas itself. The previous FEIS made no attempt to quantify any non-methane emissions components on an annualized basis or otherwise, and similarly no attempt is made here for the following reasons:

- There are no established protocols for sampling nor accurately analyzing VOCs in mine ventilation air from MDW or shaft emissions (for which the APCD has acknowledged).

- It is not known how accurately the sample values represent average or potential quantities of various non-methane hydrocarbons and other gaseous compounds, given that the methane emissions themselves (if used as a surrogate), have proved to be highly variable and not closely related to coal production levels.

- The limited number of samples available (two) taken on a single day (15 May 2009) within a relatively short period of time do not provide for a scientifically defensible or statistically significant basis from which to draw conclusion about potential VOC emissions levels.

The Colorado Air Pollution Control Division has examined the VOC concentration measurements submitted in the report and has since been in contact with most of the coal mines in the state, including the West Elk Mine, to gather additional data from the facilities in order to form a more accurate estimate

of potential VOC emissions, and to determine the facilities overall compliance status (personal communication, Debra Miller, USFS, with Charles Pray, Permitting Engineer, Colorado Air Pollution Control Division, 11 July 2012). As of January, 2017, CDPHE is still reviewing the facts of West Elk's specific circumstances and has not rendered a decision regarding reporting (via APEN) or permitting applicability for any VOC emissions the mine emits. In general, APCD is still trying to understand the technical issues related to accurately determining the level of VOC emissions emanating from all the various coal mines in Colorado, not just the West Elk. While manmade VOC emissions are regulated in Colorado by the CDPHE, they are not themselves considered a criteria air pollutant, and no standards exist to limit their concentrations in ambient air. We note that the concern here is for the potential of these emissions to form ground level ozone. The mine itself has been in operation since the 80's and yet the area remains in attainment for the ozone standard. That fact in and of itself speaks volumes for the potential of the issue. However, as noted above the BLM did analyze the West Elk mines criteria pollutant emissions as well as all of the mines in Colorado that produce federal coal within the CARMMS study. A link to the study itself and the results are all detailed in the cumulative section below. Finally, the sample analysis data (removed here) is still available for viewing within the above referenced addendum report itself (project file).

Although the mine's GHG emissions will directly contribute to potential climate change, the cumulative nature of the problem and the lack of currently available project specific assessment tools, does not make a direct analysis of the issue in the context of the alternative(s) a practical exercise at this time. A more detailed discussion of potential climate change impacts and how the mine emissions might contribute to it is provided in the cumulative analysis section below. This alternative is expected to produce methane emissions from the mine at a rate consistent with that shown in Table 3-7 above for approximately 10 more years. The total CO2e of the methane released under this alternative is approximately 9.38 million tons.

### 3.4.2.2    Indirect Effects

Mined coal will be transported away from the mine by rail to various facilities. Transportation by train will result in emissions of pollutants such as carbon monoxide, sulfur dioxide, nitrogen oxides, particulate matter, and volatile organic compounds. Locomotive emissions will also include greenhouse gases such as carbon dioxide. It is highly likely that criteria emissions from this source class have been decreasing, and will continue to do so in the future, due to the implementation of new emissions standards for new and reconstructed locomotives (see Control of Emissions of Air Pollution from Locomotives and Marine Compression-Ignition Engines Less Than 30 Liters per Cylinder, published May 6, 2008 and republished June 30, 2008).    EPA estimates that the average useful life for these engines is 750,000 miles or 10 years, whichever occurs first, meaning that on average an engine is replaced or reconstructed every ten years and will have to comply with the most stringent emissions requirement applicable to the engine at that time. Additionally, the indirect effects of coal transport from the region are analyzed and disclosed in the 2001 North Fork Valley Coal (Iron Point) EIS for all three area mines (West Elk, Elk Creek, and Bowie). The effects for West Elk alone (the only remaining operational and producing mine) will be far less than those analyzed in the afore mentioned EIS due to the area's overall coal production reductions and for reasons outlined above concerning the locomotives themselves.

According to U.S. EPA figures contained in the Draft US Greenhouse Gas Inventory Report (2012), nearly 95% percent of all coal consumed in the U.S. during 2010 was used in the generation of electric power. Although coal's share of the electrical generating fuel market has been decreasing in recent years, it can still be reasonably assumed that the coal from the West Elk mine will be shipped to and consumed by a coal-fired power plant. According to EPA data there are approximately 463 power plants in the U.S. that use coal as a primary fuel source (approximately 61 others report coal use as a secondary fuel). In general, it is reasonable to assume that coal combustion in these facilities will result in emissions of pollutants including sulfur dioxide, nitrogen oxides, volatile organic compounds, particulate matter, sulfuric acid, and mercury, as well as some hazardous air pollutants. It is also likely that coal combustion-

BLM_0050460

related emissions will contribute to atmospheric concentrations of ozone and secondary particulates when the required proper atmospheric conditions for formation are present.

