The most common maintenance risk on VAM applications is contamination of ceramic media beds. The media can require more frequent maintenance (i.e., cleaning) if air flows contain significant amounts of large inorganic dust particles. The West Elk Mine Shaft #4 exhaust airflow will contain dust particulates, though based on conversations with mine engineers, we anticipated that the small size of the dust would likely pass through the unit without causing blockage. If an oxidizer project is pursued, the actual characteristics of the exhaust flow should be investigated early in the design process.

## VI. Feasibility of Thermal Oxidation at the West Elk Mine

Based on the design and anticipated performance of the reconfigured mine ventilation system, it is not technically or economically feasible in the current or foreseeable future to develop an oxidation system at the West Elk Mine. However, there are no safety or operational concerns that would categorically prohibit the installation and operation of a VAM oxidation project at the mine, given appropriate safeguards.

From a technical perspective, Mountain Coal anticipates that the reconfigured ventilation system will produce VAM concentrations at Shaft #4 between 0.15% and 0.31%. The risk posed by this low range, which includes concentrations below the minimum operating limit of 0.2% for self-sustaining RTOs, is compounded by the inherent uncertainty of models used to predict performance of ventilation systems. Furthermore, short drops in VAM concentrations can cause oxidizers to fail quickly, requiring manual labor to adjust or restart the system.

Due to the configuration of oxidizer airflow intake systems, it is unlikely that an oxidizer would be able to process more than 50% of the 800,000 or greater cfm projected to flow from the exhaust shaft. The limits of oxidation are further constrained by the surface area available at the Shaft #4 pad, which could likely accommodate an oxidizer system with a total capacity of 150,000-250,000 cfm. The secondary exhaust at Sylvester Gulch has an expected methane concentration of 0.05% and is therefore incapable of self-sustaining oxidation with the technologies available today.

Operational and safety risks, as described above, would be low for the most likely configuration of an RTO installed at Shaft #4. It would be necessary to access the system on a daily basis throughout the year (without heavy equipment during normal operations), which would require maintenance of the mountainside access road through the winter months.

As stated above, the economics of an RTO at Shaft #4 are bleak. The typically high equipment and site preparation costs of RTOs would be exacerbated by the remote, mountainous location of the ventilation shaft. For example, installing power lines to provide electricity to Shaft #4 would present a significant cost risk to a project. As electricity generation from the RTO system would not be possible at Shaft #4, the generation of carbon offset credits would be the only source of project revenue created by an RTO system. Even in aggressive market scenarios, it is highly unlikely that the cost of the RTO would be recovered through carbon offset credit revenues in less than 10 years. We therefore conclude that it is not economically feasible to develop a VAM oxidation project in current and projected market conditions using the best available commercial technology to oxidize methane in the ventilation airflow.

In accordance with the statement of work, Verdeo is providing a basic financial analysis of oxidation systems. The analysis uses Microsoft Excel to project the 10-year economic performance of an RTO system based on multiple input assumptions. The model was designed for Mountain Coal to evaluate revenues in different carbon market scenarios. A screenshot of the financial analysis is in Appendix A. The model is also provided in the attached file, "Verdeo Mountain Coal VAM Feasibility Study, June 25, 2009.xlsx". As demonstrated by the financial model, the two most significant factors that impact the economic feasibility of an RTO system are the cost of the RTO system and the VAM concentration of the ventilation exhaust. The model uses a default cost for the RTO system that is based on budgetary cost estimates provide by five RTO manufacturers specifically for conditions at Shaft #4[1]. The cost factor is expressed as a cost per cubic feet of airflow processed by the RTO ($/cfm), a metric commonly used

---

[1] The requests for budgetary cost estimates were sanitized and did not reference Mountain Coal or the West Elk Mine.

BLM_0050860

to compare oxidizer systems. The default VAM concentration is based on the value projected for Shaft #4. Both cost and VAM concentration can be modified in the model.

BLM_0050861

| Regenerative Thermal Oxidizer Manufacturer Comparison | | | | | | | |
|---|---|---|---|---|---|---|---|
| RTO Manufacturer | Biothermica | MEGTEC | Cyclotherm | Met-Pro | Anguil | Durr | Average |
|  | n/a | 2,100,000 | 1,700,000 | 1,230,000 | 1,950,000 | 1,550,000 | 1,706,000 |
| of total system cost[1] | n/a | 420,000 | 340,000 | 246,000 | 390,000 | 310,000 | 341,200 |
|  | n/a | 2,520,000 | 2,040,000 | 1,476,000 | 2,340,000 | 1,860,000 | 2,047,200 |
|  | n/a | 25.2 | 20.4 | 14.8 | 23.4 | 18.6 | 20.5 |
| ($/a) | n/a | 75,600 | 61,200 | 44,280 | 70,200 | 55,800 | 61,416 |
|  | 350 | 350 | 300 | 390 | 480 | 440 | 385 |
| ≤ 100,00 cfm. | 1 | 2 | 2 | 2 | 2 | 2 | 2 |
|  | 32 | 24 | 16 | 24 | 20 | 24 | 23 |
|  | 96% | 95% | 94% | 95% | 95% | 95% | 95% |
|  | 15-20 | 7-20 | 20-30 | 10-15 | 20 | 15-20 | 15-20 |
| requirement) | propane, gas, 8 hours, 50 MMBtu | electricity, 24 hours, 11 MWh | diesel, 1 hour, 7 MMBtu | diesel 1 hour 9 MMBtu | diesel, gas, propane, 2 hours, 18 MMBtu | diesel, gas, propane, 8 hours, 16 MMBtu | 10 MMBtu is about (75 gallons of diesel). |
|  | 90' x 40', 200,000 lbs | 100' x 70', 680,000 lbs | 43' x 29', - | 38' x 34', 310,000 lbs | 60' x 80', 500,000 lbs | 84' x 50', - | 70' x 50', 420,000 lbs |
|  | equipment, install, commission | equipment, install, commission | equipment, install commission for fee | equipment, install for fee, commission for fee | equipment, install, commission | equipment, install for fee, commission for fee | - |

te preparation, electrical interconnection, control buildings, lighting, etc., and other development costs such as early-stage engineering and permitting.

Page 11 of 12

Supplemental Final Environmental Impact Statement | Federal Coal Lease Modifications COC-1362 & COC-67232

BLM_0050862

Values can be changed, user should use non coverage cells with black text.

These changes represent the key drivers of project performance. Note that values of carbon offset credits must be adjusted for each individual year.

Blue project (NPV and IRR) is in the yellow highlighted cells.

| | Economic Pro Forma (stand-alone project, cash-on-cash) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| t (scfm) | 100,000 | | | | | | | | | |
| | 20.0% | | | | | | | | | |
| ation, by volume | 0.25% | | | | | | | | | |
| (tCO2e) | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 12.50 | 13.00 | 13.50 | 14.00 |
| (tCO2e) | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 |
| ) | 152,775 | 183,330 | 213,885 | 244,440 | 274,995 | 305,550 | 381,937 | 397,214 | 412,492 | 427,769 |
| | 20.50 | | | | | | | | | |
| m system ($) | (2,050,000) | | | | | | | | | |
| | (50,000) | (51,250) | (53,561) | (55,416) | (57,376) | (59,384) | (61,455) | (63,534) | (65,840) | (68,145) |
| | (51,250) | (53,022) | (54,878) | (56,799) | (58,787) | (60,845) | (62,974) | (65,178) | (67,459) | (69,821) |
| | 0.02 | | | | | | | | | |
| | (220,252) | (228,476) | (280,347) | (244,752) | (253,218) | (262,184) | (271,261) | (280,858) | (290,688) | (300,867) |
| | (2,271,981) | (333,251) | (344,915) | (356,987) | (369,481) | (382,413) | (395,797) | (406,650) | (423,984) | (438,828) |
| bt, immediate cash flow recognition ($) | (2,219,207) | (149,921) | (131,030) | (112,547) | (94,487) | (76,863) | (13,860) | (12,436) | (11,496) | (11,059) |
| | 10.01% | | | | | | | | | |
| | (2,408,557) $NUM! | | | | | | | | | |

now processed by the oxidizer. Default value is 100,000 cfm. Physical space of Shaft #4 could likely accommodate a system rated at 150,000-250,000 cfm.

esents an adjustment for a system located at 6,000 asl.

resents the most likely VAM concentration anticipated at Shaft #4. The expected range of VAM concentration is 0.15% - 0.31%.

enhouse gas (CO2 equivalent). The default values represent most likely value projections based on current market and regulatory environment.

iently used to compute oxidation systems. The default value (120.5/cfm) is based on budgetary proposals described on the RTO Manufacturer Comparison worksheet.

r unitized system cost by the VAM airflow rate. This value includes engineering, development, permitting, procurement, installation, commissioning

s based on 1/3 full-time mine engineer and is conservatively based on estimates of multiple RTO manufacturers

an annual cost equivalent to 5% of RTO system cost (i.e., not total system cost). This value will vary among RTO manufacturers

V) is based on rates paid by the West Elk Mine.

an assumption that should be updated for each specific application based on internal hurdle rate requirements

Page 12 of 12

512

BLM_0050863

Appendix A: Verdeo Mountain Coal VAM Feasibility Study, June 25, 2009
RTO Manufacturer Comparison

| Regenerative Thermal Oxidizer Manufacturer Comparison | | | | | | |
|---|---|---|---|---|---|---|
| RTO Manufacturer: | Biothermica | MEGTEC | Cycletherm | Met-Pro | Anguil | Durr | Average |
| RTO Economic Comparison | | | | | | | |
| Subtotal RTO system cost ($) | n/a | 2,100,000 | 1,700,000 | 1,230,000 | 1,950,000 | 1,550,000 | 1,706,000 |
| Development costs + contingency @ 20% of total system cost[1] | n/a | 420,000 | 340,000 | 246,000 | 390,000 | 310,000 | 341,200 |
| Total RTO cost for 100,000 cfm system ($) | n/a | 2,520,000 | 2,040,000 | 1,476,000 | 2,340,000 | 1,860,000 | 2,047,200 |
| Unitized RTO cost ($/cfm) | n/a | 25.2 | 20.4 | 14.8 | 23.4 | 18.6 | 20.5 |
| Maintenance and supplies @ 3% CapEx/a ($/a) | n/a | 75,600 | 61,200 | 44,280 | 70,200 | 55,800 | 61,416 |
| Electric parasitic load (kW) | 350 | 350 | 300 | 390 | 480 | 440 | 385 |
| RTO Design Comparison | | | | | | | |
| Number of oxidizer units needed to process 100,00 cfm. | 1 | 2 | 2 | 2 | 2 | 2 | 2 |
| Manufacturing lead time (weeks) | 32 | 24 | 16 | 24 | 20 | 24 | 23 |
| Thermal efficiency (% heat recovery) | 96% | 95% | 94% | 95% | 95% | 95% | 95% |
| RTO design life (years) | 15-20 | 7-20 | 20-30 | 10-15 | 20 | 15-20 | 15-20 |
| Start-up profile (fuel type, duration, energy requirement) | propane, gas, 8 hours, 50 MMBtu | electricity, 24 hours, 11 MWh | diesel, 1 hour, 7 MMBtu | diesel 1 hour 9 MMBtu | diesel, gas, propane, 2 hours, 18 MMBtu | diesel, gas, propane, 8 hours, 16 MMBtu | 10 MMBtu is about (75 gallons of diesel). |
| RTO footprint and weight | 90' x 40', 200,000 lbs | 100' x 70', 680,000 lbs | 43' x 29', - | 38' x 34', 310,000 lbs | 60' x 80', 500,000 lbs | 84' x 50', - | 70' x 50', 420,000 lbs |
| Scope of standard manufacturer services | equipment, install, commission | equipment, install, commission | equipment, install commission for fee | equipment, install for fee, commission for fee | equipment, install, commission | equipment, install for fee, commission for fee | - |

Footnotes:

1. Includes peripheral equipment such as site preparation, electrical interconnection, control buildings, lighting, etc., and other development costs such as early-stage engineering and permitting.

513

Page 11 of 12

### Appendix A: Mountain Coal VAM Feasibility Study, June 25, 2009
### RTO Financial Analysis

**Ventilation Air Methane Thermal Oxidation Simplified Financial Analysis**

This financial analysis provides a 10-year projection of the economic performance of a ventilation air methane (VAM) oxidation system that generates economic value exclusively from the generation of carbon offset credits.

Note that all assumption cells that can be changed use blue text. Do not change cells with black text.

The assumptions cells that may be changed represent the key drivers of project performance. Note that values of carbon offset credits must be adjusted for each individual year.

The economic performance of the project (NPV and IRR) is in the yellow highlighted cells.

| Economic Pro Forma (stand-alone project, cash-on-cash) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Ventilation shaft airflow rate (acfm)[1] | 100,000 | | | | | | | | | |
| Elevation adjustment[2] | -20.0% | | | | | | | | | |
| Vent shaft flow CH4 concentration, by volume[3] | 0.25% | <<< ensure percentage is accurately entered (i.e., 0.0025 for .25%) | | | | | | | | |
| Carbon offset credit value ($/tCO2e)[4] | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 12.50 | 13.00 | 13.50 | 14.00 |
| Net GHG emission reduction (tCO2e) | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 | 30,555 |
| Revenue, carbon offset credit ($) | 152,775 | 183,330 | 213,885 | 244,440 | 274,995 | 305,550 | 381,937 | 397,214 | 412,492 | 427,769 |
| | | | | | | | | | | |
| Unitized RTO cost ($/cfm)[5] | 20.50 | | | | | | | | | |
| Total system cost, 100,000 cfm system ($)[6] | (2,050,000) | | | | | | | | | |
| OpEx, staff ($)[7] | (50,000) | (51,750) | (53,561) | (55,436) | (57,376) | (59,384) | (61,463) | (63,614) | (65,840) | (68,145) |
| Maintenance and supplies ($)[7] | (51,230) | (53,023) | (54,878) | (56,799) | (58,787) | (60,845) | (62,974) | (65,178) | (67,459) | (69,821) |
| Energy cost ($/kWh)[9] | 0.07 | | | | | | | | | |
| Energy costs ($) | (220,752) | (228,478) | (236,475) | (244,752) | (253,318) | (262,184) | (271,361) | (280,858) | (290,688) | (300,862) |
| Expenses ($) | (2,371,981) | (333,251) | (344,915) | (356,987) | (369,481) | (382,413) | (395,797) | (409,650) | (423,988) | (438,828) |
| | | | | | | | | | | |
| Simple cash flow, no tax, no debt, immediate cash flow recognition ($) | (2,219,207) | (149,921) | (131,030) | (112,547) | (94,487) | (76,863) | (13,860) | (12,436) | (11,496) | (11,058) |
| | | | | | | | | | | |
| NPV rate[10] | 10.99% | | | | | | | | | |
| Project NPV ($) | (2,408,857) | | | | | | | | | |
| Project IRR | #NUM! | | | | | | | | | |

Footnotes:

1. This represents the VAM airflow processed by the oxidizer. Default value is 100,000 cfm. Physical space of Shaft #4 could likely accommodate a system rated at 150,000-250,000 cfm.

2. The default value (-20%) represents an adjustment for a system located at 6,000' asl.

3. The default value (0.25%) represents the most likely VAM concentration anticipated at Shaft #4. The expected range of VAM concentration is 0.15% - 0.31%.

4. Dollars per metric tons of greenhouse gas (CO2 equivalent). The default values represent most likely value projections based on current market and regulatory environment.

5. Unitized cost is a metric frequently used to compare oxidation systems. The default value ($20.5/cfm) is based on budgetary proposals described on the RTO Manufacturer Comparison worksheet.

6. Calculated by multiplying the unitized system cost by the VAM airflow rate. This value includes engineering, development, permitting, procurement, installation, commissioning

7. The default value ($50,000) is based on 1/3 full-time mine engineer and is conservatively based on estimates of multiple RTO manufacturers

8. The default value is based on an annual cost equivalent to 3% of RTO system cost (i.e., not total system cost). This value will vary among RTO manufacturers.

9. The default value ($0.07/kWh) is based on rates paid by the West Elk Mine.

10. The interest rate (10.99%) is an assumption that should be updated for each specific application based on internal hurdle rate requirements

# EXHIBIT I

## VERDEO CARBON MARKET ANALYSIS

BLM_0050866

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232





# Carbon Assessment Report

September 2009

**Prepared for Mountain Coal Company LLC for the West Elk Mine**

Verdeo Group, Inc.
1600 K Street NW, Suite 700
Washington, DC  20006
Tel: 202-391-0160
Fax: 202-393-0606
www.verdeogroup.com

516

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

## Table of Contents

| | | |
|---|---|---:|
| I. | Executive Summary | 3 |
| II. | Overview of Cap-and-Trade and Carbon Offsets | 3 |
| | Cap-and-Trade | 3 |
| | Carbon Offsets | 4 |
| III. | U.S. Climate Change Policy | 4 |
| | State and Regional Policy | 4 |
| | Colorado State Policy | 5 |
| | Federal Policy | 6 |
| IV. | Impact of GHG Policy on Coal Mines | 6 |
| V. | U.S. Carbon Markets & Offset Certification Programs | 7 |
| | Market Drivers | 7 |
| | Offset Certification Programs | 8 |
| VI. | Implications for Coal Mine Methane Projects | 9 |
| VII. | Coal Mine Methane Project Types | 9 |
| | Project Types | 9 |
| | Additionality | 11 |
| VIII. | Implementing Coal Mine Methane Projects | 12 |
| IX. | Carbon Offset Credit Price Projections | 15 |
| | Drivers of Current Offset Prices | 15 |
| | Current Offset Credit Price Estimates | 16 |
| | Drivers of Future Offset Prices | 16 |
| | Future Offset Credit Price Projections | 17 |
| Appendix: Comparison of Leading U.S. Carbon Offset Certification Programs | | 18 |

BLM_0050868

## I.   Executive Summary

Federal policy to regulate greenhouse gas (GHG) emissions is developing. As currently proposed by Congress, this would take the form of a cap-and-trade program. If cap-and-trade is not enacted, the EPA may attempt to regulate U.S. GHG under the Clean Air Act. While such policy may not be welcomed by coal mining companies, opportunities are emerging for owners of coal mines to benefit financially from the implementation of these policies. In fact, it is possible that coal mines will not be regulated for methane emitted during the mining process, and that projects developed to reduce methane emissions from mine ventilation and degasification systems will be able to generate compliance-grade carbon offset credits. In response to these emerging developments, Mountain Coal Company LLC (Mountain Coal) retained Verdeo Group, Inc. (Verdeo) to develop a Carbon Assessment Report that provides a detailed overview of the U.S. carbon market and emerging GHG policies to document how the coal mining industry, and particularly gassy underground mines, may be impacted by these impending developments. This report also includes an overview of the current U.S. carbon offset project certification programs, a high-level overview of the coal mine methane (CMM) carbon offset project types, a description of processes required to certify high-quality projects, and an analysis of current carbon offset prices and future price projections.

Verdeo's key findings from this Carbon Assessment Report are:

- Emerging legislation suggests that cap-and-trade will be the most likely framework of any federal program to reduce GHG emissions. A cap-and-trade program is also expected to include a carbon offset program in order to reduce the costs of compliance for capped facilities.

- Current legislation making its way through Congress suggests that coal mines may not be regulated for their methane emissions under a cap-and-trade program, and may have the opportunity to generate carbon offset credits for emission reductions implemented under a GHG cap-and-trade program.

- As federal policy emerges, state and regional cap-and-trade programs continue to develop mandatory cap-and-trade programs. Key developments in the west, including the State of California's program and the regional Western Climate Initiative, may recognize CMM offset projects.

- In anticipation of U.S. cap-and-trade programs, a "pre-compliance" market has emerged that provides potential frameworks for developers of CMM offset projects to certify and monetize GHG emission reduction assets.

- Successful carbon project development requires careful planning and execution to ensure the value of emission reduction assets is maximized. This is critical to ensure that projects implemented in the near-term are positioned to maintain value as the market transitions to a compliance cap-and-trade program.

## II.   Overview of Cap-and-Trade and Carbon Offsets

Cap-and-trade has emerged as the most likely structure under which GHG emissions in the U.S. economy will be addressed, if federal GHG legislation is enacted. Understanding how cap-and-trade programs and carbon offset credits work is critical to understanding how coal mines may be able to participate in these emerging frameworks.

### Cap-and-Trade

Cap-and-trade is often discussed as an efficient and cost-effective system to reduce GHG emissions. The objective of an emissions cap-and-trade program is to minimize costs of compliance by providing regulated facilities with flexibility in how they meet their reduction target. The idea is that companies that can reduce emissions at lower cost than others have an incentive to do so, and can sell these reductions to other entities regulated under the cap. Cap-and-trade was first enacted into law in the emissions trading scheme developed as part of the Acid Rain Program created under Title IV of the 1990 Clean Air Act to address emissions of $NO_X$ and $SO_X$. The success of this program led U.S. climate negotiators to propose emissions trading as a way to manage GHG emissions as part of the Kyoto Protocol, which was adopted in 1997 but never ratified by the U.S. Senate.

Page 3 of 18

518

BLM_0050869

Determining the sources of emissions that will be covered under the cap is fundamental to the design of an effective cap-and-trade program. Since measuring and reporting of emissions entails significant costs, large stationary sources that emit GHG emissions such as electric power plants and large industrial facilities are typically targeted under a cap. For example, coal mining companies may not be capped directly, but electric generators that burn coal or natural gas could be capped and would have to submit allowances (i.e., pollution permits) to the government on a regular basis. The cost of electricity and other products in the U.S. will incorporate the additional costs of these allowances, an intended effect designed to reduce the carbon intensity of the U.S. economy.

Numerous other sectors and sources of emissions in the economy typically remain uncapped under GHG cap-and-trade programs, either because the sector's aggregate emissions are too small or the nature of the emissions makes them difficult or costly to cap. Under a well-designed cap-and-trade program, sources not affected by a cap will have abatement incentives through a compliance-based offset program. While emerging cap-and-trade programs in the U.S. have all defined or proposed slightly different sets of eligible project types or sectors under an offset program, all, to varying degrees, have proposed to recognize projects that capture and combust fugitive methane emissions from such sources as coal mines, landfills, and livestock farms.

**Carbon Offsets**

A carbon offset credit (or "offset") is an instrument reflecting the reduction, avoidance, or sequestration of a quantity of gas with a global warming potential equivalent to that of one metric ton of carbon dioxide that is achieved in an uncapped sector or facility (hence, the term "carbon dioxide equivalent", or $CO_2e$). Coal mines may be eligible to generate offsets in a future cap-and-trade program, for several reasons. Since the electricity sector is the largest source of GHG emissions in the U.S. and will very likely be capped, extending limitations to coal mines would essentially "double tax" utilities and the coal industry. By allowing coal mines to generate offsets instead, companies have a positive incentive to develop GHG abatement or utilization projects. In addition, coal mines must optimally manage methane for the safety of its workers; new policies must not interfere with mines' ability to safely manage its methane.

## III.   U.S. Climate Change Policy

Current activity at the state, regional, and federal levels is setting precedents and driving the formation of the forthcoming U.S. carbon market, including how coal mines and their associated methane emissions will be impacted in the long-term. Below, we provide a detailed overview of the various state, regional, and federal GHG initiatives in development.

**State and Regional Policy**

States and regions have historically been the earliest movers to introduce and pass climate change-focused policy initiatives, including renewable energy production mandates, GHG reduction goals, and mandatory cap-and-trade programs. These efforts paved the way for action at the federal level and significantly influenced developments in the U.S. voluntary and pre-compliance carbon markets. While a federal program has a high probability of eventually preempting, at least in part, GHG programs already established at the state and regional levels, the Federal government will likely recognize reductions made under these programs, including any offsets registered and generated before a federal program is formally implemented on an "early action" basis.

Page 4 of 18

BLM_0050870

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

This chart contains a brief summary of the leading state and regional cap-and-trade programs in effect or under development in the U.S., including prospects for recognizing CMM offset projects:

| | The Regional Greenhouse Gas Initiative (RGGI) | State of California | Western Climate Initiative (WCI) | Midwestern Greenhouse Gas Reduction Accord |
|---|---|---|---|---|
| **Program Scope** | Caps GHG emissions from electricity generating facilities with capacity of 25 MW or greater | Will cap approximately 85% of CA's emissions; program rules are in development | Will cap approximately 90% of regional GHG emissions; program rules are in development | Accord is under development, but participating states have committed to implement a regional cap-and-trade program |
| **States** | Ten Northeast and Mid-Atlantic states[1] | California, but expected to link with the WCI | Seven U.S. states[2] and four Canadian provinces[3] | Nine Midwestern states[4] and two Canadian provinces[5] |
| **Program Start Date** | January 2009 | 2012 | 2012 | 2012 |
| **Includes Offset Program?** | Yes – However no protocol for coal mine methane projects | Yes – Likely to include offsets from coal mine methane projects | Yes – Likely to include offsets from coal mine methane projects | Yes – Offset types are not yet defined, but Accord recommends linking with other programs such as RGGI and WCI |

State and regional activity on GHG emissions is relevant to the coal mining sector for multiple reasons. First, the rules of these programs are impacting the design of a future federal program. Second, these programs create real demand for carbon offset credits generated by coal mines, regardless of federal actions. Third, there is an expectation that recognized offsets will be accepted under a federal program, which creates demand for offsets generated under these state and regional programs. While RGGI recognizes only a sub-set of eligible offset project types (and not CMM), there is a greater chance that CMM offsets will be recognized in California and the WCI. More detail on the likelihood of CMM projects being accepted under the California and WCI programs is outlined in Section VI.

**Colorado State Policy**
The state of Colorado is taking a number of steps to transition to a lower carbon economy. Colorado, along with five other U.S. states and a handful of Mexican states and Canadian provinces, is an observer to the WCI. While Colorado's observer status does not carry regulatory authority[6], it does signal an interest of the state government in climate change issues. In 2007, Governor Ritter released the Colorado Climate Action Plan, which set a goal for the state to reduce GHG emissions by 20 percent by 2020. The state also set a precedent for similar action when it enacted an aggressive renewable portfolio standard that calls for 20% of electricity purchased by electric utilities to be from renewable sources by 2020.

Colorado also encourages the voluntary purchase of carbon offsets by individuals and corporations. The Colorado Carbon Fund (CCF), a voluntary carbon offset program developed by the Governor's Energy Office, purchases carbon offsets from projects developed in Colorado. The CCF is primarily interested in purchasing small volumes of carbon offset credits (less than 10,000 tons per year) and prefers to be the sole purchaser of offsets generated from a project. As a result, the CCF is not a target purchaser of offsets generated from CMM projects, which

---

[1] The states of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, and Vermont are signatory states to the RGGI agreement.
[2] Members: Arizona, California, New Mexico, Oregon, Washington, Utah and Montana. Observers: Alaska, Colorado, Idaho, Kansas, Nevada, and Wyoming.
[3] Members: British Columbia, Manitoba, Ontario, and Quebec. Observers: Saskatchewan. Mexico observers: Border states of Baja California, Chihuahua, Coahuila, Nuevo Leon, Sonora, and Tamaulipas.
[4] Members: Iowa, Illinois, Kansas, Michigan, Minnesota, and Wisconsin. Observers: Indiana and Ohio.
[5] Members: Manitoba. Observers: Ontario.
[6] As an observer to the WCI, Colorado has the opportunity to monitor the progress and development of the WCI, but is not bound to adopting GHG reduction targets or any other mandatory policies as agreed to by WCI members.

BLM_0050871

generate significantly larger volumes of credits annually. More importantly, the CCF is willing to work in conjunction with the Governor's Energy Office to connect sellers of large-volume offsets with large pre-compliance buyers in the state that are seeking offset credits in ahead of federal GHG regulations.

**Federal Policy**

While state and regional action on GHG emissions continues to progress, implementation of a federal climate change program may have the greatest impact on coal mines. The most notable Congressional activity of this year to date has been the passage of the *American Clean Energy and Security Act of 2009* (*ACESA*), which was introduced by Representatives Waxman (D-CA) and Markey (D-MA). This bill, H.R. 2454, proposes to establish a federal cap-and-trade program to reduce GHG emissions. It includes a domestic offset program to help reduce costs of compliance, and included provisions to provide some "early action" recognition for emission reductions generated in advance of a federal program. Overall, however, the bill largely left the EPA with the discretion to design the structure of the offset program.

With the passage of the *ACESA* bill in the House, the Senate has subsequently announced that it is working to draft its own version of a cap-and-trade bill. This process is being managed by Senator Boxer (D-CA), who is the Chair of the Environment and Public Works Committee. While initial indications suggested that Senator Boxer would release a draft bill by September 8, the Senator has since announced that the date of release will be pushed back to an as yet undetermined date at the end of September. It is too early to speculate on the content of this forthcoming bill or what its prospects for passage may be in the Senate.

As the Senate continues to develop GHG legislation, the EPA has started a rulemaking process to regulate certain sources of GHG emissions under the Clean Air Act. This rulemaking comes in response to the EPA's "endangerment finding" in April 2009, which, prompted by the 2007 Supreme Court decision in *Massachusetts v. EPA*, found that GHG emissions endanger public health and welfare. However, it is highly uncertain to what extent GHG regulation will actually be implemented by the EPA, as the rulemaking process is expected to take several years and could be pre-empted by Congressional action. In one of its first rules, the EPA has already proposed to exempt smaller sources of emissions from being subject to any new regulation under the Clean Air Act, and instead keep the regulation focused on larger sources. We anticipate that the most probable outcome of the EPA's endangerment finding and its subsequent rulemaking is that it may eventually prompt Congress to pass legislation – if not this year, then in 2010 or 2011.

## IV.   Impact of GHG Policy on Coal Mines

Although GHG legislation will likely present challenges for coal mines and related businesses, we see evidence to suggest there may be positive outcomes and opportunities for coal mines under a federal cap-and-trade program. Most members of Congress recognize the critical role that coal plays in providing the U.S. with the majority of its low-cost electricity, and want a program that will mitigate any negative effects on the competitiveness or viability of U.S. companies. Incentives for carbon capture and sequestration are likely to have a prominent role in legislation, and will be designed to facilitate development and deployment of "capture-ready" coal-fired power plants.

Notably, the *ACESA*, as well as earlier proposed versions of federal GHG legislation such as the Lieberman-Warner Climate Security Act in the Senate and the Dingell-Boucher Discussion Draft in the House, all included provisions to establish a federal offset program. With the exception of the *ACESA*, these bills specifically included a list of project types on a "positive list" that should be eligible to generate offsets under a federal program. For example, the Climate Security Act recognized "methane capture and combustion at nonagricultural facilities", and Senator Debbie Stabenow (D-MI) filed a supplementary amendment to the Act to amend much of the bill's original language on offsets to include "methane capture or combustion at...coal mines" on a positive list of eligible offset project types. The Dingell-Boucher Discussion Draft also included "methane collection and combustion from projects at active underground coal mines" on a positive list, and referenced "methane reduction from reclamation of abandoned surface mines"[7] on a list of project types that EPA should consider adding to the positive list.

---

[7] We believe this project type may have been misrepresented and the intention was to include "methane reduction from reclamation of abandoned underground mines".

BLM_0050872

While there has been significant momentum to allow emission reduction projects at coal mines to generate offsets under a cap-and-trade system, it should be noted that there is also a growing push by some environmental groups to have the EPA regulate various sources of methane under the Clean Air Act. For example, the *ACESA* included a provision to require the EPA to regulate emissions from landfills and natural gas systems – a provision that would disqualify many facilities from generating offset credits. This provision did not include emissions from coal mines as a source for which such standards would be applied. Therefore, while coal mine emissions appear to be exempt from the prospect of regulation under the *ACESA*, coal mines should closely monitor the development of legislation as it moves through Congress to ensure that this threat does not emerge in subsequent deliberations.

While activity at all levels of government suggest that it is most likely for a cap-and-trade program to be implemented at the federal level, and that it is probable that coal mines will not be capped or regulated under other standards such as the Clean Air Act, it is also possible that these and other scenarios could evolve.

The uncertainty regarding the course and details of federal legislation has several implications for Mountain Coal and other coal companies. First, the volume of carbon offsets that a coal mine might generate will depend on whether coal mine emissions are eventually capped or regulated, or allowed to generate offsets. Second, the value and rate of appreciation of carbon offsets will depend on the scope and timetable of a cap, and overall market demand for offsets. In the meantime, however, coal companies can take advantage of emerging opportunities to develop carbon offset projects as a result of growing offset certification frameworks in the U.S. The following section discusses existing certification programs and their implications for CMM projects.

## V.  U.S. Carbon Markets & Offset Certification Programs

A U.S. market for carbon has grown over the past several years in response to state and regional GHG policy development and the increased likelihood of federal GHG policy. This section provides an overview of the current state of the U.S. carbon market including the different buyers that are driving demand for offsets, leading certification programs for offset projects, and key implications for CMM projects.

**Market Drivers**
The carbon market was once dominated by corporations (that were mostly not large emitters) looking to voluntarily reduce their GHG footprint, improve sustainability, and possibly enhance brand image, has widened to include companies that are likely to be regulated under a government GHG program. This market, which is known as the "pre-compliance" carbon market, has seen large GHG emitters such as electricity generators, and large industrial and manufacturing companies participate in a range of initiatives, including quantifying corporate emissions, setting emission reduction targets, and enacting initiatives to reduce corporate emissions.

BLM_0050873

The following chart outlines the customer segments that currently participate in the U.S. carbon market.

| Buyer Type | Examples | Desired Offset Criteria | Segment Demand |
|---|---|---|---|
| Voluntary | Google, News Corporation, offset retailers that sell credits to small businesses and individuals | "Charismatic" projects with co-benefits, such as forestry projects or livestock methane projects at farms | Voluntary demand has diminished with the economic recession and as corporate discretionary budgets are reduced |
| Financial | Hedge funds, commodity traders/banks | Low price, option value, low delivery risk | Demand from banks and speculators is increasing as they are willing to take more delivery and compliance eligibility risk |
| Pre-Compliance | Utilities, IPPs, large industrials and other companies that expect to be regulated under a cap-and-trade program | Likelihood of regulatory eligibility, high volume, and certainty of delivery | Pre-compliance demand is growing as buyers see an opportunity to buy compliance-grade credits at a discount to prices expected under a regulated market |

Companies in the pre-compliance market purchase carbon offset credits in the hope that they will have value in a future compliance market. These pre-compliance buyers are expected to have the largest appetite for offset credits generated from coal mines over the next several years. CMM offset projects can provide these buyers with large-volume, cost-effective and permanent reductions that, if recognized under an eligible certification program, may have value in a federal compliance market. Because a large segment of this pre-compliance market is comprised of customers to the coal mine industry, many buyers are interested in purchasing offsets from projects developed by their current suppliers. Therefore, coal mines with large methane emissions are well-positioned to sell their carbon offset credits to the same buyers of their coal, such as utilities or other large industrials, which anticipate being capped under a cap-and-trade program.

**Offset Certification Programs**
Carbon offsets transacted in the pre-compliance market tend to be certified by one of a handful of certification programs. Certification programs provide project developers with offset project protocols that define the project requirements, and provide guidance on measuring and quantifying emission reductions. Programs also set rules and requirements for third-party offset project review and approval, and may also maintain established central registries that record approved projects and certified offset credits.

As GHG policy has evolved, it has become more apparent which projects registered (and offset credits "banked") under each of these certification programs may be recognized under a future federal cap-and-trade program. Further, the prospect for federal recognition has a direct impact on the price at which these credits trade in the market today. Please note that the Appendix at the end of this report contains a table with detailed information about these certification programs, including eligible project locations, prospects on compliance value, and current market pricing.

BLM_0050874

## VI.    Implications for Coal Mine Methane Projects

The chart below outlines the availability of an approved CMM protocol under each of the major certification programs in the U.S. today. It also includes Verdeo's assessment of the potential for projects registered under these programs to transfer into an emerging compliance cap-and-trade program at the state, regional, or federal level.

| Certification Program | Protocol for CMM Projects | Type(s) of CMM Projects Recognized | Prospects for Compliance Value |
|---|---|---|---|
| **Climate Action Reserve (the "Reserve")** | Version 1 will be released in Oct 2009, and Version 2 (pipeline) is targeted for release in Feb 2010 | ***Recognized:*** Version 1 will recognize Oxidation of VAM, and utilization/combustion of CMM via all methods except pipeline utilization<br><br>***TBD:*** Pipeline utilization performance standard is under development | Very High |
| **Voluntary Carbon Standard (VCS)** | Yes – ACM0008, approved under CDM | ***Recognized:*** VAM, Pre-Mine and Post-Mine Drainage | High |
| **EPA Climate Leaders** | In Development – release TBD | ***TBD:*** VAM, Pre-Mine and Post-Mine Drainage | Very High |
| **American Carbon Registry (ACR)** | Looks to guidance by EPA and VCS | ***Probable:*** VAM, Pre-Mine and Post-Mine Drainage | Moderate |
| **Chicago Climate Exchange (CCX)** | Yes | ***Recognized:*** VAM, Pre-Mine and Post-Mine Drainage | Low |

The Voluntary Carbon Standard (VCS) and Chicago Climate Exchange (CCX) have been the primary certification options available to developers of CMM projects. However, with forthcoming CMM protocols from both the Climate Action Reserve (Reserve) and EPA Climate Leaders program, developers of CMM offset projects will soon have two additional certification options that are backed by official government programs. This may increase the likelihood that projects using these protocols will have value in a future compliance market. Reserve offset standards are the only ones recognized by the State of California to generate offset reductions under a voluntary state reporting program, and may be recognized under California's cap-and-trade program, the WCI, and a federal program. As the Climate Leaders program is a voluntary GHG reduction program sponsored by the federal government, its forthcoming CMM offset protocol may also receive similar recognition. In that case, offset projects approved by Climate Leaders could receive early action recognition under a future federal program.

While the development of CMM protocols under the Reserve and Climate Leaders is encouraging, the degree to which these protocols foster new project development is contingent upon the specific CMM offset project types that will be recognized. The eligibility of different CMM project types to generate offset credits is discussed further in the following section.

## VII.    Coal Mine Methane Project Types

**Project Types**

There are three primary sources of fugitive methane emissions from underground coal mines and, thus, three primary types of emission reduction projects that, under different certification programs, are eligible to generate offset credits in the U.S. carbon market. The first source is ventilation air methane (VAM), the gas that is exhausted from a mine's main ventilation system that is dilute in methane concentration. While over 50% of GHG emissions from the coal mining sector are generated by VAM, this gas cannot be destroyed using traditional combustion technologies because of its low methane concentration. However, oxidation technology, which has been widely deployed in various industrial applications to destroy volatile organic compounds, can be used

Page 9 of 18

524

successfully to destroy VAM emissions. Verdeo has a prepared a separate report accompanying this one examining the state of the art in oxidation technology and potential applicability to the West Elk Mine.

A second source is methane drained from post-mine degasification systems. These systems extract methane from gob areas that form following the collapse of strata during longwall mining. Methane is drained primarily to avoid unsafe concentrations of methane migrating into the mine working areas. This gas may have potential application for electricity generation, on-site heat applications, or natural gas pipeline delivery, or, it could be incinerated with flaring technology to generate carbon offset credits. In addition, a third source is methane gas extracted in advance of mining through pre-mine vertical or in-mine horizontal boreholes. The methane extracted from this process can also be flared or utilized to generate carbon offset credits.

While there are some fugitive methane emissions from surface mines, these are a small fraction of overall methane emissions and are difficult to capture and quantify. Therefore, most certification programs focus on underground coal mines.

*Continued on Next Page*

BLM_0050876

Additional information on the three primary sources of coal mine methane and project types that can be developed to reduce these emissions is detailed below.

| Methane Source | What it Entails: | Utilization Technology | Destruction Technology | Current U.S. Examples |
|---|---|---|---|---|
| Ventilation Air Methane (Active Mine) | Oxidation technology is used to destroy ventilation air with very low methane concentrations VAM, the dilute methane emitted from central mine ventilation shafts, is responsible for over 50% of methane emissions from the mining sector in the U.S. With the exception of just two mines that developed VAM abatement projects in the U.S., all VAM from mines is released directly to the atmosphere. Therefore, any new offset project development that occurs to abate VAM emissions is likely to be considered highly additional under existing offset certification programs. | Low-grade heat Electricity generation | Thermal oxidation | Mine No. 4, Alabama (active) (Jim Walter Resources) Windsor Mine (inactive), West Virginia (CONSOL) |
| Post-Mine Degasification (Active or Abandoned Mines) | Post-mine drainage or methane recovery from vertical gob wells is employed to extract methane from the gob as mining progresses. Vertical wells can be drilled from the mine surface into the gob areas and pumps installed to extract methane that would otherwise flow into the working areas of the mine. It is also possible to drill ahead of the gob formation. While gob wells can initially produce very high concentration methane, many gob wells produce methane that requires conditioning to remove nitrogen, carbon dioxide, oxygen, and other impurities for pipeline delivery. Most mines that extract methane from vertical gob well drainage vent this methane to the atmosphere. | Gas conditioning, for pipeline delivery or onsite use Electricity generation Heat generation | Pipeline delivery Incineration with enclosed stack flare or thermal oxidation | Blue Creek Mines, Alabama (Jim Walter Resources) Blacksville No. 2 Mine, West Virginia (CONSOL) |
| Pre-Mine Degasification (Active Mine) | Pre-mine drainage entails recovering methane gas from the coal seam and surrounding strata in advance of mining either through vertical wells or in-mine horizontal boreholes or longhole horizontal boreholes. Because recovered methane is not mixed with ventilation air, the extracted methane is occasionally of pipeline-grade quality. According to the EPA, six of the underground coal mines in the U.S. that have employed methane drainage systems are using vertical pre-mine wells, nine are using horizontal borehole drainage, and two are using longhole horizontal borehole drainage.[8] | Gas conditioning, if needed, for pipeline delivery or onsite use Power generation Heat generation | Pipeline delivery Incineration with enclosed stack flare or thermal oxidation | Buchanan Mine, Virginia (CONSOL) Cumberland and Emerald Mines, Pennsylvania (Foundation) Oak Grove and Pinnacle Mines, Alabama and West Virginia (Cliffs) |

**Additionality**

Additionality is a key consideration for mines considering the development of emission reduction project. Projects that are additional and, therefore, eligible to generate carbon offset credits, are those that would have not likely been implemented without the incentive of a market for GHG emission reductions.

Additionality can be measured using a performance standard or on the basis of evaluating specific characteristics of individual projects (project-specific). A performance standard is typically designed by an offset program administrator to set a clear, upfront threshold for project eligibility. For example, a performance standard for a VAM oxidation project type could establish eligibility by assessing the number of mines that collect and oxidize VAM, and evaluate whether such practice is standard throughout the mining industry. In contrast, project-specific additionality tests require each individual project to demonstrate why it is additional. While these tend to entail

---

[8] Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002-2006. U.S. Environmental Protection Agency, September 2008.

BLM_0050877

more subjective evaluation of eligibility on the part of an offset program administrator, project-by-project reviews can help account for projects that may fall as an exception to a performance standard rule. While the international offset market under the Clean Development Mechanism (CDM)[9] has historically adopted a project-by-project approach to evaluating additionality, a federal U.S. program will likely adopt performance standard-based approaches based on precedents set by other pre-compliance offset programs[10].

With the exception of just two mines (one active) that have developed VAM abatement projects in the U.S., all VAM from mines in the U.S. is released directly to the atmosphere. Therefore, new offset project development that occurs to abate VAM emissions is universally likely to be considered additional under any of the current offset certification programs, as well as under a future federal program. In addition, projects that involve the destruction of methane extracted from pre- and post-mine degasification systems through flaring, electricity generation, on-site heat generation, or other non-pipeline utilization applications are likely to be seen as additional by certification programs because they are not prevalent in the U.S. The majority of mines that have existing systems to collect methane from degasification systems do so only for pipeline utilization. Some of these mines generate carbon offset credits along with pipeline gas sales, though some of them only rely on the revenue from pipeline sales. For a mine that considers developing a new pipeline utilization project, its ability to generate carbon offset credits will depend on the certification program used and individual circumstances of the project.

For example, while the performance standard-based CMM protocol in development by the Reserve is anticipated to recognize as additional all non-pipeline utilization projects, it is not clear whether all gas pipeline utilization projects will be considered additional. Most likely, the Reserve will set strict parameters for the types of mines that can receive carbon offset credits for pipeline utilization projects. However, certification programs like CCX universally recognize all methane collection and combustion project types, including all pipeline utilization projects. Programs like the VCS fall somewhere in between; as VCS takes a project-specific approach to evaluating additionality, mines pursuing pipeline utilization can try to demonstrate that, based on mine-specific characteristics, collection and utilization is not business-as-usual.

## VIII. Implementing Coal Mine Methane Projects

While each CMM carbon offset project has its own unique set of characteristics, all CMM projects must follow a similar process to generate a tradable carbon offset credit. A project must be sufficiently documented and developed with a strict eye towards the rules set forth by a specific offset protocol and certification program. In general, all processes will follow the following six steps.

### Step 1: Select certification standard and offset protocol
Certification programs typically have a pre-approved set of protocols that are available for public use and applicable to specific offset project types. These protocols provide guidelines for determining individual project eligibility, quantifying baseline emissions and emission reductions, and conducting monitoring of emission reductions over the life of the project. Other issues specific to carbon projects, such as guaranteeing performance of emission reductions, ownership of emission reductions, and demonstrating additionality, are also typically addressed in the project protocol.

There are several different certification programs in the U.S. and a project developer will need to take multiple factors into consideration when choosing a program under which to develop and register a CMM offset project. For instance:

> **Probability of Acceptance:** A certification program and offset protocol that fits the parameters of a given CMM offset project should be selected. For example, some programs and protocols have strict requirements about project state dates or specific project types that are eligible.

[9] The CDM is a flexible mechanism of the European Union Emissions Trading Scheme (EU-ETS), whereby regulated companies in Europe can purchase Certified Emissions Reductions (CERs) from approved offset developing countries to help meet their GHG reduction obligations.
[10] Offset project protocols recognized under the EPA Climate Leaders Program and the Climate Action Reserve utilize performance-based standards to assess project eligibility and additionality.

BLM_0050878

➢ **Rigorous Standards:** Stricter protocols for the same CMM project type tend to command a price premium in the marketplace, so it often makes sense to choose the strictest protocol possible if a project can meet the protocol requirements.

➢ **Compliance with Future Regulation:** Consideration should be given to whether the certification program may be recognized under a federal compliance program, as credits in a compliance program will likely be more valuable if and when a federal cap-and-trade program is implemented. For instance, the Reserve has been singled out in the House's *ACESA* as a certification program for which projects registered will be eligible to receive compliance-grade offset credits under a federal cap-and-trade program.

➢ **Cost:** Cost is usually not a primary consideration when choosing a certification program. Registries typically charge an annual account maintenance fee for each project registered on the registry, typically around $500. There are also small fees when a credit is issued or transferred, and which is discussed in Step 6. However, if a project is being developed for which an existing approved protocol does not apply, a developer may incur significant costs to write a new project protocol and have it certified. The cost of developing a new protocol may range from $40,000 - $100,000, depending on the range of services required and the process to certify a new protocol.

*For more detailed information on U.S. certification programs, please see the accompanying Appendix, "Comparison of Leading U.S. Carbon Offset Certification Programs".*

**Step 2: Develop carbon project documentation**
In order for a project to be approved by a certification program, project developers must draft project documentation that follows the prescribed rules of the protocol and program. This documentation, which has slightly different requirements under the various certification programs, typically requires a project developer to provide the following project and technical data including:

➢ Detailed description of the CMM project
➢ Demonstration as to why the emission reduction project is not "business-as-usual"
➢ Calculation of baseline emissions and emission reductions
➢ Detailed monitoring methodology and plan
➢ Proof of ownership of emission reductions

**Step 3: Validate project documentation & register project**
The project document is then submitted to an independent third-party that has been approved by the certification program to conduct project validations. The project validation, which is comparable to that of an ISO certification or third party financial audit, entails a desktop review of the project documentation and may include a site visit, to determine whether the project meets the requirements of the offset protocol and certification program. If a validator determines the project does meet all necessary requirements, the project becomes validated and is eligible to generate carbon offset credits. After this stage, projects are then registered on the chosen or designated registry of the certification program.

Each certification program has a slightly different list of eligible validators, all of which are generally approved to conduct validations of specific offset project-types based on demonstrated expertise. While some of these companies may also provide other offset project-related consulting services, a company can only be hired as a validator if it has not provided any consulting services for a project.

➢ **Climate Action Reserve** – The Climate Action Reserve will release its list of eligible validators following the release of Version 1 of its CMM protocol in October 2009. The list will eventually be available at: http://www.climateactionreserve.org/how-it-works/verification/connect-with-a-verification-body/.

➢ **Voluntary Carbon Standard** – All validators recognized to conduct validations for mining-related projects (Scope 8) under the Kyoto Protocol's Clean Development Mechanism are eligible to conduct CMM project validations under the VCS. While Det Norske Veritas, TÜV SÜD, and SGS United Kingdom (SGS) are the best known eligible validators, several other companies have recently been approved to conduct mining project validations, including the U.S.-based First Environment, Inc. The complete list of eligible validators is available at: http://www.v-c-s.org/validators.html.

> ➢ **EPA Climate Leaders** – At this time, the EPA staff conducts its own project validations or reviews and does not rely on assistance of third-parties.

> ➢ **American Carbon Registry** – The American Carbon Registry has approved several companies to conduct project validations for a range of project types, though the companies with the most mining-related experience are First Environment, Inc. and Ruby Canyon Engineering. The complete list of approved validators is available at: http://www.americancarbonregistry.org/carbon-accounting/verification.

> ➢ **Chicago Climate Exchange** – The Chicago Climate Exchange has approved Marshall Miller and Associates, Raven Ridge Resources Incorporated, Ruby Canyon Engineering, Summit Engineering, Inc, and TÜV SÜD to conduct verifications of emission reductions from CMM projects[11]. The list of eligible verifiers is available at: http://www.chicagoclimatex.com/content.jsf?id=1803.

Costs for validation services will vary, though estimates for one-time project validation typically range between $20,000-30,000.

**Step 4: Operate project**
Project development activities are generally conducted in a parallel process with steps two and three above. As the project documentation is developed and approved, the developer is also at work designing the project, procuring the necessary equipment and constructing the project. In fact, project commissioning and operations can sometimes commence prior to validation. Typically certification programs have rules that require validation to be complete within a certain amount of time following the project start date. Once the project begins operating, the ongoing collection and reporting of emissions reduction data also commences.

**Step 5: Periodically verify GHG reductions**
Reductions of CMM emissions do not formally become carbon offset credits until the reductions have been verified by an independent third-party that is responsible for auditing the emission reduction data. Periodic verification is a process to review and confirm the number of emission credits generated over a period of time. The verification of offset credits is typically performed on an annual basis, although it is possible to verify more often (and thus create offset credits that are available for sale more often). A CMM project developer will weigh the costs and benefits of additional verifications prior to making this decision. The cost of verification services typically ranges from $10,000-15,000 per verification, and can be performed by the same companies that are certified to conduct project validations (see eligible list of validators under Step 3).

**Step 6: Register, issue and sell offset credits**
Once emission reductions have been verified as carbon offset credits, they can be registered under a certification program's registry and issued into the owner's account. Certification programs such as the Reserve[12] or CCX[13] have one designated registry where offset projects and credits are registered, whereas programs like VCS[14] allow project developers to register projects and offset credits in one of three designated registries. Once an offset credit has been issued, the owner is then free to sell the credits in the marketplace, "bank" the credits for future use, or retire the credits if they want to make the emission reductions permanent. There are a variety of outlets for selling registered offset credits. A seller can find buyers directly, use a third-party broker, or use one of a growing number of exchanges that list offset credits.

Registries generally charge an annual account maintenance fee for each project registered on the registry, which is typically around $500. Registries also generally charge between $0.05- $0.07 for each offset credit that is verified

---

[11] The CCX Offsets Committee reviews and approves eligible offset projects, and only requires third-party verification of emission reductions. Information on the verification process and estimated cost for services can be found under Step 5.
[12] The Climate Action Reserve operates one designated registry for certified offset projects. This registry is operated by APX Inc. New accounts can be applied for by accessing: http://www.climateactionreserve.org/open-an-account/.
[13] The CCX operates its own registry, which can only be accessed as a member of CCX. For more information about CCX membership, please visit: http://www.chicagoclimatex.com/content.jsf?id=65.
[14] The VCS allows project developers to register projects under any of three different registries, APX Inc., Caisse des Dépôts, and TZ1. For more information about these registries, please visit: http://www.v-c-s.org/projects.html.

BLM_0050880

and issued, and an additional $0.02 - $0.05 when an offset credit is sold from one party to another. Additional transaction costs are added depending on the method of sale. For example, emission brokers usually charge up to 3% of the total cost transacted between parties, while exchanges typically have annual membership fees as well as initial margin and maintenance margin requirements.

## IX.    Carbon Offset Credit Price Projections

### Drivers of Current Offset Prices

Current prices for carbon offset credits range anywhere today from $0.25 to $8 per metric ton, and this pricing is based on a range of factors. Aside from the current uncertainty regarding the future course of federal GHG policy, the three most significant determinants of current offset prices in the U.S. are: 1) the certification program under which an offset is certified; 2) the type of project that generates the offset; and 3) vintage of the offset, or year in which the offset was created.

> *Certification Program:* The certification program under which credits are issued is a primary driver of price because certification programs have varying degrees of offset quality and likelihood of acceptance into a federal cap-and-trade program. Credits issued under the Reserve currently trade at $6-8 per metric ton, the highest market prices in the U.S., due to the perceived likelihood of acceptance into a federal regime. In contrast, the CCX is listing credits for $0.25 per metric ton due to the growing market perception of CCX issuing lower-quality credits that will not be accepted in a future compliance market. VCS credits are trading in the range between $3-5 per metric ton, and prices for credits under the ACR are likely to fall somewhere in the range of trading prices seen for the Reserve and CCX.

> *Offset Project Type:* While there is no precise rule about the order of projects that command the highest market pricing, different types of offset projects (e.g., livestock methane, forest carbon sequestration, coal mine methane) can command different prices in the market. Many buyers, particularly those in the voluntary carbon market, prefer to buy credits from projects with a philanthropic image, such as forest sequestration projects. This is changing as the U.S. moves toward a "pre-compliance" market and buyers start to demand credits from project types that are the most likely to be included in federal legislation.

> *Vintage:* Another factor that is important to pre-compliance buyers is vintage, which is the year that a carbon credit is generated. The *ACESA*, passed in the House of Representatives, for example, included language to clarify that only projects implemented and registered under qualifying programs[15] after January 2001 would be eligible to receive early action credits under a cap-and-trade program, and further, that actual compliance-grade offset credits awarded for those projects would only be for emission reductions generated in 2009 and beyond. While this language may not be the language of a final cap-and-trade bill passed by Congress, the carbon market has responded in short-order by already signaling a preference for credits generated from vintages 2009 and forward.

---

[15] Programs deemed eligible by the language of the *ACESA* were those developed as part of a pre-existing state program (e.g., the Reserve or RGGI) and those potentially eligible, if approved by the EPA, were programs such as the VCS and ACR.

Page 15 of 18

BLM_0050881

**Current Offset Credit Price Estimates**
The following chart outlines the range of publicly available prices that have been published for offset credits under the following programs.[16] We note that these prices are always subject to change, and do not account for private bilateral transactions between parties that have not been disclosed.

| Certification Program | Climate Action Reserve | Voluntary Carbon Standard | EPA Climate Leaders | American Carbon Registry | Chicago Climate Exchange |
|---|---|---|---|---|---|
| $/per metric ton | $6-8 | $3-5 | Not reported | Not reported | $0.25-3 |

**Drivers of Future Offset Prices**
At the most basic level, future demand and pricing for carbon offsets will depend on whether federal legislation is enacted, and how it is designed. For example, legislation introduced to date has varied across a range of issues, including the level of the emission cap, timeframe for reductions, the amount of emission allowances that will be allocated and auctioned to capped facilities, and the number of domestic and international offsets that will be allowed into the system. As the shape of future legislation remains uncertain, future offset prices could range significantly under different design scenarios.

> *Level of the Cap:* The level of the cap will influence the level of emission reductions required across the economy and hence, the number of offset credits that will be in demand by facilities to comply with the cap. For example, the *ACESA* has reduced the number of emission reductions needed under the cap from the previous Waxman and Markey Discussion Draft. If the level of the cap changes in future versions of climate legislation, it should have a resulting impact on prices for carbon offset credits.

> *Number of Offsets Allowed:* Offsets are designed to serve as a cost-containment mechanism for a cap-and-trade program. For example, according to EPA analysis of the Waxman-Markey Discussion Draft, disallowing use of international offsets alone would almost double the price of allowances under the program, while also decreasing demand for offsets. Assuming that the emissions cap creates demand for emissions reductions, increasing the amount of offsets that can be used by capped facilities will increase demand for offset credits and lead to higher prices for offsets. The lesson learned under the European Union's cap-and-trade Emission Trading System (EU-ETS) is that offsets tended to trade at a discount to allowance prices, which averaged 25% during the second phase of EU-ETS.

> *Auction vs. Allocation of Allowances:* In President Obama's federal budget, emission allowances were to be fully auctioned by the federal government. In the *ACESA*, almost all of the allowances will be allocated for free to facilities covered under the cap. The extent to which the manner of distributing emission allowances has an effect on the price of carbon offset credits is debatable, though more free allocations to companies could lead to lower demand for offset credits. Ultimately, the price of offsets will driven by demand for reductions and whether companies can procure offset credits at a price lower than that of additional emission allowances.

> *Other Governing Factors:* There are many other provisions that could have a substantive effect on the price of offsets under a federal program. These include the presence or absence of a discount for offsets vs. allowances (i.e., requiring the submission of 1.25 offsets to receive credit for reducing 1.0 ton of emissions), the composition of the industries that will be covered under the cap, and the presence or absence of a "collar" on allowance prices (i.e., a government mechanism that sets a minimum and maximum price at which allowances can trade under a cap-and-trade program).

---

[16] Prices for the Climate Action Reserve, Voluntary Carbon Standard, and Chicago Climate Exchange represent those in the bid/ask range reported by TFS Energy and Evolution Markets during June-July 2009. The $0.25 price listed for the Chicago Climate Exchange reflects the exchange-listed price reported on its website as of September 3, 2009.

BLM_0050882

**Future Offset Credit Price Projections**
The following chart highlights the outcome of three potential legislative scenarios and associated estimates of future carbon offset credit prices in 2015 and 2020 under these scenarios.

| Reference Case | Future GHG Policy Outcome Scenario | 2015 Price Range Estimate ($/ton) | 2020 Price Range Estimate ($/ton) |
|---|---|---|---|
| High Case | 20% reduction of federal GHG emissions by 2020 <br><br> *(Waxman-Markey Discussion Draft)* | $11-14 <br><br> *(EPA estimate)* | $14-18 <br><br> *(EPA estimate)* |
| Base Case | 17% reduction of federal GHG emissions by 2020, more free allocations of allowances given to capped emitters than in High Case <br><br> *(American Clean Energy and Security Act of 2009)* | $13 <br><br> *(EPA estimate)* | $16 <br><br> *(EPA estimate)* |
| Low Case | Federal gridlock that produces no policy, or, a federal cap-and-trade program with over-allocation of allowances <br><br> *(Offsets traded in state/regional compliance markets (e.g., WCI) or voluntary markets)* | $7-10 <br><br> *(Verdeo estimate)* | $11-13 <br><br> *(Verdeo estimate)* |

The high case and base case scenarios and estimates for offset prices in 2015 and 2020 are based, respectively, on the EPA's economic modeling of the Waxman-Markey Discussion Draft[17], and the EPA's economic modeling of the *ACESA*, after it was passed out of the House Energy and Commerce Committee[18]. In the both the high and base cases, price projections are based on the assumption that cap-and-trade legislation is passed and carbon offset credits can be used for compliance. As previously discussed, these figures only represent prices projected by the EPA in relation to these specific pieces of proposed legislation. We anticipate that price projections will continue to evolve as the Senate takes up consideration of legislation this fall.

In the low case scenario, Verdeo assumes a scenario where either federal GHG policy is not enacted and offset trading remains limited to regional and voluntary markets. Alternately, a low case scenario could represent one where a federal GHG program is enacted but a high cap, resulting in low demand for offset credits, or one where a price collar is implemented, effectively restricting the price at which offset credits could trade. As regional programs are still under development, forward modeling of offset prices under these frameworks is very limited. We therefore assume future projected prices are would be higher than what we currently see in the voluntary market, but lower than what we could anticipate under a federal program. In general, there is a high level of uncertainty associated with future pricing for offset credits in the event a federal GHG program is not enacted.

---

[17] "EPA Preliminary Analysis of the Waxman-Markey Discussion Draft: The American Clean Energy and Security Act of 2009 in the 111th Congress", April 20, 2009. Available at: http://www.epa.gov/climatechange/economics/pdfs/WM-Analysis.pdf
[18] "EPA Analysis of the American Clean Energy and Security Act of 2009 H.R. 2454 in the 111th Congress", June 23, 2009. Available at: "EPA Preliminary Analysis of the Waxman-Markey Discussion Draft: The American Clean Energy and Security Act of 2009 in the 111th Congress", April 20, 2009. Available at: http://www.epa.gov/climatechange/economics/pdfs/WM-Analysis.pdf

BLM_0050883

*Supplemental Final Environmental Impact Statement | Federal Coal Lease Modifications COC-1362 & COC-67232*

## Appendix: Comparison of Leading U.S. Carbon Offset Certification Programs

| Program | Eligible Project Locations | CMM Protocol | Project Eligibility Evaluation Method | State/Regional/Federal Recognition |
|---|---|---|---|---|
| Climate Action Reserve (Reserve) | • All U.S. states<br>• Possible expansion to Canada and Mexico | • The Reserve is developing a protocol for CMM projects, V. 1 expected to be released Oct. 2009<br>• All non-pipeline utilization projects will be eligible under V. 1<br>• V. 2 (for pipeline) will be released in Feb. 2010 | • Explicitly defines project-type eligibility in its protocols using a performance-standard approach | • Reserve standards are only standards to be recognized by the State of California for voluntary GHG reductions<br>• High probability of protocols being recognized under the State of California's cap-and-trade program, and the Western Climate Initiative<br>• Early action recognition for certified projects is being discussed at the federal level, but no definitive decisions have been made |
| Voluntary Carbon Standard (VCS) | • International and all U.S. states | • VCS recognizes all CDM methodologies and CAR protocols<br>• ACM0008 approved for CMM, and includes VAM, pre-mine, and post-mine drainage abatement/utilization | • Developer demonstrates eligibility of an individual project using common practice, financial, technology, and market barrier additionality tests | • Early action recognition for VCS certified projects is being discussed at the federal level, but no definitive decisions have been made |
| EPA Climate Leaders (CL) | • All U.S. states | • EPA is developing a protocol for CMM projects, expected to be released in 2009<br>• Project-type eligibility (VAM, post-mine and pre-mine degasification abatement/utilization) is TBD | • Defines project-type eligibility using a performance-standard approach | • Early action recognition for VCS certified projects is being discussed at the federal level, but no definitive decisions have been made |
| American Carbon Registry (ACR) | • All U.S. states | • ACR has proprietary protocols, and recognizes existing protocols (such as CDM) | • Developer demonstrates additionality using EPA and IPCC Guidelines and Good Practice standards | • Early action recognition for VCS certified projects is being discussed at the federal level, but no definitive decisions have been made |
| Chicago Climate Exchange (CCX) | • All U.S. states | • Protocol is applicable to VAM, pre-mine, post-mine, and abandoned mine abatement/utilization | • All projects types are eligible | • Early action recognition for VCS certified projects is being discussed at the federal level, but no definitive decisions have been made |

# EXHIBIT J

## Methane Monitoring Memorandum

534

BLM_0050885

Case No. 1:20-cv-02484-MSK   Document 42-4   filed 04/27/21   USDC Colorado   pg 27 of 284

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

# MOUNTAIN COAL COMPANY, L.L.C.

**West Elk Mine**
**MEMORANDUM**

**To/Location:**   **Gene DiClaudio**   **Don Vickers**

**From/Location:**   **John Poulos**   **Wendell A. Koontz**

**Date:**   **August 7, 2009**

**Subject:**   **2009 R2P2 West Elk Mine Methane Monitoring**

Mountain Coal Company (MCC) conducts continuous and systematic monitoring for methane concentrations and volumes at it's West Elk Mine exhaust fans and Methane Drainage Wells (MDWs). The monitoring systems are in place to ensure the safety of the miners and comply with federal regulations.

**Exhaust Fans**

The three existing exhaust fan installations, Sylvester Gulch, Shaft #2, and Shaft #3 are monitored continuously for methane concentration utilizing electronic methane sensors. These sensors report to the CONSPEC computerized monitoring station which is manned 24 hours per day.

Additionally, the exhaust air course is sampled weekly by qualified miners by collecting bag samples of the air for analysis by gas chromatograph. The volume of air is determined by measurements from hand held anemometers at the same time.

Monthly pitot tube measurements are taken by West Elk's Ventilation Engineer at the exhaust fans. The measurements record fan pressure and verifies the weekly measurements of the qualified miner. Data of methane concentration and quantity is verified and summarized by the MCC Engineering Department.

**Methane Drainage Wells**

Methane concentration and volume from MDWs is tightly monitored. Each MDW has electronic monitoring that radio transmits flow data to CONSPEC monitoring station. Flow rates are checked and recorded every two hours. Mine personnel physically inspect the operating MDWs daily and also record flow rates. Twice weekly, bag samples are collected for gas chromatograph analysis. The data is checked by the MCC Safety Department and summarized by the MCC Engineering Department.

**Exhaust Shaft #4**

Methane monitoring for the new Exhaust Shaft #4 will be similar to the three existing Exhaust Fans when it is commissioned 4Q2009. Shaft #4 will be equipped with continuous monitoring of methane concentration via the electronic CONSPEC system with weekly air volume measurements and bag samples. The two existing Exhaust Fans, #3 and #4, will be converted to intake fans and methane monitoring will be discontinued at these locations.

A Subsidiary of Arch Western Resources, LLC

535

BLM_0050886

# Appendix B. Unsuitability Analysis and Report for Federal Coal Lease COC-1362, Modification 2 & Federal Coal Lease COC-67232, Modification 1

## Description of the Federal Lands Involved

This unsuitability analysis and report has been prepared to comply with regulations at 43 CFR 3461 for:

*COC-1362 lease modification tract:*

T. 14 S., R. 90 W., 6th P.M.

Sec. 10: SE, NESW;

Sec. 11: SW, S2NW;

Sec. 14: NWNW, NENW, W2SENW, SWNW, NWSW, W2NESW;

Sec. 15: E2NE, N2SE;

Containing 800 acres more or less.

*and COC-67232 lease modification tract:*

T. 14 S., R. 90 W., 6th P.M.

Sec. 11: SWNE;W2SE;SESE

Sec. 14: E2SENW, NE, SE, S2SW, E2NESW;

Sec. 15: SESE;

Sec. 22: E2NE;

Sec. 23: NW, NWNE;

Containing 920 acres more or less.

This lease modification application was brought forward by MCC to ensure that compliant and super-compliant coal resources are recovered and not bypassed. The two lease modifications, collectively referred to in this report as the lease modifications, lie immediately south, and are contiguous with existing federal coal leases COC-1362 and COC-67232. The coal in these modifications would be accessed and recovered by underground longwall mining methods from MCCs existing West Elk Mine. The surface of the lease modification is National Forest System (NFS) lands administered by the Grand Mesa-Uncompahgre-Gunnison National Forests (GMUG). The mineral estate is federally owned and is administered by the BLM-Uncompahgre Field Office.

As a first step in this analysis, the preliminary mining plan submitted by the applicant was examined in order to identify areas in which the proposed underground mining operation would produce surface effects, including where the zone of influence from subsidence may extend beyond the lease modification boundaries. Areas identified as likely to be affected by subsidence were delineated as having surface effects. For these lease modifications the zone of influence was assessed to be the modification area as well as the area identified in the project file for being within the angle of draw for subsidence.

536

This analysis and report was prepared consistent with the unsuitability criteria published in 43 CFR 3461. The unsuitability criteria were applied individually to the area being considered, and areas identified as having surface effects as applicable.  Each criterion was applied individually, then after all criteria had been applied, the exemptions of each criterion found to be applicable were then examined; thirdly a determination was made if the exceptions to each criterion were applicable. Exceptions to certain criteria allow areas to be considered further even though they have been determined to be unsuitable.  These exceptions to the criteria are noted where applied.

## Analysis of the Unsuitability Criteria

The analysis examined the applicability of exemptions and exceptions to the criteria as detailed in regulation.  Exemptions to the criteria are not described, as no exemptions were determined to apply. Exceptions to the criteria are described only if they apply.

## Criterion 1

All Federal lands included in the following land systems or categories shall be considered unsuitable: National Park System, National Wildlife Refuge System, National System of Trails, National Wilderness Preservation System, National Wild and Scenic Rivers System, National Recreation Areas, lands acquired with money derived from the Land and Water Conservation Fund, National Forests, and federal lands in incorporated cities, towns, and villages.

1. Exceptions.(i) A lease may be issued within the boundaries of any National Forest if the Secretary finds no significant recreational, timber, economic or other values which may be incompatible with the lease; and (A) surface operations and impacts are incident to an underground coal mine, or (B) where the Secretary of Agriculture determines, with respect to lands which do not have significant forest cover within those National Forests west of the Meridian, that surface mining may be in compliance with the Multiple-Use Sustained-Yield Act of 1960, the Federal Coal Leasing Amendments Act of 1976 and the Surface Mining Control and Reclamation Act of 1977.

### Analysis

The lands described in the lease modifications were proclaimed National Forest on June 5, 1905 and are within the Gunnison National Forest.  Management direction for coal resources are listed in the Amended Land and Resource Management Plan (LRMP), Grand Mesa, Uncompahgre and Gunnison National Forests - General Direction on pages III-62 through III-70.

The LRMP allows for multiple use management on the lands in the lease modification, which are principally managed for wildlife habitat, however management includes livestock grazing, motorized recreation and vegetation treatment. No significant recreational, timber, economic or other values which may be incompatible with the lease modifications are present on the tracts. There are no National Forest System roads and trails within the lease modifications.  Recreation use in this area is mostly hunting and will not be adversely affected by leasing these lands.  No suitable timber is identified within the Forest Plan for the lease modification areas and no current timber sales authorized.  Historically this area has not had focused timber management. No outfitter guides are operating within the lease modifications. Other than livestock grazing, no natural, processed or manufactured products that enter commerce are produced from the lease modifications. No current management activities or reasonably foreseeable activities on the lease modifications are incompatible for leasing these lands.  In addition, foreseeable surface operations and impacts will be incident to an underground coal mine. Therefore, for reasons stated above, the exception can apply to this criterion.

BLM_0050888

## Criterion 2

Federal lands that are within rights-of-way or easements or within surface leases for residential, commercial, industrial, or other public purposes, on federally-owned surface shall be considered unsuitable.

1. Exceptions.  A lease may be issued, and mining operations approved, in such areas if the surface management agency determines that (i) all or certain types of coal development (e.g., underground mining) will not interfere with the purpose of the right-of-way or easement, or (ii) the right-of-way or easement was granted for mining purposes, or (iii) the right-of-way or easement was issued for a purpose for which it is not being used, or (iv) the parties involved in the right-of-way or easement agree, in writing, to leasing, or (v) it is impractical to exclude such areas due to the location of coal and method of mining and such areas or uses can be protected through appropriate stipulations.

### Analysis

There is a General Land Office Order, 10/31/1973, which classifies the lands within the application area for coal.  The lands are also within the Paonia-Somerset Known Recoverable Resource Area, COC-20093.  There are no known rights-of-way, easements or surface leases for residential, commercial, industrial, or other public purposes within the review area.

## Criterion 3

Federal lands affected by section 522(e)(4) and (5) of the Surface Mining Control and Reclamation Act of 1977 shall be considered unsuitable.  This includes lands within 100 feet of the outside line of the right-of-way of a public road, or within 100 feet of a cemetery, or within 300 feet of any public building, school, church, community or institutional building or public park, or within 300 feet of an occupied dwelling.

1. Exceptions.  A lease may be issued for lands (i) used as mine access roads or haulage roads that join the right-of-way for a public road, (ii) for which the Office of Surface Mining Reclamation and Enforcement has issued a permit to have public roads relocated,(iii) if, after public notice and opportunity for public hearing in the locality, a written finding is made by the Authorized Officer that the interests of the public and the landowners affected by mining within 100 feet of a public road will be protected, or (iv) for which owners of occupied dwellings have given written permission to mine within 300 feet of their buildings.

### Analysis

No public roads, cemeteries, occupied dwellings, public buildings, schools, churches, community, or institutional buildings exist within this area.

## Criterion 4

Federal lands designated as wilderness study areas shall be considered unsuitable while under review by the Administration and Congress for possible wilderness designation.  For any federal land which is to be leased or mined prior to completion of the wilderness inventory by the surface management agency, the environmental assessment or impact statement on the lease sale or mine plan shall consider whether the land possesses the characteristics of a wilderness study area.  If the finding is affirmative, the land shall be considered unsuitable, unless issuance of noncompetitive coal leases and mining on leases is authorized under the Wilderness Act and the Federal Land Policy and Management Act of 1976.

### Analysis

No lands within the review area are designated Wilderness Study Areas. The current LRMP manages these lands for multiple uses (see Criterion 1).  Wilderness characteristics for these lands were evaluated

538

BLM_0050889

by the GMUG in 2005. This area was determined to be not available for wilderness due to mineral values. Additionally, boundary management of the area would be difficult.

# Criterion 5

Scenic federal lands designated by visual resource management analysis as Class I (an area of outstanding scenic quality or high visual sensitivity) but not currently on the National Register of Natural Landmarks shall be considered unsuitable. A lease may be issued if the surface management agency determines that surface coal mining operations will not significantly diminish or adversely affect the scenic quality of the designated area.

## Analysis

No lands within the review area are designated as visual resource management Class I areas.

# Criterion 6

Federal lands under permit by the surface management agency, and being used for scientific studies involving food or fiber production, natural resources, or technology demonstrations and experiments shall be considered unsuitable for the duration of the study, demonstration, or experiment except where mining could be conducted in such a way as to enhance or not jeopardize the purposes of the study, as determined by the surface management agency, or where the principal scientific use or agency give written concurrence to all or certain methods of mining.

## Analysis

No lands within the review area are under permit for scientific study.

# Criterion 7

All publicly-owned places on federal lands which are included in the National Register of Historic Places shall be considered unsuitable. This shall include any areas that the surface management agency determines, after consultation with the Advisory Council on Historic Preservation and the State Historic Preservation Officer, are necessary to protect the inherent values of the property that made it eligible for listing in the National Register.

## Analysis

No publicly-owned places on federal or fee lands within the review area are included in the National Register of Historic Places.

# Criterion 8

Federal lands designated as natural areas or as National Natural Landmarks shall be considered unsuitable.

## Analysis

No lands within the review area are designated as natural areas or as National Natural Landmarks.

# Criterion 9

Federally designated critical habitat for listed threatened or endangered plant and animal species, and habitat proposed to be designated as critical for listed threatened or endangered plant and animal species or species proposed for listing, and habitat for Federal threatened or endangered species which is determined by the Fish and Wildlife Service (Service) and the surface management agency to be of

BLM_0050890

essential value and where the presence of threatened or endangered species has been scientifically documented, shall be considered unsuitable.

1. Exceptions.  A lease may be issued and mining operations approved if, after consultation with the Fish and Wildlife Service, the Service determines that the proposed activity is not likely to jeopardize the continued existence of the listed species and/or its critical habitat.

## Analysis

No lands within the review area are designated as critical habitat, proposed to be designated as critical habitat, or determined to be essential habitat for any federally listed threatened or endangered plant or animal species, or species proposed for listing (Federal Register, various dates).

A Forest species list was provided by the US Fish and Wildlife Service on 9 May 2008 (USDI 2008b).  A list was collected by the GMUG on May 14, 2015, from the USFWS website, and was checked against the USFWS website on February 19, 2016 to ensure currency.  There are no changes to the species originally evaluated for this project.

The Gunnison Sage-grouse, which is now on the GMUG list, does not occur nor is there any habitat for it in the project area.  The nearest population is south of Crawford. Information can be found at: https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf

The yellow-billed cuckoo was listed as threatened (Western DPS) effective November 2014 (https://www.gpo.gov/fdsys/pkg/FR-2014-10-03/pdf/2014-23640.pdf).  And the cuckoo has critical habitat proposed in the North Fork, but not within the project area, on Aug 15, 2015, but that has not been finalized (https://www.gpo.gov/fdsys/pkg/FR-2014-08-15/pdf/2014-19178.pdf).

Tables have been updated accordingly.  There is only one federally listed terrestrial species that has the potential to be found in the project area, the Canada lynx. Other species considered are shown in Table B-1.  As these species do not occur in the project area and no habitat for them will be impacted by the project, these species were not further analyzed.  These species would all have no effect determinations. Fish species are being analyzed separately.

**Table B-1. Federally Threatened and Endangered or Candidate Species considered for this project**

| Species | Scientific Name | Habitat Description and Requirements | Habitat in Project Area? |
|---|---|---|---|
| Gunnison sage grouse & Critical Habitat | *Centrocercus minimus* | Sagebrush and sage-oak habitats in isolated populations in the Gunnison Basin and other parts of southwest CO; nearest known population occurs south of Crawford, CO.<br><br>There is no designated Critical Habitat in or near the project area. | Species-No<br><br>Critical Habitat-No |
| Yellow-billed cuckoo | *Coccyzus americanus* | Analyzed as a sensitive species in the original Biological Evaluation. Breeding habiatat includes riparian habitat along lowgradient (surface slope less than 3 percent) rivers and streams, and in open riverine valleys that provide wide floodplain conditions (greater than 325 ft (100 m)) Known to occur in the North Fork Valley. | Not expected (no additional information which alters that is known at this time)<br><br>Critical Habitat-No |

BLM_0050891

| Species | Scientific Name | Habitat Description and Requirements | Habitat in Project Area? |
|---|---|---|---|
| Canada Lynx | *Lynx canadensis* | Spruce/fir, mixed conifer, lodgepole pine forest (primary), or mixed deciduous/conifer (secondary). | Yes |
| Mexican spotted owl | *Strix occidentalis lucida* | Desert canyons, ponderosa forests. Not known or expected to occur on the Paonia RD. | No |
| Uncompahgre fritillary butterfly | *Boloria acrocnema* | Above treeline, closely associated with larval host, snow willow. Not known or expected to occur on the Paonia RD. | No |
| Debeque Phacelia (candidate) | *Phacelia submutica* | Specific clay-based soils of the Wasatch Formation in Piceance Basin, CO. Not known or expected to occur on the Paonia RD | No |
| Greenback cutthroat trout | *Oncorhynchus clarki stomias* | Headwater streams and lakes, isolated headwater reaches with less than 30 cfs, gradients > 4%, above 7,500. Require year round stream flows to survive. Not expected in analysis area due to lack of perennial water. | No |
| Bonytail Chub | *Gila elegans* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Colorado Pikeminnow | *Ptychocheilus lucius* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Humpback Chub | *Gila cypha* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Razorback Sucker | *Xyrauchen texanus* | Habitat not present, but water depletions associated with MDW drilling may affect this species in the Upper Colorado River Basin. | No* |
| Uinta Basin Hookless Cactus | *Sclerocactus glaucus* | Coarse rocky soils above the current flood plains of the Colorado, Gunnison, and Green River drainages in western Colorado and northeastern Utah. Not known or expected to occur on the Paonia RD. | No |

*Habitat not present, but consultation has occurred with USFWS regarding depletions associated with RFMP for post-leasing activities.

The Canada Lynx was listed as threatened in March 2000. In August 2004, the Second Edition of the Canada Lynx Conservation Assessment and Strategy (LCAS) was released, to provide a consistent and effective approach to conserve Canada lynx on federal lands. The Canada Lynx Conservation Agreement (USDA 2005) identifies the Science Report (Ruggiero et al. 2000) and the LCAS (Ruediger et al. 2000) as including the best available science on habitat and conservation measures. Both of these documents, along with local information were to be used for project analyses.

Following release of the LCAS, the Forest mapped lynx analysis units (LAUs) and habitat within them, based on Regional direction. Habitat was mapped based on existing vegetation information, including

vegetation type, canopy closure and size of trees. Areas outside of LAUs are not considered to be lynx habitat even though they may contain habitat components or stands similar to those within LAUs. The GMUG Forest Plan includes direction about limiting the amount of currently unsuitable habitat within a LAU to less than 30%. Currently, 0.5% of lynx habitat within the LAU is unsuitable. The project is within the Mount Gunnison LAU, and potential impacts of the project to lynx are limited to that LAU. Existing conditions of the Mount Gunnison LAU are displayed in Table 3-27.

Implementation of the project **"may affect, but is not likely to adversely affect**" the Canada lynx. The "may affect" is based primarily on the loss of suitable habitat in the project. Other impacts such as disturbance during denning or increased mortality risk are insignificant and discountable due to the distance of the project from typical Colorado denning habitat, and the low probability of loss of lynx from traffic or incidental shooting as a result of this project.

Implementation of the project **may affect, and is likely to adversely affect**, the bonytail, Colorado pikeminnow, the humpback chub, and the razorback sucker, due to the cumulative nature of water depletions associated with this and other activities in the area. Critical habitat for the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub does exist off-site in the lower Gunnison River, and in the Colorado River. This critical habitat could be affected by water depletion from this action (Federal Register/Vol. 59, No. 54). This project **may affect, and is likely to adversely affect**, designated critical habitat for these species downstream of this project.

Water depletion associated with this project would be consistent with the programmatic document developed for small water depletions (< 100 acre-feet per year) associated with numerous mineral development projects located on the GMUG NF (USFWS May 25, 2005, amended April 27, 2007 - #ES/GJ-6_CO-99-F-033-CP062) and Programmatic Biological Opinion (ES/GJ-6-CO-09-F-0001 and TAILS 65413-2009-F-0044). At the post-leasing (permitting) stage, prior to the approval of the mine plan, if it is determined that development of the lease would result in a change in water use resulting in a surface water depletion in the upper Colorado River Basin that exceeds the quantity covered in the existing programmatic opinion, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine the appropriate conservation measures to offset the effect to these listed fishes.

Therefore for reasons stated above, the exception can apply to this criterion.

# Criterion 10

Federal lands containing habitat determined to be critical or essential for plant or animal species listed by a state pursuant to state law as endangered or threatened shall be considered unsuitable.

1. Exceptions. A lease may be issued and mining operations approved if, after consultation with the state, the surface management agency determines that the species will not be adversely affected by all or certain stipulated methods of coal mining.

## Analysis

There is habitat within the lease modification area for the Canada Lynx.

Implementation of the project **"may affect, but is not likely to adversely affect**" the Canada lynx. The "may affect" is based primarily on the loss of suitable habitat in the project. Other impacts such as disturbance during denning or increased mortality risk are insignificant and discountable due to the distance of the project from typical Colorado denning habitat, and the low probability of loss of lynx from traffic or incidental shooting as a result of this project.

Therefore, for reasons stated above, the exception can apply to this criterion.

BLM_0050893

# Criterion 11

A bald or golden eagle nest site on federal lands that is determined to be active, and an appropriate buffer zone of land around the nest site shall be considered unsuitable.  Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones.  Buffer zones shall be determined in consultation with the Fish and Wildlife Service.

1. Exceptions.  A lease may be issued if (1) it can be conditioned in such a way, either in manner or period of operation, that eagles will not be disturbed during the breeding season, or (2) the surface management agency, with the concurrence of the Fish and Wildlife Service, determines that the golden eagle nest(s) will be moved, or (3) buffer zones may be decreased if the surface management agency determines that the active eagle nests will not be adversely affected.

## Analysis

There are no known golden eagle or bald eagle nests in or near the lease modifications.  Due to the distance of the area from suitable foraging habitat (the North Fork Gunnison) it is unlikely that bald eagles nest in this area.

Underground coal mining and nesting bald or golden eagles are compatible on the same tract of land unless surface facilities or surface disturbances cause nest-site abandonment.  Present guidelines used by the CPW are:

### Golden Eagle:

No surface occupancy beyond historic levels within ¼ mile radius of active golden eagle nests. (CPW 2008)

Seasonal restriction to human encroachment within ½ mile radius of active nests from December 15 through July 15. (CPW 2008)

Any proposed surface facilities, disturbances or activities (as noted above) in or adjacent to these buffer zones will require approval from the surface management agency (BLM or USFS) on a site-specific basis, after consultation with the Fish and Wildlife Service.

Stipulations on the existing lease, which will apply to the modification area, are consistent and/or more restrictive than the current DOW language.

Therefore, for reasons stated above, the exception can apply to this criterion.

# Criterion 12

Bald and golden eagle roost and concentration areas on federal lands used during migration and wintering shall be considered unsuitable.

## Analysis

No bald or golden eagle roost sites or concentrations areas are known to exist on federal lands within the review area.

# Criterion 13

Federal lands containing a falcon (excluding kestrel) cliff nesting site with an active nest and buffer zone of federal land around the nest site shall be considered unsuitable.  Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones.  Buffer zones shall be determined in consultation with the Fish and Wildlife Service.

BLM_0050894

1. Exception. A lease may be issued where the surface management agency, after consultation with the Fish and Wildlife Service, determines that all or certain stipulated methods of coal mining will not adversely affect the falcon habitat during the periods when such habitat is used by the falcons.

## Analysis

There are no known peregrine or prairie falcon nest sites in the lease modification area. No known suitable nesting cliffs exist in the area. In addition, lease stipulations on the parent lease require raptor surveys:

Conduct surveys for nesting raptors on the lease tract prior to development of any surface facilities. No surface activities will be allowed within ½ mile rates of active nest sites between the dates of February 1 and August 15, unless authorized by the BLM or USFS on a site specific basis.

These stipulations will apply to the lease modification area.

Implementation of the proposed action "may impact individuals or habitat, but will not likely contribute to a trend towards federal listing". This is based on the presence of potential nest locations in or near the project area, and the low potential for disturbance as a result of pre-disturbance surveys and implementation of conditions for surface use if needed. As similar sites exist throughout the North Fork Valley, and this species is not known to use this area, the potential for harmful effects at the population level is anticipated to be low.

Therefore, for reasons stated above, the exception can apply to this criterion.

# Criterion 14

Federal lands which are high priority habitat for migratory bird species of high federal interest on a regional or national basis, as determined jointly by the surface management agency and the Fish and Wildlife Service, shall be considered unsuitable.

1. Exception. A lease may be issued where the surface management agency, after consultation with the Fish and Wildlife Service, determines that all or certain stipulated methods of coal mining will not adversely affect the migratory bird habitat during the periods when such habitat is used by the species.

## Analysis

Of the 278 breeding bird species in Colorado, 65 priority species in 15 major habitats and three physiographic areas are addressed in the Colorado Bird Conservation Plan. The project area is within the Southern Rocky Mountains Physiographic Province (62), and several priority habitats are present within or immediately adjacent to the lease modification area. These habitats and associated high priority species include:

- Aspen: broad-tailed hummingbird, red-naped sapsucker, purple martin, violet-green swallow;

- Cliff/Rock: peregrine falcon, black swift;

- High elevation riparian: Cordilleran flycatcher, American dipper, McGillivray's warbler, Wilson's warbler;

- Low elevation riparian: Lewis' woodpecker, lazuli bunting;

- Mixed conifer: blue (currently dusky) grouse, Williamson's sapsucker;

- Mountain shrubland: Virginia's warbler, green-tailed towhee;

- Spruce-fir: boreal owl, olive-sided flycatcher, Hammond's flycatcher.

BLM_0050895

Many of these species are known or suspected to be present in the project area. In addition, the flammulated owl is listed as a ponderosa pine species in the plan. However, it is known to use aspen in this area. Implementation of the proposed action "may impact individuals or habitat, but will not likely contribute to a trend towards federal listing".

Stipulations on the parent lease, which will apply to the lease modification, require avoidance of certain habitats of breeding and neotropical birds:

> If there is reason to believe that new individuals or populations of Threatened or Endangered, or Sensitive Species or plants or animals, or migratory bird species of high federal interest occur in the area, the lessee shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted.

Therefore, for reasons stated above, the exception can apply to this criterion.

# Criterion 15

Federal lands which the surface management agency and the state jointly agree are habitat for resident species of fish, wildlife and plants of high interest to the state and which are essential for maintaining these priority wildlife and plant species shall be considered unsuitable. Examples of such lands which serve a critical function for the species involved include: (i) active dancing and strutting grounds for sage grouse, sharp-tailed grouse, and prairie chicken, (ii) winter ranges crucial for deer, antelope, and elk, (iii) migration corridor for elk, and (iv) extremes of range for plant species.

1. Exception. A lease may be issued if, after consultation with the state, the surface management agency determines that all or certain stipulated methods of coal mining will not have a significant long-term impact on the species being protected.

## Analysis

There are no known habitats for sage grouse, sharp-tailed grouse, or prairie chickens in this area. The area does not contain winter range for deer and elk. Elk do migrate through this area from higher elevations to winter range in the valley, but it is not delineated as a corridor by CPW. This area may be at the extreme range for plant species but there are no known populations of threatened, endangered, or Forest Service Sensitive plants in this area. Therefore, for reasons stated above, the exception can apply to this criterion.

# Criterion 16

Federal lands in riverine, coastal, and special floodplains (100-year recurrence interval) on which the surface management agency determines that mining could not be undertaken without substantial threat of loss of life or property shall be considered unsuitable for all or certain stipulated methods of coal mining.

## Analysis

The application lands are not within a riverine, coastal or special floodplain.

# Criterion 17

Federal lands which have been committed by the surface management agency to use as municipal watersheds shall be considered unsuitable.

## Analysis

None of the lands in the proposed lease tract are within a municipal watershed.

BLM_0050896

## Criterion 18

Federal lands with National Resource Waters, as identified by states in their water quality management plans, and a buffer zone of federal lands ¼-mile from the outer edge of the far banks of the water, shall be unsuitable.

### Analysis

None of the lands in the proposed lease tract are identified as a National Resource Water.

## Criterion 19

Federal lands identified by the surface management agency, in consultation with the state in which they are located, as alluvial valley floors according to the definition in Subpart 3400.0-5(a) of this title, the standards of 30 CFR Part 822, the final alluvial floor guidelines of the Office of Surface Mining Reclamation and Enforcement when published, and approved state programs under the Surface Mining Control and Reclamation Act of 1977, where mining would interrupt, discontinue, or preclude farming, shall be considered unsuitable. Additionally, when mining federal land outside an alluvial valley floor would materially damage the quantity or quality of water in surface or underground water systems that would supply alluvial valley floors, the land shall be considered unsuitable.

### Analysis

The application lands are not within an alluvial valley floor, but such lands drain into the North Fork Gunnison River, along which, both surface irrigated and potentially irrigable sites exist. Within the lease modification boundaries, no known water facilities (reservoirs, ditches, diversions) exist.

Changes in ground slope and creation of tension cracks can alter surface hydrology and soil erosion processes. Increased surface erosion, debris flows and disruption of drainage pattern and flow in streams have been documented (Sidle, et al. 2000). Effects to stream channels include (1) increase in lengths of cascades and to a lesser extent glides; (2) increases in pool length, numbers and volumes; (3) increase in median particle diameter of bed sediment in pools; and (4) some constriction in channel geometry. The magnitude of these effects varies depending upon the amount and location of subsidence.

Increased sediment delivery could affect water quality in nearby creeks (e.g. increased sediment load). Two short perennial stream reaches exist within the modifications area, and intermittent and ephemeral drainages do receive nominal amounts of sediment from the soils and existing instability of slopes in the area (Figure 3-16). Increased sedimentation occurs during normal precipitation and spring runoff, so effects of increased sedimentation may not be quantifiable beyond baseline levels.

Increased surface erosion, changes to drainage morphology and possible disruption of seasonal stream-flow could occur as a result. Since subsidence is not expected in the vicinity of floodplains or major stream channels, disruptions of stream flow as a low probably of occurrence. The magnitude and duration of predicted effects depends upon the amount and location of subsidence.

Although material damage to the quality and quantity water arising on or flowing over the proposed lease modifications is possible, because of the reason listed above, this is not anticipated, and would be hard to separate from natural process that are currently affecting water quality/quantity.

Therefore, for reasons stated above, the exception can apply to this criterion.

## Criterion 20

Federal lands in a state to which is applicable a criterion (i) proposed by the state or Indian tribe located in the planning area, and (ii) adopted by rulemaking by the Secretary, shall be considered unsuitable.

BLM_0050897

**Analysis**

This criterion is not presently in effect in the State of Colorado.

## Secretary's Determination

The USFS has completed the analysis of unsuitability criteria and recommends a finding that there are no significant recreational, timber, economic, or other values that would be incompatible with modifying the leases within this analysis.

## References

Colorado Division of Wildlife GIS data http://ndis.nrel.colostate.edu/ftp/index.html

Partners in Flight 2000. Landbird Conservation Plan Colorado. Estes Park, CO. Available http://www.blm.gov/wildlife/plan/pl-co-10.pdf

Pfister, Allan R. (USFWS Grand Junction Office) 2007. Programmatic Biological Opinion for Water Depletions on the GMUG National Forest. May 25, 2005, amended April 27, 2007 - #ES/GJ-6_CO-99-F-033-CP062.

Ruediger, Bill, et.al. 2000. Canada Lynx Conservation Assessment and Strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication #R1-00-53, Missoula, Montana.

U.S. Department of The Interior, 1983, Uinta-Southwestern Utah Coal Region Environmental Impact Statement, U. S. Department of the Interior, Bureau of Land Management, Utah State Office, Salt Lake City, Utah.

U.S. Fish and Wildlife Service, 2008. Western Colorado Suboffice, Grand Junction, CO. Updated Species List.

Other references in the Biological Assessment and Biological Evaluation for the project.

## Consultation and Coordination

The following agencies and organizations were contacted to gain information pertinent to the application of the 20 coal suitability criteria:

### Federal Agencies

U.S. Department of Interior

Fish and Wildlife Service

Western Colorado Suboffice

529 25 1/2 Road

Grand Junction, CO 81505-6199

### Colorado State Agencies

Division of Wildlife

Southwest Region Office

Gunnison, CO

BLM_0050898

BLM_0050899

# Appendix C. Roles and Responsibilities of Regulatory Agencies in the Federal Coal Program in Colorado

Analysis and permitting of federal coal resources occurs in many phases, by many different regulating entities. This section is intended to briefly describe the roles and responsibilities of the primary agencies responsible for analyzing and authorizing the various phases of coal development on Federal lands in the State of Colorado. This section is not meant to describe every permitting step, every situation or scenario; only to provide the reader with a general understanding of the complex regulatory environment of the federal coal program. Each section below is broken down into a list of primary authorities that apply to each phase, as well as a brief description of roles and responsibilities.

## Exploration

### Authorities

Mining and Minerals Policy Act of 1970; Mineral Leasing Act of 1920 as amended by the federal Coal leasing Amendments Act of 1976; Federal Land Policy and Management Act of 1976 (FLPMA); Forest Service Manual 2820; 43 CFR 3400; Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30CFR 740.4(e), Colorado Surface Coal Mining Reclamation Act (CRS 34-33-101), 30 CFR Part 906, Appendix B.

### Roles

Exploration for coal on Federal mineral estate may occur prior to issuance of a lease through an exploration license (43 CFR 3410) issued by the BLM. Exploration after leasing, but prior to the issuance of a mining permit under SMCRA, is also authorized by the BLM (43 CFR 3480). After lands are leased and mining permit under SMCRA has been issued, exploration activities are permitting through the Office of Surface Mining, via the Colorado Division of Reclamation, Mining, and Safety (DRMS).

On federal lands, the BLM is the primary agency responsible for analyzing (NEPA) and authorizing exploration licenses. As the surface management agency, the FS has a role to prescribe conditions for use and protection of non-mineral interests for NFS lands in exploration licenses. The BLM also has principal authority to approve exploration plans for licenses, and on leases where there is no SMCRA permit in place. The USFS has a role to concur with the approval terms of an exploration plan, and may provide conditions for surface use (43 CFR 3410.2-3), for the BLM include as requirements to the exploration plan, if approved, and determines the adequacy of the reclamation bond amount that BLM prepares. Exploration licenses are issued for a term of two years; after that term ends the license expires, they cannot be extended. In addition, any entity intending to conduct coal exploration on any lands in Colorado, including on leased as well as unleased federal lands, that do not lie within the permit boundary of a DRMS mining permit must first obtain approval from DRMS of a State of Colorado Notice of Intent to Explore.

If exploration is proposed after leasing has occurred, and the area proposed for exploration is within a mine permit boundary, then the primary authorizing agency is the DRMS. In Colorado, the Division of Reclamation Mining and Safety (DRMS) operates under an OSMRE -approved program for administering coal mining operations in the state, codified by the Colorado Surface Coal Mining Reclamation Act (CRS 34-33-101) and attendant regulations which are consistent with the overarching federal regulations (30 CFR Part 906, Appendix B).

BLM_0050900

Proposals for exploration on federal land under permit, the BLM and/or the USFS, as the federal land management agency (FLMA), reviews an applicant's submittal to ensure that it provides for post-mining land use consistent with the land use plan and has adequate protections for Federal resources.

## Leasing

### Authorities

Mineral Leasing Act of 1920, as amended by the Federal Coal Leasing Amendments Act of 1976; Mining and Minerals Policy Act of 1970; Federal Land Policy and Management Act of 1976 (FLPMA); Forest Service Manual 2820; 43 CFR 3400; and the Energy Policy Act of 2005.

### Roles

In order for a mining company to access federal coal reserves, the company must apply to lease those Federal lands for development of the coal resource. An application is submitted to the BLM who administers the Federal mineral estate on all Federal lands. BLM initiates the lease consideration process, which ensures that a NEPA analysis is completed.  Following 43 CFR 3461, the BLM (or the USFS if on NFS lands) must insure that the assessment of coal unsuitability criteria has been completed for the lands proposed for leasing.

When on NFS lands, the Forest Service has consent authority to the BLM for leasing NFS lands for coal resource development; in addition, as the surface management agency, it prescribes stipulations for the protection of non-mineral resources, and confirms conformance with land use plans.  Where National Forest System lands are involved, the BLM and Forest Service jointly manage the leasing process according to the authorities granted in these laws, and implementing regulations at 43 CFR 3400.

At the leasing stage, for underground coal operations the federal agencies evaluate the effects of subsidence (i.e. the land surface lowered as a result of mining) on surface resources, and identify where surface resources may require specific protection from subsidence or other foreseeable surface impacts. Under a foreseeable mine plan scenario, surface uses on these modifications may include, exploration, methane drainage wells, and associated access roads required to safely mine the coal resources. Specific locations of disturbances and roads are not known at the leasing stage, and will not be known until the time specific mine plans are approved by the State, BLM, MSHA and the federal Office of Surface Mining during the subsequent permitting process (see below). However, in all alternatives that allow for surface use, this use is reasonably projected for cumulative effects analysis purposes in the NEPA at the leasing stage.

If the decision is given to lease the lands in question, then they are subsequently sold, at auction by the BLM to the highest bidder.  The BLM retains principal responsibility for enforcing lease terms and conditions.

Under 43 CFR 3432 (as amended by the Energy Policy Act of 2005), the holder of a federal coal lease may apply to non-competitively modify a lease by adding up to 960 contiguous acres.  The BLM may modify the lease to include all or part of the lands applied for if (43 CFR 3432.2(a)):

1.  The modification serves the interests of the United States;

2.  There is no competitive interest in the lands or deposits; and the additional lands or deposits cannot be developed as part of another potential or existing independent operation.

3.  The additional lands or deposits cannot be developed as part of another potential or existing independent operation.

550

The terms and conditions of the original lease shall be made consistent with the laws, regulations, and lease terms applicable at the time of modification (43 CFR 3432.3(a)).  For coal lease modifications involving National Forest System lands, the BLM will submit the application to the Secretary of Agriculture for consent, completion of a NEPA analysis, and attachment of appropriate lease stipulations (43 CFR 3432.2(d)).

## Permitting/Operations

### Authorities

Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30CFR 740.4(e), Colorado Surface Coal Mining Reclamation Act (CRS 34-33-101), 30 CFR Part 906, Appendix B; Mineral Leasing Act of 1920, as amended by the Federal Coal Leasing Amendments Act of 1976; Mining and Minerals Policy Act of 1970; Federal Land Policy and Management Act of 1976 (FLPMA); Forest Service Manual 2800; 43 CFR 3400;

### Roles

Actual mining and associated surface uses on federal coal leases are governed by the Surface Mining Control and Reclamation Act of 1977 (SMCRA), a portion of the Mineral Leasing Act, as well as other laws and regulations, which establishes requirements for planning, permitting, and monitoring compliance with specific operations, and reclamation requirements for surface disturbance associated with surface and underground coal mining operations. Implementation of SMCRA is the responsibility of the USDI-Office of Surface Mining Reclamation and Enforcement (OSMRE) according to implementing regulations at Title 30 CFR Chapter VII, Parts 816 and 817.  The law and regulations establish that administering coal mining operations are done principally at the state level, with oversight from the OSMRE.  The law and regulations also establish the roles and responsibilities of federal agencies other than the OSMRE (such as the FOREST SERVICE and BLM) whose lands may be involved in coal mining operations.

In Colorado, the Division of Reclamation Mining and Safety (DRMS) operates under an OSMRE - approved program for administering coal mining operations in the state codified by the Colorado Surface Coal Mining Reclamation Act (CRS 34-33-101) and attendant regulations which are consistent with the overarching federal regulations (30 CFR Part 906, Appendix B). Federal coal leaseholders in Colorado must hold a State-approved mining permit before performing mining and reclamation operations on Federal lands in the state. Colorado's approved federal coal program procedures include at all points in the mine permitting process, a role for the federal land management agency (FLMA) to review an applicant's submittal to ensure that it provides for post-mining land use consistent with the land use plan and has adequate protections for Federal resources.

The DRMS administers and enforces performance standards and permit requirements during the period of mine operation, reclamation, and an extended reclamation liability period, and has primary authority to approve all coal mining permits and related activities, even if those activities occur on federal land.

In addition to the mine permitting process, it would also be the jurisdiction of various State agencies (e.g. DRMS, CDPHE) to ensure that the following items are up to date, and in line with law, regulation, and policy:  1) Spill Prevention, Control, and Countermeasure plan; 2) Herbicide Use and Weed Control Plan; 3) revision or modification of Air Permits (e.g. CDPHEs determination / applicability of EPA's Tailoring Rule).

BLM_0050902

## Additional Permits Required

In addition to the mine permit process, other permitting processes not covered by DRMS authority may need to be analyzed (NEPA) and permitted by the FLMA.  Examples of these types of permits include: 1) Road Use Permits; 2) Timber contract for removal of merchantable timber; and 3) Special Use/Right-of-Way Authorizations for other surface disturbing activities not covered by the mine permit (e.g. pipelines and off-lease facilities for methane mitigation).

MCC will be required to obtain/update additional information specific to this leasing action including:

- Update Forest Service Road Use Permit
- Forest Service timber contract for any merchantable timber removed
- Update Approved Pesticide Use and Weed Control Plan
- Mine permitting with DRMS

Other permits currently held by MCC such as NPDES, SPCC, 404 Permits, Air Construction Permit, etc. remain valid until renewal is necessary.

## Other

The implementing Federal and State regulations give the Surface land Management Agency (i.e. the BLM or Forest Service) responsibility to review coal mine permit applications and revisions to them to determine the post-mining use of the land, protection of non-mineral resources, require appropriate conditions to regulate surface use and reclamation (30CFR 740.4(e)). In certain cases, coal mine permit actions require specific approval from the USDI via the OSMRE.

With respect to compliance with the National Environmental Policy Act (NEPA) for analyzing and authorizing activities under mine permits, under 30 CFR § 906.30 Appendix B, it is the responsibility of OSMRE to determine the need for an EA or an EIS, pursuant to NEPA.  It is also their responsibility to prepare an analysis in compliance with NEPA, and CEQ regulations.

BLM_0050903

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

# Appendix D. Sunset Roadless Evaluation

North Fork Valley – Roadless Evaluation                                    Sunset #20423

*Sunset  #20423 – 5,880 Acres – Gunnison County*

**General Description:**  The Sunset unit is located approximately nine miles east of Paonia.  The area is north and contiguous to the West Elk Wilderness and is bounded by private land in-holdings to the west and roads to the north.  It is separated from the Flatirons Unit #20424 by Road #711, Dry Fork of Minnesota Creek Road.



Elevation Range – 6,300' – 12,000'

Eco-Section – M33IH – Northern-Central Highlands and Rocky Mountain

Vegetation – The Potential Natural Vegetation is predominately 6% Douglas-fir, 16% spruce-fir, 36% spruce-fir-aspen, 9% aspen, 18% shrub, and 7% bare ground.

Land Type –

52% 50IH – Montane climate zone; interbedded sandstone and shale geology.

24% 30IH – Lower Montane climate zone; interbedded sandstone and shale geology.

14% 60IH – Montane and Subalpine climate zone; interbedded sandstone and shale geology.

2005 Roadless Inventory & Evaluation of Potential Wilderness Areas
48 of 53

BLM_0050904

North Fork Valley – Roadless Evaluation                                    Sunset #20423

**Resource Activities:**

Current & Ongoing:

- The Dry Fork cattle allotment is within this unit and is currently vacant.
- Although the area was outside the area of analysis and not made available for oil and gas lease, there area currently has oil and gas leases pending.
- Application for coal exploration license.

**Wilderness Potential:**

Capability:

Environment –

- Naturalness – The lands directly adjacent to the Wilderness boundary offer a high degree of naturalness
- Solitude – Opportunities for remoteness and solitude are present in the vicinity of the wilderness boundary.

Challenge – The area offers a moderate-high degree of challenge. The terrain is rugged; however, proximity to trails and roads diminishes opportunities of self-reliance and adventure.

Manageability/Boundaries –

- Size/Shape – The area is small, yet adjoins the West Elk Wilderness.
- Boundaries – The boundary would be more difficult to identify and manage than the existing boundary. The existing boundary follows the slope of the mountain and is highly defensible. Moving the boundary would not improve management of the wilderness.

Special Features/Activities – The Deep Creek Slide area exhibits a striking geologic feature.

**Evaluation:** The portion of the unit immediately adjacent to the wilderness retains the roadless qualities that make it **capable** of wilderness.

Availability (of Capable Lands):

Recreation – The area is heavily used during hunting season.

Water – No known water facilities.

Timber – There are approximately 1,500 acres within the capable portion that are tentatively suitable for producing timber for wood fiber production. Another 100 acres of suitable timber land are within the inventory portion.

Minerals – Under the 2004 RFD, the area was identified as high potential for oil and gas. There is currently an application for coal exploration license.

Management Considerations – Boundary management would not be improved; the existing boundary is highly defensible.

**Evaluation** – The capable lands are **not available** for wilderness due to mineral values. Additionally, boundary management of the area would be difficult.

2005 Roadless Inventory & Evaluation of Potential Wilderness Areas
49 of 53

BLM_0050905

# Appendix E. Forest Plan Unsuitability Assessment



555

BLM_0050906

UNSUITABILITY ASSESSMENT FOR COAL MINING

National Forest System land was analyzed for unsuitability if it is within a Known Recoverable Coal Resource Area as defined by the United States Geological Survey and delineated as Known Coal Resource Leasing Area on Colorado Geological Survey Map Series 9, or if it is already leased for coal production as in the Huntsman Ridge area.

CRITERION NUMBER 1

"All Federal lands included in the following land systems or categories shall be considered unsuitable: National Park System, National Wildlife Refuge System, National System of Trails, National Wilderness Preservation System, National Wild and Scenic Rivers System, National Recreation Areas, lands acquired with money derived from the Land and Water Conservation Fund, National Forest, and Federal lands in incorporated cities, towns and villages."

National Forests are unsuitable for coal mining.

EXCEPTIONS

National Forest System land with no significant recreational, timber, economic, or other values are suitable for underground mining.

National Forest System land with significant recreational, timber, economic, or other values which are compatible with underground mining are suitable for underground mining.

CONCLUSION

The West Elk and Raggeds Wildernesses are unsuitable for coal mining. The rest of the Known Recoverable Coal Resource Area is suitable for coal mining if other criteria do not apply or if exceptions to applicable criteria are used.

CRITERION NUMBER 2

"Federal lands that are within rights-of-way or easements or within surface leases for residential, commercial, industrial, or other public purposes, or for agricultural crop production on Federally owned surface shall be considered unsuitable."

This is interpreted under Forest Service regulations to mean, "Federal land with rights-of-way or easements or under special use permits for residential, commercial, industrial, or agricultural purposes shall be considered unsuitable."

EXCEPTIONS

A lease (or special use permit) may be issued and mining operations approved if the Forest Service determines that it is impractical to exclude such areas due to the location of coal and method of mining and such areas can be protected through appropriate stipulations.

V-2

BLM_0050907

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

CONCLUSION

All areas to which criterion number 2 apply are excepted because it is impractical to exclude these areas from underground coal mining and because such areas can be adequately protected with operating plan stipulations.

CRITERION NUMBER 3

"Federal lands affected by section 522(e)(4) and (5) of the Surface Mining Control and Reclamation Act of 1977 shall be considered unsuitable. This includes lands within 100 feet of the outside line of the right-of-way of a public road or within 100 feet of a cemetery, or within 300 feet of any public building, school, church, community or institutional building or public park or within 300 feet of an occupied dwelling."

EXCEPTIONS

A lease may be issued for land for which the Office of Surface Mining has issued a permit to have public roads relocated.

CONCLUSION

All areas to which criterion number 3 applies are excepted under the above mitigating measure which is applicable to areas to be affected under an operating plan for underground coal mining.

CRITERION NUMBER 4

"Federal lands designated as wilderness study areas shall be considered unsuitable while under review by Administration and the Congress for possible wilderness designation."

Since passage of the Colorado Wilderness Act of 1980 there are no Federal land designated as Wilderness Study Areas within the Known Recoverable Coal Resource Area on the Forest.

CRITERION NUMBER 5

"Scenic Federal lands designated by visual resource management analysis as Class I (an area of outstanding scenic quality or high visual sensitivity) but not currently on the National Register of Natural Landmarks shall be considered unsuitable."

EXCEPTIONS

A lease may be issued if the surface management agency determines that surface coal mining operations will not significantly diminish or adversely affect the scenic quality of the designated area.

CONCLUSION

Criterion number 5 applies to those portions of the Known Recoverable Coal Resource Area that have been classified as Variety Class A (distinctive landscapes) or foreground, middleground, and background areas. These areas will

F-3

BLM_0050908

be considered suitable for leasing because the Forest has determined that the surface effects of underground mining will not diminish or adversely affect the scenic quality.

## CRITERION NUMBER 6

"Federal lands under permit by the surface management agency, and being used for scientific studies involving food or fiber production, natural resources, or technology demonstrations and experiments shall be considered unsuitable for the duration of the study demonstration or experiment, except where mining could be conducted in such a way as to enhance or not jeopardize the purpose of the study."

This criterion does not apply within the Known Recoverable Coal Resource Area.

## CRITERION NUMBER 7

"All districts, sites, buildings, structures, and objects of historic, architectural, archeological, or cultural significance on Federal lands which are included in or eligible for inclusion in the National Register of Historic Places, and an appropriate buffer zone around the outside boundary of the designated property (to protect the inherent values of the property that make it eligible for listing in the National Register) as determined by the surface management agency, in consultation with the Advisory Council on Historic Preservation and the State Historic Preservation Office shall be considered unsuitable."

### EXCEPTIONS

All or certain stipulated methods of coal mining may be allowed if the surface management agency determines that the direct and indirect effects of mining, as stipulated, on a property in or eligible for the National Register of Historic Places will not result in significant adverse impacts on the property.

### CONCLUSION

Cultural resource sites have been mapped within the Known Recoverable Coal Resource Area. All areas containing cultural sites are excepted under 3461.1 (a)(2) because the Forest Service has determined that the effects of underground coal mining can be mitigated and will not, therefore, result in significant adverse impact to the property. The Advisory Council on Historic Preservation and State Historic Preservation Office were consulted.

## CRITERION NUMBER 8

"Federal lands designated as natural areas or as National Natural Landmarks shall be considered unsuitable."

There are no natural areas that meet these guidelines within the Known Recoverable Coal Resource Area on the Forest.

F-4

BLM_0050909

CRITERION NUMBER 9

"Federally designated critical habitat for threatened or endangered plant and animal species, and habitat for Federal threatened or endangered species which is determined by the Fish and Wildlife Service and the surface management agency to be of essential value and where the presence of threatened or endangered species has been scientifically documented, shall be considered unsuitable."

EXCEPTIONS

A lease may be issued and mining operations approved if the proposed activity is not likely to jeopardize the continued existence of the species and/or habitat.

CONCLUSION

Habitat for the following Federally designated threatened and endangered plant and animal species is known or suspected to be present on the Forest.

--Bald Eagle has persistently wintered on the East River and portions of the Gunnison National Forest.

--American Peregrine Falcon critical habitat has been identified on the Gunnison and Uncompahgre National Forest. A suspected active nest site will be investigated in 1981.

--Uncompahgre Fritillary Butterfly is a candidate species known to exist on the Uncompahgre National Forest.

--Whooping Crane is a migrating species seen each spring flying over the Gunnison and Grand Mesa National Forests.

None of this habitat is within the Known Recoverable Coal Resource Area.

CRITERION NUMBER 10

"Federal lands containing habitat determined to be critical or essential for plant or animal species listed by a State pursuant to State law as endangered or threatened shall be considered unsuitable."

EXCEPTIONS

A lease may be issued and mining operations approved if the proposed activity will not adversely affect the species.

CONCLUSION

Habitat for the following state designated endangered or threatened plant and animal species is known or suspected to be present on the Forest.

--Wolverine was reported present in 1977 by Rick Richards on the Gunnison National Forest.

F-5

559

BLM_0050910

--River Otter has been introduced in the Black Canyon and has not yet been seen on National Forest System land.

--American Peregrine Falcon (see Federal listed species)

--Bald Eagle (see Federal listed species)

--Whooping Crane (see Federal listed species)

--Greater Sandhill Crane migrate over the Forest each spring and fall.

None of this habitat is within the Known Recoverable Coal Resource Area.

CRITERION NUMBER 11

"A bald or golden eagle nest or site on Federal lands that is determined to be active and an appropriate buffer zone of land around the nest site shall be considered unsuitable. Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones."

A known golden eagle nest site is on the Gunnison National Forest. The hunting territory of the nesting pair will have to be mapped and possible prey species listed. Neither of these nesting sites is within the Known Recoverable Coal Resource Area.

CRITERION NUMBER 12

"Bald and golden eagle roost and concentration areas on Federal lands used during migration and wintering shall be considered unsuitable."

EXCEPTIONS

A lease may be issued if mining activities can be carried out with such limitations of method and time period that eagles are not adversely affected.

CONCLUSION

No bald or golden eagle roost trees are known to exist on the Forest.

CRITERION NUMBER 13

"Federal lands containing a falcon (excluding kestrel) cliff nesting site with an active nest and a buffer zone of Federal land around the nest site shall be considered unsuitable. Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones."

Peregrine Falcons are known to exist on the Forest, but not within the Known Recoverable Coal Resource Area. Critical habitat for American Peregrine Falcon, is mapped. Kestrels are fairly common on open areas up to 9500 feet. The Forest estimates nesting territory and hunting territory therein to be 5 acres per pair. Merlin are not common, the Forest estimates territory of those nesting near riparian sites to be 160 acres.

F-6

560

BLM_0050911

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

CRITERION NUMBER 14

"Federal lands which are high priority habitat for migratory bird species of
high Federal interest on a regional or national basis, as determined jointly
by the surface management agency and the Fish and Wildlife Service, shall be
considered unsuitable."

EXCEPTIONS

A lease may be issued if mining activity will not adversely affect the habitat
during use by the species.

These areas are considered suitable for all methods of coal mining under this
exception if disturbance to the vegetative cover by surface operations and
impacts is minimized.

CONCLUSION

No high priority habitat for migratory bird series has been identified within
the Known Recoverable Coal Resource Area.

CRITERION NUMBER 15

"Federal lands which the surface management agency and the State jointly agree
are fish and wildlife habitat for resident species of high interest to the
State and which are essential for maintaining these priority wildlife species
shall be considered unsuitable.  Examples of such lands which serve a critical
function for the species involved include:

--Active dancing and strutting grounds for sage grouse, sharp-tailed grouse,
  and prairie chicken;

--Winter ranges most critical for deer, antelope, and elk; and

--Migration corridors for elk."

EXCEPTIONS

A lease may be issued if, after consultation with the State, the surface man-
agement agency determines that all or certain stipulated methods of coal min-
ing will not have a significant long-term impact on the species being protect-
ed.

CONCLUSION

Habitat essential for maintaining high interest wildlife species exists on the
Forest and falls into three categories:

--Active strutting grounds for sage and sharp-tailed grouse.

--Critical winter range for deer, antelope, bighorn sheep, and elk.

--Cold water fishery for premium or blue ribbon waters.

F-7

BLM_0050912

Only elk and deer winter range are located within the Known Recoverable Coal Resource Area.

The Forest has determined that the surface impacts of underground coal mining will not have a significant long-term impact on the deer and elk herds.

CRITERION NUMBER 16

"Federal lands in riverine, coastal, and special floodplains (100-year recurrence interval) shall be considered unsuitable unless, after consultation with Geological Survey, the surface management agency determines that all or certain stipulated methods of coal mining can be undertaken without substantial threat of loss to people or property, and to the natural and beneficial values of the floodplain on the lease tract and downstream."

CONCLUSION

Each perennial and intermittent stream within the Forest has a narrow floodplain associated with it. Most of the floodplains on the Forest are not planar surfaces and are not composed of fluvial (stream deposited) sediments nor are they characterized by wetlands, riparian habitat, agricultural activities, or building sites. Usually the floodplain is simply a part of the river bed which is inundated during high water and dry during low water. The floodplain, therefore, is typically not an area where loss to people or property is a threat. Moreover, there are few natural and beneficial values to be derived from these floodplains except for the function of channeling flow from the mountains to the lowland valleys where agriculture and development can occur.

The Forest has determined, based on the above characteristics of most Forest floodplains, that the surface effects of underground coal mining will not cause substantial threat of loss to people, property, or the natural and beneficial values of the floodplain. Effects of the underground mining can be mitigated through mining method, monitoring, and restoration. Therefore, all Forest floodplains are considered suitable for coal mining.

CRITERION NUMBER 17

"Federal lands which have been committed by the surface management agency to use as municipal watersheds shall be considered unsuitable."

EXCEPTIONS

A lease may be issued where:

--The surface management agency determines, as a result of studies, that all or certain stipulated methods of coal mining will not adversely affect the watershed to any significant degree; and

--The municipality (incorporated entity) or the responsible governmental unit concurs in writing in the issuance of the lease.

F-8

562

BLM_0050913

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

CONCLUSION

There are five municipal watersheds within the Known Recoverable Coal Resource Area on the Forest: Grand Junction, Delta, Cedaredge, Hotchkiss, and Garvin Mesa.

The above studies and consent could not take place until at least a preliminary mining plan had been submitted with the necessary baseline hydrologic data and possible mitigation measures. Therefore, the Forest cannot apply this exception at this time and municipal watersheds as defined above, will be considered unsuitable for surface and underground mining until data is available on which to base an exception.

CRITERION NUMBER 18

"Federal lands with National Resource Waters, as identified by States in their water quality management plans, and a buffer zone of Federal lands one-quarter mile from the outer edge of the far banks of the water shall be unsuitable."

Colorado does not have a Water Quality Measurement Plan that identifies the Forest as having National Resource Waters. This criteria will not be used to declare land unsuitable for coal leasing.

CRITERION NUMBER 19

"Federal lands identified by the surface management agency, in consultation with the State in which they are located, as alluvial valley floors according to the definition in Section 3400.0-5(a) of this title, the standards in 30 CFR Part 822, the final alluvial valley floor guidelines of the Office of Surface Mining Reclamation and Enforcement when published, and approved state programs under the Surface Mining Control and Reclamation Act of 1977, where mining would interrupt, discontinue, or preclude farming, shall be considered unsuitable."

There are no areas meeting the definition of "alluvial valley floor" within the Known Recoverable Coal Resource Area on the Forest. The criterion will not be used to identify areas unsuitable for coal leasing.

CRITERION NUMBER 20

"Federal lands in a State to which is applicable a criterion (i) proposed by the State, and (ii) adopted by rulemaking by the Secretary, shall be considered unsuitable."

The Forest does not contain any land identified by the State of Colorado as unsuitable for coal development, therefore this criteria will not be used to determine land unsuitable for coal leasing.

SUMMARY

Table F-1 summarizes the land unsuitable for coal leasing on the Forest. Figure F-1 displays the Known Recoverable Coal Resource Area on the Forest. Figure F-2 displays areas within the Known Recoverable Coal Resource Area unsuitable for coal leasing.

F-9

BLM_0050914

TABLE F-1.

## SUMMARY TABLE FOR COAL UNSUITABILITY

| Designation | Total Acres | % of Total Forest |
|---|---|---|
| Grand Mesa, Uncompahgre Gunnison | 2,953,186 | 100% |
| Suitable | 755,862 | 26% |
| Unsuitable | 224,491 | 08% |

F-10

BLM_0050915



FIGURE F-1.

AREAS WITH HIGH/MEDIUM POTENTIAL FOR COAL

National Forest System Land

Areas with High/Medium Potential for Coal

F-11

BLM_0050916

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232



FIGURE F-2:

AREAS WITH HIGH/MEDIUM POTENTIAL FOR COAL AND
UNSUITABLE FOR COAL LEASING

National Forest System Land

Areas with High/Medium Potential for Coal
And Unsuitable for Coal Leasing

F-12

566

# Appendix F. MCC's Air Permit

## STATE OF COLORADO

COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT
AIR POLLUTION CONTROL DIVISION
TELEPHONE: (303) 692-3150



# CONSTRUCTION PERMIT

PERMIT NO:     **13GU1462**

**Final Approval**

DATE ISSUED: March 24, 2016

ISSUED TO:     **Mountain Coal Company, LLC**

THE SOURCE TO WHICH THIS PERMIT APPLIES IS DESCRIBED AND LOCATED AS FOLLOWS:

Underground coal mining and coal processing equipment, known as the West Elk Mine, located in Section 16, Township 13 South, Range 90 West, one mile east of Somerset on State Highway 133, in Gunnison County, Colorado.

THE SPECIFIC EQUIPMENT OR ACTIVITY SUBJECT TO THIS PERMIT INCLUDES THE FOLLOWING:

| Facility Equipment ID | AIRS Point | Description |
|---|---|---|
| Rock Dust Silo | 022 | Rock dust silo, pneumatic loading. Controlled by baghouse. |

THIS PERMIT IS GRANTED SUBJECT TO ALL RULES AND REGULATIONS OF THE COLORADO AIR QUALITY CONTROL COMMISSION AND THE COLORADO AIR POLLUTION PREVENTION AND CONTROL ACT C.R.S. (25-7-101 *et seq*). TO THOSE GENERAL TERMS AND CONDITIONS INCLUDED IN THIS DOCUMENT AND THE FOLLOWING SPECIFIC TERMS AND CONDITIONS:

## EMISSION LIMITATIONS AND RECORDS

1.     Emissions of air pollutants shall not exceed the following limitations (as calculated using the emission factors included in the Notes to Permit Holder section of this permit). Monthly and Annual records of the actual emission rates shall be maintained by the applicant and made available to the Division for inspection upon request. (Reference: Regulation No. 3, Part B, Section II.A.4)

Monthly Limits:

| Facility Equipment ID | AIRS Point | Lbs per month | | | | | | | Emission Type |
|---|---|---|---|---|---|---|---|---|---|
| | | PM | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | $SO_2$ | VOC | CO | |
| Rock Dust Silo | 022 | 46.4 | 22.0 | 22.0 | – | – | – | – | Point |

The monthly limits included in this permit were estimated based on an estimated monthly application limit.

AIRS ID: 051/0015/022

BLM_0050918

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

Mountain Coal Company, LLC
Permit No. 13GU1462
Final Approval

Colorado Department of Public Health and Environment
Air Pollution Control Division

**Annual Limits:**

| Facility Equipment ID | AIRS Point | Tons per Year | | | | | | | Emission Type |
|---|---|---|---|---|---|---|---|---|---|
| | | PM | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | $SO_2$ | VOC | CO | |
| Rock Dust Silo | 022 | 0.1 | 0.05 | 0.05 | — | — | — | — | Point |

*See "Notes to Permit Holder #3" for information on emission factors and methods used to calculate limits.*

During the first twelve (12) months of operation, compliance with both the monthly and yearly emission limitations shall be required. After the first twelve (12) months of operation, compliance with only the yearly limitation shall be required.

Compliance with the annual limits shall be determined by recording the facility's annual emissions for the pollutants listed in the table above on a rolling twelve (12) month total. By the end of each month a new twelve-month total shall be calculated based on the previous twelve months' data. The permit holder shall calculate monthly emissions and keep a compliance record on site, or at a local field office with site responsibility, for Division review.

2.   The following control equipment shall be maintained and operated to achieve the control efficiencies listed below. The owner or operator shall monitor compliance with this condition through the results of approved compliance tests (when required), compliance with the Operating and Maintenance Plan, compliance records, and other methods as approved by the Division. (Reference: Regulation No. 3, Part B, Section III.E.)

| Facility Equipment ID | AIRS Point | Control Device | Controlled Pollutants |
|---|---|---|---|
| Rock Dust Silo | 022 | Baghouse | PM, PM10, PM2.5 |

## PROCESS LIMITATIONS AND RECORDS

3.   This source shall be limited to the following maximum consumption, processing and/or operational rates as listed below. Monthly and Annual records of the actual process rate shall be maintained by the applicant and made available to the Division for inspection upon request. (Reference: Regulation 3, Part B, II.A.4.)

**Process/Consumption Limits**

| Facility Equipment ID | AIRS Point | Process Parameter | Annual Limit | Monthly Limit |
|---|---|---|---|---|
| Rock Dust Silo | 022 | Rock Dust Use | 25,000 tons/year | 5,500 tons per month |

The monthly limits included in this permit were derived from the annual limits based on a 31-day month. The owner or operator shall calculate monthly emissions based on the calendar month.

AIRS ID: 051/0015/022

Page 2 of 6

568

BLM_0050919

Mountain Coal Company, LLC                    Colorado Department of Public Health and Environment
Permit No. 13GU1462                                                           Air Pollution Control Division
Final Approval

During the first twelve (12) months of operation, compliance with both the monthly and yearly process limitations shall be required. After the first twelve (12) months of operation, compliance with only the yearly limitation shall be required.

Compliance with the yearly process limits shall be determined on a rolling twelve (12) month total. By the end of each month a new twelve-month total is calculated based on the previous twelve months' data. The permit holder shall calculate monthly process rate and keep a compliance record on site or at a local field office with site responsibility, for Division review.

## STATE AND FEDERAL REGULATORY REQUIREMENTS

4.    Visible emissions shall not exceed twenty percent (20%) opacity during normal operation of the source. During periods of startup, process modification, or adjustment of control equipment visible emissions shall not exceed 30% opacity for more than six minutes in any sixty consecutive minutes. Opacity shall be determined using EPA Method 9. (Reference: Regulation No. 1, Section II.A.1. & 4.)

## OPERATING & MAINTENANCE REQUIREMENTS

5.    The owner or operator shall develop an operating and maintenance (O&M) plan, along with a recordkeeping format, that outlines how the applicant will maintain compliance on an ongoing basis with the requirements of this permit. **Compliance with the O&M plan shall commence at startup.** Within sixty (60) days after issuance of this permit, the owner or operator shall submit the O&M plan to the Division. Failure to submit an acceptable operating and maintenance plan could result in revocation of the permit.  (Reference: Regulation No. 3, Part B, III.E.)

## COMPLIANCE TESTING AND SAMPLING

### Initial Testing Requirements

6.    Within sixty (60) days after issuance of this permit, the owner or operator shall demonstrate compliance with Condition 10, using EPA Method 9 to measure opacity from the Rock Dust Silo and the baghouse.

### Sources not Subject to opacity readings of an NSPS subpart:

This measurement shall consist of a minimum twenty-four consecutive readings taken at fifteen second intervals over a six minute period. (Reference: Regulation No. 1, Section II.A.1 & 4)

## ADDITIONAL REQUIREMENTS

7.    The AIRS ID number shall be marked on the subject equipment for ease of identification. (Reference: Regulation No. 3, Part B, III.E.) (State only enforceable)

8.    A Revised Air Pollutant Emission Notice (APEN) shall be filed.  (Reference: Regulation No. 3, Part A, Section II.C.)

      a.    Annually whenever a significant increase in emissions occurs as follows:

            **For any criteria pollutant:**

            For sources emitting less than 100 tons per year, a change in actual emissions of five tons per year or more, above the level reported on the last APEN submitted; or

AIRS ID: 051/0015/022                                                                                            Page 3 of 6

BLM_0050920

Mountain Coal Company, LLC
Permit No. 13GU1462
Final Approval

Colorado Department of Public Health and Environment
Air Pollution Control Division

For volatile organic compounds (VOC) and nitrogen oxide (NOx) sources in an ozone non-attainment area emitting less than 100 tons of VOC or nitrogen oxide per year, a change in actual emissions of one ton per year or more or five percent, whichever is greater, above the level reported on the last APEN submitted; or

For sources emitting 100 tons per year or more of a criteria pollutant, a change in actual emissions of five percent or 50 tons per year or more, whichever is less, above the level reported on the last APEN submitted; or

For sources emitting any amount of lead, a change in actual emissions, above the level reported on the last APEN submitted, of fifty (50) pounds of lead

For any non-criteria reportable pollutant:

If the emissions increase by 50% or five (5) tons per year, whichever is less, above the level reported on the last APEN submitted to the Division.

b.   Whenever there is a change in the owner or operator of any facility, process, or activity; or

c.   Whenever new control equipment is installed, or whenever a different type of control equipment replaces an existing type of control equipment; or

d.   Whenever a permit limitation must be modified; or

e.   No later than 30 days before the existing APEN expires.

## GENERAL TERMS AND CONDITIONS:

9.   This permit and any attachments must be retained and made available for inspection upon request. The permit may be reissued to a new owner by the Division as provided in Regulation No. 3, Part B, Section II.B upon a request for transfer of ownership and the submittal of a revised APEN and the required fee.

10.  This permit is issued in reliance upon the accuracy and completeness of information supplied by the applicant and is conditioned upon conduct of the activity, or construction, installation and operation of the source, in accordance with this information and with representations made by the applicant or applicant's agents. It is valid only for the equipment and operations or activity specifically identified on the permit.

By:  _____
     Charles N. Pray, P.E.-P.L.S.
     Permit Engineer

Permit History

| Issuance | Date | Description |
|---|---|---|
| Initial Approval | October 7, 2013 | Issued to Mountain Coal Company, LLC |
| Final Approval | This Issuance | Corrected weekly limits to monthly limits |

AIRS ID: 051/0015/022

Page 4 of 6

570

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

Mountain Coal Company, LLC            Colorado Department of Public Health and Environment
Permit No. 13GU1462                   Air Pollution Control Division
Final Approval

Notes to Permit Holder (as of date of permit issuance):

1) The production or raw material processing limits and emission limits contained in this permit are based on the production/processing rates requested in the permit application. These limits may be revised upon request of the permittee providing there is no exceedence of any specific emission control regulation or any ambient air quality standard. A revised air pollutant emission notice (APEN) and application form must be submitted with a request for a permit revision.

2) This source is subject to the Common Provisions Regulation Part II, Subpart E, Affirmative Defense Provision for Excess Emissions During Malfunctions. The permittee shall notify the Division of any malfunction condition which causes a violation of any emission limit or limits stated in this permit as soon as possible, but no later than noon of the next working day, followed by written notice to the Division addressing all of the criteria set forth in Part II.E.1. of the Common Provisions Regulation. See: http://www.cdphe.state.co.us/regulations/airregs/5CCR1001-2.pdf.

3) The emission levels contained in this permit are based on the following emission factors:

Point 022

| Pollutant | Emission Factors - Uncontrolled | | Emission Factors – Controlled* | |
|---|---|---|---|---|
| | lb/ton | Source | lb/ton | Source |
| PM | 3.14 | AP-42 | 0.0089 | AP-42 |
| PM10 | 1.1 | AP-42 | 0.0049 | AP-42 |
| PM2.5 | 1.1 | AP-42 | 0.0049 | AP-42 |

*Emission limitations for this emissions point were calculated assuming 99.9% control efficiency.

4) In accordance with C.R.S. 25-7-114.1, each Air Pollutant Emission Notice (APEN) associated with this permit is valid for a term of five years from the date it was received by the Division. A revised APEN shall be submitted no later than 30 days before the five-year term expires. Please refer to the most recent annual fee invoice to determine the APEN expiration date for each emissions point associated with this permit. For any questions regarding a specific expiration date call the Division at (303)-692-3150.

5) This facility is classified as follows:

| Applicable Requirement | Status |
|---|---|
| Operating Permit | Minor Source at a Synthetic Minor Source for PM10 and PM2.5 |
| PSD | Minor Source at a Synthetic Minor Source for PM10 and PM2.5 |

6) The permit holder is required to pay fees for the processing time for this permit. An invoice for these fees will be issued after the permit is issued. The permit holder shall pay the invoice within 30 days of receipt of the invoice. Failure to pay the invoice will result in revocation of this permit (Reference: Regulation No. 3, Part A, Section VI.B.).

7) If this permit specifically states that final approval has been granted, then the remainder of this condition is not applicable. Otherwise, the issuance of this construction permit does not provide

AIRS ID: 051/0015/022                                          Page 5 of 6

BLM_0050922

Mountain Coal Company, LLC   Colorado Department of Public Health and Environment
Permit No. 13GU1462          Air Pollution Control Division
Final Approval

"Final" authority for this activity or operation of this source. Final approval of the permit must be secured from the Division in writing in accordance with the provisions of 25-7-114.5(12)(a) C.R.S. and Regulation No. 3, Part B, Section III.G. Final approval cannot be granted until the operation or activity commences and has been verified by the Division as conforming in all respects with the conditions of the permit. Once self-certification of all points has been reviewed and approved by the Division, it will provide written documentation of such final approval. Details for obtaining final approval to operate are located in the Requirements to Self-Certify for Final Approval section of this permit.

8) Unless specifically stated otherwise, the general and specific conditions contained in this permit have been determined by the Division to be necessary to assure compliance with the provisions of Section 25-7-114.5(7)(a), C.R.S.

9) Each and every condition of this permit is a material part hereof and is not severable. Any challenge to or appeal of a condition hereof shall constitute a rejection of the entire permit and upon such occurrence, this permit shall be deemed denied ab initio. This permit may be revoked at any time prior to self-certification and final authorization by the Division on grounds set forth in the Colorado Air Pollution Prevention and Control Act and regulations of the AQCC including failure to meet any express term or condition of the permit. If the Division denies a permit, conditions imposed upon a permit are contested by the applicant, or the Division revokes a permit, the applicant or owner or operator of a source may request a hearing before the AQCC for review of the Division's action.

10) Section 25-7-114.7(2)(a), C.R.S. requires that all sources required to file an Air Pollutant Emission Notice (APEN) must pay an annual fee to cover the costs of inspections and administration. If a source or activity is to be discontinued, the owner must notify the Division in writing requesting a cancellation of the permit. Upon notification, annual fee billing will terminate.

11) Violation of the terms of a permit or of the provisions of the Colorado Air Pollution Prevention and Control Act or the regulations of the AQCC may result in administrative, civil or criminal enforcement actions under Sections 25-7-115 (enforcement), -121 (injunctions), -122 (civil penalties), -122.1 (criminal penalties), C.R.S.

AIRS ID: 051/0015/022                  Page 6 of 6

BLM_0050923

# STATE OF COLORADO

COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT
AIR POLLUTION CONTROL DIVISION
TELEPHONE: (303) 692-3150

# CONSTRUCTION PERMIT

PERMIT NO:      **10GU1130**

**Issuance 2**

DATE ISSUED:  February 10, 2016

ISSUED TO:      **Mountain Coal Company**

THE SOURCE TO WHICH THIS PERMIT APPLIES IS DESCRIBED AND LOCATED AS FOLLOWS:

Diesel fueled engine located on shaft #2 fan providing power to an emergency electrical generator located at the West Elk Coal Mine, one mile east of Somerset, on Highway 133, Gunnison County, Colorado.

THE SPECIFIC EQUIPMENT OR ACTIVITY SUBJECT TO THIS PERMIT INCLUDES THE FOLLOWING:

Combustion sources at this facility as detailed below:

| AIRS PT ID | Equipment ID | Description |
|---|---|---|
| 051/0015/027 | Emergency Generator | One (1) Cummins, Model: QSK50-G9, Serial Number: 33167177, diesel fueled, reciprocating, internal combustion engine, rated at 3,251 bhp, supplying power to an approximately 2,400 kW generator. This engine is equipped with an aftercooler for emission control. |
|  |  | This engine is subject to NSPS IIII Tier 1 Standards |

THIS PERMIT IS GRANTED SUBJECT TO ALL RULES AND REGULATIONS OF THE COLORADO AIR QUALITY CONTROL COMMISSION AND THE COLORADO AIR POLLUTION PREVENTION AND CONTROL ACT C.R.S. (25-7-101 et seq), TO THOSE GENERAL TERMS AND CONDITIONS INCLUDED IN THIS DOCUMENT AND THE FOLLOWING SPECIFIC TERMS AND CONDITIONS:

1.      This construction permit represents final permit approval to operate this emissions source. Therefore, it is not necessary to self-certify. (Regulation Number 3, Part B, III.G.5).

2.      AIRS Point ID numbers (for example, "AIRS PT ID:  051/0015/021") shall be marked on the subject equipment for ease of identification. (Reference: Regulation No. 3, Part B, Section III.E.) (State only enforceable)

3.      Visible emissions shall not exceed twenty percent (20%) opacity during normal operation of the source. During periods of startup, process modification, or adjustment of control equipment visible emissions shall not exceed 30% opacity for more than six minutes in any sixty consecutive minutes. Opacity shall be measured by EPA Method 9. (Reference: Regulation No. 1, Section II.A.1. & 4.)

AIRS ID: 051/0015/021

Page 1 of 6
Version 2010-1

| Mountain Coal Company | Colorado Department of Public Health and Environment |
|---|---|
| Permit No. 10GU1130 | Air Pollution Control Division |
| Issuance 2 | |

4.  This source is subject to the odor requirements of Regulation No. 2. (State only enforceable)

5.  Emissions of air pollutants shall not exceed the following limitations (as calculated in the Division's preliminary analysis): (Reference: Regulation No. 3, Part B, Section II.A.4.)

       Nitrogen Oxides:              12.36 tons per year.

       Carbon Monoxide:          15.23 tons per year.

6.  The owner or operator shall follow the most current operating and maintenance (O&M) plan and recordkeeping format approved by the Division in order to demonstrate compliance on an ongoing basis with the requirements of this permit. Revisions to the O&M plan are subject to Division approval prior to implementation. Note that the Division may modify the monitoring requirements as part of the Title V Operating Permit if this facility is subject to Title V permitting (Reference: Regulation Number 3, Part B, III.E.).

7.  These sources shall be limited to a maximum fuel use rate, and maximum hours of operation, as listed below and all other activities, operational rates and numbers of equipment as stated in the application. Annual records of the actual consumption rate shall be maintained by the applicant and made available to the Division for inspection upon request. (Reference: Regulation No. 3, Part B, Section II.A.4.)

       Consumption of #2, Low Sulfur Diesel fuel shall not exceed 75,000 gallons per year.

       Hours of operation shall not exceed 500 hours per year.

8.  A Revised Air Pollutant Emission Notice (APEN) shall be filed: (Reference: Regulation No. 3, Part A, Section II.C.)

   a.  Annually whenever a significant increase in emissions occurs as follows:

      **For any criteria pollutant:**

      For sources emitting **less than 100 tons per year**, a change in actual emissions of five tons per year or more, above the level reported on the last APEN submitted; or

      **For any non-criteria reportable pollutant:**

      If the emissions increase by 50% or five (5) tons per year, whichever is less, above the level reported on the last APEN submitted to the Division.

   b.  Whenever there is a change in the owner or operator of any facility, process, or activity; or

   c.  Whenever new control equipment is installed, or whenever a different type of control equipment replaces an existing type of control equipment; or

   d.  Whenever a permit limitation must be modified; or

   e.  No later than 30 days before the existing APEN expires.

9.  This source is subject to the New Source Performance Standards requirements of Regulation No. 6, Part A, Subpart IIII, Standards of Performance for Stationary Compression Ignition Internal Combustion Engines (CI ICE) including, but not limited to, the following:

      a.  Emissions of Nitrogen Oxides combined shall not exceed 6.9 grams per horsepower hour.

      b.  Emissions of Hydrocarbons shall not exceed 1.0 grams per horsepower hour.

AIRS ID: 051/0015/021                                                   Page 2 of 6

BLM_0050925

Mountain Coal Company
Permit No. 10GU1130
Issuance 2

Colorado Department of Public Health and Environment
Air Pollution Control Division

c.   Emissions of Carbon Monoxide shall not exceed 8.5 grams per horsepower hour.

d.   Emissions of Particulate Matter shall not exceed 0.40 grams per horsepower hour.

e.   Starting October 1, 2007 all fuel used shall meet the following specifications:

   (1)  Sulfur content shall not exceed 500 ppm.

   (2)  Have a minimum cetane index of 40 or

   Have a maximum aromatic compound content of 35% by volume.

   Compliance shall be demonstrated by maintaining copies of the fuel specifications provided by the supplier on-site or in a readily accessible location and made available to the Division for inspection upon request.

f.   Starting October 1, 2010 all fuel used shall meet the following specifications:

   (1)  Sulfur content shall not exceed 15 ppm.

   (2)  Have a minimum cetane index of 40 or

   Have a maximum aromatic compound content of 35% by volume.

   Compliance shall be demonstrated by maintaining copies of the fuel specifications provided by the supplier on-site or in a readily accessible location and made available to the Division for inspection upon request.

g.   All engines and control devices must be installed, configured, operated, and maintained according to the specifications and instructions provided by the engine manufacturer.

h.   Diesel particulate filter (if used) must be installed with a backpressure monitor that notifies the owner or operator when the high backpressure limit of the engine is approached.

In addition, the following requirements of Regulation No. 6, Part A, Subpart A, General Provisions, apply.

a.   At all times, including periods of start-up, shutdown, and malfunction, the facility and control equipment shall, to the extent practicable, be maintained and operated in a manner consistent with good air pollution control practices for minimizing emissions. Determination of whether or not acceptable operating and maintenance procedures are being used will be based on information available to the Division, which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source.  (Reference: Regulation No. 6, Part A, General Provisions from 40 CFR 60.11

b.   No article, machine, equipment or process shall be used to conceal an emission which would otherwise constitute a violation of an applicable standard. Such concealment includes, but is not limited to, the use of gaseous diluents to achieve compliance with an opacity standard or with a standard which is based on the concentration of a pollutant in the gases discharged to the atmosphere. (§ 60.12)

c.   Written notification of construction and initial startup dates shall be submitted to the Division as required under § 60.7.

AIRS ID: 051/0015/021 

Page 3 of 6

Mountain Coal Company
Permit No. 10GU1130
Issuance 2

Colorado Department of Public Health and Environment
Air Pollution Control Division

   d.   Records of startups, shutdowns, and malfunctions shall be maintained, as required under § 60.7.

10.   Operating Permit (OP) requirements shall apply to this facility at any such time that the source becomes major for OP solely by virtue of a relaxation in any permit limitation. Any relaxation that increases the potential to emit above the applicable OP threshold shall require submittal of and issuance of an operating permit, under Regulation No. 3, Part C.

11.   All previous versions of this permit are canceled upon issuance of this permit.

*Rachel Frisz*

Rachel Frisz
Permit Review Engineer

Permit History:

| Date | Issuance | Description |
|---|---|---|
| This Issuance | Issuance 2 | Final Approval |
| March 24th, 2010 | IA | Initial Approval |

APEN Submittal Log (to be maintained further by the permittee):

| APEN Submittal Date | APEN Expiry Date | Renewal APEN to be submitted by | Remarks |
|---|---|---|---|
| February 11, 2010 | February 11, 2015 | January 12, 2015 | |
| | | | |
| | | | |
| | | | |

AIRS ID: 051/0015/021

Page 4 of 8

BLM_0050927

*Supplemental Final Environmental Impact Statement* | **Federal Coal Lease Modifications COC-1362 & COC-67232**

| Mountain Coal Company | Colorado Department of Public Health and Environment |
|---|---|
| Permit No. 10GU1130 | Air Pollution Control Division |
| Issuance 2 | |

Notes to Permit Holder

1) The production or raw material processing limits and emission limits contained in this permit are based on the production/processing rates requested in the permit application. These limits may be revised upon request of the permittee providing there is no exceedance of any specific emission control regulation or any ambient air quality standard. A revised air pollution emission notice (APEN) and application form must be submitted with a request for a permit revision.

2) This source is subject to the Common Provisions Regulation Part II, Subpart E, Affirmative Defense Provision for Excess Emissions During Malfunctions. The permittee shall notify the Division of any malfunction condition which causes a violation of any emission limit or limits stated in this permit as soon as possible, but no later than noon of the next working day, followed by written notice to the Division addressing all of the criteria set forth in Part II.E.1. of the Common Provisions Regulation. See: http://www.cdphe.state.co.us/regulations/airregs/100102aqccommonprovisionsreg.pdf.

3) This source is classified as a:    Minor Source

    At a:    Synthetic Minor Facility

4) The emission levels contained in this permit are based on the following emission factors:

    Nitrogen Oxides:                325.6669 pounds per 1000 gallons of #2 diesel/engine.

    Carbon Monoxide:                405.1361 pounds per 1000 gallons of #2 diesel/engine.

AIRS ID: 051/0015/021                                    Page 5 of 6

577

Mountain Coal Company
Permit No. 10GU1130
Issuance 2

Colorado Department of Public Health and Environment
Air Pollution Control Division

### GENERAL TERMS AND CONDITIONS:  [IMPORTANT! READ ITEMS 5,6,7 AND 8]

1. This permit is issued in reliance upon the accuracy and completeness of information supplied by the applicant and is conditioned upon conduct of the activity, or construction, installation and operation of the source, in accordance with this information and with representations made by the applicant or applicant's agents. It is valid only for the equipment and operations or activity specifically identified on the permit.

2. Unless specifically stated otherwise, the general and specific conditions contained in this permit have been determined by the APCD to be necessary to assure compliance with the provisions of Section 25-7-114.5(7)(a), C.R.S.

3. Each and every condition of this permit is a material part hereof and is not severable. Any challenge to or appeal of, a condition hereof shall constitute a rejection of the entire permit and upon such occurrence, this permit shall be deemed denied ab initio. This permit may be revoked at any time prior to final approval by the Air Pollution Control Division (APCD) on grounds set forth in the Colorado Air Quality Control Act and regulations of the Air Quality Control Commission (AQCC), including failure to meet any express term or condition of the permit. If the Division denies a permit, conditions imposed upon a permit are contested by the applicant, or the Division revokes a permit, the applicant or owner or operator of a source may request a hearing before the AQCC for review of the Division's action.

4. This permit and any required attachments must be retained and made available for inspection upon request at the location set forth herein. With respect to a portable source that is moved to a new location, a copy of the Relocation Notice (required by law to be submitted to the APCD whenever a portable source is relocated) should be attached to this permit. The permit may be reissued to a new owner by the APCD as provided in AQCC Regulation No. 3, Part B, Section II.B. upon a request for transfer of ownership and the submittal of a revised APEN and the required fee.

5. Issuance (initial approval) of an emission permit does not provide "final" authority for this activity or operation of this source. Final approval of the permit must be secured from the APCD in writing in accordance with the provisions of 25-7-114.5(12)(a) C.R.S. and AQCC Regulation No. 3, Part B, Section III.G. Final approval cannot be granted until the operation or activity commences and has been verified by the APCD as conforming in all respects with the conditions of the permit. If the APCD so determines, it will provide written documentation of such final approval, which does constitute "final" authority to operate. *Compliance with the permit conditions must be demonstrated within 180 days after commencement of operation.*

6. **THIS PERMIT AUTOMATICALLY EXPIRES** IF you (1) do not commence construction or operation within 18 months after either the date of issuance of this permit or the date on which such construction or activity was scheduled to commence as set forth in the permit, whichever is later; (2) discontinue construction for a period of 18 months or more; or (3) do not complete construction within a reasonable time of the estimated completion date. Extensions of the expiration date may be granted by the APCD upon a showing of good cause by the permittee prior to the expiration date.

7. **YOU MUST** notify the APCD no later than thirty days **after commencement of the permitted operation or activity.** Failure to do so is a violation of Section 25-7-114.5(12)(a), C.R.S. and AQCC Regulation No. 3, Part B, Section III.G.1., and can result in the revocation of the permit. *You must demonstrate compliance with the permit conditions within 180 days after commencement of operation as stated in condition 5.*

8. Section 25-7-114.7(2)(a), C.R.S. requires that all sources required to file an Air Pollution Emission Notice (APEN) must **pay an annual fee** to cover the costs of inspections and administration. If a source or activity is to be discontinued, the owner must notify the Division in writing requesting a cancellation of the permit. Upon notification, annual fee billing will terminate.

9. Violation of the terms of a permit or of the provisions of the Colorado Air Pollution Prevention and control Act or the regulations of the AQCC may result in administrative, civil or criminal enforcement actions under Sections 25-7-115 (enforcement), -121 (injunctions), -122 (civil penalties), -122.1 (criminal penalties), C.R.S.

AIRS ID: 051/0015/021

Page 6 of 6

578

# STATE OF COLORADO

**COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**
**AIR POLLUTION CONTROL DIVISION**
**TELEPHONE: (303) 692-3150**



# CONSTRUCTION PERMIT

| | |
|---|---|
| **PERMIT NO:** | **09GU1382** |

**INITIAL APPROVAL**

**DATE ISSUED:** JUN 1 8 2010

**ISSUED TO:** **Mountain Coal Company, LLC**

**THE SOURCE TO WHICH THIS PERMIT APPLIES IS DESCRIBED AND LOCATED AS FOLLOWS:**

Underground coal mining and coal processing equipment, known as the West Elk Mine, located in Section 16, Township 13 South, Range 90 West, one mile east of Somerset on State Highway 133, in Gunnison County, Colorado.

**THE SPECIFIC EQUIPMENT OR ACTIVITY SUBJECT TO THIS PERMIT INCLUDES THE FOLLOWING:**

Mining operations and processing equipment, controls and production limits, as described on Attachment A of this permit.

**THIS PERMIT IS GRANTED SUBJECT TO ALL RULES AND REGULATIONS OF THE COLORADO AIR QUALITY CONTROL COMMISSION AND THE COLORADO AIR POLLUTION PREVENTION AND CONTROL ACT C.R.S. (25-7-101 et seg), TO THOSE GENERAL TERMS AND CONDITIONS INCLUDED IN THIS DOCUMENT AND THE FOLLOWING SPECIFIC TERMS AND CONDITIONS:**

1.  Within one hundred and eighty days (180) after commencement of operation, compliance with the conditions contained on this permit shall be demonstrated to the Division. It is the permittee's responsibility to self certify compliance with the conditions. Failure to demonstrate compliance within 180 days may result in revocation of the permit. (Information on how to certify compliance was mailed with the permit.)

2.  This permit shall expire if the owner or operator of the source for which this permit was issued: (i) does not commence construction/modification or operation of this source within 18 months after either the date of issuance of this initial approval permit or the date on which such construction or activity was scheduled to commence as set forth in the permit application associated with this permit; (ii) discontinues construction for a period of eighteen months or more; or (iii) does not complete construction within a reasonable time of the estimated completion date (See General Condition No. 6., Item 1.). Upon a showing of good cause by the permittee, the Division may grant extensions of the permit. (Reference: Regulation No. 3, Part B, Section III.F.4.)

3.  Within one hundred and eighty days (180) after commencement of operation, the applicant shall submit to the Division for approval an operating and maintenance plan for all control equipment and control practices, and a proposed record keeping format that will outline how the applicant will maintain compliance on an ongoing basis with the requirements of condition no.7 listed below. The operating and maintenance plan shall commence at startup. (Reference: Regulation No. 3, Part B, Section III.G.7.)

ver. 2/00

579

BLM_0050930

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval
Initial page 2

Colorado Department of Public Health and Environment
Air Pollution Control Division

4.  Visible emissions shall not exceed twenty percent (20%) opacity during normal operation of the source. During periods of startup, process modification, or adjustment of control equipment visible emissions shall not exceed 30% opacity for more than six minutes in any sixty consecutive minutes. Opacity shall be measured by EPA Method 9. (Reference: Regulation No. 1, Section II.A.1. & 4.)

5.  The particulate emission control measures listed on the attached page (as approved by the Division) shall be applied to the particulate emission producing sources as required by Regulation No. 1, Section III.D.1.b.

6.  This source shall be limited to a maximum production rate as listed below and all other activities, operational rates and numbers of equipment as stated in the application. Daily records of the actual production rate shall be maintained by the applicant and made available to the Division for inspection upon request. (Reference: Regulation No. 3, Part B, Section II.A.4.)

    Total quantity of material (coal and refuse) handled shall not exceed 59,400 tons per day and 8,500,000 tons per year.

    The total quantity of refuse material shall not exceed 5,000 tons per day from the Coal Prep Plant or 5,000 tons per day from the Reclaim Tower and 1,000,000 tons per year.

    Raw material stockpiles shall not exceed 5.1 acres.

    Processed material stockpiles shall not exceed 4.8 acres.

    Processing of through the Coal Prep Plant shall not exceed 20,000 tons per day and 4,500,000 ton per year.

    Hours of operation for maintenance activities on the three main stockpiles limited to 60 hours/day

    Hours of operation for maintenance activities on the silo stockpiles limited to **40** hours/day

    Hours of operation for maintenance activities on the refuse piles limited to **75** hours/day

7.  Emissions of air pollutants shall not exceed the following limitations, and the specific limits in Attachment A (as calculated in the Division's preliminary analysis): (Reference: Regulation 3, Part B, III. A. 4)

    Particulate Matter:        68.8 tons per year.
    PM10 (Particulate Matter<10 $\mu$m):        60.3 ton per year.
    Particulate Matter - Fugitive:        85.4 tons per year.
    PM10 (Particulate Matter<10 $\mu$m) - Fugitive:        27.9 tons per year.

    Compliance with the yearly emission limits shall be determined on a rolling twelve (12) month total.

    Notes:   For AIRS IDs **051/0015/011, 012, 013, 019 & 020**, Coal Processing System: The permit holder shall calculate emissions as defined in Attachment A, based on daily production and keep a compliance record on site in order to demonstrate compliance with the above emission limitations. Annual emissions shall be calculated based on the previous twelve (12) months' emission data. These calculated annual emissions shall be included in the demonstration of compliance with the yearly non-fugitive emission limits listed above.

051/0051

ver. 2/00

BLM_0050931

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval
Initial page 3

Colorado Department of Public Health and Environment
Air Pollution Control Division

Compliance with the fugitive emission limits shall be demonstrated by not exceeding the production limits in condition number 6 and by following the attached fugitive dust emissions control plan.

8. A Revised Air Pollutant Emission Notice (APEN) shall be filed: (Reference: Regulation No. 3, Part A, Section II.C.)

   a. Annually whenever a significant increase in emissions occurs as follows:

      **For any criteria pollutant:**

      For sources emitting **less than 100 tons per year**, a change in actual emissions of five tons per year or more, above the level reported on the last APEN submitted; or

      A change in actual emissions, above the level reported on the last APEN submitted, of 50 pounds of lead

      **For any non-criteria reportable pollutant:**

      If the emissions increase by 50% or five (5) tons per year, whichever is less, above the level reported on the last APEN submitted to the Division.

   b. Whenever there is a change in the owner or operator of any facility, process, or activity; or

   c. Whenever new control equipment is installed, or whenever a different type of control equipment replaces an existing type of control equipment; or

   d. Whenever a permit limitation must be modified; or

9. Process equipment at this facility is subject to Regulation No. 6-Standards of Performance for New Stationary Sources, Part A-Federal Register Regulations ( 40 CFR Part 60 ) Adopted By Reference, Subpart Y- Standards of Performance for Coal Preparation Plants as amended by a final rule published in the Federal Register on October 8, 2009 (FR Vol. 74, No. 194), including, but not limited to, the following:

   a. Discharge into the atmosphere shall be less than 20 % opacity for any coal processing and conveying equipment, coal storage systems and transfer and loading systems constructed, reconstructed or modified before April 28, 2008.

   b. Discharge into the atmosphere shall be less than 10 % opacity for any coal processing and conveying equipment, coal storage systems and transfer and loading systems constructed, reconstructed or modified after April 28, 2008.

   c. A fugitive coal dust emissions control plan must be submitted prior to startup for any open storage piles of coal constructed, reconstructed or modified after May 27, 2009.

   d. A logbook shall be maintained for a coal preparation plant that commences construction, reconstruction or modification after April 28, 2008, to include the information specified in Subpart Y.

   In addition, the following requirements of Regulation No. 6, Part A, Subpart A, General Provisions, apply.

051/0051

ver. 2/00

BLM_0050932

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval                    Colorado Department of Public Health and Environment
Initial page 4                                       Air Pollution Control Division

     a.   At all times, including periods of start-up, shutdown, and malfunction, the facility and control equipment shall, to the extent practicable, be maintained and operated in a manner consistent with good air pollution control practices for minimizing emissions. Determination of whether or not acceptable operating and maintenance procedures are being used will be based on information available to the Division, which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source. (Reference: Regulation 6, Part A. General Provisions from 40 CFR 60.11

     b.   No article, machine, equipment or process shall be used to conceal an emission that would otherwise constitute a violation of an applicable standard. Such concealment includes, but is not limited to, the use of gaseous diluents to achieve compliance with an opacity standard or with a standard that is based on the concentration of a pollutant in the gases discharged to the atmosphere. (§ 60.12)

     c.   Records of startups, shutdowns, and malfunctions shall be maintained, as required under § 60.7.

     d.   Compliance with opacity standards shall be demonstrated according to § 60.11.

10.   Transfer points shall be enclosed to minimize emissions of particulate matter.

11.   Public access shall be precluded, as per Mountain Coal Company's January 26, 2010 letter to Mr. Jon Torizzo, in all areas within the modeling receptor exclusion zone as submitted with the modeling with the application. Fenced areas shall be posted with no trespassing signs.

12.   This source shall be limited to the maximum production rates and emissions controls as listed in Attachment A. Daily records of the actual production rates shall be maintained by the applicant and made available to the Division for inspection upon request.

13.   Prevention of Significant Deterioration (PSD) requirements shall apply to this source at any such time that this source becomes major solely by virtue of a relaxation in any permit condition. Any relaxation that increases the potential to emit above the applicable PSD threshold will require a full PSD review of the source as though construction had not yet commenced on the source. The source shall not exceed the PSD threshold until a PSD permit is granted. (Reference: Regulation No.3, Part D, Section VI.B.4.)

14.   Operating Permit (OP) requirements shall apply to this source at any such time that this source becomes major solely by virtue of a relaxation in any permit limitation. Any relaxation that increases the potential to emit above the applicable OP threshold shall require submittal of and issuance of an operating permit, under Regulation No. 3, Part C.

15.   The applicant shall follow the most current operating and maintenance plan and record keeping format approved by the Division in order to demonstrate compliance on an ongoing basis with the requirements of this permit. (Reference: Regulation No. 3, Part B, Section III.G.7.)

051/0051                                                                      ver. 2/00

BLM_0050933

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval
Initial page 5

Colorado Department of Public Health and Environment
Air Pollution Control Division

16.   Issuance of this permit cancels the permits contained in the following table. AIRS IDs are not cancelled.

| Permit Number |
| --- |
| 95GU508-1 |
| 95GU508-2 |
| 95GU508-3 |
| 95GU508-4 |
| 95GU508-5 |
| 96GU736 |
| 99GU0832 |

Charles N. Pray, P.E.-P.L.S.
Permit Engineer

R K Hancock III, P.E.
Construction Permit Unit Supervisor

Permit History:

| Date | Action | Description |
| --- | --- | --- |
| This issuance | IA | Initial Approval. |

Notes to Permit Holder:

1)   The production or raw material processing limits and emission limits contained in this permit are based on the production/processing rates requested in the permit application.  These limits may be revised upon request of the permittee providing there is no exceedence of any specific emission control regulation or any ambient air quality standard.  A revised air pollution emission notice (APEN) and application form must be submitted with a request for a permit revision.

2)   This source is subject to the Common Provisions Regulation Part II, Subpart E, Affirmative Defense Provision for Excess Emissions During Malfunctions. The permittee shall notify the Division of any malfunction condition which causes a violation of any emission limit or limits stated in this permit as soon as possible, but no later than noon of the next working day, followed by written notice to the Division addressing all of the criteria set forth in Part II.E.1. of the Common Provisions Regulation. See: http://www.cdphe.state.co.us/regulations/airregs/100102aqcccommonprovisionsreg.pdf.

3)   Per condition number 9 above: AIRS ID **051/0015/011, 012, & 013** were built before April 28, 2008, and shall not exhibit greater than 20 % opacity. AIRS ID **051/0015/020** was built after April 28, 2008 and shall not exhibit greater than 10 % opacity.

4)   This facility is classified as a:     Synthetic Minor Facility

051/0051

ver. 2/00

BLM_0050934

*Supplemental Final Environmental Impact Statement* │ Federal Coal Lease Modifications COC-1362 & COC-67232

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval                    Colorado Department of Public Health and Environment
Initial page 6                                         Air Pollution Control Division

### PARTICULATE EMISSIONS CONTROL PLAN FOR MINING ACTIVITIES

THE FOLLOWING PARTICULATE EMISSIONS CONTROL MEASURES SHALL BE USED FOR
COMPLIANCE PURPOSES ON THE ACTIVITIES COVERED BY THIS PERMIT, AS REQUIRED BY THE
AIR QUALITY CONTROL COMMISSION REGULATION NO.1, Section III.D.1.b.  THIS SOURCE IS
SUBJECT TO THE FOLLOWING EMISSION GUIDELINES:

a.      **Mining Activities** - Visible emissions not to exceed 20% opacity, no off-property transport of
        visible emissions.

b.      **Haul Roads** - No off-property transport of visible emissions shall apply to on-site haul roads, the
        nuisance guidelines shall apply to off-site haul roads.

c.      **Haul Trucks** - There shall be no off-property transport of visible emissions from haul trucks when
        operating on the property of the owner or operator.  There shall be no off-vehicle transport of
        visible emissions from the material in the haul trucks when operating off of the property of the
        owner or operator.

### Control Measures

1.  Phased reclamation and rehabilitation, specified in Permit No. C-80-007 issued by Colorado Division
    of Reclamation, Mining, and Safety, shall be implemented to minimize emissions of fugitive particulate
    matter emissions.

2.  The surface of the active working area of the coal refuse stockpiles shall be watered as needed.
    Water shall be applied to any part of a refuse stockpile subject to vehicular activity.

3.  Unpaved haul roads shall be treated with chemical stabilizers per manufacturer's recommendations,
    and watered as often as needed to control fugitive particulate emissions.

4.  Reclamation works and sequential extraction of material shall be initiated to keep the total disturbed
    areas at any one time to a minimum.

051/0051                                                                            ver. 2/00

BLM_0050935

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval
Initial page 7

Colorado Department of Public Health and Environment
Air Pollution Control Division

**ATTACHMENT A**

| AIRS ID | Process description | Controls |
|---|---|---|
| **051/0015/011** | Conveyors/Transfers<br><br>Main Mine Conveyor<br>Conveyor ST-1<br>Conveyor ST-2<br>Conveyor ST-3 | Emissions of particulate matter from the transfer points are controlled with enclosures. Coal is naturally moist.<br><br>Throughput is limited to 8,500,000 tons per year of which not more than 1,000,000 tons per year is refuse.<br><br>Particulate Matter (PM): 6.2 tons per year. Emission factor (EF) = 0.0015 lbs/ton. Particulate Matter<10 μm (PM10): 4.2 ton per year. EF = 0.0010 lbs/ton. |
| **051/0015/012** | Coal processing system, design rated at 1,650 tons per hour, and consisting of:<br><br>One (1) McLanahan, Model: Rotary Breaker, S/N: 154-81, breaker for crushing / sorting of coal.<br><br>One (1) American Pulverizer, Model: Double Roll, S/N: 7630,. roll crusher.<br><br>Two (2) Tabor, Model: Coal Screen, S/Ns: 4511 and 4512, vibrating screens.<br><br>One (1) Custom, reject bin.<br><br>Seven (7) Custom, conveyors for coal and reject. | Emissions of particulate matter are controlled with enclosures. Coal is naturally moist.<br><br>PM: 51.0 lbs per day and 5.4 tons per year. EF = 0.0013 lbs/ton.<br>PM10: 15.4 lbs per day and 1.6 tons per year. EF = 0.0004 lbs/ton.<br><br>Compliance with the yearly emission limits shall be determined on a rolling twelve (12) month total.<br><br>The permit holder shall calculate emissions on a monthly basis and keep a compliance record on site in order to demonstrate compliance with the above emission limitations. Annual emissions shall be calculated based on the previous twelve (12) months' emission data. These calculated annual emissions shall be used to demonstrate compliance with the yearly emission limit listed above. |

051/0051

ver. 2/00

585

BLM_0050936

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval
Initial page 8

Colorado Department of Public Health and Environment
Air Pollution Control Division

**ATTACHMENT A CONTINUED**

| | | |
|---|---|---|
| **051/0015/013** | Two (1) Storage Silos for coal storage.<br><br>Two (2) Vibratory Feeders.<br><br>One (1) Train Loadout Conveyor.<br><br>One (1) Batch Weigh System.<br><br>One (1) Coal Sampling System | Emissions of particulate matter from the transfer points are controlled with enclosures. Coal is naturally wet.<br><br>PM: 0.12 tons per year. EF = 2.93 e-5 lbs/ton.<br>PM10: 0.06 ton per year. EF = 1.46 e-5 lbs/ton.<br>Fugitive PM: 5.3 tons per year. EF = 0.0012 lbs/ton.<br>Fugitive PM10: 1.6 tons per year. EF = 0.0004 lbs/ton. |
| **051/0015/014** | Storage pile, emergency stockpile, and associated hauling of coal. | Follow Fugitive Dust Control Plan.<br><br>Fugitive PM 10.7 tons per year EF = 0.024 lbs/ton.<br>Fugitive PM10: 7.9 tons per year. EF = 0.018 lbs/ton.<br><br>Coal storage areas listed on this permit shall not exceed 4 acres.<br>Truck hauling of coal shall from the silo-pad emergency storage pile to off-site locations shall not exceed 1,000,000 tons per year |
| **051/0015/015** | Coal refuse pile and associated mobile equipment and hauling of coal. | Follow Fugitive Dust Control Plan.<br><br>Production (storage) of coal refuse shall not exceed 1,000,000 tons per year.<br><br>Fugitive PM: 38.4 tons per year.<br>EF = 0.08 lbs/ton.<br><br>Fugitive PM10: 11.4 tons per year. EF = 0.023 lbs/ton. |
| **051/0015/0016** | Hauling of coal from the ROM storage pile. | Follow Fugitive Dust Control Plan.<br>Truck haulage of coal from the ROM stockpile to off-site locations shall not exceed 500,000 tons per year.<br><br>PM: 9.2 tons per year. EF = 0.037 lbs/ton.<br><br>PM10: 2.5 tons per year. EF = 0.010 lbs/ton. |

051/0051

ver. 2/00

BLM_0050937

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval
Initial page 9

Colorado Department of Public Health and Environment
Air Pollution Control Division

**ATTACHMENT A CONTINUED**

| 051/0015/019 | Coal mine ventilation shafts: | Ventilation fans are uncontrolled. |
|---|---|---|
| | Sylvester Gulch:Joy model 120-65-880, 1500 hp | Throughput of ventilation air shall not exceed 3,000,000 cubic feet per minute. Shaft #2 fans shall be restricted to one (1) fan at any time. |
| | Shaft #1 – fan #1:TLT Babcock model GAF 30-15-1, 2500 hp | |
| | Shaft #2 – fan #1:TLT Babcock model GAF 30-15-1, 2500 hp | PM: 49.2 tons per year. EF = 11.23 lbs/hour. PM10: 49.2 tons per year. EF = 11.23 lbs/hour. |
| | Shaft #2 – fan #2:TLT Babcock model GAF 30-15-1, 2500 hp | |
| | Shaft #3 – fan #1:Joy Model MF-65, 1500 hp | |
| 051/0015/020 | Coal Prep Plant Process Equipment: | All processes are enclosed. Limited to 4,500,000 tons per year of coal processing. |
| | One (1) Conn-Weld, 8X16 Negative Slope, S/N: TBD, vibrating sceen. | Conn-Weld rated at 800 tph. |
| | One (1) Crusher: McClanahan, Black Diamond, S/N: TBD | McClanahan rated at 160 tph. Bivitech rated at 800 tph. |
| | Screen #1: Bivitech, KRL/DD "B" 2400X90x, S/N: TBD | Operational rate not applicable. "Wet" process APEN exempt. |
| | Screen #2: Conn-Weld (2) 8X16 Horizontal, S/N: TBD | Operational rate not applicable. "Wet" process APEN exempt. |
| | Screen #3: Conn-Weld, 12X20 Horizontal DD, S/N: TBD | Operational rate not applicable. "Wet" process APEN exempt. |
| | Screen #4: Conn-Weld, 8X16 Horizontal, S/N: TBD | Operational rate not applicable. "Wet" process APEN exempt. |
| | Screen #5: Conn-Weld, 4X10 Negative Slope, S/N: TBD | Operational rate not applicable. "Wet" process APEN exempt. |
| | Screen #6: Conn-Weld, 4X10 Negative Slope, S/N: TBD | McClanahan rated at 200 tph. Wet process. |
| | Crusher: McClanahan, Black Diamond, S/N: TBD | PM: 3.3 tons per year. EF = 0.0015 lbs/ton. PM10 1.7 tons per year. EF = 0.0007 lbs/ton. |
| | | |

**END OF ATTACHMENT A**

051/0051

ver. 2/00

BLM_0050938

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval                     Colorado Department of Public Health and Environment
Initial page 10                                                      Air Pollution Control Division

Additional equipment located at this facility.

| AIRS ID | Description | Emissions information |
|---|---|---|
| **051/0015/009** | Fuel storage tanks under 93GU886.XA. | Emissions of VOCs de minimis. APEN exempt. |
| **051/0015/021** | Cummins emergency generator under permit 10GU1130. | NSPS IIII certified as Tier 2. |
| Exempt heaters at various locations. | | |

051/0051                                                                    ver. 2/00

588

BLM_0050939

051/0051Mountain Coal Company, LLC
Permit No. 09GU1382Approval       Colorado Department of Public Health and Environment
Initial page 11       Air Pollution Control Division

### GENERAL TERMS AND CONDITIONS:  (IMPORTANT! READ ITEMS 5,6,7 AND 8)

1.   This permit is issued in reliance upon the accuracy and completeness of information supplied by the applicant and is conditioned upon conduct of the activity, or construction, installation and operation of the source, in accordance with this information and with representations made by the applicant or applicant's agents.  It is valid only for the equipment and operations or activity specifically identified on the permit.

2.   Unless specifically stated otherwise, the general and specific conditions contained in this permit have been determined by the APCD to be necessary to assure compliance with the provisions of Section 25-7-114.5(7)(a), C.R.S.

3.   Each and every condition of this permit is a material part hereof and is not severable.  Any challenge to or appeal of, a condition hereof shall constitute a rejection of the entire permit and upon such occurrence, this permit shall be deemed denied *ab initio*.  This permit may be revoked at any time prior to final approval by the Air Pollution Control Division (APCD) on grounds set forth in the Colorado Air Quality Control Act and regulations of the Air Quality Control Commission (AQCC), including failure to meet any express term or condition of the permit.  If the Division denies a permit, conditions imposed upon a permit are contested by the applicant, or the Division revokes a permit, the applicant or owner or operator of a source may request a hearing before the AQCC for review of the Division's action.

4.   This permit and any required attachments must be retained and made available for inspection upon request at the location set forth herein.  With respect to a portable source that is moved to a new location, a copy of the Relocation Notice (required by law to be submitted to the APCD whenever a portable source is relocated) should be attached to this permit.  The permit may be reissued to a new owner by the APCD as provided in AQCC Regulation No. 3, Part B, Section II.B. upon a request for transfer of ownership and the submittal of a revised APEN and the required fee.

**5.**   Issuance (initial approval) of an emission permit does not provide "final" authority for this activity or operation of this source.  Final approval of the permit must be secured from the APCD in writing in accordance with the provisions of 25-7-114.5(12)(a) C.R.S. and AQCC Regulation No. 3, Part B, Section III.G.  Final approval cannot be granted until the operation or activity commences and has been verified by the APCD as conforming in all respects with the conditions of the permit.  If the APCD so determines, it will provide written documentation of such final approval, which does constitute "final" authority to operate.  *Compliance with the permit conditions must be demonstrated within 180 days after commencement of operation.*

6.   THIS PERMIT AUTOMATICALLY EXPIRES IF you (1) do not commence construction or operation within 18 months after either the date of issuance of this permit or the date on which such construction or activity was scheduled to commence as set forth in the permit, whichever is later; (2) discontinue construction for a period of 18 months or more; or (3) do not complete construction within a reasonable time of the estimated completion date.  Extensions of the expiration date may be granted by the APCD upon a showing of good cause by the permittee prior to the expiration date.

7.   **YOU MUST** notify the APCD no later than thirty days after commencement of the permitted **operation or activity by submitting a Notice of Startup (NOS) form to the APCD.**  The Notice of Startup (NOS) form may be downloaded online at www.cdphe.state.co.us/ap/downloadforms.html.  Failure to do so is a violation of AQCC Regulation No. 3, Part B, Section III.G.1., and can result in the revocation of the permit.  *You must demonstrate compliance with the permit conditions within 180 days after commencement of operation as stated in condition 5.*

8.   Section 25-7-114.7(2)(a), C.R.S. requires that all sources required to file an Air Pollution Emission Notice (APEN) must **pay an annual** fee to cover the costs of inspections and administration.  If a source or activity is to be discontinued, the owner must notify the Division in writing requesting a cancellation of the permit.  Upon notification, annual fee billing will terminate.

9.   Violation of the terms of a permit or of the provisions of the Colorado Air Pollution Prevention and Control Act or the regulations of the AQCC may result in administrative, civil or criminal enforcement actions under Sections 25-7-115 (enforcement), -121 (injunctions), -122 (civil penalties), -122.1 (criminal penalties). C.R.S.

051/0051                       ver. 2/00

BLM_0050940

(Intentionally left blank)

BLM_0050941

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

# Appendix G. Example Calculations for Air Resources

This technical appendix provides additional information on the procedures used to estimate direct emissions for underground mobile sources. It also includes a summary table listing all estimated emissions for the mine.

## Horsepower-hour Calculations for Underground Mobile Sources

To provide acceptable emissions estimates and to fully disclose expected direct emissions from the facilities mobile sources, the EPA's Nonroad model (2008a) was used to generate source classification code specific emissions factors (grams per horsepower-hour) for the Delta and Gunnison County based equipment inventories for the year 2000. The year 2000 inventory was chosen to be reasonably conservative, with respect to the fleets overall state of control technology integration that would be expected as the inventory equipment ages and is replaced with newer and better controlled sources. To estimate emissions from the sources, staff had to determine a reasonable thermal efficiency (TE) for the source classification code groups in order to estimate the total horsepower-hours the annual fuel use would provide to the equipment. This was necessary because the emissions factors derived from the Nonroad model already account for the overall TE of the equipment, as well as some of the other variables, such as deterioration factors, loading factors, etc. The $CO_2$ emission factor was used to estimate the TE because the model does not rely on a particular control technology, engine class, or equipment type for derivation, and instead calculates the $CO_2$ emissions rates based on the in-use brake specific fuel consumption (BSFC - reported as pounds of fuel per horsepower-hour), which is essentially static across all horsepower classes for all model years.

## Known Parameters

MCC annual diesel fuel use 670,000 (500k Under, 170k Surface) gal      * source:  West Elk Mine

The average density of the diesel fuel is 7.11 lb/gal      * source:  LSD MSDS

The LHV based energy density of the diesel fuel is 18,500 btu/gal      * source:  Ave. of literature

Conversion: btu/hp-hr = 2,544.43 conversion      * source:  Common

$CO_2$ EF = 642.323 g $CO_2$/hp-hr (2008a)      * source:  EPA Nonroad

Carbon content of diesel fuel = 2,778 g C/gal      * source:  40 CFR 600.113

$CO_2$ : C Molecular Weight  Ratio = 44/12 = 3.667 (unit-less)      * source:  Periodic Table

### *Calculate Parameters* (Underground Equipment Example):

Total Available Energy of fuel =

500,000 gal   x   7.1 lb/gal   x   18,500 btu/lb   = 65,767.5 MMbtu

Energy Converter to HP (Energy IN) = 65,767,500,000 btu   /   2544.43 btu/hp-hr   = 25,847,605.34 hp-hr

Convert $CO_2$ EF of Diesel Fuel to C EF = 642.323 g $CO_2$/hp-hr   x   $3.667^{-1}$   =175.179 g C/hp-hr

591

BLM_0050942

Derived hp-hr/gal of fuel from known Carbon Content of fuel = 2,778 g C/gal   / 175.179 g C/hp-hr= 15.858 hp-hr/gal

Derived hp-hr from fuel use (Energy Out) =15.858 hp-hr/gal   x   500,000 gal   =**7,929,026.54 hp-hr**

TE = Energy Out   /   Energy IN   x   100% = 7,929,026.54 hp-hr   /   25,847,605.34 hp-hr   x   100%   =**30.68%**

## Conclusions

The Thermal Efficiency of the underground equipment is approximately 30.68% based on the EPA Model data for $CO_2$. Although low for typical diesel engines based on the literature, it is realistic for working engines where hp is developed at various RMPs (based on loading and work cycles).  Further the EPA Model takes this into account when developing the EFs (see Nonroad Technical Document NR009d "Exhaust and Crankcase Emission factors for Nonroad Engine Modeling – Compression- Ignition").  All emissions estimates are based on the EPA Nonroad Model emissions factors and the total hp-hrs derived in calculated parameter 5 for each equipment class, i.e. underground or surface.

**Example Emissions Calculations for Mobile Sources**

**General Equation for all Emissions:**

Emissions (tons)   =   Total hp-hr (Energy Out[1])   x   NR $EF_E$ g/hp-hr   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton

<u>Where:</u>

$EF_E$ =  Either the Underground or Surface Equipment Emissions Factor

[1] For N2O, substitute (Energy In).  EF based on fuel use only.

**For $N_2O$ (surface)**

8,788,185.82 hp-hr   x   0.005 g/hp-hr   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton   =
                                                                                                0.048 tons

**$NO_X$ (underground)**

7,929,026.54 hp-hr   x   10.163 g/hp-hr   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton   =
                                                                                                88.82 tons

592

BLM_0050943

**Table G-1. Direct Criteria and GHG Emissions from Stationary and Mobile Sources in Tons (2011)**

| Stationary Sources | AIRS ID | PM | $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggregates / Mine Vents / Fugitives (09GU1382) | 11, 12, 13, 14 ,15, 16, 19, 20 | 154.2 | 88.2 | 88.2[1] | NA | NA | NA | NA | NA | NA | NA |
| Diesel Storage Tank (93GU866.XA) | 09 | NA | NA | NA | 1.99[2] | NA | NA | NA | NA | NA | NA |
| Emergency Generator(s) (10GU1130 & Exempt Units) | 21 | 0.39 | 0.39 | 0.39 | 0.66 | 5.03 | 10.34 | 0.13 | 1,007.47 | 0.05 | ND |
| MDW & VAM Exhaust | NA | NA | NA | NA | NA | NA | NA | NA | ND | 58,663[4] | NA |
| Misc. Heating Equipment | NA | 4.73 | 4.30 | 4.36 | 2.41 | 35.70 | 43.88 | 0.59 | 51,920.29 | 0.97 | 0.91 |
| Mobile Sources[3] | Source Classification Code | PM | $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Underground Mining Equipment | 2270009000 | 12.64 | 12.64 | 12.26 | 19.37 | 74.77 | 88.82 | 1.21 | 5,613.98 | 0.29 | 0.14 |
| Surface Mining Equipment | 2270002036 2270002051 2270002060 2270002069 2270002033 | 1.90 | 1.90 | 1.84 | 2.31 | 12.27 | 26.24 | 0.41 | 1,908.74 | 0.04 | 0.05 |
| Total Direct Emissions | | 173.86 | 107.43 | 107.06 | 26.742 | 127.77 | 169.28 | 2.34 | 60450.48 | 58663.54 | 1.1 |

1   All PM10 assumed to be PM2.5, site specific data is not known.  APCD permit 09GU1382 does not include PM2.5 limits or emissions.

2   Emissions based on APEN exemption threshold in attainment area (2.0 tpy).

3    Mobile sources emissions are for exhaust only.

4   The $CO_2e$ of the methane gas is approximately 1,231,919 tons.

593

*Supplemental Final Environmental Impact Statement* │ Federal Coal Lease Modifications COC-1362 & COC-67232

**Table G-2. EPA Nonroad Emissions Factors (g/hp-hr)**

| Equipment Type | Source Classification Code | PM | $PM_{10}$ | $PM_{2.5}$ | $NMOG^2$ | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4{}^3$ | $N_2O^4$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Underground Mining Equipment | 2270009000 | 1.446 | 1.446 | 1.403 | 2.216 | 8.555 | 10.163 | 0.138 | 642.323 | 0.034 | 0.005 |
| Surface Mining Equipment[1] | 2270002036 2270002051 2270002060 2270002069 2270002033 | 0.535 | 0.535 | 0.519 | 0.652 | 3.458 | 7.393 | 0.116 | 537.869 | 0.010 | 0.005 |

[1] Emissions factors from listed Source Classification Code equipment was averaged together to produce a composite emissions factor to represent likely equipment present at the facility. The individual equipment emissions did not statistically vary significantly, with the exception of the bore/drill rigs, within the model results. However, the drilling and boring equipment is not expected to be as heavily used as the other surface equipment, and therefore a straight average of all the emissions factors was used to develop the composite factor (conservative) vs. a weighted average which would have considered area equipment population data. Data was not available for site fleet data to produce a facility specific weighted average.

[2] NMOG (Non-Methane Organic Gases) used to represent potentially reactive VOC species that may participate in ground level Ozone formation. NMOG is the sum of crankcase and exhaust emissions.

[3] CH4 is represented from TOG (Total Organic Gases) – NMOG. CH4 is the sum of crankcase and exhaust emissions.

[4] N2O factor derived from EPA Climate Leaders GHG Inventory Protocol (EPA430-K-08-004) Direct Emissions from Mobile Combustion Sources, Appendix A, Table A-6. N2O factor reported as 0.08 g/kg of fuel combusted. Factor was converted to g/hp-hr based on calculated hp-hr from total annual fuel use (Appendix XX, Example TE Calculation).

BLM_0050945

# Appendix H. B Seam Estimates On Parent Leases

Estimated B Seam Disturbance (March 21, 2016).  Estimates are from numbers received from MCC and are not to date depicted on a map.

## Pad Disturbance

Overall B Seam Pad Disturbance-West Elk estimates the need for 69 well pads (approx. ½ acre per pad) to drill 77 methane drainage wells.  One of the well pads used for E seam methane drainage would be re-used for B seam methane drainage and this well pad is within the boundary of the Flatirons CRA.  The majority of these well pads (59) would be constructed outside of Colorado Roadless Areas.  Ten (10) of the well pads would be constructed within the Flat Irons CRA.

59 well pads X ½ acre per pad = 29.5 acres pad disturbance outside CRA

10 well pads X ½ acre per pad = 5 acres pad disturbance within Flat Irons CRA

## Road Disturbance

West Elk anticipates the need to construct 8.8 miles of new road to access methane drainage well locations associated with the B seam.  Approximately 7.4 miles of this road construction would be completely new construction and 1.4 miles would be opening up existing, non-system ATV routes.  West Elk also anticipates the need to re-open 1.8 miles of existing road on the east side of Deep Creek (Flat Irons CRA) to access B seam methane drainage well locations that was previously used for exploration drilling and for drilling B seam methane drainage wells.  The total amount of road construction (both CRA and non-CRA) anticipated for the B seam is 10.55 miles

### CRA Road Disturbance

Total Roadless Road Disturbance = 1.7 miles (new road disturbance) + 1.8 miles (old drill road) = 3.5 miles = 10.67 acres (based on 25 foot disturbance width) in Flat Irons CRA

### Roadless Disturbance Outside CRAs

Of the 10.55 miles of road that West Elk anticipates constructing to develop the B seam, 7.03 miles of this total would be constructed outside CRAs.  Based on a 25 foot disturbance corridor, 21.3 acres of road disturbance would occur outside Colorado Roadless Areas.

BLM_0050946

(Intentionally left blank)

BLM_0050947

# Appendix I. Response to Comments Received on DEIS (2012)

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| **Air** | | | | | |
| Air (VOCs) | WildEarth Guardians et al. | P. 2, ¶ 1 | 1. The DEIS and DEA Fail to Address VOC Emissions from Methane Drainage Wells The practice of venting methane has the potential to release significant amounts of volatile organic compound ("VOC") emissions, which the DEIS discloses are key ozone precursors. *See* DEIS at 54 and DEA at 37. To the agencies' credit, both the USFS and BLM recognize that VOC emissions are an issue with regards to methane venting. *See id.* DEIS at 67- 68 and DEA at 37-38. This is a critical recognition, but unfortunately, the USFS and BLM dismiss this issue as unimportant and fails to provide any analysis of VOC emissions in the DEIS. This is a major oversight. An extended gas analysis prepared by Analytical Solutions, Inc, which was attached as Appendix 2 to a report prepared by Arista in 2009 for Mountain Coal Company documenting the economic feasibility of methane mitigation options, indicates that a number of VOCs regulated under 40 C.F.R. § 51.100(s) are released during the mine's methane venting, including, but not limited to pentane, hexane, benzene, cyclohexane, heptane, methylcyclohexane, toluene, octane, ethylbenzene, xylene, nonane, decane, undecane, and propane. Below is a table that presents the results of the Analytical Solution extended gas analysis for select VOCs. This data, as well as the underlying Arista report and gas analysis, are referenced in the DEIS on pages 67-68 and DEA on pages 37-38. | 1. DEIS and DEA fail to address VOC emissions from methane drainage wells. The report submitted by Arista Services indicates that two samples collected from the exhaust of the methane drainage wells were sent for extended gas analysis (West Elk Mine, Somerset, Colorado, E Seam Gathering Options, September, 2009, Arista Midstream Services, LLC, pg. 4). These two samples were collected on one date within an eleven minute period (0840 and 0851 on 15 May 2009).  The report indicates that these samples were selected to represent the range of potential methane content, but does not address degree to which the samples might reflect the range the concentrations of other organic compounds in the samples. Without additional data, it is not possible to determine what the actual range of variability would be in an annual period. The analysis provided in the comment assumes these samples are representative of the range VOC concentrations that are emitted through the drainage well throughout a given year, and extrapolates these concentrations to calculate annual emissions. Using these samples to estimate annual emissions from the mine could significantly over or under estimate the emissions and would thus not serve to reliably inform the public. The DEIS has disclosed the only data known to the Forest Service on non-methane organic compounds being emitted from the methane drainage wells; extrapolating from two data points to estimate annual emissions would be speculative. The Colorado Air Pollution Control Division has examined the VOC concentration measurements submitted in the report and will be requiring all | |

BLM_0050948

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 1 To this end, we request the BLM review our previously submitted comments and administrative appeal on the USFS's proposed consent to the lease modifications, particularly with regards to the adequacy of the air quality analyses.3 Select VOCs and Volumes, in Parts Per Million, Reported as Part of Methane Drainage Well Gas Stream. *See* Arista Report, Appendix 2, at 28 and 29. VOC Volume (ppmv): Gas, V18-E1-38, 5/15/09, 0851 Volume (ppmv): Gas, V14-E1-42, 5/15/09, 0840 i-Pentane 129 94 n-Pentane 51 38 n-Hexane 26.6 13.2 Benzene 0.68 0.49 Cyclohexane 12.8 6.8 Although the Analytical Solution gas analysis found that regulated VOC concentrations are very low, the Arista report found that methane drainage wells vent on average between 4.0 and 6.0 million cubic feet of raw gas daily.2 Based on the large volume of gas emitted, it appears that even though regulated VOC concentrations may be small, they are measurable and cumulatively may exceed several hundred, perhaps even thousands, of tons annually. This is evident with regards to just one of the emitted VOCs, hexane, which is also a regulated hazardous air pollutant under Section 112 of the Clean Air Act. According to the EPA, one part per million of hexane equals 3.53 milligrams per cubic meter. *See* EPA, "Hexane," available at http://www.epa.gov/ttn/atw/hlthef/hexane.html. The Analytical Solution gas analysis sampled gas from two methane drainage wells, finding concentrations of hexane from one to be 26.6 and 13.2 ppm from the other. Depending on which gas sample is selected, the total ppm of hexane (expressed as n-hexane) would therefore | coal mines in the state, including the West Elk Mine, to gather additional data to provide a more accurate annual estimate of VOC emissions (personal communication, Debra Miller, USFS, with Charles Pray, Permitting Engineer, Colorado Air Pollution Control Division, 11 July 2012). If the emissions are determined to be high enough to warrant a minor or major source permit the mine will be required by the state to obtain a permit at that time.<br>While it is correct that ozone is formed from the interaction of VOCs and nitrogen oxides in the presence of sunlight, there is no indication that VOC emissions from the mine have contributed to any violation of the ozone standard in western Colorado to date. As indicated by the tables provided in the comments (pages 5 and 6), no violations of the ozone standards occurred in Gunnison, Mesa or Garfield counties in 2011. A day with moderate air quality is not an exceedance of the ozone standard; an exceedance occurs when an 8-hour ozone average greater than 0.075 ppm (75 ppb) is recorded. The lowest value of an 8-hour ozone standard that would exceed the standard would be 0.076 ppm. The legend attached to the provided tables indicates that moderate air quality is defined as 0.060 to 0.075 ppm, which does not exceed the standard. The tables show 0 days for all three counties where the daily AQI values were higher than moderate and therefore there were 0 days that exceeded the ozone standard. | |

BLM_0050949

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | equal 93.898 milligrams/cubic meter (for the 26.6 ppm sample) or 46.596 milligrams/cubic meter (for the 13.2 ppm sample). Using the lower number, or 46.596 milligrams/cubic meter, one can calculate daily and then annual emission rates, on a pounds/day and ton/year basis, using factors for converting cubic meters to cubic feet and milligrams to pound, which are readily available online, as follows: • 46.596 milligrams/cubic meter * 1 cubic meter/35.3146667 cubic feet = 1.3258 milligrams/cubic feet; • 1.3258 milligrams/cubic feet * 1 pounds/453,592.37 milligrams = 0.000002923 pounds/cubic feet; • 0.000002923 pounds/cubic feet * 4,000,000 cubic feet/day = 11.69 pounds/day; 2 The Arista Report is attached to this letter as Attachment 1. 4 • 11.69 pounds/day * 365 days/year = 4,267.42 pounds/year • 4,267.42 ponds/year * 1 ton/2000 pounds = 2.13 tons/year. This represents emissions of just one VOC, hexane, and represents the likely emissions on a ton/year basis from the lower emitting methane drainage well. Yet even here, 2.13 tons/year would exceed reporting thresholds under Colorado Air Quality Control Commission Regulation No. 3. Despite this, Mountain Coal has never reported VOC emissions associated with methane venting. More significantly, based on the calculations in the Analytical Solution analysis, it appears that VOC emissions may approach major source permitting thresholds under Title V and Prevention of Significant Deterioration requirements under the Clean Air Act. Just assessing the likely propane emissions, it appears that total VOC | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | emissions are likely to exceed 100 tons/year.3 The Analytical Solution data indicates that of the lower estimated 4.0 million cubic feet/day of raw gas emissions from the West Elk coal mine, 0.106-0.177% of that is considered propane. Using the lower value of 0.106%, this would equal 4,240 cubic feet/day. Assuming normal temperature and pressure, the density of propane is 0.1175 pounds/cubic feet. *See* "Engineering Toolbox," http://www.engineeringtoolbox.com/gas-density-d_158.html. Thus, 4,240 cubic feet/day would equal 498.2 pounds/day (4,240 cubic feet/day * 0.1175 pounds/cubic feet), or 90.92 tons/year. If the higher value of 0.177% is used, then emissions would be 831.9 pounds/day, or 151.82 tons/year. This indicates that direct VOC emissions from mining operations at West Elk are far greater than reported in the DEIS. Indeed, the DEIS and DEA disclose that total direct VOC emissions from the mining operations will equal 26.74 tons per year.4 This indicates that the USFS's analysis of direct VOC emissions is inaccurate to significant degree. We understand many caveats apply. For example, additional sampling of gas from methane drainage wells is likely to reveal more reliable emission factors. Furthermore, although the gas is vented, a portion of it is utilized for the operation of compressors to aid in the methane drainage process. Additionally, these emission estimates do not take into account methane and VOCs released from the ventilation shaft of the West Elk coal mine. However, it clear that VOCs are emitted as a result of methane venting from methane drainage wells at levels that arrant further scrutiny and analysis. 3 Propane is a regulated VOC | | |

BLM_0050951

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | under 40 C.F.R. § 51.100(s). 4 The DEIS identifies VOC emissions as Non-methane Organic Gases, or NMOG. The DEIS explains that NMOG are "used to represent potentially reactive VOC species that may participate in ground level ozone formation." DEIS at 217. See also DEA at 62.5. The release of VOCs is an issue of concern, particularly in light of the fact that ozone pollution is a growing concern in western Colorado. Although violations of the current National Ambient Air Quality Standards ("NAAQS") have not been reported, a number of exceedances have been reported over the years. Furthermore, the EPA reports there have been a number of days where the air quality in Gunnison, as well as neighboring Mesa and Garfield Counties, have experienced moderate air quality due to elevated ozone concentrations. In 2011 for example, Gunnison County experienced 13 days with moderate air quality, Garfield County experienced 15 days with moderate air quality, and Mesa County experienced 52 days with moderate air quality. The following images display Air Quality Index tile plots from EPA's AirData website (www.epa.gov/airdata) for Gunnison, Garfield, and Mesa Counties in 2011 and show that ozone levels are a concern in these counties. Additionally, although we are concerned with unpermitted VOC emissions at the West Elk coal mine, every other underground coal mine in the North Fork Valley also appears to employ the practice of methane venting. These mines include the Elk Creek and Bowie coal mines. Cumulatively, VOC emissions from methane venting and mine ventilation do not appear to be insignificant. The EPA has even noted its concern over the potential for | | |

BLM_0050952

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | significant VOC emissions from Colorado coal mines and the need for detailed air emissions data. In comments on the proposed Red Cliff coal mine north of Fruita, Colorado the EPA wrote to the BLM: EPA acknowledges that coal mine methane may have low concentrations of nonmethane organic compounds (NMOCs). However, given the high methane emission rates associated with the mine, the NMOC emission rates may be considerable. The Final EIS should present an actual compositional analysis and estimate of emissions of major NMOCs for the mine. Furthermore, EPA recommends that air modeling for NMOCs be conducted for high NMOC emission rates. Letter of L. Svoboda, EPA to G. Wallace, BLM (Mar. 31, 2009) at Detailed Comment p. 3. This letter is attached as Attachment 2. Despite the potential significance of VOC emissions from methane drainage wells, both the BLM and USFS explicitly make "no attempt" to analyze or assess the potential VOC emissions associated with the proposed lease modifications. *See* DEIS at 68 and DEA at 38. This is squarely at odds with NEPA.  In fact, the only reason given by the BLM and USFS for not addressing VOC emissions in either the DEIS or DEA is that emissions are "highly variable." *See* DEIS at 68 and DEA at 38. Yet simply because emissions may be "highly variable" does not indicate that such emissions are insignificant or otherwise not deserving of attention under NEPA. As explained already, data submitted by Mountain Coal Company indicates that VOC emissions from methane drainage wells may trigger certain Clean Air Act reporting and permitting requirements. This is not an | | |

BLM_0050953

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | insignificant matter, particularly given that both the USFS and BLM must ensure compliance with state and federal air quality standards, including permitting requirements. Under NEPA, when an agency is evaluating reasonably foreseeable significant adverse effects and there is "incomplete or unavailable information," that agency must gather the information unless "the overall costs of obtaining it are not exorbitant." 40 C.F.R. § 1502.22(a). Here, neither the BLM nor the USFS have indicated that the costs of obtaining information regarding VOC emissions from methane drainage wells is exorbitant. Instead, the agencies have asserted that the information is "highly variable." Such an excuse does not absolve the agencies of their duty to fully analyze and assess potentially significant environmental impacts under NEPA. | | |
| Air (EA) | WildEarth Guardians et al comments to EA | 58- | b. Any Subsequently Prepared NEPA Document Must Disclose and Quantify Impacts of Black Carbon Emissions. Any Forest Service NEPA document for this proposal must analyze emissions of black carbon, or soot, which is made up of particles or aerosols released through the inefficient burning of fossil fuels, biofuels, and biomass.231 A rapidly growing body of scientific literature, published since the IPCC's Fourth Assessment, identifies black carbon, a component of fine particulate matter (PM2.5), as a critical climate forcing agent, and suggests that reducing these emissions may be among the most effective near-term strategies for slowing Arctic warming and the melting of sea ice, the Greenland ice sheet, and glaciers and snow pack around the world.232 | A discussion of black carbon emissions has been added to the FEIS. | Section 3.4 |

BLM_0050954

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Scientists have described the average global warming potential of black carbon as about 500 times that of carbon dioxide over a 100 year period.233 Similarly, it has been estimated that the "soot effect on snow albedo may be responsible for a quarter of observed global warming." | | |
| At | WildEarth Guardians et al EA Appeal | 83-85 | E. The Forest Service Failed To Ensure Compliance With The GMUG Forest Plan With Regards To Air Quality. The GMUG LRMP explicitly requires the Forest Service to —Comply with State and Federal air quality standards.‖ See GMUG LRMP at III-85. Given the failure of the Forest Service to analyze and assess the reasonably foreseeable direct, indirect, and cumulative impacts of the lease modifications to the 2008 ozone NAAQS, the 2010 1-hour NO2 NAAQS, the 2010 1-hour SO2 NAAQS, the 2006 24-hour PM2.5 NAAQS, and the 2010 PM2.5 increments, the agency has failed to demonstrate that consent to the lease modifications will comply with federal air quality standards. Under the National Forest Management Act (—NFMA‖), the Forest Service has a duty to comply with its LRMP. 16 U.S.C. § 1604(i). The failure to ensure that consent to the Lease Modifications will comply with the LRMP's requirement that the agency comply with federal air quality standards therefore is a violation of NFMA. Although the Forest Service may claim that it lacks authority to address air emissions, this defies the plain language of the GMUG LRMP. Furthermore, it defies other relevant and applicable legal duties and authorities. In fact, the Forest Service's 1982 planning rules are explicit with regards to setting forth | The Forest Plan requires the Forest Service to comply with federal and state air quality standards. The air quality discussion in the DEIS demonstrates that air quality in the vicinity of the mine is in compliance with federal standards, and thus the mine's emissions are not contributing to any violation of the standards. As the emission rates will not increase if the parcels under consideration are leased and the additional coal is mined, air quality impacts are expected to remain the same. The DEIS fully discloses potential impacts to air quality due to the mine's activities, and includes emissions inventories for associated air pollutants. The FS is meeting its affirmative responsibility to protect air quality and related values in wilderness areas.<br><br>PM2.5 increments are relevant in the context of major source permitting, as specified in the Prevention of Significant Deterioration program (40 CFR 51.166). The CFR specifies (51.166 (a), 51.166(c)) that state implementation plans must ensure that increases in pollutant concentrations over baseline conditions do not exceed limits specified for Class I and Class II areas. Once the increment in a given area has been consumed, no new major emissions sources can be constructed (where "major" sources are defined in 51.166 (b) (1)(i)). The West Elk Mine is not presently a major source of any criteria pollutant. Major source permitting is the responsibility of the state. | |

604

BLM_0050955

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | the Agency's obligations to protect air quality, stating that management prescriptions must —[b]e consistent with maintaining air quality at a level that is adequate for the protection and use of National Forest System resources and that meets or exceeds applicable Federal, State and/or local standards or regulations.‖ 36 C.F.R. § 219.27(a)(12) (emphasis added). In other words, the applicable planning rules are clear that the Forest Service is obligated to independently assure compliance with Federal, State, and local air quality standards. To this end, it is not enough to simply assert that an activity or use will comply with relevant Federal, State, and/or local air quality standards or regulations. Rather the Agency is duty-bound to affirmatively demonstrate that management actions are consistent with maintaining air quality at levels meeting or exceeding such standards or regulations. This affirmative duty is well-founded in NFMA, as well as a number of the Forest Service's other overarching environmental mandates. Notably, as part of its renewable resource program duties, NFMA requires the Forest Service to —recognize the fundamental need to protect and where appropriate, improve the quality of air resources.‖ 16 U.S.C. § 1602(5)(C) (emphasis added). The duty to safeguard air quality is especially clear with regards to wilderness areas. The Wilderness Act of 1964 requires that Congressionally designated wilderness areas be managed —in such manner as will leave them unimpaired for future use as wilderness, and so as to provide for the protection of these areas [and] the preservation of their wilderness character[.]‖ 16 U.S.C. § 1131(a). This duty clearly | | |

BLM_0050956

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | extends to air pollution, which can oftentimes impair wilderness character. Indeed, the Forest Service itself cites the Wilderness Act as providing authority to protect air quality in all wilderness areas managed by the Agency. See —Forest Service Air Management Responsibilities,‖ http://www.fs.fed.us/air/respon.htm (last accessed Dec. 30, 2011). For wilderness areas identified as Class I under the Clean Air Act, the duty to protect air quality is even more explicit. With regards to protecting air quality in these areas, the Clean Air Act imposes upon the Forest Service an —affirmative responsibility‖ to protect all air quality values, including visibility, within these Class I areas. 42 U.S.C. § 7475(d)(2)(B). The GMUG LRMP requires that the Forest Service must protect federal air quality standards and applicable legal obligations under NFMA. Other authority, including the applicable planning rule, the Wilderness Act, and the Clean Air Act, confirm that the Forest Service has an affirmative and independent duty to demonstrate that its actions will, in fact, protect such air quality standards. The Forest Service has failed to do so for a number of air quality standards, thereby violating its LRMP and NFMA. | | |
| Air | WildEarth Guardians et al EA Appeal | 81-83 | D. The Forest Service Must Supplement Its LRMP FEIS To Address Significant New Information Regarding Air Quality. NEPA regulations require the Forest Service to supplement draft or final EISs whenever —There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.‖ 40 C.F.R. § 1502.9(c)(1)(ii); see also FSH 1909.15-18. | The Forest Plan requires the Forest comply with federal and state air quality standards. The plan does not contain specific provisions relating to air quality, or refer to a specific air quality standard or set of standards. The Forest Supervisor has the discretion to determine when updates to the LRMP are necessary. It is not feasible in a general forest plan to specifically address impacts to air quality from projects that have not | |

BLM_0050957

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | In this case, the Forest Service was required to supplement the GMUG LRMP EIS before authorizing the lease modifications in order to address significant new circumstances and information relevant to air quality impacts. Here, since the GMUG LRMP EIS was prepared in 1983 and subsequently amended in 1991, a number of new federal air quality standards have been adopted and implemented. These include the 2008 ozone NAAQS (40 C.F.R. § 50.15), the 2006 PM2.5 NAAQS (40 C.F.R. § 50.13), the 1-hour NO2 NAAQS (40 C.F.R. § 50.11(b)), the 1-hour SO2 NAAQS (40 C.F.R. § 50.17), and PSD increments for PM2.5 (75 Fed. Reg. 64863-64907). Neither the 1983 nor the 1991 EIS address these air quality standards. In fact, the 1991 EIS does not even mention any of relevant air quality standards that were applicable at the time. In its analysis of air quality impacts, all the EIS states is, —All of the alternatives may temporary affect local air quality by creating dust and smoke.‖ GMUG LRMP 1991 EIS at IV-24. The EIS does not mention, let alone analyze and assess, the potentially significant impacts of land management activities to ozone, NO2, SO2, and PM2.5. This is a significant flaw that must be addressed in a supplemental EIS before the Forest Service can authorize the lease modifications through the preparation of an EA. The need to supplement the LRMP is especially critical given that a number of land management activities have the potential to directly, indirectly, and cumulatively impact air quality in significant ways that were not even contemplated in 1983 and 1991. For example, nowhere in | yet been proposed or envisioned when the plan is written.<br><br>The air quality discussion in the DEIS (p. 53) /FEIS/SDEIS does address current National Ambient Air Quality Standards, and discloses the impacts to concentrations of criteria pollutants resulting from the mine's activities. Current conditions based upon recent air quality data are presented in the DEIS (pp. 56-59). The DEIS provides emissions inventories for criteria pollutants including sulfur dioxide, particulate matter, and nitrogen dioxide. The document addresses direct, indirect, and cumulative impacts to air quality resulting from the potential extension in the duration of mining operations. The FS does not rely upon the LRMP to ensure that ozone standards are met; ozone is discussed in this DEIS (pp. 56-57). There is no need to supplement the LRMP as a result of this project. | |

BLM_0050958

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | the 1991 EIS did the Forest Service address the direct, indirect, and cumulative impacts of coal mining to ambient ozone concentrations. Thus, the agency has no reasonable basis to conclude that the lease modifications here will adequately protect ozone air quality standards when considered together with other management activities on the GMUG National Forest. This is especially significant because NFMA planning regulations command the Forest Service to ensure that management prescriptions —[b]e consistent with maintaining air quality at a level that is adequate for the protection and use of National Forest System resources and that meets or exceeds applicable Federal, State and/or local standards or regulations.‖ 36 C.F.R. § 219.27(a)(12) (emphasis added). In this case, without supplementing the EIS, the Forest Service has no basis to conclude that the GMUG LRMP provides adequate management prescriptions that ensure ozone air quality standards will be met or exceeded as a result of implementing the lease modifications. At the least, the Forest Service was required to assess whether the LRMP EIS should be supplemented in light of significant new circumstances and information relevant to air quality impacts that bears on the Lease Modifications and their impacts. Such an analysis is required by the Forest Service Handbook, which states: If new information or changed circumstances relating to the environmental impacts of a proposed action come to the attention of the responsible official after a decision has been made and prior to completion of the approved program or | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | project, the responsible official should review the information carefully to determine its importance. Consideration should be given to whether or not the new information or changed circumstances are within the scope and range of effects considered in the original analysis.<br>If, after an interdisciplinary review and consideration of new information within the context of the overall program or project, the responsible official determines that a correction, supplement, or revision to an environmental document is not necessary, implementation should continue.<br>Document the results of the interdisciplinary review in the appropriate program or project file. This documentation is sometimes called a supplemental information report (SIR) and should conclude with whether or not a correction, supplement, or revision is needed, and if not, the reasons why. FSH 1909.15-18.1. The agency did not undertake such an assessment and instead implied that under the LRMP, air quality would be adequately protected. Without even assessing whether new information regarding air quality impacts is significant, the Forest Service has violated NEPA and the FSH.<br>Much has changed in the decades since 1983 and 1991. The Forest Service has an ongoing duty to ensure that its programmatic NEPA adequately justifies current management decisions. In this case, the Forest Service at least had a duty to assess whether new information regarding air quality impacts should trigger the preparation of a supplemental EIS, if not a duty to actually supplement. Especially given that the LRMP EIS predates the adoption of a number of air quality | | |

BLM_0050960

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | standards, this duty is especially critical. The Forest Service made no effort to address whether its programmatic NEPA was adequate in the context of air quality impacts, and therefore the FONSI and EA for the lease modifications violate NEPA. | | |
| Air | Jacqueline Carter 17094 | | We don't need the general public exposed to Black Lung. | Black lung disease is caused by chronic exposure to coal dust. It is normally an occupational disease that affects coal miners and not a risk to the general public. The West Elk Coal Mine is an underground coal mine, and the general public does not have access to either the underground mining areas or surface coal handling facilities. Coal dust is a form of particulate matter, which is regulated by the State of Colorado. As indicated in the DEIS (p. 61), emissions of all forms of particulate matter are limited by the mine's construction permit. The permit also contains a requirement for the operator to follow a fugitive dust control plan that is attached to the permit. The plan applies to coal handling equipment such as conveyors, coal processing equipment, storage silos, storage piles, hauling activities, mine ventilation shafts, and coal preparation plant processing equipment. These measures ensure that particulate matter concentrations in the ambient air due to emissions from the mine do not pose a health hazard to the | |
| Air | HCCA et al | 50 | In addition, the DEIS calculates air quality impacts by multiplying current emission rates by the 1.6-year extension of mining operations that the lease modifications allow, rather than the 2.9 years that takes adjacent mining into account. See id. at 49 (lease mods would extend the life of the mine by 2.9 years); 71 (air pollution impacts of lease modifications would be the same as that of the no action alternative "except that | Section 3.4 cumulative effects addresses the duration of the lease modifications plus additional reserves on federal and fee lands. | Section 3.4 |

BLM_0050961

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | [pollution] would continue for an additional 1.6 years"). | | |
| Air | HCCA et al | 54-55 | D. The DEIS's Analysis Of Air Quality Impacts Is Inaccurate. The signatories to this letter hereby incorporate and adopt the WildEarth Guardians's comments, submitted separately today, on the DEIS's air quality analysis. Further, the DEIS's analysis of the Lease Modifications' potential impacts on visibility is inaccurate, and thus fails to take the "hard look" NEPA mandates. The DEIS largely relies on a State of Colorado Regional Haze plan currently under review by EPA. But Colorado's Regional Haze plan is not final. EPA proposed to approve the State's haze plan on March 26, 2012, but will not issue its final rule (which may or may not endorse the State's plan) until September 10, 2012.151 The DEIS suggests that the Colorado Regional Haze plan supports a conclusion that "impacts from the [West Elk] Mine would not be sufficiently large to warrant additional particulate matter controls." DEIS at 71. This statement is not accurate for several reasons. First, the Regional Haze plan did not even mention, let alone analyze, the visibility impacts or need for particulate matter (PM) controls for the West Elk Mine. In fact, the Regional Haze plan did not even analyze PM controls for coal mines generally. Instead, when considering sources that may warrant "reasonable progress" controls in the initial haze plan, the plan only analyzed specific source categories that are large sources of SO2 and NOx emissions, such as power plants and Portland cement plants.152 The plan explains that while these large SO2 | The comment incorporates and adopts WildEarth Guardians' comments on the DEIS's air quality analysis. Please see the responses to the comments from WildEarth Guardians. The authors of this comment are correct that EPA has proposed to approve Colorado's regional haze plan, but has not yet issued a final ruling. The state implementation plan nonetheless represents a comprehensive examination of visibility in Class I areas throughout the state. Although the implementation plan does not specifically discuss emissions from the West Elk Mine, the statement in the DEIS (p. 57) "The state examined the West Elk Mine's emissions due to its proximity to the West Elk Wilderness and concluded that it would not have a significant impact on visibility in the wilderness." is accurate. This information was obtained via personal communication between Debra Miller, USFS, and Lisa Clarke, Colorado Air Pollution Division, office of Planning and Review, via telephone and email (April 18, 2012). The text of the two paragraphs on page 57 beginning with "The closest Class I areas to the mine are the Black Canyon of the Gunnison National Park and the West Elk Wilderness." and ending with "The state will re-examine visibility progress in five years (from the date of the plan) and determine whether additional steps are needed to meet visibility progress goals." were reviewed by the Division for accuracy before inclusion in the DEIS. These paragraphs indicate that the modeling analyses conducted for the preparation of the implementation plan did include emissions from the West Elk Mine. The authors of this comment are correct that the regional haze plan will be reviewed every five years. As indicated in the DEIS (p. 57), the state determined that additional particulate matter | Section 3.3 FEIS; Air analysis has been redone in SEIS |

BLM_0050962

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | and NOx sources also generally emit substantial amounts of PM, and that "PM emissions from other anthropogenic and natural sources," such as the West Elk Mine, "are not being evaluated at this time."153 The Regional Haze plan is an evolving document that will be reviewed and revised if necessary every five years, and additional controls on additional sources are anticipated in future years as the State must continually improve visibility along a 'glide path' toward natural visibility by 2064.154 Consequently, the fact that the initial plan focused on specific source categories other than coal mines does not mean that the visibility impacts of the West Elk Mine are insignificant, as the DEIS suggests. Nor can the DEIS rely on the Regional Haze plan's "technical support document" ("TSD") concerning haze in the West Elk Wilderness Area's Class I airshed as a substitute for a review of the Lease Modifications' impact on visibility there. The West Elk Wilderness TSD presents a very broad analysis of future visibility conditions, but it does not specifically analyze the cumulative visibility impacts of the West Elk Mine or other coal mines in the region.155 Nowhere in the Regional Haze plan does the State model or predict the visibility impacts of the West Elk Mine, as it did for other sources.156 For these reasons, the DEIS cannot rely on an unapproved analysis and a 5-year-old technical support document that doesn't purport to address the impacts of the West Elk Mine on visibility. | controls were not required for the initial planning period, but the state will re-examine visibility progress in subsequent five-year planning periods and determine if additional controls are required to meet visibility goals. The modeling analysis discussed above did include the West Elk Mine's emissions, as well as other emissions that could impact nearby Class I wilderness areas. The emissions rates used were at least as high as the current permitted rate as stated in the mine's 2010 permit (DEIS pg. 57, footnote). As the mining rates, and therefore emissions rates, are not expected to increase if the lease modifications are granted, the emissions rates used by the state in its modeling analysis are representative of emissions rates expected if the parcels under consideration are leased. This analysis serves as a valid analysis of cumulative visibility impacts including the West Elk Mine. | |
| Air | Michael Mclaughlin 2413 | | Coal has no place in the future of energy sources, as it is the highest ghg-emitting substance of the fossil fuels. | Determining the future role of coal as an energy source is outside the scope and authority of the Forest Service. Emissions of methane due to | |

BLM_0050963

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | | mining activities have been disclosed in the DEIS (p. 65). | |
| Air | Wendell Koontz 2409 | 1 | Table 2.la. Stipulations for Protection of Non-Mineral (Surface) Resources Air Quality This new stipulation has references to coal transfer and processing activities, mitigation measures to decrease impacts to global warming during construction, mine sealing and mine design criteria, and degasification systems. These references are vague and misplaced in a Consent to Lease action. In particular the section identifying "use of alternative fuel construction equipment; use of local building materials: and recycling of demolished construction material" appears to apply to other projects on the National Forest System and copied to this section without regard to applicability. I would suggest the entire section be eliminated from the EIS. | This stipulation was included in the DEIS.  It was removed from consideration in the FEIS after review and consideration that it was in fact more applicable to Oxbow's operations from which it originated. | Section 2.2 (DEIS 1.9 and DEIS Table 2.1a) |
| Air | Michael Drysdale 2390 | 4-5 | Page 70 of the DE IS contains a useful comparison of total GHG emissions from Colorado and the United States. It would also be useful to disclose a global figure, since total global emissions are most environmentally relevant. In addition, as MCC recommended to the BLM in Comment No. 5 to the Preliminary EA, MCC recommends that the FS (and/or BLM), calculate and report the CO2 equivalent emissions from downstream combustion of coal to be mined from the lease modification areas. *See* Comment No. 5 to the BLM for further discussion. Comment No. 10- Additional Scientific and Federal Resources Regarding GHGs The DEIS discusses that the state of climate science does not presently permit an estimation of the effects of a GHG emission | The figures for state and national greenhouse gas emissions listed in the DEIS provide the decision maker with sufficient context to make an informed decision.

The comment requests that the FS and/or BLM calculate and report the CO2 equivalent emissions from downstream combustion of the coal to be mined from the lease modification areas. The Forest Service does not have the ability to forecast where the coal will be consumed, making it infeasible to provide a precise value for CO2 emissions due to coal combustion. However, a very rough estimation has been added to the FEIS. | Section 3.3 FEIS; Updated analysis SEIS Section 3.4 |

BLM_0050964

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | source as small as the lease modifications. In coal fired utility, estimated to emit over 14,000,000 tonnes of CO2 and other GHGs per year for 50 years - over 35 times the magnitude of the CO2-equivalent from the lease modifications annually, and for decades longer than GHGs would be emitted from the lease modification areas. The EPA memorandum concluded that these emissions would have no measurable effect on global climate. As a matter of policy, the agencies determined that smaller emission sources need not be modeled. Consequently, the DE IS's qualitative discussion of the climate change implications of the proposed lease modifications is scientifically sound and justified. The DE IS references a 2010 guidance package from EPA as support for the climate change discussion, but the tri-agency technical memoranda are not expressly cited. Copies of these documents are attached as Exhibits 1-4 for inclusion in the administrative record. | | |
| Air (blm) | Michael Drysdale 2390 | 3 | On pages 40-41 of the EA, Subsection "Indirect Impacts" of Section 3.2, the BLM declines to estimate the quantity of pollutants potentially to be emitted from the combustion of coal to be extracted from the lease modification areas. This determination is clearly correct with respect to criteria air pollutants and most other pollutants, because precise emission levels and impacts depend critically on plant-specific controls and geography that cannot reasonably be known at this time. This is true both because of the variation in facility controls, and because MCC does not anticipate reaching the coal in the lease modification areas until one to three years in the future. MCC does not know to which | The Forest Service does not have the ability to predict which facilities will consume the coal produced by the West Elk Mine, and thus cannot forecast precisely the indirect emissions associated with coal burning. Approximate estimates have been added to the discussion of indirect effects in the air quality section in the FEIS. | Section 3.4 |

BLM_0050965

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | plants the coal will be shipped or what controls those facilities will have installed at the time of shipment. Carbon dioxide emissions are easier to predict. As the BLM notes, most facilities do not presently control C02 emissions, and it is unclear when or if such controls will be required. In addition, C02 emitted from any location has the same effect, if any, on climate, due to atmospheric mixing and chemistry. Consequently, it would be reasonable and informative for the BLM to carry forward a few additional steps the carbon-to-carbon dioxide calculation referenced on page 41 of the EA. The BLM could reasonably estimate the total C02 to be released from coal combustion, and then compare that emission level to total CO2equivalent emissions from North Fork coal mine sources, the State of Colorado, the United States, and globally (the primary environmental benchmark is to total global emissions). Good examples of such estimates appear on page 40 of the EA and in Finding No. 7 of the Draft FONSI, which could be referenced in the EA both with respect to the methane emissions and C02 released from coal combustion. Such simple comparisons would place the proposed actions in context, and ratio-comparisons of this type have been judicially validated as satisfying NEPA. The BLM could then further qualify the estimates by stating that these represent upper bound emissions, since emission controls could be in place at various facilities at the time of combustion. | | |
| Air, cumulative effects | Chris Ribbens 2389 | BLM comment letter 1-4 | The unique topography of the North Fork Valley makes it extremely unsuitable for industrial operations that cause air pollution. The 22 parcels of land on which the leases are proposed are surrounded by three | Potential emissions of hazardous air pollutants associated with road and drainage well construction and maintenance are disclosed in the DEIS at page 69 (Table 9, air quality discussion), and potential emissions of non- | Section 3.4 |

BLM_0050966

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | mountain ranges which create resistance for the global air masses that move from the southwest to the northeast. This setting serves as a bowl to collect global, regional and locally derived air pollutants that become trapped during air inversions. Inversions concentrate toxic chemicals near the surface, sometimes for days at a time. The BLM Montrose office has acknowledged that they regularly postpone controlled burns because of inversions. <br> II. Sources of Air Pollution <br> Air pollution from natural gas operations can arise from a variety of sources: <br> • VOCs emitted from mobile and stationary equipment <br> • Native fugitive gases released from underground <br> • Open evaporation pits <br> • Chemicals used for cleaning and maintenance <br> 2. VOCs Emitted from Mobile and Stationary Equipment Added to the chemicals described above are VOCs and nitrogen oxides (NOx) from the diesel exhaust that is released around the clock throughout both drilling and fracking from lines of idling water and diesel tanker trucks waiting their turn to unload, without turning off the engines. <br> To this is added the exhaust from huge generators and compressors that burn diesel to maintain pressure throughout operations. And added to all of the above is the venting and/or flaring of the raw natural gas that begins to escape once the drill bit hits gas in the target stratum. Along with 3 <br> the sources of VOCs and NOxs mentioned above will be the increased off-site exhaust from pick-up trucks, auxiliary trucks, and | methane organic compounds associated with stationary and mobile source emissions for equipment located at the mine at disclosed in the DEIS at page 64 (Table 7, air quality discussion). In general, these emissions are relatively small. Some non-methane organic compounds are also emitted through methane drainage wells, but there are only limited data available on these compounds. The available information is disclosed in the DEIS at page 67. The Colorado Air Pollution Control Division has examined the VOC concentration measurements submitted in the report and will be requiring all coal mines in the state, including the West Elk Mine, to gather additional data to provide a more accurate annual estimate of VOC emissions (personal communication, Debra Miller, USFS, with Charles Pray, Permitting Engineer, Colorado Air Pollution Control Division, 11 July 2012). If the emissions are determined to be high enough to warrant a minor or major source permit the mine will be required by the state to obtain a permit at that time. <br> As discussed in the DEIS page 55 (air quality discussion, pg. 4) the EPA regulates 187 hazardous air pollutants. Any source that emits or has the potential to emit more than 10 tons per year of a hazardous air pollutant, or more than 25 tons per year of a combination of hazardous air pollutants, is required to obtain an operating permit under Title V of the Clean Air Act (http://www.cdphe.state.co.us/ap/titlev.html). At present, the West Elk Mine is not required to have an operating permit for hazardous air pollutants. <br><br> Analysis has been updated in SEIS. | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | heavy equipment to build new roads, gas well pads, pipelines, and other stationary equipment. VOCs, combined with NOx in the presence of sunlight produce ozone, a highly reactive air pollutant2. Ozone combined with particulate matter less than 2.5 microns, produces smog (blue haze). As the day progresses this photochemical reaction creates more and more ground level ozone that can travel hundreds of miles in plumes in the continental air mass2.<br>3. Native Fugitive Gases Released from Underground<br>Residents and workers will also come in contact with the native VOCs that come to the surface with the raw natural gas. They may comprise as much as 17.9%3,4 or more of the raw gas. They can escape at every juncture including equipment on the pad, such as the Christmas trees where the gas comes up from the ground, the heater-treaters that separate gases, oils, and water, and the holding tanks for condensates and recovered water. They are released from stationary equipment along pipelines such as compressors and pigging stations. In addition, VOCs and fine particulate matter are released when the gases are purposely flared from the well head. Venting and flaring can last six months or more before the gas is finally trapped and put into the local delivery line.<br>4. Open evaporation pits<br>These in<br>As shown in Figure 1 below, more than 89% of these chemicals can<br>harm the eyes, skin, sensory organs, respiratory tract, gastrointestinal tract, or liver. Eighty-one clude reserve pits on each well pad used to collect drilling muds and flowback fluids and also permanent | | |

BLM_0050968

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | evaporation pits for condensate and other fluids. 5. Chemicals used for cleaning and maintenance Powerful volatile solvents and other chemicals are used regularly on well pads for sterilization, cleaning, and maintenance. Used only above ground, these chemicals do not require reporting. III. Possible Human Health Effects In TEDX's list of 944 products there were 632 chemicals used during natural gas operations1. Data were collected to determine the potential health effects of the 353 chemicals identified by Chemical Abstract Service (CAS) 5 numbers. Approximately 37% of the chemicals are volatile and can become airborne percent can cause harm to the brain and nervous system. Seventy-one percent of the volatile chemicals can harm the cardiovascular system and blood, and 66% can harm the kidneys. Chemicals used during gas operations may have long-term health effects that are not immediately expressed. | | |
| Air, cumulative effects | Chris Ribbens 2389 | 1 | In response to the Draft Environmental Impact Statement (EIS) on the Paonia Ranger District, Gunnison County, Colorado, on the Forest Service considering consenting to the BLM modifying Arklands' existing leases **COC-1362** and **COC-67232** by adding 1,722 cumulative acres, TEDX supports the **No Action Alternative.** To support this position TEDX submits a letter written to the BLM Uncompahgre Field Office on February 7, 2012 with all the citations as evidence for our position. We remind you that natural gas wells are already releasing tons of non-methane, volatile organic compounds (NMVOCs) in the air | The DEIS/FEIS fully discloses and discusses impacts from criteria pollutants that may be emitted by the West Elk Mine. Potential emissions of hazardous air pollutants associated with road and drainage well construction and maintenance were disclosed in the DEIS at page 69 (Table 3.3i, air quality discussion), and potential emissions of non-methane organic compounds associated with stationary and mobile source emissions for equipment located at the mine at disclosed in the DEIS at page 64 (Table 3.3g, air quality discussion). In general, these emissions are relatively small. Some non-methane organic compounds are also emitted through methane drainage wells, but there | Air, cumulative effects (Section 3.3 of DEIS, and Section 3.4 of FEIS, SEIS) |

BLM_0050969

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | shed of the proposed roadless-area expansion for coal mine drainage vents. And like coal extraction, natural gas extraction is expanding in the same air shed. The topography of the North Fork Valley leads to frequent inversions which may cause prolonged exposure.<br><br>In light of the comments TEDX is submitting, it is imperative that the Forest Service do a new full EIS that includes the aggregate and cumulative hazards posed to human health and the environment from air-borne chemicals from energy-related activity. The EIS must also take into consideration not only the direct impact on human health and the environment but the secondary effects of ozone on forest health and productivity.<br><br>As such, **TEDX requests that the USFS Take No Action in modifying existing leases COC-1362 and COC-67232 until an updated EIS is completed.** | are only limited data available on these compounds. The available information was disclosed in the DEIS at page 67. The Colorado Air Pollution Control Division has examined the VOC concentration measurements submitted in the report and will be requiring all coal mines in the state, including the West Elk Mine, to gather additional data to provide a more accurate annual estimate of VOC emissions (personal communication, Debra Miller, USFS, with Charles Pray, Permitting Engineer, Colorado Air Pollution Control Division, 11 July 2012). If the emissions are determined to be high enough to warrant a minor or major source permit the mine will be required by the state to obtain a permit at that time.<br><br>As discussed in the DEIS page 55 (air quality discussion, pg. 4) the EPA regulates 187 hazardous air pollutants. Any source that emits or has the potential to emit more than 10 tons per year of a hazardous air pollutant, or more than 25 tons per year of a combination of hazardous air pollutants, is required to obtain an operating permit under Title V of the Clean Air Act (http://www.cdphe.state.co.us/ap/titlev.html).   At present, the West Elk Mine is not required to have an operating permit for hazardous air pollutants.<br><br>Analysis has been updated in SEIS. | |
| Air, cumulative effects | Chris Ribbens 2389 | 1 | In response to the Draft Environmental Impact Statement (EIS) on the Paonia Ranger District, Gunnison County, Colorado, on the Forest Service considering consenting to the BLM modifying Arklands' existing leases COC-1362 and COC-67232 by adding 1,722 cumulative acres, TEDX supports the No Action Alternative.<br>To support this position TEDX submits a letter written to the BLM Uncompahgre Field Office on February 7, 2012 with all the | Air quality (including cumulative) impacts are disclosed both in the DEIS and in the FEIS Section 3.3. | DEIS/FEIS Section 3.3, SEIS Section 3.4 |

BLM_0050970

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | citations as evidence for our position. We remind you that natural gas wells are already releasing tons of non-methane, volatile organic compounds (NMVOCs) in the air shed of the proposed roadless-area expansion for coal mine drainage vents. And like coal extraction, natural gas extraction is expanding in the same air shed. The topography of the North Fork Valley leads to frequent inversions which may cause prolonged exposure.<br><br>In light of the comments TEDX is submitting, it is imperative that the Forest Service do a new full EIS that includes the aggregate and cumulative hazards posed to human health and the environment from air-borne chemicals from energy-related activity. The EIS must also take into consideration not only the direct impact on human health and the environment but the secondary effects of ozone on forest health and productivity.<br><br>As such, TEDX requests that the USFS Take No Action in modifying existing leases COC-1362 and COC-67232 until an updated EIS is completed. | | |
| Air | WildEarth Guardians et al. | P. | 2. The Analysis of Particulate Matter Impacts Fails to Consider Emissions from the Bowie Mine and Fails in Other Regards The analysis of the impacts of the proposed lease modifications to ambient PM10 concentrations indicates that mining activities at the West Elk coal mine will contribute to PM10 very near the level of the current NAAQS, which limit 24-hour concentrations to no more than 150 micrograms/cubic meter. Both the DEIS and DEA indicate that the lease modifications | The comment expresses concern that the modeling analysis completed in 2010 as part of an application for a coal preparation plant included emissions from the West Elk Mine, the Oxbow Mine, and a background concentration to account for other emissions sources not expressly listed in the modeling analysis. The background PM10 concentrations used were provided by the permitting authority, the Colorado Air Pollution Control Division (PM-10 Dispersion Modeling Study, Coal Prep Plant Modification, West Elk Mine: Gunnison County, Colorado, Air | PM10 is addressed in Section 3.4 |

BLM_0050971

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | will contribute to 24-hour PM10 concentrations of 147.89 micrograms/cubic meter. See DEIS at 62 and DEA at 32. This analysis is based on a February 25, 2010 report prepared by Air Resource Specialists, Inc. for Mountain Coal Company in conjunction with an air permitting process (hereafter referred to as "2010 Air Quality Report"). Although this level of impact is of significant concern, particularly given that both the BLM and USFS fail to disclose in the DEA and the DEIS how PM10 emissions will be effectively limited to ensure that the NAAQS are not exceeded and/or violated, it is especially of concern given that it fails to take into account PM10 emissions from the nearby Bowie coal mine, which is located west of the West Elk and Elk Creek coal mines. As both the DEA and DEIS indicate, the maximum predicted PM10 impacts are based only on the West Elk and Elk Creek (i.e., Oxbow)coal mining operations. See DEIS at 62 and DEA at 32. It does not appear to take into account PM10 impacts from the Bowie mine. The 2010 Air Quality Report similarly fails to take into account PM10 impacts from the Bowie mine. Finally, we are concerned that the 2010 Air Quality Report relied upon by the BLM and the USFS only assessed PM10 impacts in areas where it was asserted that public access was excluded. The report states, "West Elk prohibits general public access within the facility property by means of site security measures, such as fencing, employee awareness, and natural topography. As such, the property controlled by West Elk will be considered ambient air and receptors within the property were excluded from the model." 2010 Air Quality Report at 12. This is exceptionally confusing | Resource Specialists, February 25, 2010, p. 2). Emissions from the Oxbow Mine were included in the analysis at the request of the Division (p. 2). As indicated by the DEIS (DEIS, air quality analysis, pg. 61), emissions of particulate matter are limited by the construction permit by limiting the total amount of coal that can be processed in a year to 8.5 million tons of coal per year. The comment expresses concern that the modeling analysis conducted for the permit improperly excluded receptors inside of the facility property, as much of the area impacted by the mine is public property. This analysis was reviewed and approved by the permitting authority, the Colorado Air Pollution Control Division. It is accepted practice when conducting modeling for stationary sources to exclude receptors from within the property boundary when access is limited by fencing, signage, or difficult terrain (personal communication, Debra Miller, USFS, with Charles Pray, Permit Engineer, Colorado Air Pollution Control Division, 11 July 2012). The area excluded from receptor placement in the analysis did not include the entire area impacted by the mine, but included only a portion in the vicinity of the main mine processing area. As stated in the modeling report (PM-10 Dispersion Modeling Study, Coal Prep Plant Modification, West Elk Mine:  Gunnison County, Colorado, Air Resource Specialists, February 25, 2010, pg. 12): "Receptors were placed at 75-meter intervals along West Elk's fenceline/property boundary as well as out to 1,500 meters from the approximate center of the facility.  Additional receptors were then placed at 150 meter intervals to an average of 3.5 kilometers from the center of the facility. Furthermore, a 100 meter-spaced receptor grid was applied out to 400 meters around the Deer Creek Vent Shaft to ensure maximum impacts were predicted. This source is located outside of | |

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | given that the majority of the area impacted by the West Elk coal mine is under public ownership and is publicly accessible. We are hard-pressed to find any validity in the assertion that West Elk prohibits general public access within its mine area, especially by "natural topography." We request the USFS and BLM scrutinize whether the 2010 Air Quality Report inappropriately excluded receptors that are, in fact, publicly accessible, in order to assure an accurate and valid analysis and assessment of impacts to PM10 concentrations. | the Main West Elk site, but the shaft site is security-fenced and access to the site is gated." The West Elk Mine's permit includes the following statement specifically requiring the mine to restrict access to the area that was excluded from receptors in the modeling analysis: "Public access shall be precluded, as per Mountain Coal Company's January 26, 2010 letter to Mr. Jon Torizzo, in all areas within the modeling receptor exclusion zone as submitted with the modeling with the application. Fenced areas shall be posted with no trespassing signs." (State of Colorado Construction Permit 09GU1382, pg. 4) In addition, photos of areas deemed not to be accessible due to difficult terrain were submitted to the state for review (personal communication, Debra Miller, USFS, with Charles Pray, Permit Engineer, Colorado Air Pollution Control Division, 11 July 2012). Analysis has been updated in SEIS. |  |
| Air (Exceedances of NAAQS) | WildEarth Guardians et al |  | 3. The Analysis of Air Quality Impacts Fails to Address Reports that Indicate West Elk Mining Operations are Contributing to Exceedances and/or Violations of the NAAQS Both the USFS's DEIS and the BLM's DEA fail to address a 2011 report entitled, "Criteria Pollutant Dispersion Modeling Study," which was prepared in conjunction with the issuance of an air permit for Oxbow Mining, LLC's Elk Creek Mine. This report, dated December 14, 2011, was prepared by Air Resource Specialists, Inc. and submitted to the Colorado Department of Public Health and Environment; it is attached to this comment letter as Attachment 3. This air modeling analysis found that the West Elk mining operations would contribute to violations and/or exceedances of the 24-hour PM2.5 NAAQS, as well as the recently adopted 1- | This comment refers to a modeling analysis that was completed for the Elk Creek Mine, which is close to the West Elk Mine (<1 mile). The analysis referred to was prepared as part of a construction permit application to increase the allowed material throughput at its underground coal mine (Elk Creek Mine). The focus of the analysis was not the effects of the emissions from the West Elk Mine, but these emissions were included in the modeling analysis due to the proximity of the mine to the Elk Creek Mine. The modeling analysis report indicates there was just one receptor with a predicted maximum cumulative 24-hour PM2.5 concentration exceeding the standard (Criteria Pollutant Dispersion Modeling Study, Oxbow Mining, LLC, Elk Creek Mine, Gunnison County, Colorado, prepared by Air Resource Specialists, 14 December 2011). The report indicates (p. 19) that this receptor is located immediately west of the |  |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | hour NO2 NAAQS. Specifically, West Elk mining operations would contribute to 24-hour PM2.5 concentrations of 38.29 micrograms/cubic meter, above the NAAQS of 35 micrograms/cubic meter, and to 1-hour NO2 concentrations of up to 198.40 parts per billion, above the NAAQS of 100 parts per billion. *See* Attachment 3 at 20 and 23.<br><br>Although the modeling report asserts that these violations would occur in areas where public access is excluded, once again, there is no information or analysis indicating that public access is truly excluded where these violations would occur. The report asserts, for example, that public access is precluded due to "severe terrain gradients." Attachment 3 at 22. This does not indicate that public access is precluded, but rather that the authors of the report believe that the public simply would not access the area. This is an inappropriate basis to conclude that public access is excluded and therefore that modeling receptors within these areas should similarly be excluded. Once again, we request the USFS and BLM scrutinize whether this 2011 Air Quality Report inappropriately excluded receptors that are, in fact, publicly accessible, in order to assure an accurate and valid analysis and assessment of the impacts of the proposed lease modifications to PM2.5 and NO2 concentrations. | proposed Vessels Elk Creek project section, in an area closed to the public. The only access would be through the Elk Creek Mine, which is controlled by Oxbow Mining, and the terrain north, east, and west of the site is severe. As discussed in the response to WildEarth Guardians comment #2, it is accepted practice when conducting modeling for stationary sources to exclude receptors from within the property boundary when access is limited by fencing, signage, or difficult terrain. Although this receptor was not excluded for the Elk Creek Mine analysis, it is clearly located in an area that is not readily accessible by the public.<br><br>The comment also expresses concern over a predicted exceedance of the NO2 ambient air quality standard. The modeling analysis identified eight receptors where exceedances of the NO2 ambient air quality standard were predicted (p. 22). These eight receptors were also located in areas where the public does not have access and they were excluded from the analysis. As discussed above, this is an appropriate practice for this type of modeling analysis. The Colorado Air Pollution Control Division is currently reviewing the modeling analysis and will be issuing a new permit to the mine. The new permit will contain language specifically requiring the mine to restrict public access, similar to the West Elk Mine.<br><br>These exceedances occurred only when a background value of 49 mg/m3 was used (Elk Creek Mine modeling report, p. 21). This value was specified by the Colorado Air Pollution Control Division and was based upon data taken from Ignacio, Colorado. Ignacio is located approximately 125 miles south of the mine in an area of intensive oil and gas development in La Plata County, in southwest Colorado. The Elk Creek Mine modeling analysis thus provides a very conservative, and possibly unrealistic, | |

BLM_0050974

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | | estimate of the maximum NO2 concentration at the mine. | |
| Air (Exceedances) | WildEarth Guardians et al | | 4. The DEIS and DEA Fails to Disclose that Grand Junction in Mesa County is Currently in Violation of the PM10 Ambient Air Quality Standards We are extremely concerned that the DEIS and DEA assert that Grand Junction in nearby Mesa County is currently in attainment of the PM10 NAAQS. *See* DEIS at 56 and DEA at 25. According to EPA data, Grand Junction, Colorado in Mesa County is, in fact, in violation of the PM10 NAAQS based on 2008-2010 monitoring data. The location of this monitor, which is identified as 080770017, is shown in the map below. This EPA data demonstrates that Grand Junction is currently in violation of the PM10 NAAQS based on data from the years 2008-2010, the most recent years of data available. *See* EPA, "Design Values," available at http://www.epa.gov/airtrends/values.html (last accessed July 9, 2012).5 Data available on the EPA's "Design Values" website indicates that exceedance based design value for Grand Junction exceeds 1.0 for calendar year 2011, and that this area is therefore in violation. This data is attached to these comments as Attachment 4. The EPA expressly states in its design value data that all the areas identified in this petition have violated the NAAQS based on 2008-2010 monitoring data. This data shows that the three-year average of the number of exceedances at monitoring site 080770017 is 1.2, thereby violating the 24-hour PM10 NAAQS. *See* table below. This data demonstrates that Grand Junction, Colorado, as well as potentially surrounding areas of Mesa County, must be designated nonattainment for the 24-hour PM10 | The National Ambient Air Quality Standard for PM10 states that the measured 24-hour PM10 concentration must not exceed 150 mg/m3 more than once per year on average over 3 years (DEIS, air quality analysis Table 1, p. 53). The comment includes a table (labeled as Attachment 4) from the EPA web site that lists the number of expected exceedances for several PM10 monitors in Colorado for the period 2008-2010. One monitor, identified as AQS monitor 080770017, is listed in the table as having an expected number of exceedances over the 3-year period of 1.2, and an expected number of exceedances for 2010 of 3.5. To meet the standard, the expected number of exceedances over the 3-year period should not be higher than one.<br><br>This monitor collects a 24-hour sample every third day, resulting in no more than 121-122 samples per year. The expected number of exceedances is computed by adjusting the actual number of exceedances to account for the fact that data is only collected every third day. In 2010 the table indicates that there was one actual exceedance observed. To compute the expected number of exceedances, the actual number of exceedances is multiplied by the number of days in the year divided by the number of valid samples (in this case 108), resulting in the value of 3.5 listed in the table. This single exceedance occurred on May 23. A large regional wind and dust event occurred on that date, with exceedances recorded at other locations in western Colorado including Durango, Crested Butte, Rifle, and Clifton. The Colorado Air Pollution Control Division has therefore requested EPA to flag this day as an exceptional event (personal communication, Debra Miller, USFS, with Bradley Rink, Particulate Matter | Additional graphics are included behind this table to illustrate wind and dust event. |

BLM_0050975

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | NAAQS. We request the BLM and USFS address this in any final EA and EIS in order to ensure an accurate and scientifically defensible analysis and assessment of air quality impacts.<br>5 The 24-hour PM10 NAAQS are violated whenever the expected number of exceedances in any one-year period exceeds 1.0. *See* 40 C.F.R. § 50.6(a). The expected number of exceedances in any one-year period is determined by recording the number of exceedances in each calendar year and then averaging them over the past three calendar years. *See* 40 C.F.R. § 50, Appendix K, 2.1(a). The three-year average is also known as the "exceedance based design value." | Monitoring Lead, Colorado Air Pollution Control Division, 11 July 2012). Exceptional events are defined as "unusual or naturally occurring events that can affect air quality but are not reasonably controllable using techniques that tribal, state or local air agencies may implement in order to attain and maintain the National Ambient Air Quality Standards" (http://www.epa.gov/ttn/analysis/exevents.htm). A day that is determined by EPA to qualify as an exceptional event is not used to determine whether a violation of the ambient air quality standard has occurred.<br>Monitor specific summary data are available from the EPA at http://www.epa.gov/airdata/ad_rep_mon.html. Tables can be downloaded from this site showing the annual first and second highest measured PM10 concentrations, along with other information, with exceptional event data either included or excluded (see attached PM_monitor_report_included.pdf and PM_monitor_report_excluded.pdf). The report that includes exceptional events shows that the highest 24-hour PM10 concentration recorded at monitor 080770017 was 155 mg/m3, which would exceed the standard. The table also shows one actual exceedance for the year, and an expected number of exceedances of 3.5. However, the report that excludes exceptional events shows the highest observed 24-hour PM10 concentration was 64, which does not exceed the standard of 150 mg/m3, and that the number of expected exceedances for the year was zero. As there were no exceedances reported at this monitor in 2008 or 2009, the expected number of exceedances for the 3-year period 2008-2010 is also zero. The monitor data therefore does not indicate a violation of the PM10 ambient air quality standard. The EPA has not identified any areas in Colorado as being in nonattainment for | |

BLM_0050976

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (If applicable) |
|---|---|---|---|---|---|
| | | | | PM10 as of July 2012 (http://www.epa.gov/oaqps001/greenbk/pntc.html). The National Oceanic and Atmospheric Administration (NOAA) has developed a computer model that allows users to generate back trajectories showing the approximate path traveled by an air mass prior to arriving at a chosen location. This model is called the hybrid single particle Lagrangian integrated trajectory (HYSPLIT) model (http://ready.arl.noaa.gov/HYSPLIT.php). This model was run for 5 different times on 23 May 2010 and for three different heights (100, 200, and 500 meters) above the ground level to show the path traveled by the air masses arriving at Grand Junction. The chosen arrival times were 0600 UTC (0000 local time), 1200 UTC (0600 local), 1800 UTC (1200 local), 0000 UTC on May 24th (1800 local on May 23rd), and 0600 UTC on May 24th (0000 local). The model run duration was 24 hours for all five arrival times. The back trajectory plots are shown in Attachment X. The plots indicate that air arrived at Grand Junction from the west and south-southwest on May 23rd and was moving rapidly. These plots are consistent with the Colorado Air Pollution Control Division's conclusion that there was a regional wind and dust event that occurred on that day. Since the West Elk Mine is located approximately 60 miles to the east-southeast of Grand Junction, the plots also suggest that emissions from the mine were unlikely to have contributed to the high PM10 reading that was recorded by the Grand Junction monitor on that date. | |
| **Climate Change** | | | | | |
| Climate change | Gerrit Crouse 19324 | | Allowing coal mine expansion in the roadless area will degrade a natural area now enjoyed by hunters & hikers, that protected works 24/7 to buffer effects of | Climate change is addressed in Section 3.3 of DEIS/DEIS | See discussion of climate change in |

BLM_0050977

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | climate change driven by irreversibly accelerating global warming (www.globalchange.gov/usimpacts), only to benefit one of the most bioincompatible forms of power.<br><br>Reference: "Summary for Decision-Makers", /Millennium Ecosystem Assessment Synthesis/ (Washington, DC: Island Press, 2005). | | DEIS/FEIS Section 3.3; Section 3.4 and other relevant sections of the SEIS |
| | Form letter | | Protect our climate. Analysis prepared for the Colorado Roadless Rule shows that mining coal in this and adjacent roadless areas would unleash a carbon bomb causing up to $12 billion in damage to the world's economy and environment. Approving these coal leases undermines this administration's commitment to the Paris climate accord, the state's climate goals, and to clean energy. Climate change is a huge threat to Colorado's forests, quality of life, and economy. The Forest Service shouldn't be making climate change worse." | This comment refers to combination of the CRR analysis and to this Lease Modification analysis.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.6. Climate effects are disclosed in Section 3.3 and other relevant sections.<br><br>The stated policy is not that of the current administration.<br><br>See response to #9755-1 regarding the Paris Accord. | |
| Climate Change | Janell Kinzie 2472 | | You clearly have not evaluated or disclosed publicly the impacts of the proposed changes on global warming. | Climate change is addressed in Section 3.3 of DEIS/DEIS | See discussion of climate change in Section 3.4 and other relevant sections |
| Climate change, Roadless | Mary Moderacki 52565 | | Climate change is here. 2,000 scientists from 100 countries have confirmed this fact in the largest peer reviewed study ever completed. We need to STOP burning fossil fuels if we want any chance to deal with this | See Section 3.3 and other relevant sections climate change discussion. Stipulations have been added to the proposed action (Section 2.2) for the protection of surface resources including Roadless Areas. | Section 3.4 and other relevant sections |

BLM_0050978

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | mounting crisis. We are already above the recommended level of CO2 in our atmosphere that determines a stable environment. Purposely allowing coal mining to expand confirms either great ignorance or proof that the US Forest Service is actually controlled by the big energy corporations. | | |
| | | | Show me where you stand.  Prove to me the US Forest Service can protect the Sunset Roadless Area. | | |
| | | | This is your legacy to your children right now. | | |
| **Coal** | | | | | |
| Coal | John Andes 2448 | | The more so as the US does NOT now or in the future need the little amount of coal potentially produced by any mining expansion of the existing operation. | Socio-economics are addressed in chapter 3.35. | |
| Coal | WildEarth Guardians et al. | P. 2, ¶ 1 | Before we comment on the air quality analyses in the agencies' respective documents, we must reiterate that neither the BLM nor the USFS have demonstrated that the lease modifications are necessary to prevent the bypass of federal coal. Neither the DEIS nor the DEA demonstrate that, without the lease modifications, Arch Coal would not be able to exploit a similar amount of federal coal or otherwise be able to effectively exploit federal coal currently under lease. This is a significant omission as the primary purpose and need for the proposed lease modifications it to address the issue of bypassing federal coal. As it stands, it appears as if both the BLM and USFS are simply using the "bypass of federal coal" argument as an excuse to grant Arch Coal the lease modifications that | Without the lease modifications, coal on existing federal leases and private lands would be bypassed because of current panel alignment on parent leases.  Without the lease modifications, coal would be bypassed in that area as no other mine has access on private to build another portal.  This was demonstrated in the application and BLM's determinations in the GER/MER (project file) | Lease modification application map (project file), GER/MER (DEIS, Appendix A and project file) |

BLM_0050979

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | it has demanded. This is shameful stewardship of public resources | | |
| **Cumulative Effects** | | | | | |
| Cumulative Effects | Mary Hadcock 27260 | | - The mining and use of coal have an immediate, *direct* and devastating impact on PEOPLE and the environment. <br> - The use of coal has a *delayed* and devastating impact on people and the environment <br> THERE IS NO SUCH THING AS CLEAN COAL, from start to finish | See effects and cumulative effects analysis throughout FEIS. | Chapter 3 |
| Cumulative effects | HCCA et al | 50 | Although the DEIS purports to address the "cumulative impacts" of mining activities on adjacent lands to the effects on the lease modifications under Alternative 3 in its discussions of certain resources, that "analysis" is limited to the following vague statement that was cut-and-pasted throughout the DEIS: <br> If the lease modifications are granted[,] effects similar to those described in Alternative 3 could occur on the adjacent private land while mining 5.6 million tons of private coal reserves and on parent leases where additional 3.3 million tons federal coal reserves may be mineable. DEIS at 83 (discussing cumulative impacts on geology); see also id. at 80 (making identical statement re: topography); id. at 86 (making identical statement re: soils); id. at 93 (making identical statement re: surface water); id. at 98 (making identical statement re: vegetation); id. At 147 (making identical statement re: visual resources). But without reference to the slope, soil type, streams and ponds, vegetation (including potentially rare plants), or visual values of the private or adjacent lands, or the miles of road or well pads that may be required to mine those lands, the Forest Service can | At this leasing stage there are no mine plans approved for the private lands as they rely solely on a preliminary design as is the case on the lease modification areas, so it is impossible to determine exactly where, of if, surface disturbance would occur. Alternative and cumulative effects language have been supplemented to the extent necessary for informed decision-making. | Alternatives and Chapter 3 |

BLM_0050980

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | have no support for its contention that the impacts outside of the Lease Modifications will be "similar." Because the DEIS fails to inventory or describe the resources at stake on the adjacent lands, or even provide an idea for where those lands are, the DEIS fails to take the required "hard look" at the direct, indirect, or cumulative effects of Alternative 3. | | |
| Cumulative effects | HCCA et al | 50,51 | Given the fact that adjacent lands contain nearly as much coal as the lease modifications themselves (8.9 million tons to 10.1 million tons) and that mining these adjacent lands would almost double the extension of mining operations (from 1.6 years to 2.9 years), id. at 49, the Forest Service cannot claim that it simply found the direct, indirect, or cumulative impacts from nearby mining to be insignificant. Nor would it be burdensome to consider these impacts in greater depth, since they are supposedly very similar to those of Alternative 3. Whatever the burden, NEPA requires the Forest Service to disclose the direct, indirect, and cumulative impacts of a proposed action. The DEIS's failure to analyze the impacts of mining an additional 8.9 million tons of coal outside the Lease Modifications – impacts that result directly from the lease modification decision – fails to take the hard look at such impacts as NEPA requires.140<br>140 Further, the DEIS's apparent assumption that the cumulative effects of Alternative 2 and Alternative 3 are similar is in error. According to the Forest Service, "BLM confirmed that under the 2001 Rule [AKA Alternative 2] mining also becomes infeasible on a private parcel with fee coal that would be bypassed." Email of N. Mortenson (Apr. 27, 2012 4:42:42 PM) | As this document is being prepared, the Colorado Roadless Rule is in effect which allows development under Alternative 4 that would making mining possible on existing federal leases and on private lands.  However, the consideration of a leasing decision still does not authorize mining that would result in impacts and as such are not specifically known because there is no approved mine plan.  Indirect and cumulative effects are addressed throughout Chapter 3 of the FEIS related to existing leases. | Chapter 3 |

BLM_0050981

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | (Exh. 6). Thus, the indirect or cumulative impacts of Alternative 2 will be less than those of Alternative 3. | | |
| Cumulative effects- air | HCCA et al | 53-54 | C. The DEIS's Analysis Of Cumulative Impacts Violates NEPA. In evaluating cumulative impacts, agencies must do more than catalogue relevant "past projects in the area." City of Carmel-by-the-Sea v. United States Dep't of Transp., 123 F.3d 1142, 1160 (9th Cir. 1997). The EIS must also include a "useful analysis of the cumulative impacts of past, present and future projects." Id. This means a discussion and an analysis in sufficient detail to assist "the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts." Id. (citation omitted). Agencies also cannot merely list the number of road miles to be built or acres disturbed by past, present, and foreseeable projects. Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 994-95 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is … not a sufficient description of the actual environmental effects that can be expected from logging those acres…. Moreover, while a tally of the total road construction anticipated in the … watershed is definitely a good start to an adequate analysis, stating the total miles of roads to be constructed is similar to merely stating the sum of the acres to be harvested – it is not a description of actual environmental effects."). The DEIS's cumulative effects section, Section 3.37, largely includes only a list of present and reasonably foreseeable actions as well as "other activities." DEIS at 153-56. There is almost no evaluation for what the | Additional text has been added to the FEIS to disclose available information on potential cumulative air quality impacts due to the proposed Bull Mountain Unit oil and gas project. See FEIS Section 3.3 | Section 3.4 SEIS |

BLM_0050982

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | impacts of those projects might be. For example, the DEIS's description of Bull Mountain Unit drilling discloses only that surface impacts will occur; the DEIS does not address potential air quality impacts, nor does it explain how air or surface impacts will affect the environment when taken together with impacts of the Lease Modifications. DEIS at 155. The DEIS's analysis of cumulative effects therefore does not meet the standard set by NEPA or the courts. |  |  |
| Cumulative effects | HCCA et al | 55-56 | E. The DEIS Fails To Disclose The Foreseeable Impacts Of Coal Mine Exploration. The DEIS declines to disclose the likely locations of roads and MDWs because "a final mine plan has not been approved." DEIS at 51. At the same time, the DEIS assumes that "if any exploration drilling, staging areas, and ground water monitoring drill pads and access road construction are needed, they would utilize the same locations as those used for MDWs." Id. Thus, any exploration proposal is likely to display the likely location of at least some of the MDWs and roads. The Forest Service already has before it, as it has for more than a decade, an exploration proposal submitted by MCC.157 This proposal displays the location of roads and exploration wells. The DEIS fails to reference this document or the information contained in it, despite the fact that the exploration plan includes information about the site-specific impacts likely to occur if the Lease Modifications are approved. Further, it appears that the Forest Service and Ark Land Company "laid out" and mapped a dozen exploration wells in the Lease Modifications area in the fall of 2011, | The old exploration proposal was submitted by MCC in 1998. However it has remained as pending, as requested by MCC, since it was submitted.  The mine has never indicated it has wished to move forward with that proposal.  Most likely, due to mine plan changes and exploration in areas further north on parents leases, the old locations identified in the old exploration proposal would no longer be desired by the mine.  No site specific locations are known at this time for MDWs or exploration, and no current exploration proposals have been submitted.  In addition, as disclosed in this document past experience has shown that exploration and MDW drill pads are typically coincident.  Disturbances associated with these activities are covered under indirect and cumulative effects.  An Exploration analysis was prepared in 2013 and was also litigated by commenter.  On-lease exploration is included in this Supplemental DEIS. | Throughout SEIS DEIS |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | indicating the site of such wells, and potentially the roads to access them, have already been proposed.158 The Forest Service thus could – and must, pursuant to NEPA – disclose the impacts of the construction of these exploration wells.159 157 See Ark Land Co., Federal Coal Exploration License Application (Nov. 1998), attached as Exh. 86. 158 See, e.g., email of D. Gray, GMUG NF (Mar. 7, 2012 12:29 PM) (discussing Ark Land Company and Forest Service site visit to Sunset IRA "when we were laying out exp locations"), attached as Exh. 87; email of D. Gray, GMUG NF (Mar. 13, 2012 6:34:11 PM) (discussing Ark Land Company and Forest Service site visit to Sunset IRA when the Forest Service was "working on the exp layout last fall"), attached as Exh. 88; email of D. Gray, GMUG NF (Feb. 2, 2012 4:34 PM) (discussing providing locations of twelve well locations "(SST1-SST12)", and stating that "I am assuming that they [the 12 wells] are the only ones proposed so far?" (emphasis added)), attached as Exh. 89; Map, Arch Coal Sunset Trail CR Survey and Report (Oct. 2011) (displaying wells SST1 through SST12 within the Lease Modifications area for the purposes of a cultural resources survey), attached as Exh. 90. Note that two of the well locations on the October 2011 map are directly within intermittent stream courses (SST2 and SST7), indicating the potential for damage to those sensitive areas. Moreover, MCC told the Forest Service by early April 2012 that the company wanted the Forest Service to complete "a more detailed analysis for surface disturbance [in the DEIS] … so that the document can also be used for the | | |

633

BLM_0050984

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | exploration and permitting process," indicating that the Mine was likely ready for the Forest Service to analyze proposed exploration well locations. See email of N. Mortenson (Apr. 5, 2012 8:33 AM), attached as Exh. 91. These emails and maps were obtained from GMUG NF project files pursuant to a Freedom of Information Act request. 159 The DEIS states opaquely that "[a]ny proposed post-lease activities related to coal operations would be analyzed under a separate process if/when activities are proposed." DEIS at 93. As shown above, MCC has already proposed exploration plans. Any subsequent NEPA document prepared by the Forest Service must disclose when and how the exploration plan will be analyzed pursuant to NEPA. | | |
| Cumulative effects | HCCA et al. | P2 para 3 | Any NEPA document must disclose the direct, indirect, and cumulative impacts of the proposed action *outside* of the lease modification area. The DEIS discloses that the lease modification will enable MCC to mine an additional 8.9 million tons of coal, 5.6 million tons on private land and 3.3 million tons within MCC's existing leases. DEIS at 49. However the DEIS does not disclose fully the potential impacts to surface resource of mining this additional coal, failing to even include a map showing where such private and public coal will likely be mined. | Additional analysis has been included in the FEIS related to cumulative impacts. | Chapter 3 |
| Direct, Indirect, Cumulative Effects | HCCA et al | 48-49 | IV. THE DRAFT EIS FAILS TO DISCLOSE ADEQUATELY CERTAIN DIRECT, INDIRECT, AND CUMULATIVE IMPACTS OF THE PROPOSED ACTION. An EIS must analyze the direct, indirect, and cumulative impacts of a proposed action. Colo. Envtl. Coal. v. Dombeck, 185 | Cumulative effects have been supplemented to the extent possible in the FEIS related to other leaseholds. | Chapter 3 |

BLM_0050985

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | F.3d 1162, 1176 (10th Cir. 1999); see also 40 C.F.R. § 1508.25(c) (when determining the scope of an EIS, agencies "shall consider" direct, indirect, and cumulative impacts). Direct effects "are caused by the action and occur at the same time and place," while indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable [and] may include growth inducing effects." 40 C.F.R. § 1508.8; see also Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1174 (10th Cir. 2002), as modified on reh'g, 319 F.3d 1207 (10th Cir. 2003). Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. 1508.7. Forest Service regulations define reasonably foreseeable future actions as "[t]hose Federal or non-Federal activities not yet undertaken, for which there are existing decisions, funding, or identified proposals." 36 C.F.R. § 220.3 (emphasis added). The DEIS fails to properly disclose the direct, indirect, or cumulative impacts of the Lease Modifications on a number of resources. A. The DEIS Fails To Disclose The Direct, Indirect And/Or Cumulative Impacts Of Mining On Private And Adjacent Federal Land That Cannot Occur Without The Lease Modifications. The DEIS states that "the leasing and development of the lease modifications also allow for the production of 5.6 million tons of fee coal on adjacent lands as well as an additional 3.3 million | | |

BLM_0050986

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | tons from existing adjacent federal coal reserves." DEIS 49. Documents on the project record make clear that the coal on private lands cannot be accessed unless MCC can access and mine the Lease Modifications area.136 Thus, the Lease Modification is the "but for" cause, and the on/off switch, for impacts that will result from mining the coal on private lands. This appears to be the case for the coal on the parent leases as well. Further, given the geography of the Lease Modifications, the private land, and the orientation of the mining panels, MCC may be required to mine the private lands if it is to access the coal in the Lease Modifications.137 The effects of mining these adjacent private and public lands should properly be characterized as direct or indirect effects of Alternative 3, since the impacts are a direct result of approving the lease modifications.138 See 40 C.F.R. § 1508.8. The purpose of modifying the leases is to "ensure that compliant and super-compliant coal reserves are recovered." Id. at 4; cf. League for Coastal Prot. v. Norton, No. C 05-0991 CW, 2005 WL 2176910, at *5 (N.D. Cal. Aug. 31, 2005) (future exploration and development were the very purpose of oil lease suspensions). At a minimum, the impacts of coal mining made possible outside of the lease modifications area must be analyzed as cumulative effects as they also fall within the definition of reasonably foreseeable future actions.139 Regardless of whether they are direct, indirect, or cumulative, though, the DEIS should have disclosed these impacts in sufficient detail to allow informed decision- | | |

BLM_0050987

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | making and public participation. Colo. Envtl. Coal., 185 F.3d at 1172, 1176. The DEIS fails to do so in a number of cases. The DEIS discusses and maps subsidence from mining activities, but it is unclear from the map, for example, whether the area of subsidence depicted will occur as a result of just mining the Lease Modifications, or as a result of mining the Lease Modifications and the private coal. See DEIS at 50. The reasonably foreseeable mine plan ("RFMP") identifies the scope of non-subsidence surface impacts within the Lease Modifications, but that "plan" apparently does not address the well pads and roads that may be necessary on either the private land or the adjacent federal land outside the Lease Modifications. DEIS at 51. The DEIS estimates that, under the RFMP, 48 MDWs will have to be drilled "over the life of the lease modifications," resulting in 72 acres of surface disturbance from well pads and temporary roads. Id. The DEIS does not disclose how many more wells would need to be drilled, and how many more miles of roads bulldozed, on adjacent private and public land. Nor does the DEIS address whether the impacts on adjacent private and public land have cumulative effects – such as on the same stream or watershed – when taken together with the surface disturbance that will occur in the Lease Modifications. Most troubling of all, the DEIS not even contain a map displaying providing the location of the additional minerals to be mined. What maps the DEIS does include fail to display any information concerning the location for the adjacent recoverable coal outside of the Lease Modification. DEIS | | |

BLM_0050988

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | at 78, 89, 95. 137 Because the DEIS fails to contain any map showing the location of the private coal to be mined, or of MCC's planned orientation of the coal panels, is it impossible for the public or agency decisionmakers to understand how mining of the Lease Modifications and the private land are related. The failure to disclose such information violates NEPA's "hard look" mandate. |  |  |
| **Economics** |  |  |  |  |  |
| Economics | HCCA et al | 51-52 | B. The DEIS's Economic Analysis Contains Errors. The DEIS contains a summary cost/benefit analysis of the propose action that contains several errors. For example, the DEIS estimates the cost of GHG emissions by multiplying a number for the $CO_2$ equivalent of methane (383,000 tons of $CO_2$ equivalent methane) by a cost per ton ($21). But both of the factors is this equation are either wrong or arguably much too low. The figure for $CO_2$ equivalent of methane in the cost/benefit equation is low. The DEIS elsewhere estimates that the total amount of methane emitted by the lease modifications will be 1.23 million tons per year of $CO_2$ equivalent. See DEIS at 65 (1.23 million tons = $CO_2$ equivalent of methane emitted over a recent a 12-month period); id. at 216.141 The DEIS assumes that coal in the lease modifications will take 1.6 years to mine, so the total amount of methane emitted by the lease modifications will be 1.97 million tons of $CO_2$ equivalent, not 383,000 tons.142 Further, this calculation of the social costs of coal fails to include the $CO_2$ equivalent impacts of coal combustion. Burning 10 | Analysis does not contain a cost/benefit analysis nor does it contain a SCC analysis for the reasons described in Section 3.4<br><br>Royalty rate reductions in 2012 were for a specific area currently under lease due to specific conditions and do not apply to the lease modifications. | Section 3.4 |

BLM_0050989

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | million tons of coal will result in, conservatively, 20 million tons of CO2.143 Even using the carbon-cost figure from the interagency group cited by the DEIS, the total social cost of carbon from the lease modification would therefore reach $462 million.144 In addition, DEIS assumes that the social cost of carbon is $21, based apparently on a United States interagency report from 2010.145 However, in a peer-reviewed study published later that year, economists concluded that the interagency report price estimates were much too low, and that the social cost of carbon could be as over $800 per ton of CO2 equivalent.146 This study, "Climate Risks and Carbon Prices," also explains flaws in the methodology that resulted in lower estimates of the costs of carbon in the interagency report upon which the DEIS relies.147 Thus, the social costs of carbon from only the methane pollution caused by the lease modifications could be as much as (1.97 million tons CO2 equivalent) * ($800/ton) = $1.58 billion, a number that far outstrips the economic benefits of the project.148 In addition, while the DEIS assumes that carbon pollution from vented methane will be a cost, it neglects to include the costs of a lost federal resource – natural gas – and royalties that could otherwise could be captured if the methane were not wasted to facilitate coal mining. The DEIS thus appears to not use the best estimates for methane emissions, fails to factor in the costs of carbon from coal combustion, uses questionable, low estimates of the social costs of carbon, and ignores the cost of a wasted federal resource. These errors lead | | |

BLM_0050990

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | the DEIS to severely understate the Lease Modifications' costs, and demonstrate that the benefit-cost analysis fails to take the "hard look" or use the best available information as NEPA requires. The DEIS not only understates the costs of the Lease Modifications, it also appears to overstate the benefits. For example, the DEIS states that the benefits include "$32 million in royalties (at 8%)." But MCC has already announced that it is seeking to reduce from 8% to 5% the level of royalties paid to the taxpayer.149 This would reduce the benefits from royalties from $32 million to just $20 million. The DEIS thus cannot assume that the benefits of this project will include $32 million in royalties.150<br>143 The estimate of two pounds of $CO_2$ produce for each pound of coal burned is likely conservative. The DEIS itself states that burning one pound of carbon produces "3.667 pounds of carbon dioxide." DEIS at 71. See also Conservation Scoping Letter (Exh. 13) at 60-61 (Energy Information Agency estimates one pound of coal will produce between two and three pounds of $CO_2$).<br>144 (20 million tons $CO_2$ equivalent [from coal burning] + 2 million tons $CO_2$ equivalent [from methane]) * ($21/ton) = $462 million. The total purported benefits of the lease modifications are about $550 million. DEIS at 152. Thus, if the 2010 report's estimates of the social cost of carbon are even a little low, the social costs of this project outweigh the benefits.<br>145 DEIS at 152 (citing "Interagency Working Group 2010"). See also Interagency Working Group on Social Cost of Carbon, Technical Support Document (Feb. 2010), attached as Exh. 82. | | |

BLM_0050991

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | This report also: (1) addresses the social cost of carbon in 2007 dollars; (2) estimates the social costs as a range that could be as high as $64.90 per ton; and (3) shows the social cost of carbon rising from 2010 to 2015, the latter date being when some of the coal from the lease modifications will likely be burned. See id. at 1. 146 F. Ackerman & E. Stanton, Climate Risks and Carbon Prices: Revising the Social Costs of Carbon (2010), attached as Exh. 83. 147 See id. NEPA requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other. 40 C.F.R. § 1502.9(b) (requiring agencies to disclose and discuss responsible opposing viewpoints). See also Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1168 (9th Cir. 2003). 148 A 2009 National Research Council Study estimated the social cost of coal at between $10 and $100 per ton of CO2 equivalent, with a likely value of about $30 per ton. See P. Epstein et al., Full cost accounting for the life cycle of coal, Ann. N.Y. Acad. Sci. (2011) (discussing National Research Council study), attached as Exh. 84. Thus, the social cost of mining the 10 million tons of coal – with about 22 million tons of CO2 equivalent, would be between $220 million and $2.2 billion, with a likely cost of about $660 million. 149 A. Johnson, Mining officials hope for longer lease on life for West Elk Mine, Crested Butte News (Apr. 25, 2012) (Arch Coal has "ask[ed] the Bureau of Land Management for a reduction in the royalty rate to 5 percent from 8 percent"), attached as Exh. 85; E. Zukoski pers. comm. with staff of Colorado Dept. of Natural | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Resources (June 26, 2012) (confirming BLM has sought comments from the State of Colorado on a proposal to reduce royalty for coal leases at the West Elk Mine). 150 BLM's EA similarly (and erroneously) assumes royalty rates are 8% of the value of the coal mined (BLM Lease Mod. EA at 49, 51) despite the fact that BLM is processing MCC's request to lower that rate to 5%. | | |
| Economics | Michael Drysdale (Comment 2390) | p. 5 | MCC/Ark's Comment No. 6 to the BLM identifies several limitations and concerns related to the BLM's brief benefit-cost analysis. These apply equally to the discussion at pages 151-52 of the DEIS. In addition, there appears to be a typographical error in the cumulative effects discussion, where $6.9 million in GHG costs are reported, in contrast to $8 million elsewhere. | SEIS contains an impact analysis not a cost - benefit analysis. | Section 3.21 |
| Economics (BLM) | Michael Drysdale 2390 | 3-4 | The BLM's Benefit-Cost Analysis on page 49 of the EA is problematic. While clearly intended to be a rough comparison rather than a detailed analysis, such analyses depend critically on many assumptions. On the benefits side, we note that the referenced official employment data is a bit dated, but current employment at West Elk is approximately at the referenced levels. On the cost side, the BLM attempts an estimate of methane emission costs, but the $21/ton C02e cost estimate is highly debatable and contentious, given the great uncertainties in short and long term effects and adaptive responses identified elsewhere in the document. In addition, a cost estimate should probably include an estimate of costs associated with downstream release of C02 from coal | SEIS contains an impact analysis not a cost - benefit analysis. | Section 3.21 |

BLM_0050993

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | combustion, which would at first glance appear to produce a large cost number. But this would overlook the fact that there are billions invested in coal-fired electric generation, which would be lost (and would cause enormous social and economic disruption) if the facilities were denied a coal supply. As compared with other coals, West Elk's compliant and super-compliant coal provides very significant benefits, which would need to be taken into account. In sum, the BLM's benefit-cost analysis is very cursory. This is acceptable to the extent that BLM clearly explains that it is intended only as a very rough estimate for illustrative purposes and is not intended as outcome-determinative. If the BLM intends for the benefit-cost analysis to play a more significant role in the decision-making process, it will need to be substantially revised and explained. | | |
| FONSI (BLM) | Michael Drysdale 2390 | 4-5 | Proposed Finding No. 7 of the Draft FONSI states in part: The implementation of the Proposed Action Alternative is estimated to contribute 1.23 million tons of GHG equivalent annually, with that being about 0.0177 percent of total U.S. contribution. Regardless of the accuracy of emission estimates, predicting the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time. As such, the controversy is to what extent GHG emissions resulting from continued mining may contribute to global climate change, as well as the accompanying changes to natural systems, cannot be quantified or predicted. The degree to which any observable changes can, or would be, | BLM has considered this comment in their previous analysis and decision making. | |

BLM_0050994

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | attributable to the Proposed Action Alternative cannot be reasonably predicted at this time. As noted, this should be supplemented to reflect the contribution of downstream coal combustion. In addition, the discussion understates the basis for a Finding of No Significant Impact. First, as noted MCC and Ark's comments on the FS EIS, in 2008 EPA attempted modeling of the climatological effects of a much larger source, and found no material impact on global temperatures. The BLM would therefore be justified in concluding that even with the acknowledged uncertainties, the proposed modifications are too small to have a significant effect. Second, the principal purpose of a FONSI accompanying an EA is to document that the additional analysis associated with preparation of an EIS is not warranted. Here, the BLM can appropriately note that even if commenters disagree with the conclusion that GHG emissions associated with the proposed action have no significant effect, the BLM has taken the GHG/climate analysis as far as the science allows. Preparation of an EIS would therefore serve no purpose. Third, the FS has prepared a full EIS, which the BLM incorporates by reference. Consequently, there is no basis for the BLM to prepare its own EIS, even if a commenter were to disagree with the FONSI. Because the proposed action is known to be contentious, BLM would be well-served in identifying all of the reasons justifying the decision and FONSI. | | |
| Economics-air | Michael Drysdale 2390 | 7 | For additional context as to the coal market that West Elk serves, in recent years West Elk has been selling increasing quantities of coal on the spot market. By definition, the destination of such sales is not knowable in | The provided information has been disclosed in the air quality section of the FEIS. | Section 3.4 |

BLM_0050995

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | advance. MCC has two large contract customers, the Tennessee Valley Authority and Public Service Company of Colorado. These entities determine to which of their many facilities the coal ultimately goes. Specific contract terms are confidential, but aggregate shipments over the past five to the entities, as derived from public sources, are as follows: Public Service Co. of Colorado PSCC 1st Qtr 2012… As can be seen, shipments have varied widely over the period, reflecting the inherently dynamic nature of the coal market. The determination in the FS DE IS and BLM EA that shipments to specific facilities are not readily forecastable is well founded. |  |  |
| Economics | Mt. Gunnison Fuel Company | 1 | The selection of Alternative 3 is critical to Mount Gunnison Fuel Company because it could allow mining to occur on modified leases COC-1362 and COC-67232 with temporary roads constructed for methane venting and coal exploration. This could then accommodate an estimated 5.6 million tons of MGFC coal to be mined on our contiguous leases. Using the DEIS guideline of $40/ton coal (instead of the $35/ton coal estimated in MGFC's May 17, 2012 letter - attached) plus MGFC's 8% royalty rate (instead of the 3-4% estimated in the DE IS), this could translate into $17.92 million in potential revenue to MGFC. The selection of Alternative 3 is also critical to other individuals and entities. West Elk Mine could extract and profit from an additional 10.1 million tons of coal on the modified leases {18.64 months based on West Elk Mine's one year average of 6,499,048 tons of coal mined), plus 3.3 million tons of coal on the parent leases (5.5 | BLM has updated their GER/MER in 2016 as geologic faulting has become evident that would reduce mineability of fee lands. BLM has revised section 3.35 in FEIS accordingly. On a cumulative basis, if the lease modifications were not approved, and not offered for sale, coal mining in the North Fork of the Gunnison River Valley would continue until existing reserves are depleted. At that point, the mining employment sector would be terminated. Mining the coal reserves in the lease modifications and adjacent private and federal would increase the life of mine by up to 2.7 years (to 11 years), assuming that the modification was approved and the coal was extracted utilizing the West Elk Mine operation and facilities interspersed with existing leases. The cumulative social and economic effects of past, present and reasonably foreseeable actions in the North Fork of the Gunnison River Valley relative to coal mining operations would be to extend the mining employment sector, as well as tax and royalty payments, proportionately to the length of the remaining reserves. Conversely if the | FEIS, Section 3.21 |

BLM_0050996

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | months), plus 5.6 million tons of coal on Mount Gunnison Fuel Company leases (10.3 months), which would extend the life of the mine by about 34 months, and allow for additional exploration to identify future reserves. The 378 employees of West Elk Mine could have their employment extended by these 34 months. Gunnison County could receive associated tax revenues. Delta County could house those employed at West Elk Mine, plus those individuals and companies benefiting indirectly from mine operations (such as suppliers, shippers, power generation, delivery). We understand that estimates indicate that for each West Elk Mine employee there are seven associated jobs outside the mine. Colorado could enjoy increased royalty and income tax revenues. The United States could enjoy additional rent payments (1, 721 acres x a minimum of $3 acre/year), royalty payments (@ 8%), income taxes, stocks of Colorado's compliance bituminous coal to lower sulfur content of other states' coal batches, and coal output to fuel the nation's energy and economic requirements. | modifications were not approved, the result could be 8.3 year current life of mine. | |
| **Forest Plan** | | | | | |
| Forest Plan | HCCA et al | 16-17 | 2. The DEIS Arbitrarily Fails To Consider Stipulations To Protect Old Growth Forest. The GMUG Forest Plan directs the GMUG National Forest to pay special attention to old growth resources. To do so, the Plan directs that the GMUG National Forest "[d]efine and inventory old growth for each of the Forest types on the Forest." See GMUG National Forest, 1991 Plan Amendment at III-3 (emphasis added). Other plan direction is even more clear: "The GMUG Forest will conduct old growth inventories In the meantime, project level | Old growth stands have not been identified in the lease modification area.  There are 3 stands which may or may not be old growth outside the lease modification area within the affected 6th level HUC (same acreage as the 4th level watersheds described in early old growth definitions) that meet the first screening criteria (large diameter trees) for old growth using Mehl's definitions (Mehl 1992).  One is a spruce-fir stand located in the West Elk Wilderness; one is a cottonwood stand located primarily on private land; the last is a spruce-fir stand over a mile west of the lease modifications. None of these | Section 2.3 |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | decisions that might affect old growth will give special consideration to the old growth resource." Id. at III-9a (emphasis added). The GMUG National Forest does not appear to have conducted inventories in the Lease Modifications area as required by the Forest Plan's direction. The DEIS states that "[n]o old growth has been specifically defined in the lease modifications," apparently indicating that no inventories have occurred. DEIS at 40. Not only is the failure to inventory a violation of Forest Plan direction, it is impossible for the Forest to conclude that it will not violate Plan guidelines concerning old growth if it does not known if old growth is present. Further, the lack of definite information about old growth cannot be a rational basis for declining to consider stipulations to protect old growth. | stands would be impacted directly or cumulatively by post-leasing surface impacts. However, assuming post-lease surface disturbing activities would occur in mature/over-mature classes (which may provide some of the same habitat components as old growth), the GMUG Forest Plan (page III-9a, III-9b) allows for removal of 70-80% of these stands assuming residual patch sizes are met. If the RFMP were implemented in Alternative 3, it is estimated that up to 61 acres of mature/over-mature aspen (0.3% of vegetation unit), and 7 acres of mature/over-mature spruce-fir (0.09% of vegetation unit) may be disturbed. These are both only a tiny fraction of that allowed to be removed under forest plan standards to protect structural diversity. | |
| Forest Plan | HCCA et al | 18 | 34 The DEIS similarly, and arbitrarily, declines to consider a measure more protective of riparian areas than the Forest Plan. DEIS at 40. | Rationale for not considering is included in section 2.2 | Section 2.3 |
| Forest Plan, unsuitability | HCCA et al. | 64 | VIII. THE LEASE MODIFICATIONS VIOLATE THE GMUG LRMP BY ALLOWING SURFACE MINING ON LANDS DEEMED UNSUITABLE BY THE LRMP. The GMUG LRMP expressly states that lands within the National Forest are unsuitable for surface coal mining. 1983 GMUG LRMP EIS at F-2. Specifically, the "Unsuitability Assessment for Coal Mining" prepared in conjunction with the EIS for the LRMP states, "National Forests are unsuitable for coal mining," with the following exceptions: National Forest System land with no significant recreational, | With respect to the commenters assertion that the LRMP states, "National Forests are unsuitable for coal mining." That language is paraphrased from the unsuitability criteria under law and regulation (43 CFR 3461.5, which is based upon 30 USC 1272, The Surface Mining Control and Reclamation Act of 1977 (SMCRA) which principally regulates coal mine permitting actions (see Section 1.6 of FEIS). To the extent SMCRA applies at the coal leasing stage, it is the basis for the Unsuitability Assessment codified in BLM regulations at 43 CFR 3461 that is applicable at the leasing stage). | Appendix B |

BLM_0050998

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | timber, economic, or other values are suitable for underground mining [and] National Forest System land with significant recreational, timber, economic, or other values which are compatible with underground mining are suitable for underground mining. Id. (emphasis added). The LRMP further states, "The Known Recoverable Coal Resource Area is suitable for coal mining if other criteria do not apply or if exceptions to applicable criteria are used." Id. Thus, to the extent that the LRMP designates lands as suitable for coal mining, it is only to designate lands suitable for "underground mining." Indeed, with the exceptions noted above, the LRMP is clear that the GMUG is unsuitable for coal mining. In this light, the LRMP apparently expressly prohibits surface mining by designating the National Forest as unsuitable for the activity. Despite this, Alt by consenting to the lease modifications. As noted above, under SMCRA "surface coal mining operations" include "surface operations and surface impacts incident to an underground coal mine[.]" 30 U.S.C. § 1291(28)(A) (emphasis added). Although the West Elk Mine is an underground mine, authorization of the Lease Modifications will lead to surface operations and impacts incident to the mining, including construction of MDWs, well pads, and roads. The DEIS proposes no stipulations that expressly prohibit surface impacts incident to underground mining; indeed the DEIS assumes substantially road building and well-pad clearing under the "reasonably foreseeable mine plan." Thus, the Forest Service's consent to the lease modifications runs afoul of the LRMP's designation of all lands on the GMUG as suitable only for | The amended Land and Resource Management Plan (LRMP or Forest Plan) dated September 1991, for the GMUG National Forests made provisions for coal leasing subject to the application of the coal unsuitability criteria established in 43 CFR 3461 (Appendix E). In the LRMP, the "Conclusion" of Criterion #1 is that, other than the Raggeds and West Elk Wilderness, all other lands within the Known Recoverable Coal Resource Area is suitable for coal mining, with no differentiation between surface or underground mining. The lands within the lease modifications are within the Known Recoverable Coal Resource Area.<br><br>Further, MDWs and other activities analyzed in the RFMP (Section 3.2) of the FEIS, SDEIS meet the definition of underground mining in 30 CFR 701.5, which states:<br>*Underground mining activities means a combination of:*<br>*(a) Surface operations incident to underground extraction of coal or in situ processing, such as construction, use, maintenance, and reclamation of roads, above-ground repair areas, storage areas, processing areas, shipping areas, areas upon which are sited support facilities including hoist and ventilating ducts, areas utilized for the disposal and storage of waste, and areas on which materials incident to underground mining operations are placed;*<br>In addition, as allowed in 43 CFR 3461.2-1(b)(1) and 3461.3-1(b)(1), the specific lands in this proposal was reviewed for unsuitability by the Forest Service and a recommendation to the Secretary of Interior (represented by the BLM State Director) will be made who will determine whether there are no significant recreational, | |

BLM_0050999

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | underground mining. Indeed, the LRMP makes no mention of any exception related to "impacts incident to an underground coal mine." Rather, the exceptions clearly relate only to underground coal mining. Under NFMA, the Forest Service has a duty to comply with its LRMP. See 16 U.S.C. § 1604(i). If an action will not comply with the LRMP, the Forest Service is either prohibited from undertaking the action or must amend the LRMP to allow the action in accordance with 16 U.S.C. § 1604(f)(4). If an LRMP amendment is significant, the Forest Service must follow specific procedures, including opening a 90-day public comment period. See 16 U.S.C. § 1604(f)(4). Here, the Forest Service has failed to comply with the LRMP by authorizing lease modifications that will lead to surface mining. Given that lands within the GMUG have been designated as suitable only for underground mining, and even then only in certain situations, this lease modification is prohibited in accordance with 16 U.S.C. § 1604(i). Although the agency did prepare an "Unsuitability Analysis" for the Lease Modifications (see DEIS at 175-84), ultimately asserting that the Lease Modifications and subsequent mining would occur on suitable lands, this analysis did not mention or take into account the fact that the LRMP expressly prohibits surface mining. Indeed, the Forest Service asserts in the DEIS that "[t]he proposed action conforms to the overall guidance given in the LRMP, as amended …." DEIS at 4. This, however, appears incorrect given that the LRMP does not allow surface coal mining. To the extent that the Forest Service could argue that the Unsuitability Analysis | timber, economic, or other values which may be incompatible with the lease (43 CFR 3461.5(2)(i), see Appendix B-*Unsuitability Analysis Report*). | |

BLM_0051000

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | appended to the DEIS constitutes a de facto LRMP amendment, this position is not reflected in the DEIS. If all of the alternatives expressly prohibited surface mining, as defined by SMCRA, then the proposed actions would comply with the LRMP. But they do not, in violation of the Forest Plan and SMCRA. | | |
| **General** | | | | | |
| General | Elaine Wood | 1 | I am writing in response to the notification of coal lease modification COC-1362 and COC-67232: I support the Responsible Official in giving consent to the BLM for modifying the above existing federal coal leases. | Thank you for your comment. | |
| General | Randy and Peggy Litwiller | 1 | I am writing in support of the West Elk proposal to extend their coal leases and their mine life. believe West Elk to be a good steward of the land, a good operator, and an important part of the local community. West Elk has provided good jobs for over 20 years and has supported the community they operate in numerous ways. West Elk produces a valuable product necessary to help all areas of the United States maintain quality power sources at affordable prices. I believe the majority of the area residents support West Elk in their expansion efforts. Please do not allow a select vocal minority or self serving national environmental groups to negatively affect West Elk's ability to continue operations providing a good living for their employees, families, kids, local county services, and the general well being of our area. | Thank you for your comment. | |
| general | Helen Hanna 56620 | | The Forest Service's job is clearly more complex that first realized, and its decisions impact all of us. | Thank you for your comment. | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| general | J. Wilson 55005 | | We have got to stop repeating the same mistakes that have led us into a degraded atmosphere and have spoiled so many of the natural places on earth. | Thank you for your comment. | |
| general | D Riley 46479 | | In light of the fact that the entire industry built around B.  The Use of Coal as Fuel, with right-out-of-the-gate filthy air, land and water pollution, acid rain, rampant industry corruption of elected and appointed officials, lobbyist influence and outright false advertising to distract public opinion (clean coal, indeed!) one fact becomes crystal clear. Coal mining and the burning of fossil fuel in any of its forms must end altogether. The whole business is a deadly enterprise whose only justification is an orgasm of greed on the part of an infinitesimal segment of human society for which every form of life on Earth pays a substantial penalty. | Stipulations for the protection of water resources have been carried forward from the parent leases (Section 2.2).  Effects to water (Section 3.8) are analyzed. Other comments are beyond the scope of this analysis for a lease modification analysis. | Sections 2.2, 3.8 |
| General | Wendell Koontz 2409 | 1 | 1.2 Background of these Lease Modifications Please note that Ark Land Company is not the parent company of Mountain Coal Company (MCC). Both Ark Land Company and MCC are affiliates of Arch Coal Inc. | Edits have been made as requested. | Section 1.3 |
| General | Steve McMichael 52338 | | With technology available that makes coal obsolete it should be noted for public record that this can be seen in no other way as an assault against the people and all form of life in Colorado. How will we pay for the inevitable destruction left by the corporation? How many will lose their lives and treasures just so a few may profit. By doing this you knowingly put those in your employ in harm's way. I am good friends with many NFS workers, good men and women all. I find this undeniably unacceptable! | Outside the scope of analysis for this leasing decision. | |

BLM_0051002

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | You have the power to stop this madness. Not just here. I urge you to investigate the bigger picture of every decision you make as it is being influenced by a bigger picture. | | |
| General | Mary Ownby 49476 | | I oppose the coal lease modifications that will lead to more than 6 miles of road, nearly 50 drill pads, and methane vents in the Sunset Roadless Area. Mining for coal as an energy source is an outdated and dirty way to meet our energy needs. By limiting mining in these valuable natural areas, you will be sending a clear message that now is the time to look towards renewable and clean energy sources. | An Alternative (Alternative 1- No Action) has been considered where consent to and leasing would not occur. This alternative does not fulfill the Agencies' missions regarding multiple-use management. | See Alternative 1. |
| General | Brooke Battles 46468 | | The wild areas under the management of the Forest Service should provide important habitat and watersheds, not support the pocketbooks of mining companies or add to environmental damage. | The mission of the agency is multiple-use and that we consider issues from multiple perspectives. We are likewise mandated by Congress to consider energy development/extraction on federal lands. | |
| General | Kelly Wright 43819 | | Why must our government continue to subsidize the fossil fuel industry at the cost of our publicly held land, our health, and our futures? I ABSOLUTELY oppose the coal lease modifications that will lead to more than 6 miles of road, nearly 50 drill pads, and methane vents in the Sunset Roadless Area.<br><br>It became clear to me long ago that our Forest Service, for which we pay taxes and with which they are entrusted with our land, sold out to industry a long time ago. Please, do your duties to Americans citizens and stop treating these corporations and lobbies as if they are your bosses. Say no to mine expansion. | The mission of the agency is multiple-use and that we consider issues from multiple perspectives. We are likewise mandated by Congress to consider energy development /extraction on federal lands. Socio-economics of leasing is included in both the DEIS and FEIS. | See Section 3.21 |
| General | Kathryn Wild, PhD 43424 | | Please remember that the Forest Service serves the forest, not big money. Stand firm to oppose the coal lease modifications that | The mission of the agency is multiple-use and that we consider issues from multiple perspectives. We are likewise mandated by | Sections 1.6–1.8, 3.18 |

652

BLM_0051003

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | will lead to more than 6 miles of road, nearly 50 drill pads, and methane vents in the Sunset Roadless Area. Keep it roadless! | Congress to consider energy development /extraction on federal lands. | |
| General | Ann Brock 42747 | | It is definitely our duty to protect our forests and habitats. Let's do whatever we can. | Thank you for your comments. | |
| General | David Roth 33105 | | Leave fossil carbon in the ground unoxidized. | Alternative 1-No Action has been considered related to no leasing. | See Alternative 1 |
| General | John Witte 34691 | | Keep the coal barons with their more than 6 miles of road, nearly 50 drill pads, and methane vents out of the Sunset Roadless Area. Keep the place with its unspoiled habitat for deer, elk, and black bear, denning areas for lynx, and watersheds that support imperiled Colorado River cutthroat trout just like it is ROADLESS. | Alternative 1-No Action has been considered related to no leasing. | See Alternative 1 |
| General | Charles Yeargan 35038 | | President Obama promised prior to his election to stop ALL extensions of mining and timbering into existing roadless areas. Based on that position there is no question about what the Forest Service be doing in this case.

I have lived in West Virginia Coal Country for 37 years and I know firsthand the long-term effects of coal mining.  There is no such thing as "clean coal."
President Obama received my INDEPENDENT vote when he was elected BUT IF the Forest Service proceeds with approval of this incursion into the Sunset Roadless Area I cannot and will not vote for him in the next election. | No agency response required. | |
| General | Barbara George 36511 | | Find other renewable power sources closer to its point of usage. Win -win renewable power without necessity of transmission to remote grid and compromising of the environment land, wilderness and water. | Comment is beyond the scope of this analysis | |

BLM_0051004

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| General | Doris Turner 27515 | | I don't live in Colorado, however it appears that the Forest Service has been muscled into granting leases to companies that don't care about us, the people. I live in Arizona and hoping that Rosemont Copper will go away. | Socio-economics have been considered in the DEIS/FEIS including the impacts on people. | See Section 3.21 |
| General | C. Crockett 27719 | | Further, I ask Forest Service to take its mission and responsibilities to the people of this country seriously and not simply facilitate the bidding of coal and other industry seeking personal profit at the expense of everyone and everything else. | The mission of the agency is multiple-use and that we consider issues from multiple perspectives.  We are likewise mandated by Congress to consider energy development /extraction on federal lands. | Sections 1.7, 3.21 |
| General | Richard Kiefer 30850 | | I am not certain if I should oppose the coal lease modifications that will lead to more than 6 miles of road, nearly 50 drill pads, and methane vents in the Sunset Roadless Area, but I certainly hope that the Forest Service will consider all environmental concerns brought up by citizens such as myself.   Our land and people need more preservation than commercialization. | Thank you for your comments | |
| General | Cyn Scionti 24544 | | Please stop the bulldozing of the Sunset Roadless Area from mine expansion.  This is a threat to the animals and the watershed! | Impacts have been considered on animals and water.  Appropriate stipulations have been applied to protect them. | Sections 2.2, 3.8, and 3.10–3.14 |
| General | Mary Hadcock 27260 | | America's few remaining wild places are the American people's family jewels. THEY SHOULD NOT BE RUINED SO THAT BIG BUSINESS CAN LINE ITS POCKETS. | Thank you for your comments | |
| General | Anne Marie Stewart 7 | | PLEASE, PLEASE NO EXPANSION OF COAL MINES IN COLORADO! We must not continue to destroy and desecrate our magnificent planet. | Thank you for your comments | |
| General | Friends of the Nooksack 14 | | Please deny the coal lease in this area. Thank you | Thank you for your comments | |
| General | Linda Miilu 2517 | | When did the Forest Service move to the side of extraction industries and away from the citizens whose taxes pay the salaries of your employees? | The mission of the agency is multiple-use and that we consider issues from multiple perspectives.  We are likewise mandated by Congress to consider energy development | Sections 1.7, 3.21 |

BLM_0051005

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | | /extraction on federal lands.  Socio-economics are also analyzed in the DEIS/FEIS. | |
| General | Linda Ballard 2467 | | Time has been the ultimate proof that the direction the gone and the path we have taken in an effort to provide cheap fuel has led to critical concerns regarding our entire planet. In an effort to provide cheaper energy we are destroying the world. We must learn how to curb our appetite for cheap fuel and cut down our dependence in the process.  Education for the masses would do more good in the long run. Show people ways in which they can conserve their financial resources. Considering the number of unemployed, it would make more sense to send squads of human beings with picks and shovels to mine the coal by hand instead of employing massive vehicles. We human beings need to work for our daily bread. Since coal is mainly used to produce electricity, people need to be rationed a certain amount of energy per capita. If anyone needs more than their allotment, they should have to pay a premium for it. Those who have money to burn will no doubt keep on using more than their share. Those of us who are genuinely concerned about the kind of environment we leave for our legacy can choose to spend our excess financial resources on the things that are most important to us. If wasting fuel is how you want to spend yours, then be my guest, but in the process you must be prepared to pay the premium to do so.  These kinds of projects have literally destroyed mountains and vistas for every generation to come. It is past time for us to give more serious thought about what kind of messages we are sending our youth. We the people have to make choices and sacrifices in order to preserve the quality of life on this planet. | Most of these comments are beyond the scope of this analysis.  We limited our analysis to longwall mining methods, as the BLM has identified this as the method with the highest opportunity for safe and efficient coal recovery at the West Elk Mine. There are no lands within the project area which have been recommended or available for Wilderness designation, or are now Wilderness. | Section 2.3, 3.18, Project file GER/MER. |

BLM_0051006

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | We must respect Mother Earth, do what we can to preserve these habitats for nature and to do that we must Keep these wilderness habitats roadless! | | |
| General | Kathy Welt 2388 | | We the undersigned support the modifications of Mountain Coal Company's coal leases COC-1362 and COC-67232, so that mining operations at the West Elk Mine can continue into these areas. The Colorado Roadless Rule is now final and access for exploration and safe mining should be allowed. The coal mines in the North Fork Valley are important to the local and western slope economies, providing high paying jobs, including supply and support businesses that support many local families. | Thank you for your comments | |
| General | Gloriana Casey 2432 | | We do realize though, that if you do the right thing to protect the environment, then no doubt many sell outs in Congress will try to close down your jobs and entire department too. PLEASE remember POSTERITY and the humans of the future are depending on you to protect what's left of the environment | Thank you for your comment | |

BLM_0051007

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| General | Michael Drysdale 2390 | 3-4 | Table 2.3, beginning on page 41 of the DEIS, provides a lengthy comparison of the effects of the three alternatives analyzed in detail. The description of effects associated with Alternative 2 (2001 Roadless Conservation Rule) generally reads as follows: The effects would be similar to Alternative 3 but slightly reduced in scale because road construction would not occur Read in isolation, this description of effects could be confusing and misleading. On page 52 of the DEIS, the FS further explains the assumptions underlying this description: Methane drainage wells, compared to conventional coal exploration holes or water wells, are large diameter boreholes that require steel casing throughout their entire length. MOWs and MWD [sic] pads would still be permitted under this alternative if there was a way to construct the pads and drill the wells without building roads. This could occur, for example, if equipment was able to be transported by helicopter or walked in/dragged in without the use of roads. The following analysis assumes this is possible but does not specify the method or circumstances under which it may occur, so impacts are limited to surface disturbances estimated under Alternative 3 minus the 24 acres (6.5 miles) of road. The description of effects caused by Alternative 2 thus depends on the discovery of "a way to construct the pads and drill the wells without building roads." All information in MCC's and Ark's possession indicates that this is unlikely. Although MCC/Ark cannot know for certain until they conduct exploration in the lease modification area, our expectation of geologic conditions suggests that helicopter borne/off-road borne drill rigs cannot effectively drill the | The Forest Service is fully understanding of your concern of infeasibility. This discussion has been clarified in the FEIS for Alternative 2. We feel this alternative is very speculative but have fully analyzed it because it has been carried through the analyses since 2009. The BLM is also concerned that if this alternative were selected by the Forest Service for consent that they would be in an undesirable situation. As of the date of preparation of this FEIS, the Colorado Rule is in effect and concerns related to Alternative 2 are moot if either Alternative 3 or 4 is selected. | Alternatives 2 (FEIS) and 4 and Chapter 3 |

BLM_0051008

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | holes required to the depths needed in the type of ground conditions found in the lease modification area. If MCC/Ark's expectation proves correct, then coal development will not be feasible under the terms of the 2001 Road less Rule. | | |
| General | Michael Drysdale 2390 | 3-4 | Although the 2001 Roadless Rule was superseded by the Colorado Roadless Rule on July 3, 2012, some commenters may urge the FS to apply 2001 Roadless Rule restrictions anyway as a more protective measure of the surface. It is important that no one think that coal mining is likely feasible under the 2001 Roadless Rule. For these reasons, we recommend that the | Additional stipulations, analysis and discussion has been added to Alternative 2 (and 4) including extra discussions of feasibility.  As of the date of preparation of this FEIS, the Colorado Rule is in effect and concerns related to Alternative 2 are moot if either Alternative 3 or 4 is selected. | Alternative 2 FEIS (Section 2.3 and Chapter 3) |

BLM_0051009

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | description of effects of Alternative in Table 2.1 a be rephrased as follows: In the likely event that road-building is necessary in the lease modification area to access the coal reserves, the effects of Alternative 2 would be identical to Alternative 1. In the unlikely event that the coal could be feasibly accessed without road-building, the effects would be similar to Alternative 3 but slightly reduced in scale because road construction would not occur. Similar clarification is warranted for the textual discussion of the effects of Alternative 2 on pages 71, 79, 82, 85, 91, 97, 101, 107, 108, 110, 112-117, 119-120, 122-23, 125-126, 129, 131, 140, 146, and 150-151 of the DEIS. If the foregoing language is not adopted, the FEIS should at a minimum expressly cross-reference the assumptions stated on page 52 of the DE IS, and make clear that MCC/Ark does not believe that coal development can occur without construction of temporary roads. | | |
| General Edits | Michael Drysdale 2390 | 8 | The following errors are noted for accuracy and ease of reading; DORSEY'" 1. The DEIS refers to "ArkLand Company" throughout. "Ark" and "Land" should be separated-- the correct name is "Ark Land Company." In addition, as previously noted, MCC is the holder of lease COC-1362 and Ark is the holder of lease COC-67232. These references should be corrected. 2. Page 2: Ark Land is not the parent of MCC. Ark Land is the land holding company of Arch Coal, Inc. The parent company of MCC is Arch Western Bituminous Group, LLC. 3. Page 3: "in underground mine" in the second line of the last paragraph should probably read "in underground mining." | Edits and clarifications have been added to the FEIS as requested. | |

BLM_0051010

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 4. Page 4. the phrase "or ones that a high ... " in the parenthetical in the first paragraph would be clearer if rephrased as "or characterized by a high ... "<br>5. Page 5: the reference to "OSM" appears to be the first reference and should be spelled out as "Office of Surface Mining."<br>6. Page 5: Nearly identical repeated sentences in Section 1.6, beginning at "Further, federal mineral ... "<br>7. The discussion of GHG mitigation at pages 33-37 is largely repetitive of the later discussion in the air quality section. The discussion at page 33-37 also comes across a bit disjointed and would benefit from another round of editing.<br>8. Page 40 states that "Sunset Trail is not on the National System of Trails." Page 47 then states "A non-motorized system trail, the Sunset Trail "The use of the word "system" should be reconciled in these and other passages.<br>9. Page 51: there appears to be an extra "any" in the phrase "any if any" in last paragraph.<br>10. Page 52: "MOW" misspelled as "MWD" in the discussion of Alternative 2. | | |
| General | Anne Marie Stewart  7 | 1 | PLEASE, PLEASE NO EXPANSION OF COAL MINES IN COLORADO!  We must not continue to destroy and desecrate our magnificent planet. | Thank you for your comments. | |
| General | Anon 14 | 1 | Please deny the coal lease in this area. Thank you | Thank you for your comment. | |
| General | Mario Pagone 49 | 1 | I support the USDA Forest Service granting the federal coal lease modification COC-1362 and COC-67232. Please allow the West Elk MIne to retrieve these natural reserves while they are already mining in this area. I have spent the last three winters | Thank you for your comments. | |

BLM_0051011

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | helping John Monarch with biological surveys in the Sunset Trail area. I believe that mining under these areas causes will cause only minor, temporary surface disturbances, i.e. roads, drill pads, and vent wells. To access the Sunset Trail area we ride across hundreds of acres habitat in the Minnesota Creek area that has been mined under. Except for the roads there is little if any evidence of underground mining activity, and in a few years time after these roads are reclaimed they disappear entirely. I hope that in the future some brilliant physicist harnesses cold fusion. But I believe that the lights to his lab will be powered by coal. | | |
| General | Paula Moseley 422 | 1 | *US Forest Service - the name says it all. It's not called "US Fossil Fuels Service" or "US Coal Service". | Thank you for your comment. | |
| General | Cyn Scionti 1138 | 1 | Please stop the bulldozing of the Sunset Roadless Area from mine expansion.  This is a threat to the animals and the watershed! | Thank you for your comment. | |
| General | Jerry Knack | 1 | The proposed modification of the COC-1362 and COC-67232 should be approved in my opinion.<br>Based on current laws and regulations the coal reserves are a viable resource that supports community and citizen interaction-both economically and for a better way of life.<br>There is no reason to deny the access of these reserves since the impact to the environment has been shown to be minimal and actually improves the environment by laws already adhered to which reclaim the land ongoing.<br>One only needs to look at West Elk mine as an example of one such ongoing reclamation as it mines. Deer, Elk, Turkeys, | Stipulations for the continued protection of wildlife have been carried forward from the parent leases to the lease modifications.  Wildlife impacts are addressed in FEIS Sections 3.9 to 3.26. | Sections 2.2, 3.10–3.14 |

BLM_0051012

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Bears and countless other wildlife have left other marginal habitat surrounding the mine site and enjoy the benefits of improved habitat. This helps ensure the continued well being of the species especially during transition from summer to winter range. Without it I am sure many animals would have fallen victim to changing weather conditions with less food reserves available. This benefits hunters and non hunters alike by making more wildlife available for their viewing pleasure and ensures continuation of the species in healthy numbers.<br> The coal reserves that would be mined are underground and mined with minimal impact of the surface. This is not strip mining and should not be confused with such.<br>The reserves are open for development by local and federal law and should not be denied as long as continued practices of obtaining them and reclamation are adhered to.<br> Some people when they think of a mine think it destroys wildlife and rapes the land. This is simply not the case. Appeals by extreme groups who actually use electricity themselves on a daily basis should think about where those lights come from before acting rashly with no data to support their arguments. | | |
| General | Jean Public | 1 | i oppose adding 800 and 920 acres to leases of a mining profiuteer. blm is a venal, vicious destroyer of national lands. the word "consider" means this blm project can be denied and it should be denied. the environmental devastation promioted here is too extensive so that fs must deny this permit effects may include earthquakes, erosion, creation of heat islands in a temperature increasing world, death of endangered species, wildlife and birds  so | Direct, indirect and cumulative impacts have been considered for these lease modifications in compliance with federal and state laws. | Throughout FEIS |

BLM_0051013

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | all those negative effects mean this project should be denied. the public does not want this mine to be increased in size. mitigation does not work at any time or place. the public does not trust the "qualified resource specialist" approved by the fs anymore. we find that these people seem more interested in money than in saving earth so our kids have a decent place left to live. i ask for an investigation of the findings of those people - i believe an investigation will show they always favor money, greed and not protection of earth.<br><br>every bird or animal in this forest land is essential to the public for ecological survival of the usa. we cant go by what corrupt federal agenceies that play up to rich orporations allow these days. we have a corrupt govt which is working against the best interests of american citizens these days.<br><br>we want the wildilfe species protected. we dont want water "restored". we want water protected at all times. it is the most essential element on earth. no being can survive withouit it. its destruction will not be "restored" and cannot be "restored" properly to be safe and healthful. you need to protect it to the utmost. mining is toxic chemicals. that is not protecting water, the essential coal mine methane kills and is dangerous. there certainly needs to be limits and it has reached all the limits it should have. do not consent to blm modifications. no leasing shoiuld take place. | | |
| | JEAN PUBLIC | | COAL LEASES IN EIS 2012 0160 ATTN NICOLE MORTENSON = I OBJECT TO PUTTING THESE COAL LEASES IN THESE NATIONAL FOREST SITES. IT IS | Direct, indirect and cumulative impacts have been considered for these lease modifications in compliance with federal and state laws. | Throughout FEIS |

BLM_0051014

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | CLEAR THEY RUIN THESITES FOR ALL PEOPLE USE AND THEMONEY THAT THE NATIONAL CITIZENS GET OUF OF THESE LEASES IS PEANUTS = THESE LEASES ARE LEASED VERY VERY CHEAPLY. BLM WORKS FOR THE PROFITEERS, NOT FOR THE GOOD OF CITIZENS. IT IS CLEAR THAT THESE LEASES SHOUDL NOT HAPPEN. THIS COMMENT IS FOR THGE PUBLIC RECORD | | |
| **Geology & Geologic Hazards** | | | | | |
| Geology | Wendell Koontz 2409 | 2 | 2.3 Comparison of Alternatives Geology The statement "Mining of coal 'would also reduce future recoverability of oil and gas resources. is somewhat misleading. There has been no oil or gas resource identified and the physical location of the lease modifications in relation to strata outcrop and the Mt. Gunnison igneous intrusive is an impediment to oil and gas resources. The statement should reflect the mining may reduce oil and gas recoverability if such resources exist. | The use of the word "resource" in this context was not meant to imply a mineral resource classification.  Instead, it was meant to only imply that oil and gas may be present, in any amount, and recoverability may be reduced due to mining processes. | Section 2.4 |
| Geology | Mary Hadcock 27260 | | - Drilling and methane vents should not be allowed anywhere without geologic studies that PROVE there are no faults in the area. | The presence or absence of faults does not change the environmental effects of MDW drilling.  In some cases drilling into faults can increase the efficiency of MDWs because of increased porosity.  Emissions are disclosed in Section 3.4 and are the same regardless of how many faults are intercepted in drilling. | Air quality addressed in section 3.4 |
| Geologic hazards | HCCA et al | 58 | With regards to geologic hazards, and as discussed above, the Forest Service previously prohibited surface occupancy on "slopes which exceed 60%" within the parent lease for COC- 1362, as well as prohibiting surface occupancy "in areas of high geologic hazard or high erosion potential." See DEIS at 22. While the parent | As stated by Earthjustice in their comment letter from the previously released Environmental Assessment, in order to change stipulations the agency would need to have and disclose justification for doing so.  The Forest Service in analyzing the effects of this proposal did not find any justification to deviate from the existing stipulations on the parent leases (see Soils and | Section 2.2 |

BLM_0051015

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | lease for COC-67232 similarly includes no surface occupancy ("NSO") stipulations for "areas of high geologic hazard or high erosion potential," that lease does not contain the NSO stipulation for "slopes which exceed 60%." Id. In the DEIS, the Forest Service proposes to "[u]se language from parent leases." Id. The DEIS does not explain why the agency proposes to provide different levels of protection in the same decision for the two lease modification areas. At a minimum, the Forest Service must provide a reasoned basis for its different treatment of steep slopes in adjacent areas. See supra at 16-17. 163 In addition, the Forest Service's actions, with respect to failing to provide a reasoned basis for its departure from the stronger parent lease stipulations, also violate NEPA, which requires that agencies analyze in detail the direct, indirect, and cumulative impacts of a proposed agency action. 40 C.F.R. §§ 1508.7, 1508.8. In so changing these vital stipulations to weaken protections for non-mineral resources, the Forest Service failed to analyze at all the adverse, environmental impacts of its actions. | Geology environmental affects).   Protections have not been weakened, nor have they been changed except as determined necessary as it relates to changed regulatory conditions. | |
| **Irreversible and Irretrievable** | | | | | |
| Irreversible irretrievable | HCCA et al | 56 | F. The DEIS Fails To Disclose Irreversible And Irretrievable Commitments of Resources From The Action Alternative. Regulations implementing NEPA require that agencies disclose in an EIS "any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented." 40 C.F.R. § 1502.16. The DEIS fails to disclose several irreversible and irretrievable impacts | Cumulative effects sections and Section 3.36 has been updated. | Sections 2.2, Cumulative Effects 3.25 |

BLM_0051016

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | in violation of NEPA's regulations. See DEIS at 153.  First, while the DEIS acknowledges that the Lease Modifications will result in the release of about 1.2 million tons of $CO_2$ equivalent of methane each year (DEIS at 65), the DEIS does not disclose this loss of a federal resource, the loss of potential federal royalties, and the addition of this pollution to ambient greenhouse gas pollution, all of which are irreversible and irretrievable commitments of resources. The DEIS's failure to disclose this irreversible and irretrievable commitment conflicts with the Forest Service's previous conclusion that methane pollution from the 2007 expansion of the West Elk Mine constituted an irreversible commitment of resources.160 Second, the DEIS would, for the long-term, commit up to 72 acres of mature forest, which would be clearcut or bulldozed to make way for roads and MDWs. After the clearing and construction, this mature forest will take at least a generation to regrow at the earliest. In its concurrence letter addressing the project's impacts to lynx, the Fish and Wildlife Service assumed that "lynx habitat may recover to year-round functionality approximately 30-40 years post disturbance."161 Third, in the prior E-Seam Final EIS, the Forest Service concluded that the construction of MDWs and roads would lead to "some irreversible loss of soil due to erosion … due to wind and run-off …. Excavated and/or stockpiled soils would exhibit irretrievable losses of soil structure resulting in reduced water holding capacities."162 The DEIS does not acknowledge the potential for such irreversible commitment, nor does it explain | | |

666

BLM_0051017

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | why a similar mine expansion for the same mine would result in different impacts. |  |  |
| Methane | EPA | 1-3 | The DEIS considered but did not analyze in detail any alternatives to reduce the potential greenhouse gas emissions of the project through methane capture/use or flaring. According to the DEIS, the reason these alternatives were eliminated from detailed study was that their use was deemed economically infeasible in the *West Elk E-Seam Gas Economic Evaluation* Report, dated September 24, 2009 (2009 Report). This report, which was prepared under the direction of the mine owner, Mountain Coal Company (MCC), contains a detailed economic analysis of various greenhouse gas reduction options and concluded that greenhouse gas reduction for the entire mine was not economically feasible. We therefore have three recommendations: 1. Amend the FEIS Alternatives Section or add a new FEIS section to include a discussion about how individual methane mitigation technologies could be utilized at the mine. As you know, the DEIS and the 2009 Report looked at a full suite of these technologies, but the DEIS did not explain how these technologies could be used as mitigation measures. One way to reconsider this would be to add a table to the FEIS containing the following information: (1) methane reduction options evaluated; (2) whether the technology could be applied to mine drainage well emissions (MDW) (more concentrated methane), ventilation air methane (VAM) (more dilute concentrations) or both; (3) the pros and cons of each technology; and (4) identification of the more promising mitigation measures and why they are | Responses to EPAs comments: Page 2: Use of the following mitigation measures: • **Collect and use/flare a portion of methane** - The costs and infrastructure necessary to collect a portion of the methane is essentially the same as that associated with collecting all the gas. The collection lines that would be necessary for transporting the gas from the mine drainage wells (MDW) are the same and the collection equipment is the same therefore there is no economic advantage in only collecting or flaring a portion of the CMM. • **Reduce winter operations to reduce seasonally higher costs** – This is not a viable option.  Mines operate on a 24 hrs/day, 7 days/wk, 365 days/yr schedule to meet production needs that are dictated by existing contracts and the spot market. Costs are seasonally higher specifically because the demand for electricity is higher and the need for coal is higher during those periods. • **Reduce the number of internal combustion engines generating power** – **Reduce the number of internal combustion engines generating power** – If I am correct the number of combustion engines generating power is in reference to the report created by Barnes & McDonnell.  The purpose of the economic evaluation report was to design a system that was based on the amount of CMM discharge requirements of the mine that would provide the best economic possibility of success.  As a result of that evaluation which included the costs of collection, electrical | Additional mitigation is discussed in Section 2.3 |

BLM_0051018

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | promising. Given the key role the 2009 Report plays in the DEIS conclusion not to require any greenhouse gas emissions reduction technologies, the EPA reviewed all available portions of the Report (note, some portions were deemed "Confidential Business Information"). From our review of the Report, and knowledge about advances in commercially available technologies, we believe several of the technologies may warrant further evaluation as mitigation measures for a portion of the methane from the mine. Specifically, the following mitigation measures could reduce the projected capital and operating costs associated with methane collection while still providing a reduction in methane emissions: • Collect and use/flare a portion of methane from the mine instead of collecting all of the methane as evaluated in the 2009 Report • Reduce winter operations to reduce seasonally higher operation and maintenance and construction costs • Reduce the number of internal combustion engines generating power from methane from four (as analyzed in the 2009 Report) to two engines, and flaring any methane greater than the capacity of the generators. 2. Require MCC to periodically update its evaluation of the economic and technical feasibility of mitigating greenhouse gas emissions and develop a proposal to implement those mitigation measures demonstrated to be feasible. We note that our recommendation is consistent with BLM's requirement that MCC prepare an annual evaluation of the economics associated with the capture and/or use of coal mine methane and vent air methane, as discussed in BLM's March 25, 2009 letter | generation and maintenance a 4 generator scenario was settled on. A reduction in the number of generators would therefore not be the optimum operating scenario. The relative cost of the overall system would still be high due to the cost of collection remaining substantially the same with only the cost of the generators changing. Therefore by reducing the number of generators you are decreasing the amount of gas used in power generation but this is offset by the fact that you will utilizing less gas, venting more gas, producing less power and obtaining less possible revenue from the power generation.<br><br>• **Require MCC to periodically update its evaluation** – This is already required by the lease addendum and MCC provided an updates of its evaluation on April 23, 2012. The original 2009 submittal from MCC that evaluated CMM capture was thoroughly evaluated in 2010 and deemed to be sufficient justification of the economic infeasibility of coal mine methane capture. The recent 2012 submittal updating the analysis was also found to be sufficient.<br>• **Explore non – traditional options for improving the economic feasibility of methane mitigation** – The creation of carbon offset markets or opportunities for carbon offset projects is beyond the scope of the EIS and is not currently a BLM policy. The lease addendums relating to methane capture allow MCC the ability to partner with outside entities if opportunities do present themselves but it is not BLM policy to develop these options. The Elk Creek coal mine methane capture project is unique to Elk Creek and involves different in-place | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | to MCC (Enclosure 2). Periodic reevaluations are important because energy price fluctuations can affect the cost-effectiveness of mitigation measures. For example, measures that currently may not be economically feasible may become feasible with coal price increases. Encourage MCC to take advantage of several opportunities to employ current commercially [available] green house gas emission reduction strategies. Although we do not anticipate that these changes will be made as part of the FEIS, we do recommend that they be considered by MCC for use at the West Elk mine. 3. Explore non-traditional options for improving the economic feasibility of methane mitigation measures such as developing a greenhouse gas offset proposal to attract funding from outside investors. The recently announced Elk Creek coal mine methane capture/ carbon offset project to STILL NEED REST OF 3! | infrastructures, different terrain and a specific relationship between the coal lessee and the gas lessee that is not present with the MCC situation. | |
| **Methane** | | | | | |
| Methane | EPA | 4- | EPA Comments on Section 2.2 Alternatives Considered but Eliminated from Detailed Study: *Reduce the potential GHG emissions of the project through methane flaring, methane capture, or through the use of ventilation air methane (VAM)* (pages 33-37) 1. We suggest revising the sub-sections entitled Flaring &VAM, Methane Capture & VAM, and VAM Technology (including RTO) to differentiate between the mitigation measures used for reducing greenhouse gas emissions from the methane drainage wells (MDW) (which emit more concentrated methane emissions) and mitigation measures used to dilute ventilation air methane (VAM). For example, it should be | Methane mitigation considerations are addressed in Section 2.2 and Section 2.3.

July, 2012 Follow-up with the mine indicates continued participation in EPA's CMOP Program and in intended continued winter use of mine heater.

Lease addenda specify terms of payment for mitigation measures (Table 2-2) | |

BLM_0051020

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | noted that flaring is an appropriate mitigation technology only for MDW methane emissions and not for reducing methane emissions from VAM as was suggested on page 35 of the DEIS. EPA believes that appropriate mitigation technologies for VAM emissions would be thermal or catalytic oxidation, converting methane to carbon dioxide. We recommend that the sections regarding the feasibility of VAM technologies (on page 66 of the FEIS) be revised to reflect the commercial availability of VAM oxidizers that could handle the large air volumes anticipated at the West Elk mine. We also suggest separating discussions regarding the potential difficulties associated with siting the VAM oxidation equipment at the West Elk mine from the discussions of the overall technical feasibility of VAM oxidation. 2. We recommend that the FEIS explain that since 2009, the Mine Safety Health Administration (MSHA) and state mining regulatory agencies have had increased experience with the reliability and safety of coal mine methane (CMM) mitigation equipment such as ventilation air methane (VAM) oxidizers and flares for more concentrated mine methane releases. In particular, the commercial availability and regulatory acceptance of technologies for VAM oxidation has improved since the 2009 study. See the comments in the next section for more information about recent installations of these technologies. 3. The description of the regenerative thermal oxidation (RTO) on pages 36 and 65 of the FEIS should be revised to be more technically accurate (see last paragraph starting with "*adsorption media at the gas inlet to separate out and concentrate VAM* | | |

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | *exhaust to the particular saturation point of the media . . ."* ).1 Specifically, the discussion should clarify that the ceramic media in RTOs does not adsorb methane and does not need to be regenerated by heating. The ceramic media is inert and is placed in the RTO bed to provide even distribution of the gas and thermal energy (heat). For future alternatives analyses, it should be noted that mines can recover energy from RTOs in contrast to the information in the last paragraph on page 65. RTOs can supply direct thermal energy to the mine (for heating of air and water, etc.) or generate steam which may be used in a steam turbine electric generator. For example, the WestVAMP project in Australia, which began operating in 2007, generates 5 MW of electricity from their VAM oxidation system utilizing a high efficiency heat transfer system to drive a steam turbine. 4. To support full disclosure, the discussion on pages 36, 37 and 66 should acknowledge that revenues for carbon credits are available via several existing markets. More specifically, there currently is a market for carbon credits in the United States. Relevant information, including methodologies for coal mine methane capture projects, is likely available from the four carbon registries that currently exist in the U.S. • Climate Action Reserve (CAR) – www.climateactionreserve.org • Verified Carbon Standard (VCS) - http://v-c-s.org • Chicago Climate Exchange Offsets Registry - www.theice.com/ccx • American Carbon Registry (ACR) - www.americancarbonregistry.org | | |

BLM_0051022

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 5. It appears that the statement on page 34 of the DEIS "West Elk does use some methane liberated from the mine to heat air at surface openings of the mine to prevent ice build-up" is no longer accurate. It is EPA's understanding that as of June 2012, the West Elk mine heating project was discontinued and the equipment has been sold to another mine. That project combusted methane in enclosed horizontal flares for mine heating, which operated for several weeks in the winter time for a number of years. The methane came from a sealed mine district and the combustor fuel was piped through the mine to a location near the vent shaft, through a vertical borehole and pump station. Please correct or clarify this in the FEIS. 6. We recommend that the FEIS clarify whether there are situations when royalties would need to be paid for use of methane from the mine, since this could affect the economic feasibility of mitigation measures. The current and proposed revisions to the lease stipulations authorize the mine to use or combust methane that would otherwise be vented for safety purposes, without having to pay royalties. However, the DEIS does not clearly explain whether royalties would need to be paid if gas is sold or if the methane is used to generate electricity that is sold. In particular Section 2(C) states that . . . "*Leasees shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code Federal Regulations*" . . . Please clarify | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | whether royalties would need to be paid if methane or electricity from the West Elk mine was used elsewhere.<br>7. We recommend that the FEIS clarify that MCC could voluntarily implement methane mitigation measures even if the measures were not considered to be economical under current assumptions.<br>The DEIS appears to suggest that MCC would be prohibited from implementing mitigation measures if the methods were not cost effective.<br>Additional Detailed Comments on the MCC 2009 Report<br>1. Commerical VAM Technologies. The commercial availability and regulatory acceptance of technologies for oxidation of VAM has improved since the 2009 Report. There are currently two VAM oxidation projects operating at active underground U.S. coal mines: the JWR Mine 7 in Alabama, which has been operating since January 2009, and the CONSOL McElroy mine in West Virginia. A third project is currently under development at a CONSOL mine in Pennsylvania (Enlow Fork Mine). These projects have been reviewed and approved by MSHA.<br>These three U.S. projects use two different technology vendors. Globally, there are VAM oxidation projects at about ten active underground coal mines including mines in Australia and China. Several VAM oxidation projects recover and use the energy for heating or electricity generation using commercially available technologies. These VAM mitigation projects have all been undertaken in the absence of regulatory requirements, and a number of them are receiving financial revenues based on their carbon emissions reductions. | | |

BLM_0051024

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 2. Capacity of VAM oxidizers to handle large volumes. VAM oxidizers are capable of handling very large air volumes. The units are modular and multiple units can be configured to handle the appropriate ventilation flow rates. 2 3. Applicability of VAM oxidation based on site-specific conditions at West Elk. VAM oxidation systems typically operate in the range of 0.2-1.2% methane. Based on the 2009 Report which included an economic analysis conducted for West Elk, MCC predicted that the VAM concentration at Shaft #4 will range between 0.15% - 0.31%, and therefore concluded that the lower end of this operating range would make VAM mitigation a non-viable alternative. In fact, several coal mines in Australia and China that have large air flows have installed VAM oxidation units. The modular design of these systems provides the flexibility to increase or decrease capacity, depending on shaft location and exhaust air flow rate as the location of mining activities change. In addition, RTOs are not directly connected to the exhaust shaft and therefore, they are adaptable to various exhaust shaft configurations. EPA recommends that the reevaluation include the option of combining high-methane concentration gas from the MDW with the VAM, to boost the lower end of the concentration range so that it would be maintained at a sufficiently high level to make a thermal oxidation system self sustaining. This is being done in Australia at the WestVAMP project, where BHP Billiton is blending drained gas with the VAM, in order to boost the methane concentration to 0.9%, as well as to even out any variations in methane concentration of the VAM. | | |

BLM_0051025

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | It is also not clear whether the predictions of the VAM concentrations used in the 2009 Report are still accurate and whether if they were updated the technological prognosis would change. 4. VAM Technology Safety. It should be noted that VAM systems are designed with safety features in mind. For instance, for safety purposes, a physical gap is created between the exhaust shaft (evasé) and oxidizers, so the oxidizer is not directly attached to the mine ventilation system and therefore does not impede air flow from the mine fan. Since the RTO intake is physically and electrically separated from the exhaust shaft, it removes any potential impact on the ventilation system if there were to be a sudden stoppage of airflow to the RTO (or RTO system failure). Another safety feature includes automatic dampers to immediately block airflow to the RTO whenever methane concentrations in the ventilation shaft airflow reach a certain threshold. Another safety feature is the length of the ducting between the ventilation exhaust shaft and RTO intake (approximately 100 feet), which is designed to allow sufficient time to actuate the damper and stop flows into the RTO in the event of a high methane concentration detection. 5. Flaring: EPA recommends that the reevaluation include additional information regarding the potential feasibility of flaring the methane from the vent wells (MDW). While the Arista report (Appendix F to the 2009 Report) included cost estimates for two flaring scenarios, and the Burns and McDonnell report (Appendix G to the 2009 Report) used the Arista information to evaluate the feasibility of installing power generation capacity and evaluated the | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | economic feasibility of all the options, the DEIS evaluation did not provide or discuss any monetary benefit to flaring as a mitigation option such as carbon credits which could improve the economic feasibility of flaring. Furthermore, EPA believes it is worth disclosing the potential health and safety benefits attributable to using a flare to destroy VOCs and hazardous air pollutants (HAPs). More specifically, flaring of methane gas is a standard safety practice in many industries and is routinely used during processing and production of oil and gas, from landfill collection systems and the petroleum industry. Flaring appears to provide substantial benefit with less capital cost than flaring and power generation. The reevaluation of flaring should also disclose the increasing commercial availability and acceptance of flaring by regulatory agencies. The MSHA safety concerns expressed in the DEIS (page 35) do not make flaring infeasible. It is EPA's understanding that MSHA has not received or reviewed any applications for flaring at a U.S. coal mine. EPA agrees with the characterization in the DEIS that describes MSHA's policy of reviewing mine applications for flaring on a caseby-case basis. MSHA does not have an official policy on flaring of gas at coal mines, therefore MSHA would review each flaring plan individually to ensure that it adequately incorporates appropriate protections such as bubble traps, fail-safe valving, flame arresters, or monitoring and control systems. MSHA has in fact authorized a flare for mine methane from a mine degasification system that was commissioned in August 20103 | | |

BLM_0051027

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | and is now operating at Solvay's underground trona mine near Green River, Wyoming.4 While there are currently no United States underground coal mines operating with flares, there are approximately 23 installed coal mine methane flares elsewhere in the world. Methane flaring at underground coal mines has been approved as a safe practice by national level mine safety oversight agencies in the United Kingdom and Australia. Flares can combust methane in air with fluctuating concentrations between 30 to 100 percent by volume. Portable flares are also commercially available, to provide flexibility to move to different wells. It is EPA's understanding that Solvay now intends to utilize the gas for productive use in their processing plant. Trona mines have similar characteristics to underground coal mines in terms of their methane gas production and degasification technologies, and the experience at the Solvay trona mine should be applicable to underground coal mine operations.5 | | |
| Methane | Sarah Sauter 2401 | 2 | We appreciate the BLM, USFS and Mountain Coal Company's attempt to evaluate the economic and technical feasibility of methane capture. However, we disagree with the determination that methane capture measures are economically and technically infeasible and do not warrant further analysis. The purpose of the MDWs is to vent methane to the atmosphere, where it unfortunately is a major contributor to global warming. WSERC, now NWCC, has worked with the North Fork Mines for the nearly a decade to find a way for the mines to capture waste methane instead of venting it to the atmosphere. We call on the Forest Service, | Additional BLM considerations are included in Section 2.2. | Section 2.2 |

BLM_0051028

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | BLM, EPA, MSHA, the Colorado Governor's Energy Office, Mountain Coal Company and all the North Fork coal mines to work together to make sure that the methane released by coal mining is captured, used to produce energy, and oxidized to carbon dioxide. | | |
| Methane | Linda Werner 3269 | | We need clean, green energy now. We shouldn't be wasting money on more dirty unsustainable fuels. Let's instead invest in green, sustainable fuel sources. | This comment is beyond the scope of our analysis. | |
| Methane | James Boone 8686 | | Venting methane is particularly obnoxious! | Methane venting is discussed in Section 3.3. | See Section 3.4 |
| Methane | CDNR, CDPHE | | The State of Colorado strongly believes that new underground coal mines should incorporate state-of-the-art technology to capture and either flare or beneficially use methane vented from new mine works. Moreover, wherever economically feasible, new coal mines should be required to capture methane and deliver it to an on-site generator, to a more distant user, or to a pipeline. Colorado believes it is imperative that the federal government develop a leasing mechanism that grants title to both methane and coal to the coal lessees in order to expedite and simplify the process of methane capture attendant to development of new coal mines, and to develop objective standards for when methane capture will be required. Both of the leases proposed to be modified in the instant action — COC-1362 and COC-67232 — have been appended to resolve ownership issues. With the leasing issue resolved, we believe that the USFS and BLM should, in the Environmental Assessment or Environmental Impact Statement for the modification, analyze and | Methane capture is not prohibited by the lease, it will however have to conform to lease stipulations for surface use (Table 2-1) and States Air Permitting processes (Section 3.4).  Additionally, MCC has an existing Construction Permit from CDPHE (Appendix F) and has submitted an application under Title V of the Clean Air Act (Tailoring Rule) as of July 1, 2012. | Section 3.4, Appendix F. |

BLM_0051029

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | set objective standards for when methane capture will be required. The lease addenda conveying ownership expressly affirm the lessee's right to vent the methane, and excuse capture if it is "not economically viable." In other situations -- i.e. the Draft EIS for the Red Cliff Mine in Northwest Colorado -- questions of technical and economic viability were ill defined and subject to potential dispute between the BLM and the lessee. We believe that the determination of economic feasibility should be evaluated in each phase of development and should not be the operator's alone, and we also believe that the importance of capturing methane be given significant weight in the final analysis. We are concerned that decisions are being made on coal mines in Colorado that could preclude addressing the need to deal effectively with coal-mine methane, including modification of existing leases that add significant acreage without effectively addressing methane capture. We understand that the Departments of Interior, Labor, and Agriculture, along with EPA, continue to review the oversight roles of their respective agencies at such sites. The State of Colorado will continue to work closely with the federal agencies as these roles are further clarified. We hope that clarification of federal regulatory oversight and leasing vehicles will be a top priority for the USFS and BLM. We thank you for the opportunity to comment as part of the public comment process on this lease modification. By working together, we can dramatically reduce the impacts of mining while preserving the economic benefits of this valuable industry | | |

BLM_0051030

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| Methane | Michael Drysdale 2390 | 2-3 | Table 2.1a at page 28 of the DEIS states: It is recommended that these lease addenda be renegotiated with Lessee to allow flexibility for mitigations otherwise required by law, regulation or permit. (bold in original). It is not clear to MCC/Ark why this recommendation was added. Federal coal leases are generally subject to applicable law, regulations, and permit terms. Coal mine methane management involves a complex interaction of operational and safety considerations. The lease addenda were negotiated to address the specific issue of the uncertain regulatory status of coal mine methane under the Mineral Leasing Act following the *Vessels* decision in 2008. The addenda in their current form reflect an appropriate balance of policy, economic, and safety concerns. MCC and Ark are open to discussion about the feasibility of specific mitigation measures that may be proposed voluntarily or may be implied by regulatory developments, but the recommendation as stated in the DEIS is too general. Comment No.4- Textual Description of Lease Addenda and Updating Process On page 33, the DEIS states: A lease addendum has been added to the parent leases by BLM which allows MCC to consider these methods if it is economically feasible for them to do so. Lease addendums would be carried forward to the lease modifications that permit (but do not require) these possible mitigation measures (see Table 2.1 b). The addendums require MCC to prepare annual reports on the feasibility of methane capture (among other potential control options) and require that the analysis is carried out to show whether or not the | During the review of the PDEIS, EPA recommended that the lease addenda be revised to accommodate potential mitigations that may otherwise be required by state or federal law, specifically as may occur under Tailoring Rule. This language has been removed from the final FEIS and SEIS because the Secretary of Agriculture's Standard lease stipulation and the lease language itself already require compliance with state and federal law and is therefore redundant. Additional clarification has been added to the Alternative Considered but Eliminated from Detailed Study referenced by Mr. Dreysdale and to the Lease Addendum Table 2-2 in the FEIS/SEIS. | Table 2-2 and Section 3.4 |

BLM_0051031

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | mitigation measures are economically feasible and protect the health, safety, and lives of the miners. The first sentence of the foregoing paragraph does not fully capture the lease terms, which are quoted verbatim in Table 2.1 a. In addition, the lease addenda do not themselves require annual reports -this requirement was proposed by the BLM in a subsequent letter pursuant to the BLM's Resource Recovery and Protection Plan (R2P2) process. In September 2009, MCC filed a detailed report (referenced elsewhere in the DEIS) which proposed a method for annual updates. The BLM has had the R2P2 report under consideration since then. MCC voluntarily submitted an update to the R2P2 report in May 2012, and awaits direction from the BLM as to the adequacy of the update and protocol for regular additional annual updates. Comment No.5- Present Use of Coal Mine Methane On page 34, the DEIS states: West Elk Mine does use some methane liberated from the mine to heat air at surface openings of the mine to prevent ice build-up. *See also* page 67. The text should also make clear that the methane used for mine heating is extracted from a closed, sealed portion of the mine that does not pose the same hazards as methane liberated during active mining. This distinction has been a source of confusion in prior litigation, and considerable misleading argument by commenter Wild Earth Guardians. Clarifying the text of the DE IS on this point would minimize the likelihood of further confusion and demagoguery on this issue. | | |
| Methane, water | Steve McMichael 52338 | | I am watching approximately 70,000 acres of forest burning in my back yard. I have received several notices just today of | Thank you for your comments. | |

BLM_0051032

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | overturning environmental law and protections. There is fracking happening in this state that no one wants. Beetle kill has turned the entire back country into an incredibly fragile eco-system. Now you want to bring heavy machinery into the public land that we pay for to destroy it and release highly flammable gas into the environment increasing the possibility for a catastrophic event? The run off from there will in some form spread widely as that water flows from sea to sea and into our drinking water. | | |
| Methane | HCCA et al | 18 | I. The DEIS Violates NEPA By Failing To Analyze Reasonable Alternatives To Reduce The Methane Pollution From The Coal Lease Modifications. Despite the substantial GHG emissions that will result from the Forest Service's consent to the Lease Modifications – which the DEIS estimates will have the heat-trapping impacts of as much as 1.2 million tons of CO2 per year for nearly three years – the DEIS declines to analyze in detail alternatives that would reduce or otherwise mitigate these emissions.35 These substantial annual methane emissions – more than annual emissions of the coal-fired Valmont Power Plant in Boulder36 – will occur for 2.9 years without controls or effective mitigation as a result of the decision to approve the Lease Modifications. This is significant. Both the U.S. Environmental Protection Agency ("EPA") and the Council on Environmental Quality ("CEQ") have concluded that projects and sources with GHG emissions of 100,000 tons, or as low as 25,000 tons, of CO2e per year – a far lower amount than the lease modifications are predicted to cause – are significant and should be | Methane mitigation measures are addressed in Table 2-2 and Section 2.3. | |

BLM_0051033

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | subject to controls and increased analysis.37<br>34 The DEIS similarly, and arbitrarily, declines to consider a measure more protective of riparian areas than the Forest Plan. DEIS at 40.<br>35 See DEIS at 65 (July 2010-June 2011 methane emissions equivalent to 1.23 million tons of CO2); id. at 216 (estimating annual methane emissions in 2011 at the equivalent of 1.23 million tons of CO2). See also infra at 51 (describing the DEIS's contradictory estimates of the CO2evalue of methane emitted annually from the West Elk Mine).<br>36 See EPA, GHG Data, 2010 Greenhouse Gas Emissions from Large Facilities, available at http://ghgdata.epa.gov/ghgp/main.do (last viewed July 5, 2012) (Valmont Power Plant emitted 1.1 million tons of CO2 equivalent in 2010).<br>37 Greenhouse Gas Tailoring Rule, 75 Fed. Reg. 31,514, 31,516. 31,523(June 3, 2010) (under The U.S. Supreme Court has noted that the harms caused by climate change "are serious and well recognized," Massachusetts v. EPA, 549 U.S. 497, 521 (2007), while EPA has stated that the "root cause" of climate change is the elevated concentrations of GHGs resulting from anthropogenic activities (to which burning coal contributes). Endangerment Finding, 74 Fed. Reg. 66,496, 66,517–18 (Dec. 15, 2009). Accordingly, President Obama, Secretary of the Interior Salazar, and former Colorado Governor Ritter have issued orders calling for a reduction  in GHG emissions by federal and state agencies.38 Secretary Salazar has declared that the Department of the Interior "is responsible for | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | helping protect the nation from the impacts of climate change."39 The Forest Service's failure to analyze reasonable alternatives to limit GHGs while consenting to the Lease Modifications ignores all of this guidance and results in an inadequate consideration of a substantial environmental question of material significance to the proposed action, violating NEPA. The DEIS admits that climate change will harm the GMUG National Forest. The DEIS concludes that "Projected Climate Change" will have numerous "Potential Consequences to Resource Values" on the Forest, including: "Decreased summer stream flows;" "Potential change to aquatic species reproductive triggers or success;" "Increased risk to channel and floodplain infrastructure from higher runoff;" "Increased risk to riparian habitat/floodplains from higher flows;" "Decreased dissolved oxygen in lower elevation streams during the summer;" "Aquatic biota mortality and even loss of populations;" "Reduced riparian vegetation health and vigor;" "Increased landslides and slumps on geologically unstable areas;" "Increased potential damage to saturated roadbeds;" "Reduced aquatic habitat in summer and fall;" "Increased erosion associated with natural disturbances associated with drought (e.g. fire);" "Increased plant stress and susceptibility to insect and disease mortality;" and "Reduced wetland/riparian function." DEIS at 74-76. Based on the potential for these and other harms to the Forest's resources arising from climate change, GMUG Supervisor Charlie Richmond more than four years ago pledged that the Forest would "continue to 'lead the charge' with our partners to | | |

BLM_0051035

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | explore options [for coal mine mitigation] because it is the right thing to do for the environment."40 EPA's Tailoring Rule, sources that emit over 100,000 tons per year of CO2e are "major sources" subject to controls); CEQ, Draft Climate Change Guidance (Feb. 18, 2010) at 3 & n.2, attached as Exh. 17 (noting that a 25,000 tons per year CO2e threshold provides agencies with a "useful indicator" of significant climate change impacts under NEPA warranting additional analysis). 38 See Exec. Order No. 13514 (Oct. 5, 2009), reprinted in 74 Fed. Reg. 52,117 (Oct. 8, 2009); Interior Secretary Order No. 3289 (Sept. 14, 2009), attached as Exh. 18; Colo. Exec. Order No. D 004 08 (Apr. 22, 2008), attached as Exh. 19; Speech of Interior Secretary Salazar, Copenhagen, Denmark (Dec. 10, 2009) ("the United States of America understands the danger that climate change poses to our world and we are committed to confronting it. Together with our partners in the international community, we will help build a strong, achievable, carbon reduction strategy."), attached as Exh. 20. 39 Interior Secretary Order No. 3289, at 2 (Exh. 18). 40 See C. Richmond, "Capturing methane released by mines is a work in progress," Grand Junction Sentinel (Mar. 23, 2008), attached as Exh. 21. Despite the significant impacts the DEIS predicts that climate change will likely have on the GMUG National Forest, and the Forest Supervisor's commitment to "lead the charge" in "explor[ing] options" that would reduce the level of methane pollution from coal mines, the DEIS fails to analyze | | |

BLM_0051036

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | adequately such GHG mitigation measures for this project. This is disappointing because the DEIS's failure to adequately analyze measures to reduce methane pollution is a lose-lose-lose-lose proposition: it results in needless and damaging pollution; it represents a waste of a valuable federal resources; it represents a loss of royalties to state and county governments due to the failure to sell federal methane; and it represents a lost opportunity to create jobs in the area to construct and operate methane pollution reduction devices. It also means that the West Elk Mine will continue to lag behind mines in Alabama, the U.K., Australia, China, and many other countries in caring for the environment. Far from "leading the charge," as Supervisor Richmond promised, the GMUG National Forest continues to lag behind. |  |  |
| Methane | HCCA et al | 20-23 | 1. The DEIS Fails To Analyze Oxidation Of Ventilation Air Methane As A Reasonable Alternative To Reduce The Lease's Methane Pollution.<br>The Lease Modifications are expected to prolong the West Elk Mine's life for nearly three years.41 Methane pollution from the Mine's ventilation system will thus continue for that period. The majority of methane emissions from approving the Lease Modifications will likely be from the Mine's ventilation system. This methane pollution, known as ventilation air methane ("VAM"), is distinct from methane removed by methane drainage wells ("MDWs"). VAM makes up over half of all coal mining emissions in the United States and worldwide; data from the West Elk Mine from early 2010 showed that VAM constituted a little over half of the Mine's total of 7.5 million cubic feet of daily methane emissions. See Mountain Coal | Methane mitigation considerations in Sections 2.2 and 2.3. | Sections 2.2 and 3.4 |

BLM_0051037

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Co., First Quarter 2010 Methane Release Data (May 3, 2010), attached as Exh. 22. VAM mitigation measures are technically and economically feasible. Such measures have been adopted at coal mines elsewhere in the United States and around the world.42 VAM cannot be flared because the concentrations of methane in ventilation air are too dilute, so other technologies must be used to combust VAM. EPA and others report, however, that technology is available and is being successfully employed to reduce 95% or more of VAM emissions from numerous coal mines.43 EPA's Coalbed Methane Outreach Project has identified at least four VAM oxidation projects that are completed, underway, or planned across the United States that utilize oxidation to eliminate VAM.44 EPA has also compiled additional examples of technologies that use or destroy VAM in coal mines in the U.S. and around the world.45 For example, a coal mine in Australia uses VAM to generate power, and at least five VAM projects in China will begin operations in the next two years, including a project that will generate electricity from VAM.46 The Forest Service must consider "all possible approaches to, and potential environmental impacts of, a particular project." Wilderness Soc'y, 524 F. Supp. 2d at 1309 (emphasis added). Granting MCC consent for the Lease Modifications while requiring MCC to put in place VAM controls on its ventilation system to reduce methane emissions clearly represents one possible approach to MCC's request for the lease expansions. These technologies and controls are "alternatives" to the proposed action – they would, when combined with | | |

BLM_0051038

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | the proposed action, achieve the basic aims of the proposed action by different means, while eliminating or lessening the adverse environmental consequences of that action. Despite the multiple examples of successful VAM mitigation measures, the DEIS eliminated from detailed study an alternative that would require MCC to mitigate or eliminate VAM emissions. DEIS at 34-37. Data and independent research demonstrate that VAM reduction technologies may likely be technically feasible at the West Elk Mine. Data prepared for MCC shows that the Mine is producing methane in sufficient concentrations to operate a VAM oxidizer at least part of the time. These data show methane concentrations ranging from 0.15% to 0.31%.47 While in general, the higher the methane concentration the more economical VAM becomes, VAM oxidizers are proven to operate reliably at concentrations as low as 0.2%. For example, an EPA report dated 2010 concluded that "one technology (the thermal flow-reversal reactor or TFRR) has been proven to operate reliably on VAM, even at concentrations as low as 0.2 percent."48 MEGTEC's brochure states that its VAM destruction technology can generate heat or energy with volumes as low as 0.3% methane, and at varying volumes of VAM. Modular systems allow a mine to purchase the right number of VAM oxidizers for the volume of VAM for which the VAM wishes to remediate methane pollution.49 Biothermica states that its "VAMOX" VAM destruction system "[a]ccepts a broad methane level range (0.2% to more than 1%)."50 Further, a 2010 study prepared by Ph.D. economist Thomas | | |

BLM_0051039

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Power suggests that the low level of methane in West Elk's VAM may be a transitory phenomenon, and that there may be ways MCC can alter its ventilation system to produce VAM at concentrations that could be combusted.51 The DEIS dismisses VAM reduction as an option for a number of reasons, all of which lack support. The DEIS's failure to fully and fairly evaluate an alternative that would include a requirement that MCC reduce or eliminate methane in VAM emissions is arbitrary and capricious and must be set aside. See Wilderness Soc'y, 524 F. Supp. 2d at 1311 (holding that BLM violated NEPA for failing to "adequately explain why the … alternative was dropped"). First, the DEIS states that "[l]ease addendums have been added to the parent leases and would be carried forward to the lease modifications that address this possible mitigation measure," but that MCC would have to design the measure itself. DEIS at 35; id. at 37. However, these lease addendums do not address the reasonable alternative proposed here, which is to grant MCC consent for the Lease Modifications while requiring MCC to put in place VAM controls to reduce methane emissions. Rather, the addendum/stipulation only provides that MCC should implement the VAM controls if "economically feasible."52 Id. at 28. Furthermore, because this addendum/stipulation, in its current form, fails to adequately protect non-mineral resources, the DEIS's reasoning is also inconsistent with the Forest Service's mandate to include stipulations to protect non-mineral resources. See id. at 16.53 Second, the DEIS argues that "MCC's ventilation air flow quantity is much higher | | |

689

BLM_0051040

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | than anything that has to date been demonstrated as effective with [VAM control] technology." DEIS at 37. This assertion is wrong. MEGTEC has explained that its VAM oxidation system can be expanded with additional units to handle greater volumes of VAM.54 Further, the mine need not treat all of the ventilation air. It could simply oxidize some of the VAM. The DEIS fails to address such an alternative. | | |
| Methane (ghg) | HCCA et al | 35-36 | II. THE DEIS FAILS TO INCLUDE A REASONABLY COMPLETE DISCUSSION OF GREENHOUSE GAS MITIGATION MEASURES. In addition to requiring agencies to consider reasonable alternatives to the proposed action, NEPA requires agencies to provide a detailed statement of "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii). For these unavoidable impacts, an agency must adequately propose and discuss appropriate mitigation measures in an EA or EIS. 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c), 1508.25(b)(3). This discussion of mitigation measures is required "precisely for the purpose of evaluating whether anticipated environmental impacts can be avoided." S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior, 588 F.3d 718, 727 (9th Cir. 2009). An EA "should include sufficient discussion and analysis to allow the public or a reviewing court to evaluate the adequacy of proposed mitigation measures." Diné Citizens, 747 F. Supp. 2d at 1258 & n.39. And if "all practicable means to avoid or minimize environmental harm from the alternative selected" have not been adopted, the | Added in Section 2.3 | Section 2.3 |

BLM_0051041

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | agency's record of decision must explain "why they were not." 40 C.F.R. § 1505.2(c). Mitigation must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 353 (1989)); see also Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1173 (10th Cir. 1999) (analysis of mitigation "must be reasonably complete"). A "perfunctory description" of mitigation measures, without supporting data analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at mitigation. Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380–81 (9th Cir. 1998). An agency's "broad generalizations and vague references to mitigation measures … do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness that [an agency] is required to provide." Id. at 1381. VAM combustion, methane flaring, carbon offsets, and capture and use of methane would all mitigate and reduce the Lease Modifications' GHG emissions and climate change impacts. Thus, these are all practicable mitigation measures that the Forest Service should have properly analyzed in the DEIS. In draft guidance, CEQ has singled out methane venting from coal mines as warranting a mitigation discussion under NEPA: "Examples of proposals for Federal agency action that may warrant a discussion of the GHG impacts of various alternatives, as well as possible measures to mitigate climate change impacts include authorization of a | | |

BLM_0051042

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | methane venting coal mine."108 As shown, the DEIS's analysis of VAM oxidation, methane flaring, carbon offsets, and methane capture and use was flawed, based on false assumptions, and/or characterized by misinterpretations and erroneous conclusions. Such an arbitrary and capricious analysis violates NEPA. Further, the Forest Service's failure to rationally justify why "practicable means to avoid or minimize environmental harm from the alternative selected" were not adopted also violates NEPA. See 40 C.F.R. § 1505.2(c). | | |
| Methane (BLM) | Michael Drysdale 2390 | 2 | In Chapter 1, page 6 of the EA, under "Geology," the document states: Additionally, mining of the coal could result in methane loss within the coal bed and recoverability of any gas resource present in geologic formations in and/or above the coal seams could be reduced due to the evacuation of gas through mine ventilation. This statement is technically correct, but misleading to the extent that the term "gas resource" implies a valuable methane deposit. As noted elsewhere in the document, all available information indicates that the methane that would be liberated as a result of mining does not exist in sufficient quality or quantity to be economically developed, even after adjusting for any potential carbon crediting that might be available. | This appears to be similar to discussions above from EIS where gas resource was used more generically. | |
| Methane | Barbara Dahms 56647 | | We need to abandon coal as a major source of energy and do everything we can to switch to cleaner energy. | Beyond the scope of the analysis. | |
| Methane | Barbara Dahms 56647 | | Venting methane into the atmosphere is utterly stupid.  Better to burn the methane for fuel than to waste it to get to the coal. How short-sighted. | Specifying a method for the mitigation of methane vented is outside of the scope of the decision at the leasing stage where there is no surface-disturbing proposal for consideration in | m |

BLM_0051043

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | | front of the agencies; however, stipulations have been included that prescribe conditions for future surface use in accord with respective lease addenda carried forward from parent leases. Additional discussion has been included in the EA/DEIS/FEIS regarding various methodologies of methane mitigation. See Sections 2.1, 2.2 and for discussion of Alternatives related to methane. | |
| R2P2 | Michael Drysdale 2390 | 3 | The DE IS contains multiple references to MCC's R2P2 report to the BLM. The first reference, on page 35, states: A detailed assessment of the capture and centralized collection of methane drainage well (MDW) methane was provided to BLM by MCC (West *ELK Mine ESeam Gas Economic Evaluation,* September 29, 2009; this document contains confidential business information and is not intended for Agency dispersal). The confidential status of the document should be clarified. The E-Seam Gas Economic Evaluation contained two portions. The bulk of the text is not confidential and may be disclosed as part of the administrative record for this NEPA process. A separate contemporaneous document, entitled "Confidential Report-Mountain Coal Company LLC Methane Management Cost of Capital Financial Analysis, September 24, 2009" was bound with a red cover and designated as confidential under FOIA and DOI regulations. That document remains confidential and should not be disclosed either in response to FOIA requests or as part of the administrative record. The FEIS should make clear that only a portion of the total report is confidential. | R2P2 (Arista Report Appendix F) is included in this document as Appendix A. | Appendix A |
| Range of alternatives , methane | HCCA et al | 23,24 | Third, the DEIS pleads ignorance as to how a VAM system would be designed. DEIS at 37 ("The agencies involved in this analysis | See BLMs mitigation considerations in Section 2.3 and Appendix A. | Section 2.3, 3.4 and Appendix A |

BLM_0051044

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | do not know if VAM destroyers on the market are compatible with the specific design of MCC's MSHA-approved ventilation system"). This ignores the fact that it is the Forest Service's duty to explore options and track down information, not simply to rely on another agency's (or its own) ignorance of a particular topic to dismiss an alternative. Obtaining such information would not be difficult, given that other mines in the U.S. (and around the world) have designed and operated such systems. The Forest Service could easily contact any or all of the numerous vendors known to install such systems.55 Fourth, the Forest Service claims that "MCC does not believe that this is an economically viable option at this time, due to the low percentage of methane in their ventilation air." DEIS at 37. However, this excuse lacks merit for two reasons. First, mitigation measures need not economically benefit the lease holder to be reasonable or to be fully disclosed, analyzed, and adopted by the agency. The DEIS provides no explanation for why it assumes MCC must profit from mitigating pollution it would otherwise emit. Second, while the Forest Service provides no support for this argument, it appears that the basis for its claim is the West Elk E-Seam Economic Evaluation Report submitted to BLM by MCC, claiming that it was not "economically feasible" to adopt any of these mitigation measures.56 But an expert economist found that MCC's conclusions about the economic feasibility of mitigation measures were based on flawed assumptions.57 In addition, it is curious that the DEIS concludes it cannot consider a VAM | | |

694

BLM_0051045

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | alternative because it is not an "economically viable option at this time," DEIS at 37, while it considers in full the option of approving the lease modification under the 2001 National Roadless Rule, which MCC has also concluded is not economically viable.58 Fifth, the DEIS alleges that the construction of a VAM system would "require large acres of disturbance for surface facilities including roads and utilities," and "additional disturbance … in roadless areas." DEIS at 37. The DEIS's allegations here are either false or again prejudge the outcome of a valid alternatives analysis. The DEIS contains no indication of how "large" an area would be required, or where the VAM systems would be located. There is no way to weigh the considerable climate change benefits of a VAM reduction system against the environmental costs of building these systems in an area already disturbed for ventilation systems (on MCC property or already-disturbed Forest Service land) unless and until the Forest Service conducts the analysis of the costs and benefits of such an alternative as NEPA requires. The DEIS fails to include such analysis. In sum, the DEIS contains a host of erroneous or unsupported rationales for declining to consider in detail the alternative of requiring MCC to adopt VAM technologies to reduce methane pollution. The DEIS's analysis must therefore be set aside and remanded. 55 | | |
| Range of alternatives, methane | HCCA et al | 25, 26 | 2. The DEIS Fails To Sufficiently Analyze Methane Flaring As A Reasonable Alternative. The West Elk Mine removes methane not only through ventilation systems (as VAM), | BLM has considered methane mitigations in section 2.3 DRMS approved Technical Revision TR73 for the Elk Creek Mine in 2012, which documented the planned construction of this facility near a | Section 2.3 |

BLM_0051046

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | it also vents methane through MDWs. The DEIS predicts that MCC will construct 48 MDWs to remove methane in order to mine the lease modification areas. DEIS at 51. Methane vented though MDWs represented nearly 3.5 million cubic feet a day in early 2010, when the Mine was operating far below its estimated capacity.59<br>Coal mine methane from drainage wells can be combusted, or flared, before it enters the atmosphere. Flaring results in 7.5 times fewer GHG emissions than venting methane directly into the atmosphere.60 Despite the potential benefits of methane flaring, the DEIS dismisses detailed consideration of a flaring alternative without a rational basis. Methane flaring, however, is a reasonable, practical, effective, and feasible alternative to reduce the Lease Modifications' GHG emissions.61<br><br>And at another mine removing coal from GMUG National Forest lands – the Elk Creek Mine, located just a few hundred yards west of the West Elk Mine – Oxbow Mining has sought a permit to capture methane from drainage systems at one part of the Mine to generate electricity.71 Oxbow's planned methane capture facilities would apparently include a flare – "a thermal oxidizer capable of oxidizing or 'flaring' the mine methane."72 The Colorado Division of Mining, Reclamation and Safety ("DRMS") apparently approved this project, including the flare, in March 2012.73 | ventilation fan at the Elk Creek Mine. According the Elk Creek Mine Permit (page 2.05-23c, Rev Jan 2012), this facility consists of "multiple methane-fueled electric generator sets capable of utilizing the mine methane to produce electricity to be fed back onto the electric supply grid." | |
| Range of alternatives , methane | HCCA et al | 30-32 | 3. The DEIS Fails To Sufficiently Analyze Capture And Use Of Vented Methane As A Reasonable Alternative. The DEIS fails to adequately analyze an alternative that would require MCC to capture methane or use the methane for | BLM has considered methane mitigations in section 2.3 | Section 2.3 |

BLM_0051047

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | power generation. Such alternatives are reasonable. BLM has previously acknowledged the agency's need and duty to consider such alternatives during preparation of an EA for another BLM coal lease in Colorado. A BLM staffer considering the nearby Elk Creek East lease by application stated: Clearly, there are very real limitations to the applicability of CMM [coal mine methane] projects. However, they have been successfully demonstrated in many places and we need to fully and honestly explore the possibilities before we claim we cannot require or even allow them.87 Given BLM's admission that coal mine methane pollution mitigation alternatives "have been successfully demonstrated in many places," the Forest Service should have "fully and honestly explore[d]" any such alternative possibilities in any subsequently prepared NEPA document. Indeed for this project, BLM NEPA staff recommended that the Forest Service consider a "Capture Alternative," a recommendation that the Forest Service apparently declined to accept.88 There are a number of ways that the West Elk Mine could make use of methane as alternatives to methane venting. For example, a 2007 EPA presentation documents numerous methods for preventing methane waste, including 10 capture and utilization projects at active mines in the United States that involve natural gas pipeline injection, mine air heating, and coal drying.89 Reasonable alternatives that the DEIS should have addressed include: ☐ Capture and sale of methane Methane released from ventilation wells could be | | |

BLM_0051048

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | pressurized and injected into a commercial pipeline for sale.<br>☐ Liquefied natural gas. In addition, captured methane could be essentially frozen and turned into liquefied natural gas ("LNG") for transportation and sale to market in Denver.90 Such a mitigation measure has been proposed to address methane venting at the West Elk Mine, and is being pursued in China.91<br>☐ Capture and use of methane for on-site electric generation. Mountain Coal Company could capture methane and combust it in engines on-site. This electricity could be used by the mine or sold to the grid. The reasonableness of such an approach is demonstrated by the fact that the mine directly across Highway 133 from the West Elk Mine – the Oxbow's Elk Creek Mine – has won approval from DRMS to gather methane, combust it on site, and sell the electricity generated to a utility, and has found financing from Aspen Skiing Co. to construct the project.92<br>The DEIS's dismissal of such alternatives is without support. |  |  |
| Range of alternatives, methane | HCCA et al | 33-35 | 4. The DEIS Fails To Analyze Carbon Offsets As A Reasonable Alternative To Reduce The Impacts Of The Lease's Methane Pollution. Carbon offsets are a tested, feasible, and practical alternative to allowing the West Elk Mine to vent millions of cubic feet of methane into the atmosphere every day as a result of the Lease Modifications without mitigation or control, or with incomplete mitigation or control. EPA has repeatedly urged land management agencies to assess carbon offsets in EAs and EISs as a way to reduce climate change impacts of agency actions. EPA has specifically noted that offsets are a | Carbon off sets is considered in Section 2.3. | Section 2.3. |

BLM_0051049

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | reasonable alternative to lessen the impacts of coal mine methane emissions. In a 2007 letter concerning a proposal to permit MDWs at the West Elk Mine, EPA specifically rejected the Forest Service's assertion that a carbon offset alternative was not reasonable: "[I]t is reasonable to consider offset mitigation for the release of methane, as appropriate. Acquiring offsets to counter the greenhouse gas impacts of a particular project is something that thousands of organizations, including private corporations, are doing today."95 Similarly, EPA has recommended that a Forest Service NEPA analysis of a forest health project "discuss reasonable alternatives and/or potential means to mitigate or offset the GHG emissions from the action."96 Numerous state agencies already use offsets to control GHG emissions.97 As EPA noted, many entities exist that permit agencies and polluters to purchase carbon offsets that are third-party verified. For example, the Carbon Fund and the Climate Action Reserve both allow entities to purchase carbon "credits." In 2009, the total U.S. carbon offset market was worth $74 million, with 19.4 million metric tons of CO2e in traded volume.98 The DEIS dismisses any analysis of the economic costs or the environmental benefits of requiring MCC to purchase carbon offsets by stating: [P]urchasing of carbon credits is a voluntary financial investment that MCC may choose to entertain for business reasons. The federal agencies are not involved in any financial investment decisions that MCC makes as a corporation. DEIS at 37. This excuse for | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | failing to analyze or adopt offsets lacks a rational basis. Federal agencies are of course involved in decisions that impact lease-holders investment decisions. Federal agencies require lease-holders to pay royalties, implement reclamation requirements, post bonds, conduct surveys, and any number of other mandates that require lease-holders to expend financial resources. BLM has required companies seeking to exploit oil and gas leases to fund numerous surveys for wildlife, cultural resources, and air quality.99 Other agencies require those damaging wetlands to participate in wetlands mitigation banks.100 The Forest Service has required mining companies to fund wildlife and law enforcement personnel, and measures to protect wildlife.101 An alternative that proposes that the Forest Service consent to MCC's proposed Lease Modifications while requiring MCC to purchase carbon offsets is consistent with the proposed action's purpose and need. MCC would be able to obtain the lease modifications and expand its operations in the exact same manner as it proposed. A carbon offset alternative would simply require MCC to purchase carbon credits from a reputable vendor. At the end of 2009, carbon offsets were priced from $2.80 to $5.20 per ton of CO2e, which is a small fraction of the December 2011 coal sale price of at least $35.50 per ton of coal.102 Thus, MCC could sell the Lease Modification's 10.1 million tons of coal for at least $355 million (or more, if the company's long-term contracts specified otherwise), while it could completely offset the project's 1.9 million tons of CO2e emissions from | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | methane venting for less than $11 million – or about 3% of the sale price of the coal. Moreover, offsets do not present the Forest Service or MCC with an all-or-nothing scenario – MCC could offset less than 100% of the GHG emissions attributable to the Lease Modifications if offsetting all of the project's GHG emissions is not economically feasible or palatable. The DEIS also states that while "off-set (or off-site) mitigations may be possible, they have not been brought forward for consideration related to this leasing analysis." DEIS at 37. To the extent that the DEIS implies that the purchase of carbon credits or offsets was not suggested during prior comment periods, that implication is mistaken.103 Further, as noted above, a number of programs exist from which MCC could buy carbon credits, including a California cap and trade program, and including the Climate Action Reserve.104 The Climate Action Reserves lists more than two dozen wholesale sellers of carbon credits, and one operating carbon exchange where a polluter like MCC could purchase credits to offset its emissions.105 It is unclear why, if an exchange exists, commentators must suggest a specific project for MCC to purchase to offset its carbon pollution.106 The DEIS's failure to properly analyze the reasonable alternative of carbon offsets violates NEPA's mandate that an agency study, develop, and describe all reasonable alternatives to the proposed action. See, e.g., Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1245-47 (9th Cir. 2005). In addition, the DEIS violates NEPA's requirement that an agency provide a reasoned explanation why an alternative | | |

BLM_0051052

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | was eliminated from detailed analysis. See, e.g., id. at 1245-46; Wilderness Soc'y, 524 F. Supp. 2d at 1309. | | |
| **Mineral Leasing Act, Energy Policy Act** | | | | | |
| Mineral Leasing Act | HCCA et al | 15 | E. The Forest Service's And BLM's Decision To Lump The Two Lease Modifications Together As One Violates The Energy Policy Act. The Forest Service's apparent decision to merge these two Lease Modifications into a single, indivisible lease modification that can only be analyzed as a 1,720-acre whole not only violates NEPA, it also appears to violate the Mineral Leasing Act. That law provides that "[i]n no case shall the total area added by modifications to an existing coal lease ... exceed 960 acres." 30 U.S.C. § 203(a)(3). The DEIS's statement that the two, separate lease modifications must be analyzed together creates one massive lease modification, far larger than Congress envisioned or permitted. This approach appears to game the system Congress created to limit lease expansions, and thus to violate the spirit, and the letter, of the Mineral Leasing Act. | This has been separated in the Action Alternatives in the FEIS and explained as it relates to ownership of the lease modifications and compliance with MLA as amended. | Alternatives 2 (FEIS) 3, and 4 |
| Mineral Leasing Act | HCCA et al | 15 | G. The DEIS Violates NEPA By Failing To Analyze The Reasonable Alternative Of Considering Arch Coal's Proposal For A 1,700-Acre Lease Modification As A Request For A New Lease. The DEIS concludes that taking "no action" on the MCC's lease modifications would necessarily result in bypassing of coal. However, the Forest Service and BLM (cooperators on this DEIS) could consider MCC's overlarge lease modification request to be instead a request for a new lease. The BLM and Forest Service could then consider approving (or consenting to) MCC's request under regulations governing | The BLM has responded to an application from Ark Land LLC requesting modifications to existing leases under the authority of the Mineral Leasing Act as amended by the Energy Policy Act of 2005 and 43 CFR 3432. This application has been modified by BLM to further prevent bypass of federal coal as described    43CFR§3425.1–9 "Modification of application area.  The authorized officer may add or delete lands from an area covered by an application for any reason he/she determines to be in the interest of the United States in accordance with 43 CFR 3432.2(a). If an environmental assessment of the modification is | |

BLM_0051053

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | new leases as opposed to lease modifications. This might result in different stipulations, or a different return to the taxpayer. | required, BLM will solicit and consider public comments on the modified application." | |
| **Purpose and Need** | | | | | |
| Purpose and Need | Michael Drysdale 2390 | 1 | Section 1.3 of the EIS describes the Project Purpose and Need. Everything stated in the Need description is correct. It would further and more clearly inform the public, however, to expressly state that a need of the project is to avoid the bypass of federal coal. While avoiding bypass is reasonably encompassed by the phrase "ensure that coal reserves are recovered" in the current version, it is important for the public and decision-makers to clearly understand that if the lease modifications are denied, bypass of the coal in and adjacent to the lease modification areas will result, and thus a loss of appurtenant royalties and tax revenues. There is no reasonable prospect that the federal coal in lease modifications will ever be recovered if it is not recovered pursuant to the requested modifications. This is stated elsewhere in the document (e.g. page, 2), but a clear reference in the Need section would be valuable. | This has been updated in the FEIS. | |
| **Range** | | | | | |
| Range | HCCA et al | 18 | 4. Subsequent NEPA Documents Should Consider Stipulations To Ensure Re-vegetation By Fencing Out Livestock For One Season.  The DEIS admits that post mining "revegetation efforts can be negatively affected by livestock presence and use." DEIS at 128. However, the Forest Service has "[t]ypically" taken the following actions "to assure revegatative success," namely: "temporary electric fencing is placed around newly reclaimed areas during the first growing season. After this period, | As indicated in the EIS, no surface disturbing activities are proposed or authorized by this action.  Requiring fencing at a leasing stage, when no site specific information is available would not be appropriate.  In certain areas, the use of fencing could negatively impact livestock management or other multiple use activities. This type of requirement would be more appropriate working within the State permitting process, not at the leasing stage. | |

BLM_0051054

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | fencing is removed and livestock usage does not appear to impact revegetation efforts as long as the livestock is managed according to standards." Id. Because fencing out cattle for one growing season after re-seeding and reclamation is "typical" agency practice, and because such fencing is effective at mitigating the impacts of livestock grazing that might otherwise interfere with reclamation, we urge the Forest Service to adopt a stipulation requiring such fencing. Requiring the lease-holder to ensure effective reclamation is both reasonable and in line with the Forest Service's duty to protect the Forest's non-mineral resources. | | |
| **Range of Alternatives** | | | | | |
| Range of alternatives | Janell Kinzie 2472 | | Why can't you just say NO, and enforce it??? | See Alternative 1 | See Alternative 1 |
| Range of alternatives | Michael Drysdale 2390 | 3 | Page 39 of the DEIS discusses, but rejects from detailed study, an alternative of granting one lease modification but denying the other. MCC and Ark have provided additional information related to the infeasibility of this approach at Comment No. 4 of its Comments on BLM's Preliminary EA, and refers the FS to that discussion as a recommendation for further elaboration in the FEIS. | See Alternative 4- included comments | |
| Range of Alternatives | Wendell Koontz 2409 | 1 | 2.2 Alternatives Considered but Eliminated from Detailed Study<br>The DEIS has correctly identified numerous issues that were not worth of carry forward for the lease modification action. These include methane flaring/capture, carbon credit offsets, directional drilling issues, rejection of one lease modification, and the multiple No Surface Occupancy issues. The USFS has completed ample analysis of the Alternatives as identified in Section 2.2. | Additional considerations have been included in Section 2.1 of the FEIS and Appendix A | Sections 2.2, 2.3, and Appendix A |

BLM_0051055

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| Range of alternatives | HCCA et al | 16 | H. The DEIS Violates NEPA By Failing To Analyze Reasonable Alternatives To Reduce Surface Impacts From Coal Mining. Because the proposed lease modifications are slated for roadless as well as wilderness capable lands in the Sunset Roadless Area, the Forest Service must consider other reasonable alternatives that would reduce surface impacts. The DEIS cursorily dismisses a number of these stipulations based on the existence of other stipulations which are not as protective. This dismissal is arbitrary and capricious. 1. The DEIS Arbitrarily Fails To Consider NSO Stipulations On Slopes Greater Than 40%, Or Greater Than 60%. The DEIS dismisses analyzing an alternative concerning steep slopes that would place NSO stipulations on slopes greater than 40% on the grounds that the Alternatives 2 and 3 contain less protective stipulations that may permit road and MDW construction on slopes between 40% and 60%. See DEIS at 40-41 (existing stipulation requires special review on slopes prior to construction on slopes between 40%-60%); id. at 22. What the DEIS does not explain is why the lease modification for COC-1362 will contain an NSO stipulation for slopes greater than 60%, but the lease modification for COC-67232 will not. | Alternative 4 has been considered in detail responsive to commenters' request.  Stipulations have been determined adequate on parent leases to protect surface resources. Alternative 2 has been removed from detailed consideration in the Supplemental EIS because it is no longer in effect in CO. | See alternative 4, Sections 2.2, 2.3 |
| Range of Alternatives | Joanne Capozelli 2457 | | Despite the harm the mine expansion will cause, it is of deep concern that the Forest Service has declined to consider any alternatives that will reduce the footprint of the bulldozing and drilling in the roadless area, or that will result in control of the methane pollution. | Alternative 4 has been considered in detail responsive to commenters' request as have BLM's consideration of methane mitigation in Section 2.2 and 2.3. | Alternative 4 |
| Range of Alternatives (BLM) | Michael Drysdale 2390 | 2-3 | The BLM identifies, but eliminates from detailed consideration, an alternative that would involve approving one lease | Alternative 4 has been considered in detail in the FEIS.  Your concerns have been noted regarding the coal resource and lack of exploration data. | Alternative 4 |

BLM_0051056

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | modification but denying the other. On Page 16 of Chapter 2, the BLM states: Approving one lease and not the other would not fulfill requirements of the FLPMA, or other applicable laws, rules, regulations, policies, standards, or guidelines; and it would not meet the purpose and need for the Proposed Action. This statement is correct, but could be expanded upon. As the BLM states, both modifications meet federal policy goals. Alternatively, had the BLM concluded following the analysis that the impacts of the modifications were too great to justify the benefits, it could have denied both requests. But the surface, geologic, air quality, and other impacts associated with the proposed modifications are largely identical. The essential finding of the BLM is that there is no rational basis to take different actions with respect to the two requests. In addition, it is important to note that denial of one lease modification likely results in effective denial of both. Denial of one modification and grant of the other would result in the shortening of longwall panels and render the mining of the reserves uneconomic. The cost per ton of coal that would be extracted from the short panels would increase substantially because the significant costs associated with repositioning the longwall and constructing associated infrastructure would be spread over fewer tons. Coal prices are not presently and foreseeably at levels that can sustain large additional overhead charges. MCC and Ark cannot know with certainty, until exploration activities are actually conducted within the modification parcels, whether coal quantity and quality in the lease modification area could sustain short panel development, but if one | | |

BLM_0051057

|  | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
|  |  |  | modification is denied and the other granted, there would be no opportunity to revisit the decision in the event that short panel development proved uneconomic, and all the coal would be bypassed. |  |  |
| Range of alternatives | HCCA et al | 11 | C. Because The 2001 National Roadless Rule Alternative Would Likely Result In No Coal Being Mined, The DEIS Fails To Contain A Range Of Reasonable Alternatives. The Forest Service has repeatedly concluded that coal in the E-Seam cannot be mined without road construction. Thus, Alternative 2, the 2001 Roadless Rule alternative, is unlikely to result in surface impacts or any other impact associated with coal mining. If so, then the impacts of Alternative 2 (2001 Roadless Rule alternative) on the lease modification areas will be indistinguishable from those of the No Action alternative (Alternative 1). Thus, there is only one "action" alternative (Alternative 3) to compare to the "no mining" alternatives (Alternatives 1 and 2), resulting in a DEIS that contains the very sort of "binary choice" that the courts conclude represents an inadequate range of alternatives. The likely impacts of the alternatives for the lease modifications can be summarized as below: | Alternative 2 (FEIS) had been supplemented with additional discussion and analysis. Alternative 4 has been added which increases the range of action alternatives considered.<br><br>Alternative 2 has been removed from detailed consideration in the Supplemental EIS because it is no longer in effect in CO. | See FEIS Sections 2.2, 2.3 and Chapter 3 |
| Range of alternatives | HCCA et al | 12-14 | D. The DEIS Violates NEPA By Failing To Analyze A Reasonable Alternative That Would Approve One Lease Modification But Deny The Other. In the Forest Service's scoping letter for the lease modifications, the agency characterized its decision as whether or not to approve each of the two proposed lease modifications independently. The scoping notice stated that: the Responsible Official will review the proposed action, the other alternatives, and | Alternative 4 has been added which increases the range of action alternatives considered responsive to commenters' concern. | See Alternative 4 |

BLM_0051058

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | the environmental consequences in order to decide the following: ☐ Whether or not to consent to the BLM modifying existing federal coal Lease COC-1362 by 800 acres; ☐ Whether or not to consent to the BLM modifying existing federal coal Lease COC-67232 by 920 acres; ☐ Prescribe conditions (stipulations) needed for the protection of non-coal resources.22<br><br>Thus, an alternative that would approve Lease Modification COC-1362 but not COC-67232 would permit MCC to access more than 18 million tons of coal, compared to 19 million tons if both lease modifications are approved, or roughly 95% of the coal accessible under Alternative 3, while eliminating surface impacts from a 920 acre area that is roadless and directly adjacent to the West Elk Wilderness.29 Such an alternative would potentially protect virtually all of the "wilderness capable" land identified in the 2005 inventory of the Sunset Roadless Area (since nearly all, if not all of those wilderness capable lands lie within Lease Modification COC- 67232).30 This is exactly the kind of trade-off, or "middle ground" alternative that courts have required agencies to consider. See Wilderness Soc'y v. Wisely, 524 F. Supp. 2d at 1312 (setting aside EA because it failed to evaluate a "middle-ground compromise"). | | |
| Range of alternatives / wilderness | HCCA et al | 15 | F. The DEIS Violates NEPA By Failing To Analyze A Reasonable Alternative That Would Prohibit Surface Occupancy Within The Sunset IRA's Wilderness Capable Lands.<br>Another way to balance MCC's desire for coal against the potential harm to roadless | There are no lands within the project area which have been recommended or available for Wilderness designation, or are now Wilderness. Alternative 4 was developed responsive to concern. See alternative 4 | Section 2.2 and Alternative 4. |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | lands from a network of well pads and roads would be to add "no surface occupancy" ("NSO") stipulations: (1) to Lease Modification COC-67232; or (2) to either of the Lease Modifications where the lease modifications overlay lands found to be "wilderness capable" in the GMUG National Forest's 2005 inventory. The stipulations could make clear that they do not seek to preclude surface impacts from subsidence, only from roads, well pads, and similar developments related to the construction, use, and maintenance of methane drainage wells. As a practical matter, such alternatives might have impacts very similar to the alternative of only approving lease modification COC-1362. On the other hand, they may permit MCC to mine right up to the eastern edge of the COC-1362 lease modification boundary, which MCC might otherwise not be able to do because subsidence impacts from mining up to that boundary would otherwise occur beyond the COC-1362 lease boundary. | | |
| Range of alternatives | HCCA et al | Pp 3,4 | Here, the DEIS purports to examine in detail three alternatives: (1) Alternative 1, the "No Action" alternative, in which neither coal lease would be modified (and thus under which no coal would be leased, none mined, and no surface impacts would occur); (2) Alternative 2, the "2001 Roadless Area Conservation Rule Framework" alternative, under which the Forest Service would consent to both Lease Modifications requested by MCC, adding a total of 1,721 acres to those two leases, and under which "road construction would not be allowed in the modification areas;" and (3) Alternative 3, the "Colorado Roadless Rule Framework " alternative, in which the Forest Service | Alternative 4 has been brought forward from Alternatives Considered but Eliminated from Detailed Study for detailed consideration after additional consultation with BLM regarding coal resources. Effects have been divided by lease modification area. Together these additions reflect a wider range of alternatives. Alternative 2 has been removed from detailed consideration in the Supplemental EIS because it is no longer in effect in CO. | |

BLM_0051060

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | would also consent to both Lease Modifications requested by MCC, adding a total of 1,721 acres to those two leases, and under which road construction would be allowed in the modification areas. Alternative 3 is the Forest Service's "Preferred Alternative. DEIS at 13, 31 (emphasis added). As described below, this "range" of alternatives boils down to an "all or nothing" choice between coal or roadless lands. Despite the DEIS's inclusion of Alternative 2, it is unlikely, based on prior and recent agency analysis, that Alternative 2 will actually result in the removal of any coal or any surface impacts. Thus, the DEIS effectively considers no middle ground – no alternative that would permit MCC to remove some, but not all, the coal it could remove under the "Proposed Action" alternative while permitting some, but not all, of the surface disturbance anticipated to occur under the "Proposed Action" alternative. Similarly, the DEIS considers no alternative that would grant one lease modification, but not the other. Because the DEIS analyzes only two polar opposite alternatives with no real middle ground that could actually be implemented – the proposed action and the no action alternative –but eliminates from consideration every alternative with the potential to permit some, but not all, desired coal mining while reducing impacts to surface resources and roadless characteristics in the Sunset Roadless Area, the DEIS violates NEPA's alternatives requirement.3 | | |
| Range of alternatives | HCCA et al | 5 | The DEIS's analysis, based on the assumption that coal could be mined under the 2001 Roadless Rule alternative, appears to be contradicted by prior – and | Alternative 2 (FEIS) now includes additional discussions of infeasibility that were previously in the Alternatives Considered but Eliminated from Detailed Study and in the project file.  Additional | Section 2.2 Alternative 2 (FEIS) and Chapter 3 |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | current – agency analysis and statements. In the past 5 years, the Forest Service has evaluated the "no road building" alternative for coal mining at the West Elk Mine at least three times. And each time, the Forest Service rejected the alternative because roads are required to transport equipment to the MDW site. Further, while we would prefer that the facts show otherwise, Forest Service and Arch Coal employees have repeatedly concluded that it is not economically feasible for MCC to mine coal using MDWs cleared and drilled without roads, where equipment would be flown in by helicopter. And while the DEIS also states that well pads could be cleared and wells drilled if huge drill rigs and bulldozers were "walked in/dragged in without the use of roads" under Alternative 2 (DEIS 52), we could locate nothing in the record to support a conclusion that such an alternative was technically feasible, nothing in the DEIS that discloses the impacts of moving such equipment through a dense forest without a road, and nothing that would support a conclusion that dragging huge vehicles over unroaded terrain would have fewer impacts than constructing roads. The DEIS's analysis, concluding that millions of tons of coal could be mined without roads, is arbitrary and capricious because it is not supported by the record. 1. Prior, and Recent, Forest Service Analysis Concludes That The Use Of Helicopters To Construct And Operate Methane Drainage Wells Is Not Feasible. | analysis has been included to cover removal of vegetation and dragging/walking in equipment without engineering or building roads. Commenters' concerns are valid regarding feasibility of mining under the restrictions of the 2001 Roadless Rule. Commenters concern has also been reiterated by representatives of the West Elk Mine. Alternative 2 has been removed from detailed consideration in the Supplemental EIS because it is no longer in effect in CO. | |
| Range of alternatives | HCCA et al | 9 | 3. The EIS Fails To Explain Or Analyze Properly That Part Of Alternative 2 That Would Require "Walking In" Or "Dragging In" Equipment To Construct, Operate, And Maintain Methane Drainage Wells. | Alternative 2 (FEIS) has been supplemented with additional discussion and analysis. Alternative 2 has been removed from detailed consideration in the Supplemental EIS because it is no longer in effect in CO. | FEIS Section 2.2 and Chapter 3. |

BLM_0051062

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | The DEIS also alleges that coal could be mined under the 2001 National Roadless Rule if huge, 50-ton drill rigs and bulldozers are "walked in/dragged in without the use of roads" under Alternative 2. DEIS at 52. See also id. at 71 ("MDW pads could be constructed via crosscountry travel of heavy equipment."). We could locate nothing in the record to support that this alternative is technically feasible, or that it could be implemented safely. First, as noted above, prior EISs, the preamble to the Colorado Roadless Rule, and Arch's prior statements, all agree that coal mining in the lease modifications area requires road construction. If equipment could be transported "via cross-country travel" without the time and expense of road construction, and with fewer impacts than (or impacts similar to) road construction, it iscurious that such a potentially attractive alternative has never before been proposed or analyzed (for example, in evaluating the Colorado Roadless Rule or the E Seam EIS). Second, we could locate nothing in the record that describes how large drill rigs – weighing as much as 50 tons or more – could be "walked in/dragged in" or driven cross-country through forest without the use of roads. The DEIS nowhere explains how this could be accomplished. | | |
| Range of alternatives | HCCA et al. | P 2 para 2 | Any NEPA document must fully analyze at least one alternative that allows coal mining while protecting *some* of the roadless area from road construction and methane drainage wells. The DEIS fails to consider a reasonable alternative that makes a tradeoff other than all or nothing between coal and roadless lands, the two resources most in tension in this project. But at least two reasonable alternatives could permit MCC | Alternative 4 has been brought forward for detailed consideration regarding commenters concern that only one of the lease modifications be considered for approval.

The West Elk Roadless area was not brought forward as a further planning area during the RARE II wilderness inventory.  Unlike Oil, Gas and Geothermal development (Forest Plan III- | Sections 2.2, 2.3 and Chapter 3 |

BLM_0051063

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | to recover 95% of the coal it proposes to access, and protect the majority of the most pristine portion of the Sunset IRA: (1) approving only one of the lease modifications; and/or (2) applying no surface occupancy stipulations to wilderness capable lands in the Sunset IRA. In order not to cut "the heart" out of the NEPA process, the Forest Service must analyze these – and other – reasonable alternatives | 54), coal leasing does not provide any conditions that would warrant the issuance of an NSO buffer stipulation in this area (Forest Plan III-66). Further, Alternatives 2 (FEIS only), 3 & 4 include a stipulations that address development scenarios for Roadless Areas.  Recreational values according to the Forest Plan for this management area could range from semi-primitive non-motorized to roaded natural or rural. Furthermore provisions of the Colorado Wilderness Act (specific to the West Elk Wilderness) do not allow for the prevention of activities outside wilderness as stated in the provisions of the act "Congress does not intend that designation of wilderness areas in the State of Colorado lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that nonwilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area" (96-560, Sec. 110). "On the basis of such review, the Congress hereby determines and directs that  (3) areas in the State of Colorado reviewed in such Final Environmental Impact Statements and not designated as wilderness or for study by Congress or remaining in further planning upon enactment of this Act need not be managed for the purpose of protecting their suitability for wilderness designation pending revision of the initial plans" (96-560 Sec. 107 (b)) | |
| **Reclamation** | | | | | |
| Reclamation | Gloriana Casey 2432 | | DON'T FORGET, Forest Service, that once an area is decimated, it NEVER comes back. For example, you really need to take a field trip to say Harriman, TENN. Maybe anywhere in W. Vrginia too | Previous reclamation related to methane venting in this vicinity has been very successful. | See Sections 3.18 |
| Road, reclamation | Michael Drysdale 2390 | 5-7 | The significance of environmental impacts depends on context and intensity. 40 C.F.R. | Commenter is correct.  There are 3 stands which may or may not be old growth outside the lease | Sections 2.2, 3.9 |

BLM_0051064

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | § 1508.27. As stated by the DEIS, the proposed roads and well pads will directly affect approximately 73 acres, or just 4%, of the proposed lease modification areas. In an attempt to magnify the import of this tiny footprint, Appellants variously argued that the impacts should be considered significant because they will "spiderweb" the lease area, that there will be wide ranging indirect effects, that they will be long-lasting, and that the lease modification areas abut much larger high value road less/wilderness tracts. Each of these claims was either demonstrably wrong or irrelevant. A central, uncontested fact of the surface vegetation is that much of it is in "mature/overmature" condition. *See* Declaration of Michael K. Ward ("Ward Decl.") ~ 9; Declaration of John Monarch ("Monarch Decl.") ~ 9. Appellants themselves highlighted that much of the aspen is over 100 years old. Appellants' Statement of Reasons at 17. What they failed to acknowledge is that in the GMUG National Forest, mature/overmature vegetation is nearing the end of its life cycle. */d.* Equally importantly, the clearing of 4% of the surface in the proposed pattern will not materially accelerate or slow the coming natural clearing and revegetation. */d.* The affected areas simply contain too little fuel in too scattered a distribution to affect the frequency, intensity, or path of future fires or disease outbreaks. Ward Decl. ~ 7; Monarch Decl. ~~ 7, 9. From a forest perspective, the proposed construction is a nonevent. Ward Decl. ~ 5; Monarch Decl. ~ 5. Appellants "fragmentation" argument fares no better. The GMUG is not Amazonas the | modification area within the affected 6th level HUC (same acreage as the 4th level watersheds described in early old growth definitions) that meet the first screening criteria (large diameter trees) for old growth using Mehl's definitions (Mehl 1992).  One is a spruce-fir stand located in the West Elk Wilderness; one is a cottonwood stand located primarily on private land; the last is a spruce-fir stand over a mile west of the lease modifications. None of these stands would be impacted directly or cumulatively by post-leasing surface impacts.  However, assuming post-lease surface disturbing activities would occur in mature/over-mature classes (which may provide some of the same habitat components as old growth), the GMUG Forest Plan (page III-9a, III-9b) allows for removal of 70-80% of these stands assuming residual patch sizes are met.  If the RFMP were implemented in Alternative 3, it is estimated that up to 61 acres of mature/over-mature aspen (0.3% of vegetation unit), and 7 acres of mature/over-mature spruce-fir (0.09% of vegetation unit) may be disturbed.  These are both only a tiny fraction of that allowed to be removed under forest plan standards to protect structural diversity.<br><br>Additional impacts on vegetation and habitat are included in the FEIS. | |

714

BLM_0051065

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Pacific Northwest, where fragmentation is a concern because the forest in its mature state is stable, unbroken, and the plant and animal species are adapted to forest conditions with few breaks and edges. At the elevation, soil and moisture conditions of the lease modification areas, the forest naturally breaks into multiple patches with differing types and heights of vegetation, ranging from grasses through spruce-fir. Monarch Decl. ~ 8; Ward Decl. ~~ 7-8. In that context, the limited proposed patchwork of roads and well pads will not materially alter the character of the forest while they are in operation, much less when they are reclaimed. In fact, after reclamation, the temporary roads and pads will be ecologically indistinguishable from the forest in its natural condition. Monarch Decl. ~~ 10-11.<br>Because the proposed surface uses will not have any significant effect on the 1700 acre lease modification areas, they will not have any effect on surrounding road less/wilderness areas. Monarch Decl. ~~ 5-11; Ward Decl. ~~5-1 0. Appellants fail to identify any suggested impact, that if it is determined to be insignificant for the lease modification area, will not also be insignificant for the surrounding areas.<br>(2). Reclamation Will be Effective MCC has a long and respected history in award-winning reclamation and compliance. Reclamation science and standards have improved greatly over the years and is valued by the FS and BLM as a method to achieve needed habitat and landscape improvements. The EIS can discuss with a high level of confidence the degree of reclamation that can and will be implemented in the lease modification areas | | |

BLM_0051066

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | because the FS has observed *this* company successfully reclaim *these types of surface facilities* in *this environment* for over thirty years.<br>*See also* Ward Decl. ~ 10; Monarch Decl. ~ 10. As part of documenting this process, MCC has conducted an annual photographic assessment showing the progress of revegetation on old, reclaimed MDW pads and roads since 2004. These reports are found at Exhibits B and C to the Ward Declaration, 1 and show swift and steady revegetation in reclaimed areas. Perhaps the most striking example of MCC's reclamation success is found in the final boundaries for the Colorado Road less Rule. As shown on the Seeping Map for the lease modifications, the Colorado Roadless Rule is proposed to extend over a significant portion of West Elk's existing and previously reclaimed temporary roads and well pads in Leases COC- 1362 & COC-67232. These roaded areas would not have been deemed eligible for inclusion in the proposed roadless area had MCC's prior reclamation efforts not been considered highly successful and this reclamation sought after to ultimately achieve road less character in this area. To MCC's knowledge, no party in the development of the Colorado Road less Rule objected to the proposed designation of these locations as road less. | | |
| **Roadless** | | | | | |
| Roadless (BLM) | Michael Drysdale 2390 | 1-2 | Although the BLM does not identify permitting under the 2001 Road less Rule as a full alternative discussed in detail, as it is in the FS EIS, the BLM EA discusses it on Page 9 of the Chapter 1 of the EA:  If the lease modifications are approved and subject to the 2001 Roadless Rule, there | With changed conditions, the purpose of Alternative 2 as an action alternative is to show the development scenario necessary to extract coal under the 2001 Roadless Rule without roads and used as a comparison to the other alternatives.  The alternative has been updated to reflect the additional equipment and work | Alternatives 2 & 4 FEIS |

BLM_0051067

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | would be no temporary road construction allowed in the West Elk IRA to drill MDWs and such wells would have to be drilled using alternative methods (helicopters, directional drilling, etc.). As we discuss more fully in our comments to the FS EIS, it is important to not overstate the feasibility of coal development under the surface constraints imposed by the 2001 Road less Rule. Although a complete answer cannot be determined until exploration is conducted, all geologic information presently known to MCC and Ark indicates that the coal reserves underlying the lease modification area will not be accessible by helicopter or off-road borne or directional drill rigs. These systems cannot effectively drill the holes required to the depths required in the type of ground conditions found in the lease modification area. Consequently, leasing or permitting under the constraints of the 2001 Roadless Rule would likely amount to an effective prohibition on coal mining. | required for development. The analysis has been expanded for Alternative 2 to include items related to infeasibility based on past experience and possibilities of future disturbance estimated for dragging/walking equipment in. We acknowledge that development is remote and speculative under the provisions of the 2001 Roadless Rule based on MCC's experience. See Alternative 2- incorporate comments | |
| Roadless | Michael Strawn 2418 | | President Obama promised in 2008 to stop all road construction in roadless areas. But Arch Coal, the nation's second biggest coal company, sees the area as a cash cow for expanding its West Elk underground mine. In order to expand under the Roadless Area, it must release huge quantities of methane gas. And that's the problem. To get the gas out, Arch Coal will bulldoze more than 6 miles of new roads, scrape almost 50 well pads, erect drill rigs, and construct numerous methane vents inside the roadless area. That will eliminate wildlife habitat, threaten watersheds, and displace hikers and other visitors. In short, it will rip the heart out of the roadless area. | Impacts to air and methane release and mitigation was addressed in the FEIS.

The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development. The North Fork Coal Mining area allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres would be reclaimed after use. | Sections 2.2, 3.4, 3.18 |

BLM_0051068

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | | | |
| Roadless | Michael Mclaughlin 2413 | 1 | The nation's remaining roadless areas are absolutely necessary to avoid further habitat fragmentation for native species, to allow corridors for migrations - especially during the now clear accelerating climate change, for peaceful recreation, to avoid the poaching and destruction that comes with roads everywhere.<br>Therefore, I am adamantly opposed to the coal lease modifications that will lead to more than 6 miles of road, nearly 50 drill pads, and methane vents in the Sunset Roadless Area.<br>The Forest Service must protect the Sunset Roadless Area, as it provides important habitat for deer, elk, and black bear, denning areas for lynx, and watersheds that support imperiled Colorado River cutthroat trout.<br>Allowing coal mine expansion in the roadless area will damage a pristine area now enjoyed by hunters and hikers and will exacerbate climate change, all to benefit financial investors in one the most destructive climate-damaging forms of power. | The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development.  The North Fork Coal Mining area allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres would be reclaimed after use. | Sections 3.7–3.14 |
| Roadless | Sarah Sauter 2401 | 1-2 | We understand that mine safety may require drilling of methane drainage wells (MDWs) in inventoried roadless areas within the North Fork Coal Mining Area designated in the proposed Colorado Roadless Rule. Although we reserve comment on such MDWs and associated roads until specific mine plans are proposed, in general we do not object to MDWs in roadless areas provided that a) they are adjacent to existing mines and are not associated with development of new mine portals, b) they cause as little surface disturbance as | The proposed modifications would be adjacent to the parent lease and would not require a new mine portal.  Roads and MDW pads would be designed to minimize disturbance while providing adequate ventilation.  In addition, they would all be temporary and would be obliterated and restored as soon as possible. | See Alternative 3 |

BLM_0051069

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | possible, and d) well pads and associated roads are obliterated and completed restored to natural conditions as soon as possible. In the case of the lease modification areas, the goal of restoration should be to return disturbed habitat in Roadless Areas to roadless character. Thereafter, the Forest Service should manage these areas as roadless. | | |
| Roadless | D Riley 46479 | | Not Again!! Is SOMEONE over there of the opinion that no one is watching???!<br><br>In the most emphatic terms possible, recalling the Presidents vow to ban all construction in unspoiled territory, I must strongly urge you to protect the Sunset Road less Area. Its unspoiled condition, plus wildlife and recreation values are more important than bulldozing the area to support generating power from unsafe, outdated, dirty coal to line a few silk pockets. In light of the fact that the entire industry built around A.  Coal Mining, with worker safety, pollution, company store-slavery, live-your-life-in-darkness depression and despair | The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development.  The North Fork Coal Mining area, which includes the proposed lease modification area, allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres would be reclaimed after use. | Section 3.18 |
| Roadless | Kelly Wright 43819 | | "Roadless" areas are called that precisely because they are not to have roads in them. Please keep them that way. | The Colorado Roadless Rule was developed in partnership with the State of Colorado to provide a balance between management of roadless areas for roadless area characteristics and economic development.  Under alternative 3, this project will impact about 72 of roadless area acres. These acres will be reclaimed after use. See also Alternatives 1, 3, 4. | Section 3.18 |
| Roadless | HCCA et al. | Pp1-2 begin at para 4 | The Forest Service's evaluation of the 2001 Roadless Rule alternative is arbitrary and capricious. Prior Forest Service analyses, including the recently completed final EIS on the Colorado Roadless Rule, concluded that if the West Elk Mine cannot construct | The Colorado Roadless Rule EIS was a programmatic document that made the assumption that coal resources would not be developed in this area without the use of roads. This assumption was based on the general market conditions and standard mining practices | Section 3.18 |

719

BLM_0051070

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | roads on a lease area, it cannot remove coal from the area. In its analysis of Alternative 2, the 2001 Roadless Rule alternative, this Draft EIS assumes that the coal can be mined without roads, although the document provides little if any rationale for fundamentally reversing course. The Forest Service cannot have it both ways. | at the time of the writing of the Colorado Roadless Rule EIS.  Alternative 2 in the FEIS, accessing coal without roads under the 2001 Roadless Rule, is an evaluation of potential actions needed to mine coal without roads.  This alternative would not utilize standard practices and would likely only be selected if the Colorado Roadless Rule is not available.  The coal company would need to determine if such non-road and non-standard development could be viable given market conditions. | |
| Roadless | William Rosenthal 44186 | | What part of "Roadless Area" don't you understand? | The Colorado Roadless Rule was developed in partnership with the State of Colorado to provide a balance between management of roadless areas for roadless area characteristics and economic development.  Under alternative 3, this project will impact about 72 of roadless area acres. These acres will be reclaimed after use. | See also Alternatives 1, 3, 4. |
| Roadless | Stephen Canning 38863 | | The Sunset Roadless Area has intrinsic natural values in terms of watersheds, biological habitat, and recreational opportunities. By allowing coal mine expansion in the roadless area, the Forest Service will do permanent damage to a currently pristine area.<br><br>I urge you to deny the lease modifications and protect these lands for future generations rather than squander our precious resources for short-term financial gain. | The Colorado Roadless Rule was developed in partnership with the State of Colorado to provide a balance between management of roadless areas for roadless area characteristics and economic development.  Under alternative 3, this project will impact about 72 of roadless area acres. These acres will be reclaimed after use. | See Sections 3.8, 3.9– 3.16, and 3.18 |
| Roadless | Andrea Bowen 36707 | | Watersheds are extremely important please don't disturb them, the roadless rule should remain intact to protect them | Stipulations have been developed to protect watersheds. See Section 2.2. The Colorado Roadless Rule became effective July 3, 2012 and includes an exception for temporary roads for coal development within 19,100 acres of the North Fork Coal Mining area. Alternative 3 would allow disturbance on about 72 roadless area acres. | Sections 2.2, 3.8, 3.18 |

BLM_0051071

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| Roadless | HCCA et al | 35 | J. The DEIS May Not Be Able To Implement Alternative 3 Because The Colorado Roadless Rule May Be Illegal. The DEIS assumes that Alternative 3 can be implemented once the Colorado Roadless Rule is finalized. However, while the Colorado Rule is final, it is not necessarily legal and may be challenged and overturned in court. Commenters on the Colorado Rule draft EIS challenged the draft rule's compliance with NEPA, the Endangered Species Act, the National Forest Management Act, and other laws.107 If the Colorado Rule is successfully challenged, the 2001 Roadless Rule will again be in effect, under which no road construction can occur in the Lease Modifications area. The Forest Service's ability to implement Alternative 3 is thus questionable at best. | The Colorado Roadless Rule has been promulgated and is in effect as of July 3, 2012. Alternative 3 is feasible, can be implemented under the Colorado Rule allowing temporary road construction within the North Fork Coal Mining area.  If the Colorado Roadless Rule is enjoined by a court of law, then the responsible official would not be able to select Alternative 3. | See Alternative 3 analysis throughout Chapter 3 |
| Roadless, ROS | HCCA et al | 36-48 | III. THE FOREST SERVICE'S ANALYSIS CONCERNING THE SUNSET ROADLESS AREA VIOLATES NEPA. The DEIS dismisses the impacts of the proposed lease modifications on the Sunset Roadless Area, a 5,880-acre area where the agency has repeatedly documented roadless characteristics, nearly 3,000 acres of which the Forest Service found "capable" of wilderness protection in 2005. The DEIS's failure to accurately disclose the impacts to the Sunset Roadless Area violates NEPA.109 A. NEPA Requires That The Forest Service "Consider Every Significant Aspect of the Environmental Impact" Of The Proposed Lease Modifications. The National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), "places upon an agency the obligation to consider every significant aspect of the environmental impact of a | To clarify, the names for the roadless area in question changed between the 2001 Roadless Rule inventory and the inventory used for the Colorado Roadless Rule (West Elk IRA = Sunset CRA).<br><br>Within the Forest Plan process, following the identification of roadless areas, the wilderness screening is conducted.  Areas that are not recommended for wilderness are released to be assigned to another management category under soft release language.  The Forest is not required to hold areas that are found to be capable in that status indefinitely if they did not make it through the screening process to be recommended.<br><br>For the inventory used for the Colorado Rule, during the rulemaking process, the most recent inventories were used. For the GMUG that was the inventory completed in 2005. While not reviewed or finalized in the forest planning | Sections 3.2, 3.18 |

BLM_0051072

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | proposed action," an inquiry described by the federal courts as a "hard look." Wyoming v. United States Dep't of Agric., 661 F.3d 1209, 1236-37 (10th Cir. 2011) (upholding the Forest Service's NEPA analysis for the 2001 Roadless Area Conservation Rule) (internal quotation marks and citation omitted). NEPA does not require the federal agency to make substantive decisions; rather it "prohibits uninformed – rather than unwise – agency action." New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 704 (10th Cir. 2009). Courts must "ensure" that, in an EA or EIS, "the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1178 (10th Cir. 2008) (internal quotations and citations omitted). Further, [a]n agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment. New Mexico ex rel. Richardson, 565 F.3d at 704 (internal quotations and citations omitted); see also Wyoming, 661 F.3d at 1227. B. In General, Road Construction In Roadless Areas Has Significant, Damaging Impacts To The Roadless And Potential Wilderness Character Of The Land. Under well-established law, the Forest Service must generally prepare an environmental | process, it was reviewed and open for public comment during the Colorado Roadless process and finalized with input from the State. As mentioned in the comment, the Sunset CRA had experienced oil and gas development in the 1940's – the disturbance associated with that activity has been reclaimed to such a degree, that these areas are included as roadless again. It is for this reason that the temporary roads for coal development are considered temporary and left within the roadless area as the Forest Service will require these areas to be reclaimed. The roadless area analysis has been modified in the FEIS to clarify impacts of the alternatives. For impacts to the roadless area characteristics, time frames for each potential impact have been clarified in the FEIS. A map of the Recreation Opportunity Spectrum (ROS) has been included in the FEIS.  The ROS is an inventory of the current types of opportunities available in an area. The travel management decision is more likely to impact the type of access to the roadless areas for the general public as the temporary roads constructed for coal development are only used by the coal company and the Forest Service for administrative use. | |

BLM_0051073

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | impact statement ("EIS") pursuant to NEPA for actions that impact roadless areas because such actions are "an 'irreversible and irretrievable' commitment of resources that 'could have serious environmental consequences." Sierra Club, Inc. v. Austin, 82 Fed. Appx. 570, 573 (9th Cir. 2003) (observing that "[i]t is well established in this circuit that logging in an unroaded area is an 'irreversible and irretrievable' commitment of resources that 'could have serious environmental consequences'") (quoting Smith v. U.S. Forest Serv., 33 F.3d 1072, 1078 (9th Cir. 1994)); see also Nat'l Audubon Soc'y v. U.S. Forest Serv., 46 F.3d 1437, 1448 (9th Cir. 1993) ("the decision to harvest timber on a previously undeveloped tract of land is 'an irreversible and irretrievable decision' which could have 'serious environmental consequences.'").110 Not only must the Forest Service analyze the impact of the proposed action on the independent attributes of roadless areas, such as "water resources, soils, wildlife habitat, and recreation opportunities," but it must also analyze the impact on the lands' "potential for designation as wilderness." See Lands Council v. Martin, 529 F.3d 1219, 1230 (9th Cir. 2008) (internal quotations and citations omitted); see generally Draft Roadless Rule, 65 Fed. Reg. 30276, 30281- 83 (May 10, 2000) (identifying the attributes of roadless areas). The Forest Service must, at the very least, "acknowledge the existence of the 5,000 acre roadless area" that would be capable of a wilderness designation. Smith, 33 F.3d at 1079. Furthermore, it is not enough for the Forest Service to limit its analysis to the direct impacts of the proposed action, i.e. the number of acres | | |

BLM_0051074

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | that will be consumed by roads. NEPA requires that the agency examine the impact that disruption of the roadless values in the project location will have on the entire roadless area. See id. at 1078 (holding that the Forest Service must analyze the impacts to lands in addition to the lands that will be logged because they "will no longer be part of a 5,000 acre roadless expanse"); Sierra Club, Inc., 82 Fed. Appx. at 573 (finding an EIS deficient because it "did not reference the impact of logging on unroaded areas contiguous to IRAs [inventoried roadless areas]"). In line with this caselaw, the Forest Service Handbook and the Forest Service's NEPA implementing regulations require that "[p]roposals that would substantially alter the undeveloped character of an inventoried roadless area or potential wilderness area" require an EIS. FSH § 1909.15, 21.2 (effective Sept. 14, 2011); see also, 36 C.F.R. § 220.5(a)(2) (EIS required where "[c]onstructing roads and harvesting timber in an inventoried roadless area where the proposed road and harvest units impact a substantial part of the inventoried roadless area."). Two additional factors confirm that Forest Service road construction and well-pad clearing activities in roadless areas are likely to result in significant impacts that require broader disclosure of impacts to roadless values and character. First, the 2001 Roadless Area Conservation Rule generally prohibits road construction — including temporary roads — in inventoried roadless areas. The 2001 Roadless Rule has been the subject of considerable litigation over the last decade. In promulgating the 2001 Roadless Area Conservation Rule and defending the rule in courtrooms throughout the country for more | | |

BLM_0051075

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | than ten years, the Forest Service has made its view clear, based on the evidence, that a near total ban on road construction in inventoried roadless areas is essential to protect and preserve their unique characteristics. See Wyoming, 661 F.3d at 1245–46.111  Second, the Forest Service has extensive experience with forest roads, and the agency's own materials provide a well-supported catalogue of adverse impacts of road construction in roadless areas. The agency has previously recognized that roads in IRAs: (a) create "the greatest likelihood of altering landscapes," "[o]ften cause substantial landscape fragmentation and adverse changes to native plant and animal communities," and can "result in immediate, irretrievable, and long-term loss of roadless characteristics;" (b) are "the primary human-caused source of soil and water disturbances in forested environments;" (c) "contribute more sediment to streams than any other land management activity;" (d) are "major contributors to forest fragmentation" and the associated disturbance of important wildlife habitat;" (e) "convert[ ] large areas of habitat into nonhabitat" and "negative[ly] [a]ffect[ ] . . . both terrestrial and aquatic ecosystems;" (f) create "avenues for invasion by nonnative invasive plant species that frequently compete with or displace native vegetation;" and (g) adversely impact threatened and endangered wildlife species, through habitat loss, loss of connectivity with other habitats, displacement, and access for poaching and illegal collection. Id. at 1246 (quoting Forest Service, Final EIS, Forest Service Roadless Area Conservation Implementation, Proposal to Protect Roadless Areas, 1-16, 3-44, 3-131 – | | |

BLM_0051076

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 133, 3-149 – 150, 3- 165, 3-174, 3-181 – 182 (Nov. 2000)). Cleared pads for methane drainage wells ("MDWs"), 48 of which are likely to be constructed in the lease modification areas, will likely have the same impacts, if not greater impacts, than road construction. C. The DEIS's Analysis Of Impacts To The Roadless Character Of The Sunset IRA Fails To Take The 'Hard Look' NEPA Mandates, While the DEIS states Alternative 2 "would adversely impact roadless characteristics," and "Alternative 3 would result in additional impacts" to roadless character, the DEIS appears to conclude that impacts to the Sunset Roadless Area will not be significant because they would "likely be temporary" and must be "viewed in the context of an area already exhibiting impacts of past and continuing management, resulting in fragmentation." DEIS at 144. The agency's analysis of the Lease Modifications' impacts on roadless characteristics is deficient because: (1) the Forest Service often mixes up the spatial scale of its impacts, discussing the broader West Elk roadless area rather than the Sunset IRA; (2) the Forest Service ignores its own 2005 on-the-ground inventory concluding that the area possessed uncompromised roadless (and, for much of the area at stake in this decision, wilderness) character, and fails to disclose the existence of and impacts to wilderness capable lands; and (3) the impacts analysis that the Forest Service did include in the DEIS reaches conclusions about impacts — i.e., that any impacts will be "temporary"— that are unsupported or contradicted by other DEIS | | |

BLM_0051077

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | statements. For these reasons, the DEIS's analysis of the impacts of the Lease Modifications on the Sunset IRA is arbitrary and capricious and violates NEPA's obligation that the agency "consider every significant aspect of the environmental impact of a proposed action."<br>1. The DEIS Fails To Focus Its Analysis At The Appropriate Spatial Scale To Recognize Impacts To Roadless Characteristics. The DEIS's analysis of impacts to the Sunset IRA's roadless character is confusing and misleading because the agency frames its inquiry at varying spatial scales. Although the Forest Service stated in its November 2011 EA that "[f]or roadless character, the impact and cumulative area is the lease modifications area," the DEIS begins its analysis by dismissing any possible impacts to roadless characteristics as irrelevant because "[m]uch of the West Elk Roadless Area (current Forest Plan designation) has compromised character due to management activities before and after 1979 including roads, ditches, reservoirs, full-sized trails, etc." DEIS at 47; see also id. at 133 (making similar statement); id. at 143 ("Management projects in the Sunset CRA and West Elk IRA have been happening over time. Road construction for mineral exploration and extraction has led to a fragmented landscape. Some of this activity can be traced back to the 1940s." (emphasis added)). In fact, Forest Service staff preparing the DEIS stated, disparagingly, that "the roadless character [of the area] was considered crappy."112 Yet, the Sunset IRA is a "small subset" – 5,880 acres – of the West Elk IRA, see DEIS at 47, the entirety of which includes more than | | |

BLM_0051078

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 90,000 acres.113 Similarly, in addressing existing roadless character in the Lease Modifications area, the DEIS mixes together its analysis of the West Elk IRA and Sunset IRA so that it is often difficult if not impossible to tell which area the DEIS is discussing. See DEIS at 136-37. By relying on over-broad statements that roadless values are compromised somewhere in the much larger West Elk IRA, the DEIS glosses over the impacts to the roadless values of the specific 1,722 acres that will be mined under the proposed Lease Modifications and the 5,880- acre Sunset Roadless Area of which the Lease Modifications are a part. As a result, the agency violated NEPA's instruction that the agency take a "hard look" at the environmental impacts of its actions. 2. The Forest Service's Assertions That The Roadless Characteristics Of The Proposed Lease Modification Areas Are Compromised Is Contradicted By The Agency's Own Inventory Results. The DEIS purports to demonstrate that the Sunset IRA has been degraded, and thus, apparently, that further road construction will have little impact on the area. But the agency's own record contradicts such a conclusion. For example, the DEIS asserts that "heavy equipment" was repeatedly used in the Sunset IRA for livestock management "to clear fence lines and stock trails, as well as to build stockponds." DEIS at 139. Further, the DEIS alleges that "[n]umerous temporary roads associated with coal and oil/gas exploration have been pushed into the Sunset Roadless Area since the 1940s. Atlantic Richfield (ARCO) drilled at least 13 coal and oil/gas exploration wells in the Sunset Roadless area beginning in the | | |

BLM_0051079

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 1960s." Id. The DEIS further states that an "inventory evaluation process for the Colorado Roadless Rule reaffirmed these [prior] impacts to roadless characteristics" that allegedly compromised the West Elk roadless area. DEIS at 133. But the DEIS's assertions that the roadless characteristics of the Lease Modifications area are compromised (and "crappy") is arbitrary because it is based on outdated information, and contradicted by later Forest Service inventories confirming Sunset IRA's roadless (and wilderness) character. For example, while the DEIS discusses wells drilled somewhere in the area in the 1960s, the Forest Service considered the Sunset IRA to be roadless in its subsequent 1979 RARE II inventory. The 1979 RARE II inventory was generally confirmed by the agency's 2005 on-theground assessment of roadless conditions in the North Fork Valley.114 In 2005, the agency conducted an inventory of roadless characteristics throughout most of the West Elk IRA by grouping the remaining IRA lands into seven distinct tracts.115 The Forest Service observed that within the Sunset Roadless Area, "[t]he lands directly adjacent to the Wilderness boundary offer a high degree of naturalness" and "[o]opportunities for remoteness and solitude are present in the vicinity of the wilderness boundary."116 The agency noted the existence of the "Deep Creek Slide area," which the agency characterized as a "Special Feature" and a "striking geologic feature."117 The Forest Service concluded that "[t]he portion of the unit immediately adjacent to the wilderness retains the roadless qualities that make it capable of wilderness," and the agency's 2005 inventory map indicates that about | | |

BLM_0051080

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | one-half of the entire 5880-acre area – approximately 2940 acres – is capable of supporting wilderness.118 Furthermore, even though the Forest Service noted that the Sunset Roadless Area is proximate to roads and trails at its margins,119 the 2005 inventory is devoid of any mention of roads, "ditches, reservoirs, [or] full-sized trails" detracting from the Sunset area's roadless character. In its inventory analysis, the Forest Service made clear that it specifically excluded lands compromised by roads within the West Elk IRA from the 2005 inventory.120 The existence of a few old stock ponds, see DEIS at 139, even if created by bulldozers 40 years ago, does not mean the area lacks roadless, or even wilderness, character, since many roadless and wilderness areas have fences and stock ponds for livestock. Far from "reaffirming" impacts to roadless character, as the DEIS alleges (at 139), the 2005 inventory found that despite such impacts – to the extent there actually were any – the Sunset IRA was roadless in 2005, and that nearly 3,000 acres of Sunset IRA were capable of wilderness protection. None of the maps in the Lease Modifications DEIS contradict the 2005 inventory results concerning the wilderness capable portion of the Sunset IRA; none of the roads identified on DEIS's maps occur within the proposed lease modification areas. See DEIS at 135, 138.<br>Further, the Forest Service itself has repeatedly relied on the 2005 inventory since 2005. In 2010, as part of scoping on this project, the Forest Service published a map on its website that displays the vast majority of each lease modification area as roadless according to the 1970s-era RARE | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | II inventory (the "Inventoried Roadless Area Boundary" on the map) and the more recent 2005 inventory (the "Proposed Colorado Roadless Area Boundary" on the map).121 The Forest Service also relies on the 2005 inventory for its 2011 Colorado Roadless Rule Draft EIS and for its 2012 Colorado Roadless Rule Final EIS, each time adopting a map that displays the same boundaries for the Sunset Roadless Area as those in the 2005 inventory.122 For the DEIS to describe the Sunset IRA's roadless character as determined in the 2005 inventory to be "compromised" while simultaneously relying on that inventory in the Final EIS for the Colorado Roadless Rule, published only a few months ago, is arbitrary and capricious. Despite its own fact-finding concerning roadless characteristics of the Sunset Roadless Area in 2005, the Forest Service erroneously elected to offer (1) no acknowledgement that the Lease Modifications — and the 6.5 miles of road and 48 well pads that any coal mining will require — will affect lands that are a capable of supporting wilderness or (2) any analysis of how the impacts to the lease area (1722 acres) will affect the larger 5880-acre roadless area or the approximately 2940 acres capable of supporting wilderness. The proposed lease modification areas includes lands contiguous with the West Elk Wilderness, and methane well and access road installation on these lands will likely reduce the likelihood of their future addition to the existing wilderness area. The Lease Modifications open the door to development where wilderness values are the highest, and will bisect and fragment the entire 5880-acre Sunset Roadless Area. In | | |

BLM_0051082

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | electing to ignore these impacts, the DEIS contradicts the clear instruction of Smith and its progeny and violated NEPA's hard look requirement.123 The Forest Service at one point appears to dismiss the 2005 inventory as irrelevant in the Lease Modification DEIS in part because "[t]he Sunset Trail Roadless area came about in the Draft Forest Plan Revision, a plan that has been rescinded because of litigation over the Planning Rule(s)." DEIS at 47. However, that conclusion is illogical: while the Forest Service may have shelved the 2005 Draft Forest Plan Revision for reasons having nothing to do with a resource inventory, the agency cannot ignore the agency's own factual determination, based on on-the ground inventories, that the Sunset Roadless Area possessed roadless values that the agency made during that process, particularly not when the Forest Service continued to rely on the 2005 inventory in the 2007 E-Seam Final EIS, the 2011 Colorado Roadless Rule Draft EIS, and the 2012 Colorado Roadless Rule Final EIS. There is no evidence in the record that contradicts the Forest Service's 2005 roadless inventory, nor is there any evidence of any more recent Forest Service inventory, or of the identification of any additional roads in the area of the lease modifications.124 Cf. Smith, 33 F.3d at 1078 ("That the land has been released by Congress for non-wilderness use does not excuse the agency from complying with its NEPA obligations when implementing a land-use program."). The DEIS's statement that "much of the West Elk roadless area … has compromised character due to management activities," DEIS at 47, apparently refers to areas other than the | | |

BLM_0051083

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | 5,880-acre Sunset Roadless Area, and certainly other than the nearly 3,000 acre wilderness-capable portion of that IRA. As it relates to the wilderness capable portion of the Sunset area, that statement is unsupported in the record, and directly contradicted by the 2005 inventory.125 The DEIS's attempt to characterize the Sunset IRA as compromised is this arbitrary and capricious.126<br><br>3. The Forest Service's Analysis Of Impacts To Roadless Character Is Contradictory And Contrary To Evidence Before The Agency. The DEIS fails to characterize impacts to roadless character as "significant" or "not significant," but asserts that impacts to roadless character would be "temporary," although it fails to identify where those "temporary" impacts would occur. DEIS at 144. (For example, the DEIS does not clarify whether the impacts to roadless character would occur just in the roadbed of the MDW access routes, as the Nov. 2011 EA asserted, or whether road construction would, even temporarily, impact a larger area). Installation of well pads and access roads in the Sunset Roadless Area will significantly alter the character of the lands, yet the Forest Service has failed to define the spatial reach of the expected impacts on roadless characteristics and has understated their likely duration. Further, the DEIS contains contradictory statements about the extent of the harm to roadless character from road construction and MDW bulldozing As an initial matter, the agency must accurately portray the impacts of the proposed action. Road construction may directly consume 24 acres of lands (DEIS at 51), but it will result in the establishment of | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | a spider-web of roads and well pads throughout the Lease Modification areas. The Forest Service anticipates the installation of 48 methane wells, each requiring 1 acre of cleared, level ground, and 6.5 miles of access road construction in the Lease Modifications areas over the life of the leases. See DEIS at 51. In general, mines in the North Fork Valley require the installation of one methane venting well for every 32-64 acre tract of surface acres over the mine, or 10-20 pads per square mile.127 The dispersal of approximately 48 methane venting wells connected by 6.5 miles of access roads in the Sunset Roadless Area will convert more than 1,400 acres of undeveloped, unroaded lands, which is contiguous with the West Elk Wilderness and capable of supporting wilderness, into heavily developed lands crisscrossed by roads and well pads. The well pads are generally sited at regular intervals in a linear manner over the coal panel beneath and connected by roads, making it impossible for anyone (or any wildlife) to walk more than a few hundred yards without hitting a road or well pad, and leaving obvious linear scars visible from ever ridge-top. See Figure 3, E-Seam Final EIS, Exh. 2 (illustrating the density of methane venting wells at the West Elk Mine to the north of the proposed lease modification areas); DEIS at 138 (Figure 3.32b) (illustrating the location of E-Seam drainage wells near the Lease Modifications). The entire 1,400 acres of roadless land within the Lease Modifications will likely see its roadless character degraded. Yet the DEIS fails to disclose the broad extent of these impacts, or the effect on the larger Sunset IRA.128 These are, | | |

BLM_0051085

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | however, exactly the types of impacts federal courts require federal agencies to disclose. As the Tenth Circuit has noted: "the location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them." New Mexico ex rel. Richardson, 565 F.3d at 706. Here, the Forest Service has made no attempt to address the nature or location of the road and MDW network (beyond estimating road mileage and the number of MDWs), although it could readily do so, as it did for the E-Seam EIS, and as BLM has done for the road and MDW network needed for other coal lease expansions in the North Fork Valley.129 At a minimum, the Forest Service should have – and could have – disclosed the likely general location of roads and well pads, based on the location of proposed coal panels underground and on past experience with ongoing E-Seam mining. The Forest Service has had an MCC map for more than three years displaying the likely location of coal panels in the Lease Modifications area.130 Second, the Forest Service must evaluate the impact of road construction in the proposed lease modification areas on the entirety of the 5880-acre Sunset Roadless Area. See, e.g., Smith, 33 F.3d at 1078. Here, the Forest Service has failed to undertake any meaningful analysis of the impact of the proposed lease modifications on roadless values. Instead, it offers the superficial determination that impacts to an unspecific portion of the Sunset IRA would be "temporary." DEIS at 144. Nowhere does | | |

BLM_0051086

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | the DEIS state the extent (in terms of area) of these "temporary" impacts. The Forest Service's analysis fails to meet NEPA's requirements. See, e.g., Sierra Club, Inc., 82 Fed. Appx. at 573 (finding an EIS deficient for "[s]imply disclosing the fact that the unique qualities of the unroaded areas may be diminished" without analysis). The DEIS itself states at one point that road and well pad construction will result in impacts extending decades into the future, impacts that are "long term" rather than temporary.131 The Forest Service expressly acknowledged that "based on current mining practices, … about 72 total acres of surface disturbance would occur over the life of the lease modifications (expected to be about 25 years…." See DEIS at 51. The DEIS also admits that reclamation elsewhere in connection with the West Elk Mine has, in fact, permanently altered the natural community occurring in the reclamation area from oak brush to grassland. DEIS at 107-08. For the proposed lease modification areas, the effect of reclamation efforts will likely be even more pronounced and long term because the impacted area is mostly mature forest at higher elevations, where the growing season is shorter than in lower oak scrub habitat where most of MCC's previous MDWs have been bulldozed. See id. at 96-97 (road and well-pad construction is likely to destroy "approximately 7 acres of oak, 61 acres of aspen, and 7 acres of spruce-fir" in primarily "mature/overmature" condition). Nearly 90% of road and MDW construction will thus likely occur on roadless lands where aspen or spruce-fir more than a century old will be chainsawed and removed. Id. Not surprisingly in light of the | | |

BLM_0051087

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | mature forest in these areas, the Forest Service concedes that the impacts to vegetation are not temporary: "This project will [ ] not remove habitat permanently from the landscape, but will remove it in the short- and midterm." Id. at 97 (emphasis added). The DEIS also recognizes that "the construction of access roads and drill pads will result in a long-term loss of forage on about 72 acres," further underscoring the significant, long-lasting impacts to vegetation. DEIS at 127 (emphasis added).132 The Forest Service must explain its apparently contradictory conclusions that clearing mature forest vegetation over 72 acres for roads and well-pads will have impacts into the "midterm" and possibly permanently alter the plant community in these areas from forest to grassland, but that the impacts to roadless values would, nonetheless, last only a few years. See DEIS at 153 (labeling impacts of road and MDW construction "short-term" in part because lands would "revegetate within a few years"). The Forest Service's recognition of the long-term impacts to forest vegetation in the lease modification areas is echoed by the U.S. Fish and Wildlife Service and by other Forest Service analysis for this area. In its concurrence letter addressing the project's impacts to lynx, the Fish and Wildlife Service assumed that "lynx habitat may recover to year-round functionality approximately 30-40 years post disturbance."133 Further, in a prior NEPA document, the Forest Service concluded that road building in roadless areas near the West Elk Mine will result in longterm and irreversible impacts to roadless characteristics. "Road construction and operation" affiliated with the E-seam project | | |

BLM_0051088

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | in roadless areas "would be considered long term, and would impact roadless area character and management long term and diminished [sic] the quality of essential [roadless] criterions/characteristics and values." Exh. 2 (E-Seam Final EIS) at 150. The agency further concluded that such road construction would result in an "irreversible and irretrievable commitment" of the roadless resource: "Cumulative loss of roadless character in this portion of the IRA would result in the long term (extending beyond life of project estimated at 12 years) loss of manageability and planning consideration for this resource." Id. at 152. The DEIS offers no explanation for the discrepancy between its conclusions and the conclusions of the E-Seam Final EIS (which addressed the same types of impacts, from the same mine, near the Sunset Roadless Area) regarding the long-term nature of impacts to roadless values from well pad and access road construction. The DEIS's conclusion that impacts to the Sunset Roadless Area will be merely short-term and temporary is further contradicted by the Forest Service's Final EIS on the Roadless Area Conservation Rule in 2000. See supra at 9-10. The DEIS offers no explanation for contradicting the 2000 Roadless Area Conservation Rule Final EIS on the impacts of "temporary" roads; the failure to explain that contradiction is arbitrary and capricious. While the DEIS fails to explain the spatial dimension of impacts to roadless character, it does list roadless characteristics and generally discusses the impacts from roads and well pads. See DEIS at 140–41. But this analysis is also flawed and fails to take the hard look NEPA requires for several | | |

BLM_0051089

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | reasons. First, this analysis fails to acknowledge the values identified in the roadless area in the GMUG National Forest 2005 roadless inventory. As noted above, that inventory concluded that "[t]he lands [in the Sunset IRA] directly adjacent to the Wilderness boundary offer a high degree of naturalness;" that "[t]he Deep Creek Slide area exhibits a striking geologic feature;" and that "[o]pportunities for remoteness and solitude are present in the vicinity of the wilderness boundary." See DEIS at 190 (emphasis added). Yet these very values are ignored in the DEIS's analysis of potential impacts to roadless character. DEIS at 136-137 and 140-41 (failing to acknowledge the Deep Creek Slide as a "locally identified unique characteristic" of the roadless area, and failing to note the area's high degree of naturalness and opportunities for remoteness or s solitude).134 Second, the DEIS makes unsupported statements about the differences between Alternatives 2 and 3. While the DEIS states that the impacts to lynx of 48 acres of vegetation clearing under Alternative 2 "could be mitigated," and similarly that recreational opportunities "could return to baseline [pre-mining] conditions" under Alternative 2, the DEIS states with great certainty that greater impacts to lynx habitat caused Alternative 3's 72 acres of disturbance "would be mitigated," and recreation opportunities "would return to baseline conditions." Compare DEIS at 140 (discussing Alternative 2) with id. at 141 (discussing Alternative 3) (emphases added).135 134 In assessing the impacts of the proposed action on recreational resources, the DEIS states: "[t]he Recreational Opportunity | | |

BLM_0051090

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Spectrum (ROS) setting for the area ranges from semi-primitive non-motorized to roaded natural." DEIS at 137. But the DEIS contains no map showing the location of the ROS settings within the Lease Modifications, making it difficult to understand impacts to, or required management of, lands to managed to different recreation settings within the Lease Modifications. The Lease Modifications area is entirely within a 6B prescription area, which directs that the GMUG National Forest "[p]rovide semi-primitive recreation opportunities in all areas more than ½ mile away from roads and trails open to motorized recreation use." GMUG National Forest Plan (as amended, 1991) at III-146. Given that few, if any, lands in the Lease Modifications are within a ½ mile from an open road, the Forest Service should disclose that the agency must manage virtually entire area for semi-primitive, non-motorized recreation. The DEIS omits this critical fact, in violation of NEPA's "hard look" requirement. 135 The DEIS asserts that impacts to roadless character "would likely be temporary because of the rigorous standards for decommissioning and rehabilitation in the Colorado Roadless Rule." DEIS at 144. Any subsequently prepared NEPA document must explain how the Colorado Rule's standards are different in their rigor from existing reclamation standards used, for example, for MDWs and roads in the E-Seam project, where the Forest Service concluded impacts to roadless character would be "long term." Exh. 2 (E-Seam Final EIS) at 150. In sum, the DEIS's fails to take the required hard look at the action alternatives' impacts to the Sunset IRA and | | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | to its roadless character. Any subsequently prepared NEPA document must rectify the errors and omissions discussed above. | | |
| Roadless | James Boone 8686 | | I have always understood that roadless areas were set aside to protect natural areas and provide clean water to communities outside their boundaries. Allowing coal mine expansion will accomplish neither of these goals and, in fact, would seriously compromise both. | The lease modifications are outside of source protection (i.e., municipal) watersheds.<br><br>The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development. The North Fork Coal Mining area allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres would be reclaimed after use. | Section 3.18 |
| Roadless | Kenneth Deed 6626 | | What part of "roadless" do you not understand?<br>"Roadless" means "No Roads." Do your job right and keep the Sunset Roadless Area roadless! | The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development. The North Fork Coal Mining area allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres will be reclaimed after use. See also Alternatives 1, 3, 4. | Section 3.18 |

BLM_0051092

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| Roadless | Carol Steinhart 5890 | | A Roadless Area is a roadless area and there is no room for coal mines in it. | The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development. The North Fork Coal Mining area allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres would be reclaimed after use. | See also Alternatives 1, 3, 4. |
| Roadless | 23,078 form letters from supporters of EarthJustice | | I oppose the coal lease modifications that will lead to more than 6 miles of road, nearly 50 drill pads, and methane vents in the Sunset Roadless Area.<br><br>The Forest Service should protect the Sunset Roadless Area because it provides important habitat for deer, elk, and black bear, denning areas for lynx, and watersheds that support imperiled Colorado River cutthroat trout. Allowing coal mine expansion in the roadless area will damage a pristine area now enjoyed by hunters and hikers and worsen climate change, all to benefit one of the dirtiest forms of power around.<br>I urge you:<br>* Protect the roadless area! Ensure that no roads are constructed in the Sunset Roadless Area. Its wildlife and recreation values are more important than bulldozing the area to support generating power from dirty coal.<br>* Disclose and reduce the impacts to global warming. Venting methane into the atmosphere is itself a significant environmental impact that must be fully | The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development. The North Fork Coal Mining area allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres would be reclaimed after use.<br>There are no CRCT populations within the lease modification area. The previous effects on CRCT expressed by commenter regarding sedimentation and subsidence from Lick Creek (an intermittent stream) are extremely unlikely due to the several miles of distance from the nearest CRCT population to Lick Creek. Additionally, because these are intermittent streams, there are also no other MIS trout species present.<br>Impacts of climate change are discussed in Section 3.3 and other relevant sections. | See Sections 3.3, 3.8 and 3.18 |

BLM_0051093

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | analyzed before the coal mine expansion is approved. Methane is a powerful greenhouse gas, 21 times more potent than CO2 in trapping heat. The Forest Service must take a hard look at alternatives that require the coal mine to capture or burn methane that would otherwise pollute the atmosphere.<br>The Sunset area is prime Colorado backcountry that protects important habitat, offers top notch scenic qualities, and provides world-class hunting and other outdoor activities.<br>Please keep it roadless! | | |
| Roadless | John Andes 2448 | | Its roadless status must be preserved and permanently protected against the permanent destruction of those resource and human value resulting from coal mining and all the activities associated with that operation. | The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development.  The North Fork Coal Mining area allows for temporary road construction on about 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 roadless area acres. These acres would be reclaimed after use | |
| Roadless | Michael Drysdale 2390 | 1 | The Colorado Roadless Rule became effective July 3, 2012. The FEIS should reflect this fact throughout. For example, Table 2.1 a at page 25 of the DE IS states: "Include a lease notice that reflects the recent court rulings in the 2001 Rule and would allow for any potential future changes if the Colorado Rule is in effect." This and other references should be updated. | The FEIS has been updated to reflect that the Colorado Roadless Rule is effective and has replaced the 2001 Roadless Rule.  However, the 2001 Roadless Rule still serves as a useful comparison and range of alternatives, including an alternative that could be selected if the Colorado Rule were to be enjoined or otherwise negated during the process<br>The FEIS has been updated with this information. | |
| Roadless | Neil Nostrand | 1 | We have ranched in the North Fork Valley for over 25 years and have followed numerous applications for coal lease modifications. This proposal and the attendant EIS may be the most important of all regarding environmental sensitivity. | The Colorado Roadless Rule was developed with the State of Colorado to provide a balance between the management of roadless areas for roadless area characteristics and for economic development.  The North Fork Coal Mining area allows for temporary road construction on about | Section 3.18 |

BLM_0051094

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Some thoughts on the subject: <br> -Do we need to increase our domestic energy production in the face of world wide instability? YES. <br> -Do we need to increase mining and drilling for clean coal, gas, and oil on Federal lands? YES, selectively. <br> -Should we expand coal production in North Fork Valley mines? YES, conditionally. <br> -Are MDW's required to maintain proper safety for longwall mining? YES. <br> -Should these MDW's and accompanying roads and drill pads be allowed in the West Elk Inventoried Roadless Area? Absolutely not. <br> The sanctity of our roadless areas should be coveted and protected vigorously by the USFS. They are there for a reason. These prime forest designations are the product of a major commitment of time and effort by many people who care about our national forests. They are federally and state mandated. Our West Elk roadless area should not be violated with impunity, especially to squeeze out the last increment of profitability by a single mining company. Of the 1722 acres involved in these lease modifications, a significant portion appears to lie outside the roadless boundaries. To extend longwall mining in these locales probably makes sense, on a conditional basis. But, we strongly request that the USFS, in their discretion, step up, take a stance, and be accountable to the people by disallowing any violation of the West Elk Inventoried Roadless Area. | 19,100 acres, or less than 0.5% of Colorado roadless areas, to support coal production. Alternative 3 would allow disturbance on about 72 acres of roadless area acres. These acres would be reclaimed after use | |

BLM_0051095

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| **SMCRA, unsuitability** | | | | | |
| SMCRA, unsuitability | HCCA | 62-64 | VII. THE FOREST SERVICE IS NOT LEGALLY AUTHORIZED UNDER SMCRA TO CONSENT TO THE LEASE MODIFICATIONS. The Surface Mining Control and Reclamation Act ("SMCRA") presumptively prohibits surface coal leasing and mining within the boundaries of National Forests. See 30 U.S.C. § 1272(e)(2); see also 30 C.F.R. § 761.11(b); 43 C.F.R. § 3461.5(a)(1). The law only allows surface coal leasing and mining in National Forests like the GMUG when surface operations are incident to underground mining and where the Secretary of the Interior finds that they lack "significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations." 43 C.F.R. § 3461.5(a)(2)(i). Here, the Forest Service's consent to the lease modifications authorizes surface operations and impacts incident to an underground coal mine without making the requisite findings, and is therefore contrary to SMCRA's prohibition on surface mining within National Forests and the Supervisor's decision must be reversed accordingly. In its DEIS, the Forest Service recognized SMCRA's prohibition on surface mining within National Forests, addressing it as one of the "unsuitability criteria" set forth under 43 C.F.R. § 3461.5. See DEIS at 175. Unfortunately, the Forest Service's assessment of these "unsuitability criteria" fails to demonstrate that the lease modifications, and subsequent mining, are not prohibited under SMCRA. In particular, although the Forest Service asserts that: "The [GMUG] LRMP does not identify that any significant recreational, timber, | The commenter is correct in that the Secretary of Interior must determine that there are no "significant recreation, timber, economic, or other values which may be incompatible with the lease" (43 C.F.R. § 3461.5). This must be done prior to issuing the lease. The Forest Service role in the leasing process is to determine whether or not to consent to modifying the lease(s), and to prescribe stipulations needed for the protection of non-mineral interests. BLM's responsibly is to determine if the lease should be issued (authorized). The Secretary's determination is only required before lease issuance, not before USFS consent. As allowed in 43 CFR 3461.2-1(b)(1) and 3461.3-1(b)(1), the specific lands in this proposal was reviewed for unsuitability by the Forest Service and a recommendation to the Secretary of Interior (represented by the BLM State Director) will be made who will determine whether there are no significant recreational, timber, economic, or other values which may be incompatible with the lease (43 CFR 3461.5(2)(i), see Appendix B-*Unsuitability Analysis Report*). With respect to the statement of "no significant forest cover", the document was corrected per this comment. Language was added to document to better clarify the applicability of the exception to Criterion 1. With respect to the commenters assertion that the LRMP states, "National Forests are unsuitable for coal mining." That language is paraphrased from the unsuitability criteria under law and regulation (43 CFR 3461.5, which is based upon 30 USC 1272, The Surface Mining Control and Reclamation Act of 1977 (SMCRA) which principally regulates coal mine permitting | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | economic, or other values which may be incompatible the lease are present" (DEIS at 176), the authority to find whether there exists significant recreational, timber, economic, or other values does not lie with the Forest Service, but rather with the Secretary of the Interior. 30 U.S.C. § 1272(e)(2) (providing that "surface coal mining operations may be permitted on [National Forest] lands if the Secretary finds that there are no significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations and); 30 U.S.C. § 1291(23) (defining "Secretary for the purposes of SMCRA as "the Secretary of the Interior, except where otherwise described"). Furthermore, the Secretary of the Interior has not made a finding that significant recreational, timber, economic, or other values that may be incompatible with surface mining are not present. As Ryan Taylor, Acting Leasable Minerals Program Manager for the GMUG, explained in an e-mail to Liane Mattson, Geologist for the Forest Service's Office of Leasable Minerals, "I've never seen anything that comes from the Secretary [of the Interior] saying, 'GMUG you're good to go.'" See e-mail communications between Ryan Taylor and Liane Mattson (March 2-3, 2011), attached as Exh. 93. Further, as Ms. Mattson stated in response, "with respect to the GMUG situation, the #2 [30 U.S.C. § 1272(e)(2)] findings you ask about are a Dept. of the Interior responsibility, and therefore not subject to our (FS) delegation of authority, etc." Id. Thus, despite the Forest Service's claims, not only does the agency lack authority to make a finding under 30 U.S.C. § 1272(e)(2) of SMCRA, | actions (see Section 1.6 of FEIS). To the extent SMCRA applies at the coal leasing stage, it is the basis for the Unsuitability Assessment codified in BLM regulations at 43 CFR 3461 that is applicable at the leasing stage.) The amended Land and Resource Management Plan (LRMP or Forest Plan) dated September 1991, for the GMUG National Forests made provisions for coal leasing subject to the application of the coal unsuitability criteria established in 43 CFR 3461 (Appendix E). In the LRMP, the "Conclusion" of Criterion #1 is that, other than the Raggeds and West Elk Wilderness, all other lands within the Known Recoverable Coal Resource Area is suitable for coal mining, with no differentiation between surface or underground mining.  The lands within the lease modifications are within the Known Recoverable Coal Resource Area. Further, MDWs and other activities analyzed in the RFMP (section 3.2) of the FEIS meet the definition of underground mining in 30 CFR 701.5, which states: *Underground mining activities means a combination of:* <br> *(a) Surface operations incident to underground extraction of coal or in situ processing, such as construction, use, maintenance, and reclamation of roads, above-ground repair areas, storage areas, processing areas, shipping areas, areas upon which are sited support facilities including hoist and ventilating ducts, areas utilized for the disposal and storage of waste, and areas on which materials incident to underground mining operations are placed;* | |

BLM_0051097

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | but no finding has apparently been made by the Secretary of the Interior. The Forest Service therefore is in error in asserting that the lease modifications are allowed under SMCRA. Additionally, to the extent that the Forest Service asserts that the "[GMUG] LRMP does not identify any significant recreational, timber, economic, or other values which may be incompatible with the lease" (DEIS at 176), this assertion is baseless because the LRMP never actually assessed whether significant recreational, timber, economic, or other values which may be incompatible with the lease modifications are present. In fact, to the extent the GMUG LRMP assessed unsuitability for coal mining, it expressly stated, "National Forests are unsuitable for coal mining." 1983 GMUG LRMP EIS at F-2.167 The only exceptions to this blanket unsuitability determination are for underground mining and only where there are "no significant recreational, timber, economic, or other values" or where there are "significant recreational, timber, economic, or other values" that are "compatible" with underground mining. Id. Therefore, according to the LRMP, the GMUG is expressly unsuitable for surface coal mining. Regardless, the point is the Forest Service never previously analyzed whether significant recreational, timber, economic, or other values that may be incompatible with the lease modifications and subsequent surface mining activities are present in the area. Neither the LRMP nor the EA present such an analysis and consequently, there is no basis for asserting that the proposed coal leasing and mining is not prohibited by SMCRA. In fact, Appellants would submit that, given the | | |

BLM_0051098

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | roadless nature of the area, its value as wildlife habitat, and its value for primitive to semi-primitive recreation, and the determination that part of the Lease Modifications was deemed "capable" for wilderness designation in 2005, there are significant recreational, economic, and other values that are incompatible with the lease modifications and surface mining. Although the Forest Service may state that the area is managed for "multiple use" (DEIS at 176), SMCRA's prohibition on surface coal mining within National Forests is not contingent upon whether an area is managed for multiple use.168 Finally, to the extent that the Forest Service asserts that "no significant forest cover" is present in the area (DEIS at 176), this assertion is also baseless and further fails to demonstrate that SMCRA's prohibition on surface coal mining is not applicable. Under SMCRA regulations, "significant forest cover" means "an existing plant community consisting predominantly of trees and other woody vegetation." 30 C.F.R. § 761.5. Here, the DEIS discloses that the proposed lease modification area is 99% forested by aspen, spruce/fir, and Gambel Oak, all of which are tree species and/or woody vegetation. See DEIS at 96. Although SMCRA regulations require the Secretary of Agriculture to decide "on a case-by-case basis whether the forest cover is significant," in this case, the Secretary cannot possibly claim that no significant forest cover exists in light of the plain meaning set forth under the regulations and the plain reality set forth in the DEIS. Put simply, SMCRA prohibits the Forest Service's decision in this case and it must be reversed. The Forest Service failed to demonstrate that the Secretary of the | | |

BLM_0051099

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | Interior has made a finding that the area containing the lease modifications lacks "significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations" such that surface impacts incidental to underground mining may be allowed. Furthermore, to the extent the standard applies, the agency has also failed to provide an accurate assessment as to the existence of significant forest cover in the area. In either case, the decision is contrary to SMCRA in that it illegally approves coal leasing and mining within National Forest lands. 167 Although the GMUG LRMP was amended in 1991, it did not amend the 1983 coal suitability analysis. 168 SMCRA explicitly states that consideration of multiple use only applies with regards to the Secretary of Agriculture's determination of whether surface mining that is not incidental to underground mining is appropriate on National Forest lands that "do not have significant forest cover" west of the 100th meridian. See 30 U.S.C. § 1272(e)(2)(B). | | |
| **Vegetation** | | | | | |
| Vegetation | Sarah Sauter 2401 | 2 | One factor that NWCC considered in developing our policy with respect to expansion by the West Elk Mine is the nature of vegetation that would be disturbed by possible MDWs. Much of the area is dominated by oak brush, which forms dense monocultures. Oak brush regenerates rapidly after disturbance, so we expect no long-term change in habitat as the result of short-term clearing of oak brush. Moreover, clearing of oak brush is often carried out by the Colorado Division of Wildlife (CDOW) in order to improve wildlife habitat, and we see | Cumulative vegetation impacts are disclosed in the FEIS. | Section 3.9 |

BLM_0051100

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | no substantial difference between clearing by CDOW and the mine. | | |
| **Water & Wetlands** | | | | | |
| Water | Gloriana Casey 2432 | | The coming disater for every life form will be lack of clean water. HAVE your hearing Forest Service, and please supply water from any coal polluted area and have the coal reps drink it down without throwing up. This is a TRUTH or DARE moment | The lease modifications are not with in a municipal water supply and have little surface water. | Sections 3.8 and 3.18. |
| Water | James Boone 8686 | | I have always understood that roadless areas were set aside to protect natural areas and provide clean water to communities outside their boundaries. Allowing coal mine expansion will accomplish neither of these goals and, in fact, would seriously compromise both. | The lease modifications are not with in a municipal water supply and have little surface water. | Sections 3.8 and 3.18 |
| Watershed, climate change | Mary Hadcock 27260 | | There are many additional reasons to oppose these coal lease modification proposals: <br> - In this era of increasing extreme weather catastrophes, it would be irresponsible and unintelligent to cause damage to any watersheds to the Colorado River. | Water and climate change are addressed in the DEIS/FEIS. | Sections 3.4, 3.8 and other applicable sections |
| Wetlands | Mitchell Gershten 43116 | | Repeated visits to this area to observe the methane vents already in place reveal significant damage to wetland areas and drainages. | We are unaware of any area on existing leases which exhibits these characteristics.  All photo monitoring of West Elk Mine operations indicate otherwise. | Project File |
| **Wildlife and Fish** | | | | | |
| Wildlife | HCCA et al | 58-61 | VI. THE FOREST SERVICE'S CONSULTATION, AND THE U.S. FISH & WILDLIFE SERVICE'S CONCURRENCE, VIOLATE THE ENDANGERED SPECIES ACT. <br> The Endangered Species Act ("ESA") requires that each federal agency (the "action agency") "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered | The Forest Service analyzed and determined impacts to Canada Lynx based upon information provided by the project proponent, as required by law, in a Biological Assessment.  The Forest Service provided that analysis and the associated determination, as required by law, to the US Fish and Wildlife Service, which provided a letter of concurrence indicating their agreement with the determination of effects.  The project is within the standards and guidelines set forth in the SRLA | BA ,USFWS Consultation |

BLM_0051101

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | species or threatened species or result in the destruction or adverse modification" of the designated critical habitat of the listed species. 16 U.S.C. § 1536(a)(2). See also 50 C.F.R. § 402.1(a). To assist action agencies in complying with this provision, ESA Section 7 and its implementing regulations set out a detailed consultation process for determining the impacts of the proposed agency action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402. When an action agency determines that an action it proposes to take "may affect listed species or critical habitat," that agency must prepare a biological assessment ("BA") on the effects of the action. 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(c). If after preparing a BA the agency determines that the proposed action is "not likely to adversely affect" any listed species or critical habitat, then the agency need not initiate formal consultation with the U.S. Fish and Wildlife Service ("FWS").164 50 C.F.R. § 402.14(b). The process of determining whether consultation may be required is referred to as "informal consultation," which is described in implementing regulations as follows: Informal consultation is [a] … process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the [FWS], that the action is not likely to adversely affect listed species or critical habitat, the consultation | and, without extraordinary circumstances, is within the limits set forth in that document. The analysis and concurrence included the uncertainty of surface actions in the future mine plan, and provided an upper limit to impacts covered under the analysis and consultation, which, if exceeded, require the Forest Service to re-initiate consultation and re-analyze the impact of the project to lynx.  The Forest Service recently contacted the US Fish and Wildlife Service (REF) and verified that additional consultation was not needed at this time.

In the event that impacts to Canada lynx exceed the limit set in the letter of concurrence by the USFWS in regards to this project, the Forest Service will re-initiate consultation as required, and additional analysis will occur. | |

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | process is terminated, and no further action is necessary. 50 C.F.R. § 402.13. As described below, both the Forest Service and the FWS appear to have violated their ESA consultation obligations. A. Because The Forest Service BA Fails To Disclose The Impacts Of The Proposed Action On Lynx Habitat, The Consultation Is Invalid. The Forest Service issued a BA on the Lease Modifications in April 2010, focusing on impacts to the Canada lynx, a species designated as threatened under the ESA in the southern Rockies, including Colorado. GMUG NF, Biological Assessment for Federal Coal Lease Modifications (Apr. 16, 2010) at 10 ("Lease Modification BA"), attached as Exh. 92. See also DEIS at 105. The Lease Modification BA purported to examine the impacts of the Forest Service's consent to the lease modifications, the destruction of habitat likely to result from road and MDW construction caused by mining the lease, and of other past and reasonably foreseeable projects. Lease Modification BA (Exh. 92) at 10-15. The Forest Service identified a number of stipulations to the existing leases that "would be carried over" into the Lease Modifications "slightly modified to reflect changes in Management, specifically the 2008 Southern Rockies Lynx Management Direction." Id. at 6-7. The Forest Service concluded, among other things, that these stipulations "will mitigate impacts due to creation of roads and [MDW] pads within the area, winter access, and vegetative changes." Id. at 13. The Lease Modifications BA also concluded that disturbance to lynx denning and foraging "is not anticipated to be a substantial impact as | | |

BLM_0051103

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | … lease stipulations for this project follow guidelines as noted" in an appendix to the BA. Id. at 15. Based on its analysis, the Lease Modification BA concluded that "[i]mplementation of the project 'may affect, but is unlikely to adversely affect' the Canada lynx." Id. The FWS concurred with the Forest Service's "not likely to adversely affect" determination by a letter dated June 16, 2010. Letter of A. Pfister, FWS to C. Richmond, GMUG NF (June 16, 2010) at 4 ("FWS Concurrence Letter"), attached as Exh. 80. The FWS stated that "[s]everal assumptions were incorporated into your analysis [that is, the Forest Service's BA] of effects as stated above. If these assumptions prove incorrect, please contact the [Fish and Wildlife] Service to discuss any changes that may require further analysis or reinitiation of section 7 consultation." Id.<br><br>Because the assumptions included in the BA are incorrect, the FWS's concurrence is invalid, and the Forest Service must reinitiate consultation. The Forest Service's BA assumes that the total area of lynx habitat that may be disturbed is about 75 acres. See Lease Modification BA (Exh. 92) at 5 (describing project as impacting 48 acres from 48 MDWs and 24 acres from 6.5 miles of road construction); FWS Concurrence Letter (Exh. 80) at 3 (assuming 45 acres of land cleared for MDW pads, and 24 acres cleared for temporary roads). The BA identifies the land to be analyzed because habitat may be altered<br>there as only the area inside the Lease Modifications. Lease Modification BA (Exh. 92) at 9 (Table 3). In assessing the impacts | | |

753

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | of "reasonably foreseeable" actions, the BA addresses only the 75 acres likely to be disturbed by mining of the Lease Modifications themselves. Id. at 10 (Table 4).165 But, as discussed above, the BA's assumptions about foreseeable habitat loss under-represent the impacts of the Lease Modifications. A Forest Service decision to consent to the lease is also the but-for cause and the on-off switch for mining an additional 8.9 million tons of coal on adjacent private and public land; that additional mining will lead to the clear-cutting of forest resources, road construction, and pad clearing for the construction of methane drainage wells. See supra at 48. The DEIS, as well as the BA, fails to account for this additional habitat destruction, nor does the DEIS attempt to quantify or identify the location of this habitat damage, all of which will likely occur within habitat for, and the range of, the Canada lynx. See supra at 46.166 Because the Forest Service is proposing to adopt a decision that "prove[s] incorrect" the FWS's assumptions about the impacts of the Forest Service's decision, the ESA required the Forest Service to contact the FWS "to discuss any changes that may require further analysis or reinitiation of section 7 consultation." See FWS Concurrence Letter (Exh. 80) at 4; 16 U.S.C. § 1536(a)(2) (consultation mandate); 50 C.F.R. § 402.16(c) (requiring re-initiation of formal consultation if the proposed action is later modified in a manner that causes an effect that was not previously considered); 50 C.F.R. § 402.16(b) (requiring re-initiation of formal consultation if new information shows the action may impact listed species | | |

BLM_0051105

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | in a manner or to an extent not previously considered); Forest Guardians v. Johans, 450 F.3d 455, 458 (9th Cir. 2006) (applying requirements concerning reinitiation of formal consultation to informal consultation). The Forest Service has apparently failed to do so. The Forest Service's failure to re-initiate consultation with the FWS on the additional, previously undisclosed habitat destruction outside of, but made possible by, the Lease Modifications violates the ESA. 165 The BA's discussion of cumulative impacts does state: "Mining activities may occur on private lands adjacent to the lease modification, and may include MDWs and Grazing in this area may contribute to vegetation changes on private lands in the area. However, those lands are already modified through long term human use …." Lease Modification BA (Exh. 92) at 16. This statement fails to address: (1) the location and extent of roads and MDWs on private land; (2) the mining on adjacent lands could not go forward without the Lease Modifications.; (3) subsidence on private lands; and (4) any impacts of public mineral development on the parent lease. 166 U.S. Fish and Wildlife Service regulations require every agency to ensure that "any action [the agency] authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species." 50 C.F.R. § 402.01. The regulations define "action" to include any "action[] directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (emphasis added). The effects of the agency action which must be evaluated include "the direct and indirect effects of an action on the species or critical | | |

BLM_0051106

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | habitat, together with the effects of other activities that are interrelated or interdependent with that action." Id. These effects must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." Id. Under any and all of these regulations, the Forest Service must address and analyze the impacts of mining the 8.9 million tons of coal outside the Lease Modifications that consenting to the Lease Modifications will make possible. | | |
| Wildlife | Michael Drysdale 2390 | 5 | MCC/Ark's Comment No. 6 to the BLM identifies several limitations and concerns related to the BLM's brief benefit-cost analysis. These apply equally to the discussion at pages 151-52 of the DEIS. In addition, there appears to be a typographical error in the cumulative effects discussion, where $6.9 million in GHG costs are reported, in contrast to $8 million elsewhere. | Socio-economic section has been updated. | Section 3.21 |
| Wildlife | Robert F. Stewart 2392 | 1 | The Department of the Interior has reviewed the Draft Environmental Impact Statement (DEIS) for Federal Coal Lease Modifications COC-1362 and COC-67232, Paonia Ranger District, Grand Mesa, Uncompahgre and Gunnison National Forests, Gunnison County, CO, and offers the following comments provided by the U.S. Geological Survey for your consideration. Chapter 3 Affected Environment and Environmental Effects The document addresses possible impacts to the: 1) Northern goshawk (pg.109), Olive-sided flycatcher (pg. 112), Purple Martin (pg. 117), and Red-naped sapsucker (pg. 123). However, the analysis | We agree that the analysis was not updated to include this information. The information was added to the biological evaluation. Determinations for those species are not changed with inclusion of this information. | Supplement to Biological Evaluation and Management Indicator Species Report, 13 July 2012. |

BLM_0051107

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | does not use the most recent Breeding Bird Survey data available in; Sauer, J. R., J. E. Hines, J. E. Fallon, K. L. Pardieck, D. J. Ziolkowski, Jr., and W. A. Link. 2011. *The North American Breeding Bird Survey, Results and Analysis 1966 – 2009. Version 3.23.2011 USGS Patuxent Wildlife Research Center, Laurel, MD.* Available online at: http://www.mbr-pwrc.usgs.gov/bbs/. | | |
| Wildlife | HCCA et al | 50 | Finally, the DEIS fails to disclose the impacts of adjacent mining operations on the threatened Canada lynx and other sensitive species. While conceding that the construction of MDWs and grazing could alter vegetation on private land, the DEIS asserts that these lands are "already modified through long-term human use." Id. at 104. This overlooks the possibility, however, that subsidence or methane drainage facilities and potentially new roads may impact lynx habitat. The DEIS only considers such an outcome for the 1436 acres of lynx habitat within the lease modifications, and does not estimate how many acres of suitable lynx habitat, if any, might be lost to subsidence or road and well-pad construction on adjacent private – or federal – lands if the Lease Modifications are approved. As the DEIS predicts that a total of 2,400 acres may subside as a result of mining, id. at 49, the additional habitat loss may be substantial (nearly 1,000 acres). The DEIS fails to address at all potential surface impacts from mining adjacent federal lands outside of the lease modifications. There is also no discussion of effects of mining on adjacent lands on sensitive species, whereas specific numbers of acres of habitat that may be lost within the lease modifications are often | The BA and BE do consider impacts of actions on private lands in the cumulative effects section of the report.  We agree that no quantitative analysis of these impacts was undertaken at the time, due primarily to uncertainty in what actions would be undertaken on private lands.  In the case of lynx, the Forest Service analyzed impacts and consulted with the US Fish and Wildlife Service as required by law.  In this consultation, an upper limit of disturbance was agreed upon, and if that limit is reached by this project, then the Forest Service will re-initiate consultation on the project.  Upon further review, impacts to approximately 10,.3 acres of private lands in presumably suitable lynx habitat may occur if private land actions related to the coal mining associated with the two lease modifications occur.  This amount of impact is approximately one-seventh of the area of disturbance allowed for in the project and is not sufficient to change the determination of effects for Canada Lynx for this project. Additionally, impacts to listed species from projects occurring on private lands fall under Section 10 of the Endangered Species Act, and private landowners, not the Forest Service, are responsible for such consultation.<br><br>Subsidence of already mined areas on the Forest has not, at this time, resulted in large-scale vegetative changes, ie loss of forested habitat, | BA, USFWS Letter of Concurrence |

BLM_0051108

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | provided. See, e.g., id. at 111, 112, 113, 114, 118. | through landslide or other earth movements. As stated in the DEIS (REF), the possibility of these impacts was considered in analyzing effects to wildlife species.<br><br>Anticipated impacts to other wildlife species were considered in the cumulative effects analysis for each species requiring such analysis.   A quantitative review of possible impacts to Forest Sensitive and Management Indicator Species if private land actions related to the coal mining associated with the two lease modifications occur was  undertaken and included as an appendix to the Biological Evaluation (REF).   None of the quantified additional impacts were such that initial determinations of effects to species were inaccurate or insufficient. | |
| wildlife | HCCA | 57, 58 | V. THE DEIS ARBITRARILY MODIFIED OR ELIMINATED EXISTING LEASE STIPULATIONS IN VIOLATION OF NEPA AND THE APA.<br>Under the Administrative Procedure Act ("APA"), "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (quotations omitted); see also Humane Soc'y of U.S. v. Locke, 626 F.3d 1040, 1048 (9th Cir. 2010). Moreover, whenever an agency departs from "prior norms," its reasoning must be "clearly set forth so that the reviewing court may understand the basis of the agency's action…." Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973); see also Humane Soc'y, 626 F.3d at 1050 n.4. | The roads needed for access to methane drainage wells within the lease modification area are not permanent roads and as such would not violate either the previous or updated lease stipulation, nor would they violate Guideline HUG6 of the Southern Rockies Lynx Amendment.   At the present time there are no new permanent roads or trails proposed or foreseeable within the lease modification area.<br><br>The Southern Rockies Lynx Amendment language, from which the current lease stipulation arises, states that new permanent roads SHOULD not be built on ridge-tops and saddles, or in areas identified as important for lynx habitat connectivity, and that new permanent roads and trails SHOULD be situated away from forested stringers. Therefore, current management direction does not require that the lease stipulation be stated as "will not".  However, if roads DO need to be constructed within the lease modification area, the necessity of placing MDWs at specific locations to provide for | BA Appendix A, referencing HUG6 in the SRLA, pertinent lease stipulation |

BLM_0051109

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | As DEIS states, the Forest Service has a responsibility to protect non-mineral resources within National Forest lands by ensuring that the parent lease stipulations carried over to the Lease Modifications are sufficient protection measures. See, e.g., DEIS at 3, 4, 13. If they are not, the Forest Service must prescribe additional stipulations to provide the needed protection. These stipulations are a vital aspect of the Forest Service's decision whether to consent to the BLM modifying the existing coal leases and help to mitigate adverse affects from the Proposed Action Alternative. See DEIS at 16 ("As part of the Proposed Action alternatives the GMUF Forest Supervisor must decide if the existing stipulations on the existing parent leases are sufficient for the protection of non-mineral (i.e. surface) resources...."). However, the Forest Service weakened stipulations that were in place on the parent leases without proper explanation or analysis, in violation of the APA and NEPA. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; Human Soc'y, 626 F.3d at 1048. The Forest Service weakened a stipulation regarding lynx habitat: changed from, "New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forest stingers[,]" to "New permanent roads will not be built on ridge tops or in saddles, if possible, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forest stingers, if possible." DEIS at 20. The DEIS does not explain the basis for these changes.163 Its failure to explain these changes is arbitrary and capricious. | mine safety, as well as topographical, geological, hydrological, or other safety concerns, may require that a road be located on a ridgeline, saddle, forested stringer, or travel corridor.  Both the SRLA language and the lease stipulation allow for this to occur. | |

BLM_0051110

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| Wildlife | John Andes 2448 | | As an identified threatened species under the Endangered Species Act (classified as such by the US Fish & Wildlife Serive in 2000) threats to the Lynx population in the State of Colorado shuld be reviewed and evaluated in, at a minimum, an EIS if not a complete EA, following all the necessary steps required under NEPA! | Impacts to Canada lynx are addressed in the DEIS, the supporting Biological Assessment, and the Forest Service, as required by law, consulted with the US Fish and Wildlife Service on said impacts. | Chapter 3, BA, USFWS LOC. |
| Wildlife | Michael Mclaughlin 2413 | | In addition, this area was formerly wolf habitat, and in order to restore intact ecosystems, it must remain available for space to restore wolves. They are insufficiently genetically diverse in the small numbers now "managed" by either USFWS or States, and the widest possible areas must remain roadless to protect these and other species native to our continent. | Effects of the project on wildlife are addressed in the DEIS and the supporting wildlife analysis documents.<br><br>At this time the gray wolf is not on the list of species required to be addressed by the US Fish and Wildlife Service in this area.<br><br>Use of this area or re-introduction or expansion of wolves into Colorado are outside the scope of this analysis. | BA, BE/MIS, Chapter 3, species list is in reference data for BA. |
| Wildlife | Stephen Reden 50374 | | These coal lease modifications are wrong for many reasons.  Particularly, 1) we don't need any more dirty coal, and 2) the expansion of these mining operations will destroy the wildlife habitats. | 1)  Thank you for your comment<br>2)  See Sections 3.10–3.14 | Sections 3.10–3.14 |
| **Wilderness** | | | | | |
| Wilderness | Mitchell Gershten 43116 | | The area is on the northwest border of a wilderness region and should be left alone. | There are no lands within the project area which have been recommended or available for Wilderness designation, or are now Wilderness. | Sections 2.3 and 3.18 |
| Wilderness | HCCA et al | 17, 18 | 3. The DEIS Arbitrarily Fails To Consider Stipulations To Protect The West Elk Wilderness.  The DEIS declines to analyze an alternative that includes a stipulation to limit activities within ½ mile of the West Elk Wilderness boundary. However, the DEIS statements declining to do so bear little relation to the requested stipulation. The DEIS merely states that the Forest Plan does more protective than those in the Forest Plan. The DEIS's explanation for | The West Elk Roadless area was not brought forward as a further planning area during the RARE II wilderness inventory.  Unlike Oil, Gas and Geothermal development (Forest Plan III-54), coal leasing does not provide any conditions that would warrant the issuance of an NSO buffer stipulation in this area (Forest Plan III-66). Recreational values according to the Forest Plan for this management area could range from semi-primitive non-motorized to roaded natural or rural. Furthermore provisions of the Colorado | Section 2.3 |

BLM_0051111

| | Commenter | Page, Paragraph | Comment | Response to Comment | Where addressed (if applicable) |
|---|---|---|---|---|---|
| | | | failing to even consider such an alternative is arbitrary and capricious.34 not require such a stipulation, and that under the Forest Plan, the area may be degraded. DEIS at 40. That does not answer the question as to why the Forest Service cannot consider measures erosion potential to be three separate categories of resource concern, as is demonstrated by a monitoring form identifying each of the three separately. See Forest Service, GMUG National Forest Oil and Gas Leasing Final EIS, Vol. II (1993), App. H, H-31, excerpts attached as Exh. 15. 33 See Map, MCC Lease Modifications (from USFS Project File) attached as Exh. 16. Comments of HCCA et al. re: Federal Coal Lease Modifications COC-1362 & COC-67232 July 9, 2012 18 | Wilderness Act (specific to the West Elk Wilderness) do not allow for the prevention of activities outside wilderness "Congress does not intend that designation of wilderness areas in the State of Colorado lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that nonwilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area" (96-560, Sec. 110). | |
| Wilderness | Linda Miilu 2517 | | It is not too much to ask that some increasingly rare wildnerness areas be kept intact and free from polluting industrial development. | There are no lands within the project area which have been recommended or available for Wilderness designation, or are now Wilderness. | Section 2.3 and 3.18 |
| Wilderness | Janell Kinzie 2472 | | As a Colorado native, I can't believe that we are once again having to pressure the Forest Service to protect our Rocky Mtn. wilderness areas!  I thought the issue of modifications in the Sunset Roadless Area for the benefit of coal producers had been settled.  The changes you are planning to approve would lead to more than 6 miles of road, nearly 50 drill pads, and methane vents in this beautiful wilderness region. Why can't you just say NO, and enforce it??? | There are no lands within the project area which have been recommended or available for Wilderness designation, or are now Wilderness. | Section 2.3 and 3.18 |
| Wilderness | Michael Mclaughlin 2413 | | America has far too little wilderness, especially in the face of increasing populations. | There are no lands within the project area which have been recommended or available for Wilderness designation, or are now Wilderness. | Section 2.3 and 3.18 |

BLM_0051112



Case No. 1:20-cv-02484-MSK Document 42-4 filed 04/27/21 USDC Colorado pg 254 of 284



763

BLM_0051114

(Intentionally left blank)

BLM_0051115

# Appendix J. Comments Received on Supplemental EIS NOI 2016-2017 (No Official Comment Period)

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| **Alternatives** | | |
| Earthjustice #<br>8419-15/16 | While Arch may wish to have the area under lease to pad the assets on its balance sheet, that is not a valid basis for approving the Lease Modifications. In addition, Arch's desire to explore the Sunset Roadless Area should not drive the Forest Service or BLM to consider the Lease Modifications. Arch can apply for a license to explore the area even if the land is not under lease.14 Arch would apparently prefer to explore the area after it is leased because that would permit Arch to shield the exploration results from other potential coal producers.15 The Forest Service and BLM should not put a roadless area under lease simply to make it easier for Arch to conceal exploration data. Such a decision does not serve the public interest.<br><br>14 Where the exploration of federal coal will take place on lands not subject to a federal coal lease, the entity seeking to explore must receive an exploration license. 43 C.F.R. Part 3410 (Exploration Licenses). These regulations require the publication of a notice of the company's exploration plans in the Federal Register, and a requirement that other companies have the opportunity to share in the costs and the data retrieved from such exploration. 43 C.F.R. § 3410.2-1(c).<br><br>15 Where exploration of federal coal will occur on lands leased to the entity seeking to explore, but not within an approved mine permit boundary, BLM reviews the exploration plan pursuant to the requirements of 43 C.F.R. Part 3480. These regulations do not require posting notice of the exploration proposal in the Federal Register, as do the regulations for Exploration Licenses. | The agencies cannot speculate on West Elk's rationale for preferring to resubmit an exploration plan. We know the mining permitting process takes substantial time which may be limited for the mine since it has taken several years since the Court order for the remedy to occur. BLM has concluded prior to the lease modifications analysis that this was a non-competitive leasing action. Commenter correctly states the process for off-lease and on-lease exploration. At this time, BLM does not have an application for an exploration license and the regulations at 43 CFR 3410 do not apply. However, the BLM is responding to an application for on-lease exploration, not an exploration license. The exploration plan as proposed is subject to the issuance of the lease modifications. This SEIS includes analysis of the effects of potential on-lease exploration if the lease modifications are issued.<br><br>In theory, if the mine submitted an application for an exploration license to the BLM prior to leasing, off-lease exploration could be approved by BLM instead. Even if that were the case, the action might not be competitive as other mines have not indicated interest in the area of the lease modifications. |

BLM_0051116

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice      # 8419-16 | A. NEPA Mandates That Agencies Evaluate All Reasonable Alternatives.<br><br>NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E), (2)(C).… In the EIS, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" in response to a "specif[ied purpose and need." Without substantive, comparative environmental impact information regarding other possible courses of action, the ability of an EIS to inform agency deliberation and facilitate public involvement would be greatly degraded. While NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective," it does require the development of "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned."<br><br> Courts hold that an agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not "reasonable." Courts apply this same analysis to rulemakings such as the one at issue here, as well as to site-specific project in a challenge to national Roadless Rule).<br><br>While an agency has some discretion in fashioning an action's purpose and need, agencies may not constrain the range of alternatives by "defin[ing] its objectives in unreasonably narrow terms." so narrowly as to preclude a reasonable consideration of alternatives. | Comment was submitted on both CRR and this SEIS. The CRR analyzed alternatives as stated in that SFEIS.<br><br>This SEIS considers three alternatives in detail (Section 2.2) and 12 Alternatives Considered but Eliminated from Detailed Study (Section 2.3) in compliance with 40 CFR 1502.14.<br><br>The purpose and need reflects agencies assigned roles under the federal coal program per the requirements of law, regulation and policy per 40 CFR 1502.13. |
| Earthjustice #8419-18 | C. The Supplemental EIS's Proposed Alternatives Analysis    The Forest Service proposes to analyze the following three alternatives: (1) the ""no action""   alternative, under which the agency would reject both Arch's lease application and its   exploration plan; (2) ""Alternative 3,"" under which the Forest Service would consent to both lease   modifications and would concur to the exploration plan; and (3) ""Alternative 4,"" under which the Forest Service would consent only to the lease modification for COC-1362, requiring some unspecified modification of Arch's exploration plan. | Commenter provides a fairly accurate summary of the SEIS assuming that the exploration plan as submitted for Alternative 3 was terminated at the lease boundary under Alternative 4 for which no plan has been submitted. |

BLM_0051117

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice #8419-18 | D. The Supplemental EIS Should Modify The Action Alternatives To Postpone Consideration Of The Exploration Plan.  The Forest Service's proposed action alternatives (Alternatives 3 and 4) cram together two separate proposals - leasing and exploration - that do not fit together neatly, and that   unnecessarily complicate the analysis. The Forest Service should therefore adjust the purpose    and need for the proposed action to address only leasing, and postpone the consideration of the   exploration plan until after the lease, or the agency should consider a broader range of   alternatives. Arch has applied for an exploration plan pursuant to BLM regulations governing the exploration of an area already under lease. But the Lease Modifications area is not yet under lease, and so no    exploration plan can be approved until after any approval of the Lease Modifications. Arch   premised its 2013 exploration plan on the previously approved 2013 Lease Modifications.   Because the 2013 Lease Modifications were vacated, however, there is no existing lease that Arch can propose to explore. The lack of an existing lease makes it awkward for the Forest    Service to analyze the pending lease modifications and exploration plans at the same time, as the   agency's description of Alternative 4 in the 2016 Lease Modifications Federal Register Notice    makes clear: [Alternative 4] may result in a reduction of three or more exploration drill holes and a reduction of approximately 2.75 miles of temporary road within the COC-67232 lease modification. Because an exploration plan specific to this alternative   has not been submitted, the agencies are unsure if road density and miles might be increased on the COC-1362 lease to try to reach drill holes close to the lease   modification boundary or if they will be foregone.17 In short, because Arch has prepared an exploration plan for the entire proposed lease area, the    Forest Service cannot effectively disclose the impacts of the proposed exploration plan under   Alternative 4 because that exploration plan, as submitted, could not be approved under   Alternative 4.18   Because it is unclear whether and how Arch would explore under Alternative 4, the Forest Service should de-couple the analysis of exploration under both action alternatives, and postpone analysis or approval of any exploration plan until after the Forest Service has made a decision on leasing. This would require the agency to complete first the Lease Modifications NEPA and decisionmaking before pursuing an analysis of any proposed exploration plan. While Arch may not welcome the delay, it will make for a much more clear, sensible, and orderly analysis" | The Forest Service has no NEPA role in concurring to BLM over on-lease exploration. Because both proposals (leasing and exploration) have previously been before the public and have had decisions issued and rescinded in the same court decision, they are included here and address the needs of BLM's analysis and address the connected actions of leasing and on-lease exploration for applications on file.   The applications, while resubmitted, have not changed since initially submitted and therefore there remain three staged decisions before the agencies. In order to comply with 40 CFR 1500.5(h, i), 1501.5(a), 1502.2 (e, f, g) 1502.13 and 1502.14, they are being analyzed in the same document.<br><br>Under Alternative 3, commenter has requested for 8 years that they want to seesite-specific analysis of effects; the exploration discussion represents the site-specific analysis requested for that activity.<br><br>Under Alternative 4, we have made the assumption that on-lease exploration will also occur in order to delineate the coal reserve and have estimated the effects based on the assumptions specified in EIS and reiterated in commenter's letter to consider alternatives rigorously.    If Alternative 4 were selected and a subsequent exploration application was submitted to BLM, BLM would be required to assure that exploration activities were in fact consistent with the lease terms and the analysis here-in before issuing their decision. Extending commenter's logic that there is no application for exploration on Alternative 4, we would also discount that alternative (which is commenter's alternative) because the mine did not submit only |

BLM_0051118

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | an application to consider lease modification COC-1362. |
| Earthjustice #8419-33/34 | B. The Supplemental EIS Must Analyze In Detail Alternatives To The Proposed Exploration Plan.   BLM's 2013 Exploration Plan EA took an ""all or nothing"" approach to alternatives analysis,   considering in detail only the ""no action"" alternative and Arch Coal's proposal, despite having   authority to impose additional conditions. In the supplemental EIS, we request, and NEPA requires, that the agency consider other reasonable alternatives.   First, the Forest Service must analyze an alternative to reduce road construction within the   Sunset Roadless Area while allowing all ten of Arch's desired exploration holes to be drilled.<br><br>As drafted, the Exploration Plan provides redundant road access through the Roadless Area, unnecessarily increasing the damage that is likely to occur to the forest, wildlife, habitat, recreation and roadless values. Specifically, the EA's maps show that all drill pads but SST-2 and SST-7 can be accessed from two separate roads.173 First, all the other drill pads can be   accessed from MCC fee land to the east via a route which initially accesses drill pad SST-4. In   addition, all the other drill pads can be accessed from Forest Service land to the north via a route   which initially accesses drill pad SST-6. The Forest Service itself labels road access to this area   ""redundant.""174 The 2013 Exploration Plan EA did not explain its need for these redundant   access routes. A reasonable alternative to MCC's redundant-route proposal would be to approve   one the two alternate access routes but not the other. Such an alternative would reduce the   amount of road construction (and habitat destruction) when compared to the proposed action. The U.S. District Court found that the Forest Service and BLM violated NEPA by failing to   consider in detail this reasonable alternative.175   The Forest Service and BLM may attempt to dismiss this alternative on the grounds that the   redundant road is critical to worker safety in the event of a disaster requiring multiple exit options. If the agencies take this position, however, they must explain why the agencies did not   provide redundant exit options for numerous methane drainage well pads across the landscape   directly adjacent to the Exploration Plan area.<br><br>We also urge the Forest Service to analyze in detail a second alternative: allowing Arch Coal to drill all of its requested exploration holes except the most | Redundant road in exploration plan accessing the SST-4 location from private land has been removed from consideration as requested in consultation with MCC.  See Alternatives 3 & 4 exploration maps.<br><br>To clarify, the Forest Service did/does not have a NEPA decision on the on-lease exploration. Per regulation the Forest Service only has a concurrence role.<br><br>MCC has proposed the spacing of exploration holes they believe will yield enough information on faults and coal quantity to develop a mine plan. BLM also needs this data per regulation.  A single exploration hole could help delineate the extent of a fault for which there is no surface expression and yet are expected to be encountered based on parent lease info; define whether or not the coal is in a mineable quantity (or the coal seam is too thin to longwall mine); and help with panel layout for a mine plan.  It is known that Mt. Gunnison, an igneous laccolith, is present to the east and southeast of the modification area intruding into the sedimentary rock strata; it is unknown what additional obstacles this represents underground. The SST-10 hole may help verify the extent of the laccolith.<br><br>The drillhole spacing is generally the minimum necessary to acquire the data because road building and drilling exploration holes is expensive. Road building is considered the minimum needed per Section 2.2 Alternative 3. |

BLM_0051119

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | damaging single hole, SST-10, because: (1) SST-10 would be bulldozed in that part of the Sunset Roadless Area that the Forest Service in 2005 determined was the most wild, and was in fact capable of being designated as wilderness;176 (2) the access road to SST-10 cuts through mature spruce-fir forest (which will take many decades if not centuries to regenerate to its current state); and (3) the drill pad would be built nearly on top of the Sunset Trail, and so would impact recreational values.177 This alternative would also eliminate the need for a half-mile of the proposed 5.9 miles of road, and two of seven stream crossings proposed in the plan.178 Removing this single exploration pad and the road to access it would have large benefits to other multiple uses of the land while permitting Arch Coal to obtain 90% of its exploration data. These are exactly the kinds of trade-offs that NEPA requires agencies to explore."<br><br>"BLM and the Forest Service previously rejected a different alternative - one that would have eliminated access to six boreholes - on the grounds that such an alternative would not provide necessary information on the coal. But the agencies nowhere explain why eliminating this single borehole would have such a damaging impact on Arch's data gathering, or even why Arch must have the magic number of 10 boreholes (and not 8, or 6), and what criteria it used to generate its plan. It appears instead that Arch developed an exploration plan, and, rather than attempt to limit its impact, or question its scope or size, the agencies simply accepted the proposal. Such an approach violates NEPA's mandate to ensure that agencies evaluate all reasonable alternatives. Both of these proposed alternatives meet the District of Colorado's reasonableness test. First, both proposed alternatives fall within the agency's statutory mandate, which requires that BLM ""[a]pprove, disapprove, approve upon condition(s), or require modification to exploration plans.""179 BLM thus has ample authority to explore more than the ""all or nothing"" approach it took here. Second, the proposed alternatives would meet the exploration plan's ""purpose and need,"" which is to approve, disapprove, or ""approve the plan with additional conditions … if needed to minimize impacts.""180 Both the statutory framework and the purpose and need thus anticipate alternatives that condition plan approval to reduce environmental harm. Yet BLM failed to examine approving the exploration plan with reasonable conditions. The supplemental EIS should address in detail this reasonable alternative." | The agencies believe that the lease stipulations included as Tables 2-1 and 2-2 contain the necessary precautions or conditions to protect surface resources present from surface disturbance.<br><br>Exploration alternatives dismissed from further consideration are addressed in Section 2.3.<br><br>Alternative 4 avoids lands that were once considered wilderness capable. While a portion of the project area was identified in a previous Forest Planning process as being wilderness capable, that Forest Planning effort, and the regulations underlying that process are no longer in place. There is no special management associated with areas that have been identified as "wilderness capable" nor is this portion of the Sunset Roadless Area recommended for wilderness designation. The current GMUG Forest Plan has areas identified as recommended for wilderness designation allows for road construction and construction for coal-related activity, including exploration. SSST-10, SST-9, SST-8 and SST-3 locations and associated access roads would all be precluded under Alternative 4 because they are all on the COC-67232 lease modification. And elimination of SST-10 is therefore covered by the range of alternatives already considered in detail.<br><br>While the SST-10 exploration hole is approximately 250-300 feet from previously mapped alignment of the non-system Sunset Trail, this route is difficult to find/follow in this location. Effects on recreation have been addressed in Section 3.16 |

BLM_0051120

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice #8419-14 | B. The Forest Service Should Adopt The No Action Alternative Because Arch Has No Immediate Need For The Lease Modifications.   The Forest Service should adopt the no action alternative - or defer Arch's Lease Modifications application for the foreseeable future - because Arch has no demonstrated, immediate need for   the coal. As discussed above, Arch has access to approximately 10 years of coal at current production   rates. According to Forest Service records, West Elk has an estimated 10 year supply of coal under lease, and apparently has a mine plan for the B seam that involves no surface construction   until at least 2022.12 It thus will not need to access the Lease Modifications until well after 2020.  Given the ongoing and rapid deterioration in coal markets, and Arch's bankruptcy, whether the   West Elk mine will actually have the ability or interest in mining the coal in coming years is highly speculative. That deterioration is particularly plain in the North Fork Valley where in the   past four years, two of three coal mines then operating have been idled. In order to husband the     10 See Forest Service, West Elk Mine (powerpoint) (Dec. 2014) at 13, attached as Ex. 4 (""The West Elk Mine estimates that 55 million tons of coal resources are currently under lease, only a  portion of which are permitted for mining. Assuming a 5 million ton year production rate, the   current leased coal resources would represent approximately 11 years of production."")…. Forest Service's and BLM's staff and fiscal resources, the agencies should defer consideration of     this application until at least 2020.13" | As of 2017, West Elk's life of mine is expected to be approximately 11 years including lease modifications. During the autumn of 2017, and prior to entering E Seam Panel 8 on parent leases in 2018 (see Figure 3-1 2018 Wellpad/MDW development), MCC has told the agencies they will have to determine whether or not to pursue development of the lease modifications in the current E Seam mine panel lay out into the lease modifications which would allow additional mining into private lands or to reverse course into a different coal seam in parent leases (B Seam). This is a business and operational decision which has been delayed from initial forecasts by a reduced mining rate from 2013 through part of 2016. If lease modifications and private lands are bypassed at this juncture, the mine has indicated that it would be extremely unlikely that those coal reserves would be recovered later.<br><br>West Elk Mine may enter previously leased areas in the B Seam. It is currently undetermined whether this would be in lieu of the lease modifications or subsequent to them and depends on economic conditions of the coal market and/or cost of development of the seam, etc. MCC was approved by DRMS (in May 2015) to drive rock slopes from the E seam into the B seam coal reserves, underneath the coal reserves they have completed mining. These B seam reserves roughly underlie the E1 through E4 E seam panels on parent leases. The mining of these B seam reserves would require the drilling of additional MDWs. It is estimated that approximately 77 MDWs on 69 pads may be necessary (one pad may be shared with previously approved development for E Seam; pad size is estimated at ½ acre); use of previously approved access  related  to  E  Seam  development; |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | construction of approximately 8.8 miles of new access road (assumes 25 foot disturbance width with 14 foot running surface; 1.4 miles of which may be on top of existing ATV trails) and reconstruction of an approximate additional 1.8 miles of previously reclaimed road in Deep Creek. Estimated new disturbance for B Seam operations is 61 acres and re-disturbance is estimated at 5.5 acres. Roughly six (6) methane drainage wells would be within a one-mile radius of the lease modifications and forty-seven (47) within a two-mile radius. Per regulation, there is no Forest Service action to approve these activities as the area is already under lease for all coal seams. |
| **Methane** | | |
| Ramsey, Stephen #471-2 | The coal industry is suffering from the increased use of gas (methane) fired plants for electrification. It is truly ironic that the choice to vent methane from underground mine seams as a waste product is even being considered. At the very least the company should be required to capture the methane for the creation of power instead of venting it as a waste product. It is a questionable long term choice to begin with to continue the use of fossil fuels to create electricity, but simply discard a damaging atmospheric gas is insanity.   For a company whose stock value (OTC pink sheets:ACIIQ) in 2011 was $350 to fall to under $.35 at this time is an indication of how much pressure the company is under financially. They have in January 2016 filed for bankruptcy in an attempt to restructure their huge debt. Is it the US Forest Service's function to enable the expanding operation of a company which has demonstrated to be so poor at managing the risks of their own business? What guarantee can be provided that the creation of new pads and roads through a roadless forest will ever have any potential for reclamation in the future? What assurance can be made that this company will even be around to undo a mess they create." | EIA has reported that in 2016 natural gas supplied only slightly higher million kilowatthours of electricity than coal in the U.S. Unlike natural gas wells where gas is the primary product, for coal methane is a waste project of mining and must be removed to protect miners underground.  Methane stipulations and mitigation measures have been considered in this EIS at Tables 2-1 2-2 and Sections 2.2 and 2.3. Climate effects are described in Section 3.4 and other relevant sections.

Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. Reclamation bonding is required in the State of Colorado. |

BLM_0051122

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice #8419-17 | B. NEPA Mandates That Agencies Analyze Potential Mitigation Measures. Revised draft guidance from CEQ specifically directs agencies to consider where appropriate a variety of mitigation measures for actions that will cause climate pollution, including measures that will capture or use methane emissions: As Federal agencies evaluate proposed mitigation of GHG emissions or of interactions involving the affected environment, the quality of that mitigation including its permanence, verifiability, enforceability, and additionality-should be carefully evaluated. Among the alternatives that may be considered for their ability to reduce or mitigate GHG emissions and climate effects are enhanced energy efficiency, lower GHG-emitting technology (e.g., using renewable energy), carbon capture, carbon sequestration (e.g., forest and coastal habitat restoration), sustainable land management practices, and capturing or beneficially using fugitive GHG emissions such as methane. | NEPA does not require the elimination of significant effects in an EIS through the use of mitigation, only that they be disclosed and analyzed. The lease stipulations which are enforceable and not speculative will be applied to protect resources. They are found in Table 2-2. Methane mitigation measures have been considered in Section 2.2 and 2.3.<br><br>CEQ's *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate* has been rescinded by EO 13783 "Promoting Energy Independence and Economic Growth" (March 28, 2017). GHGs have been disclosed. Methane mitigation is not precluded by the CRR should it be proposed, and is addressed in lease stipulations in Tables 2-1 and 2-2, particular methods discussed and dismissed in Section 2.3.<br><br>Without knowing at the leasing stage what that coal resource even looks like, feasibility for post-lease development is unknown and therefore mitigations that rely on site-specific feasibility cannot be applied at this juncture. The appropriate place to do so may be at the mine permitting stage. |
| Earthjustice #8419-19 | E. The Supplemental EIS Must Analyze Alternatives That Reduce, Or Mitigate, Climate Pollution.   The purpose of the Lease Modifications and exploration plan is to foster coal mining, which will   result in significant climate impacts from both mining and the ultimate combustion of coal. The roads and methane drainage vents that the Forest Service proposes to pave the way for will result in the emission and waste of millions of cubic feet a day of methane unless the agency adopts   alternatives or requires mitigation that abates or offsets that pollution.   19 We note further that the Forest Service in November asserted that it could not predict impacts   of coal mining in part because: ""BLM regulations establish that a certain amount of exploration   data must be | NEPA does not require the elimination of significant effects in an EIS through the use of mitigation, only that they be disclosed and analyzed. The lease stipulations which are enforceable and not speculative about their implementation will be applied. Methane mitigation is not precluded by the CRR, is addressed lease stipulations in Tables 2-1 and 2-2, discussed in Section 2.3, in |

BLM_0051123

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | available in order for the BLM to consider leasing. Such data is not available for this SDEIS, any future consideration of leasing within the North Fork Coal Mining Area would require additional exploration data."" 2015 Colorado Roadless Rule Supplemental Draft EIS at 26 (emphasis added). If true, this statement would seem to argue for the Forest Service denying the Lease Modifications application as premature, and requiring application to come before leasing. 20 See, e.g., WildEarth Guardians v. U.S. Forest Service, 828 F. Supp. 2d 1223 (D. Colo. 2011) (challenge to mine plan approval on grounds that Forest Service failed to address climate change and methane emissions) would "continue to 'lead the charge' with our partners to explore options [for coal mine methane mitigation] because it is the right thing to do for the environment.""21 Eight years on, the GMUG's alleged ""charge"" has led to not a single molecule of methane being captured, combusted, or offset at the West Elk mine. That is largely because the Forest Service and BLM have steadfastly refused to analyze alternatives in detail or to adopt mitigation measures that would address the mine's methane pollution, despite the Forest Service's regulatory authority over the mine's impacts. Here again, with the Lease Modifications, the Forest Service proposes to do nothing. The Forest Service's failure to propose or analyze in detail any measures to address West Elk's climate pollution violates NEPA, contradicts administration policy, and ignores new information made available since 2012 regarding the need to address climate pollution. F 21 See C. Richmond, ""Capturing methane released by mines is a work in progress,"" Grand Junction Sentinel (Mar. 23, 2008), attached as Ex. 11. 22 http://www.thenation.com/article/global-warming-terrifying-new-chemistry/ 23 J. Gillis, N.Y. Times, ""Scientists Warn of Perilous Climate Shift Within Decades, Not Centuries"" (Mar. 22, 2016), attached as Ex. 12 and available at http://www.nytimes.com/2016/03/23/science/global-warming-sea-level-carbon-dioxideemissions. html?_r=1 (last viewed Apr. 12, 2016). 24 Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (Thomas Stocker et al., eds. 2013), available at http://www.climatechange2013.org/images/report/WG1AR5_ALL_FINAL.pdf (last viewed Apr. 12, 2016). Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 14 April 12, 2016 that avoiding catastrophic climate change will require both a long-term strategy to reduce carbon dioxide emissions and near-term action to mitigate methane and similar ""accelerants"" of climate change. As a 2013 article in the journal | compliance with NEPA's requirements regarding this analysis. <br><br> Combustion is discussed in Section 3.4. <br><br> Forest Supervisor Richmond is no longer the Forest Supervisor of the GMUG. <br><br> CEQ's *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate* has been rescinded by EO 13783 "Promoting Energy Independence and Economic Growth" (March 28, 2017) and Federal Register notice of the same was published on April 5, 2017, but: <br><br> Quantified GHGs associated with the lease modifications and cumulative effects are estimated in Section 3.4. <br><br> Global, national and regional climate effects are best analyzed at the rule making stage and not at the project level; however effects are generally discussed in Section 3.4 and other relevant sections. <br><br> Nothing in this project-level document proposes to create policy regarding climate change or methane. Methane continues to be reported by the mine per EPA's regulations. <br><br> West Elk's methane emissions of 485,100 tonnes $CO_2e$ (or 19,404 metric tons of methane)-- which is not tied to production levels and continues to decline--in 2015 were approximately 1% of U.S. underground coal mine methane emission sector's annual 44, 600,000 tonnes $CO_2e$. Underground coal mines represent approximately 7% of the total U.S. methane emissions sectors (654,900,000 |

BLM_0051124

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Science stated: ""The only way to permanently slow warming is through lowering emissions of CO2. ᵮ agencies concluded that reducing methane pollution would have significant social benefits, based in large part on the significant social cost of methane and/or carbon in continuing to permit unnecessary methane releases.31 Second, science that has emerged since 2012 demonstrates that an abrupt shift in sea-level rises and other climate-induced changes - climate ""tipping points"" - are likely to occur within decades unless climate emissions are reduced quickly, making more urgent the need to reduce methane emissions.. Some studies indicate that we may already be in the early stages of a mass extinction of plants and animals that would shape the Earth's biological prospects for millions of years.38 ? Initiation of ""vicious-cycle"" warming: There is a risk that, at some level of warming, the natural process whereby plants absorb carbon dioxide and remove it from the atmosphere will change direction and plants will start releasing carbon. This would cause a vicious cycle, where warming triggers release of carbon dioxide or methane into the atmosphere, which then of course further exacerbates warming.39 Any supplemental EIS must take this information - and the immediate need to curb climate pollution - into account." | tonnes CO2e) considered in EPA's 2017 Draft Report. Further, methane emissions levels from coal mines have been calculated to have declined 37% in the U.S. since 1990. This annual methane contribution is further reduced when considering CO2 equivalents of GHGs over all sectors including combustion of the coal itself. It would be difficult to assign any sort of significance to the lease mods at even the national scale and, as a percentage, infinitesimal at the global scale for which climate impacts are measured.

Methane is not regulated or considered a criteria pollutant under the Clean Air Act. Section 1 (d) of EO 13783 (March 28, 2017) states, "It further is the policy of the United States that, to the extent permitted by law, all agencies should take appropriate actions to promote clean air and clean water for the American people, while also respecting the proper roles of the Congress and the States concerning these matters in our constitutional republic." While EPA did an endangerment finding nearly a decade ago with regard to GHGs, no threshold, to date, has been identified. |
| Earthjustice #8419-21/22/23/24 | "1. The Forest Service Must Analyze Oxidation Of Ventilation Air Methane As A Reasonable Alternative To Reduce The Lease's Methane Pollution. The Forest Service predicts that Lease Modifications will prolong the West Elk mine's life for over 2.5 years.46 Methane pollution from the mine's ventilation system, and from vents constructed within the area, will thus continue for that period. A substantial portion of methane emissions from approving the Lease Modifications will likely be from the mine's ventilation system. This methane pollution, known as ventilation air methane (VAM), is distinct from methane removed by methane drainage wells (MDWs). VAM makes up over half of all coal mining emissions in the United States and worldwide; data from the West Elk Mine from early 2010 showed that VAM constituted about half of the mine's total of 7.5 million cubic feet of daily methane emissions.47 VAM | Methane to date is unregulated under the Clean Air Act with the exception of reporting which West Elk does. West Elk also participates in EPA's CMOP program.

This EIS includes both oxidation of VAM and carbon off-sets in Section 2.3. VAM methods are also described in Section 2.3 in mitigation measures that BLM might select.

Regarding the VAM addressed in Section 2.3 that commenter wants considered, commenter's VAM |

774

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | mitigation measures are technically and economically feasible. Such measures have been adopted at coal mines elsewhere in the United States and around the world.48 VAM cannot be flared because the concentrations of methane in ventilation air are too dilute, so other technologies must be used to combust VAM. EPA and others report, however, that technology is available and is being successfully employed to reduce 95% or more of VAM emissions from numerous coal mines.49 | design does not factor in the engineering and location considerations specific to the West Elk Mine that are disclosed in the EIS, relying instead on a location in West Virginia, in other parts of the world, on theoretical designs and an economic analysis by Dr. Power based on data from another coal seam. |
| | The Forest Service must consider ""all possible approaches to, and potential environmental impacts of, a particular project."" Wilderness Soc'y v. Wisely, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (emphasis added). Granting lease applicant Mountain Coal Co. (MCC), an Arch subsidiary, consent for the Lease Modifications while requiring MCC to put in place VAM controls on its ventilation system to reduce methane emissions clearly represents one possible, reasonable approach to MCC's request for the lease expansions. These technologies and controls are ""alternatives"" to the proposed action - they would, when combined with the proposed action, achieve the basic aims of the proposed action by different means, while eliminating or lessening the adverse environmental consequences of that action. Despite the multiple examples of successful VAM mitigation measures, the Forest Service states that it will not study in detail such an alternative, just as it eliminated from detailed study an alternative that would require MCC to mitigate or eliminate VAM emissions in the 2012 EIS.57 Data and independent research demonstrate that VAM reduction technologies may likely be technically feasible at the West Elk Mine. Data prepared for MCC shows that the Mine is producing methane in sufficient concentrations to operate a VAM oxidizer at least part of the time. These data show methane concentrations ranging from 0.15% to 0.31%.58 While in general, the higher the methane concentration the more economical VAM becomes, VAM oxidizers are proven to operate reliably at concentrations as low as 0.2%. -For example, an EPA report dated 2010 concluded that ""one technology (the thermal flow reversal reactor or TFRR) has been proven to operate reliably on VAM, even at concentrations as low as 0.2 percent.""59 MEGTEC's brochure states that its VAM destruction technology can generate heat or energy with volumes as low as 0.3% methane, and at varying volumes of VAM. Modular systems allow a mine to purchase the right number of VAM oxidizers for the volume of VAM for which the VAM wishes to remediate methane pollution.60 Biothermica states that its ""VAMOX"" VAM destruction system ""[a]ccepts a broad methane level range | In addition to West Elk's commissioned study specific to the mine, commenter doesn't factor in to his analysis that total methane released in 2016 at the West Elk Mine is approximately a 73% reduction compared to 2010 levels which we would also assume means a reduction in VAM (ventilation air volume remains fairly constant with current vent system, but have also shown some decline) would also be reduced by similar levels--by simple mathematical extrapolation from the range provided by commenter to a concentration of 0.04 to 0.08 % (less than half of what is required for even the EPA's reported TFRR technology of 0.2%)-- would make this even less economical than previously analyzed when having to treat and transport gas (treating and transportation of gas to a gas pipeline is central to all of the examples cited and there is no existing infrastructure proximate to the lease modifications as the lease modifications are 6-7 miles from the mine portal along the highway). "Treating some" of the VAM as commenter suggests would make this even less feasible.<br><br>Per BLM IM 2017-037 (January 20, 2017) which is included in Table 2-2 as a lease stipulation, mitigation must be economical. Coal mining must be economical per the MLA 30 U.S.C. § 201(a)(1) "The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | (0.2% to more than 1%).""61 Further, a 2010 study prepared by Ph.D. economist Thomas Power suggests that the low level of methane in West Elk's VAM may be a transitory phenomenon, and that there may be ways MCC can alter its ventilation system to produce VAM at concentrations that could be combusted.62 EPA agrees with both of Dr. Power's conclusions, urging the Forest Service to undertake a reevaluation that addresses the options of boosting methane levels in VAM, and that determines whether the 2009 data concerning VAM methane concentrations remain accurate.63 The Forest Service's justifications for declining to study in detail requiring the use of VAM reduction technology all lack support. The 2016 notice of intent states that ""no technology currently exists that has been demonstrated to have the capability of handling the volume of methane air and dilute concentrations of methane at the West Elk Mine to make capture economically feasible.""64 This assertion is wrong for at least three reasons. First, MEGTEC has explained that its VAM oxidation system can be expanded with additional units to handle greater volumes of VAM.65 EPA has agreed that this is so.66 Technology therefore exists that can handle the volume of ventilation air at West Elk. Further, the mine need not treat all of the ventilation air. It could simply oxidize some of the VAM. Second, existing technology and strategies could address the dilute concentrations of methane, including supplementing the methane that is emitted as VAM and only oxidizing methane when the concentration exceeds 0.2%.67 Third, there is no reason why the Forest Service must make VAM technology economically attractive to Arch Coal. The Forest Service can simply require the lease applicant to reduce methane pollution from VAM to protect Forest Service surface resources currently being damaged by climate change. We note that neither BLM nor EPA in their oil and gas rulemakings conditioned their proposals on regulation being financially attractive to the regulated industry. Much has changed in recent years with respect to both the financial and technological feasibility of VAM mitigation. Regarding economics, the 2009 report prepared by the Mountain Coal Company (MCC) evaluating the economics of methane mitigation, and upon which the Forest Service has relied to dismiss the financial feasibility of VAM mitigation, was flawed to begin with.68 The economic bases for the report were challenged in 2010 by a report prepared by Dr. Tom Power.69 The Forest Service never directly acknowledged or responded to that report in prior NEPA reviews, which is a reversible error. The supplemental EIS must therefore review and directly respond to Dr. Power's expert analysis and conclusions from his 2010 report.70 Further, a report prepared by the State | classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest and which will permit the mining of all coal which can be economically extracted"

West Elk Mine is not a retail provider of energy (or a utility company) such that would qualify for State incentives, it is a retail provider of coal. Oil and Gas regulations, particularly as it relates to not wasting the very product leased, do not apply to coal.

Discovery of geologic faulting in 2015 has reduced assumed mineable reserves on private lands resulting in a decrease in the mine life.

This EIS includes VAM in Section 2.3 Alternatives Considered but Eliminated from Detailed Study per the requirements of NEPA (40 CFR 1502.14(a) and consistent with EPA's request.

Commenter's VAM design does not factor in the engineering and geology/location considerations specific to the West Elk Mine that are disclosed in the EIS, relying instead on locations in West Virginia and theoretical designs for things such as pre-mining oil and gas development (drainage) of coal seam methane at Wyoming's open pit coal mines, which is different than the proposed West Elk mining underground.

Per Section 2.3, $CO_2$ is present in VAM. $CO_2$ would need to be removed (i.e., treated) to make pipeline quality (or saleable) gas because $CO_2$ at room temperature (similar to mine temperature), as a product of combustion, is not flammable. Other criteria pollutants would also need to be removed to make saleable gas. Discussion in 2.3 is not a about air quality, it is about "will the VAM be able to be used as natural gas in a pipeline to generate |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | of Colorado last month details recent changes in state and federal regulation of power that has improved the financing environment for coal mine methane mitigation and power projects.71 The report notes that a 2015 FERC ruling may make it easier for coal mines, including West Elk, to sell power produced from coal mine methane to utilities:…

The State of Colorado report also highlights that changes in state law have made coal mine methane mitigation projects attractive to finance by declaring them ""eligible energy resources"" under the state's renewable Energy Standard (RES): At the state level, Colorado's RES requires qualifying retail service providers, cooperative electric associations, and municipally owned utilities to achieve percentage targets for generating electricity sales from ""eligible energy resources"" that now include CMM.…

While the State of Colorado report notes that barriers exist to the use of VAM to generate electricity at Colorado mines, the report concludes that there is a potential to generate 17.4 megawatts of electricity from VAM at West Elk, and concludes that it is technically feasible to produce 20% of that amount or 3.49 megawatts of power.74 Neither the 2009 MCC economic report nor the 2012 Lease Modifications Final EIS addresses the changes in federal and state law that make the sale of power from coal mine methane mitigation projects more attractive and feasible. Nor has the Forest Service addressed the State of Colorado's conclusion that generating power from a portion of the VAM at West Elk is technically feasible. The Forest Service must address this significant new information in any supplemental EIS. Further, since the Forest Service approved the vacated 2012 Lease Modification ROD, California has implemented a mine methane protocol that allows California business to purchase carbon credits from out-of-state coal mines that capture or flare methane. Five different mines have registered and sold credits into the market, reducing carbon emissions by tens of thousands of tons of CO2-e. The success of this program indicates that third-party financing may be available to mitigate methane impacts at West Elk. Any supplemental EIS must address this development. Second, the Forest Service alleged that it ""is unknown and unforeseeable … what those [VAM pollution control] scenarios might look like at the West Elk mine or more specifically if they would be economically beneficial to the mine or the greater public.""78 Again, alternatives incorporating pollution control measures need not economically benefit the lease holder to be reasonable or to be fully disclosed, analyzed, | electricity/power." Rents, royalties, payments to counties would not be collected on the quantity of coal that would be bypassed. Effects extend beyond the Forest boundary to fee coal reserves that also would be lost. See Section 3.21 for more discussion. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | and adopted by the agency. The 2012 Lease   Modifications Final EIS provides no explanation for why it assumes MCC must profit from   mitigating pollution it would otherwise emit. And again, the Forest Service cannot base   dismissal of an alternative on grounds of ignorance. Further, an expert economist found that   MCC's conclusions about the economic feasibility of mitigation measures were based on flawed   assumptions.<br><br>Third, the 2012 Lease Modifications Final EIS asserted that VAM oxidation will result in   pollution, including CO2, and criteria pollutants.80 This contention does not justify the   elimination of an otherwise reasonable alternative. The EIS provides no information on the   nature or extent of criteria pollutant emissions that might result from VAM oxidation, nor does it   explain why the Forest Service could not provide such information to the public. In contrast, the Forest Service and the public know that VAM would reduce and mitigate hundreds of thousands of tons of CO2e pollution annually, which would have concrete climate benefits. Without more detailed information concerning the potential levels of criteria air pollutants, it is impossible for the Forest Service or the public to weigh the climate benefits of VAM oxidation against VAM oxidation's potential air pollution impacts. In the supplemental EIS, the Forest Service must   correct these errors. Any suggestion that VAM oxidation is unreasonable because of criteria pollutant and CO2  pollution is undermined by the fact that EPA - the federal agency responsible for regulating   criteria air pollutants and GHG emissions - has an entire program dedicated to reducing coal  mine methane emissions in part through VAM oxidation.81 EPA has urged agencies - including   encouraging the Forest Service with respect to this very mine - to analyze VAM oxidation in   EISs and EAs analyzing Colorado mine expansions. For these reasons, the Forest Service must analyze a VAM pollution control alternative in detail." | |
| Earthjustice #8419-25 | "2. The Forest Service Must Analyze Carbon Offsets As A Reasonable Alternative To Reduce The Lease's Methane Pollution.   Carbon offsets are a tested, feasible, and practical alternative to allowing the West Elk Mine to   vent millions of cubic feet of methane into the atmosphere every day as a result of the Lease   Modifications without mitigation or control, or with incomplete mitigation or control.   EPA has repeatedly urged land management agencies to assess carbon offsets in EAs and EISs as   a way to reduce climate change impacts of agency actions. EPA has specifically noted that   offsets are a reasonable alternative to lessen the impacts of coal mine methane emissions. | Cap and trade legislation—the premise for carbon credits-- should be developed at the National or State level. This policy development is not appropriate at the project level. MCC may join existing out-of-state carbon credit markets (such as California's) voluntarily, but there is no compulsory requirement for the agencies to include it. There is, however, law and regulation supporting the examples cited by commenter including collection |

BLM_0051129

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | In a 2007 letter concerning a proposal to permit MDWs at the West Elk Mine, EPA specifically rejected the Forest Service's assertion that a carbon offset alternative was not reasonable: ""[I]t is reasonable to consider offset mitigation for the release of methane, as appropriate. Acquiring offsets to counter the greenhouse gas impacts of a particular project is something that thousands of organizations, including private corporations, are doing today.""82 EPA specifically recommended that the Forest Service's Lease Modifications EIS ""acknowledge that revenues for carbon credits are available via several existing markets.""83 Similarly, EPA has recommended that a Forest Service NEPA analysis of a forest health project ""discuss reasonable alternatives and/or potential means to mitigate or offset the GHG emissions from the action.""84 Numerous state agencies already use offsets to control GHG emissions.85 As EPA noted, many entities exist that permit agencies and polluters to purchase carbon offsets that are third-party verified. For example, the Carbon Fund and the Climate Action Reserve both allow entities to purchase carbon ""credits."" In 2009, the total U.S. carbon offset market was worth $74 million, with 19.4 million metric tons of CO2e in traded volume.86 The Forest Service rejects any analysis of the economic costs or the environmental benefits of requiring Arch to purchase carbon offsets by stating: [P]urchasing carbon credits is a voluntary financial investment that MCC may choose to entertain for business reasons. The federal agencies are not involved in any financial investment decisions that MCC makes as a corporation.87 This excuse for failing to analyze or adopt offsets lacks a rational basis. Federal agencies are deeply involved in decisions that impact lease-holder's investment decisions. Federal agencies require lease-holders to pay royalties, implement reclamation requirements, post bonds, conduct surveys, and any number of other mandates that require lease-holders to expend financial resources. BLM has required companies seeking to exploit oil and gas leases to fund numerous surveys for wildlife, cultural resources, and air quality.88 Other agencies require those damaging wetlands to participate in wetlands mitigation banks.89 The Forest Service has required mining companies to fund wildlife and law enforcement personnel, and measures to protect wildlife.90 An alternative that proposes that the Forest Service consent to MCC's proposed Lease Modifications to be conditioned upon MCC's purchase of carbon offsets would be consistent with the proposed action's purpose and need. MCC would be able to obtain the lease modifications and expand its operations in the exact same manner as it proposed. A carbon offset alternative would simply require MCC to purchase | of royalties, cultural resources, T&E species, etc. that are part of the standard and applicable lease stipulations as we have described in Section 2.2.<br><br>While commenter disagrees with our approach, this EIS includes a discussion of carbon off-sets (here carbon credits) in Section 2.3 Alternatives Considered but Eliminated from Detailed Study in compliance with NEPA (40 CFR 1502.1(a)).<br><br>Beyond the carbon credits, we state that off-sets have not been brought forward for consideration. These would be akin to requiring MCC to support wind and solar energy through financial commitment, commit to planting trees somewhere most likely in an area that is being reforested like the tropics where carbon sequestration is highest or an area that is currently in agricultural production (not specifically here as a result of reclamation which is required by lease stipulations, which does not require the 381 CCF feet of aspen (~130 trees) anticipated to be removed for exploration activities to be planted in kind), or not using electricity that was generated from fossil fuels. Methane capture and combustion may also be considered off-sets, but these are addressed elsewhere in the document.<br><br>Mitigation as determined by lease modification stipulation (also BLM IM 2017-037 (January 20, 2017)) and in compliance with the Mineral Leasing Act for coal mining must be economical. |

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | carbon credits from a reputable vendor. Moreover, offsets do not present the Forest Service or MCC with an all-or-nothing scenario - the Forest Service could require MCC to offset less than 100% of the GHG emissions attributable to the Lease Modifications. The Forest Service also states that while ""off-set (or off-site) mitigations may be possible, they have not been brought forward for consideration related to this leasing analysis.""91 To the extent that the Forest Service implies that the purchase of carbon credits or offsets was not suggested during prior comment periods, that implication is false, since conservation groups suggested offset and off-site mitigation six years ago.92 Further, as noted above, a number of programs exist from which MCC could buy carbon credits. It is also unclear why, if an exchange exists, commentators must suggest a specific project for MCC to purchase to offset its carbon pollution. Further, the Forest Service itself previously identified a number of potential offsets for this very mine in 2008.93 The Forest Service's notice of intent also justifies its refusal to consider the reasonable, available alternative of requiring Arch to purchase carbon credits or offsets on the grounds that there is no Congressionally-mandated use of national offset markets or cap-and-trade program.94 This justification lacks merit. Although it is true that Congress has not passed a law requiring coal mining companies to participate in any of the available national offset markets, that does not excuse the Forest Service's from considering this proposed mitigation measure as a reasonable alternative. Neither this proposed alternative nor the use of offsets requires a mandatory national trading program created by Congress. There are several companies that provide the opportunity for the public to purchase retail carbon offsets sold in the voluntary market.95 The process is straight-forward and could be utilized by coal companies that operate in Colorado. For example, here is how one company that sells voluntary carbon offsets describes its product: ""Carbon offsets are purchased to . . . diminish the impact of your own GHG emissions . . . for emissions that are impossible to reduce, you can use funds to help reduce emissions elsewhere.""96 There is not valid reason for the Forest Service to exclude this reasonable alternative simply because Congress has not established a national carbon cap-and-trade program. Finally, coal mine methane has been included in several other voluntary emission reduction strategies that would make methane flaring or capture in the North Fork region more economical. The Climate Action Reserve (""CAR"") comprises one of the largest, most experienced and illustrious offset registries in North America. The reserve sets high quality standards for carbon offset projects, oversees third party verification bodies, | |

BLM_0051131

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | issues carbon credits and tracks    transaction of credits over time in a transparent, publicly accessible system.97 CAR adopted the    Coal Mine Methane Project protocol which establishes standards and quantifies emission reductions for mine methane capture.98   The Verified Carbon Standard (VCS) similar to CAR is a voluntary greenhouse gas program,   which employs Clean Development Mechanism (CDM) methodology, allowing emission   reduction projects in developing countries to earn certified emissions credits.99 They also   encourage and promote the development of new, innovative emission reduction methodologies.    The VCS currently includes CMM emissions from surface, abandoned and underground mines.   The American Carbon Registry (ACR) oversees the registration and verification of carbon offset   projects that follow approved carbon accounting protocols, and issues offsets in a transparent    public registry in both the voluntary carbon market and California's regulated carbon market.100    Both CAR and ACR have been approved by the California Air Resource Board to serve as an   Offset Project Registry for the Compliance Offset program under the Cap-and-Trade program.   Additionally, the passing of Assembly Bill 32 (AB 32) and the Global Warming Solutions Act   led to the establishment of California's Cap-and-Trade regulation, which sets an enforceable   emissions cap that diminishes overall emissions over time. Although California has no active  coal mines and does not cap CMM emissions, in 2013 the California Air Resource Board developed and adopted a coal mine methane emissions protocol that provides compliance offset    credits to out-of-state coal mines, detailed above.101 CAR's coal mine methane protocol both     informed and prompted the California Air Resource Board to adopt Compliance Offset Protocol    Mine Methane Capture Projects to provide methods of quantifying GHG emissions reductions    associated with the capture and destruction of methane from active and abandoned underground   mines, as well as active surface mines. Under California's Cap- and-Trade Program, private sector entities may use compliance offset    credits to satisfy up to 8% of their compliance obligation.102 These compliance offsets serve as    tradable credits representing verified greenhouse gas emissions reductions or removal enhancements that meet regulatory criteria. Mine methane capture projects must be located in    the U.S. and comply with project eligibility criteria and regulatory program requirements.   Details regarding eligibility and regulatory criteria can be found in the ARB's mine methane   capture protocol manual.103 Offset credit verification services must be an approved ARBaccredited   offset verification body such as the ACR or CAR.104 The inclusion of compliance | |

BLM_0051132

Supplemental Final Environmental Impact Statement | Federal Coal Lease Modifications COC-1362 & COC-67232

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | offset credits is intended to help incentivize voluntary GHG emission reductions and promote development of innovative projects and technologies both inside and outside of California. The fact that there are at least two existing cap-and-trade programs that allow companies that emit GHGs to purchase offset credits for coal mine methane captured anywhere in the United States certainly changes the calculus of what is economically feasible for mines operating in the North Fork, and the Forest Service must take this into consideration in its supplemental EIS" | |
| Conservation Colorado #18-1/4 | . As explained below, and as the [CRR] SDEIS makes clear, the proposed action will harm the public by encouraging the release of vast amounts of climate pollution, by polluting millions of cubic feet a day of the dangerous greenhouse gas methane, by globally increasing climate damages, and by degrading high-elevation forests and wildlife habitat. The only beneficiary of this expansion would be Arch Coal, which this week filed for bankruptcy. The Forest Service should not undermine the public interest to benefit one company and significantly undermine the state of Colorado's commitment to reduction of methane emissions.

METHANE EMISSIONS

The [CRR] DEIS assumes that the proposal will permit mines to remove an additional 172 million tons of coal, and to continue to vent (that is, waste without attempting to capture or flare) huge amounts of methane every year. The DEIS estimates that this will allow the mines to remain open another 11-33 years depending on how fast they mine the coal. The DEIS estimates that for every additional year that the mines are operating, the net methane emissions from coal mining alone - not counting the carbon emission from coal combustion - would be enough to severely undercut, or nearly wipe out all of, the greenhouse gas reductions of one Gov. Hickenlooper's signature climate and air quality accomplishments: 2014 regulations that limit methane emissions from oil and gas operations. Those regulations are predicted to reduce methane emissions by 65,000 tons per year, the equivalent of 2.34 million tons of CO2eq.1 The Colorado Roadless Rule coal mine exception will result in a net increase of 1 - 2.1 million tons CO2eq of methane emitted.2 In addition, the addition of 172 million tons of coal to the market will result in a net increase in total CO2 emissions of 131 million tons over a period of years.3 Carbon emissions from coal combustion made possible by the coal mine exception to the Colorado | CRR SFEIS addressed these comments primarily at: 2, 6, 9, 29, 40-59, 100-106, 120, 119-121, C-5, C-13, C-26-27, E-9, E-16, E3-33-34, E-36, E-40-41, and E-45.

As it pertains to lease modifications, climate effects and emissions are described in Section 3.4.

Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.

The State agency (CDPHE) that issues air permits to the West Elk Mine is the same agency that would be concerned about air quality. See Section 3.4.

Oil and gas regulations do not apply to coal mining.

The life of the West Elk Mine is expected to be 11 years with the lease modifications.

Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. The lease modifications due to their limited coal content and short duration of mining would not likely displace any renewable energy source from the market. Coal demand is most |

BLM_0051133

*Supplemental Final Environmental Impact Statement* | Federal Coal Lease Modifications COC-1362 & COC-67232

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Roadless Rule will undo all of the climate benefits from more than 23 years of implementing the methane limits in Colorado oil and gas rule.4<br><br>CARBON EMISSIONS<br><br>First, the proposal will result in significant gross carbon emissions from coal extraction and combustion. The [CRR] SDEIS estimates that Alternative B, re-instating the coal mine roadless exception, would make available for mining 172 million tons of recoverable coal.5 ""[T]he total gross accumulated GHG [greenhouse gas] emissions"" from mining and burning that coal ""could range from approximately 449 to 486 million metric tons CO2eq, depending up the production scenario,""6 with about 10% -15% of the total coming from methane emissions during coal production.7 Assuming average levels of coal production, mining and burning the coal in the North Fork coal mining area would likely result in an additional 28.1 million tons of CO2 into the atmosphere every year for 17 years, the equivalent of:  - 94 times the volume of annual greenhouse gasses attributable to operating the Forest Service.  - More than one-fifth of all human-caused climate pollution in the State of Colorado annually.8 Three times the volume of annual carbon emissions from Colorado's single largest climate pollution source, the Craig Station coal-fired power plant. 9  Coal mine methane emissions alone attributable to this decision would be 14 times the annual greenhouse gas footprint from all Forest Service business operations nationwide.10<br><br>HAMPERING RENEWABLES<br><br>Third, the[CRR] SDEIS's market analysis shows that the addition of 172 million tons of coal to the market due to the coal mining exception will undercut the market for clean renewable energy. The SDEIS estimates that this coal will displace 40,000 gigawatt hours of renewable energy between 2016 and 2054 that would be purchased by utilities were the coal not put on the market.11 It will further displace nearly 72,000 gigawatt hours of natural gas, which burns more cleanly than coal.12 Displacing clean energy with dirty coal will thus slow the needed transition to a clean energy economy." | susceptible to the price of natural gas where the higher the gas price the greater demand for coal.<br><br>"Running the Forest Service " we assume this means the operations of buildings and fleet accounting reported under sustainable operations and does not include forest fires, timber, firewood or any of the other numerous contributors to climate effects. |
| Ramsey, Stephen #471-1 | Coal powered energy is and should be a declining portion of the energy landscape. The endless release of CO2, methane, and the poisonous chemicals concentrated and released in combustion into the environment | Effects on various resource areas are considered in Chapter 3. |

BLM_0051134

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | needs to be curtailed. The current plan to install roads and methane vent pads with methane vents in a roadless area is a poor choice for future generations. Methane is scientifically proven to be a far more harmful greenhouse gas than CO2 and has a far longer longevity in the atmosphere." | Coal use is still a large portion of energy markets worldwide and. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.

FS and BLM are acting according to existing law and regulations that govern federal coal resources Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Any policy related to coal markets is outside the scope of analysis. |
| Earthjustice #8419-26 | 3. The Forest Service Must Analyze Flaring As A Reasonable    Alternative To Reduce The Lease's Methane Pollution.    The West Elk Mine removes methane not only through ventilation systems (as VAM), it also   vents methane through MDWs. The reasonably foreseeable mine plan (RFMP) in the 2012 Lease Modifications Final EIS predicts that MCC will construct 48 MDWs to remove methane in   order to mine the lease modification areas.105 Methane vented though MDWs represented nearly   3.5 million cubic feet a day in early 2010; in 2013, that number was about 2 million cubic feet   per day. Coal mine methane from drainage wells can be combusted, or flared, before it enters the atmosphere. Flaring results in an 87% reduction in GHG emissions compared with venting     methane directly into the atmosphere.107 As the State of Colorado's 2016 report states:    From a climate change standpoint, emitting carbon dioxide is much less harmful   on the environment than a mine's direct emission of methane into the atmosphere.     Accordingly, flaring methane, which converts the residual gas emission to carbon   dioxide, has nearly the same environmental impacts as using methane to generate    electricity or heat.108     Despite the potential benefits of methane flaring, the FEIS dismisses detailed consideration of a    flaring alternative without a rational basis. Methane flaring, however, is a reasonable, practical,    effective, and feasible alternative to reduce the Lease Modifications' GHG emissions.109 There is a long and safe history of flaring at working underground coal mines. Active mine flaring has been conducted at working coal mines in Australia and the United Kingdom.110  The  Global Methane Initiative's database lists 20 operating underground mines around the world that    utilize flares, including mines in Australia, China, Mexico, Poland, Russia, South Africa, the   Ukraine, | To date flaring has not been approved in the U.S. in an active coal mining situation (i.e., the underground area where miners are working) due to safety concerns of the miners and the flammability of methane at certain concentrations. Likewise, it has not been proposed to regulatory agencies such as MSHA for consideration/approval. Further commenter refers to conceptual designs and examples from around the globe that are not subject to the same safety regulations/standards to those of the U.S.  Flaring has been approved in post-mining areas of mines (such as at the now-closed Elk Creek Mine) where there is no danger to miners. The former Elk Creek Mine has different geology and the system was to be located on private lands near the highway and existing infrastructure.  Commenter references the Trona Mine as well. Here too the situation is different than West Elk because trona, unlike coal, is not in itself flammable.

Flaring at West Elk on the lease modifications would likely require even larger expanses of land within Colorado Roadless Areas to be cleared to prevent forest fires and to remain cleared longer. |

BLM_0051135

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | and Colorado.111 Evidence was presented at a 2007 EPA conference that methane flaring at working coal mines was ""state of the art,"" and that flaring to dispose of vented methane at coal mines was ""[s]imple, low cost and reliable to operate"" with ""[l]ow maintenance requirements.""112 A 2013 Global Methane Initiative paper reinforced those conclusions.113   107 Daniel J. Brunner & Karl Schultz, Effective Gob Well Flaring 724 (1999), attached as Ex. 58. at page 6 (""The implementation of 40 flaring projects worldwide over time in most major coal mining countries suggests that flaring of CMM is deemed to be a generally accepted, proven and safe technology that does not pose an intrinsic risk when employing well-designed and operated equipment and sound operating practices.""), attached as Ex. 63, and available at https://www.globalmethane.org/documents/GMICoalFlaringNov2013.pdf (last viewed Apr. 12  2016). This white paper also emphasized that significant new information since late 2011 supported the paper's conclusions: ""In the 2 years since the November 2011 release [of the white paper's draft], much has changed with respect to the availability of carbon finance and this in turn has affected the viability of some CMM utilization projects. At the same time, there is A November 2011 compilation by the Global Methane Initiative indicated at least nine vendors worldwide selling coal mine methane flare systems.114 EPA reported in late 2014 that it had identified ""40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology,"" and that flaring projects had the advantage of being far less costly than coal mine methane energy generation projects.115   Nearly a decade ago, in a comment letter urging the Forest Service to address flaring as a reasonable alternative at the West Elk mine, EPA noted that flaring is standard practice in many industries, and concluded that ""outside of the United States, methane flaring at underground coal mines is widely accepted and approved as a safe practice.""116 As a result, EPA has repeatedly urged the Forest Service and BLM to consider flaring as an alternative in NEPA documents evaluating coal mine expansions in Colorado - including encouraging the Forest Service five years ago with respect to this very mine.117 Nearly two decades ago, EPA created a conceptual design for a system to flare coal mine methane, which the agency promoted as a way to reduce coal mine methane pollution, notwithstanding other pollutants flaring might cause.118 Other agencies have realized the potential benefits of flaring. BLM's regulations specifically permit flaring of natural gas (methane) from oil and gas wells during, inter alia, initial production tests.119 | The lease modifications are not close to infrastructure or MCC's private lands. Methane volumes, which are not tied to production rates, vented at West Elk in 2016 represent a 73% decrease over 2010 levels and would require a detailed engineering (not simply an economic review based on 6 year old data) based on the conditions specific to the West Elk Mine. At the leasing and pre-exploration stages without coal seam information, without a mining plan addressing safety, and without detailed engineering based on information that has yet to collected, it is speculative to assume that this mitigation measure or alternative is appropriate for the lease modifications' likely post-mining scenario. However, if it is likely to be effective from an engineering stand point, it must also be economically feasible per the lease stipulations that are now under BLM's instruction memo and coal mining must be economical under the MLA. |

BLM_0051136

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | MSHA has also stated that methane flaring is safe and that ""there are no specific obstacles"" preventing MSHA from approving flaring at working coal mines in western    Colorado under certain conditions.120 The State of Colorado agrees.121   growing acceptance of flaring as a safe and reliable emission reduction technology option and   the number of CMM flaring projects is growing."" Id. at 1.    And at another mine that was removing coal from GMUG National Forest lands - the Elk Creek   Mine, located just a few hundred yards west of the West Elk Mine - Oxbow Mining has   developed a system for capturing and utilizing coal mine methane to generate electricity.122  Oxbow's methane capture facilities include a flare that has been safely operated for years.123    The Colorado Division of Mining, Reclamation and Safety (""DRMS"") approved this project,   including the flare, in March 2012.124 The State of Colorado reports that the Elk Creek Mine has    been safely and economically flaring coal mine methane at Elk Creek for over three years as part   of a system that generates electricity and revenue:   In 2012, Vessels Coal Gas, Inc. (Vessels) officially began generating GHG   emission reductions from the project under the Climate Action Reserve. Vessels    had The Elk Creek Coal Mine Methane Destruction and Utilization Project    verified, registering the first offset credits via the Climate Action Reserve in   September of 2014 (CAR, 2015). Currently, the mine sends drainage gas to a   thermal oxidizer and three 1 MW electrical generating engines with the potential    to install additional engines. The mine modified the borehole that drained coal   mine gas in 2010 in order to combust the CMM through heaters that warmed mine   intake air. The project has destroyed about 1 BCF of CMM via heaters, an   enclosed flare, and three 1 MW reciprocating engines since its inception in June   of 2011.125   The Elk Creek mine project demonstrates that flaring of coal mine methane in the North Fork   Valley, as well as the use of such methane to generate electricity, is safe, technical feasible and   economically rewarding.   pm), attached as Ex. 69; letter of A. Davis, MSHA District 9 to D. Dyer, BLM (May 18, 2010),   attached as Ex. 70 (""Since flaring has not been done on active mine gobs in the past in this   MSHA district, a plan to flare would have to be reviewed by MSHA's Technical Support group   to ensure it adequately addresses all the necessary precautions to ensure safety of all persons in   the mine. There is no specific obstacle to accomplishing this …..""). 121 State of Colorado, Coal Mine Methane in Colorado (Ex. 42) at 14 (""A properly engineered,   manufactured, and operated flare with redundant safety systems can fully address [safety]   concerns.""). 122 See letter of J. Kiger, Oxbow, to B. Bowles, Colo. Div. of Mining, Reclamation & Safety,   at 1 (Oct. | |

BLM_0051137

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | 14, 2011) (stating that ""North Fork Energy LLC has determined the economic viability    of constructing and operating a facility to utilize mine methane from Oxbow's underground mine   methane collection system"" and seeking agency approval for the same), attached as Ex. 71.       123 Id. at un-paginated attachment to letter (emphasis added).   124 See letter of J. Kiger, Oxbow to F. Kirby, Office of Surface Mining, (Mar. 15, 2012),   attached as Ex. 72.   125 State of Colorado, Coal Mine Methane in Colorado (Ex. 42) at 18 (emphasis added).   Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 36   April 12, 2016   Other mines in the U.S. also flare methane. For example, the Solvay trona mine in Wyoming is   now using an enclosed flare to address methane pollution, something for which that mine is generating 1.2 million ""climate reserve tonnes"" that can be purchased as carbon offsets verified     by the Climate Action Reserve.126 Further, the Pinnacle underground coal mine in West Virginia is putting in place an enclosed flare that will also generate 1.2 million climate reserve tonnes.127 ""The flare will be located at the wellhead of the mine's highest producing gob well.""128   EPA, in comments on the 2012 Lease Modifications draft EIS, reaffirmed its belief in the practicality and environmental benefits of flaring, reinforcing the points discussed above.  [T]the DEIS evaluation did not provide or discuss any monetary benefit to flaring as a mitigation option such as carbon credits which could improve the economic  feasibility of flaring. Furthermore, EPA believes it is worth disclosing the     potential health and safety benefits attributable to using a flare to destroy VOCs and hazardous air pollutants (HAPs). More specifically, flaring of methane gas is  a standard safety practice in many industries and is routinely used during processing and production of oil and gas, from landfill collection systems and the     petroleum industry. Flaring appears to provide substantial benefit with less   capital cost than … power generation.   The [Forest Service's] reevaluation of flaring should also disclose the increasing   commercial availability and acceptance of flaring by regulatory agencies. The     MSHA safety concerns expressed in the DEIS (page 35) do not make flaring   infeasible. It is EPA's understanding that MSHA has not received or reviewed   any applications for flaring at a U.S. coal mine. EPA agrees with the    characterization in the DEIS that describes MSHA's policy of reviewing mine    applications for flaring on a case-by-case basis. MSHA does not have an official    policy on flaring of gas at coal mines, therefore MSHA would review each flaring   plan individually to ensure that it adequately incorporates appropriate protections    such as bubble traps, fail-safe valving, flame arresters, or monitoring and control   systems.   MSHA | |

BLM_0051138

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | has in fact authorized a flare for mine methane from a mine degasification system that was commissioned in August 2010 and is now operating at Solvay's underground trona mine near Green River, Wyoming. 126 Sindicatum Projects, Coal Mine Methane, US: SOLVAY, Wyoming, attached as Ex. 73, available at http://www.sindicatum.com/portfolio_item/coal-mine-methane-us-solvay-wyoming/ (last viewed Apr. 12, 2016); see also Climate Action Reserve website http://www.climateactionreserve.org/how/crt-marketplace/ (explaining how Climate Action Reserve carbon offsets work) (last viewed Apr. 12, 2016), attached as Ex. 74. 127 Sindicatum Projects, Coal Mine Methane, US: CLIFFS, West Virginia, attached as Ex. 75, available at http://www.sindicatum.com/portfolio_item/coal-mine-methane-us-cliffs-westvirginia/ (last viewed Sep. 23, 2012). 128 Id. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 37 April 12, 2016 While there are currently no United States underground coal mines operating with flares, there are approximately 23 installed coal mine methane flares elsewhere in the world. Methane flaring at underground coal mines has been approved as a safe practice by national level mine safety oversight agencies in the United Kingdom and Australia. Flares can combust methane in air with fluctuating concentrations between 30 to 100 percent by volume. Portable flares are also commercially available, to provide flexibility to move to different wells. It is EPA's understanding that Solvay now intends to utilize the gas for productive use in their processing plant. Trona mines have similar characteristics to underground coal mines in terms of their methane gas production and degasification technologies, and the experience at the Solvay trona mine should be applicable to underground coal mine operations.129 Copious evidence shows flaring to be safe, practical, and effective. New information since 2012 demonstrates that flaring is technically feasible at coal mines in the North Fork Valley and at even more mines around the world, and shows that new financial incentives at the state level (including the CARB program) have incentivized completed flaring projects. Therefore, the supplemental EIS must do what the 2012 Lease Modifications Final EIS failed to: analyze a flaring alternative in detail. Such an alternative would allow MCC to produce the coal within and adjacent to the Lease Modifications, thereby fulfilling the project's purpose and need, while reducing the damaging impacts of methane pollution. In the 2012 Lease Modifications Final EIS, the Forest Service failed to provide any basis at all for failing to consider a flaring alternative. It simply ignored EPA's and conservation groups' request that such an alternative be considered. The final EIS provided no | |

BLM_0051139

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | reason for its failure to do so. While the final EIS ""considered but eliminated from detailed study"" two alternatives concerning methane pollution control - (1) ""requiring MCC to use MDW ventilation air methane,"" and (2) ""requiring MCC to purchase carbon credits or do off-set mitigations"" - neither of these eliminated alternatives involves flaring.130 The 2012 Lease Modifications Final EIS's failure to even address the alternative of methane flaring cuts ""the heart"" out of the NEPA process. 40 C.F.R. § 1502.14; All Indian Pueblo Council, 975 F.2d at 1444. The supplemental EIS must address this clear error. Rather than address the flaring option as an alternative, as required by NEPA, the final EIS merely considered giving MCC the option of flaring as a mitigation measure.131 There, the Forest Service downplayed the feasibility of flaring. But this ""analysis"" failed to provide the necessary justification required by NEPA for failing to fully analyze a reasonable alternative of mandating that MCC flare methane. Indeed, the final EIS did not address at all - or explain why it did not address - the option of requiring flaring, even as a mitigation measure. This failure to take the required ""hard look"" at the impacts of a potential flaring alternative, even in the guise of a mitigation measure, violated NEPA. This violation is one that the Forest Service must remedy in the supplemental EIS, particularly given that the Forest Service must, in any event, address significant new information concerning the technical and financial feasibility of flaring. First, the FEIS's discussion of flaring as a mitigation measure fails to disclose flaring's environmental benefits. For example, EPA told the Forest Service that the FEIS should ""disclos[e] the potential health and safety benefits attributable to using a flare to destroy VOCs and hazardous air pollutants (HAPs).""132 The 2012 final EIS contained no discussion of such benefits, nor did it explain its omission. Second, as with its discussion of VAM, the Forest Service pleaded ignorance as to whether an effective flaring system could be designed.133 Again, the Forest Service failed in its duty to explore options and track down information, not simply to rely on its own ignorance of a particular topic to dismiss an alternative. Numerous coal mines across the globe - and one just across Highway 133 from West Elk, safely and cost-effectively use flares to destroy coal mine methane. The Forest Service could have investigated these other mines so that the decisionmaker and the public could understand the potential need for supplemental fuel and cost issues. The Forest Service's failure to obtain this necessary information demonstrates that the agency failed to take the ""hard look"" NEPA requires. Again, the Forest Service must remedy this failure in the supplemental EIS in light of significant new information concerning | |

BLM_0051140

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | flaring.    Third, the 2012 Lease Modifications Final EIS alleged that MSHA's approval of flaring at a   working trona mine a few hours drive from the West Elk Mine was somehow not relevant to   whether MSHA would approve flaring at a working coal mine.134 The final EIS also   downplayed the role of flares world-wide, characterizing this pollution control practice as ""in   limited use in other countries."" 135 These characterizations are misleading. EPA published a   conceptual design for a flare nearly two decades ago; flaring is in common practice in working   coal mines and in other industries world-wide; and MSHA has invited all comers to propose a   flare at a working mine. The record before the Forest Service - in 2012, and even more so now -    conclusively demonstrates that flares are a practical, reasonable, economical, and safe way to     reduce methane pollution.    In sum, because methane flaring is a reasonable, practical, proven, effective, and feasible   alternative to reduce methane pollution, and because significant new information further supports this conclusion, the supplemental EIS must address the reasonable alternative of requiring MCC    132 EPA July 2012 Comment Letter (Ex. 29) at 7.    133 2012 Lease Modifications Final EIS at 68 (""The probability of needing to provide   supplemental fuel, or allow for the bypass of the flare is not known at this time, and therefore the   portable flare mitigation effectiveness is uncertain. It is unlikely that supplemental fuel would be   supplied to a portable flare located at an individual MDW, given the cost and additional safety considerations that would need to be realized.""). 134 Id. at 68-69.   135 Id. at 68.    Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 39    April 12, 2016    to flare some or all of the methane vented from the West Elk mine or from the lease   modifications area as a condition of those modifications." | |
| Earthjustice #8419-2 | failure to use the best available data on the likely rate of methane emissions, including data from ten years of coal mining (rather than only the last three years as in the Colorado Roadless Rule 2015 SDEIS);    to consider a range of reasonable alternatives, | CRR has addressed this comment in its SFEIS at 42, 46, 123, E30-31, E33.

This analysis includes Figure 3-5 displaying the reported methane levels and the trend at the West Elk Mine since 2010 and an analysis of methane in Section 3.4. This 6 year dataset was used because this has the same reporting requirements to EPA unlike prior-year reporting which was to MSHA based on safety requirements. The EPA has recognized the limitations of MSHA-collected data |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | for determining underground coal mine methane emissions and has recently proposed changes to the Greenhouse Gas Reporting program to improve the quality of methane emissions estimates. EPA has specifically proposed to no longer allow MSHA (i.e., pre-2010 data) quarterly inspection reports to be used as a source of data for monitoring methane emitted by ventilation systems. EPA is recommending this change because it has determined that the quarterly flow rate data gathered by MSHA cannot reliably be used for greenhouse gas reporting purposes (81 Fed. Reg. 2565-2566). |
| **Exploration** | | |
| Mount Gunnison Fuel Company #8959-4 | Alternative 3 also includes a proposed exploration plan that is built on Ark land Company's careful drilling, monitoring, and reclamation practices; its rigorous adherence to applicable lease stipulations, state and federal policies, regulations and laws' its best practices in decommissioning and rehabilitating mined areas; and its corporate citizenship in the community." | Affected private landowners have stated their support of MCC. No further response required. |
| Earthjustice #8419-32 | IV. THE SUPPLEMENTAL EIS MUST ADDRESS THE IMPACTS OF ARCH'S PROPOSED EXPLORATION PLAN. The Forest Service intends to address in the supplemental EIS whether to concur to Arch Coal's  Sunset Trail Area Coal Exploration Plan within the Lease Modifications area.161 To comply with NEPA, the Forest Service must disclose the impacts of, and alternatives to, this proposed action

A. The Supplemental EIS Must Include Maps That Help The Reader And Decisionmaker Understand Potential Impacts Of Exploration.   Neither the 2012 Lease Modifications FEIS nor the 2013 Sunset Trail Area Exploration Plan EA  contain maps that depict or identify important resources, in particular those resources likely to be  impacted by road construction for exploration. The supplemental EIS must address this deficit  so that the public can obtain a basic understanding of the proposal.  For example, the Lease Modifications notice of intent contains a detailed explanation of the road  network Arch will | Exploration is included throughout this EIS in Alternatives 3 & 4. Exploration maps are included. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | use to move people and equipment to implement the Exploration Plan.162 That explanation identifies roads by either number (NFSRs 701, 711, 711-2A, and 711-2C), by name (Lick Creek Road) or by general description (""Highway 133 to the West Elk Mine   entrance and the private"" and ""National Forest administrative road through Sylvester Gulch to   National Forest System Road (NFSR) 711."").163 This type of detail could enable the reader to   identify potential conflicts with other road users, with recreational use along the routes, with   wildlife habitat in the area, etc. But neither the 2012 Lease Modifications Final EIS nor the 2013   Sunset Trail Area Exploration Plan EA includes maps that identify any of these routes, or that   would allow the reader to understand where they are located. The Forest Service should remedy   this deficiency in any subsequently prepared NEPA document by providing maps that display and identify the access routes by name and number. While much of this information may be   available through other publicly-available maps, neither the public nor agency decisionmakers   should be forced to attempt to guess at the agencies' meaning, or rummage around the internet to   locate relevant data.   Further, the maps in the 2013 Sunset Trail Area Exploration Plan EA reveal so little detail that   they make it impossible to understand the plan's potential impacts. The EA contains two maps:   a ""Location Map"" covering hundreds of square miles (and with incorrect scale as part of Map""   legend); and a map displaying the ""Location of Exploration Drilling and Access and Stream   Crossings.""164 The exploration and drilling map fails to display: elevation, vegetation type,   surface water bodies (other than streams), wetlands, where access routes from adjacent private   land connect to any adjacent road network, roadless area boundaries, wilderness capable lands, 161 See 2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8900. 162 Id. at 8902-03.   163 Id., 81 Fed. Reg. at 8902.   164 2013 Sunset Trail Area Exploration Plan EA at Figure 1 (page 3) and Figure 2 (page 5). The location map, Figure 1, indicates that the map's scale is about 200 miles to the inch, which is   clearly incorrect.   Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 46   April 12, 2016   or any other useful information. This makes it virtually impossible to understand what values may be degraded by road construction and drill pad clearing. Figure 2, for example, shows the access road to drill-pad SST-7 crossing a stream. What it does not show is that the access road to drill-pad SST-7 will bifurcate a stand of spruce-fir; the pad   itself may be located in spruce-fir forest as well.165 One can attempt to divine this by comparing   Figure 2 with the map on page 119 of the 2012 Lease Modifications FEIS (map of Major | |

BLM_0051143