| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Vegetation Cover). The road between drill-pads SST-8 and SST-10 will apparently also cut through a spruce-fir stand, and SST-3 will be within, and require road construction through, another spruce-fir stand.166 These stands have value as potential lynx denning habitat (among other values). But only by painstakingly comparing the two maps - and some guesswork - can one attempt to understand these potential impacts. Again, neither the public nor the decisionmaker should be forced to do this because the agencies can easily prepare helpful maps, and because NEPA requires agencies to provide to the public ""high quality"" and ""accurate"" information, and to ""help public officials make decisions that are based on understanding of environmental consequences.""167 In addition, Figure 2 depicts the road connecting drill pads SST-6 and SST-9 with seven, tight hairpin turns. Without elevation data, however, the public cannot understand the impacts of this route on visual, soil, and other resources. Absent elevation data, the reviewer of the EA would not understand that that road construction will involve 600 feet of elevation gain over a 5,055- foot stretch of road. A map overlaying the roads onto topography makes the potential impact obvious.168 These roadcuts (and, if reclaimed, clearcuts) on this steep, prominent slope will be visible for miles,169 and they will be directly adjacent to one of the most eye-catching features on the landscape: the large slide or slump at the head of Deep Creek.170 Parts of the access road and drill pad itself are less than a quarter of a mile from this feature. Further, lacking elevation data, one may not understand that construction of such a steep road - the average grade is about 12%, greater than the steepest road grade of any mountain pass in Colorado171 - may create significant 165 See Earthjustice, Map, Exploration Plan - Vegetation Cover (Apr. 7, 2016), attached as Ex. 81. 166 Id. 167 40 C.F.R. § 1500.1(b), (c). 168 See Earthjustice, Map, Exploration Plan - Topography (Apr. 6, 2016), attached as Ex. 82. 169 The slope on which roads will be cut is easily visible from many locations, including from NFSR 711, and from Apache Rocks, an overlook on NFSR 711.2B. 170 In the Forest Service's 2005 evaluation of the Sunset Roadless area, the agency identified the ""Deep Creek Slide"" as ""a striking geologic feature."" See 2012 Lease Modifications Final EIS at 480. 171 See Colorado Dep't of Transportation, Maximum Grades on Colorado Mountain Passes (showing steepest mountain pass road grades in the state at less than 10%), attached as Ex. 83, and available at https://www.codot.gov/travel/maximum-grades-on-colorado-mountainpasses. html (last viewed April 12, 2016). Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 47 | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | April 12, 2016 erosion hazards. Cut and fill required for the roads and pads on such steep terrain is likely to increase the construction's on-the-ground footprint, and make it even more of a visual eyesore. Therefore, any subsequently prepared NEPA document should include a map or maps displaying the proposed road network for exploration together with elevation, vegetation type, surface water bodies (other than streams), wetlands, riparian areas, the adjacent road network, roadless area boundaries, wilderness-capable lands, and any other useful information. We attach hereto several such maps that display wildlife habitats in conjunction with the proposed Exploration Plan roads, drill pads and stream crossings, and urge the Forest Service to include such maps in the supplemental EIS.172" | |
| **Cultural** | | |
| Patriana, Zarah #1-72 | Your analysis of the effects on Cultural Resources is virtually non-existent. In Table 3.6 you state that Traditional cultural properties and sacred sites are at risk of being damaged, looted or destroyed, yet nowhere in the document do you discuss the National Historic Preservation Act Section 106 process. Was this analysis even done? What archaeological surveys were done? How many archaeological or historic sites are going to be directly impacted by this project? What mitigation efforts are going to be taken to address the loss of the sites and associated features, not to mention the loss of information that goes along with the sites? When National Register status was being evaluated were the sites actually tested to determine subsurface depth or did someone just look at the sites and make a snap decision that they aren't eligible? The U.S. Forest Service is notorious for doing as little as possible when it comes to the analysis of cultural resources and because they have never been sued by anyone for blatantly ignoring or manipulating the laws that regulate how cultural resources are supposed to be managed and because the State Historic Preservation Offices do little to address the issues, cultural resources continue to be damaged or destroyed by these types of projects. The Forest Service will barely fund the cultural resources programs let alone pay the costs to mitigate the impacts to those sites. Under the NEPA process this should be fully addressed and documented in the CEs, EAs, or EISs produced for any projects. | We believe these comments were submitted on the CRR SDEIS based on the reference to the Table 3.6 and also submitted to the forest on the lease modifications. However, for the Lease Modifications, cultural surveys have been conducted, via contract paid for by proponent, for ground disturbing activities per the requirements of NHPA. See Section 3.19 for summary. Lease stipulations require compliance with NHPA and are subject to reporting and other consultation requirements (Table 2-1). |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| **Climate Change** | | |
| Zukoski, Ted #9759-1 | This letter addresses and attaches two new scientific studies addressing the impacts of climate change on lands (including national forests) in the western U.S. that should inform the Forest Service's assessment of the proposed coal mine exception. Both studies demonstrate the urgent need to address the climate crisis, and therefore provide additional basis for rejecting the coal mine exception, which according to the Forest Service could make available for mining up to 170 million tons of coal, and could unleash more than 130 million tons of CO2. First, a study published in the Proceedings of the National Academy of Sciences concludes that human-caused climate change nearly doubled the area impacted by forest fire in the West over the last thirty years. The study found that human-caused warming in the period 2000 to 2015: contributed to 75% more forested area experiencing high … fire-season fuel aridity and an average of nine additional days per year of high fire potential…. We estimate that human-caused climate change contributed to an additional 4.2 million ha [10.4 million acres] of forest fire area during 1984-2015, nearly doubling the forest fire area expected in its absence. [A]nthropogenic climate change has emerged as a driver of increased forest fire activity and should continue to do so ….1 1 J. Abatzoglou & A. Williams, Impact of anthropogenic climate change on wildfire across western US forests, Proceeding of the National Academy of Sciences (Oct. 2016) at 1, attached as Ex. 1. Letter to Acting Regional Forester Buchanan re: Supplemental Comments on Colorado Roadless Rule Page 2 October 21, 2016 For comparison to the estimate that climate change contributed to over ten million acres of forest fire area since 1984, we note that the total acreage of national forest land in Colorado is about 13 million acres. The study concludes that climate-caused wildfire will worsen in the future, and will tax the Forest Service's budgets even further: The growing ACC [anthropogenic climate change] influence on fuel aridity is projected to increasingly promote wildfire potential across western US forests in the coming decades and pose threats to ecosystems, the carbon budget, human health, and fire suppression budgets that will collectively encourage the development of fire-resilient landscapes. Although fuel limitations are likely to eventually arise due to increased fire activity, this process has not yet substantially disrupted the relationship between western US forest fire area and aridity. We expect anthropogenic climate change and associated increases in fuel aridity to impose an increasingly dominant and | Drought and forest fire have been considered in Climate effects in Section 3.4 and other relevant sections. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | detectable effect on western US forest fire area in the coming decades while fuels remain abundant2 In sum, climate change will continue to alter forests and consume agency funding. And as the Forest Service has admitted, approving the coal mine exception will add to and worsen climate change. Second, a peer-reviewed article in Science Advances published this month estimates that the chance of a ""megadrought"" - a period of ""aridity as severe as the worst multiyear droughts of the 20th century [that] persist[s] for decades"" - in the American Southwest before the end of the century is between 70% and 99%, in large part due to human-caused climate change.3 The study projects that: business-as-usual emissions of greenhouse gases will drive regional warming and drying, regardless of large precipitation uncertainties. We find that regional temperature increases alone push megadrought risk above 70, 90, or 99% by the end of the century, even if precipitation increases moderately, does not change, or decreases, respectively. Although each possibility is supported by some climate model simulations, the latter [99% risk] is the most common outcome [of the models used]. An aggressive reduction in global greenhouse gas emissions cuts megadrought risks nearly in half.4 By making possible coal mining and coal combustion that could result in more than 130 million tons of carbon emissions, the coal mine exception will make a megadrought in Southwest more likely. This is yet another reason the Forest Service should adopt the ""no action"" alternative. 2 Id. at 4 (citations omitted). 3 T. Ault et al., Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest, Science Advances (Oct. 5, 2016) at 1, attached as Ex. 2." | |
| Zukoski, Ted #9757-4 | "III. The Forest Service Should Comply With The Council On Environmental Quality's Final Guidance On Climate Change And NEPA Reviews.... This memorandum replaces the Draft Guidance issued in December 2014 and relied upon and cited to in the [CRR] SDEIS.<br><br>We note also that the Interagency Working Group updated its social cost of carbon technical support document in August 2016, although that update does not change the social cost estimates. Rather it includes ""additional discussion of uncertainty in response to recommendations from the National Academy of Sciences."" Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, ""Technical Support Document: Technical | CEQ's Final guidance was directed to be rescinded on March 28, 2017 and was formally withdrawn on April 5, 2017 (Federal Register / Vol. 82, No. 64 / Wednesday, April 5, 2017 / Notices).<br><br>As of March 28, 2017, EO 13783 requires, "Review of Estimates of the Social Cost of Carbon, Nitrous Oxide, and Methane for Regulatory Impact Analysis." Requires the Social Cost technical reports (including EO 12866) to be withdrawn and the committees that prepared them disbanded. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866,"" (Aug. 2016), | |
| Zukoski, Ted #9758-1 | Each of these reports demonstrate that approving the proposed [CRR] coal mine exception would undermine our national climate objectives and conflict with the international commitments our country made as part of the…[Paris Accord]. These reports thus provide additional support for choosing the ""no action"" alternative and rejecting the coal mine exception. …<br><br>The first of the three new reports, entitled ""The Sky's Limit"" published in September 2016 by Oil Change International, calculates how much fossil fuel can be burned under a carbon budget that will enable the U.S. and the rest of the world to avoid the most catastrophic impacts of climate change, as measured by the necessary emission reductions set in the Paris Agreement.2<br><br>The second, an article in the peer-reviewed scientific journal Nature Climate Change, concludes that existing federal policies and finalized regulations are insufficient to meet the nation's greenhouse gas reduction commitments adopted in the Paris Agreement.<br><br>3 The third, a report by the White House Council of Economic Advisors, confirms that current policies proposed and implemented by the Obama administration, including the currently-stayed Clean Power Plan, are insufficient to achieve the U.S.'s greenhouse gas reduction commitments agreed to as part of the Paris conference.4… | The Paris Accord did not prescribe any particular course of action for the U.S. This site-specific analysis does not change federal policy regarding coal nor did the Paris Accord. |
| Earthjustice #9711-1 | This letter addresses new information regarding two issues: (1) the impacts of climate change on fires impacting national forests; and (2) the impacts of climate change on ecosystems and vegetation on the Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forest.…The Forest Service admits that climate change is a key factor in both the ongoing spruce beetle epidemic and sudden aspen decline, and predicts significant changes to forest structure over the next 44-84 years. The Final EIS states that ""documented climate trends"" are ""creating conditions conducive to beetle outbreaks"" impacting spruce-fir forests.8 Relying on earlier studies, the Final EIS concludes that the western U.S. will suffer a catastrophic loss of spruce-fir habitat in the next 45- 85 years due to climate change:…The SBEADMR Final EIS looks specifically at the likely impacts of climate change on sprucefir | This comment was submitted on CRR and lease modifications. CRR addressed the issue of forest fires at E45-46: "Information provided in the Gunnison Basin Climate Change Vulnerability Assessment (Neely et al. 2011) has been addressed more specifically in the specialist reports and SFEIS. Regarding the climate change points, the potential cumulative effects of climate change were discussed in general in the SDEIS and acknowledged as another potential stressor to species. Connected mining actions are reasonably foreseeable under Alternative B and Alternative C, |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | forests within the GMUG National Forest as a result of climate change, and concludes they will be similarly dramatic: The Rehfeldt (2015) model (Figure 3) projects little remaining habitat for spruce on the Uncompahgre Plateau, and substantial loss in the West Elk Mountains, east of Grand Mesa, and south of the Black Canyon/Blue Mesa Reservoir. Much of the Grand Mesa and low elevations elsewhere are in the threatened zone.... About 22% of the current spruce distribution is classified as lost and 58% is classified as threatened, meaning that it is conceivable that 80% of current spruce distribution may not continue into the next century.10 In addition to the impacts on spruce-fir forests, the Forest Service recognizes that climate change is a key factor causing sudden aspen decline (SAD).... Due to expected increases in dry weather [attributable to climate change], especially drought, more cases of SAD are expected. Suitability for aspen in the Southern Rockies is expected to deteriorate rapidly through the rest of the century. Rehfeldt's (2015) bioclimatic model (Figure 4) and studies on climatic change point to a complete loss of aspen in some lower-elevation sites and on south slopes ....11 As with spruce forests, the [SBEADMR] Final EIS concludes that climate change will eliminate vast swathes of aspen forest across the GMUG National Forest. Maps in the [SBEADMR] Final EIS display the likely near-elimination of spruce and aspen on the Uncompahgre Plateau and in the North Fork Valley in the next 44 years.13 The loss of wildlife, water, and recreation that these forests protect will have economic and fiscal impacts on local communities and the state. It will also impact the Forest Service's budget. The agency is committed to spending tens of millions of dollars over the next decade to reduce the impacts to spruce and aspen decline from climate change through logging via SBEADMR projects.14 If the Forest Service approves the Colorado Roadless Rule coal mine exception, the agency will pave the way for the release of millions of tons of climate pollution from coal mined and methane wasted on the GMUG National Forest, needlessly worsening climate change in the very forest where the agency is predicting climate change dramatically alter spruce and aspen forests. A Forest Service decision rejecting the Colorado Roadless Rule coal mine exception will not, by itself, eliminate the impacts of climate change on the GMUG's spruce and aspen forests. However, approving the Colorado Roadless Rule amendments will clearly add to, and worsen, climate change, and with it fire and forest loss predicted in these two documents. To protect its budget, and America's forests, this new information underscores that the Forest Service should take strong action to | and will add GHG emissions to atmospheric concentrations.<br><br>However, it is not feasible to link these specific emissions to climate change impacts on the species identified in the comments. It is not possible under current science to evaluate a cause and effect relationship between the indirect GHG emissions from future connected activities (potential coal mining, transportation, and combustion) and special status species in the CRAs or North Fork Coal Mining Area. Therefore, the effects of activities specific to the North Fork Coal Mining Area and relationship to climate change and cumulative impacts to species in the local area are difficult to quantify or reasonably evaluate.<br><br>The approach taken in the [CRR] SDEIS was to acknowledge climate change as an additional cumulative stressor in the environment. As an agency, the Forest Service is acutely aware of and concerned about climate change. The Forest Service is actively working with stakeholders to develop new science and refine management strategies for the national forests and grasslands and habitats in the face of climate change. The agency also encourages and welcomes ongoing dialogue with the public about ways to do this more effectively."<br><br>Coal production in the lease modifications is not expected to increase over currently permitted levels, but will be extended a couple of years. Power plants would not be expected to increase production because of this coal since the market will allow the purchase of coal from other vendors. MCC does not currently have long-term contracts |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | do no climate harm. It should therefore reject the Colorado Roadless Rule coal mine exception." | in place and is selling its coal on the spot market. Methane released from the MWDs, emissions, and downstream combustion of coal will all continue to contribute GHGs that lead to climate effects which are not discernable to the project scale.<br><br>Not only do fossil fuels contribute to climate change, forest fires also release bursts of CO2 over short duration that increases climate effects. Fire suppression efforts for the past century have also contributed to the conditions that intensify fires and the release of CO2 related to those fires and human-caused fires have represented over 80% of fire ignitions.<br><br>Abatzoglou and Williams report "increased forest fire activity across the western continental United States (US) in recent decades has likely been enabled by a number of factors, including the legacy of fire suppression and human settlement, natural climate variability, and human-caused climate change." They also stated, "Anthropogenic climate change accounted for ~55% of observed increases in fuel aridity from 1979 to 2015 across western US forests, highlighting both anthropogenic climate change and natural climate variability as important contributors to increased wildfire potential in recent decades."<br><br>Balch et al also report "The economic and ecological costs of wildfire in the United States have risen substantially in recent decades. Although climate change has likely enabled a portion of the increase in wildfire activity, the direct role of people in increasing wildfire activity has been largely overlooked. Humans have vastly expanded the spatial and seasonal "fire niche" in the coterminous United States, accounting for 84% |

| Commenter-Comment # | Comment | Response to Comment |
| --- | --- | --- |
| | | of all wildfires and 44% of total area burned. During the 21-y time period, the human-caused fire season was three times longer than the lightning-caused fire season and added an average of 40,000 wildfires per year across the United States. Human-started wildfires disproportionally occurred where fuel moisture was higher than lightning-started fires, thereby helping expand the geographic and seasonal niche of wildfire. Human-started wildfires were dominant (>80% of ignitions) in over 5.1 million km2, the vast majority of the United States, whereas lightning-started fires were dominant in only 0.7 million km2, primarily in sparsely populated areas of the mountainous western United States. Ignitions caused by human activities are a substantial driver of overall fire risk to ecosystems and economies."<br><br>EPA concludes:<br><br>•Climate change will likely alter the frequency and intensity of forest disturbances, including wildfires, storms, insect outbreaks, and the occurrence of invasive species.<br><br>•The productivity and distribution of forests could be affected by changes in temperature, precipitation and the amount of carbon dioxide in the air.<br><br>•Climate change will likely worsen the problems already faced by forests from land development and air pollution.<br><br>Climate changes directly and indirectly affect the growth and productivity of forests through changes in temperature, rainfall, weather, and other factors. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Moore, Chris #254-2 | We need those trees to help clean our air. | Effects air and climate are disclosed in Section 3.4, effects on vegetation are found in Section 3.9. |
| Resley, Terri #297-2 | There is no justification for losing carbon absorbing trees in order to mine harmful carbon emitting coal. | Effects air and climate are disclosed in Section 3.4, effects on vegetation are found in Section 3.9. |
| Kuhnert, Robert #308-2 | 2) Not only does it destroy natural air cleansing and oxygen generating trees, but produces coal, a proven climate destroyer, another double loss. | Effects air and climate are disclosed in Section 3.4, effects on vegetation are found in Section 3.9. |
| Earthjustice #9752--3 | On June 20, President Obama delivered remarks at Yosemite National Park extolling the majesty of the National Parks, and declaring that climate change is ""the biggest challenge we're going to face in protecting this place and places like it.""… <br><br> 1 He described the harms climate change is causing now and the urgent need for action while condemning those who pay ""lip service"" to protecting our natural areas while making climate change worse: … <br><br> 2 If the Forest Service adopts the coal mine exception, it will be taking exactly the course that President Obama warns against: bulldozing landscapes, undercutting the ""clean energy revolution,"" and giving only ""lip service"" to the idea that protected areas are important while opposing the very thing - leaving the 170 million tons of coal in the ground - that is required to protect those areas and the planet from the costly impacts of climate change. In addition, less than a week before the President's speech in Yosemite, Secretary of State John Kerry announced an agreement with Norway on climate change and the management of forests, the purpose of which was to make ""further progress in fighting deforestation and curbing greenhouse gas emissions.""3 The agreement states that ""[b]oth Norway and the United States note their intention to continuing their efforts to reduce emissions and enhance sinks on their lands, promoting overall climate benefits, consistent with their Nationally Determined Contributions under the Paris Agreement."" <br><br> 4 Adopting the coal mine exception will undermine both goals, At a minimum, any subsequently prepared NEPA document must disclose the conflict | These climate change conversations do not represent current U.S. government policy. Climate effects are addressed in Section 3.4. <br><br> The Paris Accord did not prescribe any particular course of action for the U.S. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | between President Obama's policy and the proposed action, which contradicts that policy." | |
| Earthjustice #8419-31 | III. THE SUPPLEMENTAL EIS MUST ADDRESS NEW INFORMATION CONCERNING THE NATURE AND IMPACTS OF CLIMATE CHANGE. As discussed above, significant new information concerning the scientific understanding of climate change, the likelihood of abrupt climate change, the need to limit carbon dioxide and methane emissions, the technical and financial feasibility of climate pollution mitigation measures, and the impacts of climate change on the GMUG National Forest has become available since the Forest Service completed its final EIS on the Lease Modifications in August 2012. The supplemental EIS must disclose and address all of this new information. 152 2012 Lease Modifications Final EIS at 40. 153 2012 Lease Modifications ROD at 29. 154 See Map, MCC Lease Modifications (from USFS Project File) attached as Ex. 78. 155 2012 Lease Modifications Final EIS at 552. 156 2012 Lease Modifications Final EIS at 571. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 44 April 12, 2016 The supplemental EIS must also address other significant new information concerning the impacts of climate change on water resources in the Colorado River basin and on human health. We urge the Forest Service to review and disclose the findings of the following recent reports: - A March 2016 Bureau of Reclamation report entitled ""SECURE Water Act Section 9503(c) - Reclamation Climate Change and Water 2016."" This study concludes, among other things, that climate change will be one factor leading to ""reduced volumes of water stored in system reservoirs and a vulnerability to water delivery shortages"" in the upper Colorado River basin; ""reduced hydropower production"" there; ""reduced access to shoreline recreational facilities;"" and shifting the date of peak runoff 12 days earlier than at present by the end of the century.157 - A March 2016 report from the U.S. Global Change Research Program entitled ""The Impacts Of Climate Change On Human Health In The United States.""158 The study's summary explains that: Climate change is a significant threat to the health of the American people. The impacts of human-induced climate change are increasing nationwide. Rising greenhouse gas concentrations result in increases in temperature, changes in precipitation, increases in the frequency and intensity of some extreme weather events, and rising sea levels. These climate change impacts endanger our health by affecting our food and water sources, the air we breathe, the weather we experience, and our interactions with the built and natural | Section 2.3 Alternatives Considered but Eliminated from Detailed Study considers methane mitigation technologies. Nothing in this analysis precludes these methane reduction measures if conditions in a future mine plan meet the lease stipulations ensuring these are technically and economically feasible (Table 2-2 lease addendum per BLM IM 2017-037 (January 20, 2017)). These mitigations/alternatives have been considered at commenter's request.<br><br><u>Reduced water storage</u> and <u>human effects</u> are listed in the climate section in Section 3.8 and 3.21 as a possible result of global climate change which cannot be discretized to the project level. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | environments. As the climate continues to change, the risks to human health continue to grow.159 The report estimates that extreme heat is likely to kill 27,000 Americans annually by 2100, and more than half of those deaths will be attributable to climate change.160 These two reports indicate that the impacts of climate change are likely to worsen, which is significant and relevant new information given the Forest Service's proposal to do nothing to address the climate pollution impacts of mining and burning the 19 million tons of coal to be made available by the Lease Modifications. The Forest Service must address and respond to these reports in its supplemental EIS. | |
| Earthjustice #9739-3 | III. THE [CRR] SDEIS FAILS TO ADDRESS ADEQUATELY THE CLIMATE CHANGE IMPACTS OF COAL MINING AND COAL COMBUSTION.<br><br>A. NEPA Requires Agencies To Disclose Significant New Information In A Supplemental EIS. The High Country court held that the Forest Service's analysis of the Colorado Roadless Rule coal mine exception violated NEPA by: failing to quantify projected greenhouse gas (GHG) emissions likely to occur from additional coal mining as a result of implementing the coal mine exception's goal: prolonging the life of coal mines in the North Fork Valley. Id. at 1195-96. failing to disclose the GHG emissions resulting from combustion of North Fork Valley coal made available as a result of implementing the coal mine exception's goal. Id. at 1196-98. - failing to respond to the expert report of Dr. Thomas Power concerning the GHG emissions likely to occur as a result of both mining and combustion, which critiqued .. Other significant new information includes, but is not limited to: data about the pace and impacts of climate change and the need to limit fossil fuel combustion; data about the importance of protecting roadless habitat; changed circumstances concerning local, national, and international coal markets; and data concerning wildlife.<br><br>B. The Precedent-Setting Analysis In The [CRR] SDEIS Is A Step Forward That Must Be Improved On Before Being Used In Future Agency Decision-Making. The SDEIS attempts to respond to the court's order by disclosing the climate impacts of the proposed action in several ways.…<br><br>First, the SDEIS estimate the gross quantity of carbon emissions annually from coal extraction and combustion, and compares those emissions to useful yardsticks, including total annual statewide emissions and total annual emissions from U.S. Forest Service business operations.140 The analysis | CRR SFEIS includes a social cost of carbon and methane analysis and combustion as indicated by commenter at 2, 6, 9, 28-29, 40-59, 100-106, 120, 119-121,126, 128 C-5, C-13, C-25-27, E-9, E-16, E3-33-34, E-36, E-40-41, and E-45, E67-68. The social cost of carbon analysis, which was designed for use at the rule making level, has been replaced by guidance contained in OMB Circular A-4, which also applies at the regulatory and not the project specific level.<br><br>Neither SCC nor Social Cost of Methane analysis is included in this leasing EIS for the reasons cited in Section 3.4. Private lands are considered throughout this EIS. Combustion and methane venting are considered in this EIS in Section 3.4.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Coal use is still a large portion of energy markets worldwide. EIA 2017 projects that coal will be a large part of the U.S. energy sector through at least 2040. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | identifies different categories of sources of climate pollution in terms of activities (e.g., combustion, production, and shipping) and gasses (e.g., CO2, methane, N20), and displays those numbers in charts and tables.141 We found this type of analysis to be useful.<br><br>Second, the SDEIS attempts to estimate the net quantity of carbon emissions annually from coal extraction and combustion, taking into consideration the shifts in the mixtures of energy used to generate electricity, as well as the production of different types of energy, that would result from the addition of 172 million tons of coal to the market.142 The SDEIS discloses not only the net increase in total CO2 emissions, but also what type of fuel the mined coal would displace broken down by type of energy (including natural gas and renewable energy).143 Again, this type of comparison, done properly, would provide the public and the decisionmaker with helpful information about the actual climate impacts of a proposal to unlock fossil fuel resources. Given that 40% of the nation's coal, 21% of our oil, and 14% of our natural gas come from federal public lands, obtaining an accurate understanding of the net climate change emissions caused by the mining of federal fossil fuels is critical. However, the SDEIS's analysis likely vastly underestimates the climate pollution and market displacement effects of this coal because it fails to account for significant climate emissions (methane), and fails to account for significant market responses that could result in more coal combustion and more displacement of cleaner sources of power. However, the SDEIS's approach is deeply flawed due to its failure to address the social cost of methane, its failure to properly estimate methane emissions, its invention of a ""best case scenario"" discount rate, its failure to use a model that addresses consumers' reaction to lower electricity prices, and other flaws discussed below. All of these flaws lead the SDEIS to significantly underestimate the social costs of the proposed action. C. Background: The Social Cost Of Carbon the Forest Service must include the social cost of carbon in its supplemental [CRR] EIS as a way of disclosing the scope and nature of climate pollution impacts including but not limited to the increase in climate pollution from coal combustion - on the human environment.149<br><br>D. The Supplemental EIS Fails To Accurately Project The Volume Of Coal Made Available By The Action Alternatives One of the most significant changes between the 2012 FEIS and the SDEIS is the fact that the SDEIS slashed the estimated the volume of coal available under the proposed action by 50%, from | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | 347 million tons to 172 million tons. This estimate has critical implications for the rest of the SDEIS's analysis: the volume of coal that could be combusted; the CO2 impacts from that combustion; how long existing mines would remain mining coal, which impacts the volume of methane emissions due to mining; the social costs of those emissions; etc. The SDEIS's explains that the estimate of coal volume changed because of new information: The estimations [of coal volume] for the SDEIS differ from those present in the 2012 FEIS because of currently available resource information that was not available during the 2012 FEIS. Where the 2012 FEIS assumed a 20 foot mining horizon, additional coal data from exploration and mining to date on leases adjacent to or within the North Fork Coal Mining Area were used by BLM to refine mining horizon thickness to 10 feet.1 For example, in mid-2015, Arch Coal announced that it planned to move mining operations from the E seam to the lower B seam on an approximately 2,000 acre area that is largely within or directly adjacent to the North Fork Coal Mining Area.151 In that 2,000-acre area which appears to overlap portions of both the Sunset and Flatirons Roadless Areas, there are two seams of recoverable coal, not one as the SDEIS assumes. In addition, earlier this year Oxbow applied for a lease application for the B seam on lands underlying the entirety of two leases where it had previously mined the D seam.152 Both existing leases for the B seam and that for the D seam underlie or are adjacent to the Pilot Knob roadless area.153 Again, this indicates that Oxbow believes two seams, not one, of recoverable coal can be found under lands near or within the North Fork Coal Mining area…Oxbow and West Elk recently taking action premised on the existence of two seams of recoverable coal underlying lands in or adjacent to the North Fork Coal Mining Area; and must not low-ball the recovery estimate by ignoring the fact that at least some of the North Fork Coal Mining Area has two seams, not one, of recoverable coal.…<br><br>E. The SDEIS Fails To Disclose Adequately The Quantity Of Projected Greenhouse Gas Emissions From Coal Mining. The Forest Service must ensure that the supplemental EIS quantifies all GHG emissions from the process of mining, …<br><br>As discussed below, the SDEIS relies on misleading assumptions and unrepresentative data, and omits potentially significant impacts. | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | 1. The SDEIS's Reliance on the ""Upstream Dashboard"" to Estimate Climate Emissions of Coal Production Is Arbitrary. …<br><br>2. The [CRR] SDEIS Fails to Accurately Quantify Methane Emissions. As explained in the attached expert report prepared by Dr. Tom Power et al., Power Consulting requested a longer data series of methane emissions from the EPA.162 EPA provided Power Consulting with data that spans the 2002-2013 (12 years instead of just the three-year 2011-2013 period). This data, which is available to the Forest Service, comes from quarterly methane sampling completed each year from the Mine Safety and Health Administration (""MSHA""), part of the Department of Labor, over the twelve year period.<br><br>3. The [CRR] SDEIS Fails to Quantify or Address Black Carbon Emissions.<br><br>F. The [CRR] SDEIS Fails To Account For The Climate Impacts Of Private Coal Likely To Be Mined As A Result Of The Coal Mine Exception..<br><br>G. The [CRR] SDEIS Fails To Take The Required Hard Look At The Impacts Of Climate Pollution On The Environment And Economy. The SDEIS does so by using a tool known as the social cost of carbon.185 However the Forest Service fails to use high quality data and take the hard look by: - failing to account for the social cost of methane in its evaluation in violation of the courts order in High Country Conservation Alliance; including a discount rate that the Forest Service invented and that contravenes the recommendations of Interagency Working Group that developed the social cost of carbon which confuses an evaluation of the range of social cost of carbon values; failing to include all carbon emissions" since it is based on the estimate of additional carbon emissions derived using the flawed IPM which necessarily underreports such emissions (see infra); including a """"forest level"""" cost-benefit analysis" which is not appropriate for considering in the context of climate change; even if this were economically justifiable which is it not the analysis presented in the DSEIS is internally inconsistent: it includes benefits generated outside the National Forests while excluding damages that occur outside the national forest level. Most critically as explained in detail in the attached expert report of Dr. Tom Power the Forest Service fails to account for the social cost of methane in its cost-benefit analysis of the proposed coal road loophole. | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | H. The [CRR] SDEIS's Sets An Arbitrary Boundary For The Economic Study Area.<br><br>I. The [CRR] SDEIS Fails To Address Arch Coal's Bankruptcy.<br><br>J. The [CRR] SDEIS Fails To Address The Urgent Need To Address Climate Change.<br><br>K. The {CRR] Supplemental EIS Fails To Address Whether The Coal Mine Exception Is Consistent With National Climate Goals. | |
| Zukoski, Edward 8419-20 | Third, the GMUG National Forest itself has concluded that climate change is a growing threat to this very forest, and to the Sunset Roadless Area's ecology, demonstrating the connection between land management and the need for prompt climate action. In February 2016, the GMUG issued its Final EIS for the ""Spruce Beetle Epidemic and Aspen Decline Management Response,"" or SBEADMR.40 The proposal is a response to drought- and insect-induced mortality across a substantial portion of the forest, mortality driven in part by a warmer climate. The SBEADMR Final FEIS explains the management challenges climate change is posing, and will likely continue to pose in the future: [T]hese disturbances [aspen and spruce mortality] are occurring in the context of a changing climate. Over the past 100 years, Southwestern Colorado temperatures have increased, and modeled climate projections for the region include warmer and longer frost-free summers, snowline moving up in elevation, earlier snowmelt, and consequently, a longer fire season. Due to predicted warming, spruce beetle outbreaks could be more likely in the future. Higher summer temperatures can foster spruce beetle outbreaks by allowing beetles to reproduce every year rather than every two years (Bentz et al. 2010). Additionally, anticipated more frequent drought conditions place waterstressed stands at greater risk of insect and disease. Climate changes could lead to larger fires and possibly fire with more highseverity area than in previous decades (Westerling et al. 2006, Agee 2007, Funk 2012). Modeled climate scenarios for the Gunnison Basin by 2035 indicate potential for the fire season to increase by one month; for fire frequency in highelevation forests to increase from 4 to 12 times as often as experienced between 1971-2000; and for fire extent to increase from 6 to 11 times the extent burned between 1971-2000. These scenarios model severity and frequency irrespective of tree mortality (Rangwala and Rondeau, Southwest Colorado Social-Ecological | Climate change is addressed in section 3.4 and other relevant sections. Effects on vegetation on spruce-fir and aspen dependent species are included in various sections in Chapter 3.<br><br>Methane mitigation is addressed in lease stipulations in Tables 2-1 and 2-2 and, Section 2.3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Climate Resilience (SECR) Project) [2013].41 The SBEADMR analysis predicts that as a result of climate change there will be ""little remaining habitat for spruce on the Uncompahgre Plateau, and substantial loss in the West Elk Mountains, east of Grand Mesa, and south of the Black Canyon/Blue Mesa Reservoir"" by 2060. ""[I]f no forest management action is taken, it will most likely result in the gradual conversion of spruce forests in 'lost' and threatened zones to other forest and non-forest cover types (Rehfeldt, et al., 2015).""42 Similarly, for aspen, ""[l]ittle suitable habitat is expected to remain on the Uncompahgre Plateau, the southern and eastern fringes of the Grand Mesa, and the western West Elks"" (the location of the Lease Modifications) by 2060 due to climatic warming.43 ""[C]onditions projected for 2060 could occur sooner if [global GHG] emissions are higher than projected.""44 Given the threat climate change poses to humanity and the globe, and to the GMUG National Forest specifically, and the need for urgent action to reduce methane emissions (and coal combustion) that are exacerbating that threat, it is imperative that the Forest Service evaluate in full alternatives to reduce methane and carbon emissions from the Lease Modifications, and to propose to adopt mitigation measures that do the same. To do otherwise is for the Forest to ignore its own contribution to a problem that is currently requiring the Forest to respond to with a significant investment of staff time and funds. Despite the urgent need to address methane pollution, the Forest Service dismisses without detailed consideration at least two alternatives and ignores others that could limit such pollution.45 We urge the Forest Service to consider in detail at least three alternatives aimed at reducing the climate damage of the proposed lease modifications." | |
| Earthjustice #9755-1/2, 9756-1 | "This letter addresses two pieces of new information regarding the United States' national and international commitments to reduce climate pollution. First, a new study shows that unless the United States adopts additional measures to reduce climate pollution, it will be unable to meet its commitment to reduce the nation's climate emission by 26%-28% in 2025 compared to 2005 levels. Second, the United States committed to joining Canada and Mexico to produce 50% of North America's electricity by 2025 from clean power sources (including renewable, nuclear, and carbon capture and storage technologies). The Colorado Roadless Rule coal mine exception will undermine both commitments by increasing or extending greenhouse emissions from coal, and by suppressing generation of renewables. Opening the North Fork to Additional Coal Mining Conflicts with, and Will Undercut, U.S. Commitments | Comment was submitted on CRR and is addressed there at E-7 and in the modelling described in CRR's Appendix C.<br><br>Using EIA data, coal represented approximately 31.4% of utility-scale electrical generation in 2016. And fossil fuels combined equaled 64.7% utility-scale electrical generation These levels are down from 51.0% coal and 71.7% for fossil fuels combined in 2005 for utility-scale electrical generation. The U.S. energy-related CO2 emissions are trending downward. This is likely |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | to Reduce Climate Emissions by 2025 and 2050. On March 31, 2015, the U.S. submitted its Intended Nationally Determined Contribution (INDC) to the United Nations Framework Convention on Climate Change. The INDC articulates a national target of reducing greenhouse gas emissions by 26%-28% below the 2005 level in 2025 while making ""best efforts"" to reduce emissions by the upper-target of 28%, and of putting the nation on a trajectory to achieve 80% reductions from 2005 levels by 2050.1 Under the Paris Climate Agreement, adopted in December 2015, the INDC will become the first Nationally Determined Contribution when a country ratifies the agreement. A new study concludes that the U.S. will have difficulty achieving the 2025 reduction goals, even assuming a number of additional measures are undertaken.2 The study assumes that the Clean Power Plan will be implemented, and that a number of other steps will be taken…This means that agency proposals that significantly worsen climate emissions, or that maintain the ""business as usual"" scenario of carbon emissions when significant reductions could be achieved, will impede and conflict with the United States' INDC and commitments in the Paris Agreement. The North Fork coal mine exception presents such a conflict both in the medium term (through 2025) and potentially through the long term (past 2050, when the U.S. intends to have reduced GHG emissions by 80% of 2005 levels).5 The coal mine loophole will impede U.S. achieving the INDC by generating approximately 130 million tons of additional CO2 from coal combustion over the life of additional coal mining (approximately 30 years), together with an additional annual net increase of 1.0 - 2.1 million tons of CO2e from methane emissions during coal mining. In any subsequently prepared NEPA document, the Forest Service must disclose that the proposed coal mine exception will undermine the nation's efforts to meet our national and international climate commitments.6 The proposed action's conflict with the nation's commitments further weighs in favor of the Forest Service adopting the ""no action"" alternative.<br><br>Opening the North Fork to Additional Coal Mining Conflicts with, and Will Undercut, U.S. Commitments to Increase North American Renewable Energy Production. On June 29, 2016, the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. This agreement decrees that the countries will pursue an historic goal for North America of 50 percent clean power generation by 2025.7 ""Clean power"" is defined as including ""renewable, nuclear, and carbon capture and storage technologies, as well as demand reduction | due to the change from coal to natural gas as well as reduction in fossil fuel use overall. In March 2017 EIA reported, "recent decreases are consistent with a decade-long trend, with energy-related CO2 emissions 14% below the 2005 level in 2016." This 14% decrease in emissions appears to put the U.S. on track for the 2025 INDC submission cited by commenter regardless of the mix of fossil fuels and renewables. EIA projections do not extend beyond 2040 however coal is still in the mix in their modelling.<br><br>EO 13783 addresses review of and directs EPA, if appropriate," …[to] suspend, revise, or rescind the guidance, or publish for notice and comment proposed rules suspending, revising, or rescinding" the Clean Power Plan." Clean Power Plan is the basis/assumption for the study commenter cited.<br><br>The Paris Accord, still in effect for the U.S. to date, required biennial reporting of anthropogenic emissions, it did not require any particular course of action and only required the following:<br><br>"Parties shall account for their nationally determined contributions. In accounting for anthropogenic emissions and removals corresponding to their nationally determined contributions, Parties shall promote environmental integrity, transparency, accuracy, completeness, comparability and consistency, and ensure the avoidance of double counting…".<br><br>"Each Party shall prepare, communicate and maintain successive nationally determined contributions that it intends to achieve. Parties shall pursue domestic mitigation measures, with the aim of achieving the objectives of such contributions…" |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | through energy efficiency.""8 The plan also calls for the United States, Mexico, and Canada to broadly advance clean energy development.9 The credibility of the North American Climate Plan relies on actions from each country to do its share to accomplish the clean electricity generation goal. In 2015, about 67% of the U.S.'s electricity came from fossil fuels, the balance from nuclear, hydro, wind, solar and other renewable sources.10 To reach 50% ""clean power"" in less than a decade, the U.S. will need to cut the share of power generated by fossil fuels by one-quarter, and increase the share of electricity from ""clean power"" by 50%. The coal mine exception will conflict with and undermine efforts to achieve these goals. The proposed action will deepen America's reliance on dirty fossil fuels, displacing roughly 40,000 gigawatt hours of renewable energy between 2016 and 2054 that would be purchased by utilities 6 SDEIS at 97-98 & Table 3-20. 7 See The White House, Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership (June 29, 2016), available at https://www.whitehouse.gov/the-pressoffice/ 2016/06/29/leaders-statement-north-american-climate-clean-energy-and-environment attached as Ex. 3 (last viewed Aug. 5, 2016). 8 Prime Minister of Canada, Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership (June 29, 2016), available at http://pm.gc.ca/eng/news/2016/06/29/leaders-statement-north-american-climate-clean-energyand- environment-partnership (last viewed Aug. 5, 2016), attached as Ex. 4. 9 The White House, Leaders' Statement (Ex. 3). 10 U.S. Energy Information Administration, Frequently Asked Questions, What is U.S. electricity generation by energy source?, available at https://www.eia.gov/tools/faqs/faq.cfm?id=427&t=3 (last viewed Aug. 5, 2016), attached as Ex. 5. Letter to Acting Regional Forester Buchanan re: Supplemental Comments on Colorado Roadless Rule Page 4 August 5, 2016 were the North Fork coal not made available.11 In any subsequently prepared NEPA document, the Forest Service must disclose this conflict with North American Climate, Clean Energy, and Environment Partnership. And again, this conflict is further evidence that the Forest Service should adopt the ""no action"" alternative."<br><br>******"First, a new study shows that unless the United States adopts additional measures to reduce climate pollution, it will be unable to meet its commitment to reduce the nation's climate emission by 26%-28% in 2025 compared to 2005 levels. Second, the United States committed to joining Canada and Mexico to produce 50% of North America's electricity by 2025 from clean power | "Each Party's successive nationally determined contribution will represent a progression beyond the Party's then current nationally determined contribution and reflect its highest possible ambition, reflecting its common but differentiated responsibilities and respective capabilities, in the light of different national circumstances. "<br><br>"Parties shall cooperate in taking measures, as appropriate, to enhance climate change education, training, public awareness, public participation and public access to information…"(Article 12)<br><br>" Each Party shall, as appropriate, engage in adaptation planning processes and the implementation of actions, including the development or enhancement of relevant plans, policies and/or contributions, which may include: (a) The implementation of adaptation actions, undertakings and/or efforts; (b) The process to formulate and implement national adaptation plans; (c) The assessment of climate change impacts and vulnerability, with a view to formulating nationally determined prioritized actions, taking into account vulnerable people, places and ecosystems; (d) Monitoring and evaluating and learning from adaptation plans, policies, programmes and actions; and (e) Building the resilience of socioeconomic and ecological systems, including through economic diversification and sustainable management of natural resources. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | sources (including renewable, nuclear, and carbon capture and storage technologies). The Colorado Roadless Rule coal mine exception will undermine both commitments by increasing or extending greenhouse emissions from coal, and by suppressing generation of renewables.<br><br>First, a new study shows that unless the United States adopts additional measures to reduce climate pollution, it will be unable to meet its commitment to reduce the nation's climate emission by 26%-28% in 2025 compared to 2005 levels. Second, the United States committed to joining Canada and Mexico to produce 50% of North America's electricity by 2025 from clean power sources (including renewable, nuclear, and carbon capture and storage technologies). The Colorado Roadless Rule coal mine exception will undermine both commitments by increasing or extending greenhouse emissions from coal, and by suppressing generation of renewables. Opening the North Fork to Additional Coal Mining Conflicts with, and Will Undercut, U.S. Commitments to Reduce Climate Emissions by 2025 and 2050. On March 31, 2015, the U.S. submitted its Intended Nationally Determined Contribution (INDC) to the United Nations Framework Convention on Climate Change. The INDC articulates a national target of reducing greenhouse gas emissions by 26%-28% below the 2005 level in 2025 while making ""best efforts"" to reduce emissions by the upper-target of 28%, and of putting the Letter to Acting Regional Forester Buchanan re: Supplemental Comments on Colorado Roadless Rule Page 2 August 5, 2016 nation on a trajectory to achieve 80% reductions from 2005 levels by 2050.1 Under the Paris Climate Agreement, adopted in December 2015, the INDC will become the first Nationally Determined Contribution when a country ratifies the agreement. A new study concludes that the U.S. will have difficulty achieving the 2025 reduction goals, even assuming a number of additional measures are undertaken.2 The study assumes that the Clean Power Plan will be implemented, and that a number of other steps will be taken, including: • Full implementation of Phase II heavy-duty vehicle economy standards; • Finalization of proposed, new, or updated appliance and efficiency standards; • Increased efficiency of new and existing residential and commercial buildings; • Reduction in industrial energy demand in several subsectors; • Additional state actions in the electricity sector; • Enhanced federal programs that lead to greater efficiencies in industry and transportation, including greater biofuel deployment and commercial aviation efficiency; and • Methane emissions reductions from a range of sectors, including landfills, coal mining, agriculture, | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | and oil and gas systems.3 Even implementation of these proposals, however, will not be enough to achieve the 26% reduction target; the U.S. will still be short by 3.6% short - more than 230 million tons CO2e per year.4 This means that agency proposals that significantly worsen climate emissions, or that maintain the ""business as usual"" scenario of carbon emissions when significant reductions could be achieved, will impede and conflict with the United States' INDC and commitments in the Paris Agreement. The North Fork coal mine exception presents such a conflict both in the medium term (through 2025) and potentially through the long term (past 2050, when the U.S. intends to have reduced GHG emissions by 80% of 2005 levels).5 The coal mine loophole will impede 1 United States, Intended Nationally Determined Contribution, Submission to the UNFCC Secretariat (2015), available at http://www4.unfccc.int/Submissions/INDC/Published%20Documents/United%20States%20of%20America/1/U.S.%20Cover%20Note%20INDC%20and%20Accompanying%20Information.pd f (last visited Aug. 5, 2016), and attached as Ex. 1. 2 Doug Vine, Center for Climate and Energy Solutions, Achieving the United States' Intended Nationally Determined Contribution (July 2016), available at http://www.c2es.org/docUploads/achieving-us-indc-07-2016-update.pdf (last visited Aug. 5, 2016), and attached as Ex. 2. 3 Id. at 4. 4 Id. at 2-3. 5 U.S. Forest Service, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (Nov. 2015) (""SDEIS"") at 74 (""The maximum period of time estimated to exhaust North Fork reserves [under the proposed action] is estimated to be 2015 to 2054""). Letter to Acting Regional Forester Buchanan re: Supplemental Comments on Colorado Roadless Rule Page 3 August 5, 2016 U.S. achieving the INDC by generating approximately 130 million tons of additional CO2 from coal combustion over the life of additional coal mining (approximately 30 years), together with an additional annual net increase of 1.0 - 2.1 million tons of CO2e from methane emissions during coal mining. In any subsequently prepared NEPA document, the Forest Service must disclose that the proposed coal mine exception will undermine the nation's efforts to meet our national and international climate commitments.6 The proposed action's conflict with the nation's commitments further weighs in favor of the Forest Service adopting the ""no action"" alternative. Opening the North Fork to Additional Coal Mining Conflicts with, and Will Undercut, U.S. Commitments to Increase North American Renewable Energy Production. On June 29, 2016, the leaders of Canada, Mexico, and the United States committed to the | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | North American Climate, Clean Energy, and Environment Partnership. This agreement decrees that the countries will pursue an historic goal for North America of 50 percent clean power generation by 2025.7 ""Clean power"" is defined as including ""renewable, nuclear, and carbon capture and storage technologies, as well as demand reduction through energy efficiency.""8 The plan also calls for the United States, Mexico, and Canada to broadly advance clean energy development.9 The credibility of the North American Climate Plan relies on actions from each country to do its share to accomplish the clean electricity generation goal. In 2015, about 67% of the U.S.'s electricity came from fossil fuels, the balance from nuclear, hydro, wind, solar and other renewable sources.10 To reach 50% ""clean power"" in less than a decade, the U.S. will need to cut the share of power generated by fossil fuels by one-quarter, and increase the share of electricity from ""clean power"" by 50%. The coal mine exception will conflict with and undermine efforts to achieve these goals. The proposed action will deepen America's reliance on dirty fossil fuels, displacing roughly 40,000 gigawatt hours of renewable energy between 2016 and 2054 that would be purchased by utilities were the North Fork coal not made available.11 In any subsequently prepared NEPA document, the Forest Service must disclose this conflict with North American Climate, Clean Energy, and Environment Partnership. And again, this conflict is further evidence that the Forest Service should adopt the ""no action"" alternative." | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Zukoski, Ted #9757-1/2 | Attached please find supplemental comments and exhibits from High Country Conservation Advocates et al. on the Colorado Roadless Rule coal mine exception. This letter addresses the following new information concerning climate: the adoption of EPA's social cost of methane by the Interagency Working Group on the social cost of greenhouse gases, and a new rulemaking that utilizes EPA's social cost of methane, underscoring that the Forest Service's [CRR] supplemental draft environmental impact statement (""SDEIS"") was arbitrary to decline to use that metric; - an agency rulemaking and federal court decision concluding that the correct scale to address the impacts of climate pollution is the global level, calling into question the SDEIS's evaluation of the social cost of greenhouse gas emissions at the National Forest and national boundary level;"<br><br>The Council on Environmental Quality's newly-released final guidance on climate analysis in NEPA documents, which supports the use of the social cost of carbon in any subsequent NEPA analysis the Forest Service prepares, and supports the disclosure that the proposed coal mine exception will undercut national climate pollution reduction and clean energy goals. | CRR SCC analysis was updated in their SFEIS.<br><br>CEQ's Final guidance was directed to be rescinded on March 28, 2017 and was formally withdrawn on April 5, 2017 (Federal Register / Vol. 82, No. 64 / Wednesday, April 5, 2017 / Notices).<br><br>Social Cost technical reports have also been directed to be withdrawn and the committees that prepared them disbanded. |
| Jones, Ileana #465-3 | Burning coal releases the most carbon dioxide and is the major contributor to climate change. | Combustion of coal does release carbon dioxide. Burning of fossil fuels is one of the largest contributors of GHGs. Combustion and climate effects are disclosed in Section 3.4 and other relevant sections. |
| Steitz, Jim #2603-9 | "In considering President Obama's directive against new public coal leases, the Paris Accord commitments to reduce American global warming pollutants, the Interior Department's methane regulations in development, and the decade-old Roadless Rule, the proposed ""West Elk' coal leases constitute a truly remarkable array of insubordination against this Administration's policies. It is not often in the history of the Forest Service that a proposed industry concession can violate so many major policies simultaneously, and provide such robust and incriminating evidence of a rogue agency unbidden to the public interest." | West Elk Lease Mods were always exempted from the Obama administration's coal leasing pause. However, that moratorium was lifted in March, 2017 as were methane regulations in that were in development. While EO. 13783 expresses Energy Independence policies, this project was consistent with the prior administration's policies as well. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. The 2012 Colorado Roadless Rule contains specific provisions for road construction and |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | reconstruction to facilitate access to federal coal resources in the NFCMA, see Section 3.18 of the SDEIS. |
| Brown, Sandy #8937-2 | Mining coal would unleash a carbon bomb causing unmeasurable damage to the earth, which in turn means damage to life on earth. Approving these coal lease undermines this administration's commitment to the Paris climate accord, the state's climate goals, and to clean energy. Climate change is a threat to Colorado's forests and all forests and quality of life." | The Paris Accord did not commit the U.S. to any particular course of action. Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Wildearth Guardians #9058-1 | "It is not just the release of carbon from burning coal that adds to global warming, but also, when land is stripped of vegetation, land cannot retain water, or cool the air, and soil; the opposite is true. They get hotter, topsoil hardens or erodes away and causes more drought." | Climate effects are disclosed in Section 3.4 and other relevant sections. Reclamation is bonded in Colorado to ensure lands are revegetated and return to productivity. |
| Earthjustice #9752--1 | (1) the potential for the Colorado Roadless Rule coal mine exception to conflict with this administration's climate policy; and | The Colorado Roadless Rule exception for temporary road building for coal production in the North Fork area was consistent with the prior administration's policy and this administration's policy. |
| Cotter, Tom #329-2 | We currently have 5 million of people dying each year globally (DARA report) from the burning of fossil fuels and climate change. | According to the DARA report's (http://daraint.org/wp-content/uploads/2012/09/EXECUTIVE-AND-TECHNICAL-SUMMARY.pdf ) executive summary, "This report estimates that climate change causes 400,000 deaths on average each year today, mainly due to hunger and communicable diseases that affect above all children in developing countries. Our present carbon-intensive energy system and related activities cause an estimated 4.5 million deaths each year linked to air pollution, hazardous occupations and cancer.... Several major economies will need to adjust and enact important domestic policy and legislative initiatives in order to make this a reality. Whatever the case, |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | action on climate change that seeks out international partnership is most likely to further lessen the costs of a low-carbon transition and expand the benefits of this transition for all concerned. This report documents in part the potential benefits of avoided impacts of climate change in addition to the potential co-benefits of emission reductions that are targeted at key economic, health and environmental concerns.24"" <br><br> Even according to the report the result should be a change in policy. This project-specific analysis does not attempt to change policy within the U.S. or globally. Policy is beyond the scope of this analysis. Climate effects are described within Section 3.4 and other relevant sections. |
| Webb, Leslie #398-9 | Please do not consent to expanding the Federal Coal Leases COC-1362 and COC-67232 by adding 800 and 922 acres, respectively, unless an equivalent amount of carbon can be sequestered prior to its mining, and where best to sequester carbon than in the very forests these lease expansions would destroy. | Lands included in the lease modifications will be revegetated after exploration and/or MDWs are no longer needed which will contribute to carbon sequestration. Carbon sequestration is addressed in Section 3.9. |
| Sholtis, Amy #388-2 | Many trees will lost and trees are carbon sinks that we cannot afford to lose at this time. | Carbon sequestration is addressed in Section 3.9. |
| Gunn, Brian #339-1 | Forests take polluting carbon out of the atmosphere, so we should be planting more trees, not bulldozing what we have. The reckless drilling planned would not only result in more dirty fossil fuels being burned, but tons of dangerous methane gas would also be released. Methane is even more deadly than CO2 since it traps more heat and destabilizes our climate. We have a duty to protect future generations. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Effects of climate change, combustions and emissions are disclosed in Section 3.4. <br><br> Carbon sequestration is addressed in Section 3.9. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Braico, MD, F.A.A.P., John #341-2 | This would cause substantial damage to intact ecosystems on federal lands and further add to the already intolerable burden from coal burning as it would add unnecessarily to problems with: air quality, public health, and climate change. | Effects of climate change, combustions and emissions are disclosed in Section 3.4. |
| Zingher, Judith #342-1 | Coal is a money-losing, clean air-losing, and ocean-losing proposition. And the loss of forests means the loss of natural carbon sequestering capacity, plus the release of the forest's carbon into the atmosphere. | Effects of climate change, combustions and emissions are disclosed in Section 3.4. Carbon sequestration is addressed in Section 3.9. |
| Zingher, Judith #342-3 | Clean air: Coal is the dirtiest of fossil fuels and most dangerous in particulates. Its health impacts on people living near plants which burn it are considerable. And these plants are decreasing in number, thus cutting costly liabilities, and cutting the need for coal. Instead, coal is shipped at great cost in money, fuel and clean air to China, where it is burned in huge quantities, rendering the air literally un-breathable, in crisis proportions. | Effects of climate change, combustions and emissions are disclosed in Section 3.4. |
| Patriana, Zarah #8420-3 | Protect our climate. Analysis prepared for the Colorado Roadless Rule shows that mining coal in this and adjacent roadless areas would unleash a carbon bomb causing up to $12 billion in damage to the world's economy and environment. Approving these coal leases undermines this administration's commitment to the Paris climate accord, the state's climate goals, and to clean energy. Climate change is a huge threat to Colorado's forests, quality of life, and economy. The Forest Service shouldn't be making climate change worse. | Commenter provides an interpretation of the CRR analysis.<br><br>The Paris Accord does not prescribe any particular course of Action for the U.S. CDPHE, the agency that does permitting for air permits, would continue to be involved. Clean Energy Plan is no longer in effect.<br><br>Effects on climate are disclosed in Section 3.4 and other relevant sections. |
| Linton, Jennifer #351-3 | The trees retain carbon, the area is habitat for wildlife, and the watershed supports numerous populations amongst many other priceless benefits to the ecosystem of which humans are a part. And what would the land destruction be for? It contributes more carbon to the atmosphere, which destroys our human habitat and pushes us further toward alarming climate instability. | Effects of climate change are disclosed in Section 3.4 and other relevant sections. Effects on the various resources stated are included in Chapter 3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Webb, Leslie #398-1 | Before making a determination on Federal Coal Lease Modifications COC-1362 & COC-67232 #32459, I urge the US Forest Service and GMUG Forest Supervisor to consider the latest science on climate change per the US GLOBAL CLIMATE RESEARCH PROJECT (USGCRP). | Climate effects are addressed in Section 3.4 and other relevant sections. |
| Webb, Leslie #398-3 | It is clear that the existing stipulations on the parent leases are NO LONGER ""sufficient for the protection of non-mineral resources."" Climate change has and will significantly impact forests, rivers and lakes, and people and animals that depend on these habitats through extreme heat, and disruption to the water cycle causing extreme drought, forest fires, floods and mudslides. The mining and subsequent combustion of coal resources contributes to global warming which significantly impacts non-mineral resources." | Climate effects are addressed in Section 3.4 and other relevant sections. |
| Castellino, Robert #399-6 | The outcomes of burning Coal and extracting it harm Colorado's Climate in many ways jeopardizing our lives and future generations. So of those ways include: Increased Air Temps Ice Melt & Disappearing Glaciers Shortened Winter Season Less Seasonal Precipitation Protracted Drought Cycles Water Shortages Extreme Weather Events like Floods Beetle Kill Fires Acidification of Lakes and Streams | Climate effects are addressed in Section 3.4 and other relevant sections. |
| Davis, Katie #494-2 | Arch Coal's plans to mine in Colorado poses both a direct and indirect threat. The mining operations, roads and clear-cutting will destroy untouched forests directly. And indirectly, it exacerbates climate change, which poses an existential threat to the western ecosystems. Greater and hotter fires, species extinctions and other unnaturally rapid changes are the result of extracting and burning fossil fuels." | Climate effects are addressed in Section 3.4 and other relevant sections. |
| Webb, Leslie #398-2 | I understand ""the purpose of the federal agencies' actions is to facilitate recovery of federal coal resources in an environmentally sound manner."" However, the recovery of any coal resources in ""an environmentally sound manner"" is no longer possible given the economic and environmental impacts of climate change. | Climate impacts are disclosed in Section 3.4 and other relevant sections. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Zingher, Judith #342-4 | Oceans: the huge amount of carbon we pump into the air is absorbed by the oceans, turning the pH of the water acidic and killing the phyto-plankton that all life in the ocean ultimately depends upon. | Effects on Climate are disclosed in Section 3.4 and other relevant sections |
| Webb, Leslie #398-4 | "While I understand that the ""purpose of the lease modifications is to ensure that compliant and super-compliant coal reserves are recovered and not bypassed"", the US Forest Service and GMUG Forest Supervisor must acknowledge that it must immediately re-evaluate what it means to be compliant and super-compliant with regard to climate change and its impacts." | We are aware of no legal definitions of "…compliant and super-compliant with regard to climate change and its impacts." Compliant and super-compliant coal refer to specific amounts of sulfur dioxide defined under the Energy Policy Act of 2005 at Sec. 437(2) "(A) the term ``compliant coal" means coal that contains not less than 1.0 and not more than 1.2 pounds of sulfur dioxide per million BTU; and (B) the term ``super-compliant coal" means coal that produces less than 1.0 pounds of sulfur dioxide per million BTU." To clarify "compliant" and "super-compliant" only refer to sulfur dioxide, and more specifically, emissions at combustion. North Fork coal should technically be referred to as compliant/super-compliant, low ash, low mercury, high BTU coal. These coal qualities also have attendant thresholds. |
| **Coal** | | |
| Misc | There is no such thing as ""clean coal" | Clean coal refers to how it is burned at power plants, where compliant or super-compliant coal (such as that from the West Elk Mine), requires less 'cleaning'-or processing- to meet standards under the Clean Air Act. Compliant and super-compliant coal refer to specific amounts of sulfur dioxide defined under the Energy Policy Act of 2005 at Sec. 437(2) "(A) the term ``compliant coal" means coal that contains not less than 1.0 and not more than 1.2 pounds of sulfur dioxide per million BTU; and (B) the term ``super-compliant coal" means coal that produces less than 1.0 pounds of sulfur dioxide per million BTU." To clarify "compliant" and "super- |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | compliant" only refer to sulfur dioxide, and more specifically, emissions at combustion. North Fork coal should technically be referred to as compliant/super-compliant, low ash, low mercury, high BTU coal. These coal qualities also have attendant thresholds. |
| Mount Gunnison Fuel Company #8959-2 | I provide the following comments on behalf of approximately 130 shareholders of Mount Gunnison Fuel Company (""MGFC""), a company which holds mineral rights to 3600 acres of private lands patented in 1921 by the U.S. Government that are contiguous to lands encompassed in Mountain Coal Company's federal leases COC-1362 and COC-67232 as well as their proposed lease modifications. We ask that Alternative 3 be selected , consent to modify leases COC-1362 and COC-67232 under the Colorado Roadless Rule framework with stipulations to protect non-mineral resources identified in the parent leases. This would add 800 and 922 acres to the identified lease, ensure that compliant and super-complaint coal reserves be recovered rather than by-passed, provide royalty payments for federal coal recovered, and extend local mining. It would also accommodate the mining of MGFC's 977 acres of adjacent coal land." | While the recent discovery of geologic faulting may have decreased the estimate of recoverable coal from MGFC's land (2016 GER/MER), we have disclosed in this EIS wherever applicable to effects analysis that your lands may become accessible for mining because of the COC-1632 lease modification. |
| Vercos, Stasia #29-1 | There are much more readily available areas where coal can be taken. To go into a pristine forest makes no sense. | Coal mining has occurred in this vicinity for the past 100 years. |
| Weaver, Gary #422-1 | Coal has a value that is decreasing ever more each day | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. |
| Miller, Janet #472-2 | As the demand for coal has lessened and coal companies are exploring bankruptcy options, it makes no sense to open up new areas at our expense. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>The FS and BLM are responding under the existing legal and regulatory framework for managing federal coal resources. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. The immediate vicinity has experienced coal mining for over 100 years. |
| Ciepley, David #426-1 | In an age when solar and other alternative energy technologies are reaching grid parity, it is not in the public interest to allow coal companies to bulldoze broad roads into roadless forests in Colorado or elsewhere, regardless of the leasing fees, and especially when these fees are always so paltry, and the emissions from burning the coal are so damaging. | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>The FS and BLM are responding under the existing legal and regulatory framework for managing federal coal resources. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Royalty and rental rates are established by regulation. |
| Christopher Lish #7926-10 | The mission of the U.S. Forest Service is to ""sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations."" Nowhere in that mission does it say the U.S. Forest Service is responsible to protect the profits of coal companies at the expense of national forests that belong to the American people. | Coal mining must be economical per the MLA 30 U.S.C. § 201(a)(1) "The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest and which will permit the mining of all coal which can be economically extracted" and the Mining and Mineral Policy Act of 1970. |
| Lynch, Janet #8056-12/13 | The mission of the U.S. Forest Service is to ""sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations."" The BLM has a similar mandate to manage the public lands on ""the basis of multiple use and sustained yield"", ""in a manner that | Coal mining must be economical per the MLA 30 U.S.C. § 201(a)(1) "The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been classified for coal leasing |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use"" and that by ""multiple use"", the agency must manage ""a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output"" (43 U.S.C. §1701-1702)." Nowhere in their mission statements is there any language even remotely indicating that either the U.S. Forest Service or the Bureau of Land Management is responsible to protect the profits of coal companies at the expense of national forests and public lands which belong to the American people. And your agencies most certainly have no business propping up financially moribund energy companies which are unwilling or unable to adapt to the new requirements of modern energy markets. | into leasing tracts of such size as he finds appropriate and in the public interest and which will permit the mining of all coal which can be economically extracted" Mining and Mineral Policy Act of 1970. |
| Weiskopf, David #8422-2 | Arch Coal's mismanagement of its existing coal mining operations and our country's transition to cleaner energy sources has already led the company to file for bankruptcy. Now they have laid off hundreds of workers and are seeking to deny benefits to thousands more. Meanwhile, the company paid top executives $8 million in bonuses immediately before seeking bankruptcy protection for its unpaid debts. In addition to these broken promises to workers, Arch Coal has left millions of acres of unreclaimed land in its wake. These unfulfilled obligations risk leaving American taxpayers on the hook for hundreds of millions of dollars in unpaid reclamation and environmental cleanup obligations. | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. Reclamation bonding is required and s managed by the Colorado Division of reclamation Mining and Safety. |
| Dieckmann, Don #451-2 | But besides that, there is NO logical reason to approve Federal Coal Lease Modifications, since coal as an industry is on its deathbed with mines and power plants retiring and employees being laid off by the thousands. Any | Coal demand and prices have increased in recent months. 2017 EIA projections include significant |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | limited coal production that's necessary in the U.S. can easily be supplied by the mines that are left, but the demand for it will dwindle towards non-existence in the years to come. | amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>West Elk Mine is an existing Mine who, with these lease modifications, will have approximately 11 years of reserves remaining. |
| Eaton, Scott #469-2 | Globally, coal is in substantial decline as an energy source, recognizing its negative impact on the environment at a minimum. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. |
| Smith, Ronald #105-1 | There is too much coal capacity right now and for the foreseeable future. We do NOT need to add to the problem. Save it for the future when it might really be needed. | Coal surplus has been diminishing and the coal market has been improving in recent months.<br><br>Forest Service and BLM carrying out legal and regulatory obligations under the authorities in Section 1.7. |
| Herrick, Michael #119-1 | Any new coal mining activity when coal mines are closing in Colorado and workers are losing employment seems to be a ridiculous endeavor. Please stop the potential of expanding coal leases until the current coal production and leases show that they are inadequate to provide coal to the market. | This lease modifications are a continuation of exiting mining for a short duration of time. Coal surplus has been diminishing and the coal market has been improving in recent months.<br><br>Forest Service and BLM carrying out legal and regulatory obligations under the authorities in Section 1.7. |
| Earthjustice #9752-2/4 | 2) the lack of immediate need to adopt a rule [CRR] to open areas to new coal mining when the only mine likely to take advantage of the exception - bankrupt Arch Coal's West Elk mine - has an 11-23 year supply of coal reserves still to tap. | The CRR NFCMA exception reinstatement is effective as of April 17, 2017. CRR FEIS addressed these comments at E-11. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | New Information Demonstrates That There Is No Need Now For The Coal Mine Exception. The West Elk mine, operated by a bankrupt subsidiary of bankrupt Arch Coal, is the only coal mine currently operating that can take advantage of the proposed coal mine exception. West Elk's pending lease modifications are within the coal mine exception area. New information demonstrates that the West Elk mine has no need to expand into the coal mine exception area within the next decade or two, and therefore that there is no purpose and need for the coal mine exception now. Market conditions have continued their downward slide in the North Fork Valley in 2016.... This new information regarding sagging demand and corresponding diminished production at West Elk undermine any rationale for adopting the coal mine exception. The downward trend in coal markets global amid competition from cleaner, cheaper energy sources and international consensus on the need to reduce carbon emissions is only likely to deepen. Given West Elk's difficulty in selling its significant existing reserves, providing the mine with access to tens of millions of tons of additional coal is not necessary now, and may never be necessary." | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Coal use is still a large portion of energy markets worldwide. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. The coal market is very volatile depending on many factors and while it is not rebounding to historic levels, EIA also reported in March, 2017, "After falling in six out of seven quarters from mid-2014 to mid-2016, coal production rose in the third and fourth quarters of 2016. Among the coal supply regions, the Powder River Basin in Montana and Wyoming saw the largest increases in the second half of 2016. The increases in coal production were driven by an increase in coal-fired electricity generation, which occurred as natural gas prices increased."<br><br>As of 2017, West Elk's life of mine is expected to be approximately 11 years including lease modifications and related lands. As of January, 2017, West Elk had about 8.2 years of accessible reserves under lease. During the autumn of 2017, and prior to entering E Seam Panel 8 on parent leases in 2018 (see Figure 3-1 2018 Wellpad/MDW development), MCC has indicated they need to determine whether or not to pursue development of the lease modifications in the current E Seam mine panel lay out into the lease modifications which would allow additional mining into private lands or to reverse course into a different coal seam in parent leases. This is a business and operational decision which has been delayed from initial forecasts by a reduced mining rate from 2013 through part of 2016. If lease modifications and |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | private lands are bypassed at this juncture, the mine has indicated that it would be extremely unlikely that those coal reserves would be recovered later.<br><br>Forest Service and BLM carrying out legal and regulatory obligations under the authorities in Section 1.7. |
| Patriana, Zarah #1-55 | There are billions of tons of recoverable coal resources in the U.S. that are located in much less environmental sensitive locations. There is NO acceptable reason to mine this particular area at this time. | This vicinity has had coal mining for over a century. Despite its roadless status there is nothing more or less sensitive of this part of the forest than the NFS non-wilderness lands surrounding it. See unsuitability analysis in Appendix B for more information. |
| Piernot, Ph.D., Craig A. #240-2 | Producing/burning coal by electricity producing utilities a) relies on low-grade sulfur/clean coal and b) is being displaced by natural gas. Within 10 years, few electricity producing utilities in North America will be demanding coal since power production will be with natural gas or alternative energy sources. Colorado coal mines do not produce efficiently preferred low-grade sulfur/clean coal; and, ARCH Coal cannot produce cost competitive clean coal for domestic or off-shore utilities. And, while coal is an exportable natural resource in demand from many less developed nations in Asia and Latin America, ARCH Coal mine to end-user utilities is cost-prohibitive/not net profitable. | Coal is still used to support a substantial portion of the U.S. energy market. Coal from the West Elk Mine is used to help meet Clean Air Act requirements domestically. The lease modifications are not a long term energy solution as only approximately 11 years of reserves remain at West Elk (including lease modifications) and of that coal within the lease modifications would extend mining less than 2 years. |
| Piernot, Ph.D., Craig A. #240-5 | Wyoming coal mines are both much more cost efficient and productive of low sulfur/clean coal that existing ARCH mines in Colorado. | The coal quality is similar. Open pit mines in Wyoming do produce more coal than the mines in Colorado. The GMUG doesn't allow open pit mining per regulation. |
| Mackey, Frederick #180-1 | We cannot afford to lose more land for coal development especially at practically give away lease rates. | Minimum rental and standard royalty rates are outside the scope of this analysis. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Lane, Eric #251-1 | Aside from the significant impacts to wildlife habitat in the Gunnison National Forest, it seems ill-advised to permit coal extraction when coal's value is declining rapidly due to the market and it looks like it will never recover in a climate-sensitive world. | Wildlife effects are addressed in various sections in Chapter 3. |
| Windham, Elizabeth #279-1 | Coal is on its way out. The market for fossil fuels is weakening and renewable resources are a growth industry. It's financially unsound. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040 |
| Phillips, Benita #288-1 | The market for coal is declining at a rapid pace. There is no long term future for coal. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. |
| Ellis, Clare #335-1 | Please do the right thing and leave coal in the ground. There is way too much of it as it is. Demand is slacking off as people switch to cleaner alternatives. This an outdated approach to the problem and very destructive. Thank you. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act.<br><br>Climate effects are described in Section 3.4 and other relevant sections. |
| **Reclamation** | | |
| Wolford, Deborah #492-3 | And, often, it is difficult, if not impossible to ""reclaim"" the land." | Reclamation of roads and MDW pads in this area has been very successful. See reclamation photos in Section 3.18. |
| Steitz, Jim #2603-4 | The bankruptcy of the applicant company, Arch Coal, is a favorable indication that our society is belatedly divesting from coal as an energy supply, yet the Forest Service would retard this progress by carving special favors from its | Coal demand and prices have increased in recent months. 2017 EIA projections include significant |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | pristine roadless lands for this company to inject artificially cheap, below-market coal into power plants. A more perverse negation of the public and national interest could scarcely be imagined. Moreover, the bankruptcy of Arch Coal renders quite flimsy any promise that the BLM may obtain for mine reclamation or mitigation of damage to water quality, absent dramatic reforms in the reclamation bonding practices of BLM that have already left the federal Treasury with many billions in cleanup liabilities. | amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Rental rates and standard royalty rates are matter of policy are beyond the scope of this analysis.<br><br>Reclamation bonding is required in Colorado.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Patriana, Zarah #1-71 | Before I will support any drilling or mining on public lands I will want to seeGuarantees, back with an escrow account that the land will be restored when the project is completed 2) A rapid response plane to address any accidents, 3) Profit sharing the American people should get a piece of the profit not just a one-time fee!" | State reclamation bonding is required by DRMS.<br><br>The mine already does have emergency response protocol in place.<br><br>Annual rents and royalties would paid to the U.S. Treasury under requirement of law. Approximately 50% of that is dispersed to State and/or affected counties. |
| Mannsfield, Bjoern #42-1 | Coal leases are giving away our public lands and coal companies are not even able to pay for the clean up costs anymore. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Reclamation activities are bonded by the State in Colorado DRMS. |
| Goin, Wayne #272-3 | Besides, Arch Coal is not doing well financially; I do not want to pay any more of my tax money to clean up pollution left behind by the corporate sector." | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | and have been finalized as of September 2016. Reclamation activities are bonded by the State in Colorado |
| Cernik, Eva #275-2 | Coal mining provides profits to the mining company, but the general public must eventually pay for the pollution, which is often not immediately evident. | We assume that commenter is talking about ground disturbance not climate effects. Reclamation activities are required to be bonded in Colorado. See other permits required. |
| Stokesbary, Jenai #276-2 | Additionally extraction does not cleans up after itself once it leaves an area ravaged. The burden is placed on the people who inhabit the surrounding area. I do not want to pick up the tab for coal companies that have profited off of my public lands. I do not want the citizens of my state to lose the use of public lands because a coal company damages it and never restores it. | Reclamation activities are required to be bonded in Colorado. See Section 1.7. |
| Doucet, Lisha #248-2 | Also who is going to clean up the mess left behind? All the coal companies are going bankrupt because coal is dead. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. Reclamation bonding is required in Colorado by DRMS to ensure that disturbed areas are reclaimed. |
| Voelker, Martin #449-2 | Arch Coal Inc. is in bankruptcy, following a trend that has engulfed the entire coal industry. - given Arch coal's dubious financial outlook they are unlikely to be around once claims are made against pollution and land degradation charges. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Reclamation bonding is required in the State of Colorado by DRMS. |
| Willard, Jim #425-2 | Arch coal is now in bankruptcy and to allow them to decimate the area without the possibility of reclamation as has been their history in the past with their in house self-bonding would be a travesty | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | Reclamation bonding is required in the State of Colorado. They are not permitted to self-bond. |
| **BLM's LRMP and Forest Plan** | | |
| Earthjustice #8419-44 | IX. THE FOREST SERVICE MAY NOT RELY ON THE 1983 GMUG FOREST PLAN AS AMENDED.<br><br>A. The Lease Modifications EIS Improperly Relied On A Stale, Outdated Forest Plan The Forest Service is preparing its supplemental EIS for the coal lease modifications under the umbrella of a stale, antiquated, and increasingly out-dated 33-year old Forest Plan. A review of the 1983 Forest Plan, the 1991 Forest Plan amendment, and supporting EISs reveals little discussion of coal mining, and no discussion at all of coal mining impacts. The Forest Service cannot continue to consider coal lease modifications in the context of a forest planning framework that was crafted without consideration of the direct, indirect and cumulative effects of coal mining. Further, the 1983 Forest Plan, 1991 amendment, and supporting documents fail to mention or address a key impact of coal mining and a key threat to the GMUG National Forest: climate change. NFMA mandates that Forest Plans ""shall be revised … from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years.""262 Both of these conditions were long ago met on the GMUG. The responsible official has the discretion to determine at any time that conditions within a plan area have changed significantly, such that a plan must be revised.263 In the early 2000s the Forest Service recognized that the GMUG Forest Plan was out-of-date and that it must update the Plan, and so it initiated an extensive revision process. The Forest Service put that effort on hold in 2008, but has recently stated that it will initiate its Plan assessment and revision this year. Given the antiquity of the current Plan, proceeding with the coal lease modifications in light of the Forest Service's announcement of imminent revision is unwarranted. Due to the insufficiency of the Forest Service's existing management framework, all coal leasing and development decisions, at all stages of the administrative processes, should be suspended until the Forest Plan revision is complete and outstanding deficiencies can be addressed. In the alternative, the agency should amend the current Forest Plan to comprehensively address coal development on the GMUG, something no plan amendment has done to date. The existing Forest Plan is no longer able to serve its intended land use planning function with regard to coal | While the Forest Plan is beginning revision again under the 2012 Planning Rule this year, the 1991 Forest Plan is still in effect.<br><br><u>Air</u><br><br>Existing plan also address air quality in a manner that hasn't changed (comply with state and federal air quality standards).<br><br>Methane and CO2 are still not regulated, and beyond reporting requirements, there is nothing that compels the Forest Service to do anything differently with regard to air because a significance level has not been set.<br><br>Commenter may argue that CEQ's Draft/Final Guidance set a threshold. Even though CEQ's guidance is no longer in effect as of March 28, 2017, this analysis has quantified GHGs consistent with that Guidance. Likewise commenter may argue about EPA's GHG endangerment finding, but similarly, no threshold has been set.<br><br>Agency 2015 planning directives at FSM 1900 Chapter 1926.15 (24) include " Provide management direction to protect air quality related values, including visibility, in Class I Federal areas as required by the Clean Air Act Amendments of 1977 and FSM 2120." Air quality related values are generally resources sensitive to air quality and visibility and are addressed at the local level. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | development. The 2012 Lease Modifications Final EIS states that ""[t]he Forest Service Authorized Officer will determine if the activity is consistent with the GMUG Forest Plan.""264 The problem is that the GMUG Forest Plan does not reflect the on-the-ground reality of today's forest. The Forest Plan guides all natural resource management activities and establishes management standards and guidelines for the GMUG. Management directions described in the Forest Plan are a result of public issues, management concerns, and management opportunities.265 The above statement cuts to the heart of the matter: the Forest Service is basing its leasing analysis and decision-making within a framework of public issues, management concerns and management opportunities that were relevant decades ago, but have not been updated to reflect the significant changes on the GMUG. Climate change is a key example of a preeminent contemporary public issue that was not a concern when the 1983 Forest Plan was developed, and that was not addressed in the context of coal development in the 1991 amended Forest Plan. For each potentially affected resource identified and analyzed in the 2012 Lease Modifications Final EIS, the Forest Service reaches a conclusion that all action alternatives are consistent with Forest Plan standards.266 But comparing today's resources to yesterday's Forest Plan standards is comparing apples to oranges. The standards of the 1980s and 1990s are not reflective of today's standards and our understanding of today's forest and environment. For example, the Lease Modifications EIS state that ""[t]he negative effects from this project are of short duration and magnitude and do not result in a Forest-wide decrease in trends or deter from meeting the MIS objectives in the Forest Plan.""267 But this project would release significant amounts of methane into the atmosphere. Burning the coal generated from this project would release significant amounts of carbon dioxide into the atmosphere. The negative effects of climate change on the GMUG will not be short-lived and of limited magnitude. An updated Forest Plan would likely attempt to address climate impacts to the Forest and address the how the agency could mitigate damage caused by the Forest's actions that worsen climate change. Because the Lease Modifications are viewed in terms of consistency to an outdated plan, the purposes of NFMA are subverted, and decisions may be made that undermine proper Forest stewardship.<br><br>B. The GMUG National Forest Environment Has Changed Significantly Since 1983. The landscape and resources of the GMUG National Forest and our understanding of the relationship between coal and the environment have | Coal<br><br>Coal mining in existing plan is specifically addressed at III-62 to III-70.<br><br>Coal management regulations (see Section 1.7) have not substantially changed and the Forest Service only prescribes lease stipulations to protect surface resources.<br><br>Geologically, known coal reserves, except as mined out, have not changed.<br><br>The CRR exception allows for roads that will facilitate coal development in the NFCMA.<br><br>Agency 2015 planning directives at FSM 1900 Chapter 1926.15 (16), emphasis added, include: "Provide access to energy and mineral resources in the most efficient manner and encourage industry proposals for resource development on NFS lands, consistent with the rights that individuals or companies have acquired under the mineral leasing acts and mining laws and consistent with the objective of the alternatives."<br><br>This is consistent with current Forest Plan management areas.<br><br>Even with a Forest Plan revision occurring over the next 3-5 years, it is unlikely that there will be standards or guidelines related to GHGs where there is no national regulatory framework upon which to base this. The forest plan revision strategy under the 2012 planning rule and consistent with law, regulation and policy, will identify:<br><br>• local stressors,<br>• indicators of possible impact, |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | changed significantly over the past one-third of a century. Among those changes are: - Climate change. The current Forest Plan did not anticipate or address climate change as it relates to coal development, and the impacts climate change is having and is likely to have on the Forest. Science has long since confirmed the reality of climate change, and the changing impacts are being experienced on the GMUG in the form of warmer winters, prolonged drought, beetle outbreaks and increased fire extent and severity. - Coal mining. The current Forest Plan did not address coal mining and its impact on the Forest or on the climate (through methane venting and coal combustion). - Population growth. Since 1983, the population of Gunnison County and Delta County has grown by about 50%, which has resulted in significant development near and more recreation pressure on forest lands. Oil and gas development. Since 1983, there has been unprecedented growth in natural gas development in Colorado, and a surge in development in the nearby Muddy Creek and Bull Mountain areas. Such development is impacting wildlife habitat, air quality, water quality, scenic values, and cumulative interacts with coal mining impacts. - Wildlife. Since 1983, deer populations have fallen, the lynx has returned to the GMUG, and new science concerning the presence and status of native cutthroat trout has emerged. Given these and many other changes, the Forest Plan and EIS's analysis increasingly fails to reflect the steadily growing body of scientific evidence concerning coal's impacts on the environment. Without the foundational land use planning guidance that is only available through a current and up-to-date Forest Plan, it is impossible for the Forest Service to make the type of fully informed decision that NEPA requires, and it is impossible for the Forest Service to ensure that other Forest values are adequately protected from the impacts of coal mining under the plan. The data utilized and conclusions drawn in the current Forest Plan are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the GMUG National Forests. In Northern Plains Resource Council v. Tongue River Railroad, the court addressed the duty of federal agencies to gather ""baseline data"" about wildlife species during the NEPA process.268 The court ruled that the data collected was ""stale,"" because it dated back to the 1980s and 1990s, and that insufficient efforts were made to update that data. ""Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious.""269 Here, data collected for the GMUG's planning framework stretches back to the very early 1980s. The 1983 Forest Plan and FEIS consideration of coal mining is largely limited to Appendix F - Unsuitability Assessment for Coal Mining. Coal | • useful monitoring of climate change indicators (an example might be stream temperature monitoring where there is a special status fish with particular spawning temperature requirements), and<br>• forest management actions that will aid in reducing possible impacts to and improve the resilience of the landscape (some examples might include encouraging water users to store water at higher elevations to reduce evaporation and reforestation of areas not regenerating after harvest with specific seed sources that are more tolerant to heat/drought, etc.).<br><br>At this time it is unlikely that methane use or capture from coal mines will be prescriptive under a forest plan revision as there is no way to measure any benefit or effect at the local level within the duration of the proposed revised plan cycle.<br><br>Lynx<br><br>Lynx is a threatened and endangered species. Lease stipulations specific to T&E are present and allow for the use of best available science.<br><br>Population Growth<br><br>Population growth is not expected based on the lease modifications. However this is discussed in Section 3.21.<br><br>Recreation<br><br>Recreation effects have been disclosed in Section 3.16. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Unsuitability Criteria consists of regulations developed by BLM, which use the ability of an area's surface resources to accept or absorb the impacts of coal mining activities as a means to determine suitability or unsuitability of the area for coal mining. Based on the applicability of regulatory criteria to forest conditions that existed in the early 1980s, in all alternatives approximately 755,862 acres have been identified having ""high"" to ""moderate"" suitability for coal leasing through application of the BLM Coal unsuitability criteria; 224,491 acres of the suitable acres were assessed as unsuitable for coal leasing.270 Although the GMUG Forest Plan was amended in 1991, it did not amend the 1983 coal suitability analysis. Before the Forest Service can commit itself to lease modifications and other project-level planning it must reexamine the validity of the unsuitability criteria employed in the early 1980s. Because the 1983 Forest Plan and1991 Plan amendment rely on stale data and analysis, the Forest Service cannot tier to these documents to assist the agency in adequately or fully disclosing impacts to the Forest, or to assist the public in understanding current conditions, nor can it rely on the stale plan to analyze how the environmental, social and economic foundations of the landscape would be affected by the coal lease modifications. To satisfy the ""hard look"" requirement of NEPA, the Forest Service must supplement its existing analyses when new circumstances ""raise significant new information relevant to environmental concerns.""271 Since the release of the Forest Plan in 1983, and since the 1991 Plan amendment, new information has become available and circumstances have changed that must be considered. An ""agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions.""272<br><br>C. The 2012 Lease Modifications Final EIS Does Not Correct The Forest Plan's Substantial Omissions. A project-level supplemental EIS will be unlikely to address the significant new information and changed circumstances that have occurred since adoption of the 1983 Forest Plan and its 1991 amendment. The Forest Service must address new information both at the project level and Forest-wide. ""Forest management then occurs at two distinct levels. At the first level, the Forest Service develops the Forest Plan, a broad, programmatic document accompanied by an environmental impact statement ..""273 At the second level, ""the Forest Service is required to implement the forest plan by approving or disapproving specific projects. Projects must be consistent with the governing forest plan and subject to the procedural | <u>CRCT</u><br><br>While it is true that genetic studies have been occurring, the lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far.<br><br><u>Cumulative Impacts</u><br><br>Cumulative impacts have been disclosed for each resource area.<br><br><u>Deer</u><br><br>Deer are not a TES, Sensitive or MIS species.<br><br><u>SMCRA</u><br><br>The Unsuitability Criteria are addressed in Appendix B and do not rely on the Forest Plan revision for completion. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | requirements of NEPA. 16 U.S.C. § 1604(i).""274 In addition to the non-existent analysis of coal's impacts to the environment in the Forest Plan, the Plan's coal leasing stipulations are also out-dated and do not reflect or address significantly changed conditions on the Forest today.275 The Forest Plan contains a rather skeletal list of mineral leasing stipulations, conditions that may have been pertinent to protecting surface conditions and wildlife 33 years ago, but whose restrictions fail to address the significant changes to the Forest. The EISs for the 1983 Forest Plan and the 1991 amendment contain no analysis of the stipulations or their effectiveness. The stipulations in the GMUG Forest Plan are therefore insufficient to protect the resource values of the Sunset Roadless Area and the connected landscape of the Upper North Fork Valley. In sum, the GMUG National Forest should not process coal leasing pending revision of the Forest Plan. In the alternative, the Forest Service should update the analysis that supported the 1983 Forest Plan and 1991 Plan amendment through an additional plan amendment to account for significant new information that has arisen. ""While the USFS must prepare an EIS when it decides to revise a Forest Plan, it need not supplement the existing Forest Plan EIS pending the revision if it has taken a hard look at the environmental effects of the new information and made a reasoned decision not to prepare a supplemental EIS.""276 The agency must explain why it is not pursuing an amendment to the Forest Plan in light of the significant science that has developed around coal impacts, especially climate change, over the past 30 years. The landscapes implicated in this proposed lease modifications are ripe with diverse ecosystems, wildlife and other natural resources. Similarly, important values in the form of organic orchards, tourist-centered wineries and clean irrigation canals exist immediately downstream from the potentially affected landscape. Lease modification and development on the scale proposed could impact these resources. The agency has a legal obligation to defer modifying these leases until it can address significant new information that impacts how the Forest can properly protect and successfully manage its resources. The first step in achieving this is withholding action on coal exploration and lease modifications until the Forest Service completes the comprehensive Forest Plan revision or similar analysis that addresses significant new information at the forest level. | |
| Earthjustice #8419-44 | D. BLM Similarly Cannot Rely On The Outdated Uncompahgre Field Office Resource Management Plan. The BLM Uncompahgre Field Office's Resource Management Plan (RMP), published in 1989, is also stale and outdated, | In accordance with BLM's Land Use Planning Handbook (H-1601-1) existing land use plan decisions remain in effect during a revision until the |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | creating similar legal and analysis infirmities. The 2012 Lease Modifications EIS states: Leasing is also consistent with the BLM Uncompahgre Basin Resource Management Plan (RMP, 1989). This RMP determined that the areas subject to the lease applications and exploration license applications were to be managed for both existing and potential coal development. The area is acceptable for coal development and coal production, and such coal activities could occur without conflicting with other land uses as described in the RMP.277 The 27-year old RMP should not be used to consider coal leasing in today's context. We note that BLM's decided in 2012 to abandon another fossil fuel decision impacting the North Fork Valley a proposed 30,000-acre oil and gas lease sale that included lands within a mile or two of the West Elk Mine and the GMUG National Forest in large part because of the staleness of that Uncompahgre RMP. In that case, numerous conservation groups and members of the public argued that tiering a lease sale to a 1989 RMP, a document largely devoid of relevant analysis of modern oil and gas practices, was unacceptable. The RMP's lack of consideration of climate change, fracking, methane pollution and other issues associated with oil and gas development (many of which are also associated with the Lease Modifications) sealed the August 2012 lease sale's fate, and the agency abandoned its proposal. BLM announced the deferral of all 22 parcels and 30,000 acres of public lands surrounding the North Fork Valley from the August 2012 oil and gas lease sale, citing the need to conduct additional analysis. The inadequacy of coal leasing provisions in the 1989 RMP is directly analogous to the inadequacy of oil and gas leasing provisions in that document. Given the outdated nature of the RMP (which is being revised but whose revision is not yet complete), and given the similar antiquated condition of the GMUG Forest Plan, with its non-consideration of climate change, methane and other identical issues, the agencies should not process Arch's lease modifications application unless and until both BLM and the Forest Service amend or revise their stale plans. | amendment or revision is completed and approved. Since the revision of the BLM's Uncompahgre Resource Management Plan is underway, the BLM reviewed the proposed action of the Federal coal lease modifications COC-1362 & COC-67232 and exploration plan to determine whether they would harm resource values so as to limit the choice of reasonable alternative actions relative to the land use plan decisions being reexamined. This particular action would not limit the choice of reasonable range of alternatives of the Uncompahgre Resource Management Plan revision. The area is acceptable for coal leasing, there would be 1,910 acres closed to coal leasing in Alternative D (preferred alternative) of the Draft RMP/Draft EIS in the planning area including the congressionally designated Tabeguache Area and National Trails.<br><br>The BLM and USFS prepared a site-specific Environmental Impact Statement to analyze the proposed coal lease modifications and a reasonable range of alternatives in conformance with the 1989 Uncompahgre Basin Resource Area RMP. The EIS augments the 1989 UBRA RMP EIS and on its own merits, discloses the potential site-specific significant impacts as well as analyzes the cumulative impacts in consideration of relevant past, present and reasonably foreseeable future actions in the context of best available information (see Chapter 3). Also, the agencies addressed any needed mitigation based on resource analysis, all mitigation/conservation measures not already required as stipulations or included as design features would be incorporated as appropriate into conditions of approval of the potential permits. The IBLA held that 40 CFR 1506.1(c) does not apply where the proposed action is covered by an |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | existing environmental statement, thus repudiating the contention that ongoing environmental studies bar BLM from acting until such studies have been completed. In Re Bryant Eagle Timber Sale, 133 IBLA 25, 29 (1995). See also ONRC Action v. BLM, 150 F.3d 1132, 1140 (9th Cir. 1998) ("because the RMPs are outdated, they cannot be existing program plans as stated in NEPA").<br><br>With regard to the Forest Plan see comment (#8419-44) immediately above. |
| Zukoski, Ted #9760-2 | This letter concerns comments submitted last week by the Environmental Protection Agency (EPA) on a draft environmental impact statement (EIS) and resource management plan (RMP) for federal lands and minerals, including coal, managed by BLM's Uncompahgre Field Office. The EIS and RMP address coal resources in the Somerset coal field, and coal mining in the North Fork Valley, including the same mines the Colorado Roadless Rule coal mine exception seeks to benefit by making accessible 170 million tons of coal. EPA's letter explicitly recommends that BLM prohibit new coal leasing in the area until coal mines commit to use or combust a ""substantial portion"" of methane pollution they emit. EPA states: As described in the Draft RMP/EIS and supporting documents, coal leasing and development activities are likely to continue around the existing operations at the Somerset coal field. This coal field is well known for being a gassy formation with substantial GHG [greenhouse gas] emissions of methane. This ongoing issue has been analyzed in a number of the BLM's leasing decision environmental assessments and the USFS's EISs and EAs for exploration activities, vent holes and roads located on USFS land. The majority of methane from these coal mines is vented directly into the atmosphere. We recommend that new leases in this area include stipulations that require the successful lessee to either use or combust a substantial portion of the methane vented from these mines. Given the magnitude of GHG emissions from these uncontrolled vents, if it is not economical to install methane mitigation measures then we recommend not issuing the leases until economic conditions improve sufficiently to make methane reduction feasible.1 EPA's recommendations that no new coal leasing occur in the Uncompahgre Field Office until mines agree to capture or combust substantial amounts of vented methane are | The BLM is currently reviewing and processing all comments received and will consider substantive comments during preparation of the Proposed RMP/Final EIS. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | relevant to the coal mine exception because the Forest Service did not address such an approach in the draft EIS for that rulemaking, despite the fact that the same gassy coal field is at issue. High Country Conservation Advocates et al. specifically recommended that the rulemaking EIS address such an approach.2 Any subsequently prepared EIS on the coal mine exception must analyze in detail an alternative that requires coal mines to use or combust a substantial portion of methane vented from these mines, consistent with public and expert EPA recommendations. The Forest Service's failure to do so would violate the National Environmental Policy Act's mandate that the agency analyze all reasonable alternatives and potential mitigation measures." | |
| **Wildlife and Fish** | | |
| Patriana, Zarah #1-27 | No more roads fragmenting wildlife habitat | Effects on wildlife are described in various sections in Chapter 3. |
| Form letter | The U.S. Forest Service should protect the Sunset Roadless Area because it provides important habitat for deer, elk, black bear and lynx, and is home to watersheds that support imperiled Colorado River cutthroat trout. | The Sunset Roadless Area is not special with regard to any of these species. Habitat for all of these species occurs in various locations within the GMUG.<br><br>The lease modifications would also not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |
| Glaister, Shane #34-2 | The Canada lynx is listed as a threatened species under the U.S. Endangered Species Act. Lynx depend on wilderness to survive. This proposed project, in the heart of one of Colorado's largest roadless areas, would be located in | Effects on lynx are considered in Section 3.10. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | critical lynx habitat for foraging, denning and movement to other important habitats. | |
| Form letter | Colorado River cutthroat trout are found only on the western slopes of the Rocky Mountains in the Colorado River drainage. They require clean, cold water to survive - water that this project would likely impact." | The lease modifications would also not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is up stream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far.<br><br>Climate change may pose cumulative effects to any species, but is not discernable at the project level. |
| Earthjustice #8419-48 | "XI. THE FOREST SERVICE MUST CONSULT WITH THE U.S. FISH AND WILDLIFE SERVICE. The Forest Service cannot rely on the consultation prepared for the 2012 Lease Modifications proposal, which, in any event, is years old. Nor can it rely on any consultation for the Colorado Roadless Rule, which does not address the impacts on private property. For the reasons set forth below, the Forest Service must re-consult on the Lease Modification because its initial consultation violated the Endangered Species Act (ESA). 304 Under the ESA, the Forest Service has a substantive duty to ensure that its actions do not jeopardize the continued existence of threatened or endangered species or destroy or adversely modify the designated critical habitat of listed species.<br><br>A. Legal Background Section 7 of the Endangered Species Act (""ESA"") requires that each federal agency (the ""action agency"") ""insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification"" of the designated | The only LAU present in the vicinity is the Mount Gunnison LAU (BA Map Figure 1. Project record file: 06_MCC Lease Mod Figure 1). All of the Mount Gunnison LAU is located within the proclamation boundary of the GMUG which includes the private lands that may be affected by leasing or exploration. All spruce-fir and aspen stands (22,417 acres) within the LAU are considered lynx habitat. Lease Modification BA at pp 4, 15 identifies specifically that mining is occurring on federal and private lands. Areas outside of LAUs are not considered to be lynx habitat even if they contain habitat components or stands similar to those within the LAU. No lease modification or exploration connected actions would occur outside the LAU. The BA assumed that 75 total acres of lynx habitat loss could occur |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | critical habitat of the listed species. 16 U.S.C. § 1536(a)(2). In setting the scope of the action on which consultation must occur, the ESA mandates that agencies analyze the ""entire"" agency action. This means that a biological opinion's (or BA's) analysis of effects to listed species and critical habitat ""must be coextensive with the agency action."" Further, in designating an ""action area"" for analysis, the agency must consider ""all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the action."" In addition, the ESA and FWS regulations require every agency to ensure that ""any action [the agency] authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species."" 50 C.F.R. § 402.01. The regulations define ""action"" to include any ""action[] directly or indirectly causing modifications to the land, water, or air."" 50 C.F.R. § 402.02 (emphasis added). The effects of the agency action which must be evaluated include ""the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action."" Id. ""Indirect effects"" include effects ""that are caused by the proposed action and are later in time, but still are reasonably certain to occur."" Id. These direct and indirect effects must be considered together with a separate category of impacts known as ""cumulative effects,"" which are ""those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."" Id. Courts have repeatedly found that impacts are ""reasonably certain to occur"" - and thus must be analyzed under the ESA as ""indirect effects"" in a BA or BO - where federal actions induce private or off-site development.<br><br>B. The Lease Modifications Will Cause Direct And Indirect Impacts To Lynx Habitat on Adjacent Private and Public Lands. That Final EIS admits that the decision will result in impacts outside of the lease modifications area as well. .. Without the lease modifications, coal on existing federal leases and private lands would be bypassed because of current panel alignment on parent leases.308 The 2012 Lease Modifications Final EIS underscores the link between mining, road construction, and methane drainage well construction inside the lease modifications area and outside of the lease modifications area by considering the mining of the private land and adjacent federal coal as a direct or indirect economic benefit of the agency's decision to consent to the lease Modifications.309 Not only does the Forest Service's decision make | anywhere in the LAU (63 acres on the lease mods based upon percentage of habitat at BA pp 12-13). Further, this acreage is higher than the 72 acres projected disturbance related to MWDs and access roads identified in Section 3.3 which identifies a conservative acreage for MDW pads for the modifications as a result of post-leasing activities. Exploration activities (which is a post-lease activity envisioned in the initial EIS) identifies approximately 21 acres under Alternative 3 (includes habitat in parent lease) and approximately 17 of lynx habitat disturbed which may or may not be used for future MDWs and associated access. There are no additional actions within the LAU related to post-lease development identified that exceeds the balance of the consultation. The USFWS concurrence includes requirements for reinitiating consultation if effects or extent were not previously considered. Therefore the consultation is still valid. Because roads are existing and exploration has already occurred on private and previously leased lands, exploration would only have an effect on lynx habitat on NFS lands as disclosed.<br><br>Additionally, consultation for the entire LAU was considered in the 2016 SBEADMR consultation. Approximately 163 acres of the cumulative disturbance/activities has rendered 163 acres habitat currently unsuitable (includes the 125 acres identified in the 2010 BA, roads, additional 25% on activities) within the LAU (<1% unsuitable). Potentially 122 acres (<1% habitat) may be treated for hazard trees (a cumulative effect) sometime in the future within the LAU. With these activities, the SBEADMR BA documents that the LAU would have a balance of 6,440 acres of suitable habitat that could be removed before exceeding the 30% |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | this development possible, MCC may be required to mine the private lands given the geography of the Lease Modifications, the private land, and the orientation of the mining panels if the company is to access the coal in the Lease Modifications, since its coal panels start in the northwest and move toward the southeast. The only way for MCC to access the coal in the southeast portion of the Lease Modifications area is to mine through the private land coal. The FEIS, in a cursory fashion, acknowledges that coal mining on adjacent private and public land outside of the lease modifications area is likely to have two types of impacts: (1) subsidence outside of the lease modifications area caused by underground mining there, and (2) habitat destruction caused by the construction of roads and MDW pads outside of the lease modifications area. Concerning subsidence, the FEIS estimates subsidence from mining under adjacent private and Federal lands combined: ..Here, too, the FEIS fails to display even generally where these impacts on adjacent private and public lands are likely to occur.313 Since road and drainage well construction require the elimination of all vegetation within the road-bed and drill pad, mining on private and adjacent public land outside the lease modification will eliminate all habitat values on those 63 acres. While it is unclear whether all of the additional 63 acres of habitat to be eliminated for construction of MDW pads and roads on adjacent private and public lands outside of the lease modifications will be lynx habitat, additional data in a table in the FEIS indicates that at least a portion those impacts will occur in lynx habitat. While Table 3.10a is hardly clear, it indicates that in addition to the estimated 75 acres of disturbance of suitable lynx habitat within the Lease Modifications area from MDW pad and road construction, it is ""foreseeable"" that an additional 17 acres of lynx habitat will be destroyed outside of the lease modifications area: 10 acres of suitable lynx habitat on private lands will be damaged, and similarly ""foreseeable"" that 7 acres of suitable lynx habitat on ""Parent Lease COC-1362"" will be impacted by surface impacts.314 The FEIS thus discloses that the Forest Service's decision to consent to the Lease Modifications is the ""but for"" cause of, and the on/off switch for, subsidence and habitat destruction impacts that will result from mining the coal on private and adjacent public lands. C. Because The 2010 Forest Service BA Analyzes Only Direct And Indirect Impacts Within The Lease Modifications Area, And Fails To Address Indirect Impacts To Potential Lynx Habitat On Adjacent Private And Federal Land, The Forest Service Has Violated The ESA. In an attempt to address the Forest Service's consultation duties under ESA Section 7, the Forest Service issued a BA on the Lease | conservation threshold for lynx within the LAU. USFWS has agreed with the forest's determinations in their SBEADMR BO.<br><br>Commenter assumes underground longwall mining in a northwest to southeast direction. It is the opposite at the West Elk Mine where E Seam panel mining would start on the lease modifications and move back north and west into parent leases and private land. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Modifications in April 2010 - more than two years before the completion of the FEIS. That BA focuses on impacts to the Canada lynx, a species designated as threatened under the ESA in the southern Rockies, including Colorado.315 The Lease Modification BA purported to examine the impacts of the Forest Service's consent to the lease modifications, the destruction of habitat likely to result from road and MDW pad construction caused by mining the lease, and other past and reasonably foreseeable projects.316 The Forest Service identified a number of stipulations to the existing leases that ""would be carried over"" into the Lease Modifications ""slightly modified to reflect changes in Management, specifically the 2008 Southern Rockies Lynx Management Direction.""317 The Forest Service concluded, among other things, that these stipulations ""will mitigate impacts due to creation of roads and [MDW] pads within the area, winter access, and vegetative changes.""318 The Lease Modifications BA also concluded that disturbance to lynx denning and foraging ""is not anticipated to be a substantial impact as ... lease stipulations for this project follow guidelines as noted"" in an appendix to the BA.319 Based on its analysis, the Lease Modifications BA concluded that ""[i]mplementation of the project 'may affect, but is unlikely to adversely affect' the Canada lynx.""320 314 Id. at 127-28. See also id. at 605 (""Upon further review, impacts to approximately 10,.3 [should be 10.3(?)] acres of private lands in presumably suitable lynx habitat may occur if private land actions related to the coal mining associated with the two lease modifications occur.""). 315 GMUG NF, Biological Assessment for Federal Coal Lease Modifications (Apr. 16, 2010) at 10 (""2010 Lease Modifications BA""), attached as Ex. 124. See also 2012 Lease Modifications Final EIS at 129. 316 Lease Modifications BA (Ex. 124) at 10-15. 317 Id. at 6-7. 318 Id. at 13. 319 Id. at 15. 320 Id. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 85 April 12, 2016 The FWS concurred with the Forest Service's ""not likely to adversely affect"" determination by a letter dated June 16, 2010.321 The FWS stated that ""[s]everal assumptions were incorporated into your analysis [that is, the Forest Service's BA] of effects as stated above. If these assumptions prove incorrect, please contact the [Fish and Wildlife] Service to discuss any changes that may require further analysis or reinitiation of section 7 consultation.""322 The Forest Service's BA assumptions are, in fact, incorrect, since the BA fails to account for the impacts to lynx habitat caused by coal mining under adjacent private and public lands made possible by the agency's decision. The Forest Service's BA assumes that road and MDW pad construction within | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | the lease modifications area may disturb about 75 acres of lynx habitat.323 The BA identifies only the land inside the Lease Modifications as the land where impacts to lynx habitat may occur.324 Thus, in assessing the impacts of ""reasonably foreseeable"" actions, the BA addresses only the 75 acres likely to be disturbed by mining resulting from the Lease Modifications themselves.325 The BA is based on incorrect assumptions and fails to account for the direct and indirect impacts of the Forest Service's consent to the lease modifications because it fails to account for or to mitigate the direct and indirect impacts of road or MDW pad construction on the adjacent private and public land that the FEIS admits will be induced by the Lease Modifications. The BA fails to address the 63 acres of habitat that will be eliminated to make way for roads and MDW pads on private and adjacent public lands outside of the lease modifications, as identified in the FEIS.326 Nor does the BA address the 10 acres of suitable lynx habitat on private lands that will be damaged, and the 7 acres of suitable lynx habitat on ""Parent Lease COC-1362"" that will be impacted by surface impacts as indicated in FEIS Table 3.10a.327 321 2010 FWS Concurrence Letter (Ex. 123) at 4. 322 Id. 323 See 2010 Lease Modifications BA (Ex. 124) at 5 (describing project as impacting 48 acres from 48 MDW pads and 24 acres from 6.5 miles of road construction); 2010 FWS Concurrence Letter (Ex. 123) at 3 (assuming 45 acres of land cleared for MDW pads, and 24 acres cleared for temporary roads). 324 Lease Modifications BA (Ex. 124) at 9 (Table 3). 325 Id. at 10 (Table 4). While the BA mentions private land, nowhere does the BA account for or address the impacts to lynx habitat from private and public land mining that will be induced by the Lease Modifications decision as an indirect impact. The BA recognizes the likelihood of induced impacts. Id. at 4 (""The panels in the lease modifications would include the start lines and the first few thousand feet of five panels that would extend west off the FS lands and into coal reserves under private land.""). But beyond that, the BA does not mention private land impacts except in the context of cumulative impacts, not induced, indirect impacts. 326 2012 Lease Modifications Final EIS at 92. 327 Id. at 127-128. Further, the BA assumes that there is a chance that subsidence may alter 1360.5 acres of lynx habitat within the Lease Modifications area.328 The FEIS reiterates this acreage figure, and reinforces that it does not address lands outside the Lease Modifications area.329 This figure does not appear to account for the ~400 acres of subsidence that is likely to result from mining adjacent reserves in existing federal leases and adjacent private lands.330 Nor does it match the 1500 acres of total subsidence predicted in the FEIS.331 | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | In sum, the Forest Service is violating its substantive duties to protect the lynx from jeopardy by relying on a BA and informal consultation that fails to evaluate the entirety of the agency action and all of its direct and indirect impacts. Further, because the Forest Service has adopted a decision that ""prove[s] incorrect"" the FWS's assumptions about the impacts of the Forest Service's decision, the ESA required the Forest Service to contact the FWS ""to discuss any changes that may require further analysis or reinitiation of section 7 consultation.""332 The Forest Service has apparently failed to do so. The Forest Service's failure to re-initiate consultation with the FWS on the additional habitat destruction outside of the lease modifications area that are a foreseeable indirect impact of the Forest Service's lease modifications decision, violates the ESA. At an absolute minimum, the Forest Service must prepare a new biological assessment and reinitiate consultation with FWS to address these errors. 328 2010 Lease Modifications BA (Ex. 124) at 12 (""in a subsidence worst-case-scenario situation, this lease modification and the underground mining associated with it would alter the entire surface topography of the modification area"") (emphasis added); id. at 15 (""If all of the lease modification area subsides to the extent that surface habitat is damaged or destroyed, an additional 1360.5 acres of habitat would be lost within the LAU"" (emphasis added)). 329 See 2012 Lease Modifications Final EIS at 130 (""If all of the lease modification area subsides to the extent that surface habitat is damaged or destroyed, an additional 1360.5 acres of habitat would be lost within the LAU"" (emphasis added)). 330 Id. at 91. 331 Id. 332 See 2010 FWS Concurrence Letter (Ex. 123) at 4; 16 U.S.C. § 1536(a)(2) (consultation mandate); 50 C.F.R. § 402.16(c) (requiring re-initiation of formal consultation if the proposed action is later modified in a manner that causes an effect that was not previously considered); 50 C.F.R. § 402.16(b) (requiring re-initiation of formal consultation if new information shows the action may impact listed species in a manner or to an extent not previously considered);<br><br>D. The Forest Service Has Violated Its ESA Section 7 Duty to Ensure Against Jeopardizing The Lynx.... The Forest Service may not rely on the 2010 biological assessment (BA), nor may it rely on the FWS's June 16, 2010 concurrence with that BA, to fulfill this substantive duty.334 To the extent it is the Forest Service's position that it is relying on amendments to either the BA or the concurrence, it must make those documents available as part of, or as appendices to, the supplemental EIS. If the Forest Service consents to the coal lease modifications without correcting the deficiencies in the BA, it will be | |

| Commenter-Comment # | Comment | Response to Comment |
| --- | --- | --- |
| | jeopardizing the lynx in violation of the ESA. Because the 2010 BA and FWS concurrence are arbitrary and capricious and contrary to the ESA, the Forest Service's reliance on the 2010 BA and FWS concurrence to determine that the lease modifications are not likely to adversely affect the lynx is arbitrary and capricious and violates the ESA. We therefore urge the Forest Service to explain why it believes the agency is in compliance" | |
| Reno, Danica #108-2 | These areas are critical for wildlife, including endangered species such as the Canada lynx, and human activity in this area would be disruptive to their natural behavior and movement patterns. | Effects on lynx are considered in Section 3.10. |
| Dines, Anselm #128-3 | Arch Coal must be denied the permit because of the extraordinarily sensitive flora and fauna (some animals of which are threatened or existing with seriously diminished species populations) ecology of this remote area. | Effects are disclosed in Chapter 3 regarding plants and animals including Threatened, Endangered, Sensitive and MIS. |
| Boyer, Cathy #139-2 | The Canadian lynx is still a threatened species under the U.S. Endangered Species Act. A great effort was made reintroducing the Canadian lynx into Colorado. Why would we now knowingly invade critical lynx habitat? We don't even yet know if the lynx populations in Colorado are growing or declining. | Effects on lynx are considered in Section 3.10. |
| Zukoski, Edward 8419-28 | Further, the Forest Service should consider mitigation measures to protect imperiled fish populations. The 2015 Colorado Roadless Rule Coal Mine Exception Supplement Draft EIS states that Colorado River cutthroat trout (a Region 2 sensitive species) and greenback cutthroat trout (a threatened species) are found in and around the North Fork Coal Mining Area.142 Information concerning the discovery of a Colorado River cutthroat trout population in Hoodoo Creek, very near the southern boundary of the Lease Modifications area, only came to the Forest Service's attention since after the 2012 Lease Modifications EIS was approved.143 The 2015 Roadless Rule EIS largely deferred analysis of potential impacts to the trout until later proposals were received: ""proper consideration of the Colorado River cutthroat trout in further site-specific planning of the coal mining-related activities will likely be important in conservation of local individuals and populations."" The Lease Modifications are that further planning effort where 140 See, e.g., GMUG National Forest, Final Supplemental Environmental Impact Statement for the Amendment of the Land and Resource | The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far.<br><br>Climate change may pose cumulative effects to any species, but is not discernable at the project level. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Management Plana (1991) at VI-77. 141 See supra at 17. Further, the outdated 1983/1991 Forest Plan is likely to remain in effect for many another 3-4 years because the Forest has only just begun the plan revision process. 142 U.S. Forest Service, Colorado Roadless Rule Supplemental Draft EIS (Nov. 2015) at 51-60. 143 ""While Colorado River cutthroat trout were evaluated in 2012 and programmatically determined to be potentially impacted by roadless area management, new information confirms members of the species are directly associated with the North Fork Coal Mining Area."" Id. at 53. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 41 April 12, 2016 such planning is ""important.""144 The Forest Service therefore must address in the Lease Modifications supplemental EIS the potential impacts of coal leasing and exploration, and impacts from foreseeable mining, to Colorado River cutthroat and greenback cutthroat trout. That analysis should include mitigation measures - including avoidance of watersheds that contain such trout populations - to protect these fish." | |
| Boucher, Alex #89-2 | The 5,000-acre Sunset Roadless Area in western Colorado's Gunnison National Forest provides crucial winter habitat for large mammal herds, denning areas for the threatened Canada lynx and watersheds that support populations of imperiled Colorado River cutthroat trout. | Effects are disclosed in Chapter 3 regarding plants and animals including Threatened, Endangered, Sensitive and MIS.<br><br>Effects on lynx are considered in Section 3.10.<br><br>The lease modifications would also not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | Climate change may pose cumulative effects to any species, but is not discernable at the project level. |
| Herbert, Joseph Thomas #269-2 | Beyond the actual damage caused by mining operations, which is considerable, roads permanently fragment habitat and degrade wild places. They allow for overuse of areas that were previously accessible by only a few which stresses wildlife that may be intolerant of human presence, sometimes to the point of leaving an area altogether. | Effects on wildlife are disclosed in various sections in Chapter 3. MWD access roads would not be open to the public and would be reclaimed when no longer needed per bonding requirements. |
| Goin, Wayne #272-1 | Coal mining in roadless areas threatens pristine wildlife habitat. | Effects on various resources are described in Chapter 3 |
| La Point, Peggy #291-2 | The area is critical for a wide range of wildlife | Effects on wildlife are disclosed in Chapter 3. |
| Kuhnert, Robert #308-1 | 1) It causes the destruction of forest ecosystems that provide an environment which supports many types of wildlife, and countless lifeforms that enrich the forest floor, enabling the many life cycles to continue." | Effects on various resources are described in Chapter 3 |
| Triffo, Thomas #324-3 | "Another example is the Colorado River cutthroat trout, which are found only on the western slopes of the Rocky Mountains in the Colorado River drainage. They require clean, cold water to survive - water that this project would likely impact. In turn, this would decrease the ability of fishermen and outdoorsmen to fish for this species, as populations would decline due to the coal pollution impact." | The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is up stream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |
| Weaver, Gary #422-2 | These roads destroy habitat and mating routes for deer and other animals. | The proposed temporary roads would likely disturb/displace some wildlife, primarily during |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | summer and fall during construction season. The roads would not be open to public motorized use. Effects on wildlife are disclosed in various sections in Chapter 3. |
| McMurray, Michele #452-2 | The effects of producing coal in these sensitive areas include compromising pristine wildlife areas and negatively effecting the recovering Lynx population, while also placing in jeopardy the Cutthroat Trout living in the Colorado River Drainage. Coal leasing would most likely impact the quality of the water in which the Trout live and the water on which other wildlife depends." | Effects on lynx are considered in Section 3.10.<br><br>The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is up stream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far.<br><br>Effects on other wildlife species are in various sections of Chapter 3. |
| Nugent, Susan #401-2 | Instead, these areas help maintain the diversity of life on our planet. Our watersheds are significant contributors to a healthy environment. Wildlife use this area for wintering habitat, lynx have dens here, and this natural beauty needs to remain." | Effects on various wildlife species are considered in Chapter 3. Lynx are addressed in Section 3.10. Watershed is addressed in Section 3.8. |
| Inglese, Tekla #461-4 | They will pollute the waters where the Colorado River cutthroat trout live and ruin the area for fishermen and outdoor enthusiasts. This is home to the Canada lynx which is an endangered species and needs to be protected or we will lose them as well. | The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is up stream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far.<br><br>Effects on lynx are considered in Section 3.10.<br><br>Effects on recreation are considered in Section 3.16. |
| Saul, Michael #484-2 | It would damage habitat for dozens of wildlife species including elk, beaver and goshawks. | Effects on elk are discussed in 3.13.<br><br>Effects on goshawk are discussed in Section 3.11 and 3.14.<br><br>The ponds within the lease modifications are stock ponds not beaver ponds and the effects on those are disclosed in Section 3.15. |
| Earthjustice #490-1/2/3/4 | In setting the scope of the action on which consultation must occur, the ESA mandates that agencies analyze the ""entire"" agency action. Conner v. Burford, 848 F.2d 1441, 1452-53 (9th Cir. 1988) (citing 16 U.S.C. § 1536(b)(3)(A)); Ctr. for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1155 (D. Ariz. 2002). This means that a biological opinion's (or BA's) analysis of effects to listed species and critical habitat ""must be coextensive with the agency action.""... Further, in designating an ""action area"" for analysis, the agency must consider ""all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the action."<br><br>The Forest Service's Decision on Coal Lease Modifications Will Cause Direct And Indirect Impacts To Adjacent Private and Public Lands.<br><br>Because The Forest Service BA Analyzes Only Direct And Indirect Impacts Within The Lease Modifications Area, And Fails To Address Indirect Impacts On Adjacent Private And Federal Land, The Forest Service Has Violated The ESA's Consultation Mandates. | The only LAU present in the vicinity is the Mount Gunnison LAU (BA Map Figure 1. Project record file: 06_MCC Lease Mod Figure 1). All of the Mount Gunnison LAU is located within the proclamation boundary of the GMUG which includes the private lands that may be affected by leasing or exploration. All spruce-fir and aspen stands (22,417 acres) within the LAU are considered lynx habitat. BA at pp 4, 15 identifies specifically that mining is occurring on federal and private lands. Areas outside of LAUs are not considered to be lynx habitat even if they contain habitat components or stands similar to those within the LAU. No lease modification or exploration connected actions would occur outside the LAU. The BA assumed that 75 total acres of lynx habitat loss could occur anywhere in the LAU (63 acres on the lease mods based upon percentage of habitat at BA pp 12-13). Further, this acreage is higher than the 72 acres projected |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | The Forest Service Has Violated Its ESA Section 7 Duty to Ensure Against Jeopardy. Section 7 of the ESA states that each federal agency shall ... insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'action agency') is not likely to jeopardize the continued existence of any endangered species or threatened species 16 U.S.C. § 1536(a)(2). The Forest Service may not rely on an unlawful Biological Assessment, nor may it rely on the FWS's concurrence with that BA, to fulfill this substantive duty." | disturbance related to MWDs and access roads identified in Section 3.3 which identifies a conservative acreage for MDW pads for the modifications as a result of post-leasing activities. Exploration activities (which is a post-lease activity envisioned in the initial EIS) identifies approximately 28 acres of lynx habitat disturbed which may or may not be used for future MWDs and associated access. There are no additional actions within the LAU related to post-lease development identified that exceeds the balance of the consultation. The USFWS concurrence includes requirements for reinitiating consultation if effects or extent were not previously considered. Therefore the consultation is still valid. Because roads are existing and exploration has already occurred on private and previously leased lands, exploration would only have an effect on lynx habitat on NFS lands as disclosed.<br><br>Additionally, consultation for the entire LAU was considered in the 2016 SBEADMR consultation. Approximately 163 acres of the cumulative disturbance/activities has rendered 163 acres habitat currently unsuitable (includes the 125 acres identified in the 2010 BA, roads, additional 25% on activities) within the LAU (<1% unsuitable). Potentially 122 acres (<1% habitat) may be treated for hazard trees (a cumulative effect) sometime in the future within the LAU. With these activities, the SBEADMR BA documents that the LAU would have a balance of 6440 acres of suitable habitat that could be removed before exceeding the 30% conservation threshold for lynx within the LAU. USFWS has agreed with the forest's determinations in their SBEADMR BO. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Ditty, Thomas #495-2 | It is not possible to develop this property without altering the habitat and impacting wildlife. | Effects on various wildlife species are considered in Chapter 3. |
| Rice, Shirley #1148-4 | The wildlife that depends on that land will die. | Effects on various wildlife species are considered in Chapter 3. |
| Steitz, Jim #2603-6 | The construction of 6 miles of road and nearly 50 drilling pads would lacerate the rich biological tapestry of this ecosystem, which constitutes some of the finest habitat for iconic Rocky Mountain wildlife under FS jurisdiction, including Lynx and Colorado River cutthroat trout. | Effects on lynx are considered in Section 3.10.<br><br>The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |
| Hornick, Diana #7923-2 | Coal mining in roadless areas threatens pristine wildlife habitat. We can't afford to lose more ground for wildlife, especially to energy development that threatens further changes to our climate | Effects on various wildlife species are considered in Chapter 3.<br><br>Effects on climate are considered in Section 3.4 and other relevant sections. |
| Earthjustice #8419-49 | E. The Forest Service Cannot Rely On Previously Prepared Biological Opinions To Address Water Depletions Caused By Foreseeable Exploration And Mining On Public And Private Lands. With respect to water depletions caused by both exploration and development of the Lease Modifications, the Forest Service may not rely on the terms of the 2007 GMUG programmatic BO for small water depletions. Reliance on that BO is foreclosed by its own terms because listed fish populations have not met the 2015 targets the programmatic BO sets. The Forest Service, FWS, and the courts have repeatedly confirmed that any water depletions within the Colorado River | A Recovery Implementation Program for Endangered Fish in the Upper Colorado River Basin was initiated on January 22, 1988. GMUG's PBO (ES/GJ-6-CO-99-F-033-CP062 and TAILS 65413-2007-F-0019) requires reporting of small water depletions, includes Gunnison River Basin, and relies on the umbrella of the original December 20, 1999 PBO for the Upper Colorado River Basin above the confluence with the Gunnison River. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | system jeopardize the continued existence of the endangered humpback chub, Colorado pikeminnow, razorback sucker, and bonytail (the ""four endangered 333 16 U.S.C. § 1536(a)(2). 334 See Res. Ltd., Inc. v. Robertson, 35 F.3d 1300, 1304 (9th Cir. 1993) (""Consulting with the [FWS] alone does not satisfy an agency's duty under the Endangered Species Act.""); Aluminum Co. of Am. v. BPA, 175 F.3d 1156, 1161 (9th Cir. 1999) (""an action agency may not escape its responsibility under the Endangered Species Act by simply rubber stamping the consulting agency's analysis""); Ctr. for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1143 (D. Ariz. 2002) (finding that the action agency has ""independent duty under § 7 of the ESA, 16 U.S.C. § 1536(a)(2), to not cause jeopardy or adverse modification to endangered species""). Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 88 April 12, 2016 fish"").335 All four of these fish are critically endangered due chiefly to alterations in the historical flow regime of the Upper Colorado River and its tributaries Beginning in the 1970s, the FWS determined that any water depletions would jeopardize the continued existence of the four endangered fish and adversely modify their critical habitat, and, as a result, adopted in 1988 a Recovery Implementation Program (since amended) it identified as the reasonable and prudent alternative for avoiding jeopardy.336 Prior ESA consultation concluded that the lease modifications may affect, and are likely to adversely affect, the four endangered fish due to water depletions from mining-related water withdrawals.337 The August 2012 Lease Modification ROD stated that the Lease Modifications ""may affect"" and is ""likely to adversely affect"" the lynx and the Colorado River fishes.338 At that time, the Forest Service contended, and the FWS concurred, that these withdrawals would be covered under the Recovery Implementation Program and the GMUG programmatic BO.339 The GMUG programmatic BO covers small depletions related to mineral development and other activities, such as road construction, on the GMUG national forests.340 The GMUG programmatic BO, by its terms, covers only total water depletions of less than 100 acre-feet per year for the three forests, and no individual project exceeding 50 acre-feet.341 The GMUG programmatic BO requires reinitiation of consultation under a number of conditions, including failure of the Recovery Program to meet its expected population goals of 1,100 adult Colorado pikeminnow.342 The GMUG programmatic BO requires a review of fish populations and the effectiveness of recovery actions following 50,000 total acre-feet of withdrawals, or in 335 See Rocky Mountain Wild v. Kornze, No. 13-01988, Mem. Op. at 16, 20 (D. | Similarly, depletions are covered under USFWS's "Final Gunnison River Basin Programmatic Biological Opinion" (ES/GJ-6-CO-09-F-0001 and TAILS 65413-2009-F-0044) dated December 4, 2009.<br><br>USFWS has reviewed information regarding the Colorado River endangered fishes identified in their October 7, 2015 "*Draft 2014-2015 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of Implementation of Action Items in the December 20, 1999, 15-Mile Reach Programmatic Biological Opinion and December 4, 2009, Gunnison River Basin Programmatic Biological Opinion*".<br><br>Their review had been finalized in December 20, 2016's "*Final 2015—2016 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and Implementation of Action Items in the January 10, 2005, Final Programmatic Biological Opinion on the Management Plan for Endangered Fishes in the Yampa River Basin*"<br><br>USFWS's conclusion (pp 44-45) is as follows: "The Recovery Program has made strong progress in protecting and improving flows and restoring habitat and has demonstrated strong resolve to manage nonnative fishes in recent years. Four of the 16 accomplishments listed in the table above relate to nonnative fishes, as do 10 of the 18 concerns. The Service agrees that the Recovery Program is at a critical juncture in its nonnative fish management activities and must build on recent |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Colo. Feb. 10, 2015). 336 See letter of E. Zukoski, Earthjustice to N. Walsh, U.S. Fish and Wildlife Service (Mar. 3, 2016), attached as Ex. 125. 337 See 2012 Lease Modifications ROD at 17; 2010 FWS Concurrence Letter (Ex. 123) at 1-2 (explaining that actions similar to the propose lease modifications for coal mining have resulted in water depletions and providing the Forest Service with information regarding same). 338 2012 Lease Modifications ROD at 17. 339 Id. at 17, 29; 2010 FWS Concurrence Letter (Ex. 123) at 1-2. The Biological Assessment for the lease modifications addresses only Canada lynx impacts, contending that ""[f]ish species are being analyzed separately."" 2010 Lease Modifications BA (Ex. 124) at 7. 340 Fish and Wildlife Service, Reinitiation of Consultation for GMUG NF, No. ES/GJ-6-CO-99- F-033-CP602 (April 27, 2007), at 1 (hereafter""2007 GMUG Programmatic BiOp""), attached as Ex. 126. 341 Id. at 1. 342 Id. at 4-7. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 89 April 12, 2016 2015 (last year), whichever comes first.343 The FWS's 2015 Sufficient Progress Memorandum plainly shows that the 1,100 adult pikeminnow goal has not been met by a large margin.344 The FWS concluded that projects meeting water depletion limits could avoid jeopardy under the 1999 Programmatic Biological Opinion for Recovery Program Actions in the Upper Colorado if project proponents sign the Recovery Agreement, make a monetary payment towards recovery actions, and the Forest Service retains discretionary authority for reinitiation of consultation, if required.345 The FWS in 2010 concurred that the mine expansion lease modifications were covered by the GMUG BiOp based on Forest Service representations that water withdrawals would be limited to approximately 1 acre-foot per year for a period of 5 years associated with the drilling of approximately 45 methane drainage wells.346 But the most recent information available from the Recovery Program indicates that, due to a lack of sufficient progress in recovery, continued reliance on the GMUG programmatic BO as a reasonable and prudent alternative is no longer valid. This is so because the Recovery Program's draft 2015 Sufficient Progress Memo finds that the Colorado pikeminnow is not meeting recovery goals nor is self-sustaining: The current downlisting demographic criteria for Colorado pikeminnow (USFWS 2002a) in the Upper Colorado River Subbasin is a self-sustaining population of at least 700 adults maintained over a 5-year period, with a trend in adult point estimates that does not decline significantly. Secondarily, recruitment of age-6 (400-449 mm TL; Figure 3), naturally produced fish must equal or exceed mean adult annual mortality (estimated | momentum to ensure significant progress on this front. The Service strongly encourages Program participants to push hard to implement the actions needed to manage problematic nonnative fishes and prevent new problematic species and any resurgence of existing problematic nonnative fishes. The Service will assist and support the Program by identifying accomplishments and important recovery actions that remain as we revise the Colorado River endangered fish recovery plans.<br><br>The Service is confident that with continued cooperation by all Recovery Program participants, the Recovery Program will continue to make significant strides toward recovery of the four endangered fishes. Recovery of the endangered fish is clearly taking longer than the Service and the Recovery Program stakeholders initially envisioned in 1988; however we sense an appropriate sense of urgency amongst stakeholders to achieve success as quickly as possible. The Service remains convinced that the best chance for success, i.e. recovery, rests with this collaborative Recovery Program. Based on our comprehensive evaluation of the status of the endangered fish, provision of flows (particularly during periods of drought), the magnitude of new depletion impacts (relatively minor in the historical context), the focus on nonnative threats, and cumulative Recovery Program accomplishments and shortcomings, the Service concludes that when implemented as Conservation Measures (i.e., part of the proposed action), the Recovery Program is making sufficient progress to continue avoiding the likelihood of jeopardy resulting from depletion impacts of new projects that have an annual depletion of up to 4,500 acre feet. Furthermore, that sufficient |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | to be about 20%). The average of all adult estimates (1992 - 2014; estimates from 2013 and 2014 are considered preliminary) is 613. The average of the five most recent annual adult population estimates is 501. Osmundson and White (2014) determined that recruitment rates were less than annual adult mortality in six years and exceeded adult mortality in the other six years when sampling occurred. The estimated net gain for the 12 years studied was 32 fish > 450 mm TL. Although the Colorado River population appears to meet the trend or 'self-sustainability' criterion, it has not met the abundance criteria of 'at least 700 adults' during the most recent five year period. 343 Id. at 6. 344 Fish and Wildlife Service, Draft 2014-2015 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of Implementation of Action Items in the December 20, 1999, 15-Mile Reach Programmatic Biological Opinion and December 4, 2009, Gunnison River Basin Programmatic Biological Opinion (Sept. 2, 2015) (""2015 Sufficient Progress Memo"") at 5, attached as Ex. 127. 345 Id. at 2-3. 346 2010 FWS Concurrence Letter (Ex. 123) at 2; see also 2012 Lease Modifications Final EIS at 110. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 90 April 12, 2016 The Service is reevaluating the demographic and threat removal criteria for Colorado pikeminnow through revision of the species' recovery plan.347 The Forest Service's reliance on the GMUG programmatic BO is fundamentally founded on that document's tiering to the assumed success of the overall recovery program. The 2015 population data makes clear that not only are the explicit terms of the GMUG programmatic BO not satisfied, but that the overall recovery program is not achieving its anticipated goals for recovery of Colorado pikeminnow. Therefore, neither the Forest Service nor FWS can rely on compliance with the GMUG programmatic BO, which specifies that FWS re-initiation of formal consultation under 50 C.F.R. § 402.16 is required if ""[n]ew information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not considered in the Colorado River PBO.""348 Such new information explicitly includes ""the lack of a positive population response by the year 2015;"" positive response being defined as at least 1,100 adult individual pikeminnow (±250) in the Colorado River.""349 The most recent five-year population average is 501, less than half that total. Clearly there has not been a positive population response, and Colorado River fish are experiencing effects not considered in the 2007 GMUG programmatic BO or the Colorado River programmatic BO. Therefore, neither the Forest Service nor the FWS | progress provides continued avoidance of jeopardy for the water projects and depletions currently provided with ESA compliance by the Program, i.e., 2,101 projects depleting 2.86 million af per year. Projects exceeding 4,500 acre feet or that have direct or indirect effects in addition to water depletions will be evaluated to determine if they jeopardize the species' continued existence on a case by case basis".<br><br>Therefore, given the USFWS's conclusion under their 2016 Final Assessment, all existing PBOs are still valid because USFWS found sufficient progress toward avoidance of jeopardy for those species. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | may rely on the 2007 GMUG programmatic BO or the Colorado River programmatic BO for ESA compliance to address water depletions related to the Lease Modifications or the exploration plan." | |
| Earthjustice #8419-50 | F. Any Consultation Must Address The Impacts From The Exploration Plan. We further note that any consultation must address water withdrawals that will result from the Exploration Plan for the Lease Modifications area. Drilling operations will require water, which, the 2013 Exploration Plan EA states, Arch will withdraw from ""nearby streams, where MCC owns the water rights, or stock watering ponds.""350 The 2013 Exploration Plan EA apparently takes the position that water removed from creeks in the area has no impact on the four endangered Colorado River fish because: ""The water source is considered to be non-tributary waters by the U.S. Fish and Wildlife Service, and does not exceeds a depletion amount consulted upon in the biological assessment.""351 This statement is not clear. If the waters are ""non-tributary,"" why is a BA necessary? Further, if the depletion ""does not exceed a depletion amount consulted upon,"" this likely means that the agencies are relying on the programmatic BO which, as noted above, is no longer valid. In either event, the exploration in the EA is either incorrect or legally invalid. The Lease Modifications 347 2015 Sufficient Progress Memo (Ex. 127) at 4. 348 2007 GMUG Programmatic BO (Ex. 126) at 3-4. 349 Id. at 4. 350 2013 Exploration Plan EA at 7. 351 2013 Exploration Plan EA at 20. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 91 April 12, 2016 supplemental EIS must better explain where Arch will get its water, whether that could lead to any depletion of water triggering consultation, and how the agencies will comply with the ESA.<br><br>The 2013 Exploration Plan would also result in the ""complete loss"" of 30 acres of lynx habitat in the short and long term.352 The agencies do not make clear whether this loss of habitat is included within the 70 acres of habitat to be destroyed by the Lease Modifications proposal. While the Forest Service has stated that the lease applicant is ""assumed"" to reuse the roads and pads for methane drainage wells, 353 nothing in the lease stipulations (or documents prepared pursuant to the ESA) requires that. In the Lease Modifications supplemental EIS and biological assessment, the Forest Service must make clear whether there is any chance that the exploration plan will result in additional road and drill pad impacts, and address any additional impacts in its analyses. The EIS and biological assessment must also address the potential | The 10 exploration holes would require approximately 0.017-0.026 acre feet of water each for drilling (or 0.17 to 0.26 acre feet total). The proposed action for post lease development of MDWs may result in water depletion of approximately 4.5 acre feet over the active life of the MDWs (assuming 10 MDWs were drilled each year and that for the 10 approximately 1 acre foot was needed total). The Forests PBO (April 27, 2007) ES/GJ-6-CO-F-033-CP062 limits depletions to 50 acre-feet per project and 100 acre feet per year cumulatively. This project's projected MDWs and exploration totaling a maximum of 4.76 acre feet fits that PBO's requirements and MCC reports depletions directly.<br><br>A BA is necessary per the policy requirements of the Forest Service. … Water is considered non-tributary when it does not connect to the waters that affect the Colorado River fish such as the case with stockponds, springs, or confined aquifers which do not recharge the Colorado River system.<br><br>See response to comment #8419-49 regarding consultation.<br><br>Acres of post-lease disturbance related to exploration are not expected to be additive. The 75 acres in the BA assumes that all estimated post-lease development that may occur could be in suitable lynx habitat. While it is true that we assume roads and pads will be reused between exploration and other post-lease surface development, that is not guaranteed; however, that |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | lag time between exploration, development, and recreation, which may leave unreclaimed roads and drill pads on the landscape for 5-10 years, further prolonging the period in which habitat is rendered useless for lynx. | has been common practice on adjacent lands. If the exploration roads/pads aren't reused for those lands they would be reclaimed sooner. However, It is estimated that the lease mods would be mined over the course of 3 years even though the reserves would last less than two. Even with exploration occurring over the course of two years we are unsure how commenter comes up with a figure of 5-10 years for unreclaimed roads. |
| Earthjustice #8419-12 | Beyond climate and energy impacts, opening the Sunset Roadless Area to road construction for coal mining is also likely to have significant, concentrated, damaging impacts across a 3-squaremile landscape of largely undisturbed roadless lands. These areas provide habitat for lynx and goshawk, black bear and elk, frogs, snakes, and deer; mining here will degrade soils and landscapes upstream of habitat for Colorado River cutthroat trout and endangered Colorado River fish. | Effects on resources including roadless, wildlife, soils are included in Chapter 3.<br><br>Climate effects are addressed in Section 3.4 and other relevant sections.<br><br>The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is up stream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far.<br><br>Water depletions as they related to Colorado River Fish area included in Sections 3.8, 3.10, and Appendix B. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| **Access/ Transportation** | | |
| Great Old Broads for Wilderness #15-3/16-3 | Though we are told roads are ""temporary,"" deleterious impacts of roads to natural resources are evident and endure for multiple decades. While the installation of gates and construction of berms may make roads inaccessible to further motorized use, these obstacles do not constitute reclamation nor do they mitigate the damage to the integrity of the ecosystem and the species living there. Our members hike in such areas with reclaimed ""temporary"" roads and regularly witness first-hand the resource degradation long after the roads have been closed." | Reclamation is ensured through bonding. Mine roads are not open to the public. Many of the MDW access roads for the lease modifications will cross through private lands which would first require trespass to access NFS lands. Example reclamation efforts can be seen Section 3.18 which are very successful in this area. |
| Nelson, Lisa #71-1 | If roads must be built for coal extraction, please consider how it would be done. Can it be done in such a way as to not do extensive harm to habitat? Once we ruin it, it cannot be undone. | Roads must be constructed to minimize damage per lease stipulations and must be reclaimed when their use is no longer needed. Reclamation is required under federal and state law and ensured through State bonding. |
| Hood, James #92-1 | It is not in the public interest to build roads and allow mining in a National Forest. | Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. In accordance with MLA 30 U.S.C. § 201(a)(1) "The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest and which will permit the mining of all coal which can be economically extracted"<br>See section 1.7. |
| Hiatt, Richard #107-2 | For the record a) there is no such thing as ""clean coal,"" and B) once you scar land up with roads, platforms, etc. the damage is done. It's no longer pristine. But it DOES open it up to future ""development interests"" since roads are | Clean coal refers to how it is burned at power plants, where compliant or super-compliant coal (such as that from the West Elk Mine), requires less 'cleaning'-or processing- to meet standards under the Clean Air Act. Compliant and super-compliant |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | already there - another area for which the US Forest Service has been complicit in the past. | coal refer to specific amounts of sulfur dioxide defined under the Energy Policy Act of 2005 at Sec. 437(2) "(A) the term ``compliant coal" means coal that contains not less than 1.0 and not more than 1.2 pounds of sulfur dioxide per million BTU; and (B) the term ``super-compliant coal" means coal that produces less than 1.0 pounds of sulfur dioxide per million BTU." To clarify "compliant" and "super-compliant" only refer to sulfur dioxide, and more specifically, emissions at combustion. North Fork coal should technically be referred to as compliant/super-compliant, low ash, low mercury, high BTU coal. These coal qualities also have attendant thresholds.<br><br>Effects of access roads associated with RFMP and exploration are disclosed in Chapter 3. Reclamation bonding is required in Colorado. MDW access roads prior to reclamation would not be open to the public. |
| Sweitzer, Kim #307-1 | Roads and mines leave permanent scars on out public areas. Please do not allow more of this destruction. | Effects of access roads associated with RFMP and exploration are disclosed in Chapter 3. |
| Castellino, Robert #399-7 | There is no need to further pay for roads that pay for an outdated mode of producing energy. | Mine roads and road reclamation are funded by proponent not taxpayers. |
| Ditty, Thomas #495-4 | The impact goes much further than the physical disruption of a specific area. It involves trucking, moving of large equipment, development of temporary facilities for offices and sanitation." | Effects on air (as it relates to emissions) are disclosed in Section 3.4, on wildlife in various sections in Chapter 3 and recreation in Section 3.16. Temporary offices and facilities are not required as permanent features exist on private land. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| **Recreation** | | |
| Patina, Zarah #1-4 | Valued recreation and hunting areas used by the public will be scarred for years to benefit one corporation. | Effects on recreation are disclosed in Section 3.16. |
| Form letter | Allowing coal mine expansion there will damage a pristine area now enjoyed by hunters and hikers, and will worsen climate change | Effects on recreation are disclosed in Section 3.16. Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Form letter | The Sunset Roadless Area is prime Colorado backcountry that protects important habitat, offers top-notch scenic qualities, and provides world-class hunting and other outdoor activities. | Effects on wildlife are considered in various sections in Chapter 3. Effects on recreation are disclosed in Section 3.16. |
| Piernot, Ph.D., Craig A. #240-4 | Both Colorado and the United States can develop and apply its public land natural resources more environmentally, effectively, efficiently, and productively than via leases for coal production. For the long-term, Colorado federal/public lands ought to be developed with objectives for greater social and recreational uses. | The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy. Beyond that this is a matter of policy that is outside the scope of this analysis. |
| Dunavan, Nancy #454-2 | Colorado depends on tourist dollars for a major portion of its economy, and the coal mining would destroy it. | Coal mining in this vicinity has occurred for over 100 years as have recreational activities. See sections 3.16 and 3.21. |
| Ditty, Thomas #495-3 | The use of this area by any mining company denies the utilization of this area by others who may desire to enjoy it. | The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy (see Section 1.7)..The area remains open to foot and horse travel and motorized travel on designated public roads. Beyond that this is a matter of policy that is outside the scope of this analysis. |
| Earthjustice #8419-6 | Disclose the impacts of leasing and exploration on recreation resources; | Effects on recreation are disclosed in Section 3.16. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice #8419-35 | C. The Supplemental EIS Must Address The Impacts Of The Exploration Plan On Recreation In The Sunset Roadless Area. The Exploration Plan as proposed would approve road and drill pad construction, habitat destruction, and the scarring of hillsides within the Sunset Roadless Area. Despite this fact, the 2013 Exploration Plan EA failed to address the proposal's impacts on the area's recreational use and users, particularly in its failure to address impacts to the Sunset Trail and Trail 8152, which the U.S. District Court for the District of Colorado concluded violated NEPA.181 BLM violated NEPA by explicitly declining to take any look, let alone the required ""hard look,"" at the damage that the drill pads and roads proposed in the Exploration Plan will inflict on recreation values. Instead, the 2013 Exploration Plan EA simply declared that impacts to recreation ""will not be analyzed.""182 The agency admitted that recreation values are ""Present"" but concluded that there will be ""No Impact"" to such values because there are ""no recreations [sic] facilities or areas within the analysis area.""183 The 2013 Exploration Plan EA's decision to ""not analyze []"" recreation impacts was arbitrary for three reasons.<br><br>First, the 2012 Lease Modification final FEIS specifically postponed analysis of impacts on recreation until analysis of site-specific proposal, like the Exploration Plan. Second, the 2013 Exploration Plan EA and the 2012 Lease Modifications Final EIS ~~1~~ acknowledged that the area is used by recreationists.<br><br>And third, record evidence shows that construction for, and the destruction left by, the Exploration Plan will degrade recreational experiences....The EA itself mapped at least two trails within the area, most prominently the Sunset Trail after which the Exploration Plan is named.192 The construction of roads and drill pads on or directly adjacent to these trails clearly could harm the roadless area's visitors and their recreational enjoyment. For example, the 2013 Exploration Plan EA showed that the road to access one drill pad (SST-7) will be bulldozed across Sunset Trail; another drill pad (SST-10) will be scraped less than 100 feet from Sunset Trail.193 An exploration drill pad (SST-1) will be built directly on top of Trail 8152, rendering any use of that portion of the trail impossible while exploration occurs; and to the west, roads will be constructed across and directly next to that same trail for about one-quarter mile.194 In short, bulldozing for both drill pads and access roads will degrade the very recreation facilities that BLM itself mapped in the exploration area. And that harm will continue long after the exploration is complete. What was | Effects to recreation are addressed in Section 3.16 of this EIS. While the Sunset Trail can be found on various historical maps, it is extremely difficult to find on the ground less than a mile west/southwest from its beginning at the end of NFSR 711.3A. Range permittees have cleared ~1/2 mile or so to allow for cattle dispersal. It is not a National Forest System Trail (NFST). It is not maintained by the Forest Service, nor is it on our current maps as something we encourage visitors to travel. Proposed temporary road and well pad construction for the exploration plan would not cross or coincide with the historic mapped alignment of the Sunset Trail (historic map alignment is several hundred feet away from proposed exploration disturbance) and therefore would have no effects on it even if it were determined to be a historical property.<br><br>To our knowledge, there is not currently and has never been a Trail 8152. The mapped location from previous analysis coincides with a livestock allotment pasture boundary fence which was abandoned from use in the 1960's when pasture boundaries were revised. While the alignment was likely cleared prior to fence construction, we have no records that the Forest Service constructed a trail there, and while the forest is generally open to cross-country foot and horse travel, we do not encourage or discourage its use. See Section 3.16.3, |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | once a largely undisturbed and pristine roadless area will be criss-crossed with roads and drill pads, such that for years to come, visitors seeking solitude will be unable to walk more than a few hundred yards in any direction without encountering one of these intrusions.195 To remedy these omissions and legal failures, the agencies must take a hard look at the impacts of the Exploration Plan (and the RFMP) on recreation in the Lease Modifications area. Hunting is an important use of the area, with major hunting camps being observed before and during bow hunting season along NFSR 711, at the southwest end of 711.3A (which is the northeast terminus of Sunset Trail and within a mile of the lease modifications), as well as at the eastern end of 710.5A (which terminates at Beaver Reservoir, about a mile or two from the 189 Id. at 158. The GMUG National Forest has previously suggested that the wilderness-capable portion of the Sunset Roadless Area ""is heavily used during hunting season."" Sunset Roadless Evaluation (Appendix D), 2012 Lease Modifications Final EIS at 479-80. 190 2013 Exploration Plan EA at 31. See also id. at 30 (noting traffic on adjacent roads occurs ""for recreational purposes""); id. at 9 (identifying recreation as an ""[o]n-going land use""). 191 2013 Exploration Plan EA at 13 (Table 3 n.4). 192 See id. at cover (identifying project as ""Sunset Trail Area Coal Exploration Plan""); id. at 5 (map identifying trail in area as ""Sunset Trail"" and displaying another route as ""Trail 8152"" within the Sunset Roadless Area and Exploration Area). 193 2013 Exploration Plan EA at 5. 194 Id. 195 Even if there were no ""developed recreation facilities"" in the exploration area, that does not mean supplemental EIS can ignore foreseeable impacts to recreation. Some recreationists - including members of some of the signatories - seek out roadless areas precisely because they contain few developed facilities. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 52 April 12, 2016 southern end of the lease modifications area on Sunset Trail). Hikers and equestrians also use the area. Those who do use the area are very likely to be impacted by the noise of construction and use of the area. Exploration will take two summers; the construction, use, and reclamation activities on pads and roads will likely take many more years, which will impact not only wildlife but those seeking a quiet, remote experience. The damage from the network of linear clearcuts through the area, weeds, trash, and pollution resulting from construction and motorized use will persist for decades, likely leading recreationists to avoid this area. The supplemental EIS must disclose all of these impacts. We also request that the Forest Service obtain hunting permit and success data for the | The Hammond Trail is another non-system trail which is difficult to find as one gets further from the end of NFSR 711.3A. The location of this trail from historic maps places it over a mile east of the lease modifications at its westernmost point. This trail extends east from NFSR 711.3A, from the vicinity of the Upper Cow Camp along Little Gunnison Creek and between roads open to the public (NFSRs 711 and 709). This is not the direction from which traffic related to the lease mods or exploration would approach the area so there would be no direct or indirect effects to this non-system trail with any activity on the lease modifications. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | area from Colorado Parks and Wildlife as one indicator of recreation use. Further, the agencies must determine whether Sunset Trail is eligible for protection under the National Historic Preservation Act. Sunset Trail is identified and marked as such on an early USGS topo map for the area, published in 1938.196 The Geologic Survey apparently considered the trail important enough to place three survey markers on or along the route: one where Sunset Trail diverges from the Hammond Trail at Sunset Trail's northern terminus (at elevation 9159 feet); another where it weaves between two beaver ponds just east of the Lease Modifications area (at elevation 9290 feet); and a third at its southern terminus where it connects to a trail along the east fork of Minnesota Creek (at elevation 8495 feet).197" | |
| Law, Leilani #12-7 | Its wildlife and recreation values are more important than bulldozing for dirty coal. | Effects on various wildlife species are addressed in Chapter 3. Recreation effects are addressed in Section 3.16.<br><br>The FS and BLM responsible officials will make their decisions based on the analysis in the SDEIS.<br><br>The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy. Beyond that this is a matter of policy that is outside the scope of this analysis. |
| Babcock, Reb #56-1 | Please consider the interests of wildlife and quiet recreation when mining is proposed in roadless areas. Roadless areas should remain just that. New mining activities should only be allowed in areas that already have roads in place and show significant impact of human activities. . | Effects on various wildlife species are addressed in Chapter 3. Recreation effects are addressed in Section 3.16. Effects on roadless characteristics are included in Section 3.18. |
| **NEPA General** | | |
| Earthjustice #8419-4 | Address and correct all deficiencies identified by the September 24, 2012 administrative appeal submitted by Earthjustice on behalf of High Country Citizens' Alliance. | Comment noted. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice #8419-29. | F. The Supplemental EIS Must Properly Identify The Environmentally Preferably Alternative. The Lease Modifications Notice of Intent identifies Alternative 4 (""Consent to and Modify Only COC-1362 Lease"") as the ""Environmentally Preferable Alternative.""145 The Forest Service's selection of Alternative 4 as opposed to the No Action alternative as the ""environmentally preferred alternative"" is arbitrary and capricious. CEQ guidance directs that: Section 1505.2(b) requires that, in cases where an EIS has been prepared, the Record of Decision (ROD) must identify all alternatives that were considered,""...specifying the alternative or alternatives which were considered to be environmentally preferable.""... The Forest Service must correct this error and identify the ""No Action"" alternative as the environmentally preferable alternative in the supplemental EIS and any ROD prepared therefor." | Environmentally preferred alternative has been identified as the No Action Alternative. Alternative 3, as identified in Chapter 2 remains the agencies' preferred alternative. |
| **Air Quality** | | |
| Zukoski, Edward 8419-43 | VIII. THE SUPPLEMENTAL EIS MUST ADDRESS SIGNIFICANT NEW INFORMATION CONCERNING AIR QUALITY.<br><br>A. The Supplemental EIS Must Address Significant New Information Concerning Emissions Of Volatile Organic Compounds From MDWs. New data made available since publication of the 2012 Lease Modifications Final EIS indicates that venting from MDWs at each of the three coal mines in the North Fork Valley may release significant amounts of volatile organic compounds (VOCs).We are greatly concerned over the potential for VOC emissions to cause or contribute to future violations of ozone standards. The 2012 Lease Modifications Final EIS contained almost nothing addressing the scale, quantity, or impacts of VOC pollution resulting from the Lease Modifications. The 2012 Final EIS acknowledged that two data samples taken by Arch Coal in 2009 (and provided to BLM nearly three years before the EIS was published) confirm that methane drainage wells emit VOC...Despite evidence of such pollution, the 2012 Lease Modifications Final EIS explicitly stated that ""no attempt is made here to quantify"" such pollution.254 That EIS also implied that the Forest Service need not analyze and assess VOC emissions from methane venting because the Colorado Air Pollution Control Division ""will be requiring all coal mines in the state, including the West Elk Mine, to gather additional data to provide a more accurate annual estimate of VOC | Air analysis (Section 3.4) has been updated to demonstrate compliance with Clean Air Act. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | emissions.""255 However, since the preparation of the 2012 Lease Modifications Final EIS, new information has become available indicating that VOC emissions are a significant issue and that these emissions at Arch's West Elk mine are in violation of Colorado air quality regulations. In June of 2009, an analysis of mine ventilation emissions was prepared for Arch Coal and revealed that the ratio of regulated VOC emissions to methane emissions was around 0.007 (low value of 0.007677 and a high value of 0.007913).256 Subsequent analysis of ventilation emissions at the Elk Creek mine conducted in February and August of 2014 found the ratio of regulated VOC emissions to methane emissions to average 0.005216 and 0.006048, respectively.257 Although the ratio of VOC/methane is low, because of the high quantity of methane releases, the total VOC emissions have the potential to be significant. Recognizing this, the Colorado Air Pollution Control Division calculated the likely VOC emissions from several Colorado mines, including West Elk and Elk Creek. Based on total methane emissions reported to the EPA in 2012, the Division estimated that total VOC emissions from West Elk and Elk Creek were as high as 321 and 408 tons/year, respectively, and that emissions exceeded several permitting thresholds, including state construction permitting thresholds (5 tons/year), Clean Air Act Title V Operating Permit thresholds (100 tons/year), and Prevention of Significant Deterioration (PSD) thresholds (250 tons/year).258 The table and chart …below show the Division's analyses of the North Fork coal mines and comparisons with regulatory thresholds.259… Even using 2013 methane emissions data reported to the EPA by the coal companies, total VOC emissions from the Elk Creek and West Elk mines continue to exceed regulatory thresholds. At Elk Creek, emissions still are exceeding state permitting thresholds and at West Elk, emissions are still exceeding state permitting thresholds, Title V Operating Permit thresholds, and likely PSD thresholds…In spite of this, neither Arch nor Oxbow have applied for and obtained state construction permits, or any necessary Title V Operating Permit or PSD permit under the Clean Air Act. Recognizing PSD threshold Title V threshold … his, the Colorado Air Pollution Control Division has recommended enforcement actions be undertaken at both the West Elk and Elk Creek mines.… Although the state has not undertaken an enforcement action to date, this does not mean that the mines are not releasing VOC emissions, posing potentially significant air quality impacts, or that the West Elk is not violating Colorado air quality rules. In light of this, it is crucial that the supplemental EIS fully analyze and assess the extent and significance of current VOC emissions from the West Elk mine, and analyze and assess the | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | VOC emissions that would be released as a result of any future mining in the North Fork Coal Area. To this end, the supplemental EIS must also fully analyze and assess to what extent these coal mine VOC emissions affect air quality in the area, particularly in the context of ozone concentrations. The need to analyze emissions is critical. A key consideration under NEPA is ""[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."" 40 C.F.R. § 1508.27(b)(10). Further, NEPA requires that agencies consider ""[t]he degree to which the proposed action affects public health and safety."" 40 C.F.R. § 1508.27(b)(2). Here, if the West Elk is not in compliance with PSD, then the mine's operations are not appropriately preventing significant deterioration of air quality. This means that the Forest Service's approval would fail to ""protect public health and welfare from any actual or potential adverse effect notwithstanding attainment and maintenance of all national ambient air quality standards."" 42 U.S.C. § 7470(1). Further, the supplemental EIS must fully analyze and assess to what extent the West Elk mine is complying with state air quality rules. Under the Clean Air Act, federal agencies must ensure their actions comply with ""all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of air pollution."" 42 U.S.C. § 7418(a). If approval of additional mining in the North Fork Coal Area would pave the way for mining that would not comply with state air quality rules, then the Forest Service would have to disapprove such mining. ... It is particularly critical that the supplemental EIS address these impacts because the 2015 Colorado Roadless Rule Supplemental Draft EIS punted the issue to later analysis....The 2015 Colorado Roadless Rule EIS asserts that ""more site-specific analyses of local air impacts would occur if and when new coal actions are considered.""261 The Lease Modifications supplemental EIS constitutes just such future action requiring analysis. The Forest Service has ample information regarding the lease, and so must analyze and assess the impacts of VOC emissions that will result from mining the coal proposed to be sold by the Lease Modifications.<br><br>B. The Supplemental EIS Must Disclose Air Pollution Impacts. The Forest Service must fully analyze and assess impacts to air quality, including impacts to air quality in the context of all national ambient air quality standards (""NAAQS""), prevention of significant deterioration (""PSD"") increments for Class I and II areas, and visibility impacts to Class I areas. That analysis must disclose the direct, indirect, and reasonably foreseeable impacts of mining to | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | NAAQS for ozone, particulate matter (particularly PM2.5), nitrogen dioxide, and sulfur dioxide. Important NAAQS that the Supplemental EIS Must Address Pollutant Date Adopted Standard Citation Ozone 2015 0.070 parts per million over an 8-hour period 80 Fed. Reg. 65292 (Oct. 26, 2015) PM2.5 2006 35 micrograms/cubic meter over a 24-hour period 40 C.F.R. § 50.13 PM2.5 2012 12 micrograms/cubic meter annually 40 C.F.R. § 50.18 NO2 2010 100 parts per billion over a one-hour period 40 C.F.R. § 50.11(b) SO2 2010 75 parts per billion over a one hour period 40 C.F.R. § 50.17 Mining of the Lease Modifications will result in air pollution, including from MDWs and from prolonging operations at the West Elk mine. Reasonably foreseeable impacts of the Forest Service's approval will include air quality impacts directly from mining activities, including engines, generators, locomotives, trucks and other traffic, drilling rigs, but also emissions from indirect, or reasonably foreseeable activities. This includes the air quality impacts of coal combustion, locomotive operation outside of the North Fork Coal Area (as well as particulate emissions associated with coal dust from train cars), and the air quality impacts of exporting coal overseas. Here, there is ample information for the Forest Service to analyze and assess reasonably foreseeable air quality impacts. The 2012 Lease Modifications Final EIS did not adequately disclose these impacts, and in any event that analysis did not address the new ozone standard EPA adopted in 2015. Therefore, the supplemental EIS must fully analyze and assess air quality impacts - especially VOC emissions and the potential to violate the new ozone standard - to ensure compliance with both NEPA and the Clean Air Act." | |
| **Roadless & Colorado Roadless Rule** | | |
| Whitman, Heather #8959-3 | Alternative 3 is based on reinstatement of the North Fork Coal Mining Area Exception of the Colorado Roadless Rule, a seven-year collaborative, bipartisan agreement between multiple industries, companies, environmental groups, governments, communities, and individuals. Compromises were made by all parties resulting in a document acceptable to the various stakeholders. | This is an accurate description of Alternative 3 herein and the CRR. |
| Earthjustice #9739-1 | I. THE FOREST SERVICE SHOULD ADOPT THE NO ACTION ALTERNATIVE [on CRR]. In his State of the Union speech this week, President Obama emphasized the need to ""transition away from old, dirtier energy sources."" The President emphasized that, ""[r]ather than subsidize | CRR reinstatement of the NFCMA became effective April 17, 2017. Comments regarding |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | the past, we should invest in the future."" Earlier today, the President and Interior Secretary Sally Jewell announced that pending and new federal coal leases on our public lands will be suspended while Interior reviews the entire program -- from greenhouse gas pollution to royalties. Although the Interior Department announcement earlier today did not call out the proposed North Fork exemption by name, it is clear that the policies that underlie this sea-change mark a drastic shift in how our public lands should be managed with regard to fossil fuels. Consistent with the President's statements in the State of the Union and Secretary Jewell's announced pause on new leasing, the Forest Service should reject the proposed loophole. We urge the Forest Service to continue the Obama Administration's strong leadership on climate issues by rejecting the proposed North Fork Valley exemption [CRR]. …<br><br>A. The Proposed Action Should Be Rejected Because It Is Not In The Public Interest…<br><br>B. The Colorado Roadless Rule As Adopted Was Not In The Public Interest.<br><br>C. The Forest Service Should Adopt The No Action Alternative Because There Is No Immediate Need For The Proposed Action. The Forest Service should adopt the no action alternative - or defer the rulemaking process for the foreseeable future - because there is no demonstrated, immediate need for a rule promoting road construction on these roadless lands for coal mining. | alternatives to select from the CRR SFEIS analysis are outside the scope of this decision.<br><br>Coal lease moratorium, is no longer in effect, and these coal lease modificatins were specificall exluded from the moratorium.<br><br>Climate impacts which cannot be discretized to the project level are included in Section 3.4 and other relevant sections herein. This analysis does not conduct a SCC or Social Cost of Methane analysis for the reasons cited in Section 3.4. |
| Earthjustice #9739-2 | II. THE SUPPLEMENTAL [CRR] EIS MUST FOCUS ITS ANALYSIS OF SURFACE IMPACTS ON THE NORTH FORK VALLEY.<br><br>A. NEPA Requires Agencies To Disclose The Environmental Baseline, Even In Programmatic EISs….–As such, the Forest Service must identify the environmental baseline and affected environment, as well as the scope of impacts and where those impacts are most likely to be felt.<br><br>B. The SDEIS Fails To Provide Necessary Baseline Data About, Or Evaluate Impacts To, Critical Resources. The purpose of this rulemaking is to open the door for more coal mining within the 19,700-acre North Fork Coal Mining Exception area. Within that area, the Forest Service prepared ""estimated projections"" for road and methane drainage well construction based on past experience with the area's geology and mine practices….. It is thus appropriate | CRR FEIS addressed this comment at E48-54. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | and mandatory that the supplemental EIS focus most of its analysis, and especially its analysis of potential surface impacts, on the North Fork Gunnison Valley.44 The Forest Service, for its NEPA analysis of the proposed rule, must provide detailed data and maps of the three roadless areas at stake, including information and maps describing: surface and ground water quality; hydrology; impacts of past mining; wildlife habitat; endangered species habitat; vegetation; and any other appropriate baseline data. It must then analyze and disclose the impacts that drill pad and road construction made foreseeable by the coal mine exception (and any reasonable alternatives) would have to those resources. Examples of specific issues the supplemental EIS must address follow.<br><br>1. The SDEIS Fails To Provide Baseline Information About, Or Disclose Potential Impacts To, Water Resources. Taken together, all of this information enables the Forest Service to:<br><br>(1) describe the water resources at risk;<br><br>(2) evaluate reasonably foreseeable impacts of the coal mine exception to water resources in the area; and<br><br>(3) identify alternatives and potential mitigation measures and monitoring to reduce the impacts of foreseeable future coal mining.68<br><br>2. The SDEIS Failed To Provide Baseline Information About, Or Disclose Potential Impacts To, Wildlife.<br><br>a. The Forest Service fails to disclose baseline data about or analyze potential impacts to Canada lynx.<br><br>b. The Forest Service fails to disclose baseline data about or analyze potential impacts to big game and other wildlife.<br><br>c. The Forest Service fails to adequately disclose baseline data about or analyze potential impacts to cutthroat trout.<br><br>d. The Forest Service fails to adequately disclose baseline data about or analyze potential impacts tosage grouse. | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | C. Because The SDEIS Fails To Provide Necessary Baseline Data About Or Evaluate Impacts To Critical Resources The Forest Service Fails To Properly Evaluate Alternatives and Mitigation Measures.<br><br>D. The Forest Service May Not Fail To Gather Baseline Data By Relying On Non-Existent Mitigation Measures. | |
| Earthjustice #9739-4 | L. The [CRR] SDEIS Fails To Address Air Pollution Impacts. 1. The [CRR] SDEIS Fails To Address Air Pollution Impacts Volatile Organic Compound Pollution From Coal Mine Operations. New data made available since publication of the Colorado Roadless Rule Final EIS indicates that venting from MDWs at each of the three coal mines in the North Fork Valley may release significant amounts of volatile organic compounds (VOCs). Although the failure of the FEIS to address VOC emissions is worrisome, since the preparation of the Final EIS, new information has surfaced confirming that VOC emissions are a significant issue and that these emissions at both Oxbow's Elk Creek mine and Arch's West Elk mine are in violation of Colorado air quality regulations…Recognizing this, the Colorado Air Pollution Control Division calculated the likely VOC emissions from several Colorado mines, including West Elk and Elk Creek. Based on total methane emissions reported to the EPA in 2012, the Division estimated that total VOC emissions from West Elk and Elk Creek were as high as 321 and 408 tons/year, respectively, and that emissions exceeded several permitting thresholds, including state construction permitting thresholds (5 tons/year), Clean Air Act Title V Operating Permit thresholds (100 tons/year), and Prevention of Significant Deterioration (PSD) thresholds (250 tons/year).250 it is crucial that the supplemental EIS fully analyze and assess the extent and significance of current VOC emissions from the West Elk and Elk Creek mines and analyze and assess the VOC emissions that would be released as a result of any future mining in the North Fork Coal Area. To this end, the supplemental EIS must also fully analyze and assess to what extent that these coal mine VOC emissions affect air quality in the area, particularly in the context of ozone concentrations….<br><br>2. The SDEIS Failed To Properly Disclose Air Pollution Impacts. The Forest Service must fully analyze and assess impacts to air quality, including impacts to air quality in the context of all national ambient air quality standards (""NAAQS""), prevention of significant deterioration (""PSD"") increments for Class I and II areas, and visibility impacts to Class I areas. We are particularly | Comments related to specific analysis in the CRR SEIS are outside the scope of this analysis. However, CRR SFEIS addresses criteria air pollutants at C-5 and E-34-37.<br><br>This EIS has been updated and also addresses criteria air pollutants in Section 3.4. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | concerned over the direct, indirect, and reasonably foreseeable impacts of mining to NAAQS for ozone, particulate matter (particularly PM2.5), nitrogen dioxide, and sulfur dioxide. | |
| Earthjustice #9739-5 | M. The [CRR] SDEIS Fails To Take A Hard Look At The Coal Market, Jobs, And Royalties. Since the Colorado Roadless Rule Final EIS was completed in 2012, there have been significant changes in international, national, and regional coal markets relevant to the purpose and need for the project. The SDEIS fails to address these changes.<br><br>1. Demand For Coal Is Declining....<br><br>2. Production And Employment At North Fork Mines....<br><br>Further, the Forest Service's assumption regarding royalties on new leases is arbitrary. The SDEIS assumes an 8% royalty rate for all new leases.260 For all leases actively being mined in the North Fork, we understand that the lease-holder either has won or is seeking a royalty of 5%. ... | CRR SFEIS addressed these economic comments at8, 27, 98, 11-117, Appendix C, E12-13, 18, 22, 23, 25, 60, 64, 66, and 72.<br><br>The royalty rate reduction at West Elk Mine was not a blanket reduction, but applied to specific leases for specific resource conditions. Lease modifications would be issued at the Standard 8% rate. |
| Earthjustice #9739-6 | N. The [CRR] SDEIS Failed To Disclose The Foreseeable Habitat Damage From Road Construction. Although the SDEIS displays the miles of road likely required to construct MDWs for coal mines, as it should, it failed to quantify the habitat eliminated by road construction. This failure is arbitrary given that: (1) the Forest Service calculated the acreage of habitat disturbance caused by MDW pad clearance; and (2) BLM and the Forest Service quantified habitat projected to be eradicated by road construction for the Sunset Trail coal exploration project in 2013, concluding that road construction would ""disturb 4.24 acres per mile.""263 If that projection is accurate, reinstating the coal mine exception could result in over 280 acres of linear clearcuts.264 Any subsequently-prepared NEPA document must address this new information by quantifying habitat likely to be destroyed for road construction. Further, the [CRR] SDEIS fails to address data suggesting that its assumptions concerning the impacts of road construction required for exploration are too low... | CRR SFEIS addressed these comments at 75-89 and E-52.<br><br>Disturbance from a RFMP including MDWs and associated access roads has been analyzed in this EIS. Exploration activities are specifically quantified. |
| Earthjustice #9739-7 | O. The [CRR] SDEIS Failed To Adequately Consider The Environmental Justice Impacts Of Climate Change. The Forest Service must address environmental justice implications of its decision to authorize the North Fork | CRR addressed these comments in SFEIS at E69-70. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | mining exemption and thus increase climate carbon dioxide and methane emissions. The SDEIS fails to adequately consider the impact of the proposed action's climate impacts on low income communities and communities of color. | Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," requires Federal agencies to focus on the environmental and human health conditions in minority and/or low-income communities with the goal of achieving environmental justice. A fundamental basis for Executive Order 12898, which directed Federal agencies to make environmental justice a priority, is to ensure that all Americans are equally protected from adverse environmental effects or impacts. Environmental Justice is addressed herein in Section 3.21. Climate change effects are addressed in Section 3.4, 3.21. |
| Earthjustice #9739-8 | IV. THE [CRR] SDEIS FAILED TO PROPERLY DISCLOSE THE IMPACTS OF THE PROPOSED ACTION AND ALTERNATIVES.<br><br>A. The [CRR] SDEIS Failed To Properly Disclose The Impacts Of The 'No Action' Alternative. The Forest Service must take a hard look at the impacts of Alternative A, the ""no action"" alternative. Because the record contains contradictory information about how long the West Elk mine can remove coal absent the North Fork Area coal mine exception, any subsequently prepared NEPA document must address and resolve this contradiction. Disclosing the complete picture is critical because the decisionmaker and the public should have accurate information about the time that local communities might have to transition away from coal in the North Fork Valley under Alternative A. The Forest Service should also make clear, in its analysis of Alternative A, whether and how the Colorado Roadless Rule and existing lease stipulations currently restrict, or do not restrict, road and methane drainage wellpad construction on existing leases. The SDEIS implies that no restrictions are in place, but some Forest Service documents imply otherwise.<br><br>B. The SDEIS Failed To Properly Disclose The Cumulative Impacts Of The Proposed Action. | CRR SFEIS addressed this comment throughout that FSEIS.<br><br>This EIS addresses coal made available under the action alternatives and the total life of mine. Commenter is correct in that many acres of the West Elk Mine's current lease holdings are not within Colorado Roadless Areas. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | C. The SDEIS Fails to Disclose The Cumulative Impacts Of Climate Change On Wildlife. | |
| Earthjustice #9739-9 | V. THE [CRR] SDEIS FAILED TO EVALUATE A RANGE OF REASONABLE ALTERNATIVES OR EVALUATE MITIGATION MEASURES.<br><br>A. NEPA Mandates That Agencies Evaluate All Reasonable Alternatives…<br><br>B. NEPA Mandates That Agencies Analyze Potential Mitigation Measures. NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions.… An agency's ""broad generalizations and vague references to mitigation measures do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide."… Moreover, in its final decision documents, an agency must ""[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."" 40 C.F.R. § 1505.2(c).<br><br>C. The Forest Service Must Evaluate Alternatives That Foreclose Exploration And Mining On Some Of The North Fork Coal Mining Area. We appreciate that the Forest Service identified and analyzed in detail Alternative C, which protects wilderness capable lands from coal mine road construction. However, this is not the only reasonable alternative that the Forest Service must analyze. To provide the public and the decisionmaker with a range of reasonable alternatives, the Forest Service must analyze in detail the additional alternatives.<br><br>1. The Forest Service Must Evaluate An Alternative That Does Not Permit Road Construction for Coal Mining in the Pilot Knob Roadless Area.…<br><br>a. The 'Protect Pilot Knob' Alternative Provides A Unique And Intermediate Balancing Of Coal Production And Roadless Protection.…<br><br>b. The 'Protect Pilot Knob' Alternative Protects Those Roadless Land Least Likely To Be Mined.…<br><br>c. The 'Protect Pilot Knob' Alternative Would Protect A Geographically And Ecologically Distinct Landscape. | CRR FSEIS addresses this comment at pp. 11, 23 and E, 11, E-13. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice #9739-9 | D. The Forest Service Must Revoke The Proposed [CRR] Rule's Modified Purpose And Need, Or Consider A Wider Range Of Alternatives. The SDEIS reflects a change to the proposal's ""purpose and need."" Because the revised purpose and need does not properly reflect the actual purpose of the proposal or the alternatives, we request that the Forest Service revert to the purpose and need established in the scoping notice. In scoping, the Forest Service announced: It thus is only reasonable that the Forest Service revisit a more protective alternative (Alternative 4) to offset the more destructive impacts of the coal mining exception, disclose its impacts, and make Alternative 4 an alternative that the agency can adopt in this rulemaking." | CRR SFEIS addressed this comment at 3 and E-10. |
| Earthjustice #9739-10 | "E. The [CRR] Supplemental EIS Must Analyze Alternatives That Require Mitigation Measures That Limit Carbon Pollution.... In the [CRR] SDEIS, the Forest Service should have considered and analyzed mitigation measures that will reduce the climate pollution damage of coal mining that the proposed rule seeks to unleash.<br><br>The Forest Service could achieve this goal by analyzing in full an alternative that:<br><br>(1) includes as a mitigation measure a requirement that any mine seeking to construct roads within the North Fork Coal area offset all of the carbon emissions caused by mine operations, coal transport, and coal combustion, thereby making the mine ""carbon neutral;""<br><br>(2) includes as a mitigation measure a requirement that any mine seeking to construct roads within the North Fork Coal area offset a set amount (e.g., 33%, or 50%) of the carbon emissions caused by mine operations, coal transport, and coal combustion;<br><br>(3) factors in the cost of greenhouse gas emissions and global warming when determining the fair market value of coal made available by the proposed rule;<br><br>(4) includes as a mitigation measure a requirement that any coal mined from the coal mine exception area can only be sold to those facilities using Integrated Gasification Combined Cycle (IGCC) technology or verified carbon | CRR FSEIS considers these methane mitigations at 20-22, E-8-9. E-16 |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | capture and storage (CCS) technology to significantly reduce the GHG emissions of downstream coal;<br><br>(5) requires any coal mined from the coal mine exception area to be combusted in the U.S., or in a country with environmental standards for coal combustion that are equal to or stronger than those in the United States.<br><br>1. The Supplemental EIS Must Analyze Alternatives That Require Mitigation Measures That Limit Carbon Pollution.<br><br>a. The Forest Service's Excuses For Declining To Evaluate Alternatives Lack Merit. Here, the Forest Service refused to consider in detail any alternative incorporating any of the feasible methane capture or flaring technologies currently in use in this country for a litany of unavailing reasons:<br><br>1) ""critical design criteria that bear upon the feasibility of such capture mitigation are too speculative at this time"";<br><br>2) these types of measures are typically considered later when specified tracts are proposed for leasing;<br><br>3) BLM published an Advanced Notice of Proposed Rulemaking studying the potential for that agency to institute a mine methane capture program for underground coal mines on public lands in April 2014; and finally,<br><br>4) that reinstating the coal mining exception ""allows for infrastructure for the capture or use of methane.""353 All of these excuses fail to justify the Forest Service's ""head in the sand"" approach to even considering feasible technologies that would dramatically reduce the methane emissions and climate impacts of the Forest Service's proposal. First, the Forest Service never specifies which ""critical design features"" are so problematic as to preclude detailed consideration, nor does the agency provide any insight into why technologies currently in use at other mines are deemed ""speculative."" Second, the Forest Service gives no legal justification for failing to consider mitigation measures at the earliest opportunity, simply because some other agency might consider incorporating them into a leasing decision made at a later date. 4(a)-(c). | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | b. Overview of Available Methane Capture and Flaring Technologies.<br><br>i. Waste Methane Capture and Use Pipeline Injection Mines can capture methane for:<br><br>1) pipeline injection and<br><br>2) recovery for electricity generation.<br><br>It should be noted that EPA's conclusions were made before the IPCC released the updated values concluding that methane has a global warming potential that is 86 times that of $CO_2$ is used. When this higher figure is used, all of the techniques above become cost-effective.<br><br>ii. Waste Mine Methane Capture and Use - Electricity Production Coal mine methane can be used to power generators to make electricity to power mine operations, and to sell to the local power grid.<br><br>iii. Waste Mine Methane Capture and Use - Process Heat Mines can also recover gas<br><br>1) for use in the boiler for supporting in-mine heating, and<br><br>2) for use in coal-drying.388<br><br>iv. Waste Mine Capture and Use Liquefied Natural Gas<br><br>v. Waste Mine Methane Flaring<br><br>vi. Ventilation Air Methane Capture and Use<br><br>vii. Ventilation Air Methane Destruction<br><br>c. Case Study of Economically Feasible Capture and Flaring at the West Elk Mine in Colorado In the case study attached to this comment letter Ph.D. economist Dr. Tom Power demonstrates the economic feasibility of methane capture and flaring projects at the West Elk mine in Colorado.<br><br>d. The Supplemental EIS Must Consider an Alternative Requiring The Purchase Carbon Offsets to Mitigate Climate Pollution. The First although it is | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | true that Congress has not passed a law requiring coal mining companies to participate in any of the available national offset markets that does not excuse the Forest Service's decision not to consider this proposed mitigation measure as a reasonable alternative. Second" that the Forest Service considers carbon offsets to be outside of scope of roadless area conservation is legally irrelevant. | |
| Earthjustice #9739-11 | "VI. THE [CRR] SDEIS FAILS TO DISCLOSE IMPACTS TO ROADLESS AND WILDERNESS VALUES. The SDEIS fails to properly disclose the impacts of coal mine road and drill pad construction on roadless and wilderness character. For example, the Colorado Roadless Rule Final EIS in part seeks to justify permitting road and drill pad construction throughout Pilot Knob, Sunset and Flatirons Roadless Areas based on the assumption that such impacts are temporary, and that reclamation has succeeded in eliminating impacts of prior bulldozing within a few years. The Final EIS states: About 75 miles of roads have been constructed or reconstructed since the 1960s in IRAs and CRAs on the GMUG National Forests for coal exploration, surface uses (such as methane drainage), and monitoring activities.... Decommissioning has occurred on about 55 of these miles. Decommissioning by obliteration has been effective in restoring disturbed lands to the post-mining land use (livestock grazing and wildlife habitat) .... Based on experience in the West Elk [Inventoried Roadless Area], the decommissioning and subsequent 432 Id. 433 Id. 434 Id. HCCA Comment Letter re: 2015 Supplemental Draft EIS on Colorado Roadless Rule Page 114 January 15, 2016 reclamation (revegetation) is well-established two to three years after reclamation ....435 The Colorado Rule preamble itself goes even farther, claiming that ""decommissioning roads by obliteration, along with land reclamation, effectively restores these underground mined areas.""436 The SDEIS repeats this contention.437 These statements are hyperbole at best. Reclamation activity, after several years, can and has, reestablished ground cover in some locations. But the areas will not be ""restored"" to their pre-bulldozed condition for generations, especially where mature aspen or spruce-fir forests are removed. Further, the vast majority of prior road and methane drainage well construction on forest lands at West Elk and Elk Creek mines, and thus lands where reclamation has been attempted, have occurred at elevations of 8,000 feet or less, whereas most of the coal mine exception lands within the Flatirons Roadless Area, and nearly all of it in the Sunset and Pilot Knob Roadless | Comments were submitted on CRR and leasing.<br><br>CRR SFEIS addresses this comment at E-19-20. The CRR analysis did not consider any lands for recommended Wilderness. Those areas under CRR Alternative C that were considered "wilderness capable" were screened for potential wilderness in 2007 and, as stated in the SDEIS, did not make it through the process to recommended Wilderness. There is no special management associated with areas that have been identified as "wilderness capable."<br><br>This EIS considers impacts to roadless in Section 3.18. Alternative 4 avoids lands that were once considered wilderness capable. While a portion of the project area was identified in a previous Forest Planning process as being wilderness capable, that Forest Planning effort, and the regulations underlying that process are no longer in place. The current GMUG Forest Plan has areas identified as recommended for wilderness designation. The project area does not contain any recommended wilderness areas. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Areas, exceed 8,000 feet in elevation. The Sunset Roadless Area tops out at about 9,800 feet. At higher elevation, growing seasons are shorter, and recovery times longer. Vegetation eliminated by bulldozing will take even longer to recover in these areas.438 The SDEIS does not address these issues. The U.S. Fish and Wildlife Service also concluded that ""restoring"" habitat to its former state will likely not occur on West Elk mine's drill pads for 30-40 years, if ever. In assessing the impact of the Lease Modifications, the FWS stated: ""lynx habitat may recover to year-round functionality approximately 30-40 years post disturbance.""439 Thus while reclamation may eventually lead to habitat restoration, that process will take a generation or more. Further, while the Rule preamble claims reclamation ""restores"" areas, the GMUG National Forest concluded in its 2005 roadless inventory that road and drill pad clearing for exploration that occurred years before within a part of the Flatirons Roadless Area disqualified that area from wilderness consideration: The area west of Muddy Fork has been altered by temporary road construction [for coal exploration]; even though the roads have been closed, the remnants of those roads are of such a density that the area does not retain its naturalness nor a sense of remoteness.440 435 Colorado Roadless Rule Final EIS at 71 436 Colorado Roadless Rule, 77 Fed. Reg. 39,576, 39,586 (July 3, 2012) (emphasis added). 437 SDEIS Appendix B at B-7 (""past experience indicates that roadless values can be temporarily impacted and restored through proper reclamation"" (emphasis added)). 438 See HCCA Scoping Comment Letter (May 22, 2015) at 77-78 and exhibits attached (displaying limited success of reclamation at several sites). 439 See letter of A. Pfister, FWS to C. Richmond, GMUG NF (June 16, 2010) at 3, attached as Ex. 139. 440 GMUG National Forest, 2005 Roadless Inventory & Evaluation Of Potential Wilderness Areas (July 2006) at 52, excerpts attached as Ex. 140. HCCA Comment Letter re: 2015 Supplemental Draft EIS on Colorado Roadless Rule Page 115 January 15, 2016 Thus, the Forest Service concluded that even the ""remnants"" of ""temporary"" roads for exploration, even after the roads were closed, degraded the area's naturalness. The Forest Service cannot have it both ways. It cannot proclaim that the coal mine exception will have few impacts because the land can be promptly ""reclaimed"" and ""restored,"" while concluding areas are so degraded by such actions that an area does not retain its ""naturalness."" The [CRR] SDEIS fails to disclose the potential impacts of blanketing these roadless areas with an additional 480 drainage pads and 67 miles of road, given that reclamation will not ""restore"" the former habitat for decades, and | |

| Commenter-Comment # | Comment | Response to Comment |
| --- | --- | --- |
| | that former vegetative structure and sense of naturalness that recreationists enjoy may also be eliminated over the medium- to long-term. The SDEIS's only response is that reclamation has proven successful in the past (a dubious proposition), and that ""[p]ast reclamation efforts indicate roadless values can be restored over time.""441 But how long will restoration take? Decades? Longer? The SDEIS does not estimate the time necessary for restoration, as it must to take a hard look at the proposed action's impacts. Further the SDEIS's statement addresses only one component of wilderness character (roadlessness) that will be degraded on the wilderness-capable lands that are to bulldozing in Alternative B (but not Alternative C). Other components - naturalness, opportunities for solitude, sense of remoteness - may also be degraded, and could be degraded for many more years than roadlessness (the absence of a road), as the GMUG 2005 inventory indicated when it found ""remnants of roads"" in sufficient density rendered an area not natural enough to possess wilderness character. Neither the SDEIS nor the Colorado Roadless Rule disclose or analyze the potential for long-term damage to wilderness capability, which is, after all, the central reason the Forest Service chose to consider Alternative C (which protects wilderness capable lands). Any subsequently-prepared NEPA document must address the potential impacts of road and drill pad construction under Alternative B on the wilderness capable lands off-limits to road construction under Alternative C." | |
| **Soils** | | |
| Earthjustice #8419-30 | G. The Supplemental EIS Must Address Inconsistent Mitigation Measures Concerning Protection of Soils. In its vacated 2012 Lease Modifications ROD, the Forest Service adopted stipulations concerning geologic hazards that are at odds with one another and with the GMUG Forest Plan without a rational explanation. The Forest Service must explain it's rational for adopting inconsistent measures or eliminate the inconsistency in the supplemental EIS. The Forest Service's 2012 Lease Modifications ROD prohibits surface occupancy on ""slopes which exceed 60%"" within the parent lease for COC-1362, as well as prohibiting surface occupancy ""in areas of high geologic hazard or high erosion potential.""148 While the parent lease for COC-67232 similarly includes no surface occupancy (""NSO"") stipulations for ""areas of high geologic hazard or high erosion potential,"" that lease does not contain the NSO stipulation for ""slopes which exceed 60%.""149 Not only is the failure of lease modification COC-67232 to contain an NSO stipulation for | The EIS has been edited to include an NSO for 60% slopes for COC-67232 lease modification. That lease modification stipulation will in turn modify the parent lease. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | slopes greater than 60% at odds with the stipulation for the adjoining lease (COC-1362), it conflicts with the 1993 Forest Plan amendment for oil and gas leasing. That decision required an NSO stipulation for slopes greater than 60%.150 Why the Forest Service would prohibit road and well pad construction on such slopes for oil and gas development but not bar exactly the same type of construction for coal MDWs is nowhere explained. The Forest Service's adoption of the inconsistent stipulation for COC-67232 is arbitrary and capricious.151 Further, the ROD's decision to omit the stipulation on slopes greater than 60% for lease modification COC-67232 is also arbitrary and capricious because it undermines the rationale the 2012 Lease Modifications Final EIS gave for dismissing an alternative that would have required NSO stipulations on lands with slopes greater than 40%. The agency stated: ""A stipulation that 148 2012 Lease Modifications ROD at 22. 149 Id. 150 Forest Service, Record of Decision, GMUG National Forest Oil and Gas Leasing EIS (Apr. 19, 1993), excerpts attached as Ex. 76. 151 The Forest Service cannot argue that the NSO stipulation for slopes greater than 60% is somehow duplicative, or the same as, a stipulation that bars surface use of ""areas of high geologic hazard or high erosion potential."" The parent lease for C-1362 provides that NSO stipulations are necessary for both slopes greater than 60% and ""areas of high geologic hazard or high erosion potential."" 2012 Lease Modifications Final EIS at 23. Further, the 1993 Final EIS for oil and gas leasing considered slopes greater than 60%, areas of high geologic hazard, and areas with high erosion potential to be three separate categories of resource concern, as demonstrated by a monitoring form identifying each of the three separately requires no surface occupancy be allowed [""]on slopes which exceed 60%"" ... already exist[s] as part of ... Alternatives 2 and 3.""152 But the ROD failed to adopt an NSO stipulation based on slope for lease modification COC-67232.153 This is not a case where the Forest Service determined that no areas of 60% slopes existed within the lease modification areas. According to a map in the project file, areas of land with greater than 60% slope do occur within both lease modifications.154 Finally, because the two lease modifications will have different stipulations concerning construction on slopes, they may have different types of environmental impacts. However, the 2012 Lease Modifications Final EIS fails to disclose whether this is the case. The supplemental EIS must address the potential for such impacts. The 2012 Lease Modifications Final EIS provides no rational basis for why the agency will provide different levels of protection in the same decision for the two lease | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | modification areas that are directly adjacent to one another. That EIS states only: ""The Forest Service in analyzing the effects of this proposal did not find any justification to deviate from the existing stipulations on the parent leases.""155 In other words, the Forest Service simply decided it best to perpetuate a non-sensical and unjustified difference between the two parent leases rather than correct the inconsistency with this decision. The final EIS's other explanation - that inconsistent stipulations ""have been determined adequate on parent leases to protect surface resources""156 - is equally bereft of rationality. Why the Forest Service would prevent road and drill pad construction on slopes greater than 60% for all oil and gas wells, and would prevent similar construction for MDWs on similar slopes for one coal lease, but not the other, is nowhere explained. The Forest Service must address the difference in stipulations, or eliminate the inconsistency, in its supplemental EIS." | |
| **Vegetation** | | |
| Zukoski, Edward 8419-27 | E. The Supplemental EIS Must Analyze Alternatives That Reduce Impacts To Forest And Wildlife. We urge the Forest Service to consider in the supplemental EIS a stipulation or stipulations to: - prohibit surface occupancy for road and drill pad construction within mature or overmature aspen and spruce-fir stands. These stands provide important habitat for lynx, marten, and a variety of birds and other wildlife. The proposed action will destroy mature aspen and spruce-fir forest. The 2012 Lease Modifications Final EIS predicted that the RFMP would eliminate 7 acres of spruce-fir habitat in primarily ""mature/overmature"" condition, and 58 acres of mature/over-mature aspen; the 2013 Exploration Plan EA predicted that project would destroy 1.9 acres of spruce-fir and 26 acres of aspen.136 It is unclear whether that destruction caused by the two projects would be cumulative, or whether the acreage eliminated by the lease modifications would include the acreage eradicated by the exploration plan. The Forest Service's 2016 notice of intent states that the agency will not consider in detail any alternatives that ""protect … values by adopting [certain] no surface occupancy (NSO) stipulations.137 The Forest Service rejects consideration of an NSO stipulation within ¼ mile of old growth forest because ""old growth stands have not been identified in the lease modification area,"" although the agency assumes for argument's sake that road and drill pad construction could destroy ""mature/over-mature classes (which may provide some of the same habitat components as old | Effects on spruce and aspen dependent species are disclosed in Chapter 3. SBEADMR BA documents that within the Mt Gunnison LAU there would be a balance of 6440 acres of suitable habitat (Spruce and aspen in mature/overmature condition) that could be removed before exceeding the 30% conservation threshold for lynx within the LAU. USFWS has agreed with the forest's determinations in their SBEADMR BO. Spruce-fir and aspen stands are not uncommon on the GMUG or within the lease modifications. Spruce-fir and aspen stands in the area are approximately 100-200 and 80-100 years old respectively. It is unknown at this time whether or not the acreage disturbed for exploration is the same as or in addition to MWD pads, access roads because we don't have the results of the exploration proposed. Regardless it doesn't matter because no conservation thresholds are close to being approached. Within 25-30 years, early-seral stage trees that provide habitat for lynx prey species are |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | growth).""138 The Forest Service dismisses any such impacts as immaterial because ""the GMUG Forest Plan (page III-9a, III-9b) allows for removal of 70-80% of these stands assuming residual patch sizes are met,"" citing a standard from the antiquated 1983 Forest Plan.139 The Forest Service's basis for dismissal of this alternative or mitigation measure - and any measure designed to protect mature spruce-fir or aspen forest - based on the old Forest Plan's provisions is arbitrary and capricious, given significant new information developed since the Forest Plan was adopted in 1983 and amended in 1991. Specifically, the EIS prepared for the 1983 Forest Plan failed to address or even mention the impact of climate change; the 1991 plan amendment generally dismisses the contention that logging might worsen climate change and 136 2012 Lease Modifications Final EIS at 39-40, 128 (road and MDW pad construction is likely to destroy ""approximately 7 acres of oak, 58 acres of aspen, and 7 acres of spruce-fir"" in primarily ""mature/overmature"" condition); Sunset Trail Exploration EA concludes that any impact from climate change to forest resources is years away and would be identified by monitoring.140 But climate change is now modifying the forest through drought, insects and disease. The GMUG National Forest, in the SBEADMR final EIS, now estimates that the vast majority of spruce-fir (and aspen) in the Lease Modifications area could be lost due to a warmer, drier climate in less than 45 years - or only 12 years longer than the current plan has been in effect.141 This significant new information is not reflected in the GMUG Forest Plan, nor in the standards and guidelines meant to protect forest resources. The Forest Service therefore cannot rely on these standards unless and until the Forest amends the Plan to address the significant new information concerning the threats to these forest types. It is unlikely that new standards would permit the eradication of 80% of mature forest in a particular unit in the face of the dramatic changes the climate is predicted to cause in the future. Indeed, it may be paramount to protect mature forest stands from the unnecessary damage of road construction and drill pad clearing when the Forest may, with the threat of climate change, deem it important to protect these stands. Until the Forest Plan is amended to address new information about the threat of climate change, the GMUG National Forest should protect existing mature forest through an NSO stipulation. At a minimum, the Lease Modifications supplemental EIS must address the new information concerning the massive changes predicted to occur to forests there. Addressing that new information must include consideration of stipulations - | expected to revegetate the lease mod disturbance areas.<br><br>Global climate effects as a result of the lease modifications cannot be discretized to the project level.<br><br>The GMUG is in the process of starting implementation of the SBEADMR project which will forest-wide commercially harvest thousands (up to 30% of the lynx habitat within individual LAUs) of acres of similar dead and dying spruce-fir stands and aspen (if there is a market) over the next decade in hopes of regenerating (even if by planting) or converting them to earlier seral stages and to have multi-storied stands that are more resistant to climate change effects. Further SBEADMR proposes to burn other areas releasing CO2 which can also contribute to climate change, but also help certain forest types regenerate. The only thing protecting thousands more acres from similar harvest is the inability to build roads or harvest timber in Colorado Roadless Areas. The first of these SBEADMR sales have already sold.<br><br>A stipulation for protecting dead and dying stands is not consistent with SBEADMR analysis or Forest Plan Standards.<br><br>Methane mitigation is addressed in lease stipulations in Tables 2-1 and 2-2, and Section 2.3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | such as the one proposed here -to protect forests from hastening or worsening the damage caused by climate change." | |
| Earthjustice #8419-42 | VII. THE SUPPLEMENTAL EIS MUST DISCLOSE THE CUMULATIVE IMPACTS OF REASONABLY FORESEEABLE FUTURE ACTIONS. In evaluating cumulative impacts, agencies must do more than catalogue relevant ""past projects in the area.""230 The EIS must also include a ""useful analysis of the cumulative impacts of past, present and future projects.""231 This means a discussion and an analysis in sufficient detail to assist ""the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.""232 Agencies also cannot merely list the number of road miles to be built r acres disturbed by past, present, and foreseeable projects.233 228 Last year, Arch Coal sought and received approval from state regulators to begin the process of mining the B seam throughout a broad area in two of its current leases (COC-1362 and COC-67232). See letter of K. Welt, Mountain Coal Co. to J. Stark, Colorado Division of Reclamation, Mining and Safety (DRMS) (May 8, 2015), attached as Ex. 108. A map Arch provided to state regulators indicates the company intends to mine the B seam between 2015 and 2023 in an area far to the north of the lease modifications area. The Lease Modifications supplemental EIS must address significant new information concerning cumulative impacts and activities likely to have cumulative affects, and cannot rely on previous EISs to do so for several reasons. First, the 2012 Lease Modifications Final EIS failed to properly address cumulative effects. The 2012 Lease Modifications Final EIS's cumulative effects section, Section 3.37, largely consists of a list of present and reasonably foreseeable actions as well as ""other activities.""234 There is almost no evaluation of what the impacts of those projects might be. For example, the 2012 Lease Modifications Final EIS's description of Bull Mountain Unit drilling discloses only that surface impacts will occur; the EIS does not address potential air quality impacts, nor does it explain how air or surface impacts will affect the environment when taken together with impacts of the Lease Modifications.235 And while the 2012 Lease Modifications Final EIS's cumulative effects section states that ""[a]ll cumulative effects are addressed specific to each resource in [other sections of the FEIS's] Chapter 3,""236 those resource-specific cumulative impacts analyses also contain little to none of the information required by NEPA. For example, for the expected oil and gas drilling in the Bull Mountain Unit, the 2012 Lease Modifications Final EIS identifies the number of wells to be drilled (150), and acknowledges that | Cumulative effects have been considered throughout this EIS. See the individual resource sections in Chapter 3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | ""[c]umulative effects would be expected as they relate to criteria air pollutants and visibility within the airshed.""237 And while the air quality effects section mentions the Bull Mountain Unit, it does so only to admit that it would add air pollutants, but then declines to even attempt to estimate or quantify such impacts, merely concluding summarily that ""emissions cannot yet be quantified.""238 Similarly, while the 2012 Lease Modifications Final EIS acknowledges the potential for cumulative effects when viewing the Lease Modifications together with the Oak Mesa coal exploration project (""cumulative effects could be expected as they relate to additional vegetation/habitat disturbance""),239 the only other mention of Oak Mesa is the area of the project and the footprint of road and pad construction.240 The 2012 Lease Modifications Final EIS thus fails to analyze the potential for that project to impact air quality or any other value when examined together with the impacts of the Lease Modifications. The supplemental EIS must correct these failures. Second, the 2015 Colorado Roadless Rule Supplemental Draft EIS similarly fails to address the impacts of projects that, when taken together with the Lease Modifications, may have cumulative impacts. The 2015 analysis concludes that the 2012 Colorado Roadless Rule FEIS was sufficient to address the cumulative effects, and fails to identify any specific projects in the North Fork watershed, despite the fact that numerous federal actions are likely to interact cumulative with the Lease Modifications to impact the area's water, air, wildlife, roadless values, and other resources. We specifically incorporate by reference and request the Forest Service to review and respond in its Lease Modifications supplemental EIS to our comments on the 2015 Colorado Roadless Rule Supplemental Draft EIS.241 Third, a number of specific projects, detailed in our 2015 Colorado Roadless Rule comments, post-date the 2012 Lease Modifications Final EIS and the 2012 Colorado Roadless Rule ROD and therefore must be addressed in this supplemental EIS. The proposal or adoption of these proposals constitutes significant new information that the Forest Service must address. These include: ? Petrox 2-APDs in Somerset Unit: Two APDs from Petrox Resources proposed for development in the Federal Somerset Unit, a 6,400-acre project area that largely overlies the Pilot Knob Roadless Area north of Somerset. A master development plan (MDP) has also been submitted to the Forest Service.242 A Forest Service document describes the level of development proposed in the Somerset Unit: ""24 Multiple Well Drilling Locations (up to 50 wells); 1 Centralized Processing Facility (compressor, etc); 7.4 miles of proposed roads reconstruction, and 7.8 miles of new road construction; 16.2 miles of | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | (mostly) co-located pipelines; Majority of proposed activities are within the Pilot Knob CR.)""243 If the MDP and the SDEIS proposed action are both approved, then no part of the Pilot Knob Roadless Area will be untouched by roads and drill pads. The Petrox 2 APD project (as well as the MDP) would have significant on-the-ground impacts in the northern area of the Pilot Knob Roadless Area, widening and grading miles of rough, rutted, and wet jeep tracks there and scraping two well pads while the coal activity would degrade all of the roadless lands within the coal mine exception area. 241 HCCA Jan. 2016 Roadless Rule Comments (Ex. 1) at 78-89. 242 United States Department of the Interior Bureau of Land Management and United Stated Department of Agriculture Forest Service, Environmental Assessment, Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-well Pads (Sep. 2015) at 75, attached as Ex. 110. 243 Paonia Ranger District Natural Gas Projects, Project Description and Issues (emphasis added), attached as Ex. 111, available at https://drive.google.com/file/d/0B2JbC6r59_1KcVRwZm9iY0Z5eEk/edit (last viewed Apr. 12, 2016). See also See D. Webb, Roadless dispute clouds drilling proposal, Grand Junction Sentinel (Mar. 1, 2015) (describing proposal), attached as Ex. 112, available at http://www.gjsentinel.com/news/articles/roadless-disputeclouds-drilling-proposal (last viewed Apr. 12, 2016). Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 62 April 12, 2016 ? Deadman Gulch APD: SG has proposed an APD (12-89-30#1) inside the GE Deadman Gulch Unit adjacent to the Petrox Somerset Federal Unit within the Pilot Knob Roadless Area on lease COC 64169, again scraping well pads inside that area.244 ? Huntsman Unit Proposal: SG has proposed drilling in the Huntsman Unit (COC 74403X), which includes three SG leases (COC 63886, 63888, and 63889). SG has proposed one APD there for well 10-89-31 #1 inside lease COC 63886.245 The proposal is located in the watershed of the North Fork of the Gunnison River in the Huntsman Ridge Colorado Roadless Area. The Huntsman Unit is located just west of McClure Pass, approximately 10 miles from the Pilot Knob Roadless Area.246 This unit includes the upstream reaches of the North Fork drainage. ? 150 Well Bull Mountain MDP: The Bull Mountain Unit Master Development Plan involves the exploration and development of up to 146 natural gas wells, 4 water disposal wells, and associated roads, pipelines and infrastructure on federal and private mineral leases, in the watershed of the North Fork of the Gunnison River.247 The Bull Mountain Unit includes approximately 19,645 acres of federal and private | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | subsurface mineral estate located about 30 miles northeast of the Town of Paonia and bisected by State Highway 133. The Bull Mountain project area boundary is directly adjacent to the Pilot Knob Roadless Area, and about 8 miles from the Flatirons Roadless Area. The MDP and the proposed rulemaking here impact the same watershed (North Fork Gunnison), and many species of wildlife.248 244 BLM, Environmental Assessment, Dual Operator (Ex. 110) at 75. 245 Id. See also BLM, webpage for Uncompahgre Field Office, Bull Mountain Master Development Plan EIS, http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html (last viewed Apr. 12, 2016). 246 See BLM, Categorical Exclusion DOI-BLM-CO-SO50-201-0035 CX (August 2012), at 7-8 (maps), attached as Ex. 113, available at: http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/ufo_nepa _documents0.Par.60636.File.dat/12-035CX%20SG%20USFS%20Lease%20Susp.pdf (last viewed Apr. 12, 2016). 247 BLM, Environmental Assessment, Dual Operator (Ex. 110) at 74. 248 The Bull Mountain MDP Draft EIS identified North Fork coal mining as among the projects or activities ""having the greatest likelihood to generate potential cumulative impacts when added to the Bull Mountain Unit MDP alternatives."" BLM, Bull Mountain MDP Draft EIS (Jan. 2015) at 4-11 - 4-12, excerpts attached as Ex. 114, available at http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.23863.File.dat/Bull_Mtn_DEIS_Jan2015_508_reduced.pdf (last viewed Apr. 12, 2016). Beyond estimating the total acres disturbed by coal mining, however, the Bull Mountain MDP Draft EIS does not address the actual impacts of coal mining in its cumulative impacts analysis. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 63 April 12, 2016 ? Spadafora Waste Disposal Pits: The Spadafora Water Storage Facility was approved by the Gunnison County Planning Commission on March 6, 2015. Three water storage pits, each with a pump station and a volume of about 9,240,000 gallons, will sit on roughly 19 acres and will store and recycle produced water for drilling and gas well operations, all within the watershed of the North Fork of the Gunnison River.249 The Spadafora waste pits are located approximately six miles north of Pilot Knob Roadless Area. ? In February 2016, the GMUG National Forest released its final EIS and draft record of decision for the Spruce Beetle Epidemic and Aspen Decline Management Response (SBEADMR) project.250 That project | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | appears to propose logging along two access routes to the Lease Modifications area: NFSR 710 and NFSR 711. Such logging may eliminate habitat, compact soil, result in infestations of exotic weeds, etc. in areas close to the Lease Modifications. It may also result in increased noise and traffic. The Lease Modifications supplemental EIS must address the potential for cumulative impacts when viewed together with the consequences of each of these individual projects." | |
| Earthjustice #8419-45 | "X. THE SUPPLEMENTAL EIS MUST ACCURATELY DISCLOSE THE IMPACTS OF DRILL PADS AND ROADS. A. The Supplemental EIS Must Resolve Inconsistencies About The Location And Impact Of Roads And Drill Pads Across The Two Lease Modifications. Inconsistencies between the 2012 Lease Modifications Final EIS and the 2013 Exploration Plan EA appear to show that the EIS's ""reasonably foreseeable mine plan"" grossly underestimated the impacts of road construction in Lease Modification COC-67232. The 2012 Lease Modifications Final EIS assumed that development of the lease would result in 0.5 miles of road and 4 well pads within Lease Modification COC-67232.278 The EIS also assumed that ""if any exploration drilling, staging areas, and ground water monitoring drill pads and access road construction are needed, they would utilize the same locations as those used for MDWs.""279 Thus, any exploration proposal is likely a good predictor of the future location of at least some of the MDW pads and roads. But the 2013 Exploration Plan reveals that the Lease Modifications EIS estimate of the amount of road construction in Lease Modification COC-67232 was far too low. The roads MCC proposes in the exploration plan to connect drill pads SST-3, SST-8, and SST-10, all of which are completely within Lease Modification COC-67232, total 1.43 miles in length, or nearly three times the road mileage estimated by the Lease Modifications EIS. Approximately half of the road connecting drill pad SST-6 and drill pad SST-9, and nearly all of the road accessing SST-7, are also within COC-67232, bringing the total road miles to be constructed within COC-67232 to nearly 2.4 miles, or about five times the amount of road construction (and habitat destruction) projected by the Lease Modifications Final EIS for COC-67232.280 This additional road construction in COC-67232 is not a mere ""fly-speck."" It means that more of the eastern past of the Sunset Roadless Area will be rendered ""roaded,"" and more of the wilderness-capable land will likely be rendered unsuitable for wilderness protection. In addition, Lease Modification COC-67232 is generally higher in elevation than Lease Modification COC-1362 and contains more spruce-fir | Inconsistencies have been addressed by removing acreage assumptions by lease modification and only addressing them by alternative as beyond exploration activities it is unknown where additional disturbances may occur.<br><br>Alternative 4 avoids lands that were once considered wilderness capable. While a portion of the project area was identified in a previous Forest Planning process as being wilderness capable, that Forest Planning effort, and the regulations underlying that process are no longer in place. There is no special management associated with areas that have been identified as “wilderness capable” nor is this portion of the Sunset Roadless Area recommended for wilderness designation. The current GMUG Forest Plan has areas identified as recommended for wilderness designation; this is not one of them. Wilderness character is not addressed for non-wilderness areas.<br><br>Coal panel alignment has shifted because of underground conditions on parent leases. Relying on a panel layout from 2009 is not guaranteed to place MDWs and access roads in any particular location particularly when exploration has not occurred to date to delineate coal resource or faulting necessary for establishing a mine plan and MDW spacing is only estimated. To include |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | habitat. Thus the 2012 Lease Modification Final EIS's under-reporting of impacts to Lease Modification COC-67232 almost certainly means the Forest Service underestimated the impacts to spruce-fir habitat, and thus impacts to lynx and other species that use such habitat. The Lease Modifications Final EIS also projected that four MDWs would be constructed in Lease Modification COC-67232.281 But the Exploration Plan proposes to place four drill pads for exploration alone within COC-67232 (SST-3, SST-8, SST-9, and SST-10),282 meaning that for the number of MDWs to remain at four, as predicted in the 2012 Lease Modifications EIS, only these four specific sites could be used for MDWs. This seems an unlikely outcome, given the construction pattern of MDWs, and indicates that the EIS again under-predicted the impacts of roads and MDWs in COC-67232. The Lease Modifications supplemental EIS must address these inconsistencies and more properly reflect the actual impacts of roads and drill pads across the landscape, whether from exploration or from lease development, especially within COC-67232.<br><br>B. The Supplemental EIS Must Disclose Impacts To Wilderness Character. The 2012 Lease Modifications Final EIS failed to characterize impacts to roadless and wilderness character from the selected alternative as ""significant"" or ""not significant,"" but asserted that impacts to roadless character would generally be ""short-term,"" although it fails to identify where those ""short-term"" impacts would occur.283 (For example, the EIS does not clarify whether the impacts to roadless character would occur just in the roadbed of the MDW access routes, or whether road construction would, even temporarily, impact a larger area beyond that footprint). Construction of drill pads and access roads in the Sunset Roadless Area will dramatically alter a significant extent of the lands' character, yet the Forest Service fails to define the spatial reach of the expected impacts on roadless and wilderness characteristics and has understated their likely duration. Further, the 2012 Lease Modifications Final EIS contains contradictory statements about the extent of the harm to roadless character from the construction and bulldozing of roads and MDW pads. The Forest Service must address these issues in the supplemental EIS. First, the agency must accurately portray the impacts of the proposed action. Road construction may directly consume 24 acres of lands,284 but it will result in the establishment of a spider-web of roads and drill pads throughout the Lease Modifications area. The Forest Service anticipates the installation of 48 methane drainage wells, each requiring up to 1 acre of cleared, level ground, and 6.5 miles of access road construction in | specific locations of these at the leasing stage is arbitrary and capricious. Exploration plan effects have been addressed site-specifically, but are not guaranteed to be in the same location as MDW wells or access roads.<br><br>BLM was able to accept lease applications where surface effects were known for other mines because the coal exploration data gathered from an exploration license provided the data to do it. Here that doesn't exist.<br><br>The E Seam analysis on the parent leases was done on the mine permit not at leasing. In the parent leases exploration data existed and the reserves were already under lease. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | the Lease Modifications area over the life of the leases.285 In general, mines in the North Fork Valley require the installation of one methane venting well for every 32-64 acre tract of surface acres over the mine, or 10-20 pads per square mile. The dispersal of approximately 48 methane venting wells connected by 6.5 miles of access roads in the Sunset Roadless Area will convert more than 1,700 acres of undeveloped, unroaded lands, which is contiguous with the West Elk Wilderness and much of which is capable of supporting wilderness, into a heavily developed landscape crisscrossed by roads and drill pads. The drill pads are generally sited at regular intervals in a linear manner over the coal panel beneath and connected by roads, making it impossible for anyone (or any wildlife) to walk more than a few hundred yards without hitting a road or drill pad, and leaving obvious linear scars visible from every ridge-top.286 The entire 1,700 acres of roadless land within the Lease Modifications will likely see its roadless character degraded for decades. Yet the 2012 Lease Modifications Final EIS fails to disclose the broad extent of these impacts, or the effect on the larger Sunset Roadless Area.287 These are, however, exactly the types of impacts federal courts require federal agencies to disclose. As the Tenth Circuit has noted: ""the location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them.""288 In the 2012 Lease Modifications Final EIS, the Forest Service made no attempt to address the nature or location of the road and MDW network (beyond estimating road mileage and the number of MDWs), although it could have done so, as BLM has done for the road and MDW network needed for other coal lease expansions in the North Fork Valley.289 At a minimum, the Forest Service must disclose the likely general location of roads and drill pads, based on the location of proposed coal panels underground and on past experience with E-Seam mining. The Forest Service has had an MCC map for seven years displaying the likely location of coal panels in the Lease Modifications area.290 It could, for example, provide a schematic map displaying how the area might appear with 48 drill pads on the landscape. We provide one here and urge the Forest Service to do so in its supplemental EIS.291" | |
| Earthjustice #8419-46 | Second, the Forest Service must evaluate the impact of road construction in the proposed lease modification areas on the entirety of the 5,880-acre Sunset Colorado Roadless Area.292 The 2012 Lease Modifications Final EIS failed to | Effects in Section 3.18 are addressed at the CRA level. Commenter tries to make an argument that roadless character assumes that the forest |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | undertake any meaningful analysis of the proposed lease modifications' impacts on roadless values. Instead, it offers the superficial determination that impacts to an unspecific portion of the Sunset Roadless Area would be, in general, ""shortterm."" 293 Nowhere did that EIS state the extent (in terms of area) of these ""temporary"" impacts. The Forest Service must correct this error in the supplemental EIS. The 2012 Lease Modifications Final EIS itself acknowledged in several cases that road and drill pad construction will result in impacts extending decades into the future, impacts that are ""long term"" rather than temporary.294 The Forest Service expressly acknowledged that ""based on current mining practices, about 72 total acres of surface disturbance would occur from mine operations over the life of the lease modifications (expected to be about 25 years ....).""295 The EIS also admits that reclamation elsewhere in connection with the West Elk Mine has, in fact, permanently altered the natural community occurring in the reclamation area from oak brush to grassland. 296 For the proposed Lease Modifications area, the effect of reclamation efforts will likely be even more pronounced and long term because the impacted area is mostly mature forest at higher elevations, where the growing season is shorter than in lower oak scrub habitat where most of MCC's previous MDWs have been bulldozed.297 Nearly 90% of road and MDW construction will thus likely occur on roadless lands where aspen or spruce-fir more than a century old will be chainsawed and removed." | composition and age needs be the same for the area to be roadless, disregards that roadless allows management activities but restricts "timber cutting, sale, and removal; road construction and reconstruction; and linear construction zones…with narrowly focused exceptions"--which is exactly what is being applied here—CRAs are not intended to be managed as wilderness. Effects on roadless characteristics are restored once the roads are revegetated and once again support habitat for TES species or other characteristics are restored. Animal home ranges are not generally aligned with CRA boundaries and are described at the appropriate scale in this SEIS. |
| Earthjustice #8419-36 | In addition, the supplemental EIS must disclose the potential for impact to Trail 8152. That trail is displayed on a number of maps in the 2012 Lease Modifications Final EIS, and on the only useful map in the 2013 Exploration Plan EA.202 It is also marked on USGS topo maps for the area since 1979.203 It is also a clearly discernible trail on the ground to those who have hiked in the area. Constructing drill pads for exploration directly on the route, and roads across and near it, will impact the recreation experience for those using the trail, an impact that the supplemental EIS must address pursuant to the court's order." | What was labeled as 8152 on BLM's topo layer on their 2013 exploration map or in the 2012 FEIS is not a trail. We have no system or non-system routes by that number. We do however, have an abandoned range fenceline alignment in that location with the number 8152 which would provide a disturbed area. While you might be able to follow it, as with any other stock or game trail, that does not make it a recreational feature and foot traffic is allowed in any area of the forest not specifically closed. |
| Earthjustice #8419-37 | At its northeast terminus, Sunset Trail joins the ""Hammond Trail"" on the 1938 map; the Hammond Trail today roughly follows the course of NFSR 711 and connects what is now referred to as Lower and Upper Cow Camps. Sunset | The Hammond Trail is another non-system, non-maintained trail which is difficult to find as one gets further from the end of NFSR 711.3A. The location |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Trail is also displayed on USGS topo maps at a variety of scales from 1945, 1964,199 1979,200 and 1983.201 It is possible that Sunset Trail was previously used by the area's indigenous people, as were many early trails that were then developed by European settlers. Whatever its origin and history (which the agencies must investigate), the trail has been in use by recreationists and others for decades, as evidenced by its persistence on USGS maps from 1938. Impacts to the trail must be disclosed in the supplemental EIS as the court mandated. | of this trail from historic maps places it over a mile east of the lease modifications at its westernmost point. This trail extends east from NFSR 711.3A, from the vicinity of the Upper Cow Camp along Little Gunnison Creek and between roads open to the public roads open to the public (NFSRs 711 and 709). This is not the direction from which traffic related to the lease mods or exploration would approach the area so there would be no direct or indirect effects to this non-system trail with any activity on the lease modifications.<br><br>Even if exploration is near (~200+ feet) to an alignment of the non-system Sunset Trail, there would be no effect on it from exploration as there would not be ground disturbance of it. Heritage surveys have been conducted for proposed disturbance areas and no effects to historic properties were identified. |
| Davies, Robert #336-1 | Exploring for new sources of coal is inconsistent with our needs. We are already in possession of known reserves far exceeding the amount we can safely burn. Leave it in the ground. This exercise is counter to the best interests of the citizens of the United States in the extreme. | The West Elk Mine is an existing mine; the lease modifications are adjacent to known coal reserves. The exploration is for the purpose of defining the reserves to see if mineable quantities exist, define where faults may exist and to assist with mine plan development, if they are leased.<br><br>See Mining and mineral Policy Act of 1970 in Section 1.7. Forest Service and BLM are responding according to legal and regulatory responsibilities, and will make decisions based on analysis in the SEIS |
| Hardie, Patricia #446-1 | Please do not extend the lease to Arch Coal. They are bankrupt. Where will they get the funds to clean up? They will simply plunder and close the company, leaving yet another mess for future generations to clean up. | Reclamation bonding is required in the State of Colorado.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Zukoski, Edward 8419-10 | A. The Lease Modifications Should Be Rejected Because They Are Not In The Public Interest. The undersigned groups urge the Forest Service to adopt the no action alternative and to reject the Coal Lease Modifications. The proposed action will harm the public by encouraging the release of vast amounts of climate pollution, by wasting millions of cubic feet a day of methane, by saddling the global economy and environment with millions (if not billions) of dollars in climate damages, and by degrading high-elevation forests and wildlife habitat. On the other hand, it is likely to benefit only a single company: now-bankrupt Arch Coal. The Forest Service should not undermine the public interest to benefit one of world's largest purveyors of dirty coal. The Forest Service's own analysis of the Colorado Roadless Rule coal mine exception demonstrates the proposal's damaging impacts by at least four counts." | In accordance with MLA 30 U.S.C. § 201(a)(1) "The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest and which will permit the mining of all coal which can be economically extracted"<br><br>Climate effects are disclosed in Section 3.4 and other relevant sections. Lease stipulations permit methane capture/use. Exploration has no effect on methane.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Earthjustice #8419-11 | First, coal mined from the Lease Modifications will result in significant gross carbon emissions from coal extraction and combustion.3 Second, even where the analysis takes into account the shifts in the mixtures of energy used to generate electricity, as well as the production of different types of energy which would result from the addition million tons of coal to the market, mining the Lease Modification coal will result in a net increase in total CO2 emissions.4 Third, the Colorado Roadless Rule supplemental draft EIS's market analysis shows that the addition of coal from the Lease Modifications area will undercut the market for clean renewable energy.5 Fourth, the Colorado Roadless Rule SDEIS concludes that the net social damage to the global environment and property from carbon emissions (calculated by weighing the social cost of carbon against the net value of the coal) due to coal mined from the Lease Modifications and elsewhere could be in the billions of dollars.6 That the Forest Service appears poised to ignore the significant climate impacts of unlocking 19 million tons of coal contradicts recent statements by President Obama. In announcing his decision rejecting a permit for the Keystone XL pipeline, the President stated: if we're going to prevent large parts of this Earth from | Emissions and climate effects are described in Section 3.4 and other relevant sections. SCC and Social Cost of Methane were not calculated in this analysis for the reasons cited in Section 3.4.<br><br>Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. In the short-term (~2-5 years) which is when these modifications would be mined there is unlikely to be limited if any effect on long-term renewable energy market.<br><br>See Mining and mineral Policy Act of 1970 in Section 1.7. Forest Service and BLM are responding according to legal and regulatory |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky.7" | responsibilities, and will make decisions based on analysis in the SEIS |
| Earthjustice #8419-13 | On the other hand, the alleged benefits of allowing this pollution and habitat destruction will likely accrue only to a single entity: the West Elk mine, owned by Arch Coal. The Forest Service should not be effectively subsidizing a company so poorly run that it eliminated 99% of its shareholder's value over the last two years and ran itself into bankruptcy. Because West Elk still has, by Forest Service estimates, approximately 10 years of coal reserves remaining, the Forest Service has time to help local communities transition to a more stable, cleaner economy in the North Fork Valley while preserving the natural environment and protecting the climate. This is particularly important given the bleak future coal faces across the West Slope. As the dean of the University of Colorado school of business was recently paraphrased, ""Western Slope coal lies on death's door"" due to a variety of market conditions.11 | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. If applications for renewable energy are made to the Forest Service they too will be considered. Energy policy is beyond the scope of this document.<br><br>Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. |
| **Socio-economics** | | |
| Zukoski, Ted #9757-3 | I. New Information Reinforces That The Forest Service's Failure To Disclose The Social Cost Of Methane Is Arbitrary. While the Forest Service's [CRR] supplemental draft environmental impact statement (""SDEIS"") estimated the volume of methane that would be released during coal mining as a result of opening 20,000 acres of land to coal mine road construction, the agency failed to account for the environmental damage that additional climate pollution would cause, despite the availability of the social cost of methane metric made available and used by the EPA.... For these reasons, the Forest Service must use the TSD's social cost of methane to disclose the coal mine exception's environmental and other impacts.<br><br>II. New Information Reinforces That The Appropriate Scale For Addressing Climate Impacts Is The Global, And Not National Or Regional, Scale.... | CRR SFEIS did address the Social Cost of Methane and at the global scale as requested. As stated, these lease modifications cover approximately 8.6%of the North Fork Coal Mining Area included in that analysis. EO 13783 disbanded the IWG and withdrew documents issued by the IWG as no longer representative of governmental policy. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Semper, Elena "Lane" #369-1 | I have two objections to leasing of public lands for mining: the minor one is that companies are purchasing the resources on public lands for pennies on the dollar, threatening to turn us into America Incorporated. | Leasing and rental/royalty rates are a matter of policy outside the scope of this analysis. |
| Adam, Margaret #6338-3 | Recent leasing practices have led to scandalously undervalued bids and sales of our public resources, at enormous cost to the environment. | Rental rates and standard royalty rates are matter of policy are beyond the scope of this analysis. |
| Steitz, Jim #2603-5 | The Forest Service's own analysis showed a total social cost, of transmuting this coal into carbon dioxide, of $12 billion. Adding further insult to injury, a major surface occupancy would be the surface wells required to vent methane, a hyperactive global warming pollutant which the Department of Interior is currently developing regulations to control, and which is also the object of a joint methane reduction accord between the US and Canada announced last week. This dwarfs any economic value of the coal, and must compel the FS to reject these leases, even before the direct ecological destruction to the 5,000 acres of the Sunset Roadless Area is considered | Effects on various resources are addressed in Chapter 3. Social cost of carbon was not calculated for this analysis for the reasons cited in Section 3.4. Interior's methane regulations dealt with oil and gas not coal. |
| Zukoski, Edward 8419-38 | V. THE SUPPLEMENTAL EIS MUST ADDRESS NEW INFORMATION CONCERNING COAL MARKETS AND SOCIO-ECONOMICS. Regulations implementing NEPA require that the action agency disclose the direct, indirect, and cumulative effects of actions, including ""economic, [and] social"" impacts. 40 C.F.R. § 1508.8. In addition, while NEPA does not require a specific cost-benefit analysis, regulations require that when an agency prepares such an analysis that it ""discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities."" 40 C.F.R. § 1502.23.. Similarly, an EIS that relies upon misleading economic information may violate NEPA if the errors subvert NEPA's purpose of providing decisionmakers and the public an accurate assessment upon which to evaluate the proposed project. Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 492 (9th Cir. 1987). The lease modification's economic costs and benefits were at the core of the Forest Service's analysis of, and choice among, alternatives. In her August 2012 ROD on the Lease Modifications, the Forest Supervisor relied heavily on the project's alleged, estimated economic benefits, despite the fact that she had chosen to ignore or leave undisclosed the economic and social costs of carbon. The ROD states that the Supervisor rejected the ""no action"" | Social Cost of Carbon and Methane analysis were not undertaken for this project for the reasons cited in Section 3.4. Likewise the impact analysis is not a cost-benefit analysis such as would be undertaken in rulemaking and is described in Section 3.21.<br><br>Currently (April, 2017) coal is at approximately $40/short ton. This EIS has been updated accordingly. A value just shy of $40/ton was used in section 3.21.<br><br>There have been no royalty rate reduction requests on the lease mods, there is no current royalty rate reduction for the parent leases, and a request for the parent leases is currently being processed. The royalty rate reduction requests have been and are for a portion of the parent leases where the coal |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | alternative because ""it does not achieve social and economic objectives in the area. Estimates suggest nearly a billion dollars in lost revenues, royalties, payroll and local payment for goods and services would be foregone by implementing this Alternative.""204 Similarly, in justifying the agency's selection of Alternative 3, the Supervisor stated: ""I determined that the economic nefits of Alternative 3 outweigh the environmental effects of disturbing a small amount of – NFS lands for a short period of time as assessed in Alternative 4.""205 Here, the Supervisor states that she based her decision in comparing Alternatives 3 and 4 on a lack of any additional costs of Alternative 3 other than land disturbance in the Lease Modifications area, failing to factor in the additional costs of CO2 emissions under Alternative 3. The supplemental EIS must address significant new information that has become available since 2012 concerning the socio-economics of coal markets and the North Fork Valley's economy. These changes include: - Coal production nationwide and in Colorado has dropped significantly in 2016. Colorado DRMS data indicate that coal production statewide for the first two months of 2016 is about half what it was for the same period in 2015.206 - Production at the West Elk mine in that same period was occurring at an annual rate of about 2.3 million tons per year, less than half of that mine's production in the first two months of 2015.207 - The number of those employed by the West Elk mine has fallen. The 2012 Lease Modifications Final EIS assumed that the West Elk mine had 378 employees.208 The latest DRMS report indicated 281 miners working at West Elk in February 2016.209 - The North Fork economy is transitioning away from coal, as demonstrated by the closure and demolition of structures at Elk Creek mine, and the idling of the Bowie No. 2 mine. - As the demand for coal has fallen, so has coal's value and price. - The price of energy from fuels that compete with coal remains low (as with natural gas) or continues to fall (as it has with solar and wind power), making coal less competitive over the long term. - U.S. exports of coal have also fallen as China in particular attempts to shift away from fossil fuels, reducing global demand.210 205 Id. at 9. 206 Compare Colorado DRMS, Monthly Coal Summary Report, 1/2016 through 2/2016 (Apr. 4, 2016), attached as Ex. 96, and available at http://mining.state.co.us/SiteCollectionDocuments/02Summary16.pdf (last viewed Apr. 12, 2016) with Colorado DRMS, Monthly Coal Summary Report, 1/2015 through 2/2015 (May 26, 2015) attached as Ex. 97, and available at http://mining.state.co.us/SiteCollectionDocuments/02Summary15.pdf (last viewed Apr. 12, 2016). 207 Id. 208 2012 Lease Modifications Final EIS | seam has split. The BLM will issue the lease modifications at the standard royalty rate of 8% for underground mines. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | at 186. 209 Colorado DRMS, Monthly Coal Summary Report, 1/2016 through 2/2016 (Ex. 96). Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 55 April 12, 2016 - Arch Coal and its subsidiaries (including MCC) have declared bankruptcy, raising questions about the long-term viability of the company and its operations. - Regulatory and national political changes - the Paris Accord committing the U.S. to reduce its CO2 emissions by 26%-28% in the coming years, and the potential implementation of the Clean Power Plan - may further reduce the demand for coal, including North Fork coal, in the coming years.211 We note that it is unclear whether the Colorado Roadless Rule supplemental EIS upon which the Forest Service may rely will address any of these factors. The Forest Service also acknowledged in its decision on appeal that the 2012 Lease Modifications Final EIS contained errors and inconsistencies regarding the estimated price of coal. When disclosing the economic effects under alternative 1 and 4 (FEIS, p. 190- 191) the price of coal was listed at the gross coal value of $55 per ton. Under Alternative 3, however, the price of $40 per ton was used. This inconsistency is recognized. .... [T]here is a mistake in the value of the coal among alternatives ....212 Any supplemental EIS must correct these errors and rely upon the most recent estimates for coal prices. We note that while the 2012 Final EIS used $55 and $40 per ton for coal when comparing alternatives, the price today is below $40 per ton, and may be as low as $29 per ton.213 210 U.S. Energy Information Agency, U.S. coal exports declined 23% in 2015, as coal imports remained steady (Mar. 7, 2016), attached as Ex. 98, and available at https://www.eia.gov/todayinenergy/detail.cfm?id=25252 (last viewed Apr. 12, 2016). 211 Analysts believe that the U.S. is on a path to significantly reduce its reliance on dirty coal even if the Clean Power Plan is enjoined or not implemented, due to market forces and continued implementation of other state and federal initiatives. See Law 360, Paris Climate Accord Implementation: United States (Mar. 11, 2016), attached as Ex. 99, and available at http://www.shearman.com/~/media/Files/NewsInsights/Publications/2016/03/ Paris-Climate- Accord-Implementation-United-States.pdf (last visited Apr. 12, 2016). 212 B. Ferebee, Forest Service, Recommendation Memorandum for Appeal of Federal Coal Lease Modifications COC-1362 and COC 67232 for the West Elk Mine (Nov. 6, 2012) at 6, attached as Ex. 100. 213 EIA data indicates that the spot price of Uinta Basin coal as of April 8, 2016 is $37.80. EIA, Average weekly coal commodity spot prices, April 8, 2016, attached as | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Ex. 101, and available at http://www.eia.gov/coal/markets/ (last viewed April 12, 2016). A February 2016 analysis Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 56 April 12, 2016 Any subsequently prepared NEPA document must also properly characterize the royalty rate that Arch is likely to pay. The 2012 Lease Modifications Final EIS overstated the proposal's benefits by assuming a royalty rate of 8%.214 But more than 18 months ago MCC sought to reduce from 8% to 5% the level of royalties paid to the taxpayer for these very lease expansions.215 This would reduce the benefits from royalties by nearly 40%. The 2012 Lease Modifications Final EIS's assumption that this project will result in about $30 million in royalties is arbitrary and capricious, particularly given that we are unaware that BLM has ever denied a royalty relief request for an operating mine in the North Fork Valley. If the agencies are aware of such a decision, they should so state in the supplemental EIS. Since publication of the 2012 Lease Modifications Final EIS, it has become clear that a portion of coal produced from the North Fork Valley, including the West Elk mine, is being exported overseas. The supplemental EIS must address this fact and fully analyze and assess the environmental and economic implications of coal export activities. We incorporate by reference the entirety of our May 22, 2015 scoping comments on the Colorado Roadless Rule, and request that the Forest Service address and respond to the issues raised therein.216" | |
| Earthjustice #8419-39 | VI. THE SUPPLEMENTAL EIS MUST ADDRESS THE SOCIAL COST OF CARBON AND METHANE. The Lease Modifications will permit Arch Coal to access 19 million tons of coal, and will prolong the life of the West Elk mine by nearly three years.217 The production, transport, and combustion of this coal will result in carbon emissions, and mining will also result in the release of huge amounts of methane, a greenhouse gas about 86 times more potent than CO2 as a heattrapping gas over a 20-year time period. The Lease Modifications supplemental EIS must assessed coal very similar to West Elk's, ""Colorado's 11,700 Btu/lb coal"" at $29 per short ton. Jeffrey McDonald, Platts, ""Spot demand picks up for Utah thermal coal"" (Feb. 22, 2016), available at http://www.platts.com/latest-news/coal/houston/spot-demand-picks-up-for-utahthermal- coal-21975728 (last viewed Apr. 12, 2016), and attached as Ex. 102. The 2012 Lease Modifications Final EIS stated that West Elk coal was rated at approximately 11,800 btu/lb. 2012 Lease Modifications Final EIS at 80. 214 2012 Lease Modifications Final EIS at 188 (assuming 8% royalty rate). See also id. at 190 (""Royalty payments | Social Cost of Carbon and Methane analysis were not undertaken at the project level for the reasons cited in Section 3.4.<br><br>The District Court's ruling did not require that a social cost of carbon analysis be done at the project level. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | are 8% of the value of the coal removed"" and assuming total value of royalties will therefore be ""approximately $30 million""). 215 Letter of W. Koontz, Mountain Coal Co. to R. Welch, BLM (Sep. 4, 2014), attached as Ex. 103. 216 Letter of E. Zukoski, Earthjustice to Colorado Roadless Rule (May 22, 2015), attached as Ex. 104. We specifically request that the Forest Service respond in any supplemental EIS on the Lease Modifications to those comments concerning socio-economics, found at pages 38-45 of the May 22, 2015 letter. 217 2012 Lease Modifications Final EIS at 190 (under the proposed action, Alternative 3, ""19 million tons of coal representing approximately 2.9 years of continued mining activity"" would be made available for mining). Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 57 April 12, 2016 address these impacts. The Federal Register notice on scoping for the supplemental EIS hints that the Forest Service may do so, stating that the agency may address new issues including a ""request for Social Cost of Methane analysis.""218 As an initial matter, we note that it is not a ""request"" that the Forest Service address the social cost of methane. The U.S. District Court vacated the 2012 Lease Modifications ROD because the Forest Service failed to apply the social cost of carbon in addressing the lease modifications' climate impacts, and specifically because it failed to address the costs of methane emissions.219 The court made clear that the Forest Service could not ignore the climate impacts of its actions by arguing that the social cost of climate pollution was zero, or because metrics did not exist to allow the agency to disclose those impacts.220 The Forest Service is therefore required to address the social cost of methane pollution in its supplemental EIS. Although the Forest Service may attempt to rely on the analysis it prepared in the Colorado Roadless Rule supplemental draft EIS, the agency may not do so because that analysis is inaccurate. The Colorado Roadless Rule's supplemental draft EIS, among other things: - fails to address the social cost of methane; - fails to properly estimate methane emissions; - invents a ""best case scenario"" discount rate which skews the analysis; - fails to use a model that addresses consumers' reaction to lower electricity prices; and - underestimates methane emissions based on a narrow selection of West Elk's emissions data. All of these flaws lead the Colorado Roadless Rule supplemental draft EIS to significantly underestimate the social costs of the proposed action. These flaws are discussed in greater detail in four documents that we attach and incorporate by reference and that we specifically request that the Forest Service review and address in its supplemental EIS | |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | on the lease modifications: (1) the January15, 2016 comments of High Country Conservation Advocates et al.;221 (2) the January 15, 2016 comments of the Union of Concerned Scientists et al.;222 (3) the January 14, 218 2016 Lease Modifications Federal Register Notice, 81 Fed. Reg. at 8906. 219 High Country Conservation Advocates, 52 F. Supp. 3d at 1192-93 220 Id.. 221 HCCA Jan. 2016 Roadless Rule Comments (Ex. 1). 222 Letter of R. Cleetus, Union of Concerned Scientists et al. to Forest Service (Jan. 15, 2016), attached as Ex. 105. Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 58 April 12, 2016 2016 report of Dr. Thomas Power et al.;223 and (4) the detailed comments of the Environmental Protection Agency.224" | |
| Earthjustice #8419-40 | Further, the Forest Service may not rely on the social cost of carbon analysis or the social cost of methane analysis (to the extent there is any) in the Colorado Roadless Rule supplemental draft EIS, because that analysis specifically declines to address the climate pollution from mining and combusting adjacent private land and federal coal that will be made available by the lease modifications proposal, which accounts for a significant portion of the coal and extended mine life made possible by the proposed action. The 2015 Colorado Roadless Rule supplemental draft EIS explicitly refuses to address the reasonably foreseeable impacts of making this private coal available on two grounds. First, the SDEIS alleges that ""[t]he U.S. Forest Service does not have jurisdiction over private lands with private mineral estate.""225 This is irrelevant to whether the Forest Service must disclose the impacts of private land coal mining. The Forest Service must address the indirect and cumulative effects of its proposed actions, regardless of whether it has jurisdiction over those actions. The very definition of cumulative effects includes those foreseeable actions ""regardless of what agency (Federal or non-Federal) or person undertakes such other actions."" 40 C.F.R. § 1508.7. This is why the Forest Service disclosed some of the impacts of mining this private coal in its 2012 Lease Modifications Final EIS. Even if the Forest Service concludes that the proposed rule has no impact on a decision to mine coal on private lands, the Forest Service must disclose the potential impacts of such mining as a cumulative impact if that action is reasonably foreseeable (as the Forest Service concluded it was in the Lease Modifications EIS)." | This EIS identifies that private coal may become accessible as a result of the lease modifications, not specifically as a result of the CRR. Combustion has been addressed in Section 3.4. Social Cost of Carbon and Methane analysis were not undertaken at the project level for the reasons cited in Section 3.4. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Earthjustice #8419-41 | Second, the 2015 Colorado Roadless Rule supplemental draft EIS states that ""[a]ccess to private lands and private coal resources is not dependent on the Colorado Roadless Rule, and neither are private coal resources subject to the U.S. Department of the Interior's leasing process.""226 Again, it is irrelevant whether private coal is subject to DOI leasing. Further, the Forest Service has previously concluded that the private land coal near the Lease Modifications is in fact dependent on whether Arch Coal will mine the adjacent lands within the North Fork Coal Mining Area; those private lands are simply not likely to be mined absent the coal mining exception, and are likely to be mined if the exception is adopted.227 Further, in assessing the social cost of methane and carbon from the proposed Lease Modifications and adjacent lands, the Forest Service must estimate the likely timing of coal- mining and combustion within the Lease Modifications area. This is so because both the social cost of carbon and of methane increase over time. At present, it appears unlikely that Arch Coal will mine in the Lease Modifications until after 2022. That is so because, first, it will take at least two summer seasons for Arch to explore the area at issue, based on its proposal. Second, Arch has submitted to state mining regulators documents indicating that the company intends to move its longwall miner miles away from the Lease Modifications area and mine other tracts until approximately 2023.228 Third, given that Arch Coal's rate of production so far in 2016 is half of what it was in 2015, Arch may be mining the 50 million or so tons of coal in those other tracts for a much longer period than previously estimated.229 The supplemental EIS therefore must identify the timing of coal mining so that it may effectively estimate the social cost of methane and carbon." | The CRR exception reinstatement was not dependent upon the private lands as it made no decision on the leasing or mining of specific lands, only reinstated an exception to the prohibitions on road construction and reconstruction. CRR SFEIS addresses these comments at 33-34 and E-22.<br><br>This leasing action, because of inferred panel alignment on parent leases that may extend into the lease modifications, makes private coal resources accessible and economical to mine without having to establish additional mine facilities such as a new mine portal that would be cost prohibitive based on the limited quantity of private coal reserves presumed to exist between known geologic faults. These private reserves would not be by-passed simply because they are adjacent to roadless areas, but for a host of reasons related to the existing underground mine and geology.<br><br>If West Elk stayed its course with regard to the E Seam panels, it is likely that they would begin mining under the lease modifications in approximately 2020 based on current mining rates. If they move back in to the B Seam on parent leases based on their 2017 decision, mining there may occur sooner. |
| Schoaff, Nathaniel #9761-1 | Attached are two expert reports from Dr. Thomas Power regarding the market and climate analysis in the Forest Service's FSEIS for the coal road exemption proposed for inclusion in the Colorado Roadless Rule. Please add the attached reports to the record on the COC-1362 and COC-67232 Lease Modifications<br><br>Reports available at: https://cara.ecosystem-management.org/Public/Letter/1317877?project=32459. | Both of these reports deal with modeling analysis/assumptions for the Colorado Roadless Rule. They do not apply to this analysis which does not include a Social Cost analysis for the reasons cited in Section 3.4. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| **Miscellaneous & General Comments** | | |
| Patriana, Zarah #1-74 | Not only are you contributing to our warming climate, but you are also removing the forest that moderates world temperature plus destroying a huge swath of habitat for our vanishing wildlife. Leave our forest alone! | Effects on climate are disclosed in Section 3.4 and other relevant sections, Vegetation in Section 3.9 and wildlife in various other sections in Chapter 3. |
| Dunavan, Nancy #454-3 | Plus, coal mining would harm wildlife and the environment | Effects on various resources and wildlife are described in Chapter 3 |
| New Progressive Alliance #9733-1 | Now look at the pacific Northwest, specifically Longview Washington which is fighting the millennium project to use Arch Coal because of the health hazards of coal dust, the hazards involved, and the traffic impairment caused by many mile plus long coal trains. Medical professionals have attributed the increase in asthma, chronic bronchitis, heart attacks and premature death from hear and lung disease for transporting and burning coal. *Next look at China. Burning this coal will release millions of tins of carbon into the air. There is no such thing as ""clean coal"". Smog forming nitrogen oxides, mercury, lead, arsenic, and soot forming sulfur dioxide make coal the dirtiest power by far." | We are unaware how The Millennium Project specifically relates to the coal lease modification areas. If commenter's intent is to focus on climate or air-related effects, they are already covered in Section 3.4 and other relevant sections. |
| McCall, Anon #8-1 | I strongly oppose the coal lease modifications and exploration plan that will lead to putting miles of roads in a roadless forest, and expanding the production of fossil fuels in a wilderness area. The Forest Service owes it to the American people to stop the destruction of wilderness areas, and also to stop facilitating the production of fossil fuels, which are damaging our climate and threatening the very foundation of our civilization. | None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. See Unsuitability Criteria Analysis in Appendix B.<br><br>The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy. Beyond that this is a matter of policy that is outside the scope of this analysis |
| Steitz, Jim #5-2 | This Forest Service proposal to punch 65 miles of roads into a precious forest to retrieve 170 million tons of carbon pollution is an outrageous, heinous abdication of its responsibility to our precious forest ecosystem, and to its mandate the uphold the public interest in the highest values of these lands. At | This comment was submitted on both the CRR and leasing analysis. In Colorado, reclamation bonds for coal mining on federal lands are held by the State and include the review by federal agencies |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | precisely the time that our country desperately must discontinue the use of coal, the Forest Service would destroy one of the finest remaining roadless forests under its jurisdiction in Colorado to extract more coal. The bankruptcy of the applicant company, Arch Coal, is a favorable indication that our society is belatedly divesting from coal as an energy supply, yet the Forest Service would retard this progress by carving special favors from its pristine roadless lands for this company to inject artificially cheap, below-market coal into power plants. A more perverse negation of the public and national interest could scarcely be imagined. Moreover, the bankruptcy of Arch Coal renders quite flimsy any promise that the BLM may obtain for mine reclamation or mitigation of damage to water quality, absent dramatic reforms in the reclamation bonding practices of BLM that have already left the federal Treasury with many billions in cleanup liabilities. | as to their adequacy to ensure that expenses are not incurred by tax payers as it relates to "clean-up" expenses. Lease stipulations in Table 2-1 are stringent with regard to water and water quality.<br><br>Likewise, even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. |
| Artley, Dick #306-1 | For decades there has been speculation that the USFS uses the taxpayer's money to plan projects that above all-else assure profit opportunities for the natural resource extraction companies. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Rents and Royalties are paid to the US Treasury. All funding related to leasing received by the Forest Service is appropriated by Congress. |
| Linton, Jennifer #351-4 | Surely there exists already built infrastructure where coal companies can finish their energy business before they close up shop on this dirty fuel era. It's inexcusable to be starting up new endeavors at this time. | This is not a new endeavor. Mining has been occurring in this vicinity for over 100 years. This proposal makes more coal available to an existing mine for a short duration of time and would not increase the rate of mining above currently permitted levels. |
| Earthjustice #8419-51 | XII. THE FOREST SERVICE SHOULD ADDRESS AND RESPOND TO ADDITIONAL SUBMISSIONS. We request that the Forest Service include in the record on the Lease Modifications supplemental EIS, and specifically review and respond to relevant analysis in the Lease Modifications supplemental draft EIS, the following documents, submitted to the Forest Service herewith or under separate cover: High Country Citizens' Alliance's September 24, 2012 administrative appeal of the Forest Service's 2012 Lease Modifications ROD, a document to which the GMUG National Forest did not | Commenter's CRR comments have been included as applicable in this analysis and responded to per your request.<br><br>Commenter's Notice of Intent to Sue posted dated Forest's NEPA analysis and decision and predated |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | respond (although the Forest Service's Rocky Mountain Region did), and which identified several errors in the 2012 Lease Modifications Final EIS and ROD; - Earthjustice's December 17, 2012 notice of intent to sue the Forest Service for violations of the Endangered Species Act in adopting the Forest Service's 2012 Lease Modifications ROD, which identifies errors in the agency's consultation, and to which the GMUG National Forest never responded in a NEPA document; igh Country Conservation Advocates' January 15, 2016 comment letter on the Colorado Roadless Rule Supplemental Draft EIS, which addresses many issues the GMUG National Forest faces in the Lease Modifications supplemental EIS; and 352 2013 Exploration Plan EA at 20-21. 353 2012 Lease Modifications Final EIS at 54 (""It is common practice, and therefore assumed that if any exploration drilling, staging areas, and ground water monitoring drill pads and crosscountry motorized access is needed, they would utilize the same locations as those used for MDWs"") (emphasis added). Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232 Page 92 April 12, 2016 - Earthjustice and Center for Biological Diversity's March 3, 2016 letter to the U.S. Fish and Wildlife Service raising questions about the adequacy of the Forest Service's consultation concerning the impacts of coal mining activities within the Sunset Roadless Area and adjacent roadless lands." | litigation. These ESA claims were not substantiated during litigation nor are they at issue now. |
| Form letter | I oppose the coal lease modifications and exploration plan that will lead to the construction of more than 6 miles of road, nearly 50 drill pads, and methane vents in the Sunset Roadless Area. The U.S. Forest Service should protect the Sunset Roadless Area because it provides important habitat for deer, elk, black bear and lynx, and is home to watersheds that support imperiled Colorado River cutthroat trout. Allowing coal mine expansion there will damage a pristine area now enjoyed by hunters and hikers, and will worsen climate change--all to benefit one of the dirtiest forms of power and the now-bankrupt Arch Coal. I urge you to: Protect the roadless area! Ensure that no roads are constructed in the Sunset Roadless Area. Its wildlife and recreation values are more important than bulldozing for dirty coal." | Effects on wildlife are considered in various sections in Chapter 3. See also section 3.18 related to roadless areas.<br><br>The lease modifications would also not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is up stream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | Recreation effects are considered in Section 3.16. |
| Christopher Lish #7926-15 | Approving these coal leases undermines this administration's commitment to the Paris climate accord, the state's climate goals, and to clean energy. | The Paris Accord did not commit the U.S. to any particular course of action. The State is a permitting agency for air quality related to these lease modifications. Development of clean energy is outside the scope of this analysis. |
| Christopher Lish #7926-20 | I urge you to preserve the Colorado Roadless Rule and protect the Sunset Roadless Area, close the Arch Coal loophole, and withdraw the proposed Arch Coal lease modifications." | No further response required. |
| Lynch, Janet #8056-10 | Letting Arch Coal expand coal development at the expense of thousands of acres of roadless forest and a safe climate future is unconscionably negligent at best, and completely against your agencies' statutory mandates of managing our nation's forests and public lands sustainably for the long term, and for a variety of legitimate multiple uses. | Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. See also Section 1.7 for other authorities.<br><br>Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Form letters | Protecting the Integrity of Roadless Areas We support the protection of the Sunset Roadless Areas from mining and the construction of roads. These pristine areas were designated precisely because they meet the criteria for roadless areas including, but not limited to, quality soil, water and air; species diversity; valuable habitat, reference landscapes, and scenic beauty. Bulldozing miles of roads within these 5000 acres of roadless area will negatively impact soil, air and water quality, plant species, wildlife habitat, wildlife corridors, and the integrity of this ecosystem. The construction and use of these roads will fragment this ecosystem that supports black bear, elk, deer, Canada lynx, and goshawk and includes the watershed that is home to the native Colorado River cutthroat trout." | Effects on lynx are included in Section 3.10. Effects on roadless are included in Section 3.18. Effects on other resources are described in Chapter 3. See also section 3.18 related to roadless areas.<br><br>The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |
| Great Old Broads for Wilderness #15-5 | In light of this winter's agreement at the Paris Climate Summit and President Obama announcement regarding a moratorium on new coal leasing on public lands, bulldozing roads in pristine roadless areas appears wasteful, irrational and shortsighted. Furthermore, Arch Coal's filing for bankruptcy (and their $5 billion debt!) coupled with evidence of the decline in the demand for coal nationwide make any coal mining in the Sunset Roadless Area appear rather absurd. Some statistics reported in the January 11 edition of the Casper Star Tribune include, ""U.S. coal consumption fell to levels not recorded since 1988."" ""Power companies retired 13 gigawatts of coal-fired power in 2015."" ""Coal fell from 48 percent of U.S. power generation in 2008 to 38 percent in 2014."" Such trends do not support the rational for further coal leases and road construction in the Sunset Roadless Area or the North Fork Valley. | Paris Accord doesn't commit the U.S. to any particular course of action.<br><br>These lease modifications were always subject to exemptions from the moratorium, which are no longer in existence.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>The Forest Service nd BLM are responding to legal and regulatory responsibilities for managing federal coal resources. See Section 1.7. |
| Great Old Broads for Wilderness #15-6 | Impact on Climate Change The contribution of greenhouse gases resulting from the extraction and burning of dirty coal is contrary to the Paris Climate Accord and Colorado's climate goals. Furthermore, as you no doubt are aware, the Global Warming Potential (GWP) of methane is 86 times that of CO2 during a 20-year span. Though methane venting ensures greater safety, this practice is an enormous contributor to climate change. At a time when the planet is already experiencing a 0.8 degree Celsius rise in temperature and the impact of such a change is evident in significant weather pattern changes; in natural disasters ranging from floods to drought to superstorms to massive wildfires; and in the alteration of species diversity and ranges; it is short-sighed and irresponsible for our government and federal agencies to consider expanding lease sales anywhere (and especially in roadless areas!) The U.S. Forest Service's own economic analysis indicates that proposed mining in the Sunset | Paris Accord doesn't commit the U.S. to any particular course of action.<br><br>Climate effects are considered in Section 3.4 and other relevant sections. Recreation effects are included in Section 3.16.<br><br>2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Roadless Area and adjacent roadless lands and the burning of extracted coal will cause approximately $12 billion in damage to the environment and global economy due to climate pollution. In this time of climate change crisis, our country and its communities must look for alternatives to fossil fuels and leave these dirty fuels in the ground. Oregon is leading the way by proposing legislation (supported by utilities!) to phase out coal-fired power in Oregon by 2030. Every state would be wise to support such goals. The U.S. Forest Service could encourage such efforts by opposing these coal lease modification that would sacrifice the natural resources in the Sunset Roadless Area and degrade the quality of recreational opportunities provided there for the benefit of bankrupted Arch Coal. With our collective voice, the Northern San Juan chapter of Great Old Broads for Wilderness strongly urges the US Forest Service to oppose these modifications. Thank you again for the opportunity to comment." | conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Cascade, Robyn #16-5 | Impact on Climate Change To further the contribution of greenhouse gases resulting from the extraction and burning of dirty coal is contrary to the Paris Climate Accord and Colorado's climate goals. Moreover, as you no doubt are aware, the Global Warming Potential (GWP) of methane is 86 times that of CO2 during a 20-year span. Though methane venting ensures greater safety, this practice is an enormous contributor to climate change. At a time when the planet is already experiencing a 0.8 degree Celsius rise in temperature and the impact of such a change is evident in significant weather pattern changes; in natural disasters ranging from floods to drought to superstorms to massive wildfires; and in the alteration of species diversity and ranges; it is short-sighed and irresponsible for our government and federal agencies to consider expanding lease sales anywhere (and especially in roadless areas!) The U.S. Forest Service's own economic analysis indicates that proposed mining in the Sunset Roadless Area and adjacent roadless lands and the burning of extracted coal will cause approximately $12 billion in damage to the environment and global economy due to climate pollution. In this time of climate change crisis, our country and its communities must look for alternatives to fossil fuels and leave these dirty fuels in the ground. Oregon is leading the way by proposing legislation (supported by utilities!) to phase out coal-fired power in Oregon by 2030. Every state would be wise to support such goals. The U.S. Forest Service could encourage such efforts by opposing these coal lease modifications that would sacrifice the natural resources in the Sunset Roadless Area and degrade the quality of recreational opportunities provided there. The | Paris Accord doesn't commit the U.S. to any particular course of action.<br><br>Climate effects are considered in Section 3.4 and other relevant sections. Recreation effects are included in Section 3.16.<br><br>2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | only benefactor would be bankrupted Arch Coal. I strongly urge the US Forest Service to oppose these modifications. Thank you for the opportunity to comment. | |
| Conservation Colorado #18-3 | PROTECTING ROADLESS LANDS INTEGRITY [CRR]<br><br>Beyond climate and energy impacts, opening these roadless lands to road construction for coal mining is also likely to have significant, damaging impacts on the ground across a 30-square-mile landscape of largely undisturbed roadless lands - the Sunset, Flatirons, and Pilot Knob Roadless Areas. These areas provide habitat for lynx and goshawk, black bear and elk, frogs, snakes, and deer; mining here will degrade soils and landscapes upstream of habitat for Colorado River cutthroat trout and endangered Colorado River fish.14 | CRR SFEIS at E-46 and E-49 addresses this comment.<br><br>These comments were obviously prepared on the CRR. Lease modification effects on lynx are addressed here in Section 3.10. Other resources are considered throughout Chapter 3. Water depletions as they affect Colorado River Fish were discussed in several locations.<br><br>The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |
| Zakrasek, John #433-1 | I am strongly opposed to any and all regulatory changes that enable coal mining or coal mining related activities within, next to, under or through national forests. | The proposed action is not to change coal regulations, therefore this issue is irrelevant to the decision. |
| Zakrasek, John #433-2 | Such activities damage these natural habitats, putting the wildlife at risk. They destroy the beauty of these last remaining wild areas. They enable private companies to profit from the sale of coal that, when burned, contributes to climate disruption. Climate disruption puts every living organism on the planet | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Climate effects are addressed in Section 3.4 and other relevant sections. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | at increasing risk from floods, drought, rising sea levels and the subsequent destabilization of nation states. | |
| Roth, Arlene #435-1 | The reason I stand against cutting roads through existing forests is that it is a no return situation. Cutting trees that have taken a generation to grow does permanent damage to our ecosystem. It is so wrong in so many ways! | Effects on vegetation are included in Section 3.9. |
| Falbo, Kathy #448-2 | It appears we have yet another case of this happening in our Colorado forest and parks, disregarding the impact it will have on our already pushed to the brink wildlife, not to mention the destruction of soil, minerals, trees and the environment that will be impacted by the coal industry going in and trashing pristine land" | Effects on the list of resources provided by commenter is included in Chapter 3. |
| Ramsey, Stephen #471-5 | The area surrounding the existing mine operations already show the degradation of the public commons as shown in the attached picture. It is a poor choice for a current roadless area to be degraded into something like what is shown on this google map satellite photo. | Effects on roadless are described in Sections 3.2 and 3.18. |
| Brown, Connie #68-1 | Coal mining in areas that are specifically intended to protect wildlife and remain as wilderness. That's a terrible idea. What's the point in even having wilderness if commercial leases are going to be granted? | None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. See also Section 3.18 and Appendix B. |
| Herbert, Joseph Thomas #269-3 | Drilling companies like to tout their reduced footprint, with fewer and smaller pads. These claims fail to account for the larger impact these pads have on an area: the web of roads that interconnects the pads. Fewer, smaller pads don't matter. Once the web of roads reaches a critical mass, it doesn't matter whether you have slightly fewer or slightly more pads. Once an area is devastated, it doesn't matter if you devastate it slightly less or slightly more. Devastation is devastation, period." | Effects of RFMP roads and pads are considered in Chapter 3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Misc | Numerous commenters believe federal lands should be used for renewable energy (wind, solar, geothermal, biomass, tidal, and other renewable alternative). | As applications are received for these items they too will be processed on federal lands. However, this issue does not meet the purpose and need for this action. |
| Dines, Anselm #128-2 | There are petroleum exploration and extraction areas that are legitimately suited for National Forest review to determine permitting. This area, Sunset Roadless Area in Colorado's Gunnison National Forest, is at the far end of the scale opposite the favourable conditions for review and permitting; the only difference between this area and a designated Wilderness Area is the official and legally protected 'Wilderness"" designation - as far as a permit review is concerned." | This is a coal project not oil and gas. None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. See also Appendix B. |
| Resley, Terri #297-1 | Please protect Colorado wilderness areas from any commercial development, especially mining." | None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. See also Appendix B.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available |
| Patriana, Zarah #1-14 | If this goes forward it only means one thing: someone is being bribed. | No further response required. |
| Patriana, Zarah #1-16 | I support arch coal and the forest service in building roads to further our coal mining industry. Coal is important to our local economy and manmade climate change is a myth! | No further response required. |
| Patriana, Zarah #1-23 | In this time of rapidly worsening, human-caused global warming, environmental degradation and species extinction, we simply cannot afford to mine for and burn coal, most especially at the sacrifice of irreplaceable roadless forest. You are charged with protecting our forests and the many species who call it home, not fattening the wallets of a handful of individuals at the head of Arch Coal. The tired old narrative of ""jobs versus the environment"" | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7. Climate effects are disclosed in Section 3.4 and other relevant sections. Beyond that alternative energy is outside the scope of this analysis. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | is a false dichotomy. Jobs can and will be created in the generation of clean, renewable energy. Rather than hand over our forests to be destroyed for shortterm private profit, Forest Service must do what is best for the long-term health and of our people, our biodiverse ecosystems, and our climate on which we depend for our survival." | The Colorado Roadless Rule has provisions for coal-related road construction and reconstruction. See Section 3.18 of the SDEIS. |
| Knodel, Marissa #14-1 | I am writing in opposition to the proposal to re-open the loophole to the Colorado Roadless Rule that would allow some our most pristine national forest to be turned into an energy sacrifice zone. The loophole only serves to benefit Arch Coal at the expense of our air, water, wildlife and climate. Letting Arch Coal expand what is already one of the dirtiest coal mines in our nation at the expense of thousands of acres of roadless forest and a safe climate future is unconscionable. The loophole would give Arch Coal access to 170 million tons of coal and result in nearly 500 million tons of carbon pollution, costing our economy $13 billion in environmental damages. The environmental and climate costs are way too high. | This comment refers to the CRR analysis not to this Lease Modification analysis herein, thus is irrelevant to this proposed action. |
| Braden, Scott #20-4 | I have submitted comments, but I am writing again because this issue is so important. Arch Coal is in bankruptcy. Are we really willing to let them make an even bigger mess that they will never clean up? This is nuts. Do not open roadless areas to mining by a bankrupt company." | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Reclamation activities are bonded by the State in Colorado.<br><br>See Section 3.18 in the SDEIS for a discussion on roadless areas. |
| Solomon, David #33-1 | Arch Coal recently filed for bankruptcy due to the downturn in coal mining. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Milliken, Lynne #69-1 | The closing of other coal mining and processing operations across the country is evidence of the awareness of the harmful effects of coal and the attendant mining operations. | No further response required. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Kinsel, Linda #77-3 | I realize that mining leases would bring in money, but so do the wildlife! Pretty much every time I drive on a popular mountain road, I'll see cars lined up on the side of the road and people everywhere with cameras, taking pictures of local wildlife. Those animals bring in lots of tourist dollars to the state, and it wouldn't surprise me if they brought in a lot more than coal mining would." | Socio-economics effects are addressed in Section 3.21 and recreation effects in Section 3.16. |
| Meckley, Shannon #93-1 | The mines near my home in western Colorado are shutting down. Coal is a bad thing of the past. People can find jobs in other areas. It's counterproductive to allow coal companies any use of antiquated permits. Ours lands are valuable as they are; they are our heritage. | Coal is still used to power a large percentage of the nation's and globe's electrical generation facilities. The conversion away from coal is not a quick process. Many coal miners have lost their high paying jobs in recent years particularly in the North Fork Valley. |
| Miller, Jaclyn #101-1 | With the increase in global awareness of the costs of unabated climate change and the commitment of the United States in taking a leadership role, it is important that we invest in alternate energy sources. Fossil fuel producers have the infrastructure and resources to lead this evolution. It makes less and less sense now to finance new coal operations that will incur exorbitant costs over the long-term. Please do not open the Gunnison National Forest to coal mining. | The Gunnison National Forest has hosted coal mining for the past 100 years. The proposed action would add lands to existing leases being developed by the existing West Elk Mine. The Forest Plan allows for mineral leasing on these lands. See Section 1.7 of the SDEIS. Many areas of public land are also available for renewable resource development and many mines located on public and private lands provide the mineral resources necessary for renewable energy technology. Energy policy is outside the scope of this analysis. |
| Kinsel, Linda #77-1 | Please don't allow coal mining in Colorado's wilderness areas. | None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. See also Appendix B. |
| Seda, Joe #127-1 | Arch closes mines in Wyoming, why should we be stupid enough to allow them to do the same here in Colorado. | We are not analyzing a proposal to close mines. No further response required. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Zingher, Judith #342-2 | Money: publicly held fossil fuel companies have lost $2,300,000,000,000 - that's 2.3 trillion dollars - since 2014. | No further response required. |
| Richardson, William #353-2 | Coal is on its way out. Wind, Solar, and other renewable energy sources are becoming cheaper and more easily implemented. Many coal fired plants have already been cancelled all around the U.S. Natural gas is better and may be useful as a bridge fuel but it, too, should be phased out in the long run. | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. Considering renewable energy sources would not meet the purpose and need of this action. |
| Pullen, Brian #360-4 | Furthermore, the coal industry is rapidly losing its battle against renewables (including the recently bankrupt Arch Coal) thus showing that this project will not enhance long-term success for the state of Colorado. From a financial side, this project will likely lead to billions of dollars in damage to the surrounding environment and deeply affect our economy" | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Reclamation bonding is required in the State of Colorado. No further response required. |
| Dennis, John #375-2 | Even if we accept a transition period in which we continue to rely on fossil fuels we currently have a surplus of natural gas, a far cleaner alternative, hence there is no need to dig more coal. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. The Forest Service and BLM are required by law and regulations to respond to application to lease federal coal resources. See Section 1.7 of the SDEIS. |
| Reaven, Aaron #387-3 | Thirdly, I see no merit or value in granting lease modifications that would benefit a coal company that has already filed for bankruptcy. That suggests to me that on their way out of existence as a business, Arch Coal could use the lease modifications to their financial advantage in some manner of financial manipulation. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016 |
| Castellino, Robert #399-2 | Plus much of our coal to run obsolete plants is imported from places like Wyoming and exported as far away as Florida. There is no need to desecrate the natural habitat that is vital to Colorado's clean eco-tourism. Nor to power an industry and businesses like Archer Coal that are near bankruptcy. Retrain the coal workers to install wind and solar. | U.S. coal is used domestically and exported to international markets. Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Retraining coal miners is outside the scope of this analysis.<br><br>Effects on various resources are included in Chapter 3. |
| Castellino, Robert #399-4 | There is no need to rake further havoc on Colorado's natural environment and wild lands to support an archaic and outdated industry on the verge of collapse. | The FS and BLM are required by law and regulation to respond to applications to lease federal coal resources. See Section 1.7 of the SDEIS.<br><br>Effects on various resources are included in Chapter 3 |
| Robelia, Carol #405-2 | Proposed coal lease modifications would pave the way for Arch Coal, the second-largest coal producer in the US (which recently filed for bankruptcy), to build more roads, drill pads, and climate-damaging methane vents in the Sunset Roadless Area in the mountains of Colorado. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Effects on various resources are included in Chapter 3 |
| Numerous commenters | The Sunset Roadless Area's wildlife and recreation values are more important than bulldozing the landscape to access dirty coal. | Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act.<br><br>Effects on recreation and wildlife are addressed in Chapter 3 |
| Doyle, Brian #418-2 | We are in a time where this project is immediate negative return on investment. | Without further clarification, we don't understand the intended scope and scale of investment and return. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| L'Azou, Gregory #436-3 | Allowing Arch Coal to expand mining and release millions of tons of pollution would not only be a major step backward, but could cost up to $13 billion in damages to our global environment and economy. We can't let short-term corporate gain trump the long-term health of our climate and our communities. | Commenter seems to be combining comments on the SDEIS for CRR and this leasing analysis.<br><br>Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. See Section 1.7 of the SDEIS.<br><br>Effects on climate is addressed in Section 3.4 and other relevant sections and on local communities is included in Section 3.21. |
| Eaton, Scott #469-3 | Please do not permit this to move forward, as it fails on its face to be an idea that is net positive for the environment or event the economy (as we know that in this region of Colorado, the leisure economy is a bigger and longer term will continue to be bigger contributor to local GDP)." | No further response required. |
| Ramsey, Stephen #471-4 | The public trust should be that the land will be properly protected rather then opened up for the creation of profits by a failing company engaged in an increasingly harmful industry. | Mineral activity is acknowledged as a use of these lands in the GMUG Forest Plan and Uncompahgre RMP. See Section 1.7 of the SDEIS.<br><br>Further, coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Lease stipulations in Tables 2-1 and 2-2 will are designed to protect Forest Resources.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Friehauf, Mike #137-1 | NO MORE DAMN COAL!!!!!!!!! DO NOT tear up our forests just to put money in the pockets of the coal companies while they destroy our lands, pollute our waters and air, and then walk away from the mess they make when it all goes wrong. | The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy. Coal mining is subject to the SMCRA, which |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | requires reclamation bonding. See Section 1.7 of the SDEIS. |
| Anon, Anon #144-4 | I urge you to: * Protect the roadless area! Ensure that no roads are constructed in the Sunset Roadless Area. Its wildlife and recreation values are more important than bulldozing for dirty coal. | The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy.<br><br>Wildlife and recreation effects are addressed in Chapter 3 of the SDEIS. Roadless is addressed in Section 3.18. |
| Bershenyi, Stephen #146-1 | When Peabody coal and Koch industries have decided to close their coal mining operations in Western Colorado, why in the world would the US Forest Service even think of opening pristine roadless National Forest lands to mining for last century's dirtiest most polluting energy source | These lease modifications are adjacent to the West Elk Mine operated.by MCC. The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy. The NFS lands included are managed for multiple uses for which mineral development is a part in compliance with federal law, regulation and policy. The FS and BLM are required by law and regulation to respond to applications to lease federal coal resources. |
| Wilson, Terri #158-2 | Wildlife and tourism will suffer greatly and nature is one of the biggest reasons people love living in and visiting Colorado. | Wildlife effects are addressed in various sections in Chapter 3 and recreation effects in Section 3.16. |
| Gershten, MD, Mitchell #170-2 | Furthermore, Arch is struggling financially in attempting to address the new realities. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| DeSisto, Kevin #176-2 | Today, as coal companies go out of business to avoid site clean-up is a clear indication we will suffer at their method of profit" | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | Reclamation bonding is required to ensure that disturbed areas are reclaimed.. |
| Szabelski, Larry #212-2 | Coal companies around the country are failing due to lack of demand | While this statement is true, coal demand and prices have increased in recent months. |
| Fletcher, Paddy #233-1 | Colorado's forests are part of what draw visitors to our state. How long will people come to Colorado if you allow coal companies to put in roads that traffic large, smelly trucks? | The Gunnison National Forest has hosted coal mining for the past 100 years. Tourism has increased despite this. Effects to transportation and recreation are discussed in SDEIS Chapter 3. |
| Hastings, Steven #300-2 | Beyond that, the prospective lessee, Arch Coal, has filed for bankruptcy and is laying off workers, most recently several hundred at its mines in Wyoming. The reason given for this is reduced demand for coal. It is clear that no new mines are needed and it makes no sense to bulldoze this area for dirty coal. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. West Elk has also laid off many employees in recent years. This is not a new mine but adding reserves to an existing one. Socio-economic effects are discussed in Chapter 3 of the SDEIS. |
| Krasenics, Kathleen #328-2 | With all of the work now in renewables and natural gas being at all time lows. It's utterly insane to destroy our natural heritage for a fuel that is way too costly! It's costs more to extract coal, to transport coal and to burn coal and the negative impacts on health and climate are exponential. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Climate effects are addressed in Section 3.4 and other relevant sections. |
| Misc Anon Wildearth Guardians #479-2 | This is terrible proposal is made worse by the fact that Arch Coal is bankrupt. It is senseless to use our coal, our money, and our public lands to bail out this dying company. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Reynolds, Alexandra #504-3 | Allowing Arch Coal to expand mining and release millions of tons of pollutants would not only be continuing down this self-destructive path, but could cost up to $13 billion in damages to our global environment and economy. | Climate effects are described in Section 3.4 and other relevant sections; socioeconomic effects are described in 3.21. |
| Rice, Shirley #1148-5 | The taxpayers will bail out Arch Coal, or the next mining company that buys out Arch. It is unsustainable on so many levels. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Krucoff, Rachel #1374-3 | It is senseless to use our coal, our money, and our public lands to bail out this dying company. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| MD, Mitchell #1479-2 | End Federal considerations of this bankrupt company trying to hang on by its chewed up fingernails. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Knodel, Marissa #9702-2 | The mission of the U.S. Forest Service is to ""sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations."" Nowhere in that mission does it say the U.S. Forest | Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal leasing and mining on federal |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Service is responsible to protect the profits of coal companies at the expense of national forests that belong to the American people. To fulfill your mission, the only place for dirty sources of energy like coal is in the ground. | lands, including national forest lands, is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act and the Mining and Mineral Policy Act of 1970 |
| New Progressive Alliance #9733-2 | Finally consider that the United States signed the United Nations Agreement COP21 in 2015. We agreed that ""Each party shall provide.a national inventory report of anthropogenic emissions by sources and removals.of greenhouse gases. (Article 13, Paragraph 7) this means reporting so will be compared with other counties. Take into account the fossil fuels used by trains to Washington and ships sailing to China. Consider also that coal produces more greenhouse gases that any other form of energy." | You are correct the Paris Accord required reporting; it did not, however, prescribe any particular course of action. |
| New Progressive Alliance #9733-3 | III. Arch Coal is based upon a bad business plan unlikely to succeed. Arch Coal has declared bankruptcy. China-the proposed buyer of the coal-faces a large oversupply causing a suspension of any new coal mines. Arch Coal increased CIO and executive pay so much that the SEC noticed. Their CEO pay went from 3.9 million to 4.3 million in 2013 and 7.3 million in 2014. Why increased pay for a failing company> Asians are not investing heavily in coal plants. The price of coal has dropped from 132 to 43 dollars. Coal companies have a long history of leaving behind retirement pay, jobs, and devastated landscapes after fleeing with obscene profits. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Reclamation bonding is required in the State of Colorado for coal mining. |
| Jones, Debra #1611-2 | This is not the way to assist a bankrupt company (Arch Coal) | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. The Forest Service and BLM are required by law and regulations to respond to applications to lease federal coal resources. |
| Mitchell, Cheryl #1722-6 | The Forest Service and the Bureau of Land Management are clearly doing the bidding of private interests. | The Forest Service and BLM are required by law and regulations to respond to applications to lease federal coal resources. Coal mining on federal lands is directed under the laws and regulations |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | cited in Section 1.7 of this SEIS; federal policy is to make these resources available. |
| Mitchell, Cheryl #1722-8 | The government should not be in the business of bailing out Arch Coal or any other bankrupt coal company, nor should the government act as a shill for private interests. | The Forest Service and BLM are required by law and regulations to respond to applications to lease federal coal resources. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this SEIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Form letters | It gets worse. Arch Coal is bankrupt. At the end of March, Arch executives laid off hundreds of its workers. The future is bleak for the industry, but for Arch Coal, the end is near. The latest proposal would sell more than 10 million tons of our publicly owned coal to Arch, effectively using our coal to bail out this dying company. And while Arch might profit, we get stuck with the bill of more carbon pollution and more global warming. I've had enough of bailing out the coal industry. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Climate effects are described in Section 3.4 and other relevant sections. |
| Kreuser, Deborah #2717-2 | Thus, this modification in U.S. Forest Service protocol is not in the American Public's long term interests as the costs to our environment will outweigh any possible benefits to our economy. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Effects various resources and climate are described in Chapter 3.<br><br>In accordance with MLA 30 U.S.C. § 201(a)(1) "The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been classified for coal leasing into leasing tracts of such |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | size as he finds appropriate and in the public interest and which will permit the mining of all coal which can be economically extracted" |
| Adam, Margaret #6338-5 | It is unacceptable to lay waste to our public lands, create additional greenhouse gasses, and give away public resources at fire-sale prices in order to bail out a bankrupt and incompetent private company." | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Rental rates and standard royalty rates are matter of policy are beyond the scope of this analysis.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Climate effects are described in Section 3.4 and other relevant sections |
| Lynch, Janet #8056-5 | This frankly insane proposal is made far worse by the fact that Arch Coal is a poorly run, bankrupt whose directors have failed to grasp that the future of energy is not coal, but rather sustainable, carbon-neutral fuels. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Lynch, Janet #8056-6 | It is outrageous, senseless, and frankly criminal to abuse our coal, our money, and our public lands in this deeply irresponsible manner to bail out this poorly-run dinosaur of a dying company. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. |
| Lynch, Janet #8056-16 | The Forest Service and the Bureau of Land Management must not cannot - be in the business of bailing out Arch Coal or any other bankrupt coal company whose directors have failed to responsibly plan for the energy markets of the 21st century. | The Forest Service and BLM are required by law and regulations to respond to applications to lease federal coal resources. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this SEIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Benson, Jody #8374-2 | Offering National Forest land to Arch Coal allows Arch to decimate a forest that should be preserved for more diverse development (including protection for use for future generations) for a product that is, by popular demand, obsolete. American power plants that it supports are being obsoleted. | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. |
| Benson, Jody #8374-4 | And in fact, coal isn't cheap energy anymore even when the government lets Arch have the land for cheap. Even China, to which this coal will be exported, is trying to turn to renewables. Americans don't want to sacrifice our forests for exporting coal to China. The Forest Service and the Bureau of Land Management should not be in the business of bailing out Arch Coal or any other bankrupt coal company. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. Rental rates and standard royalty rates are matter of policy are beyond the scope of this analysis. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Earthjustice #8419-1 | Adopt the no action alternative, because the proposed action will degrade sensitive roadless lands and worsen climate change, hobble renewable energy generation, and result in millions if not billions of dollars of damage to the global environment | The Responsible officials will make their decisions based on analysis in Chapter 3 of the SDEIS, including that for the No Action alternative. |
| Weiskopf, David #8422-4 | To subsidize the extraction of even more coal for a company as irresponsible as Arch Coal and to let them bulldoze one of our few remaining precious roadless wilderness areas would be a betrayal of the public trust. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. |
| Moore, Virgil #8503-1 | Urge you to abandon your plans to approve federal lease modifications COC-1362 and COC-67232. If sold to Arch Coal, these leases would open the door for 10.1 million tons of new coal mining, which stands to unleash nearly 20 million tons of carbon pollution. The mining would also despoil thousands of acres of our undeveloped National Forest lands. This is terrible proposal is made worse by the fact that Arch Coal is bankrupt. It is senseless to use our coal, our money, and our public lands to bail out this dying company. | Effects on climate are included in Section 3.4 and other relevant sections. Effects on other resources are disclosed in Chapter 3.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Moore, Virgil #8503-2 | It's time to lead our nation away from coal and toward clean energy, vibrant public lands, and sustainable economies. Your proposal would not only sacrifice our public lands and our climate, it would set back efforts to transition western Colorado and the nation away from coal. The Forest Service and the Bureau of Land Management should not be in the business of bailing out Arch Coal or any other bankrupt coal company. Reject the proposed lease modifications, protect our forests, and safeguard our climate. | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Effects on climate are included in Section 3.4 and other relevant sections. Effects on other resources are disclosed in Chapter 3. |
| Whitman, Heather (Mount Gunnison | I provide the following comments on behalf of approximately 130 shareholders of Mount Gunnison Fuel Company (""MGFC""), a company which holds mineral rights to 3600 acres of private lands patented in 1921 by the U.S. Government | No further response required. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Fuel Company) #8959-2 | that are contiguous to lands encompassed in Mountain Coal Company's federal leases COC-1362 and COC-67232 as well as their proposed lease modifications. We ask that Alternative 3 be selected, consent to modify leases COC-1362 and COC-67232 under the Colorado Roadless Rule framework with stipulations to protect non-mineral resources identified in the parent leases. This would add 800 and 922 acres to the identified lease, ensure that compliant and super-complaint coal reserves be recovered rather than by-passed, provide royalty payments for federal coal recovered, and extend local mining. It would also accommodate the mining of MGFC's 977 acres of adjacent coal land. | |
| Brana, Andrew #9098-2 | Coal is a fading energy source being replaced by renewables and less damaging carbon-based sources. Expanded coal production nowadays doesn't make any sense at all, especially at the expense of unspoiled wilderness that will benefit us far into the future. | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. |
| Medoff, Adam #9176-2 | However, I wanted to add a short pitch with a more personal tone, given both my work in the energy industry. Specifically, I focus on helping to bring distributed renewable energy to scale in this country and I can tell you with certainty that coal is dead in the United States. Just today, Peabody Coal, one of the largest coal companies in the country, filed for Chapter 11 bankruptcy. Coal simply doesn't pencil out economically at this point. it is more expensive than wind, natural gas, hydro, and yes, solar. Look at the latest levelized cost of energy reports from Lazard; coal is a legacy fuel that has no place in the future of America's energy mix. | 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>The West Elk Mine is a subsidiary of Arch Coal. |
| Webster, Jason #9309-2 | Coal mining this area would do tremendous short-term damage, but its use as a fuel has a far greater long-term cost to society and I hope you account for this in your examination of any lease proposals." | Effects on climate are included in Section 3.4 and other relevant sections. Effects on other resources are disclosed in Chapter 3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Trousdale, James #9369-4 | Allowing Arch Coal to expand mining and release millions of tons of carbon pollution into the atmosphere would not only be a major step backward, but will harm our global environment and economy. We can't let short-term corporate gain trump the long-term health of our climate and our communities. | Effects on climate are included in Section 3.4 and other relevant sections. Effects on other resources are disclosed in Chapter 3. |
| Carroll, Lingren #9509-2 | "How is this even a question? Mining like this destroys the land, permanently! Allowing a private company to destroy the land used and enjoyed by the public should be illegal. It's a disgrace that this would even be considered. I understand that the world runs on natural resources, but I work in the energy industry as an unbiased analyst collecting and disseminating data and information about the various facets of the industry, and I assure you, the coal industry is collapsing. It is collapsing because there is too much coal and the commodity price cannot find support at a breakeven price. Mining this coal is not necessary for the needs of this country. It would only be necessary for this company to make money in the very short term. It's sickening that allowing this area to be destroyed for that reason would even be considered. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. |
| Morgan, Rodney #9544-3 | Arch Coal is in bankruptcy for a reason. It represents a failed business model in an industry that is being increasingly compromised. I urge you not allow Arch to propagate its failed business plans and practices on an area such as the Sunset Wilderness area. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>None of the proposed activities occur in wilderness areas, the lease modifications occur in roadless areas which area not intended to be managed as wilderness areas nor are they proposed for wilderness designation. |
| Keefe, Chris #9617-3 | 3) The coal industry is on poor financial ground, often declaring bankruptcy, leaving tax payers with the cleanup costs. It's time to stop subsidizing fossil fuel period, especially with public money and land. | Coal demand and prices have increased in recent months. Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. Reclamation activities are bonded in Colorado. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Any policy beyond this is outside the scope of this lease specific analysis. |
| New Progressive Alliance #9733-3 | III. Arch Coal is based upon a bad business plan unlikely to succeed. Arch Coal has declared bankruptcy. China-the proposed buyer of the coal-faces a large oversupply causing a suspension of any new coal mines. Arch Coal increased CIO and executive pay so much that the SEC noticed. Their CEO pay went from 3.9 million to 4.3 million in 2013 and 7.3 million in 2014. Why increased pay for a failing company> Asians are not investing heavily in coal plants. The price of coal has dropped from 132 to 43 dollars. Coal companies have a long history of leaving behind retirement pay, jobs, and devastated landscapes after fleeing with obscene profits. | Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040<br><br>Reclamation bonding is required in Colorado. |
| Earthjustice #9738-1 | While the Forest Service's [CRR] supplemental draft environmental impact statement (""SDEIS"") estimated the volume of methane that would be released during coal mining as a result of opening 20,000 acres of land to coal mine road construction, the agency failed to account for the environmental damage that additional climate pollution would cause, despite the availability of the social cost of methane metric made available and used by the EPA… Our January 15 letter noted that SDEIS's assertion that there are ""no standard or accepted measures"" for analyzing those costs is false because EPA researchers developed a ""social cost of methane"" metric, using the same methodology as the Interagency Working Group's social cost of carbon.4 Our letter also noted that EPA has used that social cost of methane metric in the Regulatory Impact Analysis for the proposed New Source Performance Standard for methane from oil and gas production.5 Since January 15, new evidence demonstrates that the Forest Service must use the social cost of methane to disclose the coal mine exception's impacts … BLM also discussed an alternative approach to evaluating the social cost of methane—a process that involves using the global warming potential (GWP) to convert emissions to CO2 equivalents.8 The agency ultimately rejected the GWP approach in favor of the social cost of methane metric, stating ""[t]he | This comment was submitted oon the CRR and leasing analysis. CRR SFEIS addressed these comments at 2, 28, 126-128, C-25, and E67-68.<br><br>Oil and Gas regulations do not apply to coal mining.<br><br>See Section 3.4 for discussion regarding social cost of greenhouse gases. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | GWP is not ideally suited for use in benefit-cost analyses to approximate the social cost of non-CO2 GHGs because it ignores important nonlinear relationships beyond radiative forcing in the chain between emissions and damages.""9 BLM is a cooperating agency in the preparation of the coal mine exception EIS. It would be arbitrary and capricious for the Forest Service and BLM to fail to disclose the social cost of methane in evaluating the economic costs and benefits of additional methane pollution from the coal mine exception rulemaking while BLM simultaneously discloses the social cost of methane and relies on the figures generated by using that metric to justify the rulemaking to limit methane waste from natural gas operations." | |
| HCCA #9742-5 | The Forest Service shouldn't allow Arch Coal to reap profits while adding huge amounts of climate pollution to our atmosphere, all at the expense of wild, road less forests and threatened wildlife. The Sunset Roadless Area's wildlife and recreation values are more important than bulldozing the landscape to access dirty coal. | Effects on various resources from the lease modifications are described in Chapter 3. |
| Denny, Gerilyn #9753-1 | I am writing to oppose any action that provides the opportunity for Arch Coal to profit financially from extending coal mining projects in Gunnison County, Colorado. I believe that allowing projects like this to move forward is against the long term best interests of people animals and the planet. The science is clear that we should leave all coal in the ground going forward and invest all future monies into clean energy projects. Please don't keep us stuck in the dirty status quo of allowing future development in coal mining projects." | No further response required |
| Patriana, Zarah #1-29 | It is an atrocity that coal mining can strip mountains and the environment, pollute water sources and the product is contributing to global warming." | The lease modifications would be to an underground coal mine. Effects on various resources are described in Chapter 3. |
| Patriana, Zarah #1-33 | Just think of all of the animal suffering from a road project. Not to mention, there will also be soil erosion, pollution from vehicles, mining run-off into the waterways and ground and permanent damage to our forest ecosystems." | Effects on various resources are described in Chapter 3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Hernandez, Maria Celia #4-3 | Allowing coal mine expansion there will damage a pristine area now enjoyed by hunters and hikers, and will worsen climate change--all to benefit one of the dirtiest forms of power and the now-bankrupt Arch Coal." | Effects on wildlife, recreation and climate change are all addressed in Chapter 3. Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016. |
| Steitz, Jim #5-3 | The Forest Service's own analysis showed a total social cost, of transmuting this coal into carbon dioxide, of $12 billion. Adding further insult to injury, a major surface occupancy would be the surface wells required to vent methane, a hyperactive global warming pollutant which the Department of Interior is currently developing regulations to control, and which is also the object of a joint methane reduction accord between the US and Canada announced last week. This dwarfs any economic value of the coal, and must compel the FS to reject these leases, even before the direct ecological destruction to the 5,000 acres of the Sunset Roadless Area is considered. The construction of 6 miles of road and nearly 50 drilling pads would lacerate the rich biological tapestry of this ecosystem, which constitutes some of the finest habitat for iconic Rocky Mountain wildlife under FS jurisdiction, including Lynx and Colorado River cutthroat trout | See Section 3.4 for discussion of SCC and Social Cost of Methane.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Effects on various resources are described in Chapter 3. Effects on lynx are included in Section 3.10.<br><br>The lease modifications would not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is upstream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |
| Braden, Scott #20-2 | I oppose the Forest Service proposal to reopen the coal mining loophole in the Colorado Roadless Rule. Colorado has worked hard to reduce its carbon impacts, especially with our 2014 Methane Rule, which applies to oil and gas operators. It is a cornerstone of our state's climate strategy. It is irresponsible and damaging to our state's climate goals for the forest service to approve this exemption that would allow Arch Coal to vent massive quantities of methane | This comment was submitted on the CRR and on this SEIS.<br><br>Oil and gas regulations do not apply to coal mining. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | into the atmosphere, a particularly potent greenhouse gas. Creating such a huge new source of methane also runs counter to the Obama Administration's goals of reducing the United States' contributions of greenhouse gases, as well as the spirit of the 196-nation Paris international climate agreement. Please do the right thing for Colorado and for our climate and deny this expansion! | This is not a new mine it is an existing mine whose operations would be extended at the same permitted levels for a couple more years.<br><br>Paris Accord did not specify any particular course of action. President Obama's policies are not those of the U.S. government at present.<br><br>Climate effects and emissions are described in Section 3.4. |
| Braden, Scott #20-3 | Methane gas and coal mines too often go together. Methane threatens the environment into which it must be vented. Because of the complexities of maintaining adequate venting and because mine operators too often take shortcuts, methane also threatens the lives of miners through suffocation or explosion." | Climate, emissions and miner safety are addressed in Section 3.4 and other relevant sections |
| Braden, Scott #20-5 | Is there no way to vent and capture the methane for use as a power source? This could be a requirement for expanding the mine | Methane mitigation measures are considered in lease stipulations in Tables 2-1 and 2-2, alternatives not brought forward in Section 2.3 and ones that BLM might adopt in Section 3.3. |
| Braden, Scott #20-6 | Colorado -- and the entire nation -- needs to be keeping methane and other greenhouse gases out of the atmosphere, not adding more. Coal mines should be no exception. | Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Monahan, John #62-2 | The deleterious effects to wildlife, water, and air quality--let alone the absurdity of mining more carbon-producing coal--would appear obvious. | Effects to wildlife, water and air and climate are addressed in Chapter 3. |
| Harvey, Curt #94-2 | I am particularly concerned with the impacts to wildlife, water quality and additional impacts foreseen and unforeseen by this unacceptable and limited value land use application. It is not in the best interest of the landscape or the public who collectively own and wish appropriate stewardship of their National forests and PUBLIC land. | Effects to wildlife, water and air and climate are addressed in Chapter 3.<br><br>Until such time as the Forest Service is no longer a multiple use agency, competing interests for land uses will occur. Coal mining is authorized by acts |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. |
| Cook, Donna #95-4 | The Forest Service must stand up to all greedy industries that threaten to destroy the existing wildlife, pollute the air with methane and other mining related pollutants and poison our trout streams. | Effects on these resources are disclosed in Chpater 3. |
| Beck, Jody #106-1 | There is no excuse for cutting forests, and certainly not the mining of more coal. It is not in the public's interest to continue destroying the resources which actually reduce atmospheric carbon in order to dig for more coal which increases the pollution loading of our planet. | Effects to vegetation, air and climate are addressed in Chapter 3.<br><br>Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. |
| Reno, Danica #108-3 | Additionally, the probability of significant degradation in the quality of air and water in the area is high, and would have negative impacts on the local fish and mammal populations as well as releasing additional greenhouse gasses into the atmosphere at a time when we should be working to mitigate climate change. | Effects to wildlife, water and air and climate are addressed in Chapter 3. |
| Slabe, Thomas #122-2 | Those are the people's lands and they should not be used for financial gain for an industry that is destroying the planet and that leaves sacrifice zones that they are unable to fully restore. Extracting coal ruins water resources, diminishes ecosystem services, and pollutes our air. Burning coal produces acid rain and releases mercury, a persistent toxin, into our environment that is bioaccumulated and biomagnified, contaminating fishery resources." | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Effects on various resources are described in Chapter 3. |
| Rowe, Phillip #172-2 | Heavy machinery, noise, roads in these areas will ruin them for flora and fauna, as well as for people wanting to enjoy the last preserves of America's wilderness. Keep pristine wilderness areas pristine - do NOT allow leases for coal mining in these areas. | The lease modifications do not contain any wilderness areas or areas proposed for wilderness designation. Effects on various resources are described in Chapter 3. |
| Welch, Lynn #213-2 | These areas are absolutely critical habitat for plant and animal species. Trees and forests play a vital role in regulating our atmosphere and climate. The wildlife species within these forests actually maintain the health of the forests by maintaining a balance that promotes the growth of vegetation, balance in | Effects on vegetation and wildlife are disclosed in various sections in Chapter 3. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | the food web, seed dispersal, and many other important functions that we do not directly see. | |
| Welch, Lynn #213-3 | The value of these forests for the overall unseen benefits to us and our atmosphere, and the health of our planet, far outweigh any short term gain to the fossil fuel industry's bottom line. | Coal mining is authorized by acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act and others as disclosed in Section 1.7. Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Goldman, Alvin #215-1 | Leasing federal land for extraction of coal threatens air and water quality, natural habitat, and superior, non destructive recreational uses. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>Effects are disclosed on air (Section 3.4), water (Section 3.8), habitats for various species (various sections in Chapter 3) and recreation (3.30). |
| Montana, Melissa #235-2 | Starting new coal mines at this time is a huge mistake. Colorado is dependent on the tourists who come to enjoy the clean air and pristine mountains. We do not want to go back to the time of filthy factories and mines; the damage from these polluting industries is still visible in many areas. Mining scars and slag heaps are ugly reminders of the desire to put profits before people, wildlife, and the environment. Please do not allow these mines to go forward. The world is changing, and we need to adapt, and not waste time propping up outdated, polluting industries." | This is not a new coal mine. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. |
| Buckert, Kevin #239-2 | All public lands should be saved now, people are not the priority, animals and their habitat have become much more important now, since it has become a fight with our own government who is supposed to do the right things, but obviously don't because of big money interests, which at this point should be totally ignored, people should learn to do the right things irregardless of money. When a government ignores what is right, it is time for the people to take back the control, and put big money and the government in its place. People need to do what is right, not wrong. The government thinks it is bigger than the people, and they cater to big money, we have to put a stop to it, like yesterday." | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Glaeske, Lynne #257-2 | Not only does this threaten damage to wildlife habitat and recreation areas, but it contributes to pollution on a regional, national and global scale at a time when we should be trying to mitigate pollution and the effects of climate change. | Effects on wildlife and habitat are addressed in various sections in Chapter 3. Effects on recreation are addressed in Section 3.16. Effects of climate change is disclosed in Section 3.4 and other relevant sections. |
| McClurg, Joel #314-4 | Please consider our wildlife. DO NOT allow coal companies to bulldoze our land and pollute our water. Thank you. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Effects on wildlife and habitat are addressed in various sections in Chapter 3. Effects on water are addressed in Section 3.8. |
| Silvera, Megan #357-3 | To destroy the habitats, food source and water source not just to animals but also residents in the area is beyond comprehension. | Effects on the various resources stated are included in Chapter 3. |
| Pullen, Brian #360-2 | First off, this project will result in a systemic destruction of natural ecosystems through land-use change, thus leading to deforestation. Furthermore, deforestation efforts will further exacerbate biodiversity loss and habitat loss of native plants and wildlife, such as the already threatened Canadian lynx and cutthroat trout. | Areas disturbed for exploration or MWD development will be reclaimed when no longer needed (~2-3 years). Habitats might altered due to localized disturbances. Effects in various species and habitat are disclosed in Chapter 3. Canada lynx are addressed in Section 3.10.<br><br>The lease modifications would also not impact Colorado River Cutthroat Trout (CRCT) populations. Nearest CRCT population is up stream of the lease modifications and approximately 1/3-3/4 mile away in Hoodoo Creek so no direct effects would occur from subsidence or MDW construction. Any sediment if, generated by the lease modifications, would enter East Fork of Minnesota Creek from tributaries below Beaver Reservoir, the dam on which is a barricade to any fish movement so there would be no indirect effects on CRCT if they came down that far. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Oakes, Dave #378-1 | I am writing to share my concern for continued coal mining as a fuel source for electricity production and heating in the U.S. Coal causes serious air pollution, mercury contamination, sever health effects in coal workers and the general public, and it is a major contributor to greenhouse gas emissions causing climate change. | Effects of climate change, combustions and emissions are disclosed in Section 3.4.<br><br>Coal use is still a large portion of energy markets worldwide. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040. Energy policy is beyond the scope of this analysis. |
| Sholtis, Amy #388-4 | Coal is the reason we have climate change; let's leave it in the ground. | Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Stanley, Sandra #396-2 | Coal is one of the worst when it comes to carbon pollution. | Climate and emissions are addressed in Section 3.4 and other relevant sections. |
| Patriana, Zarah #1-5 | By paving the way for more coal mining, this loophole will undermine President Obama Administration's commitment to attacking climate change. | Climate and emissions are addressed in Section 3.4 and other relevant sections. |
| Patriana, Zarah #1-31 | How many millions of wilderness do we have to sacrifice for someone else's greed? | There is no wilderness within the proposed lease modifications. |
| Patriana, Zarah #1-35 | There is no way we should endorse inclusion into roadless area for COAL! Coal is the last extraction you should be considering, especially in our very fragile and shrinking wilderness areas. | There is no wilderness within the proposed lease modifications. The Colorado Roadless Rule contains provisions for coal-related road construction. See Section 3.18 of this SEIS. |
| Patriana, Zarah #1-51 | We must have a transparent accounting of carbon pollution and stop allowing the destruction of our land, water and air." | GHG transparency accounting is outside the scope of this EIS. Methane release by the West Elk Mine is reported to EPA. |
| Patriana, Zarah #1-53 | How can this specific action still be pursued in disregard to the U.S. District Court ruling? | The court ruling reversed decisions based upon the judge's analysis that insufficient analysis occurred. This EIS addresses the court deficiencies. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Patriana, Zarah #1-56 | The Sunset Trail agreement allowed the Colorado Roadless Rule to go into effect. If the then powerful coal companies had not been granted an exclusion they would have stopped the Roadless Rule from taking effect. Now King Coal is dead and the Forest Service needs to say no to the destruction of thousands of acres of pristine wildlands. I was one of the developers of the original Sunset Trail agreement. It was necessary at the time to save the Roadless Rule. It should never be allowed to be used again. | The CRR NFCMA exception has been reinstated as of April 17, 2017.<br><br>The CRR was a compromise in Colorado between many competing interests for NFS lands, coal mining was but one of several factors considered that was important to the economy of the state. CRR resulted in the inclusion of lands beyond the acres identified 2001 RACR. |
| Patriana, Zarah #1-60 | These lands belong to the people. You cannot sell their resources to the highest bidder. These lands are entrusted to us for the generations who follow us seeking wilderness for its great beauty. | Coal mining on federal lands is directed under the laws and regulations cited in Sections 1.7 and 1.8 of this EIS; federal policy and Forest Plan and LRMP all make these resources available.<br><br>There is no wilderness within the proposed lease modifications; there is however roadless areas which permit coal mining. |
| Patriana, Zarah #1-63 | You[r] job is to manage and protect our natural resources for the sustainable use and enjoyment of future generations. Not to sell them to the highest bidder. The short term economic gain of energy development is not worth destroying beautiful wildlife habitat and simultaneously undercutting an international effort to cut down on carbon dioxide emissions. This is not what US citizens want or need. This is not coherent with the US Forest Service's mission ""to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations. | Coal mining on federal lands is directed under the laws and regulations cited in Sections 1.7 and 1.8 of this EIS; federal policy and Forest Plan and LRMP all make these resources available. |
| Patriana, Zarah #1-65 | Furthermore, I am appalled and shocked that the Forest Service would make such an environmentally significant and harmful move just for private profit. There's so much more to the value of public lands then just the minerals or fuel beneath in. This action will harm multiple areas of natural resource and recreation values for decades to come. All values that the Forest Service is suppose[d] to protect and enhance. | Federal coal resources are managed acts of Congress such as the Mineral Leasing Act, the 2005 Energy Policy Act. Recreation effects are disclosed in Section 3.16. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Patriana, Zarah #1-67 | In addition, this agency is ignoring the direction of the Obama Administration to fight the threat of climate change. Coal production and consumption plays a significant role in increasing the impacts of climate change. | Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Steitz, Jim #5-1 | I implore the Forest Service to terminate any further consideration of expanded coal leases in the precious and irreplaceable Sunset Roadless Area of the Gunnison National Forest. This lease proposal has only grown more odious and contrary to the public interest since the National Roadless Rule was adopted, from which the Sunset Roadless Area was excluded only through the most tortured evasion from the Rule's meaning and spirit. The Forest Service must now respect not only the letter and spirit of the Roadless Rule, but also the national moratorium on coal leases recently issued by President Obama. | The moratorium never included these coal lease modifications and is no longer in effect. The reinstatement of the NFCMA of the Colorado Roadless Rule went into effect on April 17, 2017. |
| Steitz, Jim #5-2 | This Forest Service proposal to punch 65 miles of roads into a precious forest to retrieve 170 million tons of carbon pollution is an outrageous, heinous abdication of its responsibility to our precious forest ecosystem, and to its mandate the uphold the public interest in the highest values of these lands. At precisely the time that our country desperately must discontinue the use of coal, the Forest Service would destroy one of the finest remaining roadless forests under its jurisdiction in Colorado to extract more coal. The bankruptcy of the applicant company, Arch Coal, is a favorable indication that our society is belatedly divesting from coal as an energy supply, yet the Forest Service would retard this progress by carving special favors from its pristine roadless lands for this company to inject artificially cheap, below-market coal into power plants. A more perverse negation of the public and national interest could scarcely be imagined. Moreover, the bankruptcy of Arch Coal renders quite flimsy any promise that the BLM may obtain for mine reclamation or mitigation of damage to water quality, absent dramatic reforms in the reclamation bonding practices of BLM that have already left the federal Treasury with many billions in cleanup liabilities. | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>Even though Arch Coal underwent bankruptcy restructuring (Chapter 11), those activities were conducted by the United States Bankruptcy Court and have been finalized as of September 2016.<br><br>Reclamation bonding is required by the State In Colorado for coal mining. |
| Steitz, Jim #5-5 | In considering President Obama's directive against new public coal leases, the Paris Accord commitments to reduce American global warming pollutants, the Interior Department's methane regulations in development, and the decade-old Roadless Rule, the proposed ""West Elk' coal leases constitute a truly remarkable array of insubordination against this Administration's policies. It is | The moratorium never included these coal lease modifications. Interior's methane regulations were for oil and gas not coal and are no longer in effect. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | not often in the history of the Forest Service that a proposed industry concession can violate so many major policies simultaneously, and provide such robust and incriminating evidence of a rogue agency unbidden to the public interest. I urge you to withdraw this immoral and perfidious proposal, and to instead restore the Sunset Roadless Area to full protection under the Roadless Rule, as it rightfully deserves as all the other roadless forests that escaped the industry's snare of litigation, delay, and subsequent arbitrary loopholes. Thank you for your attention to this urgent issue. | Mr. Obama's policies do not currently represent the policies of the U.S. government.<br><br>The reinstatement of the NFCMA of the Colorado Roadless Rule went into effect on April 17, 2017. |
| Knodel, Marissa #14-2 | The mission of the U.S. Forest Service is to ""sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations."" Nowhere in that mission does it say the U.S. Forest Service is responsible to protect the profits of coal companies at the expense of national forests that belong to the American people. To fulfill your mission, the only place for dirty sources of energy like coal is in the ground. President Obama himself, in accord with climate scientists, stated that to avoid the worst consequences of climate disruption, some fossil fuels must be kept in the ground. The best place to start doing so is on the lands and waters that belong to the America people. Let's keep coal in the ground and carbon pollution out of our atmosphere. Please, reject the Arch Coal Loophole to the Colorado Roadless Rule. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available.<br><br>President Obama's policies are currently not those of the U.S. government. Effects on climate are disclosed in Section 3.4 and other relevant sections. |
| Solomon, David #33-2 | The writing has been on the wall for a while. As a nation we need to move away from fossil fuels and continue to focus on wind, solar, tidal, etc. to power our country. We need to stop exporting coal and instead help those nations convert over to a more sustainable energy portfolio. We are just exporting this pollution to other parts of the planet. Which in turns creates health and environmental issues there. | Energy policy is beyond the scope of this project-specific analysis. |
| Anon, Anon #144-5 | Protect our climate. Analysis prepared for the Colorado Roadless Rule shows that mining coal in this and adjacent roadless areas would unleash a carbon bomb causing up to $12 billion in damage to the world's economy and environment. Approving these coal leases undermines this administration's commitment to the Paris climate accord, the state's climate goals, and to clean energy. Climate change is a huge threat to Colorado's forests, quality of life, and economy. The Forest Service shouldn't be making climate change worse. | Comment contains an interpretation of the CRR. The Paris Accord did not commit the U.S. to any particular course of action.<br><br>Climate effects are disclosed here in Section 3.4 and other relevant sections. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Welch, Lynn #213-1 | Colorado's road-less wilderness areas must be maintained and protected from fossil fuel and coal development. | The lease modifications are within roadless not within wilderness or recommended wilderness areas. |
| Sharer-Price, Julie #304-2 | It is not part of the federal government's job to provide resources for extraction by private companies. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. |
| Artley, Dick #306-3 | Several national conservation groups sued to halt the project alleging you failed to disclose the extent of carbon pollution generated by mining and burning the 350 million tons of coal. Had you relied on someone with NEPA knowledge you would have known connected actions must be assessed. In June 2014, U.S. District Court Judge R. Brooke Jackson sided with the plaintiffs ruling you failed to take a ""hard look"" at the climate pollution impacts of the mine expansion. This decision meant using the exemption to Colorado's roadless rule violates the law. | Commenter provides their interpretation of former litigation related to the CRR. |
| Artley, Dick #306-5 | How will this play out in the media. Your corporate friendly behavior shows you could not care less about President Obama's climate change and fossil fuels use views. Are you aware that the USDA is an administrative agency? | The laws passed by Congress and agency regulation have not changed related to coal mining and are the framework under which we continue to operate. See Section 1.7 of SEIS |
| Bruce, Felicia #338-1 | Bulldozing national forests for fossil fuels like coal is an affront to nature, to the purpose of national forests and to every American who cares about the environment, conservation and protecting our national interests. | The laws passed by Congress and agency regulation have not changed related to coal mining and are the framework under which we continue to operate. |
| Braico, MD, F.A.A.P., John #341-3 | It is clear that this project must be stopped as we take on the responsibility of deep decarbonization as required as a signatory of COP21. | Membership in the Paris Accord is not the priority of the current administration. Additionally, the Paris Accord did not specify any particular course of action for the U.S. |
| Whitehouse, Elizabeth #343-2 | There is absolutely no justification for permitting coal mining in any area of national forest, particularly not wilderness areas." | The federal agencies are multiple-use agencies who operate coal programs under the laws passed |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | by Congress and agency regulation. There are no wilderness areas in the lease modification areas. |
| Garofalow, Leigh #371-2 | These lands were put into the care of the federal government decades ago so that their use would not be used for interests that were outside the good of the people. | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. |
| Williams, Sheelajh #385-3 | Allowing Arch Coal to expand into this roadless area would have adverse impacts that the Roadless designation was given to prevent | The Colorado Roadless Rule has specific provisions for coal-related roads in the North Fork Coal Mining Area. See Section 3.18 of the SDEIS. |
| Libre, Peter #397-1 | Given that additional coal mining contributes disproportionately to catastrophic climate change, the roadless rule should not be modified to enable coal mining. | The CRR is in effect for these lands. See Section 3.18 of the SDEIS. |
| Webb, Leslie #398-5 | I understand that the ""federal government's overall policy is to foster and encourage private enterprise in the development of economically sound and stable industries."" However, this outdated thinking has begun to shift as it responds to the realities of climate change. The U.S. government can no longer continue to subsidize and give special favor and allowances to the fossil fuel industry, which knew back in the 80's that their product contributes to global climate destabilization, yet proceeded to fund efforts to deny climate science to confuse policymakers (such as yourselves) and personally attack the integrity and reputation of decent climate scientists (i.e., the doctors that were trying to warn us). | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. Matters of national policy are outside the scope of this analysis. |
| Webb, Leslie #398-10 | Rather than fostering and encouraging ""private enterprise"", the federal government's overall priority should be to protect public lands as much as possible in order to sequester carbon and mitigate climate change. This is in the best interest of the American people. We must stop subsidizing fossil fuels." | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. Matters of national policy are outside the scope of this analysis. |
| Webb, Leslie #398-8 | This request for a lease expansion should be included in the Department of Interior's January 2016 leasing moratorium (Secretarial Order No. 3338) | These lease modifications were never excluded under the now-rescinded moratorium. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| de Nekker, Barbara #403-2 | "At a time when America's renewable, clean energy sources are increasing rapidly and quickly approaching grid parity, it is not necessary to destroy fragile habitats to extract fossil fuels that will only add to our pollution and climate warming emissions. With President Obama and leaders of other countries across the globe committing to the U.N. agreement at the Framework Convention for Climate Change last December, it is counter-intuitive to adopt coal lease modifications that would allow Arch Coal to build more roads, drill pads, and climate-damaging methane vents in the Sunset Roadless Area in the mountains of Colorado." | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. Matters of national policy are outside the scope of this analysis. |
| Burnett, Robert #428-3 | I strongly encourage the USFS to adopt a more responsible climate change policy while also protecting the remaining limited acreage of National Forest roadless areas. | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. Matters of national policy are outside the scope of this project-specific analysis. |
| Zakrasek, John #433-4 | Please maintain, strengthen and enact regulations that prevent the use of our national forests for the extraction of coal and all other fossil fuels." | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. Matters of national policy are outside the scope of this analysis. |
| Form letter, #475-1 | I'm writing to urge you to withdraw the proposal to permit the loophole in the Colorado Roadless Rule and allow Arch Coal to mine over 170 million tons of coal in Colorado's North Fork Valley, potentially releasing up to 486 million tons of carbon pollution and driving climate change. Today, the threat of climate change to our natural environment and our economy has never been clearer. And the clean energy solutions we need to power our lives without destroying our planet are getting more affordable and accessible by the day. Allowing Arch Coal to expand mining and release millions of tons of pollution would not only be a major step backward, but could cost up to $13 billion in damages to our global environment and economy. We can't let short-term corporate gain trump the long-term health of our climate and our communities. Colorado mountain communities deserve a future supported by sustainable industries, not polluters damaging our climate and a business even fossil fuel companies recognize as declining quickly. Americans across the nation deserve a future | Commenters provide their summary of the CRR analysis. The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. Matters of national policy are outside the scope of this analysis. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | where we can thrive and raise our families without the threat of devastating climate change. For the sake of Americans today and future generations around the world, I urge you to preserve the Colorado Roadless Rule and close the Arch Coal loophole. | |
| Haber, Kat #468-1 | Building roads is the fastest way to destroy a wilderness. Protect our shared wild wildernesses in America | There is no wilderness or lands recommended for wilderness in the lease modifications. |
| Eaton, Scott #469-1 | I can think of fewer ideas that are worse than permitting the creation of roads in our wilderness areas for the purpose of coal mining | There is no wilderness or lands recommended for wilderness in the lease modifications. |
| Artley, Dick #478-1 | http://www.newsmax.com/Newsmax-Tv/laurence-leamer-greed-destroying-coal/2016/04/08/id/723004 I suggest you read and heed 18 USC 1519. You won't have your way with land owned by 325 million Americans. It would also be a good idea to start briefing your OGC attorneys | We are unsure what either an interview with an author about Don Blankenship and Massy Energy or "18 U.S. Code § 1519 - Destruction, alteration, or falsification of records in Federal investigations and bankruptcy" have to do with the lease modification and exploration proposal at hand. |
| Artley, Dick #478-2 | In 2013, Supervisor Armentrout signed the decision for an Environmental Impact Statement (EIS) that approved Arch Coal's proposal to build six miles of road and scrape 48 pads for methane drainage wells in the Sunset Roadless Area. The Colorado coal mining loophole paved the way for Supervisor Armentrout to finalize his decision, however he wasn't obligated to do so. Conservation groups sued to halt the project in part on the grounds that the Forest Service failed to disclose the extent of carbon pollution generated by mining and burning the 350 million tons of coal made possible by the Colorado Roadless Rule. In June 2014, a federal court sided with the groups, ruled that the Forest Service broke the law by sweeping climate pollution impacts under the rug, and subsequently threw out the coal mine loophole. Supervisor Armentrout is now preparing another EIS he hopes will stand up to certain future court action. The public does not want the Sunset Roadless Area trashed to provide short-term profit for a coal corporation. Supervisor Armentrout is an administrative employee and should respect President Obama's wishes. Here is a more detailed description of this action: | Comment provides an interpretation of a summary of the lease modifications and exploration proposed activities. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | http://earthjustice.org/news/press/2015/forest-service-moves-to-permit-bulldozing-for-dirty-coal-in-colorado-roadless-forest" | |
| Artley, Dick #480-1 | The mining and burning of coal threatens the climate and communities and destroys landscapes. Annually, about 400 million tons of coal, nearly 40% of the U.S.'s production, comes from public lands with little concern to environmental impacts. We need to tell the Bureau of Land Management (BLM) that we support their commitment to reforming the current coal program on public lands. Tell the BLM to reduce the impacts of coal mined from our public lands and bring energy production into the 21st century. <http://tws.convio.net/site/R?i=2lsVe6zMMWXgF74hft1uGw> For the first time in over three decades, BLM has announced its commitment to change the way we mine coal on federal lands. For too long, coal companies have leased thousands of acres of land for ridiculously low prices, destroying the landscape and polluting the environment. They need to hear from you that we do not want to continue to allow companies to get away with hastening climate change for another 30 years. Tell the BLM to stand up for climate and reform the federal coal program. <http://tws.convio.net/site/R?i=gmLhRTs0Yo6pMaYoofaMSg>" | Climate effects are disclosed in Section 3.4 and other relevant sections. Policy is beyond the scope of this project specific analysis. |
| Dick Artley #481-1 | Obama Halts Federal Coal Leasing Citing Climate Change The U.S. temporarily halts coal leasing on federal lands to reassess its policy in light of global warming The Obama administration on Friday brought a temporary halt to new coal mining leases on federal lands while it conducts a three-year review meant to bring coal leasing in line with U.S. climate policy. The moratorium comes just days after Obama said in his State of the Union Address that he would push to change the way the government manages its oil and coal resources to reflect the costs they impose on both taxpayers and the planet. The moratorium takes place immediately, but does not halt coal mining and production currently underway.... Burning coal and other fossil fuels for electricity is the largest single source of human-caused greenhouse gas emissions driving climate change, accounting for about 31 percent of all U.S. greenhouse gases. The Obama administration has said the existing coal leasing program runs counter to its climate goals to cut U.S. carbon dioxide emissions by up to 28 percent below 2005 levels by 2025 and slash carbon emissions from existing coal-fired power plants by 32 percent by 2030. A comprehensive review of how, when and where coal is leased for future mining on public lands is needed to ensure that the federal coal program is managed | These lease modifications were always subject to exemptions from the moratorium which are no longer in existence. Interior Secretarial Orders 3349 and 3844 comply with the requirements of Presidential Executive Order of March 28, 2017. "Promoting Energy Independence and Economic Growth"<br><br>None of the policy and reform expressed represents the policy of the current U.S. government. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | in an environmentally responsible way and to ensure that coal royalty rates allow taxpayers and communities to get a fair return on their resources, Jewell said. Small exceptions to the moratorium will be made, mainly for emergencies, such as when a coal mine is threatened with closure if it has less than three years of coal reserves remaining, Jewell said. ... A full review of the federal coal program has occurred twice in the past, during the Nixon and Reagan administrations, and a coal leasing moratorium occurred during both reviews. We haven't done a top-to-bottom review of the program in more than 30 years,"" Jewell said. ""The federal program was designed to get as much coal out of the ground as possible. That's the program we've been operating ever since."" Neil Kornze director of the U.S. Bureau of Land Management, the agency that oversees all federal coal, oil and gas resources, said the coal leasing moratorium is being instituted immediately because when the federal government issues a major coal lease, it represents a multi-decade commitment to mining coal on a large tract of land. "... The leasing program operates on vast swathes of the West. ...""The analysis should account for direct and indirect greenhouse gas emissions, and use tools like the social cost of carbon and social cost of methane,"" Hein said in a statement. ""Putting a dollar sign on the climate effects of coal production will bolster the case for fiscal reform."" Groups associated with the coal industry were critical of the president's action...At this point, it is obvious that the President and his administration won't be satisfied until coal is completely eradicated from our energy mix. Their foolish crusade takes away one of America's greatest strengths-our diverse mix of energy sources. If the President wants electricity rates to skyrocket-as he once said he did-he's on the right path."" Environmental groups hailed the moratorium as a sign that the Obama administration is leading the world on climate change. ""This is a historic decision that greatly improves the world's chances of avoiding the worst impacts of climate change and has burnished President Obama's climate legacy,"" ... | |
| Garcia, Sally #491-1 | While the Obama Administration is working to shut down coal fired utility plants as part of the Clean Air Act, it makes no sense to allow the coal companies like Arch Coal to destroy the environment in order to produce a product that is obsolete in a fast changing world where global warming is a serious problem. | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. Matters of national policy are outside the scope of this analysis. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | | Climate effects are disclosed in Section 3.4 and other relevant sections. Energy policy is beyond the scope of this project specific analysis. |
| Hardy, Lauraa #493-1 | Please, please do NOT let a loophole in the Colorado Roadless Rule to enable and allow Arch Coal to mine over 170 million tons of coal in Colorado's North Fork Valley. The emissions from such mining would be devastating to humans and wildlife, and we need to be moving away from carbon pollution as fast as we can, not creating more. We may have reached the tipping point already for climate change, but we can't give up hope. Please deny Arch Coal this unfortunate loophole and preserve the Colorado North Fork Valley and the Colorado Roadless Rule. Our future depends on people in your positions of power making the right choices. My five grandchildren and I thank you in advance. | Emissions and climate change are addressed in Section 3.4 and other relevant sections.<br><br>Energy policy is beyond the scope of this EIS. |
| Steitz, Jim #2603-1 | I implore the Forest Service to terminate any further consideration of expanded coal leases in the precious and irreplaceable Sunset Roadless Area of the Gunnison National Forest. This lease proposal has only grown more odious and contrary to the public interest since the National Roadless Rule was adopted, from which the Sunset Roadless Area was excluded only through the most tortured evasion from the Rule's meaning and spirit. The Forest Service must now respect not only the letter and spirit of the Roadless Rule, but also the national moratorium on coal leases recently issued by President Obama. | The Colorado Roadless Area contains the Sunset Roadless Area and contains more acres of roadless than did the RACR because coal mining in this area was considered important to the State's economy and because reclamation has been successful at returning the area to a roadless condition.<br><br>These lease modifications were never included in the moratorium which is no longer in effect. |
| Steitz, Jim #2603-2 | This Forest Service proposal to punch 65 miles of roads into a precious forest to retrieve 170 million tons of carbon pollution is an outrageous, heinous abdication of its responsibility to our precious forest ecosystem, and to its mandate the uphold the public interest in the highest values of these lands. | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation |
| Kreuser, Deborah #2717-3 | It will just benefit a private coal mining company - and that's not a sufficient reason to change your current policies. | The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| Malzbender, Katherine #7925-1 | I'm writing to vehemently oppose Arch Coal's plan to expand drilling operations in pristine forest. The company is part of a dying industry that should not be propped up by exemptions form environmentally sound regulations at the expense of clean air and natural treasures. The climate impacts and adverse effects to wildlife are unacceptable, and I urge the USFS to deny Arch Coal's proposal and their request for an exemption from the Roadless Rule." | Coal demand and prices have increased in recent months. 2017 EIA projections include significant amounts of coal in the U.S. energy mix to at least year 2040.<br><br>The federal agencies are multiple-use agencies who operate coal programs under the laws passed by Congress and agency regulation.<br><br>Climate effects are found in Section 3.4 and other relevant sections and wildlife effects throughout Chapter 3. |
| Crawley, John #9164-1 | It is time to leave coal in the ground - it will do too much harm if you permit the coal to be mined. Harm to mine it and much harm to burn it! | Impacts from mining and downstream combustion of coal have been considered in this document. |
| Medoff, Adam #9176-3 | So is it in the public interest to allow Arch Coal to exploit public lands based on a legal technicality? Well, certainly not when viewed through an environmental lens -- coal mining leads to increased carbon emissions and categorically destroys surrounding ecosystems. And while Arch may make an argument for economic benefits from coal-powered energy, any benefits are, at absolute best, incredibly short-lived and undoubtedly minuscule compared to the cost of tying ourselves to an expensive, dirty fuel in the long run. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Climate effects and emissions are disclosed in Section 3.4. Other resource effects are disclosed throughout Chapter 3. |
| Form letter | Allowing Arch Coal to expand mining and release millions of tons of carbon pollution into the atmosphere would not only be a major step backward, but will harm our global environment and economy. We can't let short-term corporate gain trump the long-term health of our climate and our communities. | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Climate effects and emissions are disclosed in Section 3.4. |
| Wyman, Ralph #9499-2 | Allowing Arch Coal to expand mining and release millions of tons of carbon pollution, including highly GHG reflective methane venting, into the atmosphere would not only be a major step backward, but will harm our global environment and economy. Colorado high country ski industry is in danger as global temperatures rise, as are high alpine ecosystems in roadless areas. | Climate effects are disclosed in Section 3.4 and other relevant sections. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | More coal extraction, methane venting and more roadbuilding damage the long term value of our mountain forest systems. | |
| Keefe, Chris #9617-2 | 2) Fossil fuel development in general needs curtailed, not expanded. Air quality, watershed integrity, and global warming are all impacted. | Climate policy regarding fossil fuels is beyond the scope of this analysis. Air quality and climate effects are addressed in Section 3.4 and other relevant sections and Watershed in Section 3.8. |
| Marks, Terry 414-2 | We're ruining the land, water is becoming non-potable near mines and fracking sites poisoning the people. | Water is addressed in this EIS in Section 3.8. The leases pertain to underground coal mining not oil and gas development to which fracking applies. |
| Smith, Vicki #3882-3 | It makes NO sense to bulldoze down forests either on several levels. We have agreed to the Paris accords yet act as though it is time for business as usual. Ripping out trees that can absorb carbon to make way for mining of coal, mostly exported to China, that will send the pollution right back to us on the Easterly blowing wind. | The Paris Accord did not commit the U.S. to any particular course of action. Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Climate effects are disclosed in Section 3.4, 3.8 and other relevant sections. |
| Smith, Vicki #3882-5 | This is the wrong thing to do for the wrong reason at the wrong time! These lands belong to ALL Americans not the well connected, well lobbied, well represented or just the rich wanting to enrich themselves at the expense of everyone else and in this case at the expense of the entire world since the temps and water are rising. What will a little profit do for everyone then?" | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Climate effects are disclosed in Section 3.4 and other relevant sections. |
| Hlodnicki, Bruce #3883-3 | Coal is dirty and damages our environment, public health and climate. | Climate effects and emissions are disclosed in Section 3.4, 3.21 and other relevant sections. |
| Lynch, Janet 8056-11 | Approval of the plan would allow Arch Coal to drill nearly 50 drilling pads to access 19 million tons of coal that would result in millions of tons of carbon pollution and cost billions in environmental damages, and it would be contrary to your agencies' statutory mandates, by rendering huge tracts of pristine forests and public lands unusable for other legitimate enumerated uses. The | Coal mining on federal lands is directed under the laws and regulations cited in Section 1.7 of this EIS; federal policy is to make these resources available. Climate effects are disclosed in Section 3.4 and other relevant sections. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | environmental and climate costs, as well as the costs in lost opportunities for other uses and to your agencies' reputations are simply too high. | |
| Reynolds, Alexandra #504-5 | The human population needs these resources to survive, and destroying more of already limited forest area, disrupting habitats, and contaminating countless necessary resources, does NOT act in the interest of the future. | Effects on various resources are addressed in Chapter 3. |
| Earthjustice #8419-47 | The Forest Service's recognition of the long-term impacts to forest vegetation in the Lease Modifications area is echoed by the U.S. Fish and Wildlife Service and by other Forest Service analysis for this area. In its concurrence letter addressing the project's impacts to lynx, the Fish and Wildlife Service assumed that ""lynx habitat may recover to year-round functionality approximately 30-40 years post disturbance.""298 While the 2012 Lease Modifications Final EIS failed to explain the spatial dimension of impacts to roadless character, it does list roadless characteristics and generally discusses the impacts from roads and drill pads.299 But this analysis is flawed and fails to take the hard look NEPA requires. Most importantly, the EIS failed to disclose the Lease Modifications' impacts to the wilderness capability of the Sunset Roadless Area. The fact that a portion of the roadless area is capable of wilderness protection is a key attribute of the area, one recognized by the Forest Service in its 2005 inventory.300 While the 2012 EIS purports to examine the alternatives' potential impacts on some roadless characteristics,301 , the impacts to wilderness capability is summarily dismissed as follows: Part of IRA was identified as ""capable"" in wilderness screening process. The area is contiguous to wilderness and includes a unique geologic feature; however, the area was not recommended for Wilderness designation.302 296 Id. at 157 (""Once revegetation has occurred, the areas of previous disturbance (usually oak brush or shrub areas in the case of the West Elk Mine) become grassland areas that are a benefit to wildlife and livestock.""). 297 See id. at 39-40, 128 (road and MDW pad construction is likely to destroy ""approximately 7 acres of oak, 58 acres of aspen, and 7 acres of spruce-fir"" in primarily ""mature/overmature"" condition). 298 Letter of A. Pfister, FWS to C. Richmond, GMUG NF (June 16, 2010) at 3 (emphasis added) (hereafter ""2010 FWS Concurrence Letter""), attached as Ex. 123. 299 2012 Lease Modifications Final EIS at 175-77. 300 See id. at 171 (Figure 3.30b) (displaying areas identified as wilderness capable in the 2005 inventory); id. at 479-480 (GMUG National forest inventory report). 301 Id. at 172-182 302 | Area was not brought forward as a further planning area for wilderness designation. Capability would have to be followed by "availability" and "recommended" for wilderness under that planning rule which is no longer in effect. It was not carried forward for any of these. Wilderness character and values is applied and defined for wilderness areas not roadless areas which these lease modifications are in. Roadless is not intended to be managed as wilderness. Wilderness capable would not result in any changes under roadless analysis. Roadless characteristics were addressed in this document in Section 3.18. |

| Commenter-Comment # | Comment | Response to Comment |
|---|---|---|
| | Id. at 175. See also id. at 176 (similar analysis); id. at 585 (""The Forest is not required to hold areas that are found to be capable in that status indefinitely if they did not make it through the screening process to be recommended.""). This response misses the point. Wilderness values are present in the Sunset Roadless Area; that wilderness capability may be irretrievably lost (or lost for a generation) through the construction of a web of roads and MDWs in the heart of the wilderness capable lands. The fact that the GMUG National Forest does not manage the lands to protect those wilderness values does not erase those values, nor does it eliminate the Forest Service's duty to take a hard look at a project's potential impacts to those multiple use values. The 2013 Exploration Plan EA suffers from the same deficiencies as the Lease Modifications EIS. The Exploration EA does not address the potential for impacts to wilderness character or wilderness capable lands at all, although two drill pads (SST-8 and SST-10), all of the road between them, and about half of the road between SST-8 and SST-3 will be constructed within that portion of the Sunset Roadless Area found to be capable of protection as wilderness.303 This construction activity will likely degrade the wilderness capability of scores acres of the area. In order to take the required ""hard look"" at the impacts of the Lease Modifications - as well as the Exploration Plan - to wilderness capable lands within the Sunset Roadless Area, the supplemental EIS must address these impacts because prior NEPA analyses did not." | |

(Intentionally left blank)

# Appendix K. Response to Comments Received on SDEIS

This appendix includes summarized version of comments and responses. Full text of letters and comment reports are available for review at: https://www.fs.usda.gov/project/?project=32459.

## Forest Plan

**Comment:** I call on the U. S. Forest Service not to consider ever again coal mining in any form as an option in any land-use plan anywhere. Land-use planning now must always contribute to solving the problems of the future, not contribute to creating or worsening them.

> **Response:** This SDEIS is a project specific analysis. Consideration of whether or not the agency should address coal mining as an appropriate land use allocation on NFS lands is beyond the scope of this analysis.

**Comment:** BLM similarly cannot rely on the outdated Uncompahgre Field Office Resource Management Plan. The BLM Uncompahgre Field Office's Resource Management Plan (RMP), published in 1989, is also stale and outdated, creating similar legal and analysis infirmities.

> **Response:** See SDEIS Appendix I, response to comment Earthjustice #8419-44.

**Comment:** Neither the Forest Service nor BLM may rely on outdated plans in the midst of revision. The Forest Service must refrain from approving the lease modifications until completion of the Forest Plan Revision.

> **Response:** As stated in 36 CFR 219.17(c ) "Existing Plans will remain in effect until revised. This part does not compel a change to to any existing plan, except as required in subsection 219.12 (c )(1). None of the requirements of this part apply to projects or activities on units with plans developed or revised under a prior planning rule until the plan is revised under this part...." The assessments for Forest Plan Revision have not been finalized, nor have alternatives been developed for the assessments respective of Forest Plan Revision. As new information relevant to this project has been/is identified, it has been/will be incorporated.

## Proposed Action and Decision

**Comment:** Numerous commenters from Gunnison County have expressed their support for the lease modifications and/or the on-going efforts of the West Elk Mine due to contribution to local economies, maintaining existing direct and indirect jobs.

> **Response:** No further response.

**Comment:** Numerous commenters have noted their opposition to the proposed action and/or requested that we adopt the No Action Alternative because of Colorado Roadless Areas or climate change.

> **Response:** No further response.

**Comment:** Numerous commenters have questioned why this type of project would be considered.

> **Response:** The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

.

**Comment:** Commenter requests that we reverse the actions that provide for additional coal mining. (Hoffman, H.)

**Response:** Policy changes are beyond the scope of this project-specific analysis. The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Numerous commenters have brought up the general environmental harm and degradation of coal lease expansion and exploratory drilling which outweighs any benefit and that the coal industry is no longer viable as an energy industry. A few of the commenters added that we should prevent this assault and proposed destruction of habitat for several species, including the imperiled Colorado River trout.

**Response:** Effects on forest resources are addressed in Chapter 3. Economics are addressed in Section 3.21. There are no populations of Colorado River Cutthroat Trout that would be affected by the lease modifications.

**Comment:** Commenter states that the administration is bringing war on climate to National Forests in Colorado and wants coal mining not to expand into the Sunset Roadless Area- some of the state's most pristine backcountry. (Kastel, D.)

**Response:** Coal mining has been in existence for over 100 years in the immediate vicinity including mining under roadless areas. These lease modifications support an existing coal mine. See Chapter 3 for climate effects, Section 3.2 for background on this area and Section 3.18 for effects on roadless.

**Comment:** Several commenters state that the 17 million tons of coal that could be mined in the roadless area would pour gasoline on the fire of climate change and add the Forest Service's failure to require Arch Coal to control methane pollution created by the proposed mine would make it the single largest source of climate-destroying industrial methane pollution in the state.

**Response:** The West Elk Mine will continue to vent methane for the protection of underground miners, as it has for the past 15+ years. Methane volumes vented since 2010 have declined. West Elk Mine, with federal and state permitting agencies, has and will continue to explore options for technically and economically feasible mitigation of methane. See Sections 2.2, 2.3 and 3.4 for more information on methane mitigation, methane quantities and climate change.

**Comment:** Commenter states it is short -sighted to destroy more of the irreplaceable wilderness in the Sunset Roadless Area of Colorado. (Shallers, S.)

**Response:** The Sunset Roadless Area is not intended to be managed as wilderness. Roadless effects are described in Section 3.18

**Comment:** Commenter states mining activities will result in the release of methane and when is combusted both of which will contribute to global warming. Coal mining operations leave a scarred landscape that never fully recovers. (Perri, C.)

**Response:** Effects on climate change are discussed for each resource area in Chapter 3. Methane and coal combustion is addressed in Section 3.4. Past and projected reclamation success are addressed in several sections in Chapter 3, including 3.7-3.9, Soils, Watershed, and Vegetation.

**Comment:** If Alternative 3 or 4 is selected, conditions should be implemented to ensure: -new road and pads are constructed only when and where absolutely necessary; -all roads and pads are decommissioned upon cessation of mining activity are required to be reclaimed and remediated. Ongoing monitoring should be required to ensure that reclamation efforts are successful. (Coleman, S.)

**Response:** Action alternatives contain lease stipulations (Section 2.2.2) requiring that roads within the lease modifications are temporary and that monitoring requirements apply. State reclamation bonding measures ensure that these roads are fully reclaimed.

**Comment:** Commenter urges us to adopt the "no action" alternative to prevent the construction of damaging roads and exploratory wells that would occur under the other alternatives and to harness the methane, instead of just venting it off. (Lynch, R.)

**Response:** Commenter urges selection of the no action alternative to which we have no further response, but also suggests we do something to mitigate methane. Lease stipulations (Section 2.2.2) for action alternatives allow for methane use or capture should it be proposed. Numerous methane mitigation measures are described in Section 2.3.

**Comment:** Numerous commenters encourage us to keep the Sunset Roadless Area as it is: home to iconic mountain species and a treasured recreational resource.

**Response:** Effects on the Sunset Roadless Area are addressed in Section 3.18, effects on wildlife are addressed in Sections 3.10-3.14 and effects on recreation are addressed in Section 3.16.

**Comment:** Several commenters suggest that this is a highly pristine mountain wilderness.

**Response:** The Sunset Roadless Area is not intended to be managed as wilderness. Roadless effects are described in Section 3.18

**Comment:** Numerous commenters suggest we switch to renewable energy not coal.

**Response:** Alternative energy policy is beyond the scope of this analysis.

## Public Involvement

**Comment:** Commenter requests that comment period be extended. (Knottnerus, D.)

**Response:** The responsible official declined your request as there have been numerous opportunities to comment on this project and analysis over the past seven years. See Section 1.9 for details of public involvement process.

**Comment:** Commenter requests that we are inclusive and transparent in the decision process. (Campe, M.)

**Response:** The responsible officials will consider public input, environmental analysis, and response to comments in the decision making process.

**Comment:** Commenters have expressed concern that citizens' desires are not being met with this proposal.

**Response:** The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

## Laws

**Comment:** Commenters state that leasing coal is not in the public interest.

**Response:**NEPA requires agency decision makers to make informed decisions and to make diligent efforts to involve the public in preparing and implementing their NEPA procedures. Therefore, the

NEPA process must be completed before an agency makes a final decision on an action. The BLM developed this SFEIS in coordination with the USFS to comply with NEPA and consider a range of reasonable alternatives to examine the effects from potential exploration and the potential modification of existing leases. Additionally, 43 C.F.R. § 3432.2 (Lease Modifications) provides that the authorized officer may modify a lease to include all or part of the lands applied for if the authorized officer "determines that: (1) the modification serves the interests of the United States; (2) there is no competitive interest in the lands or deposits; and (3) the additional lands or deposits cannot be developed as part of another potential or existing independent operation." After the NEPA process is complete, the BLM will prepare a Record of Decision to document the agency's selected alternative and any accompanying mitigation measures based on the NEPA process. At this time, the BLM will also make a determination as to whether the lease modifications comply with the criteria set forth in 43 C.F.R. § 3432.2.

**Comment:** Commenter requests that we wait for the results of the U. S. Forest Service environmental impact statement on the expansion of Arch Coal's West Elk mine into the Sunset Roadless Area before allowing mining there to proceed. It only makes sense. America won't be great again if she makes decisions that are based on financial gain, not a balanced view of risks and benefits. (Carswell, D.)

**Response:** Analysis will have been completed prior to leasing.

**Comment:** Commenter states. NEPA Mandates That Agencies Analyze Potential Mitigation Measures. NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions.. Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c). (Zukoski, T.)

**Response:** Appropriate mitigation measures to the decision to be made (i.e., consent to or not lease and for BLM further approve on-lease exploration consistent with least terms or not) have been applied for the protection of NFS non-mineral estate and surface as they pertain to mineral recovery for BLM. Additional stipulations have been considered and dismissed for the reasons cited in section 2.3 in compliance with NEPA. As this analysis is not a decision, in respective decision documents agencies will "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c). Nothing in NEPA, particularly in an EIS where there might be significant effects disclosed requires them to be eliminated or mitigated at the global scale.

**Comment:** The commenter states the preferred alternative is prohibited under the Energy Policy Act of 2005. The Energy Policy Act of 2005 limits the maximum acreage that may be added to a Federal coal lease through lease modification during the life of the lease. 30 U.S.C. § 203(a)(3). That law provides that "[i]n no case shall the total area added by modifications to an existing coal lease exceed 960 acres." 30 U.S.C. § 203(a)(3). However, MCC has requested two lease modifications, an 800 acre expansion and a 920 acre expansion, which together would form a single 1,720 acre expansion. This approach, which is adopted in Alternative 3, appears to game the system Congress created to limit lease expansions, and thus to violate the spirit, and the letter, of the Energy Policy Act. In response to previous comments regarding these limitations, the Forest Service rejected this criticism, stating: This has been separated in the Action Alternatives and explained as it relates to ownership of the lease modifications and compliance with MLA as amended. . . The BLM has responded to an application from Ark Land LLC requesting modifications to existing leases under the authority of the Mineral Leasing Act as amended by the Energy Policy Act of 2005 and 43 CFR 3432. This application has been modified by BLM to further prevent bypass of federal coal as described [in] 43 CFR § 3425.1-9.559 However, the SDEIS actually makes no attempt to explain how Alternative 3 is consistent with the Energy Policy Act's acreage limitations. Rather, its discussion of the Energy Policy Act simply states that "[t]he federal

agencies are responding to applications to modify existing leases," reasserting that the purposes of the Lease Modifications is to prevent the bypass of coal, and that BLM "is required by law, to consider leasing Federally-owned minerals for economic recovery."560 All of this discussion is beside the point. Whether these lease modifications facilitate the recovery of federal coal resources, foster development, or result in an economic gain for industry is simply not relevant to the issue of whether the approach the Forest Service has chosen to adopt is consistent with the acreage limitations for lease modifications. The Forest Service cannot legally consent to Arch Coal's attempt to skirt the limits imposed by the Energy Policy Act. (Zukoski, T.)

**Response:** This comment is addressed under 1.6.1.1 Leasing in the first bullet "…according to the Mineral Leasing Act of 1920 (MLA); as amended by the Federal Coal Leasing Amendments Act of 1976 and Energy Policy Act of 2005 This Act Amends 30 U.S.C. 203(c)(4)(A) to ``secure modifications of the original coal lease by including additional coal lands or coal deposits contiguous or cornering to those embraced in the lease…(3) In no case shall the total area added by modifications to an existing coal lease under paragraph (1)--(A) exceed 960 acres; or (B) add acreage larger than that in the original lease." Parent leases are owned by different entities.They should not be treated as a single lease as commenter implies. Lease modification sizes neither exceed original lease acreages nor do they exceed the 960 acre limit identified in the Energy Policy Act. Applications have appropriately been filed with the BLM and have been reviewed in compliance with law, regulation and policy.

**Comment:** Commenter alleges the SDEIS fails to take a hard look at the Lease Modifications Cumulative Impacts. NEPA requires federal agencies to analyze the cumulative impacts of a proposed action. The Forest Service has failed to account for the cumulative effects of the proposed lease modifications. (Zukoski, T)

**Response:** Cumulative effects are addressed for each resource area in Chapter 3. Other activities that may contribute to cumulative effect are described in Section 3.2 and further incorporated into analysis.

**Comment:** Commenter alleges the SDEIS fails to disclose adequately many direct, indirect and cumulative effects of the proposed action. An agency's NEPA analysis "must disclose and evaluate all of the effects of a proposed actional" direct, indirect, and cumulative. NEPA . . . defines impacts or effects to include 'ecological [,] ... economic, [and] social' impacts of a proposed action. 40 C.F.R. § 1508.8(b).

**Response:** Direct, indirect and cumulative effects are addressed in Chapter 3.

**Comment:** Several commenters state that we must consider impacts of the proposed action

**Response:** Effects on forest resources are described in Chapter 3.

**Comment:** Commenter suggests imposing limits and conditions to limit the devastation to the area that will result from this plan. (Stebbings, B)

**Response:** Lease stipulations have been identified in Section 2.2.

**Comment:** Commenter states that since methane is poisonous to all of us, and indirectly to our safety through climate change, why would we approve more of its release from coal mines which benefit so very few for a short time? Why allow coal mining to destroy lands? (Morse, S)

**Response:** Methane is nontoxic at normal atmospheric conditions, including the concentrations at which it has been vented once mixed with ambient air. Methane is vented from the underground mine for worker safety to maintain underground concentrations below maximum allowed by Mine Safety

and Health Administration. It does contribute to climate change. The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** The public deserves a thorough environmental study on the impact of any new drill site. (Chacon, C)

**Response:** Please see SEIS.

**Comment:** Commenter states when the coal 'loophole' for this roadless area was agreed upon in 2001, the science for climate change was not where it is now. Data was emerging rapidly and opinion was shifting on how both science and the public viewed our environment. This helped support the drive for alternative sources of energy, a drive that our nation is competitively starting to lose internationally. The only sector that seemed unified in their skepticism of climate change was big energy and business, those that would profit from stopping change. So when the coal loophole for the Sunset Roadless Area was closed a short while ago, it seemed to be a positive sign in figuring out our energy balance in a thoughtful and practical way. It seemed we were listening to the overwhelming data on climate change. Natural gas, solar, and hydroelectric could all find a way to mitigate the use of coal. (Swett, M.)

**Response:** Proposed action is consistent with exceptions of the Colorado Roadless Rule as issued in 2012 and exception reinstated in 2017. More acres (approximately 400,000 more) were designated as roadless in Colorado in 2012 than in 2001 under the RACR. Renewable energy sources and alternatives and job training are beyond the scope of this analysis. However, there are three existing commercial scale hydro-electric plants within the proclaimed boundaries of the GMUG and two undeveloped geothermal leases. National Renewable Energy Laboratory and the Forest Service have prepared a report (NREL 2005) to identify and evaluate the potential for solar and wind energy resource development on NFS lands. NREL's report concluded that 495 acres may be suitable for 99 MW of solar (PV) production and 11,297 acres may be suitable for 229 MW of wind farm production on the GMUG. Zvolanek et al. (2013) refined the data used by NREL and identifies a slightly reduced 432 acres (43 MW) available for PV power and much reduced 2,039 acres (41 MW) available for wind power for the GMUG. Under either scenario, this is a very small percentage of the GMUG that is considered suitable for these types of development. Renewable energy development including commercial solar (specifically PV as CSP is not viable) and wind on the GMUG has, to date, not been proposed or developed. All of these types of energy development would be proponent-driven.

**Comment:** Commenter states roadless areas are in place to provide protection to sensitive areas, including wildlife habitat. Not only have these issues not been addressed within this plan, the air pollution from the production process has not. Please protect the Sunset Roadless Area, as was intended. (Patin, L)

**Response:** Proposed action is consistent with exceptions of the Colorado Roadless Rule. Effects on air including combustion are discussed in Section 3.4.

**Comment:** Commenter states roadless public lands like the Sunset are no place for private enterprise to alter the landscape for profit. To give Arch Coal a coal lease there would have destructive effects on a priceless pristine ecosystem and should never be allowed. What is more, dirty coal projects make no sense in this era of climate change. Why is the federal government considering offering this perk to this one company, and allowing them to create methane pollution without regulation or consequences? It smacks of senseless profiteering on a rather large scale. (Hodges, K)

**Response:** Proposed action is consistent with exceptions of the Colorado Roadless Rule. The federal agencies are acting under their role in the federal coal program under the process described in Sections 1.2, 1.3 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Commenter states the Sunset Roadless Area is invaluable and irreplaceable. Allowing a coal lease expansion and exploratory drilling within this national forest would be irresponsible choices. (Lazaron, P)

**Response:** Proposed action is consistent with exceptions of the Colorado Roadless Rule. The federal agencies are acting under their role in the federal coal program under the process described in Sections 1.2, 1.3 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Commenter alleges the public interest and the national interest, as well as local interests, all weigh heavily in favor of the "no action" alternative. Any decision by the Secretary of Interior that granting these lease modifications and exploration plan would be in the public and national interest would be arbitrary and capricious. (Zukoski, T.)

**Response:** NEPA requires agency decision makers to make informed decisions and to make diligent efforts to involve the public in preparing and implementing their NEPA procedures. Therefore, the NEPA process must be completed before an agency makes a final decision on an action. The BLM developed this SFEIS in coordination with the USFS to comply with NEPA and consider a range of reasonable alternatives to examine the effects from potential exploration and the potential modification of existing leases. Additionally, 43 C.F.R. § 3432.2 (Lease Modifications) provides that the authorized officer may modify a lease to include all or part of the lands applied for if the authorized officer "determines that: (1) the modification serves the interests of the United States; (2) there is no competitive interest in the lands or deposits; and (3) the additional lands or deposits cannot be developed as part of another potential or existing independent operation." After the NEPA process is complete, the BLM will prepare a Record of Decision to document the agency's selected alternative and any accompanying mitigation measures based on the NEPA process. At this time, the BLM will also make a determination as to whether the lease modifications compy with the criteria set forth in 43 C.F.R. § 3432.2.

**Comment:** Commenter requests we consider asking local citizens to join with you before any actions are taken to modify the Sunset Roadless Area.

**Response:** Public involvement has been extensive. See Section 1.9.

**Comment:** Commenter states they have no problem bulldozing in roads, but they do not go back and put the earth back to what it had been. The roads are not removed and the trees replanted. The streams are not restored. Barbara What about the environmental damage, you cannot fix that no matter what your regulations are. (Schmidt, B)

**Response:** Reclamation has been very successful in this area and is required by State reclamation bonding.

**Comment:** We have received comments from a handful of commenters stating that our analysis was legally flawed because we didn't do a social cost of carbon analysis or that the CRR used the wrong assumptions in its SCC analysis.

**Response:** CRR analysis is beyond the scope of this project-specific decision. CRR NFCMA exception has been reinstated as of April, 2017. See Section 3.4 and SCC comment responses addressing why SCC analysis is not appropriate for this analysis.

**Comment:** Commenter alleges the lease modifications cannot be issued because they are not in the interest of the United States. Under 30 U.S.C. § 203, the Secretary of the Interior is required to make findings regarding the proposed lease modifications. Before a lease modification may go forward, the Secretary of Interior must make findings that the modification: (A) would be in the interest of the United States; (B) would not displace a competitive interest in the lands; and (C) would not include lands or

deposits that can be developed as part of another potential or existing operation. 30 U.S.C.§ 203 (a)(2)(A)-(C). The Secretary of the Interior has discretion to consider the environmental degradation that may result from a new coal lease. Clear Creek Inn Corp., 7 IBLA *200, *221 (1972). The Secretary may decline to issue a lease "for reasons unrelated to the extent of the knowledge of the presence of workable coal, such as environmental [values]." Id. As discussed above, the proposed lease modifications are not in the interest of the United States. Development associated with the lease expansion would damage the currently pristine Sunset Roadless area, which provides summer range for elk, mule deer, black bears, and mountain lions, as well as habitat for the lynx. The area also offers visitors a "high degree of naturalness" and a "striking geologic feature" in the Deep Creek Slide area.568 The terrain is rugged and is used during hunting season.569 Granting these modifications would further encroach upon the area's "[o]pportunities for remoteness and solitude." Centuries-old spruce will be destroyed. All of these values will be degraded by the proposed lease expansion.571. The lease modifications will also contribute to climate change by producing approximately 17.6 million additional tons of coal over approximately 2.7 years.572 The Forest Service acknowledged in its EIS that the mine's greenhouse gas emissions "will directly contribute to potential climate change."573 This environmental damage is clearly contrary to the interests of the United States. On the other side of the scales sits a single company, a poor corporate citizen that is attempting to short-change taxpayers by seeking yet again to reduce the royalties it pays taxpayers. And if the Forest Service truly believes there is "perfect substitution" of West Elk coal for other U.S. produced coal, the most economic impact mining this coal will have will be to move profits from some other company to Arch. Further, as Powers Consulting's 2017 report points out, prolonging coal mining in the North Fork Valley is also unlikely to be in the long-term interest of those communities' economic future. The Interior Secretary therefore cannot determine that mining the Lease Modifications is in the public interest. (Zukoski, T.)

> **Response:** Should the BLM Deciding Officer determine from this analysis that the lease modifications are not in the interest of the United States, they would not approve the lease modifications, and rationale would be documented in the BLM Record of Decision in accordance with 43 CFR 3432.2(a). See Sections 3.18 for effects to the Sunset Roadless Area and Roadless characteristics, including degree of naturalness, remoteness and solitude. There are no direct impacts anticipated to the Deep Creek Slide. The nearest projected road is ~1200 feet from the slide, and the nearest effects of subsidence are ~850 feet from the slide (See Figures 3-4, 3-5). See Sections 3.9-3.14 for effects to Vegetation and Wildlife. See Section 3.16 for effects to Recreation and hunting. See Section 3.4 for Air Quality, Greenhouse Gases and Climate Change. There have been no royalty reduction requests for the lease modifications or the parent leases as a whole. See Section 3.21 for Socioeconomics. The FS never uses the term perfect substitution in the SDEIS (section 3.4), or within the context of an economic analysis, but rather for the purposes of an emissions analysis. The language has been clarified and revised to this effect in sections 3.4.2.2 and 3.4.5.2 of the SFEIS.

**Comment:** Commenter alleges the Forest Service is attempting to make findings it cannot lawfully make under SMCR, The Surface Mining Control and Reclamation Act ("SMCRA") presumptively prohibits surface coal leasing and mining within the boundaries of National Forests. See 30 U.S.C. § 1272(e)(2); see also 30 C.F.R. § 761.11(b); 43 C.F.R. § 3461.5(a)(1). The law only allows surface coal leasing and mining in National Forests like the GMUG when surface operations are incident to underground mining and where the Secretary of the Interior finds that they lack "significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations." 43 C.F.R. § 3461.5(a)(2)(i). Here, the Forest Service is unlawfully attempting to make findings it cannot make. In its response to comments on the 2012 DEIS, which appears as Appendix I to the SDEIS, the Forest Service acknowledges that the Secretary of the Interior must determine whether there are any "significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations."561 However, this does not seem to stop the agency from making unsupported and unlawful conclusions about unsuitability. The Forest Service conducted and includes in the SDEIS an "Unsuitability Analysis."562 It justifies the inclusion of this analysis by stating, "The extent to which SMCRA directly

applies at the leasing stage is related to the need for the Forest Service and/or BLM to conduct the Unsuitability Assessment under Section 522(e) of SMCRA. For the purposes of the unsuitability assessment conducted at the leasing stage, the procedure is codified at 43 CFR 3461. Unsuitability Analysis is found in Appendix B."563 In this "Unsuitability Analysis," the Forest Service states, "This analysis and report was prepared consistent with the unsuitability criteria published in 43 CFR 3461."564 Under a heading titled "Secretary's Determination," the analysis concludes, "[T]here are no significant recreational, timber, economic, or other values that would be incompatible with modifying the leases within this analysis."565 Not only does the Forest Service lack authority to make this finding"that authority clearly rests with the Secretary of the Interior; it is also baseless. The Forest Service's "analysis" is one paragraph long; the agency has not conducted a thorough analysis of the values at risk from mining. Furthermore, given the roadless nature of the area, its value as wildlife habitat, and its value for primitive to semi-primitive recreation, and the determination that part of the Lease Modifications was deemed "capable" for wilderness designation in 2005, there are significant recreational, economic, and other values that are incompatible with the lease modifications and surface mining. Although the Forest Service may state that the area is managed for "multiple use," SMCRA's prohibition on surface coal mining within National Forests is not contingent upon whether an area is managed for multiple use.566 To the extent that the Forest Service itself purports to have done an unsuitability analysis, the analysis it has done is inadequate and cannot be relied upon because the Forest Service has no legal authority to make unsuitability findings. Thus, the Forest Service's consent is contrary to SMCRA. (Zukowski, T.)

**Response:** SMCRA Section 522(e)(2)(a) states ""on any Federal lands within the boundaries of any national forest: Provided, however, That surface coal mining operations may be permitted on such lands if the Secretary [of Interior] finds that there are no significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations and --(A) surface operations and impacts are incident to an underground coal mine. Related to lease modificataions that have been applied for 43CFR 3425.3(b) states ""For lease applications involving lands in the National Forest System, the authorized officer shall submit the lease application to the Secretary of Agriculture for consent, for completion or consideration of an environmental assessment and for the attachment of appropriate lease stipulations, and for the making of any other findings prerequisite to lease issuance. (43 CFR 3400.3, 3461.1(a))"" The forest analyzed the unsuitability criteria in Appendix B, it did not make a determination per the SMCRA Section 522 (e). If commenter will recall, this as was done in the 2012 ROD at 17, ""I have reviewed the unsuitability criteria published in 43 CFR 3461 (FEIS, Appendix B) and am recommending to the Secretary of Interior (or their delegated representative) that there are no significant recreational, timber, economic, or other values that are incompatible with modifying the leases within the analysis."" Similarly a recommendation will be made to the BLM if consent to lease is issued based on the SFEIS.

**Comment:** Coal is a profitable business, they will cry about the costs, (meaning less corporate gain and personal bonuses), but they need to be held to standards that leave as little impact as possible on the land. As a legislator you also have the same obligation to be a steward to ALL people and the environment (Schmidt, Barbara)

**Response:** Stipulations are applied to leases to do just that.

**Comment:** Commenter states wilderness areas need buffer zones to prevent and reduce the effects of development on its inherent values. (Tippets, B &J)

**Response:** The lease modifications area is outside designated wilderness.Provisions of the Colorado Wilderness Act do not allow for the prevention of activities outside wilderness “Congress does not intend that designation of wilderness areas in the State of Colorado lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that nonwilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area” (96-560, Sec. 110)."

**Comment:** Consistent with Section 3 09 of the CAA, it is the EPA's responsibility to provide an independent review and evaluation of the potential environmental impacts of this project. Based on the procedures the EPA uses to evaluate the adequacy of the information and the potential environmental impacts of the proposed project, the EPA is rating the Draft EIS as Environmental Concerns - Insufficient Information (EC-2). The "EC" rating indicates that the EPA review has identified environmental impacts that need to be avoided in order to fully protect the environment. The "2" rating indicates that the EPA has identified additional information, data, analyses, or discussion that we recommend for inclusion in the Final EIS. (EPA)

**Response:** We have responded to EPA's comments by pointing to the sections of the SDEIS/SFEIS where it was addressed.

**Comment:** Commenter states thatpursuant to the Mineral Leasing Act of 1920 (MLA), a prerequisite to approving any coal lease modification is that the modification be in the "public interest" and the national interest. See 30 U.S.C. § 201(a)(1) ("The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest." (emphasis added)); 30 U.S.C. § 203(a)(2)(A) (Interior Secretary may modify coal leases upon a finding that, inter alia, that the lease modifications "would be in the interest of the United States" (emphasis added); 43 C.F.R. § 3432.2(a) ("The authorized officer may modify the lease to include all or part of the lands applied for if he determines that: (1) The modification serves the interests of the United States." (emphasis added)).2 To the extent that the Forest Service believes that the Secretary is without discretion to modify or deny the lease applications, that belief is without legal foundation.3 . The Forest Service should not undermine the public interest or America's national interest to benefit one of world's largest purveyors of dirty coal. The Forest Service's own analysis demonstrates the proposal's damaging impacts, and that the Lease Modifications and exploration plan are neither in the public nor the national interest.(Zukowski, T.)

**Response:** The commenter is correct in the assertion, that the Forest Service Deciding Officer could select the No Action Alternative in the Record of Decision and decide not to consent to the Lease Modifications. The citations presented by the commenter referring to "…public interest…." And "…interest of the United States…." Refer to the Secretary of the Interior's discretion as to whether or not to approve the lease modifications. Similarly, the BLM's Authorized oOfficer, as designee of the Secretary of Interior could determine through their record of decision that approving the lease modifcations do not serve the interests of the United States, and therefore decide not to modify the leases.

NEPA requires agency decision makers to make informed decisions and to make diligent efforts to involve the public in preparing and implementing their NEPA procedures. Therefore, the NEPA process must be completed before an agency makes a final decision on an action. The BLM developed this SFEIS in coordination with the USFS to comply with NEPA and consider a range of reasonable alternatives to examine the effects from potential exploration and the potential modification of existing leases. Additionally, 43 C.F.R. § 3432.2 (Lease Modifications) provides that the authorized officer may modify a lease to include all or part of the lands applied for if the authorized officer "determines that: (1) the modification serves the interests of the United States; (2) there is no competitive interest in the lands or deposits; and (3) the additional lands or deposits cannot be developed as part of another potential or existing independent operation." After the NEPA process is complete, the BLM will prepare a Record of Decision to document the agency's selected alternative and any accompanying mitigation measures based on the NEPA process. At this time, the BLM will also make a determination as to whether the lease modifications compy with the criteria set forth in 43 C.F.R. § 3432.2.

**Comment:** Multiple commenters have stated the Colorado Roadless Rule has again been finalized and the right to access these areas for exploration and safe mining should be allowed with these modified leases.

**Response:** The CRR exception has been reinstated which provides for construction of temporary roads related to exploration and mining.

**Comment:** Numerous commenters have expressed concerns about policy (or don't believe that policy exists) for leasing coal on NFS lands.

**Response:** The federal agencies are acting under their role in the federal coal program under the process described in Sections 1.2, 1.3 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** These pristine forest lands must remain exactly that - PRISTINE! Public Lands are exactly that - PUBLICLY OWNED! They are not to be sold or leased to for profit companies whose only desire is to get rich while destroying vital habitats and areas that provide recreational opportunities for the people of whom these lands were set aside as Public Lands. Please do what your agency is charged with doing - protecting and preserving our Public Lands. (Craig, D.)

**Response:** The Forest Service does not have a preservation mandate. It has a multiple-use mandate. The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Numerous commenters state that allowing coal mining on National forest lands is a dangerous precedent, that new mines shouldn't be allowed, or that new coal mines are unnecessary.

**Response:** This is an existing coal mine on NFS lands. The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Commenter states the need for coal is diminishing, not increasing, so there is no practical reason to do so much environmental harm for the benefit of a single corporation, which will not produce many jobs, just environmental harm. (Greig, J)

**Response:** This is an existing coal mine. See Table 3-40 for direct jobs comparison of the alternatives. The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Commenter states no coal company has ever been able to adequately reclaim land it has been allowed to raze. Coal mining has made land barren, devastated rivers and streams that have been either polluted or lost forever, and made lands uninhabitable for man and beast alike. Being able to lease 1,700 acres of land to Arch Coal won't change any of that. It will just make the problem worse. Dealing with coal ash and sludge is bad enough (Hoekstra, R. )

**Response:** This is an underground mine. Reclamation of roads and MDW pads has been very successful in this area and is required by State regulations, permits and bonding.

**Comment:** Commenters state we should not allot strip coal mining.

**Response:** This is not a strip mine it is an underground mine.

**Comment:** Commenters believe the role of the Forest Service is to preserve these wildernesses for all generations of Americans.

**Response:** This is not wilderness. The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Commenter states that watershed management was one of the original missions and goals for the establishment of the U.S. National Forest System lands anyway; coal development was not. Nagel, C.)

**Response:** We agree that watershed protection is one of the original goals for the establishment of National Forests. However, these laws have been augmented by other federal laws mandating multiple use, energy independence, and coal recovery. The federal agencies are acting under their respective roles in the federal coal program under the process described in Sections 1.2,1.3 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Commenter states that there are regulations in place today that prevent destruction of critical and endangered habitat. (Norwood, D.)

**Response:** We have considered the Endangered Species Act in our analysis and have consulted with USFWS.

**Comment:** Commenter states the SDEIS is Not a Mechanism to Relitigate Issues that were Upheld or not Challenged in the HCCA Litigation Another theme in the WEG form letter is the completely unsupported claim that the Lease Modifications will cause adverse impacts to "black bear, elk, lynx, and cutthroat trout." There is no evidence for any of these assertions, and elk in particular are thriving in the vicinity of West Elk's existing operations. Equally importantly, analyses of effects on these populations was either not challenged or specifically upheld in the HCCA litigation, and consequently they are not open for relitigation absent specific, new information arising between completion of the FEIS and SDEIS. The FSEIS should make note of this limited scope in light of WE G's and similar comments. (Drysdale, M)

**Response:** This matter is not currently in litigation. As such it would be speculative to address at this time.

**Comment:** A few commenters have questioned why we aren't requiring methane control.

**Response:** Methane mitigations are permitted under lease stipulations and one of BLM's stipulations requires consideration of methane mitigation.

## Alternatives

**Comment:** Commenter alleges The SDEIS Violates NEPA by Failing to Analyze a Reasonable Alternative with Stipulations to Protect Old Growth Forest and Existing Mature Forest. The GMUG Forest Plan directs the GMUG National Forest to pay special attention to old growth resources. To do so, the Plan directs that the GMUG National Forest "[d]efine and inventory old growth for each of the Forest types on the Forest."157 The plan also states: "The GMUG Forest will conduct old growth inventories . In the meantime, project level decisions that might affect old growth will give special consideration to the old growth resource."158 The GMUG National Forest does not appear to have conducted inventories in the Lease Modifications area as required by the Forest Plan's direction. The SDEIS states that "[n]o old growth has been specifically defined in the lease modification areas," but it does not indicate whether it has completed the required inventory.159 The Forest Service states: "There are 3 stands which may or may not be old growth outside the lease modification area . . . which meet the first screening criteria

(large diameter trees) for old growth using Mehl's definitions."160 The Forest Service's apparent failure to conduct a comprehensive inventory of old growth forest is a violation of Forest Plan direction, and the Forest Service's failure to analyze an alternative with stipulations to protect old growth forest violates NEPA. Conservation Group members have observed spruce stands in the Lease Modifications area with several obvious components of old growth forest (large diameter, numerous mature trees in proximity appearing to be 300 years old, standing dead trees, significant downed woody debris, etc.). It is impossible for the Forest to conclude that it will not violate Plan guidelines concerning old growth if it does not know if old growth is present. Further, the lack of definite information about old growth cannot serve as a rational basis for declining to consider stipulations to protect old growth. (Zukoski, T)

**Response:** A similar request was previously addressed in SDEIS in responses to comments on page 416, 484 and in Section 2.3.10.5 and in FEIS in 2012. Vegetation polygons (or stands vs. a few individual trees) were reviewed in 2012 in an effort to analyze old growth based on analysis summarized by habitat structural stage by cover type by Potential Natural Vegetation (PNV) Class. There are no old growth stands within the lease modification areas. See project/previous litigation files including Mehl's old-growth descriptions at FSLeasing-0116586 to FSLeasing-0116600, Mehl's old growth modified definitions for the GMUG at FSLeasing-0116601 to FSLeasing-0116607, inventory (per the requirements of the Forest Plan) data summary by structural stage class for watershed at FSLeasing-0116839 to FSLeasing-0116847,and map at FSLeasing-0116925. Even if we included the subsidence polygon for Alternative 3 (SFEIS Section 3.3) on the FSLeasing-0116925 map, subsidence from the lease modification would not come close to affecting any of these stands with very large size classes in mature stands which may or may not be old growth. Further, one of the three identified stands is not on NFS land, the second is a cottonwood stand primarily on private land and another stand is in wilderness. As lease stipulations wouldn't apply to any of those lands, inclusion of a requirement for such is unreasonable and not supported by decision framework. Likewise there is no Forest Plan standard for "mature trees" in any size class, even if old-growth standard applied to mature trees, they could be cut and protection of such would not be consistent with NFMA/Forest plan requirements.

We understand that aspen and spruce are important to commenter, but the trees that are proposed to be cut for exploration activities under Alternative 3 which have been flagged in 2013 and posted on commenter’s own website shows aspen trees appear to be close to 6" in diameter (pink flagging is 1" wide for reference) not 16" as is required in the definition. Another photo shows a single spruce tree in an aspen stand that may qualify large or very large in a stand of aspen trees which again are not large or very large per Mehl’s definitions nor does a single tree make a stand.



Photo Source: http://earthjustice.org/features/photos-sunset-roadless-area with photo credit given to commenter, Ted Zukoski



**Comment:** Commenter alleges the SDEIS Violates NEPA by failing to analyze an alternative that eliminates the southern portion of proposed lease modification COC-67232. The lease modification for COC-67232 contains over 200 acres of terrain in sections 22 and 23. SDEIS maps show, however, that Arch is not seeking to explore in either sections 22 and 23 even if it plans to mine that lease, as no exploration roads or pads occur in either section.162 The most recent maps depicted likely areas of subsidence caused by foreseeable mining indicate no subsidence (and thus no mining) will occur within sections 22 and 23.163 The Forest Service should therefore consider an alternative that eliminates the acreage in those two sections from the COC-67232 lease modification. This alternative would be distinct from Alternative 3, in that it would ensure the protection of surface resources in sections 22 and 23, although it would permit the same amount of coal to be mined as Alternative 3, and all of the exploration activities proposed under that alternative. Given that no exploration, and apparently no mining, are anticipated in these two sections, it is simply unnecessary to lease the federal coal there. (Zukoski, T.)

**Response:** An alternative that truncates the lease tract responds to neither application nor to the tract delineation that was completed under BLM regulations (43 CFR 3420.3-3 and 3425.1-9) as described in the technical report GER/MER at 5 "The boundaries of the MOD-VR area encompasses what is projected to be remaining mineable E-Seam reserves as well as covering some area of projected unmineable reserves for which the exact potential is unknown. It prevents possible bypass of the unknown reserves while allowing a mine layout that increases recovery on existing fee and federal leases" and at 6 "The MOD-VR area that MCC included in its application was reviewed by BLM and determined to be the most efficient and reasonable area to lease, given the current available data from drill holes and the existing mine workings." Lease modification sizes are also consistent with the Energy Policy Act. Should specific non-mineral surface resources or other sound rationale merit it, the Deciding Officers could make decisions drawing from multiple alternatives analyzed, yet not analyzed as a discrete alternative(s) in the EIS.

**Comment:** Commenter states the coal dust in such a windy area will impact is all, including the ranchers that make a living here. (Boyd, A.)

**Response:** Coal mining has been occurring in this immediate vicinity for nearly 100 years concurrent with livestock grazing. Dust, a particulate, is considered in Section 3.4.

**Comment:** Commenter alleges that the SDIES violates NEPA by failing to analyze a range of reasonable alternatives. The studied alternatives in the SDEIS do not represent a range of reasonable alternatives which would accommodate the agency's stated purpose and need. The agency should consider several more alternatives in order to comply with the mandates of NEPA. (Zukoski, T.)

**Response:** Commenter alleges that a reasonable range of alternatives has not been considered. The SDEIS included three alternatives analyzed in detail and 29 alternatives or sub-alternatives that were considered but eliminated from detailed study constituting the range of reasonable alternatives required in compliance with NEPA (40 CFR 1502.14(a)) and the roles of the federal agencies in the federal coal leasing process (identified in SDEIS at 1.6 and similar sections in previous documents). Addition of further variations have been considered, and were determined not to provide additional value in respective concurrence and leasing (i.e., consent to lease with stipulations specific to the resources the FS (surface or non-mineral) and BLM (minerals) manage or not) or the alternatives we have brought forward for detailed consideration (consent to and lease neither, both or only one of the modifications applied for). This range of alternatives (from status quo, to consent to and lease as applied for) is reasonable and meets the purpose and need. This range discloses the environmental effects and provides the Deciding Officers with sufficient information to select among alternatives or modify alternatives as necessary. Similarly, the addition of a single lease modification alternative (obtained from public comments), provides a reasonable number of alternatives. Fully analyzing high numbers of alternatives within that range would not be efficient government, nor would they add substantively to the Deciding Officers' ability to make informed decisions.

**Comment:** Commenter states that we should reject Arch Coal's proposed mining expansion because it caused drastic damage to the forest itself and the air we breathe. R (Leon, D.)

**Response:** Effect on forests resources are described in Chapter 3.

**Comment:** Comment alleges that thee SDEIS Violates NEPA by Failing to Analyze a Reasonable Alternative That Would Include Protections for Wilderness Capable Lands. One way to balance MCC's desire to mine coal against the potential harm to roadless lands from a network of well pads and roads would be to add "no surface occupancy" ("NSO") stipulations where the lease modifications overlay lands found to be "wilderness capable" in the GMUG National Forest's 2005 inventory. The stipulations could make clear that they do not seek to preclude surface impacts from subsidence, only from roads, well pads, and similar developments related to the construction, use, and maintenance of methane drainage wells. The SDEIS does not consider an alternative which would protect these areas through stipulations. The agency's justification for not analyzing an alternative with NSO stipulations aimed at protecting wilderness capable lands is arbitrary and capricious for several reasons.

- First, just because there are no designated wilderness areas or areas proposed for designation as wilderness within the project area does not mean that lands which have been found to be wilderness capable are undeserving of protection through NSO stipulations or that an alternative with such stipulations would not be reasonable. In fact, mining on wilderness capable lands will degrade those wilderness values (regardless of their formal status in the eyes of the Forest Service) on these lands for decades to the point that they may never be eligible for formal wilderness designation.
- Second, the distinction the agency attempts to make between wilderness and roadless areas is baseless. The fact that the GMUG National Forest does not manage lands to protect wilderness values does not erase those values, nor does it eliminate the Forest Service's duty to consider reasonable ways in which it might protect those values.

- Finally, although Alternative 4 does protect the wilderness capable lands in the proposed project area, an alternative with NSO stipulations for wilderness capable lands falling within the lease modification areas, it would be significantly distinguishable from Alternative 4 because some coal in the COC-67232 lease modification area would still be available for mining under such an alternative.

**Response:** Effects analysis of an NSO stipulation for wilderness capable is already covered between analysis of the action alternatives in compliance with NEPA (40 CFR 1502.14 and 1502.16). Alternative 4, analyzed in detail, was developed at commenter's request during the DEIS process to avoid wilderness capable lands and has been brought forward throughout the FEIS and SEIS process. Projected subsidence for the most part also avoids these lands under Alternative 3 (See Figures 3-4, 3-5) Similar to discussion in Section 2.3.10.4 the provisions of the Colorado Wilderness Act (specific to the West Elk Wilderness) "unless expressly authorized by Congress the Department of Agriculture shall not conduct any further Statewide Roadless area Review and Evaluation of National Forest System lands in the State of Colorado for the purpose of determining their suitability for inclusion in the National Wilderness Preservation System."

The commenter alleges the Forest Service is ignoring wilderness values, it is irrelevant whether the capable wilderness is "bureaucratically protected or not," and the Forest Service must address the impacts to wilderness capability. Determinations of wilderness capability and suitability are forest plan level decisions. For this area, the decision to not recommend this area for inclusion into the National Wilderness Preservation System was made in 1991 and thus the area is managed for uses other than wilderness preservation. In 2005, part of the area was identified as capable wilderness as part of the GMUG's 2007 forest plan revision process but this area was also not recommended for wilderness as part of that process. So the fact a portion of the Sunset Roadless Area was identified as capable wilderness is irrelevant to the lease modifications decision because a higher level decision has already been made that addressed this issue, the 2005 effort was consistent with the 1991 decision, and the 2007 forest plan revision effort was never finalized.

The agency is under no obligation to revisit the forest plan decision regarding wilderness recommendations. To do so would be highly inefficient because there are hundreds of issues resolved programmatically at the forest plan level that a commenter could allege needs to be revisited. This could potentially render all projects into mini-forest plan revisions and would ignore NEPA's notion of tiering.

Despite the fact the agency has no obligation to revisit the forest plan decision regarding wilderness recommendations, the agency developed Alternative 4 to respond to these concerns. Alternative 4 would only consent to modification of lease COC-1362 and not consent to modification of lease COC-67232. This alternative does not overlap with any of the lands identified as wilderness capable (see SEIS, Figure 3-26, and Section 3.18.3.4) .

**Comment:** Commenter states we must consider the devastating effects on the forest, wildlife, and air quality. (Henry, K.)

**Response:** Effects on forest resources have been considered throughout the Chapter 3. Effects on wildlife were considered in Sections 3.10-3.14 and on air in Section 3.4.

**Comment:** Commenter states this is a treasured recreational resource, home to wildlife, and that to avoid climate change we should keep all fossil fuels in the ground. (Kastel, D.)

**Response:** Effects on recreation are addressed in Section 3.16, wildlife in Sections 3.10-3.14, and climate change effects for each resource area in Chapter 3. Domestic coal policy is governed by federal energy policy and law as discussed in Table 1-1 and Sections 1.2-1.7.

**Comment:** Commenter request that we don't let Arch Coal destroy and exploit this pristine roadless area. (Marquez-Viso, L.)

**Response:** Affected environment and effects on roadless character area are described in Section 3.18.

**Comment:** Commenter states we should adopt the no action alternative, because the proposed action will degrade sensitive roadless lands and worsen climate change, hobble renewable energy generation, and result in millions if not billions of dollars of damage to the global environment and economy while likely benefitting only a single corporation: Arch Coal. (Zukoski, T.)

**Response:** Effects on Roadless character area are described in Section 3.18. Effects of Climate Change in all resource sections in Chapter 3 and Socio-economics addressed in Section 3.21.

**Comment:** Numerous commenters state that we should divert money to or expand renewable energy industry and eliminate coal fired power plants.

**Response:** Energy policy is beyond the scope of this analysis.

**Comment:** Commenter suggests an alternative to explore options to increase revenue where we should sell the land outright and make sure the buyer is held accountable to EPA standards becuase "Leasing" public lands is a scam.

**Response:** A lands, or real estate, transaction where this area may be sold -or exchanged- has not been proposed for this area and would require an agreement by two or more willing parties (one wanting to acquire the property, the other wanting to sell/trade). West Elk Mine had not expressed any interest in wanting to acquire this property. While beyond the scope of the applications being responded to herein, it has occurred in other areas for a similar purpose. Because the majority of the lease modifications are within or were recently added to Colorado Roadless Areas (CRAs) , it is highly unlikely that this would be considered in the near future because of the associated values of CRAs and unfractionated forest ownership in this area.

**Comment:** Coal mining is an activity of the past. We need to move on to cleaner ways of utilizing energy. Coal miners need to be trained into new jobs. Just as agriculture businesses are subsidized; career coal miners should be subsidized for their new job training. (Ashue-finley, T.)

**Response:** Job training is beyond the scope of this decision. Energy policy is beyond the scope of this project-specific analysis.

**Comment:** Commenter alleges the Forest Service Must Analyze Carbon Offsets As A Reasonable Alternative To Reduce The Lease's Methane Pollution. Conservation groups have repeatedly told the Forest Service that carbon offsets are a tested, feasible, and practical alternative to allowing the West Elk Mine to vent millions of cubic feet of methane into the atmosphere every day as a result of the Lease Modifications without mitigation or control, or with incomplete mitigation or control.136 EPA has repeatedly urged land management agencies to assess carbon offsets in EAs and EISs as a way to reduce climate change impacts of agency actions. EPA has specifically noted that offsets are a reasonable alternative to lessen the impacts of coal mine methane emissions. EPA has advised that many entities exist that permit agencies and polluters to purchase carbon offsets that are third-party verified.137 The Forest Service rejects any analysis of the economic costs or the environmental benefits of requiring Arch to purchase carbon offsets by stating: [P]urchasing carbon credits is a voluntary financial investment that MCC may choose to entertain for business reasons. The federal agencies are not involved in any financial investment decisions that MCC makes as a corporation.138 This excuse for failing to analyze or adopt offsets lacks a rational basis. Federal agencies are deeply involved in decisions that impact lease-holder's investment decisions. Federal agencies require lease-holders to pay

royalties, implement reclamation requirements, post bonds, conduct surveys, mitigate impacts to wetlands, and any number of other mandates that require lease- holders to expend financial resources. BLM and the Forest Service have repeatedly required those engaged in mining activities to fund activities that mitigate a project's impacts to wildlife, air and other resources.139 The SDEIS arbitrarily fails to address why the action agencies cannot take actions similar to those they have taken to mitigate the impacts of other mining projects. Nor does the SDEIS explain why purchasing carbon credits must be voluntary, as opposed to required by federal agencies. The alternative/mitigation measure we propose here is that MCC be required to purchase carbon credits. To say that "there is no compulsory requirement for the agencies to include it"140 does not in any way render the proposed alternative unreasonable.141 An alternative that proposes that the Forest Service consent to MCC's proposed Lease Modifications be conditioned upon MCC's purchase of carbon offsets would be consistent with the proposed action's purpose and need. MCC would be able to obtain the lease modifications and expand its operations in the exact same manner as it proposed. A carbon offset alternative would simply require MCC to purchase carbon credits from a legitimate vendor. Moreover, offsets do not present the Forest Service or MCC with an all-or-nothing scenario - the Forest Service could require MCC to offset less than 100% of the GHG emissions attributable to the Lease Modifications. The SDEIS also justifies the Forest Service's refusal to consider the reasonable, available alternative of requiring Arch to purchase carbon credits or offsets on the grounds that there is no Congressionally-mandated use of national offset markets or cap-and-trade program, and that requiring offsets would constitute "policy development [that] is not appropriate at the project level."142 These arguments lack merit. While Congress has not passed a law requiring coal mining companies to participate in any of the available national offset markets, that fact is irrelevant, and does not excuse the Forest Service's from considering this proposed mitigation measure as a reasonable alternative. Mandating the purchase of offsets does not require a mandatory national trading program created by Congress. There are numerous companies that provide the opportunity for the public to purchase retail carbon offsets sold in the voluntary market.143 One can readily buy carbon credits to offset one's carbon emissions from renting a car; it is unclear why cap and trade legislation would be necessary for a coal company to make a similar (though much larger) purchase. There is not a valid reason for the Forest Service to exclude this reasonable alternative simply because Congress has not established a national carbon cap-and-trade program. Further, as discussed above, EPA has previously recommended offsets as one way the impacts of a single mining project could be mitigated. The SDEIS's blanket statement that requiring offsets is a policy that "is not appropriate at the project level"144 is unsupported and contrary to EPA's prior position. Similarly, and contrary to the SDEIS's suggestion, considering as an alternative or adopting a mitigation measure requiring the purchase of carbon offsets for two lease modifications for one of the gassiest coal mines in the U.S. cannot be dismissed because it is "setting policy for coal production in the United States."145 It would not do so. The Forest Service also alleges that "[t]he creation of carbon offset markets or opportunities for carbon offset projects is beyond the scope of the EIS and is not currently a BLM policy." 146 Conservation Groups have not proposed that the federal agencies "create offset markets;" rather they propose that the agencies consider in detail the option of requiring Arch Coal to offset all or some of the GHG pollution that the Lease Modifications will cause. Even if such an approach is "not currently BLM policy," that is not a valid basis for refusing to evaluate a reasonable alternative or proposed mitigation measure. See Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 814 (9th Cir. 1999) (Forest Service was required to consider purchasing lands as alternative to land exchange, even though "it was not clear that the funds would be available for such a purpose," and the agency had not requested the funds); Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026-01, 18,027 (Mar. 23, 1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable ...."). The Forest Service also states that "[w]hile other specific off-set (or off-site) mitigations may be possible (i.e., reforestation of marginal agricultural land or investing in solar), they have not been brought forward for consideration related to this leasing analysis."147 To the extent that the Forest Service implies that the purchase of carbon credits or offsets was not suggested during prior comment periods, that implication is false, since

conservation groups suggested offset and off-site mitigation seven years ago.148 It is also unclear why, if numerous exchanges exist for the purchase of carbon credits, the Forest Service must review a specific project for MCC to purchase to offset its carbon pollution. MCC can choose what type of project it proposes to fund through the purchase of offsets, as long as the offset vendor is legitimate and ensures lasting and verifiable GHG reductions. In any event, we hereby request that the Forest Service consider other off-site mitigations, including reforestation of marginal agricultural land or investing in solar power. We note that the Forest Service itself previously identified a number of potential offsets for this very mine in 2008.149 Finally, the Forest Service disputes the reasonableness of the mitigation alternative on the grounds that "[m]itigation as determined by lease modification stipulation (also BLM IM 2017- 037 (January 20, 2017)) and in compliance with the Mineral Leasing Act for coal mining must be economical."150 These assertions are without merit. BLM IM 2017-037 only relates to voluntary measures for capture, not all mitigation, and not mandatory offsets. And again, the MLA does not mandate coal mining, whatever the cost to the environment. Finally, because the Forest Service has not evaluated in detail the cost of offsets, the agency can have no idea whether such mitigation could be implemented in a way that renders coal mining economical or not.151

**Response:** Methane is not a criteria pollutant and significance criteria has not been established for it. Methane has been analyzed in SDEIS Section 3.4 and other sections in previous analysis in compliance with 40 CFR 1502.16. Carbon capture and offsets would be permitted under lease stipulations. Lease modifications contain stipulations that requires lessee to submit to BLM consideration of methane mitigation within one year of leasing. These stipulations that could affect these mitigation measures are in compliance with the requirements of NEPA at 40 CFR 1500.2(e). We have reiterated several times that this is a staged decisionmaking process and have identified this in various sections of the analysis (including SDEIS Sections 1.2-1.7, 2.2, Appendix C) for the past seven years per the requirements of NEPA (40 CFR 1502.4(c )(3). An alternative not considered in detail in Section 2.3.6 addresses carbon credits/carbon offsets and is thus covered by prior environmental analysis. By requiring MCC to purchase carbon credits or off-sets as a stipulation (which becomes part of the lease), Forest Service (pers. phone communication N. Mortenson with the West Elk Mine in August 2017) was told that they would not qualify for the actual carbon credit which is voluntary; thereby negating the company's incentive to do so and unnecessarily burdening the lease modification(s) should they be issued. As we are unfamiliar with Colorado tax code, and the provisions therein, and its relationship to severance and other taxes, rents and royalties paid, we cannot dispute this assertion. We again assert that this a voluntary financial investment that MCC may make, which is not required for either the protection of the surface resources as in the FS stipulations (30 U.S.C. 201(a)(3)(A)(iii) provides the Forest Service authority to impose conditions: "with respect to the use and protection of the nonmineral interests in those lands")or related to BLM's decisions for minerals recovery.

**Comment:** Commenter alleges the Forest Service must analyze alternatives that require capture and/or electricity Generation from methane. In comments on the scoping phase of this proposal, Conservation Groups urged BLM to consider an alternative requiring the West Elk mine to capture methane as a means to reduce the climate impacts of the Forest Service's consent to the proposed lease.92 A In the SDEIS, the Forest Service, however, refused to consider in detail an alternative that required the mine to capture all or a portion of its methane rather than venting it into the atmosphere. As the Forest Service acknowledged, there are several methane capture technologies potentially available, including, methane drainage well ventilation, capturing methane to power on-site heaters, capturing methane to produce electricity, and to sell into the gas market.94 The Forest Service provides a number of unavailing excuses for failing to consider these viable technologies in detail.

The Forest Service states that "[c]onsideration of all these potential methane mitigation measures relies on site-specific engineering designs for 1) mining, 2) safety and finally 3) mitigation technology possibilities."95

The Forest Service asserts that "the staged process under several authorizing agencies . . . does not lend itself well to prescribing specific mitigation measures for activities that have not been proposed yet."96 The Forest Service also states that: At the leasing and pre-exploration stages without coal seam information, without a mining plan addressing safety, and without detailed engineering based on information that has yet to be collected, it is speculative to assume that this mitigation measure or alternative is appropriate for the lease modifications' post- mining scenario.97 This excuse is legally inadequate. As an initial matter, the proposed action would grant West Elk the right to mine the area, making development all but inevitable. NEPA mandates that agencies "shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values." 40 C.F.R. § 1501.2 (emphasis added). "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require that analysis as soon as it can reasonably be done." Kern v. BLM, 284 F.3d 1062, 1072 (9th Cir. 2002). Moreover, NEPA sets out mandatory steps that agencies must take when faced with incomplete or unavailable information. 40 C.F.R. § 1502.22(a)-(b). If the Forest Service needs more information, now is the time to acquire it. The Forest Service has not, however, offered any explanation as to what information it would need, but that it does not have and cannot obtain - from this single, already-operating coal mine - in order to perform this analysis.98 Nor does it state how the proposed post-mining use of the site would (or even hypothetically could) preclude use of capture technology (or methane flaring for that matter) during the operation of the mine. The fact that methane capture requires site-specific engineering related to mining, safety, and the technology used does not mean that the Forest Service can dodge analysis at the lease consent stage. Indeed, for an operating mine that is, according to the Forest Service, participating in the EPA's Coal Mine Methane Outreach Program, West Elk appears ideally situated to having all of the necessary mining and engineering information available now. Moreover, as part of its refusal to analyze methane reduction alternatives in authorizing the Colorado Roadless Rule, the Forest Service explicitly stated that it would evaluate such proposal at the lease stage: "Like capture, methane flaring is best considered at the leasing stage when there is more information on the specific minerals to be developed and the lands that would be impacted by a flaring operation."99 The Forest Service also previously stated that, the "decision whether to apply a stipulation regarding methane capture and use or reduction is more appropriately made as part of a coal leasing or development decision."100 Having reached the lease consent stage, the Forest Service appears happy to "kick the can down the road" yet one more time, or to engage in a shell game such that no analysis ever occurs. In commenting on the supplemental draft EIS for the Colorado Roadless Rule, EPA explicitly rejected this excuse - and that was for a proposal that is further removed from production than this one. EPA clearly explained both that the Forest Service's review was the appropriate place in the NEPA process for consideration of methane reduction technologies and that the Forest Service had all of the information it would need to make such as assessment. First, EPA explained that "[t]he USFS has discretion to condition leases on USFS land, so consideration of these important mitigation measures is an appropriate subject for this SDEIS."101 EPA also explained that the Forest Service could use the extensive body of information already collected by mines in the North Fork Valley to inform this assessment: The [Colorado Roadless Rule] SDEIS specifically considers the issue of methane capture and reduction and defers more detailed analysis of alternatives for methane gas mitigation "because critical design criteria that bear upon the feasibility of such capture mitigation are too speculative at this time" (SDEIS, p. 9). EPA disagrees with this characterization of the state of knowledge. All coal mines in the North Fork Coal Mining Area are well informed about methane capture systems, as they all deploy gas drainage systems to supplement their ventilation fans. In fact, representatives of West Elk Mine and Elk Creek mines have given presentations describing their gas drainage and use activities at past EPA Coalbed Methane Outreach Program (CMOP) events, and CMOP has provided funding for pre-feasibility studies at the West Elk mine in the past.102 Second, the Forest Service claims that evaluation of methane capture at the West Elk Mine is "further complicated by federal policy on coal, current climate policy . . . and that a regulatory significance threshold under EPA's endangerment finding has not been established for methane to date."103 Again, this argument fails. First, the Forest Service offers no explanation by what it is about "federal policy on coal" that impacts its ability to consider a reasonable

alternative requiring methane flaring at one mine in Colorado. Cf. 40 C.F.R. § 1502.22(a)-(b). Nor has the Forest Service explained which federal policy supposedly impedes this review to such an extent that it cannot examine viable alternatives now. Similarly, the Forest Service offers no explanation for what the executive order says about methane reduction from coal mines that operate on public lands, nor what provisions supposedly make the Forest Service's evaluation of an otherwise reasonable alternative impracticable. Finally, the Forest Service provides no explanation for how the existence or non-existence of an EPA factual finding as to the harmful public health effects of methane could feasibly preclude the Forest Service from considering ways to reduce methane emissions. Nor could it. Whether EPA issues such a finding or not has no bearing on the information necessary to determine whether the West Elk Mine could capture or flare all or a portion of its methane emissions and thereby significantly reduce the indisputable climate impacts of the Forest Service's decision to consent to the lease modifications, a decision that will extend the operation of the single largest industrial source of methane pollution in the state. The Forest Service also states that "[a]t this time is unlikely that methane use or capture from coal mines will be prescriptive under a forest plan revision as there is no way to measure any benefit or effect at the local level within the duration of the proposed plan cycle."104 This statement does not excuse the agencies' failure to examine a methane capture alternative. Such an alternative is consistent with the Forest Plan, which neither requires nor precludes methane capture, and thus the Forest Plan provides no barrier to the Forest Service analyzing methane capture alternatives in detail in this NEPA process. Finally, the Forest Service further relies on outdated information from the West Elk Mine operators to conclude that any methane capture alternative would be uneconomical. In one example, the Forest Service states that "MCC commissioned an analysis (Appendix A) for capturing and/or conditioning the MDW methane for use onsite as fuel for a co-generation facility in order to produce electricity for sale to the grid, or for sale as pipeline quality natural gas," but ultimately rejects various proposals as uneconomic.105 That 2009 study fails to account for significant regulatory developments that could change the financial analysis of methane capture technologies. In particular, the Forest Service does not address California Air Resources Board's greenhouse gas cap-and-trade program that allows California business to purchase carbon credits from out-of-state coal mines that capture or flare methane. Numerous mines have registered and sold credits into the market, reducing carbon emissions by tens of thousands of tons of CO2-e. Among these is the Elk Creek mine, which sits just across the highway from the West Elk mine.106 The following chart, compiled using information from the California Air Resources Board's website, provides a description of each project, its location, the mine owner, the methane capture or flare technology used, the amount of CO2 not emitted into the atmosphere as a result of the project, and the amount of CO2-e not captured for flared. Although much of this information was presented in Conservation Organizations scoping comments on the lease modifications, neither MCC's 2009 report nor the SDEIS addresses these developments or the impact of the newly-available revenue on the economic feasibility of methane capture at West Elk. This information demonstrates not only the feasibility of methane capture and related projects, it shows they can be financially remunerative.

**Response:** Methane is not a criteria pollutant and no significance criteria or ambient air quality standards have been established for it. The harmful health effects of methane in the context of climate change are disclosed in section 3.2.1.6 of the SFEIS. Methane has been analyzed in SDEIS Section 3.4 and other sections in previous analysis in compliance with 40 CFR 1502.16. This means that while mitigation may be desirable, there is no local, regional or global threshold established that would be exceeded by not doing it. However, these types of methane mitigation would be permitted under lease stipulations. Lease modifications contain stipulations that requires lessee to submit to BLM consideration of methane mitigation within one year of leasing. These stipulations that could affect these mitigation measures are in compliance with the requirements of NEPA at 40 CFR 1500.2(e). We have reiterated several times that this is a staged decisionmaking process and have identified this in various sections of the analysis (including SDEIS Sections 1.2-1.7, 2.2, Appendix C) for the past seven years per the requirements of NEPA (40 CFR 1502.4(c )(3). Alternatives that address methane mitigation in the form of capture and /or electricity generation are analyzed in Sections 2.3.7.1-2.3.7.4. The Forest Plan discusses air quality in terms of compliance with state and federal

law (III-85), which we have done in SDEIS/SFEIS (Section 3.4). 30 U.S.C. 201(a)(3)(A)(iii) provides the Forest Service authority to impose conditions. It states that conditions may be prescribed "with respect to the use and protection of the nonmineral interests in those lands."

**Comment:** The Forest Service Must Analyze Oxidation Of Ventilation Air Methane As A Reasonable Alternative To Reduce The Lease Modifications' Methane Pollution. VAM mitigation measures are technically and economically feasible. Such measures have been adopted at coal mines elsewhere in the United States and around the world.36 VAM cannot be flared because the concentrations of methane in ventilation air are too dilute, so other technologies must be used to combust VAM. EPA and others report, however, that technology is available and is being successfully employed to reduce 95% or more of VAM emissions from numerous coal mines.37 The Forest Service must consider "all possible approaches to, and potential environmental impacts of, a particular project." Wilderness Soc'y v. Wisely, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (emphasis added). Granting lease applicant Mountain Coal Co. (MCC), an Arch subsidiary, consent for the Lease Modifications while requiring MCC to put in place VAM controls on its ventilation system to reduce methane emissions clearly represents one possible, reasonable approach to MCC's request for the lease expansions. These technologies and controls are "alternatives" to the proposed action - they would, when combined with the proposed action, achieve the basic aims of the proposed action by different means, while eliminating or lessening the adverse environmental consequences of that action. Despite the multiple examples of successful VAM mitigation technologies, the Forest Service declines to study in detail such an alternative.59 Data and independent research demonstrate that VAM reduction technologies may likely be technically feasible at the West Elk mine. Data prepared for MCC shows that the mine is producing methane in sufficient concentrations to operate a VAM oxidizer at least part of the time. These data show methane concentrations ranging from 0.15% to 0.31%.60 While in general, the higher the methane concentration the more economical VAM becomes, many VAM oxidizers are proven to operate reliably at concentrations as low as 0.2%, and some have been proven as low as 0.1%. The SDEIS rejects analyzing such an alternative because "no technology currently exists that has been demonstrated to have the capability of handling the volume of ventilation air and dilute concentrations of methane at the West Elk Mine to make capture economically feasible."67 As we noted in our comments on scoping, to which the Forest Service did not directly respond, these assertions are wrong.68 First, individual oxidation systems can be expanded with additional units to handle greater volumes of VAM.69 EPA has agreed that this is so.70 Technology therefore exists that can handle the volume of ventilation air at West Elk. Further, the mine need not treat all of the ventilation air. It could simply oxidize some of the VAM, an option implicitly recognized in West Elk's 2009 report to BLM.71 Second, existing technology and strategies could address the dilute concentrations of methane, including supplementing the methane that is emitted as VAM and only oxidizing methane when the concentration exceeds 0.1%.72 Third, there is no reason why the Forest Service must make VAM technology economically attractive to Arch Coal. The Forest Service can simply require the lease applicant to reduce methane pollution from VAM to protect Forest Service surface resources currently being damaged by climate change, damage that requires the Forest Service to expand millions to address. We note that neither BLM nor EPA in their recent oil and gas rulemakings conditioned their proposals on regulation being financially attractive to the regulated industry. Even if economic feasibility is required, much has changed in the eight years since West Elk concluded VAM oxidation faced financial and technological hurdles. Regarding economics, the 2009 report prepared by the Mountain Coal Company (MCC) evaluating the economics of methane mitigation, and upon which the Forest Service has relied to dismiss the financial feasibility of VAM mitigation, was flawed to begin with.73 The economic bases for the report were challenged in 2010 by a report prepared by Dr. Thomas Power.74 The Forest Service has never directly acknowledged or responded to that report in prior NEPA reviews, which is a reversible error. Any subsequently prepared NEPA analysis for the Lease Modifications must review and directly respond to Dr. Power's 2010 expert analysis and conclusions.75 Further, a report prepared by the State of Colorado last year detailed recent changes in state and federal regulation of power that has improved the financing environment for coal mine methane mitigation and power projects.76 The report notes that a 2015 FERC ruling may make it easier for coal mines, including

West Elk, to sell power produced from coal mine methane to utilities, and highlights changes in state law that have made coal mine methane mitigation projects attractive to finance by declaring them "eligible energy resources" under the state's renewable Energy Standard (RES). While the State of Colorado report notes that barriers exist to the use of VAM to generate electricity at Colorado mines, the report concludes that there is a potential to generate 17.4 megawatts of electricity from VAM at West Elk, and concludes that it is technically feasible to produce 20% of that amount or 3.49 megawatts of power.77 The Forest Service has not responded to this finding in the State's report.78 EPA also recently published a list of the 25 gassiest coal mines in the U.S., identifying them as "potential opportunities" for VAM and other methane mitigation efforts. West Elk is the only currently operating Colorado coal mine on the list.79 State and federal agencies agree that VAM reduction measures are worth exploring. To support its argument that VAM alternatives are not financially viable, the Forest Service relies on a 2009 Department of Energy study which alleges that VAM destruction is not economically feasible absent "carbon credits, cap-and-trade, or another market or regulatory- based incentivized system for reducing GHGs."80 Given that numerous markets for carbon credits now exist, and that VAM projects around the nation are being funded in part by credits from the California cap and trade system, this study is outdated. The study has also vanished from EPA's website.81 The SDEIS also alleges that VAM concentrations are now likely too low to permit oxidation using existing technology.82 But the SDEIS fails to identify any data supporting its conclusion about methane concentrations, as it apparently has none. Any subsequently-prepared NEPA document should contain actual VAM methane concentration data if the Forest Service intends to support this claim, particularly given that the agency relies on data previously collected that shows VAM concentrations would not be too low to support oxidation.83 The SDEIS further justified dismissing VAM oxidation as an alternative because it "could" result in "potentially significant quantities of criteria pollutants" as well as CO2.84 This unsupported speculation does not justify the elimination of an otherwise reasonable alternative. The SDEIS provides no information on the nature or extent of criteria pollutant emissions that might result from VAM oxidation (or flaring), nor does it explain why the Forest Service could not provide such information to the public. In contrast, the Forest Service and the public know that VAM oxidation would reduce and mitigate hundreds of thousands of tons of CO2e pollution annually, which would have concrete climate benefits. Without more detailed information concerning the potential levels of criteria air pollutants, it is impossible for the Forest Service or the public to weigh the climate benefits of VAM oxidation against VAM oxidation's potential air pollution impacts. In any subsequently prepared NEPA document, the Forest Service must either provide data to substantiate its speculation, or drop this rationale for declining to consider VAM oxidation as a reasonable alternative. Any suggestion that VAM oxidation is unreasonable because of criteria pollutant and CO2 pollution is undermined by the fact that EPA - the federal agency responsible for regulating criteria air pollutants and GHG emissions - has an entire program dedicated to reducing coal mine methane emissions in part through VAM oxidation, and. As noted above, has identified West Elk as a potential opportunity for VAM mitigation.85 EPA has urged agencies - including encouraging the Forest Service with respect to this very mine - to analyze VAM oxidation in EISs and EAs analyzing Colorado mine expansions. For these reasons, the Forest Service must analyze a VAM pollution control alternative in detail. The Forest Service also appears to rely on ignorance as a rationale for rejecting VAM reduction alternatives. "What is unknown and unforeseeable" about VAM reduction technology "is what those scenarios might look like at the West Elk mine or more specifically if they would be economically beneficial to the mine or the greater public."86 This ignores the fact that an expert economist found that MCC's conclusions about the economic feasibility of mitigation measures were based on flawed assumptions.87 Again, alternatives incorporating pollution control measures need not economically benefit the lease holder to be reasonable or to be fully disclosed, analyzed, and adopted by the agency. Further, the Forest Service cannot base dismissal of an alternative on grounds that further study is required. The agency can and should work with the West Elk mine to update the 2009 study to address flaws in the original study, new technologies and new financing tools to develop an alternative that addresses this significant pollution issue. The Forest Service further asserts that proposed VAM oxidation designs do not "factor in the engineering and location considerations specific to the West Elk Mine that are disclosed in the EIS, relying instead on a location in West Virginia, in other parts of the world, on theoretical designs and an economic analysis by

Dr. Power based on data from another coal seam."88 The SDEIS only addresses "engineering and location considerations" in West Elk's 2009 feasibility study,89 a study that is eight years old, was flawed from the start, and fails to consider new technologies and financing mechanisms. Finally, the Forest Service's reliance on a BLM Instruction Memo to argue that "mitigation must be economical" is misplaced.90 BLM IM 2017-037's purpose is "to foster voluntary activities by operators to capture waste mine methane from underground coal."91 This Instruction Memo is irrelevant to the question of whether VAM oxidation (or any other methane mitigation measures) is a reasonable alternative. First, VAM destruction technologies do not "capture" methane. Second, the fact that BLM has a policy of working with mines to voluntarily seek to capture methane pollution does not deprive the agency of the authority to mandate methane destruction when necessary to prevent harmful environmental impacts. Third, mandating VAM oxidation (or other methane destruction or capture technologies) is eminently reasonable in these Lease Modifications because the West Elk's leases have had, since 2009, lease provisions very similar to those contemplated in IM 2017-037, and the mine has declined to undertake any new measures to voluntarily reduce its methane pollution. Despite nearly a decade of opportunity to voluntarily capture or destroy methane, West Elk has captured exactly zero methane molecules as a result of its amended leases, and the mine remains the largest single industrial source of methane pollution in Colorado. (Zukoski, T).

**Response:** Response: Methane is not a criteria pollutant and significance criteria has not been established for it. This means that while mitigation of methane would be desirable, there is no local, regional or global threshold established that would be exceeded by not mitigating it. Methane has been analyzed in SDEIS Section 3.4 and other sections in previous analysis and climate change has been analyzed throughout the SDEIS in compliance with 40 CFR 1502.16. We recognize and have identified adverse effects. NEPA does not require us to mitigate all impacts (particularly in an EIS) or to include anything beyond "appropriate mitigation measures" (40 CFR 1502.14(f)), which in this case are lease stipulations that we can ensure can be implemented at this leasing stage of the process. For the Forest Service, as the lead agency, that is explicit in terms of non-mineral resources and surface protection of NFS lands per regulation. As a point of clarification, commenter includes 4.2 million tons of private coal to which this mitigation would not apply unless approved during the State permitting process and 3.3 million tons of existing federal coal reserves already under lease. The lease modifications themselves represent approximately 1.6- years of mining. See Table 3-1. VAM mitigation could be permitted under lease stipulations. Lease modifications contain addenda that require lessee to submit to BLM consideration of economic feasibility of methane mitigation within one year of leasing. These addenda that could affect VAM are in compliance with the requirements of NEPA at 40 CFR 1500.2(e). There is no VAM mitigation proposal to specifically analyze at this time in the leasing process as it would be dependent on mining methods and ventilation not specifically on leasing actions and may be tied to existing surface resources that deal specifically with ventilation such as the existing Deer Creek Shaft which is already under State permit and for which no further NEPA decision is needed. This is a staged decisionmaking process and have identified this in various sections of the analysis (including SDEIS Sections 1.2-1.7, 2.2, Appendix C) per the requirements of NEPA (40 CFR1502.4(c )(3). Additionally, alternatives that consider VAM capture and oxidation as mitigations were considered in the SDEIS in Section 2.3 and in various sections of prior analysis in compliance with the requirements of NEPA for the federal coal program at 40 CFR 1502.1 and 1502.14(a). There are many options for VAM mitigation in various stages of use, test, demonstration and development stages. After reviewing them, we selected two general types (capture and oxidation) which are briefly discussed in Section 2.3.

Commenter is incorrect, VAM is included in Section 3.4 and displayed in Table 3-7 based on reporting to EPA (Source: EPA FLIGHT, Colorado Department of Natural Resources, Division of Mine Reclamation and Safety) and levels for 2016 are included in the project file which have been submitted to EPA for publication, but have not yet published.

The applicability and feasibility of specific options would be reviewed in accordance with the BLM lease addenda in Table 2-2. Regarding the State's report and conclusion on partial VAM use, technical feasibility is only the first step in getting power from generation to use, as has been proven by Oxbow/Vessels. They found a buyer for generated electricity, yet still flare approximately 80% of the methane retrieved from the inactive mine as demonstrated in commenter's Exhibit 57.

Commenter continues to rely on 2010 Power and Power economic analysis of who we do not dispute as expert economists. The 2010 analysis was an 1) an economic modeling analysis, 2) relied on projected carbon off-set values and 3) and is not an engineering analysis that would make these methods technically feasible or practical at the West Elk Mine. Dr. Power's himself stated on page 3, "…results are not offered as the final word on the economic feasibility of the capture and use of the West Elk Mine's coal mine methane. Rather, they are offered to encourage a closer and more careful look at that possibility than that provided by Mountain Coal Company's initial negative analysis." The latest Power and Power (July 2017) revised economic analysis offers alternate methodology and results as compared to feasibility analyses completed by MCC. I

f the lease modifications are approved, MCC will submit an updated feasibility analysis, and BLM will review with respect to many criteria, including site-specific technological feasibility or effectiveness based on the specific engineering or configuration requirements at the West Elk Mine. We agree that methane mitigation may be possible and could be consistent with lease terms, options have not been precluded. However, at the leasing stage, there are many details about mining yet undetermined which could include or preclude feasibility of available options.

**Comment:** The Forest Service Must Analyze Methane Flaring As A Reasonable Alternative To Reduce The Lease's Methane Pollution. Despite the significant climate benefits of flaring, in the SDEIS the Forest Service again refused to consider an alternative that would requires the West Elk Mine to flare its methane emissions. Instead, BLM rejected the alternative out of hand, including a cursory refusal to consider it in the "alternatives considered but eliminated from detailed study" section of the SDEIS. In addition to the excuses noted above, which the Forest Service also applies to flaring, the Forest Service makes two additional flaring-specific arguments: (1) that flaring may not be safe; and (2) uncovered flaring may cause forest fires. The Forest Service has not adequately studied either risk. According to Colorado, a "properly engineered, manufactured, and operated flare with redundant safety systems can fully address [safety] concerns."115 The Forest Service has not addressed Colorado's finding. As EPA stated in 2012 comments regarding the West Elk Mine, "flaring of methane gas is a standard safety practice in many industries and is routinely used during processing and production of oil and gas, from landfill collection systems, and the petroleum industry."116 The Forest Service has not addressed EPA's finding. As EPA further explained, the Mine Safety and Health Administration ("MSHA") "would review each flaring plan individually to ensure that it adequately incorporates appropriate protections such as bubble traps, fail-safe valving, flame arresters, or monitoring and control systems."117 The Forest Service does not address the effectiveness and availability of these safety measures, as it must before rejecting methane flaring as an alternative. Second, the Forest Service states that any flare at West Elk would need to be "fully enclosed" to limit the risk of starting a forest fire. But the Forest Service never evaluates, for example, whether the currently-proposed size of the well pads provides a sufficient buffer from plant cover, or whether the Forest Service could simply increase the size of the tree-removal area for the well pads to provide sufficient cover. Moreover, the Forest Service never evaluates use of an enclosed flare like the one at the nearby Elk Creek mine, even though Conservation Organizations pointed out that Elk Creek utilizes an enclosed flare in scoping comments.118 Colorado's Coal Mine Methane in Colorado (2016) report confirms that Elk Creek's methane capture program "has destroyed about 1 BCF [billion cubic feet] of CMM [coal mine methane] via heaters, an enclosed flare, and three 1 MW reciprocating engines since its inception in June of 2011."119 We are unaware of any concerns about forest fires at that site directly across the road from the West Elk mine. Third, BLM asserts that any mitigation must be "economically feasible" per a BLM Instruction Memo and the Mineral Leasing Act.120 This excuse fails for several reasons. First, BLM's instruction memorandum sets out to "foster voluntary activities by

operators to capture waste mine methane from underground coal . . . mines."121 Thus, by its own terms this memo only applies to methane "capture" and has no bearing on the Forest Service's ability to evaluate methane flaring as an alternative here. Second, there is nothing inconsistent with promoting voluntary capture of methane in some instances, and requiring either flaring or capture of methane in others. Third, the Mineral Leasing Act imposes on BLM an obligation to prevent undue waste. See 30 U.S.C. § 187 (requiring lease provisions preventing undue waste), id. at § 225 (requiring lessee to prevent waste). Thus, if anything, these provisions would direct BLM to require methane capture from mines on public lands; they cannot reasonably be read to prevent the Forest Service from considering methane flaring as an alternative before consenting to coal mining and road building on Forest Service lands. Finally, there is no authority for the notion that the Forest Service can refuse to consider ways to mitigate environmental damage under NEPA based on the profit-loss sheets of coal companies. Fourth, the Forest Service claims that although flaring is used at a trona mine in Wyoming, and that coal mines and trona mines are similar in terms of methane concentrations and technology used to remove methane from underground mines, "combustibility of coal" means that precludes use of trona flaring technologies at West Elk.122 Yet the Forest Service fails explain, even in general terms, why the combustibility of underground coal necessarily means that above-ground flaring technology would be too dangerous for workers. Indeed, there are existing coal mines that use both covered and uncovered flares, including coal mines in Colorado. The Forest Service has not offered a single example, from any country anywhere in the world, where a methane flare caused coal to catch fire. The Forest Service thus offers an unsubstantiated road- block in an effort to avoid meaningful analysis of a reasonable alternative.

**Response:** Methane is not a criteria pollutant and significance criteria has not been established for it. This means that while its mitigation would be beneficial, there is no local, regional or global threshold established that would be exceeded by not mitigating. Methane has been analyzed in SDEIS Section 3.4 and other sections in previous analysis and climate change has been analyzed throughout the SDEIS in compliance with 40 CFR 1502.16. We recognize and have identified adverse effects. NEPA does not require us to mitigate all impacts (particularly in an EIS) or to include anything beyond "appropriate mitigation measures" (40 CFR 1502.14(f)), which in this case are lease stipulations that we can ensure can be implemented at this stage of the process. For the Forest Service, as the lead agency, that is explicit in terms of non-mineral resources and surface protection of NFS lands per regulation. The requirement of a specific methane mitigation which would likely apply post-mining due to safety issues underground is not appropriate at the leasing stage as there are many mining details unknown at this stage. We have acknowledged that it may be physically possible when, or if, a mine ventilation plan (tied to an actual mine plan) has been prepared and reviewed by permitting agency, MSHA, who would review the plan for mine-specific safety issues. Why is this important? Above-ground (even enclosed) flares rely on air in the mine where fluctuations in methane may pull the flame underground depending upon the particular system used which might affect miner safety. Coal is also flammable. This is why flares are used in closed or sealed-off portions of coal mines where there are no workers. We have reiterated several times that this is a staged decisionmaking process and have identified this in various sections of the analysis (including SDEIS Sections 1.2-1.7, 2.2, Appendix C) per the requirements of NEPA (40 CFR1502.4(c )(3). Flaring would also be permitted under lease stipulations. Lease modifications contain stipulations that require lessee to submit to the FS a fire prevention and protection plan if flaring or other combustion is prescribed as part of any future mitigation and BLM requires consideration of methane mitigation measures (flaring has been added to language) within one year of leasing. These stipulations are in compliance with the requirements of NEPA at 40 CFR 1500.2(e). As there is no flaring proposal to specifically analyze at this time, we do not know if a larger pad footprint would be required to accommodate flaring as it would depend on slope, clearing distance from a flare, overhanging vegetation, vegetation height and other measures that would come out of a fire prevention and protection plan. An alternative that considers flaring as a mitigation was considered in the SDEIS in Section 2.3.7.5 and in various sections of prior analysis in compliance with the requirements of NEPA for the federal coal program at 40 CFR 1502.1 and 1502.14(a). New flaring information provided by

commenter was reviewed for emerging technologies around the globe that still do not show this technology being applied in the active workings (area where actual mining is occurring) of an underground coal mine in the U.S (example cited not in U.S.); however section 2.3.7.5 was updated slightly for clarity with regard to lease stipulation and permitting. We do not speculate whether this method is infeasible or uneconomical, leasing is just not the appropriate time to address potential permitting actions that relate to in-mine safety for which no mine plan or ventilation plan has been prepared.

**Comment:** Commenter alleges the EIS failed to address the direct and cumulative effects of the release of methane on the air quality and subsequently, it's effects on birds, including the Gunnison Sage Grouse, and other wildlife and big game in the area. (Brown Jr, R.)

**Response:** Methane, while it is a greenhouse gas, is not considered toxic at the atmospheric low levels which have and could continue to occur at ground level. Effects on Air Quality are addressed in Section 3.4. Climate change is addressed throughout Chapter 3. Gunnison sage grouse do not have habitat in the area of the lease modifications.

**Comment:** Commenter states that NEPA, if done correctly, cannot find this as the preferred alternative. Select the no-build alternative. (Brack, V.)

**Response:** NEPA does not require that the agency's preferred alternative (40 CFR 1502.14 (e )) have no effects, only that it be identified.

**Comment:** Commenter alleges, the lease modifications will worsen climate change. Coal mined from the lease modifications will result in significant greenhouse gas pollution from coal extraction and combustion. Mining the lease modifications - setting aside the impacts of coal combustion - will result in a huge amount of pollution from methane. The West Elk mine was the largest single industrial methane polluter in Colorado from 2011 to 2015 (the latest date for which EPA has published data). Neither the Forest Service nor any other agency has taken any action to cause Arch Coal to limit or mitigate that pollution. Regrettably, the SDEIS specifically rejects mandating any methane control, or even analyzing in detail an alternative to require such controls, in violation of the agency's duty to consider all reasonable alternatives and mitigation measures. (Sandler, M.)

**Response:** No significance criteria or levels for methane have been set under current law, regulation or policy and it is not a criteria pollutant. There is no local, regional or global threshold established that would be exceeded by not prescibing lease stipulations that require this and thus it would be arbitrary to mandate its control when effectiveness of the mitigation is only measured in tons of CO2e and not by effects on either surface or non-mineral resources. Methane and other greenhouse gases have been analyzed in SDEIS Section 3.4 and other sections in previous analysis and climate change has been analyzed throughout the SDEIS in compliance with 40 CFR 1502.16. We recognize and have identified adverse effects. NEPA does not require us to mitigate all impacts (particularly in an EIS) or to include anything beyond "appropriate mitigation measures" (40 CFR 1502.14(f)), which in this case are lease stipulations that we can ensure can be implemented at this stage of the process. For the Forest Service, as the lead agency, that is explicit in terms of surface protection of NFS lands per regulation. Lease stipulations (Section 2.6) do not prohibit methane use or capture in fact require additional analysis of feasibility.

**Comment:** Commenter states that we don't need this coal because there wouldn't be any control over the methane that will be released into the air.(Lawman, H.)

**Response:** No significance criteria or levels for methane have been set under current law, regulation or policy and it is not a criteria pollutant. There is no local, regional or global threshold established that would be exceeded by not prescibing lease stipulations that require this and thus it would be arbitrary to mandate its control when effectiveness of the mitigation is only measured in tons of CO2e

and not by effects on either surface or non-mineral resources. Methane and other greenhouse gases have been analyzed in SDEIS Section 3.4 and other sections in previous analysis and climate change has been analyzed throughout the SDEIS in compliance with 40 CFR 1502.16. We recognize and have identified adverse effects. NEPA does not require us to mitigate all impacts (particularly in an EIS) or to include anything beyond "appropriate mitigation measures" (40 CFR 1502.14(f)), which in this case are lease stipulations that we can ensure can be implemented at this stage of the process. For the Forest Service, as the lead agency, that is explicit in terms of surface protection of NFS lands per regulation. Lease stipulations (Section 2.6) do not prohibit methane use or capture in fact require additional analysis of feasibility.

**Comment:** Commenter has suggested an alternative where we use hemp oil instead. (Steinbicker, R.)

**Response:** Oil, hemp or otherwise, is beyond the scope of this analysis.

**Comment:** Several commenters have suggested numerous alternatives that would use alternative/clean energy instead and that we should use and/or retrain coal miners to do this.

**Response:** Renewable energy sources and alternatives and job training are beyond the scope of this analysis. However, there are three existing commercial scale hydro-electric plants within the proclaimed boundaries of the GMUG and two undeveloped geothermal leases. National Renewable Energy Laboratory and the Forest Service have prepared a report (NREL 2005) to identify and evaluate the potential for solar and wind energy resource development on NFS lands. NREL's report concluded that 495 acres may be suitable for 99 MW of solar (PV) production and 11,297 acres may be suitable for 229 MW of wind farm production on the GMUG. Zvolanek et al. (2013) refined the data used by NREL and identifies a slightly reduced 432 acres (43 MW) available for PV power and much reduced 2,039 acres (41 MW) available for wind power for the GMUG. Under either scenario, this is a very small percentage of the GMUG that is considered suitable for these types of development. Renewable energy development including commercial solar (specifically PV as CSP is not viable) and wind on the GMUG has, to date, not been proposed or developed. All of these types of energy development would be proponent-driven.

**Comment:** Commenter tells us not try to explain our way out of it by trying to sell the story that it can be fixed and returned to its original state after it's been decimated it's way too expensive, and the damage will have been done. (Layaou, A.)

**Response:** We assume that commenter refers to reclamation. Compliance with State reclamation regulations and sufficient bonding is required for any surface disturbance associated with permitted mining activities.

**Comment:** Commenter suggest that the Forest Service should adopt the no action alternative. We urge the Forest Service to reject the proposed lease modifications and exploration plan. The Lease Modifications would provide Arch Coal with access to more than 17.6 million tons of publicly- and privately-owned coal; cause millions of dollars in climate-related economic damages; suppress production of clean, renewable energy; and degrade and fragment more than a thousand acres of wild forest directly adjacent to the West Elk Wilderness. It would do so all to assist a single entity, Arch Coal, and it would do nothing to assist the transition, already ongoing in the North Fork Valley, away from coal. Because the Lease Modifications and exploration proposal will degrade roadless character, worsen climate change, and result in unnecessary and unmitigated methane pollution, with the only benefits flowing to a single coal company, both BLM and the Forest Service have ample basis to reject this lease application. (Zukoski, T.)

**Response:** The responsible officials may select the No Action Alternative in their respective decisions. The approximately 18-72 acres in the lease modification area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with

http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. Energy policy is beyond the scope of this project-specific analysis. Climate change effects are disclosed throughout the SEIS in Chapter 3.

**Comment:** Commenter requests that no coal or drilling leases occur in the Sunset Roadless Area or West Elk Wilderness. (Berry, A.)

**Response:** The coal lease modifications are not within the West Elk Wilderness.

**Comment:** The fossil fuel profit motive model is short-sighted and unsustainable. Yet it leads to long-term irreversible damage. The habitat destruction and pollution that will result from this proposed coal lease expansion are social costs that outweigh any economic argument for this project. Please do not allow this to happen. Please protect Colorado for future generations and for the ecosystem values of roadless areas. ( Williams, L.)

**Response:** The Colorado Roadless Rule specifically excepts temporary roads in this area for coal mining. All temporary roads and pads would be recontoured and reclaimed. Reclamation in this area has been successful and requires State bonding to ensure that it is completed. Effects on wildlife are described in Sections 3.10-3.14. Effects on roadless characteristics are included in Section 3.

**Comment:** Numerous commenters believe that coal leasing is not an authorized activity on NFS lands.

**Response:** The federal agencies are acting under their role in the federal coal program under the process described in Section 1.2 and under the decision framework and authorities described in Sections 1.6-1.7.

**Comment:** Commenter alleges the SDEIS violates NEPA by failing to analyze reasonable alternatives to reduce surface impacts from coal mining. Because the proposed lease modifications are slated for roadless as well as wilderness capable lands in the Sunset Roadless Area, the Forest Service must consider other reasonable alternatives that would reduce surface impacts. The SDEIS cursorily dismisses a number of these stipulations based on the existence of other stipulations which are not as protective. This dismissal is arbitrary and capricious.

**Response:** The lease modifications are located within Colorado Roadless that excepts certain surface disturbances related to underground coal mining. In compliance with the requirements of NEPA (40 CFR 1502.14 9a), alternatives that were eliminated from detailed study (Sectoion 2.3) have briefly discussed the reasons they were eliminated.

**Comment:** Commenters state that their policy analysis has shown that the most substantial barriers to development of CMM resources and emissions reduction is ownership of the methane resource. In the case of the West Elk Mine expansion proposal, although the BLM has authorized the drilling, extraction, removal, development, and production of methane gas for use or sale of the CMM from the proposed permit area, Arch and its subsidiary, Mountain Coal have persistently stated the biggest barrier to utilization is economics. This has been the reason used even when the sales price of coal and natural gas have been much higher than today's commodity prices. Based on experiences in the USA and other countries, it is clear that if the ownership issues are addressed, opportunities for economic development will arise. An additional barrier to the West Elk Mine expansion is the limited access to surface locations required for exploration activities driven by the Roadless Rule and the rugged terrain in which the proposed activities are to take place, nevertheless, if the access to the area is allowed, the economics should be more favorable. If the economics of methane extraction and abatement are still not satisfactory for West Elk the expansion should be denied, as this signals that the USG will be losing revenue from coal and gas royalties. (Long, C.)

**Response:** The North Fork Coal Mining Area exception to the CRR has been reinstated which allows for temporary road construction in this area allowing for surface access. Additionally, methane capture, use or mitigation is permitted under any of the action alternatives as a by-product of mining the coal under the coal regulations; however additional economic analysis of methane mitigation would be required by BLM. See stipulations in Section 2.2.2.1. Economic analysis is included in Section 3.21.

**Comment:** Commenter requests that we not allow coal mining to destroy this valuable wilderness. (Gonzalez, C.)

**Response:** There are no designated wilderness areas within the lease modifications area.

**Comment:** Commenter states that tailings from mining coal are incredibly toxic to water quality and to wildlife. (Goodwin, K.)

**Response:** There would be no tailings or mine spoils within the lease modification area. See Section 3.8 for effects to water resources. Annual water quality monitoring has been completed, and will continue (Section 3.8.1.3).

**Comment:** Commenter states the effect of mountain top removal is too devastating to the natural environment. (Johnson, J.

**Response:** These lease modifications are for an underground mine not a strip mine.

**Comment:** Commenter states that new technologies exist that allow extraction of coal without disturbance to the surface. (Heiss, S.)

**Response:** These lease modifications are for an underground mine. The post-leasing surface disturbance is not related to the extraction of coal but to the venting of methane from the mine for safety purposes.

**Comment:** Commenter states the Forest Service must analyze an alternative that requires the use of helicopters for exploration An alternative requiring the use of helicopters to transport drill rigs for exploration would permit Arch Coal to gather geologic data while eliminating the necessity for road construction on roadless lands, thereby vastly reducing the on-the-ground damage exploration would otherwise cause. It would therefore meet the purpose and need for the exploration proposal while differing substantially from the other action alternatives. The Forest Service fails to provide a rational basis for rejecting this alternative. The SDEIS states: [t]his alternative was not carried forward for detailed analysis because it is ineffective and technically infeasible. The geology of the exploration area is such that the aggregate material is not structurally sound; therefore, the drill hole must be cased. In order for the holes to be properly cased, the initial diameter must be wide enough to allow for casing and core extraction. This is not necessarily the drill rig used for MDW holes as described above. This is not feasible to do with a drill rig that can be transported by helicopter because they are too small and not powerful enough. 1 This explanation is inadequate. If the drill rigs are not necessarily the same, the Forest Service must disclose what kind of rigs would be capable of drilling exploration holes, and the specifications, availability, and costs of such rigs, just as it did for the analysis of helicopter drilling for MDWS, so that the agency can inform the public and the decisionmaker as to the reasonableness of an alternative requiring helicopter drilling for exploration. The SDEIS fails to contain this information. (Zukoski, T.)

**Response:** This alternative, considered but eliminated from detailed study, is addressed in the in Section 2.3.10.9. While the exploration holes are smaller diameter than the MDW holes requiring very large drill rigs as described in SDEIS Section 2.3.2, the drill rigs needed here -where there are casing requirements due to structurally unsound aggregate material-are also larger than the ones used in areas where there is structurally sound geologic material as has been indicated in the alternative

language. We understand the confusion and refer the commenter to the Section 2.3.2 discussion of horse power, torque, lifting capacity and general unavailability of large heli-portable rigs in the contiguous U.S. This discussion has also been updated based on capabilities of helicopters in the SFEIS. Therefore this alternative is covered by existing analysis.

**Comment:** Commenter alleges the SDEIS violates NEPA by failing to analyze the reasonable alternative of considering the lease modifications as a request for one, new, 1,720 Acre Lease. This amounts to a violation of NEPA, as such an alternative would be more consistent with the system Congress set up for the review and approval of adding contiguous or cornering lands to existing coal leases. See 30 U.S.C. § 203. The primary regulatory difference between a lease modification and a new lease is that a lease modification does not have to be approved through a competitive process. See 43 C.F.R. Part 3430 ('Noncompetitive Leases"), Subpart 3432 ("Lease Modifications"). The SDEIS thus never explains why lease modification, rather than lease issuance, is appropriate here. The document lacks any analysis on whether the requested parcels constitute small areas of undiscovered coal which cannot be developed as an independent lease because of their size and configuration. In fact, it would seem that this is distinctly not the case. The lease modifications are approximately 25% the size of the existing lease area.26 Nor does the SDEIS discuss or explain how granting a lease modification will ensure that the United States receives fair market value for its coal. The bypass of federal coal is not the only consideration the agencies must weigh in assessing alternatives. Under 30 U.S.C. § 203, a lease modification must satisfy three requirements: (1) it must "be in the interest of the United States"; (2) it must "not displace a competitive interest in the lands"; and (3) it must "not include lands or deposits that can be developed as part of another potential or existing operation." 30 U.S.C. § 203(a)(2). Regulations implementing these statutory requirements provide federal agencies involved in the lease modification approval process with discretion to modify an application area if doing so is in the public interest. See 43 C.F.R. § 3432.2(a) ("The authorized officer may modify the lease to include all or part of the lands applied for if he determines that: (1) The modification serves the interests of the United States." (emphasis added)). For several reasons, it is clearly in the public interest to consider the proposed lease modifications as one, new, 1,720 acre lease. First, a competitive lease would ensure that the United States receives fair market value for the coal. The SDEIS gives no assurance that the United States will receive fair market value for its coal. Considering the lease modifications as one new, 1,720 acre lease would better protect the interests of the United States in ensuring both a competitive bidding process and a return of fair market value. The Forest Service should have considered this reasonable alternative. (Zukoski, T.)

**Response:** This is not a competitive leasing action. BLM has verified there is no other interest in parcels as noted in GER/MER technical report. This is already addressed under Section 1.7.1 regarding the Mining and Minerals Policy Act of 1970 and Mineral Leasing Act of 1920, as amended. BLM has already made the determination under their regulations at 43 CFR 3432 that these lease modifications conforms to the requirements of the Energy Policy Act of 2005 for a non-competitive lease modification. Therefore, this already been addressed by law and policy and an additional alternative addressing the same physical and social effects would not contribute anything to the analysis or to the decision process. Additionally, 43 C.F.R. § 3432.2 (Lease Modifications) provides that the authorized officer may modify a lease to include all or part of the lands applied for if the authorized officer "determines that: (1) the modification serves the interests of the United States; (2) there is no competitive interest in the lands or deposits; and (3) the additional lands or deposits cannot be developed as part of another potential or existing independent operation." After the NEPA process is complete, the BLM will prepare a Record of Decision to document the agency's selected alternative and any accompanying mitigation measures based on the NEPA process. At this time, the BLM will also make a determination as to whether the lease modifications compy with the criteria set forth in 43 C.F.R. § 3432.2.

**Comment:** Commenter alleges the SDEIS violates NEPA by failing to analyze an alternative that would make available Less than 16.8 million tons of coal. In addition to the no-action alternative, the Forest

Service considers only two action alternatives, one of which would make 17.6 million additional tons of coal available for mining (Alternative 3), and one of which would make more than 95% that amount of additional coal available, or 16.8 million tons (Alternative 4).152 The Forest Service should consider at least one middle-ground alternative which would make far less than 16.8 million tons of additional coal available. The Forest Service cannot ignore a "middle-ground compromise" which meets its purpose and need. BLM regulations governing lease modifications make clear that Interior Secretary need not approve the entirety of the application, and has the discretion to approve a lease modification for less than all of the federal coal applied for. See 43 C.F.R. § 3432.2(a) ("The authorized officer may modify the lease to include all or part of the lands applied for if he determines that: (1) The modification serves the interests of the United States.."(emphasis added)). By only considering alternatives at the high and absolute bottom ends of the spectrum, the Forest Service has excluded more protective alternatives in favor of development, all while claiming a principal need to prevent the bypass of coal resources. However, the agency has statutory and regulatory obligations which mandate the consideration of a more middle-ground alternative. Specifically, the agency should consider an alternative which would provide access to 8 or 9 million tons of additional coal. Coal lease modifications are not automatically approved, even if the coal at issue would otherwise be bypassed. See 30 U.S.C. § 203(a)(2)(A)-(C) (requiring certain findings before a coal lease modification can be approved, including a finding that the proposed modification is "in the interest of the United States"). Furthermore, regulations empower the agency to "modify the lease to include all or part of the lands applied for [in the lease modification]" if doing so will "serve[] the interests of the United States." 43 C.F.R. § 3432.2(a). (Zukoski, Ted)

**Response:** To be clear, selection of either Alternative 3 or 4 would add acreage to existing leaseholds with the application of stipulations (Sections 2.2). Coal quantities are estimated to be 9,541,000 tons on the COC-1362 modification and 559,000 tons on the COC-67232 modification (or 10.1 million tons combined) (Section 3.3). Lease modifications would facilitate recovery of previously leased federal and privately owned reserves where there is no leasing NEPA decision to make (approximately ~7.5 million tons). Coal exploration, and thus the inclusion of on-lease exploration analysis, has not occurred so these values are estimates only for the purposes of analysis based on existing leaseholds and data. Per BLM regulation, BLM had reviewed the applications and had added acreage to them to delineate the lease tracts in compliance with See 43 C.F.R. § 3432.2(a). BLM retains the discretion to modify lease boundaries to reduce coal quantity/ leaseholds until they issue their decision (See 43 C.F.R. § 3432.2(a). This would be a reduction in the effects disclosed in the SFEIS, but also bounded by the extent of the existing alternative analysis in compliance with NEPA. For the Forest Service, Alternative 4 already represents a middle ground alternative where our decision space lies within consenting to lease with stipulations or not. As part of their Record of decision the BLM's Authorized Officer will make determinations in accordance with 43 C.F.R. § 3432.2(a). Therefore, this variation of the existing alternatives is already covered by existing regulation and bounded by existing analysis. We assume that despite commenter's language, "Specifically, the agency should consider an alternative which would provide access to 8 or 9 million tons of additional coal." he does not really intend that to be a larger leasehold.

**Comment:** If the coal lease expansion is granted to Arch Coal and its subsidiary, Mountain Coal as an addendum to the lease blocks that it presently operates COC-1362 and COC-67232, an exemption to the Colorado Roadless Rule for the West Elk mine is an essential step in guaranteeing the potential to offset the carbon dioxide that will be released upon combustion of the mined coal, and will contribute to protecting the local and global environment. Under an exemption to the Roadless Rule for the expanded lease the resulting footprint of the surface activities should be designed to share the footprint with a methane-drainage gathering and transport system, and should not add additional cumulative disturbances to what has been estimated by Arch. If West Elk's coal lease expansion under the Sunset Trail area is granted, it is logical and environmentally sound to allow the West Elk coal mine an exemption to the Colorado Roadless Rule in the area overlying the existing mine workings and proposed expansion, given one major stipulation: West Elk must either use the gas that is drained or flare it using an intrinsically

safe and enclosed flare. The coal lease expansion should not be allowed without agreement by Arch Minerals and its subsidiary, Mountain Coal, to mitigate the emissions of methane that the mine already produces as well as proactively abate increasing emissions of methane from the expanded lease area. If the West Elk Mine operator is not interested or capable of extracting and using the gas, the expansion should not be granted unless Arch identifies and contracts another entity to extract the gas. Whether it is due to no active recovery project being initiated, or because no economical way to recover and use the gas is found, the coal lessee should be responsible for methane emissions mitigation, and should be required to cease activities until a way to mitigate emissions is found. (Long, C.)

**Response:** To clarify, this is a multi-step process. If coal is leased and exploration activities reveal mineable coal quantities, then we anticipate the temporary exploration roads and pads may be reused for MDWs and/or other surface mitigation and monitoring uses; however, this is not guaranteed because a mine plan and associated MDW spacing may require a different configuration (Section 3.3). The NFCMA exception to the CRR was re-instated in April, 2017. Lease stipulations (Section 2.2.2.1) allow for methane use or capture and require Mountain Coal to submit a report to BLM regarding the economic feasibility of capturing the mine methane within one year of leasing.

**Comment:** Commenter alleges the Forest Service should consider an alternative that eliminates Exploration Hole 10. The agencies should also consider as a reasonable alternative eliminating drilling pad SST-10. Conservation Groups have long sought this alternative because: (1) SST-10 would be bulldozed in that part of the Sunset Roadless Area that the Forest Service in 2005 determined was the most wild, and was in fact capable of being designated as wilderness; (2) the access road to SST-10 cuts through mature spruce-fir forest (which will take many decades to regenerate);168 and (3) the drill pad would be built nearly on top of the Sunset Trail, and so would impact recreational values. This alternative would also eliminate the need for a over a half-mile of the proposed five miles of road, and two of seven stream crossings proposed in the plan. Removing this single exploration pad and the road to access it would have large benefits to other multiple uses of the land while permitting Arch Coal to obtain 90% of its exploration data. Further, it is unclear why Arch Coal requires information from this site at all. Maps from 2012 indicate no subsidence (and thus almost certainly no underground mining) predicted in this area. The nearest panel directly to the west appears to be over a half-mile away; the nearest to the north appears to be over 200 yards away.169 While the SDEIS alleges that "BLM also needs data [from SST-10] per regulation," and that Arch needs to verify the extent of an igneous laccolith and/or faulting in an area, it is unclear why Arch seeks information from a site so far from where Arch is predicted to mine.170 Drilling the hole at this location will not serve the purpose the SDEIS suggests. It is simply unnecessary to characterize the area Arch intends to mine. (Zukoski, T.)

**Response:** To reiterate Section 1.6.1.2, the Forest Service's role in on-lease exploration is limited to concurrence which is not a NEPA decision under 36 CFR 218.1. This new subset of the original suggestion similar to commenter's alternative not considered in detail in Section 2.3.12, which also included removal of the SST-10 location, was not carried forward for detailed analysis because it is ineffective as it would not provide the necessary information on the extent of mineable coal (and fault lines). Likewise, removal of this location would minimize information on lease modification COC-67232 under the proposed action. This alternative would not meet the purpose and need of the proposed action because it would not effectively explore the coal lease consistent with lease rights, if granted, under Alternative 3. We also remind commenter that there is not an approved mine plan for this area which cannot be developed until there is information on the coal resource.

**Comment:** Commenter alleges he Forest Service Must Analyze In Detail Alternatives and/or Mitigation Measures That Reduce, Or Offset, Methane Pollution. In the SDEIS, the Forest Service should have considered and analyzed in detail alternatives (or mitigation measures) that will reduce the climate pollution damage of coal mining that the Lease Modifications will make possible. The mine's unrestrained methane pollution has long drawn criticism and calls for the pollution to be controlled or mitigated through a variety of measures, all of which Arch Coal, BLM, and the Forest Service have systematically rejected.

There is wide and deep support for measures to reduce emissions from the state's worst methane polluter. (Zukoski, T.)

**Response:** We agree that we are not requiring a specific methane mitigation measures to combat global climate change at this time. Numerous methane mitigation alternatives have been briefly considered and described in Section 2.3 in compliance with 40 CFR 1502.14 (a & f). While methane mitigation would reduce methane, under current law, regulation and policy there is no established significance threshold that would be exceeded by not implementing these measures. The lease modifications and stipulations (Section 2.2.2.1) do not preclude methane mitigation measures from being implemented at the mining stage. Likewise, BLM has identified a stipulation that requires additional information. Also in compliance with NEPA we have disclosed methane impacts and climate change. We are not required, particularly in an EIS to mitigate effects to zero. EPA's latest comment letter on this project only asks for clarification to the process for when this might occur.

**Comment:** Commenter states if the company is going to spend millions of dollars to drill vent holes for a usable resource, and bulldoze miles of roads to access the seam, the company could save literally millions of dollars by reopening the two closed mines in the Somerset-Bowie area (plus retrieve a million dollar machine). (Keasey Jr, W.)

**Response:** The Oxbow mine is closed and the longwall miner (machinery) is unable to be retrieved. The Bowie Mine is shut-in. This alternative does not respond to the agencies' purpose and need related to applications for the West Elk Mine.

**Comment:** Commenter alleges the Forest Service Should Consider a mitigation measure to ensure revegetation by fencing out livestock for one season. Because fencing out cattle for one growing season after re-seeding and reclamation is "typical" agency practice, and because such fencing is effective at mitigating the impacts of livestock grazing that might otherwise interfere with reclamation, we urge the Forest Service to adopt a stipulation requiring such fencing. Requiring the leaseholder to ensure effective reclamation is both reasonable and in line with the Forest Service's duty to protect the Forest's non-mineral resources. The agency rejects such a stipulation because "no surface disturbing activities are proposed or authorized by this action. Requiring fencing at a leasing stage, when no site specific information is available would not be appropriate. In certain areas, the use of fencing could negatively impact livestock management or other multiple use activities. This type of requirement would be more appropriate working within the State permitting process, not at the leasing stage."174 This statement is false because the proposed action will authorize surface disturbing activities, namely the exploration plan with its 10 drill pads and nearly 5 miles of road. Further, the lease stage is a perfectly appropriate stage to put in place such a stipulation because it is the decision-point at which the agency grants Arch Coal the right to mine (including the right to construct surface developments). Further it is unclear how fencing out disturbed areas with no forage to ensure revegetation success would "negatively impact livestock management or other multiple use activities." The Forest Service should therefore adopt a stipulation limiting livestock grazing to protect forest resources.

**Response:** Further clarification has been provided in Section 3.15.3. Fencing is and would continue to be evaluated on a case-by-case basis. While fencing may often be beneficial, in some cases the resultant changes to livestock behavior are more undesirable than the slight delay in vegetation seral progression on reclaimed areas.. FS monitoring has determined that livestock grazing is not detrimental to reclamation activities, but may slow it on some sites. Reclamation success is required by state bonding requirements (Title 34, Article 33 of the Colorado Revised Statutes of 1973 (House Bill No. 1223), known as the Colorado Surface Coal Mining Reclamation Act.)

**Comment:** Commenter suggest an alternative that recommends this roadless area for wilderness protection. (Parsons, D.)