**Response:** This alternative is beyond the scope of this analysis. Forest Service recommendation for wilderness designation is a required part of forest planning, and is not within the purpose and need for this project. Wilderness designation of NFS lands is done by Congress. Congress has specifically released these lands from wilderness designation consideration in the 1980 Colorado Wilderness Act.

## Air Quality & Emissions

### Non-substantive comments (358 comments)

**Summary and Response:** The FS and BLM received approximately 360 comments dealing with air quality and climate change that were deemed non-substantive in that the comments were statement clauses either supporting or opposing the lease modification. The most common theme of the opposition comments was focused on the climate change concerns of continuing to develop and use fossil fuels. However, these comments did not address a perceived deficiency in the analysis of the SDEIS itself, and thus there is no specific response prepared for them.

### Particulate Matter (comment 52)

**Summary:** This comment was primarily concerned with the referenced air quality analysis prepared to support the West Elk mine's CDPHE issues air quality permit, specifically with the definition of ambient air for modeling purposes. The report data was summarized within the body of the SDEIS to support the NEPA air resources analysis and to disclose impacts. The report is wholly included as an appendix.

**Response:** The determination of the facility boundaries for modeling and to establish "ambient air" (i.e. where the public would have access) is the sole responsibility of the CDPHE as the regulatory authority for stationary sources of pollution in Colorado. The FS and BLM have no knowledge of those discussions, but assume that they were mutually agreed upon such that Air Resource Specialists (the firm that performed the modelling and prepared the report) could proceed with the permit modeling in confidence, knowing the CDPHE would not baulk at either the receptor configurations, emissions rates, meteorology, or other factors that would have been detailed within the modeling protocol itself (the protocol is a basis document that the state requires as part of any modeling study). However, is it apparent the text cited in the comment (referencing the ARS report on pg. 12) is confusing, as it is inaccurate, in that the receptors eliminated from within the facility boundaries would NOT be considered ambient air. To reiterate, neither the FS nor BLM bear any regulatory responsibility for defining facility boundaries for the purposes of permit modeling, or establishing permitting conditions designed to keep a facility in compliance with the air quality standards. All of that responsibility is the function of the regulatory authority (CDPHE). As such, the FS and BLM provided the publically available facility permit number(s) that detail the operational conditions the mine operator must follow to achieve and maintain compliance with the applicable air quality standards. In this way, the FS and BLM have disclosed (by virtue of referencing the publically available CDPHE issued permits to operate) all of the controls and operational parameters the State of Colorado expects will keep the West Elk mine in compliance with applicable air quality standards for pollutants of concern.

### Potential VOC Emissions (comment 51)

**Summary:** This comment broadly claims that the SDEIS failed to analyze air quality impacts, specifically VOC emissions that are known exist within (but not quantified) the coalmine methane exhaust streams. Further, the comment claims that given that VOC can contribute to ground level ozone formation (when reacted with significant quantities of NOx in the presence of sunlight), that the FS and BLM have an obligation to analyze the VOC's potential to contribute to ozone formation. The commenter brings up several regulatory matters that are not within the scope or regulatory authority of the FS or BLM to

address (specifically permitting / reporting thresholds, and apparent non-compliance with permitting regulations). Finally, the commenter contends that under CEQ, the FS and BLM have an obligation to discover the VOC data for the purposes of analysis, citing 40 C.F.R. 1502.22(a), "If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement."

**Response:**  The FS and BLM disclose the reasons why we declined to estimate VOC emissions resulting from coalmine methane in the SDEIS (at 107 & 108).  As a regulated pollutant in Colorado, VOC's emitted by a regulated facility are under the authority and responsibility of the CDPHE.  As stated in the SDEIS, CDPHE is working the issue, and as the technical experts for such matters, they will be the authority to make formal determinations at regulated facilities as to the applicability for reporting, permitting and control requirements, if any.

As explained in the SDEIS, the area is currently in attainment for ozone the whole time the mine and two other mines have been in existence for decades.  It's highly likely that the VOC emissions have been occurring at various levels over the entirety of the mines active life and yet these VOC emissions (at any level) have not caused the region to slip into non-attainment for ozone. This fact is evidenced by the closest downwind ozone monitor located in Gothic, CO (Gothic - Gunnison County, data in SDEIS @ 95).  The Gothic monitor is showing data statistically consistent with other areas of Colorado that are currently in attainment of the standard (i.e. they are all mostly close to the standard, due in part by the fact that the standard itself is so low).

The logic pushing analysis of VOC emissions is further flawed by the fact that the commenter assumes that these emissions would have reasonably foreseeable significant impacts for which no evidence actually exists to support that assertion given the above, nor does the commenter present any evidence of their own to support such claims. Further, any such VOC investigation would be applicable to all the alternatives, such that there would in fact be no difference between them to inform a well reasoned choice among the alternatives.

Regardless, the FS and BLM find that the source apportionment results from the High CARMMS Oil and Gas Scenario emissions (SDEIS at 114 and 115) for the UFO would offer a reasonable approximation (or surrogate) for potential ozone impacts from the mines methane VOC emissions. The basis for our assertion is the commenter's claim that CDPHE calculated the mines emissions to be approximately 321 tons per year.  The CARMMS Oil and Gas VOC and NOx emissions are larger than what CDPHE calculated for the mine, and the relative impacts (i.e. modelled ozone formation) from such higher emissions are relatively minor (approximately 0.57% of the standard, see SDEIS figure 3-8 plot 4).  Given that there are no known significance levels established for ozone impacts within the context of NEPA, we find that the mine's potential impact (using emissions as a surrogate) on ground level ozone formation is not significant, and warrants no changes to the body of the SDEIS itself.

Finally, the public should know that the BLM is in the process of establishing a full suite of federal reference monitoring in Paonia, Colorado (contract award is imminent) to better understand the impacts of federally authorized activities on air resources in the region (the data gathering process is defined in the BLM Colorado's CARPP).

## Methane Emissions and Climate Change (comments 4, 28, 47, and multiple non-substantive comments)

**Summary:**  A few commenters noted a units conversion error in the CH4 and N2O calculations for coal combustion (indirect emissions) in the SDEIS that resulted in values that were 1000 times higher than they should have been.  Similarly, these commenters requested that the direct methane emissions be

BLM_0051331

presented in terms of CO2e. These commenters also express an opinion that the cumulative West Elk emissions from mining coal of the estimated life of the mine are significant when compared to the annual emissions of the United States relative to 2015 EPA GHG estimates. Many commenters also expressed the desire to have the FS and BLM address the impacts of the mine's methane on the climate explicitly, and some felt that we underestimated the mine's methane emissions.

**Response:** The FS and BLM have corrected the units conversion error and have reported direct methane emissions in terms of CO2e where applicable. Additionally, all of the calculations have been updated to reflect the highest methane CO2e emissions factor that includes climate feedbacks (36). The FS and BLM have updated the SDEIS to provide an annual emissions comparison of direct and indirect GHG emissions relative to the 2015 Total U.S. GHG emissions reported by EPA (approx. 6,587 MMtonnes), although we note that the EPA report (Inventory of U.S. GHG Emissions and Sinks) uses the lessor CO2e value for methane (25), and thus our relative contribution calculations are biased high.

At present there are no known significance (NEPA) levels to prescribe to GHG emissions for evaluating the proposed action or alternatives, and thus that is why we state "no credible reason to deny the modification solely on the basis of climate change". The cumulative nature of climate change requires that either everything is significant, or nothing is until such time that significance levels for project related activities are determined by CEQ, EPA, or other policy / rule makers with the authority and expertise to provide such rational. FS and BLM acknowledge that all of the alternatives will contribute to climate change without prescribing significance, and further realize that project level NEPA is not an appropriate vehicle for determining national level policy. Any attempt to prescribe project level significance here would simply be used in future litigation to force FS, BLM , or other government sectors to apply an arbitrary significance standard to future unforeseeable actions that may further and unnecessarily complicate an already complicated issue. To assume that everything is significant doesn't address the problem here because FS Region 2 and BLM Colorado do not have authority to apply meaningful mitigation to the entirety of the U.S. (or world) economy (let alone our own agencies), such that the residual impacts of mitigated alternatives could be nothing more than simply less than they would have been otherwise. Such a result does not provide any meaningful information within the context of the problem of climate change for the decision maker, nor does it account for the uncertainty of other global contributor's failure or lack of options to meet specific reductions for limiting emissions to meet internationally agreed upon targets. The FS and BLM understand that the world needs to reduce emissions, but absent an actual top down policy or framework to achieve this goal at global, economy-wide scales, a piecemealed project by project approach is arbitrary, not practically implementable or fair, and would be destined to fail utterly to achieve any desired result given that in and of themselves these projects tend to be exceptionally small compared to the scope of the issue.

The mines methane emissions are disclosed in table 3-7 for a production year that is similar for the projected future year mining rates. The data is from the EPA's Flight database and represents the most accurate data available for the facility. The future projected estimates of methane are made in the SDEIS based on the production year that correlates best with previous monitoring data, such that we are using an actual production to emissions coefficient despite the fact that these are subject to fluctuations as shown in the SDEIS (pg. 106). In all the alternatives FS and BLM state that the intensity of mining emissions will be similar to those disclosed in Table 3-7, or alternative 1 (which references table 3-7). We have added a CO2e column to Table 3-7 as commenters suggested and have provided the CO2e of methane venting to all the alternatives within the direct effects section. Regardless, the disclosed climate change impacts and lack of project specific analysis tools remains relevant and unchanged in the SDEIS. The disclosed impacts represent the best available data to describe how this project (as a whole) will contribute to projected global climate change. The impacts of methane emissions are included with the climate change section of the SDEIS along with the other greenhouse gases. Methane is not specifically singled out for the impacts as the information would

BLM_0051332

have no further specific relevance in the context of the climate change impacts disclosed, nor would a GHG specific speciation provide additional meaningful information for the decision maker. In terms of disclosing this information for the purposes of evaluating potential mitigation options, it is not necessary given that the result (i.e. residual impacts) is not quantifiable. Any mitigation would simply be less potentially damaging than would have been without mitigation (i.e. emissions are a surrogate for impacts), assuming the rest of the world reduces emissions in line with modelled projections.

## Flaring (comments 5, 6 & 8)

**Summary:** A few commenters suggested that flaring the MDW methane should be considered as a viable mitigation option for the selected alternative, assuming that mine safety could be preserved. Commenters suggested that the FS and BLM require the mine to submit a request to the MSHA for approval to employ enclosed flares at the MDW sites to mitigate the direct release of methane, thus reducing the gases global warming potential. In general these comments were in support of having the FS and BLM apply methane mitigation given the risks of climate change and the fact that the mine is the largest single source of industrial methane releases in the state (according to EPA data).

**Response:** The FS and BLM discussed the technical aspects of several mitigation options within the SDEIS, and specifically for flares in section 2.3.7.5 on page 62. See additional resposes in Alternatives above.

## Social Cost of Carbon/Greenhouse Gas emissions Comment and Responses

**Comment:** Several comments were received stating that the Forest Service should include a social cost of carbon/social cost of greenhouse gas estimate as a way to analyze climate impacts and indicated that the court in *High Country Conservation Advocates v. United States Forest Service* requires inclusion of a social cost of carbon/greenhouse gas estimate. Commenters stated that social cost of carbon/greenhouse gas estimate has to be included when a cost-benefit analysis is conducted. Comments were also received that claimed that the Interagency Working Group on the social cost of carbon/greenhouse gas protocol that monetizes climate impacts associated with carbon and other greenhouse gas emissions provides a common metric for analysis across alternatives and reflects best available information for evaluating climate impacts.

**Response:** The judge in *High Country Conservation Advocates v. United States Forest Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014) did not order the agency to use the Social Cost of Carbon protocol. Rather, the Court determined that the agency did not offer non-arbitrary reasons why the quantification of the lease modifications' contribution to the social cost of carbon were abandoned in the FEIS. The Court found the agency did not demonstrate that it took a "hard look" at whether using the Social Cost of Carbon protocol should not have been included in the FEIS when the protocol was included in the SEIS (Id. at 1191-1192).

As the SDEIS, the revised SFEIS and these responses further explain, the economic benefits of the coal lease modifications were not calculated. Rather for this SDEIS and revised SFEIS, a regional economic impact analysis utilizing input-output modeling was conducted as discussed in Section 3.21.2. Regional economic impact analyses describe effects that agency activities may have on economic conditions and local economic activity, generally expressed as projected changes in employment, labor income, and economic output (Watson, Wilson, Thilmany, and Winter 2007) and it is the basis for evaluating economic contributions by the Forest Service in the impact area (USFS Manual Chapter 1970[31]). Employment and income are not considered measures of benefits but are a descriptor of distribution of potential impacts of the decision on local or regional economics and

---

[31] FSM 1900 - Planning. Chapter 1970 – Economic and Social Evaluation, section 1972 (p. 11)

BLM_0051333

populations, consistent with Forest Service Manual 1970 and Handbook 1909.17. The process for regional economic impact analysis is to first identify the direct impacts of an economic activity affected by management decisions. For instance, direct impacts include expenditures made by the coal company for mining and coal production. Primary impacts also include the value of the coal that is produced and sold. Next, where primary impacts can be quantified, they can generally also be run through an economic model to estimate the total economic activity that is generated as the primary impact ripples through the economy, as the directly affected industries purchase goods and services that are necessary inputs to production, and as labor income generated from production is spent by the households that receive the income. The results of the impact modeling effort would be the changes in economic activity as discussed above (employment, labor income, etc.).

A cost-benefit analysis, on the other hand, is an approach used to determine economic efficiency by focusing on changes in social welfare by comparing whether the monetary benefits gained by people from an action/policy are sufficient in order to compensate those made worse off and still achieve net benefits (Watson et al. 2007, EPA 2010, Kotchen 2011). A cost-benefit analysis requires the identification and valuation of all the costs and benefits associated with an action/policy in a common monetary measure and is often expressed either as net benefits or as a cost-benefit ratio, which indicates the value of benefits obtained from each dollar of costs (Field 2008, EPA 2010).

This SDEIS and revised SFEIS did not attempt to monetize all of the economic benefits which would be included in the benefit side of a cost-benefit analysis for the lease modifications. Notably it did not include the total economic benefits of coal production, which may include the domestic or international benefits of coal production and electricity generation, expressed in terms of annual cost savings of domestic power generation. This type of information would be needed for a full benefit-cost analysis, which may incorporate social cost of carbon estimates or other monetized costs, in order to be meaningful to the public and the decision maker. The absence of any economic benefit information limits the usefulness of the social cost of carbon analysis as the information would not be placed in an appropriate context.

To summarize, cost-benefit analyses and regional economic impact analyses are very different methods that are focused on quantifying/monetizing different measures (social welfare and economic activity respectively) and are based upon differing assumptions and terminology and are not interchangeable. As such, results from a regional economic impact analysis are not considered benefits or costs (Watson et al. 2007). Furthermore, Watson et al. (2007) explicitly stated that an economic impact does not equate to any measure of net welfare change and that an economic impact analysis is not the same as a benefit-cost analysis, and the term 'economic benefit' should be used only in the context of cost-benefit analysis.

There are different approaches that an agency can take to examine climate impacts associated with greenhouse gas emissions, with the social cost of carbon/greenhouse gases estimates being just one metric that could be used. The Forest Service examined the possible use of social cost of carbon/greenhouse gas estimates and determined to use a different approach for the SDEIS and revised SFEIS that quantified greenhouse gas emissions as the common metric used to compare across alternatives and then qualitatively discussed potential cumulative climate impacts at the local, state/regional, and global scales. The Forest Service took this approach for several reasons. First, as stated above, the Forest Service did not engage in a cost-benefit analysis that would place the social cost of carbon/greenhouse gas estimates in a useful or meaningful context.

Second, climate change and potential climate impacts, in and of themselves, are often not well understood by the general public (Etkin and Ho 2007, National Research Council 2009a). This is in part due to the challenges associated with communicating about climate change and climate impacts, stemming in part from the fact that most causes are invisible factors (such as greenhouse gases) and there is a long lag time and geographic scale between causes and effects (National Research Council

BLM_0051334

2010). Research indicates that for difficult environmental issues such as climate change, most people more readily understand if the issue is brought to a scale that is relatable to their everyday life (Dietz 2013); when the science and technical aspects are presented in an engaging way such as narratives about the potential implications of the climate impacts (Corner, Lewandowsky, Phillips, and Roberts 2015); use examples and make information relevant to the audience while also linking the local and global scales (National Research Council 2010). In order to more effectively convey the potential climate impacts, the Forest Service quantified greenhouse gas emissions as a common metric to compare across alternatives and discussed narratively the climate related impacts-both in the air/climate change section as well as in other resource sections such as the Watershed section (3.8) and Vegetation section (3.9). This approach presents the data and information in a manner that follows many of the guidelines for effective climate change communication developed by the National Academy of Sciences (National Research Council 2010) by making the information more readily understood and relatable to the decision-maker and the general public. Additionally, based upon the quantified greenhouse gas emissions and emissions scenarios known as Representative Concentration Pathways (RCPs), global, state and local impacts are discussed. The projected climate impacts to the local GMUG area (for example see Table 3-17) provides a narrative in a scale that is more relevant to the decision-maker and the general public since it provides more detailed specifics on potential implications to their everyday life--such as increased demand for irrigation water, more frequent extreme warm months, more localized flooding, etc.. This does not discount the quantified greenhouse gas emissions nor the qualitative discussions of global and state level impacts, but provides a meaningful and engaging way to connect the reader to more relevant impacts that then allow them to make the connections to the state and global impacts. As mentioned in the SDEIS and revised SFEIS (Sections 3.4.2 and 3.4.5), there is no standard methodology to determine how a project's incremental contribution to GHG would result in physical effects on the environment, either locally or globally. The approach taken for this SEIS provides quantitative GHG emissions as a common metric across alternatives and qualitatively discusses climate impacts, thus effectively informing the decision-maker and the public of potential climate impacts at global, regional/state, and local scales. This approach allows the Forest Service to meet the "hard look" requirement by presenting the environmental impacts of the proposal and the alternatives in comparative form (quantified greenhouse gas emissions), and discusses cumulative climate impacts, providing for the definition of issues and environmental consequences ensuring that an informed decision can be made.

Third, given that the quantity of coal and emissions associated with these lease modifications are encompassed by the analysis completed under the Colorado Roadless Rule (CRR) SFEIS (which incorporated social cost of carbon and social cost of methane estimates, along with detailed discussions on numerous assumptions and constraints associated with such calculation), the monetary value of social cost of carbon/greenhouse gas emissions was not calculated for this lease modifications SEIS. In the CRR Supplemental EIS the Forest Service provided a social cost of carbon and social cost of methane analysis for the North Fork Coal Mining Area (NFCMA) exception (36 CFR 294.43(c)(1)(ix)) reinstatement. The CRR was rulemaking and was required to do a cost-benefit analysis and draft CEQ guidance at the time the analysis was being conducted encouraged, but did not require the inclusion of social cost of carbon/greenhouse gas estimates as part of the cost-benefit analysis. All except approximately 20 acres of the lease modification area falls within the NFCMA with the lease modifications covering approximately 8.6 percent of the NFCMA. Although the lease modifications are only a small portion of the NFCMA, the social cost of carbon and social cost of methane analyses for the CRR, being at a larger geographic scale, incorporate more reasonable foreseeable developments that may also contribute to greenhouse gas emissions and climate impacts thereby providing a more cumulative impact result than a focused analysis on just the lease modification area would provide. Additionally, the CRR SEIS discusses in detail the challenges and caveats of using the social cost of carbon and social cost of methane analyses and how one should interpret the results. Some of these challenges and caveats are summarized below.

BLM_0051335

There are various challenges involved with the application of the social cost of carbon/greenhouse gas protocol, which were discussed in a report from the National Academy of Sciences (National Research Council, 2009b).  The report pointed out that any assessment will suffer from uncertainty, speculation, and lack of information about (1) future emissions of GHG, (2) the effects of past and future emissions on the climate system, (3) the impact of changes in climate on the physical and biological environment, and (4) the translation of these environmental impacts into economic damages (National Research Council, 2009b). The 2010 Interagency Working Group (IWG) social cost of carbon technical support document also noted a number of limitations to the SCC analysis, primarily concerning an assortment of incomplete information and treatments on different effects of climate change (IWG 2010). Periodic improvements on the protocol and associated models have been recommended and are currently underway (National Research Council 2017). The discount rate used, both for the IWG and other social costs of GHG estimates, is an important criteria/methodology that lacks consensus since small differences in the discount rate can create large variations to the estimated social cost of carbon estimate. While the IWG recommended using three discount rates (2.5, 3.0, and 5.0 percent) when applying the social cost of carbon/greenhouse gas estimates, others have asserted that they are too high, thereby underestimating the true costs of emissions (National Research Council 2017). Additionally, the U.S. Office of Management and Budget (OMB) Circular A-4 suggests using discount rates of 3.0 and 7.0 percent as "best practices" for regulatory analyses (OMB 2003). Disagreement on discount rates are nontrivial, due to compounding effects since even what might be considered "minor" differences in the choice of discount rates will result in vastly wide-ranging social cost of carbon/greenhouse gas estimates.

Finally, on March 28, 2017, the President issued an Executive Order entitled "Promoting Energy Independence and Economic Growth."  The EO disbanded the Interagency Working Group on the Social Cost of Greenhouse Gases (IWG) and withdrew the IWG's various technical support documents for implementing the SCC as no longer representative of government policy (Section 5 of the EO). It further directed that when monetizing the value of changes in greenhouse gas emissions resulting from regulations, agencies follow the guidance contained in OMB Circular A-4 of September 17, 2003.[32] However, it is not necessary to quantify the greenhouse gas emissions using the IWG protocol to assess the impacts of GHG emissions.

**Comment:**   Commenter suggested that in light of a recent court ruling, *Montana Environmental Information Center v. U.S. Office of Surface Mining,* --F.32---, 2017 WL 3480262 (D. Mont. Aug. 14, 2017) that the Forest Service disclose climate impacts of the Lease Modifications, including using the social cost of carbon since the Court agreed with plaintiffs' argument that "it was arbitrary and capricious for the Enforcement Office to quantify socioeconomic benefits while failing to quantify costs" and that the agency's assertion that no climate impacts would occur due to the perfect substitution of coal from other mines was rejected because it was "illogical, and places [OSM's] thumb on the scale by inflating the benefits of the action while minimizing its impacts." (Supplemental Comment, Zukoski, T.)

**Response:** The Forest Service is aware of the recent court ruling, *Montana Environmental Information Center v. U.S. Office of Surface Mining.* As noted in the above responses to social cost of carbon comments, the analysis conducted for this SDEIS and SFEIS are not quantifying any economic benefits or costs since a cost-benefit analysis was not conducted.  The Forest Service conducted a regional economic impact analysis for the SDEIS and SFEIS which is different from a cost-benefit analysis. Based upon the Forest Service Manual 1900, Planning, Chapter 1970— Economic and Social Evaluation, in Section 3.21.2 of the SFEIS, the FS clearly articulates that "jobs, income, or revenues contributed to State and local governments are measures of economic impacts and not measures of economic benefits, as such, they cannot be used, or accounted for as parameters in any benefit-cost, or economic efficiency analysis."   Consequently, the increased

---

[32] Similar to the withdrawn IWG technical papers, OMB Circular A-4 provides guidance to Federal agencies for regulatory analyses.

BLM_0051336

economic activity, discussed in terms of revenue, employment, labor income, total value added, and output are simply the economic impacts associated with the Proposed Action. People, based upon their views and values, may perceive this increased economic activity as a 'positive' impact that they desire to have occur; however, that is very distinct from being an "economic benefit" as defined in economic theory and methodology. Additionally, another person may perceive increased economic activity as a 'negative' impact due to potential in-migration of new people, competition for jobs, and concerns that newcomers will change the sense of community and community qualities that are important to herself/himself. Therefore, it is critical to distinguish that how people may perceive an economic impact is not the same as, nor should be interpreted as, a cost or a benefit as defined in a cost-benefit analysis.

As stated in the above responses to social cost of carbon comments, the SDEIS and revised SFEIS did not attempt to monetize all of the economic benefits which would be included in the benefit side of a cost-benefit analysis for the lease modifications. Notably it did not include the total economic benefits of coal production, which may include the domestic or international benefits of coal production and electricity generation, expressed in terms of annual cost savings of domestic power generation. This type of information would be needed for a full benefit-cost analysis, which may incorporate social cost of carbon estimates or other monetized costs, in order to be meaningful to the public and the decision maker.

Also as discussed in the above responses to social cost of carbon comments, the approach taken for this SEIS provides quantitative GHG emissions as a common metric across alternatives and qualitatively discusses climate impacts. This approach effectively informs the decision-maker and the public of potential climate impacts at global, regional/state, and local scales, whereas the social cost of carbon metric would only provide the impact at the global scale. The approach taken by the Forest Service to meet the "hard look" requirement by presenting the environmental impacts of the proposal and the alternatives in comparative form (quantified greenhouse gas emissions), and discusses cumulative climate impacts, providing for the definition of issues and environmental consequences ensuring that an informed decision can be made.

The Forest Service does not make an assumption that there would not be impacts from the use of other coal if West Elk coal is unavailable. In Section 3.4.2.2 of the SDEIS and SFEIS estimated GHG emissions are quantified from coal combustion and potential cumulative climate impacts are discussed in Section 3.4.5.2 even though the location of coal combustion facilities is unknown given the nature of the coal spot market. As clarified in the SFEIS in Section 3.4.2.2 the combustion facilities have operational parameters that are fixed regardless of the alternatives analyzed here, there is very little decision space or scope available to the decision makers to consider combustion related impacts as being significantly different in the context of any of the alternatives analyzed. Simply stated, we assume for the purposes of analysis that no new coal fired facilities will be brought online as a result of this decision, and no existing facilities will go offline for any alternative, regardless of the governments influence with this decision. We have further clarified in the SFEIS in Section 3.4.5.2 that relative to the alternatives themselves, that the no action alternative is anticipated to produce the least of incremental GHG increases. Due to the complexities involved with overall coal supplies, coal spot market responses to current demand, possible fuel substitutions, and other governmental regulations and authorities, it is not possible to translate these GHG reductions into incremental climate change impact reductions. The table below summarizes the climate effects considered in this SFEIS.

BLM_0051337

| Resource | SFEIS Section | Climate Change Impacts Summary |
|---|---|---|
| Air Quality, Greenhouse Gases and Climate Change | 3.4.5.2 | Includes quantification of GHG direct, Indirect and Cumulatively includes emission scenarios<br>Discussion of why SCC was not done here,<br>Impacts on oceans, rising sea temps, weather, floods, droughts, winds, future warming, local seasonal predictions, carbon budget, temperature benchmark |
| Soils | 3.7.5.1 | Increased soil erosivity soil moisture, or soil properties/productivity if affected by higher intensity fires |
| Watershed | 3.8.5.1 | State water resources, precipitation |
| Vegetation | 3.9.6.2, 3.9.6.3 | Ecosystem structure and function, species' ecological interactions, and species' geographic ranges, biodiversity, carbon sequestration,  forest disturbances, including wildfires, insect outbreaks, invasive species, productivity, growth and distribution of forest |
| Wildlife | 3.10.1.5, 3.11.3, | Ecosystem structure and function, species' ecological interactions, and species' geographic ranges, biodiversity. |
| Range Resources | 3.15.6 | Water supply and vegetation, pathogens and affect animal health and loss of weight |
| Recreation | 3.16.5 | Outdoor recreation activities may increase or be compromised s |
| Transportation System | 3.17.4 | Air quality (dust) and water movement. |
| Socioeconomics | 3.21.6 | Human health and well-being,  floods, wildfires, and other extreme events, heat, pollution, energy costs, irrigation, hydropower, poor and minority groups |

BLM_0051338

## Climate Change

**Comment:** The analysis failed to consider, or inadequately considered the impacts of climate change, including impacts to aspen, snowpack, human health and well-being, fires and vegetation. Specific concerns about impacts to aspen and spruce in the North Fork Watershed were also raised.

> **Response:** The analysis of impacts of climate change to the project area have been expanded throughout the SDEIS. Additonal information regarding impacts to vegetation and ecosystems were included in the cumulative effects section under Vegetation. Additional considerations for human health and well-being are contained in the cumulative effects section for Socioeconomics.

> Additional references were utilized to expand the analysis and incorporate more current information. A 2015 report entitled Colorado Climate Change Vulnerability Study (Gorden, Ojima) and a 2014 report from the Union of Concerned Scientists (Funk) have been added. References can be found throughout Chapter 3.

> Specific projected impacts to the GMUG National Forest, which includes the North Fork Watershed can be found in table 3-17.

**Comment:** The lease modifications will worsen climate change by increasing $CO_2$ and methane emissions. Many commenters strongly endorse Alternative A, or the decision not to make coal reserves available.

> **Response:** The proposed action will result in additional GHGs to the atmosphere. These have been analyzed in detail and disclosed in the air quality section of the SDEIS. Although this will increase atmospheric concentrations, it is unlikely to have any measureable impact on worsening the effects of climate change.

> The impacts of not modifying the leases were analyzed in detail with Alternative A. Alternative A does not meet the intent as described in the purpose and need for the project.

**Comment:** The costs to make the GMUG National Forest resilient to climate change will cost millions of dollars.

> **Response:** This comment is generally beyond the analysis scope for the proposed action. However, vegetation treatments recently undertaken on the GMUG National Forest promote resilience through restoration. There is no discernable link to emissions associated with these lease modifications to impacts on the GMUG National Forest.

**Comment:** The cumulative effects section is inadequate. Climate change is the sum of many small projects. The BLM and the Forest Service incorrectly assume the volumne of coal associated with the lease modifications is too small to matter.

> **Response:** The SDEIS has been revised based on this comment. Additional information has been added to select cumulative effects sections as appropriate.

> Human-caused climate change is the result of many decisions and actions, largely in the past century. The proposed action will contribute to the increase of atmospheric concentrations of greenhouse gases.

**Comment:** The carbon analysis is flawed for the vegetation section. Analysis portrays this project as a vegetation management project instead of a coal lease modification.

BLM_0051339

**Response:** Changes were made to the carbon discussion throughout the vegetation section. Additional comments were added to clarify that impacts were being considered as tree-cutting and ground disturbance would be connected to the lease modifications.

## Soils

**Comment:** Multiple commenters believe that the proposed action will cause damage to the natural landscape, particularly soil erosion and stream pollution.

**Response:** See Section 3.7 for effects to soils; Section 3.8 for effects to water resources; and see other sections in Chapter 3.

## Water and Other Resources

**Comment:** Commenters have expressed an array of general concerns about water ("jeopardizing high alpine waterways", "river's ecosystem", etc.) and water quality ("toxic run-offs", "poisons the earth", "dumping rock and debris into the rivers", clean drinking water, etc) air ("release methane"), vegetation, wildlife ("destroys habitats", soils, public health related to the lease modifications.

**Response:** Because these are general comments, we refer commenters to the following: See Section 3.8 for effects to water resources. Annual water quality monitoring has been completed, and will continue (Section 3.8.1.3). See Section 3.9 for effects to vegetation. See Sections 3.10-3.14 for effects to wildlife. See Section 3.7 for effects to soils.  See air (Section 3.4) and climate change sections throughout the document for effects to humans.

Rock and debris will not be dumped into rivers and streams, and is prohibited as per http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised.

**Comment:** Commenter states that the mine causes toxic runoff that will spill into Blue Mesa, it will kill off fish and hurt small businesses in and around the town. (Baliczek, D.)

**Response:** Blue Mesa Reservoir is approximately 25 miles from the lease modifications at its nearest point, on the opposite side of the West Elk Mountains and is not downstream of the project area.  See Section 3.8 for effects to water.  Annual water quality monitoring has been completed, and will continue (Section 3.8.1.3).

**Comment:** Commenter states that destroying 1,700 acres of land will take a very long time to recover; coal mines have a history of not cleaning up after their work resulting in remnants of mining that can pollute water for decades. (Anthony, B.)

**Response:** Total projected disturbance within the lease modifications would be between 18 and 72 acres. See Section 3.9 for effects to vegetation. All ground disturbance will be bonded, recontoured and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. Annual water quality monitoring has been completed, and will continue (Section 3.8.1.3). See Section 3.8 for effects to water.

**Comment:** Commenter states that development needs to be wisely planned and determined if project exceeds the cost-benefit ratio and that it is hard to place a value on water. (Nagel, C.)

**Response:** A cost-benefit analysis (or ratio) has not been prepared for this analysis as that generally applies to rule making efforts, which this is not.  This is addressed in Section 3.4. Socio-economic contributions are addressed in Section 3.21. See Section 3.8 for effects to water resources.

BLM_0051340

**Comment:** This area should be preserved at least for the benefit of the endangered cutthroat trout. (Hoekstra, R.)

**Response:** Native cutthroat trout do not occur in the project area (Table 3-26, SDEIS p.186).

**Comment:** Commenter states that each phase of coal production: mining, disposal of contaminated water and tailings, transportation, washing, combustion, and disposing of post-combustion wastes, produces pollutants that affect human health. Any mining in the region would expose residents to coal dust. Exposure to coal dust can occur through inhalation, ingestion, or eye contact. (Pope, N.)

**Response:** See Section 3.4.1.1 for criteria air pollutants. See Section 3.4.2.2 for indirect air effects. See Section 3.4.5 for cumulative air effects. See Section 3.8.5 for cumulative water effects.

**Comment:** Commenter stats that  chemicals used in the mining process will be discarded into the water system. (Barnes, G)

**Response:** See Section 3.8 for effects to water resources. Annual water quality monitoring has been completed, and will continue (Section 3.8.1.3). Chemicals are specifically prohibited from being discharged into water systems; see Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised http://mining.state.co.us/Rules/Pages/home.aspx

**Comment:** Exploration and mine development will damage soils and landscapes upstream of endangered   Colorado River fish. (Sandler, M.)

**Response:** See Section 3.7 for effects to soils. See Section 3.10 for effects to endangered Colorado River Fish.

**Comment:** Commenter states that Colorado forests are providing needed carbon sequestration. Breaking up the coal will release toxic waste and foul the watersheds in this area. (Barrows, S.)

**Response:** See Section 3.9.6.4 for Carbon Sequestration. See Section 3.8 for effects to water resources.

**Comment:** Commenter states that spills into surface water sources are almost a given, since the House just passed a bill to remove protections against dumping coal waste into streams. Even if nothing is dumped directly into streams, the potential for toxic seepage into groundwater is still y high. (Sadler, C.)

**Response:** Spill Prevention, Control and Countermeasure Plans, and conformance are required by Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised http://mining.state.co.us/Rules/Pages/home.aspx. See Section 3.8.1.6 and 3.8.1.7 for projected and past impacts to groundwater resources.

**Comment:** The SDEIS Fails To Properly Disclose Impacts To Streams And Wetlands. The SDEIS omits important information, and contains contradictory statements and errors concerning streams and wetlands. Any subsequently prepared NEPA document must correct address and correct these errors. (Zukoski, T.)

• Existence of wetlands/ponds and resultant impacts on certain species of wildlife

• Existence of perennial streams specifically Horse and South Prong Creeks on USGS Quad whereas FS reports them as ephemeral

• SDEIS also omits critical information: the BLM's exploration plan EA in 2013 identified stream crossings, the SDEIS contains no such map.

BLM_0051341

- SDEIS does not identify stream crossings for Alternative 4.

- Any subsequently prepared NEPA document should contain maps identifying stream crossing for both alternatives.

- SDEIS does not contain a map identifying wetlands or riparian areas.

**Response:** The statement suggesting there are no ponds has been changed to "There are several small lakes/ponds in the lease modifications area (Figure 3-18)." Figure 3-18 has been changed to include waterbodies. Figure 3-18 has been changed to include water bodies in the legend. Projected numbers of stream crossings for Alternative 4 are disclosed in SDEIS Table 2-6. SDEIS Figures 2-2 and 2-3 depict topo-layer background (similar to the USGS topo map commenter cites regarding perennial streams and ponds) with temporary roads crossing them.  Wetlands for the lease modifications area have not been mapped, however stipulations state "Surface use or disturbances (except for surface subsidence and resource monitoring purposes defined in the approved mining permit) will avoid riparian, wetland or floodplain areas, and a buffer zone surrounding these areas... unless no practical alternatives exist."(SDEIS p. 34) Also, stipulations require inventory and monitoring sufficient to "...locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology (SDEIS p.33)." The stretches of streams shown as perennial and intermittent on Figure 3-18 have been updated and ground-truthed by Forest Service personnel.

**Comment:** Clearly, the largest counter you're hearing is due to the environmental damage this expansion will cause, both locally and on an already stressed larger scale. The extraction volume being requested is staggering. To give it scale, the weight of the coal being requested from this pristine wilderness is the equivalent to extracting the USS Gerald Ford (an aircraft carrier with a surface area of 4.5 acres and a height of 250 feet) 121 times! With this all taking place over a ten year span, how can this not do irreparable damage? And then it's done. The income is done, the methane and C02 are in the air, some rich guy has made his money and taken it elsewhere and you're left to manage a damaged forest. We the people will be left with the costs, both economically for the clean-up, and in loss of use. Profits will be short-term, but the losses will be exponentially longer.  (Swett, M.)

**Response:**  There are no lands within the project area which have been recommended or available for Wilderness designation, or are now Wilderness. All ground disturbance will be bonded, recontoured and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised "

**Comment:** Tailings from mining coal are incredibly toxic to water quality and to wildlife. (Goodwin, K.)

**Response:** There are no mining spoils within the lease modifications area. Mining spoils are regulated by Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised http://mining.state.co.us/Rules/Pages/home.aspx.

**Comment:**  Commenter states the current administrations proposed de-regulation new mines could end up dumping millions of tons of metal-laced waste rock into streams, including arsenic, lead, and mercury pollution. (Potter, J.)

**Response:** There is no waste rock proposed to be placed in streams in this project. Annual water quality monitoring has been completed, and will continue (Section 3.8.1.3).

**Comment:** Commenter asked how much water will be used and how much will be contaminated? (Nash, M.)

BLM_0051342

**Response:** Up to 8.7 acre-feet of water may be used (Table 2-6, SDEIS p. 70). This water will not be contaminated. Annual water quality monitoring has been completed, and will continue (Section 3.8.1.3). See Section 3.8 for effects to water.

**Comment:** These changes in rules fought for and approved by Coloradans will allow to dump millions of tons of stone laced with arsenic, lead, and mercury to pollute rivers and lakes. (Nath. C)

**Response:** We are unsure of what rules the commenter is referring to.

## Vegetation

**Comment:** Multiple commenters want the forest (and mature forest) protected from roads, drilling pads, and mining.

**Response:** See Section 3.9 for effects to vegetation.

**Comment:** [T]he FSEIS should also note that the forest in the lease modification area is generally covered with oak brush, mountain shrub and timber that is of a mature or over-mature age class. Opening up old and decadent vegetation creates openings that are filled with palatable forbs and grasses. The openings created by reclaimed roads and pads diversify the age class of the vegetation and create "edge" habitat favored by many species which in turn promotes greater biological diversity. [36019-3]

**Response:** As descried in several places in the SDEIS, the overall effects, including biological and seral diversity added by disturbing and reclaiming ~18 to ~72 acres within the project area will be minimal.

**Comment:** Construction of roads and well pads can generate corridors for invasive plants. [1923-1].

**Response:** Noxious Invasives are treated in accordance with http://mining.state.co.us/Rules/Pages/home.aspx. Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised Pg. 25 Section 1.04 Noxious Weeds defined. Pg. 328, Section 4.15.1 Requirement for a weed management plan. Pg. 335, Section 4.15.7 Weed control measures comply with "Colorado Weed Management Act" (35-5.5-115) and CDRMS Guidelines.

**Comment:** Commenters are concerned construction of roads and well pads will negatively impact elk and other wildlife habitat.

**Response:** Effects to elk are addressed in Section 3.13.3.1. See Sections 3.10 - 3.14 for effects to wildlife.

**Comment:** Protect one of the world's largest aspen groves near Kebler Pass. [268-4].

**Response:** The project area is geographically distinct from the Kebler Pass area. It can be estimated from figure 1-1 that the project area is at least 6 miles away from, and across a major drainage (Coal Creek) from the Kebler Pass Aspen stand(s). Estimated impacts to aspen are addressed in Section 3.9.

**Comment:** Protect the forest to help mitigate climate change. [36097]

**Response:** There are approximately 18-72 acres of probable disturbance for this project. See Section 3.9 for effects to vegetation, specifically Section 3.9.1.2 for effects to Carbon Sequestration.

**Comment:** The Lease Modifications area may also include the Colorado tansy-aster. "Occurrences of this species have not been documented in the project area but its habitat is likely to occur." 336 The SDEIS states that for the exploration plan no effects "are expected." 337 But the analysis also states: "At

992

BLM_0051343

[the] time surface activities might be proposed, appropriate populations or habitats will be surveyed on a site-specific basis prior to ground disturbance." 338 That time is now because the proposed action here is to approve the exploration plan with its nearly 5 miles of road and 22 acres of cleared habitat. The Forest Service must conduct surveys now, and disclose survey results in any subsequently prepared NEPA analysis

> **Response:** Section 3.12.1 has been updated to reflect that according to previous Rangeland management Specialist and previous Forest Botanist, Colorado tansy-aster is highly unlikely to occur in the project area (personal communication, D. Gray with John Monarch 08/02/17).

**Comment:** We believe we need to see this proposal in the context of what is happening across much of Colorado. Many proposals to explore for or produce coal or coal seam gas/ coal bed methane (CSG/ CBM) are already having negative impacts on agricultural producing areas. [251-6]

> **Response:** See Sections 3.2.9 and 3.2.11 for other past, present and reasonably foreseeable coal and oil and gas projects in the area. We are unaware of any negative impacts of these projects on agricultural production.

**Comment:** While indirect or cumulative impacts may not seem to be environmentally unsound, further habitat fragmentation in previously roadless areas must be considered unsound given the variety of impacts to wildlife and vegetation with edge effect and other realities of road intrusion.

> **Response:** There are between ~18 and ~72 acres of total disturbance in the lease modifications area. See Section 3.9 for effects to vegetation. See Sections 3.10- 3.14 for effects to wildlife.

## Wildlife

**Comment:** Properly disclose the direct, indirect and cumulative impacts on wildlife, including big game and threatened and endangered species.

> **Response:** An analysis of impacts to species are described in the SDEIS sections 3.10-3.15.

**Comment:** Updated Consultation Is Required In Light Of Substantial Vegetation And Unexpected Habitat Changes Since 2010. The Forest Service's reliance on the outdated 2010 consultation fails to account for significant changes over the last seven years across the GMUG National Forest.

> **Response:** Consultation on Canada Lynx is still valid.  This LAU has not seen extreme loss of conifer habitat due to spruce beetle, harvest, or other factors and has not approached levels which would trigger review of projects in order to not exceed caps of unsuitable acres.  If or when such widespread impacts occur, the Forest Service would re-initiate consultation with the Fish and Wildlife Service.

**Comment:** The SDEIS Fails to Take A Hard Look At Cumulative Impacts To Wildlife. NEPA requires the Forest Service to take a hard look at the cumulative impacts on the affected geographic area, not just the immediate planning area.321 The Forest Service's cumulative impacts analysis "must be more than perfunctory; it must provide a 'useful analysis of the cumulative impacts of past, present, and future projects.'"322 The agency must, therefore, "give a realistic evaluation of the total impacts [of the action] and cannot isolate the proposed project, viewing it in a vacuum."

> **Response:** Cumulative impact areas vary by the species being considered.  In some instances it is appropriate to use defined areas such as the Lynx Analysis Unit, whereas elk data and management is done at the DAU and GMU level.  However, if the area being considered is very large, impacts tend to be diluted by the very scale of the area.

BLM_0051344

**Comment:** The SDEIS Fails to Take A Hard Look At Direct And Indirect Impacts To Big Game. The Forest Service has failed to consider sufficiently direct, indirect and cumulative impacts to elk, mule deer and black bear. Neither the analysis of the proposed lease modifications, nor previous analysis for the supplemental rulemaking reinstating the North Fork Coal Mining Area exception to the Colorado Roadless Rule, sufficiently discloses impacts to these species.

**Response:** Impacts to elk are described in the DSEIS, Section 3.15. Neither deer nor black bear are Threatened, Endangered, Forest Service Sensitive, nor Management Indicator Species and are not analyzed for ESA, NEPA, or NFMA compliance. There are numerous wildlife species which occur in the project area which are not special status species and are not addressed in the Biological Assessment, Biological Evaluation or, Management Indicator Species Assessment,. While these species are not individually addressed herein, they are considered during project planning and evaluation. These species are anticipated to be impacted similarly to species described in the analysis, through habitat loss or alteration (positively or negatively depending on species), through disturbance from noise, light, and human presence from project sites or equipment, and from vehicular traffic associated with the project. None of these species are anticipated to be impacted at the population level, and design criteria, mitigation measures, and best management practices used for this project will in most cases reduce impacts to those species.

**Comment:** The Forest Service Needs To Analyze All Areas To Be Affected Directly, Indirectly, And Cumulatively By The Lease Modifications And Subsequent Mine-Related Development. Scoping comments noted that the agency must analyze "all the areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the action."435 This standard requires the Forest Service to analyze and disclose impacts on lynx that would occur as a result of private land impacts stemming from the Forest Service's approval of the lease modifications.

**Response:** Impacts to private lands are included in the cumulative effects analysis for Canada Lynx and other species as noted in the DSEIS, particularly section 3.10.1 for lynx as the private lands that may be indirectly affected are within the LAU. The US Fish and Wildlife Service concurred with the Forest Service's analysis of impacts on this species related to this project.

**Comment:** The Forest Service Fails To Identify The ESA Compliance Documents On Which It Intends To Rely.

**Response:** Existing conditions within the LAU and the past, present, and reasonably foreseeable future actions occurring within this LAU have not changed substantially since the 2010 analysis, and there is no need to reinitiate consultation based on this. The adequacy of the initial analysis and consideration of changed conditions is addressed in a supplement to the BA which is in the project file.

**Comment:** President Trump tried this with National Monuments and Parks. 98% of the American public wish to keep these lands public and out of the hands of the greedy few. These lands are our National Treasure. There are not many out there, and to hand them over to a corporation for strip mining and methane production. Is despicable. Simply because this Administration is stuck in the Fifties and clueless to how this level of destruction will destroy, the landscape, the habitat ,the water and air, lean air Clean Water and a great Environment don't just happen because one says so, it had been forty years of fighting and planning to  attempt to minimize out impact on the natural world which has gotten us to where we are today.  It can be undone all too easily and quickly, when the Federal Government does not require special interest to follow and respect our rules and laws.  The presence of an endangered fish and its habitat demand that the US Forest Service and Fish and Wildlife, deny this type of destructive and likely irreversible damage. Endangered species must be protected! I am counting on the career scientist and employees of the federal government to protect our national lands from harmful and permanently disfiguring practices.  Thank you!

BLM_0051345

**Response:** Analyses of impacts to wildlife and plant species are included in Chapter 3 of the DSEIS, sections 3.10 to 3.15.  Appropriate mitigation to reduce impacts to species is included in the project and its analysis.

**Comment:** I am concerned about the deep, long-term environmental impact on soils, flora, fauna, and threatened species in the region - such as the Gunnison sage-grouse.

**Response:** Analyses of impacts to wildlife and plant species are included in Chapter 3 of the DSEIS, sections 3.10 to 3.15.  Gunnison Sage-grouse do not occur in or near the project area.  The nearest Gunnison Sage-grouse critical habitat is about 19 air miles to the south/southwest of the lease modifications area.

**Comment:** The EIS fails to address the direct, indirect and cumulative impacts on big game in the area and thus the impact on hunting, decreasing tourism.

**Response:** Analyses of impacts to wildlife and plant species are included in Chapter 3 of the DSEIS, sections 3.10 to 3.15.  Impacts to recreation are included in the elk analysis as well as Section 3.16, Recreation.

**Comment:** The Forest Service's consultation, and the U.S. Fish & Wildlife Service's concurrence, violate the Endangered Species Act. The Forest Service fails to comply with NEPA and the Endangered Species Act (ESA) in addressing the impacts of the Lease Modifications and exploration plan of the lynx and Colorado River fish.

**Response:** Analyses of impacts to wildlife and plant species are included in Chapter 3 of the SEIS, sections 3.10 to 3.15.  The US Fish and Wildlife Service concurred with the Forest Service's analysis of impacts to threatened and endangered species and a letter of concurrence is (June 16, 2010; ES/CO: FS/GMUG/Paonia RD; TAILS 65413-2010F-109). USFWS's Final Sufficient Progress Memo (December 20, 2016) was cited in Appendix J.

**Comment:** Our collective American value of a roadless area in a National Park that supports habitat, and also satisfies species specific needs, for a variety of wildlife strikes me as the much greater and more important value than the Energy company, particularly coal, destroying  habitat for the questionable goal of enhancing the company's bottom line.

**Response:** Analyses of impacts to wildlife and plant species are included in Chapter 3 of the DSEIS, sections 3.10 to 3.15.  This is a National Forest, not a National Park.

**Comment:** Please note also that Corydalis caseana is a common wildflower in that area, and it, as well as the Delphinium species that occur there, are frequent host plants for Bombus occidentalis, a bumble bee species listed as Vulnerable on the IUCN Red List, and a USDA Forest Service Sensitive Species in Region 2. In Colorado it is designated SGCN, Tier 2Species of Greatest Conservation Need. I suggest that you consider that area as potential or existing habitat for the Western Bumble Bee.

**Response:** DSEIS Section 3.11.17 does acknowledge that this species may occur in the area and may be impacted by the project.

**Comment:** The Forest Service Fails To Comply With NEPA And The ESA Regarding Endangered Fish In The Upper Colorado River Basin. As noted in the scoping comments of High Country Conservation Advocates et al.,462 and acknowledged in the Lease Modifications SDEIS,463 issuance of the lease modifications will result in water depletions from methane drainage wells and other mining activities that will deplete approximately 9 acre-feet from the Gunnison River. These depletions will adversely affect the four endangered fish - Colorado pikeminnow, humpback chub, bonytail, and razorback sucker - that

995

rely on the Colorado River system at its flows for their survival and critical habitat. As the Forest Service acknowledges, these depletions will adversely affect the four listed fish and their critical habitat:

**Response:** Water depletions associated with the project are authorized under the 2007 and 2009 Biological Opinion. The Forest Service completed consultion under Section 7(a)(2) of the Endangered Species Act. This consultaton resulting in issuence of a biological opinion (BO) for the big river fishes on May 19, 2016 (ES/GJ-6-CO-09_F-001_GP030). This BO determined that the project fits under the umbrella of the Gunnison River PBO. USFWS's Final Sufficient Progress Memo (December 20, 2016) was cited in Appendix J.

**Comment:** The Forest Service Does Not Provide Evidence That It Will Require Sufficient Mitigation Measures, Stipulations, Or Other Measures That Support Its "May Affect But Is Not Likely To Adversely Affect" Determination. As noted above, nearly all the lands included in the lease modifications and all lands that are proposed for exploration activities are within suitable lynx habitat.

**Response:** The DSEIS Section 3.10.1 describes impacts to Canada lynx. The US Fish and Wildlife Service concurred with the analysis conducted by the Forest Service.

**Comment:** Persistent Drought Conditions and Increasing Water Demand Have Reduced Water Supply. Compounding this threat to the endangered fish are persistent drought conditions that have diminished natural flows in the Colorado River Basin and reduced water storage that is needed to supplement Upper Basin flows. The period from 2000 to 2015 was the lowest 16-year period for natural flow in the last century, and one of the lowest 16-year periods for natural flow in the past 1,200 years, according to paleorecords.

**Response:** The Fish and Wildlife Service determined in 2015 and again in 2016 that sufficient progress has been made toward recovery of the big river fishes (Creed Clayton, personnel communication, August 4, 2017). USFWS's Final Sufficient Progress Memo (December 20, 2016) was cited in Appendix J.

**Comment:** The Forest Service Fails To Comply With The ESA And NEPA Concerning The Canada Lynx.

**Response:** The Forest Service completed a Biological Assessment as required by Section 7(a)(2) of the Act. This BA requested concurrence that the project may affect, but is not likely to adversely affect Canada lynx. The FWS concurred on this determination in the BO submitted on May 19, 2016 (ES/GJ-6-CO-09-F-001-GP030).

**Comment:** The SDEIS Fails To Disclose Impacts to Sensitive Wildlife And Plants.

**Response:** The scale of the reasonably foreseeable mine development within the lease modification area is such that free movement of wildlife is not anticipated to be substantially reduced. Access roads are typically not wide enough to curtail movement of any TES/FSS/MIS species. We acknowledge that activities may disturb species and such is noted in the DSEIS, for example at 3.11.8.3 for boreal owls.

**Comment:** The Forest Service Cannot Rely On Documents Created For SBEADMR To Discharge Its ESA Obligations. In response to comments reminding the Forest Service of its duty to refresh consultation on the lease modifications, the Forest Service points to analysis developed for an entirely different programmatic project spanning the entire GMUG National Forest.430 The Forest Service cannot rely on this analysis.

**Response:** The US Fish and Wildlife Service concurred with the Forest Service's analysis of impacts to threatened and endangered species and a letter of concurrence is (June 16, 2010; ES/CO: FS/GMUG/Paonia RD; TAILS 65413-2010F-109). The area of the 2010 consultation was also

BLM_0051347

included in 2016 in the GMUG wide Programmatic SPEADMR BO (ES/L-6-CO-08-F-024-GH016; TAILS 06E24100-2016-F-132: Bundle 65413-2009-B-2008) as that addressed vegetation removal and road or temporary building (similar to activities proposed as post-lease surface use here) and established the conservation threshold consistent with the SLRA for each LAU on the Forest.

**Comment:** Studies show that many animals avoid drilling pads because of noise and light pollution.

**Response:** There are numerous wildlife species which occur in the project area which are not special status species and are not addressed in the Biological Assessment, Biological Evaluation, Management Indicator Species Assessment, or in the Migratory Bird evaluation for this project. While these species are not individually addressed herein, they are considered during project planning and evaluation. These species are anticipated to be impacted similarly to species described in the analysis, through habitat loss or alteration (positively or negatively depending on species), through disturbance from noise, light, and human presence from project sites or equipment, and from vehicular traffic associated with the project. None of these species are anticipated to be impacted at the population level, and design criteria, mitigation measures, and best management practices used for this project will in most cases reduce impacts to those species.

## Recreation

**Comment:** Commenters suggest that the proposed lease modifications must disclose the effects on tourism and recreation. 4287-2

**Response:** See Section 2.16 for effects to recreation.

## Roads

**Comment:** Many commenters believe building roads in the project area would cause great and irreparable harm to the ecosystem.

**Response:** Temporary roads for exploration and methane drainage have been constructed and decommissioned in the general area for over 20 years. These roads have been, and would continue to be closed to motorized use by the public. According to current and past district employees, these closures have generally been respected, and in isolated cases, violations have been reported by mine employees and enforced by the Forest service personnel. The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. Effects on physical, biological, and social environments are addressed in Chapter 3.

**Comment:** Many commenters believe that roads, once built, are difficult to remove.

**Response:** As addressed in several places in the SEIS, roads have been constructed and successfully reclaimed in the general area for coal exploration and mining for over 15+ years. The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised.

**Comment:** The Forest Service Can Only Approve The Lease Applications If It Concludes That Motorized Access Without Road Construction Is Not Feasible. In order to authorize road construction for the lease and (separately) for the exploration plan, the Forest Service must conclude in each case that "[m]otorized access, without road construction is not feasible." 36 C.F.R. § 294.43(c)(2). Evidence in the record undercuts, or is not adequate to support, such a conclusion. As noted above, the Forest Service does not provide sufficient evidence that helicopter access for exploration is not feasible.

BLM_0051348

**Response:** Sections 2.3.1 and 2.3.2, addressing alternatives to construct exploration and methane drainage well pads without roads have been updated to reflect why they were eliminated from detailed study.

**Comment:** Many commenters state that new roads would damage wilderness.

**Response:** There are no Designated Wilderness areas in the lease modifications area.  The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx  Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. Also in accordance with these regulations, treatment of nonnative invasive plants are required. See Section 3.8 for effects to soils.

**Comment:** Commenter does not want more truck traffic due to this project.

**Response:** There is no increased traffic in the general area anticipated under any of the action alternatives.See Section 3.17 for effects to Transportation System.

**Comment:** Commenter states the citizens of Gunnison County do not want to lose access to these beautiful portions of the back country.

**Response:** While recreation experiences could temporarily change under action alternatives (See Section 3.16 for effects to Recreation), public access to the lease modifications area would not be restricted under any of the alternatives.

**Comment:** The Forest Service must clarify the extent to which cross-country motorized activity, presumably in addition to road construction and on-road vehicle use, is foreseeable and/or approved by this proposal, and what type of activity that might be, and how it would impact all resources.

**Response:** With the exception of Alternative 2, which has been eliminated from detailed study, references to cross-country travel for pad construction have been removed from the SDEIS.

## Roadless

**Comment:** Many commenters expressed that coal development into the affected roadless area should not occur due to the benefits roadless and pristine areas provide, such as wildlife habitat, biodiversity, water quality, recreation, and the restorative benefits to humans.

**Response:**  The Colorado Roadless Rule was developed to provide management direction for conserving 4.2 million acres of Colorado Roadless Areas while addressing State concerns.  The North Fork Coal Mining exception was specifically developed to address the State's interest in not foreclosing opportunities for exploration and development of coal resources in the North Fork Valley.

The Forest Service recognizes the value of roadless and pristine areas (high quality or undisturbed soil, water and air; sources of public drinking water; diversity of plant and animal communities; habitat for threatened, proposed, candidate and sensitive species, and for those species dependent on large, undisturbed areas of land; primitive, semi-primitive non-motorized and semi-primitive motorized dispersed recreation; reference landscapes; natural appearing landscapes with high scenic quality; traditional cultural properties and sacred sites; and other locally identified unique characteristics). That is why the agency has developed regulations for management of roadless areas.  However, the agency also has an affirmative responsibility to manage National Forest System lands for multiple uses.  The North Fork Coal Mining exception is a means of balancing the values and opportunities that roadless areas provide and the commodity needs to the American citizens and industries.  The Colorado Roadless Rule set aside 19,700 acres in which temporary roads could be constructed for

BLM_0051349

coal exploration and/or coal-related surface activities. This equates to about 0.5% of Colorado Roadless Areas. This is an appropriate balance between conservation of roadless areas and economic needs.

**Comment:** Many commenters expressed concern that coal mining impacts to the roadless area and characteristics would be long lasting or irreversible.

**Response:** The SDEIS discusses irreversible and irretrievable impacts in Section 3.24. The SDEIS acknowledges that there are some long lasting and irreversible impacts related to the proposal and these impacts will be considered if and when a decision is made.

**Comment:** Commenters expressed concern that impacts to the roadless area were being made to benefit only one company.

**Response:** The economic contributions of modifying the coal leases extend beyond Arch Coal Inc. The SFEIS discloses some of those effects, which include increased employment, labor income, and royalty payments. Please see the Socio-economic section (3.21) in this document.

**Comment:** Commenters were concerned that the proposal would enter into wilderness and stated this was inconsistent with the Wilderness Act.

**Response:** Designated roadless areas are not the same as a designated wilderness areas. Management activities, such as the proposed lease modifications, in designated roadless areas in Colorado are governed by the Colorado Roadless Rule, whereas wilderness areas are governed by the Wilderness Act. Colorado Roadless Areas were administratively designated through the Colorado Roadless Rule. Wilderness Areas, such as the adjacent West Elk Wilderness, can only be designated by Congress. The proposed lease modifications would underlie designated roadless and not designated wilderness. Therefore, the proposal for lease modifications is consistent with the Wilderness Act.

**Comment:** Commenters were concerned that the proposal is adjacent to the West Elk Wilderness Area and some suggested the Forest Service consider buffering the Wilderness to minimize impacts to the Wilderness.

**Response:** The West Elk Wilderness Area immediately adjacent to the proposed coal lease modifications was designated Wilderness through the 1980 Colorado National Forest Wilderness Act (P.L. 96-560). Section 110 of this Act prohibits the Agency for creating a protective perimeter of buffer zones around a wilderness area. The Act states "the fact that nonwilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area." In addition, it is agency policy not to "maintain buffer strips of undeveloped wildland to provide an informal extension of wilderness" (FSM 2320.3).

**Comment:** The Forest Service Must Adopt Stipulations To Ensure Effective Road Decommissioning. Further, the Colorado Roadless Rule requires: the inclusion of a road decommissioning provision in all contracts or permits. Design decommissioning to stabilize, restore, and revegetate unneeded roads to a more natural state to protect resources and enhance roadless area characteristics. Examples include obliteration, denial of use, elimination of travelway functionality, and removal of the road prism (restoration of the road corridor to the original contour and hydrologic function). 36 C.F.R. § 294.43(d)(2). The stipulations proposed pursuant to the Colorado Roadless Rule do not contain all of this language, stating only that: "All temporary roads must be decommissioned and affected landscapes restored when it is determined that the road is no longer needed for the established purpose," and that "[a]ll temporary roads must prohibit public motorized vehicles (including off-highway vehicles) except" under certain conditions.552 The stipulations thus omit the Rule's mandates about the specific nature of decommissioning (stabilizing, restoring, and revegetating unneeded roads to a more natural state to

BLM_0051350

protect resources and enhance roadless area characteristics), and fail to specifically address decommissioning as including obliteration, elimination of travelway functionality, removal of the road prism, and restoration of the road corridor to the original contour and hydrologic function. To ensure compliance with law, the Forest Service must include stipulations that strictly adhere to the precise language of the Rule.

> **Response:** Proposed stipulations specific to the lease modifications are displayed in Table 2-1 of the SDEIS. It is unnecessary to explicitly duplicate the requirements of the CRR since the standard USDA lease notice requires the lessee to comply with all rules and regulations of the Secretary of Agriculture when not inconsistent with the rights granted by the Secretary of Interior.

**Comment:** The Forest Service must ensure compliance with the Colorado Roadless Rule. The Lease Modifications, and foreseeable mining and proposed exploration activity, will occur almost exclusively within lands identified as managed under the Colorado Roadless Rule.550 Any road construction activities, therefore, can only occur, if at all, in compliance with the rule.

> **Response:** Proposed stipulations specific to the lease modifications are displayed in Table 2-1 of the SFEIS. It is unnecessary to explicitly duplicate the requirements of the CRR since the standard USDA lease notice requires the lessee to comply with all rules and regulations of the Secretary of Agriculture when not inconsistent with the rights granted by the Secretary of Interior.

**Comment:** The Forest Service must prevent unnecessary or unreasonable surface disturbance. The Colorado Roadless Rule mandates that road construction permitted under the rule's exceptions shall "prevent unnecessary or unreasonable surface disturbance": (d)Road construction/ reconstruction/ decommissioning project implementation and management. The following elements will be incorporated into any road construction/reconstruction projects implemented within Colorado Roadless Areas. (1) Road construction/reconstruction. If it is determined that a road is authorized in a Colorado Roadless Area, conduct construction in a manner that reduces effects on surface resources, and prevents unnecessary or unreasonable surface disturbance. 36 C.F.R. § 294.43(d)(1). The Forest Service includes the "prevent unnecessary or unreasonable" language in a stipulation. But the SDEIS contains no discussion of what specific measures are necessary to ensure such a result. The requirements must be more than what is required for standard stipulations or they would be redundant. The Forest Service should propose specific measures to define and protect against unnecessary or unreasonable disturbance. Further, the Forest Service must conclude that Lease Modifications should be prohibited on the grounds that mining this particular coal is "unnecessary and unreasonable," given the Forest Service's assertion that if the coal does not come from this mine it will come from somewhere else.

> **Response:** Proposed stipulations specific to the lease modifications are displayed in Table 2-1 of the SDEIS. It is unnecessary to explicitly duplicate the requirements of the CRR since the standard USDA lease notice requires the lessee to comply with all rules and regulations of the Secretary of Agriculture when not inconsistent with the rights granted by the Secretary of Interior.

**Comment:** The roads are an attractive nuisance for future development of other sorts...habitation or other resource extraction (e.g. lumber).

> **Response:** Roads constructed as a result of the proposed lease modifications would be closed to public use and would be reclaimed after use.

**Comment:** My understanding is that the roadless rule does not allow traffic of any kind without explicit authorization, hence coal mining would be illegal.

> **Response:** The Colorado Roadless Rule allows for temporary road construction and administrative use of those roads within the North Fork Coal Mining Area for coal exploration and coal-related

BLM_0051351

surface activities.  Part of the lease modification areas fall within the North Fork Coal Mining Area, thus it is not illegal.

**Comment:** The area in question is recognized Roadless and it should stay that way.

**Response:**  The Colorado Roadless Rule recognized the North Fork Coal Mining Area as roadless but allows for temporary road construction to preserve coal exploration and development opportunities in the area.  Although the area allows temporary road construction, the area would remain as a designated Colorado Roadless Area.  After coal development has occurred, the area would be reclaimed and roadless area characteristics would return.

**Comment:**  Commenters contend these actions are a result of a Colorado Roadless Rule "loophole" which was thrown out by lawsuit.

**Response:**  The North Fork Coal Mining exception in the Colorado Roadless Rule is not a loophole. It was intentionally developed to address the State concern of preserving the exploration and development opportunities of coal resources in the North Fork Coal Mining Area.  The U.S. Department of Agriculture and Forest Service solicited public comments, disclosed impacts, and worked collaboratively with a multitude of individuals and groups in the development of the North Fork Coal Mining exception.  The North Fork Coal Mining exception was vacated by the District Court of Colorado due to analysis deficiencies which were remedied in a supplemental analysis.

**Comment:**  Please do not consider adding open pit mining to the Colorado wilderness.

**Response:**  The Surface Mining Control and Reclamation Act of 1977 prohibits surface mining on national forests west of the 100th meridian.  Therefore no open pit mining method would occur in this area.  Coal mining operations in this area occur in underground mines.  In addition, there is no proposal to enter designated wilderness.

**Comment:**  The Forest Service has a responsibility to maintain roadless areas until legislative decisions can be made regarding potential wilderness designation. Sunset is a particularly sensitive area with rich wildlife diversity.

**Response:**  There is no law, regulation or policy that requires the Forest Service to maintain roadless areas as roadless until legislative decisions can be made regarding wilderness designation.

**Comment:**  The Forest Service may not consent to the lease modifications because the 2016 reinstatement of the North Fork Coal Mining Area was illegal.  The SDEIS assumes that Alternative 3 can be implemented now that the North Fork Coal Mining Area exception has been reinstated. However, while that rule is final, it is not legal and may be challenged and overturned in court. Commenters on the Colorado Rule draft EIS challenged the draft rule's compliance with NEPA, the Endangered Species Act, and other laws. For example, the Colorado Roadless Rule North Fork Coal Mine Exception Supplemental Final EIS (CRR SFEIS) failed to consider an adequate range of alternatives, failed to meaningfully describe the affected areas and assess impacts to wildlife habitat and other resources, and failed to take a "hard look" at the climate impacts of permitting road construction for coal mining.   First, the agency failed in the CRR SFEIS to consider a range of reasonable alternatives consistent with its stated purpose and need. 40 C.F.R. § 1502.14. The Forest Service should have considered an alternative to provide enhanced protection for additional lands outside the North Fork Coal Mining Area and an alternative to exclude the Pilot Knob Roadless Area from the North Fork Coal Mining Area. Second, the agency also failed to "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration." 40 C.F.R. § 1502.15. In failing to assess important values and resources present in the North Fork Coal Mining Area - the epicenter of impacts from the proposed action and its alternatives - the Forest Service failed to take a "hard look" at the impacts of each alternative. Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1179 (10th Cir. 2008). Third, the agency failed in the CRR

BLM_0051352

SFEIS to take a "hard look" at the climate impacts of its decision to reinstate the North Fork Coal Mining Area exception. The agency relied on now- outdated modeling and assumptions, including the assumption that the Clean Power Plan—which this Administration has vowed, and begun, to rescind—would be in effect. This resulted in the significant under-accounting of GHG emissions. It also failed to account for the price elasticity of demand—the phenomenon whereby additional coal drives the price of coal-fired electricity down, inducing additional demand and resulting in increased climate pollution. If the reinstatement of the North Fork Coal Mining Area exception is successfully challenged, no road construction can occur in the Lease Modifications area. The Forest Service's ability to implement Alternative 3 is thus questionable at best.

> **Response:** No court has found the 2016 reinstatement of the North Fork Coal Mining exception to be illegal.  If this occurs and a court vacates the exception, then the proposed lease modifications would not be able to proceed.  Until a court does such, the reinstatement of the North Fork Coal Mining exception is considered legal.

**Comment:** The SDEIS's analysis of impact to roadless and wilderness character is arbitrary. The SDEIS fails to characterize impacts to roadless character from the selected alternative as "significant" or "not significant," but asserts that impacts to roadless character would generally be "short-term," although it fails to identify where those "short-term" impacts would occur. It also asserts, remarkably, that "the overall character of the Sunset Colorado Roadless Area will not change due to reasonably foreseeable actions." Installation of well pads and access roads in the Sunset Roadless Area will significantly alter the lands' character, yet the Forest Service fails to define the spatial reach of the expected impacts on roadless characteristics and has understated their likely duration. Further, the SDEIS contains contradictory statements about the extent of the harm to roadless character from the construction and bulldozing of roads and MDW pads.  First, the agency must accurately portray the impacts of the proposed action. Road construction may directly consume 24 acres of lands, but it will result in the establishment of a spider-web of roads and well pads throughout the Lease Modifications area. The Forest Service anticipates the installation of 48 methane wells, each requiring up to one acre of cleared, level ground, and 6.5 miles of access road construction in the Lease Modifications area over the life of the leases. The construction of approximately 48 methane venting wells connected by 6.5 miles of access roads in the Sunset Roadless Area will convert as much as 1,700 acres of undeveloped, unroaded lands, which is contiguous with the West Elk Wilderness and much of which is capable of supporting wilderness, into heavily developed lands crisscrossed by roads and well pads. The well pads are generally sited at regular intervals in a linear manner over the coal panel beneath and connected by roads, making it impossible for anyone (or any wildlife) to walk more than a few hundred yards without hitting a road or well pad, and leaving obvious linear scars visible from every ridge-top. The Forest Service has admitted "[r]oad construction for mineral exploration and extraction has led to a fragmented landscape." But here, where up to 1,700 acres of roadless land within the Lease Modifications will likely see its roadless character degraded, the SDEIS fails to address such landscape fragmentation, or the effect on the larger Sunset Roadless Area.  These are, however, exactly the types of impacts federal courts require federal agencies to disclose. As the Tenth Circuit has noted: "the location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them." New Mexico ex rel. Richardson, 565 F.3d at 706 (emphasis added). Here, the Forest Service has made no attempt to address the nature or location of the road and MDW network (beyond estimating road mileage and the number of MDWs), although it could readily do so. At a minimum, the Forest Service should have - and could have - disclosed the likely general location of roads and well pads, based on the location of proposed coal panels underground and on past experience with ongoing E-Seam mining, and on currently projected location of coal panels in the Lease Modifications area, information that is available to the federal agencies, and that has been used to estimate the amount of recoverable coal in the area.

> **Response:** The analysis of impacts to roadless characteristics is not arbitrary.  The commenter contends that the analysis is arbitrary in part because the SDEIS did not characterize the impacts as

BLM_0051353

"significant" or "not significant." NEPA only requires an agency to determine whether the proposal as a whole is a major action that significantly affects the quality of the human environment. The Forest Service has determined that this proposal is a major action that could significantly affect the environment, which is why an environmental impact statement is being prepared. There is no requirement for an agency to determine whether each discrete impact disclosed in an EIS is significant or not significant. Therefore this was not done in the SDEIS but it still complies with NEPA.

Tables 3-35 and 3-36 in the SDEIS describe the impacts to roadless characteristics and when possible describes the locations of the impacts. The exact locations of surface disturbance is not known at this stage of the tiered decision-making process related to coal resource development on federal lands. However, the impacts to soil, air, species habitat, primitive/semi-primitive recreation opportunities, and scenic quality were described in context of the road and MDW pad locations. Impacts to water were described to occur in the streams and Figure 3-18 displays the locations of the perennial and intermittent streams. Roadless characteristics such as air and biodiversity of plant and animal communities are larger scale resources and thus the impacts are described in a broader manner.

The assertion that reasonably foreseeable actions would not change the overall character of the Sunset Colorado Roadless Area is correct. However, the paragraph as structured in the SDEIS is confusing and is rewritten in the SFEIS. It is understandable that one would expect impacts of actions in the "reasonably foreseeable mine plan" would be considered reasonably foreseeable future actions, but they aren't. This point of confusion is an artifact of agency jargon. For clarification, reasonably foreseeable future actions in cumulative effect analyses do not include actions related to the proposal, which are considered direct or indirect impacts. Reasonably foreseeable future actions are described in Section 3.2 of the SDEIS and include road and MDW pad construction associated with existing coal leases outside of the Sunset Roadless Area; oil and gas development in several areas outside the Sunset Roadless Area; continued grazing with no changes in the grazing system or range improvements; and continued limited recreational use. The reasonably foreseeable future actions occurring outside the Sunset Roadless Area have limited impact to the Sunset Roadless Area as do the continued grazing and limited recreational use within the roadless area. Therefore the overall character of the Sunset Roadless Area is not expected to change from reasonably foreseeable future actions.

The SDEIS addressed the impacts of roads and MDW pads on the Sunset Roadless Area. Table 3-35 and 3-36 describe the impact to diversity of plant and animal communities. The SDEIS recognized the impacts of the roads and MDW pads as an irretrievable commitment of resources (SDEIS p. 278) due to loss of habitat. The SDEIS wildlife sections recognized that roads and well pads would result in permanent loss of habitat within the footprint for many of the species analyzed. For the majority of species analyzed the SDEIS also recognized a long-term change of their habitat.

The commenter notes that it is impossible for wildlife "to walk more than a few hundred yards without hitting a road or well pad." Generally, it isn't the fact a road exists that affects terrestrial wildlife, rather it is the amount of traffic on the roadway. Many terrestrial wildlife species utilize roads as travelways, much like humans, unless there is traffic on the road. As for impacts associated with the "spider-web of roads and well pads throughout the lease modification area", it is not anticipated to have a substantial impact to the wildlife and their communities because the public use of the temporary roads would be restricted, traffic would be low-speed, and traffic volume is expected to be low.

**Comment:** The SDEIS fails to disclose the Lease Modifications' impacts to the wilderness capability of the Sunset Roadless Area. The fact that a portion of the roadless area is capable of wilderness protection is a key attribute of the area, one recognized by the Forest Service in its 2005 inventory. While the SDEIS purports to examine the alternatives' potential impacts on some roadless characteristics, the impacts to wilderness capability are summarily dismissed as irrelevant because wilderness capable lands have no

BLM_0051354

special management protection under Forest Service policy. This ignores the fact the wilderness values - whether they must be bureaucratically protected or not - are present in the Sunset Roadless Area, and that wilderness capability may be irretrievably lost through the construction of a web of roads and MDWs in the heart of the wilderness capable lands. The fact that the GMUG National Forest does not manage the lands to protect those wilderness values does not erase those values, nor does it eliminate the Forest Service's duty to take a hard look at a project's potential impacts to those multiple use values. Further, the Forest Service's attempts to down play the area's values - "Despite its roadless status there is nothing more or less sensitive of this part of the forest than the NFS non- wilderness lands surrounding it" - this area is now an undeveloped island threatened by mine development from the north and west, making its wild character even more valuable. The SDEIS failed to take the hard look at the impacts of bulldozing and road and MDW construction to wilderness capable lands; that failure violates NEPA.

**Response:** The commenter alleges the Forest Service is ignoring wilderness values, it is irrelevant whether the capable wilderness is "bureaucratically protected or not," and the Forest Service must address the impacts to wilderness capability. Determinations of wilderness capability and suitability are forest plan level decisions. For this area, the decision to not recommend this area for inclusion into the National Wilderness Preservation System was made in 1991 and thus the area is managed for uses other than wilderness preservation. So the fact a portion of the Sunset Roadless Area was identified as capable wilderness is irrelevant to the lease modifications decision because a higher level decision has already been made that addressed this issue. The agency is under no obligation to revisit the forest plan decision regarding wilderness recommendations. To do so would be highly inefficient because there are hundreds of issues resolved programmatically at the forest plan level that a commenter could allege need to be revisited. This could potentially render all projects into mini-forest plan revisions and would ignore NEPA's notion of tiering. Regulations at 40 CFR 1501.7(a)(3) allow agencies to eliminate issues from detailed study which have been have been covered by prior environmental review. Wilderness capability is one such issue. In 2005, part of the area was identified as capable wilderness as part of the GMUG's 2007 forest plan revision process but this area was also not recommended for wilderness designation as part of that process. The 2005 effort was never finalized. However, the 2005 analysis results were consistent with the 1991 decision and the 2007 forest plan revision effort was never finalized. Therefore, the 2005 analysis of capable wilderness for this area indicates that the 1991 analysis is still sufficient.

Despite the fact the agency has no obligation to revisit the forest plan decision regarding wilderness recommendations, the agency developed Alternative 4 to respond to these concerns. Alternative 4 would only provide consent to lease COC-1362 and not consent to lease COC-67232. This alternative does not overlap with any of the lands identified as wilderness capable (see SDEIS, Figure 3-26).

**Comment:** The Forest Service must evaluate the impact of road construction in the proposed lease modification areas on the entirety of the 5880-acre Sunset Colorado Roadless Area. See, e.g., Smith, 33 F.3d at 1078. Here, the Forest Service has failed to undertake any meaningful analysis of the impact of the proposed lease modifications on roadless values. Instead, it offers the superficial determination that impacts to an unspecific portion of the Sunset Roadless Area would be, in general, "short-term." Nowhere does the SDEIS state the extent (in terms of area) of these "temporary" impacts. The Forest Service's analysis fails to meet NEPA's requirements. See, e.g., Sierra Club, Inc., 82 Fed. Appx. at 573 (finding an EIS deficient for "[s]imply disclosing the fact that the unique qualities of the unroaded areas may be diminished" without analysis). The SDEIS itself acknowledges in several cases that road and well pad construction will result in impacts extending decades into the future, impacts that are "long term" rather than temporary. The Forest Service expressly states that "based on current mining practices, about 72 total acres of surface disturbance would occur from mine operations over the life of the lease modifications (expected to be about 25 years)." The SDEIS also admits that reclamation elsewhere in connection with the West Elk Mine has, in fact, permanently altered the natural community occurring in the reclamation area from oak brush to grassland. For the proposed Lease Modifications area, the effect

BLM_0051355

of reclamation efforts will likely be even more pronounced and long term because the impacted area is mostly mature forest at higher elevations, where the growing season is shorter than in lower oak scrub habitat where most of MCC's previous MDWs have been bulldozed. Nearly 90% of road and MDW construction will thus likely occur on roadless lands where aspen or spruce-fir more than a century old will be chainsawed and removed. Not surprisingly in light of the mature forest in these areas, the Forest Service concedes that the impacts to vegetation are not temporary: "This project will not remove habitat permanently from the landscape, but will remove it in the short- and mid-term." The Forest Service must explain its apparently contradictory conclusions that clearing mature forest vegetation over 72 acres for roads and well-pads will have impacts into the "mid-term" and possibly permanently alter the plant community in these areas from forest to grassland, but that the impacts to roadless values would, nonetheless, last only a few years. While the SDEIS fails to explain the spatial dimension of impacts to roadless character, it does list roadless characteristics and generally discusses the impacts from roads and well pads. But this analysis is flawed and fails to take the hard look NEPA requires. For example, the SDEIS fails to properly disclose the impacts on roadless recreational values. In assessing the impacts of the proposed action on recreational resources, the SDEIS states: "[t]he Recreational Opportunity Spectrum (ROS) setting for the area ranges from semi-primitive non- motorized to roaded natural." Most of the Lease Modifications area is within a 6B prescription area, which directs that the GMUG National Forest "[p]rovide semi-primitive recreation opportunities in all areas more than ½ mile away from roads and trails open to motorized recreation use." Given that few, if any, lands in the Lease Modifications are within a ½ mile from an open road, the Forest Service should have disclose that the agency must manage virtually entire area for semi-primitive, non-motorized recreation. By failing to include this information, the SDEIS cannot adequately assess the impacts of years of road and MDW construction and operation on the recreational opportunities within the area.

> **Response:** Section 3.18 of the SDEIS discussed the potential impacts of the proposed lease modifications on the entire Sunset Roadless Area. The SDEIS discusses that the loss of mature forest habitat to road and MDW pad construction is an irretrievable impact (SDEIS p. 278) and the loss of habitat for many species would be mid- to long-term. This is not a contradiction with the statement that impacts to the roadless area characteristics would generally be adverse over the short-term because the sentence goes on to state that aspen and spruce/fir forest types would take longer to restore. This section has been rewritten in the SFEIS to provide clarity.
>
> The ROS for the entire lease modification area is Roaded Natural (SDEIS pp. 234-235). However, disclosing what ROS class the agency is striving for does not change the fact that temporary roads and noise from MDWs diminishes the quality of semi-primitive recreational opportunities, which is stated in Tables 3-35 and 3-36 of the SDEIS. In addition, a noise analysis of the operation of MDW exhausters was completed between the SDEIS and SFEIS, and the analysis indicates that noise from MDW exhausters would not degrade roadless character beyond a 420-foot radius.

**Comment:** The SDEIS Violates NEPA by Failing to Analyze a Reasonable Alternative That Would Include Protections for Wilderness Capable Lands. One way to balance MCC's desire to mine coal against the potential harm to roadless lands from a network of well pads and roads would be to add "no surface occupancy" ("NSO") stipulations where the lease modifications overlay lands found to be "wilderness capable" in the GMUG National Forest's 2005 inventory. The stipulations could make clear that they do not seek to preclude surface impacts from subsidence, only from roads, well pads, and similar developments related to the construction, use, and maintenance of methane drainage wells. The SDEIS does not consider an alternative which would protect these areas through stipulations. The SDEIS justifies this approach by stating that "[t]here is no wilderness within the lease modification areas," and claiming that "[t]here are no lands within the project area which have been recommended or available for Wilderness designation or are now Wilderness." The SDEIS also states that Alternative 4, under which the Forest Service would consent to only Lease Modification COC-001362 and not to Lease Modification COC-67232, where much of the Sunset wilderness capable lands lie, addresses this concern. Finally, the SDEIS states, the Area was not brought forward as a further planning area for wilderness designation.

BLM_0051356

Capability would have to be followed by "availability" and "recommended" for wilderness under that planning rule which is no longer in effect. It was not carried forward for any of these. Wilderness character and values is applied and defined for wilderness areas not roadless areas which these lease modifications are in. Roadless is not intended to be managed as wilderness. Wilderness capable would not result in any changes under roadless analysis. Roadless characteristics were addressed in this document in Section 3.18.  The agency's justification for not analyzing an alternative with NSO stipulations aimed at protecting wilderness capable lands is arbitrary and capricious for several reasons. First, just because there are no designated wilderness areas or areas proposed for designation as wilderness within the project area does not mean that lands which have been found to be wilderness capable are undeserving of protection through NSO stipulations or that an alternative with such stipulations would not be reasonable. In fact, mining on wilderness capable lands will degrade those wilderness values (regardless of their formal status in the eyes of the Forest Service) on these lands for decades to the point that they may never be eligible for formal wilderness designation. Second, the distinction the agency attempts to make between wilderness and roadless areas is baseless. The fact that the GMUG National Forest does not manage lands to protect wilderness values does not erase those values, nor does it eliminate the Forest Service's duty to consider reasonable ways in which it might protect those values.  Finally, although Alternative 4 does protect the wilderness capable lands in the proposed project area, an alternative with NSO stipulations for wilderness capable lands falling within the lease modification areas, it would be significantly distinguishable from Alternative 4 because some coal in the COC-67232 lease modification area would still be available for mining under such an alternative.

**Response:** The agency developed Alternative 4 to respond to concerns for protecting wilderness capable lands.  Alternative 4 would only provide consent to lease COC-1362 and not consent to lease COC-67232.  This alternative does not overlap with any of the lands identified as wilderness capable (see SDEIS, Figure 3-26).

A "no surface occupancy" alternative was not considered because methane venting is needed for any coal lease modification in this area to occur.  Without MDWs, safe coal mining in this area would not be feasible.  An alternative was considered but dismissed from detailed analysis that considered not allowing roads and utilizing helicopters for equipment needed for MDW drilling.  It was determined that current commercially available helicopters were insufficient for the type of available equipment needed for MDW drilling.

Determinations of wilderness capability and suitability are forest plan level decisions.  For this area, the decision to not recommend this area for inclusion into the National Wilderness Preservation System was made in 1991 and thus the area is managed for uses other than wilderness preservation.  So the fact that a portion of the Sunset Roadless Area was identified as capable wilderness is irrelevant to the lease modifications decision because a higher level decision has already been made that addressed this issue.  The agency is under no obligation to revisit the forest plan decision regarding wilderness recommendations.  To do so would be highly inefficient because there are hundreds of issues resolved programmatically at the forest plan level that a commenter could allege need to be revisited.  This could potentially render all projects into mini-forest plan revisions and would ignore NEPA's notion of tiering.  Regulations at 40 CFR 1501.7(a)(3) allow agencies to eliminate issues from detailed study which have been have been covered by prior environmental review.  Wilderness capability is one such issue.

## Cultural

**Comment:** Commenters state that the proposed action would not create more jobs and destroy cultural and paleontological resources within the area.

**Response:** See Section 3.19 for effects to heritage resources; see Section 3.21.1.5 for employment, and see Section 3.6 for Geologic resources.

BLM_0051357

**Comment:** Without sufficient survey data, how can the SDEIS conclude no impacts would occur? (Comment 36078-60)

> **Response:** Surveys have been completed for Alternative 3 exploration, and no resources have been found. If alternative 4 is selected, surveys would be completed as specified in Table 2-6 in accordance with the Cultural and Paleontological Stipulation in Table 2-1. This includes "Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures." (SEIS Table 2-1)

## Visuals

**Comment:** Commenter states that the SDEIS Fails To Take A Hard Look At Lease Modifications' Impacts To Visual Resources.  The SDEIS states, "The GMUG Forest Plan promotes protection, and if possible enhancement, of the visual quality of an area." When it developed the Forest Plan in 1983, the Forest Service "determined Visual Quality Objectives."249 However, since 1995, the Forest Service has measured scenic integrity using the Scenery Management System, which is described in Forest Service Agriculture Handbook 701.250    The SDEIS analyzes "[v]isual impacts to the lease modification areas [based on] whether a visual impact is able to be detected from the travelways within the lease modifications and whether or not the viewshed meets the assigned scenic integrity level."251 There are five scenic integrity levels: very high (unaltered), high (appears unaltered), moderate (slightly altered), low (moderately altered), and very low (heavily altered).252    The SDEIS concludes that "[t]he lease modification areas have Scenic Integrity Objectives of 'moderate' and 'moderate/high.'"253 However, it provides no explanation of how or when those determinations were made. Nor does it explain why a roadless landscape directly adjacent to a wilderness area would have only a "moderate" objective. Because the Forest Service last amended the GMUG Forest Plan in 1991, neither the 1983 Forest Plan nor the 1991 Amendment includes the scenic integrity evaluations that the Forest Service implemented in 1995. The SDEIS itself contains no maps of the scenic integrity of the area. Whatever analysis the Forest Service did on the scenic integrity of the impacted area, it does not appear to be readily available to the public. Furthermore, it could be very dated. There is no indication that the Forest Service has recently assessed the scenic values in this area.    The Forest Service should provide updated information "including maps" on the scenic integrity of the lands affected by the lease modifications in the SDEIS.

> **Response:**  As acknowledged in the CRR FEIS, in the North Fork coal mining area "…where roads are constructed, the scenic integrity could change...." (CRR FEIS, p. 245) On the same page, respecting the North Fork coal mining area "…disturbance in these areas, which includes both road construction and tree cutting while operations are ongoing, can be expected to have an impact on the scenic value. However, as areas are reclaimed and roads are removed, the scenic values would increase over time, commensurate with revegetation." As suggested by the commenter, we have reviewed the SMS source data, and determined that they were based on management areas created for the GMUG FLRMP revision process circa 2007. Since the revision, and its proposed management areas were never adopted, we reverted to VMS completed concurrent with the original GMUG FLRMP (See Section 3.20) "Typically, the transition from the VMS process to the SMS process occurs whenever a forest goes through their forest plan revision. Some national forests in Colorado have revised forest plans and have converted to the Scenery Management System. Other national forests are under the Visual Management System."(CRR FEIS, pp243-244) As shown in the SMS handbook (Agriculture Handbook 701, 1995), p. 6, SMS begins with Ecological Unit Description and Existing Land Uses/Themes. These are sourced from forest plans. Also, Forest Service Handbook 2382.3 "The recommended  timeframe for updating the scenery inventory is prior to or at initiation of Forest land and resource management plan revisions." The GMUG is currently at pre-assessment phase of forest plan revision, and has yet to develop alternatives that would inform SMS. Due to lack of applicability of management areas and resultant SMS map, it has been replaced with Figure 3-33

included in SFEIS showing VMS codes. This overlay was created in 1983, concurrent with the GMUG Forest Plan, and has been reviewed by GMUG Headquarters Recreation Staff.   Table 3-50 in the CRR FEIS displays a crosswalk between Scenic Quality and Visual Quality. This crosswalk has been included in Section 3.20 of the SFEIS and analysis updated.

**Comment:** Multiple commenters believe that proposed action will affect the visual or scenic environment, spoiling the natural beauty of the area.

**Response:** See Section 3.20 for effects to visual resources.

## Socioeconomics

### Local Economy

**Comment:** (Impacts to Tourism) The Forest Service should focus on protection of natural resources that attract recreation visitors. There has been a recent resurgence of growth in the economically depressed areas of Gunnison and Delta counties from recreation opportunities and not coal. The proposal will harm the regions strong tourism industries that generate more revenue into the economy in the long-run and is unfair to businesses that depend on the pristine environment which attracts visitors. Allowing further coal drilling in the area will shift the trajectory of this growth in favor of a short-term unsustainable industry, which will impact recreation opportunities for future generations.

**Response:** The West Elk mining project is a lease extension, mining has been occurring on the Gunnison National Forest for the past 100 years (see 3.2.1 pg. 77). Therefore, any recent growth in the tourism industry has occurred concurrent with mining operations, which have been occurring for over 15 years nearby with methods consistent with the action alternatives. Additionally, the project area is not often used for recreation purposes, there are no developed recreation sites within the project area, and the area is difficult to navigate (See Section 3.16).

Environmental impacts are addressed throughout chapter 3 of the SDEIS. The impact to water resources are addressed in the SDEIS chapter 3.8 page 152.

**Comment:** (Direct and Indirect Employment from Coal Mining) The West Elk Mine directly supports high paying employment in North Fork Valley and is extremely important to local and western slope economies. Indirectly, local businesses supply and support the mining industry – sustaining other local families. These indirect impacts extend to businesses in Paonia and Grand Junction, CO, whose employees livelihoods depend on supplying mining companies with necessary equipment to run their operations.

This mining project could benefit Gunnison residents that are currently in supporting industries, such as, pipeline builders, cement producers, steel mills, manufacturers that build equipment and all the small business that support these companies.

Historically, mining has supported numerous families and businesses in Delta County. Since 2012, Delta County has lost 500 mining jobs (a 48 percent decrease in jobs) and 3 businesses. Delta County asks that you consider the small communities who bear the brunt of energy policies

**Response:** The Forest Service recognizes that employment in the coal industry supports local families and businesses, however, coal supply and demand is dependent on a global market and policies impacting the industry are outside the purview of the Forest Service. Presently, 2017 EIA projections estimate a significant amount of coal in the U.S. energy mix to at least year 2040.

BLM_0051359

**Comment:** (Employment Sustainability) The economic damages will far outweigh the small number of jobs that might be created. While an argument can be made that the mine will support roughly 300 workers, these jobs are temporary and will not provide economic solvency for these families.

We need to provide economic support to the towns of Paonia, Hotchkiss, Bowies and Somerset by providing job retraining for local coal miners in the transition to the usage of more environmentally friendly energy sources.

**Response:** 2017 EIA projections estimate a significant amount of coal in the U.S. energy mix to at least year 2040. Additionally, the demand for coal has increased slightly in 2017 and is expected to remain at similar levels in 2017. Coal prices are also forecasted to increase in 2017 and 2018.

Page 270-271 of the SDEIS discusses layoffs in the coal industry that have occurred in the area and the difficulty and widespread impacts they create. The need for economic support, job retraining, and job development in communities facing declining industries are widespread across the west as well as Appalachia. These issues are discussed in the updated socioeconomic section.

## Energy Market and Economic Sustainability

**Comment:** (Long Term Sustainability of Coal) Coal is no longer an economical and viable source of energy. The coal market (prices and demand) has been in decline in recent years. Supporting the development of coal displaces other forms of cleaner energy such as natural gas and other renewable energy – which brings in more jobs and revenue.

The demand for and value of coal is declining as our country and others move towards renewable energy resources. The economic analysis should take that into consideration.

This is an unnecessary and short-lived solution to a problem that ignores the worldwide impacts, both in the integrity of the environment and in keeping the U.S. out of the global market as other countries move forward with their own energy agendas. The energy industry is shifting to "green" energy, which will quickly render coal obsolete.

Coal is not sustainable for the environment, community, or future generations. If you plan to have a future, be the future and commit to economically and environmentally sound projects.

**Response:** The CRR provides a comprehensive review of the energy sectors, including present and future demands, sustainability, and need for coal and other energy resources. Coal is still used to meet a large portion of the national and global energy demand; 2017 EIA projections include significant amount of coal in the U.S. energy mix to at least year 2040.

Coal prices are forecasted to increase in 2017 and 2018, demand for coal has increased slightly in 2017 and is expected to remain at similar levels through 2018.

**Comment:** (Where Is the Coal Used?) If you grant these lease modifications would the coal be used in the U.S.?

**Response:** Chapter 3 page 108 of the CRR discusses the disposition of North Fork coal. There are a number of plants in the U.S. that have used and will continue to use North Fork coal. However, the U.S. is a coal exporter, therefore, it is possible that coal from the North Fork Coal Mining area will be exported, especially if U.S. demand for coal declines and foreign demand increases. There are currently no long-term coal purchase contracts in the area which could aid in predicting specific locations the coal in the lease modifications area might be sent.

BLM_0051360

## Royalties and Other Fiscal and Financial Considerations

**Comment:** (Royalty Subsidization Request) Arch Coal's request for a royalty rate reduction is akin to ongoing subsidization for a declining industry. It makes no sense to subsidize coal mining in Gunnison County.

**Response:** There have been no royalty rate reduction requests on the lease mods, there is no current royalty rate reduction for the parent leases, and a request for the parent leases is currently being processed. The royalty rate reduction requests have been and are for a portion of the parent leases where the coal seam has split.

**Comment:** (Impact of Royalties to the Local Area) Expanding the coal mine will increase tax revenue for schools and other projects. Without mining, Gunnison County will lose its second largest tax base. Delta County also receives considerable tax revenue and royalty payments from local mining, $25 million in 2011. Real estate taxes will go down from this project.

**Response:** Federal Revenues (Coal Royalties) have been analyzed by alternative and are available in chapter 3 of the SDEIS. Additionally, chapter 3.24, page 278 of the SDEIS recognizes that if coal is bypassed, economic recovery, including royalties, is not likely to occur on portions of parent leases, private (fee) leases and lease modifications this would be either irreversible or irretrievable depending on future scenarios.

Many commenters believe that this project will draw enough county revenue to subsequently lower their property taxes. Royalty revenues are discussed in Section 3.21.. However, current and future property tax rates are outside the scope of this analysis and are determined by local county districts based on individual budgets and revenue needs.

**Comment:** (Real Estate Values) Real estate values will be negatively impacted by this project.

**Response:** The West Elk mining project is a lease extension, mining has been occurring on the Gunnison National Forest for the past 100 years, therefore, present real estate values are a reflection of the surrounding landscape, including the proximity to the National Forest and its associated scenic and recreation values, as well as the presence of mining. Conversely, layoffs in the coal and other resource extracting industries can negatively impact the value of real estate, see page 271 of the SDEIS.

## Social Impacts

**Comment:** Coal mining in the area will reduce the quality of life for visitors and residents engaged in other activities, such as hunting and recreation. There will be an increase in noise, changes in scenery, and overall, the project will reduce the quality of recreation experiences.

Low-income populations are not able to afford the increased travel costs necessary to recreate at other locations after project implementation – reducing their quality of life.

**Response:** The project area is not often used for recreation purposes, there are no developed recreation sites within the project area, and the area is difficult to navigate, see Section 3.16. The same recreation opportunities currently available will remain available, however, under alternative 3 and 4, exploration could affect recreational users' experience through traffic on public roads, noise, big game movement, primitive experiences/solitude (page 73 SDEIS).

Environmental justice populations were addressed in chapter 3.21 of the SDEIS and updated in the SFEIS to include Montrose County. When compared to the State of Colorado, none of the individual minority categories, total minority, nor poverty percentages for Delta, Gunnison, and Montrose Counties meet the criteria discussed above to be considered environmental justice populations.

BLM_0051361

There is, however, the potential for impacts to recreation users which may cause them to recreate elsewhere possibly increasing their travel costs.

## Multiple Resource

**Comment:** Many commenters state that coal is dirty and polluting, decreasing in importance for energy, and will lead to health problems and degradation of our air, water, soils, flora and fauna, and social and natural environments.

**Response:** The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. Effects on physical, biological, and social environments are addressed in Chapter 3. See Section 3.21 for Socioeconomics. See Section 3.4 for effects to Air Quality, Greenhouse Gases and Climate Change. See Appendix J for coal demand.

**Comment:** Many commenters urge the Forest Service to not build roads, drill wells, and lease coal in the Sunset Roadless Area (specifically).

**Response:** Effects on physical, biological, and social environments are addressed in Chapter 3. See Section 3.18 for effects to Roadless. See Section 3.20 for effects to Visuals.

**Comment:** Commenters believe Coal (and coal jobs) needs replaced by newer and cleaner energy technology.

**Response:** Alternate energy sources and respective jobs are beyond the scope of this analysis.

**Comment:** Mining greatly benefits the local economy, and this project would have little impact to the area.

**Response:** See Section 3.21 for effects to Socioeconomics.

**Comment:** This proposal is an example of the current administration's disregard for good stewardship of our lands.

**Response:** Previous similar versions of this project were analyzed in 2010 and 2012. See Section 3.4 for effects to air. See Section 3.20 for Visuals. See Section 3.8 for effects to water. See Sections 3.10-3.14 for effects to Wildlife.

**Comment:** Meeting the Paris agreement: Permitting the expansion of this coal mine will undermine Colorado's ability to meet the Paris agreement by allowing the increased acquisition of one of the earth's dirtiest energy source, coal. In 2015, 60% of Colorado's electricity came from coal (https://www.eia.gov/state/?sid=CO#tabs-4) if this lease expands, it will only delay our action for renewable resources and increase our annual CO2 contribution into the atmosphere.

**Response:** See Appendix J which addresses the Paris Accord.

**Comment:** Stop allowing mining and oil exploration on our public lands.

**Response:** See Chapter 1 for legal and regulatory framework addressing coal exploration and mining related to National Forest System lands.

**Comment:** Many commenters state that coal is dirty and will pollute our air, water, and soils.

BLM_0051362

**Response:** See Section 3.4 for effects to air. See Section 3.8 for effects to water.  See Section 3.7 for effects to Soils.

**Comment:** Many commenters state that the proposed actions degrade habitat for wildlife.

**Response:** See Sections 3.10–3.14 for effects to Wildlife.

**Comment:** Many commenters believe the proposed actions will blight the land.

**Response:** The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised.

**Comment:** The SDEIS also fails to accurately address impacts to the roadless area's "unique geologic feature," the Deep Creek slide.

**Response:** The Deep Creek Slide, a landslide, is outside the lease modifications and is approximately 850' from a worst-case projected subsidence scenario and about 1200' from the nearest exploration road under Alternative 3. Natural landslides in the West Elk Mountains area are common, and not a locally unique features (i.e., roadless characteristic).  See Figures 3-4, and 3-5 for projected subsidence.  Due to topography and vegeatation screening, the Deep Creek Slide is almost completely unseen from NFSRs and Trails in the area. There is no requirement under CRR or Forest Plan to have no effects to visual resources. If there are effects in this case, they would occur in the background.  Visual resources are considered in Section 3.20.

**Comment:** The proposed actions would impact the unique and iconic town of Aspen.

**Response:** The Town of Aspen is approximately 40 air miles, and over 75 driving miles from the project area. We do not anticipate any direct effects from any of the alternatives to the Town of Aspen. The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations  of the Colorado Mined Land Reclamation Board for Coal Mining, as revised.

**Comment:** I am absolutely opposed to this Arch mine expansion. This would turn out to be basically two new mines in two different locations requiring the mass removal of forest.

**Response:** The two lease modifications would be extensions of a single, existing mine (Sections 3.2.2.1-3.2.2.5).  The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised.

**Comment:** This expansion would needlessly damage important wilderness.

**Response:** There are no designated wilderness areas in the lease modifications area.

**Comment:** Strip mining and mountain-top removal are exceedingly destructive to the environment, including streams and rivers.

**Response:** There is no mountain-top removal or strip mining under any of the alternatives. Mine spoils are prevented from being placed in water and waterbodies, as well as other protections to non-mineral resources are addressed in Stipulations in Tables 2-1 and 2-2, as well as at http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land

BLM_0051363

Reclamation Board for Coal Mining, as revised. Alternate energy sources are outside the scope of this analysis.

**Comment:** The proposal to vent methane rather than capture it is a terrible idea, as methane is a potent greenhouse gas and this this venting could impact air quality, as well as lead to contamination of the headwaters of irrigation water for the North Fork Valley of the Gunnison River.

**Response:** There is nothing in any of the alternatives preventing methane capture. See Section 3.4 for effects on Greenhouse gases. See Section 3.8 for effects to water.

**Comment:** The proposed actions would restrict and eliminate traditional uses of the land. These lands are used for grazing, hunting, backcountry travel and other recreation. Such traditional uses generate far more economic activity for the local economy than would the expansion of the mine.

**Response:** These uses have and would continue coincident with the project. See 3.15 for effects to Range Resources. See Section 3.16 for effects to Recreation. See Section 3.17 for effects to Transportation System.

## Environmental Justice

**Comment:** This project creates intergenerational inequity, meaning that future generations of Coloradoans will have to bear the cost of cleanup, public health damage, and climate change.

**Response:** The mission of the USDA Forest Service is to sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations. The CRR was developed to provide a balance between management of roadless area characteristics and economic development. Climate change, combustion, and emissions are addressed in chapter 3.4 of the SDEIS. The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx   Regulations   of the Colorado Mined Land Reclamation Board for Coal Mining, as revised.

**Comment:** The preservation of our National Forests are meant for the benefit of all citizens, this project puts the needs of one company above the needs of many. Don't devastate this forest for the benefit of a private company. No single company's profits are worth the beauty of this nation.

The economic damage far outweighs any possible benefit to the public.

**Response:** The mission of the Forest Service is to provide multiple-uses and is mandated by Congress to consider energy development and extraction on Federal lands.

The Surface Mining Control and Reclamation Act (SMCRA) principally applies to coal permitting. SMCRA balances the need to protect the environment from the adverse effects of surface coal mining with the Nation's need for coal as an essential energy source. It ensures that coal mining operations are conducted in an environmentally responsible manner and that the land is adequately reclaimed during and following the mining process (see chapter 1.7.2).

## Economic Impact Analysis

**Comment:** Because of different assumptions regarding the quantity of coal production and the length of extended mining operations between the CRR SFEIS and the current proposed action, it is misleading to invoke results from the CRR SFEIS in this project's analysis. Specially, commenters assert that the IMPLAN model used was outdated, and its multipliers and methodology were not fully disclosed, also,

BLM_0051364

that the analysis utilized a study area that is inappropriate for the proposed Lease Modifications, thus overestimating the economic impact results.

**Response:** An economic impact analysis was conducted for the Colorado Roadless Rule (CRR) reinstatement of the North Fork Coal Mining Area exception SFEIS. Although the geographic area of proposed coal production activities associate with this Lease Modifications is entirely contained within the broader economic study area already covered by the CRR SFEIS analysis, a customized and more targeted IMPLAN model is constructed here using the latest dataset available at the time of SFEIS analysis (2015 IMPLAN). The revised model and analytical approach using Multi-Regional Input-Output (MRIO) modeling technique allows this analysis to better reflect project level specificities as well as responsive to public comments. Specifically, MRIO technique allows the analysis to keep the Multiplier identity of the core area (i.e. counties most connected to coal mining) while still being able to see how activity in the core area (where the Direct Effect takes place) touches other regions within a broader functional economy.

This updated analysis in the SFEIS addressed concerns regarding the selection of a larger study area might inflate the impact results, thus overestimating the employment and income impacts of coal mining activities. At the same time, MRIO models ensuring that the study area is large enough to capture sufficient feedbacks within a functional economy. MRIO, in effect, extends the supply chain impacts into surrounding regions while still keeping the Multipliers for the core region intact and unique. Thus the rounds of additional impacts are extended to include feedback between all the linked regions until all purchasing dollars are leaked from the Indirect and Induced Effects. (IMPLAN Group LLC 2015) Therefore, an appropriate MRIO model for this Lease Modification analysis includes two linked study area: (1) The primary economic study area, which is a smaller core area where direct impacts – including spending from commuters – would occurs, and (2) a secondary economic study area, which is a larger area of influence capturing other indirect and induced effects.

Model parameters used to interact with IMPLAN multipliers are displayed in full, including Coal Reserves available to mine, estimated years of production, annual average production rate, total industry output, average nominal coal prices, and change in final demand. Methodologies employed for this revised impact analysis are disclosed to the fullest extent in accordance with agency policy and copyright law. Per Forest Service policy, agency documents and the preparation of project records must comply with copyright law and IMPLAN site license restrictions. IMPLAN's site license requires that both the data and software are copyrighted, and all of the un-summarized data, including multipliers, are not publishable in agency prepared documents and the planning record and cannot be released to the public by the Forest Service. However, final impact analysis results using IMPLAN models and dataset are publishable.

**Comment:** The economic analysis only analyzes benefits and omits cost. While there are positive impacts, for example high wages, there are several studies to indicate that coal mining communities are often economically struggling communities. History shows that coal mining areas, as well as other natural resource extraction dependent communities, have been noted for high levels of unemployment, slow rates of income and employment growth, high poverty, and stagnant or declining populations. As such, the analysis provides no evidence that, "coal mining activities are vital to local and regional economies", or that it, "provides an important contribution and stability for communities," as stated in the ROD for the CRR. Explanations for poor economic performance by coal communities should be explained.

**Response:** Empirical evidence analyzing the issues that economies dependent on natural resources face and a selection of this body of evidence has been added to the SFEIS.

Empirical evidence for other mining communities does suggest that mining income leaks out of the areas directly surrounding a mine. This analysis analyzes the employment and income gains for a two and three county area, not just the towns directly surrounding the mine. Therefore, without further

BLM_0051365

studies, there is no evidence that leakages in employment and income are occurring outside of the counties analyzed for this report. It is inappropriate to assume or quantify the amount of leakages without empirical evidence. The potential of leakages from the study area are internalized in the IMPLAN model by utilizing SAM multipliers and local purchasing coefficients. Additionally, the reverse is true for other industries. As stated in one commenter's detailed report, in-migration to rural economics has been supported by improvements in communication technology and transportation. The impact to recreation, landscape, wildlife, and other Forest resources have been analyzed throughout the SDEIS.

**Comment:** (Cost of Reclamation) How much will it cost to restore the land to its current environmental state after the coal is removed? Are the coal mining companies required to put money in a reserve fund equal to the amount it will take to restore the land?

**Response:** The office of Surface Mining Reclamation and Enforcement (OSMRE) and Colorado Division of Reclamation Mining and Safety (DRMS) have participated as cooperating agencies for the SDEIS.   The Surface Mining Control and Reclamation Act (SMCRA) ensures that coal mining operations are conducted in an environmentally responsible manner and that the land is adequately reclaimed during and following the mining process. Reclamation bonding is required by the DRMS and reclamation requirements, plan, and process is discussed throughout this document.

Coal lease revenue including royalties collected by the Federal government are paid to the US Treasury where 40% is appropriated to the Reclamation Fund. In addition, Section 402 of the Department of Interior's Abandoned Mine Reclamation Program requires coal operators to pay 13.5 cents per ton or 10% of the value of non-lignite coal produced (underground), whichever is less, and 50% of the reclamation fees collected are returned to the States where is was collected (30 U.S.C. 1232). See page 271-272 of the SDEIS.

## Public Health

**Comment:** This project does not consider the health, economic, or environmental impacts it would have on the states and its communities.

The effects of mining – extraction and burning of coal, can lead to disease and grave health issues in the local communities and is a danger to public health.

Coal mining causes highly acidic runoff known as acid mine drainage (AMD), which infiltrates waterways, contaminates local water supplies, and changes the PH balance in surrounding lakes and streams. Coal dust is dirty, smelly, and dangerous if inhaled for a long period of time.

**Response:** The impact to public health is addressed in section 3.4 and 3.21 of the SDEIS. Environmental impacts are addressed throughout chapter 3 of the SDEIS. The impact to water resources are addressed in the SDEIS chapter 3.8 page 152.

## Cumulative Effects

**Comment:** Please consider all impacts of this proposed project and resist pressures from the federal government.

**Response:** Effects on physical, biological, and social environments at respective appropriates scales are addressed in Chapter 3

**Comment:** Overall, this project does not consider the health, economic or environmental impacts it would have on the state and it's communities

BLM_0051366

**Response:** Effects on physical, biological, and social environments at respective appropriates scales are addressed in Chapter 3. Due to the broader scale nature of effects, see Sections 3.4 for Air Quality, Greenhouse Gases, and Climate Change (including health effects), and Section 3.21 for Socioeconomics.

**Comment:** Will other uses be achievable after this particular use is completed?

**Response:** As addressed throughout Chapter 3, the area would continue to be open for multiple uses during implementation and after reclamation under of any of the alternatives. We anticipate some short-term displacement of some wildlife, and possibly recreationists who may choose not to visit the area during times of construction, exploration, and methane venting should they occur. The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised.

**Comment:** Never mind that I personally use roadless areas to stay sane and connected to the Earth, destroying the natural balance and future life sustaining ability of our planet requires us to IMMEDIATELY STOP extraction of fossil fuels. I understand this will mean changes in our way of life and economy. It is also the only path to the survival of our species.

**Response:** Discontinuing all fossil fuel extraction is beyond the scope of this analysis.

**Comment:** The SDEIS Fails To Disclose The Direct, Indirect And/Or Cumulative Impacts Of Mining On Private And Adjacent Federal Land That Cannot Occur Without The Lease Modifications.

**Response:** Effects on private land and adjacent federal land are described as they relate to exploration specifically throughout Chapters 2 and 3 (FEIS remains the same as SDEIS) and are depicted on maps related to estimated subsidence (subsidence maps added to Section 3.3 in SFEIS based on August 2017 mining projections by MCC and acres updated throughout) and acres remain as estimated for post-lease effects as described in SDEIS. For site-specific exploration, as roads for the most part exist on private land, there would be 0 acres of disturbance on private land under Alternative 3 and 0.15 acres of disturbance on private land under Alternative 4 in the aspen cover type similarly a portion of road on the parent leases would be needed for either alternative also in the aspen cover type (see maps Section 2.3). All private lands and adjacent federal lands affected are within the boundaries of the Mt Gunnison LAU which was used for analysis of species unless noted otherwise.

**Comment:** This is happening all over the states. Pristine, breathtaking areas are under threat in order to develop coal.

**Response:** Known or proposed actions in the vicinity are addressed in Section 3.2.11.

**Comment:** Allowing this to move forward will set a precedent and encourage more mines and even (oil) drilling to be allowed on our public lands.

**Response:** Known or proposed actions in the vicinity are addressed in Section 3.2.11. Any future proposals would be evaluated on their own merits, and therefore this analysis would not serve as a precedent.

**Comment:** Please consider the bigger picture of the long term effects of this project and the thousands of other projects like it. Each project individually devastates another region, and together they are devastating our country and our planet.

BLM_0051367

**Response:** Known or proposed actions in the vicinity are addressed in Section 3.2.11. Due to the disparity of scales, effects of the alternatives analyzed at the global scale would not be meaningful to the analysis.

**Comment:** Third, coal-fired power plants are especially unclear sources of energy. Even a clean coal plant produces more radioactive waste per kilowatt-hour than a nuclear power plant.

**Response:** Radioactivity from both nuclear plants and coal-fired plants is extremely low. See Scientific American, Coal Ash Is More Radioactive than Nuclear Waste, by Mara Hvistendahl, December 13, 2007 (https://www.scientificamerican.com/article/coal-ash-is-more-radioactive-than-nuclear-waste/) in project file "In a 1978 paper for Science, J. P. McBride at Oak Ridge National Laboratory (ORNL) and his colleagues looked at the uranium and thorium content of fly ash from coal-fired power plants in Tennessee and Alabama. McBride and his co-authors estimated that individuals living near coal-fired installations are exposed to a maximum of 1.9 millirems of fly ash radiation yearly. To put these numbers in perspective, the average person encounters 360 millirems of annual "background radiation" from natural and man-made sources, including substances in Earth's crust, cosmic rays, residue from nuclear tests and smoke detectors."

**Comment:** Coal is becoming expensive, and not that fracking is any better, but it destroys our planet and ruining eco systems. So please stop hurting the earth that sustains us. thank you

**Response:** See Appendix J for coal demand. Effects on physical, biological, and social environments are addressed in Chapter 3

**Comment:** I urge you to consider the long-term environmental impact on the forest and waterways surrounding.

**Response:** See cumulative effects sections throughout Chapter 3, and specifically sections 3.9 and 3.8 for vegetation and water.

**Comment:** In addition, the USFS should monetize the social costs of greenhouse gases by accounting for the global harms caused by climate change because of the reciprocated benefits the United States will receive from taking action against climate change. Including global effects of climate change in the SCC makes it more likely that other countries will accurately account for climate change risks in their own decisionmaking and strengthens the United States' ability to persuade other countries to reduce their own GHG emissions.

**Response:** See Section 3.4 addressing Social Cost of Carbon (SCC).

**Comment:** You may think that there is plenty of it left, that some other people will protect the other wild places at some point; but in the end, each individual action to help or hurt the land adds up.

**Response:** See Section 3.18 for effects to roadless in context of other roadless areas and cumulative effects.

**Comment:** The recently revised Colorado Roadless Rule identifies the areas east and southeast of the existing leases and proposed lease modifications as areas with potentially economic coal reserves. Similarly, the Combined Geologic and Engineering Report and Maximum Economic Recovery Report for Coal Lease Modifications (COC-1362 & COC 67232) (GER & MER), identifies areas east and southeast of existing leases as "unleased and unmined federal coal reserves" [Appendix A in the November 2011 BLM Environmental Assessment for Leases COC-1362 & COC 67232]. The DSEIS's cumulative effects analysis and indirect effects analysis are based on the assumption that mining operations will conclude in approximately 2.7 years at the West Elk mine and analyzes impacts within the boundaries of the current mine and the proposed lease modifications. We recommend that the FSEIS discuss whether additional

BLM_0051368

coal leases may be forthcoming to achieve the maximum economic recovery of federal coal resources. If additional coal mining appears reasonably foreseeable, the indirect and the cumulative environmental effects analysis should be revised in the FSEIS.

**Response:** See Section 3.3.1 for Reasonably Foreseeable Mine Plan For Action alternatives. As identified therein, projected unleased mineable coal beyond the lease modifcations area is limited to adjacent private lands. The effects of potential recovery of this coal are addressed throughout chapter 3 for individual resources for action alternatives.

**Comment:** Think about this: the mountain pine beetle is wiping out the forests of Colorado, and this is potentially going to scar this surface of the West Elks, as it has millions of acres in your state and throughout the U.S.. The evidence shows that this blight has been exacerbated by the stress caused due to climate change, to which coal has clearly added. I had this exact conversation with a Forest Service Employee while hiking in the Uncompahgre NF in 2015, which is ironic since I am not seeing any defiance from your branch of the government. What's more ironic is reaching underneath this stressed forest to extract huge amounts of coal, which will only increase the problems our forests are facing.

**Response:** See Section 3.4 for Air Quality, Greenhouse Gases, and Climate Change, specifically 3.4.5 Cululative Effects and Climate Change. See also Section 3.9.6 for Vegetation Cumulative Effects and Climate Change.

**Comment:** There are several good reasons why rejecting Arch Coal's proposal to expand mining operations into the Sunset Roadless Area, especially when cumulative impacts are considered.  Coal mining and combustion are dirty activities, releasing atmosphere warming gases, polluting water and air resources. The complete cost of this energy source has not been adequately addressed by our government. We are in effect, subsidizing private corporations for private gain, at the expense of the planet and all life contained herein. It does not make sense for private corporations are allowed to continue polluting when we have cleaner more renewable energies available today. Bad business should not be rewarded. We know ARch asked for royalty reductions to lower their cost of business, but the cost to the planet is higher than ever. CEO pay and bonuses don't demonstrate leadership, the exorbitant salaries and bonuses are inconceivable, adding to the cost of business to the coal resource buyers!

**Response:** See Section 3.4 for effects to Air Quality, Greenhouse Gases and Climate Change. See section 3.8 for effects to water. Socioeconomics of this project are addressed in Section 3.21. Alternate energy sources are outside the scope of this analysis. Recent royalty reduction requests were not related to the lease modifications being anlayzed. There have been no royalty rate reduction requests on the lease mods, there is no current royalty rate reduction for the parent leases, and a request for the parent leases is currently being processed. The royalty rate reduction requests have been and are for a portion of the parent leases where the coal seam has split. CEO pay and bonuses are outside the scope of this analysis.

**Comment:** Bulldozers do damage that requires decades of natural actions to repair.  In the meantime, additional damage may worsen the initial destruction.  We ask that the pristine beauty and current ecosystem be maintained.  We, as a nation, value the land as it exists today.

**Response:** The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. Effects on physical, biological, and social environments are addressed in Chapter 3

**Comment:** The roadless forest and pristine areas of land in Colorado are priceless gems that need to be preserved for ALL generations not taken by the greedy few in this one. As family of hunters, hikers and wildlife enthusiasts, this would be devastating for us. We also already have some of the worst air

BLM_0051369

conditions in this state due to fracking. Aspen has some of the highest valued real estate in the state/country. This would very negatively impact that. Thank you for reading my letter.

**Response:** The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. See Section 3.18 for effects to Roadless. See Section 3.21 for Socioeconomics. See Sections 3.4 for Air Quality, Greenhouse Gases, and Climate Change, including cumulative effects. The Town of Aspen is approximately 40 air miles, and over 75 driving miles from the project area. We do not anticipate any direct effects from any of the alternatives to the Town of Aspen.

## Irreversible and Irretrievable

**Comment:** The SDEIS Fails To Disclose Irreversible And Irretrievable Commitments of Resources From The Action Alternatives. Regulations implementing NEPA require that agencies disclose in an EIS "any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented." 40 C.F.R. §1502.16. The SDEIS acknowledges that "[i]rreversible resource commitments are those that cannot be reversed (loss of future options)" and that "[i]rretrievable resource commitments are those that are lost for a period of time." However, the SDEIS fails to disclose several irreversible and irretrievable impacts in violation of NEPA's regulations. The SDEIS fails to disclose important irreversible and irretrievable commitments of resources, including: -- impacts of roads on topography/ soils  -- impacts to water resources from the release of sediments and pollutants to water bodies, as well as wetland or vegetation removal -- impacts to fish and wildlife as a result of loss vegetation and water resources and habitat degradation; impacts to fish and wildlife from mining operations (use of heavy machinery, blasting, coal transport, etc.). As discussed elsewhere, some habitat flattened for drilling pads and road will take 25-30 years to recover any semblance of utility as habitat. Mature spruce - hundreds of years old - cut down for these roads will be replaced within the span of the lifetime of anyone now on the planet  -- impacts to land use and recreation, including roadless and wilderness values will be lost for decades -- impacts to aesthetics (visual intrusions into the landscape by mining personnel and equipment, removal of vegetation, road construction and traffic, light pollution). In addition, although the SDEIS recognizes that the release of greenhouse gas is irretrievable, it states that although "climate impacts maybe [sic] either irreversible or irretrievable, [they] cannot be attributed specifically to this proposal." This statement is incorrect. As previously explained, it is entirely possible to measure and assess the climate impacts of the Forest Service's proposed decision to consent to the lease modifications. (Zukoski, T.)

**Response:** The Section "Irreversible and Irretrievable Commitments of Resources" has been updated for the SFEIS to better capture some of the losses the commenter noted were missed. However, the commenter inferred the proposal would result in irreversible and/or irretrievable loss in recreation opportunities, wilderness values, and aesthetic resources. The SDEIS recognized that the action alternatives would degrade primitive and semi-primitive recreational opportunities. However, the agency does not consider this degradation an irreversible or irretrievable loss of resources because none of the action alternatives would preclude the area from being used recreationally, albeit a degraded experience. Wilderness values were also not considered to be an irreversible or irretrievable loss because, regardless of the degradation of these values, none of the action alternatives would preclude the area from being designated by Congress as a Wilderness. Areas much more degraded than would result from any of the action alternatives have been designated as wilderness before. Aesthetics also was not considered an irreversible or irretrievable loss because there is no loss of future options or use based on the aesthetics of the area.

BLM_0051370

## Technical

**Comment:** All coal companies have declared bankruptcy.

**Response:** All coal companies have not declared bankruptcy.

**Comment:** By Arch's own admission this is a temporary, last gasp effort to perhaps extend coal production for up to 10 years, this is an optimistic estimate.

**Response:** Coal production is subject to many variables. Our best estimates are in Section 3.3, Reasonably Foreseeable Mine Plan.

**Comment:** Commenter is concerned that the proposed actions will irreparable damage the area.

**Response:** The approximately 18-72 acres in the project area of disturbance will be bonded, recontoured, revegetated and reclaimed in accordance with http://mining.state.co.us/Rules/Pages/home.aspx Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, as revised. Effects on physical, biological, and social environments are addressed in Chapter 3. See Sections 3.10-3.14 for effects to Wildlife.

**Comment:** The DSEIS includes proposed modified lease stipulations that implement a number of important mitigation measures to protect the environment. It is unclear which regulatory agency would be responsible for effectuating and monitoring compliance with these stipulations. Appendix C of the DSEIS identifies the roles and responsibilities of the USFS, BLM and the DRMS. It would be useful for this section of the FSEIS to include additional roles and responsibilities with respect to the stipulations, mine plans and permits. Specifically, we recommend the FSEIS identify the agencies responsible for monitoring compliance with the stipulations and mitigation measures as well as the agencies responsible for assuring that deficiencies are corrected.

**Response:** Stipulations in Table 2-1 are the responsibility of the Forest Service. Stipulations in Table 2-2 are the responsibility of the BLM. Table 1-1 displays regulatory roles respecting exploration, leasing and mining. Other roles and responsibilities are listed respectively in Appendix C.

**Comment:** The discussion of alternatives "considered but eliminated from detailed study" includes Section 2.3.7.5 Flaring (MDW Emissions) We note that the use of enclosed portable flare units to combust methane from drainage wells appears to be one of the easier to implement alternatives to reduce emissions; therefore, we recommend that the FSEIS include information as to whether the Mine Safety and Health Administration would consider an application from the mining company to flare methane. If flaring can be done safely and is economically feasible, we recommend incorporating flaring in the selected alternative.

**Response:** We believe that MSHA would review and consider an application from the company to flare methane. As stated in Section 2.3.7.5 Flaring Emissions "... the agency has a process in place to analyze the safety aspects of any designs within an application." There is nothing preventing flaring from occurring in any of the action alternatives, assuming it could be accomplished in conformance with Stipulations in Tables 2-1 and 2-2.

**Comment:** The minimal information that is provided in the SDEIS regarding lynx and their habitat contains contradictions and ambiguities that call into question the agency's assumptions that led to its "may affect, but is not likely to adversely affect" conclusion.420 For example, the SDEIS states that "Table 3-28 shows vegetation structural stages within the lease modification area," yet this refers to the wrong table.421 Table 3-28 (which does not appear to have been updated since the 2010 BA that it was copied from) provides a brief rundown of "Vegetation Management within the Mount Gunnison LAU Since 2000" not "vegetation structural stages within the lease modification area."422 Should Table 3-27 ("Mount

BLM_0051371

Gunnison Lynx Analysis Unit Existing Condition") have been referenced here instead of Table 3-28, the Forest Service needs to correct this typographic error.

> **Response:** The reference to Table 3-28 that commenter suggests was in error was found to be redundant with the preceding sentence. It has been removed.

**Comment:** For stipulations, the SDEIS points the reader to "section III of the BA (Project File) and their application to specific Forest Plan objectives and guidelines for human uses project such as the proposed action . . . in Appendix 1 of the BA (Project File)."429 It seems this refers to the 2010 BA, however without stating which BA with specificity it is not clear exactly what document the Forest Service refers to. The Forest Service must be specific at to which document(s) it is referring to for the public and the decisionmaker. The lack of clarity makes it difficult to follow        what stipulations and mitigations measures the Forest Service is planning to implement to reduce impacts on lynx. A complete list of such measures needs to be included in the EIS as well as analysis and fresh consultation on their sufficiency.

> **Response:** The 2010 BA For Federal Coal Lease Modifications COC-1362 and COC-67232 has been specifically referenced at the location in the SDEIS commenter refers to.

**Comment:** The Forest Service also needs to explain what appears to be a contradiction in the Table 3-27 footnote that the table contains "analysis updated per SBEADMR BA 7 BO, USDA 2016," with its statement at the outset that this section that it used vegetation data from 2010.423

> **Response:** The 2010 BA For Federal Coal Lease Modifications COC-1362 and COC-67232 has been specifically referenced at the location in the SDEIS commenter refers to.

**Comment:** Similarly confusing, the SDEIS states: "A new habitat model is proposed for the GMUG. A new habitat model has been developed to reflect current direction in the SRLA. An interim model was used to determine acres of habitat impacted under this project, as the final model was not in place at the time of initial analysis."424 Because the outset of this section states that data was used from 2010, it is unclear whether this may be a left-over copy and pasted statement from the 2010 BA or if the SDEIS is to be referring to a model that is currently being developed. To the extent an interim habitat model was used, this needs to be provided for public review and analysis. In general, to resolve confusion, the Forest Service needs to clarify what it is referring to for habitat models, their age/date, and disclose their contents. To the extent the Forest Service is in the process of developing a new habitat model, we urge the Forest Service to use this new model to comply with its ESA consultation duties.

> **Response:** Because the 2010 model was not finalized when initial consultation occured earlier in 2010, an an interim model used. Reference was to the current model in development at the time of previous (2010) drafting of EIS. Statements regarding new and interim models have been removed.

**Comment:** Table 3-27 also contains an error as two asterisks were not used in this table even though below the table such a signal is meant to indicate: "** As it is unknown specifically where disturbance may occur." We suggest that the Forest Service place the two asterisks were they are meant to be in this table or, should such a note be unnecessary, remove it from the table.

> **Response:** The footnote "**As it is unknown specifically where disturbance might occur" has been removed from Table 3-27.

**Comment:** The Forest Service must also address the potential conflict between the following two figures. The SDEIS states that 2,550 acres have been treated since 2002 in the LAU.426 It also states that: "Past and current activities have rendered 144 acres unsuitable within the LAU over the last 15 years."427 The SDEIS, however, says that "none" of the 2,550 acres occurred in lynx habitat.428 The Forest Service needs to clarify how many acres within the LAU (suitable lynx habitat) have been treated and how many acres within the LAU (suitable lynx habitat) are now unsuitable as a result.

BLM_0051372

**Response:** The 144 (number updated to match 2016 BA) acres currently unsuitable previously listed throughout this section was in error. It has been changed 163, which is consistent with the June, 2016 SBEADMR BA. Commenter's footnote 428 appears to reference "Approximately 2,550 acres of vegetation have been disturbed through past activities within the past ten years, associated primarily with big game wildlife habitat improvement projects, with the majority occurring in oak and juniper habitats. Neither of these are considered habitat for lynx." (Section 3.9.6) As addressed in multiple places in the next sections, 163 acres of the 2,550 were in Canada lynx habitat. Therefore, the majority (2,387 acres or 93%+) were not in areas considered habitat for Canada lynx. There is no conflict as worded. We did not find the word "none" in this Section.

BLM_0051373

# FINAL RECORD OF DECISION

## Federal Coal Lease Modifications COC-1362 & COC-67232

Paonia Ranger District

Grand Mesa, Uncompahgre and Gunnison National Forests

Gunnison County, Colorado

Sections 10, 11, 14, 15, 22 and 23 of T. 14S., R. 90W., 6th PM



SCOTT G. ARMENTROUT
Forest Supervisor

12/11/2017

Date

BLM_0051374

# I. BACKGROUND

A Supplemental Final Environmental Impact Statement (SFEIS) for Federal Coal Lease Modifications COC-1362 & COC-67232 (including on-lease exploration plan) has been prepared by Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) in cooperation with:

- Uncompahgre Field Office of the Bureau of Land Management (BLM),
- Southwest District Office of the BLM
- Colorado State Office of the BLM,
- Western Region of the Office of Surface Mining, Reclamation and Enforcement (OSM), and
- Colorado Division of Reclamation, Mining and Safety (DRMS)

The SFEIS supplements the final EIS for coal lease modifications and incorporates and updates analysis from the BLM Environmental Assessment (EA) for the consideration of on-lease exploration. The EIS and EA were prepared in 2012 and 2013 respectively. Portions of the environmental analyses were found to be inadequate, *High Country Conservation Advocates v. United States Forest Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014). the agency decisions, as well as the exception for temporary road building in the North Fork Coal Mining Area under the Colorado Roadless Rule, were vacated and enjoined by the Court. *High Country Conservation Advocates v. United States Forest Service*, 67 F. Supp. 3d 1262 (D. Colo. 2014).   This SFEIS was prepared to address Court-identified deficiencies and to incorporate new information and policies since 2012.The SFEIS incorporates analysis and disclosure of proposed on-lease exploration and analyzes and discloses the impacts of modifying federal coal leases COC-1362 and COC-67232 in response to applications received by the BLM Colorado State Office.

On February 04, 2015, the Forest Service received a request from the BLM to resume analysis of proposed modifications and stipulations to COC-1362 containing about 800 acres, and COC-67232, containing about 920[1] acres. Coal in the existing leases is mined at the West Elk Mine near Somerset, Colorado. Lease COC-67232 is held by Ark Land LLC (Ark), and lease COC-1362 is held by Mountain Coal Company (MCC). The applications were made to ensure that compliant and super-compliant coal reserves are recovered and not bypassed. These applications are being processed according to procedures set forth in 43 CFR 3432.

The coal lease modification areas lie in portions of sections 10, 11, 14, 15, 22 and 23 of T. 14S., R. 90W., 6th PM in Gunnison County, Colorado. The modification areas are within National Forest System (NFS) lands managed by the GMUG. The coal estate is administered by the BLM.

The BLM is required by law to consider leasing Federally-owned minerals for economic recovery. With respect to NFS lands, the Forest Service considers whether or not to consent to the BLM leasing coal reserves underlying NFS lands and prescribes stipulations for the protection of non-mineral surface resources.

Within the lease modification areas, the coal would be accessed and recovered by underground longwall mining methods from the existing West Elk Mine. The coal would

---

[1] [1]Certificates from Cadastral Land Description Reviews on 3/29/2012 and 5/10/2016 have revised this to 920 acres down from 921-922 acres.

BLM_0051375

be transported using the existing coal transportation system and surface facilities. At the leasing (or modification) stage, the federal agencies evaluate the effects of mining on non-mineral (surface) resources.   This evaluation includes direct impacts resulting from expected subsidence (i.e. the elevation of the land surface over mined areas would slightly be reduced as a result of mining), and other foreseeable impacts to surface resources from mining related activities. Under a foreseeable mine plan scenario, surface impacts within these modification areas would include those from constructing methane drainage wells (MDWs) and associated access routes required to safely mine the coal resources. Methane gas is a byproduct of the process of mining coal using longwall systems. Methane concentrations in excess of 5% can be explosive, and thus must be removed to levels of 1% or less to meet safety standards, most commonly through methane drainage wells (MDWs) or methane vent bores. Specific locations of the MDWs and roads are not known at the leasing stage, and will not be known until specific mine plans are approved by DRMS, BLM, OSM, and the Mine Safety and Health Administration (MSHA) during the mine permitting process, subsequent to leasing. The surface impacts associated with mining were estimated to consider cumulative effects of leasing and are based on similar impacts from recent mining.

On July 3, 2012, the Colorado Roadless Rule (CRR) was promulgated and codified at 36 CFR Part 294. The CRR is now the controlling law and the 2001 Roadless Area Conservation Rule (RACR) no longer applies in Colorado.  The State of Colorado and the Forest Service developed the CRR in partnership to create a balance between conserving roadless area characteristics for future generations and allowing limited management activities within roadless areas.   The CRR includes an exception for temporary road construction within an area on the GMUG defined as the North Fork Coal Mining Area (NFCMA). This exemption was crafted to allow temporary roads needed for coal mining activities. These temporary roads would not have been allowed under the RACR, and the project proponent has said that absent these roads, coal mining would not occur. The portions of lease modification areas within the Sunset Colorado Roadless Area (CRA) are located within the NFCMA and are subject to the exception for temporary road construction. In 2014, the court severed and vacated the NFCMA exception. *High Country Conservation Advocates v. United States Forest Service*, 67 F. Supp. 3d 1262 (D. Colo. 2014). Following this, a Supplemental Environmental Impact Statement was prepared, and rulemaking "Roadless Area Conservation; National Forest System Lands in Colorado," was published in the *Federal Register* at 81 FR 91811 on December 19, 2016. This rule reinstated the NFCMA exception to the Colorado Roadless Rule and was effective April 17, 2017.

About 915 of the approximately 920 acres of the proposed modification to federal coal lease COC-67232, and about 786 of the approximately 800 acres of the proposed modification to federal coal lease COC-1362 are within the Sunset CRA. If the lease modifications are approved by BLM and coal mining is permitted by DRMS, temporary roads and tree cutting, as allowed by the CRR, will likely be used to construct, operate and maintain MDWs necessary for safety and incidental to underground mining.

The NFCMA direction was developed in the CRR (36 CFR Part 294).  In compliance with these requirements, all coal leases containing NFS lands and respective subsequent lease modifications contain standard lease notice language in accordance with Forest Service Manual (FSM) 2820 (SFEIS, Table 2-1); "The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of

BLM_0051376

Interior in the permit." Lease stipulations have also been included that are specifically from the CRR. (SFEIS, Table 2-1)

It is important to understand that coal mining is a multi-staged process with multiple federal and state agencies involved. The consent to modifying leases does not authorize actual mining or surface disturbing activities. These activities, including lease modifications, mining operations and on-lease exploration, are handled in separate and sequential approval and permitting processes by appropriate state and federal agencies after the leases are modified; however, a projection of these possible post-leasing impacts has occurred and has been analyzed in the SFEIS and all previous documents.

As has become evident throughout the history of this leasing consent decision, the public does not understand this complicated process and it was recommended that I show the process described in the table and appendix of the SFEIS in layman's terms in a flow chart. The requested flow chart follows.



Proponent sends applications for lease and/or modifications to BLM; BLM performs tract delineation including some coal resource work
BLM tracts on NFS sent to FS for NEPA (leasing consent decision)
FS decision is to consent or not with lease stipulations (We are here)
FS decision is not to consent
Lease is not issued
FS decision is to consent
FS transmits consent to BLM
BLM issues lease and includes all FS and BLM stipulations
BLM issues decision to lease or not
BLM decision is not to lease
Or in process where exploration has previously occurred skip to "Proponent submits mine plan"
Proponent submits on-lease exploration plan to BLM
BLM analyzes exploration plan
BLM decision is not to approve exploration plan
BLM decision is to approve exploration plan
Exploration plan is not approved
FS concurs with terms of exploration plan and reclamation bonding amount
FS does not concur with terms of exploration plan/reclamation bond amount
BLM approves exploration plan
Next page



BLM_0051379

With respect to modifying federal coal leases, the GMUG, as the surface managing agency, is responsible for:

- Deciding whether or not to consent to the BLM modifying existing Federal Coal Lease COC-1362 by adding 800 acres according to the Federal Coal Leasing Amendments Act of 1976;
- Deciding whether or not to consent to the BLM modifying existing Federal Coal Lease COC-67232 by adding 920 acres according to the Federal Coal Leasing Amendments Act of 1976; and
- If consent is provided, prescribing stipulations needed for the protection of non-mineral surface resources by determining if the existing stipulations on the respective parent leases are sufficient.
  - If they are sufficient, stipulations from the parent leases will be applied to lease modification areas.
  - If they are not sufficient, prescribe additional stipulations that will provide for the protection of non-mineral surface resources to comply with regulations, policy and Forest Plan direction (SFEIS, Table 2-1).

As shown in the above flowchart, the Forest's involvement in the process does not end with my current decision. There are several other points which require GMUG resource specialist assistance and review and my concurrence and/or identification of additional conditions of approval. Concurrence is not a NEPA decision subject to administrative review. There are also several other points during the permitting process where the public has the opportunity to weigh in.

# II. DECISION AND REASON FOR THE DECISION

## Decision Process Summary

I have decided to select Alternative 3, based on my consideration of: the purpose and need for the action; the issues; the GMUG Land and Resource Management Plan (LRMP) and associated amendments; current policies and regulations; the analysis of alternatives contained in the SFEIS; public comments received and other information in the project record.

I recognize that this is a complex decision, but it is one of many similar decisions made over decades of mining in the North Fork Valley. The vast amounts of technical information and analyses contained in the SFEIS can overshadow the relatively small scale of this decision. Many commenters continue to point out possible new ways to look at the decision, new types of analyses that should be used, new methods to mine, etc. At this point, I, as the decision maker must make a choice. I have been underground in the West Elk Mine. I have hiked and viewed areas where surface impacts and reclamation have occurred on parent leases and will occur under my decision. I have been responsible for overall Forest Management of the entire three million plus-acre Grand Mesa, Uncompahgre and Gunnison National Forests for over five years and have been involved in Public lands decision making for over 30 years. In making a decision such as this it would be easier if there were thresholds or confidence intervals involved that took away any uncertainty related to yet unknown locations for surface occupancy or related to greenhouse gas effects at the local, regional, national or global scales. That is simply not the case. I have reviewed the analysis and re-analysis conducted by agency specialists and have all the information necessary to make an informed decision. I am aware of the effects and potential impacts to the environment and have decided that these impacts are

BLM_0051380

acceptable in light of their scope and scale; existing laws and regulations; compromises made during negotiations of the CRR; and agency mandates described under Authorities.

## Identification of the Environmental Documents Considered in Making Decision

This decision was made after carefully considering the contents of the SFEIS, public comments, agency response to comments, and the supporting project file.  The GMUG Forest Plan acknowledges and allows for coal leasing and resource development in areas where such activities would be consistent with the Plan.  Further, my decision follows the legal direction for coal resource management (SFEIS, Section 1.7).  Other environmental documents (SFEIS, Section 1.11) prepared for activities in the immediate vicinity were also consulted.  I have considered the court order and the resultant revised and additional analysis and clarifications in the SFEIS, with particular attention to greenhouse gas emissions, social cost of carbon, socioeconomics, and recreation. The additional analysis and clarifications did not compel me to make a decision dissimilar to my predecessor.

## Scope of Decision

The scope of this decision is limited to whether or not to consent to the lease modifications and determining stipulations necessary for the use and protection of the non-mineral interests in those lands. BLM will make a subsequent decision determining whether or not to issue the lease modifications upon my consent. The decision regarding approval of the exploration plan will be made by the BLM. If the BLM decides to approve the exploration plan, they would request the GMUG to review the exploration plan and concur with approval terms and determine adequacy of the bond. I have no decision subject to administrative review to make with regard to exploration.

## Decision

I have decided to select Alternative 3 as described in the SFEIS (Section 2.2.3) and summarized in Section III of this document. Selection of this Alternative provides the BLM-Colorado State Office my consent to lease the NFS lands included in federal coal lease modifications COC-1362 and COC-67232 as described in the SFEIS, Table 1.2 (legal descriptions) and shown on the map at Figure 2-1 in SFEIS and in Appendix A herein.  My consent decision includes the application of terms and conditions, identified as stipulations, to protect surface resources on NFS lands (Appendix B of this document, SFEIS Tables 2-1 and 2-2).

My decision will be implemented through issuance of this Record of Decision (ROD), formal notification by letter of consent to BLM, followed by BLM's actions of: 1) making a subsequent decision on whether or not to approve lease modification(s), and 2) modifying the lease(s).  The lessees would then be responsible to secure any local, State, or Federal permits and approvals as applicable and required by law for future operations or development on the lease modifications.

In the event of any contradiction or conflict between descriptions or depictions of authorized actions, my decision is to be taken from the project documents in the following order of precedence:

BLM_0051381

- The description in this ROD,
- The representations on the Appendix A- Decision Map and Stipulations in Appendix B, and
- Descriptions in the SFEIS.

My decision to consent to the lease modifications under Alternative 3 and potential future uses of NFS lands which may result from consenting to the lease modifications, including the construction of temporary roads, would be consistent with the CRR.

## Authorities

The primary authorities for issuing coal lease modifications are found in the SFEIS, Section 1.6 and restated below.

### *Mining and Minerals Policy Act of 1970 and Mineral Leasing Act of 1920, as amended*

The Forest Service and BLM manage their minerals programs under law as specified in the Mining and Minerals Policy Act of 1970 which states in part that it is the "continuing policy of the federal government in the national interest to foster and encourage private enterprise in…(t)he development of economically sound and stable domestic mining minerals and mineral reclamation industries…(and) the orderly and economic development of domestic mineral resources…." Further, federal mineral leasing follows the Mineral Leasing Act of 1920 as amended by the Federal Coal Leasing Amendments Act of 1976 (MLA), and specific procedures set forth in 43 CFR 3400.

These lease modification applications are being processed according to procedures set forth in 43 CFR 3432. Lease modifications are non-competitive leasing actions. Since Ark Land applied for these modifications to add acreage to existing leases, other coal companies could not obtain the rights to the coal if these coal lease modifications are approved.

Subsequent permitting actions to allow mining and changing of the approved mine permit boundary to include the modification areas would be evaluated by DRMS under procedures set forth in 30 CFR PART 906.30 Appendix B and the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining. These modifications may also require approval from the Unites States Department of the Interior (USDI) through the OSM.

### *Surface Mining Control and Reclamation Act of 1977 (SMCRA)*

The Surface Mining Control and Reclamation Act (SMCRA) principally applies to coal permitting. SMCRA balances the need to protect the environment from the adverse effects of surface coal mining with the Nation's need for coal as an essential energy source. It ensures that coal mining operations are conducted in an environmentally responsible manner and that the land is adequately reclaimed during and following the mining process. Most coal-mining states now have the primary responsibility to regulate surface coal mining on lands within their jurisdiction, with OSM performing an oversight role. SMCRA requires that all coal mining be conducted under a permit approved by the designated regulatory authority. The Colorado Division of Reclamation Mining and Safety is the regulatory authority for coal mining in the state.

Any applications submitted to the State of Colorado to revise the state mining and reclamation permit, including applications to allow mining and its related surface

BLM_0051382

disturbances, reclamation, and the changing of the approved mine permit boundary to include the modification areas, would be reviewed by the Colorado Division of Reclamation, Mining and Safety (DRMS).  This review would be conducted by DRMS as set forth in the Colorado Surface Coal Mining Reclamation Act (34-33-101 et seq., C.R.S. 1973 as amended) and the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining (2 CCR 407-2, August 30, 1980 as revised).  Coordination between DRMS and appropriate federal agencies of the review of any applications for Permit Revisions that may be submitted by Mountain Coal Company in conjunction with these lease modifications will be overseen by DRMS in accordance with the Colorado Surface Coal Mining Reclamation Act, the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, and, as applicable, 30 CFR 906.30.  These state permitting actions may also require issuance or modification of a federal mine plan (or plans) by the USDI through the Office of Surface Mining, Reclamation and Enforcement (OSM) under the MLA.

The extent to which SMCRA directly applies at the leasing stage is related to the need to conduct the Unsuitability Assessment under Section 522(e) of SMCRA.  For the purposes the unsuitability assessment conducted at the leasing stage, the procedure is codified at 43 CFR 3461.

### Energy Policy Act of 2005

The purpose of the Energy Policy Act of 2005 was to ensure jobs for the future with secure, affordable, and reliable energy.

This Act Amends 30 U.S.C. 203(c)(4)(A) to ``secure modifications of the  original coal lease by including additional coal lands  or coal deposits contiguous or cornering to those embraced in the lease…(3) In no case shall the total area added by modifications to an existing coal lease under paragraph (1)--(A) exceed 960 acres; or (B) add acreage larger than that in the original lease.''

## Applicable Laws, Regulations, and Policy

This decision is consistent with applicable laws, regulations, and policies (refer to Section V of this document and SFEIS, Chapter 1) and with Forest Plan direction (SFEIS Section 1.8.1 and for each resource section in Chapter 3).

## Reasons for my Decision

This section summarizes the considerations that informed my decision. Subsequent sections detail specific concerns.

Environmental impacts, regulatory framework, and the context of this decision on local, national and global scales have been the focus of analysis, discussions and litigation around this project for the last ~8 years. In making this decision, I want to emphasize how vital I believe the fundamental aims of the NEPA process are: to disclose to the public the anticipated impacts of the project, and to ensure that both the environmental effects and public comments are considered in my decision.

First, I want to clarify how my decision to consent to the lease modifications with additional stipulations fits in the entire process of coal mine development and regulation.  Several overarching laws give the Forest Service an affirmative role in developing domestic energy resources as further described in the GMUG Forest Plan.  At the same time, regulations divide the responsibility for mineral development between several other federal and state agencies.  These agencies work in partnership with the coal industry to efficiently and

BLM_0051383

safely extract this source of fuel. Thus, the proposed action for this decision originates with an industry partner proposing to implement this portion of the GMUG Forest Plan. The only matter ripe for Forest Service decision is whether to consent to the proposed lease modifications, and whether additional stipulations should be added to the modified leases to protect the Forest Service surface resources.  See flow chart above.

Next, there are reasonably foreseeable actions authorized by the BLM and other state and federal agencies that could follow my decision – that is why the Forest Service and BLM prepared this SFEIS jointly.  Much of the information disclosed in the SFEIS is related to the subsequent connected actions and cumulative effects associated with reasonably foreseeable coal exploration and mining. These disclosures are in support of the BLM's decision and I have considered them when exercising my decision authority. Considering the 100 year history and importance to custom and culture of coal mining in the North Fork area, the scope/scale of the Forest Service decision is quite small (<0.5% of the area I administer and less than 9% of the North Fork Coal Mining Area Exception to the CRR), the decision is well within precedent, and I have worked with the BLM to review existing stipulations and include a variety of updated stipulations (Appendix B) to protect NFS surface resources.

The NEPA range of alternatives necessary to adequately analyze, disclose and consider the impacts of this proposal is also relatively small. The decision to be made is whether to consent to lease modifications and whether to require additional stipulations be attached to the leases, if modified.  A reasonable range of alternatives for the decision whether to consent to lease modifications therefore has three expressions:  do not consent (No Action), consent to modify one or both leases without additional stipulations, or consent to modify one or both lease with additional stipulations. In addition to the proposed action to modify both leases (Alternative 3), public concern for leasing minerals under the Sunset Roadless Area led me to direct the interdisciplinary team to analyze in detail Alternative 4, which would not modify lease COC-67232, which includes the wilderness capable portions of this roadless area although "wilderness capable" comes with no special designation nor management direction and further has not been recommended for designation in inventories due to mineral potential and boundary management issues.

NEPA requires that we identify means to mitigate impacts to the quality of the human environment, and that we have done so in the proposed stipulations in the Action Alternatives and in the Alternatives Considered but Dismissed from Detailed Analysis. None of the action alternatives are without additional stipulations, because changes in the regulatory framework for surface occupancy on NFS lands has changed since establishment of the parent leases; an action alternative with no additional stipulations would not be consistent with other law, policy and regulations for the GMUG (for example roadless).  In addition to the action alternatives, the scenario to consent with additional stipulations has been evaluated from 12 alternative viewpoints including 17 variations on No Surface Occupancy, drilling, or methane mitigation stipulations.  Many of these viewpoints reflect options for mining or mitigation methods that are not required by stipulations included in the action alternatives, but are also not prohibited, so would be available during development and evaluation of the exploration and mining plans.

Some stakeholders in this project have suggested that the alternatives and my decision must include specific requirements to mitigate impacts on the quality of the human environment by certain methods that minimize or mitigate methane released. I have considered these suggestions and believe that my decision will allow for adaptive development of methods to meet the proposed stipulations in the Action Alternatives and the intent of the Alternatives Considered but Dismissed from Detailed Analysis. My

BLM_0051384

statutory obligation is to protect surface resources. There is room to implement a wide variety of mitigation measures within the proposed stipulations, so the requested alternatives could have outcomes that are substantially similar to effects disclosed for Alternatives 3 and 4.  Furthermore, because the project would be consistent with the existing regulatory framework, there is no compelling reason to constrain the decision to specific methods that are known, when other methods not yet known would also continue to be available for permitting and implementation in the future. Mountain Coal Company has conveyed their intent to continue collaborative work in this area with local groups, state and federal agencies. Some viewpoints reflect options that do not meet the purpose and need of the lease modification and subsequent exploration and/or mining.  I feel that the alternatives in the SFEIS -- whether analyzed in detail or considered without detailed analysis -- more than fully meet the requirements of NEPA to analyze all reasonable alternatives while striving for efficiency in NEPA compliance.

Stakeholders have also suggested that analysis in the SFEIS does not sufficiently consider the current and future impacts of coal mining on the global climate, particularly with respect to methane mitigation. This issue is fraught with emotional, scientific and political controversy that I fully acknowledge. Analysis and approaches have varied throughout the project history to reflect changes in best available science and policies. In making the decision at this time, I have fully weighed the implications of the project using a variety of qualitative and quantitative techniques that are fully consistent with the agency guidance on this issue at this time. I have also reviewed the emerging Colorado Climate Plan and am comfortable that this decision is consistent with it.

These are the most pressing considerations in my deliberation over this decision, but I am aware of the full range of impacts to national forest resources. I make the decision with full recognition of the weight of responsibility I have to balance economic, environmental and social outcomes toward meeting the Forest Service mission.

My decision space is whether to consent to a lease issued by the Department of the Interior and to determine conditions necessary for the use and protection of the non-mineral, or surface resources.  It is made in the context of staged decision making.  The GMUG LRMP at III-63 (1)(a) states " Forest Service authorize…disposals under terms and conditions  to prevent or control adverse impacts on surface resources and uses."  And under 1(b) "Recommendations for and consent to BLM…will include stipulations that may be necessary for specific surface resources." This area was also identified as part of BLM's known coal recovery area.  In response to the State of Colorado, an exception to the Colorado Roadless Rule was promulgated to allow for temporary road construction for coal mining purposes in this area.  After my decision is made, there will be subsequent state and federal decisions determining whether it is in the public interest to mine coal in this area and grant the lease, as well as decisions identifying and specifying mine plans and mine operations if the decision is made to lease the coal. Specific mitigation measures which condition mine operations to reduce the emission of greenhouse gases are better made by federal and state agencies which will have the benefit of more specific information, mine plans, and mining operations.

## How Specific Issues Were Considered

Issues were identified by the interdisciplinary team (IDT) and through public involvement. Significant issues were identified in the SFEIS (Section 1.10, Table 1-3) and carried forward for analysis in the SFEIS in both the development of Alternatives and in the individual resource sections (Chapter 3).   Other issues brought forward were reviewed and addressed in: Response to Comments (SFEIS, Appendices I-K), comments received

BLM_0051385

are available on the project website, and in Alternatives Considered but Eliminated from Detailed Study (SFEIS, Section 2.3).

### Cumulative Effects

Consenting to lease does not result in any direct effects on the ground. However, should future development of the leases occur, such actions would result in indirect and cumulative effects. Indirect and cumulative effects (SFEIS Chapter 3) were addressed based on a Reasonably Foreseeable Mine Plan (SFEIS Section 3.3) for each resource area.

### Lease Stipulations

Specific lease stipulations (Appendix B herein,  SFEIS, Table 2-1) are being prescribed for: cultural and paleontological resources; endangered or threatened species; Canada lynx; raptors; big game winter range; water depletions; breeding birds; geologic hazards; baseline information; monitoring program; riparian, wetland or floodplain; subsidence; roadless; visuals; methane use or flaring and BLM's addenda and stipulation (SFEIS, Table 2-2) regarding methane flaring, capture or use or other alternatives to venting.

### Private & Adjacent Federal Lands

I have considered the effects of my decision not just on the lease modifications area but also upon adjacent NFS lands which are currently under lease (parent leases) and private lands with coal resources owned by Mt. Gunnison Fuel Company also under lease. Even though it is not within my decision space, in consenting to the modifications I am facilitating coal resource recovery on those lands because of projected mine layout if coal is present in mineable quantities on the lease modifications. This is not a decision I take lightly as my decision can affect existing operations and expectations of royalties and other revenue on existing leaseholds to entities other than the federal government. Similarly, when stipulations have been considered, my staff has been very deliberate not to prescribe measures which could negatively affect existing leaseholds or permitted activities as the modifications amend the parent leases.  A couple of things in particular come to mind from comments that can affect these adjacent lands.

While not timely to the process at hand because of the detailed engineering process that would go into a future mining permit that has not been proposed, one of these is the continued request for a requirement of specific methane mitigation measures.  Because this is an underground mine, the workings of private and existing federal leases are interconnected through ventilation and other systems. Ventilation systems are existing and may not be compatible with specific measures. Restrictions of this nature (such as for methane), however well intentioned, may affect royalties received by private coal owner or workings in the existing mine.

Conversely, with regard to surface areas on parent lease, the CRR made areas roadless that were not roadless under the 2001 RACR. This includes stipulations that have been applied consistent with the CRR to the lease modifications to comply with the regulation and will further replace the lease notices (see Appendix B) on the parent leases. This will, in turn, bring the Sunset CRA portion of the parent leases into compliance with new regulation.

BLM_0051386

### Mitigation Measures & Methane Venting

The lease stipulations which have been *adopted* are the mitigation measures identified to protect non-mineral surface resources in those lands. The analysis presented in the SFEIS considers the lease stipulations as part of the Proposed Action; therefore, they are analyzed in detail (CEQ describes this as having been "explained and committed"). Should mining activities be authorized, these stipulations will be monitored and enforced by the respective appropriate permitting agencies for mining and associated operations.

Mitigation is an important part of the environmental analysis and NEPA's hard look. Reasonable mitigation measures that can mitigate the impacts of the project are discussed in the environmental analysis. Mitigation measures are discussed even if those measures are outside the scope of my authority. Commenters have urged the Forest Service to analyze mitigation measures to reduce methane emissions released to the atmosphere anticipated from potential mining operations by capture, use or flaring. I recognize the public concern and potential climate impacts resulting from methane releases, and mitigation to address these concerns has been identified and further addressed in the SFEIS in Table 2-2 and Section 2.3. While I do not believe it is appropriate at the consent to lease stage to prescribe this level of specificity to mine plan operations, these stipulations are permissive of methane capture, use or flaring and do not preclude their inclusion in a subsequent mine plan. Further, these stipulations prescribe surface protections if methane mitigation does occur consistent with my role under the federal coal regulations. In addition, the parent leases have respective addenda added by BLM will also be carried forward to the lease modifications (language was modified slightly by BLM's Instruction Memo in 2017) which allow capture and/or use of methane as a by-product of mining coal, if it is economically feasible for MCC to do so. BLM further has identified a need for additional information as a stipulation subsequent to leasing related to methane mitigation.

Commenters further contend that the Forest Service should require MCC to capture, use or flare methane vented to the atmosphere to reduce the effects of global climate change. Methane is currently an unregulated constituent under the Clean Air Act as managed by the Environmental Protection Agency (EPA) and through their agent Colorado Department of Public Health and Environment (CDPHE). There is no established threshold of significance for methane. While the Forest Service does not have the authority to promulgate or enforce air quality regulations pursuant to the Clean Air Act, there are several options for reducing greenhouse gas emissions which may be implemented consistent with this decision and Forest Service lease stipulations identified in SFEIS Table 2-1. As the decision maker, I disagree with commenters' assertions that I am required to do so. Beyond quantified methane emissions which are identified in SFEIS in Section 3.4, there is no reasonable way of measuring global climate change effects at the local level from this particular action, which is the continuation of an existing activity at or below permitted air quality levels, and for which it was acknowledged (throughout Chapter 3 of SFEIS) that specific on-going climate change related-effects will continue to occur. Should methane mitigation be implemented in the future, monitoring and enforcement would be conducted by the respective appropriate permitting agencies for mining and associated operations.

### Air Quality

The SFEIS (Section 3.4, Appendices F & G) addresses issues related to air quality standards and possible effects globally and locally from climate change. Trends in air quality and climate change impacts have been identified. A few commenters requested

BLM_0051387

to see modeling impacts of criteria pollutants and climate change from this project. However, regulations at 40 CFR 1502.14-1502.16 describe that a comparison between the existing or baseline condition and the proposed activities be described "as is necessary to support the comparisons" and "provide a clear basis for choice by the decision maker." The SFEIS shows that the existing air quality impacts are in compliance with the CAA permits (permit for Construction Emissions) issued to MCC (SFEIS Appendix F). MCC has also filed an application under Title V of the Clean Air Act ("Tailoring Rule") as of July 1, 2012; however, these applications were withdrawn after the Supreme Court remanded the Tailoring Rule in 2014. Under the selected Alternative, the rate of mining and mining systems would not change. The change to air quality under the selected Alternative would be an extension of time over which the impacts would occur. The addition of the lease modification areas would add approximately 1.3 years to the permitted baseline on NFS lands, and an additional 1.4 years would be added due to probable associated activities on private lands and parent lease COC-1362 which would become accessible under this decision. Therefore, I find that the effects to air quality and climate change are adequately disclosed in SFEIS in Section 3.4 and Appendices F and G. The magnitude of the effect is compliant with the CAA permits, and it is projected that emissions are likely to occur at current annual rates for less than 3 additional years under the Proposed Action compared with the No Action Alternative.

I did not require methane capture/destruction as a mitigation measure because:

1. Lease mods methane is incremental when viewed in context of the alternatives available:
   a. Alt 1- 9.38 MM tons CH4 (CO2e) over 8.2 years
   b. Alt 3- 11.91 MM tons CH4 (CO2e) over 10.9 years
   c. Alt 4- 11.82 MM tons CH4 (CO2e) over 10.8 years
2. The range of my decision space entails a maximum 11.91-9.38= 2.54 MM tons CH4 CO2e, an amount for which specific climate change effects are unable to be predicted.
3. Methane levels released at the West Elk Mine have decreased steadily since 2012 without the imposition of a methane mitigation measure as a lease stipulation (SFEIS, Figure 3-7)

I feel confident that the effects of burning coal (combustion) under the action alternatives have been considered in Section 3.4.

### Social Cost of Carbon

Several commenters have suggested that we use the Social Cost of Carbon (SCC) protocol to monetize global costs of greenhouse gas (GHG) emissions associated with mining and burning coal.

The Colorado Roadless Rule (CRR) was the programmatic decision (rulemaking) to determine how to balance maintaining and preserving roadless area characteristics while addressing the State's concern of not foreclosing coal mining opportunities in the North Fork Valley (81 FR 91816). The CRR SFEIS included an SCC analysis as part of the cost- benefit analysis as required for the rule-making decision and the coal in the proposed federal coal lease modifications was included within that SCC analysis. I am familiar with that analysis and believe that the analysis was conducted at the appropriate level at that time and in the appropriate context. This analysis informs my decision and the public. I know that the potential costs of GHG emissions are not "zero" and indeed, depending on what assumptions prove to be true, may be significant.

BLM_0051388

From comments and objections received, I believe several commenters including members of the Interagency Working Group have also been well informed about the SCC analysis prepared for the CRR and the potential costs of greenhouse gas emissions. Although the recent Executive Order 13783 disbanded the Interagency Working Group on Social Cost of Greenhouse Gases and withdrew technical supporting documents used for the SCC analysis, even if this Executive Order was not issued, and if GHGs were analyzed in a manner that monetized global costs, this type of analysis would not better inform my decision for this project, which fully recognizes the significant potential future costs of GHG emissions. However, monetizing the SCC is not appropriate at this time because NEPA does not require a cost-benefit analysis, a cost benefit analysis was not conducted and a benefit-cost analysis would not substantively add to my ability to reach an informed decision in the matters before me. While the SFEIS contains quantified impacts, and while some of these quantified impacts are monetary, the SFEIS does not contain comparable economic benefits and costs to the SCC that would be needed for cost-benefit analysis per OMB Circular A-4. The SFEIS contains an analysis of environmental consequences (40 CFR 1502.16) that meets the qualitative requirements of NEPA (40 CFR 1502.23). If we set out to quantify climate impacts as monetized costs, it would be necessary to balance these costs by also quantifying the benefits of burning coal to generate electricity such as providing affordable, reliable electricity and the resultant benefits of having electricity in general such as human health from medical advancements, comfort, work efficiencies, etc. and other actions that are beyond the scope of my decision. Regardless, quantifying these benefits and the SCC were not feasible here in the absence of an analysis of effects on domestic and international energy and economic systems as a whole. However, as part of that CRR SFEIS, an energy market analysis was conducted and found that substitute sources of underground and surface coal around the nation are likely to decrease in response to an increases of North Fork Coal Mining Area underground coal production. Additionally, the CRR SFEIS found that relatively low coal price elasticity values indicate that increases in the availability of coal and corresponding decreases in coal prices may <u>not</u> trigger significant changes either in production or consumption of coal.

I acknowledge the potential adverse impacts of greenhouse gas release on the global climate. Further, in review of the analysis in CRR and additional consideration of that analysis during the Objection period, I understand that even with the extreme range of negative to positive values of the cost-benefit analysis driven by variation in SCC estimates (-$3,440 million to $206 million), the analysis shows that under most scenarios the economic costs associated with GHGs emission likely exceed the economic benefits of electricity generation associated with coal. I recognize supplemental information suggests that economic costs may be at the high end of the variation in costs. Currently, there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes, and, at present, there are no known significance (NEPA) levels to prescribe to GHG emissions for evaluating climate change impacts[2]. I acknowledge there are variations on the analysis which could be done today, and criticisms of the analysis done at the rule-making stage, but given the reasons above, I do not believe any additional project level SCC analysis would improve my decision. A hard look at this issue has been taken and both I and the public have been informed by the analysis done to date.

---

[2] Please see the additional detail of this discussion on significance and scope of this issue at SFEIS 981.

BLM_0051389

I do not need a project-level SCC analysis to determine stipulations and whether non-mineral and surface resource impacts are acceptable or not. The SCC protocol describes the monetary impact at the global scale of increased carbon emissions and does not translate to site-specific surface resource impacts.

I know there are resource impacts caused by the effects of climate change and I know that greenhouse gas releases contribute to this change. My decision has been informed by the climate change analysis for each of the resources in Chapter 3 at the local, regional, global levels of the SFEIS and all other impact analyses contained within the SFEIS.

To summarize this SCC issue:  1) for this project it was more effective to qualitatively disclose local regional and global effects of climate change for this project and we quantified GHG emissions across all alternatives, 2)  the SCC protocol was used in the CRR as the framework to consider the uncertainty around the estimates and caveats around using the protocol; 3) we did not conduct a cost-benefit analysis for several reasons, including: a. because we did not monetize comparable economic benefits and costs and b. it was not feasible because we determined that  analysis of the domestic and international energy and economic systems were out of the scope for this project.

## Factors Other Than Environmental Effects Considered In Making the Decision

Furthermore, none of the action alternatives are without additional stipulations, because changes in the regulatory framework for surface occupancy on NFS lands has changed since establishment of the parent leases; an action alternative with no additional stipulations would not be consistent with other law, policy and regulations for the GMUG. In addition to the action alternatives, the scenario to consent with additional stipulations has been evaluated from 12 alternative viewpoints including 17 variations on No Surface Occupancy, drilling, or methane mitigation stipulations.  Many of these viewpoints reflect options for mining or mitigation methods that are not required by stipulations included in the action alternatives, but are also not prohibited, so would be available during development and evaluation of the exploration and mining plans.

Some stakeholders in this project have suggested that the alternatives and my decision must include specific requirements to mitigate impacts on the quality of the human environment by certain methods. I have considered these suggestion, and feel that my decision will allow for adaptive development of methods to meet the proposed stipulations in the Action Alternatives and the intent of the Alternatives Considered but Dismissed from Detailed Analysis. My stipulations address the protection of surface resources. There is room to implement a wide variety of mitigation measures within the proposed stipulations, so the requested alternatives would have outcomes that are substantially similar to effects disclosed for Alternatives 3 and 4.  Furthermore, because the project would be consistent with the existing regulatory framework, there is no compelling reason to constrain the decision to specific methods that are known, when other methods not yet known would also continue to be available for permitting and implementation in the future. Mountain Coal Company has conveyed their intent to continue collaborative work in this area. Some viewpoints reflect options that do not meet the purpose and need of the lease modification and subsequent exploration and/or mining.  I feel that the alternatives in the SFEIS -- whether analyzed in detail or considered without detailed analysis -- more than fully meet the requirements of NEPA to analyze all reasonable alternatives while striving for efficiency in NEPA compliance.

BLM_0051390

The purpose and need of this project is to consider consenting to and issuing coal lease modifications for federal coal lands immediately adjacent to existing federal coal leases COC-1362 and COC-67232.  The purpose of the lease modifications is to ensure that compliant and super-compliant coal reserves are recovered.

The BLM, charged with administration of the mineral estate on these Federal lands, is required, by law, to consider leasing Federally-owned minerals for economic recovery. Under 43 CFR 3432 (as amended by the Energy Policy Act of 2005), the holder of a federal coal lease may apply to modify a lease by adding up to 960 acres. The federal agencies are responding to applications to modify existing leases.

The need is also linked to the GMUG Land and Resource Management Plan, as amended (Forest Plan), which emphasizes environmentally sound mineral and energy development (Forest Plan, page II-61).  My decision supports the Purpose and Need for this project and is consistent with Forest Plan direction.

My decision fulfills the Federal Government's policy to foster and encourage mineral development (Mining and Mineral Policy Act of 1970), the Federal Land Policy and Management Act (FLPMA), and complies with GMUG Forest Plan direction.

I considered the Forest Service Strategic Plan, which calls for the Forests to "help meet energy resource needs," the Forest Service implementation of the National Energy Plan (2001) generally directing the agency to expedite federal actions necessary for energy-related project approvals, and Executive Order 13212 directing federal agencies to take steps to increase the energy supply to our nation.

I considered the CRR which made an exemption for temporary road construction in the North Fork coal mining area.

I considered all other laws pertaining to management of NFS including but not limited to the Multiple-Use Sustained Yield Act of 1960 and the National Forest Management Act of 1976.

## How Considerations Were Weighed and Balanced In Arriving At the Decision

The resource effects analyses presented in Chapter 3 of the SFEIS (Table 2.3 and Chapter 3) describe potential impacts to surface resources from leasing or not leasing. Stipulations and lease addenda were developed and/or carried forward from the parent leases specifically for: cultural and paleontological resources; threatened or endangered species; Canada lynx; raptors; big game winter range; water depletions; breeding birds; geologic hazards; riparian/wetland/floodplain, roadless; methane use; visuals and baseline information and monitoring program.  Because of the surface protections in place (Appendix B and SFEIS Tables 2-1 and 2-2), I chose to consent to lease modification parcels as requested by BLM.

My decision to consent to leasing included evaluating the role and responsibility of the Forest Service in meeting overall energy needs for the nation as well as evaluating the environmental consequences of the decision. This consideration, along with our legal responsibilities, led me to the consent to lease decision.

Roads and well pads for coal exploration and methane drainage have been constructed and reclaimed in the general area for over 20 years including within roadless areas. While temporary displacement of some wildlife have undoubtedly occurred, and some recreational visitors may have chosen to avoid areas of construction and activity, all other

BLM_0051391

valid uses of the area have occurred concurrently with all phases of above-ground mining operations for the underground mines. Particularly, West Elk Mine's history of reclamation to return disturbed sites to ecological productivity is stellar. The most telling evidence of this may be that during the original development of the CRR, environmental organizations were insistent and successful at ensuring the inclusion of areas with existing temporary roads and well pads in what was then the West Elk Inventoried Roadless Area into the current adjacent Flatirons Colorado Roadless Area, as well as existing and near-term (already permitted) roads and well pads in the northern portion of the Sunset Colorado Roadless Area (See Figure 3-27, SFEIS).

To compare this alternative with the No Action Alternative, existing and currently permitted temporary roads and well pads (including those in Colorado Roadless Areas) can be seen in figure 3-27. The incremental addition of 2.7 years of operations, and 18-72 acres of additional of disturbance are quite small in context of past and ongoing operations. In reviewing SFEIS Chapter 3, I find that local interests are best served by consenting to the lease modifications to continue our long-standing community and stewardship collaboration with the mine under the applicable mineral leasing laws and regulations compared to impacts of the projected extended duration of mining coal and limited surface disturbance associated with underground mining.

As a steward of about 3.5 million acres of National Forest System lands, I am assigned the task of balancing multiple and often conflicting uses, as well as appropriate scope and scale of disturbances to dynamic landscapes. While many commenters have suggested that the primarily aspen ecotype of the lease modifications area suggest that it is different from past disturbances which have been more in the oakbrush type, and will be evident on the landscape longer, in my trips to the area, what struck me about the disturbance and reclamation in both oakbrush and aspen was that the previous disturbances were desirable for providing increased species and seral diversity; however, they were at scales so small that they could not be deemed beneficial. E.G., when we treat oakbrush for seral diversity and stand regeneration on the GMUG, we often aim for a minimum size of 500-1000 acres per treatment. When we treat aspen stands to promote seral diversity and stand regeneration, we typically aim for a minimum treatment area of 100 acres. There is a long local history of treatment and successful self-regeneration of aspen and oakbrush. And vegetation treatments of these variety have occurred within this general vicinity. On a ranger district comprising over 450,000 acres, with ~40% of its land base in aspen and ~20% in oakbrush, the past, present and projected future surface disturbances above the West Elk mine are quite small.

Because mine-related temporary roads are not open to the public and have been successfully reclaimed in a timely manner through State permitting and bonding in the area, I do not find these disturbances in the Sunset CRA to be detrimental to future generations' experiences as roadless areas or otherwise significant in context on the local, forest or state scale.

## Consideration of Other Alternatives

### *Alternative 1- No Action Alternative (Environmentally Preferred Alternative)*

I did not select Alternative 1, no action, primarily because it is only incrementally different from the selected alternative in environmental effects, and does not meet the purpose and need or the intent of minerals laws as well as the selected alternative. The purpose of ensuring recovery of high-quality coal reserves on lands adjacent to existing coal mine operations would not be met with this Alternative. Minerals laws direct the Agency to

BLM_0051392

continue a policy of encouraging private enterprise to develop mineral resources and ensure jobs for the future with secure, affordable and reliable energy (Minerals Policy Act of 1970 and Energy Policy Act of 2005). Further, the Forest Plan supports environmentally sound energy and mineral development.

This Alternative was identified as the environmentally preferable Alternative.

Even though this is the No Action Alternative, currently permitted temporary road and pad construction and use would continue for about ten years under this alternative. Most of these uses are and would continue to be in the Sunset Roadless Area. The selected alternative would likely add less than 3 years to this progression, and add from 18-72 acres of additional temporary disturbance to the many which have been constructed, used and reclaimed concurrent with other valid uses of NFS lands in the area.

### Alternative 2

Alternative 2 was moved to Section 2.3 Alternatives Considered, but Eliminated from Detailed Study in the due to the high likelihood of decreased operating periods, increased erosion potential, and safety concerns of cross country travel with no roads. Moreover, the RACR, which prevented road construction in Inventoried Roadless Areas has been replaced with the Colorado Roadless Rule.

### Alternative 4

Alternative 4 was fully considered in this analysis.  I compared: reasonably foreseeable surface disturbance; amount of expected coal to be recovered; and extension of mine life of the three action Alternatives. See Table 1 below.

**Table 1. Summary of Reasonably Foreseeable Actions by Alternative**

| Action | Alternative  3 | Alternative 4 | Difference |
|---|---|---|---|
| Estimated Foreseeable Surface Disturbance (acres) | 72 | 66 | (6) |
| Estimated Coal (tons) | 10,100,000 | 9,265,000 | (835,000) |
| Estimated         Foreseeable Extension of Mine Life (years) | 1.6 | 1.4 | (0.2) |

I considered the relatively small environmental footprint difference between Alternatives, temporary nature of the expected post-lease disturbance and past reclamation success at the West Elk Mine when selecting Alternative 3. I determined that while both the environmental impacts and coal recovery differences were very small between Alternatives 3 and 4, preventing the bypass of recoverable incompliance with the purpose and need of this decision is best served by Alternative 3. The 835,000-ton increase in coal recovery outweighs the environmental effects of disturbing 6 more acres of NFS lands for a short period of time as compared to Alternative 4.

BLM_0051393

## Public Involvement Considerations

Public and agency comments were sought during preparation of the SFEIS (see Section IV). Responsive to some comments on the DEIS, the following changes were completed in development of the SFEIS with respect to Alternatives:

- Development of Alternative 4; analyzing and disclosing impacts of consenting to only one of the proposed lease modifications (COC-1362)

# III. SUMMARY OF ALTERNATIVES CONSIDERED

A total of 15 Alternatives with several derivations were considered in the SFEIS (Sections 2.2 through 2.3.12) with 3 carried forward for detailed analysis. Alternative 2 from the 2012 FEIS was eliminated from detailed study. I have selected Alternative 3, conditioned with stipulations. A summary of the Alternatives Considered in Detail in the SFEIS follows:

## Alternative 1- No Action Alternative

Analysis of the No Action Alternative is required by CEQ, 40 CFR Part 1502.14(d). Under the No Action Alternative, consent for the lease modifications would not be granted, and no mining would occur in these specific areas. Impacts from mining coal under these areas would not occur on these lands, and the effects from on-going land uses could continue including coal mining activities such as exploration and monitoring related to mine activities, as well as continued recreation and grazing. The land would continue to be managed according to Forest Plan standards, goals and guidelines. This Alternative was the environmentally preferred, as it minimized ecological disturbance compared with the other two alternatives considered.

## Common to All Action Alternatives

The proposed action is for the Forest Service to consent to and BLM leasing/modifying MCC's existing federal coal leases COC-67232 and/or COC-1362 and by adding 920 and 800 additional acres (respectively) to ensure that compliant and super-compliant coal reserves are recovered and not bypassed, and to identify stipulations for the protection of non-mineral (i.e. surface) resources.

Methane drainage well construction is essential for operating longwall operations in the North Fork Valley. Normal mine ventilation alone does not allow for safe longwall mining in the North Fork Valley. Without MDWs methane builds up quickly during the longwall mining process. The current use of MDWs is necessary to mitigate methane safety hazards making mine-air compliant with MSHA standards. For the West Elk Mine, MDWs are a required part of their MSHA approved ventilation Plan (see project record).

## Alternative 3 (Agency Preferred Alternative)

By selecting Alternative 3 the Forest Service consents to the lease modifications and BLM could modify the leases with stipulations/notices/addenda in Appendix B.

The majority of both lease modification areas are within the Sunset CRA, which is entirely within the NFCMA that provides an exception for post-lease surface-disturbing activities, including the construction and use of temporary roads (36 CFR 294.43 (c)(1)(ix)). 786 acres of the COC-1362 lease modification and 915 acres of the COC-67232 lease modification are within the Sunset CRA. Allowing temporary roads would facilitate MDW

BLM_0051394

drilling and would therefore allow for mining the coal under the RFMP (described in Section 3.3).

## Alternative 4

Many commenters expressed concerns regarding roadless area effects due to post-lease development. Similarly, in the original DEIS, some commenters suggested an Alternative requesting agencies' consent/leasing for proposed modification to COC-1362 only, while not consenting to proposed modification to lease COC-67232. In response to those comments, Alternative 4 was brought forward for further analysis from Alternatives Considered but Eliminated from Detailed Study in the DEIS.

Alternative 4 analyzed the effects of post-lease surface activities under The CRR and resultant NFCMA, similar to Alternative 3.

An RFMP was developed (Section 3.3.3) to address indirect and cumulative effects specific to the COC-1362 modification.

### Stipulations for Action Alternatives

I am prescribing some additional stipulations to the existing stipulations on the parent leases to provide for the protection of non-mineral surface resources. All stipulations are listed in Appendix B corresponding to the respective applicability to lease modification(s).

# IV. PUBLIC INVOLVEMENT

Extensive public involvement occurred during the preparation of an Environmental Assessment for this same EIS. During that comment period (April-May 2010), approximately 32,002 versions of email form letters were received from environmental groups (more detailed description in subsequent sections); 576 hardcopy/faxed form letters were received from local community members in four counties in support of mining in this area; 78 (mostly modified form letters) were received in response to this scoping effort. Issues ranged from support to opposition of coal mining, effects to Inventoried Roadless Areas, and global climate change. Most concerns dealt with post-leasing development. These issues led the agencies to develop the Proposed Action which has lease stipulations to protect surface resources including: cultural/paleontological resources, threatened/endangered species, Canada Lynx, raptors, big game winter range, water depletions, breeding birds, geological hazards, riparian/wetlands, subsidence, lease notices for presence of roadless areas, lease addendums for methane flaring/capture/use and new lease stipulations for visual resources. The decision was remanded to the forest over stipulations in February of 2012.

In late 2011 and early 2012 Colorado was in the middle of transitioning to new state-wide roadless area regulations, Environmental Protection Agency was considering greenhouse gas regulations, Council on Environmental Quality was considering significance thresholds for analysis of greenhouse gases and BLM was preparing their own leasing analysis for these modifications. All of these combined contributed to the decision to prepare an Environmental Impact Statement (EIS).

The Forest Service published a Notice of Intent to Prepare an EIS in the Federal Register on April 25, 2012. Approximately 830 copies of letters/emails informing interested parties (including state, federal, local agencies, tribes, environmental groups, and interested parties) of this intent were also sent out on April 25, 2012 inviting additional comments throughout the process. Additional notification was sent out with the Draft EIS to

BLM_0051395

approximately 768 individuals; additional legal notices were published in the Grand Junction Daily Sentinel and Delta County Independent.

Approximately 24,680 comment letters were received on the Draft EIS. Of those, 67 were original comments. Responses to comments received during the 30 day period following the printing of the NOI and the 45 day comment period on the DEIS and other comments specifically included by reference can be found in Appendix I. Comments received during this time can be viewed in entirety in Appendix I (Volume II) of the 2012 Final EIS.

Previous GMUG and BLM decisions (available at: https://www.fs.usda.gov/project/?project=32459) were vacated in High Country Conservation Advocates v. United States Forest Service, 67 F. Supp. 3d 1262 (D. Colo. 2014)) on September 11, 2014. A Supplemental EIS is being prepared to correct Court-identified deficiencies and to update analysis, as needed, since the Final EIS in 2012 and BLM's Environmental Assessment (EA) for exploration in 2013. The leasing and exploration analyses will be combined into a single document for agency and public convenience.

Over 9,800 additional submissions (primarily form letters, groups of form letters and petitions) were received on the Notice of Intent to Prepare a Supplemental Environmental Impact Statement in 2016-2017 which was not an official comment period. Comments and responses can be found in Appendix J.

During the official comment period (June 2, 2017-July 24, 2017) on the Supplemental Draft Environmental Impact Statement we received approximately 127,250 expressions of interest or comment letters. Issue topics are consistent with those raised in previous comment periods. Summarized substantive comments and responses are included in Appendix K.

# V. FINDINGS REQUIRED BY OTHER LAWS AND REGULATIONS

To the best of my knowledge, this decision complies with all applicable laws and regulations. In the following, I have summarized the association of my decision to some pertinent legal requirements.

## Executive Order 13212 of May 18, 2001

This Order called the federal agencies to expedite their review of permits for energy-related projects while maintaining safety, public health, and environmental protections. My decision is consistent with this Order.

## Federal Land Policy and Management Act of 1976

The Federal Land Policy and Management Act of 1976 states that public lands are to be managed in a manner that recognizes the need for the domestic sources of minerals, including renewable and non-renewable resources. My decision is consistent with this act.

## Multiple-Use Sustained-Yield Act of 1960

This act states that renewable resources are to be managed for the long term sustained yield. My decision is consistent with this act.

BLM_0051396

## National Forest Management Act of 1976

The Forest Plan was approved in 1983 and amended in 1991, as required by this Act. This long-range land and resource management plan provides guidance for all resource management activities in the Forest.  The National Forest Management Act requires all projects and activities to be consistent with the Forest Plan.  The Forest Plan has been reviewed in consideration of this project (SFEIS, Section 1.8). Forest Plan compliance is also addressed in the final subsection of each resource section in Chapter 3 of the SFEIS. My decision is consistent with the Forest Plan.

## Mining and Minerals Policy Act of 1970

This Act declared it would be the continuing policy of the Federal government and in the national interest to foster and encourage private enterprise in the development of economically sound and stable domestic mining industries, and the orderly and economic development of domestic mineral resources (SFEIS, Section 1.6).

My decision is consistent with this act.

## Mineral Leasing Act of 1920 (MLA) as amended, Energy Policy Act of 2005

Federal coal leasing follows the Mineral Leasing Act of 1920 (MLA), as amended and specific procedures set forth in 43 CFR 3400. These lease modification applications are being processed according to procedures set forth in 43 CFR 3432.

The purpose of the Energy Policy Act of 2005 was to ensure jobs for the future with secure, affordable, and reliable energy.

The Energy Policy Act Amended MLA [30 U.S.C. 203(c)(4)(A)] to ``secure modifications of the  original coal lease by including additional coal lands  or coal deposits contiguous or cornering to those  embraced in the lease…(3) In no case shall the total area added by modifications to an  existing coal lease under paragraph (1)--(A) exceed 960 acres; or (B) add acreage larger than that in the original lease.'

Some commenters have suggested that the processing of proposed modifications is not in compliance with MLA, and suggest that due to total acreage of both modifications, they should have been submitted and reviewed as a lease by application instead of two lease modifications.

On January 26, 2009, the GMUG received a request from the BLM to analyze an application to modify and review stipulations for federal coal lease COC-67232, containing about 762 acres. On that same date the GMUG also received a request to modify and review stipulations for federal coal lease COC-1362, containing about 800 acres. COC-1362 currently contains approximately 4,996 acres, including about 160 acres from a lease modification approved October 15, 2001. COC-67232 currently contains approximately 1,517 acres.

On December 14, 2009, the GMUG received an amended request from the BLM regarding COC-67232, addressing acres which removed NFS Wilderness while adding other NFS lands, bringing the total requested modification to 920 acres.

On February 04, 2015, the Forest Service received a request from the BLM to resume analysis of proposed modifications and stipulations to COC-1362 containing about 800

BLM_0051397

acres, and COC-67232, containing about 920[3] acres. Coal in the existing leases is mined at the West Elk Mine near Somerset, Colorado. Lease COC-67232 is held by Ark Land LLC (Ark), and lease COC-1362 is held by Mountain Coal Company (MCC).

If BLM authorizes these lease modifications, the total modified acres for COC-1362 would be approximately 960 acres.

In summary, neither of the respective proposed lease modification areas exceeds 960 acres. Neither of the respective proposed lease modification areas exceeds acres within respective parent leases. Therefore, my decision is consistent with these Acts, and these lease modification applications are being processed according to procedures set forth in 43 CFR 3432.

## Colorado Surface Coal Mining Reclamation Act (CRS. 34-33-101)

This Act and attendant regulations are consistent with the overarching federal regulations (30 CFR Part 906, Appendix B). Federal coal leaseholders in Colorado must hold a State-approved mining permit before performing mining and reclamation operations on Federal lands in the state. In accordance with Colorado's approved federal coal program procedures, during the mine permitting process the GMUG will review an applicant's submittal, including bond sufficiency to ensure that it provides for post-mining land use consistent with the Forest Plan and has adequate protections for NFS lands.

## Clean Air Act of 1955, as amended 1977

This Clean Air Act (CAA) required States to develop plans to implement, maintain, and enforce primary and secondary ambient air quality standards for any criteria air pollutants, and called federal agencies to prevent deterioration of air quality. The Forest Service as a Federal Land Manager also has the responsibility to protect Class II wilderness areas under the Wilderness Act so they are untrammeled by human use.  The Forest Service choses to protect the Air Quality Related Values (AQRVs) in these areas with the same standards afforded to Class I wilderness areas.  To do otherwise could be viewed as arbitrary and capricious based on a date of August 7, 1977.  Effects on air quality as a result of this project were analyzed and showed that this project will have negligible effects on air quality.  Further, MCC is required to hold and maintain state air quality permits for their activities under the CAA. MCC currently holds a valid permit from the Colorado Division of Public Health and Environment (CDPHE) for construction air emissions.. This decision is consistent with this Act.

## Clean Water Act and Amendments of 1972

This Act requires State and Federal agencies to control and abate water pollution.  This project was designed to comply with this Act (Appendix B and SFEIS Table 2-1 through the inclusion of stipulations for surface and ground water, water depletions, baseline data, and monitoring and compliance with all state and local laws, the GMUG Forest Plan, and the Forest Service Watershed Conservation Practices Handbook (FSH 2509.25). This decision is consistent with this Act.

---

[3] [1] Certificates from Cadastral Land Description Reviews on 3/29/2012 and 5/10/2016 have revised this to 920 acres down from 921-922 acres.

BLM_0051398

## Executive Orders 11990 and 11988

The management of wetlands and floodplains are subject to Executive Orders 11990 and 11988, respectively. The purpose of the EOs are to avoid to the extent possible the long- and short-term adverse impacts associated with the destruction or modification of wetlands and floodplains and to avoid direct or indirect effects of new construction in wetlands wherever there is a practical Alternative.  This order requires the Forest Service to take action to minimize destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands.  In compliance with this order, Forest Service direction requires that an analysis be completed to determine whether adverse impacts would result (SFEIS, Chapter 2 and Appendix B).  The project was designed to avoid impacts to wetlands and floodplains through the addition of lease stipulations. Permits currently held by MCC, including NPDES, SPCC and CWA section 404 remain valid until renewal is necessary. Therefore, my decision is consistent with these orders.

## Executive Order 12898

Concern for environmental justice stems from Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," signed February 11, 1994 by President Clinton.  In this order (Section 1-101),

> "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States."

The population around the project area was reviewed (SFEIS Section 3.21.1.1). For this project, no disproportionately high adverse impacts are expected. This decision is consistent with this Order.

## Executive Order 13045

Direction regarding protection of children is recognized in "Protection of Children from Environmental Health Risks and Safety Risks", April 21, 1997. Children are seldom present at coal mining facilities. On such occasions, the coal mining companies have taken and will continue to take precautions for the safety of children by using a number of means, including fencing, limitations on access to certain areas, and provision of adult supervision. (See SFEIS, Section 3.21.1.2). This decision is consistent with this Order.

## Executive Order 13783

*EO 13783 provides direction regarding promoting energy independence and economic growth. This Order disbanded the Interagency Working Group on Social Cost of /technical supporting documents for SCC analysis. My decision does not rely on the SCC protocol and technical documents and is therefore consistent with this Order.*

## National Historic Preservation Act

To date, three cultural resource inventories have occurred within the project area and no heritage resources were located.  Therefore the lease modifications are found to have no potential to affect cultural resources, as defined in regulations 36 CFR 800. The addition of the standard lease clause will protect currently undiscovered sites (SFEIS Section 3.31

BLM_0051399

and Project File). Site specific resource surveys have been completed for exploration disturbance, and must be conducted prior to any post-lease ground disturbing activities (Appendix B, SFEIS Table 2-1). Therefore, at this time, no additional inventories need to be completed, and consultation with the State Historic Preservation Office (SHPO) is not required. My decision is consistent with this and other acts protecting heritage resources.

## Endangered Species Act

A Biological Assessment (BA) was prepared for this decision (SFEIS, Sections 3.9-3.10, Project File, and Internet). All known endangered or threatened species in the area were considered. Due to "may affect, not likely to adversely affect" determinations for Canada Lynx and water depletions related to the four endangered Colorado River fish, informal consultation with the USFWS was completed on June 16, 2010 (ES/CO: FS/GMUG/Paonia RD; Tails 65413-2010-F-0109) USFWS had concurred with our findings. If additional findings regarding threatened or endangered, proposed or sensitive species are discovered, a new biological assessment or evaluation will be written, and formal consultation reinitiated.

Compliance with terms and conditions of the Biological Opinion are addressed in lease stipulations for threatened and endangered species (Appendix B, SFEIS Tables 2-1 and 2-2). Therefore, my decision is consistent with this Act.

### Lynx

During the objection process, Objectors alleged that we not comply with ESA requirements and our use of consultation from 2010 for documenting effects to Canada lynx with the USFWS. I am including the following summary of the process of Canada lynx consultations that are included within the project record.

- A Biological Assessment (BA) was prepared for this decision (SFEIS, Sections 3.10, Project File). All known endangered or threatened species in the area were considered.
- Informal consultation with the USFWS was completed on June 16, 2010 (ES/CO:FS/GMUG/Paonia RD; Tails 65413-2010-F-0109). The USFWS concurred with findings of "may affect, not likely to adversely affect" based on the calculation that less than 0.6% (up to 75 acres) of suitable lynx habitat would become unsuitable due to vegetation alterations under the Foreseeable Mining Plan, which included impacts from MDWs and temporary roads.
- During the CRR rulemaking process additional consultation (ES/GJ-6-CO-09-F-001-GP030' Tails 06E24100-2016-F-0194) occurred with USFWS. The determination of "may affect, not likely to adversely affect" for Canada Lynx applies projected roads and timber removal to the entire North Fork Coal Mining Area (NFCMA), not just to the project area which is approximately 1/10th of the NFCMA.
- Further, GMUG consultation of June 2, 2016 for vegetation removal forest-wide (BO ES/LK-6-CO-08-F-024-GJ0t 6 and TAILS 06824t00-201 6-F -0132) included the earlier project consultation acreages and set acreage limits for disturbance within the lynx analysis units before consultation would again be required. There is over 6,000 additional acres beyond this project and previous disturbances of habitat in the Mount Gunnison Lynx Analysis Unit that may be treated before approaching a conservation limit in compliance with the Southern Rockies Lynx Amendment (SRLA; USFS 2008). Cumulative effects to lynx

BLM_0051400

habitat within the LAU is tracked under a forest-wide programmatic consultation that occurred on June 2, 2016 that set habitat alteration limits within the LAU at no more than 30%. This threshold is consistent with the SRLA. There is no critical habitat in the Southern Rockies. The project is covered under the Southern Rockies Lynx Amendment Standards and Guidelines for protection of lynx and lynx habitat and the project is not expected to cause harm to lynx populations or "take" of lynx. This is supported in the concurrence letter from the USFWS.

- The current project consultation (ES:CO:FS/GMUG/Paonia RD; Tails 65413-2010-F-0109) addresses 75 acres of disturbance of lynx habitat in the Lynx Analysis Unit (LAU) for the post-leasing development. This includes habitat that may be lost to roads and drill pads. No disturbance has occurred to date under this consultation.

- Although the forest lynx habitat map was updated in 2010, following the June 16, 2010 concurrence letter from the USFWS, the changes to percentage of affected habitat does not change much from the previous calculations and is far from reaching the thresholds identified in the SRLA. The SRLA provides standards and guidance regarding vegetation alteration in LAUs. Under SLRA, an LAU should not have more than 30% unsuitable habitat.

- The SFEIS and project (ES:CO:FS/GMUG/Paonia RD; Tails 65413-2010-F-0109) consultation identifies that if greater than 75 acres would be affected by the project, consultation would be reinitiated.

Given the USFWS concurrence and consistent coordination with the USFWS and stipulations (provided by the SRLA) required for each lease renewal the GMUG has worked hard to best analyze impacts to Canada lynx and their habitat and ensure that cumulative impacts within the LAU are not leading to exceeding the limits of unsuitable habitat within the LAU. As a result, I find the GMUG is in full compliance with ESA requirements for Canada lynx.

### Colorado River Fish

Similarly, during the objection process Objectors alleged concerns about basing project consultation on a programmatic biological opinion for water depletions despite updated information regarding threats to the species and the failure of the Recovery Program to offset those threats. And due to that, they allege that the Forest Service cannot rely on USFWS Recovery Program or those programmatic consultations.

Although no special-status fish species are present within the project area, there are four endangered fish within the Gunnison and Colorado River downstream of the project area (Colorado pikeminnow, razorback sucker, humpback chub, and bonytail) that may be affected by water depletions within the watershed. Methane Drainage Wells and exploration drill holes require the use of water to drill. As a result, water depletions were estimated based on the foreseeable mining plan and previous water use activity in the existing mine shown in reports submitted to the USFWS annually although not all water used by the mine is expected to be tributary (i.e., connected) to the Colorado River. The USFS estimated that water use would be only about 1 acre-foot per year or 4.5 acre-feet over the course of 5 years. A concurrence letter from the USFWS for the project was received by the USFS on June 16, 2010, which deferred to the 2007 Grand Mesa, Uncompahgre, and Gunnison National Forests (GMUG) Programmatic Biological Opinion (PBO) for water depletion thresholds (one time project use of 50 acre-feet or 100 acre-feet annually) and annual water use reporting by the operator to the USFWS (ES/GJ-6-CO-99-F-033-CP062 and TAILS 65413-2007-F-0019).

BLM_0051401

Water depletions are best assessed through a cumulative, programmatic approach to best address recovery needs and regulate water use basin-wide. A Recovery Implementation Program for Endangered Fish in the Upper Colorado River Basin was initiated on January 22, 1988. This agreement established a framework for conducting section 7 consultations on depletion impacts related to new projects and impacts associated with existing projects in the Upper Basin. The PBO issued to the GMUG from the USFWS on April 27, 2007 (ES/GJ-6-CO-99-F-033-CP062 and TAILS 65413-2007-F-0019) falls under the umbrella of the original December 20, 1999 PBO for the upper Colorado River Basin above the confluence with the Gunnison River. These PBOs require annual reporting of small water depletions. The 2007 PBO for the GMUG requires that projects do not exceed 50 acre-feet per project and 100 acre-feet per year. Similarly, depletions are covered under the USFWS "Final Gunnison River Basin Programmatic Biological Opinion" (ES/GJ-6-CO-09-F-0001 and TAILS 65413-2009-F-0044) dated December 4, 2009, Which includes all previous depletions consulted on including GMUG's PBO in 2007. The 2009 PBO also addresses climate change and recognizes adaptive management as a strategy for adjusting to changing needs for recovery (pg. 20).

Additionally, USFWS has conducted progress reviews regarding the Colorado River endangered fishes including their October 7, 2015 "Draft 2014-2015 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of Implementation of Action Items in the December 20, 1999, 15-Mile Reach Programmatic Biological Opinion and December 4, 2009, Gunnison River Basin Programmatic Biological Opinion". Their review was finalized on December 20, 2016, in the "Final 2015—2016 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and Implementation of Action Items in the January 10, 2005, Final Programmatic Biological Opinion on the Management Plan for Endangered Fishes in the Yampa River Basin".

The conclusion provided by the USFWS in that 2016 Sufficient Progress document (pp 44-45) is as follows: "The Recovery Program has made strong progress in protecting and improving flows and restoring habitat and has demonstrated strong resolve to manage nonnative fishes in recent years…The Service remains convinced that the best chance for success and recovery, rests with this collaborative Recovery Program. Based on our comprehensive evaluation of the status of the endangered fish, provision of flows (particularly during periods of drought), the magnitude of new depletion impacts (relatively minor in the historical context), the focus on nonnative threats, and cumulative Recovery Program accomplishments and shortcomings, the Service concludes that when implemented as Conservation Measures (i.e., part of the proposed action), the Recovery Program is making sufficient progress to continue avoiding the likelihood of jeopardy resulting from depletion impacts of new projects that have an annual depletion of up to 4,500 acre feet. Furthermore, that sufficient progress provides continued avoidance of jeopardy for the water projects and depletions currently provided with ESA compliance by the Program. Projects exceeding 4,500 acre feet or that have direct or indirect effects in addition to water depletions will be evaluated to determine if they jeopardize the species' continued existence on a case by case basis."

Therefore, given the USFWS's conclusion under their 2016 Final Assessment, all existing PBOs are still valid because USFWS found sufficient progress toward avoidance of jeopardy for those species.

In May 19, 2016, the USFS received a concurrence letter from the USFWS after reinitiating consultation for the reinstatement of the North Fork Coal Mining Area (NFCMA) temporary

BLM_0051402

road exception to the Colorado Roadless Rule. This Biological Opinion covers the project and foreseeable activities, including water depletions, by recognizing the adequacy of the Gunnison River PBO thresholds for water depletions. In the 2016 PBO, the USFWS has "determined that projects that fit under the umbrella of the Gunnison River PBO would avoid the likelihood of jeopardy and/or adverse modification of critical habitat for depletion impacts to the Gunnison River basin. For projects involving water depletions less than 100 acre-feet per year that fit under the umbrella of the Gunnison River PBO, the Federal agency requesting consultation must document the project location, the amount of the water depletion, identify if the depletion is new or historic, and provide the information to the Service when consultation is initiated. This information was provided in your consultation request, therefore, the requirements have been met for the subject project to fit under the umbrella of the Gunnison River PBO. The Service requests that the Forest Service retain discretionary Federal authority for the subject project in case reinitiation of section 7 consultation is required."

Based on this consultation history for the project, the 2010 USFWS concurrence remains valid in light of the USFWS findings in subsequent BOs and recovery agreements which includes by reference all previous consultations including the forest's 2007 programmatic and 2010 project specific consultations.

## National Environmental Policy Act

All documentation in the project record in support of, and including the SFEIS and ROD have been developed to comply with this Act, CEQ regulations at 40 CFR 1500, Forest Service policies at Forest Service Handbook 1909.15 and 36 CFR 220, requirements that evolved through the practice of NEPA, and from case law.

## Coal Unsuitability

Upon receipt of the applications to modify the leases, BLM completed tract delineation. I have reviewed the unsuitability criteria published in 43 CFR 3461 (SFEIS, Appendix B) and am recommending to the Secretary of Interior (or their delegated representative) that there are no significant recreational, timber, economic, or other values that are incompatible with modifying the leases within the analysis.

The criteria have also been reviewed for implications with all Alternatives in this analysis.  My recommendation is consistent with 43 CFR 3461.

## Colorado Roadless Rule, 36 CFR 294

Within portions of proposed lease modification areas within the Sunset CRA, in accordance with § 294.43(c)(2), "If proposed road construction/ reconstruction meets one of the exceptions, subject to the legal rights identified in § 294.43(c)(1), the responsible official must determine:

> (i)    *Motorized access, without road construction is not feasible;"*

As described previously in this ROD, development of the lease modifications without roads (Alternative 2) is not feasible at this time. Therefore, motorized access via roads is necessary.

> (ii)    *"When proposing to construct a forest road, that a temporary road would not provide reasonable access;"*

All roads that may be constructed would be temporary.

BLM_0051403

  (iii)  *"Road construction is consistent with applicable land management plan direction;"*

The use of roads is consistent with the land management plan. During the permitting stage when the roads would be designed and approved, the Forest Service will work with the permitting agency to ensure compliance with the land management plan and lease stipulations.

  (iv)  *Within a native cutthroat trout catchment or identified recovery watershed, road construction will not diminish, over the long term, conditions in the water influence zone and the extent of the occupied native cutthroat trout habitat;"*

The lease modification area is not within a native cutthroat trout catchment or identified recovery watershed (project file).

    *",and*

  (v)  *That watershed conservation practices will be applied to all projects occurring in native cutthroat trout habitat."*

The lease modification area is not within native cutthroat trout habitat. However, watershed conservation practices will be applied.

Stipulations have been developed to ensure compliance with CRR respecting temporary roads, pipelines and linear construction zones should the latter be needed at a future date for capture of methane incident to mining. My decision is consistent with the requirements of the CRR.

## Other Permits Required

- DRMS mine permit

In addition to the mine permit process, other permitting processes not covered by DRMS authority may need to be analyzed (NEPA) and permitted. Examples of these types of permits include: 1) Road Use Permits; 2) Timber contract for harvest of merchantable timber; and 3) Special Use/Right-of-Way Authorizations for other surface disturbing activities not covered by or outside the area covered in the mine permit (e.g. pipelines and off-lease facilities for methane mitigation).

MCC will be required to obtain/update additional information specific to this leasing action including:

- BLM on-lease Exploration Plan
- Update Forest Service Road Use Permit for roads outside the mine permit area
- Forest Service timber contract for any merchantable timber removed
- Update Approved Pesticide Use and Weed Control Plan

Other permits currently held by MCC such as NPDES, SPCC, 404 Permits, Air Construction Permit, Spill Prevention, control, and Countermeasure Plan, etc. remain valid until renewal is necessary.

BLM_0051404

# VII. IMPLEMENTATION DATE AND ADMINISTRATIVE REVIEW (OBJECTION) OPPORTUNITY

## Administrative Review (Objection) Process

This decision has been subjected to a pre-decisional objection process in accordance with the provision of 36 CFR § 218 subparts A and B. Objection period ran from September 8th through October 23rd, 2017 after publication of the legal notice in the *Grand Junction Daily Sentinel* on September 8th. Twenty-one written objections were filed with the Reviewing Officer, Deputy Regional Forester, Maribeth Gustafson. All objections received and Reviewing Officer responses to them are available for public inspection at https://www.fs.usda.gov/project/?project=32459. Issues raised in objections should have been based on previously submitted and timely, specific written comments regarding the lease modifications and attributed to the objector, unless the issue was based on new information that arose after the opportunities for comment. Eleven of the objections were dismissed without further review by the Reviewing Officer as one or more of the objection criteria in 36 CFR § 218 were not met. Two of the objections were in support of the project, but wanted to maintain administrative standing in the process and provided recommended technical corrections to this final ROD. The remaining objections were reviewed by an independent team of resource specialists under the direction of the Reviewing Officer. Based on issues in objections, I wish to provide the following clarifications for certain items within the SFEIS or project record:

### ESA Compliance

Objectors alleged violations of ESA. An expanded summary of the consultation processes conducted for both the Canada lynx and water depletions related to the four endangered fish in the Colorado River has been included in the Findings Required by other Laws and Regulations section above.

### Social Cost of Carbon & Economic Analysis

Objectors alleged several violations regarding failure to calculate social cost of carbon (SCC) for the project. SCC analysis was not completed for this project for the reasons cited in the SFEIS. Additional discussion is found in my decision rationale above.

Objectors alleged that we quantified benefits but not costs and that assumptions were withheld for IMPLAN analysis. Objectors are continuing to confuse regional economic impacts addressed in SFEIS (because money is used as a metric) as identified under Forest Service policy with the requirements of a cost-benefit analysis, which was not conducted, is generally reserved for regulatory activities and evaluates different items than the regional impact analysis that was done. Methodology of regional impact analysis is disclosed which includes modelling assumptions and modelling results (SFEIS pp. 275-279 and 281-284, with more description in project record of model inputs). Additional discussion is found in SFEIS, project record and decision rationale above.

### Roadless

Objector alleges that the 2016 reinstatement of the North Fork Coal Mining Area of the CRR was illegal for a few reasons. These CRR-related objection issues pertain to the CRR re-instatement of the North Fork Coal Mining Area exception, not to this project specific analysis or decision. These issues are beyond the scope of the decision. The CRR was

BLM_0051405

promulgated on July 3, 2012. It remains legal and in effect until proven otherwise by a court. The reinstatement of the North Fork Coal Mining Area (NFCMA) within the Colorado Roadless Rule went into effect on April 19, 2017. To date there have been no legal challenges to the NFCMA portion of the rule. Analysis and assumptions completed in 2016 were valid at the time the Rule was issued.

Objector alleges we failed to ensure compliance with the Colorado Roadless Rule including that I must identify specific measures to prevent unnecessary or unreasonable surface disturbance. I have included stipulations in my decision and also ones specific to roadless consistent with those identified CRR to prevent unnecessary or unreasonable surface disturbance and minimize effects to roadless characteristics present including soil, water, air (regulation requires State permits), plants and animal habitat, recreation features (in the case of subsidence), landscapes, and cultural resources. These are included in the SFEIS and here in Appendix B.

Objector alleges we failed to take a hard look at the lease modifications' impacts to Sunset Roadless Area and its values.   SFEIS and response to comments thoroughly addresses this issue. Alternative 2 in 2012 DEIS/FEIS was developed solely because of regulatory transition between the RACR and CRR. Alternative 4 was brought forward to deal with objectors concerns about "wilderness capable lands" based on a 2005 inventory.   All alternatives include impacts on roadless. Roadless analysis was also included all NEPA analysis.

Objector alleges that I must determine roads are necessary and further contends that an alternative that an alternative that allows cross country travel should have been analyzed. During the DEIS in 2012 this alternative (Alternative 2) for cross country travel was analyzed in detail under the regulatory framework of the Roadless Area Conservation Rule of 2001. Under the current CRR regulations, cross country motorized use is not proposed. We determined in 2012 that the effects of cross-country travel without the design features required for road construction for heavy drill rigs, is likely to result in more impacts on forest resources than road building. This is summarized under the Alternative 2 (page 51 and pp. 51, 719-720) of the SFEIS. Additionally, we have analyzed other methods to drill MDWs and exploration holes without roads and for various reasons have found them ineffective (SFEIS Section 2.3). Therefore, roads are necessary both to prevent unnecessary or unreasonable surface disturbance and to be technologically feasible for the activities proposed and are in compliance with CRR.

> *Technical errata to SFEIS:  Section 3.6.4.1 of the SFEIS includes a statement about the impact of cross country motorized travel on geology for Alternative 4. This errata deletes this statement as it applied to the now removed Alternative 2.*

Objector alleges failure to adopt stipulations to ensure effective road decommissioning. I have included stipulations in my decision that address temporary roads (roadless stipulations) and with regard to the requirements under the Southern Rockies Lynx Amendment (Lynx) that assure reclamation (SFEIS and here in Appendix B). Reclamation bonding is required during exploration and per statute to ensure reclamation success with opportunity for my staff to review bonding amounts and success at several subsequent process steps.

### Wilderness Capable

The SFEIS Violates NEPA by Failing to Analyze a Reasonable Alternative That Would Include Protections for Wilderness Character Lands. See SFEIS Alternative 4, alternatives not considered in detail, and pp. 760-761, 874-876 (#9739-11), 942-943, 959-960. During

BLM_0051406

review, "Wilderness character" was interpreted as equivalent to "Wilderness capable" from Roadless evaluations.   Objector's initial 2012 alternative suggested that we should consider an alternative that we would prohibit surface occupancy with the Sunset IRA's wilderness capable area. Alternative 4 was developed to accommodate this request. Objector over the past five years has also brought forward numerous stipulations for wilderness character lands. Alternative 4 analyzed in detail specifically excluded the Wilderness capable portions of the Sunset Roadless Area as well as the adjacent non-capable lands within the lease modification tract, as shown on SFEIS Figure 3.26.   In SFEIS Alternative 4, the lease extending over the Wilderness capable areas would not be modified.  While a portion of the project area was identified in a previous Forest Planning process as being wilderness capable, that Forest Planning effort, and the regulations underlying that process are no longer in place. Area was not brought forward as a further planning area for wilderness designation. Capability would have to be followed by "availability" and "recommended" for wilderness under that planning rule which is no longer in effect. It was not carried forward for any of these. Wilderness character and values is applied and defined for wilderness areas not roadless areas which these lease modifications are in. Roadless is not intended to be managed as wilderness. Wilderness capable would not result in any changes under roadless analysis. Roadless characteristics were addressed in this document in Section 3.18. The current GMUG Forest Plan has areas identified as recommended for wilderness designation; this is not one of them. Wilderness character is not addressed for non-wilderness areas. See also SFEIS response at p. 1003.

### Recreation

Objector alleged that we failed to take a hard look at the leasing and exploration impacts to recreation. First, my decision does not authorize surface disturbance that would have effects on recreation. This would occur in subsequent permitting decisions. Recreation effects were included in SFEIS specific to projected mine plan and the specifics of exploration. Each NEPA effort has resulted in additional additions of recreation considerations brought up by Objector including range features, historic trail alignments that are not part of the NFS system and/or trails that are not proximate to the lease modification area. Objector is concerned about two non-system trails including "8152" which is apparently an abandoned range drift fence that appeared on historic maps and at one time as a user-created (identified as "UT-8152") in our database. While surface activities of any variety of the multiple uses of the NFS lands I manage may have site-specific impacts on recreational users of the GMUG, nearly the entire forest is open to cross-country foot access including roadless areas in the same and similar environments for recreational activities. My decision does not preclude the use of the surface by recreationists. See also SFEIS Section 3.16, pp 858-860 (#8419-35), and 887-888 (8419-37).

### New Information

During the objection period Earth Justice commissioned two new studies and included them as attachments to their objection. The first of these, Exhibit 63, (Analysis of the Federal Coal Lease Modifications COC-1362 & COC-67232 Final Supplemental Environmental Impact Statement and Record of Decision by Power Consulting, Inc. October 27)) was included in objection point issue directly regarding SCC and, therefore, requires no additional clarification on my part.

BLM_0051407

The second study (Raven Ridge, Exhibit 53) relates to the economic feasibility of flaring. Exhibit 53 was reviewed and found to be a reasonable way to assess flaring as a mitigation method.  However, the information provided in Exhibit 53 does not change the policy or regulatory framework for the FS decision to be made.  In other words, there is no compelling reason to require a more detailed analysis of flaring because the project would otherwise be consistent with air quality regulations.  If new incentives develop, flaring could be used to further mitigate methane releases at any future time within the scope of the proposed stipulations and would be consistent with my decision. SFEIS considers flaring as an alternative not considered in detail because it, like all other methane mitigation measures, requires detailed engineering and economic considerations that would occur later in the process. See flowchart above regarding process. My decision does not preclude the inclusion of any methane mitigation measure including flaring, but does provide the sideboards for how these activities may occur on NFS lands in the form of stipulations which address placement and requirements related to a fire plan. This report would mostly appropriately be reviewed by BLM along with their review of economic feasibility to be submitted by MCC for methane mitigation measures within one year of leasing as required by stipulation (see Appendix B).  The study does not change the analysis of impacts or my decision space, but provides additional information that is not relevant to this stage of the process.  Focusing on this particular method of methane mitigation as economically feasible may also preclude the use of emerging technology and more effective methods.

Earth Justice submitted an additional new report (November 13, 2017) to the Reviewing Officer after the close of the objection period as a supplement to their objection. My staff has reviewed this new report, Climate Science Special Report.  I would first like to note that according to page 2 of the document "It does not express any regulatory policies of the United States or any of its agencies, or make any findings of fact that could serve as predicates of regulatory action. Agencies must comply with required statutory and regulatory processes before they could rely on any statements in the document or by the USGCRP as basis for regulatory action."  While this report describes that current climate models may be erring on the low side of projected impacts it also does not contradict the analysis, uncertainties identified, and conclusions contained in SFEIS (section 3.4) regarding climate model scenarios and positive feedbacks. Report indicates that while methane is more potent than CO2, it also has a relatively short atmospheric life. Report (p. 395) concludes that for any given cumulative CO2 budget, higher emissions in the near term imply the need for steeper restrictions in the long term. Report does not require any specific methane mitigation measure or provide direction requiring it. This new report does nothing to change my decision and does not present new information significant to my decision or the analysis. My decision does not preclude any methane mitigation technology from being used only provides the sideboards for its use on NFS lands in the form of lease stipulations.

Earth Justice submitted a second additional new analysis to the Reviewing Officer after the close of the objection period (November 29, 2017) regarding the Liberty Development Project Draft EIS noting that agencies have used SCC in NEPA analyses, and that the SCC is a "useful measure to assess the benefits of CO2 reductions and inform agency decisions," despite the fact that it likely underestimates those climate damages…Objector goes on to state "These statements contradict the Forest Service's conclusion in the Lease Modifications SFEIS that the SCC is not a useful measure to assess climate impacts, that it should only be used in rulemakings, and that the SCC metric may overstate the climate costs of fossil fuel projects." First, the document referenced is a DEIS that is out for public comment until December 8, 2017. Final Liberty analysis may change before either final

BLM_0051408

analysis or a decision on that project is issued in the coming years. Notably the referenced DEIS at ES-2 states, "A number of Federal agencies are using this EIS to meet their own regulatory (and in some cases, NEPA) requirements concerning activities described within the Liberty Development and Production Plan that fall under their respective jurisdiction. The Bureau of Safety and Environmental Enforcement (BSEE), the Environmental Protection Agency (EPA), and the U.S. Army Corps of Engineers (USACE) are all adopting this EIS to satisfy NEPA requirements associated with their proposed regulatory actions concerning various activities described in the DPP." This (along with the comment address of "Federal eRulemaking Portal") suggests there is regulatory nexus for Liberty Development that we have further specified that our project is not.  Because this is a draft document and that does not pose case law considerations to my decision, this possible use of SCC protocol in it is irrelevant to and beyond the scope of my decision.

Objector alleged that we must disclose the extent to which the Proposed Action will undermine Colorado's New Executive Order on Climate Change. Colorado's new executive order (2017 Climate Action Plan) was out for public comment until November 3, 2017. Posted version does not address a reduction in coal mining. While the plan recognizes the greenhouse gas issues associated with coal mines and has encouraged electrical generation from coal mine methane (Section 5.4.1), it has only suggested in its strategies to:  1) Consult with stakeholders and our state partners in the United States Climate Alliance to identify and implement future GHG reduction strategies for meeting statewide emission goals. (Section 4.6) and 2) Aid in the commercialization of emerging electric generation technologies that reduce greenhouse gas emissions, such as coal mine methane capture, anaerobic digestion of agricultural waste, geothermal and small/micro hydro. (Section 5.5) To date, it also does not require methane use or capture from coal mines.  Since the State also is the permitting entity for coal mining and for air permits, it would be a non sequitur if the State's Plan didn't follow State permitting regulations and federal laws where they also have delegated implementation authority. The GMUG's analysis and my consent decision also do not prohibit addition of any measures to reduce GHG's in accordance with State's future goals to implement the Clean Air Act or this new Executive Order in accord with compliance with federal, state and local regulations.  Lease stipulations specifically provide the sideboards for methane mitigation/capture, but do not prescribe a specific method of mitigation. Therefore, my decision poses no effect on the State's climate goals, as written.

### Dated Forest Plan

Objector alleges that I must refrain from consenting to lease until completion of Forest Plan Revision. This is not the intent of law, regulation or policy to which I must adhere for the processing of minerals applications.  See Authorities section above. Likewise, the current forest plan remains active until replaced.  To date, I have not reviewed or approved alternatives for proposed forest plan revision that would in any manner curtail my decision space with regard to this coal leasing activity.

### Air & Climate

Objector alleges the USFS has dramatically revised its emissions estimates in the SFEIS without any explanation of the change or opportunity for the public to comment on its analysis. Commenters on the SDEIS noticed the units conversion error in the numbers displayed in the air section. The FS and BLM had corrected the units conversion error in the SFEIS (Section 3.4) and had reported direct methane emissions in terms of $CO_2e$ where applicable, as requested during comments in compliance with 40 CFR 1503.4 to

BLM_0051409

make factual corrections in response to comments received. Because agency's SDEIS methodology was re-capped in comment letters received, noting the errors, which were available to the public in the reading room and errors were noted and corrected in compliance with existing methodology, this is not significant new information under 36 CFR 218.8 that has arisen since the SDEIS that would warrant another comment period. No changes in the proposed action have occurred and with the technical/mathematical edits in the effects analysis, and the environmental effects are less than those previously analyzed not greater. This change is not significant new information which would warrant additional supplementation of the EIS analysis. 40 CFR 1502.9 (c )(1). See SFEIS Section 3.4, pp 980-982; EarthJustice Comment Letter (SDEIS # 36078) and Dr. Power's Comment letter (SDEIS #34937).

Objector alleges the USFS erroneously dismissed the significance of the direct and indirect GHG as a result of lease modifications. Referring to SFEIS (pp. 105-113, 122,127-129, 896), I believe objector is mischaracterizing the analysis for the following reasons:

- First, methane and CO2 are neither regulated under the Clean Air Act nor has a significance level been established. The only requirement is for inventory of GHGs above 25,000 metric tons CO2e annually in compliance with FY2008 Consolidated Appropriations Act (H.R. 2764; Public Law 110--161). This is important because there is no way to determine what is considered an adverse effect or significance under the law. Emissions have been quantified in direct and indirect effects for all alternatives (SFEIS 105-113).
- Second, Objector quotes parts of the Carbon Budget analysis (SFEIS pp 127-129) to try to pinpoint a contradiction that does not exist between quantified emissions (pp 105-113) and climate change where objector assumes that any incremental increase in GHGs directly relates to climate change effects. This is not necessarily the case.  SFEIS at 122 states, "Standardized protocols designed to measure factors that may contribute to climate change at the project scale, and to quantify climatic impacts, are presently unavailable. As a consequence, impact assessment of specific impacts related to anthropogenic activities on global climate change cannot be accurately estimated." While all models show impacts above zero, and I acknowledge there will be effects on climate change from the GHC emissions, I do not believe additional attempts to quantify these impacts provide information sufficiently reliable for my decision or that contribute meaningfully to the information available to the public. SFEIS (128) also explains the variables that contribute to GHG reductions including market, changes in fuel, government actions, etc. Climate change modelling uses various climate scenarios that result in different projections.  These climate scenarios (SFEIS pp. 122) have varying effects on local climate–related effects. The Carbon Budget (SFEIS 127-129) adds context of quantified emissions.
- Third, Objector confuses an emissions analysis with portions of an economic cost-benefit analysis for which was not conducted. The SFEIS does not refer to "perfect" substitution in the manner suggested by Objector.  This was not a long-term economic assumption in the SDEIS for a cost-benefit analysis (which was not conducted or an analysis of the U.S. Energy Market). It was used to calculate possible emissions at broad geographic scales for pollutants. Summarizing the SFEIS at 109-111:
  - According to U.S. EPA figures contained in the Draft US Greenhouse Gas Inventory Report (2012), nearly 95% percent of all coal consumed in the U.S. during 2010 was used in the generation of electric power. There 463 powerplants that use coal as a primary fuel source.

BLM_0051410

    o   It is reasonable to assume that existing coal power plants will continue to have emissions of criteria pollutants as long as they are in operation.

    o   Because there are no long term contracts in place, coal is sold on the spot market and is mined/delivered within 3 months after being ordered. If coal is purchased by a coal power plant it is likely that it is in turn used to generate electricity.

    o   Emissions are estimated using EPA's Emissions & Generation Resource Integrated Database (eGRID, 2014 v2)

    o   For the purposes of disclosure, estimates were provided for the total foreseeable coal to be mined under the alternative. U.S. eGRID based combustions emissions (which include criteria and non-criteria emissions) are shown in SFEIS Table 3-10 and are the result of multiplying the foreseeable total coal to be mined (cumulatively) by the derived emissions factors.

Therefore, as described in the air analysis and further described in the SEIS appendix (pp. 896), this is not an energy market analysis, it is the assumptions used to calculate the combustion emissions and criteria pollutants  that may occur from estimated coal quantities within the alternatives that would be mined/delivered  after having been purchased and  with a very high likelihood (95% based on EPA data) that coal purchased in advance by an existing powerplant would in fact be used/combusted there.

Objector alleged that we failed to take a hard look at the lease modifications' air quality impacts. In response to objector's specific allegations, the information is in the SFEIS, but not consolidated. Production emissions will remain the same for all alternatives (year to year), but the project duration will vary between alternatives. SFEIS Table 3-7 shows the West Elk emissions/year; Table 3-10 displays the coal combustion GHG/ year; Table 3-9 shows emissions from MDW development; and Table 3-11 shows the emissions related to exploration.

Objector alleged that we failed to "properly" analyze VOC emissions from methane venting. Air quality impacts related to local, conditions, construction, methane, VOCs, particulates, and combustion have been addressed. Modelled effects from oil and gas development in the Muddy Country are include in SFEIS. See SFEIS Section 3.4, pp. 597-602, 861-864 (#8419-43), 979-9787. The reasons for not analyzing methane VOC emissions are explained SFEIS (page 108). This information was deemed to be unavailable and incomplete to do a detailed analysis of methane VOC emissions in compliance with NEPA.  The State's regulatory department, Colorado Air Pollution Control Department (CAPCD), is reviewing the data, to determine a direction for future permitting of this project and other coal mines around the state under their delegated authority for implementing the Clean Air Act.

Objector alleged we are deferring our regulatory authority to other agencies. The Forest Service did not defer our regulatory authority to another agency for Clean Air Act compliance.  We have no regulatory authority to defer.  We are awaiting other agencies regulatory actions or input to move forward to provide information on future permits. At this time, MCC has State air permits are in place that control the rate of mining due to emissions in compliance with the requirements of the Clean Air Act.

Objector alleged the SFEIS failed to "properly" assess ozone Impacts. Air quality impacts related to local, conditions, construction, methane, VOCs, particulates, and combustion have been addressed. Modelled effects from oil and gas development in the Muddy Country are included in SFEIS. See SFEIS Section 3.4, pp. 597-602, 861-864 (#8419-43), 979-9787. SFEIS (p. 94) discusses the ozone in the area, and highlights that ozone may

BLM_0051411

occur in wintertime conditions.  Though VOCs are released from CMM, NOX may be a limiting factor for ozone formation.

Objector alleged that we failed to analyze and disclose the indirect effects of coal transport and combustion. SFEIS Section 3.4.2.2 (page 109) discusses the indirect emissions related to transport of coal on trains.  Table 3-10 (page 211) displays the emissions from combustion of coal.

Objector alleged that we failed to supplement Forest Plan Standards to address new air quality information. The current forest plan standard (Forest Plan III-85) is to "Comply with State and Federal air quality standards".  This is not a dated standard as it allows for any update in State or Federal regulation. The existing plan will remain in effect until it is replaced by a Revised Forest Plan.

Objector alleged that we failed to take a hard look at the climate impacts of the proposed action further arguing (objection p.54) that the USFS acknowledges that extending the mine life could have substantial global impacts by referencing language from SFEIS (pp. 255-56; Roadless Characteristics). This SFEIS language was taken out of context and not representative of the overall climate impacts discussions in the SFEIS. Climate change was addressed throughout the SFEIS although not in the SCC manner requested by objector.

## Subsidence

Objector alleged that we failed to take a hard look at the impacts of subsidence. There are numerous locations in the SFEIS where subsidence is addressed including private lands and adjacent federal lands. Impacts from subsidence is addressed for every resource in the SFEIS. Lease stipulations (Appendix B) specifically relate to the monitoring and mitigation of subsidence. These lease modification stipulations originated from the parent leases, so would cover adjacent federal land where subsidence may also occur. I have no decision authority over private lands; however, similar subsidence requirements would occur as part of the State permitting process. There is also documentation in the record for the different subsidence estimates in the 2012 FEIS and the 2017 SFEIS. Specific to water, SFEIS (Section 3.8 and pp. 21-38, 990-991) addresses effects on surface and ground water sources. Lease stipulations protect water resources on federal lands, state permitting further protects water resources on federal and private lands. To the extent known where subsidence may occur from mining on private lands it is shown on maps; roads exist on private that can be used for exploration and/or mining. Existing road on private crosses South Fork Prong Creek as displayed on maps.

## Heritage Resources

Objector alleged that we failed to take a hard look at the impacts to heritage resources. The SFEIS addresses impacts to cultural resources. Lease stipulations protect cultural resources. Stipulations (SFEIS and here in Appendix B) are very clear that cultural resource inventories must be completed prior to ground-disturbing activities and that compliance with mitigation measures is required. Some surveys have been completed for previously authorized surface disturbance for exploration in 2013.  The results of those surveys have been disclosed. Further, my consent decision does not authorize ground-disturbing activities; those would occur later in the process. However, the same surveys that have already been completed would apply if BLM authorizes exploration consistent with submitted exploration plan analyzed under the proposed action.

BLM_0051412

### *Alternatives and Stipulations*

Objector alleged NEPA mandates agencies analyze potential mitigation measures. My stipulations are those intended to protect the surface resources. Stipulations that have been applied by me and will apply to subsequent agency actions have been analyzed in detail as part of the proposed action. My decision allows for the application of other site-specific conditions of approval at the appropriate times and does not preclude the use of methane mitigation measures in the future. Furthermore, because the project would be consistent with the existing regulatory framework, there is no compelling reason to constrain my decision to specific methods proposed by Objector when other still untested/unknown methods would also continue to be available for permitting and implementation in the future.

Objector alleged that we failed to analyze an alternative that would make available less than 16.8 million tons of coal. First, this allegation is a mischaracterization because the coal tonnage includes coal resources already under lease and private coal resources that are not part of my or BLM's decision spaces included in the No Action Alternative. There is no NEPA requirement to develop alternatives with specific quantitative degrees of estimated outputs. Estimated outputs are provided as a baseline and method of comparison with the existing lease outputs (No Action) and would also be subject to adjustment by BLM of the lease modifications themselves in their subsequent decision, as BLM deems appropriate, or from the from results of exploration which would help quantify the coal resource present. See also SFEIS pp. 975-976.

Objector alleged that we failed to analyze an alternative that would eliminate the southern portion of proposed lease modification COC-67232. This alternative is a subset of the proposed action. The alternative does not meet the purpose and need which is to prevent bypass of federal coal resources. BLM retains full discretion to reduce the lease modification sizes in their subsequent leasing decision; however, the surface effects would still remain within the bounds of alternatives disclosed in the EIS. Further, this alternative is captured by the design of alternative 4 which excludes the entire COC-67232 modification. See also SFEIS at 958.

Objector alleged that we failed to analyze an alternative that requires the use of helicopters for exploration. This alternative, brought forward in the SDEIS and SFEIS (Section 2.3.10.9 and pp 974-975), was considered but eliminated from detailed study because it is ineffective and technically infeasible, and would not meet the purpose and need for exploration. Further, exploration is beyond the scope of my decision.

Objector alleges analyze the reasonable alternative of considering the lease modifications as a request for one, new, 1,720-acre lease. Lease modifications are being considered in response to two separate applications as is permitted by law and regulation. The lease modification tracts have been delineated (and modified) by BLM prior to being sent to the GMUG for consent. Each application is tied to existing rights (of different owners of record) and submitted and processed by BLM under the authority of the Mineral Leasing Act as amended by the Energy Policy Act of 2005. There are some administrative distinctions in BLM's regulations and laws between the processes for lease modifications (which BLM has already determined is non-competitive here) and competitive leasing as would be the case for a new lease. Even if BLM's administrative and regulatory process were different for leasing these lands as a single new lease, environmental effects on NFS resources and the stipulations deemed necessary for protection of NFS lands would be identical to those of the proposed action I have selected. There is no range of alternatives here that has not been covered by the existing analysis.

BLM_0051413

Objector alleged that we failed to analyze stipulations to protect old growth forest and existing mature forest further citing that we failed to inventory the area incompliance with the Forest Plan. Initial comments from objector included old growth then morphed to also include mature forests. GIS data (FS Veg) from corporate databases was used to provide stand structure which is used to determine old growth and mature stand characteristics. No old growth is present based on the first screening criteria (large diameter trees) thus project level inventory as required by the Forest Plan (III-9a) would not apply. The Forest Plan (III-9a) does not eliminate projects in old growth, but has some silvicultural requirements for old growth retention at the fourth-order (5000-20,000 acres) watershed scale. Timber cruise plot data collected for exploration in 2013 (project file) provides the required "inventories" for old growth and validates the GIS layer. Results are still negative for old growth and marginal for mature forest.  As a result, additional stipulations were not necessary to protect attributes that are 1) not present and 2) not required to be protected in entirety by the Forest Plan. See also SFEIS at 62-63, 646-647, 713-715, 828, 878-880, 956-880.

Objectors allege that we should require various methane mitigation measures or alternatives. SFEIS addresses all the methods proposed in alternatives not considered in detail. My decision does not preclude any type of methane mitigation as long as the sideboards of the stipulations (Appendix B) are met.

Objectors allege I should consider a mitigation measure to ensure revegetation by fencing out livestock for one season. Fencing stipulation has been addressed in response to comments in SDEIS (pp. 703-704) and SFEIS (p 978). It is not being carried forward because it is site-specific and could impact livestock management or other activities. However, this may be a strategy that is employed as a site-specific condition of approval in subsequent permitting processes.

Objectors allege the SFEIS failed to analyze reasonable alternatives that would reduce surface impacts from exploration, including eliminating exploration hole 10. Proposed action includes exploration hole 10. Based on BLM's 2013 EA, an alternative considered but eliminated from detailed study (SFEIS and SDEIS section 2.3.12) addresses removal of all of the second season exploration drill holes which includes hole 10. Objector modified his comment on the SDEIS comments to only include the exploration hole 10. Neither of commenter's alternative versions meets on-lease exploration purpose and need (40 CFR 1502.13) for the proposed action. SFEIS Alternative 4 analyzes in detail an opportunity to reduce surface impacts from exploration and/or mining by disclosing the impacts of consenting to modification of one lease but not the other; the lease excluded in Alternative 4 includes the potential location of exploration hole 10. Forest Service has no authority to approve exploration.

### Visuals

Objector alleged that we failed to take a hard look at the lease modifications' impacts to visual resources. I have reviewed the long history of visual resource analysis.  SFEIS revised the visuals section to comply with the current Forest Plan not the visuals assessment that was completed for the abandoned Forest Plan Revision effort ~10 years ago in response to requests for maps from objector. When the previous project documents were prepared, we were unable to locate original Mylar overlays (~1983 vintage) or metadata on the visuals layer used which, when located, indicated that the scenery designations applied to proposed management areas for forest plan revision in 2005 which was never implemented. Visual Quality Objectives (VQOs) tier to Recreation Opportunity Spectrum (ROS) in the current Forest Plan. The Forest Plan established ROS of "roaded

BLM_0051414

natural for project area". The directive reference (FSM 2311.11 Exhibit 1) identifies partial retention or modification of visual resources as being consistent with roaded natural ROS. The CRR did not amend or change the current Forest Plans with regard to visuals. This project is consistent with the ROS established for the Forest Plan for the project area and with the CRR because of the implementation of lease stipulations which require post-lease roads to be temporary.

## Wildlife & ESA

Objector alleged that we failed to disclose impacts to wildlife. Impacts on wildlife have been addressed in the SFEIS and all previous NEPA documents. Analysis includes effects on private lands within HUC 6 watershed which is approximately the same as the Mount Gunnison Lynx Analysis Unit. Stipulations protect wildlife. SFEIS in section 3.10 explains why not every species that has potential to be present within the project area is analyzed although the unsuitability criterion analysis in SFEIS appendix also mentions some of these species. The analysis of TEPS, R2 FS Sensitive, MIS, and BOCC cover a wide variety and breadth of habitat requirements and effects to adequately disclose effects to wildlife species. We are only required to analyze effects to species with special status that may be affected by the proposed action.  The 40,000 + acre watershed does not include the Muddy Country which is approximately 20 miles away.

Objector alleged that we failed to take a hard look at the lease modifications cumulative impact. With regard to wildlife, Objector had concerns about using an LAU for all species in the Cumulative Effects analysis and stated that it is an "arbitrary and capricious" boundary to use for all species. The area used is actually the watershed boundary which happens to coincide with the old LAU boundary. A watershed boundary is a good, defined boundary to analyze cumulative effects for a variety of species, per FS guidance and directives. This is described in the vegetation section of the SFEIS as being the same. The Muddy Country which objector tries to force us include in cumulative effects is over 20 miles away and the oil and gas projects there are not in the same watershed. The Muddy Country (i.e., the oil and gas) projects have been included for applicable resources such as air quality; these are described in SFEIS at Section 3.2.11.

## Other

Objector alleged that we failed to disclose irreversible or irretrievable commitments of resources from the action alternatives. While objector may disagree with the agencies analysis, the SFEIS (pp 288-289, 665-667, 999, 1019) discloses irreversible and irretrievable commitments of resources.

Objector alleged that we failed to disclose the direct, indirect and/or cumulative Impacts of mining on private and adjacent federal land. Effects from on private land and adjacent federal lands have been disclosed throughout NEPA documents. Maps include private and adjacent federal lands lands including vegetation, water courses, subsidence, existing roads. For example, a key word search on "private" results in approximately 270 locations and searching on "private lands" results in about 150 locations in the SFEIS. Similar is true about the parent leases where the affected adjacent federal lands are located.

Objector alleges that the proposed action is prohibited under the Energy Policy Act of 2005. Energy Policy Act of 2005 (Subtitle D-Federal Coal Leases, Section 431) amended Section 3 of the Mineral Leasing Act (30 U.S.C. 203) which allows for modifications of leases up to 960 acres which do not exceed the acreage of original lease; application and approval of both leases modifications meet the requirements of the act. These lease

BLM_0051415

requirements meet the amended requirement of 30 U.S.C.§ 203(a)(3). BLM (GER/MER, project file) has performed tract delineation in accordance with 43 CFR 3425.1-9, the Energy Policy Act of 2005 and Mineral Leasing Act (30 U.S.C. 203) to prevent bypass of federal reserves. BLM has also determined this is a non-competitive leasing action. Parent leases, while operated by the same mine, are owned by different entities.   BLM is responding to two applications (project file) not one. There is no evident violation of the Energy Policy Act in my consent decision.

Objector alleges that we failed to properly disclose impacts to streams and wetlands. SFEIS analysis addresses impacts to streams and wetlands appropriate to lease modification decision. Lease stipulations protect water resources on federal lands, state permitting further protects water resources on federal and private lands. Objector is requesting much more detailed information that will be addressed in later in a mine plan, during layout, etc. To the extent known where subsidence may occur from mining on private lands it is shown on maps; roads exist on private that can be used for exploration and/or mining. An existing road on private crosses South Fork Prong Creek. Roads and other disturbances for exploration are shown on maps.

> *Technical errata to SFEIS: While it appears there is a map (SFEIS p 154) discrepancy with regard to a portion of South Prong Creek showing as perennial vs. text on pg 152 stating that South Prong is ephemeral; it should only be clarified that the text on 152 is based on monitoring data and should prevail.*

## Implementation Date

This decision may be implemented immediately. In relation to the Forest Service role in this project as the federal surface land management agency, my consent will be formally transmitted to BLM in compliance with agency processes. BLM decision making relating to leasing these lands and exploration may occur at their convenience upon receipt of consent/concurrence.

## Contact

For more information about this project, contact either Niccole Mortenson phone 406-329-3163 or nmortenson@fs.fed.us or Levi Broyles at 970-527-4131 or lbroyles@fs.fed.us.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require Alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, DC 20250-9410, or for Forest Service issues please call, toll free, (866) 632-9992 (Voice). TDD users can contact USDA through local relay or the Federal Relay at (800) 877-8339 (TDD) or (866) 377-8642 (relay voice users). USDA is an equal opportunity provider and employer.

BLM_0051416

## Appendix A- Decision Map



BLM_0051417

# Appendix B- Stipulations for National Forest System Lands Federal Coal Lease COC-1362 & COC-67232

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Cultural and Paleontological Resources** | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures.  Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:<br><br>• Contact the FS to determine if a site specific cultural resource inventory is required. If a survey is required then:<br><br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance.  The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations.  An acceptable inventory report is to be | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures.  Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:<br><br>• Contact the FS to determine if a site specific cultural resource inventory is required. If a survey is required then:<br><br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance.  The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations.  An acceptable inventory report is to be | Use language from parent leases (required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture.) |

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted. | submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted. | |
| | • Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate. | • Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate. | |
| | • The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest discovered as a result of surface operations under this license, and shall leave such discoveries intact | • The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest discovered as a result of surface operations under this license, and shall leave such discoveries intact | |

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | until directed to proceed by FS and BLM. | until directed to proceed by FS and BLM. | |
| **Endangered or Threatened Species** | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats. | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats. | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |
| | The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resource specialist approved by the FS. An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resource specialist approved by the FS. An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | |
| | If there is reason to believe that Forest Service Sensitive species, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator | If there is reason to believe that Sensitive, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator shall be | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |

BLM_0051420

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted.  The inventory shall include species or groups of species identified by the FS, and will be conducted to by a qualified specialist.  A report of findings will be prepared and provided to the FS.  A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance consistent with the Forest Plan.   The cost of conducting such inventory, preparing reports and carrying out mitigation measures shall be borne by the Lessee/Operator. | required to conduct an intensive field inventory of the area to be disturbed and/or impacted.  The inventory shall be conducted by a qualified specialist, and a report of findings prepared.  A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance.   The cost of conducting such inventory, preparing reports and carrying out mitigation measures shall be borne by the Lessee/Operator. | |
| Canada Lynx | To comply with the USDA Forest Service Conservation Agreement with Fish and Wildlife Service, to follow the conservation measures in the Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000), the following special constraints will apply if surface use on the lease is proposed in lynx habitat:<br><br>• Winter access will be limited to designated routes.<br>• Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances: | To comply with the Canada Lynx Assessment and Strategy (Ruediger *et al.* 2000), the following special constraints will apply if post-lease surface use is proposed in lynx habitat:<br><br>• Winter access will be limited to designated routes.<br><br>Further, should post-lease operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances:<br><br>• Remote monitoring of the development sites and facilities may be required to reduce snow compaction. | To comply with the GMUG Forest Plan 2008 amendment, the following special constraints will apply if surface use on the lease is proposed in lynx habitat:<br><br>• Winter access will be limited to designated routes.<br><br>Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints will apply:<br><br>• Remote monitoring of the development sites and facilities will be required to reduce snow compaction.<br>• A reclamation plan (e.g. road reclamation and vegetation |

BLM_0051421

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | • Remote monitoring of the development sites and facilities may be required to reduce snow compaction. <br> • A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required. <br> • Public motorized use on new roads constructed for project-specific purposes will be restricted. <br> • Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives. <br> • New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers. | • A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required. <br> • Public motorized use on new roads constructed for project-specific purposes will be restricted. <br> • Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives. <br> • New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers. <br> • If post lease surface use occurs in lynx habitat, the Lessee will be required to submit an annual report to the USDA-FS and USFWS of all activities having occurred in lynx habitat. | rehabilitation) for sites and facilities that promotes the restoration of lynx habitat will be required. <br> • Public motorized use on new roads constructed for project-specific purposes will be restricted. <br> • Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives. <br> • New permanent roads will not be built on ridge tops or in saddles, if possible, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers, if possible. |

BLM_0051422

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Raptors** | For raptors (except American kestrel) the Lessee will be required to:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ¼ mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>• No surface activities will be allowed within 1-mile radius of active bald eagle or peregrine falcon nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. | For raptors (except American kestrel) the Lessee will be required to:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ½-mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. | Use combined language from COC-67232 and COC-1362 which reflects Forest Plan standards as well as guidelines from the Biological Evaluation for this project:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ½-mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>• No surface activities will be allowed within 1-mile radius of active bald eagle or peregrine falcon nest sites * between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>(* No bald eagle or peregrine falcon nest site habitat has been identified within the lease modifications as indicated in the Biological Evaluation prepared for this analysis.) |
| **Big game winter range** | In order to protect big game wintering areas, elk calving areas, and other key | In order to protect big game wintering areas, elk calving areas, and other key | Use language from parent leases. |

BLM_0051423

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year. Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year. Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | |
| Water depletions | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | Based on the CRR Section 7 consultation effort for the CRR's NFCMA in 2016, the Forest Service took on the responsibility for reinitiating consultation if minor water depletion caps were exceeded. The Forest Service wants to ensure the lessee provides the necessary information from monitoring and reporting to determine if minor water depletion caps are exceeded, and, in the highly unlikely event that the depletion caps were exceeded, the lessee would meet any additional conservation measures the USFWS might require. This updated stipulation provides clarification to the process that has been occurring on the parent leases regarding water depletion. Changes to stipulation are in italics.<br><br>In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, *the surface* |

BLM_0051424

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | | *management agency* must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. *The lessee shall monitor and report all depletions to the Forest Service. Notwithstanding the fact that the surface management agency has the obligation to consult, the Lessee has the obligation to comply with all appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin in the event the depletion threshold is exceeded and additional reasonable and prudent actions are required.* |
| Breeding birds | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance as prescribed by the Forest Service. | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance. | Use language from COC-1362 parent lease on both modifications. |
| Geologic hazards | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential, or on slopes which exceed 60%. | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential. | Use language from parent lease COC-1362 on both modifications. |
| | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The | Use language from parent leases. |

BLM_0051425

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. | interdisciplinary team could include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. | |
| Baseline Information | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources. Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology. Baseline studies are critical to the success of future observation and assessment of mining related effects on resources. | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources. Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology. Baseline studies are critical to the success of future observation and assessment of mining related effects on resources in the Dry Fork lease tract. | Use language from parent leases. |
| Monitoring Program | The operator/lessee would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts. The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and hydrology identified in the baseline assessment to mining activities on the lease area. The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | The operator/lessee of the lease tract would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts. The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and hydrology identified in the baseline assessment to mining activities in the lease tract area. The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | Use language from parent leases. |
| Riparian, wetland or floodplain | Surface use or disturbances (except for surface subsidence and resource | Surface use or disturbances (except for surface subsidence and resource | Use language from parent leases. |

BLM_0051426

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | monitoring purposes defined in the approved mining permit) will avoid riparian, wetland or floodplain areas, and a buffer zone surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent with that defined in the Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | monitoring purposes defined in the approved mining permit) will not be permitted in riparian, wetland or floodplain areas, or within a buffer zone surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent with that defined in the Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | |
| Subsidence | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | Use language from parent leases. |
| | The Lessee/Operator shall be responsible for monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation, if needed, would be performed at the | The Lessee/Operator shall be required to perform the following with respect to monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation will be performed at the | As parent lease for COC-67232 deals specifically with an irrigation ditch on that lease, use language from COC-1362 on both lease modifications. |

BLM_0051427

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | Lessee's expense. These requirements will be coordinated with the District Ranger and the Special Use Permittee. | Lessee's expense. The Lessee may request variations on timing for surveys, monitoring and reporting. Approving such requests would be at the discretion of the District Ranger. | |
| | | a. Baseline condition surveys of existing facilities will be completed the Fall following award of lease. Reports of this survey will be deliverable to the Forest Service by December 1 of that same year.<br>b. In consultation with the Special Use Permittee and the Forest Service, install equipment to monitor flow on water conveyance facilities during the Fall following award of lease. Flow monitoring shall commence the following spring and continue until one year post mining. Flow data shall be provided to the Forest Service annually by December 1.<br>c. A Surface Facility Monitoring and Mitigation Plan (Plan) will be submitted to the Forest Service for review and approval not later than 12 months prior to scheduled undermining. The Plan will detail measures to be taken to monitor, repair and mitigate subsidence effects of the facilities during actual mining and for one year. | |
| **Roadless** | The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with | All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable | On the following lands within the Sunset CRA, surface operations incident to underground coal mining are subject to regulations in 36 CFR 294, subpart D: |

BLM_0051428

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | the rights granted by the Secretary of Interior in the permit. The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy of the NFS not authorized by the permit/operation approved by the Secretary of the Interior.<br><br>Federal Coal Lease C-1362, as modified October 2001<br><br>All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease.<br><br>Legal descriptions are approximate. Locations of any proposed surface use would be verified for relationship to IRA boundaries using site-specific maps if/when surface operations are proposed. | at the time any roads may be proposed on the lease.<br><br>All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease. | • All roads that may be constructed must be temporary.<br>• All temporary road construction must be consistent with applicable land management plan direction<br>• Road construction may only occur if motorized access has been deemed infeasible by the responsible official; unless a temporary road is needed to protect public health and safety in cases of an imminent threat of flood, fire or other catastrophic event that, without intervention, would cause the loss of life or property<br>• Temporary road construction must be completed in a manner that reduces effects on surface resources, and prevents unnecessary or unreasonable surface disturbance<br>• All temporary roads must be decommissioned and affected landscapes restored when it is determined that the road is no longer needed for the established purpose<br>• All temporary roads must prohibit public motorized vehicles (including off-highway vehicles) except: |

BLM_0051429

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | | I. Where specifically used for the purpose for which the road was established; or <br> II. Motor vehicle use that is specifically authorized under a Federal law or regulation. <br><br> For any linear construction zone (LCZ) over 50 inches wide used to install pipelines, the Regional Forester must determine that they are needed, and the responsible official must determine that motorized access without a linear construction zone is not feasible. <br><br> • Construction and use of linear construction zones must be consistent with the GMUG Forest Land and Resource Management Plan, and may be no wider than their respective intended uses. <br> • Installation of linear construction zones will be done in a manner that minimizes ground disturbance. <br> • Reclamation of a linear construction zone will not diminish, over the long-term, roadless area characteristics. All |

BLM_0051430

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | | authorizations approving the installation of linear facilities through the use of a linear construction zone shall include a responsible official approved reclamation plan for reclaiming the affected landscape while conserving roadless area characteristics over the long-term. Upon completion of the installation of a linear facility via the use of a linear construction zone, all areas of surface disturbance shall be reclaimed as prescribed in the authorization and the approved reclamation plan and may not be waived. |
| Visuals | n/a | n/a | Within the lease modification areas, the lessee will work with the District Ranger and his/her representative to see that all mine operations are situated on the ground in such a manner that reasonably minimizes impacts to the scenic integrity of that landscape as prescribed in the Forest Plan. |
| Methane use | n/a | n/a | If flaring or other combustion is prescribed as part of any future mitigation measure, lessee will be required to submit a fire prevention and protection plan subject to responsible Forest Service official for approval. |

BLM_0051431

**BLM-specific Lease Stipulations for Protection of Non-Mineral (Surface) Resources**

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| Methane Flaring, Capture/Use or other alternatives to venting | Sec. 3. Notwithstanding the language in Sec.2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.<br><br>Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order | Sec. 3. Notwithstanding the language in Sec.2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.<br><br>Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order | "Section 3.   Notwithstanding the language in Section 2 of the lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the waste mine methane for the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "waste mine methane" means any combustible methane gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations and that must be vented to protect the health and safety of the mine workers.<br><br>Section 4.  Notwithstanding any other provision of this lease, nothing herein waives, alters, or amends lessee's right to vent, discharge or otherwise dispose of waste mine methane as necessary for mine safety or lessee's obligation to mine the coal deposits consistent with Federal and state law and regulation and with safety requirements contained in permits applicable to underground mining operations subject to this lease. Lessee is not obligated or required to capture for use or sale waste mine methane that would otherwise be |

BLM_0051432

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| | to abate the potential hazard to the health or safety of the coal miners or coal mining activities.  In the event of a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.

Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES- Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease.  For purposes of this lease, the term "capture for use or sale" shall not include and the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine.  When not inconsistent with any express provision of this lease, the | to abate the potential hazard to the health or safety of the coal miners or coal mining activities.  In the event of a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.

Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES- Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease.  For purposes of this lease, the term "capture for use or sale" shall not include and the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine.  When not inconsistent with any express provision of this lease, the | vented or discharged if the capture of waste mine methane, independent of the activities related to mining coal, is not economically feasible, or if the waste mine methane must be vented in order to abate the potential hazard to the health or safety of the miners or mining activities.  In the event of a dispute between the lessor and the lessee as to the economic or technical feasibility of capturing the waste mine methane for use or sale, lessor's remedy as a prevailing party is limited to recovery of compensatory royalties on the waste mine methane not captured for use or sale by the lessee. Lessee retains the right to continue all mining activities under the lease, including venting waste mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.

PART II. TERMS AND CONDITIONS (c)   WASTE   MINE   METHANE OPERATIONS  AND  ROYALTY  – Notwithstanding the language in Part II, Sec.2(a) of this lease, the royalty will be 12.5 percent of the value of any waste mine methane that is captured for use or sale from this lease.  For purposes of this lease, the term "capture for use or sale" does not include, and the royalty will not apply to, waste mine methane that is vented, or otherwise discharged and not captured, for the economic feasibility or safety reasons described in Part I, |

BLM_0051433

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| | lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable reporting and gas measurement now or hereinafter in effect

SEVERABILITY- In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation. | lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable reporting and gas measurement now or hereinafter in effect

SEVERABILITY- In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation. | Section 4 of this lease.  Lessee will have no obligation to pay royalties on any waste mine methane that is used on or for the benefit of mineral extraction at the (insert mine name here) coal mine.  When not inconsistent with any express provision of this lease, this lease is subject to all the rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and the lessor's rules, regulations, notices, and orders related to applicable reporting and gas measurement now or hereinafter in effect.

SEVERABILITY – In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable, or illegal in any respect, the validity, legality, and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove, or otherwise process and dispose of the coal deposits in, upon, or under the lands described in this lease, including the right to vent or otherwise discharge waste mine methane for safety purposes as required by applicable laws and regulations. |

BLM_0051434

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| | | | West Elk Mine shall provide to BLM an updated report on the economic feasibility of capturing or flaring the mine's mine methane for beneficial use or abatement, and should provide it to BLM no later than 1 year after the modification is approved. |

BLM_0051435

BLM_0051436

# ENVIRONMENTAL ASSESSMENT

# GUNNISON TRAVEL INTERIM RESTRICTIONS

Portions of Gunnison, Hinsdale, Delta,
Montrose, and Saguache Counties
Colorado



## AUGUST, 2000

*Responsible Officials:*

**USDA FOREST SERVICE**
Robert L. Storch, Forest Supervisor
Grand Mesa, Uncompahgre & Gunnison
National Forests
2250 Highway 50
Delta, CO 81416



**USDI BUREAU OF LAND MANAGEMENT**
Barry Tollefson and Allan Belt
Representing Gunnison and Uncompahgre
BLM Field Offices
216 N. Colorado Avenue
Gunnison, CO 81230



*For more information please contact:*

Jim Dawson, Project Leader/District Ranger
Gunnison Ranger District
216 N. Colorado Avenue
Gunnison, CO 81230
970-641-0471

BLM_0051437

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, DC  20250-9410 or call (202) 720-5964 (voice and TDD).  USDA is an equal opportunity provider and employer.

BLM_0051438

# TABLE OF CONTENTS

## CHAPTER I

Introduction......................................................................... 1

Purpose and Need/Proposed Action............................................. 1

Specific Proposed Interim Restriction.......................................... 10

Decisions to be Made............................................................. 13

Scoping Issues.................................................................... 14

## CHAPTER II

Alternatives, Including the Proposed Action.................................. 18

## CHAPTER III

Affected Environment/Environmental Consequences of Alternatives........... 23

Introduction....................................................................... 23

Effects on soils, water, and vegetation....................................... 24

Effects on recreation............................................................ 31

Effects on roadless areas....................................................... 38

Effects on wildlife............................................................... 41

Effects on aquatic resources/fisheries......................................... 51

Effects on threatened, endangered, proposed, and sensitive species........... 54

Effects on cultural/heritage resources......................................... 58

Effects on air quality........................................................... 61

Effects on local economies...................................................... 62

Effects on transportation systems.............................................. 65

Effects on lifestyles and traditional patterns of use of the public lands.......... 70

Law enforcement................................................................. 74

Monitoring........................................................................ 78

## CHAPTER IV

List of Preparers/Publics Contacted............................................. 80

Bibliography...................................................................... 88

## APPENDICES

Appendix A --Glossary........................................................... 91

Appendix B – Threatened, Endangered, Proposed, and Sensitive Species..... 96

Appendix C – Motorized and Mechanized Vehicle Restrictions
              on BLM-Managed lands............................................ 99

# MAPS

**1.) Road and Trail Inventory- Gnnnison Analysis Area: East Half**

**2.) Road and Trail Inventory- Gunnison Analysis Area: West Half**

BLM_0051440

# CHAPTER I

INTRODUCTION•PROPOSED ACTION•PURPOSE AND NEED
•DECISIONS TO BE MADE•SCOPING/ISSUES

## INTRODUCTION

This Environmental Assessment (EA) documents the public involvement and environmental analysis for a proposal to restrict travel on the Gunnison National Forest, including the Gunnison and Paonia Ranger Districts, as well as portions of the Public Lands managed by the Bureau of Land Management's (BLM) Uncompahgre and Gunnison Field Offices. This EA was prepared jointly by the Forest Service and BLM.

Map 1 is a vicinity map and Map 2 portrays the area affected. Also, attached to this EA is a ½ inch-to-the-mile scale map indicating the affected area and showing inventoried roads and trails (see Transportation section of Chapter 3 for discussion). In this EA, the National Forest System lands (managed by the Forest Service) and public lands (managed by BLM) being considered will be referred to as the Gunnison Travel Analysis Area, abbreviated GTAA.

> **GTAA:**
>
> **Gunnison Travel Analysis Area**

## PURPOSE AND NEED FOR THE PROPOSAL /PROPOSED ACTION

Much of the GTAA is open to motorized and mechanized vehicle travel off established roads and trails. Outside of Wilderness areas and other restricted areas, off-route wheeled-vehicle travel is currently allowed on over 1.5 million acres (72%) of the 2.2-million acre GTAA.

|  | **Forest Service** | **BLM** | **Total** |
|---|---|---|---|
| **Acres in GTAA** | 1,524,489 | 651,646 | 2,176,135 |
| **Acres open to travel off roads and trails** | 960,546 | 603,884 | 1,564,430 |
| **Percent of lands open to travel off roads and trails** | 63% | 93% | 72% |

During scoping we called this our "green to yellow" proposal because open travel areas on the Gunnison National Forest (NF) and BLM-Gunnison Field Office lands are shown on the current Gunnison Basin Area Visitor Map in green and restricted areas are shown in yellow and pink. The map does not differentiate between open and restricted areas for lands managed by the BLM-Uncompahgre Field Office. A large transportation system,

BLM_0051441

comprised of approximately 2,600 miles of road on NF and 1,533 miles on BLM, and 1,300 miles of National Forest trails, is currently in place.

In the last decade, unanticipated increases in motorized use has occurred on these public lands. The popularity of off-highway vehicles (OHVs), including sport-utility vehicles and motorcycles has steadily increased, while the popularity of ATVs (all-terrain vehicles, also known as "four-wheelers") has increased dramatically. Users of these smaller four- and six-wheel ATVs have gained and created access to areas that were until now inaccessible by full-sized 4WD vehicles. In addition, mountain biking in certain areas has increased dramatically. Riders of these aggressively treaded bicycles are pioneering routes of their own and impacting fragile environments. The capability of these vehicles to go nearly anywhere, coupled with their increasingly widespread use, has resulted in hiking and game/livestock trails being converted to ATV trails. New routes are being pioneered in places where none have ever existed before. This proliferation of access is changing the face of public lands.



*Photo 1. An ATV using one of the many ATV trails in the GTAA.*

Conflicts among users have developed. The recreation experience sought by some is incompatible with area-wide access by all. Increased travel and new access to remote areas is altering the recreation experience. It is also affecting wildlife, soil, water, and vegetation resources. Under the current travel management direction, motorized and mechanized use in open travel areas has become increasingly difficult to manage.

While the Grand Mesa, Uncompahgre, and Gunnison National Forests (GMUG) will soon start revising its Forest Land and Resource Management Plan, a decision on this plan may not be reached for several years. Both the public and Forest Service field personnel have expressed a desire for some interim direction to help curb increasing resource degradation and enhance the recreation experience within the GTAA. Decisions made by the Forest Service through this process will be consistent with the existing Forest Plan, and will require no amendment.

The BLM has identified the same need to address this issue. Decisions made by BLM to change existing OHV designations will require amendments to the existing Resource Management Plans (RMP) for the Gunnison and Uncompahgre Field Offices. Notice to that effect has been published in the Federal Register and is discussed in more detail below under Public Involvement.

BLM_0051442

The Proposed Action

Where not already restricted, the Forest Service and BLM are proposing to eliminate cross-country, off-route travel by all wheeled modes of travel; that is, to limit all OHV (ATVs, motorcycles, and four-wheel-drives) and mountain bike use to existing, established routes on the Gunnison National Forest and specified BLM areas. Current use of existing established roads and trails would be allowed to continue. Map 2 shows the area where new travel restrictions would apply. A more detailed definition of "existing routes" is provided in the following pages.

This proposal, if implemented, would be Interim Direction, until such time as route-by-route travel planning is undertaken.

The proposal would NOT affect:
- Congressionally designated areas, such as the West Elk, Raggeds, and Powderhorn Wildernesses and the Fossil Ridge Recreation Management Area. (These are already restricted-travel areas.),
- Private or State lands,
- Areas where travel is currently restricted to specific designated roads and trails through previous travel- or resource-management decisions,
- Existing roads or trails, or
- Snowmobiles, snowcats, and other over-the-snow travel.

> NOTE TO READER: Acronyms and terms you may not be familiar with are defined in the Glossary (Appendix A).

BLM_0051443

BLM_0051444





BLM_0051445

## PURPOSE AND NEED

The agencies believe the proposed restriction of off-route, cross-country travel is necessary to prevent the proliferation of new, user-created routes until more detailed travel planning is completed. There is an immediate need to protect the resource and user experience. These conclusions are based on field observation by agency personnel, and increasing comments and complaints by the public. Listed below and briefly discussed are more specific elements of the need to which this proposal is responding.

A.   There is a need to make management on the GTAA more consistent with National, Forest Plan, and BLM RMP direction for maintaining soil and water quality.   The goal of maintaining and restoring healthy ecosystems and watersheds is not being met.



B.   There is a need to curtail the development of user-created motorized and mountain bike routes, specifically   the conversion of single-track routes to ATV routes, and then to full-size vehicle routes (see photo 12).

*Photo 2.  Damage to open meadow has occurred as OHVs have created numerous tracks to avoid wet areas.*

User-created routes:

- create ruts, which in turn causes a loss of vegetation, accelerated soil erosion, and stream sedimentation;
- damage fragile environments such as alpine tundra, meadows, and riparian areas;
- are not properly designed or constructed with appropriate alignments, grades, and drainage structures;
- have damaged sensitive plants and/or sensitive plant habitat;
- fragment and degrade wildlife habitat;
- increase potential for spread of noxious weeds.

C.   There is a need to efficiently and cost-effectively manage public lands transportation systems. Funding is not adequate to maintain the transportation system now in place.   By allowing user-created routes to increase we are, by default, increasing the transportation system and maintenance costs.

D. There is a need to manage travel to accommodate and protect the opportunity for quality recreation experiences, including hunting.   Hunting is one of the largest

BLM_0051446

recreation uses on these public lands and the quality of hunting experiences and success rates are being degraded by ATV off-route use during hunting season. Wildlife habitat quality (habitat effectiveness), big game movement, and the quality of the hunting experience are all being adversely impacted.

E.   There is a need to reduce confusion over existing travel management direction, reduce conflict among users in backcountry areas, and ensure public safety. Complaints by all types of users are increasing regarding the current travel situation. Unrestricted OHV use increases safety concerns and reduces opportunities for people who enjoy non-motorized activities, such as hiking, wildlife viewing, and horseback riding.

F.   There is a need to keep big game on public lands as long as possible in the fall, thereby minimizing conflicts with private landowners.  OHV use often displaces elk and deer from public to private lands, reducing hunting opportunities and creating conflicts with landowners and livestock.  Big game animals are being moved off public lands earlier and earlier each year by the pressure of human use.  Winter range habitats are being depleted before the real winter season, and private lands are being overused.



G.   There is a need to manage public access to prevent both intentional and inadvertent ATV encroachment into Wilderness.   This encroachment is occurring at places other than signed portals.  Restricting ATVs to existing routes would address this.

In summary, there is a widely acknowledged and significant need to manage motorized/mechanized travel within the GTAA.  This need translates into the opportunity to better manage and protect natural resources and to better provide for quality recreation experiences for all who use these lands.

*Photo 3. Wilderness trails are closed to all motorized and mechanized use.*

Specific Proposed Interim Restriction

Travel off of established routes using a mountain bike, motorcycle, ATV, full-size vehicle, or any other wheeled vehicle that facilitates human travel would be prohibited. Established routes would be open to the current modes of travel and legal use as of August 1, 2000.  Established routes are defined as roads and trails that:

- exist on-the-ground as of August 1, 2000, and are portrayed on the ½ inch-to-the-mile map attached to this EA, or
- are easily recognizable on-the-ground as a route, and have been traveled routinely by users.

BLM_0051447

See Photos 5 through 8 for examples of what would and would not be considered existing routes.

This restriction would not override existing travel management decisions; it only changes "open" travel areas to "restricted" travel areas.   This restriction would still allow motorized travel 300 feet off of routes for camping and forest product gathering, where currently allowed (see Photo 4). OHVs would need to stay on established roads and trails to retrieve game.



Administrative use, including special-use authorizations, would be exempt from this restriction. Disabled persons may request authorization for access into restricted areas by contacting the District Ranger/BLM Manager.

*Photo 4.  The proposed action would allow vehicles to travel up to 300 feet off roads and trails to camp, picnic or gather firewood, providing no resource damage occurs.*

This restriction would not affect the management of the agencies' existing transportation system, such as road and trail additions, relocations, maintenance and reconstruction, seasonal and permanent closures, and obliteration of some routes (approved though site-specific analysis).  This measure in no way limits the agencies' authority to take necessary actions to protect public safety or prevent resource damage.

Direction for specific roads, trails, and over-the-snow travel will be addressed in the Revised Forest Plan and the BLM – RMPs or other, more detailed analyses at a later date.

BLM_0051448





*Photo 6.  Though there is some evidence of vegetation in the tracks, this route is still receiving "routine" use and would be considered an existing route.*

*Photo 5.  Obvious example of an existing established two-track route.*





*Photo 7.  This long-ago route is revegetating nicely (obviously not being traveled "routinely") and would not be considered an existing, established route.*

*Photo 8.  This photo shows where a vehicle has made a couple passes over the same area and compacted vegetation, but this would not be considered an existing, established route.*

BLM_0051449

# DECISIONS TO BE MADE

The primary decision that will be made is:

- Should travel by motorized and mechanized vehicles be restricted to currently existing routes, and prohibited off of these routes, in areas of the GTAA where this use is currently allowed?

Secondary decisions needed in response to issues raised in public scoping and considered in the analysis are:

- Should the mode of travel allowed on existing routes be restricted to existing modes of travel for each respective route (i.e., ATV use not allowed on single-track routes, jeeps not allowed on current ATV routes, etc)?

- If proposed restrictions are imposed, should motorized/mechanized travel off route be allowed for the purpose of retrieving downed big game?

- For what distance from existing routes should motorized access be allowed for the purpose of accessing dispersed camping sites?

- Which specific monitoring measures should be implemented?

<u>Consistency with Forest Plan/BLM RMP and Current Visitor Maps</u>

The Proposed Action and Action Alternatives are consistent with the overall management direction set forth in the GMUG Forest Plan. The Forest Plan is being implemented as required by the Forest and Rangeland Renewable Resources Planning Act of 1974 (RPA, P.L. 93-378) and the National Forest Management Act of 1976 (NFMA, P.L. 94-588). The Forest Plan provides the framework for the actions proposed here. If the Proposed Action or an Action Alternative were selected, a Supervisor's Order would be written to implement the travel regulation changes.

The Proposed Action and Action Alternatives are also consistent with the Uncompahgre and Gunnison RMPs, which were amended to include the requirement that BLM management activities comply with the standards for land health. Not all the BLM lands in the GTAA have been assessed for landscape health under the BLM's Standards and Guidelines procedures; these assessments would be scheduled over time. If the Proposed Action or an Action Alternatives were selected, the Uncompahgre and Gunnison RMPs would need to be amended.

The Proposed Action and Action Alternatives are not consistent with the current Gunnison Basin Area Visitor Map. If the Proposed Action or an Action Alternative were selected, the map would need to be updated to reflect the new travel regulations. No revision would be necessary if the No Action Alternative is selected.

BLM_0051450

# SCOPING/ISSUES

Scoping (40 CFR 1501.7) is an important part of the environmental analysis process for determining the scope of issues to be addressed and for identifying the environmental issues related to a proposed action.

Scoping letters detailing the proposed action were mailed to over 800 individuals and interest groups in February 2000. The list included grazing and special-use permittees, outfitter-guides, water users, and private landowners, as well as individuals who had expressed an interest in travel management.

News releases were sent to newspapers in communities surrounding the GTAA. Legal notices of the proposed action were published in the Crested Butte Chronicle and Pilot, the Gunnison Country Times, and the Delta County Independent.

From this initial scoping effort more than 120 comments were received.

In addition, BLM published a Notice of Intent in the Federal Register on March 30, 2000 requesting comments on the proposal. Approximately 55 comment letters and e-mail messages were received.

## Issues

Public comments received during scoping were used to help determine issues related to the proposal. Other information used to determine the issues included Interdisciplinary Team meeting discussions, management requirements, Forest Service monitoring information, and past agency and public comments related to travel management.

Issues were broken down into four basic categories:

A) **Key issues leading to the development of the Proposed Action** - These issues were identified after reviewing public and agency (i.e., Forest Service, BLM) comments, and monitoring information.

B) **Key issues used to develop alternatives to the Proposed Action** - These issues were identified after reviewing comments received during scoping.

C) **Issues suggesting the focus of the analysis of effects of alternatives** – These issues were identified from both public comments and the Interdisciplinary (ID) Team. These issues describe the environmental (and social and economic) factors affected by the proposed action and alternatives.

D) **Issues beyond the scope of this analysis or beyond agency control** - These are issues that did not fall within the bounds of the analysis, that could not be addressed at this level of analysis, or over which the agencies have no control.

BLM_0051451

## A. KEY ISSUES LEADING TO THE DEVELOPMENT OF THE PROPOSED ACTION:

1) **Adverse resource impacts caused by unrestricted off-route vehicular use** - Existing travel management direction allows off-route travel by both full-sized and off-highway vehicles, including mountain bikes, on much of the GTAA. The result has been an increase in off-route travel and the development of unplanned and unauthorized routes. Land managers and the public have expressed concern that unrestricted use and the proliferation of unauthorized routes impacts vegetation, soils, water resources and riparian areas, roadless character, and detracts from an area's scenic beauty.

2) **Wildlife Habitat Effectiveness -** Increased off-route use and new routes created by such use have made once remote and secure habitats easily accessible. This has reduced habitat effectiveness by displacing wildlife from preferred habitat; it has also reduced wildlife security areas. Disturbance to wildlife during critical seasons (e.g., breeding seasons) may reduce breeding success and survival rates.

3) **Conflicts between motorized and non-motorized public lands users -** Unrestricted OHV use increases safety concerns and reduces opportunities for people who enjoy non-motorized experiences, such as hiking, wildlife viewing, and horseback riding. It also reduces hunting quality for hunters who choose not to use OHVs, as well as for those who do.

4) **Conflicts with private landowners -** Unrestricted off-route use often displaces elk and deer from public to private lands, reducing hunting opportunities and creating conflicts with landowners and livestock.

5) **Inconsistent restrictions and lack of consistent signing and law enforcement –** Existing travel management designations vary in different parts of the GTAA and are confusing to our recreating public. For example, off-route travel is allowed in some areas but not in others. Consequently, up-to-date visitor and travel management maps are needed to know what activities are permitted where. Signs, maps, and interpretation and enforcement of travel restrictions also vary across the GTAA. This causes confusion, reduces public service, and hinders law enforcement efforts.

6) **Inconsistency with the Forest and BLM Resource Management Plans --** Existing travel management direction is resulting in continued resource damage, loss of solitude in semi-primitive non-motorized areas, conflicts with other public land users, and declines in the effectiveness of wildlife habitat. Consequently, the direction is not consistent with resource management objectives contained in Forest Plan Direction, or Forest Plan Standards and Guidelines in areas emphasizing non-motorized recreation, wildlife habitat, and riparian ecosystems. In addition, existing travel direction does not comply with

BLM_0051452

direction outlined in the Rocky Mountain Regional Guide.  The Regional Guide states, "On all land areas outside of developed travelways, motorized use with wheeled vehicles will be restricted unless such use is specifically allowed and so designated" (Chapter 2, pages 12 and 13, item #3).  The Regional Guide contains overriding Regional travel management policies that apply to all National Forest System lands in the Rocky Mountain Region.

The current travel management direction is also inconsistent with BLM Resource Management Plan Standards and Guidelines for landscape health, which are:

- Ensure health of upland soils;
- Protect and improve riparian systems;
- Maintain health, productive plant and animal communities;
- Maintain or increase populations of threatened and endangered species in suitable habitat; and
- Ensure water quality meets minimum Colorado water standards.

The existing OHV designations and the proliferation of new routes make it difficult for the agencies to continue to meet the standards for healthy public lands.

## B. KEY ISSUES USED TO DEVELOP ALTERNATIVES TO THE PROPOSED ACTION:

**1) The Proposed Action is too restrictive and limits personal freedom** - The proposal would restrict the freedom of motorized/mechanized users rather than just those who do not abide by existing restrictions.  It would also limit some opportunities for motorized recreation and deny users motorized access to some locations on public lands.

**2) The Proposed Action reduces game-retrieval opportunities -** The proposal would make it difficult for some people to retrieve big game since game is usually not taken adjacent to roads. It may also give preferential treatment to people who use horses during the hunting season.

**3) Distance allowed for off-route travel is too great -** The 300-foot distance is too great and would lead to increased resource damage.  The proposal would also lead to law enforcement problems and the creation of new user-created roads and trails.

**4) The Proposed Action may legitimize as open all non-system routes "easily recognizable on the ground and routinely traveled."**  Many of these routes are causing negative impacts and were not established through a NEPA analysis and decision.

BLM_0051453

## C. ISSUES SUGGESTING THE FOCUS OF THE ANALYSIS OF EFFECTS:

The following factors are used to describe the effects of alternatives. These are the basis for the public and the decision-maker to understand the environmental consequences (physical, biological, social and economic) of possible choices before them. These are the foundation of informed decision-making, and are basis for the organization of Chapter 3.

- Effects on soils, water, and vegetation resources
- Effects on recreation opportunity/experience
- Effects on roadless areas
- Effects on wildlife
- Aquatic resources/fisheries
- Effects on threatened, endangered, proposed, or sensitive species of plants and wildlife
- Effects on cultural/heritage resources
- Effects on air quality
- Effects on local economies
- Effects on transportation systems
- Effects on lifestyles and traditional use of public lands
- Law enforcement of travel restrictions
- Effects on access for private inholders and permittees

## D. ISSUES BEYOND THE SCOPE OF THIS ANALYSIS OR BEYOND FOREST SERVICE OR BLM JURISDICTION:

**Snowmobiles should be included in the proposal.**
> **Response:** This issue is beyond the scope of this analysis. The purpose of the analysis is to address the proliferation of user-created routes and the associated resource damage, social conflicts, and disturbance to wildlife. However, we do recognize that snowmobile use on the Forest is an important issue; therefore, it will be addressed in a future analysis.

**The agencies should create more OHV trails.**
> **Response:** This issue is beyond the scope of this analysis. The agencies are not proposing to open, close, or create any roads or trails as a result of this analysis. The main decision to be made is whether or not to restrict future off-route vehicle use. We will, however, be conducting site-specific travel management analyses in the future. At that time, we will be looking at motorized opportunities and determining whether or not specific roads or trails should be opened or closed or if the construction of new routes is warranted. These decisions would be made only after further public discussion and disclosure.

BLM_0051454

# CHAPTER II

## ALTERNATIVES, INCLUDING THE PROPOSED ACTION

The National Environmental Policy Act (NEPA) Regulations (40 CFR 1502.14) require rigorous exploration and objective evaluation of reasonable alternatives. According to NEPA, Federal agencies are also required to include and discuss appropriate measures to mitigate adverse environmental impacts that could result from implementing a proposed action.

This Chapter examines a range of alternatives to the Proposed Action, each having different environmental impacts and protection measures. The alternatives were developed in response to the significant issues. Four (4) alternatives, including a No Action alternative and the Proposed Action, were studied in detail and are documented in this EA.

The Proposed Action and Alternatives 2 and 3 are not consistent with the current Gunnison Basin Area Visitor Map. This map would need to be updated if one of these alternatives is selected; no updating would be necessary if the No Action alternative is selected.

## FEATURES COMMON TO ALL ACTION ALTERNATIVES (PROPOSED ACTION AND ALTERNATIVES 2 AND 3)

- If an action alternative is selected, the Gunnison Basin Area Visitor Map would be updated to reflect the new travel regulations. A Forest Supervisor's Order/BLM-RMP amendment would be prepared to implement the travel regulation changes.

## FEATURES COMMON TO ALL ALTERNATIVES, INCLUDING THE NO ACTION ALTERNATIVE

- Access would be provided to private inholders, as required by Section 1323(a) of the Alaska National Interest Lands Conservation Act (P.L. 96-487; 16 U.S.C. 3210). Access would also be regulated, as needed, with permit holders. Access for permitted activities (e.g., livestock operations, mineral exploration and development, outfitter and guide operations, recreation events, etc.) on National Forest System or BLM-managed public lands is independent of general public access. Individuals or groups with special permits are allowed to conduct their business according to their permits. Permittees have rights of access to their

BLM_0051455

permitted area; however, the agencies can stipulate when and how access is achieved through approval of permits or annual operating plans. It is the responsibility of all permittees to follow the terms of their permits.

- Any Federal, State, local official, or member of a rescue organization or fire-fighting organization, in the performance of an official duty related to emergency search and rescue, and/or fire suppression, would be exempt from travel restrictions, except in Wilderness and Congressionally designated special areas (Title 36 CFR 261.50 (e), Forest Service Manual 2355.32, Region 2 Supplement 2300-93-7. The operation and use of vehicles on BLM lands is regulated by 43 CFR 8340.

- Administrative access would be subject to existing policies for such access.

- The Forest Supervisor or BLM Field Office Manager would continue to implement Special Orders or regulations to restrict public use on roads, trails, and/or areas where unacceptable resource damage is occurring. Title 36 CFR Part 261 prohibits damage to the land, wildlife, or vegetative resources. The Federal Land Policy and Management Act of 1976 also includes this provision.

- All Federal and Colorado State laws applying to motorized vehicles are subject to enforcement. Title 36 CFR 261.12 and 261.13 regulate the operation of motorized vehicles on and off Forest Development Roads (FDR), respectively. Additionally, Colorado State Statutes apply to the operation of all motorized vehicles on public lands.

- If funding allows, law enforcement efforts and Agency education and ethics programs regarding travel on public lands would be increased;

- Subsequent site-specific travel management analyses would be completed through a separate process to determine whether to keep open or to close individual roads and trails or to develop additional motorized opportunities. Decisions pertaining to road/trail closures and/or openings and additional motorized opportunities would occur only after further public discussion and disclosure.

## ALTERNATIVES CONSIDERED AND ANALYZED IN DETAIL

### PROPOSED ACTION: Restrict motorized and mechanized vehicle use to existing routes (i.e., eliminate cross-country, off-route travel)

The Proposed Action is described in Chapter 1 and, to save space, is not repeated here.

BLM_0051456

***ALTERNATIVE 1:  No Action - Existing travel management direction would remain unchanged***

Under the No Action alternative, Forest Service and BLM travel management direction would not be revised.  Areas open to off-route motorized and mechanized travel would remain open.  Existing travel restrictions would remain in place in areas currently restricted to off-route motorized travel.

***ALTERNATIVE 2:  Allow use of off-road vehicles for big game retrieval***

All aspects of the Proposed Action would apply to Alternative 2.  In addition, under Alternative 2, ATVs and motorcylces would be allowed to travel off of existing roads and trails during the big-game hunting season for the purpose of downed game retrieval.  **Off-route motorized travel would be allowed for big game retrieval only, providing resource damage does not occur.**  For the purposes of this analysis and decision, the agencies adopt the Colorado Division of Wildlife's definition of big game.  Animals included are elk, deer, bighorn sheep, moose, mountain goat, antelope, lion, and black bear.  Under this alternative, retrieval of downed animals by ATVs and motorcycles would be allowed in all legal hunting seasons, including archery, muzzle-loader, standard rifle, and special seasons.

Other aspects of Alternative 2 include:

> 1) Game retrieval would not be allowed in areas of the GTAA where motorized travel is currently restricted.

> 2) Game retrieval would be allowed from 10:00 a.m. until 2:00 p.m.

> 3) Only one vehicle per downed animal could be used for game retrieval.

***ALTERNATIVE 3:  Reduce off-route travel restriction from 300 feet to 100 feet***

All aspects of the Proposed Action would apply to Alternative 3, except under Alternative 3, wheeled travel off of existing routes for such activities as firewood gathering, camping, and picnicking would be reduced from 300 feet to 100 feet, providing that resource damage does not occur.

## ALTERNATIVES ELIMINATED FROM DETAILED STUDY

***ALTERNATIVE 4:  Restrict wheeled-vehicle use on only portions of the GTAA (i.e., a mix of open and restricted areas)***

BLM_0051457

It was proposed by some that instead of restricting off-route travel on the entire GTAA, a part of the area be left open. The areas to be left open would be identified on the basis of suitability for such use and/or resistance to the impacts of such use.

This alternative was eliminated from further study because the purpose and need described in Chapter I applies across all lands in the GTAA, and the ID Team was unable to identify any one area over another that would be suited to off-route use. Leaving selected areas open would concentrate this type of use and amplify the impacts we are seeking to reduce.

### ALTERNATIVE 5: Restrict the use of motorized vehicles off of existing routes differently during the big game hunting season.

This alternative would restrict the use of motorized vehicles off of existing routes during the big game hunting season, but would allow such use during the remainder of the year.

Some people commented that the impact of motorized use during hunting season has caused most of the resource impacts we are seeking to manage, and that the average motorized recreationist should not be penalized.

This alternative would allow for scouting for game prior to hunting season, and seems to selectively discriminate against hunters in particular. Neither agency felt that it was appropriate to selectively regulate one single group of users. Neither did we feel that such regulation was reasonably enforceable.

Alternately, some commented that off-route use should be allowed ONLY DURING the hunting season. This would facilitate access for hunters of all ages and abilities. The same concern about the selective regulation of one group applied in the elimination of this alternative. Also, the bulk of the impacts to the resource, and to wildlife would not be addressed under this scenario of management. Therefore, it was eliminated.

### ALTERNATIVE 6: Restrict the Use of Motorized Vehicles to Forest Service and BLM System Routes only.

Some people commented during scoping that making any decision allowing use of the numerous user-created routes would be affirming and legitimizing those routes, when in fact they were not planned or intended to be permanent transportation facilities. The suggestion was to consider limiting all motorized and mechanized use to designated, Forest Service and BLM System roads and trails. System roads and trails are either intentionally designed and built by the agency, or formally accepted as part of the official system.

This alternative was eliminated from detailed consideration because route-by-route decisions are not being made in this process. See "Decisions to be Made" in Chapter I. The proposed action would not legitimize or positively establish these routes. Individual road and trail decisions will be made in separate processes to follow. The decision to be

BLM_0051458

made through this environmental analysis (this EA) focuses on off-route/cross-country travel.

The most immediate need to which this proposed restrictions are responding is to stop the proliferation of new routes and the "creep" of existing routes to higher levels of use. A decision to restrict use to Agency routes would result in closure of many existing routes to current motorized/mechanized use. We believe a more in-depth analysis that considers the entire system of routes is needed to make these decisions. Such detailed analysis is beyond the scope of the current process. Both agencies recognize the need for more detailed route-by-route analysis.

BLM_0051459

# CHAPTER III

## AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES OF ALTERNATIVES

### INTRODUCTION

This chapter describes the affected environment of the GTAA and the environmental consequences of implementing the Proposed Action and each alternative. The affected environment consists of various resources and uses within the GTAA. Generally, there will be physical and biological changes in the environment as a result of actions proposed in the alternatives. In some cases, the environmental effects of the alternatives may extend beyond the public land boundaries, such as displacing wildlife onto private land. In most cases, however, the affected environment is generally limited to National Forest or BLM-managed lands, and most environmental effects would occur within the GTAA boundary.

The Proposed Action and alternatives were designed to address one or more of the issues described in Chapter I. The issues suggest a need for analysis in several resource areas/disciplines. These become the basis for the organization of this chapter. They are:

- Effects on soils, water, and vegetation resources
- Effects on recreation opportunity/experience
- Effects on roadless areas
- Effects on wildlife
- Effects on aquatic resources/fisheries
- Effects on threatened, endangered, and sensitive species of plants and wildlife
- Effects on cultural/heritage resources
- Effects on air quality
- Effects on local economies
- Effects on transportation systems
- Effects on lifestyles and traditional patterns of use
- Law enforcement of travel restrictions

Under each resource area/discipline, direct, indirect, and cumulative effects (see definitions below) are described for the Proposed Action and each alternative. The area of analysis for cumulative effects can differ for each issue.

Definitions:       Direct Effects are caused by the action and occur at the same time and place.

BLM_0051460

Indirect Effects are caused by the action, but occur later in time and are farther removed in distance.

Cumulative Effects are impacts on the environment that result from incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions. These effects occur regardless of what agency (Federal or non-Federal), entity, or person undertakes such other actions.

## SOILS/WATER/VEGETATION

### A. *AFFECTED ENVIRONMENT*

#### Soils

The soils within the GTAA vary considerably in terms of physical and chemical characteristics. This variability is due, in large part, to the great contrast in elevation, topography, microclimate, moisture, parent material, and vegetation found across the GTAA.

Geology, climate, and topography contribute to or determine the erosion potential, or hazard, of the land. Erosion hazard is the inherent susceptibility of a soil to erosive forces such as a raindrop or water flow over the surface of the soil. The amount of hazard depends on particle size, distribution, rock fragment content, organic matter content, soil structure, permeability, slope gradient, and rainfall characteristics. The combination of soil material (very fine sand, silt, and clay) and soil permeability makes these soil types highly erodible. This is not to say that no use should occur on these areas, but design, location, and drainage features should be considered so as to mitigate possible soil erosion problems.

Generally, sediment yields within the GTTA vary from less than 0.35 tons per acre annually in higher elevations, to 0.70 tons per acre annually in lower elevations (Gunnison Basin Draft Resource Management Plan, 1992). Sediment yields are accelerated in many upland areas by surface-disturbing land uses such as grazing, mining, timber harvesting, and off-road vehicle use. Poorly located and unmaintained roads and water developments also produce sediment. Incised channels (gullies) are also common in the GTTA uplands and are a major sediment source. Gullies can form naturally but are often aggravated or initiated by upland land uses, roads that increase or concentrate surface runoff, or from direct physical disturbance to stream channels or adjacent riparian zones. Channels in this condition increase peak flood flows and drain alluvial aquifers, often reducing the quality and areal extent of the riparian zone.

BLM_0051461

## Water

The GTAA is the headwaters for the East, Gunnison, North Fork of The Gunnison, and Taylor Rivers, and Tomichi and Cebolla Creeks. These and other streams contribute water to the Colorado River. Streams range in character from ephemeral (flowing only in response to precipitation events) to perennial (year-round). These streams range in size from tiny headwater channels to major rivers.

In general in the GTTA, wetlands are limited to narrow strips of vegetation adjacent to streams and lakes. However, some larger, isolated marshes and wet meadows can also be found in high elevation montane terrain. By definition, wetlands are biologically and morphologically diverse wet areas that support water-dependent plant species. Wetlands will exhibit wetland vegetation types, hydric soil, and a wetland hydrologic regime dealing mostly with depth and duration of ground water.

Riparian areas are the zones of lush, green vegetation that live or grow near water on the banks of streams, lakes, and rivers. Riparian ecosystems, aquatic ecosystems, wetlands, lakeside zones, and floodplains have been considered one and the same for this analysis and will be referred to as riparian areas. Although these terms are used interchangeably, by strict ecological definition, they may not be the same in all instances. Riparian zones within the GTTA are hydrologically important. Riparian areas intercept sediment from uplands and attenuate flood flows. Riparian areas and stream channels are the principal ground water recharge areas for alluvial aquifers, and dense, vigorous riparian vegetation is crucial for maintaining stable stream channels and high water quality.

In general, most water sources (streams, lakes, and riparian areas) on the GTAA are in good condition. Exceptions exist in sensitive and easily accessible watersheds. Some of these areas have incurred streambank disturbance, channel instability, shoreline disturbance, removal of riparian vegetation, rutting of wet meadows, and increased sediment. Causes include aspects of multiple-use management, such as timber harvest, road construction, grazing, mining and recreation. including off-route vehicle use. The results are considered non-point sources of pollution and all act in the same fashion, i.e., an increase in erosion and sediment in streams and lakes.

## Vegetation

Vegetation types of the GTAA vary greatly, depending on elevation, terrain, and aspect. Refer to the information in the **Wildlife Habitat Management** section of this chapter for more detailed data regarding vegetation types.

High-alpine vegetation types occur above timberline (above 11,000 feet). Due to the short growing season and harsh climatic conditions, major disturbances to this, and other vegetation types in the GTTA are very slow to recover.

The Engelmann spruce-subalpine fir (*Picea engelmanii - Abies lasiocarpa*) type occupies the elevational range between 11,000 and 8,000 feet. Spruce-fir forests tend to be dense and occupy moist sites. Stands may vary from single-aged, single-layered canopies to

BLM_0051462

multiple-aged, multiple-layered canopies.   Most spruce-fir stands are mature to overmature across the GTAA.

Generally between 11,000 to 7,000 feet in elevation and intermingled with spruce-fir stands, aspen (*Populus tremuloides*) and lodgepole pine (*Pinus contorta*) vegetation types are found.  These forest stands are also intermingled with grasslands, wet meadows, and mountain shrub cover types.  Aspen and lodgepole pine stands are usually single-aged with more open understories than are commonly found in spruce-fir forests.  Aspen stands usually have very productive understories which support livestock grazing and many wildlife species. Lodgepole pine stands are usually dense, closely grown, and have very little vegetation on the forest floor.

Mountain shrub (dominant species include Gambels oak (*Quercus gambelii*), mountain mahogany (*Cercocarpus montanus*), serviceberry (*Amelanchier* spp.), mountain big sagebrush (*Artemisia tridentata*), snowberry (*Symphoricarpos oreophilus*)) and pinyon-juniper (*Pinus edulis-Juniperus osteosperma*) vegetation types are found on west- and southwest-facing slopes.  Mountain shrub cover types are in the elevational range of 9,000 to 7,000 feet, with pinyon-juniper occurring lower in the 7,000 to 6,000 feet range.

Riparian areas - Refer to the information under the previous heading titled **Water** for information regarding riparian vegetation.  Riparian habitat within parts of the GTAA is commonly overgrazed and the resulting excessive vegetation utilization and physical damage to soils and stream channels is a management concern.  In some areas, this overuse by livestock occurs in the spring and fall when vegetation and soils are sensitive to damage, thereby exacerbating the concern.  The same concern for riparian resources exists when cross-country, off-route vehicle use occurs in riparian areas.

## B. *ISSUES*

This section provides information related to the following issues identified in Chapter I of this EA:

> ▶ Adverse resource impacts caused by unrestricted off-route vehicular use.

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

Effects common to all alternatives:

Cross-country, off-route travel occurring over the same path crushes and bruises vegetation affecting plant vigor.  Roots become exposed and damaged.  Results vary and can range from less individual plant growth to loss of a species.  Trees and shrubs could be cut down or pushed over to clear paths.  Loss of vegetation and soil surface-disturbance would continue to generally be the first consequences of user-developed trails.  Continued OHV use would result in soil compaction, which would effect and restrict water filtration, and cause increases in overland flow of water, and soil erosion.  Secondary impacts include reduced soil moisture, aeration and nutrient cycling, which further prevent the establishment of vegetation.  Accelerated soil erosion becomes the

BLM_0051463

primary problem once vegetation is lost, especially when water concentrates on the trail in "puddles," or when water is directed down slope within trail "tracks," rather than spreading and flowing slowly and gradually over the land surface. Since slope gradient and soil loss are positively correlated, the steeper the trail, the greater the soil loss. The erosion rate is also influenced by the position of a trail with respect to the top or bottom of a slope and the gradient of the slope along and across the trail.



In wet areas, soil compaction would occur, and plants may be unable to germinate in the impacted area. Loss of vegetation in wet areas could result in these sites drying up. Non-native or undesirable plant seeds could also be introduced. These impacts are associated with the path of travel and result in "user-created" roads and trails. When cross-country, off-route motorized traffic is spread out over a large area, so are the associated environmental effects, with most impacts occurring during wet soil conditions (See Photos 2 and 9). If the disturbance is not repeated, natural regeneration could occur in areas with productive soils. However, areas containing less productive soils will show signs of disturbances caused by cross-country, off-route OHV travel for years.

*Photo 9. A meadow damaged by OHVs traveling off existing routes.*



*Photo 10. This user-created route up a steep hillside will probably never recover due to low soil productivity, erosion problems, and poor conditions for vegetation growth.*

Within the GTAA, cross-country motorized routes have dissected and reduced riparian and wetland areas. Roads of all kinds have fragmented many wet meadows, and these roads have drained away surface water or altered subterranean flows. Consequently, some wet meadows have lost their ability to retain water and are now dry.

People are naturally drawn to water and riparian areas. Cross-country, off-route travel paths crossing streams and wetlands would continue to result in the loss of vegetation and increased soil compaction, bank instability, and increased sedimentation. Streambanks and lake and reservoir shorelines that receive heavy motorized use could become denuded of vegetation, soils could become compacted and rutted, and increased sediment could enter the water. Increased sediment could negatively impact fisheries by reducing available oxygen and potentially covering spawning gravel.

BLM_0051464

Based on work from the Wenatchee National Forest in Washington, Dunnell (1980) pointed out that most resource damage from off-route vehicle use is caused by improper trail location rather than by improper use. This is true of many of the user-created trails found across the GTAA. Because of their location (e.g., wet areas, steep hills, etc.), many of the user-created trails produce more erosion than roads or trails that have been constructed using proper trail design and drainage techniques. Often the user-created trails either cross or run perpendicular to steep slopes, which results in accelerated erosion potential. Other trails have stream crossings that are not hardened, i.e., they have muddy bottoms rather than rocky bottoms, thus contributing sediment directly into the watercourse.



*Photo 12. The vegetation in this meadow would likely recover provided more vehicles do not travel in the same tracks.*

The effects of travel on vegetation in the GTTA depend on the types of vegetation, the moisture content of the soil, the number of vehicle passes, and the disturbance and pressure applied to the vegetation by vehicles. Under dry soil conditions, a single vehicle pass usually does little harm to vegetation. Plants may be bent over and bruised. Repeated passes over the same path can be detrimental to vegetation and soils. Under certain conditions on some soil types, one pass by a vehicle could result in a very noticeable and continuous track void of most vegetation. The level of impact is directly related to the frequency and density of off-route use. Impacts would include (Miller 1976, Westbrooks 1998):

- A reduction and/or elimination of vegetative plant cover and density from repeated use.
- A reduction in root biomass due to soil compaction and reduced soil moisture.
- Serious soil erosion problems when weakened plants are not able to protect the soil from overland water flow.
- Poor seed germination in disturbed areas due to soil compaction and reduced soil moisture.
- A change in plant species composition on the disturbed sites caused by higher levels of disturbance as different plant species can tolerate different levels of disturbance. Favorable environments for noxious weeds may be created.
- The dispersal of noxious weeds along travel routes by vehicles, livestock, pack stock and hikers.

BLM_0051465

In areas with productive soils, natural regeneration may occur if the disturbance is not repeated. In areas with low soil productivity, the disturbance of off-route travel could be visible for years as evidenced in the photo to the right.



Most of these impacts are associated with the path of travel. As noted earlier, noxious weeds can invade into areas adjacent to travel corridors. Where off-route travel is allowed over large areas, the potential for impacts increases in scope. Instead of exposing narrow corridors of designated routes to the contamination of noxious weeds, area-wide, off-route travel exposes all accessible areas to the likely deposit of noxious weed seed and eventual infestation. Restricting cross-country, off-route travel to limited corridors would be a substantial step towards limiting the area of initial weed establishment. It would not eliminate the need to continually treat designated travel corridors, but would narrow the area to be treated.

*Photo 13. Due to low soil productivity and the steepness of this hill, these ruts will be seen for many years to come.*

## PROPOSED ACTION: *Restrict wheeled-vehicle vehicle use to existing routes*

The Proposed Action would have a positive effect on overall watershed health (includes streams, lakes, riparian areas) due to the reduction of future user-created routes. User-created routes are not designed according to agency standards and guidelines; consequently, they are often poorly located and do not include proper drainage structures. Improper drainage can result in higher than normal erosion rates and increased surface flow.

## ALTERNATIVE 1: *No Action - Existing travel management direction would remain unchanged*

Cross-country, off-route use of OHVs would continue on 1.5 million acres of the 2.2-million acre GTAA. Unrestricted OHV use would result in a large number of connected disturbed areas (i.e., user-created routes), which would cause increased sediment in the stream network. Increased sediment would result from improper design, route location, and the lack of drainage structures.

Existing direct effects of user-created routes, such as delivery of sediment to the stream system through disturbed areas, expansion of the channel network through conversion of subsurface flow to surface flow, and soil compaction would continue under the No Action alternative.

BLM_0051466

Indirect effects would include a decline in aquatic habitat due to sediment deposition, increased flows during runoff events, and a decline in vegetative vigor due to soil compaction. Determining the relative amounts of sedimentation occurring from the existing trails is difficult due to the variation in location, topography, weather, and soil types. Wilson and Seney (1994) found that the quantity of sediment eroded from trails was largely dependent on site-specific geomorphic variables and soils, but that sediment yields from wet trails were typically higher than from drier trails.

Impacts to riparian areas would continue under the No Action alternative. Green (1998) sampled riparian areas at different recreational use levels and found that, at high use levels, bare soil accounted for 82 percent of the ground cover as compared to 4.9 percent at medium use and 1.4 percent at low use. Those riparian areas that are impacted by recreational use would be slow to recover under the No Action alternative.

### ALTERNATIVE 2: *Allow use of off-road vehicles for big game retrieval*

Under Alternative 2, the effects of user-created routes would be reduced from those of the No Action alternative. As with the Proposed Action, erosion rates and sedimentation from this alternative would be reduced from current levels. The actual effects of using off-road vehicles during typical hunting seasons for big game retrieval would depend upon such factors as soil moistures, weather, soil types, amount of snow, or depth of frozen soil.

### ALTERNATIVE 3: *Reduce off-route travel restriction from 300 feet to 100 feet*

The effects of Alternative 3 would be similar to those described under the Proposed Action. Because of the smaller area in which off-route traffic would be permitted, impacts would be confined to a smaller area than in the Proposed Action or Alternative 2.

## D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENT OF RESOURCES*

Once new routes are established, the compaction of soils, loss of vegetation and even loss of topsoil/organics takes a very long time to recover. On drier sites in the GTAA soil formation occurs at the rate of several hundred years per inch. Roads pioneered during the mining era are still visible on the landscape today in some areas of the GTTA.

## E. *CUMULATIVE EFFECTS*

Compared to the No Action alternative, the Proposed Action and Alternatives 2 and 3 would result in cumulative beneficial effects to the soil, water, and vegetation on affected lands in the GTTA due to the reduction of future user-created routes. Under the No Action alternative, user-created routes would continue to be made, erosion rates would continue to increase, sediment levels would increase, and areas currently experiencing some degree of mass soil movement could be further impacted. Thus, the No Action alternative would result in adverse cumulative effects to the soil and water resource.

BLM_0051467

# RECREATION

## A. *AFFECTED ENVIRONMENT*

The goal of recreationists using Forest and BLM lands is to obtain satisfying experiences through recreational activities in attractive settings. Resource managers have two goals in providing recreation experiences. The first is to provide opportunities for people to obtain those recreation experiences; the second is to minimize the impacts of recreational use on the natural resources. Recreation managers try to provide satisfying experiences through management of natural resource settings, and the activities that occur within them. To obtain this goal, settings and probable experience opportunities have been set along a spectrum called the Recreation Opportunity Spectrum (ROS) (see Glossary). A broad spectrum of recreation opportunities, ranging from primitive to rural settings, are provided in the GTAA.

Recreation opportunities in the GTAA are truly a national resource. The diversity of Rocky Mountain settings defined by terrain, scenic beauty, and types of access available offer outstanding recreation opportunities to users of these public lands. The diverse types of recreation that occur in the GTAA inlcude hunting, fishing, hiking, dispersed and developed camping, picnicking, horseback riding, mountain bike riding, motorcycle riding, ATVs and 4WD touring, rafting, and skiing.

Nearly all public land visitors use vehicles to get to their preferred activities and settings, whether it is a hiking trailhead, a fishing spot, or a ghost town. For many people, their vehicle is just the mode of transportation used to access their recreational activity. For others, vehicle use itself is the activity. Given these realities, it is clear that an adequate road and trail system must be in place and maintained for the public to access the GTAA.

More recreationists are using public lands today than 10 or 20 years ago. The technology of recreational equipment also advanced during this time to create ATVs and mountain bikes that were not used for recreation when previous travel management plans were completed. Changing values, attitudes and motivations of recreationists have resulted in changes in the way they use technology, especially new types of vehicles with which to enjoy public lands.

### Hunting

Southwest Colorado is a nationally popular destination for big-game hunting. Hunters use vehicles extensively to access camping sites, search for game, and retrieve game once it is harvested. Big-game hunting brings the highest number of visitors and the highest number of conflicts between motorized and non-motorized GTAA users. Hunters, both local and from out of state, literally flock to the area with trailers of ATVs. The capability of ATVs to go nearly anywhere impacts wildlife and also the hunting experience of hunters using more traditional methods of access, such as foot and horses.

With the increased number of hunters, roads and trails, and modes of travel that occur on and off roads and trails, it is becoming increasingly difficult for individuals and groups to find secluded locations that do not result in frequent encounters with other hunters.

BLM_0051468

Comments indicated that many hunters who hunt in remote terrain with the use of backpacks and/or horses are the ones most concerned about ATV use. There are several remote areas where ATV use changed the hunting experience. Even hunters who use ATVs to access hunting areas or retrieve game are complaining about the amount of ATV use in given areas.

### Dispersed Camping and Picnicking

Dispersed camping and picnicking is widespread throughout the GTAA and occurs along streams and lakes as well as along Forest and BLM roads and trails. The sites were developed by different user groups based on their accessibility and the experiences sought. Many sites have existed for years, but each year new camping sites are being created. The increase in new dispersed sites results in an increase in the damage to soil and water resources. Many of these sites are located in sensitive areas along lakes and streams and in wet meadows. Continued use of these sites, i.e., going to and from camp, as well as use during wet seasons (e.g. spring, fall), is resulting in damage to the soil and water resource.

### Mountain Biking

The popularity of mountain bike use has rapidly increased during the past decade. Crested Butte is considered by many as the birthplace of the mountain bike. The more



*Photo 14. Mountain bikers on a single-track trail.*

gentle terrain of the BLM lands in the GTAA is also popular with mountain bikers. Mountain bike use has increased on the single-track trails across the GTAA. In addition, mountain bikers have developed many new user-created routes in an effort to expand the area they can ride. What used to be faint cattle/game trails are now mountain bike routes. Motorcyclists also use the single-track routes established by mountain bikers. In some areas, ATV riders are using these single-track trails, thereby widening the trails. As with other user-created trails, these trails often cause more damage and impact to a variety of resources.

### Off-Highway Vehicle (OHV) Use

A portion of the recreating public focuses on the use of vehicles as the recreation activity they want to enjoy on public lands. Often these vehicles are specialized to handle rough roads and trails which are found in the semi-primitive setting that the GTAA offers. OHVs include four-wheel-drive trucks and jeeps, sport-utility vehicles, motorcycles, ATVS, and Humvees.

BLM_0051469

Many OHV enthusiasts are content to stay on the existing road and trail system. Impacts to the land occur when people drive off roads and trails to maneuver around obstacles or avoid wet spots.

Some OHV users prefer to travel off of roads and trails. The effects of this use varies with the manner, location, and terrain of the off-route travel.

This increased use is causing concern because it is much easier to take these vehicles off the existing roads and trails into areas that were not receiving motorized use in the past. Motorized road and trail and non-motorized trail opportunities that link the Forest and BLM trails are provided across the GTAA. The main mode of motorized travel on motorized trails has been by motorcycles. ATV use on single-track trails results in a widening of these trails as seen in Photo 15.



The current motorized trail system was not designed to accommodate the increase in ATV use. Consequently, ATV use on non-motorized trails as well as the proliferation of user-created ATV trails have occurred

*Photo 15. Notice how an ATV has flattened the vegetation on either side of this single-track trail that it should not have been on.*

across the GTAA. Some people are opting to use ATVs in place of full-size, four-wheel-drive vehicles because they are able to access areas more quickly, easily, and cheaply. This also saves wear and tear on more expensive full-sized, four-wheel-drive vehicles. An area that normally took two hours to access in a full-sized vehicle now takes only thirty minutes to access on an ATV. Due to quicker and easier access, people continue to look for prolonged riding opportunities. This, in part, results in user-created routes.

OHV impacts are monitored in several ways, including field observations by agency personnel and reports from the public. Damage caused by this OHV use is much the same as that mentioned for other activities above – road proliferation, soil erosion and compaction, destruction of vegetation, fragmentation of wildlife habitat, increase in introduced weeds on disturbed ground, disruption of wildlife, impacts to water quality, disturbance to other visitors, trespassing and conflicts with private landowners. All areas of the GTAA outside of Wilderness, continue to experience resource damage caused by OHVs. Most of the areas currently designated as open for motorized use in the GTAA are suffering from these types of impacts as a result of increased travel off of existing routes. Some of the soil and water concerns are on existing roads and trails where use has been allowed to continue without road maintenance.

Each field season, some damaged areas are rehabilitated. Budget is a constraint on how much of this work can be done.

BLM_0051470

## *B. ISSUES*

This section provides information related to the following issues identified in Chapter 1 of this EA.

> ▶ *Adverse resource impacts caused by unrestricted off-route vehicle use*

> ▶ *Conflicts between motorized and non-motorized GTAA users*

> ▶ *Limitations on personal freedom*

> ▶ *Game retrieval opportunities*

> ▶ *Inconsistent restrictions and lack of consistent signing and law enforcement*

> ▶ *Conflicts with private landowners*

## *C. EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

### PROPOSED ACTION: *Restrict motorized/mechanized vehicle use to existing routes*

Restricting off-route wheeled travel to existing routes would help reduce the creation of future user-created roads and trails, and would help preserve the remaining semi-primitive non-motorized (SPNM) (see Glossary) areas in the GTAA. With the increase in ATV and sport-utility vehicles (SUVs) use, semi-primitive non-motorized opportunities have decreased dramatically in the GTAA over the last 10 to 15 years. User-created roads and trails, and increases in off-route motorized use, have changed the GTAA to a semi-primitive motorized setting (see Glossary) and, in some cases, even a roaded-natural setting. The density of motorized roads and trails and the fact that most of the GTAA is open to off-route motorized travel has caused user conflicts and a loss of solitude.

Because off-route travel would not be allowed under the Proposed Action, hunters would have to use existing motorized roads and trails for game retrieval. Outside of Wilderness, many areas of the GTAA are still within one-half mile of an existing motorized or mechanized route. The proposed restriction would probably result in some hunters choosing to hunt closer to motorized routes to prevent having to pack game too far. Alternatively, they would have to put in more effort packing their animals out to an existing route by foot or horse. Hunting experiences for those who do venture further from roads and trails would be improved.

People who hold the belief that public lands should be open to all forms of recreation without restrictions might feel their personal freedoms are being taken away by the proposed action. Conversely, recreationists who do not like to see or hear the impacts associated with off-route wheeled-vehicle use feel their freedoms are currently being affected by these impacts.

BLM_0051471

People with disabilities will continue to have opportunities to recreate in the GTAA under this proposal. Wheeled-vehicle travel would be limited to existing, established routes. People with disabilities may request authorization for access into restricted areas by contacting the FS District Ranger or BLM Field Office Manager.

Other effects associated with the Proposed Action include:

- Dispersed recreationists would have greater opportunities for solitude and fewer conflicts with other Forest and BLM visitors. Sportsmen, hikers, OHV enthusiasts, horse users, fisherman, and hunters would have fewer conflicts, improved resources, and greater opportunities for solitude.

- Consistency of travel management restrictions would be improved. These restrictions would be much easier for the general GTAA visitor to understand and follow if wheeled use were restricted to roads and trails through consistent policy.

- Damage to soil, water, and vegetative resources would be reduced, resulting in improved aesthetics over time.

**ALTERNATIVE 1:** *No Action - Existing travel management direction would remain unchanged*

Cross-country, off-route wheeled-vehicle recreational opportunities would continue to be available on 1.5 million acres in the GTAA. Hunters would be able to retrieve downed game with any motorized or mechanized vehicle open to off-route travel. The elderly and the physically disadvantaged would continue to be able to access remote areas of the GTAA using wheeled vehicles off-route, and would be able to retrieve downed game without restriction.

Under the No Action alternative, the creation of future, unauthorized roads and trails through repeated use of the same portions of ground would continue to occur on the 1.5 million acres of the GTAA open to off-route travel.

There would be a continuing loss of opportunities for solitude for dispersed recreationists, and continued conflicts between recreationists. Sportsmen, hikers, OHV enthusiasts, horse users, bikers, and hunters would be faced with more conflicts, less satisfying experiences, and a degraded resource as off-route wheeled use continues to increase.

There would be continued confusion to public land users with regards to travel management policy and restrictions. Open travel areas allow motorized travel off route when it does not cause damage or unreasonable disturbance to the land, wildlife, or vegetative resources. Resource damage means different things to different people which makes enforcement difficult.

BLM_0051472

There would also be continued damage to soil and water resources that occur from wheeled-vehicle off-route use.

Finally, conflicts with adjacent private landowners would continue due to off-route use creating an opportunity for trespass.

## ALTERNATIVE 2:  *Allow use of off-road vehicles for big game retrieval*

This alternative would allow the use of motorized or mechanized vehicles off of existing roads and trails for game retrieval for those people who are unable to or choose not to pack a large animal out of the backcountry by foot or horse.  Game retrieval using motorized/mechanized vehicles would be allowed only in open travel areas (on the Visitor Map).  It would not apply to areas where travel is already restricted to roads and trails.

User-created game retrieval trails could be created through repeated use of the same portion of ground and other recreationists could be confused as to whether these are legitimate routes or not.  This confusion could result in more use on these trails and the creation of more routes.

User conflicts between non-motorized and motorized hunters could still occur.  The guidelines listed for game retrieval (i.e., limiting hours for retrieval) could eliminate some of these conflicts.

Having different regulations in different parts of the Forest is currently, and would continue to be, confusing for hunters.  Signing could help, however, signing can be ineffective due to cost, vandalism, and maintenance.

Enforcement would be difficult under this alternative.  The burden of proof would be upon the federal agencies to determine if motorized off-route travel was because of game retrieval or other reasons.

This alternative would allow a differential treatment of one segment of the recreating public, because it gives preference to hunters and hunters with ATVs.  Such restrictions are widely perceived as unfair by other members of the public.

Allowing hunters to use ATVs for game retrieval would continue to result in the proliferation of trails and the associated impacts.

## ALTERNATIVE 3:  *Reduce off-route travel restriction from 300 feet to 100 feet*

This alternative is similar to the Proposed Action with the exception of how far off route users may drive to camp, picnic, or gather firewood.  In this alternative, that distance would be limited to 100 feet off of established roads and trails.  Hunters would be restricted to the use of existing roads and trails when retrieving downed game.  Most of the effects discussed previously under the Proposed Action would apply.

BLM_0051473

Many of the previously used dispersed camping spots across the GTAA already have a road or trail leading to them. Therefore, the majority of camping sites would remain accessible for recreationists even if the distance to drive off route were limited to 100 feet.

Many arterial and collector roads have had extensive firewood gathering, and in some places, it is becoming difficult to find firewood within 100 feet of the road. Restricting firewood gathering to 100 feet could cause the loss of firewood-gathering opportunities.

In areas of the GTAA where travel is currently restricted, the Forest Service restriction is as follows: In areas where developed parking sites are not provided for camping, trailheads, or fuelwood gathering, people can drive to a suitable site within 300 feet of a designated route; unless this is expressly prohibited and signed. Off-route travel to the parking spot must not damage the land, vegetation, or streams and no live trees may be cut. (FSM 2355.03, R2 Supp. 2300-93-07). BLM restrictions do not allow this, but rather, allow people to park vehicles no further off route than the shoulder of the road. This inconsistency in FS/BLM restrictions would become even larger under this alternative when open travel areas become restricted travel areas. It would also create an inconsistency between restricted areas on the Gunnison National Forest and with surrounding national forests (which allow travel 300 feet off roads and trails).

Restricting dispersed recreational opportunities to 100 feet could reduce the length of new roads and trails leading to dispersed sites, thus reducing the resource impact of these routes. These sites continue to get pushed farther off the road each year, and new roads or trails are created.

Many of the new routes created to access dispersed camping sites are located in biologically sensitive riparian areas along streams. Allowing visitors to drive as much as 300 feet off existing roads and trails would continue to permit impacts in these sensitive areas. This activity would still continue in some places if campers are allowed to drive 100 feet off road and trails, but the overall impacts would be less.

### D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENT OF RESOURCES*
While there would be no permanently irreversible and irretrievable impacts to the recreation resource under any of the proposed alternatives, the continued use of these public lands by unrestricted/area-wide motorized use is creating long-term effects that are very difficult to reverse. The routes being pioneered can be rehabilitated, and over time may recover depending on site productivity. However, the longer these uses are allowed the more substantial and difficult the effects become. In some cases, many routes are prohibitively expensive for the agencies to rehabilitate.

### E. *CUMULATIVE EFFECTS*
The demand for recreation in and around the GTAA is growing and the demand is varied. People desire a satisfying recreational experience.

BLM_0051474

Cumulative effects that are detrimental to recreation in general are greatest under the No Action alternative. With 71% of the GTAA currently managed as open travel, vehicular recreation is relatively unmanaged. "Open travel" presents the greatest potential for user conflicts, resource damage, and social conflicts. This leads to an undesirable recreational experience. The population will continue to increase in and around the GTAA, and consequently, demand for recreation will increase. As motorized and mechanized use increases, there would be more displacement of non-motorized users to designated Wilderness and already restricted areas. This would lead to more impacts in Wilderness areas, and eventually a loss of opportunity for solitude there. The GTAA would continue to lose semi-primitive non-motorized recreation opportunities outside of Wilderness.

The elimination of off-route wheeled-vehicle use would have a positive cumulative effect on GTAA resources and resource values. It would help slow or stop the incremental degradation of resources caused by the proliferation of roads and trails. Over time, user conflicts, opportunities for solitude, soil and water, and wildlife habitat resources would improve under the Proposed Action. Without off-route motorized travel restrictions, user conflicts, opportunities for solitude, soil and water, and wildlife habitat resources would continue to degrade.

The Proposed Action and Alternative 3 would provide more positive long-term effects for recreation than Alternatives 1 or 2. Under all alternatives, recreationists would still have an opportunity to use motorized and mechanized vehicles on a large and established transportation system within the GTAA.

Alternative 2 and the No Action alternative would provide for game retrieval during all big game seasons. Alternative 2 would provide ATV off-route travel for nearly four months of the year. Neither alternative would help decrease or lessen the issues raised within the Purpose and Need for the Proposal found in Chapter 1. The cumulative effect of both alternatives would be a continuation of resource degradation and user conflicts. New routes would continue to be created.

## ROADLESS AREAS

### A. *AFFECTED ENVIRONMENT*

Within the GTAA there are a number of Forest Service Inventoried Roadless Areas. Since 1970, the Forest Service has inventoried and studied roadless areas greater than 5,000 acres, and roadless lands regardless of size that are adjacent to existing wilderness. These roadless areas are referred to and tracked today as Inventoried Roadless Areas. Some of these areas were recommended for Wilderness designation in the Forest Plan, and have since become Wilderness, such as Powderhorn and portions of the Raggeds.

In 1979 the Roadless Area Review and Evaluation (RARE II) identified 27 roadless areas on the Gunnison National Forest, totaling approximately 1.1 million acres. Table 1 lists these areas by number, name, and acreage.

BLM_0051475

Table 1.  RARE II Areas on the Gunnison National Forest

| RARE II Number and Name | RARE II Acres |
|---|---|
| 180 Elk Mtns - Collegiate | 138,400 |
| 181 Raggeds | 123,920 |
| 182 Drift Creek | 1,440 |
| 184 Springhouse Park | 16,000 |
| 185 Electric Mtn | 8,600 |
| 186 Clear Creek | 29,440 |
| 191 Priest Mtn | 26,880 |
| 196 West Elk | 208,410 |
| 198 Beaver-Castle | 62,780 |
| 199 Gothic Mountain | 6,700 |
| 200 Whetstone Mountain | 16,500 |
| 201 Flattop Mountain | 23,530 |
| 202 Boston Peak | 50,100 |
| 203 Matchless | 35,600 |
| 204 Crystal Creek | 91,680 |
| 205 Kreutzer-Princeton | 13,300 |
| 206 Romley | 8,900 |
| 207 Canyon Creek | 14,000 |
| 209 Cochetopa Hill | 65,680 |
| 210 Cochetopa Dome | 7,000 |
| 211 Monchego | 3,520 |
| 212 Sawtooth Mountain | 45,400 |
| 215 Mineral Mountain | 51,600 |
| 217 Middle Fork | 19,500 |
| 218 Cannibal Plateau | 31,990 |
| 220 Carson Peak | 27,600 |
| 358 Chipeta | 16,520 |
| **TOTAL** | 1,144,990 |

The information in Table 1 was obtained from the Forest Service's RARE II Summary - Final Environmental Impact Statement Roadless Area Review and Evaluation dated January 1979. Some of the areas listed in the chart below have since received Wilderness designation, and some have since become roaded.

In the 1980s and early 1990s, the BLM went through a process of inventory, analysis, and recommendation for lands that could be included in the National Wilderness Preservation System. An EIS was completed and the report submitted to Congress. The GTAA contains only one Wilderness Study Area (WSA), which the BLM manages. OHV use in the WSA is currently unrestricted. This WSA is adjacent to the Powderhorn Wilderness, which is jointly managed by the FS and BLM. BLM is committed to preventing impairment of wilderness values by any type of use in all their WSAs.

## B. *ISSUES*

This section provides information related to the following issues identified in Chapter I of this EA.

▶ *Adverse resource impacts caused by unrestricted off-route vehicular use*

▶ *Conflicts between motorized and non-motorized Forest users*

▶ *Maintaining roadless character in inventoried roadless areas*

BLM_0051476

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

**PROPOSED ACTION:** *Restrict motorized/mechanized vehicle use to existing routes*

Restricting off-route wheeled-vehicle travel to existing routes would reduce the creation of future user-created roads and trails. Eliminating cross-country travel would further enhance the protection of the physical naturalness of these areas. It should begin to allow nature to reclaim some damaged areas.

**ALTERNATIVE 1:** *No Action - Existing travel management direction would remain unchanged*

Cross-country motorized and mechanized travel would continue on 1.5 million acres off of existing, established routes.

While single-track motorcycle and mountain bike use may create routes that are consistent with roadless character, the proliferation of these routes "degrades" the overall character of the area in terms of candidacy for wilderness designation. The extension of ATV-wide routes does alter the character of the area and make it more of a "roaded" condition. If travel restrictions were not changed to limit use to existing routes, the proliferation of new routes would continue in Roadless Areas. The eventual cumulative effect of this would be the accelerated loss of areas with roadless character in the GTAA.

**ALTERNATIVE 2:** *Allow use of off-route vehicles for big game retrieval*

Allowance of limited ATV use to retrieve game, if properly enforced, would have some effect, but a very small one on the roadless character of an area. One pass by an ATV over terrain to retrieve a downed animal should not result in new routes. It would leave tracks, which may catch the eye of the new person in the area, but these would be temporary, unless wet meadows are rutted or vegetation is cut. This alternative only allows off-route use providing resource damage does not occur, however, allowing ATV use for game retrieval would invite occasional resource damage.

Many roadless areas on the Gunnison National Forest provide the highest quality hunting areas for elk in the western United States. Whether hunters rely on their ATV to retrieve game after a kill does not have a substantial effect on the nature of the hunting experience, but may affect the range or distance from roads that hunters are willing to hunt. Over time, retrieval of game would result in observable impacts to soils, water and vegetation (see those sections of the EA), which in turn do alter roadless values. However, by comparison with the substantially greater effects of the No Action Alternative this effect would be minor.

**ALTERNATIVE 3:** *Reduce off-route travel restriction from 300 feet to 100 feet*

In a perfect world, this alternative would show no change in effect to Roadless Areas, because if an area is roadless, by definition, there are no roads to travel off of. However, many of the inventoried roadless areas do contain roads and trails. By curtailing off-route travel to 100 feet off of established routes, it would lessen the likelihood of user-

BLM_0051477

created routes from 300 feet to 100 feet on both sides of an established route. This would have a minor effect on the character of roadless areas.

## D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENTS OF RESOURCES*

While there would be no permanently irreversible and irretrievable impacts to the resource under any of the proposed alternatives, the continued use of these public lands by unrestricted/area-wide wheeled vehicle use, and especially motorized use is creating long-term effects that are difficult to reverse. The routes being pioneered can be rehabilitated, and over time would recover. The longer these uses are allowed to continue the more substantial and difficult to rehabilitate their effects become. This effect is of particular concern in roadless areas as it is the absence of roads that, by definition, sets them apart from other areas of the National Forest. The character of roadless areas would be most protected by implementing the Proposed Action.

## E. *CUMULATIVE EFFECTS*

Motorized and mechanized opportunities would continue to be provided on existing routes and trails on the GTAA. These routes and trails provide a wide range of opportunities for the novice and expert alike.

The elimination of off-route motorized use would have a positive cumulative effect on Roadless Area values. It is the cumulative effect of one route after another being pioneered and then used that is causing the concern on these public lands. One route has very little impact in terms of any of the issues areas. The cumulative total of the routes being pioneered has very real effect. Under the proposed action, and over time, the roadless character of some areas now being impacted and the associated, opportunities for solitude, quality of soil and water, and wildlife habitat resources would improve. Without off-route motorized travel restrictions, and when coupled with the impacts to roadless areas from other resource use and development such as timber sales and mineral development these values would continue to degrade.

The overall effect of allowing game retrieval in hunt areas that already have a mix of motorized closures and restrictions would be confusing to the public and would create a difficult management situation.

## WILDLIFE

## A. *AFFECTED ENVIRONMENT*

The nature of the topography, climate, and vegetation within the GTAA provides ecosystems that support over 300 wildlife and fish species. Approximately 90 of these species are hunted, fished or trapped. Species of special interest include big game, game birds, waterfowl, carnivores, predators, furbearers, those designated sensitive, and those listed as threatened or endangered. Threatened and endangered species are listed in Appendix B, as are BLM and FS sensitive species.

BLM_0051478

### Wildlife Habitat

The following vegetative zones describe habitats within the GTAA:

The **adobe** – The lowest elevation vegetation type within the GTAA is the adobe grasslands/shrublands ranging in elevation range from 5,000 feet to 7,600 feet. Precipitation in this zone averages 8-10 inches per year. This area is primarily composed of Mancos-shale soils. Plant species found in this type are western wheatgrass, squirreltail, Indian ricegrass, a variety of forbs, greasewood, saltbrush, sagebrush and other species tolerant of saline soils and low moisture availability. Both elk and deer use this zone during winter.

**Foothill woodlands** – This vegetation zone consists of varying densities of pinyon-juniper (PJ), with understories of shrubs and forbs. Understory vegetation is dependent on the density of the PJ overstory. Understories include sagebrush, Gambel oak, serviceberry, chokecherry, and squaw apple. Herbaceous vegetation includes western wheatgrass, galleta, Indian ricegrass and cheatgrass. This zone ranges from 6,500 feet to 8,000 feet in elevation. Riparian habitat in this zone is composed of cottonwood, willow, alders and sedges. This zone is important to deer and elk as winter and transitional range. Openings and understories containing browse species, sagebrush, rabbitbrush, mountain mahogany, serviceberry and forbs are important feeding areas. Deer generally use this area for a longer portion of the year than elk.

**Deciduous shrubland** - This zone occurs from 7,500 feet to 8,500 feet. Gambel oak, serviceberry, chokecherry, and mountain mahogany are the dominant vegetation. Understories include Kentucky bluegrass, sedges and forbs. Riparian habitat is similar to that within the foothills woodland zone with the inclusion of additional deciduous tree species such as alder, dogwood, and mountain ash. This zone is also important deer and elk winter and transitional range. Black bear use this zone in spring and fall to forage on mast, berries, and early green-up of forbs. Many bird species including Lewis' woodpecker favor riparian areas within sight of shrublands. Small openings within shrublands are important feeding areas for bird species that feed on insects.

**Sagebrush steppe** – A large portion of the GTAA is sagebrush-dominated steppe below 9,400 feet. The steppe is dry, influenced by the rainshadows, lower elevations, and cold air drainage. Big sagebrush, black sagebrush, and bitterbrush are the common shrub species. Small patches of Douglas-fir, blue spruce, aspen, and serviceberry occur in protected places. This zone provides important habitat to the Gunnison sage grouse.

**Montane** – The montane zone consists of mixed-conifer, aspen, lodgepole and Engelmann spruce-subalpine fir forests. Engelmann spruce, subalpine fir, aspen, ponderosa pine, lodgepole pine, bristle cone pine, Douglas fir, blue spruce, limber pine (also identified as southwest white pine) are the dominant tree species.

Ponderosa pine dominated or pure stands are limited in extent on the Gunnison National Forest. Where they occur is in patches along the lower forest edge against the sagebrush steppe and on southerly aspects. Stand elevations range from 8,400 to 10,400 feet.

BLM_0051479

Ponderosa pine is a component of the mixed-conifer cover type. As with several other forest cover types, ponderosa pine are mostly mature to overmature.

Lodgepole pine is the dominant species in extensive forests between the edge of the sagebrush steppe at 8,700 feet up to the alpine timberline at 12,300 feet in the Gunnison Basin. Most of the lodgepole pine occurs in pure stands which lack species or structural diversity. The Cochetopa Hills area is on the southern edge of the lodgepole pine range. The forests of Taylor Park and Pitkin are up to 90% lodgepole pine dominated.

Douglas-fir/blue spruce stands with fewer other tree species are found elsewhere on the Gunnison National Forest at lower elevations, usually on steeper, north aspects and in canyons such as near Blue Mesa Reservoir, along the Lake Fork Gunnison, and along Anthracite Creek. In recent years, the Douglas-fir/blue spruce cover type has been extensively impacted by western spruce budworm defoliation and mortality.

Aspen stands cover large portions of the North Fork of the Gunnison watershed and Kebler Pass. In those areas mature aspen stands with dense, large and tall trees are the norm. Many aspen stands have an understory of Engelmann spruce and subalpine fir seedlings and saplings. The aspen groves of Kebler and McClure Passes represent the best aspen can be. Elsewhere on the Gunnison National Forest aspen occurs in pure stands or mixed with conifers on a wide variety of slopes, aspects, and terrain from the sagebrush steppe to the alpine. The best expression of aspen is between about 9,400 and 10,200 feet elevation on southerly aspects.

Engelmann spruce-subalpine fir forest occurs in the **subalpine zone** between 8,300 and 11,000 feet. Spruce-fir stands normally occur on sites higher, cooler and moister than those of lodgepole pine or mixed-conifer. Blue spruce, cottonwoods, alder and willow species are found in riparian areas. Portions of the lower elevations in this zone are used as elk calving and deer fawning areas. Higher elevation areas are used as summer range by elk and deer. Late-successional mixed conifer, spruce/fir and aspen forests provide important habitat to several sensitive species including the pine marten, goshawk, three-toed woodpecker and boreal owl. These species are dependent on these forested sites for breeding and foraging.

**Alpine** - The alpine tundra occurs from 11,800 to 12,300 feet elevation. The characteristic vegetation is very low herbaceous species such as curly sedge, alpine avens, and tufted hairgrass. At high elevations there are extensive talus fields. Moist areas host a low shrub cover of several willow species. The willow cover is important for ptarmigan and big game summer range. Bristlecone pine-dominated stands are common south of Gunnison in the rainshadow area. Bristlecone pine is usually associated with the alpine.

Elk and mule deer are the most common big game species and are widely distributed across the GTAA. Populations of bighorn sheep occur in the West Elk Wilderness, Almont Triangle area, Lake Fork and Dillon Pinnacles near Blue Mesa Reservoir, Lake City, Quartz Creek in the Pitkin area, Cochetopa Canyon, Rock Creek, and Cebolla area.

BLM_0051480

The most common mammalian predators on the GTAA include coyote, black bear, mountain lion, bobcat, and American marten. Among the many bird species are raptors and neotropical migrants, as well as game species, such as the wild turkey, sage grouse, and blue grouse.

Several species are found in specialized habitats such as cliffs and caves. Fish and most amphibians are entirely restricted to streams, ponds, and other wetland areas.

The area that could be affected by the proposed interim travel management regulation changes also contains habitat that supports, or potentially supports, a variety of listed, candidate, and USFS and BLM sensitive species (see TES section).

### Existing Impacts From Roads and Trails on Wildlife

Many factors have the potential to affect wildlife, however this analysis is focused on the effects to wildlife that result from changes in motorized use patterns within the GTAA. The major conflict between wildlife and motorized recreation is disturbance to wildlife. This disturbance can result in stress and displacement of animals, nest or territory abandonment, destruction of nests and habitat, interruption of breeding behavior, and death of animals.

Roads result in the direct loss of habitat for most wildlife species. Roads may also indirectly represent a loss of habitat due to the displacement effects caused by human disturbance, thus reducing the effectiveness of habitat along roads. The proliferation of user-created roads and trails, and increases in motorized off-route vehicle use, have resulted in increased disturbance to wildlife and reduced habitat effectiveness in some areas.

On managed public lands, a developed road and trail system is needed to provide adequate motorized access for a variety of management and recreational activities. Public lands have had a large increase in the numbers of users in recent decades and a large increase in the amount of motorized off-route vehicle use. Some of this off-route use has resulted in a network of user-created trails. These routes are not properly engineered and often pass through sensitive habitats such as alpine tundra, steep slopes, wet meadows, and riparian habitats. "Incremental creep" characterizes some of these routes. That is, they are pushed a little farther each year into previously unroaded areas through clearing or sometimes just through exploration and repeated use.

Motorized off-route vehicle use and the creation of user-established roads/trails can impact wildlife habitat and wildlife habitat effectiveness in the following ways:

- Direct impacts on vegetation and habitats for all wildlife species;
- More roads and disturbance on winter range areas;
- A decrease in elk habitat effectiveness as once remote and secure habitats become easily accessible;

BLM_0051481

- Displacement of wildlife to private lands. In some parts of the GTAA, elk are pushed onto adjacent private lands where hunter access is restricted. This also results in decreased hunting opportunities and harvest for hunters on public lands;
- Elk spend more time on private lands and compete with domestic livestock for forage. This may result in more depredation claims submitted to the Colorado Division of Wildlife; and
- There has been an increase in user conflicts, primarily between motorized off-route vehicle users and others preferring non-motorized recreational experiences (e.g., hiking, horseback riding, wildlife viewing, photography, etc.) and decreased opportunities for people who enjoy non-motorized recreational experiences.

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

**PROPOSED ACTION:** *Restrict motorized/mechanized vehicle use to existing routes*

Under the Proposed Action, roaded access would not change since no roads would be opened or closed. Therefore, the effects of existing open roads on wildlife and wildlife habitats would not change. However, the reduction in off-route wheeled-vehicle travel use that would occur under the Proposed Action would have a positive effect on wildlife and wildlife habitats. The Proposed Action would only allow off-route motorized travel for 300 feet on either side of an existing road versus the 1.5 million acres currently available for such activity. This off-route travel would not include OHV use for game retrieval.

Disturbance to Wildlife
Smaller animals, such as reptiles and amphibians are more likely to be directly killed by vehicles and are especially vulnerable when crossing roadways. Motorized cross-country travel may disrupt habitat to the point that it becomes unusable by reptiles and amphibians (Busak and Bury 1974). The diversity and density of small mammals in an area is inversely related to the level of off-road vehicle use (Bury et al. 1977). Habitat modification through vegetation and soil disturbance may also impact many small mammals. Sensitive habitats such as alpine areas, bogs, and arid areas would be most vulnerable from impacts to vegetation.

Impacts to small mammals may not be immediately obvious. According to Knight and Cole (1991), effects often include abandonment of disturbed areas in favor of undisturbed sites, or, in some cases, attraction to recreational activities (Phelps and Hatter 1977, Klein 1971). This may lead to behavioral changes such as mating, feeding and predator avoidance.

Some raptors such as the ferruginous hawk can be extremely sensitive to vehicular visits, especially during courtship and nest building. Disturbance during these time periods can result in nest abandonment. With increased recreational pressures raptor populations could decline.

Effects from habitat fragmentation are recognized with songbirds. Roads and trails add to forest fragmentation by dissecting large patches into smaller pieces and by converting

BLM_0051482

forest interior habitat into edge habitat (Askins 1994, Askins et al. 1987, Reed et al. 1996, Schonewals-Cox and Buechner 1992). Fragmentation of limited, high -value habitats such as riparian areas may cause some of the most severe impacts to songbirds.

One of the most serious impacts on wildlife from vehicles has been indirect. Vehicle traffic on and off roads has been linked with high rates of establishment and spread of noxious weeds in wildlife habitat. Competition from noxious weeds may reduce the quality and quantity of summer forage for ungulates, resulting in poor reproductive performance over the lifetime of the animal.

Limiting wheeled-vehicle travel to existing and established routes will reduce encroachment into wildlife habitat. Sensitive habitats like meadows, riparian areas and wetlands will be protected from further degradation. Interior-forested habitats would also be protected from further degradation. The spread of noxious weeds is expected to be lower under this alternative.

## Elk Security Areas

Hillis et al. (1991) state that elk security areas should be at least 250 acres in size. If existing security areas are smaller than 250 acres, management activities should be directed to achieve larger blocks. Effectiveness declines if the security area is within one-half mile of open roads or if closed roads bisect the area. Terrain features can mitigate impacts of roads to some degree. Security is defined as the protection, in any situation, that allows elk to remain in a defined area despite an increase in stress or disturbance associated with hunting or other human activities (Lyon and Christensen 1990). Restricting motorized travel to existing and established routes, the Proposed Action, would increase elk security habitat by reducing future user-created roads and trails which, in effect, would increase the amount of undisturbed acres that are more than one-half mile from a road. The Proposed Action would also eliminate the "incremental creep" into areas that are now providing security to elk therefore protecting these areas from further degradation. Analysis and designation of elk security areas within the GTAA is appropriate during the more detailed route-by-route analysis.

## Elk Habitat Effectiveness

Elk habitat effectiveness is another measure of the ability of different habitats to meet elk growth and welfare requirements. Elk habitat effectiveness in and of itself is often misapplied as a measure of security during hunting season. Habitat effectiveness is defined as the percentage of available habitat that is usable by elk outside the hunting season (Lyon and Christensen 1992). Summer range includes the habitat used by elk from about late green-up until they move to winter ranges. Summer range is the complete matrix upon which elk herds depend for growth, reproduction, and thrift. Management focus is on maintaining the ability of the habitat to meet elk needs for forage, water, seclusion, and special features such as licks and moist areas (Christensen, et al 1993). Elk security areas and elk and deer habitat effectiveness are further discussed in the Wildlife cumulative effects section.

BLM_0051483

**ALTERNATIVE 1:** *No Action - Existing travel management direction would remain unchanged*

The 1.5 million acres of federally managed lands in the GTAA currently open to off-route wheeled-vehicle travel would continue to be open under the No Action Alternative. Many hunting and fishing areas would continue to be accessed by motorized means. Hunters would be able to retrieve downed game with any motorized or mechanized means in areas open to off-route travel, provided that resource damage does not occur.

All open roads (4,133 miles) would continue to be available for motorized travel.

It is assumed that public land use, as well as motorized off-route vehicle use, would continue to increase in the GTAA. Consequently, there would be a corresponding loss of opportunities for solitude to dispersed recreationists and continued conflicts between Forest visitors. These are two factors that appear to increase off-route motorized use into more secluded areas as people search for solitude. When access to these areas receives repeated use, the result is a continued proliferation of user-created roads and trails.

Under these circumstances, resource degradation would continue in the form of disturbance to wildlife and damage to wildlife habitats, including the soil and water resources. As more and more habitats that were once remote and secure become easily accessible, elk habitat effectiveness would continue to decline. The displacement of wildlife to private lands can be expected to continue or increase. Disturbance to other species is expected to increase.

**ALTERNATIVE 2:** *Allow use of off-route vehicles for big game retrieval*

All aspects of the Proposed Action apply to Alternative 2. In addition, Alternative 2 would allow OHVs to travel off of existing and established roads and trails during big game hunting seasons only to retrieve game, providing resource damage does not occur. For the purposes of this alternative, big game is defined as elk, deer, antelope, bear, mountain goat, and bighorn sheep.

Differences between this alternative and the No Action alternative explain some of the rationale for the game retrieval alternative. Under the No Action alternative (Alternative 1), unlimited off-route motorized access would continue for a variety of recreational activities including, hunting, accessing remote hunting or fishing areas, game retrieval, sight-seeing, exploring, hill climbing. etc. This use would occur during the entire snow-free period. Under Alternative 2, off-route motorized travel beyond the 300-foot limit would occur only while retrieving downed big game animals during fall hunting seasons. All of the effects described under the Proposed Action would apply to Alternative 2.

The assumption is that this level of off-route motorized use represents a reduction in the amount of use that currently exists. Thus, it is assumed that, compared to the No Action Alternative, reduced off-route motorized opportunities would lessen impacts to wildlife habitat effectiveness and elk security areas. It would also reduce resource damage and conflicts with various Forest users and landowners. This alternative reduces the amount of days and assumes a reduction in the amount of users who will travel cross-country;

BLM_0051484

however, the fall hunting seasons are typically the highest recreational use period on the GTAA, so the reduction of cross-country travel may only be slight. The majority of cross-country travel occurs during fall hunting seasons. In addition, this alternative has a potential for user-created routes and incremental creep into more remote areas to continue to increase. Non-compliance and effective enforcement are potential problems associated with game retrieval.

## ALTERNATIVE 3:  *Reduce off-route travel restriction from 300 feet to 100 feet*

Alternative 3 is very similar to the Proposed Action. The only difference is that wheeled-vehicle travel off of existing and established routes would be reduced from 300 feet to 100 feet, providing resource damage does not occur. Only activities like camping, picnicking, and firewood gathering could occur within this 100 feet; use of ATVs for game retrieval would be limited to existing roads and trails. This alternative was developed because many people felt the restrictions contained in the Proposed Action did not go far enough in reducing the effects of off-route motorized travel. In addition, many people desired that the user-created roads and trails that have appeared in the last 10-20 years be closed and obliterated. Road closure, however, is not part of the Proposed Action. Any road closures, openings, or design of new motorized trails that would occur in the future, will need more site-specific analyses.

The effects of this alternative would be similar to those described under the Proposed Action. Compared to the Proposed Action and the other alternatives, Alternative 3 would have the least impact on wildlife and wildlife habitats, including soil and water resources.

## D.  *IRREVERSIBLE and IRRETRIEVABLE COMMITMENTS OF RESOURCES*

None of the alternatives analyzed in this EA would result in irreversible and irretrievable impacts to the wildlife resource. Although the proliferation of user-created routes would likely continue if the No Action alternative or Alternative 2 was selected, the resulting effect of reduced habitat effectiveness would not be irreversible or irretrievable. This effect could be reversed, over time, if a future decision were to restrict off-route motorized travel across the entire Forest.

## E.  *CUMULATIVE EFFECTS*

There are numerous management activities occurring in and adjacent to the GTAA that are associated with the development and use of routes. These activities create varying degrees of access to areas on Forest and BLM lands. These activities include water diversions and reservoirs, spring developments and pipelines, right-of-ways and easements; coal exploration drilling activities, oil and gas drilling operations, timber harvest, fence construction and pond development associated with livestock grazing management, outfitter and guide operations, and trail and road construction. Many roads are authorized under a special-use permit. Roads developed for management activities are often closed to minimize effects to wildlife and recreationists. Closure by gating and even obliteration still leaves a change in habitat conditions for a period of time and can contribute to a decrease in wildlife habitat effectiveness. However, the activities listed above are "managed" through a process that enables the public and land managers to address the location of routes, conflicts and mitigations that may be associated with a

BLM_0051485

particular route and make decisions which are best for protection of resources. In areas presently open to cross-country travel, routes are for the most part "unmanageable." Identifying the location and condition of user-created routes is time consuming and difficult. Having an inventory of all user-created routes is difficult because of how fast routes are created. The managed activities coupled with unmanaged user-created routes are cumulatively impacting wildlife and wildlife habitat.

Off-route vehicles do not operate in a vacuum or in areas unused for other purposes. For example, wildlife populations on public lands are subject to hunting or control activities in some places (certain predators). In some areas they may be in competition with livestock for food, water, and cover. Wildlife may be restricted in range or carrying capacity due to agriculture, roadways, and habitat alteration. Thus, off-route vehicle disruption of habitat is an additional factor interacting with several other forces detrimental to wildlife (Bury 1980). Another immediate response of wildlife to recreational disturbance is change in behavior. One behavioral change is abandonment of disturbed areas in favor of undisturbed sites (Knight and Cole 1991). Elk tend to be more disturbed by people engaged with out-of-vehicle activities than by traffic or equipment on Forest Service system roads. Logging and recreation roads with traffic moving mostly during the daytime had little effect on elk activity within 400 meters once elk became used to them. Elk preferred to be at least one-half mile from out-of-vehicle human activities (Ward 1973, 1976, 1985).

Displacement into new environments can lead to a number of further behavioral changes, such as altered feeding ecology. On the Medicine Bow National Forest, Ward (1985) showed that when displaced, elk often move to other areas that are already occupied, placing additional demands on food supplies. New access routes with no traffic controls are the most serious problems contributing to this situation. Increased off-route motorized access can worsen the problem. For example, Yarmoloy et al. (1988) disturbed radio-collared female mule deer with an ATV and noted that harassed deer altered feeding and spatial-use patterns, while undisturbed animals maintained normal usage. The harassed mule deer shifted feeding times more into the night, used cover more frequently, left their home ranges more often, and increased flight distance from the ATV. Additionally, disturbed deer experienced decreased reproduction the following year.

Disturbance can also reduce the vigor of individuals and ultimately result in death. Elevated heart rates, energy expended in disturbance flights, and reduction of energy input through disturbance will all increase energy expenditures or decrease energy acquisition (Knight and Cole 1991, MacArthur et al. 1982, Gabrielsen and Smith 1995, Ward and Cupal 1979).

To reduce recreation-related displacement, managers should control the proximity, frequency, duration, and seasonal timing of disturbances (Gutzwiller 1995). The severity of most recreational impacts on animal habitat is influenced by the amount of use that occurs. Since impact levels generally increase as use levels increase, indirect influences on wildlife could be limited by controlling the amount of recreation allowed. The nature

BLM_0051486

and severity of recreational impacts are influenced by both the type and spatial extent of use. Motorized recreational activities are generally much more disruptive than non-motorized activities. Motorized use can be prohibited in areas of concern or restricted to particular roads, trails or locations. This confinement strategy is one of the most commonly employed techniques in recreation management (Cole and Landres 1995).

Cumulative effects that are detrimental to wildlife and wildlife habitats are greatest under the existing management condition (No Action alternative). If the present situation continues with no restriction to off-route travel by wheeled modes of travel, along with increasing recreational pressure, added impact to wildlife and wildlife habitat would result. More roads and trails would be pioneered causing more disturbances to wildlife, a decrease in wildlife habitat, and an increase in noxious weed areas, which degrade wildlife habitat.

The Proposed Action Alternative and Alternative 3 would be positive actions for wildlife. Alternative 3 would be more beneficial to wildlife than the Proposed Action as it would protect more area from degradation.

Elk Habitat Effectiveness
Roads are undoubtedly the most significant consideration on elk summer range (Christensen et al. 1993). Relatively sophisticated technologies exist for calculating habitat effectiveness. Christensen et al. (1993) give several sources of information for habitat effectiveness and the major factors that influence it. Their first recommendation in evaluating habitat effectiveness is to include a road model in the analysis.

Some models used to evaluate habitat effectiveness use only open road density (e.g., Lyon 1983). Others include cover and foraging area information. Elk and mule deer habitat effectiveness are often evaluated for land management project proposals (such as timber sales) using the USFS Region 2 Habitat Capability computer model (HABCAP). HABCAP takes into consideration the amounts of hiding cover, foraging areas, and roads. Although this model is not expected to produce accurate predictions of actual populations of wildlife species, it is useful in comparing the relative magnitude of changes in existing habitat.

All models for examining habitat effectiveness assume that more open roads, indicated by higher open road density in the algorithms of the model, cause decreases in habitat effectiveness. A disadvantage is that these models uses open road density information. These models do not, however, provide a mechanism to account for off-route motorized travel. The Region 2 HABCAP model uses open road density classified by the degree of use on a particular road or trail. For off-route travel this can be difficult to assess. Also this model is applied to diversity units as defined within Forest Plans. These units are generally based on fourth order watersheds and are roughly 5,000 to 20,000 acres in size. Applying HABCAP to larger units can produce misleading results because all acres entered into the model might not actually be available to a species. HABCAP is a useful tool for project analysis to assist in determining differences in management alternatives.

BLM_0051487

Because the proposed action and alternatives apply to a broad area and do not include specific route-by-route decisions, habitat modeling was not done for this analysis. Rather, the more general understanding from both research literature, and field observation by agency and Colorado DOW biologists is reported here and in other parts of this EA. In short, off-route travel into remote areas reduces habitat effectiveness substantially.

## AQUATIC RESOURCES/FISHERIES

### A. *AFFECTED ENVIRONMENT*
The aquatic environments affected by this proposal are on lands which drain into the following fourth-order watersheds: North Fork of the Gunnison River, Taylor and East Rivers, Upper Tomichi, and Upper Gunnison Rivers.

Streams, lakes, springs and wetlands provide habitat for fish, fresh water invertebrates, and amphibians, wildlife; livestock; domestic water uses; recreational opportunities; power generation and salinity reduction. Water is important in supporting riparian communities. Water flowing from public lands has been used for irrigation for over 100 years. Water resources have been intensively and extensively developed for the purpose of meeting irrigation needs. Within the GTAA, there are portions of fifth level watersheds that the local communities of Paonia and Mt. Crested Butte use as a source for public water supply.

Fish species present within the GTAA include rainbow trout, brook trout, brown trout, Colorado River cutthroat trout, Snake River cutthroat trout, Yellowstone cutthroat trout, golden trout, kokanee salmon, lake trout (Makinaw (sp.)), sculpins, dace and shiners. There are a variety of macroinvertebrates within stream and lake environments in the GTAA including: mayfly, stonefly, and caddis fly larvae, *Gammarus* sp., aquatic worms, beetles, clams, and snails. These animals provide an important food source for fish.

### B. *ISSUES*
This section provides information related to the following issues identified in Chapter I of this EA:

  ▸ *Conflicts between motorized and non-motorized Forest users;*

  ▸ *Adverse resource impacts caused by unrestricted off-route vehicular use.*

### C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

**PROPOSED ACTION:** *Restrict motorized/mechanized vehicle use to existing routes*
One of the main impacts of travel of any type over an unconsolidated surface is to loosen and displace soil material, making it susceptible to being washed into the drainage network to become sediment. The type of travel and surface and size of the travel route

BLM_0051488

are also factors determining how much material is available as potential sediment. As the weight, size and torque of various modes of travel (foot, horse, ATV, full-sized vehicle) increase, the potential to loosen soil increases. Routes composed of unsurfaced native material have greater potential of producing sediment than do surfaced routes. Also, the more surface area bared and disturbed, the greater the likelihood for the material to become sediment. Where and how much of this potential sediment impacts the watershed depends on a number of things. These factors include: how close to the stream network the travel route is; the climatic situations during use; whether the route crosses a stream, and the condition of that crossing. It has been found that roads and trails can act as channels that multiply sediment loads to the stream network during runoff events.

Travel routes also tend to increase runoff due to compaction of the soil, decreased infiltration and lack of vegetation. This could increase the magnitude and duration of high flows causing stream channels to erode their banks, such that their stability and aquatic habitat are damaged. Bank damage can add large amounts of sediment directly into streams. Brown (1994) evaluated riverbed sedimentation caused by OHVs at river fords. Five major processes by which locally eroded sediment was added to the stream channel were identified: the creation of wheel ruts and concentration of surface runoff, the existence of tracks and exposed surfaces, the compaction and subsequent reduction in the infiltration rate of soils leading to increased surface runoff, backwash from the vehicle, and undercutting of banks by wave action. Not surprisingly, it was determined that as vehicle traffic increased so did sediment deposited in the stream.

Sediment can be described as suspended solids in the form of silt, clays and other fine materials that cause temporary to permanent turbidity or murkiness. Prolonged turbidity can cover the streambed with silt, which can smother macroinvertebrates, cover spawning areas, and reduce photosynthetic rates. Turbidity can cause feeding problems for sight-feeding trout and gill irritation to most fishes with the exception of those adapted to year-round turbidity. Additionally, streams with large loads of organic material may deplete oxygen to levels unfavorable for clean-water aquatic species.

Because they would restrict travel to existing roads and trails, the Proposed Action and Alternative 3 would provide the greatest reduction in sedimentation, stream bank erosion, compaction of soils, loss of vegetation, and compaction of riparian soils and vegetation. Habitat alteration and sediment generated by OHVs and other wheeled modes of travel are not expected to spread to new areas under the Proposed Action.

## ALTERNATIVE 1:  *No Action - Existing travel management direction would remain unchanged*

Cross-country use of OHVs and other modes of wheeled travel in popular use areas would likely continue to increase, as would the negative effects of such use on streams, wetlands, and riparian areas. User-created routes from OHVs and other modes of wheeled travel would incrementally increase road densities. Due to topography and vegetation, this process will most likely continue to occur more rapidly in the arid and less steep terrain. Many of the effects associated with water and water resources are often localized in the arid geographic settings where little fish habitat is available, such as

BLM_0051489

the many isolated and fragmented lands administered by the BLM. These lands are "brittle" in that they take longer to recover from soil compaction and loss of vegetation, factors which greatly influence water infiltration into the soil.

Implementation of the No Action Alternative would continue to allow access to riparian areas, stream channels, and wetlands. Erosion, sedimentation and riparian area degradation would continue to occur with the No Action Alternative.

### ALTERNATIVE 2:  *Allow use of off-route vehicles for big game retrieval*
Under Alternative 2, cross-country travel beyond the 300-foot limit would only occur while retrieving big game animals during the fall hunting seasons.  This alternative reduces the number of days and assumes a reduction in number of users who will travel off-route, however, typically the fall hunting seasons are the highest use period on the GTAA, therefore the reduction of cross-country travel may only be slight.  Overall, the effects of this alternative would be less than those associated with the No Action Alternative because there are fewer days during which this activity could occur, and we are assuming there will be fewer users.  Negative impacts associated with sedimentation, erosion, wetland and riparian degradation will occur, however they will be less than those expected from the No Action Alternative.

### ALTERNATIVE 3:  *Reduce off-route travel restriction from 300 feet to 100 feet*
The effects of this alternative would be very similar to those described under the Proposed Action Alternative.  Because of the reduction from 300 feet to 100 feet allowance in travel off established routes Alternative 3 would have the least impact to aquatic resources and fisheries habitat.

### D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENT OF RESOURCES*
None of the alternatives analyzed in this EA would result in irreversible and irretrievable impacts to the aquatic or fishery resource.  Although the proliferation of user-created routes would likely continue if the No Action alternative or if Alternatives 2 were selected, the resulting effect of increase sedimentation would not be irreversible or irretrievable.  This effect could be reversed, over time, if a future decision were to restrict off-route motorized travel across the entire Forest.

### E. *CUMULATIVE EFFECTS*
The greatest cumulative effects exist in areas where existing road densities are contributing to the degradation of aquatic habitat and watershed resources.  If off-route travel and user-created routes increase as they has over the past ten years, it will continue to cumulatively impact aquatic and watershed resources.  User-created roads and trails have a greater impact than designed roads and trails, since routes are created in sensitive areas like riparian areas or on sensitive and erodible soils and impacts are not mitigated. The interim prohibition on off-route, cross-country travel would maintain conditions in their current state in the short term until site-specific travel planning is completed.  The Proposed Action and Alternative 3 would provide the best opportunity to prevent further degradation of the aquatic habitat and watershed resources.

BLM_0051490

# THREATENED, ENDANGERED, AND SENSITIVE PLANT AND ANIMAL SPECIES

## A. *AFFECTED ENVIRONMENT*

No identified critical habitat for any state or federally listed threatened or endangered species has been identified within or near the GTAA. Appendix B, Tables 1, 2 and 3, *Threatened, Endangered and Sensitive Species Occurring in the GTAA*, lists federal threatened, endangered, and sensitive species potentially occurring in the GTAA. The detailed analysis and determination of potential effects of the Proposed Action and alternatives on listed threatened and endangered species were documented in a Biological Assessment (BA) and are summarized in the Effects section. The BA is on file in the Paonia Ranger District office.

## B. *ISSUES*

This section provides information related to the following issues identified in Chapter I of this EA:

▶ Adverse resource impacts caused by unrestricted off-route vehicular use.

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

### Plants

**Threatened, Endangered, and Proposed Species:** Suitable habitat for the Uinta Basin hookless cactus is the lower elevation Mancos shale badlands, which occur between 5,200 to 6,400 feet in elevation. Suitable habitat to the clay-loving wild buckwheat includes rocky hills, mesa slopes, and alluvial benches in desert shrub communities. These habitats occur between 4,500 to 6,000 feet in elevation. Populations of these species are known to occur with the GTAA on isolated BLM tracts or private lands.

Primary impacts to Uinta Basin hookless cactus and clay-loving wild buckwheat populations from off-route road use are direct mortality to individual plants in suitable habitats. Off-route travel is not currently known to be impacting these populations. Under the Proposed Action, impacts due to off-route travel to these listed plant species would be eliminated or reduced.

**Sensitive Species:** There are 26 sensitive plant species on the combined Forest Service and BLM list (see Appendix B). Of these twenty-six species, six occur in habitats that are not accessible to wheeled methods of travel; these habitats include walls, ledges, cliffs, alpine scree, and fens. Therefore, these species will not be impacted by any of the alternatives proposed in this EA. Off-route travel and user-created routes do occur in or adjacent to habitats suitable to the remaining seventeen sensitive plant species. These activities may cause direct mortality to individual plants, and may indirectly result in competition with noxious weeds that can be spread and established by off-route travel and its associated activities.

BLM_0051491

## Wildlife

**Threatened, Endangered, and Proposed Species:**  Bald eagle winter concentration areas, roost sites, or suitable nesting areas have not been identified within the GTAA. Preferred habitat areas of the Mexican spotted owl includes major canyon systems tributary to the Uncompahgre and Gunnison Rivers.  In Colorado and Utah all Mexican spotted owls have been found in deep sheer-walled, sandstone or rocky canyons from 5,500 to 6,400 feet in elevation.  Suitable canyon habitats occur within the GTAA and are largely unaffected by past and present management activities.  The terrain and lack of timber harvest potential has limited road construction and off-route travel activities in these areas.  Under all alternatives, travel management activities will not result in any direct or indirect effects to suitable bald eagle or Mexican spotted owl habitat.

Black-footed ferrets are not known to occur within the GTAA, however, potential habitat for this species does occur.  Black-footed ferret habitat is associated with prairie dog towns.  Surveys for black-footed ferret have been conducted outside but adjacent to the GTAA on BLM lands.  Occupied ferret sites were not discovered.  Off-route travel allows increased access to prairie dog habitat, which increases the likelihood of mortality from recreational shooting or accidentally running them over with a vehicle.  This effect most likely has little effect on prairie dog populations.  Under all alternatives, travel management activities will have no effect on the black-footed ferret.

The Southwestern willow flycatcher and whooping crane are dependent on aquatic and or wetland areas.  Under the Proposed Action and alternative 3, impacts to aquatic, riparian and wetland habitats from off-route travel would be reduced or eliminated.  Alternative 3 has the least potential of impacting aquatic, riparian and wetland habitats.  Alternative 1 has the most potential for impacting these habitats.

Occupied Uncompahgre fritillary butterfly colonies are located either within designated wilderness areas or areas that are inaccessible by wheeled modes of travel.  There is no effect to the Uncompahgre fritillary butterfly under any of the alternatives.

Preliminary information suggests that lynx may not be directly influenced by roads through displacement or avoidance, except at very high traffic volumes.  There is some evidence that summer use of roads and trails may have negative effects on denning habitat, if lynx are forced to move kittens because of disturbance.  Human activities in close proximity to den sites may disturb lynx and cause them to be displaced or abandon the den.  Under the Proposed Action, eliminating off-route travel would reduce the effects described to lynx.

**Sensitive Species:**  Sensitive species associated with aquatic, riparian and or wetland habitats include the boreal toad, northern leopard frog, tiger salamander, fox sparrow, white-faced ibis, long-billed curlew, and osprey.  Potential impacts from off-route travel to these species includes direct destruction of habitat, nests, eggs, and fledglings, and intentional or unintentional disturbance to nesting birds from off-route travel and user-

BLM_0051492

created routes in or adjacent to suitable habitat. There is potential for direct mortality to individual amphibian species due to off-route travel in and adjacent suitable habitat.

The reptile species, longnose leopard lizard and milksnake, inhabit the lower elevation (below 6,000 feet), more arid vegetative zones of the GTAA. These species are vulnerable to being directly killed from crossing paths with an off-route vehicle or other mode of wheeled travel. Alternative 3 has the least potential of impacting these species.

The Canyon tree frog is only known to occur in John Brown Canyon, outside of the GTAA. Habitat for this species is associated with intermittent streams in deep rocky canyons. There will be no impact to this species under any of the alternatives presented.

Gunnison sage grouse habitat is specific to one particular plant type, sagebrush. The primary concerns associated with use of motorized and wheeled modes of transportation in their habitats are direct mortality, fragmentation and degradation of habitat, and conflicting uses during critical biological active periods. Critical biological activity periods are during winter (Nov.-March), breeding (March-May), nesting (April-June), and brood rearing (May-August). Conflicting uses are those that physically prevent sage grouse from using preferred habitats. These uses include human disturbance and motorized vehicles. Sage grouse are especially sensitive to fragmentation because of their fidelity to lek, nest, winter and brood-rearing sites. Even when these habitats become absent or degraded they will continue to try to use these areas and consequently become exposed to higher mortality risks. Invasion of exotic plants reduces the abundance and diversity of forbs needed for cover and food. There is an increases risk of direct mortality (running over a sage grouse) with increases motorized use and to a lesser extent bicycle use. The Proposed Action and Alternative 3 have the least potential of impacting sage grouse as described above. The No Action Alternative, followed by Alternative 2, has the greatest potential of impacting this species.

Wolverines are very wide-ranging animals that could utilize much of the habitat types available in the GTAA. Unroaded or otherwise secluded habitat areas are favored over areas with high road densities and human activity. The Proposed Action and Alternative 3 will reduce habitat fragmentation and human disturbance throughout the summer and fall seasons thus having less impact to this species.

Habitats of primary concern for sensitive bat species; the spotted bat, Townsend's big-eared bat, Allen's big-eared bat, fringed myotis and Yuma myotis are roosting sites, particularly those used for hibernacula and nurseries. Those sites include mines, caves, rock crevices, buildings and trees. None of these habitats will be significantly altered by any of the alternatives under consideration therefore these species will not be impacted by any of the proposed alternatives.

Ferruginous hawks use trees for nest sites but also readily nest on the ground. During the breeding season 44% of the recorded sightings in Colorado occur in shortgrass prairie. Colorado's ferruginous hawks prey heavily on prairie dogs, especially in winter. The conversion of prairies to cropland and the war on prairie dog towns have most likely

BLM_0051493

affected the ferruginous hawk. Off-route travel allows increased access to prairie dog habitat and ferruginous hawk nesting site habitat thus increasing the likelihood of disturbance. The Proposed Action and Alternative 3 will have the least impact on this species.

Within the GTAA, the primary breeding habitat of the loggerhead shrike are shrubby habitats (greasewood, saltbush and sagebrush) and pinyon/juniper. None of these habitats will be significantly altered by any of the alternatives under consideration; therefore, these species will not be impacted by any of the proposed alternatives.

Burrowing owls primarily nest in rodent burrows in grasslands, shrublands, and deserts. In western Colorado, they use burrows of prairie dogs, ground squirrels, and rock squirrels. Habitat loss, habitat fragmentation, pesticide poisoning of insect populations, and collisions with vehicles have contributed to their decline in North America. Off-route travel allows increased access and disturbance to their nesting habitat. Eliminating off-route travel will have the least impact on this species.

Species associated with mature to late seral spruce-fir habitats include pine marten, three-toed woodpecker, northern goshawk, golden-crowned kinglet, boreal owl, olive-sided flycatcher, pygmy shrew and dwarf shrew. Habitats for these species could be affected by human disturbance and habitat fragmentation due to off-route travel and user-created routes. Cavity nesters (birds who nest in cavities of dead or partly dead trees) include three-toed woodpecker, purple martin, flammulated owl, Lewis' woodpecker and pygmy nuthatch. Off-route travel and user-created routes could impact these species by providing increased access to snags and other deadwood harvested for firewood. The northern goshawk and ferruginous hawk are sensitive to prolonged disturbance adjacent to their nests. Disturbance from off-route travel if prolonged near nest sites could cause adults to abandon the nest and their young.

The Great Basin silverspot butterfly is only known to occur within an existing Wilderness area. None of the alternatives proposed in this EA will impact this area. Suitable nesting habitat for the black swift is associated with waterfalls. None of the alternatives in this EA will impact the black swift or its habitat.

The detailed analysis and determination of potential effects of the Proposed Action and alternatives on Forest Service sensitive species were documented in a Biological Evaluation (BE). The BE is on file at the Paonia Ranger District office.

### Fish

**Threatened, Endangered, and Proposed Species:**  Under all alternatives proposed in this EA, there are no effects to the four endangered Colorado River fish, the bonytail chub, humpback chub, Colorado pikeminnow, or razorback sucker. These species inhabit waters downstream of BLM and FS lands within the analysis area and none of the alternatives would result in a depletion of water from the upper Colorado River Basin.

BLM_0051494

**Sensitive Species:**   Colorado River cutthroat trout inhabit relatively low gradient headwater streams with good to excellent water quality. The great reduction of cutthroat populations in southwestern Colorado is due primarily to introduction of non-native species and habitat losses. In addition, over-harvest by anglers has further reduced the populations.   Off-route travel and user-created routes can impact Colorado River cutthroat through increased sedimentation into occupied stream habitats and increase human access.   Access can increase fishing pressure in streams with low population numbers and may increase the chances of illegal stocking of non-native species into cutthroat waters. The Proposed Action and Alternative 3 have the least potential of impacting Colorado River cutthroat trout or their habitat.

The roundtail chub, bluehead sucker and flannelmouth sucker occur in the North Fork Gunnison, Gunnison, and Colorado Rivers. Localized increases in sediment due to off-route travel would most likely have little impact to these fish species. However, long-term and large-scale increases in sediment from proliferation of off-route travel in the higher-elevation watersheds, coupled with other impacts such as pollution run-off from highway construction and agricultural activities, may cumulatively impact these species.

## HERITAGE RESOURCES

### A. *AFFECTED ENVIRONMENT*
Over the last 25 years, field surveys for timber sales, land exchanges, and other projects have resulted in the identification and recording of heritage resource sites across the GTAA. Approximately 80 percent of the cultural sites are prehistoric Native American sites dating between 120 and 12,000 years in age. Roughly 20 percent are classified as historic sites (50 years or older in age) and have also been recorded. These heritage properties are representative of important cultural themes, such as prehistoric settlement, historic exploration, trapping, logging, mining, homesteading, livestock grazing, and transportation. A few paleontological sites with fossilized remains of extinct animals are known in the GTAA.

It is common practice to initiate and complete heritage resource surveys only when site-specific projects are planned; consequently, to date, only approximately 5 percent of the Forest and BLM lands in the GTAA have been inventoried for heritage properties. Where inventories have been completed our knowledge of the resource and its condition is good. However, because a large portion of the GTAA has not been inventoried, including much of the area where off-route vehicle travel has been allowed in the past, our overall knowledge of the extent and condition of heritage resources is poor.

Heritage resources are extremely fragile and can be adversely affected by a variety of factors, including natural erosion, livestock, and human activity. Heritage resources are particularly vulnerable to surface disturbances that can directly harm artifacts or indirectly accelerate erosion processes and permanently damage individual sites. Off-route travel results in surface disturbance through the creation of unauthorized trails; consequently, off-route travel has the potential to adversely affect and damage heritage resources. Sites that were attractive campsites for Native Americans 200 years ago are

BLM_0051495

attractive for recreationists today. Unrestricted vehicle use enables visitors to access some of these remote sites.

Forest Plan Standards and Guidelines for heritage resource management states, "Protect, find an adaptive use for, or interpret all cultural resources on National Forest System lands which are listed on the National Register of Historic Places, the National Register of Historic Landmarks, or have been determined to be eligible for the National Registers."

Gunnison Resource Area Resource Management Plan (RMP) states, "Archaeological resources would be managed according to existing legislation and BLM policy. Measures designed to protect significant resources would be required in all land use activity plans."

Both the Forest Service and the BLM Plans mandate compliance with Sections 106 and 110 of the Archaeological Resource Protection Act, as amended. In addition to defining management direction, this statement clearly describes the desired future condition for the resource.

## B. *ISSUES*
This section provides information related to the following issues identified in Chapter I of this EA:

> ▶ *Adverse resource impacts caused by unrestricted off-route vehicular use.*

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

Effects Common to All Alternatives:

A wide variety of heritage resources, ranging from Native American campsites to historic logging camps and mining towns dot the landscape of the GTAA. These sites provide the link between past, current, and future generations. These sites are very fragile and can be damaged by a variety of natural and human caused impacts. These resources are nonrenewable, and once they have been damaged, they cannot be restored to their original character. Protection of significant heritage resources is called for by the Forest Plan, the Gunnison and Uncompahgre Field Office RMP, and by a series of Federal cultural resource protection laws.

Damage to heritage resources sites or properties can take several forms. Artifacts can be broken as vehicles drive over them. Artifacts can also be illegally removed from these sites. The most important aspect of a heritage site is the spatial relationship between artifacts or between artifacts and site features such as buildings or fire hearths. It is the spatial relationship between artifacts and associated features which archaeologists study and which yield the most important information on past ways of life and cultures. Once intact artifact deposits are disturbed, the spatial relationships or "context" is lost forever.

BLM_0051496

We have documented damage to heritage resources by off-route vehicle and mountain bike travel on the GTAA. What we do not know is the extent of damage to heritage resources by off-route travel over the entire Forest, but we do know that off-route travel is detrimental to heritage and cultural sites.

The selection of a new travel management policy restricting off-route travel would increase the protection of heritage resources. Without extensive inventories, however, the alternatives below can only be ranked in a relative and qualitative order with regards to heritage resource protection. If ranked from most to least protective, the alternatives would be listed as follows: Alternative 3, Proposed Action, Alternative 2, and Alternative 1 (No Action).

## PROPOSED ACTION: *Restrict motorized/mechanized vehicle use to existing routes*

Under the Proposed Action, heritage resources would be provided with greater protection than currently afforded. As an example, accelerated erosion, which can expose heritage sites, would be reduced from current levels. Potential adverse effects to heritage resources on routes would be identified during inventories for landscape analyses such as timber sales, grazing allotments, site-specific travel management analyses, road construction, obliteration and maintenance, or other projects. Damage to heritage resources would continue to occur in the 300-foot zone on each side of existing routes as people use these areas for parking, camping, firewood gather, and other activities.

## ALTERNATIVE 1: *No Action - Existing travel management direction would remain unchanged*

Selection of the No Action Alternative would result in increasing levels of off-route travel and an increase in this activity over time. Damage to fragile heritage resources would continue and likely increase over time. Heritage resource properties are nonrenewable resources. Once damaged, these properties cannot be returned to their original condition. The No Action Alternative would not meet Forest Plan and BLM RMP direction for the protection of significant heritage resources in those areas where off-route travel is unrestricted.

Off-route vehicle use also has the potential to result in increased soil erosion, which can accelerate erosion of intact archaeological deposits. This is a specific concern for prehistoric sites that occur in meadows or riparian zones. These sites are particularly vulnerable to severe damage when soils are wet. As stated above, once a nonrenewable heritage property has been damaged through erosion, it cannot be restored to its original quality.

## ALTERNATIVE 2: *Allow use of off-route vehicles for big game retrieval*

Under Alternative 2, damage to heritage resources would be reduced from current levels because ATV use would be allowed off-route only during hunting seasons for game retrieval. Similar to the Proposed Action, accelerated erosion, which can expose heritage sites, would be reduced from levels anticipated under the No Action Alternative. Potential damage to heritage resources would be limited to existing routes and those areas impacted during game retrieval. Potential effects to heritage resources on the existing

BLM_0051497

travel routes would be identified during the landscape analyses mentioned above. If user-created routes were established for game retrieval, these routes would be closed. Off-route use would be allowed, but the formation of routes would not be acceptable.

**ALTERNATIVE 3:** *Reduce off-route travel restriction from 300 feet to 100 feet*

Due to the reduced off-route travel restriction from 300 feet to 100 feet, Alternative 3 would offer the greatest potential for heritage resource protection and would most closely follow Forest Plan/BLM RMP direction for the resource. Accelerated erosion, which can expose heritage sites, would be reduced from current levels the most under this alternative. Potential adverse effects to heritage resources on existing routes would be identified during future route analyses.

## D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENT OF RESOURCES*

As mentioned above, heritage resources are nonrenewable; once damaged, they cannot be restored to their original quality. Although some level of damage would still occur from wheeled travel on uninventoried existing routes, Alternative 3, followed by the Proposed Action, and Alternative 2 would reduce irreversible and irretrievable impacts to heritage resources from current levels. The reduced damage would be the result of restricted off-route travel. Selection of the No Action alternative would result in current levels of off-route travel continuing, and most likely increasing, over time. Consequently, irreversible and irretrievable impacts to heritage resources would continue and likely increase over time under the No Action alternative.

## E. *CUMULATIVE EFFECTS*

The potential for damage to heritage resources would be reduced with the selection of the Proposed Action or Alternative 2 or 3. Selection of the No Action alternative would increase the potential for damage to heritage resources.

---

# AIR QUALITY

---

## A. *AFFECTED ENVIRONMENT*

The area of influence for the air resource is the ambient air over the Forest itself, those Class I airsheds within 20 miles, and the area northeast of the analysis area (down-wind in terms of the prevailing wind). Class I airsheds nearby include the Weminuche, La Garita, West Elk and Maroon Bells Wildernesses and Black Canyon National Park. The "down-wind" airshed would include areas up to 40 miles north and east of the actual potential source area for pollutants in a standard modeling analysis.

The air quality on the GTAA has received very little direct study. This is likely because the uses of the area have had almost no impact on the air resource. Ambient air of this area is as clean as anywhere on the continent with the single exception of the Crested Butte area. Prevailing winds are southwesterly and sweep across vast expanses of unpopulated areas. Crested Butte areas have experienced several "excedences" of air quality standards, but is not designated as a non-attainment area for the pollutant PM-10.

BLM_0051498

The excedences were caused by reintrainment of dust from sanded/dirty roads in the spring coupled with highway traffic. The community is in the process of resolving air quality problems.

Vehicle traffic up and down main access routes to public lands does produce dust (reintrained dust that would fall within the PM-10 classification of pollutants) that is visible for miles on dry summer days. This is an established use and is not the subject of the decision supported by this EA but has been considered as a cumulative effect.

## B. *ISSUES*
This section provides information related to the following issues identified in Chapter I of this EA:

> ▸ *Impact of various travel management decisions on the air quality of the Uncompahgre National Forest and any Class I airsheds near the affected area.*

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*
None of the alternatives would have any discernible, measurable or differentiable effects on PM-10 pollution. The impacts that could occur in very limited circumstances (such as an ATV route that gets heavy use in the dry season) creates so little dust that it is not measurable above the natural background of dust 1/2 mile from the site of origin. This conclusion is based on repeated observation in the field. It is on this basis that we conclude that there will be no impact upon any of the Class I airsheds from any of the alternatives considered in this EA.

## D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENT OF RESOURCES*
There are no unavoidable adverse, irreversible or irretrievable effects to air quality as a result of any alternative.

## E. *CUMULATIVE EFFECTS*
The effects described above are essentially no effects. Even when considered in accumulation with the observable dust along main arterial travel routes, the impacts of OHV use are so small that they cannot even be measured as an additive factor. No decision, within the range of those considered in this analysis can be differentiated in terms of cumulative air impact.

# LOCAL ECONOMIES

## A. *AFFECTED ENVIRONMENT*
According to the Gunnison Country Chamber of Commerce, the strongest economic bases to the Gunnison area economy in descending order are tourism, education, and ranching. Tourism includes recreation on public lands, two ski areas – Crested Butte and Monarch (in Chaffee County), and private developed recreation such as golf courses.

BLM_0051499

The largest segment of jobs within the GTAA are in retail trade and services. This segment of the job market showed a 12.5% increase from 1997 to 1998. Manufacturing and wholesale trade showed a decline in this same year.

The public lands included in the GTAA are essential to the tourism industry of the area. About 85% of the lands in Gunnison County are managed by the Forest Service and BLM. The features of the Rocky Mountains, described under the Recreation section of this EA, attract large numbers of visitors every year. This is a major component of the local economy of all areas of the GTAA, and the Gunnison Basin in particular.

It is thought by many that management decisions affecting the public lands of the GTAA can alter patterns of use and thereby affect local economies.

### Local Sales of Motorized and Mechanized Recreation Equipment

Local vendors of ATVs, motorcycles, and mountain bikes market to both the local and the tourism markets.

In the GTAA there are currently three ATV and motorcycle vendors, however there are several vendors adjacent to the GTAA in Montrose, Delta and Grand Junction. Hunters in particular, travel to Colorado and may purchase ATVs, and in fewer cases motorcycles, to use for hunting access. More frequently, accessories and services offered by local dealers are sought by out-of-state visitors.

There has also been a sustained local market for motorcycles and ATVs.

OHVs not licensed to be street legal must be registered in the State of Colorado. Records show that in 1999, 53,320 OHV registrations were sold statewide. This was an 18% increase from 1998. Since the registration program began in 1990, registrations have increased an average of 16% per year. These state-wide figures, although not just for the GTAA locale, show a trend in OHV use.

There are approximately nine mountain bike vendors within the GTAA. These vendors sell to the local population, college students, and visitors. Typically, over 50% of sales are to the local population. Although the mountain bike industry projects the sales market to level or flatten, retail owners in the GTAA say sales are increasing, and some say steadily increasing. All agree that the service and repair of mountain bikes is steadily increasing. The mountain bike market rental business is steady and increasing slightly, especially around Crested Butte.

### Support to the Local Economy by Tourism

In addition to direct sales of ATV, motorcycle, and mountain bike equipment and service, there are indirect expenditures from this recreation industry. Visitors purchase gasoline, buy food at restaurants and grocery stores, shop, stay in hotels and resorts, and purchase general goods.

BLM_0051500

### B. ISSUES

This section provides information related to the following issues identified in Chapter I of this EA:

▸ *Effects of proposed restrictions on local economy*

### C. EFFECTS ASSOCIATED WITH THE ALTERNATIVES

The fundamental question to be considered is whether the proposed restriction of motorized and mechanized use to existing routes is going to affect the numbers of people 1) coming to use the area for summer recreation and in hunting season, and 2) who live in the area that will purchase and outfit motorized/mechanized equipment.

Three points of view have been expressed.

- One is that the proposed restriction will limit the appeal of the area, resulting in fewer visitors, and hence lower revenues to suppliers of vehicles, services, and goods.

- Another is that the same numbers of people will come, the same numbers of people will ride existing routes, and hence the same levels of contribution to local economies can be expected.

- It has also been argued that the improved management of the use of these lands would make them even more attractive to tourism in all seasons, and consequently result in increased contributions to the local economies.

No existing models (such as input-output economic models) are of assistance in arriving at conclusions, as they all rely on these very conclusions as input.

No conclusive research has come to our attention that addresses these questions.

Hence, the agencies acknowledge that any of the several possible effects represented above are possible. These would be the effect of implementing the proposed action or any alternative other than the No Action Alternative. No distinction can be made between Alternatives 1 – 3 in terms of effects on local economies.

The most negative effect of the proposal on local economies could be the reduction of tourism. We think that is highly unlikely, but acknowledge that there is the possibility of some loss of local income. We do not believe this would cause a loss of jobs in the area, however, that is to a small degree, possible. Rather we expect that the level of wheeled-vehicle recreation use will continue, and that it will take place on existing routes.

### D. IRRETRIEVABLE and IRREVERSIBLE COMMITMENT OF RESOURCES

This concept applies only to resources so is not applicable here.

BLM_0051501

## E. *CUMULATIVE EFFECTS*

Vehicle registration information indicates that OHV ownership has increased during the past decade. This trend is expected to continue given the expected population growth in Colorado and the Gunnison/Paonia area. If motorized and mechanized travel is not restricted to existing roads and trails the impacts of off-route, cross-country travel would continue to increase.

Some have argued that the cumulative effect of this proposal with other changes in the production of goods from National Forests and BLM lands` (i.e., reduction of timber harvest, grazing and mining) is hurting small communities that depend on public land, in part, to support their economies. As above, we acknowledge that there could be some small loss of sales of equipment and supplies for wheeled-recreation vehicles, but we do not think there will be.

As more and more natural areas are altered by development, urban sprawl and the impacts of overuse, recreationists will increasingly value areas still in a natural condition. Places like the Gunnison Basin and the Paonia area with a high percentage of public lands will continue to attract visitors if the beauty and integrity of these natural areas is maintained. To allow the slow but steady degradation of the resource by inappropriate vehicle use may draw a few economic benefits for the short term but over the long term would diminish the beauty and integrity of the area. This could have the long-term effect of reducing the economic benefits that come from tourism.

We do believe that over the longer term, management of public lands which supports healthy ecosystems and watershed systems, and which protects the overall appearance of these lands will support sustained production of goods, services, and opportunities important to diverse, healthy local economies.

## TRANSPORTATION

### Forest Service Inventory Information

In the mid-1980s, the Gunnison Ranger District undertook an intensive transportation inventory effort. At that time, several hundred miles of non-system (non-classified) roads (see Glossary) were mapped and added to the road database. Inventories were kept up to date to the extent possible. However, in 1997, the inventory effort received renewed emphasis. A combination of Global Positioning Systems (GPS) data and ground-truthing was undertaken, and new routes were delineated on the District Inventory maps. During 1998-1999 the Forest inventoried all passenger-car routes and described in detail the condition of the road and what maintenance work would be required to bring the road up to Forest Service standards. This year the Forest is inventorying a random sample of all high-clearance roads, approximately 25 percent of the remaining transportation system.

Until recently, transportation inventories on the Paonia Ranger District have been focused on system (classified) roads and trails. In 1995, a District-wide review of both classified

BLM_0051502

and non-classified roads and trails was initiated. Routes were added to the District inventory maps using GPS or digitizing. The majority of the additional routes were non-classified routes. Several changes to status of classified and non-classified were made at the time because of a change in the type of use on the route. For example, a route previously classified as a four-wheel-drive road was changed to a trail because the standard of that route had changed.

The objective on the Gunnison National Forest is to complete the inventory of all routes and delineate them on the District map draft inventories. This information will be used during site-specific travel management area analyses to make decisions about whether or not to close, open, or obliterate roads, and to help decide the mode of travel allowed on routes. This EA only addresses whether or not to restrict off-route travel.

## BLM Inventory Information

The BLM-Gunnison Field Office began to update their inventory of roads and trails in 1998. BLM employees drove or hiked every route that could be found on public lands in the Gunnison Area. This included roads currently recognized in the BLM inventory, including routes created by the public, closed roads, and abandoned routes. Basic information such as condition, length, and ownership was collected for each route. This information was entered in the Geographic Information Systems (GIS). The BLM inventory for this area is considered to be current and very accurate. Fieldwork will continue in 2000 to capture additional routes.

BLM-Uncompahgre Field Office lands in the Paonia area have not had a recent transportation inventory completed. Existing roads and trails in this area were inventoried using data from the USFS 1:100,000 scale 30- by 60-minute quadrangle maps. Delta County roads were inventoried in 1998 using GPS technology. Road and trail inventory in this area was minimally field checked and may not include all existing roads and trails.

## Map of Inventoried Routes

Routes inventoried as discussed above are portrayed on the ½-inch to the mile scale map attached to this EA. This represents the agencies' best knowledge of existing routes as of the date on that map.

## A. *AFFECTED ENVIRONMENT*

### Existing Travel Opportunities

Public lands within the GTAA provide a variety of travel opportunities. Designated Wilderness, including WSAs, accounts for 24% of the GTAA. Access in these areas is by foot and horse only.

Outside of designated Wilderness, large portions of the GTAA are roaded. This is due in large part to the terrain, which lends itself to easy access, and to the mining, ranching, and logging history. Access opportunities include motorized and non-motorized trails,

BLM_0051503

primitive four-wheel-drive roads, two-track roads, improved dirt and gravel roads, and paved highways.

Existing motorized travel opportunities include both improved and unimproved roads and trails. Improved roads include everything from historic logging roads to major graveled roads, which are maintained by the agencies and cooperators. Unimproved roads are typically primitive or two-track roads often created by hunters and other GTAA users.

### Existing Travel Restrictions

Currently, off-route motorized travel is allowed on roughly 71% percent of the GTAA. The remaining 29% percent currently has some form of travel restrictions in place.

The Forest and BLM began implementing travel restrictions in the form of travel-restricted areas roughly 20 years ago. Some restrictions were implemented as "white arrow" areas, which restricted motorized traffic to routes signed with white arrows, while others were closed completely to motorized traffic, either seasonally or year-round. The restrictions were put in place for a variety of reasons. Some restrictions were meant to protect natural resources such as high elevation ecosystems that are slow to recover from damage. Others were established to provide more effective summer or winter habitat for wildlife, to protect wildlife calving areas and winter range, or to protect open meadows near high use recreation areas. Still others were needed to minimize conflicts with other users or to provide areas for non-motorized activities, such as hiking, mountain biking, and horseback riding. Current travel-restricted areas in the GTAA are displayed on the **Existing Situation map**. The Gunnison Basin Area Visitor map depicts travel-restricted areas as yellow, and the legend defines five different categories of restricted travel. Specific travel restrictions are supplemented with a Travel Availability Guide and signed closures. Both can be obtained at most local FS/BLM offices.

Despite these restrictions, problems and conflicts associated with off-route vehicle use have grown over the last decade. Conflicts have arisen, in part, from a mixture of motorized and non-motorized uses on the same trails. User-created routes have been developed, and in some areas trees are being cut illegally to facilitate route development. User-created routes are often developed in inappropriate locations. Erosion results from existing trails being shortcut or user-created routes being developed on steep hills. Resource damage is especially prevalent in riparian areas and near streams as accessibility to these areas increases. Furthermore, as users access areas that were once remote, the potential to impact wildlife and reduce solitude for non-motorized GTAA users increases. These conflicts and impacts led to the proposal to restrict off-route vehicle use across the entire GTAA.

### B. *ISSUES*

This section provides information related to the following issues identified in Chapter I of this EA:

▸ *Adverse resource impacts caused by unrestricted off-route vehicular use;*

BLM_0051504

▸ *Conflicts between motorized and non-motorized Forest users;*

▸ *Inconsistent restrictions and lack of consistent signing and enforcement;*

▸ *Inconsistent with agency management plan direction*

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

Features common to all alternatives:

The GTAA has an extensive road and trail system with good access provided by major roads and secondary roads. Any decisions made as a result of this analysis would apply only to off-route travel. No roads or trails would be closed as a result of this decision. Consequently, road densities would not be affected. Existing seasonal and yearlong restrictions, and permanent road and trail closures, would remain in effect. Site-specific decisions about road and trail management would continue to be made as part of future agency analyses with interdisciplinary review and public input, or through an administrative order.

**PROPOSED ACTION:** *Restrict motorized/mechanized vehicle use to existing routes*

Under the Proposed Action, existing legal uses on established roads and trails would continue while off-route, cross-country motorized and mechanized vehicle use would be prohibited. The creation of user-created routes would be reduced and eventually eliminated through education and enforcement of the new travel restrictions. Restricting travel to existing routes would allow the agencies to concentrate inventory work, mapping, signing, enforcement, and maintenance manpower and budget resources on a known set of travelways. Limited budgets could be used to identify and correct existing stream degradation and riparian damage instead of repairing newly created problem areas.

Providing safe, yet challenging routes for a variety of OHV riders is an important part of managing travel on the GTAA. Restricting motorized and mechanized vehicle use to existing roads and trails would eliminate the off-road/trail recreational experience and reduce access options. It could also increase safety concerns by consolidating multiple motorized uses (i.e., ATVs and full-sized vehicles) on the same routes.

**ALTERNATIVE 1:** *No Action – Existing travel management direction would remain unchanged*

Current impacts and conflicts, including conflicts between non-motorized and motorized users, would increase as population centers around the GTAA increase. Motorized access would continue to expand as the network of user-created roads expands. The potential for resource damage, safety, maintenance, inventory, signing, and law enforcement-related concerns would also increase proportionately as unrestricted motorized use increases and additional unplanned roads and trails are created through repeated use.

BLM_0051505

In addition, if this alternative is implemented within all or portions of the GTAA, travel management would be inconsistent with travel restrictions on neighboring Ranger Districts, other Region 2 Forests, and adjacent BLM Offices which already have, or are in the process of implementing, off-route travel restrictions. The Rangeland Renewable Resources Planning Act of 1974, as amended, requires the publication of forest management Standards and Guidelines at the Regional level and adoption of those Standards and Guidelines at the Forest level. This helps ensure a consistent approach to land use planning across the Rocky Mountain Region. The Rocky Mountain Regional Guide published in 1992 meets this requirement and provides guidance on a variety of forest planning and management issues. Of particular interest to this analysis are the Regional guidelines for travel management policies. These guidelines, although general in nature, are intended to eliminate visitor confusion about the intent, implementation, and enforcement of travel management across various Forest and District boundaries within Region 2.

Under the No Action alternative the Gunnison National Forest would be the one of the few Forests in Region 2 to allow wheeled-vehicle travel off of established or designated routes on the majority of the Forest. This could lead to confusion by the visiting public and, perhaps more significantly, could concentrate OHV usage from other Forests that have restrictions onto the GTAA. This would lead to increased user conflicts, resource damage, and increased costs associated with a continually growing, uncontrolled network of roads and trails.

It would be expected that user-created routes would continue to be created across the GTAA under this alternative.

### ALTERNATIVE 2: *Allow use of off-route vehicles for big game retrieval*

Effects of implementing Alternative 2 would be the same as those listed under the Proposed Action, with the following additions. Allowing off-route travel for game retrieval would result in the continued creation of unplanned roads and trails and the continued potential for resource damage, user conflicts, and increased maintenance and signing needs. Enforcement would be difficult and would require additional resources. This alternative may also be perceived as allowing a unique set of the recreating public special rights.

Finally, allowing the use of OHVs for game retrieval would conflict with Regional travel management policies and with how other Districts and Forests are implementing their policies. This would lead to confusion by the visiting public and, perhaps more significantly, would concentrate OHV usage from other Forests that do not allow motorized vehicle use for game retrieval onto the GTAA.

### ALTERNATIVE 3: *Reduce off-route travel restriction from 300 feet to 100 feet*

Effects of implementing this alternative would be similar to Alternative 1. Alternative 3 would prove more restrictive in non-forested areas, where off-route use is currently occurring, since off-route use in heavily forested areas is already naturally restricted.

BLM_0051506

Reducing the distance from 300 to 100 feet would result in less user-created routes from various off-route activities allowed in that corridor.

### D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENT OF RESOURCES*
There would be no irreversible and irretrievable impacts to the transportation resource under any of the proposed alternatives.

### E. *CUMULATIVE EFFECTS*
There are numerous management activities occurring in and adjacent to the GTAA that include the development of roads and trails. These activities include water diversions and reservoirs, spring developments and pipelines, right-of-ways and easements; coal exploration drilling activities, oil and gas drilling operations, timber harvest, fence construction and pond development, and outfitter and guide operations. These activities are managed and allow land managers to plan the location of the routes, and mitigate resource issues and potential conflicts. In addition to these managed routes, many user-created routes are being created across the GTAA. These routes are unmanaged and unplanned. In addition to road and trail managers managing a system of routes, they are faced with identifying, locating, and mapping these user-created routes. These routes, because they are not included on the transportation system, do not receive any road or trail maintenance, which leads to resource concerns. The managed activities, coupled with unmanaged user-created routes are cumulatively impacting the transportation resource across the GTAA.

Cumulative effects that are most detrimental to the transportation resource are greatest under the existing management conditions (No Action alternative).

No new roads would be constructed, obliterated, opened, or closed as a result of this analysis, nor would existing trails be closed. However, the environmental effects of user-created roads and trails would have an inherent set of potential environmental consequences. These include resource damage to adjacent streams and wet meadow areas, potential safety issues, increased inventory, signing, maintenance, and law enforcement requirements.

## LIFESTYLES AND TRADITIONAL PATTERNS OF USE

### A. *AFFECTED ENVIRONMENT*
Travel management on the GTAA has been, and continues to be, a contentious issue. Debate over travel management is certainly not new, and the Gunnison National Forest and associated BLM offices are not the only entities dealing with this issue. Some people have described travel management as one of the most difficult public lands issues to address. This conflict exists for the same reason that many public lands issues are controversial -- the way people feel about the issue is often tied to their core values and beliefs. Because core values and beliefs are so strongly held, people can become polarized when they encounter others with different points of view.

BLM_0051507

In general, recreation experiences are very personal and individual. One person's recreation experience can be another person's annoyance. Travel plays an important role in a person's recreation experiences. In a broad sense, recreation travel issues can be pared down to philosophical differences among various recreationists wishing to use the same area. This philosophical difference exists even between users of the same activity. For example, some hunters will argue that motorized vehicles disturb and intrude on their hunting experience; others will attest that the ease of access improves the hunt. The fact that they each value the experience differently introduces social conflict.

Some people recreate on the GTAA using a mode of motorized travel while others recreate using non-motorized modes of travel. There are also those who engage in both motorized and non-motorized forms of recreation and some who use ATVs only during the fall hunting seasons. There are strong feelings regarding the appropriateness of varying types of travel on public land.

The social issues surrounding travel management in general include a desire for personal freedom with few restrictions, a desire to keep things the way they are, a concern about "what's next," "prescribed rights" (the idea that people tend to associate, as a right, opportunities they have experienced in the past), a desire to not hear or see motorized vehicles in the backcountry, concern that increased restrictions might further concentrate use and increase visitor conflicts, and even perceptions people have about other people who recreate differently, hold different values, and who think differently than they do. This issue is one that is complex, strikes at people's core values and possibly their livelihood, and for which there is no single correct solution, only more or less useful courses of action.

While all sides of the social equation need to be considered, no decision can optimize the desires of all interested parties.

## B. *ISSUES*
This section provides information related to the following issues identified in Chapter I of this EA:

> ▶ *Conflicts between motorized and non-motorized GTAA users*

> ▶ *Limitations on personal freedom*

## C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

**PROPOSED ACTION:** *Restrict motorized/mechanized vehicle use to existing routes*
This alternative is most responsive to the desires of individuals and groups who feel vehicle use on public lands should be limited to roads and trails with very limited exceptions.

Wheeled-vehicle users would lose the ability to travel off-route more than 300 feet to collect firewood, picnic, or camp with vehicles. Some may interpret the loss of these

BLM_0051508

recreation opportunities as a loss of personal freedom. There would be a perceived loss of freedom by those who wish to travel unrestricted. During the short a time they have been in use, ATVs have already established themselves as important parts of some visitors (especially hunters) experience on these public lands. Hunters would need to keep their OHVs on roads and trails when retrieving game.

In the Proposed Action and Alternatives 2 and 3, the primary social effect to visitors who use motorized or mechanized wheeled vehicles to travel is the loss, in some form, of the above opportunities. Conversely, non-motorized visitors who wish not to see or hear motorized vehicles would be able to have that experience to a greater degree.

Non-motorized recreation users would benefit from a reduction in conflicts with motorized users, which could enhance their recreation experience and social well-being. GTAA visitors who wish not to see or hear motorized vehicles would have more opportunities for that experience than currently exist.

Motorized and mechanized vehicle users who choose to pioneer new routes and connect or link existing trails where no trail exists would no longer be able to do so.

### ALTERNATIVE 1: *No Action - Existing travel management direction would remain unchanged*

If the No Action Alternative were selected, there would be no immediate change to the current social environment relating to travel on the GTAA. This alternative is most responsive to the desires of individuals and groups who feel public lands should remain open to wheeled-vehicle access at the current levels. This alternative best addresses their concerns and would enhance their social well-being.

GTAA visitors who enjoy off-route wheeled-vehicle travel would continue to experience current opportunities, including off-route access for recreation, firewood gathering, and other activities. Non-motorized recreationists not wishing to see or hear motorized vehicles would continue to have their recreation experience negatively impacted, and visitor conflicts between motorized and non-motorized recreationists would likely continue.

Increasing number of people in the West and across the country believe that cross-country vehicle management should place more emphasis on protecting natural resources. This alternative is not consistent with these attitudes.

### ALTERNATIVE 2: *Allow use of off-route vehicles for big game retrieval*

The effects of this alternative would be similar to the No Action alternative. Hunters would be allowed to use ATVs off existing roads and trails in areas currently open to off-route travel to retrieve downed big game but only during certain hours. Under this alternative, hunters using ATVs would continue to enjoy current opportunities to retrieve game off-route, subject to the conditions listed in the alternative description in Chapter II.

BLM_0051509

Conflicts between non-motorized and motorized hunters would continue which could diminish the social well-being of affected hunters.  There is some concern that the exceptions allowed for game retrieval would be difficult to enforce and some people would continue to drive ATVs anywhere they wanted.

Non-motorized hunters who wish to not be within the sight or sound of motorized use would be negatively impacted when encountering hunters with ATVs or other motorized vehicles.

**ALTERNATIVE 3:** *Reduce off-route travel restriction from 300 feet to 100 feet*

This alternative is most responsive to the desires of individuals and groups who feel wheeled-vehicle use on public lands should be limited to existing or designated roads and trails with very few exceptions.  Non-motorized recreation users would benefit from a minor reduction in conflicts (going from 300 feet to 100 feet) with motorized cross-country users, which could enhance their recreation experiences and social well-being. People who engage in off-route, wheeled vehicle activities (i.e., retrieving downed game, camping, pleasure riding) would lose that opportunity on public lands, except for a 100-foot limit off road and trail, which could diminish their social well-being.  However, they would still be able to use their vehicles on roads and trails.

Restricting off-route travel to 100 feet on either side of existing routes, off-route wheeled-vehicle users would be more affected by Alternative 3 than the other alternatives.

**D.** **IRREVERSIBLE and IRRETRIEVABLE COMMITMENT of RESOURCES**
This concept applies to resources so is not applicable here.

**E.** **CUMULATIVE EFFECTS**
The expected increase in population and related increase in recreation activities on the GTAA, would, in general, lead to more conflicts among recreationists.  The loss of opportunities for non-motorized/mechanized users due to increases in conflict that occur on trails that are open to motorized and mechanized travel would be at least partially offset by the enhanced opportunities for non-motorized recreation available in Alternatives 2 and 3 and the Proposed Action.

Some users have expressed concerns regarding control and management of public lands. Since travel is already restricted in about 45% of the GTAA (including Wilderness) choosing an alternative that further restricts travel could add to these concerns. Specifically, these users may feel that public land managers are not listening and/or responding to their wishes to keep public lands open to off-route cross-country travel. All alternatives except the No Action Alternative would add to these feelings.

BLM_0051510

## LAW ENFORCEMENT

### A. *AFFECTED ENVIRONMENT*
The GTAA covers a large geographic area, which equates to a large area of enforcement responsibility for Forest Service and BLM personnel. Law enforcement officers (LEOs), Forest Protection Officers (FPOs), and BLM Rangers enforce petty misdemeanors to felony offenses on public lands within the GTAA. Relating to this proposal, law enforcement personnel would enforce the restrictions pertaining to travel management violations, and specifically, requirements on the Gunnison Basin Area Visitor Map and associated Travel Availability Guide (TAG), and the pertinent Code of Federal Regulations (CFR) associated with travel and resource concerns.

### B. *ISSUES*
This section provides information related to the following issues identified in Chapter I of this EA:

▸ *Conflicts between motorized and non-motorized GTAA users*

▸ *Inconsistent regulation, lack of consistent signing and law enforcement*

### C. *EFFECTS ASSOCIATED WITH THE ALTERNATIVES*

Features common to the Proposed Action and Alternatives 2 and 3.

*1) Education and ethics programs regarding travel on the GTAA would be maintained.*

Implementation of restricted type of travel management programs would improve law enforcement efforts. These types of programs generally result in cooperation from the public. Additionally, they increase the public's willingness to report violators to Agency personnel.

Implementation of an action alternative would involve the publication of a brochure explaining, through pictures and text, what constitutes an established route. A brochure could also provide travel management ethics, and information on what modes of travel are appropriate on routes (i.e., only single-track vehicles can operate on single-track trails). The photographs and language in the brochure would serve as information and education for users, and enforcement personnel would be better able to exercise enforcement and take appropriate actions when necessary.

*2) Agency law enforcement efforts would continue.*

Success would be dependent on the agency personnel within the GTAA to do a complete job of law enforcement. A complete job in law enforcement is a three-pronged effort which includes all Forest/BLM employees, as well as

BLM_0051511

enforcement personnel. To be successful on the ground, the three elements that must work together include:

1) Provide the public with consistent and up-to-date education and travel management information;
2) Prevention through complete and on-the-ground engineering (i.e., proper closures, proper signing, and on-going maintenance of closures, signs, etc.); and
3) Fair, consistent, and progressive enforcement by agency law enforcement, with support from GTAA personnel. Key enforcement actions would include incident reports, warning notices, and violation notices.

3) *Users would be involved with regulation enforcement through peer pressure and information gathering. Clubs, manufacturers, individuals, and retailers would be asked to help.*

Successful implementation of this element would be in direct proportion to the effort put forth through public education by the Forest Service, BLM, mountain bike, OHV, and related organizations. Over the past 3 to 4 years, the public has reported a greater number of violations. In part, this can be attributed to acceptance of the Tread Lightly and Leave No Trace Programs taught by the agencies and the public. It is reasonable to assume that peer pressure would continue with educational programs and citizen assistance to law enforcement.

Features common to all alternatives, including the No Action Alternative:

1) *All Federal and Colorado State laws that apply to motorized vehicle use must be followed.*

Title 36 CFR, Parts 261.12, 261.13, 261.16(a), 261.54, 261.55 and 261.56 all apply to the operation of motorized vehicles on and off of Forest Development Roads and Trails. Only Colorado state laws covered by Forest Supervisor Orders apply under 36 CFR 261.54 and 36 CFR 261.55 and may be enforced on Forest Development Roads and Trails. Some Title 42 state traffic laws may also be applicable. BLM will continue to enforce Title 43 CFR 9268.3 and other applicable regulations.

Both agencies will continue to work cooperatively with local and state law enforcement, including the Division of Wildlife (DOW).

For the most part, the Colorado Sheriff's Department or the Colorado State Patrol will not enforce state restrictions on Forest or BLM roads and trails.

BLM_0051512

Specific effects associated with the alternatives:

**PROPOSED ACTION:** *Restrict motorized/mechanized vehicle use to existing routes*

The effects of implementing the Proposed Action would benefit law enforcement in three areas:

1) It would help to eliminate existing confusion and ambiguity over a large portion of the GTAA where different travel management restrictions are currently applied;
2) It would allow consistent and uniform enforcement of restrictions across the GTAA and between two agencies; and
3) It would provide clear regulation, so visitors would know when they are violating a regulation.

A major gray area subject to interpretation under this alternative would be what constitutes resource damage within the 300-foot corridor. This determination would be left to the discretion of law enforcement personnel. If new routes were created, they would be closed.

**ALTERNATIVE 1:** *No Action - Existing travel management direction would remain unchanged*

Existing travel management on the GTAA would remain unchanged. Law enforcement would remain the same.

Currently, restrictions in place do not regulate travel off roads and trails in open travel areas. On the Forest, restrictions of travel on and off roads and trails may be implemented through a Forest Supervisors Order using 36 CFR 261.54, 261.55, 261.56 and 261.13. Regulations of off-route travel on BLM-managed lands are found in 43 CFR 8340, or in RMPs.

The confusion related to travel management areas, and restrictions on those areas, would continue if the existing situation (No Action alternative) does not change.

**ALTERNATIVE 2:** *Allow use of off-route vehicles for big game retrieval*

Implementation of this alternative would create difficulties for law enforcement. Some of these difficulties include:

▸ *How, and who, would determine when resource damage occurs;*

▸ *At current funding levels, there are not enough Forest Protection or Law Enforcement Officers or BLM rangers to monitor and enforce the time limitations associated with Alternative 2;*

▸ *It puts the burden of proof on the agency to determine if off-route ATV use is for game retrieval or some other reason.*

BLM_0051513

On the other hand, not allowing use of ATVs for game retrieval could present enforcement challenges also. There is strong motive for people to disregard this aspect of the proposed restrictions. A downed elk weighing 800 pounds may take as many as eight three-hour trips to pack out by hand, when one 30-minute trip on an ATV would accomplish the same thing. The experience is altogether different. The amount of work, and even many hunters' inability to perform such work, will be a strong invitation to commit these types of violations. Hunters need to be made aware that these violations may result in a mandatory court appearance, which carries up to a $5000 fine and/or 6 months imprisonment.

**ALTERNATIVE 3:** *Reduce off-route travel restriction from 300 feet to 100 feet*
This alternative has nearly the same effects as the Proposed Action.

The gray area subject to interpretation under Alternative 3 would be what constitutes resource damage within the 100-foot corridor. This determination would be left to the discretion of law enforcement personnel. If new routes were created, they would be closed.

Implementation of Alternative 3, similar to the Proposed Action, would greatly simplify the interpretation of what constitutes a violation of travel management restrictions.

GTAA visitors need to know whether they can drive 100 or 300 feet off an existing route. Currently, the BLM does not allow any distance off-route by motorized vehicles in restricted travel areas. It would be consistent, and much clearer to GTAA visitors if the BLM and Forest agreed to the same distance limits in their respective decisions and regulations. If not, there would be continued inconsistency within the GTAA.

Surrounding Forests, and the Gunnison National Forest allow motorized travel 300-foot off existing routes for camping, picnicking, and forest product gathering. Implementing this alternative would be inconsistent with other Forests.

## D. *IRREVERSIBLE and IRRETRIEVABLE COMMITMENT OF RESOURCES*
There would be no irreversible and irretrievable commitment of resources to law enforcement under any of the proposed alternatives.

## E. *CUMULATIVE EFFECTS*
Under all alternatives, increased public education efforts and more consistent enforcement of travel management restrictions would reduce confusion of GTAA users. The greatest improvements would be seen under the Proposed Action and Alternative 3 since nearly consistent travel management restrictions would apply across the entire GTAA. Although improved conditions would still be realized under the remaining alternatives, the effects would not be as great since travel restrictions would be different in different areas of the GTAA. Consequently, there would still be some degree of confusion.

BLM_0051514

## MONITORING REQUIREMENTS

Any alternative that is selected would be monitored to ensure that the Purpose and Need for this Proposal described in Chapter 1 is being met. Table 2 displays the conditions that would be monitored under each alternative.

Table 2. Items to be Monitored During the Next 3 Years.

| Monitoring Item | When | Who[1] |
|---|---|---|
| Creation of new, user-created roads and trails | During future site-specific travel management analyses and during field operations | Field-going and law enforcement personnel |
| Trends in violation notices and reported incidents | Year-round | Law enforcement personnel |
| Effects on game and non-game wildlife species | During future site-specific travel management analyses | Wildlife biologists |
| User conflicts | Year-round | Frontliners and field-going personnel |
| Resource damage | Year-round | Field-going and law enforcement personnel |
| Conflicts with private landowners | Year-round | Frontliners and field-going personnel |

**NOTE: Future site-specific travel management analyses will be conducted to determine if certain routes need to be closed as a result of impacts associated with motorized vehicle use and to determine whether or not sufficient motorized opportunities are being provided across the GTAA. Decisions to open or close individual routes, or to develop additional motorized opportunities, would only be made after further public discussion and disclosure.**

## COMPARISON OF ALTERNATIVES

Table 3 displays how the issues listed on page 13 through 16 of this EA would be affected by implementation of the various alternatives.

**Proposed Action:** Restrict motorized/mechanized vehicle use to existing routes
**Alternative 1:** No Action -- Existing travel management direction would remain unchanged
**Alternative 2:** Allow use of off-route vehicles for big game retrieval
**Alternative 3:** Reduce off-route travel restriction from 300 feet to 100 feet

---

[1] All incidents would be reported to the BLM Field Office or Forest Travel Management Coordinator so that a centralized record could be maintained.

BLM_0051515

### Table 3. Effects to the Issues by Alternative[2]

| Issue | Proposed Action | Alt. 1 | Alt. 2 | Alt. 3 |
|---|---|---|---|---|
| **Wildlife habitat effectiveness** | Improved | Reduced | Improved, except during the big game hunting season | Improved |
| **Conflicts with private landowners** | Reduced | Maintained or Increased | Reduced, except during the big game hunting season | Reduced |
| **Adverse resource impacts caused by unrestricted vehicle travel** | Reduced | Maintained or Increased | Reduced, except during the big game hunting season | Reduced |
| **Reduced conflicts between motorized and non-motorized Forest users** | Yes | No | Yes, except during the big game hunting season | Yes |
| **Consistent signing and enforcement** | Yes | No | Yes | Yes |
| **Conflicts with the Forest Plan and the Regional Guide** | No | Yes | During the big game hunting season | No |
| **Limiting personal freedom** | Yes | No | Yes | Yes |
| **Allow off-route vehicle use for big game retrieval** | No | Yes | Yes | No |
| **Reduce 300-foot off-route travel allowance to 100 feet for such activities as firewood gathering, dispersed camping, etc.** | No | No | No | Yes |

---

[2] More detailed information regarding the effects to issues can be found in Chapter III, Environmental Consequences.

BLM_0051516

# CHAPTER IV

## AGENCIES AND PERSONS CONSULTED

### LIST OF PREPARERS

In accordance with 40 CFR 1501.2(a), the Forest Supervisor selected a team of resource specialists to utilize a systematic, interdisciplinary approach in planning and decision making which may have an impact on the human environment.  The following people contributed to the preparation of this EA either as full ID Team members or as reviewers of the work reported here.

> Jim Dawson – Gunnison District Ranger
> Sandy Thompson – Gunnison Recreation Specialist
> Jeff Burch – Environmental Coordinator
> Andrea Wang – Wildlife Biologist
> Pam Wilson – Public Affairs Specialist
> Bill Bottomly – BLM Coordinator for Gunnison and Uncompahgre Field Managers
> Dennis Murphy – BLM Hydrologist
> Arden Anderson – Recreation Planner, Gunnison Field Office
> Carl Bauer – Recreation Planner, Uncompahgre Field Office

BLM_0051517

# CONSULTATION AND COORDINATION

The ID Team consulted with various other federal, state, and local agencies, as well as private businesses, organizations, and individuals during the analysis process for this proposed action). The list below displays those specific agencies, organizations, individuals, Native American contacts, businesses, and media contacts that expressed an interest in this type of project.

## Federal Agencies

Congressman Scott McInnis
Senator Wayne Allard
Senator Ben Nighthorse Campbell
Environmental Protection Agency, Region VII
Bureau of Land Management (Montrose, Grand Junction, Gunnison, Denver)
Natl. Park Service-Black Canyon of the Gunnison
Natl. Park Service-Curecanti Natl. Rec. Area

Natural Resources Conservation Service
US Army Corps of Engineers
US Dept. of Housing & Urban Development
US Forest Service, San Juan National Forest
US Forest Service, White River National Forest
US Forest Service, Rocky Mtn. Regional Office
US Fish & Wildlife Service, Western CO Office

## State/Local/Tribal Agencies

City of Gunnison
Colorado Department of Parks and Recreation
Colorado Division Of Wildlife
Colorado State Forest Service
Crested Butte Chamber of Commerce
Delta County Commissioners
Delta County Health Department
Gunnison County Attorney
Gunnison County Chamber of Commerce
Gunnison County Commissioners
Gunnison County Manager
Gunnison County Planning Department
Gunnison County Road Department
Hinsdale County Planning Commission
Hinsdale County Commissioners
Hinsdale County Road Department
Lake City Chamber of Commerce

Lake City County Commissioners
Montrose Chamber of Commerce
Montrose County Commissioners
Northern Ute Tribe
Ouray County Commissioners
Paonia Chamber of Commerce
Saguache County Commissioners
Saguache County Road & Bridge
San Miguel County Commissioners
Southern Ute Tribe
Town of Crawford
Town of Crested Butte
Town of Mt Crested Butte
Town of Paonia
Town of Saguache
Ute Mountain Ute Tribe

## Media

Crested Butte Chronicle & Pilot
Daily Sentinel
Delta County Independent
Fruita Times
Gunnison Country Times
High Country News

Montrose Daily Press
Mountain Valley News
Ouray County Plaindealer
Palisade Tribune
Plateau Valley News
Silver World

## Organizations/Businesses

J Brink Outfitters
Action Adventures
Action Adventures
Adams Ranch

Adaptive Sports Center
Adventure Experiences Inc.
Adventure Unlimited
Adventures Rolling Cross-Country

BLM_0051518

Adventures to the Edge
Agape Outfitters
Allen and Sons, Inc
Alpine Express
Alpine Meadows
Alpine Outfitters Ii, Inc
AMA-Colorado OHV Coalition
American Lands Access Association, Inc.
American Lands Alliance
American Motorcyclist Association
America's Adventure Inc.
Amoco Production Company
Arrowhead Improvements Association
Aspen Alpine Guides Inc.
B&B Partnership
Backcountry Skiers Alliance
Bar Diamond Outfitters
Bar X Bar Ranch Ltd.
Bar ZX Ranch & Lodge
Barrett Park Outfitters
Bicycle Colorado Mar
Bio-Environs
Black Canyon Audubon Society
Black Mesa Lodge
Blue Mesa Four Wheelers
Brandt Logging Inc
Buckhorn Contractors
Buena Vista Snow Drifters
Buena Vista Snowmobile Club
Burns dba Wrights Brangus
Burt Rentals Snowmobile Tours
C Bar T Trail Ranch
Cadwell Outfitters
Camp Gunnison
Camp Redcloud
Cannibal Outdoors
Capitol Peak Outfitters
Castle Lakes Resort
Cedar Mesa Ditch & Reservoir Co.
Chaco Sandals
Chu Chu Pate
Club 20
Coal Creek Outfitting
Coleman Ranches, Inc
Collegiate Peaks Outfitters
Colorado 500
Colorado 500
Colorado Assoc of 4WD Clubs Inc.
Colorado Environmental Coalition
Colorado History Museum
Colorado Holistic Resource Management
Colorado Mountain Club
Colorado Mountain West Magazine
Colorado Natural Areas Program
Colorado Off-Highway Vehicle Coalition
Colorado Outfitters Assn, Gunnison Chapter

Colorado Outward Bound
Colorado Recreation Initiative
Colorado Snowmobile Association
Colorado Sportsman Wildlife Fund
Colorado Timber Industry Association
Colorado Wild
Colorado Wildlife Federation
Columbine Hiking
Continental Divide Snowmobile Club
Continental Trail Divide Alliance
Cosmic Cruisers
Cottonwood Country Enterprises
Coyote Color Photo
Crested Butte Academy
Crested Butte Mountain Guides
Crested Butte Mountain Resort
Crested Butte Mountain Runners
Crested Butte Nordic Council
Crested Butte Wildflower Festival
Crystals Meadows Ranch
CSU Cooperative Extension
CU Wilderness Study Group
Cutthroat Adventures
D&T Simms Timber Products
Dan's Fly Shop
Del Flynn & Sons
Delta County Livestock Association
Delta County Tourism Cabinet
Delta-Montrose Electric Association
Dilley's Guide Service
Dotty's Towing Service
Doug Jones Sawmill
Duncan 4x4 and Auto Repair
Dvorak's Expeditions
Eagle Mountain Outfitters LLC
East River Free Trappers Club
Educational Advances
Electric Mountain Lodge
Elk Mountain Grand Traverse
Fantasy Ranch Outfitters
Figure 3 Ranch & Sawmill
Figure 4 Salers
Fire Mountain Outfitters
Forest Conservation Council
Forest Conservation Council –
    Ecology & Law Institute
Fox Creek Guide & Outfitters
Fun Time Jeep Tours
Gersh & Danielson
Goodrich Contract Logging
Gunnison Basin Biodiversity Project
Gunnison Basin Weed District
Gunnison County Stockgrowers Association
Gunnison County Trails Commission
Gunnison Gorge Anglers #426
Gunnison Horse Endurance

BLM_0051519

Gunnison Valley Adventure Guides
Hall Realty
Hard Rock 100
Harmel's
Heart of the Rockies
Heart of the Rockies Snowmobilers
Heron Construction
Hidden Valley Ranch
High Country Citizens Alliance
High Country Outfitters
High Mountain Drifter
Holman Ranches
Holman's High Country Outfitters
Hotchkiss Ranches, Inc.
Hotchkiss Ranches, Inc.
Hubbard Park Outfitters
Intermountain Forest Products
Intermountain Resources
Intermountain Timber Products
International Mountain Biking Assn
Irby Ranches L.L.C.
Irwin Lodge
Irwin Ten LLC
J.H. Wagner & Co. Inc.
Jacob's Ranch Partners
JKM Enterprises
Jones Lumber Company
Kitchen Pass 4-Wheelers, Pikes
      Peaks Chapter
Kuntz Living Trust
KW Wapiti Outfitters, LLC
L Ranch Partnership
La Garita Llamas
Lake City 50
Lakeview Resort & Outfitters
Lamborn Valley School
Land Rover of North America
Lazy F Bar Outfitters
Leisure Sports Photography
Leroux Creek Water Users Assn
Longacre Expeditions Inc.
Lost Enterprises, LLC
Lost Miner Ranch
Louisiana-Pacific Corporation
Lucky Cat Dog Farm
Marble General Store
McDonald's Outfitting Service
McIntyre Livestock Corporation
Mile-Hi Jeep Club
Miller Ranch Corporation
Mineral Mountain Outfitter & Guides
Motorcycle Enduro
Motorcycle Trail Riding Association
Mountain Coal Company
Mountain Valley Lumber Inc.
Mt. Lamborn Ranches

Murdie Subdivision Homeowners Association
Navigators
Needle Rock Ranch
Nicolas Brothers
Noah's Ark Adventure Program
National Outdoor Leadership School
Northern Colorado Trail Riders Association
Ouray Livery
Overland Ditch & Reservoir Co.
Paonia Garage & Sawmill
Paul Guerrieri & Sons
Pea Green Store
People for the USA
Pierce Brothers Outfitting
Pioneer Guide Service
Powderhorn Guest Ranch
PR Property Management Inc.
Premier Medical Group
Purcell Brothers Outfitting, Inc.
Quaking Aspen Outfitters
Quarter Circle Circle Ranch
Quiet Use Coalition Inc.
Rainbow Lake Lodge & Outfitters
Red Feather Bowmen
Redd Riders LLC
Redden Ranches. Inc.
Redstone Community Association
Rendezvous Outfitters & Guides
Riveria Drilling & Exploration
Roads Less Traveled
Rocky Mountain Bighorn Society
Rocky Mountain Biological Lab
Rocky Mountain Outfitters
Rocky Mountain Recreation Initiative
Rocky Mountain Safaris
Rocky Mountain Trials
Rocky Mountain Forestry
Round Up Riders of the Rockies
S&A Investments
Saddle Mountain Guest Ranch
San Juan Service
Scenic River Tours
Schmittel Packing & Outfitting
Sierra Club, Rocky Mountain Chapter
Sierra Club, Uncompahgre Group
Silver Fox Outfitters
Silver Thread Interest
SINAPU
Smith Forest Products
Soap Mesa Venture LLC
Spadafore Ranches, Inc.
Spann Ranches, Inc.
Sperry's Inc.
Spruce Ridge Llamas
Staiduharranches
State Farm Insurance

BLM_0051520

Stover Ranches
Sutherland Ranches
Tabor Mountain School
Taylor Park Cattle Association
Taylor Park Marina Ltd
Tenderfoot Outfitter & Guide Services
Terror Ditch & Reservoir Co.
The Bear Ranch
The Nature Conservancy
The Rock at Ute Trail
The Wilderness Society
Thor
Three Rivers Resort
Thunder Mountain Wheelers
Timberline Bicycle Tours
Timberline Llamas
Timberline Outfitters & Guides
Todd Enterprises
Trailmark Outdoor Adventure
Trampe and Rundell
Triangle Forest Products
Trout Unlimited
Trout Unlimited, Grand Valley Anglers
Upper Arkansas Motorized Recreation Coalition

US Forest Industries Inc
Vader Cloverleaf Ranch
Valley View Guest Ranch
Vaughan Ranches
Vickers Enterprises Inc.
Wapiti Canyon Ranch
Ward Ranches, Inc.
Waunita Hot Springs Ranch
Western Colorado Outfitters
Western Land Group, Inc.
Western Slope 4-Wheelers Association
Western Slope ATV Association
Western Slope Environmental
    Resource Council
Western State College
Whinnery Outfitting
Wilderness Opportunities
Wilderness Ranch
Wilderness Society
Wilderness Study Group
Wildhorse Energy
X7R Ranch
XTC Cycles
Young Brothers

## Individuals

Wesley Adams
Dorothy Alderman
Anne Allen
Betty Allen
David & Norma Allen
Edwin Allen
Larry Allen
Paul Allen
Ross Allen
Steve & Rachel Allen
Erin Amme
Paul & Ankie Amos
Richard Armstrong
Loretta Arnett
Dr. Romney Ashton
Kirsten Atkins
Frank Austin
James & Susan Ayer
Angel Babudro
Billy Barr
Jim Barry
Jean & William Barton
Eric Baumm
Arliss Beach
Tatiana Beadleston
Lorna Beal
John Beezley
Ted & Kimberly Bemis
Robert Benell

Jerome & MaryLou Benkert
Bob & Zuma Bennett
W.S. Bennett
Frank & Adrianne Bifulk
Peter Blake
Ray Blaum
Troy Boehm
Jerry Boldt
Leroy & Velma Borich
Nichael Bouton
Herman Brand
Rayola Brandt
Peter Bridges
Harold Brill
Sam Brown
Bill & Jen Brunner
Charlie Burgin
Peter Burkhardt
Karl Burns
Gerald Burrows
Paulette Byassee
Bill Byrd
Greg Caldwell
Cal Campbell
Don Campbell
Brian Carlson
Lane & Lisa Carlson
Wayne & Kathy Carlson
Suzanne Carlstedt

William & Ruth Carsten
Ev Carter
Tim & Adrienne Casey
Michael Cerise
Kathryn & Leo Chaney
Gary & Margie Charlton
Bill & Pat Chenault
Hans Christensen
David & Susan Chrostek
Donald Chrydinsky
David Clinger
Deinse Clynes
Henry Cocain
Warren Cockroft
Geary Cockrum
Bill Cole
Junior & Ruby Cole
Richard Cole
Katherine Colerich
Rebie Sue Collins
Vicki Colvin
Jennifer Condon
Frank Conklin
Bonny Cooley
Corey Corbett
Kenneth Courtright
Terry & Janice Crane
Jan Cressman
Paul & Joey Crosnoe

BLM_0051521

David Crosson
Harold & Phyllis Cunningham
Robert Czillinger
DeWitt Daggett
Junior Dalton
Shari Dangremond
Michael Ray Darr
Katherine Darrow
Bob & Shari Davis
Bruce Davis
Roger Day
Lanny Denham
Scott DePauw
Paul Douglas
Paul & Debbie Douglas
Doris Dransfield
Jim & Jean Drummond
Diane Duck
Doyce Easterling
Lawrence Ebaugh
B. Eden
Randall Egelkamp
Floyd Ehman
Ryan Ekmark
Richard Elze
James Enchandler
Elmer Enyart
Duane Erkman
Susan Eskew
Teddy Evans
Kenneth & Virginia Evers
Michael Fahrlander
Sidney Farmer, III
Gertrude Fehr
Jake & Lola Feis
Aaron Feist
Fred Field
Terry Finn
Mike Fisher
Darrel Flager
Ronald Fleshman
Spencer & Stephanie Fonte
Margaret Forester
Bill & Margaret Forster
Joe & Cathy Frank
Russell & Cindy Fraser
Bill Frazer
Harold Frazier
Sarah Fuld
Karen Fulscher
Howard Funk
Charles Gallagher
Joanna Gallegos
David Gann
Don Gann
Thomas Gann

A.V. Gardner
John Garramone
Alvin Garst
Orlando Garza
Maxine Gates
James Gaukler
Ernie Gianetti
Shea Gibbons
Darrell Gilks
L.L. Gillespie
Nancy Gilliland
Merle Glenn
James Glivar
Bret Goodman
Charles Goracke
Sarah Graham
Duane Gray
Nick Gray
Russell Gregg
Jay Grenawalt
Joe Grenawalt
John Grenawalt
Adam Griffith
Morrill Griffith
Marvin Gruenlah
Dick Guadagno
Burt Guerrieri
C.E. & Pat Guin
J Guinn
Al Gurule
Dianne Haberman
Ken Hale
Don Hall
Maureen Hall
Collen Hannon
Bradford Hanson
Dallas Harding
Kathy Harrison
William & Monica Harwood
Robert & Nancy Haueusen
Harold Hawkins
Hershel Hayden
Amy Hayutin
Lonney Head
Kermit & Margie Hebert
Peter Heller
Phil & Ellen Hendrickson
Joan Hicks
Steve & Debbie Hicks
Samuel & Tracy Hill
Steve Hinchman
Michael Hinton
George Hintzsche
Chad Hixon
Robert Hobson
James Hockenberry

Ernie Hoeckel
Ernie Hoeckel, Sr.
Gary Hollenbaugh
Kara Hooper
Michael House
Patrick Huber
Richard & Karen Hurlburt
Helen Hyde
Juan & Donna Inda
Bob Inge
Jeff Isaac
Dana Isham
John Ismert
Douglas Ivor-Smith
Owen Jacobs
Marion & Frank Jacobson
Paul Jakebe
Darrel Boyd Jara
Larry & Michelle Jensen
Theron & Kristine Johnson
David Johnston
Axton Jones
David Jones
Rod and Rosie Kamm
Leslie Kareus
Nick & Stella Kersen
Alan & Elizabeth Kershaw
Roark Kiklevich
Gene King
Art Kirby
Bruce & Velma Kirkpatrick
Ray Kitson
R. Charles & Betty Klaseen
Ronnie Klaseen
Kirby Kline
Hobart Knight
Gary Kobylarz
Gary Kocsis
Wendell Koontz
David Korzilius
John Kramer
Leonard Kreuger
Fredric Kullberg
Remy LaBrouche
Remy & Ruth Labrouche
Wayne & Martha Landt
Eric Larson
Jim Lathom
Denise Laverty
Paula Lehr
John Lewis
David Lindstrom
Donald & Betty Little
Monty Little
Ronald Long
James & Melitta Luca

BLM_0051522

Lucille Lucas
Susan Luecht
Dennis Lukens
Sharon Machan
Joy MacNulty
John Marta
Alan Martin
Jack Martin
Edna Mason
Philip Mason
Wayne Maurer
Larry Mautz
Kathryn Mauz
Marie McCabe
Mo McCoy
Claire McCullough
Wendy McDermott
Daniel McElroy
Jane McGarry
Charles McHugh
Erin McIntyre
Sid McIntyre
Miriam McKinley
David McLain
Leroy & Violet McLaughlin
Mike McMillan
Jim & Brenda Meagher
David & Nola Means
Don & Donna Meiners
George & Nancy Meyer
Harold Michael
Harry & Rebecca Miller
Jonathan Miller
Joseph Miller
Katherine Miller
T.J. Miller
Azra Mills
Jack Mincher
John Minerich
Ken Mitchell
Ramsay & Virginia Mohr
Susan Mol
C.B. & W.A. Moncrief
W. Moncrief
Claire Moore
Houston Morrow
Richard & Faye Mott
Robert & Catherine Moyer
Ceil Murray
Clela Murray
Harold Stucker
Harry Stucker
Pat Stucker
Brent Suiter
Dan & Jayne Sullivan
Bob Sunich

Paul Murrill
Daniel Nantze
Roy Nelson
Ernie Nesbit
Robin & Gretchen Nicholoff
Darrell & Sue Ann Nicklin
Neil Nostrand
Jay & Kathryn Novak
Charles Nystrom
Michael O'Connor
Kinna Ohman
Ike Olson
Jay Olson
Michael Osterkamp
Al & Rena Oswald
Bill Owens
Dr. Ralph Pacini
David Panek
Angelo & Denise Papotto
John Parker
Todd Parker
Stan Parks
James & Lois Patterson
Gordon Patton
Kenneth Pavilisick
Ken & Rena Pavlisick
Greg Pawlson
William Pearce
William Pecharich
Steve Pendergraft
Phil & Joan Perkins
Bill & Clemente Peters
Brad Phelps
Carol Pierce
Deno & Ivy Piloni
Marie Piloni
Ellis & Myrna Pineo
Luce Pipher
Robert Pizzurro
Gordon Pope
Jana Preheim
Peggy Preston
Mary Prock
Bill Puruit
Dick and Tina Rabun
Joy Hoyt Rackley
Nicholas Radovich
Rick Ramsey
Martin Rector
Ben Paul Redding
Edward Suppes
Bob & Billie Sutherland
Sherry Swager
Joel Swank
Cyndi Swanson
Kevin Swisher

Mike Rice
Bob Riggs
Greta Ringsby
Tommy Roark
Lea Rolfsen
Don & Carolyn Ross
Rudy Rudibaugh
Bill Rueger
B. Shea Ruggles
Randy Russell
John Russey
Sara Sabin
Larry Sanders
Dick & Jan Scar
James & Jean Schauster
Paul Schmucker
Richard Schnautz
Tim Schneider
Walter Schroeder
Leonard & Iva Schultz
Ann Schulz
Paul & Patricia Seebeck
Sandra & Bruce Sewell
James Sherman
Adrienne Sherrill
George Sibley
Craig Simpson
Kenny Simpson
Floyd Skinner
Ken & Kaleta Slyzuik
David H. Smith
Dr. Jeffrey Smith
Harold Smith
Rocky Smith
W. Alan Smith
Terrell & Jo Snyder
Becki Sober
Tom & Pam Sober
Dean Soell
Cindy Somers
Steve Spaar
Frank Spadafore
Randy Spadafore
Doug Spann
John Stansfield
Greg Stedman
Jack Steenbergen
Elini Stelter
Marie Stone
Mac & Barbara Stratman
David Swonger
Joseph Taramarcaz
Lee Taramarcaz
John & MaryAnne Tarr
Dorothy Taylor
William & Deborah Taylor

BLM_0051523

William Theimer
Betsy Tine
Danny Todd
Everett & Ann Todd
Monty Todd
Dora Mae Trampe
Henry Trickett
Thomas Twerdall
Raymond Van Tuyl
Debra Van Winegarden
Todd Vandewar
Bill Vanice
Tim Vaughan
Kenny Vaught
Arthur & Patricia Vigil
Edwin Vigneaux
Richard Waack
Troy Wade
Mike Wakefield
James Walls
C.R. Walters Jr.
Orville Ware
Ricky Ware
Francis J.& Ire Weems
Judith Weir
Rick Weiss
Ralph Welp
John Whalley
Sarah Whalley
Helen Whinnery

Stan Whinnery
Billy & Cassie White
Daniel White
Julie White
Kelly Whittington
Ben & Lois Wiancko
Alan & Ann Wiggins
Monica & Wayne Wiitanen
Ruth Willey
Jim & Mary Willkinson
Gary & Helen Wilson
John Wineman
Jimmy Wise
Roger Womble
Burton Wright
Gene Writer
Beth Wyman
Ira Jon Yates
John & Barbara Yeoman
Jonathan Yoder
Joseph Youmans
Jess Young
Dick Yuhnke
Jerry & Alice Zeldenthuis
Susan Zmrzel
Michael & Shirley Zubowicz
Bob Zucca

BLM_0051524

**BIBLIOGRAPHY**

Askins, R.A. 1994. *Open corridors in a heavily forested landscape: impact on shrubland and forest-interior birds*. Wildlife Society Bulletin 22:339-347.

Askins, R.A., M.J. Philbrick, and D.S. Sugeno. 1987. *Relationship between the regional abundance of forest and the composition of forest bird communities*. Biological Conservation 39:129-152.

Brown, K.J. 1994. *River-bed sedimentation caused by off-road vehicles at river fords in the Victorian Highlands, Australia*. Water Resources Bulletin. Vol. 30, No.2.

Bury, R.B., R.A., Luckenbach, and S.O. Busack. 1977. *Effects of off-road vehicles on vertebrates in the California Desert*. Wildlife Research Report 8:1-23. U.S. Fish and Wildlife Service, Washington, D.C.

Bury, R. B. 1980. *What we know and do not know about off-road vehicle impacts on wildlife*. Pages 110-122 in R. N. L. Andrews and P. F. Nowak, eds. Off-road vehicle use: A management challenge. Conf. Proc. 16-18 March 1980. Ann Arbor, MI.

Busack, S.D. and R.B. Bury. 1974. *Some effects of off-road vehicles and sheep grazing on lizard populations in the Mojave Desert*. Biological Conservation 6(3):179-83.

Christensen, A. G., L. J. Lyon, and J. W. Unsworth. 1993. *Elk management in the Northern Region: considerations in forest plan updates or revisions*. Gen. Tech. Rep. INT-303. Ogden, UT: U. S. Department of Agriculture, Forest Service, Intermountain Research Station. 10 pp.

Cole, D. N., and P. B. Landres. 1995. *Indirect effects of recreation on wildlife*. Pages 183-202 in R. L. Knight and K. J. Gutzwiller, eds. Wildlife and recreationists: coexistence through management and research. Island Press, Washington D. C. 372 pp.

Dunnell, Calvin. 1980. *Protecting and rehabilitating ORV use areas. In Off-road vehicle use: A management challenge*. Edited by Andrews and Nowak. Sponsored by: The Office of Environmental Quality USDA and University of Michigan Extension Service.

Gabrielsen, G. W., and E. N. Smith. 1995. *Physiological responses of wildlife to disturbance*. Pages 95-107 in R. L. Knight and K. J. Gutzwiller, eds. Wildlife and recreationists: coexistence through management and research. Island Press, Washington D. C. 372 pp.

BLM_0051525

Gutzwiller, K. J. 1995. *Recreational disturbance and wildlife communities.* Pages 169-181 in R. L. Knight and K. J. Gutzwiller, eds. Wildlife and recreationists: coexistence through management and research. Island Press, Washington D. C. 372 pp.

Hillis, J. M., M. J. Thompson, J. E. Canfield, L. J. Lyon, C. L. Marcum, P. M. Dolan, and D. W. McCleerey. 1991. *Defining elk security: the Hillis paradigm.* Pages 38-43 in A. G. Christensen, L. J. Lyon, and T. N. Lonner, comps., Proc. Elk Vulnerability Symp., Montana State Univ., Bozeman. 330 pp.

Klein, D.R. 1971. *Reaction of reindeer to obstruction and disturbance.* Science 173:393-398.

Knight, R. L., and D. N. Cole. 1991. *Effects of recreational activity on wildlife in wildlands.* Trans. N. Amer. Wildland and Natural Resource Conference 56:238-247.

Lyon, L. J. 1983. *Road density models describing habitat effectiveness for elk.* Journal of Forestry 81(9):592-594, 613.

Lyon, L. J., and A. G. Christensen. 1990. *Toward a working glossary of elk management terms.* Paper presented at West. States and Provinces Elk Workshop, Eureka, CA, May 1990.

Lyon, L. J., and A. G. Christensen. 1992. *A partial glossary of elk management terms.* Gen. Tech. Rep. INT-288. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station. 6 pp.

MacArthur, R. A., V. Geist, and R. H. Johnson. 1982. *Cardiac and behavioral responses of mountain sheep to human disturbance.* J. Wildlife Mgt. 46(2):351-358.

Phelps, J.E. and J. Hatter. 1977. *The effects of campgrounds on small mammals in Canyonlands and Arches National Park, Utah.* Forty-Second North American Wildlife Conference. Pp. 473-485.

Reed, R.A., J. Johnson-Barnard, and W.L. Baker. 1996. *Contribution of roads to forest fragmentation in the Rocky Mountains.* Conservation Biology 10:1098-1106.

Schonewald-Cox, C., and M.Buechner. 1992. *Park protection and public roads.* Pp. 373-396. In Conservation Biology: the theory and practice of nature conservation, preservation, and management, P.L. Fielder and S.K. Jain, eds. Chapman and Hall, New York and London.

USDA Forest Service. 1991. *Amended Land and Resource Management Plan. Grand Mesa, Uncompahgre, and Gunnison National Forests.* Delta, Colorado

BLM_0051526

USDI-Bureau of Land Management – *Draft Gunnison Resource Management Plan and Environmental Impact Statement.* March 1991.

USDI-Bureau of Land Management - *Gunnison Resource Area Record of Decision, Approved Resource Management Plan, and Rangeland Program Summary.* February 1993.

USDI-Bureau of Land Management - *Uncompahgre Basin Resource Management Plan and Record of Decision.* July 1989.

Ward, A. L. 1973. *Elk behavior in relation to multiple uses on the Medicine Bow National Forest.* Proc. West. Assoc. State Game Fish Comm. 53:125-141.

Ward, A. L. 1976. *Elk behavior in relation to timber harvest operations and traffic on the Medicine Bow Range in south-central Wyoming.* Pages 32-43 in Elk, Logging, Roads Symp. Proc. (Dec. 1976, Moscow, Idaho), 142 pp. Univ. of Idaho, Moscow, ID.

Ward, A. L. 1985. *The response of elk and mule deer to firewood gathering on the Medicine Bow Range in Southcentral Wyoming.* Pages 28-40 in Proc. of the 1984 Western States and Provinces Elk Workshop, April 17-19, 1984, Edmonton, Alberta.

Ward, A. L., and J. J. Cupal. 1979. *Telemetered heart rate of three elk as affected by activity and human disturbance.* Pages 47-56 in Proc. of the Trails and Rivers Symposium (Laramie, WY, Nov. 7-8, 1979). Univ. of Wyoming, Laramie.

Wilson, J. P., and Seney, J. P., 1994. *Erosional impact of hikers, horses, motorcycles, and off-road bicycles on mountain trails in Montana.* Mountain Research and Development, 14: 77-78.

Yarmoloy, C., M. Bayer, and V. Geist. 1988. *Behavior responses and reproduction of mule deer, Odocoileus hemionus, does following experimental harassment with an all-terrain vehicle.* Canadian Field Naturalist 102:425-429.

BLM_0051527

# APPENDIX A

## GLOSSARY

**ATV:** All-terrain-vehicle. Also called 4-wheelers.

**Access:** This term generally refers to a road or trail route over which a public agency claims a right-of-way for public use.

**BLM:** Bureau of Land Management

**Classified:** A road constructed or maintained for long-term highway-vehicle use. Classified roads may be public, private or forest development.

**Decommission:** The term is primarily assigned to roads. It is the act of removing motorized use from a travelway. Activities range from blocking the entrance, scattering boughs on the roadbed, revegetating, and waterbarring, to removing fills and culverts, re-establishing drainage-ways, and pulling back unstable road shoulders, to full obliteration by re-contouring slopes. The end result is to terminate the function as a road and mitigate the adverse impacts.

**Designated Routes:** Designated routes include all Forest Service, BLM, and user-created roads marked with a numbered route marker. Designated routes also include all Forest Service, BLM, and user-created trails marked with symbols authorizing motorized use. User-created routes were not designed for safe public travel or resource protection; thus, travel on these routes is at the risk of the public lands user, provided resource damage does not occur.

**Forest Development Road:** A forest road under the jurisdiction of the Forest Service (23 U.S.C. 101), which has been determined through an interdisciplinary process to be necessary for the protection, administration, and/or use of National Forest System lands.

**Forest Transportation System:** A term, sometimes shortened to "system," generally used to denote the database containing information about all travelways classified as Forest Development Roads.

**GMUG:** Grand Mesa, Uncompahgre, and Gunnison National Forests

**GTAA:** Gunnison Travel Analysis Area. The area examined in this EA.

**Highway Safety Act (Roads Subject to the):** Forest Development Roads that are open to unrestricted use by the general public for standard passenger cars. These roads include those that are closed on a seasonal basis, closed during extreme weather conditions or

BLM_0051528

fore emergencies but are otherwise open for public use (FSM 1535.11; FSH 7709.58, sec. 12.3 para. 3).

**Improved Road:**  A Forest Development Road designed for passenger vehicles that is included in the Forest Development Transportation Plan.  The surface of this category of road is well-compacted and maintained with hardened, gravel, or native material that provides a stable surface during the normal season of use.  These roads are generally double-lane or single-lane with turnouts.

**Jurisdiction:**  The legal right to control or regulate use of a transportation facility.  Jurisdiction requires authority, but not necessarily ownership.  The authority to construct or maintain a road may be derived from fee title, an easement, an agreement, or some other similar method.

**Maintenance Level 3 Roads:**  This is a level assigned to roads open and maintained for travel by a prudent driver in a standard passenger car.  User comfort and convenience are not considered priorities.  Roads in this maintenance level are typically low speed, single lane with turnouts and spot surfacing.  Some roads may be fully surfaced with either native or processed material.   Appropriate traffic management strategies are either "encourage" or "accept."  "Discourage" or "prohibit" strategies may be employed for certain classes of vehicles or users.

**Mechanized Vehicle:**  Mountain Bike

**Motorized Vehicle:**  As used in this document -- any sport-utility or four-wheel-drive vehicle, all-terrain vehicle, Humvee, or motorcycle that may be used off roads and trails.

**NEPA:**  National Environmental Policy Act

**NF:**  National Forest

**Non-classified:**  An existing road, user-created road, or RS2477 road, whose need and jurisdiction is to be determined.  A road that is not constructed, maintained, or intended for long-term highway vehicle use, such as roads built for temporary access and other remnants of short-term roads associated with fire suppression, timber harvest; oil, gas and mineral activities; as well as travelways resulting from off-highway use.

**Non-System:**  Roads and trails that were developed over time by various users such as ATVs, livestock, big game, and horseback riders. They do not meet current design standards and drainage facilities have not been installed to reduce erosion.  The new Forest Service term for these type of routes is "non-classified."  See also definition for user-created.

**OHV:**  Off-highway vehicle, including sport-utility vehicles, ATVs, Humvees, and motorcycles.

BLM_0051529

**Obliteration:** The act of eliminating the functional characteristics of a travelway and the reestablishment of natural resource production capability. The intent is to make the corridor unusable as a road or a trail and stabilize it against soil loss. Generally, a road will not be considered obliterated unless natural drainage patterns have been restored through recontouring.

**Obliterated:** For the purpose of this analysis, the term obliterated refers to any intentional activity that is designed to prevent the use of motorized vehicles on an existing travelway. These activities range from decommissioning the road by blocking the entrance, scattering boughs on the roadbed, or revegetating and adding waterbars to removing fill and culverts, reestablishing original drainage patterns, and/or recontouring the road template (full obliteration). Regardless of the method, the result is to terminate the function of the travelway as a road and mitigate adverse impacts to some degree.

**Off-Highway Vehicle:** Any motorized vehicle designed for or capable of cross-country travel on or immediately over land, water, snow, ice, marsh, swampland, or other natural terrain. It includes, but is not limited to, four-wheel-drive or low-pressure-tire vehicles, motorcycles and related two-wheel vehicles, amphibious machines, ground-effect or air-cushion vehicles, and any other means of transportation deriving power from any source other than muscle or wind.

**Off-Road Vehicle:** See definition under Off-Highway Vehicle.

**Public Lands:** Official nomenclature for the lands managed by BLM. (Similarly, lands managed by the Forest Service are called National Forest System lands).

**Public Road:** Any road under the jurisdiction of, and maintained by, a public authority which is "open to public travel." (23 U.S.C. 101a)

**Recreation Opportunity Spectrum (ROS):** Land delineations that identify a variety of recreation experience opportunities categorized into six classes along a continuum from primitive to urban. Each class is defined in terms of the degree to which it satisfied certain recreation-experience needs based on the extent to which the natural environment has been modified, the type of facilities provided, the degree of outdoor skills needed to enjoy the area, and the relative density of recreation use (USDA, FS ROS Users Guide). The six classes are:

> **Primitive:** Area is characterized by essentially unmodified natural environment of fairly large size. Interaction between users is very low and evidence of other uses is minimal. The area is managed to be essentially free from evidence of human-induced restrictions and controls. Motorized use within the area is not permitted. The following subclass of the Primitive ROS class is used in some wilderness prescriptions.

> **Pristine:** Area is characterized by essentially pristine biophysical conditions and a high degree of remoteness for both wildlife and humans with no perceptible

BLM_0051530

evidence of past human use.  Interaction between users is very low.  All resource management activities are integrated so that natural biological processes are not adversely or artificially changed over time by human use.

**Semi-Primitive Non-Motorized:**   An area that is characterized by a predominately natural or natural-appearing environment of moderate-to-large size.  Interaction between users is low, but there is often evidence of other users. The area is managed in such a way that minimum on-site controls and restrictions may be present but are subtle.  Motorized recreation use is not permitted, but local roads used for other resource management activities may be present on a limited basis.   Use of such roads is restricted to minimize impacts on recreation experience opportunities.

**Semi-Primitive Motorized:**  An area that is characterized by a predominately natural or natural-appearing environment of moderate-to-large  size. Concentration of users is low, but there is often evidence of other users.  The area is managed in such a way that minimum on-site controls and restrictions may be present, but are subtle.  Motorized recreation use is allowed using local primitive or collector roads with predominately natural surfaces and trails suitable for motorbike use.

**Roaded Natural:**  Area is characterized by predominately natural-appearing environments with moderate evidences of the sights and sounds of man.  Such evidences usually harmonize with the natural environment.  Interaction between users may be moderate to high, with evidence of other users prevalent.  Resource modification and utilization practices are evident, but harmonize with the natural environment.   Conventional motorized use is provided for in construction standards and design of facilities.

**Rural:**  Area where the natural environment has been substantially modified by development of structures, vegetative manipulation, and/or pastoral agricultural development.  Resource modification and utilization practices may be used to enhance specific recreation activities and to maintain vegetative cover and soil. Sights and sounds of humans are readily evident, and the interaction between users is often moderate to high.  A considerable number of facilities are designed for use by a large number of people.  Moderate densities are provided for away from developed sites.  Facilities for intensified motorized use and parking are available.

**Urban:**  Area is characterized by a substantially urbanized environment, although the background may have natural-appearing elements.   Renewable resource modification and utilization practices are often used to enhance specific recreation activities.  Vegetative cover is often exotic and manicured.  Sights and sounds of humans, on-site, are predominant.  Large numbers of users can be expected both on-site and in nearby areas.  Facilities for highly intensified motor use and

BLM_0051531

parking are available with forms of mass transit often available to carry people throughout the site.

**Road:** A general term denoting a transportation facility for purposes of travel by vehicles.

**System:** Roads and trails that are inventoried, managed, operated, and maintained. Appropriated road and trail dollars are available for their operation and maintenance. They are usually signed and noted on maps. The new Forest Service term for these routes is "classified."

**Temporary Roads:** Roads associated with timber sale contracts, fire activities, or other short-term access needs, not necessary for future resource management and not intended to be part of the forest development transportation plan.

**Trail:** A commonly used term denoting a pathway for purposes of travel by foot, stock, or trail vehicles.

**Unimproved Road:** A Forest Development Road included in the Forest Development Transportation Plan designed for high-clearance and 4-wheel-drive vehicles. The surface of this category of road is maintained only to provide drainage and to protect the surrounding environment. The surface is usually rough and irregular. The road width is generally 10 to 14 feet, and backing to allow vehicles to pass should be expected.

**User-Created Route:** Any travelway that has been created through repeated use, primarily for recreation or access purposes, and was not planned, located, designed, or constructed in accordance with Forest Service or BLM Road Specifications.

**Wheeled Vehicles:** Any motorized or non-motorized conveyance (four-wheel-drives, ATVs, Humvees, motorcycles, mountain bikes) that may be used off roads and trails.

BLM_0051532

# APPENDIX B

## THREATENED, ENDANGERED, PROPOSED, AND SENSITIVE SPECIES

Table 1.  Threatened, Endangered, Proposed Species

| Common Name | Scientific Name | Status[1] | Potential Habitat in Analysis Area |
|---|---|---|---|
| **Invertebrates** | | | |
| Uncompahgre fritillary butterfly | *Bolorea acrocnema* | E | Alpine associated with snow willow (*Salix reticulata nivalis*) |
| **Birds** | | | |
| Bald Eagle | *Haliaeetus leucocephalus* | T, EC Proposed for Delisting | Major river systems, reservoirs |
| Southwestern willow flycatcher | *Empidonax trailii extimus* | E | Riparian along drainages |
| Whooping crane | *Grus americana* | E | Marshlands, riverine |
| Mexican spotted owl | *Strix occidentalis* | T | Pockets of Douglas-fir on steep canyon side-slopes |
| **Mammals** | | | |
| Black-footed ferret | *Mustela nigripes* | E | Preferred habitat represented by prairie dog towns in lower elevation valleys |
| Canada lynx | *Lynx canadensis* | T | Spruce/fir/mixed conifer/lodgepole pine forests |
| **Plants** | | | |
| Clay-loving wild buckwheat | *Eriogonum pelinophilum* | E | Mancos shale badlands in salt desert shrub communities. 5.200-6,400 feet in elevation. |
| Uinta Basin hookless cactus | *Sclerocactus glaucus* | T | Rocky hills, mesa slopes, alluvial benches, desert shrub communities. 4,500-6,000 feet in elevation. |

[1] Status:

> E = Listed as Endangered by the U.S. Fish and wildlife Service under the Endangered Species Act.
>> Species that are in imminent jeopardy of extinction.
>
> T = Listed as Threatened by the U.S. Fish and Wildlife Service under the Endangered Species Act.
>> Species that are threatened with extinction.
>
> P = Proposed for listing as Threatened or Endangered by the U.S. Fish and Wildlife Service
>
> EC = Listed by the Colorado Division of Wildlife as endangered in Colorado.

BLM_0051533

Table 2.  Sensitive Wildlife Species

| Common Name | Scientific Name | Status[1] | Potential Habitat in Analysis Area |
|---|---|---|---|
| **Invertebrates** | | | |
| Great Basin silverspot butterfly | *Speyeria nokomis* | BLM | Marshlands and boggy streamsides |
| **Birds** | | | |
| Northern goshawk | *Accipiter gentilis* | FS, BLM | Mature spruce-fir, aspen, Douglas-fir forests |
| Gunnison sage grouse | *Centrocercus minimus* | BLM | Sagebrush |
| Long-billed curlew | *Numenius americanus* | BLM | Wetlands |
| White-faced ibis | *Plegadis chihi* | FS, BLM | Wetlands |
| Flammulated owl | *Otus flammeolus* | FS | Mature ponderosa pine./Douglas-fir forests |
| Three-toed woodpecker | *Picoides tridactylus* | FS | Mature Douglas-fir and spruce-fir forests |
| Black swift | *Cypseloides niger* | FS | Cliffs near waterfalls |
| Olive-sided flycatcher | *Contopus borealis* | FS | Spruce-fir forests |
| Golden-crowned kinglet | *Regulus satrapa* | FS | Mature spruce-fir and Douglas-fir forests |
| Loggerhead shrike | *Lanius ludovicianus* | FS | Open shrubby habitats |
| Boreal owl | *Aegolius funereus* | FS | Mature spruce-fir, Douglas-fir forests |
| Western burrowing owl | *Athenecunicularia hypugea* | FS | Associated with rodent burrows in grasslands and desert habitats |
| Ferruginous hawk | *Buteo regalis* | FS, BLM | Short-grass prairie |
| Osprey | *Pandion haliaetus* | FS | Forested wetlands along larger rivers, lakes and reservoirs |
| Pygmy nuthatch | *Sitta pygmaea* | FS | Mature ponderosa pine |
| Fox sparrow | *Passerella iliaca* | FS | Riparian |
| Baird's sparrow | *Ammodramus bairdii* | FS | Prairie grassland |
| Lewis' woodpecker | *Malanerpes lewis* | FS | |
| Purple martin | *Progne subis* | FS | Forested areas, snags with existing cavities. Feeds over open grassy areas and open water |
| **Reptiles** | | | |
| Longnose leopard lizard | *Gambelia wislizenii* | BLM | Lower elevation (below 6,000 feet) arid vegetation zones |
| Milksnake | *Lampropeltis triangulum* | FS | Lower elevation (below 6,000 feet) arid vegetation zones |
| **Amphibians** | | | |
| Boreal Toad | *Bufo boreas boreas* | C, FS | Wetlands, ponds, still water areas, elevations form 7,000 to 12,900 feet |
| Tiger Salamander | *Ambystoma tigrinum* | FS | Wetlands and aquatic |
| Northern leopard frog | *Rana pipiens* | FS | Wetlands and aquatic |
| Canyon tree frog | *Hyla arenicolor* | BLM | Wetlands, aquatic |
| **Fish** | | | |
| Colorado River cutthroat trout | *Oncorhyncus clarki pleuriticus* | FS | Streams and rivers |
| Bluehead sucker | *Catostomus discobulus* | BLM | Streams and rivers |
| Flannelmouth sucker | *Catostomus latipinnis* | BLM | Streams and rivers |
| Roundtail chub | *Gila robusta* | BLM | Streams and rivers |
| **Mammals** | | | |
| Spotted bat | *Euderma maculatum* | FS, BLM | Rocky cliffs near riparian habitats |
| Townsend's big-eared bat | *Plecotus townsendii* | FS, BLM | Natural caves, abandoned mine adits |
| Fringed myotis | *Myotis thysanodes* | BLM | Mines, caves, rock crevices, buildings and trees |
| Allen's (Mexican) big-eared bat | *Idionycteris phyllotis* | BLM | Mines, caves, rock crevices, buildings and trees |
| Yuma myotis | *Myotis yumanensis* | BLM | Mines, caves, rock crevices, buildings and trees |
| American marten | *Martes americana* | FS | Mature spruce-fir , lodgepole pine |
| Dwarf shrew | *Sorex nanus* | FS | Rock slides, rocky areas |
| Pygmy shrew | *Microsorex hoyi montanus* | FS | Spruce-fir bog, sphagnum. |
| Wolverine | *Gulo gulo luscus* | FS | Timbered ridges and creek bottoms for travel. Need large areas with little human activity. |

[1] Status:
    C = Candidate for listing as Threatened or Endangered. U.S. Fish and Wildlife Service have sufficient information on biological vulnerability and threats to support proposals to list as an endangered or threatened species.
    FS = Classified as "sensitive" by the Regional Forester when occurring on lands managed by the U.S. Forest Service (5/6/94).
    BLM = BLM-listed sensitive species.

BLM_0051534

## Table 3.  Sensitive Plant Species

| Common Name | Scientific Name | Status[1] | Habitat Characteristics |
|---|---|---|---|
| Crandall rockcress | Arabis crandalii | BLM | Rocky sagebrush |
| Gunnison milkvetch | Astragalus anisus | FS | Dry or sandy clay soils. under low sagebrush. 7,500-8,500 feet elevation. |
| Grand Junction milkvetch | A. linifolius | BLM | Chinle and Morrison geologic formations. 4,800-6,200 feet elevation. |
| Skiff milkvetch | A. microcymbus | BLM | Open sagebrush or juniper, mod. to steep slopes. 7,600-8,400 feet in elevation |
| Molybdenum milkvetch | A. molybdenus | FS | Rocky slopes. turf hillsides. 11,400-13,200 feet elevation. |
| Naturita milkvetch | A. naturitensis | BLM | Sandstone mesas in pinyon-juniper woods. 5,000-7,000 feet elevation. |
| Sandstone milkvetch | A. sesquiflorus | BLM | Sandstone ledges, talus and sandy washes. 5,000-5,500 feet in elevation. |
| Smooth rockcress | Braya glabella | FS | Calcareous substrate above timberline. 12,000-13,000 feet in elevation. |
| Reflected moonwort | Botrychium echo | FS | Gravelly granite sites above 10,000 feet in elevation. Usually full sun and < 6% slope. |
| Slender moonwort | Botrychium lineare | FS | Gravelly sites on edge of aspen. |
| Rocky Mountain thistle | Cirsium perplexans | BLM | Barren gray shale; adobe hills. 4,500-7,000 feet in elevation. |
| Round-leaf sundew | Drosera rotundifolia | FS | Peat mats, acidic ponds and fens. 9,100-9,800 feet in elevation. |
| Wooly fleabane | Erigeron lanatus | FS | Steep alpine scree, talus slopes. 12,500-13,500 feet in elevation. |
| Colorado wild buckwheat | Eriogonumcoloradense | BLM | Gravelly or sandy soils, subalpine, alpine slope, montane grasslands.  8,500-12,500 feet in elevation. |
| White-bristle cotton grass | Eriphorum altaicum | FS | Fens and wetlands.  9,500-14,000 feet in elevation. |
| Beard-tongue gilia | Gila penstemonoides | FS | Walls, ledges, cliffs in gneiss, schist and shale. 6,800-9,000 feet in elevation. |
| Montrose bladderpod | Lesquerella vicina | BLM | Mancos shale, also sandstone soils, sagebrush steppe; disturbances. 6,000-7,200 feet in elevation. |
| Northern twayblade | Listera borealis | BLM | Moist, spruce forests.  8,700-10,800 feet in elevation. |
| Colorado desert parsley | Lomatium cocinnum | BLM | Rocky soils from Mancos shale: shrub communities. 5,500-7,000 feet in elevation. |
| Paradox Valley lupine | Lupinus crassus | BLM | Chinle and Mancos geologic formations; sparse vegetation.  5,000-5,800 feet in elevation. |
| Dolores skeleton plant | Lygodesmia doloresensis | BLM | Red alluvial soil in juniper grassland. 4,400-4,700 feet in elevation. |
| Colorado tansy aster | Machaeranthera coloradoensis | FS | Gravelly parks. slopes. rock outcrops up to dry tundra. 8,500-12,500 feet in elevation. |
| Eastwood monkey-flower | Mimulus eastwoodiae | BLM | Shallow caves and seeps on canyon walls. 4,700-5,800 feet in elevation. |
| Paradox breadroot | Pediomelum aromaticum | BLM | Red clay, clay outcrops. rocky soils, rock outcrops. 4,000-5,000 feet in elevation. |
| Woolly willow | Salix lanata | FS | Alpine. limestone outcrops. 11,000-13,000 feet in elevation. |
| Hapman's coolwort | Sullivantia hapemanii | FS | Hanging gardens, wet cliffs. boulders in limestone and shale.  7,000-10,000 feet in elevation. |

[1] Status:
C = Candidate for listing as Threatened or Endangered.  U.S. Fish and Wildlife Service have sufficient information on biological vulnerability and threats to support proposals to list as an endangered or threatened species.
FS = Classified as "sensitive" by the Regional Forester when occurring on lands managed by the U.S. Forest Service (5/6/94).
BLM = BLM listed sensitive species.
EC = Listed by the Colorado Division of Wildlife as endangered in Colorado.

BLM_0051535

# APPENDIX C

## MOTORIZED AND MECHANIZED VEHICLE RESTRICTIONS ON BLM-MANAGED LANDS –
## UNCOMPAHGRE AND GUNNISON FIELD OFFICES

Tables A and B show the current restrictions for motorized and mechanized vehicle use for affected management units (**MUs**) analyzed in this EA within the GTAA.  Management unit locations may be found in the Uncompahgre and Gunnison Resource Management Plans.

<table>
<tr><td colspan="4" align="center"><b>TABLE A</b><br><br><b>Current Motorized and Mechanized Vehicle Restrictions<br>BLM - Uncompahgre Field Office (UFO)</b></td></tr>
<tr><td>MU</td><td>MU Acres Within GTTA</td><td>Motorized Restrictions</td><td>Mechanized Restrictions</td></tr>
<tr><td>2</td><td>36,615</td><td>Limited to designated roads/trails seasonally if needed</td><td>None</td></tr>
<tr><td>3</td><td>1,112</td><td>Limited to designated roads/trails seasonally if needed</td><td>None</td></tr>
<tr><td>5</td><td>1,329</td><td>Limited to designated roads/trails seasonally if needed</td><td>None</td></tr>
<tr><td>7</td><td>1,730</td><td>Crucial winter range in Unit 7, where use is limited to designated roads and trails seasonally, if needed, to protect wintering big game</td><td>None</td></tr>
<tr><td>7</td><td>948</td><td>Riparian areas in Bear and Roatcap Creeks, where use is limited to designated roads/trails yearlong</td><td>None</td></tr>
<tr><td>9</td><td>726</td><td>Riparian areas, where use is limited to designated roads/trails yearlong</td><td>None</td></tr>
<tr><td>14</td><td>80</td><td>Needle Rock – limited to designated roads/trails yearlong</td><td>None</td></tr>
<tr><td>7 and 16</td><td>24,107</td><td>None</td><td>None</td></tr>
<tr><td>Total UFO Acres in GTAA</td><td>66,647</td><td></td><td></td></tr>
</table>

No roads or trails in the GTAA within the UFO have been designated or signed that would restrict off-route travel by motorized or mechanized vehicles, either yearlong or seasonally.

BLM_0051536

| MU | MU Acres Within GTTA | Motorized Restrictions | Mechanized Restrictions |
|---|---|---|---|

<table>
<tr><td colspan="4"><strong>TABLE B</strong><br><strong>Current Motorized and Mechanized Vehicle Restrictions</strong><br><strong>BLM - Gunnison Field Office</strong></td></tr>
<tr><td>MU</td><td>MU Acres Within GTTA</td><td>Motorized Restrictions</td><td>Mechanized Restrictions</td></tr>
<tr><td>1</td><td>95,827;<br>(14,954 open)</td><td>None, except for:<br>1) 80,873 acres south of the north section line, Sec. 12, T. 45 N., R. 4 W., NMPM, where motorized use is limited to designated roads and trails yearlong</td><td>None</td></tr>
<tr><td>2</td><td>47,762</td><td>Closed</td><td>Closed</td></tr>
<tr><td>3</td><td>2,710</td><td>None</td><td>None</td></tr>
<tr><td>4</td><td>1,597</td><td>Restricted to designated routes yearlong</td><td>None</td></tr>
<tr><td>5</td><td>5,960</td><td>Restricted to designated routes yearlong</td><td>None</td></tr>
<tr><td>6</td><td>1,405</td><td>Restricted to designated routes yearlong</td><td>None</td></tr>
<tr><td>7</td><td>27,615</td><td>Limited to designated roads/trails seasonally if needed, except 600 acres closed yearlong to motorized use</td><td>None</td></tr>
<tr><td>8</td><td>4,570</td><td>Restricted to designated routes yearlong</td><td>None</td></tr>
<tr><td>9</td><td>535</td><td>Closed</td><td>None</td></tr>
<tr><td>10</td><td>15,112</td><td>None</td><td>None</td></tr>
<tr><td>11</td><td>57,525</td><td>None</td><td>None</td></tr>
<tr><td>12</td><td>91,547</td><td>None, except for 37,423 acres where use is now limited to designated roads/trails seasonally, if needed (east of the Gunnison River, north of Hwy. 50, and west of Quartz Creek)</td><td>None</td></tr>
<tr><td>13</td><td>187,030</td><td>Some use is now limited to designated roads/trails seasonally if needed</td><td>None</td></tr>
<tr><td>14</td><td>2,667</td><td>None</td><td>None</td></tr>
<tr><td>15</td><td>4,725</td><td>None, except:<br>1) 235 acres in Alder Creek, where use is limited to designated roads/trails seasonally if needed<br>2) 1,680 acres south of Lake City, where motorized use is now limited to designated routes yearlong</td><td>None</td></tr>
<tr><td>16</td><td>36,768</td><td>None on 33,695 acres; 3,073 acres where use is limited to designated roads/trails seasonally if needed</td><td>None</td></tr>
</table>

Acres where off-route motorized vehicle use would be affected by the proposed action:  429,033

Acres where off-route mechanized vehicle use would be affected by the proposed action:  537,238

Powderhorn Wilderness is closed to motorized/mechanized vehicle use.

☆ U.S. GOVERNMENT PRINTING OFFICE: 2000 — 575-892 / 25009 Region No. 8

BLM_0051537

BLM_0051538

# PROPOSED AMENDMENT TO UNCOMPAHGRE BASIN RESOURCE AREA RESOURCE MANAGEMENT PLAN DATED APRIL, 2001

Prepared by:
United States Department of the Interior
Bureau of Land Management
Colorado State Office
Uncompahgre Field Office

Field Manager
Uncompahgre Field Office

State Director
Colorado

BLM_0051539



## United States Department of the Interior

**Bureau of Land Management**
Uncompahgre Field Office
2505 South Townsend  Montrose, Colorado 81401



# FINDING OF NO SIGNIFICANT IMPACT

Proposed Amendment to
Uncompahgre Basin Resource Management Plan

## Environmental Assessment #CO-GUFO-00-027-EA

The Environmental Assessment (EA) analyzing the environmental effects of the proposed action and alternatives have been reviewed.  These proposals do not involve significant environmental impacts in context or intensity.  We have determined that the analysis of the proposed action supports a <u>finding of no significant impact</u> on the human environment and therefore an EIS will not be prepared.


_Allan Belt_     / 3/28/01
Allan Belt             Date
Manager
Uncompahgre Field Office



BLM_0051541

**Proposed amendment to Standard Management and Management Unit Prescriptions for Off-Road Vehicle (OHV) use and designations in the Uncompahgre Basin Resource Management Plan, July, 1989**

This Proposed Amendment to the Uncompahgre Basin Resource Management Plan (RMP) dated July 1989, will affect existing designations for wheeled, motorized and non-motorized mechanical off-highway vehicle use on public lands administered by the Uncompahgre Field Office (UFO) located east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties (see map attached) where that use is now permitted seasonally or year long. This Proposed Amendment will affect the management prescriptions for part or all of some Management Units described and shown in the subject RMP. Standard Management Direction for Off-Road Vehicles, page 11 in Chapter Two, in the Uncompahgre Basin RMP, will also be changed by this Proposed Amendment. This Proposed Amendment will not close any routes or trails that are existing, established and regularly used as of January 12, 2001, anywhere on public lands in the UFO. Any routes created after that date without specific agency authorization will be closed to motorized or mechanized use. Maps of existing routes and trails are available for review in the Uncompahgre Field Office. If we overlooked a route or trail, we will investigate to determine if it was established and receiving regular use as of January 12, 2001, and should therefore be added to the map.

This Proposed Amendment will not affect current motorized or non-motorized access allowed under terms and conditions of a valid BLM-issued or other federal lease, right-of-way, permit, or other forms of approved land use authorizations. Valid existing rights will not be affected. Authorized agency administrative uses, and motorized or non-motorized vehicular access normally authorized to others during the administration of agency contracts, will not be affected by the Proposed Amendment. Snowmobile use will not be affected by this Proposed Amendment.

The underlying purpose of this Proposed Amendment is to prevent the creation of new, unauthorized transportation routes on the affected lands until more detailed transportation analysis and planning can be done. The fact that a route is authorized for use by this action does not confer any "special status" to that route regarding future planning and management. All existing routes will be considered during subsequent route-by-route transportation planning, in close cooperation with the public, to determine which should remain in use, which should be closed, and the appropriate types of use for each.

## STANDARD MANAGEMENT FOR THE RESOURCE MANAGEMENT PLAN AFFECTED BY THIS PROPOSED AMENDMENT TO THE UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN

Description of the STANDARD MANAGEMENT for Off-Road Vehicle travel language for the Uncompahgre Basin RMP, page 11, Uncompahgre Basin Resource Management Plan and Record of Decision, July, 1989:

**Off-Road Vehicles.** Public lands will be open to off-road vehicle (ORV) use.

Description of the Proposed Amendment for the language above.

Unless otherwise specified in management unit prescriptions or specifically authorized by the BLM, travel off-route or cross-country using wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, on public lands administered by the UFO east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, will be prohibited year long. This use will be limited to existing, established routes and trails that are included in the UFO road and trail inventory as of January 12, 2001. If the inventory overlooked a route or trail, it will be investigated to determine if it was easily recognizable on the ground as a route and had been routinely traveled by users as of January 12, 2001. Any routes created after that date without specific agency authorization will be considered closed to motorized or mechanized use.

Wheeled, motorized or non-motorized mechanical vehicles will be permitted for camping, picnicking, and forest product gathering only within 300 feet either side of existing established routes or trails as long as that use does not result in resource damage. If BLM identifies areas where unacceptable resource damage is occurring, corrective measures will be taken. Snowmobiles may operate on snow unless winter wildlife closures are in effect.

On any public lands administered by the UFO east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, the use of motorized vehicles will not be permitted cross-country or off existing established routes to retrieve game but mechanical, non-motorized game carts will be permitted. For these purposes, an existing route is defined as one that is included in the UFO road and trail inventory as of January 12, 2001, or BLM determines existed and should have been included as of that date. If the public encounters a route that is easily recognizable on the ground and has been routinely traveled it can continue to be used unless the BLM determines that it was created after January 12, 2001. The Field Office Manager may, at his or her discretion, grant permission to individuals considered legally disabled to use motorized or mechanized vehicles off of existing routes. Cross-country, off route travel is defined as traveling cross-country and off established, existing routes using any wheeled, motorized or non-motorized mechanical device or vehicle, including mountain bikes. This definition includes, and prohibits, the use of a vehicle on a smaller route not intended for that use (e.g. using an ATV or full sized vehicle on a single track trail). Typical examples of off-highway vehicles include 2-or-4-wheel drive motorized passenger vehicles, motorcycles, multi-wheeled all-terrain vehicles, and mountain bikes. This definition includes any vehicle or device being used to travel cross-country or off established routes, regardless of the type of use the vehicle was designed and intended for.

Some roads or routes normally or routinely closed during part of the year will continue to be kept closed in the spring or other seasons as necessary until resource damage would likely not occur. Emergency road closures will occur if unacceptable resource damage

BLM_0051543

occurs. The BLM will continue to recognize and respond to the need for seasonal closures on the affected lands in order to prevent or mitigate potential resource damage by installing gates at key access points, for instance to restrict spring access until roads have dried out.

# MANAGEMENT UNITS AND PRESCRIPTIONS AFFECTED BY THIS PROPOSED AMENDMENT IN THE UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN

## MANAGEMENT UNIT 2

67,320 Acres of Public Surface

Description of the OHV designation in the unit in the Uncompahgre Basin RMP dated July, 1989:

**Off-Road Vehicles.** A total of 2,482 acres In the Camel Back/upper Roubideau Creek drainage area will be closed to ORV use. Vehicle use In the remainder of the management unit will be limited to designated roads and trails from December 1 through April 30. Variances to this seasonal limitation may be granted If ORV use would not result In any negative impacts on wintering deer and elk.

Description of the Proposed Amendment to the above language

Off-Road Vehicles. A total of 2,482 acres within the unit, in the Camel Back/upper Roubideau Creek drainage area, will continue to be closed to wheeled, motorized or non-motorized mechanical vehicles. These lands will also be closed to mountain bikes. On approximately 36,615 acres of public lands in elk and deer crucial winter range in the part of the unit located east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, off-route, off-highway use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, will be prohibited yearlong. Use by wheeled, motorized or non-motorized mechanical vehicles will be permitted for camping and forest product gathering only within 300 feet either side of existing established routes or trails as long as that use does not result in resource damage. The use of motorized vehicles will not be permitted cross-country or off existing established routes to retrieve game.

Use by off-higway, off-route wheeled, motorized or non-motorized mechanical vehicles on public lands in the remainder of this Management Unit in the UFO will be limited to designated routes and trails from December 1 through April 30 if necessary, to prevent disturbance to wintering deer and elk. Variances to this seasonal limitation may be granted if the requested use will not result in any negative impacts on wintering deer and elk.

## MANAGEMENT UNIT 3

47,607 Acres of Public Surface; 10 percent 0f the Planning Area

Description of the OHV designation in the unit in the Uncompahgre Basin RMP dated July 1989:

**Off-Road Vehicles.** The management unit will be open to ORV use except in crucial deer and elk winter range (28,552 acres) where vehicle use will be limited to designated roads

and trails from December 1 through April 30 if necessary to reduce Stress on wintering deer and elk. Use of ORVs for woodland management and harvest purposes will be authorized year-round.

Description of the Proposed Amendment to the above language.

On approximately 1,112 acres of public lands in elk and deer crucial winter range in the part of the Management Unit located east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, off-route, off-highway use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, will be prohibited yearlong. Use by wheeled, motorized or non-motorized mechanical vehicles will be permitted for camping and forest product gathering only within 300 feet either side of existing established routes or trails as long as that use does not result in resource damage. The use of motorized vehicles will not be permitted cross-country or off existing established routes to retrieve game.

Public lands in the remainder of the unit in the UFO (46,495 acres) will remain open to wheeled, motorized or non-motorized mechanical vehicle use, except in crucial deer and elk winter range where vehicle use will be limited to designated roads and trails from December 1 through April 30 if necessary to reduce stress on wintering deer and elk. Use of ORVs for woodland management and harvest purposes will be authorized year-round on the remainder of the unit.

## MANAGEMENT UNIT 5

24,117 Acres of Public Surface; 5 percent of the Planning Area

Description of the OHV designation in the unit in the Uncompahgre Basin RMP dated July 1989:

**Off-Road Vehicles.** To protect highly saline soils, vehicle use In the entire management unit will be limited to designated roads and trails yearlong.

Description of the Proposed Amendment to the above language.

On approximately 1,329 acres of public lands on highly saline soils in the part of the unit located east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, off-route, off-highway use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, will be prohibited yearlong. Use by wheeled, motorized or non-motorized mechanical vehicles will be permitted for camping, picnicking, and forest product gathering only within 300 feet either side of existing established routes or trails as long as that use does not result in resource damage. The use of motorized vehicles will not be permitted cross-country or off existing established routes to retrieve game.

Vehicle use on public lands in the remainder of the unit in the UFO will be limited to designated roads and trails yearlong to protect these highly saline soils.

## MANAGEMENT UNIT 7

17,232 Acres of Public Surface; 4 percent of the Planning Area

Description of the OHV designation in the unit in the Uncompahgre Basin RMP dated July 1989:

**Off-Road Vehicles.** Vehicle use in the riparian zones associated with Bear and Roatcap creeks will be limited to designated roads and trails yearlong. Vehicle use in crucial deer

and elk winter range (1,730 acres) will be limited to designated roads and trails from December 1 through April 30 If necessary to reduce stress on wintering deer and elk.

Description of the Proposed Amendment to the above language.

Of the approximately 16,119 acres of public land in the unit located east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, off-route, off-highway use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, will be prohibited yearlong. The use of motorized vehicles will not be permitted cross-country or off existing established routes to retrieve game. This limitation of use is to protect resource values, including riparian areas and soils, and elk and deer wintering on crucial winter range.

On public lands in the remainder of the unit in the UFO, use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, in crucial deer and elk winter range will be limited to designated roads and trails from December 1 through April 30, if necessary, to reduce stress on wintering deer and elk.

## MANAGEMENT UNIT 9

6,320 Acres of Public Surface; 1 percent of the Planning Area

Description of the OHV designation in the unit in the Uncompahgre Basin RMP dated July 1989:

**Off-Road Vehicles.** A total of 680 acres in Roubideau and Potter creeks will be closed to ORV use. Vehicle use in the remainder of the management unit will be limited to designated roads and trails yearlong.

Description of the Proposed Amendment to the above language.

On approximately 726 acres of public lands in riparian areas in the part of the unit located east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, off-route, off-highway use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, will be prohibited yearlong. Use by wheeled, motorized or non-motorized mechanical vehicles will be permitted for camping, picnicking, and forest product gathering only within 300 feet either side of existing established routes or trails as long as that use does not result in resource damage. The use of motorized vehicles will not be permitted cross-country or off existing established routes to retrieve game.

On public lands in the remainder of the unit in the UFO, off road vehicle use will be limited to designated roads and trails year long, with the exception of a total of 680 acres in Roubideau and Potter creeks, which will remain closed to ORV use.

## MANAGEMENT UNIT 14

80 Acres of Public Surface; less than 1 percent of the Planning Area

Description of the OHV designation in the unit in the Uncompahgre Basin RMP dated July 1989:

**Off-Road Vehicles.** Vehicle use within the management unit will be limited to designated roads and trails year long.

Description of the Proposed Amendment to the above language.

BLM_0051546

On the public lands in the approximately 80-acre Needle Rock Outstanding Natural Area/Area of Critical Environmental Concern that is located in the part of the unit east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, off-route, off-highway use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, will be limited to designated routes yearlong. If no routes are designated, this use will not be permitted off any existing route, trail, or road in the unit.

## MANAGEMENT UNIT 16

48,422 Acres of Public Surface; 10 percent of the Planning Area

Description of the OHV designation in the unit in the Uncompahgre Basin RMP dated July 1989:

**Off-Road Vehicles.** Public lands within the management unit will be open to ORV use.

Description of the Proposed Amendment to the above language.

On approximately 12,748 acres of public lands in that part of the unit located east or north of Colorado Highways 62 and 92 in Montrose, Delta, and Gunnison Counties, off-route, off-highway use by wheeled, motorized or non-motorized mechanical vehicles, including mountain bikes, will be prohibited year long. Use by wheeled, motorized or non-motorized mechanical vehicles will be permitted for camping, picnicking, and forest product gathering only within 300 feet either side of existing established routes or trails as long as that use does not result in resource damage. The use of motorized vehicles will not be permitted cross-country or off existing established routes to retrieve game. This limitation of use is to protect resources, including soils and watershed values.

The remainder of the public lands in management unit 16 are outside of the affected area and will remain open to ORV use.

**National Park Service**
**U.S. Department of the Interior**



Natural Resource Program Center

# Federal Land Managers'
# Air Quality Related Values Work Group (FLAG)

*Phase I Report—Revised (2010)*

Natural Resource Report NPS/NRPC/NRR—2010/232



BLM_0051548



**ON THE COVER**
Courthouse Towers, Arches National Park, Utah.
Photo by Debbie Miller.

**THIS PAGE:**
Jumping Cholla, Superstition Wilderness, Arizona.
Photo by Steve Boutcher

# Federal Land Managers'
# Air Quality Related Values Work Group (FLAG)

*Phase I Report—Revised (2010)*

Natural Resource Report NPS/NRPC/NRR—2010/232

U.S. Forest Service
Air Quality Program
1400 Independence Ave, SW
Washington, DC 20250

National Park Service
Natural Resource Program Center
Air Resources Division
PO Box 25287
Denver, Colorado 80225

U.S. Fish and Wildlife Service
National Wildlife Refuge System
Air Quality Branch
7333 W. Jefferson Ave., Suite 375
Lakewood, CO 80235

October 2010

BLM_0051550

The National Park Service, Natural Resource Program Center publishes a range of reports that address natural resource topics of interest and applicability to a broad audience in the National Park Service and others in natural resource management, including scientists, conservation and environmental constituencies, and the public.

The Natural Resource Report Series is used to disseminate high-priority, current natural resource management information with managerial application. The series targets a general, diverse audience, and may contain NPS policy considerations or address sensitive issues of management applicability.

All manuscripts in the series receive the appropriate level of peer review to ensure that the information is scientifically credible, technically accurate, appropriately written for the intended audience, and designed and published in a professional manner.

This guidance document was jointly prepared by the National Park Service, U.S. Forest Service, and the U.S. Fish and Wildlife Service, in collaboration with the Environmental Protection Agency. Guidance contained herein has been reviewed by subject matter experts and the general public through formal public review and comment period. This guidance document provides information for Federal Land Managers, permitting authorities, and permit applicants to use when assessing air quality impacts to air quality related values. Mention of trade names or commercial products does not constitute endorsement or recommendation for use by the U.S. Government.

This report is available from the Air Resources Division of the NPS (http://www.nature.nps.gov/air) and the Natural Resource Publications Management Web site (http://www.nature.nps.gov/publications/NRPM) on the Internet.

Please cite this publication as:

U.S. Forest Service, National Park Service, and U.S. Fish and Wildlife Service. 2010. Federal land managers' air quality related values work group (FLAG): phase I report—revised (2010). Natural Resource Report NPS/NRPC/NRR—2010/232. National Park Service, Denver, Colorado.

**NPS 999/105412, October 2010**

BLM_0051551



# United States Department of the Interior

### OFFICE OF THE SECRETARY
Washington, D.C. 20240

OCT - 7 2010

Dear FLAG User:

We are pleased to provide the final revised FLAG report (FLAG 2010). FLAG was formed at the request of permit applicants and State permit review authorities to develop a more consistent and objective approach for the Federal Land Managers (FLMs), *i.e.*, National Park Service, U.S. Fish and Wildlife Service, and U.S. Department of Agriculture Forest Service, to evaluate air pollution effects on their Air Quality Related Values (AQRVs). The FLAG effort focused on how air pollutants – primarily particulate matter, nitrogen dioxide, sulfur dioxide, nitrates, sulfates, ozone – affect the health and status of resources in areas managed by the three agencies. FLAG subgroups concentrated on four key issues: (1) visibility; (2) aquatic and terrestrial effects of wet and dry pollutant deposition; (3) terrestrial effects of ozone; and (4) process and policy issues. In December 2000, the FLMs published a final Phase I report (FLAG 2000). Based on knowledge gained and regulatory developments since FLAG 2000, the FLMs believe certain revisions to FLAG 2000 are now appropriate. The final revised FLAG 2010 report reflects those changes.

The FLAG 2010 report contains a wealth of information and should continue to be a very useful tool; we support its recommendations. The FLAG report is guidance and reflects agency direction, but it is not a rule. Nevertheless, we encourage all FLMs, permitting authorities, permit applicants, and other interested parties to take advantage of the helpful information contained in the FLAG report when assessing air pollution impacts on AQRVs.

We want to thank the many people who contributed to this important and worthwhile project.

Sincerely,

Thomas L. Strickland
Assistant Secretary for Fish and Wildlife and Parks
Department of the Interior

Sincerely,

Harris Sherman, Under Secretary
Natural Resources and the Environment
Department of Agriculture

BLM_0051552

BLM_0051553

# Contents

Figures ....................................................................................................................................................................... vii

Tables ....................................................................................................................................................................... viii

Preface to this Edition of the FLAG Phase I Report (New).................................................................................... ix

Executive Summary (Revised)................................................................................................................................ xii

1. Background ............................................................................................................................................................ 1

   1.1. History (Revised)............................................................................................................................................ 1

      1.1.1. FLAG Approach (Revised) ................................................................................................................. 1

      1.1.2. FLAG Organization ........................................................................................................................... 2

   1.2. Overview of Resource Issues (Revised) ....................................................................................................... 2

      1.2.1. Visibility ............................................................................................................................................ 2

      1.2.2. Vegetation......................................................................................................................................... 2

      1.2.3. Soils and Surface Waters.................................................................................................................. 3

   1.3. Legal Responsibilities (Revised) .................................................................................................................. 3

   1.4. Commonalities Among Federal Land Managers ......................................................................................... 4

      1.4.1. Identifying AQRVs (Revised) ............................................................................................................ 4

      1.4.2. Determining the Levels of Pollution that Trigger Concern for the Well-Being of AQRVs (Revised)..................... 4

      1.4.3. Visibility ............................................................................................................................................ 5

      1.4.4. Biological and Physical Effects.......................................................................................................... 5

      1.4.5. Determining Pollution Levels of Concern (Revised)........................................................................ 5

      1.4.6. FLM Databases (Revised) ................................................................................................................. 5

   1.5. Regulatory Developments Since FLAG 2000 (New) .................................................................................... 5

2. Federal Land Managers' Approach to AQRV Protection ...................................................................................... 7

   2.1. AQRV Protection and Identification (Revised) ............................................................................................ 7

   2.2. New Source Review (Revised) ..................................................................................................................... 7

      2.2.1. Roles and Responsibilities of FLMs (Revised) ................................................................................. 7

      2.2.2. Elements of Permit Review ............................................................................................................... 9

      2.2.3. FLM Permit Review Process ............................................................................................................ 10

      2.2.4. Criteria for Decision Making (Adverse Impact Considerations) (Revised)..................................... 12

      2.2.5. Air Pollution Permit Conditions that Benefit Class I Areas ........................................................... 12

      2.2.6. Reducing Pollution in Nonattainment Areas (Nonattainment Permit Process)............................ 13

   2.3. Other Air Quality Review Considerations (Revised) ................................................................................. 13

      2.3.1. Remedying Existing Adverse Impacts............................................................................................. 13

      2.3.2. Requesting State Implementation Plan (SIP) Revisions to Address AQRV Adverse Impacts (Revised)............... 14

      2.3.3. Periodic Increment Consumption Review (Revised) ...................................................................... 14

   2.4. Managing Emissions Generated in and Near FLM Areas (Revised)........................................................... 14

      2.4.1. Prescribed Fire ............................................................................................................................... 15

      2.4.2. Strategies to Minimize Emissions from Sources In and Near FLM Areas (Revised)...................... 15

      2.4.3. Conformity Requirements in Nonattainment Areas....................................................................... 16

3. Subgroup Reports: Technical Analyses and Recommendations ........................................................................ 18

   3.1. Subgroup Objectives and Tasks ................................................................................................................ 18

   3.2. Initial Screening Criteria (New) ................................................................................................................ 18

BLM_0051554

3.3. Visibility .................................................................................................................................. 19
   3.3.1. Introduction (Revised) ...................................................................................................... 19
   3.3.2. Recommendations for Evaluating Visibility Impacts (Revised) ........................................ 20
   3.3.3. Air Quality Models and Visibility Assessment Procedures (Revised) ............................... 20
   3.3.4. Summary (Revised) ........................................................................................................... 25
   3.3.5. Natural Visibility Conditions and Analysis Methods (New) .............................................. 26
3.4. Ozone ...................................................................................................................................... 54
   3.4.1. Introduction (Revised) ...................................................................................................... 54
   3.4.2. Ozone Effects on Vegetation (Revised) ............................................................................ 54
   3.4.3. Established Metrics to Determine Phytotoxic Ozone Concentrations (Revised) ............. 55
   3.4.4. Identification of Ozone Sensitive AQRVs or Sensitive Receptors (Revised) ..................... 55
   3.4.5. Review Process for Sources that Could Affect Ozone Levels or Vegetation in FLM Areas  (Revised) ............... 55
   3.4.6. Further Guidance to FLMs (Revised) ................................................................................. 56
   3.4.7. Ozone Air Pollution Web Sites (Revised) .......................................................................... 58
3.5. Deposition ............................................................................................................................... 58
   3.5.1. Introduction (Revised) ...................................................................................................... 58
   3.5.2. Current Trends in Deposition (Revised) ............................................................................ 59
   3.5.3. Identification and Assessment of AQRVs (Revised) .......................................................... 59
   3.5.4. Determining Critical Loads (Revised) ................................................................................ 62
   3.5.5. Other AQRV Identification and Assessment Tools (Revised) ............................................ 64
   3.5.6. Recommendations for Evaluating Potential Effects from Proposed Increases in Deposition
          to an FLM Area (Revised) ................................................................................................. 65
   3.5.7. Summary (Revised) ........................................................................................................... 71
   3.5.8. Web sites for Deposition and Related Information (Revised) ........................................... 71
4. Expansion of Discussion of Process for Adverse Impact Determination (New Chapter) .................................. 73
   4.1. Background ............................................................................................................................. 73
   4.2. Regulatory Factors ................................................................................................................. 73
   4.3. Contextual Considerations ..................................................................................................... 74
   4.4. Preliminary Adverse Impact Concerns ................................................................................... 74
   4.5. Adverse Impact Determination .............................................................................................. 74
5. Future FLAG Work ........................................................................................................................ 75
   5.1. Implementing FLAG Recommendations (Revised) ................................................................. 75
   5.2. Phase I Updates (Revised) ...................................................................................................... 75
   5.3. Phase II Tasks (Revised) ......................................................................................................... 75
Appendix A: Glossary ....................................................................................................................... 76
Appendix B: Legal Framework for Managing Air Quality and Air Quality Effects on Federal Lands .................. 79
Appendix C: General Policy for Managing Air Quality Related Values in Class I Areas ......................................... 84
Appendix D: Best Available Control Technology (BACT) Analysis ........................................................................ 85
Appendix E: Maps of Federal Class I Areas ......................................................................................................... 86
Appendix F: FLAG 2000 Participants .................................................................................................................. 89
Appendix G: Bibliography (Revised) ................................................................................................................... 91

BLM_0051555

# Figures

Figure 1. Procedure for Visibility Assessment for Distant/Multi-Source Applications (Revised) .......................................... xii

Figure 2. FLM Assessment of Potential Ozone Effects from New Emissions Source (Revised) ........................................... xiii

Figure 3. FLM Assessment of Potential Deposition Effects from New Emissions Sources (Revised) ................................. xiv

Figure 4. Procedure for Visibility Assessment for Distant/Multi-Source Applications (Revised) ........................................ 26

Figure 5. IMPROVE Equation for Calculating Light Extinction ......................................................................................... 29

Figure 6. FLM Assessment of Potential Ozone Effects from New Emissions Source (Revised) .......................................... 57

Figure 7. FLM Assessment of Potential Deposition Effects from New Emissions Sources (Revised) ................................. 67

Figure 8. National Park Services Class I Areas ................................................................................................................... 86

Figure 9. Fish and Wildlife Service Class I Areas ............................................................................................................... 87

Figure 10. Forest Service Class I Wilderness Areas ........................................................................................................... 88

BLM_0051556

# Tables

Table 1. FLAG 2000 vs. FLAG 2010 Analyses ....................................................................................... xi

Table 2. Section of Table 6 Used for Step 1 Calculations of the Alpine Lakes Wilderness Example ................................. 27

Table 3. Step 3 Calculation Results for the Alpine Lakes Wilderness Example ............................... 27

Table 4. Step 4 Calculation Results for the Alpine Lakes Wilderness Example ................................. 28

Table 5. 20% Best Natural Conditions – Concentrations and Rayleigh Scattering By Class I Area ................................. 30

Table 6. Annual Average Natural Conditions - Concentrations and Rayleigh Scattering By Class I Area ........................ 34

Table 7. Monthly $f_L(RH)$ – Large $(NH_4)_2SO_4$ and $NH_4NO_3$ Relative Humidity Adjustment Factor ..................... 38

Table 8. Monthly $f_S(RH)$ – Small $(NH_4)_2SO_4$ and $NH_4NO_3$ Relative Humidity Adjustment Factor ..................... 42

Table 9. Monthly $f_{SS}(RH)$ – Sea Salt Relative Humidity Adjustment Factor ...................................................... 46

Table 10. Monthly Average Natural Conditions Visual Range In Kilometers ................................................................. 50

Table 11. Indicators for monitoring and evaluating effects from deposition of S and N (Revised) .................................. 60

BLM_0051557

# Preface to this Edition of the FLAG Phase I Report (New)

Under the Clean Air Act, the Federal Land Manager (FLM) and the Federal official with direct responsibility for management of Federal Class I parks and wilderness areas (i.e., Park Superintendent, Refuge Manager, Forest Supervisor) have an affirmative responsibility to protect the air quality related values (AQRVs) (including visibility) of such lands, and to consider whether a proposed major emitting facility will have an adverse impact on such values. The FLM's decision regarding whether there is an adverse impact is then conveyed to the permitting authority – usually a State agency – for consideration in its determinations regarding the permit. The permitting authority's determinations generally consider a wide range of factors, including the potential impact of the new source or major modification on the AQRVs of Class I areas, if applicable.

Both State permitting agencies and permit applicants requested that the FLMs provide better consistency pertaining to their role in the review of new source permit applications near Federal Class I areas. To address this concern, the FLMs formed the Federal Land Managers' Air Quality Related Values Work Group (FLAG). The official "FLM" is the Secretary of the department with authority over the Federal Class I areas (or the Secretary's designee). For the Department of the Interior, the Secretary has designated the Assistant Secretary for Fish and Wildlife and Parks as the FLM, whereas the Secretary of Agriculture has delegated the FLM responsibilities to the Regional Forester, and in some cases, the Forest Supervisor.

The purpose of FLAG is twofold: (1) to develop a more consistent and objective approach for the FLMs to evaluate air pollution effects on public AQRVs in Class I areas, including a process to identify those resources and any potential adverse impacts, and (2) to provide State permitting authorities and potential permit applicants consistency on how to assess the impacts of new and existing sources on AQRVs in Class I areas, especially in the review of Prevention of Significant Deterioration (PSD) of air quality permit applications. Under the Clean Air Act, the FLM formal "affirmative responsibility" role in the permitting process is limited to the extent a proposed new or modified source may affect AQRVs in a Class I area.[1]



**Adult Brown Pelicans on Breton Island National Wildlife Refuge, Louisiana.**
Credit: USFWS

FLAG members include representatives from three of the federal land management agencies that administer Federal Class I areas: the U.S. Forest Service (USFS), under the Department of Agriculture, and the National Park Service (NPS) and U.S. Fish and Wildlife Service (FWS) under the Department of the Interior, hereafter referred to as "the Agencies" or the "FLMs." In addition, five Tribal governments each administer their redesignated Class I areas, and the Bureau of Land Management (BLM) jointly administers four mandatory Federal Class I areas with the USFS. BLM is not a member of FLAG. However, because BLM does manage federal PSD Class I lands, as well as large amounts of acres in the vicinity of many FLAG Agencies' Class I areas, they may apply, when appropriate, the assessment methodologies outlined in the FLAG report. Applicants with the potential to adversely impact visibility or other AQRVs at PSD Class I areas administered by the BLM should contact that agency directly to discuss their considerations. The Agencies review permit applications for projects that may impact their areas, and make recommendations to their respective FLM as to whether or not those impacts might be considered adverse. The FLM will then make the final decision regarding the nature of the potential impacts to AQRVs, which is then conveyed to the permitting authority for its consideration.

In December 2000, after undergoing a public review and comment process that included a 90 day public comment period announced in the *Federal Register* and a public meeting, the FLMs published a *FLAG Phase I Report* (FLAG 2000), along with an accompanying "Response to Public Comments" document. The FLAG 2000 report described the work accomplished in Phase I of the FLAG effort. FLAG 2000 provided State permitting authorities and potential permit applicants a consistent methodology for conducting Class I area impact analyses. At that time, the Agencies envisioned a FLAG Phase II to address unresolved issues

---

1.  Nevertheless, the FLMs are also concerned about resources in Class II parks and wilderness areas because they have other mandates to protect those areas as well. The information and procedures outlined in this document are generally applicable to evaluating the effect of new or modified sources on the AQRVs in both Class I and Class II areas, including the evaluation of effects as part of Environmental Assessments and/or Environmental Impact Statements under the National Environmental Policy Act (NEPA). However, FLAG does not preclude more refined or regional analyses being performed under NEPA or other programs.

BLM_0051558

including those that will require research and the collection of new data. However, resource constraints have prevented the Agencies from embarking on a formal FLAG Phase II process, but the Agencies have made significant progress in obtaining effects-based information as part of their resource-protection responsibilities. This information is included in this revised report.

The Agencies formed three separate subgroups to deal with area specific technical and policy issues associated with visibility impairment, ozone effects on vegetation, and effects of pollutant deposition on soils and surface waters. FLAG 2000 consolidated the results of those three subgroups.

FLAG 2000 included recommendations for completing and evaluating New Source Review (NSR) projects that may affect federally protected areas. It was intended to be a screening tool to help the Agencies and permit applicants determine whether impacts would be negligible. It was not intended to provide a bright-line test that would allow one to determine whether or not a proposed source of air pollution would cause or contribute to an adverse impact on AQRVs. That determination remains a project-specific management decision of the FLM. Among other factors, the FLMs' assessment of whether or not an adverse impact would occur is based on the sensitivity of the AQRVs at the particular federally protected area under consideration, and the magnitude, frequency, duration, timing, and geographic extent of the estimated new source impacts. This report (FLAG 2010) reaffirms these intentions.

FLAG 2000 has been a useful tool to the Agencies, State permitting authorities, and permit applicants. It was intended to be a working document that would be revised as necessary as the Agencies learn more about how to better assess the health and status of AQRVs. Based on knowledge gained and regulatory developments since FLAG 2000, the Agencies believe certain revisions to FLAG 2000 are now appropriate. This revised report (FLAG 2010) reflects those changes. However, it is important to emphasize that in this revision the Agencies have made certain changes to update specific information and data, but retain intact much of the background and general information contained in FLAG 2000 (e.g., Appendices A through H). Therefore, while this version replaces FLAG 2000, FLAG 2010 does not constitute a comprehensive update of all the information and material contained in FLAG 2000. Instead, the Agencies have focused their efforts on those areas of FLAG 2000 that have received the most attention and concern from permit applicants and permitting authorities. In that regard, the Agencies have included substantial changes to the visibility analysis sections, as well as included a more detailed discussion of the factors that the FLMs will use in the decision making process for an adverse impact determination. The Agencies have also taken this opportunity to discuss some key regulatory developments since FLAG 2000, as well as update some information in the FLAG 2000 deposition and ozone

sections. To aid the FLAG user wanting to focus on the most recent changes, the Agencies have identified those new and revised sections throughout the FLAG 2010 report.

The most significant changes in this FLAG 2010 revision are summarized as follows:

- Adopts similar criteria derived from EPA's 2005 Best Available Retrofit Technology (BART) guidelines for the Regional Haze Rule to screen out from AQRV review those sources with relatively small amounts of emissions located a large distance from a Class I area (i.e., $Q/D \le 10$, for sources located greater than 50 km away).

- Utilizes the most recent EPA estimates to determine annual average or 20% best natural visibility conditions for Class I areas, using the new EPA-approved visibility algorithm.

- Adopts criteria derived from the 2005 BART guidelines that utilizes monthly average relative humidity adjustment factors to minimize the effects of weather events (i.e., short-term meteorological phenomena) on modeled visibility impacts.

- Adopts criteria derived from the 2005 BART guidelines that sets a 98th percentile value to screen out roughly seven days of haze-type visibility impairment per year.

- Includes deposition analysis thresholds and concern thresholds for nitrogen and sulfur deposition impacts on vegetation, soils, and water.

- Increases transparency and consistency of factors considered for adverse impact determinations.

A comparison of these FLAG 2010 changes to information contained in FLAG 2000 is provided in Table 1:

Other changes of note included in FLAG 2010 are:

- Clarifies the near field visibility analysis techniques for analyzing plumes or layers viewed against a background;

- Expands discussion of "Critical Loads" to reflect some significant developments in this area since FLAG 2000;

- Updates ozone sensitive species lists contained in Appendix 3.A of the FLAG 2000 report, but now includes that information on individual agency web sites rather than in the FLAG 2010 report;

- Replaces Appendix 3.B of FLAG 2000 (W126 and N100 ozone values) with current information on the individual agency web sites;

- Updates the information contained in Table D-2 of FLAG 2000 to reflect current information, but now includes that information on individual agency web sites rather than in the FLAG 2010 report;

- Replaces the dated sulfate, nitrate, and ammonium ion concentration maps (Figures D-2, D-3, and D-4 of FLAG 2000), with a reference to the NADP site for current trends data.

BLM_0051559

**Table 1. FLAG 2000 vs. FLAG 2010 Analyses**

| | FLAG 2000 | FLAG 2010 |
|---|---|---|
| Annual emissions/Distance (Q/D) screening criteria. (Not applicable for Class I increment analyses). | None | ≤10 (sum of certain pollutant emissions (TPY) divided by distance (km) from Class I area; applies to all AQRVs, not just visibility. See section 3.2. |
| Background Visibility Conditions. | Based on annual average natural, using NAPAP estimates. | Based on annual average natural, or 20% best natural, using EPA data from Regional Haze Rule development. See section 3.3.3. |
| Relative Humidity Adjustment Factor (f(RH)). | Hour-by-hour (with RH capped at 98%). | Monthly average (with RH capped at 95%). See section 3.3.3. |
| First Level Screening Model. | CALPUFF or CALPUFF-lite. | CALPUFF only. See section 3.3.3. |
| Visibility Assessment Criteria. | Maximum modeled value. | 98th percentile modeled value at any receptor. See section 3.3.3. |
| Deposition Analysis Thresholds/ Concern Thresholds | None | Provided for nitrogen and sulfur deposition. See section 3.5.6. |
| Adverse Impact Determination Criteria. | "Likely to Object" if 10% threshold exceeded; regulatory factors implicitly considered. | Adverse impact determination process more explicit; considers regulatory and other factors. See sections 4.2-4.4 |

BLM_0051560

# Executive Summary (Revised)

The Federal Land Managers' Air Quality Related Values Work Group (FLAG) formed to develop a more consistent approach for the Federal Land Managers (FLMs) to evaluate air pollution effects on resources. As discussed in the Preface, the *FLAG Phase I Report* (FLAG 2000) is being revised in part at this time. The primary—but not sole—focus of FLAG is the New Source Review (NSR) program, especially in the review of Prevention of Significant Deterioration (PSD) of air quality permit applications. The goals of FLAG have been to provide consistent policies and processes both for identifying air quality related values (AQRVs) and for evaluating the effects of air pollution on AQRVs, primarily in Federal Class I air quality areas, but also in some instances, in other national parks, national forests, national wildlife refuges, wilderness areas, and national monuments. Federal Class I areas are defined in the Clean Air Act as national parks over 6,000 acres and wilderness areas and memorial parks over 5,000 acres, established as of 1977. All other FLM areas are designated Class II. Maps of the Agencies' Federal Class I areas are provided in Appendix E.

FLMs have an "affirmative responsibility" to protect AQRVs. In this respect, the FLM role consists of considering whether emissions from a new or modified source may have an adverse impact on AQRVs and providing comments to permitting authorities (States or EPA). FLMs have no permitting authority under the Clean Air Act, and they have no authority under the Clean Air Act to establish air quality-related rules or standards. It is important to emphasize that the FLAG report only explains factors and information the FLMs expect to use when carrying out their consultative role. It is separate from Federal regulatory programs.

FLAG members include representatives from the three primary agencies that administer the nation's Federal Class I areas: the U.S. Forest Service (USFS), the National Park Service (NPS), and the U.S. Fish and Wildlife Service (FWS). (Subsequently in this report, these three agencies collectively will be referred to as "the Agencies" or the "FLMs." Class I and Class II air quality areas are called "FLM areas" in this report.) Appendix F contains a list of participants that worked on the original FLAG 2000 report.

This report describes the work accomplished in Phase I of the FLAG effort as revised to reflect current developments. That work includes identifying policies and processes common to the FLMs (herein called "commonalities") and developing new policies and processes using readily available information. This report provides State permitting authorities and potential permit applicants a consistent and predictable process for assessing the impacts of new and existing sources on AQRVs, including a process to identify those AQRVs and potential adverse impacts. The report also



**Marble Mountain Wilderness, California.**
Credit: Steve Boutcher

discusses considerations unrelated to new source review and managing emissions in Federal areas. If and when the Agencies embark on Phase II, FLAG will address unresolved issues including those that will require research and the collection of new data.

This revised *FLAG Phase I Report* consolidates the results of the FLAG Visibility, Ozone, and Deposition subgroups. The chapters prepared by these subgroups contain issue-specific technical and policy analyses, recommendations for evaluating AQRVs, and information for completing and evaluating NSR permit applications. This information and the associated recommendations are intended for use by the FLMs, permitting authorities, NSR permit applicants, and other interested parties. The report includes background information on the roles and responsibilities of the FLMs under the NSR program.

This document includes recommendations for completing and evaluating NSR applications that may affect Class I FLM areas. This information can also be used to evaluate impacts on Class II parks and wilderness areas. It does not provide a universal formula that would, in all situations, allow one to determine whether or not a source of air pollution causes or contributes to an adverse impact. That determination remains a project-specific management decision, the responsibility for which remains with the FLM, as delegated by Congress. The FLM's assessment of whether or not an adverse impact would occur is based on the sensitivity of the AQRVs at the particular FLM area under consideration, as well as the consideration of several other factors, including the magnitude, frequency, duration, timing, and geographic extent of the new source's impacts.

To provide information for the FLM's assessment of adverse impacts on AQRVs, the permit applicant should identify the potential impacts of the source on all applicable AQRVs of that area. An FLM may ask that an applicant address any or all of the areas of concern. The primary areas of concern to the FLMs with respect to air pollution emissions are

BLM_0051561

visibility impairment, ozone effects on vegetation, and effects of pollutant deposition on soils and surface waters.

The *FLAG Phase I Report* also describes the FLAG effort, including the FLAG approach, organization, and plans for future FLAG work. Appendix A of the report contains a glossary of technical terms, abbreviations, and acronyms used in the report along with associated definitions. Appendix G provides a list of all references cited in the FLAG report.

The key recommendations developed by the Visibility, Ozone, and Deposition subgroups are summarized below, and updated in part in this FLAG 2010 revision. However, for all three subject matter areas, FLAG recommends that the permit applicant consult with the appropriate permitting authority and with the FLM for the affected area(s) for confirmation of preferred procedures. This consultation should take place in the early stages of the permit application process.

## Recommendations for Evaluating Visibility Impacts (Revised)

FLAG provides recommendations, specific procedures, and interpretation of results for assessing visibility impacts of new or modified sources on Class I area resources.[2]

FLAG addresses assessments for sources proposed for locations near (generally within 50 km) and at large distances (greater than 50 km) from these areas. The key components of the recommendations are highlighted below.

In general, FLAG recommends that an applicant:

- Apply the Q/D test (see "INITIAL SCREENING TEST" below) for proposed sources greater than 50 km from a Class I area to determine whether or not any further visibility analysis is necessary.

- Consult with the appropriate regulatory agency and with the FLM for the affected Class I area(s) or other affected area for confirmation of preferred visibility analysis procedures.

- Obtain FLM recommendation for the specified reference levels (estimate of natural conditions) and, if applicable, FLM recommended plume/observer geometries and model receptor locations.

---

2.   Nevertheless, the FLMs are also concerned about resources in Class II parks and wilderness areas because they have other mandates to protect those areas as well. The information and procedures outlined in this document are generally applicable to evaluating the effect of new or modified sources on the AQRVs in both Class I and Class II areas, including the evaluation of effects as part of Environmental Assessments and/or Environmental Impact Statements under the National Environmental Policy Act (NEPA). However, FLAG does not preclude more refined or regional analyses being performed under NEPA or other programs.

- Apply the applicable EPA Guideline, steady-state models for regions within the Class I area that are affected by plumes or layers that are viewed against a background (generally within 50 km of the source).

  - Calculate hourly estimates of changes in visibility, as characterized by the change in the color difference index ($\Delta E$) and plume contrast (C), with respect to natural conditions, and compare these estimates with the thresholds given in section 3.3.3.

- For regions of the Class I area where visibility impairment from the source would cause a general alteration of the appearance of the scene (generally 50 km or more away from the source or from the interaction of the emissions from multiple sources), apply a non-steady-state air quality model with chemical transformation capabilities (refer to EPA's *Guideline on Air Quality Models*), which yields ambient concentrations of visibility-impairing pollutants. At each Class I receptor:

  - Calculate the change in extinction due to the source being analyzed, compare these changes with the reference conditions, and then compare these results with the thresholds given in section 3.3.3.

  - Utilize estimates of annual average natural visibility conditions for each Class I area as presented in Table 6, unless otherwise recommended by the FLM or permitting authority. Alternative estimates of visibility conditions are provided in Table 5 for consistency with State agencies that elected to use 20% best visibility for regional haze or BART implementations, or when FLMs recommend using the 20% best visibility as natural background.

- If first-level modeling results are above levels of concern, continue to consult with the Agencies to discuss other considerations (e.g., possible impact mitigation, more refined analyses).

This review process for distant/multi-source applications is portrayed schematically in Figure 1.

## Recommendations for Evaluating Ozone Impacts (Revised)

- FLM actions or specific requests on a permit application will be based on the existing air pollution situation at the area they manage. These conditions include (1) whether or not actual ozone damage has occurred in the area, and (2) whether or not ozone exposure levels occurring in the area are high enough to cause damage to vegetation (i.e., phytotoxic $O_3$ exposures). Figure 2 shows the FLM review process to assess ozone impacts for a project that exceeds the initial annual emissions over distance (Q/D) screening criteria. As noted in Figure 2, ambient ozone concentrations are considered along with data from exposure response studies (EPA 2007b) to determine whether a source will cause or contribute to phytotoxic

BLM_0051562



**Figure 1. Procedure for Visibility Assessment for Distant/Multi-Source Applications (Revised)**
*Q/D test only applies to sources located greater that 50 km from a Class I area.
**Difference Change in the 98th percentile with respect to (wrt) the annual average Natural Condition (NC). Applicant should use the 20th percentile best natural condition background if recommended by the FLM or permitting authority.

ozone levels (i.e., levels toxic to plants) at the affected site. The FLM may ask the applicant to calculate the ozone exposure values if these data are not already available. Ozone damage to vegetation is determined from field observations at the impacted site.

- Oxidant stipple necrosis on plant foliage and ozone-induced senescence infer adverse physiological or ecological effects, and are considered to be damage if they are determined to have a negative impact on aesthetic value.

- Established ozone metrics to describe ozone exposure are referenced.

- $NO_x$ and VOC emissions are of concern because they are precursors of ozone. Current information indicates most FLM areas are $NO_x$ limited. Until we determine the VOC or $NO_x$ status of each area, we will focus on $NO_x$ emission sources.

## Recommendations for Evaluating Deposition Impacts (Revised)

For a project that exceeds the initial annual emissions over distance (Q/D) screening criteria, the permit applicant should consult with the appropriate regulatory agency and FLM for the affected area(s) to determine if a deposition impact analysis should be done (i.e., expected sulfur and/

BLM_0051563