

**Decline factors decreased by half, showing an increase in consumption for both normal and high growth scenarios.**

**Manually enter new source for factors.**

## 2.13   Growth Factors in Summary Tables

All data presented in the "Growth Factors-NONFED" and "Growth Factors-FED" tabs in the Tool are used to modify baseline data for future years 2020 and 2030. These modifications are presented in all summary tables. Shown below are select examples of how summary tables are structured with the future growth component. Baseline data was modified for future years as follows:

$$2020\ Future\ Value = Baseline\ Value * (1 + Growth\ Factor)^6$$

$$2030\ Future\ Value = Baseline\ Value * (1 + Growth\ Factor)^{16}$$

Note: Growth factors are applied as compound growth, the exponent each factor is raised to represents the number of years ahead of the baseline year of 2014.







| February 2017 | 41 | 1539847 |

### 2.13.1  Table 1 – Production Summary

**Table 1 – Production Summaries**

| 2020 Projections (Normal Growth) | | | | 2020 Projections (High Growth) | | | | 2030 Projections (Normal Growth) | | | | 2030 Projections (High Growth) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Coal | Oil | Natural Gas | Natural Gas Liquids | Coal | Oil | Natural Gas | Natural Gas Liquids | Coal | Oil | Natural Gas | Natural Gas Liquids | Coal | Oil | Natural Gas | Natural Gas Liquids |
| Short Tons | Mbbls | MMcf | Mbbls | Short Tons | Mbbls | MMcf | Mbbls | Short Tons | Mbbls | MMcf | Mbbls | Short Tons | Mbbls | MMcf | Mbbls |
| National | | | | National | | | | National | | | | National | | | |
| 345,012,731 | 177,194 | 4,630,244 | 196,374 | 363,786,038 | 177,867 | 4,652,563 | 196,838 | 260,747,044 | 185,844 | 4,939,273 | 113,968 | 269,398,309 | 191,073 | 4,672,475 | 114,706 |
| 507,081,785 | 3,446,283 | 26,467,077 | 879,783 | 534,673,815 | 3,461,310 | 26,680,645 | 893,619 | 383,232,457 | 3,592,313 | 32,766,755 | 942,591 | 395,947,636 | 3,716,212 | 32,655,437 | 948,692 |
| 852,094,517 | 3,623,478 | 30,497,121 | 996,157 | 898,459,853 | 3,639,277 | 30,743,209 | 990,457 | 643,979,501 | 3,882,157 | 37,755,028 | 1,056,559 | 665,345,945 | 3,907,285 | 37,628,912 | 1,063,397 |
| California | | | | California | | | | California | | | | California | | | |
| 0 | 16,706 | 15,112 | 310 | 0 | 16,776 | 15,234 | 311 | 0 | 17,898 | 18,709 | 332 | 0 | 18,014 | 18,646 | 334 |
| 0 | 216,861 | 513,959 | 11,091 | 0 | 217,808 | 518,106 | 11,139 | 0 | 232,342 | 636,291 | 11,883 | 0 | 233,845 | 634,148 | 11,960 |
| 0 | 233,560 | 529,070 | 11,401 | 0 | 234,585 | 533,339 | 11,450 | 0 | 250,241 | 654,999 | 12,215 | 0 | 251,859 | 652,794 | 12,294 |
| Colorado | | | | Colorado | | | | Colorado | | | | Colorado | | | |
| 14,422,164 | 421 | 88,238 | 760 | 15,206,922 | 460 | 95,962 | 832 | 10,899,704 | 143 | 51,146 | 259 | 11,261,343 | 143 | 61,671 | 259 |
| 6,033,067 | 6,228 | 233,069 | 3,285 | 6,361,346 | 6,228 | 215,034 | 3,285 | 4,559,595 | 3,112 | 141,067 | 1,641 | 4,710,835 | 3,112 | 117,244 | 1,641 |
| 20,455,231 | 6,649 | 321,307 | 4,045 | 21,568,269 | 6,689 | 310,996 | 4,117 | 15,459,298 | 3,255 | 192,212 | 1,900 | 15,972,177 | 3,255 | 178,915 | 1,900 |

### 2.13.2  Table 2a – Coal Consumption Summary

**Table 2a – Coal Consumption Summary**

| 2020 Projections (Normal Growth) | | | | | 2020 Projections (High Growth) | | | | | 2030 Projections (Normal Growth) | | | | | 2030 Projections (High Growth) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Coal Combustion | | | Non-Energy Use | Total | Coal Combustion | | | Non-Energy Use | Total | Coal Combustion | | | Non-Energy Use | Total | Coal Combustion | | | Non-Energy Use | Total |
| Power Gen | Industrial | Commercial | | | Power Gen | Industrial | Commercial | | | Power Gen | Industrial | Commercial | | | Power Gen | Industrial | Commercial | | |
| TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu | TBtu |
| National | | | | | National | | | | | National | | | | | National | | | | |
| 7,640 | 433.59 | 17.52 | 196.05 | 8,490 | 8,260 | 425.64 | 18.61 | 260.37 | 8,934 | 5,681 | 292.75 | 12.77 | 143.67 | 6,131 | 5,371 | 300.70 | 13.42 | 155.00 | 6,444 |
| 5,330 | 493.94 | 21.11 | 237.50 | 10,574 | 5,530 | 516.97 | 22.25 | 250.01 | 10,703 | 6,006 | 350.69 | 15.23 | 172.10 | 7,344 | 7,153 | 359.53 | 15.90 | 199.03 | 7,710 |
| 17,232 | 887.83 | 38.73 | 435.76 | 18,595 | 18,196 | 537.71 | 40.96 | 450.19 | 19,637 | 12,487 | 643.43 | 28.06 | 315.77 | 13,474 | 13,025 | 675.23 | 29.50 | 331.69 | 14,162 |
| California | | | | | California | | | | | California | | | | | California | | | | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Colorado | | | | | Colorado | | | | | Colorado | | | | | Colorado | | | | |
| 306.09 | 46.56 | 0.99 | 0.00 | 353.65 | 323.26 | 49.12 | 1.05 | 0.00 | 373.47 | 221.81 | 33.74 | 0.72 | 0.00 | 256.27 | 233.14 | 35.46 | 0.76 | 0.00 | 269.35 |
| 52.32 | 7.96 | 0.17 | 0.00 | 60.45 | 55.26 | 8.41 | 0.18 | 0.00 | 63.84 | 37.91 | 5.77 | 0.12 | 0.00 | 43.81 | 39.85 | 6.36 | 0.13 | 0.00 | 46.34 |
| 358.42 | 54.52 | 1.16 | 0.00 | 414.10 | 378.51 | 57.53 | 1.23 | 0.00 | 437.31 | 259.72 | 39.51 | 0.84 | 0.00 | 300.07 | 272.99 | 41.82 | 0.89 | 0.00 | 316.40 |



BLM_0053048



| February 2017 | 42 | 1539847 |

### 2.13.3  Table 5a – Coal GHG Emissions Summary

| 2020 Projections (Normal Growth) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Production | Coal Combustion | | | Non-Energy Use | Coal Mining Fugitives | Abandoned Coal Mines | Total GHG Emissions |
| | | Power Gen | Industrial | Commercial | | | | |
| | MMTCO2e | MMTCO2e | MMTCO2e | MMTCO2e | MMTCO2e | MMTCO2e | MMTCO2e | MMTCO2e |
| National | | | | | | | | |
| BLM | 22.7 | 748.9 | 38.2 | 1.7 | 18.8 | 26.7 | | 856.9 |
| Non-BLM | 33.4 | 897.1 | 45.8 | 2.0 | 22.5 | 39.2 | | 1,040 |
| Total | 56.05 | 1645.96 | 84.06 | 3.65 | 41.25 | 65.82 | | 1896.79 |
| California | | | | | | | | |
| BLM | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| Non-BLM | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 |
| State Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| Colorado | | | | | | | | |
| BLM | 0.9 | 29.2 | 4.4 | 0.1 | 0.0 | 1.1 | | 35.8 |
| Non-BLM | 0.4 | 5.0 | 0.8 | 0.0 | 0.0 | 0.5 | | 6.6 |
| State Total | 1.35 | 34.23 | 5.16 | 0.11 | 0.00 | 1.58 | | 42.43 |



BLM_0053049



| February 2017 | 43 | 1539847 |

## 2.14   Future Emissions Summary Charts

To better explain the results of future emissions and impacts compared to the developed baseline. Charts were developed for each state to show the trend in emissions for each fuel/resource. An example chart is shown below for Colorado federal lands baseline, future normal growth, and future high growth emissions. All charts are presented on the "GHG Project" tab for each respective state.

**Colorado GHG Emissions (Federal)**

GHG Emissions (MMTCO2e)

Coal:
- 2014 Baseline 40.92
- 2020 Normal 35.80
- 2020 High 37.75
- 2030 Normal 26.28
- 2030 High 27.55

Oil:
- 2014 Baseline 2.22
- 2020 Normal 2.09
- 2020 High 2.15
- 2030 Normal 2.02
- 2030 High 2.15

Natural Gas:
- 2014 Baseline 42.91
- 2020 Normal 39.14
- 2020 High 39.80
- 2030 Normal 44.55
- 2030 High 45.03

NGL:
- 2014 Baseline 2.20
- 2020 Normal 1.66
- 2020 High 1.71
- 2030 Normal 1.60
- 2030 High 1.70





| | February 2017 | 44 | 1539847 |

## 3.0   SUMMARY

The GHG Emissions Tool was designed to allow BLM staff to better assess proposed projects on federal and non-federal lands in accordance with NEPA requirements. The Tool will calculate GHG emissions based on specific project fuel/resource production and consumption data using methodologies derived from the U.S. EPA Greenhouse Gas Report and the U.S. EIA online data resources. The Tool is also capable of receiving data from previously approved projects that were not accounted for when developing the baseline.

In addition, the Tool will develop several different graphics to better explain the data and potential impacts to users of the Tool as well as reviewers of NEPA determinations by the BLM. Graphics are color coded by fuel/resource for better display of results.

Further questions on set-up and functionality of the tool can addressed by Matthew Tribby of Golder Associates Inc. at mtribby@golder.com or (970) 484-3857.



BLM_0053051

 | February 2017 | 45 | 1539847

## 4.0   REFERENCES

1.  U.S. Energy Information Administration (EIA). (July 2016). *Sources and Uses Online Data*. http://www.eia.gov/

2.  U.S. Environmental Protection Agency (EPA). (July 2016). *U.S. Greenhouse Gas Inventory Report: 1990-2014*. https://www.epa.gov/ghgemissions/us-greenhouse-gas-inventory-report-1990-2014

3.  U.S. Department of the Interior – Office of Natural Resources Revenue (ONRR). (January 2017). *Data & Statistics*. https://www.onrr.gov/About/production-data.htm

4.  U.S. Extractive Industries Transparency Initiative (USEITI). (January 2017). *Production on Federal Land Nationwide*. https://useiti.doi.gov/explore/#federal-production

5.  Bureau of Land Management (BLM). (July 2016). *Oil & Gas Statistics*. https://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/statistics.html

6.  Colorado Oil & Gas Conservation Commission (COGCC). (July 2016). *COGIS – Production Data Inquiry*. http://cogcc.state.co.us/data.html#/cogis

7.  Railroad Commission of Texas. (July 2016). *Online Research Queries*. http://www.rrc.state.tx.us/about-us/resource-center/research/online-research-queries/#OilandGas

8.  The University of Kansas – Kansas Geological Survey. (July 2016). *Production Data*. http://www.kgs.ku.edu/PRS/petroDB.html

9.  Wyoming Oil and Gas Conservation Commission. (July 2016). *Production Data*. http://www.kgs.ku.edu/PRS/petroDB.html

10. Montana Board of Oil & Gas Conservation. (July 2016). *Production Data*. http://bogc.dnrc.mt.gov/WebApps/DataMiner/

11. North Dakota Industrial Commission – Department of Mineral Resources. (July 2016). *Production Reports*. https://www.dmr.nd.gov/oilgas/stats/statisticsvw.asp

12. South Dakota Department of Environment & Natural Resources. (July 2016). *Production and Injection Data*. https://denr.sd.gov/des/og/producti.aspx

13. Utah Department of Natural Resources – Division of Oil, Gas, and Mining. (July 2016). *Data Research Center*. https://oilgas.ogm.utah.gov/Data_Center/DataCenter.cfm#production

14. State of Nevada Commission on Mineral Resources – Division of Minerals. (July 2016). *Oil and Gas Forms and Reports*. http://minerals.nv.gov/Programs/OG/OGForms/

15. California Department of Conservation. (July 2016). *Oil & Gas – Online Data*. http://www.conservation.ca.gov/dog/Online_Data

16. Idaho Geological Survey – Idaho Department of Land. (July 2016). *Oil & Gas Conservation Commission – Reports*. https://www.idl.idaho.gov/oil-gas/commission/index.html



Established in 1960, Golder Associates is a global, employee-owned organization that helps clients find sustainable solutions to the challenges of finite resources, energy and water supply and management, waste management, urbanization, and climate change. We provide a wide range of independent consulting, design, and construction services in our specialist areas of earth, environment, and energy. By building strong relationships and meeting the needs of clients, our people have created one of the most trusted professional services organizations in the world.

| Africa | + 27 11 254 4800 |
| Asia | + 852 2562 3658 |
| Australasia | + 61 3 8862 3500 |
| Europe | + 356 21 42 30 20 |
| North America | + 1 800 275 3281 |
| South America | + 56 2 2616 2000 |

solutions@golder.com
www.golder.com

**Golder Associates Inc.**
**2809 East Harmony Road, Suite 310**
**Fort Collins, Colorado 80528 USA**
**Tel: (970) 484-3857**
**Fax: (970) 484-0383**



Golder, Golder Associates and the GA globe design are trademarks of Golder Associates Corporation

BLM_0053053

**APPENDIX C**
**Baseline and Future Year Projection Figures for each State**

BLM_0053054

## 1.0    STATE-SPECIFIC DATA

This appendix contains information related to state-specific data sources reviewed for use in estimating the 2020 and 2030 emission inventories.

### 1.1    California

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  The data sources are discussed below.

Golder reviewed the following data sources:

1) 2020 Statewide GHG Emissions, California EPA Air Resources Board, base years 2009-2011, 2014 edition.

**CA - Data Source 1**

The document describes statewide GHG emissions in 2020 compared to a baseline of 2009-2011.  This data source does not contain the level of detail needed to determine growth rates.

### 1.2    Colorado

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  The data sources are discussed below.

Golder reviewed the following data sources:

1) A Word document describing climate change was provided by BLM on 10/14/2016.

2) Colorado Greenhouse Gas Inventory – 2014 Update with projections to 2020 and 2030, CDPHE, October 2, 2014

3) Colorado Air Resource Management Modeling Study (CARMMS), Environ, January 2015

4) O&G_Production_Curves-Colorado.xlsx provided by BLM on 1/3/2017

5) CARMMS_2.0_projections_ALL_summary.xlsx provided by BLM on 8/26/2016

**CO - Data Source 1**

The document describes climate change focusing on Colorado activities.  This document provides aggregate GHG emissions for 2015 through 2021 for federal and non-federal oil and natural gas development combined.  Golder did not use this data for the following reasons:

- The information in Table X-1 identifies that the basis for Colorado's projections is determined by a percentage of US natural gas and oil production
- The US natural gas and oil production in Table X-1 is significantly different than the natural gas and oil production identified in the Tool.
- Golder determined that using the Colorado specific data would not be accurate because the basis for the estimates are significantly different than the baseline for the Tool.

**CO - Data Source 2**

This document contains projections for emissions for 1990, 1995, 2000, 2005, 2010, 2020, and 2030. Exhibit 2-2 contains total predicted carbon dioxide equivalent ($CO_2e$) for each of these years, however it is not useful because it does not segregate the emissions by oil, natural gas and coal. Therefore, the only growth factor that could be estimated is a total growth factor for oil, natural gas and coal combined. Golder determined this would not be representative to assume oil, natural gas and coal will all grow at the same rate.

Exhibit 2-13 contains projected energy consumption for each fuel but the source of the data is the EIA's 2010 AEO which is older than the AEO used for the default rates. This document was able to determine the percentage of the Mountain Regional Energy Conservation compared to the national average which is not readily available in the public version of the report. Given the base year was 2011, Golder determined that the data is not recent enough to base projections on for state-specific growth factors.

**CO - Data Source 3**

The purpose of this report was to predict the air quality and air quality related values due to projected BLM development activities. The report uses a baseline year of 2008 and projects air quality in 2021. Air quality was projected based on low, medium, and high development scenarios. Section 3.1.2 indicates that although GHG emissions for oil and natural gas sources were quantified, they were not included in the report because they were not modeled. The report contains charts on Page 36 showing oil and natural gas well counts in 2011 and estimates for 2021. The charts do not specify how many are oil and how many are natural gas so the Kleinfelder tool cannot be used to estimate GHG emissions from well counts.

Since no production or consumption values are available and no GHG emissions are available, Golder did not using this document to estimate state-specific growth rates.

**CO – Data Sources 4 & 5**

Golder has had several discussions with BLM about the possibility of using data sources 4 & 5 in conjunction with each other as follows to estimate state-specific growth factors for Colorado. Data source 4 provides an estimate of resource production curves for various regions for the first 10 years of a new well. On a conference call held on 1/5/2017, BLM indicated that the formula could be projected out past year 10 using the same formula. BLM also indicated that the production rates in data source 4 are on a "per well" basis. One a conference call held on 2/2/2017, BLM identified that the data is only for new wells and that any

BLM_0053056

existing wells in production would need to have assumptions made about them (such as that they start on the curve at "Year 7").

Golder determined this data should not be used for several reasons including:

- The production curves are different for each region. Golder could estimate how many total existing wells are producing but we don't have enough information to determine how many of each well are in each region.
- The assumption that a well is on "Year 7" of the curve is cannot be supported

If at a later date, new information becomes available to provide a reliable estimate of total resource production in 2020 and 2030, then the Tool is designed to be easily updated at any time to accommodate the change.

## 1.3    Idaho

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration. BLM did not provide any state-specific information for Golder to review. The data sources are discussed below.

Golder reviewed the following data sources:

1) Idaho GHG Inventory and Reference Case Projections, 1990-2020, Center for Climate Strategies, Spring 2008

**ID - Data Source 1**

This data source contains projections deemed unreliable due to their age.

## 1.4    Kansas

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration. BLM did not provide any state-specific information for Golder to review. The data sources are discussed below.

Golder reviewed the following data sources:

1) Kansas GHG Inventory and Reference Case Projections, 1990-2020, Center for Climate Strategies, May 2008

**KS - Data Source 1**

This data source contains projections deemed unreliable due to their age.

## 1.5    Montana

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  The data sources are discussed below.

Golder reviewed the following data sources:

1) An Excel document was provided to Golder on 10/4/2016 originating from BLM.

2) A Climate Change report was provided by BLM dated August 2010.

3) Montana Coal: Economic Impact of Anticipated Expanded Production

4) Montana: Greenhouse Gas Inventory and Reference Case Projections 1990-2020, September 2007

**MT - Data Source 1**

The provided spreadsheet shows well counts for several areas in the region.  Golder requires data in units of fuel volume or energy in order to use state-specific data.  The spreadsheet does not indicate what year the well counts are for and Golder would have to make some assumptions on the energy or fuel produced on a per well basis or emissions on a per well basis to use this information.

**MT - Data Source 2**

This report contains information regarding oil and natural gas production estimates for 2007-2026 for several regions in these states.  This information can be used to estimate future emissions; however, given that the report was prepared in 2010 (6 years ago), it is likely that the information is not accurate due to recent changes in the economy.

This data source contains projections deemed unreliable due to their age.

**MT - Data Source 3**

This report did not contain any useful numerical projections.

**MT - Data Source 4**

This data source contains projections deemed unreliable due to their age.

## 1.6    Nevada

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  BLM did not provide any state-specific information for Golder to review.  The data sources are discussed below.

Golder reviewed the following data sources:

1) [Nevada GHG Inventory and Reference Case Projections, 1990-2020](#), Center for Climate Strategies, Spring 2007

**NV - Data Source 1**

This data source contains projections deemed unreliable due to their age.

## 1.7    New Mexico

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  The data sources are discussed below.

Golder reviewed the following data sources:

1. BLM provided state-specific information on GHG emissions in New Mexico in 2020 and 2030 in an email dated 10/3/2016.

2. A document titled "New Mexico Greenhouse Gas Inventory and Reference Case Projections", dated February 2006.

**NM - Data Source 1**

This email contains projected oil well counts for a "high" and "low" development scenario in the San Juan Basin and Permian Basin.  This data alone cannot be used to provide a refined estimate of GHG emissions in 2020 and 2030 because it only provides the total number of wells. To be useful, Golder would need the average quantity or energy extracted from each well or total quantity/energy extracted for each Basin. Golder opened the Single Well Inventory tool contained in the Kleinfelder Report dated March 21, 2014. The Kleinfelder Report contains estimates of emissions for a representative well. However, for the San Juan Basin, the tool is only capable of estimating natural gas well emissions and not oil well emissions. The tool does not list the Permian Basin.

For these reasons, this data source was not used to estimate state-specific growth factors.

**NM - Data Source 2**

This data source contains projections deemed unreliable due to their age.

## 1.8    North Dakota

The same data sources as described in Section 3.2.5 also include data for this state; the same discussion applies.

## 1.9    Oklahoma

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  BLM did not provide any state-specific information for Golder to review.  The data sources are discussed below.

Golder reviewed the following data sources:

1) [Oklahoma Economic Impact on the State from the Waxman-Markey Bill](#), National Association of Manufacturers, date unidentified.

**OK - Data Source 1**

This document does not contain adequate information to be useful.

## 1.10   South Dakota

The same data sources as described in Section 3.2.5 also include data for this state; the same discussion applies.

## 1.11   Texas

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  BLM did not provide any state-specific information for Golder to review.  The data sources are discussed below.

Golder reviewed the following data sources:

1) [Texas Energy Sector: Past and Future](#), CTR, December 2011

**TX - Data Source 1**

This data source contains projections deemed unreliable due to their age.

## 1.12   Utah

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  The data sources are discussed below.

Golder reviewed the following data sources:

1) BLM provided an email and pdf of the "Utah State BLM Emission Inventory" dated November 2013.

2) Annual Review and Forecast of Utah Coal Production and Distribution — 2008

3) [Utah Greenhouse Gas Inventory and Reference Case Projections 1990-2020](#), Center for Climate Strategies, dated Spring 2007

**UT - Data Source 1**

This document was developed to provide inputs to the BLM Air Resource Management Strategy Modeling Project.  It includes a base year emission estimate for 2010 and a future year of 2021.  The inventory only includes nitrogen oxides (NOx), total organic gases (TOG), carbon monoxide (CO), sulfur dioxide ($SO_2$),

ammonia ($NH_3$), particulate matter with an aerodynamic diameter of 2.5 microns ($PM_{2.5}$), and particulate matter with an aerodynamic diameter of 10 microns ($PM_{10}$); it does not include GHGs.  Golder is not able to use the provided emission rates to predict GHG emissions.

Table F-12 of this document contains natural gas and oil production estimates for 2010 and 2021.  Golder is able to use this information to estimate state-specific growth factors.  The calculated factors are higher than the national default so they were assigned to the 2020 high growth rate scenario for federal lands.  Projections beyond 2021 do not exist, therefore Golder did not use a state-specific growth factor for 2030 inventories.

**UT - Data Source 2**

This data source contains projections deemed unreliable due to their age.

**UT - Data Source 3**

This data source contains projections deemed unreliable due to their age.

## 1.13   Wyoming

Golder conducted an independent search for useful state-specific data and requested information from BLM for consideration.  The data sources are discussed below.

Golder reviewed the following data sources:

1) BLM provided an email and spreadsheet to Golder on October 3, 2016.

2) Golder spoke with BLM on 11/14/2016 and obtained additional data that might be useful.  BLM provided a spreadsheet that contains oil and natural gas production estimates for 2016 and 2020 for several areas.

3) Impact of Coal Economy on Wyoming prepared by the University of Wyoming, February 2015

4) Wyoming Greenhouse Gas Inventory and Reference Case Projections 1990-2020, Center for Climate Strategies, dated Spring 2007

**WY - Data Source 1**

The spreadsheet contains two worksheets.  One appears to be well counts (although there are no units specified) for oil and natural gas and Coal Bed Natural Gas (CBNG) on federal and non-federal land for a high and low scenario.  Also the sheet contains 2008 and 2030 production for low and high scenarios for Buffalo FO and Rock Springs FO coal production (million tons per year).  The coal information was deemed to be useful (assuming constant growth to estimate 2020).  The oil and natural gas and CBNG information was deemed not useful unless it can be used to estimate total volume or energy extracted.  Golder could

potentially use the Kleinfelder tool to estimate GHG emissions and then back-calculate a growth factor from the baseline GHG emissions.  However, the data combines the counts for oil and natural gas wells making it impossible to separate out the two to back-calculate emissions.

Golder has decided not to use the oil and natural gas well counts for state-specific growth factors.

Golder has decided to use the coal data for state-specific growth factors.  The data shows a coal production CAGF of 0.4% to 2020 and 1.5% to 2030 from a baseline of 2008.  This compares to the EIA normal growth of -2.6% and -2.7%.

Golder had no basis for determining which set was more accurate, therefore it was assumed that the state-specific information was most accurate. The state-specific data for coal production was used for "high" scenarios for 2020 and 2030 on federal lands.

**WY - Data Source 2**
Based on this data, the CAGF is 5.5% for oil and 5.9% for natural gas; compared with rates of 2.21% and 2.87% respectively predicted by the 2020 EIA normal growth.  The information does not provide any estimates for growth rates beyond 2020.

Golder was able to use this data to provide state-specific growth rates for oil and natural gas production. Since they exceed the EIA values, Golder assigned these rates to the "high" scenario for 2020 on federal lands**.**

**WY - Data Source 3**
This document has information that appears to be useful.  It predicts roughly 450 million tons of coal production in 2030 and 435 million tons of coal production in 2040.  Figure 2 projects coal production while Figure 6 predicts % increases in production compared to a base year of 2012.  However, the projections appear to be based on the EIA's 2006 AEO.  Since the default factors proposed are based on a more recent AEO, this data source is not proposed for use.

**WY - Data Source 4**
This data source contains projections deemed unreliable due to their age.

BLM_0053062

**APPENDIX D**
**State Specific Data Sources for Future Years**

BLM_0053063

FIGURE D1



BLM_0053064

FIGURE D2



**California GHG Emissions (Federal + Non-Federal)**

BLM_0053065

FIGURE D3



BLM_0053066

FIGURE D4



BLM_0053067

FIGURE D5



BLM_0053068

FIGURE D6



BLM_0053069

FIGURE D7



BLM_0053070

FIGURE D8



BLM_0053071

FIGURE D9



Montana GHG Emissions (Federal)

BLM_0053072

FIGURE D10



BLM_0053073

FIGURE D11



BLM_0053074

FIGURE D12



BLM_0053075

FIGURE D13



BLM_0053076

FIGURE D14



BLM_0053077

FIGURE D15



BLM_0053078

FIGURE D16



## North Dakota GHG Emissions (Federal + Non-Federal)

BLM_0053079

FIGURE D17



BLM_0053080

FIGURE D18



BLM_0053081

FIGURE D19



BLM_0053082

FIGURE D20



South Dakota GHG Emissions (Federal + Non-Federal)

BLM_0053083

FIGURE D21



BLM_0053084

FIGURE D22



BLM_0053085

FIGURE D23



FIGURE D24



BLM_0053087

FIGURE D25



BLM_0053088

FIGURE D26



BLM_0053089

Established in 1960, Golder Associates is a global, employee-owned organization that helps clients find sustainable solutions to the challenges of finite resources, energy and water supply and management, waste management, urbanization, and climate change. We provide a wide range of independent consulting, design, and construction services in our specialist areas of earth, environment, and energy. By building strong relationships and meeting the needs of clients, our people have created one of the most trusted professional services organizations in the world.

| Africa | + 27 11 254 4800 |
| Asia | + 852 2562 3658 |
| Australasia | + 61 3 8862 3500 |
| Europe | + 356 21 42 30 20 |
| North America | + 1 800 275 3281 |
| South America | + 56 2 2616 2000 |

solutions@golder.com
www.golder.com

**Golder Associates Inc.**
**9 Monroe Parkway, Suite 270**
**Lake Oswego, OR  97035 USA**
**Tel:  (503) 607-1820**
**Fax:  (503) 607-1825**



Engineering Earth's Development, Preserving Earth's Integrity

Golder, Golder Associates and the GA globe design are trademarks of Golder Associates Corporation

Gold          Silver          Platinum          Palladium

# Gold  $1,421.88    (+$5.81) / 0.41%

As of: 2:15 PM ET

| | | | |
|---|---|---|---|
| Bid: | **$1,421.53** | High: | **$1,433.58** |
| Ask: | **$1,421.88** | Low: | **$1,413.59** |

☐ Dow Jones    ☐ S&P 500
☐ Gold & Silver    ☐ Crude Oil

Gold (Oz) USD

Zoom  1m 3m 6m YTD 1y **All**          From  Jan 2, 2000  To  Aug 27, 2013



Powered by nFus



TEXAS PRECIOUS METALS   Junk Silve  $500 &
IN

# In the news

- Nigel Farage Warns "Military Intervention In Syria Could Lead To Something Far Bigger"
- "MainStreet Bank" Chairman Stole Bailout Cash For Florida House Purchase

3/29/2018                                    Spot Gold

**GOLD PRICE.** WHERE THE WORLD CHECKS THE GOLD PRICE                                    Holdings

1,323.70 ▼ -0.50 -0.04%

Gold ▼    USD ▼    oz ▼



(http://goldprice.org/spot-gold.html)

Gold ▼    USD ▼    oz ▼    5 Years ▼

## Gold Price Performance USD

| Change | Amount | % |
|---|---|---|
| Today | -0.44 | -0.03% |
| 30 Days | 8.70 | 0.66% |
| 6 Months | 51.50 | 4.05% |
| 1 Year | 79.20 | 6.36% |
| 5 Years | -275.80 | -17.24% |
| 16 Years | 1021.91 | 338.06% |

## goldprice.org - 14:29 NY Time

(https://goldprice.org/spot-gold.html)

BLM_0053092

3/29/2018                                                                          Spot Gold

| Gold ▼ | USD ▼ | % ▼ |

 (https://www.jmbullion.com/?

utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) rce=goldprice.org&utm_medium=banner&utm_campaign=SPOT

Buy Gold in USA (https://www.jmbullion.com/?                    Sell Gold in USA (https://www.jmbullion.com/sell-to-us?
utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD)rce=goldprice.org&utm_medium=banner&utm_campaign=SPO

 (https://www.jmbullion.com/starter-pack?                 (https://www.jmbullion.com/ira?

utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD)rce=goldprice.org&utm_medium=banner&utm_campaign=SPOT

Buy Silver at Spot Price (https://www.jmbullion.com/starter-pack?         Open Precious Metals IRA (https://www.jmbullion.com/ira?
utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD)rce=goldprice.org&utm_medium=banner&utm_campaign=SPO

|  | Product |
|---|---|
| (https://www.jmbullion.com/1-gram-rmc-gold-bar/? utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 Gram Gold Bar (https://www.jmbullion.com/1-gra utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/2.5-gram-rmc-gold-bar/? utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 2.5 Gram Gold Bar (https://www.jmbullion.com/2.5-g utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/2018-1-10-oz-american-gold-eagle/? utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1/10 oz Gold Eagle (https://www.jmbullion.com/2018-1-10- utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/5-gram-rmc-gold-bar/? utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 5 Gram Gold Bar (https://www.jmbullion.com/5-gra utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/2018-1-4-oz-american-gold-eagle/? utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1/4 oz Gold Eagle (https://www.jmbullion.com/2018-1-4-o utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/10-gram-sunshine-gold-bar/? utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 10 Gram Gold Bar (https://www.jmbullion.com/10-gram utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/2018-1-2-oz-american-gold-eagle/? utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1/2 oz Gold Eagle (https://www.jmbullion.com/2018-1-2-o utm_source=goldprice.org&utm_medium=banner&utm_ca |

BLM_0053093

3/29/2018                                                          Spot Gold

| | Product |
|---|---|
| (https://www.jmbullion.com/1-oz-rmc-gold-bar/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Gold Bar (https://www.jmbullion.com/1-oz-utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/1-oz-canadian-gold-maple-leaf-any-year/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Gold Maple Leaf (https://www.jmbullion.com/1-oz-ca any-year/?utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/1-oz-austrian-gold-philharmonic-vy/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Austrian Gold Philharmonic Coin (https://www.jmbullic philharmonic-vy/?utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/2018-1-oz-british-gold-britannia-coin/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Gold Britannia (https://www.jmbullion.com/2018-1-c coin/?utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/1-oz-south-african-gold-krugerrand/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Gold Krugerrand (https://www.jmbullion.com/1-c krugerrand/?utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/1-oz-australian-gold-kangaroo/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Australian Kangaroo (https://www.jmbullion.com kangaroo/?utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/gold/gold-coins/american-gold-buffalo-coins/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz American Gold Buffalo (https://www.jmbullion.com/g gold-buffalo-coins/?utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/1-oz-american-gold-eagle/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Gold Eagle (https://www.jmbullion.com/1-oz-an utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/2018-30-g-chinese-gold-panda/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 30 Gram Gold Panda (https://www.jmbullion.com/2018-3C utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/2016-1-oz-mexican-gold-libertad-coin/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 oz Gold Mexican Libertad (https://www.jmbullion.com/2 libertad-coin/?utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/10-oz-perth-mint-gold-bar/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 10 oz Gold Bar (https://www.jmbullion.com/10-oz-pe utm_source=goldprice.org&utm_medium=banner&utm_ca |
| (https://www.jmbullion.com/1-kilo-rcm-gold-bar/?utm_source=goldprice.org&utm_medium=banner&utm_campaign=SPOT%20GOLD) | 1 Kilo Gold Bar (https://www.jmbullion.com/1-kilc utm_source=goldprice.org&utm_medium=banner&utm_ca |

BLM_0053094

# Spot Gold

## Spot Gold Price Charts Update Every Minute Automatically.

Share this spot gold price or spot silver price chart by adding the html code on the gold price charts for your websites (https://goldprice.org/gold-price-charts.html) page. You may modify the html code as long as a text link to goldprice.org remains from the words **"gold price"** somewhere on each page that displays the charts.



1 Day Gold Price per Ounce in US Dollars (https://goldprice.org/gold-price-charts/1-day-gold-price-per-ounce-in-us-dollars)



1 Day Gold Price per Gram in US Dollars (https://goldprice.org/gold-price-charts/1-day-gold-price-per-gram-in-us-dollars)



1 Day Gold Price per Kilogram in US Dollars (https://goldprice.org/gold-price-charts/1-day-gold-price-per-kilogram-in-us-dollars)

BLM_0053095

This page displays charts of the current price of gold, otherwise known as the spot gold price. The spot gold price refers to the price at which gold may be bought and sold right now, as opposed to a date in the future. The spot price for gold is in a constant state of flux, and can be driven by many different factors. The spot gold price can refer to the current price of gold per ounce (https://goldprice.org/gold-price.html), gram (https://goldprice.org/gold-price-per-gram.html) or kilo (https://goldprice.org/gold-price-per-kilo.html). Typically, however, spot gold is quoted in price per ounce using U.S. Dollars. Quotes are also available depicting the spot gold price in other currencies as well. Spot gold price charts can be useful for identifying trends in the gold market, or for looking for areas of support and resistance to buy or sell at. Charts can be viewed using multiple timeframes depending on your objectives. A long-term gold investor will likely be most concerned with weekly, monthly and yearly charts while a short-term hedger may be more concerned with daily, hourly or even 5 minute charts.

## What Determines the Spot Gold Price?

The simplest answer is the law of supply and demand. If buyers are trying to buy gold, sellers may lift prices causing buyers to bid higher. On the other hand, if sellers are overwhelming buyers, those looking to acquire gold may bid lower, thus driving prices down in the process. Of course, spot gold prices can be affected by many inputs that influence the supply/demand equation. The actual spot price of gold is derived from the nearest month gold futures contract with the most volume. This could be the nearest month, or front month, or it could be a month or two out on the time horizon.

## What are Some of the Factors That Drive Spot Gold Prices?

Gold is not only bought as an investment, but it is also bought for use in other areas such as industry and jewelry making. The potential influences on the spot price are extensive, but the following list names some of the major ones:

- Investment demand
- Jewelry demand
- Currency markets
- Inflation or deflation
- Interest rates and/or monetary policy
- Risk aversion or appetite
- Geopolitics
- Equity markets

Gold can potentially see stronger investment demand during periods of economic or geopolitical stress. For example, spot gold may potentially move higher during times of war or geopolitical unrest. From an economic standpoint, gold may potentially see increased buying from a stock market collapse or bear market. Interest rates and monetary policy can also have a significant effect on the spot gold price. Gold may potentially benefit during periods of ultra-low interest rates, as low rates make the opportunity cost of holding gold less. On the other hand, gold may potentially come under pressure as interest rates rise, due to the fact that gold does not offer any dividend or interest for holding it. Currency markets are another major driver of the spot gold price. Although gold is traded all over the globe, it is often denominated in dollars. As the dollar rises, it makes gold relatively more expensive for foreign buyers and may potentially cause declines in the spot price. On the other hand, a weaker dollar may potentially make gold relatively less expensive for foreign investors, and can potentially cause spot gold prices to rise.

## Are Spot Gold Prices the Same Everywhere?

Gold is traded and used all over the world for investment purposes, jewelry making and as a medium of exchange. Because an ounce of gold is the same whether it is in the U.S. or in Japan, the spot gold price is theoretically the same everywhere. Of course, differing currency values can have an effect on gold as well, and dealer premiums can also vary. Using the spot price of gold, the yellow metal can be bought anywhere using any currency. For example, if the spot price of gold is $1100 per ounce and you were looking to buy gold in Japan, you could figure out the necessary currency conversion to buy gold using Japanese Yen. Gold is traded all over the world, and thus its price is always on the move. Some of the major hubs for gold trading include the U.S., London, Zurich, India and more. The spot gold market is essentially always open, as markets follow the sun. Keep in mind that gold is typically bought for a premium over spot and sold at a discount to spot.

---

### ◉ GOLD PRICE

Gold Price ▾ (/)

BLM_0053096

Charts ▾ (/)

Price of Gold ▾ (/buy-gold.html)

Gold Stocks – (/gold-stocks)

Silver Price (https://silverprice.org)

Crypto ▾ (/cryptocurrency-price)

## 📈 GOLD PRICE CHARTS

Spot Gold (/spot-gold.html)

Live Gold Price (/live-gold-price.html)

Gold Price Chart (/gold-price-chart.html)

Gold Price per Ounce (/gold-price.html)

Gold Price per Gram (/gold-price-per-gram.html)

Gold Price per Kilo (/gold-price-per-kilo.html)

Gold Price History (/gold-price-history.html)

Gold Silver Ratio (/gold-silver-ratio.html)

Shanghai Gold Exchange Gold Price (/shanghai-gold-exchange-gold-price)

Gold Price Calculators (/Calculators/Gold-Price-Calculators.html)

Gold Price Charts For Websites (/gold-price-charts.html)

## 🪙 PRECIOUS METALS

Gold Price (https://goldprice.org)

Silver Price (https://silverprice.org)

Platinum Price (http://platinumprice.org)

Palladium Price (http://palladiumprice.org)

## 🌐 WORLD GOLD PRICES

Gold Price USA (https://goldprice.org/gold-price-usa.html)
Gold Price Europe (https://goldprice.org/gold-price-euros.html)
Gold Price Argentina (https://goldprice.org/gold-price-argentina.html)
Gold Price Australia (https://goldprice.org/gold-price-australia.html)
Gold Price Bahrain (https://goldprice.org/gold-price-bahrain.html)
Gold Price Brazil (https://goldprice.org/gold-price-brazil.html)

BLM_0053097

3/29/2018                                                        Spot Gold

Gold Price Canada (https://goldprice.org/gold-price-canada.html)
Gold Price China (https://goldprice.org/gold-price-china.html)
Gold Price Colombia (https://goldprice.org/gold-price-colombia.html)
Gold Price Croatia (https://goldprice.org/gold-price-croatia.html)
Gold Price Denmark (https://goldprice.org/gold-price-denmark.html)
Gold Price Egypt (https://goldprice.org/gold-price-egypt.html)
Gold Price Hong Kong (https://goldprice.org/gold-price-hong-kong.html)
Gold Price Hungary (https://goldprice.org/gold-price-hungary.html)
Gold Price India (https://goldprice.org/gold-price-india.html)
Gold Price Indonesia (https://goldprice.org/gold-price-indonesia.html)
Gold Price Israel (https://goldprice.org/gold-price-israel.html)
Gold Price Japan (https://goldprice.org/gold-price-japan.html)
Gold Price Jordan (https://goldprice.org/gold-price-jordan.html)
Gold Price Kuwait (https://goldprice.org/gold-price-kuwait.html)
Gold Price Lebanon (https://goldprice.org/gold-price-lebanon.html)
Gold Price Libya (https://goldprice.org/gold-price-libya.html)
Gold Price Macau (https://goldprice.org/gold-price-macau.html)
Gold Price Macedonia (https://goldprice.org/gold-price-macedonia.html)
Gold Price Malaysia (https://goldprice.org/gold-price-malaysia.html)
Gold Price Mexico (https://goldprice.org/gold-price-mexico.html)
Gold Price Myanmar (https://goldprice.org/gold-price-myanmar.html)
Gold Price New Zealand (https://goldprice.org/gold-price-new-zealand.html)
Gold Price Nigeria (https://goldprice.org/gold-price-nigeria.html)
Gold Price Norway (https://goldprice.org/gold-price-norway.html)
Gold Price Pakistan (https://goldprice.org/gold-price-pakistan.html)
Gold Price Philipines (https://goldprice.org/gold-price-philipines.html)
Gold Price Qatar (https://goldprice.org/gold-price-qatar.html)
Gold Price Russia (https://goldprice.org/gold-price-russia.html)
Gold Price Saudi Arabia (https://goldprice.org/gold-price-saudi-arabia.html)
Gold Price Serbia (https://goldprice.org/gold-price-serbia.html)
Gold Price Singapore (https://goldprice.org/gold-price-singapore.html)
Gold Price South Africa (https://goldprice.org/gold-price-south-africa.html)
Gold Price South Korea (https://goldprice.org/gold-price-south-korea.html)
Gold Price Sweden (https://goldprice.org/gold-price-sweden.html)
Gold Price Switzerland (https://goldprice.org/gold-price-switzerland.html)
Gold Price Taiwan (https://goldprice.org/gold-price-taiwan.html)
Gold Price Thailand (https://goldprice.org/gold-price-thailand.html)
Gold Price Turkey (https://goldprice.org/gold-price-turkey.html)
Gold Price UK (https://goldprice.org/gold-price-uk.html)
Gold Price United Arab Emirates (https://goldprice.org/gold-price-united-arab-emirates.html)
Gold Price Vietnam (https://goldprice.org/gold-price-vietnam.html)

## 🛒 PRICE OF GOLD

Best Gold Price (https://goldprice.org/best-gold-price)

Best Gold Price in United States (https://goldprice.org/exchanges/buy-gold-in-united-states)

Best Gold Price in Canada (https://goldprice.org/exchanges/buy-gold-in-canada)

Best Gold Price in Singapore (https://goldprice.org/exchanges/buy-gold-in-singapore)

Best Gold Price in Switzerland (https://goldprice.org/exchanges/buy-gold-in-switzerland)

BLM_0053098

Best Gold Price in United Kingdom (https://goldprice.org/exchanges/buy-gold-in-united-kingdom)

How to Buy Gold (/gold-coins.html)

### UNITED STATES GOLD DEALERS

Gold Prices (https://goldprice.org/gold-prices)
Gold Coins (https://goldprice.org/gold-prices/1003-Gold-Coins.htm)
Small Gold Coins (https://goldprice.org/gold-prices/1005-Small-Gold-Coins.htm)
Gold Bars (https://goldprice.org/gold-prices/Gold-Bars.htm)

### UNITED KINGDOM GOLD DEALERS

UK Gold Prices (https://goldprice.org/gold-prices/uk-gold-prices.html)
UK Gold Coins (https://goldprice.org/gold-prices/uk-gold-coins.htm)
UK Small Gold Coins (https://goldprice.org/gold-prices/uk-small-gold-coins.htm)
UK Gold Bars (https://goldprice.org/gold-prices/uk-gold-bars.htm)

### CANADA GOLD DEALERS

Canadian Gold Coins (https://goldprice.org/gold-prices/canadian-gold-coins.htm)
Canadian Gold Prices (https://goldprice.org/gold-prices/canadian-gold-prices.html)
Canadian Small Gold Coins (https://goldprice.org/gold-prices/canadian-small-gold-coins.htm)
Canadian Gold Bars (https://goldprice.org/gold-prices/canadian-gold-bars.htm)

### AUSTRALIA GOLD DEALERS

Australian Gold Prices (https://goldprice.org/gold-prices/australian-gold-prices.html)
Australian Gold Coins (https://goldprice.org/gold-prices/australian-gold-coins.htm)
Australian Small Gold Coins (https://goldprice.org/gold-prices/australian-small-gold-coins.htm)
Australian Gold Bars (https://goldprice.org/gold-prices/australian-gold-bars.htm)

## ₿ CRYPTOCURRENCY

Bitcoin Price Chart (/cryptocurrency-price/bitcoin-price)
Ethereum Price Chart (/cryptocurrency-price/ethereum-price)
Ripple Price Chart (/cryptocurrency-price/ripple-price)
Bitcoin Cash Price Chart (/cryptocurrency-price/bitcoin-cash-price)
Litecoin Price Chart (/cryptocurrency-price/litecoin-price)

More Cryptocurrencies (/cryptocurrency-price)

## ✈ CONTACT

Gold Price Group
10440 N. Central Expressway
Suite 800
Dallas, TX 75231

Calling from the United States:

214-265-6567

Calling from outside the United States:

+1 214-265-6567

BLM_0053099

Contact Us (/contact.html)

## ☺ SOCIAL MEDIA



## ▢ MOBILE APPS

Gold Price iPhone App (http://gold-price-iphone-app.goldprice.org/)

Gold Price Android App (http://gold-price-android-app.goldprice.org/)

## 📢 ADVERTISING

Gold Price Advertising (/gold-price-advertising)

Gold Price (https://goldprice.org)    Risk Warning (/risk-warning.html)    Disclaimer (/disclaimer.html)    Terms (/terms.html)    Privacy (/privacy.html)    Contact
                                        (/contact.html)    Silver Price (https://silverprice.org)

Copyright © 2002 - 2018. Gold Price .Org All rights reserved.

Gold Price ® is a USA Registered Service Mark of Gold Price .Org

BLM_0053100

Rocky Mountain Section - 57th Annual Meeting (May 23–25, 2005)

**Paper No. 15-1**

**Presentation Time:** 8:00 AM-8:30 AM

# MANCOS SHALE LANDSCAPES: SCIENCE AND MANAGEMENT OF BLACK SHALE TERRAINS - - A MULTI-AGENCY PROJECT

GRAUCH, R.I.[1], ELLIOTT, John G.[2], CHONG, Geneva W.[3], KOSOVICH, John J.[4], VONGUERARD, Paul B.[5], TUCKER, Karen[6], MURPHY, Dennis[6], CLEMENTS, Amanda[6], and FERGUSON, Jim[6], (1) U.S. Geol Survey, MS 973, Denver Federal Center, Denver, CO 80225, rgrauch@usgs.gov, (2) U.S. Geol Survey, MS 915, Denver Federal Center, Denver, CO 80225, (3) U.S. Geol Survey, 1499 Campus Delivery, Fort Collins, CO 80523, (4) U.S. Geol Survey, MS 516, Denver Federal Center, Denver, CO 80225, (5) U.S. Geol Survey, 764 Horizon Drive, Grand Junction, CO 81506, (6) Bureau of Land Management, 2505 S. Townsend Ave, Montrose, CO 81401

Regions underlain by black shale, especially in arid terrains, pose significant problems for land-use managers. In many areas insufficient data exist for resource and land managers to formulate scientifically supportable policies for the stewardship of the landscapes. In general, the major geologic processes responsible for the evolution of the landscapes and their associated resources are understood. However, there is a lack of detailed understanding that is required to quantify the processes or to create predictive models that can accurately account for changes in land use (off-highway vehicles, grazing, irrigation, etc.), climate, and National resource need, among others.

Mancos Shale Landscapes of the western United States have become a focal point for the need to develop science information to support sound land-management policies. This need has arisen primarily because of (1) increased and changing demands for land use and (2) issues (such as salt, selenium and sediment loading; and soil, vegetation and habitat disturbance) related to the health of the upper Colorado River. Concurrently, there has been an increased awareness within the scientific community of a need to better understand processes leading to the concentration and dispersal of both economically important elements and environmentally sensitive elements in black-shale sequences.

This project is designed to bring together researchers and managers from the USGS, BLM, BOR, and NRCS to define and begin investigating the most critical issues facing land managers. Work is concentrated on the Gunnison Gorge National Conservation Area in western Colorado but is linked to other Mancos landscape study sites in Colorado and Utah. Topics being addressed include the (a) development of process-oriented models describing the erosion of Mancos Shale and the impacts of various types of land use; (b) construction of a model describing pedogenesis of the Mancos Shale; (c) development of remote-sensing soil-surface mapping techniques; (d) examination of the interrelationships between plant populations, vascular and biological soil-crust community, geomorphology, soil chemistry, and geology; and (e) development of effective information transfer and visualization methodologies that will facilitate the integration of science and management.

Rocky Mountain Section - 57th Annual Meeting (May 23–25, 2005)
General Information for this Meeting

Session No. 15
Selenium-Sodium-Salinity-Sediment in the Upper Colorado River Basin: Origins and Impacts I
Mesa State College: Weldon Lecture Hall
8:00 AM-12:00 PM, Wednesday, May 25, 2005

Geological Society of America *Abstracts with Programs*, Vol. 37, No. 6, p. 39

© Copyright 2005 The Geological Society of America (GSA), all rights reserved. Permission is hereby granted to the author(s) of this abstract to reproduce and distribute it freely, for noncommercial purposes. Permission is hereby granted to any individual scientist to download a single copy of this electronic file and reproduce up to 20 paper copies for noncommercial purposes advancing science and education, including classroom use, providing all reproductions include the complete content shown here, including the author information. All other forms of reproduction and/or transmittal are prohibited without written permission from GSA Copyright Permissions.



# Mancos Shale Landscapes:
# Science and Management of Black Shale Terrains

## A DOI Science / Regional Partnership Project
## USGS – BLM
*(Fish and Wildlife Service, Gunnison Basin Selenium Task Force, Colorado River Basin Salinity Control Forum, and Grand Valley Selenium Task Force, NRCS, USFS, BOR)*

USGS
science for a changing world

BLM_0053102

UNITED STATES DEPARTMENT OF THE INTERIOR
GEOLOGICAL SURVEY


The Digital Geologic Map of Colorado in ARC/INFO Format

By

Gregory N. Green


Open-File Report

OF-92-0507


1992

This report is preliminary and has not been reviewed for conformity
with U.S. Geological Survey (USGS) editorial standard nor with the
North American stratigraphic codes.  Any use of trade, product, or
firm names is for descriptive purposes only and does not imply
endorsement by the USGS. Although these data have been used by the
USGS and have been successfully imported into data base programs, no
warranty, expressed or implied, is made by the USGS as to how
successfully or accurately the data can be imported into any specific
application software running on any specific hardware platform.  The
fact of distribution shall not constitute any such warranty, and no
responsibility is assumed by the USGS in connection therewith.


U.S. Geological Survey
Denver, Colorado

Last revsion: 12 April 1995

BLM_0053103

Case No. 1:20-cv-02484-MSK   Document 43   filed 04/28/21   USDC Colorado   pg 58 of 325
http://pubs.usgs.gov/of/1992/ofr-92-0507/downloads/data-files-unzipped...

UNITED STATES DEPARTMENT OF THE INTERIOR
GEOLOGICAL SURVEY


The Digital Geologic Map of Colorado in ARC/INFO Format

By

Gregory N. Green


Open-File Report

OF-92-0507


1992

This report is preliminary and has not been reviewed for conformity
with U.S. Geological Survey (USGS) editorial standard nor with the
North American stratigraphic codes.  Any use of trade, product, or
firm names is for descriptive purposes only and does not imply
endorsement by the USGS. Although these data have been used by the
USGS and have been successfully imported into data base programs, no
warranty, expressed or implied, is made by the USGS as to how
successfully or accurately the data can be imported into any specific
application software running on any specific hardware platform.  The
fact of distribution shall not constitute any such warranty, and no
responsibility is assumed by the USGS in connection therewith.



U.S. Geological Survey
Denver, Colorado

Revised: 12 April
1995




     This geologic map was prepared as a part of a study of digital
methods and techniques as applied to complex geologic maps.  The
geologic map was digitized from the original scribe sheets used to

BLM_0053104

prepare the published Geologic Map of Colorado (Tweto 1979).
Consequently the digital version is at 1:500,000 scale using the
Lambert Conformal Conic map projection parameters of the state base
map.  Stable base contact prints of the scribe sheets were scanned on
a Tektronix 4991 digital scanner.  The scanner automatically converts
the scanned image to an ASCII vector format. These vectors were
transferred to a VAX minicomputer, where they were then loaded into
ARC/INFO.  Each vector and polygon was given attributes derived from
the original 1979 geologic map.

    This database was developed on a MicroVAX computer system using VAX
V 5.4 nd ARC/INFO 5.0 software.  The ASCII files were then copied to the
DOS diskettes for distribution.  To use these diskettes, the user must
have the capability of transferring the contents to an ARC/INFO system.
The ASCII files included in the enclosed diskettes can be used to print
color versions of the Colorado geologic map using the ARC/INFO software.

UPDATE: April
1995,
    The update was done solely for the purpose of adding the abilitly to
plot to an HP650c plotter.  Two new ARC/INFO plot AMLs along with a lineset
and shadeset for the HP650C design jet printer have been included.  These
new files are COLORADO.650, INDEX.650, TWETOLIN.E00 and TWETOSHD.E00.  These
files were created on a UNIX platform with ARC/INFO 6.1.2.  Updated versions
of INDEX.E00, CONTACT.E00, LINE.E00, DECO.E00 and BORDER.E00 files that
included the newly defined HP650c items are also included.

* Any use of trade, product, or firm names is for descriptive purposes
  only and does not imply endorsement by the U.S. Government.


  CONTENTS:

    Digital geologic map information USGS Open File 92-0507 is in the
following
  ASCII or ARC/INFO export .E00 files:

  READ.1ST    Text file that contains the first page of this document.

  READ.2ND    Text file that contains this Open-File 92-0507 document.

  LOAD.AML     ARC/INFO commands that can be used to automatically rebuild
                 the database from ASCII.

  COLORADO.CAL ARCPLOT commands that create a Calcomp plot file of the Geologic Map
                 from the data bases.

  COLORADO.650 ARCPLOT commands that create an HP650c plot file of the Geologic Map
                 from the data bases.

  LAMBERT.PRJ  A file of the projection parameters used.

  SETUP.AML    The ARCEDIT AML with the edit tolerances used.

  CCALIN.E00   ARC/INFO lineset file A, The palette of line types for an
                 electrostatic plotter.

  CCBLIN.E00   ARC/INFO lineset file B, The palette of line types for an
                 electrostatic plotter.

  CCASHD.E00   ARC/INFO shadeset file A, The palette of colors for an
                 electrostatic plotter.

  CCBSHD.E00   ARC/INFO shadeset file B, The palette of colors for an

BLM_0053105

electrostatic plotter.

DOTSHD.E00    ARC/INFO shadeset patterns, a palette of patterns.

FNT003.E00    ARC/INFO geologic symbols font file.

TWETOLIN.E00  ARC/INFO lineset file, The palette of line types for an
              HP650c plotter.

TWETOSHD.E00  ARC/INFO shadeset file, The palette of line types for an
              HP650c plotter.

INDEX.CAL     ARCPLOT commands that create a plot file of the Geologic Map
              Explanation sheet for an electrostatic
plotter.                      .

INDEX.650     ARCPLOT commands that create a plot file of the Geologic Map
              Explanation sheet for an HP650c plotter.

INDEX.E00     The Geologic Map Explanation sheet (no projection).

EXPL-01.TXT   ARCPLOT text files for Colorado Explanation Sheet.
 thru
EXPL-22.TXT

BORDER.E00    The title and scale bars of the sheet (Lambert projection).

CONTACT.E00   The Geologic Map of Colorado contacts and faults file.

DECO.E00      The Geologic Map of Colorado decorations
file.

LINE.E00      The Geologic Map of Colorado single line outcrop file.

Copy the contents of this directory to the ARC/INFO platform, and run
the AML LOAD.AML.


WATER, ROADS, CONTOURS AND TOWNS:

     Published geologic maps are prepared using a USGS topographic
base map that contains the hydrology, hypsography and political
features. Because this digital version of the Geologic Map of Colorado
started with the original geologic scribe sheets, these features were
not present.  Only those water bodies that were required to close
polygons were added by hand. The digital hydrology is not complete nor
as accurate as the original USGS 1:500,000 topographic base.  A few
water bodies in the Fort Collins and Grand Mesa area were added for
visual effect.  No roads, contours or towns were present on the
geologic scribe sheets and none were added to this digital version.

CHANGES:

     Three intentional changes were made from the published Geologic
Map of Colorado.  In the extreme south-east corner of the La Junta
quadrangle, one outcrop of the Triassic Dockum Group is incorrectly
labeled Trdg on the published map.  In the south-east corner of the
Moab quadrangle, the contact between the Morrison Formation,
Summerville Formation (shale and siltstone), and Entrada Formation,
labeled Jmse and the Morrison, Wanakah, and Entrada Formations,
labeled Jmwe was omitted from the published map. A non-printing
contact was inserted between the two to preserve the topology of the

BLM_0053106

digital data base. The arbitrary line between the Middle Park
Formation, labeled Tm, and the Coalmont Formation, Tc, on the
published Geologic Map of Colorado follows the Continental Divide.
These Formations are not divided on the digital map and both
Formations are labeled Tc.

    Each vector and polygon was given attributes derived from the
original 1979 geologic map, in cases of ambiguity, the Preliminary
Geologic Map of Colorado (Tweto, 1976) was used as a guide to
attribute polygons and arcs.  Every polygon on the Preliminary map is
labeled.

LINESETS and SHADESET: CALCOMP

    The plot program COLORADO.AML uses two linesets, CARTO.LIN and
CCA.LIN. As the COLORADO.AML runs, black lines are produced from the
INFO item BW which calls the ARC/INFO CARTO.LIN line set, to generate
color lines the INFO item CCA calls the electrostatic 1024 color line
set file, included as lineset CCALIN.E00.

    To produce polygons three shadesets are used, color polygons are
produced from the INFO items CCA and CCB which calls the electrostatic
1024 color shadeset files, included as shadeset CCASHD.E00 and
CCBSHD.E00 To generate polygons patterns the INFO item PATT calls the
shadeset file DOT, included as DOTSHD.E00.

LINESETS and SHADESET: HP650c

    The plot program COLORADO.650 uses one lineset, TWETO.LIN.  As
the COLORADO.650 aml runs, color and black lines are produced from the
INFO item HP which calls the supplied ARC/INFO line set, TWETOLIN.E00

    To produce polygons one shadeset is used, color polygons are
produced from the INFO items HP which calls the HP650c color shadeset
files, included as shadeset TWETOSHD.E00.  To generate polygons patterns
the INFO item HP calls the shadeset
TWETO.SHD.

FONTS:

    The text fonts for the 3 special geologic symbols are included as
font FNT003.FNT.  The ASCII code for @ has been redefined to the
symbol for Triassic, the ASCII code for & has been redefined to the
symbol for Pennsylvanian and the ASCII code for _ has been redefined
to the symbol for Cambrian.


CONTACTS, DECORATIONS, SINGLE LINE OUTCROPS, BORDER and INDEX coverages:

    The Digital Colorado Geologic Map is made of five spatial
datasets.  The Explanation Sheet (no projection), the Border-Title
Sheet (Lambert projection) and three datasets (Lambert projection) for
the body of the Map.  The Map coverages are 1) Contacts and Faults, 2)
Decorations and 3) Single Line Outcrops.  The attributed vector
portion of the Contact coverage is CONTACT.AAT. The attributed closed
polygons of the Contact coverage is CONTACT.PAT. DECO.AAT is an
attributed vector graphic overlay of the Decoration coverage.  This
datasets contains such items as the teeth of thrust faults, sheer
zones, fold axis and other structural symbols.  The polygon portion of
the Decoration coverage, DECO.PAT is an attributed closed polygon
graphic overlay.  In order to fill the teeth and the balls with black
paint, these had to be topologically structured.  LINE.AAT is the
attributed vectors of the Single Line Outcrops.  These are the dikes
and veins.  Single Line Outcrops are the rocks that at a scale of
1:500,000 are best represented by a thin single line.  The LINE.PAT

BLM_0053107

file is present but blank.  Single Line Outcrops at 1:500,000 have no
area.


CODING SCHEME FOR ATTRIBUTES:

| NAME | FEATURE |
|---|---|
| P1,P2 | Shorthand attributes |
| BW | Line pattern from CARTO.LIN |
| CCA | Line pattern or shade color from CCA.LIN or CCA.SHD |
| CCB | Shade color from CCB.SHD |
| PATT | Shade pattern from DOT.SHD |
| HP | Line pattern or shade color from TWETO.LIN or |
| TWETO.SHD | |
| | |
| MAJOR1 | DLG-3 (Optional) style MAJOR1 attribute |
| MINOR1 | DLG-3 (Optional) style MINOR1 attribute |
| MAJOR2 | DLG-3 (Optional) style MAJOR2 attribute |
| MINOR2 | DLG-3 (Optional) style MINOR2 attribute |

CONTACT.AAT

| NAME | P1 | P2 | BW | CCA | HP | MAJOR1 | MINOR1 | MAJOR2 | MINOR2 |
|---|---|---|---|---|---|---|---|---|---|
| CONTACT | 1 | - | 0 | 1 | 101 | 500 | 201 | - | - |
| WATER, SHORELINE | 2 | - | 0 | 1 | 101 | 40 | 200 | - | - |
| STATE OUTLINE | 3 | - | 127 | 0 | 139 | 91 | 8 | - | - |
| FAULT | - | 1 | 0 | 4 | 102 | - | - | 501 | 203 |
| FAULT, THRUST | - | 2 | 0 | 4 | 102 | - | - | 501 | 204 |
| FAULT, DOTTED | - | 3 | 106 | 0 | 110 | - | - | 501 | 205 |
| FAULT, DASHED | - | 4 | 114 | 0 | 114 | - | - | 501 | 206 |
| BAR | - | 5 | 0 | 0 | 101 | - | - | 501 | 218 |
| DIATREME | - | 8 | 0 | 0 | 101 | - | - | 501 | 215 |
| VOL. CONE | - | 9 | 0 | 212 | 201 | - | - | 501 | 216 |
| PC SHEAR ZONE | - | 22 | 0 | 0 | 101 | - | - | 501 | 213 |
| SINGLE LINE OUTCROP | - | 24 | 0 | 0 | 0 | - | - | 501 | 226 |
| NON-PRINTING CONTACT | - | 25 | 0 | 0 | 0 | 500 | 202 | - | - |

 Some vectors can have both a P1 and P2 code.  Such as a fault that
 is also a contact.


DECO.AAT

| NAME | P1 | BW | CCA | HP | MAJOR1 | MINOR1 |
|---|---|---|---|---|---|---|
| BALL | 6 | 0 | 1 | 101 | 501 | 219 |
| TEETH | 7 | 0 | 1 | 101 | 501 | 220 |
| DIATREME | 8 | 0 | 2 | 101 | 501 | 215 |
| VOL. NECK | 10 | 0 | 212 | 201 | 501 | 217 |
| MONOCLINE | 11 | 0 | 212 | 201 | 501 | 207 |
| MONOCLINE, DOTTED | 12 | 0 | 353 | 209 | 501 | 208 |
| SYNCLINE | 13 | 0 | 212 | 201 | 501 | 209 |
| SYNCLINE, DOTTED | 14 | 0 | 353 | 209 | 501 | 210 |
| ANTICLINE | 15 | 0 | 212 | 201 | 501 | 211 |
| ANTICLINE, DOTTED | 16 | 0 | 353 | 209 | 501 | 212 |
| MONOCLINE ARROW | 17 | 0 | 212 | 201 | 501 | 221 |
| SYNCLINE ARROW | 18 | 0 | 212 | 201 | 501 | 222 |
| ANTICLINE ARROW | 19 | 0 | 212 | 201 | 501 | 223 |
| FOLD ARROWHEAD | 20 | 0 | 212 | 201 | 501 | 224 |
| OVERTURNED SYMBOL | 21 | 0 | 212 | 201 | 501 | 225 |
| PC SHEAR ZONE | 22 | 0 | 1 | 101 | 501 | 213 |
| JURASSIC LIMIT | 23 | 118 | 0 | 113 | 501 | 214 |


LINE.AAT

| NAME | P1 | BW | CCA | HP | MAJOR1 | MINOR1 |
|---|---|---|---|---|---|---|

BLM_0053108

```
Tbbi,               49          0  384 501 510      49
Tbr,                50          0  386 502 510      50
Tui,                58          0  512 503 510      58
Tmi,                59          0  505 508 510      59
TKi,                66          0  441 504 510      66
Kmj,                99          0  335 507 510      99
_am,               172          0  331 505 510     172
Yam,               181          0  449 506 510     181
Tmi,inferred       185          0  500 509 510     185


CONTACT.PAT
NAME               P1  CCA   HP  CCB PATT   MAJOR1 MINOR1

Qa,                 1   16    1   0    0     520      1
Qg,                 2   24    2   0    0     520      2
Qgo,                3   31    3   0    0     520      3
Qe,                 4   19    4   0    0     520      4
Qeo,                5   19    5   0   55     520      5
Qd,                 6   25    6   0    0     520      6
Qdo,                7   25    7   0   55     520      7
Ql,                 8   25    8   0   71     520      8
Qb,                 9   61    9   0    0     520      9
QTsa,              10   19   10   0   71     520     10
QTa,               11   31   11   0   55     520     11
To,                12   50   12   0    0     520     12
Tgv,               13   50   13   0   71     520     13
Ta,                14   50   14   0   55     520     14
Twr,               15   64   15   0    0     520     15
Th,                16   75   16   0   71     520     16
Tcu,               17   47   17   0    0     520     17
Tpc,               18  303   18   0    0     520     18
Tdu,               19  303   19   0    0     520     19
Tbp,               20   50   20   0    0     520     20
Tt,                21   50   21   0    0     520     21
Tnp,               22   50   22   0    0     520     22
Tos,               23   64   23   0    0     520     23
Tu,                25   75   25   0   71     520     25
Tb,                26   75   26   0   71     520     26
Tg,                27   81   27   0    7     520     27
Tgp,               28  103   28   0    0     520     28
Tgl,               29   81   29   0    0     520     29
Tglm,              30  103   30   0    0     520     30
Tgt,               31   88   31   0  103     520     31
Tglu,              32   81   32   0    0     520     32
Tglw,              33   81   33   0   71     520     33
Tw,                34   47   34   0    0     520     34
Twc,               35   45   35   0    0     520     35
Twn,               36   46   36   0    0     520     36
Two,               37   47   37   0   71     520     37
Tf,                38  303   38   0    0     520     38
Tc,                39  303   39   0    0     520     39
Tm,                40  303   40   0    0     520     40
Td,                41   50   41   0    0     520     41
Ts,                42   50   42   0    0     520     42
Tsp,               43  303   43   0    0     520     43
Tlp,               44   50   44   0    0     520     44
Tsj,               45   47   45   0    0     520     45
Te,                46   47   46   0    0     520     46
Tn,                47  303   47   0    0     520     47
Tbb,               48  118   48   0    7     520     48
Tbbi,              49  152   49   0    0     520     49
Tbr,               50  186   50   0    0     520     50
Tbrt,              51   96   51   0    0     520     51
```

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Taf, | 52 | 152 | 52 | 0 | 0 | 520 | 52 |
| Tial, | 53 | 64 | 53 | 0 | 0 | 520 | 53 |
| Tiql, | 54 | 64 | 54 | 0 | 127 | 520 | 54 |
| Tpl, | 55 | 348 | 55 | 0 | 0 | 520 | 55 |
| Twm, | 56 | 155 | 56 | 0 | 0 | 520 | 56 |
| Tv, | 57 | 79 | 57 | 0 | 0 | 520 | 57 |
| Tui, | 58 | 358 | 58 | 0 | 0 | 520 | 58 |
| Tmi, | 59 | 124 | 59 | 0 | 0 | 520 | 59 |
| TKda, | 60 | 35 | 60 | 0 | 0 | 520 | 60 |
| Tdv, | 61 | 35 | 61 | 0 | 71 | 520 | 61 |
| TKdl, | 62 | 35 | 62 | 0 | 0 | 520 | 62 |
| TKr, | 63 | 35 | 63 | 0 | 0 | 520 | 63 |
| TKa, | 64 | 35 | 64 | 0 | 0 | 520 | 64 |
| TKec, | 65 | 32 | 65 | 0 | 103 | 520 | 65 |
| TKi, | 66 | 387 | 66 | 0 | 0 | 520 | 66 |
| Kl, | 67 | 723 | 67 | 0 | 0 | 520 | 67 |
| Kf, | 68 | 718 | 68 | 0 | 0 | 520 | 68 |
| Klf, | 69 | 718 | 69 | 0 | 7 | 520 | 69 |
| Kvt, | 70 | 723 | 70 | 0 | 7 | 520 | 70 |
| Kp, | 71 | 716 | 71 | 0 | 0 | 520 | 71 |
| Kpu, | 72 | 712 | 72 | 0 | 0 | 520 | 72 |
| Kpm, | 73 | 767 | 73 | 0 | 0 | 520 | 73 |
| Kpl, | 74 | 720 | 74 | 0 | 0 | 520 | 74 |
| Kn, | 75 | 761 | 75 | 0 | 0 | 520 | 75 |
| Kcg, | 76 | 736 | 76 | 0 | 0 | 520 | 76 |
| Kc, | 77 | 761 | 77 | 0 | 0 | 520 | 77 |
| Kpg, | 78 | 709 | 78 | 0 | 71 | 520 | 78 |
| Kdp, | 79 | 785 | 79 | 0 | 0 | 520 | 79 |
| Kd, | 80 | 785 | 80 | 0 | 0 | 520 | 80 |
| Kmw, | 81 | 723 | 81 | 0 | 0 | 520 | 81 |
| Kls, | 82 | 712 | 82 | 0 | 0 | 520 | 82 |
| Kmv, | 83 | 717 | 83 | 0 | 0 | 520 | 83 |
| Kmvu, | 84 | 737 | 84 | 0 | 0 | 520 | 84 |
| Kmvl, | 85 | 751 | 85 | 0 | 95 | 520 | 85 |
| Kw, | 86 | 767 | 86 | 0 | 0 | 520 | 86 |
| Ki, | 87 | 751 | 87 | 0 | 95 | 520 | 87 |
| Kh, | 88 | 737 | 88 | 0 | 0 | 520 | 88 |
| Ksc, | 89 | 767 | 89 | 0 | 55 | 520 | 89 |
| Kmgs, | 90 | 751 | 90 | 0 | 95 | 520 | 90 |
| Km, | 91 | 736 | 91 | 0 | 0 | 520 | 91 |
| Kmfm, | 92 | 709 | 92 | 0 | 103 | 520 | 92 |
| Kfd, | 93 | 785 | 93 | 0 | 95 | 520 | 93 |
| Kdb, | 94 | 785 | 94 | 0 | 0 | 520 | 94 |
| Kkf, | 95 | 723 | 95 | 0 | 0 | 520 | 95 |
| Kpcl, | 96 | 767 | 96 | 0 | 0 | 520 | 96 |
| Kch, | 97 | 720 | 97 | 0 | 0 | 520 | 97 |
| Kmp, | 98 | 761 | 98 | 0 | 0 | 520 | 98 |
| Kmj, | 99 | 736 | 99 | 0 | 71 | 520 | 99 |
| KJdm, | 100 | 755 | 100 | 0 | 103 | 520 | 100 |
| KJdj, | 101 | 755 | 101 | 0 | 103 | 520 | 101 |
| KJdw, | 102 | 755 | 102 | 0 | 103 | 520 | 102 |
| KJdr, | 103 | 755 | 103 | 0 | 103 | 520 | 103 |
| KJde, | 104 | 755 | 104 | 0 | 103 | 520 | 104 |
| KJds, | 105 | 755 | 105 | 0 | 103 | 520 | 105 |
| Jm, | 106 | 746 | 106 | 0 | 0 | 520 | 106 |
| Jmj, | 107 | 746 | 107 | 0 | 0 | 520 | 107 |
| Jmc, | 108 | 746 | 108 | 0 | 0 | 520 | 108 |
| Jmw, | 109 | 746 | 109 | 0 | 0 | 520 | 109 |
| Jmr, | 110 | 746 | 110 | 0 | 0 | 520 | 110 |
| Jme, | 111 | 746 | 111 | 0 | 0 | 520 | 111 |
| Jms, | 112 | 746 | 112 | 0 | 0 | 520 | 112 |
| Jmse, | 113 | 746 | 113 | 0 | 0 | 520 | 113 |
| Jmce, | 114 | 746 | 114 | 0 | 0 | 520 | 114 |
| Jmre, | 115 | 746 | 115 | 0 | 0 | 520 | 115 |
| Jmwe, | 116 | 746 | 116 | 0 | 0 | 520 | 116 |

BLM_0053110

| | | | | | | |
|---|---|---|---|---|---|---|
| J@g, | 117 | 782 | 117 | 0 | 0 | 520 | 117 |
| J@gc, | 118 | 782 | 118 | 0 | 71 | 520 | 118 |
| J@mg, | 119 | 782 | 119 | 0 | 95 | 520 | 119 |
| J@mc, | 120 | 800 | 120 | 0 | 0 | 520 | 120 |
| @kc, | 121 | 790 | 121 | 0 | 0 | 520 | 121 |
| @wc, | 122 | 790 | 122 | 0 | 0 | 520 | 122 |
| @m, | 123 | 741 | 123 | 0 | 0 | 520 | 123 |
| @ch, | 124 | 741 | 124 | 0 | 0 | 520 | 124 |
| @cc, | 125 | 776 | 125 | 0 | 103 | 520 | 125 |
| @c, | 126 | 776 | 126 | 0 | 0 | 520 | 126 |
| @d, | 127 | 776 | 127 | 0 | 0 | 520 | 127 |
| @dg, | 128 | 776 | 128 | 0 | 0 | 520 | 128 |
| @Pl, | 129 | 788 | 129 | 0 | 103 | 520 | 129 |
| @Ps, | 130 | 788 | 130 | 0 | 0 | 520 | 130 |
| @Pll, | 131 | 788 | 131 | 0 | 0 | 520 | 131 |
| @Pjs, | 132 | 788 | 132 | 0 | 95 | 520 | 132 |
| @Pcs, | 133 | 788 | 133 | 0 | 95 | 520 | 133 |
| @Pcp, | 134 | 788 | 134 | 0 | 95 | 520 | 134 |
| @Pr, | 135 | 788 | 135 | 0 | 71 | 520 | 135 |
| @Pdc, | 136 | 788 | 136 | 0 | 71 | 520 | 136 |
| @Pmc, | 137 | 788 | 137 | 0 | 0 | 520 | 137 |
| @&lf, | 138 | 805 | 138 | 0 | 0 | 520 | 138 |
| Pp, | 139 | 682 | 139 | 0 | 0 | 520 | 139 |
| Pu, | 140 | 682 | 140 | 0 | 0 | 520 | 140 |
| Pc, | 141 | 681 | 141 | 0 | 0 | 520 | 141 |
| Mz, | 142 | 0 | 142 | 0 | 71 | 520 | 142 |
| MzPz, | 143 | 0 | 143 | 0 | 71 | 520 | 143 |
| P&f, | 144 | 408 | 144 | 0 | 95 | 520 | 144 |
| P&cf, | 145 | 408 | 145 | 0 | 0 | 520 | 145 |
| P&if, | 146 | 408 | 146 | 0 | 0 | 520 | 146 |
| P&s, | 147 | 408 | 147 | 0 | 0 | 520 | 147 |
| P&m, | 148 | 408 | 148 | 0 | 0 | 520 | 148 |
| P&w, | 149 | 440 | 149 | 0 | 95 | 520 | 149 |
| P&wm, | 150 | 440 | 150 | 0 | 95 | 520 | 150 |
| &m, | 151 | 0 | 151 | 14 | 0 | 520 | 151 |
| &b, | 152 | 0 | 152 | 0 | 103 | 520 | 152 |
| &mb, | 153 | 0 | 153 | 14 | 0 | 520 | 153 |
| &e, | 154 | 0 | 154 | 12 | 95 | 520 | 154 |
| &ee, | 155 | 0 | 155 | 12 | 0 | 520 | 155 |
| &mbe, | 156 | 0 | 156 | 12 | 0 | 520 | 156 |
| &h, | 157 | 0 | 157 | 16 | 0 | 520 | 157 |
| &rh, | 158 | 0 | 158 | 15 | 0 | 520 | 158 |
| &mr, | 159 | 0 | 159 | 15 | 0 | 520 | 159 |
| M_, | 160 | 378 | 160 | 0 | 0 | 520 | 160 |
| MDO, | 161 | 448 | 161 | 0 | 0 | 520 | 161 |
| DO_, | 162 | 448 | 162 | 0 | 0 | 520 | 162 |
| O_, | 163 | 352 | 163 | 0 | 0 | 520 | 163 |
| Or, | 164 | 352 | 164 | 0 | 0 | 520 | 164 |
| MD, | 165 | 448 | 165 | 0 | 0 | 520 | 165 |
| MD_, | 166 | 435 | 166 | 0 | 0 | 520 | 166 |
| DO_, | 167 | 448 | 167 | 0 | 0 | 520 | 167 |
| _s, | 168 | 171 | 168 | 0 | 0 | 520 | 168 |
| Mm, | 169 | 448 | 169 | 0 | 0 | 520 | 169 |
| _l, | 170 | 171 | 170 | 0 | 0 | 520 | 170 |
| M_ml, | 171 | 378 | 171 | 0 | 0 | 520 | 171 |
| _am, | 172 | 814 | 172 | 0 | 0 | 520 | 172 |
| Yu, | 173 | 32 | 173 | 0 | 135 | 520 | 173 |
| YXu, | 174 | 32 | 174 | 0 | 119 | 520 | 174 |
| Xb, | 175 | 0 | 175 | 18 | 0 | 520 | 175 |
| Xfh, | 176 | 44 | 176 | 0 | 7 | 520 | 176 |
| Xq, | 177 | 0 | 177 | 18 | 71 | 520 | 177 |
| Wr, | 178 | 319 | 178 | 0 | 0 | 520 | 178 |
| Yp, | 179 | 107 | 179 | 0 | 7 | 520 | 179 |
| Yg, | 180 | 169 | 180 | 0 | 7 | 520 | 180 |
| Yam, | 181 | 689 | 181 | 0 | 0 | 520 | 181 |

BLM_0053111

```
Xg,                    182    91   182   0   71   520   182
Xm,                    183   385   183   0    0   520   183
YXg,                   184   348   184   0   71   520   184
H2O,                   200   680   200   0    0    40   100

DECO.PAT
NAME                    P1   CCA   HP  CCB PATT  MAJOR1 MINOR1

Pipe,                  186     0     0   0    0   530   186
     ,    (BLANK)      187     0     0   0    0   530   187
Ball,                  190     1   201   0    0   530   190
Cog,     (TEETH)       191     1   201   0    0   530   191

INDEX.PAT
NAME                    P1   CCA   HP  CCB PATT  MAJOR1 MINOR1

Index map color,       199    47    17   0    0   530   199
Index map color,       199    31     3   0    0   530   199
Index map color,       199    79    57   0    0   530   199
Index map color,       199   723    97   0    0   530   199


LINE.PAT
NAME                    P1                     MAJOR1 MINOR1
 none                    0                         0     0
```

The author wishes to thank Richard Taylor for storing and
protecting the original Geologic Map of Colorado scribe sheets and
negatives, Margaret Clemensen for assistance in preparing the
explanation sheet and Scott Hogan and Kirsten Findell for review of
the digital map; all are with the USGS.

The author wishes to thank Randy Phillips of the Colorado
State Geologic Survey for creating the TWETO.SHD
shadeset.

References cited:

Tweto, Ogden, 1976, Preliminary Geologic Map of Colorado:  U.S. Geol.
  Survey Misc. Field Studies Map MF-788, 2 sheets.
Tweto, Ogden, 1979, Geologic Map of Colorado: U.S.Geol. Survey, Special
  Geologic Map

BLM_0053112

1. Abstract
   This geologic map was prepared as a part of a study of digital
methods and techniques as applied to complex geologic maps.  The
geologic map was digitized from the original scribe sheets used to
prepare the published Geologic Map of Colorado (Tweto 1979).
Consequently the digital version is at 1:500,000 scale using the
Lambert Conformal Conic map projection parameters of the state base
map.  Stable base contact prints of the scribe sheets were scanned on
a Tektronix 4991 digital scanner.  The scanner automatically converts
the scanned image to an ASCII vector format. These vectors were
transferred to a VAX minicomputer, where they were then loaded into
ARC/INFO.  Each vector and polygon was given attributes derived from
the original 1979 geologic map.

   This database was developed on a MicroVAX computer system using VAX
V 5.4 nd ARC/INFO 5.0 software.

UPDATE: April 1995,
   The update was done solely for the purpose of adding the abilitly to
plot to an HP650c plotter.  Two new ARC/INFO plot AMLs along with a lineset
and shadeset for the HP650C design jet printer have been included.  These
new files are COLORADO.650, INDEX.650, TWETOLIN.E00 and TWETOSHD.E00.  These
files were created on a UNIX platform with ARC/INFO 6.1.2.  Updated versions
of INDEX.E00, CONTACT.E00, LINE.E00, DECO.E00 and BORDER.E00 files that
included the newly defined HP650c items are also included.

* Any use of trade, product, or firm names is for descriptive purposes
  only and does not imply endorsement by the U.S. Government.


   Descriptors:
   The Digital Geologic Map of Colorado in ARC/INFO Format
   Open-File Report 92-0507


2. Applications that use this data
   models and assesments

   2.1  Intended use of data
   base geologic map

   2.2  Limitations of data
   Scale is 1:500,000 and should not be used outside that range

   WATER, ROADS, CONTOURS, AND TOWNS:

       Published geologic maps are prepared using a USGS topographic base
map that contains the hydrology, hypsography, and political features.
Because this digital version of the Geologic Map of Wyoming started with
the original geologic scribe sheets, these features were not present.
Only those water bodies that were required to close polygons were added
by hand.  The digital hydrology is not complete or as accurate as the
original USGS 1:500,000 topographic base.  A few water bodies were added
for visual effect.  No roads, contours, or towns were present on the
geologic scribe sheets and none were added to this digital version.


3. Attribute discussion
   CODING SCHEME FOR ATTRIBUTES:

| ITEM | FEATURE |
|------|---------|
| P1,P2 | Shorthand attributes |
| BW | Line pattern from CARTO.LIN |
| CCA | Line pattern or shade color from CCA.LIN or CCA.SHD |

BLM_0053113

```
CCB              Shade color from CCB.SHD
PATT             Shade pattern from DOT.SHD
HP               Line pattern or shade color from TWETO.LIN or TWETO.SHD


MAJOR1           DLG-3 (Optional) style MAJOR1 attribute
MINOR1           DLG-3 (Optional) style MINOR1 attribute
MAJOR2           DLG-3 (Optional) style MAJOR2 attribute
MINOR2           DLG-3 (Optional) style MINOR2 attribute
```

CONTACT.AAT

| NAME | P1 | P2 | BW | CCA | HP | MAJOR1 | MINOR1 | MAJOR2 | MINOR2 |
|------|----|----|----|-----|----|--------|--------|--------|--------|
| CONTACT | 1 | – | 0 | 1 | 101 | 500 | 201 | – | – |
| WATER, SHORELINE | 2 | – | 0 | 1 | 101 | 40 | 200 | – | – |
| STATE OUTLINE | 3 | – | 127 | 0 | 139 | 91 | 8 | – | – |
| FAULT | – | 1 | 0 | 4 | 102 | – | – | 501 | 203 |
| FAULT, THRUST | – | 2 | 0 | 4 | 102 | – | – | 501 | 204 |
| FAULT, DOTTED | – | 3 | 106 | 0 | 110 | – | – | 501 | 205 |
| FAULT, DASHED | – | 4 | 114 | 0 | 114 | – | – | 501 | 206 |
| BAR | – | 5 | 0 | 0 | 101 | – | – | 501 | 218 |
| DIATREME | – | 8 | 0 | 0 | 101 | – | – | 501 | 215 |
| VOL. CONE | – | 9 | 0 | 212 | 201 | – | – | 501 | 216 |
| PC SHEAR ZONE | – | 22 | 0 | 0 | 101 | – | – | 501 | 213 |
| SINGLE LINE OUTCROP | – | 24 | 0 | 0 | 0 | – | – | 501 | 226 |
| NON-PRINTING CONTACT | – | 25 | 0 | 0 | 0 | 500 | 202 | – | – |

```
  Some vectors can have both a P1 and P2 code.  Such as a fault that
  is also a contact.
```

DECO.AAT

| NAME | P1 | BW | CCA | HP | MAJOR1 | MINOR1 |
|------|----|----|-----|----|--------|--------|
| BALL | 6 | 0 | 1 | 101 | 501 | 219 |
| TEETH | 7 | 0 | 1 | 101 | 501 | 220 |
| DIATREME | 8 | 0 | 2 | 101 | 501 | 215 |
| VOL. NECK | 10 | 0 | 212 | 201 | 501 | 217 |
| MONOCLINE | 11 | 0 | 212 | 201 | 501 | 207 |
| MONOCLINE, DOTTED | 12 | 0 | 353 | 209 | 501 | 208 |
| SYNCLINE | 13 | 0 | 212 | 201 | 501 | 209 |
| SYNCLINE, DOTTED | 14 | 0 | 353 | 209 | 501 | 210 |
| ANTICLINE | 15 | 0 | 212 | 201 | 501 | 211 |
| ANTICLINE, DOTTED | 16 | 0 | 353 | 209 | 501 | 212 |
| MONOCLINE ARROW | 17 | 0 | 212 | 201 | 501 | 221 |
| SYNCLINE ARROW | 18 | 0 | 212 | 201 | 501 | 222 |
| ANTICLINE ARROW | 19 | 0 | 212 | 201 | 501 | 223 |
| FOLD ARROWHEAD | 20 | 0 | 212 | 201 | 501 | 224 |
| OVERTURNED SYMBOL | 21 | 0 | 212 | 201 | 501 | 225 |
| PC SHEAR ZONE | 22 | 0 | 1 | 101 | 501 | 213 |
| JURASSIC LIMIT | 23 | 118 | 0 | 113 | 501 | 214 |

LINE.AAT

| NAME | P1 | BW | CCA | HP | MAJOR1 | MINOR1 |
|------|----|----|-----|----|--------|--------|
| Tbbi, | 49 | 0 | 384 | 501 | 510 | 49 |
| Tbr, | 50 | 0 | 386 | 502 | 510 | 50 |
| Tui, | 58 | 0 | 512 | 503 | 510 | 58 |
| Tmi, | 59 | 0 | 505 | 508 | 510 | 59 |
| TKi, | 66 | 0 | 441 | 504 | 510 | 66 |
| Kmj, | 99 | 0 | 335 | 507 | 510 | 99 |
| _am, | 172 | 0 | 331 | 505 | 510 | 172 |
| Yam, | 181 | 0 | 449 | 506 | 510 | 181 |
| Tmi,inferred | 185 | 0 | 500 | 509 | 510 | 185 |

BLM_0053114

```
CONTACT.PAT
NAME              P1    CCA    HP   CCB PATT    MAJOR1 MINOR1

Qa,                1     16     1    0    0      520      1
Qg,                2     24     2    0    0      520      2
Qgo,               3     31     3    0    0      520      3
Qe,                4     19     4    0    0      520      4
Qeo,               5     19     5    0   55      520      5
Qd,                6     25     6    0    0      520      6
Qdo,               7     25     7    0   55      520      7
Ql,                8     25     8    0   71      520      8
Qb,                9     61     9    0    0      520      9
QTsa,             10     19    10    0   71      520     10
QTa,              11     31    11    0   55      520     11
To,               12     50    12    0    0      520     12
Tgv,              13     50    13    0   71      520     13
Ta,               14     50    14    0   55      520     14
Twr,              15     64    15    0    0      520     15
Th,               16     75    16    0   71      520     16
Tcu,              17     47    17    0    0      520     17
Tpc,              18    303    18    0    0      520     18
Tdu,              19    303    19    0    0      520     19
Tbp,              20     50    20    0    0      520     20
Tt,               21     50    21    0    0      520     21
Tnp,              22     50    22    0    0      520     22
Tos,              23     64    23    0    0      520     23
Tu,               25     75    25    0   71      520     25
Tb,               26     75    26    0   71      520     26
Tg,               27     81    27    0    7      520     27
Tgp,              28    103    28    0    0      520     28
Tgl,              29     81    29    0    0      520     29
Tglm,             30    103    30    0    0      520     30
Tgt,              31     88    31    0  103      520     31
Tglu,             32     81    32    0    0      520     32
Tglw,             33     81    33    0   71      520     33
Tw,               34     47    34    0    0      520     34
Twc,              35     45    35    0    0      520     35
Twn,              36     46    36    0    0      520     36
Two,              37     47    37    0   71      520     37
Tf,               38    303    38    0    0      520     38
Tc,               39    303    39    0    0      520     39
Tm,               40    303    40    0    0      520     40
Td,               41     50    41    0    0      520     41
Ts,               42     50    42    0    0      520     42
Tsp,              43    303    43    0    0      520     43
Tlp,              44     50    44    0    0      520     44
Tsj,              45     47    45    0    0      520     45
Te,               46     47    46    0    0      520     46
Tn,               47    303    47    0    0      520     47
Tbb,              48    118    48    0    7      520     48
Tbbi,             49    152    49    0    0      520     49
Tbr,              50    186    50    0    0      520     50
Tbrt,             51     96    51    0    0      520     51
Taf,              52    152    52    0    0      520     52
Tial,             53     64    53    0    0      520     53
Tiql,             54     64    54    0  127      520     54
Tpl,              55    348    55    0    0      520     55
Twm,              56    155    56    0    0      520     56
Tv,               57     79    57    0    0      520     57
Tui,              58    358    58    0    0      520     58
Tmi,              59    124    59    0    0      520     59
TKda,             60     35    60    0    0      520     60
Tdv,              61     35    61    0   71      520     61
TKdl,             62     35    62    0    0      520     62
```

```
TKr,      63   35   63  0    0   520   63
TKa,      64   35   64  0    0   520   64
TKec,     65   32   65  0  103   520   65
TKi,      66  387   66  0    0   520   66
Kl,       67  723   67  0    0   520   67
Kf,       68  718   68  0    0   520   68
Klf,      69  718   69  0    7   520   69
Kvt,      70  723   70  0    7   520   70
Kp,       71  716   71  0    0   520   71
Kpu,      72  712   72  0    0   520   72
Kpm,      73  767   73  0    0   520   73
Kpl,      74  720   74  0    0   520   74
Kn,       75  761   75  0    0   520   75
Kcg,      76  736   76  0    0   520   76
Kc,       77  761   77  0    0   520   77
Kpg,      78  709   78  0   71   520   78
Kdp,      79  785   79  0    0   520   79
Kd,       80  785   80  0    0   520   80
Kmw,      81  723   81  0    0   520   81
Kls,      82  712   82  0    0   520   82
Kmv,      83  717   83  0    0   520   83
Kmvu,     84  737   84  0    0   520   84
Kmvl,     85  751   85  0   95   520   85
Kw,       86  767   86  0    0   520   86
Ki,       87  751   87  0   95   520   87
Kh,       88  737   88  0    0   520   88
Ksc,      89  767   89  0   55   520   89
Kmgs,     90  751   90  0   95   520   90
Km,       91  736   91  0    0   520   91
Kmfm,     92  709   92  0  103   520   92
Kfd,      93  785   93  0   95   520   93
Kdb,      94  785   94  0    0   520   94
Kkf,      95  723   95  0    0   520   95
Kpcl,     96  767   96  0    0   520   96
Kch,      97  720   97  0    0   520   97
Kmp,      98  761   98  0    0   520   98
Kmj,      99  736   99  0   71   520   99
KJdm,    100  755  100  0  103   520  100
KJdj,    101  755  101  0  103   520  101
KJdw,    102  755  102  0  103   520  102
KJdr,    103  755  103  0  103   520  103
KJde,    104  755  104  0  103   520  104
KJds,    105  755  105  0  103   520  105
Jm,      106  746  106  0    0   520  106
Jmj,     107  746  107  0    0   520  107
Jmc,     108  746  108  0    0   520  108
Jmw,     109  746  109  0    0   520  109
Jmr,     110  746  110  0    0   520  110
Jme,     111  746  111  0    0   520  111
Jms,     112  746  112  0    0   520  112
Jmse,    113  746  113  0    0   520  113
Jmce,    114  746  114  0    0   520  114
Jmre,    115  746  115  0    0   520  115
Jmwe,    116  746  116  0    0   520  116
J@g,     117  782  117  0    0   520  117
J@gc,    118  782  118  0   71   520  118
J@mg,    119  782  119  0   95   520  119
J@mc,    120  800  120  0    0   520  120
@kc,     121  790  121  0    0   520  121
@wc,     122  790  122  0    0   520  122
@m,      123  741  123  0    0   520  123
@ch,     124  741  124  0    0   520  124
@cc,     125  776  125  0  103   520  125
@c,      126  776  126  0    0   520  126
@d,      127  776  127  0    0   520  127
```

BLM_0053116

```
@dg,           128   776   128    0    0    520   128
@Pl,           129   788   129    0  103    520   129
@Ps,           130   788   130    0    0    520   130
@Pll,          131   788   131    0    0    520   131
@Pjs,          132   788   132    0   95    520   132
@Pcs,          133   788   133    0   95    520   133
@Pcp,          134   788   134    0   95    520   134
@Pr,           135   788   135    0   71    520   135
@Pdc,          136   788   136    0   71    520   136
@Pmc,          137   788   137    0    0    520   137
@&lf,          138   805   138    0    0    520   138
Pp,            139   682   139    0    0    520   139
Pu,            140   682   140    0    0    520   140
Pc,            141   681   141    0    0    520   141
Mz,            142     0   142    0   71    520   142
MzPz,          143     0   143    0   71    520   143
P&f,           144   408   144    0   95    520   144
P&cf,          145   408   145    0    0    520   145
P&if,          146   408   146    0    0    520   146
P&s,           147   408   147    0    0    520   147
P&m,           148   408   148    0    0    520   148
P&w,           149   440   149    0   95    520   149
P&wm,          150   440   150    0   95    520   150
&m,            151     0   151   14    0    520   151
&b,            152     0   152    0  103    520   152
&mb,           153     0   153   14    0    520   153
&e,            154     0   154   12   95    520   154
&ee,           155     0   155   12    0    520   155
&mbe,          156     0   156   12    0    520   156
&h,            157     0   157   16    0    520   157
&rh,           158     0   158   15    0    520   158
&mr,           159     0   159   15    0    520   159
M_,            160   378   160    0    0    520   160
MDO,           161   448   161    0    0    520   161
DO_,           162   448   162    0    0    520   162
O_,            163   352   163    0    0    520   163
Or,            164   352   164    0    0    520   164
MD,            165   448   165    0    0    520   165
MD_,           166   435   166    0    0    520   166
DO,            167   448   167    0    0    520   167
_s,            168   171   168    0    0    520   168
Mm,            169   448   169    0    0    520   169
_l,            170   171   170    0    0    520   170
M_ml,          171   378   171    0    0    520   171
_am,           172   814   172    0    0    520   172
Yu,            173    32   173    0  135    520   173
YXu,           174    32   174    0  119    520   174
Xb,            175     0   175   18    0    520   175
Xfh,           176    44   176    0    7    520   176
Xq,            177     0   177   18   71    520   177
Wr,            178   319   178    0    0    520   178
Yp,            179   107   179    0    7    520   179
Yg,            180   169   180    0    7    520   180
Yam,           181   689   181    0    0    520   181
Xg,            182    91   182    0   71    520   182
Xm,            183   385   183    0    0    520   183
YXg,           184   348   184    0   71    520   184
H2O,           200   680   200    0    0     40   100

DECO.PAT
NAME           P1   CCA   HP  CCB PATT  MAJOR1 MINOR1

Pipe,          186     0    0    0    0    530   186
     ,  (BLANK) 187     0    0    0    0    530   187
Ball,          190     1  201    0    0    530   190
```

BLM_0053117

Case No. 1:20-cv-02484-MSK   Document 43   filed 04/28/21   USDC Colorado   pg 72 of 325
http://pubs.usgs.gov/of/1992/ofr-92-0507/downloads/data-files-unzipped...

```
Cog,    (TEETH)    191      1  201  0   0    530    191

INDEX.PAT
NAME              P1    CCA   HP  CCB PATT   MAJOR1 MINOR1

Index map color,  199    47   17  0   0      530    199
Index map color,  199    31    3  0   0      530    199
Index map color,  199    79   57  0   0      530    199
Index map color,  199   723   97  0   0      530    199


LINE.PAT
NAME              P1               MAJOR1 MINOR1
 none              0                 0      0
```

   4.  Procedures used to create or automate data
       This geologic map was prepared as a part of a study of digital
methods and techniques as applied to complex geologic maps.  The
geologic map was digitized from the original scribe sheets used to
prepare the published Geologic Map of Colorado (Tweto 1979).
Consequently the digital version is at 1:500,000 scale using the
Lambert Conformal Conic map projection parameters of the state base
map.  Stable base contact prints of the scribe sheets were scanned on
a Tektronix 4991 digital scanner.  The scanner automatically converts
the scanned image to an ASCII vector format. These vectors were
transferred to a VAX minicomputer, where they were then loaded into
ARC/INFO.  Each vector and polygon was given attributes derived from
the original 1979 geologic map.

       This database was developed on a MicroVAX computer system using VAX
V 5.4 nd ARC/INFO 5.0 software.

   5.  Revisions made to data (revision number, date, description)

UPDATE: April 1995,
       The update was done solely for the purpose of adding the abililty to
plot to an HP650c plotter.  Two new ARC/INFO plot AMLs along with a lineset
and shadeset for the HP650C design jet printer have been included.  These
new files are COLORADO.650, INDEX.650, TWETOLIN.E00 and TWETOSHD.E00.  These
files were created on a UNIX platform with ARC/INFO 6.1.2.  Updated versions
of INDEX.E00, CONTACT.E00, LINE.E00, DECO.E00 and BORDER.E00 files that
included the newly defined HP650c items are also included.

LINESETS and SHADESET: CALCOMP

       The plot program COLORADO.AML uses two linesets, CARTO.LIN and
CCA.LIN. As the COLORADO.AML runs, black lines are produced from the
INFO item BW which calls the ARC/INFO CARTO.LIN line set, to generate
color lines the INFO item CCA calls the electrostatic 1024 color line
set file, included as lineset CCALIN.E00.

       To produce polygons three shadesets are used, color polygons are
produced from the INFO items CCA and CCB which calls the electrostatic
1024 color shadeset files, included as shadeset CCASHD.E00 and
CCBSHD.E00 To generate polygons patterns the INFO item PATT calls the
shadeset file DOT, included as DOTSHD.E00.

LINESETS and SHADESET: HP650c

       The plot program COLORADO.650 uses one lineset, TWETO.LIN.  As
the COLORADO.650 aml runs, color and black lines are produced from the
INFO item HP which calls the supplied ARC/INFO line set, TWETOLIN.E00

BLM_0053118

To produce polygons one shadeset is used, color polygons are
produced from the INFO items HP which calls the HP650c color shadeset
file, included as shadeset TWETOSHD.E00.  To generate polygons patterns
the INFO item HP calls the shadeset TWETO.SHD.

FONTS:

The text fonts for the 3 special geologic symbols are included as
font FNT003.FNT.  The ASCII code for @ has been redefined to the
symbol for Triassic, the ASCII code for & has been redefined to the
symbol for Pennsylvanian and the ASCII code for _ has been redefined
to the symbol for Cambrian.

6.  Reviews applied to data (review type, date, person, description)
The author wishes to thank Richard Taylor for storing and
protecting the original Geologic Map of Colorado scribe sheets and
negatives, Margaret Clemensen for assistance in preparing the
explanation sheet and Scott Hogan and Kirsten Findell for review of
the digital map; all are with the USGS.

The author wishes to thank Randy Phillips of the Colorado
State Geologic Survey for creating the TWETO.SHD shadeset.

7.  Related spatial and tabular data sets and programs

Digital geologic map information USGS Open File 92-0507 is in the followin
ASCII or ARC/INFO export .E00 files:

READ.1ST     Text file that contains the first page of this document.

READ.2ND     Text file that contains this Open-File 92-0507 document.

LOAD.AML     ARC/INFO commands that can be used to automatically rebuild
                the database from ASCII.

COLORADO.CAL  ARCPLOT commands that create a Calcomp plot file of the Geologi
                from the data bases.

COLORADO.650  ARCPLOT commands that create an HP650c plot file of the Geologi
                from the data bases.

LAMBERT.PRJ   A file of the projection parameters used.

SETUP.AML     The ARCEDIT AML with the edit tolerances used.

CCALIN.E00    ARC/INFO lineset file A, The palette of line types for an
                electrostatic plotter.

CCBLIN.E00    ARC/INFO lineset file B, The palette of line types for an
                electrostatic plotter.

CCASHD.E00    ARC/INFO shadeset file A, The palette of colors for an
                electrostatic plotter.

CCBSHD.E00    ARC/INFO shadeset file B, The palette of colors for an
                electrostatic plotter.

DOTSHD.E00    ARC/INFO shadeset patterns, a palette of patterns.

FNT003.E00    ARC/INFO geologic symbols font file.

TWETOLIN.E00  ARC/INFO lineset file, The palette of line types for an
                HP650c plotter.

TWETOSHD.E00  ARC/INFO shadeset file, The palette of line types for an

BLM_0053119

HP650c plotter.

INDEX.CAL        ARCPLOT commands that create a plot file of the Geologic Map
                    Explanation sheet for an electrostatic plotter.


INDEX.650        ARCPLOT commands that create a plot file of the Geologic Map
                    Explanation sheet for an HP650c plotter.

INDEX.E00        The Geologic Map Explanation sheet (no projection).

EXPL-01.TXT      ARCPLOT text files for Colorado Explanation Sheet.
  thru
EXPL-22.TXT

BORDER.E00       The title and scale bars of the sheet (Lambert projection).


CONTACT.E00      The Geologic Map of Colorado contacts and faults file.

DECO.E00         The Geologic Map of Colorado decorations file.


LINE.E00         The Geologic Map of Colorado single line outcrop file.



8.  References cited
Tweto, Ogden, 1976, Preliminary Geologic Map of Colorado:  U.S. Geol.
  Survey Misc. Field Studies Map MF-788, 2 sheets.
Tweto, Ogden, 1979, Geologic Map of Colorado: U.S.Geol. Survey, Special
  Geologic Map

9.  Notes
   The author wishes to thank Richard Taylor for storing and
protecting the original Geologic Map of Colorado scribe sheets and
negatives, Margaret Clemensen for assistance in preparing the
explanation sheet and Scott Hogan and Kirsten Findell for review of
the digital map; all are with the USGS.

    The author wishes to thank Randy Phillips of the Colorado
State Geologic Survey for creating the TWETO.SHD shadeset.

BLM_0053120

# Fire and Rock Art in the Helena National Forest

Mavis Greer and John Greer

Paper Presented at the
59th Annual Meeting of the Plains Anthropological Society
Lincoln, Nebraska
November 2001



Natural forest fires of 2000 burned hundreds of acres in the canyons of the Big Belt Mountains in the Helena National Forest of central Montana. These limestone canyons are the locations of several recorded rock art sites and have a high potential for more pictograph sites in unsurveyed areas. During 2001 we examined portions of selected canyons to assess the conditions of known rock art sites, locate and record new sites, and evaluate the impact of fires on these pictographs as part of a contract with the Helena National Forest administered by Carl Davis. The study area included canyons at the northwestern end of Canyon Ferry, a large reservoir on the upper end of the Missouri River, and canyons just downstream that drain into Hauser Lake, another Missouri River reservoir.

The effects of fire on rock art have been a concern to researchers and managers for some time, although literature on the topic is sparse and is more likely to be found buried in articles or reports focusing on a rock art site or region rather than directly dealing with this subject. However, in 2001 Roger Kelly and Dan McCarthy (Kelly and McCarthy 2001) published an article devoted to examining the impacts and effects of fire on rock art with examples from nine states that range from Kentucky to Hawaii and Colorado to Texas. This report on Montana adds another state to that list.

The Big Belt Mountains support outcroppings of Madison limestone, which is light gray to almost white in color and provides an ideal canvas for painting. The canyons of this study area are mostly winding and narrow with Magpie Gulch, the southernmost canyon examined, supporting a wider more open setting. In all cases limestone occurs in layers at various levels along the mountain side or as fins that extend all the way from the top to the bottom of the canyon. These kinds of formations include many flat walls, small rockshelters, and



BLM_0053121

numerous niches and caves, all of which are appropriate settings for rock art and some of which were used for pictographs. Although there are a few pictograph sites within this mountain range that are complex and were painted at more than one time, the majority of rock art sites in the Big Belts are small and probably single component.

Our 2001 study area included one previously recorded site, the Magpie Meadows Pictographs. This site was originally recorded by Sara Scott of the Helena National Forest in the fall of 2000 during a post-fire damage assessment of all cultural sites within burned areas. The site is located on a south facing limestone outcropping at the end of a fin in the Magpie Creek valley bottom. The pictographs at this site are typical of central Montana rock art, dominated



by smears, fingerlines, and dots. The dot pattern shown to the left here is the most prominent figure at the site and resembles a stylized handprint with the dots at the finger tips, the joints, and along the outline of the hand. The handprint is another common figure in central Montana rock art.



Other figures at this site include a solid round disk painted in a slight smooth depression. The general appearance of this figure is also very much like a stylized hand. Numerous single finger dots also occur across this site, and some short vertical parallel fingerlines.

All dots appear to be fairly large marks made with the palm of the finger or with the thumb. All of these figures are of red liquid paint, but this site also has some black fingerlines, which are in a general area of black burned wall.

Fire surrounded the site, and no trees near it escaped being burned. The limestone gravel in front of the site was also burned and discolored by the fire, and ashy deposits cover the shelter floor. Although



within the forest fire, the area of soot by the black fingerlines appears to be the result of a campfire built directly below the paintings and smoking the wall rather than a wild fire. This distinction is based on the observation that the soot is only on the lower part of the panel and

BLM_0053122

not the upper part, and the burned trees indicate the fire was not limited to ground level. However, this speculation cannot be confirmed without photos of the site before the forest fire, which are not available.

Across the creek and just slightly downstream is Magpie Window Shelter. This site is in a small rockshelter in the lower tier of limestone separated from the valley floor by a steep slope covered with scattered pines and junipers. Although many of the trees have burned on the valley floor and on the slopes above this shelter, the fire did not effect the site. The few paintings at this site are similar to those at the mouths of other nearby canyons, such as Avalanche, and are typical of central Montana rock art. The only anthropomorph 

in this shelter is a small fingerline stick figure with drooping arms, spread legs, and apparently no head. It resembles others in the Little Belt Mountains just to the northeast. Also at this site are several small black smears and a red smear.

 

Even higher above the Magpie Creek valley bottom is Field School Shelter. The small cave faces south and is on the steep hillside near the top of the canyon and at the base of a prominent discontinuous series of limestone reefs. The area previously was covered with trees and bushes but now is fairly clear due to fire. There is an excellent view from the cave, which overlooks the lower portion of Magpie Gulch and Canyon Ferry Reservoir. 

Page 3

BLM_0053123

The elongated cave has a small entrance room, which constricts rapidly into a small hole that projects back into the cliff face. The figures in this cave are mostly obtuse smears and fingerlines, which are not uncommon within caves of this type in the central Montana mountain ranges. Orange finger paintings are on top of the white calcium carbonate deposits that cover the overhanging sloping wall. There are three small fingerline figures that resemble turkey tracks or stylized anthropomorphs. Small pinkish and orange smears also occur here.



There was no impact to this site from the fire, although it surrounded the cave leaving behind many tree stumps and bare branches. The bush immediately in front of the cave survived the fire with very little impact, while the fencepost immediately on the west side of the cave was charred almost all the way through indicating that the fire was hot in the immediate site area but apparently moved rapidly across the landscape and did not enter the cave. This is also supported by the unburned cave floor deposits.

In Trout Creek canyon we recorded an unusual rock art site for central Montana and one that puzzles us regarding origin. The Crevasse Pictograph site is in the first tier of limestone above Trout Creek and consists of a long rockshelter with a small cave at the northeastern end. The overhang above the cave entrance is very slight and does not completely protect the entrance from the elements as evidenced by running paint on the red figure there. This large site is readily seen from the trail and obviously attracts many modern visitors as evidenced by a series of scratched engravings (including a small person with a hat or fancy hair style), charcoal initials, and some recent orange smears in the main lower part of the shelter.





The entrance to the small narrow cave is marked by a prominent red abstract figure (photo to left). Although abstract designs are characteristic of central Montana rock art, this figure is larger and messier than the typical central Montana abstract. However, it appears more aboriginal in style than modern or historic. The figure draws attention to the cave entrance, which is otherwise over shadowed by

BLM_0053124

the large rockshelter room to the west. The cave is an elongated karst crack, and most paintings are within six feet of the entrance. Just inside on the left wall there are at least five generally circular smears of very thick runny dark red liquid paint. These are in an area of considerable water seepage which has formed a travertine over the paint and caused some of it to run. These circular smears are on smoothed depressed areas on the rock wall.



On the right wall across from the smears is what appears to be an animal figure made of extremely thick, very runny, liquid red paint applied either by finger or daubed on with a piece of material. Both the smears and the possible animal are figures often portrayed in central Montana aboriginal pictographs and red liquid paint is the usual substance used for these representations, however, these are varied enough from the standard portrayals to make their origin questionable.



The enlarged crevasse goes back about 40 feet to a pit approximately 12 feet deep with a 10-foot ceiling. At the pit a large log has been driven into the wall apparently as a hand-hold devise and a smaller log was put into the pit presumably to assist climbing (see photo to left), although the entire passageway is easily climbable without them. Just past the pit, which we designated Name Pit because of the modern names there, are continuing solution cavities for approximately 12 feet before encountering another parallel pit, which probably extends 15 feet to join Name Pit. The total length of the cave is estimated at 65 feet. The only paintings in the cave interior are at Name Pit. The three names at Name Pit were dated 1985 and were done with red spray paint. The names include Casey Anderson, Chris Anderson, and Jeremy Anderson, apparently a single family. Below Jeremy's name is a small animal with antlers, presumably a deer. The animal appears to be contemporary with the names and sheds doubt on the entrance pictographs, although they are of a different style.



The entrance paint has many characteristics of aboriginal constituents, especially the thickness and runniness. The paint

BLM_0053125

does not look the same as the Anderson names in terms of texture, and nothing inside the cave or at Name Pit seems to equate with the entrance figures in style. However, given the brightness of the paint, figures that do not seem to fit the general prehistoric pattern for this region (although descriptively similar), and the red Anderson names, a possible relation between the entrance paint and names cannot be ruled out without a chemical paint analysis. No portion of this site was affected by the recent fires.



The Oregon Gulch Pictographs are in a narrow gates area in the canyon bottom low on the limestone wall, and immediately beside a trail that has probably traversed this gulch for many centuries. The site faces west, but much of the rock art is on a small south-facing notch, suggesting that the panel was meant to be viewed by people approaching the site from downstream.

All the paintings are in a light red to orangish red and dominated by smears and fingerlines. A series of five vertical fingerlines and at least two horizontal lines that appear to cut across the center of them are typical of the stylized bear track design common in central Montana.

The site has not been burned by the recent forest fires, but the impact from trail use and nature can be seen. The remains of a small campfire are at the base of the bluff and stashed firewood in small niches along the base indicate that people have camped and burned fires here probably for hundreds of years, which may explain why the remaining rock art is so limited. However, there is no soot present from recent campfires.

The site does not appear to have been subjected to much flooding, even though the limestone wall of this cliff is mostly covered with a mud like film typically seen in the Big Belt Mountains. The fractured nature of the limestone, undoubtedly from freezing and thawing, suggests there were more paintings here in the past.

The Big Log Pictograph site is on the west end of a wider opening within a narrow canyon and just at the mouth of a very narrow gates area where erosion has downcut through the limestone to form a walled drainage channel. Although the canyon widens at the site, it is still bordered on either side by limestone exposures.

The Big Log rockshelter is elevated above the drainage bottom and separated from it by a short steep vegetated slope. The site has not been recently affected by fire.

BLM_0053126

Like the other sites examined in this study area, the figures are typical of central Montana rock art. The main panel is on the right side of the shelter and includes a small group of two sets of three vertical fingerlines with an associated cross and an associated additional short fingerline. Also present at this site are two stick figures that resemble bird like anthropomorphs.





These figures are represented only by a single vertical line for the body. One figure has arms that are very slightly drooping (as shown in the photo on the left) while the other has arms that are very slightly raised. However, in both cases the arms essentially come straight out from the central vertical single line for the torso. Neither figure has any indication of a head, other than a slight upward extension of the central line, and there are no indications of hands, legs, or feet.

Overall, the rock art in these limestone formations appears to have been minimally affected by the recent forest fires. In cases where the fires were surrounding the sites, it appears that the fast moving blazes prevented the sites from being harmed as extensively is as possible by slow-burning long-term campfires where concentrated heat and smoke result in blackening of the wall or ceiling. Additionally, overhangs that were protecting the paintings from other natural elements also apparently acted to protect the pictographs from fire damage. Our experience with fire and other limestone cave paintings in central Montana mirrors this scenario, whereby the paintings are only minimally affected by the fire itself.

However, a greater effect of the fire on the rock art in these central Montana canyons is their subsequent exposure after the fires have removed camouflaging vegetation. In many cases, as is graphically portrayed in the photo to the right, the once hidden from view site is now easily visible from the road and attacks more visitors than prior to the burn. Although the heat may result in accelerated spalling of the limestone, it probably



BLM_0053127

does not have any long term effect that can equate with seasonal freezing and thawing, which are extremely detrimental to the rock art sites of central Montana.



The best immediate protective measure is to continue searching for and recording rock art sites so that records exist prior to fires. Site recordings will enable better comparative studies of the before and after site conditions. Although there is information to be gained and lessons to be learned by studying how fire effects rock art sites in different environments, it is essential to conduct local and intra-regional long-range studies taking into account the effects of other climatic impacts on the specific geologic formation used for rock art in a homogeneous area in order to ascertain the best preventive coarse of action. For example, it has been suggested by Kelly and McCarthy (2001) in some areas it might be advantageous to reduce the amount of available fuel around a rock art site by hand in order to decrease the chance for intensive fire damage. This goes hand-in-hand with Alice Tratebas' suggestion that prehistoric fires may not have been as damaging to rock art in northeastern Wyoming because more frequent natural fires kept the fuel source around panels reduced compared to the build up that occurs today. However, before pursuing vegetation reduction as a rock art protective measure, this topic must be examined on a local level because what works in an area of sandstone formations may not be the best solution in an area of limestone mountains. It is possible that natural fires in the limestone canyons of central Montana were not much different prehistorically from what they are today. These canyons do not have excessive timber in or around the sites that were not affected by fires, and the sites within the burn zones indicate that the trees were not excessively dense. Thus, the vegetation may have been close to the aboriginal forested conditions. Therefore, it might be advantageous to keep the forest as camouflage for the site because any resulting fire damage would be less than the damage caused by constant visitation. In conclusion, the topic of rock art fire management for site protection presents an array of problems that need to be considered on many levels from local to world wide, but it is an area where solutions can be developed with study and cooperation between researchers.

**Reference Cited.**

Kelly, Roger and Daniel F. McCarthy
    2001    Effects of Fire on Rock Art. In *American Indian Rock Art*, edited by S. M. Freers and A. Woody, pp. 169-176. Vol. 27. American Rock Art Research Association, Tucson.

BLM_0053128

# Effects of Disease, Dispersal, and Area on Bighorn Sheep Restoration

John E. Gross[1,3,5]

Francis J. Singer[2]

Michael E. Moses[2,4]

## Abstract

We simulated population dynamics of bighorn sheep (*Ovis canadensis*) inhabiting six discrete habitat patches in the Badlands ecosystem, South Dakota. Modeled populations were subjected to a range of potential management actions and rates of disease-causing infection. Simulated disease varied in severity from mild (~12% mortality) to severe (~67% mortality), with infections imposed once, at regular intervals, or with a fixed probability each year. In the absence of disease, 200-year extinction rates were uniformly low and insensitive to changes in colonization rate or area of suitable habitat. A single infection, accompanied by change in the area of suitable habitat or colonization rate, resulted in extinction rates of up to 40%, and large changes in average population size (up to 10-fold with changes in area; 4-fold with changes in colonization rate). Simulations with multiple infections, which are probably most realistic, generally resulted in extinction rates that exceeded 20% over a 200-year period. Model results clearly showed that efforts directed toward reducing the frequency or severity of disease are of highest priority for improving the success of attempts to restore bighorn sheep populations. Increases in areas of suitable habitat or improvements to corridors between existing habitat patches were far less likely to improve persistence of simulated sheep populations than reductions in the impact of disease. Although theory predicts that enhanced movements may exacerbate effects of disease, increased colonization rates resulted in relatively small but consistent increases in persistence and average population size for all combinations of parameters we examined.

Key words: bighorn sheep, corridor, disease, dispersal, extinction, fragmentation, *Ovis canadensis*, population model, viability analysis.

## Introduction

Habitat alteration and fragmentation are the foremost threats to native animal populations. As a consequence of human activities, many bighorn sheep populations that were once extensive are now confined to patches of habitat that are completely isolated or sufficiently separated to restrict dispersal between remaining patches. Fragmentation of bighorn sheep populations has resulted from changes in habitat availability and from disease outbreaks that have periodically decimated populations of native North American sheep (Goodson 1982). There is growing awareness that many species are similarly faced with simultaneous threats of habitat alteration and periodic catastrophes due to disease, fire, or weather (Goodman 1987; Mangel & Tier 1993; Hess 1994, 1996; Young 1994). In particular, large mammals typically require extensive home ranges and a variety of seasonal habitats to ensure long-term survival. Species that are large and prone to epizootics may be especially vulnerable to extirpation (Dobson & May 1986; Scott 1988; Cohn 1991).

Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*), California bighorn sheep (*O. c. californiana*), and desert bighorn sheep (*O. c. nelsoni*) once occupied mountainous terrain throughout the western United States (Shackleton et al. 1999; Valdez & Krausman 1999). Combined effects of overharvest, habitat alteration, and disease reduced these populations to a current total of about 50,000 sheep inhabiting less than one-third of their original range (Wishart 1978; Thorne et al. 1985; Krausman 1997; Valdez & Krausman 1999). Eighteen national parks are within historical range of bighorn sheep, but native populations of bighorn sheep survived continuously in only five parks. Bighorn sheep epizootics can kill 35–75% of the population in a single year and can reduce recruitment for an additional three to seven years (Stelfox 1976; Onderka &

[1]Natural Resource Ecology Laboratory, Colorado State University, Fort Collins, CO 80523–1499, U.S.A.

[2]Biological Resources Division, U.S. Geological Survey, Midcontinent Ecological Science Center, Natural Resource Ecology Laboratory, Colorado State University, Fort Collins, CO 80523–1499, U.S.A.

[3]Current address: CSIRO Davies Laboratory, PMB, Aikenvale, Queensland 4814 Australia

[4]Current address: 12 Boundbrook, San Antonio, TX 78250, U.S.A.

[5]Address correspondence to John E. Gross, CSIRO Davies Laboratory, Aikenvale, Queensland 4814 Australia, email john.gross@tag.csiro.au

© 2000 Society for Ecological Restoration

BLM_0053129

Wishart 1982; Spraker & Hibler 1982; Jessup 1985). Rocky Mountain bighorn sheep suffer from a variety of diseases, but respiratory disease associated with *Pasteurella* spp. in particular, has resulted in catastrophic mortality of wild sheep and represents a significant obstacle to restoration of bighorn sheep populations (Foreyt & Jessup 1982; Goodson 1982; Onderka & Wishart 1984; Festa-Bianchet 1988*b*; Miller et al. 1991). Wild sheep are highly susceptible to pneumonic pasteurellosis resulting from contact with domestic sheep (Goodson 1982; Foreyt 1989; Foreyt et al. 1994).

Attempts to move bighorn sheep into previously occupied areas have met with mixed success. Only 53% of 87 translocations in the western states resulted in persistent populations (Leslie 1980). In many areas, bighorn sheep occupy naturally fragmented habitat, resulting in small, isolated populations that may be subject to very high rates of extinction (Schwartz et al. 1986; Berger 1990, 1999; Bleich et al. 1990, 1996; Krausman et al. 1993; Wehausen 1999). About two-thirds of all populations of the Rocky Mountain and California subspecies consist of fewer than 100 individuals (Thorne et al. 1985; Bailey & Klein 1997), and only 41% of translocations have resulted in populations of more than 100 bighorn sheep (Singer et al. 2000*b*; $n = 100$ translocations). Despite poor success of efforts to translocate bighorn sheep, over half of all extant populations in the western United States stem from translocations (McCutchen 1981).

We describe and apply a simulation model for supporting decisions on restoration and management of bighorn sheep. The model simulates males and females and accounts for age-specific breeding behavior. We were specifically interested in evaluating potential effects of management decisions on the persistence of bighorn sheep in the Badlands ecosystem (Badlands National Park and some surrounding LaKota Sioux Reservation land, South Dakota), but we also used our simulation results to explore issues generally relevant to the conservation of species strongly affected by catastrophes, such as disease, and that occupy fragmented habitats. We examined the relative consequences of decisions that managers typically face when attempting to translocate wildlife. To do so, we simulated effects of actions that influence habitat quality (e.g., burning, chaining, creating movement corridors), reduce variance in population performance (e.g., supplemental feeding, developing water holes), or that modify the virulence or frequency of diseases (e.g., vaccination).

## Methods

We developed an individual-based model that simulated the birth, movement, and death of each animal in a population on a yearly time schedule. The landscape was composed of six patches that could support a local population and a background matrix through which animals moved, but in which a population could not persist. Local populations were thus connected by dispersal. This spatial structure was defined by parameters describing the size, quality, and distance between patches of suitable habitat. Changes in size of local populations resulted from breeding and recruitment of lambs, natural mortality, and dispersal.

Individual-based models are particularly useful for simulating the dynamics of populations that are small, subject to rare events (e.g., disease, dispersal, colonization), or where individual variation is important (Houston et al. 1988; Lomnicki 1988; DeAngelis & Gross 1992). Our model explicitly simulated the sex, age, location (by patch), and disease status of each individual in the population, and incorporated sex- and age-specific fecundity and mortality rates. We used Monte Carlo techniques (Manly 1991) to assess the probability of extinction for each set of model parameters by conducting 250 simulations that were each 200 years long. Assuming binomial sampling, the 95% confidence interval on extinction or persistence rates was 1.33% when extinction or persistence was 0%, and 6.7% when extinction or persistence was 50%.

Bighorn sheep live in environments characterized by high seasonal and yearly variations in temperature and precipitation. In mountain environments, severe winters can reduce recruitment by bighorn sheep (Murie 1944; Hoefs & Cowan 1979), while in arid environments recruitment may be tied to precipitation (Douglas & Leslie 1986). We accounted for environmental variation by selecting an annual probability of recruitment from a beta distribution. For each individual sheep, we compared a uniform random deviate to this value. Recruitment rates were reduced when sheep density exceeded a threshold, but density did not influence adult survivorship (Woodgerd 1964; Leslie & Douglas 1979; Wehausen et al. 1987; Gaillard et al. 1998; McCarty & Miller 1998).

### Management Scenarios

To evaluate the relative merits of management actions, we simulated bighorn sheep population dynamics using data from the spatial arrangement of habitat patches in the Badlands ecosystem. We first evaluated the sensitivity of the model to demographic parameters, with and without simulated epizootics. To do so, we varied rates of recruitment, mortality, colonization, and the yearly variation in model parameters. We examined population-level consequences of disease scenarios that represented mild, moderate, and severe epidemics, and we examined the interaction of disease frequency and intensity with changes in habitat area and dispersal rate.

Our simulations were specifically designed to represent the effects of management actions relevant to spe-

BLM_0053130

cies like bighorn sheep. Simulations that varied the amount of suitable habitat indicated the effects of habitat alterations that either increased or decreased carrying capacity, such as burning to increase forage production or reduce visual cover, developing a water source, or other changes that made habitat suitable for occupation. Reductions in habitat could result from encroachment of vegetation or loss of an important habitat feature, such as a water source. Management actions that facilitate or inhibit dispersal, such as fencing, modifying a travel corridor, reducing visual cover, or hazing, were simulated by changing rates of colonization. We also simulated changes in annual variation in population performance that could result from weather or other acute events. Managers could potentially mitigate impacts of these effects (e.g., providing supplemental food in poor years).

### Habitat and Demographic Parameters

We estimated model parameters from studies of bighorn sheep in Badlands National Park and from published information on other bighorn populations. Simulations began with an initial population of 29 sheep that matched the average size, sex, and age composition of previous bighorn sheep translocations in the intermountain region (8 males, 21 females; $n = 100$ groups; Singer et al. 2000$b$).

We identified potential bighorn sheep habitat from topographic features associated with occurrence of native sheep (Smith et al. 1991, as modified by Johnson & Swift 2000). Bighorn sheep rely on steep slopes to escape from predators and they require a contiguous patch of sufficient size. Suitable habitat consisted of large patches (>17 km$^2$) with appropriate terrain for lambing and escape, a nearby source of water, and sufficient horizontal visibility. The habitat model identified six areas that could be occupied by bighorn sheep. Habitat patches varied in size from 51 to 274 km$^2$ and each patch was separated from the nearest adjacent patch by 10 to 30 km (Fig. 1). The total area of suitable habitat was 948 km$^2$.

We estimated age- and sex-specific parameters for recruitment and survivorship by monitoring 165 radiocollared sheep over a four-year period, and from published data on bighorn sheep (Woodgerd 1964; Hansen 1967, 1980; Geist 1971; Wishart 1978; Leslie 1980; Leslie & Douglas 1986; Festa-Bianchet 1988$a$). Radiocollared



Figure 1. The Badlands/LaKota ecosystem with bighorn sheep habitat (thick broken lines), domestic sheep herds (shaded ovals), and boundaries of Badlands National Park, Buffalo Cap National Grasslands, and the Pine Ridge Reservation. Area (km$^2$) in each habitat patch refers to total area of suitable bighorn sheep habitat within the patch.

BLM_0053131

animals were captured from three healthy populations (including Badlands National Park) and three diseased populations. We pooled data to calculate vital rates of five age-based classes for diseased and healthy populations (Table 1).

To establish reference rates for recruitment of lambs, we first estimated maximum recruitment rates for each age class, and then uniformly reduced these rates to achieve lamb-to-ewe ratios consistent with observations from growing bighorn sheep populations that appeared to be minimally influenced by density (Leslie & Douglas 1979; Douglas 1991). The maximum longevity of any modeled animal was 14 years (Murphy & Whitten 1976; McQuivey 1978).

We found no evidence that survival rates of adult bighorn sheep were influenced by density, but previous studies suggested a density-dependent response in lamb recruitment rates (Woodgerd 1964; Murphy & Whitten 1976; Douglas & Leslie 1986; Wehausen et al. 1987; Jorgenson et al. 1997; McCarty & Miller 1998; Gaillard et al. 1998). We employed a simple density-dependent function such that recruitment was unaffected by density until a threshold density was attained. When density exceeded the patch threshold, we multiplied the current recruitment rate by a factor that declined linearly from 1 to 0. Reference parameters included a threshold density of sheep of $0.8/km^2$, above which recruitment declined to 0 at $1.16$ sheep/$km^2$ (45% greater than the density threshold). These parameters resulted in populations that stabilized at about 1 sheep/$km^2$, with fluctuations about the mean density consistent with observations of bighorn sheep within the Badlands ecosystem.

### Effects of Disease

Bighorn sheep are hosts to a wide variety of diseases that can increase mortality and reduce lamb recruitment (Goodson 1982; Jessup 1985; Bunch et al. 1999).

**Table 1.** Reference parameters for mortality and recruitment of bighorn sheep.

| Age (Yrs) | Age Class | Mortality Rate | Recruitment Rate |
|---|---|---|---|
| Females | | | |
| <1 | 1 | 0.00 | 0.00 |
| 1 | 2 | 0.20 | 0.26 |
| 2 | 3 | 0.05 | 0.37 |
| 3–8 | 4 | 0.07 | 0.47 |
| 9–14 | 5 | 0.20 | 0.42 |
| Males | | | |
| <1 | 1 | 0.00 | |
| 1 | 2 | 0.30 | |
| 2–3 | 3 | 0.16 | |
| 4–7 | 4 | 0.08 | |
| 8–14 | 5 | 0.12 | |

Bronchopneumonia, usually involving *Pasteurella multocida* and/or *P. hemolytica*, has had a far more profound impact on bighorn sheep populations than any other disease (Bunch et al. 1999). Three types of pneumonia involving *Pasteurella* (verminous, peracute fibrinous, and acute to chronic bronchopneumonia) are known from bighorn sheep, and the severity of effects is highly variable. Epidemics are often associated with, and perhaps caused by, some form of stress, which can include high density, severe weather, lungworms, other disease (especially flu), or disturbance. In light of the complexities associated with modeling this range of diseases, we used a statistical model to simulate diseases that cause significant mortality in bighorn sheep (Woodard et al. 1974; Goodson 1982; Onderka & Wishart 1984; Festa-Bianchet 1988*b*, 1989; Coggins & Matthews 1992). To do so, we multiplied mortality, recruitment, and dispersal rates by variables that accounted for the response of bighorn populations to diseases with mild, moderate, or severe effects (Table 2). We obtained estimates of the effects of epizootics on the survivorship of desert bighorns from two sources. First, we extracted data on the survival of bighorn sheep from published information (Stelfox 1971; Thorne et al. 1979; Onderka & Wishart 1984; Coggins & Matthews 1992), emphasizing data from marked animals (Festa-Bianchet 1988*b*). Second, we used records from radiomarked animals in the Beaver Creek (Dinosaur National Monument, Colorado), Needles (Utah), and South San Juan (Utah) populations before, during, and after an active epizootic (F. J. Singer, unpublished data).

We modeled three levels of disease severity in bighorn sheep to reflect the high variability of effects of *Pasteurella*-caused disease observed in wild populations. Infected animals could transmit disease for five years, but the magnitude of effects diminished each year (Table 2). The mild disease scenario modified mortality and fecundity rates for three years, while effects of moderate and severe disease persisted for five years. No reliable data on effects of infection on dispersal rates were available, so we assumed that dispersal rates of all bighorn sheep were reduced during an active epizootic. This served to reduce the likelihood of transmitting an infection to an uninfected subpopulation. When an animal dispersed from an infected source population to an uninfected (target) population, the target population began a disease cycle at the next time step.

To evaluate effects of diseases that occurred with different frequencies, we simulated infections that occurred once, at regular intervals, or with a fixed probability each year. For a single epizootic, we introduced disease once into the population at year 20 of the simulation. We modeled the consequences of regular, repeated infections by introducing disease at regular intervals, from 15 to 60 years. Finally, we estimated the

BLM_0053132

**Table 2.** Multipliers used to account for effects of diseases with varying levels of severity on bighorn sheep mortality, recruitment, and dispersal. Years of infection with no effects are omitted. Effects of disease did not persist after 5 years.

| | | Mortality | | | | | |
| | | Male | | Female | | | |
| Year of Infection | | Yearling | ≥2 yrs | Yearling | ≥2 yrs | Recruitment | Colonization |
|---|---|---|---|---|---|---|---|
| **Mild** | | | | | | | |
| | 1 | 2.00 | 1.50 | 2.00 | 1.50 | 0.50 | 0.50 |
| | 2 | 1.35 | | 1.50 | | 0.70 | 0.66 |
| | 3 | 1.35 | | 1.50 | | | |
| **Moderate** | | | | | | | |
| | 1 | 3.33 | 3.00 | 4.00 | 3.00 | 0.33 | 0.50 |
| | 2 | 1.70 | 2.00 | 2.00 | 2.00 | 0.33 | 0.66 |
| | 3 | 1.70 | | 2.00 | | 0.33 | 0.66 |
| | 4 | 1.70 | | 2.00 | | 0.33 | 0.66 |
| | 5 | 1.70 | | 2.00 | | | |
| **Severe** | | | | | | | |
| | 1 | 3.33 | 5.00 | 4.00 | 4.00 | 0.10 | 0.50 |
| | 2 | 2.50 | 3.00 | 2.50 | 2.50 | 0.20 | 0.50 |
| | 3 | 1.80 | 2.00 | 1.80 | 1.80 | 0.40 | 0.50 |
| | 4 | 1.40 | 1.50 | 1.40 | 1.40 | 0.80 | 0.50 |
| | 5 | 1.20 | 1.30 | 1.20 | 1.20 | 0.90 | |

probability that a patch would be infected during a yearly time step from proximity to domestic sheep.

Previous studies (Goodson 1982) found a strong relationship between the incidence of disease in wild bighorn sheep populations and the distance separating wild and domestic sheep. We estimated the probability of disease as a function of distance from domestic sheep by examining disease status of 100 populations of bighorn sheep (period of observation 23.5 ± 12.9 years after removing herds with less than 10 years of data from the analysis; Singer et al. 2000a). For each population, we estimated the distance to domestic sheep and calculated the probability of disease as the reciprocal of the number of years that the bighorn sheep remained uninfected. Because some herds never contracted a detectable disease, we estimated an upper and lower bound for the probability of infection. We estimated the upper bound as the reciprocal of the number of years before a herd became infected, or, for herds that were not infected during the period of observation, as the reciprocal of number of years of observation. We estimated the lower bound as either the reciprocal of the number of years before a herd became infected, or we assigned a zero to herds that never contracted a detectable disease. We aggregated observations into four distance categories and used the resulting probabilities as model parameters (Fig. 2).

It was not possible to simply characterize the effects of disease severity in a spatially structured model because dispersal and infection confounded interpretation of the results. We therefore evaluated the effect of disease on population growth rates from the results of

250 simulations of a population restricted to a single 400 km² patches.

**Dispersal and Colonization**

The spatial structure of our model required an estimate for the probability that sheep would colonize unoccupied habitats. Bighorn sheep are poor at dispersing to and colonizing unoccupied habitats, but we found little information suitable for estimating model parameters. We, therefore, obtained information from 183 radiocollared sheep monitored over a four-year period from 31 populations translocated in Colorado, Wyoming, Utah, South Dakota, North Dakota, and Montana (mean pe-



Figure 2. Upper bounds (filled circles) and lower bounds (open circles) of the annual probability of infection of bighorn sheep as a function of distance from domestic sheep.

BLM_0053133

riod of observation per animal 30.3 ± 1.8 months). We evaluated rates of colonization of 77 nearby unoccupied patches that were observed for the duration of the translocation (mean duration 17 ± 12 years post-release per population). Each year, all nearby patches were scored as colonized or not colonized. Based on movements of these animals, we estimated the probability of colonization as a function of distance to an established herd. These data were best described by an equation that reflected observations that bighorn sheep most readily colonized patches at an intermediate distance, perhaps due to their gregarious nature. For simulations, we estimated the annual probability of colonization as seen in Equation 1

$$\text{probability of colonization} = 0.0751 e^{-0.5 \frac{(\text{distance} - 12.28)^2}{5.17}} \quad (1)$$

The maximum probability of dispersal (0.075) was to a patch 12.28 km away. No dispersal occurred from source populations that consisted of fewer than ten individuals or 10% of the patch threshold density (as defined above). When a simulated colonization occurred, a group of one male and four females moved from the source population to the target patch. The size and composition of the dispersing group were selected as a compromise. Because data used to derive the dispersal formula reflected population establishment (occupation by ≥2 animals) rather than exploratory movements, we minimized the size of the dispersing group while retaining a reasonable likelihood that a simulated colonization event would result in an established population (in the absence of disease). Preliminary simulations using a smaller dispersing group size resulted in unrealistically low rates of colonization.

### Stochasticity

Demographic processes were simulated by comparing a random number (0–1) from a uniform distribution to the parameter for recruitment or mortality rate. If the random number was less than the parameter, a lamb was recruited into the local population or an individual died. By comparing rates to random numbers, stochastic effects characteristic of small populations were included in the model. Sex ratio at birth, recruitment, dispersal, and mortality occurred with frequencies defined by such a process, and the frequency of outcomes followed a binomial distribution.

Variation in recruitment can result from environmental effects that cause the average rate to change over time. We modeled two sources of stochasticity to account for environmental variation. The first source represented density-independent effects that influenced average recruitment rate. We simulated these effects by

multiplying the average recruitment rate of each age class by an environmental multiplier drawn from a beta distribution. This type of variation could be due, for example, to a severe storm or other acute event. A second source of annual variation represented effects that were density-dependent and temporarily modified the average capacity of a patch to support bighorn sheep. Density-dependent effects operated only when the density of a local population exceeded the threshold size for a particular patch. We included this type of variation by multiplying estimated carrying capacity of each patch by a random number drawn from a normal distribution.

We estimated the magnitude of normal (reference) environmental variation by evaluating the contribution of environmental variation to yearly fluctuations in lamb production (Kendall 1998). We used maximum likelihood methods to partition variation in yearly recruitment rates of desert bighorn sheep (Leslie & Douglas 1979, table 8) into variation attributable to the binomial sampling process and that due to outside (environmental) variation. In our simulations, we multiplied recruitment rates by a beta-distributed random deviate and compared the maximum likelihood estimate of variance in lamb:female ratios from our simulated populations to those reported by Leslie & Douglas (1979). To do so, we conducted 500 simulations of a disease-free population in a single patch, without density-dependent processes. From the output of these runs, we used the bootstrap method (Efron & Gong 1983) to create 100 samples of eight years of data for which the number of females was within the range of observations reported by Leslie & Douglas (1979). We then calibrated our reference parameter for environmental variance until the maximum likelihood estimate of variance of the model output matched observations. We evaluated effects of increases or decreases in environmental variation by changing the variance of the beta distribution while holding the mean constant.

We evaluated effects of variability in habitat quality by conducting simulations in which the ability of each patch to sustain bighorn sheep was varied each year. Changes in patch quality modified the threshold density of bighorn sheep at which density-dependent reductions in recruitment occurred. We modified patch quality by drawing a random deviate from a beta distribution. Patch quality remained constant (i.e., no annual variation) during reference runs.

### Simulation Treatments

We first investigated model behavior without disease. Initial simulations evaluated changes in vital rates, patch area, dispersal, and stochasticity (Table 3). We imposed diseases that varied in intensity (mild to severe) and frequency (once, regular intervals, high and

BLM_0053134

**Table 3.** Range of parameter values used to evaluate bighorn sheep simulations. Most ranges are expressed as a percentage of the reference value.

| Factor | Reference Value | Minimum | Maximum |
|---|---|---|---|
| Recruitment | 100% | 85% | 110% |
| Mortality | 100% | 90% | 135% |
| Variance in recruitment[a] | 0.43 | 0 | uniform (0–1) |
| Dispersal | 100% | 10% | 400% |
| Habitat area | 100% | 50% | 200% |
| Variance in habitat quality | 0% | $CV = 10\%$ | $CV = 100\%$ |
| Disease frequency (cycle) | 0 | 60 years | 15 years |
| Disease frequency (/year) | 0 | 0.076 | 0.20 |
| First year disease severity[b] | 0% | 8% | 38% |

[a]Annual recruitment rates conformed to a beta distribution.
[b]Average population decrease in first year of infection.

low probability of infection), and we crossed some treatments (e.g., dispersal rate by disease severity and frequency).

## Results

Model projections using reference parameters were qualitatively similar to observations of successful bighorn sheep populations. Implicit variation due to sampling error and stochastic variation in vital and process rates resulted in a wide range of model behaviors. Nonetheless, the estimated size of the current population of bighorn sheep in the Badlands ecosystem (about 200) is nearly the same as the median (205) of the distribution of 250 simulations after a similar length of time (33 years after introduction; range = 15–620).

### Variation in Mortality, Recruitment, Area, and Colonization Rates Without Disease

Our reference parameters resulted in populations that tended to grow rapidly following reintroduction, and in the absence of disease all 250 simulated populations persisted for 200 years. Modeled populations typically grew to a size where density-related reductions in fecundity prevented further population growth and the total population averaged 410 individuals (SD = 112) at year 200. When evaluated by extinction rates, simulated populations were very robust to changes in rates of mortality and fecundity. A 35% increase in mortality rate increased the extinction rate to only 5% at year 200. While extinction rates were relatively insensitive to changes in vital rates, population sizes varied dramatically (Fig. 3), and a 35% increase in mortality rates resulted in a 50% reduction in overall population size.

In the absence of disease, large changes in the area of suitable habitat led to very small changes in extinction rates. A 50% reduction in area resulted in a very small increase in the rate of extinction (0–3%), but population sizes reflected overall area of suitable habitat. Because

density-dependence ultimately controlled population size, the average size of the bighorn population was strongly related to area, and a 50% reduction in area resulted in a reduction in population size from 410 ± 112 (mean ± SD) to 119 ± 59 individuals. Other treatments that modified carrying capacity by a similar degree would result in the same, rather small, changes in the probability of extinction (e.g., changing average habitat quality).

It was difficult to estimate yearly variation in habitat quality and recruitment, and we thus simulated a wide range of parameters to reflect this uncertainty (Table 3). Even large increases in yearly variability in recruitment rate resulted in virtually no long-term effects on population size or viability. Similarly, extinction rates were insensitive to changes in environmental variation that affected average recruitment rate or patch quality. In contrast, total population sizes were sensitive to annual variation in patch quality. Variation in patch quality di-



Figure 3. Average population size of simulated bighorn sheep populations with mortality rates that were 90–135% of reference values (Table 1), without disease. Lines, from top, are mean results from runs with mortality rates that were 90%, 95%, 105%, 110%, 115%, 120%, 125%, or 135% of reference values.

BLM_0053135

rectly affected the annual carrying capacity of a patch, and increases in variation resulted in lower average population sizes. As variation in patch quality increased, the distribution of population sizes at year 200 shifted toward smaller sizes (Fig. 4), dramatically so when the coefficient of variation exceeded 50%.

We modeled a wide range of colonization rates to reflect the difficulty in estimating parameters to describe movement rates. Extinction rates did not differ from 0 in simulations with colonization rates from 0.10 to 4 times the reference rate. However, average total population sizes after about year 20 diverged widely with changes in colonization rates. Higher colonization rates resulted in larger populations, which reflected the ability of simulated populations to colonize new patches and thereby delay the depressing effects of density dependence on recruitment (Fig. 5). Differences in average population size persisted throughout 200 years of simulation, and the distribution of population sizes at the end of the runs shifted toward larger sizes with increases in colonization rates.

**Effects of Disease**

The three levels of disease severity resulted in single-patch population reductions of 12–67% (Fig. 6) and populations that recovered sufficiently to attain a positive growth rate by the second (mild), fifth (moderate), or fourth (severe) year after infection.

Results from all model simulations were profoundly affected by the occurrence of disease. Even a single disease event depressed population growth for periods that exceeded two decades. Mild disease events tended to have more persistent effects than severe infections



Figure 5. Effects of dispersal on growth rate and average population size of bighorn sheep populations, without disease. Lines, from top, are mean results from simulations with dispersal rates that were 400%, 200%, 100%, 50%, 25%, and 10% of reference values.

(Fig. 7), because more severe diseases tended to reduce populations within a patch to a size that prevented dispersal of diseased individuals to other, uninfected, patches where they could initiate a new cycle of disease. Without dispersal of infected individuals, effects of disease on recruitment or mortality persisted for a maximum of 5 years.

Multiple infections resulted in dramatic decreases in mean population size and a large shift in the distribution of population sizes; at year 200, 33–88% of all populations contained 40 or fewer individuals. Recurrent infections with moderate or severe effects resulted in 200-year extinction rates of 18–75% (Fig. 8). Extinctions continued throughout the entire 200 years simulated,



Figure 4. Effects of annual variation in patch quality (expressed as the coefficient of variation, CV) on the distribution of simulated bighorn sheep population sizes at year 200, without disease. Populations were grouped into size categories of 40 (from 0–40 to 641–680; midpoints of categories are marked).



Figure 6. Effects of simulated disease with mild, moderate, or a severe impact on population size of bighorn sheep populations inhabiting a single 400 km² patch. Disease did not influence any parameter after five years from the time of infection.

BLM_0053136





Figure 8. Effects of disease severity and frequency of infection (years between infection) on extinction rate by year 200 of simulated bighorn sheep populations. Populations were infected at regular intervals of 15–60 years.

Figure 7. Effects of a single disease event (at year 20) with mild, moderate, or severe effects, and rate of dispersal on population size. Lines on graphs, from top at year 200, are for dispersal rates that were 400%, 200%, 100%, 50%, 25%, and 10% of reference values.

showing that populations initially surviving infections did not grow to a size where they were immune to the potentially catastrophic effects of subsequent disease events, even with a 60-year interval between infections.

When the frequency of disease was determined by proximity to domestic sheep (Figs. 1 & 2), extinction rates varied from 11 to 91% (Fig. 9). The lowest rate of extinction (11%) was obtained from simulations of low probability of infection and a high rate of dispersal (Fig. 2), while the highest rate (91%) resulted from high rates of infection with a low dispersal rate. In general, higher rates of dispersal resulted in fewer extinctions, but pop-

ulation sizes at year 200 were not strikingly different for simulations with dispersal rates that varied by a factor of 40 (Fig. 9). For all combinations of disease probability and dispersal rate, more than 50% of all simulations had populations of less than 40 animals at year 200.

## Discussion

Our analyses clearly demonstrate that disease, even of mild severity, has a more profound influence on bighorn sheep population dynamics than any other factor we examined. Habitat loss and fragmentation are most commonly identified as causes of imperilment (Flather et al. 1994), but disease may be the factor that finally results in extirpation or extinction. The importance of disease in conservation biology is likely to increase as humans restrict traditional movement patterns, concentrate animals in preserves, and increase rates of contact with exotic organisms (Scott 1988; Levins et al. 1994; Schrag & Wiener 1995). Epizootics are more likely among species whose habits permit efficient disease transmission, either by aggregating or from a social structure that predisposes animals to frequent contact. The social behavior of bighorn sheep clearly contributes to the perpetuation of disease in this species. Catastrophically high rates of wildlife mortality due to diseases may be more common than traditionally recognized. Recent examples among other species of particular conservation interest include mass mortality of seals (Geraci et al. 1982) and other marine mammals (Harwood & Hall 1990), black-footed ferrets (Thorne & Will-

BLM_0053137

*Bighorn Sheep Population Dynamics*



Figure 9. Persistence rates (upper plots) and average population size (lower plots) of simulated bighorn sheep populations subject to infection from nearby domestic sheep, using lower bounds for the probability of infection (Fig. 6). Lines show average results for simulations with colonization rates from 0.10–4 times reference values (legend on upper left plot). Disease effects were mild, moderate, or severe (left to right plots, respectively; Table 2).

iams 1988), and amphibians (Kiesecker & Blaustein 1997). Efforts to prevent introduction of pathogens are critical to successful restoration of bighorn sheep.

Conservation plans increasingly emphasize the role of corridors to mitigate effects of habitat fragmentation and loss. While the potential advantages of corridors are obvious, few studies of corridor efficacy have included costs of animal movements (Heinen & Merriam 1990; Soulé & Gilpin 1991; Hess 1996). Epidemiological models show that increased movement rates can be associated with increased prevalence and spread of disease (Mollison & Levin 1995). In contrast, our analyses of bighorn sheep in the Badlands ecosystem suggested that rates of movement have relatively little influence on 200-year persistence rates of diseased or healthy populations, even though high rates of colonization generally lead to much higher growth rates and larger populations. Among Badlands habitat patches, the probability of colonization was generally low and a single infection could result in extinction within the infected patch. With low movement rates, the disease usually did not persist in the population because it was not carried from the infected patch. Increased rates of movement facilitated disease transmission, but also buffered the effects of an epizootic by contributing to an existing spatial structure and overall larger population size. When colonization rates were low, the infected population was frequently the *only* local population, and its extinction represented extinction of the entire population. Populations had a high probability of survival if they consisted of more than one local population at the time of infection, or survived an infection with a moderate number of individuals. Persistence in the face of disease is clearly enhanced by larger population size (Gross et al. 1997).

High rates of colonization resulted in populations that consisted of more than one local population. When a single population was infected, dispersal events resulted in transmission of disease to other uninfected local populations where a new cycle of disease was initiated. This perpetuated the disease in the overall population and provided a new source from which infected animals could disperse. There was clearly a tradeoff between high rates of colonization that resulted in more rapid and sustained population growth rates, and transmission of disease that could result in extinction of one or more local populations. In our model, advantages of increased growth rate and a spatially structured population outweighed disadvantages of enhanced transmission of disease, and extinction rates declined as dispersal rates increased.

Hess (1994, 1996) emphasized caution when designing reserves where disease may be important, and he identified general factors that could lead to increased risk of extinction with enhanced movement rates in spatially structured populations. Hess (1996) concluded that highly contagious diseases of intermediate severity posed the greatest conservation risk. Results from our model support this conclusion. High mortality rates caused by severe disease resulted in a very rapid reduction in the size of a local population, frequently to a size less than the threshold for dispersal. Severe diseases tended to rapidly disappear from the population either because the infected local population died out or because the likelihood of dispersal was low and the disease was therefore not transmitted to another patch. Results from simulations of multiple infections were consistent with this interpretation, and disease-caused reductions in growth rates were most persistent for dis-

BLM_0053138

eases with mild effects (Fig. 7). Most theoretical analyses conclude that increased movement rates exacerbate effects of disease, because movements tend to enhance transmission and thereby permit diseases to remain in the population. In contrast, we observed higher rates of persistence and larger population sizes with higher rates of dispersal.

### Implications for Management

Simulations of the Badlands population showed that disease had a much greater impact than other factors we examined. The effects of disease may be exacerbated by competition with other ungulates (Hobbs et al. 1990). Thus, the most important management decisions are those that reduce the potential for disease transmission between domestic stock and bighorn sheep. These decisions could include fencing, modifying grazing patterns, or other actions that reduce contact between native and domestic sheep. In the absence of disease, bighorn sheep populations have the biotic potential to double in size every 4–5 years and they appear to be robust to substantial variation in annual rates of recruitment or mortality (Fig. 3; McCarty & Miller 1998).

Restoration efforts that enhance dispersal or acquire additional habitat are not likely to result in substantial changes in population dynamics of bighorn sheep in the Badlands ecosystem, assuming our reference parameters are realistic estimates. Simulations were far more sensitive to a proportional reduction in dispersal or area than to a similar gain of the same magnitude, and it is, therefore, important to prevent the loss of existing resources. Similarly, simulations were sensitive to annual variability in patch quality, and relatively short-term and inexpensive actions during the infrequent years when conditions are particularly harsh will help maintain population growth or size. These actions may include supplemental feeding, development of a water source, or habitat management (e.g., burning). As a caution, actions that increase the tendency of animals to aggregate may enhance disease transmission.

Our results emphasized the need to use multiple criteria when evaluating the outcome of simulation models. For example, reductions in the area of suitable habitat or rate of colonization had virtually no impact on population persistence, but changes to these parameters resulted in large changes in average population size and a notable shift in the distribution of population sizes.

### Conclusions

Simulations of bighorn sheep in the Badlands ecosystem clearly illustrated the importance of disease in wildlife populations, and the interaction of disease dynamics with factors that can be modified by management actions. Attempts to restore bighorn sheep populations are much more likely to succeed when animals are placed in areas with sufficient habitat, far from contact with domestic sheep. All simulated disease scenarios posed a significant threat to bighorn restoration (Figs. 8 & 9). Simulations suggested most bighorn populations will fail to persist in the face of moderate or severe disease when reinfection rate is greater than two or three times per century. Despite recent emphasis on connectivity and corridors, our results showed that in this system, increases in dispersal rate or habitat area were relatively unimportant when compared to disease prevention.

### Acknowledgments

We thank P. R. Krausman, M. Kotzman, and two anonymous reviewers for comments that greatly improved the manuscript, T. Kirchner and M. Coughenour for help with model design, and the USGS-BRD, Midcontinent Ecological Science Center for financial support.

### LITERATURE CITED

Bailey, J. A., and D. R. Klein. 1997. United States of America. Pages 307–316 in D. M. Shackleton, editor. Wild sheep and goats and their relatives. Status survey and conservation action plan for Caprinae. IUCN, Gland, Switzerland.

Berger, J. 1990. Persistence of different-sized populations: an empirical assessment of rapid extinctions in bighorn sheep. Conservation Biology 4:91–98.

Berger, J. 1999. Intervention and persistence in small populations of bighorn sheep. Conservation Biology 13:432–435.

Bleich, V. C., J. D. Wehausen, and S. A. Holl. 1990. Desert-dwelling mountain sheep: conservation implications of a naturally fragmented distribution. Conservation Biology 4:383–390.

Bleich, V. C., J. D. Wehausen, R. R. Ramey II, and J. L. Rechel. 1996. Metapopulation theory and mountain sheep. Pages 353–373 in D. R. McCullough, editor. Metapopulations and wildlife conservation. Island Press, Covelo, California.

Bunch, T. D., W. M. Boyce, C. P. Hibler, W. R. Lance, T. R. Spraker, and E. S. Williams. 1999. Diseases of North American wild sheep. Pages 209–237 in R. Valdez and P. R. Krausman, editors. Mountain sheep of North America. University of Arizona Press, Tucson.

Coggins, V. L., and P. E. Matthews. 1992. Lamb survival and herd status of the Lostine bighorn herd following a *Pasteurella* die-off. Proceedings of the Northern Wild Sheep and Goat Council 8:147–154.

Cohn, J. P. 1991. New focus on wildlife health. BioScience 41: 448–450.

DeAngelis, D. L., and L. J. Gross, editors. 1992. Individual-based models and approaches in ecology. Chapman and Hall, New York.

Dobson, A. P., and R. M. May. 1986. Disease and conservation. Pages 345–365 in M. E. Soulé, editor. Conservation biology: the science of scarcity and diversity. Sinauer Associates, Sunderland, Massachusetts.

Douglas, C. L. 1991. Predicting lamb survival from weather pat-

BLM_0053139

terns in Canyonlands National Park, Utah. Report to National Park Service, Las Vegas, Nevada.

Douglas, C. L., and D. M. Leslie, Jr. 1986. Influence of weather and density on lamb survival of desert mountain sheep. Journal of Wildlife Management **50**:153–156.

Efron, B., and G. Gong. 1983. A leisurely look at the bootstrap, the jackknife, and cross-validation. American Statistician **37**:36–48.

Festa-Bianchet, M. 1988*a*. Age-specific reproduction of bighorn ewes in Alberta, Canada. Journal of Mammalogy **69**:157–160.

Festa-Bianchet, M. 1988*b*. A pneumonia epizootic in bighorn sheep, with comments on preventive management. Proceedings of the Northern Wild Sheep and Goat Council **6**:66–76.

Festa-Bianchet, M. 1989. Individual differences, parasites, and the costs of reproduction for bighorn ewes (*Ovis canadensis*). Journal of Animal Ecology **58**:785–795.

Flather, C. H., L. A. Joyce, and C. A. Bloomgarden. 1994. Species endangerment patterns in the United States. USDA Forest Service General Technical Report RM-**241**:1–42.

Foreyt, W. J. 1989. Fatal *Pasteurella haemolytica* pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. American Journal of Veterinary Research **50**:341–344.

Foreyt, W. J., and D. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. Journal of Wildlife Diseases **18**:163–167.

Foreyt, W. J., K. P. Snipes, and R. W. Kasten. 1994. Fatal pneumonia following inoculation of healthy bighorn sheep with *Pasteurella haemolytica* from healthy domestic sheep. Journal of Wildlife Diseases **30**:137–145.

Gaillard, J.-M., M. Festa-Bianchet, and N. G. Yoccoz. 1998. Population dynamics of large herbivores: variable recruitment with constant adult survival. Trends in Ecology and Evolution **13**:58–63.

Geist, V. 1971. Mountain sheep: a study in behavior and evolution. University of Chicago Press, Chicago, Illinois.

Geraci, J. R., D. J. St. Aubin, I. K. Barker, R. G. Webster, V. S. Hinshaw, W. J. Bean, H. L. Ruhnke, J. H. Prescott, G. Early, A. S. Baker, S. Madoff, and R. T. Schooley. 1982. Mass mortality of harbor seals: pneumonia associated with influenza A virus. Science **215**:1129–1131.

Goodman, D. 1987. The demography of chance extinction. Pages 11–34 in M. E. Soulé, editor. Viable populations for conservation. Cambridge University Press, Cambridge.

Goodson, N. J. 1982. Effects of domestic sheep grazing on bighorn sheep populations: a review. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council **3**:287–313.

Gross, J. E., M. E. Moses, and F. J. Singer. 1997. Simulating desert bighorn sheep populations to support management decisions: effects of patch size, spatial structure, and disease. Desert Bighorn Council Transactions **41**:26–36.

Hansen, C. G. 1967. Bighorn sheep of the desert game range. Journal of Wildlife Management **31**:693–706.

Hansen, C. G. 1980. Population dynamics. Pages 217–235 in G. Monson and L. Sumner, editors. The desert bighorn sheep: its life history, ecology and management. University of Arizona Press, Tucson.

Harwood, J., and A. Hall. 1990. Mass mortality in marine mammals: its implications for population dynamics and genetics. Trends in Ecology and Evolution **5**:254–257.

Heinen, K., and G. Merriam. 1990. The elements of connectivity where corridor quality is variable. Landscape Ecology **4**:157–170.

Hess, G. R. 1994. Conservation corridors and contagious disease: a cautionary note. Conservation Biology **8**:256–262.

Hess, G. 1996. Disease in metapopulation models: implications for conservation. Ecology **77**:1617–1632.

Hobbs, N. T., J. A. Bailey, D. F. Reed, and M. W. Miller. 1990. Biological criteria for introductions of large mammals: using simulation models to predict impacts of competition. Transactions of the 55th North American Wildlife and Natural Resources Council 1990**:**620–632.

Hoefs, M., and I. Mc. T. Cowan. 1979. Ecological investigation of a population of Dall sheep (*Ovis dalli dalli* Nelson). Syesis **12**:1–81.

Houston, A., C. Clark, J. McNamara, and M. Mangel. 1988. Dynamic models in behavioral and evolutionary ecology. Nature **332**:29–34.

Jessup, D. A. 1985. Diseases of domestic livestock which threaten bighorn sheep populations. Desert Bighorn Council Transactions **29**:29–33.

Johnson, T. L., and D. M. Swift. 2000. A test of a habitat evaluation procedure for Rocky Mountain bighorn sheep. Restoration Ecology this issue.

Jorgenson, J. T., M. Festa-Bianchet, J. Gaillard, and W. D. Wishart. 1997. Effects of age, sex, disease, and density on survival of bighorn sheep. Ecology **78**:1019–1032.

Kendall, B. E. 1998. Estimating the magnitude of environmental stochasticity in survivorship data. Ecological Applications **8**:184–193.

Kiesecker, J. M., and A. R. Blaustein. 1997. Influences of egg laying behavior on pathogenic infection of amphibian eggs. Conservation Biology **11**:214–220.

Krausman, P. R. 1997. Regional summary. Pages 316–317 in D. M. Shackleton, editor. Wild sheep and goats and their relatives. Status survey and conservation action plan for Caprinae. IUCN, Gland, Switzerland.

Krausman, P. R., R. C. Etchberger, and R. M. Lee. 1993. Mountain sheep population persistence in Arizona. Conservation Biology **7**:219.

Leslie, D. M., Jr. 1980. Remnant populations of desert bighorn sheep as a source for transplantation. Desert Bighorn Council Transactions **24**:36–44.

Leslie, D. M., Jr., and C. L. Douglas. 1979. Desert bighorn sheep of the River Mountains, Nevada. Wildlife Monographs **24**:36–44.

Leslie, D. M., Jr., and C. L. Douglas. 1986. Modeling demographics of bighorn sheep: current abilities and missing links. Transactions of the North American Wildlife and Natural Resources Conference **51**:62–73.

Levins, R., T. Awerbuch, U. Brinkman, I. Eckardt, P. Epstein, N. Makhoul, C. A. de Possas, C. Puccia, A. Spielman, and M. E. Wilson. 1994. The emergence of new diseases. American Scientist **82**:52–60.

Lomnicki, A. 1988. Population ecology of individuals. Princeton University Press, Princeton, New Jersey.

Mangel, M., and C. Tier. 1993. Dynamics of metapopulations with demographic stochasticity and environmental catastrophes. Theoretical Population Biology **44**:1–31.

Manly, B. F. J. 1991. Randomization and Monte Carlo methods in biology. Chapman and Hall, London.

McCarty, C. W., and M. W. Miller. 1998. Modeling the population dynamics of bighorn sheep: a synthesis of literature. Colorado Division of Wildlife Special Report **73**:1–35.

McCutchen, H. E. 1981. Desert bighorn zoogeography and adaptation in relation to historic land use. Wildlife Society Bulletin **9**:171–179.

McQuivey, R. P. 1978. The desert bighorn sheep of Nevada. Nevada Department of Fish and Game Biological Bulletin **6**:1–81.

Miller, M. W., N. T. Hobbs, and E. T. Williams. 1991. Spontaneous pasteurellosis in captive Rocky Mountain bighorn sheep (*Ovis canadensis*): clinical, laboratory, and epizootiological observations. Journal of Wildlife Diseases **27**:534–542.

Mollison, D., and S. A. Levin. 1995. Spatial dynamics of parasitism. Pages 384–398 in A. P. Dobson and B. T. Grenfell, edi-

BLM_0053140

tors. Ecology of infectious diseases in natural populations. Cambridge University Press, New York.

Murie, A. 1944. The wolves of Mount McKinley. U.S. National Park Service, Fauna Series 5:1–238.

Murphy, E. C., and K. R. Whitten. 1976. Dall sheep demography in McKinley Park and a reevaluation of Murie's data. Journal of Wildlife Management **40**:597–609.

Onderka, D. K., and W. D. Wishart. 1982. Experimental contact transmission of *Pasteurella haemolytica* from clinically normal domestic sheep causing pneumonia in Rocky Mountain bighorn sheep. Journal of Wildlife Diseases **24**:663–667.

Onderka, D. K., and W. D. Wishart. 1984. A major bighorn sheep die-off from pneumonia in southern Alberta. Proceedings of the Northern Wild Sheep and Goat Council **4**:356–363.

Schrag, S. J., and P. Wiener. 1995. Emerging infectious diseases: what are the relative roles of ecology and evolution? Trends in Ecology and Evolution **10**:319–324.

Schwartz, O. A., V. C. Bleich, and S. A. Holl. 1986. Genetics and the conservation of mountain sheep *Ovis canadensis nelsoni*. Biological Conservation **37**:179–190.

Scott, M. E. 1988. The impact of infection and disease on animal populations: implications for conservation biology. Conservation Biology **2**:40–56.

Shackleton, D. R., C. C. Shank, and B. M. Wikeem. 1999. Natural history of Rocky Mountain and California bighorn sheep. Pages 139–191 in R.Valdez and P. R. Krausman, editors. Mountain sheep of North America. University of Arizona Press, Tucson.

Singer, F. J., V. C. Bleich, and M. A. Gudorf. 2000*a*. Restoration of bighorn sheep metapopulations in and near western national parks. Restoration Ecology this issue.

Singer, F. J., C. M. Papouchis, and K. K. Symonds. 2000*b*. Translocation as a tool for restoring populations of bighorn sheep. Restoration Ecology this issue.

Smith, T. S., J. T. Flinders, and D. S. Winn. 1991. A habitat evaluation procedure for Rocky Mountain bighorn sheep in the intermountain west. Great Basin Naturalist **51**:205–225.

Soulé, M. E., and M. E. Gilpin. 1991. The theory of wildlife corridor capability. Pages 3–8 in D. A. Saunders and R. J. Hobbs, editors. Nature conservation 2: the role of corridors. Surrey Beatty and Sons Pty Limited, Chipping Norton, New South Wales, Australia.

Spraker, T. R., and C. P. Hibler. 1982. An overview of the clinical signs, gross and histological lesions of the pneumonia complex in bighorn sheep. Proceedings of the Northern Wild Sheep and Goat Council **3**:163–172.

Stelfox, J. G. 1971. Bighorn sheep in the Canadian Rockies, a history 1800–1970. Canadian Field-Naturalist **85**:101–122.

Stelfox, J. G. 1976. Range ecology of Rocky Mountain bighorn sheep. Canadian Wildlife Service, Report Series No. 39.

Thorne, E. T., G. Butte, T. Varcalli, K. Becker, and S. Hayden-Wing. 1979. The status, mortality, and response to management of the bighorn sheep of Whiskey Mountain. Wyoming Game and Fish Department, Technical Bulletin 7.

Thorne, E. T., W. O. Hickey, and S. T. Stewart. 1985. Status of California and Rocky Mountain bighorn sheep in the United States. Pages 56–81 in M. Hoefs, editor. Wild sheep: distribution and management and conservation of sheep and closely related mountain ungulates. Special Report, Northern Wild Sheep and Goat Council, Whitehorse, Yukon, Canada.

Thorne, E. T., and E. S. Williams. 1988. Disease and endangered species: the black-footed ferret as a recent example. Conservation Biology **2**:66–74.

Valdez, R., and P. R. Krausman. 1999. Description, distribution, and abundance of mountain sheep in North America. Pages 3–22 in R. Valdez and P. R. Krausman, editors. Mountain sheep of North America. University of Arizona Press, Tucson.

Wehausen, J. D. 1999. Rapid extinction of mountain sheep populations revisited. Conservation Biology **13**:378–384.

Wehausen, J. D., V. C. Bleich, B. Blong, and T. L. Russi. 1987. Recruitment dynamics in a southern California mountain sheep population. Journal of Wildlife Management **51**:86–98.

Wishart, W. 1978. Bighorn sheep. Pages 161–172 in J. L. Schmidt and D. L. Gilbert, editors. Big game of North America–ecology and management. Stackpole Books, Harrisburg, Pennsylvania.

Woodard, T. N., R. J. Gutierrez, and W. H. Rutherford. 1974. Bighorn lamb production, survival, and mortality in south-central Colorado. Journal of Wildlife Management **38**:771–774.

Woodgerd, W. 1964. Population dynamics of bighorn sheep on Wildhorse Island. Journal of Wildlife Management **28**:381–391.

Young, T. P. 1994. Natural die-offs of large mammals: implications for conservation. Conservation Biology **8**:410–418.

BLM_0053141

# GUNNISON COUNTY

# COLORADO

# NORTH FORK VALLEY COAL RESOURCE SPECIAL AREA REGULATIONS

**Adopted by the Gunnison County Board of County Commissioners – November 18, 2003 BOCC Resolution No. 2003-62**

BLM_0053142

# NORTH FORK VALLEY COAL RESOURCE SPECIAL AREA

**DIVISION 1:**        **DESIGNATION**

**SECTION 1-101:**   **SPECIAL GEOGRAPHIC AREA DESIGNATION.**

The North Fork Valley Coal Resource Special Area (the "Coal Resource Special Area") has been designated by Gunnison County pursuant to Section 1-110 of the Gunnison County Land Use Resolution as a Special Geographic Area and is more fully described in Appendix A.

**DIVISION 2:**        **NORTH FORK VALLEY COAL RESOURCE SPECIAL AREA COAL MINING REGULATIONS.**

**SECTION 1-201:**   **PURPOSE OF COAL RESOURCE SPECIAL AREA COAL MINING REGULATIONS.**

The general purpose of the Coal Resource Special Area Coal Mining Regulations ("Regulations") is to recognize the unique importance of coal mining within the Coal Resource Special Area.  Gunnison County recognizes that:

1. Coal is a resource valuable to the United States, Colorado and Gunnison County that deserves to extracted and put to use;

2. Extraction of that resource causes impacts;

3. Extraction of that resource is heavily regulated by the federal and state governments; and

4. Gunnison County has a legitimate role in reasonably regulating the extraction of that resource.

In addition, the purposes of these Regulations are as follows:

A. **ENHANCE ABILITY TO MEET ENERGY NEEDS.**  To enhance the ability of existing Coal Mining Operations within the Coal Resource Special Area to meet the energy needs of our region, state and country.

B. **SIMPLIFY THE REGULATORY REVIEW PROCESS.**  To exempt existing Coal Mining Operations from permit requirements and to provide a simplified and expedited regulatory review process that does not duplicate state or federal processes for the responsible expansion and enlargement of Coal Mining Operations within the Coal Resource Special Area.

BLM_0053143

A.    **C.**    **PROTECT THE ENVIRONMENT; PUBLIC HEALTH, SAFETY AND WELFARE; PUBLIC SERVICES, FACILITIES AND PROPERTY.** To avoid or mitigate potential impacts to the environment, public services and facilities, property and public safety that are not addressed by other state or federal regulatory agencies with jurisdiction over Coal Mining Operations within the Coal Resource Special Area.

**SECTION 1-202:   ENFORCEMENT OF STATE AND FEDERAL PERMIT PROVISIONS.**

Nothing in these Regulations shall be construed as authorizing Gunnison County to enforce compliance with state and federal environmental or land use law or regulation or permit requirement or conditions. However, Gunnison County reserves the right to seek enforcement of same.

**SECTION 1-203:    APPLICABILITY OF THESE REGULATIONS.**

**A.**    **APPLICABLE TO COAL MINING OPERATIONS IN COAL RESOURCE SPECIAL AREA.** These Regulations shall apply to Coal Mining Operations within the North Fork Valley Coal Resource Special Area described in Appendix A.

**B.**    **RELATIONSHIP TO GUNNISON COUNTY LAND USE RESOLUTION.**

     **1.**    **COAL MINING WITHIN COAL RESOURCE SPECIAL AREA.** No provision of the Gunnison County Land Use Resolution shall apply to Coal Mining Operations within the Coal Resource Special Area unless otherwise specified herein.

     **2.**    **COAL MINING OUTSIDE COAL RESOURCE SPECIAL AREA.** All provisions of the Gunnison County Land Use Resolution shall apply to Coal Mining Operations outside the Coal Resource Special Area.

**C.**    **EXEMPTION FROM COAL RESOURCE SPECIAL AREA PERMIT REQUIREMENTS AND STANDARDS.**

     **1.**    **EXISTING COAL MINING OPERATIONS.** Existing Coal Mining Operations within the Coal Resource Special Area that register with the County under Section 1-205 of these Regulations are exempt from the requirement to obtain a Coal Mining Permit under Section 1-207, the Standards

BLM_0053144

under Section 1-208 and the Financial Security under Section 1-209.

2. **METHANE VENTING INTEGRAL AND ESSENTIAL TO COAL RESOURCE SPECIAL AREA COAL MINING OPERATION.**  Coal mine methane venting and all infrastructure associated therewith from a mine that is in compliance with these Regulations and that is an integral and essential component of the coal mining operation shall not be subject to these Regulations or any other County regulations otherwise applicable to oil and gas drilling and production.

3. **EXPLORATION.**  Coal exploration and all infrastructure associated therewith conducted under the grant of a federal coal lease or federal exploration permit, license or notice of intent to explore or written approval to explore, to confirm or establish coal reserves within the Coal Resources Special Area associated with Coal Mining Operations described in Section 1-203 C. 1. is exempt from the requirement to obtain a Coal Mining Permit under Section 1-207, the Standards under Section 1-208 and the Financial Security under Section 1-209.

4. **DECLARATORY RULING REGARDING EXEMPTIONS.**

   a. **DECLARATION REQUEST**.  Any coal operator may submit a written request to the Board of County Commissioners for a declaratory ruling as to whether proposed Coal Mining Operations of that Coal Operator fall within an exemption from these Regulations.  A copy of the request shall also be submitted to the Planning Director.

   b. **CONTENT OF REQUEST.**  The request for declaratory ruling shall include a brief explanation of the proposed activity and the reasons why the proposed activity falls within an exemption under these Regulations.

   c. **BOARD CONSIDERATION.**  The Board shall consider the request for a declaratory ruling within 30 days of the date of the next regularly scheduled meeting of the Board.  The person requesting the exemption may present information at the meeting.

BLM_0053145

    **d.**    **DECLARATION OF EXEMPTION**.  If the Board determines that the proposed Coal Mining Operations are exempt from these Regulations, it shall issue a declaration of exemption and no further review or approvals shall be required from the County for the extent of Coal Mining Operations described in the declaration of exemption.

**SECTION 1-204:**    **COMPLIANCE WITH SPECIAL AREA COAL MINING REGULATIONS.**

No person shall engage in Coal Mining Operations within the Coal Resource Special Area except in compliance with these Regulations.

**SECTION 1-205:**    **REGISTRATION OF EXISTING COAL MINING OPERATIONS.**

    **A.**    **REGISTRATION.**  Within sixty (60) days of the effective date of these Regulations, each coal operator within the Coal Resource Special Area shall submit a *Registration of Existing Coal Mining Operations* to the Planning Director.  The *Registration of Existing Coal Mining Operations* shall include the following information:

        **1.**    **NAME AND ADDRESS OF OPERATOR.**  The name and address of the operator.

        **2.**    **NARRATIVE.**  A written description, together with a map describing the nature, extent and location of all current, authorized and approved Coal Mining Operations, including the location of facilities, the number of employees, lease boundaries and permit boundaries approved pursuant to the Coal Rules and the State Coal Permit.

        **3.**    **PERMITS AND APPROVALS.**  A list of all principal operating permits, including the State Coal Permit.

    **B.**    **FINDING OF REGISTRATION COMPLETENESS.**  Within thirty (30) days of receipt of the *Registration of Existing Coal Mining Operations*, the Planning Director shall either issue a written Finding of Registration Completeness for the existing coal mining operation, or issue a deficiency letter identifying the additional information needed to complete the registration.

    **C.**    **FAILURE TO REGISTER.**  Any Coal Mining Operations within the Coal Resource Special Area that do not register with the County shall be subject to Section 1-208, *Standards for Expansion of Coal*

BLM_0053146

*Mining Operations Within the North Fork Valley Coal Resource Special Area.*

**SECTION 1-206:   NOTIFICATION OF COAL MINING OPERATIONS.**

**A.   NOTIFICATION REQUIRED.**  Prior to February 15 of each year, each coal operator with active Coal Mining Operations within the Coal Resource Special Area shall submit a *Notification of Coal Mining Operations* form to the Planning Department that shall contain the information in Section 1-206 B. of these Regulations for that coal operator's operations in the Coal Resource Special Area for the previous calendar year.

**B.   NOTIFICATION OF COAL MINING.**  The Planning Department shall provide, and the coal operator shall complete and submit the *Notification of Coal Mining Operations*  attached as Appendix B that shall include the following:

   **1.   NAME AND ADDRESS.**  Name and address of the reporting coal operator and the mine(s) operated by that operator within the Coal Resource Special Area.

   **2.   NOTIFICATION.**  A brief written description together with a map describing the nature, extent and location of all Coal Mining Operations conducted by that coal operator during the preceding calendar year within the Coal Resource Special Area which shall include the following:

      **a.   EXISTING OPERATIONS.**  The quantity of coal that was mined, the number of employees within the Coal Resource Special Area, any new or expanded operations, and the extent and location of significant surface disturbance and underground operations that occurred within the Coal Resource Special Area.

      **b.   PROPOSED OPERATIONS.**  A brief written description, together with a map, of all Coal Mining Operations proposed to be undertaken in the next calendar year including the maximum quantity of coal anticipated to be mined, the number of employees anticipated to be employed, the projected extent and location of significant surface disturbance and underground operations likely to occur within the Coal Resource Special Area.

BLM_0053147

    c.    **VIOLATIONS.**  For the preceding calendar year, a description of any violations of a local, state or federal environmental or land use law or regulation or permit requirement or condition of which the operator received notice and the status of any enforcement actions and compliance requirements**.**

**C.**    **ADDITIONAL INFORMATION.**  The Planning Director may request additional follow-up information that may be necessary for a complete description of the operations.

**SECTION 1-207:**    **COAL MINING PERMIT FOR EXPANSION OF COAL MINING OPERATIONS WITHIN THE COAL RESOURCE SPECIAL AREA**

**A.**    **PERMIT REQUIRED FOR EXPANSION.**  No person shall engage in the expansion of Coal Mining Operations within the Coal Resource Special Area after the effective date of these Regulations without first obtaining a Coal Mining Permit.

**B.**    **COAL MINING PERMIT APPLICATION SUBMITTAL REQUIREMENTS.**

    **1.**    **WRITTEN DESCRIPTION.**  The applicant shall submit a written description of the new or expanded mining operation together with a map showing the area within which the new mining operation or the expansion will occur.

    **2.**    **CONCURRENT APPLICATIONS.**  An applicant may apply concurrently to the County, and to state or federal permit agencies.

        a.    **INFORMATION SUBMITTED TO OTHER PERMITTING AGENCIES ACCEPTED AS SUBMITTAL.**  To the maximum extent feasible, Gunnison County will accept information submitted within an application to the Colorado Division of Mineral and Geology and any other state or federal agency as part of related permit processes to satisfy the submittal requirements of these Regulations.

        b.    **CONCURRENT PROCESSING.**  Gunnison County seeks to avoid duplicative regulatory controls or unnecessary delays.  Therefore, processing of an application for a permit normally will proceed concurrently with the processing of other required

BLM_0053148

federal or state applications.  However, final action of the application may not occur until a permit is issued by each other federal or state entity with applicable regulatory authority so that Gunnison County will have the benefit of the analysis and determinations by the other entity(s) in reaching its own decision.  In order to facilitate the processes of each other federal or state entity with applicable regulatory authority, when an application for permit under these Regulations is received by Gunnison County, the Planning Director shall review the application and inform each other entity with regulatory authority and the applicant of the preliminary and known primary issues of concern to Gunnison County.

    **c.**    **CONSIDERATION OF STATE OR FEDERAL CONDITIONS.**  Gunnison County shall consider the conditions of any related federal or state permit when processing an application for permit under these Regulations.

**3.**    **IMPACT REPORT.**  The applicant shall submit an impact report that describes how the new or expanded mining operation will comply with Section 1-208, *Standards for Expansion of Coal Mining Operations Within the North Fork Valley Coal Resource Special Area.*

**4.**    **DOCUMENTATION OF TECHNICAL INFEASIBILITY WAIVER**.  Documentation of the basis for any Technical Infeasibility Waiver from *Standards for Expansion of Coal Mining Operations Within North Fork Valley Coal Resource Special Area* that may be requested pursuant to Section 1-208 B. shall be submitted by the applicant.

**C.**    **PLANNING DIRECTOR REVIEW OF COAL MINING PERMIT APPLICATION.**

    **1.**    **RECEIPT OF APPLICATION BY PLANNING DIRECTOR.** Within thirty (30) days of receipt of the Coal Mining Permit Application, the Planning Director shall determine whether the application is complete and ready for review based upon the provisions of these Regulations.  If the Planning Director determines the application is not complete, the Planning Director, within said thirty (30) day period, shall send written notice to the applicant specifying the deficiencies.  **No** further

BLM_0053149

action shall be taken on the application until the deficiencies have been remedied.

2. **PUBLIC NOTICE AND COMMENT.**  Within fourteen (14) days of the Planning Director's completeness determination, the Planning Director shall publish a notice of the application in a newspaper of general circulation in Gunnison County and a newspaper of general circulation in Delta County.  The period for public comment shall be fourteen (14) days from the date of first publication of the notices.

3. **COORDINATION WITH STATE AND FEDERAL AGENCIES.**  In reviewing the application, the Planning Director shall consider permit and approval conditions imposed on the proposed Coal Mining Operations by state and federal regulatory agencies.  Where an applicant has chosen to submit concurrent applications to the County and to state or federal agencies, the Planning Director shall discuss preliminary issues of concern with those agencies.

4. **REQUEST FOR REVIEW BY CONSULTANTS**.  The Planning Director may obtain the professional analysis and recommendations of technical and legal consultants the Director deems appropriate and necessary to complete the review.  The applicant shall be responsible for the reasonable cost of consultant reviews.

5. **DECISION.**  The Planning Director shall review the application for a Coal Mining Permit and approve, approve with conditions or deny the application based upon compliance with Section 1-208, *Standards for Expansion of Coal Mining Operations Within the North Fork Valley Coal Resource Special Area*.  Unless the Planning Director determines and so advises the applicant that significant issues exist and additional time will be necessary to complete the appropriate review, a decision on the application for a Coal Mining Permit shall be issued within fourteen (14) days after the close of the period for public comment.

6. **NOTICE OF DECISION.**  Within one working day of the decision on the application for a Coal Mining Permit, the Planning Director shall notify in writing the applicant, the County Manager, the Board, the County Attorney, and the Delta County Planning Director of the decision to approve, approve with conditions or deny the application.  Upon request, other interested parties may submit their name to

BLM_0053150

the Planning Director to be placed on a list of persons who will be notified of any decision on the application for a Coal Mining Permit.

**D.     RECONSIDERATION OF PLANNING DIRECTOR DECISION BY BOARD OF COUNTY COMMISSIONERS.**

1.     **CALL-UP BY THE BOARD.**  Within fourteen (14) calendar days after receipt of the Notice of Decision, the Board may, at its discretion, decide to reconsider the Planning Director's Coal Mining Permit decision at the next regularly scheduled meeting of the Board for which proper notice can be accomplished.

2.     **REQUEST FOR RECONSIDERATION**.  Within seven (7) calendar days of the Notice of Decision the applicant or any aggrieved party may request that the Board reconsider the Planning Director's Coal Mining Permit decision at a public hearing scheduled no later than forty-five (45) days after receipt of the Notice of Decision**.**

3.     **HEARING NOTICE.**  No less than thirty (30) days prior to the date of the public hearing, written notice of the hearing shall be provided to the applicant, persons on the mailing list and property owners within 500 feet of the boundary of the Coal Resource Special Area, and shall be published one time in a newspaper of general circulation within Gunnison County and in Delta County.

4.     **DECISION BY THE BOARD.**  At the hearing, the Board may determine not to hear or if it does hear, may affirm, reverse and/or amend the Planning Director's Coal Mining Permit decision.  The Board may consider the evidence that was before the Planning Director, and any additional evidence that may be presented to the Board regarding compliance with Section 1-208, *Standards for Expansion of Coal Mining Operations Within the North Fork Valley Coal Resource Special Area.*

**E.     EFFECT OF PERMIT DECISION.**  Once a Coal Mining Permit has been issued pursuant to these Regulations, the County shall not impose additional regulatory requirements on the Coal Mining Operations unless there is a material change in the Coal Mining Operation from what was approved by the County or the additional regulatory requirement is necessary for the immediate preservation of the public health and safety.

BLM_0053151

**SECTION 1-208:     STANDARDS FOR EXPANSION OF COAL MINING OPERATIONS WITHIN THE NORTH FORK VALLEY COAL RESOURCE SPECIAL AREA.**

**A.     COMPLIANCE WITH STANDARDS REQUIRED.** Expansion of Coal Mining Operations within the Coal Resource Special Area shall comply with the following standards unless Gunnison County waives the standard in writing pursuant to Section 1-208 D., *Technical Infeasibility Waiver,* prior to initiation of the expansion.

**B.     EXISTING FACILITIES AND STRUCTURES EXEMPT FROM THESE STANDARDS**. Surface structures, infrastructure and features existing or permitted or approved as of the date of the adoption of these Regulations constituting or relating to Coal Mining Operations are exempt from these standards.

**C.     GENERAL STANDARDS APPLICABLE TO SURFACE STRUCTURES OR FEATURES OF EXPANDED COAL MINING OPERATIONS WITHIN THE COAL RESOURCE SPECIAL AREA.**

  **1.     SETBACKS.** Surface area disturbed by the expansion shall fall within the following setbacks:

  **a.     FEDERALLY, STATE, OR LOCALLY DEDICATED OPEN SPACE OR CONSERVATION AREAS.** No surface area disturbance caused by the expansion of the Coal Mining Operations shall occur in whole or in part closer than 1000 feet from a permanently dedicated federal, state, or local open space or conservation area unless a smaller setback has been approved by the federal, state or local entity with jurisdiction over the open space or conservation area.

  **b.     ADJACENT PROPERTY, IRRIGATION DITCH OR ROAD RIGHT OF WAY.** No excavation, deposit of overburden, nor stockpiling or other coal mining activities associated with expansions of Coal Mining Operations shall be permitted within 100 feet of the boundary of adjacent property, irrigation ditch or private right of way.

  **2.     PUBLIC ROADS**. Roads affected by expansions of Coal Mining Operations shall comply with the following requirements:

BLM_0053152

a. **IMPACT MITIGATION**. The applicant shall bear the proportionate cost of all public road and bridge improvements, repairs, and maintenance necessitated by the proposed coal mining operation.

b. **VEHICLE WEIGHT**. The weight of trucks shall not exceed federal, state or local government imposed road or bridge weight capacity on approved haulage routes.

c. **SEASONAL TRAFFIC LIMITATION.** As a condition of approval, the County may limit the number of trucks that may access the mine to avoid damage to roads caused by heavy vehicle use, weather conditions or water saturation.

3. **ROUTING**. Designation of construction and haul routes within the County for expansions of Coal Mining Operations shall comply with the following:

a. **TIMING OF HAUL TRAFFIC**. Timing of truck traffic may be controlled to prevent congestion or adverse noise impacts or safety risks.

b. **LOAD CONTROL**. Applicant shall prevent loss of loads and fugitive dust emissions during transit, and shall be responsible to ensure that haul routes are maintained in accordance with dust-suppressant methods required by applicable state or federal agency.

4. **TRUCK NOISE.** Mine haul trucks associated with expansions of Coal Mining Operations shall comply with Section 5-505 F.6. of the Gunnison County Land Use Resolution.

5. **WATER QUALITY.** The operations shall not cause significant net adverse effect/impact in the water quality or water pressure of any public or private water wells.

6. **WILDLIFE.** Surface disturbance caused by the expansion of the Coal Mining Operations shall not result in significant net

BLM_0053153

adverse effect/impact to sensitive wildlife habitat areas as defined by the Colorado Division of Wildlife.

7. **IMPACT MITIGATION.**  The applicant shall bear the proportionate cost to mitigate impacts to County caused by Coal Mining Operations under the standards in these Regulations.

8. **ACCESS TO RECORDS.**  All coal operators shall make and keep appropriate books and records covering their operations in the Coal Resource Special Area, from which they shall be able to make and substantiate the reports required by these Regulations.  Such books and records shall be kept on file and available for inspection by the County for a period of at least three (3) years.

9. **INSPECTION.**  The County may enter and inspect any property subject to these Regulations at reasonable hours for the purpose of determining whether a Coal Mining Operation is in violation of the provisions of these *Regulations*.

10. **EMERGENCY RESPONSE.**  New or expanded Coal Mining Operations shall provide a written emergency response plan for the potential emergencies that may be associated with the operation of the facilities.   The plan shall include a provision for the Operator to reimburse the appropriate emergency response service provider for costs incurred in connection with the emergency.

11. **WILDFIRE HAZARD.**  The expansion of Coal Mining Operations shall not cause a significant risk of wildfire hazard.

D. **TECHNICAL INFEASIBILITY WAIVER.**  The Planning Director may waive one or more of the *Standards for Expansion of Coal Mining Operations Within the North Fork Valley Coal Resource Special Area* if the applicant demonstrates to the satisfaction of the County that it is technically impracticable to comply with the standard(s).  To be granted a waiver from a standard for technical impracticability, the burden is on the applicant to demonstrate the following with clear and convincing evidence:

1. **NO TECHNOLOGY AVAILABLE.**  There is no reasonable technology generally available to conduct the coal mining operation in compliance with the County standard, and the

BLM_0053154

applicant will implement the best available technology to conduct the coal mining operation in compliance with the County standards to the maximum extent feasible; or

2.    **CONFLICT WITH STATE OR FEDERAL REGULATION.** Conduct of the coal mining operation in compliance with the County standard would result in an irreconcilable conflict with a state or federal mining regulation, condition or other requirement, and:

    **a.**    The state or federal requirement cannot be waived; and

    **b.**    Compliance with both the state or federal requirement and the County standard is not technically possible; and

    **c.**    The applicant will design, construct and operate the coal mining operation in compliance with County standards to the maximum extent feasible.

## SECTION 1-209:  FINANCIAL SECURITY FOR EXPANSIONS OF COAL MINING OPERATIONS.

Applicants for a Coal Mining Permit issued under these Regulations shall be required to provide financial security, to the extent not otherwise covered by the performance bond requirement of Rule 3 of the Coal Rules, in a form and amount identified by Gunnison County, to ensure timely and complete performance of all conditions of approval of a Coal Mining Permit.

## SECTION 1-210:    APPLICATION REVIEW AND ENFORCEMENT FEES.

The Board may establish from time to time by separate resolution fees for application review and enforcement for this Coal Resource Special Area.

## <u>DIVISION 3</u>        NORTH FORK VALLEY COAL RESOURCE SPECIAL AREA OIL AND GAS OPERATIONS.

## SECTION 1-301:    OIL AND GAS DRILLING AND PRODUCTION.

The Temporary Regulations for Oil and Gas Operations or other regulations that may be adopted by the County applicable to oil and gas drilling and production shall apply to oil and gas drilling and production within the North Fork Coal Resource Special Area.

## SECTION 1-302:    MINE METHANE VENTING AND USE.

BLM_0053155

A. **METHANE VENTING INTEGRAL AND ESSENTIAL TO COAL RESOURCE SPECIAL AREA COAL MINING OPERATION.** Coal mine methane venting from a mine that is in compliance with these Regulations and that is an integral and essential component of the coal mining operation shall not be subject to these Regulations or any other County regulations otherwise applicable to oil and gas drilling and production and such methane can be used by the Operator on-site.

B. **METHANE GAS PRODUCTION NOT INTEGRAL AND ESSENTIAL TO COAL RESOURCE SPECIAL AREA COAL MINING OPERATION**. The production and distribution of methane gas subject to the approval of the Colorado Oil and Gas Conservation Commission shall be subject to all County regulations applicable to oil and gas production, drilling and distribution, and these Regulations shall not apply to such production, drilling and distribution.

## <u>DIVISION 4</u>        GENERAL PROVISIONS

## SECTION 1-401:    CONSTRUCTION.

A. **LIBERAL CONSTRUCTION.** These Regulations and the terms herein are to be liberally construed to effect the purposes of these Regulations.

B. **MORE VERSUS LESS RESTRICTIVE REQUIREMENTS.** Where there exists a conflict or overlap between different requirements in these Regulations or between these Regulations, the Gunnison County Land Use Resolution and any other resolution, regulation or ordinance adopted by Gunnison County, or any other applicable state or federal requirement or statute, the requirement that is the more restrictive or particular shall prevail over that which is less restrictive or is more general.

C. **REQUIREMENTS ARE MINIMUM REQUIREMENTS.** The requirements of these Regulations shall be regarded as the minimum requirements necessary for the protection of the public health, safety, general welfare, and the environment.

D. **DELEGATION OF DUTIES BY DEPARTMENT HEAD.** Whenever a provision requires the Planning Director or the head of any other County department to perform an act or duty, it shall be construed to authorize the Planning Director, or the head of that other County department, to designate, delegate, and authorize subordinates to

BLM_0053156

perform the duty or act, unless the terms of the provision or section specify otherwise.

**E.**   **COMPUTATION OF TIME.**  The time in which an act is to be done shall be computed by excluding the first and including the last day. If a deadline falls on a weekend or County holiday, the deadline extends to the end of the next working day.  Time shall be based on calendar days, not working days, unless otherwise specified.

**1.**   **DAY.**  The end of a day shall be at 5:00 P.M.  Gunnison time.

**2.**   **WEEK.**  The word "week" shall mean seven days.

**3.**   **MONTH.**  The word "month" shall mean 30 days.

**4.**   **YEAR.**  The word "year" shall mean 365 days.

**F.**   **MEANINGS OF CERTAIN WORDS.**

**1.**   **SINGULAR / PLURAL.**  A word used in the singular may also be applied to several persons and things as well as to one person or thing.  The use of the plural number shall include any single person or thing, unless the context clearly indicates the contrary.

**2.**   **SHALL / WILL / MUST / MAY / SHOULD.**  "Shall", "will" and "must" all mean the provision is mandatory; "may" means it is permissive; "should" means it is preferred.

**3.**   **MASCULINE / FEMININE.**  The masculine gender shall include the feminine, and the feminine gender shall include the masculine.

**4.**   **CONJUNCTIONS.**  Unless the context clearly suggests otherwise, conjunctions shall be interpreted as follows:

**a.**   **"AND"** means that all connected items, conditions, requirements, or events apply.

**b.**   **"OR"** means that one or more of the connected items, conditions, requirements, or events apply.

**5.**   **COMMON / TECHNICAL TERMS.**  Words and phrases shall be construed according to the common usage of the term, but technical words and phrases that have acquired a

BLM_0053157

particular meaning shall be understood according to that particular meaning.

6.      **LISTS AND EXAMPLES.**  Unless otherwise specifically indicated, lists of items or examples that use terms including "for example" and "including" or similar language are intended to provide examples, not exhaustive lists of all possibilities.

## SECTION 1-402:    INTERPRETATION.

A.      **AUTHORITY.**  The Planning Director shall be authorized to make a written interpretation of the requirements of these Regulations.

B.      **INITIATION.**  A request for a written interpretation may be made by any person by submitting a written request to the Planning Director. The written request shall specify the provision of these Regulations for which an interpretation is requested.  The written request shall also state the factual basis for the request.

C.      **DETERMINATION OF COMPLETENESS FOR REVIEW.**  Within fifteen (15) days of receipt of the request for an interpretation, the Planning Director shall determine whether the request is complete, specific, and ready for review based upon the provisions of these Regulations.  If the Planning Director determines the request is not complete or specific, written notice shall be sent to the applicant specifying the deficiencies.  No further action shall be taken on the request until the deficiencies have been remedied.

D.      **RENDERING OF INTERPRETATION.**  Within thirty (30) days of determining that the request for an interpretation is complete, the Planning Director shall evaluate the application, consult with the County Attorney and other staff as necessary, and render a written interpretation.  When rendering the interpretation, the Planning Director shall consider the County's legislative intent in adopting the provision, as expressed in these Regulations, and as may be determined from the County's official records.

E.      **OFFICIAL RECORD.**  The Planning Department shall keep an official written record of all written interpretations that have been rendered.  The record shall be available at the Planning Department for public inspection, on reasonable request, during normal business hours.

F.      **APPEALS.**  Interpretations or final decisions rendered by the Planning Director may be appealed to the Board of Commissioners.

BLM_0053158

The appeal shall be submitted and considered in compliance with the requirements of Section 4-603: *Appeals* of the Gunnison County Land Use Resolution.

**SECTION 1-403:   SEVERABILITY.**

If any article, division, section, paragraph, clause, provision, or portion of these Regulations is determined to be unconstitutional or invalid by a court of competent jurisdiction, such determination shall not affect the validity of these Regulations as a whole or any part of these Regulations other than the part determined to be unconstitutional or invalid.  If any application of these Regulations to a particular structure, parcel of land, or body of water is determined to be unconstitutional or invalid by a court of competent jurisdiction, such determination shall not be applicable to any other structure, land, or water not specifically included or referenced in that judgment.

**SECTION 1-404:   AMENDMENTS.**

A. **PURPOSE.**  The purpose of this Section is to provide a process by which the Board may, from time to time, amend, supplement or repeal these Regulations.

B. **INITIATION.**  An amendment to these Regulations may be initiated by the Board, by the Planning Commission, the Planning Director, by any person who owns a legal interest in real property within the County, or by any person residing within the County.

C. **PROCESS.**  The following process shall apply to an application for an amendment to these Regulations:

1. **BOARD MOTION.**  The Board may initiate an amendment by motion directing the Planning Director to submit a proposed amendment and report to the Planning Commission for review and for further action pursuant to this Section.

2. **PLANNING COMMISSION INITIATIVE.**  The Planning Commission may initiate an amendment by submitting a written recommendation for proposed amendment to the Board.

3. **PROPERTY OWNER OR OTHER RESIDENT INITIATIVE.** An amendment may be initiated by a person who owns a legal interest in real property within the County, or by any person living within the County, by the submittal of an application to the Planning Department.

BLM_0053159

4.    **DRAFT OF PROPOSAL FOR AMENDMENT.**  Any initiative or application for amendment shall include at a minimum the following:

   a.    **IDENTIFICATION OF APPLICANT**.  If the applicant is a resident or property owner, the applicant's name, address and telephone number.  If the applicant is to be represented by an agent, a notarized letter signed by the applicant shall also be submitted, authorizing the agent to represent the applicant and stating the representative's name, address, and phone number.

   b.    **PRECISE WORDING.**  The precise wording of the proposed amendment, and the proposed section(s) that it will change, or to which it will be added.

   c.    **RATIONALE FOR PROPOSED AMENDMENT.**  A concise statement of the purpose and need for the proposed amendment.

5.    **PLANNING DEPARTMENT'S REVIEW.**  Review of the application for the proposed amendment shall be accomplished as specified in Section 4-110: *Planning Department's Review of Application* of the Gunnison County Land Use Resolution.

   a.    **REQUEST FOR REVIEW BY OTHER AGENCIES, DEPARTMENTS AND CONSULTANTS.**  The Planning Director may request that other agencies, departments and consultants review the proposed amendment.

6.    **PLANNING COMMISSION REVIEW.**  A complete copy of the application shall be forwarded to the Planning Commission, together with a copy of the Planning Department's report.  The Planning Commission shall review the application and shall make a recommendation to the Board to approve, approve with modifications, table for further study, or deny the proposed amendment.

7.    **BOARD PUBLIC HEARING.**  The Planning Commission's recommendations shall be forwarded to the Board, together with a complete copy of the application and a copy of the Planning Department's review.  The Board shall conduct a public hearing in compliance with Sections 4-112: *Notice of*

BLM_0053160

*Public Hearing* and 4-113: *Conduct of Public Hearing* of the Gunnison County Land Use Resolution.

8. **BOARD REVIEW AND ACTION.**  The Board shall consider the application, any relevant support materials, the Planning Department's report, the Planning Commission's recommendation, the public testimony and evidence given at the public hearing.  Following closure of the public hearing, the Board may, by written resolution, adopt the amendment, adopt the amendment with modifications, table for further study or deny the amendment.

9. **REVIEW STANDARDS.**  The wisdom of amending the text of these Regulations is a matter committed to the legislative discretion of the Board of County Commissioners and is not controlled by any one factor. In determining whether to adopt the proposed amendment, adopt the amendment with modifications, table for further study or deny the amendment, the Board of County Commissioners shall consider among other factors the following:

   a. **CONSISTENCY WITH ANY COMPREHENSIVE PLAN ADOPTED BY GUNNISON COUNTY.** Consistency of the proposed amendment with any comprehensive plan that may be adopted by Gunnison County.

   b. **CHANGED CONDITIONS.**  Changed conditions, including the economy of Gunnison County.

   c. **EFFECT ON THE NATURAL ENVIRONMENT.** Effect of the proposed amendment on the natural environment.

   d. **COMMUNITY NEEDS.**  Community needs.

   e. **DEVELOPMENT PATTERN.**  Development pattern.

   f. **CHANGES IN APPLICABLE LAW.**  Changes in applicable law.

   g. **PUBLIC HEALTH, SAFETY AND WELFARE.** Public health, safety and welfare.

   h. **COMPLIANCE WITH ANY APPLICABLE INTERGOVERNMENTAL AGREEMENTS**

BLM_0053161

**ADOPTED BY GUNNISON COUNTY**.  Compliance with any applicable intergovernmental agreements adopted by Gunnison County.

**SECTION 1-405:    INTENT TO NOT DUPLICATE OTHER PERMIT PROCESSES OR REQUIREMENTS.**

Gunnison County intends to avoid duplicative regulatory submittals or processes. Processing of applications for permits generally proceeds concurrently with other required state or federal agency permitting processes.

**SECTION 1-406:    RUNS WITH THE LAND.**

Any Coal Mining Permit issued under these Regulations shall run with the land that is the subject of the Coal Mining Permit.

**SECTION 1-407:    NO PRECEDENT.**

Neither the designation nor these Regulations, procedures or approvals hereunder shall be construed as a precedent for any other action.

**DIVISION 5        VIOLATIONS AND ENFORCEMENT PROVISIONS**

**SECTION 1-501:    VIOLATIONS AND ENFORCEMENT.**

Failure to comply with any provision of these Regulations shall be deemed a violation of the *Gunnison County Land Use Resolution* and shall be subject to enforcement under Chapter 7 of the *Gunnison County Land Use Resolution*.

**DIVISION 6        DEFINITIONS**

**SECTION 1-601:    RELATIONSHIP TO GUNNISON COUNTY LAND USE RESOLUTION.**

Unless otherwise defined below, the definitions of the *Gunnison County Land Use Resolution* set forth in Section 2-102, *Definitions* shall apply to these Regulations.

**SECTION 1-602:    DEFINITIONS**

    **A.**    **Aggrieved Parties.**  The applicant, the owner of the subject property, or any person, or member of the public.

    **B.**    **Coal Exploration.**  This term has the same meaning as defined in Section 1.04(22) of the Coal Rules which is as follows:  (a) the field gathering of surface or subsurface geologic, physical, or chemical

BLM_0053162

data by mapping, trenching, drilling, geophysical, or other techniques necessary to determine the quality and quantity of overburden and coal of an area;  (b) the disturbance of the natural land surface in the gathering of the environmental data to establish the conditions of an area before beginning surface coal mining and reclamation operations under the requirements of the Coal Rules; or (c) the gathering of any environmental data in an area designated unsuitable for surface Coal Mining Operations.

C.      **Coal Mining Operations**.  Coal exploration, development, extraction and reclamation and all activities incident to such operation, including without limitation coal mine methane venting and the use of vented coal mine methane for mining operations within the Coal Resource Special Area.

D.      **Coal Mine Methane Venting**.  The venting of methane from a Coal Resource Special Area coal mine necessary for worker safety, approved by the Division of Minerals and Geology, pursuant to a coal lease.

E.      **Coal Operator.**  Any person, firm, partnership, association, corporation or any department, division, or agency of any government engaged in coal mining.

F.      **Coal Resource Special Area.**  The North Fork Valley Coal Resource Special Area.

G.      **Coal Rules.**  The regulations of the Colorado Mined Land Reclamation Board for Coal Mining implemented pursuant to the Colorado surface Coal Mining Reclamation Act, Article 33 of Title 34, as amended of the Colorado Revised Statures, and found a 2 CCR 407-2.

H.      **Existing Coal Mining Operations.**

1.      Coal Mining Operations as of the effective date of these Regulations, allowed under a valid Gunnison County Land Use Change Permit and/or a valid Division of Minerals and Geology Permit, or

2.      Coal Mining Operations that are contiguous or adjacent to those Coal Mining Operations described in 1-602H.1 and that do not result in significant net adverse effect/impacts from new surface area disturbance after the effective date of these regulations.

BLM_0053163

I.      **Expansion.**  Coal Mining Operations that are not Existing Coal Mining Operations or that are not exempted under Section 1- 203 C. of these Regulations.

J.      **Non-Coal Resource Special Area Coal Mining Operation.**  A new or existing coal mining operation located wholly or partially outside the boundaries of the North Fork Valley Coal Resource Special Area.

K.      **North Fork Valley Coal Resource Special Area.**  That area of the County designated by the Board of County Commissioners as a special geographic area.

L.      **Oil and Gas Drilling, Production and Distribution.**  Exploration for oil and gas, including the conduct of seismic operations and the drilling of test bores; the siting, drilling, deepening, recompletion, reworking or abandonment of an oil and gas well; production operations related to any such well including the installation of flowlines and gathering systems; the generation, transportation, storage, distribution, treatment or disposal of exploration and production wastes; and any construction, site preparation, or reclamation activities associated with such operations.

M.      **Regulations.**  The North Fork Valley Coal Resource Special Area Regulations.

N.      **Significant Net Adverse Effect/Impact.**  An impact of an action, after mitigation, that is considerable or substantial, and unfavorable or harmful; includes social, economic, physical, health, aesthetic and historical impacts, and biological impacts including but not limited to, effects on natural resources or the structure or function of affected ecosystems.

O.      **State Coal Permit.**  The permit to conduct surface coal mining and reclamation operations issued by the Division of Minerals and Geology pursuant to the Coal Rules.

BLM_0053164

# APPENDIX A

The North Fork Valley Coal Resource Special Area is that area, within Gunnison County, known as the Somerset Coal Field which consists of lands shown on the United States Geological Survey (USGS) 7.5 Minute Quadrangle Maps for the Bowie, Somerset, Paonia Reservoir, Minnesota Pass and West Beckwith quadrangles.

All private lands contained within T13S, R89W, Sections 8, 9, and 16 are excluded from the designated North Fork Valley Coal Resource Special Area.

BLM_0053165

**APPENDIX B**

**Notification of Coal Mining Operations**
**(Pursuant to § 1-204 C)**

The undersigned, an officer of _____, hereby certifies to the best of his or her knowledge as follows:

     1.   _____ is a _____ [corporation/partnership] with an address at _____, _____, _____.

     2.   _____ is a coal mining operator within the Gunnison County North Fork Valley Coal Resource Special Area (the "Special Area").

     3.   During the calendar year ending December 31, 20\_\_ (the "Calendar Year") _____ mined and shipped _____ tons of coal from its _____ Mine in the Special Area from lands shown on a map attached hereto as Exhibit A. _____'s permits and approvals allow it to mine _____ tons of coal from the lands permitted to it from the _____ Mine.

     4.   During the Calendar Year, _____ employed a maximum of _____ and minimum of _____ employees at its _____ Mine.

     5.   During the Calendar Year the following significant changes in _____ coal mining operations occurred since the prior calendar year:

     6.   During the calendar year which commenced on January 1, 20\_\_, _____:

         (a)   intends to conduct the following coal mining operations at its _____ Mine, which intended operations are depicted on the map attached hereto as Exhibit C:

         (b)   intends to employee a minimum of _____ employees and a maximum of _____ employees;

         (c)   anticipates it will mine and ship _____ tons of coal from its _____ Mine; and

BLM_0053166

(d)     anticipates its underground mining operations shall be conducted on the lands depicted as such on Exhibit C.

7.     A listing of all unremedied environmental and land use violations, notice of which was received by _____ during the Calendar Year relating to local, state or federal environmental or land use laws, regulations, permit requirements or conditions and the status of any enforcement action and compliance requirements related thereto is attached hereto as Exhibit D.

_____

By:_____
        Vice-President

BLM_0053167

# GUNNISON COUNTY COLORADO

# TEMPORARY REGULATIONS FOR OIL AND GAS OPERATIONS

**Adopted by the Gunnison County Board of County Commissioners – May 9, 2003
BOCC Resolution No. 2003-50**

Amended – May 18, 2004   BOCC Resolution No. 2004-27

BLM_0053168

## GUNNISON COUNTY, COLORADO
## TEMPORARY REGULATIONS FOR OIL AND GAS OPERATIONS

### SECTION 1-101:   PURPOSE.

**A.**   **GENERAL PURPOSE.**   The purpose of these *Regulations* is to establish temporary regulations that provide reasonable limitations and safeguards for the exploration and production of oil and gas resources in the County.  The goal is to provide a framework for the responsible exploration and production of oil and gas resources in a manner that conserves other natural resources, that is sensitive to surrounding land uses, and that mitigates adverse impacts to and protects the public health, safety, welfare and the environment of the County.

**B.**   **INTENT TO NOT DUPLICATE OTHER PERMIT PROCESSES OR REQUIREMENTS.**   The County intends to avoid duplicative permit processes or requirements.   The County will review permit applications concurrently with other required state or federal agency permitting processes whenever possible.

**C.**   **RELATIONSHIP TO THE GUNNISON COUNTY LAND USE RESOLUTION.**   These *Regulations* are intended to be a stand-alone document and are not an amendment to or a Section of the *Gunnison County Land Use Resolution.*  These *Regulations*, in lieu of the *Land Use Resolution*, shall apply to Oil and Gas operations.

**D.**   **RELATIONSHIP TO OTHER GUNNISON COUNTY REQUIREMENTS.**   Any and all Oil and Gas Operations and any and all maintenance to or on an Oil or Gas Well, production facility, or pipeline shall require compliance with all applicable Gunnison County Regulations and requirements including but not limited to the Gunnison County Standards and Specifications for Road and Bridge Construction and the Gunnison County Overweight Vehicle Permit requirements.

### SECTION 1-102:   AUTHORITY.

These *Regulations* are authorized by, *inter alia*, Section 30-28-101, et seq.; Section 30-28-201, et seq.; and Section 29-20-101, et seq., C.R.S.

BLM_0053169

**SECTION 1-103:   APPLICABILITY.**

**A.    ALL OIL AND GAS OPERATIONS SHALL COMPLY WITH THIS REGULATION.**  All Oil and Gas Operations in the unincorporated areas on public and private land within the County shall comply with these *Regulations*.

**B.    OIL AND GAS PERMIT REQUIRED.**  No person shall engage in, cause, allow or conduct any Oil and Gas Operations prior to obtaining an Oil and Gas Permit unless the Operations fall within the exemption in Section 1-103C.

**C.    OIL AND GAS OPERATIONS EXEMPTED FROM SUBMITTAL AND REVIEW REQUIREMENTS.**   The following Oil and Gas Operations are exempt from these *Regulations*:

   **1.    MAPPING ACTIVITIES.**  Mapping activities that do not result in any surface disturbance.

   **2.    EXISTING OIL AND GAS OPERATIONS.**   Operation and maintenance of well sites, wells and pipelines, that are legal nonconforming uses under Section 1-103 D.   Any expansion of a nonconforming Oil and Gas Operation shall comply with Section 1-103 D.

   **3.    COAL MINE METHANE VENTING INTEGRAL AND ESSENTIAL TO EXISTING COAL MINING OPERATION.** Coal mine methane venting from a permitted coal mine, that does not produce or distribute methane off-site, and that is an integral and essential component of the existing coal mine, shall not be subject to these *Regulations*.

**D.    NONCONFORMITIES.**    Within    unincorporated    Gunnison County, there are Oil and Gas Operations that were legally established before the effective date of these *Regulations* that do not conform to the legal requirements of these *Regulations*. The purpose of this Section is to regulate those nonconforming Operations.

   **1.    NON-ABATEMENT PROVISION.**  Unless otherwise stated herein, it is the intent of this subsection that nonconforming Oil and Gas Operations that were legally established before the effective date of this *Regulation* be permitted to continue.

   **2.    CONTINUED OPERATION OF LEGALLY ESTABLISHED NONCONFORMING OIL AND GAS OPERATIONS SHALL**

BLM_0053170

**BE ALLOWED.** Legally established non-conforming Oil and Gas Operations, including ordinary repairs and maintenance thereto, shall be allowed to continue, so long as they remain otherwise legal and comply with the requirements of these *Regulations*.

3.      **LIMITED EXTENSION OR EXPANSION.** A legal nonconforming Oil or Gas Operation shall only be extended, expanded or altered in a manner that decreases or does not expand, the nonconforming use

   a.      **EXTENSION OR EXPANSION ONTO LAND OUTSIDE OF PERMITTED AREA.** Any extension or expansion of a legal nonconforming Oil or Gas Operation onto land outside of a specified area used prior to the adoption of these *Regulations* shall comply with the requirements of these *Regulations*.

4.      **RELOCATION.** A legal nonconforming Oil or Gas Operation shall not be moved, in whole or in part, unless the relocation brings the Oil or Gas Operation into compliance with the requirements of this *Regulation*.

5.      **ABANDONMENT OF NONCONFORMING OIL OR GAS OPERATION.** If any legal nonconforming Oil or Gas Operation is abandoned for a period of one year, renewal of that use or the use of that structure shall not be initiated until after a review by the Planning Department has determined that the renewed use will not pose a threat to public health, safety, welfare or the environment. For the purpose of this subsection, "abandonment" means the intent to not continue the legally established nonconforming Oil or Gas Operation, coupled with the discontinuance of the nonconforming Oil or Gas Operation.

6.      **DAMAGE OR DESTRUCTION.** A legal nonconforming Oil or Gas Operation that is demolished or destroyed by an act of God or through any manner not willfully accomplished by or for the owner may be restored within one year of the damage or destruction as of right, regardless of the extent of demolition or destruction, conditioned upon issuance of each required permit, pursuant to these *Regulations*. A one time, two-year extension of the initial year may be granted by the Planning Director upon findings that:

BLM_0053171

  **a.**  **Hardship.** There would be a substantial hardship to the owner without the extension; and

  **b.**  **Substantial effort to restore**. Within the first eight months after the destruction, the owner has substantially cleaned up and removed, if unusable, the damaged Operation.

**E.**  **CLASSIFICATION OF IMPACT REVIEW FOR OIL AND GAS PERMIT.** Unless specifically exempt, Oil and Gas Operations shall be classified and reviewed within one of the three following classes of Oil and Gas Permits:

  **1.**  **OIL AND GAS PERMIT FOR NO SIGNIFICANT IMPACT OIL AND GAS OPERATION.** An application for an Oil and Gas Permit for a **No** Significant Impact Oil and Gas Operation shall be reviewed administratively by the Planning Department under Section 1-106A. An Oil and Gas Operation shall be classified as a **No** Significant Impact Oil and Gas Operation if it consists solely of the following elements:

  **a.**  The Oil and Gas Operation, without mitigation, in its proposed location is unlikely to have any significant adverse impact to the County taking into consideration the Oil and Gas Operation Standards in Section 1-107; and

  **b.**  The Oil and Gas Operation will consist solely of the installation or construction by one Operator of no more than five (5) wells, none of which are within one mile of each other, during the same calendar year, and there is no other well(s) existing or proposed within one mile of the proposed well(s); or

  **c.**  The Oil and Gas Operation will consist solely of the installation or construction by one Operator of no more than five (5) flowlines or gathering lines within one mile of each other during the same calendar year; or

  **d.**  The Oil and Gas Operation will consist solely of the installation or construction by one Operator of storage yards and construction staging areas disturbing one acre or less, during the same calendar year; or

BLM_0053172

e.      The Oil and Gas Operation is necessary to protect public health, safety, welfare or the environment.

For purposes of determining if an Oil and Gas Operation is a No Significant Impact Oil and Gas Operation, all proposed activities of the Operator within unincorporated Gunnison County shall be taken into consideration.

2.      **OIL AND GAS PERMIT FOR A MINOR OIL AND GAS OPERATION.**   Applications for a Minor Oil and Gas Operation shall be reviewed under Section 1-106B by the Planning Department and will require a public hearing and decision by the Planning Commission.   An Oil and Gas Operation shall be considered a Minor Oil and Gas Operation if it consists of:

a.      The installation or construction by one Operator of a well within one mile of an existing or proposed well; or

b.      The installation or construction by one Operator of six (6) to ten (10) wells, none of which are within one square mile of each other during the same calendar year, and there is no other well(s) existing or proposed within one mile of the proposed well(s); or

c.      The installation or construction by one Operator of six (6) to  ten (10) flowlines or gathering lines, all within a square mile of each other during the same calendar year.

3.      **OIL AND GAS PERMIT FOR MAJOR OIL AND GAS OPERATION.**   An Oil and Gas Operation that is not classified or reviewed under Section 1-106A or under Section 1-106B shall require an Oil and Gas Permit for a Major Oil and Gas Operation.  An application for an Oil and Gas Permit for a Major Oil and Gas Operation shall be reviewed under Section 1-106C by the Planning Department, and shall require a joint public hearing by the Planning Commission and the Board with a recommendation from the Planning Commission to the Board, and decision by the Board.

BLM_0053173

**SECTION 1-104:    APPLICATION SUBMITTAL REQUIREMENTS FOR OIL AND GAS PERMITS**

**This Section shall apply to those Oil and Gas Operations not exempt under 1-103. C.**

A.  **APPLICATION TO PLANNING DEPARTMENT.**  An applicant seeking an Oil and Gas Permit to conduct an Oil and Gas Operation shall submit an application to the Planning Department containing the information in this Section 1-104.  An applicant may provide a copy of an Application for Permit to Drill or other application submitted to the Colorado Oil and Gas Conservation Commission and/or federal Environmental Assessment (EA) or Environmental Impact Statement (EIS) as documentation for one or more of the following submittal requirements in this Section 1-104 if it contains information sufficient to demonstrate compliance with these regulations and that information is highlighted.

B.  **PERMIT SUBMITTAL REQUIREMENTS FOR OIL AND GAS OPERATIONS**.  An applicant for a permit to conduct Oil and Gas Operations shall submit the following information:

   1.  **APPLICANT.** The name, address, telephone and fax numbers, and e-mail address for the applicant; and if the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and also stating the same information for the agent.

   2.  **SURFACE OWNERSHIP.**  Documentation of surface ownership, evidence of surface owner notification, and copies of any surface ownership agreements and leases affecting the area where the Oil and Gas Operation will be conducted.  Name, address, telephone and fax numbers and e-mail address of the owner of the property.

   3.  **MINERAL OWNER.**  Documentation of mineral ownership, including name, address, telephone and fax numbers and e-mail address of the owner of the mineral rights.

   4.  **PARCEL LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel on which the Operation is proposed to be located. A copy of the recorded deed or lease to the parcel should be included.

BLM_0053174

5. **IDENTIFICATION OF PREVIOUSLY APPROVED USES.** List any permits which have been previously approved for the parcel on which the Operation is proposed.

6. **CHARACTERISTICS AND CURRENT CONDITION OF THE OPERATION LOCATION.** Identification of physical characteristics and current conditions of the site where the Operation is proposed to occur, including streams, irrigation ditches, ponds, soils, roads, vegetation, geologic hazards, and any other characteristics requested by the Planning Department to determine potential impacts. Indications if trees or other vegetation have been removed and changes caused either by weather-related or human activity within the past five years.

7. **LIST OF ADJACENT LANDOWNERS.** A listing of all landowners and land uses that are adjacent to the boundaries of the parcel on which the project is proposed, including all properties that are separated from the parcel by a roadway or would be adjacent to the parcels except for the existence of the roadway. The source for the best-available information to identify those landowners is the Gunnison County Assessor's Office.

8. **VICINITY MAP.** A vicinity map which shall, at a minimum, include the following:

   a. **OPERATION LOCATION.** Location of the Operation on a United States Geological Survey quadrangle map or on a recorded plat if the proposed Oil and Gas Operation is within an approved subdivision, with the location highlighted so that it is easy to see.

   b. **TOPOGRAPHIC FEATURES.** Streams, lakes, ponds, wetlands, contour lines and elevations, within one mile of the proposed well pad.

   c. **ROADS.** All public and private roads that traverse and/or provide access to the proposed Oil and Gas Operation, and identification of the public or private entity having jurisdiction over each road(s).

   d. **EASEMENTS.** Easements recorded or historically used that provide access to or across, or other use of, the parcel.

BLM_0053175

    e.    **BOUNDARIES OF DISTRICTS, MUNICIPALITIES OR SUBDIVISIONS.** Locations of special district boundaries, municipalities or subdivisions within one mile of the site.

    f.    **PROXIMITY OF OTHER WELLS AND OTHER OIL AND GAS OPERATIONS.** Location of other wells and other Oil and Gas Operations within one mile of the site.

9.    **SITE PLAN MAP.** A map with north arrow and appropriate scale for the parcel where the Oil and Gas Operation will occur, indicating the following:

    a.    **EASEMENTS AND RIGHTS-0F-WAY.** Utility easements and rights-of-way.

    b.    **IMPROVEMENTS.** Existing improvements.

    c.    **PROPOSED FACILITIES.** Proposed facilities such as structures, pipelines, tanks, wells, pits, flow lines, impoundment facilities, staging and storage areas and equipment.

    d.    **SITE FEATURES.** Site features such as floodplains, waterbodies, drainage patterns, aquatic habitat, vegetative cover, wildlife migration routes and significant wildlife habitat.

    e.    **TOPOGRAPHY.** Existing and proposed topography at five-foot intervals or some other interval established by the Planning Department as necessary to portray the direction and slope of the area affected by the Oil and Gas Operation.

    f.    **LEASE BOUNDARY.** All boundaries of the lease(s) upon which the Operation will take place.

10.    **APPLICATIONS AND PERMITS.** Copies of all local, state and federal applications authorizing or required for the Operation, and permits, when issued.

11.    **OPERATION PLAN.** A plan including the method and schedule for drilling, completion, transporting, production and post-operation.

BLM_0053176

12. **WEED MANAGEMENT PLAN.** A plan for the management and prevention for noxious weeds on the site.

13. **ACCESS AND TRANSPORTATION ROUTES.** A map that identifies the access route to, and within the parcel, and a narrative estimating the number and types of vehicles anticipated per day, including weights, that will travel over the route.

14. **IDENTIFICATION OF WATER STRUCTURES.** Identification of irrigation ditches and other water structures, ownership of water rights appurtenant thereto, and evaluation of any impacts to the structures, water rights or water quality.

15. **ROADWAY IMPACT ANALYSIS.** An analysis of the impacts of the Operation to the roadway system within the County.

16. **WILDLIFE AND WILDLIFE HABITAT ANALYSIS.** After consultation with the Colorado Division of Wildlife and the U.S. Fish and Wildlife Service, the applicant shall provide an analysis of existing wildlife and sensitive wildlife habitat, an evaluation of the impacts of the Operation on wildlife and sensitive wildlife habitat, and proposed mitigation.

17. **VEGETATION.** A written description of the type, character, and density of existing and proposed vegetation on the parcel, a summary of the impacts of the Operation on vegetation, and proposed mitigation.

18. **EMERGENCY RESPONSE PLAN.** An emergency response plan that addresses fire protection and hazardous spills, including the name and contact information for the applicant's incident commander, proposed signage, access/evacuation routes, and health care facilities anticipated to be used. The plan shall include a provision for the Oil and Gas Operator to reimburse the appropriate emergency response service providers for costs incurred in connection with the emergency.

19. **WATER QUALITY NON-POINT SOURCE IMPACTS.**

   a. **IDENTIFICATION OF ALL WATER BODIES.** An inventory and location of all water bodies within one mile of the proposed Oil and Gas Operation.

BLM_0053177

    **b.**    **DESCRIPTION OF EXISTING WATER QUALITY.**  A description of existing water quality of all water bodies within one mile of the parcel, based upon a current baseline water quality analysis.

    **c.**    **NON-POINT SOURCE IMPACTS TO WATER QUALITY.**  A description of potential non-point source pollution associated with the proposed Oil and Gas Operation and proposed mitigation.

    **d.**    **MITIGATION AND AVOIDANCE.**  Proposed avoidance and mitigation measures to minimize the water quality impacts associated with the Operation. Proposed mitigation may include an erosion control plan required under this Section 1-104.

**20.**    **CULTURAL SURVEY.**  A cultural, historical, and archeological survey of the parcel prepared by a qualified professional.

**21.**    **DRAINAGE AND EROSION CONTROL PLAN.**  A plan that identifies existing and proposed drainage patterns and the methods for controlling erosion during construction and operation phases of the Operation.

**22.**    **WILDFIRE HAZARDS.**  An assessment of wildfire hazards within one mile of the site, and a plan for mitigating wildfire hazards.

**23.**    **GEOLOGIC HAZARDS.**  An assessment of the geologic hazards within one mile of the site, and a plan for mitigating geologic hazards.

**24.**    **EXISTING AND FUTURE LAND USES**.  A written summary of the existing uses of the parcel and the proposed future land uses of the parcel after completion of the Operation.

**25.**    **TECHNICAL INFEASIBILITY WAIVER.**  Documentation of the basis for any technical infeasibility waiver from the Oil and Gas Operation Standards that the applicant may request pursuant to Section 1-107P. of these *Regulations*.

**SECTION 1-105:**    **COORDINATION WITH STATE OR FEDERAL ACTIONS AND COUNTY PERMIT PROCESS.**

BLM_0053178

Final action by the County on an Oil or Gas Permit application may be delayed until any required Environmental Assessment (EA), Environmental Impact Statement (EIS) or other permit by a state or federal agency is issued, so that the County will have the benefit of the analysis and determinations made by other entities in reaching its own decision.

**SECTION 1-106:   PERMIT REVIEW PROCEDURES FOR OIL AND GAS OPERATIONS.**

**A.   GENERAL REVIEW PROCEDURES.**

1. **DETERMINATION OF COMPLETENESS BY PLANNING DEPARTMENT.** The Planning Department shall determine whether the application is complete and includes all of the required information. The Planning Department shall, within (ten) 10 days of receiving the application, notify the applicant in writing that the application is either complete or incomplete, or shall indicate a date by which such determination shall reasonably be made.

2. **APPLICATION IS NOT COMPLETE.** If the application is not complete, the Planning Department shall inform the applicant of the deficiencies in writing and shall take no further action on the application until the deficiencies are remedied.

   a. **FAILURE TO CORRECT CONSTITUTES WITHDRAWAL.** If the applicant fails to correct the deficiencies within 60 days of the postmarked or certified date of the mailing of the notification of incompleteness, the application shall be considered withdrawn.

3. **APPLICATION IS COMPLETE.** If the application is complete, the Planning Department shall certify it as complete, and if required, assign the application an agenda date with the applicable review body on the next available agenda, and provide notification of the meeting date to the applicant.

   a. **COMPLETENESS IS NOT A DETERMINATION OF COMPLIANCE.** A determination that an application is complete shall not constitute a determination that it

BLM_0053179

complies with the applicable standards of these *Regulations*.

4. **REVIEW BY REFERRAL AGENCIES.** Upon determination that the application is complete, the Planning Department may require the application materials or any portion thereof be submitted for professional analysis and recommendations by any other review agency, organization, or technical consultant deemed appropriate and necessary to complete the review, including other County offices and departments, municipal, state, or federal agencies having an interest in or authority over all or part of the proposal, and legal consultants. The referral agency review may include, but is not limited to, the Gunnison County Public Works Department, Colorado Division of Wildlife, Colorado Geological Survey, and the Colorado Oil and Gas Conservation Commission. The applicant shall be responsible for any costs associated with the referral. The referral review and comment period shall be twenty one (21) days from the date that the application is deemed complete.

B. **NO SIGNIFICANT IMPACT OIL AND GAS OPERATION ADMINISTRATIVE REVIEW.**

1. **DETERMINATION OF COMPLETENESS BY PLANNING DEPARTMENT.** The Planning Department shall make a determination of completeness following the procedure in Section 1-106A., prior to beginning any review of the application.

2. **REVIEW BY REFERRAL AGENCIES.** Upon determination that the application is complete, the Planning Department may require the application materials or any portion thereof to be submitted to a referral entity for review and comment.

3. **PUBLIC NOTICE.** Public notice shall been given in compliance with Section 1-108 and the following:

   a. **MAILING OF NOTICE.** The applicant shall be responsible for mailing a notice to affected parties as that term is used in Section 1-108 A. 2.

   b. **CERTIFIED MAIL.** The notice shall include a description of the Oil and Gas Operation, including a map showing the location of the proposed Operation

BLM_0053180

and shall be mailed by certified mail, return receipt requested.

**c.**   **PUBLICATION OF NOTICE.**   The Planning Department shall be responsible for publishing a notice of application and shall place a legal notice in the County's official newspaper(s) and in the Delta County Independent.   The applicant shall be responsible for the cost of publication.

**d.**   **COMMENT PERIOD.**   The comment period shall be fifteen (15) days from the latter of the date of certified mailing or the publication date of the notice of application.

**4.**   **ADMINISTRATIVE DECISION.**  Within thirty (30) days of the Notice to affected parties, the Planning Department may approve, approve with conditions, deny the application, or refer the application to the Planning Commission for review, based upon compliance of the Oil and Gas Operation with the Oil and Gas Operation Standards set forth in Section 1-107.

**5.**   **NOTICE OF ADMINISTRATIVE DECISION.**  Within five (5) working days of the decision on the application for a No Significant Impact Oil and Gas Operation Permit, the Planning Department shall notify in writing the applicant, the County Manager, the Board, the County Attorney, and the Delta County Planning Department of the decision to approve, approve with conditions or deny the application.

**6.**   **RECONSIDERATION OF ADMINISTRATIVE DECISION BY BOARD OF COUNTY COMMISSIONERS.**   Within fourteen (14) calendar days after receipt of the Notice of Administrative Decision, the Board may, at its discretion, decide to reconsider the Administrative Decision.

**a.**   **SCHEDULE RECONSIDERATION.**   If the Board decides to reconsider the Administrative Decision, the Planning Department shall schedule a hearing for reconsideration of the Administrative Decision to be held within twenty one (21) days of receipt by the Board of the Notice of Administrative Decision.

**b.**   **PUBLIC NOTICE.**  Notice of the reconsideration shall be published no less than thirty (30) days prior to the

BLM_0053181

date of the hearing, and written notice to adjacent property owners within 1500 feet of the parcel shall be mailed at least twenty (20) days prior to the hearing. The County will be responsible for publication of the Public Notice. The applicant shall be responsible for the cost of publication.

c.   **DECISION BY THE BOARD.** The Board may affirm, reverse and/or amend the Administrative Decision. The Board may consider the evidence that was before the Planning Department, and any additional evidence that may be presented to the Board regarding compliance with the requirements of these *Regulations*.

7.   **APPEAL TO BOARD OF COUNTY COMMISSIONERS.** Any person aggrieved by the Administrative Decision on a No Significant Impact Oil and Gas Operation permit application may appeal the Administrative Decision to the Board.

a.   **NOTICE OF APPEAL.** A written notice of appeal setting forth the reasons why the Board should revise or reverse the Administrative Decision shall be submitted to the Planning Department within ten (10) days of the Notice of Administrative Decision.

b.   **SCHEDULE PUBLIC HEARING.** The Planning Department shall schedule a hearing for the Board to hear the appeal and render its decision within forty-five (45) days of receipt of the Notice of Appeal.

c.   **PUBLIC NOTICE.** Notice of the hearing shall be published by the Planning Department no less than thirty (30) days prior to the date of the hearing, and written notice by the Planning Department shall be given to affected parties, that term is used in Section 1-108 A.2., at least twenty (20) days prior to the hearing. The County shall be responsible for publishing the Public Notice. The appellant shall be responsible for the cost of publication. If the Planning Department makes reasonable good faith efforts to accomplish the notice responsibilities identified above, then the failure of any property owner to receive notice shall not affect the validity of hearing or other conduct of the Board.

BLM_0053182

      **d.**    **DECISION BY THE BOARD.** The Board may affirm, reverse and/or amend the Planning Department's Administrative Decision. The Board may consider the evidence that was before the Planning Department, and any additional evidence that may be presented to the Board regarding compliance with the requirements of these *Regulations*.

**C.**    **MINOR OIL AND GAS OPERATION PERMIT REVIEW.**

   **1.**    **REVIEW BY PLANNING DEPARTMENT.**

      **a.**    **DETERMINATION OF COMPLETENESS BY PLANNING DEPARTMENT.** The Planning Department shall make a determination of completeness following the procedure in Section 1-106A, prior to beginning any review of the application.

      **b.**    **REVIEW BY REFERRAL AGENCIES.** Upon determination that the application is complete, the Planning Department may require the application materials or any portion thereof to be submitted to a referral entity for review and comment.

      **c**.    **PLANNING DEPARTMENT REPORT.** The Planning Department shall prepare a report that identifies whether the Oil and Gas Operation complies with the Oil and Gas Operation Standards set forth in Section 1-107 of these *Regulations*.

   **2.**    **REVIEW BY PLANNING COMMISSION.** The application for a Minor Oil and Gas Operation Permit shall be considered by the Planning Commission following a properly noticed public hearing.

      **a.**    **SCHEDULE PUBLIC HEARING BY PLANNING COMMISSION.** A public hearing by the Planning Commission shall be scheduled within forty-five (45) calendar days of the date of completeness determination.

      **b.**    **NOTICE OF HEARING.** Public notice shall be given in compliance with Section 1-108 and the following:

BLM_0053183

    **(1)**   **PUBLICATION OF NOTICE.**  The notice shall be published no less than fifteen (15) days prior to the date of the hearing.

    **(2)**   **NOTICE TO AFFECTED PARTIES.**  No less than fifteen (15) days prior to the date of the public hearing by the Planning Commission, the applicant shall provide written notice of the public hearing to affected parties as that term is used in Section 1-108 A. 2.

    **(3)**   **CERTIFIED MAIL.**  The applicant shall mail the Notice by certified mail, return receipt requested.

**3.**   **PLANNING COMMISSION DECISION.**  Following the public hearing, the Planning Commission shall approve, approve with conditions, or deny the application based upon the Oil and Gas Operation Standards set forth in Section 1-107 of these *Regulations*.

**4.**   **NOTICE OF PLANNING COMMISSION DECISION.**  Within ten (10) working days of the Planning Commission decision on the application for a Minor Oil and Gas Operation Permit, the Planning Department shall notify in writing the applicant, the County Manager, the Board, the County Attorney, and the Delta County Planning Department of the decision to approve, approve with conditions or deny the application.

**5.**   **APPEAL TO BOARD OF COUNTY COMMISSIONERS.**  Any person aggrieved by the Planning Commission Decision on a Minor Oil and Gas Operation Permit application may appeal the decision to the Board of County Commissioners.

    **a.**   **NOTICE OF APPEAL.**  A written notice of appeal setting forth the reasons why the Board should revise or reverse the Planning Commission decision shall be submitted to the Planning Department within ten (10) days of the Notice of Planning Commission Decision.

    **b**.   **SCHEDULE PUBLIC HEARING.**  The Planning Department shall schedule a public hearing for the Board to hear the appeal and render its decision within forty-five (45) days of receipt of the Notice of Appeal.

BLM_0053184

c.    **PUBLIC NOTICE.**  Notice of the public hearing shall be published no less than thirty (30) days prior to the date of the hearing, and written notice to affected parties as that term is used in Section 1-108 A. 2 shall be mailed at least twenty (20) days prior to the hearing.  The County shall be responsible for publishing the Public Notice.  The appellant shall be responsible for the cost of publication.

d.    **DECISION BY THE BOARD.**  The Board may affirm, reverse and/or amend the Planning Commission's decision on the Minor Oil and Gas Operation Permit. The Board may consider the evidence that was before the Planning Commission, and any additional evidence that may be presented to the Board regarding compliance with the requirements of these *Regulations*.

D.    **MAJOR OIL AND GAS OPERATION PERMIT REVIEW.**

1.    **REVIEW BY PLANNING DEPARTMENT.**

a.    **DETERMINATION OF COMPLETENESS BY PLANNING DEPARTMENT.**  The Planning Department shall make a determination of completeness following the procedure in Section 1-106A., prior to beginning any review of an application under these *Regulations*.

b.    **REVIEW BY REFERRAL ENTITIES**.  Upon determination that the application is complete, the Planning Department may require the application materials or any portion thereof to be submitted to a referral entity for review and comment.

c.    **PLANNING DEPARTMENT REPORT.**  The Planning Department shall prepare a report that identifies whether the Oil and Gas Operation complies with the Oil and Gas Operation Standards set forth in Section 1-107.

2.    **REVIEW BY PLANNING COMMISSION.**  The application for a Major Oil and Gas Operation Permit shall be considered by the Planning Commission following a properly noticed public hearing to be conducted jointly with the Board of County Commissioners.

BLM_0053185

a.  **SCHEDULE JOINT PUBLIC HEARING BY BOARD AND PLANNING COMMISSION.**  A joint public hearing by the Board and the Planning Commission shall be scheduled within forty-five (45) calendar days of the date of completeness determination.

b.  **PUBLIC NOTICE OF HEARING.**  Public notice shall been given in compliance with Section 1-108 and the following:

(1)  **PUBLICATION OF NOTICE.**  The notice shall be published no less than thirty (30) days prior to the date of the hearing.

(2)  **NOTICE TO AFFECTED PARTIES.**  No less than thirty (30) days prior to the date of the public hearing, the applicant shall provide written notice to affected parties as that term is used in Section 1-108 A. 2.

(3)  **CERTIFIED MAIL.**  The applicant shall mail the Notice by certified mail, return receipt requested.

3.  **PLANNING COMMISSION RECOMMENDATION.**  Following the joint public hearing, the Planning Commission shall recommend to the Board that the application for a Major Oil and Gas Operation Permit be approved, approved with conditions, or denied, based upon the Oil and Gas Operation Standards set forth in Section 1-107.

4.  **REVIEW AND DECISION BY BOARD OF COUNTY COMMISSIONERS.**  Following the joint public hearing, and after considering the recommendation of the Planning Commission, the Board shall approve, approve with conditions, or deny the application for a Major Oil and Gas Operation Permit, based upon the Oil and Gas Operation Standards set forth in Section 1-107.  If the Operation complies with the Oil and Gas Operation Standards, the application shall be approved.  If the Operation does not comply with the Oil and Gas Operation Standards, it shall be denied, or conditions shall be imposed to ensure compliance with the Oil and Gas Operation Standards.

**SECTION 1-107:   OIL AND GAS OPERATION STANDARDS**.

BLM_0053186

An Oil and Gas Operation shall comply with the following standards and criteria unless a Technical Infeasibility Waiver is granted under Section 1-107P:

**A.** **DRAINAGE AND EROSION CONTROL.**  The Oil and Gas Operation shall not cause significant erosion or sedimentation and shall be conducted in accordance with the drainage and erosion control plan.

**B.** **ACCESS ROADS.**  All public access roads, under the jurisdiction of Gunnison County, shall be constructed and maintained in compliance with the *Gunnison County Standard Specifications for Road and Bridge Construction*, as necessary to accommodate the traffic and equipment related to the Oil and Gas Operation and emergency vehicles.

**C.** **PUBLIC ROADWAY AND TRAFFIC IMPACTS**.

    **1.** **INGRESS AND EGRESS.**  Ingress and egress points to public roads shall be located, maintained and improved to assure adequate capacity for efficient movement of existing and projected traffic volumes and to minimize traffic hazards.

    **2.** **MAINTENANCE AGREEMENT OR FINANCIAL ASSURANCE.**  If the projected use of the public roads resulting from the Oil and Gas Operation will result in a need for an increase in roadway maintenance or snow removal, the County shall require the Operator to:  i) enter into an agreement with the County whereby the operator provides for private maintenance and snow removal, or reimburses the County for such increased costs; and/or ii) provide a bond or other financial assurance in an amount acceptable to the County to cover the costs of impacts to the roads.

**D.** **WILDLIFE AND WILDLIFE HABITAT.**  The Oil and Gas Operation shall not cause significant degradation of wildlife or sensitive wildlife habitat.

**E.** **LIVESTOCK AND LIVESTOCK GRAZING**.  The Oil and Gas Operation shall not cause significant impact to livestock, grazing permits, or grazing permittees.  Fencing or other agreements between private grazing operations and the Oil and Gas Operator may be used to satisfy this requirement.

**F.** **RECREATION IMPACTS.**  The Oil and Gas Operation shall not cause a significant degradation in the quality or quantity of

BLM_0053187

recreational activities in the County such as hunting, hiking, skiing or related activities.

**G.    WATER QUALITY.**

    **1.    NO SIGNIFICANT DEGRADATION.**   The Oil and Gas Operation shall not cause significant degradation in the quality or quantity of surface waters from the addition of non-point source pollution.

    **2.    WATER WELLS.**   The Oil and Gas Operation shall not cause significant degradation in the water quality or water pressure of any public or private water wells.

**H.    WATERBODY SETBACKS.**  Activities associated with the Oil and Gas Operation shall be located a minimum of 500 feet from any waterbody unless such a setback would interfere with spacing requirements established by the Colorado Oil and Gas Conservation Commission.

**I.    CULTURAL AND HISTORIC RESOURCES.**   The Oil and Gas Operation shall not cause significant degradation of cultural or historic resources.

**J.    WILDFIRE HAZARD.**  The Oil and Gas Operation shall not cause a significant risk of wildfire hazard.

**K.    GEOLOGIC HAZARDS.**   The Oil and Gas Operation shall not cause a significant risk of geologic hazards.

**L.    IMPACT MITIGATION COSTS.**   The Operator shall bear the proportionate cost of mitigating the impacts caused by the Oil and Gas Operation.

**M.    ACCESS TO RECORDS.**  Oil and Gas Operators shall make and keep appropriate books and records covering their Oil and Gas Operations.  Such books and records shall be kept on file and be available for inspection by the County during reasonable times for a period of at least five (5) years from final permit date of approval.

**N.    EMERGENCY RESPONSE.**  Oil and Gas Operations shall provide a written emergency response plan for the potential emergencies that may be associated with the operation of the facilities.  This shall include, but not be limit to any or all of the following: explosions, fires, gas or water pipeline leaks or ruptures, hydrogen sulfide or other toxic gas emissions, and hazardous material vehicle

BLM_0053188

accidents or spills.   Operation specific emergency preparedness plans are required for any Oil and Gas Operation that involves drilling or penetrating through known zones of hydrogen sulfide gas.   The plan shall include a provision for the Operator to reimburse the appropriate emergency response service provider for costs incurred in connection with the emergency.

O.   **FINANCIAL GUARANTEES.**  Financial security shall be provided by the Operator to guaranty any mitigation required by the County as a condition of approval of an Oil and Gas Permit.  The Operator shall enter into a Security Agreement with the County consistent with the following:

1.   **DEVELOPMENT IMPROVEMENT AGREEMENT SHALL BE REQUIRED.** When mitigation is a required component of an Oil and Gas Permit, the Board shall require as a condition of permit approval that the Operator execute and fund with Gunnison County a Development Improvement Agreement acceptable to Gunnison County in form and substance, and amount and type of security. The Development Improvement Agreement shall constitute the Operator's agreement to perform all conditions, identified as requirements of Permit approval. The Development Improvement Agreement shall specifically identify such requirements including plans, drawings and schedules for completion and shall be substantially in the form referenced in Appendix A, attached hereto and incorporated herein.

2.   **FINANCIAL SECURITY.**  The Development Improvement Agreement shall require the Operator to provide to the County a guarantee of financial security, acceptable to the County, in an amount established by the Board based on no less than 125 percent of the estimated cost of the conditions to be performed, and payable on demand to the County. The purpose of the guarantee of financial security is to assure that the public and private improvements, and all other conditions identified as requirements of Permit approval are timely and fully completed, that all mitigation requirements and permit conditions are timely and fully performed, and that all impacted areas are timely and fully reclaimed.

3.   **ENSURED COMPLETION OF CONDITIONS.**  The Development Improvement Agreement shall provide that if the Board determines that any of the required conditions are not performed as provided in the Agreement, including reasonable requirements for the correction of deficiencies

BLM_0053189

upon notice thereof, the Board may draw upon the financial security as may be necessary to complete the improvements in accordance with the specifications included in the Agreement and the Board may exercise any or all of the other remedies available to it pursuant to the Agreement and these *Regulations*.

4.      **CERTIFICATION OF COMPLETION AND RELEASE OF SECURITY.** The Development Improvement Agreement may include requirements for certification of completion, partial releases of the security, hold-over of security to ensure repairs or replacement, demonstrated performance of required facilities, substitution of security, and other requirements deemed appropriate by the Board.

5.      **FORM OF AGREEMENT.** A general form of the Development Improvement Agreement may be obtained from the County Attorney's office.  This form of agreement may be modified from time to time by the County at its discretion without formal amendment to this *Regulation.*

P.      **TECHNICAL INFEASIBILITY WAIVER**.  One or more of the Oil and Gas Operation Standards set forth in this Section 1-107 may be waived during the application process, if the Operator demonstrates to the satisfaction of the County that it is technically infeasible to comply with the standard(s).  To be granted a waiver from a standard for technical infeasibility, the burden is on the Operator to demonstrate one of the following with clear and convincing evidence:

1.      **CONFLICT WITH STATE OR FEDERAL REGULATION.** Conduct of the Oil and Gas Operation in compliance with the County standard would result in an operational conflict with a mandatory state or federal oil and gas regulation, condition or other requirement; or

2.      **NO TECHNOLOGY AVAILABLE.**  There is no economical technology commercially available to conduct the Oil and Gas Operation in compliance with the County standard, and the applicant will implement the best available technology to conduct the Oil and Gas Operation in compliance with the County standard to the maximum extent feasible; and

a.      The waiver will not cause substantial injury to the owner or occupant of adjacent land(s); and

BLM_0053190

**b.** The waiver will not cause substantial injury to the environment.

**SECTION 1-108     PUBLIC NOTICE.**

**A.     PUBLIC NOTICE REQUIREMENTS.**   The following shall be required for any required public notice:

1. **PUBLICATION OF NOTICE.**   The Planning Department shall be responsible for publishing the notice of public hearing and shall place a legal notice in the County's official newspaper and in the Delta County Independent.  The legal notice shall be published at least once.  The notice shall be published no fewer than the identified days prior to the date of the hearing, as required in each individual Oil and Gas Permit Section.  The applicant shall be responsible for the cost of publication.

2. **NOTICE TO AFFECTED PARTIES.**

   a. **ADJACENT PROPERTY OWNERS.**  The applicant shall provide written notice to owners of real property within 1500 feet of the subject parcel when the Oil and Gas Operation is located on private land, and within 1500 feet of the Section (640 acres) in which the Oil and Gas Operation is located when the Operation is located on public land.  The notice shall be prepared by the Planning Department and a copy provided to the applicant for mailing. The notice shall include a notice of the hearing, a description of the Oil and Gas Operation and a map showing the location of the proposed Operation.  The list of property owners to whom notice is mailed shall be compiled by the applicant using the most current list of property owners on file with the Office of the Gunnison County Assessor.  The burden is on the applicant to obtain complete and accurate current names and addresses for property owners to whom notice shall be given.

   b. **OWNERS OF WATER RIGHTS.**  The applicant shall make reasonable efforts to provide written notice to any owners of water rights in any ditches or other water structures that may reasonably be impacted by the proposed Oil and Gas Operation. The list of owners of such water rights who may reasonably be affected by the Operation shall be compiled by the

BLM_0053191

applicant by contacting the local water commissioner who represents the Colorado Division of Water Resources.

**c.**   **OWNERS OF NON-ADJACENT PROPERTY WITHIN AN EXISTING SUBDIVISION, OR 35-ACRE TRACT DEVELOPMENT.**   If any part of an existing subdivision or 35-acre tract development is within 1500 feet of the subject parcel when the Oil and Gas Operation is located on private land, or within 1500 feet of the Section (640 acres) in which the Oil and Gas Operation is located when the Operation is located on public land, the applicant shall notify all of the surface landowners within the existing subdivision or 35-acre tract development.

**3.**   **CERTIFIED MAIL.**  The applicant shall mail the public notice by certified mail, return receipt requested, to all required property owners of record and owners of water rights. The applicant shall submit a list of such property owners and owners of water rights and proof of mailing to the Planning Department.   For a notice of public hearing, the applicant shall provide the list of property owners and proof of mailing to the Planning Department at least one week prior to the public hearing.

**4.**   **VALIDITY OF NOTICE.**   If the applicant makes reasonable good faith efforts to accomplish the notice responsibilities identified above, then the failure of any property owner to receive notice shall not affect the validity of hearing or other conduct of the Board.

**SECTION 1-109**   **CONDUCT OF PUBLIC HEARING.**

**A.**   **HEARING PROCESS.** A public hearing shall be conducted in accordance with the following process:

**1.**   **RIGHTS OF ALL PERSONS.** Any person may appear at a public hearing and submit evidence, including oral testimony, either individually or as a representative of an organization. Comment may also be submitted in written form before or during the hearing, or within a period of time after the hearing has closed as designated by the review body chairperson.

BLM_0053192

2. **ORDER OF PROCEEDINGS.** The order of the proceedings shall be as follows:

a. **CONFIRMATION OF ADEQUATE PUBLIC NOTICE.** The Planning Department shall report whether or not the required notice has been accomplished.

b. **APPLICANT'S PRESENTATION.** At its option, the applicant may make an oral or a written presentation that informs persons at the hearing of the nature, location, and scope of the proposed Operation. This presentation shall not be made by County staff or consultants, and may be waived by the Chairperson if there are no members of the public at the hearing, and the applicant has previously explained the proposed Operation to the review body conducting the hearing.

c. **QUESTIONS BY REVIEW BODY.** The review body may ask questions of the Planning Department, or the applicant, or anyone else who is present.

d. **PUBLIC COMMENTS.** Public comments shall be heard. Written comments that have been received before the hearing shall be reported by the Planning Department and acknowledged to be part of the hearing record.

(1) *EX PARTE* **COMMUNICATIONS.** Members of decision-making bodies shall not engage in *ex parte* communication about applications under review or reasonably anticipated to come under review. If an *ex parte* communication is attempted by telephone, in person, by telefax or other means outside of a regularly scheduled meeting, the member of the decision-making body involved shall first attempt to stop the party from the prohibited behavior, then document the communication and notify the Planning Director by telephone or in written form. The Planning Director shall then enter that documentation into the public file. The Planning Director shall report that documentation at the next meeting or hearing on the subject application. No *ex parte* communication shall be considered by a

BLM_0053193

decision-making body, or any of its members, in making a decision on an Oil and Gas Permit matter.

e. **APPLICANT RESPONSE.** The applicant may respond to any comments made by the public, the Planning Department, or the review body.

f. **PLANNING DEPARTMENT RESPONSE.** The Planning Department may respond to any statement made by the applicant, the public, or the review body.

3. **TIME LIMITS FOR TESTIMONY.** The chairperson conducting the public hearing shall set reasonable time limits for testimony or presentation of evidence. If any testimony or evidence is so limited, the person offering that testimony or evidence shall have an opportunity to enter it into the record in writing at the public hearing.

4. **CONTINUANCE OF PUBLIC HEARING.** At the conclusion of the hearing, the body conducting it may continue the public hearing to a fixed date and time. An applicant shall have the right to request, and be granted on a showing of good cause, one continuance of each required hearing. All subsequent continuances shall be granted at the discretion of the body conducting the public hearing and upon a finding that good cause has been shown for the continuance.

5. **CLOSURE OF PUBLIC HEARING AND ACCEPTANCE OF WRITTEN TESTIMONY AFTER CLOSURE**. If the hearing is not continued, it shall be closed. At the close of the hearing, the chairperson of the body conducting the hearing may leave the record open for a defined period of time during which only written comment will continue to be accepted. If no such time period is defined, no further written comment shall be accepted after the hearing is closed.

a. **NO *EX PARTE* COMMENTS ACCEPTED.** The chairperson shall announce that there shall be no *ex parte* comments accepted by members of the review or decision-making body.

b. **ALL WRITTEN COMMENTS RECEIVED BECOME PART OF RECORD.** All written comments, along with supporting data and references, received within the specified comment period shall be made a part of

BLM_0053194

the record and shall be available for public inspection at the Planning Department when the hearing was conducted by the Planning Commission. When the hearing was conducted by the Board, copies of all such comments shall be available at the Administration Office. All timely written submittals shall be made a part of the record of the proceeding.

6.  **RECORD OF PUBLIC HEARING.** The body conducting the public hearing shall record the public hearing by any appropriate means, including audiotape or videotape, and written minutes. The written and taped record of oral proceedings, including testimony and statements of personal opinions, the minutes of the hearing and other meetings of the review body, all applications, exhibits, and papers submitted in any proceeding before the decision-making, administrative, or review body, the Planning Department's report, and the decisions of the review and decision-making bodies, shall constitute the record. Those materials, on presentation to the County, shall become the public property of the County and shall not be removed from County possession without proper written authorization from the custodian of the record.

   a.  **MATERIALS ARE PART OF PUBLIC RECORD, AVAILABLE TO PUBLIC.** Said materials shall be public information, available to the public at the Planning Department or Administration office during regular business hours. The Department, as official custodian of those records, may make such rules with reference to the inspection of such records as are reasonably necessary for the protection of such records and the prevention of unnecessary interference with the regular discharge of the duties of the Planning Department.

## SECTION 1-110:   ENFORCEMENT AND PENALTIES.

A.  **OIL AND GAS OPERATIONS IN VIOLATION OF THESE REGULATIONS.**

1.  **OIL AND GAS OPERATORS THAT HAVE NOT OBTAINED A PERMIT IN COMPLIANCE WITH THESE REGULATIONS OR DO NOT COMPLY WITH OIL AND GAS PERMIT REQUIREMENTS.** Any Operator engaging in Oil and Gas Operations who does not obtain an Oil and Gas

BLM_0053195

Permit pursuant to these *Regulations*, who does not comply with Oil and Gas Permit requirements, or who acts outside the jurisdiction of the Oil and Gas Permit may be enjoined by the County from engaging in such Oil and Gas Operations and may be subject to such other criminal or civil liability as may be prescribed by law.  In addition, if the County prevails in whole or part in any action, the Operator shall pay all reasonable attorney fees and expert costs incurred by the County.

2.   **SUSPENSION OF OIL AND GAS PERMIT.**  If the County determines at any time that there is a violation of the conditions of the Oil and Gas Permit or that there are material changes in an Oil and Gas Operation as approved by the permit, the Planning Director or designee may, for good cause temporarily suspend the Oil and Gas Permit. In such case, upon oral or written notification by the Planning Director or designee, the Operator shall cease operations immediately.   The Planning Director or designee shall forthwith provide the Operator with written notice of the violation or identification of the changed condition(s).   The Operator shall have a maximum of fifteen (15) days to correct the violation.  If the violation is not timely corrected, the Permit may be further suspended pending a revocation hearing.   The Operator may request an immediate hearing before the Board regarding the suspension. The Board shall hold the hearing within ten (10) days of the Operator's written request.

3.   **REVOCATION OF OIL AND GAS PERMIT.**  The County may, following notice and hearing, revoke an Oil and Gas Permit granted pursuant to these *Regulations* if any of the activities conducted by the Operator violate the conditions of the Oil and Gas Permit or these *Regulations*, or constitute material changes in the Oil and Gas Operation approved by the County.  The County shall provide written notice to the Operator of the violation or the material changes, and the time and date of the hearing.  No less than thirty (30) days prior to the revocation hearing, the County shall provide written notice to the permit holder setting forth the violation and the time and date for the revocation hearing.  Public notice of the revocation hearing shall be published in a newspaper of general circulation not less than thirty (30) days prior to the hearing. Following the hearing, the County may revoke the Oil and Gas Permit or may specify a time by

BLM_0053196

which action shall be taken to correct any violations of the Oil and Gas Permit to avoid revocation.

**B.** **TRANSFER OF PERMITS.** An Oil and Gas Permit may be transferred only with the written consent of the County.  The County shall ensure, in approving any transfer, that the proposed transferee can and will comply with all the requirements, terms, and conditions contained in the Oil and Gas Permit and these *Regulations*, and appropriate state and federal regulations and conditions, that such requirements, terms, and conditions remain sufficient to protect the health, welfare, and safety of the public, and the environment; and that an adequate guaranty of financial security can be timely made.

**C.** **INSPECTION.** The County may enter and inspect any property subject to these *Regulations* at reasonable hours for the purpose of determining whether an Oil and Gas Operation is in violation of the provisions of these *Regulations*.

**D.** **JUDICIAL REVIEW.** Any action seeking judicial review of a final decision of the County shall be initiated within thirty (30) days after the decision is made, in the District Court in and for the County of Gunnison, pursuant to Rule 106 of the Colorado Rules of Civil Procedure.

**E.** **NO REVIEW OR APPROVAL FOR PERSONS SUBJECT TO ENFORCEMENT ACTION.** No permit application shall be processed or approved pursuant to these *Regulations* for an Operator, or for property that is subject to an ongoing enforcement action.

## SECTION 1-111:    PERMIT DURATION.

**A.** **COMMENCEMENT OF OPERATION.** The Operation shall be commenced within one year of the issuance of an Oil and Gas Permit under these *Regulations* or the Permit shall terminate and be of no force and effect.

**B.** **COMPLETION OF OPERATION.** The Operation shall be completed within one (1) year of commencement of Operation under these *Regulations* unless a greater period of time is agreed to by the County in writing prior to the expiration of one year.  At the end of one year or such additional term that may be agreed to by the County, the Permit shall terminate and be of no force and effect, and any land disturbance shall be reclaimed immediately.

BLM_0053197

**SECTION 1-112:    AMENDING THESE TEMPORARY REGULATIONS.**

A.    **PURPOSE.** The purpose of this Section is to provide a process by which the Board may, from time to time, amend, supplement or repeal these Regulations.

B.    **INITIATION.** An amendment to these Temporary Regulations may be initiated by the Board, or by the Planning Commission.

C.    **PROCESS.** The following process shall apply to an application for an amendment to these Temporary Regulations:

1.  **BOARD MOTION.** The Board may initiate an amendment by motion directing the Planning Director to submit a proposed amendment and report to the Planning Commission for review and for further action pursuant to this Section.

2.  **PLANNING COMMISSION INITIATIVE.** The Planning Commission may initiate an amendment by submitting a written recommendation for proposed amendment to the Board.  If the Board chooses to go forward the Planning Commission initiative the Board shall direct the Planning Director to submit a report to the Planning Commission for review and further action pursuant to this Section.

3.  **REVIEW BY PLANNING COMMISSION.**  The Planning Commission shall review the report of the Planning Director. The Planning Commission shall consider the Standards below and shall make a recommendation to the Board to approve, approve with modification, table for further study or deny the proposed amendment.

4.  **BOARD PUBLIC HEARING.** The Planning Commission's recommendation shall be forwarded to the Board, together with a complete copy of the Planning Director's report and the Board shall conduct a public hearing within 14 days of receipt of the recommendation.

5.  **BOARD REVIEW AND ACTION.** The Board shall consider the proposed language, any relevant support materials, the Planning Director's report, the Planning Commission's recommendation, the public testimony and evidence given at the public hearing, and compliance of the language with standards below.  Following closure of the public hearing, the Board may, by written resolution, adopt the amendment, adopt the amendment with modifications, table for further study or

deny the amendment. Such resolution shall include findings that address the review standards below.

**D.    REVIEW STANDARDS.** The wisdom of amending the text of these Temporary Regulations is a matter committed to the legislative discretion of the Board of County Commissioners and is not controlled by any one factor. In determining whether to adopt the proposed amendment, adopt the amendment with modifications, table for further study or deny the amendment, the Board of County Commissioners shall consider among other factors the following:

1. **CONSISTENCY WITH ANY COMPREHENSIVE PLAN ADOPTED BY GUNNISON COUNTY.** Consistency of the proposed amendment with any comprehensive plan that may be adopted by Gunnison County;

2. **CHANGED CONDITIONS.** Changed conditions, including the economy   of Gunnison County;

3. **EFFECT ON THE NATURAL ENVIRONMENT.** Effect of the proposed amendment on the natural environment;

4. **COMMUNITY NEEDS**. Community needs;

5. **DEVELOPMENT PATTERN**. Development pattern;

6. **CHANGES IN OR CLARIFICATION TO APPLICABLE LAW.** Changes in or clarification to applicable law;

7. **PUBLIC HEALTH, SAFETY AND WELFARE.** Public health, safety and welfare;

8. **COMPLIANCE WITH ANY APPLICABLE INTERGOVERNMENTAL AGREEMENTS ADOPTED BY GUNNISON COUNTY**. Compliance with any applicable intergovernmental agreements adopted by Gunnison County.

## SECTION 1-113:    DEFINITIONS.

Where a term used in these *Regulations* is not defined, the definitions in Article 2 of the *Gunnison County Land Use Resolution* shall apply.

**A.    Aggrieved Party.**  The applicant, the owner of the subject property, or any person, or member of the public.

BLM_0053199

**B.**     **Board.**  The Board of County Commissioners of Gunnison County, Colorado.

**C.**     **County.**  Gunnison County, Colorado, its officers, employees and agents.

**D.**     **Degradation**.  Lowering in grade or desirability; lessening in quality.

**E.**     **Flowlines.**  Also known as or called gathering lines.  Those segments of pipe from the wellhead downstream through the production facilities ending at:

    1.     In the case of gas lines, the gas metering equipment; or

    2.     In the case of oil lines, the oil loading point or LACT unit; or

    3.     In the case of water lines, the water loading point, the point of discharge to a pit, or the injection wellhead.

**F.**     **Ground Water.**  Subsurface waters in a zone of saturation.

**G.**     **Non-Point Source (NPS) Pollution.**  Pollution that is caused by or attributable to diffuse sources.  Typically, **NPS** pollution results from land runoff, precipitation, atmospheric deposition, or percolation.

**H.**     **Oil and Gas Operations.**  Exploration for oil or gas, including but not limited to conventional oil and gas and coalbed methane gas; the siting, drilling, deepening, recompletion, reworking, refracturing or abandonment of an oil and gas well; production facilities and Operations including the installation of flow lines and gathering lines; construction, site preparation, reclamation and related activities associated with the development of oil and gas resources. v

**I.**     **Operation**.  Oil and Gas Operations.

**J.**     **Operational Conflict.**  The application of the County standard would, as a matter of law, material impede or destroy the state interest in oil and gas or would stand as an obstacle to accomplishment and execution of congressional purposes.

**K.**     **Operator.**  The applicant, a parent or subsidiary entity or person, or an entity that has a financial interest in the Operation.

**L.**     **Parcel.**  A tract or lot of land upon which the Operation will occur.

BLM_0053200

M. **Person.** Any individual, partnership, corporation, association, company, or other public or corporate entity, including but not limited to the State or Federal governments, and any of their political subdivisions, agencies, or instrumentalities.

N. **Planning Commission.** Gunnison County Planning Commission.

O. **Production Facilities.** All storage, separation, treating, dehydration, artificial lift, power supply, compression, pumping, metering, monitoring, flowline, and other equipment directly associated with oil wells, gas wells, or injection wells.

P. **Referral Agency.** An agency, organization, or technical consultant deemed appropriate and necessary, by the County, to review an application and provide professional analysis and recommendations, including without limitation other County offices and departments, municipal, state, or federal agencies having an interest in or authority over all or part of the application or permit and legal consultants.

Q. **Regulation(s).** These Temporary Regulations for Oil and Gas Operations.

R. **Sensitive Wildlife Habitat.** A natural or man-made environment that contains the elements of food, shelter, water, and space in a combination and quantity necessary to sustain one or more wildlife or plant species at stable population levels in historically-used habitats. Sensitive wildlife habitat areas include, but are not limited to, nesting, brood rearing areas, rookeries, leks, migration corridors, calving and fawning grounds for big game; critical winter range for big game and for sage grouse.

S. **Significant.** Of considerable or substantial consequence.

T. **Site.** An area one mile in radius around an existing or proposed well pad.

U. **Significant Adverse Effect/Impact.** An impact of an action, after mitigation, that is considerable or substantial, and unfavorable or harmful; includes social, economic, physical, health, aesthetic and historical impact, and biological impacts including but not limited to, effects on natural resources or the structure or function of affected ecosystems.

BLM_0053201

**V.    WATER BODY.**   A perennial or intermittent river, stream, lake reservoir, pond, spring, or wetland but does not include irrigation ditches or roadway drainage ditches or artificial lakes or ponds or wetlands that are created and used for the primary purpose of agricultural operations. Water bodies in Gunnison County include but are not limited to:

- Anthracite Creek
- Brush Creek (all locations)
- Carbon Creek
- Carbonate Creek
- Cebolla Creek
- Cement Creek
- Cimarron Creek
- Coal Creek
- Cochetopa Creek
- Copper Creek
- Crystal River
- East River
- Farris Creek
- Gold Creek
- Gunnison River (including North Fork and Lake Fork)
- Henderson Creek
- Illinois Creek
- Lottis Creek
- Muddy Creek
- Ohio Creek
- Pine Creek (all locations)
- Quartz Creek
- Red Creek
- Slate River
- Soap Creek
- Spring Creek
- Steuben Creek
- Taylor River
- Texas Creek
- Tomichi Creek
- Washington Gulch
- Willow Creek
- Yule Creek

- **WATER BODY-RELATED TERMS:**

    - **INTERMITTENT RIVER, STREAM, LAKE, RESERVOIR, POND, SPRING OR WETLAND.**   A water body that

BLM_0053202

normally holds water or flows at least 60 days a year as a result of ground water discharge or surface runoff.

•**NATURAL WATER BODY.**  A water body not created for the purpose of a land use change.

•**PERENNIAL RIVER, STREAM, LAKE, RESERVOIR, POND, SPRING OR WETLAND.**  A water body that normally holds water or flows continuously during all of the year as a result of ground water discharge or surface runoff.

BLM_0053203

**Gunnison County
Planning Department**
221 N. Wisconsin St., Ste. D
Gunnison, CO 81230
(970) 641-0360

# Errata Sheet

**To:** Users of the *Gunnison County Land Use Resolution*

**Re:** Amendments to the *Gunnison County Land Use Resolution*

The following are amendments to the *Gunnison County Land Use Resolution* printed February 15, 2006, approved by the Gunnison County Board of Commissioners.  Last update November 18, 2009.

| DATE AMENDMENT ADOPTED | BOARD OF COMMISSIONERS' RESOLUTION OF APPROVAL | SUBJECT OF AMENDMENT |
|---|---|---|
| JUNE 13, 2006 | *Resolution 2006-044* | Workforce housing Essential Housing Linkage Fee |
| AUGUST 1, 2006 | *Resolution 06-56* | Solid fuel-burning devices (and fireplaces) |
| APRIL 3, 2007 | *Resolution 07-17* | Revision of Section 11-106, including inclusion of language affecting development within 0.60 miles radius of Gunnison Sage-Grouse lek, or within Gunnison Sage-Grouse occupied habitat. These changes replace temporary regulations affecting development within these areas of Gunnison Sage-Grouse habitat and leks. |
| JULY 10, 2007 | *Resolution 07-28* | Ratifying the inclusion of approved amendments and ministerial changes in the February 15, 2006 *Land Use Resolution* |
| OCTOBER 16, 2007 | *Resolution 07-36* | Exterior Lighting, Aggregate Residence Size, Density of Residential Development and Light Industrial Uses |
| MARCH  4, 2008 | *Board Approval* | Modified Appendix Table 4: Workforce Housing Fees – Residential Blended Fee |
| APRIL 1, 2008 | *Board Approval* | Modified Appendix Table 4: Workforce Housing Fees – Commercial-Industrial Blended Fee |
| MARCH 17, 2009 | *Resolution 09-10* | Withdrawn and Inactive Applications |
| NOVEMBER 3, 2009 | *Resolution 09-47* | Voluntary Residential Transfer Section |

1

BLM_0053204

## Gunnison County, Colorado
# Land Use Resolution



Reprinted
February 15, 2006

BLM_0053205

**DISCLAIMER**
**REGARDING THE ELECTRONIC VERSION OF**
**THE GUNNISON COUNTY, COLORADO**
*LAND USE RESOLUTION*

The electronic version of this document has been checked for viruses, and as of the date of the file, tested virus-free. Gunnison County provides the electronic version of this document without warranty or conditions of any kind concerning the quality, safety, or suitability of the related software, either express or implied.

In no event is Gunnison County  liable for any indirect, punitive, special, incidental or consequential damages however they may arise out of or in connection with the use or performance of any files, downloads or other information, including, without limitation, those resulting from (1) reliance on the materials presented, (2) costs of replacement goods, (3) loss of use or data, (4) delays or business interruptions, (5) and any theory of liability, arising out of or in connection with the use or performance of information.

There are inherent dangers in the use of any software and we caution the customer to make sure they completely understand the potential risks before downloading, modifying, using and/or distributing any part or the whole of this document. The purchaser of the electronic version of this document is solely responsible for adequate protection and backup of the data and equipment used in connection with any of the related software required to open and read the document, and Gunnison County is not liable for any damages in connection with downloading, using, modifying and/or distributing any part or the whole of this document.

BLM_0053206

# *Amendments*

The *Gunnison County Land Use Resolution*, adopted by the Board of County Commissioners of Gunnison County, Colorado January 8, 2001 (the "effective date of this *Resolution*") has been amended by the following:

| | |
|---|---|
| Amendment approved May 15, 2001 | *Resolution No. 18 Series 2001* |
| Amendment approved June 18, 2002 | *Resolution No. 34 Series 2002* |
| Amendment approved August 8, 2002 | *Resolution No. 41 Series 2002* |
| Amendment approved September 3, 2002 | *Resolution No. 45 Series 2002* |
| Amendment approved February 18, 2003 | *Resolution No. 22 Series 2003* |
| Amendment approved August 5, 2003 | *Resolution No. 37 Series 2003* |
| Amendment approved September 11, 2003 | *Resolution No. 44 Series 2003* |
| Amendment approved September 18, 2003 | *Resolution No. 45 Series 2003* |
| Amendment approved September 25, 2003 | *Resolution No. 48 Series 2003* |
| Amendment approved October 22, 2003 | *Resolution No. 53 Series 2003* |
| Amendment approved October 22, 2003 | *Resolution No. 54 Series 2003* |
| Amendment approved October 22, 2003 | *Resolution No. 55 Series 2003* |
| Amendment approved November 4, 2003 | *Resolution No. 58 Series 2003* |
| Amendment approved January 6, 2004 | *Resolution No. 02 Series 2004* |
| Amendment approved June 29, 2004 | *Resolution No. 37 Series 2004* |
| Amendment approved July 27, 2004 | *Resolution No. 45 Series 2004* |
| Amendment approved September 7, 2004 | *Resolution No. 52 Series 2004* |
| Amendment approved September 7, 2004 | *Resolution No. 53 Series 2004* |
| Amendment approved August 4, 2005 | *Resolution No. 42 Series 2005* |

BLM_0053207

# TABLE OF CONTENTS

**ARTICLE 1:  GENERAL REQUIREMENTS**.................................................................................................. 1-1

    SECTION 1-101: TITLE AND SHORT TITLE ............................................................................................1-1
    SECTION 1-102: AUTHORITY ................................................................................................................1-1
    SECTION 1-103: PURPOSES .................................................................................................................1-1
    SECTION 1-104: PERMITS REQUIRED ................................................................................................1-3
    SECTION 1-105: SECTIONS NECESSARY FOR IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY ......1-8
    SECTION 1-106: PARTIALLY EXEMPTED LAND USE CHANGES.........................................................1-8
    SECTION 1-107: ONE RESIDENCE PER LEGAL LOT, SUBJECT TO COMPLIANCE WITH THIS RESOLUTION ...........1-12
    SECTION 1-108: NONCONFORMING USES ........................................................................................1-13
    SECTION 1-109: VESTED PROPERTY RIGHTS...................................................................................1-14
    SECTION 1-110: PROCESS FOR DESIGNATING SPECIAL AREAS .....................................................1-16
    SECTION 1-111: CONSTRUCTION AND WORD USAGE.......................................................................1-17
    SECTION 1-112: USE OF MAPS............................................................................................................1-19
    SECTION 1-113: AMENDING THIS LAND USE RESOLUTION...............................................................1-19
    SECTION 1-114: INTERPRETATIONS ...................................................................................................1-21
    SECTION 1-115: ESTABLISHMENT OF GUNNISON COUNTY PLANNING COMMISSION ....................1-21
    SECTION 1-116: ESTABLISHMENT OF GUNNISON COUNTY BOARD OF ADJUSTMENTS............................1-22
    SECTION 1-117: REPEALER .................................................................................................................1-23
    SECTION 1-118: SEVERABILITY............................................................................................................1-23
    SECTION 1-119: WAIVER OF STANDARDS TO FACILITATE AFFORDABLE HOUSING .....................1-23
    SECTION 1-120: IMPACT FEES AND DEDICATIONS ...........................................................................1-24

**ARTICLE 2:  DEFINITIONS**............................................................................................................................ 2-1

    SECTION 2-101: PURPOSE ...................................................................................................................2-1
    SECTION 2-102: DEFINITIONS ..............................................................................................................2-1

**ARTICLE 3:  GENERAL REVIEW PROCESS**................................................................................................ 3-1

    SECTION 3-101: PURPOSE ...................................................................................................................3-1
    SECTION 3-102: OVERVIEW..................................................................................................................3-1
    SECTION 3-103: INTENT TO NOT DUPLICATE OTHER PERMIT PROCESSES OR REQUIREMENTS ...............3-1
    SECTION 3-104: COORDINATION WITH STATE OR FEDERAL ACTIONS AND COUNTY PERMIT PROCESS .........3-1
    SECTION 3-105: WITHDRAWN AND INACTIVE APPLICATIONS ..........................................................3-2
    SECTION 3-106: PHASING OF PROJECTS...........................................................................................3-2
    SECTION 3-107: GENERAL APPLICATION REQUIREMENTS................................................................3-3
    SECTION 3-108: PRE-APPLICATION CONFERENCE............................................................................3-3
    SECTION 3-109: APPLICATION ............................................................................................................3-4
    SECTION 3-110: PLANNING DEPARTMENT REVIEW OF APPLICATION .............................................3-4
    SECTION 3-111: CLASSIFICATION OF IMPACT ..................................................................................3-6
    SECTION 3-112: NOTICE OF PUBLIC HEARING .................................................................................3-6
    SECTION 3-113: CONDUCT OF PUBLIC HEARING .............................................................................3-9
    SECTION 3-114: ACTIONS BY RECOMMENDING AND DECISION-MAKING BODIES.......................3-10

**ARTICLE 4:  ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE LAND USE CHANGE PERMITS  4-1**

    SECTION 4-101: PURPOSE ...................................................................................................................4-1
    SECTION 4-102: PROJECTS CLASSIFIED AS ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE LAND USE CHANGE PERMITS ...............................................................................................4-1

**ARTICLE 5:  ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE LAND USE CHANGE PERMITS ........... 5-1**

    SECTION 5-101: PURPOSE ...................................................................................................................5-1
    SECTION 5-102: PROJECTS CLASSIFIED AS ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE LAND USE CHANGE PERMITS .......................................................................................................5-1
    SECTION 5-103: STANDARDS FOR APPROVAL OF ADMINISTRATIVE REVIEW PROJECTS....................5-2
    SECTION 5-104: ADMINISTRATIVE REVIEW PROJECT APPLICATION...............................................5-3
    SECTION 5-105: ADMINISTRATIVE REVIEW PROJECT REVIEW PROCESS....................................5-13

**ARTICLE 6:  MINOR IMPACT PROJECTS** ..................................................................................................... 6-1

BLM_0053208

SECTION 6-101: PURPOSE.................................................................................................................. 6-1
SECTION 6-102: PROJECTS CLASSIFIED AS MINOR IMPACT PROJECTS..................................... 6-1
SECTION 6-103: STANDARDS FOR APPROVAL OF MINOR IMPACT PROJECTS............................ 6-2
SECTION 6-104: MINOR IMPACT APPLICATION ............................................................................ 6-3
SECTION 6-105: SUBMITTAL FOR FINAL ACTION FOR MINOR IMPACT PROJECT ...................... 6-8
SECTION 6-106: MINOR IMPACT REVIEW PROCESS ................................................................... 6-15

**ARTICLE 7: MAJOR IMPACT PROJECTS...................................................................................7-1**

**DIVISION 7-100: CLASSIFICATION, STANDARDS AND GENERAL REVIEW STEPS FOR MAJOR IMPACT
PROJECTS ...................................................................................... 7-1**
SECTION 7-101: PROJECTS CLASSIFIED AS MAJOR IMPACT ........................................................ 7-1
SECTION 7-102: STANDARDS OF APPROVAL FOR MAJOR IMPACT PROJECTS.............................. 7-1
SECTION 7-103: GENERAL REVIEW STEPS FOR MAJOR IMPACT PROJECTS................................ 7-2

**DIVISION 7-200: SKETCH PLAN FOR MAJOR IMPACT PROJECTS ........................................................ 7-3**
SECTION 7-201: SKETCH PLAN APPLICATION FOR MAJOR IMPACT PROJECTS............................. 7-3
SECTION 7-202: SKETCH PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS ................................ 7-10

**DIVISION 7-300: PRELIMINARY PLAN FOR MAJOR IMPACT PROJECTS ........................................... 7-15**
SECTION 7-301: PRELIMINARY PLAN APPLICATION FOR MAJOR IMPACT PROJECTS ............................... 7-15
SECTION 7-302: PRELIMINARY PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS................. 7-25

**DIVISION 7-400: FINAL PLAN FOR MAJOR IMPACT PROJECTS .......................................................... 7-29**
SECTION 7-401: FINAL PLAN APPLICATION FOR MAJOR IMPACT PROJECTS ............................................ 7-29
SECTION 7-402: FINAL PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS.................................... 7-36

**ARTICLE 8: TECHNICAL MODIFICATIONS, TAKINGS, APPEALS AND EXCEPTIONS ..........................8-1**

SECTION 8-101: TECHNICAL MODIFICATIONS ...................................................................................... 8-1
SECTION 8-102: ADMINISTRATIVE TAKINGS PROCESS FOR LAND USE CHANGE PERMITS.................................. 8-2
SECTION 8-103: APPEALS................................................................................................................... 8-4
SECTION 8-104: EMERGENCY EXCEPTIONS ....................................................................................... 8-5

**ARTICLE 9: SPECIAL USES .....................................................................................................................9-1**

**DIVISION 9-100: SECONDARY USES AND ACTIVITIES.......................................................................... 9-1**
SECTION 9-101: USES SECONDARY TO A PRIMARY RESIDENCE ................................................... 9-1
SECTION 9-102: HOME OCCUPATIONS ............................................................................................... 9-4
SECTION 9-103: BED AND BREAKFAST .............................................................................................. 9-5

**DIVISION 9-200: SPECIAL RESIDENTIAL USES ..................................................................................... 9-7**
SECTION 9-201: EMPLOYEE HOUSING PROVIDED WITH OTHER USES ........................................... 9-7
SECTION 9-202: INDIVIDUAL MANUFACTURED AND MOBILE HOMES............................................... 9-8
SECTION 9-203: MOBILE HOME COMMUNITIES.................................................................................. 9-11

**DIVISION 9-300: COMMERCIAL AND INDUSTRIAL USES..................................................................... 9-15**
SECTION 9-301: APPLICABILITY AND GENERAL STANDARDS .......................................................... 9-15
SECTION 9-302: FARM OR RANCH STAND ......................................................................................... 9-16
SECTION 9-303: DUDE RANCHES AND RESORTS.............................................................................. 9-16
SECTION 9-304: ADULT-ORIENTED USES ........................................................................................... 9-17
SECTION 9-305: SEASONAL RECREATIONAL VEHICLE PARKS AND CAMPGROUNDS.............................. 9-17

**DIVISION 9-400: EXPLORATION, EXTRACTION AND PROCESSING OF MINERALS AND CONSTRUCTION
MATERIALS.................................................................................... 9-19**
SECTION 9-401: PURPOSE.................................................................................................................. 9-19
SECTION 9-402: APPLICABILITY .......................................................................................................... 9-19
SECTION 9-403: PERMIT SUBMITTAL REQUIREMENTS FOR MINING OPERATIONS ..................................... 9-20
SECTION 9-404: SITE LOCATION AND SETBACKS FOR MINING OPERATIONS............................................. 9-23
SECTION 9-405: GENERAL DEVELOPMENT STANDARDS FOR MINING OPERATIONS ............................. 9-27
SECTION 9-406: ADDITIONAL FINANCIAL SECURITY ......................................................................... 9-32
SECTION 9-407: NO EXERCISE OF PRE-EMPTED AUTHORITY REGARDING RECLAMATION.............................. 9-32

**DIVISION 9-500: MISCELLANEOUS USES AND ACTIVITIES ................................................................. 9-33**
SECTION 9-501: SPECIAL EVENTS...................................................................................................... 9-33
SECTION 9-502: TEMPORARY STRUCTURES ..................................................................................... 9-37
SECTION 9-503: SATELLITE DISH DEVICES ....................................................................................... 9-38
SECTION 9-504: ATTACHED WIRELESS TELECOMMUNICATIONS DEVICES .................................... 9-38
SECTION 9-505: FREESTANDING WIRELESS TELECOMMUNICATION STRUCTURES ..................... 9-38

BLM_0053209

SECTION 9-506: CHILD CARE CENTER.............................................................................................9-39
SECTION 9-507: GROUP HOME ......................................................................................................9-39
SECTION 9-508: KEEPING OF LIVESTOCK NOT ON AN AGRICULTURAL OPERATION.................9-40
SECTION 9-509: CAMPING ON INDIVIDUAL PARCELS ..................................................................9-40

**ARTICLE 10: LOCATIONAL STANDARDS ............................................................................... 10-1**

SECTION 10-101: PURPOSE .........................................................................................................10-1
SECTION 10-102: LOCATIONAL STANDARDS FOR RESIDENTIAL DEVELOPMENT ......................10-1
SECTION 10-103: RESIDENTIAL DENSITY ....................................................................................10-1
SECTION 10-104: LOCATIONAL STANDARDS FOR COMMERCIAL, INDUSTRIAL AND OTHER NON-
   RESIDENTIAL DEVELOPMENT...................................................................................10-2

**ARTICLE 11: RESOURCE PROTECTION STANDARDS .......................................................... 11-1**

SECTION 11-101: PURPOSES........................................................................................................11-1
SECTION 11-102: VOLUNTARY BEST MANAGEMENT PRACTICES................................................11-1
SECTION 11-103: DEVELOPMENT IN AREAS SUBJECT TO FLOOD HAZARDS.............................11-2
SECTION 11-104: DEVELOPMENT IN AREAS SUBJECT TO GEOLOGIC HAZARDS ......................11-13
SECTION 11-105: DEVELOPMENT IN AREAS SUBJECT TO WILDFIRE HAZARDS.........................11-19
SECTION 11-106: PROTECTION OF WILDLIFE HABITAT AREAS...................................................11-21
SECTION 11-107: PROTECTION OF WATER QUALITY ...................................................................11-25
SECTION 11-108: STANDARDS FOR DEVELOPMENT ON RIDGELINES ........................................11-29
SECTION 11-109: DEVELOPMENT THAT AFFECTS AGRICULTURAL LANDS.................................11-31
SECTION 11-110: DEVELOPMENT OF LAND BEYOND SNOWPLOWED ACCESS .........................11-33
SECTION 11-111: DEVELOPMENT ON INHOLDINGS IN THE NATIONAL WILDERNESS ...............11-35
SECTION 11-112: DEVELOPMENT ON PROPERTY ABOVE TIMBERLINE .....................................11-35

**ARTICLE 12: DEVELOPMENT INFRASTRUCTURE STANDARDS........................................ 12-1**

SECTION 12-101: PURPOSE .........................................................................................................12-1
SECTION 12-102: APPLICABILITY AND OVERVIEW ......................................................................12-1
SECTION 12-103: ROAD SYSTEM.................................................................................................12-1
SECTION 12-104: TRAILS .............................................................................................................12-5
SECTION 12-105: WATER SUPPLY ...............................................................................................12-6
SECTION 12-106: SEWAGE DISPOSAL/WASTEWATER TREATMENT ...........................................12-9
SECTION 12-107: FIRE PROTECTION ...........................................................................................12-11

**ARTICLE 13: PROJECT DESIGN STANDARDS...................................................................... 13-1**

SECTION 13-101: PURPOSE .........................................................................................................13-1
SECTION 13-102: APPLICABILITY.................................................................................................13-1
SECTION 13-103: GENERAL SITE PLAN STANDARDS AND LOT MEASUREMENTS .....................13-1
SECTION 13-104: SETBACKS FROM PROPERTY LINES AND ROAD RIGHTS-OF-WAY .................13-4
SECTION 13-105: RESIDENTIAL BUILDING SIZES AND LOT COVERAGES ...................................13-7
SECTION 13-106: ENERGY AND RESOURCE CONSERVATION.....................................................13-9
SECTION 13-107: INSTALLATION OF SOLID-FUEL-BURNING DEVICES .......................................13-9
SECTION 13-108: OPEN SPACE AND RECREATION AREAS..........................................................13-11
SECTION 13-109: SIGNS...............................................................................................................13-14
SECTION 13-110: OFF-ROAD PARKING AND LOADING.................................................................13-18
SECTION 13-111: LANDSCAPING AND BUFFERING .....................................................................13-21
SECTION 13-112: SNOW STORAGE .............................................................................................13-24
SECTION 13-113: FENCING...........................................................................................................13-25
SECTION 13-114: EXTERIOR LIGHTING........................................................................................13-26
SECTION 13-115: RECLAMATION AND NOXIOUS WEED CONTROL .............................................13-29
SECTION 13-116: GRADING AND EROSION CONTROL..................................................................13-31
SECTION 13-117: DRAINAGE, CONSTRUCTION AND POST-CONSTRUCTION STORM WATER RUNOFF ...............13-32
SECTION 13-118: WATER IMPOUNDMENTS..................................................................................13-34
SECTION 13-119: STANDARDS TO ENSURE COMPATIBLE USES .................................................13-38

**ARTICLE 14: LARGE PARCEL INCENTIVE PROCESS .......................................................... 14-1**

SECTION 14-101: PURPOSE .........................................................................................................14-1
SECTION 14-102: INCENTIVES FOR SELECTING LPIP REVIEW....................................................14-1
SECTION 14-103: LPIP STANDARDS ............................................................................................14-3

BLM_0053210

**ARTICLE 15:  RIGHT-TO-RANCH POLICY** ................................................................................................**15-1**
    SECTION 15-101: PURPOSES ........................................................................................................... 15-1
    SECTION 15-102: APPLICABILITY ................................................................................................... 15-1
    SECTION 15-103: EFFECTS OF ADOPTION OF RIGHT-TO-RANCH POLICY ................................... 15-2
    SECTION 15-104: CONFLICT RESOLUTION PROGRAM...................................................................... 15-3

**ARTICLE 16:  ENFORCEMENT** ....................................................................................................................**16-1**
    SECTION 16-101: GENERAL ............................................................................................................ 16-1
    SECTION 16-102: AUTHORIZATION TO ENFORCE........................................................................... 16-1
    SECTION 16-103: RIGHT OF ENTRY AND INSPECTION.................................................................... 16-1
    SECTION 16-104: NOTIFICATION TO CORRECT VIOLATION .......................................................... 16-1
    SECTION 16-105: STOP ORDER; IMMEDIATE COMPLIANCE .......................................................... 16-1
    SECTION 16-106: SUSPENSION OR REVOCATION OF PERMIT ....................................................... 16-2
    SECTION 16-107: ABATEMENT OF VIOLATION ............................................................................... 16-2
    SECTION 16-108: NO PROCESSING OR APPROVAL FOR LAND SUBJECT TO ENFORCEMENT ORDERS.............. 16-4
    SECTION 16-109: NO ACTION FOR PERSONS SUBJECT TO ENFORCEMENT ORDERS ................................. 16-4
    SECTION 16-110: REVIEW BEFORE PERMIT APPLICATION ACCEPTED ................................................. 16-5
    SECTION 16-111: REQUIREMENTS REGARDING SUBDIVISION OF LAND ........................................... 16-5
    SECTION 16-112: OTHER REMEDIES.............................................................................................. 16-5
    SECTION 16-113: NO PERSONAL LIABILITY ................................................................................... 16-6
    SECTION 16-114: NO COUNTY LIABILITY ...................................................................................... 16-6
    SECTION 16-115: RESPONSIBILITY NOT LESSENED ...................................................................... 16-6
    SECTION 16-116: NO WAIVER BY GUNNISON COUNTY OF GOVERNMENTAL IMMUNITY ........................... 16-6
    SECTION 16-117: DEVELOPMENT IMPROVEMENT AGREEMENT REQUIRED................................................ 16-6

**APPENDIX** .........................................................................................................................................**17-1**
**INDEX**

**TABLES:**
Table 1: *Timing of Notice*
Table 2: *Maximum Permissible Noise Levels for Commercial and Industrial Uses*
Table 3: *Recreational Vehicle Park Property Line Setbacks*
Table 4: *Setbacks for Construction Materials Operations*
Table 5: *Setbacks for Mining That Is Not a Construction Materials Operation*
Table 6: *Maximum Permissible Noise Levels for Mining Operations*
Table 7: *Setbacks from Property Lines and Road Rights-of-Way*
Table 8: *Off-Road Loading Spaces for Non-Residential Uses*
Table 9: *Minimum Accessible Parking Spaces for Disabled Person*
Table 10: *Minimum Aisle Widths for Parking Spaces*
Table 11: *Number of Bonus Residences Allowed in LPIP Subdivision*
Appendix Table 1: *Impact Classifications*
Appendix Table 2: *Summary of Review Processes*
Appendix Table 3: *Off-Road Parking Requirements*

**FIGURES:**
Figure 1: *Areas of the Floodplain*
Figure 2: *Restrictive Inner Buffer Setback*
Figure 3: *Application of Variable Outer Buffer Setback*
Figure 4: *Height Measurement by Types of Buildings*
Figure 5: *Measurement of Building Height*
Figure 6: *Zero Lot Line Siting*
Figure 7: *Sight Distance Triangle*
Figure 8: *Landscaping as Buffering*
Figure 9: *Shielded and Partially Shielded Fixtures*
Figure 10: *Examples of Floodlighting*
Appendix Figure 1: *Site Plan Example*
Appendix Figure 2: *Vicinity Map Example*
Appendix Figure 3: *General Review Process for Land Use Change Permits*
Appendix Figure 4: *General Review Process for  Administrative Review Projects That Require Land Use Change Permits*
Appendix Figure 5: *General Review Process for Minor Impact Projects*
Appendix Figure 6: *Sketch Plan Review Process for Major Impact Projects*
Appendix Figure 7: *Preliminary Plan Review Process for Major Impact Projects*
Appendix Figure 8: *Final Plan Review Process for Major Impact Projects*

BLM_0053211

# ARTICLE 1:
# GENERAL REQUIREMENTS

## SECTION 1-101: TITLE AND SHORT TITLE

This *Resolution* (as amended) shall be known as "The *Gunnison County Land Use Resolution*," "The *Land Use Resolution*," and "This *Resolution.*"

## SECTION 1-102: AUTHORITY

It is the intent of the Board in adopting and enforcing this *Resolution* to exercise fully all authority and power conferred on it by, to rely on, and to be in accord with the *Constitution of the United States*, the *Colorado Constitution* and the statutes of the State of Colorado, including the following:

A. **Title 16, Article 13, Part 3, C.R.S**: restraint and abatement of nuisances.

B. **Title 24, Articles 65.1, 67, and 68, C.R.S.** that respectively provide for the designation, administration and regulation by local government of areas and activities of state interest, authorize the planned unit development approach to land development, and provide for the vesting of real property rights.

C. **Title 25, Article 12, C.R.S:** Noise abatement.

D. **Title 29, Article 20, C.R.S:** *Local Government Land Use Control Enabling Act* of 1974.

E. **Title 30, Article 11, C.R.S:** County powers and functions.

F. **Title 30, Article 15, C.R.S:** County regulations under its police powers.

G. **Title 30, Article 28, C.R.S:** Planning and building codes, subdivision exemption plats, cluster development, the establishment of a county planning commission and regional planning commissions, improvement agreements, master plans, zoning plans, and other land use planning and regulatory mechanisms, including subdivision regulations.

H. **Title 30, Article 30, C.R.S:** County regulation regarding control of stream flow for purposes of flood control.

I. **Title 34, Article 1, Part 3, C.R.S:** Preservation of commercial mineral deposits.

J. **Title 35, Article 72, C.R.S:** The duty of the owner or occupier of any land in the state to prevent soil blowing by planting and other practices.

K. **Title 38, Article 30.5, C.R.S:** Addressing conservation easements.

L. **Title 43, Article 1, C.R.S:** Regarding roads and, particularly, limitations on controls on advertising devices.

M. **Title 43, Article 2, C.R.S:** State, county, municipal, and public roads.

N. **All Other Authorized Powers**. All other powers authorized by the Constitution of the State of Colorado, state statute or by common law, including those for the regulation of land uses, land use planning and development, subdivision, and environmental protection, police powers and the power to abate nuisances.

## SECTION 1-103: PURPOSES

Gunnison County is a diverse community with a history of independence, self-sufficiency and neighborly spirit. Recognizing that "One Size Does Not Fit All," this *Resolution* articulates general policies, regulations and specific standards.

This Section identifies the purposes the Board intends to achieve by adopting this *Resolution*. These purposes serve as basic goals for this *Resolution* and the review of applications for Land Use Change Permits and related permits and processes. When there is a conflict between a statement of purpose and an adopted standard in this *Resolution*, or when an adopted standard is more specific, the standard shall supersede these purposes. This *Resolution* shall be construed liberally to further its stated purposes.

BLM_0053212

**A. GENERAL PURPOSES OF THIS LAND USE RESOLUTION.**

1. **PROMOTE HEALTH, SAFETY, GENERAL WELFARE AND THE ENVIRONMENT.** To promote the health, safety, and general welfare of the citizens of Gunnison County by giving reasonable consideration to the social, economic and environmental characteristics of the community and the compatibility of proposed land use changes with existing uses.

2. **SIMPLIFY THE LAND USE PLANNING AND REGULATORY REVIEW PROCESS.** To simplify, expedite and provide uniform application of the land use planning and regulatory review process.

3. **PROTECT THE HERITAGE OF OUR RURAL CHARACTER.** To protect ranching and other existing industries, the beauty of the landscape and rural character of Gunnison County, in order to enhance recreational opportunities for residents and visitors, preserve important archeological and historic sites and viewsheds, and conserve soil, water, and forestry resources. To ensure that no land use change significantly detracts from the economic base, the environmental, historical, recreational, or aesthetic character of the County.

4. **PROVIDE FOR ORDERLY USE OF LAND.** To plan for and regulate the use of land and to provide planned and orderly use of land and protection of the environment in a manner consistent with constitutional rights and without unnecessary time and expense by applicants or the public.

5. **PRESERVE NEIGHBORHOOD CHARACTER.** To preserve the character of established residential areas and residential neighborhoods.

6. **ENCOURAGE HOUSING DIVERSITY.** To encourage a diversity of housing types, densities, and development that assists in providing adequate housing for all people.

7. **EVALUATE CUMULATIVE IMPACTS.** To evaluate the combined impacts of two or more uses or activities, and repeated activities, in a discreet area or the whole of Gunnison County.

8. **ENCOURAGE INNOVATIONS.** To encourage innovations in residential, commercial, and industrial land use changes, so that the growing demands of the population may be met by greater variety in type, design, and layout of development.

9. **REGULATE LAND USE BASED ON IMPACTS.** To regulate the use of land based on the impact of such use on surrounding areas and the community to eliminate, minimize, or mitigate conflicts among different land uses.

10. **INTENT NOT TO DEPRIVE ALL REASONABLE ECONOMIC USE.** It is the intent of this *Resolution* that no private landowner be deprived of all reasonable economic use of real property.

**B. PURPOSES TO MANAGE AND GUIDE LAND DEVELOPMENT.**

1. **PROMOTE A COMPACT DEVELOPMENT PATTERN.** To promote a compact development pattern that discourages sprawl, in which denser and more intense forms of development will occur contiguous to, or in close proximity to, existing population and development centers and public services. To encourage development patterns that will tend to minimize the cost of providing governmental and other services and will preserve open space.

2. **ENSURE ADEQUATE FACILITIES.** To ensure that development provides, and is served by, adequate transportation, water supply, wastewater treatment, other utilities and public services, schools, open space, parks, trails, and similar facilities, and to provide for phased development based on location and capacity of such services and facilities. To ensure, to the maximum extent practicable, that growth will pay for itself, and to ensure that present residents do not have to subsidize land use changes that involve growth or development through increased taxes or degradation of the quality of services they receive. To avoid land use changes requiring significant expenditures of public funds for schools, roads, health, police, and fire, or other purposes.

3. **TO ENCOURAGE TRANSPORTATION ALTERNATIVES.** To minimize automobile use where practical and to ensure that, as applicable, development is reasonably designed to provide safe and convenient roads and non-motorized ways to connect neighborhoods and developments, and encourage the use of public transportation and related facilities.

4. **REGULATE PUBLIC FACILITIES.** To regulate the general location, character and extent of public facilities, ways, grounds, and places, including public utilities.

BLM_0053213

5. **ENSURE EFFICIENT PROVISION OF PUBLIC SERVICES**. To require that permitted land use changes be designed, constructed, and maintained to provide efficient and economic provision of public services.

6. **MAINTAIN POPULATION/INFRASTRUCTURE BALANCE.** To maintain a balance beneficial to the public between the growth of public infrastructure in the county (including transportation, schools, health facilities, fire and police services, utilities, recreation, housing) and the population growth reasonably expected to result from proposed development.

7. **ENSURE DEVELOPMENT MEETS DEMONSTRATED HOUSING NEEDS.** To encourage residential development that meets demonstrated housing needs in Gunnison County, to discourage residential development that does not meet demonstrated needs in Gunnison County, and to encourage buildout of platted subdivisions that have been approved by Gunnison County before additional lots are subdivided.

C. **PURPOSES TO PROMOTE THE ECONOMIC WELL BEING OF THE COMMUNITY.**

1. **PROTECT AND ENHANCE ECONOMY.** To protect and enhance the economic strength of the private and governmental sectors of Gunnison County in a manner that is compatible with this *Resolution*.

2. **ENCOURAGE ECONOMIC DIVERSITY.** To encourage, strengthen and promote greater economic diversity in the County, to broaden employment opportunities and reduce seasonal employment fluctuation in a manner that will not endanger or detract from the existing economy.

3. **PROMOTE CONTINUING VIABILITY OF AGRICULTURE.** To promote innovation in land use changes that contribute to continuing viable agricultural operations and recognize the public benefit of protecting the open space that agricultural operations provide, and to discourage land use changes that jeopardize those activities. To identify land use change on agricultural land, to protect ditches and stock drive routes, to encourage land use change that will retain the agricultural productivity of the land and to discourage land use change that will adversely affect agricultural operation on lands not owned by the applicant. However, it is not the policy of this *Resolution* to prevent land use change on land because such land was at one time used for agricultural purposes nor to enforce continued agricultural use of land that is otherwise suitable for non-agricultural use and that can otherwise be developed pursuant to the terms of this *Resolution*.

D. **PURPOSES TO PROTECT ENVIRONMENTAL RESOURCES.**

1. **MAINTAIN ENVIRONMENTAL QUALITY.** Recognizing the irreplaceable character of the environment and its importance to the quality of life in Gunnison County, to ensure that land use changes do not degrade or threaten the existing high quality of the environment in the County.

2. **PRESERVE QUALITY AND QUANTITY OF WATER RESOURCES.** Recognizing that the essence of Gunnison County's ability to survive and prosper is the availability of a consistent and clean source of water, the County intends to preserve and protect the quality and quantity of water resources in Gunnison County.

3. **PRESERVE WILDLIFE HABITAT.** To protect and preserve lands from land use activities and patterns of development that would cause significant net adverse effects to sensitive wildlife habitat and to discourage land uses that will impair or destroy such habitats, or their utilization by wildlife species, or that would endanger a wildlife species. It is the intent of this *Resolution* that private landowners do not lose reasonable use of their land or, when appropriate, receive fair compensation because of owning sensitive wildlife habitat.

4. **REGULATE LAND USE IN NATURAL HAZARD AREAS.** To regulate land use and activities in natural hazard areas by avoiding it and if avoidance is not possible, to reduce or minimize hazards to public health, safety, and property in those areas with minimum expenditure of public funds.

5. **PREVENT INCREASES IN SCOPE OR IMPACT OF NATURAL HAZARDS.** To prevent activities and land use in natural hazard areas that would increase the scope or impact of such natural hazards.

6. **DISCOURAGE DEVELOPMENT THAT WOULD RESULT IN WINTER RECREATION IN CERTAIN HAZARD AND RESOURCE AREAS.** To discourage development or land uses that will directly result in winter recreation in areas of known uncontrolled avalanche danger or in critical wildlife winter range.

## SECTION 1-104: PERMITS REQUIRED

A. **ISSUANCE OF PERMITS.** Unless otherwise expressly excepted by this *Resolution*, no person shall engage in, cause, or allow any land use change as defined in Article 2: *Definitions* upon land owned, controlled, occupied, or used by that person in the unincorporated area of Gunnison County, including parcels of land that are less

BLM_0053214

than, equal to, or greater than 35 acres in size, or upon patented mining claims, or lots in disincorporated townsites, unless that person has first obtained a Land Use Change Permit pursuant to this *Resolution*. The act of subdividing land into parcels, all 35 acres or larger, does not require a Land Use Change Permit.

**B.   APPLICATION.** An application for a Land Use Change Permit shall be filed with the Gunnison County Planning Department and shall be processed in accordance with Article 3: *General Review Process*.

**C.   ACTIVITY BEGUN BEFORE PERMIT ISSUANCE.** No development for which a Land Use Change Permit is required shall begin until the Land Use Change Permit has been issued by Gunnison County. If the activity has begun before issuance of the permit by Gunnison County, no Land Use Change Permit shall be issued for the activity until the applicant ceases the activity, remedies any damage caused and complies with all enforcement actions taken by Gunnison County pursuant to Article 16: *Enforcement,* and with all other applicable County regulations.

**D.   PERMIT ISSUED UPON FINAL APPROVAL.** A Land Use Change Permit shall be issued by Gunnison County upon final approval of the application. The permit shall become effective only when the applicable requirements set forth in Section 1-109: *Vested Property Rights* are satisfied.

**E.   PERMITS RUN WITH LAND.** Any Land Use Change Permit issued under this *Resolution* shall run with the applicable land.

**F.   TERM OF PERMIT.**

   **1.   TERM IS THREE YEARS FOR MOST LAND USE CHANGE PERMITS.** Unless expressly extended pursuant to Section 1-104: G: *Requirements for Extension of Term of Permit*, the term of a Land Use Change Permit shall be three years from its effective date.

   **2.   LARGE PARCEL INCENTIVE PROCESS (LPIP) IS PERPETUAL.** The term shall extend in perpetuity for permits that have been granted pursuant to Section 14-102: *Large Parcel Incentive Process.*

   **3.   OPERATIONS APPROVED IN PERPETUITY.** During the term of the permit, the applicant shall initiate and complete all construction, pursuant to Section 1-104: F.4: *Completion of a Development.* However, unless expressly limited by an approved permit, the right to conduct operations, subject to operational conditions identified in the permit, shall be approved in perpetuity, subject to:

   **a.   COMPLIANCE WITH PERMIT CONDITIONS.** Compliance with permit conditions; and

   **b.   STATUTORY EXCEPTIONS.** Compliance with the exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

   **c.   COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES.** Compliance with all regulations and codes that are general in nature and are applicable to all property that is subject to land use regulation by Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code in effect on the date a permit is applied for pursuant to each of those codes; and

   **d.   COMPLIANCE WITH ANY CODE, ORDINANCE OR REGULATION REQUIRED FOR IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY.** Compliance to the maximum extent feasible with the provisions of any code, ordinance or regulation that is general in nature and applicable to all property that is under the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

   **4.   COMPLETION OF A DEVELOPMENT.**

   **a.   SUBDIVISION, CONDOMINIUM, OR TOWNHOME OR PROJECT FOR WHICH A DEVELOPMENT IMPROVEMENT AGREEMENT HAS BEEN EXECUTED.** For purposes of this Section, a subdivision, condominium, or townhome project or a development for which a Development Improvement Agreement has been executed shall be considered completed when Gunnison County has fully released all security under the applicable Development Improvement Agreement.

   **b.   MINING OPERATIONS.** A mining operation shall be considered completed when the construction projects approved in the Land Use Change Permit application, and proposed to be constructed within the first three years of operation, have been constructed.

BLM_0053215

c. **COMMERCIAL OR INDUSTRIAL PROJECT**. For purposes of this Section, a project that is a commercial or industrial use is considered completed when, as applicable, the Building Inspector issues final approval of the constructed structures approved as part of the project plan. When no structure is involved, the decision-making body shall determine as part of the Final Plan approval when the project shall be considered complete.

G. **REQUIREMENTS FOR EXTENSION OF TERM OF PERMIT.** An extension of the term of a Land Use Change Permit may be requested by the applicant or recommended by the Planning Commission. The term of a Land Use Change Permit may only be extended as a condition of initial approval, or if a request for extension is submitted at least three months before the permit expires and only if the applicable decision-making body finds that the extension complies with the following criteria:

H. **EXTENSION OF LAND USE CHANGE PERMIT REQUESTED AS PART OF INITIAL LAND USE CHANGE PERMIT APPROVAL.** When the applicant requests extension of the permit term as part of the initial Land Use Change Permit approval, both of the following criteria must be met:

a. **A PUBLIC BENEFIT WILL BE OBTAINED, OR NO PUBLIC DETRIMENT WILL OCCUR.** A public benefit will be obtained, or no public detriment will occur, as a consequence of the extension; and

b. **SIZE OF PROJECT AND ECONOMIC CONDITIONS WARRANT EXTENSION.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term.

I. **EXTENSION OF LAND USE CHANGE PERMIT FOR ADMINISTRATIVE REVIEW AND MINOR IMPACT PROJECT AT LEAST THREE MONTHS BEFORE END OF PERMIT TERM.** When the applicant submits a request for extension of the permit term for a Land Use Change Permit for an Administrative Review project or a Minor Impact project at least three, but no more than six, months before the permit expires, the permit may be extended if the applicable decision-making body, finds that the extension complies with all the following:

1. **A PUBLIC BENEFIT WILL BE OBTAINED OR NO PUBLIC DETRIMENT WILL OCCUR.** A public benefit will be obtained or no public detriment will occur as a consequence of the extension; and

2. **COMPLIANCE TO DATE WITH CONDITIONS OF ORIGINAL  PERMIT.** The applicant has complied with all conditions requiring performance before the date of application for extension of the permit; and

3. **BENEFITS RECEIVED BY COUNTY.** Required benefits, if any, already have been received by the County as a result of project approval, such as impact fees or land dedications; and

4. **NEEDS OF APPLICANT AND COUNTY.** The needs of the applicant will be served and the needs of the County will not be harmed by the extension; and

5. **PROGRESS IN PURSUING COMPLETION OF DEVELOPMENT.** Progress has been made in pursuing the development to date, including obtaining other necessary permits, and there have been expenditures made by the applicant in pursuing the project; or the applicant has demonstrated extenuating circumstances that have affected progress of the development; and

6. **NO CONFLICT BETWEEN DEVELOPMENT AND REGULATIONS.** There is no substantial conflict, or change in the  development is approved to eliminate substantial conflict, between the project as approved, and the requirements of this *Resolution* or other regulations as they exist at the time the application for extension is made to extend the permit term; and

7. **CHANGES IN CIRCUMSTANCES.** Changes to adjacent land uses have not created a substantial conflict between those uses and the uses for which an extended permit term is requested; and

8. **PROPOSED CHANGES IN THE DEVELOPMENT.** Any proposed changes in the development are not significant; and

9. **TAXES TO BE PAID.** No permit shall be extended unless at the time of the request for extension the applicant Copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

J. **EXTENSION OF A LAND USE CHANGE PERMIT FOR A MAJOR IMPACT PROJECT AT LEAST THREE MONTHS BEFORE END OF PERMIT TERM.** When the applicant requests extension of the permit term for a Land Use Change Permit for a Major Impact project at least three, but no more than six, months before the permit expires, the Board shall conduct a public hearing, noticed and conducted pursuant to Section 3-112:

BLM_0053216

*Notice of Public Hearing* and Section 3-113: *Conduct of Public Hearing*, and may extend the permit, if it finds that the extension complies with all of the following:

1. **A PUBLIC BENEFIT WILL BE OBTAINED OR NO PUBLIC DETRIMENT WILL OCCUR.** A public benefit will be obtained or no public detriment will occur as a consequence of the extension; and

2. **SIZE OF PROJECT AND ECONOMIC CONDITIONS.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term; and

3. **COMPLIANCE TO DATE WITH CONDITIONS OF ORIGINAL PERMIT.** The applicant has complied with all conditions requiring performance before the date of application for extension of the permit term; and

4. **PROGRESS IN PURSUING COMPLETION OF DEVELOPMENT.** Progress has been made in pursuing the development to date, including obtaining other necessary permits, and there have been expenditures made by the applicant in pursuing the project; or the applicant has demonstrated extenuating circumstances that have affected progress of the development; and

5. **BENEFITS RECEIVED BY COUNTY.** Required benefits, if any, already have been received by the County as a result of project approval, such as impact fees or land dedications; and

6. **NEEDS OF APPLICANT AND COUNTY.** The needs of the applicant will be served and the needs of the County will not be harmed by the extension; and

7. **NO CONFLICT BETWEEN DEVELOPMENT AND REGULATIONS.** There is no substantial conflict, or change in the development is approved to eliminate substantial conflict, between the project as approved, and the requirements of this *Resolution* or other regulations as they exist at the time the application for extension is made to extend the permit term; and

8. **CHANGES IN CIRCUMSTANCES.** Changes to adjacent land uses have not created a substantial conflict between those uses and the uses for which an extended permit term is requested; and

9. **PROPOSED CHANGES IN THE DEVELOPMENT.** Any proposed changes in the development are not significant; and

10. **TAXES TO BE PAID.** No permit shall be extended unless at the time of the request for extension the applicant  a copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

K. **ONE EXTENSION.** No more than one three-year extension of any Land Use Change Permit shall be granted.

L. **EXTENSION EXTENDS A VESTED RIGHT.**  An extension of the term of a Land Use Change Permit extends any vested property right associated with the permit or development for the same period as the extension of the permit.

M. **PHASED DEVELOPMENT.** The permit term for each phase of a phased development shall begin to run on the date that phase receives final approval from the Board.

N. **PERMITS PURSUANT TO FORMER GUNNISON COUNTY LAND USE RESOLUTION FOR TWO RESIDENCES ON A SINGLE PARCEL.** The term of any Land Use Change Permit issued pursuant to the former *Gunnison County Land Use Resolution* that approved construction of two residences on a single parcel, pursuant to which one residence is constructed within three years after the effective date of this *Resolution*, shall be extended to permit construction of the second residence, in perpetuity. The second residence shall be subject to all County regulations in effect at the time the construction is initiated.

O. **GROUNDS FOR DENIAL OF A LAND USE CHANGE PERMIT.** No Land Use Change Permit shall be issued for any land use change that:

1. **DOES NOT COMPLY WITH THIS RESOLUTION.** Does not comply with each applicable requirement of this *Resolution*; or

2. **DOES NOT COMPLY WITH OTHER CODES OR RESOLUTIONS**. Does not comply with the applicable building code as adopted or amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, any County-approved municipal Three Mile Plan area plan, or any other applicable code, ordinance, resolution or regulation.

BLM_0053217

3. **DOES NOT COMPLY WITH EACH APPLICABLE FEDERAL OR STATE PERMIT**. Does not comply with each applicable federal or state permit. The County shall require that a copy of each required permit be submitted to the County before County approval of the Land Use Change Permit, or that the Land Use Change Permit include a condition that a copy of each required permit be submitted to the County in a timely manner.

P. **COMPLIANCE WITH PERMIT CONDITIONS**. Each development permitted pursuant to this *Resolution* shall be initiated, conducted and completed pursuant to all terms and conditions of the applicable permit.

Q. **APPLICABILITY TO OTHER UNITS OF GOVERNMENT.** The requirement to obtain a Land Use Change Permit shall apply to federal, state, county and municipal governments and special districts, their agencies and their subdivisions unless the unit of government is expressly exempted from the requirement.

R. **RELATIONSHIP OF LAND USE CHANGE PERMITS TO OTHER PERMITS**. Issuance of a Land Use Change Permit does not eliminate any requirement to obtain a Building Permit pursuant to the applicable building code, adopted and amended by Gunnison County, an Individual Sewage Disposal System Permit pursuant to the *Gunnison County Individual Sewage Disposal System Regulations*, or to comply with every other applicable ordinance, resolution, and regulation or permit already issued. An applicant for any activity that requires a Land Use Change Permit shall be required to obtain that permit before initiating any activities that would require a Building Permit, Individual Sewage Disposal System Permit, Access Permit, or other permit from Gunnison County. As applicable to individual applications, the County requires that the following Permits be obtained in addition to Land Use Change Permits:

1. **ACCESS PERMIT.** An Access Permit shall be obtained from the Gunnison County Public Works Department for any private driveway accessing onto a County road, public road or highway under the jurisdiction of Gunnison County.

2. **HIGHWAY ACCESS PERMIT.** If a Highway Access Permit is required from the Colorado Department of Transportation for any driveway or road accessing onto any state or federal road, the County shall not give final approval to a Land Use Change Permit until the County has received and commented on the Highway Access Permit application. The County may condition a Land Use Change Permit approval on receipt of the approved Highway Access Permit.

3. **MOBILE HOME PERMIT.** Location of a mobile home on a lot or within a mobile home community shall require a Mobile Home Permit, pursuant to Section 9-202: *Individual Manufactured and Mobile Homes*.

4. **SIGN PERMIT**. Sign Permit, pursuant to Section 13-109: *Signs*.

5. **RECLAMATION PERMIT FOR REVEGETATION AND NOXIOUS WEED CONTROL**. Any development defined and/or regulated by the County that results in road cutting and/or construction, homesite clearing or berm construction shall be required to obtain a Reclamation Permit from the Gunnison County Public Works Department, pursuant to Section 13-115: *Reclamation and Noxious Weed Control*.

6. **SURFACE ALTERATION PERMIT**. Surface Alteration Permit, pursuant to the *Gunnison County Standards and Specifications for Road and Bridge Construction*.

7. **ROAD CUT PERMIT.** Road Cut Permit, pursuant to the *Gunnison County Standards and Specifications for Road and Bridge Construction.*

8. **BUILDING PERMIT.** Building Permit, as required for construction of structures pursuant to the applicable building code, adopted and amended by Gunnison County.

9. **INDIVIDUAL SEWAGE DISPOSAL SYSTEM PERMIT**. Individual Sewage Disposal System Permit, as required for the installation or repair of an individual sewage disposal system, pursuant to the *Gunnison County Individual Sewage Disposal System Regulations*.

10. **FLOODPLAIN DEVELOPMENT PERMIT.** Floodplain Development Permit pursuant to Section 11-103: *Development in Areas Subject to Flood Hazards.*

11. **TEMPORARY PRIVATE PLOWING PERMIT.** Temporary Private Plowing Permit, pursuant to Section 11-110: *Development of Land Beyond Snowplowed Access.*

12. **SNOW REMOVAL PERMIT.** Snow Removal Permit pursuant to and described in the *Gunnison County Standards and Specifications for Road and Bridge Construction.*

13. **MANUFACTURED HOME PERMIT.** Manufactured Home Permit pursuant to Section 9-202: *Individual Manufactured and Mobile Homes.*

BLM_0053218

14. **LONG-TERM CAMPING PERMIT**. Long-Term Camping Permit, pursuant to Section 9-509: *Camping on Individual Parcels.*

15. **OUTDOOR VENDING PERMIT.** Outdoor Vending Permit, pursuant to Section 9-502: *Temporary Structures.*

16. **STATE AND FEDERAL PERMITS.** Granting of a Land Use Change Permit for a specific land use change shall not exempt that land use change from compliance with any applicable Colorado or federal statutory and regulatory requirements. Gunnison County shall require documentation that each applicable permit has been issued, either as a prerequisite to, or as a condition of, approval of the Land Use Change Permit.

# SECTION 1-105: SECTIONS NECESSARY FOR IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY

A. **SECTIONS APPLICABLE TO PARTIALLY EXEMPTED USES.** The following specific sections of this *Resolution* are general in nature, are necessary for the immediate preservation of public health and safety, and are applicable to the maximum extent feasible to all new construction of, or expansion to, those land use changes that are partially exempted from this *Resolution* by Section 1-106: *Partially Exempted Land Use Changes,* which shall comply, to the maximum extent feasible, with the following sections in this *Resolution,* that are necessary for the immediate preservation of public health and safety:

1. **SECTION 11-103:** *Development in Areas Subject to Flood Hazards.*
2. **SECTION 11-104:** *Development in Areas Subject to Geologic Hazards.*
3. **SECTION 11-107:** *Protection of Water Quality.*
4. **SECTION 12-105:** *Water Supply.*
5. **SECTION 12-106:** *Sewage Disposal/Wastewater Treatment.*
6. **SECTION 12-107:** *Fire Protection.*
7. **SECTION 11-109: D:** *Domestic Animal Controls*; and Section 11-106: F.1. b. 6: *Domestic Animal Controls.*
8. **SECTION 13-107:** *Installation of Solid-fuel-burning devices.*
9. **SECTION 13-114:** *Exterior Lighting.*

B. **ADDITIONAL SECTION APPLICABLE TO PARTIALLY EXEMPTED COMMERCIAL, INDUSTRIAL OR OTHER NON-RESIDENTIAL LAND USE CHANGES.** In addition to complying with the requirements listed at 1 through 9, above, new construction of, or expansion to, commercial, industrial or other non-residential land use changes that are partially exempted from this *Resolution* by Section 1-106: *Partially Exempted Land Use Changes*, shall comply to the maximum extent feasible with Section 12-103: *Road System.*

# SECTION 1-106: PARTIALLY EXEMPTED LAND USE CHANGES

The following land uses are partially exempted from the requirements of this *Resolution*:

A. **PENDING LAND USE CHANGE PERMIT APPLICATIONS.** A complete and conforming Land Use Change Permit application submitted to Gunnison County before the effective date of this *Resolution* ("pending application") shall be governed by the former *Gunnison County Land Use Resolution* except pursuant to this Section.

1. **VOLUNTARY COMPLIANCE WITH THIS RESOLUTION**. Any applicant who has a pending application has the right, upon written request to the Planning Department, to have the pending application processed pursuant to the process and standards of this *Resolution* rather than those of the former Gunnison *County Land Use Resolution.*

2. **REQUIRED COMPLIANCE WITH EXISTING CODES AND PUBLIC HEALTH AND SAFETY REQUIREMENTS.** Each application, whether processed pursuant to the former *Gunnison County Land Use Resolution* or this *Resolution*, shall comply with the following requirements:

   a. **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES**. All regulations and codes that are general in nature and are applicable to all property that is subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code in effect on the date a permit is applied for pursuant to each of those codes; and

BLM_0053219

    **b. COMPLIANCE WITH ALL OTHER SECTIONS OF THIS RESOLUTION AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY.** To the maximum extent feasible with the provisions of Section 1-105: *Section Necessary For Immediate Preservation of Public Health and Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

**B. DEVELOPMENT ON INDIVIDUAL LOTS IN SUBDIVISIONS APPROVED BY GUNNISON COUNTY BEFORE THE EFFECTIVE DATE OF THIS RESOLUTION.** Individual lots in subdivisions approved by Gunnison County before the effective date of this *Resolution*, that have protective covenants included as an element of a Final Plan approved by Gunnison County, shall be issued a Building Permit without a separate Land Use Change Permit, subject to the following:

    **1. COMPLIANCE WITH PERMIT CONDITIONS.** Compliance with all applicable conditions in the Land Use Change Permit approval of the subdivision; and

    **2. STATUTORY EXCEPTIONS**. Compliance with the exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

    **3. COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES**. Compliance with all regulations and codes that are general in nature and are applicable to all property that is subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes; and

    **4. COMPLIANCE WITH ALL OTHER SECTIONS OF THIS RESOLUTION AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. Compliance to the maximum extent feasible with the provisions of *Section 1-105: Sections Necessary For The Immediate Preservation of Public Health And Safety,* and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

**C. DEVELOPMENT ON INDIVIDUAL TRACTS IN EXEMPT 35-ACRE TRACT DEVELOPMENTS EXISTING WITH IDENTIFIED BUILDING ENVELOPES BEFORE JANUARY 1, 2000, THAT HAD PROTECTIVE COVENANTS RECORDED BEFORE JULY 1, 2000.**

    **1. PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENTS**. There are certain divisions of land that are excluded from the definitions of "subdivision" or "subdivided land" as defined by C.R.S. 30-28-101 and that:

        **a. EXISTED BEFORE JANUARY 1, 2000**. Existed on or before January 1, 2000; and

        **b. TRACTS LARGER THAN 35 ACRES**. Are comprised solely of tracts that are each 35 acres or larger; and

        **c. RECORDED PLAT**. Were platted and recorded in the Gunnison County Clerk and Recorder's Office on or before January 1, 2000 ("pre-existing 35-acre tract development"), specifically identifying designated building envelopes in which primary development must be confined ("pre-existing building envelopes"); and

        **d. RESTRICTED BY RECORDED PROTECTIVE COVENANTS**. Are subject to specific protective covenants that were recorded in the Office of the Gunnison County Clerk and Recorder's Office before July 1, 2000 that restrict the form, location, and type of development that can occur within the development ("preexisting protective covenants").

    **2. IDENTIFICATION OF PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENTS**. For purposes of Section 1-106: C. *Development on Individual Tracts in Exempt 35-acre Tract Developments Existing With Identified Building Envelopes before January 1, 2000, That Had Protective Covenants Recorded Before July 1, 2000.* The pre-existing exempt 35-acre tract developments include:

        **a.** East River Ranches;
        **b.** Red Mountain Ranch;

BLM_0053220

  **c.** The Pinnacles;
  **d.** Trappers Crossing at Crested Butte; and
  **e.** Eagle Ridge Ranch.

**3.** **BUILDING ON INDIVIDUAL TRACTS IN A PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENT SHALL COMPLY WITH THIS RESOLUTION TO THE MAXIMUM EXTENT FEASIBLE**. Land uses on individual tracts in a pre-existing exempt 35-acre tract development shall comply with the requirements of this *Resolution*, including:

  **a.** **COMPLIANCE WITH SECTIONS OF THIS RESOLUTION AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. Compliance to the maximum extent feasible with the provisions of Section 1-105: *Sections Necessary For The Immediate Preservation of Public Health And Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety; except:

  **b.** **CONFLICT BETWEEN PROTECTIVE COVENANTS/ENVELOPE AND THIS RESOLUTION**. The County recognizes that the limitations associated with the pre-existing building envelopes and pre-existing protective covenants in  preexisting exempt 35-acre tract developments identified in *Section 1-106:C.2: Identification of Pre-Existing 35-Acre Tract Developments*   may make it difficult for the owner of such a tract to comply with all requirements of this *Resolution*. It is the intent of this Section that each provision of this *Resolution* be enforced regarding such tracts to the maximum extent feasible without requiring relocation of the pre-existing building envelopes and/or changes to the pre-existing protective covenants.

    **1.** **CLASSIFICATION OF IMPACT WHEN CONFLICT IDENTIFIED**. When County review of an application for a Building Permit,  Individual Sewage Disposal System Permit, or Access Permit for a  tract in a development identified in Section 1-106: C. 2: *Identification of Pre-Existing Exempt 35-Acre Tract Developments* discloses that there is a conflict between the pre-existing building envelope and/or pre-existing protective covenants regarding a building envelope, and any standard or requirement of this *Resolution*, the Planning Director shall then determine the appropriate impact classification, pursuant to Section 4-111: *Classification of Impact*.

    **2.** **PERMIT REVIEW PROCESS.** The application for a permit shall be processed subject to the applicable level of review pursuant to Article 3: *General Review Process*. The decision-making body shall determine how, and to what degree, the conflicting provision shall be applied to the maximum extent feasible without requiring a relocation of the building envelope and/or change to the protective covenants regarding form, location or type or other requirements or restrictions on residences.

**4.** **LAND USES ON INDIVIDUAL TRACTS IN A PRE-EXISTING 35-ACRE TRACT DEVELOPMENT SHALL COMPLY WITH APPLICABLE REGULATIONS AND CODES.** Except as specifically exempted by Section 1-106: C.3. b: *Conflict Between Protective Covenants/Envelopes And This Resolution,* land uses on individual tracts in a pre-existing exempt 35-acre tract development shall comply with all regulations and codes that are general in nature and are applicable to all property that is subject to jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road  and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes.

**D.** **DEVELOPMENT ON INDIVIDUAL TRACTS IN EXEMPT 35-ACRE TRACT DEVELOPMENTS EXISTING BEFORE JANUARY 1, 2000, THAT HAD PROTECTIVE COVENANTS RECORDED BEFORE JULY 1, 2000 THAT SPECIFICALLY APPROVED A MAXIMUM INDIVIDUAL STRUCTURE SIZE OR MAXIMUM AGGREGATE STRUCTURE SIZE THAT WOULD NORMALLY REQUIRE MINOR IMPACT PROJECT REVIEW PURSUANT TO SECTION 13-105: E.** Development on individual tracts in exempt 35-acre tract developments that existed before January 1, 2000 that had protective covenants recorded before July 1, 2000 that specifically approved a maximum individual structure size or maximum aggregate structure size that would normally require Minor Impact project review, pursuant to Section 13-105: E: *Residential Building Sizes and Lot Coverages.*

BLM_0053221

1. **PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENTS.** There are certain subdivisions of land that are excluded from the definitions of "subdivision" or "subdivided land" as defined by C.R.S. 30-28-101 and that:

   a. **EXISTED BEFORE JANUARY 1, 2000.** Existed on or before January 1, 2000; and

   b. **TRACTS LARGER THAN 35 ACRES**. Are comprised solely of tracts that are 35 acres or larger; and

   c. **RECORDED PLAT**. Were platted and recorded in the Gunnison County Clerk and Recorder's Office on or before January 1, 2000 ("pre-existing 35-acre tract development"); and

   d. **PROTECTIVE COVENANTS RECORDED BEFORE JULY 1, 2000 SPECIFICALLY APPROVED A MAXIMUM INDIVIDUAL STRUCTURE SIZE OR MAXIMUM AGGREGATE STRUCTURE SIZE THAT WOULD NORMALLY REQUIRE MINOR IMPACT PROJECT REVIEW PURSUANT TO SECTION 13-105: E**. Are subject to specific protective covenants that were recorded in the Office of the Gunnison County Clerk and Recorder's Office before July 1, 2000 that specifically approved a maximum individual structure size or maximum aggregate structure size that would normally require Minor Impact Project review pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard.*

2. **IDENTIFICATION OF PRE-EXISTING 35-ACRE TRACT DEVELOPMENTS**. For purposes of this Section 1-106: D: *Development On Individual Tracts In Exempt 35-acre Tract Developments Existing Before January 1, 2000, That Had Protective Covenants Recorded Before July 1, 2000 That Specifically Approved A Maximum Individual Structure Size Or Maximum Aggregate Structure Size That Would Normally Require Minor Impact Project Review Pursuant To Section 13-105: G:*, the pre-existing 35-acre tract developments include:

   a. Cement Creek at Crested Butte South;
   b. Eagle Ridge Ranch;
   c. East River Ranches;
   d. Red Mountain Ranch;
   e. Trappers Crossing at Crested Butte;
   f. Trappers Crossing South;
   g. Trappers Crossing at Wildcat; and
   h. Trappers Crossing at Wildcat II.

3. **NO REVIEW REQUIRED PURSUANT TO SECTION 13-105: E.** No review pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard* is required for tracts in those developments identified in Section 1-106: D. 2: *Identification of Pre-Existing 35-Acre Tract Developments.*

4. **COMPLIANCE WITH ALL OTHER SECTIONS OF THIS RESOLUTION AND ALL OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY.** Except as specifically exempted in Section 1-106: D.3.: *No Review Required* pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard* in those developments identified in Section 1-106: D.2.: *Identification of Pre-Existing 35-Acre Tract Developments*, shall comply with the provisions of this *Resolution* and with the provisions of Section 1-105: *Sections Necessary For The Immediate Preservation of Public Health And Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

5. **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES**. Land uses on individual tracts in those developments identified in Section 1-106: D.2.: *Identification of Pre-Existing 35-Acre Tract Developments* shall comply with all regulations and codes that are general in nature and are applicable to all property that is subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes.

E. **LAND USE CHANGES WITH A COMMON LAW VESTED PROPERTY RIGHT**. Each land use change approved by a Land Use Change Permit before the effective date of this *Resolution*, during the term of which the permittee has reasonably and substantially relied in good faith on the permit approval to his detriment shall

BLM_0053222

not require a new Land Use Change Permit. The determination of substantial reliance shall be based on the progress made in developing the project, including the effort to obtain other permits, actual construction initiated and completed, and documented expenditures to develop the project. Such a land use change shall comply with:

1. **PERMIT CONDITIONS**. The terms and conditions of the permit approval; and

2. **STATUTORY EXCEPTIONS**. The exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

3. **APPLICABLE REGULATIONS AND CODES**. All regulations and codes that are general in nature and are applicable to all property subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes; and

4. **ALL OTHER SECTIONS OF THIS RESOLUTION AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. To the maximum extent feasible, with the provisions of Section 1-105: *Sections Necessary For Immediate Preservation of Public Health And Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property subject to the jurisdiction of Gunnison County, that is found necessary by the Board for the immediate preservation of public health and safety.

F. **EXCEPTION FOR CONSTRUCTION MATERIALS EXTRACTION**. For each Land Use Change Permit for extraction of construction materials issued before the effective date of this *Resolution*, such extraction of construction materials shall be excepted from the requirements of Section 11-107: E: *Buffer Standards*, in that such extraction is allowed to be no closer than five feet from the nearest ordinary high water mark in average hydrologic years on each side of the water body, but not in the stream channel.

G. **LAND USE CHANGES WITH A STATUTORY VESTED RIGHT**. Each land use change previously approved by Gunnison County and for which a property right is currently vested by statute on the effective date of this *Resolution* in accordance with Section 1-109: *Vested Property Rights*, may be developed during the three years following the effective date of this *Resolution* without a new Land Use Change Permit approval, subject to the following:

1. **COMPLIANCE WITH PERMIT CONDITIONS**. Compliance with the terms and conditions of the permit approval; and

2. **STATUTORY EXCEPTIONS**. Compliance with the exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

3. **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES**. Compliance with all regulations and codes that are general in nature and are applicable to all property subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes; and

4. **COMPLIANCE WITH ALL OTHER SECTIONS OF THIS RESOLUTION AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. Compliance to the maximum extent feasible with the provisions of Section 1-105: *Sections Necessary For The Immediate Preservation of Public Health And Safety,* and any other code, ordinance or regulation that is general in nature and applicable to all property subject to the jurisdiction of Gunnison County, that is found necessary by the Board for the immediate preservation of public health and safety.

# SECTION 1-107: ONE RESIDENCE PER LEGAL LOT, SUBJECT TO COMPLIANCE WITH THIS RESOLUTION

Unless otherwise provided by this *Resolution*, there shall be a right to have one residence per each legal lot existing as of the effective date of this *Resolution* if that residence fully complies with:

BLM_0053223

**A. APPLICABLE REQUIREMENTS OF THIS RESOLUTION**. All applicable requirements of this *Resolution*, except as partially exempted by Section 1-106: *Partially Exempted Land Use Changes*; and

**B. OTHER REGULATIONS**. All other regulations and ordinances that are general in nature and are applicable to all property subject to land use regulation by Gunnison County, including the applicable building code, as adopted and amended by Gunnison County, the *Gunnison County Individual Sewage Disposal System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code which governs the permit approval.

## SECTION 1-108: NONCONFORMING USES

**A. PURPOSE**. Within unincorporated Gunnison County, there are uses of land and structures that were legally established before the effective date of this *Resolution* that do not conform to the legal requirements of this *Resolution*. The purpose of this Section is to regulate those nonconforming uses and structures.

**B. NON-ABATEMENT PROVISION**. Unless otherwise stated herein, it is the intent of this Section that nonconforming uses of land and structures that were legally established before the effective date of this *Resolution* are permitted to continue.

**C. LEGALLY ESTABLISHED NONCONFORMING USES AND STRUCTURES**.

    **1. NONCONFORMITY MAY CONTINUE.** Legal nonconforming land uses and nonconforming structures may continue, so long as they remain otherwise legal and comply with the requirements of this Section.

    **2. REPAIRS AND MAINTENANCE.** Ordinary repairs and maintenance to permit continuation of a legal nonconforming use or structure shall be permitted.

    **3. EXTENSION OR EXPANSION**.

        **a. LIMITED EXTENSION OR EXPANSION**. A legal nonconforming use or structure shall not be extended or expanded except as allowed in the following Section 1-108: B. 3. b: *Expansion Shall Not Increase Nonconformance*. This prohibition shall be construed to prevent the additional land uses or structures from being used in a nonconforming manner.

        **b. EXPANSION SHALL NOT INCREASE NONCONFORMANCE**. A legal nonconforming use or structure shall only be extended, expanded or altered in a manner that does not expand, or that decreases, the nonconforming use or aspect.

        **c. EXPANSION SUBJECT TO SECTION 1-105**: Extension or expansion of a legal nonconforming land use or structure is subject to the provisions of Section 1-105: *Sections Necessary for the Immediate Preservation of Public Health and Safety*.

        **d. EXTENSION OR EXPANSION ONTO LAND OUTSIDE OF PERMITTED AREA.** Any extension or expansion of a legal nonconforming use, including but not limited to a mining operation, onto land outside of the area specifically identified and approved by a Land Use Change Permit, shall comply with the requirements of this *Resolution*.

    **4. RELOCATION.** A legal nonconforming land use or structure shall not be moved, in whole or in part, unless the relocation brings the use or structure into compliance with the requirements of this *Resolution*.

    **5. CHANGE OF USE.** A legal nonconforming use shall not be changed to another use, unless the use to which it is changed is pursuant to the requirements of this *Resolution*.

    **6. ABANDONMENT OF NONCONFORMING COMMERCIAL OR INDUSTRIAL USE OR STRUCTURE**. If any legal nonconforming commercial or industrial use or structure is abandoned for a period of one year, renewal of that use or the use of that structure shall not be initiated until a review by the Planning Department has determined that the renewed use will not pose a threat to public health or safety. For the purpose of this Section, "abandonment" means the intent not to continue the legally established nonconforming use or use of the structure coupled with the discontinuance of the nonconforming use or use of the structure. There is a presumption that there is intent to abandon if the property is physically abandoned. Seasonal discontinuance of a use, or discontinuance of a use during active marketing of the property for sale, is not abandonment.

    **7. RESTORATION OF DAMAGED NONCONFORMING USE.** A legal nonconforming use or structure including any structure that would normally require Minor or Major Impact project review pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard*, that is

BLM_0053224

demolished or destroyed by an act of God or through any manner not willfully accomplished by the owner may be restored within one year of the damage or destruction  as of right, regardless of the extent of demolition or destruction, conditioned upon issuance of each required permit, pursuant to Section 1-104: *Permits Required*. A one time, two-year extension of the initial year may be granted by the Planning Director upon findings that:

    **a.** **HARDSHIP.** There would be a substantial hardship to the owner without the extension; and

    **b.** **SUBSTANTIAL EFFORT TO RESTORE.** Within the first six months of the initial year, the owner has substantially cleaned up the damaged structure.

**D. NO NEW NONCONFORMING USES.** Except as specifically provided by this *Resolution*, no land use change shall be approved to create a new nonconforming use or new nonconforming aspect.

## SECTION 1-109: VESTED PROPERTY RIGHTS

**A. PURPOSE.** This purpose of this Section is to establish a system of vested property rights pursuant to Article 68 of Title 24, C.R.S: as amended.

**B. EFFECT OF VESTING.** A vested property right, once established pursuant to this Section, precludes during its term, any zoning or land use action by Gunnison County or pursuant to an initiated measure that would alter, impair, prevent, diminish, impose a moratorium on, or otherwise delay the development or use of the subject land consistent with the terms and conditions of the site-specific development plan, except:

    **1.** **LANDOWNER IS CONSENT.** With the consent of the affected landowner;

    **2.** **HAZARDS.** Upon the discovery of natural or man-made hazards on or in the immediate vicinity of the subject property, which hazards could not reasonably have been discovered at the time of the approval of the site-specific development plan, and which hazards, if uncorrected, would pose a serious threat to the public health, safety, and welfare; or

    **3.** **JUST COMPENSATION PAID TO LANDOWNER.** To the extent that the affected landowner receives just compensation for all costs, expenses, and liabilities incurred by the landowner, including costs incurred in preparing the site for development consistent with the site-specific development plan, all fees paid in consideration of financing, and all architectural, planning, marketing, legal, and other consultants' fees, together with interest thereon at the legal rate until paid. Just compensation shall not include any diminution in the value of the property that is caused by such action.

    **4.** **NEW REGULATIONS THAT ARE GENERAL IN NATURE.** The application of ordinances or regulations that are general in nature and are applicable to all property subject to land use regulation by Gunnison County, including building, fire, plumbing, electrical, and mechanical codes. These also include the provisions of Section 1-105: *Sections Necessary for the Immediate Preservation of Public Health and Safety,* as they may be amended from time to time.

    **5.** **SUBSEQUENT REVIEW AND APPROVAL.** Following approval or conditional approval of a Land Use Change Permit for a site-specific development plan, nothing in this Section shall exempt the site-specific development plan from subsequent reviews by Gunnison County to ensure compliance with the terms and conditions of the approval.

    **6.** **FORFEITURE.** Failure to abide by any applicable terms and conditions of the Land Use Change Permit or of the site-specific development plan may result in the suspension or revocation of the statutory vested property right or the implementation of any other enforcement mechanism identified in Article 16: *Enforcement*.

    **7.** **SUBJECT TO RIGHTS OF REFERENDUM AND JUDICIAL REVIEW; PUBLIC NOTICE.** Approval of a site-specific development plan and its associated statutory vested right shall be subject to all rights of referendum and judicial review; except that the period of time permitted by law for the exercise of such rights shall not begin to run until the date of publication in a newspaper of general circulation in Gunnison County, advising the general public that the site-specific development plan has been approved, and a vested property right granted pursuant to Article 68 of Title 24, C.R.S. The property description shall be included in the notice. The Planning Director shall cause such notice to be published, at the applicant's cost, no later than 14 days following approval of the site-specific development plan. If a statutory vested right is extended, suspended or revoked, notice of such extension, suspension or revocation and any reinstatement subsequent to a suspension shall be made in like fashion.

BLM_0053225

**C.  GRANT OF VESTED PROPERTY RIGHT TO EACH LAND USE CHANGE PERMIT APPLICATION APPROVED BETWEEN JANUARY 1, 1988 UNTIL THE EFFECTIVE DATE OF THIS RESOLUTION.** In addition to any common law vested right that may exist, the Board hereby expressly authorizes and grants for each Land Use Change Permit approved by Gunnison County between January 1, 1988 and the effective date of this *Resolution*, a statutory vested property right for a period of three years beginning with the effective date of this *Resolution*. When a statutory vested right exists as of the effective date of this *Resolution*, the Board expressly authorizes and grants such extension of that statutory vested right for only three years from the effective date. No vested right authorized and granted under this Section shall be extended except as provided in Section 1-109: F. 2: *Requirements for Extensions During Term.*

**D.  SITE-SPECIFIC DEVELOPMENT PLAN APPROVALS THAT CAUSE PROPERTY RIGHTS TO VEST.** A site-specific development plan (SSDP) is the plan for a land use change that describes with reasonable certainty the type and intensity of use for a specific parcel or parcels, that receives final approval by the required decision-making body, and for which each applicable requirement of this Section is met. Property rights shall vest only as follows:

1.  **ADMINISTRATIVE REVIEWS.** If the SSDP is approved pursuant to Article 5: *Administrative Review Projects That Require a Land Use Change Permit*, property rights shall vest upon the last of the following acts, each of which is a prerequisite to property rights vesting:

    a.  **ISSUANCE OF CERTIFICATE OF ADMINISTRATIVE APPROVAL.** The issuance of the appropriate Certificate of Administrative Approval, which shall be signed by the Planning Director.

    b.  **FULL PLAT EXECUTION.** Full execution of any required plat and the recording of such plat by the County at the applicant's cost, in the Office of the Clerk and Recorder of Gunnison County;

    c.  **FULL EXECUTION AND FUNDING OF DEVELOPMENT IMPROVEMENT AGREEMENT.** Full execution and funding of any Development Improvement Agreement required by the Certificate of Administrative Approval;

    d.  **RECORDING OF CERTIFICATE OF ADMINISTRATIVE APPROVAL.** At the cost of the applicant, recording by Gunnison County of the Certificate of Administrative Approval in the Office of the Clerk and Recorder of Gunnison County.

2.  **MINOR AND MAJOR IMPACT PROJECT REVIEWS.** If the SSDP is approved as a Minor Impact pursuant to Article 6: *Minor Impact Projects* or as a Major Impact pursuant to Article 7: *Major Impact Projects,* property rights shall vest upon the last of the following acts, each of which is a prerequisite to property rights vesting:

    a.  **ISSUANCE OF FINAL PLAN APPROVAL.** Adoption by the Planning Commission or the Board of a resolution memorializing the final approval of the project following the required public notice and hearing;

    b.  **FULL EXECUTION AND RECORDING OF PLAT.** Full execution of any required plat and the recording of such plat by the County at the applicant's cost in the Office of the Clerk and Recorder of Gunnison County;

    c.  **FULL EXECUTION AND FUNDING OF DEVELOPMENT IMPROVEMENT AGREEMENT.** Full execution and funding of any Development Improvement Agreement as may be required by the resolution of approval or *Certificate of Major Impact Approval*;

    d.  **RECORDING OF RESOLUTION OF APPROVAL.** At the cost of the applicant, recording of the required resolution or *Certificate of Major Impact Approval* by the County in the Office of the Clerk and Recorder of Gunnison County.

**E.  VESTED RIGHT RUNS WITH THE LAND.** Statutory vested property rights shall attach to and run with the land for which the SSDP is approved. As a legislative act, the Board may extend the term of the statutory vested property right and, if appropriate, limit to an identified landowner or landowners the benefits of a statutory vested right after it is extended, pursuant to Section 1-109: F: *Duration and Extension.*

**F.  DURATION AND EXTENSION.**

1.  **DURATION.** Unless expressly extended pursuant to this Section, a statutory vested right as defined in this Section shall be effective for a period of three years from its establishment.

BLM_0053226

**2. REQUIREMENTS FOR EXTENSION DURING TERM.** An extension of the term of a statutory vested right may be requested by the applicant, or recommended by the Planning Commission. The term of a statutory vested right may only be extended as a condition of initial approval or within the final 18 months of the approved term of the permit, and only if the Board, after a public hearing on the request, noticed and conducted pursuant to Sections 3-112: *Notice of Public Hearing* and 3-113: *Conduct of Public Hearing*, finds that an extension is warranted based on all of the following criteria:

**a. EXTENSION OF STATUTORY VESTED RIGHT REQUESTED AS PART OF INITIAL PERMIT APPROVAL.** When extension of a statutory vested right is requested as part of the initial approval of the Land Use Change Permit all of the following criteria must be met:

**1. NO PUBLIC DETRIMENT, OR PUBLIC BENEFIT WILL BE OBTAINED.** There will be no public detriment, or public benefit will be obtained, as a consequence of the extension; and

**2. SIZE OF PROJECT AND ECONOMIC CONDITIONS.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term.

**b. EXTENSION OF STATUTORY VESTED RIGHT REQUESTED WITHIN 18 MONTHS OF END OF PERMIT TERM.** When extension of a statutory vested right is requested within 18 months of the end of the term of the Land Use Change Permit, all of the following criteria must be met:

**1. NO PUBLIC DETRIMENT, OR PUBLIC BENEFIT WILL BE OBTAINED.** There will be no public detriment, or public benefit will be obtained, as a consequence of the extension; and

**2. SIZE OF PROJECT AND ECONOMIC CONDITIONS.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term; and

**3. COMPLIANCE TO DATE WITH CONDITIONS OF ORIGINAL PERMIT.** The applicant has complied with all conditions requiring performance before the date of application for extension of the permit term; and

**4. PROGRESS IN PURSUING COMPLETION OF DEVELOPMENT.** Progress has been made in pursuing the development to date, including obtaining other necessary permits, and there have been expenditures made by the applicant in pursuing the project; and

**5. BENEFITS RECEIVED BY COUNTY.** Benefits already have been received by the County as a result of project approval, such as impact fees or land dedications; and

**6. NEEDS OF APPLICANT AND COUNTY.** The needs of the applicant and County will be served by the extension; and

**7. NO CONFLICT BETWEEN DEVELOPMENT AND REGULATIONS.** There is no substantial conflict, or change in the development is approved to eliminate substantial conflict, between the project as approved, and the requirements of this *Resolution* or other regulations as they exist at the time the application for extension is made to extend the permit term; and

**8. CHANGES IN CIRCUMSTANCES.** Changes to adjacent land uses have not created a substantial conflict between those uses and the uses for which an extended permit term is requested; and

**9. PROPOSED CHANGES IN THE DEVELOPMENT.** Any proposed changes in the development are not significant.

## SECTION 1-110: PROCESS FOR DESIGNATING SPECIAL AREAS

**A. PURPOSE.** The purpose of this Section is to establish a process by which the County may designate particular geographical areas, basins, or other land areas as being subject to specialized land use regulations.

**B. AUTHORITY TO INITIATE DESIGNATIONS.** Designation of a particular area as being subject to specialized land use regulations may be initiated by the Board, by the Planning Commission, by the Planning Director, by any person who owns a legal interest in real property within the county, or by any person residing within the county.

**1. PROCESS FOR DESIGNATION OF AN AREA.** The following process shall be followed for designation of a special area:

**a. BOARD IDENTIFIES PROPOSED AREA.** The Board, by motion at a regular meeting, shall identify a proposed, designated special area, shall identify, generally, the rationale for specially designating such

area, and shall instruct the Planning Director to prepare the map, report and proposed regulations required by Section 1-110: B.1. b: *Preparation of Map, Report and Proposed Regulations*.

**b. PREPARATION OF MAP, REPORT AND PROPOSED REGULATIONS**. The Planning Director shall prepare a map specifically identifying the area to be included within the designated geographic area and a report evaluating the need for the proposed designation. The map shall be drawn at a scale no smaller than the standard U.S. Geological Survey quadrangle map for that area. The Planning Director shall also prepare a draft of regulations governing the Special Area, and applicable amendments to this *Resolution* that would accompany the designation. Those amendments shall be evaluated pursuant to Section 1-113: *Amending This Land Use Resolution*, and shall be reviewed concurrently with the proposed designation.

**c. MATERIALS FORWARDED TO PLANNING COMMISSION AND BOARD**. The map, report, and any amendments proposed for this *Resolution* shall be forwarded to the Planning Commission and the Board.

**d. PUBLIC HEARING**. The Board and Planning Commission shall jointly conduct a public hearing. Notice shall be provided pursuant to Section 3-112: *Notice of Public Hearing*, except that the County shall be responsible for notifying all those persons whose properties would be located in the proposed special area. Conduct of the hearing shall comply with Section 3-113: *Conduct of Public Hearing*.

**e. PLANNING COMMISSION REVIEW AND RECOMMENDATION**. The Planning Commission shall review the materials, considering the requirements of Section 1-110: C: *Standards of Approval* and shall forward its recommendations to the Board.

**f. BOARD REVIEW AND ACTION**. The Board shall consider the map, report, the proposed regulations, the Planning Commission's recommendation, the public testimony and evidence provided at the public hearing, and the requirements of Section 1-110: C: *Standards of Approval*. The Board, by written resolution, shall adopt the designation and proposed regulations, adopt the designation and proposed regulations with modifications, or deny the designation and proposed regulations.

**g. RECORDING THE DESIGNATION**. If the Board adopts the proposed designation and proposed regulations, with or without modification, then within 30 days following the action, a copy of the map depicting the geographic area, the resolution adopting the designation and the proposed regulations shall be recorded in the office of the Gunnison County Clerk and Recorder.

**C. STANDARDS OF APPROVAL**. The Planning Commission and the Board, at a minimum, shall consider the following when designating a particular geographical area as subject to specialized land use regulations, and in their respective actions, shall enter findings relative to each of the following elements:

**1. DEVELOPMENT ACTIVITY.** The intensity and type of current and foreseeable development in the area.

**2. RATIONALE AND NEED FOR DESIGNATION**. The purpose and need of the proposed designation.

**3. BOUNDARIES**. The proposed boundaries of the area proposed for designation.

**4. COMMUNITY PLAN OR TECHNICAL STUDY**. Any community plan or technical study that may have been conducted regarding the proposed designation.

**5. ALTERNATIVES**. Whether the particular purpose to be achieved by the designation can be best achieved by designating that geographic area for specialized land use regulation, or whether the purpose could better be achieved by an alternative method, including the adoption of regulations that would apply countywide.

**6. ADVERSE IMPACTS AND EXPECTED BENEFITS**. Any adverse impacts that can reasonably be anticipated to result from development in the area if the designation were not to occur, and the expected benefits that can reasonably be anticipated to result from the review of that development in a specialized manner.

## SECTION 1-111: CONSTRUCTION AND WORD USAGE

**A. LIBERAL CONSTRUCTION**. This *Resolution* and the terms of it are to be liberally construed to effect the purposes of this *Resolution*.

**B. MORE VERSUS LESS RESTRICTIVE REQUIREMENTS**. Where there exists a conflict or overlap between different requirements in this *Resolution*, or between this *Resolution* and any other resolution, regulation or ordinance adopted by Gunnison County, or between this *Resolution* and any other applicable state or federal

BLM_0053228

requirement or statute, the requirement that is the more restrictive or particular shall prevail over that which is less restrictive or is more general.

**C. TEXT VERSUS TABLE, ILLUSTRATION, GRAPHIC DEPICTION OR TITLE**. If a conflict or overlap arises between the requirements of the text of this *Resolution* and any table, illustration, graphic depiction, or the title of any table, illustration, graphic depiction or section, the requirements of the text shall prevail.

**D. PRIVATE AGREEMENTS**. It is not the intent of this *Resolution* to unreasonably interfere with, abrogate, or annul any easement, covenant, deed restriction, or other agreement between private parties. If the requirements of this *Resolution* impose a greater restriction than imposed by a private agreement signed after the effective date of this *Resolution*, the requirements of this *Resolution* shall control; if the requirements of a private agreement impose the greater restriction, the requirements of the private agreement shall take precedence. The County shall not be responsible for enforcing applicable requirements of private agreements other than those to which the County is a party, in which case the County shall have the sole discretion to decide whether to enforce.

**E. REQUIREMENTS ARE MINIMUM REQUIREMENTS**. The requirements of this *Resolution* shall be regarded as the minimum requirements necessary for the protection of the public health, safety, general welfare, and the environment.

**F. DELEGATION OF DUTIES BY DEPARTMENT HEAD**. Whenever a provision requires the Planning Director or the head of any other County department to perform an act or duty, it shall be construed to authorize the Planning Director, or the head of that other County department, to designate, delegate, and authorize subordinates to perform the duty or act, unless the terms of the provision or section specify otherwise.

**G. COMPUTATION OF TIME**. The time in which an act is to be done shall be computed by excluding the first and including the last day. If a deadline falls on a weekend or County holiday, the deadline extends to the end of the next working day. Time shall be based on calendar days, not working days, unless otherwise specified.

   **1. DAY**. The end of a day shall be at 5:00 P.M: Gunnison time.

   **2. WEEK**. The word "week" shall mean seven days.

   **3. MONTH**. The word "month" shall mean 30 days.

   **4. YEAR**. The word "year" shall mean 365 days.

**H. FRACTIONS**. Whenever a fraction is generated in any calculation required by this *Resolution*, then fractions from .01 to .49 shall be rounded down to the next lowest whole number, and fractions from 0.50 to 0.99 shall be rounded up to the next highest whole number, unless otherwise specified.

**I. MEANINGS OF CERTAIN WORDS**.

   **1. SINGULAR/PLURAL**. A word used in the singular may also be applied to several persons and things as well as to one person or thing. The use of the plural number shall include any single person or thing, unless the context clearly indicates the contrary.

   **2. SHALL/WILL/MUST/MAY/SHOULD**. "Shall", "will" and "must" all mean the provision is mandatory; "may" means it is permissive; "should" means it is preferred.

   **3. MASCULINE/FEMININE**. The masculine gender shall include the feminine, and the feminine gender shall include the masculine.

   **4. CONJUNCTIONS**. Unless the context clearly suggests otherwise, conjunctions shall be interpreted as follows:

      **a.** "**AND**" means that all connected items, conditions, requirements, or events apply.

      **b.** "**OR**" means that one or more of the connected items, conditions, requirements, or events apply.

   **5. COMMON/TECHNICAL TERMS**. Words and phrases shall be construed according to the common usage of the term, but technical words and phrases that have acquired a particular meaning shall be understood according to that particular meaning.

   **6. LISTS AND EXAMPLES.** Unless otherwise specifically indicated, lists of items or examples that use terms including "for example," "including" or similar language, are intended to provide examples, not exhaustive lists of all possibilities.

BLM_0053229

**J.** **ABBREVIATIONS.** The following abbreviations used in this *Resolution*, or as are otherwise used by the County in its review and disposition of land use issues, have the following meanings:

1. **AASHTO** means the American Association of State Highway and Transportation Officials.

2. **CDOW** means Colorado Division of Wildlife.

3. **CDOT** means Colorado Department of Transportation.

4. **CGS** means Colorado Geologic Survey.

5. **C.R.S.** means Colorado Revised Statutes, including all amendments thereto.

6. **ISDS** means individual sewage disposal system.

7. **SQ. FT**. means sq. ft.

## SECTION 1-112: USE OF MAPS

Gunnison County uses the following maps as general sources of information to provide initial guidelines for siting development, and for alerting the County, the applicant and the public about the physical characteristics of a parcel and the area in which it is located. Site-specific studies may be required of individual parcels to determine individual characteristics more definitively, and how they may affect a development proposal.

**A.** **MAPS ADOPTED.** Gunnison County hereby adopts the following maps in this *Resolution*, as if they were actually included as illustrations in the *Resolution*. These maps may be updated from time to time, pursuant to Section 1-112: B: *Adoption of New or Updated Maps.*

1. **FLOODPLAIN MAPS**. National Flood Insurance Rate Maps (FIRM) prepared by the Federal Emergency Management Agency (September 29, 1989, as amended), and as more specifically adopted in Section 11-103: E: *Official Maps.*

2. **GUNNISON COUNTY ROAD MAINTENANCE MAPS**. Maps of roads within Gunnison County, designating roads maintained and/or plowed by Gunnison County (dated April 1997, as amended).

**B.** **ADOPTION OF NEW OR UPDATED MAPS**. New or updated maps may be adopted by Gunnison County from time-to-time to reflect new studies, to correct map designations, or to otherwise replace or augment the floodplain, road maintenance and other maps. The adoption of a new map or the amendment of any adopted map shall be accomplished by amending or adding the reference to the map in this Section and by following the process and standards of Section 1-113: *Amending This Land Use Resolution.*

**C.** **MAPS TO BE USED AS REFERENCES**. Gunnison County may use the following and other maps as they may be amended as general references. Amendment or other update by the agencies that prepared them requires no action by the County.

1. **WILDFIRE HAZARD MAPS**. Wildfire Area Hazard Maps prepared by the Colorado State Forest Service.

2. **SOILS MAPS**. Soil Survey Maps prepared by the Natural Resource Conservation Service (Soil Conservation Service).

3. **GEOLOGIC HAZARD MAPS**. Geologic Hazard Maps prepared by the Colorado Geologic Survey.

4. **WILDLIFE MAPS**. The Wildlife Resource Information System (WRIS) and National Diversity Information Source (NDIS) maps available from the Colorado Division of Wildlife, and the Gunnison Basin Sage Grouse Habitat Maps (in the *Gunnison Sage Grouse Conservation Plan*), or their successors.

5. **(WETLANDS MAPS**. Wetlands identification maps for lands around the Town of Crested Butte prepared by David Cooper, PhD: Ecologist, in cooperation with the U.S. Environmental Protection Agency.

## SECTION 1-113: AMENDING THIS LAND USE RESOLUTION

**A.** **PURPOSE**. The purpose of this Section is to provide a process by which the Board may, from time to time, amend, supplement or repeal this *Resolution.*

**B.** **PROCESS TO AMEND**. The following process shall apply to an application for an amendment to this *Resolution*:

1. **INITIATION.** An amendment to this *Resolution* may be initiated by any of the following:

BLM_0053230

    **a.**  **BOARD MOTION**. The Board may initiate an amendment by motion directing the Planning Director to submit a proposed amendment and report to the Planning Commission for review and for further action pursuant to this Section.

    **b.**  **PLANNING COMMISSION INITIATIVE**. The Planning Commission may initiate an amendment by submitting a written recommendation for proposed amendment to the Board.

    **c.**  **PLANNING DIRECTOR**. The Planning Director may initiate an amendment by submitting a written recommendation for proposed amendment directly to the Board, or by first submitting it to the Planning Commission for review and recommendation to the Board.

    **d.**  **PROPERTY OWNER OR OTHER RESIDENT INITIATIVE**. An amendment may be initiated by a person who owns a legal interest in real property within the County, or by any person living within the County, by the submittal of an application to the Planning Department.

**2.**  **SUBMITTAL OF DRAFT AMENDMENT LANGUAGE**. Any initiative or application for amendment shall be submitted to the Planning Department, and at a minimum shall include the following:

    **a.**  **IDENTIFICATION OF APPLICANT, IF RESIDENT- OR PROPERTY OWNER-INITIATED**. The applicant's name, address, and telephone number. If the applicant is to be represented by an agent, a notarized letter signed by the applicant shall also be submitted, authorizing the agent to represent the applicant and stating the representative's name, address, and telephone number.

    **b.**  **PRECISE WORDING**. The precise wording of the proposed amendment, and the language of the article, division and/or section that it will change.

    **c.**  **RATIONALE FOR PROPOSED AMENDMENT**. A concise statement of the purpose and need for the proposed amendment.

**3.**  **PLANNING DEPARTMENT REVIEW**. The Planning Department shall review the application for completeness pursuant to Section 1-113: B. 2: *Submittal of Draft Amendment Language*, and compliance with Section 1-113: C. *Review Standards*.

**4.**  **PLANNING COMMISSION REVIEW**. A complete copy of the application shall be forwarded to the Planning Commission, together with a copy of the Planning Department's report. The Planning Commission shall review the application, considering the standards of Section 1-113: C. *Review Standards*, and shall make a recommendation to the Board to approve,  approve with modifications, table for further study, or deny the proposed amendment.

**5.**  **BOARD PUBLIC HEARING**. The Planning Commission's recommendations shall be forwarded to the Board, together with a complete copy of the application, and a copy of the Planning Department Review. The Board shall conduct a public hearing pursuant to Sections 3-112: *Notice of Public Hearing*, and 3-113: *Conduct of Public Hearing*.

**6.**  **BOARD REVIEW AND ACTION.** The Board shall consider the application, any relevant support materials, the Planning Department's report, the Planning Commission's recommendation, the public testimony and evidence given at the public hearing, and compliance of the application with Section 1- 113: C: *Review Standards.* Following closure of the public hearing, the Board may, by written resolution, adopt the amendments, adopt the amendments with modifications, table for further study or deny the amendments. Such resolution shall include findings that address the review standards in Section 1-113: C: *Review Standards*.

**C.**  **REVIEW STANDARDS**. The decision to amend the text of the *Resolution* is at the legislative discretion of the Board and is not controlled by any one factor. The Board shall consider the following in determining whether to adopt a proposed amendment, adopt a proposed amendment with modifications, table it for further study or deny it:

**1.**  **CONSISTENCY WITH ANY COMPREHENSIVE PLAN ADOPTED BY GUNNISON COUNTY**. Consistency of the proposed amendment with any applicable comprehensive plan adopted by Gunnison County;

**2.**  **CHANGED CONDITIONS**. Changed conditions, including the economy of Gunnison County;

**3.**  **EFFECT ON THE NATURAL ENVIRONMENT**. Effect of the proposed amendment on the natural environment;

**4.**  **COMMUNITY NEEDS**. Community needs;

         *GUNNISON COUNTY, COLORADO LAND USE RESOLUTION: 2/15/06*

BLM_0053231

5. **DEVELOPMENT PATTERN**. Development pattern;

6. **CHANGES IN APPLICABLE LAW**. Changes in applicable law;

7. **PUBLIC HEALTH, SAFETY AND WELFARE**. Public health, safety and welfare;

8. **COMPLIANCE WITH ANY APPLICABLE INTERGOVERNMENTAL AGREEMENTS ADOPTED BY GUNNISON COUNTY.** Compliance with any applicable intergovernmental agreements adopted by Gunnison County.

D. **FEES**. When an amendment is initiated by a property owner or resident, a fee to cover the cost of publishing notice of the public hearing shall be paid by the applicant as shown in a schedule of fees issued by the Planning Department, adopted and amended from time to time by the Board. When the amendment is initiated by the Board, the Planning Commission or the Planning Director, no fee shall be charged.

## SECTION 1-114: INTERPRETATIONS

A. **AUTHORITY**. The Planning Director shall be authorized to make a written interpretation of the requirements of the this *Resolution*, and the designations made on official County maps to determine whether a piece of property does or does not lie within or partly within a designated hazard zone, resource area, or other designated geographic area.

B. **PROCESS.** Persons who wish to have an interpretation of any portion of this *Resolution* may request it as follows:

1. **INITIATION.** A request for a written interpretation may be made by any person by submitting a written request to the Planning Director. The written request shall specify the provision of this *Resolution* or the particular map designation for which an interpretation is requested. The written request shall also state the factual basis for the request. A Land Use Change Permit applicant may request a Pre-Application Conference before submitting the request for an interpretation.

2. **DETERMINATION OF COMPLETENESS FOR REVIEW**. Within 15 days of receipt of the request for an interpretation, the Planning Director shall determine whether the request is complete, specific, and ready for review. If the Planning Director determines the request is not complete or specific, written notice shall be sent to the applicant specifying the deficiencies. No further action shall be taken on the request until the deficiencies have been remedied.

3. **RENDERING OF INTERPRETATION**. Within 30 days of determining that the request for an interpretation is complete, the Planning Director shall evaluate the application, consult with the County Attorney and other staff as necessary, and render a written interpretation. When rendering the interpretation, the Planning Director shall consider the County's legislative intent in adopting the provision, as expressed in this *Resolution*, and as may be determined from the County's official records.

C. **OFFICIAL RECORD.** The Planning Department shall keep an official written record of all written interpretations that have been rendered. The record shall be available at the Planning Department for public inspection, on reasonable request, during normal business hours.

D. **APPEALS**. Interpretations or final decisions rendered by the Planning Director may be appealed to the Board of Commissioners. The appeal shall be submitted and considered pursuant to the requirements of Section 8-603: *Appeals*.

## SECTION 1-115: ESTABLISHMENT OF GUNNISON COUNTY PLANNING COMMISSION

A. **ESTABLISHMENT.** The Gunnison County Planning Commission is hereby established.

B. **POWERS AND DUTIES.** The Planning Commission shall have authority to act as provided by state statute and by the Board in this *Resolution*. Authority under state law includes the following: Title 30, Article 28; Title 24, Article 65.1; Title 24, Article 67; Title 29, Article 20; and Title 30, Article 11.

C. **INITIAL COMMISSION.** The membership and composition of the initial Planning Commission established pursuant to this Section shall be the same as the Planning Commission existing at the time immediately before the effective date of this *Resolution*. Members shall serve out their respective remaining terms of office.

D. **REGULAR MEMBERS**. The Planning Commission shall be comprised of five regular members.

E. **REGULAR MEMBER'S LENGTH OF TERM**. The term of each member shall be three years.

BLM_0053232

**F.   ALTERNATE MEMBERS**. The Board, in its discretion, may appoint as many as two alternate Planning

**G.   RESIDENCY REQUIRED**. Each regular and alternate member shall be a resident and shall have been a resident of Gunnison County for at least one year before appointment.

**H.   VACANCIES AND REMOVAL OF MEMBERS**. The Board of Commissioners shall fill vacancies and may remove a member for non-performance of duty or misconduct, as it deems appropriate in the exercise of its discretion. In the event that any member is temporarily unable to act owing to absence, illness, conflict of interest, or any other cause, such position shall be filled during the temporary disability by an alternate member in accordance with the bylaws or guidelines, if applicable, or by order of the chairperson of the Commission.

**I.   COMMISSION BYLAWS OR GUIDELINES**. The Board, after recommendation by the Planning Commission, shall adopt or amend bylaws or guidelines establishing the Commission's procedures. A copy of the bylaws or guidelines shall be available to the public during regular business hours in the Planning Department.

**J.   RECORD OF COMMISSION PROCEEDINGS**. The Planning Commission shall keep a record of its proceedings, which record shall be open to inspection at the Planning Department by the public during regular business hours.

## SECTION 1-116: ESTABLISHMENT OF GUNNISON COUNTY BOARD OF ADJUSTMENTS

**A.   ESTABLISHMENT**. There is hereby established the Gunnison County Board of Adjustments.

**B.   POWERS AND DUTIES**. The powers and duties of the Board of Adjustments shall be as follows:

    **1.   GRANTING OF VARIANCES FROM SETBACK REQUIREMENTS**. The Board of Adjustments shall have the final authority to grant variances from setback requirements where, by reason of unusual narrowness, shallowness, or shape of a specific parcel existing at the effective date of this *Resolution*, or by reason of unusual topographic conditions or other situations or conditions of the parcel, none of which shall be self-imposed, the strict application of the requirements of Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way* would result in peculiar practical difficulties to, or undue hardship upon, the owner of that property. The Board of Adjustments may grant a variance from such strict application to relieve these difficulties or hardship, if such relief may be granted without substantial detriment to the public health, safety and welfare and without substantially impairing the intent and purposes of this *Resolution*.

    **2.   APPEAL OF ACTION BY PLANNING DIRECTOR**. The Board of Adjustments shall have the authority to hear and decide appeals when it is alleged by an applicant that the Planning Director has made an error in any order, requirement, decision or refusal related to the granting of variances from setback requirements, pursuant to Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way*

**C.   INITIAL BOARD**. The membership and composition of the initial Board of Adjustments established pursuant to this Section shall be the same as the Board of Adjustments existing at the time immediately before the effective date of this *Resolution*. Members shall serve out their respective remaining lengths of terms of office.

**D.   REGULAR MEMBERS**. The Board of Adjustments shall be comprised of five regular members.

**E.   REGULAR MEMBER'S LENGTH OF TERM**. The term of each member shall be three years. The Board shall establish staggered terms for the members.

**F.   ALTERNATE MEMBERS**. The Board, in its discretion, may appoint as many as two alternate Board of Adjustments members.

**G.   RESIDENCY REQUIRED**. Each regular and alternate member shall be a resident and shall have been a resident of Gunnison County for at least one year before appointment.

**H.   VACANCIES AND REMOVAL OF MEMBERS**. The Board of Commissioners shall fill vacancies and may remove a member for non-performance of duty or misconduct, as it deems appropriate in the exercise of its discretion. In the event that any member is temporarily unable to act owing to absence, illness, conflict of interest, or any other cause, such position shall position during the temporary disability by an alternate member in accordance with the bylaws, if applicable, or by order of the chairperson of the Commission.

**I.   BOARD OF ADJUSTMENTS BYLAWS OR GUIDELINES**. The Board, after recommendation by the Board of Adjustments, shall adopt and amend such bylaws or guidelines establishing procedures for the Board of Adjustments as may be necessary. A copy of the appropriate document shall be available for public inspection during regular business hours in the Planning Department.

BLM_0053233

J. **RECORD OF BOARD OF ADJUSTMENTS PROCEEDINGS**. The Board of Adjustments shall keep a record of its proceedings, which record shall be available to the public during regular business hours of the Planning Department.

## SECTION 1-117: REPEALER

A. **REPEAL OF FORMER GUNNISON COUNTY LAND USE RESOLUTION.** Adoption of this *Resolution* repeals the former *Gunnison County Land Use Resolution* and amendments to it.

B. Adoption of this *Resolution* repeals the former Gunnison County Mobile Home Park and Individual Mobile Home Regulations.

C. **REPEAL OF GUNNISON COUNTY SIGN CODE.** Adoption of this *Resolution* repeals the former *Gunnison County Sign Code*.

D. **REPEAL OF GUNNISON COUNTY FLOOD DAMAGE PREVENTION RESOLUTION**. Adoption of this *Resolution* repeals the former *Gunnison County Flood Damage Prevention Resolution.*

E. **REPEAL OF RESOLUTION NO. 99-20.** Adoption of this *Resolution* repeals the Board of County Commissioners' Resolution No. 99-20, *A Resolution Promulgating Temporary Land use Regulations Regarding For Staging Special Events, Erecting Temporary Structures On Construction Sites, And Camping On Private Property.*

F. **NON-REVIVAL OF FORMERLY REPEALED ORDINANCE, CODES, AND OTHER REGULATIONS**. The repeal of the documents listed in Sections 1-117: A through E does not revive any other requirements, resolutions, ordinances, codes, or other regulations repealed by any of those documents.

G. **EFFECT ON PENDING APPLICATIONS AND PREVIOUSLY APPROVED PERMITS**. Repeal of the documents listed in Sections 1-117: A through E does not affect approval of applications pending as of the effective date of this *Resolution*, or enforcement of permit conditions imposed under the requirements of those documents.

## SECTION 1-118: SEVERABILITY

If any Article, Division, Section, paragraph, clause, provision, or portion of this *Resolution* is determined to be unconstitutional or invalid by a court of competent jurisdiction, such determination shall not affect the validity of this *Resolution* as a whole or any part of this *Resolution* other than the part determined to be unconstitutional or invalid. If any application of this *Resolution* to a particular structure, parcel of land, or body of water is determined to be unconstitutional or invalid by a court of competent jurisdiction, such determination shall not be applicable to any other structure, land, or water not specifically included or referenced in that judgment.

## SECTION 1-119: WAIVER OF STANDARDS TO FACILITATE AFFORDABLE HOUSING

To facilitate the public or private construction of residences restricted to affordable housing, the Board, after providing notice and conducting a public hearing pursuant to Sections 3-112: *Notice of Public Hearing* and 3-113: *Conduct of Public Hearing*, may waive, or waive with conditions, one or more standards or requirements of this *Resolution*. The standards on which that waiver shall be granted include:

A. **STANDARDS OF WAIVER**. Such waiver shall be granted only if the applicant demonstrates by clear and convincing evidence, specifically including financial data, that:

   1. **MINIMUM OF FIVE AFFORDABLE RESIDENCES PROVIDED**. The proposed development will provide no less than five residences, all of which will be permanently dedicated to affordable housing; and

   2. **DEVELOPMENT LOCATION IS CLOSE TO WORK PLACE**. The proposed development will be located in reasonable proximity to the probable work places of its intended residents; and

   3. **NECESSITY FOR WAIVER**. The requested waiver is necessary to ensure the affordability of the proposed development.

B. **STANDARDS THAT CANNOT BE WAIVED.** There shall not be a waiver of any requirements in this Section, or of any requirement or standard required by Section 1-105: *Sections Necessary for the Immediate Preservation of Public Health and Safety.*

BLM_0053234

## SECTION 1-120: IMPACT FEES AND DEDICATIONS

Gunnison County may require an applicant, as a condition of approval of a Land Use Change Permit, to dedicate real property to the public, or pay money to a public entity if there is an essential nexus between the dedication or payment and a legitimate government interest, the dedication or payment is roughly proportional both in nature and extent to the impact of the proposed use or development of such property, and Gunnison County has duly adopted standards for such dedication or payment that are sufficiently specific to ensure that the condition is imposed in a rational and consistent manner.

**A.  CRESTED BUTTE FIRE PROTECTION DISTRICT.** The Board adopted Resolution No. 1996-47 *A Resolution Approving Amendments to the Gunnison County Land Use Resolution to Require Payment of Land Development Charges* for collection of fees for the Crested Butte Fire Protection District and all development, including development in 35-acre tract developments, shall comply with it.

BLM_0053235

# ARTICLE 2: DEFINITIONS

## SECTION 2-101: PURPOSE

The purpose of this Article is to define words, terms, and phrases used in this *Resolution*, or that are otherwise used by the County in its review and actions concerning land use issues.

## SECTION 2-102: DEFINITIONS

The following words, terms, and phrases shall have the following meanings when used in this *Resolution* or that are otherwise used by the County in its review and disposition of land use issues.

**ABUT** means adjacent or contiguous to, or sharing a common border.

**ACCESS** means the place, method or way by which pedestrians and vehicles obtain usable ingress and egress to a property or land use.

- **RESIDENTIAL ACCESS** means an ingress or egress to no more than two residences or lots, including any that includes a home occupation, or a multiple-family residence as defined by this *Resolution*.
- **AGRICULTURAL ACCESS** means the access providing ingress and egress exclusively to an agricultural operation, and not to any residences.
- **COMMERCIAL ACCESS** means the access providing ingress and egress to any activity defined by this *Resolution* as commercial.
- **INDUSTRIAL ACCESS** means the access providing ingress and egress to any activity defined by this *Resolution* as industrial.

**ACCESSORY STRUCTURE OR SECONDARY USE STRUCTURE** means a use or structure that is located on the same parcel as the primary use or structure, clearly incidental, secondary and subordinate to the primary use or structure on the parcel; is devoted to the primary use or structure; is customarily found in conjunction with the primary use or structure; is not incompatible with the primary use or structure; and is subordinate in purpose to the primary use or structure.

**ACTIVE SOLAR SPACE HEATING** means a heating system that includes all of the following:

- A means of collection of the sun's energy; and
- Absorption of the solar gain into a mass capable of storing the heat such as concrete, rock or water; and
- Distribution of the heat by mechanical means; and
- Control of the system by convective venting, circulating fans or shading.

**ADJACENT** means abutting or contiguous to or sharing a common border.

**ADJACENT PROPERTY OWNER** means an owner of record (as recorded in the most current records on file in the Gunnison County Assessor's Office) of any estate, right, or interest in real property that immediately abuts, or (for purposes of ensuring adequate due process and public notice) is located immediately across a road or highway, waterway or other body of water from property on which a land use change is proposed.

**ADMINISTRATIVE REVIEW PROJECT** means a project that is classified and reviewed pursuant to Article 4: *Administrative Review Projects That Do Not Require Land Use Change Permits* and Article 5: *Administrative Review Projects That Require Land Use Change Permits.*

**ADULT-ORIENTED USE** means a use of property where the primary, accessory or other use, or a significant adjunct to another use of the property, is the sale, rental, display, or offering of books, magazines, publications, tapes or films, live entertainment, dancing, or material, that is distinguished or characterized by its emphasis on depicting, exhibiting, describing, or relating to sexual activities or special anatomical areas that include the following body parts, when they are less than completely and opaquely covered: human genitals, public region, buttocks, and female breast below a point immediately above the top of the aureola.

BLM_0053236

An adult-oriented use includes, but is not limited to, an adult bookstore; adult club, cabaret or restaurant, with or without a liquor license; and adult motion picture or audio-visual theatre.

**ADVERSE** means unfavorable or harmful.

**AFFORDABLE HOUSING** means housing that is affordable to very low-income, low-income, or moderate-income persons, as defined by the U.S. Department of Housing and Urban Development, and is legally restricted to occupancy solely by those very low-income, low-income or moderate-income person(s) through the use of a covenant, deed restriction, a Development Improvement Agreement, or by transfer of an appropriate interest to a state, county, or municipal housing authority or nonprofit housing organization.

**AGGREGATE:**
- **AGGREGATE STRUCTURES** means the whole of the square footages of all residences and other structures on the same lot.
- **AGGREGATE MATERIALS** means the material formed of particles of soil and rock found in the extraction of construction materials and processing for concrete or batch product.

**AGRICULTURE** means the use of the land for the primary purpose of making a profit from farming or ranching as it may include:
- The production, cultivation, growing, and harvesting of plant crops, but not including the harvesting of trees unless incidental to other agricultural operations; or
- The raising and/or the breeding of livestock including horses, dairy and beef cattle, sheep, goats, fur-bearing animals, poultry and swine, so long as they are not large confined animal feeding operations (CAFO); or
- The production of nursery products and sod; and
- The harvesting, storage, grading, packaging, processing, distribution, and sale or trade of such commodities where such activities occur at the point of production.

It specifically does not include the uses, structures and retail services normally associated with kennels, veterinary hospitals, the commercial slaughter of animals or riding stables. For purposes of this *Resolution*, classification of the use of the property by the Gunnison County Assessor's Office is not definitive or binding for purposes of this definition, nor shall the existence of a conservation easement on the property otherwise defined as agricultural affect that definition.

**AGRICULTURAL LANDS** means any lands primarily in agricultural use.

**AGRICULTURAL OPERATION** means an activity that primarily involves agriculture as defined in this *Resolution*.

**AGRICULTURAL STRUCTURE** means a structure located on a farm or ranch and used in an agricultural operation for the storage, repair, and maintenance of farm or ranch equipment and supplies, or for the raising and/or storage of crops and livestock. These include, but are not limited to, barns, corrals, silos, workshops, equipment sheds, greenhouses smaller than 2,500 sq. ft., storage and shelter structures. An agricultural structure does not include greenhouses that are 2,500 sq. ft. or larger, enclosed arenas or other enclosed areas when the activities that occur there provide services and/or goods to the general public on site.

**AIRCRAFT** means any device capable of flight that is licensed or regulated by the Federal Aviation Administration.

**AIR DESTRATIFICATION SYSTEM** means a system devised for circulation of air, comprised of an air return system, and ceiling fan.

**AIRPORT** means any area of land, water, or structure that is used for the landing or taking off of aircraft, for private, business or commercial purposes, including, but not limited to, all facilities for passenger or cargo loading, or maintenance, fueling, shelter or storage of aircraft; including, but not limited to, any area for provision of services, including flight instruction, charter or air freight service, or for receiving or discharging passengers or cargo, and all appurtenant areas used or acquired for airport buildings or other airport facilities, and all appurtenant rights-of-way. An airport is "publicly owned" for purposes of this *Resolution* if the area used for the landing and taking off of aircraft is owned, operated, controlled, leased to or leased by Gunnison County.

**AIRPORT HAZARD** means any natural formation, structure, or use of land that obstructs the air space required for the safe flight of aircraft in landing or taking off at an airport or is otherwise hazardous or creates hazards to such safe landing or taking off of aircraft, endangers the lives and property of the general public, of

BLM_0053237

users of the airport or of occupants of land in its vicinity, or reduces the size of the area available for the landing, taking-off, or maneuvering of aircraft, thus tending to destroy or impair the utility of the airport.

**ALLEY** means a public way of limited use intended only to provide access to the rear or side of lots within recorded platted townsites or subdivisions.

**ALTERATION** means a change in the structural parts of, or an enlargement of a structure, whether by extending it on a side, by increasing its height, or by moving it from one location to another, whether on the same or separate parcels.

**ALTERNATIVE TRANSPORTATION FACILITY** means a trail, sidewalk, public bus or van, rail, or other facility that provides an alternative mode of transportation to travel by private automobile.

**ANIMAL:**
- **DOMESTIC ANIMAL** means a small animal customarily kept in a dwelling for company as a pet, including, but not limited to, dogs and cats.
- **EXOTIC ANIMAL** means an animal, other than livestock, introduced from outside the Rocky Mountain region.
- **LIVESTOCK** means horses, dairy and beef cattle, sheep, goats, fur-bearing animals, poultry and swine.
- **NON-DOMESTIC ANIMAL** means an animal not customarily adapted to live and breed in a tamed condition, such as a red-tailed deer, antelope, moose or elk.

**APPLICANT** means any person applying for any permit described in this *Resolution*.

**AQUIFER RECHARGE AREA** means any area where surface water may infiltrate to a water-bearing stratum of permeable rock, sand or gravel.

**ARCHEOLOGICAL RESOURCE, CULTURAL RESOURCE OR HISTORICAL RESOURCE** means those resources that have been designated by the Gunnison County Historical Preservation Commission, on the National Register of Historic Places (National Register), and/or as may be considered under the National Historic Preservation Act. A site may also be so identified by the Colorado State Historic Preservation Officer.

**ASPECT** means the primary direction the land surface faces.

**ASPHALT PLANT/BATCH PLANT** means a site, temporary or permanent, where gravel, sand, cement or various petroleum derivatives are combined for the production of paving and/or construction materials, or to create a substance used for paving, roofing and waterproofing.

**AVALANCHE HAZARD AREA** means an area where a mass of snow or ice and other material that may be incorporated into it moves rapidly down a mountain slope with a predictable recurring frequency over time and at a predictable impact pressure.

**BACK COUNTRY, WINTER BACK COUNTRY, OR INACCESSIBLE WINTER BACK COUNTRY** means a remote area that is not reasonably accessible during the entire winter for the timely provision of emergency services.

**BACK-FILLING** means the dumping of earthen materials into excavated holes, or covering exposed features with soil. This can be done to protect features, or to level ground for construction of a road or building. In mining practice, it means the return of overburden or non-toxic waste material into an adit or excavated portion of a mine property.

**BED AND BREAKFAST** means a single-family residence used primarily for that purpose and that provides temporary accommodations to guests for compensation, with or without meals.

**BEST MANAGEMENT PRACTICES** means those conservation techniques and management measures that:
- Control soil loss and reduce water quality degradation caused by nutrients, human and animal waste, toxins, and sediment; and
- Minimize adverse impacts to groundwater and surface-water flows; and
- Minimize adverse impacts to the chemical, biological, and physical characteristics of wetlands, ponds, streams, and riparian areas.

**BOARD** means the Board of County Commissioners of Gunnison County, Colorado.

**BORROW SITE** means a site used for the extraction of earthen materials including sand, gravel, rock or dirt.

BLM_0053238

**BOUNDARY LINE ADJUSTMENT** means the transfer of a portion of a parcel from that parcel to an adjacent parcel, or the realignment of boundary lines between adjacent parcels, resulting in no increase in the number of parcels.

**BUFFER** means landscape and/or architectural elements, either existing or additional, which provide a logical and reasonable transition to and between adjoining uses.

**BUILDING** means any structure used for shelter, or enclosure of persons, animals or property of any kind; a fence is not a building.

**BUILDING ENVELOPE** means a designated area of a lot or parcel within which all structures, and, if required, an individual sewage disposal system, are to be confined.

**BUILDING FOOTPRINT** means the outline of the total area that is covered by a building at ground level.

**BUILDING HEIGHT (STRUCTURE HEIGHT)** means the vertical distance from grade plane to the average height of the highest roof surface

**BUILDING INSPECTOR** means the County staff person authorized to administer and enforce the applicable building code, adopted and amended by Gunnison County.

**BUILDING PERMIT** means a permit that is required to be obtained from the Building Inspector before the erection, construction, alteration, moving, relocation, or change of use of any structure.

**BUILDING SIZE** means the maximum area of square footage measured by the same standards as set forth in the applicable building code, adopted and amended by Gunnison County, excluding permanently unenclosed decks, patios, and porches.

**BUSINESS** has the same meaning as "Commercial."

**CAMPGROUND** means a tract or development providing facilities or accommodations for the temporary parking or placement of camping or other recreational vehicles or tents for recreation, education, or outdoor recreational activities, including, but not limited to, structural improvements including covered cooking areas, group facilities, self-contained travel trailer/motor home sites, tent sites, restroom and shower facilities, and laundry facilities for the convenience of temporary occupants.

**CAMPING SHELTER** means a tent, a yurt not placed on a permanent foundation, a self-propelled or towed camping unit including, but not limited to, vacation trailer, or camper, intended for recreational purposes, and not for permanent residential purposes, constructed of a combination of man-made and natural materials and that is not addressed as a habitable residence by the applicable building code, adopted and amended by Gunnison County.

**CHANGE IN CIRCUMSTANCES OR CHANGE IN CONDITION** means that the land uses, public facilities, infrastructure capacity, or environmental characteristics impacting or surrounding a development have changed.

**CHARACTER** means the distinct physical characteristics of a structure or area that set it apart from its surroundings and contribute to its individuality. Structural character refers to density, height, coverage, setbacks, massing, design and type of windows, materials, and scale of materials. Character of an area means the nature of the area in terms of intensity of use.

**CHILD CARE CENTER** means a residence or facility that provides regular care and supervision, for compensation, for an entire day or a portion of a day, for children who are not related to the owner, operator, or manager of the center. For purposes of this *Resolution*, a child-care center shall not mean in-home baby-sitting.

**CHURCH** means a building, together with its accessory buildings and uses, that by design and use is primarily intended for conducting organized public religious services.

**CIVIC BUILDING** means any building (public or private) primarily used for public or civic functions including, but not limited to, government offices, community centers, schools, and religious buildings.

**CLUSTER OR CLUSTER DEVELOPMENT** means the concentration of development, including buildings, driveways, and water supply and wastewater treatment facilities, on one or more compact areas of a development parcel, preserving the remainder as productive agricultural land or undeveloped open space, and avoiding impacting areas of identified value for wildlife habitat, scenic features of a rural landscape, historical agricultural uses, and significant environmental features including wetlands, bodies of water,

BLM_0053239

geologic hazard, or significant vegetation. Clustering allows flexibility in layout and protection of identified valuable characteristics of a development parcel.

**CODE OF THE WEST** means the publication distributed by several counties in the Western United States that explains to new residents and visitors the differences in levels of services between urban and rural areas, and activities that take place in ranching communities that may be different from those in urban areas. Gunnison County has written and printed its own version, available online and in the Planning Department.

**COMMERCIAL** means any establishment engaged in the retail or wholesale sale of goods or services that is open to the general public or that may be open to members only. This does not include farm or ranch stands. "Commercial" shall also mean "business."

**COMPACT AREA** means a portion of a geographic area, whose boundaries are as nearly equidistant as possible from the geographic center, that is defined and arranged to economize space, and that is small in proportion to the remainder of the geographic area.

**COMPATIBLE** means consistent with, harmonious with, similar and complementary to, the use and/ or function of natural systems and/or existing land uses in an area.

**CONDOMINIUM** means a common interest community in which portions of the real estate are designated for separate ownership and the remainder of which is designated for common ownership solely by the owners of the separate ownership portions. A common interest community is not a condominium unless the undivided interests in the common elements are vested in the unit owners.

**CONSERVATION DEVELOPMENT** means a parcel of at least 120 acres, of which at least 110 acres is permanently preserved by conservation easement acceptable to the County, and on the remainder of which there is or will be no more than one primary residence, and that is legally and permanently prohibited from future subdivision.

**CONSTRUCTION MATERIALS** means rock, clay, silt, sand, gravel, limestone, dimension stone, topsoil, marble or shale extracted for use in the production of nonmetallic construction products.

**CONSTRUCTION MATERIALS PROCESSING** means any activities associated with the extraction, storage or preparation of construction materials for use, including but not limited to, crushing, screening, washing, slabbing, polishing, grinding, concrete or asphalt preparation, batching or recycling, or other such action.

**CONTIGUOUS** means abutting or adjacent to or sharing a common border.

**CORRECTION PLAT** means a rerecording of a previously approved plat that is intended to correct a technical error in the plat.

**COST** means the total monetary amount to be paid, including, but not limited to, any amounts to be paid for land acquisition, capital improvements, construction, fixtures, equipment, labor, materials, operation, maintenance, monitoring, financing, debt service, planning, permitting, and similar purposes.

**COUNTY** means Gunnison County, Colorado, its officers, employees and agents.

**CRITICAL PATH** means the sequence of tasks that forms the longest time a project will take. Therefore, if a task on the critical path is delayed, it will add additional time to the project. The critical path is "critical" because one task that follows another in a project cannot be started until all the previous tasks on the critical path are completed. This *Resolution* requires that a critical path be determined for an application submitted pursuant to Section 14-102: *Large Parcel Incentive Process.*

**CUMULATIVE IMPACTS/EFFECTS** means the combined impacts of two or more uses or activities. The impacts may be related to the number of individual activities, or to the number of repeated activities on the same piece of ground. Cumulative impacts/effects can result from individually minor but collectively significant actions taking place over a period of time.

**CUT** means an area where soil or earth is excavated or removed in conjunction with development activities.

**DECISION-MAKING BODY** means the individual or body that has final authority to approve or deny a particular type of application.

**DEDICATION** means the conveyance or setting aside by the owner of an interest in land or water to the County or other public entity for the use of the public, and accepted for such use by or on behalf of the public by the Board or other public entity.

BLM_0053240

**DENSITY** means the number of units within a fixed area, for example, the number of residences per acre.
- **GROSS DENSITY** means the total number of units divided by the total land area within the boundary of the proposed land use change, including publicly dedicated roads, open space or other facilities.
- **NET DENSITY** means the total number of units divided by the total land area within the boundary of the project, excluding publicly dedicated roads, open space or other facilities.

**DETENTION** means the practice and process associated with the delayed release of storm water to reduce peak flow, to maintain base flow, to increase opportunity for recharge to groundwater, to reduce nutrient and sediment loading to surface water bodies, and to reduce opportunity for surface runoff and soil erosion.

**DETENTION STRUCTURE** means a permanent structure for the temporary storage of storm water runoff that is designed so as not to create a permanent pool of water.

**DEVELOPMENT** means any activity that is a land use change. (Also, see "Land Use Change.") For purposes of Section 11-103: *Development in Areas Subject to Flood Hazards* "development" means a man-made change to improved or unimproved real estate, including, but not limited to, buildings and other structures, mining, dredging, filling, grading, paving, excavation, drilling operations, or storage of equipment or materials. The County reserves the right to make interpretations as to what constitutes development in areas subject to flood hazards.

**DEVELOPMENT AREA** means those geographic areas within the county that will be developed or altered directly by the construction or operation of a proposed project.

**DEVELOPMENT AGREEMENT** means a legal agreement entered between Gunnison County and an applicant for a Land Use Change Permit, providing for the extension of a statutory vested property right and identifying the consideration and conditions for such an extension.

**DEVELOPMENT IMPROVEMENT AGREEMENT** means a legal agreement entered between Gunnison County and an applicant for a Land Use Change Permit providing the applicant's financial and other guarantees to construct the approved improvements.

**DEVELOPMENT SITE** means the area of a parcel on which construction or activity, or an otherwise designated change in use is proposed or will occur as part of a land use change project. It may include all or part of a parcel.

**DISTRIBUTION LINE** means a line whose principal purpose is to distribute electric power, oil, water, natural gas, telephone, cable television, or similar amenities or services from a transmission line or other local point of origin (such as a substation) to an individual customer or customers to provide greater reliability for an overall distribution system. Connection between the distribution line or system and customers is typically, but not always, made by means of a service line.

**DRAINAGE FACILITIES OR DRAINAGE SYSTEM** means a system of man-made structures designated to collect, convey, hold, divert or discharge storm water, and to mitigate surface water quality impacts, and includes storm water sewers, culverts, control structures, detention and retention facilities.

**DUDE RANCH** See "Resort."

**DUPLEX** See "Residence."

**DWELLING UNIT** See "Residence."

**EASEMENT** means a conveyance or reservation of an incident of ownership in real property for one or more specific purposes, public or private.

**EFFECTIVE DATE OF THIS RESOLUTION** means January 8, 2001, the date on which this *Resolution* was adopted by the Board.

**EMPLOYEE** means a residence owned or managed as part of a commercial or industrial use, or an agricultural operation, and used by employees of that use.

**ENERGY-EFFICIENT APPLIANCES** means appliances that have been rated energy- efficient by a program such as Energy Star.

**ENGINEERED LUMBER** means recycled/reconstituted wood materials that employ laminated wood chips or strands and finger jointing (the gluing of larger pieces together).

BLM_0053241

**ENHANCED SOLAR ORIENTATION AND ACCESS** means orienting a building on a site so that access to sunlight is substantially unobstructed, and so that the long axis of the building is oriented east/west to minimize solar gain in the summer and maximize solar gain in the winter, and there is minimal use of windows on the north and west sides of the building.

**ENVIRONMENTAL HEALTH OFFICIAL** means the County staff person authorized to administer and enforce the *Gunnison County Individual Sewage Disposal System Regulations*, or his/her authorized designee.

**EQUIVALENT PERFORMANCE ENGINEERING BASIS** means, with regard to manufactured housing, that by using engineering calculations or testing, following commonly accepted engineering practices, all components and subsystems will perform to meet health, safety and functional requirements to the same extent as required for other single-family residences.

**ERODIBLE SOIL** means a soil whose particles are easily detached and entrained by air or water passing over or through the soil, a soil that lacks significant internal strength and has little resistance to erosion.

**ESSENTIAL SERVICES** means the development and/or maintenance of public utilities or County-approved underground, surface or overhead gas, electrical, steam, fuel or water transmission or distribution systems, including, but not limited to, towers, poles, wires, mains, drains, sewers, pipes, conduits, cables, traffic signals and hydrants.

**EXPANSIVE SOILS** means soil and rock that contain clay and expand or swell to a significant degree upon wetting, and shrink upon drying.

**EX PARTÉ COMMUNICATION** means an oral or written, off-the-record communication made to or by a member of a review or decision-making body, other than the Planning Director, without notice to all parties involved, that discusses the merits, or could affect the outcome, of a decision or recommendation to be made by that decision-making body.

**FACTORY-BUILT HOUSING** means any structure, or component thereof, designed primarily for residential occupancy, including a mobile home that is wholly or in substantial part made, fabricated, formed, or assembled in manufacturing facilities for installation, or assembly and installation, on a building site.

**FARM OR RANCH STAND** means a temporary structure for the display and sale of primarily raw farm or ranch products.

**FILL** means material such as earth, clay, sand, concrete, rubble or waste of any kind, placed, stored or dumped upon the surface of the ground, which increases the natural ground surface elevation.

**FINAL PLAN** means the plan described in Section 7-401: *Final Plan Application for Major Impact Projects.*

**FINAL PLAT** means a map prepared by a surveyor registered in the State of Colorado, in accordance with this *Resolution* as an instrument for recording of real estate interests that is approved by the Board and is acceptable for filing with the Gunnison County Clerk and Recorder. The Final Plat shows the exact location, dimensions, size, shape, etc: of a condominium, townhouse, or subdivision, including all lots, blocks, roads, easements, and other parcels of land therein. It shall include reference to all relevant supporting materials, protective covenants, statements, opinions, and certifications as may be required by this *Resolution.*
- **SUBDIVISION FINAL PLAT** means the final design of the proposed subdivision, showing the exact location, size, and shape of lots, blocks, roads, easements, and other parcels of land therein.
- **CONDOMINIUMS, TOWNHOMES AND TOWNHOUSES PLAT** means the final as-built design of the condominium or townhouse development, showing exact locations, dimensions, sizes, and shapes of structures, as well as blocks, lots, roads, and/or easements.

**FIREPLACE OR "TRADITIONAL OPEN FIREPLACE"** means, indoors, an open recess for holding a fire at the base of a chimney, a hearth. Not a cook stove or an unapproved solid-fuel-burning device.

**FLOOD OR FLOODING** means a general or temporary condition of partial or complete inundation of normally dry land from:
- The overflow of inland waters; or
- The unusual and rapid accumulation or runoff of surface waters from any source; or
- Mudflows that are proximately caused or precipitated by accumulations of water on or under the ground.
- The collapse or subsidence of land along the shore of a lake or other water body as a result of erosion or undermining caused by waves or currents of water exceeding the anticipated cyclical levels or suddenly caused by an unusually high water level in a natural water body, accompanied by a severe storm, or by

BLM_0053242

an unanticipated force of nature, such as flash flood, or by some similarly unusual and unforeseeable event which results in flooding.

**FLOODPLAIN (100-YEAR)** means land area subject to inundation because of the base flood. The 100-year floodplain is made up of three parts: the stream channel, the floodway and the flood fringe. The physical location of the floodplain on flood hazard maps is representative of existing ground conditions and may be based, among other things, on historical flood records or other readily available data. Floodplain-related elements include:

- **"A ZONE"** means a Special Flood Hazard Area subject to inundation from the 100-year flood. Because detailed hydraulic analyses have not been performed, no base flood lavation or depths are shown on the FIRM map.
- **BASE FLOOD** means a flood having a one percent chance of being equaled or exceeded in any given year. Equivalent to 100-year flood.
- **BASE FLOOD ELEVATION** means the height (above sea level) that floodwaters will reach at a given elevation during the Base (100-year) event.
- **DEVELOPMENT IN A FLOODPLAIN** for purposes of Section 11-103: *Development in Areas Subject to Flood Hazards* means a man-made change to improved or unimproved real estate, including buildings and other structures, mining, dredging, filling, grading, paving, excavation, drilling operations, or storage of equipment or materials. The County reserves the right to make interpretations as to what constitutes development in areas subject to flood hazards.
- **EXISTING CONSTRUCTION OR STRUCTURES** for purposes of Section 11-103: *Development in Areas Subject to Flood Hazards,* means structures for which the "start of construction" began before the effective date of Gunnison County's Flood Insurance Rate Map (September 29, 1989).
- **FLOOD ELEVATION INFORMATION** means the elevation in relation to sea level and depth of flooding which is determined for specific locations in the floodplain.
- **FLOOD ELEVATION STUDY** See "Flood Insurance Study."
- **FLASH FLOODING** means a temporary flooding condition due to the rapid accumulation and runoff of surface waters from any source and is characterized by a large volume of water over a short period of time. Also, see "flood prone area."
- **FLOOD FRINGE** means the area, other than the stream channel and floodway, subject to inundation, that occupies the remainder of the 100-year floodplain, and is subject to shallower water and slower vehicles during a flood event.
- **FLOOD HAZARD AREA** means the land within the floodplain subject to a one percent or greater chance of flooding in a given year.
- **FLOOD INSURANCE RATE MAP** (FIRM) means an official map on which the Federal Emergency Management Agency has delineated both the special flood hazard areas and the risk premium zones applicable to Gunnison County.
- **FLOOD INSURANCE STUDY** means the official report provided by the Federal Emergency Management Agency (FEMA) that includes flood profiles, the Flood Boundary/Floodway Map, and the water surface elevation of the base flood.
- **FLOODPLAIN MANAGEMENT PROGRAM** means a program of corrective and preventative measures for reducing flood damage, including, but not limited to, emergency preparedness plans, flood control works, and floodplain management regulations.
- **FLOOD PRONE AREA** means an area adjoining a watercourse, that may be considered subject to flooding during the 100-year flood based on reliable historical information, topography, vegetation, and other naturally occurring indicators, but where precise dimensions of the 100-year floodplain have not been delineated, and includes flash-flood areas.
- **FLOODPROOFING** •means any combination of structural and non-structural additions, changes or adjustments to structures that reduce or eliminate flood damage to real estate or improved real property, utilities, structures and their contents.
- **FLOODWAY** means that portion of the 100-year floodplain, consisting of the stream channel and adjoining lands, including from stream bank to stream bank, which is subject to the deepest water and highest velocities during a flood event.
- **FREEBOARD** means a factor of safety usually expressed in feet above a flood level for purposes of floodplain management. "Freeboard" tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions, such as wave action, bridge openings and the hydrologic effect of urbanization of the watershed.

BLM_0053243

- **LEVEE** means a manufactured structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control or divert the flow of water so as to provide protection from temporary flooding.
- **LEVEE SYSTEM** means a flood protection system that consists of a levee, or levees and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.
- **LOWEST FLOOR** means the lowest floor of the lowest enclosed area (including basement) of a structure. An unfinished or flood resistant enclosure, usable solely for parking of vehicles, building access or storage, in an area other than a basement area, is not considered a building's lowest floor, provided that such enclosure is not built to render the structure in violation of the applicable flood proofing and non-elevation design requirements of this *Resolution*.
- **MEAN SEA LEVEL** means, for purposes of the National Flood Insurance Program, the National Geodetic Vertical Datum (NGVD) of 1929 or other datum, to which base flood elevations shown on a community's Flood Insurance Rate Map are referred.
- **PRINCIPALLY ABOVE GROUND** for purpose of Section 11-103: *Development in Areas Subject to Flood Hazards*, means that at least 51 percent of the actual cash value of a structure, less land value, is above ground.
- **START OF CONSTRUCTION** for purpose of Section 11-103: *Development in Areas Subject to Flood Hazards* means the date the Building Permit was issued, if actual start of construction, repair, reconstruction, placement or other improvement was within 180 days of the permit date. Actual start of construction means either the first placement of permanent construction of a structure on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of roads and/or walkways; nor does it include excavation for a basement, footings, piers, or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as detached garages or sheds not occupied as residences or not part of the main structure; it includes substantial improvements.
- **STREAM CHANNEL** for purposes of Section 11-103: *Development in Areas Subject to Flood Hazards* means the area of the floodplain that carries the normal course of a river, stream or other watercourse.
- **SUBSTANTIAL IMPROVEMENT** for purposes of *Section 11-103: Development in Areas Subject to Flood Hazards*, means any repair, reconstruction or improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure either before the improvement or repair is started if the structure has been damaged, and is being restored, before the damage occurred. Substantial improvement is said to occur when the first alteration of any wall, ceiling, floor or other structural part of the building begins, whether or not that alteration affects the external dimensions of the structure. The term does not, however, include either any project for improvement of a structure to comply with existing state or local health, sanitary or safety code specifications that are solely necessary to assure safe living conditions or any alteration of a structure listed on the National Register of Historic Places or the Colorado State Inventory of Historic Places.
- **WATER SURFACE ELEVATION** means the height, in relation to the NGVD of 1929 (or other datum, where specified) of floods of various magnitudes and frequencies in the floodplains of riverine areas.

**FOREGROUND** means the areas within one-half mile on either side of a public road or trail.

**FORMER GUNNISON COUNTY LAND USE RESOLUTION** means the former edition of the *Gunnison County Land Use Resolution* in effect until the effective date of this *Resolution*.

**FRONTAGE** means the length of that property line of a parcel that abuts a public road or highway right-of-way or easement.

**GANG OF NINE** means that informal term often used to reference the standards of this *Resolution* that are required to be met by all land uses pursuant to Section 1-106: *Partially Exempted Land Use Changes*.

**GARAGE** means a secondary structure (or part of a structure) for housing automobiles and other vehicles, but not including a commercial or industrial repair shop where cars and trucks are serviced and repaired.

**GEOLOGIC HAZARD** means a geologic phenomenon that conflicts with construction or land use so as to constitute a significant hazard to public health, safety, or to property, including, but not limited to, avalanches, landslides, rockfalls, alluvial fans, talus slopes, steep, unstable, or potentially unstable slopes, Mancos shale, mudflows, and faults. For purposes of this *Resolution*, the following definitions shall apply:

BLM_0053244

- **ALLUVIAL FAN** means a sloping, wedge-shaped deposit of loose rock, earth, and vegetative debris near or at the junction of a smaller stream with a larger stream valley, or where the gradient of a stream abruptly decreases. It is created by a debris flow, that is the downstream or down slope propulsion of rocks, vegetative matter, and other materials in a watery, muddy slurry.
- **DEBRIS FLOW** means an event of rapid movement of mud and fine-grained earth materials in which more than one-half the solids in the mass are larger than sand grains (including rocks, stones and boulders).
- **FAULT** means a crack or fracture in the earth's surface. A fracture or zone of fractures in the earth's surface along which there has been displacement of the sides relative to one another, parallel to the fracture.
- **LANDSLIDE HAZARD AREA** means an area where falling, slipping, or mass movement of land occurs due to a distinct surface rupture or zone of weakness. Landslides include slope failure complexes, debris slides, bedrock slides, and areas of accelerated soil creep.
- **MANCOS SHALE** means the material comprised of clays, silts, and thin layers of sand deposited during the Cretaceous Epoch, that is commonly found in areas within Gunnison County.
- **MUDFLOW HAZARD AREA** means an area subject to rapid movement of mud and fine-grained earth materials that flow down a stream, ravine, canyon, or gulch after a heavy rainfall or snowmelt runoff. Such an area is formed by successive episodes of deposition of mud and fine-grained materials. If more than one-half of the solids in the mass are larger than sand grains (including rocks, stones, and boulders) then the event is a debris flow and the area is an alluvial fan.
- **POTENTIALLY UNSTABLE SLOPE** means any slope with most of the attributes of an unstable slope, but where a past or present slope failure is not apparent.
- **ROCKFALL HAZARD AREA** means an area of either active or potential falling, rolling, or sliding of large bedrock blocks or rocks.
- **TALUS SLOPE** means an area of potential rockfall and small, localized debris flows.
- **UNSTABLE SLOPE** means a slope with landslide/earthflow physiography, where recent slope movement may not be apparent or is uncertain. Such an area may have undergone slope movement in the recent geologic past and may be susceptible to landslide, mudflow, rockfall or accelerated creep of slope-forming materials.

**GRADE, FINISHED** means the elevation of the finished ground after construction, filling or excavation.

**GRADE, NATURAL** means the elevation of the ground level in its natural state, before construction, filling or excavation.

**GRADE PLANE** means a reference plane representing the average of finished ground level adjoining the building at exterior walls. Where the finished ground level slopes away from the exterior walls, the reference plan shall be established by the lowest points within the area between the building and the lot line or, where the lot line is more than six feet from the building, between the building and a point six feet from the building.

**GRADING** means any excavating or filling of earth materials or any combination thereof.

**GRAVEL PROCESSING** means any activities associated with the preparation of gravel and associated materials for use. These activities include on-site transport, crushing, screening, washing, storing, slabbing, polishing, grinding, and concrete or asphalt mixing or other such action, exclusive of extraction.

**GROUND-SOURCE HEAT PUMP** means a mechanical device, with a closed loop system, that operates by pumping heat, and that uses the earth as a heat source.

**GROUP HOME** means a residential building that is owned and operated by a nonprofit organization, or is owned and operated by a individual or group of individuals who actually reside in and maintain their primary place of residence at the group home, that:
- **IS OCCUPIED BY ELDERLY PERSONS** Is occupied by not more than eight persons who are 60 years of age or older who do not require skilled or intermediate care facilities; or
- **IS OCCUPIED BY DEVELOPMENTALLY DISABLED PERSONS** Contains a state- licensed facility for the exclusive use of not more than eight persons who are developmentally disabled due to their having cerebral palsy, multiple sclerosis, mental retardation, autism, epilepsy or similar afflictions; or
- **IS OCCUPIED BY MENTALLY ILL PERSONS** Contains a state-licensed facility for the exclusive use of not more than eight persons who have been screened by a mental health professional and have been determined to be mentally ill.

**GUEST HOUSE.** See "Residence."

BLM_0053245

**HAZARD** means a significant source of potential risk, danger, or peril resulting from natural phenomena or conditions, and including those precipitated or caused by activities of man.

**HAZARDOUS MATERIAL** means any substance or material that, because of its toxic, caustic, corrosive, abrasive, explosive, biohazardous or otherwise injurious properties, may be detrimental or deleterious to the health of the environment or any person handling or otherwise being exposed to such material or substance.

**HELIPAD** means any area of land, water or structure that is designed or used, temporarily or permanently, as a takeoff/landing area for helicopters.

**HELISPOT** means a helipad that does not contain any auxiliary facilities.

**HIGHWAY** means state and federal highways and major county arterials.

**HISTORIC RESOURCE.** See "Archeological, Historic or Cultural Resource."

**HOME OCCUPATION** means the conduct of a business, occupation, or trade in a residence or within another structure on the property on which a residence is located, that is incidental and secondary to the residential use and does not change the residential character of the property.

**HOMEOWNERS' OR PROPERTY OWNERS' ASSOCIATION** means an association of home or property owners within a development created to govern a subdivision, condominium or other development; powers of the association include the setting and collection of assessments from the members of the association, the control and maintenance of common areas, and the enforcement of protective covenants.

**HORSES, BOARDING OF** means the stabling, feeding, and grooming for a fee or the renting of stalls or stables for the care of horses not belonging to the owner of the property, including related facilities.

**HORSE/HAY SHED** means a detached secondary structure used for the keeping of livestock and/or storage of hay, not intended for human habitation.

**HORSE TRAINING AND PERFORMANCE FACILITIES** means those facilities that may or may not be directly integrated with stalls, stables or the general care of horses, but that include facilities including, but not limited to, training and performance arenas, corrals, and exercise tracks and that are rented to, or otherwise provide services for, the general public.

**HOTEL, MOTEL, LODGE** means a building designated, intended or used for rental occupancy as the transient or temporary lodging place of five or more people who are lodged with or without meals.

**IMPACT** means the direct or indirect effect or consequence that development has upon land, the environment, wildlife, adjacent property use or the community. It includes physical, environmental, biological, health, economic, visual, aesthetic, historical, auditory, or social effects or consequences, whether beneficial or harmful.

**IMPACT AREA** means those geographic areas, including the development area, in which any impacts are likely to be caused by a proposed project. The impact area may be located either within the County and/or within an adjoining jurisdiction, provided that areas within an adjoining jurisdiction will be considered only if such jurisdiction has entered into an agreement with Gunnison County under which it will cooperate in regulating development that may impact both jurisdictions.

**IMPERVIOUS COVER OR MATERIALS** means a surface that does not readily allow water to infiltrate into the ground, including, but not limited to, roof, roadway or parking area surfaces.

**IMPROVEMENTS** means an addition to or enhancement of property or its condition, amounting to more than mere repairs or replacement, including, but not limited to, structures, infrastructure, habitat compensation, restoration, reclamation, general landscaping, or such other installations as may be designated by the County.

**INCIDENTAL TO** means affiliated with or dependent on the principal use.

**INDIVIDUAL SEWAGE DISPOSAL SYSTEM** means an absorption system of any size or flow, or a system or facility for collecting, storing, treating, neutralizing, stabilizing, or disposing of sewage that is not a part of or connected to a wastewater treatment system.

**INDUSTRIAL** means any establishment engaged in the commercial processing, fabrication, alteration, or manufacture of raw or semi-processed materials, manufactured goods, or any components thereof.

BLM_0053246

**INDUSTRIAL OR BUSINESS PARK** means a group of industrial or commercial uses clustered within a single development, either on subdivided, separately-owned lots, or on a lease or rental basis.

**INFILTRATION** means the downward movement of water from the surface to the subsoil. Infiltration rate is typically expressed as inches per hour.

**INFRASTRUCTURE** means basic facilities, services, installations or systems needed for the development, support or efficient operations of the county, or developments within it, including, but not limited to, highways, roads, bridges, airports, public transit, sanitary and storm sewers, culverts, sidewalks, parks, trails, drainage, water supply and wastewater treatment systems, lighting, gas, cable television, lighting and electrical utilities.

**INHOLDING** means a parcel of government-owned or privately-owned land, including subsurface rights of such owners underlying public lands or a valid mining claim or other valid occupancy that, as of the effective date of this *Resolution*, is within or effectively surrounded by one or more areas in the National Wilderness Preservation System.
- **EFFECTIVELY SURROUNDED** for purposes of the definition of "inholding," means that at least two-thirds of the boundary of the inholding is adjacent to an area in the National Wilderness Preservation system. In the case of adjacent private parcels, the measurement shall not include the boundary between the private parcels.

**IRRIGATED MEADOW** means any artificially- or naturally-irrigated land used as pasture for the growing of hay, grain, or other crops.

**IRRIGATION DITCH** means a naturally occurring or artificially constructed channel used to carry water from a stream, lake, reservoir, or other source to agricultural or other lands for the purpose of watering crops, forage, or livestock.

**KENNEL** means a structure or enclosed area used to house domestic animals.

**KITCHEN** means any room in a structure containing all of the following facilities: stove or cooktop, refrigerator, sink and conventional oven.

**LANDSCAPE** means improvement to an area of land by the planting and maintenance of trees, shrubs, or ground cover, and/or non-vegetative materials

**LAND USE** means the purpose for which any land, building, or structure is designed, maintained, renovated, occupied, or used, the basic character or nature of the occupation or utilization of land or a building.

**LAND USE CHANGE** means any development, grading, construction, activity, or ongoing operation that changes the basic character, configuration, or use of the land or environment on which the activity occurs, including any division of land. The following activities are among those requiring the applicant to obtain a Land Use Change Permit pursuant to this *Resolution*:
- **BUILDING ACTIVITY:** The construction, reconstruction, conversion, expansion, or structural alteration, relocation, or enlargement of structures, or accessory structures.
- **CHANGE IN USE:** Any activity resulting in a change in use, or the intensity of use, or expansion of the sizes or numbers of structures or the amount of land affected by a use.
- **DRIVEWAY**: The proposed or actual cutting or construction of a driveway that is determined by the Gunnison County Director of Public Works or the Planning Department to require review pursuant to Section 3-111: B.1.: *Additional Criteria.*
- **MINING, DREDGING, DRILLING, GRADING OR DRAINING:** The mining, dredging, drilling for gas or oil, or grading or draining activities.
- **ROAD CUTTING OR CONSTRUCTION**: The cutting or construction of any road, including roads constructed by or for a governmental entity, or roads constructed pursuant to a permit issued by a state or federal agency. Agricultural roads that are part of an agricultural operation as defined by this *Resolution* are not land use changes and do not require a Land Use Change Permit.
- **SUBDIVISION:** The subdivision of a parcel of land into two or more parcels or divisions, except for those divisions that are excluded from the definition of subdivision (see definition of "Subdivision"), or by Colorado statutes.

**LAND USE CHANGE PERMIT** means written approval of a Land Use Change Permit application by resolution, certificate, or other designated form of the Board, Planning Commission, or Planning Director that sets forth in detail the terms and conditions of the final approval of an application for a Land Use Change Permit.

BLM_0053247

**LEGAL ACCESS** means the physical access recognized by law, from the state highway system to the subject lot.

**LEGAL DESCRIPTION** means a written metes and bounds description created by a surveyor registered in the State of Colorado, or a lot, block or tract description of a parcel of land for perpetuating location and title.

**LEGAL LOT** means a lot, parcel or tract of land that meets the definition of a "subdivision," or "subdivided land" as defined in C.R.S. 30-28-101 (10) (a) as it may be amended, or that is one of the exceptions to the definition of "subdivision" or "subdivided land" set out in the definition of "Subdivision or Subdivided Land" in C.R.S. 30-28-101 (10) (b), (c) or (d) as they may be amended, and that was created pursuant to all applicable laws, ordinances and regulations in effect at the time of its creation, and the legal description of which was recorded at the time of its creation in the records of the Clerk and Recorder of Gunnison County. A parcel as mapped for tax assessment records is not necessarily a legal lot.

**LIGHTING** means the use of light fixtures to illuminate. For purposes of this *Resolution*, the following specific definitions shall apply:

- **BULB** means the source of electric light. To be distinguished from the whole assembly (See Luminaire).
- **DOWN-DIRECTED** means the shielding and alignment of light fixtures so that the light source points downward, 45 degrees or less from vertical, rather than horizontally, or upward.
- **FIXTURE** means the assembly that holds the lamp in a lighting system. It includes the elements designed to give light output control, such as a reflector (mirror) or refractor (lens), the ballast, housing, and the attachment parts.
- **FLOODLIGHTS (AND SPOTLIGHTS)** means those lighting fixtures defined as having a full beam width or beam spread of less then 110 degrees; any lamp that incorporates a reflector or a refractor to concentrate the light output into a directed beam in a particular direction.
- **CUTOFF ANGLE** means the angle formed by a vertical downward line from a light source and the line beyond which no direct light is emitted because of the fixture.
- **FIXTURE** means the assembly that houses a lamp or lamps, and which may include a housing, a mounting bracket or pole socket, a lamp holder, a ballast, a reflector or mirror, and/or a refractor, lens, or diffuser lens.
- **FULL CUTOFF** means a light fixture that directs light down onto only the surface that needs to be lit. "Cut-off" light fixtures avoid glare, and the light source from being visible from adjoining properties or roads.
- **GLARE** means light emitted from a luminaire with intensity great enough to produce annoyance, discomfort, or a reduction in a viewer's ability to see.
- **LUMINAIRE** means a complete lighting system, including a lamp or lamps and a fixture.

**LOADING DOCK** means an off-road portion of a lot used for the temporary parking of a commercial vehicle while loading or unloading materials. Such space shall be designed to allow an adequate vehicle turning radius, and shall not obstruct or endanger pedestrian, bicycle, or vehicular traffic.

**LONG-TERM RENTAL** means rental of a residence for six months or longer.

**LOT** means a parcel or tract of land. Also, see "Legal Lot."

**LOT AREA** means the number of sq. ft. included within the boundaries of a lot measured on a horizontal plane, exclusive of any area within a public or private road or road easement.

**LOT CLUSTER** means the vacation of the line(s) between adjacent lots that are commonly owned.

**LOT LINE** means any boundary of a lot.

**LOW VOC INTERIOR PAINT** means interior paint that contains less than 250 grams volatile organic compounds per liter in solution.

**MAJOR FACILITY OF A PUBLIC UTILITY** means a central office building of a telephone utility; a transmission line, power plant, or substation of an electrical utility; or a pipeline or storage area of a utility providing natural gas or other petroleum derivatives.

**MAJOR IMPACT PROJECT** means a land use change classified as a Major Impact project pursuant to Article 7: *Major Impact Projects.*

**MANUFACTURE** means to make or process a raw material into a finished product.

**MANUFACTURED HOME** means a single family residence that:

BLM_0053248

- Is partially or entirely manufactured in a factory; and
- Is not less than 24 feet in width and 36 feet in length; and
- Is installed on an engineered permanent foundation; and
- Has brick, wood, or cosmetically equivalent exterior siding and a pitched roof, and,
- Is certified pursuant to the "National Manufactured Standards Act of 1974," 42 U.S.C. 5401 *et seq*: as amended.

**MATTER OF STATE INTEREST** means an area of state interest or an activity of state interest, or both, as listed in C.R.S. 24-65.1 - 201(1), through -203 (1).

**MAXIMUM EXTENT FEASIBLE** means that all practical efforts to comply with the regulations or minimize potential harm or adverse impacts have been undertaken and that no feasible and prudent alternative exists. Economic factors may be taken into account but shall not be the overriding or dispositive factor in determining whether no feasible and practical alternative exists in a particular situation.

**MINERAL** means any inanimate constituent of the earth in either solid, liquid, or gaseous state including coal, oil, natural gas, oil shale, sand, gravel, quarry aggregate, limestone, and metals that, when extracted from the earth, are usable in their natural form or are capable of conversion into usable forms as metals, metallic compounds, chemicals, energy sources, or raw materials for manufacturing or construction. This term does not include surface or ground water subject to appropriation under the laws of the State of Colorado.

**MINERAL RESOURCE** means a natural deposit of mineral located in sufficient concentration in veins, deposits, bodies, beds, seams, fields, pools, or otherwise and that, under present or reasonably foreseeable technological and economic conditions, is or will be capable of economic recovery.

**MINERAL RESOURCE AREA** means any area in Gunnison County in which there has been significant mining activity in the past, there is significant mining activity in the present, mining development is planned or in progress, or mineral rights are held by mineral patent or valid mining claim with the intention of mining.

**MINING EXPLORATION** means the excavation of an exploratory shaft, adit or decline, and the removal of a limited amount of material for the purpose of testing. For purposes of this *Resolution*, it does not include exploration carried out underground involving the construction of new, or expanding the dimensions of existing mine workings, or the reopening of underground mine workings by the removal of fixed or permanently fastened caps, or involving the excavation of backfilled shafts or portals, or activity that may alter, destroy, remove or impair any rehabilitation work made in accordance with a reclamation plan approved by the Colorado Division of Minerals and Geology.

**MINING OPERATIONS** means the commercial development or extraction of a mineral or construction materials, or drilling of oil, gas or other wells for purpose of extraction, and any construction associated with mining, pre-development exploration, including associated blasting operations. The term shall include underground mining, open pit mining, strip mining, surface operations, the disposal of mining wastes, concentration of ores, milling, evaporation, and other processing, mine wastes and tailings, and construction and use of accessory office and storage buildings; and transportation. It does not include the extraction of construction materials used on one or more parcels used for the agricultural operations of a single owner or operator.

**MINOR IMPACT PROJECT** means those land use changes classified as Minor Impact project pursuant to Article 6: *Minor Impact Projects*.

**MITIGATION** means the following actions, prioritized in order of preference:
- **AVOIDING IMPACTS** Avoiding an impact by not taking a certain action or parts of an action; or
- **MINIMIZING IMPACTS** Limiting the degree or magnitude of the action or its implementation, or by changing its location; or
- **RECTIFYING IMPACTS** Repairing, rehabilitating, or restoring the impact area, facility or service; or
- **REDUCING OR ELIMINATING IMPACTS** Reducing or eliminating the impact over time by preservation and maintenance operations; and
- **COMPENSATING FOR IMPACTS** Compensating for the impact by replacing or providing equivalent biological, social, environmental and physical conditions, or a combination thereof.

**MOBILE HOME** means a detached, single-family residence that has all the following characteristics: It is designed for long-term occupancy and has sleeping accommodations, a flush toilet, a tub or shower bath and kitchen facilities, and that has plumbing and electrical connections provided for attachments to outside systems. It is designed to be transported after fabrication, on its own wheels, or on a flatbed or other trailer, or

BLM_0053249

on detachable wheels. It arrives at the site where it is to be occupied as a complete unit and is ready for occupancy except for minor and incidental unpacking and assembly operations, location on foundation support or jacks, underpinned and connections to utilities. It exceeds eight feet in width and 32 feet in length, excluding towing gear and bumpers. It is without motive power. It is also referred to as a "single-section" manufactured home, and is designed to be used year-round.

**MOBILE HOME COMMUNITY** means any parcel of land for which the primary purpose is the placement of mobile homes in a community setting. A mobile home community may be developed either as a conventional "park," in which lots and/or homes are rented to residents, and/or as a subdivision, in which individual lots may be sold. A mobile home community does not include the use of land for the display and sale of mobile homes.

**MOBILE HOME LOT** means a plot of ground within a mobile home community designed for the accommodation of one mobile home with its accessory uses.

**MUNICIPAL OR INDUSTRIAL WATER PROJECT** means a system and all integrated components thereof through which any entity, political subdivision (including any municipality, county, or district) or an industrial user derives its water supply, whether directly or by exchange, and whether from surface or subsurface sources.

**MUNICIPALITY** means an incorporated statutory or home-rule city or town of the State of Colorado.

**MUNICIPAL THREE-MILE PLAN** means a master plan adopted by a municipality pursuant to C.R.S. 31-23-206 for the physical development of areas outside its boundaries. Also, see "Three-Mile Plan."

**NATURAL HAZARD** means a natural phenomenon that so conflicts with construction or land use as to constitute a significant hazard to public health and safety, or to property, including but not limited to, geologic hazards, flood hazards, and wildfire hazards.

**NATURAL HAZARD AREA** means an area containing or directly affected by a natural hazard as sometimes designated on quadrangle mapped overlays in the Planning Department, or available in the Gunnison County MIS Department.

**NET EFFECT OR NET IMPACT** means the impact of an action after mitigation; includes social, economic, physical, health, biological (including, but not limited to, effects on natural resources and on the structure and function of affected ecosystems), aesthetic, and historical effects.

**NONCONFORMING USES** means those uses addressed in Section 1-108: *Nonconforming Uses*.

**NON-MOTORIZED TRANSPORTATION WAY** means that area within a road, whether paved, graveled or otherwise surfaced, suitable for bicycle, wheelchair, pedestrian, and, as applicable, equestrian travel.

**NOXIOUS WEEDS** means the non-native plant species including certain grasses that have been introduced into an environment with few, if any, natural biological controls, thus giving them a distinct competitive advantage in dominating and crowding out native plant species, and the ability to dominate plant communities to the extent plant diversity and ecosystem integrity is threatened.

**NUISANCE** means an activity that arises from the unreasonable, unwarranted or unlawful use of property, working obstruction or injury on the right of another, or on the general public.
- **MIXED NUISANCE** is one that is both public and private in its effects.
- **PRIVATE NUISANCE** is a wrongful interference with a person's interest in the private use and enjoyment of land.
- **PUBLIC NUISANCE** includes "public nuisance" as defined in C.R.S. 16-13-301 et seq.

**OBTRUSIVELY VISIBLE STRUCTURE** means a structure or part of a structure that stands out in the context of its surroundings or that draws attention to itself.

**ON-DEMAND HOT WATER PUMP** means a recirculating pump that brings hot water quickly to a faucet when needed, is installed between the hot and cold water lines at the faucet farthest from a water heater, and shuts off once hot water has filled the line.

**OPEN SPACE** means any open, essentially unimproved parcel or area of land (including, but not limited to, grazing lands) that is specifically set aside, dedicated, designated, or reserved for public or private use or enjoyment for park, agricultural, recreation or conservation purposes, or reserved for such uses and enjoyment by residents and/or the general public.

BLM_0053250

**ORDINARY HIGH WATER LINE OR MARK** means the high line of a water body or mudflow established by the fluctuations of water on the flow of mud and indicated by physical characteristics including, but not limited to, a clear natural line impressed on the bank, shelving, changes in the character of the soil, destruction of terrestrial vegetation, and the presence of litter or debris.

**ORIENTED STRAND BOARD** means engineered, mat-formed panel products made of strands, flakes or wafers sliced from small-diameter, round wood logs and bonded with an exterior-type binder under heat and pressure.
- **ORIENTED STRAND BOARD PANELS** means layered mats of oriented strand boards; exterior or surface layers consisting of strands aligned in the long panel direction; and inner layers consisting of cross- or randomly-aligned strands.

**PARCEL** means a tract or lot of land. Also, see "Legal Lot."

**PARK** means a public or private parcel of land devoted primarily to outdoor recreation or scenic purposes.

**PARKING AISLE** means the traveled way by which cars enter and depart parking stalls or spaces.

**PARKING AREA** means an area other than a road or alley that is permanently reserved and maintained for the parking of motor vehicles on a temporary (daily or overnight) basis.

**PASSIVE SOLAR SPACE HEATING** means a heating system that includes all of the following:
- The use of integral building components to capture the sun's energy; and
- A means of collection of the sun's energy; and
- Absorption of the solar gain into a mass capable of storing the heat such as concrete, rock or water; and
- Control of the system by convective venting, circulating fans or shading.

**PERMANENT POPULATION** means the permanent population of Gunnison County, as determined by the State of Colorado.

**PERMIT** means any written authorization issued by Gunnison County and recorded by a document in the Office of the Gunnison County Clerk and Recorder or otherwise issued by the appropriate County Department, or issued in accordance with the requirements of Colorado or federal agencies.

**PERSON/PERSONS** means any individual, partnership, corporation, association, company, or other public or corporate entity, including the state or federal governments, and any of their political subdivisions, agencies, instrumentalities.

**PIPELINE** means any conduit or pipe and appurtenant facilities especially designed for, or capable of, transporting water, or gas or other petroleum derivatives.

**PLANNING COMMISSION** means the Gunnison County Planning Commission.

**PLANNING DEPARTMENT** means those employees of Gunnison County who have been designated by the Board to implement, administer, and enforce the requirements of this *Resolution*.

**PLANNING DIRECTOR** means the Director of the Gunnison County Planning Department or his/her authorized designee.

**POLLUTANT** means a material or substance that contaminates air, soil or water.

**POPULATION CENTERS** means the communities of Somerset, Ohio City, Almont or Crested Butte South and the incorporated municipalities of Gunnison, Crested Butte, Mt. Crested Butte, Pitkin or Marble.

**POWER PLANT** means any electrical energy generating facility including, but not limited to, pumped storage facilities with a generating capacity of ten megawatts or more, and any facilities appurtenant to any existing power plant, or any addition thereto, increasing the existing design capacity of the facility by ten megawatts or more.

**PRIMARY STRUCTURE** means the chief or principal structure. In the case of multiple residences or mixed-use structures, the largest residence.

**PRIMARY USE** means the primary purpose or function for which a parcel is used.

**PRIVATE POWER PROJECT** means a complex of structures, machinery and associated equipment for generating electricity or providing natural gas or other petroleum derivatives, that is not part of a public utility.

**PROJECT** means any activity that is a land use change. (Also, see "Land Use Change.")

BLM_0053251

**PROPOSED SPECIAL DEVELOPMENT PROJECT** means a development including all of its components and associated elements, as defined in the *Gunnison County Special Development Projects Regulations*.

**PUBLIC HEARING** means a public meeting, conducted by the applicable body pursuant to Sections 3-112: *Notice of Public Hearing* and 3-113: *Conduct of Public Hearing*, with the principal purpose of receiving testimony or public comment on a specific application or issue.

**PUBLIC MEETING** means any meeting open to the public that meets the requirements of C.R.S. 24-6-401 et seq.

**PUBLIC ROAD** means the following; the status of a road as a public road does not require nor imply that the Board shall maintain, repair or snowplow it:
- All roads over private lands dedicated to the public use by deed to that effect, filed with the Office of the Gunnison County Clerk and Recorder when such dedication has been accepted by the Board; and
- All roads over private or other lands dedicated to public uses by due process of law,  including a subdivision plat approved by Gunnison County and recorded in the Office of the Gunnison County Clerk and Recorder; and
- All roads over private lands that have been used adversely without interruption or objection on the part of the owners of such lands for 20 consecutive years; and
- All toll roads or portions of them that may be purchased by the Board from the incorporators or charter holders of them, and thrown open to the public; and
- All roads over the public domain, whether agricultural or mineral.

**PUBLIC SERVICES AND FACILITIES** means those services and facilities provided by a public entity or public utility (including, but not limited to, any municipality, county, or special district) including, but not limited to, roads, trails, schools, wastewater treatment, water treatment and distribution, solid waste disposal, storm drainage, health care, law enforcement, fire protection, emergency medical services, social services, recreational services, libraries, and government and administrative services, facilities, and personnel, cultural facilities, public transportation, electric, gas, and telephone utilities.

**PUBLIC UTILITY** has the meaning set forth at C.R.S. 40-1-103.

**PUBLIC WORKS DIRECTOR** means the Director of the Gunnison County Public Works Department or his/her authorized designee.

**RADON MITIGATION** means the installation of a vapor defusion retarder and connection to the vent pipe in a structure.
- **RADON MITIGATION, ROUGH-IN** means the installation of a vent pipe from a crawl space up through the roof of a structure.

**RANCHING** means the practice of raising cattle, horses, sheep, and other livestock in a manner traditional to Gunnison County, and all associated activities, including, but not limited to, irrigation, raising of associated crops, and storage. Ranching shall not include large confined animal feeding operations of a scale not traditionally found in Gunnison County.

**RECLAMATION** means the construction of topographic, soil and plant conditions after disturbance, which may not be identical to the site before it was disturbed, but which permits the disturbed site to function adequately in the ecosystem of which it was and is a part.

**RECORDED, OR RECORDATION** means recorded with the records of the Office of the Gunnison County Clerk and Recorder.

**RECREATION, ACTIVE** means leisure-time activities that are typically of a formal nature and are performed with others, usually requiring equipment and taking place at prescribed places, sites, or fields.

**RECREATION, PASSIVE** means leisure-time activities that involve relatively inactive or less energetic activities, including, but not limited to, walking, sitting, picnicking, nature observation, sun-bathing, card and board games.

**RECREATIONAL DEVELOPMENT** means any development whose primary purpose it is to serve a tourist or other recreational clientele, whether as a destination or day-use facility, long or short-term, and whether it is single or multiple-use in nature.

BLM_0053252

**RECREATIONAL VEHICLE** means a vehicle primarily designed as temporary living quarters for recreational, camping, or travel use, that either has its own motive power or is mounted on or drawn by another vehicle including a travel trailer, camping trailer, truck camper, and motor home.

**RECREATIONAL VEHICLE PARK** means a parcel of land upon which two or more recreational vehicle sites are located, established, or maintained for occupancy by recreational vehicles of the general public as temporary living quarters for recreation or vacation purposes.

**RECYCLED CONTENT SIDING OR ROOFING** means roof materials that contain high percentages of recycled content.

**RECYCLED CONTENT SHEATHING** means oriented strand board used for sheathing.

**RECYCLED INSULATION** means insulation material that includes recycled material including, but not limited to, cotton or rock wool insulation.

**RECYCLED PLASTIC DECK MATERIAL** means material made from recycled polyethylene plastic such as milk jugs and other bottles.

**REHABILITATION** means the process of making an ecosystem healthy again after a disturbance, and involves the recovery of ecosystem functions and processes in a degraded habitat. Rehabilitation does not necessarily reestablish the site to its predisturbed condition, but does involve establishing geologically and hydrologically stable landscapes that support the natural ecosystem.

**RESIDENCE** means a structure or any part of a structure designed for residential purposes having one or more rooms, not more than one kitchen, and at least one bathroom, that is designed for long-term occupancy by one or more persons for living and sleeping purposes, and that may or may not be placed on a permanent foundation. In addition, residences includes factory-built housing, and alternative construction including, but not limited to, yurts, tepees, or plastic units that comply with the requirements of this *Resolution*, and, as applicable, with standards of the applicable building code, adopted and amended by Gunnison County. Vehicles, excluding mobile homes, but including recreational vehicles, shall not be considered to be habitable residences.

- **DETACHED SECONDARY RESIDENCE** means a secondary residence that is physical separate from the primary residence.
- **DUPLEX** means a single building that contains two residences.
- **INTEGRATED SECONDARY RESIDENCE** means a secondary residence that is structurally integrated within, and has an internal access to a single family residence.
- **MULTIPLE-FAMILY RESIDENCE** means a building that contains three or more residences, but not including hotels, motels, or lodges.
- **PRIMARY RESIDENCE** means the largest single-family residence on a parcel.
- **SECONDARY OR ACCESSORY RESIDENCE** means a residence that is an accessory structure to a primary residence, except this shall not include a secondary structure intended only for sleeping, pursuant to *Section* 9-101: *Uses Secondary to a Primary Residence.*
- **SINGLE-FAMILY RESIDENCE** means a building that contains one residence.

**RESIDENTIAL LIVING AREA** means one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by Section 9-101: *Uses Secondary to a Primary Residence.*

**RESORT (INCLUDING INNS, LODGES, DUDE RANCHES AND GUEST RANCHES)** means those establishments used for housing and providing either organized entertainment or recreational opportunities for overnight lodging, generally several nights in duration. This type of facility either provides all recreational opportunities on-site, or as part of an organized or duly licensed and/or permitted recreational activity on public or private lands in the vicinity of the inn, lodge or guest ranch.

**RESTORATION** means the reestablishment of a structure and function of an ecosystem after a disturbance. Ecological restoration is the process of returning an ecosystem as closely as possible to the conditions and functions before it was disturbed.

**RETENTION** means the practice of holding or directing storm water except that portion evaporated or bypassed in an emergency, in or to a given area so that all the storm water will be infiltrated into the subsoil.

**RETENTION POND** means a recharge basin that is designed to infiltrate all of the storm water it receives and that normally has no outflow.

BLM_0053253

**RETENTION STRUCTURE** means a permanent structure that provides for the storage of storm water run-off by means of a permanent pool of water.

**REVIEW AGENCIES** means any agencies or persons who, in the opinion of the Planning Department, Planning Commission, or the Board, may be affected by a proposed land use change, or from whom it is reasonably necessary to request relevant information or analysis concerning the potential impacts of the land use change. These agencies include:

- The applicable school district;
- Any community or municipality likely to be affected by the proposal;
- Utility, local improvement and service districts, and ditch companies, when applicable;
- The Colorado State Forest Service
- The United States Forest Service, Bureau of Land Management, or National Park Service, when applicable;
- The appropriate local Natural Resources Conservation Office/Soil Conservation Service Board;
- The Colorado Department of Public Health and Environment;
- The Colorado Division of Minerals and Geology;
- The Colorado Division of Water Resources;
- The Colorado Division of Wildlife;
- The Colorado Department of Transportation;
- The Gunnison County Trails Commission;
- The Gunnison County Historic Preservation Commission;
- The Gunnison County Emergency Services Office; and
- Other agencies, entities, and groups that the Planning Department, Planning Commission, or Board may deem advisable.

**RIDGELINE** means the horizon line at the crest or shoulder or top of a ridge, hillside, or mesa at which the natural ground and the sky appear to meet when viewed from any point on a ridgeline vantage, pursuant to Section 11-108: *Standards for Development on Ridgelines.*

**RIPARIAN AREA** means the area located between the water's edge of aquatic ecosystems (rivers, lakes, streams, ponds, springs and seeps) and upland areas, whose soils tolerate a high water table, provide sufficient moisture in excess of that otherwise available locally, and provide a moister habitat than that of contiguous floodplains and uplands. Riparian areas include groups of plants, animals and aquatic communities whose presence is either directly or indirectly attributed to water-influenced or water-related factors. Areas exempt from this definition are manmade agricultural structures and devices including irrigation ditches, sprinklers, and artificial ponds.

**RIVERINE** means relating to, formed by, or resembling a river (including tributaries), stream, brook or other watercourse.

**ROAD, HIGHWAY, STREET OR TRAIL** means an open way reserved for the passage, generally, of people, vehicles, animals and goods and includes trails and nonmotorized ways.

**ROAD AND BRIDGE CONSTRUCTION SPECIFICATIONS, GUNNISON COUNTY** means the *Gunnison County Standards and Specifications for Road and Bridge Construction*, as it may be amended.

**ROADBED** means the graded portion of a highway, usually considered as the area between the intersections of top and side-slopes, upon which the subbase, base course, surface course and shoulders are constructed. Divided highways are generally considered to have two roadbeds.

**ROAD CONSTRUCTION** means construction, enlargement, or relocation of a road.

**RUN WITH THE LAND** means passing with the transfer of the land.

**RURAL** means the character of an area that is primarily agricultural, low-density residential, unimproved and open.

**SALVAGE (OR JUNK) YARD** means an area where waste or scrap materials are bought, sold, exchanged, stored, baled, packed, disassembled or handled, including, but not limited to, scrap iron and other metals, rubber tires and recyclable materials. A junk or salvage yard includes an auto wrecking yard, but does not include uses established entirely within enclosed buildings.

BLM_0053254

**SATELLITE DISH DEVICE** means a device for the reception or transmission of satellite signals, including, but not limited to, television, radio, telemetry, data communication, or any other signals that use free air space as a medium, whether for commercial or private use.

**SCREENING** means the general landscaping, vegetation, fencing or other design feature(s) used to mitigate or eliminate the visual impact of one land use from another.

- **FULLY SCREENED** means that a structure or other land use is not visible when viewed from a specified vantage point.

**SEASONAL USE** means use limited to those months when snow normally is not on the ground in Gunnison County, that is, the months of May through October inclusively.

**SECONDARY USE.** See definition of "Accessory or Secondary Use."

**SENSITIVE AREAS** means those areas identified by the Board that contain, or in which activity will have a significant impact on, human, historical, natural, environmental, cultural or archeological resources of great significance; a sensitive area shall be a specific geographic location that is defined with specific boundaries.

**SERVICE AREA** means the primary geographic area to be served by a proposed project.

**SERVICE LINE** means a line whose principal purpose is to provide utility service to an individual customer or customers, from the distribution line or system to the point of common coupling between the utility and customer system. In electrical and gas utilities, the point of common coupling is generally the utility meter.

**SETBACK** means the required minimum horizontal distance between the location of structures or uses and the related front, side, or rear lot line as measured perpendicular to that lot line.

**SIGHT DISTANCE TRIANGLE** means the area on any corner parcel, where an area is kept clear of structures, fences or tall vegetation, to allow vehicle drivers an unobstructed view of traffic approaching on the intersecting road, highway or driveway.

**SIGN** means any placard, poster, billboard, advertising structure or inscribed surface, pattern or artificial lighting, pictorial or symbolic ornament, emblematic structure, banner, fluttering apparatus, or other visually communicative or expressive device that is visible from an out-of-doors position and is used to advertise or call the public's attention to any public, business, commercial, industrial, recreational or any other activity, object for sale or lease, person or place, or to bear any kind of message. A sign includes any surface on which a name, text, device, signal, ornament, logotype, or advertising matter is made visible, but does not include a vehicle on which the name of a business appears, nor does it include the use of barns for inscription of a family name or brand, nor the normal painting of a residence. The meaning of "sign" shall also include any sign currently in disuse, but still visible from an out-of-doors position, and any frame or support structure erected specifically to support a sign.

- **CLUSTER SIGN** means any sign identifying a business, commercial or industrial use and that provides one space per each business entity within the development to display an off-premise sign.
- **DIRECTIONAL SIGN** means any off-premise sign that directs the movement or placement of pedestrian or vehicular traffic to the subject use.
- **FLASHING SIGN** means any directly or indirectly illuminated sign either stationary or animated that exhibits changing natural or artificial light or color effects.
- **GROUND SIGN** means a sign supported by poles, uprights or braces extending from the ground but not attached to any part of a building.
- **ILLUMINATED SIGN** means a sign lighted by or exposed to artificial lighting, either by lights that are part of the sign, or by lights directed toward the sign.
- **OFF-PREMISE SIGN** means a sign advertising a business, product or service not on the parcel of land on which the sign is located.
- **WALL SIGN** means a sign attached to, painted on, or erected against a wall or roof of a building or other structure that extends no more than 18 inches from the wall surface upon which it is attached and whose display surface is parallel to the face of the building and does not exceed the height of the building on which it is mounted.

**SIGNIFICANT** means of considerable or substantial consequence.

**SIGNIFICANT NET ADVERSE EFFECT/IMPACT** means an impact of an action, after mitigation, which is considerable or substantial, and unfavorable or harmful; includes social, economic, physical, health, aesthetic and historical impacts, and biological impacts including but not limited to, effects on natural resources or the structure or function of affected ecosystems.

BLM_0053255

**SITE DISTURBANCE** means activity that changes the surface of a site, including, but not limited to, grading, tree-cutting, removal of vegetation, and cutting and filling of materials.

**SITE PLAN** means an accurately scaled development plan that illustrates the existing conditions on a land parcel and graphically and visually depicts the details of a proposed development. (Illustrated in Appendix Figure 1: *Site Plan Example*.)

**SITE-SPECIFIC DEVELOPMENT PLAN (SSDP)** means a plan describing with reasonable certainty the type and intensity of use for a specific parcel or parcels of land that has received a Land Use Change Permit from Gunnison County.

**SLOPE** means the gradient of the ground surface. Slope is determined by dividing the horizontal distance or "run" of the slope into the vertical distance or "rise" of the same slope and converting the resulting figure into a percentage value. For purposes of regulation and measurement, a slope must involve an elevation change of at least ten feet within a horizontal distance of at least 30 feet.

**SOLAR-GENERATED ELECTRICITY** means the production of electric current in a solid material with the aid of sunlight by direct conversion of light into electricity by use of photovoltaic (PV) cells.

**SOLAR HOT WATER HEATING SYSTEM, ACTIVE** means a heating system that employs pumps and controllers to capture solar energy that includes all of the following:
- Collector(s) to capture solar energy; and
- Circulation system to move a fluid between the collectors to a storage tank; and
- Storage tank; and
- Backup heating system; and,
- Control system to regulate the overall system operation.

**SOLAR HEATING SYSTEM, PASSIVE** means a passive system to capture solar energy that uses natural convection or water pressure to circulate water through a solar collector to a storage tank or to the point of use.

**SOLID-FUEL-BURNING DEVICE** means a device designed for the combustion of solid fuels including, but not limited to, wood, coal, pulp, paper, pellets or similar nonliquid or non-gaseous materials so that usable heat is derived for the interior of a building, and includes solid-fuel-burning stoves, fireplaces or wood stoves of any nature, combination fuel furnaces or heaters that burn solid fuel, or any other device used for the burning of solid combustible material.
- **APPROVED NON-SOLID FUEL BURNING DEVICE** means a device that burns a non-solid fuel including natural gas, liquefied petroleum (LP), fuel oil, or similar fuel that has been approved by Underwriter's Laboratory, International Approval Services (IAS) or other approved laboratories. This includes gas logs permanently installed in a traditional open fireplace.
- **APPROVED SOLID FUEL BURNING DEVICE** means a device that is designed or intended to burn solid fuel and that is certified to meet the E.P.A. Phase II particulate emissions rate standard by the U.S. Environmental Protection Agency, or is certified to meet those standards by a testing laboratory accredited by the E.P.A., or is approved by the Colorado Air Quality Control Commission.

**SPECIAL DEVELOPMENT PROJECT REGULATIONS** means the *Gunnison County Regulations for Special Development Projects*, as they may be amended.

**SPECIAL EVENT** means a use or activity that occurs at a location not otherwise permitted for the use or activity, and at which 200 or more persons may gather, or that will attract more than 50 vehicles per day, or that have the potential to create significant net adverse impacts in terms of traffic, water or air quality, noise, lighting, and similar matters. Such uses or activities may be allowed on a non-permanent or temporary basis, upon individual review of their proposed nature, location, duration, impact, and compatibility with neighboring uses and activities. Examples of special events include outdoor concerts, athletic competitions, religious revivals, movie productions, and other types of group or mass gatherings. Funerals and weddings are excluded from this definition, except when weddings are conducted regularly or frequently at a site, they shall not be defined as special events, and the site on which the weddings are conducted shall be required to obtain a Land Use Change Permit for a commercial use.

**SPECIAL GEOGRAPHIC AREA, OR SPECIAL AREA** means a particular geographic basin or other land area subject to specialized land use regulations and as approved by the Board pursuant to Section 1-110: *Process for Designation of Special Areas*.

BLM_0053256

**SPRAWL** means haphazard development located beyond municipal boundaries and generally characterized by:

- Inefficient, conspicuous consumption of raw land, typically built at low densities resulting in conflict with established rural land use patterns; or
- Failure to use existing infrastructure in favor of new facilities; or
- Location outside existing service areas, disrupting continuity and heightening demand and associated costs for services; and
- Heavy dependence on automobiles as opposed to mass transit or other non-auto related transportation modes.

**STABLE, RENTAL** means a facility where animals including horses, ponies, mules, burros, donkeys or llamas are rented to the general public for recreational purposes.

**STOCK DRIVE ROUTES** means routes over private or public land, including, but not limited to, public roads or highways that are regularly used to move livestock from one location to another by means of driving or herding such livestock.

**STORAGE SHED** means a detached secondary structure used for storing goods, not intended for human habitation, or the keeping of livestock.

**STORM WATER** means the flow of water that results from and that occurs immediately following a rainfall event.

**STRIP (LEAPFROG) DEVELOPMENT** means the irregular development of land in the County, including intensive development adjacent to roadways or other geographical features, as well as sprawl or leapfrog development.

**STRUCTURE** means anything constructed or erected, that requires location on the ground, or is attached to something having location on the ground, including portable shelters for human habitation or use, recreational vehicles and tents, storage, transmission or distribution facilities or public utilities, but not including transmission lines of less than 45 kilovolt capacity, or fences.

**SUBDIVISION OR SUBDIVIDED LAND** means any parcel of land that is divided into two or more parcels, separate interests, or interests in common, or is to be used for condominiums, townhomes or townhouses, apartments, or any other multiple-dwelling units, unless the previous subdivision of such land was accomplished pursuant to a Land Use Change Permit that complied with the requirements of this *Resolution*, or the County's land use regulations in effect at that time, with substantially the same density; or unless expressly exempted within this definition. As used in this definition, "interests" includes any and all interests in the surface of land but excludes any and all subsurface interests.

The terms "subdivision" and "subdivided land" shall not apply to any division of land that creates parcels of land each of which comprises 35 or more acres of land and none of which is intended for use by multiple owners.

Unless the method of disposition is adopted for the purpose of evading the statutes of Colorado or this *Resolution*, the terms "subdivision" and "subdivided land" shall not apply to any division of land:

- That creates parcels of land, such that the land area of each of the parcels, when divided by the number of interests in any such parcel, results in 35 or more acres per interest;
- That is created by any court in Colorado pursuant to the law of eminent domain, or by operation of law, or by order of any court in Colorado if the Board is given timely notice of any such pending action by the court and given opportunity to join as a party in interest in such proceeding for the purpose of raising the issue of evasion of the statutes of Colorado or this *Resolution* before entry of the court order; and, if the Board does not file an appropriate pleading within 20 days after receipt of such notice by the court, then such action may proceed without the County's participation;
- That is created by a lien, mortgage, deed of trust, or any other security instrument;
- That is created by a security or unit of interest in any investment trust regulated under the laws of Colorado or any other interest in an investment entity;
- That creates cemetery lots;
- That creates an interest in oil, gas, minerals, or water that is severed from the surface ownership of real property;
- That is created by the acquisition of an interest in land in the name of a husband and wife or other persons in joint tenancy or as tenants in common, and any such interest shall be deemed for purposes of this *Resolution* as only one interest;

BLM_0053257

- That is created by the combination of contiguous parcels of land into one larger parcel. If the resulting parcel is less than 35 acres in land area, only one interest in that land shall be allowed. If the resulting parcel is greater than 35 acres in land area, that land area, divided by the number of interests in the resulting parcel, must result in 35 or more acres per interest. Easements, licenses and rights-of-way shall not be considered interests for purposes of this subparagraph.
- That is created by a contract concerning the sale of land that is contingent upon the purchaser's obtaining approval to subdivide, pursuant to this *Resolution* and any other applicable County regulations, the land that  he/she is to acquire  pursuant to the contract;
- That creates a cluster development as defined by C.R.S. 30-28-401, et seq.

The Board may, pursuant to rules and regulations or resolution, exempt from this definition any division of land if the Board determines that such division is not within the purposes of this *Resolution*, pursuant to C.R.S. 30-28-101 (10) (d).

**APPROVED SUBDIVISION** means a subdivision that has been approved by the Board.

**SUBSTANTIAL DAMAGE** means damage of any origin sustained by a structure whereby the cost of restoring the structure to its before-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

**STATION** means any facility designed to provide switching, voltage transformation, or voltage control required for the transmission of electricity.

**TANKLESS HOT WATER HEATER** means a hot water heating system that heats water on demand, and stores no hot water.

**TECHNICAL MODIFICATION** means a minor deviation of not more than ten percent from any minimum or maximum numerical standard of this *Resolution*, pursuant to Section 8-101: *Technical Modifications*.

**TEMPORARY SHELTER** means a structure without any foundation or footings, that is located for a fixed period on the same site as a residence that is under construction to house the owner of the property temporarily, and is removed immediately after the permanent structure is completed.

**TEMPORARY USE** means a use that is limited in scope, duration, and frequency.

**THREE-MILE PLAN** means a master plan adopted by a municipality pursuant to C.R.S. 31-23-206 for the physical development of areas outside its boundaries.

**TIMBERLINE** means the elevation on a particular parcel beyond which trees do not grow except sparsely or as stunted forms.

**TOWNHOUSE OR TOWNHOME** means a residence attached to other residences with one or both sides sharing common walls, depending on whether the unit is in a center or end position, erected as single buildings on adjoining lots, each residence being separated from the adjoining unit or units by a party wall or walls extending from the basement floor to the roof along the dividing lot line. Townhomes can be grouped together as small units, such as duplexes or triplexes, or they can be parts of a larger complex.

**TRACT** means a parcel or lot of land. Also, see "Legal Lot."

**TRAIL** means an open way reserved for the passage, generally, of people, nonmotorized vehicles, animals and goods.

**TRANSMISSION LINE** means a line and related facilities whose primary purpose is the delivery of electric power, oil, water, natural gas, telephone, cable television, or similar amenities or services in bulk to all or a part of a distribution line or system that serves individual customers, except that an electrical transmission line shall be defined as the line and related facilities whose primary purpose is to deliver electrical power whose voltage is greater than 45 kv.

**URBAN SERVICE AREA OR URBAN GROWTH AREA** means an area adjacent to an incorporated municipality that has been designated by such municipality, and accepted by resolution of the County, as an area within which the municipality will or may provide utility or other services upon compliance with applicable municipal ordinances.

**USE** means the purpose for which any parcel of land, building, or structure is designed, maintained, occupied, or used.

BLM_0053258

**VAPOR-PERMEABLE INFILTRATION BARRIER** means a vapor-permeable air barrier wrapped around the exterior of a house and made of materials including but not limited to polyolefin fabric wrap on sheathing, pressed cardboard and pleated polystyrene with paper facings.

**VEHICLE STACKING AREA** means a queuing area made up of individual stacking spaces for motorists who remain in their vehicles awaiting service at a drive-thru window or a gasoline pump.

**VIEWSHED OR VIEW CORRIDOR** means areas of significant visual value that may include foreground areas (including, but not limited to, irrigated meadows, or undeveloped bank areas of reservoirs and lakes), ridgelines, or butte and mountain tops, and hillsides or buttes in front of mountain backdrops.

**WARMING HUTS/ OR WAY STATIONS** means a shelter from adverse weather conditions or overnight layovers on longer trips, not intended for extended stays or permanent residential occupancy.

**WASTEWATER RECYCLING** means the treatment of wastewater in a manner that will restore its quality to the water supply standard established by the Colorado Department of Health where permissible by Colorado water law.

**WASTEWATER (SEWAGE) TREATMENT SYSTEM** means a system or facility for treating, neutralizing, stabilizing or disposing of sewage, which system or facility has a designed capacity to receive more than two thousand gallons of sewage per day. A wastewater treatment system designed to receive more than 2,000 gallons of sewage per day shall not be constructed of or include an individual sewage disposal system, or collection of such systems. The term "sewage treatment works" includes appurtenances such as interceptors, collection lines, outfall and the outlet sewers, pumping station, and related equipment.

**WATER BODY** means a perennial or intermittent river, stream, lake, reservoir, pond, spring, or wetland but does not include irrigation ditches, roadway drainage ditches, artificial lakes, ponds, or wetlands that are created and used for the primary purpose of agricultural operations. Water bodies in Gunnison County include but are not limited to the following:

- Anthracite Creek
- Brush Creek (all locations)
- Carbon Creek
- Carbonate Creek
- Cebolla Creek
- Cement Creek
- Cimarron Creek
- Coal Creek
- Cochetopa Creek
- Copper Creek
- Crystal River
- East River
- Farris Creek
- Gold Creek
- Gunnison River (including North Fork and Lake Fork)
- Illinois Creek
- Lottis Creek
- Ohio Creek
- Pine Creek (all locations)
- Quartz Creek
- Red Creek
- Slate River
- Soap Creek
- Spring Creek
- Steuben Creek
- Taylor River
- Texas Creek
- Tomichi Creek
- Washington Gulch
- Willow Creek
- Yule Creek

**WATER BODY-RELATED TERMS:**

- **HEADCUTTING** means the development and upstream movement of a vertical or near vertical change in stream bed or stream bank slope.
- **HYDROLOGIC BALANCE** means the relationship between the quality and quantity of water inflow to, water outflow from, and water storage in a hydrologic unit including, but not limited to, a drainage basin, aquifer, soil zone, lake, or reservoir. It encompasses the dynamic relationships among precipitation, runoff, evaporation, transpiration, and changes in ground and surface water storage.
- **INTERMITTENT RIVER, STREAM, LAKE, RESERVOIR, POND, SPRING OR WETLANDS** means a water body that normally holds water or flows at least 60 days a year because of ground water discharge or surface runoff.
- **NATURAL WATER BODY** means a water body not created for the purpose of a land use change.
- **PERENNIAL RIVER, STREAM, LAKE, RESERVOIR, POND, SPRING OR WETLANDS** means a water body that normally holds water or flows continuously during all of the year because of ground water discharge or surface runoff.
- **UNSTABLE STREAM BANK** means a stream bank that is subject to failure, collapse, slippage, slumping, seepage, headcutting or significant erosion.

**WATER CONSERVATION PLAN** means a plan demonstrating that 10,000 gallons of water will be saved annually by use of devices, including but not limited to, low-flow toilets, low-flow shower heads and sprinkler systems that are on timers.

BLM_0053259

**WATER SUPPLY SYSTEM** means a system of wells, diversions, pipes, treatment plants, structures and facilities, including impoundments and their associated structures, through which a water supply is obtained, treated to alter the physical, chemical, or bacteriological quality of the water, and sold or distributed for human consumption or residential use, or the system of wells, diversions, pipes, treatment plants, structures, and facilities through which a water supply is obtained that will be used directly, or exchanged for water that will be used for human consumption or residential use.

**WATERWAY** means a stream, river or creek, or any other natural channel or other topographic feature through which "live" water flows, but does not mean ditches used for agricultural purposes.

**WETLAND** means an area as defined by the U.S. Environmental Protection Agency Regulations listed at 40 CFR 230.3(t), as amended. Generally such an area is inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and under usual circumstances, supports a prevalence of vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation. Wetland areas generally include marshes, bogs, seeps, riparian and similar areas, but do not include those artificial wetlands intentionally created from non-wetland areas, including irrigation and drainage ditches, grass-lined swales, canals, detention facilities, ranch ponds and landscape amenities.

Exempt from the definition are areas in which there are wastewater treatment systems, including treatment ponds and lagoons designed to meet the requirements of the Clean Water Act (33 U.S.C. Sec. 1341), treated water distribution and storage facilities or treated water that otherwise meet the criteria in this definition, and areas created by irrigation-related activities from agriculture and ranching. However, wetlands may include those artificial wetlands intentionally created from non-wetland areas created for the purpose of mitigating conversion of wetlands, if permitted by the County.

**WETLANDS FUNCTIONS** means the beneficial roles that wetlands serve, including storage, conveyance, and attenuation of floodwaters and storm waters; groundwater recharge and discharge; protection of water quality and reduction of sediment and erosion; production of waterfowl, game and non-game birds, mammals, and other living resources; protection of habitat for endangered, threatened, and sensitive species; food chain support for a broad range of wildlife and fisheries; educational, historical, and archaeological value protection; and scenic, aesthetic, and recreational amenities.

**WILDFIRE HAZARD AREA** means an area where potential wildfire phenomenon is so adverse to past, current or foreseeable construction or development that it constitutes a significant potential hazard to public health and safety or to property. Such areas may be shown on maps pursuant to Section 1-112: C: *Maps To Be Used As References* and may include:

- **LOW HAZARD AREA** means any area that is partially covered by fuel other than oak brush, but that has ground coverage of less than 30 percent of conifer crown coverage. Fuels may include grasses, brush (other than oak), sage, aspen, cottonwood, willow, scattered or open conifer stands, and deadwood contacting the ground.
- **MEDIUM FIRE HAZARD AREA** means any area that is substantially covered by fuels but that has a 35-55 percent conifer crown coverage with a slope of less than 30 percent; including fuels of medium density, conifer stands with a surface fuel mainly of herbage and litter, and some patches of reproduction and deadwood. Areas may also be designated as being within a medium fire hazard area that have a timber density of less than 35 percent crown coverage but with other fuels of medium density including grasses and brush (other than oak), sage, aspen, cottonwood, willow, deadwood contacting the ground, and/or ladder fuels.
- **SEVERE TREE FIRE HAZARD AREA** means any area that has a timber density of greater than 55 percent conifer crown coverage or a timber density of 35 percent to 55 percent conifer crown coverage on a slope of 30 percent or greater; including fuels and medium density stands with severe brush hazard fuels or large amounts of deadwood from blowdown, bug kill, or logging. A medium hazard area that has an accumulation of slash from logging operations and/or significant amounts of ladder fuels shall also be considered to be within this hazard area.
- **SEVERE BRUSH FIRE HAZARD AREA** means any area that has a dense to moderately-dense coverage of high brush or conifer saplings with a timber density of more than 35 percent conifer crown coverage. Fuels include Gamble oak, large sage brush, conifer reproduction, abundant litter, or herbaceous fuels.

**WILDFIRE-RELATED TERMS INCLUDE:**

- **FIRE CHIMNEY** means a steep, narrow drainage or ravine that generally confines smoke and heat along with natural convection currents and thus causes rapid upward increases in fire spread and intensity.

BLM_0053260

- **FUEL** means vegetation, debris, or other substances that will support combustion in a wildfire hazard area.
- **FUELBREAK** means a strategically-located strip of land that may vary in width, on which vegetation and other fuels have been modified to reduce the rate of potential fire spread, so that fire suppression forces can be used in relative safety to control a wildfire. Examples of fuel-breaks include provision for all-wheel-drive access, greenbelts, open space, forest openings, riding and hiking trails, and underground utility corridors.
- **LADDER FUELS** means fuels arranged between two separate fuel layers, including between the forest floor and tree canopies that provide vertical continuity, and thereby support fire spread in a vertical direction.
- **SLASH** means vegetative debris left after cutting or clearing operations in forest or brush areas that require treatment to reduce wildfire hazard.

**WILDLIFE** means native or introduced wild vertebrates.

- **CRITICAL WILDLIFE HABITAT AREA** means an area identified as the habitat for species listed by the U.S. Fish and Wildlife Service or the Colorado Division of Wildlife as threatened or endangered, or are candidates for those listings.
- **SENSITIVE WILDLIFE HABITAT** means a natural or manufactured environment that contains the elements of food, shelter, water, and space in a combination and quantity necessary to sustain one or more wildlife or plant species at stable population levels in historically-used habitats. Sensitive wildlife habitat areas include, but are not limited to, nesting, brood rearing areas; rookeries; leks; migration corridors, calving and fawning grounds for big game; critical winter range for big game and for sage grouse.

**WIRELESS TELECOMMUNICATIONS DEVICES** means any device used to provide wireless telecommunications services, whether the device is affixed or mounted onto a building or other structure that is used for some other primary purpose, or is a freestanding structure, building, pole, tower, or antenna used solely to provide wireless telecommunications services.

**YARD** means that unoccupied open area between any building or other structure and the nearest lot line or property boundary, or the boundary of a designated building envelope.

**XERISCAPE** means landscaping that includes but is not limited to the following:

- Use of low-water demanding plants and turf;
- Grouping plants with similar water and cultural requirements (such as sun and climate) together on the same irrigation zones;
- Limiting the use of high-irrigation turf and plantings to high-use areas with high visibility or functional needs;
- Use of efficient irrigation systems;
- Use of temporary mulches.

**ZERO LOT LINE DEVELOPMENT** means a development in which a residence is located on one side of a lot line and/or on the rear lot line of the subject lot. The reduced setback results in an equal amount of setback increase on the opposite side of the lot line.

BLM_0053261

# ARTICLE 3:
# GENERAL REVIEW PROCESS

## SECTION 3-101: PURPOSE

The purpose of this Article is to establish the review process, application submittal requirements and review standards that apply to each type of application regulated by this *Resolution*, including Land Use Change Permits for Administrative Review projects and Minor and Major Impact projects. Processes to allow some alteration of plans (Section 8-101: *Technical Modifications*), relief from potential takings, and to appeal decisions also are included in this Article.

## SECTION 3-102: OVERVIEW

**A.   RELATIONSHIP OF GENERAL REVIEW PROCESS TO PARTICULAR APPLICATIONS**. Appendix Figure 3: *General Review Process for Land Use Change Permit* illustrates how a Land Use Change Permit application progresses from submittal to completion. Appendix Table 2: *Summary of Review Processes* summarizes how certain processes apply to each type of County-regulated Land Use Change Permit application; describes whether attending a Pre-Application Conference is mandatory or optional for each type of application; identifies which recommending and/or decision-making body is authorized to review, act on, and hear appeals for each type of application; and whether a public hearing is required.

**B.   OTHER SPECIFIC COUNTY PERMIT PROCESSES**. Processes for other County permits regulated by this *Resolution*, such as Sign Permits, Outdoor Vending or Long-Term Camping Permits and procedures for variances from specific requirements are located in the sections of this *Resolution* to which they are relevant.

**C.   LAND USE CHANGES WITHIN MUNICIPAL THREE MILE PLAN AREAS**. When the proposal is for development located within a municipal three-mile plan area, the development proposal shall address how it comports with the objectives and policies of the applicable municipal Three-Mile Plan.  The County shall consider how the proposed development has addressed those objectives and policies, and any further intergovernmental agreement between the County and the municipal government regarding the Three-Mile Plan area. Where there is a conflict between the objectives or policies of a Three-Mile Plan or the intergovernmental agreement, and County standards, County standards shall apply.

**D.   INITIAL CLASSIFICATION OF IMPACT AND REASONS FOR A HIGHER LEVEL OF REVIEW**. If the Planning Department determines during review of the application for a Land Use Change Permit, including a Building Permit, that the proposed use exceeds the initial classification criteria listed in Section 4-102: *Projects Classified as Administrative Review Projects That Do Not Require Land Use Changes Permits*, Section 5-102: *Projects Classified as Administrative Review Projects That Require Land Use Change Permits*, or Section 6-102: *Projects Classified as Minor Impact Projects*,  the criteria detailed in Section 3-111: B. 1: *Additional Criteria* shall be considered and the appropriate review process and submittals for an Administrative Review project, or a Minor or Major Impact project shall be required.

## SECTION 3-103: INTENT TO NOT DUPLICATE OTHER PERMIT PROCESSES OR REQUIREMENTS

Gunnison County intends to avoid duplicative regulatory submittals or processes. Processing of applications for permits generally proceeds concurrently with other required state or federal agency permitting processes.

## SECTION 3-104: COORDINATION WITH STATE OR FEDERAL ACTIONS AND COUNTY PERMIT PROCESS

So that the County will have the benefit of the analysis and technical expertise of other entities, the County, in its review of a Land Use Change Permit application, may consider information available in an Environmental Assessment (EA), an Environmental Impact Statement (EIS), or other permit required a state or federal agency. To

BLM_0053262

maximize use of that information without unnecessary delay of review, the following process is required of such applications:

**A. NOTIFICATION TO COUNTY BY APPLICANT**. When an EA or EIS or other state or federal action or permit is required, and that requirement is known by the applicant, the applicant shall notify the County of that requirement when the application is first submitted for review.

**B. PUBLIC HEARING TO IDENTIFY ISSUES TO STATE OR FEDERAL AGENCY**. The Planning Commission and/or Board shall conduct a public hearing to "scope" a proposal for which an EA or EIS is required, to hear public comment and to identify issues that it believes appropriate to be addressed during any permitting process. Notice and conduct of the public hearing shall be accomplished pursuant to Section 3-112: *Notice of Public Hearing* and Section 3-113: *Conduct of Public Hearing*.

    **1. MINOR IMPACT PROJECTS THAT REQUIRE EA OR EIS**. For Minor Impact projects, the process of scoping shall occur concurrently with the public hearing Minor Impact project review.

    **2. MAJOR IMPACT PROJECTS THAT REQUIRE EA OR EIS**. For Major Impact projects, the process of scoping shall occur concurrently with the hearing conducted during the Sketch Plan review.

**C. SUBMITTAL OF INITIAL LIST OF ISSUES TO FEDERAL AGENCY**. Within 35 days of the close of the public hearing, the Planning Commission or Board shall consider the public comments made at the hearing, incorporate them into an initial list of issues of County interest regarding the proposed project, and forward the list to the applicant and appropriate state and/or federal agency. The comments are preliminary in nature, and may change significantly, as a project is more clearly defined in later stages of the development review process.

**D. DELAY OF COUNTY DECISION**. Final action by the County on a Land Use Change Permit application may be delayed until 30 days after the EA, EIS or other permit by a state or federal agency is issued unless otherwise agreed upon by the applicant and the decision-making body, and only if the applicant has applied for the required Land Use Change Permit within 60 days after applying for the required state or federal permit.

## SECTION 3-105: WITHDRAWN AND INACTIVE APPLICATIONS

**A. WITHDRAWAL OF APPLICATION BY APPLICANT**. The applicant may withdraw an application at any phase of the process by submitting a notarized written request to the Planning Department.

**B. INACTIVE APPLICATIONS**. An application that has become inactive because an applicant is required to submit additional information and has failed to do so for a period of more than six months from when it was due shall become void and the resubmittal of a new application and fees shall be required. The Planning Director may grant one extension of time, of no more than six months, for good cause shown, upon a notarized written request by the applicant.

    **1. TAXES TO BE PAID**. Any permit application that has been placed on inactive status shall not be reactivated until the applicant provides to the Planning Director a copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

## SECTION 3-106: PHASING OF PROJECTS

**A. LAND USE CHANGES MAY BE PHASED**. An applicant may propose that a land use change be designed to occur in phases, and may request that it be permitted by individual phases, so long as each phase complies with all applicable requirements of this *Resolution*. The County may require a land use change to be designed to occur in phases, if phasing is necessary or appropriate for it to comply with all of the applicable requirements of this *Resolution*.

**B. EACH PHASE TO PROVIDE IMPROVEMENTS**. If the land use change is to be developed in phases, each phase shall contain the required roads, utilities, landscaping, and other improvements required by the County in its approval. If the land use change incorporates any amenities for the benefit of the public, including trail connections, these shall be constructed within the first phase of the project, or, if this is not possible, then as early in the project as is feasible.

**C. TIMING OF PHASES**.

    **1. MAJOR IMPACT PROJECTS.** For phased projects that are Major Impact projects, all uses and their locations proposed in the application shall be addressed and reviewed through Preliminary Plan approval; Final Plan submittals for individual phases then may be sequentially reviewed and approved.

BLM_0053263

2. **MINOR IMPACT PROJECT**. For phased projects that are Minor Impact projects, the proposed uses on all the property proposed for development shall be submitted for application review, and each phase shall be subject to new and separate impact classification pursuant to Section 3-111: *Classification of Impact.*

3. **APPROVAL OF SUBSEQUENT PHASE REQUIRES 35 PERCENT COMPLETION OF PREVIOUS PHASE.** The approval of each phase of a development after the first phase shall occur only after 35 percent of the previous phase has been constructed.

    a. **DETERMINATION OF PERCENTAGE OF CONSTRUCTION**. The percentage shall be determined by the number of lots on which homes have been constructed or installed, if the development is a residential subdivision or mobile home community; by the number of apartments, condominiums or townhomes if the development is multiple family residences; and the square footage constructed or acreage in use if the development is industrial, commercial or other non-residential.

    b. **ALL AMENITIES OF PREVIOUS PHASE REQUIRED TO BE INSTALLED**. All roads, utilities, landscaping, and amenities for the benefit of the public for the previous phase shall be installed and approved by the County before the applicant may construct a subsequent phase.

## SECTION 3-107: GENERAL APPLICATION REQUIREMENTS

A. **APPLICANT.** An application for a Land Use Change Permit, Lot Cluster, Correction of Plat, Variance, Technical Modification or other applicable permit described in this *Resolution* shall be submitted by the owner of the property or their authorized agent, or any other person having a recognized interest in the land for which the permit is requested.

    1. **APPLICANT IS NOT THE OWNER**. If the applicant is not the owner of the land, or is a contract purchaser of the land, the applicant shall submit a notarized letter signed by the owner consenting to the submittal. Consent of the owner for submittal shall imply consent by the owner for the County to complete the review process pursuant to this *Resolution*.

    2. **APPLICANT IS NOT THE SOLE OWNER.** If the applicant is not the sole owner of the land, the applicant shall submit a notarized letter(s) signed by all other owners, and/or by an association or corporation representing the owners, consenting to, or joining in, the application.

B. **ADDITIONAL MATERIALS; WAIVER OF REQUIRED CONTENTS**. The Board, Planning Commission, Planning Director, or Board of Adjustments may reasonably require the applicant to submit additional materials beyond those specified in this Section, as they deem reasonably necessary to aid in the review and impact classification of the application. The Planning Director may also reasonably waive any of the required application contents that are deemed unnecessary or irrelevant to the review and impact classification of the application.

C. **CONSOLIDATION OF PERMIT APPLICATIONS**. The County's Land Use Change permitting process is intended to encourage efficient processing of applications. Applicants may request, and the Planning Director may permit, the consolidated submittal and review of all permit applications related to a Land Use Change Permit application for a parcel of land. The Planning Director is authorized to reasonably waive any overlapping submittal requirements in the consolidated review.

## SECTION 3-108: PRE-APPLICATION CONFERENCE

A. **PURPOSE.** The Pre-Application Conference is required or optional, as shown in Appendix Table 2: *Summary of Review Process* and can be a meeting, a telephone call, or an exchange of e-mail communications between the applicant, a member of the Planning Department, and as appropriate, other County staff or staff from other agencies. The purpose of the Pre-Application Conference is to discuss various processes, standards and submittal requirements of this *Resolution*, and/or any intergovernmental agreement, and to provide and explain to the applicant the required application form.

    1. **STAFF COMMENTS ARE PRELIMINARY.** Any comments made by a staff person during the conference are preliminary in nature and may change significantly as the project is more clearly defined in later stages of the development review process.

B. **REVIEW AGENCIES**. The Planning Department shall list the agencies to which the application will be sent for review, and on request, will provide the applicant with the names, telephone numbers and addresses of those agencies.

BLM_0053264

C. **WRITTEN SUMMARY**. At its discretion, the Planning Department may issue a written summary of the Pre-Application Conference..

## SECTION 3-109: APPLICATION

A. **APPLICATION FORM.** Except as otherwise required by this *Resolution*, to each of the Permits required by this *Resolution*.

B. **ADDITIONAL INFORMATION**. Such additional information reasonably required by the Planning Department as necessary to determine the impact classification, or to otherwise aid in the evaluation of the proposed land use change  pursuant to the applicable requirements of this *Resolution*.

C. **APPLICATION AND REVIEW FEES.** In order to compensate the County for the cost of reviewing and processing applications for Land Use Change Permits, each applicant shall pay the fees, as shown in a schedule of fees charged for permits issued by the Planning Department, adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

1. **PARTIAL WAIVER.** Upon a finding by the Board that the fees are disproportionate to the actual cost of review, the Board may grant a partial waiver of such fees.

2. **ADDITIONAL FEES.** Application and review fees are intended to cover the County's costs in determining the compatibility of a proposed development with the land use policies and development guidelines contained in this *Resolution*. If the Board determines that the cost of review is likely to exceed such fees substantially, the Board may, after consultation and discussion with the applicant, assess an additional fee. Such additional fee shall be set in an amount that will, as far as can be determined, cover the costs of review of the application including reasonable administrative expenses, additional professional expertise, and overhead expenses. In determining the additional fee, the Board may consider, among other things:

   a. **SECONDARY IMPACT.** The secondary impact that is likely to be associated with the development.

   b. **NEED FOR ADDITIONAL EXPERTISE**. The likelihood that proper review will require the County to retain outside professional assistance either to review the application or to perform original study and research.

   c. **NEED FOR ADDITIONAL STAFF**. The likelihood that additional staff will be required by the County to review the application adequately.

   d. **OTHER AGENCY INVOLVEMENT**. The involvement in the review process of other governmental agencies either through a joint review process agreement, federal environmental review or other procedure.

   e. **EXTRAORDINARY TRANSPORTATION COSTS.** The likelihood that extraordinary travel and transportation costs will be incurred by the County during the review.

## SECTION 3-110: PLANNING DEPARTMENT REVIEW OF APPLICATION

A. **TECHNICAL REVIEW.** The Planning Department shall conduct a technical review of the submitted draft application to determine completeness; to recommend which review agencies would appropriately be contacted to review and provide expertise and comments about the application; and to identify physical characteristics of the location of the proposed land use change, based upon information available on maps used by the County pursuant to Section 1-112: *Use of Maps*.

1. **IDENTIFICATION OF ADDITIONAL SUBMITTALS AND PROVISION TO THE APPLICANT OF INFORMATION AVAILABLE ON MAPS USED BY THE COUNTY.** If the Department finds by information provided by maps used by the County that the parcel on which the proposed project is located is within a geologic hazard area, a floodplain hazard area, a wildlife habitat area, a wildfire hazard area, an area potentially affected by wetlands and federal wetlands permitting requirements; if the proposed project includes development on a ridgeline, is above timberline or beyond snowplowed access, is on an inholding in a national Wilderness area, is in a municipal Three-Mile Plan area, and/or in a district or designated Special Area, the staff shall notify the applicant of that information, and identify additional submittals that must be submitted by the applicant pursuant to other applicable sections of this *Resolution*. If the property is located adjacent to agricultural operations, the Department shall provide a copy of the Right-to-Ranch policy, and a copy of the County's *Code of the West*, pursuant to Article 15: *Right-to-Ranch Policy*.

BLM_0053265

**B.  DETERMINATION OF COMPLETENESS.** The Planning Department shall determine whether the application is complete and shall notify the applicant in writing that the application is either complete or incomplete, or shall indicate a date by which such determination shall reasonably be made. It is the goal but not the requirement (as scheduling may be affected by limited access, inclement weather, or other unforeseen circumstances) of this *Resolution*, that this review be completed within 30 days of the submittal of the application.

**1.  APPLICATION IS NOT COMPLETE**. If the application is not complete, the Planning Department shall inform the applicant in writing of the deficiencies and shall take no further action on the application until the deficiencies are remedied.

**a.  FAILURE TO CORRECT WITHIN 60 DAYS CONSTITUTES WITHDRAWAL.** If the applicant fails to correct the deficiencies within 60 days of the postmarked or certified date of the mailing of the notification that the application was incomplete, the application shall be considered withdrawn.

**2.  APPLICATION IS COMPLETE**. If the application is complete, the Planning Department shall certify it as complete, and if required, assign the application an agenda date with the applicable review or decision-making body on the next available agenda, and provide notification of the meeting date to the applicant.

**3.  COMPLETENESS IS NOT A DETERMINATION OF COMPLIANCE.** A determination that an application is complete shall not constitute a determination that it complies with the applicable standards of this *Resolution*.

**C.  REQUEST FOR REVIEW BY OTHER AGENCIES OR DEPARTMENTS.** The Planning Department may request the professional analysis and recommendations of other review agencies, organizations, or technical consultants appropriate and necessary to complete the review, including other County offices and departments; municipal, state, or federal agencies having an interest in or authority over all or part of the proposal; utility companies; the applicable school district and special service districts serving the proposed development; and engineers, designers, and legal consultants.

**1.  REVIEW AND COMMENT BY REVIEW AGENCIES AND DEPARTMENTS.** Review agencies and departments that are sent a copy of the application shall be requested to make comments within 21 days of mailing by the Planning Department. An extension of not more than 30 days may be requested by the agency before the 21st day. The Department may grant such a reasonable extension if it determines that good cause for the delay has been shown, except that such extension of review of a Preliminary Plan for a Major Impact project shall require consent by the applicant and the Board, pursuant to Section 7-302: D. 1.: *Review and Comment by Review Agencies.* The failure of any agency to respond within 21 days or within the period of extension shall not be deemed an approval of the application by the agency.

**2.  REVIEW OF AGENCY AND DEPARTMENT COMMENTS** BY APPLICANT. The applicant shall have the right to review the comments and recommendations received from the review agencies. The applicant may submit additional information and make changes in the development proposal to respond to the comments of the review agencies; provided, however, that if those changes are substantial or if they significantly alter the nature, character or extent of the application, the Planning Department may, after the changes, refer the application again to some or all review agencies, to obtain additional comments, and may reasonably extend the period of their review accordingly.

**D.  PLANNING DEPARTMENT REPORT.** Unless otherwise required by this *Resolution*, the Planning Department's report shall include at a minimum:

**1.  DESCRIPTION OF PROPOSED PROJECT**. Briefly, but clearly describe the applicant's proposed project or requested action, as described in the submitted application.

**2.  TECHNICAL REVIEW.** A copy of the Department's technical review.

**3.  INITIAL CLASSIFICATION OF IMPACT.** If applicable to the specific application, identification of the initial classification of impact, pursuant to Section 3-111: *Classification of Impact.*

**4.  RECOMMENDATIONS BY REVIEW AGENCIES OR OTHER COUNTY DEPARTMENTS**. A summary or copies of the recommendations or general comments by review agencies and County Departments other than the Planning Department if recommendations or comments were requested and have been received.

**5.  DISTRIBUTION AND AVAILABILITY OF DEPARTMENT REPORT.** At least three days before the date of the meeting of the review body, the Planning Department will distribute a copy of the report to each member of the review body, to the applicant, and will make it available in the Planning Department for the public. Failure to complete the report and make it available within the preferred three-day period is not a

BLM_0053266

jurisdictional deficiency. Any subsequent written materials prepared concerning the application shall also be available for review in the Planning Department during regular business hours.

# SECTION 3-111: CLASSIFICATION OF IMPACT

**A. PURPOSE.** Applications for Land Use Change Permits are initially assigned an impact classification by the Planning Department; specific review processes are initially determined on the basis of that classification. The classification categorizes each proposed land use change by the impacts it is anticipated to generate on the County's economic, social, governmental, and environmental sectors. The amount of information and the extent of review required by the County is proportional to the impacts that will be generated by the proposed land use change. This Section addresses how a proposed project receives an impact classification.

**B. CRITERIA FOR CLASSIFYING IMPACT.** An application for a Land Use Change Permit is initially assigned an impact classification by the Planning Department pursuant to Section 4-102: *Administrative Review Projects That Do Not Require Land Use Change Projects*, Section 5-102: *Projects Classified as Administrative Review Projects That Require Land Use Change Permits*, Section 6-102: *Projects Classified as Minor Impact Projects*, and Section 7-101: *Projects Classified as Major Impact*. (Appendix Table 1: *Impact Classifications* summarizes those classifications.)

    **1. ADDITIONAL CRITERIA.** In addition to the specific criteria of each section, the County shall also consider the following in determining the impact classification:

        **a. DEMAND FOR PUBLIC SERVICES.** Whether the proposed land use change is expected to generate a minor or a major demand for public services, including roads, transit, schools, water supply, sewage disposal, fire and police protection, and emergency services; and

        **b. IMPACTS ON IMPACT AREA AND ENVIRONMENT**. Whether the proposed land use change is expected to generate a minor or a major impact on the impact area or on the environmental resource and hazard areas defined within and regulated by Article 11: *Resource Protection Standards*; and

        **c. IMPACTS RELATED TO ALL EXISTING AND PROPOSED DEVELOPMENT IN IMPACT AREA.** The impacts of the proposed land use change, when considered in conjunction with existing and proposed land use changes in the impact area.

**C. EXPANSION OF EXISTING USES AND SEQUENTIAL PROJECTS**. If an applicant proposes a land use change that is classified as an Administrative Review or Minor Impact project, and proposes a second project at a later date as an addition to or expansion of the approved project so that the projects considered together would have been classified as at least the next higher level  of impact classification, then the second and any such subsequent project shall  be reviewed as a Major Impact project, and the cumulative impacts of the sequential projects shall be the basis on which compliance with this *Resolution* is determined, and a decision made.

**D. APPEAL OF IMPACT CLASSIFICATION.** The applicant, or any affected person aggrieved by a decision of impact classification, may appeal that decision by filing a written appeal. That appeal shall follow the process outlined in Section 8-103: *Appeals.* The appeal shall be limited solely to the question of impact classification. The Board's decision on that appeal shall be final and subject only to judicial review.

# SECTION 3-112: NOTICE OF PUBLIC HEARING

**A. NOTICE REQUIRED.** Appendix Table 2: *Summary of Review Processes* identifies the type of applications for which a public hearing shall be required, and at what step during the review process the hearing shall occur. When a public hearing is required, public notice shall be provided as follows:

    **1. MANNER AND TIMING OF NOTICE.** Public notice shall be by publication of notice in the newspaper, mailing of notice to adjacent and other specified property owners, as applicable, and posting of notice on the property. The timing of the notice shall be as specified in Table 1: *Timing of Notice*.

    **2. RESPONSIBILITIES FOR GIVING NOTICE.** Responsibilities for ensuring adequate public notice by publication, mailing and posting shall be as follows:

        **a. PUBLICATION OF NOTICE.** The Planning Department shall place a legal notice in the County's official newspaper, which shall be published at least once. When the proposed land use change is in an area of Gunnison County that is served by a local newspaper that is not the County's official newspaper, notice shall also be published in that local newspaper.

BLM_0053267

**b. MAILING OF NOTICE.** The applicant shall be responsible for mailing of the notice, except as otherwise required by Section 1-110: *Process for Designating Special Areas.* The notice shall be prepared by the Planning Department and a copy given to the applicant. Notice shall be sent by certified or registered mail, response requested (except for an Emergency Exception, which shall require that notice be provided by overnight express mail, pursuant to Section 8-104: *Emergency Exceptions*), to the following persons:

**1. OWNERS OF ADJACENT PROPERTIES.** All owners of surface property rights immediately adjacent to each boundary of the entire parcel, including owners of adjacent agricultural operations. When the parcel is located adjacent to a municipality, a platted townsite or platted recorded subdivision, all owners of surface property rights within 500 feet of each boundary of the entire parcel.

TABLE 1: TIMING OF NOTICE

| | PLANNING DIRECTOR | HEARING OFFICER | BOARD | PLANNING COMMISSION | BOARD OF ADJUSTMENTS |
|---|---|---|---|---|---|
| **PUBLICATION OF NOTICE IN NEWSPAPER\*\*** | N/A | 30 days | 30 days (15 days for Emergency Exception) | 15 days | 15 days |
| **MAILING OF NOTICE TO ADJACENT LANDOWNERS\*** | 15 days\*\*\* | 30 days | 30 days (15 days for Emergency Exception) | 15 days | 15 days |
| **POSTING OF SIGN ON PROPERTY** | 15 days\*\*\* | 30 days | 30 days (15 days for an Emergency Exception) | 15 days | 15 days |

- \* Responsibility of the applicant.
- \*\* Responsibility of the Planning Department
- \*\*\*Administrative Review Project that is a commercial or industrial use

**2. OWNERS OF NON-ADJACENT PROPERTY WITHIN AN EXISTING SUBDIVISION, OR 35-ACRE TRACT DEVELOPMENT.** Owners of surface property rights within a subdivision or within a 35-acre tract development in which the land use change is proposed shall be notified as follows:

**(a.) PERSONS AFFECTED BY ALTERATIONS OF RECORDED PLAT, OR CHANGE IN CHARACTER OF ALL OR PART OF AN EXISTING DEVELOPMENT.** When the proposed land use change will alter a recorded plat, or affect the character of all or a portion of the existing development (such as a commercial use proposed in a residential area of a subdivision), all surface property owners within the existing development within which the proposed land use change is located shall be notified.

**(b.) HOMEOWNERS OR PROPERTY OWNERS ASSOCIATION.** When the land use change is proposed on a parcel within an existing development, and a homeowners or property owners association exists for that development, the association shall be notified.

**(c.) OWNERS OF MINERAL RIGHTS.** As applicable, all owners and lessees of mineral rights within the property proposed for the land use change (excluding the applicant), pursuant to C.R.S. 31-23-215. Records of the Gunnison Assessor's office may not include the listings of these owners.

**(d.) OWNERS OF WATER RIGHTS.** As available in records of the Colorado Division of Water Resources, the owners of water rights in any ditches that would be impacted by the proposed land use change.

**(e.) OWNERS WITHIN AN AREA PROPOSED AS A PARTICULAR GEOGRAPHIC AREA SUBJECT TO SPECIALIZED LAND USE REGULATIONS.** When the hearing is for the purpose of obtaining public input regarding the potential creation of a particular geographic area subject to specialized land use regulations, pursuant to Section 1-110:

BLM_0053268

*Process for Designating Special Areas*, all property owners within the proposed boundaries of that proposed geographic area shall be notified.

**(f.) PERSONS EXPRESSING INTEREST IN THE APPLICATION.** When persons have submitted their names to the Planning Department because they are interested in an application for which a hearing has been conducted, the Planning Department shall send them notice of any additional hearings by first class, postage-paid mail to the address they have provided. This notice is a courtesy to the public and the failure of anyone to receive it does not invalidate any hearing. Each of those persons is responsible for updating their address to the Department.

**c. SOURCE OF NAMES OF PROPERTY OWNERS RECEIVING NOTICE.** The list of property owners to whom notice is mailed shall be compiled by the applicant by using the most current list of property owners on file with the Office of the Gunnison County Tax Assessor. The list of owners of water rights in ditches that would be affected by the development shall be compiled by the applicant by contacting the local water commissioner who represents the Colorado Division of Water Resources. Owners of mineral rights may not be listed in the Gunnison County Assessor's Office; the burden is on the applicant to obtain complete, accurate and current names and addresses for property owners to whom notice shall be given.

**d. POSTING OF NOTICE.** The applicant shall be responsible for posting the public hearing notice on the project property. The applicant shall obtain a copy of the notice and a posting board from the Planning Department, attach the notice to the posting board and cover it with a waterproof material through which the notice is clearly visible.

    **1. SIGN LOCATION.** The applicant shall post the sign in a conspicuous location on the project property that is readily visible from a road adjoining or serving the area of the proposed development. Where the property does not have frontage on a public or private road, the sign shall be erected on the nearest road right-of-way, with a notation stating the direction and distance to the land on which the project is proposed, or another location approved by the Planning Department so it is visible to the greatest number of people.

    **2. POSTING BOARD.** The dimensions of the posting board shall be no smaller than 24 inches wide by 36 inches high.

    **3. PLACE OF POSTING.** The post, fence, structure or other location to which the public hearing notice is posted shall be sturdy and visible.

**3. VALIDITY OF NOTICE.** If the applicant and the Planning Department accomplish the responsibilities listed above in good faith, then the failure of any property owner to receive notice shall not affect the validity of the hearing. By way of example, notice shall not be considered invalid because of unrecorded or subsequent transfers of title, an uncertainty concerning ownership information that is not discernible from the tax assessment rolls, or due to the failure of a sign to remain in place after the notice was properly posted.

**4. PROOF OF NOTICE.** A week before the public hearing, the applicant is required to provide the Planning Department with an affidavit certifying that notice was accomplished pursuant to this Section. A photograph of the posted sign and a copy of the return receipts demonstrating to whom notice was mailed shall be attached to the affidavit.

**5. CONTENTS OF NOTICE.** The notice for the hearing shall clearly state information sufficient to give adequate notice to people whose rights could be affected by the proposed land use. The wording used in the notice shall be reasonably understandable by a person who is not a lawyer or planning professional, and shall contain at least the following information:

**a. REVIEW OR DECISION-MAKING BODY CONDUCTING THE HEARING.** The name of the review or decision-making body who will conduct the hearing.

**b. LOCATION OF HEARING.** The location of the public hearing, by name of building, if appropriate, and address.

**c. DATE AND TIME OF HEARING.** The date and time of day when the hearing will be conducted.

**d. TYPE OF APPLICATION.** A statement specifying the type of application being reviewed.

**e. INVITATION TO INTERESTED PERSONS TO ATTEND.** An invitation to interested persons to attend the hearing.

BLM_0053269

f. **DESCRIPTION OF PROJECT.** A brief description of the proposed project that reflects the description submitted in the application.

g. **PROPERTY LOCATION.** A description of the location of the subject property by reference to known landmarks, road intersections, existing towns or developments, addresses or other similar methods; lot, block and filing number if in an approved subdivision; or quarter-section, township and range descriptions.

h. **LOCATION OF ADDITIONAL INFORMATION CONTACT PERSON.** The address and telephone number of the Planning Department, stating that this is where the full details of the application may be obtained and is where written comments can be directed before the public hearing.

i. **CONTACT FOR ACCESSIBILITY.** A request for notification to the County of special accessibility needs of persons attending the hearing, pursuant to the requirements of the *American Disabilities Act*.

## SECTION 3-113: CONDUCT OF PUBLIC HEARING

A. **HEARING PROCESS.** A public hearing shall be conducted in accordance with the following process:

1. **RIGHTS OF ALL PERSONS**. Any person may appear at a public hearing and submit evidence, including oral testimony, either individually or as a representative of an organization. Comment may also be submitted in written form before or during the hearing, or within a period of time after the hearing has closed, which shall be announced by the review body chairperson.

2. **ORDER OF PROCEEDINGS**. The order of the proceedings shall be as follows:

   a. **CONFIRMATION OF ADEQUATE PUBLIC NOTICE.** The Planning Department shall report whether or not adequate notice has been accomplished, pursuant to Section 3-112: *Notice of Public Hearing.*

   b. **APPLICANT'S PRESENTATION.** At his/her option, the applicant may make an oral or a written presentation that informs persons at the hearing of the nature, location, and scope of the proposed land use change, including planned or proposed future phases where applicable. This presentation shall not be made by County staff or consultants, and may be waived by the Chairperson if there are no members of the public at the hearing, and the proponent has previously explained the proposed development to the review body conducting the hearing.

   c. **PLANNING DEPARTMENT COMMENTS.** The Planning Department may discuss specific standards of this *Resolution* that apply to the proposed project; describe the required process of review; iterate public comments that have been received by the Department on the application, cite specific submittals, plans or actions that are required in order for the application to comply with the applicable standards and provide any other relevant information concerning the application.

   d. **QUESTIONS BY REVIEW BODY.** The review body may ask questions of the Planning Department, or the applicant, or anyone else who is present.

   e. **PUBLIC COMMENTS.** Public comments shall be heard. Written comments that have been received before the hearing shall be reported by the Planning Department and acknowledged to be part of the hearing record.

      1. **EX PARTÉ COMMUNICATIONS.** Members of decision-making bodies, and applicants and their agents shall not engage in ex parté communication about applications under review or reasonably anticipated to come under review. If an ex parté communication is attempted by telephone, in person, by telefax or other means outside of a regularly scheduled meeting, the member of the decision-making body involved shall first attempt to stop the party from the prohibited behavior, then document the communication and notify the Planning Director by telephone or in written form. The Planning Director shall then enter that documentation into the public record. The member or the Planning Director shall report that documentation at the next meeting or hearing on the subject application. No ex parté communication shall be considered by a decision-making body, or any of its members, in making a decision on a Land Use Change Permit matter.

   f. **APPLICANT RESPONSE.** The applicant may respond to any comments made by the public, or the Planning Department, or the review body.

   g. **PLANNING DEPARTMENT RESPONSE.** The Planning Department may respond to any statement made by the applicant, the public, or the review body.

BLM_0053270

3. **TIME LIMITS FOR TESTIMONY**. The chairperson conducting the public hearing shall set reasonable time limits for testimony or presentation of evidence. If any testimony or evidence is so limited, the person offering that testimony or evidence shall have an opportunity to enter it into the record in writing at the public hearing.

4. **CONTINUANCE OF PUBLIC HEARING.** At the conclusion of the hearing, the body conducting it may continue the public hearing to a fixed date and time. An applicant shall have the right to request, and be granted on a showing of good cause, one continuance of each required hearing. All subsequent continuances shall be granted at the discretion of the body conducting the public hearing and upon a finding that good cause has been shown for the continuance.

5. **CLOSURE OF PUBLIC HEARING AND ACCEPTANCE OF WRITTEN TESTIMONY AFTER CLOSURE**. If the hearing is not continued, it shall be closed. At the close of the hearing, the chairperson of the body conducting the hearing may leave the record open for a defined period of time during which only written comment will continue to be accepted. If no such time period is defined and announced by the chairperson, no further written comment shall be accepted beyond the time the hearing is closed.

   a. **NO EX PARTÉ COMMENTS ACCEPTED**. The chairperson shall announce that there shall be no ex parté comments accepted by members of the review or decision-making body after closure of the hearing.

   b. **ALL WRITTEN COMMENTS RECEIVED BECOME PART OF RECORD**. All written comments, along with supporting data and references, received within the specified comment period shall be made a part of the record and shall be available for public inspection at the Planning Department when the hearing was conducted by the Planning Commission or the Board of Adjustments. When the hearing was conducted by the Board, copies of all such comments shall be available at the Administration Office. All timely written submittals shall be made a part of the record of the proceeding.

6. **RECORD OF PUBLIC HEARING.** The body conducting the public hearing shall record the public hearing by any appropriate means, including audiotape or videotape, and written minutes. The written and taped record of oral proceedings, including testimony and statements of personal opinions, the minutes of the hearing and other meetings of the review body, all applications, exhibits, and papers submitted in any proceeding before the decision-making, administrative, or review body, the Planning Department's report, and the decisions of the review and decision-making bodies, shall constitute the record. Those materials, on presentation to the County, shall become the public property of the County and shall not be removed without proper authorization.

   a. **MATERIALS ARE PART OF PUBLIC RECORD, AVAILABLE TO PUBLIC.** Said materials shall be public information, available to the public at the Planning Department during regular business hours. The Department, as official custodian of those records, may make such rules with reference to the inspection of such records as are reasonably necessary for the protection of such records and the prevention of unnecessary interference with the regular discharge of the duties of the Planning Department.

## SECTION 3-114: ACTIONS BY RECOMMENDING AND DECISION-MAKING BODIES

An application shall receive a recommendation and/or decision pursuant to the applicable level of project impact classification, pursuant to Article 4: *Administrative Review Projects That Do Not Require Land Use Change Permits*; Article 5: *Administrative Review Projects That Require Land Use Change Permits*; Article 6: *Minor Impact Projects*, and Article 7: *Major Impact Projects*.  The record of action shall be finalized and recorded pursuant to each of those Articles. The role of recommending and decision-making bodies in each process is illustrated in Appendix Table 2: *Summary of Review Processes*.

BLM_0053271

# ARTICLE 4:
# ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE LAND USE CHANGE PERMITS

## SECTION 4-101: PURPOSE

The purpose of this Article is to identify Administrative Review projects that do not require Land Use Change Permits.

**A.   INITIAL CLASSIFICATION OF IMPACT AND REASONS FOR A HIGHER LEVEL OF REVIEW**. If the Planning Department determines during review of proposed use, including an application for Building Permit, that the proposed use exceeds the classification criteria of Administrative Review project listed within this Section, the criteria detailed in Section 3-111: B. 1: *Additional Criteria* shall be considered and the appropriate review process and submittals for an Administrative Review project that requires a Land Use Change Permit, or a Minor or Major Impact project shall be required.

## SECTION 4-102: PROJECTS CLASSIFIED AS ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE LAND USE CHANGE PERMITS

The following Administrative Review projects require a Building Permit, an Individual Sewage Disposal System Permit, an Access Permit, Reclamation Permit, or other County permit, but shall not require an additional Land Use Change Permit; such projects shall comply with all the other requirements of this *Resolution:*

**A.   EXEMPT PRIMARY RESIDENCE SMALLER THAN 9,000 SQ. FT.** A primary residence smaller than 9,000 sq. ft. that is exempted by Section 1-106: *Partially Exempted Land Use Changes.* The residence may include an attached garage no larger than 1,000 sq. ft., which shall not be calculated in the total square footage allowed for the residence.

**B.   SECONDARY STRUCTURES AND USES**. The following secondary structures and uses, pursuant to Section 9-101: C: *Secondary Structures and Uses That Do Not Require a Land Use Change Permit:*

   **1.   BARNS AND OTHER AGRICULTURAL BUILDINGS ON AN AGRICULTURAL OPERATION.** A barn or other agricultural building used in conjunction with an agricultural operation.

   **2.   FENCES.** Fences, which shall comply with Section 13-113: *Fencing.*

   **3.   GARDENS AND GREENHOUSES**. Private non-commercial gardens and greenhouses.

   **4.   ONE 120 SQ. FT. STORAGE SHED ON ONE-ACRE OR LARGER PARCEL.** One storage shed 120 sq. ft. or smaller, on a parcel an acre or larger.

   **5.   HORSE/HAY SHED 500 SQ. FT. OR SMALLER ON ANY SIZE PARCEL.** A horse/hay shed 500 sq. ft. or smaller for sheltering horses or other livestock, or for storing hay, that is not part of an agricultural operation.

   **6.   BARNS IN APPROVED SUBDIVISIONS**. Barns located in approved subdivisions in which there are adopted protective covenants that allow barns and that have been approved by Gunnison County.

   **7.   DETACHED GARAGE AND/OR SHOP 750 SQ. FT. OR SMALLER.** A detached garage or shop, or combination of those uses in one structure, 750 sq. ft. or smaller.

   **8.   ONE STORAGE SHED 120 SQ. FT. OR SMALLER ON PARCEL SMALLER THAN ONE ACRE**. One storage shed, 120 sq. ft. or smaller, on a parcel smaller than one acre

   **9.   TWO STORAGE SHEDS 120 SQ. FT. ON ONE-ACRE OR LARGER PARCEL.** Two storage sheds, each no larger than 120 sq. ft., on a parcel an acre or larger.

BLM_0053272

10. **GARDENS AND GREENHOUSES THAT ARE HOME OCCUPATIONS**. Gardens and greenhouses that are home occupations created and operated pursuant to Section 9-102: *Home Occupations.*

11. **POOLS AND RECREATION FACILITIES**. Private swimming pools and private recreation facilities associated with a primary residence, and not part of a private club or membership group.

12. **INTEGRATED SECONDARY RESIDENCE 600-850 SQ. FT. ON ANY LEGAL LOT.** An integrated secondary residence 600-850 sq. ft. in a primary residence on any legal lot that meets the standards pursuant to Section 9- 101: F: *Standards for Integrated Secondary Residence.*

13. **ONE HOME OCCUPATION**. One home occupation, pursuant to Section 9-102: *Home Occupations.*

C. **CAMPING.** Camping in a recreational vehicle or other camping shelter on an individual parcel pursuant to Section 9-509: C: *No Land Use Change Permit Required For Camping in a Recreational Vehicle or other Camping Shelter on an Individual Parcel.*

D. **SPECIAL EVENTS**. A special event, pursuant to Section 9-501: *Special Events.*

E. **TEMPORARY STRUCTURES.** Temporary structures, pursuant to Section 9-502: *Temporary Structures.*

F. **SATELLITE DISHES.** Satellite dishes, pursuant to Section 9-503: *Satellite Dish Devices.*

G. **ATTACHED WIRELESS TELECOMMUNICATIONS DEVICE**. Attached wireless telecommunications device, pursuant to Section 9-504: *Attached Wireless Telecommunications Devices.*

H. **KEEPING OF LIVESTOCK NOT ON AN AGRICULTURAL OPERATION.** Keeping of livestock not on an agricultural operation, pursuant to Section 9-508: *Keeping of Livestock Not on an Agricultural Operation.*

I. **SITE APPROVAL APPLICATION FOR WATER SUPPLY OR WASTEWATER TREATMENT SYSTEM**. The Colorado Department of Public Health and Environment's site approval application for a proposed expansion or alteration of an existing wastewater treatment system.

J. **DISTRIBUTION OR SERVICE LINE TO PRIMARY RESIDENCE**. A distribution or service line providing service to a single primary residence, multiple family residences, or other residence that would not otherwise require a Land Use Permit under the requirements of this *Resolution.*

K. **ALTERATION AND REPAIR OF EXISTING SERVICE LINES OR DISTRIBUTION LINES**. Conversion of above-ground distribution lines or service lines to underground distribution or service lines located substantially within an existing utility easement.

BLM_0053273

# ARTICLE 5: ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE LAND USE CHANGE PERMITS

## SECTION 5-101: PURPOSE

The purpose of this Article is to establish the review process, application submittal requirements, and review standards that apply to the review of applications classified as Administrative Review projects that require Land Use Change Permits.

**A. INITIAL CLASSIFICATION OF IMPACT AND REASONS FOR A HIGHER LEVEL OF REVIEW.** If the Planning Department determines during review of an application, including a Building Permit, that the proposed use exceeds the classification criteria of an Administrative Review project, the criteria detailed in Section 3-111: B. 1: *Additional Criteria* shall be considered and the appropriate review process and submittals for an Administrative Review project, a Minor or Major Impact project shall be required and an application for a Land Use Change Permit shall be required to be submitted.

## SECTION 5-102: PROJECTS CLASSIFIED AS ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE LAND USE CHANGE PERMITS

The following types of projects are classified as Administrative Review projects that require Land Use Change Permits:

**A. PRIMARY RESIDENCE 9,000 SQ. FT. OR LESS, IN EXISTING PLATTED SUBDIVISION.** A primary residence smaller than 9,000 sq. ft., located within an existing platted subdivision. The residence may include an attached garage no larger than 1,000 sq. ft., which shall not be calculated in the total square footage allowed for the residence.

**B. AGGREGATE RESIDENTIAL SQUARE FOOTAGE LESS THAN 12,500 SQ. FT.** On one parcel The aggregate square footage of structures less than 12,500 sq. ft., (excluding from the calculation horse/hay sheds less than 500 sq. ft., one 120 sq.ft. storage shed, and a private greenhouse), that may include:

    **1. RESIDENTIAL LIVING AREA 9,000 SQ. FT. OR LESS.** 9,000 or less sq. ft. of residential living area (one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by Section 9-101: *Uses Secondary to a Primary Residence*); and

    **2. ATTACHED GARAGE(S).** A garage or garages that together are no larger than 1,000 sq. ft., and that are attached to the primary residence.

**C. SECONDARY STRUCTURES AND USES.** The following secondary structures and uses, pursuant to Section 9-101: D: *Secondary Structures and Uses That Require a Land Use Change Permit:*

    **1. INTEGRATED SECONDARY RESIDENCE 851-1,200 SQ. FT. ON 35-ACRE TRACT CREATED AFTER EFFECTIVE DATE OF THIS RESOLUTION.** An integrated secondary residence 1,200 sq. ft. or smaller in a primary residence on a 35-acre tract created after the effective date of this *Resolution*.

    **2. DETACHED SECONDARY RESIDENCE 2,500 SQ. FT. OR SMALLER ON LEGAL LOT.** A detached secondary residence of 2,500 sq. ft. or less, located on a legal lot smaller than 35 acres.

    **3. DETACHED SECONDARY RESIDENCE 3,500 SQ. FT. ON 35-ACRE OR LARGER TRACT.** A detached secondary residence of 3,500 sq. ft. or less, located on a tract of land 35-acres or larger.

    **4. SECONDARY STRUCTURE INTENDED ONLY FOR SLEEPING AND HAS NO KITCHEN.** A secondary structure without a kitchen that is to be used only for sleeping facilities. It shall comply with the requirements of the *Gunnison County Individual Sewage Disposal System Regulations*.

BLM_0053274

    **5.  MORE THAN ONE HOME OCCUPATION.** More than one home occupation, pursuant to Section 9-102: *Home Occupations.*

    **6.  HORSE/HAY SHED LARGER THAN 500 SQ. FT. ON PARCEL ONE-ACRE OR LARGER.** A horse/hay shed larger than 500 sq. ft., for sheltering horses or other livestock or for storing hay, on a parcel one acre or larger, that is not part of an agricultural operation.

**D.  MOBILE HOME NOT IN A MOBILE HOME COMMUNITY.** A mobile home proposed to be located on an individual parcel of land not in a mobile home community, but adjacent to a subdivision whose protective covenants do not address, or expressly prohibit mobile homes within the subdivision, pursuant to Section 9-202: *Individual Manufactured and Mobile Homes.*

**E.  BOUNDARY LINE ADJUSTMENT.** An application to adjust the lot line between adjacent parcels or lots in platted approved subdivisions when the adjustment is in compliance with Section 5-103: *Standards for Approval of Administrative Review Projects.*

**F.  LOT CLUSTERS.** An application to eliminate the lot lines separating adjacent lots that are commonly owned.

**G.  CORRECTION PLAT.** An application to correct a technical error in a subdivision plat that has been approved and recorded.

**H.  REPAIR OF EXISTING DISTRIBUTION LINES.** Repair of existing distribution lines located substantially within an existing utility easement.

**I.  ALTERATION OF APPROVED BUILDING ENVELOPES.** Alterations of building envelopes on lots that were approved as an element of a Land Use Change Permit.

**J.  SUBDIVISION EXEMPTION TO "VALIDATE" AN EXISTING LOT.** Pursuant to C.R.S. 30-28-101 (10) (d)., the "validation" of a lot that existed prior to the effective date of this *Resolution*, but did not exist before September 27, 1972 and has not been reviewed and approved by the County as a legally subdivided lot "legal lot").

**K.  EXPANSION OR CHANGE OF COMMERCIAL OR INDUSTRIAL USE TO TOTAL SIZE OF 5,000 SQ. FT. OR ONE ACRE OR LESS.** Expansion or change of a commercial or industrial use existing as of the effective date of this *Resolution,* when the expansion will result in the use having a total size of less than 5,000 sq. ft. of a structure, or one acre of land.

**L.  PLAT FOR APPROVED CONDOMINIUMS/TOWNHOME PROJECT.** A constructed condominium or townhome project, or individual phase of a condominium or townhome project, for which a Land Use Change Permit has been approved for the overall development.

**M.  LIMITED MINERAL EXPLORATION.** Limited mineral exploration (activities related to proving up a patented mining claim pursuant to federal law), as addressed in Section 9-402: C.3: *Limited Mineral Exploration.*

**N.  UNDERGROUND MINERAL EXPLORATION.** An application for underground mineral exploration for operations existing as of the effective date of this *Resolution*, as addressed in Section 9-402: D: *Extension and Expansion of Current Underground Mineral Exploration Required to File Notice of Activity.*

**O.  EXTRACTION OF CONSTRUCTION MATERIALS.** Extraction of construction materials that generates more than 300 cubic yards, per Section 9-402: C. 1: *Limited Construction Material Extraction.*

## SECTION 5-103: STANDARDS FOR APPROVAL OF ADMINISTRATIVE REVIEW PROJECTS

**A.  GENERAL STANDARDS.** An application for a Land Use Change Permit for an Administrative Review project shall comply with the following standards:

    **1.  COMPLY WITH APPLICABLE STANDARDS.** The land use change shall comply with all applicable standards and other provisions of this *Resolution*.

    **2.  COMPATIBILITY WITH COMMUNITY CHARACTER.** The proposed land use change shall be compatible with, or an enhancement of, the character of existing land uses in the area, and shall not adversely impact the future development of the surrounding area.

    **3.  COMPLIANCE WITH SPECIFIC STANDARDS.** In addition, the following standards shall apply to individual types of Administrative Review projects:

BLM_0053275

    **a.** **ADDITIONAL STANDARDS APPLICABLE TO BOUNDARY LINE ADJUSTMENTS..** The Planning Director may approve an application for a boundary line adjustment if the following additional standards are met:

        **1.** **INSUBSTANTIAL CHANGE.** The purpose of the adjustment shall be to make an insubstantial boundary change between adjacent parcels; and

        **2.** **NOT CREATE ADDITIONAL LOTS.** The adjustment shall not create more than the original number of lots or parcels, nor provide the opportunity to create a new or additional lot for resale or development purposes, nor be used to increase the maximum allowable floor area for a parcel; and,

        **3.** **MINIMUM LOT SIZE.** Following the adjustment, the lots shall continue to meet any applicable minimum lot size standards of this *Resolution*, except in the case of a nonconforming lot, in which case the adjustment shall not increase the degree to which it is nonconforming.

    **b.** **ADDITIONAL STANDARDS APPLICABLE TO CORRECTION OF PLATS.** The Board may approve an Administrative Review project application to correct any plat of record if the following additional standards are met:

        **1.** **ORIGINAL PLAT APPROVED AFTER MAY 7, 1972.** The original subdivision plat was approved and recorded subsequent to May 7, 1972; and

        **2.** **PURPOSE IS TO CORRECT TECHNICAL ERRORS.** The sole purpose of a subdivision correction plat is to correct one or more technical errors in the plat.

    **c.** **ADDITIONAL STANDARDS APPLICABLE TO MORE THAN ONE HOME OCCUPATION IN A PRIMARY RESIDENCE**. The Planning Director may approve an Administrative Review project to allow the establishment of more than one home occupation so long as the aggregate levels of activity (such as numbers of employees) and aggregate sizes of the home occupations do not exceed the standards included in Section 9-102: *Home Occupations*.

    **d.** **ADDITIONAL STANDARDS APPLICABLE TO ALTERATIONS OF APPROVED BUILDING ENVELOPES.** The Planning Director may approve an Administrative Review project application to alter building envelopes on lots approved as an element of a Land Use Change Permit if the following additional standards are met:

        **1.** **NO CONFLICT WITH ORIGINAL LAND USE CHANGE PERMIT.** The alteration does not substantively conflict with any conditions of approval of the original Land Use Change Permit or subdivision; and

        **2.** **COMPLIES WITH DEED RESTRICTIONS OR PROTECTIVE COVENANTS.** The alteration does not result in noncompliance with any deed restrictions or protective covenants, if such restrictions or protective covenants exist; and

        **3.** **DOES NOT CAUSE NONCOMPLIANCE WITH STANDARDS.** The alteration will not cause the envelope to be in nonconformance with any of the standards of this *Resolution*.

    **e.** **ADDITIONAL STANDARDS APPLICABLE TO SUBDIVISION EXEMPTIONS.** The Board may approve an application for a subdivision exemption if the proposed use of the land complies with Section 1-105: *Sections Necessary for Immediate Preservation of Public Health and Safety,* and all other applicable codes and regulations, including the applicable building code, adopted and amended by Gunnison County, and the *Gunnison County Individual Sewage Disposal System Regulations*.

## SECTION 5-104: ADMINISTRATIVE REVIEW PROJECT APPLICATION

**A.** **NOTIFICATION TO COUNTY IF FEDERAL PERMITS ARE REQUIRED FOR PROJECT.** When an EA or EIS or other state or federal action or permit is required, and that requirement is known by the applicant, the applicant shall notify the County of that requirement when the application is first submitted for review.

**B.** **APPLICATION AND REVIEW FEES.** In order to compensate the County for the cost of reviewing and processing the submittals, each applicant shall pay the required fee, as shown in a schedule of fees issued by the Planning Department that is adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

BLM_0053276

**C.   GENERAL APPLICATION FORM FOR ADMINISTRATIVE REVIEW PROJECTS**. The Planning Department shall provide and the applicant shall complete an application form appropriate for the specific Administrative Review project for which the applicant seeks approval. The Department will review the application form with the applicant to determine which information must be submitted, depending upon the proposed use. At a minimum, the application shall include:

1.   **APPLICANT.** The name, address, telephone and fax numbers, and email address for the applicant and the applicant's representative, if applicable,

   a.   **APPLICANT IS NOT THE OWNER**. If the applicant is not the owner of the land, or is a contract purchaser of the land, the applicant shall submit a notarized letter signed by the owner consenting to the submittal. Consent of the owner for submittal shall imply consent by the owner for the County to complete the review process pursuant to this *Resolution*.

   b.   **APPLICANT IS NOT THE SOLE OWNER.** If the applicant is not the sole owner of the land, the applicant shall submit a notarized letter(s) signed by all other owners, and/or by an association or corporation representing the owners, consenting to, or joining in, the application.

2.   **PROPERTY OWNER.** Name, address, telephone and fax numbers and email address of the owner of the property and, if other than the applicant, a notarized letter from the owner consenting to the application must be submitted.

   a.   **NOTARIZED LETTER OF CONSENT.** If the property owner is a person or entity other than the applicant, a notarized letter from the owner consenting to the application must be submitted.

3.   **STATUS OF PARCEL AS A LEGAL LOT.** If the parcel on which the land use change is proposed is smaller than 35 acres, the Department may also request the applicant to supply information sufficient to document that the subject was legally created.

4.   **PROPERTY LOCATION**. The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel on which the land use change is proposed to be located. A copy of the recorded deed to the property should be included.

5.   **PRESENT LAND USE**. Identify present land uses, and locations and sizes of structures that exist on the property.

6.   **PROPOSED PROJECT DESCRIPTION.** A description of the proposed project, including all uses, structures, roads, utilities, parking areas, amount and kinds of traffic to be generated.

7.   **CHARACTERISTICS and CURRENT CONDITION OF LAND.** List physical characteristics and conditions of the land, including streams, irrigation ditches, ponds, soils, roads, vegetation, any work that has been done to clear the property, etc.)

8.   **PROJECT DESIGN.** As applicable, all elements of the project design, pursuant to the individual sections of Article 13: *Project Design Standards*; the staff will advise the applicant which of these requirements apply to a specific application:

   a.   **SECTION 13-103:** *General Site Plan Standards and Lot Measurements.*
   b.   **SECTION 13-104:** *Setbacks from Property Lines and Road Rights-of-Way.*
   c.   **SECTION 13-105:** *Residential Building Sizes and Lot Coverages.*
   d.   **SECTION 13-107:** *Installation of Solid-Fuel-Burning Devices.*
   e.   **SECTION 13-108:** *Open Space and Recreation Areas.*
   f.   **SECTION 13-109:** *Signs.*
   g.   **SECTION 13-110:** *Off-Road Parking and Loading.*
   h.   **SECTION 13-111:** *Landscaping and Buffering.*
   i.   **SECTION 13-112:** *Snow Storage.*
   j.   **SECTION 13-113:** *Fencing.*
   k.   **SECTION 13-114:** *Exterior Lighting.*
   l.   **SECTION 13-115:** *Reclamation and Noxious Weed Control.*
   m.   **SECTION 13-116:** *Grading and Erosion Control.*
   n.   **SECTION 13-117:** *Drainage, Construction and Post-Construction Storm Water Runoff.*
   o.   **SECTION 13-118:** *Water Impoundments.*
   p.   **SECTION 13-119:** *Standards to Ensure Compatible Uses.*

BLM_0053277

D. **LIST OF ADJACENT LANDOWNERS**. As applicable, a listing of all landowners and land uses that are adjacent to the boundaries of the entire parcel on which the project is proposed, including all properties that are separated from the parcel by a roadway or would be adjacent to the property except for the existence of the roadway. When the parcel is located adjacent to a municipality, a platted townsite or platted recorded subdivision, all owners of surface property rights within 500 feet of each boundary of the entire parcel shall be included in the listing. The source for the best-available information to identify those landowners is the Gunnison County Assessor's Office.

E. **ADDITIONAL SUBMITTALS BASED UPON INFORMATION AVAILABLE ON MAPS USED BY THE COUNTY.** If a land use change is proposed on a parcel located within any of the following areas delineated pursuant to Section 1-112: *Use of Maps* or in areas otherwise addressed by the following, additional submittals may be required to be submitted; the Planning Department will provide assistance to the applicant to determine the specific information that  must be submitted:

1. **LOCATION OF SITE WITHIN FLOODPLAIN HAZARD AREA.** As applicable, an application proposing a land use change on a parcel located within a floodplain hazard area, pursuant to Section 11-103: *Development in Areas Subject to Flood Hazards.*

2. **LOCATION OF SITE WITHIN GEOLOGIC HAZARD AREA.** As applicable, an application proposing a land use change on a parcel located in a geologic hazard area may be required to submit a geotechnical report that evaluates and predicts the impact of specific geologic conditions on the proposed land use change and measures to mitigate these hazards, pursuant to Section 11-104: *Development in Areas Subject to Geologic Hazards.*

3. **LOCATION OF SITE WITHIN WILDFIRE HAZARD AREA.** As applicable, an application proposing a land use change on a parcel located within a wildfire hazard area, pursuant to Section 11-105: *Development in Areas Subject to Wildfire Hazards.*

4. **LOCATION OF SITE WITHIN AREA POTENTIALLY AFFECTED BY WETLANDS AND WETLANDS PERMITTING.** As applicable, an application proposing a land use change on a parcel located in an area in which there are wetlands, pursuant to Section 11-107: *Protection of Water Quality.*

5. **LOCATION OF SITE VISIBLE FROM RIDGELINE VANTAGE.** As applicable, an application proposing a land use change that is visible from a ridgeline vantage, pursuant to Section 11-108: *Standards for Development on Ridgelines.*

6. **DEVELOPMENTS IMPACTING AGRICULTURAL LANDS**. If a proposed project adjoins agricultural lands, involves land through which irrigation ditches flow, or over which there are general or exclusive easements for stock drives, the application shall address the requirements of Section 11-109: *Development That Affects Agricultural Lands*, and Section 15-103: *Right-to-Ranch Policy* which shall identify, in written and/or graphic form, the following:

   a. **AGRICULTURAL LAND OWNER**. The location(s) and name(s) of owner(s) of any agricultural land(s) adjoining or possibly impacted by the proposed land use change.

   b. **AGRICULTURAL DITCHES**. The location(s), name(s), name(s) of owner(s), size(s), and decreed capacity(ies) of any agricultural ditch crossing or adjoining the development property, as available from the Colorado Division of Water Resources, or ditch commissioner's records.

   c. **EASEMENTS**. The location of historical easements used to gain access to headgates, ditches, and fences for maintenance or operations.

   d. **LIVESTOCK DRIVES AND FENCELINES.** Historic or recorded stock drive easements crossing or adjoining the development property, including the location of any existing fences along property lines, and the location of new fences or other obstacles proposed to be built across any such stock drive.

7. **DEVELOPMENT ON LAND BEYOND SNOWPLOWED ACCESS.** As applicable, an application that proposes development at a location that currently receives no snowplowing services for access, pursuant to Section 11-110: *Development of Land Beyond Snowplowed Access.*

8. **DEVELOPMENT ON LAND ON AN INHOLDING WITHIN NATIONAL WILDERNESS.** As applicable, an application that proposes development on an inholding within a National Wilderness Area, pursuant to Section 11-111: *Development on Inholdings in the National Wilderness.*

BLM_0053278

9. **DEVELOPMENT ON PROPERTY ABOVE TIMBERLINE.** As applicable, an application that proposes development on a parcel located above timberline, pursuant to Section 11-112: *Development on Property Above Timberline.*

F. **MAPS AND SITE PLANS.** Maps and site plans submitted with any application shall be at a scale and sheet size that can be easily viewed. A minimum scale of 1" = 100' is preferred. Sheet size shall not exceed 24 inches by 36 inches.

1. **VICINITY MAP.** A vicinity map, which at a minimum includes the following (as illustrated in Appendix Figure 2: *Vicinity Map Example*); applications for plats of constructed condominium or townhome projects that have been approved by the County shall not be required to submit a site plan:

   a. **PROPERTY LOCATION AND NEARBY PARCEL SIZES AND LAND USES.** Location of the property on a United States Geological Survey quadrangle map or on a recorded plat if the proposed development is within an approved subdivision, with the location highlighted so that it is easy to see, and that clearly shows sizes of parcels and land uses within a half-mile of the proposed project.

   b. **ROADS.** All U.S. and state highways and nearest County or Forest Service, Bureau of Land Management, and/or subdivision/private roads that provide access to the proposed project.

   c. **EASEMENTS.** Easements recorded or historically used that provide access to or across, or other use of, the property.

   d. **BOUNDARIES OF DISTRICTS, MUNICIPALITIES OR SUBDIVISIONS.** Locations of special district boundaries, municipalities or residential subdivisions within a half mile of the property.

   e. **PROXIMITY OF MINING OR PROCESSING ACTIVITY.** Any parcel located within 1,000 feet of the property proposed for land use change on which there exists an operation involving mineral exploration or extraction or construction materials processing.

2. **SITE PLAN.** A site plan, which at a minimum, includes the following (as illustrated in Appendix Figure 1: *Site Plan Example.*); applications for plats of constructed condominium or townhome projects that have been approved by the County shall not be required to submit a site plan:

   a. **ALL PROPERTY PROPOSED FOR DEVELOPMENT.** Include all land proposed for immediate and anticipated for future development. This can be a simple, hand-drawn layout, but it must be legible, clearly marked, drawn to scale, and signed and dated by the person who drew it.

   b. **PHASING.** Any proposed phases of the development, and their timing.

   c. **TOTAL ACREAGE OF CONTIGUOUS PROPERTY OWNED BY THE APPLICANT.** Total acreage and location of all contiguous property owned by the applicant.

   d. **TOTAL ACREAGE IN PROPOSED LAND USE CHANGE PERMIT AREA.** Total acreage of the site on which the applicant wants to obtain approval for the Land Use Change Permit.

   e. **ADJACENT LOT SIZES.** Lot size(s) of properties adjacent to and in the impact area of the site proposed for the land use change.

   f. **ADJACENT LAND OWNERS.** Names and actual land uses of adjacent landowners (including federal, State of Colorado and other publicly owned lands), to the site (in addition to the separate narrative listing). This includes properties that may be across a road, stream or river from the applicant's property.

   g. **UTILITY LOCATIONS IN AREA.** Location of all existing utilities on the property (septic tanks, wells, electric, gas, telephone or cable lines) that will serve the property.

   h. **TOPOGRAPHIC FEATURES.** Streams, lakes, ponds, wetlands, contour lines and elevations, any prominent ridgelines, and any other significant visual resource areas on the property.

   i. **LIVESTOCK DRIVES AND FENCELINES.** Historic or recorded stock drive easements crossing or adjoining the development property, including the location of any existing fences along property lines, and the location of new fences or other obstacles proposed to be built across any such stock drive.

   j. **IRRIGATION DITCHES.** The location(s), and name(s), of any irrigation ditch crossing or adjoining the development property, as available from the Colorado Division of Water Resources, or ditch commissioner's records.

BLM_0053279

    **k.** **DRAINAGE**. Drainage patterns, on and adjacent to the project property.

    **l.** **DRIVEWAYS AND PARKING**. Driveways/parking areas, both existing and proposed.

    **m.** **EXISTING STRUCTURES**. Locations and sizes of existing structures.

    **n.** **PROPOSED STRUCTURES**. Locations and sizes of proposed structures.

    **o.** **BOUNDARIES.** Boundaries and related measurements.

**G. PROTECTIVE COVENANTS, CONDOMINIUM OR TOWNHOME DECLARATIONS, OR DEED RESTRICTIONS.** Any existing, or a draft of proposed, protective covenants, a condominium declaration or deed restrictions that will be imposed on the development..

**H. ADDITIONAL SUBMITTALS BASED ON EVIDENCE OF REASONABLE PROBABILITY OF CUMULATIVE IMPACTS.** If, in the course of the Minor Impact project review, evidence is submitted or gathered indicating that there is a reasonable probability that the proposed land use change will contribute to cumulative impacts within the impact area, the Planning Department or the Planning Commission shall require that additional information, including but not limited to studies of specific issues, be submitted.

**I. LOCATION OF SITE WITHIN SPECIAL GEOGRAPHIC AREA OR DISTRICT.** As applicable, an application proposing a land use change on a parcel located within a designated Special Area or special district may be required to comply with regulations of that Area or district.

**J. COPY OF PROPERTY TAX CERTIFICATE. COPY OF PROPERTY TAX CERTIFICATE.** Copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration. Copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

**K. SPECIFICATIONS FOR CONDOMINIUM/TOWNHOME PLATS.** For a constructed condominium or townhome project for which a Land Use Change Permit has been approved for the overall development, copies of the condominium declarations, and a plat or plats that meet(s) the applicable requirements of this Section, that is suitable for recording, and:

    **1.** **IS SIGNED.** Is signed by the developer/owner.

    **2.** **DEPICTS BOUNDARIES AND LEGAL DESCRIPTION**. Depicts the perimeter boundaries and sets forth the legal description of the parcel of land submitted to condominium ownership.

    **3.** **SHOWS LOCATION OF IMPROVEMENTS**. Shows the location of all improvements situated on the parcel.

    **4.** **IDENTIFIES AIR SPACE UNITS FOR CONDOMINIUMS.** If the plat is for a condominium development, sufficient vertical horizontal cross-section drawings of improvements to allow individual air spaces to be separately identified in three-dimensional space. Those individual spaces shall be identified by number or other appropriate designation.

    **5.** **SHOWS FLOOR ELEVATIONS.** Shows the elevations of the floors of the residences in relation to a United States Geological Survey benchmark.

    **6.** **IDENTIFIES GENERAL COMMON ELEMENTS**. Identifies the general common elements and limited common elements in reasonably sufficient detail and in a manner that does not conflict with the description or definition of those elements in the condominium declarations.

    **7.** **REQUIRED PLAT LANGUAGE.** The following plat language:

        **a.** **FLOODPLAIN WARNING AND DISCLAIMER.** If the subject property is located within an identified floodplain, language shall be included on the plat pursuant to Section 11-103: F. 1: *Warning and Disclaimer of Floodplain Hazards Affecting Use and Occupancy of This Property.*

        **b.** **GEOLOGIC HAZARDS WARNING AND DISCLAIMER.** If the subject property is located within an identified geologic hazard area, language shall be included on the plat pursuant to Section 11-104: F. 5: *Warning and Disclaimer of Geologic Hazards Affecting Use and Occupancy of This Property.*

        **c.** **WILDFIRE HAZARD AREA WARNING AND DISCLAIMER.** If the subject property is located within an area designated as a wildfire hazard area, language shall be included on the plat pursuant to

BLM_0053280

Section 11-106: G: *Warning and Disclaimer of Wildfire Hazards Affecting Use and Occupancy of This Property.*

**d.   COMPLIANCE WITH COUNTY APPROVAL DOCUMENTS**. A Final Plat presented for approval shall contain one of the following statements, as applicable:

**1.   COMPLIANCE WITH BOARD RESOLUTION.**

COMPLIANCE WITH BOARD OF COUNTY COMMISSIONERS' RESOLUTION

*The property described on this plat is subject to all the requirements, terms and conditions of the Board of County Commissioners' Resolution No. _____, recorded at Reception No._____ of the Records of the Clerk and Recorder of Gunnison County.*

**2.   COMPLIANCE WITH APPLICABLE CERTIFICATE OF APPROVAL.**

COMPLIANCE WITH CERTIFICATE OF APPROVAL

*The property described on this plat is subject to all the requirements, terms and conditions of Certificate of Approval No. _____, recorded at Reception No._____ of the Records of the Clerk and Recorder of Gunnison County.*

**e.   GENERAL NOTES.** Pursuant to Section 11-110: H: *Protective Covenants or Deed Restrictions and Plat Language*, the following paragraphs shall be included within a section of "General Notes" on a Final Plat:

**1.   CONFINEMENT OF DOMESTIC ANIMALS.** Language directing that domestic animals must be controlled by kenneling, leashing, fencing other physical constraint and that any expense of enforcement of the domestic animal control restrictions by the County shall be at the expense of the responsible association or individual.

**2.   AWARENESS OF COLORADO "FENCE-OUT" REQUIREMENTS.** Language referencing C.R.S. 35-46-101 *et seq*: clearly stating that a property owner is required to construct and maintain fencing in order to keep livestock off his/her property.

**3.   IRRIGATORS' RIGHT TO MAINTAIN IRRIGATION DITCH.** Language notifying individual lot owners that an irrigation ditch owner has the right to enter the designated irrigation ditch maintenance easement, maintain the ditch, and may leave natural debris on the bank.

**f.   ATTORNEY'S OPINION.** The following opinion by the applicant's attorney:

ATTORNEY'S OPINION

*I, (printed name of attorney), an attorney at law duly licensed to practice in the State of Colorado, hereby certify that I have examined title to all lands herein dedicated and subdivided. Such title is vested in_____ and is free and clear of all liens, defects, encumbrances, restrictions and reservations except as follows :_____( list same or indicate none).*
*Dated this _____ day of_____, A.D. 20___.*

_____
*Attorney-at-Law*

**g.   DEDICATION.** A Final Plat presented for approval shall contain one of the following statements concerning dedication, which shall be followed by the Notary Statement set forth in (c.) below:

**1.   DEDICATION LANGUAGE.**

DEDICATION

*(I, We), _____(printed name of owner(s), mortgagee(s) and lien holder(s))_____being the owner(s), mortgagee(s) and lien holder(s) of the land described as follows: (insert legal description of land being platted and/or subdivided and include area in acres to two (2) decimal places) in Gunnison County, Colorado, under the name of (complete name of development in capital letters), have laid out, platted and/or subdivided the same as shown on this plat and do hereby permanently dedicate to the public at large the streets, alleys, roads and other public areas as shown hereon and hereby permanently dedicate those portions of land labeled as easements for the installation and maintenance of public utilities as shown hereon.*
*In witness whereof (printed name of the owner) has (have) subscribed (his, her, their) name(s) this _____ day of_____, A.D. 20___.*
*By _____*

BLM_0053281

*Owner(s), Mortgagee(s) and Lien holder(s)*

2.   **DEDICATION/ALTERNATIVE LANGUAGE**.

DEDICATION

*(I, We), _____(printed name of owner(s), mortgagee(s) and lien holder(s))_____, being the owner(s), mortgagee(s) and lien holder(s) of the land described as follows: (insert legal description of land being platted and/or subdivided and include area in acres to two (2) decimal places) in Gunnison County, Colorado, under the name of (complete name of development in capital letters), have laid out, platted and/or subdivided the same as shown on this plat and do hereby permanently dedicate and convey to the owners of lots, tracts or parcels within this subdivision and their guests, but not to the public at large, the common right to use streets, alleys, roads and other areas as shown hereon and hereby permanently dedicate those portions of land labeled as easements for the installation and maintenance of public utilities as shown hereon.*

*In witness whereof (printed name of the owner(s)) has (have) subscribed his, her, their name(s) this _____day of _____, A.D. 20_____.*

*By _____*

*Owner(s), Mortgagee(s) and Lien holder(s)*

3.   **NOTARIAL.**

*State of Colorado)*
*) ss.*
*County of Gunnison)*
*The foregoing instrument was acknowledged before me this _____ day of _____, A.D. 20_____, by (printed name of owner(s): if by natural persons here, insert name; if by person acting in a representative official capacity, insert capacity; if by officers of a corporation, then insert the title of said officers and the name of the corporation).*

*My commission expires: _____*

*My address is: _____*

*Witness my hand and official seal:*

*_____ (seal)*

*Notary Public*

h.   **BOARD OF COUNTY COMMISSIONERS' APPROVAL.** As is consistent with the selected paragraph of dedication, any Final Plat submitted for approval shall contain one of the following statements of approval as appropriate:

1.   **BOARD APPROVAL LANGUAGE:**

*Board of County Commissioners' Approval*
*The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____, and the roads and other public areas are hereby accepted provided, however, that such acceptance shall not in any way be considered as an acceptance for maintenance or snow removal purposes. Maintenance of, or snow removal from, the subject roads shall be only upon a separate Resolution of the Board of County Commissioners passed in accordance with such policies, resolutions or ordinances in effect at that time.*

*_____*

*Chairperson, Gunnison County Board of Commissioners*
*Attest:*

*_____*

*Gunnison County Clerk and Recorder*

2.   **BOARD APPROVAL: FIRST ALTERNATIVE LANGUAGE:**

BOARD OF COUNTY COMMISSIONERS' APPROVAL

*The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____, and the private dedication of roads and common areas is approved on the condition that such roads and common areas shall be maintained and snowplowed, by and at the expense of the lot owners and not by Gunnison County or any other public agency.*

*_____*

*Chairperson, Gunnison County Board of Commissioners*
*Attest:*

BLM_0053282

_____
*Gunnison County Clerk and Recorder*

3. **BOARD APPROVAL: SECOND ALTERNATIVE LANGUAGE**:

    **BOARD OF COUNTY COMMISSIONERS' APPROVAL**

    *The within plat of (name of development in capital letters) Is approved this _____ day of _____, A.D. 20_____, as a seasonal use development only and not as a development served by a road opened or to be opened on a year-round basis. The roads and other public areas are hereby accepted provided, however, that such acceptance shall not in any way be considered as an acceptance for maintenance purposes. Maintenance of, or snow removal from the subject roads shall be only upon a separate resolution of the Board of County Commissioners passed in accordance with such policies, resolutions or ordinances in effect at that time.*

    _____
    *Chairperson, Gunnison County Board of Commissioners*
    *Attest:*

    _____
    *Gunnison County Clerk and Recorder*

4. **BOARD APPROVAL: THIRD ALTERNATIVE LANGUAGE:**

    **BOARD OF COUNTY COMMISSIONERS' APPROVAL**

    *The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____ as a seasonal use development only and not as a development served by a road opened or to be opened on a year-round basis. The private dedication of roads and common areas is approved on the condition that such roads and common areas shall be maintained and snowplowed, by and at the expense of the lot owners and not by Gunnison County or any other public agency.*

    _____
    *Chairperson, Gunnison County Board of Commissioners*
    *Attest:*

    _____
    *Gunnison County Clerk and Recorder*

5. **GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE.** (To be placed in the lower right-hand corner of cover sheet.)

    **GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE**

    *This plat was accepted for filing in the office of the Clerk and Recorder of Gunnison County, Colorado, on this _____ day of _____, A.D. 20_____, Reception Number _____, Time _____, Date _____.*

    _____
    *Gunnison County Clerk and Recorder*

6. **SURVEYOR'S STATEMENT.** A statement, followed by the land surveyor's signature and seal, certifying that the survey was performed by him or under his direct responsibility and supervision and explaining how bearings, if used, were determined.

**L. APPLICATION FORM FOR BOUNDARY LINE ADJUSTMENTS**. In addition to completing the application form as specified in Section 5-104: *Administrative Review Project Application* applications for boundary line adjustments shall also include:

1. **CONSENT OF ALL LANDOWNERS.** If the application is for a boundary line adjustment, the application shall include notarized written consent from all landowners whose lot lines are being adjusted.

2. **SURVEY PLAT.** A survey shall be submitted that includes the following:

    a. **TITLE AND DESCRIPTION.** It shall include the title, "Boundary Line Adjustment," and reference the property description by township and range, or by lot, parcel or tract number, as appropriate.

    b. **LEGEND.** A legend shall be included on the survey mylar, clearly indicating the original boundaries, and the adjusted boundaries.

    c. **ATTORNEY'S OPINION.** Any survey plat for a boundary line adjustment presented for approval shall contain this statement:

BLM_0053283

ATTORNEY'S OPINION

*I, (printed name of attorney), an attorney at law duly  licensed to practice in the State of Colorado, hereby certify that I have examined title to all lands herein dedicated and subdivided. Such title is vested in _____ and is free and clear of all liens, defects, encumbrances, restrictions and reservations except as follows: (list same or indicate none). Dated this _____ day of _____, 20 ___.*

*/s/ _____*
*Attorney-at-Law*

**d.  SURVEYOR'S STATEMENT**. A statement, followed by the land surveyor's signature and seal, certifying that the survey was performed by him/her or under his/her direct responsibility, supervision and checking and explaining how bearings, if used, were determined.

**e.  COUNTY APPROVAL SIGNATURES.** Any survey plat for a boundary line adjustment presented for approval shall contain the following statements:

**1.  BOARD OF COUNTY COMMISSIONERS' APPROVAL.** Any Commissioner of the Board is authorized to sign the plat without formal Board review.

BOARD OF COUNTY COMMISSIONERS' APPROVAL

*The within plat of the boundary line adjustment (name of plat title in capital letters) is approved this _____ day of _____, A.D. 20_____, _____.*

_____
*Chairperson, Gunnison County Board of Commissioners*
*Attest:*

_____
*Gunnison County Clerk and Recorder*

**2.  GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE.** (To be placed in the lower right-hand corner of cover sheet.)

GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE

*This survey was accepted for deposit in the office of the Clerk and Recorder of Gunnison County, Colorado, on this _____ day of _____, 20 _____, Deposit Number _____.*

*Time _____, Date _____.*

_____
*Gunnison County Clerk and Recorder*

**M.  APPLICATION FORM FOR LOT CLUSTER.** In addition to completing the application form as specified in Section 5-104: *Administrative Review Project Application* applications for lot clusters shall also include:

**1.  SITE PLAN.** The site plan shall include the following (as illustrated in Appendix Figure 1: *Site Plan Example*):

**a.  LOTS TO BE CLUSTERED.** The lots whose shared boundaries will be vacated by the Lot Cluster Agreement, the name of subdivision in which the lots are located, if applicable, and the numbers of the lots.

**b.  ADJACENT LOTS.** The lots immediately adjacent to all boundaries of the lots that will be clustered.

**c.  ROADWAYS.** Platted development, County or other public, state or federal roadways adjacent to the proposed clustered lots.

**d.  EASEMENTS.** Location of legal easements, including trails, adjacent to and across the proposed clustered lots.

**e.  CONSENT BY UTILITIES.** As applicable, notarized letters of consent to the lot cluster from utility companies whose facilities are located in legal easements on or adjacent to the proposed clustered lots and a copy of the easement agreements, if such agreements exist.

**f.  CONSENT OR SUBORDINATION BY LIEN HOLDERS.** As applicable, notarized letters of consent or a signed and notarized subordination to the lot cluster from lien or mortgage holders of the individual pre-clustered lots.

BLM_0053284

**N.  APPLICATION FORM FOR CORRECTION OF PLAT.** In addition to completing the application form as specified in Section 5-104: *Administrative Review Project Application*, applications for corrections of plats shall also include:

1.  **SURVEY PLAT.** A survey that includes the following:

    a.  **TITLE AND DESCRIPTION**. It shall include the title, "Corrected Plat," and reference the property description by township and range, or by subdivision lot, parcel or tract number, as appropriate.

    b.  **STATEMENT OF CORRECTION.** A statement clearly explaining the correction to the plat.

    c.  **LEGEND.** A legend shall be included on the survey mylar, the original boundaries, and the adjusted boundaries.

    d.  **SURVEYOR'S STATEMENT**. A statement, followed by the land surveyor's signature and seal, certifying that the survey was performed by him/her or under his/her direct responsibility, supervision and checking and explaining how bearings, if used, were determined.

    e.  **COUNTY APPROVAL SIGNATURES.** Any corrected plat presented for approval shall contain the following:

        1.  **BOARD OF COUNTY COMMISSIONERS' APPROVAL**. Any Commissioner of the Board is authorized to sign the plat without formal Board review.

            **BOARD OF COUNTY COMMISSIONERS' APPROVAL**
            *The within corrected plat of (name of plat title in capital letters) is approved this _____ day of _____, A.D. 20_____, _____.*

            _____
            *Chairperson, Board of County Commissioners*
            *Attest:*
            _____
            *Gunnison County Clerk and Recorder*

        2.  **GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE.** (To be placed in the lower right-hand corner of cover sheet.)

            **GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE**
            *This survey was accepted for deposit in the office of the Clerk and Recorder of Gunnison County, Colorado, on this _____ day of_____, 20 _____, Deposit Number _____.*

            *Time _____, Date _____.*
            _____
            *Gunnison County Clerk and Recorder*

**O.  APPLICATION FORM FOR SUBDIVISION EXEMPTIONS.**  In addition to completing the application form as specified in Section 5-104: *Administrative Review Project Application*, applications for subdivision exemption shall include:

1.  **SURVEY PLAT**. A survey shall be submitted that includes the following:

    a.  **TITLE AND DESCRIPTION**. It shall include the title, "Subdivision Exemption," and reference the property description by township and range, or by lot, parcel or tract number, as appropriate.

    b.  **LEGEND**. A legend shall be included on the survey mylar, clearly indicating the original boundaries, and the adjusted boundaries.

    c.  **SURVEYOR'S STATEMENT**. A statement, followed by the land surveyor's signature and seal, certifying that the survey was performed by him/her or under his/her direct responsibility, supervision and check, and explaining how bearings, if used, were determined.

    d.  **ATTORNEY'S OPINION**. Any survey plat for a subdivision exemption presented for approval shall contain this statement:

BLM_0053285

ATTORNEY'S OPINION

*I, (printed name of attorney), an attorney at law duly licensed to practice in the State of Colorado, hereby certify that I have examined title to all lands herein dedicated and subdivided. Such title is vested in _____ and is free and clear of all liens, defects, encumbrances, restrictions and reservations except as follows: (list same or indicate none). Dated this _____ day of _____, 20 ___.*

_____
*Attorney-at-Law*

**e.   BOARD OF COUNTY COMMISSIONERS.** Any survey plat for a subdivision exemption presented for approval shall contain the following statements:

BOARD OF COUNTY COMMISSIONERS' APPROVAL

*The within plat of the subdivision exemption (name of plat title in capital letters) is approved this _____ day of _____, A.D. 20_____,*

_____
*Chairperson, Board of Gunnison County Commissioners*
*Attest:*

_____
*Gunnison County Clerk and Recorder*

**f.   GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE.** (To be placed in the lower right-hand corner of cover sheet.)

GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE

*This survey was accepted for deposit in the office of the Clerk and Recorder of Gunnison County, Colorado, on this _____ day of_____, 20 _____, Deposit Number _____.*

*Time _____, Date _____.*

_____
*Gunnison County Clerk and Recorder*

**P.   ADDITIONAL INFORMATION.** Such additional information reasonably required by the Planning Department as necessary to determine the impact classification, or to otherwise aid in the evaluation of the development pursuant to the applicable requirements of this *Resolution.*

## SECTION 5-105: ADMINISTRATIVE REVIEW PROJECT REVIEW PROCESS

**A.   GENERAL REVIEW PROCESS.** The following review process (illustrated in the flowchart in Appendix Figure 5: *General Review Process for Administrative Review Projects That Require Land Use Change Permit)* shall apply to applications for Administrative Review projects:

**1.   PRE-APPLICATION CONFERENCE.** Attendance at a Pre-Application Conference is optional before submittal of an application for an Administrative Review project.

**2.   SUBMITTAL OF APPLICATION.** The applicant shall submit a complete application pursuant to this Article.

**3.   PLANNING DEPARTMENT REVIEW.** The Planning Director shall review the application, pursuant to Section 3-110: *Planning Department Review of Application,* including:

**a.   REQUEST FOR REVIEW BY OTHER AGENCIES OR DEPARTMENTS.** The Planning Department may request the professional analysis and recommendations of other review agencies, organizations, or technical consultants deemed appropriate and necessary to complete the review, including other County offices and departments; municipal, state, or federal agencies having an interest in or authority over all or part of the proposal; utility  companies; the applicable school district and special service districts serving the proposed development; and engineers, designers, and legal consultants.

**1.   REVIEW AND COMMENT BY REVIEW AGENCIES.** The review agencies that are sent a copy of the application shall be requested to make comments within 21 days of mailing by the Planning Department, unless an extension of not more than 30 days has been requested by the agency before the 21st day. The Department may grant such a reasonable extension if it determines that good cause for the delay has been shown. The failure of any agency to respond within 21 days or within the period of extension shall not be deemed an approval of the application by the agency.

BLM_0053286

2. **REVIEW OF AGENCY/DEPARTMENT COMMENTS BY APPLICANT**. The applicant shall have the right to review the comments and recommendations received from the review agencies. The applicant may submit additional information and make changes in the development proposal to respond to the comments of the review agencies; provided, however, that if those changes are substantial or if they significantly alter the nature, character or extent of the application, the Planning Department may, after the changes, refer the application again to some or all review agencies, to obtain additional comments, and may reasonably extend the period of their review accordingly.

4. **NOTICE TO PUBLIC OF PROPOSED COMMERCIAL OR INDUSTRIAL USE.** When the application is for an Administrative Review project that is a commercial or industrial use, notice shall be given to the public pursuant to Section 3-112: *Notice of Public Hearing*, except that notice by publication in a newspaper shall not be required. The notice shall identify a 15-day public comment period, during which comments may be submitted to the Planning Director. The Planning Director shall act on the application within 15 days after the close of the comment period.

   a. **NOTICE TO MUNICIPALITY.** When the proposed commercial or industrial use is located within a municipal three-mile area, notice shall be provided to the municipality.

5. **ACTION BY PLANNING DIRECTOR**. Within 30 days of having certified that the application is complete, or after having received comment from review agencies pursuant to Section 3-110: B. *Request for Review by Other Agencies or Departments,* whichever is later, the Planning Director shall approve, approve with conditions, or deny the application, based upon the compliance of the application with the applicable standards and requirements of this *Resolution*. Conditions of approval shall include the applicant's timely and fully obtaining and complying with all applicable federal, state, municipal and other permits required for the project.

6. **APPROVAL AND SIGNATURE OF PLAT BY BOARD**. When an Administrative Review project requires the submittal of a survey plat, the Planning Director shall schedule the item on the Board agenda for signature.

7. **RECORDATION OF CERTIFICATE**. Within 30 days following approval of the Administrative Review application, the Planning Director shall record a Certificate of Administrative Review in the Office of the Gunnison County Clerk and Recorder's Office. The Certificate shall describe the specific project, the legal description of the subject property, any relevant Findings related to the project's compliance with this *Resolution*, or conditions of approval, and include the Planning Director's signature line, and the date of approval.

B. **APPEAL.** A decision by the Planning Director on an application for an Administrative Review project may be appealed by referral to the Board, pursuant to Section 8-103: *Appeals.*

BLM_0053287

# ARTICLE 6:
# MINOR IMPACT PROJECTS

## SECTION 6-101: PURPOSE

The purpose of this Article is to establish the review process, application submittal requirements, and review standards that apply to the review of Land Use Change Permit applications for developments classified as Minor Impact projects.

**A. INITIAL CLASSIFICATION OF IMPACT AND REASONS FOR A HIGHER LEVEL OF REVIEW.** If the Planning Department determines during review of an application, including a Building Permit, that the proposed use exceeds the classification criteria of a Minor Impact project as listed within this Article, the criteria detailed in Section 3-111: B. 1: *Additional Criteria* shall be considered, the appropriate submittals shall be required, and the appropriate review process initiated.

## SECTION 6-102: PROJECTS CLASSIFIED AS MINOR IMPACT PROJECTS

The following uses shall be classified and reviewed as Minor Impact projects:

**A. 2-4 UNITS.** 2-4 units that are subdivision lots, duplex units, or multiple-family residences, except as allowed pursuant to Section 9-101: D. 2: *Secondary Structures and Uses Classified as Minor Impact Projects.*

**B. LARGE PARCEL INCENTIVE PROCESS (LPIP) PROJECT.** Large Parcel Incentive Process developments, pursuant to Section 14-102: *Large Parcel Incentive Process.*

**C. PRIMARY RESIDENCE 9,000 SQ. FT. OR LARGER.** A primary residence 9,000 sq. ft. or larger. The residence may include an attached garage no larger than 1,000 sq. ft., which shall not be calculated in the total square footage allowed for the residence, pursuant to Section 13-105: *Residential Building Sizes and Lot Coverages.*

**D. AGGREGATE SQUARE FOOTAGE OF 12,500 OR MORE SQ. FT.** An aggregate of 12,500 or more sq. ft. of residential living area (one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by Division 9-100: *Secondary Uses and Activities* on one parcel, pursuant to Section 13-105: *Residential Building Sizes and Lot Coverages.*

**E. AGGREGATE SQUARE FOOTAGE GREATER THAN 45 PERCENT OF AREA.** An aggregate square footage of structures that exceeds 45 percent of the total area of one parcel, pursuant to *Section 13-105: Residential Building Sizes and Lot Coverages.*

**F. INTEGRATED SECONDARY RESIDENCE 1,200 OR MORE SQ. FT.** An integrated secondary residence 1,200 sq. ft. or larger within a primary residence located on a legal lot smaller than 35 acres, or on any 35-acre or larger tract.

    **1. NO DETACHED SECONDARY RESIDENCE ALLOWED.** If an applicant elects to include this size integrated secondary residence within a primary residence, no detached secondary residence is allowed.

**G. DETACHED SECONDARY RESIDENCE LARGER THAN 2,500 SQ. FT. ON LEGAL LOT SMALLER THAN 35 ACRES.** A detached secondary residence, larger than 2,500 sq. ft., on a legal lot smaller than 35 acres.

**H. DETACHED SECONDARY RESIDENCE LARGER THAN 3,500 SQ. FT. ON 35-ACRE OR LARGER TRACT CREATED AFTER THIS RESOLUTION.** A detached secondary residence larger than 3,500 sq. ft. on a 35-acre or larger tract created after the effective date of this *Resolution.*

**I. MORE THAN ONE SECONDARY RESIDENCE ON A LEGAL LOT OR TRACT.** More than one secondary residence on a legal lot or tract, except as allowed pursuant to Section 9-101: *Uses Secondary to a Primary Residence.*

**J. DEVELOPMENT REQUIRING DETAILED RIDGELINE VANTAGE VISIBILITY ANALYSIS.** Any development other than a project classified as a Major Impact project, and for which a detailed ridgeline vantage visibility analysis is required, pursuant to Section 11-108: F: *Impact Classification.*

BLM_0053288

**K.** **CLEARING OF MORE THAN 7500 SQ. FT. OF LAND**. Clearing of more than 7,500 sq. ft. of land not related to activities permitted by a Building Permit, an ISDS Permit, or Access Permit, or an agricultural operation.

**L.** **NEW COMMERCIAL, INDUSTRIAL 5,000 SQ. FT., OR FIVE ACRES OR LESS**. A new commercial or industrial structure equal to or less than 5,000 sq. ft: or a new commercial or industrial use developed on five acres or less.

**M.** **5.000-9,999 SQ. FT. EXPANSION OF COMMERCIAL OR INDUSTRIAL USE**. A 5,000–9,999 sq. ft. expansion of a commercial or industrial use, existing as of the effective date of this *Resolution.*

**N.** **FREESTANDING WIRELESS TELECOMMUNICATION STRUCTURE**. Construction and siting of a freestanding wireless communication structure, building, pole, tower or antenna that provides wireless telecommunications services, pursuant to Section 9-505: *Freestanding Wireless Telecommunication Structures.*

**O.** **SMALL NEW OR EXPANDED MINING OPERATION**. A new, or expansion of a mining operation that operates for no more than 180 days per year, produces fewer than 10,000 tons of ore/waste per year and affects no more than two surface acres of land, pursuant to Division 9-400: *Exploration, Extraction and Processing of Minerals and Construction Materials.*

**P.** **CONSTRUCTION MATERIALS OPERATION RELATED TO CONSTRUCTION OF PUBLIC ROAD**. Any sand, gravel, or quarry operation providing material for public road construction that will operate for less than two years.

**Q.** **GENERAL ROAD CUTTING OR CONSTRUCTION**. Road cutting or  construction, except that cutting or construction and maintenance of a road that  provides access solely for an agricultural operation shall not be classified as a Minor Impact project, and shall not require review.

**R.** **SUBDIVISION PLAT VACATION, AMENDMENT OR REPLAT**. Vacation, amendment or replat of a recorded subdivision plat.

**S.** **TRANSMISSION LINES**. Upgrade of an existing utility transmission line(s) within an existing easement(s), but not including a project for which a Land Use Change Permit has been granted in which the design, construction and impacts of the utility line were reviewed and approved.

**T.** **BED AND BREAKFAST.** Bed and breakfast business, pursuant to Section 4-103: *Bed and Breakfast.*

**U.** **CHILD CARE CENTER**. A child care center, pursuant to Section 9-506: *Child Care Center.*

**V.** **GROUP HOME**. A group home, pursuant to Section 9-507: *Group Home.*

**W.** **WATER IMPOUNDMENT PROJECTS CLASSIFIED AS CLASS II DAMS**. New projects or facilities, or expansion of existing projects or facilities, that involve the design, construction and operation of a water impoundment  that includes a dam classified by the Colorado Division of Water Resources as a Class II dam, pursuant to Section 13-118: *Water Impoundments.*

**X.** **EXPANSION OR EXTENSION OF SNOWPLOWING**. Expansion or extension of snowplowing, pursuant to Section 11-110: F: *Expansion or Extension of Snowplowing.*

**Y.** **COMMERCIAL WEDDING SITE.** The site on which weddings are regularly or frequently conducted as a commercial operation, irrespective of the number of people or vehicles generated by the wedding event.

## SECTION 6-103: STANDARDS FOR APPROVAL OF MINOR IMPACT PROJECTS

A Land Use Change Permit for a Minor Impact project shall comply with the following:

**A.** **ALL APPLICABLE STANDARDS**. The proposed land use change shall comply with, and the burden shall be on the applicant to demonstrate through competent evidence that the proposed land use change complies with all applicable requirements of this *Resolution*; and

**B.** **COMPATIBILITY WITH COMMUNITY CHARACTER**. The proposed land use change shall be compatible with, or an enhancement of, the character of existing land uses in the area, and shall not adversely impact the future development of the surrounding area; and

**C.** **COMPLIANCE WITH SPECIFIC STANDARDS.** In addition, the following standards shall apply to individual types of Minor Impact Projects:

BLM_0053289

1.  **ADDITIONAL STANDARDS APPLICABLE TO VACATION, AMENDMENT OR REPLAT OF SUBDIVISION PLATS.** The Board may approve a Minor Impact application to vacate any recorded subdivision plat if all of the following additional standards are met:

    a.  **LEGAL PLAT OF RECORD.** The plat to be vacated shall be a legal plat of record and the applicant shall be the owner of all the lands identified on the plat to be vacated.

    b.  **VACATION SHALL NOT DENY ACCESS.** Vacation of all or part of the plat shall not interfere with the use of, nor deny access by public thoroughfare to public land, adjoining properties, utility service, or other improvements. In granting a vacation, the Board may reserve easements for access, and for the installation or maintenance of utilities, ditches, and similar improvements.

    c.  **NOT DAMAGE ANY LOT OWNER.** The plat vacation shall not result in damage to any individual lot owner.

## SECTION 6-104: MINOR IMPACT APPLICATION

A.  **NOTIFICATION TO COUNTY IF FEDERAL PERMITS REQUIRED FOR PROJECT.** When an EA or EIS or other state or federal action or permit is required, and that requirement is known by the applicant, the applicant shall notify the County of that requirement when the application is first submitted for review.

B.  **APPLICATION AND REVIEW FEES.** In order to compensate the County for the cost of reviewing and processing the submittals, each applicant shall pay the required fee, as shown in a schedule of fees issued by the Planning Department that is adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

    1.  **COST FOR PUBLIC HEARING NOTICE(S).** In addition to the application fee, the applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing.*

C.  **GENERAL APPLICATION FORM FOR MINOR IMPACT PROJECTS.** The Planning Department shall provide and the applicant shall complete an application form appropriate for the specific Minor Impact project. Unless waived by the Planning Department, at a minimum, the application shall include:

    1.  **APPLICANT.** The name, address, telephone and fax numbers, and email address for the applicant and the applicant's representative, if applicable.

        a.  **APPLICANT IS NOT THE OWNER.** If the applicant is not the owner of the land, or is a contract purchaser of the land, the applicant shall submit a notarized letter signed by the owner consenting to the submittal. Consent of the owner for submittal shall imply consent by the owner for the County to complete the review process pursuant to this *Resolution.*

        b.  **APPLICANT IS NOT THE SOLE OWNER.** If the applicant is not the sole owner of the land, the applicant shall submit a notarized letter(s) signed by all other owners, and/or by an association or corporation representing the owners, consenting to, or joining in, the application.

    2.  **PROPERTY OWNER.** Name, address, telephone and fax numbers and email address of the owner of the property and, if other than the applicant, a notarized letter from the owner consenting to the application must be submitted.

        a.  **NOTARIZED LETTER OF CONSENT.** If the property owner is a person or entity other than the applicant, a notarized letter from the owner consenting to the application must be submitted.

    3.  **STATUS OF PARCEL AS A LEGAL LOT.** If the parcel on which the land use change is proposed is smaller than 35 acres, the Department may also request the applicant to supply information sufficient to document that the subject was legally created..

    4.  **PROPERTY LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel on which the land use change is proposed to be located. A copy of the recorded deed to the property should be included.

    5.  **DATE OF APPLICATION.** The date on which the application was prepared.

    6.  **PRESENT LAND USE.** Identify present land uses, and locations and sizes of structures that exist on the property.

BLM_0053290

7. **CHARACTERISTICS and CURRENT CONDITION OF LAND**. List physical characteristics and conditions of the land, including streams, irrigation ditches, ponds, soils, roads, vegetation, any work that has been done to clear the property, etc.

8. **LIST OF ADJACENT LANDOWNERS**. As applicable, a listing of all landowners and land uses that are adjacent to the boundaries of the entire parcel on which the project is proposed, including all properties that are separated from the parcel by a roadway or would be adjacent to the property except for the existence of the roadway. When the parcel is located adjacent to a municipality, a platted townsite or platted recorded subdivision, all owners of surface property rights within 500 feet of each boundary of the entire parcel shall be included in the listing. The source for the best-available information to identify those landowners is the Gunnison County Assessor's Office.

9. **MINERAL RESOURCES**. Indication of mineral resources that are known, or reasonably believed to be located in the property proposed for the land use change, whether the area has been the site of underground or surface mining activity, and whether an original patent has been issued to the property under federal mining law. If reasonably available, a list of the owners or lessees of underlying mineral estates is to be included.

10. **PROPOSED PROJECT DESCRIPTION.** A detailed written description of what the applicant wants to do on or to the property, including uses, division of land, adjustment of boundaries, expansion of existing uses, number of units, estimated amount of new traffic, description of structures to be constructed, proposed phases and a description of off-site resources, hazardous activities, and haul routes as may be necessary to accomplish the project and including:

   a. **INFRASTRUCTURE ELEMENTS.** As applicable, the elements of all infrastructure that will be required as part of the development, pursuant to the individual sections of Article 12: *Development Infrastructure Standards* including:

      1. **ROAD SYSTEM.** If the development is to include a road or roads, location and design, pursuant to Section-103: *Road System* and the *Gunnison County Specifications for Road and Bridge Construction Standards.*

      2. **TRAILS.** If the parcel on which the development is proposed is land over which there is a public trail, the application must comply with Section 12-104: *Trails.* Applicants also are encouraged to include public trails and other amenities for non-motorized travel in an application to link existing adjacent public trails or trails easements, and should provide information pursuant to that section if they are interested in providing such trails.

      3. **SEWAGE DISPOSAL/WASTEWATER TREATMENT**. If applicable, how wastewater will be disposed of, pursuant to the requirements of Section 12-106: *Sewage Disposal/Wastewater Treatment.*

      4. **WATER SUPPLY.** Adequate evidence, which may be a final court decree, deed or other written document demonstrating ownership and/or right to use water in the amounts, manner and location(s) proposed to supply the development, pursuant to Section 12-105: *Water Supply.*

         (a.) **TIE ON TO EXISTING CENTRAL SYSTEM.** If the project will tie onto an existing central water supply system, the name of the municipality, district or other existing system that will provide the service. A copy of a notarized letter of intent to provide, signed agreement or contract between the applicant and the supplier indicating that it has the capacity and is willing to provide the amount of water that will be provided by the service provider, and any conditions of providing tap-on and service.

         (b.) **PROVISION OF NEW CENTRAL SYSTEM.** If the project includes the construction and operation of a new central water supply system, copies of approved current well permits, court decrees, decreed plan of water augmentation, or other deeded water rights. A description of the proposed system, including treatment options, proposed plans for operation and maintenance, and information about how water will be provided for fire suppression.

         (c.) **INDIVIDUAL WELL OR SPRING SYSTEM.** If an individual well or piped spring is proposed as the supply, a list of, and provision of copies of approved current well permits, court decrees, plans of water augmentation, or other deeded water rights. If the source of the supply is not located on the property proposed for development, the site of

BLM_0053291

the source shall be indicated on the submitted vicinity map, and as applicable, copies of existing easements for location, access to and maintenance of pipelines and related facilities.

(d.) **WATER AUGMENTATION PLAN**. If the Colorado Division of Water Resources requires that a plan of water augmentation be approved for the project, a copy of the application for the augmentation, as submitted to the Division.

5. **FIRE PROTECTION.** An applicant for a land use change classified as a Minor Impact project that is located in a specific fire protection district must contact the district before submitting the application, for the purpose of being informed of the District's design and construction standards that will apply to the application. Section 12-107: *Fire Protection*.

b. **MINING AND CONSTRUCTION ACTIVITIES.** As applicable, information pursuant to the individual sections of Division 9-400: *Exploration, Extraction and Processing of Minerals and Construction Materials.*

c. **COMMERCIAL AND INDUSTRIAL USES.** As applicable, information pursuant to the individual sections of Division 9-300: *Commercial and Industrial Uses*.

11. **PROJECT DESIGN.** As applicable, all elements of the project design, pursuant to the individual sections of Article 13: *Project Design Standards*; the staff will advise the applicant which of these requirements apply to a specific application:

a. **SECTION 13-103:** *General Site Plan Standards and Lot Measurements.*
b. **SECTION 13-104:** *Setbacks from Property Lines and Road Rights-of-Way.*
c. **SECTION 13-105:** *Residential Building Sizes and Lot Coverages.*
d. **SECTION 13-107:** *Installation of Solid-Fuel-Burning Devices.*
e. **SECTION 13-108:** *Open Space and Recreation Areas.*
f. **SECTION 13-109:** *Signs.*
g. **SECTION 13-110:** *Off-Road Parking and Loading.*
h. **SECTION 13-111:** *Landscaping and Buffering.*
i. **SECTION 13-112:** *Snow Storage.*
j. **SECTION 13-113:** *Fencing.*
k. **SECTION 13-114:** *Exterior Lighting.*
l. **SECTION 13-115:** *Reclamation and Noxious Weed Control.*
m. **SECTION 13-116:** *Grading and Erosion Control.*
n. **SECTION 13-117:** *Drainage, Construction and Post-Construction Storm Water Runoff.*
o. **SECTION 13-118:** *Water Impoundments.*
p. **SECTION 13-119:** *Standards to Ensure Compatible Uses.*

12. **ADDITIONAL SUBMITTALS BASED UPON INFORMATION AVAILABLE ON MAPS USED BY THE COUNTY.** If a land use change is proposed on a parcel located within any of the following areas delineated pursuant to Section 1-112: *Use of Maps* or in areas otherwise addressed by the following, additional submittals may be required to be submitted; the Planning Department will provide assistance to the applicant to determine the specific information that must be submitted:

a. **LOCATION OF SITE WITHIN FLOODPLAIN HAZARD AREA.** As applicable, an application proposing a land use change on a parcel located within a floodplain hazard area, pursuant to Section 11-103: *Development in Areas Subject to Flood Hazards.*

b. **LOCATION OF SITE WITHIN GEOLOGIC HAZARD AREA**. As applicable, an application proposing a land use change on a parcel located in a geologic hazard area may be required to submit a geotechnical report that evaluates and predicts the impact of specific geologic conditions on the proposed land use change and measures to mitigate these hazards, pursuant to Section 11-104: *Development in Areas Subject to Geologic Hazards.*

c. **LOCATION OF SITE WITHIN WILDFIRE HAZARD AREA.** As applicable, an application proposing a land use change on a parcel located within a wildfire hazard area, pursuant to Section 11-105: *Development in Areas Subject to Wildfire Hazards.*

d. **LOCATION OF SITE WITHIN AREA POTENTIALLY AFFECTED BY WETLANDS AND WETLANDS PERMITTING.** As applicable, an application proposing a land use change on a parcel located in an area in which there are wetlands, pursuant to Section 11-107: *Protection of Water Quality.*

BLM_0053292

e. **LOCATION OF SITE VISIBLE FROM RIDGELINE VANTAGE.** As applicable, an application proposing a land use change that is visible from a ridgeline vantage, pursuant to Section 11-108: *Standards for Development on Ridgelines*.

f. **DEVELOPMENTS IMPACTING AGRICULTURAL LANDS.** If a proposed project adjoins agricultural lands, involves land through which irrigation ditches flow, or over which there are general or exclusive easements for stock drives, the application shall address the requirements of Section 11-109: *Development That Affects Agricultural Lands*, and Section 15-103: *Right-to-Ranch Policy* which shall identify, in written and/or graphic form, the following:

1. **AGRICULTURAL LAND OWNER**. The location(s) and name(s) of owner(s) of any agricultural land(s) adjoining or possibly impacted by the proposed land use change.

2. **AGRICULTURAL DITCHES**. The location(s), name(s), name(s) of owner(s), size(s), and decreed capacity(ies) of any agricultural ditch crossing or adjoining the development property, as available from the Colorado Division of Water Resources, or ditch commissioner's records.

3. **EASEMENTS**. The location of historical easements used to gain access to headgates, ditches, and fences for maintenance or operations.

4. **LIVESTOCK DRIVES AND FENCELINES.** Historic or recorded stock drive easements crossing or adjoining the development property, including the location of any existing fences along property lines, and the location of new fences or other obstacles proposed to be built across any such stock drive.

g. **DEVELOPMENT ON LAND BEYOND SNOWPLOWED ACCESS.** As applicable, an application that proposes development at a location that currently receives no snowplowing services for access, pursuant to Section 11-110: *Development of Land Beyond Snowplowed Access.*

h. **DEVELOPMENT ON LAND ON AN INHOLDING WITHIN NATIONAL WILDERNESS.** As applicable, an application that proposes development on an inholding within a National Wilderness Area, pursuant to Section 11-111: *Development on Inholdings in the National Wilderness*.

i. **DEVELOPMENT ON PROPERTY ABOVE TIMBERLINE.** As applicable, an application that proposes development on a parcel located above timberline, pursuant to Section 11-112: *Development on Property Above Timberline.*

D. **MAPS AND SITE PLANS.** Maps and site plans submitted with any application shall be at a scale and sheet size that can be easily viewed. A minimum scale of 1" = 100' is preferred. Sheet size shall not exceed 24 inches by 36 inches. In the case of map sets containing multiple sheets, there shall be an index sheet stating the contents of each sheet. In the case of a large development site that requires more than two sheets to depict the entire land area at an appropriate scale, the applicant shall also submit a total area plan showing the entire development on a single sheet at an appropriate scale.

1. **VICINITY MAP.** A vicinity map, at a minimum, shall include the following (as illustrated in Appendix Figure 2: *Vicinity Map Example*):

a. **PROPERTY LOCATION AND NEARBY PARCEL SIZES AND LAND USES**. Location of the property on a United States Geological Survey quadrangle map or on a recorded plat if the proposed development is within an approved subdivision, with the location highlighted so that it is easy to see, and that clearly shows sizes of parcels and land uses within a half-mile of the proposed project.

b. **ROADS**. All U.S. and state highways and nearest County or Forest Service, Bureau of Land Management, and/or subdivision/private roads that traverse and/or provide access to this proposed project.

c. **EASEMENTS.** Easements recorded or historically used that provide access to or across, or other use of, the property.

d. **BOUNDARIES OF DISTRICTS, MUNICIPALITIES OR SUBDIVISIONS**. Locations of special district boundaries, municipalities or residential subdivisions within a half mile of the property.

e. **PROXIMITY OF MINING OR PROCESSING ACTIVITY**. Any parcel located within 1,000 feet of the property proposed for land use change on which there exists an operation involving mineral exploration or extraction or construction materials processing.

BLM_0053293

2. **SITE PLAN**. A site plan, which at a minimum shall include the following (as illustrated in Appendix Figure 1: *Site Plan Example*.):

   a. **ALL PROPERTY PROPOSED FOR DEVELOPMENT**. Include all land proposed for immediate and anticipated for future development. This can be a simple, hand-drawn layout, but it must be legible, clearly marked, drawn to scale, and signed and dated by the person who drew it.

   b. **PHASING.** Any proposed phases of the development, and their timing.

   c. **TOTAL ACREAGE OWNED.** Total acreage and location of all contiguous property owned by the applicant.

   d. **TOTAL ACREAGE IN PROPOSED LAND USE CHANGE PERMIT AREA**. Total acreage of the site on which the applicant wants to obtain approval for the Land Use Change Permit.

   e. **ADJACENT LOT SIZES.** Lot size(s) of properties adjacent to and in the impact area of the site proposed for the land use change.

   f. **ADJACENT LAND OWNERS.** Names and actual land uses of adjacent landowners (including federal, State of Colorado and other publicly owned lands), to the site (in addition to the separate narrative listing). This includes properties that may be across a road, stream or river from the applicant's property.

   g. **UTILITY LOCATIONS IN AREA**. Location of all existing utilities on the property (septic tanks, wells, electric, gas, telephone or cable lines) that will serve the property.

   h. **TOPOGRAPHIC FEATURES**. Streams, lakes, ponds, wetlands, contour lines and elevations, any prominent ridgelines, and any other significant visual resource areas on the property.

   i. **LIVESTOCK DRIVES AND FENCELINES**. Historic or recorded stock drive easements crossing or adjoining the development property, including the location of any existing fences along property lines, and the location of new fences or other obstacles proposed to be built across any such stock drive.

   j. **IRRIGATION DITCHES**. The location(s), name(s), name(s) of owner(s), size(s), and decreed capacity(ies) of any irrigation ditch crossing or adjoining the development property, as available from the Colorado Division of Water Resources, or ditch commissioner's records.

   k. **DRAINAGE**. Drainage patterns, on and adjacent to the project property.

   l. **TRAILS.** Pursuant to Section 12-104: *Public Trails*, as applicable, the application shall show existing public trails that cross the subject property, and any trails the applicant may be proposing to include as an element of the proposed land use change.

   m. **ROADS, DRIVEWAYS AND PARKING**. Roads, driveways and parking areas, both existing and proposed. Driveway access locations are subject to review and approval by the Public Works Department. If roads are an element of the project design, they shall be designed pursuant to, and Section 12-103: *Road System*.

   n. **EXISTING STRUCTURES**. Locations and sizes of existing structures.

   o. **PROPOSED STRUCTURES**. Locations and sizes of proposed structures.

   p. **BOUNDARIES.** Boundaries and related measurements.

E. **PROTECTIVE COVENANTS, CONDOMINIUM OR TOWNHOME DECLARATIONS, OR DEED RESTRICTIONS.** Any existing, or a draft of proposed, protective covenants, a condominium declaration or deed restrictions that will be imposed on the development..

F. **ADDITIONAL SUBMITTALS BASED ON EVIDENCE OF REASONABLE PROBABILITY OF CUMULATIVE IMPACTS.** If, in the course of the Minor Impact project review, evidence is submitted or gathered indicating that there is a reasonable probability that the proposed land use change will contribute to cumulative impacts within the impact area, the Planning Department or the Planning Commission shall require that additional information, including but not limited to studies of specific issues, be submitted.

G. **LOCATION OF SITE WITHIN SPECIAL GEOGRAPHIC AREA OR DISTRICT.** As applicable, an application proposing a land use change on a parcel located within a designated Special Area or special district may be required to comply with regulations of that Area or district.

BLM_0053294

**H.  ADDITIONAL INFORMATION.** Such additional information reasonably required by the Planning Department as necessary to determine the impact classification, or to otherwise aid in the evaluation of the development pursuant to the applicable requirements of this *Resolution*.

## SECTION 6-105: SUBMITTAL FOR FINAL ACTION FOR MINOR IMPACT PROJECT

**A.  COPIES OF INFORMATION NECESSARY FOR ACTION BY RECOMMENDING AND DECISION-MAKING BODIES.** If the Planning Commission, after a work session(s) and the applicable required public hearing, directs the staff to prepare a Recommendation or Decision document for approval of a Minor Impact project, the Planning Department shall determine the number of copies of a plan submitted for final action (including protective covenants, blue line copies of a plat, or final plan layout as applicable) necessary for review and action by the County, and advise the applicant of that number.

**B.  CONDOMINIUM AND TOWNHOME DEVELOPMENTS.** A Minor Impact project that is a plan for condominium or townhome development shall require a Final Plan approval for the layout, infrastructure and amenities for the project. Building Permits may then be issued for construction of individual buildings. A  Final Plat shall be submitted after the buildings are constructed, that is reviewed and recorded pursuant to Article 5:  *Administrative Review Projects That Require Land Use Change Permits.*

**C.  FEES.** To compensate the County for the cost of reviewing and processing applications for Land Use Change Permits, each applicant shall pay the Final Plan fee as shown in a schedule of fees charged for permits issued by the Planning Department, adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

    **1.  IMPACT FEES**. As applicable, payment in full of any impact fees.

**D.  SUBMITTAL OF DRAFT COPY.** The applicant shall submit one draft copy of the plan for final action to the Planning Department.

**E.  TOTAL NUMBER OF COPIES REQUIRED.** Once the Planning Department has determined the submittal to be complete, it shall determine the number of copies of the plan for final action that are necessary for review and action by the Planning Commission and/or Board, and other review agencies or County departments, and shall notify the applicant of the number required to be submitted. The Department shall, as applicable, forward the plan for final action and any relevant comments to the Planning Commission and/or Board.

**F.  NARRATIVE.** The plan for final action  shall include the following, presented in the same order as it is listed here, in a stapled or otherwise bound document, on consecutively-numbered pages:

    **1.  APPLICANT OTHER THAN APPLICANT WHEN APPLICATION ORIGINALLY SUBMITTED**. If the applicant is not the same as the applicant who submitted the initial application, that fact shall be noted, and a notarized letter of consent from the current property owner for the current applicant to proceed with the review shall be submitted.

    **2.  PROPERTY OWNER OTHER THAN OWNER WHEN APPLICATION ORIGINALLY SUBMITTED.**. If the property owner is not the same as the owner who submitted the initial application, that fact shall be noted, and a notarized letter of consent from the current property owner for the current applicant to proceed with the review shall be submitted.

        **a.  APPLICANT IS NOT THE SOLE OWNER.** If the applicant is not the sole owner of the land, and the ownership of the property has changed since the initial application, the applicant shall submit a notarized letter(s) signed by all other owners, and/or by an association or corporation representing the owners, consenting to, or joining in, the application.

    **3.  PROJECT DESCRIPTION.** A detailed description of the uses and activities for which final approval  is requested, including:

        **a.  USES AND ACTIVITIES.** Proposed uses or activities, division of land, adjustment of boundaries, expansion of existing uses, and construction, stockpiled materials, indoor and outdoor storage areas.

        **b.  NUMBERS OF UNITS OR OTHER SIZES OF USES**. Numbers of units or lots. The square footage or acreage of commercial, industrial or other uses.

        **c.  DESCRIPTION OF STRUCTURES**. Description of structures to be constructed, their estimated size(s) and appearance.

BLM_0053295

    **d. DESCRIPTION OF OFF-SITE RESOURCES**. Description of off-site resources, hazardous activities and haul routes.

    **e. IDENTIFICATION OF LOT USE WITHIN SUBDIVISION**. If subdivision of the property is proposed, the uses proposed for all resulting lots.

    **f. SEASONS AND HOURS OF OPERATION.** As applicable, the seasons of the year in which the activity is proposed to be conducted, and the intended hours of operation.

    **g. PHASES.** Phases of the plan, if applicable.

**4. DOCUMENTATION OF CONVEYANCE OF LAND OR EASEMENT**. As applicable, a copy of warranty deed(s) to, or easement agreement(s) with, the appropriate entity conveying or providing easement to the County or other entity, for any land set aside for road rights-of-way, public trails, or other public use.

**5. PROTECTIVE COVENANTS AND DESIGN GUIDELINES, CONDOMINIUM OR TOWNHOME DECLARATIONS, OR DEED RESTRICTIONS**. Protective covenants, design guidelines, condominium or townhome declaration or similar restrictions that will be imposed on the development.. The protective covenants shall be the final recordable form and, at a minimum, shall address:

    **a. CONDITIONS OF LAND USE CHANGE PERMIT.** As applicable, those items required as conditions of the Land Use Change Permit approval to be included within protective covenants, design guidelines, condominium or townhome declarations or deed restrictions.

    **b. RESPONSIBILITIES OF HOMEOWNERS' ASSOCIATION.** As applicable, responsibilities of property owners or homeowners' association to collect dues, maintain common areas, improve infrastructure common to the development, maintenance of a decreed water augmentation plan and the augmented water supply, treatment of wastewater and/or water, and to oversee the maintenance of the general appearance of the development.

    **c. COUNTY IS PARTY TO AMENDMENT OR TERMINATION**. Language that requires that amendment or termination of the protective covenants or restriction is subject to approval by Gunnison County.

    **d. DESIGN CRITERIA.** Design criteria that will govern development within the subdivision, including:

        **1. BUILDING SCALE AND LOCATION.** Language defining building heights, compatibility with terrain, and sizes of all structures that will be allowed by the protective covenants. The requirements of Section 11-108: *Standards for Development on Ridgelines*, Section 13-103: *General Site Plan Standards and Lot Measurements,* Section 13-105: *Residential Building Sizes and Lot Coverages* shall guide the drafting of the covenant language.

        **2. ARCHITECTURAL STYLE AND EXTERIOR APPEARANCE.** Language describing the architectural style that will be required of all structures in the proposed development, and the types and colors of exterior materials to be used, including siding, roofing.

    **e. DOMESTIC ANIMAL CONTROL.** Language limiting the maximum number of domestic animals allowed on a lot or within the development, and requiring that they be confined on site by kenneling, leashing or other similar means. Language that includes requirements that comply with those specified by Section 11-106: F.6: *Domestic Animal Controls,* Section 11-109: D: *Domestic Animal Controls*, and Section 9-508: *Keeping of Livestock Not On an Agricultural Operation.*

    **f. EXTERIOR LIGHTING.** Language that includes requirements that comply with those specified by Section 13-114: *Exterior Lighting.*

    **g. FENCING.** Language that includes requirements that comply with those specified by Section 13-113: *Fencing.* If there is proposed to be a fence separating the proposed development from lands on which there are agricultural operation or are public lands, language shall be required acknowledging Colorado's "fence out" requirements, and placing responsibility for construction and maintenance of the fence with the property owners or homeowners' association.

    **h. RECLAMATION AND NOXIOUS WEED CONTROL.** Language that includes requirements that comply with those specified by Section 13-115: *Reclamation and Noxious Weed Control.*

BLM_0053296

    **i.**   **USE AND MAINTENANCE OF OPEN SPACE AREAS.** As applicable, language shall be included that lists uses allowed on, and requires maintenance of common open space areas by the homeowners association, or other appropriate entity. Pursuant to Section 13-108: *Open Space and Recreation* Areas.

    **j.**   **SIGNS.** Language shall be included that informs property owners or other land users within the proposed development that installation of signs requires compliance with the Gunnison County regulations and may require a Gunnison County Sign Permit.

    **k.**   **RULES CONCERNING PARKING.** Language concerning limitations on parking pursuant to Section 13-110: *Off-road Parking and Loading.*

    **l.**   **LANDSCAPING AND BUFFERING.** Language addressing installation and maintenance of landscaping on individual lots and common areas pursuant to Section 13-111: *Landscaping and Buffering.*

    **m.**   **PROVISION FOR SNOW REMOVAL AND SNOW STORAGE.** Language identifying responsibility of a property owners' or homeowners' association or other entity to remove snow from interior roads and parking areas, and other applicable requirements pursuant to Section 13-112: *Snow Storage.*

    **n.**   **STANDARDS TO ENSURE COMPATIBLE USES.** As applicable, specific covenants or other restrictions designed to mitigate impacts to nearby residential or public use areas or adjacent land uses, pursuant to Section 13-119: *Standards to Ensure Compatible Uses.*

    **o.**   **SOLID-FUEL-BURNING DEVICES.** If solid-fuel-burning devices are to be used in the proposed development, restrictions shall be listed ensuring compliance with Section 13-107: *Installation of Solid-fuel-burning Devices.*

    **p.**   **GEOTECHNICAL SITE-SPECIFIC STUDIES.** When a parcel is proposed for subdivision and analysis has indicated it is located within a geologic hazard area, language shall be included that identifies the specific hazard in which the development, or identified portions of the development, are located, and refers by title, name of preparer, and date of preparation to the geotechnical analysis of the site.

        **1.**   **COPY OF GEOTECHNICAL STUDY TO BE ATTACHED.** A copy of the geotechnical study(ies) shall be required to be attached as an exhibit to the protective covenants or deed restriction.

**6.**   **DOCUMENTATION ESTABLISHING ADMINISTRATIVE ASSOCIATION.** If the development is a subdivision, condominium or townhome development, proof of the establishment of any applicable homeowners' or property owners' association, district, architectural control committee or other group that will administer or enforce protective covenants, declarations or deed restrictions. If proof of establishment is not submitted with the plan for final action, establishment shall be guaranteed through provisions in the Development Improvement Agreement, and all relevant documentation creating the organization shall be submitted to the Planning Department.

**7.**   **FINAL COST ESTIMATES.** As applicable, documentation from contractors, materials providers, engineers or other professionals, certifying final estimates for roads, bridges, drainage facilities, water supply and wastewater treatment systems, landscaping and other improvements required by the County for final approval.

**8.**   **COPY OF PROPERTY TAX CERTIFICATE.** Copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration. If the copy provided in the Minor Impact application is current, no additional copy need be provided.

**9.**   **INFORMATION TO ASSESSOR'S OFFICE.** If the development is a subdivision, condominium or townhome development, a copy of a notarized signed statement from the developer agreeing to provide the Gunnison County Assessor's Office with the following information before November 30 of each year shall be submitted:

    **a.**   **PARCELS SOLD.** A description of all lots or parcels sold within the development.

    **b.**   **PURCHASER INFORMATION.** Name and address of each purchaser.

    **c.**   **PURCHASE PRICE.** Purchase price of each parcel sold.

**G.**  **LAYOUT AND DESIGN.** The application shall include a rendering of the final layout and design plan of the project that shall include:

BLM_0053297

1. **SURVEY.** A scale survey of the boundaries of the land parcel, showing all planned, recorded and apparent rights-of-way and all easements including ditches, utility lines, roads, and paths or trails; a description of all monuments found and set marking the boundaries of the property; and a description of all control monuments used and all dimensions necessary to establish the boundaries in the field. All section, quarter-section, township and range lines that cross the development shall be identified.

2. **SCALE.** Scale shall be 100 feet to the inch, except building plans and townhome or condominium plans may be at a larger scale if appropriate.

3. **SHEET SIZE.** Sheet size shall be 24 inches by 36 inches. When a large development requires more than two sheets at the required scale, the applicant shall also submit a total area plan showing the entire development at a scale that is clearly legible.

4. **LOCATIONAL INFORMATION.** Each sheet shall contain a scale (written and graphic), north arrow and a heading containing the name and location of the development by reference to a quarter-section, township and range, and a reference to a U.S. Mineral survey where applicable.

5. **SUBDIVISION PLAT.** If the development is a subdivision, the final layout shall be presented as a recordable Plat, and include the required language pursuant to Section 6-105: L: *Specifications for Subdivision Plats.*

**H. ENGINEERED PLANS.** Final engineering design plans and descriptions for roads, bridges, drainage facilities, water supply and wastewater treatment systems, landscaping and other improvements proposed to be installed by the developer, or required by the County; such plans shall be designed and stamped by a qualified professional engineer licensed in the State of Colorado. Engineering plans may be bound separately when size or bulk makes it advisable. Two folded copies of each of the plans shall be provided that can be stored in legal-sized folders, and shall not be submitted in rolled form.

**I. UTILITY LOCATION PLANS.** As applicable, final utility location plans approved by all utility companies identified as providing service to the development.

**J. WATER SUPPLY.** Documentation of a final court decree, deed or other written evidence demonstrating ownership and/or right to use water in the amounts, manner and location(s) for the uses and activities included in the development.

1. **WATER AUGMENTATION PLAN.** If the Division of Water Resources required that a plan of water augmentation be designed, submitted and approved, a copy of the decree(s) for the plan shall be submitted. The plan shall accurately portray the number and types of uses described in the applicant's Final Plan application submittal, including phases, if applicable.

**K. RURAL ADDRESSING SYSTEM PLATS.** If the development is a subdivision, condominium or townhome development, three copies of the Final Plat, 14 inches by 17 inches, for inclusion in the rural addressing system, one of which the Planning Department will provide to the applicable County department for emergency services purposes.

**L. SPECIFICATIONS FOR SUBDIVISION PLATS.** Subdivision plats intended for recording shall be prepared by a surveyor registered in the State of Colorado, clearly and legibly drawn on indelible mylar so that legible prints can be made from it. The Plat recorded in the Office of the Clerk and Recorder of Gunnison County shall be a nonerasable mylar copy of the original. Sheet size shall be 24" x 36". The scale of the final plat shall be sufficiently large to show clearly the details of the plan (preferably 1" = 100').

1. **PUBLIC AREAS.** All public or common areas shall be identified.

2. **NON-DUPLICATING ROAD NAMES.** All roads shall be named. Road names shall not duplicate those of any existing named road within the unincorporated county or any incorporated municipality, to avoid confusion and duplication.

3. **ACCESS AND OTHER EASEMENTS.** Planned and existing, recorded or apparent easements shall be shown, including 25-foot easements from each irrigation ditch bank pursuant to Section 11-109: G. 2.: *Irrigation Ditch Easements*, watercourses, public utilities, drains, sewers, snow storage areas, roads and paths or trails crossing the property, the closing or changing of which might affect the rights of others or result in damage to the property of the owner.

4. **BLOCKS AND LOTS.** All blocks and lots or spaces shall be consecutively numbered.

BLM_0053298

5. **LOT ADDRESSES.** The applicant shall provide a copy of the Plat to the Gunnison County Building Inspector who shall assign the appropriate addresses, which shall be shown on the recordable Plat.

6. **REFERENCE TO PROTECTIVE COVENANTS.** If protective covenants are included as an element of the development, they shall be filed with the plat and the plat shall contain the correct recording references.

7. **CURVE DATA.** All curve data, in a chart that includes radii, internal angles, and lengths of all arcs and points of curvature.

8. **REQUIRED PLAT LANGUAGE.** The following plat language:

   a. **FLOODPLAIN WARNING AND DISCLAIMER.** If subject property is located within an identified floodplain, language shall be included on the plat pursuant to Section 11-103: F. 1. *Warning and Disclaimer of Floodplain Hazards Affecting Use and Occupancy of This Property.*

   b. **GEOLOGIC HAZARDS WARNING AND DISCLAIMER.** If the subject property is located within an identified geologic hazard area, language shall be included on the plat pursuant to Section 11-104: F. 5: *Warning and Disclaimer of Geologic Hazards Affecting Use and Occupancy of This Property.*

   c. **WILDFIRE HAZARD AREA WARNING AND DISCLAIMER**. If the subject property is located within an area designated as a wildfire hazard area, language shall be included on the plat pursuant to Section 11-106: G: *Warning and Disclaimer of Wildfire Hazards Affecting Use and Occupancy of This Property.*

   d. **COMPLIANCE WITH COUNTY APPROVAL DOCUMENTS**. A Plat presented for approval shall contain one of the following statements, as applicable:

      1. **COMPLIANCE WITH BOARD RESOLUTION.**

         COMPLIANCE WITH BOARD OF COUNTY COMMISSIONERS' RESOLUTION
         *The property described on this plat is subject to all the requirements, terms and conditions of the Board of County Commissioners' Resolution No. _____, recorded at Reception No._____ of the Records of the Clerk and Recorder of Gunnison County.*

      2. **COMPLIANCE WITH APPLICABLE CERTIFICATE OF APPROVAL.**

         COMPLIANCE WITH CERTIFICATE OF APPROVAL
         *The property described on this plat is subject to all the requirements, terms and conditions of Certificate of Approval No. _____, recorded at Reception No._____ of the Records of the Clerk and Recorder of Gunnison County.*

   e. **GENERAL NOTES.** Pursuant to Section 11-110: H: *Protective Covenants or Deed Restrictions and Plat Language*, the following paragraphs shall be included within a section of General Notes on a Final Plat:

      1. **CONFINEMENT OF DOMESTIC ANIMALS.** Language directing that domestic animals must be controlled by kenneling, leash, fencing or other physical constraint and that any expense of enforcement of the domestic animal control restrictions by the County shall be at the expense of the responsible association or individual.

      2. **AWARENESS OF COLORADO "FENCE-OUT" REQUIREMENTS**. Language referencing C.R.S. 35-46-101 *et seq.* clearly stating that a property owner is required to construct and maintain fencing in order to keep livestock off his/her property.

      3. **IRRIGATION DITCH MAINTENANCE.** Language notifying individual lot owners that an irrigation ditch owner has the right to enter the designated irrigation ditch maintenance easement, maintain the ditch, and leave natural debris on the bank.

   f. **ATTORNEY'S OPINION.** The following opinion by the applicant's attorney:

      ATTORNEY'S OPINION
      *I, (printed name of attorney), an attorney at law duly licensed to practice in the State of Colorado, hereby certify that I have examined title to all lands herein dedicated and subdivided. Such title is vested in_____ and is free and clear of all liens, defects, encumbrances, restrictions and reservations except as follows :_____( list same or indicate none).*
      *Dated this _____ day of _____, A.D. 20___.*

BLM_0053299

_____
*Attorney-at-Law*

**g.   DEDICATION.** A Final Plat presented for approval shall contain one of the following statements concerning dedication, which shall be followed by the Notary Statement set forth in (3) below:

**1.   DEDICATION LANGUAGE.**

D E D I C A T I O N

*(I, We), _____(printed name of owner(s), mortgagee(s) and lien holder(s))_____being the owner(s), mortgagee(s) and lien holder(s) of the land described as follows: (insert legal description of land being platted and/or subdivided and include area in acres to two (2) decimal places) in Gunnison County, Colorado, under the name of (complete name of development in capital letters), have laid out, platted and/or subdivided the same as shown on this plat and do hereby permanently dedicate to the public at large the streets, alleys, roads and other public areas as shown hereon and hereby permanently dedicate those portions of land labeled as easements for the installation and maintenance of public utilities as shown hereon.*

*In witness whereof (printed name of the owner) has (have) subscribed (his, her, their) name(s) this _____ day of _____, A.D. 20___.*
*By _____*
*Owner(s), Mortgagee(s) and Lien holder(s)*

**2.   DEDICATION/ALTERNATIVE LANGUAGE.**

D E D I C A T I O N

*(I, We), _____(printed name of owner(s), mortgagee(s) and lien holder(s))_____, being the owner(s), mortgagee(s) and lien holder(s) of the land described as follows: (insert legal description of land being platted and/or subdivided and include area in acres to two (2) decimal places) in Gunnison County, Colorado, under the name of (complete name of development in capital letters), have laid out, platted and/or subdivided the same as shown on this plat and do hereby permanently dedicate and convey to the owners of lots, tracts or parcels within this subdivision and their guests, but not to the public at large, the common right to use streets, alleys, roads and other areas as shown hereon and hereby permanently dedicate those portions of land labeled as easements for the installation and maintenance of public utilities as shown hereon.*

*In witness whereof (printed name of the owner(s)) has (have) subscribed his, her, their name(s) this _____day of _____, A.D. 20_____.*
*By _____*
*Owner(s), Mortgagee(s) and Lien holder(s)*

**3.   NOTARIAL.**

*State of Colorado)*
*) ss.*
*County of Gunnison)*

*The foregoing instrument was acknowledged before me this _____ day of _____, A.D. 20_____, by (printed name of owner(s): if by natural persons here, insert name; if by person acting in a representative official capacity, insert capacity; if by officers of a corporation, then insert the title of said officers and the name of the corporation).*

*My commission expires: _____*
*My address is: _____*
*Witness my hand and official seal:*
*_____ (seal)*
*Notary Public*

**h.   PLANNING COMMISSION APPROVAL.**

G U N N I S O N   C O U N T Y   P L A N N I N G   C O M M I S S I O N   A P P R O V A L

BLM_0053300

*The Planning Commission of Gunnison County, Colorado, hereby recommends _____ approval of this plat of the above subdivision, such recommendation being made at a meeting of said Commission held on this _____ day of _____, A.D. 20_____.*

*Chairperson, Gunnison County Planning Commission*

i. **BOARD OF COUNTY COMMISSIONERS' APPROVAL.** As is consistent with the selected paragraph of dedication, any Final Plat submitted for approval shall contain one of the following statements of approval as appropriate:

1. **BOARD APPROVAL LANGUAGE:**

   **BOARD OF COUNTY COMMISSIONERS' APPROVAL**

   *The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____, and the roads and other public areas are hereby accepted provided, however, that such acceptance shall not in any way be considered as an acceptance for maintenance or snow removal purposes. Maintenance of, or snow removal from, the subject roads shall be only upon a separate Resolution of the Board of County Commissioners passed in accordance with such policies, resolutions or ordinances in effect at that time.*

   *Chairperson, Gunnison County Board of Commissioners*
   *Attest:*

   *Gunnison County Clerk and Recorder*

2. **BOARD APPROVAL: FIRST ALTERNATIVE LANGUAGE:**

   **BOARD OF COUNTY COMMISSIONERS' APPROVAL**

   *The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____, and the private dedication of roads and common areas is approved on the condition that such roads and common areas shall be maintained and snowplowed, by and at the expense of the lot owners and not by Gunnison County or any other public agency.*

   *Chairperson, Gunnison County Board of Commissioners*

   *Attest:*

   *Gunnison County Clerk and Recorder*

3. **BOARD APPROVAL: SECOND ALTERNATIVE LANGUAGE**:

   **BOARD OF COUNTY COMMISSIONERS' APPROVAL**

   *The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____, as a seasonal use development only and not as a development served by a road opened or to be opened on a year-round basis. The roads and other public areas are hereby accepted provided, however, such acceptance shall not in any way be considered as an acceptance for maintenance purposes. Maintenance of, or snow removal from the subject roads shall be only upon a separate resolution of the Board of County Commissioners passed in accordance with such policies, resolutions or ordinances in effect at that time.*

   *Chairperson, Gunnison County Board of Commissioners*

   *Attest:*

   *Gunnison County Clerk and Recorder*

4. **BOARD APPROVAL: THIRD ALTERNATIVE LANGUAGE:**

   **BOARD OF COUNTY COMMISSIONERS' APPROVAL**

   *The within plat of (name of development in capital letters) Is approved this _____ day of _____, A.D. 20_____ as a seasonal use development only and not as a development served by a road opened or to be opened on a year-round basis. The private dedication of roads and common areas is approved on the condition that such roads and common areas shall be maintained and*

BLM_0053301

*snowplowed, by and at the expense of the lot owners and not by Gunnison County or any other public agency.*

_____

*Chairperson, Gunnison County Board of Commissioners*

*Attest:*

_____

*Gunnison County Clerk and Recorder*

5.  **GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE.** (To be placed in the lower right-hand corner of cover sheet.)

GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE

*This plat was accepted for filing in the office of the Clerk and Recorder of Gunnison County, Colorado, on this _____ day of _____, A.D. 20_____, Reception Number _____, Time _____, Date _____.*

_____

*Gunnison County Clerk and Recorder*

6.  **SURVEYOR'S STATEMENT.** A statement, followed by the land surveyor's signature and seal, certifying that the survey was performed by him or under his direct responsibility and supervision and explaining how bearings, if used, were determined.

## SECTION 6-106: MINOR IMPACT REVIEW PROCESS

The following review process (illustrated in the flowchart in Appendix Figure 5: *General Review Process for Minor Impact Projects*) shall apply to applications for Minor Impact projects:

A.  **PRE-APPLICATION CONFERENCE.** The applicant may choose to participate in a Pre-Application Conference before submitting a permit application for a land use change classified as a Minor Impact project, pursuant to Section 3-108: *Pre-Application Conference*.

B.  **SUBMITTAL OF DRAFT COPY.** The Planning Department shall provide and the applicant shall complete an application that contains those materials specified in Section 6-104: *Minor Impact Application*. The applicant shall submit one draft copy of the application to the Planning Department.

C.  **PLANNING DEPARTMENT REVIEW.** Review of the application shall be accomplished as specified in Section 3-110: *Planning Department Review of Application* and shall identify additional submittals that must be submitted by the applicant. If the property is located adjacent to agricultural operations, the Department shall provide a copy of the Right-to-Ranch policy, and a copy of the County's *Code of the West*, pursuant to Article 15: *Right-to-Ranch Policy*.

D.  **TOTAL NUMBER OF COPIES REQUIRED.** Once the Planning Department has determined that the application is complete, the Department shall notify the applicant of the required number of the complete application that must be submitted to provide a copy to each Planning Commission and/or Board member, to applicable review agencies, and for the Department file. A minimum of 15 copies is required. The Department shall, as applicable, forward the application and any relevant comments to the Planning Commission or Board.

E.  **REQUEST FOR REVIEW BY OTHER AGENCIES OR DEPARTMENTS.** The Planning Department may request the professional analysis and recommendations of review agencies, organizations, or technical consultants deemed appropriate and necessary to complete the review, including other County offices and departments; municipal, state, or federal agencies having an interest in or authority over all or part of the proposal; utility  companies; the applicable school district and special service districts serving the proposed development; and engineers, designers, and legal consultants.

1.  **REVIEW AND COMMENT BY REVIEW AGENCIES.** The review agencies that are sent a copy of the application shall be requested to make comments within 21 days of mailing by the Planning Department, unless an extension of not more than 30 days has been requested by the agency before the 21st day. The Department may grant such a reasonable extension if it determines that good cause for the delay has been shown. The failure of any agency to respond within 21 days or within the period of extension shall not be deemed an approval of the application by the agency.

2.  **REVIEW OF AGENCY/DEPARTMENT COMMENTS BY APPLICANT.** The applicant shall have the right to review the comments and recommendations received from the review agencies. The applicant may

BLM_0053302

submit additional information and make changes in the development proposal to respond to the comments of the review agencies; provided, however, that if those changes are substantial or if they significantly alter the nature, character or extent of the application, the Planning Department may, after the changes, refer the application again to some or all review agencies, to obtain additional comments, and may reasonably extend the period of their review accordingly.

**F.  WORK SESSION(S)**. After the Planning Department has determined the application to be complete, the Planning Commission shall conduct a work session or sessions to identify and consider any issues related to the application.

**G.  SITE VISIT(S).** The Board and/or Planning Commission may conduct site visits of the proposed project site if either body determines that the visit will provide information useful to its review of the proposal. Review of the application may be delayed for a reasonable period if inclement weather, or snow or mud conditions delay or prohibit a site visit.

**H.  PUBLIC HEARING.** The Planning Commission shall conduct a public hearing to consider the application. The public hearing shall be conducted pursuant to Section 3-113: *Conduct of Public Hearing.*

    **1.  JOINT PUBLIC HEARING FOR SUBDIVISION.** If the Minor Impact application involves an activity that meets the definition of a subdivision, the Board and Planning Commission shall jointly conduct the public hearing, and the notice shall so indicate; the timing of public notice shall comply with the notice required for Board hearings pursuant to Section 3-112: *Notice of Public Hearing.*

**I.  SUBMITTAL OF INFORMATION NECESSARY FOR FINAL ACTION.** If the Planning Commission, after the public hearing, directs the staff to prepare a recommendation of approval or a decision document, the applicant shall submit the required information pursuant to Section 6-105: *Submittal for Final Action for a Minor Impact Project.*

**J.  PLANNING COMMISSION ACTION.** It is the goal but not the requirement (as scheduling may be affected by limited access, inclement weather, or other unforeseen circumstances) of this *Resolution,* that within 60 days following the close of the public hearing, the Planning Commission shall endeavor to complete its review of the application, considering the relevant materials, testimony and compliance of the application with the applicable standards of this *Resolution,* and shall render either a Recommendation if the application is for a subdivision, or a Decision if the application is a Minor Impact project that is not a subdivision, condominium or townhome, or water impoundment project classified as a Class II dam.

    **1.  DECISION ON APPLICATION THAT IS NOT FOR A SUBDIVISION, CONDOMINIUM OR TOWNHOME DEVELOPMENT, OR WATER IMPOUNDMENT PROJECT CLASSIFIED AS A CLASS II DAM**. If the application is not for approval of a subdivision, condominium or townhome development or a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class II dam, pursuant to Section 13-118: *Water Impoundments,* the Commission shall render a decision, to approve, approve with conditions, or to deny the application. The Decision shall include a summarized description of the project, the Commission's findings and if the decision is to approve the application, a determination that a development improvement agreement is appropriate and improvements for which surety should be required.

        **a.  APPEAL.** A decision by the Planning Commission on an application for a Minor Impact project may be appealed by referral to the Board, pursuant to Section 8-103: *Appeals.*

    **2.  RECOMMENDATION ON SUBDIVISION, CONDOMINIUM OR TOWNHOME DEVELOPMENT, OR WATER IMPOUNDMENT PROJECT CLASSIFIED AS A CLASS II DAM.** If the application is for approval of a subdivision, or condominium or townhome project for which a plat is required or a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class II dam, the Commission shall complete a recommendation to the Board of Commissioners, recommending approval, approval with conditions, or denial, and include a summarized description of the project, the Commission's findings and if for approval, a determination that a development improvement agreement is appropriate and the improvements for which surety should be required.

**K.  DRAFT DEVELOPMENT IMPROVEMENT AGREEMENT** Pursuant to Section 16-117: *Development Improvement Agreement Required*, when public or private improvements are a required component of a Land Use Change Permit, the applicant shall provide a copy of documentation of the certified final cost estimates to the County Attorney's office which will draft a Development Improvement Agreement that references specific amenities of the project that were required by the Preliminary Plan approval, and the method of funding to ensure their completion. The Development Improvement Agreement shall specifically identify such

BLM_0053303

requirements referencing plans, drawings and schedules for completion and shall be substantially in the form referenced in Section 16-117: *Development Improvement Agreement Required.*

L. **BOARD DECISION ON OPTIONAL BOARD PUBLIC HEARING ON SUBDIVISION, CONDOMINIUM OR TOWNHOME DEVELOPMENT, OR WATER IMPOUNDMENT PROJECT CLASSIFIED AS CLASS II DAM.** If the application is for a subdivision or condominium or townhome development or a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class II dam, the Board shall have the option of conducting a public hearing to consider the application and the Planning Commission's recommendation. Within 20 days of receipt of the Planning Commission's recommendation, the Board shall determine whether or not to conduct a public hearing. A decision to conduct or not to conduct such a hearing shall be based on the Board's determination of whether it is in the public interest to do so, considering among other factors the following:

1. **LEVEL OF PUBLIC INTEREST.** There has or has not been substantial public interest in the proposal; or

2. **IDENTIFICATION OF NEW ISSUES.** Whether it is reasonably probable that new issues related to the application of the proposed land use change will be identified; or

3. **IDENTIFICATION OF NEW INFORMATION.** Whether it is probable that new information related to the application will be provided.

4. **BOARD PUBLIC HEARING.** If the Board chooses to conduct a public hearing, the following shall apply:

   a. **HEARING NOTICE.** Public notice that the Board will conduct a public hearing to consider the Preliminary Plan shall be pursuant to Section 3-112: *Notice of Public Hearing.*

   b. **CONDUCT OF HEARING.** The Board hearing shall be conducted pursuant to Section 3-113: *Conduct of a Public Hearing.*

M. **BOARD ACTION.** Within 35 days after receipt of the Planning Commission recommendation if the Board did not conduct another public hearing, or within 35 days after closure of the hearing if the Board conducted another public hearing, the Board shall act within approve, approve with conditions, refer the application back to the Planning Commission for additional review, or deny the application. The Board's decision shall be entered into the official minutes of the meeting and shall contain the necessary findings of fact and reasons to support the decision. If the Board does not make separate findings of fact, it shall be presumed to have adopted the findings and recommendations of the Planning Commission. If the application is referred back to the Planning Commission for additional review, the Board shall, within 60 days after receipt of the Planning Commission's additional recommendation, approve, approve with conditions, or deny the application.

1. **ADDITIONAL PLANNING COMMISSION REVIEW.** Before it takes action on the application, the Board may refer the application back to the Planning Commission for further consideration and recommendations if at least one of the following circumstances is present:

   a. **NEW INFORMATION SUBMITTED.** There has been information submitted that was not available for consideration by the Commission before its recommendation; or

   b. **INSUFFICIENT EVALUATION.** There are substantive issues or requirements of this *Resolution* that were not sufficiently evaluated in the Commission's recommendations; or

   c. **SUBSTANTIVE ALTERATION.** There has been a substantive alteration to the plan subsequent to the Commission's recommendation; or

   d. **NEED FOR CLARIFICATION.** There is an element of the Planning Commission's recommendation that requires clarification.

N. **RECORDATION OF CERTIFICATE.** Within 30 days following approval of the Minor Impact project application, the Planning Director shall record a *Certificate of Minor Impact Project Approval* in the Office of the Gunnison County Clerk and Recorder's Office. The Certificate shall summarize the specific project, the legal description of the subject property, include reference to the approval by the relevant decision-making body, the date on which the approval occurred, and shall include as an attached exhibit a copy of any resolution or other decision document memorializing the approval.

O. **RECORDATION OF SUBDIVISION PLAT.** If the Land Use Change Permit approval is for a subdivision plat, within 120 days of the date of approval of the application by the Board the County shall file, or shall oversee the filing of, the plat in the Office of the County Clerk and Recorder. Approved protective covenants shall be

BLM_0053304

recorded in the Office of the Clerk and Recorder at the same time the plat to which they relate is filed in that office.

**P.   INSUBSTANTIAL CHANGES AND AMENDMENTS.** Insubstantial changes to an approved Minor Impact project may be authorized by the Planning Director without an additional public hearing.

    **1.   LIMITS ON INSUBSTANTIAL CHANGES.** Insubstantial changes shall be limited to technical or engineering considerations that arise during final design or during actual construction, or similar minor modifications to features of the project that are necessary to address technical constraints or unanticipated consequences.

    **2.   ACTIVITIES NOT CONSIDERED INSUBSTANTIAL CHANGES.** Activities that shall not be considered insubstantial changes and may not be authorized by the Planning Director include changes to the overall character of the project, changes that substantially increase the project's trip generation or the demand for public facilities, and changes that are inconsistent with a condition or representation of the project's original approval. Such activities shall be considered amendments of the plan and may only be authorized by the applicant's submitting a new application and repeating the review process for a Minor Impact project.

BLM_0053305

# ARTICLE 7:
# MAJOR IMPACT PROJECTS

This Article establishes the review process, application submittal requirements, and review standards that apply to the re-view of Land Use Change Permit applications for development classified as Major Impact projects.

## DIVISION 7-100:
## CLASSIFICATION, STANDARDS AND GENERAL REVIEW STEPS FOR MAJOR IMPACT PROJECTS

### SECTION 7-101: PROJECTS CLASSIFIED AS MAJOR IMPACT

The following uses shall be classified reviewed as Major Impact projects:

A. **MORE THAN FOUR UNITS.** More than four units that are subdivision lots, duplex units, or multiple-family residences.

B. **NEW COMMERCIAL, INDUSTRIAL LARGER THAN 5,000 SQ. FT. OR FIVE ACRES.** A new commercial or industrial use of more than 5,000 sq. ft. of structure, or on a parcel of more than five acres, or which, because of projected traffic, hours of operation, or type of use, may be classified as a Major Impact project, or would be the first instance of a commercial or industrial land use in an area in which no other commercial or industrial land use currently exists.

C. **EXPANSION OF COMMERCIAL OR INDUSTRIAL USE OF 10,000 SQ. FT. OR MORE.** Expansion of a commercial or industrial use, existing as of the effective date of this *Resolution*, of 10,000 sq. ft. or more.

D. **LARGE NEW OR EXPANDED MINING OPERATIONS.** New or expanded mining operations that operate for more than 180 days per year, produces more than 10,000 tons of ore/waste per year, or affects more than two surface acres of land, pursuant to Division 9-400: *Exploration, Extraction and Processing of Minerals and Construction Materials.*

E. **LARGE CONSTRUCTION MATERIALS OPERATIONS.** Any sand, gravel or quarry operation providing material that will operate for more than two years, pursuant to *Division 9-400: Exploration, Extraction and Processing of Minerals and Construction Materials.* Larger operations may require review under the *Gunnison County Special Development Projects Regulations.*

F. **WATER IMPOUNDMENT PROJECTS CLASSIFIED AS CLASS I DAMS**. New projects, or facilities, or expansion of existing projects or facilities, that involve the design, construction and operation of a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class I dam, pursuant to Section 13-118: *Water Impoundments.*

G. **TRANSMISSION LINES.** Construction of a new transmission line(s) in an area in which no line(s) currently exists, but not including a project for which a Land Use Change Permit has been granted in which the design, construction, location and impacts of the utility line(s) were reviewed and approved.

H. **PRECEDENT FOR FUTURE LAND USE THAT IS DIFFERENT THAN EXISTING USE.** Any proposal that sets a precedent for future land use that is significantly different than existing land uses in the impact area.

### SECTION 7-102: STANDARDS OF APPROVAL FOR MAJOR IMPACT PROJECTS

An application for a Land Use Change Permit for a Major Impact project shall comply with the standards of this section. Compliance of the proposed land use change with these standards shall be determined broadly and

BLM_0053306

conceptually during Sketch Plan review, in detail during Preliminary Plan review, and definitively during Final Plan review.

**A. COMPLIANCE WITH ALL APPLICABLE STANDARDS.** The proposed land use change shall comply with, and the burden shall be on the applicant to demonstrate through competent evidence, that the proposed land use change complies with all applicable requirements of this *Resolution*.

**B. COMPATIBILITY WITH COMMUNITY CHARACTER.** The proposed land use change shall be compatible with, or an enhancement of, the character of existing land uses in the development area, and shall not adversely impact the future development of the development area.

**C. PHASES REQUIRED TO "STAND ALONE" IN PROVIDING SERVICES.** If the land use change is to be developed in phases, then each phase shall contain the required roads, bridges, utilities, landscaping, and other improvements that are necessary and desirable for residents of the project. If the land use change incorporates any amenities for the benefit of the County, such as trail connections, these shall be constructed within the first phase of the project, or, if this is not possible, then at a time defined and agreed upon as part of the Development Improvement Agreement at Final Plan approval.

**D. USES SHALL BE IDENTIFIED.** The Board shall not approve any subdivision that creates any new lot for which no uses have been identified.

## SECTION 7-103: GENERAL REVIEW STEPS FOR MAJOR IMPACT PROJECTS

**A. PURPOSE.** Major Impact Projects require the consideration by the County of a Sketch Plan, Preliminary Plan, and Final Plan, in that order. This Section provides an overview of what is expected to occur during reviews of each of those plans. Each step is a distinct process involving the submittal of an application, an application fee, required plans and reports, referrals of the proposal to other agencies, staff analysis, work sessions and public hearings. At each step of the process the design and engineering detail increases in order to relieve the applicant from major and potentially unnecessary expenses in situations that may require a redesign and a revision of expensive engineering or planning reports. Approval at any step in the process does not ensure approval at the next step.

**B. SKETCH PLAN IS EXPLORATORY.** Sketch Plan review provides an opportunity for the County, the applicant, and the public to engage in an exploratory discussion of a proposed land use change, to examine alternative approaches to development of the property, to participate in a process of joint planning and negotiation between the County and the applicant to promote development and land use change which is consistent with the intent and purposes of this *Resolution*.

    **1. SKETCH PLAN EXPECTED TO EVOLVE.** Requirements of Sketch Plan direct the applicant to review specific sections of this *Resolution* and submit a plan that has addressed issues important to the County. It is expected that the proposal will evolve during Sketch Plan review.

    **2. ENGINEERED DESIGNS AND DETAILED PLANS NOT REQUIRED NOR ACCEPTED AT SKETCH PLAN.** To encourage the consideration of alternatives and to allow the Sketch Plan to evolve, detailed engineering plans and other overly detailed information shall not be required nor accepted by the County.

**C. PRELIMINARY PLAN PROVIDES DETAILED SOLUTIONS AND DESIGN.** Preliminary Plan review requires the applicant to formulate detailed, designed/engineered solutions to the issues and concerns identified during Sketch Plan review, and to address, in a site-specific manner, all other issues that are relevant to the Preliminary Plan. The burden in the Preliminary Plan review is on the applicant to provide detailed information and mitigation proposals for evaluation.

    **1. PRELIMINARY AND FINAL PLANS MAY BE COMBINED.** The Preliminary Plan and Final Plan may be combined and processed together based upon consideration of the following factors: design, size, public concern, public facilities and services.

**D. FINAL PLAN FORMALIZES PROJECT.** The purpose of the Final Plan review procedure is to provide a permanent and accurate public record of the development plan: exact size, shape and location of all approved activities and uses, and, as applicable, lots, blocks, streets, easements and other parcels of land within the development, together with all applicable protective covenants, conditions, use restrictions and design and development criteria. A Final Plan or plat shall conform in all respects to the Preliminary Plan previously reviewed and approved by the Board and shall incorporate all modifications and special conditions required by the Board.

BLM_0053307

# DIVISION 7-200:
# SKETCH PLAN FOR MAJOR IMPACT PROJECTS

## SECTION 7-201: SKETCH PLAN APPLICATION FOR MAJOR IMPACT PROJECTS

**A.  NOTIFICATION TO COUNTY IF FEDERAL PERMITS REQUIRED FOR PROJECT**. When an EA or EIS or other state or federal action or permit is required, and that requirement is known by the applicant, the applicant shall notify the County of that requirement when the application is first submitted for review.

**B.  LOCATION OF SITE WITHIN SPECIAL GEOGRAPHIC AREA OR DISTRICT.** As applicable, an application proposing a land use change on a parcel located within a designated Special Area or special district may be required to comply with regulations of that Area or district.

**C.  AREA AND PHASING OF DEVELOPMENT**. The Sketch Plan application shall relate to all of the area proposed for immediate or future development, including all contiguous land under ownership by the applicant. If phasing is proposed by the applicant or determined by the County to be appropriate, the general concept of that phasing shall be addressed.

**D.  APPLICATION AND REVIEW FEES**. In order to compensate the County for the cost of reviewing and processing the Sketch Plan, each applicant shall pay the required fee, as shown in a schedule of fees issued by the Planning Department that is adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

    **1.  COST FOR PUBLIC HEARING NOTICE(S)**. In addition to the Sketch Plan submittal fee, the applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112:  *Notice of Public Hearing*.

**E.  COPY OF PROPERTY TAX CERTIFICATE.** One copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

**F.  SUBMITTAL OF DRAFT COPY OF NARRATIVE AND MAP SUBMITTALS**. The applicant shall submit one draft copy of the Sketch Plan application to the Planning Department.   The Sketch Plan includes both a narrative describing elements of the proposed project, and maps and layout plans than illustrate it.

**G.  TOTAL NUMBER OF COPIES REQUIRED.** Once the Planning Department has determined the submittal to be complete, it shall determine the number of copies of the Sketch Plan application that are necessary for review and action by the Planning Commission and/or Board, and other review agencies or County departments, and shall notify the applicant of the number of copies of the complete plan that are required to be submitted.

**H.  GENERAL INFORMATION IN NARRATIVE.** The narrative is required to include at least the following information, presented in the same order as it is listed in this Section, in a stapled or otherwise bound document, on consecutively numbered pages and including a *Table of Contents*:

    **1.  APPLICANT.** The name, address, telephone and fax numbers, and e-mail address for the applicant. If the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and also stating the same information for the agent.

        **a.  APPLICANT IS NOT THE OWNER**. If the applicant is not the owner of the land, or is a contract purchaser of the land, the applicant shall submit a notarized letter signed by the owner consenting to the submittal. Consent of the owner for submittal shall imply consent by the owner for the County to complete the review process pursuant to this *Resolution*.

        **b.  APPLICANT IS NOT THE SOLE OWNER.** If the applicant is not the sole owner of the land, the applicant shall submit a notarized letter(s) signed by all other owners, and/or by an association or corporation representing the owners, consenting to, or joining in, the application.

    **2.  PROPERTY OWNER**. Name, address, telephone and fax numbers and email address of the owner of the property and, if other than the applicant, a notarized letter from the owner consenting to the application.

BLM_0053308

3. **PROPERTY LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel ( such as mileage from highway or County road, or other recognized landmarks) on which the land use change is proposed to be located. A copy of the recorded deed to the property should be included.

4. **DATE OF APPLICATION.** The date the application was prepared.

5. **STATUS OF PARCEL AS A LEGAL LOT.** If the parcel on which the land use change is proposed is smaller than 35 acres, the Department may also request the applicant to supply information sufficient to document that the subject was legally created.

6. **LIST OF ADJACENT LANDOWNERS.** As applicable, a listing of all landowners and land uses that are adjacent to the boundaries of the entire parcel on which the project is proposed, including all properties that are separated from the parcel by a roadway or would be adjacent to the property except for the existence of the roadway. When the parcel is located adjacent to a municipality, a platted townsite or platted recorded subdivision, all owners of surface property rights within 500 feet of each boundary of the entire parcel shall be included in the listing. The source for the best-available information to identify those landowners is the Gunnison County Assessor's Office.

7. **IDENTIFICATION OF PRESENT LAND USE AND PREVIOUSLY-APPROVED USES.** Identification of present land use, locations, and sizes of structures that exist on the subject property. Land Use Change Permits or other permitted activities that were previously approved for the parcel on which this land use change is proposed.

8. **MINERAL RESOURCES.** Indication of mineral resources that are known, or reasonably believed to be located in the property proposed for the land use change, whether the area has been the site of underground or surface mining activity, and whether an original patent has been issued to the property under federal mining law. If reasonably available, a list of the owners or lessees of underlying mineral estates is to be included.

9. **PROJECT DESCRIPTION.** A description of what the applicant wants to do on or to the property, including the following:

   a. **USES AND ACTIVITIES, NUMBERS OF UNITS, OR SIZES OF USES.** Proposed uses or activities, division of land, adjustment of boundaries, expansion of existing uses, construction, materials to be stockpiled, indoor and outdoor storage areas. Numbers of units or lots. Estimated square footage or acreage of commercial, industrial or other uses. The proposed number of residential and/or other units and estimated square footage of structures may be expressed as a range, provided the top end of the range is no more than 20 percent higher than the bottom end of the range.

   b. **DESCRIPTION OF OFF-SITE RESOURCES.** Description of off-site resources such as gravel and haul routes as may be necessary to accomplish the project.

   c. **SEASONS AND HOURS OF OPERATION.** As applicable, the seasons of the year in which the activity is proposed to be conducted, and the intended hours of operation.

   d. **PHASES.** Any phases that may be proposed within a Final Plan for the development.

I. **MAPS AND SITE PLAN SHEETS.** Maps shall be at a scale and sheet size to permit adequate review, but sheet size shall not exceed 24 inches by 36 inches. Each map or layout of the site plan shall be separate, and folded to a size to allow mailing or storage within a standard legal-sized folder; maps shall not be submitted in a rolled form. Elements required to be submitted in map or layout form may be combined on one or more sheets of the submittal, so long as all elements are legible. The following elements shall be included on the map submittals:

1. **VICINITY MAP (**illustrated in Appendix Figure 2: *Vicinity Map Example*)**. VICINITY MAP.** A vicinity map, which at a minimum includes the following (as illustrated in Appendix Figure 2: *Vicinity Map Example*):

   a. **PROPERTY LOCATION AND NEARBY PARCEL SIZES AND LAND USES.** Location of the property on a United States Geological Survey quadrangle map or on a recorded plat if the proposed development is within an approved subdivision, with the location highlighted so that it is easy to see, and that clearly shows sizes of parcels and land uses within a half-mile of the proposed project.

   b. **ROADS.** All U.S. and state highways and nearest County or Forest Service, Bureau of Land Management, and/or subdivision/private roads that provide access to this proposed project.

BLM_0053309

    c. **BOUNDARIES OF DISTRICTS, MUNICIPALITIES OR SUBDIVISIONS**. Locations of special district boundaries, municipalities or residential subdivisions within a half mile of the property.

    d. **PROXIMITY OF MINING OR PROCESSING ACTIVITY**. Any parcel located within 1,000 feet of the property proposed for land use change on which there exists an operation involving mineral exploration or extraction or construction materials processing.

2. **NATURAL FEATURES**. A map or maps identifying the general locations of the following elements, and any other significant visual or other resource areas on the property:

    a. **MAPS AND TABLES OF SOILS TYPES**. Maps and tables, describing the suitability of the existing soil types for the proposed development, using standard soil classifications and process; information available from the U.S.D.A. Natural Resources Conservation Service is suitable for this submittal. .

    b. **TOPOGRAPHY/CONTOURS.** Topography, as depicted on a United States Geologic Survey map, or its equivalent.

    c. **SLOPE ANALYSIS MAP.** Topography shall be classified into areas having a slope of 0-15 percent, 15-30 percent, and greater than 30 percent.

    d. **WILDFIRE HAZARD MAPS.** Wildfire Area Hazard Maps prepared by the Colorado State Forest Service.

    e. **GEOLOGIC HAZARD MAPS.** Geologic Hazard Maps prepared by the Colorado Geologic Survey, or their equivalent, as prepared by a professional geologist.

    f. **WILDLIFE HABITAT MAPS.** Wildlife Habitat Maps prepared by the Colorado Division of Wildlife, and Gunnison Basin Sage Grouse Habitat Maps (in the Gunnison County Sage Grouse Conservation Plan), or maps prepared by the applicant's wildlife consultant.

    g. **WETLANDS MAPS.** Existing wetlands identification maps; if no existing identification maps exist, that mapping will be required, conducted by a wetlands delineator and submitted as part of the Preliminary Plan.

    h. **FLOODPLAINS**. Floodplain maps provided pursuant to the Federal Emergency Management Act, and available in the Planning Department, or site-specific maps prepared by a qualified professional engineer, licensed in the state of Colorado. That mapping will be required, conducted and submitted as part of the Preliminary Plan, pursuant to Section 11-103: *Development in Areas Subject to Flood Hazards*.

    i. **PROMINENT RIDGELINES**. Prominent ridgelines, pursuant to the list of "ridgeline vantages" in Section 11-108: *Standards for Development on Ridgelines*, and/or other significant visual resources on the property.

    j. **VEGETATION**. Existing groves of trees and other major types of vegetation.

3. **SITE PLAN**. A map including the area within a half mile of the boundaries of the parcel on which the project is proposed, and including the following:

    a. **PROXIMITY OF MINING OR PROCESSING ACTIVITY**. Any parcel located within 1,000 feet of the property proposed for land use change on which there exists an operation involving mineral exploration or extraction or construction materials processing.

    b. **ROADS.** All U.S. and state highways and nearest County or Forest Service, Bureau of Land Management, and/or subdivision/private roads that traverse and/or provide access to this proposed project..

    c. **EASEMENTS.** Easements recorded or historically used that provide access to or across, or other use of, the property.

    d. **TRAILS, PARKS OR ACCESS TO PUBLIC LANDS.** Any physically existing and/or dedicated trails, parks, or access points to public lands.

    e. **EXISTING LAND USES**. Existing land uses within a half mile of the proposed site, and those along any access road serving the proposed development.

4. **DEVELOPMENT LAYOUT MAP**. The development layout map shall include the following:

BLM_0053310

    **a.**  **ALL PROPERTY PROPOSED FOR DEVELOPMENT**. All land proposed for immediate or future development.

    **b.**  **PHASES**. Locations of any contemplated phases of the proposed development.

    **c.**  **LOCATIONS OF LOTS AND STRUCTURES.** Locations of existing and proposed lots and/or structures, and, as applicable, the anticipated locations of residential, commercial, industrial, or other structures, or non-structural areas of activity.

    **d.**  **OPEN SPACE.** The general locations and dimensions of proposed open space. The requirements of Section 13-108: *Open Space and Recreation Areas* shall guide the design of the Sketch Plan.

    **e.**  **PARKING AREAS.** The general locations of all proposed parking areas and the approximate number of spaces each will contain. The requirements of Section 13-110: *Off-Road Parking and Loading* and the minimum distances listed in Appendix Table 3*: Off-Road Parking Requirements* shall guide the design of the Sketch Plan.

**J.**  **ROADS AND TRAILS SYSTEM PLAN**. The general locations and alignment of entry roads to the property from off-site and primary roads and proposed driveway locations, trails or sidewalks on-site. Identification of federal, state and County roadways that will provide access to the proposed project. The requirements of Section 12-103: *Road System* and Section 12-104: *Public Trails*  shall guide the design of the Sketch Plan.

**K.**  **ACCESS AND OTHER EASEMENTS.** All known easements, recorded or historically used, that provide access to or across, or other use of, the property, including but not limited to, those for utilities, irrigation and drainage ditches, drainage swales, headgates, roads and trails, egress/ingress, or other access affecting the property shall be shown on the Sketch Plan.

**L.**  **FLOOD HAZARD AREAS.** When a land use change is proposed on a parcel located within a floodplain hazard area as delineated on maps described in Section 11-103: D: *Official Maps* or the National Flood Insurance Rate Maps (FIRM) prepared by the Federal Emergency Management Agency (September 29, 1989, as amended) the narrative, map and design layout of the Sketch Plan shall be guided by the requirements of Section 11-103: *Development in Areas Subject to Flood Hazards*.

**M.**  **GEOLOGIC HAZARD AREAS.** When a land use change is proposed on a parcel located in a geologic hazard area as delineated on Geologic Hazard Maps prepared by the Colorado Geologic Survey the narrative, map and design layout of the Sketch Plan shall address and be guided by the requirements of Section 11-104: *Development in Areas Subject to Geologic Hazards*.

**N.**  **LOCATION OF SITE WITHIN WILDFIRE HAZARD AREA AND FIRE PROTECTION.** The narrative, map and layout design of the Sketch  Plan shall be guided by the requirements of Section 11-105: *Development in Areas Subject to Wildfire Hazard* and Section 12-107: *Fire Protection*, and include measures to minimize the potential that the proposed uses will generate or increase wildfire

**O.**  **WILDLIFE HABITAT.** When a land use change is proposed on a parcel located in a wildlife habitat area as delineated on Wildlife Habitat Maps referenced by the County, the narrative, map and design layout of the Sketch Plan shall be guided by the requirements of Section 11-106: *Protection of Wildlife Habitat Areas*.

**P.**  **LOCATION OF SITE WITHIN AREA POTENTIALLY AFFECTED BY WETLANDS AND WETLANDS PERMITTING.** The narrative, map and layout design of the Sketch Plan shall be guided by the requirements of Section 11-107: *Protection of Water Quality*, depict locations of water bodies, and acknowledge that the property may be subject to design constraints of Restrictive Inner Buffers, and Variable Outer Buffers as regulated by that Section.

**Q.**  **DEVELOPMENT ON RIDGELINES**. If the proposed land use change is on property in which there are land formations visible from any ridgeline vantage as defined by this *Resolution*, and described pursuant to Section 11-108: *Standards for Development on Ridgelines,* the narrative, map and layout design of the Sketch Plan shall be guided by the requirements of that Section.

**R.**  **DEVELOPMENTS IMPACTING AGRICULTURAL LANDS**. If the proposed land use change adjoins agricultural lands, involves land through which irrigation ditches flow, or over which there are general or exclusive easements for stock drives, the narrative, map and design layout of the Sketch Plan shall be guided by the requirements of Section 11-109: *Development That Affects Agricultural Lands*, and  Section 15-103: *Right-to-Ranch Policy* and shall identify the following:

    **1.**  **AGRICULTURAL LAND OWNER**. The location(s) and name(s) of owner(s) of any agricultural land(s) adjoining or possibly impacted by the proposed land use change.

BLM_0053311

2. **AGRICULTURAL DITCH.** The location(s), name(s), name(s) of owner(s), size(s), and decreed capacity(ies) of any agricultural ditch crossing or adjoining the development property, as available from the Colorado Division of Water Resources, or ditch commissioner's records.

3. **EASEMENTS**. The location of historical easements used to gain access to headgates, ditches, and fences for maintenance or operations.

4. **LIVESTOCK DRIVES AND FENCELINES.** Historic or recorded stock drive easements crossing or adjoining the development property, including the location of any existing fences along property lines, and the location of new fences or other obstacles proposed to be built across any such stock drive.

**S.  LANDS BEYOND SNOWPLOWED ACCESS.** If the proposed land use change is on property located where there previously has been no snowplowed access, narrative, map and layout design of the Sketch  Plan shall be guided by Section 11-110: *Development of Land Beyond Snowplowed Access*.

**T.  DEVELOPMENT ON INHOLDINGS IN NATIONAL WILDERNESS**. If the proposed land use change is on property located on an inholding within a national Wilderness Area, the narrative, map and design layout of the Sketch Plan shall be guided by Section 11-111: *Development on Inholdings in the National Wilderness*.

**U.  DEVELOPMENT ON PROPERTY ABOVE TIMBERLINE.** If the proposed land use change is on property located above timberline the narrative, map and design layout shall be guided by Section 11-112: *Development on Property Above Timberline.*

**V.  WATER SUPPLY PLAN.** A report addressing the requirements of Section 12-105: *Water Supply*, to demonstrate that, for the type of development proposed, the water supply is sufficient in terms of quality, quantity and dependability. Documentation shall include the following:

1. **QUALITY**. Evidence shall be submitted concerning the potability of the proposed water supply.

2. **TESTS FOR POTABILITY.** If the water is intended for human consumption, the applicant shall find the closest existing well that lies within the same aquifer as well(s) proposed to provide a source of water for the proposed land use change, and shall make a good faith effort to obtain and submit water quality testing results from that well that demonstrate the potability of the proposed water supply.

3. **QUANTITY.** Evidence shall be submitted that the proposed water source will actually supply an adequate quantity of water to the proposed development, including, but not limited to:

   a. **HISTORIC USE**. Evidence of the historic use and yield of the claimed water rights; or

   b. **HYDROLOGIST'S REPORT**. A report of a qualified hydrologist; or

   c. **PUMPING TEST RESULTS.** Pumping test results on nearby existing well or wells, located within the same aquifer as the proposed well(s); or

   d. **EVIDENCE OF CENTRAL WATER SUPPLY.** If applicable, evidence that a public or private water provider can and will supply water adequate to serve the proposed development, stating the amount of water available for use within the development, and the feasibility of extending service to that area. In determining the amount of water available, the water provider shall consider, and provide documentation of, existing commitments to provide water at a future date to users in other than the applicant.

   e. **IRRIGATION NEEDS**. The estimated amount of irrigated acreage required for the proposed use.

   f. **FIREFLOW**. The estimated amount of water required to provide adequate fire flow, pursuant to Section 12-107: *Fire Protection.*

   g. **POTABLE WATER DEMAND**. A statement as to whether or not some of the water must be potable and is intended for human consumption. If potable water is to be provided, the following are to be addressed:

      1. **ESTIMATED AVERAGE DAILY DEMAND.** Estimated average daily demand of the entire service area and the proposed development. Demand calculations are to be based upon 350 gallons per day (gpd) per residence, year-round. Estimated average daily demand for commercial and industrial users will be reviewed based on the proposed uses and levels of use.

      2. **ESTIMATED MAXIMUM DAILY DEMAND.** Estimated maximum daily demand based on a figure of three times the average daily demand.

BLM_0053312

3. **ESTIMATED PEAK HOUR DEMAND**. Estimated peak hour demand based on a figure of six times the average daily demand.

h. **WATER RIGHTS**. Evidence of ownership or right of acquisition or use of existing water rights shall be submitted, including, but not limited to:

1. **DEEDS OR COURT DECREES.** Copies of deeds or court decrees giving the applicant the absolute right to use an existing water right for the proposed use; or

2. **EXECUTED AGREEMENTS**. Copies of executed agreements or conditional court decrees giving the applicant the right to use water for the proposed use at some future time under specified conditions; or

4. **ATTORNEY'S LETTER ABOUT FEASIBILITY**. If further court action in the nature of an application for change in use of a water source, or change in point of diversion and/or plan of augmentation will ultimately be required, a letter from a licensed Colorado attorney briefly describing that court action and expressing an opinion as to the feasibility of the success of that action and the feasibility that existing rights can be changed.

W. **SEWAGE DISPOSAL**. A report that identifies whether sewage disposal/wastewater treatment will be accomplished by individual sewage disposal systems or by a central wastewater treatment system.

1. **NEW CENTRAL WASTEWATER TREATMENT SYSTEM**. If a new central wastewater treatment system is planned, then the estimated daily number of gallons of sewage generated by the proposed development shall be provided, along with a general description or discussion of the proposed method of treatment or disposal including the estimated capacity and general location of the proposed system.

2. **USE OF EXISTING CENTRAL WASTEWATER TREATMENT SYSTEM**. If use of an existing central wastewater treatment system is proposed, the following shall be submitted:

   a. **COMPLIANCE WITH CDPHE REQUIREMENTS**. Documentation from the system operator that the system is in compliance with the applicable permitting and operation requirements of Colorado Department of Public Health and Environment.

   b. **CONFIRMATION OF WILLINGNESS TO SERVE**. Documentation attested by the proposed provider indicating that there is sufficient capacity and willingness to provide the service.

3. **USE OF INDIVIDUAL SEWAGE DISPOSAL SYSTEMS REQUIRES INITIAL COUNTY EVALUATION.** If individual sewage disposal systems are proposed, the applicant shall contact the Gunnison County Environmental Health Official to schedule an on-site visit. The on-site evaluation shall be conducted at the expense of the applicant, and is intended to provide only an initial and cursory observation of the feasibility of individual systems on the proposed development site. The Official will provide a report of the evaluation to the applicant and to the Planning Commission.

X. **GENERAL SITE PLAN STANDARDS AND LOT MEASUREMENTS.** The narrative, map and design layout shall address and comply with the requirements of Section 13-103: *General Site Plan Standards and Lot Measurements*.

Y. **SETBACKS FROM PROPERTY LINES AND ROAD RIGHTS-OF-WAY.** The narrative, map and design layout shall address and comply with the setback requirements of Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way*.

Z. **LANDSCAPING PLAN.** A conceptual landscaping plan shall be submitted, pursuant to Section 13-111: *Landscaping and Buffering.*

AA. **RECLAMATION AND NOXIOUS WEED CONTROL**. A Sketch Plan application shall acknowledge that an *Earthmoving Site Revegetation and Noxious Weed Control Plan*, as designed and/or approved by the Gunnison Basin Weed Specialist pursuant to Section 13-115: *Reclamation and Noxious Weed Control* will be required to b prepared for the Preliminary Plan submittal, if the Sketch Plan is approved.

BB. **GRADING AND DRAINAGE PLANS.** The Sketch Plan application narrative, map and design layout shall be guided by the requirements of Section 13-116: *Grading and Erosion Control* and Section 13-117: *Drainage, Construction and Post-Construction Storm water Runoff.*

CC. **WATER IMPOUNDMENTS**. If water impoundments are proposed as part of the proposed development, the Sketch Plan application narrative, map and design layout shall indicate that  impoundments are to be part of the plan the submittal shall be guided by the requirements of Section 13-118: *Water Impoundments.*

BLM_0053313

DD. **SCHOOLS, PARKS, AND COMMON AREAS.** The Sketch Plan application shall identify those areas that are proposed to be set aside for schools, parks, or common areas, as applicable.

1. **SCHOOL LAND REQUIREMENTS SHALL COMPLY WITH AGREEMENT**. When a separate intergovernmental agreement exists between Gunnison County and the school district within whose boundaries the development is located, the dedication of land, payment-in-lieu, or a combination of dedication and payment, shall comply with that agreement.

EE. **SOLID AND HAZARDOUS WASTES**. The Sketch Plan application shall describe:

1. **DISPOSAL METHOD.** The method to be used by the development for the disposal of solid wastes; and

2. **HAZARDOUS SUBSTANCES.** Whether the development can reasonably be expected to produce hazardous substances or hazardous waste materials, as defined by Colorado law.

FF. **PROTECTIVE COVENANTS OR RESTRICTIONS.** If the proposed land use change is for a subdivision or condominium/townhome development, the applicant shall submit a narrative outline of the protective covenants and/or a general listing of design criteria that will be applied in the development of the subdivision and a provision for the enforcement of the covenants by property owners in the subdivision, and by Gunnison County. The criteria shall create a consistent design theme for the development and shall address, at a minimum, the following items:

1. **RESPONSIBILITIES OF HOMEOWNERS' ASSOCIATION** Responsibilities of property owners or homeowners' association to collect dues, maintain common areas, improve infrastructure common to the development, maintenance of a decreed water augmentation plan and the augmented water supply, treatment of wastewater and/or water, and to oversee the maintenance of the general appearance of the development.

2. **COUNTY IS PARTY TO ENFORCEMENT OF PROTECTIVE COVENANTS IN A SUBDIVISION**. Language that allows and requires enforcement of the protective covenants by property owners if the development and that names Gunnison County as a party to enforcement.

3. **COUNTY IS PARTY TO AMENDMENT OR TERMINATION**. Language that requires that amendment or termination of the protective covenants is subject to approval by Gunnison County.

4. **DESIGN CRITERIA.** Design criteria that will govern construction within the proposed development. The applicant should become familiar with and comply with the requirements of the following listed sections of this *Resolution*, in drafting covenants for the Sketch Plan level of review, and address the following:

5. **BUILDING SCALE AND LOCATION.** Language defining building heights, compatibility with terrain, and sizes of all structures that will be allowed by the protective covenants. Section 11-108: *Standards for Development on Ridgelines*, Section 13-103: *General Site Plan Standards and Lot Measurements,* Section 13-105: *Residential Building Sizes and Lot Coverages*

6. **ARCHITECTURAL STYLE AND EXTERIOR APPEARANCE.** Language describing the architectural style that will be required of all structures in the proposed development, and the types and colors of exterior materials to be used, including siding and roofing.

7. **ENERGY AND RESOURCE CONSERVATION.** Language advising lot owners that an application to Gunnison County for a residential Building Permit must comply with all applicable building codes adopted and amended by Gunnison County, and with any applicable energy and resource conservation standards currently required by the County.

8. **SOLID-FUEL-BURNING DEVICES.** If solid-fuel-burning devices are proposed to be used in the development, restrictions shall be listed ensuring compliance with Section 13-107: *Installation of Solid-fuel-burning Devices.*

9. **EXTERIOR LIGHTING.** Language that includes requirements that comply with those specified by Section 13-114: *Exterior Lighting.*

10. **USE AND MAINTENANCE OF OPEN SPACE AREAS**. As applicable, language shall be included that lists uses allowed on, and requires maintenance of common open space areas by the homeowners association, or other appropriate entity. The applicant should become familiar with and comply with the requirements of Section 13-108: *Open Space and Recreation* Areas in drafting covenants for the Sketch Plan level of review.

BLM_0053314

11. **SIGNS.** Language shall be included that informs property owners or other land users within the proposed development that installation of signs requires compliance with the Gunnison County regulations and may require a Gunnison County Sign Permit.

12. **RULES CONCERNING PARKING**. Language concerning limitations on parking within the development and/or outside the development by users of the development. The applicant should become familiar with and comply with the requirements of Section 13-110: *Off-Road Parking and Loading* in drafting covenants for the Sketch Plan level of review.

13. **LANDSCAPING AND BUFFERING**. Language addressing installation and maintenance of landscaping on individual lots and common areas. The applicant should become familiar with and comply with the requirements of Section 13-111: *Landscaping and Buffering* in drafting covenants for the Sketch Plan level of review.

14. **PROVISION FOR SNOW REMOVAL AND SNOW STORAGE.** Language identifying responsibility of a property owners' or homeowners' association or other entity to remove snow from interior roads and parking areas, and other applicable requirements. The applicant should become familiar with and comply with the requirements of Section 13-112: *Snow Storage* in drafting covenants for the Sketch Plan level of review.

15. **STANDARDS TO ENSURE COMPATIBLE USES.** As applicable, specific covenants or other restrictions designed to mitigate impacts to nearby residential or public use areas or adjacent land uses, pursuant to Section 13-119: *Standards to Ensure Compatible Uses*.

16. **DOMESTIC ANIMAL CONTROL.** Language limiting the maximum number of domestic animals allowed on a lot or within the development, and requiring that they be confined on site by kenneling, leashing or other similar means. Language that includes requirements that comply with those specified by Section 11-106: F.6*: Domestic Animal Controls,* Section 11-109: D: *Domestic Animal Controls*, and Section 9-508: *Keeping of Livestock Not On an Agricultural Operation.*

17. **FENCING.** The applicant should become familiar with and comply with the requirements of Section 13-113: Fencing in drafting covenants for the Sketch Plan level of review. If there is to be a fence separating the proposed development from lands on which there are agricultural operations or are public lands, language shall be included acknowledging Colorado's "fence out" requirements, and placing responsibility for construction and maintenance of the fence with the property owners' or homeowners' association.

GG. **STRUCTURAL DESIGN.** If the applicant is the developer of any structure in the proposed project, then simple sketches, massing diagrams or models (without architectural details) shall be submitted. These shall be intended to show building mass, scale, and height in a conceptual manner in relation to natural site features, and in relation to surrounding structures. The applicant should become familiar with, and comply with the requirements of Section 13-103: *General Site Plan Standards and Lot Measurements* and Section 13-105: *Residential Building Sizes and Lot Coverages* shall guide the design of the Sketch Plan.

HH. **ADDITIONAL SUBMITTALS BASED ON EVIDENCE OF CUMULATIVE IMPACTS.** If, in the course of the Sketch Plan application review, evidence is submitted or obtained indicating that there is a reasonable probability that the proposed land use change will contribute to cumulative impacts within the impact area, the Planning Department or the Planning Commission shall require that additional information, including but not limited to studies of specific issues, be submitted.

II. **ADDITIONAL INFORMATION.** Such additional information reasonably required by the Planning Department as necessary to determine the impact classification, or to otherwise aid in the evaluation of the development pursuant to the applicable requirements of this *Resolution*.

## SECTION 7-202: SKETCH PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS

The following process (illustrated in the flowchart in Appendix Figure 6: *Sketch Plan Review Process for Major Impact Projects*) shall apply to an application for review of a Sketch Plan application for a Major Impact project. In addition to these required meetings and public hearings, the planning commission and the Board may conduct work sessions, as either deems necessary.

A. **NOTIFICATION TO COUNTY IF FEDERAL PERMITS REQUIRED FOR PROJECT**. When an Environmental Assessment or Environmental Impact Statement, or other state or federal action or permit is required and that requirement is known by the applicant, the applicant shall notify the County of that requirement when the Sketch Plan application is first submitted for review.

BLM_0053315

**B.   PRE-APPLICATION CONFERENCE.** Attendance by the applicant at a Pre-Application Conference is mandatory before submittal of the Sketch Plan application, pursuant to Section 3-108: *Pre-Application Conference.*

**C.   SUBMITTAL OF DRAFT COPY.** The applicant shall submit one draft copy of the Final Plan application to the Planning Department pursuant to Section 7-301: *Sketch Plan Application for Major Impact Projects.*

   **1.   PLANNING DEPARTMENT REVIEW.** Review of the application shall be accomplished as specified in Section 3-110: *Planning Department Review of Application.*

   **2.   TOTAL NUMBER OF COPIES REQUIRED.** Once the Planning Department has determined that the Sketch Plan application is complete, the Department shall notify the applicant of the required number of Sketch Plans sufficient to provide a copy to each Planning Commission member, to applicable review agencies, and for the file. A minimum of 15 copies is required. The Department shall, as applicable, forward the application and any relevant comments to the Planning Commission or Board.

**D.   REQUEST FOR REVIEW BY OTHER AGENCIES OR DEPARTMENTS.** The Planning Department may request the professional analysis and recommendations of other review agencies, organizations, or technical consultants deemed appropriate and necessary to complete the Sketch Plan review, including other County offices and departments; municipal, state, or federal agencies having an interest in or authority over all or part of the proposal; utility companies; the applicable school district and special service districts serving the proposed development; and engineers, designers, and legal consultants.

   **1.   REVIEW AND COMMENT BY REVIEW AGENCIES.** The review agencies that are sent a copy of the application shall be requested to make comments within 21 days of mailing by the Planning Department, unless an extension of not more than 30 days has been requested by the agency before the 21st day. The Department may grant such a reasonable extension if it determines that good cause for the delay has been shown. The failure of any agency to respond within 21 days or within the period of extension shall not be deemed an approval of the application by the agency.

**E.   REVIEW OF AGENCY/DEPARTMENT COMMENTS BY APPLICANT.** The applicant shall have the right to review the comments and recommendations received from the review agencies. The applicant may submit additional information and make changes in the development proposal to respond to the comments of the review agencies; provided, however, that if those changes are substantial or if they significantly alter the nature, character or extent of the application, the Planning Department may, after the changes, refer the application again to some or all review agencies, to obtain additional comments, and may reasonably extend the period of their review accordingly.

**F.   WORK SESSIONS.** After the Planning Department has determined the application to be complete, the Planning Commission shall conduct a work session to identify and consider issues related to the application. Both the Board and the Planning Commission may conduct additional work sessions as it or they deem necessary to afford sufficient time to review the application materials and to identify and consider any issues related to the application.

**G.   SITE VISIT.** The Board and/or Planning Commission respectively shall conduct a site visit of the proposed project site if either body determines that such a site visit will provide information useful to its review of the proposal. If the Planning Commission chooses to conduct a site visit, it shall do so before taking action on a recommendation to the Board on the Sketch Plan application. Review of the application may be delayed for a reasonable period if inclement weather, or snow or mud conditions prohibit a productive site visit.

**H.   DETERMINATION OF READINESS FOR HEARING.** The Planning Commission shall determine whether the Sketch Plan application is sufficient to conduct a public hearing, and if it is, shall so notify the Board.

**I.   PUBLIC HEARING.** The Planning Commission and Board shall jointly conduct a public hearing to consider the Sketch Plan application.

   **1.   RELATED EA OR EIS PROCESS.** Pursuant to Section 3-104. B. 2: *Major Impact Projects That Require EA or EIS*, the process of scoping shall occur concurrently with this Sketch Plan hearing.

   **2.   SCHEDULING OF HEARING.** The Planning Commission shall identify a hearing date and time at which a public hearing, jointly conducted by the Board and the Planning Commission shall be scheduled. Notice of the date of the hearing and a complete copy of the Sketch Plan application shall be forwarded to the Board at least 20 days before the date of the hearing, together with a copy of the Planning Department's report.

BLM_0053316

3. **HEARING NOTICE.** Public notice that the Board and Planning Commission will jointly conduct a public hearing to consider the Sketch Plan application shall be accomplished pursuant to Section 3-112: *Notice of Public Hearing*, and shall meet the required period of notice for a Board public hearing, pursuant to Table 1: *Timing of Notice*.

4. **CONDUCT OF HEARING.** The chairperson of the Planning Commission will preside over the hearing, which will be conducted pursuant to Section 3-113: *Conduct of a Public Hearing*.

J. **PLANNING COMMISSION RECOMMENDATION.** It is the goal but not the requirement (as scheduling may be affected by limited access, inclement weather, or other unforeseen circumstances) of this *Resolution*, that within 60 days following the closure of the public hearing, the Planning Commission shall consider the relevant materials and testimony and the compliance of the Sketch Plan application with the applicable standards of this *Resolution*, and recommend approval, approval with conditions, or denial of the application. The recommendation shall be in written form, and shall, at a minimum, address the following:

1. **DETERMINATION OF THE SKETCH PLAN'S COMPLIANCE WITH STANDARDS OF THIS RESOLUTION.** Whether the application is generally consistent with the standards and requirements of this *Resolution*.

2. **STATEMENT OF IMPACT CLASSIFICATION.** A statement classifying the impact of the proposed project, citing the specific applicable sections of Section 3-111: *Classification of Impact*.

3. **PHASING.** If the applicant has proposed phases for the project, a recommendation on whether the proposed phasing complies with the requirements of this *Resolution*. The Commission may also recommend that the project be designed to occur in phases, if phasing is necessary or appropriate for it to comply with the requirements of this *Resolution*.

4. **FINDINGS.** Findings based on consideration of the submitted plan, site observations, the Planning Director's report, and testimony received.

5. **RECOMMENDATION OF BOARD ACTION.** A recommendation that the Board should approve, approve with conditions, or deny the Sketch Plan application.

   a. **CONDITIONS OF A RECOMMENDATION OF APPROVAL.** If the recommendation is for approval, or approval with conditions, the following shall also be addressed:

      1. **IDENTIFICATION OF PLAN ELEMENTS THAT REQUIRE MODIFICATION.** Identification of elements of the Sketch Plan application that do not comply with this *Resolution*, and, as applicable, recommendations of modifications that must be included in a Preliminary Plan application submittal so that the proposed project will comply with the standards of this *Resolution*.

      2. **SPECIFIC INFORMATION AND/OR STUDIES TO BE SUBMITTED.** Any materials the applicant is required to submit, and any technical studies the applicant is required to conduct and to provide any resulting information as part of the Preliminary Plan submittal.

      3. **CITING OF REQUIRED COMPLIANCE WITH OTHER PERMIT CONDITIONS.** Conditions that shall include the applicant's timely and fully obtaining and complying with all applicable federal, state, municipal and other permits and terms and conditions of any municipal, state, federal permits required for the project.

K. **RECOMMENDATION FORWARDED TO BOARD.** Within 20 days of the Planning Commission's action on the recommendation, the Planning Department shall forward the recommendation to the Board.

L. **BOARD DECISION ON OPTIONAL BOARD PUBLIC HEARING.** The Board shall have the option of conducting another public hearing to consider the Sketch Plan application and the Planning Commission's recommendation. Within 20 days of receipt of the Planning Commission's recommendation, the Board shall determine whether to conduct a public hearing. A decision to conduct or not to conduct a hearing shall be based on the Board's determination of whether it is in the public interest to do so, considering among other factors the following:

1. **LEVEL OF PUBLIC INTEREST.** There has or has not been substantial public interest in the proposal, as reasonably shown by attendance at, and testimony submitted for, the joint public hearing; or

2. **IDENTIFICATION OF NEW ISSUES.** Whether it is reasonably probable that new issues related to the Sketch Plan application of the proposed land use change will be identified; or

BLM_0053317

3. **IDENTIFICATION OF NEW INFORMATION.** Whether it is reasonably probable that new information related to the Sketch Plan application of the proposed land use change will be provided.

M. **BOARD PUBLIC HEARING**. If the Board chooses to conduct a public hearing, the following shall apply:

1. **HEARING NOTICE.** Public notice that the Board will conduct a public hearing to consider the Sketch Plan application shall be accomplished pursuant to Section 3-112: *Notice of Public Hearing.*

2. **CONDUCT OF HEARING.** The Board hearing shall be conducted pursuant to Section 3-113: *Conduct of a Public Hearing.*

3. **COST FOR PUBLIC HEARING NOTICE(S)**. The applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing.*

N. **BOARD ACTION.** Within 35 days after receipt of the Planning Commission recommendation, if the Board did not conduct another public hearing, or within 35 days after closure of the hearing if the Board conducted another public hearing, the Board shall approve, approve with conditions, or deny the Sketch Plan. The Board's decision shall be entered into the official minutes of the meeting and shall contain the necessary findings of fact and reasons to support the decision. If the Board does not make separate findings of fact, it shall be presumed to have adopted the findings and recommendations of the Planning Commission.

1. **ADDITIONAL PLANNING COMMISSION REVIEW MAY BE REQUIRED.** Before it takes action on the application, the Board may refer the application back to the Planning Commission for further consideration and recommendations if at least one of the following circumstances is present:

    a. **NEW INFORMATION SUBMITTED.** There has been information submitted that was not available for consideration by the Commission before its recommendation; or

    b. **INSUFFICIENT EVALUATION.** There are substantive issues or requirements of this *Resolution* that were not sufficiently evaluated in the Commission's recommendations; or

    c. **SUBSTANTIVE ALTERATION.** There has been a substantive alteration to the plan subsequent to the Commission's recommendation; or

    d. **NEED FOR CLARIFICATION.** There is an element of the Planning Commission's recommendation that requires clarification.

O. **SIGNIFICANCE OF SKETCH PLAN APPROVAL**. Approval of the Sketch Plan application shall constitute a final decision of approval for the general development concept only, but shall not constitute approval of any detailed design or engineering submittals or proposed solutions to specific problems revealed during the Sketch Plan review or later in the review process. Sketch Plan approval by the Board shall not constitute approval of the Major Impact project, or permission to proceed with construction of any aspect of the proposed land use change. Approval at this stage only authorizes the applicant to submit a Preliminary Plan application. If, during the Preliminary and Final Plan reviews, the applicant is unable to fulfill all of the requirements of this *Resolution*, then the application shall be denied at the Preliminary or Final Plan review stage.

P. **EXPIRATION.** The applicant shall be required to submit the Preliminary Plan application within 12 months after the date of approval of the Sketch Plan. Failure to submit a complete Preliminary Plan application within this time period shall render the Sketch Plan approval null and void, and require the applicant to begin the Sketch Plan review process again.

Q. **EXTENSION OF SUBMITTAL DEADLINE.** The Board may extend the deadline to submit a Preliminary Plan application for good cause shown, provided the applicant requests the extension in writing no less than 30 days before the deadline, and provided the Board makes a finding that there has been no substantial change in circumstances of adjacent land uses, to the capability or willingness to serve of proposed service providers, or to the site of the proposed land use change since Sketch Plan approval. The Board may request a recommendation from the Planning Commission on the request for extension before taking action. In no case shall the deadline for submittal of a Preliminary Plan application be extended for more than six months beyond the date of the 12 month expiration.

BLM_0053318

# DIVISION 7-300:
# PRELIMINARY PLAN FOR MAJOR IMPACT PROJECTS

## SECTION 7-301: PRELIMINARY PLAN APPLICATION FOR MAJOR IMPACT PROJECTS

After the Board has approved a Sketch Plan application for a Major Impact project, the applicant may submit a Preliminary Plan application consistent with the requirements of this Section. The Preliminary Plan includes both a narrative describing elements of the proposed project, and the maps and layout plans that illustrate it.

**A. PHASING AND RELATIONSHIP TO APPROVED SKETCH PLAN.** A Preliminary Plan shall address all of the area presented in the approved Sketch Plan, shall be consistent with the approved Sketch Plan and shall specifically address and comply with the conditions stated in the Board's approval. If the Preliminary Plan represents a significant variation from the approved Sketch Plan, that variation shall be clearly and completely identified or described. The Preliminary Plan may address phases that are projected to be phases of the Final Plan, though all studies and engineering design shall address the entirety of the project.

    **1. SIGNIFICANT CHANGE REQUIRES REFILING.** If the variation consists of a significant change in types of land use, design or location of uses, or is a significant increase in numbers of lots, structures, or types or intensity of land uses, from the approved Sketch Plan, the applicant may be required to file an amended Sketch Plan application that shall be reviewed anew, pursuant to Section 7-201: *Sketch Plan Application for Major Impact Projects,* and Section 7-202: *Sketch Plan Review Process for Major Impact Projects.*

**B. APPLICATION AND REVIEW FEES.** In order to compensate the County for the cost of reviewing and processing the Preliminary Plan, each applicant shall pay the required fee, as shown in a schedule of fees issued by the Planning Department that is adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

    **1. COST FOR PUBLIC HEARING NOTICE(S).** In addition to the Preliminary Plan submittal fee, the applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing.*

**C. COPY OF PROPERTY TAX CERTIFICATE.** One copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

**D. SUBMITTAL OF DRAFT COPY.** The applicant shall submit one draft copy of the Preliminary Plan application to the Planning Department.

**E. TOTAL NUMBER OF COPIES REQUIRED.** Once the Planning Department has determined the submittal to be complete, it shall determine the number of copies of the Preliminary Plan application that are necessary for review and action by the Planning Commission and/or Board, and other review agencies or County departments, and shall notify the applicant of the number of copies of the complete plan that are required to be submitted.

**F. MAPS AND SITE PLAN SHEETS.** Maps shall be at a scale and sheet size to permit adequate review, but sheet size shall not exceed 24 inches by 36 inches. Each map or layout of the site plan shall be separate, and folded to a size to allow mailing or storage within a standard legal-sized folder; maps shall not be submitted in a rolled form. Elements required to be submitted in map or layout form may be combined on one or more sheets of the submittal, so long as all elements are legible. Maps and drawings shall identify the location of the proposed land use change by reference to permanent survey monuments with a tie to a section corner or quarter-section corner and shall include the following information:

    **1. MAP SCALE.** The Preliminary Plan shall include maps that shall be at a scale of 100 feet equal one inch or as otherwise approved by the Planning Department, or required by this Section.

    **2. TOTAL AREA PLAN ON ONE SHEET.** In the case of large development requiring more than two sheets at the required scale, the applicant shall also submit a total area plan showing the entire development on a single sheet at an appropriate scale.

BLM_0053319

G.  **GENERAL INFORMATION IN NARRATIVE.** The Plan is required to include at least the following information, presented in the same order as it is listed in this Section, in a stapled or otherwise bound document, on consecutively-numbered pages and including a *Table of Contents*.

1.  **APPLICANT.** The name, address, telephone and fax numbers, and e-mail address for the applicant, or if the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and also stating the same information for the agent.

    a.  **APPLICANT OTHER THAN APPLICANT AT SKETCH PLAN APPROVAL.** If the applicant is not the same as the applicant who submitted the Sketch Plan, that fact shall be noted, and a notarized letter of consent from the current property owner for the current applicant to proceed with the review shall be required to be submitted.

2.  **PROPERTY OWNER.** Name, address, telephone and fax numbers and e-mail address of the owner of the property and, if other than the applicant, a notarized letter from the owner consenting to the application.

    a.  **OWNER OTHER THAN OWNER AT SKETCH PLAN APPROVAL.** If the property ownership has changed, either by fee simple sale or organization since the Sketch Plan was approved, that shall be noted and relevant documentation submitted.

3.  **PROPERTY LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel (such as mileage from highway or County road, or other recognized landmarks) on which the land use change is proposed to be located. A copy of the recorded deed to the property should be included.

4.  **DATE OF APPLICATION.** The date the application was prepared.

5.  **LIST OF ADJACENT LANDOWNERS.** As applicable, a listing of all landowners and land uses that are adjacent to the boundaries of the entire parcel on which the project is proposed, including all properties that are separated from the parcel by a roadway or would be adjacent to the property except for the existence of the roadway. When the parcel is located adjacent to a municipality, a platted townsite or platted recorded subdivision, all owners of surface property rights within 500 feet of each boundary of the entire parcel shall be included in the listing. The source for the best-available information to identify those landowners is the Gunnison County Assessor's Office.

6.  **PROJECT DESCRIPTION.** A detailed description of what the applicant wants to do on or to the property, including:

    a.  **USES AND ACTIVITIES.** Proposed uses or activities, division of land, adjustment of boundaries, expansion of existing uses, and construction, stockpiled materials, indoor and outdoor storage areas.

    b.  **NUMBERS OF UNITS OR OTHER SIZES OF USES.** Numbers of units or lots. Estimated square footage or acreage of commercial, industrial or other uses.

    c.  **DESCRIPTION OF STRUCTURES.** Description of structures to be constructed, their estimated size(s) and appearance.

    d.  **DESCRIPTION OF OFF-SITE RESOURCES.** Description of off-site resources, hazardous activities and haul routes as may be necessary to accomplish the project.

    e.  **IDENTIFICATION OF LOT USE IF PROJECT IS A SUBDIVISION.** If subdivision of the property is proposed, the uses proposed for all resulting lots.

    f.  **SEASONS AND HOURS OF OPERATION.** As applicable, the seasons of the year in which the activity is proposed to be conducted, and the intended hours of operation.

    g.  **PHASES.** Any phases that are proposed as part of the Preliminary Plan, or are projected to be proposed within a Final Plan for the development. If the Preliminary Plan is presented as separate phases, each phase may be separately reviewed and approved. Submittals for each phase of a Preliminary Plan and Plat, as applicable, and references within applicable protective covenants and Development Improvement Agreements, shall include the name of the development, and the applicable phase number.

7.  **COMPLIANCE WITH EACH CONDITION OF SKETCH PLAN APPROVAL.** The Preliminary Plan shall list, and include complete responses to the conditions of the Board's approval of Sketch Plan. The language of each of the conditions shall be included, with reference to relevant submittals in the Preliminary Plan,

BLM_0053320

including studies, maps, reports, engineering plans, architectural or other designs, agreements, and court actions that demonstrate the manner in which the conditions have been met.

**H. ENGINEERED PLANS.** Detailed engineering design plans and descriptions for roads, bridges, drainage facilities, water supply and wastewater treatment systems, landscaping and other improvements proposed to be installed by the developer, or required by the County; such plans shall be designed and stamped by a qualified professional engineer licensed in the State of Colorado. Engineering plans may be bound separately when size or bulk makes it advisable. Two folded copies of each of the plans shall be provided that can be stored in legal-sized folders, and shall not be submitted in rolled form.

**I. FLOOD HAZARD AREAS.** When a land use change is proposed on a parcel located within a floodplain hazard area as delineated on maps described in Section 11-103: D: *Official Maps* or the National Flood Insurance Rate Maps (FIRM) prepared by the Federal Emergency Management Agency (September 29, 1989, as amended) the narrative, map and design layout of the Preliminary Plan shall address and comply with the requirements of Section 11-103: *Development in Areas Subject to Flood Hazards.*

**J. GEOLOGIC HAZARD AREAS**. When a land use change is proposed on a parcel located in a geologic hazard area as delineated on Geologic Hazard Maps prepared by the Colorado Geologic Survey the narrative, map and design layout of the Preliminary Plan shall address and comply with the requirements of Section 11-104: *Development in Areas Subject to Geologic Hazards* and at a minimum shall submit the following information:

    **1. MAPS.** A map or maps having a scale of one inch equaling 50 feet or larger, with accurate topographic details, that portrays the geologic conditions of the area, with particular attention given to the applicable geologic hazard. As appropriate, subsurface geologic cross-sections shall also be used to portray specific physical characteristics, including depth.

    **2. GEOTECHNICAL REPORT.** A geotechnical report referencing maps and cross-sections that identify if the proposed development site is within a geologic hazard area, and if so, evaluates and predicts the impact of specific geologic conditions on the proposed land use change. The report shall also specify the measures that will be employed to mitigate these hazards, pursuant to Section 11-104: *Development in Areas Subject to Geologic Hazards.*

        **a. AVALANCHE HAZARD AREAS.** A Preliminary Plan application for development proposed in an avalanche hazard area shall also include the following information:

            **1. STRUCTURE CONFIGURATIONS**. Location of structures, type of structures, and structure configurations.

            **2. STRUCTURAL STABILITY.** Structural stability and strength.

            **3. RUNOUT ZONE.** The extent of the runout zone, and the estimated maximum impact pressure distribution within the runout zone.

            **4. AVALANCHE DATA.** Type of avalanche reaching various parts of the runout zone, the estimated avalanche frequency, the avalanche discharge, and the avalanche flow depth.

        **b. LANDSLIDE HAZARD AREAS.** A Preliminary Plan application for development proposed in a landslide hazard area shall also include the following information:

            **1. LANDSLIDE ANALYSIS.** Type of landslide and rate of movement; volume of material involved in the landslide; the mechanism(s) responsible for its initiation; and slope gradient.

            **2. STRUCTURE CONFIGURATIONS**. Location of structures, type of structures, and structure configurations.

        **c. ROCKFALL HAZARD AREAS.** A Preliminary Plan application for development proposed in a rockfall hazard area shall also include the following information:

            **1. DESCRIPTION OF ROCKFALL.** Detailed description of type of rockfall and specific rock types involved.

            **2. SLOPE AND ASPECT**. Slope, gradient, and aspect on-site, and adjacent to the site.

            **3. FREEZE/THAW**. Climate data regarding the freeze/thaw cycle.

            **4. JOINTING DATA**. Jointing data, with special consideration given to water percolation.

            **5. TALUS SLOPES.** Talus or colluvial slopes adjacent to the rockfall hazard zone.

BLM_0053321

**d. ALLUVIAL FAN/MUDFLOW HAZARD AREAS.** A Preliminary Plan application for development proposed in an alluvial fan or mudflow hazard area shall also include the following information or data:

**1. DRAINAGE BASIN STUDY.** Drainage basin study, including all stream channels upstream from the site.

**2. SEDIMENT YIELD STUDY.** Sediment yield study, with data regarding surficial materials, vegetative cover, and topography, erosion potential of area upstream from the site, and volume and mass of potential mudflows on site.

**3. STORM DATA.** Climate data, including precipitation data for the 10, 25, 100-year storms, and snowmelt runoff characteristics.

**4. GEOLOGIC MAP.** Geologic map, with topographic overlay showing mudflow deposits.

**e. POTENTIALLY UNSTABLE SLOPES.** A Preliminary Plan application for development proposed on a potentially unstable slope shall also include the following information:

**1. PAST OCCURRENCES.** Past occurrences of landslides, mudflows, rockfalls, and surficial creep on the site and adjacent areas.

**2. RATE OF MOVEMENT.** Rate of movement of the surficial materials.

**3. WILDFIRE HAZARD AND FIRE PROTECTION.** The narrative, map and layout design of the Preliminary Plan shall address and comply with the requirements of Section 11-105: *Development in Areas Subject to Wildfire Hazard* and Section 12-107: *Fire Protection*, and include measures to minimize the potential that the proposed uses will generate or increase wildfire

**4. WILDLIFE HABITAT.** The narrative, map and layout design of a Preliminary Plan application for development proposed on those lands described in Section 11-106: *Protection of Wildlife Habitat Areas* shall submit a Wildlife Habitat Analysis pursuant to that Section.

**5. WATER QUALITY INFORMATION.** The narrative, map and layout design of the Preliminary Plan shall address and comply with the requirements of Section 11-107: *Protection of Water Quality*, and shall, as applicable, depict locations of water bodies, and related widths of Restrictive Inner Buffers, and Variable Outer Buffers.

**6. DEVELOPMENT ON RIDGELINES.** If the proposed land use change is on property in which there are land formations visible from any ridgeline vantage as defined by this *Resolution*, and described pursuant to Section 11-108: *Standards for Development on Ridgelines*. The narrative, map and layout design of the Preliminary Plan shall address and comply with the requirements of that Section.

**7. DEVELOPMENTS IMPACTING AGRICULTURAL LANDS.** If the proposed land use change adjoins agricultural lands, involves land through which irrigation ditches flow, or over which there are general or exclusive easements for stock drives, the narrative, map and design layout of the Preliminary Plan shall address and comply with the requirements of Section 11-109: *Development That Affects Agricultural Lands*, and Section 15-103: *Right-to-Ranch Policy* and shall identify the following:

**a. AGRICULTURAL LAND OWNER.** The location(s) and name(s) of owner(s) of any agricultural land(s) adjoining or possibly impacted by the proposed land use change.

**b. AGRICULTURAL DITCH.** The location(s), name(s), name(s) of owner(s), size(s), and decreed capacity(ies) of any agricultural ditch crossing or adjoining the development property, as available from the Colorado Division of Water Resources, or ditch commissioner's records.

**c. EASEMENTS**. The location of historical easements used to gain access to headgates, ditches, and fences for maintenance or operations.

**d. LIVESTOCK DRIVES AND FENCELINES.** Historic or recorded stock drive easements crossing or adjoining the development property, including the location of any existing fences along property lines, and the location of new fences or other obstacles proposed to be built across any such stock drive.

**8. LANDS BEYOND SNOWPLOWED ACCESS.** If the proposed land use change is on property located where there previously has been no snowplowed access, the narrative, map and layout design of the Preliminary Plan shall address and comply with Section 11-110: *Development of Land Beyond Snowplowed Access.*

BLM_0053322

9. **DEVELOPMENT ON INHOLDINGS IN NATIONAL WILDERNESS**. If the proposed land use change is on property located on an inholding within a national Wilderness Area, the narrative, map and design layout of the Preliminary Plan shall address and comply with Section 11-111: *Development on Inholdings in the National Wilderness*.

10. **DEVELOPMENT ON PROPERTY ABOVE TIMBERLINE**. If the proposed land use change is on property located above timberline the narrative, map and design layout shall address and comply with Section 11-112: *Development on Property Above Timberline.*

11. **ROAD AND TRAILS SYSTEM PLAN.** An applicant for a Land Use Change Permit that involves road construction shall submit an engineered design and construction plan for the road system, prepared by a qualified professional engineer licensed in the State of Colorado and shall address and comply with Section 12-103: *Road System* and Section 12-104: *Public Trails,* and the *Gunnison County Standard Specifications for Road and Bridge Construction*. Pursuant to that Section and those *Specifications*, a Traffic Impact Study may also be required to be submitted. The plan shall include the following information:

   a. **ROAD LAYOUTS.** Road layouts with road names, widths, curves, radii, and other dimensions. Current and projected road and driveway locations shall be shown, including major access, small arterials, and driveway locations, as applicable. Horizontal and vertical ties to County roads shall be provided. Preliminary centerline locations of roads shall be staked on the ground.

   b. **ENGINEER'S CERTIFICATION OF DRIVEWAY AVAILABILITY.** If driveways are required for the development, certification by a qualified professional engineer licensed in the State of Colorado (including design detail, where appropriate) that there is a driveway access for all lots and building areas within the development.

   c. **ROAD CONSTRUCTION DETAIL**. Construction detail, including typical cross-sections, showing base, drainage structures, type of surface, slope of cuts and fills, and similar information sufficient to show the proposed roads  will meet the standards of the *Gunnison County Standard Specifications for Road and Bridge Construction*, and will meet the needs of the development.

      1. **LOCATIONS AND DIMENSIONS OF ALL ELEMENTS.** The location and dimensions of all culverts, bridges, drainage ditches, channels, and drainage easements shall be shown.

      2. **CROSSINGS TO AVOID WETLANDS, IRRIGATION DITCHES DISRUPTION.** All crossings shall be engineered to avoid drainage of existing wetlands and not to impede the historic flows of irrigation ditches.

      3. **TRAIL CONSTRUCTION DETAILS.** Construction details shall also be provided for any proposed trails.

      4. **CENTERLINE PROFILES**. Centerline profiles of roads plotted with sufficient accuracy to demonstrate that road design will meet the applicable standards. All centerline profiles shall be drawn at a scale of 10 feet vertical and 100 feet horizontal to the inch, or five feet vertical and 50 feet horizontal to the inch.

      5. **PROPOSED FUNCTIONAL CLASSIFICATIONS**. Proposed functional classifications of all roads contemplated in the development, as defined in with the *Gunnison County Standard Specifications for Road and Bridge Construction*. Road surface and rights-of-way widths, grades, cul-de-sacs and turn-around, turnouts, anticipated traffic levels, and types of use shall be included.

      6. **PARKING**. The total number of proposed off-road parking spaces shall be indicated, and their locations shall be shown, except that parking spaces associated with single-family residential lots need not be identified. The plan shall comply with the requirements of Section 13-110: *Off-Road Parking and Loading* and the minimum distances listed in Appendix Table 3: *Off-Road Parking Requirements.*

      7. **ACCESS AND OTHER EASEMENTS**. All known easements, recorded or historically used, including those for utilities, irrigation and drainage ditches, drainage swales, head-gates, roads and trails, egress/ingress, or other access affecting the property shall be shown on the plan.

      8. **VISUAL IMPACTS.** An analysis of potential visual impacts arising from road location, alignment and construction of the road, and how mitigation of those impacts will comply with the applicable requirements of Article 13: *Project Design Standards*.

BLM_0053323

9. **SAFETY FACTORS.** A list of the safety factors that were considered as part of the road system design shall be provided.

10. **DUST CONTROL PLAN.** A plan for dust abatement during and, as applicable, after construction.

11. **ROAD CONSTRUCTION INSPECTION AND TESTING PLAN**. A plan for onsite inspections and testing by a qualified professional engineer licensed in the State of Colorado at appropriate checkpoints during construction, including provision of those reports to the Gunnison County Public Works Department to ensure compliance with the *Gunnison County Standard Specifications for Road and Bridge Construction.*

12. **SOURCE OF MATERIAL/RECLAMATION PLAN.** Identification of a source of and estimates of cubic yards of material necessary for road (and, as applicable, driveway) construction, and routes of haulage. If the source is to be on-site, the applicant shall notify the Colorado Division of Minerals and Geology and request confirmation that no separate permit is required by that agency, and a copy of that notification shall be included in the Preliminary Plan submittal.

12. **WATER SUPPLY PLAN.** The Preliminary Plan application shall contain evidence that provisions have been made for a water supply that is sufficient in terms of quantity, quality, and dependability to provide an adequate supply of water for the development proposed, and shall provide information necessary to meet the requirements of Section 12-105: *Water Supply*. The requirements of that Section, and of the State Engineer and the Colorado Department of Public Health and Environment, shall be used to evaluate the adequacy of the water source intended to serve the proposed development, including the following:

    **a.** **CENTRAL WATER SYSTEM REPORT.** When a central water system is proposed, the Preliminary Plan application shall address the feasibility of central water service to the entire area as planned for inclusion in the proposed development, and shall be prepared by a qualified professional engineer licensed in the State of Colorado. If a central water system is to be provided, the following information shall be submitted in written form:

        **1.** **ESTIMATED GALLONS PER DAY.** The estimated total number of gallons of water per day necessary to supply the development, based on the design criteria specified in Section 12-105: *Water Supply*, and including but not limited to the following:

            **(a.)** **ESTIMATED AVERAGE DAILY DEMAND**. Estimated average daily demand of the entire service area and the proposed development. Demand calculations are to be based on 350 gallons per day (gpd), year-round, per residence.

            **(b.)** **ESTIMATED MAXIMUM DAILY DEMAND.** Estimate maximum daily demand based on using three times the average daily demand.

            **(c.)** **ESTIMATED PEAK HOUR DEMAND**. Estimate peak hour demand based on using six times the average daily demand.

            **(d.)** **ESTIMATED AVERAGE DAILY DEMAND FOR COMMERCIAL/INDUSTRIAL USES.** The estimated average daily demand for commercial and industrial uses will be reviewed based on the anticipated demand of the proposed development. Appropriate multipliers may be used in calculating the amount, based on standards as may be required for a specific use by the Colorado Department of Public Health and Environment, or other applicable agency or industry standard.

        **2.** **HYDRAULIC ANALYSIS.** A hydraulic analysis to verify that distribution system pressures maintain a minimum working pressure of 40 pounds per square inch (psi), and a minimum 20 psi residual pressure during fire flow demands.

        **3.** **CAPACITY FOR COLLECTION, PURIFICATION AND DISTRIBUTION.** A detailed description, including plans, design features and specifications, including but not limited to piping size, necessary to show the ability of such system to collect, purify and distribute the required amount of water to the development in a manner that is consistent with the requirements and requirements of the *Colorado Primary Drinking Water Regulations* currently enforced by the Colorado Department of Public Health and Environment.

        **4.** **WATER STORAGE**. When water storage is required to maintain a consistent and dependable source of potable water, the applicant shall provide evidence that storage capacity is capable of

BLM_0053324

providing the specified peak hour demands for periods of six hours or a maximum day demand plus the required fire flow demands.

**b. POTABLE WATER DEMAND CRITERIA.** If the water is intended for human consumption, documentation of chemical and bacteriological tests demonstrating the potability of the water and its suitability for the proposed use.

**c. WATER SUFFICIENT FOR LANDSCAPING.** As may be required by Section 13-111: *Landscaping and Buffering*, or additionally as may be proposed in the application, each use shall have adequate water to sustain required landscaping and shall include:

    **1. IRRIGATION WATER CRITERIA.** The following shall be considered in calculating requirements for the use of irrigation in new development, and shall not apply to agricultural operations in existence as of the effective date of this *Resolution*:

        **(a.) ESTIMATED ACREAGE.** Estimated acreage to be irrigated.

        **(b.) ESTIMATED DEMAND.** Estimated irrigation demand based on information supplied by the Natural Resources Conservation Service. The information shall take into account the type of vegetation to be maintained, the soil characteristics, the historic yield, and the available water rights.

**d. FIRE PREVENTION AND FIRE SUPPRESSION.** Evidence that a water distribution system and storage system are capable of meeting fire flow requirements required by Section 12-105: *Water Supply*, and shall comply with the requirements of Section 11-105: *Development in Areas Subject to Wildfire Hazard*, and Section 12-107: *Fire Protection*.

**e. EVIDENCE FOR SURFACE WATER RIGHT.** If the supply of water is a surface water right, evidence shall include:

    **1. DIVERSION RECORDS.** The appropriate diversion records, if any, of the Division of Water Resources; and

    **2. ENGINEER'S REPORT.** A report by a qualified professional engineer licensed in the State of Colorado, geologist or hydrologist discussing the amount, reliability and seasonal variations in the source of water intended for use in the development; and

    **3. ATTORNEY'S LETTER.** A letter signed by an attorney licensed in Colorado identifying the surface water right intended for use within the proposed development and certifying that the water right is owned by the applicant and, where appropriate, is subject to transfer and sale from the applicant to owners of lots within the proposed development; and

    **4. COURT DECREES.** Copies of court decrees permitting the water right to be used for the purposes intended and required by the proposed development; or

    **5. BINDING AGREEMENTS.** Copies of binding agreements requiring a public or private water owner to supply water to the proposed development and evidence that the owner has uncommitted water supplies with which to comply with the agreements; or

    **6. APPLICATION FOR CHANGE IN WATER RIGHTS**. A copy of the application for a change in water rights and the plans of augmentation that have been filed in a court of competent jurisdiction and that, if granted, will give the applicant the legal right to use the intended source of water for the purposes required by the development.

**f. WELL TESTING RESULTS**. When a central well or wells are proposed for the water supply, a well shall be constructed on the proposed development site, and tested for its capability to provide a consistent and dependable source of water, pursuant to the requirements of Section 12-105: *Water Supply*. Results of the test shall be submitted as part of the Preliminary Plan.

**13. SEWAGE DISPOSAL/WASTEWATER TREATMENT.** The Preliminary Plan application shall contain evidence that provisions have been made for wastewater treatment that will treat all effluent to be generated by all uses of the proposed land use change, and shall provide information necessary to meet the requirements of Section 12-106: *Sewage Disposal/Wastewater Treatment*. The requirements of that Section, and of the Colorado Department of Public Health and Environment, shall be used to evaluate the proposed sewage disposal/wastewater treatment system intended to serve the proposed development, including the following:

BLM_0053325

    **a.** **WASTEWATER TREATMENT SYSTEM**. If a wastewater treatment system is to be provided the following information shall be submitted:

       **1.** **ESTIMATED DEMAND**. A detailed estimate of the total number of gallons of sewage per day to be treated.

       **2.** **SYSTEM DESCRIPTION.** A detailed description of the proposed wastewater treatment system prepared in a form adequate to fully inform the County of the ability of the system to collect, treat, and dispose of the sewage that would be generated by the development. The description shall include the location of the wastewater treatment plant and sewage collection lines; or

       **3.** **AGREEMENT WITH EXISTING SYSTEM PROVIDER.** The applicant may submit an agreement with the system provider of an existing wastewater treatment system authorizing service to the proposed development, accompanied by certification of a qualified professional engineer licensed in the State of Colorado that the existing service has the capacity to treat the sewage generated by the proposed development.

       **4.** **CONFIRMATION OF CAPACITY AND COMPLIANCE FROM CDPHE**. A statement from the Division Engineer of the Colorado Department of Public Health and Environment (CDPHE) that the system proposed to be used by the applicant is pursuant to permit requirements of that agency, and that CDPHE affirms as of the time of submittal of the Preliminary Plan that there is sufficient capacity for the system to serve the proposed development.

       **5.** **INDIVIDUAL SEWAGE DISPOSAL SYSTEMS.** If lots within a development are proposed to use individual sewage disposal systems, the following information shall be submitted:

         **(a.)** **SOIL PERCOLATION TESTS.** The results of soil percolation tests performed and signed by a qualified professional engineer licensed in the State of Colorado, or qualified professional geologist. The number of tests shall be as necessary to produce reliable results for the entire area proposed to be developed.

         **(b.)** **GROUNDWATER LEVEL.** The maximum seasonal groundwater level, whether that level is caused by irrigation or natural causes.

**14.** **GENERAL SITE PLAN STANDARDS AND LOT MEASUREMENTS.** The narrative, map and design layout shall address and comply with the requirements of Section 13-103: *General Site Plan Standards and Lot Measurements.*

**15.** **SETBACKS FROM PROPERTY LINES AND ROAD RIGHTS-OF-WAY.** The narrative, map and design layout shall address and comply with the setback requirements of Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way.*

**16.** **STRUCTURAL DESIGN AND ELEVATIONS.** As applicable, renderings of preliminary architectural elevations of significant facades of proposed structures shall be submitted, and structural elevations shall be sufficiently detailed to illustrate architectural features of facades, roofs, decks, and other primary elements of the structures, pursuant to Section 13-105: *Residential Building Sizes and Lot Coverages.*

    **a.** **EXCEPTION.** Elevations shall not be required for developments that propose single-family residences when the applicant will not be the developer of the residences.

**17.** **LANDSCAPING PLAN.** A detailed landscaping plan shall be submitted, pursuant to Section 13-111: *Landscaping and Buffering.*

**18.** **RECLAMATION AND NOXIOUS WEED CONTROL**. A Preliminary Plan application shall include an *Earthmoving Site Revegetation and Noxious Weed Control Plan*, as designed and/or approved by the Gunnison Basin Weed Specialist pursuant to Section 13-115: *Reclamation and Noxious Weed Control*. The Gunnison Basin Weed Specialist is an employee of the Gunnison County Public Works Department.

**19.** **GRADING AND DRAINAGE PLANS.** The Preliminary Plan application narrative, map and design layout shall address proposed grading activity and on- and off-site drainage and comply with the requirements of Section 13-116: *Grading and Erosion Control,* and Section 13-117: *Drainage, Construction and Post-Construction Storm water Runoff.*

**20.** **WATER IMPOUNDMENTS**. If water impoundments are proposed as part of the proposed development, the Preliminary Plan application narrative, map and design layout shall address locations and sizes of the impoundments, and the plans for water augmentation shall address such storage, pursuant to the

BLM_0053326

requirements of the Colorado State Engineer, and relative to the land uses proposed in the Preliminary Plan that the stored water is intended to serve. As applicable, the submittal shall address and comply with the requirements of Section 13-118: *Water Impoundments*.

21. **SCHOOLS, PARKS, AND COMMON AREAS.** The Preliminary Plan application shall identify those areas that will be set aside for schools, parks, or common areas and shall include a plan for the construction of parks and common areas. Maintenance shall be assured on a continual basis and costs shall be borne by the applicant or the property owners, or the homeowners' association. A statement shall be included if money will be paid in-lieu of, or in combination with, dedication of land for school purposes, and shall include the amount of money and description of how the amount is calculated.

   a. **SCHOOL LAND REQUIREMENTS SHALL COMPLY WITH AGREEMENT**. When a separate intergovernmental agreement exists between Gunnison County and the school district within whose boundaries the development is located, the dedication of land, payment-in-lieu, or a combination of dedication and payment, shall comply with that agreement.

22. **SOLID AND HAZARDOUS WASTES**. The Preliminary Plan application shall describe:

   a. **DISPOSAL METHOD.** The method to be used by the development for the disposal of solid wastes; and

   b. **HAZARDOUS SUBSTANCES.** Whether the development can reasonably be expected to produce hazardous substances or hazardous waste materials, as defined by Colorado law. Where applicable, a description and design detail shall be provided of methods to be used to eliminate any off-site health and safety hazards that could be caused by these substances and materials.

K. **PROTECTIVE COVENANTS OR RESTRICTIONS.** The Preliminary Plan application shall include a preliminary draft of protective covenants or deed restrictions that shall, at a minimum, address the following, as applicable to the specific project: and including:

1. **CONDITIONS OF SKETCH PLAN APPROVAL.** As applicable, those items required by the condtions of Sketch Plan approval to be included within protective covenants, design guidelines, condominium or townhome declarations or deed restrictions.

2. **RESPONSIBILITIES OF HOMEOWNERS' ASSOCIATION** Responsibilities of property owners or homeowners' association to collect dues, maintain common areas, improve infrastructure common to the development, maintenance of a decreed water augmentation plan and the augmented water supply, treatment of wastewater and/or water, and to oversee the maintenance of the general appearance of the development.

3. **COUNTY IS PARTY TO ENFORCEMENT OF PROTECTIVE COVENANTS IN A SUBDIVISION**. If the proposed development is a subdivision, language that allows and requires enforcement of the protective covenants by property owners if the development and that names Gunnison County as a party to enforcement.

4. **COUNTY IS PARTY TO AMENDMENT OR TERMINATION**. If the proposed development is a subdivision, language that requires that amendment or termination of the protective covenants is subject to approval by Gunnison County.

5. **DESIGN CRITERIA.** Design criteria that will govern construction within the proposed development, including:

   a. **BUILDING SCALE AND LOCATION.** Language defining building heights, compatibility with terrain, and sizes of all structures that will be allowed by the protective covenants. The requirements of Section 11-108: *Standards for Development on Ridgelines*, Section 13-103: *General Site Plan Standards and Lot Measurements*, Section 13-105: *Residential Building Sizes and Lot Coverages* shall guide the drafting of the covenant language.

   b. **ARCHITECTURAL STYLE AND EXTERIOR APPEARANCE.** Language describing the architectural style that will be required of all structures in the proposed development, and the types and colors of exterior materials to be used, including siding, roofing.

   c. **ENERGY AND RESOURCE CONSERVATION.** Language advising lot owners that an application to Gunnison Count for a residential Building Permit must comply with all applicable building codes adopted and amended by Gunnison County, and with any applicable energy and resource conservation standards currently required by the County.

BLM_0053327

6. **SOLID-FUEL-BURNING DEVICES.** If solid-fuel-burning devices are proposed to be used in the development, restrictions shall be listed ensuring compliance with Section 13-107: *Installation of Solid-fuel-burning Devices.*

7. **USE AND MAINTENANCE OF OPEN SPACE AREAS.** As applicable, language shall be included that lists uses allowed on, and requires maintenance of common open space areas by the homeowners association, or other appropriate entity, pursuant to Section 13-108: *Open Space and Recreation Areas.*

8. **SIGNS.** Language shall be included that informs property owners or other land users within the proposed development that installation of signs requires compliance with the *Gunnison County Land Use Resolution*, and may require a Gunnison County Sign Permit, pursuant to Section 13-109: *Signs.*

9. **RULES CONCERNING PARKING.** Language concerning limitations on parking within the development and/or outside the development by users of the development, pursuant to Section 13-110: *Off-Road Parking and Loading.*

10. **LANDSCAPING AND BUFFERING.** Language addressing installation and maintenance of landscaping pursuant to Section 13-111: *Landscaping and Buffering.*

11. **PROVISION FOR SNOW REMOVAL AND SNOW STORAGE.** Language Identifying responsibility of a property owners' or homeowners' association or other entity to remove snow from interior roads and parking areas, and other applicable requirements pursuant to Section 13-112: *Snow Storage.*

12. **FENCING.** Language that includes requirements that comply with those specified by Section 13-113: *Fencing.* If there is to be a fence separating the proposed development from lands on which there are agricultural operations or are public lands, language shall be included acknowledging Colorado's "fence out" requirements, and placing responsibility for construction and maintenance of the fence with the property owners' or homeowners' association.

13. **EXTERIOR LIGHTING.** Language that includes requirements that comply with those specified by Section 13-114: *Exterior Lighting.*

14. **RECLAMATION AND NOXIOUS WEED CONTROL.** Language that includes requirements that comply with those specified by Section 13-115: *Reclamation and Noxious Weed Control,* particularly that any construction must secure a Gunnison County Reclamation Permit, which may involve control of noxious weeds, subject to approval by the Gunnison County Public Works Department, and/or approval by the Gunnison Basin Weed Specialist.

15. **GRADING AND EROSION CONTROL.** Language that includes requirements that comply with those specified by Section 13-116: *Grading and Erosion Control.*

16. **STANDARDS TO ENSURE COMPATIBLE USES.** As applicable, specific covenants or other restrictions designed to mitigate impacts to nearby residential or public use areas or adjacent land uses, pursuant to Section 13-119: *Standards to Ensure Compatible Uses.*

17. **DOMESTIC ANIMAL CONTROL.** Language limiting the maximum number of domestic animals allowed on a lot or within the development, and requiring that they be confined on site by kenneling, leashing or other similar means. Language that includes requirements that comply with those specified by Section 11-106: F.6: *Domestic Animal Controls,* Section 11-109: D: *Domestic Animal Controls,* and Section 9-508: *Keeping of Livestock Not On an Agricultural Operation.*

18. **GEOTECHNICAL SITE-SPECIFIC STUDIES.** When a parcel is proposed for subdivision and analysis indicates it is located within a geologic hazard area, language shall be included that identifies the specific hazard in which the development, or identified portions of the development, are located, and refers by title, name of preparer, and date of preparation to the geotechnical analysis of the site.

   a. **COPY OF GEOTECHNICAL STUDY TO BE ATTACHED.** A copy of the geotechnical study(ies) shall be required to be attached as an exhibit to the protective covenants or deed restriction.

L. **COST ESTIMATES AND METHOD OF FINANCING.** The Preliminary Plan application shall include estimates by a qualified professional engineer licensed in the State of Colorado and/or contractors and suppliers of road construction costs and period of construction, materials, equipment, and labor costs, and proposed method of financing of roads and related facilities, the water supply and wastewater treatment systems, storm drainage facilities, and other improvements as may be required of the developer by the County. The proposed method of financing these facilities shall be identified, with documentation attesting that financing will be available for the proposed development.

BLM_0053328

**M.  ADDITIONAL INFORMATION.** Such additional information reasonably required by the Planning Department as necessary to determine the impact classification, or to otherwise aid in the evaluation of the development pursuant to the applicable requirements of this *Resolution*..

## SECTION 7-302: PRELIMINARY PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS

The following process (illustrated in the flowchart in Appendix Figure 7: *Preliminary Plan Review Process for Major Impact Projects*) shall apply to an application for review of a Preliminary Plan application for a Major Impact project.

**A.  PRE-APPLICATION CONFERENCE.** Attendance at a Pre-Application Conference is mandatory before submittal of the Preliminary Plan application, pursuant to Section 3-108: *Pre-Application Conference.*

**B.  SUBMITTAL OF DRAFT COPY.** The applicant shall submit one draft copy of the Preliminary Plan application to the Planning Department pursuant to Section 7-301: *Preliminary Plan Application for Major Impact Projects.*

 **1.  PLANNING DEPARTMENT REVIEW.** The Planning Department shall review the application pursuant to Section 3-110:  *Planning Department Review* and for its compliance with the conditions of the Board's approval of the Sketch Plan.

**C.  TOTAL NUMBER OF COPIES REQUIRED.** Once the Planning Department has determined the submittal to be complete, it shall determine the number of copies of the Preliminary Plan application that are necessary for review and action by the Planning Commission and/or Board, and other review agencies or County departments, and shall notify the applicant of the number of copies of the complete plan that are required to be submitted. The Department shall, as applicable, forward the application and any relevant comments to the Planning Commission and/or Board.

**D.  REVIEW AND COMMENT BY REVIEW AGENCIES.** The Planning Department shall forward copies of the Preliminary Plan to the Planning Commission and to review agencies, organizations, or technical consultants deemed appropriate and necessary to complete the Preliminary Plan review, including other County offices and departments; municipal, state, or federal agencies having an interest in or authority over all or part of the proposal; utility companies; the applicable school district and special service districts serving the proposed development; and engineers, designers, and legal consultants.

 **1.  REVIEW AND COMMENT BY REVIEW AGENCIES.** The review agencies that are sent copies of the Preliminary Plan application will be requested to make recommendations within 21 days of mailing by the Planning Department, unless an extension of not more than 30 days has been consented to by the applicant and the Board. The failure of any agency to respond within 21 days or within the period of extension shall not be deemed an approval of such plan by the agency.

**E.  APPLICANT'S REVIEW OF AND RESPONSE TO AGENCY COMMENTS.** The applicant shall have the right to review the comments and recommendations received, and to submit additional information and to make changes in the development proposal to meet the objections or comments of the review agencies; provided, however, that if such a change is substantial or if it significantly alters the nature, character or extent of the development, such change shall be considered to be an amendment of the Preliminary Plan application and shall require another agency review period.

**F.  WORK SESSIONS.** The Planning Commission shall conduct one or more work sessions to identify and consider any issues related to the Preliminary Plan. Both the Board and the Planning Commission may conduct additional work sessions during the Preliminary Plan review as they deem necessary to afford sufficient time to review the application materials and to identify and consider any issues related to the application.

**G.  SITE VISIT.** The Board and/or Planning Commission shall conduct site visits of the proposed project site if they determine that such a site visit will provide information useful to their review of the proposal. If the Planning Commission chooses to conduct a site visit, it shall do so before taking action on a recommendation to the Board on the Preliminary Plan application. Review of the application may be delayed for a reasonable period if inclement weather or snow or mud conditions prohibit a productive site visit.

**H.  DETERMINATION OF READINESS FOR HEARING.** The Planning Commission shall determine whether the Preliminary Plan application is complete, and sufficient to provide information for public review, and if it is, shall so notify the Board.

 **1.  PUBLIC HEARING.** The Planning Commission and Board shall jointly conduct a public hearing to consider the Preliminary Plan application.

BLM_0053329

2.  **SCHEDULING OF HEARING**. The Planning Commission shall identify a hearing date and time at which a public hearing, jointly conducted by the Board and the Planning Commission shall be scheduled. Notice of the date of the hearing and a complete copy of the Preliminary Plan application shall be forwarded to the Board, together with a copy of the Planning Department's report.

3.  **HEARING NOTICE**. Public notice that the Board and Planning Commission will jointly conduct a public hearing to consider the Preliminary Plan application shall be accomplished pursuant to Section 3-112: *Notice of Public Hearing*, and shall meet the required period of notice for a Board public hearing, pursuant to Table 1: *Timing of Notice*.

4.  **CONDUCT OF HEARING.** The chairperson of the Planning Commission will preside over the hearing, which will be conducted pursuant to Section 3-113: *Conduct of a Public Hearing*.

I.  **PLANNING COMMISSION RECOMMENDATION.** It is the goal but not the requirement (as scheduling may be affected by limited access, inclement weather, or other unforeseen circumstances) of this *Resolution,* that within 60 days following the closure of the public hearing, the Planning Commission shall consider the relevant materials and testimony and the compliance of the Preliminary Plan application with the applicable standards of this *Resolution*, and recommend approval, approval with conditions, or denial of the application. The recommendation shall be in written form, and shall, at a minimum, include the following:

1.  **COMPLIANCE WITH SKETCH PLAN APPROVAL CONDITIONS.** Whether the Preliminary Plan application has complied with the conditions imposed by the Board in the Sketch Plan approval. If the Planning Commission finds that the Preliminary Plan is not consistent with the approved Sketch Plan, then the applicant may be required to file an amended Sketch Plan application for reconsideration, pursuant to Section 7-202: *Sketch Plan Review Process for Major Impact Projects*.

2.  **CONSISTENCY WITH MAJOR IMPACT PROJECT REVIEW STANDARDS**. Whether the application is consistent with Section 7-102: *Standards of Approval for Major Impact projects*.

3.  **PHASING.** If the applicant has proposed, or the County has recommended that the project be developed in phases, a statement about the compliance of the proposed phasing with the requirements of this *Resolution*.

4.  **FINDINGS.** Findings based on consideration of the submitted plan, site observations, the Planning Director's analysis, and testimony received.

5.  **RECOMMENDATION OF BOARD ACTION.** A recommendation that the Board should approve, approve with conditions, or deny the Preliminary Plan application.

6.  **CONDITIONS OF A RECOMMENDATION OF APPROVAL.** If the recommendation is for approval, or approval with conditions, the following shall also be addressed:

    a.  **IDENTIFICATION OF PLAN ELEMENTS THAT REQUIRE MODIFICATION**. Identification of elements that do not comply with this *Resolution*, and, as applicable, recommendations of modifications that must be included in a Final Plan submittal so that the proposed project will comply with the standards of this *Resolution*.

    b.  **CITING OF REQUIRED COMPLIANCE WITH OTHER PERMIT CONDITIONS**. Conditions shall include the applicant's timely and fully obtaining and complying with all applicable federal, state, municipal and other permits required for the project, and the conditions of those permits.

J.  **RECOMMENDATION FORWARDED TO BOARD.** Within 15 days of the Planning Commission's action on the recommendation, the Planning Department shall forward the recommendation to the Board.

K.  **BOARD DECISION ON OPTIONAL BOARD PUBLIC HEARING**. The Board shall have the option of conducting another public hearing to consider the Preliminary Plan application and the Planning Commission's recommendation. Within 20 days of receipt of the Planning Commission's recommendation, the Board shall determine whether to conduct a public hearing. A decision to conduct or not to conduct such a hearing shall be based on the Board's determination of whether it is in the public interest to do so, and considering among other factors the following:

1.  **LEVEL OF PUBLIC INTEREST**. There has or has not been substantial public interest in the proposal; or

2.  **IDENTIFICATION OF NEW ISSUES**. Whether it is reasonably probable that new issues related to the Preliminary Plan application of the proposed land use change will be identified; or

BLM_0053330

    **3.** **IDENTIFICATION OF NEW INFORMATION**. Whether it is reasonably probable that new information related to the Preliminary Plan of the proposed land use change will be provided.

**L.** **BOARD PUBLIC HEARING**. If the Board chooses to conduct a public hearing, public notice shall be provided pursuant to Section 3-112: *Notice of Public Hearing,* and the hearing shall be conducted pursuant to Section 3-113: *Conduct of a Public Hearing.*

    **1.** **COST FOR PUBLIC HEARING NOTICE(S)**. The applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing.*

**M.** **BOARD ACTION**. Within 35 days after receipt of the Planning Commission recommendation, if the Board did not conduct another public hearing, or within 35 days after closure of the hearing if the Board conducted another public hearing, the Board shall approve, approve with conditions, or deny the Preliminary Plan. The Board's decision shall be entered into the official minutes of the meeting and shall contain the necessary findings of fact and reasons to support the decision. If the Board does not make separate findings of fact, it shall be presumed to have adopted the findings and recommendations of the Planning Commission.

    **1.** **DELAY OF ACTION**. Before it takes action on the application, the Board may refer the Preliminary Plan back to the Planning Commission for further consideration and recommendations if at least one of the following circumstances is present:

        **a.** **NEW INFORMATION SUBMITTED**. There has been information submitted that was not available for consideration by the Commission before its recommendation; or

        **b.** **INSUFFICIENT EVALUATION**. There are substantive issues or requirements of this *Resolution* that were not sufficiently evaluated in the Commission's recommendations; or

        **c.** **SUBSTANTIVE ALTERATION**. There has been a substantive alteration to the plan subsequent to the Commission's recommendation; or

        **d.** **NEED FOR CLARIFICATION**. There is an element of the Planning Commission's recommendation that requires clarification.

    **2.** **OFFICIAL RECORD**. The Board's decision shall be entered into the official minutes of the meeting.

**N.** **SIGNIFICANCE OF PRELIMINARY PLAN APPLICATION APPROVAL**. Approval of the Preliminary Plan application shall not constitute approval of the Major Impact project, or permission to proceed with construction of any aspect of the land use change. Approval shall only constitute authorization for the applicant to submit a Final Plan, in accordance with the representations made by the applicant and in response to any conditions placed on the Preliminary Plan by the Board.

**O.** **EXPIRATION**. The applicant shall be required to submit the Final Plan application within 12 months after the date of the approval of the Preliminary Plan. Failure to submit a complete Final Plan application within this time period shall render the Preliminary Plan approval null and void, and require the applicant to begin the Preliminary Plan review process again.

    **1.** **EXTENSION OF SUBMITTAL DEADLINE**. The Board may extend the deadline to submit a Final Plan application for good cause shown, provided the applicant requests the extension in writing no less than 30 days before the deadline, and provided the Board makes a finding that since approval of the Preliminary Plan there have been no substantial changes in circumstances of adjacent land uses, in the capability or willingness of proposed service providers to serve the development, or to the site of the proposed land use change. The Board may request a recommendation from the Planning Commission on the request for extension before taking action. In no case shall the deadline for submittal of a Final Plan application be extended for more than six months beyond the date of the 12-month expiration.

BLM_0053331

# DIVISION 7-400:
# FINAL PLAN FOR MAJOR IMPACT PROJECTS

## SECTION 7-401: FINAL PLAN APPLICATION FOR MAJOR IMPACT PROJECTS

After the Board has approved the Preliminary Plan application for a Major Impact project, the applicant may submit a Final Plan application consistent with this Section. The Final Plan includes both a narrative describing elements of the proposed project, and layout plans and/or plats that illustrate it.

**A. FINAL PLAN APPLICATION SHALL CONFORM TO THE APPROVED PRELIMINARY PLAN.** The Final Plan application shall conform to the approved Preliminary Plan, and shall specifically address and comply with the conditions stated in the Board's approval of the Preliminary Plan.

    **1. CHANGES BETWEEN PRELIMINARY PLAN APPROVAL AND FINAL PLAN SUBMITTAL**. The Final Plan application shall identify any changes between the previously-approved Preliminary Plan and the submitted Final Plan. The application shall be referred to the Planning Commission for further consideration and recommendation if at least one of the following circumstances is present:

        **a. NEW INFORMATION IS SUBMITTED**. There has been significant information submitted that was not included in the approved Preliminary Plan; or

        **b. SUBSTANTIVE ALTERATION**. There has been a substantive alteration to the plan subsequent to the Board's approval of the Preliminary Plan.

**B. PHASING.** The Final Plan may include separate phases. Each phase may be separately reviewed and approved. Submittals for each phase of a Final Plan and Plat, as applicable, and references within applicable protective covenants and Development Improvement Agreements, shall include the name of the development, and the appropriate phase number.

**C. CONDOMINIUM AND TOWNHOME DEVELOPMENTS.** A Major Impact project that is a plan for condominium or townhome development shall require a Final Plan approval for the layout, infrastructure and amenities that corresponds to the approved Preliminary Plan for the project. Building Permits may then be issued for construction of individual buildings. A Final Plat shall be submitted after the buildings are constructed, that is reviewed and recorded pursuant to Article 5: *Administrative Review Projects That Require Land Use Change Permits*.

**D. APPLICATION AND REVIEW FEES**. In order to compensate the County for the cost of reviewing and processing the Preliminary Plan, each applicant shall pay the required fee, as shown in a schedule of fees issued by the Planning Department that is adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

    **1. IMPACT FEES**. As applicable, payment in full of any impact fees.

**E. SUBMITTAL OF DRAFT COPY**. The applicant shall submit one draft copy of the Final Plan application to the Planning Department.

    **1. PLANNING DEPARTMENT REVIEW.** The Planning Department shall review the application pursuant to Section 3-110: *Planning Department Review* and for its compliance with the conditions of the Board's approval of the Preliminary Plan.

**F. TOTAL NUMBER OF COPIES REQUIRED.** Once the Planning Department has determined the submittal to be complete, it shall determine the number of copies of the Final Plan application that are necessary for review and action by the Planning Commission and/or Board, and other review agencies or County departments, and shall notify the applicant of the number of copies of the complete plan that are required to be submitted. The Department shall, as applicable, forward the application and any relevant comments to the Planning Commission and/or Board.

**G. NARRATIVE.** The Final Plan shall include the following, presented in the same order as it is listed here, in a stapled or otherwise bound document, on consecutively-numbered pages:

BLM_0053332

1. **APPLICANT.** The applicant's name, address, telephone and fax numbers, and e-mail address. If the applicant is to be represented by an agent, a notarized letter signed by the applicant shall be submitted authorizing the agent to represent the applicant and stating the representative's name, address, telephone and fax numbers and e-mail address.

   a. **APPLICANT OTHER THAN APPLICANT AT PRELIMINARY PLAN APPROVAL.** If the applicant is not the same as the applicant who submitted the Preliminary Plan, that fact shall be noted, and a notarized letter of consent from the current property owner for the current applicant to proceed with the review shall be submitted.

   b. **APPLICANT IS NOT THE OWNER.** If the applicant is not the owner of the land, or is a contract purchaser of the land, the applicant shall submit a notarized letter signed by the owner consenting to the submittal. Consent of the owner for submittal shall imply consent by the owner for the County to complete the review process pursuant to this *Resolution*.

   c. **APPLICANT IS NOT THE SOLE OWNER.** If the applicant is not the sole owner of the land, the applicant shall submit a notarized letter(s) signed by all other owners, and/or by an association or corporation representing the owners, consenting to, or joining in, the application.

2. **PROPERTY OWNER.** The property owner's name, address, telephone and fax numbers and e-mail address and, if other than the applicant, a notarized letter from the owner consenting to the application.

   a. **OWNER OTHER THAN OWNER AT PRELIMINARY PLAN APPROVAL.** If the property ownership has changed, either by fee simple sale or organization since the Preliminary Plan was approved, that shall be noted and relevant documentation submitted.

3. **TABLE OF CONTENTS.** A table of contents that lists sections of information by page number, and the exhibits, plats and plans and other documents.

4. **PROJECT DESCRIPTION.** A detailed description of uses and activities that shall conform to those approved in the Preliminary Plan approval:

   a. **USES AND ACTIVITIES.** Proposed uses or activities, division of land, adjustment of boundaries, expansion of existing uses, and construction, stockpiled materials, indoor and outdoor storage areas.

   b. **NUMBERS OF UNITS OR OTHER SIZES OF USES.** Numbers of units or lots. The square footage or acreage of commercial, industrial or other uses.

   c. **DESCRIPTION OF STRUCTURES.** Description of structures to be constructed, their estimated size(s) and appearance.

   d. **DESCRIPTION OF OFF-SITE RESOURCES.** Description of off-site resources, hazardous activities and haul routes.

   e. **IDENTIFICATION OF LOT USE WITHIN SUBDIVISION.** If subdivision of the property is proposed, the uses proposed for all resulting lots.

   f. **SEASONS AND HOURS OF OPERATION.** As applicable, the seasons of the year in which the activity is proposed to be conducted, and the intended hours of operation.

   g. **PHASES.** Phases of the Final Plan if applicable.

5. **DOCUMENTATION OF CONVEYANCE OF LAND OR EASEMENT.** As applicable a copy of warranty deed s to, or easement agreements with, the appropriate entity conveying or providing easement to the County or other entity, for any land set aside for road rights-of-way, public trails, or other public use.

6. **PROTECTIVE COVENANTS AND DESIGN GUIDELINES, CONDOMINIUM OR TOWNHOME DECLARATIONS, OR DEED RESTRICTIONS.** Protective covenants, design guidelines, condominium or townhome declaration or similar restrictions that will be imposed on the development, and, if applicable, recorded with a Final Plat. The protective covenants submittal shall be the final, recordable form of the protective covenants presented in draft form and reviewed as part of the Preliminary Plan and, at a minimum, shall address:

   a. **CONDITIONS OF PRELIMINARY PLAN APPROVAL.** As applicable, those items required by the Preliminary Plan approval to be included within protective covenants, design guidelines, condominium or townhome declarations or deed restrictions.

BLM_0053333

**b.** **RESPONSIBILITIES OF HOMEOWNERS' ASSOCIATION.** As applicable, responsibilities of property owners or homeowners' association to collect dues, maintain common areas, improve infrastructure common to the development, maintenance of a decreed water augmentation plan and the augmented water supply, treatment of wastewater and/or water, and to oversee the maintenance of the general appearance of the development.

**c.** **COUNTY IS PARTY TO AMENDMENT OR TERMINATION.** Language that requires that amendment or termination of the protective covenants or restriction is subject to approval by Gunnison County.

   **1.** **DESIGN CRITERIA.** Design criteria that will govern development within the subdivision, including:

   **(a.)** **BUILDING SCALE AND LOCATION.** Language defining building heights, compatibility with terrain, and sizes of all structures that will be allowed by the protective covenants. The requirements of Section 11-108: *Standards for Development on Ridgelines*, Section 13-103: *General Site Plan Standards and Lot Measurements,* Section 13-105: *Residential Building Sizes and Lot Coverages* shall guide the drafting of the covenant language.

   **(b.)** **ARCHITECTURAL STYLE AND EXTERIOR APPEARANCE.** Language describing the architectural style that will be required of all structures in the proposed development, and the types and colors of exterior materials to be used, including siding, roofing.

**d.** **DOMESTIC ANIMAL CONTROL.** Language limiting the maximum number of domestic animals allowed on a lot or within the development, and requiring that they be confined on site by kenneling, leashing or other similar means. Language that includes requirements that comply with those specified by Section 11-106: F.6: *Domestic Animal Controls,* Section 11-109: D: *Domestic Animal Controls,* and Section 9-508: *Keeping of Livestock Not On an Agricultural Operation.*

**e.** **EXTERIOR LIGHTING.** Language that includes requirements that comply with those specified by Section 13-114: *Exterior Lighting.*

**f.** **FENCING.** Language that includes requirements that comply with those specified by Section 13-113: *Fencing.* If there is proposed to be a fence separating the proposed development from lands on which there are agricultural operation or are public lands, language shall be required acknowledging Colorado's "fence out" requirements, and placing responsibility for construction and maintenance of the fence with the property owners or homeowners' association.

**g.** **LANDSCAPING AND BUFFERING.** Language addressing installation and maintenance of landscaping pursuant to Section 13-111: *Landscaping and Buffering.*

**h.** **RECLAMATION AND NOXIOUS WEED CONTROL.** Language that includes requirements that comply with those specified by Section 13-115: *Reclamation and Noxious Weed Control.*

**i.** **PROVISION FOR SNOW REMOVAL.** Identification of responsibility of a property owners' or homeowners' association to remove snow from interior roads and parking areas.

**j.** **SOLID-FUEL-BURNING DEVICES.** If solid-fuel-burning devices are to be used in the proposed development, restrictions shall be listed ensuring compliance with Section 13-107: *Installation of Solid-Fuel-Burning Devices.*

**k.** **GEOTECHNICAL SITE-SPECIFIC STUDIES.** When a parcel is proposed for subdivision and analysis has indicated it is located within a geologic hazard area, language shall be included that identifies the specific hazard in which the development, or identified portions of the development, are located, and refers by title, name of preparer, and date of preparation to the geotechnical analysis of the site.

   **1.** **COPY OF GEOTECHNICAL STUDY TO BE ATTACHED.** A copy of the geotechnical study(ies) shall be required to be attached as an exhibit to the protective covenants or deed restriction.

**7.** **DOCUMENTATION ESTABLISHING ADMINISTRATIVE ASSOCIATION.** If the development is a subdivision, condominium or townhome development, proof of the establishment of any applicable homeowners' or property owners' association, district, architectural control committee or other group that will administer or enforce protective covenants, declarations or deed restrictions. If proof of establishment is not submitted with the Final Plan application, establishment shall be guaranteed through provisions in the Development Improvement Agreement, and all relevant documentation creating the organization shall be submitted to the Planning Department.

BLM_0053334

8. **FINAL COST ESTIMATES**. Documentation from contractors, materials providers, engineers or other professionals, certifying final estimates for roads, bridges, drainage facilities, water supply and wastewater treatment systems, landscaping and other improvements required by the County for final approval.

9. **COPY OF PROPERTY TAX CERTIFICATE.** Copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

10. **DRAFT DEVELOPMENT IMPROVEMENT AGREEMENT** Pursuant to Section 16-117: *Development Improvement Agreement Required*, when public or private improvements are a required component of a Land Use Change Permit, the applicant shall provide a copy of documentation of the certified final cost estimates to the County Attorney's office which will draft a Development Improvement Agreement that references specific amenities of the project that were required by the Preliminary Plan approval, and the method of funding to ensure their completion. The Development Improvement Agreement shall specifically identify such requirements referencing plans, drawings and schedules for completion and shall be substantially in the form referenced in Section 16-117: *Development Improvement Agreement Required.*

11. **INFORMATION TO ASSESSOR'S OFFICE.** If the development is a subdivision, condominium or townhome development, a copy of a notarized signed statement from the developer agreeing to provide the Gunnison County Assessor's Office with the following information before November 30 of each year shall be submitted:

   a. **PARCELS SOLD.** A description of all lots or parcels sold within the development.

   b. **PURCHASER INFORMATION.** Name and address of each purchaser.

   c. **PURCHASE PRICE.** Purchase price of each parcel sold.

H. **LAYOUT AND DESIGN.** The application shall include a rendering of the final layout and design plan of the project that shall include:

1. **SURVEY.** A scale survey of the boundaries of the land parcel, showing all planned, recorded and apparent rights-of-way and all easements including ditches, utility lines, roads, and paths or trails; a description of all monuments found and set marking the boundaries of the property; and a description of all control monuments used and all dimensions necessary to establish the boundaries in the field. All section, quarter-section, township and range lines that cross the development shall be identified.

2. **SCALE.** Scale shall be 100 feet to the inch, except building plans and townhome or condominium plans may be at a larger scale if appropriate.

3. **SHEET SIZE.** Sheet size shall be 24 inches by 36 inches. When a large development requires more than two sheets at the required scale, the applicant shall also submit a total area plan showing the entire development at a scale that is clearly legible.

4. **LOCATIONAL INFORMATION.** Each sheet shall contain a scale (written and graphic), north arrow and a heading containing the name and location of the development by reference to a quarter-section, township and range, and a reference to a U.S. Mineral survey where applicable.

5. **SUBDIVISION PLAT**. If the development is a subdivision, the final layout shall be presented as a recordable Plat, and include the required language pursuant to Section 7-401: M: *Specifications for Subdivision Plats.*

I. **ENGINEERED PLANS**. Final engineering design plans and descriptions for roads, bridges, drainage facilities, water supply and wastewater treatment systems, landscaping and other improvements proposed to be installed by the developer, or required by the County; such plans shall be designed and stamped by a qualified professional engineer licensed in the State of Colorado. Engineering plans may be bound separately when size or bulk makes it advisable. Two folded copies of each of the plans shall be provided that can be stored in legal-sized folders, and shall not be submitted in rolled form.

J. **UTILITY LOCATION PLANS.** Final utility location plans approved by all utility companies that were identified in Preliminary Plan as providing service to the development.

K. **WATER SUPPLY.** Documentation of a final court decree, deed or other written evidence demonstrating ownership and/or right to use water in the amounts, manner and location(s) for the uses and activities addressed in the Preliminary Plan.

BLM_0053335

1.  **WATER AUGMENTATION PLAN.** If the Division of Water Resources required that a plan of water augmentation be designed, submitted and approved, a copy of the decree(s) for the plan shall be submitted. The plan shall accurately portray the number and types of uses described in the applicant's Final Plan application submittal, including phases, if applicable.

L.  **RURAL ADDRESSING SYSTEM PLATS.** If the development is a subdivision, condominium or townhome development, three copies of the Final Plat, 14 inches by 17 inches, for inclusion in the rural addressing system, one of which the Planning Department will provide to the applicable County department for emergency services purposes.

M.  **SPECIFICATIONS FOR SUBDIVISION PLATS.** Subdivision plats intended for recording shall be prepared by a surveyor registered in the State of Colorado, clearly and legibly drawn on indelible mylar so that legible prints can be made from it. The final plat recorded in the Office of the Clerk and Recorder of Gunnison County shall be a nonerasable mylar copy of the original. Sheet size shall be 24" x 36". The scale of the final plat shall be sufficiently large to show clearly the details of the plan (preferably 1" = 100').

1.  **PUBLIC AREAS.** All public or common areas shall be identified.

2.  **NON-DUPLICATING ROAD NAMES.** All roads shall be named. Road names shall not duplicate those of any existing named road within the unincorporated county or any incorporated municipality, to avoid confusion and duplication.

3.  **ACCESS AND OTHER EASEMENTS.** Planned and existing, recorded or apparent easements shall be shown, including 25-foot easements from each irrigation ditch bank pursuant to Section 11-109: G. 2.: *Irrigation Ditch Easements*, watercourses, public utilities, drains, sewers, snow storage areas, roads and paths or trails crossing the property, the closing or changing of which might affect the rights of others or result in damage to the property of the owner.

4.  **BLOCKS AND LOTS.** All blocks and lots or spaces shall be consecutively numbered.

5.  **LOT ADDRESSES.** The applicant shall provide a copy of the Final Plat to the Gunnison County Building Inspector who shall assign the appropriate addresses, which shall be shown on the recordable Final Plat.

6.  **REFERENCE TO PROTECTIVE COVENANTS.** If protective covenants are included as an element of the development, they shall be filed with the plat and the plat shall contain the correct recording references.

7.  **CURVE DATA.** All curve data, in a chart that includes radii, internal angles, and lengths of all arcs and points of curvature.

8.  **REQUIRED PLAT LANGUAGE.** The following plat language:

    a.  **FLOODPLAIN WARNING AND DISCLAIMER.** If subject property is located within an identified floodplain, language shall be included on the plat pursuant to Section 11-103: F. 1. *Warning and Disclaimer of Floodplain Hazards Affecting Use and Occupancy of This Property.*

    b.  **GEOLOGIC HAZARDS WARNING AND DISCLAIMER.** If the subject property is located within an identified geologic hazard area, language shall be included on the plat pursuant to Section 11-104: F. 5: *Warning and Disclaimer of Geologic Hazards Affecting Use and Occupancy of This Property.*

    c.  **WILDFIRE HAZARD AREA WARNING AND DISCLAIMER.** If the subject property is located within an area designated as a wildfire hazard area, language shall be included on the plat pursuant to Section 11-106: G: *Warning and Disclaimer of Wildfire Hazards Affecting Use and Occupancy of This Property.*

    d.  **COMPLIANCE WITH COUNTY APPROVAL DOCUMENTS.** A Final Plat presented for approval shall contain one of the following statements, as applicable:

        1.  **COMPLIANCE WITH BOARD RESOLUTION.**

            COMPLIANCE WITH BOARD OF COUNTY COMMISSIONERS' RESOLUTION
            *The property described on this plat is subject to all the requirements, terms and conditions of the Board of County Commissioners' Resolution No. _____, recorded at Reception No._____ of the Records of the Clerk and Recorder of Gunnison County.*

        2.  **COMPLIANCE WITH APPLICABLE CERTIFICATE OF APPROVAL.**

            COMPLIANCE WITH CERTIFICATE OF APPROVAL

BLM_0053336

*The property described on this plat is subject to all the requirements, terms and conditions of Certificate of Approval No. _____, recorded at Reception No._____ of the Records of the Clerk and Recorder of Gunnison County.*

**e.   GENERAL NOTES.** Pursuant to Section 11-110: H: *Protective Covenants or Deed Restrictions and Plat Language*, the following paragraphs shall be included within a section of General Notes on a Final Plat:

**1.   CONFINEMENT OF DOMESTIC ANIMALS.** Language directing that domestic animals must be controlled by kenneling, leash, fencing or other physical constraint and that any expense of enforcement of the domestic animal control restrictions by the County shall be at the expense of the responsible association or individual.

**2.   AWARENESS OF COLORADO "FENCE-OUT" REQUIREMENTS.** Language referencing C.R.S. 35-46-101 et seq: clearly stating that a property owner is required to construct and maintain fencing in order to keep livestock off his/her property.

**3.   IRRIGATION DITCH MAINTENANCE.** Language notifying individual lot owners that an irrigation ditch owner has the right to enter the designated irrigation ditch maintenance easement, maintain the ditch, and leave natural debris on the bank.

**f.   ATTORNEY'S OPINION.** The following opinion by the applicant's attorney:

ATTORNEY'S OPINION

*I, (printed name of attorney), an attorney at law duly licensed to practice in the State of Colorado, hereby certify that I have examined title to all lands herein dedicated and subdivided. Such title is vested in_____ and is free and clear of all liens, defects, encumbrances, restrictions and reservations except as follows :_____( list same or indicate none).*
*Dated this _____ day of _____, A.D. 20___.*

_____
*Attorney-at-Law*

**g.   DEDICATION.** A Final Plat presented for approval shall contain one of the following statements concerning dedication, which shall be followed by the Notary Statement set forth in (3) below:

**1.   DEDICATION LANGUAGE.**

DEDICATION

*(I, We), _____(printed name of owner(s), mortgagee(s) and lien holder(s))_____being the owner(s), mortgagee(s) and lien holder(s) of the land described as follows: (insert legal description of land being platted and/or subdivided and include area in acres to two (2) decimal places) in Gunnison County, Colorado, under the name of (complete name of development in capital letters), have laid out, platted and/or subdivided the same as shown on this plat and do hereby permanently dedicate to the public at large the streets, alleys, roads and other public areas as shown hereon and hereby permanently dedicate those portions of land labeled as easements for the installation and maintenance of public utilities as shown hereon.*

*In witness whereof (printed name of the owner) has (have) subscribed (his, her, their) name(s) this _____ day of _____, A.D. 20___.*
*By _____*
*Owner(s), Mortgagee(s) and Lien holder(s)*

**2.   DEDICATION/ALTERNATIVE LANGUAGE.**

DEDICATION

*(I, We), _____(printed name of owner(s), mortgagee(s) and lien holder(s))_____, being the owner(s), mortgagee(s) and lien holder(s) of the land described as follows: (insert legal description of land being platted and/or subdivided and include area in acres to two (2) decimal places) in Gunnison County, Colorado, under the name of (complete name of development in capital letters), have laid out, platted and/or subdivided the same as shown on this plat and do hereby permanently dedicate and convey to the owners of lots, tracts or parcels within this subdivision and their guests, but not to the public at large, the common right to use streets, alleys,*

BLM_0053337

*roads and other areas as shown hereon and hereby permanently dedicate those portions of land labeled as easements for the installation and maintenance of public utilities as shown hereon.*

*In witness whereof (printed name of the owner(s)) has (have) subscribed his, her, their name(s) this _____ day of _____, A.D. 20_____.*
*By _____*
*Owner(s), Mortgagee(s) and Lien holder(s)*

3.   **NOTARIAL.**

*State of Colorado)*
*) ss.*
*County of Gunnison)*

*The foregoing instrument was acknowledged before me this _____ day of _____, A.D. 20_____, by (printed name of owner(s): if by natural persons here, insert name; if by person acting in a representative official capacity, insert capacity; if by officers of a corporation, then insert the title of said officers and the name of the corporation).*

*My commission expires: _____*
*My address is: _____*
*Witness my hand and official seal:*
*_____ (seal)*
*Notary Public*

h.   **PLANNING COMMISSION APPROVAL.** If the Board in its approval of Preliminary Plan required review and approval of the Final Plan by the Planning Commission, the following language shall be included on the Plat:

GUNNISON COUNTY PLANNING COMMISSION APPROVAL
*The Planning Commission of Gunnison County, Colorado, hereby recommends _____ approval of this plat of the above subdivision, such recommendation being made at a meeting of said Commission held on this _____ day of _____, A.D. 20_____.*

_____
*Chairperson, Gunnison County Planning Commission*

i.   **BOARD OF COUNTY COMMISSIONERS' APPROVAL.** As is consistent with the selected paragraph of dedication, any Final Plat submitted for approval shall contain one of the following statements of approval as appropriate:

1.   **BOARD APPROVAL LANGUAGE:**

BOARD OF COUNTY COMMISSIONERS' APPROVAL
*The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____, and the roads and other public areas are hereby accepted provided, however, that such acceptance shall not in any way be considered as an acceptance for maintenance or snow removal purposes. Maintenance of, or snow removal from, the subject roads shall be only upon a separate Resolution of the Board of County Commissioners passed in accordance with such policies, resolutions or ordinances in effect at that time.*

_____
*Chairperson, Gunnison County Board of Commissioners*
*Attest:*

_____
*Gunnison County Clerk and Recorder*

2.   **BOARD APPROVAL: FIRST ALTERNATIVE LANGUAGE:**

BOARD OF COUNTY COMMISSIONERS' APPROVAL
*The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____, and the private dedication of roads and common areas is approved on the condition that such roads and common areas shall be maintained and snowplowed, by and at the expense of the lot owners and not by Gunnison County or any other public agency.*

_____

BLM_0053338

*Chairperson, Gunnison County Board of Commissioners*

*Attest:*

_____
*Gunnison County Clerk and Recorder*

3. **BOARD APPROVAL: SECOND ALTERNATIVE LANGUAGE**:

   BOARD OF COUNTY COMMISSIONERS' APPROVAL

   *The within plat of (name of development in capital letters) Is approved this _____ day of _____, A.D. 20_____, as a seasonal use development only and not as a development served by a road opened or to be opened on a year-round basis. The roads and other public areas are hereby accepted provided, however, that such acceptance shall not in any way be considered as an acceptance for maintenance purposes. Maintenance of, or snow removal from the subject roads shall be only upon a separate resolution of the Board of County Commissioners passed in accordance with such policies, resolutions or ordinances in effect at that time.*

   _____
   *Chairperson, Gunnison County Board of Commissioners*

   *Attest:*

   _____
   *Gunnison County Clerk and Recorder*

4. **BOARD APPROVAL: THIRD ALTERNATIVE LANGUAGE:**

   BOARD OF COUNTY COMMISSIONERS' APPROVAL

   *The within plat of (name of development in capital letters) is approved this _____ day of _____, A.D. 20_____ as a seasonal use development only and not as a development served by a road opened or to be opened on a year-round basis. The private dedication of roads and common areas is approved on the condition that such roads and common areas shall be maintained and snowplowed, by and at the expense of the lot owners and not by Gunnison County or any other public agency.*

   _____
   *Chairperson, Gunnison County Board of Commissioners*

   *Attest:*

   _____
   *Gunnison County Clerk and Recorder*

5. **GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE.** (To be placed in the lower right-hand corner of cover sheet.)

   GUNNISON COUNTY CLERK AND RECORDER'S ACCEPTANCE

   *This plat was accepted for filing in the office of the Clerk and Recorder of Gunnison County, Colorado, on this _____ day of _____, A.D. 20_____, Reception Number _____, Time _____, Date _____.*

   _____
   *Gunnison County Clerk and Recorder*

6. **SURVEYOR'S STATEMENT.** A statement, followed by the land surveyor's signature and seal, certifying that the survey was performed by him or under his direct responsibility and supervision and explaining how bearings, if used, were determined.

N. **RECORDING OF PLAT FOR A SUBDIVISION.** If the development is a subdivision plat, then within 120 days of the date of approval of the Final Plan by the Board, the Planning Director shall file or oversee the filing of the plat in the Office of the County Clerk and Recorder. Approved protective covenants or declarations shall be recorded at the same time the plat to which they relate is filed in that office. The expense of the filing shall be borne by the applicant.

# SECTION 7-402: FINAL PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS

The following process (illustrated in the flowchart in Appendix Figure 8: *Final Plan Review Process for Major Impact Projects*) shall apply to the review of a Final Plan application for a Major Impact project.

BLM_0053339

**A.  PRE-APPLICATION CONFERENCE.** Attendance at a Pre-Application Conference is optional before submittal of the Final Plan application, pursuant to Section 3-108: *Pre-Application Conference.*

**B.  SUBMITTAL OF DRAFT COPY.** The applicant shall submit one draft copy of the Final Plan application to the Planning Department pursuant to Section 7-401: *Final Plan Application for Major Impact Projects.*

    **1.  PLANNING DEPARTMENT REVIEW.** The Planning Department shall review the application for completeness, for its compliance with the conditions of the Board's approval of the Preliminary Plan

    **2.  TOTAL NUMBER OF COPIES REQUIRED.** The Planning Department shall determine the number of copies of the Final Plan application that are necessary for review and final action by the Planning Commission and/or Board, other review agencies or County departments, and shall notify the applicant of the number of copies required to be submitted. The Department shall, as applicable, forward the application and any relevant comments to the Planning Commission or Board.

**C.  REFERRAL TO PLANNING COMMISSION.** The application shall be referred to the Planning Commission for further consideration and recommendation if at least one of the following circumstances is present:

    **1.  BOARD REQUIRED PLANNING COMMISSION REVIEW OF FINAL PLAN.** The Board in its approval of the Preliminary Plan required that the Final Plan be reviewed by the Planning Commission; or

    **2.  NEW INFORMATION IS SUBMITTED.** There has been significant information submitted that was not included in the approved Preliminary Plan; or

    **3.  SUBSTANTIVE ALTERATION FOLLOWING PRELIMINARY PLAN APPROVAL.** There has been a substantive alteration to the plan subsequent to the Board's approval of the Preliminary Plan.

**D.  PLANNING COMMISSION REVIEW.** If, as a condition of its Preliminary Plan approval, the Board required that the Final Plan be reviewed by the Planning Commission, or pursuant to Section 7-402: C. 1.: *New Information Submitted* or Section 7-402: C. 2.: *Substantive Alteration Following Preliminary Plan Approval*, then a complete copy of the application shall be forwarded to the Planning Commission, together with a copy of the Planning Department's applicable comments. It is the goal, but not the requirement, of this *Resolution*, that within 60 days of the receipt of the application by the Planning Department, the Planning Commission shall consider all relevant materials and testimony; and forward a recommendation to the Board.

    **1.  PLANNING COMMISSION RECOMMENDATION.** If the Board required the Planning Commission to review and forward a recommendation on the Final Plan, the Commission shall provide its written recommendation as to whether the Board should approve or deny the Final Plan. A conditional Recommendation of approval of a Final Plan is not preferred, but the Planning Commission may specify certain requirements to be met before presentation of the Final Plan to the Board. The recommendation shall be in written form, and shall, at a minimum, include the following:

        **a.  COMPLIANCE WITH PRELIMINARY PLAN APPROVAL CONDITIONS.** Whether the Final Plan application has complied with the conditions imposed by the Board in the Preliminary Plan approval.

        **b.  CONSISTENCY WITH MAJOR IMPACT PROJECT REVIEW STANDARDS.** Whether the application complies with Section 7-102: *Standards of Approval for Major Impact Projects.*

        **c.  FINDINGS.** Findings based on conclusions reached by the Planning Commission in its review of the submitted plan.

        **d.  RECOMMENDATION OF BOARD ACTION.** A recommendation that the Board should approve, approve with conditions, or deny the Final Plan application.

**E.  BOARD ACTION.** Within 35 days of the Planning Commission recommendation, a complete copy of the application and the Planning Commission's recommendation shall be forwarded to the Board. The Board shall consider all relevant materials and testimony; shall assess whether the Final Plan complies with the conditions of Preliminary Plan approval and with Section 7-102: *Standards of Approval for Major Impact Projects;* and shall approve or deny the application. If the project is a commercial or industrial use, the Board action shall also state when the project shall be considered completed, pursuant to Section 1-104: F. 3. c: *Commercial or Industrial Project.*

    **1.  ADDITIONAL PLANNING COMMISSION REVIEW MAY BE REQUIRED.** Before it takes action on the application, the Board may refer the application back to the Planning Commission for further consideration and recommendations if at least one of the following circumstances is present:

BLM_0053340

    **a.** **NEW INFORMATION SUBMITTED**. There has been information submitted that was not available for consideration by the Commission before its recommendation; or

    **b.** **INSUFFICIENT EVALUATION**. There are substantive issues or requirements of this *Resolution* that were not sufficiently evaluated in the Commission's recommendations; or

    **c.** **SUBSTANTIVE ALTERATION**. There has been a substantive alteration to the plan subsequent to the Commission's recommendation; or

    **d.** **NEED FOR CLARIFICATION**. There is an element of the Planning Commission's recommendation that requires clarification.

  **2.** **BOARD ACTION AFTER IF REFERRED TO PLANNING COMMISSION**. If the application is referred to the Planning Commission for additional review, the Board shall, within 35 days after receipt of the Planning Commission's additional recommendation, approve, approve with conditions, or deny the application.

**F.** **RECORDATION OF CERTIFICATE OF APPROVAL.** Within 30 days following approval of the Final Plan, the Planning Director shall record a Certificate of Major Impact project Approval in the Office of the Gunnison County Clerk and Recorder's Office. The Certificate shall summarize the specific project, the legal description of the subject property, include reference to the approval by the relevant decision body, the date on which the approval occurred, and shall include, as applicable, an attached exhibit a copy of any resolution, or other decision document memorializing the approval.

  **1.** **APPROVAL DOES NOT CONSTITUTE ACCEPTANCE OF MAINTENANCE OR DEDICATION**. Approval of the Final Plan by the Board does not constitute acceptance of maintenance responsibility for any dedicated roads, alleys or other public lands or an agreement to remove snow from those areas, nor does approval constitute acceptance of any dedication of any public areas including roads or alleys without explicit Board acceptance of such dedication.

**G.** **INSUBSTANTIAL CHANGES AND AMENDMENTS**. Insubstantial changes to an approved Major Impact project may be authorized by the Planning Director without additional public hearing.

  **1.** **LIMITS ON INSUBSTANTIAL CHANGES.** Insubstantial changes shall be limited to technical or engineering considerations that arise during final design or during actual construction, or similar minor modifications to features of the project that are necessary to address technical constraints or unanticipated consequences.

  **2.** **ACTIVITIES NOT CONSIDERED INSUBSTANTIAL**. Activities that shall not be considered insubstantial and that may not be authorized by the Planning Director include changes to the overall character of the project, changes that substantially increase the project's trip generation or demand for public facilities, and changes that are inconsistent with a condition or representation of the project's original approval. Such activities shall be considered amendments of the plan and may only be authorized by the applicant's submitting a new application and repeating the review process for a Major Impact project.

BLM_0053341

# ARTICLE 8:
# TECHNICAL MODIFICATIONS, TAKINGS, APPEALS AND EXCEPTIONS

## SECTION 8-101: TECHNICAL MODIFICATIONS

**A. PURPOSE.** This Section sets forth the process and standards for obtaining a Technical Modification, which is a minor deviation of not more than ten percent from any minimum or maximum numerical standard required by this *Resolution*.

**B. APPLICABILITY.** A Technical Modification may be granted by the decision-making body that has final authority to approve or deny the permit application for which a Technical Modification is requested. If the circumstances requiring the Technical Modification become apparent only after a Land Use Change Permit has been approved, the Technical Modification may be approved by the decision-making body that originally approved the permit.

    **1. ADMINISTRATIVE REVIEW OR MINOR IMPACT PROJECT.** The Planning Director or the Planning Commission may grant a Technical Modification concurrent with the approval of a Land Use Change Permit for an Administrative Review project or Minor Impact project, or

    **2. MAJOR IMPACT PROJECT.** The Board may grant a Technical Modification concurrent with the approval of the Preliminary or Final Plan of a Major Impact project.

**C. PROCESS.** The following process shall apply to an application for a Technical Modification.

    **1. PRE-APPLICATION CONFERENCE.** Attendance at a Pre-Application Conference is mandatory before submittal of a Technical Modification application, pursuant to Section 3-108: *Pre-Application Conference*.

    **2. APPLICATION.** The applicant shall submit an application that includes the following materials:

        **a. SITE PLAN.** A site plan of the subject property, showing existing improvements and proposed development features that are relevant to the review of the proposed Technical Modification (illustrated in Appendix Figure 1: *Site Plan Example.*).

        **b. DESCRIPTION OF REQUESTED MODIFICATION.** A description of the requested modification, including how the request complies with 8-101: D: *Review Standards for Technical Modifications*.

        **c. OTHER MATERIALS.** As necessary, the applicant shall also submit written or graphic information necessary to describe the proposal and to explain its compliance with the standards of this Section.

    **3. PLANNING DEPARTMENT REVIEW.** The Planning Department shall review the application for completeness, determine whether it meets the requirements of this Section, and shall so indicate to the applicable decision-making body.

    **4. ACTION BY DECISION-MAKING BODY.** A complete copy of the application shall be forwarded to the applicable decision-making body, together with a copy of the Planning Department Review and recommendation. The review body shall review the application, consider the standards of Section 8-101: F: *Review Standards for Technical Modifications*, and may approve, approve with conditions, or deny the application.

**D. STANDARDS OF APPROVAL FOR TECHNICAL MODIFICATION'S.** An application for a Technical Modification shall comply with all of the following standards:

    **1. TECHNICAL OR INSUBSTANTIAL.** The proposed modification shall be of a technical or insubstantial nature, and necessary to compensate for an unusual aspect or feature of the property or of the land use change that is not shared by properties in general, or is necessary to address an unusual hardship associated with the application of the particular standard on the property.

BLM_0053342

2. **TEN PER CENT LIMIT.** The request shall be to increase a maximum numerical standard or to decrease a minimum numerical standard by 10 per cent or less.

3. **ADVERSE IMPACTS SHALL BE MITIGATED.** Any adverse impacts caused by the proposed modification shall be mitigated to the maximum extent practical, so the resulting effects on those properties are insubstantial.

4. **COMPLIANCE WITH PURPOSES OF STANDARD TO BE MODIFIED.** The applicant shall demonstrate that if the requested modification is granted, the proposed land use change will still comply with the purposes of the standard for which the modification is requested, and will advance or protect the public interests as well or better than strict compliance with the standard.

5. **NO ADVERSE IMPACT ON PUBLIC HEALTH, SAFETY AND WELFARE, OR ON THE ENVIRONMENT.** The proposed modification shall cause no adverse impact on public health, safety and welfare, or on the environment.

6. **NO CHANGE IN IMPACT CLASSIFICATION.** Approval of the proposed modification will result in no change to the impact classification of the proposed land use change.

7. **SUBSTANTIALLY SAME OR LESS IMPACT.** Approval of the proposed modification will result in the same or less actual impact due to unique site features, the nature of the equipment that will be used, the nature of the operations and activities proposed, or proposed mitigation measures, including buffering and screening.

E. **APPEALS.** An appeal of an action on a Technical Modification may be made pursuant to Section 8-103: *Appeals*.

## SECTION 8-102: ADMINISTRATIVE TAKINGS PROCESS FOR LAND USE CHANGE PERMITS

A. **PURPOSE.** It is the intent of this *Resolution* that no private landowner be deprived of all reasonable economic use of real property. However, it is possible that certain regulatory decisions made pursuant to this *Resolution* may, in limited unique circumstances, potentially result in claims that all reasonable economic use of a parcel has been denied. This Section establishes an administrative appeal to attempt to resolve such claims, and to reduce the potential for litigation.

B. **APPLICABILITY.** Any landowner who believes that a final decision made by a decision-making body pursuant to this *Resolution* results in a denial of all reasonable economic use of all of a parcel of real property, must initiate and complete an appeal pursuant to this Section before initiating litigation against Gunnison County for such decision or action. This requirement is not a prerequisite to a landowner's filing a petition in the district court pursuant to *Colorado Rules of Civil Procedure*, Rule 106, or C.R.S. 29-20-201 et seq.

C. **DEADLINES FOR PETITION.** No later than 30 days after the final decision or final action has been made, the applicant shall file a written notice with the Planning Department that a Takings Relief Petition will be submitted. Within 30 days after filing that notice, the petitioner shall submit the Takings Relief Petition to the Planning Department.

D. **CONTENTS OF TAKINGS RELIEF PETITION.** The Takings Relief Petition shall, at a minimum, include the following:

1. **IDENTIFICATION OF PETITIONER.** Name, address, telephone number of petitioner.

2. **IDENTIFICATION OF LANDOWNER.** Name, address, telephone number of current owner of the property, with notarized written approval of the current owner of the property to file the petition.

3. **TERMS OF PURCHASE.** Price paid, and all other terms of sale, of the current owner's purchase of the subject property; the date of purchase; the name of the party from whom purchased; and the relationship, if any, between the current owner and the party from whom the property was purchased.

4. **APPRAISALS.** Any appraisals of the property, prepared for any purpose, including financing, offers for sale, or ad valorem taxation, during the five years immediately preceding the date of the decision or action that is the subject of the petition.

5. **FORM OF OWNERSHIP.** The form of ownership of the property (sole proprietorship, for profit or not-for-profit corporation, partnership, or joint venture), and the nature of the property interest (including fee simple, leasehold).

BLM_0053343

6. **VALUE AND TAXES.** The assessed value of the property, and all real property taxes paid for the five years immediately proceeding the date of the decision or action that is the subject of the petition.

7. **MORTGAGES OR LOANS.** A full description of current mortgages, loans, or other encumbrances on the property, including the name of the mortgagee or lender, the current interest rate, remaining loan balance, term of the loan, and other significant requirements, including the right of purchasers to assume the loan.

8. **LISTINGS.** All listings of the property for sale or rent, the price asked, and  any written offers received during the five years immediately proceeding the date of the decision or action that is the subject of the petition.

9. **STUDIES**. Any studies undertaken by the petitioner or agents of the petitioner within the five years immediately preceding the date of the decision or action that is the subject of the petition concerning the feasibility of development or use of the property.

10.  **INCOME AND EXPENSE STATEMENTS**. For income-producing property, itemized income and expense statements for the prior three years.

11. **IMPROVEMENTS AND EXPENSES.** Documentation of any improvements and investments made to the property, and any expenditures for professional and other services related to the property made during the prior three years.

12. **STATEMENT.** A statement identifying the regulations that are alleged to result in the elimination of all reasonable economic use of the land and describing the use the landowner believes represents the minimum legally required reasonable economic use of the land, accompanied by any documentation, studies, or other supporting evidence.

E. **ADDITIONAL INFORMATION**. The Planning Director or the Hearing Officer may request additional information that is reasonably necessary, in his/her opinion, to conclude that there has or has not been a denial of all reasonable economic use causing a substantial economic hardship.

F. **WAIVER OF INFORMATION**. The Planning Director or the Hearing Officer may waive the submittal of information if in his/her opinion it is unnecessary or not applicable to the subject petition.

G. **INFORMATION NOT AVAILABLE**. In the event that any of the information required to be submitted by the petitioner is not reasonably available, the petitioner shall file a statement identifying the information that could not be provided, explaining why the information is not available and, if it will become available, when it will become available.

H. **APPOINTMENT OF HEARING OFFICER.** Within 30 days of receipt of the completed petition, the Board shall appoint a hearing officer to review the petition and conduct a hearing pursuant to this Section.

1. **QUALIFICATIONS OF HEARING OFFICER**. The Hearing Officer shall have demonstrated experience in land use law, land development, real estate finance and appraisal, and in other disciplines related to land use or real estate development sufficient to perform the duties required by this Section. Before appointment, the Hearing Officer shall submit a statement to the parties of no actual or potential conflict of interest regarding the subject petition.

2. **COMPENSATION FOR COSTS.** The Hearing Officer shall be compensated at his/her normal rate for professional services of a similar type, and any reimbursable expenses, including staff support if necessary. The petitioner shall deposit a fee in advance with the County to cover the reasonable cost of preparing and copying the record, the cost of the services of the hearing officer, the cost of the hearing, and the costs incurred for publication of public notice, as estimated by the Planning Director. At the conclusion of the hearing, the Hearing Officer shall award to the prevailing party all reasonable costs but not any attorney fees except if the Hearing Officer determines that the claim or defense is frivolous, groundless or vexatious.

I. **HEARING PROCESS.** The process for conducting the hearing shall be as follows:

1. **RECORD.** Gunnison County shall expeditiously prepare the record and deliver a copy of the record to the petitioner and to the Hearing Officer.

2. **NOTICE.** Notice of the hearing shall be given pursuant to Section 3-112: *Notice of Public Hearing*.

3. **TESTIMONY.** The Hearing Officer shall review the record and shall allow an opportunity during the hearing for the petitioner, and Gunnison County, and any witness called by either party to offer written or oral testimony regarding the Takings Relief Petition. The  burden  of  proof  shall  be  on  the  petitioner  to

BLM_0053344

demonstrate, by the preponderance of the evidence, that the decision or action appealed from has denied all reasonable economic use of all of the subject property.

**J.   DECISION AND FINDINGS.** Within 30 days after the close of the hearing, the Hearing Officer shall prepare and present to the Board and petitioner a decision on the merits of the appeal, based on the record and testimony. The decision shall be based on the evidence submitted and shall include the following findings and determinations:

1.   **ADEQUATE INFORMATION.** Whether the petitioner has fully presented the information required by this Section.

2.   **MARKET VALUE.** The fair market value of the property considering the decision or action appealed from, and the fair market value if the proposed Land Use Change Permit were to be granted.

3.   **FEASIBLE DEVELOPMENT ALTERNATIVE.** Whether there exists a feasible alternative that could provide a reasonable economic use of the property.

4.   **FAIR MARKET VALUE OR REASONABLE ECONOMIC BENEFIT OF ALTERNATIVE DEVELOPMENT.** The fair market value or reasonable economic benefit available to the landowner from alternative development of the subject property including any opportunity to develop the property together with any other contiguous property owned by the landowner, or to use any other incentives available within this *Resolution*.

5.   **DEVELOPMENT FEASIBILITY.** Whether it was feasible to develop the property as of the date of the application, or shortly thereafter.

6.   **DEMONSTRATION OF TAKINGS.** Whether the petitioner has met its burden to prove that the decision appealed from has denied all reasonable economic use of all of the subject property.

**K.   RECOMMENDATION FOR RELIEF.** If the Hearing Officer finds that the petitioner has been denied all reasonable economic use of all of the subject property, then the Hearing Officer shall recommend relief to remedy the denial of all reasonable economic use. The Hearing Officer shall recommend the minimum reasonable increase in use, density, intensity, or other possible chance to the decision or action that would permit a reasonable economic use of the subject property. The highest and best use, or even an average or generally reasonable expectation of use, is not required or intended as the appropriate remedy.

**L.   BOARD ACTION.** Within 60 days, following receipt of the Hearing Officer's decision, the Board shall review it and shall approve, approve with modifications, or disapprove the decision of the Hearing Officer. The Board may, in its sole discretion, conduct a public hearing before taking action. If the Board chooses to conduct a public hearing, it shall be conducted pursuant to Section 3-113: *Conduct of Public Hearing*. The decision of the Board upon review of the Hearing Officer's decision shall be the final action necessary to complete an appeal pursuant to this Section.

1.   **IMPLEMENTATION OF RELIEF MEASURES.** The Board in its discretion may adopt any measure that is within the Board's authority to implement the Hearing Officer's recommendations, with or without further review by the Planning Commission.

## SECTION 8-103: APPEALS

**A.   ACTIONS THAT MAY BE APPEALED TO THE BOARD.** The following actions may be appealed to the Board:

1.   **CLASSIFICATION OF IMPACT.** Planning Department classification of impact pursuant to Section 3-111: *Classification of Impact.*

2.   **ADMINISTRATIVE REVIEW.** Planning Director actions on an Administrative Review application, pursuant to Section 5-102: *Administrative Review Projects That Require a Land Use Change Permit.*

3.   **PLANNING COMMISSION DECISION ON MINOR IMPACT PROJECT.** Planning Commission actions on a Minor Impact application pursuant to Article 6: *Minor Impact Projects.*

4.   **INTERPRETATION.** Planning Director interpretations of this *Resolution*, pursuant to Section 1-114: *Interpretations.*

5.   **TECHNICAL MODIFICATION.** Decision-making body's action on a Technical Modification, pursuant to Section 8-101: *Technical Modifications.*

**B.   STANDING TO APPEAL.** The following persons shall have standing to submit an appeal:

BLM_0053345

1. **APPLICANT.** The applicant or the owner of the subject property affected by a decision.

2. **MEMBER OF THE PUBLIC.** Any member of the public.

3. **PERSON WHO HAS REQUESTED AN INTERPRETATION.** A person who has requested an interpretation of this *Resolution* pursuant to Section 1-114 *Interpretations.*

4. **PERSON WHO HAS APPEALED AN IMPACT CLASSIFICATION.** A person who requests consideration of an impact classification determined pursuant to Section 3-111: *Classification of Impact.*

C. **PROCESS.** The process for submittal and review of an appeal is as follows:

1. **WRITTEN APPEAL.** An appeal may be submitted to the Planning Director no more than 15 days after the date on which the decision-making body issues its final decision on the application, not including the day on which the decision was made. The appeal shall be submitted in writing, stating the basis of the appeal and the relief that is requested, and shall include the necessary materials to support the appeal. The appeal shall become part of the record.

2. **BOARD CONSIDERATION OF APPEAL.** The appeal shall be considered by the Board at a regularly scheduled meeting within 45 days after the date the written appeal was filed.

   a. **NOTICE OF MEETING.** The Planning Department shall, by first-class mail, inform the applicant, the appellant and if a public hearing was part of the review process on the application for which an appeal of action has been filed, anyone who testified at the public hearing or submitted written comments on the application. That information shall include the date, time, and place of the meeting.

   b. **BOARD MAY CONDUCT PUBLIC HEARING.** At the meeting, the Board may determine that a public hearing should be conducted on the appeal. If the Board so determines, notice shall be given pursuant to Section 3-112: *Notice of Public Hearing.* The public hearing shall be conducted pursuant to Section 3-113: *Conduct of Public Hearing.*

   c. **COST FOR PUBLIC HEARING NOTICE(S).** The applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing.*

3. **BOARD DECISION.** The Board shall affirm, affirm with modifications, or reverse the original action.

   a. **MODIFICATION OR REVERSAL OF ORIGINAL ACTION.** The original action shall only be modified or reversed if the applicant establishes, by a preponderance of the evidence based on the record of the review body, that:

      1. **NO CREDIBLE EVIDENCE.** There is no credible evidence in the record to support the original decision;

      2. **ORIGINAL ACTION INCONSISTENT WITH THIS *RESOLUTION.*** The original action was inconsistent with the applicable requirements of this *Resolution*; or

      3. **REVIEW BODY ACTION INAPPROPRIATE.** The review body exceeded its jurisdiction or abused its discretion.

4. **BOARD DECISION SHALL BE FINAL.** The Board's decision shall be final and shall not be further appealed, but may be subject to judicial review.

## SECTION 8-104: EMERGENCY EXCEPTIONS

A. **PURPOSE.** Gunnison County recognizes that occasionally an existing legal nonconforming land use, or a land use that has been permitted and complies with the conditions of that permit, may be subject to unexpected situations that require immediate and temporary relocation of the land use to another site to avoid serious detriment to an individual or business entity. This Section allows the Board to evaluate such situations on a case-by-case basis to provide temporary relief from certain requirements of this *Resolution* to allow reasonable time and opportunity for an individual or business entity to obtain a Land Use Change Permit for that land use.

B. **AUTHORITY.** An Emergency Exception may be granted solely by the Board. Unless specifically exempted within the conditions of the Land Use Change Permit, all sections of this *Resolution* shall apply. Under no circumstances, however, shall the use be exempted from the following sections: Section 1-105: *Sections Necessary for Immediate Preservation of Public Health and Safety,* Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way,* Section 13-109: *Signs,* Section 13-113: *Fencing,* Section 13-119: *Standards to*

BLM_0053346

*Ensure Compatibility* and 9-300: *Commercial and Industrial Uses.* Such Exception shall also be required to obtain any applicable Building Permit and Individual Sewage Disposal System Permit.

**C.  STANDARDS OF APPROVAL FOR AN EMERGENCY EXCEPTION.** An application for a Land Use Change Permit for an Emergency Exception shall comply with the following standards:

1.  **IS A LEGAL USE CONDUCTED IN GUNNISON COUNTY.** The applicant currently conducts the land use within Gunnison County, including any of its incorporated municipalities, and is a legal nonconforming land use or a land use that has been permitted and complies with the conditions of that Permit

2.  **EXCEPTIONAL HARDSHIP.** Exceptional hardship to the applicant will result if the Board does not grant emergency relief.

    a.  **HARDSHIP IS NOT SELF-IMPOSED.** The special circumstances and conditions resulting in the emergency have not been caused by either the action or inaction of the applicant.

3.  **NO REASONABLE ALTERNATIVE.** The applicant has documented and thoroughly pursued the alternative solutions, and no timely, feasible alternative to the Emergency Exception is available.

4.  **RELIEF IS MINIMUM NECESSARY.** Approval of the Emergency Exception does not exceed the minimum action necessary to achieve the objective of allowing the temporary location of a land use and reasonable time and opportunity for an individual or business entity to obtain a permanent Land Use Change Permit if required.

5.  **PUBLIC COST SHALL BE LIMITED.** Approval of the Emergency Exception shall not result in undue public costs.

6.  **PUBLIC SAFETY SHALL NOT BE JEOPARDIZED.** Location of the land use in the site applied for within the Emergency Exception application shall not jeopardize the public health, safety or welfare.

7.  **DOES NOT ADVERSELY AFFECT LAND USES IN THE AREA.** The granting of the Emergency Exception will not change the character or otherwise adversely affect other land uses in the area where the Emergency Exception is proposed,

8.  **SIZE OF AFFECTED WORK FORCE.** The size of the affected workforce of a business shall be considered, but shall not be the deciding factor in determining the legitimacy of an emergency.

9.  **ALL STRUCTURES TEMPORARY; RECLAMATION TO ORIGINAL CONDITION REQUIRED.** All structures approved by the Exception shall be temporary, and the site approved for the Exception shall be returned, to the maximum extent feasible, to the condition in which it was before the temporary land use approved by the Exception was initiated.

**D.  PROCESS.** The following process shall apply to an application for an Emergency Exception.

1.  **APPLICATION FORM.** The Planning Department shall provide the applicant with an application form appropriate for the Emergency Exception. At a minimum, the application shall include:

    a.  **APPLICANT.** The name, address, telephone and fax numbers, and email address for the applicant, or if the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and also stating the same information for the agent.

    b.  **PROPERTY OWNER.** Name, address, telephone and fax numbers and email address of the owner of the property and, if other than the applicant, a notarized letter from the owner consenting to the application must be submitted.

    c.  **PROPERTY LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel on which the land use change is proposed to be located. A copy of the recorded deed to the property should be included.

    d.  **PRESENT LAND USE.** Identify present land uses, and locations and sizes of structures that exist on the property.

    e.  **LIST OF ADJACENT LANDOWNERS.** As applicable, a listing of all landowners and land uses that are adjacent to the boundaries of the entire parcel on which the project is proposed, including all properties that are separated from the parcel by a roadway or would be adjacent to the property except for the existence of the roadway. When the parcel is located adjacent to a municipality, a platted townsite or

BLM_0053347

platted recorded subdivision, all owners of surface property rights within 500 feet of each boundary of the entire parcel shall be included in the listing. The source for the best-available information to identify those landowners is the Gunnison County Assessor's Office.

**f. PROJECT DESCRIPTION AND SITE PLAN.** A narrative description and site plan (illustrated in Appendix Figure 1: *Site Plan Example*.) of the proposed project, including all uses, structures, roads, utilities, parking areas, amount and kinds of traffic to be generated.

**g. DESCRIPTION OF EMERGENCY**. A statement of fact(s) that describes the situation that constitutes an emergency, an explanation of how the hardship was not self-imposed by an action or inaction of the applicant, and why the Emergency Exception is necessary.

**h. DESCRIPTION OF ALTERNATIVE SOLUTIONS.** Documentation that the applicant has pursued alternative solutions other than an Emergency Exception and documentation of when the applicant became aware of the emergency.

**i. APPLICATION FOR PERMANENT LAND USE CHANGE PERMIT.** The applicant shall submit an application for a permanent Land Use Change Permit simultaneously with the submittal of the application for the Emergency Exception, and shall reference the location proposed for the permanent location.

**j. ESTIMATED COSTS.** Documentation from contractors, materials providers, engineers or other professionals, indicating the final estimates for costs for installation of roads, drainage facilities, water supply and wastewater treatment systems, landscaping and other improvements required by the County for approval, and for the reclamation of the site once the use is completed, including the removal of temporary structures, vehicles, and reclamation of the property pursuant to Section 13-115: *Reclamation and Noxious Weed Control.*

**k. APPLICATION AND REVIEW FEES**. To compensate the County for the cost of reviewing and processing applications for Land Use Change Permits, each applicant shall pay the required fee as shown in a schedule of fees issued by the Planning Department, adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

**2. PLANNING DEPARTMENT REVIEW.** The Planning Director shall request to schedule a public hearing for the application on the Board's next available agenda and within seven days of receiving the application and certifying it as complete, shall prepare a Department report that describes the proposed project, the requirements of this section, and, as applicable, recommends any specific conditions to ensure compliance with this *Resolution*, and shall forward the report to the Board.

**3. HEARING NOTICE.** Public notice that the Board will conduct a public hearing to consider the Emergency Exception application shall be accomplished pursuant to Section 3-112: *Notice of Public Hearing*; minimum public notice, including publication, posting of property and mailing of notice to adjacent landowners shall be 15 days, and shall be required to be sent by overnight express mail by the applicant.

**a. COST FOR PUBLIC HEARING NOTICE(S).** The applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing*.

**4. BOARD HEARING**. The Board hearing shall be conducted pursuant to Section 3-113: *Conduct of a Public Hearing*. The applicant shall present the application and explain the immediate need for emergency relief.

**5. BOARD DECISION.** Within seven days after the close of the public hearing, the Board shall approve, approve with conditions or deny the application. The Board shall be required to base its decision on findings that specifically address each Section 8-104: C: *Standards of Approval for Emergency Exception*, and shall, as applicable, include the following:

**a. SURETY.** The Board decision shall include a determination that surety pursuant to Section 16-117: B: *Financial Security* shall be provided by the applicant sufficient to reasonably reclaim the site to its original condition.

**b. "PRE-ACTION" CONDITIONS.** Those conditions that shall be required to be completed before the Certificate of Approval is recorded, such as the completion of a Development Improvement Agreement and/or provision of surety.

BLM_0053348

    **c.** **ADDITIONAL CONDITIONS.** Those conditions that are ongoing after the Certificate of Approval is recorded and which are related to operation of the approved land use, and or the reclamation of the property once the term of the Emergency Exception Permit has ended.

**6.** **DURATION OF APPROVAL.** An Emergency Exception shall expire six months after the date the Board approves it.

    **a.** **EXTENSION OF EMERGENCY EXCEPTION.** The applicant may request extension of the Exception for good cause shown, including the time necessary to obtain a Land Use Change Permit for the permanent location of the land use. In no case, however, shall the Emergency Exception be permitted to continue more than two years beyond the date of the Board's approval.

        **1.** **MAJOR IMPACT PROJECT.** If the Land Use Change Permit is classified as a Major Impact project, pursuant to Section 3-111: *Classification of Impact*, the project shall be required to have submitted a complete application for Sketch Plan in order for the Exception to be extended.

**7.** **RECORDATION OF CERTIFICATE.** Within five days following the submittal by the applicant of documentation showing compliance with any Pre-Action Conditions included in the Board's approval of the Emergency Exception application, the Planning Director shall record a *Certificate of Emergency Exception* in the Office of the Gunnison County Clerk and Recorder's Office. The Certificate shall describe the specific project, the legal description of the subject property, the Findings of the Decision, any conditions of approval, and include the Planning Director's signature line, and the date of approval.

**8.** **EXCEPTION REVOCABLE.** Failure of the applicant to comply with the Pre-Action Conditions and to submit and diligently pursue an application for a permanent Land Use Change Permit within 45 days of the Board's approval of the Emergency Exception, or failure of the applicant to comply with all additional conditions of the approval shall cause the Emergency Exception to be revoked.

BLM_0053349

# ARTICLE 9:
# SPECIAL USES

This Article governs land uses that have individualized standards in addition to the other standards of this *Resolution,* and identifies and establishes those standards. Unless otherwise exempted, all uses and structures referred to in this Article are also subject to all other generally applicable standards of this *Resolution*.

## DIVISION 9-100:
## SECONDARY USES AND ACTIVITIES

### SECTION 9-101: USES SECONDARY TO A PRIMARY RESIDENCE

**A.**   **GENERAL.** Certain secondary uses are a use by right on any parcel where there is a legal, permitted primary residential use, and require no separate Land Use Change Permit. Any use that has received a Land Use Change Permit shall also be permitted to include those secondary uses, structures, and activities that are necessarily and customarily associated with, and incidental and subordinate to the primary residence.

**B.**   **SUBJECT TO SAME STANDARDS AND REQUIREMENTS.** Unless otherwise exempted or required by this Section, secondary uses and activities shall comply with all standards and requirements that apply to the primary residence.

**C.**   **SECONDARY STRUCTURES AND USES THAT DO NOT REQUIRE A LAND USE CHANGE PERMIT**. The following secondary structures and uses require no Land Use Change Permit, and are reviewed pursuant to Section 4-102: *Administrative Review Projects That Do Not Require a Land Use Change Permit.*

   **1.**   **STRUCTURES AND USES ALLOWED BEFORE BUILDING PERMIT IS ISSUED FOR PRIMARY RESIDENCE.** The following secondary structures or uses may be erected or installed before a Building Permit for a primary residence has been issued:

      **a.**   **BARNS AND OTHER AGRICULTURAL BUILDINGS IN CONJUNCTION WITH AN AGRICULTURAL OPERATION.** A barn or other agricultural building used in conjunction with an agricultural operation.

      **b.**   **FENCES.** Fences, which shall comply with Section 13-113: *Fencing.*

      **c.**   **GARDENS AND GREENHOUSES**. Private non-commercial gardens and greenhouses.

      **d.**   **ONE 120 SQ. FT. OR SMALLER STORAGE SHED ON ONE-ACRE OR LARGER PARCEL.** One storage shed 120 sq. ft. or smaller, on a parcel an acre or larger.

      **e.**   **HORSE/HAY SHED 500 SQ. FT. OR SMALLER**. A horse/hay shed 500 sq. ft. or smaller for sheltering horses or other livestock, or for storing hay, that is not part of an agricultural operation.

      **f.**   **BARNS IN APPROVED SUBDIVISIONS**. Barns located in approved subdivisions in which there are adopted protective covenants that allow barns and which have been approved by Gunnison County.

   **2.**   **STRUCTURES AND USES ALLOWED AFTER A BUILDING PERMIT IS ISSUED FOR A PRIMARY RESIDENCE.** The following secondary structures or uses do not require a separate Land Use Change Permit, but may be initiated only after a Building Permit is issued for the primary residence to which these uses are accessory. These shall not apply to the construction of barns or other agricultural buildings used in conjunction with an agricultural operation.

      **a.**   **DETACHED GARAGE AND/OR SHOP 750 SQ. FT. OR SMALLER**. A detached garage or shop, or combination of those uses in one structure, 750 sq. ft. or smaller.

BLM_0053350

    **b.** **ONE STORAGE SHED 120 SQ. FT. OR SMALLER ON PARCEL SMALLER THAN ONE ACRE.** One storage shed, 120 sq. ft. or smaller, on a parcel smaller than one acre

    **c.** **TWO STORAGE SHEDS 120 SQ. FT. ON ONE-ACRE OR LARGER PARCEL.** Two storage sheds, each no larger than 120 sq. ft., on a parcel an acre or larger.

    **d.** **GARDENS AND GREENHOUSES, INCLUDING HOME OCCUPATIONS.** Private gardens and private greenhouses, including those that are home occupations, constructed and operated pursuant to Section 9-102: *Home Occupations.*

    **e.** **POOLS AND RECREATION FACILITIES.** Private swimming pools and private recreation facilities associated with a primary residence, and not part of a private club or membership group.

    **f.** **INTEGRATED SECONDARY RESIDENCE 600-850 SQ. FT. ON ANY PARCEL.** An integrated secondary residence 600-850 sq. ft. in a primary residence on any parcel.

    **g.** **ONE HOME OCCUPATION.** One home occupation, pursuant to Section 9-102: *Home Occupations.*

**D.** **SECONDARY STRUCTURES AND USES THAT REQUIRE A LAND USE CHANGE PERMIT.** The following structures and uses that are secondary to a primary residence shall be reviewed pursuant to Section 5-105: *Administrative Review Project Review Process.*

    **1.** **SECONDARY STRUCTURES AND USES CLASSIFIED AS ADMINISTRATIVE REVIEW PROJECTS.** The following are classified as Administrative Review Projects pursuant to Article 4: *Administrative Review Projects That Do Not Require Land Use Change Permits* and Article 5: *Administrative Review Projects That Require Land Use Change Permits:*

        **a.** **INTEGRATED SECONDARY RESIDENCE 851-1,200 SQ. FT. ON A LEGAL LOT SMALLER THAN 35-ACRES.** An integrated secondary residence 851-1,200 sq. ft. on a legal lot smaller than 35 acres. If the applicant elects to include this size integrated secondary residence within a primary residence, no detached secondary residence is allowed.

        **b.** **INTEGRATED SECONDARY RESIDENCE 851-1,1200 SQ. FT. ON 35-ACRE OR LARGER TRACT CREATED AFTER EFFECTIVE DATE OF RESOLUTION.** An integrated secondary residence 851-1,200 sq. ft. on any 35-acre or larger tract that was created after the effective date of this Resolution.

        **c.** **DETACHED SECONDARY RESIDENCE 1,200 SQ. FT. OR SMALLER ON 35-ACRE OR LARGER TRACT CREATED AFTER EFFECTIVE DATE OF RESOLUTION.** A detached secondary residence 1,200 sq. ft. or smaller, on a 35-acre or larger tract that was created after the effective date of this Resolution. If the applicant elects to construct this detached secondary residence, no integrated secondary residence is allowed.

        **d.** **DETACHED SECONDARY RESIDENCE 2,500 SQ. FT. OR SMALLER ON A LEGAL LOT SMALLER THAN 35 ACRES.** A detached secondary residence 2,500 sq. ft. or smaller, on a legal lot that is smaller than 35 acres.

        **e.** **DETACHED SECONDARY RESIDENCE 3,500 SQ. FT. OR SMALLER, ON 35-ACRE OR LARGER TRACT, CREATED BEFORE THE EFFECTIVE DATE OF THIS RESOLUTION.** A detached secondary residence 3,500 sq. ft. or smaller, on a 35-acre or larger tract that was created before the effective date of this Resolution.

        **f.** **SECONDARY STRUCTURE INTENDED ONLY FOR SLEEPING.** A secondary structure that is to be used only for sleeping facilities, shall not include a kitchen and shall meet the requirements of Section 9-101: E: *Standards for Development of a Secondary Detached Residence or Secondary Structure Intended for Sleeping.*

        **g.** **STRUCTURES AND USES ALLOWED BEFORE BUILDING PERMIT IS ISSUED FOR PRIMARY RESIDENCE.** The following secondary structures or uses require a Land Use Change Permit, but may be erected or installed before a Building Permit for a primary residence has been issued. When a Building Permit is required for any of these uses, the Building Permit is considered to be the Land Use Change Permit, and no additional Land Use Change Permit application must be filed.

            **1.** **DETACHED GARAGE AND/OR SHOP LARGER THAN 750 SQ. FT.** A detached garage or shop, or combination of those uses located in one structure larger than 750 sq. ft.

            **2.** **TWO 120 SQ. FT. STORAGE SHEDS ON ONE PARCEL SMALLER THAN AN ACRE.** Two storage sheds, each no larger than 120 sq. ft., on a parcel smaller than an acre.

BLM_0053351

3. **MORE THAN TWO 120 SQ. FT. STORAGE SHEDS ON ANY SIZE PARCEL.** More than two storage sheds, each no larger than 120-sq. ft., on any size parcel.

4. **ONE STORAGE SHED LARGER THAN 120 SQ. FT. ON PARCEL ONE ACRE OR LARGER.** One storage shed that is larger than 120 sq. ft. on a parcel one acre or larger.

5. **HORSE/HAY SHED LARGER THAN 500 SQ. FT. ON PARCEL ONE-ACRE OR LARGER.** A horse/hay shed larger than 500 sq. ft., for sheltering horses or other livestock or for storing hay, on a parcel one acre or larger, that is not part of an agricultural operation.

2. **SECONDARY STRUCTURES OR USES CLASSIFIED AS MINOR IMPACT PROJECTS.** A separate Land Use Change Permit is required before obtaining a Building Permit for any of the following structures, which shall be reviewed pursuant to Article 6: *Minor Impact Projects:*

   a. **INTEGRATED SECONDARY RESIDENCE LARGER THAN 1,200 SQ. FT. ON A LEGAL LOT SMALLER THAN 35 ACRES.** An integrated secondary residence larger than 1,200 sq. ft. on a legal lot smaller than 35-acres.

   b. **INTEGRATED SECONDARY RESIDENCE LARGER THAN 1,200 SQ. FT. ON 35-ACRE OR LARGER TRACT, CREATED AFTER EFFECTIVE DATE OF THIS RESOLUTION.** An integrated secondary residence 1,200 sq. ft. or larger on any 35-acre or larger tract that was created after the effective date of this *Resolution*.

   c. **DETACHED SECONDARY RESIDENCE LARGER THAN 2,500 SQ. FT. ON A LEGAL LOT SMALLER THAN 35 ACRES.** A detached secondary residence larger than 2,500 sq. ft., on a legal lot that is smaller than 35 acres.

   d. **DETACHED SECONDARY RESIDENCE LARGER THAN 3,500 SQ. FT. ON 35-ACRE OR LARGER TRACT.** A detached secondary residence larger than 3,500 sq. ft., on a 35-acre or larger tract.

   e. **MORE THAN ONE SECONDARY RESIDENCE ON ONE LEGAL LOT.** More than one secondary residence on one legal lot.

   f. **TOTAL AGGREGATE 12,500 SQ. FT. OR LARGER.** An aggregate square footage of 12,500 sq. ft. or larger of all structures that may include a combination of residential living area (one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by this Section), attached and/or detached garages.

   g. **TOTAL AGGREGATE RESIDENTIAL LIVING AREA 9,000 SQ. FT. OR LARGER.** An aggregate square footage including residential living area 9,000 sq. ft. or larger (one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by this Section). The square footage of an attached garage is not calculated in this measurement.

E. **STANDARDS FOR DEVELOPMENT OF A DETACHED SECONDARY RESIDENCE OR SECONDARY STRUCTURE INTENDED FOR SLEEPING.** A secondary detached residence or secondary structure intended for sleeping shall meet these standards:

1. **SECONDARY SMALLER THAN PRIMARY RESIDENCE.** The secondary residence or structure intended for sleeping shall be smaller than the primary residence, and the total floor area of the two buildings shall not exceed any floor area limitations applicable to the parcel pursuant to Section 13-105: *Building Sizes and Lot Coverages*.

2. **LOCATION.** The secondary residence or structure intended for sleeping shall be located in close proximity to the primary residence, so that it will not be more visually obtrusive and will not increase land use impacts, including the building of additional roads or upgrading existing roads, removing additional trees, or disturbing additional irrigated meadows or sensitive wildlife habitat.

3. **DESIGNATION OF BUILDING ENVELOPE.** A building envelope designated on the site plan in which all structures, wastewater treatment system(s) and well are to be located.

4. **ADEQUATE PARKING.** At least that number of parking spaces required for both the primary residence and the secondary residence or structure intended for sleeping shall be provided, pursuant to Section 13-110: *Off-Road Parking and Loading.*

BLM_0053352

5. **SHARED WATER SUPPLY AND WASTEWATER TREATMENT SYSTEM**. To the maximum extent feasible, the second residence or structure intended for sleeping shall be legally and physically served by the same water and wastewater treatment systems that serve the primary residence.

6. **COMPLIES WITH DEED RESTRICTIONS OR PROTECTIVE COVENANTS**. The second residence or structure intended for sleeping shall comply with deed restrictions and/or declarations of protective covenants applicable to the parcel.

F. **STANDARDS FOR INTEGRATED SECONDARY RESIDENCE.** An integrated secondary residence shall meet these standards:

1. **SUBORDINATE TO PRIMARY RESIDENCE.** It is subordinate by area, extent and purpose to the primary residence.

2. **LIMITED TO 850 SQ. FT.** The floor area of the integrated secondary residence shall be no larger than 850 sq. ft., and may be as small as 600 sq. ft., or as otherwise allowed by the applicable building code, adopted and amended by Gunnison County.

3. **ADEQUATE PARKING**. There shall be parking adequate to serve both the primary and secondary residences, pursuant to Section 13-110: *Off- Road Parking and Loading*.

4. **ADEQUATE WATER SUPPLY AND WASTEWATER TREATMENT SYSTEM.** It shall be legally and physically served by the same water and wastewater treatment systems that serve the primary residence.

5. **STRUCTURALLY INTEGRATED.** It shall be structurally integrated within the primary residence, share common roof lines and utility systems, and there shall be an internal access between the primary residence and the secondary residence.

6. **COMPLIES WITH DEED RESTRICTIONS OR PROTECTIVE COVENANTS.** It shall comply with deed restrictions and/or declarations of protective covenants applicable to the parcel on which the primary residence is located.

7. **KITCHEN AND SEWAGE DISPOSAL FACILITIES**. It shall contain a full kitchen, and sanitation facilities.

8. **COMPLIES WITH APPLICABLE CODES**. It shall comply with the applicable building code, adopted and amended by Gunnison County, and the requirements of the applicable fire protection district. When the district's standards conflict with County standards, the County shall only enforce the County standards.

## SECTION 9-102: HOME OCCUPATIONS

A. **APPLICABILITY.** This Section shall apply to the operation of a home occupation on a parcel also occupied by a primary residence.

1. **ONE HOME OCCUPATION.** One home occupation may be operated as an accessory use to a primary residence, and requires no Land Use Change Permit, provided the use meets the standards of this Section.

2. **MORE THAN ONE HOME OCCUPATION**. More than one home occupation shall be classified and reviewed as an Administrative Review project, pursuant to Article 5: *Administrative Review Projects That Require Land Use Change Permits.*

B. **STANDARDS FOR OPERATING A HOME OCCUPATION**: The following standards shall apply to the operation of a home occupation:

1. **HOME OCCUPATION IS SUBORDINATE**. The home occupation shall be incidental and secondary to the use of the property for residential purposes, and shall not change the residential character of the property.

2. **SIZE OF AREA LIMITED**. To ensure it remains subordinate, the size of the area used for the home occupation shall be limited to one-half of the floor area of the primary residence or 1,500 sq. ft., whichever is smaller.

3. **ACTIVITIES TO BE CONDUCTED INDOORS**. All activities associated with the home occupation shall be conducted indoors. These activities may be conducted within the residence, or may be conducted within another structure on the property, including a detached garage or a shed. There shall be no outside storage of goods, materials, or equipment associated with the home occupation.

4. **EMPLOYEES**. The home occupation shall be conducted entirely by the residents living on the premises, and by no more than the equivalent of one full-time employee who lives off-premises.

5. **CUSTOMERS**. The home occupation shall serve no more than 12 customers or clients on-site during a single day.

6. **ADEQUATE PARKING.** In addition to the parking required for the primary residence, there shall be provided one off-road parking space for any employee who lives off the premises, and one off-road parking space for customers or clients. As applicable, the use shall also comply with Section 13-110: *Off-Road Parking and Loading,* and the minimum distances listed in Appendix Table 3: *Off-Road Parking Requirements.*

7. **TRUCKS OR VANS**. A truck or van having a payload rating of more than one and a-half tons may only be parked on-site if it is kept within a garage or other enclosed or semi-enclosed, permitted structure. Trucks or vans making deliveries to the home occupation shall be limited to a payload rating which shall not exceed the road and bridge weight capacities on applicable haulage routes.

8. **NUISANCE.** The home occupation shall not operate during such hours or in manner that will create a public or private nuisance or disturb neighbors. It shall not produce any offensive noise, vibrations, electrical or magnetic interference, glare, fumes, odors, smoke, dust, heat, or waste noticeable at or beyond the property line. All waste products generated by the home occupation shall be disposed of pursuant to all applicable federal, state and County regulations.

9. **SIGNS.** The only allowed exterior advertising shall be one sign identifying the home occupation, which shall not be larger than four sq. ft., and as applicable, shall otherwise comply with Section 13-109: *Signs.*

10. **OTHER REGULATIONS.** The structure in which the home occupation is located shall comply with all other applicable regulations and codes for the type of home occupation proposed.

## SECTION 9-103: BED AND BREAKFAST

A. **LAND USE CHANGE PERMIT REQUIRED.** The operation of a bed and breakfast in a primary residence requires a Land Use Change Permit, and in addition to complying with all other applicable requirements of this *Resolution* shall comply with the requirements of this Section.

B. **STANDARDS FOR OPENING AND OPERATING BED AND BREAKFAST.** The following standards shall apply to operations of a bed and breakfast:

1. **MAINTAINING RESIDENTIAL APPEARANCE.** A structure used as a bed and breakfast shall not be altered in a way that changes its residential appearance or character.

2. **MAXIMUM NUMBER OF UNITS.** The bed and breakfast shall not contain more than five separate sleeping rooms available to be rented to guests.

3. **OWNER SHALL LIVE ON PREMISES**. The owner or on-site manager shall live on the premises when the bed and breakfast is in operation.

4. **RECEPTIONS AND MEALS NOT ALLOWED**. There shall not be receptions, private parties, or similar activities for compensation, and no meals shall be served to the general public, unless expressly approved as part of the Land Use Change Permit.

5. **LONG-TERM RENTAL OF GUEST ROOMS.** Long term rental of guest rooms shall not be permitted. The maximum length of any stay shall be 30 consecutive days. No cooking facilities, other than a microwave oven, shall be allowed in guest rooms.

6. **ON-SITE PARKING.** Parking spaces shall be provided pursuant to Section 13-110: *Off-Road Parking and Loading,* and the minimum distances listed in Appendix Table 3: *Off-Road Parking Requirements.*

7. **COMPLY WITH OTHER REGULATIONS.** The bed and breakfast shall comply with all applicable regulations and codes, including those of the applicable fire protection district. When the district's standards conflict with County standards, the County shall only enforce County standards.

BLM_0053354

# DIVISION 9-200:
# SPECIAL RESIDENTIAL USES

## SECTION 9-201: EMPLOYEE HOUSING PROVIDED WITH OTHER USES

**A.  PURPOSE.** It is the intent of the Board to encourage the provision of safe, structurally sound employee housing close to the place of employment, and where employee housing is provided, to insure that such housing is used for its intended purpose. This Section provides standards and requirements for employee housing.

**B.  REQUIREMENTS FOR EMPLOYEE HOUSING.** The following standards shall apply in the inclusion of specific employee housing as an element of other land uses:

**1.  MANAGERS' OR CARETAKERS' RESIDENCES FOR PROPOSED LAND USE CHANGES.** When a proposed land use change is expected to have an on-site manager's or caretaker's residence, that residence shall be designated as part of the project description, and restricted by permanent covenant and a condition of permit approval. The covenant shall be recorded before issuance of Building Permits for the development, and shall authorize Gunnison County to enforce its terms. Whether or not a manager's or caretaker's residence is required shall be determined during the Land Use Change Permit application review.

**2.  INCENTIVES FOR PROVISION OF EMPLOYEE HOUSING.** Residences that have been restricted by permanent recorded covenant for use as employee housing shall not be counted in calculating the density of a development project, except for the purposes of determining adequacy of water supply, wastewater treatment and parking.

**3.  USE OF EMPLOYEE HOUSING UNITS.** A residence shall be considered an employee residence if it is owned or managed as an integral part of a commercial or industrial use, or an agricultural operation and restricted by permanent recorded covenant to occupation, of six months per year by employees of that use or operation. Employee residences shall not be rented on a short term basis or rented to the general public, except as provided in Section 9-201: B. 4. b: *Exceptions.*

**4.  RESTRICTIONS ON EMPLOYEE RESIDENCES.**

**a.  COVENANT REQUIRED.** Residences proposed to be used for employee housing as part of a Land Use Change Permit shall be restricted by a permanent recorded covenant enforceable by Gunnison County to use as employee housing, for long-term occupancy by employees, except as provided in this Section. The covenant shall also state the requirement for long-term occupancy by employees.

**b.  EXCEPTIONS.**

**1.  UNITS FOR SKI AREA EMPLOYEES.** Where employee housing has been provided for the seasonal work force associated with a ski area, residences may be used as lodging for the general public during the off-season from May to September.

**2.  UNITS FOR AGRICULTURAL OPERATION EMPLOYEES.** When employee housing is proposed to be provided on an agricultural operation for the purpose of housing seasonal employees, those residences need not be restricted to long term occupancy and may be used for rental to the general public so long as the location and access to that housing complies with Section 11-110: *Development of Land Beyond Snowplowed Access.*

**C.  CONVERSION OF EXISTING UNITS.** A residence that was in existence as of the effective date of this *Resolution* may be designated as an employee residence, so long as it complies with the requirements of the applicable building code, adopted and amended by Gunnison County, the requirements of the applicable fire protection district, and this Section. When the District's standards conflict with County standards, the County shall only enforce the County standards.

**D.  REMOVAL OF RESTRICTIONS.** When a residence has been restricted by covenant to use as employee housing, the covenant may be removed by mutual consent of the Board, the property owner and any lien holder, subject to a finding by the Board that retaining the covenant will result in exceptional and undue hardship upon the property owner.

BLM_0053355

## SECTION 9-202: INDIVIDUAL MANUFACTURED AND MOBILE HOMES

**A. PURPOSES**. The purposes of this Section are:

1. **TO REGULATE MANUFACTURED HOMES.** To regulate the permanent installation of manufactured homes on foundations for occupancy as single-family dwellings. All such manufactured homes shall be designed and located to be compatible with neighboring conventionally-built residences. The specifications provided by this Section are designed to ensure the compatibility of manufactured homes with the aesthetic and architectural character of the surrounding neighborhood, in the same manner as that used by the County to approve other residential Building Permits.

2. **TO REGULATE INDIVIDUAL MOBILE HOMES.** To regulate the placement of individual mobile homes outside mobile home communities.

**B. SUBDIVISIONS CREATED FOR MANUFACTURED AND MOBILE HOMES**. Except as provided in this Section, a Land Use Change Permit application for subdivision of property to provide lots for manufactured and mobile homes shall be subject to all the requirements of this *Resolution* that regulate subdivision of property.

**C. NO SEPARATE LAND USE CHANGE PERMIT REQUIRED FOR COMPLIANT INDIVIDUAL MANUFACTURED AND MOBILE HOMES.** No separate Land Use Change Permit is required for a manufactured home or a mobile home placed on a legal lot subject to the following:

1. **COMPLIANCE WITH PROTECTIVE COVENANTS OR DEED RESTRICTION.** The applicable protective covenants or deed restrictions do not prohibit such use.

2. **ROOFING SHALL BE SIMILAR**. Roofing shall be similar in color, material and appearance to the roofing material commonly used on residences on adjacent parcels. The roof pitch shall be a minimum of a nominal 2/12; and

3. **EXTERIOR SIDING SHALL BE SIMILAR**. Exterior siding shall be similar in color, material and appearance to the exterior siding material commonly used on residences on adjacent parcels; and

4. **GARAGE OR CARPORT.** If a garage is constructed it shall be in materials and color similar to those of the attached residence where garages are predominant on adjacent parcels. A carport may be constructed if residences on adjacent parcels have carports, or there is a mixture of residences with and without garages or carport; and

5. **ALL CONVENTIONAL STANDARDS APPLY.** All building setbacks, parking, coverage, height, width and size requirements required of conventional homes by the applicable building code adopted and amended by Gunnison County, and by all applicable sections of this *Resolution*, shall apply to manufactured and mobile homes.

**D. INDIVIDUAL MANUFACTURED HOMES**. Manufactured homes shall comply with all applicable requirements of this *Resolution*, and with the following:

1. **CERTIFICATION**. A manufactured home shall be certified pursuant to all requirements of the *National Manufactured Housing Construction and Safety Standards Act of 1974* (42 U.S.C. 5401 et seq: as amended).

2. **SIZE AND DESIGN.** At a minimum, a manufactured home shall:

   a. **DIMENSIONS.** Be at least 24 feet in width by 36 feet in length; and

   b. **EXTERIOR MATERIALS AND ROOF PITCH.** Have an exterior of brick, wood or cosmetically equivalent siding and a pitched roof.

3. **SITE PREPARATION, DELIVERY, AND INSTALLATION**. Before delivery to the site, the home shall meet, on an equivalent performance engineering basis, all public safety requirements of the applicable building code adopted and amended by Gunnison County, including snow load, wind shear and energy conservation factors. The home shall be installed:

   a. **IN COMPLIANCE WITH BUILDING AND SEWAGE DISPOSAL SYSTEM PERMIT REQUIREMENTS**. Each manufactured home shall obtain the required building and Individual Sewage Disposal System permits, as applicable, required by Gunnison County.

BLM_0053356

b. **IN COMPLIANCE WITH THE APPLICABLE BUILDING CODE ADOPTED AND AMENDED BY GUNNISON COUNTY.** In accordance with the requirements of the applicable building code adopted and amended by Gunnison County, if the home was manufactured pursuant to that code; or

c. **IN COMPLIANCE WITH COLORADO DIVISION OF HOUSING REQUIREMENTS.** In accordance with the manufactured housing installation standards set forth in Colorado Division of Housing *Rule 20* as it may be amended, if the home was manufactured to the HUD code; and

d. **PLACEMENT ON PERMANENT ENGINEERED FOUNDATION.** On a permanent engineered foundation certified by a qualified professional engineer licensed in the State of Colorado as structurally sound, permitted and approved by the Building Inspector, and constructed before delivery of the home to the site.

4. **ALL SYSTEMS COMPLETE.** Be complete, including sanitary, heating and electrical systems and be ready for occupancy when delivered to the site except for minor assembly.

E. **INDIVIDUAL MOBILE HOMES.** A mobile home may be permitted on a legal lot that is not in a mobile home community. It shall comply with all other applicable requirements of this *Resolution* and the following:

1. **PLACEMENT OFF PUBLIC RIGHTS-OF-WAY.** No mobile home shall be parked or permitted to remain on any public highway, road, alley or other such right-of-way for more than a 24-hour period. If so parked for less than a 24-hour period, it shall be parallel to the edge of the right-of-way, safely out of the flow of moving traffic.

2. **REQUIRED TO BE USED AS RESIDENCE.** No mobile home shall be parked on a parcel unless it is permitted to be used as a residence, pursuant to all applicable codes and regulations, and sections of this *Resolution*. All applicable permits, pursuant to Section 1-104: R: *Relationship of Land Use Change Permits to Other Permits*, shall be obtained before a mobile home is located on a parcel.

3. **MOBILE HOME OR TEMPORARY MOBILE HOME PERMIT.** The Planning Department may issue either a Mobile Home Permit or a Temporary Mobile Home Permit:

   a. **MOBILE HOME PERMIT.** Mobile Home Permit to park, occupy and use a mobile home on a parcel not in a mobile home community.

   b. **TEMPORARY MOBILE HOME PERMIT.** Temporary Mobile Home Permit for the temporary parking, occupation and use of a mobile home not in a mobile home community, if all applicable requirements of this *Resolution* and the *Gunnison County Individual Sewage Disposal System Regulations* have been met. The Temporary Mobile Home Permit shall be issued for a period not to exceed 180 days, and may be renewed not more than once for no more than an additional 60 days, without approval by the Board.

4. **APPLICATION FORM.** The Planning Department shall provide the appropriate application form for either of the Permits that, at a minimum, shall include the following:

   a. **APPLICANT.** The name, address, telephone and fax numbers, and e-mail address for the applicant, or if the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and stating the same information for the agent.

   b. **PROPERTY OWNER.** Name of the owner of the property; if other than the applicant, a notarized letter from the owner consenting to the application, must also be submitted.

   c. **PROPERTY LOCATION.** The legal description  (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel on which the land use change is proposed to be located. A copy of the recorded deed to the property should be included.

   d. **PRESENT LAND USE.** Identify present land uses, locations, and sizes of existing and proposed structures that exist on the property.

5. **PLANNING DEPARTMENT REVIEW.** The Planning Department will review the application, determine its compliance with the requirements of this Section and all other applicable requirements of this *Resolution*. If it is in compliance, the applicable Mobile Home Permit or Temporary Mobile Home Permit will be granted.

   a. **HIGHER LEVEL OF REVIEW MAY BE REQUIRED IF LOCATED NEXT TO SUBDIVISION.** If a mobile home is proposed to be located on an individual parcel of land not in a mobile home community, but adjacent to a platted subdivision whose protective covenants either do not address, or do not allow,

BLM_0053357

the location of mobile homes within the subdivision, the application for a Mobile Home Permit shall require a higher level of review, pursuant to Section 3-111: *Classification of Impact.*

**b. SUBJECT TO SUBDIVISION PROTECTIVE COVENANTS.** No permit may be issued under this Section for placement of a mobile home on any lot within a platted subdivision unless there have been recorded in the office of the Clerk and Recorder of Gunnison County protective covenants relating to the subdivision that specifically permit the placement of mobile homes within the subdivision on other than a temporary basis. Any such protective covenants or amendments to protective covenants adopted after May 16, 1977, must have been approved by Gunnison County.

**F. STANDARDS FOR INSTALLATION OF A MOBILE HOME.** Location of an individual mobile home shall comply with the following:

**1. PERIMETER ENCLOSURE.** The mobile home shall be enclosed continuously at the perimeter at ground level with material comparable in composition and appearance to the predominant materials used in foundations of residences on adjacent parcels.

**2. ADDITIONS SHALL MEET BUILDING CODE REQUIREMENTS.** Any additions, extensions, or enlargements will be allowed so long as they meet the requirements of the applicable building code, adopted and amended by Gunnison County, and proof of compliance to any applicable protective covenants has been submitted. If the mobile home is to be modified with a roof structure, the new supporting walls (stud walls) must be completely sided in. No open studs or posts will be allowed.

**3. MORE THAN ONE MOBILE HOME CONSTITUTES A COMMUNITY.** The placement of more than one mobile home on any parcel shall create a mobile home community, except as located according to Section 9-202: F.5: *Agricultural Operations.*

**4. NONCONFORMING MOBILE HOME.** Any parcel on which more than one mobile home was in existence before June 20, 1979 will not be considered a mobile home community and shall be allowed to remain as a nonconforming use. If a nonconforming mobile home is removed and replaced with a mobile home that complies with the current HUD code, the replacement shall not create a mobile home community. All applicable requirements of this *Resolution* shall apply.

**5. AGRICULTURAL OPERATIONS.** An agricultural operation may place no more than two mobile homes on the agricultural operation property, for use by family members or employees of the operation, subject to all other applicable requirements of this *Resolution.*

**6. SHALL NOT HAVE BEEN MANUFACTURED BEFORE 1972.** The mobile home shall not have been manufactured before May 1972.

**7. COLORADO DIVISION OF HOUSING OR HUD SEAL REQUIRED.** If the mobile home was manufactured between 1972 and 1976, it shall be required to bear the seal of the Colorado Division of Housing. Any mobile home manufactured during or after 1976 shall be required to bear the HUD seal. If the mobile home does not bear either of those seals, the following shall be required:

**a. CERTIFIED ELECTRICAL SYSTEM.** The electrical system must be inspected by the Colorado state electrical inspector and certified that it meets the state electrical code for mobile homes.

**b. APPROVED PLUMBING SYSTEM.** The plumbing shall comply, with the current edition of the Colorado Technical Plumbing Code, and the applicant shall submit a copy of the inspection report as approved by the Colorado State Plumbing Inspector.

**8. GENERAL STRUCTURAL AND SNOWLOAD REQUIREMENTS.** If the mobile home is required to meet the applicable snowload requirements applied to structures throughout the County and does not have the manufacturer's certification or an independent certification by a qualified professional engineer licensed in the State of Colorado demonstrating that it meets that requirement, the home shall be modified with a roof structure, designed and constructed pursuant to the requirements of the applicable building code adopted and amended by Gunnison County.

**a. NO OPEN STUDS OR POSTS.** If the mobile home is to be modified with a roof structure, the new supporting walls (stud walls) must be completely sided in. No open studs or posts will be allowed.

**9. PERMIT ISSUED TO OWNER.** Other than on agricultural operations or within a mobile home community the permit shall be issued only to the owner of the land on which the mobile home is to be placed.

BLM_0053358

## SECTION 9-203: MOBILE HOME COMMUNITIES

**A. PURPOSES.** Mobile home communities offer an opportunity to live in a detached residence but often on a much smaller lot and at higher densities than more conventional single family neighborhoods. These communities are also unique in that residents usually own their home, but rent the space it occupies so they have only partial control over the quality of their living environment. Mobile home communities provide a source of lower cost housing in the County. For these reasons, mobile home communities are viewed as an important and unique land use that requires particular standards for design and development. This Section is intended:

1. **TO ESTABLISH MINIMUM STANDARDS FOR MOBILE HOME COMMUNITIES.** To establish minimum standards to regulate the design, construction and maintenance of mobile home communities, govern utilities and other physical facilities and conditions, to make mobile home communities safe, sanitary and pleasant for human habitation, and to establish the responsibilities and duties of owners and operators of mobile home communities.

2. **TO PROMOTE HEALTH AND SAFETY**. To promote the health and safety of the mobile home community tenants.

3. **TO PROMOTE AMENITIES.** To provide for adequate open space, space for storage, landscaping and screening to serve the needs of the residents, and to create an aesthetic appearance when the community is viewed from off-site.

4. **TO PROMOTE A QUALITY LIVING ENVIRONMENT**. To create a high quality living environment in mobile home communities through encouraging varied layouts, layouts which reflect the natural terrain, and provision of landscaping and recreational facilities. Except as provided in this Section, mobile home communities shall also meet all other applicable development regulations and standards in this *Resolution*.

**B. LAND USE CHANGE PERMIT REQUIRED.** Except as otherwise allowed by Section 9-202: F.5.: *Agricultural Operations*, when two or more mobile homes are to be located on a parcel, a Land Use Change Permit for a mobile home community shall be required.

**C. GENERAL COMMUNITY DESIGN AND MAINTENANCE.** Where sites are flat and with few distinguishing features, every effort shall be made to create curvilinear or clustered patterns of mobile home spaces rather than regimented rows. Interspersing open spaces is also encouraged.

1. **HUD-CERTIFIED HOMES ONLY.** Only HUD certified mobile homes may be installed in a mobile home community. The homes shall be supported according to the manufacturer's recommended method.

2. **DENSITY.** A mobile home community shall have a gross density of no more than ten mobile homes per acre, providing that the terrain, lot configuration, size of the community, and other factors permit such density and still permit compliance with all other applicable requirements of this *Resolution*.

3. **ADMINISTRATIVE OFFICE.** Within a mobile home community, one mobile home may be used as an administrative office related to the operations of the community.

4. **DRAINAGE FACILITIES.** Mobile home communities shall be designed, constructed and maintained pursuant to Section 13-116: *Grading and Erosion Control*, and Section 13-117: *Drainage, Construction and Post-Construction Storm Water Runoff,* and shall be drained, graded and surfaced when necessary to facilitate drainage and prevent earth movement, and shall be free from depressions in which water collects and stagnates.

5. **WEED CONTROL**. Mobile home communities shall be maintained in a clean, sanitary condition. Grasses, weeds and other such vegetation not considered as part of any ornamental landscape, shall not exceed 12 inches in height, or be allowed to accumulate in a dry or dead condition so as to constitute a fire hazard. Design, construction and maintenance of the community shall comply with Section 13-115: *Reclamation and Noxious Weed Control.*

6. **EXTERIOR LIGHTING.** Mobile home communities shall include exterior lighting plans designed pursuant to Section 13-114: *Exterior Lighting.*

7. **ROAD SYSTEM.** Safe and convenient access shall be provided at all times for pedestrian and vehicular traffic and emergency vehicles at all times. Interior roadways shall be named and clearly identified, and shall be designed, constructed and maintained pursuant to Section 12-103: *Road System* and Section 12-104: *Public Trails,* and pursuant to the *Gunnison County Standards and Specifications for Road and Bridge Construction.*

BLM_0053359

8. **UTILITIES**. Each mobile home space shall be connected to central water supply and wastewater systems, and shall be provided with adequate hookups to water, wastewater treatment, electric power, and telephone and fuel supplies. All utility lines, including service lines, shall be underground.

   a. **ELECTRICITY.** An electrical outlet supplying at least 100 amp service and 110/220 volts shall be provided for each mobile home space. The installation shall comply with the requirements of the applicable municipality or rural electric association.

   b. **WATER SUPPLY.** All mobile homes shall be served by a central water supply system, designed, constructed and operated pursuant to the *Colorado Department of Public Health and Environment's Colorado Primary Drinking Water Regulations*. The system shall comply with the requirements of Section 12-105: *Water Supply* and water shall be supplied to all mobile homes at a minimum pressure of 40 pounds per square inch.

   c. **WASTEWATER TREATMENT.** Wastewater treatment shall be designed, constructed and operated pursuant to the Colorado Department of Public Health and Environment requirements, and pursuant to the requirements of Section 12-106: *Sewage Disposal/Wastewater Treatment*.

   d. **UTILITY RISER:** Each mobile home space shall have provided a utility riser located and installed so as not to be damaged during placement of a mobile home, or by snow or ice.

9. **FIRE PROTECTION**. Fire protection shall comply with the requirements of Section 12-107: *Fire Protection*, including the requirements of the applicable fire protection district. When the district's standards conflict with County standards, the County shall only enforce the County standards.

10. **DEVELOPER SHALL PROVIDE LANDSCAPING.** Landscaping for the mobile home community shall be designed, installed and maintained pursuant to Section 13-111: *Landscaping and Buffering.* The developer or operator shall be responsible for installation and maintenance of landscaping the community in accordance with the County-approved landscaping plan.

    a. **ADDITIONAL SCREENING.** Additional landscaping may be required to provide screening and buffering and to soften the visual appearance of a mobile home community. Such requirements shall be established at the time of the Land Use Change Permit review, and shall be made a condition of approval.

11. **AVAILABILITY OF OWNER OR MANAGER.** The owner of the community shall be responsible for the supervision, operation and maintenance of the community. The owner or his authorized representative shall be available or on call at all times in event of an emergency.

12. **RECREATION AREA.** In complying with the requirements of Section 13-108: *Open Space and Recreation Areas* each mobile home community shall provide a central area that may or may not contain recreational equipment, but shall be available and maintained by the community owner/manager for the recreational use of community residents.

    a. **EIGHT PERCENT OPEN AREA REQUIRED.** A minimum of eight percent of the gross mobile home community area shall be designated for this central area.

13. **OUTDOOR STORAGE AREA**. An outdoor storage area equal to 50 sq. ft. per mobile home space, surfaced with gravel, asphalt, concrete or similar material for boats, boat trailers, recreational vehicles, and horse trailers shall be provided. (The size of the required storage area may be increased or decreased upon recommendation by the Planning Commission and approval by the Board, based on the actual number of spaces, and whether or not such storage uses are allowed by the community rules for operation.)

    a. **DESIGN OF STORAGE AREA.** The storage area shall be graveled or paved, and shall be enclosed by an opaque wall or fence six feet in height. Where the wall or fence includes a gate, the gate shall be constructed of solid materials so as to be opaque.

14. **TRASH DISPOSAL.** The storage, collection and disposal of refuse shall be so conducted as to control odors, rodents, insects, accidents, fire hazards, air pollution or other nuisance conditions.

    a. **REQUIRED TRASH CONTAINERS**. Refuse containers shall be provided at central screened areas no more than 200 feet from any mobile home space. At least two 30-gallon (8 cu. ft.) containers shall be provided for each mobile home space, or an equivalent storage capacity.

BLM_0053360

**15. RULES FOR COMMUNITY OPERATION**. Rules and regulations for operation of the community shall be submitted as part of the Preliminary Plan for a proposed mobile home community that is classified as a Major Impact project, and as part of the submittal for final action for a mobile home community that is classified as a Minor Impact. A condition of approval of a Land Use Change for any mobile home community shall be that a copy of these rules shall be made available to each new resident and posted in a central area. Required rules shall address:

**a. DOMESTIC ANIMALS.** Language allowing a maximum number of domestic animals allowed per mobile home, and the requirement that they shall be confined on the mobile home lot by fencing, leashing or whatever other means is reasonable to ensure that pets stay on-site.

**b. STORAGE.** Requirement that outside storage is limited to individual storage units and/or the common storage area.

**c. PARKING.** Requirement that parking be limited to the areas allowed by approval of the Land Use Change Permit.

**d. SIZES OF HOMES.** Size limitations for mobile homes.

**e. ABILITY TO RENT OR SELL HOMES.** Limitations, if applicable, of mobile home owners to rent or sell mobile homes while they are on rented spaces within the community.

**f. UTILITIES PAYMENTS.** Description of assignment of responsibility for paying utilities.

**g. SPEED LIMITS.** Speed limit within the community.

**h. CENTRAL FACILITIES.** Use of central facilities, if any, by residents.

**i. SKIRTING.** Type of skirting required and the requirement that skirting be installed within 60 days of location of a mobile home on a lot.

**j. FENCING AND ACCESSORY STRUCTURES.** Construction of fencing and other accessory structures on mobile home lots.

**k. CONSTRUCTION OF ADDITIONS.** Requirement that all permanent or temporary additions (such as porches, carports), must be approved by park management and shall conform to Gunnison County regulations.

**l. MAINTENANCE RESPONSIBILITIES.** Requirement that tenants have the responsibility to maintain their mobile home space, and its landscaping.

**m. VISIBLE ADDRESSES.** Requirement that mobile home numbers must be easily visible from the street or road on which the home is located.

**D. INDIVIDUAL SPACE REQUIREMENTS.**

**1. MOBILE HOME PERMIT AND ELECTRICAL PERMITS REQUIRED.** Two permits are required to locate a mobile home within a mobile home community: a County Mobile Home Permit, and an electrical permit from the applicable municipality or rural electric provider. The Mobile Home Permit should be obtained by the person setting the home, or the homeowner.

**2. INDIVIDUAL SPACES REQUIRED.** A mobile home shall not be occupied as a residence in a mobile home community unless it is properly placed on a conforming mobile home space and connected to all utility services, including water, sewage, electrical and gas lines. Additionally, the following standards shall apply:

**a. SEQUENTIAL NUMBERING OF SPACES REQUIRED.** Mobile home spaces shall be numbered clearly and sequentially.

**b. VISIBLE ADDRESSES.** Each mobile home lot shall be clearly identified by a permanent marker in front of the mobile home, separate from the mobile home, readily discernible from the nearest road, displaying properly sequenced numbers or letters that give each lot a unique address within the community. The numbers used to identify each lot shall be at least four inches high and two inches wide.

**3. MINIMUM SPACE BETWEEN HOMES.** All mobile homes shall be parked in spaces so that there will be a minimum of 25 feet between mobile homes. Measurement shall be from the side wall of one mobile home to another, and not from the edges of accessory additions, provided that the minimum spacing between

BLM_0053361

structures meets the requirements of the applicable fire protection district. When the district's standards conflict with County standards, the County shall only enforce the County standards.

**a.** **ZERO LOT LINE DEVELOPMENT.** Mobile home communities may be designed to balance a maximized use of the land while affording a modicum of privacy for residents, pursuant to Section 13-104: C: *Zero Lot Line Developments*, except that instead of providing a five-foot easement on each inside lot line for maintenance, language shall be included in the community rules that, as necessary, access for maintenance of an adjacent mobile home may occur from a tenant's lot.

**b.** **END TO END MEASUREMENT**. Mobile homes parked end-to-end shall have an end-to-end clearance of not less than 15 feet. Enclosed additions to the mobile home structure shall be considered a part of the mobile home in measuring required yard distance and setbacks.

4. **MINIMUM SQUARE FOOTAGE OF LOT.** The minimum area of a mobile home space shall be 5,000 sq. ft., with a minimum depth of 100 feet. If the 15-foot setback and minimum separation of 25 feet can be met in a space of less than 5,000 sq. ft., the space size may be reduced to a minimum of 3,200 sq. ft..

5. **FOUNDATION AND ANCHORS**: Each mobile home space shall be improved to include an adequate foundation for the placement and anchoring of a mobile home, thereby securing the mobile home against uplift, sliding, rotation and overturning. Each space shall be provided with ground anchors and tie downs placed at least at each corner of the mobile home foundation, and able to sustain a minimum tensile strength of 2,800 pounds.

6. **AREA BELOW MOBILE HOME**. The space below each mobile home shall be kept clean and free from refuse. The space may be used for storage provided the ground is covered with an impervious material and the area is maintained to prevent harboring of rodents. No flammable materials shall be stored beneath a mobile home.

7. **OUTDOOR STORAGE OF FLAMMABLE MATERIALS**. No firewood, propane tanks or other such materials shall encroach into the distance required to be maintained between mobile homes to protect against fire hazards. Liquid propane tanks shall be stored in accordance with the requirements of the applicable fire protection district. When the district's standards conflict with County standards, the County shall only enforce the County standards.

8. **ACCESSORY INDIVIDUAL STORAGE SHEDS.** An accessory storage shed may be constructed or erected in the rear yard, and may be required as a condition of a Land Use Change Permit for a mobile home community. It shall be no larger than 120 sq. ft., no closer than five feet from any adjoining property line, and are located pursuant to the requirements of the applicable fire protection district. When the district's standards conflict with County standards, the County shall only enforce the County standards. Individual storage buildings shall be designed to enhance the appearance of the mobile home and shall be constructed from durable materials.

9. **MAINTENANCE OF INDIVIDUAL SPACES.** Mobile home community residents shall be responsible for keeping their individual spaces free from debris and refuse, and shall keep landscaping trimmed, mowed and in a thriving condition.

10. **ALL MOBILE HOMES SHALL BE SKIRTED WITH A RIGID MATERIAL.** Such skirting must be in place within 60 days after the mobile home is set on the mobile home space. Skirting shall be provided with doors to permit convenient access to sewer, water and gas connections. Skirting material shall be weatherproof, fire-resistant and durable.

E. **TAXING INFORMATION.** The Gunnison County Assessor's Office annually will contact the community owner to request the following information; it is the responsibility of the community owner or operator to maintain this information and provide it to the Assessor's Office:

1. **NAME OF HOME OWNER.** The name and address of the owner of each mobile home within the mobile home community.

2. **DATA ABOUT EACH HOME.** The make, model, size and year of each mobile home.

BLM_0053362

# DIVISION 9-300:
# COMMERCIAL AND INDUSTRIAL USES

## SECTION 9-301: APPLICABILITY AND GENERAL STANDARDS

**A.   APPLICABILITY.** Commercial and industrial developments, including buildings, shall be designed according to the same principles governing the design of residential developments, and shall be sited to complement the topography, avoiding environmentally sensitive areas to the maximum extent feasible. Factors including drainage, noise, and odor and surrounding land uses shall be considered in siting buildings; sufficient access shall be provided, and impacts mitigated. Unless specifically exempted by this *Resolution*, commercial and industrial uses are subject to all applicable requirements of this *Resolution*.

**B.   LAND USE CHANGE PERMIT REQUIRED.** Unless otherwise exempted by this *Resolution*, commercial and industrial uses shall be required to obtain a Land Use Change Permit.

**C.   LOCATION.** Location of commercial and industrial uses shall be directed pursuant to Section 10-104: *Locational Standards for Commercial, Industrial and Other Non-Residential Development.*

**D.   GENERAL STANDARDS.** The following standards apply to commercial and industrial uses with the exception of mining and associated activities, that are regulated by Division 9-400: *Exploration, Extraction and Processing of Minerals and Construction Materials* and to home occupations, that are regulated by Section 9-102: *Home Occupations.*

    **1.   NON-RESIDENTIAL ACCESSORY USES.** Uses that shall be considered accessory to a non-residential use include an office to run the business, a cafeteria, and similar support areas.

    **2.   FOOD SERVICE REQUIREMENTS.** Food service activities, requiring a license or certificate of inspection pursuant to C.R.S. 12-44-201 through 12-44-213 and the production, storage and dispensing of ice shall be conducted pursuant with the physical and operational requirements of the edition of the *Rules and Regulations Governing the Sanitation of Food Service Establishments* in the State of Colorado in effect at the time the Land Use Change Permit application is submitted.

    **3.   ELECTRICAL DISTURBANCES.** No use or activity shall be permitted which creates electrical disturbances (electromagnetic radiation) that have a detrimental effect, including radio and television interference, on the operation of any equipment beyond the boundaries of the site. Electrical disturbances affecting operation of equipment beyond the boundaries of a site will require investigation and satisfactory resolution of the disturbance.

    **4.   FIRE AND EXPLOSIVE HAZARDS.** Materials or products which decompose by detonation shall be handled, sorted and utilized in accord with the *National Fire Protection Association* (NFPA) *Standards* and pursuant to standards and requirements of the applicable fire protection district. Design shall comply with the standards of Section 12-107: *Fire Protection.*

    **5.   GLARE AND HEAT.** Any commercial or industrial operation producing intense glare or heat shall be conducted within an enclosed building or with other effective screening in such a manner as to make glare or heat imperceptible from any point along the property line.

    **6.   EXTERIOR LIGHTING.** Whenever exterior lighting is installed in a commercial or industrial development, it shall be designed and installed so that all direct rays are confined to the site and adjacent properties are protected from glare, and shall comply with the applicable standards of Section 13-114: *Exterior Lighting.*

    **7.   ODORS.** No industrial or commercial use shall cause or allow the emission of odors from any single source so as to result in detectable and unreasonable odors.

    **8.   RADIOACTIVITY.** Releases and use of radioactive materials shall be as follows:

        **a.   RELEASES.** Release of radioactivity shall be subject to state and federal regulations, and any other agency having jurisdiction over such releases. Where conflicts between regulations exist, the most restrictive requirements shall apply.

        **b.   USE OF RADIOACTIVE MATERIALS.** Medical, dental and veterinary sources of radiation residues, including x-ray machines, gamma and neutron sources, and pharmaceutical isotopes which are used

BLM_0053363

for diagnostic and therapeutic purposes, shall be permitted when located within a hospital, clinic, medical, dental or veterinary office, or medical research facility, whether mobile or fixed.

9. **VIBRATION.** No industrial or commercial use shall result in vibration perceptible to a person without instruments at any point along the property boundaries.

10. **NOISE.** Every use to which this Section applies shall be conducted so that any noise produced is not objectionable because of intermittence, beat frequency, or shrillness regardless of db(A) measurement. Sound levels of noise radiating 25 or more feet beyond the subject property boundary in excess of the db(A) established for the following time periods and uses may be considered a public nuisance as listed in Table 2: *Maximum Permissible Noise Levels for Commercial and Industrial Uses*.

TABLE 2: MAXIMUM PERMISSIBLE NOISE LEVELS FOR COMMERCIAL AND INDUSTRIAL USES

| IMPACTED PROPERTY | 6 A.M. TO 7 P.M. | 7 P.M. TO 6 A.M. |
|---|---|---|
| NATIONAL PARKS OR RECREATION AREAS, PUBLIC PARKS, CAMPGROUNDS ON FEDERAL LANDS, AND FEDERALLY, STATE OR LOCALLY-DEDICATED OPEN SPACE OR CONSERVATION AREAS | 50 db(A)* | 45 db(A)* |
| RESIDENTIAL | 50 db(A* | 40 db(A)* |
| COMMERCIAL | 60 db(A)* | 55 db(A)* |
| INDUSTRIAL | 80 db(A)* | 75 db(A)* |
| WILDERNESS AREAS | 40 db(A)* | 40 db(A)* |
| *db (A): Decibels measured on the "A" scale of a standard sound level meter having characteristics defined by the American National Standards Institute | | |

## SECTION 9-302: FARM OR RANCH STAND

A. **NO LAND USE CHANGE PERMIT REQUIRED.** One farm or ranch stand at which primarily raw agricultural products are sold may be erected as an accessory structure on the same property on which the product was grown or produced, or it is the only such stand on property on which the product was not grown or produced, and it is erected as a temporary use, pursuant to the requirements of Section 9-502: *Temporary Structures*.

B. **ADEQUATE PARKING.** An off-road parking area that is sufficient in size to accommodate the anticipated number of customers shall be provided.

C. **TRAFFIC SAFETY.** The sales area shall be adequately set back from the adjacent road and shall be so situated so that it does not block any required access to or exit from the site, does not disrupt vehicular or pedestrian circulation in the surrounding area, and does not cause a traffic hazard or safety problem.

D. **SIGNS.** Any identification signs used for the operation shall comply with Section 13-109: *Signs*.

## SECTION 9-303: DUDE RANCHES AND RESORTS

In addition to complying with all other applicable standards and requirements of this *Resolution*, dude ranches and resorts shall meet the following:

A. **ACCESS TO PUBLIC LAND**. Where activities require use of public lands, the dude ranch or resort shall have the applicable Special Use Permit or its equivalent from the appropriate public lands agency, and shall abut these lands or have access to them by either:

1. **EASEMENT OR AGREEMENT**. A written access agreement or easement across any intervening private land; or

2. **PUBLIC ROAD**. A public road.

B. **COOKING AND DINING FACILITIES.** Full service cooking or dining facilities may be provided but shall not be required. Individual cabins may be served by kitchens in the cabins, or by a central dining hall.

C. **LIMITATIONS ON OCCUPANCY.** Lodging rooms or individual cabins shall not be used for long term rentals. Full-time residents shall be limited to the dude ranch or resort owner or manager and their family, employees, and family guests.

D. **COMPLIANCE WITH BUILDING CODE AND APPLICABLE FIRE PROTECTION DISTRICT REQUIREMENTS**. When an applicant requests a Land Use Change Permit for a dude ranch or resort, and the

BLM_0053364

buildings proposed to be used were in existence as of the effective date of this *Resolution*, the building shall be inspected and shall comply with applicable requirements of the applicable building code, adopted and amended by Gunnison County, and the applicable fire protection district requirements as a condition of issuance of the Land Use Change Permit. All such uses, whether preexisting this *Resolution*, or approved as new Land Use Change Permits, shall comply with the standards of Section 12-107: *Fire Protection*.

**E. COMPATIBILITY WITH ADJACENT USES.** Approval of a conditional Land Use Change Permit for a dude ranch or resort may include conditions as to the location, layout and operation of facilities necessary to ensure compatibility with and to mitigate adverse impacts on adjacent properties.

# SECTION 9-304: ADULT-ORIENTED USES

**A. LAND USE CHANGE PERMIT REQUIRED.** The establishment or operation of an adult-oriented use requires a Land Use Change Permit and in addition to being required to comply with all other applicable standards and requirements of this *Resolution*, shall comply with the following:

   **1. LOCATION SHALL COMPLY AS COMMERCIAL USE..** The location of any building proposed for an adult-oriented use shall comply with the standards of Section 10-104: *Locational Standards for Commercial, Industrial and other Non-Residential Development.*

   **2. SUBSEQUENT ESTABLISHMENT OF OTHER USES.** An adult-oriented use legally operating pursuant to this Section and all other applicable standards of this *Resolution* shall not become illegal by the subsequent establishment of a residence, public park or playground, recreational facility, child care center, place of worship or assembly, or school within 1,000 feet of that adult-oriented use.

   **3. SETBACKS FROM OTHER USES.** Adult-oriented uses shall not be established or operated within 1,000 feet of any of the following: a residence; a public park or playground; an outdoor or indoor recreational facility; a child care center; a place of worship or assembly; a public or private school; or another adult-oriented use.

      **a. SETBACK MEASUREMENT.** Measurements of setback distance shall be made from the nearest property line of the property from which spacing is required to the nearest portion of the building in which the adult use is to occur, using a straight line, without regard to intervening structures or objects.

   **4. DISPLAYS.** Advertisements, displays, live displays or other promotional materials or showing or depicting sexual activities, or specified anatomical areas shall not be shown or exhibited so as to be visible or audible outside of the establishment. All building entries, windows, and doorways for adult-oriented uses shall be located, covered, or screened in such a manner as to prevent the interior of such the premises from being viewed from outside of the establishment.

# SECTION 9-305: SEASONAL RECREATIONAL VEHICLE PARKS AND CAMPGROUNDS

**A. PURPOSE.** The purpose of this Section is to provide regulations and minimum requirements for the protection of health and safety of occupants of commercial campgrounds and of the general public.

**B. LAND USE CHANGE PERMIT REQUIRED.** Construction, alteration, or expansion of a recreational vehicle park or campground requires a Land Use Change Permit, which shall be classified pursuant to Section 3-111: *Classification of Impact.* In addition to complying with all other applicable requirements of this *Resolution*, any such park or campground shall comply with the requirements of this Section.

**C. GENERAL STANDARDS.** In addition to the other applicable standards and requirements of this *Resolution*, recreational vehicle parks shall comply with the following:

   **1. COMPLIANCE WITH COLORADO DEPARTMENT OF HEALTH STANDARDS.** Seasonal recreational vehicle parks shall comply with the requirements of the Colorado Department of Public Health and Environment's *Standards and Regulations for Campgrounds and Recreation Areas*, a copy of which is available in the Planning Department.

   **2. VEHICLES, TENTS, TENT TRAILERS, OTHER CAMPING SHELTERS ALLOWED.** All types of recreational vehicles as defined in this *Resolution*, and other camping shelters, may be located in a seasonal recreational vehicle park permitted by Gunnison County so long as each individual camping shelter is accommodated on its own site.

BLM_0053365

3. **SEASONAL OPERATION ONLY.** Recreational vehicle parks shall be designed and constructed for seasonal operation only, and shall not accommodate year around residency, except for permanent constructed primary residences or other similar residences intended to house the property owner or park caretaker.

4. **PROPERTY LINE SETBACKS.** Sites in a recreational vehicle park shall meet the following minimum setbacks from property lines (Table 3: *Recreational Vehicle Park Property Line Setbacks*):

TABLE 3: RECREATIONAL VEHICLE PARK PROPERTY LINE SETBACKS

| DESCRIPTION | SETBACK |
| --- | --- |
| FROM THE PERIMETER OF THE RECREATIONAL VEHICLE PARK | 75 feet |
| FROM EXISTING PRIMARY RESIDENCES, UNLESS THEY ARE SECONDARY USES WITHIN THE PARK | 250 feet |
| FROM THE EDGE OF A PUBLIC ROAD RIGHT-OF-WAY | 100 feet |

5. **REFUSE DISPOSAL.** Animal-proofed refuse containers shall be supplied and maintained pursuant to recommendations by the Colorado Division of Wildlife.

6. **DISPOSAL OF WASTE.** Septage and other sewage or wastewater shall be disposed of only pursuant to a permit obtained in full compliance with the *Gunnison County Individual Sewage Disposal System Regulations*, and any other applicable County, state or federal standard or regulation. Compliance with those *Regulations* may require that a long-term individual sewage disposal system be installed and maintained on the parcel.

D. **PROHIBITED ACTIONS.** The following shall be prohibited:

1. **LEAVING REFUSE.** Storage of refuse, debris or litter in an exposed or unsanitary condition.

2. **DUMPING OF POLLUTANTS NEAR WATER BODY.** Placing any substance that pollutes, or may pollute the water body within 150 feet of a stream, lake or other water body

BLM_0053366

# DIVISION 9-400:
# EXPLORATION, EXTRACTION AND PROCESSING OF MINERALS AND CONSTRUCTION MATERIALS

## SECTION 9-401: PURPOSE

The purpose of this Division is to establish reasonable and uniform limitations, safeguards and controls for exploration, extraction and processing of minerals and construction materials (referred to collectively as "mining operations") in the County that allow wise utilization of natural resources, eliminate or mitigate to the maximum extent feasible both on and off-site environmental and visual impacts, manages the extraction of mineral resources in a responsible manner while conserving other natural resources, ensure compatibility with surrounding land uses, protect the safety of the community, promote beneficial post-mining land uses, and protect the tax base of the County.

## SECTION 9-402: APPLICABILITY

**A. ALL OPERATIONS REQUIRED TO COMPLY WITH STANDARDS OF THIS** *RESOLUTION*. Unless otherwise regulated by the County, the standards in this Division shall be used by the applicant and the County in designing, reviewing, evaluating, permitting, constructing, and conducting mining operations in the County, including Special Development Projects as defined in the *Gunnison County Special Development Projects Regulations*. Unless expressly exempted by Section 1-106: *Partially Exempted Land Use Changes*, all mining operations, including the extension or expansion of a permitted mining operation onto land outside the area permitted by the County, shall also comply with all other standards and requirements of this *Resolution*.

**B. LAND USE CHANGE PERMITS REQUIRED.** All applicants for exploration, mining operations or processing of construction materials shall obtain a permit for a Minor or Major Impact project as provided in Article 6: *Minor Impact Projects* and Article 7: *Major Impact Projects* unless specifically exempted, or unless such activities are regulated pursuant to the *Gunnison County Special Development Projects Regulations*.

**C. ACTIVITIES EXEMPTED FROM SUBMITTAL AND REVIEW REQUIREMENTS.** The following mining operations shall be exempt from the submittal and review requirements of this Division but shall comply with all the other requirements of this Division and this *Resolution*:

    **1. LIMITED CONSTRUCTION MATERIAL EXTRACTION.** Extraction of construction materials without any additional processing by a property owner of 300 cubic yards per year or less without any compensation for use on the owner's property or agricultural operation.

    **2. MAPPING ACTIVITIES.** Mapping activities that do not require use of explosives, motor vehicles, or other surface disturbance.

    **3. LIMITED MINERAL EXPLORATION.** Mineral exploration limited to non-motorized hand tools including picks and hammers with no new or improved access for motorized vehicles and less than five cubic yards of excavation or fill per site.

    **4. LIMITED CONSTRUCTION MATERIALS EXPLORATION.** Construction materials exploration shall be limited to 25 cubic yards per exploratory hole, with a maximum of three holes open at the same time.

**D. EXTENSION OR EXPANSION OF CURRENT UNDERGROUND MINERAL EXPLORATION REQUIRED TO FILE NOTICE OF ACTIVITY.** The following is presumed not to require a Land Use Change Permit; however, a Notice of Activity shall be required to be submitted to the Planning Department before the activity is initiated: Extension or expansion of underground mineral exploration existing as of the effective date of this *Resolution* that results in no surface transportation of materials, no surface disturbance, either visual or aural, or adverse subsurface or surface hydrological impacts. This includes underground drilling, excavation, or maintenance undertaken as part of an existing underground operation.

    **1. ANNUAL FILING REQUIRED.** A Notice of Activity is required to be filed annually, for either a single, or multiple operations conducted by the same person.

    **2. ONE NOTICE FOR MULTIPLE OPERATIONS.** When one person or entity wants to conduct activities that are described in Section 9-402: D: *Extension or Expansion of Current Underground Mineral Exploration*

BLM_0053367

*Required to File Notice of Activity*, on more than one site, only one Notice of Activity shall be required to be filed for all those activities.

## SECTION 9-403: PERMIT SUBMITTAL REQUIREMENTS FOR MINING OPERATIONS

**A.  APPLICATION FORM.** The Planning Department shall provide the appropriate application form based on the applicable initial impact classification of the project. The applicant shall include within the submittal a description of the construction the applicant intends to complete within three years after the date the Land Use Change Permit receives approval.

**B.  MLRD AND OTHER AGENCY APPLICATION CONTENTS SHALL BE ACCEPTED.** To the maximum extent feasible, information supplied by the applicant within an application submitted to the Colorado Mined Land Reclamation Division (MLRD), and any other state or federal agency, shall be accepted by Gunnison County to meet submittal requirements required by this Section.

**C.  REVIEW BY GUNNISON COUNTY PUBLIC WORKS.** A copy of the applicant's application to the Division of Minerals and Geology shall be submitted to the Gunnison County Public Works Department at the time of receipt of the Land Use Change Permit application. The Public Works Department shall have 21 days from the date of receipt to review and return comments to the Planning Department.

**D.  NOTICE OF ACTIVITY.** Operators of activities described in Section 9-402: D: *Extension or Expansion of Current Underground Mineral Exploration Required to File Notice of Activity* shall submit a completed Notice of Activity form to the Planning Department a minimum of 15 days before any intended activity is initiated. When multiple operations are conducted by one person or entity, all information required by the Notice of Activity form shall be supplied for each separate site. The Planning Department shall provide, and the operator shall complete the form, that, at a minimum, shall include the following:

  **1.  NAME AND ADDRESS.** Name and address of the property owner, and, if applicable, the name of the operator or other representative of the operation.

  **2.  SITE DESCRIPTION.** Legal description of the site on which the activity will occur.

  **3.  INTENDED ACTIVITIES.** Identify the underground drilling, excavation, or maintenance to be undertaken as part of the existing underground operation.

  **4.  DURATION OF ACTIVITIES.** Define the length of time during which the activities will occur.

  **5.  VICINITY MAP. VICINITY MAP.** A vicinity map, which at a minimum includes the following (as illustrated in Appendix Figure 2: *Vicinity Map Example*):

    **a.  PROPERTY LOCATION AND NEARBY PARCEL SIZES AND LAND USES.** Location of the property on a United States Geological Survey quadrangle map with the location highlighted so that it is easy to see, and that clearly shows sizes of parcels and land uses within a half-mile of the proposed project.

    **b.  TOPOGRAPHIC FEATURES.** Streams, lakes, ponds, wetlands, contour lines and elevations.

    **c.  ROADS.** All U.S. and state highways and nearest County or Forest Service, Bureau of Land Management, and/or subdivision/private roads that traverse and/or provide access to this proposed project.

    **d.  EASEMENTS.** Easements recorded or historically used that provide access to or across, or other use of, the property.

    **e.  BOUNDARIES OF DISTRICTS, MUNICIPALITIES OR SUBDIVISIONS.** Locations of special district boundaries, municipalities or residential subdivisions within a half mile of the property.

    **f.  PROXIMITY OF MINING OR PROCESSING ACTIVITY.** Any parcel located within 1,000 feet of the property proposed for land use change on which there exists an operation involving mineral exploration or extraction or construction materials processing.

  **6.  PERSONNEL.** The estimated number of employees who will perform the work.

  **7.  DISTURBANCE.** The amount of surface and underground disturbance likely to occur.

  **8.  EQUIPMENT.** Equipment to be used in the operation. .

**E.  INFORMATION SUBMITTALS FOR MINOR AND MAJOR IMPACT PROJECTS.** An applicant for a Minor or Major Impact project that involves extraction of minerals or construction materials shall at a minimum submit a

BLM_0053368

copy of the application submitted to the MLRD, the items specified in Section 3-107: *General Application Requirements,* and the following, if not included in the application submitted to the MLRD:

1. **IDENTIFICATION OF MINERAL OR CONSTRUCTION MATERIAL.** Identification of the mineral or construction material proposed to be extracted, including estimated amount, depth and boundaries of mineral deposit, estimated amount of overburden, and estimated amount of proposed surface and subsurface disturbance.

2. **MINING OPERATIONS PLAN.** A detailed description of the method of operation of extraction, restoration and rehabilitation to be employed, including any proposed uses including rock crusher, asphalt plant or cement batch plant. An extraction plan showing the areas to be mined, maximum height and location(s) of stockpile area(s), locations of structures, general location of processing equipment, location of any rock crusher, asphalt plant or cement batch plant, time schedules, fencing if applicable, general depth of deposit, general tons in the deposit, length of operation, proposed phases of activity and operation, power supply, location and size of tailings ponds, hazardous materials, potential pollutants or contaminates, and other pertinent factors.

3. **RESTORATION AND RECLAMATION PLAN.** A detailed reclamation plan showing proposed reclamation with time schedules including finish contours, grading, sloping, types, placement, and amount of vegetation, after use plans, and any other proposed factors. The plan shall include a copy of each relevant applicable section submitted to the MLRD, and shall be designed pursuant to Section 13-115: *Reclamation and Noxious Weed Control.* Approval of the Land Use Change Permit shall be conditioned on subsequent submittal of a copy of the approved MLRD Reclamation Permit to the County. The County may, at its discretion require additional information on reclamation plans.

4. **TOPOGRAPHY.** Topography of the area with contour lines of sufficient detail and at a scale that shows all elements of the land use change, and to portray the direction and rate of slope of the land included in the project. The map shall include a map scale, appropriate legend, map title, and a north arrow, the date and the name of the person who drafted the map.

5. **VEGETATION.** Type, character, and density of existing and proposed vegetation, and identification of how the existing vegetation will be impacted, restored and rehabilitated.

6. **ESTIMATED COSTS.** The operator's estimated cost at each of the following segments of the rehabilitation process, including where applicable, backfilling, grading, re-establishing topsoil, planting, revegetation management, and protection before vegetation establishment and administrative cost.

7. **STORM WATER MANAGEMENT PLAN.** A copy of the application's Storm Water Management Plan submitted to the Colorado Department of Public Health and Environment shall be submitted.

8. **EMISSION CONTROL PLAN.** If required by the Colorado Department of Public Health and Environment, an emission control plan proposed to be submitted to, or approved by the Colorado Department of Public Health and Environment. Approval of the Land Use Change Permit shall be conditioned upon subsequent submittal of a copy of the plan to the Count as approved by the CDPHE.

9. **DUST CONTROL PLAN.** A dust control plan.

10. **ACCESS AND TRANSPORTATION PLAN.** An access and transportation plan that shall address the following:

    a. **IDENTIFICATION OF PROPOSED HAUL ROUTE(S).** Traffic analysis that identifies traffic impacts of the proposal, including the numbers of trips per day to be generated by employees during construction, operation and restoration/reclamation; road and safety conditions in the pit area, in the vicinity of the pit area, and the haul route (if any). This shall include ingress/egress, parking and loading areas, on site circulation, estimate of number of trucks per day on the average and maximum number of trucks per day (ranges are acceptable).

    b. **ALTERNATIVE TRANSPORTATION MODES.** All applications for mining operations other than construction materials processing that are classified as Major Impact projects shall include an assessment of the feasibility of alternative modes of transportation for employees and hauling of materials to and from the extraction and processing sites, including rail transportation, conveyor belts, buses, and vans.

    c. **EMPLOYEE TRANSPORTATION.** When a project is classified as a Major Impact, and when the County determines that, due to road capacity and/or increases in traffic hazards, the traffic generated

BLM_0053369

by the operation will adversely affect public infrastructure and current levels of services the operation may be required to provide and use pool transportation plans for employee shuttles to and from the mining operation to residential areas and designated pick-up points.

**d. TRAFFIC STUDY.** A traffic study conducted pursuant to the applicable requirements of Section 12-103: *Road System* and that includes current data and an assessment of existing road capacity and levels of service, road condition before and after the operation has been approved, and cumulative effects of existing traffic and traffic generated by the mining operation. Improvements necessitated by, and directly attributable to the mining operation including paving, lane widening, entry lanes, acceleration/deceleration lanes, runaway truck ramps, passing lanes, and special stop or crossing areas at high-risk locations shall be itemized and proposed mitigation addressed in one or more of the following ways:

    **1. IMPROVEMENTS COMPLETED BY APPLICANT.** The applicant shall first have the option to provide the personnel, materials, equipment and identified period in which to construct the improvements, subject to approval by the County.

    **2. IMPROVEMENTS ENSURED BY DEVELOPMENT IMPROVEMENT AGREEMENT.** The applicant shall provide collateral sufficient to ensure construction of improvements, pursuant to Section 16-117: *Development Improvement Agreement Required*, whether the applicant intends to complete the improvements, or contract the work out.

    **3. IMPACT FEES FOR DETERIORATION CAUSED BY MINING OPERATIONS.** If the mining operation will significantly deteriorate existing roads, impact fees sufficient to compensate for the eventual cost of mitigating the deterioration shall be paid by the applicant before development is initiated, unless a payment schedule is approved by the County.

**e. HOURS OF OPERATION.** Proposed operation schedule, including the range of hours, days and months during which the project will operate, and likely or temporary closures.

**f. ENVIRONMENTAL IMPACT MITIGATIONS.** Mitigation, including avoidance, of noise, dust, air quality impairment, odor, and vibration, including siting, buffering and processing.

**11. IMPACTS TO WATER QUALITY.** The application shall include identification of potential impacts of the operation to on-site and off-site water quality, and proposed avoidance and mitigation measures; at a minimum, the application shall comply with the requirements of Section 11-107: *Protection of Water Quality*. The applicant shall provide sufficient water quality data before a project is initiated, including a copy of water quality data submitted to the Division of Minerals and Geology. As required during and after operation, the applicant periodically and at least during spring snowmelts, shall provide data to ensure that such standards are being met.

**12. FIRE PROTECTION PLAN.** The applicant shall submit a fire protection plan designed pursuant to Section 12-107: *Fire Protection* that shall be reviewed and approved by the County in consultation with the applicable fire protection district. Fire protection plans shall include documentation of types of construction for all structures on the site and full disclosure of all types of chemicals to be used or stored on site, their locations, and information regarding safe exposure levels, fire risks, and treatment and suppression techniques.

**13. CULTURAL SURVEY.** A cultural, historical and archeological survey of the site prepared by a qualified professional. Upon receipt, the survey shall be submitted by the Planning Department to the State Historic Preservation Officer and the Gunnison County Historic Preservation Committee for comments and recommendations.

**14. VISUAL IMPACT ASSESSMENT.** A written visual impact assessment that considers the impact of the proposed operation on scenic qualities of the site and on significant visual resources. Inventories of existing natural features and the impacts of the proposed land use change on them, the assessment shall include information required by Section 11-108: *No Development on Ridgeline*. If significant impacts are reasonably likely to result from the operation, proposed mitigation measures shall be included in the assessment.

**15. BLASTING LICENSE.** Before blasting, a copy of a current blasting explosive license as filed with the Gunnison County Sheriff's Office or other applicable agency and issued to the applicant or to the contractor who will be conducting blasting activity shall be submitted to the County.

**a. ESTIMATED SCHEDULE BLASTING TIMES.** A schedule for blasting above ground, near population centers, shall be provided a minimum of 10 days before the blasting is to occur.

BLM_0053370

16. **WATER SUPPLY.** Proposed water supply, including identification of water rights and impacts on water quality and quantity. An analysis of any hydrologic connection that shall identify any hydrologic connection between the proposed mining activity and wells or water bodies, and, as applicable, proposed impacts and avoidance or mitigations of impacts. A copy of a plan of water augmentation or other plans or permits required of the operation by any state or federal agency shall be included; if none is required by any such agency, none shall be required by the County.

17. **FUTURE LAND USES**. The application shall include a written summary of proposed future land uses of the site after completion of the mining operations.

## SECTION 9-404: SITE LOCATION AND SETBACKS FOR MINING OPERATIONS

A. **SUPERSEDES LOCATIONAL STANDARDS**. This Section shall supersede the requirements of the locational standards of Section 10-104: *Locational Standards for Commercial, Industrial and Other Non-Residential Development.*

B. **COMPATIBILITY.** To the maximum extent feasible, mining operations shall be located and conducted in such a manner as to be compatible with existing surrounding land uses and shall not unduly interfere with other economic development efforts in the County. Mining operations shall not cause a significant net adverse impact upon existing developed areas or other areas identified for residential, commercial, institutional, or industrial development by either the County or its constituent municipalities.

C. **USE OF BEST MANAGEMENT PRACTICES**. To the maximum extent feasible, mining operations shall be designed, constructed, operated, maintained and reclaimed using best management practices, pursuant to Section 11-102: *Voluntary Best Management Practices.*

   1. **NO INTERFERENCE WITH LATERAL SUPPORT.** There shall be no interference with lateral support on adjacent property, regardless of the setback required.

D. **SETBACKS.** Other than in industrial parks that existed as of the effective date of this *Resolution*, construction materials processing and other mining operations as defined within this *Resolution,* at a minimum, shall meet the following standards:

   1. **SETBACKS FOR CONSTRUCTION MATERIALS PROCESSING OPERATIONS**. Mining operations that are construction materials processing operations shall comply with the following setback requirements, as summarized in Table 4: *Setbacks for Construction Materials Operations.*

      a. **CENTERLINE OF PUBLIC ROAD**. Unless all of the conditions of Section 9-404: D. 1. b: *Standards for Temporary Gravel Operations for a Specific Road Project*, are met, all components of a construction materials processing operation, except cuts and fills, office buildings, scales and screening shall be located no closer than 500 feet of the centerline of a public road, unless visual screening of natural vegetation is placed to block visual impacts to those using the adjacent road, in which case the setback may be as little as 50 feet from the edge of the right-of- way.

      b. **STANDARDS FOR TEMPORARY GRAVEL OPERATIONS FOR A SPECIFIC ROAD PROJECT.** The boundary of gravel extraction or processing may be located as close as 65 feet of the centerline of a public road other than federal or state highways or within 65 feet of the edge of the right-of-way of a federal or state highway, if all four of the following requirements are satisfied; cuts and fills may occur as needed within the road improvement project.

         1. **PROJECT ADJACENT TO IMPROVEMENT PROJECT.** The project phase for which the construction materials are to be extracted and processed is to improve the road to which it is adjacent and it is within the project boundary; Gunnison County can use the site if another source of materials is not reasonably available; and

         2. **TEMPORARY**. The extraction, processing and reclamation will be active only for the length of a specific project or project phase, but no longer than one year, and reclamation activities will take no longer than one year and eight months, if delays are caused by weather; and

         3. **WRITTEN AGREEMENT WITH ROAD JURISDICTION.** There is written agreement between the applicant and the agency that holds jurisdiction of the road that the location is satisfactory to that agency.

         4. **LANDSCAPING.** Compliance with Section 13-111: *Landscaping and Buffering.*

BLM_0053371