BLM Form 3150-5
FS Form 2800-16a
(May 2006)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**DEPARTMENT OF AGRICULTURE**
**FOREST SERVICE**

FORM APPROVED
OMB NO. 1004-0162
Expires: February 28, 2009

NOI Case File No.

**NOTICE OF COMPLETION OF OIL AND GAS**
**GEOPHYSICAL EXPLORATION OPERATIONS**

| Lessee or Operator | | | Geophysical Co. Representative | | |
|---|---|---|---|---|---|
| Address | | | Address | | |
| City | | State | City | | State |
| Zip Code | Phone No. *(Include area code)* | | Zip Code | Phone No. *(Include area code)* | |
| E-Mail Address | | | Cellular Phone No. *(Include area code)* | | |

1. If different from the Notice of Intent and Authorization to Conduct Oil and Gas Geophysical Exploration Operations (NOI), list the lands that you actually used for geophysical activities. Describe the lands by Meridian, Township, Range, and Section(s), or metes and bounds as appropriate:

2. Miles of source line or acres of survey on: a. Your Lease _____ b. Other Federal lands _____

3. If your operations were different from those proposed in the approved NOI, attach shotpoint or field maps showing actual line locations and access routes. (The map(s) must be a minimum scale of 1:24,000 (7 1/2-minute USGS quadrangle or equivalent.) The maps must indicate public lands you crossed.

4. Describe how you plugged any shotholes.

5. If the Bureau of Land Management (BLM) or the Forest Service (FS) requests it, attach a copy of the "Hole Plugging Log" describing each shothole, including whether holes were wet or dry, the static water level, flowing holes, breached or caved holes, or lost hole locations.

6. Describe any surface disturbance and how you reclaimed it.

I CERTIFY that the oil and gas explorations approved under the NOI were completed on _____ and that the operations
complied with all terms and conditions of the approved NOI.                                     (Date)

_____
(Printed Name of Authorized Company Representative)

_____
(Signature of Authorized Company Representative)

_____
(Title of Authorized Company Representative)

_____
(Date)

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on page 2)

S Dominguez  Gunnison County, CO          615250
9/5/2012  3:09:05 PM                      Page 327 of 333
447                                       R 0.00 D 0.00



BLM_0053882

**76**

## NOTICES

The Privacy Act of 1974 and the regulation in 43 CFR 2.48(d) provide that you be furnished the following information in connection with information required by this Notice of Completion of Oil and Gas Geophysical Exploration Operations.

AUTHORITY:   30 U.S.C. 181 et seq.

PRINCIPAL PURPOSE: We use the information to process your Notice.

ROUTINE USES:   (1)  To determine that mitigating measures are made to protect the environment.   (2)  Transfer to appropriate Federal agencies when concurrence is required prior to granting a right in public lands or resources.   (3)  Information from the record and/or the record will be transferred to appropriate Federal, State, local or foreign agencies when relevant to civil, criminal or regulatory investigations or prosecutions.

EFFECT OF NOT PROVIDING INFORMATION:   Disclosure of the information is voluntary. If all the information is not provided, your right to conduct geophysical exploration activities may be revoked.

The Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) requires us to inform you that:

BLM will collect this information under 43 CFR 3150.

FS will collect this information under 36 CFR 251.15.

BLM/FS will use this information to process geophysical exploration notices.

Response to this request is required to obtain a benefit.

BLM would like you to know that you do not have to respond to this or any other Federal agency-sponsored information collection unless it displays a currently valid OMB control number.

**BURDEN HOURS STATEMENT:** Public reporting burden for this form is estimated to average 20 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing of the form. Direct comments regarding the burden estimate or any other aspect of this form to the U.S. Department of the Interior, Bureau of Land Management (1004-0162), Bureau Information Collection Clearance Officer (WO-630),1849 C Street, N.W., Mail Stop 401LS, Washington, D.C. 20240.

(BLM Form 3150-5 and FS Form 2800-16a, page 2)

S Dominguez   Gunnison County,  CO
9/5/2012  3:09:05 PM                              615250
447                                          Page 328 of 333
                                             R 0.00 D 0.00



BLM_0053883



S Dominguez  Gunnison County,  CO
9/5/2012  3:09:05 PM
447

615250
Page 329 of 333
R 0.00 D 0.00

BLM_0053884



S Dominguez   Gunnison County, CO
9/5/2012  3:09:05 PM
447

615250
Page 330 of 333
R 0.00 D 0.00

BLM_0053885



The mention of company names, trade names, or commercial products does not constitute endorsement or recommendation for use by the Federal Government.

S Dominguez   Gunnison County, CO
9/5/2012  3:09:05 PM
447

615250
Page 331 of 333
R 0.00 D 0.00

BLM_0053886



S Dominguez   Gunnison County,  CO          615250
9/5/2012  3:09:05 PM                  Page 332 of 333
447                                    R 0.00 D 0.00

BLM_0053887

S Dominguez   Gunnison County,  CO
9/5/2012  3:09:05 PM
447

615250
Page 333 of 333
R 0.00 D 0.00



BLM_0053888

## Gunnison County, Colorado
# Land Use Resolution



Amended
February 16, 2016

BLM_0053889

**DISCLAIMER**
**REGARDING THE ELECTRONIC VERSION OF**
**THE GUNNISON COUNTY, COLORADO**
*LAND USE RESOLUTION*

The electronic version of this document has been checked for viruses, and as of the date of the file, tested virus-free. Gunnison County provides the electronic version of this document without warranty or conditions of any kind concerning the quality, safety, or suitability of the related software, either express or implied. In no event is Gunnison County liable for any indirect, punitive, special, incidental or consequential damages however they may arise out of or in connection with the use or performance of any files, downloads or other information, including, without limitation, those resulting from:

- reliance on the materials presented
- costs of replacement goods
- loss of use or data
- delays or business interruptions
- and any theory of liability, arising out of or in connection with the use or performance of information

There are inherent dangers in the use of any software and we caution the customer to make sure they completely understand the potential risks before downloading, modifying, using and/or distributing any part or the whole of this document. The purchaser of the electronic version of this document is solely responsible for adequate protection and backup of the data and equipment used in connection with any of the related software required to open and read the document, and Gunnison County is not liable for any damages in connection with downloading, using, modifying and/or distributing any part or the whole of this document.

BLM_0053890

# *Amendments*

The *Gunnison County Land Use Resolution* was adopted by the Board of County Commissioners of Gunnison County, Colorado January 8, 2001 (the "effective date of this *Resolution*") and has been amended as follows:

| | |
|---|---|
| Amendments approved May 15, 2001 | *Resolution No. 18 Series 2001* |
| Amendments approved June 18, 2002 | *Resolution No. 34 Series 2002* |
| Amendments approved August 8, 2002 | *Resolution No. 41 Series 2002* |
| Amendments approved September 3, 2002 | *Resolution No. 45 Series 2002* |
| Amendments approved February 18, 2003 | *Resolution No. 22 Series 2003* |
| Amendments approved August 5, 2003 | *Resolution No. 37 Series 2003* |
| Amendments approved September 11, 2003 | *Resolution No. 44 Series 2003* |
| Amendments approved September 18, 2003 | *Resolution No. 45 Series 2003* |
| Amendments approved September 25, 2003 | *Resolution No. 48 Series 2003* |
| Amendments approved October 22, 2003 | *Resolution No. 53 Series 2003* |
| Amendments approved October 22, 2003 | *Resolution No. 54 Series 2003* |
| Amendments approved October 22, 2003 | *Resolution No. 55 Series 2003* |
| Amendments approved November 4, 2003 | *Resolution No. 58 Series 2003* |
| Amendments approved January 6, 2004 | *Resolution No. 02 Series 2004* |
| Amendments approved June 29, 2004 | *Resolution No. 37 Series 2004* |
| Amendments approved July 27, 2004 | *Resolution No. 45 Series 2004* |
| Amendments approved September 7, 2004 | *Resolution No. 52 Series 2004* |
| Amendments approved September 7, 2004 | *Resolution No. 53 Series 2004* |
| Amendments approved August 4, 2005 | *Resolution No. 42 Series 2005* |
| Amendments approved June 13, 2006 | *Resolution No. 44 Series 2006* |
| Amendments approved August 1, 2006 | *Resolution No. 56 Series 2006* |
| Amendments approved April 3, 2007 | *Resolution No. 17 Series 2007* |
| Ministerial changes and previously-approved amendments, ratified  July 10, 2007 | *Resolution No. 28 Series 2007* |
| Amendments approved October 16, 2007 | *Resolution No. 36 Series 2007* |
| Amendments approved October 21, 2008 | *Resolution No. 10 Series 2009* |
| Amendments approved November 3, 2009 | *Resolution No. 47 Series 2009* |
| Amendments approved July 6, 2010 | *Resolution No. 23 Series 2010* |
| Amendments approved December 20, 2011 | *Resolution No. 49 Series 2011* |
| Ministerial changes and previously-approved amendments, ratified December 4, 2012 | *Resolution No. 35 Series 2012* |
| Amendments approved May 7, 2013 | *Resolution No. 06 Series 2013* |
| Amendments approved November 5, 2013 | *Resolution No. 23 Series 2013* |
| Amendment approved July 1, 2014 | *Resolution No. 19 Series 2014* |
| Amendment approved August 19, 2014 | *Resolution No. 24 Series 2014* |
| Amendment approved April 21, 2015 | *Resolution No.10  Series 2015* |
| Amendment approved February 16, 2016 | *Resolution No. 06 Series 2016* |

BLM_0053891

BLM_0053892

# TABLE OF CONTENTS

**ARTICLE 1:  GENERAL REQUIREMENTS**..................................................................................... 1

*SECTION 1-101: TITLE AND SHORT TITLE* .............................................................................. 1
*SECTION 1-102: AUTHORITY* ....................................................................................................... 1
*SECTION 1-103: PURPOSES* ........................................................................................................ 1
*SECTION 1-104: PERMITS REQUIRED* ..................................................................................... 3
*SECTION 1-105: SECTIONS NECESSARY FOR IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY* .... 7
*SECTION 1-106: PARTIALLY EXEMPTED LAND USE CHANGES* ......................................... 8
*SECTION 1-107: ONE RESIDENCE PER LEGAL LOT, SUBJECT TO COMPLIANCE WITH THIS RESOLUTION* ........ 12
*SECTION 1-108: NONCONFORMING USES*................................................................................ 12
*SECTION 1-109: VESTED PROPERTY RIGHTS*........................................................................ 13
*SECTION 1-110: PROCESS FOR DESIGNATING SPECIAL AREAS*..................................... 15
*SECTION 1-111: CONSTRUCTION AND WORD USAGE*........................................................ 17
*SECTION 1-112: USE OF MAPS*.................................................................................................. 18
*SECTION 1-113: AMENDING THIS LAND USE RESOLUTION*................................................ 18
*SECTION 1-114: INTERPRETATIONS* ........................................................................................ 20
*SECTION 1-115: ESTABLISHMENT OF GUNNISON COUNTY PLANNING COMMISSION* .... 20
*SECTION 1-116: ESTABLISHMENT OF GUNNISON COUNTY BOARD OF ADJUSTMENTS* .... 21
*SECTION 1-117: REPEALER* ........................................................................................................ 22
*SECTION 1-118: SEVERABILITY* ................................................................................................ 22
*SECTION 1-119: IMPACT FEES AND DEDICATIONS* .............................................................. 22


**ARTICLE 2:  DEFINITIONS**........................................................................................................ 23

*SECTION 2-101: PURPOSE* .......................................................................................................... 23
*SECTION 2-102: DEFINITIONS* .................................................................................................... 23


**ARTICLE 3:  GENERAL REVIEW PROCESS** ......................................................................... 49

*SECTION 3-101: PURPOSE* .......................................................................................................... 49
*SECTION 3-102: OVERVIEW*......................................................................................................... 49
*SECTION 3-103: INTENT TO NOT DUPLICATE OTHER PERMIT PROCESSES OR REQUIREMENTS*........ 49
*SECTION 3-104: COORDINATION WITH STATE OR FEDERAL ACTIONS AND COUNTY PERMIT PROCESS*.... 49
*SECTION 3-105: WITHDRAWN AND INACTIVE APPLICATIONS* ........................................... 50
*SECTION 3-106: PHASING OF PROJECTS* ............................................................................... 50
*SECTION 3-107: GENERAL APPLICATION REQUIREMENTS* ............................................... 51
*SECTION 3-108: PRE-APPLICATION CONFERENCE* ............................................................. 51
*SECTION 3-109: APPLICATION*.................................................................................................... 52
*SECTION 3-110: COMMUNITY DEVELOPMENT DEPARTMENT APPLICATION REVIEW*........ 52
*SECTION 3-111: CLASSIFICATION OF IMPACT* ....................................................................... 54
*SECTION 3-112: NOTICE OF PUBLIC HEARING* ..................................................................... 54
*SECTION 3-113: CONDUCT OF PUBLIC HEARING* ................................................................ 57
*SECTION 3-114: ACTIONS BY RECOMMENDING AND DECISION-MAKING BODIES* ....... 58


**ARTICLE 4:  ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE LAND USE CHANGE PERMITS** .................................................................................................................. 59

*SECTION 4-101: PURPOSE* .......................................................................................................... 59
*SECTION 4-102: PROJECTS CLASSIFIED AS ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE LAND USE CHANGE PERMITS* ...................................................................... 59


**ARTICLE 5:  ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE LAND USE CHANGE PERMITS**........ 61

*SECTION 5-101: PURPOSE* .......................................................................................................... 61
*SECTION 5-102: PROJECTS CLASSIFIED AS ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE LAND USE CHANGE PERMITS* .................................................................................. 61
*SECTION 5-103: STANDARDS FOR APPROVAL OF ADMINISTRATIVE REVIEW PROJECTS* .... 62
*SECTION 5-104: ADMINISTRATIVE REVIEW PROJECT APPLICATION* .............................. 63
*SECTION 5-105: ADMINISTRATIVE REVIEW PROJECT REVIEW PROCESS* .................... 73

BLM_0053893

**ARTICLE 6:  MINOR IMPACT PROJECTS** ....................................................................................... **75**
    *SECTION 6-101: PURPOSE*....................................................................................................*75*
    *SECTION 6-102: PROJECTS CLASSIFIED AS MINOR IMPACT PROJECTS*...............................*75*
    *SECTION 6-103: STANDARDS FOR APPROVAL OF MINOR IMPACT PROJECTS*..........................*76*
    *SECTION 6-104: MINOR IMPACT APPLICATION* ......................................................................*76*
    *SECTION 6-105: SUBMITTAL FOR FINAL ACTION FOR MINOR IMPACT PROJECT* ....................*81*
    *SECTION 6-106: MINOR IMPACT REVIEW PROCESS*...............................................................*88*

**ARTICLE 7:  MAJOR IMPACT PROJECTS** ...................................................................................... **93**
    **DIVISION 7-100:  CLASSIFICATION, STANDARDS AND GENERAL REVIEW STEPS FOR MAJOR IMPACT PROJECTS** .......................................................................................... **93**
    *SECTION 7-101: PROJECTS CLASSIFIED AS MAJOR IMPACT*..................................................*93*
    *SECTION 7-102: STANDARDS OF APPROVAL FOR MAJOR IMPACT PROJECTS* ..........................*93*
    *SECTION 7-103: GENERAL REVIEW STEPS FOR MAJOR IMPACT PROJECTS* ............................*94*

    **DIVISION 7-200:  SKETCH PLAN FOR MAJOR IMPACT PROJECTS** ........................................ **95**
    *SECTION 7-201: SKETCH PLAN APPLICATION FOR MAJOR IMPACT PROJECTS*...........................*95*
    *SECTION 7-202: SKETCH PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS*.....................*102*

    **DIVISION 7-300:  PRELIMINARY PLAN FOR MAJOR IMPACT PROJECTS** ................................. **107**
    *SECTION 7-301: PRELIMINARY PLAN APPLICATION FOR MAJOR IMPACT PROJECTS*....................*107*
    *SECTION 7-302: PRELIMINARY PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS*...............*116*

    **DIVISION 7-400:  FINAL PLAN FOR MAJOR IMPACT PROJECTS**............................................. **121**
    *SECTION 7-401: FINAL PLAN APPLICATION FOR MAJOR IMPACT PROJECTS* .............................*121*
    *SECTION 7-402: FINAL PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS* ........................*128*

**ARTICLE 8:  TECHNICAL MODIFICATIONS, TAKINGS, APPEALS AND EXCEPTIONS**................................. **131**
    *SECTION 8-101: TECHNICAL MODIFICATIONS* .......................................................................*131*
    *SECTION 8-102: ADMINISTRATIVE TAKINGS PROCESS FOR LAND USE CHANGE PERMITS* ...........*132*
    *SECTION 8-103: APPEALS*..................................................................................................*134*
    *SECTION 8-104: EMERGENCY EXCEPTIONS* .........................................................................*135*

**ARTICLE 9:  SPECIAL USES** ...................................................................................................... **139**
    **DIVISION 9-100:  SECONDARY USES AND ACTIVITIES** ...................................................... **139**
    *SECTION 9-101: USES SECONDARY TO A PRIMARY RESIDENCE* .............................................*139*
    *SECTION 9-102: HOME OCCUPATIONS*.................................................................................*141*
    *SECTION 9-103: BED AND BREAKFAST*.................................................................................*141*
    SECTION 9-104: MARIJUANA CULTIVATION, MANUFACTURING OR TESTING FACILITY ................. 143

    **DIVISION 9-200:  SPECIAL RESIDENTIAL USES** ................................................................. **145**
    *SECTION 9-201: INDIVIDUAL MANUFACTURED AND MOBILE HOMES*.......................................*145*
    *SECTION 9-202: MOBILE HOME COMMUNITIES*.....................................................................*147*

    **DIVISION 9-300:  COMMERCIAL AND INDUSTRIAL USES** .......................................................... **153**
    *SECTION 9-301: APPLICABILITY AND GENERAL STANDARDS* ................................................*153*
    *SECTION 9-302: FARM OR RANCH STAND*.............................................................................*155*
    *SECTION 9-303: DUDE RANCHES AND RESORTS* ..................................................................*155*
    *SECTION 9-304: ADULT-ORIENTED USES*.............................................................................*156*
    *SECTION 9-305: SEASONAL RECREATIONAL VEHICLE PARKS AND CAMPGROUNDS*.................*156*

    **DIVISION 9-400:  EXPLORATION, EXTRACTION AND PROCESSING OF MINERALS AND CONSTRUCTION MATERIALS**.................................................................................................... **159**
    *SECTION 9-401: PURPOSE*.................................................................................................*159*
    *SECTION 9-402: APPLICABILITY* .........................................................................................*159*
    *SECTION 9-403: PERMIT SUBMITTAL REQUIREMENTS FOR MINING OPERATIONS*....................*160*

BLM_0053894

SECTION 9-404: SITE LOCATION AND SETBACKS FOR MINING OPERATIONS .................................................. 163
SECTION 9-405: GENERAL DEVELOPMENT STANDARDS FOR MINING OPERATIONS ................................. 167
SECTION 9-406: ADDITIONAL FINANCIAL SECURITY ...................................................................................... 171
SECTION 9-407: NO EXERCISE OF PRE-EMPTED AUTHORITY REGARDING RECLAMATION .......................... 171

**DIVISION 9-500: MISCELLANEOUS USES AND ACTIVITIES ............................................................. 173**
SECTION 9-501: SPECIAL EVENTS ................................................................................................................. 173
SECTION 9-502: TEMPORARY STRUCTURES .................................................................................................. 176
SECTION 9-503: SATELLITE DISH DEVICES .................................................................................................... 177
SECTION 9-504: ATTACHED WIRELESS TELECOMMUNICATIONS DEVICES .................................................. 178
SECTION 9-505: FREESTANDING WIRELESS TELECOMMUNICATION STRUCTURES ....................................... 178
SECTION 9-506: CHILD CARE CENTER ........................................................................................................... 178
SECTION 9-507: GROUP HOME ..................................................................................................................... 179
SECTION 9-508: KEEPING OF LIVESTOCK NOT ON AN AGRICULTURAL OPERATION ..................................... 179
SECTION 9-509: CAMPING ON INDIVIDUAL PARCELS .................................................................................... 180

**DIVISION 9-600: ESSENTIAL HOUSING ................................................................................................ 183**
SECTION 9-601: PURPOSES ........................................................................................................................... 183
SECTION 9-602: RELATIONSHIP OF DEVELOPMENT AND ESSENTIAL HOUSING NEED ................................ 183
SECTION 9-603: WORKFORCE HOUSING LINKAGE ........................................................................................ 184
SECTION 9-604: INCENTIVES TO PROVIDE ESSENTIAL HOUSING .................................................................. 185

**ARTICLE 10:  LOCATIONAL STANDARDS ........................................................................................... 187**
SECTION 10-101: PURPOSE ............................................................................................................................ 187
SECTION 10-102: LOCATIONAL STANDARDS FOR RESIDENTIAL DEVELOPMENT ............................................ 187
SECTION 10-103: RESIDENTIAL DENSITY ....................................................................................................... 187
SECTION 10-104: LOCATIONAL STANDARDS FOR COMMERCIAL, INDUSTRIAL AND OTHER NON-RESIDENTIAL
       DEVELOPMENT .................................................................................................................. 189

**ARTICLE 11: RESOURCE PROTECTION STANDARDS ...................................................................... 191**
SECTION 11-101: PURPOSES .......................................................................................................................... 191
SECTION 11-102: VOLUNTARY BEST MANAGEMENT PRACTICES .................................................................. 191
SECTION 11-103: DEVELOPMENT IN AREAS SUBJECT TO FLOOD HAZARDS ................................................ 192
SECTION 11-104: DEVELOPMENT IN AREAS SUBJECT TO GEOLOGIC HAZARDS .......................................... 202
SECTION 11-105: DEVELOPMENT IN AREAS SUBJECT TO WILDFIRE HAZARDS ........................................... 208
SECTION 11-106: PROTECTION OF WILDLIFE HABITAT AREAS ...................................................................... 210
SECTION 11-107: PROTECTION OF WATER QUALITY ...................................................................................... 215
SECTION 11-108: STANDARDS FOR DEVELOPMENT ON RIDGELINES ............................................................ 219
SECTION 11-109: DEVELOPMENT THAT AFFECTS AGRICULTURAL LANDS ..................................................... 221
SECTION 11-110: DEVELOPMENT OF LAND BEYOND SNOWPLOWED ACCESS ............................................. 223
SECTION 11-111: DEVELOPMENT ON INHOLDINGS IN THE NATIONAL WILDERNESS ..................................... 225
SECTION 11-112: DEVELOPMENT ON PROPERTY ABOVE TIMBERLINE ......................................................... 225

**ARTICLE 12:  DEVELOPMENT INFRASTRUCTURE STANDARDS ................................................... 227**
SECTION 12-101: PURPOSE ............................................................................................................................ 227
SECTION 12-102: APPLICABILITY AND OVERVIEW .......................................................................................... 227
SECTION 12-103: ROAD SYSTEM .................................................................................................................... 227
SECTION 12-104: TRAILS ............................................................................................................................... 231
SECTION 12-105: WATER SUPPLY .................................................................................................................. 232
SECTION 12-106: SEWAGE DISPOSAL/WASTEWATER TREATMENT ............................................................... 235
SECTION 12-107: FIRE PROTECTION .............................................................................................................. 237

**ARTICLE 13:  PROJECT DESIGN STANDARDS .................................................................................. 239**
SECTION 13-101: PURPOSE ............................................................................................................................ 239
SECTION 13-102: APPLICABILITY .................................................................................................................... 239
SECTION 13-103: GENERAL SITE PLAN STANDARDS AND LOT MEASUREMENTS ........................................... 239
SECTION 13-104: SETBACKS FROM PROPERTY LINES AND ROAD RIGHTS-OF-WAY ...................................... 242
SECTION 13-105: RESIDENTIAL BUILDING SIZES AND LOT COVERAGES ...................................................... 245

BLM_0053895

SECTION 13-106: ENERGY AND RESOURCE CONSERVATION.................................................247
SECTION 13-107: INSTALLATION OF SOLID-FUEL-BURNING DEVICES ...............................247
SECTION 13-108: OPEN SPACE AND RECREATION AREAS...............................................249
SECTION 13-109: SIGNS ..................................................................................................251
SECTION 13-110: OFF-ROAD PARKING AND LOADING......................................................255
SECTION 13-111: LANDSCAPING AND BUFFERING ..........................................................258
SECTION 13-112: SNOW STORAGE ..................................................................................261
SECTION 13-113: FENCING ...............................................................................................262
SECTION 13-114: EXTERIOR LIGHTING .............................................................................262
SECTION 13-115: RECLAMATION AND NOXIOUS WEED CONTROL .................................265
SECTION 13-116: GRADING AND EROSION CONTROL.......................................................265
SECTION 13-117: DRAINAGE, CONSTRUCTION AND POST-CONSTRUCTION STORM WATER RUNOFF.............268
SECTION 13-118: WATER IMPOUNDMENTS.........................................................................270
SECTION 13-119: STANDARDS TO ENSURE COMPATIBLE USES ....................................274

**ARTICLE 14:  INCENTIVES.................................................................................................... 275**
SECTION 14-100: PURPOSES ...........................................................................................275

**DIVISION 14-100: RESIDENTIAL DENSITY TRANSFER PROGRAM ..................................... 277**
SECTION 14-101: CALCULATING  RESIDENTIAL DENSITY TRANSFER AMOUNT AND PAYMENT OF FEES..........277
SECTION 14-102: STANDARDS FOR USE OF RDT FUNDS ...............................................278

**ARTICLE 15:  RIGHT-TO-RANCH POLICY ........................................................................... 279**
SECTION 15-101: PURPOSES ...........................................................................................279
SECTION 15-102: APPLICABILITY .....................................................................................281
SECTION 15-103: EFFECTS OF ADOPTION OF RIGHT-TO-RANCH POLICY .....................281
SECTION 15-104: CONFLICT RESOLUTION PROGRAM ....................................................283

**ARTICLE 16: ENFORCEMENT ............................................................................................. 285**
SECTION 16-101: GENERAL ..............................................................................................285
SECTION 16-102: AUTHORIZATION TO ENFORCE ............................................................285
SECTION 16-103: RIGHT OF ENTRY AND INSPECTION ....................................................285
SECTION 16-104: NOTIFICATION TO CORRECT VIOLATION..............................................285
SECTION 16-105: STOP ORDER; IMMEDIATE COMPLIANCE.............................................286
SECTION 16-106: TEMPORARY SUSPENSION OR PERMANENT REVOCATION OF PERMIT....................286
SECTION 16-107: ABATEMENT OF VIOLATION..................................................................287
SECTION 16-108: NO PROCESSING OR APPROVAL FOR LAND OR PERMITTEE SUBJECT TO ENFORCEMENT 288
SECTION 16-109: NO ACTION FOR PERSONS SUBJECT TO ENFORCEMENT ORDERS....................288
SECTION 16-110: REVIEW OF POTENTIAL VIOLATION AND NECESSARY REMEDIATION BEFORE PERMIT
          APPLICATION ...............................................................................................289
SECTION 16-111: REQUIREMENTS REGARDING SUBDIVISION OF LAND..........................289
SECTION 16-112: OTHER REMEDIES ................................................................................289
SECTION 16-113: NO PERSONAL LIABILITY......................................................................290
SECTION 16-114: NO COUNTY LIABILITY ..........................................................................288
SECTION 16-115: RESPONSIBILITY NOT LESSENED........................................................290
SECTION 16-116: NO WAIVER BY GUNNISON COUNTY OF STATUTORY AUTHORITY .........290
SECTION 16-117: NO WAIVER BY GUNNISON COUNTY OF GOVERNMENTAL IMMUNITY ....290
SECTION 16-118: DEVELOPMENT IMPROVEMENT AGREEMENT REQUIRED........................290

**APPENDIX.....**...................................................................................................................**291**

**INDEX**..................................................................................................................................**309**

BLM_0053896

# ARTICLE 1:
# GENERAL REQUIREMENTS

## SECTION 1-101: TITLE AND SHORT TITLE

This *Resolution* (as amended) shall be known as "The *Gunnison County Land Use Resolution*," "The *Land Use Resolution*," and "This *Resolution.*"

## SECTION 1-102: AUTHORITY

It is the intent of the Board in adopting and enforcing this *Resolution* to exercise fully all authority and power conferred on it by, to rely on, and to be in accord with the *Constitution of the United States*, the *Colorado Constitution* and the statutes of the State of Colorado, including the following:

A. **Title 16, Article 13, Part 3, C.R.S**: restraint and abatement of nuisances.

B. **Title 24, Articles 65.1, 67, and 68, C.R.S.** that respectively provide for the designation, administration and regulation by local government of areas and activities of state interest, authorize the planned unit development approach to land development, and provide for the vesting of real property rights.

