2. **TO PROTECT RESIDENTS IN FLOODPLAIN AREAS.** To protect those who may occupy areas of the floodplain by:

   a. **REGULATING CONSTRUCTION.** Regulating the manner in which structures and developments designed for human occupancy may be constructed and developed to minimize danger to human life within them;

   b. **REGULATING WATER SUPPLY AND WASTEWATER TREATMENT SYSTEMS.** Regulating the method of constructing water supply and wastewater treatment systems to prevent disease, contamination and unsanitary conditions resulting from flood inundation;

   c. **REGULATING ROADS AND BRIDGES.** Regulating the location and method of constructing roads and bridges so as to prevent damage during flooding;

   d. **REQUIRING INFORMATION TO BE MADE AVAILABLE TO THE PUBLIC.** Requiring the requirements of this Section and maps delineating floodplain areas to be available to the public to protect people from purchasing floodplain lands for purposes that are not suitable.

3. **TO AVOID UNNECESSARY EXPENDITURE.** To protect the public from the burden of avoidable financial expenditures for flood control and relief by:

   a. **MINIMIZING DAMAGE.** Regulating uses and construction methods within floodplain areas. Providing for patterns of development and methods of construction that will minimize the probability of damage to property and loss of life or injury to the occupants of flood hazard areas.

4. **TO PROTECT FLOODPLAIN STORAGE CAPACITY.** To protect the storage capacity of floodplains and to assure retention of sufficient area to convey flood flows that can reasonably be expected to occur by:

   a. **REGULATING ACTIVITY IN DRAINAGE CHANNELS.** Regulating filling, dumping, dredging, and alteration of drainage channels;

   b. **PROHIBITING ENCROACHMENTS.** Prohibiting excessive encroachments.

B. **REPEAL OF THE *GUNNISON COUNTY FLOOD DAMAGE PREVENTION RESOLUTION*.** This Section repeals and replaces the requirements adopted in the *Gunnison County Flood Damage Prevention Resolution*. All rights and liabilities that accrued by actions taken pursuant to that resolution are preserved and may be enforced.

C. **STRUCTURES AND USES THAT ARE SPECIFICALLY NOT IN CONFORMANCE WITH THIS SECTION.**

   1. **LEGAL BEFORE THE EFFECTIVE DATE OF THIS *RESOLUTION*.** The use of any structure or land within the 100-year floodplain that was legal before the application of the requirements of the *Gunnison County Flood Damage Prevention Resolution*, or as it was amended, but that does not conform to the requirements of this Section may be continued subject to the following conditions:

      a. **EXPANSION SHALL COMPLY.** No such structure or use may be expanded or enlarged unless the expansion or enlargement complies with the requirements of this Section. When a structure, including a manufactured home, has been damaged so that the market value of repair or replacement does not exceed 50 percent of the market value before the damage occurred, the structure may be restored to its size before the damage occurred. Such reconstruction shall be constructed pursuant to this Section, and shall not be deemed to be a substantial expansion or enlargement. Any restoration or replacement of a structure, including a manufactured home, damaged to an extent exceeding 50 percent of its market value before the damage occurred shall be deemed a substantial expansion or enlargement, and the entire structure shall be protected pursuant to this Section.

      b. **REPLACEMENT MANUFACTURED HOME SHALL COMPLY.** Whenever an existing manufactured home, that is nonconforming or is located in a nonconforming manufactured home park or subdivision, in the 100-year floodplain, is replaced by a new manufactured home, regardless of the reason for the replacement, the new manufactured home shall comply with the requirements of this Section.

      c. **SUBSTANTIAL IMPROVEMENTS SHALL COMPLY.** If any person makes substantial improvement to any nonconforming structure or use, that person shall permanently change the structure or use to conform to the requirements of this Section.

D. **ADOPTED FLOOD INSURANCE STUDY. ADOPTED FLOOD INSURANCE STUDY.** The Board hereby affirms Gunnison County's adoption of the Flood Insurance Study of Gunnison County, Colorado, and Incorporated Areas, May 16, 2013, published by FEMA for purposes of designating flood hazard areas within the unincorporated areas of Gunnison County and implementing floodplain regulations.  This adoption includes all Flood Insurance Rate Maps (FIRM) and flood profiles included or referenced in the Flood Insurance Study.

BLM_0054089

*SECTION 11-103: DEVELOPMENT IN AREAS SUBJECT TO FLOOD HAZARDS*

**E.   OFFICIAL MAPS.**

**1.   DESIGNATION OF OFFICIAL MAPS.** The Flood Insurance Rate Maps and Flood Insurance Study prepared and published by FEMA for the unincorporated areas of Gunnison County are hereby designated as official flood maps, with the following qualifications:

**a.   LETTERS OF MAP AMENDMENT OR MAP REVISION.** Property owners who believe that their land is not located within a flood hazard area or that their land or structures will not be affected by a flood hazard, as shown of the National Flood Insurance Program Maps, may submit a request to the Federal Emergency Management Agency for a Letter of Map Amendment or a Letter of Map Revision. Specific technical requirements regarding the flood hazard are required for the application, which is available in the Community Development Department.

**b.   REVISIONS AND AMENDMENTS SHALL BE NOTED.** If FEMA issues a Letter of Map Amendment or a Letter of Map Revision, and this amendment or revision has not yet been depicted on the most recent edition of the Flood Insurance Rate Maps or Flood Insurance Study, approval of those changes shall be noted on the official map at the approximate map locations where the affected sites are located.

**c.   NEW EDITION OF FLOOD INSURANCE RATE MAPS SUPERSEDES EXISTING MAPS.** Whenever FEMA issues a new edition of the Flood Insurance Rate Maps or a Flood Insurance Study, the maps in the new edition shall constitute the official maps. No additional adoption of those maps shall be required by the Board.

**d.   AVAILABILITY OF OFFICIAL MAPS AND APPROVED CHANGES.** The Community Development Department shall keep the Flood Insurance Rate Maps on file in the Community Development Department, and shall make them available for public inspection. In addition, the Community Development Department shall make available copies of any Letters of Map Amendment or Letters of Map Revision issued by FEMA but not yet depicted on the Flood Insurance Rate Maps. When a Flood Insurance Rate Map has been modified by a Letter of Map Amendment or a Letter of Map Revision, and this amendment or revision is not yet depicted on the map, no copy of the map shall be distributed by the Community Development Department to the public without a copy of the Letter of Map Amendment or of the Letter of Map Revision.

**e.   RESPONSIBILITY FOR INTERPRETATION OF OFFICIAL MAPS.** When interpretation of floodplain boundaries is needed to determine whether an applicant is required to comply with the requirements of this Section, the Community Development Director shall be responsible for making those interpretations.

**f.   AREAS NOT MAPPED.** Lands located in areas subject to flood hazards, but not identified on the FEMA Flood Insurance Rate Maps, may be subject to the requirements of this Section.

**F.   WARNING AND DISCLAIMER.** The degree of flood protection intended to be provided by this Section has been determined to be reasonable for regulatory purposes and is based on engineering and scientific methods of study. Floods of greater magnitude may occur and flood heights may be increased by man-made or natural causes, including ice jams and bridge or culvert openings restricted by debris. This Section does not imply that areas outside the floodplain area boundaries or land uses permitted within such areas will be free from flooding or flood damages or that compliance with this Section will prevent any or all damages from flooding.

**1.   DEVELOPMENT IN FLOODPLAIN REQUIRES LANDOWNER ACKNOWLEDGEMENT.** As a condition of approval of a proposed land use change in the floodplain, the landowner shall sign the following warning and disclaimer, which shall be included on the Final Plat for a subdivision, and/or within the applicable recorded document that approves the Land Use Change Permit:

WARNING AND DISCLAIMER OF FLOODPLAIN HAZARDS
AFFECTING USE AND OCCUPANCY OF THIS PROPERTY

*"I/We, _____ (owner(s) of property) on behalf of myself/ourselves and all successors, heirs and assigns, hereby acknowledge having been informed by Gunnison County of the existence of floodplain hazard areas that may affect the use and occupancy of this property, and any improvements thereto. I/We acknowledge that the County's approval of this land use change does not guarantee the safety of the property, or in any way imply that areas outside of the designated hazard areas will be free from hazards and hereby agree to indemnify, defend and save harmless the County, its agents, officers and employees from and against any and all liability, expense including defense costs and legal fees, and claims for damages of any nature whatsoever, including, bodily injury, death, personal injury, or property damage arising from or connected with any activity related to these hazards, including any suits, liability, or expense."*

BLM_0054090

2. **OWNERS SHALL BE RESPONSIBLE.** Property owners who develop in, or have access through, flood hazard areas shall be required to construct, implement, maintain, improve and bear the cost of their development's proportionate share of all reasonable measures necessary to mitigate any flood-related hazard created by such development.

G. **APPLICABILITY.** The requirements and regulations of this Section shall apply to all lands within the unincorporated area of Gunnison County that are located:

1. **WITHIN AREAS MAPPED AS 100-YEAR FLOODPLAIN.** Within the 100-year floodplain, Zone A (Area of Special Flood Hazard) on the most recent Flood Insurance Rate Maps or Flood Insurance Study prepared and published by FEMA.

2. **WITHIN AREAS SHOWN BY AMENDMENT OR REVISION TO BE WITHIN THE 100-YEAR FLOODPLAIN.** Within the 100-year floodplain as a result of a Letter of Map Revision or Letter of Map Amendment approved by FEMA, but not yet depicted on the Flood Insurance Rate Maps or Flood Insurance Study published by FEMA.

3. **WITHIN AREAS THAT ARE DETERMINED TO BE "FLOOD PRONE".** Within areas that are determined to be "flood prone" on the basis of reliable historical information, topography, vegetation, or other naturally occurring indicators. Flood prone areas may require a detailed hydrologic engineering study in order to define and map the actual 100-year floodplain, to determine site-specific flood elevations and ground elevations, and to distinguish between the floodway and the floodplain. Such maps shall include at a minimum the requirements of Section 11-103: L.1. e: *Maps and Plans.*



FIGURE 1: AREAS OF THE FLOODPLAIN

4. **WITHIN AREAS THAT HAVE BEEN ISSUED A LETTER OF MAP REVISION BASED UPON FILL (LOMR-F).** Areas that have been removed from the floodplain by the issuance of a FEMA Letter of Map Revision.

H. **PLAN REQUIRED TO BE SUBMITTED SHOWING DESIGNATED FLOODPLAIN AND IDENTIFYING AVOIDANCE OR MITIGATION MEASURES.** When a Land Use Change Permit is sought in areas that have been identified on the Flood Insurance Rate Maps or Flood Insurance Study prepared and published by FEMA for the unincorporated areas of Gunnison County as being in a designated floodplain, a copy of the mapped area, and a narrative indicating how the hazard will be avoided or mitigated pursuant to the general and specific standards of this Section is required to be included as part of the submittal.

I. **USES WITHIN THE 100-YEAR FLOODPLAIN.** The floodplain is divided into three areas: the stream channel, the floodway and the floodplain (Figure 1: *Areas of the Floodplain*). A site-specific engineering analysis considering flood elevations and ground elevations may be necessary to establish the location of these distinct areas.

1. **USES PERMITTED IN THE FLOODPLAIN.** The following uses shall be permitted in the floodplain, subject to compliance with the applicable requirements this *Resolution*:

BLM_0054091

    **a.** **AGRICULTURAL USES.** Agricultural uses, including grazing of livestock and production of hay;

    **b.** **RESIDENTIAL ACCESSORY USES**. Residential accessory uses, not involving structures, including lawns, gardens, play areas, open yard areas and driveways;

    **c.** **RECREATIONAL USES**. Recreational uses not requiring permanent or temporary structures designed for human habitation, including parks, public trails, golf courses, driving ranges, wildlife and natural preserves, and areas for fishing and hiking;

    **d.** **UTILITIES**. Utility facilities, including dams, spillways, power plants, transmission lines, and pipelines;

    **e.** **ROADWAYS**. Roads, highways and bridges;

    **f.** **CONSTRUCTION MATERIALS PROCESSING**. Sand and construction materials processing operations;

    **g.** **FLOOD MITIGATION STRUCTURES**. Flood mitigation structures and stream bank stabilization;

    **h.** **RESIDENTIAL STRUCTURES**. Residential structures, provided that the lowest floor of the structure, including the basement, is one foot above the base flood elevation;

    **i.** **NON-RESIDENTIAL STRUCTURES**. Non-residential structures, provided that the lowest floor of the structure is one foot above the base flood elevation; or together with attendant utility and sanitary facilities, complies with requirements of Section 11-103: J. 2: *Construction Materials and Methods.*

**2.** **USES PROHIBITED WITHIN THE FLOODPLAIN**. The following uses shall be prohibited within the floodplain, even if the use would otherwise be permitted by this *Resolution*:

    **a.** **LOWEST FLOOR**. Any residential structure in which the lowest floor, including the basement, is lower than one foot above the base elevation of the 100-year flood.

    **b.** **SANITARY LANDFILL**. A sanitary landfill or other site used for the storage or disposal of garbage, trash, debris, or similar materials, regardless of whether such storage or disposal is for commercial, governmental, or private purposes.

    **c.** **LUMBER STORAGE**. Any use involving the storage of lumber, trees, logs, or similar materials that, if flooded, could result in substantial solid debris being carried downstream by floodwaters.

    **d.** **STORAGE OF MATERIALS THAT MAY CREATE A HAZARD DURING A FLOOD**. The commercial or private storage or processing of materials that are flammable, explosive, or otherwise potentially injurious to human, animal, or plant life during floods. However, this limitation shall not prohibit private storage of motor fuel in containers that are anchored to protect and prevent flotation during flooding, nor shall motor fuel or heating fuel be prohibited from being stored underground, provided the storage tank is constructed to prevent floodwater contamination by the fuel, regardless of the damage done to above-ground structures.

    **e.** **STORAGE OR STOCKPILING OF MANURE.** Storage or stockpiling of manure that could result in the inundation of manure piles or manure piles being carried downstream by floodwaters.

**J.** **GENERAL STANDARDS FOR FLOOD HAZARD REDUCTION**. In all areas of flood hazards, the following standards apply:

    **1.** **GENERAL.** For waterways with Base Flood Elevations for which a regulatory Floodway has not been designated, no new construction, substantial improvements, or other development (including fill) shall be permitted within Zones A1-30 and AE on the community's FIRM, unless it is demonstrated that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one-half foot at any point within the community.

    **2.** **ANCHORING.**

        **a.** **NEW CONSTRUCTION**. All new construction and substantial improvement shall be anchored to prevent flotation, collapse, or lateral movement of the structure and capable of resisting the hydrostatic and hydrodynamic loads.

        **b.** **MANUFACTURED HOMES AND MOBILE HOMES**. All manufactured and mobile homes must be elevated and anchored to resist flotation, collapse or lateral movement and capable of resisting the hydrostatic and hydrodynamic loads. In addition to applicable State and County anchoring requirements for resisting wind forces, anchoring must be accomplished as follows:

BLM_0054092

1. **OVER-THE-TOP TIES**. Over-the-top ties at each of the four corners of the manufactured home, with two additional ties per side at intermediate locations, with manufactured homes less than 50 feet long requiring one additional tie per side; or

2. **FRAME TIES**. Frame ties at each corner of the home with five additional ties per side at intermediate points, with manufactured homes less than 50 feet long requiring four additional ties per side;

3. **MINIMUM FORCE CAPACITY**. All components of the anchoring system capable of carrying a force of 4,800 pounds; and shall ensure 15 psi lateral immobility of the home.

4. **ADDITIONS MUST BE ANCHORED**. Similar anchoring of any additions to the manufactured home.

3. **CONSTRUCTION MATERIALS AND METHODS**.

   a. **FLOOD RESISTANT MATERIALS**. All new construction and substantial improvements shall be constructed with materials and utility equipment resistant to flood damage.

   b. **FLOOD DAMAGE REDUCING METHODS**. All new construction and substantial improvements shall be constructed using methods and practices that minimize flood damage.

   c. **FLOOD-RESISTANT ELEMENTS**. All new construction and substantial improvements shall be constructed with electrical, heating, ventilation, plumbing, and air conditioning equipment and other service facilities that are designed and/or located to prevent water from entering or accumulating within the components during conditions of flooding.

4. **UTILITIES.**

   a. **WATER SUPPLY SYSTEMS**. All new and replacement water supply systems shall be designed to minimize or eliminate infiltration of flood waters into the system.

   b. **WASTEWATER TREATMENT SYSTEMS**. New and replacement wastewater treatment systems shall be designed to minimize or eliminate infiltration of flood waters into the systems and discharge from the systems into flood waters; and,

   c. **INDIVIDUAL SEWAGE DISPOSAL SYSTEMS**. On-site individual sewage disposal systems shall be located to avoid impairment to them or contamination from them during flooding.

5. **SUBDIVISION DESIGN**. Designs for land use change applications that propose the subdivision of land shall include the following:

   a. **MINIMIZING FLOOD DAMAGE**. All subdivision proposals shall be designed to minimize flood damage;

   b. **UTILITIES LOCATIONS**. All subdivision proposals that have public utilities and facilities including sewer, gas, electrical, and water systems shall locate and construct such systems to minimize flood damage;

   c. **DRAINAGE FACILITIES**. All subdivision proposals shall have adequate drainage provided to reduce exposure to flood damage;

   d. **BASE FLOOD ELEVATION DATA**. Base flood elevation data shall be provided for subdivision proposals and other proposed developments that contain at least 50 lots or five acres (whichever is less).

K. **SPECIFIC STANDARDS FOR FLOOD HAZARD REDUCTION**. In all areas of flood hazards where base flood elevation data has been provided, and areas removed from the floodplain by issuance of a LOMR-F, the following shall apply:

1. **RESIDENTIAL CONSTRUCTION**. New construction and substantial improvement of any residential structure shall have the lowest floor (including basement) elevated to one foot above the base flood elevation.

2. **COMMERCIAL, INDUSTRIAL OR OTHER NONRESIDENTIAL CONSTRUCTION**. New construction and substantial improvement of any commercial, industrial or other nonresidential structure shall either have the lowest floor (including basement) elevated to one foot above the base flood elevation; or, together with attendant utility and sanitary facilities, shall:

   a. **IS FLOOD PROOFED**. Be flood proofed so that one foot above the base flood elevation the structure is watertight with walls substantially impermeable to the passage of water;

BLM_0054093

**b. HAVE RESISTIVE STRUCTURAL COMPONENTS.** Have structural components capable of resisting hydrostatic and hydrodynamic loads and the effects of buoyancy; and,

**c. HAVE ENGINEER'S CERTIFICATION.** Be certified by a qualified professional engineer licensed in the State of Colorado that the design and methods of construction are in accordance with accepted standards of practice for meeting the requirements of this paragraph. Such certifications shall be provided to the Community Development Department as set forth in this Section.

3. **OPENINGS IN ENCLOSURES BELOW THE LOWEST FLOOR.** For all new construction and substantial improvements, fully enclosed areas below the lowest floor that are subject to flooding shall be designed to automatically equalize hydrostatic flood forces on exterior walls by allowing for the entry and exit of floodwaters. Designs for meeting this requirement must either be certified by a qualified professional engineer licensed in the State of Colorado or architect or must meet or exceed the following minimum criteria:

**a. MINIMUM NUMBER.** A minimum of two openings having a total net area of not less than one square inch for every square foot of enclosed area subject to flooding shall be provided;

**b. MINIMUM ELEVATION ABOVE GRADE.** The bottom of all openings shall be no higher than one foot above grade;

**c. FLOODWATER ENTRY AND EXIT.** Openings may be equipped with screens, louvers, or other coverings or devices provided that they permit the automatic entry and exit of floodwaters.

4. **RECREATIONAL VEHICLES.** All recreational vehicles shall be fully licensed and ready for highway use; or meet the floodplain development permit requirements and elevation and anchoring requirements for manufactured/mobile homes and be on a site fewer than 180 days.

5. **BRIDGES.** All bridges shall include a minimum one foot clearance, between the lowest horizontal member and the base flood elevation.

6. **NO INCREASED RISK.** No structures shall be erected and no activity take place in a manner or location that would increase the risk of flood damage to the property or personal safety of others, or would shift the hazard onto another owner's property.

7. **CRITICAL FACILITY.** All new and substantially improved critical facilities and additions to critical facilities shall have the lowest floor elevated to two feet above the base flood elevation; or be flood proofed to two feet above the base flood elevation.

**L. FLOODPLAIN DEVELOPMENT PERMIT REQUIRED.** A Floodplain Development Permit shall be obtained from the Community Development Department before any development begins within the 100-year floodplain.

1. **FLOODPLAIN DEVELOPMENT PERMIT APPLICATION.** The Community Development Department shall provide and the applicant shall complete an application form for floodplain development that at a minimum shall include:

**a. ELEVATION CERTIFICATE.** A copy of an Elevation Certificate, in a form prescribed by FEMA, with applicable sections completed, including certification by a qualified professional engineer licensed in the State of Colorado, is required for any proposed structure. Colorado Professional Engineers should use methodology acceptable to the Federal Emergency Management Agency, including methods noted in *Managing Development in Floodplains in Approximate A Zone Areas - A Guide For Obtaining and Determining Base (100-year) Flood Elevations,* FEMA publication 265, April 1995.

**b. BUFFER AREA COMPLIANCE.** Evidence of compliance with Section 11-107: *Protection of Water Quality*, if applicable;

**c. WETLANDS PROTECTION COMPLIANCE.** Evidence of compliance with Section 404 of the *Federal Clean Water Act* concerning protection of wetlands, if applicable;

**d. ISDS COMPLIANCE.** Evidence of compliance with the *Gunnison County On-Site Wastewater Treatment System Regulations*, if applicable;

**e. MAPS AND PLANS.** Maps and plans stamped by a qualified professional engineer licensed in the State of Colorado showing:

1. **SITE LOCATION;**

2. **LEGAL DESCRIPTION.** Legal description of parcel;

3. **BOUNDARIES.** Boundaries of 100-year floodplain;

BLM_0054094

4. **WATERCOURSES.** Names and locations of all watercourses, ponds, lakes, and other bodies of water;

5. **ELEVATION.** Elevation in relation to mean sea level of the lowest floor (including basement) of all new or substantially improved structures, and a statement whether or not they structures contain basements;

6. **PROPOSED FLOOD PROOFING.** Proposed elevations in relation to mean sea level that structures will be, or have been flood proofed, if applicable;

7. **ROADWAYS.** Location of existing roads and utilities;

8. **WATER SUPPLY.** Existing water supply ditches, irrigation ditches and laterals;

9. **CROSS-SECTIONS.** Typical valley cross-section (where required) showing:

   a. **WATERCOURSE CHANNELS.** Channels of any watercourses;

   b. **FLOODPLAIN LIMITS.** Limits of floodplain adjoining each side of channel;

   c. **FLOODWAY DELINEATION.** Delineation of floodway, if applicable;

   d. **DEVELOPMENT SITE.** Area to be occupied by the proposed development;

10. **ALTERATION OF WATERCOURSE.** A description of the extent to that any watercourse is proposed to be altered or relocated as a result of the proposed development;

11. **DRAINAGE FACILITIES.** A description of proposed drainage system including, if appropriate, design drawings and construction specifications showing typical sections and noting standards to be applied;

12. **CONSTRUCTION SPECIFICATIONS.** Design and construction specifications for structures, flood proofing, bridges, filling, dredging, grading, channel improvements, storage of materials and utilities, as applicable;

13. **INDIVIDUAL SEWAGE DISPOSAL SYSTEMS LOCATIONS.** Location of individual sewage disposal systems, if applicable;

14. **ADDITIONAL APPLICABLE INFORMATION.** Such additional information as may be required by the Community Development Department, to determine if the requirements of this Section have been or will be fulfilled.

2. **ACTION ON FLOODPLAIN DEVELOPMENT PERMIT APPLICATIONS.**

   a. **COMMUNITY DEVELOPMENT DEPARTMENT REVIEW.** The Community Development Department shall review all submitted information, shall evaluate the suitability of the proposed use in relation to the flood hazard, and may forward any application to the appropriate Colorado agency, or to an engineering firm of the County's choice, to review the application and provide technical expertise in evaluating the flood potential of a given site.

   b. **COMMUNITY DEVELOPMENT DEPARTMENT APPROVAL OR DENIAL.** If the Community Development Director determines that the application for a Floodplain Development Permit meets the requirements of this Section, he shall sign and issue the permit and may attach any conditions as deemed necessary to ensure compliance with this Section. If the Director determines that the requirements cannot reasonably be met, the application shall be denied.

3. **APPEAL OF ACTION ON FLOODPLAIN DEVELOPMENT PERMITS.** The applicant, or any affected person aggrieved by a decision on an application for a Floodplain Development Permit, may appeal such decision by filing a written appeal. The appeal shall follow the process outlined in Section 8-103: *Appeals,* and shall be limited solely to the question of the action taken on the Floodplain Development Permit application. The Board's decision on such appeal shall be final and subject only to judicial review.

4. **EXPIRATION OF FLOODPLAIN DEVELOPMENT PERMIT.** A Floodplain Development Permit shall expire two years after the date of issuance if the permit holder has not begun construction pursuant to the permit.

M. **REQUIREMENT FOR BASE FLOOD ELEVATION CERTIFICATE.** A Base Flood Elevation Certificate shall be provided to the Community Development Department before any Building Permit is issued for construction within the 100-year floodplain.

BLM_0054095

1. **PRE-CONSTRUCTION**. A base flood elevation certificate, completed as required by FEMA, shall be submitted for each structure to be constructed within the 100-year floodplain, and is subject to review and approval by the Community Development Department before any grading or Building Permit is issued for the structure.

2. **POST-CONSTRUCTION**. After completion of each structure constructed within the 100-year floodplain, the remaining applicable Sections of the elevation certificate shall be completed by the applicant and is subject to review and approval by the Community Development Department before a Certificate of Occupancy is issued.

N. **VARIANCES FROM THIS SECTION**. Any property owner seeking relief from the requirements of this, other than Section 11-103.: H. 1. *Uses Permitted in the Floodway* and Section 11-103: H.2. *Uses Prohibited in the Floodway* may file a variance request to the Board.

1. **USES FOR WHICH VARIANCES MAY BE GRANTED**. Variances may be issued for new construction and substantial improvements and for other development necessary for the conduct of a functionally dependent use, provided that the requirements for a Floodplain Development Permit and Federal 404 permit are met.

2. **APPLICATION FORM FOR VARIANCE**. The Community Development Department shall provide an application form for variance from this Section. At a minimum, the form shall include:

   a. **APPLICANT**. The applicant's name, address, telephone and fax numbers, and e-mail address, if applicable. If the applicant is to be represented by an agent, a notarized letter signed by the applicant shall be submitted, authorizing the agent to represent the applicant and stating the representative's name, address, and telephone number.

   b. **PROPERTY OWNER**. Name of the owner of the property; if different than the applicant, submit a notarized letter from the owner consenting to the application, must be submitted.

   c. **PRIMARY CONTACT PERSON/AUTHORIZED REPRESENTATIVE**. Name of the primary person and/or authorized representative with whom the Planning Office should be communicating.

   d. **PROPERTY LOCATION**. The legal description (referencing lot and block or tract numbers, homesteads), property address and common description of the parcel on which the land use change is proposed to be located. A copy of the recorded deed to the property, and/or a metes and bounds description should be included.

   e. **PRESENT LAND USE**. Identify present land uses and locations and sized of structures that exist on the property.

   f. **DESCRIPTION OF VARIANCE REQUESTED**. A description of the requested variance, citing this Section and the specific section from which the variance is requested and why the variance is requested. The applicant shall also address how the request meets the standards of Section 11-103: N. 6: *Criteria for Evaluating Variance Requests.*

3. **COMMUNITY DEVELOPMENT DEPARTMENT REVIEW AND REPORT**. The Community Development Department shall review the application, and prepare a report that, at a minimum, describes the proposed application for variance, its compliance with Section 11-103: N. 6.: *Criteria for Evaluating Variance Requests*, and that includes copies of, or reference to, engineering reports or similar data that address the application.

4. **MEETING WITH BOARD**. Once a completed application is received, a meeting will be scheduled on the next available Board agenda. No public hearing is required.

   a. **COMMUNITY DEVELOPMENT DEPARTMENT REPORT**. The Community Development Department shall present its report.

   b. **APPLICANT PRESENTATION**. The applicant shall, at his/her choice, present the application for variance, and the reasons for requesting it.

5. **BOARD DECISION**. The Board shall make a decision to deny, approve, or approve with conditions, having considered Section 11-103: N. 6: *Criteria for Evaluating Variance Requests*, and having made relevant findings based on Section 11-103: N. 7: *Findings for Approval of Variance Requests.*

6. **CRITERIA FOR EVALUATING VARIANCE REQUESTS**. In reviewing variance requests, the Board shall consider all technical evaluations, all relevant factors, the requirements and standards in this Section, and the following:

   a. **POTENTIAL FOR DEBRIS TRANSPORT**. The danger that materials may be carried by flood waters onto other lands to the injury of others;

BLM_0054096

b. **HAZARD TO LIFE AND PROPERTY**. The danger to life and property due to flooding or erosion damage;

c. **SUSCEPTIBILITY TO FLOOD DAMAGE**. The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner;

d. **VALUE OF FACILITY TO THE COMMUNITY.** The importance of the services provided by the proposed facility to the community;

e. **IMPORTANCE OF LOCATION**. The necessity of a waterfront location, where applicable;

f. **COMPATIBILITY.** The compatibility of the proposed use with existing development;

g. **RELATIONSHIP WITH OTHER PLANS AND PROGRAMS**. The relationship of the proposed use to any adopted area plan, and floodplain management program for that area;

h. **ACCESS SAFETY**. The safety of access to the property in times of flood for ordinary emergency vehicles;

i. **CHARACTERISTICS OF FLOODING**. The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site;

j. **PUBLIC COSTS**. The costs of providing governmental services during and after flood conditions, including maintenance and repair of roads, bridges and utilities; and

k. **AVAILABILITY OF ALTERNATIVE LOCATIONS**. The availability of alternative locations not subject to flooding or erosion damage.

