*SECTION 13-110: OFF-ROAD PARKING AND LOADING*

G. **LOCATION OF OFF-ROAD PARKING SPACES.** Required off-road parking spaces shall be located on the same lot as the primary use, unless otherwise provided in this Section. In all cases, the nearest parking shall be provided within 100 feet of, and to the maximum extent feasible, the farthest parking shall be no more than 300 feet from the primary use for which parking is required, unless adequate ground transportation is provided.

   1. **LOCATION IN NON-RESIDENTIAL AREAS.** Required off-road parking spaces may occupy any part of the property, except in required landscape areas, or sight distance triangles (Figure 7: *Sight Distance Triangle*), or in locations disconnected from the primary use.

   2. **PROHIBITED USES OF REQUIRED PARKING SPACES.** Required parking spaces shall be available only for the parking of operable passenger vehicles of residents, guests, customers, patrons, and employees of the use for which the parking spaces are required. Prohibited uses of the required parking spaces shall be as follows:

      a. **MATERIALS OR INOPERABLE VEHICLES.** Materials or inoperable vehicles shall not be stored in required parking spaces.

      b. **DELIVERY VEHICLES.** Delivery vehicles or trucks used in conducting the business or use shall not be parked in required parking spaces during business hours, but may be parked in those spaces for overnight storage.

      c. **COMMERCIAL VEHICLES ON RESIDENTIAL PROPERTY**. Commercial vehicles or heavy equipment used in a business operation shall not be parked in the parking spaces that are required for a residential use, unless the commercial vehicle is used for a permitted home occupation or is a company vehicle used for commuting.

H. **ACCESSIBLE PARKING FOR PHYSICALLY DISABLED PERSONS.** A portion of the total number of required parking spaces in each off-road parking area shall be specifically designated, located, and reserved for use by persons with physical disabilities.



FIGURE 7: SIGHT DISTANCE TRIANGLE

   1. **Number of Spaces.** The minimum number of accessible spaces shall be a portion of the total number of off-road parking spaces required, as determined from Table 9: *Minimum Number of Accessible Parking Spaces Required for Disabled Persons.* Parking spaces reserved for persons with disabilities shall be counted toward fulfilling off-road parking requirements.

   2. **MINIMUM DIMENSIONS.** All parking spaces reserved for persons with disabilities shall comply with the parking space dimension standards of this Section. Access aisles shall immediately abut the spaces, and:

      a. **CAR-ACCESSIBLE SPACES.** Car-accessible spaces shall have at least a five foot wide access aisle located next to the designated parking space.

      b. **VAN-ACCESSIBLE SPACES.** Van-accessible spaces shall have at least an eight foot wide access aisle located next to the designated parking spaces.

   3. **LOCATION OF SPACES.** Required spaces for persons with disabilities shall be located in close proximity to building entrances and shall be designed to permit occupants of vehicles to reach the building entrance along an unobstructed path.

   4. **SIGNS AND MARKING.** Required spaces for persons with disabilities shall be identified with signs and pavement markings identifying them as reserved for persons with disabilities. Signs shall be posted directly in front of the parking space at a height of no less than 42 inches and no more than 72 inches above pavement level.

I. **PARKING AREA DESIGN STANDARDS.**

TABLE 9: MINIMUM ACCESSIBLE PARKING SPACES FOR DISABLED PERSONS

| TOTAL PARKING SPACES PROVIDED PER LAND USE | NUMBER OF VAN-ACCESSIBLE SPACES REQUIRED | NUMBER OF CAR-ACCESSIBLE SPACES REQUIRED |
|---|---|---|
| 1-25 | 1 | 0 |
| 26-50 | 1 | 1 |

BLM_0054152

| 51-75 | 1 | 2 |
|---|---|---|
| 76-100 | 1 | 3 |
| 101-150 | 1 | 4 |
| 151-200 | 1 | 5 |
| 201-300 | 1 | 6 |
| 301-400 | 1 | 7 |
| 401-500 | 2 | 7 |
| 501-1,000 | 1 of every 8 accessible spaces | 7 of every 8 accessible spaces |
| 1,000 or more | | |

- These numbers may be superseded by current regulations pursuant to the federal *American With Disabilities Act*.

1. **SURFACING AND MAINTENANCE**. All permanent off-road parking areas shall be constructed with a dust-free, all-weather surface and shall be compacted and graded with a minimum grade of one-half percent to permit drainage of surface water without damage to adjacent land or improvements and will not adversely alter natural drainage patterns.

   a. **SPECIAL EVENTS PARKING SURFACES**. Parking areas for special events and similar temporary uses may be treated with water for dust control during the time the special event is to occur.

2. **MARKING FOR PAVED LOTS.**

   a. **IDENTIFICATION**. Each required off-road parking space and off-road parking facility that is paved shall be identified by surface markings and shall be maintained to be easily visible and accessible, unless infeasible due to snowfall. Markings shall provide for orderly and safe loading, unloading, parking, and movement of vehicles, and maintained in a highly visible condition include striping, directional arrows, lettering on signs, and in handicapped-designated areas.

   b. **ACCESS**. One-way and two-way accesses into required parking facilities shall be identified by directional arrows. Any two-way access located at any angle other than 90 degrees to a road shall be marked with a traffic separation stripe the length of the access. This requirement does not apply to drive aisles.

3. **DIMENSIONS OF PARKING SPACES.**

   a. **GENERAL.** Each off-road parking space shall measure at least nine feet by 20 feet.

   b. **COMPACT SPACES.** The applicable review body shall be authorized to approve the use of compact parking spaces for up to 30 percent of employee parking, if a parking study, prepared by the applicant, indicates that demand and use by smaller vehicles. Compact parking spaces shall have minimum dimensions of eight and one-half feet by 18 feet. Compact parking spaces shall be designated by signs or other pavement markings.

   c. **VERTICAL CLEARANCE.** Vertical clearance for off-road parking spaces shall be a minimum of eight feet.

   d. **REDUCTION FOR PLANTER OVERHANGS.** When a parking space abuts a landscape island or planter, the front two feet of the required parking space length may overhang the planter.

   e. **SPACES NEAR OBSTRUCTIONS.** The width of each parking space that abuts a wall, column, or other obstruction higher than six inches shall be increased by two feet on the obstructed side.

TABLE 10: MINIMUM AISLE WIDTHS FOR PARKING SPACES

| INCREASE IN PARKING SPACE WIDTH IN FEET | MINIMUM AISLE WIDTH FOR SPECIFIED PARKING ANGLE IN FEET | | | |
|---|---|---|---|---|
| | 90 DEGREES | 75 DEGREES | 60 DEGREES | 45 DEGREES OR LESS |
| 0.00 | 24 | 22.5 | 18 | 13 |
| 0.50 | 23 | 20.5 | - | - |
| 1.00+ | 22 | - | - | - |

- Required fire lanes shall have a minimum width of 24 feet with a vertical clearance of 13.5 feet.

4. **AISLE WIDTHS.** Aisle widths adjoining off-road parking spaces shall comply with the following dimensional standards (Table 10: *Minimum Aisle Widths for Parking Spaces*).

5. **PARKING SPACES BACKING ONTO PUBLIC RIGHTS-OF-WAY PROHIBITED.** Parking spaces shall be designed so that vehicles will not back directly into a public right-of-way.

BLM_0054153

6. **ACCESS DRIVEWAYS.** Access driveways into required off-road parking areas shall be designed and constructed to facilitate flow of traffic and provide the maximum safety of access and egress for vehicles and pedestrians. Driveways shall not be used to meet off-road parking requirements.

   a. **MINIMUM SURFACE WIDTH**. The minimum width of the access driveway shall be 12 feet for a one-way drive and 24 feet for a two-way drive.

J. **SCREENING, LIGHTING AND LANDSCAPING OF PARKING AREAS.**

   1. **COMPLIANCE WITH LANDSCAPING REQUIREMENTS.** The design of all parking areas shall comply with the requirements of Section 13-111: *Landscaping and Buffering.*

   2. **COMMERCIAL OR INDUSTRIAL USES.** All off-road parking areas serving commercial or industrial uses and containing five or more spaces shall be screened from view of all adjacent residential uses by sufficient vegetation, or by a solid, decorative concrete, wood, or masonry wall, which shall comply with the requirements of Section 13-113: *Fencing.*

   3. **PARKING LOT LIGHTING.** Lighting provided for a parking area shall be designed pursuant to Section 13-114: *Exterior Lighting.*

# SECTION 13-111: LANDSCAPING AND BUFFERING

A. **APPLICABILITY.** This Section shall apply to all Land Use Change Permits except for mining operations.

B. **GENERAL.** Proposed land use changes shall integrate the elements of the site plan and design, so that the land use change preserves and enhances the unique identity of the site. Landscaping may include plant materials including trees, shrubs, ground covers, perennials and annuals, and other materials including rocks, walls, fences, planters, and paving materials.

C. **NEW RESIDENTIAL LAND USE CHANGES**. Plant materials or landscaping elements shall be required throughout any new residential subdivision where desirable or necessary for privacy or buffering from other land uses.

D. **NON-RESIDENTIAL LAND USE CHANGES.** To the maximum extent feasible, areas of the site that are not occupied by buildings and required improvements shall be landscaped by retaining, maintaining, or planting native grasses, ground cover, shrubs, and trees.

E. **LANDSCAPING PLAN.** Applicants for a land use change shall prepare a landscaping plan if the land use change is a residential development that is classified as a Major Impact Project, or any multiple-family residential development, mobile home community or recreational vehicle park, or commercial, industrial or other non-residential use that is classified as either a Minor or Major Impact Project, pursuant to Section 3-111: *Classification of Impact.* Information is available from the Colorado State Forest Service to assist in designing a landscaping plan that minimizes the potential for wildfire hazard. The plan shall indicate the type and location of vegetation to be included on the site. The plan shall also contain a planting schedule and a plan for maintenance of all landscaping to be installed.



FIGURE 8: LANDSCAPING AS BUFFERING

   1. **AMOUNT OF LANDSCAPING REQUIRED**. At least one tree and three shrubs shall be provided per each 500 sq. ft. of the area that is shown as being landscaped on the landscaping plan. All landscape planting areas that are not dedicated to trees or shrubs shall be landscaped with grass, ground cover, or other appropriate landscape treatment.

   2. **PROTECTION OF EXISTING VEGETATION.** No material or temporary soil stockpiling shall be placed within four feet of existing shrubs or in the drip line of trees. During construction, temporary protective barriers or tree

wells shall be installed around each plant and/or group of plants that are to remain onsite. Protective barriers should be of a durable material that will last until construction is completed. Snow fences and silt fences are examples of acceptable barriers.

3. **RESTORATION WITH NATIVE PLANT MATERIAL.** The County requires native plant materials in the portion of the East River Corridor to the Gothic Townsite, as delineated within a map that can be obtained from the Public Works Department, but otherwise may require planting native trees or other native plant material where natural trees or vegetation are destroyed by grading or other construction work, or where existing vegetation is inadequate to mitigate visual impacts of a land use change. Substantial disturbances of the land created by construction of structures, roads, water, or wastewater treatment facilities, drainage control systems, installation of utilities, or other improvements shall be restored, pursuant to Section 13-115: *Reclamation and Noxious Weed Control.*

4. **VISIBILITY.** To avoid landscape materials from blocking driver sight distances at intersections, no material greater than 30 inches in height shall be located within 15 feet of a driveway or road edge.

5. **ALLOWANCE FOR SNOW STORAGE AND PLOWING.** All landscaping design shall provide adequate space for snow plowing and areas for snow storage, that shall be indicated on the landscaping plan.

**F. SITE PROTECTION.**

1. **TOPSOIL PRESERVATION.** Topsoil moved during construction shall be stockpiled and redistributed on all re-graded surfaces in order to provide an even cover to all disturbed areas of the land use change. Such surfaces shall be stabilized by seeding or planting.

2. **REMOVAL OF DEBRIS.** All stumps, other tree parts, litter, brush, weeds, excess or scrap construction materials, or other debris should be removed from the site within six months of substantial completion of construction and disposed of pursuant to requirements of the Gunnison County Landfill, or by other means pursuant to any applicable regulation.

   a. **RETAINING DEADWOOD FOR WILDLIFE HABITAT.** All dead or dying trees should be removed from the site, unless those trees are to be retained for wildlife habitat, upon the recommendation of the Colorado Division of Parks and Wildlife or the Colorado State Forest Service. If trees and limbs are reduced to chips, they may be used as mulch in landscaped areas.

3. **SLOPE PLANTINGS.** Landscaping of all cuts and fills and/or terraces shall be sufficient to prevent erosion. All roadway slopes steeper than one foot vertical to three feet horizontal (1': 3') shall be planted with ground cover appropriate for soil conditions, water availability, and environment, and pursuant to Section 13-115: *Reclamation and Noxious Weed Control.*

**G. PLANTING SPECIFICATIONS.**

1. **MINIMUM TREE/SHRUB SIZES.** When landscaping is included as an element of site design, and/or required by the County in the approval of a Land Use Change Permit, deciduous trees shall have at least a two inch caliper at planting. Sizes of evergreens and shrubs shall be allowed to vary depending upon the characteristics of the land use change and its location and the types of shrubs proposed. Trees shall be staked upon planting and provision made by the developer for regular watering and maintenance until they are established. Dead and dying plants shall be replaced by the developer no later than the following planting season.

2. **PLANT SPECIES.** A mixture of plants, evergreen, and deciduous shrubs may be planted. Evergreen trees should be located on the perimeter of the lot for screening.

**H. TIMING.** All landscaping shall be installed no later than one growing season after substantial completion of the development or land use change.

**I. SITE-SPECIFIC SELECTION.** The type and amount of landscaping shall be allowed to vary with the type, size and impact classification of land use change proposed. Plants or other landscaping material(s) that best serve the intended function of the land use should be selected, in consideration of site-specific environment, soil conditions, and the legal and physical availability of water. Appropriateness of any proposed phasing, as well as short and long-term impacts of the landscaping plan, should be considered.

**J. WATER CONSERVING LANDSCAPING.** Use of xeriscape plantings is recommended when suitable to the altitude and location of the proposed land use change.

**K. USE OF NON-TREATED WATER.** Use of water that has not been processed through a water treatment plant is encouraged.

BLM_0054155

**I.   LANDSCAPE ADJACENT TO BUILDINGS.** Landscape elements may be located adjacent to buildings except that when sites that are designated as wildfire hazard areas, landscaping must be designed considering the need for defensible space as recommended by the Colorado Forest Service.

**M.   BUFFERING.**

1.   **APPLICABILITY.** Every land use change that is classified as Minor or Major Impact Project, pursuant to Section 3-111: *Classification of Impact* shall provide landscaped buffering between adjacent uses when topographical or other natural barriers do not provide reasonable screening and when the County finds that:

    a.   **NEIGHBORING PROPERTIES.** There is a need to shield neighboring properties from any adverse external effects of a proposed land use change; or

    b.   **ADVERSE IMPACTS.** There is a need to shield the land use change from negative impacts or adjacent land uses in high-density land use changes, and/or when building design and siting do not provide privacy.

2.   **BUFFER MATERIALS.** Buffering may consist of fencing and plant materials pursuant to this Section, but may also include berms, rocks, boulders, mounds, or combinations of those materials, to achieve the same objective.

3.   **BUFFER DIMENSIONS.**

    a.   **DIFFERENT ABUTTING USES.** When more intensive land uses abut less intensive uses, a buffer strip of at least 15 feet in width shall be required, except that when industrial, or light industrial, or commercial or business uses are to be located adjacent to residential uses, then a 50 foot buffer strip is required.

    b.   **DUMPSTER AND UTILITY SCREENING.** Trash dumpsters and other waste/recycling containers serving multiple-family or non-residential uses shall be completely screened from view off-site.

4.   **ARTERIAL OR COLLECTOR ROADS.** Where residential subdivisions abut arterial or collector roads, a landscaped buffer area shall be provided along the property line abutting the road that shall be a minimum of 25 feet wide.

5.   **DRIVEWAYS.** Required landscaped buffer areas shall not include driveways.

6.   **MINIMUM PLANTING REQUIREMENTS IN LANDSCAPE BUFFERS.**

    a.   **15-FOOT LANDSCAPE BUFFER.** A landscape buffer that is required to be a minimum of 15 feet wide shall be planted with a minimum of one shade tree, two understory trees, and two shrubs per 100 linear feet.

    b.   **A 25-FOOT LANDSCAPE BUFFER.** A landscape buffer that is required to be a minimum of 25 feet wide shall be planted with a minimum of one shade tree, one understory tree, and one shrub per 100 linear feet.

    c.   **A 50-FOOT LANDSCAPE BUFFER.** A landscape buffer that is required to be a minimum of 50 feet wide shall be planted with a minimum of two shade trees, two understory trees, and two shrubs per 100 linear feet.

7.   **DESIGN OF LANDSCAPE BUFFER.** Arrangement of plantings and other landscaping elements in buffers shall, to the maximum extent feasible, provide protection to adjacent properties without obstructing views and access to solar exposure. If berms are used, the minimum top width shall be four feet, and the maximum side slope shall be two feet vertical to one foot horizontal (2':1').

8.   **MAINTENANCE OF LANDSCAPING WITHIN BUFFERS.** Plantings shall be watered regularly, in a manner appropriate to the specific plant species. Dead and dying plants shall be replaced by the developer no later than the next planting season. The applicant shall make provisions to ensure that landscaped buffer areas shall be maintained and kept free of all debris, rubbish, and noxious weeds.

9.   **MATERIALS USED IN BUFFERS.** Existing and supplementary native vegetation should be used to the maximum extent feasible and planted in random patterns (not rows). Plant materials of a scale capable of screening and softening structural mass shall be used to reduce visual impacts of development. A list of recommended plant materials is available from the Gunnison Office of the U.S.D.A. Natural Resources Conservation Service.

10.   **SCREENING WITH VEGETATION AND EARTH BERMS.** If total screening is impractical or undesirable, partial screening should be used to break horizontal lines of structures and minimize apparent height of taller structures. Screening development with vegetation is preferable to screening with berms or other significant earth moving. If berms or recontouring of soil are used for screening, the features should complement natural land forms.

11.   **REVIEW BY PUBLIC WORKS DEPARTMENT.** If landscaped buffers are proposed along roadways or parking areas within the Project, the plan may be submitted for review to the Gunnison County Public Works Department, for their compliance with snow removal and traffic-related sight-distance requirements.

BLM_0054156

N. **PARKING AREAS.**

1. **APPLICABILITY.** The interior parking lot landscaping standards of this Section shall apply to all off-road parking lots for land use changes classified as Major Impact Projects pursuant to Section 3-111: *Classification of Impact.* They shall not apply to vehicle or equipment storage or sales lots.

2. **PLANTING AREA.** At least ten percent of the interior area of off-road parking lots shall be devoted to landscape planting areas.

3. **DIVIDER MEDIANS.** Divider medians that form a continuous landscaped strip may be installed between abutting rows of parking spaces. The minimum width of divider medians shall be five feet if wheel stops or raised curbs prevent vehicle overhang of the median. If vehicle overhang is allowed, the minimum width shall be eight feet. All tree planting areas shall have a minimum width of seven feet.

4. **PERIMETER LANDSCAPE BUFFER.** Parking lots, loading, and unloading areas that are not part of a parking lot shall have perimeter screening with a buffer strip at least five feet wide. No landscaping shall be required on the side of the parking lot that is adjacent to the entry of the primary building served by the lot.

# SECTION 13-112: SNOW STORAGE

A. **PURPOSE.** The purpose of this Section is to minimize the potential impacts of snow storage, particularly on water quality.

B. **SNOW DISPOSAL INTO WATER BODIES PROHIBITED**. Plowing, dumping, or storage of snow into any water body is prohibited.

C. **PREFERRED SNOW STORAGE AREAS.** Areas that are preferred for snow storage include gently sloping ground, existing meadows and gentle, south-facing slopes, concave surfaces, and unpaved surfaces free of trees.

D. **STORAGE EASEMENTS.** Designated snow storage easements shall be provided in perpetuity by dedication on a Final Plat or non-revocable license.

E. **SITE DESIGN.** In development that will require snow removal from roadways and/ or parking areas, site design shall incorporate the following elements:

1. **MINIMUM AREA.** In addition to the standard right-of-way width required by the *Gunnison County Standards and Specifications for Road and Bridge Construction* and as appropriate to a specific area when historic snowfalls require increased snow storage area, the Gunnison County Public Works Department may require a greater right-of-way on either side of a roadway to ensure adequate area for snow storage.

2. **MINIMUM WIDTH, ADJACENT TO PLOWED AREA.** Designated snow storage areas shall not be less than six feet wide and, to the maximum extent feasible, shall be located adjacent to the area of the Project site from which snow is to be removed. The storage area shall not be included in any parking area pursuant to Section 13-110: *Off-Road Parking and Loading*, and the minimum distances listed in Appendix Table 2: *Off-Road Parking Requirements.*

3. **SNOW STORAGE OBSTRUCTIONS.** Snow storage areas shall be free of fences, landscaping (except for ground cover), retaining walls, and other obstructions of similar nature.

4. **SNOW PLOWING OBSTRUCTIONS**. Pathways, signage, vegetation, fencing, and lighting shall be configured to cause the least obstruction to snow plowing. Locations of trash dumpsters relative to snow storage shall allow access and maintenance of the dumpsters, but shall not impede the free movement of trash removal vehicles.

5. **FORMAL APPROVAL BY PUBLIC WORKS DEPARTMENT.** All designs for snow storage shall be subject to review and approval by the Gunnison County Public Works Department.

6. **DRAINAGE AND STORM WATER FACILITIES.** Snow storage areas shall be designed, constructed and maintained to comply with the requirements of Section 13-117: *Drainage, Construction and Post-Construction Storm Water Runoff.*

7. **SNOW ON PAVED SURFACES**. If snow must be piled on a paved surface, the surface shall be designed so that the snowmelt shall drain away from the pile and the plowed surface. Snowmelt from storage areas shall not cross pedestrian and recreational pathways.

BLM_0054157

## SECTION 13-113: FENCING

Unless otherwise expressly provided in this *Resolution*, fences and walls used for screening shall comply with the following general standards:

**A. GENERAL.**

    **1. WALLS AND FENCES.** Walls and fences may be erected as part of a buffer in a land use change when required by the applicable review body for privacy, screening, separation, security, erosion control, or to serve other necessary and reasonable functions specific to a particular land use.

    **2. TRAFFIC HAZARDS OR PUBLIC SAFETY**. No fence or screening wall shall be a hazard to traffic or public safety.

**B. STANDARDS FOR FENCING**.

    **1. FENCING MAY BE REQUIRED BETWEEN DIFFERENT TYPES OF LAND USES.** Fencing and landscaping may be required between residential and other land uses, to buffer between the two. When a residential use is proposed adjacent to an existing commercial or industrial use, and fencing is required, it shall be the responsibility of the developer, and subsequently the homeowners or property owners' association or individual lot owners, to construct, maintain and repair the fence.

        **a. FENCING REQUIRED BETWEEN A LAND USE CHANGE AND AGRICULTURAL USES.** Fences may be required between a land use change and private grazing or other agricultural uses and shall be designed on a site-specific basis to minimize impacts to agricultural operations. All fence wire on barbed wire and combination fences shall be placed on the side of the fence that faces the livestock.

            **1. EXISTING AGRICULTURAL ACCESS PROTECTED.** Fencing shall not be allowed that in any way constricts the operation or maintenance of any existing or historic agricultural access, including to historic ditches.

        **b. FENCING REQUIRED BETWEEN A LAND USE CHANGE AND PUBLIC LANDS**. Fencing may be required between a land use change and public lands on which livestock are grazed. Fences may further be required to prevent use by unauthorized motorized vehicles, according to applicable standards of the controlling public agency.

        **c. FENCING BETWEEN RESIDENTIAL AND NON-RESIDENTIAL AREAS**. The fence or screening wall in a non-residential development shall be determined on a site specific basis, depending up on the type of use proposed, and the established adjacent development, and the Projected visual impact of the proposed use.

        **d. FENCES FOR WILDLIFE HABITAT AREAS**. The design, materials, and height of fences in wildlife habitat areas shall be subject to the requirements of Section 11-106: *Protection of Wildlife Habitat Areas.*

    **2**. **MAXIMUM HEIGHT AND MEASUREMENT**. The maximum height of a fence or screening wall in a residential development shall be six feet. Fence or screening wall height shall be measured from finished grade.

    **3. AGREEMENTS TO DEFINE MAINTENANCE RESPONSIBILITY.** Maintenance agreements, protective covenants and similar documents defining maintenance responsibilities shall describe a process for notifying owners adjacent to agricultural operations that the State of Colorado has adopted statutory requirements for "fencing out" livestock. Those agreements shall place responsibility for fence maintenance on the developer, or the appropriate association or individual, so long as the agricultural operation continues.

## SECTION 13-114: EXTERIOR LIGHTING

**A. PURPOSE**. The purpose of this Section is to provide standards for exterior lighting that assure the safety, utility and security appropriate to development and that prevent night lighting that adversely impacts adjacent properties and neighborhoods or unduly illuminates the night sky enjoyed by residents and visitors of Gunnison County. A secondary purpose is to avoid exterior night lighting that distracts and interferes with safe, quick and accurate vision of drivers and pedestrians. (Illustrations in this Section are courtesy of Dark Sky, International, and the New England Light Pollution Advisory Group (NELPAG.)

**B. APPLICABILITY**.

    **1. GENERAL.** Except as otherwise exempted by this Section, the requirements of this Section shall apply to all land uses in Gunnison County, subject to Section 1-106: *Partially Exempted Land Use Changes*, and Section 1-108: *Nonconforming Uses.*

BLM_0054158

2. **EXEMPTIONS.** The following uses are exempted from the requirements and review standards of this Section:

    a. **AGRICULTURAL OPERATIONS.** Exterior lighting whose primary purpose is essential to the efficient functioning or security of an agricultural operation shall be exempted from the standards of this Section, though agricultural operations are encouraged to comply.

    b. **FEDERAL, STATE AND COUNTY CONSTRUCTION PROJECTS.** Federal, state and County construction Projects, during the course of construction.

    c. **SPECIAL EVENTS.** Lighting that is temporarily installed or operated as part of a special event, pursuant to Section 9-501: *Special Events*.

    d. **EMERGENCY LIGHTING.** Lighting fixtures used temporarily for emergency purposes.

    e. **SPECIALIZED LIGHTING.** Lighting necessary for public safety, such as runway lighting of airports, and traffic control signals.

C. **NONCONFORMING FIXTURES.** Fixtures that were nonconforming as of July 1, 2004, shall be replaced when:

    1. **LIGHT IS DAMAGED BEYOND REPAIR.** When the light fixture is damaged beyond repair and must be replaced, it shall comply with the standards of this Section.

    2. **STRUCTURE IS EXPANDED OR REPLACED.** When a structure is replaced, or expanded by 50 percent or more of square footage as calculated by the applicable building code adopted by Gunnison County, all light fixtures shall be replaced and shall comply with the standards of this Section.

D. **STANDARDS.** Exterior lighting shall meet the following standards:

    1. **EXTERIOR LIGHTING FIXTURES SHALL BE FULL CUTOFF/FULLY-SHIELDED, SHIELDED BY ROOF ELEMENT OR EFFECTIVELY RECESSED.** Except as otherwise restricted in this Section, all exterior lighting fixtures, including those used to illuminate roadways, parking lots, walkways and buildings, used for residential, commercial, or industrial purposes shall be of the full cutoff/fully-shielded type or be shielded by a roof element so that there is the effect of a full cutoff/ fully-shielded light fixture. All fixtures that are installed in recessed locations shall maintain this full-cutoff/fully-shielded characteristic.

**SHIELDED FIXTURES**
Exterior lighting fixtures that are not fully cut-off, or fully-shielded by a roof element are prohibited.



Only those exterior lighting fixtures that are fully cut-off, fully shielded, or are shielded by a roof element are allowed.



    2. **EXTERIOR LIGHTING LIMITED TO FUNCTIONAL USES.** Exterior lighting shall be limited to functional applications such as illumination of doorways, garage doors, decks, terraced levels, walkways or hot tubs and recreational areas when in use.

BLM_0054159

3. **MOTION SENSOR LIGHTS ALLOWED FOR COMMERCIAL, INDUSTRIAL OR RESIDENTIAL ACCESS FOR SECURITY PURPOSES.** A maximum of two motion sensor fixtures is allowed as reasonably required to provide lighting for access security. These are permitted where the sensor will be triggered by activity only within the owner's property lines.

4. **FLOOD LIGHTING LIMITED.** Floodlighting is only permitted when it is down-directed (45 degrees or less from vertical as illustrated in Figure 10: *Examples of Floodlighting*) so that the light source is not visible from adjacent and/or neighboring properties, and shall be full cutoff/fully shielded. Ground-mounted floodlighting of a structure is prohibited.

5. **HEIGHT LIMITATION FOR POLE-MOUNTED FIXTURES.** Pole-mounted fixtures (as measured from grade to the bottom face of a fixture) shall be no higher than 35 feet and the fixture shall be a full cutoff/fully shielded, non-adjustable and directed down.

6. **ILLUMINATION OF BUILDING FAÇADE AND LANDSCAPING PROHIBITED.** Lights that are used for the primary purpose of illuminating a building façade or landscaping are prohibited except for illuminating a building entrance, or for other purposes required by the *National Electrical Code*.

7. **BLINKING, FLASHING AND LIGHTS OF CHANGING INTENSITY PROHIBITED.** Blinking, flashing or exterior lights that change in intensity are prohibited, except for temporary holiday displays, traffic control devices authorized by a federal, state or local government, or lights required by regulations of the Federal Aviation Administration for air traffic control and warning purposes.

8. **INTERFERENCE WITH SAFE MOVEMENT OF MOTOR VEHICLES PROHIBITED.** No exterior lighting shall be installed or used in any way that interferes with the safe movement of motor vehicles. The following are prohibited:

   a. **LIGHTING NOT DESIGNED FOR ROADWAY OR PEDESTRIAN WAY.** Any exterior lighting not designed for roadway or pedestrian way illumination that produces incident or reflected light that could be disturbing to the operator of a motor vehicle; and

   b. **LIGHTING THAT MAY BE CONFUSED WITH TRAFFIC CONTROL DEVICES.** Any exterior lighting that may be confused with, or may be construed to be a traffic control device, except as authorized by a state, federal or local government.

9. **MERCURY VAPOR LIGHT FIXTURES.** Installation of new mercury vapor light fixtures is prohibited, and replacement of mercury vapor light fixtures existing as of July 1, 2004 with fixtures that comply with the standards of this Section is encouraged.

10. **TEMPORARY HOLIDAY DISPLAYS.** Winter holiday lighting shall be allowed between November 15 and March 30. All other lighting associated with any national, local or religious holiday or celebration shall be allowed two weeks before the holiday, and extinguished within two weeks after the holiday. A waiver from these time restrictions may be requested from the Board, which may elect to conduct a public hearing on the request before making its decision. The applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing*.

E. **SUBMITTAL REQUIREMENTS.** Applications for Building Permits and other Land Use Change Permits shall submit information about exterior lighting as follows:

1. **APPLICATIONS FOR BUILDING PERMITS AND OTHER ADMINISTRATIVE REVIEW PROJECTS.** Activities and uses that are classified as Administrative Review Projects pursuant to Article 4: *Administrative Review Projects That Do Not Require Land Use Change Permits,* including Projects that require only a Building Permit, and Article 5: *Administrative Review Projects That Require Land Use Change Permits*, when such Projects involve uses that reasonably would include lighting shall include:

   a. **LOCATIONS OF LIGHTING FIXTURES.** The locations of exterior lights on the building(s) and/or other activity or use on the property for which the application is submitted.

   b. **DESCRIPTION OF TYPES OF LIGHTING FIXTURES.** Description(s) of the lighting fixtures, demonstrating how lighting fixtures will comply with this Section.

2. **MINOR AND MAJOR IMPACT PROJECTS.** Each application for a Land Use Change Permit classified as a Minor or Major Impact Project pursuant to Article 6: *Minor Impact Projects* and Article 7: *Major Impact Projects* shall submit a plan for exterior lighting as follows:

BLM_0054160

    **a.** **MINOR IMPACT PROJECTS.** When a proposed land use change is classified as a Minor Impact Project, its application shall include a proposed plan for exterior lighting when any of the following is proposed as part of the development:

        **1.** **RESIDENTIAL USES**. Residential development.

        **2.** **NON-RESIDENTIAL USES.** Non-residential uses intended to serve people or otherwise operate during non-daylight hours. Flat glass lens, eliminates or minimizes direct glare, has no upward throw of light.

        **3.** **MIXED USES.** A development that mixes residential and non-residential uses.

    **b.** **MAJOR IMPACT PROJECTS.** Any proposed Land Use Change Permit application that is classified as a Major Impact Project shall include an exterior lighting plan.

    **c.** **ELEMENTS OF EXTERIOR LIGHTING PLAN.** The following elements shall be included within an exterior lighting plan:

        **1.** **COMPLIANCE WITH REQUIREMENTS OF APPLICABLE ELECTRICAL PROVIDER.** The exterior lighting plan shall be designed pursuant to the requirements of the electric association or municipality that will serve the development. The standards in the IES Lighting Handbook may also be used as guidelines. The plan shall address the following:

        **2.** **LOCATION AND TYPE.** The locations of exterior lights within the development, and the type of lighting devices, fixtures, lamps, supports, reflectors and other devices;

        **3.** **DESCRIPTION.** A description of the lighting devices, fixtures, lamps, supports, reflectors and other devices; the description may include photographs or illustrations by manufacturers; and

        **4.** **METHOD OF SHIELDING.** Photographs or other illustrations by manufacturers of the fixtures demonstrating how lighting fixtures will be shielded to comply with this Section.

## SECTION 13-115: RECLAMATION AND NOXIOUS WEED CONTROL

**A.** **PURPOSE.** The purpose of this Section is to establish standards to control the growth and proliferation of noxious weeds in Gunnison County, in conformance with Colorado Revised Statutes 35-5.5, *et seq*: the *Colorado Noxious Weed Act*, by requiring site reclamation after earth moving and/or construction has occurred.

**B.** **APPLICABILITY.** This Section shall apply to all earth moving sites including road and driveway cutting and construction, clearing of land, and berm construction. This Section shall not conflict with the requirements of Division 9-400: *Exploration, Extraction and Processing of Minerals and Construction Materials* or with reclamation within the jurisdiction of the Colorado Division of Reclamation Mining and Safety and applied to mining operations. Nothing in this Section is or shall be construed to be a limit on the County's authority regarding noxious weeds.

    **1.** **EXEMPTIONS.** The following uses are exempt from having to obtain a Reclamation Permit:

        **a.** **AGRICULTURAL OPERATIONS.** Agricultural operations, as defined within this *Resolution*.

        **b.** **AREAS OF DISTURBANCE SMALLER THAN 10,000 SQ. FT.** Areas of disturbance that are smaller than 10,000 sq. ft. that are located outside of mapped occupied Gunnison Sage-grouse habitat.

        **c.** **RECORDED SUBDIVISIONS WITH APPLICABLE PROTECTIVE COVENANTS.** In platted, recorded subdivisions, that are located outside of mapped occupied Gunnison Sage-grouse habitat, approved by the County for which there are recorded protective covenants that require reclamation that meets or exceeds the standards of this Section. Determination of that compliance shall be made by the Gunnison County Public Works Department.

        **d.** **AREAS RECOMMENDED BY WEED COORDINATOR.** Areas that are defined and recommended by the Gunnison County Weed Coordinator, as may be designated from time to time by the Board.

**C.** **GUNNISON SAGE-GROUSE REVIEW.**

    **1.** **GUNNISON SAGE-GROUSE PREAPPLICATION CONFERENCE.** A Gunnison Sage-grouse preapplication conference shall be required for any proposed site disturbance if the site is located within mapped occupied Gunnison Sage-grouse habitat.

BLM_0054161

    **2. RECLAMATION PERMIT.** A reclamation permit shall be required for all projects involved in any level of site disturbance within Tier 1 Habitat. A reclamation permit may be required for site disturbance in Tier 2 Habitat, based upon a site-specific analysis.

**D. RECLAMATION PERMIT REQUIRED FOR DEVELOPMENT THAT DISTURBS10,000 OR MORE SQ. FT.** Except as otherwise exempted, a development which results in any site disturbance that involves 10,000 or more sq. ft. of disturbance, shall be required to obtain a Reclamation Permit from the Gunnison County Public Works Department.

**E. SITE RECLAMATION AND NOXIOUS WEED CONTROL PLAN.** Prior to obtaining a Certificate of Occupancy the applicant shall have implemented reclamation of the affected site pursuant to the requirements of Section 13-116: *Grading and Erosion* and with Section 11-105: *Development in Areas Subject to Wildfire Hazards* and be required, if applicable, to address the following:

    **1. NATIVE PLANTS REQUIRED IN EAST RIVER CORRIDOR.** Native plant materials are required to be used in the portion of the East River Corridor to the Gothic Townsite as delineated a map that can be obtained from the Public Works Department.

    **2. SLASH AROUND HOMES.** To avoid insects, diseases, and wildfire hazards, all vegetative residue, slushiness, branches, limbs, stumps, roots, or other such flammable lot-clearing debris shall be disposed of from around homesite areas by either chipping or removal prior to final building inspection approval. Homesite areas shall include all areas of the lot in which such materials are generated or deposited; and

    **3. REMOVAL OF DEBRIS.** Within six months of substantial completion of soil disturbance, all stumps, and other tree parts, and brush should be removed from the site and disposed of in compliance with requirements of any applicable municipal tree disposal site or the Gunnison County Landfill, or by other means pursuant to applicable regulation. Excess or scrap building material, weeds, or other debris should be removed from the site and disposed of pursuant to requirements of the Gunnison County Landfill, or by other means pursuant to applicable regulation.

        **a. RETAINING DEADWOOD FOR WILDLIFE HABITAT.** All dead or dying trees should be removed from the site, unless those trees are to be used for fire wood or retained for wildlife habitat, upon recommendation of the Colorado Division of Parks and Wildlife or the Colorado State Forest Service. If trees and limbs are reduced to chips, they may be used as mulch in landscaped areas.

**F. SURETY.**

    **1. DISTURBANCE OF 10,000 OR MORE SQ. FT.** When activities of development or a land use change results in any site disturbance that disturbs 10,000 sq. ft. or more, surety in the form of a bond, letter of credit, interest-bearing account, or as may be addressed within a Development Improvement Agreement, shall be required by the County to assure satisfactory implementation of the plan. Such surety shall be subject to the approval of the Gunnison County Attorney.

    **2. DISTURBANCE OF LESS THAN 10,000 SQ. FT.** When development or land use change causes disturbance of fewer than 10,000 sq. ft., no surety shall be required, but shall be subject to civil procedure if the Project is found by the County not to have complied with the requirements of this *Resolution*.

## SECTION 13-116: GRADING AND EROSION CONTROL

**A. PURPOSE.** The purpose of this Section is to minimize the potential erosion and sedimentation impacts of development.

**B. APPLICABILITY.**

    **1. AGRICULTURAL OPERATIONS EXEMPT.** Agricultural operations shall be exempt from the requirements of this Section.

    **2. GRADING ACTIVITIES REQUIRED TO OBTAIN RECLAMATION PERMIT.** Activity which disrupts the earth, including grading conducted independent of, or before obtaining a Building Permit or an Individual Sewage Disposal System Permit, Access Permit, or any Land Use Change Permit shall be required to obtain a Reclamation Permit from the Public Works Department, pursuant to Section 13-115: *Reclamation and Noxious Weed Control.*

**C. NO EARTHWORK UNTIL ALL REQUIRED PERMITS ARE OBTAINED.** No activity that disrupts the earth shall be allowed until all required permits are obtained.

BLM_0054162

**D. GENERAL STANDARDS**. All land use changes shall comply with the following standards:

**1. MINIMIZE ON-SITE EROSION.** Development shall minimize erosion on-site by:

**a. PHASING CONSTRUCTION.** Stage and schedule timing of earth disturbing construction activities, including clearing, grading, and utilities installation to minimize soil disruption and exposure.

**b. INSTALLATION OF EROSION AND SEDIMENTATION CONTROL MEASURES.** Erosion and sedimentation control measures shall be installed, to the maximum extent feasible.

**1. STABILIZING SOIL.** Disturbed areas and soil stockpiles shall be stabilized or protected to control erosion effectively. Those areas shall be surface-roughened, mulched or seeded and mulched, or otherwise protected from erosive forces if they will remain exposed and inactive for longer than 14 days, or are otherwise expected to be exposed during winter to minimize erosion from occurring during spring snowmelt. The soil surface of cut and fill slope shall not remain exposed without an approved method of soil stabilization.

**2. STABILIZATION ON STEEPER SLOPES.** On slopes steeper than 3:1, or within 100 feet of any water body, exposed soils shall be stabilized within 14 days of final disturbance, weather permitting, using appropriate techniques such as hydro mulching, erosion control blankets, bonded fiber matrices or other equally protective measures. Grass or straw mulch should be crimped, traced or tacked in place to promote surface anchoring.

**c. TEMPORARY AND PERMANENT REVEGETATION.** Disturbed areas that will not be built upon for one year shall incorporate a temporary cover crop to promote soil stability. Areas that will likely remain exposed for two or more years must be revegetated with a perennial, native grass mix (or other grass mixtures as recommended by the local Natural Resources Conservation Service Office).

**d. AVOIDANCE OF CUT AND FILL SLOPES**. Cut and fill slopes shall be avoided to the greatest extent feasible.

**1. AVOIDANCE ON STEEPER SLOPES**. Except for mining extraction activities cut and fill shall be avoided on slopes greater than 3:1, unless avoidance would result in loss of all economic benefit of the parcel; then stabilization shall be attained by using a combination of retaining walls, rock walls, up-slope runoff diversions, terracing, slope drains, soil nailing, mulch binders, erosion control blankets, vegetation or other measures appropriate for the specific situation. Revegetation, or other methods of soil stabilization, is required.

**2. PERMANENT VEGETATION ON SLOPES 3:1 OR LESS.** Where cut and fill cannot be avoided, slopes shall be designed, constructed and maintained for long-term stability. Permanent vegetation shall be used to stabilize cut and fill where slopes are less than or equal to 3:1.

**e. CONSTRUCTION IN OR DIRECTLY ADJACENT TO ANY WATER BODY, OR MUDFLOW.** Construction, including culvert or bridge installation, shall require measures to protect water quality in or directly adjacent to any water body or mudflow to protect water quality and channel stability, and shall address the following:

**1. COMPLIANCE WITH 404 PERMITTING REQUIREMENTS.** All construction shall conform to applicable U.S. Army Corps of Engineers 404 permitting requirements.

**2. CONTAINMENT AND LIMITED TIMES OF IN-STREAM WORK.** Construction shall protect water quality by measures including, but not limited to stream isolation using coffer dams, complete containment of the stream in the area of the disturbance, stream-crossing structures, and limitations on the dates when in-stream work can be performed.

**f. DRAINAGE STRUCTURES AND OTHER ELEMENTS.** All drainage structures and other elements designed to avoid or mitigate erosion or sedimentation shall comply with the requirements of Section 13-117: *Drainage, Construction and Post-construction Storm Water Runoff.*

**g. PROTECTION FROM ACCELERATED EROSION.** New or rerouted swales, receiving channels and streams shall be protected from erosion until vegetation is established and is stable during flows for which the feature was designed.

**h. PROTECTION OF CULVERT OUTLETS.** Culvert outlets shall be protected from erosive flows by installing velocity reducers.

**i. DIVERSION OF RUNOFF.** Runoff from offsite shall be diverted around the construction site to the maximum extent feasible.

BLM_0054163

*SECTION 13-117: DRAINAGE, CONSTRUCTION AND POST-CONSTRUCTION STORM WATER RUNOFF*

**2. MINIMIZE SEDIMENT LEAVING A SITE.** Development shall minimize sediment leaving a site by:

    **a. DIVERSION OF CONCENTRATED STORM WATER FLOWS.** Concentrated Storm Water runoff flows shall be diverted away from disturbed slopes. The length and steepness of the areas of disturbed slopes shall be minimal; slope drains may be used to provide control.

    **b. PROTECTION OF ACCESS WITH ROAD BASE OR BY WASHING.** Disbursement of sediment and mud from a construction site shall be minimized by protecting access routes by either immediate placement of road base materials, or construction of mud pads, which shall be at least 50 feet long and comprised of angular rock and/or a wheel-washing facility.

    **c. PROTECTION OF ADJACENT PROPERTIES BY FENCING OR TRAPPING.** Adjacent properties shall be protected from sediment-laden runoff by use of sediment fences, sediment or silt traps, or other appropriate controls.

    **d. PROTECTION OF STORM SEWER INLETS.** Storm sewer inlets shall be protected from entry of sediment-laden water, by placement of straw bales, supported silt fence structure, dumped rock or other barriers.

**3. REQUIREMENTS FOR CONSTRUCTION DEWATERING.** All land use changes shall meet the following construction dewatering requirements:

    **a. COMPLIANCE WITH STATE PERMITTING REQUIREMENTS.** Construction dewatering activities shall comply with the Colorado Water Quality Control Division Discharge Permit System for Construction Dewatering Wastewater Discharge.

    **b. USE OF BEST MANAGEMENT PRACTICES.** Discharges from construction dewatering operations shall be done to minimize erosion and use best management practices, including velocity reducers, sediment basins, and straw bales.

# SECTION 13-117: DRAINAGE, CONSTRUCTION AND POST-CONSTRUCTION STORM WATER RUNOFF

**A. PURPOSE.** The purpose of this Section is to minimize the potential adverse impacts to water quality and on- and off-site drainage, construction and post-construction storm water runoff.

**B. LIMITED APPLICABILITY.** The requirements of this Section shall apply only to those Projects that are either commercial or industrial uses, any subdivision classified as a Major Impact Project or any other development proposed after the effective date of this *Resolution* that is within 100 feet of a water body or a mudflow, or development that creates 10,000 sq. ft. or more of impervious surface area.

**C. STORM WATER DISCHARGE.** Projects that are required to do so shall obtain a Storm Water Discharge Permit from the Colorado Department of Public Health and Environment.

**D. GENERAL STANDARDS.** Certification that a proposed land use change Project meets the standards of this Section shall be required from a qualified professional engineer licensed in the State of Colorado. Each applicable land use change Project shall meet the following requirements for drainage, construction or post-construction storm water runoff:

**1. METHOD TO DETERMINE RATE OF RUNOFF.** Runoff from a Project site after construction shall not exceed the level of runoff that occurred before construction. The entire drainage area upstream from a Project site shall be defined. Runoff identified from stream flow records may be used in identifying historical runoff patterns. The following methods may be used for estimating peak runoff flows:

    **a. TABULAR METHODS.** Tabular methods as defined by the Engineering Division of the U.S. Department of Agriculture.

    **b. HEC PROGRAM.** The most current HEC-HMS computer program used by the U.S. Army Corps of Engineers.

    **c. COLORADO WATER CONSERVATION BOARD MANUAL.** Technical manual for estimating flood characteristics from the Colorado Water Conservation Board.

    **d. NATURAL RESOURCES CONSERVATION SERVICE.** The method used by the Natural Resources Conservation Service (Soil Conservation Service).

    **e. RATIONAL METHOD.** The Rational Method, relating runoff to rainfall intensity, surface area and surface characteristics should be used only for estimating runoff from small simple watershed areas. Where the

BLM_0054164

watershed area is relatively small but complicated by a mainstream fed by one or more significant tributaries, the Rational Method should be applied separately to each tributary stream and the tributary flows then routed down the main channel.

2. **DETAINING AND TREATING RUNOFF.** Permanent post-construction storm water detention facilities are required to be multipurpose to not only detain flows to historic peak discharge rates, and to avoid impact to adjacent properties, but also to protect water quality. Detention elements may be either on-site or "regional," and shall be installed concurrent with construction of development. Detention facilities shall be designed to:

   a. **STORE INCREASED VOLUME AFTER DEVELOPMENT.** Storm drainage facilities shall prevent storm waters in excess of historic runoff caused by the proposed development from entering, damaging or being carried by existing conduits, water supply ditches and appurtenant structures. Detention devices shall be designed, at a minimum, to store the difference between the historic volume and the volume after development, figuring the peak discharge rate for the two-year, and 25-year return frequency, 24-hour duration storm. Discharge from the detention system will be at 25-year historic rates. Retention systems will be designed to store the entire 25-year 24-hour event from the developed site. In areas subject to runoff from snow storage, the determination shall include a melt rate from the snow stock pile of two inches in 24 hours. In determining runoff rates, the entire area contributing runoff shall be addressed, including any contribution from offsite into the detention or retention facility. No system design shall be allowed to contribute to soil instability.

   b. **ALLOW PASSAGE OF 100-YEAR STORM EVENT.** Minimize the threat of major property damage or loss of life, all permanent storm water detention facilities shall be designed to allow clear passage of the 100-year storm event without causing property damage on- or off-site.

   c. **PROTECT DOWNSTREAM CHANNELS.** Channels downstream from the storm water detention pond discharge shall be protected from increased channel scour, bank instability, erosion, and sedimentation from the 25-year return frequency, 24-hour duration storm.

3. **REMOVAL OF POLLUTANTS.** Removal of pollutants shall be accomplished by sizing dry detention basins to incorporate a 40-hour emptying time for a design precipitation event of 0.5 inches in 24 hours, with no more than 50 percent of the stored water being released during a 12-hour period. If retention ponds ("wet ponds") are used, a 24-hour emptying period is required.

   a. **DRAINAGE OF VEHICLE REPAIR AND STORAGE SITES.** Sand and oil grease traps, extended wetlands with no initial release, or similar devices, shall be required to accommodate drainage from parking lots, vehicle maintenance facilities, or other areas with extensive vehicular use.

   b. **MAXIMUM EFFICIENCY OF STRUCTURES.** To promote pollutant removal, detention basins length-to-width shall be not less than two, with a ratio of four recommended where site constraints allow. A sedimentation forebay is recommended to promote long-term functioning of the structure. Access to both the forebay and pond by maintenance equipment is required.

   c. **WASTE STORAGE.** Areas used for the collection and temporary storage of solid or liquid waste shall be designed to prevent discharge of these materials in runoff from the site and shall be no closer than 100 horizontal feet from a water body and no closer at least than four feet above natural grade. Collection sites shall be located at least 100 feet from any component of a storm drainage system.

4. **AVOIDANCE OF DIRECT DISCHARGE TO WATER BODIES.** Storm water runoff shall be managed in a manner that provides for at least one of the following:

   a. **DIRECT RUNOFF TO VEGETATED AREAS.** Direct runoff to stable, vegetated areas capable of maintaining sheet flow for infiltration. Vegetated receiving areas should be resistant to erosion from a design storm of 0.5 inches in 24 hours.

   b. **ON-SITE MANAGEMENT.** On-site management of storm water by use of best management practices designed to detain or infiltrate the runoff before discharge to any natural water body.

   c. **DISCHARGE TO CONVEYANCE STRUCTURE.** Discharge to a storm water conveyance structure, designed to accommodate the Projected additional flows from the proposed Project, with treatment by a regional or other storm water facility before discharge into any natural water body.

5. **MINIMIZE DIRECTLY-CONNECTED IMPERVIOUS AREAS.** Landscape features including grass buffer strips can be used to minimize directly-connected impervious areas; site design shall include such elements as necessary to minimize the extent of directly-connected impervious areas.

BLM_0054165

a. **INITIAL IMPERVIOUS RUNOFF AREAS**. Runoff from 50 percent of all developed impervious surfaces (including rooftops, parking lots, and sidewalks) shall drain over stable, vegetated pervious areas before reaching impervious storm water conveyance systems.

   1. **REDUCTION OF SURFACE COVERAGE ALLOWED**. The 50 percent requirement may be reduced if the outflow from the vegetated pervious buffer strip is directed to other storm water treatment structures or elements, including infiltration devices, grass swales, constructed wetlands, sand filters or dry ponds.

   2. **MAXIMUM GRASS BUFFER STRIP SLOPE OF 5 PERCENT**. When impervious surfaces drain onto grass buffer strips (or similar areas with equivalent ground cover), the maximum slope of the grass buffer strips should be five percent, and the gradient should be uniform to foster evenly-distributed sheet flows. Retaining walls or check dams may be used to maintain the maximum five percent slopes.

   3. **DESIGN WIDTH OF PERVIOUS VEGETATED BUFFER STRIPS**. The recommended design width of the distance along the direction of sheet flow for pervious vegetated buffer strips shall be eight feet or 0.2 times the length of the flow path of the sheet flow over upstream impervious surface, whichever is greater.

E. **AGREEMENT TO MAINTAIN.** Any applicable application for a Land Use Change Permit shall include a description of the method(s) by which the proposed detention and retention facilities shall be regularly inspected and maintained. Assurance of regular inspections and maintenance of those facilities shall be addressed in the Development Improvement Agreement for the land use change.

## SECTION 13-118: WATER IMPOUNDMENTS

A. **PURPOSES.** This Section is implemented in accordance with the Board's *Gunnison County Position Statement: Protection and Development of Water Resources in Gunnison County and the Gunnison River Basin.*

   1. **SUPPORT PROTECTION AND DEVELOPMENT OF WATER RESOURCES FOR USE IN THE GUNNISON RIVER BASIN**. It is the intent of this Section to support the protection and development of water resources, particularly smaller, off-channel impoundments for multiple purposes, for use in the Gunnison River basin in Gunnison County in a manner that:

      a. **IS ENVIRONMENTALLY SOUND.** Is environmentally sound;

      b. **FOSTERS LOCAL BASIN USES**. Fosters uses in the Gunnison River basin including retaining or enhancing the productivity of agricultural lands, meeting municipal and domestic needs, and providing beneficial instream flows and levels for fisheries and recreation within the basin;

      c. **HAS NO SIGNIFICANT NET ADVERSE EFFECT**. Insures that, after mitigation, the impoundment does not create a significant adverse net effect; and

      d. **ENCOURAGES USES THAT WILL RETAIN AGRICULTURAL USE AND PRODUCTIVITY OF LAND.** Encourages uses that will retain the agricultural use and productivity of the land.

      e. **RECOGNIZES THAT COUNTY LAND USE REGULATION IS APPROPRIATE**. Recognizes that, while the right to store water of a natural stream for later application to beneficial use is a right of appropriation in order of priority under the Colorado Constitution, land use regulation of the impoundment construction, impacts of operation and the offsite impacts related to it may appropriately affect that legitimate property interest.

   2. **NO COUNTY REVIEW, DETERMINATION OR REGULATION OF POTENTIAL INJURY TO DECREED WATER RIGHTS.** It is not the purpose of this Section to review, determine or regulate potential injury to decreed water rights by the construction, operation or use of a proposed impoundment.

B. **APPLICABILITY.** The requirements of this Section shall apply to Projects that involve the construction and operation of new reservoirs or dams, major modifications, additions or expansions to existing reservoirs or dams, and/or their attendant system of pipes, structures and facilities, that are wholly or partially in Gunnison County. Projects shall be classified pursuant to Section 3-111: *Classification of Impact,* unless it also meets the criteria of a "Special Development Project" as defined by the *Gunnison County Regulations for Special Development Projects,* in which case it shall be reviewed within the requirements of those *Regulations.*

C. **APPLICATION.** The Community Development Department shall provide the appropriate application form for a proposed water impoundment that complies with the criteria for Minor or Major Impact Projects as described in this Section. Proposed water impoundment Projects that are not required to secure a Land Use Change Permit pursuant

to this Section shall not be required to submit a Land Use Change Permit application. The owner or developer of any proposed water impoundment shall provide the Community Development Department with a copy of any completed application required by and submitted to the Colorado Division of Water Resources for the impoundment, and documentation of the Division's classification of the proposed dam.

D. **CLASSIFICATION OF IMPACT.** The Board, rather than the Community Development Department, shall make the initial impact classification for a proposed water impoundment Project.

1. **PROCESS OF DETERMINATION OF IMPACT CLASSIFICATION.** The following process of determining impact classifications for water impoundment Projects shall be accomplished as follows:

   a. **RECEIPT OF APPLICATION AND SCHEDULING OF PUBLIC HEARING TO DETERMINE IMPACT CLASSIFICATION.** Upon receipt of a copy of the completed application required by and submitted to the Colorado Division of Water Resources for the impoundment and documentation of the Division's classification of the proposed dam, the Community Development Department shall schedule a public hearing on the Board's next available meeting agenda, for the purposes of determining the Project's impact classification. The hearing shall be noticed and the applicant shall be billed and shall be responsible for paying for the actual cost of publication of all applicable public hearing notices as required pursuant to Section 3-112: *Notice of Public Hearing.* , Section 3-112: *Notice of Public Hearing,* and the hearing shall be conducted pursuant to Section 3-113: *Conduct of Public Hearing.*

   b. **BOARD DECISION.** The Board shall, within 15 days of the public hearing, determine the impact classification, and shall take such action by motion. The Board shall consider the criteria of this Section and Section 3-111: B. 1: *Additional Criteria* and their determination shall be recorded in the Board minutes.

2. **PROJECTS EXEMPT FROM LAND USE CHANGE PERMIT REQUIREMENTS.** No Land Use Change Permit is required for construction of a water impoundment that:

   a. **IS 99-ACRE FEET OR SMALLER.** Is 99 acre feet or smaller; or

   b. **IS CLASSIFIED AS A CLASS III OR CLASS IV DAM AND MEETS CERTAIN CRITERIA.** Is classified as a Class III or Class IV dam by the Colorado Division of Water Resources and meets all of the following criteria:

      1. **USE IS LIMITED TO THE GUNNISON RIVER BASIN.** The water contained in the impoundment will be used only within the Gunnison River Basin in Gunnison County; and

      2. **IS LOCATED ON PRIVATE LAND.** The impoundment will be constructed on land that is wholly privately owned; and

      3. **CONSTRUCTION IMPACT IS LIMITED.** Construction impact will be wholly contained on the parcel on which the impoundment will be located, and shall not extend to adjacent properties or public roads; and

      4. **FOSTERS SPECIFIC LOCAL BASIN USES.** The impoundment will help retain or enhance the productivity of agricultural lands or provide beneficial instream flows and levels for fisheries and recreation.

3. **PROJECTS CLASSIFIED AS CLASS II DAMS ARE MINOR IMPACT PROJECTS.** New Projects or facilities, or expansion of existing Projects or facilities, that involve the design, construction and operation of a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class II dam shall be classified as Minor Impact Projects and shall be reviewed pursuant to Article 6: *Minor Impact Projects*, except that the Board, not the Planning Commission, shall be the decision-making body.

4. **PROJECTS CLASSIFIED AS CLASS I DAMS ARE MAJOR IMPACT PROJECTS.** New Projects, or facilities, or expansion of existing Projects or facilities, that involve the design, construction and operation of a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class I dam shall be classified as a Major Impact Projects, and be reviewed pursuant to Article 7: *Major Impact Projects*.

5. **GUNNISON COUNTY REGULATIONS FOR SPECIAL DEVELOPMENT PROJECTS.** Any proposal that meets the criteria of a Special Development Project as defined by the Gunnison County Regulations for Special Development Projects, as it may be amended, shall be reviewed and regulated pursuant to those *Regulations*.

6. **EXCEPTIONS.** The requirements of this Section expressly shall not apply to water diversion structures or ditches that are unrelated to water storage or water impoundment, or the collection of water(s) for those purposes, or that are unrelated to the construction and operation of a new, or the modification or expansion of an existing, reservoir or dam.

BLM_0054167

**E.  PRIORITY REVIEW FOR GUNNISON RIVER BASIN PROJECTS**. A complete Land Use Change Permit application for water impoundment whose waters would be used exclusively in the Gunnison River basin generally shall be given priority over other applications pursuant to this *Resolution* or the Gunnison County Regulations for Special Development Projects that are being reviewed by staff, the Planning Commission or the Board. At each phase of its review, each application shall be placed on the first scheduled Commission or Board agenda for which it can be properly noticed.

**F.  RELATIONSHIP OF THIS SECTION WITH FEDERAL AND STATE REQUIREMENTS.**

    **1.  DIVISION OF WATER RESOURCES AND OTHER AGENCY APPLICATION CONTENTS ACCEPTED.** To the maximum extent feasible, information supplied by the applicant within a permit application submitted to the Colorado Division of Water Resources and any other state or federal agency, shall be accepted by Gunnison County to meet submittal requirements required by this Section.

    **2.  CONCURRENT PROCESSING**. Gunnison County seeks to avoid duplicative regulatory controls or unnecessary delays. Therefore, processing of an application for a permit normally will proceed concurrently with the processing of other required federal, state and/or local authorizations or certifications.

        **a.  IDENTIFICATION OF ISSUES OF CONCERN**. In order to facilitate the processes of each other federal, state or local entity with applicable regulatory authority, when an application for a Land Use Change Permit for an impoundment of water is received by Gunnison County, the Community Development Director shall review the application and inform each other entity with regulatory authority and the applicant of the preliminary and known primary issues of concern to Gunnison County. The applicant has the opportunity to request, or may be required to participate in, a Pre-Application conference for the purpose of discussing various processes, standards and submittal requirements of this *Resolution*, and/or any intergovernmental agreement, and for the Community Development Department to provide and explain to the applicant the required application form, pursuant to Section 3-108: *Pre-Application Conference,* and Appendix Table 2: *Summary of Review Process.*

        **b.  COUNTY ACTION INDEPENDENT OF FEDERAL OR STATE AGENCIES. The** County shall not be bound to wait until permitting and/or other federal or state review processes are complete in order to take action pursuant to this *Resolution*, nor shall the County be required to follow the determinations by applicable state or federal agencies in making decisions pursuant to this *Resolution.*

        **c.  SCHEDULING WHEN PROJECT REQUIRES ENVIRONMENTAL ASSESSMENT OR ENVIRONMENTAL IMPACT STATEMENT.** The County's schedule of review for Projects pursuant to this Section for which a state or federally Environmental Assessment or Environmental Impact State is required shall include the following:

            **1.  SCHEDULING OF HEARING AFTER ENVIRONMENTAL ASSESSMENT OR ENVIRONMENTAL IMPACT STATEMENT.** Whenever reasonably feasible, the County shall conduct its required hearing(s) within 60 days after the date of issuance of a Draft Environmental Assessment of Environmental Impact Statement.

            **2.  FINAL ACTION.** Final action by the County on a Land Use Change Permit application may be delayed until 30 days after the Final Environmental Assessment (EA), Environmental Impact Statement (EIS) permit by a state or federal agency are issued unless otherwise agreed upon by the applicant and the decision-making body, and only if the applicant has applied for the required Land Use Change Permit within 60 days after applying for the required state or federal permit.

        **d.  RELATIONSHIP TO REGULATION BY THE U.S. ARMY CORPS OF ENGINEERS**. While the primary responsibility for determining land use matters rests with local government, Gunnison County recognizes that, the U.S. Army Corps of Engineers ("Corps") also regulates the discharge of dredged or fill materials in the waters of the United States. The Corps' regulatory process includes consideration of the "public interest" (including conservation, economics, aesthetics, environmental concerns, wetlands, fish, wildlife, historic, cultural, scenic and recreational values, flood hazards, floodplain values and water quality). Gunnison County shall participate in relevant Corps' processes, and shall seek appropriate resolution of land use issues through those processes, but shall neither be bound to wait until the Corps' process is complete to take action pursuant to this *Resolution* nor to follow determinations by the Corps in making decisions pursuant to this *Resolution.*

        **e.  RELATIONSHIP TO RULES AND REGULATIONS OF THE COLORADO STATE ENGINEER, DIVISION OF WATER RESOURCES**. The primary responsibility to promulgate and enforce regulations for dam safety and dam construction rests with the Colorado State Engineer. Gunnison County will normally accept

BLM_0054168

decisions by the State Engineer on dam safety and dam construction unless there are significant issues of overriding County importance. Such issues include the impact of a potential failure of an impoundment on neighboring lands and land uses.

**G. STANDARDS.** Land Use Change Permit applications for water impoundments subject to this Section shall comply with all applicable federal, state and local requirements and shall be approved unless any of the following standards is not met:

1. **NO SIGNIFICANT NET ADVERSE EFFECT.** The proposed impoundment, its construction and operation shall not, after mitigation, cause a significant net adverse effect to the following; there is not a presumption that inundation alone, except for inundation of critical habitat, is a significant net adverse effect:

    a. **SURFACE OR GROUND WATER QUALITY.** Surface or ground water quality within the impact area. The determination of the effects of the Project shall include:

        1. **CHANGES TO EXISTING WATER QUALITY.** Changes to existing water quality, as certified by the Colorado Water Quality Control Commission;

        2. **WATER TO BE IMPOUNDED WITHIN LOCAL BASINS.** There is a rebuttable presumption that, unless the primary use of the water to be impounded shall be in Gunnison County or downstream of Gunnison County in the Gunnison and/or Colorado River basins, there will be significant net adverse effect to surface or ground water quality within the impact area;

        3. **CROSS-BASIN OR OUT-OF-BASIN IMPOUNDMENT.** There is a rebuttable presumption that, unless the primary use of the water to be impounded shall be in the same basin as the water body from which it flows, there will be significant net adverse effect to surface or ground water quality within the impact area; and

    b. **HYDROLOGIC FUNCTION AND CAPACITY.** The hydrologic capacities or functioning of streams, floodplains, wetlands and riparian areas, lakes and reservoirs in the impact area;

    c. **AIR QUALITY.** Air quality in the impact area;

    d. **VEGETATION.** Vegetation in the impact area except that which is actually inundated;

    e. **ANIMALS.** Terrestrial and aquatic animals and their habitat in the impact area;

    f. **THREATENED OR ENDANGERED SPECIES.** Threatened or endangered species as defined in C.R.S. 33-1-102 as it may be amended, within the impact area;

    g. **SOILS AND GEOLOGIC CONDITIONS.** Soils and geologic conditions within the impact area;

    h. **EXISTING LAND USES.** Existing land uses (except those owned by the applicant), public services and facilities, and government revenues and expenditures;

    i. **UNIQUE AREAS OF INTEREST.** Areas of geological, paleontological, ecological, historic or archaeological importance within the impact area;

    j. **PUBLIC ROADS.** Public roads and their uses, including hours during which vehicles related to the Project will be operating;

    k. **HISTORIC PUBLIC ACCESS.** Historic public access;

    l. **ADJOINING OR OTHER LANDS.** Impacts on adjoining or other affected lands in the impact area; or,

    m. **VISUAL IMPACTS.** Visual impacts in the impact area shall require mitigation. However, a Project shall not be denied solely on its inability to mitigate visual impacts totally.

    n. **ACREAGE AND LOCATION INUNDATED.** The amount of surface acreage inundated and its location.

2. **TECHNICAL FEASIBILITY OF THE PROJECT.** The proposed development is technically feasible.

3. **ABILITY TO DEVELOP THE PROJECT.** The applicant has the technical and financial ability to develop and operate the proposed development in a manner that is consistent with the permit conditions and public health, safety and welfare.

4. **OTHER APPLICABLE COUNTY PERMIT REQUIREMENTS HAVE BEEN MET.** The Project for which the impounded water is intended currently to be used has received each applicable approval or permit from Gunnison County.

BLM_0054169

5. **COMPLIANCE WITH APPLICABLE DESIGN STANDARDS**. All Projects shall comply with the requirements of Section 13-114: *Exterior Lighting*. Requirements for mitigation of impacts may also be imposed, pursuant to Article 10: *Locational Standards*, Article 11: *Resource Protection Standards*, Article 12: *Development Infrastructure Standards*, and Article 13: *Project Design Standards*, if they are applicable to elements specific to individual Projects.

H. **STANDARDS OF APPROVAL**. Any Land Use Change Permit approved for a water impoundment that requires a Land Use Change Permit pursuant to this Section shall include the condition that the applicant shall provide the County a copy of any maintenance and operations report as prepared for the Colorado Division of Water Resources. The County shall also, upon approval of the Permit, submit a request to the Colorado Division of Water Resources that the County be notified when the agency notifies the owner that there has been an error in the maintenance or operation of the approved facility.

I. **APPROVAL FOR LAND USE CHANGE PERMITS ONLY**. Approval by Gunnison County of a Land Use Change Permit for a new, modified or expanded water impoundment structure and its operation in no manner implies approval of the design, concept, construction or maintenance program of the dam structure.

## SECTION 13-119: STANDARDS TO ENSURE COMPATIBLE USES

A. **GENERAL.** Proposed land use changes shall be designed, constructed, and maintained in a manner that will not adversely affect the character and tranquility of nearby residential or public use areas, as well as the following:

1. **HAZARDS OR NUISANCES**. Land use changes shall not subject other uses to undue noise, dust, fumes, odor, explosion, aircraft flight patterns, or other hazards or nuisances, whether the result of design, location, basic character, or of planned or reasonably expected growth.

2. **ADVERSE IMPACTS TO ADJOINING LAND**. Land use changes shall eliminate or minimize or mitigate conflicts between adjoining land uses and to the maximum extent feasible, avoid changes that will result in significant net adverse impact to adjoining land.

B. **ADDITIONAL COMPATIBILITY REQUIREMENTS**. As a condition of approval for Land Use Change Permits and in addition to any other requirements of this *Resolution*, the applicable review body may recommend and the decision-making body shall be authorized to impose conditions that are necessary to minimize any potentially adverse impacts. Such conditions may include the following:

1. **HOURS.** Limitation on hours of operation and deliveries;

2. **NOISE AND GLARE.** Relocation on a site of activities that generate potential adverse impacts neighborhood uses including noises and glare;

3. **TRASH.** Appropriate placement of trash receptacles;

4. **LOADING AND DELIVERY**. Appropriate location of loading and delivery areas;

5. **ILLUMINATION**. Appropriate lighting location, intensity, and hours of illumination;

6. **OUTDOOR SERVICES**. Appropriate placement and illumination of outdoor vending machines, telephones, and similar outdoor services and activities;

7. **LANDSCAPING.** The requirement of additional landscaping and buffering;

8. **HEIGHT AND SIZE RESTRICTIONS**. The imposition of height and size restrictions to preserve light, privacy, views of significant features from public property and rights-of-way, and to ensure reasonable compatibility of structure sizes;

9. **NATURAL LIGHTING**. Preservation of natural lighting;

10. **SOLAR ACCESS**. Preservation of solar access;

11. **ODORS AND FUMES**. Ventilation and control of odors and fumes; and

12. **DUST CONTROL**. The imposition of paving or other means as a dust control measure.

BLM_0054170

# ARTICLE 14:
# INCENTIVES

## SECTION 14-100: PURPOSES

The purposes of this Article are to provide alternatives to the minimum subdivision open space requirements of this *Resolution* to permanently conserve private lands that have value in open space, agriculture, wildlife habitat, wetlands or watershed protection by significantly limiting development.

**LARGE PARCELS SUBJECT TO DEVELOPMENT PRESSURE.** There are in Gunnison County large tracts of private land, including productive agricultural land, that are subject to increasing pressures to be divided and sold for development. County regulation and incentives that encourage appropriate development of that land as a whole will foster orderly planning and will provide significant public benefits, including maintenance of the open character of rural Gunnison County, continuation of agriculture in Gunnison County, and preservation of wildlife habitat, wetlands and watersheds in Gunnison County.

**ALTERNATIVES TO 35-ACRE TRACT EXEMPT SUBDIVISION APPROPRIATE**. The County is precluded by C.R.S. 30-28-101 (10) (c) (1) from regulating the subdivision of land into parcels all of which are 35 acres or greater in size. It is appropriate and in the public interest that the developers and owners of those large tracts of private land be given reasonable incentives to submit to County review and regulation an application for the division and development of large tracts as an alternative to the statutory 35-acre exemption described in C.R.S. 30-28-101 (c)(1).

BLM_0054171

BLM_0054172

# DIVISION 14-100:
# RESIDENTIAL DENSITY TRANSFER PROGRAM

**A. PURPOSE.** The purpose of this Division is to provide an effective and equitable tool to conserve ranchlands used in agricultural operations and other valuable natural lands, and to help protect those lands from development impacts.

**B. METHOD.** The Residential Density Transfer (RDT) program transfers units by providing the option of increased density through reduced open space in a new subdivision in exchange for cash payment to Gunnison County for the purchase of undeveloped land and/or conservation easements in areas where lower density development is desirable.

**C. APPLICABILITY.** Any Land Use Change Permit application involving residential subdivision or multiple-family subdivision consisting of five or more residential lots or residences ("Qualifying Development") may include a RDT pursuant to this Division.

**D. REDUCTION OF OPEN SPACE REQUIREMENTS FOR QUALIFYING DEVELOPMENT.** The amount of open space required of a Qualifying Development pursuant to *Section 13-108: G.: Residential Uses* may be reduced from 30 percent to 15 percent when the proposed Project conforms to the standards of this Division.

## SECTION 14-101: CALCULATING RESIDENTIAL DENSITY TRANSFER AMOUNT AND PAYMENT OF FEES

The calculation of RDT amount and payment of fees shall be as follows:

**A. VALUE ACQUISITION.** The RDT requirement is determined by calculating a percentage of the value increase given to land when a Qualifying Development is approved. Values used in this calculation shall be based on the non-agricultural land market value, as determined by the Gunnison County Assessor using mass appraisal techniques ("Mass Appraisal Value"). Specifically, the RDT amount equals 10 percent of the sum of the Mass Appraisal Value for all residential lots in the subdivision (A) minus the Mass Appraisal Value that existed for the subject property before the subdivision approval (B).

$$\text{RDT CALCULATION} = 10\% \times \left( \underset{\text{A}}{\underset{\substack{\text{SUM OF MASS APPRAISAL} \\ \text{VALUE FOR ALL} \\ \text{RESIDENTIAL LOTS IN} \\ \text{QUALIFYING} \\ \text{DEVELOPMENT}}}{} - \underset{\text{B}}{\underset{\substack{\text{MASS APPRAISAL VALUE OF} \\ \text{PROPERTY BEFORE THE} \\ \text{QUALIFYING DEVELOPMENT} \\ \text{WAS APPROVED}}}{}} \right)$$

**B. EXCLUDED LOTS.** Lots used exclusively for essential housing pursuant to Division 9-600: *Essential Housing* or mobile home units pursuant to *Section 9-203: Mobile Home Communities* shall be excluded from the RDT requirement calculation.

**C. MIXED DEVELOPMENT.** When residential and non-residential uses are located on the same lot, the calculation of (B) shall be accomplished by multiplying the Mass Appraisal Value of the property before the subdivision approval by the percentage of the lot containing or attributable only to residential use.

**D. TIMING.** The RDT amount shall be calculated by the County and be secured via an agreement acceptable to the County Attorney's Office prior to recording the final plat. When the Assessor value is unavailable before the final plat is ready for recording, the Board of County Commissioners shall establish a preliminary lot value to calculate an initial RDT amount that will serve until the Assessor values are available. Lot value estimates shall be calculated by averaging the current Mass Appraisal Values of the most similar lots available, as recommended by the Assessor and subject to approval by the County Attorney.

**E. FINAL CALCULATION.** When an initial RDT amount is used, the County shall notify the applicant when the final Mass Appraisal Values become available. At that time and in accordance with the County-approved agreement, adjustments to the RDT amount, RDT compliance method, and security shall be made, subject to approval by the County Attorney, to ensure the RDT requirements are fully met. The final calculation shall only be used when it decreases the RDT amount and the difference shall be reimbursed or recalculated.

**F. RDT PAYMENT.** At the discretion of the applicant, either all or a portion of the RDT amount shall be paid before the final subdivision plat is recorded, or incrementally with the sale of individual lots. Cash received before the plat is

BLM_0054173

recorded shall qualify for a 10 percent early payment discount.  When the incremental payment method is chosen, the amount apportioned to lots shall be relative to lot value and shall be paid at the close of sale on the lot.

## SECTION 14-102: STANDARDS FOR USE OF RDT FUNDS

A.  **RDT REQUIREMENT COMPLIANCE.** Monies collected by Gunnison County pursuant to the RDT program shall be placed into a segregated interest bearing account.  Gunnison County shall use funds received pursuant to this Division solely for the purchase of a qualifying conservation easements, restrictive covenants, or fee simple lands located in Gunnison County that permanently conserves private lands that have value in open space, agriculture, wildlife habitat, wetlands, or watershed protection by significantly limiting development; and

B.  **RDT FUNDS EXPENDITURE APPROVAL.**  Funds acquired by the County through the RDT program shall not be expended without prior written approval of the Board of County Commissioners.

BLM_0054174

# ARTICLE 15:
# RIGHT-TO-RANCH POLICY

**COLORADO STATUTE PROTECTS AGRICULTURAL ACTIVITIES**. It is the declared policy of the State of Colorado, pursuant to C.R.S. 35-3.5-101 *et seq*: to conserve, protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products.

**GUNNISON COUNTY IS CHANGING**. Population increases affect many elements of the community that is Gunnison County, including development in areas that have been rural for decades. When non-agricultural residents move into traditionally agricultural areas, conflict may occur. Gunnison County has a viable economic and cultural agricultural history. When agricultural operators and residents, and non-agricultural residents and visitors collide, the economic viability of agricultural operations, and the rural heritage that enriches the quality of life in the County, may be threatened.

**CONFLICTS BETWEEN AGRICULTURAL USES AND DEVELOPMENT**. Conflicts between agricultural operations and developed areas can arise from harassment of livestock, free roaming dogs threatening livestock and/or wildlife, trespass by humans and livestock, livestock on roadways, gates left open, fence construction and maintenance, maintenance of ditches across private property, storm water management, burning of ditches, complaints about noise, dust and odor, disposal of dead animals, noxious weeds, pest control, and chemical application issues.

## SECTION 15-101: PURPOSES

A. **INTENT TO ENCOURAGE AGRICULTURE AND PRESERVE RANCHERS' RIGHTS**. It is the purpose of this Section to conserve, protect, and encourage the continued use and improvement of traditional ranching lands in Gunnison County for the production of agricultural products. Additionally, the *Right-to-Ranch Policy* is designed to preserve the right of ranchers to produce, without unnecessary interference, agricultural products using generally accepted agricultural practices and to discourage the encroachment of non agricultural land uses into rural areas. Gunnison County in adopting this Policy intends:

1. **TO ENCOURAGE RESPONSIBLE RANCHING**. To conserve, enhance, and encourage responsible ranching and farming, and lawful agricultural activities and operations within and throughout the county where appropriate.

2. **TO PROTECT AGRICULTURAL ACTIVITIES FROM COMPLAINTS.** To protect agricultural operators from complaints concerning agricultural activities that are legal and responsible.

3. **TO EDUCATE THE PUBLIC.** To educate the public and visitors and nonagricultural residents of the County about the existence, validity, and importance of the county's agricultural operations and activities.

4. **TO ASSIST IN DISPUTE RESOLUTION.** To provide a forum for the informal and non-binding resolution of disputes between agricultural operators and nonagricultural residents and visitors to the county.

5. **TO MINIMIZE CONFLICT BETWEEN AGRICULTURAL AND OTHER USES.** To minimize potential conflicts between agricultural and non-agricultural users of land in the county. To educate new rural residents and long-time agricultural operators alike to their rights, responsibilities, and obligations relating to agricultural activities.

## SECTION 15-102: APPLICABILITY

The requirements of this Section shall apply to all Land Use Change Permit applications in Gunnison County. This Right-to-Ranch policy is not intended to apply to general agricultural operations not related to ranching or to small-scale hobby farms or ranches. The protections of this Section, including the limitations on actions for private or public nuisance, are applicable only to agricultural operations as defined by this *Resolution*.

A. **LANDOWNER'S RIGHT TO PUT LAND INTO ALTERNATIVE USE**. The requirements of this Section shall not prevent an owner from selling his/her land or prevent or hinder the owner in seeking approval to put the land into alternative use.

## SECTION 15-103: EFFECTS OF ADOPTION OF RIGHT-TO-RANCH POLICY

A. **ADOPTION OF THE RIGHT-TO-RANCH POLICY**. Upon the effective date of this *Resolution*, and therefore the adoption of this Right-to-Ranch Policy, the Board establishes that:

BLM_0054175

*SECTION 15-103: EFFECTS OF ADOPTION OF RIGHT-TO-RANCH POLICY*

1. **RANCHING IS INTEGRAL TO GUNNISON COUNTY**. It is the policy of the Board that continued ranching and farming within Gunnison County are integral elements of and necessary for the continued vitality of the county's history, tourism, economy, landscape, open space, lifestyle, and culture.

2. **AGRICULTURAL OPERATIONS WARRANT PROTECTION**. Given their importance to the county, the Western Slope of Colorado, and to the State, agricultural lands and operations are worthy of recognition and protection. Because, by law, Colorado is a "Right-to-Farm" State, residents and visitors must be prepared to accept the activities, sights, sounds, and smells of Gunnison County's agricultural operations as a normal and necessary aspect of living in a County with a strong rural character and a healthy agricultural sector.

3. **LAWFUL RANCHING IS NOT A NUISANCE**. People with urban expectations may perceive agricultural activities, sights, sounds, and smells as inconvenient, an eyesore, or unpleasant; however, state law and County policy provide that ranching, farming, or other agricultural activities and operations within the county shall not be considered to be nuisances so long as operated in conformance with the law and in a non-negligent manner.

4. **OTHER LAND USERS ON NOTICE**. Residents and visitors must be prepared to encounter noises, odors, lights, mud, dust, smoke, chemicals, machinery and livestock on public roads, storage and disposal of manure, and the application of chemical and organic fertilizers, soil amendments, herbicides, and pesticides, by spraying and other mechanisms, pursuant to applicable local, state and federal laws.

5. **FENCING RESPONSIBILITIES**. All landowners, whether agricultural operators or residential owners, have obligations under state law and County regulation, to maintain fences and adhere to Colorado laws that require livestock to be fenced out, rather than in.

6. **IRRIGATORS' RIGHT TO MAINTAIN DITCHES**. Pursuant to Colorado law and Section 11-109: *Development That Affects Agricultural Lands* irrigators have the right to maintain irrigation ditches, head-gates and other diversion structures. Irrigation ditches are not to be used for the dumping of refuse.

   a. **IRRIGATION DITCH EASEMENTS**. Pursuant to Section 11-109: G. 2.: *Irrigation Ditch Easements*, a maintenance easement of at least 25 feet from the edges of the ditch banks shall be preserved and indicated on a Final Plat for subdivision. For parcels that are the subject of Land Use Change Permits, Building Permits or Individual Sewage Disposal System Permits, access for maintenance of an irrigation ditch is required to be 25 feet from each ditch bank. When approved in notarized written form by the ditch owner(s), that distance may be decreased and existing historical easements used to gain access to ditches, headgates, and fences for maintenance or operational purposes shall be preserved or replaced with reasonable alternate easements suitable for continuation of the historic use.

7. **LANDOWNERS' RESPONSIBILITIES**. All landowners are responsible for controlling noxious weeds, keeping pets under control, using property in accordance with this *Resolution* and all other applicable codes and regulations adopted by the County, and maintaining the environmental resources of their property wisely.

B. **LIMITATION ON PRIVATE ACTION**. An agricultural operation shall not be found to be a public or private nuisance if the agricultural operation alleged to be a nuisance employs methods or practices that are commonly or reasonably associated with agricultural production. An agricultural operation that employs methods or practices that are commonly or reasonably associated with agricultural production shall not be found to be a public or private nuisance as a result of any of the following activities or conditions:

1. **CHANGE IN OWNERSHIP**. Change in ownership; or

2. **NONPERMANENT INTERRUPTION**. Nonpermanent cessation or interruption of farming or ranching; or

3. **PARTICIPATION IN GOVERNMENT PROGRAM**. Participation in a government-sponsored agricultural program; or

4. **NEW TECHNOLOGY**. Employment of new technology; or

5. **PRECEDED NON-AGRICULTURAL ACTIVITIES IN THE AREA.** The agricultural operation was established before non-agricultural activities began in the area around the agricultural operation; or

6. **IS NOT OPERATING NEGLIGENTLY**. Is not operating negligently.

   a. **REBUTTABLE PRESUMPTION OF NON-NEGLIGENT OPERATION**. Employment of methods or practices that are commonly or reasonably associated with agricultural production shall create a rebuttable presumption that an agricultural operation is not operating negligently.

C. **INCORPORATING THIS POLICY INTO GUNNISON COUNTY PERMIT APPROVALS**. In reviewing any application for a Land Use Change Permit, the applicable review body shall, to the maximum extent feasible, ensure that such

BLM_0054176

change does not adversely affect any existing agricultural operation on land not a part of the land use change, including maintenance of historic irrigation ditches and access to active agricultural operations The following shall be included in the County's approval of permits:

1. **INFORMATION TO BE PROVIDED TO BUILDERS ADJACENT TO AGRICULTURAL OPERATIONS.** When a Building Permit is issued for new construction in unincorporated areas of the county that are adjacent to agricultural operations, Building Permit applicants shall be provided with a copy of this *Policy*, and a copy of Gunnison County's *Code of the West*

2. **NOTIFICATION REQUIRED FOR LAND USE CHANGE PERMITS.** As of the effective date of this *Resolution*, pursuant to this Policy, notification of existence of this Policy and of Gunnison County's *Code of the West* shall be required to be included in the recorded resolution approving any Land Use Change Permit, and, as applicable, on the recorded plat of any subdivision that is located adjacent to an agricultural operation.

## SECTION 15-104: CONFLICT RESOLUTION PROGRAM

A. **AGRICULTURAL LAND USE CONFLICT RESOLUTION PROGRAM.** There is hereby created an Agricultural Land Use Conflict Resolution Program for providing a forum for the resolution of conflicts between or among landowners and/or residents regarding agricultural operations or practices referenced in this Section and occurring within Gunnison County.

1. **MEDIATION PANEL TO RESOLVE CONFLICTS.** A mediation panel shall be appointed for hearing grievances regarding agricultural land use conflicts between Gunnison County agricultural operations and other residents. The mediation panel shall have the responsibility for making recommendations for the resolution of those conflicts.

   a. **APPOINTED MEMBERS.** The panel shall be made up of a pool of four year-round residents of Gunnison County, appointed by the Board of Commissioners. Each member shall serve a term of two years, except that one member of the initial panel shall be appointed for a one year term in order to stagger the terms of the panel.

   b. **QUALIFICATIONS TO SERVE.** Priority in appointment shall be given to individuals with mediation, arbitration, and other dispute resolution skills; however, experience in ranching or farming shall be mandatory for at least one member of the panel.

   c. **COMPENSATION.** Members of the panel shall receive no compensation, but may receive reasonable expenses incurred in the carrying out of their duties, and the County shall make reasonable staff time and other in-kind resources available to the panel, as needed.

2. **PROCESS AND RULES.** The initial mediation panel shall draft and recommend rules or process for the hearing of grievances by the panel. Once drafted, such rules or process shall be presented to the Board for its approval and adoption. Any amendments to such rules and process shall be made in the same manner. The rules or process recommended by the panel and adopted by the Board shall conform in the minimum to the following:

   a. **INFORMAL HEARINGS.** Hearing of grievances shall be informal and appearances before the panel shall be by the parties themselves or their official representative. A party may be represented by legal counsel to receive general advice on how to proceed or whether to accept a resolution recommended by the panel, but such legal counsel may not make an appearance in person, in writing, or otherwise, before the panel.

   b. **ACCEPTANCE OF RECOMMENDATIONS.** Hearing of grievances and acceptance of any recommendation of the panel shall be voluntary; the process is not mandatory and the results are not binding on either party, unless the parties by mutual written agreement agree that they shall be bound by the decision of the mediation panel.

   c. **CONFIDENTIALITY.** All proceedings shall be confidential and no panel member or other county staff shall disclose any information discovered or made known in the course of any grievance proceeding, without consent by the parties.

BLM_0054177

BLM_0054178

# ARTICLE 16:
# ENFORCEMENT

## SECTION 16-101: GENERAL

A. **ENFORCEMENT SHALL COMPLY WITH ALL APPLICABLE LAW.** This *Resolution* shall be enforced in accordance with the requirements of Colorado law and as provided in this Article. Each enforcement remedy can be invoked by Gunnison County independently or in conjunction with any or all of the other enforcement remedies.

B. **OWNER HAS BURDEN OF PROOF OF COMPLIANCE.** The burden of proof that a project is in compliance with this *Resolution* lies with the owner of the land on which the project is occurring.

C. **ENFORCEMENT COSTS ARE OWNER/PERMITTEE RESPONSIBILITY.** The costs of any County investigation of the violation and the costs of the hearing and Board action, including incidental expenses of abating the violation, shall be the responsibility of the landowner and permittee, jointly and severally. The term "incidental expenses" shall include personnel costs, both direct and indirect; costs incurred in documenting the violation; the actual expenses and costs to the County in the preparation of notices, specifications and contracts, and in inspecting the work; and the costs of printing and mailing, and attorney's fees required. The County shall provide written notice of those costs to the permittee and landowner by first class mail at the last known address. If the landowner or permittee fails to pay those costs within 30 days of the County mailing, the costs shall become a lien against the subject land or any improvement on the subject land.

D. **IMPLEMENTATION OF MITIGATION DOES NOT RELIEVE PERMITTEE OF RESPONSIBILITY FOR COMPLIANCE WITH STANDARDS.** Implementation of mitigation does not relieve permittee's responsibility to comply with all County standards and criteria. Failure to conduct the project in compliance with standards and criteria at any time shall be deemed a permit violation and may result in enforcement and/or require a permit amendment to address whether standards and criteria can be satisfied with different mitigation or change in project operations.

## SECTION 16-102: AUTHORIZATION TO ENFORCE

The Board, County Manager, County Community Development Director, the Community Development Director's designees, County Attorney, County Building Inspector, County Environmental Health Official, County Public Works Director and such other persons as the Board may designate are charged with and authorized to enforce all the requirements of this *Resolution*.

## SECTION 16-103: RIGHT OF ENTRY AND INSPECTION

When a person charged with enforcement of this *Resolution* has reasonable cause to believe that any project is being conducted or any condition exists on a tract of land or in any building or other structure which is contrary to or in violation of this *Resolution* or any permit issued pursuant to this *Resolution*, any person charged with enforcement of this *Resolution* may enter and inspect or cause to be entered and inspected, the tract, building or other structure at reasonable times to determine compliance with this *Resolution* or that permit, provided that if that tract, building or other structure is occupied, credentials shall be presented to the occupant and entry requested. If the tract of land, building or other structure is unoccupied, such person shall first make a reasonable effort to locate the owner or other person having charge or control of the tract, building or other structure and request entry. If entry is refused, or the owner or person having charge or control cannot be located after reasonable effort, the Board or its designee shall apply to the District Court, Gunnison County, for an order to permit entry. Nothing in this Section precludes or constrains any entry upon or into, or inspection of, any land or into a building otherwise permitted by law.

## SECTION 16-104: NOTIFICATION TO CORRECT VIOLATION

When a person charged with enforcement of this *Resolution* has reasonable cause to believe that any project is being conducted or any condition exists on any tract of land or in any building or other structure which is contrary to or in violation of this *Resolution* the County Attorney shall give written notice to the land owner or other person having charge or control of such tract, building or other structure, by certified mail, return receipt requested at the last known address. The notification shall state which requirements of this *Resolution* or of a permit are being violated, shall state the conditions that are to be satisfied for compliance, and shall state that the violator shall immediately initiate correction of the violation to be

BLM_0054179

substantially complete within 30 days of receipt of the notification. Such written notification is cumulative to, and not a prerequisite to, any other enforcement remedies available to Gunnison County. The Community Development Director shall issue a written compliance letter only if the project or condition that is the basis of the notice has been remedied.

# SECTION 16-105: STOP ORDER; IMMEDIATE COMPLIANCE

A. **COMMUNITY DEVELOPMENT DIRECTOR MAY ISSUE ORDER**. When a person charged with enforcement of this *Resolution* has reasonable cause to believe that any project is being conducted or any condition exists on any tract of land or in any building or other structure which is contrary to or in violation of this *Resolution* or any permit issued pursuant to this *Resolution* the Community Development Director may, by written notice ("stop order"), order the activity or use stopped immediately or by a time certain. The stop order shall state the conditions that shall be satisfied for compliance. The stop order shall be served by delivering it to any person engaged in that activity or use, or to any person owning, leasing, or controlling the land, building or other structure, or by posting the order in a conspicuous location on the land, building or other structure.

B. **IMMEDIATE COMPLIANCE REQUIRED.** All persons shall comply immediately with the stop order upon its service or posting, as set forth above.

C. **STOP ORDER LIFTED ONLY BY COMPLIANCE ORDER**. The stop order shall remain in effect until the Community Development Director determines that the activity or condition that is the basis for the stop order has been remedied, and the Community Development Director issues a written compliance order that is served by Gunnison County.

D. **DISCRETIONARY BOARD REVIEW.** The Board may review and amend the stop order if the permittee or landowner demonstrates that such amendment is warranted and will not result in an amendment to the subject permit.  Any proposed amendment to the subject permit shall comply with all other applicable requirements of this *Resolution*.

E. **STOP ORDER NOT A PREREQUISITE TO OTHER REMEDIES.** The issuance of a stop order is cumulative to, and not a prerequisite to any other enforcement remedies available to Gunnison County.

# SECTION 16-106: TEMPORARY SUSPENSION OR PERMANENT REVOCATION OF PERMIT

A. **TEMPORARY SUSPENSION OR PERMANENT REVOCATION OF PERMIT UPON VIOLATION.**

1. **BOARD ACTION AFTER WRITTEN NOTICE TO PERMITTEE.** The Board may temporarily suspend or permanently revoke an approved Permit if the provisions of any permit or the terms of any related Development Improvement Agreement have been violated.  Before making such a temporary suspension or permanent revocation, the Board shall give the permittee written notice of the violation, by certified mail. The Board shall allow the permittee to correct the violation within 30 calendar days from the date of receipt of the notice.

2. **PERMITTEE OPPORTUNITY TO PROVIDE EVIDENCE IN RESPONSE**. If the permittee believes that the notice of violation has been issued in error, the permittee shall, within 15 calendar days from the date of receipt of the notice, provide evidence satisfactory to the County to show that the determination is in error.

B. **PUBLIC HEARING.** The Board shall conduct a hearing to determine if the permit shall be temporarily suspended, permanently revoked or that there is no demonstrated violation.

1. **NOTICE AND CONDUCT OF HEARING.** The Board shall give written notice of the hearing to the permittee by mailing notice, certified, return receipt requested at the last known address, postmarked at least 14 days before the hearing. The notice shall contain a summary of the grounds for the potential suspension or revocation.

2. **HEARING DATE MAY BE ADVANCED.** The County Manager shall make reasonable efforts to schedule an expedited hearing if requested by the permittee, and/or if irreparable harm may occur if the hearing process is not completed in an expedited manner.

3. **CREDIBLE EVIDENCE REQUIRED TO SUSPEND OR REVOKE.** At the hearing, the County shall have the burden to demonstrate, by credible evidence presented at the hearing, that the permit should be temporarily suspended or permanently revoked.

C. **GENERAL STANDARDS.** The permit shall be suspended or revoked if, after the close of the hearing, and based on credible evidence, either of the following findings is made by the Board:

1. **PERMIT ISSUANCE WAS BASED ON MISLEADING INFORMATION OR MISREPRESENTATION.** The permit was issued in reliance on materially erroneous or misleading information from the permittee or his/her representative; or

BLM_0054180

2. **VIOLATION OF CONDITIONS OF PERMIT OR APPLICABLE REGULATION.** Activity is being conducted or a condition exists on the tract of land or in the building or other structure that is a violation of the subject permit, or any applicable regulation.

D. **DECISION OF BOARD.** Within five working days after the close of the hearing, the Board shall render a decision based upon its findings that there is no violation of the permit, or that there is a violation and the permit is temporarily suspended or permanently revoked, and the effective date of such suspension or revocation.

E. **NOTIFICATION.** Notification of the Board's decision shall be provided by the Community Development Director to the permittee, by certified mail postmarked within five working days of the Board's decision.

F. **SUSPENSION LIFTED ONLY BY COMPLIANCE FINDING.** A suspension order shall remain in effect until,  at a regular meeting of the Board, the Board finds that the activity or condition that is the basis for the suspension order has been remedied, and the Board issues a written compliance finding.

G. **CUMULATIVE REMEDY.** The Board's right to suspend or revoke a permit as provided in this Section shall be cumulative to, and not a prerequisite to, any other enforcement remedies available to the Board.

## SECTION 16-107: ABATEMENT OF VIOLATION

Any violation of this *Resolution* or of a permit issued pursuant to this *Resolution* may be abated under the process and standards of this Section.

A. **PROCESS FOR ABATEMENT.**

1. **NOTIFICATION OF VIOLATION.** If, after investigation by any person charged with enforcement of this *Resolution*, or the Board determines that reasonable cause exists to believe that any activity is being conducted or any condition exists on any tract of land or in any building or other structure which is contrary to or in violation of this *Resolution* or any permit issued pursuant to this *Resolution*, the Board shall serve the permittee, by certified mail, return receipt requested, with a Notice to Abate, stating the grounds of the violation, and setting forth a reasonable time for the permittee to abate and correct the violation.

2. **HEARING TO CORRECT VIOLATION.** If the permittee fails to comply with the Notice to Abate, the Board shall conduct a hearing on abatement to ascertain whether abatement should be conducted.

3. **NOTICE OF HEARING.** The Board shall provide notice of the Hearing on Abatement to the permittee or landowner and any complainant by certified mail, return receipt requested at the last known address, a minimum of 14 days before the date established for the hearing. Notice shall be substantially in this format:

### Notice of Hearing on Abatement of Violation of
### Gunnison County Land Use Resolution

*This is a notice of hearing before the Board of County Commissioners of Gunnison County, Colorado, to ascertain whether certain activity being conducted on, or condition existing on, a tract of land, in any building or other structure situated in unincorporated Gunnison County, Colorado, known and designated as _____(address)_____, in said County, and more particularly described as _____(legal description)_____ with Tax Parcel No. _____, constitutes a violation of the Gunnison County Land Use Resolution  and is subject to abatement pursuant to this Resolution. If the violation is not promptly abated by the permittee or landowner, such violation may be abated by Gunnison County, in which case the cost of that abatement will be assessed on such land, and the costs, together with interest thereon, shall constitute a lien on such until paid.*

*Said alleged violation does not comply with Section _____ of the Gunnison County Land Use Resolution,  and consists of the following: _____.*

*The method(s) of abatement are: _____.*

*All persons having an interest in said matters may attend the hearing and their testimony and evidence will be heard and given due consideration.*

*Dated this _____ day of _____, 20___.*

*Time and Date of Hearing: _____.*

4. **DECISION BY BOARD.**

BLM_0054181

    **a.** **GENERAL.** At the time stated in the notice of the hearing on abatement, the Board shall conduct a hearing pursuant to the requirements of this Section, and shall hear and consider all relevant evidence, objections or protests, and shall hear testimony of the alleged violator, if desiring to testify, and all other persons having an interest in the hearing.

**5.** **CONTINUANCE.** The Board may continue the hearing to a specific date and time for good cause.

**6.** **RECOMMENDED ORDER.** If, after the conclusion of the hearing, the Board finds that a violation of the this *Resolution* does exist and there is sufficient cause to abate the violation, within five days after the close of the hearing the County Attorney shall prepare a recommended Order to Abate with findings of fact specifying the nature of the violation, the method of abatement and the time within which the abatement shall be commenced and completed. The recommended Order to Abate shall then be forwarded to the Board for adoption.

**7.** **BOARD DECISION.** At its next regularly scheduled meeting, the Board shall take action on the recommended Order to Abate.

**8.** **NOTIFICATION OF RECOMMENDED ORDER.** The County Attorney shall provide the permittee a copy of the recommended Order to Abate by certified mail, return receipt requested at the last known address, postmarked the day the recommended Order to Abate is forwarded to the Board for adoption.

**9.** **BOARD DECISION.** At the next regularly scheduled meeting of the Board after receipt of the recommended Order to Abate, the Board shall approve the Order to Abate or a modified version of it, if there is competent evidence in the record that a violation of this *Resolution* does exist and there is sufficient cause to evict or relocate an illegal use or rehabilitate, demolish, remove or repair an illegal structure.

**10.** **NOTICE OF ORDER.** The Board shall provide a copy of the decision to the landowner by certified mail, return receipt requested.

**B.** **EFFECT OF ORDER TO ABATE.** If an Order to Abate is issued it shall mean that the land, building or structure is in violation of this *Resolution*, and the illegal activity shall be discontinued and rehabilitated, repaired, removed, or demolished in the manner and means specifically set forth in the Order to Abate, including but not limited to the abatement being performed by Gunnison County.

**C.** **ABATEMENT BY COUNTY.** If the violation is not abated pursuant to the Order to Abate within the prescribed abatement period, the County Manager shall cause the violation to be abated by County employees or by private contract, or by any other means provided by Colorado law. The County Manager is authorized to enter upon land for those purposes. In addition to the costs regarding the Order to Abate, the landowner shall be responsible to pay all costs, including incidental expenses, of the abatement by the County. The County shall provide written notice of those costs to the landowner by first class mail at the last known address. If the landowner fails to pay those costs within 30 days of the County mailing, the costs shall become a lien against the subject land or any improvement on the subject land.

**D.** **CUMULATIVE REMEDY.** The Board's right to abate a violation of this *Resolution* or of any permit issued pursuant to this *Resolution*, as provided in this Section, shall be cumulative to, and not a prerequisite to, any other enforcement remedy provided by this *Resolution*.

## SECTION 16-108: NO PROCESSING OR APPROVAL FOR LAND OR PERMITTEE SUBJECT TO ENFORCEMENT

No permit application shall be processed or approved pursuant to this *Resolution*, and no other Gunnison County permit shall be issued by Gunnison County, for property or permittee that is the subject of an existing Stop Order, Suspension Order, or Order of Abatement. The enforcement remedy provided by this Section shall be cumulative to, and not a prerequisite to, any other enforcement remedy provided by this *Resolution*.

## SECTION 16-109: NO ACTION FOR PERSONS SUBJECT TO ENFORCEMENT ORDERS

No application shall be processed or approved pursuant to this *Resolution*, and no other Gunnison County permit shall be issued by Gunnison County, for or to any person who is responsible for a violation that is the subject of an existing Stop Order, Suspension Order or Order of Abatement. The enforcement remedy provided by this Section shall be cumulative to, and not a prerequisite to, any other enforcement remedy provided by this *Resolution*.

BLM_0054182

# SECTION 16-110: REVIEW OF POTENTIAL VIOLATION AND NECESSARY REMEDIATION BEFORE PERMIT APPLICATION

A. **COMMUNITY DEVELOPMENT DEPARTMENT REVIEW.** When any activity has begun or any condition exists on a tract of land or in any building or other structure without the necessary permit having been obtained pursuant to this *Resolution* the Community Development Director shall conduct a review to determine what remediation must occur before a permit application will be accepted to consider that activity or condition.

B. **REVIEW FEE.** A review fee, in addition to the application fee, shall be collected whether or not a permit is issued based on the application. The review fee shall be equal to three times the amount of the application fee and payable at the time of the application.

C. **FEE PAYMENT OR FILING OF APPLICATION DOES NOT PROVIDE EXEMPTION FROM OTHER REQUIREMENTS.** Neither the payment of the review fee nor the filing of an application shall exempt any person from compliance with all other requirements of this *Resolution* and all other applicable regulations or relieve any person from any other enforcement remedies available to Gunnison County.

D. **CUMULATIVE REMEDY.** The requirement of a review pursuant to this Section shall be cumulative to, and not a prerequisite to, any other enforcement remedy provided by this *Resolution*.

# SECTION 16-111: REQUIREMENTS REGARDING SUBDIVISION OF LAND

In addition to the enforcement remedies provided in this *Resolution*, but not as a prerequisite to any of them:

A. **FINE FOR TRANSFERRING TITLE BEFORE FINAL PLAN APPROVAL AND FILING OF WARRANTS.** Pursuant to C.R.S. 30-28-110(4)(a) as it may be amended, any subdivider or agent of a subdivider, who transfers legal or equitable title or sells any subdivided land before a Final Plat for subdivided land has been approved by the Board and recorded or filed in the Office of the County Clerk and Recorder, is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than $1,000 nor less than $500 for each parcel of, or interest in, subdivided land which is sold. All fines collected under this Section shall be credited to the General Fund of Gunnison County.

B. **LOTS MAY NOT BE SOLD BEFORE FINAL APPROVAL.** Pursuant to C.R.S. 30-28-110(4)(b) as it may be amended, the Board has the power to bring an action to enjoin any subdivider from selling subdivided land before a Final Plat for such subdivided land has been approved by the Board and properly recorded.

C. **TAXES TO BE PAID.** An application for any land use change, any subdivision of land or the subsequent phasing of an approved subdivision of land or issuance of any related County permits shall be placed on inactive status pursuant to Section 3-105: B.: *Withdrawn and Inactive Applications* if the real property taxes for the subject parcel are determined by the Gunnison County Treasurer's Office to be delinquent in whole or in part. No plat for subdivided land shall be approved by the Board unless at the time of the approval of platting the applicant provides the certification of the County Treasurer's office that all real property taxes applicable to that subdivided land, up to the year in which approval is granted, have been paid.

# SECTION 16-112: OTHER REMEDIES

A. **CIVIL REMEDIES.** Any person violating any provision of this *Resolution* shall be subject to all civil sanctions and penalties authorized by law, including Sections 30-28-124 C.R.S. and 124.5 C.R.S. as they may be amended. For purposes of civil sanctions the County may seek, this *Resolution* shall be considered to be a zoning resolution. A civil sanction and penalty may be assessed for each day the violation exists.

B. **CRIMINAL REMEDIES.** Any person violating any provision of this *Resolution* shall be subject to all criminal sanctions and penalties authorized by law, including but not limited to Sections 30-28-124, 124.5, and 16-13-301 C.R.S., *et seq.* as they may be amended. For purposes of criminal sanctions the County may seek, this *Resolution* shall be considered to be a zoning resolution. A sanction and penalty may be assessed for each day the violation exists.

C. **CUMULATIVE REMEDY.** The Board's right to seek civil and/or criminal remedies shall be exercised only by the Board and shall be cumulative to, and not a prerequisite to, any other enforcement remedies provided by this *Resolution*.

D. **FEES.** The Board shall be entitled to recover from any person violating any provision of this *Resolution* all reasonable attorneys' fees as well as all reasonable costs including staff time incurred in enforcing requirements of this *Resolution*.

BLM_0054183

## SECTION 16-113: NO PERSONAL LIABILITY

Any County official, employee or agent charged with the enforcement of this *Resolution* who acts in good faith in the discharge of the duties required by this *Resolution* or other pertinent law, ordinance, regulation or *Resolution* shall not thereby be rendered personally liable for any damages that may accrue to any person or property as a result of an act or omission to act in the discharge of those duties.

## SECTION 16-114: NO COUNTY LIABILITY

This *Resolution* does not make, and shall not be construed to make, Gunnison County, or any of its officials, employees or agents responsible or liable for any injury to persons or property resulting from any action taken pursuant to this *Resolution*.

## SECTION 16-115: RESPONSIBILITY NOT LESSENED

This *Resolution* does not and shall not be construed to relieve from or lessen the responsibility of any person owning or controlling any land for any damages to persons or property caused by use of such land for which a permit was issued pursuant to this *Resolution*.

## SECTION 16-116: NO WAIVER BY GUNNISON COUNTY OF STATUTORY AUTHORITY

Nothing in this Article 16 is, or shall be construed to be, a waiver by Gunnison County of any statutory authority including the authority identified in Section 24-32-2109, C.R.S., *Local Disaster Emergencies*, as it may be amended.

## SECTION 16-117: NO WAIVER BY GUNNISON COUNTY OF GOVERNMENTAL IMMUNITY

Nothing in this *Resolution*, and no act performed pursuant to this *Resolution*, is or shall be construed to be a waiver by Gunnison County, its officials, employees or agents of governmental immunity.

## SECTION 16-118: DEVELOPMENT IMPROVEMENT AGREEMENT REQUIRED

A. **DEVELOPMENT IMPROVEMENT AGREEMENT SHALL BE REQUIRED.** When public or private improvements are a required component of a Land Use Change Permit, the Board shall require as a condition of permit approval, in addition to the guarantees identified in C.R.S. 30-28-137 as it may be amended, that the applicant execute and fund with Gunnison County a Development Improvement Agreement acceptable to Gunnison County in form and substance, and amount and type of security. The Development Improvement Agreement shall constitute the applicant's agreement to construct the public improvements and private improvements identified as requirements of project approval. The Development Improvement Agreement shall specifically identify such requirements including plans, drawings and schedules for completion and shall be substantially in the form referenced in Section 16-117: E: *Form of Agreement.*

B. **FINANCIAL SECURITY.** The Development Improvement Agreement shall require the applicant to provide to the County a guarantee of financial security, acceptable to the County, in an amount established by the Board based on no less than 125 percent of the estimated cost of the project, and payable on demand to the County. The purpose of the guarantee of financial security is to assure that the public improvements and private improvements identified as requirements of project approval are timely and fully completed, that all mitigation requirements and permit conditions are timely and fully performed, and that the development area is timely and fully reclaimed.

C. **ENSURED COMPLETION OF IMPROVEMENTS.** The Development Improvement Agreement shall provide that if the Board determines that any of the required improvements are not timely and fully constructed or if any of the requirements of approval are not performed as provided in the Agreement, including reasonable requirements for the correction of deficiencies upon notice thereof, the Board may draw upon the financial security as may be necessary to complete the improvements in accordance with the specifications included in the Agreement and the Board may exercise any or all of the other remedies available to it pursuant to the Agreement and this *Resolution*.

D. **CERTIFICATION OF COMPLETION AND RELEASE OF SECURITY.** The Development Improvement Agreement may include requirements for certification of completion, partial releases of the security, hold-over of security to ensure repairs or replacement, demonstrated performance of required facilities, substitution of security, and other requirements deemed appropriate by the Board.

BLM_0054184

**E.  FORM OF AGREEMENT.** A general form of the Development Improvement Agreement is available in the County Attorney's office. This form of agreement may be modified from time to time by the County in its discretion without formal amendment to this *Resolution*.

BLM_0054185

*APPENDIX*

# APPENDIX

## Tables in the Appendix:

Appendix Table 1: *Impact Classifications*
Appendix Table 2: *Summary of Review Processes*
Appendix Table 3: *Off-Road Parking Requirements*

## Figures in the Appendix:

Appendix Figure 1: *Site Plan Example*
Appendix Figure 2: *Vicinity Map Example*
Appendix Figure 3: *General Review Process for Land Use Change Permits*
Appendix Figure 4: *General Review Process for  Administrative Review Projects That Require Land Use Change Permits*
Appendix Figure 5: *General Review Process for Minor Impact Projects*
Appendix Figure 6: *Sketch Plan Review Process for Major Impact Projects*
Appendix Figure 7: *Preliminary Plan Review Process for Major Impact Projects*
Appendix Figure 8: *Final Plan Review Process for Major Impact Projects*

BLM_0054186

**APPENDIX FIGURE 1: SITE PLAN EXAMPLE**



**APPENDIX FIGURE 2: VICINITY MAP EXAMPLE**



BLM_0054187

**APPENDIX TABLE 1: IMPACT CLASSIFICATIONS**

| ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE A LAND USE CHANGE PERMIT | ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE A LAND USE CHANGE PERMIT | MINOR IMPACT PROJECT | MAJOR IMPACT PROJECT |
|---|---|---|---|
| • **EXEMPT PRIMARY RESIDENCE SMALLER THAN 10,000 SQ. FT.** A primary residence smaller than 10,000 sq. ft. that is exempted by Section 1-106: *Partially Exempted Land Use Changes*. <br><br> • **BARNS AND OTHER AGRICULTURAL BUILDINGS ON AN AGRICULTURAL OPERATION.** A barn or other agricultural building used in conjunction with an agricultural operation. <br><br> • **FENCES.** Fences, which shall comply with Section 13-113: *Fencing*. <br><br> • **GARDENS AND GREENHOUSES**. Private non-commercial gardens and greenhouses. <br><br> • **ONE 120 SQ. FT. STORAGE SHED.** One storage shed 120 sq. ft. or smaller. <br><br> • **BARNS IN APPROVED SUBDIVISIONS.** Barns located in approved subdivisions in which there are adopted protective covenants that allow barns and that have been approved by Gunnison County. <br><br> • **GARDENS AND GREENHOUSES THAT ARE HOME OCCUPATIONS**. Gardens and greenhouses that are home occupations, created and operated pursuant to Section 9-102: *Home Occupations*. <br><br> • **POOLS AND RECREATION FACILITIES**. Private swimming pools and private recreation facilities associated with a primary residence, | • **PRIMARY RESIDENCE 10,000 SQ. FT. OR LESS, IN EXISTING PLATTED SUBDIVISION.** A primary residence smaller than 10,000 sq. ft., located within an existing platted subdivision. <br><br> • **AGGREGATE RESIDENTIAL SQUARE FOOTAGE LESS THAN 12,500 SQ. FT.** On one parcel The aggregate square footage of structures less than 12,500 sq. ft., (excluding from the calculation horse/hay sheds less than 500 sq. ft., one 120 sq.ft. storage shed, and a private greenhouse), that may include: <br><br> • RESIDENTIAL LIVING AREA 10,000 SQ. FT. OR LESS. 10,000 or less sq. ft. of residential living area (one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by Section 9-101: *Uses Secondary to a Primary Residence*); and <br><br> • **SECONDARY STRUCTURE INTENDED ONLY FOR SLEEPING AND HAS NO KITCHEN.** A secondary structure without a kitchen that is to be used only for sleeping facilities. It shall comply with the requirements of the *Gunnison County On-Site Wastewater Treatment System Regulations*. <br><br> • **MORE THAN ONE HOME OCCUPATION.** More than one home occupation, pursuant to Section 9-102: *Home Occupations*. <br><br> • **MOBILE HOME NOT IN A MOBILE HOME COMMUNITY.** A mobile home proposed to be located on an individual parcel of land not in a mobile home community, but adjacent to a subdivision whose protective covenants do not address, or expressly prohibit mobile | • **PRIMARY RESIDENCE 10,000 SQ. FT. OR LARGER.** A primary residence 10,000 sq. ft. or larger. <br><br> • **AGGREGATE SQUARE FOOTAGE OF 12,500 OR MORE SQ. FT.** An aggregate of 12,500 or more sq. ft. of residential living area (one single-family residence, or any combination of a primary single-family residence, an integrated secondary residence, and/or a detached secondary residence allowed by Division 9-100: *Secondary Uses and Activities* on one parcel, pursuant to *Section 13-105: Residential Building Sizes and Lot Coverages*. <br><br> • **MORE THAN ONE SECONDARY RESIDENCE ON A LEGAL LOT OR TRACT.** More than one secondary residence on a legal lot or tract, except as allowed pursuant to Section 9-101: *Uses Secondary to a Primary Residence*. <br><br> • **2-4 UNITS.** 2-4 units that are subdivision lots, duplexes, or multiple-family residences, except as allowed pursuant to Section 9-101: G: *Secondary Structures and Uses Classified as Minor Impact Projects*. <br><br> • **DEVELOPMENT REQUIRING DETAILED RIDGELINE VANTAGE VISIBILITY ANALYSIS.** Any development other than a project classified as a Major Impact project, and for which a detailed ridgeline vantage visibility analysis is required, | • **MORE THAN FOUR UNITS.** More than four units that are subdivision lots, duplex units, or multiple-family residences. <br><br> • **NEW COMMERCIAL, INDUSTRIAL LARGER THAN 5,000 SQ. FT. OR FIVE ACRES.** A new commercial or industrial use of more than 5,000 sq. ft. of structure, or on a parcel of more than five acres, or which, because of projected traffic, hours of operation, or type of use, may be classified as a Major Impact project, or would be the first instance of a commercial or industrial land use in an area in which no other commercial or industrial land use currently exists. <br><br> • **EXPANSION OF COMMERCIAL OR INDUSTRIAL USE OF 10,000 SQ. FT. OR MORE.** Expansion of a commercial or industrial use, existing as of the effective date of this *Resolution*, of 10,000 sq. ft. or more. <br><br> • **LARGE NEW OR EXPANDED MINING OPERATIONS.** New or expanded mining operations that operate for more than 180 days per year, produces more than 10,000 tons of ore/waste per year, or affects more than two surface acres of land, pursuant to Division 9-400: *Exploration, Extraction and Processing of Minerals and* |

BLM_0054188

**APPENDIX TABLE 1: IMPACT CLASSIFICATIONS**

| ADMINISTRATIVE REVIEW PROJECTS THAT DO **NOT** REQUIRE A LAND USE CHANGE PERMIT | ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE A LAND USE CHANGE PERMIT | MINOR IMPACT PROJECT | MAJOR IMPACT PROJECT |
|---|---|---|---|
| and not part of a private club or membership group. | homes within the subdivision, pursuant to Section 9-202: *Individual Manufactured and Mobile Homes.* | pursuant to *Section 11-108: E: Impact Classification.* | *Construction Materials.* |
| • **INTEGRATED SECONDARY RESIDENCE SMALLER THAN 1,250 SQ. FT. ON ANY LEGAL LOT.** An integrated secondary residence smaller than 1,250 sq. ft. in a primary residence on any legal lot that meets the standards pursuant to Section 9-101. 7.: *Standards for Integrated Secondary Residence.* | • **BOUNDARY LINE ADJUSTMENT..** An application to adjust the lot line between adjacent parcels or lots not in platted approved subdivisions, when the adjustment is in compliance with Section 5-103: *Standards for Approval of Administrative Review Projects.* | • **CLEARING OF MORE THAN 7500 SQ. FT. OF LAND.** Clearing of more than 7,500 sq. ft. of land not related to activities permitted by a Building Permit, an ISDS Permit, or Access Permit, or an agricultural operation. | • **LARGE CONSTRUCTION MATERIALS OPERATIONS.** Any sand, gravel or quarry operation providing material that will operate for more than two years, pursuant to *Division 9-400: Exploration, Extraction and Processing of Minerals and Construction Materials.* Larger operations may require review under the *Gunnison County Special Development Projects Regulations.* |
| • **ONE HOME OCCUPATION.** One home occupation, pursuant to Section 9-102: *Home Occupations.* | • **LOT CLUSTERS.** An application to eliminate the lot lines separating adjacent lots that are commonly owned. | • **NEW COMMERCIAL, INDUSTRIAL 5,000 SQ. FT., OR FIVE ACRES OR LESS.** A new commercial or industrial structure equal to or less than 5,000 sq. ft: or a commercial or industrial use developed on five acres or less. | |
| • **CAMPING.** Camping in a recreational vehicle or other camping shelter on an individual parcel pursuant to Section 9-509: C. *No Land Use Change Required For Camping in a Recreational Vehicle or other Camping Shelter on an Individual Parcel.* | • **CORRECTION PLAT.** An application to correct a technical error in a subdivision plat that has been approved and recorded. | • **5.000-9,999 SQ. FT. EXPANSION OF COMMERCIAL OR INDUSTRIAL USE.** Expansion of a commercial or industrial use, existing as of the effective date of this *Resolution*, of 5,000 – 9,999 sq. ft. | • **WATER IMPOUNDMENT PROJECTS CLASSIFIED AS CLASS I DAMS.** New projects, or facilities, or expansion of existing projects or facilities, that involve the design, construction and operation of a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class I dam, pursuant to Section 13-118: *Water Impoundments.* |
| | • **REPAIR OF EXISTING DISTRIBUTION LINES.** Repair of existing distribution lines located substantially within an existing utility easement. | | |
| • **SPECIAL EVENTS.** A special event, pursuant to Section 9-501: *Special Events.* | • **ALTERATION OF APPROVED BUILDING ENVELOPES.** Alterations of building envelopes on lots that were approved as an element of a Land Use Change Permit. | • **FREESTANDING WIRELESS TELECOMMUNICATION STRUCTURE.** Construction and siting of a freestanding wireless communication structure, building, pole, tower or antenna that provides wireless telecommunications services, pursuant to *Section 9-505: Freestanding Wireless Telecommunication Structures.* | • **TRANSMISSION LINES.** Construction of a new transmission line(s) in an area in which no line(s) currently exists, but not including a project for which a Land Use Change Permit has been granted in which the design, construction, location and impacts of the utility line(s) were reviewed and approved. |
| • **TEMPORARY STRUCTURES.** Temporary structures, pursuant to Section 9-502: *Temporary Structures.* | • **SUBDIVISION EXEMPTION TO "VALIDATE" AN EXISTING LOT.** Pursuant to C.R.S. 30-28-101 (10) (d)., the "validation" of a lot that existed prior to the effective date of this *Resolution*, but did not exist before September 27, 1972 and has not been reviewed and approved by the County as a legally subdivided lot "legal lot". | | |
| • **SATELLITE DISHES.** Satellite dishes, pursuant to Section 9-503: *Satellite Dish Devices.* | | • **SMALL NEW OR EXPANDED MINING OPERATIONS.** New or expanded mining operation that operates for no more than 180 days per year, produces fewer than 10,000 tons of ore/waste per year and affects no more than two surface acres of land, pursuant to *Division 9-400: Exploration,* | |
| • **ATTACHED WIRELESS TELECOMMUNICATIONS DEVICE.** Attached wireless telecommunications device, pursuant | • **EXPANSION OR CHANGE OF COMMERCIAL OR INDUSTRIAL USE TO TOTAL SIZE OF 5,000 SQ. FT. OR ONE ACRE OR LESS.** Expansion or change of a commercial or industrial use existing as of the effective date of this *Resolution*, when | | |

BLM_0054189

APPENDIX

| APPENDIX TABLE 1: IMPACT CLASSIFICATIONS | | | |
|---|---|---|---|
| **ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE A LAND USE CHANGE PERMIT** | **ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE A LAND USE CHANGE PERMIT** | **MINOR IMPACT PROJECT** | **MAJOR IMPACT PROJECT** |
| to Section 9-504: *Attached Wireless Telecommunications Devices.*<br><br>• **KEEPING OF LIVESTOCK NOT ON AN AGRICULTURAL OPERATION.** Keeping of livestock not on an agricultural operation, pursuant to Section 9-508: *Keeping of Livestock Not on an Agricultural Operation.*<br><br>• **SITE APPROVAL APPLICATION FOR WATER SUPPLY OR WASTEWATER TREATMENT SYSTEM.** The Colorado Department of Public Health and Environment's site approval application for a proposed expansion or alteration of an existing wastewater treatment system.<br><br>• **DISTRIBUTION OR SERVICE LINE TO PRIMARY RESIDENCE.** A distribution or service line providing service to a single primary residence, multiple family residences, or other residence that would not otherwise require a Land Use Permit under the requirements of this *Resolution.*<br><br>• **ALTERATION AND REPAIR OF EXISTING SERVICE LINES OR DISTRIBUTION LINES.** Conversion of above-ground distribution lines or service lines to underground distribution or service lines located substantially within an existing utility easement. | the expansion will result in the use having a total size of less than 5,000 sq. ft. of a structure, or one acre of land.<br><br>• **PLAT FOR APPROVED CONDOMINIUMS/TOWNHOME PROJECT.** A constructed condominium or townhome project for which a Land Use Change Permit has been approved for the overall development.<br><br>• **LIMITED MINERAL EXPLORATION.** Limited mineral exploration (activities related to proving up a patented mining claim pursuant to federal law), as addressed in Section 9-402: C.3: *Limited Mineral Exploration.*<br><br>• **UNDERGROUND MINERAL EXPLORATION.** An application for underground mineral exploration for operations existing as of the effective date of this *Resolution*, as addressed in Section 9-402: D: *Extension and Expansion of Current Underground Mineral Exploration Required to File Notice of Activity.*<br><br>• **EXTRACTION OF CONSTRUCTION MATERIALS.** Extraction of construction materials that generates more than 300 cubic yards, per Section 9-402: C. 1: *Limited Construction Material Extraction.* | *Extraction and Processing of Minerals and Construction Materials.*<br><br>• **CONSTRUCTION MATERIALS OPERATION RELATED TO CONSTRUCTION OF PUBLIC ROAD.** Any sand, gravel, or quarry operation providing material for public road construction that will operate for less than two years.<br><br>• **GENERAL ROAD CUTTING OR CONSTRUCTION.** Road cutting or construction, except that cutting or construction and maintenance of a road that provides access solely for an agricultural operation shall not be classified as a Minor Impact project, and shall not require review.<br><br>• **TRANSMISSION LINES.** Upgrade of an existing utility transmission line(s) within an existing easement(s), but not including a project for which a Land Use Change Permit has been granted in which the design, construction and impacts of the utility line were reviewed and approved.<br><br>• **BED AND BREAKFAST.** Bed and breakfast business, pursuant to *Section 4-103: Bed and Breakfast.*<br><br>• **CHILD CARE CENTER.** A child care center, pursuant to Section 9-506: *Child Care Center.*<br><br>• **GROUP HOME.** A group home, pursuant to *Section 9-507: Group Home.*<br><br>• | • **PRECEDENT FOR FUTURE LAND USE THAT IS DIFFERENT THAN EXISTING USE.** Any proposal that sets a precedent for future land use that is significantly different than existing land uses in the impact area. |

BLM_0054190

| APPENDIX TABLE 1: IMPACT CLASSIFICATIONS | | | |
|---|---|---|---|
| **ADMINISTRATIVE REVIEW PROJECTS THAT DO NOT REQUIRE A LAND USE CHANGE PERMIT** | **ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE A LAND USE CHANGE PERMIT** | **MINOR IMPACT PROJECT** | **MAJOR IMPACT PROJECT** |
| | | • **FREESTANDING WIRELESS COMMUNICATION STRUCTURES.** Freestanding wireless communication structures, pursuant to *Section 9-505: Freestanding Wireless Communication Structures.* | |
| | | • **WATER IMPOUNDMENT PROJECTS CLASSIFIED AS CLASS II DAMS.** New projects or facilities, or expansion of existing projects or facilities, that involve the design, construction and operation of a water impoundment that includes a dam classified by the Colorado Division of Water Resources as a Class II dam, pursuant to *Section 13-118: Water Impoundments.* | |
| | | • **EXPANSION OR EXTENSION OF SNOWPLOWING.** Expansion or extension of snowplowing, pursuant to *Section 11-110: F: Expansion or Extension of Snowplowing.* | |
| | | • **COMMERCIAL WEDDING SITE.** The site on which weddings are regularly or frequently conducted as a commercial operation, irrespective of the number of people or vehicles generated by the wedding event. | |

BLM_0054191

APPENDIX

**APPENDIX TABLE 2: SUMMARY OF REVIEW PROCESSES**

| APPLICATION TYPE | PRE- APPLICATION CONFERENCE | COMMUNITY DEVELOPMENT DEPARTMENT | PLANNING COMMISSION | BOARD OF COMMISSIONERS | BOARD OF ADJUSTMENTS | PUBLIC HEARING |
|---|---|---|---|---|---|---|
| **ADMINISTRATIVE REVIEW PROJECTS** | | | | | | |
| **ALL ADMINISTRATIVE REVIEW PROJECTS** | Optional | Community Development Director makes decision | N/A | Decisions may be appealed to the Board | N/A | None |
| **MINOR IMPACT PROJECTS** | | | | | | |
| **MINOR IMPACT SUBDIVISION** | Optional | Provides analysis of Project to Planning Commission | Makes recommendation to Board | Makes decision; subdivision plat requires Board Signature | N/A | Planning Commission and Board jointly conduct one hearing |
| **MINOR IMPACT NOT A SUBDIVISION** | Optional | Provides analysis of Project to Planning Commission | Makes decision | Decisions may be appealed to the Board | N/A | Planning Commission conducts one hearing |
| **MINOR IMPACT, EXTENSION OF SNOWPLOWING** | Optional | N/A | N/A | Makes decision | N/A | Board conducts one hearing |
| **MAJOR IMPACT PROJECTS** | | | | | | |
| **SKETCH PLAN** | Mandatory | Provides analysis of Sketch Plan to Planning Commission | Makes recommendation to Board | Makes decision | N/A | One jointly conducted hearing required by Commission; and Board; Board has option to separately conduct one additional |
| **PRELIMINARY PLAN** | Mandatory | Provides analysis of Preliminary Plan to Planning Commission | Makes recommendation to Board | Makes decision | N/A | One jointly conducted hearing by Commission and Board; Board has option to separately conduct one additional |

BLM_0054192

APPENDIX TABLE 2: SUMMARY OF REVIEW PROCESSES

| APPLICATION TYPE | PRE-APPLICATION CONFERENCE | COMMUNITY DEVELOPMENT DEPARTMENT | PLANNING COMMISSION | BOARD OF COMMISSIONERS | BOARD OF ADJUSTMENTS | PUBLIC HEARING |
|---|---|---|---|---|---|---|
| FINAL PLAN | Optional | Provides analysis of Final Plan to Board | If included as a specific condition of Preliminary Plan Approval, Commission reviews and makes recommendation to board | Makes decision | N/A | None |
| MISCELLANEOUS PROCESSES | | | | | | |
| VARIANCE FROM SETBACKS FROM PROPERTY LINES AND ROAD RIGHTS-OF-WAY | N/A | Building Inspector presents report and analysis to Board of Adjustments | N/A | N/A | Makes decision | Board of Adjustment has one hearing |
| VARIANCE FROM SIGN REQUIREMENTS | N/A | Building Inspector presents report and analysis to Board | N/A | Makes decision | N/A | None |
| VARIANCE FROM FLOODPLAIN DEVELOPMENT REQUIREMENTS | N/A | Presents report and analysis to Board | N/A | Makes decision | N/A | None |
| EXTENSION OF VESTED RIGHT DURING TERM OF PERMIT | N/A | N/A | N/A | Makes decision | N/A | Board conducts one hearing |
| DESIGNATION OF SPECIAL GEOGRAPHIC AREAS | N/A | Prepares maps and provides analysis for Planning Commission on this *Resolution* language | Makes recommendation to Board | Makes decision | N/A | Planning Commission and Board jointly conduct one hearing |
| AMENDING THIS *RESOLUTION* | N/A | Makes analysis to Planning Commission | Makes recommendation to Board | Makes decision | N/A | Board required to conduct one hearing |

BLM_0054193

BLM_0054194

**APPENDIX FIGURE 3: GENERAL REVIEW PROCESS FOR LAND USE CHANGE PERMITS**



Both the Planning Commission and Board may conduct work sessions and site visits in addition to the described meetings and hearings.

BLM_0054195

*APPENDIX*

APPENDIX FIGURE 4: GENERAL REVIEW PROCESS FOR ADMINISTRATIVE REVIEW PROJECTS THAT REQUIRE LAND USE CHANGE PERMITS



Estimated **MINIMUM** timeline for Administrative Review project review is 2-6 weeks. The number of applications being reviewed by the County, and schedules of the applicant's surveyors, attorneys and engineers will affect actual length of review.

BLM_0054196

APPENDIX FIGURE 5: GENERAL REVIEW PROCESS FOR MINOR IMPACT PROJECT :



Estimated **MINIMUM** timeline for Minor Impact project review is six weeks to two months. The number of applications being reviewed by the County, scheduling with the Board and Planning Commission, limited availability of publication dates within weekly newspapers, and schedules of the applicant's surveyors, attorneys and engineers will affect actual length of review. Both the Planning Commission and Board may conduct **work sessions** and **site visits** in addition to the described meetings and hearings. The Board also has the option of conducting its own separate additional public hearing.

BLM_0054197

APPENDIX

APPENDIX FIGURE 6: SKETCH PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS:



Pre-Application Conference (mandatory)

Applicant submits application

7-30 days | 7-30 days

Community Development Department certifies application is complete; sends to review agencies and prepares report

Applicant submits additional information

Community Development Department notifies applicant of incomplete portions of application

7-45 days

Planning Commission conducts work session

Public hearing conducted jointly by Board and Planning Commission

40-45 days | 14-60 days

Board approves, approves w/ conditions or denies Sketch Plan (35 days after Planning Commission recommendation or Board's public hearing)

Board has option to conduct second public hearing if it determines necessary

(Board has 20 days to decide whether to have public hearing)

Planning Commission recommends approval, approval w/ conditions or denial of Sketch Plan

15 days

If approved, document of approval recorded in Clerk and Recorder's Office

Applicant may submit Preliminary Plan application

Estimated **MINIMUM** timeline for Sketch Plan review: 140 days (4.6 months). the number of days shown between review steps is an estimated minimum. The number of applications being reviewed by the County, scheduling with the Board and Planning Commission, limited publication dates within weekly newspapers, and schedules of the applicant's surveyors, attorneys and engineers will affect actual length of review. Both the Planning Commission and Board may conduct work sessions and site visits in addition to the described meetings and hearings.

BLM_0054198

**Appendix Figure 7: Preliminary Plan Review Process for Major Impact Projects**



Estimated **MINIMUM** timeline for Preliminary Plan review: 140 days (4.6 months). the number of days shown between review steps is an estimated minimum. The number of applications being reviewed by the County, scheduling with the Board and Planning Commission, limited availability of publication dates within weekly newspapers, and schedules of the applicant's surveyors, attorneys and engineers will affect actual length of review. Both the Planning Commission and Board may conduct work sessions and site visits in addition to the described meetings and hearings.

BLM_0054199

*APPENDIX*

**APPENDIX FIGURE 8: FINAL PLAN REVIEW PROCESS FOR MAJOR IMPACT PROJECTS**



Estimated timeline for Final Plan review: Two months. The number of days shown between review steps is an estimated minimum. The number of applications being reviewed by the County, scheduling with the Board and Planning Commission, limited availability of publication dates within weekly newspapers, and schedules of the applicant's surveyors, attorneys and engineers will affect actual length of review. Both the Planning Commission and Board may conduct work sessions and site visits in addition to the described meetings and hearings.

BLM_0054200

**APPENDIX TABLE 3: OFF-ROAD PARKING REQUIREMENTS**

| TYPE OF USE OR FACILITY | NUMBER OF OFF-ROAD SPACES | PER UNIT |
|---|---|---|
| **RESIDENTIAL (MAY BE A GARAGE, CARPORT OR PARKING AREA)** | | |
| MANUFACTURED HOUSING SUBDIVISION OR MOBILE HOME PARK | 2 parking spaces | Residence |
| MULTIPLE FAMILY, INCLUDING CONDOMINIUMS AND TOWNHOMES | 2 parking spaces per residence for up to 3 bedroom residence; one additional space for each additional bedroom in the residence | Residence |
| SINGLE-FAMILY AND DUPLEX | 2 parking spaces per residence for up to 3 bedroom residence; one additional space for each additional bedroom in the residence | Residence |
| **INSTITUTIONAL, PUBLIC, SEMI-PRIVATE** | | |
| SPECIAL EVENTS, AUDITORIUMS, ARENAS | 1 parking space/ | Four persons or spaces of seating capacity |
| CLUBS | 1 parking space/ | 100 sq. ft. of assembly area |
| GOVERNMENT OFFICE | 1 parking space/ | 300 sq. ft. |
| HOSPITAL | 1 parking space/ | Bed, and for every three employees |
| CHURCH | 1 parking space/ | 50 sq. ft. of seating/ meeting area |
| SCHOOLS, PUBLIC OR PRIVATE: ELEMENTARY OR MIDDLE SCHOOL | 1 parking space/ 1 drop-off space | Teacher or employee School |
| SCHOOL, PUBLIC OR PRIVATE: HIGH SCHOOL | 1 parking space/ 1 parking space/ 1 drop-off space | Teacher or employee 5 students School |
| **GENERAL COMMERCIAL USES** | | |
| ANIMAL SALES (UNRELATED TO AN AGRICULTURAL OPERATION) | 1 parking space/ | 250 sq. ft. |
| DOMESTIC ANIMAL BOARDING | 1 parking space/ | 400 sq. ft. |
| DOMESTIC ANIMAL GROOMING | 1 parking space/ | 400 sq. ft. |
| STABLE | 1 parking space/ | 5 stalls |
| RIDING SCHOOL | 1 parking space/ | 4 stalls |
| VETERINARY OFFICE OR HOSPITAL | 1 parking space/ | 400 sq. ft. |
| **COMMERCIAL RECREATION AND ENTERTAINMENT FACILITIES** | | |
| GOLF COURSE (PUBLIC OR PRIVATE) | 4 parking spaces/ 1 parking space/ | Hole Employee |
| SKATING RINK | 1 parking space/ 1 parking space/ | Five fixed spaces or 60 sq. ft. of seating 250 sq. ft. of non-seating area |
| TENNIS AND RACQUETBALL COURTS | 3 parking spaces/ | Court |
| EATING AND/OR DRINKING FACILITIES | 1 parking space/ 1 parking space/ | Four persons of seating capacity Three employees |
| FINANCIAL INSTITUTION | 1 parking space/ based on site design | 300 sq. ft. Space sufficient for vehicle stacking area |
| COMMERCIAL NURSERIES | 1 parking space/ | Two acres |
| HOTELS, MOTELS, LODGES, BED AND BREAKFAST FACILITY | 1 parking space/ 1 parking space/ | Sleeping room Three employees |
| **Retail Sales Facilities and offices** | | |
| MEDICAL AND DENTAL | 1 parking space/ | 200 sq. ft. |
| ALL OTHER OFFICES | 1 parking space/ | 300 sq. ft. |
| FURNITURE, APPLIANCE OR LARGE STORE | 1 parking space/ | 500 sq. ft. |
| CONVENIENCE STORE WITH GAS PUMPS | 1 parking space 1 vehicle stacking area | 200 sq. ft. |
| VEHICLE OR EQUIPMENT SALES AND SERVICE, REPAIR, OR RENTAL | 1 parking space/ | 400 sq. ft. |
| CAR WASH | 1 parking space/ | 200 sq. ft. of sales/office area Space sufficient for vehicle stacking area |
| SERVICE STATION | 1 parking space/ | 200 sq. ft. of sales/ office area Space sufficient for vehicle stacking area |
| MINI-STORAGE RENTAL UNITS | 1 parking space/ | 100 lockers inside and at least 5 spaces outside fenced area |
| WAREHOUSING AND STORAGE | 1 parking space/ | 500 sq. ft. |
| **Industrial Uses** | | |
| MANUFACTURING & PROCESSING FACILITIES | 1 parking space/ | 350 sq. ft. of gross floor area |

BLM_0054201

BLM_0054202

# INDEX

**35-ACRE TRACTS**
Detached secondary residence on ...........................................139
Development alternative for, LPIP subdivision as .................275
Development on, subject to regulations.....................................10
Exemption of, from subdivision definition....................................43
Listing of partially exempt....................................................9, 10
Pre-existing, with building envelopes and protective covenants9
Pre-existing, with maximum size restrictions............................10
Required to comply with *Resolution*.....................................9, 11

**404 PERMIT**
Required for construction near water body or mudflow.........267
Required for development in floodplain...................................200
Required for protection of floodplain wetlands.......................198

**ACCESS**
Definitions of.....................................................................23, 34
**Development of land beyond snowplowed** .....................223
Emergency services, required for special events...................175
For emergency services in determining density....................189
Owners' responsibility in flood hazard area...........................195
Owners' responsibility in wildfire hazard area.......................210
Shared, to minimize impact to ................................................231
Standards for ..........................................................................230
Through  avalanche return areas.............................................205

**ACCESS PERMIT**
Land Use Change Permit required before .............................230
Required by Colorado Department of Transportation.......7, 230
Required by Gunnison County...........................................7, 230

**ACCESSORY STRUCTURE**
Aggregate size requirements exempt on agricultural,
     commercial, or industrial operations...............................245
Definition of...............................................................................23
Farm or ranch stand as............................................................155
Height limitation of...................................................................242
Solid-fuel-burning devices in...................................................248

**ADDRESSES**
Required in mobile home community .......................................150
Subdivision plat, as assigned by Building Official...........85, 125
Subdivision plat, required for emergency services..........85, 125

**ADMINISTRATIVE REVIEW PROJECT ...................59, 61**
Appeal of decision on................................................................74
**Application form for**................................................................63
**Approval standards for**..........................................................62
Definition of...............................................................................23
Extension of permit for..................................................................5
**Land Use Change Permit required for** ...............................61
Requiring no Land Use Change Permit......................................59
**Review process for**................................................................73
**Summary of review process for**.........................................296
Technical Modification of...........................................................131
Vested right for..........................................................................14

**ADULT-ORIENTED USE ............................................. 156**
Definition of...............................................................................23
Land Use Change Permit required for ....................................156
Minimum distance of, from child care center .........................156

**AFFORDABLE HOUSING**
Definition of...............................................................................24

**AGGREGATE SQUARE FOOTAGE**
Above timberline, maximum allowed .......................................225
Agricultural exemption from standards of ...............................245
Classified as Major Impact project ...........................................75

Maximum allowed in Wilderness inholding............................225

**AGRICULTURAL EXEMPTION**
From  mining operation definition.............................................36
From aggregate square footage standards............................245
From Building Permit requirements ................................ 59, 292
From exterior lighting requirements........................................263
From grading requirements......................................................266
From irrigation water calculation requirements......................113
From Reclamation Permit requirements..................................265
From road construction definition..............................................34
From road construction standards ................................... 76, 294
From trail easement requirement.............................................232
From water quality requirements.............................................216

**AGRICULTURAL OPERATION**
Code of the West for neighbors of..........................................281
Definition of...............................................................................24
Fencing required between development and...........................262
Mobile homes allowed on.......................................................147
Right-to-Ranch policy to protect.............................................279
**Standards for development that affects** ..........................221

**AGRICULTURAL STRUCTURE**
Building Permit not required for ....................................... 59, 292
Definition of...............................................................................24
Exemption of, from building height requirements...................242

**AGRICULTURE**
Definition of...............................................................................24
Policy to protect...........................................................................3

**AIRCRAFT**
Access for, prohibited above timberline.................................225
Access for, prohibited within Wilderness................................225

**ALLUVIAL FAN**
Definition of...............................................................................31
Standards for development in ......................................... 203, 206

**AMENDMENT**
Of County maps.........................................................................18
Of covenants, County approval required for............ 83, 115, 123
Of FEMA maps.........................................................................194
**Of Land Use Resolution**........................................................18
Of Major Impact project...........................................................130
Of Minor Impact project.............................................................91

**ANIMAL**
Confinement of, during special events....................................176
Confinement of, to protect agricultural operations.... 67, 86, 126,
     222
Control of, required by protective covenants ... 83, 102, 116, 123
Definitions of exotic and domestic............................................25
Exotic, keeping of....................................................................180
Numbers of, allowed in mobile home community ...................149
Odor control required for.........................................................179

**APPEAL ............................................................................ 134**
Of action on Floodplain Development Permit.........................199
Of action on Technical Modification.........................................132
Of Administrative Review decision............................................74
Of impact classification..............................................................54
Of Land Use Resolution interpretation......................................20
Of Planning Commission Decision on Minor Impact ...............90
Of setback determination...........................................................21

**APPLICATION**
**Administrative Review Project**.............................................63
Boundary Line Adjustment.........................................................70

BLM_0054203

Consolidation with other applications............................................51
Construction of water impoundment.........................................270
Correction of plat.............................................................................71
Emergency Exception.................................................................136
Exterior lighting information required in..................................264
Floodplain Development Permit................................................198
**General requirements for**..........................................................51
**Inactive Land Use Change**........................................................50
ISDS Permit, referral of, to Environmental Health Board......283
**Land Use Change Permit**..........................................................52
Long-term Camping Permit.........................................................181
Lot Cluster.........................................................................................71
Mobile Home Permit....................................................................146
Preliminary Plan, for Major Impact project.............................107
Sign Permit.....................................................................................251
Sketch Plan, for Major Impact project.....................................102
Special Event Permit....................................................................173
Subdivision Exemption..................................................................72
Variance from floodplain development requirements...........200
Variance from property line setback standards.....................244

ARCHEOLOGICAL RESOURCE
Definition of......................................................................................25
Preservation of, during mining..................................................169

AUTHORITY
Board, to grant Emergency Exception......................................136
**County, to regulate land use**.......................................................1
Planning Commission.....................................................................20
Planning Director, to interpret *Resolution*...............................20
To initiate designations of Special Areas...................................16

AVALANCHE HAZARD AREA
Definition of......................................................................................25
Development allowed in Blue Zone of......................................204
Development of roads in..............................................................205
Geotechnical information required for development in..........109
Residential development prohibited in Red Zone of.............204

BABY-SITTING
No permit required for in-home.................................................179

BARN
Definition of, as agricultural structure.......................................24
Exemption of,  from sign requirements......................................42
In approved subdivision.....................................................59, 292
No permit required for, on agricultural operation.....59, 139, 292

BASE FLOOD ELEVATION
Certificate required for building.................................................199
Data required for new subdivisions..........................................197
Definition of......................................................................................29

**BED AND BREAKFAST**..........................................................**142**
Classification of, as Minor Impact project......................76, 294
Compliance of, with Fire Protection District standards........142
Definition of......................................................................................25
Land Use Change Permit required for......................................142
**Standards for operation of**.....................................................142

**BEST MANAGEMENT PRACTICES**............................**191**
Definition of......................................................................................25
Use of, in construction dewatering discharge........................268
Use of, in mining operations......................................................163

BOARD OF ADJUSTMENTS
Members' terms...............................................................................21
Powers and duties of.......................................................................21

BOUNDARY LINE ADJUSTMENT
Application form for.........................................................................70
Definition of......................................................................................25
Land Use Change Permit required for.............................61, 293
Standards for approval of..............................................................62

BUILDING
Definition of......................................................................................25
Footprint, definition of....................................................................25
Height, definition of.........................................................................26
Height, how to measure...............................................................241
Prohibition of, in avalanche Red Zone....................................203
**Residential sizes and lot coverages**...................................245
Size limitations of, in Wilderness inholding............................225
Size, definition of.............................................................................26
Size, how to measure...................................................................241
Temporary, that requires no permit..........................................176

BUILDING ENVELOPE
Alteration of, as Administrative Review project........62, 240, 293
And setback requirements...........................................................240
Definition of......................................................................................25
Required for secondary structures............................................140
Site-specific, required...................................................................240
Standards for location and uses in...........................................246

BUILDING PERMIT
Agricultural building exemption from..............................59, 292
Building envelope designation required for............................240
Compliance of, with Energy Resource Conservation Worksheet
    required.....................................................................................247
Definition of......................................................................................26
Exterior lighting information required for..................................264
Fire hydrant function required before issuance of.................238
Flood Elevation Certification required before issuance of.....200
For parcel adjacent to agricultural operation.........................281
Geologic hazards mitigation required as part  of...................202
Issuance of, when protective covenants and *Resolution* conflict
    .............................................................................................................9
On lot not approved before January 8, 2001................................8
Parking spaces on site plan for..................................................255
Reason for higher level of review for...........................................59
Required in Gunnison County..........................................................7
Site plan compliance with setbacks required for...................242
Standards for issuance of............................................................239
That requires higher level of review....................................61, 75
Woodstove standards related to................................................247

CAMPGROUND
Definition of......................................................................................26
Land Use Change Permit required for......................................156
**Noise protection for**...............................................................170

**CAMPING**.................................................................................**180**
**14-day limit for**.........................................................................180
No Land Use Change Permit required for short-term.....59, 293
On private parcel............................................................................180
Permit required for long-term.....................................................180

CAMPING SHELTER
14-day camping limit for..............................................................180
Definition of......................................................................................26
In recreational vehicle parks......................................................156
Long-term Camping Permit required for...................................180
Temporary use of, during special events.................................174

**CHILD CARE CENTER**..........................................................**178**
Definition of......................................................................................26
Land Use Change Permit required for.............................76, 294
Minimum standard for, from adult-oriented use.....................156
**Standards for operating**........................................................178

CLUSTER DEVELOPMENT
Definition of......................................................................................26
Exemption of, from subdivision definition..................................44

CLUSTER SIGN
Definition of......................................................................................42
For multiple businesses...............................................................252

BLM_0054204

**CODE OF THE WEST**
Definition of.................................................................26
Required distribution of, to applicants for Land Use Change
Permits ........................................................... 52, 89
Required distribution of, to neighbors building next to ranching
........................................................................281

**COMMERCIAL USE ....................................................153**
Abandonment of nonconforming...............................13
Classification of, as Minor Impact project...........75, 93, 293, 292
Exemption of, from aggregate square footage standards .....245
Expansion of, as Administrative Review  project............ 62, 293
Expansion of, as Major Impact project............. 93, 292
Expansion of, as Minor Impact project............ 75, 293
Fencing of...............................................................262
Height limitation of ................................................241
Lighting standards for.............................................263
**Locational standards for**......................................189
Noise limitations in.................................................154
Open space required for..........................................249
Parking lot screening required for .........................258
**Parking space requirements for** ........................305
Public notice requirement for Administrative Review project....55
Security lighting allowed for ...................................264
Setbacks for.............................................................243
Solid fuel-burning devices in..................................248
**Standards for** .....................................................153
Storm Water Discharge Permit required for ..............268

**COMPATIBILITY**
As standard for approval...............62, 76, 94, 156, 163, 201, 250
Definition of.............................................................26
**Standards to ensure, between land uses** ..........274

**CONDOMINIUM**
Definition of.............................................................26
Development, Final Plan approval for layout of............... 82, 121
Development, parking spaces required for..........................305
Development, signs allowed to advertise ...............254
Homeowners' association required for development of.. 83, 123
Plat, required language on.........................................67
Setbacks required for development of ....................243

**CONSERVATION EASEMENTS**
In designated open space .......................................250
Statutory authority addressing.....................................1

**CONSTRUCTION MATERIALS OPERATIONS ...........159**
Classification of, as Administrative Review project......... 62, 294
Classification of, as Major Impact project............. 93, 293
Classification of, as Minor Impact project....................... 75, 294
Definition of.............................................................27
Exemption of, from water quality buffer standards ..................11
In flood fringe ........................................................196
Reduced water quality buffer standards for existing .........218
Setback of, from centerline of public road..............................163
Setback of, from high water mark ..........................218
Setbacks required of ...............................................163
Setbacks, table of ...................................................164
Standards of operation in floodplain areas ............197

**CORRECTION PLAT**
Classification of, as Administrative Review project......... 61, 293
Definition of.............................................................27
Plat language for.......................................................71
Standards for.............................................................63

**COST ESTIMATES**
Required for Emergency Exception submittal.......................137
Required for Final Plan submittal for Major Impact project.....84, 124
Required for Preliminary Plan submittal for Major Impact project

...............................................................................116

**COVENANTS**
County approval required to amend ................83, 101, 115, 123
Draft of, required for Preliminary Plan of Major Impact project
........................................................................115
Draft of, required for Sketch Plan of Major Impact project .....101
Required for Final Plan of Major Impact project ............ 83, 122
To address wildfire prevention ................................209
To confine animals...................................67, 86, 126
To ensure fire district standards.............................237
To ensure irrigation ditch maintenance easement .................68
To ensure perpetual open space...............................251
To inform of "fence-out" requirements....................68
To protect agricultural operation ............................222

**CRITICAL PATH**
Definition of.............................................................27

**CULTURAL RESOURCE**
Definition of.............................................................25
Protection of, during mining...................................169

**CUMULATIVE IMPACTS**
Definition of.............................................................27
Effects of, on density calculations..........................189
Evaluation of, in sequential projects ........................54
Evaluation of, in wastewater treatment...................235
In analysis of impacts to Gunnison Sage-grouse...................213
In locating new commercial development ..............189
In locating new residential development...................187

**DAM SAFETY**
Authority of Colorado State Engineer concerning .................273

**DEBRIS FLOW ....................................See "Alluvial fan"**
Definition of.............................................................31

**DEED RESTRICTIONS**
Required for condominium/townhome development...... 83, 122
To ensure perpetual open space...............................251

**DEFINITIONS ..........................................................23**

**DENSITY**
Definitions of...........................................................27
Evaluation of, in wastewater treatment...................235
Limits on, in geologic hazard areas.........................203
Maximum allowed in mobile home community......................148
Related to individual sewage disposal systems ...................188
**Residential, standards for** ...................................187

**DESIGN STANDARDS .............................................239**

**DEVELOPMENT AGREEMENT**
Definition of.............................................................28

**DEVELOPMENT IMPROVEMENT AGREEMENT**
Completion of development related to ........................4
Definition of.............................................................28
Draft of, required in Final Plan ....................... 90, 124
**Financial security required by** ...........................288
Fire-protection testing required to be addressed in...............238
Related to granting of vested rights..........................14
Release of security for .............................................288
Required for mining operations ...............................162
Road signs required to be funded by.......................231
Trails construction required to be funded by.......................232

**DISTRIBUTION LINE**
Administrative review required for ......................62, 293
Alteration and repair of.........................................60, 62, 294, 293
Definition of.............................................................28
No Land Use Change Permit required for primary residence60, 294

**DOGS**

BLM_0054205

Control of, on agricultural lands..........................................222
Prohibition and control of in Sage-grouse habitat.................214
**DRAINAGE** ........................................................................**268**
And snow storage areas ....................................................261
Controlling flooding by regulating.....................................193
In protection of water quality............................................217
Of foundations in geologic hazard areas...........................208
Of vehicle repair and storage sites....................................269
On-site required for zero lot line developments...................243
Plan required in Preliminary Plan ......................................114
Plan required in Sketch Plan .............................................100
Protection of natural, in stream buffer ...............................218
Protection of, during snowplowing.....................................224
Required in subdivisions to reduce flood damage ...............197
System, definition of............................................................28
**DRIVEWAY**
Access Permit required for...........................................7, 230
Construction of, in avalanche Red Zone ............................204
Construction of, on 30% slopes .........................................207
Definition of, as land use change ........................................34
Design of, in grading plan.................................................217
Design of, in parking areas...............................................258
Design of, using best management practices......................192
Engineer's certification required for...................................111
Required compliance of, with Road and Bridge Standards ..227
Required to comply with noxious weed management ..........265
Shared, required for structures in building envelope ...........246
**DUDE RANCHES** ..........................................................**155**
Definition of..........................................................................40
**Standards for** ..................................................................155
**DUST CONTROL**
Plan required for road construction....................................111
Required for mining operations.............................161, 167, 168
Required for special events...............................................257
Required to ensure compatibility between uses ..................274
Required to protect agricultural operations.........................222
**EASEMENT**
Access, required to be recorded........................................230
Conservation, in open space.............................................250
Conservation, statutory authority addressing ........................1
Definition of..........................................................................28
Ensuring historical agricultural access...............65, 80, 98, 110
For mobile home in zero lot line development .....................150
For public trails ................................................................231
For zero lot line walls .......................................................243
Irrigation ditch maintenance, required covenant language for68, 86, 126, 222, 280
Required for snow storage ................................................261
Required in Minor Impact project..........................65, 80, 97
Required on Final Plat ................................................85, 125
Road, required of new development....................................229
To public lands, for dude ranches, resorts.........................155
Trail, agricultural land exempt from...................................232
Width of, for utilities .........................................................229
**EMERGENCY EXCEPTION**........................................**135**
Extension of approval of....................................................138
Public hearing notice requirements......................................54
Standards of approval for .................................................136
**EMERGENCY SERVICES**
Required for special events...............................................174
Risk to personnel, related to density..................................189
Risk to personnel, related to snowplowing..........................224
Standards for vehicle access to provide.............................237
**ENERGY CONSERVATION** ........................................**247**
In efficient appliances, definition of......................................28

**Required of residential construction** ........................247
**ENFORCEMENT**................................................................**283**
**Against Illegal subdivision**................................................287
County as enforcer, in protective covenants ..........101, 115, 123
County option of, in private agreements ...............................17
Of violation of floodplain regulations .................................202
Of violation of sign requirements.......................................255
**ENVIRONMENTAL IMPACT STATEMENT**
Applicant required to provide notice of.... 49, 63, 76, 95, 102
County's coordination of review process with .......................50
Delay of County decision related to .............................50, 272
Review of water impoundments related to...........................272
Timing of County permit approval related to..........................49
**ESSENTIAL HOUSING** ........................................**183–86**
Definition of Def.................................................................28
Incentives to provide ........................................................185
**EX PARTÉ COMMUNICATION**
Definition of..........................................................................29
Prohibited after closure of public hearing............................58
Record of, in application review ...........................................57
**EXOTIC ANIMAL**
Confinement of, during special events...............................176
Definition of..........................................................................25
Keeping of, on non-agricultural property.............................180
**EXTENSION**
Of inactive Land Use Change Permit application ..................50
Of lifetime for Land Use Change Permit................................4
Of review agency review period for Administrative Review project ............................................................................53
Of submittal deadline for Final Plan for Major Impact project 119
Of submittal deadline for Preliminary Plan for Major Impact project ..........................................................................105
Of time to reconstruct damaged nonconforming use ...........13
Of vested right ..............................................................6, 15
**EXTENSION OF PERMIT**
For Administrative Review project........................................5
For Major Impact project.....................................................5
For Minor Impact project.....................................................5
**EXTERIOR LIGHTING**................................................**262**
Agricultural operation exemption from requirements for.......263
Definitions of types of.........................................................35
During special events ........................................................174
Fixtures allowed ..............................................................263
Floodlighting standards.....................................................264
For commercial and industrial uses ...................................153
Mercury vapor, prohibition of............................................264
Motion sensor allowed for residential access......................264
Of signs, required to be minimized ....................................253
Of telecommunication structures ......................................178
Plan required for mobile home communities........................148
Required in protective covenants...............................83, 123
**Standards for** ..................................................................262
**FARM OR RANCH STAND** ........................................**155**
Definition of..........................................................................29
Exemption of,  from locational standards ...........................189
No Land Use Change Permit required for............................155
Sign requirements for .......................................................155
**FAULT**
Definition of..........................................................................32
Standards for development in ............................................203
**FEDERAL PERMITS**
**Coordination of County review process with**....................49
Required for Land Use Change Permit approval ....................7
**Fees**

BLM_0054206

Attorneys', for enforcement action....................................287

**FEES**

Added, for residences larger than 1,000 sq. ft. ......................246
Business license...........................................................177
Deferred, for Essential Housing.......................................185
Final Plan submittal for Major Impact project.......... 82, 137, 175
For additional technical expertise.......................................52
For costs of public hearings 66, 81, 95, 104, 107, 118, 133, 137, 244, 264, 271
For inspection of solid-fuel-burning devices.........................249
For Minor Impact project application ............................ 63, 77
For resubmitting Land Use Change Permit application...........50
Impact .......................................................... 82, 121, 162
Land Use Change Permit general application........................52
Long-term Camping Permit...............................................181
Outdoor Vending Permit..................................................177
Preliminary Plan submittal ...................................... 107, 121
Sign Permit..................................................................255
Sketch Plan submittal.......................................................95
Special Event Permit......................................................173
To amend Land Use Resolution..........................................20
Waiver of, for Land Use Change Permit..............................52

**FENCING** ................................................................**262**

"Fence-out" requirement, in protective covenant .... 83, 86, 102, 116, 123, 126, 222, 262, 280
As sediment control.......................................................268
Covenant for, to protect agricultural operation ...................222
Exemption of residences from requirements for ..................215
Maximum height allowed for............................................262
No Land Use Change Permit required for.................... 59, 292
Of mining operations.....................................................170
Of wildlife habitat areas.................................................215
Of wildlife habitat areas.................................................262
Required between public lands and other land uses.............262
Standards for...............................................................262

**FIGURES**

Areas of the floodplain ...................................................195
Examples of floodlighting................................................264
Height measurement by types of buildings.........................241
Landscaping as buffering................................................260
Measurement of building height.......................................241
Restrictive Inner Buffer Setback......................................217
Shielded and partially-shielded light fixtures......................262
Sight distance triangle...................................................256
Variable Outer Buffer setback.........................................219
Zero lot line siting.........................................................243

**FINAL PLAN**

**Application, Major Impact project**...................................**121**
Definition of...................................................................29
Protective covenants required in ............................... 83, 122
**Review process, Major Impact project**............................**128**

**FIRE PROTECTION** ...................................................**237**

And height restrictions of commercial structures..................241
And setbacks between buildings.......................................242
Annexation to district to ensure ......................................237
District review to ensure adequate...................................208
For child care centers....................................................179
For commercial and industrial uses..................................153
For group homes...........................................................179
For special events.........................................................175
Plan required for mining operations ........................ 162, 170
Water supply requirements to ensure...............................233

**FIRE PROTECTION DISTRICT**

Dude ranches required to meet standards of......................155
Mobile home community's compliance with standards of .....149

Required reference in protective covenants to standards of .237
Requirements to mitigate wildfire hazards...........................209
Review of driveway access ............................................230
Water adequacy related to standards of............................233

**FIREPLACE**

Definition of...................................................................29

**FLOODLIGHTING**

Illustration of permitted..................................................264

**FLOODPLAIN**

Amending FEMA maps of.................................................194
Base flood elevation of....................................................29
Definition of 100-Year.....................................................29
Development Permit required in........................................198
Elevation Certificate required to build in...........................198
Flood Insurance Rate Maps (FIRM), affecting development locations in ............................................................... 18
Flood Insurance Rate Maps (FIRM), delineating ..................30
Grandfathered structures in.............................................193
Illustration of areas within...............................................194
Protection of, in designated open space............................251
**Standards for development in** .....................................**192**
Uses allowed in flood fringe............................................195
Uses allowed in floodway................................................195
Variance from requirements affecting development in...........200
Warning language for, required on Final Plat ......................67

**FLOOR AREA**

For caretaker's apartment....................................... 140, 154
For home occupation......................................................141
For integrated secondary residence ......................... 140, 154
Maximum, for sleeping quarters.......................................140
Minimum residential allowed............................................241

**FLOOR for commercial loading areas**......................**255**

**FOOD SERVICE**

License, required for special event...................................174
Outdoor Vending Permit for providing...............................177
Requirements for...........................................................153

**FULL CUTOFF**

Lighting fixture, definition of.............................................35

**FUNERALS**

Exempt from Special Event Permitting ................................43

**GANG OF NINE**

Definition of...................................................................31
**Development in flood hazard areas**..............................**192**
**Development in geologic hazard areas** .........................**202**
Domestic animal controls................................................222
**Exterior Lighting**.......................................................**262**
**Fire protection**..........................................................**237**
**Partially exempted land uses' compliance with** ............... **8**
**Protection of water quality**.........................................**215**
**Road system**.............................................................**227**
**Sewage and wastewater treatment**.............................**235**
**Solid-fuel-burning devices**........................................**247**
**Water supply**............................................................**232**

**GARAGE**

Definition of...................................................................31
Home occupation conducted in detached...........................141

**GEOLOGIC HAZARD AREAS** ....................................**202**

Building Permit review requirements in...............................202
Definitions of..................................................................31
Geotechnical report required in protective covenants....84, 116, 123
Geotechnical report required to evaluate.................. 65, 79, 109
Maps of, used by County.................................................18
Review of, by Colorado Geologic Survey............................202

BLM_0054207

Warning language required on Final Plat ........................67, 203
**Governmental immunity**
  No waiver of .................................................................. 288
**GRADE**
  Finished, definition of ..................................................... 32
  Natural, definition of ...................................................... 32
  Related to building height measurement............................. 241
**GRADING** ...............................................................**266**
  Definition of ................................................................... 32
  Plan required for water quality protection ......................... 217
  Prohibited before all required permits obtained.................. 266
  Reclamation Permit required for .................................... 266
**GRAVEL**
  Definition of, as "construction materials"............................ 27
  Land Use Change Permit required for mining of .... 75, 93, 294,
    293
  Processing of, defined ...................................................... 32
  Setback for public road project requiring ........................... 164
  Standards for temporary removal of ................................. 163
  Stockpiling of, prohibited in Restrictive Inner Buffer.............. 217
**GROUP HOME** ........................................................**179**
  Classification of, as Minor Impact project .....................76, 294
  Definition of ................................................................... 32
  Land Use Change Permit required for...........................76, 294
**HEIGHT**
  Commercial structure maximum............................................ 241
  Industrial structure maximum.............................................. 241
  Maximum allowed for sign.................................................. 253
  Maximum structure, on parcel above timberline ................... 225
  Maximum structure, on Wilderness inholding ...................... 225
  Measuring of building, illustration of................................... 241
  Of fences in wildlife habitat areas...................................... 262
  Residential structure maximum.......................................... 241
**HELICOPTER**
  Access for, prohibited above timberline ............................. 225
  Access for, prohibited within Wilderness ........................... 225
**HISTORICAL RESOURCE**
  Definition of .................................................................... 25
  Preservation of, during mining............................................ 169
**HOME OCCUPATION** ...............................................**141**
  Allowed without Land Use Change Permit ............ 59, 292, 293
  Definition of .................................................................... 33
  Exemption of, from general standards for commercial uses. 153
  Gardens and greenhouses as .............................................. 139
  **General standards of operation** ...................................... 141
  Larger sign allowed by variance for .................................... 254
  Limited to indoor activities.................................................. 141
  Parking of commercial vehicles used in .............................. 256
  Prohibited from creating nuisances...................................... 141
  Residential access for ....................................................... 23
  Secondary to primary residence .......................................... 139
  Signs for, allowed without Sign Permit................................. 252
  Standards for more than one, in one home .......................... 63
  Two, requiring Land Use Change Permit..........................61, 292
**HOMEOWNERS' ASSOCIATION**
  As owner of wastewater treatment system............................. 236
  Definition of .................................................................... 33
  Required for condominium/townhome developments.....83, 123
  Responsibilities of, required by protective covenants ..... 83, 101,
    115, 122
  Responsibility of, for maintaining water supply for fire
    suppression ................................................................. 238
  Responsibility of, to "fence out"livestock................102, 116, 222
  Responsibility of, to remove snow in subdivisions ........ 116, 123

Responsibilty of, to maintain parks in subdivisions........ 100, 114
**HORSE/HAY SHED**
  Definition of.................................................................... 33
**HOURS OF OPERATION**
  For mining operations ...................................................... 170
  For special events............................................................. 176
  To mitigate impacts to neighbors........................................ 274
**HOUSING**
  Affordable, definition of...................................................... 24
  County policy to encourage diversity of.................................. 2
  County policy to ensure development meets need for ............ 3
  Essential, definition of ....................................................... 28
  Factory-built, definition of.................................................. 29
  Long-term rental, definition of............................................. 35
**IMPACT**
  Definition of.................................................................... 33
  Methods to mitigate........................................................... 36
**IMPACT CLASSIFICATION** .........................................**54**
  Affected by sequential applications...................................... 54
  Appeal of ........................................................................ 54
  Criteria for ...................................................................... 54
  Expansion of existing uses and .......................................... 54
  Higher level of review caused by ...................................49, 59
  Of Administrative Review projects requiring permit ............... 61
  Of Adminstrative Review Projects NOT requiring permit......... 59
  Of Major Impact project .................................................... 93
  Of Minor Impact project .................................................... 75
  Of Technical Modifications of applications............................ 132
  **Table of** .....................................................................**292**
  When land use change is modified....................................... 132
**IMPACT FEES** .........................................................**22**
  For road damage caused by mining operations ................... 162
**INDIVIDUAL SEWAGE DISPOSAL SYSTEM**
  Location of, in floodplain area............................................ 197
  Permit required for .............................................................. 7
  Related to residential density ............................................ 188
  Required for long-term camping .......................................... 157
  Required for long-term recreational vehicle use ................... 180
  Required for temporary structure ........................................ 177
**INDUSTRIAL USE** ...................................................**153**
  Abandonment of nonconforming .......................................... 13
  Classification of, as Major Impact project ........................93, 292
  Classification of, as Minor Impact project.......................75, 293
  Exemption of, from aggregate square footage standards..... 245
  Expansion of, as Major Impact project ...........................93, 292
  Expansion of, as Minor Impact project ....................... 62, 75, 293
  Fencing of......................................................................... 262
  Height limitation of............................................................ 241
  Lighting standards for ........................................................ 263
  **Locational standards for** .................................................. 189
  Open space required for..................................................... 249
  Parking lot screening required for ....................................... 258
  Security lighting allowed for................................................ 264
  Setbacks for ..................................................................... 243
  Solid fuel-burning devices in............................................... 248
  **Standards for** ................................................................ 153
  Storm Water Discharge Permit required for ........................ 268
**INFRASTRUCTURE** ..................................................**227**
  Definition of.................................................................... 34
  **Standards for development of**.......................................... 227
**INHOLDING**
  Definition of.................................................................... 34
  **Development on, in Wilderness**........................................ 225
  Exemption of, from vehicle access requirements ................. 237

BLM_0054208

Maximum square footage of structures allowed on Wilderness ..................................................225

Maximum structure height allowed on Wilderness ...............225

**INTEGRATED SECONDARY RESIDENCE**

Definition of.............................................................................40

Standards for.........................................................................140

That requires no Land Use Change Permit.................. 59, 293

**INTERPRETATION**

Of County's maps.................................................................194

**Of Land Use Resolution**........................................................20

Of Land Use Resolution, appeal of........................................20

When codes conflict...............................................................17

**IRRIGATION**

Calculations for, included in water supply plan .....................233

**IRRIGATION DITCHES**

Definition of.............................................................................34

Exemption of, from "water body" definition ............................45

Required easement for..........................................................222

Right to maintain...................................................................280

Right-to-maintain language on Final Plat................................68

Setback of construction materials operations from ...............165

**LAND USE CHANGE PERMIT**

Definition of.............................................................................34

Extension of, Administrative Review project.............................5

Extension of, Major Impact project...........................................5

Extension of, Minor Impact project...........................................5

Grounds for denial of...............................................................6

Pending application for.............................................................8

Relationship with other permits ...............................................6

Required for commercial and industrial uses ........................153

Required for secondary uses ........................................ 139, 143

Required of all governments.....................................................6

**LANDSCAPING**.....................................................................**258**

Minimum planting required for...............................................260

Plan required in Preliminary Plan .........................................114

Plan required in Sketch Plan .................................................100

Required by protective covenants.........................................123

Required in mobile home community .....................................149

Standards for.........................................................................258

Water conservation in ...........................................................259

Water required for..........................................................112, 233

**LANDSLIDE HAZARD AREA**

Definition of.............................................................................32

Development permitted in......................................................205

Prohibited development in .....................................................205

Standards for development in ...............................................203

Submittal requirements related to.........................................109

**LARGE PARCEL INCENTIVE PROCESS (LPIP)** ........**275**

Exemption of, from visibility standards .................................246

Expedited review for.............................................................275

**LEAPFROG DEVELOPMENT**

Compact development pattern promoted to discourage ...........2

Definition of.............................................................................43

**LEGAL LOT**

Definition of.............................................................................34

**One residence allowed by right on**......................................12

**Liability**

Of county employees.............................................................288

Related to administration of this Resolution..........................288

**LIGHT INDUSTRIAL**

Definition of.............................................................................35

Design standards for development of....................................154

Setbacks required for............................................................243

**LIGHTING**

Agricultural operation exempt from requirements .................263

Definition of.............................................................................35

During special events............................................................174

Exterior fixtures allowed........................................................263

Floodlighting standards.........................................................264

For commercial and industrial uses ......................................153

Mercury vapor, prohibition of ................................................264

Motion sensors allowed for residential access .....................264

Of signs, required to be minimized........................................253

Of telecommunication structures...........................................178

Plan required for mobile home communities..........................148

Required to be regulated in protective covenants.. 83, 101, 116, 123

**Standards for**.......................................................................**262**

**LIQUOR**

License required for special event................................. 174, 175

**LIVESTOCK**

Allowed without Land Use Change Permit..............60, 179, 294

Definition of.............................................................................25

Dog controls to protect..........................................................222

Drive route, definition of..........................................................43

Drive route, historic easement for........................ 65, 80, 99, 110

Drives, signs for, allowed without permit...............................252

Fencing required to protect ............ 68, 86, 126, 222, 262, 280

**LOCATIONAL STANDARDS**..............................**187, 189**

**For commercial/industrial development**..........................**189**

**For residential development**............................................**187**

Mining operations exempt from.............................................163

**LONG-TERM CAMPING PERMIT**

Application form for ...............................................................181

Fees for .................................................................................181

**LOT CLUSTER**

Administrative Review required for................................. 61, 293

Application form for .................................................................71

Definition of.............................................................................35

**LOT SIZE**

Density standards related to..................................................187

For mobile home space .........................................................150

Minimum allowed in new subdivisions ..................................240

Minimum of 35-acres.............................................................240

**MAJOR IMPACT PROJECT**

Definition of.............................................................................35

Environmental Impact Statement review process for ..... 50, 103

Extension of permit for..............................................................5

Extension of Preliminary Plan approval for...........................119

Extension of Sketch Plan approval for..................................105

**Final Plan review process for** ...........................................128

Final Plan submittal for.........................................................121

General Review Process for....................................................94

Landscaping requirements for.......................................258, 260

Lighting plan required for ......................................................265

Phasing of...............................................................................50

Preliminary Plan fees for............................................... 107, 121

Preliminary Plan review process for......................................116

**Preliminary Plan submittal for**..........................................107

Sketch Plan fees for................................................................95

Sketch Plan review process for.............................................102

**Sketch Plan submittal for**...................................................95

**Standards of approval for**...................................................93

**Summary of review process for**.......................................**296**

Technical Modification of.......................................................131

Uses classified as...................................................................93

Vested right for........................................................................14

Water quality requirements for..............................................268

**MANCOS SHALE**

BLM_0054209

Definition of........................................................ 32
Development on.................................................. 208
**MANUFACTURED HOME**
Definition of........................................................ 35
Location of,  in floodplain hazard areas........... 196
Mobile home as................................................... 36
Permit required for ....................................... 7, 145
**Requirements for locating individual**............. 145
Site preparation required for............................. 145
Subdivision, requirements for........................... 145
**MANURE**
Required disposal of.......................................... 179
Setback from, required for water quality protection.............. 179
Stockpiling of, in floodplain hazard areas ........ 196
**MAPS**
Floodplain, used by County.................. 18, 194, 198
Geologic hazard, used by County ............... 18, 202
Gunnison County road maintenance and snowplowing ........ 18
Gunnison Sage-grouse leks and occupied habitat................. 18
Revising and amending floodplain, process for ................... 201
Sage-grouse habitat............................................ 97
Soils survey, used by County ............................. 18
Wetlands identification around Crested Butte ......... 18
Wildfire hazard, used by County ............... 18, 208
Wildlife habitat, used by County ....................... 18
**MINING**
Definition of, as land use change...................... 34
Exploration, definition of.................................... 36
**MINING OPERATIONS**
Definition of........................................................ 36
Exempt uses related to...................................... 159
Exemption of,  from landscaping requirements.................. 258
Exemption of, from cut and fill requirements on steep slopes
.................................................................... 267
Financial security required for reclamation of................... 171
Impact fee for road damage caused by............. 162
Mitigation of visual impacts of.......................... 169
**Permit application for**.................................... 160
Phasing of......................................................... 170
Setback of machinery for, from centerline of public road...... 163
**Standards for**.................................................. 167
**Table of setbacks for**..................................... 165
**MINOR IMPACT PROJECT** ............................... **75**
Application form for ............................................ 77
Dams/water impoundments classified as........... 271
Definition of........................................................ 36
Environmental Impact Statement review process for............. 50
Extension of permit for......................................... 5
Fees for application for............................... 63, 77
Final action submittal requirements for............. 81
Lighting plan required for.................................. 265
Open space requirement for.............................. 249
Phasing of........................................................... 50
**Review process for**........................................ 88
**Standards of approval for**............................. 76
**Summary of review process for**..................... 296
Technical Modification of.................................. 131
**Uses classified as**........................................... 75
Vested right for................................................... 14
**MITIGATION**
Best management practices as.......................... 191
Definitions of...................................................... 36
Of development in flood hazard areas.............. 195
Of development in geologic hazard areas........ 202, 203
Of development in landslide hazard areas.......... 205

Of development in rockfall hazard areas........... 206
Of development in wildfire hazard area............ 209
Of development on Restrictive Inner Buffer ...... 218
Of dust, in mining operations..................... 167, 168
Of environmental impacts in mining................ 162
Of impacts to allow waiver of setback for mining ........ 167
Of impacts to Gunnison Sage-grouse.............. 213
Of impacts to public trails................................. 231
Of noise, in mining operations......................... 170
Of traffic impacts............................... 162, 228, 229
Of visual impacts related to mining.......... 162, 169
Radon, definition of............................................ 39
Role of, in determining net impact of development.......... 37, 42
Techniques to protect wildlife........................... 213
**MOBILE HOME**
Colorado Division of Housing/HUD certification of............... 147
Community, definition of..................................... 36
Definition of........................................................ 36
**Individual manufactured and**....................... 145
Located on legal lot, requirements for.............. 146
Location of,  in floodplain hazard areas........... 196
Mobile Home Permit required for............... 146, 150
On agricultural operation.................................. 147
Permit required when adjacent to subdivision...... 146
Snowload requirements for............................... 147
Subdivision....................................................... 145
Temporary 200-day Permit for.......................... 146
**MOBILE HOME COMMUNITY** ......................... **147**
Definition of....................................................... 147
Density allowed in............................................. 148
Design and maintenance of.............................. 148
Domestic animals allowed................................. 149
Land Use Change Permit required for............... 148
Rules for operation of....................................... 149
Space requirements.......................................... 150
**MUDFLOW HAZARD AREA**
Definition of........................................................ 32
Ordinary high water line or mark, defining......... 37
Standards for development in........................... 203
Submittal requirements related to.................... 109
**MULTIPLE-FAMILY**
Buildings, setbacks allowed between............... 243
Development, open space required in............... 249
Parking spaces required for residential development............ 305
Residence, definition of...................................... 40
Residence, setbacks required for development of............... 243
Residence, solid fuel-burning devices in.......... 248
**NOISE**
Limited mining haul hours to minimize impact of ............ 167
Limits of, in commercial uses........................... 154
Limits of, near sage grouse breeding areas...... 171
Limits of, to mitigate impacts to neighbors....... 274
Limits on trucks and crusher in mining operations........ 168
Permissible levels in mining operations........... 170
Prohibited levels in special events.................... 176
State statute regulating........................................ 1
**Table of allowed levels of, in commercial  and industrial uses**............... 154
**Table of allowed levels of, in mining operations** ........ 170
**NONCONFORMING USES**................................. **12**
Abandonment of commercial............................. 13
Damage or destruction of.................................. 13
Definition of........................................................ 37
Expansion of...................................................... 12
Legal existing..................................................... 12

Mobile homes as ................................................147
Relocation of ....................................................12
Repairs and maintenance of ..............................12
Signs as ...........................................................252
**NOXIOUS WEEDS ...................................... 265**
And maintenance of livestock areas ..................180
And maintenance of open space ........................251
Control of, required by protective covenants in Final Plan ......83, 123
Control of, required by protective covenants in Preliminary Plan ...............................................114, 116
Control of, required by protective covenants in Sketch Plan .100
Control of, required in mobile home community ....................148
Definition of ......................................................37
Exemption of individual residences from plan to control ........265
General standards for controlling ......................267
Landowners' responsibility to control ................280
**NUISANCE**
Definition of ......................................................37
Failure to maintain camping site as .................180
Noise as, prohibited during special events ........176
Of noncompliant home occupation ...................141
Undue, prohibited, to protect other uses ...........274
What lawful ranching is not ..............................280
**OBTRUSIVE VISIBILITY ............................. 221**
Definition of ......................................................37
Reason for denial of oversize house ..................246
**OPEN SPACE ............................................. 249**
Calculation of ....................................................249
Commercial or industrial uses, amount of, required in ..........249
Commercial uses on commonly-owned ..............251
Definition of ......................................................37
Required in municipal Three Mile Plan areas .....249
Required in residential development ..................249
**OUTDOOR VENDING PERMIT**
Business license fees related to .......................177
Required in Gunnison County ......................7, 177
**PARKING**
Aisle, definition of ............................................37
Area, design standards for ................................256
Area, landscaping design for .....................258, 261
Bed and Breakfast, requirement for on-site ........142
Child care center, requirements for ...................179
Farm or ranch stand, requirements for off-road .....155
For home occupation .........................................141
General standards for off-road ..........................255
Outdoor vendor requirements for .....................177
Prohibited for RV's, in public right-of-way ...........180
Sleeping structure, requirements for .................140
SPACES REQUIRED FOR DISABLED PERSONS .....................256
Special event plan required for .........................175
Table of commercial loading requirements .........256
**PARTIALLY EXEMPTED LAND USE CHANGES ............8**
Common law vested right of ..............................11
Sections of Resolution that apply to ...............7, 8
Three-year vested right of .................................11
**PENDING APPLICATION**
Regulation governing .........................................8
**Permit**
Violation of .......................................................283
**PERMIT .......................................................... 3**
404, required for wetlands activity ............. 198, 267
Access, Gunnison County ..................................230
Access, onto state and federal highways ............230

Consolidation of applications for ........................51
Definition of ......................................................38
Discharge, required by state for water quality protection ......268
Floodplain Development ....................................198
For wireless, freestanding telecommunications structure ....178
Land Use Change, required for most uses ............3
Life (term) of Land Use Change .........................4
Long-term Camping ..........................................180
Mobile Home and Temporary Mobile Home ........146
Outdoor Vending ..............................................177
Reclamation .....................................................265
Sign ................................................................251
Snowplowing, private and temporary ..................224
Special Event ...................................................173
Temporary suspension or permanent revocation of ............284
**PHASING ....................................................... 50**
Amenities required at "front end" of developmen ....................94
Final Plan of Major Impact project ....................121
**Land Use Change applications** ......................50
Mining operations .............................................170
Preliminary Plan in Major Impact project ............107
Required schedule of completion for ..................51
Sketch Plan of Major Impact project ..................95
Timing of, in Major Impact project .....................50
**PLANNING COMMISSION**
Members' terms .................................................20
Powers and duties of ........................................20
**PLAT**
Addresses required on, for emergency services ............. 85, 125
Correction of, application form for ......................71
Required language on ......................... 67, 85, 125
Standards for correction of ................................63
Survey, required for correction of subdivision plat ....................71
Vacation of, application form for ........................71
**PLAT VACATION**
STANDARDS FOR APPROVAL OF ........................76
**POPULATION CENTERS**
Definition and list of .........................................38
**PRE-APPLICATION CONFERENCE ............................. 51**
For interpretation of Land Use Resolution ...........20
For water impoundment project .........................272
Mandatory for Technical Modification request .....131
Mandatory, for Preliminary Plan of Major Impact project ....116
Mandatory, for Sketch Plan of Major Impact project ........102
Optional, for Administrative Review project ..........73
Optional, for Final Plan of Major Impact project ....................128
Optional, for Minor Impact project .....................88
**PRELIMINARY PLAN ....................................... 107**
Application, for Major Impact project ..................107
Approval, significance of ...................................119
Cause for denial of ...........................................105
Combining of, with Final Plan for Major Impact project ..........94
Cost estimates required for ...............................116
Detailed engineering required in .......................94
Expiration of approval of ...................................119
Extension of approval of ...................................119
Fees for review of ......................... 107, 121
Incomplete, consequences of ...........................105
Phasing of, in Major Impact project ...................107
Protective covenant language required in ............115
Public hearing required, for Major Impact project ................117
**Review process for** ......................................116
**PRIMARY RESIDENCE**
Larger than 9,000 sq. ft., classification of, as Minor Impact project ......................................................292

BLM_0054211

*INDEX*

**PROTECTIVE COVENANTS**
County approval required to amend ............... 83, 101, 115, 123
Draft of, required for Preliminary Plan of Major Impact project
.................................................................................... 115
Required for Final Plan of Major Impact project.............83, 122
To address wildfire prevention.................................................209
To confine animals ................................................................... 68
To ensure fire district standards.............................................237
To ensure irrigation ditch maintenance easement................. 68
To ensure perpetual open space ...........................................251
To inform of "fence-out" requirements.................................... 68
To protect agricultural operation ............................................222

**PUBLIC HEARING**
Adjacent property owners, identifying for................................. 23
Administrative takings process, optional, additional, for ....... 134
Amending Land Use Resolution, required for......................... 19
Before temporary suspension or permanent revocation of
Permit..................................................................................284
Conduct of.................................................................................57
Continuing ................................................................................ 58
Costs of publication to be paid by applicant ..... 77, 95, 104, 107,
118, 133, 137, 244, 271
Definition of............................................................................... 38
Environmental Impact Statement scoping, coordination of
timing with ............................................................................ 50
Ex parte communication related to ......................................... 58
Extension of Land Use Change Permit, required for...........5, 15
For Minor Impact project.......................................................... 89
For setback variance in Land Use Change Permit review....244
Minor Impact subdivision, additional, optional for................... 90
Notice required for.................................................................... 54
Posting of notice for ................................................................. 56
Preliminary Plan of Major Impact project...............................117
Preliminary Plan of Major Impact project, optional, additional,
.............................................................................................118
Required for administrative takings process ..........................133
Sketch Plan of Major Impact project, optional, additional, t....104
Sketch Plan, for Major Impact project....................................103
Special area designation, required for..................................... 16
To determine impact classification of water impoundment....271
To extend seasonal lighting, optional.....................................264

**PUBLIC MEETING**
Definition of............................................................................... 38

**PUBLIC ROAD**
Corridors, list of, as "ridgeline vantages" ..............................219
County Access Permit required to access...............................230
Definitions of............................................................................. 38
Legal access to, required of new land use change.................230
Seasonal truck traffic limitation on.........................................167
Setback of construction materials operation from centerline of
.....................................................................................163, 164
Setback of mining machinery from centerline of...........163, 165
Setbacks required from ...........................................................157
Snowplowing not a guaranteed service on .............................223
Uses of, by ranchers...............................................................280

**RADON**
Mitigation of.............................................................................. 39

**RANCHING**
As essential element of County economy...............................221
County's intent to encourage and conserve........................2, 279
Definition of.............................................................................. 39
Right-to-Ranch Policy..............................................................279

**REAL ESTATE SIGN**
Type of, allowed without Sign Permit......................................252

**RECLAMATION**

Definition of............................................................................... 39
Of mining operation.................................................................161
Of mining operations in compliance with Mined Land
Reclamation Division ..........................................................171
Of vegetation, East River to Gothic........................................259
On disturbed 30% slopes ........................................................207
Permit required for ..................................................................265
Plan for, required in Preliminary Plan....................................112, 114
Plan for, required in Sketch Plan............................................100
Required by protective covenants .....................................83, 123
Required by protective covenants in Preliminary Plan.. 114, 116
Required by protective covenants in Sketch Plan ........100, 102
Required, on disturbed slopes ................................................207
**Requirements same as Colorado MLRD** .............................171
Standards for...........................................................................265

**RECLAMATION PERMIT**
Required for grading activities................................................266
Required for road cuts .............................................................266

**RECREATION**
Active and passive, definitions of............................................ 39
Areas, included in required open space ..................................250

**RECREATIONAL VEHICLE**
**14-day camping limit**...........................................................180
Definition of............................................................................... 39
Individual sewage disposal system required for .....................157
Long-term Camping Permit allowed for...................................180

**RECREATIONAL VEHICLE PARK**..............................**156**
Definition of............................................................................... 39
Land Use Change Permit required for.....................................156
Regulation of, by State of Colorado ......................................156
Standards for construction and operation of ..........................156

**REPEAL OF REGULATIONS**
Flood Damage Prevention Resolution ..................................... 22
Land Use Resolution................................................................ 22
Mobile Home Regulations........................................................ 22
Resolution restricting camping on private property................. 22
Sign Code................................................................................. 22
Special Events Resolution........................................................ 22
Temporary structures on construction sites............................ 22

**RESIDENCE**
Definitions of............................................................................ 40
Integrated secondary, definition of......................................... 40
Primary, exempt from Land Use Change Permit..................... 59

**RESIDENTIAL LIVING AREA**
Administrative Review Project, measurement of..................... 61
Allowed increase for Essential Housing .................................185
Classification of, as Administrative Review project..........61, 292
Definition of.............................................................................. 40
Minor Impact Project, measurement of ...........................75, 140

**RESORT**
Definition of.............................................................................. 40
Occupancy limit for .................................................................155
**Standards for**.......................................................................155

**RESTRICTIVE INNER BUFFER**
Illustration of............................................................................217
Prohibited activities in.............................................................217
Setback for ..............................................................................217
Unavoidability, allowing land use change in ..........................218

**REVEGETATION**
And noxious weed control.......................................................266
Plan required, in mining.......................................................... 171
Required after grading activities..............................................267
Required in reclamation of geologic hazard areas ................207
Required in Reclamation Permit................................................ 7

BLM_0054212

**REVIEW AGENCIES**
List of...........................................................................40
Referral of Administrative Review project application to .........73
Referral of Land Use Change Permit application to.................53
Referral of Minor Impact project application to ........................89
Referral of Preliminary Plan for Major Impact project to..........117
Referral of Sketch Plan for Major Impact project to..............102
**Revocation**
Permanent, of Permit.................................................284
**RIDGELINE**..........................................................**219**
And mining operations ..................................... 162, 169
Definition of................................................................40
Land Use Change Permit required for building on.......... 75, 292
List of......................................................................220
List of specific viewpoints related to development on ...........220
**Standards for development on**..................................219
Visibility of buildings on...............................................220
**Right of entry**
To conduct inspections................................................283
**RIGHT-TO-RANCH POLICY**.......................................**279**
As element of Administrative Review project............. 65, 80
As element of Preliminary Plan of Major Impact project .......110
As element of Sketch Plan of Major Impact project ...............98
Conflict resolution program provided by ..........................281
Required distribution of, to applicants for Land Use Change
Permits................................................................. 52, 89
To reduce conflicts between agricultural operations and growth
....................................................................................279
**ROAD CONSTRUCTION**
Agricultural exemption for ........................................ 76, 294
Classification of, as Minor Impact project.................. 76, 294
County standards for....................................................41
Definition of................................................................41
Definition of, as land use change ...................................34
Reclamation Permit required for.......................................7
Road Cut Permit required for............................................7
**ROAD SYSTEM**.....................................................**227**
For mobile home community.........................................148
Plan required in Sketch Plan for Major Impact project............98
Plan, required in Preliminary Plan for Major Impact project... 111
**ROADS**
Corridors, list of, as "ridgeline vantages"........................219
Definition of................................................................41
Developer required to mitigate share of impact to County's ..229
Development of, in avalanche hazard area...........................205
Functional classifications of ..........................................111
Maintenance and snowplowing of, County maps of ...........18
Names, duplication of prohibited .............................. 85, 125
Public, definition of......................................................38
Seasonal truck traffic limitation on ................................167
Setback of construction materials operation from centerline of
public ............................................................... 163, 164
Setback of mining machinery from centerline of ..................165
Setbacks from .............................................................243
Setbacks required from.................................................157
Standards for construction of, on 30% slopes.....................207
**ROCKFALL HAZARD AREA**
Definition of................................................................32
Development allowed in.................................................206
Mitigation of development in...........................................206
Standards for development in ........................................203
Submittal requirements related to ...................................109
Uses prohibited in.......................................................206
**SAGE GROUSE CONSERVATION PLAN**

Definition of................................................................32
Mitigation of mining noise advised by ...............................171
**SAGE-GROUSE**
Division of Wildlife property review review related to............212
Land Use Change Permit habitat maps for............................97
Lek, definition of........................................................35
Maps of leks and occupied habitat....................................18
Pre-Application conference regarding.................................210
Standards of development in habitat of .............................214
**SATELLITE DISH** .................................................**177**
Definition of................................................................41
Larger than 36 inches....................................................177
No Land Use Change Permit required for...................... 60, 293
**Standards for mitigating visibility of**............................177
**SCREENING**
For ridgeline development ....................................... 220, 221
To mitigate visibility of mining operations ..................... 169, 170
**SEASONAL USE**
Deed restrictions required for, in avalanche areas ................205
Definition of................................................................41
Plat language required for.......................................... 69, 88, 128
**SECONDARY RESIDENCE**
Detached, definition of ..................................................40
Integrated, definition of .................................................40
Sewage treatment system required for................................140
**SECONDARY USES**
Allowed after primary residence ....................................139
Definition of................................................................23
Land Use Change Permit required for........................... 139, 143
**SEDIMENTATION CONTROL**
Required during grading ...............................................267
**SENSITIVE WILDLIFE HABITAT**
Definition of................................................................47
**SERVICE LINE**
Definition of................................................................41
**SETBACKS** ........................................................**242**
Between asphalt plants and residences .............................164
Between mining operations and residences .........................166
Between mobile homes.................................................150
Between zero lot line residences.....................................242
Definition of................................................................41
For construction materials operations............................ 163, 164
For mining operations from other uses ..............................163
For recreational vehicle park.........................................156
For Restrictive Inner Buffer ..........................................217
For telecommunication towers .......................................178
**From property lines**................................................242
From roads.................................................................243
From water body, waiver for ..........................................165
Of adult uses from property lines....................................156
Of construction materials operations from high water mark ..218
Of machinery, materials from centerline of public road .........163
Of manure piles from water body....................................179
Of outdoor vendor from residential boundary.....................177
Of soil disturbance from water body.................................267
Of Variable Outer Buffer ..............................................219
Of vehicle maintenance area from water body.....................219
Requirements, table of.................................................243
Table of, for mining operations.......................................165
Table of, for recreational vehicle park................................156
Variance application form for property line.........................244
Variance from standards for......................................... 243, 244
Waivers from, for mining operations.................................166
**SEWAGE TREATMENT SYSTEM**.............................**235**

BLM_0054213

Central, related to increased residential density.....................187
Definition of..............................................................................45
Feasibility analysis required in Preliminary Plan of Major Impact project ...............................................................113, 235, 236
For mobile home community ...................................................149
For secondary residences ......................................................140
Homeowners' association responsibility to maintain.......83, 101, 115, 123
Requirement of zero lot line development to tie onto,...........242
Requirement to tie onto, if within 400' ....................................235
Standards for construction of .................................................236

**SIGNS** .................................................................................**251**
Advertising condominiums or townhomes before development approval .............................................................................254
Cluster, for commercial/industrial parks.................................252
Definitions of.............................................................................41
For lot sales before development approval .............................253
Home occupation ....................................................................141
Nonconforming .......................................................................252
Off-premise, variance required for .........................................253
Real estate, size allowed without Sign Permit.......................252
Road name ..............................................................................231

**SITE PLAN**
Definition of..............................................................................42
For Administrative Review project............................................71
For Building Permit .................................................................255
For Minor Impact project...................................................66, 80
For water quality protection ....................................................216
**Standards and measurements for**.....................................239

**SITE-SPECIFIC DEVELOPMENT PLAN**
As vested right trigger ..............................................................14
Definition of..............................................................................42

**SKETCH PLAN** .....................................................................**95**
**Application for Major Impact Projects** ................................95
Approval, significance of.........................................................105
Engineered designs not required for........................................94
Evolution of, during review process .........................................94
Expiration of approval of, in Major Impact project .................105
Extension of approval of..........................................................105
Fees for review of.....................................................................95

**SLEEPING STRUCTURE**
Land Use Change Permit required for.....................61, 139, 292
Standards for...........................................................................140

**SLOPE**
30 %, limited development on..................................................207
And water quality protection ...................................................219
Avoidance of cut and fill on.....................................................267
Definition of..............................................................................42
Landscaping on.......................................................................259
Stabilizing steep, for weed control..........................................267
Unstable, development limited on...........................................207

**SNOW STORAGE**.................................................................**261**
And landscaping design requirements ....................................259
And protection of water bodies ...............................................261
Parking area design, related to ..............................................255

**SNOWPLOWING** ..................................................................**223**
And risk to emergency services ..............................................224
County not obligated to provide ..............................................223
Design requirements for..........................................................261
Land Use Change Permit required for................................76, 295
**Landowner's acknowledgement of no snowplowing service** ............................................................................223
**On roads where no service exists** .....................................223
Private temporary permit for....................................................224
Required by protective covenants ..........................................116

Temporary Private Permit required for.........................................7
**SOLAR**
Active space heating, definition of............................................23
Heating systems, definitions of.................................................42
**SOLAR ACCESS**
Definition of..............................................................................28
Design of landscape buffer to protect.....................................260
Protected from adjacent heights .............................................241
**SOLID-FUEL-BURNING DEVICE**...............................**247**
Approved non-solid, definition of...............................................42
Approved, definition of..............................................................43
Definition of..............................................................................42
**Installation of**....................................................................247
Installation of, around municipalities ......................................248
Regulation of, required in protective covenants.............84, 123
**SPECIAL AREA**...................................................................**15**
Definition of..............................................................................43
**Designation of** ....................................................................15
Standards for designation of ....................................................16
*SPECIAL DEVELOPMENT PROJECT REGULATIONS*
*Definition of*............................................................................43
**SPECIAL EVENT**.................................................................**173**
Classification of, as Administrative Review project ..........59, 293
Coordination of, with municipality...........................................176
Definition of..............................................................................43
Exemptions of, from requirements ..........................................173
Fees for...................................................................................173
Hours of operation limited for .................................................176
Indemnification of County required for....................................176
Insurance required for.............................................................176
**Parking spaces required for** .............................................305
Parking surface requirements for............................................257
Permit application for...............................................................173
**Permit requirements FOR**.................................................173
Sign requirements for..............................................................252
Standards of operation for ......................................................175
Weddings and funerals as.......................................................173
**SPECIAL GEOGRAPHIC AREA**
Definition of..............................................................................43
**Designation of** ....................................................................15
Standards for designation of ....................................................16
**SPRAWL**
And strip development................................................................43
Compact development pattern promoted to discourage...........2
Definition of..............................................................................43
**STANDARDS**
Access...........................................................................230, 237
Drainage and storm water control...........................................268
Drinking Water.........................................................................234
Exterior lighting .......................................................................263
For fencing..............................................................................262
**For Administrative Review Project** .....................................62
For altering building envelopes.................................................63
For approval of variance from setback requirements ...........245
For bed and breakfast operation.............................................142
For boundary line adjustment....................................................62
For commercial and industrial uses ........................................153
For constructing water supply system.....................................235
For construction of water impoundments.................................273
For correction of plat.................................................................63
For designation of Special Area................................................16
For detached secondary residence.........................................140
For determining residential density.........................................187
For development in alluvial fan................................................203
For development in avalanche Blue Zone................................203

BLM_0054214

For development in avalanche hazard areas..........................204
For development in geologic hazard area.........................203
For development in mudflow hazard area...........................203
For development in rockfall hazard area..........................203
For development in Variable Outer Buffer.........................219
For development in wildfire hazard area..........................208
For development in wildlife habitat areas........................213
**For development on ridgelines**..................................219
For development on talus slopes..................................203
For development over a fault.....................................203
For Emergency Exceptions.........................................136
For home occupation..............................................141
For integrated secondary structure (caretaker's apartment).140, 142, 143
For keeping livestock on non-agricultural parcel.................180
For light industrial uses........................................154
**For lighting**.................................................262
**For Major Impact projects**....................................93
**For mining operations**........................................167
**For Minor Impact projects**....................................76
For mobile home communities......................................148
For mobile home installation.....................................147
For more than one home occupation in one home....................63
For noxious weed control.........................................267
For off-road parking.............................................255
For outdoor vending operation....................................177
For parking area design..........................................256
For reclamation and noxious weed control.........................265
For recreational vehicle parks...................................156
For Site Plan....................................................239
For Special events...............................................175
For structure intended for sleeping..............................140
For Technical Modifications......................................131
For wastewater/sewage  treatment system construction.......236
For wireless telecommunication structure.........................178
**Infrastructure**...............................................227
Lighting.........................................................263
Location, for structures.........................................240
Locational, for commercial and industrial development...........189
**Locational, for residential development**......................187
Of development in Sage-grouse habitat............................214
Sign.............................................................252
Site Plan........................................................239
To amend Land Use Resolution.....................................19
**To ensure compatibility between land uses**....................274
**To protect natural resources**.................................191
To reduce flood hazard.......................................196, 197
Trail design.....................................................232
Water quality buffer.............................................217

**STATE INTEREST**
Matter of, definition of.........................................36

**STORAGE SHED**
Definition of....................................................43
In mobile home community.........................................151
No Land Use Change Permit required for...........................292

**STORM WATER** ................................................**268**
Colorado permit required for discharge of........................268
Definition of....................................................43
Management of, in mining operations..............................161
**Regulation for discharge of**..................................268

**STRUCTURE**
Accessory, definition of.........................................23
Agricultural, definition of......................................24
Definition of....................................................43
Height restriction of............................................241

Intended for sleeping only, Land Use Change Permit required for................................................61, 292
Maximum size of, on wilderness inholding.........................225
Nonconforming legal..............................................12
Obtrusively visible, definition of...............................37
Secondary, not requiring Land Use Change Permit..................59
Secondary, requiring Land Use Change Permit.................139, 143
Size limitations of residential..................................245

**SUBDIVISION**
Approved, definition of..........................................44
Cemetery lots exempt as..........................................44
Correction of plat for...........................................71
Creation of "legal lots" by process of...........................34
Defined as land use change.......................................34
Definitions of...................................................43
Exemption to validate existing lot.........................62, 293
Fire district's authority in.....................................237
Flood hazard warning required in.................................194
Floodplain design standards for..................................197
Geologic hazard warning in.......................................203
Landscaping required in..........................................258
Large Parcel Incentive Process alternative to....................275
Locational standards for.........................................187
Lot size required in new.........................................240
Manufactured home, requirements for..............................145
Open space required in...........................................249
Plat requirements for.......................................85, 125
Recording final plat for Major Impact............................128
Setbacks required in.............................................243
Storm Water Discharge Permit required for........................268
Transfer of title before approval of.............................287
What a 35-acre tract development is not...........................43
Wildfire hazard warning in.......................................210

**SUBDIVISION EXEMPTION**
Application form for..............................................72
Standards for approval of.........................................63

**SURVEY**
For correction or vacation of plat................................71
For subdivision exemption.........................................72
Plat, required for Administrative Review project..................70
Plat, required for boundary line adjustment.......................70

**Suspension**
Temporary, of Permit.............................................284

**TABLES**
Impact classification of land use changes........................292
Minimimum aisle widths for parking spaces........................257
Noise levels for commercial and industrial uses..................154
Noise levels for mining operations...............................170
Off-road loading spaces for non-residential use..................255
PARKING SPACES FOR DISABLED PERSONS..............................256
RV park setback requirements.....................................156
Setbacks for construction materials operations...................164
Setbacks for mining operations...................................165
Setbacks from property lines and rights-of-way...................243
Summary of review processes......................................296

**TAKINGS**
**Process to resolve claim of**..................................132

**TALUS SLOPES**
Definition of....................................................32
Development on...................................................206
Standards for development in.....................................203

**TAX CERTIFICATE**
Required for Minor Impact project application......................67
Required to reactivate Land Use Change Permit application.50
Required to submit Final Plan for Major Impact project..84, 124

BLM_0054215

Required to submit Preliminary Plan application.................. 107
Required to submit, in Sketch Plan application.............77, 95
**TECHNICAL MODIFICATION**
Definition of.................................................................. 44
Standards for approval of.......................................... 131
**To allow minor changes to Permits and applications**..... 131
**TELECOMMUNICATIONS ............................................178**
Safety lighting for.................................................... 178
**Wireless, attached, standards for**........................ 178
Wireless, definition of.............................................. 47
Wireless, freestanding, standards for ..................... 178
**TEMPORARY**
Gravel operations for road project............................ 163
Holiday displays....................................................... 264
Mobile Home Permit................................................ 146
Private Plowing Permit............................................. 224
Reclamation for emergency exception..................... 136
Shelter, definition of................................................ 44
Signs........................................................................ 252
Structures, required to comply with fire district...... 175
Use, definition of..................................................... 44
**TEMPORARY STRUCTURE.........................................176**
Contractor's office as............................................... 177
Exempt from vested right ....................................... 176
Farm and ranch stand as ....................................... 155
Living in during construction................................... 177
Outdoor Vending Permit for.................................... 177
Use of, during special event.............................174, 175
**THREE MILE PLAN**
Definition of.........................................................37, 44
**THREE MILE PLAN AREA**
Coordination of special events in ........................... 176
Grounds for denial of development in........................ 6
Locational standards for commercial development in .......... 189
Locational standards for residential development in............ 187
Open space standards in ......................................... 249
Residential density in .............................................. 187
Woodstoves allowed in, City of Gunnison............... 248
Woodstoves allowed in, Crested Butte and Mt. Crested Butte
................................................................................ 248
**TIMBERLINE ...............................................................225**
Aggregate square footage of structures on parcel above ..... 225
Definition of.............................................................. 44
Height maximum of structure on parcel above ...... 225
Helicopter access prohibited above......................... 225
**Standards for development above**...................... 225
**TOWNHOME (TOWNHOUSE)**
Definition of..........................................................26, 44
Development, Final Plan approval for layout of .............82, 121
Homeowners' association required for development of ..83, 123
Parking spaces required for development of.......... 305
Plat, definition of...................................................... 29
Plat, required language on ....................................... 67
Setbacks required for development of..................... 243
Signs allowed to advertise....................................... 254
**TRAFFIC STUDY**
Required for development creating 100+ trips per day .........228
Required for mining operations................................ 161
**TRAILS ......................................................................231**
"Rational nexus" required for new............................ 231
Allowed within dedicated open space ..................... 250
Definition of.........................................................41, 45
Design standards for................................................ 232
Mitigation not required for, in Administrative Review project . 231

Pedestrian ways required as.................................... 231
Public, encouraged within dedicated open space ................ 250
**TRANSMISSION LINE**
Classified as Major Impact project.....................93, 293
Definition of.............................................................. 45
Land Use Change Permit required for...............76, 294
**UNSTABLE SLOPE**
Definition of.............................................................. 32
Development on........................................................ 207
Potentially, definition of........................................... 32
Submittal requirements related to .......................... 110
**URBAN SERVICE AREA**
And provision of wastewater treatment ................... 235
And provision of water supply .................................. 232
Definition of.............................................................. 45
**UTILITIES**
Installation of, on 30% slopes................................. 207
Location of, in avalanche hazard areas................... 205
Repair of lines for, requiring no Land Use Change Permit .... 295
Required for special event....................................... 174
Required to be underground in mobile home community..... 148
**VACATION**
Of lot lines for lot cluster........................................ 35
**VACATION OF SUBDIVISION PLATS**
STANDARDS FOR APPROVAL OF............................ 76
**VARIABLE OUTER BUFFER**
**Illustration of** .....................................................218
Standards for land use change in ........................... 219
**VARIANCE**
From floodplain requirements ................................. 200
From property line setbacks..................................... 244
Required for off-premise signs ................................ 253
**VESTED RIGHT .............................................................13**
Common law, for partially-exempted land use changes......... 11
Extension of, in initial permit approval..................... 15
Extension of, when Land Use Change Permit extended ........ 6
Extension of, within 18 months of permit approval ... 15
For Administrative Review project............................. 14
For Major Impact project.......................................... 14
For Minor Impact project.......................................... 14
Not granted for temporary structure......................... 176
Site-specific Development Plan creating.................. 14
**VICINITY MAP**
Required for Administrative Review project............... 65
Required for mining application................................ 160
Required for Minor Impact project............................ 80
Required for Sketch Plan in Major Impact project.................. 96
**VIEW CORRIDOR**
Definition of.............................................................. 45
Provision of open space to protect........................... 249
**Violation**
Abatement of............................................................ 285
**VIOLATION**
Of subdivision statutes............................................ 287
**VISIBILITY**
Analysis required for ridgeline development .......... 75, 220, 292
Minimizing, of road construction......................229, 231
Mitigation of, in locating satellite dishes ................ 178
Mitigation of, in mining operations....................169, 170
Obtrusive, *definition of* ........................................ 37
Of drivers, related to landscaping........................... 259
Of larger houses, standards for............................... 246
Ridgeline, and required standards........................... 220

BLM_0054216

**WAIVER**
For seasonal exterior lighting.................................................264
From water body setback standard .........................................165
Of fees.....................................................................................52
Of liability outside fire protection district..............................237
Of setback in fire protection district......................................166
Of submittal requirements........................................... 51, 133

**WARNING**
Devices, exempt from noise standards...................................171
Signs, required for development in avalanche hazard area..205
To buyers in floodplain hazard areas ............................ 67, 194
To buyers in geologic hazard areas ..................67, 85, 125, 203
To buyers in wildfire hazard areas..................67, 85, 125, 210
To buyers outside fire protection district...............................237

**WASTEWATER TREATMENT SYSTEM .......................235**
Central, related to increased residential density....................187
Definition of..............................................................................45
Feasibility analysis required in Preliminary Plan of Major Impact
    project.................................................................... 235, 236
For mobile home community...................................................149
For secondary residences.......................................................140
Homeowners' association responsibility to maintain...... 83, 101,
    115, 123
Information required in Preliminary Plan...............................113
Requirement of zero lot line development to tie onto,..........242
Requirement to tie onto, if within 400'..................................235
Standards for construction of.................................................236

**WATER BODIES**
Avoidance of direct discharge to .........................................269
Definition of..............................................................................45
Listing of, in Gunnison County...............................................45
Ordinary high water line or mark, defining .............................37
Prohibition of snow storage in...............................................261
Protection of, during grading activities..................................267
Protection of, from vehicle maintenance activities................219
Restrictive Inner Buffer for....................................................217
Setback from, for construction materials operations.............163
Setback from, of mining operations from...............................165
Setback from, of pollutant-dumping from..............................181
Setback from, required during soil disturbance.....................267
Setback of manure piles from.................................................179
Snow disposal prohibited in...................................................261

**WATER IMPOUNDMENTS ...........................................270**
Classification of, as Major Impact project.............93, 271, 293
Classification of, as Minor Impact project.....76, 90, 271, 295
Classification of, by dam size.................................................271
Diversion structure exempt from requirements for...............271
Exemption of, from water quality requirements....................216
Expedited review for Gunnison basin ...................................272
Impact classification of, by Board.........................................271
Regulation of, related to decreed rights................................270
Standards for construction of.................................................273
That require no Land Use Change Permit...............................271

**WATER SUPPLY ..........................................................232**
Adequacy of, calculating........................................................233
Central, required for mobile home community ......................149
Construction standards for.....................................................235
Definition of..............................................................................46
Drinking standards related to................................................234
Evidence of, for Minor Impact project.....................................78
Final Plan submittal for Major Impact project................. 85, 124
Fire hydrants as part of...........................................................238
Fire suppression needs in calculating adequacy of..............233
For mining operations .............................................................162
Homeowners' association responsibility to maintain...... 83, 101,

Irrigation as part of.................................................................233
Preliminary Plan submittal for Major Impact project..............112
Requirement to tie on to existing...........................................232
Shared, required for secondary residences............................140
Shared, required for structures in building envelope.............246
Sketch Plan submittal for Major Impact project......................99
State site approval application required for..................... 60, 294
Well test required for...............................................................234

**WEDDINGS**
Exempt from Special Event Permitting ........................... 43, 173
Land Use Change Permit on commercial site.......... 43, 76, 295

**WEEDS................................................................................265**
And maintenance of livestock areas .....................................180
And maintenance of open space ...........................................251
Control of, required by protective covenants in Final Plan......83,
    123
Control of, required by protective covenants in Preliminary Plan
    ..................................................................................114, 116
Control of, required by protective covenants in Sketch Plan..100
Control of, required in mobile home community.....................148
General standards for controlling ..........................................267
Landowners' responsibility to control....................................280
Noxious, definition of................................................................37

**WELLS**
Potability test required for........................................................99
Testing required to prove adequacy of...................................113
Testing requirements for.........................................................234

**WETLANDS**
404 Permit required for protection of.....................................198
Agricultural, exempt as water body..........................................45
Agricultural, exempt from water quality requirements..........216
Constructed, for storm water management............................270
Crested Butte, maps of.............................................................18
Delineation required..................................................................97
Intermittent, definition of..........................................................46
Maps of, used by County...........................................................18
Perennial, definition of..............................................................46
Setback of construction materials operations from...............163
Setback of mining operations from........................................165
Setback of Restrictive Inner Buffer in...................................217
Setback of Variable Outer Buffer in.......................................219

**WILDERNESS ...................................................................225**
Development on inholdings in.................................................225
Helicopter and aircraft prohibited in......................................225
Maximum square footage on property in...............................225
Maximum structure height on inholding within .....................225
**Noise protection for**...............................................................170
Setback of construction materials operations from...............164

**WILDFIRE HAZARD AREA ............................................208**
Covenants required to address development in .....................209
Defensible space and screening of ridgeline development...221
Definitions of.............................................................................46
**Development in**.......................................................................208
Development prohibited in......................................................208
Landscaping and defensible space in....................................260
Maps of, used by County...........................................................18
Mitigation of development in...................................................209
Property owners' responsibility in.........................................210
Standards for development in.................................................208
Warning to buyers about.............................................67, 85, 125, 210

**WILDLIFE**
And secondary residences.....................................................140
And trash containers...............................................................157
Fencing to protect in mining areas........................................170

BLM_0054217

*INDEX*

Preserves, allowed in flood fringe .......................................... 196
**WILDLIFE HABITAT ..................................................210**
  Analysis of, required for land use changes..................... 98, 110
  Best management practices to improve................................. 191
  Critical, definition of ........................................................ 47
  Fencing to protect ............................................................ 262
  Maps of, used by County..................................................... 18
  Policy to discourage winter recreation in ................................ 3
  Policy to preserve............................................................... 3
  Protection of, in LPIP subdivisions .................................... 275
  Retaining dead wood for ..........................................259, 266
  Sensitive, definition of ...................................................... 47
  Setback of construction materials operations from............... 165
  Use of open space to protect ............................................ 250

**WORKFORCE HOUSING FEE**
  Area median income, defnition of ..................................... 25
  Definition of............................................................ 47
  Exemptions from........................................................ 184
  Formula for ............................................................. 185
**XERISCAPE**
  Definition of............................................................ 47
  Recommended for land use changes.................................259
**ZERO LOT LINE DEVELOPMENT**
  Definition of............................................................ 47
  Illustration of........................................................... 242
  In mobile home community...........................................150
  Maintenance easements required for.................................243
  Reduced setbacks in .................................................242

BLM_0054218

# GUNNISON SAGE-GROUSE RANGEWIDE CONSERVATION PLAN

## April 2005



**PLAN REPRESENTATIVES:**
**Bureau of Land Management**
**Colorado Division of Wildlife**
**National Park Service**
**Natural Resources Conservation Service**
**North American Mediation Associates**
**United States Forest Service**
**United States Fish and Wildlife Service**
**Utah Division of Wildlife Resources**



Cover Artwork by Brian Maxfield

BLM_0054219

BLM_0054220

# GUNNISON SAGE-GROUSE RANGEWIDE CONSERVATION PLAN

This document should be cited as:

Gunnison Sage-grouse Rangewide Steering Committee.  2005.  Gunnison sage-grouse
    rangewide conservation plan.  Colorado Division of Wildlife, Denver, Colorado,
    USA.

BLM_0054221

Gunnison Sage-grouse Rangewide Conservation Plan

# TABLE OF CONTENTS

**List of Figures**.................................................................................................................... viii

**List of Tables** .................................................................................................................... xi

**Acknowledgements** ...........................................................................................................xv

**I.  EXECUTIVE SUMMARY** ...........................................................................................1

**II.  INTRODUCTION** ........................................................................................................4
    **A.  Purpose**.....................................................................................................................4
    **B.  Goals and Scope**......................................................................................................5
        Assessment Goals ................................................................................................ 5
        Strategy Goals...................................................................................................... 5
        Scope                                   ..................................................................................................... 6
    **C.  Guiding Principles and Philosophy** .......................................................................6
    **D.  Plan Duration** ........................................................................................................7
    **E.  Mechanics of the RCP** ...........................................................................................8
        Process and Structure........................................................................................... 8
        Information and Data Sources ............................................................................ 10
        Scientific Assessment and Review .................................................................... 10
        Public Participation Process .............................................................................. 11
    **F.  Socio-economic Considerations** ...........................................................................14
    **G.  Management and Legal Authorities**......................................................................14
        Colorado Division of Wildlife ......................................................................... 14
        Utah Division of Wildlife Resources ................................................................ 15
        Counties                              ................................................................................................ 15
        United States Forest Service ............................................................................. 16
        Natural Resources Conservation Service........................................................... 16
        Bureau of Land Management ............................................................................ 17
        United States Fish and Wildlife Service ............................................................ 17
        National Park Service ....................................................................................... 18
        Memoranda of Understanding .......................................................................... 18
    **H.  PECE Standards** ..................................................................................................19

**III.  CONSERVATION ASSESSMENT**...........................................................................22
    **A.  Biology and Life History**.......................................................................................22
        Species Description............................................................................................ 22
        Life History ...................................................................................................... 22
        Habitat Requirements........................................................................................ 26
            Breeding Habitat ......................................................................................... 27
            Summer - Fall Habitat.................................................................................. 30
            Winter Habitat............................................................................................. 30

*Table of Contents*

BLM_0054222

Gunnison Sage-grouse Rangewide Conservation Plan

**B. Distribution and Abundance** ................................................................................32
  Distribution ................................................................................................. 32
    *Historic Distribution* .............................................................................. 32
    *Current Distribution* .............................................................................. 36
  Abundance ................................................................................................. 39
    *Lek Counts and Population Estimation* ................................................ 39
      Assumptions Made in Sage-grouse Population Estimation from Lek Counts........ 40
      Alternative Methods of Population Estimation ................................. 43
      Conclusions ..................................................................................... 44
    *RCP Estimated Population Size* ........................................................... 45
    *Decline of Gunnison Sage-grouse* ...................................................... 45
**C. Genetics** ................................................................................................46
**D. GUSG Habitat Mapping Efforts** ................................................................54
  RCP Habitat Mapping ................................................................................ 54
  BLM Habitat Mapping ............................................................................... 54
**E. Status and Distribution of Individual Populations** ................................56
  Cerro Summit – Cimarron - Sims Mesa Population ................................... 56
    *General Description* ............................................................................. 56
    *Population Information* ......................................................................... 58
    *Historic Information* ............................................................................. 58
    *Local Conservation Plan* ..................................................................... 59
    *Habitat Improvements/Completed Conservation Actions* ..................... 59
    *Easements/Candidate Conservation Agreements with Assurances* .......... 59
  Crawford Population .................................................................................. 62
    *General Description* ............................................................................. 62
    *Population Information* ......................................................................... 64
    *Historic Information* ............................................................................. 64
    *Local Conservation Plan* ..................................................................... 64
    *Habitat Improvements/Completed Conservation Actions* ..................... 65
    *Easements/Candidate Conservation Agreements with Assurances* .......... 65
  Dove Creek Subpopulation ....................................................................... 68
    *General Description* ............................................................................. 68
    *Population Information* ......................................................................... 70
    *Historic Information* ............................................................................. 70
    *Local Conservation Plan* ..................................................................... 70
    *Habitat Improvements/Completed Conservation Actions* ..................... 71
    *Easements/Candidate Conservation Agreements with Assurances* .......... 71
  Gunnison Basin Population ........................................................................ 73
    *General Description* ............................................................................. 73
    *Population Information* ......................................................................... 75
    *Historic Information* ............................................................................. 77
    *Local Conservation Plan* ..................................................................... 77
    *Habitat Improvements/Completed Conservation Actions* ..................... 77
    *Easements/Candidate Conservation Agreements with Assurances* .......... 79

*Table of Contents*

BLM_0054223

Gunnison Sage-grouse Rangewide Conservation Plan

Monticello, Utah Subpopulation ................................................................................ 81
  General Description ................................................................................................ 81
  Population Information ........................................................................................... 81
  Historic Information .............................................................................................. 82
  Local Conservation Plan ....................................................................................... 83
  Habitat Improvements/Completed Conservation Actions ...................................... 83
  Easements/Candidate Conservation Agreements with Assurances ........................ 84
Piñon Mesa Population ............................................................................................. 85
  General Description ................................................................................................ 85
  Population Information ........................................................................................... 87
  Historic Information .............................................................................................. 87
  Local Conservation Plan ....................................................................................... 88
  Habitat Improvements/Completed Conservation Actions ...................................... 88
  Easements/Candidate Conservation Agreements with Assurances ........................ 89
Poncha Pass Population ............................................................................................ 91
  General Description ................................................................................................ 91
  Population Information ........................................................................................... 93
  Historic Information .............................................................................................. 94
  Local Conservation Plan ....................................................................................... 94
  Habitat Improvements/Completed Conservation Actions ...................................... 95
  Easements/Candidate Conservation Agreements with Assurances ........................ 95
San Miguel Basin Population .................................................................................... 96
  General Description ................................................................................................ 96
  Population Information ........................................................................................... 99
  Historic Information .............................................................................................. 99
  Local Conservation Plan ..................................................................................... 100
  Habitat Improvements/Completed Conservation Actions .................................... 100
  Easements/Candidate Conservation Agreements with Assurances ...................... 101

IV.  THREATS AND ANALYSIS ..............................................................................103
  A.  Threats Potentially Affecting GUSG ............................................................103
    Disease and Parasites ......................................................................................... 103
      West Nile Virus ............................................................................................... 103
      Coccidiosis and Tularemia ............................................................................. 104
      Avian Malaria ................................................................................................. 104
      Diseases of Captive Birds ............................................................................... 105
      Conclusions .................................................................................................... 105
    Fire and Fuels Management ................................................................................ 107
    Genetics .............................................................................................................. 109
      Inbreeding Depression .................................................................................... 109
      Loss of Genetic Variation ............................................................................... 111
      Accumulation of New Mutations .................................................................... 112
      Conclusions .................................................................................................... 113

*Table of Contents*

Gunnison Sage-grouse Rangewide Conservation Plan

Grazing .............................................................................................. 114
   *General Debate* ............................................................................ 114
   *Impacts on Sage-grouse Habitat* ................................................ 115
   *Impacts on Sage-grouse Behavior and Demographics* .............. 116
   *Grazing Rotation, Intensity, and Timing* ................................. 117
   *Recommendations* ....................................................................... 118
   *Grazing Management: Related Structures and Activities* ......... 118
   *Wild Ungulate Effects on Sage-grouse Habitat* ....................... 119
   *Conclusions* ................................................................................ 119
Habitat Quality ................................................................................ 121
Hunting ............................................................................................ 122
Lek Viewing .................................................................................... 124
Mining, Energy Development, and Human Community Infrastructure ...................... 127
   *Habitat Loss, Fragmentation, and Degradation* ..................... 127
   *Disturbance to and Collision Mortality of Grouse* .................. 128
   *Increased Predation Pressure* ................................................... 128
   *Spread of West Nile Virus* .......................................................... 129
Noxious and Invasive Weeds .......................................................... 131
Pesticides ........................................................................................ 132
   *Insecticides* ................................................................................ 132
   *Herbicides* ................................................................................... 133
Predation ......................................................................................... 134
   *Sage-grouse and Predators* ....................................................... 134
   *Predator Community and Interactions* ...................................... 134
   *Predator Control - Background* ................................................. 136
   *Predator Control - Methods* ...................................................... 136
   *Habitat Management as Predator Control* ............................... 137
   *Conclusions* ................................................................................ 139
Recreational Activity ...................................................................... 141
Weather/Drought ............................................................................. 143
Threats Summarized by ESA Listing Factor .................................. 144
**B. Habitat – Risk of Permanent Loss** ......................................... 149
Problem Definition .......................................................................... 149
Regulatory and Other Relief ........................................................... 149
Risk Assessment of Habitat Loss Among Populations .................. 150
Conversion to Agriculture Uses ...................................................... 154
Spatially Explicit Analysis of Impacts of Additional Housing Units .......... 154
Prioritization of Habitat Protection Efforts .................................... 160
**C. Habitat Linkages Among GUSG Populations** ...................... 163
Theory and Background ................................................................... 163
Mapping Potential GUSG Habitat Linkages ................................... 164
**D. Population Viability Analysis** .................................................. 168
Concepts and Principles .................................................................. 168
Current Model ................................................................................. 169
   *Baseline Parameters and Simulations* ..................................... 169
   *Relative Extinction Risk* ............................................................ 170

*Table of Contents*

BLM_0054225

Gunnison Sage-grouse Rangewide Conservation Plan

    *Sensitivity Analysis* .............................................................................. 173
    *Maintenance of Genetic Diversity* ...................................................... 176
    *Population Augmentation and Relative Extinction Risk* ...................... 176
    *Conclusions* .......................................................................................... 179
  **E. Population Augmentation** .................................................................180
    Translocation ......................................................................................... 180
    Captive Breeding ................................................................................... 181
      *Sage-grouse* ...................................................................................... 181
      *Other Prairie Grouse* ...................................................................... 182
      *Summary* .......................................................................................... 183
    Potential Approaches for GUSG ............................................................ 183
      *(1) Transplant Eggs to Populations in Need* .................................. 183
      *(2) Incubate Eggs in Captivity to Reduce Depredation Losses* ...... 184
      *(3) Supplement Wild-reared Broods with Captive-produced Young* ...... 184
      *(4) Raise Grouse in Captivity and Release to Populations in Need* ...... 185
      *(5) Maintain a Captive Flock as a Genetic Diversity Bank* ............ 185
  **F. Analysis:   GUSG Population Size in Relation to the Amount of Available Habitat** .........................................................................186
    Model Development ............................................................................... 186
    Model Selection ..................................................................................... 191
    Computing 95% C.I. for Predicted Values of the Number of Males Counted on Leks 195
  **G. GUSG Population Targets Development** ...................................................198

**IV. CONSERVATION STRATEGY** ...................................................................201
  **A. Overview of Rangewide Population Objectives** .....................................202
  **B. Rangewide Conservation Strategies** ......................................................202
    Disease and Parasites ............................................................................ 205
    Fire and Fuels Management ................................................................... 206
    Genetics    .......................................................................................... 208
    Grazing    ............................................................................................ 211
      *Grazing Management Guidelines for GUSG* ................................. 212
    Habitat Enhancement ............................................................................ 214
      *Evaluating Effects of Habitat Quality on GUSG* .......................... 214
      *Habitat Improvement Approach* ..................................................... 214
      *Specific Steps for Habitat Improvement* ........................................ 215
    Habitat Linkages Among Populations ................................................... 218
    Habitat Monitoring ................................................................................ 220
    Habitat Protection from Permanent Loss .............................................. 223
    Human Infrastructure: Powerlines, Other Utility Corridors, Wind Turbines, Communication Towers, Fences, and Roads ......................................... 225
    Hunting    ........................................................................................... 229
    Information and Education ..................................................................... 230
    Lek Viewing ........................................................................................... 231
    Noxious and Invasive Weeds ................................................................. 232
    Oil & Gas Development and Mining ..................................................... 233

*Table of Contents*

BLM_0054226

Gunnison Sage-grouse Rangewide Conservation Plan

Pesticides .................................................................................................. 239
Population Augmentation ........................................................................... 241
Population Monitoring and Targets ............................................................ 242
Predation ................................................................................................... 243
Recreational Activity .................................................................................. 245
Research .................................................................................................... 247
Weather/Drought ....................................................................................... 253

**C. Local Conservation Targets and Strategies** ..............................................255
    Cerro Summit - Cimarron - Sims Mesa ...................................................... 257
      *Primary Issues to be Addressed* ............................................................. 257
      *Population Target* ................................................................................. 257
      *Recommended Conservation Strategies* .................................................. 259
    Crawford .................................................................................................... 263
      *Primary Issues to be Addressed* ............................................................. 263
      *Population Target* ................................................................................. 264
      *Recommended Conservation Strategies* .................................................. 265
    Gunnison Basin ........................................................................................... 269
      *Primary Issues to be Addressed* ............................................................. 269
      *Population Target* ................................................................................. 270
      *Recommended Conservation Strategies* .................................................. 271
    Monticello, Utah and Dove Creek, Colorado ............................................. 276
      *Primary Issues to be Addressed* ............................................................. 276
      *Population Target* ................................................................................. 277
      *Recommended Conservation Strategies* .................................................. 279
    Piñon Mesa ................................................................................................ 285
      *Primary Issues to Be Addressed* ............................................................ 285
      *Population Target* ................................................................................. 285
      *Recommended Conservation Strategies* .................................................. 286
    Poncha Pass ................................................................................................ 291
      *Primary Issues to be Addressed* ............................................................. 291
      *Population Target* ................................................................................. 291
      *Recommended Conservation Strategies* .................................................. 292
    San Miguel Basin ....................................................................................... 296
      *Primary Issues to be Addressed* ............................................................. 296
      *Population Target* ................................................................................. 296
      *Recommended Conservation Strategies* .................................................. 298
**D. Adaptive Management Process** ................................................................302
**E. Summary** .................................................................................................303

**VI. GLOSSARY** ..............................................................................................305

**VII. LITERATURE CITED** ............................................................................320

*Table of Contents*

BLM_0054227

Gunnison Sage-grouse Rangewide Conservation Plan

## APPENDICES

**Appendix A: Scientific Names of Organisms Mentioned in the RCP** ........................... A-1

**Appendix B: Definitions of Acronyms Used in the RCP and Description of "Responsible Parties" Listed in the Conservation Strategy** ............................. B-1

**Appendix C: Available Funding Opportunities for GUSG Habitat Conservation** ........ C-1

**Appendix D: GUSG GIS Data: Habitat Type, Landownership, Easements** ................ D-1

**Appendix E: Effective Population Size Discussion** ........................................... E-1

**Appendix F: Detailed Discussion of Spatially Explicit Analysis of Additional Housing Units in GUSG Habitat** ........................................................... F-1

**Appendix G: Report on PVA Analysis for GUSG** .......................................... G-1

**Appendix H: GUSG Structural Habitat Guidelines** ....................................... H-1

**Appendix I: GUSG Disturbance Guidelines** .................................................. I-1

**Appendix J: GUSG Habitat Use Data** .......................................................... J-1

**Appendix K:  Tables of Content and Introductions from 2 sections of Monsen (2005)** ............................................................................................ K-1

**Appendix L: Suggested Management Practices Applicable for Oil and Gas Development, within Lease Rights** ............................................... L-1

BLM_0054228

Gunnison Sage-grouse Rangewide Conservation Plan

## List of Figures

Fig. 1.  Decision making process and public participation methods models ......................... 9

Fig. 2.  Public participation model for rangewide conservation plan for Gunnison sage-grouse .................................................................................................................... 13

Fig. 3.  Current and historical Gunnison sage-grouse range .................................................. 33

Fig. 4.  Locations of current Gunnison sage-grouse populations .......................................... 38

Fig. 5.  Location of Curecanti within Gunnison Basin GUSG population area .................... 50

Fig. 6.  Neighbor joining trees created from 2 genetic distances .......................................... 52

Fig. 7.  Results of STRUCTURE analysis conducted by Oyler-McCance et al. (in press) .. 53

Fig. 8.  Location, landownership, and habitat status of the Cerro Summit – Cimarron – Sims Mesa GUSG population ................................................................................. 57

Fig. 9.  Conservation easements in the Cerro Summit – Cimarron – Sims Mesa GUSG area ........................................................................................................................... 61

Fig. 10.  Location, landownership, and habitat status of the Crawford GUSG population .. 63

Fig. 11.  Conservation easements in the Crawford GUSG area ........................................... 67

Fig. 12.  Location, landownership, and habitat status of the Dove Creek and Monticello GUSG subpopulations ......................................................................................... 69

Fig. 13.  Conservation easements in the Dove Creek and Monticello GUSG area ............. 72

Fig. 14.  Location, landownership, and habitat status of the Gunnison Basin GUSG population ............................................................................................................. 74

Fig. 15.  Conservation easements in the Gunnison Basin GUSG area ................................ 80

Fig. 16.  Location, landownership, and habitat status of the Piñon Mesa GUSG population ............................................................................................................. 86

Fig. 17.  Conservation easements in the Piñon Mesa GUSG area ....................................... 90

Fig. 18.  Location, landownership,  and habitat status of the Poncha Pass GUSG population ............................................................................................................. 92

*List of Figures*

BLM_0054229

Gunnison Sage-grouse Rangewide Conservation Plan

Fig. 19.  Location, landownership, and habitat status of the San Miguel Basin GUSG population ......................................................................................................98

Fig. 20.  Conservation easements in the San Miguel Basin GUSG area ............................102

Fig. 21.  Diagram of consequences of inbreeding ..............................................................109

Fig. 22.  The increase of average inbreeding coefficient as a function of population size and the number of generations of breeding...........................................................110

Fig. 23.  Lek counts at 2 leks where public lek viewing is allowed ...................................124

Fig. 24.  Lek counts at a Watchable Wildlife lek and nearby leks .....................................125

Fig. 25.   Potential oil and gas reserves in GUSG range.....................................................130

Fig. 26.  Modeled housing densities for unprotected lands, 2000 ......................................157

Fig. 27.  Projected housing densities for unprotected lands, 2020 .....................................158

Fig.  28.  Areas of growth from modeled year 2000 to 2020, for areas less than 320 acres per unit, on unprotected lands ..........................................................................159

Fig.  29.  Potential linkages in GUSG habitat.....................................................................167

Fig.  30.  GUSG population risk analysis ............................................................................172

Fig.  31.  Demographic sensitivity analysis of a simulated GUSG population ...................174

Fig.  32.  Gunnison sage-grouse population mortality analysis...........................................175

Fig.  33.  Locations of GRSG populations used in analysis of sage-grouse population size and amount of available habitat .............................................................................188

Fig.  34.  All models relating the number of males within each GUSG population ...........190

Fig.  35.  All models relating the number of males within each GUSG and GRSG population ..............................................................................................................190

Fig.  36.  Linear model (with 95% C.I. for mean values) relating the number of males within each GUSG population ...............................................................................194

Fig.  37.  Linear model (with 95% C.I. for individual predicted values) relating the number of males within each GUSG population .................................................194

*List of Figures*

BLM_0054230

Gunnison Sage-grouse Rangewide Conservation Plan

Fig. 38.  Linear model (with 95% C.I. for mean values) relating the number of males within each GUSG and GRSG population.........................................................195

Fig. 39.  Example of lek count target-setting in a long-term stable GRSG population in North Park, Colorado, from 1973-2004............................................................200

*List of Figures*

BLM_0054231

Gunnison Sage-grouse Rangewide Conservation Plan

### List of Tables

Table 1.   Gunnison sage-grouse RCP steering committee members ......................................8

Table 2.   Scientists who assisted in conducting analyses of GUSG population
conservation needs for the GUSG Rangewide Conservation Plan .......................11

Table 3.   Evaluation of local conservation plans and PECE criteria ...................................20

Table 4.   Annual survival rates of GRSG ..........................................................................26

Table 5.   Museum specimens collected for area identified in Fig. 3 as "Uncertain Sage-
grouse Species" ..................................................................................................36

Table 6.   Untested assumptions made in using lek count data to estimate sage-grouse
population size ....................................................................................................41

Table 7.   GUSG 2004 lek counts and population estimates ................................................45

Table 8.   Polymorphism of microsatellite loci among 6 populations of GUSG ..................48

Table 9.   High male counts on leks in Cerro Summit – Cimarron - Sims Mesa population,
2001-2004 ..........................................................................................................58

Table 10.  High male counts on leks in the Crawford population, 2001-2004 ....................64

Table 11.  High male counts on leks in the Dove Creek subpopulation, 2001-2004 ...........70

Table 12.  High male counts on leks in the Gunnison Basin population, 2001-2004 ...........76

Table 13.  Habitat improvement projects in Gunnison Basin, reported by CDOW .............78

Table 14.  High male counts on leks in the Monticello subpopulation, 2001-2004 .............82

Table 15.  High male counts on leks in the Piñon Mesa population, 2001-2004 ................87

Table 16.  High male counts on leks in the Poncha Pass population, 2001-2004 ...............93

Table 17.  Age and sex of GUSG transplanted to Poncha Pass, 2000-2002 .......................94

Table 18.  High male counts on leks in the San Miguel population, 2001-2004 .................99

Table 19.  Hunter numbers and harvest of GUSG in the Gunnison Basin .........................122

Table 20.  Current and potential issues affecting GUSG populations ...............................146

*List of Tables*

BLM_0054232

Gunnison Sage-grouse Rangewide Conservation Plan

Table 21.   Summary of threats that may cause permanent habitat loss .............................151

Table 22.   Relative conservation importance, threat of permanent habitat loss, area subject to threat, and assessment of priority ranking for protection of habitat among populations of GUSG .........................................................................................160

Table 23.   Vegetation classes from the Colorado Vegetation Classification Project used to identify GUSG habitat linkages in Colorado .......................................................165

Table 24.   Vegetation classes from the Utah Gap Vegetation Layer used to identify GUSG habitat linkages in Utah ...........................................................................166

Table 25.   Results of simulations augmenting populations of 100, 200 and 300 birds with 10-40 sage-grouse when populations declined by 50% .......................................177

Table 26.   Results of simulations augmenting populations of 100, 200 and 300 birds with 10-40 sage-grouse when populations declined by 75% .......................................178

Table 27.   Summary statistics for number of males counted on leks used in the regression for GUSG populations .........................................................................................187

Table 28.   A) Log-transformed data for model selection, B) parameter estimates using real scale data for analysis of the number of males for a given amount of habitat within each sage-grouse population (GUSG only) ...............................................192

Table 29.   A) Log-transformed data for model selection,  B) parameter estimates using real scale data for analysis of the number of males) for a given amount of habitat  within each  sage-grouse population  (GUSG and GRSG data combined) ........................................................................................................193

Table 30.   Summary statistics and parameter estimates of a linear model using lek counts from each year (real scale data)  to analyze the number of males for a given amount of habitat for A) GUSG only and B) GRSG and GUSG combined........197

Table 31:   95% C.I. for expected number of males (95% C.I. : $y_i$) and expected mean number of males (95% C.I. :) for a select range of habitat acreages ..................197

Table 32.   Occupied, vacant, and potential habitat, modeled population capability, recent population size, and future population target, by GUSG population..................256

Table 33.   Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable" in the Cerro Summit – Cimarron – Sims Mesa population area.........................................................258

*List of Tables*

BLM_0054233

Gunnison Sage-grouse Rangewide Conservation Plan

Table 34.  Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable in the Crawford population area .................................................................................................264

Table 35.  Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable" in the Gunnison Basin ...................................................................................................................271

Table 36.  Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable" in the Monticello area..........................................................................................................................278

Table 37.  Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable" in Dove Creek........279

Table 38.  Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable" in the Piñon Mesa area..........................................................................................................................286

Table 39.  Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable" in the Poncha Pass area..........................................................................................................................292

Table 40.  Vegetation classification of occupied habitat and adjacent areas that are delineated as "vacant/unknown" and "potentially suitable" in the San Miguel Basin ...................................................................................................................297

Table 41.  Population targets, expected ranges, 50-year extinction probabilities, and conservation importance of GUSG populations .................................................303

Table 42.  Relative importance of individual threats and opportunities for each population of GUSG ........................................................................................................304

*List of Tables*

BLM_0054234

Gunnison Sage-grouse Rangewide Conservation Plan

BLM_0054235

Gunnison Sage-grouse Rangewide Conservation Plan

# ACKNOWLEDGEMENTS

Many people, agencies and organizations have contributed to the development of this conservation plan. Special thanks go to Robbie Baird-LeValley, Michelle Cowardin, Jim Garner, James P. Gionfriddo and the Colorado Natural Heritage Program, Paul Jones, Chris Kloster, Kathleen Mawhinney, Stephen B. Monsen, Philip S. Miller, John Toolen, Alma H. Winward, the Western Association of Fish and Wildlife Agencies, and those, both from the public and from various agencies, who reviewed and commented on the plan.

xv

*Acknowledgements*

Gunnison Sage-grouse Rangewide Conservation Plan

## I. EXECUTIVE SUMMARY

The Gunnison Sage-grouse Rangewide Conservation Plan is the culmination of almost 2 years of effort by the Rangewide Steering Committee and others.  Yet in many ways, it is a continuation of a conservation planning process that began almost as soon as a Ph.D. student named Jessica Young verified her and other biologists' suspicions that the sage-grouse in Gunnison, adjacent areas in southwest Colorado, and a portion of southeast Utah were different than sage-grouse further north.  Although not officially designated as a new species by the American Ornithologists' Union until 2000, the first local work group was formed in the Gunnison Basin in 1995, and their plan completed in 1997.  Other local work groups quickly followed suit; local plans were completed for Crawford, Dove Creek and the San Miguel Basin populations in 1998, and for the Monticello (Utah), Piñon Mesa, and Poncha Pass populations in 2000.

This Rangewide Conservation Plan is intended to supplement local plans, and to offer a rangewide perspective, so as to ensure that the cumulative result of conserving local populations is conservation of the species.  It is intended as guidance to aid in the Gunnison sage-grouse conservation efforts of federal land management agencies, various industry groups, the Colorado Division of Wildlife, and the Utah Division of Wildlife Resources, as well as local work groups.  While we hope and trust that it will serve as a blueprint for management actions by these groups and others, and as a catalyst for increased attention and action, it is not a legal document, a regulatory document, a Recovery Plan under the Endangered Species Act (ESA), nor a NEPA (National Environmental Policy Act) decision document.  Representatives of the U.S. Forest Service, Bureau of Land Management, National Park Service, and Fish and Wildlife Service participated in the preparation of this plan, but these agencies will consider this guidance as well as other information following established public participation protocols when preparing decision documents under NEPA or the ESA.

We include substantial information on Gunnison sage-grouse that was not available to local work groups when their plans were developed, such as new information on biology, genetic diversity, habitat use, population estimation, and a population viability analysis.  We analyzed the capability of habitats to support grouse, and evaluated threats to local populations.  For these reasons we strongly suggest local work groups review the Rangewide Conservation Plan in its entirety, update their local plans, and adopt the conservation strategies proposed in order to meet or exceed population and habitat target ranges identified.

A guiding philosophy of this plan is that conservation works best when implemented at the most local level possible.  Maintaining sustainable local economies will in the long run be the most cost-effective and socially acceptable means to conserve Gunnison sage-grouse.  It was our intent that this plan would provide the scientific basis upon which local and rangewide conservation efforts could be based.

Gunnison sage-grouse occupy a small fraction of their historical range, having been extirpated by habitat conversion from much of their presumed historical distribution in southwest Colorado, southeast Utah, northeast Arizona, and northern New Mexico.  Distribution was probably always somewhat fragmented, but fragmentation has been greatly exacerbated by habitat loss.  Currently (2004 data), we estimate approximately 3,200 breeding birds occur in 7 populations, approximately 2,400 of which occur in the Gunnison

BLM_0054237

Gunnison Sage-grouse Rangewide Conservation Plan

Basin.  Gunnison sage-grouse have relatively low genetic diversity compared to greater sage-grouse, and genetic information suggests most populations are isolated from each other.

Potential threats to Gunnison sage-grouse are varied, but numerous.  Low genetic diversity, genetic drift from small population sizes, habitat issues (loss, degradation, and fragmentation from a variety of causes), the interaction of these with predator communities, and impacts of drought are the most significant threats facing Gunnison sage-grouse.  Of these, by far the greatest threat is the permanent loss, and associated fragmentation and degradation of sagebrush habitat associated with urban development and/or conversion.  We employed a spatially explicit model in an attempt to predict where most urban growth would occur between now and 2020, and evaluated parcel sizes as an index to short-term risk.  The immediacy and extent of this threat varies from population to population and within subpopulations.  Nevertheless, some level of land use planning, easements, fee-title acquisitions, or voluntary agreements not to develop private land, will be necessary in all populations.

A population viability analysis was conducted with *VORTEX* software as an aid to setting population size targets, and to determine which demographic parameters of sage-grouse influence population growth rates the most.  *VORTEX* is a stochastic, individually based model, which means variability in survival and recruitment rates is incorporated.  We also incorporated a severe drought into the model, which increased chick mortality over a 3-year period with a probability of occurrence of 1 in 100 years.  Impacts of "normal" (less severe) droughts should be factored into the mean and variance of survival and recruitment rates used.  The model suggested that chick mortality, followed by adult female mortality, most strongly influenced population growth rates.  Relative extinction probabilities during a simulated 50-year period were very high for very small populations (less than 25 birds), and low (0 to 0.8%) for populations of 3,000 birds.  Populations could only be considered "secure" (95% probability of persistence at stable growth rates) if they contained 500 or more individuals.  Modeled loss of genetic diversity after 50 years was significant at all population sizes, but a population size of 3,000 retained 92-94% of genetic diversity initially present.  Somewhat simplistic models of augmentation suggested extinction probabilities could be lowered substantially, and genetic diversity retention could be increased greatly, by supplementing small populations, if and when population sizes decline precipitously.

We evaluated alternative models for how sage-grouse population size increases as the amount of available habitat increases.  The model in which sage-grouse populations increased linearly with increasing habitat size (no density dependence) was the best fit to the data.  We used this model to estimate how many birds each population could support given the amount of habitat within currently occupied areas and other areas that could possibly be used with habitat improvement.  Although habitat improvement could increase populations above modeled estimates, this analysis suggested that population targets in several local conservation plans are probably not achievable, given the amount of current and potential habitat.

Conservation strategies were identified for all significant threats to Gunnison sage-grouse, with a conservation goal of retaining large enough populations within the Gunnison Basin and elsewhere to have less than a 1% modeled risk of extinction, and to retain over 90% of genetic diversity over this 50-year time frame.  While the Gunnison Basin is clearly the cornerstone for the preservation of this species, smaller populations retain 25% of the overall genetic diversity (not found in the Basin), and collectively represent a sizable pool of

*Executive Summary*

BLM_0054238

Gunnison Sage-grouse Rangewide Conservation Plan

individuals to buffer catastrophic, unforeseen losses in the Gunnison Basin. Population targets were recommended for each population based on an assessment of current and potential habitat, potential habitat improvements, and conservation needs. Targets represent an expected long-range average, along with a range of variation expected around this long-term average: Gunnison – 3,000 (range 1,730-5,280), San Miguel Basin – 450 (260-792), Monticello, UT – 300 (173-528), Dove Creek – 200 (115-352), Crawford – 275 (159-484), Piñon Mesa – 200 (115-352), and Poncha Pass – 75 (43-132).

To achieve and maintain these population targets, we identified local conservation strategies and local habitat protection goals. The most significant threat to Gunnison sage-grouse is permanent habitat loss from urban development or conversion. To meet these goals we recommend protecting 90% of all habitats currently occupied, or that become occupied through future expansion, through some combination of voluntary agreements, land use planning, easements, fee-title acquisition or land trades. We also present habitat guidelines to serve as a benchmark against which to evaluate habitat conditions, and develop strategies to minimize habitat degradation from other causes.

The Rangewide Conservation Plan is the first up-to-date and rigorous assessment of rangewide population and habitat data for Gunnison sage-grouse. However, it was evident in developing this plan that there are many gaps in our knowledge about Gunnison sage-grouse and sagebrush habitat, particularly in the context of a constantly changing landscape. Therefore, the Steering Committee recognizes the need to continually reevaluate and revise local and rangewide conservation plans in the light of new information, tools, and techniques, as part of an adaptive management process. An adaptive management program is an iterative process that uses information from research and monitoring projects to evaluate the relative effectiveness of alternative management plans, identify where important information is lacking, and to develop more effective management plans in order to accomplish the population and habitat goals of the Rangewide Plan. The Steering Committee will develop and implement an objective and quantitative adaptive management program in cooperation with the signatories of the Rangewide Plan and the local work groups.

BLM_0054239

Gunnison Sage-grouse Rangewide Conservation Plan

## II. INTRODUCTION

### A. Purpose

The Gunnison Sage-grouse Rangewide Conservation Plan (RCP) is intended to help reach the goal of increasing the current abundance and viability of Gunnison sage-grouse and their habitat. The purpose of the plan is to identify measures and strategies to achieve this goal. This will be accomplished by providing guidance, recommendations, and a rangewide perspective on Gunnison sage-grouse management to local work groups and other interested or affected parties and stakeholders.

The concern that led to the development of the RCP is that local conservation efforts may be sufficient to protect a local population of Gunnison sage-grouse (GUSG), but collectively they may be insufficient to conserve the species. Local conservation plans typically do not consider broader scale issues such as variation in genetic diversity among populations, regional population dynamics, dispersal, or landscape structure (e.g., habitat connectivity between populations or configuration of important habitat).

In addition, the 7 GUSG local conservation plans were written prior to publication of the U. S. Fish and Wildlife Service's (USFWS) Policy for Evaluation of Conservation Efforts (PECE) standards. The USFWS now uses the PECE standards as a guideline in determining whether, and to what extent, conservation plans will be considered when making listing and listing priority decisions. The RCP will provide guidance to local conservation groups and assist them in meeting the PECE standards through their conservation efforts.

It is our intent that the RCP will build upon the foundation established by the local conservation plans. This rangewide plan was developed as a resource upon which local conservation decisions can be based. This plan will supplement, not replace, local plans and the locally driven process that created them. The RCP will present the best available science for assessing target population goals and genetic diversity, as well as an assessment of possible tools to help reach these goals. Few conservation strategies are likely to be added to those already described in local conservation plans. However, this rangewide plan should assist local work groups and other stakeholders in prioritizing strategies, determining where to focus habitat improvements, refining techniques, and managing disturbances (see "Local Conservation Targets and Strategies", pg. 255). The Colorado Division of Wildlife (CDOW) and Utah Division of Wildlife Resources (UDWR) have the lead on implementation of the rangewide strategies recommended within the RCP ("Rangewide Conservation Strategies", pg. 202), until an implementation plan is complete.

The RCP is neither a National Environmental Policy Act (NEPA) decision document, nor a federal recovery plan. Any Candidate Conservation Agreement with Assurances (CCAA; see pg. 59 for details) developed by CDOW will be based on the RCP, and will include a NEPA process. Agency-specific use of this plan is outlined in each agency's respective signature page.

BLM_0054240

Gunnison Sage-grouse Rangewide Conservation Plan

## B.  Goals and Scope of the RCP

The RCP goals are divided into 2 categories: Assessment and Strategy Goals.  The goals are not listed in any particular order.

Assessment Goals:

The RCP will provide an assessment of the status of each population by accomplishing the following 5 goals:

1. Estimate current population size, amount and status of habitat, degree of genetic isolation, potential for recovery, potential for expansion, and odds of maintaining long-term protection.
2. Identify research needs and knowledge gaps.
3. Determine population and habitat requirements needed to sustain GUSG for the future.
4. Identify and discuss threats and issues that potentially impact GUSG, including those not covered in the local plans.
5. For each local GUSG conservation plan, assess the compliance with the USFWS PECE criteria and describe all threats to GUSG under the 5 USFWS listing factors.

Strategy Goals:

The aim of the RCP is to maintain, and increase where possible, the current abundance and viability of GUSG populations and habitats by accomplishing the following 7 goals:

1. Incorporate management strategies and options from local planning efforts and solicit participation in meeting RCP goals and objectives.
2. Develop and distribute information on management practices that result in diverse and productive sagebrush habitat.
3. Identify and promote beneficial rangewide conservation actions (e.g., potential habitat linkages and transplants as a means to maintain or enhance genetic diversity).
4. Increase public education and awareness of GUSG.
5. Address threats and risks and prioritize issues, by population, from a rangewide perspective (to aid in prioritizing management actions).
6. Identify funding sources and develop a process to set priorities for populations to receive funding for conservation easements, habitat improvements, fee titles, etc.
7. Upon completion of the RCP, have cooperating state and federal agencies sign a signatory page setting priorities for consideration of committing resources to this effort.

*Introduction*

BLM_0054241

Gunnison Sage-grouse Rangewide Conservation Plan

Scope

Conservation strategies, including transplants of GUSG to suitable but currently unoccupied range within historical range, will be considered within Colorado and Utah only. Thus, throughout the RCP, the word "rangewide" refers to GUSG range only within Colorado and Utah. Arizona and New Mexico, where GUSG were historically found, have chosen not to participate in this planning process. It is hoped that the scientific assessment, strategies, and guidelines contained within this plan can assist these states as they consider the potential for reintroduction and management of GUSG in their states.

## C. Guiding Principles and Philosophy of the Gunnison Sage-grouse Rangewide Conservation Plan

The guiding principles of this plan are to (1) encourage and support conservation actions that meet the needs of GUSG and that promote diverse economic communities or minimize impacts to communities; (2) manage for a healthy sagebrush steppe ecosystem so that other sagebrush obligate species in the system will benefit; (3) create a plan that will be flexible enough to incorporate GUSG research findings and successful management practices into conservation actions (4) acknowledge the pivotal role private landowners and local work groups play in the recovery effort; and (5) maintain an atmosphere of cooperation, participation, and commitment among wildlife managers, landowners, private and public land managers, other stakeholders, and interested public in development and implementation of conservation actions.

Managing for sustainable local economies is a conservation philosophy that guides this plan because its authors and signatories believe that sustainable local economies are essential to successful conservation of the GUSG. Ultimately, the hope is to achieve within GUSG range "civic environmentalism" (Shutkin 2000:14). Shutkin (2000:22) asserts, "the best kind of American environmentalism fundamentally entails a holistic approach to environmental problems in that those problems and their solutions are seen as inextricably linked to social, political, and economic issues—what I collectively refer to as civic issues because each is directly associated with the quality of life of civil society, of community life in its totality".

Shutkin (2000) perceives civic environmentalism as a stage of environmentalism with interest groups working together rather than vying to defeat each other. It is a process and an end point that reaches consensus and makes long-term plans that benefit both the environment and the community. He describes an explicit link between environmental problem solving and the goal of community building. Protecting the environment (and species within it) is joined to civic health and sustainable local economies; it becomes the ultimate expression of local control.

In a case study, Shutkin (2000:189) describes a conservation-based effort in the Elk River Valley in Routt County, Colorado. He summarizes the effort as follows: "Blending their agricultural, economic, and cultural concerns with a conservation and open space focus, the ranchers formulated a conservation-based development strategy to protect the area's rural heritage and ecology. They wanted to protect in perpetuity the open and productive character

BLM_0054242

Gunnison Sage-grouse Rangewide Conservation Plan

of the area that comprises the basis of its economic vitality. Unlike traditional conservation efforts, they were intent on protecting the area as a whole, not just islands of land, with working landscapes as a main feature" (Shutkin 2000:199). This group of ranchers partnered with environmentalists and citizens to defeat the proposed Catamount ski area. As a result they developed the Upper Elk River Valley Compact. This compact developed a set of planning and implementation principles that ultimately led to a county-wide plan to protect important wildlife habitat and open space while allowing growth and development. Great Outdoors Colorado (GOCO), a lottery-funded program that supports outdoor values including protection of wildlife, contributed $250,000 towards the first round of easements. GOCO then followed with a legacy grant of $6 million for Yampa River System protection. Recognizing that conservation easements cannot compete with developers dollar for dollar, this same group of ranchers developed a variety of marketing strategies to make sheep and cattle ranching profitable.

Similar approaches are used in addressing environmental problems. The Nature Conservancy (The Nature Conservancy 2004) describes economic sustainability as a key value: "We respect the needs of local communities by developing ways to conserve biological diversity while at the same time enabling humans to live productively and sustainably on the landscape. We know that lasting conservation success requires the active involvement of individuals from diverse backgrounds and beliefs, and we value the unique contributions that each person can make to our cause."

Zeller (1999:6) describes "community stewardship" which "takes the lessons of active land management practiced on individual properties and applies these on a community wide or landscape basis for the long-term benefit of the land, people and economy. Community stewardship focuses on large land complexes or regions and a process to tie the local and regional community to effective and long-term management of its natural resources."

Adopting support of sustainable local economies as a cornerstone of the RCP will help ensure its effectiveness and will avoid the obvious ecological consequences of the alternative scenario. Shutkin (2000:196) concludes that, "...the all-too-common refrain in the Rocky Mountain West (is) that a rancher's last crop is a subdivision."


## D.  Plan Duration

The GUSG RCP is a dynamic document designed to change and adapt to the needs of GUSG as they are identified. The RCP is a long-term plan that will terminate when the GUSG is removed from the Colorado Species of Concern List in Colorado and the Utah Sensitive Species List. For Colorado, this list includes, "Any species or subspecies of native wildlife which (1) has been removed from the State threatened or endangered list within the last five years, (2) is a Federal candidate or is Federally proposed for listing and is not already state listed, (3) the best available data indicate a 5-year or more downward trend in numbers or distribution and this decline may lead to a threatened or endangered status, or (4) is otherwise determined to be vulnerable in Colorado" (Colorado Division of Wildlife 1999:3). In Utah, species on the sensitive species list include species that are federally listed, are candidates for federal listing, or for which there is "credible scientific evidence to

*Introduction*

BLM_0054243

Gunnison Sage-grouse Rangewide Conservation Plan

substantiate a threat to continued population viability" (Utah Division of Wildlife Resources 2005:1).

## E. Mechanics of the RCP

Process and Structure

A rangewide steering committee (RSC) (Table 1), facilitated by Cathleen Neelan of North American Mediation Associates, developed the concept and process for plan development. When "we" or "our" is used within the RCP, it refers to the RSC. The RSC has broad representation from state and federal agencies from both Colorado and Utah (Table 1). The role of the RSC members was to guide the development of the RCP and to represent their agencies. After completion of the RCP, representatives from all agencies on the RSC will continue to operate as a committee to address strategies (where specified) in the RCP "Conservation Strategy" section (pg. 201). The directors of CDOW and UDWR have the ultimate authority for the plan.

Table 1.  Gunnison sage-grouse RCP steering committee members.

| Name | Agency / Role |
| --- | --- |
| Tony Apa | Colorado Division of Wildlife |
| Brad Banulis | Natural Resources Conservation Service/Colorado Division of Wildlife |
| Myron Chase | National Park Service |
| Julie Grode | U. S. Forest Service |
| Terry Ireland | U. S. Fish and Wildlife Service |
| Cathleen Neelan | Facilitator, North American Mediation Associates, LLC. |
| Jenny Nehring | Technical Writer |
| Al Pfister | U.S. Fish and Wildlife Service |
| Mike Phillips | Colorado Division of Wildlife and Technical Writer |
| Tom Remington | Colorado Division of Wildlife |
| Pam Schnurr | Colorado Division of Wildlife |
| Robin Sell | Bureau of Land Management |
| Barbara Ver Steeg | Technical Writer / Editor |
| Guy Wallace | Utah Division of Wildlife Resources |

BLM_0054244

Gunnison Sage-grouse Rangewide Conservation Plan

The committee reviewed numerous examples of statewide and rangewide conservation plans for different species to determine the most appropriate approach for the RCP. In many of the examples local plans had not already been completed. In our case, having local conservation plans already in place influenced the public involvement and development process for the RCP. It was decided that the RCP should be an overarching plan that ties together all the local plans and supplements them with a scientific analysis.

Most of the local plans employed a consensus approach in making decisions. For decisions regarding the RCP, consensus was reached among representatives of the agencies serving on the RSC. Sections 5 and 6 of the Endangered Species Act (ESA) direct state and federal agencies to cooperate to develop conservation activities that protect candidate species. Because the responsibility rests with state agencies and their federal cooperators, the decision ultimately is limited to them. Nevertheless, all agencies felt it was important to involve the public as much as possible in the RCP process, to garner support at the critical local level.

Public participation methods were used in association with the decision making process (Fig. 1). For the RCP, the decision and public involvement process is some place in the middle of the illustrated continuum, a decision with repeated opportunities for input and recommendations from stakeholders (Fig. 1). The far right of the decision-making process represents a consensus decision, the approach used for local plans; the far left of the decision process involves no pubic input and the responsible agencies make all decisions (Fig. 1).

| Decision by Vested Power Alone | Decision with Minimal Input for Informed Consent | Decision with Repeated Opportunity to Provide Input | Decision Based on Recommended Stakeholder Consensus | Stakeholder Consensus Decision Making |
|---|---|---|---|---|

**DECISION-MAKING PROCESS**

←less public involvement------------------------------------more public involvement→

**PUBLIC PARTICIPATION METHODS**

| No Public Input or Involvement | Public Hearings for Comment on Proposed Action | Series of Public Involvement Steps with Focus/work Groups | Direct Negotiations among Key Stakeholders | Stakeholder Negotiations Leading to Implementable Decision |
|---|---|---|---|---|

*©CDR Associates*

Fig. 1. Decision making process and public participation methods models.

The structure of the RCP resembles traditional conservation plans, with both a conservation assessment and a conservation strategy, but it also includes a section that separately details and analyzes potential threats to GUSG. The assessment was based on information extracted from local plans, and was then supplemented with the most contemporary research and scientific findings. For the strategy section we considered many of the same issues as the local plans, but added broader scale issues such as genetics,

BLM_0054245

Gunnison Sage-grouse Rangewide Conservation Plan

dispersal, and habitat linkages between populations.  In order to understand the rangewide perspective of the importance and role of local populations to the future of GUSG , it is recommended that the reader go through the entire plan rather than focus solely on sections relating to a single population.

The writing style used for the plan generally follows that of the Journal of Wildlife Management, although we used English, rather than metric, measurements throughout. Scientific names of organisms are not provided in the text if a common name exists; all scientific names are provided in Appendix A (listed alphabetically by common name).  A glossary of terms used in the plan follows the "Conservation Strategy", as does a list of acronyms (Appendix B).  Lists of figures and tables immediately follow the "Table of Contents".

Information and Data Sources

We primarily relied on peer-reviewed scientific literature and graduate theses/ dissertations as supporting information in the RCP.  However, as is the case for many wildlife species, important and reliable information for GUSG can be found in agency reports, both those with peer-review and those without.  We used these agency sources when they were the only available information, or when they contributed significantly to available information on a particular topic.  Likewise, we used internet web sites for information when necessary, citing the date the site was accessed.

Scientific Assessment and Review

To address broad scale, complex issues, a group of scientists was used (Table 2). Individuals were selected for this team because of their impartiality and/or technical expertise in a relevant scientific area.  The RSC was unsuccessful in finding a neutral range management scientist familiar with sage-grouse research in a timely fashion to serve on this team.  However, Robbie Baird-LeValley, a Colorado State University (CSU) extension agent, was consulted in development and review of grazing sections of this document.

The science team assisted in conducting an analysis of conservation needs for maintaining GUSG populations.  "Conservation need" was interpreted broadly and included minimum viable population size, desired genetic diversity, and necessary habitat quantity and condition.  The team was also charged with compiling best management practices for the sagebrush steppe that would aid in preserving/restoring the habitat base necessary.  The Ecological Society of America was contracted to conduct a double blind review (4 reviewers) of the draft RCP (see "Technical Review" in Fig. 2).  The review process was facilitated by the Western Association of Fish and Wildlife Agencies (WAFWA) and the RSC addressed input from the reviewers.

BLM_0054246

Gunnison Sage-grouse Rangewide Conservation Plan

Table 2.  Scientists who assisted in conducting analyses of GUSG population conservation needs for the GUSG Rangewide Conservation Plan.

| Discipline | Science Team |
|---|---|
| Sage-grouse Biology | Dr. Tony Apa, Colorado Division of Wildlife<br>Dr. Michael Phillips, Colorado Division of Wildlife<br>Dr. Tom Remington, Colorado Division of Wildlife |
| Behavioral Ecology | Dr. Robert Gibson, University of Nebraska |
| Genetics | Dr. Sara Oyler-McCance, U.S. Geological Survey/Denver University<br>Dr. Tom Quinn, Denver University |
| Population Ecology (Modeling) | Dr. Philip Miller, Conservation Breeding Specialist Group |
| Ecology and Restoration of Sagebrush Rangelands | Steve Monsen, U.S. Forest Service Shrub Sciences Lab, retired<br>Dr. Alma Winward, U.S. Forest Service, retired |
| Spatially Explicit Modeling of Housing Development | Dr. David Theobald, Natural Resource Ecology Lab, Colorado State University |
| Modeling Habitat Quantity and GUSG Population Size | Dr. Michael Phillips, Colorado Division of Wildlife |

## Public Participation Process

In developing the RCP we relied on the 7 local conservation plans for our initial information.  There was some diversity in issues, interest, and needs of stakeholders.  The RSC, believing that stakeholder input and support are essential to the success of the plan, designed a public participation process (Fig. 2) offering several opportunities for public input.

The first opportunity for public input was an Issue Assessment conducted by the RCP facilitator.  Approximately 38 stakeholders were contacted for one-on-one confidential interviews.  The individuals who provided a diversity of opinions and interests were involved in development of the local conservation plans, representatives of organizations or special interest groups, petitioners, or others with vested interests in GUSG.  The objective of these confidential interviews was to identify stakeholder interests and needs that might be addressed in the RCP.  This information was summarized in a report and presented to the RSC with recommendations to consider during the development of the plan.

The second opportunity for public participation was at a Gunnison Sage-grouse Conference held in Norwood, Colorado, in September, 2003.  During this conference, attendees (approximately 150-200 people) were provided an opportunity to discuss the RCP, their ideas for managing the species at the rangewide level, and prioritization of actions across the species' range.  This was the first chance for many people to hear about the RCP

BLM_0054247

Gunnison Sage-grouse Rangewide Conservation Plan

and to learn about other local plans.  Attendees' comments and suggestions were compiled and reviewed by the RSC.

A third opportunity for public input was offered in October, 2003 (the early writing stages of the plan).  The RSC traveled to 6 different communities in south-central and southwestern Colorado, and eastern Utah, to meet directly with the work groups and other interested stakeholders.  During these meetings ("Focus Group Meetings"), the RSC sought input from attendees and answered questions about the intent of the RCP.  Valuable comments emerged from these discussions, and some of them resulted in altering the content of the RCP.

For regular updates on the RCP, interested members of the public were able to check the website (hosted by CDOW) for the plan (http://wildlife.state.co.us/species_cons/Gunnison_sage_grouse/index.asp).  During the development of the RCP, items of interest, RCP progress, and several frequently asked questions were posted on this website.

Finally, stakeholders were provided an opportunity to review and comment on the draft RCP.  These reviewers provided comments and recommendations to be considered for incorporation into the final version of the plan.  Once the RCP is completed it will be provided to local work groups for consideration and incorporation into their plans, where, and if necessary.  Because the RCP is a dynamic plan, further research will be continually incorporated and appropriate modifications will be made to the plan.  Ultimately, the success of this plan and the conservation of GUSG will rely on conservation actions taken by local work groups and land managers within each population area.

*Introduction*

BLM_0054248

**Concern for decline & potential listing drives the need for development of a Rangewide Conservation Plan**



Fig. 2.  Public participation model for rangewide conservation plan for Gunnison sage-grouse.

13

Introduction

BLM_0054249

Gunnison Sage-grouse Rangewide Conservation Plan

## F.  Socio-economic Considerations Including Consequences of Federal Listing

State and federal agencies involved in implementation of the RCP will coordinate with landowners, county, and local governments to develop the best solutions for GUSG conservation while maintaining social and economic values to the maximum extent possible. The RCP was developed to address issues of rangewide concern for the GUSG but is not intended to replace local conservation plans.  Consequently, it is intended to work within local conservation plan considerations of social and economic values.

In the event of federal listing of GUSG under the ESA, the USFWS will use the RCP and local conservation plans as the basis to develop a federal recovery plan (FRP).  The FRP will also seek to maintain social and economic considerations to the maximum extent possible while ensuring the survival and recovery of GUSG.  In fact, in the July 1, 1994, Federal Register (59 FR 34272) the USFWS issued a policy stating that the USFWS will involve stakeholders in FRP preparation to minimize the social and economic impacts of implementing recovery actions.  There are also funding and incentive programs to facilitate socio-economic considerations and conservation of the GUSG (Appendix C).

## G.  Management and Legal Authorities

There are many state, federal, and county regulations that offer protection to GUSG. Both Colorado and Utah have state laws and regulations to restrict possession of GUSG. Funding programs in both states support population and habitat conservation actions. Federal agencies including the Bureau of Land Management (BLM), United States Forest Service (USFS), National Park Service (NPS), Natural Resources Conservation Service (NRCS), and USFWS have laws, regulations, policies, and funding programs that authorize and support conservation actions for habitat and population management.  In Colorado, several of the counties have provisions for wildlife and/or sage-grouse conservation.

<u>Colorado Division of Wildlife</u>

The CDOW, a branch of the Colorado Department of Natural Resources, has responsibility for the management and conservation of wildlife resources within state borders, including the conservation and management of threatened and endangered species, as defined and directed by state laws (i.e. Colorado Revised Statutes, Title 33 Article 1). Title 33 Article 1-101, Legislative Declaration states: "It is the policy of the State of Colorado that the wildlife and their environment are to be protected, preserved, enhanced and managed for the use, benefit, and enjoyment of the people of this state and its visitors.  It is further declared to be the policy of this state that there shall be provided a comprehensive program designed to offer the greatest possible variety of wildlife-related recreational opportunity to the people of this state and its visitors and that, to carry out such program and policy, there shall be a continuous operation of planning, acquisition, and development of wildlife habitats and facilities for wildlife-related opportunities."

*Introduction*

BLM_0054250

Gunnison Sage-grouse Rangewide Conservation Plan

In addition, the 5-year Strategic Plan for CDOW, adopted by the Colorado Wildlife Commission on January 11, 2002, emphasizes the importance of wildlife conservation. The plan lists 10 management principles, or 'core beliefs' that guide the agency in fulfilling its mission; these beliefs underscore the importance of wildlife conservation and maintenance of healthy, diverse and abundant wildlife. A specific section of this plan addresses species conservation. The vision statement of this section states: "Recognizing the pitfalls of single species management, the CDOW will emphasize the development of management approaches encompassing multi-species communities across the landscape. The CDOW defines species conservation as conserving, protecting, and enhancing Colorado's native wildlife, by taking the actions necessary to assure the continued existence of each species and thereby precluding or eliminating the need for state and/or federal listing. The CDOW will form partnerships with landowners, land management agencies, and others to manage, protect, enhance, and restore wildlife and their habitat. The CDOW will lead efforts to monitor wildlife communities and manage them as needed to prevent their decline. The CDOW will work aggressively with others to recover threatened and endangered species. The CDOW encourages partnerships to share in the vision to protect, enhance, and restore wildlife communities that need assistance to survive." The CDOW has authority to regulate possession of the GUSG, set hunting seasons, and issue citations for poaching of GUSG. In 2000, the CDOW closed the hunting season for GUSG in the Gunnison Basin, the only area then open to hunting for the species.

Utah Division of Wildlife Resources

Title 23 of the Utah Code is the Wildlife Resources Code of Utah and provides the UDWR the powers, duties, rights, and responsibilities to protect, propagate, manage, conserve, and distribute wildlife throughout the state. Section 23-13-3 declares that wildlife existing within the state, not held by private ownership and legally acquired, is property of the state. Sections 23-14-18 and 23-14-19 authorize the Utah Wildlife Board to prescribe rules and regulations for the taking and/or possession of protected wildlife. The hunting season for GUSG in Utah has been closed since 1989.

UDWR's wildlife management philosophies are reflected in its Mission Statement and Strategic Plan. The mission of the UDWR is to assure the future of protected wildlife for its intrinsic, scientific, educational, and recreational values through protection, propagation, conservation, and distribution throughout the state of Utah. The UDWR Strategic Plan calls for focusing efforts on increasing the abundance, distribution, and range for species of conservation need by sustaining and restoring habitat functions. A ten-year comprehensive wildlife conservation plan for Utah will be developed and implemented to address species/habitats of conservation need, their priorities, and the necessary actions and future changes.

Counties

The Board of County Commissioners of Gunnison County, Colorado, has: (1) the authority to protect and promote the health, welfare and safety of the people of Gunnison

BLM_0054251

Gunnison Sage-grouse Rangewide Conservation Plan

County; (2) the authority to regulate land use, land planning and quality and protection of the environment in Gunnison County; and (3) has duly adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources.  Section 5-206 of the Gunnison County Land Use Resolutions adopted in 2001, promotes conservation for sage-grouse and other wildlife through restriction and mitigation of development.  Several of the other Colorado counties within current GUSG range in Colorado (Dolores, Mesa, Montrose, and San Miguel Counties) have general provisions for consideration of wildlife in development plans.

United States Forest Service

The United States Department of Agriculture (USDA) Forest Service (USFS) has authority for conservation of the GUSG through: 1) the Multiple Use-Sustained Yield Act (MUSY) of 1960 (P.L. 86-517, 74 Stat. 215, 16 U.S.C 528(note), 528-531); 2) the Sikes Act of 1960 (P.L. 86-797, 74 Stat. 1052, 16 U.S.C. 670 et seq., as amended); 3) the Forest and Rangeland Renewable Resources Planning Act (RPA) of 1974 (P.L. 93-378, 88 Stat. 476, as amended; 16 U.S.C. 1600(note), 1600-1614); 4) the National Forest Management Act (NFMA) of 1976 (P.L. 94-588, 90 Stat. 2949, 16 U.S.C. 472 et seq.) and its implementing regulations (36 CFR 219); 5) Public Rangelands Improvement Act of 1978 (P.L. 95-514, 92 Stat. 1806, 43 U.S.C. 1901-1908); and 6) USDA Regulation 9500-4 and the Forest Service Manual (FSM) Chapter 2600. MUSY directs the USFS to administer the National Forests for outdoor recreation (including wilderness), range, timber, watershed, and wildlife and fish purposes, in cooperation with interested State and local governmental agencies and others. "Multiple use" means the harmonious and coordinated management of the various surface renewable resources so that they are utilized in the combination that will best meet the needs of the American people.  The Sikes Act provides authority for cooperative planning, habitat improvement, and providing adequate protection for threatened or endangered species under the Endangered Species Act of 1973 or species considered to be threatened, rare, or endangered by the State agency. RPA and NFMA provide for comprehensive, integrated planning that will provide for the diversity of plant and animal communities to meet overall multiple-use objectives.  USDA Regulation 9500-4 directs the USFS to manage "habitats for all existing native and desired nonnative plants, fish and wildlife species in order to maintain at least viable populations of such species."  USFS policy states: "To preclude trends toward endangerment that would result in the need for federal listing, units must develop conservation strategies for those sensitive species whose continued existence may be negatively affected by the forest plan or a proposed project." (FSM 2621.2)

Natural Resources Conservation Service

The USDA NRCS has authority for conservation of GUSG through: (1) the Soil Conservation and Domestic Allotment Act of 1936, as amended (PL 74-46; (2) the Department of Agriculture Reorganization Act of 1994 (PL 103-354; 7 U.S.C. 6962); and (3) the Farm Security and Rural Investment Act (Farm Bill) of 2002 (PL 107-171).

*Introduction*

BLM_0054252

Gunnison Sage-grouse Rangewide Conservation Plan

Bureau of Land Management

The United States Department of Interior (USDI) BLM has authority for conservation of GUSG through: (1) the Federal Land Management Policy Act (FLMPA) of 1976 (43 U.S.C. 1701 et seq.; 90 stat. 2743; PL 94-579; (2) the Sikes Act, Title II (16 U.S.C. 670 et seq.), as amended; and (3) the BLM Manual 6840, Special Status Species Management. Specifically, the FLMPA guidance on sensitive species authorizes that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals… (43 USC 1701 Sec. 102 (a) (8))."

Section 06 (C) of the 6840 Manual gives the following guidance on candidate species: "Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed." Specific BLM guidance is outlined in the 6840 Manual. Section .12 of the 6840 Manual states: "Actions authorized by BLM shall further the conservation of federally listed and other special status species and shall not contribute to the need to list any special status species under provisions of the ESA, or designate additional sensitive species under provisions of this policy." The Department of Interior Fish and Wildlife Policy: State-Federal Relationships (43CFR Part 24.4 (c) ) states in part that "…the Secretary of Interior is charged with the responsibility to manage non-wilderness BLM lands for multiple uses, including fish and wildlife conservation. In addition, the RCP is consistent with the BLM National Conservation Strategy for Sage-grouse (Bureau of Land Management 2004b).

United States Fish and Wildlife Service

The USDI USFWS has authority for conservation of the GUSG through: (1) the ESA of 1973, as amended; (2) the Fish and Wildlife Act of 1956, as amended; and (3) the Fish and Wildlife Coordination Act, as amended. Congress, in Section 2 of the ESA, declares that there is value in having incentives for conservation, and Section 5 of the Act, as amended in 1978, provides authority for agencies to engage in conservation activities for the protection of candidate species. Section 6 of the ESA directs that the "Secretary shall cooperate to the maximum extent with the states..." (16 U.S.C. 1535(a)). The Secretary of Interior may also authorize states for monitoring the status of candidate species (16 U.S.C. 1535(c)). The Fish and Wildlife Act of 1956, as amended, and the Fish and Wildlife Coordination Act, as amended, give authorities to the USFWS for enhancement of all fish and wildlife species and mitigation of impacts to fish and wildlife, particularly from Federal water development projects. The Federal Aid and Wildlife Restoration Act of 1937 (Pittman-Robertson Act), as amended, serves as the principal mechanism for providing federal assistance to states for the acquisition, restoration, and maintenance of wildlife habitat, for the management of wildlife areas and resources, and for research into problems of wildlife management (16 U.S.C. 669-669i).

*Introduction*

BLM_0054253

Gunnison Sage-grouse Rangewide Conservation Plan

<u>National Park Service</u>

The USDI NPS has authority for conservation of the GUSG through the 1916 NPS Organic Act (16 USC 1) which charges the NPS with management of parks to "... conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Additional authorities that guide the NPS are found in the General Authorities Act of 1970 (16 USC 1c(a)) and the Redwood Act of 1978 (16 USC 1a-1). Furthermore, the Presidential Proclamation establishing Black Canyon of the Gunnison National Monument (Proclamation No. 2033; March 2, 1933; 17 Stat. 2558), and the Memorandum of Agreement between the NPS and Bureau of Reclamation dated February 11, 1965, provide authorities for protection of the GUSG at Black Canyon of the Gunnison National Park and Curecanti National Recreation Area.

NPS Management Policies and the NPS-77 Natural Resources Management Guideline state that the NPS will seek to perpetuate the native animal life as part of the natural ecosystem of parks. They further define Species of Concern as all native animal species within a park that face an immediate danger of losing their natural role in an ecosystem because of human-induced change, which would include the GUSG. Regarding Species of Concern, NPS-77 states that the NPS should also look for opportunities to enter into cooperative and interagency agreements and memoranda of understanding with other federal and state agencies on research, monitoring, and management of the Species of Concern, and, where appropriate, promulgate regulations. The NPS must strive to protect the natural conditions and processes and the ecosystem integrity to the greatest extent possible for Species of Concern.

NPS-77 further states, "Management of Candidate species should, to the greatest extent possible, parallel the management of federally listed species." The NPS Management Policies identifies the management of threatened or endangered plants and animals as follows: "The Service will survey for, protect, and strive to recover all species native to national park system units that are listed under the ESA. The Service will fully meet its obligations under the NPS Organic Act and the ESA to both proactively conserve listed species and prevent detrimental effects on these species."

<u>Memoranda of Understanding</u>

In addition to the authorities listed above there are 2 Memoranda of Understanding (MOU) that promote conservation of the GUSG. The first, between members of WAFWA, was signed in July 1999 to promote conservation and management of sage-grouse and the sagebrush habitat upon which they depend. The 1999 MOU was signed by members of 13 states and 2 Canadian provinces who are members of WAFWA. The second MOU is between WAFWA, USFS, BLM, and USFWS. The MOU was signed in August 2000, and its purpose is to provide for cooperation among state, provincial, and federal agencies in development of a rangewide strategy for the conservation of sage-grouse and their sagebrush habitats.

*Introduction*

BLM_0054254

Gunnison Sage-grouse Rangewide Conservation Plan

## H. PECE Standards

The ESA requires the USFWS to assess conservation efforts to protect a species. The PECE identifies criteria the USFWS will use in determining whether formalized conservation efforts that have yet to be implemented or shown to be effective contribute to making listing a species as threatened or endangered unnecessary. This policy applies to conservation efforts identified in conservation agreements, conservation plans, management plans, or similar documents developed by federal agencies, state and local governments, tribal governments, businesses, organizations, and individuals, or a combination of the above. The purpose of PECE is to ensure consistent and adequate evaluation of formalized conservation efforts and to guide development of conservation efforts that will sufficiently improve a species' status. Ultimately, successful PECE compliance would make listing the species unnecessary.

The PECE contains 9 criteria the USFWS will use to determine the certainty that the conservation effort will be implemented, and 6 criteria the USFWS will use to determine the certainty that the conservation effort will be effective. These criteria should not be considered comprehensive evaluation criteria. The certainty that a formalized conservation effort will be implemented and effective may also depend on species-, habitat-, location-, and effort-specific factors. The USFWS will consider all appropriate factors in evaluating formalized conservation efforts. The specific circumstances will also determine the amount of information necessary to satisfy these criteria.

The draft PECE was published on June 13, 2000 (65 FR 37102), and was finalized on March 28, 2003, (68 FR 15100-115). Although the local conservation plans pre-date PECE and do not cover all areas of existing GUSG range (specifically the Cerro Summit – Cimarron - Sims Mesa population), the plans include some criteria identified in the PECE. The RCP assesses how each local conservation plan complies with the PECE (Table 3). However, this assessment was conducted at a plan level, prior to explicit guidance on how to conduct PECE reviews. Subsequently, guidance has been provided that PECE reviews will be conducted for individual conservation actions (instead of for conservation plans). If the RCP undergoes a PECE review, it will be conducted during preparation of a listing decision and will follow the latest procedural guidance. Neither PECE review of the local conservation plans nor signature of the RCP by the USFWS constitutes a PECE review of the RCP.

*Introduction*

BLM_0054255

Gunnison Sage-grouse Rangewide Conservation Plan

Table 3. Evaluation of local conservation plans and PECE criteria.

| PECE Evaluation Factor | F = Fulfills entire criteria, P = Partially fulfills criteria, DN = Does not fulfill criteria. | GUNNISON SAGE-GROUSE POPULATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Criteria | Cerro – Cimarron - Sims Mesa | Crawford | Dove Creek | Gunnison Basin | Piñon Mesa | Poncha Pass | Monticello Utah | San Miguel Basin |
| A. The certainty that the conservation effort will be implemented. | 1. The conservation effort; the party(ies) to the agreement or plan that will implement the effort; and the staffing, funding level, funding source, and other resources necessary to implement the effort are identified. | NO PLAN | P | P | P | P | P | P | P |
| | 2. The legal authority of the party(ies) to the agreement or plan to implement the formalized conservation effort, and the commitment to proceed with the conservation effort are described. | NO PLAN | F | F | F | P | P | P | F |
| | 3. The legal procedural requirements (e.g., environmental review) necessary to implement the effort are described, and information is provided indicating that fulfillment of these requirements does not preclude commitment to the effort. | NO PLAN | DN | DN | DN | DN | DN | DN | DN |
| | 4. Authorizations (e.g., permits, landowner permission) necessary to implement the conservation effort are identified, and a high level of certainty is provided that the party(ies) to the agreement or plan that will implement the effort will obtain these authorizations. | NO PLAN | DN | DN | DN | DN | DN | DN | DN |
| | 5. The type and level of voluntary participation (e.g., number of landowners allowing entry to their land, or number of participants agreeing to change sagebrush community management practices and acreage involved) necessary to implement the conservation effort is identified, and a high level of certainty is provided that the party(ies) to the agreement or plan that will implement the conservation effort will obtain that level of voluntary participation (e.g., an explanation of how incentives to be provided will result in the necessary level of voluntary participation). | NO PLAN | DN | DN | DN | DN | DN | DN | DN |
| | 6. Regulatory mechanisms (e.g., laws, regulations, ordinances) necessary to implement the conservation effort are in place. | NO PLAN | P | P | P | P | P | P | P |
| | 7. A high level of certainty is provided that the party(ies) to the agreement or plan that will implement the conservation effort will obtain the necessary funding. | NO PLAN | DN | DN | DN | DN | DN | DN | DN |
| | 8. An implementation schedule (including incremental completion dates) for the conservation effort is provided. | NO PLAN | P | P | P | D | D | P | P |
| | 9. The conservation agreement or plan that includes the conservation effort is approved by all parties to the agreement or plan. | NO PLAN | F | F | F | F | F | F | F |

20

*Introduction*

Gunnison Sage-grouse Rangewide Conservation Plan

Table 3 (Con't).  Evaluation of Local Conservation Plans and PECE Criteria.

| PECE Evaluation Factor | F = Fulfills entire criteria, P = Partially fulfills criteria, DN = Does not fulfill criteria. | GUNNISON SAGE-GROUSE POPULATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Criteria | Cerro – Cimarron - Sims Mesa | Crawford | Dove Creek | Gunnison Basin | Piñon Mesa | Poncha Pass | Monticello Utah | San Miguel Basin |
| **A.  The certainty that the conservation effort will be effective.** | 1. The nature and extent of threats being addressed by the conservation effort are described, and how the conservation effort reduces the threats are described. | NO PLAN | P | P | P | P | P | P | P |
| | 2. Explicit incremental objectives for the conservation effort and dates for achieving them are stated. | NO PLAN | DN | DN | DN | DN | DN | DN | DN |
| | 3. The steps necessary to implement the conservation effort are identified in detail. | NO PLAN | P | P | P | P | P | P | P |
| | 4. Quantifiable, scientifically valid parameters that will demonstrate achievement of objectives, and standards for these parameters by which progress will be measured, are identified. | NO PLAN | P | P | P | P | P | P | P |
| | 5. Provisions for monitoring and reporting progress on implementation (based on compliance with the implementation schedule) and effectiveness (based on evaluation of quantifiable parameters) of the conservation effort are provided. | NO PLAN | P | P | P | P | P | P | P |
| | 6. Principles of adaptive management are incorporated. | NO PLAN | P | P | P | P | P | P | P |

21

*Introduction*

BLM_0054257

Gunnison Sage-grouse Rangewide Conservation Plan

## III. CONSERVATION ASSESSMENT

### A. Biology and Life History

<u>Species Description</u>

The largest grouse in North America is the sage-grouse, a species first described by Lewis and Clark in 1805 (Schroeder et al. 1999). Sage-grouse are charismatic birds known for their elaborate mating ritual where males congregate and "dance" to attract a mate on a specific strutting ground called a lek. Sage-grouse species in North America were once abundant and widespread but have declined throughout their range (Schroeder et al. 1999).

Sage-grouse are most easily identified by their large size, dark brown color, distinctive black bellies, long, pointed tails, and association with sagebrush habitats. Both sexes have yellow-green eye combs, which are less prominent in females. During the breeding season males have conspicuous filoplumes (specialized feathers on the neck), a black bib on a white upper breast and yellow-green air sacs on the chest.

For many years it was believed that all sage-grouse were a single species, known as the sage-grouse. In 2000, Young et al. (2000) identified GUSG as a distinct species. Geographic isolation, distinct genetic differences (Kahn et al. 1999, Oyler-McCance et al. 1999) and behavioral differences in strutting display separate GUSG from other sage-grouse, which are now called greater sage-grouse (Barber 1991, Young 1994, Young et al. 2000). The current ranges of the 2 species are not overlapping or adjacent (Schroeder et al. 2004). GUSG are also significantly smaller than greater sage-grouse (GRSG) in size of culmen, carpel, and tarsus, and they weigh approximately 1/3 less (Hupp and Braun 1991, Young et al. 2000). There are also distinctive plumage differences; GUSG males have more elaborate filoplumes and distinct, broad white barring on the tail feathers (Young et al. 2000).

Concern about the small population sizes and the long-term survival of the sage-grouse in current GUSG population areas started to surface in the early 1990's. These concerns lead environmental groups to petition the USFWS in January 2000 to list the species as endangered. On March 15, 2000, the USFWS designated the GUSG as a Candidate species for threatened and endangered status. Under this designation, the status of GUSG is reviewed annually to determine if it is still warranted for listing and, if so, to determine its listing priority, which is based on the taxonomy of the species and the magnitude and immediacy of threats to the bird.

<u>Life History</u>

Although GUSG and GRSG are different genetically, morphologically, and behaviorally with respect to strutting ground displays, their life histories and habitat requirements are believed to be similar (Young 1994). Most research exploring the life history and habitat requirements of sage-grouse has been conducted on GRSG and comparably little research has been done specifically on GUSG. Through the remainder of this document, the term sage-grouse is used when referring to sage-grouse in general. When

BLM_0054258

Gunnison Sage-grouse Rangewide Conservation Plan

information is known to be specific to GRSG or GUSG, the species acronym will be used. Except where referenced, the following life history information is taken from Schroeder et al. (1999) and applies to both GRSG and GUSG.

Sage-grouse require sagebrush throughout the year for food and cover. Unlike many other game birds, GRSG and GUSG do not possess a muscular gizzard and therefore lack the ability to grind and digest seeds and only occasionally, by accident, consume grit (Rasmussen and Griner 1938, Leach and Hensley 1954). With the exception of insects in the summer, the year-round diet of adult GRSG consists of leafy vegetation. Forbs dominate the summer diet and sagebrush leaves are used the rest of the year (Leach and Hensley 1954, Wallestad 1975).

In the spring, sage-grouse gather on traditional breeding areas commonly referred to as "strutting grounds," but more generally referred to as "leks" (Patterson 1952, Gill 1965). Lek sites are open areas that have good visibility (allowing sage-grouse a greater opportunity to avoid predation) and acoustical qualities so the sounds of display activity can be heard by other sage-grouse.

In Colorado, strutting occurs from mid-March through late May, depending on elevation (Rogers 1964), and the same would hold true for Utah. Males establish territories on leks in early March, but the timing varies annually by 1-2 weeks depending on weather condition, snow melt, and day-length. Males assemble on the leks approximately 1 hour before dawn, and strut until approximately 1 hour after sunrise each day for about 6 weeks (Scott 1942, Eng 1963, Lumsden 1968, Wiley 1970, Hartzler 1972, Gibson and Bradbury 1985, Gibson et al. 1991). The sage-grouse mating system is polygamous (a male mates with several females). Most females visiting the lek are bred by a few males occupying the most advantageous sites near the center of the lek (Scott 1942, Lumsden 1968, Wiley 1973a, Hartzler and Jenni 1988). Most females arrive on leks each morning after the males do, and depart while the males are still displaying. When a hen is ready to mate she invites copulation by spreading her wings and crouching (Scott 1942, Hartzler 1972, Wiley 1978, Boyce 1990). Males provide no parental care or resources and females generally leave the lek and begin their nesting effort immediately after mating.

Nests are not uniformly distributed within nesting habitat (Bradbury et al. 1989, Wakkinen et al. 1992) although some research indicates that 70-80% of all nests often occur within 2 miles of an active lek (Bradbury et al. 1989, Wakkinen et al. 1992). Research on GRSG in northwestern Colorado from 2001-2002 shows that female movements are more extensive than previously reported, with 46% (n = 78/169) of the radio-marked females nesting within 1.8 miles of the lek of capture, 76% (n = 128/169) within 4 miles, and 88% (n = 148/169 within 5.8 miles (Hausleitner 2003, A. D. Apa unpublished data). In addition, female grouse have been documented moving as far as 15-20 miles from the lek where they were captured (assumed to be the lek upon which they bred). In North Park, Colorado, Schoenberg (1982) reported an average GRSG lek to nest movement of 1.6 miles, and research in Idaho has shown movements that range from 2.1 – 3.0 miles (Wakkinen 1990, Fischer 1994, Apa 1998).

For GUSG, 85.2% (n = 69/81) of all nests were located within 4 miles from the lek of capture (Apa 2004, NPS unpublished data; see Appendix J, "GUSG Habitat Use Data"). When only considering the Gunnison Basin, 80% (n = 20/25) of nests were placed < 4 miles from the lek of capture (Young 1994, Apa 2004, NPS unpublished data). In contrast, only 68% (n = 17/25) of nests are placed < 3 miles from the lek of capture. GUSG lek-to-nest

BLM_0054294

Gunnison Sage-grouse Rangewide Conservation Plan

distances range from 0.6 – 0.83 miles at Poncha Pass (n = 3; Nehring and Braun 2000), 0.3 – 2.0 miles at Monticello, Utah (n = 3; Swenson 2003), and 0.1 – 12.6 miles for 6 of the GUSG populations (n = 37; Apa 2004). Young (1994) reported nest locations averaged 2.6 ± 2.2 miles from the nearest lek (n = 37) in the Gunnison Basin.

Nests are typically shallow bowls lined with leaves, feathers and small twigs placed on the ground at the base of a live sagebrush bush. GRSG clutch size ranges from 6 to 10 eggs, with 7 to 9 being the most common (Wallestad and Pyrah 1974, Connelly et al. 1993, Gregg et al. 1994, Schroeder 1997). In Moffat County, Colorado, GRSG clutch size averages from 5.7 eggs for yearling females to 7.0 eggs for adult females (overall average was 6.7 eggs; Hausleitner 2003). Young (1994) reported a mean clutch size for GUSG of 6.8 ± 0.7 (n = 24) eggs, and Swenson (2003) found GUSG clutches ranging from 6-10 in Utah (n = 3). Incubation does not start until the last egg is laid and eggs are incubated 27 to 28 days (Patterson 1952).

GRSG have one of the lowest nest success rates of all the upland game bird species (Schroeder 1997), ranging from 63% in Montana to 10% in Oregon (Drut 1994, Connelly et al. 2000). In Moffat County, nest success in 2001-02 ranged from 45% - 60% (Hausleitner 2003, A. D. Apa unpublished data). GRSG nest abandonment is not uncommon if the hen is disturbed. While re-nesting is infrequent, it does occur (Patterson 1952; Eng 1963; Hulet 1983; Connelly et al. 1991). Young (1994) reported that 1 (4.8%) GUSG female renested during her 3-year study. GUSG are less apt to re-nest than GRSG (Young 1994). Clutch size of re-nesting attempts varies from 4 to 7 eggs (Schroeder 1997). Hatching begins around mid-May and usually ends by July. Most eggs hatch in June, with a peak between June 10 and June 20. In Moffat County the mean clutch initiation date was 26 April in 2001 and 21 April for 2002 (Hausleitner 2003).

Chicks are precocial and leave the nest with the hen shortly after hatching. The availability of food and cover are key factors related to chick and juvenile survival. During the first 3 weeks after hatching, insects (beetles, ants, grasshoppers) are the primary food of GRSG chicks (Patterson 1952, Trueblood 1954, Klebenow and Gray 1968, Savage 1968, Peterson 1970; Johnson and Boyce 1990, Johnson and Boyce 1991, Drut et al. 1994b; Pyle and Crawford 1996, Fischer et al. 1996b). Diets of 4 to 8-week-old chicks were found to have more plant material (approximately 70% of the diet), of which 15% was sagebrush (Peterson 1970). Succulent forbs are predominant in the diet until chicks exceed 3 months of age, at which time sagebrush becomes a major dietary component (Gill 1965; Klebenow 1969; Savage 1969; Connelly and Markham 1983; Gates 1983; Connelly et al. 1988, Fischer et al. 1996b).

During the pre-egg laying period, females select forbs that are generally higher in calcium and crude protein than sagebrush (Barnett and Crawford 1994). Females with chicks move to areas containing succulent forbs and insects, often in wet meadow habitat, where cover is sufficiently tall to conceal broods and provide shade. Groups of unsuccessful females and flocks of males follow similar habitat use patterns but are less dependent on wet meadow areas than females with broods. Insects are consumed by adult grouse, but forbs and sagebrush leaves represent a majority of the diet (Rasmussen and Griner 1938, Moos 1941, Knowlton and Thornely 1942, Patterson 1952, Leach and Hensley 1954). Highly used forbs include common dandelion, prickly lettuce, hawksbeard, salsify, milkvetch, sweet clover, balsamroot, lupine, Rocky Mountain bee plant, alfalfa, and globemallow (Girard 1937, Knowlton and Thornley 1942, Batterson and Morse 1948, Patterson 1952, Trueblood

*Conservation Assessment:*
*Biology & Life History*

BLM_0054260

Gunnison Sage-grouse Rangewide Conservation Plan

1954, Leach and Browning 1958, Wallestad et al. 1975, Barnett and Crawford 1994). The quantity of forbs in adult GRSG diets in summer varies with location.

As fall approaches, intermixing of broods and flocks of adult birds is common and the birds move from riparian areas to sagebrush-dominated landscapes that continue to provide green forbs. Fringed sagebrush is often a transitional food as grouse shift from summer to winter diets.

From late-autumn through early spring the diet of GRSG is almost exclusively sagebrush (Girard 1937, Rasmussen and Griner 1938, Bean 1941, Batterson and Morse 1948, Patterson 1952, Leach and Hensley 1954, Barber 1968, Wallestad et al. 1975). Many species of sagebrush can be consumed, including big, low, silver, and fringed sagebrush (Remington and Braun 1985, Welch et al. 1988, 1991, Myers 1992). GRSG have been shown to select differing subspecies of sagebrush for their higher protein levels and lower concentrations of monoterpenes (Remington and Braun 1985, Myers 1992). Grouse have been shown to gain weight over the winter (Beck and Braun 1978, Remington and Braun 1988), but in exceptionally harsh winters, fat reserves can decrease (Hupp and Braun 1989a).

During particularly severe winters sage-grouse are dependent on very tall sagebrush, which is exposed even above deep snow, providing a consistently available food source. GRSG are capable of making long movements (>18 miles) to find appropriate habitat. GUSG have been documented making movements as large as 17 miles (Root 2002). The extent of movement varies with severity of winter weather, topography, and vegetation cover.

GRSG winter range in Colorado varies according to snowfall, wind conditions, and suitable habitat (Rogers 1964). Sage-grouse may travel short distances or many miles between seasonal ranges. Movements in fall and early winter (September-December) can be extensive with some movements exceeding 20 miles. In North Park, Colorado, Schoenberg (1982) documented female GRSG moving more than 18 miles from winter to nesting areas. Hausleitner (2003) found that in Moffat County, Colorado, female GRSG moved an average of 6 miles from nesting areas to winter sites. The range of movements was extensive, and ranged from < 0.5 - 19 miles

Flock size in winter is variable (15-100+), with flocks frequently comprised of a single sex (Beck 1977, Hupp 1987). Many, but not all, flocks of GRSG males can over-winter in the vicinity of their leks, and by March they are usually within 2-3 miles of breeding areas used the previous year. These movements depend on whether the population is non-migratory or moves between 2 or more seasonal ranges (Connelly et al. 2000).

Annual survival rates of GRSG also vary (Table 4). Survival rates have been estimated from banding or radio telemetry studies. Survival of juveniles from hatch to fall has been estimated to be 38% in Wyoming (June 1963). The survival rate of GRSG varies by year, sex, and age (Zablan 1993). There is reasonable evidence to suggest that female GRSG have higher survival rates than males (Swenson 1986). This higher survival rate may be due to sexual dimorphism. Females have cryptic plumage and a more secretive nature versus the more elaborate plumage and display activities of males (Schroeder et al. 1999).

*Conservation Assessment:*
*Biology & Life History*

BLM_0054261

Gunnison Sage-grouse Rangewide Conservation Plan

Table 4.  Annual survival rates of GRSG.

| GRSG Sample | Survival Rate | Location | Study |
|---|---|---|---|
| Adult females | 55% | Colorado | Zablan 1993 |
| Females | 75% | Idaho | Connelly et al. 1994 |
| Males | 60% | Idaho | Connelly et al. 1994 |
| Females | 67% | Wyoming | June 1963 |
| Males | 59% | Wyoming | June 1963 |
| Adult Females (2001-2002) | 65% | Colorado | Hausleitner 2003 |
| Yearling Females (2001-2002) | 71% | Colorado | Hausleitner 2003 |
| Adult females (2002-2003) | 48% | Colorado | Hausleitner 2003 |
| Yearling Females (2002-2003) | 78% | Colorado | Hausleitner 2003 |

It is not unreasonable to expect that GUSG survival rates are similar to those of GRSG.  Apa (2004) reported that GUSG survival from capture (April 2002) through 31 March 2003 for males was $0.48 \pm 0.07$ ($\underline{n} = 47$) and for females was $0.57 \pm 0.06$ ($\underline{n} = 57$). Survival across all the isolated populations was pooled to empirically compare GUSG male and female survival in the isolated populations to the Gunnison Basin (Apa 2004).  Female survival in the isolated populations and Gunnison Basin was $0.52 \pm 0.08$ ($n = 40$) and $0.71 \pm 0.11$ ($n = 17$), respectively.  Male survival in the isolated populations and Gunnison Basin was $0.51 \pm 0.09$ ($n = 29$) and $0.41 \pm 0.12$ ($n = 17$), respectively.

Habitat Requirements

The extensive literature describing seasonal habitat use by GRSG spans 9 western states and 60 years, but there is considerably less information available for GUSG (Hupp 1987, Hupp and Braun 1989b, Young 1994, Commons 1997, Swenson 2003, and Apa 2004). The following habitat descriptions are based on GUSG data when available, and on GRSG information when needed.  In addition, if the quality of GUSG data is questionable, information from GRSG is used.

Sage-grouse use extensive landscapes throughout the year and can move great distances or have annual migratory patterns (Beck 1975, Wallestad 1975, Hulet 1983, Berry and Eng 1985, Connelly et al. 1988, Wakkinen 1990, Fischer 1994).  Sage-grouse are wide ranging because they require a diversity of seasonal habitats (Connelly et al. 2000), and have specialized dietary requirements (see Schroeder et al. 1999 for numerous citations).  Sage-grouse may use small portions of many different landscape types during different life stages (Connelly et al. 2000) and movements between small seasonal ranges may be extensive.

Sage-grouse habitat requirements may differ by season (Connelly et al. 2000). Connelly et al. (2000) segregated habitat requirement into 4 seasons: (1) breeding habitat; (2) summer - late brood-rearing habitat; (3) fall habitat; and (4) winter habitat.  In some situations, fall and summer - late brood-rearing habitats are indistinguishable, but this depends on the movement patterns of the population and habitat availability.  The breeding habitat category includes lekking, pre-laying female, nesting, and early brood-rearing habitat. Summer - late brood-rearing habitat includes habitat used during this period by males, non-brooding females, and females with broods.  Fall habitat consists of "transition" range from

26

BLM_0054262

Gunnison Sage-grouse Rangewide Conservation Plan

late summer to winter, and can include a variety of habitats used by males and females (with and without broods). Winter habitat is used by segregated flocks of males and females (Beck 1977). Management of sage-grouse habitats should include all habitat types necessary for fulfillment of life history needs.

For the purpose of this plan, we have combined the summer - late brood-rearing and fall habitat into a single habitat category, "summer – fall", resulting in 3 instead of 4. Summer – late brood-rearing habitat is typically characterized by high elevation mesic areas, cropland, wet meadows, and riparian areas. Grouse continue to use these as fall approaches and there is a slow conversion of the diet from forbs to sagebrush. As mentioned earlier, in many cases these two seasonal habitats are indistinguishable, but in the future local information may provide additional insight as to when and where these 2 seasonal habitats can be clearly separated.

All the seasonal habitats described here include habitat used by brooding females, unsuccessful female, and male flocks.


Breeding Habitat (Leks, Pre-laying Habitat, Nesting Habitat, and Early Brood-rearing
    Habitat)

*Leks (mid-March – mid-May)*

There are no habitat investigations specific to GUSG strutting habitat. Most of the information collected is specific to GRSG.

Lek sites can be very traditional with grouse displaying in the very same location from year to year. Some leks are known to have been in use since the 1950's (Rogers 1964). Leks are usually located in small open areas adjacent to stands of sagebrush with 20% or greater canopy cover (Klott and Lindzey 1989). Openings may be natural or human created, including (but not limited to) small burns, drill pads, irrigated pasture, and roads (Connelly et al. 1981, Gates 1985).

Superficially, lek sites do not appear limiting (Schroeder et al. 1999), but they may vary in escape cover and quality of sagebrush (Patterson 1952, Gill 1965, Connelly et al. 1988, Connelly et al. 2000). The amount of land needed for males to strut can vary greatly. Lek sites are usually flat to gently sloping areas of <15% slope in broad valleys or on ridges (Hanna 1936, Patterson 1952, Hartzler 1972, Giezentanner and Clark 1974, Wallestad 1975, Dingman 1980, Autenrieth 1981, Klott and Lindzey 1989). Lek sites have good visibility and low vegetation structure (Tate et al. 1979, Connelly et al. 1981, Gates 1985), and acoustical qualities that allow sounds of breeding displays to carry (Patterson 1952, Hjorth 1970, Hartzler 1972, Wiley 1973b, 1974, Bergerud 1988, Phillips 1990). The absence of taller shrubs/trees or other obstructions appears to be critical for continued use of these sites by displaying males.

Sites chosen for display are typically close to sagebrush that is > 6 inches tall and has a canopy cover $\geq$ 20% (Wallestad and Schadweiler 1974). Usually leks are located in the vicinity of nesting habitat (Wakkinen et al. 1992) and are in areas intersected by high female traffic (Bradbury and Gibson 1983, Bradbury et al. 1986, Gibson et al. 1990, Gibson 1992, 1996). These sagebrush areas are used for feeding, roosting, and escape from inclement

27

*Conservation Assessment:*
*Biology & Life History*

weather and predators. Males are usually found roosting in sagebrush stands with canopy cover of 20 - 30% (Wallestad and Schladweiler 1974).

Daytime movements of adult males GRSG during the breeding season do not vary greatly. Wallestad and Schladweiler (1974) found daily movements ranged between 0.2 and 0.8 miles from leks, with a maximum cruising radius of 0.9 to 1.2 miles. Ellis et al. (1987) reported that dispersal flights of male GRSG (to day-use areas) ranged from 0.3 – 0.5 miles, with the longest flights ranging from 1.2 – 1.3 miles. Carr (1967) reported that the cruising radius of male GRSG ranged from 0.9 – 1.1 miles. Rothenmaier (1979) found that 60 – 80% of male GRSG locations were within 0.6 – 0.7 miles of a lek. Emmons (1980) reported that male dispersal distances to day-use areas of 0.1 miles were common and that 67% of all use areas were greater than 0.3 miles from the lek. In addition, Schoenberg (1982) found that male daily movements averaged 0.6 miles, but ranged from 0.02 – 1.5 miles. No similar data are available for GUSG.

*Pre-laying Habitat (late-March – April)*

No information is available regarding pre-laying habitat for GUSG. Connelly et al. (2000) recommend that breeding habitat should include pre-laying habitat but little is known or understood about pre-laying habitat, even for GRSG. It has been suggested that pre-laying habitats should provide a diversity of vegetation to meet the nutritional needs of females during the egg development period. For pre-laying females in Oregon, Barnett and Crawford (1994) suggest that the habitat should contain a diversity of forbs that are rich in calcium, phosphorous and protein.

*Nesting Habitat (mid-April – June)*

GRSG prefer to nest under tall (11 – 31 inches) sagebrush (Connelly et al. 2000). Peterson (1980) found in North Park, Colorado that nest bushes averaged approximately 20 inches. In Moffat County, Colorado this value is slightly higher and ranges from 30 – 32 inches (Hausleitner 2003). Often, the actual nest bush is taller than the surrounding sagebrush plants (Keister and Willis 1986, Wakkinen 1990, Apa 1998). In northwestern Colorado, the nest bush was nearly 10 inches taller than surrounding shrubs (Hausleitner 2003). The canopy cover of sagebrush around the nest ranges from 15 - 38% (Patterson 1952, Gill 1965, Gray 1967, Wallestad and Pyrah 1974, Keister and Willis 1986, Wakkinen 1990, Connelly et al. 1991, Apa 1998, Connelly et al. 2000). Sagebrush canopy cover around nests in northwestern Colorado had a similar range of values, and averaged 27% (Hausleitner 2003).

Young (1994) reported GUSG nesting under sagebrush that had a mean height of 16.1 inches in the Gunnison Basin. In the Gunnison Basin, Apa (2004) found GUSG nested in areas with a mean sagebrush height of 18.6 inches. In contrast, non-use sites exhibited average mean sagebrush heights of 3.6 inches (Apa 2004). Average horizontal cover of sagebrush varied from 17.4 – 26.0% while non-sagebrush cover varied from 7.9 – 13.7%; non-sagebrush cover at non-use locations was 6.9%.

BLM_0054264

Gunnison Sage-grouse Rangewide Conservation Plan

Good quality nesting habitat consists of live sagebrush with sufficient canopy cover, and substantial grasses and forbs in the understory (Connelly et al. 2000). Few herbaceous plants are growing in April when nesting begins, so residual herbaceous cover from the previous growing season is critical for nest concealment in most areas, although the level of herbaceous cover depends largely on the potential of the sagebrush community (Connelly et al. 2000). Reasonable and scientifically defensible habitat structure guidelines specific to GUSG need to be developed.

Nearly all nests are located beneath sagebrush plants (Patterson 1952, Gill 1965, Gray 1967, Wallestad and Pyrah 1974) and GRSG nesting under sagebrush plants have higher nest success than those that nest under plants other than sagebrush (Connelly et al. 1991). Sage-grouse nest sites also have an important component of herbaceous vegetation (Connelly et al. 2000). Grass heights are variable and as measured across the West range from 5 – 13 inches (Connelly et al. 2000). In addition, horizontal grass cover measurements are also variable and range from 4 – 51% cover. These measurements are similar to northwest Colorado data; Hausleitner (2003) reported that grass heights at nests ranged from 5-6 inches, grass cover averaged approximately 4%, and forb cover averaged about 7% (Hausleitner 2003).

Although not clearly understood, it is also believed that understory herbaceous cover (horizontal and vertical) is important for GUSG nesting habitat. Young (1994) found in the Gunnison Basin that nesting females used nest sites with horizontal grass and forb cover that averaged 9.5% and 3.7%, respectively. Apa (2004) found across southwestern Colorado that GUSG females nested in areas with grass cover of 24.9% and forb cover of 17.6%. Grass height was 4.0 inches and forb height was 1.6 inches.

*Early Brood-rearing*

Early brood-rearing habitat requirements are very similar to nesting habitat requirements. Early brood-rearing habitat is found relatively close to nest sites (Connelly et al. 2000), but individual females with broods may move large distances (Connelly 1982, Gates 1983). Early brood-rearing habitat is typically characterized by sagebrush stands with canopy cover of 10-15% (Martin 1970, Wallestad 1971) with herbaceous understories that exceed 15% cover (Sveum et al. 1998a, Lyon 2000). In Moffat County, Colorado, sagebrush stands average approximately 11% canopy cover and herbaceous understories average about 14% horizontal cover (Hausleitner 2003). High plant species diversity (sometimes also referred to as species richness) is also typical in early brood-rearing habitat (Dunn and Braun 1985, Klott and Lindzey 1990, Drut et al. 1994a, Apa 1998). Sagebrush heights ranged from 6 to 18 inches in Montana (Sveum et al. 1998a, Lyon 2000) and about 23 inches in Moffat County (Hausleitner 2003). Adjacent shrub areas of 20-25% canopy cover have been reported as preferred for escape and day roosting (Wallestad 1971; Dunn and Braun 1987), but night roosting sites in Moffat County, Colorado had only 4% sagebrush canopy cover and sagebrush height was 20 inches

In early summer, the size of the area used appears to depend on the interspersion of sagebrush types that provide an adequate amount of food and cover. Females and broods can select riparian habitats in the sagebrush type that have abundant forbs and moisture (Gill 1965; Klebenow 1969; Savage 1969; Connelly and Markham 1983; Gates 1983; Connelly et al. 1988; Fischer et al. 1996a). Females with broods remain in sagebrush uplands as long as

29

BLM_0054265

the vegetation remains succulent, but may move to wet meadows as vegetation desiccates (Fischer et al. 1996b). Depending on precipitation and topography, some broods may stay in sagebrush/grass communities all summer while others shift to lower areas (riparian areas, hay meadows or alfalfa fields) as upland plant communities desiccate (Wallestad 1975).

## Summer - Fall Habitat

As sagebrush communities continue to dry out and many forbs complete their life cycles, sage-grouse typically respond by moving to a greater variety of and more mesic habitats (Patterson 1952). Sage-grouse begin movements in late June and into early July (Gill 1965, Klebenow 1969, Savage 1969, Connelly and Markham 1983, Gates 1983, Connelly et al. 1988, Fischer 1994). By late summer and into the early fall, females with broods, non-brood females, and groups of males become more social, and flocks are more concentrated (Patterson 1952). This is the period of time when GUSG can be observed in atypical habitat such as agricultural fields (Commons 1997).

From mid-September into October, GRSG prefer areas with more dense sagebrush (>15% canopy cover) and late green succulent forbs before moving to early transitional winter range where sexual segregation of flocks becomes notable (Wallestad 1975, Beck 1977, Connelly et al. 1988). During periods of heavy snow cover in late fall and early winter, use of mountain and Wyoming big sagebrush stands is extensive.

## Winter

As late fall approaches weather events trigger movements to winter areas. The timing of this movement varies, influenced by yearly weather conditions. Winter habitat use depends upon snow depth and availability of sagebrush, which is used almost exclusively for both food and cover. Used sites are typically characterized by canopy cover > 25% and sagebrush > 12 - 16 inches tall (Shoenberg 1982) associated with drainages, ridges, or southwest aspects with slopes < 15% (Gill 1965, Wallestad 1975, Beck 1977, Robertson 1991). In Colorado, less than 10% of available sagebrush habitat is used during deep snow conditions by GRSG (Beck 1977) and GUSG (Hupp and Braun 1989b). When snow deeper than 12 inches covers over 80% of the winter range, GRSG have been shown in Idaho to rely on sagebrush greater than 16 inches in height in valleys for foraging (Robertson 1991).

Lower flat areas and shorter sagebrush along ridge tops provide roosting areas. During extreme winter conditions, GRSG will spend nights and portions of the day (when not foraging) burrowed into "snow roosts" (Back et al. 1987). Snow roosts are dug when snow has the proper texture by scratching with feet or by wing movements.

Hupp and Braun (1989b) found that most GUSG feeding activity during the winter occurred in drainages and on slopes with south or west aspects in the Gunnison Basin. In years with severe winters resulting in heavy accumulations of snow, the amount of sagebrush exposed above the snow can be severely limiting. Hupp and Braun (1989b) investigated GUSG feeding activity during a severe winter in the Gunnison Basin in 1984, where they estimated <10% of the sagebrush was exposed above the snow and available to sage-grouse.

*Conservation Assessment:*
*Biology & Life History*

BLM_0054266

Gunnison Sage-grouse Rangewide Conservation Plan

In these conditions, the tall and vigorous sagebrush typical in drainages were an especially important food source for GUSG.

*Conservation Assessment:*
*Biology & Life History*

BLM_0054267

Gunnison Sage-grouse Rangewide Conservation Plan

## B. Distribution and Abundance

<u>Distribution</u>

*Historic Distribution*

Determining the historic range of GUSG is problematic for many reasons, most notably because of widespread loss of sagebrush habitats, which preceded scientific study of the species. Additionally, GUSG have been extirpated from many areas for which no useful zoological records or specimens exist. According to Young et al. (2000) the GUSG is believed to have historically occurred in Colorado, Kansas, Oklahoma, New Mexico, Arizona, and Utah. A more recent review of historical records, museum specimens, and potential sage-grouse habitat by Schroeder et al. (2004) concluded that GUSG are believed to have historically occurred in southwestern Colorado, northwestern New Mexico, northeastern Arizona, and southwestern Utah (Fig. 3). Accounts of GUSG in Kansas and Oklahoma are not supported with museum specimens and Schroeder et al. (2004) found potential inconsistencies with the historic records and the sagebrush habitat currently believed to be necessary for GUSG survival available in those areas. Applegate (2001) concluded that sage-grouse should be considered hypothetical in Kansas because none of the sagebrush species closely associated with sage-grouse occurred there. He attributed historical, anecdotal reports as mistaken locations or misidentification of lesser prairie chickens.

For these reasons, southwestern Kansas and western Oklahoma were not included on the historic GUSG range map (Schroeder et al. 2004). GUSG range is estimated to have been 21,376 mi$^2$ historically, and 1,822 mi$^2$ (8.5% of the original) is estimated to be the current species range (Schroeder et al. 2004). We modified the historical distribution map by Schroeder et al. (2004) in Colorado and Utah, based on several sources (Fig. 3, see pg. 34 for explanation).

*Conservation Assessment:*
*Distribution & Abundance*

BLM_0054268

33

*Conservation Assessment:*
*Distribution and Abundance*

Fig 3.  Current and historical Gunnison sage-grouse range.  See next page for details on numbers found on map.

Fig. 3.  Current and historical GUSG range.  This map is based on Schroeder et al. (2004), but has been modified in 6 ways (labeled on the map as #1 - # 6):

(1) Schroeder et al. (2004) described the 2 polygons in the north part of the pre-settlement range as being pre-settlement habitat for GUSG based upon 12 museum specimens (Table 5).  The RSC questioned the accuracy of the inclusion of this area being GUSG pre-settlement habitat (as opposed to GRSG habitat) because the museum specimens were not actually reviewed by Schroeder et al. (2004).  The RSC has requested photos of these specimens from the various host museums (Table 5) but has not yet acquired the documentation.  Until these specimens are actually seen (and, if possible, genetic information is obtained), the RSC has agreed to refer to these areas as pre-settlement habitat for "Uncertain Sage-grouse Species".  In either case, the RCP does not intend for any historical GUSG habitat in Garfield, Eagle, or Pitkin Counties, or in the portion of Mesa County that is illustrated under #1 (all in Colorado), to be managed as potential GUSG habitat, until or unless it is proven that the museum specimens in question are GUSG.

(2) This is an area the RSC expanded slightly over the pre-settlement distribution drawn by Schroeder et al. (2004).  The UDWR recently mapped vacant/unknown and potential GUSG habitats (see pg. 54 for definitions).  These mapped areas were based upon current and past distribution of sagebrush habitats.  In a few areas, the newly mapped areas extended outside of the Schroeder et al. (2004) described area.  The RSC agreed to include these small extensions to more accurately describe pre-settlement habitat in Utah.

(3) The Schroeder et al. (2004) map did not illustrate a pre-settlement habitat connection between the San Miguel and the Cerro Summit – Cimarron - Sims Mesa populations.  Recent results from an analysis of genetic material by Oyler-McCance et al. (in press) (see "Genetics", pg. 47) document the exchange of genetic information between these populations.  Based upon this evidence, we used the Colorado Vegetation Classification Project (CVCP, Colorado Division of Wildlife 2004b) GIS (Geographic Information System) data to identify habitats in the area between these 2 populations that are, or could have historically been suitable for GUSG use (e.g., current piñon-juniper habitat with sagebrush understory may have historically been sagebrush habitat).  Thus, we extended the pre-settlement habitat in the region between the 2 populations.

(4) We questioned whether an area on the west side of the San Luis Valley, identified as presettlement habitat by Schroeder et al. (2004), had ever actually been GUSG habitat.  The CVCP (Colorado Division of Wildlife 2004b), which used 82-foot (25 m) Landsat TM Satellite Imagery and ground truthing to derive vegetation classes showed few, if any, polygons of sagebrush or sagebrush-associated classes on the west side of the San Luis Valley.  As a result, the RSC decided to label this area as "questionable" presettlement habitat.  In addition, a rangewide strategy was designed to investigate the historical nature of this area using historic photos, soils, and other available information (see "Habitat Monitoring" rangewide strategy, pg. 220, Objective 3, Strategy 1).

BLM_0054270

Gunnison Sage-grouse Rangewide Conservation Plan

(5) Based on the CVCP (Colorado Division of Wildlife 2004b) we added pre-settlement distribution on the east side of the San Luis Valley.  Both the GIS data and a long-term CDOW employee's knowledge of the area suggest that GUSG were likely distributed on the east side of the valley, and that this was the area linked to pre-settlement GUSG distribution in New Mexico.

(6) We expanded the Schroeder et al. (2004) pre-settlement distribution map in 3 areas. All these areas (2 associated with the Gunnison Basin population, 1 with the Poncha Pass population) currently contain GUSG and/or sagebrush habitat.  The broad scale used by Schroeder et al. (2004) for delineation of pre-settlement habitat could have understandably missed small areas like these.  The RSC agreed to include these small extensions to more accurately describe pre-settlement habitat in Colorado.

*Conservation Assessment:*
*Distribution & Abundance*

BLM_0054271

Gunnison Sage-grouse Rangewide Conservation Plan

Table 5.  Museum specimens collected for area identified in Fig. 3 as "Uncertain Sage-grouse Species".

| SEX | AGE | NUMBER | DATE | SPECIFIC LOCATION | COLLECTION | COLLECTOR |
|------|------|--------|------|-------------------|------------|-----------|
| Female | Adult | DMNH-27087 | 7/12/1905 | Between Colter and Spitzer's Neck near Grand River | Denver Museum of Natural History | A. H. Felger |
| Female | Adult | DMNH-27088 | 7/12/1905 | Between Colter and Spitzer's Neck near Grand River | Denver Museum of Natural History | A. H. Felger |
| Male | Unknown | AM-315107 | 3/7/1906 | Garfield County | Agassiz Museum, Harvard University | J. E. Thayer |
| Male | Unknown | AM-315106 | 3/22/1906 | Garfield County | Agassiz Museum, Harvard University | J. E. Thayer |
| Female | Unknown | FMNH-131312 | 10/27/1902 | Newcastle, Garfield County | Field Museum-Chicago | H. W. Marsden, L. B. Bishop (9295) |
| Female | Unknown | FMNH-131313 | 10/27/1902 | Newcastle, Garfield County | Field Museum-Chicago | H. W. Marsden, L. B. Bishop (9296) |
| Male | Unknown | FMNH-131315 | 9/14/1903 | Newcastle, Garfield County | Field Museum-Chicago | H. W. Marsden, L. B. Bishop (9792) |
| Female | Unknown | FMNH-131314 | 9/15/1903 | Newcastle, Garfield County | Field Museum-Chicago | H. W. Marsden, L. B. Bishop (9791) |
| Female | Unknown | FMNH-131316 | 9/15/1903 | Newcastle, Garfield County | Field Museum-Chicago | H. W. Marsden, L. B. Bishop (9793) |
| Unknown | Juvenile | AM-272666 | 7/7/1904 | Newcastle, Garfield County | Agassiz Museum, Harvard University | From Peabody Museum |
| Male | Unknown | AMNH-353699 | 9/15/1903 | Newcastle, Garfield County | American Museum of Natural History | Unknown |
| Female | Unknown | AMNH-353700 | 9/15/1903 | Newcastle, Garfield County | American Museum of Natural History | Unknown |

*Current Distribution*

GUSG currently occur in what have previously been considered 8 widely scattered and isolated populations in Colorado and Utah (Fig. 4).  In Colorado, 7 GUSG population areas are: Cerro Summit – Cimarron - Sims Mesa, Crawford, Dove Creek, Gunnison Basin, Piñon Mesa, Poncha Pass, and San Miguel Basin.  During the winter in some or most years, GUSG also inhabit a small portion of Grand County, Utah.  These birds are believed to be part of the Piñon Mesa population that predominantly occupies and breeds in Mesa County, Colorado.

*Conservation Assessment:*
*Distribution & Abundance*

BLM_0054272

Gunnison Sage-grouse Rangewide Conservation Plan

The Utah population is located near the town of Monticello and may be contiguous with the Dove Creek population in Colorado.  Genetic data have also suggested these 2 populations could be considered one population (see "Genetics", pg. 47).  Thus, we consider them 2 subpopulations of a single population, but discuss them separately within the "Conservation Assessment" section because they occur in 2 states and each has its own local work group and local conservation plan.  However, on RCP maps the 2 subpopulations are shown as a single population, and within the "Conservation Strategy" (pg. 201) we consider them as a single population from a conservation standpoint, although we specify some actions and targets for each state, again because of the separate entities and groups involved in managing the birds.  Because we deem these 2 former "populations" as 1 population, we consider there to currently be 7 GUSG populations.

The Cerro Summit – Cimarron – Sims Mesa and San Miguel Basin populations both exhibit a patchy distribution of GUSG.  As a result, we identify separate "subpopulations" within each.  At Cerro Summit – Cimarron – Sims Mesa there are 2 subpopulations: (1) Cerro Summit – Cimarron; and (2) Sims Mesa.  In San Miguel Basin there are 6 subpopulations: (1) Dry Creek Basin; (2) Hamilton Mesa; (3) Miramonte Reservoir; (4) Gurley Reservoir; (5) Beaver Mesa; and (6) Iron Springs.

*Conservation Assessment:*
*Distribution & Abundance*

BLM_0054273

38

*Conservation Assessment:*
*Distribution and Abundance*

Fig. 4.  Locations of current Gunnison sage-grouse populations.  The discontinuity in occupied habitat at the state line in the Dove Creek – Monticello area is not entirely a mapping artifact; where there is occupied habitat on the Colorado side there is an abrupt change to cropland on the Utah side of the border.  The abrupt transition at the state border in the Piñon Mesa area may be due to differing mapping efforts between the states and is addressed in the "Habitat Monitoring" rangewide strategy (see Objective 1, Strategy 3, pg. 221).

BLM_0054274

Gunnison Sage-grouse Rangewide Conservation Plan

<u>Abundance</u>

*Lek Counts and Population Estimation*

Inventory and monitoring of wildlife populations is an obvious prerequisite to conserving them, and is especially important when quantitative goals for species conservation have been developed. What is not obvious is how to accomplish inventory, and what level of resources is appropriate to commit to this task, since resources devoted to inventory and monitoring will not be available for other critical conservation tasks. Having very accurate and precise estimates of GUSG numbers does not in and of itself improve the species' status.

Population trends of sage-grouse have been monitored across the western U.S. using variations on a lek count methodology first described by Patterson (1952), who studied sage-grouse in Wyoming. Patterson speculated that the maximum number of males counted over 3 or 4 counts spread throughout the display period might be a useful index to sage-grouse population trends. Wildlife managers have monitored populations of many species through the use of indices, where a count or measurement is made of some characteristic of a population that is both convenient to measure and is thought to be related to abundance. With birds, indices are often based on vocalizations made during the breeding season, such as pheasant "crow" call counts, dove coo-count indices, and bobwhite whistling counts (Lancia et al. 1994). Anderson (2001) noted the weaknesses of this type of sampling, which may be convenient for wildlife managers, but does not lead to defensible estimates of population size or status. The index, whether it is pheasant crows or the number of male sage-grouse counted on a lek, has an unknown relationship to the larger population of interest.

As a result of the publication of Patterson (1952) the lek count became the standard for sage-grouse population monitoring. Patterson (1952) based the census on the belief that all males regularly attend leks. His suggested maximum of 3 or 4 counts made sense under this assumption, because given normal environmental variables associated with lek counts (e.g., cold temperatures, snow, predator harassment), it might take 3 or 4 trips to get a "good" count of all the males present.

The lek count protocol proposed by Patterson (1952) has weaknesses. Dalke et al. (1963:833) thought lek counts provided a reasonably accurate method of determining breeding population trends, but noted the high degree of variability in daily counts and suggested a "…need for more refined census methods as sage-grouse management becomes more intensive in the future." Jenni and Hartzler (1978:51) used and supported the technique but speculated that high variance in counts was because "…some unestablished birds wandered about visiting different leks on different mornings."

Beck and Braun (1980) presented a critical review of the practice of using lek counts to assess population trends or size. They pointed out that without information on the total number of leks in an area, attendance patterns of adult and yearling males, inter-lek movements, and the relationship between the maximum count and the population size, nothing could be concluded about population size or trends from lek counts. Despite these criticisms, the Western States Sage Grouse Committee essentially codified lek counts as a means to assess population trends 2 years later when it published its Sage Grouse Management Practices (Autenrieth et al. 1982). The publication advises caution in the interpretation of counts because of the high level of variance in the data, but no additional aid

*Conservation Assessment:*
*Distribution & Abundance*

BLM_0054275

Gunnison Sage-grouse Rangewide Conservation Plan

in interpretation of lek count data is given.  The committee's most recent guidelines (Connelly et al. 2000) also suggest viewing lek data with caution, but state that lek counts (per Autenreith et al. 1982) provide the best index to breeding population levels.  In an extension of that assumption, Connelly et al. (2000) reaffirm specific statements from Connelly and Braun (1997) that suggest there has been a 17 - 47% decline in breeding populations across their range.

Applegate (2000) and Anderson (2001) pointed out that index data cannot be extrapolated to estimates of animal density or abundance unless the proportion of the total population that is counted in the index method is known.  For sage-grouse populations, this depends on (1) the proportion of leks that are known and counted; (2) the number and timing of counts conducted; (3) time of day in which counts are conducted; (4) lek attendance rates by yearling and adult males; and (5) the sex ratio of the population.  All of these parameters are likely to vary significantly spatially and over time, yet when population estimates are derived from lek count data these parameters are assumed to be fixed constants.

Assumptions Made in Sage-grouse Population Estimation from Lek Counts

Lek count data have been used to make inferences about sage-grouse population trends for at least 50 years, without any credible scientific investigation into the relationship between lek counts and population size.  Because of the interest in having population estimates for sage-grouse (and because of the lack of other efficient methods for population estimation of sage-grouse), it is now a common practice to use lek data to estimate the size of various populations of sage-grouse.  Multiple untested assumptions are often made in using lek count data to estimate sage-grouse population size (Table 6).  These usually include assumptions regarding population sex ratio, an estimate of the percentage of leks that are counted, and the percent of males in the population that are counted at leks.  The Washington State Recovery Plan for Greater Sage-grouse (Stinson et al. 2004) also mentions that males could make inter-lek movements, but does not address this in its estimates (Stinson et al. 2004).

*Conservation Assessment:*
*Distribution & Abundance*

BLM_0054276

Gunnison Sage-grouse Rangewide Conservation Plan

Table 6.  Untested assumptions made in using lek count data to estimate sage-grouse population size.

| Region/Source | Assumptions | | |
|---|---|---|---|
| | Sex Ratio M:F | Percentage of all leks that were located and counted | % of males (associated with the lek) that are actually counted |
| Gunnison Basin/Gunnison Basin Conservation Plan (GBCP 1997) | 1:2 | 80 % | (50 – 100 %) used 75 % |
| San Juan County, Utah/Utah Gunnison Sage Grouse Conservation Plan (SJCCP 2000) | 1:2 | Not described | 75% |
| Nevada – statewide Conservation Plan (Neel 2001) | 3:7 – 2:3 | 80 % | 75 % |
| Washington State (Stinson et al. 2004) | 1:1.6 | 100 % | 100 % |

Here we examine 4 assumptions made in estimating population from lek counts.

(1) *Percent of leks counted.*  We recognize that lek counts may be useful as a trend indicator, under the assumption that a constant percentage of leks are detected.  It is not necessary to know what the percentage of leks detected is, but to estimate population size, either all leks must be counted, or the proportion of the total that is counted must be estimated (lek detection probability).

Numerous studies have documented that lek densities vary considerably over time.  Bradbury et al. (1989) found a persistent excess of large and small lek sizes.  Within an area, lek numbers seem to increase roughly in proportion to population size (Cannon and Knopf 1981).  Core or "traditional" leks increase in size, while satellite leks appear and disappear as populations increase and decrease.  Thus, it is probably not reasonable to assume that the proportion of leks detected is constant over time unless search effort increases proportionally as populations increase.  Managers and researchers are also far more likely to detect and count a higher proportion of leks at low population densities than at high densities.  It is probably also not reasonable to assume unknown leks are of "average" size, because unknown leks are more likely to be satellite leks and thus smaller, and because detectability may be a function of number of males, larger leks may be more noticeable.

(2) *Interlek Movements.*  Attendance by males at more than 1 lek is problematic, because birds may be counted multiple times at different leks, thus inflating population estimates, or they may not be counted at all if are attending a different lek when counts occur.  The ability of lek counts to serve as an index to population trends will not be affected by inter-lek movements if the movements are relatively constant from year to year.

*Conservation Assessment:
Distribution & Abundance*

BLM_0054277

Unfortunately, interlek movements are both significant and variable. Dalke et al. (1963) reported interlek movements by individual (banded) adult males varied by year from 22 - 47%. Dunn and Braun (1987) recorded no marked birds moving between leks in 1982, but 14 of 91 (15%) were observed at 2 or more leks in 1983. Emmons and Braun (1984) reported all (11) juvenile males attended from 2-4 leks during the breeding season, while interlek movements of adults were infrequent (3 of 11; 27%).

*(3) Lek Attendance.* Population estimates from lek count data assume that a constant proportion of males, often 75%, are detected by the maximum of 3-4 counts (e.g., Table 6). There is considerable evidence that lek attendance is highly variable due to age, social status, weather, body condition, and parasite load or disease. Patterson (1952:152) suggested that all males regularly attended leks, although the only data he presented to support this assertion was: "All these marked birds were identified morning after morning occupying the same territory on the strutting ground." He was examining marked birds with respect to territoriality in this reference, and the marking referred to birds he captured on leks and dyed, or birds he identified by tail feather patterns. Dalke et al. (1963:820) didn't calculate attendance rate for banded birds, but indicated that "…banded males were ordinarily absent from the strutting grounds from 1 to 3 days at a time…", and "The less dominant males were irregular in their visitations. The dominant males were present almost daily under all conditions." Dalke et al. (1963:822) also noted, "Banded males were often seen in the sagebrush adjacent to the strutting grounds," although this was attributed to trapping disturbance. Hartzler (1972) documented males with almost daily lek attendance and others that only sporadically attended leks in Montana. Wiley (1973a) stated that there was a "…large pool of non-lek males that exists in most lek species," and he further speculated (Wiley 1974) that attendance patterns of males were likely to be a function of density (lek size). Dunn and Braun (1987) reported daily attendance rate of marked adult males was only 43%, ranging from 3-96% for individual males. Daily attendance by yearling males was only 33% (Dunn and Braun 1987).

One bias in assessing attendance based on observations of banded birds is that apparent low attendance may be caused by mortality of banded birds. Emmons and Braun (1984:1023) studied male sage-grouse lek attendance with the objective "…to examine the daily attendance patterns on leks of male sage grouse during the breeding season," but lumped attendance across 5-day, 15-day, or season-long averages. Although their data indicated significant within-year and across-year variation even when lumped into 5-day intervals, they did not report what fraction of radio-marked males would be detected by normal counting protocols. Since 93% of the birds they based their attendance rates on were trapped while night-roosting on leks, it is probable they (and others) caught highly territorial, dominant males who regularly attend leks, and thus it is likely the estimate of lek attendance may be biased high.

The physical condition of sage-grouse can also affect their attendance at leks. Hupp and Braun (1989a) found that sage-grouse had depleted lipid and protein reserves following a severe winter in Colorado. This, and snow cover, caused the birds to largely delay initiating display activities until late April. There was substantial variation in lipid reserves across 3 years, which could impact lek attendance and display rates. The authors noted substantially higher variation in lek counts within a season for GUSG than for GRSG in North Park.

BLM_0054278