What is not clear at this point is exactly what which facilities these might be and exactly how they are configured (locations, physical and operational characteristics, controls, permit limitations, monitoring, etc.). In recent years, MCC has been selling increasing amounts of coal from the West Elk Mine on the spot market. The spot market provides for a one-time open market transaction for near term delivery of coal (where near term is the quarter following the order date quarter) where the commodity is purchased at current market rates. Due to the nature of this market, it is not possible to determine in advance where this coal will be consumed (it is unknown where the coal will be delivered until the quarter before it gets delivered (https://www.eia.gov/coal/markets/)). A detailed analysis of any current and potential future contractual agreements between MCC and any coal fired facility power plant (or fuels broker) for a time in the future when the lease modification coal would be mined and MCC is unknown and outside the scope of this analysis, and neither the Forest Service nor BLM determines at which facilities the coal will be consumed.

Although it would be possible to provide an estimate of emissions associated with the burning of the mined coal at a specific facility; the types facility controls configurations, applicable regulatory structures, age, and firing practices make this exercise speculative, and impractical from a criteria pollutant disclosure standpoint. The facilities that could combust the coal purchased on the spot market are currently unforeseeable.  Further, the heavily regulated nature of these combustion sources provides limited decision space or scope to the decision makers. However, the FS and BLM can disclose estimated emissions on broad geographic scales for pollutants reported and estimated by EPA's Emissions & Generation Resource Integrated Database (eGRID, 2014 v2). eGrid is a comprehensive source of data on the environmental characteristics of almost all electric power generated in the United States, and includes emissions for nitrogen oxides, sulfur dioxide, carbon dioxide, methane, and nitrous oxide; emissions rates; net generation; resource mix; and other attributes. For this analysis, we report the total nitrogen oxide and sulfur dioxide for West Elk coal combustion relative to the Colorado and U.S. average coal fired power plant fleet mix emissions rates (these are the only criteria pollutants reported to the eGrid database). The rates are derived by dividing the subtotal of the targeted fleet emissions (tons) by their heat input (MMbtu). West Elk coal is estimated to have a btu content of approximately 11,800 btu/lb. The total Colorado and U.S. eGrid based combustions emissions are shown in Table 3-10 below and are the result of multiplying the foreseeable total coal to be mined (cumulatively) by the derived emissions factors.

Because the afore mentioned specific facility configurations are not known, any further analysis or disclosure of either the other criteria and HAP related emissions and their locality related impacts to relative near-field or regional air resources is not feasible for this analysis. However, given the nature of these facilities, in that they are major stationary source of air pollution and are heavily regulated, any impacts resulting from their continued operations are highly likely to have been appropriately analyzed by the applicable permitting authority. Any impacts to local or regional air quality from these facilities would not exceed those already authorized, and in theory should be in compliance with all applicable standards regulating their operations.  Compliance with applicable operating permits should provide for compliance with air quality standards within the areas where these facilities operate. Facilities with operations producing ambient air concentrations (as the result of compliance with a permit or rule) of a regulated pollutant less than an applicable standard (as determined and set by EPA) is equivalent to an insignificant affect as it relates to human health impacts. Given that these combustion facilities have operational parameters that are fixed regardless of the alternatives analyzed here, there is very little decision space or scope available to the decision makers to consider combustion related impacts as being significantly different in the context of any of the alternatives analyzed. Simply stated, we assume for the purposes of analysis that no new coal fired facilities will be brought online as a result of this decision, and no existing facilities will go offline for any alternative, regardless of the governments influence with this decision.

BLM_0050461

We can however also disclose the estimated GHG emissions from coal combustion due to the fact that specific facility details have less of an influence over these types of emissions, and few if any potential sources provide for carbon capture or otherwise abate these emissions presently. For the purposes of disclosure, we are providing estimates for the total foreseeable coal to be mined under the alternative. The total GHG emissions presented in Table 3-10 and are the result of multiplying the foreseeable total coal to be mined by the appropriate EPA emissions factors.

**Table 3-10. Coal Combustion GHG Emissions (MMtons)**

| Coal (MMtons) | Colorado $NO_x$ | Colorado $SO_2$ | U.S. $NO_x$ | U.S. $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|---|---|---|---|
| 53.5 | 0.14 | 0.096 | 0.114 | 0.238 | 137.11 | 0.016 | 0.002 | 138.22 |

EPA GHG emissions factor source: https://www.epa.gov/sites/production/files/2015-07/documents/emission-factors_2014.pdf (bituminous coal)

Similar to the direct affects discussion above, the GHG emissions from coal combustion will contribute to potential climate change impacts. A more detailed discussion of these impacts, and how the coal combustion emissions might contribute to it, is provided in the cumulative analysis section below.