C. **Title 25, Article 12, C.R.S:** Noise abatement.

D. **Title 29, Article 20, C.R.S:** *Local Government Land Use Control Enabling Act* of 1974.

E. **Title 30, Article 11, C.R.S:** County powers and functions.

F. **Title 30, Article 15, C.R.S:** County regulations under its police powers.

G. **Title 30, Article 28, C.R.S:** Planning and building codes, subdivision exemption plats, cluster development, the establishment of a county planning commission and regional planning commissions, improvement agreements, master plans, zoning plans, and other land use planning and regulatory mechanisms, including subdivision regulations.

H. **Title 30, Article 30, C.R.S**: County regulation regarding control of stream flow for purposes of flood control.

I. **Title 34, Article 1, Part 3, C.R.S:** Preservation of commercial mineral deposits.

J. **Title 35, Article 72, C.R.S:** The duty of the owner or occupier of any land in the state to prevent soil blowing by planting and other practices.

K. **Title 38, Article 30.5, C.R.S**: Addressing conservation easements.

L. **Title 43, Article 1, C.R.S**: Regarding roads and, particularly, limitations on controls on advertising devices.

M. **Title 43, Article 2, C.R.S**: State, county, municipal, and public roads.

N. **All Other Authorized Powers**. All other powers authorized by the Constitution of the State of Colorado, state statute or by common law, including those for the regulation of land uses, land use planning and development, subdivision, and environmental protection, police powers and the power to abate nuisances.

## SECTION 1-103: PURPOSES

Gunnison County is a diverse community with a history of independence, self-sufficiency and neighborly spirit. Recognizing that "One Size Does Not Fit All," this *Resolution* articulates general policies, regulations and specific standards.

This Section identifies the purposes the Board intends to achieve by adopting this *Resolution*. These purposes serve as basic goals for this *Resolution* and the review of applications for Land Use Change Permits and related permits and processes. When there is a conflict between a statement of purpose and an adopted standard in this *Resolution*, or when an adopted standard is more specific, the standard shall supersede these purposes. This *Resolution* shall be construed liberally to further its stated purposes.

A. **GENERAL PURPOSES OF THIS *LAND USE RESOLUTION*.**

BLM_0053897

1. **PROMOTE HEALTH, SAFETY, GENERAL WELFARE AND THE ENVIRONMENT.** To promote the health, safety, and general welfare of the citizens of Gunnison County by giving reasonable consideration to the social, economic and environmental characteristics of the community and the compatibility of proposed land use changes with existing uses.

2. **SIMPLIFY THE LAND USE PLANNING AND REGULATORY REVIEW PROCESS.** To simplify, expedite and provide uniform application of the land use planning and regulatory review process.

3. **PROTECT THE HERITAGE OF OUR RURAL CHARACTER.** To protect ranching and other existing industries, the beauty of the landscape and rural character of Gunnison County, in order to enhance recreational opportunities for residents and visitors, preserve important archeological and historic sites and viewsheds, and conserve soil, water, and forestry resources. To ensure that no land use change significantly detracts from the economic base, the environmental, historical, recreational, or aesthetic character of the County.

4. **PROVIDE FOR ORDERLY USE OF LAND.** To plan for and regulate the use of land and to provide planned and orderly use of land and protection of the environment in a manner consistent with constitutional rights and without unnecessary time and expense by applicants or the public.

5. **PRESERVE NEIGHBORHOOD CHARACTER.** To preserve the character of established residential areas and residential neighborhoods.

6. **ENCOURAGE HOUSING DIVERSITY.** To encourage a diversity of housing types, densities, and development that assists in providing adequate housing for all people.

7. **EVALUATE CUMULATIVE IMPACTS.** To evaluate the combined impacts of two or more uses or activities, and repeated activities, in a discreet area or the whole of Gunnison County.

8. **ENCOURAGE INNOVATIONS.** To encourage innovations in residential, commercial, and industrial land use changes, so that the growing demands of the population may be met by greater variety in type, design, and layout of development.

9. **REGULATE LAND USE BASED ON IMPACTS.** To regulate the use of land based on the impact of such use on surrounding areas and the community to eliminate, minimize, or mitigate conflicts among different land uses.

10. **INTENT NOT TO DEPRIVE ALL REASONABLE ECONOMIC USE.** It is the intent of this *Resolution* that no private landowner be deprived of all reasonable economic use of real property.

B. **PURPOSES TO MANAGE AND GUIDE LAND DEVELOPMENT.**

1. **PROMOTE A COMPACT DEVELOPMENT PATTERN.** To promote a compact development pattern that discourages sprawl, in which denser and more intense forms of development will occur contiguous to, or in close proximity to, existing population and development centers and public services. To encourage development patterns that will tend to minimize the cost of providing governmental and other services and will preserve open space.

2. **ENSURE ADEQUATE FACILITIES.** To ensure that development provides, and is served by, adequate transportation, water supply, wastewater treatment, other utilities and public services, schools, open space, parks, trails, and similar facilities, and to provide for phased development based on location and capacity of such services and facilities. To ensure, to the maximum extent practicable, that growth will pay for itself, and to ensure that present residents do not have to subsidize land use changes that involve growth or development through increased taxes or degradation of the quality of services they receive. To avoid land use changes requiring significant expenditures of public funds for schools, roads, health, police, and fire, or other purposes.

3. **TO ENCOURAGE TRANSPORTATION ALTERNATIVES.** To minimize automobile use where practical and to ensure that, as applicable, development is reasonably designed to provide safe and convenient roads and non-motorized ways to connect neighborhoods and developments, and encourage the use of public transportation and related facilities.

4. **REGULATE PUBLIC FACILITIES.** To regulate the general location, character and extent of public facilities, ways, grounds, and places, including public utilities.

5. **ENSURE EFFICIENT PROVISION OF PUBLIC SERVICES.** To require that permitted land use changes be designed, constructed, and maintained to provide efficient and economic provision of public services.

6. **MAINTAIN POPULATION/INFRASTRUCTURE BALANCE.** To maintain a balance beneficial to the public between the growth of public infrastructure in the county (including transportation, schools, health facilities, fire

BLM_0053898

and police services, utilities, recreation, housing) and the population growth reasonably expected to result from proposed development.

7. **ENSURE DEVELOPMENT MEETS DEMONSTRATED HOUSING NEEDS.** To encourage residential development that meets demonstrated housing needs in Gunnison County, to discourage residential development that does not meet demonstrated needs in Gunnison County, and to encourage buildout of platted subdivisions that have been approved by Gunnison County before additional lots are subdivided.

C. **PURPOSES TO PROMOTE THE ECONOMIC WELL BEING OF THE COMMUNITY.**

1. **PROTECT AND ENHANCE ECONOMY.** To protect and enhance the economic strength of the private and governmental sectors of Gunnison County in a manner that is compatible with this *Resolution*.

2. **ENCOURAGE ECONOMIC DIVERSITY.** To encourage, strengthen and promote greater economic diversity in the County, to broaden employment opportunities and reduce seasonal employment fluctuation in a manner that will not endanger or detract from the existing economy.

3. **PROMOTE CONTINUING VIABILITY OF AGRICULTURE.** To promote innovation in land use changes that contribute to continuing viable agricultural operations and recognize the public benefit of protecting the open space that agricultural operations provide, and to discourage land use changes that jeopardize those activities. To identify land use change on agricultural land, to protect ditches and stock drive routes, to encourage land use change that will retain the agricultural productivity of the land and to discourage land use change that will adversely affect agricultural operation on land not owned by the applicant. However, it is not the policy of this *Resolution* to prevent land use change on land because such land was at one time used for agricultural purposes nor to enforce continued agricultural use of land that is otherwise suitable for non-agricultural use and that can otherwise be developed pursuant to the terms of this *Resolution*.

D. **PURPOSES TO PROTECT ENVIRONMENTAL RESOURCES.**

1. **MAINTAIN ENVIRONMENTAL QUALITY.** Recognizing the irreplaceable character of the environment and its importance to the quality of life in Gunnison County, to ensure that land use changes do not degrade or threaten the existing high quality of the environment in the County.

2. **PRESERVE QUALITY AND QUANTITY OF WATER RESOURCES.** Recognizing that the essence of Gunnison County's ability to survive and prosper is the availability of a consistent and clean source of water, the County intends to preserve and protect the quality and quantity of water resources in Gunnison County.

3. **PRESERVE WILDLIFE HABITAT.** To protect and preserve lands from land use activities and patterns of development that would cause significant net adverse effects to sensitive wildlife habitat and to discourage land uses that will impair or destroy such habitats, or their utilization by wildlife species, or that would endanger a wildlife species. It is the intent of this *Resolution* that private landowners do not lose reasonable use of their land or, when appropriate, receive fair compensation because of owning sensitive wildlife habitat.

4. **REGULATE LAND USE IN NATURAL HAZARD AREAS.** To regulate land use and activities in natural hazard areas by avoiding it and if avoidance is not possible, to reduce or minimize hazards to public health, safety, and property in those areas with minimum expenditure of public funds.

5. **PREVENT INCREASES IN SCOPE OR IMPACT OF NATURAL HAZARDS.** To prevent activities and land use in natural hazard areas that would increase the scope or impact of such natural hazards.

6. **DISCOURAGE DEVELOPMENT THAT WOULD RESULT IN WINTER RECREATION IN CERTAIN HAZARD AND RESOURCE AREAS.** To discourage development or land uses that will directly result in winter recreation in areas of known uncontrolled avalanche danger or in critical wildlife winter range.

## SECTION 1-104: PERMITS REQUIRED

A. **ISSUANCE OF PERMITS.** Unless otherwise expressly excepted by  this *Resolution*, no person shall engage in, cause, or allow any land use change as defined in Article 2*: Definitions* upon land owned, controlled, occupied, or used by that person in the unincorporated area of Gunnison County, including parcels of land that are less than, equal to, or greater than 35 acres in size, or upon patented mining claims, or lots in disincorporated townsites, unless that person has first obtained a Land Use Change Permit pursuant to this *Resolution*. The act of subdividing land into parcels, all 35 acres or larger, does not require a Land Use Change Permit.

B. **APPLICATION**. An application for a Land Use Change Permit shall be filed with the Gunnison County Community Development Department and shall be processed in accordance with Article 3: *General Review Process*.

BLM_0053899

C.   **ACTIVITY BEGUN BEFORE PERMIT ISSUANCE.** No development for which a Land Use Change Permit is required shall begin until the Land Use Change Permit has been issued by Gunnison County. If the activity has begun before issuance of the permit by Gunnison County, no Land Use Change Permit shall be issued for the activity until the applicant ceases the activity, remedies any damage caused and complies with all enforcement actions taken by Gunnison County pursuant to Article 16: *Enforcement,* and with all other applicable County regulations.

D.   **PERMIT ISSUED UPON FINAL APPROVAL.** A Land Use Change Permit shall be issued by Gunnison County upon final approval of the application. The permit shall become effective only when the applicable requirements set forth in Section 1-109: *Vested Property Rights* are satisfied.

E.   **PERMITS RUN WITH LAND.** Any Land Use Change Permit issued under this *Resolution* shall run with the applicable land.

F.   **TERM OF PERMIT.**

1.   **TERM IS THREE YEARS FOR MOST LAND USE CHANGE PERMITS.** Unless expressly extended pursuant to Section 1-104: G: *Requirements for Extension of Term of Permit*, the term of a Land Use Change Permit shall be three years from its effective date.

2.   **OPERATIONS APPROVED IN PERPETUITY.** During the term of the permit, the applicant shall initiate and complete all construction, pursuant to Section 1-104: F.4: *Completion of a Development.*  However, unless expressly limited by an approved permit, the right to conduct operations, subject to operational conditions identified in the permit, shall be approved in perpetuity, subject to:

a.   **COMPLIANCE WITH PERMIT CONDITIONS.** Compliance with permit conditions; and

b.   **STATUTORY EXCEPTIONS.** Compliance with the exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

c.   **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES.** Compliance with all regulations and codes that are general in nature and are applicable to all property that is subject to land use regulation by Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire,  plumbing, electrical and mechanical code in effect on the date a permit is applied for pursuant to each of those codes; and

d.   **COMPLIANCE WITH ANY CODE, ORDINANCE OR REGULATION REQUIRED FOR IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY.** Compliance to the maximum extent feasible with the provisions of any code, ordinance or regulation that is general in nature and applicable to all property that is under the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

3.   **COMPLETION OF A DEVELOPMENT.**

a.   **SUBDIVISION, CONDOMINIUM, OR TOWNHOME OR PROJECT FOR WHICH A DEVELOPMENT IMPROVEMENT AGREEMENT HAS BEEN EXECUTED.** For purposes of this Section, a subdivision, condominium, or townhome Project or a development for which a Development Improvement Agreement has been executed shall be considered completed when Gunnison County has fully released all security under the applicable Development Improvement Agreement.

b.   **MINING OPERATIONS.** A mining operation shall be considered completed when the construction Projects approved in the Land Use Change Permit application, and proposed to be constructed within the first three years of operation, have been constructed.

c.   **COMMERCIAL OR INDUSTRIAL PROJECT.** For purposes of this Section, a Project that is a commercial or industrial use is considered completed when, as applicable, the Building Inspector issues final approval of the constructed structures approved as part of the Project plan. When no structure is involved, the decision-making body shall determine as part of the Final Plan approval when the Project shall be considered complete.

G.   **REQUIREMENTS FOR EXTENSION OF TERM OF PERMIT.** An extension of the term of a Land Use Change Permit may be requested by the applicant or recommended by the Planning Commission.  The term of a Land Use Change Permit may only be extended as a condition of initial approval, or if a request for extension is submitted at least three months before the permit expires and only if the applicable decision-making body finds that the extension complies with the following criteria:

4

1. **EXTENSION OF LAND USE CHANGE PERMIT REQUESTED AS PART OF INITIAL LAND USE CHANGE PERMIT APPROVAL.** When the applicant requests extension of the permit term as part of the initial Land Use Change Permit approval, both of the following criteria must be met:

    a. **A PUBLIC BENEFIT WILL BE OBTAINED, OR NO PUBLIC DETRIMENT WILL OCCUR.** A public benefit will be obtained, or no public detriment will occur, as a consequence of the extension; and

    b. **SIZE OF PROJECT AND ECONOMIC CONDITIONS WARRANT EXTENSION.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term.

2. **EXTENSION OF LAND USE CHANGE PERMIT FOR ADMINISTRATIVE REVIEW AND MINOR IMPACT PROJECT AT LEAST THREE MONTHS BEFORE END OF PERMIT TERM.** When the applicant submits a request for extension of the permit term for a Land Use Change Permit for an Administrative Review Project or a Minor Impact Project at least three, but no more than six, months before the permit expires, the permit may be extended if the applicable decision-making body, finds that the extension complies with all the following:

    a. **A PUBLIC BENEFIT WILL BE OBTAINED OR NO PUBLIC DETRIMENT WILL OCCUR.** A public benefit will be obtained or no public detriment will occur as a consequence of the extension; and

    b. **COMPLIANCE TO DATE WITH CONDITIONS OF ORIGINAL          PERMIT.** The applicant has complied with all conditions requiring performance before the date of application for extension of the permit; and

    c. **BENEFITS RECEIVED BY COUNTY.** Required benefits, if any, already have been received by the County as a result of Project approval, such as impact fees or land dedications; and

    d. **NEEDS OF APPLICANT AND COUNTY.** The needs of the applicant will be served and the needs of the County will not be harmed by the extension; and

    e. **PROGRESS IN PURSUING COMPLETION OF DEVELOPMENT.** Progress has been made in pursuing the development to date, including obtaining other necessary permits, and there have been expenditures made by the applicant in pursuing the Project; or the applicant has demonstrated extenuating circumstances that have affected progress of the development; and

    f. **NO CONFLICT BETWEEN DEVELOPMENT AND REGULATIONS.** There is no substantial conflict, or change in the development is approved to eliminate substantial conflict, between the Project as approved, and the requirements of this *Resolution* or other regulations as they exist at the time the application for extension is made to extend the permit term; and

    g. **CHANGES IN CIRCUMSTANCES.** Changes to neighborhood land uses have not created a substantial conflict between those uses and the uses for which an extended permit term is requested; and

    h. **PROPOSED CHANGES IN THE DEVELOPMENT.** Any proposed changes in the development are not significant.

3. **EXTENSION OF A LAND USE CHANGE PERMIT FOR A MAJOR IMPACT PROJECT AT LEAST THREE MONTHS BEFORE END OF PERMIT TERM.** When the applicant requests extension of the permit term for a Land Use Change Permit for a Major Impact Project at least three, but no more than six, months before the permit expires, the Board shall conduct a public hearing, noticed and conducted pursuant to Section 3-112: *Notice of Public Hearing* and Section 3-113: *Conduct of Public Hearing*, and may extend the permit, if it finds that the extension complies with all of the following:

    a. **A PUBLIC BENEFIT WILL BE OBTAINED OR NO PUBLIC DETRIMENT WILL OCCUR.** A public benefit will be obtained or no public detriment will occur as a consequence of the extension; and

    b. **SIZE OF PROJECT AND ECONOMIC CONDITIONS.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term; and

    c. **COMPLIANCE TO DATE WITH CONDITIONS OF ORIGINAL PERMIT.** The applicant has complied with all conditions requiring performance before the date of application for extension of the permit term; and

    d. **PROGRESS IN PURSUING COMPLETION OF DEVELOPMENT.** Progress has been made in pursuing the development to date, including obtaining other necessary permits, and there have been expenditures made by the applicant in pursuing the Project; or the applicant has demonstrated extenuating circumstances that have affected progress of the development; and

    e. **BENEFITS RECEIVED BY COUNTY.** Required benefits, if any, already have been received by the County as a result of Project approval, such as impact fees or land dedications; and

BLM_0053901

    **f.** **NEEDS OF APPLICANT AND COUNTY.** The needs of the applicant will be served and the needs of the County will not be harmed by the extension; and

    **g.** **NO CONFLICT BETWEEN DEVELOPMENT AND REGULATIONS.** There is no substantial conflict, or change in the development is approved to eliminate substantial conflict, between the Project as approved, and the requirements of this *Resolution* or other regulations as they exist at the time the application for extension is made to extend the permit term; and

    **h.** **CHANGES IN CIRCUMSTANCES.** Changes to neighborhood land uses have not created a substantial conflict between those uses and the uses for which an extended permit term is requested; and

    **i.** **PROPOSED CHANGES IN THE DEVELOPMENT.** Any proposed changes in the development are not significant; and

  **4.** **TAXES TO BE PAID.** No permit shall be extended unless at the time of the request for extension the applicant  a copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

  **5.** **ONE EXTENSION.** No more than one three-year extension of any Land Use Change Permit shall be granted.

  **6.** **EXTENSION EXTENDS A VESTED RIGHT.** An extension of the term of a Land Use Change Permit extends any vested property right associated with the permit or development for the same period as the extension of the permit.

**H. PHASED DEVELOPMENT.** The permit term for each phase of a phased development shall begin to run on the date that phase receives final approval from the Board.

**I. PERMITS PURSUANT TO FORMER GUNNISON COUNTY LAND USE RESOLUTION FOR TWO RESIDENCES ON A SINGLE PARCEL.** The term of any Land Use Change Permit issued pursuant to the former *Gunnison County Land Use Resolution* that approved construction of two residences on a single parcel, pursuant to which one residence is constructed within three years after the effective date of this *Resolution*, shall be extended to permit construction of the second residence, in perpetuity. The second residence shall be subject to all County regulations in effect at the time the construction is initiated.

**J. GROUNDS FOR DENIAL OF A LAND USE CHANGE PERMIT.** No Land Use Change Permit shall be issued for any land use change that:

  **1.** **DOES NOT COMPLY WITH THIS *RESOLUTION*.** Does not comply with each applicable requirement of this *Resolution*; or

  **2.** **DOES NOT COMPLY WITH OTHER CODES OR RESOLUTIONS.** Does not comply with the applicable building code as adopted or amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, any County-approved municipal Three Mile Plan area plan, or any other applicable code, ordinance, resolution or regulation.

  **3.** **DOES NOT COMPLY WITH EACH APPLICABLE FEDERAL OR STATE PERMIT.** Does not comply with each applicable federal or state permit. The County shall require that a copy of each required permit be submitted to the County before County approval of the Land Use Change Permit, or that the Land Use Change Permit include a condition that a copy of each required permit be submitted to the County in a timely manner.

**K. COMPLIANCE WITH PERMIT CONDITIONS.** Each development permitted pursuant to this *Resolution* shall be initiated, conducted and completed pursuant to all terms and conditions of the applicable permit.

**L. APPLICABILITY TO OTHER UNITS OF GOVERNMENT.** The requirement to obtain a Land Use Change Permit shall apply to federal, state, county and municipal governments and special districts, their agencies and their subdivisions unless the unit of government is expressly exempted from the requirement.

**M. RELATIONSHIP OF LAND USE CHANGE PERMITS TO OTHER PERMITS.** Issuance of a Land Use Change Permit does not eliminate any requirement to obtain a Building Permit pursuant to the applicable building code, adopted and amended by Gunnison County, an Individual Sewage Disposal System Permit pursuant to the *Gunnison County On-Site Wastewater Treatment System Regulations*, or to comply with every other applicable ordinance, resolution, and regulation or permit already issued. An applicant for any activity that requires a Land Use Change Permit shall be required to obtain that permit before initiating any activities that would require a Building Permit, Individual Sewage Disposal System Permit, Access Permit, or other permit from Gunnison County. As applicable to individual applications, the County requires that the following Permits be obtained in addition to Land Use Change Permits:

BLM_0053902

1. **ACCESS PERMIT.** An Access Permit shall be obtained from the Gunnison County Public Works Department for any private driveway accessing onto a County road, public road or highway under the jurisdiction of Gunnison County.

2. **HIGHWAY ACCESS PERMIT.** If a Highway Access Permit is required from the Colorado Department of Transportation for any driveway or road accessing onto any state or federal road, the County shall not give final approval to a Land Use Change Permit until the County has received and commented on the Highway Access Permit application. The County may condition a Land Use Change Permit approval on receipt of the approved Highway Access Permit.

3. **MOBILE HOME PERMIT.** Location of a mobile home on a lot or within a mobile home community shall require a Mobile Home Permit, pursuant to Section 9-201: *Individual Manufactured and Mobile Homes*.

4. **SIGN PERMIT.** Sign Permit, pursuant to Section 13-109: *Signs*.

5. **RECLAMATION PERMIT FOR REVEGETATION AND NOXIOUS WEED CONTROL.** Any development defined and/or regulated by the County that results in road cutting and/or construction, homesite clearing or berm construction shall be required to obtain a Reclamation Permit from the Gunnison County Public Works Department, pursuant to Section 13-115: *Reclamation and Noxious Weed Control*.

6. **SURFACE ALTERATION PERMIT.** Surface Alteration Permit, pursuant to the *Gunnison County Standards and Specifications for Road and Bridge Construction*.

7. **ROAD CUT PERMIT.** Road Cut Permit, pursuant to the *Gunnison County Standards and Specifications for Road and Bridge Construction*.

8. **BUILDING PERMIT.** Building Permit, as required for construction of structures pursuant to the applicable building code, adopted and amended by Gunnison County.

9. **INDIVIDUAL SEWAGE DISPOSAL SYSTEM PERMIT.** Individual Sewage Disposal System Permit, as required for the installation or repair of an individual sewage disposal system, pursuant to the *Gunnison County On-Site Wastewater Treatment System Regulations*.

10. **FLOODPLAIN DEVELOPMENT PERMIT.** Floodplain Development Permit pursuant to Section 11-103: *Development in Areas Subject to Flood Hazards*.

11. **TEMPORARY PRIVATE PLOWING PERMIT.** Temporary Private Plowing Permit, pursuant to Section 11-110: *Development of Land Beyond Snowplowed Access*.

12. **SNOW REMOVAL PERMIT.** Snow Removal Permit pursuant to and described in the *Gunnison County Standards and Specifications for Road and Bridge Construction*.

13. **MANUFACTURED HOME PERMIT.** Manufactured Home Permit pursuant to Section 9-201: *Individual Manufactured and Mobile Homes*.

14. **LONG-TERM CAMPING PERMIT.** Long-Term Camping Permit, pursuant to Section 9-509: *Camping on Individual Parcels*.

15. **OUTDOOR VENDING PERMIT.** Outdoor Vending Permit, pursuant to Section 9-502: *Temporary Structures*.

16. **STATE AND FEDERAL PERMITS.** Granting of a Land Use Change Permit for a specific land use change shall not exempt that land use change from compliance with any applicable Colorado or federal statutory and regulatory requirements. Gunnison County shall require documentation that each applicable permit has been issued, either as a prerequisite to, or as a condition of, approval of the Land Use Change Permit.

# SECTION 1-105: SECTIONS NECESSARY FOR IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY

A. **SECTIONS APPLICABLE TO PARTIALLY EXEMPTED USES.** The following specific sections of this *Resolution* are general in nature, are necessary for the immediate preservation of public health and safety, and are applicable to the maximum extent feasible to all new construction of, or expansion to, those land use changes that are partially exempted from this *Resolution* by Section 1-106: *Partially Exempted Land Use Changes*, which shall comply, to the maximum extent feasible, with the following sections in this *Resolution*, that are necessary for the immediate preservation of public health and safety:

1. **SECTION 11-103:** *Development in Areas Subject to Flood Hazards*.

BLM_0053903

2. **SECTION 11-104:** *Development in Areas Subject to Geologic Hazards.*
3. **SECTION 11-107**: *Protection of Water Quality.*
4. **SECTION 12-105**: *Water Supply.*
5. **SECTION 12-106**: *Sewage Disposal/Wastewater Treatment.*
6. **SECTION 12-107**: *Fire Protection.*
7. **SECTION 11-109: D.:** *Domestic Animal Controls*; and Section 11-106: G.3.d.: *Domestic Animal Controls.*
8. **SECTION 13-107**: *Installation of Solid-fuel-burning devices.*
9. **SECTION 13-114:** *Exterior Lighting.*

B. **ADDITIONAL SECTION APPLICABLE TO PARTIALLY EXEMPTED COMMERCIAL, INDUSTRIAL OR OTHER NON-RESIDENTIAL LAND USE CHANGES.** In addition to complying with the requirements listed at 1 through 9, above, new construction of, or expansion to, commercial, industrial or other non-residential land use changes that are partially exempted from this *Resolution* by Section 1-106: *Partially Exempted Land Use Changes*, shall comply to the maximum extent feasible with Section 12-103: *Road System.*

## SECTION 1-106: PARTIALLY EXEMPTED LAND USE CHANGES

The following land uses are partially exempted from the requirements of this *Resolution*:

A. **PENDING LAND USE CHANGE PERMIT APPLICATIONS.** A complete and conforming Land Use Change Permit application submitted to Gunnison County before the effective date of this *Resolution* ("pending application") shall be governed by the former *Gunnison County Land Use Resolution* except pursuant to this Section.