7. **FINDINGS FOR APPROVAL OF VARIANCE REQUESTS**. Variances shall be approved by the Board, only upon the following Findings:

a. **THE USE IS A REGISTERED HISTORIC PLACE**. The use is the reconstruction, rehabilitation or restoration of structures listed on the National Register of Historic Places or the Colorado Inventory of Historic Places; or

b. **GOOD CAUSE**. There is good and sufficient cause; and

c. **EXCEPTIONAL HARDSHIP**. A determination that failure to grant the variance would result in exceptional hardship to the applicant; and

d. **NO ADDITIONAL THREATS TO PUBLIC SAFETY**. A determination that the granting of the variance will not result in increased flood heights, additional threats to public safety, or extraordinary public expense; and

e. **COMPLIANCE WITH OTHER REGULATIONS**. There is no conflict with other codes or regulations adopted and administered by Gunnison County; and

f. **ONLY METHOD TO AFFORD RELIEF**. A determination that the variance is the minimum necessary, considering the flood hazard, to afford relief; and

g. **REQUEST IS NOT A SELF-IMPOSED HARDSHIP**. A determination that the special circumstances and conditions have not resulted from any act of the applicant, or his/her predecessor.

8. **NOTICE TO APPLICANT**. Any applicant to whom a variance is granted shall be given written notice that the structure will not be permitted to be built with a lowest floor below the base flood elevation and that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced lowest flood elevation.

9. **EFFECTIVE DATE FOR VARIANCES**. The variance shall become effective as of the approval date.

10. **EXPIRATION OF VARIANCES**. Variances from the requirements of this Section shall expire two years after the date of approval if the permit holder has not begun construction as permitted by the variance.

O. **RECORD KEEPING REQUIREMENTS**.

1. **ELEVATION CERTIFICATES**. The Community Development Department shall keep on file an elevation certificate for each building constructed or flood proofed, and for which a Building Permit was issued in the 100-year floodplain after the effective date of this *Resolution*.

2. **REPORTING VARIANCES**. The Community Development Department shall report any variances granted in an annual report to FEMA.

3. **LETTERS OF MAP AMENDMENT OR MAP REVISION**. The Community Development Department shall keep on file any Letters of Map Amendment or Map Revision approved by FEMA and not yet depicted on the Flood Insurance Rate Maps or Flood Insurance Study published by FEMA for Gunnison County.

BLM_0054097

4. **FLOOD STUDIES**. The Community Development Department shall keep on file flood studies for use in implementing the requirements of this Section or as the basis for issuance of a Floodplain Development Permit.

5. **APPEALS AND VARIANCES**. The Community Development Department shall keep on file a record of all actions of appeals and variances from the requirements of this Section, including technical information used as justification for their issuance.

6. **NOTIFICATION OF CHANGES TO WATERCOURSES.** The Community Development Department shall notify adjacent communities, adjacent property owners who may be affected, and the Colorado Water Conservation Board before any alteration or relocation of a watercourse by publishing a notice once in a newspaper of general circulation in Gunnison County and shall submit evidence of such notification to FEMA.

P. **ENFORCEMENT OF FLOODPLAIN REGULATIONS.** It shall be illegal to erect, construct, reconstruct, alter, maintain or use any structure, or use any land in violation of this Section. Any person, firm or corporation violating any portion of these regulations may be subject to enforcement requirements pursuant to Article 16: *Enforcement*.

## SECTION 11-104: DEVELOPMENT IN AREAS SUBJECT TO GEOLOGIC HAZARDS

A. **PURPOSE.** There are certain lands in Gunnison County that have the potential to pose hazards to human life and safety and to property due to their geologic characteristics. Geologic hazard areas include avalanche areas, landslide areas, rockfall areas, alluvial fans, talus slopes, steep or potentially unstable slopes, Mancos shale, mudflow hazard areas, and faults.

This Section is intended to ensure that development avoids geologic hazard areas whenever possible. Where it is not possible for development to avoid these areas, standards are provided to reduce or minimize the potential impacts of these hazards on the occupants of the property and the occupants of adjacent properties, and to reduce or minimize the environmental impacts of development in these areas.

B. **MAPS INCORPORATED.** The Gunnison County Geologic Hazard Maps, prepared by the Colorado Geologic Survey, are incorporated into this *Resolution* by Section 1-112: *Use of Maps.* Copies of the maps are available for review by the public in the Community Development Department during normal business hours.

C. **APPLICABILITY.** The requirements of this Section shall apply to land use changes in the following areas:

1. **AREAS DESIGNATED ON THE GEOLOGIC HAZARD MAPS**. Land use changes on lands that are designated on the Gunnison County Geologic Hazards Maps as avalanche areas, landslide areas, rockfall areas, alluvial fans, talus slopes, steep or potentially unstable slopes, Mancos shale, mudflow hazard areas, and faults.

2. **AREAS NOT INCLUDED, OR NOT DESIGNATED ON THE GEOLOGIC HAZARD MAPS**. Proposed land use changes in areas of the County not mapped on the County's Geologic Hazard Maps and proposed land use changes on lands shown on the maps, but that are not designated as being located in one of the above-listed geologic hazards, and have been identified by Community Development Department onsite observation, or by an evaluation by a qualified professional engineer licensed in the State of Colorado, or other similarly qualified source as potentially being in a geologic hazard area may be reviewed as at least an Administrative Review Project, and to mitigate any applicable geologic hazard pursuant to this Section, before receiving a Building Permit.

D. **PLAN REQUIRED TO BE SUBMITTED SHOWING HAZARDS AND IDENTIFYING AVOIDANCE OR MITIGATION**. When a Land Use Change Permit is sought in areas that have been identified on the Gunnison County Geologic Hazard maps as being in a geologic hazard area, a copy of the mapped area, or in areas identified in Section 11-104: C. 2: *Areas Not Included, or Not Designated on the Geologic Hazard Maps*; and a narrative indicating how the hazard will be avoided or mitigated pursuant to this Section is required to be included as part of the submittal.

E. **REFERRAL TO COLORADO GEOLOGIC SURVEY**. When a Land Use Change Permit is sought in areas that have been identified on the Gunnison County Geologic Hazard Maps as being in a geologic hazard area, the Community Development Department shall submit the application to the Colorado Geological Survey (CGS), for review and comment. The application will be subject to that agency's standard process and fee schedule.

1. **REVIEW BY CGS**. As statutorily required by the State, CGS will review the application and provide comments to the Community Development Department. The purpose of this review is to make use of the expertise and judgment of CGS to evaluate the potential impacts of these hazards on development, and to determine the appropriate avoidance or mitigation techniques that should apply to the proposed development.

2. **DETERMINATION BY CGS**. If CGS determines there are geologic hazards on the property that have not been adequately addressed by the applicant, or that the application is otherwise incomplete or inadequate, the County shall require the applicant to revise the application to address those hazards.

BLM_0054098

**F.   STANDARDS APPLICABLE TO LAND USE CHANGES IN ALL GEOLOGIC HAZARD AREAS**. The following standards shall apply to land use changes in all geologic hazard areas:

1. **RESIDENTIAL BUILDING IN AVALANCHE RED ZONE IS PROHIBITED**. Residential building shall be prohibited in the Red Zone areas of avalanche.

2. **USES CAUSING UNDUE DANGER OR SUBSTANTIAL PUBLIC EXPENSE ARE PROHIBITED**. Any land use change proposed in geologic hazard areas that subject people (including emergency service personnel and residents of neighboring properties) to undue dangers, or that will possibly result in substantial public expenses required to mitigate hazardous conditions, respond to emergencies created by such conditions, or rehabilitate infrastructure or lands, or that cannot otherwise be accomplished in a manner that the applicant demonstrates will be safe, shall be prohibited.

3. **DEVELOPMENT IN AVALANCHE BLUE ZONES, ROCKFALL, LANDSLIDE, ALLUVIAL FANS AND MUDFLOW HAZARD AREAS, FAULTS AND TALUS SLOPES.** A land use change may be permitted in the Blue Zone of an avalanche hazard area, or in a rockfall, or landslide hazard area, alluvial fan, mudflow hazard areas, faults or talus slope, when the applicant demonstrates that:

   a. **HAZARD CANNOT BE AVOIDED.** The land use change cannot avoid the hazard area because there are no hazard-free areas on the property, or no hazard-free routes to provide access to the development; and

   b. **RESTRICTED TO LEAST HAZARDOUS AREAS.** The land use change has been restricted to those areas on the property that are subject to the least degree of potential hazard and has been located as far away as possible from avalanche paths, landslide paths, rockfall paths, mudflow or alluvial fans, or faults.

4. **LIMITATIONS ON USES AND DENSITY.** When there are no hazard-free areas on a property or no hazard-free routes to provide access, then to prevent or minimize potential dangers, the land uses shall be subject to the following mitigation standards:

   a. **HAZARDS WILL BE MITIGATED.** Site planning and engineering techniques will substantially mitigate any potential hazards to public health, safety and welfare;

   b. **NOT INITIATE OR INTENSIFY ADVERSE NATURAL CONDITIONS**. The proposed development activities will not cause or intensify adverse natural conditions in a geologic hazard area;

   c. **COMPLY WITH GENERALLY APPLICABLE STANDARDS**. The land use change will comply with this Section; and

   d. **COMPLY WITH STANDARDS FOR PARTICULAR HAZARD**. The land use change will comply with the applicable standards for the particular type of hazard, in Section 11-104: G: *Standards Applicable to Development in Particular Geologic Hazard Areas.*

5. **WARNING AND DISCLAIMER**. As a condition of approval of the proposed land use change, the following language shall be included on the Final Plat for a subdivision, and within the applicable recorded document that approves the Land Use Change Permit, the applicant shall sign the following warning and disclaimer:

**WARNING AND DISCLAIMER OF GEOLOGIC HAZARDS**
**AFFECTING USE AND OCCUPANCY OF THIS PROPERTY**

   *"I/We, _____ (owner(s) of property) on behalf of myself/ourselves and all successors, heirs and assigns, hereby acknowledge having been informed by Gunnison County of the existence of geologic hazard areas that may affect the use and occupancy of this property, and any improvements thereto. I/We acknowledge that the County's approval of this land use change does not guarantee the safety of the property, or in any way imply that areas outside of the designated hazard areas will be free from hazards and hereby agree to indemnify, defend and save harmless the County, its agents, officers and employees from and against any and all liability, expense including defense costs and legal fees, and claims for damages of any nature whatsoever, including, bodily injury, death, personal injury, or property damage arising from or connected with any activity related to these hazards, including any suits, liability, or expense."*

6. **DESIGN BY A QUALIFIED PROFESSIONAL ENGINEER LICENSED IN THE STATE OF COLORADO OR OTHER QUALIFIED PROFESSIONAL**. When the collection and submittal of data, and design of structural or mechanical elements are required by this Section, the data and design shall be shall be based on site-specific geo-technical analysis and recommendations certified by a qualified professional engineer licensed in the State of Colorado, or by a qualified professional geologist.

BLM_0054099

7. **MEASURES REQUIRED BEFORE OR DURING INITIAL CONSTRUCTION.** When an applicant is permitted to develop in an area that is subject to geologic hazards, the applicant shall construct, install, or otherwise provide all required measures to mitigate the geologic hazards to the maximum extent feasible before or at the time of initial construction. This requirement shall also apply to the roads and utilities that serve permitted uses.

G. **STANDARDS APPLICABLE TO DEVELOPMENT IN PARTICULAR GEOLOGIC HAZARD AREAS.** All land use changes in areas identified as geologic hazards in 11-104: C: *Applicability*, or in areas determined to be geologic hazards, pursuant to Section 11-104: E. 2: *Determination by CGS,* shall comply with Section 11-104: F: *Standards Applicable to Land Use Changes in All Geologic Hazard Areas*, and with the following hazard-specific requirements and standards:

1. **DEVELOPMENT IN AVALANCHE HAZARD AREAS.** Development shall permitted to occur in avalanche hazard areas only when the applicant demonstrates that the development cannot avoid such areas, pursuant to Section 11-104: F. 3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and that it complies with the following minimum requirements and standards, as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist specializing in avalanche hazard area identification and analysis, and approved by the County:

   a. **AVALANCHE PATH DELINEATION AND HAZARD DESIGNATION.** When development is proposed in or adjacent to potential avalanche paths, as determined by Gunnison County, the magnitude and frequency of the avalanche path affecting the development shall be defined as follows:

      1. **RED (HIGH HAZARD) ZONE.** The Red Zone is an area affected by avalanches with return periods of 30 years or less and/or by avalanches producing impact pressures on flat surfaces normal to the flow direction of 600 lbs./ft.$^2$ or more. Residential building construction shall be prohibited in Red Zones; driveways and subdivision roads shall avoid areas where avalanches have return periods of fewer than 10 years; utilities shall be buried or otherwise designed to minimize avalanche exposure.

      2. **BLUE (SPECIAL ENGINEERING) ZONE.** The Blue Zone is an area affected by avalanches with return periods of more than 30 but fewer than 300 years and by avalanches capable of producing impact pressures on flat surfaces normal to the flow direction of less than 600 lbs./ft.$^2$. Residential building construction shall be permitted in the Blue Zone only if that construction has been certified by a qualified professional engineer licensed in the State of Colorado to withstand avalanche impact and static loads and that the structure has been otherwise protected by external avalanche-defense structures that have been similarly certified by that engineer, and the following standards have been met:

         a. **DESIGN LOADING AND OTHER DESIGN CRITERIA.** Design-loading criteria and other criteria used to design avalanche defense structures shall be developed on a site-specific basis by the engineer, who must explicitly identify the methods used to develop those criteria.

         b. **STRUCTURAL BARRIERS.** When the proposed location of development alone will not provide adequate protection for people and structures from avalanche hazards, then structural barriers shall be placed in the avalanche starting zone, track or runout zone (including, but not limited to excavations, berms, dams, retaining structural walls, direct protection structures and similar devices), or accepted avalanche diversion or control practices shall be used.

            1. **DESIGN.** All proposed structural barriers shall be designed to withstand snow creep and vertical forces, avalanche impact and deposition forces, and air pressures. The proposed locations, dimensions, and specifications of those structural barriers shall be included in the application. The dynamic characteristics of the design avalanche upon which the structural design is based shall be specified, including avalanche runout distance, velocity, flow depth, density and impact pressure potential.

         c. **DIVERTED PATH.** If an application proposes to divert potential avalanches from the proposed development or in any manner alter an existing avalanche path, the plans shall clearly show the anticipated path the diverted avalanche is expected to follow.

   b. **RISK OF HAZARD SHALL NOT BE INCREASED.** No device to be constructed as a barrier against potential avalanches or alteration of an existing avalanche path shall be designed in a manner or location that would increase the risk of avalanche damage to the property or personal safety of others, or would shift the hazard onto another owner's property.

BLM_0054100

**c.** **ROADS SHALL AVOID AREAS OF RETURN FEWER THAN TEN YEARS.** Roads intended for winter use shall avoid areas where avalanches with return periods of fewer than 10 years cross roads. If it is not possible to design the road to avoid avalanche hazard areas, then the road shall be designed to limit the exposure of users to the hazard and to use avalanche control practices to reduce the danger along exposed road segments. Where the main access road (whether public or private) to a proposed land use change is crossed by an avalanche path, then a secondary access way may be required, or the road may be subject to periodic or seasonal closures in order to avoid unnecessary exposure to the danger.

**d.** **UTILITIES.** All utilities shall be located and constructed to minimize or eliminate the possibility of damage to them by an avalanche. This shall include burying utility lines that cross avalanche hazard areas and protecting above-ground utility facilities located in moderate or high avalanche hazard areas by the use of avalanche barriers or diversion techniques.

**e.** **VEGETATION REMOVAL.** Clear-cutting, or other large-scale removal of vegetation in avalanche path starting zones or in other locations that can increase the potential avalanche hazard on the property, shall be prohibited.

**f.** **NOTICE OF HAZARD.** In the application, the applicant shall describe the methods to be employed to give notice to the public and to prospective purchasers of the subject property that an avalanche hazard exists, including the following:

    **1.** **WARNING SIGNS.** Placement of warning signs on any road or trail that crosses an avalanche path; and

    **2.** **DEED RESTRICTIONS, PROTECTIVE COVENANTS AND PLAT NOTES.** Proposed deed restrictions, protective covenants, and plat notes identifying special structural requirements to be imposed upon structures built in the development or any seasonal use limitations designed to protect them and their inhabitants from avalanche damage.

**g.** **OWNERS SHALL BE RESPONSIBLE.** Property owners who develop in, construct, implement, maintain, improve and bear the cost of their development's proportionate share of all reasonable measures necessary to mitigate any avalanche related hazard created by such development.

**h.** **EXTRACTIVE OPERATIONS.** Extractive operations in avalanche hazard areas shall be prohibited when snow is on the ground in the proximity of the operation, unless a program of avalanche control and defense measures has been approved by the County to protect the operation.

**2.** **DEVELOPMENT IN LANDSLIDE HAZARD AREAS.** Development shall be permitted to occur in landslide hazard areas only if the applicant demonstrates that the development cannot avoid such areas, pursuant to Section 11-104: F. 3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with the following minimum requirements and standards, as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist.

**a.** **CONSTRUCTION PRACTICES.** When the proposed location of development alone will not provide adequate protection for people and structures from landslide hazards, then the applicant shall also comply with construction practices recommended by a qualified professional engineer licensed in the State of Colorado, or by a qualified professional geologist, and approved by the County to artificially stabilize, support, buttress or retain the potential slide area and to control surface and subsurface drainage that affects the slide area. The proposed locations, dimensions, and specifications of such mitigation measures shall be included in the application.

**b.** **PROHIBITED ACTIVITIES.** The following development activities shall be prohibited in landslide hazard areas:

    **1.** **ADD WATER OR WEIGHT.** Activities that add water or weight to the top of the slope, or along the length of the slope, or otherwise decrease the stability of the hazard area. Measures and structural improvements to permanently control surface and subsurface drainage from the development shall be required.

    **2.** **REMOVE SUPPORT MATERIAL.** Activities that remove vegetation or other natural support material that contributes to its stability.

    **3.** **INCREASE STEEPNESS OF SLOPE.** Activities that increase the steepness of a potentially unstable slope.

BLM_0054101

    **4.** **REMOVE TOE OF LANDSLIDE**. Activities that remove the toe of the landslide, unless adequate mechanical support is provided.

**3.** **DEVELOPMENT IN ROCKFALL HAZARD AREAS.** Development shall be permitted to occur in rockfall hazard areas only if the applicant demonstrates that the development cannot avoid such areas, pursuant to Section 11-104: F. 3: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with the following minimum requirements and standards, as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist:

    **a.** **CONSTRUCTION PRACTICES**. When the proposed location of development alone will not provide adequate protection for people and structures from rockfall hazards, then the applicant shall comply with construction practices recommended by a qualified professional engineer licensed in the State of Colorado, or by a qualified professional geologist, and approved by the County, designed to minimize the degree of hazard. The proposed locations, dimensions and specifications of such practices shall be included in the application, along with requirements for periodic maintenance of any measures that are installed. Construction practices may include:

        **1.** **STABILIZATION**. Stabilizing rocks by bolting, gunite application (cementing), removal of unstable rocks (scaling), cribbing, or installation of retaining walls;

        **2.** **CATCHING, SLOWING OR DIVERTING ROCKS**. Slowing or diverting moving rocks with rock fences, screening, and channeling, damming, or constructing concrete barriers or covered galleries. If an applicant proposes to divert a potential rockfall from the development or to alter an existing rockfall path in any manner, the plans shall clearly specify the dynamics of the design rockfall event upon which the proposed mitigation is based, including rock source area, mass, velocity, bounce height, and energy. When rocks are to be diverted, the plans shall clearly show the anticipated path the diverted rockfall is expected to follow; and

        **3.** **BARRIERS**. Installation of physical barriers around vulnerable structures to prevent rock impact.

    **b.** **RISK OF HAZARD SHALL NOT BE INCREASED**. No device to be constructed as a barrier against potential rockfall or alteration of an existing rockfall path shall be designed in a manner or location that would increase the risk of rockfall or other damage to the property or personal safety of others, or create an increased hazard, or would shift the hazard onto another owner's property.

    **c.** **PROHIBITED ACTIVITIES**. The following development activities shall be prohibited in rockfall hazard areas:

        **1.** **ADD WATER OR WEIGHT**. Activities that add water or weight to, or otherwise decrease the stability of, cliffs or overhanging strata.

        **2.** **REMOVE SUPPORT MATERIAL**. Activities that remove vegetation or other natural support material, or that make excavations or cause erosion that will reduce the stability of, or remove underlying support to, a rockfall hazard.

**4.** **DEVELOPMENT IN ALLUVIAL FAN HAZARD AREA**. Development shall only be permitted to occur in an alluvial fan only if the applicant demonstrates that the development cannot avoid such areas, pursuant to Section 11-104: F. 3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with the following minimum requirements and standards, as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist and approved by the County:

    **a.** **PROTECTIVE MEASURES**. The proposed development shall be protected, using structures or other measures on the uphill side of the proposed land use change that channelize, dam, or divert the potential mud or debris flow. The dynamics of the alluvial-fan process, including velocity, flow height, discharge, and impact-pressure potential upon which the protective measures are based shall be clearly specified.

    **b.** **DISTURBANCE ABOVE ALLUVIAL FAN.** Disturbance shall be prohibited in the drainage basin above an alluvial fan, unless an evaluation of the effect on runoff and stability of the fan and on the ground water recharge area conducted by a qualified professional engineer licensed in the State of Colorado, or a qualified professional geologist shows that disturbance is not substantial or can be successfully mitigated.

**5.** **DEVELOPMENT ON TALUS SLOPES**. Development shall be permitted to occur on a talus slope only if the applicant demonstrates that the development cannot avoid such areas, pursuant to Section 11-104: F.3: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with the following minimum requirements and standards, as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist and approved by the County:

BLM_0054102

    **a.** **WITHSTAND DOWN SLOPE MOVEMENT**. The development shall be designed to withstand down slope movement.

    **b.** **BURIED FOUNDATION AND UTILITIES.** The design shall include buried foundations and utilities below the active talus slope surface.

    **c.** **MINIMIZE SITE DISTURBANCE**. Site disturbance shall be minimized, to avoid inducing slope instability.

    **d.** **REMOVAL OF TOE OF SLOPE.** The toe of a talus slope shall not be removed, unless adequate mechanical support is provided.

**6.** **DEVELOPMENT ON SLOPES GREATER THAN 30 PERCENT**. Development shall be permitted to occur on slopes greater than 30 percent only if the applicant demonstrates that the development cannot avoid such areas, pursuant to Section 11-104: F. 3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with the following minimum requirements and standards, as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist:

    **a.** **CUTTING AND FILLING**. Cutting, filling, and other grading activities shall be confined to the minimum area necessary for construction and shall comply with the requirements of Section 13-116: *Grading and Erosion Control*, and Section 13-117: *Drainage, Construction and Post-Construction Storm Water Runoff.*

    **b.** **DESIGN SHALL FIT SITE**. Development shall be located and designed to follow natural grade, rather than adjusting the site to fit the structure. For example, instead of creating a single flat bench or terrace for a building platform, the structure should instead be stepped up or down the hillside. Roads and driveways built to serve the development shall follow the contours of the natural terrain and, if feasible, shall be located behind existing landforms. When applicable possible, driveways that serve more than one lot are encouraged required, to minimize necessary grading, paving and site disturbance.

    **c.** **RECLAMATION OF DISTURBED AREAS**. Areas disturbed during development shall be restored as natural-appearing landforms that blend in with adjacent undisturbed slopes. Abrupt angular transitions and linear slopes shall be avoided. Areas disturbed by grading shall be contoured so they can be re-vegetated, and shall be planted and shall have vegetation established and growing within two growing seasons, using species with a diversity of native and/or desirable non-native vegetation capable of supporting the post-disturbance land use. Species planted shall include those that will provide for quick soil stabilization, provide litter and nutrients for soil building and are self-renewing. Top soil shall be stockpiled and placed on disturbed areas. Retaining walls made of wood, stone, vegetation or other materials that blend with the natural landscape should be used to reduce the steepness of cut slopes and to provide planting pockets conducive to revegetation. Where such materials cannot be used, masonry that conveys a scale and texture similar to that of traditional surrounding rock walls shall be used.

    **d.** **UTILITIES.** Utilities serving the development shall be placed underground, in existing or proposed road rights-of-way, to the maximum extent feasible, unless such placement would cause significant disturbance to a sensitive natural area or feature. Underground utility easements shall have vegetation established and growing within two growing seasons.

    **e.** **DEVELOPMENT PROHIBITED**. Development shall be prohibited on any slope in excess of 30 percent that is also located in an area that is determined to be a severe wildfire hazard area, pursuant to Section 11-104: C: *Applicability.*

**7.** **UNSTABLE OR POTENTIALLY UNSTABLE SLOPES**. If a site is designated on the Gunnison County Geologic Hazard Maps, or are otherwise identified in Section 11-104: C.2.: *Areas Not Included or Not Designated on the Geologic Hazard Maps* as having moderate or extremely unstable slopes, then development shall be permitted only if the applicant demonstrates that the development cannot avoid such areas pursuant to Section 11-104: F. 3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with geotechnical design and construction stabilization and maintenance measures as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist and approved by the County. Practices that shall be avoided on unstable slopes include:

    **a.** **CUTTING INTO A SLOPE**. Cutting into the slope without providing adequate mechanical support;

    **b.** **ADDING WATER OR WEIGHT**. Decreasing slope stability by adding water or weight to the top of the slope, or along the length of the slope;

    **c.** **REMOVING VEGETATION**. Removing vegetation from the slope without timely replacement and ensured viability of similar vegetation; and

BLM_0054103

    **d.**  **OVER-STEEPENING**. Activities that over-steepen the existing grade of an unstable slope.

**8.**  **DEVELOPMENT ON MANCOS SHALE**. Development in a Mancos shale area shall be designed based upon an evaluation of the development's effect on slope stability and shrink-swell characteristics. Development shall be permitted only if the applicant demonstrates that the development cannot avoid such areas pursuant to Section 11-104: F. 3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with design, construction stabilization, and maintenance measures as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist and approved by the County. At a minimum, development design shall:

    **a.**  **DRAIN AWAY FROM FOUNDATIONS**. Provide positive surface drainage away from foundations and other such facilities; and

    **b.**  **CONCENTRATE RUNOFF INTO NATURAL DRAINAGES**. Concentrate runoff from impervious surfaces into natural drainages, or onto another owner's property, so that no adverse impacts result, either to the development site, or to another owner's property.

**9.**  **DEVELOPMENT IN MUDFLOW HAZARD AREAS**. Development shall be permitted in a mudflow hazard area only if the applicant demonstrates that the development cannot avoid such areas pursuant to Section 11-104: F.3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with mitigating design, construction stabilization, and maintenance measures are used, as certified by a qualified professional engineer licensed in the State of Colorado or qualified professional geologist and approval by the County. Such measures may include channelization, diversion dikes, special foundations, and debris catchment basins.

**10.**  **DEVELOPMENT OVER FAULTS.** Development shall be permitted over faults only if the applicant demonstrates that the development cannot avoid such areas pursuant to Section 11-104: F.3.: *Development in Avalanche Blue Zones, Alluvial Fans and Mudflow Hazard Areas* and the development complies with the design incorporates mitigation measures based on geotechnical analysis and recommendations conducted by a qualified professional engineer licensed in the State of Colorado, or by a qualified professional geologist and approved by Gunnison County.

## SECTION 11-105: DEVELOPMENT IN AREAS SUBJECT TO WILDFIRE HAZARDS

**A.**  **PURPOSE.** There are certain types of lands in Gunnison County that may be hazardous to human life and safety and to property due to their potential for wildfire. The purpose of this Section is to ensure that development avoids these hazard areas whenever possible. When avoidance is not possible, to provide standards to reduce or minimize the potential threats that wildfire may pose to the safety of occupants, their property, and emergency service personnel.

**B.**  **APPLICABILITY.** The requirements of this Section shall apply to any development in areas designated as wildfire hazard areas on the Wildfire Hazard Maps, and in areas where the Colorado State Forest Service determines that there is the potential for a proposed development to be threatened by a wildfire hazard.

**C.**  **MAPS INCORPORATED.** The Gunnison County Wildfire Hazard Maps, prepared by the Colorado State Forest Service, shall be used as references for determining when parcels are located within wildfire hazard areas, pursuant to Section 1-112: *Use of Maps.* Where areas have not been mapped, review and analysis by the Colorado Forest Service shall determine the status of wildfire hazards. Copies of the maps are available for public review in the Community Development Department during normal business hours.

**D.**  **REFERRAL TO AND REVIEW BY COLORADO STATE FOREST SERVICE.** The Community Development Department may submit any application to the Colorado State Forest Service for review and comment, to use the expertise and judgment of that agency to evaluate the severity of potential wildfire hazards related to the proposed land use change, and to determine the appropriate avoidance or mitigation.