## 3.4.3    Alternative 3 (Proposed Action) Environmental Effects

The lease modifications are estimated to extend the life by approximately 1.6 years. In addition to these reserves, another 3.3 million tons federal coal and 4.2 million tons of fee coal would be accessible on adjacent lands already under reserve. The total coal to be mined (in addition to the reserves under Alternative 1) based on the estimated production rates would be approximately 17.6 million tons over a total of approximately 2.7 years.

### 3.4.3.1    Direct Effects

The proposed lease modifications represent a continuation of the existing activity occurring at the mine location, and will not increase the intensity of operations above currently evaluated levels (there is no proposed change in the rate of coal extraction under any alternative). The current existing facilities would also be used for mining the proposed lease modification areas (there is no additional construction or capacity required to process the additional coal). These facilities include office, warehouse, shop, and coal handling units, and are located about 6 miles north of the proposed modifications. The mine would continue to develop and operate MDWs above active coal panel mining as necessary to meet the health and safety concerns as required by law. This alternative assumes a maximum production rate of 6.5 million tons of coal per year (the same as Alternative 1), and thus all of the air quality impacts associated with this alternative would be identical to those disclosed in Alternative 1.

This alternative is expected to produce methane emissions from the mine at a rate consistent with that shown in Table 3-7 above for approximately 10.9 more years. The total $CO_2e$ of the methane released under this alternative is approximately 11.91 million tons.

In addition, this alternative includes an exploration plan proposal (see details in Table 2-3) that would allow MCC to ascertain the qualitative properties of the coal in the lease mod areas and formulate a mining strategy necessary to safety mine this coal. Given these details, the agencies estimated the emissions associated with the exploration activities (road construction, well pad construction, well drilling, and reclamation activities) using the same methods as described above for the MDW development. The data for the worst-case year out of the two years of planned exploration under this alternative (i.e., 6 pads, and acres of disturbance for the associated access roads) is summarized in Table 3-11 below. As can be seen from the table, the construction-related emissions are relatively small and are not expected to contribute significantly to localized or regional air quality degradation.

Table 3-11. Exploration Emissions (max tons per year)

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | $SO_2$ | CO | VOC | HAPs | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|
| Road / Well Pad Construction & Reciaimation - Fugitive Dust | 5.384 | 0.538 | --- | --- | --- | --- | --- | --- | --- | --- |
| Heavy Equipment Combustive Emissions | 0.135 | 0.131 | 1.798 | 0.043 | 0.662 | 0.158 | 0.016 | 201.188 | 0.002 | 0.002 |
| Wind Erosion | 0.208 | 0.031 | --- | --- | --- | --- | --- | --- | --- | --- |
| Commuting Vehicles - Crew Trips | 2.859 | 0.286 | 0.030 | 0.000 | 0.198 | 0.011 | 0.001 | 9.787 | 0.001 | 0.002 |
| **Totals** | **8.586** | **0.986** | **1.827** | **0.043** | **0.860** | **0.169** | **0.017** | **210.975** | **0.003** | **0.004** |

### 3.4.3.2    Indirect Effects

Same as Alternative 1, with the exception of the total combusted coal estimates.

This alternative will incrementally contribute GHG emissions above those disclosed in alternative 1. However, the potential affects would be similar to those disclosed in the cumulative section below. This is due to the fact that no tools exist to describe how the minor amount of incremental GHG increase (relative to the cumulative, i.e. global annual GHG burden) would directly contribute to modeled climate change impacts (2100 future year projections) evaluated by the leading international scientific bodies (for example IPCC scientists).

Table 3-12. Coal Combustion Emissions (MMtons)

| Coal (MMtons) | Colorado $NO_x$ | Colorado $SO_2$ | U.S. $NO_x$ | U.S. $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|---|---|---|---|
| 71.1 | 0.187 | 0.129 | 0.151 | 0.317 | 182.22 | 0.021 | 0.003 | 183.69 |

EPA GHG emissions factor source: https://www.epa.gov/sites/production/files/2015-07/documents/emission-factors_2014.pdf (bituminous coal)

## 3.4.4    Alternative 4 Environmental Effects

Similar to Alternative 3, the lease modifications here would be expected to extend the life of the mine by another 2.6 years, which would allow for approximately 16.8 million tons of coal (in addition to the reserves under Alternative 1) to be mined from both federal and fee reserves that would be accessed from the modification.

### 3.4.4.1    Direct Effects

The proposed lease modification represents a continuation of the existing activity occurring at the mine location, and will not increase the intensity of operations above currently evaluated levels (there is no proposed change in the rate of coal extraction under any alternative). The current existing facilities would also be used for mining the proposed lease modification areas (there is no additional construction or capacity required to process the additional coal). These facilities include office, warehouse, shop, and coal handling units, and are located about 6 miles north of the proposed modifications. The mine would continue to develop and operate MDWs above active coal panel mining as necessary to meet the health and safety concerns as required by law. This alternative assumes a maximum production rate of 6.5 million tons of coal per year (the same as alternative 1), and thus all of the air quality impacts associated with this alternative would be identical to those disclosed in alternative 1.