1. **VOLUNTARY COMPLIANCE WITH THIS *RESOLUTION***. Any applicant who has a pending application has the right, upon written request to the Community Development Department, to have the pending application processed pursuant to the process and standards of this *Resolution* rather than those of the former Gunnison *County Land Use Resolution.*

2. **REQUIRED COMPLIANCE WITH EXISTING CODES AND PUBLIC HEALTH AND SAFETY REQUIREMENTS**. Each application, whether processed pursuant to the former *Gunnison County Land Use Resolution* or this *Resolution*, shall comply with the following requirements:

   a. **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES**. All regulations and codes that are general in nature and are applicable to all property that is subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code in effect on the date a permit is applied for pursuant to each of those codes; and

   b. **COMPLIANCE WITH ALL OTHER SECTIONS OF THIS *RESOLUTION* AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY.** To the maximum extent feasible with the provisions of Section 1- 105: *Section Necessary For Immediate Preservation of Public Health and Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

B. **DEVELOPMENT ON INDIVIDUAL LOTS IN SUBDIVISIONS APPROVED BY GUNNISON COUNTY BEFORE THE EFFECTIVE DATE OF THIS *RESOLUTION*.** Individual lots in subdivisions approved by Gunnison County before the effective date of this *Resolution*, that have protective covenants included as an element of a Final Plan approved by Gunnison County, shall be issued a Building Permit without a separate Land Use Change Permit, subject to the following:

1. **COMPLIANCE WITH PERMIT CONDITIONS.** Compliance with all applicable conditions in the Land Use Change Permit approval of the subdivision; and

2. **STATUTORY EXCEPTIONS**. Compliance with the exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

3. **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES**. Compliance with all regulations and codes that are general in nature and are applicable to all property that is subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes; and

BLM_0053904

4. **COMPLIANCE WITH ALL OTHER SECTIONS OF THIS** *RESOLUTION* **AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. Compliance to the maximum extent feasible with the provisions of *Section 1-105: Sections Necessary For The Immediate Preservation of Public Health And Safety,* and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

C. **DEVELOPMENT ON INDIVIDUAL TRACTS IN EXEMPT 35-ACRE TRACT DEVELOPMENTS EXISTING WITH IDENTIFIED BUILDING ENVELOPES BEFORE JANUARY 1, 2000, THAT HAD PROTECTIVE COVENANTS RECORDED BEFORE JULY 1, 2000.**

1. **PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENTS**. There are certain divisions of land that are excluded from the definitions of "subdivision" or "subdivided land" as defined by C.R.S. 30-28-101 and that:

   a. **EXISTED BEFORE JANUARY 1, 2000**. Existed on or before January 1, 2000; and

   b. **TRACTS LARGER THAN 35 ACRES**. Are comprised solely of tracts that are each 35 acres or larger; and

   c. **RECORDED PLAT**. Were platted and recorded in the Gunnison County Clerk and Recorder's Office on or before January 1, 2000 ("pre-existing 35-acre tract development"), specifically identifying designated building envelopes in which primary development must be confined ("pre-existing building envelopes"); and

   d. **RESTRICTED BY RECORDED PROTECTIVE COVENANTS**. Are subject to specific protective covenants that were recorded in the Office of the Gunnison County Clerk and Recorder's Office before July 1, 2000 that restrict the form, location, and type of development that can occur within the development ("preexisting protective covenants").

2. **IDENTIFICATION OF PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENTS**. For purposes of Section 1-106: C. *Development on Individual Tracts in Exempt 35-acre Tract Developments Existing With Identified Building Envelopes before January 1, 2000, That Had Protective Covenants Recorded Before July 1, 2000.* The pre-existing exempt 35-acre tract developments include:

   a. East River Ranches;
   b. Red Mountain Ranch;
   c. The Pinnacles;
   d. Trappers Crossing at Crested Butte; and
   e. Eagle Ridge Ranch.

3. **BUILDING ON INDIVIDUAL TRACTS IN A PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENT SHALL COMPLY WITH THIS** *RESOLUTION* **TO THE MAXIMUM EXTENT FEASIBLE**. Land uses on individual tracts in a pre-existing exempt 35-acre tract development shall comply with the requirements of this *Resolution*, including:

   a. **COMPLIANCE WITH SECTIONS OF THIS** *RESOLUTION* **AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. Compliance to the maximum extent feasible with the provisions of Section 1-105: *Sections Necessary For The Immediate Preservation of Public Health And Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety; except:

   b. **CONFLICT BETWEEN PROTECTIVE COVENANTS/ENVELOPE AND THIS** *RESOLUTION*. The County recognizes that the limitations associated with the pre-existing building envelopes and pre-existing protective covenants in  preexisting exempt 35-acre tract developments identified in *Section 1-106:C.2: Identification of Pre-Existing 35-Acre Tract Developments*  may make it difficult for the owner of such a tract to comply with all requirements of this *Resolution*. It is the intent of this Section that each provision of this *Resolution* be enforced regarding such tracts to the maximum extent feasible without requiring relocation of the pre-existing building envelopes and/or changes to the pre-existing protective covenants.

      1. **CLASSIFICATION OF IMPACT WHEN CONFLICT IDENTIFIED**. When County review of an application for a Building Permit,  On-Site Wastewater Treatment System Permit, or Access Permit for a  tract in a development identified in Section 1-106: C. 2: *Identification of Pre-Existing Exempt 35-Acre Tract Developments* discloses that there is a conflict between the pre-existing building envelope and/or pre-existing protective covenants regarding a building envelope, and any standard

BLM_0053905

or requirement of this *Resolution*, the Community Development Director shall then determine the appropriate impact classification, pursuant to Section 4-111: *Classification of Impact*.

    **2.  PERMIT REVIEW PROCESS.** The application for a permit shall be processed subject to the applicable level of review pursuant to Article 3: *General Review Process*. The decision-making body shall determine how, and to what degree, the conflicting provision shall be applied to the maximum extent feasible without requiring a relocation of the building envelope and/or change to the protective covenants regarding form, location or type or other requirements or restrictions on residences.

**4.  LAND USES ON INDIVIDUAL TRACTS IN A PRE-EXISTING 35-ACRE TRACT DEVELOPMENT SHALL COMPLY WITH APPLICABLE REGULATIONS AND CODES.** Except as specifically exempted by Section 1-106: C. 3. b: *Conflict Between Protective Covenants/Envelopes And This Resolution*, land uses on individual tracts in a pre-existing exempt 35-acre tract development shall comply with all regulations and codes that are general in nature and are applicable to all property that is subject to jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes.

**D.  DEVELOPMENT ON INDIVIDUAL TRACTS IN EXEMPT 35-ACRE TRACT DEVELOPMENTS EXISTING BEFORE JANUARY 1, 2000, THAT HAD PROTECTIVE COVENANTS RECORDED BEFORE JULY 1, 2000 THAT SPECIFICALLY APPROVED A MAXIMUM INDIVIDUAL STRUCTURE SIZE OR MAXIMUM AGGREGATE STRUCTURE SIZE THAT WOULD NORMALLY REQUIRE MINOR IMPACT PROJECT REVIEW PURSUANT TO SECTION 13-105: E.** Development on individual tracts in exempt 35-acre tract developments that existed before January 1, 2000 that had protective covenants recorded before July 1, 2000 that specifically approved a maximum individual structure size or maximum aggregate structure size that would normally require Minor Impact Project review, pursuant to Section 13-105: E: *Residential Building Sizes and Lot Coverages*.

**1.  PRE-EXISTING EXEMPT 35-ACRE TRACT DEVELOPMENTS.** There are certain subdivisions of land that are excluded from the definitions of "subdivision" or "subdivided land" as defined by C.R.S. 30-28-101 and that:

    **a.  EXISTED BEFORE JANUARY 1, 2000.** Existed on or before January 1, 2000; and

    **b.  TRACTS LARGER THAN 35 ACRES.** Are comprised solely of tracts that are 35 acres or larger; and

    **c.  RECORDED PLAT.** Were platted and recorded in the Gunnison County Clerk and Recorder's Office on or before January 1, 2000 ("pre-existing 35-acre tract development"); and

    **d.  PROTECTIVE COVENANTS RECORDED BEFORE JULY 1, 2000 SPECIFICALLY APPROVED A MAXIMUM INDIVIDUAL STRUCTURE SIZE OR MAXIMUM AGGREGATE STRUCTURE SIZE THAT WOULD NORMALLY REQUIRE MINOR IMPACT PROJECT REVIEW PURSUANT TO SECTION 13-105: E.** Are subject to specific protective covenants that were recorded in the Office of the Gunnison County Clerk and Recorder's Office before July 1, 2000 that specifically approved a maximum individual structure size or maximum aggregate structure size that would normally require Minor Impact Project review pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard*.

**2.  IDENTIFICATION OF PRE-EXISTING 35-ACRE TRACT DEVELOPMENTS.** For purposes of this Section 1-106: D: *Development On Individual Tracts In Exempt 35-acre Tract Developments Existing Before January 1, 2000, That Had Protective Covenants Recorded Before July 1, 2000 That Specifically Approved A Maximum Individual Structure Size Or Maximum Aggregate Structure Size That Would Normally Require Minor Impact Project Review Pursuant To Section 13-105: G:*, the pre-existing 35-acre tract developments include:

    **a.** Cement Creek at Crested Butte South;
    **b.** Eagle Ridge Ranch;
    **c.** East River Ranches;
    **d.** Red Mountain Ranch;
    **e.** Trappers Crossing at Crested Butte;
    **f.** Trappers Crossing South;
    **g.** Trappers Crossing at Wildcat; and
    **h.** Trappers Crossing at Wildcat II.

**3.  NO REVIEW REQUIRED PURSUANT TO SECTION 13-105: E.** No review pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard* is required for tracts in those developments identified in Section 1-106: D. 2: *Identification of Pre-Existing 35-Acre Tract Developments*.

BLM_0053906

4. **COMPLIANCE WITH ALL OTHER SECTIONS OF THIS *RESOLUTION* AND ALL OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY.** Except as specifically exempted in Section 1-106: D.3.: *No Review Required* pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard* in those developments identified in Section 1-106: D.2.: *Identification of Pre-Existing 35-Acre Tract Developments*, shall comply with the provisions of this *Resolution* and with the provisions of Section 1-105: *Sections Necessary For The Immediate Preservation of Public Health And Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property that is subject to the jurisdiction of Gunnison County and that is found necessary by the Board for the immediate preservation of public health and safety.

5. **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES.** Land uses on individual tracts in those developments identified in Section 1-106: D.2.: *Identification of Pre-Existing 35-Acre Tract Developments* shall comply with all regulations and codes that are general in nature and are applicable to all property that is subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes.

E. **LAND USE CHANGES WITH A COMMON LAW VESTED PROPERTY RIGHT**. Each land use change approved by a Land Use Change Permit before the effective date of this *Resolution*, during the term of which the permittee has reasonably and substantially relied in good faith on the permit approval to his detriment shall not require a new Land Use Change Permit. The determination of substantial reliance shall be based on the progress made in developing the Project, including the effort to obtain other permits, actual construction initiated and completed, and documented expenditures to develop the Project. Such a land use change shall comply with:

1. **PERMIT CONDITIONS**. The terms and conditions of the permit approval; and

2. **STATUTORY EXCEPTIONS**. The exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

3. **APPLICABLE REGULATIONS AND CODES**. All regulations and codes that are general in nature and are applicable to all property subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes; and

4. **ALL OTHER SECTIONS OF THIS *RESOLUTION* AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. To the maximum extent feasible, with the provisions of Section 1-105: *Sections Necessary For Immediate Preservation of Public Health And Safety*, and any other code, ordinance or regulation that is general in nature and applicable to all property subject to the jurisdiction of Gunnison County, that is found necessary by the Board for the immediate preservation of public health and safety.

F. **EXCEPTION FOR CONSTRUCTION MATERIALS EXTRACTION**. For each Land Use Change Permit for extraction of construction materials issued before the effective date of this *Resolution*, such extraction of construction materials shall be excepted from the requirements of Section 11-107: E: *Buffer Standards,* in that such extraction is allowed to be no closer than five feet from the nearest ordinary high water mark in average hydrologic years on each side of the water body, but not in the stream channel.

G. **LAND USE CHANGES WITH A STATUTORY VESTED RIGHT**. Each land use change previously approved by Gunnison County and for which a property right is currently vested by statute on the effective date of this *Resolution* in accordance with Section 1-109: *Vested Property Rights,* may be developed during the three years following the effective date of this *Resolution* without a new Land Use Change Permit approval, subject to the following:

1. **COMPLIANCE WITH PERMIT CONDITIONS**. Compliance with the terms and conditions of the permit approval; and

2. **STATUTORY EXCEPTIONS**. Compliance with the exceptions identified in C.R.S. 24-68-105 (1) (a), (b), (c) and (2), as they may be amended; and

3. **COMPLIANCE WITH APPLICABLE REGULATIONS AND CODES**. Compliance with all regulations and codes that are general in nature and are applicable to all property subject to the jurisdiction of Gunnison County including the applicable building code, adopted and amended by Gunnison County, the *Gunnison County On-Site*

BLM_0053907

*Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code, in effect on the date a permit is applied for pursuant to each of those codes; and

4.  **COMPLIANCE WITH ALL OTHER SECTIONS OF THIS *RESOLUTION* AND OTHER CODES, ORDINANCES OR REGULATIONS NECESSARY FOR THE IMMEDIATE PRESERVATION OF PUBLIC HEALTH AND SAFETY**. Compliance to the maximum extent feasible with the provisions of Section 1-105: *Sections Necessary For The Immediate Preservation of Public Health And Safety,* and any other code, ordinance or regulation that is general in nature and applicable to all property subject to the jurisdiction of Gunnison County, that is found necessary by the Board for the immediate preservation of public health and safety.

## SECTION 1-107: ONE RESIDENCE PER LEGAL LOT, SUBJECT TO COMPLIANCE WITH THIS *RESOLUTION*

Unless otherwise provided by this *Resolution*, there shall be a right to have one residence per each legal lot existing as of the effective date of this *Resolution* if that residence fully complies with:

A.  **APPLICABLE REQUIREMENTS OF THIS *RESOLUTION***. All applicable requirements of this *Resolution*, except as partially exempted by Section 1-106: *Partially Exempted Land Use Changes*; and

B.  **OTHER REGULATIONS**. All other regulations and ordinances that are general in nature and are applicable to all property subject to land use regulation by Gunnison County, including the applicable building code, as adopted and amended by Gunnison County, the *Gunnison County On-Site Wastewater Treatment System Regulations*, the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and each applicable fire, plumbing, electrical and mechanical code which governs the permit approval.

## SECTION 1-108: NONCONFORMING USES

A.  **PURPOSE**. Within unincorporated Gunnison County, there are uses of land and structures that were legally established before the effective date of this *Resolution* that do not conform to the legal requirements of this *Resolution*. The purpose of this Section is to regulate those nonconforming uses and structures.

B.  **NON-ABATEMENT PROVISION**. Unless otherwise stated herein, it is the intent of this Section that nonconforming uses of land and structures that were legally established before the effective date of this *Resolution* are permitted to continue.

C.  **LEGALLY ESTABLISHED NONCONFORMING USES AND STRUCTURES**.

1.  **NONCONFORMITY MAY CONTINUE.** Legal nonconforming land uses and nonconforming structures may continue, so long as they remain otherwise legal and comply with the requirements of this Section.

2.  **REPAIRS AND MAINTENANCE.** Ordinary repairs and maintenance to permit continuation of a legal nonconforming use or structure shall be permitted.

3.  **EXTENSION OR EXPANSION**.

    a.  **LIMITED EXTENSION OR EXPANSION**. A legal nonconforming use or structure shall not be extended or expanded except as allowed in the following Section 1-108: B. 3. b*: Expansion Shall Not Increase Nonconformance*. This prohibition shall be construed to prevent the additional land uses or structures from being used in a nonconforming manner.

    b.  **EXPANSION SHALL NOT INCREASE NONCONFORMANCE**. A legal nonconforming use or structure shall only be extended, expanded or altered in a manner that does not expand, or that decreases, the nonconforming use or aspect.

    c.  **EXPANSION SUBJECT TO SECTION 1-105**: Extension or expansion of a legal nonconforming land use or structure is subject to the provisions of Section 1-105: *Sections Necessary for the Immediate Preservation of Public Health and Safety.*

    d.  **EXTENSION OR EXPANSION ONTO LAND OUTSIDE OF PERMITTED AREA.** Any extension or expansion of a legal nonconforming use, including but not limited to a mining operation, onto land outside of the area specifically identified and approved by a Land Use Change Permit, shall comply with the requirements of this *Resolution*.

4.  **RELOCATION.** A legal nonconforming land use or structure shall not be moved, in whole or in part, unless the relocation brings the use or structure into compliance with the requirements of this *Resolution*.

BLM_0053908

5. **CHANGE OF USE**. A legal nonconforming use shall not be changed to another use, unless the use to which it is changed is pursuant to the requirements of this *Resolution*.

6. **ABANDONMENT OF NONCONFORMING COMMERCIAL OR INDUSTRIAL USE OR STRUCTURE**. If any legal nonconforming commercial or industrial use or structure is abandoned for a period of one year, renewal of that use or the use of that structure shall not be initiated until a review by the Community Development Department has determined that the renewed use will not pose a threat to public health or safety. For the purpose of this Section, "abandonment" means the intent not to continue the legally established nonconforming use or use of the structure coupled with the discontinuance of the nonconforming use or use of the structure. There is a presumption that there is intent to abandon if the property is physically abandoned. Seasonal discontinuance of a use, or discontinuance of a use during active marketing of the property for sale, is not abandonment.

7. **RESTORATION OF DAMAGED NONCONFORMING USE**. A legal nonconforming use or structure including any structure that would normally require Minor or Major Impact Project review pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard*, that is demolished or destroyed by an act of God or through any manner not willfully accomplished by the owner may be restored within one year of the damage or destruction  as of right, regardless of the extent of demolition or destruction, conditioned upon issuance of each required permit, pursuant to Section 1-104: *Permits Required*. A one time, two-year extension of the initial year may be granted by the Community Development Director upon findings that:

   a. **HARDSHIP**. There would be a substantial hardship to the owner without the extension; and

   b. **SUBSTANTIAL EFFORT TO RESTORE**. Within the first six months of the initial year, the owner has substantially cleaned up the damaged structure.

D. **NO NEW NONCONFORMING USES**. Except as specifically provided by this *Resolution*, no land use change shall be approved to create a new nonconforming use or new nonconforming aspect.

## SECTION 1-109: VESTED PROPERTY RIGHTS

A. **PURPOSE.** This purpose of this Section is to establish a system of vested property rights pursuant to Article 68 of Title 24, C.R.S: as amended.

B. **EFFECT OF VESTING**. A vested property right, once established pursuant to this Section, precludes during its term, any zoning or land use action by Gunnison County or pursuant to an initiated measure that would alter, impair, prevent, diminish, impose a moratorium on, or otherwise delay the development or use of the subject land consistent with the terms and conditions of the site-specific development plan, except:

1. **LANDOWNER CONSENT**. With the consent of the affected landowner;

2. **HAZARDS.** Upon the discovery of natural or man-made hazards on or in the immediate vicinity of the subject property, which hazards could not reasonably have been discovered at the time of the approval of the site-specific development plan, and which hazards, if uncorrected, would pose a serious threat to the public health, safety, and welfare; or

3. **JUST COMPENSATION PAID TO LANDOWNER**. To the extent that the affected landowner receives just compensation for all costs, expenses, and liabilities incurred by the landowner, including costs incurred in preparing the site for development consistent with the site-specific development plan, all fees paid in consideration of financing, and all architectural, planning, marketing, legal, and other consultants' fees, together with interest thereon at the legal rate until paid. Just compensation shall not include any diminution in the value of the property that is caused by such action.

4. **NEW REGULATIONS THAT ARE GENERAL IN NATURE**. The application of ordinances or regulations that are general in nature and are applicable to all property subject to land use regulation by Gunnison County, including building, fire, plumbing, electrical, and mechanical codes. These also include the provisions of Section 1-105: *Sections Necessary for the Immediate Preservation of Public Health and Safety,* as they may be amended from time to time.

5. **SUBSEQUENT REVIEW AND APPROVAL**. Following approval or conditional approval of a Land Use Change Permit for a site-specific development plan, nothing in this Section shall exempt the site-specific development plan from subsequent reviews by Gunnison County to ensure compliance with the terms and conditions of the approval.

BLM_0053909

*SECTION 1-109: VESTED PROPERTY RIGHTS*

6. **FORFEITURE.** Failure to abide by any applicable terms and conditions of the Land Use Change Permit or of the site-specific development plan may result in the suspension or revocation of the statutory vested property right or the implementation of any other enforcement mechanism identified in Article 16: *Enforcement*.

7. **SUBJECT TO RIGHTS OF REFERENDUM AND JUDICIAL REVIEW; PUBLIC NOTICE.** Approval of a site-specific development plan and its associated statutory vested right shall be subject to all rights of referendum and judicial review; except that the period of time permitted by law for the exercise of such rights shall not begin to run until the date of publication in a newspaper of general circulation in Gunnison County, advising the general public that the site-specific development plan has been approved, and a vested property right granted pursuant to Article 68 of Title 24, C.R.S. The property description shall be included in the notice. The Community Development Director shall cause such notice to be published, at the applicant's cost, no later than 14 days following approval of the site-specific development plan. If a statutory vested right is extended, suspended or revoked, notice of such extension, suspension or revocation and any reinstatement subsequent to a suspension shall be made in like fashion.

C. **GRANT OF VESTED PROPERTY RIGHT TO EACH LAND USE CHANGE PERMIT APPLICATION APPROVED BETWEEN JANUARY 1, 1988 UNTIL THE EFFECTIVE DATE OF THIS** *RESOLUTION*. In addition to any common law vested right that may exist, the Board hereby expressly authorizes and grants for each Land Use Change Permit approved by Gunnison County between January 1, 1988 and the effective date of this *Resolution*, a statutory vested property right for a period of three years beginning with the effective date of this *Resolution*. When a statutory vested right exists as of the effective date of this *Resolution*, the Board expressly authorizes and grants such extension of that statutory vested right for only three years from the effective date. No vested right authorized and granted under this Section shall be extended except as provided in Section 1-109: F. 2: *Requirements for Extensions During Term*.

D. **SITE-SPECIFIC DEVELOPMENT PLAN APPROVALS THAT CAUSE PROPERTY RIGHTS TO VEST.** A site-specific development plan (SSDP) is the plan for a land use change that describes with reasonable certainty the type and intensity of use for a specific parcel or parcels, that receives final approval by the required decision-making body, and for which each applicable requirement of this Section is met. Property rights shall vest only as follows:

1. **ADMINISTRATIVE REVIEWS.** If the SSDP is approved pursuant to Article 5: *Administrative Review Projects That Require a Land Use Change Permit* property rights shall vest upon the last of the following acts, each of which is a prerequisite to property rights vesting:

   a. **ISSUANCE OF CERTIFICATE OF ADMINISTRATIVE APPROVAL.** The issuance of the appropriate Certificate of Administrative Approval, which shall be signed by the Community Development Director.

   b. **FULL PLAT EXECUTION.** Full execution of any required plat and the recording of such plat by the County at the applicant's cost, in the Office of the Clerk and Recorder of Gunnison County;

   c. **FULL EXECUTION AND FUNDING OF DEVELOPMENT IMPROVEMENT AGREEMENT.** Full execution and funding of any Development Improvement Agreement as may be required by *the Certificate of Administrative Approval*;

   d. **RECORDING OF CERTIFICATE OF ADMINISTRATIVE APPROVAL.** At the cost of the applicant, recording by Gunnison County of the Certificate of Administrative Approval in the Office of the Clerk and Recorder of Gunnison County.

2. **MINOR AND MAJOR IMPACT PROJECT REVIEWS.** If the SSDP is approved as a Minor Impact pursuant to Article 6: *Minor Impact Projects* or as a Major Impact pursuant to Article 7: *Major Impact Projects,* property rights shall vest upon the last of the following acts, each of which is a prerequisite to property rights vesting:

   a. **ISSUANCE OF FINAL PLAN APPROVAL.** Adoption by the Planning Commission or the Board of a resolution memorializing the final approval of the Project following the required public notice and hearing;

   b. **FULL EXECUTION AND RECORDING OF PLAT.** Full execution of any required plat and the recording of such plat by the County at the applicant's cost in the Office of the Clerk and Recorder of Gunnison County;

   c. **FULL EXECUTION AND FUNDING OF DEVELOPMENT IMPROVEMENT AGREEMENT.** Full execution and funding of any Development Improvement Agreement as may be required by the resolution of approval or *Certificate of Major Impact Approval*;

   d. **RECORDING OF RESOLUTION OF APPROVAL.** At the cost of the applicant, recording of the required resolution or *Certificate of Major Impact Approval* by the County in the Office of the Clerk and Recorder of Gunnison County.

BLM_0053910

E. **VESTED RIGHT RUNS WITH THE LAND.** Statutory vested property rights shall attach to and run with the land for which the SSDP is approved. As a legislative act, the Board may extend the term of the statutory vested property right and, if appropriate, limit to an identified landowner or landowners the benefits of a statutory vested right after it is extended, pursuant to Section 1-109: F: *Duration and Extension*.

F. **DURATION AND EXTENSION**.

1. **DURATION.** Unless expressly extended pursuant to this Section, a statutory vested right as defined in this Section shall be effective for a period of three years from its establishment.

2. **REQUIREMENTS FOR EXTENSION DURING TERM**. An extension of the term of a statutory vested right may be requested by the applicant, or recommended by the Planning Commission. The term of a statutory vested right may only be extended as a condition of initial approval or within the final 18 months of the approved term of the permit, and only if the Board, after a public hearing on the request, noticed and conducted pursuant to Sections 3-112: *Notice of Public Hearing* and 3-113: *Conduct of Public Hearing*, finds that an extension is warranted based on all of the following criteria:

   a. **EXTENSION OF STATUTORY VESTED RIGHT REQUESTED AS PART OF INITIAL PERMIT APPROVAL.** When extension of a statutory vested right is requested as part of the initial approval of the Land Use Change Permit all of the following criteria must be met:

      1. **NO PUBLIC DETRIMENT, OR PUBLIC BENEFIT WILL BE OBTAINED.** There will be no public detriment, or public benefit will be obtained, as a consequence of the extension; and

      2. **SIZE OF PROJECT AND ECONOMIC CONDITIONS.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term.

   b. **EXTENSION OF STATUTORY VESTED RIGHT REQUESTED WITHIN 18 MONTHS OF END OF PERMIT TERM.** When extension of a statutory vested right is requested within 18 months of the end of the term of the Land Use Change Permit, all of the following criteria must be met:

      1. **NO PUBLIC DETRIMENT, OR PUBLIC BENEFIT WILL BE OBTAINED.** There will be no public detriment, or public benefit will be obtained, as a consequence of the extension; and

      2. **SIZE OF PROJECT AND ECONOMIC CONDITIONS.** The size and phasing of the development, economic cycles and market conditions warrant the extension of the permit term; and

      3. **COMPLIANCE TO DATE WITH CONDITIONS OF ORIGINAL PERMIT**. The applicant has complied with all conditions requiring performance before the date of application for extension of the permit term; and

      4. **PROGRESS IN PURSUING COMPLETION OF DEVELOPMENT**. Progress has been made in pursuing the development to date, including obtaining other necessary permits, and there have been expenditures made by the applicant in pursuing the Project; and

      5. **BENEFITS RECEIVED BY COUNTY**. Benefits already have been received by the County as a result of Project approval, such as impact fees or land dedications; and

      6. **NEEDS OF APPLICANT AND COUNTY**. The needs of the applicant and County will be served by the extension; and

      7. **NO CONFLICT BETWEEN DEVELOPMENT AND REGULATIONS**. There is no substantial conflict, or change in the development is approved to eliminate substantial conflict, between the Project as approved, and the requirements of this *Resolution* or other regulations as they exist at the time the application for extension is made to extend the permit term; and

      8. **CHANGES IN CIRCUMSTANCES**. Changes to neighborhood land uses have not created a substantial conflict between those uses and the uses for which an extended permit term is requested; and

      9. **PROPOSED CHANGES IN THE DEVELOPMENT**. Any proposed changes in the development are not significant.

## SECTION 1-110: PROCESS FOR DESIGNATING SPECIAL AREAS

A. **PURPOSE.** The purpose of this Section is to establish a process by which the County may designate particular geographical areas, basins, or other land areas as being subject to specialized land use regulations.

BLM_0053911

**B. AUTHORITY TO INITIATE DESIGNATIONS**. Designation of a particular area as being subject to specialized land use regulations may be initiated by the Board, by the Planning Commission, the Community Development Director, by any person who owns a legal interest in real property within the county, or by any person residing within the county.

    **1. PROCESS FOR DESIGNATION OF AN AREA**. The following process shall be followed for designation of a special area:

        **a. BOARD IDENTIFIES PROPOSED AREA**. The Board, by motion at a regular meeting, shall identify a proposed, designated special area, shall identify, generally, the rationale for specially designating such area, and shall instruct the Community Development Director to prepare the map, report and proposed regulations required by Section 1-110: B.1. b: *Preparation of Map, Report and Proposed Regulations*.

        **b. PREPARATION OF MAP, REPORT AND PROPOSED REGULATIONS**. The Community Development Director shall prepare a map specifically identifying the area to be included within the designated geographic area and a report evaluating the need for the proposed designation. The map shall be drawn at a scale no smaller than the standard U.S. Geological Survey quadrangle map for that area. The Community Development Director shall also prepare a draft of regulations governing the Special Area, and applicable amendments to this *Resolution* that would accompany the designation. Those amendments shall be evaluated pursuant to Section 1-113: *Amending This Land Use Resolution*, and shall be reviewed concurrently with the proposed designation.

        **c. MATERIALS FORWARDED TO PLANNING COMMISSION AND BOARD**. The map, report, and any amendments proposed for this *Resolution* shall be forwarded to the Planning Commission and the Board.

        **d. PUBLIC HEARING**. The Board and Planning Commission shall jointly conduct a public hearing. Notice shall be provided pursuant to Section 3-112: *Notice of Public Hearing*, except that the County shall be responsible for notifying all those persons whose properties would be located in the proposed special area. Conduct of the hearing shall comply with Section 3-113: *Conduct of Public Hearing*.