**E.**  **REFERRAL TO AND REVIEW BY APPLICABLE FIRE PROTECTION DISTRICT.** When a Land Use Change Permit is sought in an area located within a specific fire protection district the Community Development Department may submit the application to that District for review and comment to use the District's expertise and judgment to evaluate whether the development has included design elements compatible with adopted District standards, and to recommend how the development can best provide fire prevention and suppression.

**F.**  **STANDARDS.** The following standards shall apply to land use changes in all wildfire hazard areas:

**1.**  **GENERAL STANDARD**. All new construction, substantial improvement, use, fill, encroachments, alteration, fuel modification or treatment, except utility lines, on or over any portion of a wildfire hazard area, shall be designed so it does not increase the potential intensity or duration of a wildfire, or adversely affect wildfire behavior or fuel

BLM_0054104

composition. Development that subjects persons (including emergency service personnel and residents of neighboring properties) to undue dangers, or that will result in substantial public expenses required to mitigate hazardous conditions, respond to emergencies created by such conditions, or rehabilitate infrastructure or lands, or that cannot otherwise be accomplished in a manner that the applicant demonstrates will be safe, shall be prohibited.

2. **PROHIBITED LOCATIONS FOR DEVELOPMENT**. Development shall not be located in any area designated as having severe wildfire hazard that also has slopes greater than 30 percent. Development shall also not be located in a fire chimney, as identified by the Colorado State Forest Service.

3. **WILDFIRE MITIGATION PLAN**. A wildfire mitigation plan addressing wildland urban interface design and land maintenance shall be required when a parcel is located within any wildfire hazard area as mapped by the Colorado State Forest Service (CSFS), and shall incorporate applicable methods of fire prevention as recommended within publications of the CSFS. The plan shall, at a minimum, include:

    a. **CREATION OF DEFENSIBLE SPACE.** The inclusion of language in protective covenants enforceable by Gunnison County, or other similar recordable document, that refers property owners to publications of the CSFS, the Gunnison County Weed Specialist, the Gunnison County Public Works Department, or by Colorado State University regarding creating defensible space, using methods including but not limited to thinning around homes or other structures.

    b. **NOT CAUSE ADVERSE IMPACTS**. When mitigating a wildfire hazard pursuant to this Section, applicants shall not cause soil erosion, remove existing vegetation, thin trees or create adverse impacts to wildlife to an extent beyond that which is necessary to mitigate the hazard effectively.

4. **LOCATION IN A FIRE PROTECTION DISTRICT.** All developments located in a specific fire protection district shall comply with the fire suppression requirements of that District, when those requirements are recommended by the District, and when determined by the County to be appropriate. When the District's standards conflict with County standards, the County shall only enforce the County standards.

5. **WILDFIRE PREVENTION STANDARDS TO BE ADDRESSED IN PROTECTIVE COVENANTS**. Development shall comply with the following standards. Assurances as to compliance with these standards shall be addressed in a recorded, permanent protective covenant enforceable by the County.

    a. **FUEL MODIFICATIONS**. If the proposed development includes areas that have medium to severe fire hazard ratings, as determined by the Colorado State Forest Service, that can be reduced to lower hazard ratings through thinning, clumping, reduction of "ladder" fuels (vegetation that may allow a fire to burn from ground level to lower tree branches), removal of hanging limbs near chimneys, creation of defensible space around structures, or other such modifications, then such modifications shall be accomplished by the applicant.

    b. **FUEL BREAKS**. Practical fuel break systems shall be installed as needed in locations that are approved by the Colorado State Forest Service.

    c. **ROOF MATERIALS AND DESIGN**. Roof materials shall be made of noncombustible "Class A" materials and roofs shall employ a design that is pitched.

6. **SAFETY AREAS IN RESIDENTIAL DEVELOPMENT**. Areas designated by the applicable fire protection district as temporary public evacuation areas during fires shall be indicated by permanent signs along roads in developments. These areas shall also be designated on a final subdivision plat or final development plan for any development that is classified as a Major Impact Project.

7. **CUL-DE-SACS**. Cul-de-sacs shall not cross major draws, canyons, or gullies conducive to fire spread, nor shall cul-de-sacs terminate in such draws, canyons or gullies. Cul-de-sacs shall have a turn-around pad at the end with a minimum radius of 45 feet and an all-weather gravel or paved surface of a minimum of 45 feet. Dead end roads without turn-around areas shall be prohibited.

8. **ROAD RIGHT-OF-WAY CLEARING**. All roads shall be cleared and maintained four feet from each edge of the road surface in the right-of-way, so they are free from all living or dead flammable materials.

9. **ROAD GRADE**. All dedicated roads shall meet the minimum and maximum grade standards pursuant to the *Gunnison County Standards and Specifications for Road and Bridge Construction.*

10. **CLEAN-UP OF SLASH**. To minimize wildfire hazards and to avoid insects and diseases, the following actions shall be accomplished:

BLM_0054105

    **a.**  **ROAD SLASH.** All cut combustible materials, vegetative residues, including fallen or cut trees and shrubs, pulled stumps, or other such flammable debris shall be disposed of by either chipping or removal from development roadside strips. These strips shall be 100-foot wide areas that parallel each side of the road, measured outward from the edge of the road right-of-way.

    **b.**  **SLASH AROUND HOMES.** All vegetative residue, slashing, branches, limbs, stumps, roots, or other flammable debris shall be disposed of from around the home site areas by either chipping or removal before final building inspection approval. Home site areas shall include all areas of the lot in which the materials are generated or deposited.

    **c.**  **FILLS.** Compacting slash and debris into roadbed fill areas shall be prohibited, but such materials may be buried in the road right-of-way outside the roadbed provided that the burial is done to minimize the potential for erosion.

  **11.**  **COMPLY WITH FIRE PROTECTION STANDARDS.** Developments in wildfire hazard areas shall also comply with the standards of Section 12-107: *Fire Protection.*

**G.**  **WARNING AND DISCLAIMER.** As a condition of approval of the proposed land use change, the applicant shall sign the following warning and disclaimer that shall be included on the Final Plat of a subdivision, or within the applicable recorded document that approves the Land Use Change Permit:

WARNING AND DISCLAIMER OF WILDFIRE HAZARDS
AFFECTING USE AND OCCUPANCY OF THIS PROPERTY

    *"I/We_____ (owner(s) of property) on behalf of myself/ourselves and all successors, heirs and assigns, hereby acknowledge having been informed by Gunnison County of the existence of wildfire hazard areas that may affect the use and occupancy of the property, and any improvements thereto. I/We acknowledge that the County's approval of this land use change does not guarantee the safety of the property, or in any way imply that areas outside of the designated hazard areas will be free from hazards and hereby agrees to indemnify, defend and save harmless the County, its agents, officers and employees from and against any and all liability, expense including defense costs and legal fees, and claims for damages of any nature whatsoever, including bodily injury, death, personal injury, or property damage arising from or connected with any activity related to these hazards, including any suits, liability, or expense."*

**H.**  **OWNERS SHALL BE RESPONSIBLE.** Property owners who develop in, or have access through, areas subject to wildfire hazards shall be required to construct, implement, maintain, monitor, improve and bear the cost of their development's proportionate share of all reasonable measures necessary to mitigate any wildfire-related hazard created by such development.

## SECTION 11-106: PROTECTION OF WILDLIFE HABITAT AREAS

**A.**  **PURPOSE.** The natural and scenic resources in Gunnison County, including wildlife, are essential components of the County's economic base and help to establish the rural character of the County. Tourists visit and recreate in Gunnison County because of the quality of these natural resources, including the abundance of wildlife species found in the area. These resources are also a basic element of the quality of life for residents of Gunnison County. The standards in this Section are intended to protect sensitive wildlife habitat areas, to protect biological field research, and to ensure that wildlife remains a part of Gunnison County's natural environment for generations to come. In addition, this Section is designed to:

  **1.**  **SUSTAIN AND ENHANCE EXISTING POPULATIONS OF GUNNISON SAGE-GROUSE.** Sustain and enhance survival of the Gunnison Sage-grouse.

  **2.**  **PRECLUDE THE NEED TO LIST, OR MINIMIZE THE IMPACT OF LISTING OF GUNNISON SAGE-GROUSE AS CANDIDATE SPECIES.** Help implement an effective strategy and programs that will preclude the need to list, or minimize the impact of listing of the Gunnison Sage-grouse as a candidate for threatened or endangered status pursuant to the *Endangered Species Act of 1973*, or at a minimum, demonstrate the intent of Gunnison County to preserve and protect habitat that will lessen the impact if listing does occur.

**B.**  **APPLICABILITY.** All applications for Land Use Change Permits, including Building Permits, Individual Sewage Disposal System Permits, Gunnison County Access Permits, Gunnison County Reclamation Permits, and Land Use Change Permits shall be processed subject to the individual requirements of this Section, and assessed to determine if the location of the proposed activity is within the sensitive wildlife habitat areas designated on the maps referenced in *Section 11-106: C.: Maps Used to Identify Sensitive Wildlife Habitats.*

BLM_0054106

1. **DEVELOPMENT ON INDIVIDUAL LOTS, WITHIN A BUILDING ENVELOPE, IN SUBDIVISIONS APPROVED BY GUNNISON COUNTY.** If a building envelope on individual lots in subdivisions approved by Gunnison County that was designated on an approved plat, recorded in the Office of the Gunnison County Clerk and Recorder, and is located in Tier 1 Sage-grouse habitat, the building envelope shall be relocated to avoid or minimize impacts to Gunnison Sage-grouse or their habitat, to the maximum extent feasible. This requirement is general in nature and applicable to property subject to land use regulation by Gunnison County. If it is determined that relocation of the building envelope is necessary to avoid or minimize impacts to Gunnison Sage-grouse or their habitat, the process to relocate the building envelope shall be handled as an administrative review by the Community Development Department.

C. **MAPS USED TO IDENTIFY SENSITIVE AND CRITICAL WILDLIFE HABITATS.** The general reference maps used to identify locations of sensitive wildlife habitats. Because maps depicting wildlife habitat are general in nature, and because animal distribution is fluid and animal populations are dynamic, the maps shall be used as "guides" or "red-flags."

1. **COLORADO DIVISION OF PARKS AND WILDLIFE MAPS.** The Wildlife Resource Information System (WRIS) and Natural Diversity Information Source (NDIS) maps available from the Colorado Division of Parks and Wildlife.

2. **GUNNISON COUNTY MAPS.** The Gunnison County *Gunnison Sage-grouse Habitat Map*. The purpose of this map is to place a landowner on notice that a parcel may contain important Sage-grouse habitat areas.

D. **INITIAL SITE-SPECIFIC ANALYSIS REQUIRED FOR ACTIVITY PROPOSED ON A PARCEL THAT IS WHOLLY OR PARTIALLY WITHIN GUNNISON SAGE-GROUSE HABITAT.** As part of the applicable required permit application review process, the Gunnison County Wildlife Conservation Coordinator, in consultation with the Colorado Division of Parks and Wildlife, shall conduct an initial site-specific analysis of development that is proposed on a parcel that is wholly or partially within Gunnison Sage-grouse habitat.

E. **APPLICATIONS FOR BUILDING PERMITS, ACCESS PERMITS, INDIVIDUAL SEWAGE DISPOSAL SYSTEM PERMITS AND GUNNISON COUNTY RECLAMATION PERMITS ON A PARCEL THAT IS WHOLLY OR PARTIALLY WITHIN GUNNISON SAGE-GROUSE HABITAT.** Development located on a parcel that is wholly or partially within Gunnison Sage-grouse habitat that requires a Building Permit, Access Permit, an Individual Sewage Disposal System Permit, or a Gunnison County Reclamation Permit.

1. **LOCATION WITHIN GUNNISON SAGE-GROUSE TIER 1 HABITAT.** All applications for Land Use Change Building Permits, Access Permits and Individual Sewage Disposal System Permits and Gunnison County Reclamation Permits shall be reviewed by the Gunnison County Wildlife Conservation Coordinator and shall require consultation with the Colorado Division of Parks and Wildlife.

2. **LOCATION WITHIN GUNNISON SAGE-GROUSE TIER 2 HABITAT.** All applications for Land Use Change Permits, Building Permits, Access Permits, Individual Sewage Disposal System Permits and Gunnison County Reclamation Permits shall be reviewed by the Gunnison County Wildlife Conservation Coordinator and may require consultation with the Colorado Division of Parks and Wildlife.

3. **PRE-APPLICATION CONFERENCE.** Owner(s) of land may request a pre-application conference with Gunnison County staff to review Gunnison Sage-grouse issues that reasonably may arise from an application pursuant to this Section. Upon receipt of such request, Gunnison County staff, and as available a representative of the Colorado Division of Parks and Wildlife, will meet with the owner(s) to review such issues and to identify potential solutions. The Community Development Department will coordinate the conference. Gunnison County shall consider the advice of applicant's wildlife biologist/ecologist or a similar qualified expert.

4. **REFERRAL TO GUNNISON COUNTY WILDLIFE CONSERVATION COORDINATOR AND ON-SITE CONSULTATION.** The Community Development Department and the Public Works Department shall forward a copy of the application(s) to the Gunnison County Wildlife Conservation Coordinator. The Gunnison County Wildlife Conservation Coordinator shall determine the habitat type and whether an on-site consultation is required. If an on-site consultation is required the Gunnison County Wildlife Conservation Coordinator shall coordinate and schedule an on-site consultation with the applicant and/or applicant's representative, the Community Development Department, Public Works Department and a representative from the Division of Parks and Wildlife. The purpose of the on-site consultation shall include location of any habitat, identification of site-specific data to inform the review process, and identification of potential mitigation of Sage-grouse related issues..

   a. **TIMELINE FOR REVIEW.** The County shall request that the Colorado Division of Parks and Wildlife submit comments about the application within 21 days after the on-site consultation; when comments are not provided within that time by the Division, the County shall proceed to complete the permit process without those comments.

BLM_0054107

**F. REVIEW, REFERRAL TO COLORADO DIVISION OF PARKS AND WILDLIFE OF MINOR AND MAJOR IMPACT PROJECT APPLICATIONS.** The Community Development Department shall refer Land Use Change Permit applications for Minor or Major Impact projects to the local office of the Colorado Division of Parks and Wildlife for that agency's review and comments to make use of the expertise and judgment of that agency in the protection of sensitive wildlife habitat, and its recommendations, if any, to reduce or eliminate adverse impacts to sensitive wildlife habitat and species that may result from proposed development.  It is intended that the Division of Parks and Wildlife will review the application and participate in on-site consultations and provide timely comments to the Community Development Department that identify actions and/or recommendations to reduce or eliminate adverse impacts  to wildlife.

1. **MINOR IMPACT PROJECTS.** The Department shall submit a copy of the Minor Impact project application to the Division pursuant to *Section 6-106: E: Request for Review by Other Agencies or Departments*, with a written request that the Division review the application and identify in a written response whether or not the parcel on which the land use change is proposed is located within sensitive wildlife habitat, and issues that it believes appropriate to be addressed during the permitting process. Based upon the Division's knowledge of a specific site, the Division may also recommend that a wildlife habitat analysis be conducted, pursuant to *Section 11-106: F.4.: Wildlife Habitat Analysis of Minor Impact or Major Impact Projects,* which shall be required to be submitted by the applicant before a public hearing is scheduled on the Minor Impact project application.

2. **MAJOR IMPACT PROJECTS.** The Department shall submit a copy of the Preliminary Plan for a Major Impact project application to the Division pursuant *to Section 7-302: C: Review and Comment by Review Agencies,* with a written request that the Division review the application and identify in a written response whether or not the parcel on which the land use change is proposed is located within sensitive wildlife habitat and issues that it believes appropriate to be addressed during the permitting process. If the parcel is located within sensitive wildlife habitat, a wildlife habitat analysis conducted pursuant to *Section 11-106: F.4.: Wildlife Habitat Analysis* shall be submitted by the applicant before the public hearing on the Preliminary Plan is scheduled.

3. **PRE-APPLICATION CONFERENCE FOR MINOR OR MAJOR IMPACT PROJECTS LOCATED ON A PARCEL WHOLLY OR PARTIALLY WITHIN GUNNISON SAGE-GROUSE HABITAT.** A Pre-Application Conference is required for any Minor or Major Impact project located wholly or partially on a parcel within Gunnison Sage-grouse habitat.

4. **WILDLIFE HABITAT ANALYSIS OF MINOR IMPACT OR MAJOR IMPACT PROJECTS.** If Colorado Division of Parks and Wildlife comments indicate that the proposed land use change for a Minor Impact or Major Impact project is within sensitive wildlife habitat, the applicant shall be required to submit a site-specific wildlife habitat analysis. The analysis shall evaluate the relevant physical features of the property, shall make a site-specific determination of the locations of wildlife habitat on the property, and shall describe how the proposed development will comply with *Section 11-106: G.: General Standards for Development in Sensitive Wildlife Habitat Areas.* The analysis shall be prepared by a wildlife biologist/ecologist or similar qualified expert in consultation with the Colorado Division of Parks and Wildlife. It shall be submitted with the Preliminary Plan application for a Major Impact project, or before the public hearing is scheduled on a Minor Impact project, and shall contain the following:

   a. **MAP.** A map of the property shall be submitted, depicting the activity patterns of the wildlife using the sensitive wildlife habitat, identifying, where relevant, migration routes, travel corridors or patterns, nesting, feeding, watering and production areas, and any critical connections or relationships with habitat adjoining, but outside of, the project site. The map shall also identify whether the land immediately surrounding the proposed land use change is privately owned or is public land owned by the U.S. Forest Service, U.S. Bureau of Land Management, Colorado Division of Parks and Wildlife, or other similar agency.

   b. **REPORT.** A report shall be submitted that describes the activity patterns of the wildlife using the habitat, using a scientifically valid time period. It will also identify any species that use the property that are listed by the U.S. Department of the Interior or the State of Colorado as endangered, threatened, or are species of special concern.

      1. **EVALUATE IMPACTS.** The report shall evaluate the potential impacts of the proposed land use change on the sensitive wildlife habitat and the species using that habitat, including whether it could be a threat to the viability of the species, cause a reduction in the diversity of wildlife species in the county, or change the status of its federal or state listing. The report shall identify the types of potential impacts that are anticipated (including stress due to human presence, interference with reproduction, change of migration routes, etc.) and the time periods (spring, summer, fall, winter, year-round, etc.) during which wildlife are expected to be affected by the proposed land use change.

BLM_0054108

2. **CUMULATIVE IMPACTS.** The report addressing any Major Impact project (and any proposed land use change classified as a Minor Impact project that the Planning Commission determines requires such evaluation) shall also evaluate the cumulative impacts on wildlife habitat beyond the project site. The report shall also address whether the cumulative impacts of the proposed land use change when added to the past and present impacts of other land use changes, will eliminate, reduce, or fragment wildlife habitat in the county to the extent that the viability of an individual species is threatened or the diversity of species found in the county is reduced, or the population of a species in the impact area will be significantly reduced.

3. **MITIGATION PLAN.** The report shall include a wildlife habitat mitigation plan that describes how the proposed development will comply with *Section 11-106: G.: General Standards for Development in Wildlife Habitat Areas,* providing detail regarding the avoidance, mitigation, and enhancement techniques, monitoring and performance criteria that will be employed.

G. **GENERAL STANDARDS FOR DEVELOPMENT IN SENSITIVE WILDLIFE HABITAT AREAS**. All development shall comply with the following standards when it is located on lands designated as sensitive wildlife habitat, including but not limited to parcels located partially or wholly in habitat areas delineated on the Gunnison County *Gunnison Sage-grouse Habitat Map*, and all lands determined to be sensitive wildlife habitat pursuant to Section 11-106: B: *Applicability*.

1. **MITIGATION OF ADVERSE IMPACTS TO SENSITIVE HABITAT.** A proposed land use change must mitigate adverse impacts it causes to lands determined to be sensitive wildlife habitat including but not limited to a Gunnison Sage-grouse habitat. Proposed land use changes that are found to have a significant net adverse impact that cannot be mitigated upon sensitive wildlife habitat, shall be denied.

   a. **CONSIDERATION OF BENEFICIAL EFFORTS.** Gunnison County shall consider, and affirmatively recognize as mitigation in the permitting process, conservation easements/covenants (and similar mechanisms), and documented management agreements/programs accomplished, or to be accomplished, in coordination with the Colorado Division of Parks and Wildlife or other agencies (such as the Natural Resources Conservation Service or the U.S. Fish and Wildlife Service) that are beneficial to the Gunnison Sage-grouse. Each case will be reviewed on an individual basis to determine if the easement, covenant or deed restriction satisfies all of these standards.

      1. **TERMS OF EASEMENT ARE PERPETUAL AND SATISFACTORY TO COUNTY**. The terms of the existing easement, covenant or deed restriction are perpetual and acceptable to the County.

      2. **PRESERVED LANDS PROVIDE GUNNISON SAGE-GROUSE HABITAT**. That both the preserved land provides Gunnison Sage-grouse habitat, and the restrictions imposed by the pertinent easement, covenant or deed restriction are sufficient to justify the determination that adverse impacts have been substantially or wholly mitigated by such preservation.

      3. **ADDITIONAL BENEFITS SUBSTANTIALLY OR WHOLLY MITIGATE ADVERSE IMPACTS.** Additional preservation efforts substantially or wholly mitigate adverse impacts to sensitive wildlife habitat.

2. **IRRIGATION DITCHES.** Pursuant to Colorado law, owners of irrigation ditches have the right to maintain irrigation ditches, headgates and other diversion structures. Gunnison County shall not require mitigation that will interfere with the right of ditch owners to maintain ditches, headgates or other diversion structures.

3. **MITIGATION TECHNIQUES**. Mitigation techniques to protect wildlife species that the County determines may be impacted by a proposed land use change on lands identified in Section 11-106: B: *Applicability,* including, but not limited to:

   a. **LIMITATIONS.** Requirements to avoid sensitive wildlife habitat during seasons the wildlife species use the habitat. When appropriate, the proposal shall include techniques to minimize human intrusion, including, but not limited to:

      1. **BUFFERS.** Visual and sound buffers to screen structures and activity areas from habitat areas through effective use of topography, vegetation, and similar measures.

      2. **LIMITATIONS OF HUMAN ACTIVITIES DURING SENSITIVE TIME PERIODS**. Seasonal avoidance limitations on, or stoppages of intrusive human activities during sensitive time periods, including limiting construction activities and recreational uses during sensitive time periods such as elk migration, elk calving or when sage grouse mating, nesting or brood rearing is occurring on

BLM_0054109

parcels located partially or wholly in habitat areas delineated on the Gunnison County *Gunnison Sage-grouse Habitat Map.*

3. **LOCATIONAL CONTROLS.** Controls on the location of development, so it does not force wildlife to use new migration corridors, or expose wildlife to significantly increased predation, interaction with vehicles, intense human activity, or more severe topography or climate, or encircle wildlife habitat with development.

b. **WATERING AREAS**. Measures to avoid disturbance of waterholes, springs, seepages, marshes, stream beds, stream banks, wetlands, streamside vegetation, ponds, and watering areas to the maximum extent feasible. Catchment basins may be required to prevent stream siltation.

c. **HABITAT COMPENSATION**. Requirements to develop additional habitat, or to acquire and permanently protect existing habitat to compensate for habitat that is lost to development, in the form of ongoing on-site or off-site wildlife habitat enhancement. Enhancement is the process of increasing wildlife carrying capacity on undeveloped habitat and may include prescribed burns, seeding, brush cutting, and fertilization, as determined to be appropriate by the County, based on the advice of the Colorado Division of Parks and Wildlife or other technical experts.

d. **DOMESTIC ANIMAL CONTROLS.** Controls on domestic animals within or near areas of sensitive wildlife habitat. Dogs may be prohibited within one-half mile of elk, deer, and bighorn sheep critical winter ranges and winter concentration areas. The number of cats and dogs allowed in a development may also be limited.

1. **DOGS AND CATS PROHIBITED OR CONTROLLED NEAR GUNNISON SAGE-GROUSE HABITAT.** Requirements in the form of conditions of a permit, and/or inclusion within declarations of a subdivision's protective covenants enforceable by Gunnison County, may be required prohibiting, or requiring control by kenneling or other physically-secure methods within Gunnison Sage-grouse lek or within Gunnison Sage-grouse habitat.

e. **PROTECTION FROM ANIMAL-BORNE DISEASES**. Gunnison County may impose limitations on the introduction or possession of non-native species to lessen the possibility of the introduction of disease to native wildlife populations.

f. **CONTROL OF NUISANCES.** Controls on lighting, noise, excess use of fertilizers or pesticides, and similar nuisances that could have a significant net adverse effect on Gunnison Sage-grouse habitat and the continued use of the area by other wildlife.

g. **DENSITY RELOCATION.** Residential development may be clustered to avoid sensitive wildlife habitat.

h. **ROAD CONSTRUCTION.** Requirements to avoid new road construction through sensitive wildlife habitat.

i. **STREAM ALTERATIONS OR DIVERSIONS.** Controls on alterations or diversions of streams to retain the character and productivity of the streams. Such alterations will be subject to all applicable local, state and federal codes and regulations.

j. **ALTERATIONS OF EXISTING WET MEADOW/SAGE HABITAT INTERFACE AREAS.** Controls on alterations of existing wet meadow/sage habitat interface areas.

k. **STRUCTURES TO MINIMIZE HAZARDS.** Requirements to design, locate, construct and maintain game-proof fencing, one-way gates, game underpasses, or other structures to minimize hazards to wildlife, such as requiring a minimum distance between high-power electric wires to avoid electrocution of eagles.

l. **AGENCY ACCESS.** Where applicable, the provision of access to Colorado Division of Parks and Wildlife or other applicable agencies to facilitate maintenance of wildlife and wildlife habitat.

H. **STANDARDS SPECIFIC FOR DEVELOPMENT PROPOSED ON PARCELS THAT ARE WHOLLY OR PARTIALLY WITHIN GUNNISON SAGE-GROUSE HABITAT.** In addition to the standards and mitigation techniques included within this Section, the following standards shall apply specifically to development proposed on a parcel that is wholly or partially within Gunnison Sage-grouse habitat:

1. **DISTURBANCE GUIDELINES**. Development activity shall comply with the GUSG *Disturbance Guidelines in the Gunnison Sage-grouse Rangewide Conservation Plan, Appendix 1,* as may be adopted and amended from time to time by the Board.

2. **LIMITATION ON HUMAN ACTIVITIES INCLUDING RECREATIONAL USES DURING GUNNISON SAGE-GROUSE SENSITIVE TIME PERIODS**. Seasonal avoidance or limitations of intrusive human behavior during

BLM_0054110

sensitive time periods, including but not limited to winter and when Gunnison Sage-grouse are mating or raising chicks.

3. **UNDERGROUND UTILITIES REQUIRED NEAR GUNNISON SAGE-GROUSE LEKS**. Utility lines shall be placed underground within Gunnison Sage-grouse habitat, to discourage avian predators.

I. **FENCES.** Design of fences other than those associated with agricultural operations to shall ensure they do not adversely impact wildlife. Design standards for fences are as follows:

1. **MAXIMUM HEIGHT**. Fences shall not be higher than 42 inches.

2. **MATERIALS.** Fences should be limited to a maximum of three strands or rails. Rail fences should only use rounded rails. Wire fences should not be made of woven wire, unless they are used to enclose sheep or goats. Wire and rail fences shall have a kick-space (distance between the top two wires or rails) of not less than 18 inches that uses wire or rail that has a smooth surface. The top rail should be made of a solid material in heavy use areas, to make it more visible to wildlife.

3. **REMOVABLE SECTIONS**. Fences in migration corridors should have removable sections or openings to allow for seasonal passage of wildlife. The applicant shall be responsible for removing fence sections when migration is occurring and replacing those sections when the season of migration has ceased.

4. **UPGRADING EXISTING FENCES.** As a condition of development approval, applicants proposing land use changes within sensitive wildlife habitat areas should agree to remove or to alter any existing fences on the property to comply with the above requirements.

5. **FENCES AROUND RESIDENCES EXEMPT.** Fences located in the immediate vicinity of a residence shall be exempt from these limitations.

6. **DESIGN AND LOCATION.** Fence location and design should minimize adverse impacts to sensitive wildlife habitat.

J. **VEGETATION.** Proposed land use changes shall be designed to comply with the recommendations of the Colorado Division of Parks and Wildlife regarding vegetation, and to preserve large areas of vegetation utilized by wildlife for food and cover. Roads shall be located on the edge of wildlife habitat areas, to prevent fragmentation of wildlife habitat. When native vegetation must be removed within habitat areas, it shall be replaced with native and/or desirable non-native vegetation capable of supporting post-disturbance land use. Individuals planting vegetation away from the homesite should consider using vegetation suitable for wildlife cover and food. Vegetation removed to control noxious weeds shall not be required to be replaced, unless the site requires revegetation to prevent erosion or noxious weeds from becoming established.

1. **TIME ALLOTTED FOR REVEGETATION.** Vegetation required pursuant to *Section 13-115: Reclamation and Noxious Weed Control* shall be established and growing within two growing seasons (730 days) of the issue date of the applicable Gunnison County Reclamation Permit.

K. **CDOW ACCESS.** Where applicable, the applicant shall continue to provide historical access or agreed-upon new access other than the historical access, for the Colorado Division of Parks and Wildlife to manage wildlife and to monitor wildlife activities.

## SECTION 11-107: PROTECTION OF WATER QUALITY

A. **PURPOSE.** The purpose of this Section is to protect the quantity, quality and dependability of water resources in Gunnison County by avoiding development in and adjacent to water bodies and mudflow hazard areas whenever possible, by minimizing adverse impacts of development, including siltation, sedimentation, salinization, runoff, loss of decreed minimum in-stream flows, stream bank erosion and change to existing drainage patterns.