BLM_0050463

This alternative is expected to produce methane emissions from the mine at a rate consistent with that shown in Table 3-7 above for approximately 10.8 more years. The total $CO_2e$ of the methane released under this alternative is approximately 11.82 million tons.

For this alternative, exploration would be curtailed such that there would be roughly a 21% reduction in the access roads, and a projected reduction of 2 bore holes/pads needed to define the extent and parameters of the coal contained within the lease modification area. However, we assume that all of the exploration would more or less occur within a single year and that the intensity of such exploration would be approximately the same as that disclosed for alternative 3 in Table 3-12 above (with equally similar non-significant impacts).

### 3.4.4.2    Indirect Effects

Same as alternative 1, with the exception of the total combusted coal estimates. Same as alternative 1, with the exception of the total combusted coal estimates. This alternative will incrementally contribute GHG emissions above those disclosed in alternative 1, but less than those evaluated under alternative 3. However, the potential affects would be similar to those disclosed in the cumulative section below. This is due to the fact that no tools exist to describe how the minor amount of incremental GHG increase (relative to the cumulative, i.e. global annual GHG burden) would directly contribute to modeled climate change impacts (2100 future year projections) evaluated by the leading international scientific bodies (for example IPCC scientists).

**Table 3-13. Coal Combustion GHG Emissions (MMtons)**

| Coal (MMtons) | Colorado $NO_X$ | Colorado $SO_2$ | U.S. $NO_X$ | U.S. $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
|---|---|---|---|---|---|---|---|---|
| 70.3 | 0.184 | 0.127 | 0.15 | 0.313 | 180.17 | 0.021 | 0.003 | 181.62 |

EPA GHG emissions factor source: https://www.epa.gov/sites/production/files/2015-07/documents/emission-factors_2014.pdf (bituminous coal)

## 3.4.5    Cumulative Effects & Climate Change

### 3.4.5.1    Cumulative Effects

To examine potential cumulative air quality impacts from activities that it authorizes, BLM initiated the Colorado Air Resources Management Modeling Study (CARMMS). The study was primarily concerned with assessing statewide impacts of projected oil and gas development (both federal and fee (i.e., private)) out to year 2021 for three development scenarios (low, medium, and high). Projections for development are based on either the most recent Reasonably Foreseeable Development (RFD) document (high), or a projection of the current 5-year average development pace forward to 2021 (low). The medium scenario includes the same well count projections as the high scenario, but assumes restricted emissions, whereas the high assumes current development practices and existing emissions controls required by regulations (2012). Each BLM field office was modeled with the source apportionment (SA) option, meaning that incremental impacts to regional ozone and AQRVs from development in these areas are essentially tracked to better understand the significance of such development on impacted resources and populations (see other sections and affected populations in Section 3.35).

The CARMMS study leverages the work completed by the WestJumpAQMS, and the base model platform configuration (CAMx), meteorology (WRF), and model performance metrics are based on those products. The complete report and associated data are available on our website at https://www.blm.gov/sites/blm.gov/files/program_natural%20resources_soil%20air%20water_airco_quick%20link_CARMMS.pdf. The CARMMS model domain has a minimum grid resolution of 4km.

BLM_0050464

Because CAMx is a one-atmospheric dispersion model, it requires emissions inventories to be modelled accurately at both spatial and temporal scales. This fact allowed the BLM to leverage the study and apply the source apportionment technology to all of the emissions from coal mines in Colorado that produce federal coal. Unfortunately, the Bureau did not have the resources to track each mine independently as was done for each field office's oil and gas development (which was the primary purpose of the CARMMS model), but rather all of the mines were tracked together as a single source group. The source group included the following existing and hypothetical mines:

- Book Cliffs Area (Grand Junction)
- McClane (Grand Junction)
- Bowie (Uncompahgre)
- King II (Tres Rios)
- Foidel (Kremmling)
- Deserado (White River)
- Trapper (Little Snake)
- Colowyo (Little Snake)
- Sage Creek (Little Snake)
- West Elk (Uncompahgre)
- Elk Creek (Uncompahgre)

The study provided for a single mining scenario based on each mines maximum allowable emissions rate, which were estimated based on the CDPHE APEN database and available EISs and EAs prepared for previous authorizations. EPA default chemical speciation profiles were used in the SMOKE emissions modeling for mining except that the EPA mining $PM_{2.5}$ speciation profile was adjusted for abnormally high sulfur emissions that were erroneous for typical underground mining operations. The modelled emissions details are provided in the CARMMS report (Report appendices D and D-1).

Although the predicted impacts are based on a future model year emissions (2021), the differences in the impacts between the scenarios and the base year provide insight into how mass emission changes impact the atmosphere on a relative basis, and are thus useful for making qualitative and quantitative comparisons with emissions levels at the current pace of development (which is how the model results are currently being used).