        **e. PLANNING COMMISSION REVIEW AND RECOMMENDATION**. The Planning Commission shall review the materials, considering the requirements of Section 1-110: C: *Standards of Approval* and shall forward its recommendations to the Board.

        **f. BOARD REVIEW AND ACTION**. The Board shall consider the map, report, the proposed regulations, the Planning Commission's recommendation, the public testimony and evidence provided at the public hearing, and the requirements of Section 1-110: C: *Standards of Approval*. The Board, by written resolution, shall adopt the designation and proposed regulations, adopt the designation and proposed regulations with modifications, or deny the designation and proposed regulations.

        **g. RECORDING THE DESIGNATION**. If the Board adopts the proposed designation and proposed regulations, with or without modification, then within 30 days following the action, a copy of the map depicting the geographic area, the resolution adopting the designation and the proposed regulations shall be recorded in the office of the Gunnison County Clerk and Recorder.

**C. STANDARDS OF APPROVAL**. The Planning Commission and the Board, at a minimum, shall consider the following when designating a particular geographical area as subject to specialized land use regulations, and in their respective actions, shall enter findings relative to each of the following elements:

    **1. DEVELOPMENT ACTIVITY.** The intensity and type of current and foreseeable development in the area.

    **2. RATIONALE AND NEED FOR DESIGNATION**. The purpose and need of the proposed designation.

    **3. BOUNDARIES**. The proposed boundaries of the area proposed for designation.

    **4. COMMUNITY PLAN OR TECHNICAL STUDY**. Any community plan or technical study that may have been conducted regarding the proposed designation.

    **5. ALTERNATIVES**. Whether the particular purpose to be achieved by the designation can be best achieved by designating that geographic area for specialized land use regulation, or whether the purpose could better be achieved by an alternative method, including the adoption of regulations that would apply countywide.

    **6. ADVERSE IMPACTS AND EXPECTED BENEFITS**. Any adverse impacts that can reasonably be anticipated to result from development in the area if the designation were not to occur, and the expected benefits that can reasonably be anticipated to result from the review of that development in a specialized manner.

BLM_0053912

# SECTION 1-111: CONSTRUCTION AND WORD USAGE

**A.** **LIBERAL CONSTRUCTION**. This *Resolution* and the terms of it are to be liberally construed to effect the purposes of this *Resolution*.

**B.** **MORE VERSUS LESS RESTRICTIVE REQUIREMENTS**. Where there exists a conflict or overlap between different requirements in this *Resolution*, or between this *Resolution* and any other resolution, regulation or ordinance adopted by Gunnison County, or between this *Resolution* and any other applicable state or federal requirement or statute, the requirement that is the more restrictive or particular shall prevail over that which is less restrictive or is more general.

**C.** **TEXT VERSUS TABLE, ILLUSTRATION, GRAPHIC DEPICTION OR TITLE**. If a conflict or overlap arises between the requirements of the text of this *Resolution* and any table, illustration, graphic depiction, or the title of any table, illustration, graphic depiction or section, the requirements of the text shall prevail.

**D.** **PRIVATE AGREEMENTS**. It is not the intent of this *Resolution* to unreasonably interfere with, abrogate, or annul any easement, covenant, deed restriction, or other agreement between private parties. If the requirements of this *Resolution* impose a greater restriction than imposed by a private agreement signed after the effective date of this *Resolution*, the requirements of this *Resolution* shall control; if the requirements of a private agreement impose the greater restriction, the requirements of the private agreement shall take precedence. The County shall not be responsible for enforcing applicable requirements of private agreements other than those to which the County is a party, in which case the County shall have the sole discretion to decide whether to enforce.

**E.** **REQUIREMENTS ARE MINIMUM REQUIREMENTS**. The requirements of this *Resolution* shall be regarded as the minimum requirements necessary for the protection of the public health, safety, general welfare, and the environment.

**F.** **DELEGATION OF DUTIES BY DEPARTMENT HEAD**. Whenever a provision requires the Community Development Director or the head of any other County department to perform an act or duty, it shall be construed to authorize the Community Development Director, or the head of that other County department, to designate, delegate, and authorize subordinates to perform the duty or act, unless the terms of the provision or section specify otherwise.

**G.** **COMPUTATION OF TIME**. The time in which an act is to be done shall be computed by excluding the first and including the last day. If a deadline falls on a weekend or County holiday, the deadline extends to the end of the next working day. Time shall be based on calendar days, not working days, unless otherwise specified.

    **1.** **DAY**. The end of a day shall be at 5:00 p.m., Gunnison time.

    **2.** **WEEK**. The word "week" shall mean seven days.

    **3.** **MONTH**. The word "month" shall mean 30 days.

    **4.** **YEAR**. The word "year" shall mean 365 days.

**H.** **FRACTIONS**. Whenever a fraction is generated in any calculation required by this *Resolution*, then fractions from .01 to .49 shall be rounded down to the  next lowest whole number, and fractions from 0.50 to 0.99 shall be rounded up to the next highest whole number, unless otherwise specified.

**I.** **MEANINGS OF CERTAIN WORDS**.

    **1.** **SINGULAR/PLURAL**. A word used in the singular may also be applied to several persons and things as well as to one person or thing. The use of the plural number shall include any single person or thing, unless the context clearly indicates the contrary.

    **2.** **SHALL/WILL/MUST/MAY/SHOULD**. "Shall", "will" and "must" all mean the provision is mandatory; "may" means it is permissive; "should" means it is preferred.

    **3.** **MASCULINE/FEMININE**. The masculine gender shall include the feminine, and the feminine gender shall include the masculine.

    **4.** **CONJUNCTIONS**. Unless the context clearly suggests otherwise, conjunctions shall be interpreted as follows:

        "**AND**" means that all connected items, conditions, requirements, or events apply.

        "**OR**" means that one or more of the connected items, conditions, requirements, or events apply.

    **5.** **COMMON/TECHNICAL TERMS.** Words and phrases shall be construed according to the common usage of the term, but technical words and phrases that have acquired a particular meaning shall be understood according to that particular meaning.

BLM_0053913

6. **LISTS AND EXAMPLES.** Unless otherwise specifically indicated, lists of items or examples that use terms including "for example," "including" or similar language, are intended to provide examples, not exhaustive lists of all possibilities.

J. **ABBREVIATIONS.** The following abbreviations used in this *Resolution*, or as are otherwise used by the County in its review and disposition of land use issues, have the following meanings:

1. **AASHTO** means the American Association of State Highway and Transportation Officials.

2. **CDOW** means Colorado Division of Parks and Wildlife.

3. **CDOT** means Colorado Department of Transportation.

4. **CGS** means Colorado Geologic Survey.

5. **C.R.S**. means Colorado Revised Statutes, including all amendments thereto.

6. **ISDS** means individual sewage disposal system.

7. **SQ. FT**. means square feet.

## SECTION 1-112: USE OF MAPS

Gunnison County uses the following maps as general sources of information to provide initial guidelines for siting development, and for alerting the County, the applicant and the public about the physical characteristics of a parcel and the area in which it is located. Site-specific studies may be required of individual parcels to determine individual characteristics more definitively, and how they may affect a development proposal.

A. **MAPS ADOPTED.** Gunnison County hereby adopts the following maps in this *Resolution*, as if they were actually included as illustrations in the *Resolution*. These maps may be updated from time to time, pursuant to Section 1-112: B: *Adoption of New or Updated Maps.*

1. **FLOODPLAIN MAPS.** National Flood Insurance Rate Maps (FIRM) prepared by the Federal Emergency Management Agency May 16, 2013, and as more specifically adopted in Section 11-103: E: *Official Maps.*

2. **GUNNISON COUNTY ROAD MAINTENANCE MAPS.** Maps of roads within Gunnison County, designating roads maintained and/or plowed by Gunnison County (dated April 1997, as amended).

3. **GUNNISON SAGE-GROUSE HABITAT MAP**. Gunnison County map that depicts private lands located within areas defined as Gunnison Sage-grouse habitat, as currently adopted by the Board.

B. **ADOPTION OF NEW OR UPDATED MAPS**. New or updated maps may be adopted by Gunnison County from time-to-time to reflect new studies, to correct map designations, or to otherwise replace or augment the floodplain, road maintenance and other maps. The adoption of a new map or the amendment of any adopted map shall be accomplished by amending or adding the reference to the map in this Section and by following the process and standards of Section 1-113: *Amending This Land Use Resolution.*

C. **MAPS TO BE USED AS REFERENCES**. Gunnison County may use the following and other maps as they may be amended as general references. Amendment or other update by the agencies that prepared them requires no action by the County.

1. **WILDFIRE HAZARD MAPS**. Wildfire Area Hazard Maps prepared by the Colorado State Forest Service.

2. **SOILS MAPS**. Soil Survey Maps prepared by the Natural Resource Conservation Service (Soil Conservation Service).

3. **GEOLOGIC HAZARD MAPS**. Geologic Hazard Maps prepared by the Colorado Geologic Survey.

4. **WILDLIFE MAPS**. The Wildlife Resource Information System (WRIS) and National Diversity Information Source (NDIS) maps available from the Colorado Division of Parks and Wildlife, and the Gunnison Basin Sage Grouse Habitat Maps (in the *Gunnison Sage Grouse Conservation Plan*), or their successors.

5. **WETLANDS MAPS**. Wetlands identification maps for lands around the Town of Crested Butte prepared by David Cooper, PhD: Ecologist, in cooperation with the U.S. Environmental Protection Agency.

## SECTION 1-113: AMENDING THIS *LAND USE RESOLUTION*

A. **PURPOSE**. The purpose of this Section is to provide a process by which the Board may, from time to time, amend, supplement or repeal this *Resolution*.

BLM_0053914

B. **PROCESS TO AMEND.** The following process shall apply to an application for an amendment to this *Resolution*:

1. **INITIATION.** An amendment to this *Resolution* may be initiated by any of the following:

    a. **BOARD MOTION.** The Board may initiate an amendment by motion directing the Community Development Director to submit a proposed amendment and report to the Planning Commission for review and for further action pursuant to this Section.

    b. **PLANNING COMMISSION INITIATIVE.** The Planning Commission may initiate an amendment by submitting a written recommendation for proposed amendment to the Board.

    c. **COMMUNITY DEVELOPMENT DIRECTOR.** The Community Development Director may initiate an amendment by submitting a written recommendation for proposed amendment directly to the Board, or by first submitting it to the Planning Commission for review and recommendation to the Board.

    d. **PROPERTY OWNER OR OTHER RESIDENT INITIATIVE.** An amendment may be initiated by a person who owns a legal interest in real property within the County, or by any person living within the County, by the submittal of an application to the Community Development Department.

2. **SUBMITTAL OF DRAFT AMENDMENT LANGUAGE.** Any initiative or application for amendment shall be submitted to the Community Development Department, and at a minimum shall include the following:

    a. **IDENTIFICATION OF APPLICANT, IF RESIDENT- OR PROPERTY OWNER-INITIATED.** The applicant's name, address, and telephone number. If the applicant is to be represented by an agent, a notarized letter signed by the applicant shall also be submitted, authorizing the agent to represent the applicant and stating the representative's name, address, and telephone number.

    b. **PRECISE WORDING.** The precise wording of the proposed amendment, and the language of the article, division and/or section that it will change.

    c. **RATIONALE FOR PROPOSED AMENDMENT.** A concise statement of the purpose and need for the proposed amendment.

3. **COMMUNITY DEVELOPMENT DEPARTMENT REVIEW.** The Community Development Department shall review the application for completeness pursuant to Section 1-113: B. 2: *Submittal of Draft Amendment Language*, and compliance with Section 1-113: C. *Review Standards.*

4. **PLANNING COMMISSION REVIEW.** A complete copy of the application shall be forwarded to the Planning Commission, together with a copy of the Community Development Department's report. The Planning Commission shall review the application, considering the standards of Section 1-113: C. *Review Standards,* and shall make a recommendation to the Board to approve, approve with modifications, table for further study, or deny the proposed amendment.

5. **BOARD PUBLIC HEARING.** The Planning Commission's recommendations shall be forwarded to the Board, together with a complete copy of the application, and a copy of the Community Development Department Review. The Board shall conduct a public hearing pursuant to Sections 3-112: *Notice of Public Hearing*, and 3-113: *Conduct of Public Hearing.*

6. **BOARD REVIEW AND ACTION.** The Board shall consider the application, any relevant support materials, the Community Development Department's report, the Planning Commission's recommendation, the public testimony and evidence given at the public hearing, and compliance of the application with Section 1- 113: C: *Review Standards.* Following closure of the public hearing, the Board may, by written resolution, adopt the amendments, adopt the amendments with modifications, table for further study or deny the amendments. Such resolution shall include findings that address the review standards in Section 1-113: C: *Review Standards.*

C. **REVIEW STANDARDS.** The decision to amend the text of this *Resolution* is at the legislative discretion of the Board and is not controlled by any one factor. The Board shall consider the following in determining whether to adopt a proposed amendment, adopt a proposed amendment with modifications, table it for further study or deny it:

1. **CONSISTENCY WITH ANY COMPREHENSIVE PLAN ADOPTED BY GUNNISON COUNTY.** Consistency of the proposed amendment with any applicable comprehensive plan adopted by Gunnison County;

2. **CHANGED CONDITIONS.** Changed conditions, including the economy of Gunnison County;

3. **EFFECT ON THE NATURAL ENVIRONMENT.** Effect of the proposed amendment on the natural environment;

4. **COMMUNITY NEEDS.** Community needs;

BLM_0053915

5. **DEVELOPMENT PATTERN**. Development pattern;

6. **CHANGES IN APPLICABLE LAW**. Changes in applicable law;

7. **PUBLIC HEALTH, SAFETY AND WELFARE**. Public health, safety and welfare;

8. **COMPLIANCE WITH ANY APPLICABLE INTERGOVERNMENTAL AGREEMENTS ADOPTED BY GUNNISON COUNTY.** Compliance with any applicable intergovernmental agreements adopted by Gunnison County.

D. **FEES**. When an amendment is initiated by a property owner or resident, a fee to cover the cost of publishing notice of the public hearing shall be paid by the applicant as shown in a schedule of fees issued by the Community Development Department, adopted and amended from time to time by the Board. When the amendment is initiated by the Board, the Planning Commission or the Community Development Director, no fee shall be charged.

## SECTION 1-114: INTERPRETATIONS

A. **AUTHORITY**. The Community Development Director shall be authorized to make a written interpretation of the requirements of the this *Resolution*, and the designations made on official County maps to determine whether a piece of property does or does not lie within or partly within a designated hazard zone, resource area, or other designated geographic area.

B. **PROCESS.** Persons who wish to have an interpretation of any portion of this *Resolution* may request it as follows:

1. **INITIATION.** A request for a written interpretation may be made by any person by submitting a written request to the Community Development Director. The written request shall specify the provision of this *Resolution* or the particular map designation for which an interpretation is requested. The written request shall also state the factual basis for the request. A Land Use Change Permit applicant may request a Pre-Application Conference before submitting the request for an interpretation.

2. **DETERMINATION OF COMPLETENESS FOR REVIEW**. Within 15 days of receipt of the request for an interpretation, the Community Development Director shall determine whether the request is complete, specific, and ready for review. If the Community Development Director determines the request is not complete or specific, written notice shall be sent to the applicant specifying the deficiencies. No further action shall be taken on the request until the deficiencies have been remedied.

3. **RENDERING OF INTERPRETATION**. Within 30 days of determining that the request for an interpretation is complete, the Community Development Director shall evaluate the application, consult with the County Attorney and other staff as necessary, and render a written interpretation. When rendering the interpretation, the Community Development Director shall consider the County's legislative intent in adopting the provision, as expressed in this *Resolution*, and as may be determined from the County's official records.

C. **OFFICIAL RECORD**. The Community Development Department shall keep an official written record of all written interpretations that have been rendered. The record shall be available at the Community Development Department for public inspection, on reasonable request, during normal business hours.

D. **APPEALS**. Interpretations or final decisions rendered by the Community Development Director may be appealed to the Board of Commissioners. The appeal shall be submitted and considered pursuant to the requirements of Section 8-603: *Appeals*.

## SECTION 1-115: ESTABLISHMENT OF GUNNISON COUNTY PLANNING COMMISSION

A. **ESTABLISHMENT.** The Gunnison County Planning Commission is hereby established.

B. **POWERS AND DUTIES.** The Planning Commission shall have authority to act as provided by state statute and by the Board in this *Resolution*. Authority under state law includes the following: Title 30, Article 28; Title 24, Article 65.1; Title 24, Article 67; Title 29, Article 20; and Title 30, Article 11.

C. **INITIAL COMMISSION.** The membership and composition of the initial Planning Commission established pursuant to this Section shall be the same as the Planning Commission existing at the time immediately before the effective date of this *Resolution*. Members shall serve out their respective remaining terms of office.

D. **REGULAR MEMBERS.** The Planning Commission shall be comprised of five regular members.

E. **REGULAR MEMBER'S LENGTH OF TERM**. The term of each member shall be three years.

F. **ALTERNATE MEMBERS.** The Board, in its discretion, may appoint as many as two alternate members.

BLM_0053916

G. **RESIDENCY REQUIRED**. Each regular and alternate member shall be a resident and shall have been a resident of Gunnison County for at least one year before appointment.

H. **VACANCIES AND REMOVAL OF MEMBERS**. The Board of Commissioners shall fill vacancies and may remove a member for non-performance of duty or misconduct, as it deems appropriate in the exercise of its discretion. In the event that any member is temporarily unable to act owing to absence, illness, conflict of interest, or any other cause, such position shall be filled during the temporary disability by an alternate member in accordance with the bylaws or guidelines, if applicable, or by order of the chairperson of the Commission.

I. **COMMISSION BYLAWS OR GUIDELINES.** The Board, after recommendation by the Planning Commission, shall adopt or amend bylaws or guidelines establishing the Commission's procedures. A copy of the bylaws or guidelines shall be available to the public during regular business hours in the Community Development Department.

J. **RECORD OF COMMISSION PROCEEDINGS.** The Planning Commission shall keep a record of its proceedings, which record shall be open to inspection at the Community Development Department by the public during regular business hours.

## SECTION 1-116: ESTABLISHMENT OF GUNNISON COUNTY BOARD OF ADJUSTMENTS

A. **ESTABLISHMENT**. There is hereby established the Gunnison County Board of Adjustments.

B. **POWERS AND DUTIES**. The powers and duties of the Board of Adjustments shall be as follows:

1. **GRANTING OF VARIANCES FROM SETBACK REQUIREMENTS.** The Board of Adjustments shall have the final authority to grant variances from setback requirements where, by reason of unusual narrowness, shallowness, or shape of a specific parcel existing as of the effective date of this *Resolution*, or by reason of unusual topographic conditions or other situations or conditions of the parcel, none of which shall be self-imposed, the strict application of the requirements of Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way* would result in peculiar practical difficulties to, or undue hardship upon, the owner of that property. The Board of Adjustments may grant a variance from such strict application to relieve those difficulties or hardship, if such relief may be granted without substantial detriment to the public health, safety and welfare and without substantially impairing the intent and purposes of this *Resolution*.

2. **APPEAL OF ACTION BY COMMUNITY DEVELOPMENT DIRECTOR**. The Board of Adjustments shall have the authority to hear and decide appeals when it is alleged by an applicant that the Community Development Director has made an error in any order, requirement, decision or refusal related to the granting of variances from setback requirements, pursuant to Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way.*

C. **INITIAL BOARD**. The membership and composition of the initial Board of Adjustments established pursuant to this Section shall be the same as the Board of Adjustments existing at the time immediately before the effective date of this *Resolution*. Members shall serve out their respective remaining lengths of terms of office.

D. **REGULAR MEMBERS**. The Board of Adjustments shall be comprised of five regular members.

E. **REGULAR MEMBER'S LENGTH OF TERM.** The term of each member shall be three years. The Board shall establish staggered terms for the members.

F. **ALTERNATE MEMBERS**. The Board, in its discretion, may appoint as many as two alternate Board of Adjustments members.

G. **RESIDENCY REQUIRED**. Each regular and alternate member shall be a resident and shall have been a resident of Gunnison County for at least one year before appointment.

H. **VACANCIES AND REMOVAL OF MEMBERS**. The Board of Commissioners shall fill vacancies and may remove a member for non-performance of duty or misconduct, as it deems appropriate in the exercise of its discretion. In the event that any member is temporarily unable to act owing to absence, illness, conflict of interest, or any other cause, such position shall position during the temporary disability by an alternate member in accordance with the bylaws, if applicable, or by order of the chairperson of the Commission.

I. **BOARD OF ADJUSTMENTS BYLAWS OR GUIDELINES**. The Board, after recommendation by the Board of Adjustments, shall adopt and amend such bylaws or guidelines establishing procedures for the Board of Adjustments as may be necessary. A copy of the appropriate document shall be available for public inspection during regular business hours in the Community Development Department.

BLM_0053917

**J.   RECORD OF BOARD OF ADJUSTMENTS PROCEEDINGS**. The Board of Adjustments shall keep a record of its proceedings, which record shall be available to the public during regular business hours of the Community Development Department.

## SECTION 1-117: REPEALER

**A.   REPEAL OF FORMER *GUNNISON COUNTY LAND USE RESOLUTION*.** Adoption of this *Resolution* repeals the former *Gunnison County Land Use Resolution* and amendments to it.

**B.**   Adoption of this *Resolution* repeals the former Gunnison County Mobile Home Park and Individual Mobile Home Regulations.

**C.   REPEAL OF GUNNISON COUNTY SIGN CODE.** Adoption of this *Resolution* repeals the former *Gunnison County Sign Code.*

**D.   REPEAL OF GUNNISON COUNTY FLOOD DAMAGE PREVENTION RESOLUTION**. Adoption of this *Resolution* repeals the former *Gunnison County Flood Damage Prevention Resolution.*

**E.   REPEAL OF RESOLUTION NO. 99-20**.   Adoption of this *Resolution* repeals the Board of County Commissioners' Resolution No. 99-20*, A Resolution Promulgating Temporary Land use Regulations Regarding For Staging Special Events, Erecting Temporary Structures On Construction Sites, And Camping On Private Property.*

**F.   NON-REVIVAL OF FORMERLY REPEALED ORDINANCE, CODES, AND OTHER REGULATIONS**. The repeal of the documents listed in Sections 1-117: A through E does not revive any other requirements, resolutions, ordinances, codes, or other regulations repealed by any of those documents.

**G.   EFFECT ON PENDING APPLICATIONS AND PREVIOUSLY APPROVED PERMITS**. Repeal of the documents listed in Sections 1-117: A through E does not affect approval of applications pending as of the effective date of this *Resolution*, or enforcement of permit conditions imposed under the requirements of those documents.

## SECTION 1-118: SEVERABILITY

If any Article, Division, Section, paragraph, clause, provision, or portion of this *Resolution* is determined to be unconstitutional or invalid by a court of competent jurisdiction, such determination shall not affect the validity of this *Resolution* as a whole or any part of this *Resolution* other than the part determined to be unconstitutional or invalid. If any application of this *Resolution* to a particular structure, parcel of land, or body of water is determined to be unconstitutional or invalid by a court of competent jurisdiction, such determination shall not be applicable to any other structure, land, or water not specifically included or referenced in that judgment.

## SECTION 1-119: IMPACT FEES AND DEDICATIONS

Gunnison County may require an applicant, as a condition of approval of a Land Use Change Permit, to dedicate real property to the public, or pay money to a public entity if there is an essential nexus between the dedication or payment and a legitimate government interest, the dedication or payment is roughly proportional both in nature and extent to the impact of the proposed use or development of such property, and Gunnison County has duly adopted standards for such dedication or payment that are sufficiently specific to ensure that the condition is imposed in a rational and consistent manner.

BLM_0053918

# ARTICLE 2: DEFINITIONS

## SECTION 2-101: PURPOSE

The purpose of this Article is to define words, terms, and phrases used in this *Resolution*, or that are otherwise used by the County in its review and actions concerning land use issues.

## SECTION 2-102: DEFINITIONS

The following words, terms, and phrases shall have the following meanings when used in this *Resolution* or that are otherwise used by the County in its review and disposition of land use issues.

**ABUT** means adjacent or contiguous to, or sharing a common border.

**ACCESS** means the place, method or way by which pedestrians and vehicles obtain usable ingress and egress to a property or land use.
- **RESIDENTIAL ACCESS** means an ingress or egress to no more than two residences or lots, including any that includes a home occupation, or a multiple-family residence as defined by this *Resolution*.
- **AGRICULTURAL ACCESS** means the access providing ingress and egress exclusively to an agricultural operation, and not to any residences.
- **COMMERCIAL ACCESS** means the access providing ingress and egress to any activity defined by this *Resolution* as commercial.
- **INDUSTRIAL ACCESS** means the access providing ingress and egress to any activity defined by this *Resolution* as industrial.

**ACCESSORY STRUCTURE OR SECONDARY USE STRUCTURE** means a use or structure that is located on the same parcel as the primary use or structure, clearly incidental, secondary and subordinate to the primary use or structure on the parcel; is devoted to the primary use or structure; is customarily found in conjunction with the primary use or structure; is not incompatible with the primary use or structure; and is subordinate in purpose to the primary use or structure.

**ACTIVE SOLAR SPACE HEATING** means a heating system that includes all of the following:
- A means of collection of the sun's energy; and
- Absorption of the solar gain into a mass capable of storing the heat such as concrete, rock or water; and
- Distribution of the heat by mechanical means; and
- Control of the system by convective venting, circulating fans or shading.

**ADJACENT** means abutting or contiguous to or sharing a common border.

**ADJACENT PROPERTY OWNER** means an owner of record (as recorded in the most current records on file in the Gunnison County Assessor's Office) of any estate, right, or interest in real property that immediately abuts another parcel.

**ADMINISTRATIVE REVIEW PROJECT** means a Project that is classified and reviewed pursuant to Article 4: *Administrative Review Projects That Do Not Require Land Use Change Permits* and Article 5: *Administrative Review Projects That Require Land Use Change Permits.*

**ADULT-ORIENTED USE** means a use of property where the primary, accessory or other use, or a significant adjunct to another use of the property, is the sale, rental, display, or offering of books, magazines, publications, tapes or films, live entertainment, dancing, or material, that is distinguished or characterized by its emphasis on depicting, exhibiting, describing, or relating to sexual activities or special anatomical areas that include the following body parts, when they are less than completely and opaquely covered: human genitals, public region, buttocks, and female breast below a point immediately above the top of the aureola. An adult-oriented use includes, but is not limited to, an adult bookstore; adult club, cabaret or restaurant, with or without a liquor license; and adult motion picture or audio-visual theatre.

**ADVERSE** means unfavorable or harmful.

BLM_0053919

**AFFORDABLE HOUSING** means housing that is affordable to very low-income, low-income, or moderate-income persons, as defined by the U.S. Department of Housing and Urban Development, and is legally restricted to occupancy solely by those very low-income, low-income or moderate-income person(s) through the use of a covenant, deed restriction, a Development Improvement Agreement, or by transfer of an appropriate interest to a state, county, or municipal housing authority or nonprofit housing organization.

**AGGREGATE:**
- **AGGREGATE STRUCTURES** means the whole of the square footages of all residences and other structures on the same lot.
- **AGGREGATE MATERIALS** means the material formed of particles of soil and rock found in the extraction of construction materials and processing for concrete or batch product.

**AGRICULTURE** means the use of the land for the primary purpose of making a profit from farming or ranching as it may include:
- The production, cultivation, growing, and harvesting of plant crops, but not including the harvesting of trees unless incidental to other agricultural operations; or
- The raising and/or the breeding of livestock including horses, dairy and beef cattle, sheep, goats, fur-bearing animals, poultry and swine, so long as they are not large confined animal feeding operations (CAFO); or
- The production of nursery products and sod; and
- The harvesting, storage, grading, packaging, processing, distribution, and sale or trade of such commodities where such activities occur at the point of production.

   It specifically does not include the uses, structures and retail services normally associated with kennels, veterinary hospitals, the commercial slaughter of animals or commercial riding stables. For purposes of this *Resolution*, classification of the use of the property by the Gunnison County Assessor's Office is not definitive or binding for purposes of this definition, nor shall the existence of a conservation easement on the property otherwise defined as agricultural affect that definition.