B. **RELATIONSHIP TO OTHER SECTIONS.** As applicable, of the standards imposed by this Section, and Section 11-103: *Development in Areas Subject to Flood Hazards*, Section 13-116: *Grading and Erosion Control*, and Section 13-117: *Drainage, Construction and Post-Construction Storm Water Runoff*, the more restrictive shall apply.

C. **APPLICABILITY.** Unless otherwise exempted, this Section shall apply to all Land Use Change Permit applications that involve uses within 125 feet of water bodies and mudflow hazard areas in unincorporated areas of Gunnison County, except as exempted in Section 11-107: C. 1.: *Exempt,* and Section 11-107: C. 2.: *Partially Exempt.*

1. **EXEMPT.** The following structures, improvements, activities, or areas shall be exempt from all of the requirements of this Section:

BLM_0054111

    **a.**  **STRUCTURES USED FOR DECREED WATER RIGHT.** Structures or improvements used for the exercise of a decreed water right, including headgates and measuring devices; and

    **b.**  **WETLANDS RESULTING FROM AGRICULTURAL OPERATIONS.** Wetlands and riparian areas created solely by normal and customary agricultural activities; and

    **c.**  **PROJECTS PRIMARILY FOR WATER PROTECTION THAT HAVE RECEIVED REQUIRED STATE OR FEDERAL PERMITS.** Projects that have received all applicable permits required by state and/or federal agencies, such as those designed primarily for the enhancement, protection and/or restoration of water body banks or channels, wetlands, riparian areas and/or piscatorial wildlife habitat; and

    **d.**  **WATER IMPOUNDMENTS.** Water impoundments that are a component of an approved mineral exploration or extraction Project or construction materials processing Project, and comply with Section 13-118: *Water Impoundments,* and with all applicable federal codes and regulations; and

    **e.**  **EMERGENCY FLOOD CONTROL MEASURES.** A structure or other land use change necessary, in an emergency declared by the County Manager to eliminate or reduce potential flood hazards or damage. If it is to be removed, it shall be removed as soon as possible; and

    **f.**  **ROADS AND BRIDGES.** Maintenance, repair or replacement of roads, roads that approach bridges, and bridges, existing as of the effective date of this *Resolution*, or constructed thereafter pursuant to this *Resolution* and all other County, state and federal regulations.

**2.**  **PARTIALLY EXEMPT.** The following Projects, classified as Administrative Review Projects pursuant to Section 3-111: *Classification of Impact*, approved pursuant to this *Resolution* are exempt from Section 11-107: D: *Submittal Requirements* but are required to comply with all other requirements of this Section:

    **a.**  **A PRIMARY RESIDENCE SMALLER THAN 10,000 SQ. FT. IN AN APPROVED SUBDIVISION.** The development of a primary residence smaller than 10,000 sq. ft. (which may include an attached garage in the calculation of square footage), pursuant to Section 13-105: *Residential Building Sizes and Lot Coverage*, in a subdivision approved by Gunnison County and platted as of the effective date of this *Resolution*; and

    **b.**  **LIMITED MINERAL EXPLORATION.** Limited mineral exploration (activities related to proving up a patented mining claim pursuant to federal law), as addressed in Division 9-400: *Exploration, Extraction and Processing of Minerals and Construction Materials,* and limited construction materials exploration, pursuant to Section 9-402: C: *Activities Exempted from Submittal and Review Requirements*; and

    **c.**  **UNDERGROUND MINERAL EXPLORATION.** Underground mineral exploration as identified in Division 9-400: *Exploration, Extraction and Processing of Minerals and Construction Materials*; and

    **d.**  **BOUNDARY LINE ADJUSTMENTS.** An application to adjust the lot line between adjacent parcels or lots that are separately owned; and

    **e.**  **LOT CLUSTERS.** An application to eliminate the lot lines separating adjacent lots that are commonly owned; and

    **f.**  **CORRECTION OF PLAT.** An application to correct a technical error in a subdivision plat that has been approved and recorded; and

    **g.**  **TECHNICAL MODIFICATION.** An application to allow a minor deviation of not more than ten percent from any minimum or maximum numerical standard of this *Resolution*, and that is identified as a category in Section 8-101: *Technical Modifications.*

**D.**  **SUBMITTAL REQUIREMENTS.** In addition to the submittal requirements included in the applicable Land Use Change Permit application, all applications for Projects that are not exempted by Section 11-107: C. 2.: *Exempt* and Section 11-107: C. 3.: *Partially Exempt* shall include the following:

**1.**  **SITE PLAN.** The site plan submitted as part of the application shall include locations of any existing structures, water bodies, hydrologic features or mudflow hazard areas on the site, and including the following items; the Community Development Department may require a field verification of the locations.

**2.**  **PLAN FOR WATER QUALITY PROTECTION.** A site-specific plan for protection of water quality, including:

    **a.**  **TOPOGRAPHIC FEATURES, DEVELOPMENT AND PROPERTY LINES.** A map showing existing topography at no greater than 20-foot contour intervals. The map shall highlight existing and proposed slopes greater than 15 percent but less than 30 percent grade and existing and proposed slopes equal to or greater than 30 percent grade, and shall extend a minimum of 100 feet beyond the development site line and show the location of all property lines; and

BLM_0054112

**b. GRADING PLAN.** A grading plan, addressing the requirements of Section 13-116: *Grading and Erosion Control.* The map shall show elevations, dimensions, locations, extent and slope of all clearing, grading and fills at no greater than 20-foot contour intervals proposed for the development site, including any building sites and driveway grades; and

**c. SOIL AND SOIL STOCKPILES.** Proposed locations of any stockpiles of soil, gravel, snow or other materials; and

**d. EQUIPMENT AND WASTE MATERIAL STORAGE.** Location(s) of storage areas designated for equipment, fuel, lubricants, chemical and waste storage with an explanation of spill containment structures to be used on-site; and

**e. DRAINAGE FACILITIES.** Proposed drainage plan, pursuant to Section 13-117: *Drainage, Construction and Post-Construction Storm Water Runoff,* including locations of existing and proposed drainage structures, and natural drainage features on land adjacent to the site and within a minimum of 300 feet from the development site line, including, as applicable, road gutters, storm sewers, drainage channels, other water conveyance structures, water bodies, highly erodible soils, unstable stream banks, and mudflow hazard areas; and

**f. WATER QUALITY DATA.** Water quality data, including designation, classification, and numeric standards as established by the Colorado Water Quality Control Commission, for all water bodies located on the site; and

**g. LOCATION OF PROPOSED PERMANENT AND TEMPORARY ROADS.** The location of proposed permanent and temporary roads including roads proposed to be used only during construction.



FIGURE 2: RESTRICTIVE INNER BUFFER SETBACK

Restrictive Inner Buffer 25' setback from edge of wetlands

Wetlands

Stream

Restrictive Inner Buffer 25' setback from ordinary high water mark of stream

**E. BUFFER STANDARDS.**

**1. GENERAL.** Activities within the Restrictive Inner Buffer and the outer variable buffer shall comply with Section 13-116: *Grading and Erosion Control.*

**2. RESTRICTIVE INNER BUFFER SETBACKS.** In addition to each other setback, requirement or prohibition for land use in this *Resolution,* a setback of 25 feet measured horizontally from the ordinary high water mark in average hydrologic years on each side of a water body or mudflow is required (Figure 2: *Restrictive Inner Buffer Setback);* this setback is referred to as the "Restrictive Inner Buffer." The following activities are not allowed within the Restrictive Inner Buffer:

**a. OBSTRUCTION OR STRUCTURE.** Construction, installation or placement of any obstruction or the erection of a structure;

**b. PLACEMENT OF MATERIAL.** Placement of material, including any soil, sand, gravel, mineral, aggregate, organic material or snow plowed from roadways and parking areas;

**c. DREDGING.** Removal, excavation or dredging of solid material, including soil, sand, gravel, mineral, aggregate, or organic material;

**d. REMOVAL OF LIVE VEGETATION.** Removal of any existing live vegetation or conduct of any activity that will cause any loss of vegetation, unless it involves the permitted and/or required removal of noxious weeds, non-native species, dead or diseased trees;

**e. LOWERING OF WATER LEVEL.** Lowering of the water level or water table by any means, including draining, ditching, trenching, impounding, pumping or comparable means, except as allowed by the Colorado Division of Water Resources; and

BLM_0054113

**f. DISTURBANCE OF NATURAL DRAINAGE**. Disturbance of existing natural surface drainage characteristics, sedimentation patterns, flow patterns, or flood retention characteristics by any means including grading and alteration of existing topography. Measures taken to restore existing topography to improve drainage, flow patterns or flood control must be approved.

**g. USE OF EQUIPMENT.** Use of construction equipment within the buffer except as exempted by Section 11-107: C. 1. f: *Roads and Bridges.*

**3. EXCEPTIONS TO PROHIBITION OF LAND USE CHANGES IN THE RESTRICTIVE INNER BUFFER.**

**a. PRE-EXISTING CONSTRUCTION MATERIALS EXTRACTION**. Construction materials extraction approved before the effective date of this *Resolution* shall be permitted no closer than five feet from the nearest ordinary high water mark in average hydrologic years on each side of a water body, but not in the stream channel.



**Figure 3: Application of Variable Outer Buffer Setback**

**b. SHOWING OF UNAVOIDABILITY**. The following exceptions to prohibition of land use changes in the Restrictive Inner Buffer shall be permitted as a Minor Impact Project only upon a demonstration by the applicant of clear and convincing evidence that the proposed land use change in the Restrictive Inner Buffer is unavoidable, that the land use change in the Restrictive Inner Buffer shall be designed, constructed and used to minimize encroachment into the Restrictive Inner Buffer, and that after mitigation, adverse impact shall be minimized to the Restrictive Inner Buffer, to the water body, and to water quality, including but not limited to minimizing the deposit of sedimentation in the water body, the clearing of vegetation, the pollution of return water flows, and channelization.

**1. LAND USE CHANGE IS WATER DEPENDENT AND AUTHORIZED**. The proposed land use change in the Restrictive Inner Buffer is water dependent (including docks, piers, watercraft launches and ramps, flood control structures, water diversion facilities, and stream bank stabilization structures ); and is authorized by each appropriate regulatory authority (including but not limited to the U.S. Army Corps of Engineers); or

**2. DENIAL WOULD DENY ALL ECONOMICALLY VIABLE USE OF THE PARCEL**. Denial of the proposed Land Use Change Permit in the Restrictive Inner Buffer would result in denying the land owner all economically viable use of the subject parcel; or

**3. CONSTRUCTION OUTSIDE RESTRICTIVE INNER BUFFER SUBSTANTIALLY CONTRIBUTES TO HAZARDOUS CONDITIONS**. Because of the physical features, other restrictions and conditions of the parcel, construction or use of the proposed land use change outside of the Restrictive Inner Buffer would substantially create or contribute to a hazardous condition; or

**4. LOCATION IS NECESSARY FOR AN ESSENTIAL SERVICE**. In the case of a road, bridge approach, public utility or essential service, the proposed land use change in the Restrictive Inner Buffer is necessary to provide access or service to the parcel; or

**5. IS A FLOOD CONTROL MEASURE**. The proposed land use change consists of a structure or other improvement to eliminate or reduce potential flood hazards or damage. If such structure or improvement is necessary because of an emergency, it may be approved by the Community Development Director after an Administrative Review, pursuant to Article 4: *Administrative Review*

BLM_0054114

*Projects That Do Not Require Land Use Change Permits*. If a flood control measure is to be removed, it shall be removed as soon as possible.

4. **VARIABLE OUTER BUFFER.** In addition to a Restrictive Inner Buffer, a Variable Outer Buffer shall be defined and indicated on the plan. In addition to each other setback requirement or prohibition for land use in this *Resolution*, a proposed land use change within a Variable Outer Buffer, including disturbance of earth or vegetation shall be prohibited, limited, or specific mitigation required on a site-specific basis, to the maximum extent feasible to protect the integrity of the water body, to minimize the deposit of sediment in the water body, the pollution of return water flows, channelization, and adverse impact on water quality.

   a. **MAXIMUM WIDTH OF VARIABLE OUTER BUFFER**. In no circumstance shall a Variable Outer Buffer be required to extend more than 100 feet beyond the outer boundary of the Restrictive Inner Buffer.

   b. **NON-UNIFORMITY OF VARIABLE OUTER BUFFER.** The width of the Variable Outer Buffer need not be uniform across a parcel. Specific features within 100 feet of the outer boundary of the Restrictive Inner Buffer shall define the width of the Variable Outer Buffer on a site-specific basis and shall be defined, as is reasonable, by the presence of these characteristics:

      1. **SLOPES STEEPER THAN 15 PERCENT**. Slopes steeper than 15 percent draining into the water body or mudflow hazard area; in such a case, the setback shall be 25 feet back from the edge of the slope above the closest border of the delineated wetland (Figure 3: *Application of Variable Outer Buffer Setback* ); or

      2. **PRESENCE OF HIGHLY ERODIBLE SOILS**. The presence of highly erodible soils; in such a case, the setback shall be 25 feet from the edge  of the highly erodible soils farthest from the closest border of the delineated wetland; or

      3. **PRESENCE OF FEATURES THAT PROVIDE BANK STABILITY OR RIPARIAN AREA PROTECTION**. The presence of trees, shrubs, vegetation or other natural features that provide for bank stability or riparian area protection; in such a case, the setback shall be 25 feet from the edge of such features farthest back from the closest border of the delineated wetland.

      4. **AREAS OF RECORDED OR KNOWN FLOOD OR MUDFLOW**. An area of recorded or known flood or mudflow; in such a case, the setback shall be the full 100-foot Variable Outer Buffer.

5. **MANAGEMENT OF HAZARDOUS MATERIALS AND POLLUTANTS**. All land use changes shall meet the following requirements for management of hazardous materials and pollutants:

   a. **COMPLIANCE WITH STATE AND FEDERAL REGULATIONS**. At a minimum, all hazardous materials shall be stored and used pursuant to applicable state and federal hazardous materials regulations.

   b. **STORAGE NEAR WATER BODIES RESTRICTED**. Hazardous materials, pollutants, sand and salt for road traction shall not be stored within 100 horizontal feet of any water body or mudflow. When no practical alternative exists, site-specific best management practices must be used.

   c. **SPILL PREVENTION**. Measures shall be designed and implemented to prevent spilled fuels, lubricants or other hazardous materials from entering a water body, including ground water, during construction or operation of equipment and/or a facility. If a spill occurs, it shall be cleaned up immediately and disposed of properly.

   d. **MACHINE MAINTENANCE.** Routine field maintenance of vehicles or mobile machinery shall not be performed within 100 feet of any water body or mudflow. Emergency maintenance can only be conducted until the vehicle or machinery can be moved. Routine equipment maintenance should be performed in a designated area and measures such as drip pans used to contain petroleum-based hazardous products.

   e. **FUEL STORAGE AREAS**. Containment measures shall be provided for all fuel storage areas to prevent release to any water body. Inventory management or leak detection may be required.

## SECTION 11-108: STANDARDS FOR DEVELOPMENT ON RIDGELINES

A. **PURPOSE**. The purpose of this Section is to establish regulations to preserve and maintain the scenic resources in Gunnison County as viewed from specifically identified vantages including municipalities and certain public road corridors that are particularly important to the character and economy of Gunnison County.  This shall be accomplished by the establishment of ridgeline vantages from which the siting and construction of buildings will be reviewed to maintain the natural appearance of the mountain skyline and to avoid penetration or interruption of the natural skyline by buildings.

BLM_0054115

*SECTION 11-108: STANDARDS FOR DEVELOPMENT ON RIDGELINES*

**B.   APPLICABILITY**. This Section is applicable to all buildings that would be visible from any municipality in Gunnison County or from any of the following State, County or public roads that are individually and collectively referred to as a "ridgeline vantage":

- U.S. Highway 50;
- Road 3 (Marble);
- Road 4 (Peanut Lake);
- Road 10 (Cranor Hill Road);
- Road 12 (Kebler Pass);
- Road 17 (Antelope Creek Road);

- Road 20 (Steuben Creek);
- Road 25 (Pine Creek)
- Road 26 (Sapinero Mesa Lake City Cutoff);
- Road 27 (Powderhorn);
- Road 38 (Gold Basin Road);
- Road 76 (Quartz Creek Road);
- State Highway 114;

- State Highway 133;
- State Highway 135;
- State Highway 149;
- Road 209 (Cottonwood Pass);
- Road 265 (Buzzard Divide);
- Road 314 (Marble to Schofield);
- Road 317 (Gothic Road);
- Road 727 (Mill Creek);
- Road 730 (Ohio Creek Road);
- Road 734 (Slate River);
- Road 737 (Carbon Creek);
- Road 738 (Brush Creek);
- Road 740 (Cement Creek);
- Road 742 (Taylor River Road);
- Road 811 (Washington Gulch);

- Road 813 (Jack's Cabin Cutoff);
- Road 858 (Big Cimarron);
- Road 860 (Big Cimarron);
- Road 861 (Big Cimarron);
- Road 864 (Little Cimarron);
- Road 864.99 (High Mesa);
- Road 867 (Alpine Plateau);
- Road 887 (Waunita Road);
- Road 888 (Whitepine).

**C**.   **RIDGELINE VISIBILITY**. When viewed from any ridgeline vantage, no building shall be visible on a ridgeline that is more than 150 feet vertically higher from the closest point on a ridgeline vantage from which such building would be visible.

**D.   INITIAL ANALYSIS OF VISIBILITY OF PROPOSED SITE**. If the Community Development Director determines that a building is proposed to be sited on a ridgeline that potentially is visible from a ridgeline vantage as described in Section 11-108: E: *Detailed Analysis Required If Location Is Determined To Be Visible*, the applicant shall submit an initial visual analysis of potential ridgeline visibility that shall contain:

1.   **MAP**. A map of the proposed site that depicts the proposed location of the building footprint including distances and elevations from the two closest ridgeline vantages.

2.   **WRITTEN STATEMENT**. A brief written statement describing, in a general manner, the location, size, height and potential visibility of the proposed building from any ridgeline vantage.

**E.   DETAILED ANALYSIS REQUIRED IF LOCATION IS DETERMINED TO BE VISIBLE**.   If the Community Development Director determines, after a review of the initial submittal pursuant to Section 11-108: D: *Initial Analysis of Visibility of Proposed Site*, and any other relevant material that the building is proposed to be so sited on a ridgeline that it would be visible from a ridgeline vantage, the applicant shall submit a detailed visual analysis illustrating the existing features of the site, depicting the location, mass and form of the proposed buildings and illustrating all potential visibility that would be prohibited by this Section. This analysis may be provided as photographs of the property on which the development is proposed to be sited, a computer simulation, an architectural site section or other similar display technique. The applicant will provide such further information as the Community Development Director reasonably requires.

**F.   IMPACT CLASSIFICATION**. Each building for which the Community Development Director has required a detailed analysis shall be reviewed at least as a Minor Impact Project, pursuant to Article 6: *Minor Impact Projects* unless a higher impact classification is otherwise required by this *Resolution*.

**G.   SCREENING IS NOT ACCEPTABLE MITIGATION UNLESS NO OTHER FEASIBLE SITE EXISTS**. Screening, including earth berming, of a structure otherwise in violation of this Section is not acceptable mitigation, unless allowed per Section 11-108: I. 1. b: *No Feasible Alternative Site Exists on the Parcel.*

**H.   NO MODIFICATIONS, ADDITIONS OR ALTERATIONS**. No building shall be modified, added to or altered so as to be in violation of this Section.

**I.   EXCEPTIONS.** A building on a ridgeline that is sited, designed, shaped, oriented, screened, lighted and constructed to avoid visibility from ridgeline vantages to the maximum extent feasible otherwise prohibited by this Section shall be permitted only if:

1.   **PLANNING COMMISSION FINDINGS**. The Planning Commission finds by clear and convincing evidence that the building meets or exceeds the following standards:

a.   **PUBLIC UTILITY FACILITY.** It is a public utility and no other feasible and prudent alternative site exists for the facility; or

BLM_0054116

b. **NO FEASIBLE ALTERNATIVE SITE EXISTS ON THE PARCEL.** No feasible non-ridgeline site for the building exists on the parcel which, considering existing natural vegetation, would be less visibly obtrusive than the ridgeline site; or

c. **FULL SCREENING EXISTS AND IS PROTECTED.** Any building on the ridgeline shall be <u>fully</u> screened by existing (as opposed to new) natural vegetation on the applicant's property, of such volume, density and species of tree cover, after provision of defensible space for wildfire hazard, so that no part of the building shall be visible from any ridgeline vantage, at any time of the year. A recorded mechanism (e.g. protective covenant, conservation easement, bonding agreement) acceptable to the County must be provided to ensure, in perpetuity, the existence and replacement of the natural vegetation on the applicant's property used for screening; or

d. **IF SIGNIFICANT SCREENING EXISTS AND IS PROTECTED, DECISION SHALL BE MADE BY THE BOARD.** If the Planning Commission finds that the Project does meet the first three requirements of this section, but that any building on the ridgeline shall be <u>significantly</u> screened by existing (as opposed to new) natural vegetation on the applicant's property, of such volume, density and species of tree cover, after provision of defensible space for wildfire hazard, so that no part of the building that is partially visible shall be visibly obtrusive from any ridgeline vantage, at any time of the year, the Commission shall so note in a recommendation to the Board, and the Board shall be the decision-making body.  If approved, the approval shall include:

    1. **RECORDED COVENANT, EASEMENT OR AGREEMENT.** A recorded mechanism (e.g. protective covenant, conservation easement, bonding agreement) acceptable to the County must be provided to ensure, in perpetuity, the existence and replacement of the natural vegetation on the applicant's property used for screening; and

    2. **MINIMAL VISUAL IMPACT.** When significant screening exists and is protected, the building on the ridgeline shall have minimal visual impact and:

        a. **IS NOT OBTRUSIVE OR VISIBLE FROM A MUNICIPAL RIDGELINE VANTAGE.** Must comply with both of the following standards:

            1. **OBTRUSIVENESS.** The building will blend in with its surroundings and will not stand out in the context of its surroundings nor draw attention to itself; and

            2. **MUNICIPAL RIDGELINE VANTAGE.** The building will not be visible with the naked eye from a municipal ridgeline vantage; and

        b. **MUST NOT BE VISIBLE FROM RIDGELINE VANTAGE OR VISIBILITY IS ONLY MOMENTARY.** Must comply with and with one of the following standards:

            1. **DISTANCE FROM RIDGELINE VANTAGE(S).** The building will not be visible with the naked eye from near or distant ridgeline vantages; or

            2. **NUMBER AND LENGTH OR DURATION OF RIDGELINE VANTAGES**. The number and length or duration of public road ridgeline vantages from which the building will be visible are so small that the building will be visible only momentarily to passersby.

e. **DESTRUCTION OF BUILDING AND/OR NATURAL VEGETATION.** In the event the building and/or the natural vegetation providing screening is substantially damaged or destroyed the owner shall, prior to construction of the building and within two years, plant and maintain new vegetation and ensure its survival to provide screening for the building in the least amount of time so that the building complies with the standards of this Section, and the recorded protective covenant, conservation easement, or bonding agreement).

## SECTION 11-109: DEVELOPMENT THAT AFFECTS AGRICULTURAL LANDS

A. **PURPOSE.** The agricultural resources of Gunnison County are essential to the County's economic base and are the primary element of the County's rural heritage. Both year-round residents and visitors enjoy the expanses of irrigated green meadows and the sense of history and community that ranching operations offer to the overall quality of life in Gunnison County. The standards in this Section are intended to ensure that new development impacts existing ranching operations as little as possible, and that development and ranching can exist together compatibly.

B. **APPLICABILITY.** This Section shall apply to all land use changes on land adjacent to or directly affecting agricultural operations. The County shall assure that adequate requirements are included in the approval of a Land Use Change

BLM_0054117

Permit that minimize or eliminate impact of any land use change on agricultural lands. Those land use changes shall comply with this Section and all other applicable requirements of this *Resolution.*

**C.   GENERAL STANDARD.** Land use changes are encouraged that will retain the agricultural use and productivity of the land. Land use changes should not adversely affect, or have the potential for limiting the viability of existing agricultural operations, including the use of irrigation ditches, irrigated hay meadows, and historic stock drives. However, it is not the County's policy to prevent land use change on land because such land is now was once used for agricultural purposes.

**D.   DOMESTIC ANIMAL CONTROLS**. Dogs and other domestic animals that are not being used to assist with the herding or the care of livestock shall not be permitted to interfere with livestock or the care of livestock that occurs as part of an agricultural operation. Enforceable protective covenants or deed restrictions shall be provided for land use changes that are required to confine pets by kenneling, leashing, fencing or other physical constraint, and allow enforcement by the County at the expense of a responsible homeowners or property owners' association.

**E.   ROADS.** Development roads shall be located a sufficient distance back from the property boundaries so that normal maintenance of such roads, including snow removal, will not damage boundary fences. Dust control shall be required both during and after construction pursuant to Section 13-119: *Standards to Ensure Compatible Uses* to minimize adverse impacts to livestock and crops.

**F.   FENCES.** Construction and maintenance of fencing are subject to the rights and obligations defined by C.R.S. 35-46-101 *et seq.* Language shall be included in protective covenants or in the approval of a Final Plan and on the recorded plat of a subdivision, putting lot owners on notice that maintenance of any applicable fence for the purposes of fencing out livestock is the responsibility of the lot owner or the homeowners' association. Fences shall be constructed that separate the development from adjoining agricultural lands or stock drives. Those newly constructed fences, and existing fences serving the same purpose shall be maintained and any breaks in such fences shall be at properly maintained metal or wood gates or cattle guards.

**G.   IRRIGATION DITCHES.** Land use changes shall not interfere with ditch rights-of-way. Where irrigation ditches cross or adjoin the land proposed to be developed, a condition of a Land Use Change Permit shall include requirements to insure that the use of those ditches, including their maintenance, can continue uninterrupted.

    **1.   EMERGENCY CONTACT PERSON.** If the land will not be occupied full-time by the applicant, provision shall be made for a person or institution (who shall be identified by name, address, and telephone number) to represent the owner and act on behalf of that owner in case of a ditch washout or similar emergency.

    **2.   IRRIGATION DITCH EASEMENTS.** A maintenance easement of at least 25 feet from the edges of the ditch banks shall be preserved and indicated on any Final Plat for subdivision, or in the Final Plan for any non-subdivision use. For parcels that are the subject of Land Use Change Permits, Building Permits or Individual Sewage Disposal System Permits, access for maintenance of an irrigation ditch is required to be 25 feet from each ditch bank. When approved in notarized written form by the ditch owner(s), that distance may be decreased and existing historical easements used to gain access to ditches, headgates, and fences for maintenance or operational purposes shall be preserved or replaced with reasonable alternate easements suitable for continuation of the historic use.

**H.   PROTECTIVE COVENANTS OR DEED RESTRICTIONS AND PLAT LANGUAGE.** Suitable and enforceable protective covenants or deed restrictions shall be required as a condition of approval of new Land Use Change Permits that include the following language that shall also be required to be included on the Final Plat of a subdivision.

    **1.   CONFINEMENT OF DOMESTIC ANIMALS.** Language directing that domestic animals must be controlled by kenneling, leash, fencing or other physical constraint. Language shall be also be included within those protective covenants or restrictions stating that any expense of enforcement of the domestic animal control restrictions by the County shall be at the expense of the responsible association or the individual.

    **2.   AWARENESS OF COLORADO "FENCE-OUT" REQUIREMENTS.** Language referencing C.R.S. 35-46-101 *et seq*: and clearly stating that a property owner is required to construct and maintain fencing in order to keep livestock off his/her property.

    **3**.   **IRRIGATION DITCH MAINTENANCE**. Language notifying individual lot owners within a subdivision, or future owners of a parcel on which a development that is not a subdivision has been granted a Land Use Change Permit, that an irrigation ditch owner has the right to enter the designated irrigation ditch maintenance easement, maintain the ditch, and leave natural debris on the bank.

BLM_0054118

## SECTION 11-110: DEVELOPMENT OF LAND BEYOND SNOWPLOWED ACCESS

**A. PURPOSE.** The purpose of this Section is to establish regulations to limit the impacts of development on land beyond snowplowed road access in Gunnison County. Development of land beyond snowplowed road access, or expansion or extension of snowplowed road access, poses issues that land use by non-snowplowed over-the-snow road access do not pose, including road damage, creation or expectation about the availability of public and emergency services, creation or increased risk(s) to emergency services personnel who may be called upon to respond to the land, disruption of significant, existing land uses of modes or travel, and creation or increased detrimental, environmental impact to road(s) and/or land(s).

**B. NO COUNTY OBLIGATION TO MAINTAIN OR SNOWPLOW.** Nothing in this *Resolution* or in any permit granted pursuant to it, or in any permit granted before the effective date of this *Resolution*, creates or shall be construed to create, any obligation of Gunnison County to maintain, snowplow, open or improve any road or to allow private maintenance or snowplowing of any section of federal, state, County or public road.

    **1. EXCEPTIONS.** Exceptions shall be limited to:

        **a. AT PRIVATE COST, CONTINUED PLOWING AS PREVIOUSLY PROVIDED BY COUNTY.** Upon request to Gunnison County at the time that Gunnison County ceases to snowplow all or a section of road it then plows throughout the winter, the owner of real property directly accessed by the road shall be granted permission by Gunnison County to privately snowplow the same section of the road, to the same extent and for the same time period it had previously been plowed, at private cost and subject to any conditions that Gunnison County and other applicable government entities may impose.