BLM_0050465

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232



**Figure 3-8. CARMMS Mining Results**

The results show that PM emission impacts are primarily the result of surface mining facilities in the northern portion of the CARMMS analysis domain. In general, primary PM (the kind the mines emit) is a localized pollutant. The 4km grid resolution of the model is less sensitive to settling and terrain impaction (i.e. plume depletion) for primary PM than a nearfield model would show (results of AERMOD discussed above). Although the PM concentrations are a bit high due to the model resolution, they are reasonable across the larger domain. The PM contributions in the North Fork Valley from all of the mines contributions appears to be fairly low (not more than $10\mu g/m^3$ for $PM_{10}$ and $5\mu g/m^3$ for $PM_{2.5}$). The other pollutants ($NO_2$ and $O_3$) are also equally minor impactors, although we note that the ozone predictions are a function of the mines direct NOx and VOC contributions and does not include CMM VOCs since they are unknown. See Figure 3-8.

BLM_0050466

For the Uncompahgre Field Office, we are disclosing the high CARMMS scenario to account for all of the reasonably foreseeable future actions that are likely to occur within the area (mostly oil and gas development), while noting that the area is currently tracking far below the low scenario.



**Figure 3-9. CARMMS 2021 UFO High Oil and Gas Scenario Emissions**

BLM_0050467

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232



**Figure 3-10. CARMMS UFO Oil and Gas Results**

The high scenario oil and gas development emissions are large enough to account for all of the reasonably foreseeable activities outlined in the document that have significant emissions generation potential. As can be seen in the source apportionment results, the impacts are relatively minor, and are mostly the result of development in and proximate to the Bull Mountain Unit. The West Elk mine has far fewer $NO_X$ emissions than that of the high oil and gas scenario, such that even with the unknowns of mines potential CMM VOC's, the mine itself would not be expected to contribute significantly to direct ozone formation on a stoichiometric basis (less than 0.4 ppb, given that the mines $NO_X$ emission would be the limiting factor in the reaction). See Figure 3-10. Several other data metrics produced by CARMMS to describe potential impacts to sensitive resources are disclosed in Table 3-14 below.

BLM_0050468

**Table 3-13. Maximum Source Group Contributions**

| Source Group | Visibility Impacts | | | Deposition (kgN/ha-yr) | AQRV Impacted Area | Max Contribution to Exceedance | |
|---|---|---|---|---|---|---|---|
| | Max dv | Days > 0.5dv | Days > 1.0dv | | | O3 | PM2.5 |
| CO Mines | 0.642 | 5 | 0 | 0.0048 | West Elk | 0.474 | 45.625 |
| UFO O&G | 0.218 | 0 | 0 | 0.024 | Maroon Bells | 0.029 | 0.0041 |

As would be expected given the plots above the Colorado Mines (particularly the surface mines) contribute greatly to the PM related NAAQS and visibility impacts. Although the exact West Elk contributions cannot be teased out of the data, it's highly likely that the mine is a significant fraction of the AQRV impacts given the isolation that occurs for PM on the plots above. However, the direct impacts from the mine have already been deem negligible above.

For the total cumulative results (rolled up source apportionment and total model outputs), the BLM is disclosing the low CARMMS scenario. Figure 3-11 below shows the tracked report year (2015) federal oil and gas development emissions contrasted to each CARMMS scenario, where the emissions levels of each pollutant are shown relative to the High scenario (i.e. the high scenario is 100% on the graph). In most cases the 2015 emissions are far below the low CARMMS scenario, such that this has been deemed the appropriate scenario to disclose given the likelihood or potential for emissions generating activities to exceed the 2021 estimates in the short term. As noted above the mining emission were held constant in all future year scenarios such that those impacts are static regardless of the CARMMS oil and gas scenario.



**Figure 3-11. CARMMS BLM CO Cumulative Oil and Gas Tracking (federal)**

BLM_0050469



**Figure 3-12. CARMMS BLM CO Results (federal)**

As shown above Figure 3-12, it is fairly evident that the surface mines are driving the estimated PM impacts with the CARMMS model from all of the federal emissions. We also note that the impacts represent the maximum contributions recorded (in the form of the applicable standard), but that these maximums are not necessarily relative to any exceedance values that may have been modeled for a pollutant shown.