**AGRICULTURAL LANDS** means any lands primarily in agricultural use.

**AGRICULTURAL OPERATION** means an activity that primarily involves agriculture as defined in this *Resolution*.

**AGRICULTURAL STRUCTURE** means a structure located on a farm or ranch and used in an agricultural operation for the storage, repair, and maintenance of farm or ranch equipment and supplies, or for the raising and/or storage of crops and livestock. These include, but are not limited to, barns, corrals, silos, workshops, equipment sheds, greenhouses smaller than 2,500 sq. ft., storage and shelter structures. An agricultural structure does not include greenhouses that are 2,500 sq. ft. or larger, enclosed arenas or other enclosed areas when the activities that occur there provide services and/or goods to the general public on site.

**AIRCRAFT** means any device capable of flight that is licensed or regulated by the Federal Aviation Administration.

**AIR DESTRATIFICATION SYSTEM** means a system devised for circulation of air, comprised of an air return system, and ceiling fan.

**AIRPORT** means any area of land, water, or structure that is used for the landing or taking off of aircraft, for private, business or commercial purposes, including, but not limited to, all facilities for passenger or cargo loading, or maintenance, fueling, shelter or storage of aircraft; including, but not limited to, any area for provision of services, including flight instruction, charter or air freight service, or for receiving or discharging passengers or cargo, and all appurtenant areas used or acquired for airport buildings or other airport facilities, and all appurtenant rights-of-way. An airport is "publicly owned" for purposes of this *Resolution* if the area used for the landing and taking off of aircraft is owned, operated, controlled, leased to or leased by Gunnison County.

**AIRPORT HAZARD** means any natural formation, structure, or use of land that obstructs the air space required for the safe flight of aircraft in landing or taking off at an airport or is otherwise hazardous or creates hazards to such safe landing or taking off of aircraft, endangers the lives and property of the general public, of users of the airport or of occupants of land in its vicinity, or reduces the size of the area available for the landing, taking-off, or maneuvering of aircraft, thus tending to destroy or impair the utility of the airport.

**ALLEY** means a public way of limited use intended only to provide access to the rear or side of lots within recorded platted townsites or subdivisions.

**ALTERATION** means a change in the structural parts of, or an enlargement of a structure, whether by extending it on a side, by increasing its height, or by moving it from one location to another, whether on the same or separate parcels.

**ALTERNATIVE TRANSPORTATION FACILITY** means a trail, sidewalk, public bus or van, rail, or other facility that

provides an alternative mode of transportation to travel by private automobile.

**ANIMAL:**
- **DOMESTIC ANIMAL** means a small animal customarily kept in a dwelling for company as a pet, including, but not limited to, dogs and cats.
- **EXOTIC ANIMAL** means an animal, other than livestock, introduced from outside the Rocky Mountain region.
- **LIVESTOCK** means horses, dairy and beef cattle, sheep, goats, fur-bearing animals, poultry and swine.
- **NON-DOMESTIC ANIMAL** means an animal not customarily adapted to live and breed in a tamed condition, such as a red-tailed deer, antelope, moose or elk.

**APPLICANT** means any person applying for any permit described in this *Resolution*.

**AQUIFER RECHARGE AREA** means any area where surface water may infiltrate to a water-bearing stratum of permeable rock, sand or gravel.

**AREA MEDIAN INCOME (AMI)** means the median income for Gunnison County adjusted for household size, as established and defined in an annual schedule published by the U.S. Department of Housing and Urban Development (HUD).

**ARCHEOLOGICAL RESOURCE, CULTURAL RESOURCE OR HISTORICAL RESOURCE** means those resources that have been designated by the Gunnison County Historical Preservation Commission, on the National Register of Historic Places (National Register), and/or as may be considered under the National Historic Preservation Act. A site may also be so identified by the Colorado State Historic Preservation Officer.

**ASPECT** means the primary direction the land surface faces.

**ASPHALT PLANT/BATCH PLANT** means a site, temporary or permanent, where gravel, sand, cement or various petroleum derivatives are combined for the production of paving and/or construction materials, or to create a substance used for paving, roofing and waterproofing.

**AVALANCHE HAZARD AREA** means an area where a mass of snow or ice and other material that may be incorporated into it moves rapidly down a mountain slope with a predictable recurring frequency over time and at a predictable impact pressure.

**BACK COUNTRY, WINTER BACK COUNTRY, OR INACCESSIBLE WINTER BACK COUNTRY** means a remote area that is not reasonably accessible during the entire winter for the timely provision of emergency services.

**BACK-FILLING** means the dumping of earthen materials into excavated holes, or covering exposed features with soil. This can be done to protect features, or to level ground for construction of a road or building. In mining practice, it means the return of overburden or non-toxic waste material into an adit or excavated portion of a mine property.

**BED AND BREAKFAST** means a single-family residence used primarily for that purpose and that provides temporary accommodations to guests for compensation, with or without meals.

**BEST MANAGEMENT PRACTICES** means those conservation techniques and management measures that:
- Control soil loss and reduce water quality degradation caused by nutrients, human and animal waste, toxins, and sediment; and
- Minimize adverse impacts to groundwater and surface-water flows; and
- Minimize adverse impacts to the chemical, biological, and physical characteristics of wetlands, ponds, streams, and riparian areas.

**BOARD** means the Board of County Commissioners of Gunnison County, Colorado.

**BORROW SITE** means a site used for the extraction of earthen materials including sand, gravel, rock or dirt.

**BOUNDARY LINE ADJUSTMENT** means the transfer of a portion of a parcel from that parcel to an adjacent parcel, or the realignment of boundary lines between adjacent parcels, resulting in no increase in the number of parcels.

**BUFFER** means landscape and/or architectural elements, either existing or additional, which provide a logical and reasonable transition to and between adjoining uses.

**BUILDING** means any structure used for shelter, or enclosure of persons, animals or property of any kind; a fence is not a building.

**BUILDING ENVELOPE** means a designated area of a lot or parcel within which all structures and, if required, an individual sewage disposal system, are to be confined.

**BUILDING FOOTPRINT** means the outline of the total area that is covered by a building at ground level.

BLM_0053921

*SECTION 2-102: DEFINITIONS*

**BUILDING HEIGHT (STRUCTURE HEIGHT)** means the vertical distance from grade plane to the average height of the highest roof surface

**BUILDING INSPECTOR** means the County staff person authorized to administer and enforce the applicable building code, adopted and amended by Gunnison County.

**BUILDING PERMIT** means a permit that is required to be obtained from the Building Inspector before the erection, construction, alteration, moving, relocation, or change of use of any structure.

**BUILDING SIZE** means the maximum area of square footage measured by the same standards as set forth in the applicable building code, adopted and amended by Gunnison County, excluding permanently unenclosed decks, patios, and porches.

**BUSINESS** has the same meaning as "Commercial."

**CAMPGROUND** means a tract or development providing facilities or accommodations for the temporary parking or placement of camping or other recreational vehicles or tents for recreation, education, or outdoor recreational activities, including, but not limited to, structural improvements including covered cooking areas, group facilities, self-contained travel trailer/motor home sites, tent sites, restroom and shower facilities, and laundry facilities for the convenience of temporary occupants.

**CAMPING SHELTER** means a tent, a yurt not placed on a permanent foundation, a self-propelled or towed camping unit including, but not limited to, vacation trailer, or camper, intended for recreational purposes, and not for permanent residential purposes, constructed of a combination of man-made and natural materials and that is not addressed as a habitable residence by the applicable building code, adopted and amended by Gunnison County.

**CHANGE IN CIRCUMSTANCES OR CHANGE IN CONDITION** means that the land uses, public facilities, infrastructure capacity, or environmental characteristics impacting or surrounding a development have changed.

**CHARACTER** means the distinct physical characteristics of a structure or area that set it apart from its surroundings and contribute to its individuality. Structural character refers to density, height, coverage, setbacks, massing, design and type of windows, materials, and scale of materials. Character of an area means the nature of the area in terms of intensity of use.

**CHILD CARE CENTER** means a residence or facility that provides regular care and supervision, for compensation, for an entire day or a portion of a day, for children who are not related to the owner, operator, or manager of the center. For purposes of this *Resolution*, a child-care center shall not mean in-home baby-sitting.

**CHURCH** means a building, together with its accessory buildings and uses, that by design and use is primarily intended for conducting organized public religious services.

**CIVIC BUILDING** means any building (public or private) primarily used for public or civic functions including, but not limited to, government offices, community centers, schools, and religious buildings.

**CLUSTER OR CLUSTER DEVELOPMENT** means the concentration of development, including buildings, driveways, and water supply and wastewater treatment facilities, on one or more areas of a development parcel, preserving the remainder as productive agricultural land or undeveloped open space, and avoiding impacting areas of identified value for wildlife habitat, scenic features of a rural landscape, historical agricultural uses, and significant environmental features including wetlands, bodies of water, geologic hazard, or significant vegetation. Clustering allows flexibility in layout and protection of identified valuable characteristics of a development parcel.

**CODE OF THE WEST** means the publication distributed by several counties in the Western United States that explains to new residents and visitors the differences in levels of services between urban and rural areas, and activities that take place in ranching communities that may be different from those in urban areas. Gunnison County has written and printed its own version, available online and in the Community Development Department.

**COMMERCIAL** means any establishment engaged in the retail or wholesale sale of goods or services that is open to the general public or that may be open to members only. This does not include farm or ranch stands. "Commercial" shall also mean "business."

**COMPATIBLE** means consistent with, harmonious with, similar and complementary to, the use and/ or function of natural systems and/or existing land uses in an area.

**CONDOMINIUM** means a common interest community in which portions of the real estate are designated for separate ownership and the remainder of which is designated for common ownership solely by the owners of the separate ownership portions. A common interest community is not a condominium unless the undivided interests in the common elements are vested in the unit owners.

BLM_0053922

**CONSERVATION DEVELOPMENT** means a parcel of at least 120 acres, of which at least 110 acres is permanently preserved by conservation easement acceptable to the County, and on the remainder of which there is or will be no more than one primary residence, and that is legally and permanently prohibited from future subdivision.

**CONSTRUCTION MATERIALS** means rock, clay, silt, sand, gravel, limestone, dimension stone, topsoil, marble or shale extracted for use in the production of nonmetallic construction products.

**CONSTRUCTION MATERIALS PROCESSING** means any activities associated with the extraction, storage or preparation of construction materials for use, including but not limited to, crushing, screening, washing, slabbing, polishing, grinding, concrete or asphalt preparation, batching or recycling, or other such action.

**CONTIGUOUS** means abutting or adjacent to or sharing a common border.

**CORRECTION PLAT** means a rerecording of a previously approved plat that is intended to correct a technical error in the plat.

**COST** means the total monetary amount to be paid, including, but not limited to, any amounts to be paid for land acquisition, capital improvements, construction, fixtures, equipment, labor, materials, operation, maintenance, monitoring, financing, debt service, planning, permitting, and similar purposes.

**COUNTY** means Gunnison County, Colorado, its officers, employees and agents.

**CRITICAL PATH** means the sequence of tasks that forms the longest time a Project will take. Therefore, if a task on the critical path is delayed, it will add additional time to the Project. The critical path is "critical" because one task that follows another in a Project cannot be started until all the previous tasks on the critical path are completed.

**CUMULATIVE IMPACTS/EFFECTS** means the combined impacts of two or more uses or activities. The impacts may be related to the number of individual activities, or to the number of repeated activities on the same piece of ground. Cumulative impacts/effects can result from individually minor but collectively significant actions taking place over a period of time.

**CUT** means an area where soil or earth is excavated or removed in conjunction with development activities.

**DECISION-MAKING BODY** means the individual or body that has final authority to approve or deny a particular type of application.

**DEDICATED CONSERVATION EASEMENT** means the permanent written conveyance or setting aside  by the owner of an interest in land or water by an appropriate recorded conservation easement, or by an appropriate recorded deed with conservation covenants acceptable to the County.  A recorded conservation easement or deed with conservation covenants shall be acceptable only if the County determines that the preserved land will be preserved essentially in its natural or agreed-upon improved state, and is subject to the County's determination that the easement or otherwise conserved land has public benefit.  The Grantee of Conservation Easements must be an organization qualified to hold conservation easements (as defined by the Internal Revenue Service) acceptable to Gunnison County.

**DEDICATION** means the conveyance or setting aside by the owner of an interest in land or water to the County or other public entity for the use of the public, and accepted for such use by or on behalf of the public by the Board or other public entity, or by an appropriate recorded conservation easement or recorded deed with conservation covenants acceptable to the County, to which the County is a party and that the County has authority to enforce.

**DEED RESTRICTION OR DEED RESTRICTED** means a provision in a deed, recorded in the records of the Clerk and Recorder of Gunnison County, mandating, limiting or prohibiting certain uses of a parcel of real property and/or structures, in perpetuity.

**DENSITY** means the number of units within a fixed area, for example, the number of residences per acre.

- **GROSS DENSITY** means the total number of units divided by the total land area within the boundary of the proposed land use change, including publicly dedicated roads, open space or other facilities.
- **NET DENSITY** means the total number of units divided by the total land area within the boundary of the Project, excluding publicly dedicated roads, open space or other facilities.

**DETENTION** means the practice and process associated with the delayed release of storm water to reduce peak flow, to maintain base flow, to increase opportunity for recharge to groundwater, to reduce nutrient and sediment loading to surface water bodies, and to reduce opportunity for surface runoff and soil erosion.

**DETENTION STRUCTURE** means a permanent structure for the temporary storage of storm water runoff that is designed so as not to create a permanent pool of water.

BLM_0053923

**DEVELOPMENT** means any activity that is a land use change. (Also, see "Land Use Change.") For purposes of Section 11-103: *Development in Areas Subject to Flood Hazards* "development" means a man-made change to improved or unimproved real estate, including, but not limited to, buildings and other structures, mining, dredging, filling, grading, paving, excavation, drilling operations, or storage of equipment or materials. The County reserves the right to make interpretations as to what constitutes development in areas subject to flood hazards.

**DEVELOPMENT AREA** means those geographic areas within the county that will be developed or altered directly by the construction or operation of a proposed Project.

**DEVELOPMENT AGREEMENT** means a legal agreement entered between Gunnison County and an applicant for a Land Use Change Permit, providing for the extension of a statutory vested property right and identifying the consideration and conditions for such an extension.

**DEVELOPMENT IMPROVEMENT AGREEMENT** means a legal agreement entered between Gunnison County and an applicant for a Land Use Change Permit providing the applicant's financial and other guarantees to construct the approved improvements.

**DEVELOPMENT SITE** means the area of a parcel on which construction or activity, or an otherwise designated change in use is proposed or will occur as part of a land use change Project. It may include all or part of a parcel.

**DISTRIBUTION LINE** means a line whose principal purpose is to distribute electric power, oil, water, natural gas, telephone, cable television, or similar amenities or services from a transmission line or other local point of origin (such as a substation) to an individual customer or customers to provide greater reliability for an overall distribution system. Connection between the distribution line or system and customers is typically, but not always, made by means of a service line.

**DRAINAGE FACILITIES OR DRAINAGE SYSTEM** means a system of man-made structures designated to collect, convey, hold, divert or discharge storm water, and to mitigate surface water quality impacts, and includes storm water sewers, culverts, control structures, detention and retention facilities.

**DUDE RANCH** See "Resort."

**DUPLEX** See "Residence."

**DWELLING UNIT** See "Residence."

**EASEMENT** means a conveyance or reservation of an incident of ownership in real property for one or more specific purposes, public or private.

**EFFECTIVE DATE OF THIS** *RESOLUTION* means January 8, 2001, the date on which this *Resolution* was adopted by the Board.

**ENERGY-EFFICIENT APPLIANCES** means appliances that have been rated energy- efficient by a program such as Energy Star.

**ENGINEERED LUMBER** means recycled/reconstituted wood materials that employ laminated wood chips or strands and finger jointing (the gluing of larger pieces together).

**ENHANCED SOLAR ORIENTATION AND ACCESS** means orienting a building on a site so that access to sunlight is substantially unobstructed, and so that the long axis of the building is oriented east/west to minimize solar gain in the summer and maximize solar gain in the winter, and there is minimal use of windows on the north and west sides of the building.

**ENVIRONMENTAL HEALTH OFFICIAL** means the County staff person authorized to administer and enforce the *Gunnison County On-Site Wastewater Treatment System Regulations*, or his/her authorized designee.

**EQUIVALENT PERFORMANCE ENGINEERING BASIS** means, with regard to manufactured housing, that by using engineering calculations or testing, following commonly accepted engineering practices, all components and subsystems will perform to meet health, safety and functional requirements to the same extent as required for other single-family residences.

**ERODIBLE SOIL** means a soil whose particles are easily detached and entrained by air or water passing over or through the soil, a soil that lacks significant internal strength and has little resistance to erosion.

**ESSENTIAL HOUSING** means housing for qualified households as determined by the Gunnison County Housing Authority.

**ESSENTIAL HOUSING PROJECTS** means housing developments in which all residences are deed-restricted Essential Housing.

BLM_0053924

**ESSENTIAL SERVICES** means the development and/or maintenance of public utilities or County-approved underground, surface or overhead gas, electrical, steam, fuel or water transmission or distribution systems, including, but not limited to, towers, poles, wires, mains, drains, sewers, pipes, conduits, cables, traffic signals and hydrants.

**EXPANSIVE SOILS** means soil and rock that contain clay and expand or swell to a significant degree upon wetting, and shrink upon drying.

**EX PARTÉ COMMUNICATION** means an oral or written, off-the-record communication made to or by a member of a review or decision-making body, other than the Community Development Director, without notice to all parties involved, that discusses the merits, or could affect the outcome, of a decision or recommendation to be made by that decision-making body.

**FACTORY-BUILT HOUSING** means any structure, or component thereof, designed primarily for residential occupancy, including a mobile home that is wholly or in substantial part made, fabricated, formed, or assembled in manufacturing facilities for installation, or assembly and installation, on a building site.

**FARM OR RANCH STAND** means a temporary structure for the display and sale of primarily raw farm or ranch products.

**FILL** means material such as earth, clay, sand, concrete, rubble or waste of any kind, placed, stored or dumped upon the surface of the ground, which increases the natural ground surface elevation.

**FINAL PLAN** means the plan described in Section 7-401: *Final Plan Application for Major Impact Projects.*

**FINAL PLAT** means a map prepared by a surveyor registered in the State of Colorado, in accordance with this *Resolution* as an instrument for recording of real estate interests that is approved by the Board and is acceptable for filing with the Gunnison County Clerk and Recorder. The Final Plat shows the exact location, dimensions, size, shape, etc: of a condominium, townhouse, or subdivision, including all lots, blocks, roads, easements, and other parcels of land therein. It shall include reference to all relevant supporting materials, protective covenants, statements, opinions, and certifications as may be required by this *Resolution.*
- **SUBDIVISION FINAL PLAT** means the final design of the proposed subdivision, showing the exact location, size, and shape of lots, blocks, roads, easements, and other parcels of land therein.
- **CONDOMINIUMS, TOWNHOMES AND TOWNHOUSES PLAT** means the final as-built design of the condominium or townhouse development, showing exact locations, dimensions, sizes, and shapes of structures, as well as blocks, lots, roads, and/or easements.

**FIREPLACE OR "TRADITIONAL OPEN FIREPLACE**" means, indoors, an open recess for holding a fire at the base of a chimney, a hearth. Not a cook stove or an unapproved solid-fuel-burning device.

**FLOOD OR FLOODING** means a general or temporary condition of partial or complete inundation of normally dry land from:
- The overflow of inland waters; or
- The unusual and rapid accumulation or runoff of surface waters from any  source; or
- Mudflows that are proximately caused or precipitated by accumulations of water on or under the ground.
- The collapse or subsidence of land along the shore of a lake or other water body as a result of erosion or undermining caused by waves or currents of water exceeding the anticipated cyclical levels or suddenly caused by an unusually high water level in a natural water body, accompanied by a severe storm, or by an unanticipated force of nature, such as flash flood, or by some similarly unusual and unforeseeable event which results in flooding.

**FLOODPLAIN (100-YEAR)** means land area subject to inundation because of the base flood. The 100-year floodplain is made up of three parts: the stream channel, the floodway and the floodplain. The physical location of the floodplain on flood hazard maps is representative of existing ground conditions and may be based, among other things, on historical flood records or other readily available data. Floodplain-related elements include:
- **"A ZONE"** means a Special Flood Hazard Area subject to inundation from the 100-year flood. Because detailed hydraulic analyses have not been performed, no base flood lavation or depths are shown on the FIRM map.
- **BASE FLOOD** means a flood having a one percent chance of being equaled or exceeded in any given year. Equivalent to 100-year flood.
- **BASE FLOOD ELEVATION** means the height (above sea level) that floodwaters will reach at a given elevation during the Base (100-year) event.
- **BASEMENT** means any area of the building having its floor below ground level (subgrade) on all sides.
- **CONDITIONAL LETTER OF MAP AMENDMENT (CLOMAR)** means a conditional letter of map amendment (See LOMR).
- **CRITICAL FACILITY** includes:
    Structures or facilities that produce, use, or store highly volatile, flammable, explosive, toxic and/or water-reactive materials;

BLM_0053925

Hospitals, nursing homes, and housing likely to contain occupants who may not be sufficiently mobile to avoid death or injury during a flood;

Police stations, fire stations, vehicle and equipment storage facilities, and emergency operations centers that are needed for flood response activities before, during, and after a flood; and

Public and private utility facilities that are vital to maintaining or restoring normal services to flooded area before, during, and after a flood.

- **DIGITAL FLOOD INSURANCE RATE MAP (DFIRM)** FEMA digital floodplain map.  Digital maps that serve as "regulatory floodplain maps" for insurance and floodplain management purposes.
- **DEVELOPMENT IN A FLOODPLAIN** for purposes of Section 11-103: *Development in Areas Subject to Flood Hazards* means a man-made change to improved or unimproved real estate, including buildings and other structures, mining, dredging, filling, grading, paving, excavation, drilling operations, or storage of equipment or materials. The County reserves the right to make interpretations as to what constitutes development in areas subject to flood hazards.
- **EXPANSION TO AN EXISTING MANUFACTURED HOME PARK OR SUBDIVISION**-
  The preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).
- **EXISTING CONSTRUCTION OR STRUCTURES** for purposes of Section 11-103: *Development in Areas Subject to Flood Hazards*, means structures for which the "start of construction" began before the effective date of Gunnison County's Flood Insurance Rate Map (September 29, 1989).
- **FLASH FLOODING** means a temporary flooding condition due to the rapid accumulation and runoff of surface waters from any source and is characterized by a large volume of water over a short period of time. Also, see "flood prone area."
- **FLOOD HAZARD AREA** means the land within the floodplain subject to a one percent or greater chance of flooding in a given year.
- **FLOOD INSURANCE RATE MAP** (FIRM) means an official map on which the Federal Emergency Management Agency has delineated both the special flood hazard areas and the risk premium zones applicable to Gunnison County.
- **FLOOD INSURANCE STUDY** means the official report provided by the Federal Emergency Management Agency (FEMA) that includes flood profiles, the Flood Insurance Rate Mate (FIRM), and the water surface elevation of the base flood.
- **FLOODPLAIN MANAGEMENT PROGRAM** means a program of corrective and preventative measures for reducing flood damage, including, but not limited to, emergency preparedness plans, flood control works, and floodplain management regulations.
- **FLOOD PRONE AREA** means an area adjoining a watercourse, that may be considered subject to flooding during the 100-year flood based on reliable historical information, topography, vegetation, and other naturally occurring indicators, but where precise dimensions of the 100-year floodplain have not been delineated, and includes flash-flood areas.
- **FLOODPROOFING** •means any combination of structural and non-structural additions, changes or adjustments to structures that reduce or eliminate flood damage to real estate or improved real property, utilities, structures and their contents.
- **FLOODWAY (REGULATORY FLOODWAY) -** The channel of a river or other watercourse and adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height. The Colorado statewide standard for the designated height to be used for all newly studied reaches shall be one-half foot (six inches). Letters of Map Revision to existing floodway delineations may continue to use the floodway criteria in place at the time of the existing floodway delineation.
- **FREEBOARD** means a factor of safety usually expressed in feet above a flood level for purposes of floodplain management. "Freeboard" tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions, such as wave action, bridge openings and the hydrologic effect of urbanization of the watershed.
- **LETTER OF MAP REVISION (LOMR)** - FEMA's official revision of an effective Flood Insurance Rate Map (FIRM), or Flood Boundary and Floodway Map (FBFM), or both. LOMRs are generally based on the implementation of physical measures that affect the hydrologic or hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway, the effective Base Flood Elevations (BFEs), or the Special Flood Hazard Area (SFHA).
- **LETTER OF MAP REVISION BASED ON FILL (LOMR-F) –** FEMA's modification of the Special Flood Hazard Area (SFHA) shown on the Flood Insurance Rate Map (FIRM) based on the placement of fill outside the existing regulatory floodway.
- **LEVEE** means a manufactured structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control or divert the flow of water so as to provide protection from temporary flooding.
- **LEVEE SYSTEM** means a flood protection system that consists of a levee, or levees and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.
- **LOWEST FLOOR** means the lowest floor of the lowest enclosed area (including basement) of a structure. An unfinished or flood resistant enclosure, usable solely for parking of vehicles, building access or storage, in an area other than a basement area, is not considered a building's lowest floor, provided that such enclosure is not built to render the structure in violation of the applicable flood proofing and non-elevation design requirements of this *Resolution*.
- **MANUFACTURED HOME -** A structure transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. The term "manufactured home" does not include a "recreational vehicle".
- **MANUFACTURED HOME PARK OR SUBDIVISION** - A parcel (or contiguous parcels) of land divided into two or more manufactured home lots for rent or sale.

BLM_0053926

- **NEW MANUFACTURED HOME PARK OR SUBDIVISION -** A manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the effective date of floodplain management regulations adopted by a community.
- **MEAN SEA LEVEL** means, for purposes of the National Flood Insurance Program, the National Geodetic Vertical Datum (NGVD) of 1929 or other datum, to which base flood elevations shown on a community's Flood Insurance Rate Map are referred.
- **PRINCIPALLY ABOVE GROUND** for purpose of Section 11-103: *Development in Areas Subject to Flood Hazards*, means that at least 51 percent of the actual cash value of a structure, less land value, is above ground.
- **RECREATIONAL VEHICLE -** means a vehicle which is:
  1. Built on a single chassis;
  2. 400 square feet or less when measured at the largest horizontal projections;
  3. Designed to be self-propelled or permanently towable by a light duty truck; and
  4. Designed primarily not for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.
- **SPECIAL FLOOD HAZARD AREA –** The land in the floodplain within a community subject to a one percent or greater chance of flooding in any given year, i.e., the 100-year floodplain.
- **START OF CONSTRUCTION** for purpose of Section 11-103: *Development in Areas Subject to Flood Hazards* means the date the Building Permit was issued, if actual start of construction, repair, reconstruction, placement or other improvement was within 180 days of the permit date. Actual start of construction means either the first placement of permanent construction of a structure on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of roads and/or walkways; nor does it include excavation for a basement, footings, piers, or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as detached garages or sheds not occupied as residences or not part of the main structure; it includes substantial improvements.
- **STREAM CHANNEL** for purposes of Section 11-103: *Development in Areas Subject to Flood Hazards* means the area of the floodplain that carries the normal course of a river, stream or other watercourse.
- **SUBSTANTIAL IMPROVEMENT** for purposes of *Section 11-103: Development in Areas Subject to Flood Hazards*, means any repair, reconstruction or improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure either before the improvement or repair is started if the structure has been damaged, and is being restored, before the damage occurred. Substantial improvement is said to occur when the first alteration of any wall, ceiling, floor or other structural part of the building begins, whether or not that alteration affects the external dimensions of the structure. The term does not, however, include either any Project for improvement of a structure to comply with existing state or local health, sanitary or safety code specifications that are solely necessary to assure safe living conditions or any alteration of a structure listed on the National Register of Historic Places or the Colorado State Inventory of Historic Places.
- **VARIANCE -** A grant of relief to a person from the requirement of this ordinance when specific enforcement would result in unnecessary hardship. A variance, therefore, permits construction or development in a manner otherwise prohibited by this ordinance.
- **VIOLATION -** The failure of a structure or other development to be fully compliant with the floodplain regulations.
- **WATER SURFACE ELEVATION** means the height, in relation to the NGVD of 1929 (or other datum, where specified) of floods of various magnitudes and frequencies in the floodplains of riverine areas.

**FOREGROUND** means the areas within one-half mile on either side of a public road or trail.

**FORMER *GUNNISON COUNTY LAND USE RESOLUTION*** means the former edition of the *Gunnison County Land Use Resolution* in effect until the effective date of this *Resolution*.

**FRONTAGE** means the length of that property line of a parcel that abuts a public road or highway right-of-way or easement.

**GANG OF NINE** means that informal term often used to reference the standards of this *Resolution* that are required to be met by all land uses pursuant to Section 1-106: *Partially Exempted Land Use Changes*.