        **b. AT PRIVATE COST, CONTINUED PLOWING BY PRIVATE PARTY.** Upon request to Gunnison County at the time that a private party ceases to snowplow throughout the winter with the permission of Gunnison County all or a section of a road accessing a property, the owner of real property directly accessed by the road shall be granted permission by Gunnison County to privately snowplow the same section of the road to the same extent and for the same time period it had previously been plowed, at private cost and subject to any conditions that Gunnison County and other relevant government entities may impose.

**C. NO RESTRICTION ON CLOSURES.** Nothing in this *Resolution* or in any permit granted pursuant to it, or granted before the effective date of this *Resolution*, limits or shall be construed to limit the authority of Gunnison County to close or regulate roads or use of roads.

**D. CONDITIONS OF APPROVAL.** Approval of any Land Use Change Permit for a parcel of land beyond snowplowed road access shall require the following:

    **1. WRITTEN ACKNOWLEDGEMENT.** The landowner shall execute the following written statement acknowledging the following; the statement shall be recorded as an exhibit to the County's approval document:

LAND OWNER'S ACKNOWLEDGEMENT OF NO SNOWPLOWING,
NO COUNTY LIABILITY AND NO RESTRICTION ON ROAD CLOSURES

*I/We _____ (Owner(s) of Property) _____, on behalf of myself/ ourselves and all successors, heirs and assigns, do hereby acknowledge that _____ (name, number of access road) _____ is not snowplowed throughout the winter, and might never have that service. Year-round, over-the-road access by emergency services (including fire, ambulance, law enforcement, etc.) does not exist for _____ (legal description of subject property) _____.*

*I acknowledge that nothing in the Gunnison County Land Use Resolution, or in any permit granted pursuant to it, or granted before the effective date of the Resolution, limits or shall be construed to limit the authority of Gunnison County to temporarily, periodically, seasonally or otherwise close or further regulate this road, or its use.*

*I further acknowledge that nothing in the Gunnison County Land Use Resolution, or in any permit granted pursuant to it, or granted before the effective date of the Resolution, creates or shall be construed to create, any obligation of Gunnison County to maintain, snowplow, open or improve any road or to allow private maintenance or snowplowing of any section of federal, state, County or public road.*

*/s/ _____*

*(Owner of Property)*
*Date: _____*


*Attest:*

*_____*

BLM_0054119

*Gunnison County Clerk and Recorder*

**E. TEMPORARY PRIVATE PLOWING PERMIT**.

1. **COSTS AND CONDITIONS**. Upon formal, written request to Gunnison County, a temporary permit not to exceed one year may be issued by Gunnison County pursuant to the *Gunnison County Standards and Specifications for Road and Bridge Construction*, to privately plow a County or public road under the jurisdiction of Gunnison County on an annual basis, at private cost, and subject to any conditions that Gunnison County and any other applicable government entities may impose.

2. **REQUIRED FINDINGS**. No temporary plowing permit shall be issued unless, after a public hearing, the Board determines by clear and convincing evidence, that private plowing of the requested section of federal, state, County or public road:

   a. **NO SUBSTANTIAL CONFLICT WITH ARTICLE 1.** Does not substantially conflict with the requirements of Article 1: *General Requirements.*

   b. **MEETS ROAD AND BRIDGE CONSTRUCTION SPECIFICATIONS**. Meets or exceeds the requirements of the *Gunnison County Standards and Specifications for Road and Bridge Construction.*

   c. **NO INCREASED RISK TO EMERGENCY SERVICES PERSONNEL**. Does not create or substantially increase the risk to emergency services personnel who may be called upon to travel over the subject section of road;

   d. **NOT DISRUPTIVE TO EXISTING TRAVEL MODES**. Does not disrupt significant, existing modes of travel;

   e. **DOES NOT CREATE OR SIGNIFICANTLY INCREASE ENVIRONMENTAL DETRIMENT.** Does not create or significantly increase detrimental environmental impact to road(s) and/or land(s); and

   f. **BENEFITS OUTWEIGH DETRIMENTS.** Considering the existing use, and the proposed use, of the areas accessed by the proposed expansion or extension of snowplowing, presents benefits that clearly outweigh its detriments.

**F. EXPANSION OR EXTENSION OF SNOWPLOWING.** Except for an emergency declared by the Board or County Manager, which emergency shall not exceed one month, each proposal for expansion or extension of snowplowing of a County or public road to be performed either by Gunnison County or a different public entity, or privately, shall be considered a land use change classified as a Minor Impact Project, and shall be reviewed pursuant to Article 6: *Minor Impact Projects.* The application shall not be approved unless, in addition to compliance with all other standards and requirements of this *Resolution*, the Board determines by clear and convincing evidence that:

1. **NO CONFLICT WITH ARTICLE 1.** Such expansion or extension does not substantially conflict with the requirements of Article 1: *General Requirements;*

2. **MEETS ROAD AND BRIDGE CONSTRUCTION SPECIFICATIONS**. Meets or exceeds the requirements of the *Gunnison County Standards and Specifications for Road and Bridge Construction*;

3. **NO INCREASED RISK TO EMERGENCY SERVICES PERSONNEL**. Does not create or substantially increase the risk to emergency services personnel who may be called upon to travel over the subject section of road;

4. **NOT DISRUPTIVE TO EXISTING TRAVEL MODES**. Does not disrupt significant, existing modes of travel;

5. **NO INCREASED ENVIRONMENTAL DETRIMENT.** Does not create or significantly increase detrimental environmental impact to road(s) and/or land(s); and

6. **BENEFITS OUTWEIGH DETRIMENTS**. Considering the existing use and the proposed use of the areas accessed by the proposed expansion or extension of snowplowing, presents benefits that clearly outweigh its detriments.

7. **CLEAR PUBLIC BENEFIT**. In case of a proposed expansion or extension of snowplowing to be performed or paid for by Gunnison County, that there is a clear public benefit of such expansion or extension.

**G. SNOWPLOWING REQUIREMENTS**. Any snowplowing permit approved and issued pursuant to this *Resolution* shall comply with the following:

1. **CLEARING OF TRAVELED WAY**. Removal of snow from all of the traveled way, including turnouts sufficient for the safe and efficient use by all users;

2. **MAINTENANCE OF DRAINAGE FACILITIES**. Leaving culvert inlets in a natural condition, without snow or other material plowed into them, so that the drainage system will function normally; and

BLM_0054120

3. **ADDITIONAL CONDITIONS**. The Board shall impose additional conditions based on the section of road to be snowplowed, including:

   a. **RANGE OF PLOWING**. The frequency, duration and extent of snowplowing; and

   b. **EQUIPMENT.** Identification of the type of equipment to be used; and

   c. **PLOWER'S QUALIFICATIONS.** Identification of the qualifications of the people who will perform the snowplowing; and,

   d. **ROAD MAINTENANCE AND IMPROVEMENTS.** Preparation, improvements and maintenance of the section of road to ensure public safety, to protect and preserve the road section, and to ensure that the road section is suitable for snowplowing.

H. **FEDERAL ACTION.** Nothing in this Section supersedes or shall be construed to supersede a requirement by the federal government to abandon, close, or reclaim a federal road.

## SECTION 11-111: DEVELOPMENT ON INHOLDINGS IN THE NATIONAL WILDERNESS

A. **PURPOSE.** Gunnison County includes a number of individual parcels that are effectively surrounded by lands designated as part of the National Wilderness Preservation System, in some cases including subsurface rights underlying those lands. This Section establishes regulations to limit the impacts of development on inholdings in the National Wilderness Preservation System.

B. **DIMENSIONAL RESTRICTIONS.** The following dimensional requirements shall apply to permitted uses on inholdings in the National Wilderness Preservation System, and supersede general standards of Section 13-105: *Residential Building Sizes and Lot Coverages:*

   1. **MAXIMUM INDIVIDUAL STRUCTURE SIZE.** The maximum size for an individual structure shall not exceed 800 sq. ft., measured pursuant to Section 13-105: *Residential Building Sizes and Lot Coverages.*

   2. **MAXIMUM AGGREGATE SIZE OF ALL STRUCTURES.** The maximum size for the aggregate measurement of all structures shall not exceed 1,200 sq. ft. measured pursuant to Section 13-105: *Residential Building Sizes and Lot Coverages.*

   3. **MAXIMUM STRUCTURE HEIGHT.** The maximum height of any structure on an inholding shall not exceed 20 feet to the highest roof or parapet surface of a flat roof as measured pursuant to Section 13-103: *General Site Plan Standards and Lot Measurements.*

4. **NO HELICOPTER OR AIRCRAFT ACCESS.** Except for bona fide emergency medical purposes, there shall be no helicopter or aircraft access to, or use on, any private inholding in the National Wilderness Preservation System.

## SECTION 11-112: DEVELOPMENT ON PROPERTY ABOVE TIMBERLINE

A. **PURPOSE.** Gunnison County includes a number of individual parcels that are located above timberline. This Section establishes regulations to limit the impacts of development on land and the environment above timberline.

B. **DIMENSIONAL RESTRICTIONS.** The following dimensional requirements shall apply to each permitted use above timberline and supersede general standards of Section 13-105: *Residential Building Sizes and Lot Coverages:*

   1. **MAXIMUM AGGREGATE SIZE OF ALL STRUCTURES.** The maximum size for the aggregate measurement of all structures shall not exceed 1000 sq. ft. as measured pursuant to Section 13-105: *Residential Building Sizes and Lot Coverages* and may be further restricted to a smaller square footage by *Section 11-111: Development on Inholdings in the National Wilderness.*

   2. **MAXIMUM STRUCTURE HEIGHT.** The maximum height of any structure above timberline shall not exceed 20 feet to the highest roof or parapet surface of a flat roof as measured pursuant to Section 13-103: *General Site Plan Standards and Lot Measurements.*

C. **NO HELICOPTER OR AIRCRAFT ACCESS.** Except for bona fide emergency medical purposes, there shall be no helicopter or aircraft access to, or use on, any property above timberline.

   1. **EXCEPTION ALLOWED AFTER ADMINISTRATIVE REVIEW.** Helicopter or aircraft access may be allowed by the Community Development Director after an application has been submitted and reviewed pursuant to Article 5: *Projects Classified as Administrative Review Projects That Require Land Use Change Permit* and the Community Development Director has determined by clear and convincing evidence that the benefits of such access outweigh the detriments.

BLM_0054121

BLM_0054122

# ARTICLE 12:
# DEVELOPMENT INFRASTRUCTURE STANDARDS

## SECTION 12-101: PURPOSE

This Article establishes the minimum standards for the design of infrastructure and similar improvements necessary to serve developments that are classified as Minor or Major Impact Projects in unincorporated Gunnison County. These standards are intended to further the orderly layout and use of land and to protect and promote the public health, safety and welfare of residents and visitors in Gunnison County. Additional information or analysis beyond the minimums set forth in this Section may reasonably be required by the Community Development Director or the Planning Commission, if issues are raised during the review process that so warrant.

## SECTION 12-102: APPLICABILITY AND OVERVIEW

A. **APPLICABILITY TO LAND USE CHANGE PERMITS.** These improvement standards shall apply to all applications submitted for Land Use Change Permit that are classified as Minor or Major Impact Projects, except as exempted by Section 1-106: *Partially Exempted Land Use Changes*, or as otherwise exempted by specific sections of this Article.

B. **STANDARDS ARE MINIMUM.** These improvements standards are intended to ensure a minimum level of performance. If an alternate design, process, or material can be shown to provide performance equal to or better than that established by these standards, or where it can be shown that strict compliance with these standards would cause unacceptable environmental impacts, or would result in adverse conditions on- or off-site because of unusual topography, size or shape of the property, existing vegetation, or other exceptional situation or condition, then the Community Development Director may recommend that the decision-making body accept the alternative. The evaluation shall consider whether the alternative will provide for an equivalent level of public safety and whether the alternative will be equally durable, so that normally anticipated maintenance costs will not be increased.

C. **PLANS SHALL BE PREPARED BY A QUALIFIED PROFESSIONAL ENGINEER LICENSED IN THE STATE OF COLORADO.** All plans, reports, and specifications for development of improvements required in this Article shall be prepared by, or under the direct supervision of, a qualified professional engineer licensed in the State of Colorado. Final public improvement plans, reports and specifications shall bear the seal and signature of the qualified professional engineer licensed in the State of Colorado responsible for their preparation.

## SECTION 12-103: ROAD SYSTEM

The road system shall be designed and constructed to permit safe, efficient and orderly movement of pedestrian, motorized and non motorized vehicular traffic; to meet, but not exceed the needs of the present and future population served; to have a simple and logical pattern; to respect natural features and topography; and to present a reasonably attractive appearance.

A. **COMPLIANCE WITH ROAD AND BRIDGE CONSTRUCTION STANDARDS.** All applicants for Land Use Change Permits that have a component of driveways, roads and/or bridges shall comply with the requirements of the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and this Section.

B. **COMPLIANCE WITH MUNICIPAL STANDARDS.** When the proposal is for development located within a municipal three-mile plan area, the development proposal shall address how it comports with the objectives and policies of the applicable municipal Three-Mile Plan. The County shall consider how the proposed development has addressed those objectives and policies, and any further intergovernmental agreement between the County and the municipal government regarding the Three-Mile Plan area. Where there is a conflict between the objectives or policies of a Three-Mile Plan or the intergovernmental agreement, and County standards, County standards shall apply.

1. **STANDARDS WITHIN INTERGOVERNMENTAL AGREEMENT.** When an adopted intergovernmental agreement exists between the County and a municipality, proposed roadways for any land use change located within three miles of that municipality shall be designed to comply with the standards referenced or imposed by that agreement.

2. **COUNTY STANDARDS APPLY IF NO INTERGOVERNMENTAL AGREEMENT.** If no intergovernmental agreement exists, and the proposed development is within three miles of a municipality, the County shall consider comments submitted by the municipality and require that the roads comply with the County's standards, but be

BLM_0054123

designed so that they are capable of being upgraded to comply with municipal standards if the development were to be annexed to the municipality. This may require, at a minimum, that adequate right-of-way be granted by the applicant to ensure that such upgrading can be accomplished.

3. **COUNTY'S STANDARDS APPLY WHEN STANDARDS CONFLICT**. Where there is a conflict between the objectives or policies of a Three Mile Plan or the intergovernmental agreement, and County standards, County standards shall apply.

C. **MEETING WITH PUBLIC WORKS DEPARTMENT**. Before an applicant submits engineered plans for a proposed road system as part of a Preliminary Plan for any Major Impact Project, or for a subdivision that is a Minor Impact Project, the applicant shall initiate and schedule a meeting with the Gunnison County Public Works Department to discuss the scope of the Project, identify transportation issues specific to the proposed Project that are to be addressed, and to provide the Department with the name, telephone number and address of the engineer or engineering firm that will be drafting the proposed road plans.

D. **RECOMMENDATION OF PUBLIC WORKS DEPARTMENT.** The Public Works Department shall review and evaluate the general design, engineering submittals, and as appropriate, traffic study recommendations submitted by the applicant, and shall, as appropriate, report to the appropriate review body whether the submitted plans comply with the requirements of this Section and with the applicable sections of the *Gunnison County Standards and Specifications for Road and Bridge Construction*, and, if applicable, those mitigations that may reasonably be required related to impacts of the proposed Project.

E. **TRAFFIC STUDY.** The applicant for a proposed development that is Projected to generate more than 100 vehicle trips per day shall be required to conduct a detailed traffic study to adequately assess the impacts of the proposed development on the existing and/or planned transportation system. The standard for Projecting trip or traffic generation is ten trips per day per residence or guest house, or as otherwise adopted by the Institute of Traffic Engineers. In addressing the traffic impacts of a proposed development, it shall be assumed that there will be full build out, maximum use, and full time occupancy of each residence and guest house. A traffic study may also be required for any proposed development, at the discretion of the Public Works Director, in the case where a localized transportation safety or capacity deficiency exists or is Projected. The traffic study shall be prepared by or under the supervision of a qualified professional engineer licensed in the State of Colorado who has demonstrated experience in transportation planning and traffic engineering.

1. **ISSUES TO BE ADDRESSED.** The submitted traffic study shall include supporting tabulations, figures and technical appendices, and shall, at a minimum, address the following traffic impact study elements:

   a. **PURPOSE.** Study purpose and objective.

      1. **AREA AND SITE.** Study area and site description.

      2. **EXISTING TRANSPORTATION SYSTEM.** Existing transportation system and operational and safety conditions, including:

         a. **COUNTS.** Traffic counts.

         b. **PEAK LEVEL OF SERVICE.** Peak hour level of service.

         c. **DEFICIENCIES.** Existing deficiencies.

         d. **ACCIDENT ANALYSIS.** Traffic accident evaluations.

         e. **ALTERNATIVE MODES.** Alternative mode systems.

      3. **LAND USES.** Existing and proposed land uses.

      4. **TRANSPORTATION AND ACCESS.** Proposed transportation system and access plan.

      5. **PHASING.** Anticipated Project phasing and timing.

      6. **TRAFFIC PROJECTIONS.** Background traffic projections (not related to the proposed development) and operations.

      7. **SITE-GENERATED TRAFFIC.** Anticipated site-generated traffic, including:

         a. **TRIP GENERATION RATES.** Trip generation rates (Institute of Traffic Engineers (ITE)) rates and supporting documentation.

         b. **TRIP GENERATION ADJUSTMENTS.** Trip generation adjustments (including pass-by trips, multi-purpose trips, alternative mode adjustments) and supporting documentation.

BLM_0054124

   **b.   TRIP GENERATION FOR CONSTRUCTION.** Anticipated trip generation for the construction of infrastructure and construction of each component of the development.

   **c.   TRIP DISTRIBUTION.** Assumed trip distribution.

   **d.   TRAFFIC ASSIGNMENT.** Traffic assignment (by development phase and planning horizon as appropriate).

   **e.   PROJECTED DEVELOPMENT IMPACTS.** Identification and evaluation of development impacts (by development phase and planning horizon), including:

     **1.   CAPACITY.** Capacity and level of service evaluation.

     **2.   ACCIDENT EVALUATION.** Accident and safety evaluation.

     **3.   INTERSECTION GEOMETRY.** Roadway and intersection geometry.

     **4.   TRAFFIC SIGNALS.** Traffic signal warrants (based on warrants contained in the Federal; Highway Administration's Manual on Uniform Traffic Control Devices).

     **5.   STATE HIGHWAY ISSUES**. State highway access issues (as appropriate).

   f.    **ALTERNATIVE MODES.** Alternative transportation modes (internal system, access to adjacent systems, and connections to off-site facilities).

   **g.   CONCLUSIONS.** Conclusions and improvement recommendations (onsite and off-site as appropriate), including percent contribution of development to the need for the improvements.

**F.   MITIGATION OF IMPACTS TO ROAD SYSTEM.** Based upon the results of the traffic study, applicants for a Land Use Change Permit shall be required to mitigate their proportionate share of the impacts of the proposed activity upon the County's road system. This may require construction of improvements to existing roads and bridges, the construction of new roads and bridges on and off-site, or payment to the County of sufficient funds to be used exclusively to improve existing roads or construct new roads off-site, in accordance with the conclusions of the study and pursuant to the requirements and definitions of the *Gunnison County Standards and Specifications for Road and Bridge Construction.*

**1.   DESIGN OBJECTIVES.** Any road improvements that are provided shall be designed to meet the following objectives:

   **a.   PROPER FUNCTIONING OF ROADS AND INTERSECTION.** To permit the safe, efficient and orderly movement of traffic, by ensuring that roadways and intersections function at acceptable levels of service. To address intersection peak hour operations, intersection design shall meet Level of Service (LOS) D, using evaluation procedures described in the Federal Highway Administration's Highway Capacity Manual.

   **b.   MEET POPULATION NEEDS.** To meet, but not exceed, the needs of the present and future population served;

   **c.   LOGICAL PATTERN**. To have a simple and logical road pattern;

   **d.   PRESERVE NATURAL LAND FORMS** . To preserve the natural land forms found on the property, to minimize use of cut or fill, and to minimize visibility of the road system from off site; and

   **e.   PRACTICALITY OF PLOWING AND MAINTENANCE.** To provide roadways and related snow storage areas that are sufficient to ensure reasonable access and maneuverability for required plowing and maintenance equipment.

**2.   IMPROVEMENTS THAT MAY BE REQUIRED.** Improvements that may be required to mitigate the proportionate share of impacts on the road system caused by the proposed land use change, during both construction and operational phases, include:

   **a.   GRANTING OF RIGHTS-OF-WAY OR EASEMENTS.** Granting rights-of-way to the County, public, or other appropriate entity, including easements for existing or future roads, parking and snow storage areas, public trails, expansion of roads or other travel-related areas, utilities (including electric, telephone, oil or gas), water and/or sewage, drainage, irrigation and similar services, or for construction of frontage roads to minimize the number of driveways or side roads accessing a collector.

     **1**.   **WIDTH OF EASEMENT.** The width of any required easement shall satisfy the reasonable requirements of the applicable utility provider and the County, pursuant to the design standards of the utility provider or the County, as applicable.

BLM_0054125

2. **DEDICATION TO PUBLIC.** Rights-of-way intended for any public use shall be dedicated to public use; that dedication shall appear on any plat. Acceptance by the Board of a dedication to the County or public does not create an obligation for the County to maintain, snowplow or improve the right-of-way; any such obligation shall be created only by written resolution of the Board.

b. **ADDITION OF LANES AND OTHER WAYS.** Addition of travel and/or turn lanes and other ways, including bikeways and pedestrian walkways;

c. **INTERSECTION AND BRIDGES.** Re-design and construction of intersections, enlargement of bridges, and other road surface improvements;

d. **SIGNAGE.** Signs such as those regulating speed, providing warning of certain physical characteristics of the road or of heavy vehicles accessing the roads, or otherwise providing direction to drivers. Signs and markings designed and installed pursuant to the Federal Highway Administration's *Manual on Uniform Traffic Control Devices;*

e. **BICYCLE AND PEDESTRIAN FACILITIES.** The provision of safe walkways for pedestrians, either separate from or adjacent to roadways, depending on site-specific and Project-specific conditions; on-road bicycle lanes, and off-road bicycle paths (designed pursuant to AASHTO *Facilities Design Guide*);

f. **TRAFFIC CONTROL DEVICES.** Traffic control devices;

g. **TRAFFIC SEPARATION FACILITIES.** Traffic separation facilities including underpasses or bridges; and

h. **TRAFFIC CALMING DEVICES.** Traffic calming devices.

G. **STANDARDS FOR ACCESS TO PROPERTIES.** The following shall apply to any proposed land use change:

1. **NO INTERFERENCE WITH OR OBSTRUCTION OF PUBLIC ROAD.** No land use change proposed for land over which there is a public road shall interfere with or obstruct such road without written authority from the government entity that has jurisdiction over the road. Approval by the County of the Land Use Change Permit is not a vacation of such a public road.

2. **LEGAL ACCESS SHALL BE PROVIDED.** Design and construction of any land use change shall ensure that all residential lots have legal access to a public road.

   a. **ACCESS EASEMENTS SHALL BE MADE OF RECORD.** If access is provided to lots or tracts through private rights-of-way, then access easements benefiting all properties having such access shall be made of record in conjunction with approval of the land use change.

   b. **LIMITED SNOWPLOWED ACCESS.** Every development shall comply with the requirements of Section 11-110: *Development of Land Beyond Snowplowed Access.*

3. **ACCESS PERMITS.**

   a. **ACCESS ONTO STATE AND FEDERAL HIGHWAYS.**  Access onto state and federal highways is under the jurisdiction of the Colorado Department of Transportation (CDOT). A Highway Access Permit is required from CDOT for any new access, change of existing access, or change of use of a property that accesses onto a state or federal highway. Access design shall meet the requirements of the *Colorado State Highway Access Code.* The County shall not give final approval to a Land Use Change Permit until the County has received a copy and commented on the Highway Access Permit application.

   b. **ACCESS ONTO A COUNTY ROAD OR A PUBLIC ROAD THAT DOES NOT REQUIRE A CDOT ACCESS PERMIT.** Driveway access onto a County road or a public road that does not require a CDOT Access Permit shall require an Access Permit from the Gunnison County Public Works Department, and shall meet the standards of the *Gunnison County Standards and Specifications for Road and Bridge Construction.*

      1. **LAND USE CHANGE PERMIT PRECEDES ACCESS PERMIT.** No Access Permit shall be issued by the Public Works Department before approval of a Land Use Change Permit, when the proposed activity requires a Land Use Change Permit.

      2. **FIRE PROTECTION DISTRICT REVIEW.** All applications for driveway access may be submitted by the Gunnison County Public Works Department to the applicable fire protection district for review and recommendation.

H. **ROAD PATTERN.** The road pattern in the proposed development shall generally conform to any adopted County plan for future development of the areas that the roads proposed for a land use change are intended to serve.

BLM_0054126

1. **CONTINUITY OF ALIGNMENT.** Where appropriate to the design, roads shall be continuous and in alignment with existing platted roads with which they are to connect.

2. **STUB ROADS.** All stub roads shall have a turnaround pad constructed at their end until the road becomes a through road. Pad requirements for a stub road shall comply with the *Gunnison County Standards and Specifications for Road and Bridge Construction*.

3. **PRESERVE NATURAL LAND FORMS.** The road pattern shall be designed to preserve natural land forms found on the property, to minimize use of cut or fill, and to minimize visibility of the roads from off-site.

4. **SHARED ACCESS ROAD OR ACCESS POINT.** More than one lot may be required to share an access road or access point to minimize access roads or points or to maximize safety.

I. **ROAD NAMES AND SIGNS.** Proposed road names assigned to internal roads of a proposed land use change shall not duplicate other existing or proposed road names in the county. Light-reflective road signs of durable and permanent materials shall be installed at all intersections in the development and other appropriate locations, and shall be addressed in a Development Improvement Agreement. House or lot numbering systems should be plainly visible year around from the public and/or subdivision road.

J. **LOT ADDRESS SIGNS.** Each lot shall be identified by a lot sign that identifies by number, and in reflective materials, the numerical address of the lot.

K. **PEDESTRIAN AND NON-MOTORIZED WAYS.** Each land use change that includes residential or other uses (such as schools) or amenities that will generate pedestrian or other non-mechanized traffic and meets one of the following criteria must provide a pattern of pedestrian or non-mechanized-use ways, each at least six feet wide, to accommodate the pedestrian traffic to be generated by the proposed development. Those pedestrian ways can be used as utility corridors, can be counted towards acreage required by the *Gunnison County On-Site Wastewater Treatment System Regulations*, and will not preclude the land over which they cross from being characterized as open space. Impacts that require the integration of pedestrian ways include:

1. **LOCATION WITHIN THREE-MILES OF POPULATION CENTER.** Is within three miles of a population center; or

2. **MORE THAN TEN RESIDENCES.** Will contain more than ten residences; or

3. **ROAD PATTERN IS MORE THAN DRIVEWAYS.** Will create a road pattern other than driveways.

## SECTION 12-104: TRAILS

A. **MITIGATION OF IMPACT TO PUBLIC TRAILS.** Except when an application is for an Administrative Review Project, an applicant for a Land Use Change Permit shall mitigate the proportionate share of the impact caused by the proposed development on public trails.

B. **NO INTERFERENCE WITH OR OBSTRUCTION OF PUBLIC TRAIL.** No land use change proposed for land over which there is a public trail shall interfere with or obstruct that trail without written authority from the government entity that has jurisdiction over the trail. Approval by the County of the Land Use Change Permit is not a vacation of such a public trail.

C. **INCLUSION OF PUBLIC TRAILS.** Applicants are encouraged to include public trails and other amenities for non-motorized travel in an application for a Land Use Change Permit to link existing adjacent public trails or trails easements and to provide an alternative routing of pedestrian and generally non motorized vehicles (use of trails by golf carts, or motorized vehicles for the disabled may be appropriate to specific developments).

D. **REVIEW OF CONTESTED, OR NEWLY PROPOSED, PUBLIC TRAIL ACCESS.** When there is an issue of a contested, or newly proposed, public trail, the applicant and County shall review the issue, including the history of use, impact on the proposal, public concerns, existing and proposed public trails in the *Gunnison County Trails Master Plan*, and whether access over the subject land is advisable. This review does not preclude any other legal proceeding available to the applicant or County.

E. **DEDICATION WITHOUT COMPENSATION IS LIMITED.** Dedication of new public trail access without compensation shall be required only:

1. **RATIONAL NEXUS.** If there is a rational connection between impacts caused by the proposed Project and the need for a new public trail; and

2. **MITIGATION OF PROPORTIONATE SHARE OF IMPACT.** To the degree necessary to mitigate the proportionate share of the impact caused by the proposed development on public trails; and

BLM_0054127

3. **PUBLIC INTEREST**. When such a new trail is in the public interest.

4. **COUNTY AND APPLICANT TO EXPLORE ALTERNATIVES**. When dedication without compensation is required, the County and the applicant shall explore recreation easements and irrevocable license agreements in addition to any other lawful way to establish a public trail.

F. **EXEMPTION FOR AGRICULTURAL LANDS**. The County shall not require a new trail easement to be granted through that portion of a development that is proposed to continue to be used for agricultural purposes.

G. **TRAIL DESIGN STANDARDS**. The *Gunnison County Trails Master Plan* contains recommendations to guide the planning, design, alignment and implementation of trail construction and use. Proposed trail easements shall be of sufficient dimension and appropriate alignment to accommodate the type of trail use that is depicted on the Plan, and to accommodate any other proposed trail planned to cross the property.

H. **CONSTRUCTION AND MAINTENANCE**. The costs of trail maintenance, construction and signage shall be performed as stated provided for in the Development Improvement Agreement.