BLM_0050470

**Table 3-14. Maximum Source Group Contributions**

| Source Group | Visibility Impacts | | | Deposition (kgN/ha-yr) | AQRV Impacted Area | Max Contribution to Exceedance | |
|---|---|---|---|---|---|---|---|
| | Max dv | Days > 0.5dv | Days > 1.0dv | | | O3 | PM2.5 |
| CO O&G and Mines (federal) | 0.655 | 16 | 0 | 0.043 | Mount Zirkel (vis) / Flat Tops (dep) | 0.621 | 45.737 |



**Figure 3-13. CARMMS Cumulative "one atmosphere" Results**

120



**Figure 3-14. CARMMS Cumulative Changes (future minus base)**

The plots in figure 3-14 show the maximum modeled concentrations and the expected changes from future emissions relative to the base year. As can be seen there, the majority of the analysis area sees relatively modest decreases or no changes to ozone formation potential. Particulate matter impacts are mostly confined to the urban areas in Colorado, and can be attributed to the expected population increases projected to occur (which have occurred steadily since the CARMMS base year). Interestingly these areas also project some of the largest drops (undoubtable due to tighter mobile source standards). Another interesting model artifact is the high ozone predicted along the I-70 corridor just north of the proposed project area. This region has always been a "hot spot" for the CAMx and CMAQ photo-chemical models (even in the updated Intermountain West Data Warehouse 2011b platform), for reasons which are currently unknown. Although we suspect the area's topography, especially the rapid elevation gains along the Roan cliffs, along with the limits of the CAMx and WRF meteorological model resolutions may have something to do with it. Ultimately, it has been shown that the model tends to over predict ozone in western Colorado. So the ozone results on face value should be considered conservative.

121

## 3.4.5.2    Climate Change

In this analysis, the agencies acknowledge that greenhouse gas emissions are contributing to climate change.  The agencies present a qualitative discussion of the environmental effects of climate change below. The agencies have used estimated GHG emissions associated with the proposed action as a reasonable proxy for the effects of climate change in this NEPA analysis and as a way to display best available science. The agencies have placed those emissions in the context of relevant emissions.  The climate change analysis recognizes that there are adverse environmental impacts associated with the development and use of coal and discusses potential impacts qualitatively.

According to the U.S. Global Change Research Program (2009), global warming is unequivocal, and the global warming that has occurred over the past 50 years is primarily human-caused. Standardized protocols designed to measure factors that may contribute to climate change at the project scale, and to quantify climatic impacts, are presently unavailable. As a consequence, impact assessment of specific impacts related to anthropogenic activities on global climate change cannot be accurately estimated. Moreover, specific levels of significance have not yet been established by regulatory agencies. Therefore, climate change analysis for the purpose of this EIS is limited to accounting for C02 emissions scenarios that would contribute incrementally to climate change. Qualitative and quantitative evaluations of potential contributing factors are included where appropriate and practicable.    (Source: http://globalchange.gov/what-we-do/assessment/previous-assessments/global-climate-change-impacts-in-the-us-2009).

All of the modeled climate change predictions used by IPCC scientists to project potential climate change scenarios are predicated upon various GHG emissions scenarios, known as Representative Concentration Pathways (RCPs).  RCPs are not fully integrated scenarios of climate feedback, policy, or socioeconomic projections, but rather a consistent set of projections of only the components of radiative forcing that are meant to serve as input for climate modeling, pattern scaling, and atmospheric chemistry modeling.  The RCPs provide a consistent analytical baseline from which climate change science communities can start additional analysis from.

BLM_0050473



**Figure 3-15. RCP Scenario Data**

For the purposes of this document the agencies have considered RCP's scenario data (Figure 3-15), given the recent and reasonably foreseeable regulatory developments, policy changes, and direct actions that are being taken by countries around the globe in response to the issue.  Scenarios 2.6 and 4.5 are the only two that result in decreasing future emissions relative to the baseline.  The RCP2.6 pathway, developed by the IMAGE modeling team, is representative of scenarios leading to very low greenhouse gas emissions/concentration levels.  Its radiative forcing level is predicted to peak at a value around 3.1 W/m2 mid-century before returning to 2.6 W/m2 by 2100.  The RCP4.5 pathway, developed by the MiniCAM modeling team, is a stabilization scenario where total radiative forcing is stabilized before 2100 by employment of a range of technologies and strategies for reducing greenhouse gas emissions.  It should be noted that according to the IPCC, only projections following the lowest concentration pathway (RCP2.6) result in an estimated mean increase in global average temperatures below 2° C (the current internationally agreed upon target for limiting average surface warming).  Equally important, IPCC scientists project warming will continue beyond 2100 under all RCP scenarios except for RCP2.6. The RCP2.6 scenario provides for an abrupt and rapid decline in CO2 emissions starting around 2020, with atmospheric concentrations of GHGs and subsequent radiative forcing stabilizing between 2040 and 2060.  This scenario also provides for "negative emissions" starting in 2080, and essentially projects more carbon being removed from the atmosphere than is emitted.  The curve suggests that emissions from fossil fuels and other sources would decline by approximately 3.5% per year until 2040, and then continue at a pace of approximately 10% per year until the emissions become negative between 2070 and 2080.