**GARAGE** means a secondary structure (or part of a structure) for housing automobiles and other vehicles, but not including a commercial or industrial repair shop where cars and trucks are serviced and repaired.

**GEOLOGIC HAZARD** means a geologic phenomenon that conflicts with construction or land use so as to constitute a significant hazard to public health, safety, or to property, including, but not limited to, avalanches, landslides, rockfalls, alluvial fans, talus slopes, steep, unstable, or potentially unstable slopes, Mancos shale, mudflows, and faults. For purposes of this *Resolution*, the following definitions shall apply:
- **ALLUVIAL FAN** means a sloping, wedge-shaped deposit of loose rock, earth, and vegetative debris near or at the junction of a smaller stream with a larger stream valley, or where the gradient of a stream abruptly decreases. It is created by a debris flow, that is the downstream or down slope propulsion of rocks, vegetative matter, and other materials in a watery, muddy slurry.
- **DEBRIS FLOW** means an event of rapid movement of mud and fine-grained earth materials in which more than one-half

BLM_0053927

the solids in the mass are larger than sand grains (including rocks, stones and boulders).

- **FAULT** means a crack or fracture in the earth's surface. A fracture or zone of fractures in the earth's surface along which there has been displacement of the sides relative to one another, parallel to the fracture.
- **LANDSLIDE HAZARD AREA** means an area where falling, slipping, or mass movement of land occurs due to a distinct surface rupture or zone of weakness. Landslides include slope failure complexes, debris slides, bedrock slides, and areas of accelerated soil creep.
- **MANCOS SHALE** means the material comprised of clays, silts, and thin layers of sand deposited during the Cretaceous Epoch, that is commonly found in areas within Gunnison County.
- **MUDFLOW HAZARD AREA** means an area subject to rapid movement of mud and fine-grained earth materials that flow down a stream, ravine, canyon, or gulch after a heavy rainfall or snowmelt runoff. Such an area is formed by successive episodes of deposition of mud and fine-grained materials. If more than one-half of the solids in the mass are larger than sand grains (including rocks, stones, and boulders) then the event is a debris flow and the area is an alluvial fan.
- **POTENTIALLY UNSTABLE SLOPE** means any slope with most of the attributes of an unstable slope, but where a past or present slope failure is not apparent.
- **ROCKFALL HAZARD AREA** means an area of either active or potential falling, rolling, or sliding of large bedrock blocks or rocks.
- **TALUS SLOPE** means an area of potential rockfall and small, localized debris flows.
- **UNSTABLE SLOPE** means a slope with landslide/earthflow physiography, where recent slope movement may not be apparent or is uncertain. Such an area may have undergone slope movement in the recent geologic past and may be susceptible to landslide, mudflow, rockfall or accelerated creep of slope-forming materials.

**GRADE, FINISHED** means the elevation of the finished ground after construction, filling or excavation.

**GRADE, NATURAL** means the elevation of the ground level in its natural state, before construction, filling or excavation.

**GRADE PLANE** means a reference plane representing the average of finished ground level adjoining the building at exterior walls. Where the finished ground level slopes away from the exterior walls, the reference plan shall be established by the lowest points within the area between the building and the lot line or, where the lot line is more than six feet from the building, between the building and a point six feet from the building.

**GRADING** means any excavating or filling of earth materials or any combination thereof.

**GRAVEL PROCESSING** means any activities associated with the preparation of gravel and associated materials for use. These activities include on-site transport, crushing, screening, washing, storing, slabbing, polishing, grinding, and concrete or asphalt mixing or other such action, exclusive of extraction.

**GROUND-SOURCE HEAT PUMP** means a mechanical device, with a closed loop system, that operates by pumping heat, and that uses the earth as a heat source.

**GROUP HOME** means a residential building that is owned and operated by a nonprofit organization, or is owned and operated by a individual or group of individuals who actually reside in and maintain their primary place of residence at the group home, that:

- **IS OCCUPIED BY ELDERLY PERSONS** Is occupied by not more than eight persons who are 60 years of age or older who do not require skilled or intermediate care facilities; or
- **IS OCCUPIED BY DEVELOPMENTALLY DISABLED PERSONS** Contains a state- licensed facility for the exclusive use of not more than eight persons who are developmentally disabled due to their having cerebral palsy, multiple sclerosis,  mental retardation, autism, epilepsy or similar afflictions; or
- **IS OCCUPIED BY MENTALLY ILL PERSONS** Contains a state-licensed facility for the exclusive use of not more than eight persons who have been screened by a mental health professional and have been determined to be mentally ill.

**GUEST HOUSE.** See "Residence."

**GUNNISON COUNTY HOUSING AUTHORITY** means the agency of Gunnison County created pursuant to C.R.S. 29-4-503 *et seq.*

**GUNNISON SAGE-GROUSE HABITAT** means areas that are mapped as habitat for Sage-grouse as defined by the Gunnison Basin Gunnison Sage-grouse Habitat Prioritization Tool (Gunnison Basin Sage-grouse Strategic Committee 2012), as may be amended by the Gunnison Basin Sage-grouse Strategic Committee, with final approval by the Gunnison County Board of County Commissioners.

**GUNNISON SAGE-GROUSE RANGEWIDE CONSERVATION PLAN** means the document titled the *Gunnison Sage-grouse Rangewide Conservation Plan, Gunnison Sage-grouse Rangewide Steering Committee, Colorado Division of Parks and Wildlife, Denver, Colorado, 2005*, as may be amended and accepted by resolution of the Board. If not listed specifically within this *Resolution*, definitions related to the Gunnison Sage-Grouse shall be as specified in the *Gunnison Sage-grouse Rangewide Conservation Plan*.

BLM_0053928

**HAZARD** means a significant source of potential risk, danger, or peril resulting from natural phenomena or conditions, and including those precipitated or caused by activities of man.

**HAZARDOUS MATERIAL** means any substance or material that, because of its toxic, caustic, corrosive, abrasive, explosive, biohazardous or otherwise injurious properties, may be detrimental or deleterious to the health of the environment or any person handling or otherwise being exposed to such material or substance.

**HELIPAD** means any area of land, water or structure that is designed or used, temporarily or permanently, as a takeoff/landing area for helicopters.

**HELISPOT** means a helipad that does not contain any auxiliary facilities.

**HIGHWAY** means state and federal highways and major county arterials.

**HISTORIC RESOURCE.** See "Archeological, Historic or Cultural Resource."

**HOME OCCUPATION** means the conduct of a business, occupation, or trade in a residence or within another structure on the property on which a residence is located, that is incidental and secondary to the residential use and does not change the residential character of the property.

**HOMEOWNERS' OR PROPERTY OWNERS' ASSOCIATION** means an association of home or property owners within a development created to govern a subdivision, condominium or other development; powers of the association include the setting and collection of assessments from the members of the association, the control and maintenance of common areas, and the enforcement of protective covenants.

**HORSES, BOARDING OF** means the stabling, feeding, and grooming for a fee or the renting of stalls or stables for the care of horses not belonging to the owner of the property, including related facilities.

**HORSE/HAY SHED** means a detached secondary structure used for the keeping of livestock and/or storage of hay, not intended for human habitation.

**HORSE TRAINING AND PERFORMANCE FACILITIES** means those facilities that may or may not be directly integrated with stalls, stables or the general care of horses, but that include facilities including, but not limited to, training and performance arenas, corrals, and exercise tracks and that are rented to, or otherwise provide services for, the general public.

**HOUSEHOLD,** for the purposes of Essential Housing, means one person living alone or two or more persons sharing residency whose income, time of residency and place of employment are considered to determine eligibility and housing payment requirements for Essential Housing.

**HOTEL, MOTEL, LODGE** means a building designated, intended or used for rental occupancy as the transient or temporary lodging place of five or more people who are lodged with or without meals.

**IMPACT** means the direct or indirect effect or consequence that development has upon land, the environment, wildlife, neighborhood property use or the community. It includes physical, environmental, biological, health, economic, visual, aesthetic, historical, auditory, or social effects or consequences, whether beneficial or harmful.

**IMPACT AREA** means those geographic areas, including the development area, in which any impacts are likely to be caused by a proposed Project. The impact area may be located either within the County and/or within an adjoining jurisdiction, provided that areas within an adjoining jurisdiction will be considered only if such jurisdiction has entered into an agreement with Gunnison County under which it will cooperate in regulating development that may impact both jurisdictions.

**IMPERVIOUS COVER OR MATERIALS** means a surface that does not readily allow water to infiltrate into the ground, including, but not limited to, roof, roadway or parking area surfaces.

**IMPROVEMENTS** means an addition to or enhancement of property or its condition, amounting to more than mere repairs or replacement, including, but not limited to, structures, infrastructure, habitat compensation, restoration, reclamation, general landscaping, or such other installations as may be designated by the County.

**INCIDENTAL TO** means affiliated with or dependent on the principal use.

**INDIVIDUAL SEWAGE DISPOSAL SYSTEM** means an absorption system of any size or flow, or a system or facility for collecting, storing, treating, neutralizing, stabilizing, or disposing of sewage that is not a part of or connected to a wastewater treatment system.

**INDUSTRIAL** means any establishment engaged in the commercial processing, fabrication, alteration, or manufacture of raw or semi-processed materials, manufactured goods, or any components thereof.

BLM_0053929

**INDUSTRIAL OR BUSINESS PARK** means a group of industrial or commercial uses clustered within a single development, either on subdivided, separately-owned lots, or on a lease or rental basis.

**INFILTRATION** means the downward movement of water from the surface to the subsoil. Infiltration rate is typically expressed as inches per hour.

**INFRASTRUCTURE** means basic facilities, services, installations or systems needed for the development, support or efficient operations of the county, or developments within it, including, but not limited to, highways, roads, bridges, airports, public transit, sanitary and storm sewers, culverts, sidewalks, parks, trails, drainage, water supply and wastewater treatment systems, lighting, gas, cable television, lighting and electrical utilities.

**INHOLDING** means a parcel of government-owned or privately-owned land, including subsurface rights of such owners underlying public lands or a valid mining claim or other valid occupancy that, as of the effective date of this *Resolution*, is within or effectively surrounded by one or more areas in the National Wilderness Preservation System.
- **EFFECTIVELY SURROUNDED** for purposes of the definition of "inholding," means that at least two-thirds of the boundary of the inholding is adjacent to an area in the National Wilderness Preservation system. In the case of adjacent private parcels, the measurement shall not include the boundary between the private parcels.

**IRRIGATED MEADOW** means any artificially- or naturally-irrigated land used as pasture for the growing of hay, grain, or other crops.

**IRRIGATION DITCH** means a naturally occurring or artificially constructed channel used to carry water from a stream, lake, reservoir, or other source to agricultural or other lands for the purpose of watering crops, forage, or livestock.

**KENNEL** means a structure or enclosed area used to house domestic animals.

**KITCHEN** means any room in a structure containing all of the following facilities: stove or cooktop, refrigerator, sink and conventional oven.

**LANDSCAPE** means improvement to an area of land by the planting and maintenance of trees, shrubs, or ground cover, and/or non-vegetative materials

**LAND USE** means the purpose for which any land, building, or structure is designed, maintained, renovated, occupied, or used, the basic character or nature of the occupation or utilization of land or a building.

**LAND USE CHANGE** means any development, grading, construction, activity, or ongoing operation that changes the basic character, configuration, or use of the land or environment on which the activity occurs, including any division of land. The following activities are among those requiring the applicant to obtain a Land Use Change Permit pursuant to this *Resolution*:
- **BUILDING ACTIVITY:** The construction, reconstruction, conversion, expansion, or structural alteration, relocation, or enlargement of structures, or accessory structures.
- **CHANGE IN USE:** Any activity resulting in a change in use, or the intensity of use, or expansion of the sizes or numbers of structures or the amount of land affected by a use.
- **DRIVEWAY:** The proposed or actual cutting or construction of a driveway that is determined by the Gunnison County Director of Public Works or the Community Development Department to require review pursuant to Section 3-111: B.1.: *Additional Criteria.*
- **MINING, DREDGING, DRILLING, GRADING OR DRAINING:** The mining, dredging, drilling for gas or oil, or grading or draining activities.
- **ROAD CUTTING OR CONSTRUCTION:** The cutting or construction of any road, including roads constructed by or for a governmental entity, or roads constructed pursuant to a permit issued by a state or federal agency. Agricultural roads that are part of an agricultural operation as defined by this *Resolution* are not land use changes and do not require a Land Use Change Permit.
- **SUBDIVISION:** The subdivision of a parcel of land into two or more parcels or divisions, except for those divisions that are excluded from the definition of subdivision (see definition of "Subdivision"), or by Colorado statutes.

**LAND USE CHANGE PERMIT** means written approval of a Land Use Change Permit application by resolution, certificate, or other designated form of the Board, Planning Commission, or Community Development Director that sets forth in detail the terms and conditions of the final approval of an application for a Land Use Change Permit.

**LEGAL ACCESS** means the physical access recognized by law, from the state highway system to the subject lot.

**LEGAL DESCRIPTION** means a written metes and bounds description created by a surveyor registered in the State of Colorado, or a lot, block or tract description of a parcel of land for perpetuating location and title.

**LEGAL LOT** means a lot, parcel or tract of land that meets the definition of a "subdivision," or "subdivided land" as defined in C.R.S. 30-28-101 (10) (a) as it may be amended, or that is one of the exceptions to the definition of

BLM_0053930

"subdivision" or "subdivided land" set out in the definition of "Subdivision or Subdivided Land" in C.R.S. 30-28-101 (10) (b), (c) or (d) as they may be amended, and that was created pursuant to all applicable laws, ordinances and regulations in effect at the time of its creation, and the legal description of which was recorded at the time of its creation in the records of the Clerk and Recorder of Gunnison County. A parcel as mapped for tax assessment records is not necessarily a legal lot.

**LEK** means an arena where male Sage-grouse display for the purpose of gaining breeding territories and attracting females. These arenas are usually open areas with short vegetation within sagebrush habitats, usually on broad ridges, benches, or valley floors where visibility and hearing acuity are excellent.

**LIGHT INDUSTRIAL** means any establishment engaged in the commercial processing, fabrication, alteration, or manufacture of raw or semi-processed materials, manufactured goods, or any components thereof; and conforming to *Section 9-301:E.: Design Standards for Light Industrial Uses.*

**LIGHTING** means the use of light fixtures to illuminate. For purposes of this *Resolution*, the following specific definitions shall apply:
- **BULB** means the source of electric light. To be distinguished from the whole assembly (See Luminaire).
- **DOWN-DIRECTED** means the shielding and alignment of light fixtures so that the light source points downward, 45 degrees or less from vertical, rather than horizontally, or upward.
- **FIXTURE** means the assembly that holds the lamp in a lighting system. It includes the elements designed to give light output control, such as a reflector (mirror) or refractor (lens), the ballast, housing, and the attachment parts.
- **FLOODLIGHTS (AND SPOTLIGHTS)** means those lighting fixtures defined as having a full beam width or beam spread of less then 110 degrees; any lamp that incorporates a reflector or a refractor to concentrate the light output into a directed beam in a particular direction.
- **CUTOFF ANGLE** means the angle formed by a vertical downward line from a light source and the line beyond which no direct light is emitted because of the fixture.
- **FIXTURE** means the assembly that houses a lamp or lamps, and which may include a housing, a mounting bracket or pole socket, a lamp holder, a ballast, a reflector or mirror, and/or a refractor, lens, or diffuser lens.
- **FULL CUTOFF** means a light fixture that directs light down onto only the surface that needs to be lit. "Cut-off" light fixtures avoid glare, and the light source from being visible from adjoining properties or roads.
- **GLARE** means light emitted from a luminaire with intensity great enough to produce annoyance, discomfort, or a reduction in a viewer's ability to see.
- **LUMINAIRE** means a complete lighting system, including a lamp or lamps and a fixture.

**LOADING DOCK** means an off-road portion of a lot used for the temporary parking of a commercial vehicle while loading or unloading materials. Such space shall be designed to allow an adequate vehicle turning radius, and shall not obstruct or endanger pedestrian, bicycle, or vehicular traffic.

**LONG-TERM RENTAL** means rental of a residence for six months or longer.

**LOT** means a parcel or tract of land. Also, see "Legal Lot."

**LOT AREA** means the number of sq. ft. included within the boundaries of a lot measured on a horizontal plane, exclusive of any area within a public or private road or road easement.

**LOT CLUSTER** means the vacation of the line(s) between adjacent lots that are commonly owned.

**LOT LINE** means any boundary of a lot.

**LOW VOC INTERIOR PAINT** means interior paint that contains less than 250 grams volatile organic compounds per liter in solution.

**MAJOR FACILITY OF A PUBLIC UTILITY** means a central office building of a telephone utility; a transmission line, power plant, or substation of an electrical utility; or a pipeline or storage area of a utility providing natural gas or other petroleum derivatives.

**MAJOR IMPACT PROJECT** means a land use change classified as a Major Impact Project pursuant to Article 7: *Major Impact Projects.*

**MANUFACTURE** means to make or process a raw material into a finished product.

**MANUFACTURED HOME** means a single family residence that:
- Is partially or entirely manufactured in a factory; and
- Is not less than 24 feet in width and 36 feet in length; and
- Is installed on an engineered permanent foundation; and
- Has brick, wood, or cosmetically equivalent exterior siding and a pitched roof, and,
- Is certified pursuant to the "National Manufactured Standards Act of 1974," 42 U.S.C. 5401 *et seq:* as amended.

BLM_0053931

**MATTER OF STATE INTEREST** means an area of state interest or an activity of state interest, or both, as listed in C.R.S. 24-65.1 - 201(1), through -203 (1).

**MAXIMUM EXTENT FEASIBLE** means that all practical efforts to comply with the regulations or minimize potential harm or adverse impacts have been undertaken and that no feasible and prudent alternative exists. Economic factors may be taken into account but shall not be the overriding or dispositive factor in determining whether no feasible and practical alternative exists in a particular situation.

**MINERAL** means any inanimate constituent of the earth in either solid, liquid, or gaseous state including coal, oil, natural gas, oil shale, sand, gravel, quarry aggregate, limestone, and metals that, when extracted from the earth, are usable in their natural form or are capable of conversion into usable forms as metals, metallic compounds, chemicals, energy sources, or raw materials for manufacturing or construction. This term does not include surface or ground water subject to appropriation under the laws of the State of Colorado.

**MINERAL RESOURCE** means a natural deposit of mineral located in sufficient concentration in veins, deposits, bodies, beds, seams, fields, pools, or otherwise and that, under present or reasonably foreseeable technological and economic conditions, is or will be capable of economic recovery.

**MINERAL RESOURCE AREA** means any area in Gunnison County in which there has been significant mining activity in the past, there is significant mining activity in the present, mining development is planned or in progress, or mineral rights are held by mineral patent or valid mining claim with the intention of mining.

**MINING EXPLORATION** means the excavation of an exploratory shaft, adit or decline, and the removal of a limited amount of material for the purpose of testing. For purposes of this *Resolution*, it does not include exploration carried out underground involving the construction of new, or expanding the dimensions of existing mine workings, or the reopening of underground mine workings by the removal of fixed or permanently fastened caps, or involving the excavation of backfilled shafts or portals, or activity that may alter, destroy, remove or impair any rehabilitation work made in accordance with a reclamation plan approved by the Colorado Division of Minerals and Geology.

**MINING OPERATIONS** means the commercial development or extraction of a mineral or construction materials, or drilling of oil, gas or other wells for purpose of extraction, and any construction associated with mining, pre-development exploration, including associated blasting operations. The term shall include underground mining, open pit mining, strip mining, surface operations, the disposal of mining wastes, concentration of ores, milling, evaporation, and other processing, mine wastes and tailings, and construction and use of accessory office and storage buildings; and transportation. It does not include the extraction of construction materials used on one or more parcels used for the agricultural operations of a single owner or operator.

**MINOR IMPACT PROJECT** means those land use changes classified as Minor Impact Project pursuant to Article 6: *Minor Impact Projects*.

**MITIGATION** means the following actions, prioritized in order of preference:
- **AVOIDING IMPACTS** Avoiding an impact by not taking a certain action or parts of an action; or
- **MINIMIZING IMPACTS** Limiting the degree or magnitude of the action or its implementation, or by changing its location; or
- **RECTIFYING IMPACTS** Repairing, rehabilitating, or restoring the impact area, facility or service; or
- **REDUCING OR ELIMINATING IMPACTS** Reducing or eliminating the impact over time by preservation and maintenance operations; and
- **COMPENSATING FOR IMPACTS** Compensating for the impact by replacing or providing equivalent biological, social, environmental and physical conditions, or a combination thereof.

**MOBILE HOME** means a detached, single-family residence that has all the following characteristics: It is designed for long-term occupancy and has sleeping accommodations, a flush toilet, a tub or shower bath and kitchen facilities, and that has plumbing and electrical connections provided for attachments to outside systems. It is designed to be transported after fabrication, on its own wheels, or on a flatbed or other trailer, or on detachable wheels. It arrives at the site where it is to be occupied as a complete unit and is ready for occupancy except for minor and incidental unpacking and assembly operations, location on foundation support or jacks, underpinned and connections to utilities. It exceeds eight feet in width and 32 feet in length, excluding towing gear and bumpers. It is without motive power. It is also referred to as a "single-section" manufactured home, and is designed to be used year-round.

**MOBILE HOME COMMUNITY** means any parcel of land for which the primary purpose is the placement of mobile homes in a community setting. A mobile home community may be developed either as a conventional "park," in which lots and/or homes are rented to residents, and/or as a subdivision, in which individual lots may be sold. A mobile home community does not include the use of land for the display and sale of mobile homes.

**MOBILE HOME LOT** means a plot of ground within a mobile home community designed for the accommodation of one mobile home with its accessory uses.

BLM_0053932

**MUNICIPAL OR INDUSTRIAL WATER PROJECT** means a system and all integrated components thereof through which any entity, political subdivision (including any municipality, county, or district) or an industrial user derives its water supply, whether directly or by exchange, and whether from surface or subsurface sources.

**MUNICIPALITY** means an incorporated statutory or home-rule city or town of the State of Colorado.

**MUNICIPAL THREE-MILE PLAN** means a master plan adopted by a municipality pursuant to C.R.S. 31-23-206 for the physical development of areas outside its boundaries. Also, see "Three-Mile Plan."

**NATURAL HAZARD** means a natural phenomenon that so conflicts with construction or land use as to constitute a significant hazard to public health and safety, or to property, including but not limited to, geologic hazards, flood hazards, and wildfire hazards.

**NATURAL HAZARD AREA** means an area containing or directly affected by a natural hazard as sometimes designated on quadrangle mapped overlays in the Community Development Department, or available in the Gunnison County MIS Department.

**NEIGHBORHOOD** means an area or locality characterized by similar or compatible land uses, that may be identified by a place name and/or has boundaries composed of major streets, distinct changes in land use and/or land formations, topography or water bodies.

**NET EFFECT OR NET IMPACT** means the impact of an action after mitigation; includes social, economic, physical, health, biological (including, but not limited to, effects on natural resources and on the structure and function of affected ecosystems), aesthetic, and historical effects.

**NONCONFORMING USES** means those uses addressed in Section 1-108: *Nonconforming Uses*.

**NON-MOTORIZED TRANSPORTATION WAY** means that area within a road, whether paved, graveled or otherwise surfaced, suitable for bicycle, wheelchair, pedestrian, and, as applicable, equestrian travel.

**NOXIOUS WEEDS** means the non-native plant species including certain grasses that have been introduced into an environment with few, if any, natural biological controls, thus giving them a distinct competitive advantage in dominating and crowding out native plant species, and the ability to dominate plant communities to the extent plant diversity and ecosystem integrity is threatened.

**NUISANCE** means an activity that arises from the unreasonable, unwarranted or unlawful use of property, working obstruction or injury on the right of another of another, or on the general public.
- **MIXED NUISANCE** is one that is both public and private in its effects.
- **PRIVATE NUISANCE** is a wrongful interference with a person's interest in the private use and enjoyment of land.
- **PUBLIC NUISANCE** includes "public nuisance" as defined in C.R.S. 16-13-301 *et seq.*

**OBTRUSIVELY VISIBLE STRUCTURE** means a structure or part of a structure that stands out in the context of its surroundings or that draws attention to itself.

**ON-DEMAND HOT WATER PUMP** means a recirculating pump that brings hot water quickly to a faucet when needed, is installed between the hot and cold water lines at the faucet farthest from a water heater, and shuts off once hot water has filled the line.

**OPEN SPACE** means any open, essentially unimproved parcel or area of land (including, but not limited to, grazing lands) that is specifically set aside, dedicated, designated, or reserved for public or private use or enjoyment for park, agricultural, recreation or conservation purposes, or reserved for such uses and enjoyment by residents and/or the general public.

**ORDINARY HIGH WATER LINE OR MARK** means the high line of a water body or mudflow established by the fluctuations of water on the flow of mud and indicated by physical characteristics including, but not limited to, a clear natural line impressed on the bank, shelving, changes in the character of the soil, destruction of terrestrial vegetation, and the presence of litter or debris.

**ORIENTED STRAND BOARD** means engineered, mat-formed panel products made of strands, flakes or wafers sliced from small-diameter, round wood logs and bonded with an exterior-type binder under heat and pressure.
- **ORIENTED STRAND BOARD PANELS** means layered mats of oriented strand boards; exterior or surface layers consisting of strands aligned in the long panel direction; and inner layers consisting of cross- or randomly-aligned strands.

**PARCEL** means a tract or lot of land. Also, see "Legal Lot."

**PARK** means a public or private parcel of land devoted primarily to outdoor recreation or scenic purposes.

**PARKING AISLE** means the traveled way by which cars enter and depart parking stalls or spaces.

BLM_0053933

**PARKING AREA** means an area other than a road or alley that is permanently reserved and maintained for the parking of motor vehicles on a temporary (daily or overnight) basis.

**PASSIVE SOLAR SPACE HEATING** means a heating system that includes all of the following:
- The use of integral building components to capture the sun's energy; and
- A means of collection of the sun's energy; and
- Absorption of the solar gain into a mass capable of storing the heat such as concrete, rock or water; and
- Control of the system by convective venting, circulating fans or shading.

**PERMANENT POPULATION** means the permanent population of Gunnison County, as determined by the State of Colorado.

**PERMIT** means any written authorization issued by Gunnison County and recorded by a document in the Office of the Gunnison County Clerk and Recorder or otherwise issued by the appropriate County Department, or issued in accordance with the requirements of Colorado or federal agencies.

**PERSON/PERSONS** means any individual, partnership, corporation, association, company, or other public or corporate entity, including the state or federal governments, and any of their political subdivisions, agencies, instrumentalities.

**PIPELINE** means any conduit or pipe and appurtenant facilities especially designed for, or capable of, transporting water, or gas or other petroleum derivatives.

**PLANNING COMMISSION** means the Gunnison County Planning Commission.

**COMMUNITY DEVELOPMENT DEPARTMENT** means those employees of Gunnison County who have been designated by the Board to implement, administer, and enforce the requirements of this *Resolution*.

**COMMUNITY DEVELOPMENT DIRECTOR** means the Director of the Gunnison County Community Development Department or his/her authorized designee.

**POLLUTANT** means a material or substance that contaminates air, soil or water.

**POPULATION CENTERS** means the communities of Somerset, Ohio City, Almont or Crested Butte South and the incorporated municipalities of Gunnison, Crested Butte, Mt. Crested Butte, Pitkin or Marble.

**POWER PLANT** means any electrical energy generating facility including, but not limited to, pumped storage facilities with a generating capacity of ten megawatts or more, and any facilities appurtenant to any existing power plant, or any addition thereto, increasing the existing design capacity of the facility by ten megawatts or more.

**PRIMARY STRUCTURE** means the chief or principal structure. In the case of multiple residences or mixed-use structures, the largest residence.

**PRIMARY USE** means the primary purpose or function for which a parcel is used.

**PRIVATE POWER PROJECT** means a complex of structures, machinery and associated equipment for generating electricity or providing natural gas or other petroleum derivatives, that is not part of a public utility.

**PROJECT** means any activity that is a land use change. (Also, see "Land Use Change.")

**PROPOSED SPECIAL DEVELOPMENT PROJECT** means a development including all of its components and associated elements, as defined in the *Gunnison County Special Development Projects Regulations*.

**PUBLIC HEARING** means a public meeting, conducted by the applicable body pursuant to Sections 3-112: *Notice of Public Hearing* and 3-113: *Conduct of Public Hearing*, with the principal purpose of receiving testimony or public comment on a specific application or issue.