I. **RECORDATION**. Location of the approved route for public trails and any restrictions on their uses shall be set forth as elements identified on recorded plats, and referenced in recorded declarations of protective covenants. Any significant change to the approved route or approved use shall require approval by the Board. A subsequent plat shall be provided by the applicant if the route of the trail as it is built is significantly different than the approved route.

## SECTION 12-105: WATER SUPPLY

A. **GENERAL STANDARD.** All land use changes for Minor or Major Impact Projects, for which water is a required and necessary element of the development, shall provide a water supply that is legally and physically adequate in terms of quality, quantity, dependability, and pressure for the proposed development. In making its determination as to whether the proposed water supply will be adequate for the proposed use, the decision-making body shall consider the recommendations of the Colorado Division of Water Resources, the Gunnison County Environmental Health Official and other County staff, or consultants engaged by the County and the applicant.

B. **CONNECTION TO EXISTING SYSTEMS.** It is the policy of Gunnison County to encourage land use changes to use existing water supply systems, especially those paid for in whole or in part by the sale of municipal, county, special district, or other political subdivision bonds. When an existing water supply system can provide a documented legal and physically sufficient source of water for a proposed use pursuant to this *Resolution*, an applicant for a Land Use Change Permit shall be required to connect to the existing system and to install those water lines and other appurtenances necessary to make the water supply available at the property line of each lot in the development in the following circumstances:

1. **LOCATED WITHIN 400'.** The proposed land use change is located within 400 feet of a component of an available existing water supply system; or

2. **LOCATED WITHIN AN URBAN SERVICE AREA**. The proposed land use change is located in a designated urban service area and it is determined that it is feasible, logical, and consistent with applicable municipal, district and county plans, to connect the development to the water supply system serving the area. If it is determined that it is premature to connect the development to the system at the time of the Land Use Change Permit approval, the County may require, as a condition of approval, that assurances be given, including granting of easements, and/or commitments to pay for or construct specified improvements, to ensure that when it is timely to connect the development to the water supply system, this can feasibly occur.

C. **EXISTING SYSTEM NOT ACCESSIBLE**. Where an existing water supply system approved by the Colorado Department of Public Health and Environment is not reasonably accessible or connection to it is not feasible, the applicant shall implement one of the following options:

1. **INSTALL WATER SUPPLY SYSTEM**. Install a water supply system, with water lines to each lot, the design, construction, maintenance and operation of which complies with the County's regulations and with the standards of the Colorado Department of Public Health and Environmental Resources; or

2. **SUBMIT EVIDENCE OF ADEQUACY OF INDIVIDUAL SUPPLIES.** Submit evidence satisfactory to the County that adequate individual water supplies that comply with the standards of the Colorado Department of Public Health and Environment and Gunnison County will be available to each lot in the proposed development. The County may refer the application to the Colorado Division of Water Resources for comments on the adequacy of the proposed supply.

BLM_0054128

D. **CALCULATION OF ADEQUACY OF SUPPLY.** The legal and physical adequacy of the water supply for a proposed water supply for a land use change proposed as a Major Impact shall be calculated based on the total planned development at full buildout, and for year-round use, using standard engineering practices. Fire flow requirements shall be related to the location and character of the development, and shall comply with the standards of Section 12-107: *Fire Protection*. Calculation shall be based on the following:

1. **ESTIMATED AVERAGE DAILY DEMAND.** Estimated average daily demand of the entire service area and the proposed development. Demand calculations are to be based on 350 gallons per day (gpd) per residence.

2. **ESTIMATED MAXIMUM DAILY DEMAND.** Estimated maximum daily demand based on using three times the average daily demand.

3. **ESTIMATED PEAK HOUR DEMAND.** Estimated peak hour demand based on using six times the average daily demand.

4. **ESTIMATED AVERAGE DAILY DEMAND FOR COMMERCIAL / INDUSTRIAL USES.** The estimated average daily demand for commercial and industrial uses will be reviewed based on the anticipated demand of the proposed development. Appropriate multipliers may be used in calculating the amount, based on standards as may be required for a specific use by the Colorado Department of Public Health and Environment, or other applicable agency or industry standard.

5. **WATER SUFFICIENT FOR LANDSCAPING.** As may be required by Section 13-111: *Landscaping and Buffering* each use shall have adequate water to supply required landscaping. Amounts shall be calculated using the irrigation water criteria in Section 12-105: D. 5. a. 1: *Estimated Demand*.

   a. **IRRIGATION WATER CRITERIA.** The following shall be considered in calculating requirements for the use of irrigation in new development, and shall not apply to agricultural operations in existence as of the effective date of this *Resolution*.

      1. **ESTIMATED DEMAND.** Estimated irrigation demand based on information supplied by the Natural Resources Conservation Service. The information shall take into account the type of vegetation to be maintained, the soil characteristics, the historic yield, and the available water rights.

      2. **ESTIMATED ACREAGE.** Estimated acreage to be irrigated.

6. **ADEQUATE AND RELIABLE WATER SUPPLY**. A water supply that is sufficient and accessible year-round to control and extinguish anticipated fires in the development. This standard shall identify minimum requirements for water supplies for structural and wildland fire-fighting purposes in rural and suburban areas of the county.

   a. **NFPA CLASSIFICATIONS MAY BE REFERENCED**. To determine the requirements for an adequate and reliable water supply specific to the development, the County may refer to current standards as published by the National Fire Protection Association including the *Occupancy Hazard Classification and Construction Classification Tables* within the *Standard on Water Supplies for Suburban and Rural Fire Fighting*.

   b. **COMPLIANCE WITH FIRE PROTECTION DISTRICT REQUIREMENTS**. The applicant shall provide evidence that the distribution system and storage system are capable of meeting the requirements of the applicable fire protection district, and shall be located on the same site for which development is proposed. When the District's standards conflict with County standards, the County shall only enforce the County standards.

   c. **MINIMUM REQUIREMENTS MAY BE INCREASED IF CONDITIONS ARE UNIQUE**. The County may determine during the permit application review that additional water supplies are required for fire suppression purposes, considering particular conditions such as the following:

      1. **LIMITED FIRE DEPARTMENT RESOURCES**. Available equipment is not sufficient to provide suppression for proposed heights of buildings, or there are similar limitations.

      2. **EXTENDED FIRE DEPARTMENT RESPONSE TIME**. The time reasonably expected for response from the closest fire protection district facility will likely exceed the amount of time in which a structure may be saved.

      3. **LIMITED ACCESS**. Existing roadways are narrow, of particularly steep grade, existing bridges are not constructed to accommodate emergency vehicles, or no traversable roadways exist from collector roads.

      4. **HAZARDOUS VEGETATION**. Vegetation that because of its physical characteristics is likely to contribute to the intensity or quick travel of fire.

BLM_0054129

     **5. UNUSUAL TERRAIN**. Slope, aspect and elevation create chimneys or similar configurations such that fire is likely to travel quickly.

     **6. SPECIAL USES**. Uses proposed within the Land Use Change Permit application involve hazardous products, or processes.

    **d. IDENTIFYING WATER SOURCES**. An indicator, reasonably visible in winter and approved by the applicable fire protection district, shall be installed at each location where water may be extracted, and identifying the site for fire protection district emergency use.

    **e. SECONDARY WATER SUPPLY**. Determination that a secondary water supply is necessary for purposes of fire suppression may be requested from the applicable fire protection district; the County will decide whether that secondary supply shall be required.

**E. COMPLIANCE WITH COLORADO DRINKING WATER STANDARDS**. Representative samples of the water source shall be analyzed by a reputable, qualified laboratory to determine compliance with Colorado drinking water standards. When the proposed land use will require potable water for human consumption, the quality of the water shall meet the Primary Drinking Water Standards of the Colorado Department of Public Health and Environment.

**F. WATER RIGHTS**. The applicant shall demonstrate ownership, or the right of acquisition, of sufficient water rights to serve the proposed land use change.

**G. WELL TESTING**. When a central well or wells are proposed for the water supply, a well shall be constructed on the proposed development site and tested for its capability to provide a consistent and dependable water source in quantity and quality sufficient to serve the proposed use(s). The well shall be installed, tested and monitored as follows:

    **1. CONTINUOUS PUMPING REQUIRED FOR 24 HOURS**. The well shall be continuously pumped using an electric submersible or top-drive turbine pump for a minimum of 24 hours. The discharge rate shall be measured using a calibrated in-line flow meter or frequent bucket-and-stopwatch measurements. The discharge rate shall be controlled using a control valve on the pump discharge pipe.

    **2. MONITORING OF RECOVERY**. The well shall be monitored for a minimum of 24 hours following the cessation of pumping to affirm the ability of the aquifer to recover. The monitoring report shall include data concerning the rate and volume of the recovery process.

    **3. CRITERIA FOR FIRST HOUR OF TESTING**. During the first hour of testing, the flow rate can be adjusted so that the water level drawdown inside the well is about 50 percent of the available drawdown. After the first hour, all attempts should be made to hold the discharge flow rate constant for the remainder of the test. If, during the test, the pumping water level reaches the pump intake, it is permissible to decrease the discharge rate. However, decreasing the discharge rate should occur as a discrete step, rather then a series of small flow rate adjustments.

    **4. REQUIRED MONITORING DEVICES**. During testing, water levels in the well shall be monitored using an electric water level probe or pressure transducer.

    **5. FREQUENCY OF LEVEL MEASUREMENTS**. The frequency of water level measurements should be commensurate with the rate at which water levels are changing inside the well. As a rule, water levels should be measured once every two minutes during the start of the test, and the time between measurements can be increased as the water level stabilizes or establishes a long-term trend.

    **6. WATER SAMPLE TO BE TESTED FOR COMPLIANCE WITH DRINKING WATER STANDARDS**. After a minimum of 24 hours of pumping, a water sample shall be obtained from the pump discharge pipe using appropriate sampling protocol. The water sample shall be analyzed by a State-certified laboratory to evaluate whether or not the well water complies with the Primary Drinking Water Regulations of the Colorado Department of Public Health and Environment.

    **7. TESTING REQUIRES QUALIFIED PROFESSIONAL**. Well testing and sampling shall be performed by a Colorado-licensed water well contractor, a certified professional geologist, or a qualified professional engineer licensed in the State of Colorado or a person who has a current State of Colorado certification granting a license for well-testing and installation of pumping equipment.

    **8. UNIQUE SEASONAL REQUIREMENTS**. Because natural water bodies in Gunnison County are affected by cyclical seasonal conditions, the County may require that tests be conducted during the winter months of January and February to ensure testing that most realistically can ensure that a year-round consistent supply will be available to new development. If that requirement is imposed, the applicant may elect also to conduct additional tests during other months of the year.

BLM_0054130

9. **CONSTRUCTION STANDARDS**. The water supply system shall be built to conform to the standards of the Colorado Department of Public Health and Environment and the well drilling standards of the Colorado Division of Water Resources. The system, to the maximum extent feasible, shall be built also to be consistent with the standards of the nearest public entity that supplies water, to facilitate the possibility of future connection to the system.

10. **ADMINISTRATION**. Where a water supply system is to be installed, an organization shall be set up to administer the operation of the system. Administration shall be by a municipality, water district, or an approved corporation.

## SECTION 12-106: SEWAGE DISPOSAL/WASTEWATER TREATMENT

A. **SANITARY SEWAGE DISPOSAL SYSTEM REQUIRED**. No land use change shall be permitted unless a method of sewage disposal is available to that lot or development that complies with all applicable standards of this *Resolution*, the *Gunnison County On-Site Wastewater Treatment System Regulations*, and of the Colorado Department of Public Health and Environment.

B. **CONNECTION TO EXISTING SYSTEMS**. An applicant for a Land Use Change Permit shall be required to connect to an existing wastewater treatment system approved by the Colorado Department of Public Health and Environment and to install those connection lines and other appurtenances necessary to make the system available at the property line of each lot in the development in the following circumstances:

   1. **LOCATED WITHIN 400 FEET.** The proposed land use change is located in 400 feet of an existing available wastewater treatment system approved by the Colorado Department of Public Health and Environment; or

   2. **LOCATED IN URBAN SERVICE AREA.** The proposed land use change is located in a designated urban service area and it is determined that it is feasible, logical, and consistent with municipal, district and County plans, to connect the development to the wastewater treatment system serving the area and approved by the Colorado Department of Public Health and Environment. If it is determined that it is premature to connect the development to the wastewater treatment system at the time of the Land Use Change Permit approval, the County may require, as a condition of approval, that assurances are given, including granting of easements, or commitments to pay for or construct specified improvements, to ensure that when it is timely to connect the development to the system, that this can feasibly occur.

C. **DEVELOPMENTS SHALL COMPLY WITH SPECIFIC STUDIES, PLANS OR AGREEMENTS**. New development shall comply with requirements of any applicable "201" *Wastewater Treatment Facilities Studies* (pursuant to the federal *Clean Water Act*) and agreements adopted by Gunnison County.

D. **EXISTING SYSTEM NOT ACCESSIBLE**. Where an existing wastewater treatment system approved by the Colorado Department of Public Health and Environment is not reasonably accessible or connection to it is not feasible, the applicant shall, at the discretion of the decision-making body, implement either of the following options:

   1. **INSTALL WASTEWATER TREATMENT SYSTEM**. Install a wastewater treatment system, with sewage collection lines to each lot, the design, construction, maintenance and operation of which complies with the County's regulations and with the standards of the Colorado Department of Public Health and Environment; or

   2. **SUBMIT EVIDENCE OF ADEQUACY OF INDIVIDUAL SYSTEMS**. Submit evidence satisfactory to Gunnison County that it will be feasible to install an individual sewage disposal system on each lot in the proposed development that will comply with the requirements of the *Gunnison County On-Site Wastewater Treatment System Regulations*. The area in the lot where the system is to be located shall be identified.

      a. **REFERRAL TO COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT.** The County may refer the development plans to the Colorado Department of Public Health and Environment for comment and approval, if necessary to make use of the expertise and judgment of that agency to evaluate the potential impacts of individual systems, and determine if a permit from that agency will be required.

E. **EVALUATION REQUIRED**. Any application for a Land Use Change Permit for a Major Impact Project that is proposed for development at a density of more than one unit per acre, or as a cluster type of development, or where soil conditions indicate potential problems with individual sewage disposal systems, shall include as part of the Preliminary Plan application an engineering and economic evaluation of the feasibility of providing a central wastewater treatment system for that development or tying onto an existing central wastewater treatment system. The evaluation shall include, at a minimum, the following:

   1. **ASSESSMENT OF CUMULATIVE IMPACTS**. An assessment of the cumulative environmental impacts of individual sewage disposal systems versus a wastewater treatment system and an assessment of the economic feasibility of implementing a wastewater treatment system.

BLM_0054131

2. **TOTAL CONSTRUCTION COST.** Total construction cost of the system, including the collection system necessary to serve each lot. Cost to serve each lot, based on estimated tap fees, service fees and operation, replacement and maintenance costs, shall be provided.

3. **IMPACTS ON LOT COSTS.** The estimated impacts on the costs of each lot from the total construction costs of the proposed system.

4. **OPERATING COSTS.** The estimated annual operating and maintenance costs of the system.

5. **SOILS TYPES.** The types of soils and water resources, and hydrologic characteristics present in the area and an evaluation of soil suitability for individual sewage disposal systems, and Projected impacts on soils and aquifers.

6. **SURROUNDING USES.** Location of property in relation to other developments in a one-mile radius, including a reasonable calculation of the density of development in the foreseeable future in that area, if known by the applicant. Location of any other existing or proposed wastewater treatment systems, individual sewage disposal systems, domestic water wells, streams, creeks, flat bodies of water, irrigation ditches, and wetlands in this area. Information may also be required on the history of any individual sewage disposal systems failures in this area, as may be available from the Gunnison County Environmental Health Office, or as may otherwise be provided by the applicant.

F. **COUNTY REVIEW.** The Board of Commissioners, as part of its review of the Preliminary Plan application for a Major Impact Project, will make a determination as to the viability of a wastewater treatment system, considering the information provided in the evaluation, and the recommendation of the Planning Commission.

1. **DELAY OF DECISION.** The County shall not approve any application for site approval of a new wastewater treatment plant until it has given approval to the Preliminary Plan for the development to be served by such plant.

G. **DEVELOPER RESPONSIBILITIES.** If a determination is made by the Board that there is sufficient evidence that the proposed density, intensity of use, or characteristics of soils and hydrology of an area of a proposed land use change are such that a wastewater treatment system should be installed in the development, then the applicant, in addition to any other obligations imposed by this or other County regulations, shall:

1. **SUBMIT DESIGN.** Submit the proposed design to the Colorado Department of Public Health and Environment for review and approval of the proposed treatment plant and collection system.

2. **CHOOSE INSPECTOR.** Allow the Board to choose an inspector of its choice who will work with the developer during construction and represent the County on-site to ensure construction and installation complies with the approved design plans. All change orders or modifications to the approved design shall only be allowed if they are approved by the County's inspector.

3. **PAY COSTS.** Pay all reasonable costs associated with the design and construction of the system and with the employment of the inspector.

H. **STANDARDS FOR WASTEWATER TREATMENT SYSTEM.** Whenever a wastewater treatment system is to be constructed, it shall meet the following standards:

1. **TREATMENT FACILITIES.** Wastewater treatment facilities shall be designed, constructed, maintained an operated pursuant to the requirements of the Colorado Department of Public Health and Environment.

2. **COLLECTION LINES.** Collection lines shall be designed, installed, and maintained to service each lot.

3. **CONSTRUCTION STANDARDS.** The wastewater treatment system shall be built and arrangements made to provide ongoing operation and maintenance to conform to the standards of the Colorado Department of Public Health and Environment. The system shall, to the maximum extent feasible, be built also to be consistent with the standards of the nearest public entity that treats wastewater, to facilitate the possibility of future connection to the system. The construction of the system shall also take into account any recommendations in the applicable "201" Wastewater Treatment Facilities Study with regard to that connection.

4. **DEVELOPER RESPONSIBILITIES FOLLOWING CONSTRUCTION.** Upon completion of system construction, the developer shall provide the County with the following:

   a. **AS-BUILT DRAWINGS.** As-built drawings of the system.

   a. **OPERATIONS MANUAL.** An operations and maintenance manual of the system.

   b. **DEEDING OF FACILITIES TO HOMEOWNERS' ASSOCIATION OR COUNTY.** The developer shall deed the facility, collection system, and all easements and rights-of-way associated with the system to the homeowners' association or the County, if approved by the County upon conditions, including sufficient

BLM_0054132

guaranties of maintenance, performance, operation, and replacement, acceptable to the County, and shall warrant the system for a period of two years, or until at least 50 percent buildout of the development occurs, whichever is greater. Depending upon the Projected build out rate, the County may require the developer to provide operating funds (including labor, materials, utilities, and contracted services) for the system, until sufficient users have connected to the system to cover its operating costs.

    **c.**  **SECURITY AGAINST LIENS.** The developer shall verify for the County that no liens exist against the system, or shall provide the County a labor and materials bond.

    **d.**  **MONITORING.** The plan for monitoring, and provision of monitoring records, acceptable to Gunnison County.

**5.**  **COUNTY TO PROVIDE CERTIFIED OPERATOR.** The Board of Commissioners will provide a certified operator who will manage the system. The Board will determine the rate structure and tap fees associated with operation of the system. The rate structure will reflect all reasonable operating costs (including labor, materials, utilities and contracted services) and a capital reserve for repairs and replacement. All costs associated with the rate structure shall be paid by the system users.

## SECTION 12-107: FIRE PROTECTION

**A.**  **APPLICANT SHALL CONTACT FIRE PROTECTION DISTRICT.** It is required that an applicant for a land use change classified as a Major or Minor Impact Project that is located in a specific fire protection district contact the district before submitting the application, for the purpose of being informed of the District's design and construction standards that will apply to the application.

**1.**  **PROTECTIVE COVENANTS.** When a land use change that is a subdivision is proposed within a specific fire protection district, subdivision protective covenants shall include language ensuring compliance with the requirements of the applicable fire protection district and giving the applicable district the authority to enforce those provisions.

**2.**  **COUNTY STANDARDS APPLY.** When the District's standards conflict with County standards, the County shall only enforce the County standards.

**3.**  **PROPOSED LAND USE CHANGE OUTSIDE OF ANY DISTRICT.** When a proposed land use change lies outside of any District boundaries, then the applicant shall contact the nearest such District.

    **a.**  **MAJOR IMPACT PROJECT.** As a condition of approval of a proposed Major Impact Project outside of District boundaries, the County may require the applicant to provide evidence that the property will be annexed to the applicable District, or that a service agreement has been entered into between the applicant and the District.

    **b.**  **MINOR IMPACT PROJECT.** As a condition of approval of a proposed Minor Impact Project outside of District boundaries, the County may require the applicant to provide evidence that the property will be annexed to the applicable District, or that a service agreement has been entered into between the applicant and the District, or the applicant shall meet one of the following requirements:

        **1.**  **INSTALL SPRINKLER SYSTEM.** The applicant shall install a sprinkler system in any structure proposed for habitation, subject to standards of and approval by the applicable fire protection district; or

        **2.**  **SUBMIT WAIVER OF LIABILITY.** The applicant shall submit a signed Warning and Waiver of Liability releasing the County and the applicable fire protection district as part of the application.

**B.**  **STANDARDS FOR VEHICLE ACCESS.** All sites proposed for land use changes shall provide access that is sufficient for emergency vehicles, and for service and other vehicles that need access to the property, except when the site is a patented mining claim, is an inholding within state or federal lands, or it was created before the effective date of this *Resolution*;

**1.**  **SEPARATED TWO POINTS OF ACCESS ON PRIMARY ROADS.** All subdivision filings shall provide two or more points of dedicated access on primary roads that permit adequately separated ingress/egress, unless an alternative design for a single access point can afford similarly safe access.

**2.**  **CULVERTS AND BRIDGES.** Any culverts or bridges that are installed or built as part of a development shall be capable of supporting the maximum legal load allowed by Colorado Department of Transportation load factor ratings.

BLM_0054133

   **3.   TURNAROUNDS**. A turn-around of 45' radius shall be included if determined by the applicable fire protection district to be necessary to accommodate emergency vehicles.

**C.   FIRE HYDRANTS**. Any residential development that is a Major Impact Project, or that uses a central water supply system may be required to install a fire hydrant system that meets the current standards of the applicable fire protection district. Commercial and industrial development may also be required to install a hydrant system, based upon the nature of the proposed use, and subject to approval by the County.

   **1.   INSTALLATION OF HYDRANTS**. Hydrants shall be installed no more than 1,000 feet apart and shall be fully charged with water and tested before issuance of a Building Permit within a new subdivision. Fire hydrants shall be located as specified by the applicable fire protection district. Generally, fire hydrants shall be located in the public right-of-way, at road intersections.

**D.   CISTERNS AND DRY HYDRANTS**. In those developments where a fire hydrant system is not required, water cisterns that meet current standards of the applicable fire protection district may be used and shall be shown on the Final Plan or plat. Dry hydrants that meet current standards of the applicable fire protection district may be installed in lieu of cisterns where available fire suppression water supplies can meet or exceed those of proposed cisterns. The installer of the dry hydrant shall comply with specifications established by the applicable fire protection district.

   **1.   MINIMUM CAPACITY**. Capacity shall comply with the requirements of the applicable fire protection district.

   **2.   LOCATION AND ACCESS**. The location and design of the cisterns or dry hydrants shall be subject to the requirements of the applicable fire protection district; the Colorado State Forest Service can assist in the determination of such locations. The location of the fire protection facilities shall be easily accessible to fire protection personnel and vehicles and shall be identified with a visible sign. Access to the facilities shall be dedicated to Gunnison County for use by the applicable fire protection district, subject to such interagency agreements as may affect such facilities.

   **3.   CONSTRUCTION AND MAINTENANCE WITHIN A SUBDIVISION**. The developer of a subdivision shall construct and maintain the cisterns until responsibilities for their maintenance is assumed by the homeowners or property owners association as provided by the declaration of protective covenants. Thereafter, the property or homeowners association for the development shall provide care and maintenance, and shall be charged with such responsibility consistent with protective covenants governing the association. Specific language shall be included in the protective covenants assigning that responsibility to the association.

**E.   OTHER FIRE SUPPRESSION SYSTEMS**. Other fire suppression systems may be required as necessary, after consultation with the applicable fire protection district.

**F.   FITTINGS AND CONNECTIONS.** All fittings and connections for the components of the fire protection system shall be provided at the cost of the developer and shall be compatible with specifications established by the applicable fire protection district. All such equipment shall be required to be tested in accordance with the Development Improvement Agreement and in cooperation with the applicable fire protection district.

**G.   WILDFIRE HAZARD AREAS**. Developments proposed in areas that may be subject to wildfire hazards shall also comply with the applicable standards of Section 11-105: *Development in Areas Subject to Wildfire Hazards.*

BLM_0054134

# ARTICLE 13:
# PROJECT DESIGN STANDARDS

## SECTION 13-101: PURPOSE

This Article establishes the standards by which proposals will be reviewed and approved to regulate development and improvements. Overall, these standards address site details, including structures, roads, utilities, and plantings in order to promote high quality design. These standards are intended to be uniformly applied, to be flexible based on the function of each development, to be sensitive to the unique character of a specific development site, and to local needs and objectives as listed in this Article.

## SECTION 13-102: APPLICABILITY

A. **GENERAL.** Unless otherwise exempted, these standards apply to all applications for Land Use Change Permits and to Building Permit applications on legal lots in Gunnison County for which no Land Use Change Permit has been issued, regardless of impact classification. These standards are to be used by the applicant and the County in designing, reviewing, evaluating, constructing, and operating uses and development activities in Gunnison County. In designated planning areas, more specific guidelines and specifications may apply. Unless specifically exempted within this *Resolution*, all applications for Land Use Change Permits shall also comply with all other applicable standards and requirements of this *Resolution*.

B. **DEVELOPMENT SHALL CONSIDER MUNICIPAL THREE MILE PLANS**. When the proposal is for development located within a municipal three-mile plan area, the development proposal shall address how it comports with the objectives and policies of the applicable municipal Three-Mile Plan. The County shall consider how the proposed development has addressed those objectives and policies, and any further intergovernmental agreement between the County and the municipal government regarding the Three-Mile Plan area. Where there is a conflict between the objectives or policies of a Three-Mile Plan or the intergovernmental agreement, and County standards, County standards shall apply.

   1. **MUNICIPAL THREE MILE PLAN AREAS MAY HAVE DIFFERENT OR ADDITIONAL REVIEW STANDARDS**. Parcels that are located within an area designated within a three-mile area of a municipality, for which an intergovernmental agreement has been adopted between the County and the municipality, may be subject to different or additional review standards, based upon the specific requirements of that agreement and plan.

   2. **COUNTY STANDARDS APPLY WHEN STANDARDS CONFLICT.** Where there is a conflict between the objectives or policies of a Three Mile Plan or the intergovernmental agreement, and County standards, County standards shall apply.

C. **STANDARDS ARE MINIMUM**. These improvements standards are intended to ensure a minimum level of performance. If an alternate design, process, or material can be shown to provide performance equal to or better than that established by these standards, or where it can be shown that strict compliance with these standards would cause unacceptable environmental impacts, or would result in adverse conditions on- or off-site because of unusual topography, size  or shape of the property, existing vegetation, or other exceptional situations or condition, then the Community Development Director may recommend that the decision-making body accept the alternative. The evaluation shall consider whether the alternative will provide for an equivalent level of public safety and whether the alternative will be equally durable, so that normally anticipated maintenance costs will not be increased.

## SECTION 13-103: GENERAL SITE PLAN STANDARDS AND LOT MEASUREMENTS

A. **PURPOSE.** This Section establishes standards for site design.

B. **GENERAL SITE PLAN STANDARDS**. Development of any site requires a comprehensive analysis of the site. A proposed site plan shall design and locate roads, driveways, lot lines, building sites and utility corridors to preserve, to the maximum extent feasible the natural features of the site, avoid areas of environmental sensitivity, minimize visual impacts and eliminate adverse impacts to and alteration of, natural features.

BLM_0054135

1. **DESIGN OF BUILDING LOTS.** To carry out the general site plan standards, individual lot lines shall be designed to follow existing features of the site, such as tree lines and natural contours. Location and orientation of lots should complement the natural topography, and maximize the use of existing vegetation and solar exposure.

2. **STRUCTURAL LOCATION STANDARDS.** The location of structures shall complement the natural topography and use existing vegetation.

C. **SITE-SPECIFIC BUILDING ENVELOPES.** To assure compliance with the standards of Article 11: *Resource Protection Standards* and this Article, designation of site-specific building envelopes on site plans shall be required for all Land Use Change Permit applications, including those for Building Permits.

1. **EXCEPTION.** Site-specific building envelopes shall not be required if the subdivision lots were approved by the County before the effective date of this *Resolution.*

2. **ALTERATIONS ALLOWED FOR FLEXIBILITY.** The designation of a building envelope is not intended to be inflexible; alterations may be allowed for the following:

   a. **ENVELOPES ON LEGAL LOTS NOT IN PLATTED, RECORDED SUBDIVISIONS.** A building envelope location approved as part of a Building Permit, or other Land Use Change Permit may be altered by review and approval pursuant to Article 4: *Administrative Review Projects That Do Not Require Land Use Change Permits.*

   b. **ENVELOPES IN PLATTED, RECORDED SUBDIVISIONS.** Except as otherwise regulated pursuant to the requirements of Section 1-106: *Partially Exempted Land Use Changes,* building envelope locations on subdivision lots approved by the County and recorded in the Office of the Gunnison County Clerk and Recorder may be altered as an Administrative Review Project, pursuant to Article 5: *Administrative Review Projects That Require Land Use Change Permits.* The relocation shall not substantively conflict with the siting criteria used as part of the original subdivision approval.