BLM_0050474

The RCP4.5 scenario forecasts global emissions will increase until about 2040, with actual stabilization occurring between 2030 and 2050. Starting in 2050 RCP4.5 scenario emissions would start to decline at rates commensurate with the 2.6 pathway until 2080, when emissions stabilize again through the end of the century. As noted earlier, GHG concentrations and forcing would continue to rise under RCP4.5 scenario through the end of the century, although the rate of increase diminishes significantly around 2070.

The future climate equilibrium is dependent upon warming caused by past GHG emissions, future GHG emissions, and natural variability. Global mean surface temperature changes for the period 2016–2035 relative to 1986–2005 is similar for the four RCPs and will likely be in the range 0.3° C to 0.7° C (medium confidence). The projection assumes no major volcanic eruptions, changes in natural emissions sources (e.g., $CH_4$ and $N_2O$), or unexpected changes in total solar irradiance. By 2050, the magnitude of the projected climate change is significantly affected by the overall emissions path the world is tracking along.

The projected increase of global mean surface temperature by the end of the 21st century (2081–2100) relative to 1986–2005 is likely to be 0.3° C to 1.7° C under RCP2.6, 1.1° C to 2.6° C under RCP4.5, 1.4° C to 3.1° C under RCP6.0 and 2.6° C to 4.8° C under RCP8.5. It is virtually certain that there will be more frequent hot and fewer cold temperature extremes over most land areas on daily and seasonal timescales, as global mean surface temperature increases. It is also very likely that heat waves will occur with a higher frequency and longer duration. Occasional cold winter extremes will continue to occur, due to the inherent variability within the climate system. Year-round reductions in Arctic sea ice are projected for all RCP scenarios and it is virtually certain that near-surface (upper 3.5 m) permafrost extent at high northern latitudes will be reduced (37% - RCP2.6 to 81% - RCP8.5) as global mean surface temperature increases.

Changes in precipitation patterns will not be uniform, but in general arid regions are expected to become dryer while wetter areas can expect more frequent exceptional precipitation events.

Oceans will continue to warm, with the greatest impacts occurring at the surface of tropical and northern hemisphere subtropical regions. Models also predict ocean acidification will increase for all RCP scenarios, where surface pH can be expected to decrease by 0.06 to 0.07 (15 to 17%) for RCP2.6 and 0.14 to 0.15 (38 to 41%) for RCP4.5. Global mean sea level rise will very likely continue at a faster rate than observed from 1971 to 2010. For the period 2081–2100 relative to 1986–2005, the rise will likely be in the ranges of 0.26 to 0.55 m for RCP2.6, and of 0.45 to 0.82 m for RCP8.5. It is very likely that the sea level will rise in more than about 95% of the ocean area, where about 70% of coastlines worldwide would experience a sea level change within ±20% of the global mean.

Because warm sea surface temperatures energize hurricanes, a warming climate is likely to make hurricanes more intense. Hurricanes in the future will probably have stronger peak winds and increased rainfall. The relationship between sea surface temperatures and the frequency of hurricanes is less clear. There is currently no scientific consensus on how a warming climate is likely to affect the frequency of hurricanes, but research continues (IPCC Climate Change and EPA Climate Change Effects, Extreme Events).

In a warming climate, extreme events like floods and droughts are likely to become more frequent. More frequent floods and droughts will affect water quality and availability. It is believed that poor and minority groups may be disproportionately affected because they may not have the financial resources to deal with the changes brought about. For example, increases in drought in some areas may increase the frequency of water shortages and lead to more restrictions on water usage. An overall increase in precipitation may increase water availability in some regions, but also create greater flood potential (IPCC Climate Change and EPA Climate Change Effects, Water).

BLM_0050475

All climate model projections indicate future warming in Colorado. Statewide average annual temperatures are projected to warm by +2.5° F to +5° F by 2050 relative to a 1971–2000 baseline under RCP4.5. Under the high emissions scenario (RCP8.5), the projected warming is +3.5° F to +6.5° F and would occur later in the century as the two referenced scenarios diverge. Summer temperatures are projected to warm slightly more than winter temperatures, where the maximums would be similar to the hottest summers that have occurred in past 100 years. Precipitation projections are less clear, with individual models showing a range of changes by 2050 of -5% to +6% for RCP 4.5%, and -3% to +8% under RCP8.5. Nearly all of the models predict an increase in winter precipitation by 2050, although most projections of snowpack (April 1 SWE) show declines by mid-century due to the projected warming. Typical projected winter monthly temperatures are between the 10th and 90th percentiles of the historical record. Between today and 2050, typical January temperatures of the Eastern Plains of Colorado are expected to shift northward by approximately 150 miles. In all seasons, the climate of the mountains is projected to migrate upward in elevation, and the climate of the Desert Southwest to progress up into the valleys of the Western Slope.