**PUBLIC MEETING** means any meeting open to the public that meets the requirements of C.R.S. 24-6-401 *et seq.*

**PUBLIC ROAD** means the following; the status of a road as a public road does not require nor imply that the Board shall maintain, repair or snowplow it:
- All roads over private lands dedicated to the public use by deed to that effect, filed with the Office of the Gunnison County Clerk and Recorder when such dedication has been accepted by the Board; and
- All roads over private or other lands dedicated to public uses by due process of law, including a subdivision plat approved by Gunnison County and recorded in the Office of the Gunnison County Clerk and Recorder; and
- All roads over private lands that have been used adversely without interruption or objection on the part of the owners of such lands for 20 consecutive years; and
- All toll roads or portions of them that may be purchased by the Board from the incorporators or charter holders of them, and thrown open to the public; and

BLM_0053934

- All roads over the public domain, whether agricultural or mineral.

**PUBLIC SERVICES AND FACILITIES** means those services and facilities provided by a public entity or public utility (including, but not limited to, any municipality, county, or special district) including, but not limited to, roads, trails, schools, wastewater treatment, water treatment and distribution, solid waste disposal, storm drainage, health care, law enforcement, fire protection, emergency medical services, social services, recreational services, libraries, and government and administrative services, facilities, and personnel, cultural facilities, public transportation, electric, gas, and telephone utilities.

**PUBLIC UTILITY** has the meaning set forth at C.R.S. 40-1-103.

**PUBLIC WORKS DIRECTOR** means the Director of the Gunnison County Public Works Department or his/her authorized designee.

**QUALIFIED HOUSEHOLD** means a household that earns less than 120 percent of the AMI as qualified by the Gunnison County Housing Authority.

**RADON MITIGATION** means the installation of a vapor diffusion retarder and connection to the vent pipe in a structure.
- **RADON MITIGATION, ROUGH-IN** means the installation of a vent pipe from a crawl space up through the roof of a structure.

**RANCHING** means the practice of raising cattle, horses, sheep, and other livestock in a manner traditional to Gunnison County, and all associated activities, including, but not limited to, irrigation, raising of associated crops, and storage. Ranching shall not include large confined animal feeding operations of a scale not traditionally found in Gunnison County.

**RECLAMATION** means the construction of topographic, soil and plant conditions after disturbance, which may not be identical to the site before it was disturbed, but which permits the disturbed site to function adequately in the ecosystem of which it was and is a part.

**RECORDED, OR RECORDATION** means recorded with the records of the Office of the Gunnison County Clerk and Recorder.

**RECREATION, ACTIVE** means leisure-time activities that are typically of a formal nature and are performed with others, usually requiring equipment and taking place at prescribed places, sites, or fields.

**RECREATION, PASSIVE** means leisure-time activities that involve relatively inactive or less energetic activities, including, but not limited to, walking, sitting, picnicking, nature observation, sun-bathing, card and board games.

**RECREATIONAL DEVELOPMENT** means any development whose primary purpose it is to serve a tourist or other recreational clientele, whether as a destination or day-use facility, long or short-term, and whether it is single or multiple-use in nature.

**RECREATIONAL VEHICLE** means a vehicle primarily designed as temporary living quarters for recreational, camping, or travel use, that either has its own motive power or is mounted on or drawn by another vehicle including a travel trailer, camping trailer, truck camper, and motor home.

**RECREATIONAL VEHICLE PARK** means a parcel of land upon which two or more recreational vehicle sites are located, established, or maintained for occupancy by recreational vehicles of the general public as temporary living quarters for recreation or vacation purposes.

**RECYCLED CONTENT SIDING OR ROOFING** means roof materials that contain high percentages of recycled content.

**RECYCLED CONTENT SHEATHING** means oriented strand board used for sheathing.

**RECYCLED INSULATION** means insulation material that includes recycled material including, but not limited to, cotton or rock wool insulation.

**RECYCLED PLASTIC DECK MATERIAL** means material made from recycled polyethylene plastic such as milk jugs and other bottles.

**REHABILITATION** means the process of making an ecosystem healthy again after a disturbance, and involves the recovery of ecosystem functions and processes in a degraded habitat. Rehabilitation does not necessarily reestablish the site to its predisturbed condition, but does involve establishing geologically and hydrologically stable landscapes that support the natural ecosystem.

BLM_0053935

**RESIDENCE** means a structure or any part of a structure designed for residential purposes having one or more rooms, not more than one kitchen, and at least one bathroom, that is designed for long-term occupancy by one or more persons for living and sleeping purposes, and that may or may not be placed on a permanent foundation. In addition, residences includes factory-built housing, and alternative construction including, but not limited to, yurts, tepees, or plastic units that comply with the requirements of this *Resolution*, and, as applicable, with standards of the applicable building code, adopted and amended by Gunnison County. Vehicles, excluding mobile homes, but including recreational vehicles, shall not be considered to be habitable residences.

- **DETACHED SECONDARY RESIDENCE** means a secondary residence that is physical separate from the primary residence.
- **DUPLEX** means a single building that contains two residences.
- **INTEGRATED SECONDARY RESIDENCE** means a secondary residence that is structurally integrated within, and has an internal access to a single family residence.
- **MULTIPLE-FAMILY RESIDENCE** means a building that contains three or more residences, but not including hotels, motels, or lodges.
- **PRIMARY RESIDENCE** means the largest single-family residence on a parcel.
- **SECONDARY OR ACCESSORY RESIDENCE** means a residence that is an accessory structure to a primary residence, except this shall not include a secondary structure intended only for sleeping, pursuant to *Section 9-101: Uses Secondary to a Primary Residence*.
- **SINGLE-FAMILY RESIDENCE** means a building that contains one residence.

**RESIDENTIAL LIVING AREA** means one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by Section 9-101: *Uses Secondary to a Primary Residence.*

**RESORT (INCLUDING INNS, LODGES, DUDE RANCHES AND GUEST RANCHES)** means those establishments used for housing and providing either organized entertainment or recreational opportunities for overnight lodging, generally several nights in duration. This type of facility either provides all recreational opportunities on-site, or as part of an organized or duly licensed and/or permitted recreational activity on public or private lands in the vicinity of the inn, lodge or guest ranch.

**RESTORATION** means the reestablishment of a structure and function of an ecosystem after a disturbance. Ecological restoration is the process of returning an ecosystem as closely as possible to the conditions and functions before it was disturbed.

**RETENTION** means the practice of holding or directing storm water except that portion evaporated or bypassed in an emergency, in or to a given area so that all the storm water will be infiltrated into the subsoil.

**RETENTION POND** means a recharge basin that is designed to infiltrate all of the storm water it receives and that normally has no outflow.

**RETENTION STRUCTURE** means a permanent structure that provides for the storage of storm water run-off by means of a permanent pool of water.

**REVIEW AGENCIES** means any agencies or persons who, in the opinion of the Community Development Department, Planning Commission, or the Board, may be affected by a proposed land use change, or from whom it is reasonably necessary to request relevant information or analysis concerning the potential impacts of the land use change. These agencies include:

- The applicable school district;
- Any community or municipality likely to be affected by the proposal;
- Utility, local improvement and service districts, and ditch companies, when applicable;
- The Colorado State Forest Service
- The United States Forest Service, Bureau of Land Management, or National Park Service, when applicable;
- The appropriate local Natural Resources Conservation Office/Soil Conservation Service Board;
- The Colorado Department of Public Health and Environment;
- The Colorado Division of Minerals and Geology;
- The Colorado Division of Water Resources;
- The Colorado Division of Parks and Wildlife;
- The Colorado Department of Transportation;
- The Gunnison County Trails Commission;
- The Gunnison County Historic Preservation Commission;
- The Gunnison County Emergency Services Office; and
- Other agencies, entities, and groups that the Community Development Department, Planning Commission, or Board may deem advisable.

**RIDGELINE** means the horizon line at the crest or shoulder or top of a ridge, hillside, or mesa at which the natural

BLM_0053936

ground and the sky appear to meet when viewed from any point on a ridgeline vantage, pursuant to Section 11-108: *Standards for Development on Ridgelines.*

**RIPARIAN AREA** means the area located between the water's edge of aquatic ecosystems (rivers, lakes, streams, ponds, springs and seeps) and upland areas, whose soils tolerate a high water table, provide sufficient moisture in excess of that otherwise available locally, and provide a moister habitat than that of contiguous floodplains and uplands. Riparian areas include groups of plants, animals and aquatic communities whose presence is either directly or indirectly attributed to water-influenced or water-related factors. Areas exempt from this definition are manmade agricultural structures and devices including irrigation ditches, sprinklers, and artificial ponds.

**RIVERINE** means relating to, formed by, or resembling a river (including tributaries), stream, brook or other watercourse.

**ROAD, HIGHWAY, STREET OR TRAIL** means an open way reserved for the passage, generally, of people, vehicles, animals and goods and includes trails and non-motorized ways.

**ROAD AND BRIDGE CONSTRUCTION SPECIFICATIONS, GUNNISON COUNTY** means the *Gunnison County Standards and Specifications for Road and Bridge Construction,* as it may be amended.

**ROADBED** means the graded portion of a highway, usually considered as the area between the intersections of top and side-slopes, upon which the subbase, base course, surface course and shoulders are constructed. Divided highways are generally considered to have two roadbeds.

**ROAD CONSTRUCTION** means construction, enlargement, or relocation of a road.

**RUN WITH THE LAND** means passing with the transfer of the land.

**RURAL** means the character of an area that is primarily agricultural, low-density residential, unimproved and open.

**SALVAGE (OR JUNK) YARD** means an area where waste or scrap materials are bought, sold, exchanged, stored, baled, packed, disassembled or handled, including, but not limited to, scrap iron and other metals, rubber tires and recyclable materials. A junk or salvage yard includes an auto wrecking yard, but does not include uses established entirely within enclosed buildings.

**SATELLITE DISH DEVICE** means a device for the reception or transmission of satellite signals, including, but not limited to, television, radio, telemetry, data communication, or any other signals that use free air space as a medium, whether for commercial or private use.

**SCREENING** means the general landscaping, vegetation, fencing or other design feature(s) used to mitigate or eliminate the visual impact of one land use from another.
- **FULLY SCREENED** means that a structure or other land use is not visible when viewed from a specified vantage point.

**SEASONAL USE** means use limited to those months when snow normally is not on the ground in Gunnison County, that is, the months of May through October inclusively.

**SECONDARY USE.** See definition of "Accessory or Secondary Use."

**SENSITIVE AREAS** means those areas identified by the Board that contain, or in which activity will have a significant impact on, human, historical, natural, environmental, cultural or archeological resources of great significance; a sensitive area shall be a specific geographic location that is defined with specific boundaries.

**SERVICE AREA** means the primary geographic area to be served by a proposed Project.

**SERVICE LINE** means a line whose principal purpose is to provide utility service to an individual customer or customers, from the distribution line or system to the point of common coupling between the utility and customer system. In electrical and gas utilities, the point of common coupling is generally the utility meter.

**SETBACK** means the required minimum horizontal distance between the location of structures or uses and the related front, side, or rear lot line as measured perpendicular to that lot line.

**SIGHT DISTANCE TRIANGLE** means the area on any corner parcel, where an area is kept clear of structures, fences or tall vegetation, to allow vehicle drivers an unobstructed view of traffic approaching on the intersecting road, highway or driveway.

**SIGN** means any placard, poster, billboard, advertising structure or inscribed surface, pattern or artificial lighting, pictorial or symbolic ornament, emblematic structure, banner, fluttering apparatus, or other visually communicative or expressive device that is visible from an out-of-doors position and is used to advertise or call the public's attention to any public, business, commercial, industrial, recreational or any other activity, object for sale or lease, person or

BLM_0053937

place, or to bear any kind of message. A sign includes any surface on which a name, text, device, signal, ornament, logotype, or advertising matter is made visible, but does not include a vehicle on which the name of a business appears, nor does it include the use of barns for inscription of a family name or brand, nor the normal painting of a residence. The meaning of "sign" shall also include any sign currently in disuse, but still visible from an out-of-doors position, and any frame or support structure erected specifically to support a sign.

- **CLUSTER SIGN**  means any sign identifying a business, commercial or industrial use and that provides one space per each business entity within the development to display an off-premise sign.
- **DIRECTIONAL SIGN** means any off-premise sign that directs the movement or placement of pedestrian or vehicular traffic to the subject use.
- **FLASHING SIGN** means any directly or indirectly illuminated sign either stationary or animated that exhibits changing natural or artificial light or color effects.
- **GROUND SIGN** means a sign supported by poles, uprights or braces extending from the ground but not attached to any part of a building.
- **ILLUMINATED SIGN** means a sign lighted by or exposed to artificial lighting, either by lights that are part of the sign, or by lights directed toward the sign.
- **OFF-PREMISE SIGN** means a sign advertising a business, product or service not on the parcel of land on which the sign is located.
- **WALL SIGN** means a sign attached to, painted on, or erected against a wall or roof of a building or other structure that extends no more than 18 inches from the wall surface upon which it is attached and whose display surface is parallel to the face of the building and does not exceed the height of the building on which it is mounted.

**SIGNIFICANT** means of considerable or substantial consequence.

**SIGNIFICANT NET ADVERSE EFFECT/IMPACT** means an impact of an action, after mitigation, which is considerable or substantial, and unfavorable or harmful; includes social, economic, physical, health, aesthetic and historical impacts, and biological impacts including but not limited to, effects on natural resources or the structure or function of affected ecosystems.

**SITE DISTURBANCE** means activity that changes the surface of a site, including, but not limited to, grading, tree-cutting, removal of vegetation, and cutting and filling of materials.

**SITE PLAN** means an accurately scaled development plan that illustrates the existing conditions on a land parcel and graphically and visually depicts the details of a proposed development. (Illustrated in Appendix Figure 1: *Site Plan Example*.)

**SITE-SPECIFIC DEVELOPMENT PLAN (SSDP)** means a plan describing with reasonable certainty the type and intensity of use for a specific parcel or parcels of land that has received a Land Use Change Permit from Gunnison County.

**SLOPE** means the gradient of the ground surface. Slope is determined by dividing the horizontal distance or "run" of the slope into the vertical distance or "rise" of the same slope and converting the resulting figure into a percentage value. For purposes of regulation and measurement, a slope must involve an elevation change of at least ten feet within a horizontal distance of at least 30 feet.

**SOLAR-GENERATED ELECTRICITY** means the production of electric current in a solid material with the aid of sunlight by direct conversion of light into electricity by use of photovoltaic (PV) cells.

**SOLAR HOT WATER HEATING SYSTEM, ACTIVE** means a heating system that employs pumps and controllers to capture solar energy that includes all of the following:
- Collector(s) to capture solar energy; and
- Circulation system to move a fluid between the collectors to a storage tank; and
- Storage tank; and
- Backup heating system; and,
- Control system to regulate the overall system operation.

**SOLAR HEATING SYSTEM, PASSIVE** means a passive system to capture solar energy that uses natural convection or water pressure to circulate water through a solar collector to a storage tank or to the point of use.

**SOLID-FUEL-BURNING DEVICE** means a device designed for the combustion of solid fuels including, but not limited to, wood, coal, pulp, paper, pellets or similar nonliquid or non-gaseous materials so that usable heat is derived for the interior of a building, and includes solid-fuel-burning stoves, fireplaces or wood stoves of any nature, combination fuel furnaces or heaters that burn solid fuel, or any other device used for the burning of solid combustible material.
- **APPROVED NON-SOLID FUEL BURNING DEVICE** means a device that burns a non-solid fuel including natural gas, liquefied petroleum (LP), fuel oil, or similar fuel that has been approved by Underwriter's Laboratory, International Approval Services (IAS) or other approved laboratories. This includes gas logs permanently installed in a traditional open fireplace.

BLM_0053938

- **APPROVED SOLID FUEL BURNING DEVICE** means a device that is designed or intended to burn solid fuel and that is certified to meet the EPA Phase II particulate emissions rate standard by the U.S. Environmental Protection Agency, or is certified to meet those standards by a testing laboratory accredited by the EPA, or is approved by the Colorado Air Quality Control Commission.

**SPECIAL DEVELOPMENT PROJECT RESOLUTION** means the *Gunnison County Regulations for Special Development Projects*, as they may be amended.

**SPECIAL EVENT** means a use or activity that occurs at a location not otherwise permitted for the use or activity, and at which 200 or more persons may gather, or that will attract more than 50 vehicles per day, or that have the potential to create significant net adverse impacts in terms of traffic, water or air quality, noise, lighting, and similar matters. Such uses or activities may be allowed on a non-permanent or temporary basis, upon individual review of their proposed nature, location, duration, impact, and compatibility with neighboring uses and activities. Examples of special events include outdoor concerts, athletic competitions, religious revivals, movie productions, and other types of group or mass gatherings. Funerals and weddings are excluded from this definition, except when weddings are conducted regularly or frequently at a site, they shall not be defined as special events, and the site on which the weddings are conducted shall be required to obtain a Land Use Change Permit for a commercial use.

**SPECIAL GEOGRAPHIC AREA, OR SPECIAL AREA** means a particular geographic basin or other land area subject to specialized land use regulations and as approved by the Board pursuant to Section 1-110: *Process for Designation of Special Areas*.

**SPRAWL** means haphazard development located beyond municipal boundaries and generally characterized by:
- Inefficient, conspicuous consumption of raw land, typically built at low densities resulting in conflict with established rural land use patterns; or
- Failure to use existing infrastructure in favor of new facilities; or
- Location outside existing service areas, disrupting continuity and heightening demand and associated costs for services; and
- Heavy dependence on automobiles as opposed to mass transit or other non-auto related transportation modes.

**SQUARE FEET** means the measurement of square footage as established by the applicable building code adopted and amended by Gunnison County.

**STABLE, RENTAL** means a facility where animals including horses, ponies, mules, burros, donkeys or llamas are rented to the general public for recreational purposes.

**STOCK DRIVE ROUTES** means routes over private or public land, including, but not limited to, public roads or highways that are regularly used to move livestock from one location to another by means of driving or herding such livestock.

**STORAGE SHED** means a detached secondary structure used for storing goods, not intended for human habitation, or the keeping of livestock.

**STORM WATER** means the flow of water that results from and that occurs immediately following a rainfall event.

**STRIP (LEAPFROG) DEVELOPMENT** means the irregular development of land in the County, including intensive development adjacent to roadways or other geographical features, as well as sprawl or leapfrog development.

**STRUCTURE** means anything constructed or erected, that requires location on the ground, or is attached to something having location on the ground, including portable shelters for human habitation or use, recreational vehicles and tents, storage, transmission or distribution facilities or public utilities, but not including transmission lines of less than 45 kilovolt capacity, or fences.

**SUBDIVISION OR SUBDIVIDED LAND** means any parcel of land that is divided into two or more parcels, separate interests, or interests in common, or is to be used for condominiums, townhomes or townhouses, apartments, or any other multiple-dwelling units, unless the previous subdivision of such land was accomplished pursuant to a Land Use Change Permit that complied with the requirements of this *Resolution*, or the County's land use regulations in effect at that time, with substantially the same density; or unless expressly exempted within this definition. As used in this definition, "interests" includes any and all interests in the surface of land but excludes any and all subsurface interests.

The terms "subdivision" and "subdivided land" shall not apply to any division of land that creates parcels of land each of which comprises 35 or more acres of land and none of which is intended for use by multiple owners.

Unless the method of disposition is adopted for the purpose of evading the statutes of Colorado or this *Resolution*, the terms "subdivision" and "subdivided land" shall not apply to any division of land:

BLM_0053939

- That creates parcels of land, such that the land area of each of the parcels, when divided by the number of interests in any such parcel, results in 35 or more acres per interest;
- That is created by any court in Colorado pursuant to the law of eminent domain, or by operation of law, or by order of any court in Colorado if the Board is given timely notice of any such pending action by the court and given opportunity to join as a party in interest in such proceeding for the purpose of raising the issue of evasion of the statutes of Colorado or this *Resolution* before entry of the court order; and, if the Board does not file an appropriate pleading within 20 days after receipt of such notice by the court, then such action may proceed without the County's participation;
- That is created by a lien, mortgage, deed of trust, or any other security instrument;
- That is created by a security or unit of interest in any investment trust regulated under the laws of Colorado or any other interest in an investment entity;
- That creates cemetery lots;
- That creates an interest in oil, gas, minerals, or water that is severed from the surface ownership of real property;
- That is created by the acquisition of an interest in land in the name of a husband and wife or other persons in joint tenancy or as tenants in common, and any such interest shall be deemed for purposes of this *Resolution* as only one interest;
- That is created by the combination of contiguous parcels of land into one larger parcel. If the resulting parcel is less than 35 acres in land area, only one interest in that land shall be allowed. If the resulting parcel is greater than 35 acres in land area, that land area, divided by the number of interests in the resulting parcel, must result in 35 or more acres per interest. Easements, licenses and rights-of-way shall not be considered interests for purposes of this subparagraph.
- That is created by a contract concerning the sale of land that is contingent upon the purchaser's obtaining approval to subdivide, pursuant to this *Resolution* and any other applicable County regulations, the land that he/she is to acquire pursuant to the contract;
- That creates a cluster development as defined by C.R.S. 30-28-401, *et seq.*

The Board may, pursuant to rules and regulations or resolution, exempt from this definition any division of land if the Board determines that such division is not within the purposes of this *Resolution*, pursuant to C.R.S. 30-28-101 (10) (d).

**APPROVED SUBDIVISION** means a subdivision that has been approved by the Board.

**SUBSTANTIAL DAMAGE** means damage of any origin sustained by a structure whereby the cost of restoring the structure to its before-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

**STATION** means any facility designed to provide switching, voltage transformation, or voltage control required for the transmission of electricity.

**TANKLESS HOT WATER HEATER** means a hot water heating system that heats water on demand, and stores no hot water.

**TECHNICAL MODIFICATION** means a minor deviation of not more than ten percent from any minimum or maximum numerical standard of this *Resolution*, pursuant to Section 8-101: *Technical Modifications*.

**TEMPORARY SHELTER** means a structure without any foundation or footings, that is located for a fixed period on the same site as a residence that is under construction to house the owner of the property temporarily, and is removed immediately after the permanent structure is completed.

**TEMPORARY USE** means a use that is limited in scope, duration, and frequency.

**THREE-MILE PLAN** means a master plan adopted by a municipality pursuant to C.R.S. 31-23-206 for the physical development of areas outside its boundaries.

**TIER 1 HABITAT** means seasonally important Sage-grouse habitat defined in the Rangewide Conservation Plan 2005, by the Gunnison Basin Gunnison Sage-grouse Habitat Prioritization Tool as having a score of +15 or higher.

**TIER 2 HABITAT** means Sage-grouse habitat defined by the Gunnison Basin Gunnison Sage-grouse Habitat Prioritization Tool as having a score of +14 or lower.

**HABITAT PRIORITIZATION TOOL** means the modeling methodology adopted by the Gunnison Basin Sage-grouse Strategic Committee (2012) to map Gunnison Sage-grouse habitat types and provide comparative numerical scoring of those habitats. The Habitat Prioritization Tool is maintained by the Gunnison County Geographic Information Systems (GIS) Department.

**TIMBERLINE** means the elevation on a particular parcel beyond which trees do not grow except sparsely or as stunted forms.

**TOWNHOUSE OR TOWNHOME** means a residence attached to other residences with one or both sides sharing

common walls, depending on whether the unit is in a center or end position, erected as single buildings on adjoining lots, each residence being separated from the adjoining unit or units by a party wall or walls extending from the basement floor to the roof along the dividing lot line. Townhomes can be grouped together as small units, such as duplexes or triplexes, or they can be parts of a larger complex.

**TRACT** means a parcel or lot of land. Also, see "Legal Lot."

**TRAIL** means an open way reserved for the passage, generally, of people, non-motorized vehicles, animals and goods.

**TRANSMISSION LINE** means a line and related facilities whose primary purpose is the delivery of electric power, oil, water, natural gas, telephone, cable television, or similar amenities or services in bulk to all or a part of a distribution line or system that serves individual customers, except that an electrical transmission line shall be defined as the line and related facilities whose primary purpose is to deliver electrical power whose voltage is greater than 45 kv.

**URBAN SERVICE AREA OR URBAN GROWTH AREA** means an area adjacent to an incorporated municipality that has been designated by such municipality, and accepted by resolution of the County, as an area within which the municipality will or may provide utility or other services upon compliance with applicable municipal ordinances.

**USE** means the purpose for which any parcel of land, building, or structure is designed, maintained, occupied, or used.

**VAPOR-PERMEABLE INFILTRATION BARRIER** means a vapor-permeable air barrier wrapped around the exterior of a house and made of materials including but not limited to polyolefin fabric wrap on sheathing, pressed cardboard and pleated polystyrene with paper facings.

**VEHICLE STACKING AREA** means a queuing area made up of individual stacking spaces for motorists who remain in their vehicles awaiting service at a drive-thru window or a gasoline pump.

**VIEWSHED OR VIEW CORRIDOR** means areas of significant visual value that may include foreground areas (including, but not limited to, irrigated meadows, or undeveloped bank areas of reservoirs and lakes), ridgelines, or butte and mountain tops, and hillsides or buttes in front of mountain backdrops.

**WARMING HUTS/ OR WAY STATIONS** means a shelter from adverse weather conditions or overnight layovers on longer trips, not intended for extended stays or permanent residential occupancy.

**WASTEWATER RECYCLING** means the treatment of wastewater in a manner that will restore its quality to the water supply standard established by the Colorado Department of Health where permissible by Colorado water law.

**WASTEWATER (SEWAGE) TREATMENT SYSTEM** means a system or facility for treating, neutralizing, stabilizing or disposing of sewage, which system or facility has a designed capacity to receive more than two thousand gallons of sewage per day. A wastewater treatment system designed to receive more than 2,000 gallons of sewage per day shall not be constructed of or include an individual sewage disposal system, or collection of such systems. The term "sewage treatment works" includes appurtenances such as interceptors, collection lines, outfall and the outlet sewers, pumping station, and related equipment.

**WATER BODY** means a perennial or intermittent river, stream, lake, reservoir, pond, spring, or wetland but does not include irrigation ditches, roadway drainage ditches, artificial lakes, ponds, or wetlands that are created and used for the primary purpose of agricultural operations. Water bodies in Gunnison County include but are not limited to the following:

- Anthracite Creek
- Brush Creek (all locations)
- Carbon Creek
- Carbonate Creek
- Cebolla Creek
- Cement Creek
- Cimarron Creek
- Coal Creek
- Cochetopa Creek
- Copper Creek
- Crystal River
- East River
- Farris Creek
- Gold Creek
- Gunnison River (including North Fork and Lake Fork)
- Illinois Creek
- Lottis Creek
- Ohio Creek
- Pine Creek (all locations)
- Quartz Creek
- Red Creek
- Slate River
- Soap Creek
- Spring Creek
- Steuben Creek
- Taylor River
- Texas Creek
- Tomichi Creek
- Washington Gulch
- Willow Creek
- Yule Creek

**WATER BODY-RELATED TERMS:**

BLM_0053941

- **HEADCUTTING** means the development and upstream movement of a vertical or near vertical change in stream bed or stream bank slope.
- **HYDROLOGIC BALANCE** means the relationship between the quality and quantity of water inflow to, water outflow from, and water storage in a hydrologic unit including, but not limited to, a drainage basin, aquifer, soil zone, lake, or reservoir. It encompasses the dynamic relationships among precipitation, runoff, evaporation, transpiration, and changes in ground and surface water storage.
- **INTERMITTENT RIVER, STREAM, LAKE, RESERVOIR, POND, SPRING OR WETLANDS** means a water body that normally holds water or flows at least 60 days a year because of ground water discharge or surface runoff.
- **NATURAL WATER BODY** means a water body not created for the purpose of a land use change.
- **PERENNIAL RIVER, STREAM, LAKE, RESERVOIR, POND, SPRING OR WETLANDS** means a water body that normally holds water or flows continuously during all of the year because of ground water discharge or surface runoff.
- **UNSTABLE STREAM BANK** means a stream bank that is subject to failure, collapse, slippage, slumping, seepage, headcutting or significant erosion.

**WATER CONSERVATION PLAN** means a plan demonstrating that 10,000 gallons of water will be saved annually by use of devices, including but not limited to, low-flow toilets, low-flow shower heads and sprinkler systems that are on timers.

**WATER SUPPLY SYSTEM** means a system of wells, diversions, pipes, treatment plants, structures and facilities, including impoundments and their associated structures, through which a water supply is obtained, treated to alter the physical, chemical, or bacteriological quality of the water, and sold or distributed for human consumption or residential use, or the system of wells, diversions, pipes, treatment plants, structures, and facilities through which a water supply is obtained that will be used directly, or exchanged for water that will be used for human consumption or residential use.