3. **SETBACK REQUIREMENTS NOT RELAXED.** A designated building envelope does not alter setback requirements pursuant to Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way* except when permitted by a variance.

D. **GENERAL LOT SIZE.** Except as otherwise required by Section 13-105: *Residential Building Sizes and Lot Coverages* the following shall apply:

1. **MEASUREMENT.** Lot size refers to the amount of horizontal land area contained inside the lot lines of a lot or site. Public rights-of-way shall not be included in calculating lot size.

2. **MINIMUM LOT SIZE.** The minimum permitted lot size is 35 acres, unless a smaller lot size has been authorized pursuant to:

   a. **CONDITIONS OF A LAND USE CHANGE PERMIT.** Conditions of an approved Land Use Change Permit, or a subdivision plat approved and recorded in the Office of the Gunnison County Clerk and Recorder before the effective date of this *Resolution.*

   b. **COMPLIANCE WITH MUNICIPAL THREE MILE PLAN.** When the proposal is for development located within a municipal three-mile plan area, the development proposal shall address how it comports with the objectives and policies of the applicable municipal Three-Mile Plan. The County shall consider how the proposed development has addressed those objectives and policies, and any further intergovernmental agreement between the County and the municipal government regarding the Three-Mile Plan area. Where there is a conflict between the objectives or policies of a Three-Mile Plan or the intergovernmental agreement, and County standards, County standards shall apply.

   c. **PERMIT ISSUED BEFORE MAY 6, 1977.** Is a parcel created by a Gunnison County zoning permit issued before May 6, 1977; or

   d. **EXEMPT PARCEL.** Is an "exempt" parcel created pursuant to C.R.S. 30-28-101.

3. **LOT SIZE IN NEW SUBDIVISIONS.** In residential subdivisions created after the effective date of this *Resolution,* the minimum lot size shall be no smaller than one acre unless served by a public waste-water treatment system. Determination of lot size for a proposed development in a certain location shall be evaluated by its compliance with Article 10: *Locational Standards.*

BLM_0054136

E. **MEASUREMENT OF BUILDING SIZE.** The measurement of the size of a building shall be by the definition of "floor area" in the applicable building code, adopted and amended by Gunnison County, and which includes the size of the basement in the overall measurement.

F. **MINIMUM RESIDENCE FLOOR AREA.** The minimum floor area of residences shall be as allowed by the applicable building code, adopted and amended by Gunnison County.

G. **HEIGHT MEASUREMENT.** Height shall be measured as the vertical distance from grade plane to the average height of the highest roof surface, which may include the highest point of the coping of a flat roof or to the deck line of a mansard roof or to the average height of the highest gable of a pitched or hipped roof (Figure 4: *Height Measurement by Types of Buildings*). Where the finished ground level slopes away from the exterior walls, the reference plane shall be established by the lowest points within the area between the building and the lot line or, where the lot line is more than six feet from the building between the structure and a point six feet from the building (Figure 5: *Measurement of Building Height*.)



FIGURE 4: HEIGHT MEASUREMENT BY TYPES OF BUILDINGS

FIGURE 5: MEASUREMENT OF BUILDING HEIGHT

H. **ALLOWED STRUCTURE HEIGHTS.** Height of structures shall be as follows:

1. **RESIDENTIAL STRUCTURES.**

   a. **FLAT ROOFS.** Structures with flat roofs shall not exceed 30 feet in height.

   b. **PITCHED ROOFS.** All structures with pitched roofs shall not exceed 30 feet in height. The minimum roof pitch shall be as required by the applicable building code, adopted and amended by Gunnison County.

2. **STEEPLES, CHIMNEY AND SPIRES.** Steeples, chimneys and spires may extend ten feet higher than the roof peak.

3. **COMMERCIAL OR INDUSTRIAL STRUCTURES.** Unless otherwise exempted or regulated by this *Resolution*, commercial and industrial structures shall not exceed 30 feet in height, except that the allowable height may be increased to a maximum of 45 feet upon findings by the applicable decision-making body that:

   a. **ADEQUATE FIRE PROTECTION AVAILABLE.** Adequate fire protection shall be available, pursuant to Section 11-105: *Development in Areas Subject to Wildfire Hazards*; and Section 12-107: *Fire Protection*;

   b. **VIEWS AND SOLAR ACCESS NOT OBSTRUCTED.** Views and solar access shall not be significantly obstructed by the increased height; and

   c. **USE AND ENJOYMENT OF ADJACENT LAND USE NOT DIMINISHED.** Use and enjoyment of adjacent lands shall not be diminished.

   d. **NO INTERFERENCE WITH AIRPORT PATHS OR ZONES.** There shall be no interference with established airport flight paths or structural height restrictions within airport influence zones.

BLM_0054137

4. **HEIGHTS OF ACCESSORY STRUCTURES.** Unless otherwise exempted or regulated by this *Resolution*, no accessory structure that has a flat or pitched roof shall exceed 30 feet in height, except that agricultural structures constructed as part of an agricultural operation may exceed the height of the residence.

## SECTION 13-104: SETBACKS FROM PROPERTY LINES AND ROAD RIGHTS-OF-WAY

A. **APPLICABILITY.** Unless otherwise exempted by this *Resolution*, the following shall apply, all land use changes and approved Building Permit site plans shall meet property line setback requirements indicated in Table 7: *Setbacks from Property Lines and Road Rights-of-Way.* Other setback requirements, not directly related to property lines or road rights-of-way, are addressed in Table 3: *Recreational Vehicle Park Property Line Setbacks,* Table 4: *Setbacks for Construction Materials Operations,* and Table 5: *Setbacks for Mining That Is Not a Construction Materials Operation.*

B. **MEASUREMENT.** Front, rear and side setbacks shall be measured as the distance between the nearest lot line and the foundation of a structure, along a line at right angles to the lot line. Where no minimum front, side or rear yards are specified for large parcels, a setback line shall parallel the corresponding lot line.

C. **ZERO LOT LINE DEVELOPMENTS.** To allow an alternative to standard single-family home development, and encourage an efficient use of land and maximization of centralized wastewater treatment systems, zero lot line developments are allowed. They are considered compatible with other residential uses and may be used to create a transition from lower or medium to higher density residential development.

1. **GENERAL SITING REQUIREMENTS.** Zero lot line houses may be sited on one side lot line, and sometimes also on the rear or front lot line to maximize the available yard space, or on a common lot line so that they resemble duplexes. They may also be sited on alternating lot lines, to give the appearance of housing in a more conventional subdivision. (Figure 6: *Zero Lot Line Siting*)

   a. **NO ZERO LOT LINE ON BOUNDARY OF UNRELATED PARCEL.** No zero lot line construction shall be allowed on the exterior boundary line of a parcel or lot that is adjacent to an unrelated parcel; all structures proposed to be located along that line shall be required to meet the standard setbacks required by this Section.

2. **REQUIRED TO TIE ON TO EXISTING WASTEWATER TREATMENT SYSTEMS.** Zero lot line developments shall be permitted only if served by wastewater treatment systems that have the capacity to provide service, and the providers are willing to provide service.

3. **MINIMUM LOT WIDTHS.** Minimum lot width shall be 40 feet. Lot widths may be alternated, combining narrow and wide lots to provide visual variety.

4. **MINIMUM SEPARATION BETWEEN RESIDENCES.** There shall be a minimum of 16 feet between residences, unless a greater distance is required by the applicable fire protection district.

5. **USES LIMITED ON LOT LINE WALL.** The wall of the residence located on the zero lot line shall have no windows, doors, air conditioning units or any other type of opening except that the following alternatives may be used:

   a. **AMENITIES ON THE ZERO LOT LINE.** Enclosed atriums, patios or similar amenities are permitted on the zero lot line side when they are enclosed by three walls of the residence and a solid wall on the zero lot line at least eight feet in height and constructed of material that complements the color and texture of the residence exterior.

   b. **ALTERNATE ORIENTATION OF LOTS.** When lots are angled at a 45 degree angle to the roadway, windows may be added on the zero lot line wall.



FIGURE 6: ZERO LOT LINE SITING

BLM_0054138

**TABLE 7: SETBACKS FROM PROPERTY LINES AND ROAD RIGHTS-OF-WAY**

| SETBACK TYPE | MINIMUM PROPERTY LINE SETBACK |
|---|---|
| **RESIDENTIAL SETBACKS** | |
| **Single family** | Front: 25<br>Side/Rear: 15 |
| **Townhomes, condominiums and other multiple family buildings** | Front: 25 feet<br>Side/Rear: 15 feet<br>Separate multiple-family buildings within a single Project may be constructed a minimum of ten feet from other buildings within the single Project. |
| **Zero Lot Line developments** | Residences may be constructed on the property line, pursuant to Section 13-104: C: *Zero Lot Line Developments* |
| **BUSINESS AND COMMERCIAL SETBACKS** | |
| **Adjoining all other non-residential** | 15 feet |
| **Adjoining residential** | 50 feet |
| **Outdoor Vending Operation** | 35 feet from a residential property boundary |
| **INDUSTRIAL SETBACKS** | |
| **Adjoining other industrial** | 15 feet |
| **Adjoining business or commercial** | 100 feet |
| **Adjoining residential areas, agricultural areas or public lands** | 300 feet |
| **LIGHT INDUSTRIAL SETBACKS** | |
| **Adjoining residential** | 50 feet |
| **Adjoining business and commercial** | 15 feet |
| **Adjoining other light industrial** | 15 feet |
| **Adjoining industrial** | 15 feet |
| **SETBACKS FROM ROADS:** | |
| **When width of right-of-way is known, measurement shall be from edge of right-of-way; when unknown, measurement shall be from the road center line, and an additional 40 feet added to the requirements for setbacks from roads.** | |
| **Federal highways** | 40 feet |
| **State highways** | 40 feet•<br>Land uses that access onto either federal or state highways shall comply with the Colorado Highway Access Code |
| **County and other public roads** | 40 feet |
| **Platted subdivision development roads** | 25 feet |

- Unless adjoining uses enter into party-wall or similar agreements permitting the construction of adjoining buildings to the common lot line and construction meets requirements of applicable building code.

- If compliance with setbacks from roads results in an inability to build, the applicant may request a variance, pursuant to Section 13-104: E: *Variance from This Section.*

- Other setback requirements, not directly related to property lines or road rights-of-way, are addressed in Section 11-109: G. 2: *Irrigation Ditch Easements*; Section 15-103: A. 6. a: *irrigation Ditch Easements*; Section 11-107: *Protection of Water Quality* relative to the Restrictive Inner Buffer and Outer Variable Buffer; Table 3: *Recreational Vehicle Park Property Line Setbacks;* Table 4: *Setbacks for Construction Materials Operations;* and Table 5: *Setbacks for Mining That Is Not a Construction Materials Operation.*

6. **EASEMENT REQUIRED.** A minimum five foot easement shall be required on a zero lot line development plat, and referenced within protective covenants for the development, providing access to the zero lot line wall from the adjoining lot for purposes of maintenance of the zero lot line wall.

7. **DRAINAGE SHALL BE CONTAINED ON-SITE.** In addition to meeting the requirements of Section 13-117: *Drainage, Construction and Post Construction Storm Water Runoff,* runoff from the residence located on the zero lot line shall be contained within the zero lot line easement of the adjacent lot. Roofs pitched in the direction of the zero lot line shall be guttered.

D. **LAND USE PERMIT APPLICATION DESIGN PLAN THAT DOES NOT COMPLY WITH THIS SECTION.** When a Land Use Change Permit application is being reviewed by the Planning Commission in which the plans propose a design layout that includes setbacks that do not comply with the standards of this Section, the applicant shall submit

BLM_0054139

the information required by Section 13-104: E: *Variance From This Section*. The Community Development Department shall review of the application, pursuant to Section 3-110: *Community Development Department Application Review*, and shall submit copies of the application and the Department report to members of both the Planning Commission and Board of Adjustments.

1.  **JOINT PUBLIC HEARING**. The Board of Adjustments and Planning Commission shall jointly conduct the public hearing, and the notice shall so indicate. The chairperson of the Planning Commission shall preside by the board of Adjustments shall be the body that determines the variance.

2.  **SCHEDULING OF VARIANCE REVIEW DURING LAND USE CHANGE PERMIT APPLICATION REVIEW.**

    a.  **MINOR IMPACT.** When the proposed land use change is classified as a Minor Impact Project, the joint hearing shall be conducted during, and shall meet the requirements of the Minor Impact Project review process, pursuant to Article 6: *Minor Impact Projects*.

    b.  **MAJOR IMPACT.** When the proposed land use change is classified as a Major Impact Project, the joint hearing shall be conducted during, and shall meet the requirements of the Preliminary Plan review process, pursuant to Section 7-302: *Preliminary Plan Review Process for Major Impact Projects.*

E.  **VARIANCE FROM THIS SECTION**.  A variance from the requirements of this Section may be requested. An applicant for variance from property line setback requirements shall submit:

1.  **APPLICATION FORM.** The Community Development Department shall provide an application form, which shall be completed by the applicant and returned to the Community Development Department. The form shall, at a minimum, include the following:

    a.  **APPLICANT.** The name, address, telephone and fax numbers, and e-mail address for the applicant, or if the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and stating the same information for the agent.

    b.  **PROPERTY OWNER**. Name of the owner of the property; if different than the applicant, a notarized letter from the owner consenting to the application, must be submitted.

    c.  **PROPERTY LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads), property address and common description of the parcel on which the land use change is proposed to be located. A copy of the recorded deed to the property, and/or a metes and bounds description should be included.

2.  **ACTION ON VARIANCE APPLICATION**. It is the goal but not the requirement (as scheduling may be affected by limited access, inclement weather, or other unforeseen circumstances) of this *Resolution* that within 15 days following the closure of the public hearing, the Board of Adjustments shall complete its review of the application, approve or deny the application, and forward that decision to the Planning Commission.

    a.  **DENIAL REQUIRES REDESIGN OF SITE PLAN**. If the Board of adjustments denies the application for variance from setback, the applicant shall be required to submit a new design to the Planning Commission that complies with this Section. No additional public hearing on the redesign shall be required, unless the change significantly alters the numbers of units or types or intensity of uses.

    b.  **VARIANCE REVIEW EXTENDS LAND USE CHANGE PERMIT APPLICATION REVIEW TIMELINE**. The Planning Commission period of review shall be extended by the length of time necessary for the Board of Adjustments to complete its action, but shall otherwise meet the time restrictions imposed by the respective impact classification review process.

3.  **BOARD OF ADJUSTMENTS REVIEW, HEARING AND ACTION**. A complete copy of the application shall be forwarded to the Board of adjustments, together with a copy of any comments by the Building Inspector.

4.  **PUBLIC NOTICE**. Public notice that the Board of Adjustments will consider the application shall be given by publication, posting, and mailing of notice, pursuant to Section 3-112: *Notice of Public Hearing.*

    a.  **COST FOR PUBLIC HEARING NOTICE(S)**. The applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing.*

5.  **HEARING**. The Board of Adjustments shall conduct a public hearing to consider the application, that shall be conducted pursuant to Section 3-113: *Conduct of Public Hearing*, and shall include the following:

    a.  **COMMUNITY DEVELOPMENT DEPARTMENT REPORT**. The Community Development Department shall present its report.

BLM_0054140

b.   **APPLICANT PRESENTATION**. The applicant shall, at his/her choice, present the application for variance, and the reasons for requesting it.

6.   **ACTION BASED ON FINDINGS**. The Board of Adjustments shall consider all relevant materials and testimony and the standards of this Section and shall approve, approve with conditions, or deny the application, and shall, as part of that action, include specific findings that the application does or does not comply with Section 13-104: F: *Standards for Approval of Variance from Property Line Setbacks.*

F.   **STANDARDS FOR APPROVAL OF VARIANCE FROM PROPERTY LINE SETBACKS**. An application for a variance for setback from property line requirements shall comply with all of the following standards:

1.   **SPECIAL CIRCUMSTANCES EXIST**. There are special circumstances or conditions, including exceptional topography, or the narrowness, shallowness, or shape of the property, that are peculiar to the land or structure for which the variance is sought, and do not apply generally to land or structures in the neighborhood; and

2.   **SITUATION DOES NOT RESULT FROM ACTION BY APPLICANT.** The special circumstances and conditions have not resulted from any act by the applicant or land owner; and

3.   **STRICT APPLICATION CAUSES PRACTICAL DIFFICULTIES**. The special circumstances and conditions are such that the strict application of the requirements of this *Resolution* would result in peculiar and exceptional practical difficulties for, or an exceptional and undue hardship on, the owner of the land if the requirements of this *Resolution* were to be strictly applied; and

4.   **NECESSARY TO RELIEVE PRACTICAL DIFFICULTIES**. The granting of the variance is necessary to relieve the applicant of the peculiar and exceptional practical difficulties or the exceptional and undue hardship, and is the minimum variance that could be granted to achieve that relief; and

5.   **DOES NOT ADVERSELY AFFECT NEIGHBORHOOD**. The granting of the variance will not change the character or otherwise adversely affect the neighborhood surrounding the land where the Variance is proposed, will not have a substantially adverse impact on the enjoyment of land abutting on or across the road from the property in question, will not impair an adequate supply of light or air to adjacent property, and will not increase the danger of fire, or otherwise endanger public safety or the public interest.

G.   **APPROVAL SHALL BE RECORDED.** An approval action by the Board of Adjustment shall be memorialized by a Certificate of Variance Approval, with which shall be included a copy of the site plan that illustrates the variance from property line setback requirement. The Certificate shall be recorded, at the cost of the applicant, by the Community Development Department in the Office of the Gunnison County Clerk and Recorder. An action of denial shall be filed in the records of the Community Development Department.

## SECTION 13-105: RESIDENTIAL BUILDING SIZES AND LOT COVERAGES

A.   **PURPOSES.** This Section establishes standards for structure sizes and building envelopes to achieve the purposes stated in Section 1-103: *Purposes* and in addition, to preserve the historic and architectural scale of structures and building envelopes in the county, to provide for innovation and flexibility in the use of individual parcels, and to recognize that a variety of appropriately sized, sited and scaled buildings are an amenity to Gunnison County.

B.   **APPLICABILITY.**

1.   **RESIDENTIAL AND RESIDENTIAL/MIXED USES**. The requirements of this Section shall apply to all residential and residential/mixed land uses, including multiple-family housing developments.

2.   **RESIDENCES ASSOCIATED WITH AGRICULTURAL, COMMERCIAL OR INDUSTRIAL OPERATIONS.** Residences associated with agricultural, commercial or industrial operations shall be subject to maximum structure size requirements of this Section. However, the size of accessory structures, the aggregate size of residences and accessory structures, the constraints on coverage and on building envelopes shall not apply to agricultural, commercial or industrial operations.

C.   **PARCELS SMALLER THAN 6,500 SQ. FT.** The aggregate square footage of all structures on a parcel that is smaller than 6,500 sq. ft. shall not exceed 45 percent of the square footage of the parcel unless approved pursuant to Section 13-105: G: *Impact Classification And Required Findings For Coverage Exceeding Standard.*

D.   **PARCELS EQUAL TO OR LARGER THAN 6,500 SQ. FT.** The following shall apply to residential structures on parcels equal to or larger than 6,500 sq. ft:

1.   **PERCENT OF COVERAGE**. In no event shall the aggregate square footage of coverage by structures on a parcel 6,500 sq. ft. or larger exceed 45 percent of the total area of the parcel, or 4,100 sq. ft. whichever is greater,

BLM_0054141

unless approved pursuant to Section 13-105: G: *Impact Classification And Required Findings For Coverage Exceeding Standard.*

    **2.** **MAXIMUM BUILDING SIZE AND MAXIMUM AGGREGATE OF ALL STRUCTURES**. No building on a parcel equal to or larger than 6,500 sq. ft. shall exceed 10,000 sq. ft. (and a secondary residence no larger than 2,500 sq. ft.) and the aggregate of all structures shall not exceed 12,500 sq. ft. unless:

        **a.** **LAND USE CHANGE PERMIT APPROVES GREATER SIZE.** Approved pursuant to Section 13-105: G: *Impact Classification and Required Findings for Coverage Exceeding Standard.*

**E.** **ADDITIONAL FEE FOR RESIDENCES LARGER THAN 1,000 SQ. FT.** A fee shall be included within the overall Land Use Change Permit fee for those residences larger than 1,000 sq. ft., subject to a schedule of fees adopted by the Board, available in the Community Development Department.

**F.** **BUILDING ENVELOPE**. The following standards shall apply in the location and use of a residential building envelope:

    **1.** **BUILDINGS SHALL BE CONFINED IN ENVELOPE.** Except as approved pursuant to Section 13-105: G: *Impact Classification And Required Findings For Coverage Exceeding Standard,* all structures on a parcel equal to or larger than 6,500 sq. ft. must be confined in a compact building envelope.

    **2.** **BUILDINGS SHALL SHARE SAME SERVICES.** Except when not practicable or efficient, or as may be modified or prohibited by County, state or federal regulation, all buildings on a parcel that is 6,500 sq. ft. or larger shall:

        **a.** **SHARE SEWAGE DISPOSAL.** Share the same individual sewage disposal system;

        **b.** **SHARE WATER SUPPLY**. Utilize the same water supply;

        **c.** **BE LOCATED IN SAME DRAINAGE BASIN**. Be located in the same drainage basin; and

        **d.** **SHARE ROAD AND DRIVEWAY**. Be accessed by the same road and driveway.

**G.** **IMPACT CLASSIFICATION AND REQUIRED FINDINGS FOR COVERAGE EXCEEDING STANDARD.** An application for a primary residence larger than 9,000 sq. ft. or for an aggregate of structures larger than 12,500 sq. ft. shall be classified and reviewed as a Minor Impact Project. No approval shall be given to a Project that exceeds the maximum coverage, building size, or the aggregate size of buildings allowed by this Section unless, in addition to the proposal's having complied with Article 10: *Locational Standards*, Article 11: *Resource Protection Standards*, Article 12: *Development Infrastructure Standards*, and Article 13: *Project Design Standards,* the Planning Commission finds by clear and convincing evidence that the Project shall meet or exceed the following standards:

    **1.** **FINDING OF NO OBTRUSIVE VISIBILITY REQUIRED FOR APPROVAL.** The structure(s) is found not to be obtrusively visible. Elements to minimize such visibility shall include:

        **a.** **MINIMIZE VISIBILITY OF STRUCTURE BY SITING.** The proposed Project and structures have been sited and shall be constructed using existing topography and natural vegetation for screening to the maximum extent feasible, to minimize the visibility of each structure from outside of the parcel on which it is to be built. During construction and use, disturbance and removal of existing vegetation outside of the permanent footprint of the structures shall be constrained to the maximum extent feasible, and restored substantially to its preconstruction state, to the maximum extent feasible; and

        **b.** **MINIMIZE VISIBILITY OF STRUCTURE BY SCREENING**. After such siting, any structure that would be obtrusively visible from outside of the parcel on which it is to be built shall be screened to the maximum extent feasible from such visibility to preserve the natural characteristics of the site by natural vegetation, landscaping and architectural techniques (including colors that blend with the natural background, forms, and textures of the site, non-reflectability and clustering). Natural land forms are acceptable as screening; earth berming is acceptable only if it replicates the natural forms, scale and characteristics of the site. Deciduous vegetation of adequate density in its non-foliage season to provide effective screening is acceptable in combination with other screening techniques.

        **c.** **LOCATION OF UTILITIES UNDERGROUND.** Utilities shall be located and installed, to the maximum extent feasible, to not be visible. If installed underground, the natural environment disturbed by installation shall be restored to the maximum extent feasible to its condition before the utilities were installed.

    **2.** **OBTRUSIVE VISIBILITY SHALL CAUSE DENIAL.** If, after such siting and screening, any portion of a structure is obtrusively visible from outside of the parcel on which it is to be built, that portion of the Project shall be denied. In order to meet this standard, the entire structure need not be invisible from outside of the parcel on which it is to be built.

BLM_0054142

H.  **FURTHER SUBDIVISION.** Nothing in this Section forbids, or shall be construed to forbid, subdivision of a parcel on which there exists a residential structure larger than 10,000 sq. ft. or an aggregate of structures larger than 12,500 sq. ft., except that no subdivision shall be permitted unless the resulting parcel that contains the structure that exceeds 10,000 sq. ft., and/or all of the buildings that total an aggregate of 12,500 sq. ft. is at least 40 acres in size.

## SECTION 13-106: ENERGY AND RESOURCE CONSERVATION

A.  **PURPOSE.** The purpose of this Section is to ensure that residential development contains features to minimize the consumption of energy and to conserve resources

B.  **APPLICABILITY.** Applications for residential construction, including manufactured homes, must earn points according to requirements of the *Energy Resource Conservation Worksheet*, separately adopted and amended from time to time by the Board.

C.  **INSPECTION AND COMPLIANCE.**

  1.  **COMPLIANCE FORM MUST BE SUBMITTED WITH BUILDING PERMIT APPLICATION.** A completed form identifying proposed compliance with the *Energy Resource Conservation Worksheet* must be submitted with the applicable residential building permit application; no residential building permit application will be processed without the completed form.

  2.  **COMPLIANCE SATISFACTION.** Compliance with the *Energy Resource Conservation Worksheet* requires at least 50 percent of the surface or total application for that measure to be fulfilled.

  3.  **DEMONSTRATION OF COMPLIANCE.** Compliance with the *Energy Resource Conservation Worksheet* will generally be demonstrated by one of two methods:

    a.  **COMPLIANCE IS INDICATED AS "COUNTY."** If compliance is indicated as "County," County staff may conduct actual on-site inspections, or require the submittal of appropriate engineering reports or calculations to establish compliance.

    b.  **COMPLIANCE IS INDICATED AS "SELF."** If compliance is indicated as "Self," the Applicant will be required to sign the form and certify that a measure has been complied with. Gunnison County reserves the right to conduct follow-up inspections or compliance audits of self-certified measures.

## SECTION 13-107: INSTALLATION OF SOLID-FUEL-BURNING DEVICES

A.  **PURPOSE**. The purpose of this Section is to minimize air pollution caused by solid-fuel-burning devices emissions by regulating their use, and to encourage the use of other heating alternatives that achieve better emission performance and heating efficiency and that comply with the emissions performance standards as adopted by the Colorado Department of Public Health and Environment Air Quality Control Commission. It is further the policy of the Board to encourage the replacement of non-approved devices with cleaner sources of heat.

B.  **APPLICABILITY.**

  1.  **NEW STRUCTURES REQUIRING BUILDING PERMITS**. Any structure for which a Building Permit is requested or required after the effective date of this *Resolution* shall be required to comply with this Section. When a new portion of a structure requires a Building Permit, and a solid-fuel-burning device is to be located in that new portion, that solid-fuel-burning device shall comply with this Section.

  2.  **NEW STRUCTURES THAT DO NOT REQUIRE BUILDING PERMITS**. Any new structure for which no Building Permit is required pursuant to this *Resolution*, the applicable building code, adopted and amended by Gunnison County, or by any other code or regulation adopted by Gunnison County, shall be required to comply with this Section.

  3.  **EXISTING DEVICES IN EXISTING STRUCTURES**. Any solid fuel-burning device, including coal-fired furnaces, existing in an existing structure as of the effective date of this *Resolution* is not required to be replaced, except that any non-approved solid-fuel-burning device, when replaced or relocated, shall comply with Section 13-107: J: *Replacement or Modification of Solid Fuel- Burning Devices.*

  4.  **DEVICES DESIGNED FOR HEATING A STRUCTURE, LOCATED OUTSIDE OF THE STRUCTURE**. Any solid fuel-burning device designed for heating a structure, including but not limited to solid fuel-burning furnaces or boilers located outside of the structure, shall be required to be an approved solid fuel-burning device.

C.  **LIMITATION ON NUMBER OF DEVICES.**

BLM_0054143

1. **SINGLE FAMILY RESIDENCES**. Any single-family residential structure, manufactured home, or a mobile home located outside of a mobile home community, for which a Building, Manufactured Home or Mobile Home Permit is issued after the effective date of this *Resolution* shall be allowed to install two approved solid-fuel-burning devices per single family residence. A mobile home located within a mobile home community shall be limited to the installation of one approved solid fuel-burning device per mobile home.

2. **MULTIPLE-FAMILY RESIDENCES, HOTELS, COMMERCIAL AND INDUSTRIAL BUILDINGS.** No solid-fuel-burning device shall be allowed in individual units of multiple-family buildings, hotel/motel units, commercial or industrial buildings, except that two approved solid-fuel-burning devices may be installed per building.

D. **LIMITATION ON NUMBER OF DEVICES IN AREAS AROUND THE TOWNS OF CRESTED BUTTE AND MT. CRESTED BUTTE.** When the land is located within the boundaries of a municipal three mile plan area defined within a Three-Mile Plan of the Towns of Crested Butte or Mt. Crested Butte the installation of solid-fuel devices shall comply with the following standards, or if an adopted intergovernmental agreement identifies specific standards regarding the installation of solid fuel-burning devices, the standards identified within the intergovernmental agreement shall prevail:

1. **SINGLE FAMILY RESIDENCES**. Any single-family residence, manufactured or mobile home for which a Building, Manufactured Home or Mobile Home Permit is issued after the effective date of this *Resolution* shall be allowed to install one approved solid-fuel-burning device per single family residence.