Local predictions have also been made predicting temperature increases of +2-4° C and precipitation swings of -20% to +15% varying by season (Table 3-16). Locally, under a moderate scenario, no substantial change in annual precipitation, but an increase in cool season precipitation and a decrease in warm season precipitation is expected. And under a more extreme scenario, a 10% decrease in annual precipitation, with greater decreases in warm season precipitation. Under a moderate scenario, a decrease in annual natural stream flows of 5 to 10% is expected due to increased temperature, even if annual precipitation remains the same. And under a more extreme scenario, a decrease in precipitation and increase in temperature both act to reduce annual stream flow totals in the range of 20 to 25%. Warming temperatures lead to a later accumulation of snow in the fall, and earlier snowmelt in the spring. However, because of the increased precipitation in winter, and the generally cold, high-elevation nature of the upper Gunnison basin, the mid-winter snowpack may be similar to the present under a moderate scenario. And under a more extreme scenario, this likely represents a hot/dry scenario for much of the West, the potential exists for more frequent dust deposition events, which also may lead to an earlier melt and to reduced water yield from the snowpack. Under a moderate scenario, snowmelt-driven stream flow will occur earlier in the spring by about a week on average. (Note: this shift is due to warming and does not include the effects of dust-on snow, which can result in an even earlier shift in snowmelt. And under a more extreme scenario, snowmelt-driven stream flow will peak about two or more weeks earlier in the spring, though this effect may be less if dust effects on snowmelt are strong. The combined effects of dust and temperature on snowmelt tend to be dominated by the dust effects.

**Table 3-15. Temperature and Precipitation Climate Change Scenarios for 2050 developed by Barsugli and Mearns for the Gunnison Basin**

|  | Precipitation (%) | | Temperature (°C) | |
|---|---|---|---|---|
|  | Moderate Scenario | More Extreme Scenario | Moderate Scenario | More Extreme Scenario |
| Annual | ~0.0 | -10.0 | +2.0 to +3.0 | +3.0 |
| Winter | +15.0 | ~0.0 | +2.0 | +3.0 |
| Spring | -12.0 | -15.0 | +2.5 | +3.0 |
| Summer | -15.0 | -20.0 | +3.0 | +4.0 |
| Fall | +4.0 | -10.0 | +2.5 | +3.0 |

Late-summer stream flows are projected to decrease as the peak shifts earlier in the season, although the changes in the timing of runoff are more certain than changes in the amount of runoff. In general, the majority of published research indicates a tendency towards future decreases in annual streamflow for

BLM_0050476

all of Colorado's river basins. Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, will continue to increase wildfire risks and impacts to people and ecosystems.

Based upon these scenarios, the GMUG has identified the following consequences to resource values on NFS lands they manage. See Table 3-17.

**Table 3-16. Projected Climate Changes to the GMUG**

| Projected Climate Change | Anticipated Hydrologic Response | Potential Consequences to Resource Values |
|---|---|---|
| Warmer Winter/Spring Temperatures Average daily winter/spring temperature expected to increase > 3˚C by 2050. | • Fewer extreme cold months, more frequent extreme warm months, more consecutive warm winters. <br>• Later accumulation of snowpack. <br>• Earlier onset of snowpack runoff (1-3 weeks) <br>• Higher winter stream flows <br>• Increased water temperature <br>• Winter precipitation more often rain than snow below 8200 feet <br>• Snowline to move up in elevation. | • Reduced duration of winter snow cover. <br>• Longer period of saturated roadbeds vs frozen roadbeds. <br>• Increased demand for water storage. <br>• Earlier demand for irrigation water. <br>• Decreased summer stream flows. <br>• Potential change to aquatic species reproductive triggers or success. <br>• Increased risk to channel and floodplain infrastructure from higher runoff. <br>• Increased risk to riparian habitat/floodplains from higher flows. <br>• Changes to winter habitat, winter recreation and plant communities. |
| Warmer Summer Temperatures Average daily summer temperature expected to increase > 3˚C by 2050. | • Increased evapotranspiration <br>• Decreased soil moisture <br>• Reduced summer stream flows <br>• Increased water temperature | • Increased demand for irrigation water. <br>• Shifts in cold water habitat to higher elevations. <br>• Increases in warm water habitat. <br>• Decreased dissolved oxygen in lower elevation streams during the summer. <br>• Aquatic biota mortality and even loss of populations. <br>• Loss of summer stream flow. |
| Changes in Precipitation At higher elevations may be slightly greater precipitation during the winter, but likely less total precipitation, especially during warmer months. | • May see higher peak flows associated with snowmelt, earlier in the year. <br>• Lower summer and fall baseflows <br>• Increased soil moisture during spring at lower elevations | • Decreased water availability during irrigation season. <br>• Increased risk to channel and floodplain infrastructure. <br>• Reduced riparian vegetation health and vigor. <br>• Increased landslides and slumps on geologically unstable areas. <br>• Increased potential damage to saturated roadbeds. <br>• Reduced aquatic habitat in summer and fall. |

BLM_0050477