**WATERWAY** means a stream, river or creek, or any other natural channel or other topographic feature through which "live" water flows, but does not mean ditches used for agricultural purposes.

**WETLAND.** means an area inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and under usual circumstances supports, a prevalence of vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation.

- Wetland areas generally include marshes, bogs, seeps, riparian and similar areas

- Wetland areas do not include artificial wetlands intentionally created from non-wetland areas, including:  flood-irrigated agricultural and ranch lands and ranch ponds; irrigation and drainage ditches; grass-lined swales; canals; detention facilities; landscape amenities; and areas in which there are wastewater treatment systems, including treatment ponds and lagoons designed to meet the requirements of the Clean Water Act (33 U.S.C. Sec. 1341), treated water distribution and storage facilities or treated water that otherwise meet the criteria in this definition However, wetlands may include those artificial wetlands intentionally created from non-wetland areas created for the purpose of mitigating loss of wetlands, if permitted by the County.

**WETLANDS FUNCTIONS.** The beneficial roles that wetlands serve, including storage, conveyance, and attenuation of floodwaters and storm waters; groundwater recharge and discharge; protection of water quality and reduction of sediment and erosion; habitat; food chain support for a broad range of wildlife and fisheries; educational, historical, and archaeological value protection; and scenic, aesthetic, and recreational amenities..

**WILDFIRE HAZARD AREA** means an area where potential wildfire phenomenon is so adverse to past, current or foreseeable construction or development that it constitutes a significant potential hazard to public health and safety or to property. Such areas may be shown on maps pursuant to Section 1-112: C: *Maps To Be Used As References* and may include:

- **LOW HAZARD AREA** means any area that is partially covered by fuel other than oak brush, but that has ground coverage of less than 30 percent of conifer crown coverage. Fuels may include grasses, brush (other than oak), sage, aspen, cottonwood, willow, scattered or open conifer stands, and deadwood contacting the ground.
- **MEDIUM FIRE HAZARD AREA** means any area that is substantially covered by fuels but that has a 35-55 percent conifer crown coverage with a slope of less than 30 percent; including fuels of medium density, conifer stands with a surface fuel mainly of herbage and litter, and some patches of reproduction and deadwood. Areas may also be designated as being within a medium fire hazard area that have a timber density of less than 35 percent crown coverage but with other fuels of medium density including grasses and brush (other than oak), sage, aspen, cottonwood, willow, deadwood contacting the ground, and/or ladder fuels.
- **SEVERE TREE FIRE HAZARD AREA** means any area that has a timber density of greater than 55 percent conifer crown coverage or a timber density of 35 percent to 55 percent conifer crown coverage on a slope of 30 percent or greater; including fuels and medium density stands with severe brush hazard fuels or large amounts of deadwood from blowdown, bug kill, or logging. A medium hazard area that has an accumulation of slash from logging operations and/or significant amounts of ladder fuels shall also be considered to be within this hazard area.
- **SEVERE BRUSH FIRE HAZARD AREA** means any area that has a dense to moderately-dense coverage of high brush or

conifer saplings with a timber density of more than 35 percent conifer crown coverage. Fuels include Gamble oak, large sage brush, conifer reproduction, abundant litter, or herbaceous fuels.

## WILDFIRE-RELATED TERMS INCLUDE:

- **FIRE CHIMNEY** means a steep, narrow drainage or ravine that generally confines smoke and heat along with natural convection currents and thus causes rapid upward increases in fire spread and intensity.
- **FUEL** means vegetation, debris, or other substances that will support combustion in a wildfire hazard area.
- **FUELBREAK** means a strategically-located strip of land that may vary in width, on which vegetation and other fuels have been modified to reduce the rate of potential fire spread, so that fire suppression forces can be used in relative safety to control a wildfire. Examples of fuel-breaks include provision for all-wheel-drive access, greenbelts, open space, forest openings, riding and hiking trails, and underground utility corridors.
- **LADDER FUELS** means fuels arranged between two separate fuel layers, including between the forest floor and tree canopies that provide vertical continuity, and thereby support fire spread in a vertical direction.
- **SLASH** means vegetative debris left after cutting or clearing operations in forest or brush areas that require treatment to reduce wildfire hazard.

**WILDLIFE** means native or introduced wild vertebrates.

- **CRITICAL WILDLIFE HABITAT AREA** means an area identified as the habitat for species listed by the U.S. Fish and Wildlife Service or the Colorado Division of Parks and Wildlife as threatened or endangered, or are candidates for those listings.
- **SENSITIVE WILDLIFE HABITAT** means a natural or manufactured environment that contains the elements of food, shelter, water, and space in a combination and quantity necessary to sustain one or more wildlife or plant species at stable population levels in historically-used habitats. Sensitive wildlife habitat areas include, but are not limited to, nesting, brood rearing areas; rookeries; leks; migration corridors, calving and fawning grounds for big game; critical winter range for big game and for sage grouse.

**WIRELESS TELECOMMUNICATIONS DEVICES** means any device used to provide wireless telecommunications services, whether the device is affixed or mounted onto a building or other structure that is used for some other primary purpose, or is a freestanding structure, building, pole, tower, or antenna used solely to provide wireless telecommunications services.

**WORKFORCE** means persons who are employees in Gunnison County whose household incomes are categorized as low income (i.e., a household whose annual income does not exceed 80 percent of the area median income as published annually by the U.S. Department of Housing and Urban Development) or moderate income ((i.e., a household whose income is between 81 percent and 120 percent of the area median income as published annually by the U.S. Department of Housing and Urban Development).

**WORKFORCE HOUSING FEE** means that fee enacted by Gunnison County and assessed to certain new construction in the unincorporated areas of the County, based upon the number of new employees generated by it.

**YARD** means that unoccupied open area between any building or other structure and the nearest lot line or property boundary, or the boundary of a designated building envelope.

**XERISCAPE** means landscaping that includes but is not limited to the following:

- Use of low-water demanding plants and turf;
- Grouping plants with similar water and cultural requirements (such as sun and climate) together on the same irrigation zones;
- Limiting the use of high-irrigation turf and plantings to high-use areas with high visibility or functional needs;
- Use of efficient irrigation systems;
- Use of temporary mulches.

**ZERO LOT LINE DEVELOPMENT** means a development in which a residence is located on one side of a lot line and/or on the rear lot line of the subject lot. The reduced setback results in an equal amount of setback increase on the opposite side of the lot line.

BLM_0053943

BLM_0053944

# ARTICLE 3:
# GENERAL REVIEW PROCESS

## SECTION 3-101: PURPOSE

The purpose of this Article is to establish the review process, application submittal requirements and review standards that apply to each type of application regulated by this *Resolution*, including Land Use Change Permits for Administrative Review Projects and Minor and Major Impact Projects. Processes to allow some alteration of plans (Section 8-101: *Technical Modifications*), relief from potential takings and to appeal decisions also are included in this Article.

## SECTION 3-102: OVERVIEW

**A.  RELATIONSHIP OF GENERAL REVIEW PROCESS TO PARTICULAR APPLICATIONS**. Appendix Figure 3: *General Review Process for Land Use Change Permit* illustrates how a Land Use Change Permit application progresses from submittal to completion. Appendix Table 1: *Summary of Review Processes* summarizes how certain processes apply to each type of County-regulated Land Use Change Permit application; describes whether attending a Pre-Application Conference is mandatory or optional for each type of application; identifies which recommending and/or decision-making body is authorized to review, act on, and hear appeals for each type of application; and whether a public hearing is required.

**B.  OTHER SPECIFIC COUNTY PERMIT PROCESSES**. Processes for other County permits regulated by this *Resolution*, such as Sign Permits, Outdoor Vending or Long-Term Camping Permits and procedures for variances from specific requirements are located in the sections of this *Resolution* to which they are relevant.

**C.  LAND USE CHANGES WITHIN MUNICIPAL THREE MILE PLAN AREAS**. When the proposal is for development located within a municipal three-mile plan area, the development proposal shall address how it comports with the objectives and policies of the applicable municipal Three-Mile Plan.  The County shall consider how the proposed development has addressed those objectives and policies, and any further intergovernmental agreement between the County and the municipal government regarding the Three-Mile Plan area. Where there is a conflict between the objectives or policies of a Three-Mile Plan or the intergovernmental agreement, and County standards, County standards shall apply.

**D.  INITIAL CLASSIFICATION OF IMPACT AND REASONS FOR A HIGHER LEVEL OF REVIEW**. If the Community Development Department determines during review of the application for a Land Use Change Permit, including a Building Permit, that the proposed use exceeds the initial classification criteria listed in Section 4-102: *Projects Classified as Administrative Review Projects That Do Not Require Land Use Changes Permits*, Section 5-102: *Projects Classified as Administrative Review Projects That Require Land Use Change Permits*, or Section 6-102: *Projects Classified as Minor Impact Projects*, the criteria detailed in Section 3-111: B. 1: *Additional Criteria* shall be considered and the appropriate review process and submittals for an Administrative Review Project, or a Minor or Major Impact Project shall be required.

## SECTION 3-103: INTENT TO NOT DUPLICATE OTHER PERMIT PROCESSES OR REQUIREMENTS

Gunnison County intends to avoid duplicative regulatory submittals or processes. Processing of applications for permits generally proceeds concurrently with other required state or federal agency permitting processes.

## SECTION 3-104: COORDINATION WITH STATE OR FEDERAL ACTIONS AND COUNTY PERMIT PROCESS

So that the County will have the benefit of the analysis and technical expertise of other entities, the County, in its review of a Land Use Change Permit application, may consider information available in an Environmental Assessment (EA), an Environmental Impact Statement (EIS), or other permit required a state or federal agency. To maximize use of that information without unnecessary delay of review, the following process is required of such applications:

BLM_0053945

**A. NOTIFICATION TO COUNTY BY APPLICANT**. When an EA or EIS or other state or federal action or permit is required, and that requirement is known by the applicant, the applicant shall notify the County of that requirement when the application is first submitted for review.

**B. PUBLIC HEARING TO IDENTIFY ISSUES TO STATE OR FEDERAL AGENCY**. The Planning Commission and/or Board shall conduct a public hearing to "scope" a proposal for which an EA or EIS is required, to hear public comment and to identify issues that it believes appropriate to be addressed during any permitting process. Notice and conduct of the public hearing shall be accomplished pursuant to Section 3-112: *Notice of Public Hearing* and Section 3-113: *Conduct of Public Hearing.*

    **1. MINOR IMPACT PROJECTS THAT REQUIRE EA OR EIS**. For Minor Impact Projects, the process of scoping shall occur concurrently with the public hearing Minor Impact Project review.

    **2. MAJOR IMPACT PROJECTS THAT REQUIRE EA OR EIS**. For Major Impact Projects, the process of scoping shall occur concurrently with the hearing conducted during the Sketch Plan review.

**C. SUBMITTAL OF INITIAL LIST OF ISSUES TO FEDERAL AGENCY**. Within 35 days of the close of the public hearing, the Planning Commission or Board shall consider the public comments made at the hearing, incorporate them into an initial list of issues of County interest regarding the proposed Project, and forward the list to the applicant and appropriate state and/or federal agency. The comments are preliminary in nature, and may change significantly, as a Project is more clearly defined in later stages of the development review process.

**D. DELAY OF COUNTY DECISION.** Final action by the County on a Land Use Change Permit application may be delayed until 30 days after the EA, EIS or other permit by a state or federal agency is issued unless otherwise agreed upon by the applicant and the decision-making body, and only if the applicant has applied for the required Land Use Change Permit within 60 days after applying for the required state or federal permit.

## SECTION 3-105: WITHDRAWN AND INACTIVE APPLICATIONS

**A. WITHDRAWAL OF APPLICATION BY APPLICANT**. The applicant may withdraw an application at any phase of the process by submitting a notarized written request to the Community Development Department.

**B. INACTIVE APPLICATIONS**. An application that has become inactive because an applicant is required to submit additional information and has failed to do so for a period of more than six months from when it was requested shall become void and the resubmittal of a new application and fees shall be required. The Community Development Director may grant one extension of time, of no more than six months, for good cause shown, upon a notarized written request by the applicant, prior to the end of the initial six month period.

    **1. TAXES TO BE PAID**. Any permit application that has been placed on inactive status shall not be reactivated until the applicant provides to the Community Development Director a copy of certification from the Gunnison County Treasurer's Office indicating that all real property taxes applicable to the subject parcel on which the land use change is proposed have been paid up to the year in which approval is under consideration.

## SECTION 3-106: PHASING OF PROJECTS

**A. LAND USE CHANGES MAY BE PHASED**. An applicant may propose that a land use change be designed to occur in phases, and may request that it be permitted by individual phases, so long as each phase complies with all applicable requirements of this *Resolution*. The County may require a land use change to be designed to occur in phases, if phasing is necessary or appropriate for it to comply with all of the applicable requirements of this *Resolution*.

**B. EACH PHASE TO PROVIDE IMPROVEMENTS**. If the land use change is to be developed in phases, each phase shall contain the required roads, utilities, landscaping, and other improvements required by the County in its approval. If the land use change incorporates any amenities for the benefit of the public, including trail connections, these shall be constructed within the first phase of the Project, or, if this is not possible, then as early in the Project as is feasible.

**C. TIMING OF PHASES**.

    **1. MAJOR IMPACT PROJECTS.** For phased Projects that are Major Impact Projects, all uses and their locations proposed in the application shall be addressed and reviewed through Preliminary Plan approval; Final Plan submittals for individual phases then may be sequentially reviewed and approved.

    **2. MINOR IMPACT PROJECT**. For phased Projects that are Minor Impact Projects, the proposed uses on all the property proposed for development shall be submitted for application review, and each phase shall be subject to new and separate impact classification pursuant to Section 3-111: *Classification of Impact.*

BLM_0053946

3. **APPROVAL OF SUBSEQUENT PHASE REQUIRES 35 PERCENT COMPLETION OF PREVIOUS PHASE.** The approval of each phase of a development after the first phase shall occur only after 35 percent of the previous phase has been constructed.

   a. **DETERMINATION OF PERCENTAGE OF CONSTRUCTION.** The percentage shall be determined by the number of lots on which homes have been constructed or installed, if the development is a residential subdivision or mobile home community; by the number of apartments, condominiums or townhomes if the development is multiple family residences; and the square footage constructed or acreage in use if the development is industrial, commercial or other non-residential.

   b. **ALL AMENITIES OF PREVIOUS PHASE REQUIRED TO BE INSTALLED.** All roads, utilities, landscaping, and amenities for the benefit of the public for the previous phase shall be installed and approved by the County before the applicant may construct a subsequent phase.

## SECTION 3-107: GENERAL APPLICATION REQUIREMENTS

A. **APPLICANT.** An application for a Land Use Change Permit, Lot Cluster, Correction of Plat, Variance, Technical Modification or other applicable permit described in this *Resolution* shall be submitted by the owner of the property or their authorized agent, or any other person having a recognized interest in the land for which the permit is requested.

   1. **APPLICANT IS NOT THE OWNER.** If the applicant is not the owner of the land, or is a contract purchaser of the land, the applicant shall submit a notarized letter signed by the owner consenting to the submittal. Consent of the owner for submittal shall imply consent by the owner for the County to complete the review process pursuant to this *Resolution*.

   2. **APPLICANT IS NOT THE SOLE OWNER.** If the applicant is not the sole owner of the land, the applicant shall submit a notarized letter(s) signed by all other owners, and/or by an association or corporation representing the owners, consenting to, or joining in, the application.

B. **ADDITIONAL MATERIALS; WAIVER OF REQUIRED CONTENTS.** The Board, Planning Commission, Community Development Director, or Board of Adjustments may reasonably require the applicant to submit additional materials beyond those specified in this Section, as they deem reasonably necessary to aid in the review and impact classification of the application. The Community Development Director may also reasonably waive any of the required application contents that are deemed unnecessary or irrelevant to the review and impact classification of the application.

C. **CONSOLIDATION OF PERMIT APPLICATIONS.** The County's Land Use Change permitting process is intended to encourage efficient processing of applications. Applicants may request, and the Community Development Director may permit, the consolidated submittal and review of all permit applications related to a Land Use Change Permit application for a parcel of land. The Community Development Director is authorized to reasonably waive any overlapping submittal requirements in the consolidated review.

## SECTION 3-108: PRE-APPLICATION CONFERENCE

A. **PURPOSE.** The Pre-Application Conference is required or optional, as shown in Appendix Table 2: *Summary of Review Process* and can be a meeting, a telephone call, or an exchange of e-mail communications between the applicant, a member of the Community Development Department, and as appropriate, other County staff or staff from other agencies. The purpose of the Pre-Application Conference is to discuss various processes, standards and submittal requirements of this *Resolution*, and/or any intergovernmental agreement, and to provide and explain to the applicant the required application form.

   1. **STAFF COMMENTS ARE PRELIMINARY.** Any comments made by a staff person during the conference are preliminary in nature and may change significantly as the Project is more clearly defined in later stages of the development review process.

B. **REVIEW AGENCIES.** The Community Development Department shall list the agencies to which the application will be sent for review, and on request, will provide the applicant with the names, telephone numbers and addresses of those agencies.

C. **WRITTEN SUMMARY.** At its discretion, the Community Development Department may issue a written summary of the Pre-Application Conference.

BLM_0053947

## SECTION 3-109: APPLICATION

**A. APPLICATION FORM.** Except as otherwise required by this *Resolution*, to each of the Permits required by this *Resolution*.

**B. ADDITIONAL INFORMATION.** Such additional information reasonably required by the Community Development Department as necessary to determine the impact classification or to otherwise aid in the evaluation of the proposed land use change  pursuant to the applicable requirements of this *Resolution*.

**C. APPLICATION AND REVIEW FEES.** In order to compensate the County for the cost of reviewing and processing applications for Land Use Change Permits, each applicant shall pay the fees, as shown in a schedule of fees charged for permits issued by the Community Development Department, adopted and amended from time to time by the Board. The fee schedule is designed to make the amount of the fee proportional to the amount of expense likely to be incurred by the County in reviewing and processing the application.

    **1. PARTIAL WAIVER.** Upon a finding by the Board that the fees are disproportionate to the actual cost of review, the Board may grant a partial waiver of such fees.

    **2. ADDITIONAL FEES.** Application and review fees are intended to cover the County's costs in determining the compatibility of a proposed development with the land use policies and development guidelines contained in this *Resolution*. If the Board determines that the cost of review is likely to exceed such fees substantially, the Board may, after consultation and discussion with the applicant, assess an additional fee. Such additional fee shall be set in an amount that will, as far as can be determined, cover the costs of review of the application including reasonable administrative expenses, additional professional expertise, and overhead expenses. In determining the additional fee, the Board may consider, among other things:

        **a. SECONDARY IMPACT.** The secondary impact that is likely to be associated with the development.

        **b. NEED FOR ADDITIONAL EXPERTISE**. The likelihood that proper review will require the County to retain outside professional assistance either to review the application or to perform original study and research.

        **c. NEED FOR ADDITIONAL STAFF**. The likelihood that additional staff will be required by the County to review the application.

        **d. OTHER AGENCY INVOLVEMENT**. The involvement in the review process by other governmental agencies through a joint review process agreement, federal environmental review or other process.

        **e. EXTRAORDINARY TRANSPORTATION COSTS.** The likelihood that extraordinary travel and transportation costs will be incurred by the County during the review.

## SECTION 3-110: COMMUNITY DEVELOPMENT DEPARTMENT APPLICATION REVIEW

**A. TECHNICAL REVIEW.** The Community Development Department shall conduct a technical review of the submitted draft application to determine completeness; to recommend which review agencies would appropriately be contacted to review and provide expertise and comments about the application; and to identify physical characteristics of the location of the proposed land use change, based upon information available on maps used by the County pursuant to Section 1-112: *Use of Maps*.

    **1. IDENTIFICATION OF ADDITIONAL SUBMITTALS AND PROVISION TO THE APPLICANT OF INFORMATION AVAILABLE ON MAPS USED BY THE COUNTY.** If the Department finds by information provided by maps used by the County that the parcel on which the proposed Project is located is within a geologic hazard area, a floodplain hazard area, a wildlife habitat area, a wildfire hazard area, an area potentially affected by wetlands and federal wetlands permitting requirements; if the proposed Project includes development on a ridgeline, is above timberline or beyond snowplowed access, is on an inholding in a national Wilderness area, is in a municipal Three-Mile Plan area, and/or in a district or designated Special Area, the staff shall notify the applicant of that information, and identify additional submittals that must be submitted by the applicant pursuant to other applicable sections of this *Resolution*. If the property is located adjacent to agricultural operations, the Department shall provide a copy of the Right-to-Ranch policy, and a copy of the County's *Code of the West*, pursuant to Article 15: *Right-to-Ranch Policy*.

**B. DETERMINATION OF COMPLETENESS.** The Community Development Department shall determine whether the application is complete and shall notify the applicant in writing that the application is either complete or incomplete, or shall indicate a date by which such determination shall reasonably be made. It is the goal but not the requirement (as scheduling may be affected by limited access, inclement weather, or other unforeseen circumstances) of this *Resolution*, that this review be completed within 30 days of the submittal of the application.

BLM_0053948

1. **APPLICATION IS NOT COMPLETE**. If the application is not complete, the Community Development Department shall inform the applicant in writing of the deficiencies and shall take no further action on the application until the deficiencies are remedied.

   a. **FAILURE TO CORRECT WITHIN 60 DAYS CONSTITUTES WITHDRAWAL.** If the applicant fails to correct the deficiencies within 60 days of the postmarked or certified date of the mailing of the notification that the application was incomplete, the application shall be considered withdrawn.

2. **APPLICATION IS COMPLETE**. If the application is complete, the Community Development Department shall certify it as complete, and if required, assign the application an agenda date with the applicable review or decision-making body on the next available agenda, and provide notification of the meeting date to the applicant.

3. **COMPLETENESS IS NOT A DETERMINATION OF COMPLIANCE**. A determination that an application is complete shall not constitute a determination that it complies with the applicable standards of this *Resolution*.

C. **REQUEST FOR REVIEW BY OTHER AGENCIES OR DEPARTMENTS**. The Community Development Department may request the professional analysis and recommendations of other review agencies, organizations, or technical consultants appropriate and necessary to complete the review, including other County offices and departments; municipal, state, or federal agencies having an interest in or authority over all or part of the proposal; utility companies; the applicable school district and special service districts serving the proposed development; and engineers, designers, and legal consultants.

1. **REVIEW AND COMMENT BY REVIEW AGENCIES AND DEPARTMENTS**. Review agencies and departments that are sent a copy of the application shall be requested to make comments within 21 days of mailing by the Community Development Department. An extension of not more than 30 days may be requested by the agency before the 21st day. The Department may grant such a reasonable extension if it determines that good cause for the delay has been shown, except that such extension of review of a Preliminary Plan for a Major Impact Project shall require consent by the applicant and the Board, pursuant to Section 7-302: D. 1.: *Review and Comment by Review Agencies.* The failure of any agency to respond within 21 days or within the period of extension shall not be deemed an approval of the application by the agency.

2. **REVIEW OF AGENCY AND DEPARTMENT COMMENTS BY APPLICANT**. The applicant shall have the right to review the comments and recommendations received from the review agencies. The applicant may submit additional information and make changes in the development proposal to respond to the comments of the review agencies; provided, however, that if those changes are substantial or if they significantly alter the nature, character or extent of the application, the Community Development Department may, after the changes, refer the application again to some or all review agencies, to obtain additional comments, and may reasonably extend the period of their review accordingly.

D. **COMMUNITY DEVELOPMENT DEPARTMENT REPORT.** Unless otherwise required by this *Resolution*, the Community Development Department's report shall include at a minimum:

1. **DESCRIPTION OF PROPOSED PROJECT**. Briefly, but clearly describe the applicant's proposed Project or requested action, as described in the submitted application.

2. **TECHNICAL REVIEW.** A copy of the Department's technical review.

3. **INITIAL CLASSIFICATION OF IMPACT.** If applicable to the specific application, identification of the initial classification of impact, pursuant to Section 3-111: *Classification of Impact.*

4. **RECOMMENDATIONS BY REVIEW AGENCIES OR OTHER COUNTY DEPARTMENTS**. A summary or copies of the recommendations or general comments by review agencies and County Departments other than the Community Development Department if recommendations or comments were requested and have been received.

5. **DISTRIBUTION AND AVAILABILITY OF DEPARTMENT REPORT.** At least three days before the date of the meeting of the review body, the Community Development Department will distribute a copy of the report to each member of the review body, to the applicant, and will make it available in the Community Development Department for the public. Failure to complete the report and make it available within the preferred three-day period is not a jurisdictional deficiency. Any subsequent written materials prepared concerning the application shall also be available for review in the Community Development Department during regular business hours.

BLM_0053949

# SECTION 3-111: CLASSIFICATION OF IMPACT

**A.  PURPOSE.** Applications for Land Use Change Permits are initially assigned an impact classification by the Community Development Department; specific review processes are initially determined on the basis of that classification. The classification categorizes each proposed land use change by the impacts it is anticipated to generate on the County's economic, social, governmental, and environmental sectors. The amount of information and the extent of review required by the County is proportional to the impacts that will be generated by the proposed land use change. This Section addresses how a proposed Project receives an impact classification.

**B.  CRITERIA FOR CLASSIFYING IMPACT.** An application for a Land Use Change Permit is initially assigned an impact classification by the Community Development Department pursuant to Section 4-102: *Administrative Review Projects That Do Not Require Land Use Change Projects*, Section 5-102: *Projects Classified as Administrative Review Projects That Require Land Use Change Permits*, Section 6-102: *Projects Classified as Minor Impact Projects*, and Section 7-101: *Projects Classified as Major Impact.*

  **1.  ADDITIONAL CRITERIA.** In addition to the specific criteria of each section, the County shall also consider the following in determining the impact classification:

   **a.  DEMAND FOR PUBLIC SERVICES.** Whether the proposed land use change is expected to generate a minor or a major demand for public services, including roads, transit, schools, water supply, sewage disposal, fire and police protection, and emergency services; and

   **b.  IMPACTS ON IMPACT AREA AND ENVIRONMENT**. Whether the proposed land use change is expected to generate a minor or a major impact on the impact area or on the environmental resource and hazard areas defined within and regulated by Article 11: *Resource Protection Standards*; and

   **c.  IMPACTS RELATED TO ALL EXISTING AND PROPOSED DEVELOPMENT IN IMPACT AREA.** The impacts of the proposed land use change, when considered in conjunction with existing and proposed land use changes in the impact area.

**C.  EXPANSION OF EXISTING USES AND SEQUENTIAL PROJECTS**. If an applicant proposes a land use change that is classified as an Administrative Review or Minor Impact Project, and proposes a second Project at a later date as an addition to or expansion of the approved Project so that the Projects considered together would have been classified as at least the next higher level of impact classification, then the second and any such subsequent Project shall  be reviewed as a Major Impact Project, and the cumulative impacts of the sequential Projects shall be the basis on which compliance with this *Resolution* is determined, and a decision made.

**D.  APPEAL OF IMPACT CLASSIFICATION.** The applicant, or any affected person aggrieved by a decision of impact classification, may appeal that decision by filing a written appeal. That appeal shall follow the process outlined in Section 8-103: *Appeals.* The appeal shall be limited solely to the question of impact classification. The Board's decision on that appeal shall be final and subject only to judicial review.

# SECTION 3-112: NOTICE OF PUBLIC HEARING

**A.  NOTICE REQUIRED.** Appendix Table 1: *Summary of Review Processes* identifies the type of applications for which a public hearing shall be required, and at what step during the review process the hearing shall occur. When a public hearing is required, public notice shall be provided as follows:

  **1.  MANNER AND TIMING OF NOTICE.** Public notice shall be by publication of notice in the newspaper, mailing of notice to adjacent and other specified property owners, as applicable, and posting of notice on the property. The timing of the notice shall be as specified in Table 1: *Timing of Notice.*

  **2.  RESPONSIBILITIES FOR GIVING NOTICE.** Responsibilities for ensuring adequate public notice by publication, mailing and posting shall be as follows:

   **a.  PUBLICATION OF NOTICE.** The Community Development Department shall place a legal notice in the County's official newspaper, which shall be published at least once. When the proposed land use change is in an area of Gunnison County that is served by a local newspaper that is not the County's official newspaper, notice shall also be published in that local newspaper.

   **b.  MAILING OF NOTICE.** The applicant shall be responsible for mailing of the notice, except as otherwise required by Section 1-110: *Process for Designating Special Areas.* The notice shall be prepared by the Community Development Department and a copy given to the applicant. Notice shall be sent by certified or registered mail, response requested (except for an Emergency Exception, which shall require that notice be

BLM_0053950