2. **MULTIPLE-FAMILY RESIDENCES, HOTELS, COMMERCIAL AND INDUSTRIAL BUILDINGS.** No solid-fuel-burning device shall be allowed in individual units of multiple-family buildings, hotel/motel units, commercial or industrial buildings, except that one approved solid-fuel-burning device may be installed per building.

E. **LIMITATION ON NUMBER OF DEVICES IN AREAS AROUND THE CITY OF GUNNISON**. When the land is located within the boundaries of the municipal three mile plan area defined within the Three-Mile Plan of the City of Gunnison the installation of solid-fuel devices shall comply with the following standards or if an adopted intergovernmental agreement between the City and the County identifies specific standards regarding the installation of solid fuel-burning devices, the standards identified within the intergovernmental agreement shall prevail:

1. **SINGLE FAMILY RESIDENCES**. Any single-family residence, manufactured home, or mobile home outside of a mobile home community, for which a Building, Manufactured Home or Mobile Home Permit is issued after the effective date of this *Resolution* shall be allowed to install two approved solid-fuel-burning devices per single family residence. A mobile home located within a mobile home community shall be limited to the installation of one approved solid fuel-burning device per mobile home.

2. **MULTIPLE-FAMILY RESIDENCES, HOTELS, COMMERCIAL AND INDUSTRIAL BUILDINGS.** No solid-fuel-burning device shall be allowed in individual units of multiple-family buildings, hotel/motel units, commercial or industrial buildings, except that two approved solid-fuel-burning devices may be installed per building.

F. **COMPLIANCE IN SPECIAL GEOGRAPHIC AREAS**.  When the County has adopted  requirements governing development review, permitting or inspections of solid fuel-burning devices in designated special geographic areas, the more restrictive  requirements shall apply to solid fuel-burning devices in that particular area.

G. **NO ADDITIONAL DEVICES**. In existing structures that have two or more solid-fuel-burning devices as of the effective date of this *Resolution*, an additional one shall not be installed.

H. **ACCESSORY STRUCTURES.** One approved solid-fuel-burning device is allowed per non-residential structure that is accessory to a residence, for temporary or sporadic use, whether the structure is attached or detached.

I. **NO LIMIT TO NUMBER OF NON-SOLID-FUEL-BURNING DEVICES**. There is no limitation on the number of approved non-solid-fuel-burning devices that may be installed in any structure, so long as they all comply with all applicable federal, state and County codes and regulations.

J. **REPLACEMENT OR MODIFICATION OF SOLID FUEL-BURNING DEVICES.**  Any non-approved solid fuel-burning device that requires replacement or relocation shall be required to be removed and replaced with an approved solid fuel-burning device, or approved non-solid fuel burning device.  Replacement of a non-approved device in one condominium or townhouse unit shall not affect devices in other units.

K. **INSTALLATION**. Devices shall be installed as follows:

1. **SOLID-FUEL-BURNING DEVICE.** Any solid-fuel-burning device shall be installed pursuant to the standards and specifications defined by the manufacturer of that device, or shall meet the clearances specified in the *International Mechanical Code*.

2. **NON-SOLID-FUEL-BURNING DEVICE.** Any non-solid-fuel-burning device shall be installed pursuant to the standards and specifications of its manufacturer and the *International Fuel-Gas Code*.

BLM_0054144

**L.   INSPECTION.** The installation of any solid-fuel-burning device or non-solid-fuel-burning device shall be subject to inspection and approval by the Gunnison County Building Inspector and, as applicable, by the applicable fire protection district in which the device is located. Only the affected unit will be inspected.

**M.   FEES.** Inspection fees shall be as delineated in a schedule of fees charged for permits issued by the Community Development Department, adopted and amended from time to time by the Board of Commissioners.

**N.   SPARK ARRESTORS**. Spark arrestors shall be required in al solid-fuel-burning device systems to which this Section applies pursuant to Section 13-107: B.1.: *New Structures Requiring Building Permits*, Section 13-107: B. 2.: *New Structures That Do Not Require Building Permits*, and Section 13-107: B. 3.: *Existing Devices in Existing Structures*.

## SECTION 13-108: OPEN SPACE AND RECREATION AREAS

**A.   GENERAL.** This Section intends to insure that new development provides for or contributes to park and recreation facilities for the community and residents of new developments, to provide passive and active recreation opportunities, and to preserve open space for the purpose to protect sensitive natural areas, agricultural forage areas and view corridors.

**B.   EXEMPTIONS.** This Section shall not apply to agricultural operations. Unless specifically required by this Section, Projects that are classified as Administrative Review Projects and Minor Impact Projects are exempt.

**C.   PROPOSED DEVELOPMENT LOCATED WITHIN MUNICIPAL THREE MILE PLAN AREA.** When a development is proposed within a municipal Three-Mile Plan area, the development design shall address the objectives and policies of the applicable Three Mile Plan, as follows:

   **1.   STANDARDS WITHIN INTERGOVERNMENTAL AGREEMENT**. When an adopted intergovernmental agreement exists between the County and a municipality, proposed open spaces, including parks and other recreational amenities for any land use change located within the applicable municipal Three-Mile Plan area shall be designed to comply with the standards referenced or imposed by that agreement.

   **2.   COUNTY STANDARDS APPLY IF NO INTERGOVERNMENTAL AGREEMENT**. If no intergovernmental agreement exists, or there are no open space standards within the intergovernmental agreement, the County shall consider, but not necessarily be bound by, comments submitted by the municipality.

**D.   MOBILE HOME COMMUNITIES.** Whether classified as a Minor or Major Impact Project, a mobile home community shall include open space pursuant to Section 9-203: *Mobile Home Communities*.

**E.   MINOR IMPACT PROJECTS.** Except as exempted by Section 13-108: B: *Exemptions*, the requirements of this Section shall apply to specific Minor Impact Projects as follows:

   **1.   CHILD CARE CENTER.** A child care center shall provide an outdoor play area, as required within Section 9-506: *Child Care Center*.

   **2.   GROUP HOME.** A group home shall comply with the standards required by Section 9-507: *Group Home*.

   **3.   MINOR IMPACT COMMERCIAL AND INDUSTRIAL USES**. Unless otherwise required by this *Resolution* or other adopted policy or regulation of Gunnison County to contribute a prorated share to the purchase and maintenance of open space, and/or developed recreation areas, commercial and industrial uses that are classified as Minor Impact Projects pursuant to Section 6-102: *Projects Classified as Minor Impact* shall provide open space by including landscaping elements pursuant to Section 13-111:  *Landscaping and Buffering*, and setbacks from property lines pursuant to Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way*.

**F.   MAJOR IMPACT COMMERCIAL AND INDUSTRIAL USES**. Unless otherwise required by this *Resolution* or other adopted policy or regulation of Gunnison County to contribute a prorated share to the purchase and maintenance of open space, and/or developed recreation areas, commercial and industrial uses that are classified as Major Impact Projects pursuant to Section 7-101: *Projects Classified as Major Impact* shall provide open space by including landscaping elements pursuant to Section 13-111:  *Landscaping and Buffering*, and setbacks from property lines pursuant to Section 13-104: *Setbacks from Property Lines and Road Rights-of-Way*.

**G.   RESIDENTIAL USES.** A minimum of 30 percent of any proposed residential subdivision, or multiple-family development consisting of five or more lots or residences shall be permanently set aside for public, private, or common developed and/or undeveloped open space, except that the amount of open space shall be reduced to 15 percent when the proposed Project conforms to the requirements of *Division 14-200:  Residential Density Transfer Program*.

**H.   CALCULATION OF OPEN SPACE.** Calculation of open space shall not include the footprints of buildings or structures, roadbeds or parking areas, except when those buildings, structures, roadbeds or parking areas are

BLM_0054145

required by the County as part of a recreational area to serve a residential development, or when such buildings or structures are designated on federal, state or local lists of historically significant buildings or sites; and shall not include land within the building envelopes of residential lots, except that that the land between designated building envelopes may comprise up to ten percent of the total amount of building space.

**I.   USES ALLOWED AND AREAS TO BE PROTECTED.** The following are areas that should be protected to the maximum extent feasible within designated open space, listed in no particular order of priority:

    **1.   HABITAT AND ENVIRONMENTALLY SENSITIVE AREAS**. Areas of environmental sensitivity and those that are sensitive wildlife habitat shall be included in the undeveloped open space to the maximum extent feasible.

    **2.   UNIQUE AND/OR FRAGILE AREAS.**   Unique or fragile areas, including geological formations, forested areas, critical view sheds or water bodies.

    **3.   FLOODPLAINS.** Lands in the floodplain, as identified by mapping, pursuant to Section 11-103: *Development in Areas Subject to Flood Hazards*.

    **4.   HISTORIC SITES.** Historically significant structures and sites, as listed on federal, state, or local lists of historic places.

    **5.   PUBLIC LANDS ACCESS.** Areas that have historically provided, or are identified as desirable for public access to public lands.

    **6.   AGRICULTURAL LANDS.** Irrigated agricultural lands, including valley bottoms, hay meadows, and pasturelands.

    **7.   NATURAL CONDITION**. Land designated as undeveloped open space shall be left in its natural condition, except as may be recommended by the Colorado Forest Service for maintenance to discourage fire. A developer or owner may make certain improvements, including constructing walking and bicycle trails, providing picnic areas, or similar amenities, as approved by the County.

    8.   **PASSIVE OR ACTIVE RECREATIONAL AREAS MAY BE REQUIRED**. Gunnison County may require or allow the designation of a passive or active recreational area within the designated open space of a development, and the installation of recreational facilities for use by its residents and/or the general public, based upon the following criteria. Standards of the National Recreation and Park Association and the American Academy for Park and Recreation Administration's *Park, Recreation, Open Space and Greenway Guidelines*, or standards obtained from another credible source shall be used to determine the exact spatial and dimensional requirements needed for a specific type of recreation area or facility.

        **a.   CHARACTERISTICS**. The characteristics of the open space land;

        **b.   POPULATION NEEDS.** The estimated age and the Projected recreational needs of persons likely to live in the development;

        **c.   EXISTING FACILITIES.** The proximity, nature, availability and capacity of existing public or private facilities, and/or the close proximity of public lands.

        **d.   COST.** The estimated cost of the recreational facilities; and

        **e.   COMPATIBILITY.** Compatibility with adjacent land uses.

**J.   DESIGN REQUIREMENTS.** Design of open space areas shall address the following:

    **1.   CONTIGUOUS BLOCKS.** Open space for non-recreational or passive recreational uses shall be in relatively large contiguous blocks and shall not be fragmented into small, unconnected areas, to the maximum extent feasible. This shall not preclude open space that protects wetlands or sensitive wildlife habitat area.

    **2.   LINKAGE.** To the maximum extent feasible, sites shall be designed so that designated open space areas and conservation easements are linked to other open spaces, particularly stream corridors and contiguous wetlands, including such open lands or spaces that are located on adjacent properties.

**K.   PRESERVATION AND MAINTENANCE OF OPEN SPACE**. Open space areas shall be physically maintained so that the historic natural condition or use and enjoyment as open space is not diminished or destroyed. Open space areas shall be owned, preserved, and maintained pursuant to this Section, by any of the following methods, alone or in combination:

    **1.   CONSERVATION EASEMENTS**. The dedication of perpetual conservation easements or their equivalent is encouraged, particularly when uses of those easements shall be restricted to ranching or undeveloped recreation, or when those easements are to be dedicated for public use and enjoyment, and where appropriate, incorporate public trails.

2. **DEDICATION.** Open space areas shall be designated to a municipality or any other appropriate public or private non-profit entity acceptable to the County that is also willing to accept the obligation for monitoring and preservation.

3. **COMMERCIAL USE ON COMMONLY-OWNED OPEN SPACE**. In the case of private open space in a subdivision, ownership in common and held by a homeowners' or property owners' association that assumes full responsibility for its maintenance, common undeveloped open space may not be used as a commercial enterprise that charges the general public a fee for its use, unless approved by the County.

L. **DEED RESTRICTIONS**. Any lands deeded in private, public, or common ownership and dedicated for open space purposes shall have protective covenants and deed restrictions ensuring perpetual compliance with the following requirements:

1. **FUTURE SUBDIVISION OR NON-OPEN SPACE USES**. The open space shall not be subdivided or used for non-open space purposes in the future.

2. **PERPETUITY**. The use of the open space shall continue in perpetuity, subject to state statutory limitations for the purposes specified;

3. **MAINTENANCE**. Appropriate requirements, including funding, shall be made for the maintenance of the open space. Such requirements shall include requirements for removal of litter, dead and diseased trees, noxious weeds and other vegetation, pursuant to Section 13-115: *Reclamation and Noxious Weed Control,* when appropriate. Removal of plant material may not be required where the vegetation provides important wildlife habitat or assists in the maintenance of free-flowing natural or artificial watercourses or stream channels so that floodplain levels are not altered. Maintenance of open spaces used for recreational activities may be limited to insuring that there are no hazards, nuisances, or unhealthy conditions; and

M. **DESIGNATION ON PLAN**. The Preliminary and Final Plans/Plat of a Major Impact Project and the Final Plan/Plat of a Minor Impact Project shall show the dedications of any open space lands and recreation areas.

## SECTION 13-109: SIGNS

A. **GENERAL.** This Section is designed to permit signs that facilitate communication, promote the safety of motorists and pedestrians, and encourage economic development by identifying businesses and other land uses in ways that complement and enhance the environment. This provides a permitting system to govern the placement of outdoor advertising and other informational signs in the unincorporated areas of Gunnison County.

B. **REPEAL OF GUNNISON COUNTY SIGN CODE**. This Section repeals and replaces the requirements in the *Gunnison County Sign Code.*

C. **RELATIONSHIP TO OTHER REGULATIONS.** Nothing in this Section shall be construed as exempting an applicant from any other applicable county, state, or federal regulations, including but not limited to those in Gunnison County Resolution Series 1989 No. 42: *Concerning Placement of Tourist-Oriented Directional Signs*, pursuant to C.R.S. 43-1-420 (3).

D. **PERMIT REQUIRED.** Before any sign is erected, constructed, structurally altered or moved, it shall comply with the requirements in this Section and shall have received a permit from the Community Development Department, unless the sign is expressly exempted from the provisions of this *Resolution*.

1. **APPLICATION FORM.** The Community Development Department shall provide the appropriate application form, which, at a minimum, shall include the following:

   a. **APPLICANT.** The name, address, telephone and fax numbers, and e-mail address for the applicant, or if the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and stating the same information for the agent.

   b. **PROPERTY OWNER**. Name of the owner of the property; if other than the applicant, notarized letter from the owner consenting to the application, must be submitted.

   c. **PROPERTY LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel on which the sign is proposed to be located. A copy of the recorded deed to the property should be included.

   d. **ILLUSTRATION OF SIGN.** A rendering, to scale and dated by the person who prepared it, of the dimensions and appearance of the proposed sign.

E. **SIGNS ALLOWED WITHOUT PERMITS.** The following signs do not require a Sign Permit:

BLM_0054147

*SECTION 13-109: SIGNS*

1. **PUBLIC DIRECTIONAL SIGNS.** Signs required or authorized for a public purpose by law or statute, including traffic control signs, and excluding those defined by Gunnison County Resolution Series 1989 No. 42: *Concerning Placement of Tourist-Oriented Directional Signs*, pursuant to C.R.S. 43-1-420 (3).

2. **PUBLIC UTILITY LOCATION SIGNS**. Signs placed by a public utility showing the location of underground facilities.

3. **SIGNS LOCATED WITHIN A BUILDING,** so long as such signs are not oriented to and are not viewed from a public right-of-way, private road, parking area or public space outside the building

4. **TEMPORARY SIGNS.** Pennants or banners advertising a special event. Notice of such signs shall be required to be filed by the sponsoring organization with the Community Development Department before display. Such signs may be erected no sooner than two weeks before the event, and shall be removed in one week after the event; but in no event shall a banner be erected more than 30 days.

5. **LIVESTOCK DRIVES.** Signs necessary for the safe movement of livestock on public roads.

6. **OCCUPANT AND HOME OCCUPATION SIGNS.** One residential identification sign per residence, containing the name(s) of occupant(s), address of the premises, and/or identifying any home occupation as defined and regulated in this *Resolution*. These signs shall be limited to wall and ground signs that are no more than six sq. ft. in area, and may be illuminated by a concealed, non-flashing light source. Wall signs may be attached to any structure and/or fence.

7. **REAL ESTATE SIGN**. A temporary wall or ground sign not more than six sq. ft. advertising the sale, rental, or lease of a designated structure or land area for a permitted use on which the sign is located. One sign shall be allowed per lot, shall not be illuminated, except that when the subject property abuts two public roadways, there may be one sign facing each roadway. The sign(s) shall be removed immediately after the property is sold, rented or leased.

8. **CONSTRUCTION SIGN.** A temporary wall or ground sign not more than 32 sq. ft. advertising the construction, remodeling or rebuilding of a certain structure for a permitted use on which the signs are located. One sign shall be allowed per Project, shall not be illuminated and shall be removed immediately on completion of construction.

9. **MEMORIAL AND HISTORICAL SIGNS**. Cornerstones, monuments, commemorative tablets and historical signs of not more than ten sq. ft.

10. **HOLIDAY AND SEASONAL DECORATIONS**. Decorative, customary signs commonly associated with designated national, local or religious holidays or season.

11. **ADVISORY SIGNS**. Signs warning of prohibited activities including trespassing, hunting, fishing, or swimming may be posted without limitation as to numbers, but are limited to two sq. ft. or less per sign.

**BUSINESS HOURS SIGNS**. "Open/closed" and related hours-of-operation signs that do not exceed two sq. ft.

**POLITICAL CAMPAIGN SIGNS.** Political signs that do not exceed 32 sq. ft. in area are permitted. The signs shall be removed no later than one week following the date of the subject election.

12. **SIGNS INTEGRAL TO LAND USE CHANGE PERMITS.** A sign to be located in, or as an integral part of a development shall conform to the requirements of this Section except when differing sign requirements are 13. incorporated into, and approved as a part of the Land Use Change Permit by the applicable decision-making body.

14. **COMMERCIAL, INDUSTRIAL AND BUSINESS CLUSTER SIGNS.** Multiple businesses, commercial, or industrial establishments that are part of an industrial or business park may construct one cluster sign at each approved access to the development that includes the name of the development and/or listings of individual businesses in the development. Within the development, one sign per establishment is allowed, and each shall comply with the requirements of this Section.

15. **NONCONFORMING SIGNS.** All signs that existed as of the effective date of the *Gunnison County Sign Code,* or were permitted pursuant to its requirements, may be retained so long as they are kept in a state of good repair as specified in Section 13-109: J.3. *Repair or Removal,* and so long as they are not relocated, replaced, structurally altered, or damaged by wind, fire or other cause to the extent that 50 percent or more of their replacement value has been destroyed.

16. **GENERAL STANDARDS**.

   a. **ON-SITE LOCATION.** All signs shall identify or advertise only the business or establishment upon which the sign is located.

BLM_0054148

b. **ONE SIGN PER USE**. There shall be one sign per primary use, except that when the subject property abuts two public roadways, there may be one sign facing each roadway.

c. **NO SIGN IN ROAD RIGHT-OF-WAY.** No signs shall be allowed on any County or development road right-of-way, and existing signs in either of these rights-of-way shall be removed immediately upon request of the governing body.

d. **EXTERNAL LIGHT SHALL BE MINIMIZED**. Externally lit signs shall be designed, installed and maintained to eliminate or minimize upward directed light and glare and so that lights illuminate only the sign and not property

e.    that adjoins or is nearby. Such light shall not interfere with the vision of motorists.

e. **INTERNALLY LIT SIGNS PROHIBITED**. There shall be no internally lit signs.

f. **NO MISLEADING INFORMATION**. Information presented on a sign shall not be misleading, erroneous or patently untrue.

g. **NO SETBACK LIMITATION SPECIFIC TO SIGNAGE**. There shall be no setback limitation except that sign placement shall not interfere with snow removal, or vision of motorists, and shall not significantly detract from the environmental or aesthetic character of the County.

J. **CONSTRUCTION AND MAINTENANCE**.

1. **STURDY CONSTRUCTION**. All signs and sign structures shall be constructed of materials of sufficient strength and quality to withstand weathering or deterioration by wind, moisture and other natural elements, and shall be maintained in a state of good repair with all braces, bolts, supporting framework, fastenings, lettering and design work free from deterioration.

2. **WIND LOAD**. Wind load requirements shall be equal to, or greater than 26 pounds per sq. ft. of sign area.

3. **REPAIR OR REMOVAL**. The County Building Inspector shall have the authority to order the repair, alteration or removal of any sign or structure that constitutes a hazard to public health and safety, or which is otherwise not pursuant to this Section. In the event that such a sign has not been removed, altered or repaired within 60 days after written notification by the Inspector, the Board may, after due public notice and hearing, require that sign or structure to be removed at the expense of the owner of the sign.

K. **SIGN AREA MEASUREMENT**.

1. **MAXIMUM INDIVIDUAL SIGN AREA.** The maximum permitted area of individual signs shall be 50 sq. ft.

2. **MAXIMUM AGGREGATE SIGN AREA.** The maximum permitted aggregate area for cluster signs shall be 70 sq. ft.

3. **MAXIMUM HEIGHT.** The maximum height of a sign shall be no greater than 16 feet above the natural grade of the ground on which it is placed, except that a sign located over a property's entranceway or exit way may be 20 feet above the road over which it is placed.

4. **MEASUREMENT OF SINGLE SURFACE.** To determine the surface area of a sign, the County Building Inspector shall measure the perimeter enclosing the extreme limits of the display surface(s) of the sign, including all graphic elements, borders and riders, but excluding the sign's structure or bracing unless those elements are part of the message or face of the sign. Where there are two faces back to back, the total area of the largest face shall determine the area of the sign.

5. **MEASUREMENT OF MULTI-FACETED SIGN.** Where two faces are placed at greater than 45-degree angles to one another, the sign area shall mean the total area of both faces.

L. **SIGNS ALLOWED ONLY BY VARIANCE BY THE BOARD.** The following signs are not permitted, except by variance issued by the Board, pursuant to Section 13-109: M: *Variances from the Requirements of this Section*:

1. **NON-COMPLIANT SIGNS**. Any sign not in compliance with the provision of these regulations.

2. **OFF-PREMISE SIGNS.** Off-premise signs except public directional signs, and those signs permitted pursuant to Gunnison County Resolution Series 1989 No. 42: *Concerning Placement of Tourist-Oriented Directional Signs*, which are allowed without a variance.

3. **PROJECTING ROOF-MOUNTED SIGNS**. Roof-mounted signs that Project above the highest point of a roofline or fascia of a building.

4. **SIGNS ADVERTISING LOTS IN PROPOSED DEVELOPMENTS.** Signs promoting lots or units for sale in a proposed development after approval of Preliminary Plan, but before approval of the Final Plan. A variance for

BLM_0054149

this type of sign may be granted for up to one year. The sign shall include language that the development is pending approval.

**5. SIGNS ADVERTISING CONDOMINIUM AND TOWNHOMES.** Signs advertising condominium and townhouse construction may be posted after approval of Preliminary Plan, but before approval of the Final Plan. A variance for this type of sign may be granted for up to one year.

**6. OVERSIZE HOME OCCUPATION SIGN SIGNS.** Signs of more than six sq. ft. identifying a home occupation.

**M. VARIANCES FROM THE REQUIREMENTS OF THIS SECTION.** The Board may authorize a variance from this Section, in accordance with the following process:

**1. SUBMITTAL OF REQUEST BY APPLICANT.** The Community Development Department shall provide the appropriate application form that shall, at a minimum, include the following:

**a. APPLICANT.** The name, address, telephone and fax numbers, and e-mail address for the applicant, or if the applicant is to be represented by an agent, a notarized letter signed by the applicant authorizing the agent to represent the applicant and stating the same information for the agent.

**b. PROPERTY OWNER.** Name of the owner of the property; if other than the applicant, notarized letter from the owner consenting to the application, must be submitted.

**c. PROPERTY LOCATION.** The legal description (referencing lot and block or tract numbers, homesteads, or metes and bounds), property address and common description of the parcel on which the sign is proposed to be located. A copy of the recorded deed to the property should be included.

**d. COMPLIANCE WITH CRITERIA OF DECISION.** An explanation of how the variance meets the requirements of Section 13-109: M. 4: *Criteria for Board Decision*.

**2. BUILDING INSPECTOR REVIEW.** The Building Inspector shall prepare a written report that includes:

**a. SIGN PERMIT APPLICATION.** A copy of the Sign Permit application as submitted by the applicant.

**b. DETERMINATION OF NON-COMPLIANCE.** Reference to the specific subsections of this Section with which the application does not comply.

**3. BOARD MEETING.** The request for variance shall be scheduled on the next available agenda of the Board.

**a. BUILDING INSPECTOR'S REPORT.** The Building Inspector shall explain the sign application's noncompliance with the applicable standards of this Section.

**b. APPLICANT'S PRESENTATION.** The applicant may present his request, including the reasons that the request complies with Section 13-109: M.4: *Criteria for Board Decision.*

**4. CRITERIA FOR BOARD DECISION.** The Board shall consider the Building Inspector's report, the information included in the request for variance, and the presentation of the applicant. A variance shall be granted only upon a demonstration by the applicant by a preponderance of the evidence that the literal enforcement of this Section would cause unnecessary or undue hardship to the applicant, and that there will be no adverse impact to adjacent land uses or the general public; and upon written finding by the Board that all of the following criteria have been met:

**a. HARDSHIP NOT SELF-IMPOSED.** That the hardship has not been created by the applicant, or his/her predecessor;

**b. NO HARM TO PUBLIC SAFETY.** That there is no detriment to the public health, safety and welfare;

**c. DEMONSTRATION OF NEED.** That there exists a clear and reasonable need for the sign at the proposed location;

**d. CONSISTENCY WITH NEIGHBORHOOD.** That the type, style, size and other characteristics of the proposed sign are consistent with the character of the proposed location;

**e. COMPLIANCE WITH ALL OTHER STANDARDS.** That the location, character and format of the proposed sign are not in conflict with the purposes of this Section, or of this *Resolution*.

**f. PUBLIC BENEFIT OUTWEIGHS IMPACTS.** That the benefits that the sign would provide to the public and county visitors would outweigh any adverse aesthetic or other impacts caused by the proposed sign.

**N. RECORD OF DECISION.** The record of the Board's decision shall be included within the Board's meeting minutes.

O.  **VIOLATIONS AND ENFORCEMENT OF THIS SECTION**.

    1.  **TYPES OF VIOLATIONS**. Any sign or sign structure erected, constructed, reconstructed, altered, maintained or used in a manner not in compliance with this Section shall be considered in violation.

    2.  **ENFORCEMENT**. Enforcement of this Section shall comply with the requirements of Article 16: *Enforcement.* To initiate enforcement, the Building Inspector shall notify the sign owner of the violation by certified mail at their last known address, citing portions of this Section that the sign specifically violates.

P.  **FEES**. The cost of Sign Permits shall be as delineated in a schedule of fees charged for permits available in the Community Development Department, and adopted and amended by the Board.

## SECTION 13-110: OFF-ROAD PARKING AND LOADING

A.  **PARKING FACILITIES REQUIRED.** There shall be provided for any structure that is constructed, expanded, or structurally altered, or for which the use is proposed to be changed, permanent off-road parking facilities sufficient to minimize traffic congestion and provide safe vehicular access, pursuant to all of the requirements of this Section and with snow storage requirements in Section 13-112: *Snow Storage.*

B.  **CONTINUING OBLIGATION**. The provision and maintenance of off-road parking and loading spaces that comply with the standards of this Section shall be a continuing year-round obligation of the property owner.

C.  **BUILDING PERMIT SITE PLANS**. The site plan for a Building Permit application shall indicate the number and location of parking loading spaces to be provided for the proposed structure (s). Location of the parking shall comply with Section 13-112: *Snow Storage.* As applicable, the number of spaces shall comply with requirements of the protective covenants for individual subdivisions, or shall otherwise meet the requirements of this Section, whichever number is larger.

D.  **CHANGE OF USE.** Should the use to which a lot or building is put, so that the need for off-road parking and loading requirements is increased, the required Land Use Change Permit application shall include the additional required spaces or loading facilities.

E.  **STANDARDS FOR OFF-ROAD PARKING.** Unless otherwise required by this *Resolution*, off-road parking facilities shall meet the minimum distances listed in Appendix Table 2: *Off-Road Parking Requirements.* Staff shall determine the appropriate classification for any use or facility not listed based on the impacts and traffic generation characteristics of the proposed use or facility.

    1.  **MULTIPLE USES.** Unless otherwise permitted, a land use change that includes more than one use shall provide parking and loading in an amount equal to the total of the requirements for all uses.

    2.  **OCCUPANCY- OR CAPACITY-BASED STANDARDS**. For the purpose of computing parking requirements based on employees, students, residents, or occupants, calculations shall be based on the largest number of persons working on any single shift, the maximum enrollment, or the maximum fire-rated capacity of a structure, whichever is applicable and whichever results in the greater number of spaces.

| TABLE 8: OFF-ROAD LOADING SPACES FOR NON-RESIDENTIAL USES | |
|---|---|
| GROSS FLOOR AREA | NUMBER OF SPACES REQUIRED |
| •   1-15,000 sq. ft. | 1 |
| •   15,001-50,000 sq. ft. | 2 |
| •   50,001-001 sq. ft. | 3 |

F.  **OFF-ROAD LOADING.** Non-residential uses shall, at a minimum, provide the number of off-road loading spaces as listed in Table 8: *Off-Road Loading Spaces for Non-Residential Uses.*

BLM_0054151