TABLE OF CONTENTS - Continued

H. Plan Implementation Strategies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
    Exhibit V.14: Joint Urban Area Plan Implementation Strategies . . . . . . . . . . . . . . . . . . . . . 108
I. Key Action Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

CHAPTER SIX:   FUTURE LAND USE PLAN, REVIEW AND UPDATES . . . . . . . . . . . . . . . . . 133
A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
B. Administration of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
C. Legal Status of Previous Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
D. Adoption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
E. Review and Update . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
F. Revisions, Amendments or Abolishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

CHAPTER SEVEN: MESA COUNTY LAND USE INCENTIVES, FINAL REPORT . . . . . . . . . . . 136
Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137
Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
   1.0    Benefits of and Obstacles to Clustering Growth . . . . . . . . . . . . . . . . . . . . . . . . . 140
   1.1    Reducing the Costs of Sprawl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
   1.2    Elements Necessary for Implementation of Incentives . . . . . . . . . . . . . . . . . . . . . . 141
         1.2.1 Minimize Conflicts Between Agricultural and Residential Land Uses . . . . . 141
         1.2.2 Develop Open Space and Protection Policies . . . . . . . . . . . . . . . . . . . . . . . 142
         1.2.3 Consider Factors Driving Sprawl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
         1.2.4 Formulate Design Standards for Developed Areas . . . . . . . . . . . . . . . . . . . . 143
         1.2.5 Keep it Simple . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
         1.2.6 Evaluate Cumulative Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
   2.0    Overview of Incentives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
   2.1    Selection of Incentives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
   2.2    Legal Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
   3.0    Description and Discussion of Incentives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
   3.1    Density Bonuses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
         3.1.1 Density Bonus Within 201 Areas (Sewer Service Areas) in Mesa County . . 145
         3.1.2 Density Bonus Outside of 201 Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
         3.1.3 Sliding Scale Density . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
         3.1.4 Advantages and Disadvantages of Density Bonus Systems . . . . . . . . . . . . . 146
   3.2    Transfer of Development Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
         3.2.1 Transfer on Same Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
         3.2.2 Transfer to County Receiving Zones . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
         3.2.3 Transfer to Incorporated Municipalities . . . . . . . . . . . . . . . . . . . . . . . . . . 152
         3.2.4 Advantages and Disadvantages of TDRs . . . . . . . . . . . . . . . . . . . . . . . . . 152
   3.3    Relaxed and Revised Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
         3.3.1 Create More Flexible Park and Open Space Dedication/Preservation
             Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
         3.3.2 Relax Road Improvement Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 153
         3.3.3 Relax Shared Driveway Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
         3.3.4 Relax Interior Street Widths in Clustered Development . . . . . . . . . . . . . . . 154
         3.3.5 Reduced Lot Frontage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

iii

TABLE OF CONTENTS - Continued

|        | 3.3.6 Advantages and Disadvantages of Relaxed Standards .................. | 154 |
| 3.4    | Streamlined Administrative Procedures .................................... | 155 |
|        | 3.4.1 Advantages and Disadvantages of Streamlined Procedures .............. | 155 |
| 3.5    | Rural Cluster Subdivision Exemption .................................... | 155 |
|        | 3.5.1 Advantages and Disadvantages of Rural Cluster Subdivision Exemption ... | 156 |
| 3.6    | Planned Unit Developments ............................................. | 156 |
|        | 3.6.1 Rural Planned Unit Development .................................. | 157 |
|        | 3.6.2 TDR Planned Unit Development ................................... | 157 |
|        | 3.6.3 Advantages and Disadvantages of Rural PUD ....................... | 157 |
| 3.7    | Change Zoning ....................................................... | 158 |
|        | 3.7.1 Advantages and Disadvantages of Change in Zoning .................. | 158 |
| 3.8    | Capital Improvement Planning and Impact Fees ......................... | 159 |
|        | 3.8.1 Advantages and Disadvantages of Capital Improvement Planning and Fees . | 159 |
| 3.9    | Brownfields ......................................................... | 160 |
|        | 3.9.1 Advantages of Brownfields ...................................... | 161 |
| 4.0    | Conclusion and Recommendation ...................................... | 161 |
| 4.1    | Identify and Evaluate Target Areas Where Growth Will Be Encouraged ........ | 161 |
| 4.2    | Enter into intergovernmental agreements with special districts and municipalities ................................................ | 162 |
| 4.3    | Establish Overlay Districts ............................................ | 163 |
| 4.4    | Establish A Rural Subdivision Exemption ............................... | 163 |
| 4.5    | Establish a pilot TDR program ........................................ | 164 |
| 4.6    | Coordinate Capital Improvement Planning with land use objectives .......... | 165 |
| Conclusion ..................................................................... | | 165 |
| Acknowledgments ................................................................ | | 165 |
| Addendum to the Mesa County Land Use Report ..................................... | | 166 |

GLOSSARY OF TERMS, ACRONYMS, PHRASES AND ABBREVIATIONS ................ 167

iv

# CHAPTER ONE
## INTRODUCTION

**Mesa Countywide Land Use Plan**
**From Issues to Action**

BLM_0057499

### A.   The Mesa Countywide Land Use Plan

The Mesa Countywide Land Use Plan provides a new direction for Mesa County. It is the first land use plan ever prepared countywide as a guide for future land use and development. This land use plan is the product of a unique planning process set in motion in September 1994 by Mesa County's Board of County Commissioners. The board's charge was to discover and reflect the land uses that the citizens of Mesa County wanted for their future.

The Mesa Countywide Land Use Plan was initiated with the realization that traditional planning methods do not effectively embody the needs and desires of the people. Often the public is invited only to participate at the end of a land use planning process, to review and react to the plan during public hearings. Mesa County chose to engage the public from the very beginning of this project and maintain their interest and input throughout this process. Mesa County built the plan around a countywide consensus, not on the advice of a few professional planners and consultants. Mesa County's citizens were asked to express concerns and develop their own ideas. Mesa County challenged a representative steering committee (see Mesa Countywide Steering Committee, Chapter Two) and other leaders from within each community to refine these issues and work with a consultant team to develop policies and action plans needed to produce the land use plan.

The Mesa Countywide Land Use Plan actively engaged the public in more than 50 meetings, bringing county residents together in public workshops, steering committee meetings, and discussions to share ideas and participate in defining Mesa County's course for the future. People came from throughout the county and kept coming back to participate in subsequent meetings. They wanted to ensure that their comments and suggestions were considered.

Out of this process came specific proposals and suggestions. One of the early resounding public sentiments was that the City of Grand Junction Urban Area Plan process, which was paralleling the county planning process, be combined with the Mesa Countywide Land Use Plan process for the urbanizing area around the City of Grand Junction. In response, both entities collaborated on a joint land use process, the results of which are reflected in this document as the Future Land Use Plan, Joint Urban Planning Area (see Chapter Five).

Once they heard citizen concerns and visions for Mesa County, the Mesa Countywide Steering Committee refined proposals into a series of clear alternatives. Interested citizens, representatives of the business community, special interest groups, and institutions who will live with and realize the plans comprised the steering committee. The steering committee used this inclusive and interactive process to then refine alternatives using community input to form a final plan, complete with a set of policies and practical action plans.

Mesa County is a diverse landscape of beautiful valleys, mesas and plateaus. Equal to its natural diversity is its rich culture and heritage that must be respected as plans are created for the future. The future land use plan protects existing private property rights and respects many other individual issues. It also recognizes that future generations may want and require different land use goals and policies than are included in this plan. The Mesa Countywide Land Use Plan is the result of a two year planning process which drew heavily on community differences and strengths in its development. While not perfect, the land use plan fairly reflects the land use hopes and values of Mesa County's citizens.

BLM_0057500

**B.    Why Mesa County Needs a Land Use Plan**

Mesa County covers approximately 3,300 square miles in Western Colorado. Approximately 76 percent is publicly owned and controlled, primarily by the U.S. Forest Service and the Bureau of Land Management. The county's 1995 population was approximately 100,000. The county seat, the City of Grand Junction, is the largest urban area between Denver, Colorado and Salt Lake City, Utah. For the large geographic area of western Colorado and eastern Utah, Grand Junction is a center for banking, health care services, and retail trade.

Mesa County is experiencing many growth pressures and trends that have led to the need for a countywide land use plan. The following provides a few key indicators, with more detail provided on existing conditions and trends in Chapter Three and in the Appendix:

- Widespread perceptions and fears that Mesa County is rapidly losing its rural and agricultural lifestyle.

- Much of the new job growth has been (and forecasts predict this will continue) in the lower-paying segments of the economy such as the retail and service sectors.

- The county's population growth is taking place increasingly in the urbanizing areas surrounding Grand Junction. In 1980, 70 percent of the county's population lived in the city and surrounding urban area. By 1990 this area had captured 77 percent of the population. The urbanizing area outside the city limits grew 27 percent over this period, or 2.4 percent per year on average, while the county as a whole experienced a 14 percent change.

- The need for expression of common community values and a clear guide to land use decision-making for the future.

- The lack of a Countywide Land Use Plan to direct and guide future growth throughout the county.

The absence of a single land use plan for the county has been problematic for both public policy-makers and the private sector. Without an overall land use plan, the county, municipalities, special districts, and other entities have had no common basis for future land use, zoning, and capital improvement decisions. Similarly, without such a plan, the private sector has been forced to make many decisions pertaining to land use and development within a vacuum of public policy. This situation has produced an array of land use, zoning, and development decisions by both the public and private sectors which have not always been consistent.

The county expressed interest in preparing a community-wide visioning and strategic planning process. This would have required a comprehensive look at all the community systems currently in place and would need to be accomplished through a highly public and interactive process. The Board of County Commissioners has chosen to address the various planning issues one at a time on a priority basis. The issues of land use and zoning are central to many other outstanding issues. Without establishing the plan for land use first, many issues, such as capital facility plans, cannot be properly addressed.

BLM_0057501

Mesa County is a statutory county which derives its elected official structure from the Colorado Constitution and its powers from the state through enabling legislation. The three-member Board of County Commissioners serves as the legislative, policy-making, and administrative body governing the unincorporated area of Mesa County. Commissioners are elected at large from each of three geographical districts and serve staggered four-year terms.

Historically, the Mesa County Planning Commission has adopted area plans for specific portions of the county to serve as elements of the Mesa County Master Plan and known as the Mesa County Land Use and Development Policies. The policies also include general policies applicable to the entire unincorporated county regarding services, agricultural land, energy development, procedures, and standards for development; however, no comprehensive land use element exists in the document. Although some parts of the county are "planned" by virtue of the existence of county-adopted neighborhood or area plans, existing area plans may be out of date and are not necessarily consistent with one another or sensitive to the land use and zoning needs of the entire county.

In December 1993 the Mesa County Board of County Commissioners developed a list of five general goals for the land use plan. In February 1994 Mesa County requested the submission of statements of qualifications from professional planning firms for the preparation of a countywide land use plan for the unincorporated areas of the county. Proposals were submitted in April, with interviews and selection of a consultant team completed in May. In September 1994 the Mesa County Board of County Commissioners approved a professional services contract with Design Studios West, Inc. of Denver, Colorado to assist in the preparation of a countywide land use plan as the first step towards developing a countywide master plan.

C.   **Goals of the Mesa County Board of County Commissioners**

In December 1993 the Board of County Commissioners adopted the following five general goals for the land use plan. The Mesa Countywide Land Use Plan will:

1.   Reflect the current culture of Mesa County as well as its past customs.

2.   Serve as both a practical and philosophical framework for the future. It will be based on the protection of private property rights and the free market concept in concert with community values.

3.   Consider both public and private lands within its boundaries, promote full participation in all land use planning processes, and provide a framework for all area plans.

4.   Maximize public/citizen input in the planning process.

5.   Recognize that there are limits to available resources and develop a process to maintain current inventories of those resources.

On September 3, 1996, the Mesa County Planning Commission adopted the following general goal to supplement the five goals previously adopted by the BOCC.

6.   Through monitoring and evaluation, ensure prompt recognition and appropriate response to changed conditions related to factors such as shifting demographics, altered public attitudes and values, different economic conditions, or other

BLM_0057502

pertinent factors.

**D.    The Legal Authority of the County to Plan**

Colorado statute provides the legal basis for the preparation of the Mesa Countywide Land Use Plan (CRS 30-28-106 et seq.).  The authority to make and adopt such a master plan is given to the Mesa County Planning Commission (Planning Commission) by virtue of the statute. The Planning Commission is charged with preparing and adopting a master plan capable of guiding the physical development of the unincorporated portions of the county.     The master plan represents the planning commission's vision of the most desirable land uses and serves as a guide for development rather than as an instrument to control land use.  It may cover the whole county or subareas of the county.  It may also address specific planning considerations such as drainage, transportation, flooding, etc.  The master plan is an advisory document only and has no regulatory effect.

**E.    The Relationship of this Plan to the Existing Land Use and Development Policies (Mesa County Master Plan), Area Plans, and Existing Zoning and Subdivision Regulations**

**Mesa County Master Plan**

The Mesa Countywide Land Use Plan will serve as a guide to development within unincorporated Mesa County.  This plan is advisory only and has no regulatory effect.  It does, however, include land use and development policies and implementation strategies which will guide the preparation of both regulatory and voluntary mechanisms used for implementation of the plan.  The existing Mesa County Land Use and Development Policies should remain in effect except where inconsistent with these new policies.  In such cases these policies prevail.

**Area Plans**

The contents of this plan are intended to provide a general framework for future countywide land use decision-making.  This Countywide Land Use Plan creates a future vision for the county that is more current than the adopted area plans, many of which were adopted five to ten years ago.  The most recent, the Orchard Mesa Area Plan, is reflected in the urban planning area land use plan.  All existing and future area plans should follow the policies and desired land uses as expressed by the Mesa Countywide Land Use Plan.  Further, area plans are good vehicles for focusing on smaller segments of the county and add more detail to land use recommendations (see Exhibits 1 and 2).

The Mesa County Land Use and Development Policies document contains several adopted area plans, namely:

| | |
|---|---|
| Policy #24: | Powderhorn - June 21, 1984 |
| Policy #27: | Lower Valley (Fruita, Loma, Mack) - March 21, 1985 |
| Policy #28: | Clifton (Clifton, Fruitvale, Pear Park, Central Grand Valley) - April 25, 1985 |
| Policy #30: | Redlands - April 17, 1986 |
| Policy #31: | Glade Park - December 22, 1988 |
| Policy #33: | Mid-Valley/Appleton - June 28, 1990 |
| Policy #36: | Grand Mesa Slopes Management Area Plan - January 27, 1994 |
| Policy #38 | Orchard Mesa - March 1995 |

BLM_0057503

Mesa Countywide Land Use Plan

**Exhibit 1**
**Existing Urban Area Plans**

BLM_0057504

**Exhibit 2**
**Existing Master and Area Plans Countywide**

BLM_0057505

**Existing Zoning and Subdivision Regulations**

The Mesa Countywide Land Use Plan does *not* change existing zoning. The future land use plan and policies contained herein will serve as a guide for reviewing new development applications and for implementing any new land development regulations (zoning and subdivision) desired. Any changes to zoning or subdivision regulations would require proper notice and public hearings before adoption or approval.

**F.     How this Plan is Organized**

This plan is organized into five chapters and includes an appendix and summary under separate cover. The plan contains a large amount of information and guidance. It is designed to assist those who wish to build projects in the county, staff personnel who must review project proposals, and decision-makers who are called upon to act on these projects.

1.     The Introduction chapter (Chapter One) provides a broad overview of the plan's goals, authority, background, and relationship to other documents and their organization.

2.     The Planning Process chapter (Chapter Two) provides an overview on planning methodology, the three planning areas, the 11 community areas, the role of the steering committee, the joint city and county planning process for the urban planning area, and the land use classification system.

3.     The Existing Conditions chapter (Chapter Three) summarizes the county's history, population trends and projections, economic trends, environmental characteristics. service capacity. and provides the results of an opinion survey.

4.     The Rural Planning Area (Chapter Four) and Joint Urban Planning Area (Chapter Five) chapters describe the future land use plan and land use policies. These chapters clearly identify the urban planning area as the joint urban planning area in and around the City of Grand Junction and includes the same text and policies in the City of Grand Junction Urban Area Plan. The two rural planning areas (east and west) are formatted to express countywide policies, actions and plans. This material provides guidance in land use decision-making, but it is not regulatory.

5.     The Future Land Use Plan Review and Updates chapter (Chapter Six) identifies the process for reviewing, updating and amending the land use plan.

6.     The Mesa County Land Use Incentives, Final Report (Chapter Seven) explores and recommends techniques for implementing the land use plan through positive incentive approaches.

7.     The Glossary lists terms, phrases and acronyms used throughout the plan document.

8.     The Appendix (under separate cover) contains a variety of background data and analyses which were used in the formulation of the plan and/or its interpretation. This material is informative but not regulatory.

BLM_0057506

# CHAPTER TWO
## THE PLANNING PROCESS

**Mesa Countywide Land Use Plan**
**From Issues to Action**

BLM_0057507

### A.   Mesa Countywide Steering Committee

The Mesa Countywide Steering Committee, representing 11 geographic community areas and appointed by the Mesa County Board of County Commissioners, was charged with coordinating the work effort between Mesa County and various special interest groups. The Mesa Countywide Steering Committee was formed to coordinate the work effort between the county, municipalities, special districts, federal and state land managers, the 11 communities, and the public. There were over 30 members on the steering committee initially, each representing a different geographic area and special interest (see Appendix for membership and affiliation list). The committee first met on November 13, 1994 and at least once a month until June 1996. In January 1995 the committee met to adopt its bylaws and purpose statement and to elect a chairperson, Dr. Michael Nyikos, and a vice-chairperson, Mrs. Jean Moores.

This working committee met regularly over the planning process and reported directly to the Mesa County Board of County Commissioners. The steering committee played an important role in balancing yet respecting the differences expressed in the various communities. This group also provided technical review of the Draft Land Use Plan document and, ultimately, presented its final recommended land use plan to the public and Planning Commission.

The following summarizes the committee's responsibilities:

- Communicate the concerns of all interested community groups regarding the long-range development of the county.

- Give representatives with differing viewpoints a forum for discussing these perspectives.

- With the assistance of the planning staff's technical analysis, develop a statement of community goals.

- Assist in communication with the general community about this process.

- Reflect the concerns of the interests being represented.

- Report back to those interest groups during the process.

- Make recommendations to the Planning Commission and Board of County Commissioners throughout the development of the Mesa Countywide Land Use Plan.

### B.   Joint Urban Area Steering Committee

Mesa County and the City of Grand Junction committed to a joint planning effort early in the process. The joint planning process for the urban area of the county included the communities of Grand Junction, the Redlands, Clifton and Orchard Mesa. The Joint Urban Area Steering Committee was comprised of members of both the Mesa Countywide Steering Committee and the Grand Junction Growth Plan Steering Committee. They discussed urban issues and alternative land uses, selected a preferred future land use plan, and drafted recommended goals, policies and action plans for the urban area.

BLM_0057508

### C.    Planning Process Overview

The planning process undertaken by Mesa County was based on a high degree of public input and participation. Mesa County employed citizen participation which became the foundation for future planning. A number of community workshops and open houses were held to determine community values. These forums invited direct participation from citizens within the planning areas and included an opinion survey, review of population trends and projections, general economic trends, environmental characteristics, and service capacity analyses.

From its inception, Mesa County desired and sought a planning approach which emphasized a search for deeply held community values and principles, protection of private property rights, an environmental scan of existing conditions and trends, and development of a framework plan with implementation strategies and action items.

It should be noted that this planning effort focused primarily on public participation and secondarily on assisting the county in the development of a comprehensive computer database of existing conditions. Development of this database is an ongoing effort, and considering its countywide nature, it should be viewed only as a general analysis tool. Conclusions in the plan are based generally on trend information and inventories of existing conditions. More specific reliance was given to community and steering committee input on community values and preferred directions for growth.

The planning process was divided into a five phase work effort (see Exhibit 3):

| Phase | Timeframe |
|---|---|
| 1.    Orientation Issues, Concerns and Mapping | Sept. '94 - Apr. '95 |
| 2.    Planning Scenario | Apr. '95 - Sept. '95 |
| 3.    Policy and Action Plan Development | Sept. '95 - Oct. '95 |
| 4.    Draft Plan Review and Revision | Nov. '95 - May '96 |
| 5.    Adoption | May '96 - Oct. '96 |

### Phase 1:    Orientation Issues, Concerns and Mapping

The first phase included solicitation of public input and the formation of the steering committee. Coordination of the mapping effort and opinion survey was also begun.

Opinion Survey: The firm of Talmey-Drake Research in Boulder, Colorado conducted a random phone survey of Mesa County residents at the beginning of the planning process to identify county trends, attitudes, values and desires. This phone survey of 300 households was conducted in November 1994. A complete copy of these survey results may be found in the Appendix.

Public Involvement: In November 1994 three workshops were held to identify issues and concerns and to orient the public with the planning effort. General county issues and concerns were identified as follows: 1) loss of agricultural lands; 2) preservation of open space; 3) annexation, subdivision and sprawl; and 4) unmanaged growth.

Issues facing the Grand Valley included: 1) urban sprawl, unstructured growth, 2) providing

urban services, 3) affordable housing, 4) school space, and 5) crime.

The first round of workshops for the 11 communities was conducted from February 28 through March 2, 1995. A countywide newsletter was distributed to all county postal patrons announcing this round of workshops. The purpose of these workshops was to meet with the communities and engage the public in identifying and refining the issues and concerns. Discussion included potential planning scenarios which would serve as the main topic at the next workshop.

Mapping:  The mapping effort for the land use plan involved extensive coordination between Mesa County and Design Studios West, Inc.  Mesa County produced or acquired data from outside sources to incorporate into a geographic information system (GIS) needed for existing conditions analysis.  Over 100 coverages on various land use, environmental, and service capacity topics were assembled.  From this information many countywide maps were produced and utilized in the generation of alternative land use scenarios and the final land use plan. These may be summarized as follows:

Land Use Related Maps (countywide and planning area scales):

- Community areas, planning areas, existing zoning, and existing land use

Environmental Related Maps (countywide):

- Steep slopes, natural hazards, wildlife, vegetation, and agricultural lands of importance

- Opportunities Composite

Service Capacity Related Maps  (countywide):

- Water, wastewater, public schools, parks, irrigation and fire protection

**Phase 2:    Planning Scenario**

Alternative Land Use Scenario: The planning team worked with the community, steering committees, county commissioners, and county staff to prepare three alternative planning scenarios for both the rural and urban planning efforts.  Each scenario defined potential future land uses within the context of existing community values (see alternative scenarios in the Appendix for complete descriptions). The three alternative scenarios include:

Rural Areas:    Alternative One:  Current Practices
Alternative Two:  Concentrated Rural Growth
Alternative Three:  Farmland Protection

Urban Area     Alternative One:  Existing Policies and  Practices
Alternative Two:  Concentrated Urban Growth
Alternative Three:  Urban Core and Adjacent Growth Centers

The second round of workshops was held on May 23, 24, and 25, 1995 in each of the 11 community areas in order to present these alternative land use scenarios and solicit public comment.

BLM_0057510

Preferred Scenario: The Mesa Countywide Steering Committee commented on the alternative scenarios and recommended one alternative as the preferred scenario for the rural area. The Joint Urban Area Steering Committee recommended one of these alternatives as its preferred scenario for the urban area.

On August 23, 1995 the Mesa Countywide Steering Committee selected Alternative Two: Concentrated Rural Growth (along with some modifications and elements contained in Alternative One) as the preferred rural area land use scenario. The third round of workshops was conducted in the seven rural communities at individual meetings on September 5 and 6, 1995 to gain public comment and further refine the preferred rural area land use scenario.

The Joint Urban Area Steering Committee met on August 22, 1995 and considered the analysis of three land use alternatives for the urbanizing part of the Grand Valley. They agreed on a preliminary description of a preferred alternative. The preferred scenario was later refined after it and the original three alternative scenarios were presented to the public in an open house on September 7, 1995. (See Chapters Four and Five, respectively, for more details on the rural and urban land use plan elements.)

**Phase 3:   Policy and Action Plan Development**

Goals and Policies: Specific goals and policies consistent with the desires of the community were prepared for the preferred land use scenarios. These policies were prepared in October 1995 and discussed with the steering committees in November and December 1995.

Action Plans: Action plans were developed and, based upon the above policies, were oriented towards defining specific timeframes for implementation. Action plans were reviewed and revised by the steering committees from January to February 1996. A draft of the action plan was also submitted to county counsel for review.

**Phase 4:   Draft Plan Review and Revision**

Based on planning phases one through three, a draft Future Land Use Plan document was created with goals, policies and an action plan for implementation.

The public review draft of the Mesa Countywide Land Use plan was released and widely circulated in March 1996. In March and April 1996, the Mesa Countywide Steering Committee conducted its fourth round of workshops in the 11 rural communities to present its recommended plan to individual community areas. After these meetings, the steering committees reviewed public input received. This culminated in the Mesa County Planning Commission's adoption of the Mesa Countywide Land Use Plan in May 1996.

**Phase 5:   Adoption**

The Mesa Countywide and Joint Urban Area Steering Committees presented this plan to the Mesa County Board of County Commissioners, Mesa County Planning Commission, Grand Junction City Council, and Grand Junction Planning Commission on July 10, 1996 for consideration. The City and County Planning Commissions conducted public hearings on July 30, August 1, August 8, September 3, and September 10, 1996. The Mesa County

BLM_0057511

Planning Commission formally adopted this proposed plan by resolution on October 17, 1996. It was presented to the Board of County Commissioners on October 22, 1996.

The plan adoption process followed in this process included:

1. Recommendation of adoption by the steering committee, following input from the general public.

2. Adoption by County Planning Commission pursuant to CRS 30-28-109.

3. Certification of plan to Board of County Commissioners and all municipal planning commissions in the county pursuant to CRS 30-28-109.

The municipal planning commissions may adopt any part of the plan pursuant to CRS 30-28-109.

**Exhibit 3**
**Planning Process**

| Phase | | Dates |
|---|---|---|
| Phase 1 | Orientation, Issues, Concerns and Mapping | Sept. '94 - Apr. '95 |
| Phase 2 | Planning Scenario | Apr. '95 - Sept.'95 |
| Phase 3 | Policies and Action Plan Development | Sept. '95 - Oct. '95 |
| Phase 4 | Draft Plan Review and Revision | Nov. '95 - May '96 |
| Phase 5 | Adoption | May '96 - Sept. '96 |

**D.    Three Planning Areas and 11 Communities Defined**

The Mesa Countywide Land Use Plan encompasses the entire area of Mesa County which is approximately 3,300 square miles. Of this total, 24 percent of the land area is privately owned and 76 percent is publicly owned. The focus of this plan is predominantly on the private lands of Mesa County. Due to the size of the county and certain mapping and data constraints, the county was further divided into three planning areas--east rural, west rural and urban planning areas. These three planning areas are divided into smaller community areas which more closely represent the geographic and community areas of the county.

There are 11 community areas, delineated as such to better facilitate public participation while providing a framework for the analysis of existing conditions.

East Rural Planning Area:    Mesa/Plateau Valley
DeBeque
Whitewater/Kannah Creek
Palisade/East Orchard Mesa

BLM_0057512

| West Rural Planning Area: | Fruita/Lower Mid-Valley |
| | Glade Park |
| | Gateway/Unaweep Canyon |
| | |
| Urban Planning Area: | Redlands |
| | Orchard Mesa |
| | Clifton |
| | Grand Junction |

East Planning Area: The east rural planning area is approximately 883,157 acres and includes four community areas--Mesa/Plateau Valley, DeBeque, Whitewater/Kannah Creek, and Palisade/East Orchard Mesa. Geographically, the east planning area includes much of the Grand Mesa, Battlement Mesa, and most of the Roan Plateau. The major drainages include eastern portions of the Colorado and Gunnison Rivers, Kannah Creek, Plateau Creek and Divide Creek. The main roads are Interstate 70 (along the Colorado River and past DeBeque), State Highway 50 (south through Whitewater to Delta County), State Highway 330 (east along Plateau Creek), and U.S. Highway 65 (south through Mesa and Powderhorn to Delta County). The existing rural communities are Mesa, Powderhorn, Molina and Whitewater. The three incorporated municipalities include DeBeque, Collbran and Palisade.

West Rural Planning Area: The west rural planning area is approximately 1,183,329 acres. It includes three community areas--Fruita/Lower Mid-Valley, Glade Park, and Gateway/Unaweep Canyon. Geographically, the west planning area includes the western portions (lower and mid-valley areas) of the Grand Valley and the western part of the Roan Plateau and the Uncompahgre Plateau (the most extensive single land form in the county, including the Colorado National Monument). Major drainages include the Colorado and Dolores Rivers and the East and West Creeks in Unaweep Canyon.

The main highways are State Highway 141 (from Whitewater through Unaweep Canyon to Gateway and south along the Dolores River), Interstate 70 (from Fruita west to the Utah border), State Highway 139 (north from Loma to Garfield County) and State Highway 340 (west from the Redlands to Fruita). There is one incorporated city--Fruita, and four existing rural communities--Gateway, Glade Park, Mack and Loma.

Urban Planning Area: The urban planning area is approximately 51,452 acres. It is a joint Mesa County/Grand Junction planning area which includes four county community areas (the Redlands, Orchard Mesa, Clifton, and areas in and around Grand Junction) and the incorporated area of the City of Grand Junction.

The urban planning area is generally defined by I Road and BLM land on the north, the Colorado National Monument and A Road on the south, 33 Road to 35 Road on the east, and 19 Road on the west. The urban planning area is located almost entirely on the flatter urbanizing central and eastern portions of the Grand Valley which is framed on the north by the Bookcliffs and on the south by the Colorado National Monument. It is home to the City of Grand Junction, county seat of Mesa County, located at the confluence of the Colorado and Gunnison Rivers.

BLM_0057513

The main roads are Interstate 70 (which passes east-west along the northern edge of the city), Interstate 70B/U.S. Highway 6 (which passes east-west through the industrial and business districts and parallels the D&RGW Railroad), State Highway 340 (through the Redlands), State Highway 141 (which passes north-south through Clifton and Orchard Mesa), and U.S. Highway 50 (from downtown southeasterly through Orchard Mesa and continuing southward). The City of Grand Junction is the only incorporated city in the urban planning area.

BLM_0057514

## E.   Land Use Classification System

A comprehensive land use classification system was developed for the Mesa Countywide Land Use Plan. This classification system should be used for both existing and future land uses in the county and serves as a coordinating tool for the existing county area plans and possibly for the municipal plans in their areas of influence. Presently, a wide range and number of land use classes are used in the county. For example, the number of land use classes for the area plans vary dramatically as shown by this partial list: Mid-Valley (6), Clifton (12), Glade Park (3), and Orchard Mesa (14). The municipalities vary greatly as well: Fruita (7), and Palisade (5).

An existing land use inventory was prepared for the urban area which utilizes ten general land use classes and many more subcategories. The coordinated planning effort for the urban area, both in and around Grand Junction, required a common land use classification system. This land use plan recognizes the various municipalities' plans, provides a countywide land use framework for urban expansion, and coordinates policies and plans for the county and its municipalities.

A simplified, three-tiered, countywide land use classification system was designed to incorporate all existing and future county area plans and include the five municipal areas of influence (including the City of Grand Junction) land use systems. This classification system includes rural areas, urban area, and the areas of influence for the four remaining municipalities as described in Chapters Four and Five.

## F.   Areas of Municipal Influence

The issue of extraterritorial planning areas surrounding municipalities and urbanized centers in the county underscores the need for intergovernmental cooperation. The county and the five incorporated municipalities need to work together in clearly delineated planning areas with formal intergovernmental agreements for processing development proposals within the planning areas.

Colorado law allows municipalities to plan, but not regulate, lands within three miles of the municipal limits. The General Assembly of the State of Colorado imposes several requirements on municipalities prior to annexation of adjoining lands. The state requires that a three-mile plan document be reviewed and adopted by the governing body of the municipality on an annual basis, and within its content, should generally describe the location, character and extent of streets, subways, bridges, waterways, waterfronts, parkways, playgrounds, squares, parks, aviation fields, other public ways, grounds, open spaces, public utilities and terminals for water, light, sanitation, transportation, power to be provided by the municipality, and the proposed land use for the area (CRS 31-12-105 e. as well as Senate Bill 45).

The land within this three mile planning area is the municipality's potential sphere of influence. The county encourages joint planning with municipalities in these areas. This sphere of influence, or the municipality's "area of municipal influence," is the probable ultimate physical boundary and service area of the municipality. In establishing the limits of cooperative extraterritorial planning, the county and municipalities should take into account barriers to local growth such as freeways, large rural open space areas, and natural topographic or hydrographic features.

BLM_0057515

Also important are those physical features and significant land uses at or beyond the county's boundary of common concern to the adjacent jurisdictions such as air basins, watersheds, waterways, or potentially developable land.

The planning area should extend as far as desired by the municipality (within the three mile limit) to include all areas of municipal concern and those requiring joint action to solve problems.

There are at least three territories to consider for countywide land use planning:

1. <u>Unincorporated Territory/Rural Areas</u>: Land not to be annexed or served by a town or city. Land use planned and controlled by the county.

2. <u>Unincorporated Territory/Urban Area and Other Areas of Influence</u>: Land to be ultimately annexed and serviced by a town or city. Land use planned and controlled by the county in formal consultation or by joint action with a town or city such as an intergovernmental agreement. Each municipality's adopted municipal plans should be used as a guide by the county in land use decision-making.

3. <u>Incorporated Territory</u>: Land use will be planned and controlled by the individual municipality. This land will be designated on the Future Land Use Plan(Map) as "urban."

BLM_0057516

# CHAPTER THREE
## EXISTING CONDITIONS

**Mesa Countywide Land Use Plan**
**From Issues to Action**

BLM_0057517

## A.   History and Overview

Mesa County is, as its name suggests, a landscape of distinct mesas, plateaus and valleys shaped through the gradual and dynamic process of geologic time. The Uncompahgre Plateau and the Grand Mesa are the county's dominant land forms. The Grand Valley is a broad, fertile valley and floodplain carved by the Colorado and Gunnison Rivers; the canyonlands of the Dolores River are to the southwest; and the Grand Mesa is carved by a series of ancient lava flows. The land that we now know as Mesa County was created by numerous advances and retreats of seas, deserts and dunes, lava flows, lush forests, and rivers with broad floodplains.

An understanding of county history is important in that the first goal of the Mesa Countywide Land Use Plan states that the plan will "reflect the current culture of Mesa County as well as its past customs." Mesa County's history can generally be described in ten periods, from prehistory to present. This summary is based on several resources: "The Valley of Opportunity" by Steven F. Mehls, and "Mesa County, A 100-Year History (1883-1993)" from The Museum of Western Colorado Press.

Prehistory and Native Americans (700-1200): Prehistoric Fremont People created much of the rock art in the area between 700 and 1200. The Ute Indians, members of the Shoshone family, utilized the Grand Valley as a favorite wintering and hunting area (see Ute Reservation/ Removal below).

Spanish Explorers (1540-1770s): The Spanish may have entered the area as early as 1540. In 1776 a group of friars in the Dominguez-Escalante Expedition explored the region from Gateway northward to DeBeque.

Fur Traders and Government Exploration (1810-1870s): Beaver trappers were in the region as early as 1810. Many explored the area in the mid-1800s. The U.S. Geological Society mapped Colorado from 1873 to 1876. West and central Colorado were well mapped before white settlers came into the Grand Valley.

Transportation Frontier (1830-1910): Road building dated to 1830-1831 in Mesa County when James Yount laid out the Old Spanish Trail. The northern branch followed the Gunnison River north to the Grand (Colorado) River and then west along that waterway to Utah. The largest single road building effort of the 1880s was the Roan Creek Toll Road that went from Grand Junction to Glenwood Springs.

On November 21, 1882 the first Denver and Rio Grande train rolled into Grand Junction. Then, in 1910, as the interurban electric train craze swept the nation, trolley cars were running between Fruita and Palisade.

Mining Frontier (1850-1902): Mining attracted people to west and central Colorado. It led to development of transportation systems, farms, and lumbering. The first mineral abstract in the Grand Junction region was filed in 1882 near the confluence of the Gunnison and Grand Rivers. Coal mining evolved in the region with rich deposits being found under the Grand Mesa. Other minerals were found in Mesa County such as copper in the Unaweep area from 1899-1902. Uranium mining later boomed after World War II (see Mining, Energy, and the New Prosperity below).

BLM_0057518

Ute Reservation/Removal (1860-1881): Mesa County was part of the Ute Reservation, set aside by a 1868 treaty. In 1881 the Utes were escorted at gunpoint from the Grand Valley, paving the way for white settlers moving into Mesa County.

Settlement: The Stockman and the Farmer (1880-1920): With the founding of the townsite of Grand Junction in September 1881, the era of the stockman and the farmer began. The cattle industry was based on three factors--the vast amount of federal land offered free, limited water, and the discovery of how nutritious western grasses proved to be for stock. Rail service encouraged stock growers to move to the region in the 1890s. Rustling was soon the greatest problem faced by lawmen.

Farming was the economic backbone of the area between 1881 and 1920. By 1920 the stockman's frontier had passed, as individuals became both ranchers and farmers to survive. In 1882 the first irrigation ditches were dug near Grand Junction. With irrigation water came the search for dependable cash crops which fueled the region's agricultural development. The area's fruit potential was discovered, and peaches, pears, apples, cherries and plums proved most popular. Sugar beets also became a staple cash crop during the 1890s, centering in Grand Junction.

Federal Government (1890-1910): In 1892 the federal government set aside the Battlement Mesa Forest Reserve. (The name was changed to Grand Mesa National Forest in 1924.) The Uncompahgre National Forest was so designated in 1905, and the Colorado National Monument was designated by President Taft in 1911. The National Park Service manages the Colorado National Monument for the preservation of significant resources. Most of the monument is managed, currently, as proposed wilderness lands. Major irrigation canal projects were also built through this period by the federal government.

Depression Decade: Projects undertaken in Mesa County by the federal Civilian Conservation Corps included repair and maintenance of the Grand Valley Canal, work on the diversion dam and canal in Palisade, and construction of the Rimrock Highway on the Colorado National Monument. The Works Progress Administration assisted in community and library services and the Resettlement Administration helped to relocate qualified persons in the lower valley.

Mining, Energy and the New Prosperity (1920-present): Several of Mesa County's boom and bust cycles have centered around oil shale which was first located near DeBeque in 1917. This boom faded in 1925. Other booms were short lived during the 1940s and in 1957. In the late 1970s new technology fueled a regional boom that lasted until 1982-1983 when Exxon, Union, and Occidental Oil pulled out. Radium was recovered from the early 1900s to 1923. Vanadium was mined near Loma and Gateway during the 1940s. Uranium boomed in the late 1940s and early 1950s. Natural gas and some oil deposits have been discovered near DeBeque, Vega Reservoir and Mack. Many of these resources are located on lands managed by the U.S. National Forest Service and Bureau of Land Management.

B.    **Population Trends and Projections**

This section summarizes recent trends and projections in population in Mesa County. Information was derived from many resources including the 1990 Census Data, the Mesa County Economic Development Council (MCEDC) Community Profile Notebook, and others. A separate section of this chapter focuses on county employment and economics.

BLM_0057519

In 1990 the total population of Mesa County was 93,145 persons. The total urban population was 76,011 persons (81.6 percent) and the rural population was 17,134 (18.6 percent). Of this total, 91,075 were born in the United States (with 51 percent born in Colorado). The ancestries of Mesa County's citizens are largely German, English and Irish, with sizable groups of Hispanics, French, Italian, Scotch-Irish and Dutch.

Mesa County has the largest population of any county on the Western Slope. Of Colorado's 63 counties, Mesa County ranks tenth in population based on 1995 figures; however, all nine of the larger counties are located along the Front Range.

Population from 1993 to 2010 has been projected to grow at an annual average rate of nearly 2 percent by the Colorado State Demographer's Office.

### TABLE 3.1: Population Estimates and Projections 1990-2010

| 1990-2010 | 1990 | 1991 | 1992 | 1993 | 1995 | 2000 | 2010 |
|---|---|---|---|---|---|---|---|
| Mesa County | 93,577 | 96,107 | 99,490 | 99,914 | 105,408 | 116,426 | 137,184 |

Most of the county's population growth during the 1980s took place in the urbanized areas surrounding Grand Junction. In 1980, 70 percent of the County's population lived in Grand Junction and the surrounding urban area. By 1990 this area had captured 77 percent of the population. As shown in Table 3.2, the urbanized area grew at over 1.5 times the rate of Mesa County as a whole. From 1970 to 1990, Grand Junction's urbanized area became a progressively smaller percentage of the county's total population; however, the more aggressive Grand Junction annexation policy of the early 1990s has accelerated the city's growth rate.

### TABLE 3.2: 1980 and 1990 Population/Housing by Urban Area

| AREA | POPULATION | | | DWELLING UNITS | | PERSONS PER HOUSEHOLD | |
|---|---|---|---|---|---|---|---|
| | 1980 | 1990 | Percent | 1980 | 1990 | 1980 | 1990 |
| Grand Junction | 28,144 | 29,034 | 3.2 | 12,992 | 12,810 | 2.2 | 2.2 |
| Mesa County Urbanized Area (including Grand Junction) | 56,854 | 71,938 | 27.0 | n/a | n/a | n/a | n/a |
| Mesa County | 81,530 | 93,145 | 14.0 | 34,397 | 36,250 | 2.5 | 2.6 |

BLM_0057520

Mesa Countywide Land Use Plan

## TABLE 3.3: RECORDED LOTS** BY AREA AND YEAR

| PLANNING AREA | COMMUNITY AREA | 1993* | 1994* | TO MARCH 30, 1995* | TOTAL |
|---|---|---|---|---|---|
| Urban | Redlands | 86 | 203 | 3 | 292 |
| | Fruitvale | 177 | 92 | 18 | 287 |
| | North G.J. | 90 | 18 | 15 | 123 |
| | Orchard Mesa | 19 | 5 | 0 | 24 |
| | Clifton | 30 | 71 | 19 | 120 |
| West Rural | Mid-Valley | 14 | 39 | 8 | 61 |
| | Lower-Valley | 4 | 13 | 0 | 17 |
| | Loma | 0 | 0 | 2 | 2 |
| | Gateway | 0 | 0 | 0 | 0 |
| | Glade Park | 0 | 0 | 0 | 0 |
| East Rural | Collbran | 0 | 2 | 0 | 2 |
| | Palisade | 0 | 6 | 0 | 6 |
| | East Orchard Mesa | 2 | 0 | 2 | 4 |
| | DeBeque | 0 | 24 | 0 | 24 |
| | Whitewater/ Kannah Creek | 0 | 5 | 12 | 17 |
| | Total | 422 | 478 | 79 | 979 |

\*   Excludes replats where no new lots were created. Includes subdivisions recorded in the county and then later annexed by the City of Grand Junction. These are only the number of lots which were recorded in a given year, *not* the total cumulative recorded lots over the years.

\*\*   Recorded lots are those platted/surveyed subdivision lots recorded in the County Clerk and Recorder's Office during the timeframe indicated (not cumulative) after final county approval and which are legally available for sale.

Assuming building permit activity trends continue, and using projeded population growth for the county from 1990-2010, projections were made for growth in each planning area. This analysis indicates that the most rapid growth is occurring on the fringe of existing munici-palities.

BLM_0057521

**TABLE 3.4: Rural Planning Area**

| PLANNING AREAS (3) | TOTAL S.F. BLDG. PERMITS | | PROJECTED POPULATION @ 2%/YR. | | |
|---|---|---|---|---|---|
| COMMUNITY AREAS (11) | 1992-94 | (%) | 1990 | 2001 | 2010 |
| **WEST PLANNING AREA** | | | | | |
| Fruita/Lower/ Mid-Valley | 416 | (82) | 9,426 | 11,500 | 13,569 |
| Glade Park | 57 | (11) | 1,264 | 1,543 | 1,821 |
| Gateway/Unaweep | 33 | (7) | 805 | 981 | 1,158 |
| SUBTOTAL | 506 | (100) | 11,495 | 14,024 | 16,548 |
| **EAST PLANNING AREA** | | | | | |
| Whitewater/Kannah Creek | 63 | (15) | 1,854 | 2,261 | 2,668 |
| Mesa/Plateau Valley | 144 | (33) | 4,077 | 4,974 | 5,870 |
| DeBeque | 20 | (5) | 618 | 754 | 889 |
| East Orchard Mesa/Palisade | 200 | (47) | 5,807 | 7,085 | 8,360 |
| SUBTOTAL | 427 | (100) | 12,356 | 15,074 | 17,787 |

C.   **Economic Summary**

This summary of existing economic conditions in Mesa County documents available facts and economic trends.  A complete copy of this report on economic trends may be found in the Appendix.  The ten segments of the Mesa County economy are summarized below in terms of employment from the Mesa County Economic Development Council.

**TABLE 3.5:  Ten Segments of the Mesa County Economy**

| SEGMENT (1992-1993) | JOBS* | % OF |
|---|---|---|
| 1.   Services | 11,280 | 28.2% |
| 2.   Retail | 9,000 | 22.5% |
| 3.   Government | 7,360 | 18.4% |
| 4.   Manufacturing | 3,600 | 9.0% |
| 5.   Transp./Communic./Utilities | 2,280 | 5.7% |
| 6.   Construction (not include in 8.) | 2,000 | 5.0% |
| 7.   Wholesale Trade | 1,840 | 4.6% |
| 8.   Finance/Insurance/Real Estate | 1,600 | 4.0% |
| 9.   Mining | 560 | 1.4% |
| 10.   Agriculture/Forestry/Fishing | 520 | 1.3% |
| **TOTAL** | **40,040** | **100%** |

*   Mesa County Economic Development Council:  Jobs totals adjusted to match percentage column.

BLM_0057522

### Mesa County Trends

Grand Junction continues as a regional trade and distribution center.

| Major Job Sectors: | Service Sector (28.2%) | | |
|---|---|---|---|
| | Retail (22.5%) | | |
| | Government (18.4%) | | |
| | Manufacturing (9.0%) | | |

| County Acreage: | Public Lands | 1,525,885 | (76%) |
|---|---|---|---|
| | Private Lands | 520,320 | (24%) |
| | Total | 2,133,120 | (100%) |

Agricultural Lands:
420,233 acres
Average ranch/farm size 317 acres
81% of private lands
20% of all county lands

Non-Agricultural Land:
100,000 acres (20% of all private lands)
5% of all county lands

Job Growth Forecast:
5,070 jobs by the year 2000
Mainly in service, retail and manufacturing

## D.    Environmental Summary

The Mesa Countywide Land Use Plan process included analysis of the following environmental characteristics: steep slopes, natural hazards, agricultural lands of importance, wildlife and vegetation. A composite map was created by overlaying this environmental data to identify key sensitive and opportunity areas for each community. A complete copy of environmental conditions may be found in the Appendix which includes a detailed description of each topic by community.

### Topic Assumptions and Limitations

This environmental summary is derived from countywide data mapped at 1:125,000 (1 inch equals 2 miles) which is very general and useful for discerning general patterns and overlapping environmental constraints. This information should be refined over time based on specific community needs or property owner interests.

The topics listed represent either natural resources or hazards which have been generally evaluated for each of Mesa County's 11 community areas as: no, unknown, low, moderate or high significance. Due to the large amount of public land outside county jurisdiction (76 percent), the environmental constraints analysis focused on private lands.

**TABLE 3.6**
**Environmental Composite Criteria**

| TOPIC | SIGNIFICANT LANDS * | LESS SIGNIFICANT LANDS |
|---|---|---|
| Steep Slopes | 25% + Slope | < 25% Slope |
| Natural hazards | 100-Yr. Flood<br>Floodway<br>Rivers, streams, lakes<br>Earthquake faults | 500-Yr. Flood<br>Dams<br>Landslides<br>Epicenters |
| Agricultural lands of importance | Prime, irrigated<br>Irrigated, not prime<br>Irrigated, unknown soil | Potential prime, if irrig.<br>Lands not prime or irrig. |
| Wildlife (DOW) | Very high potential<br>High potential<br>Moderate potential | Low potential<br>Mod. low potential |
| Vegetation (DOW) | Aspen<br>Conifer<br>Conifer-Aspen<br>Desert shrub<br>Mountain shrub<br>Pinon/Juniper<br>Shade-Conifer | Arid<br>Rocky<br>Snow and rock<br>Irrigated agricultural<br>Pasture/meadow<br>Residential<br>High meadow |

\* "Significant" lands will be defined as unique physical attributes which need to be acknowledged in future land use planning. The "less significant" lands, while important in their own right, are less constraining in long-range land use decision-making for private lands, or are located largely on public lands.

**Steep Slopes**

Due to the extreme amount of topographic data for the entire county, the information was simplified to display only those areas which are privately-owned lands, have a slope of more than 25 percent, and are larger than 10 acres in size.

**Natural Hazards**

Natural hazards include water-related natural hazards (rivers, streams, lakes, dams and floodplains), earthquake faults and epicenters, and landslides. The floodplain and floodway information is limited to the Colorado River in the Grand Valley. For analysis purposes the more significant hazards are: 100-year floodplain, floodways, earthquake faults, rivers, streams, lakes and reservoirs (year-round).

**Agricultural Lands of Importance**

Agricultural lands of importance represent a composite of important agricultural soils in Mesa County. Data was provided by Mesa County and was derived from three sources:

- Natural Resources Conservation Service maps dated 1979

- Colorado Division of Wildlife maps derived from satellite photos taken July 1989

BLM_0057524

- Bureau of Land Management maps dated 1994

For analysis purposes, the more significant soil categories selected with the aid of the Natural Resources Conservation Service are: prime, irrigated; irrigated, not prime; and irrigated, unknown soil.

## Wildlife

The Wildlife Composite Map for Mesa County was prepared by the Colorado Division of Wildlife (DOW) by combining important activity areas for 29 different wildlife species (impact factor) and a weighting a factor (status factor) related to the rarity and economic importance of the species. The impact factor and the status factor were then added to equal a total factor which defines the potential for wildlife impact in geographic areas of the county. The total factor is divided into five categories of potential impact to wildlife--low, moderately low, moderate, high, and very high.

The DOW ranked riparian areas in the "very high potential for impact" category. Two wildlife species were mapped as having human/wildlife conflicts--mountain lion and black bear. Based on DOW concurrence, the most significant potential impact categories included in the environmental composite are: moderate, high and very high potential.

## Vegetation

Satellite image data provided by the DOW was generalized to the smallest discreet vegetation type area of 40 acres for this plan. There are 14 vegetation types grouped into two categories, significant and less significant:

| Significant | Less Significant |
|---|---|
| Aspen | Arid |
| Conifer | Rocky |
| Conifer-Aspen | Snow and rock |
| Desert shrub | Irrigated agriculture |
| Mountain shrub | Pasture meadow |
| Pinon-Juniper | Residential |
| Shade-Conifer | High meadow |

Vegetation data for the south and west part of the county is not currently available from the DOW.

BLM_0057525

**TABLE 3.7**
**Environmental Summary By Community Area**

| Community | Steep Slopes | Vegetation | Natural Hazards | Agricultural Lands of Importance | Wildlife | Summary |
|---|---|---|---|---|---|---|
| **WEST PLANNING AREA** | | | | | | |
| Gateway/ Unaweep | Moderate | (no data) | Low | Moderate | Moderate | Moderate |
| Glade Park | High | Low | Low | Moderate | Moderate | Moderate |
| Lower Mid-Valley | Low | Low | Moderate | High | Low | Mod-High |
| **EAST PLANNING AREA** | | | | | | |
| Whitewater | Low | Unknown | Low | Mod-High | High | Low to Mod |
| East Orchard Mesa | Moderate | Mod-High | Moderate | High | Moderate | Mod to High |
| DeBeque | Low | Mod-High | Low | Moderate | High | Moderate |
| Mesa/ Plateau Valley | Moderate | High | Moderate | Moderate | High | Mod to High |
| **URBAN PLANNING AREA** | | | | | | |
| Redlands | Low | Moderate | Moderate | Moderate | Low | Moderate |
| Orchard Mesa | Low | Low | Low | High | Low | Low to Mod |
| Clifton | No | Low | Moderate | Moderate | Low | Low to Mod |
| Grand Junction | No | Low | Low | Moderate | Low | Low |

E.    **Service Capacity Summary**

This summary includes findings on three topic areas: facility needs, consolidation of services, and potential tools to address service issues. The entire Service Capacity Analysis Report prepared by Alan Richman Planning Services is included in the Appendix.

**Facility Needs**

Generally, the capacity of existing public facilities and services does not appear to be a constraint to the continued growth of Mesa County. Most facilities can be categorized as having either excess or sufficient capacity. This is due, in part, because many facilities were expanded during prior growth periods of the 1970s and 1980s. However, even taking into account growth of the last three to five years, growth occurring after these facilities were built has not been as rapid as was expected by their design, thus many facilities' capacities far exceed current demands.

The most significant facilities, which are constrained but appear to be expandable, are many of the Mesa County School District 51 elementary, middle, and high schools, the schools located in both the DeBeque and Plateau Valley school districts, and park lands. Many fire stations also fall into the "constrained but expandable" category.

Certain facilities are listed as having constrained capacity which do not appear to be expandable. In several instances, however, this limit is simply because no planning or engineering analysis of the facility's expansion potential has been conducted by the entities responsible. Once the analysis is conducted, it may be found that these facilities do not pose an actual limit to future growth in the area.

Statements made by participants in the planning process indicate that existing community needs should be addressed first, but facilities and services should also be planned and built to keep up with growth as it occurs.

It will be particularly important that the capital improvement programs of the various service providers be coordinated with the direction provided by this land use plan. For example, it would be best if the committee responsible for assessing Mesa County's future school needs used the land use plan to identify appropriate locations for new facilities and those schools in need of expansion. The area's water and sewer providers could also serve existing and future customers more efficiently if they were guided by the land use plan.

One challenge in planning for future facility needs is to resolve the service conflicts which have arisen between what have traditionally been rural/agricultural areas and the expanding area of urban influence. This has been reported as a problem concerning the supply of irrigation water, given the periods and levels of demand from suburban water users. It is also a problem for the Ute Water Conservancy District, which has traditionally built its system to meet rural water demands but is now being asked to build a system which meets a more urban standard.

### Consolidation of Services

Consolidation of services is a theme which runs through several facility types which have been inventoried. Consolidation appears to have the greatest relevance to water supply and wastewater treatment in the urbanizing portion of the Grand Valley and to fire protection services in the east end of the Grand Valley. Consolidation may be beneficial in providing the means to:

- Reverse the past practice whereby municipalities and service districts have "competed" for growth and thereby taken the lead away from sound land use planning practices in determining development patterns.

- Set consistent standards for equipment and facilities.

- Provide the opportunity for creation of a more uniform schedule of charges to be paid by development, thus ensuring that growth pays its own way.

- Create agencies which have the necessary levels of taxing power and management capabilities to effectively provide services to the growing population base within Mesa County.

Potential issues related to consolidation of the provision of services:

BLM_0057527

- How should costs and benefits be apportioned so that consolidation has positive economic effects for all parties (i.e., how to address varying levels of debt service and varying levels of necessary improvements among the parties)?

- How can several appointed or elected boards be combined into a single, politically representative, elected board, capable of effectively managing a new organization?

- What is the relationship of consolidation to municipal annexation plans?

- Can the individual identities of communities be maintained after consolidation?

## Potential Tools to Address Service Issues

There are many capital facility planning/financing tools which may be applicable to Mesa County and should receive further consideration in the planning process. Three capital facility planning/financing tools are introduced in this plan--impact fees, adequate public facilities (concurrency), and tax base sharing (see Appendix for a detailed discussion on these options).

Impact Fees:  A monetary charge to recoup a proportionate share of the capital costs required to accommodate new development with necessary public facilities.  Impact fees represent one financing technique which provides an opportunity for local governments to assign responsibility for financing capital facilities to the developments which cause the need for new or expanded facilities.  The effect of such systems is to shift the financial burden for new public facilities away from the general taxpayer to those persons who are creating the need for and will benefit from the facilities.  If new impact fees are to be adopted or existing fees updated, fees should be based on a study which demonstrates a direct, roughly proportional relationship between the amount paid and benefit received.

Adequate Public Facilities (Concurrency):  For a project to be approved, public services and facilities must be either in place, planned for, or provided concurrent with development and must conform to specified levels of service standards.  Such programs seek to prevent an unacceptable decline in service for existing residents by making certain that new or enhanced services are available to meet the demands by new residents.  If the necessary infrastructure is not adequate, the development will be denied or deferred until the facilities are available.

Concurrency systems generally do not require the developer to pay for public improvements but only that such improvements be made when development occurs.  The costs of services are best addressed by combining a concurrency system with impact fees which require development to pay its fair share for the costs of growth.  However, as part of a concurrency system, if facilities are not in place, the developer can be allowed to pay for a facility at his expense so that the project may proceed.

Given the existing and planned capacities of facilities in Mesa County, those which might be most appropriate to address through a concurrency system include but are not necessarily limited to schools, fire protection, parks and recreation, and roads.

Tax Base Sharing:  A method of regionally redistributing tax revenues received from new development without necessarily changing jurisdictional boundaries or governmental organization.

BLM_0057528

The premise behind tax base sharing is that the impacts of major new developments often stretch well beyond the boundaries of the taxing district which receives property taxes from the project. In a tax base sharing system, a portion of property tax increases resulting from new development is pooled and redistributed back to the taxing districts via a formula typically favoring those districts with below average per capita assessed property values. All jurisdictions can thereby share in the economic development of the region despite where growth occurs.

F.   **Opinion Survey Summary and Trends**

### Background

The Mesa County Long Range Planning Division commissioned Talmey-Drake Research & Strategy, Inc. of Boulder, Colorado to conduct a survey to measure Mesa County residents' perceptions of county government and the issues of growth and land use. A total of 302 random telephone interviews were conducted between November 2 and November 10, 1994. (This sample has a worst-case 95 percent confidence interval of plus or minus 5.6 percent about any one reported percentage.) The complete final report is provided in the Appendix.

### Summary

Residents of Mesa County are generally satisfied with the job their county government is doing. Residents do feel, however, that interaction of the Mesa County government with its municipal governments needs improvement. A majority believe (including one-third who strongly believe) that local governments do not cooperate to get things done.

An overwhelming majority believes the quality of life in the County is either good (50 percent) or excellent (32 percent). Further, more residents believe the quality of life has improved over the past few years (35 percent) than feel it has deteriorated (23 percent). However, that outlook does not hold true for the future; the percentage of residents who think the quality of life will improve in the next few years equals the percentage who believe it will deteriorate.

Residents feel that the most important issue facing Mesa County today is growth and growth management. A majority of residents (58 percent) believe population growth in the county has been too fast over the past few years. However, rather than government actively reducing growth, more than two in three residents (69 percent) think government's role should be to plan and manage growth.

Three measures to curb growth in the county were met with varying degrees of approval. Seventy-three percent of residents believe county government should limit growth by restricting the number of houses that can be built on sites over one acre in unincorporated areas of the county. However, that support is nearly half if such a limitation would reduce the value of land owned by large land owners. Fifty percent of residents favor limiting the number of residential building permits issued annually in unincorporated areas of Mesa County, and only 34 percent favor limiting access to sewer and water hookups as a way to limit growth.

About half of residents (49 percent) say they generally favor the purchase of open space. However, when the acquisition of open space is put in the context of limiting growth, 58 percent of Mesa County residents favor government purchase of open space. Residents are divided on the use of open space land--40 percent believe it should be for parks and

BLM_0057529

# CHAPTER SIX
# FUTURE LAND USE PLAN

### REVIEW AND UPDATES

**Mesa Countywide Land Use Plan
From Issues to Action**

## A.   Introduction

While the Mesa Countywide Land Use Plan sets the framework for community development, the day-to-day actions of county government truly shape the community. Thus, the manner in which a plan is implemented is the real test of commitment to the goals, policies, and actions in the plan, not the mere adoption of the plan itself.

## B.   Administration of the Plan

After the County Planning Commission has adopted all or part of the land use plan, it is recommended that the County Planning Department administer the plan by:

- Investigating and making recommendation to the commission(s) of all reasonable and practical means for putting the plan into effect in order that it can serve as a pattern and guide for orderly physical growth and development, protecting the rural and agricultural economy of the county, and serve as a basis for the efficient expenditure of its funds relating to the subjects of the plan. The measures recommended may include plans, regulations, financial reports, and capital budgets.

- Rendering an annual report to the commission(s) on the status of the plan and progress in its application.

- Endeavor to promote public interest in and understanding of the land use plan, and regulations relating to it.

- Consult and advise with public officials and agencies, public utility companies, civic, educational, professional and other organizations, and citizens generally with relation to carrying out the plan.

## C.   Legal Status of Previous Plans

With the adoption of this plan, all existing plans will remain in effect; however, in the case of a conflict, the Mesa Countywide Land Use Plan will apply.

## D.   Adoption

The authority to make and adopt the Mesa Countywide Land Use Plan is provided by Colorado Statute (CRS 30-28-106 et seq.) to the Mesa County Planning Commission. This Master Plan is advisory only and has no regulatory effect.

## E.   Review and Update

To ensure that implementation actions occur in a timely manner, it is recommended that their status will be reviewed annually by a citizens committee and the Planning Commission, with a report made to the Board of County Commissioners and the citizens of Mesa County. It is recommended that this review be required by resolution.

In addition, a regular review of the Plan itself should be required by resolution. This review will also be conducted by the Planning Commission within two years of adoption of the plan and every five years thereafter. The review should consist of:

BLM_0057531

- The number and reasons for variations from the plan.

- Identification of problems with the plan.

- Recommendations for revisions in accordance with approved amendment process policies.

## F.  Revisions, Amendments or Abolishment

The plan (any part or all) may be revised, amended, or abolished at any time it is deemed necessary by the Planning Commission and the Board of County Commissioners, in accordance with the procedures set forth in CRS 30-28-108 and after holding a duly notified public hearing.

### Future Land Use Plan (Map) Amendments

The Future Land Use Plan maps are intended to serve as a guide for public and private development and land use decisions. A formal amendment process should be negotiated with the affected municipalities as part of the intergovernmental agreement process. While land use map amendments may occur more frequently than policy changes, they should not occur more than twice per year. By limiting opportunities to amend the Future Land Use Plan (Map), the county will reduce the potential for incremental land use changes to result in unintended policy shifts.

BLM_0057532

# CHAPTER SEVEN
# MESA COUNTY LAND USE INCENTIVES
# FINAL REPORT

**June 24, 1996**

**Hale, Pratt, Midgley, Laitos,**
**Green, and Hackstaff, P.C.**
**1675 Broadway, Suite 2000**
**Denver, Colorado 80202**

BLM_0057533

# EXECUTIVE SUMMARY

This report recommends to Mesa County different incentives to encourage growth to locate in and around existing rural and urban communities, a land use strategy developed in response to problems and goals identified in the Mesa Countywide Land Use Plan. The Mesa Countywide Land Use Plan identifies preferred land use scenarios for the rural and urban areas of the County which identify concentrated growth as preferable to urban or rural sprawl. The preferred scenarios rest on the principle that sprawl is neither desirable nor cost-effective and that the preservation and protection of agricultural land is essential to protecting Mesa County's customs and culture.

The benefits of clustering growth in and around existing growth centers ("Target Areas") include cost savings to developers, local governments and tax payers because of fewer miles of infrastructure; preservation of open space; energy savings associated with more efficient utility services; reductions in air pollution and traffic congestion and improved aesthetics. In states like California, urban sprawl has been identified as one of the primary causes of economic downturn; enormous social, environmental and economic costs and the degradation of quality of life. There, concentrating growth in Target Areas has been identified as a critical solution to these problems.

According to the literature and the experience of communities across the United States that have implemented strategies to reduce sprawl, a program that successfully directs growth to Target Areas must include, at a minimum:

- techniques to minimize conflicts between agricultural and residential land uses;
- open space/agricultural land policies and protection strategies;
- intergovernmental cooperation;
- density restrictions and design standards that reflect the carrying capacity of Target Areas;
- techniques that are easily understood and a program to inform the public;
- evaluation of the cumulative effects of incentive strategies; and
- a menu of strategies from which developers and property owners can choose.

Unless otherwise noted, the legal authority for incentives recommended in this report can be found in the land use authority granted to counties by Colorado state statutes.

On the basis of research and interviews conducted with officials in Mesa County and around the United States, the report identifies and evaluates for applicability to Mesa County several techniques that have been implemented to encourage growth to locate in Target Areas. These include density bonuses, transfer of development rights, relaxed development standards, streamlined administrative procedures, rural cluster subdivision exemption, planned unit developments, downzoning, and impact fees.

The report concludes that Mesa County should begin to implement strategies that encourage clustering in Target Areas while protecting agricultural land by taking a series of recommended actions.

**Identify and Evaluate Target Areas.** Identify and evaluate the areas in which growth will be encouraged, taking into consideration these factors: future land use plans; service capacity; prime agricultural lands, natural hazards, steep slopes, wildlife areas and areas of significant vegetation; minimization of vehicle miles traveled and adjacent land uses.

BLM_0057534

**Negotiate Intergovernmental Agreements.** The County should negotiate intergovernmental agreements with municipalities and special districts that address utility extension policies, permanent growth boundaries, receiving zones for development rights and uniform fee structures.

**Establish Overlay Districts.** Overlay districts should be established that define standards for density, siting, open space, infrastructure and other planning elements for each identified Target Area.

**Establish A Rural Subdivision Exemption.** Overlay districts alone will not positively affect development patterns unless the County designs an alternative to carving up agricultural land in outlying areas into 5-acre lots allowed under current zoning. The County should implement a rural subdivision exemption similar to the Routt County Land Preservation Subdivision ("LPS").

**Initiate a Pilot Project for Transfer of Development Rights.** TDRs provide the owner of agricultural land an alternative to subdividing the land that is a powerful tool to encourage growth to locate in Target Areas. The County should seek funding from Great Outdoors Colorado and coordinate with public land trusts to establish a pilot project.

**Coordinate Capital Improvement Planning with Land use Objectives.** Utility extensions and improvements in Target Areas should be a top priority whereas extensions and improvements in outlying areas should be minimized.

In conclusion, the recommendations in this report are the beginning of a process to encourage growth to locate in and around existing growth centers. The best approach for Mesa County will evolve over a period of many years but there is little doubt that concentrated growth patterns have fewer costs and greater benefits than leap frog development and sprawl.

## INTRODUCTION

**Purpose of the Report.** The purpose of this report is to identify alternative land use incentives that encourage growth to locate in and around existing rural and urban communities (Target Areas) in Mesa County, a land use strategy developed in response to problems and goals identified in the Mesa Countywide Land Use Plan.

According to the Mesa Countywide Land Use Plan, residents want to preserve the extensive agricultural and open space land surrounding the urban areas and want to reap the benefits of more efficient streets and utility services. Unfortunately, sprawling infrastructure, historical development approvals and market demand for large lots has led to leap frog growth and decreased urban density.

The Mesa Countywide Land Use Plan also documents that residents are concerned about increased traffic, utility demands, park usage and school enrollment pressure. The need to expand utility systems to keep pace with growth typically translates into rate increases and as streets, parks or schools become more crowded, residents begin to resent growth.

In response to these issues, the Joint Steering Committee recommended preferred land use scenarios for rural and urban areas. The preferred scenario for the rural planning area is "concentrated rural growth" which incorporates four principles:

1.   To respect the historic and existing private property rights, customs and culture of Mesa County.

BLM_0057535

2.   To recognize that urban/rural sprawl are neither desirable nor cost-effective.

3.   To encourage future growth to locate in and around existing urban and rural communities. Mesa County will provide a variety of policies, programs and incentives to private property owners.

4.   To encourage cost-effective and efficient infrastructure when development is approved in outlying, non-adjacent agricultural lands, development shall pay its fair and equitable cost of providing all related utilities, services and facilities. and articulated goals and policies as part of the Mesa Countywide Land use Plan.

The preferred scenario for the joint urban planning area is defined by eight principles:

1.   Concentrate urban growth.

2.   Support/enhance existing neighborhoods.

3.   Reinforce existing community centers.

4.   Provide open spaces throughout the urban area.

5.   Ensure that development pays its own way.

6.   Disperse higher density housing.

7.   Continue coordination to implement the Plan.

8.   Retain valued cultural and environmental resources.

The incentives strategies selected by the County for consideration in this report wil help the County to achieve these preferred scenarios.

**Methodology.** In preparation for this report, literature describing various growth management tools has been reviewed, interviews have been held with various municipal and county officials around the United States and specific regulatory approaches used to encourage the location of development in target areas have been evaluated. In particular, representatives from communities in California, Colorado, New Jersey, Vermont, Minnesota, Montana, Washington, Pennsylvania and Oregon have been interviewed.

Additionally, the Mesa County Board of County Commissioners, Planning Commission, planning staff and the Mesa Countywide Steering Committee have provided input regarding specific County land use planning objectives and challenges. Representatives from the local business and development community were also interviewed. Finally, the Mesa Countywide Land Use Plan was used as a guide to understanding how Mesa County residents see the future of the County. The Land Use Plan is organized around Rural Planning Area issues and Urban Planning Area issues. As part of the countywide planning process, goals were identified for both of these planning areas. The recommended strategy to encourage growth to locate in and around existing growth centers is a tool to implement many of those goals.

BLM_0057536

## 1.0 Benefits of and Obstacles to Clustering Growth in and Around Existing Communities.

For purposes of this report, the short-hand terms "clustering" or "cluster development" will be used to refer to the practice of locating growth in and around existing communities. Cluster or cluster development can refer either to countywide land use patterns or to site design techniques applied to specific developments. In both cases, the primary purpose is to reduce sprawl by concentrating growth.

## 1.1 Reducing the Costs of Sprawl.

Cluster development is essentially an approach first used in many parts of the country where urban sprawl and the proliferation of tract housing has resulted in increased costs to provide public services and the loss of quality of life. Unchecked sprawl has been associated with enormous social, environmental and economic costs to states that have experienced significant growth over the last decades. In California, for example, dependence on the automobile has increased and older neighborhoods have been allowed to deteriorate while infrastructure investments have been left behind that are extremely expensive to replicate in the suburbs. Forty of the state's 350 groundwater basins are seriously over drafted and natural ecosystems have been destroyed. Based on these impacts, it is clear that a new development model that utilizes land adjacent to existing communities more efficiently, encourages the reuse of land in already developed areas and identifies ecologically important lands is essential.[14]

The premise behind clustering is that open spaces, rural character, environmental assets, prime farm land and other important community resources will be lost unless steps are taken to encourage growth to locate in and around existing growth areas where the infrastructure and services are available, leaving other areas undeveloped.

Through clustered growth patterns, local governments, developers and the public experience cost savings and increased efficiencies. For example, local governments may save on the cost of road maintenance, water and sewer line installation and maintenance and related services where development takes place in and around existing growth centers. Fewer miles of infrastructure translates to lower cost. Where new growth is guided to areas where there is excess utility capacity, services can be provided more cost-effectively because the problem of too little demand in an over-sized capital facility is the primary obstacle to achieving efficient utility service delivery.[15] In Mesa County, this is a particularly important benefit because of considerable underutilized capacity in water and sewer facilities. Developers also save on the initial cost of site preparation and utility extensions when growth is clustered.

The National Association of Homebuilders has documented a savings of over $2,000 per dwelling unit in site development costs where a clustered site planning process has been used in lieu of conventional site plan design.[16]

---

[14]   Bank of America, "Beyond Sprawl: New Patterns of Growth to Fit California". Environmental Policies and Programs # 5800, 1996.

[15]   Ford, Kristina, "Planning Small Town America", American Planning Association 1990.

[16]   Sanders, Welford, "The Cluster Subdivision: A Cost-Effective Approach", PAS Report No. 356, 1980.

BLM_0057537

The preservation of open space is another important benefit of concentrating development. Where cluster options are offered, farmers and ranchers may be encouraged to sell a part of their land to generate capital, but still retain the productive portions of their land, thereby supporting the tax base and continuing traditional industries. Home buyers can benefit from communities planned with open space nearby, "without having a yard that is too big to mow but too small to plow."[17]

Energy is saved at the construction phase of development by the reduction in street lengths and utility installations associated with more concentrated development patterns. Later savings in energy are realized in street maintenance, electricity and water transmission, water and wastewater treatment and vehicle miles traveled. Increasing areas of open space and vegetation saves energy by reducing air temperature and the need for air conditioning.[18]

The linkage between urban sprawl, high rates of per capita vehicle use and poor air quality have sparked an interest in using concentrated land use patterns that require less vehicular travel as a tool to reduce pollutant emissions.[19] Studies have shown that locating residential communities too far away from urban areas increases the home-to-work commute, aggravating traffic congestion and air pollution.[20] An emphasis on more concentrated development can mitigate these negative impacts and may, over time, increase urban densities to the point where effective bus service or other mass transit become a viable option. For example, research done in Montgomery County, Maryland has shown that one of the most effective measures for reducing air pollution, energy use, and traffic congestion is to adopt "recentralization" policies that encourage housing growth in existing neighborhoods close to the center, rather than at the edges of a region.[21]

## 1.2    Elements Necessary for Implementation of Incentives That Work To Encourage Growth to Locate in and Around Existing Communities.

From interviews with planning practitioners and a review of the literature, several key ingredients emerge as essential to any program that is intended to encourage growth to locate in and around existing growth centers.

## 1.2.1   Minimize Conflicts Between Agricultural and Residential Land Uses.

Some counties have found that certain incentive techniques can cause a conflict between agricultural interests and the residents of new developments unless care is taken to locate denser developments away from productive agricultural lands. For example,

---

[17]   Arendt, Randall, "Open Space Zoning: What it is and Why it Works", Land Patterns, 1996, 1000 Friends of Minnesota.

[18]   Erley, Duncan, "Energy-Efficient Land Use", PAS Report No. 135, 1960.

[19]   Federal Highway Administration, "Transportation and Air Quality", Policy Discussion Series Number 5, August 1992.

[20]   Bryant, Jim, et al., "Transit-Oriented Development Design Guidelines: City of San Diego Land Guidance System".

[21]   Replogle, Michael, "Transportation Conformity and Demand Management: Vital Stratgies for Clean Air Attainment", USEPA No. A-92-21 (1/11/93).

BLM_0057538

experience in Clallam County, Clark County and King County, Washington has shown that "right-to-farm" policies and careful siting and design that take into consideration compatibility with agricultural uses are important to gaining support from the agricultural community for cluster development. Officials from the State of New Jersey, have found that mandatory clustering and state-dictated standards are necessary to minimizing conflicts.

Planners in Rochester-Olmstead County, Minnesota suggest that rural cluster development makes the most sense in transitional areas where residential development is already displacing agricultural operations. In these circumstances, rural cluster development can be designed to preserve open tracts of land large enough for wildlife habitat, recreation or farming that help to protect the rural character of the area.
Also, planners in several areas have warned that rural residential development should not be allowed to occur in areas that have been identified as prime agricultural land.

### 1.2.2   Develop Open Space and Protection Policies.

Planning practitioners advise that in any development scheme intended to preserve open space and direct growth toward growth centers, land set aside as open space must be large enough to be used for the intended purposes. Systems such as the rural cluster subdivision used by Boulder County that require a percentage of the parcel to be left undeveloped only work where the subdivision is of a large enough size. Otherwise, the land set aside for protection may not be adequate for wildlife habitat, farming, recreation or other intended uses of the reserved land.

In small subdivisions, a minimum size open space parcel that reflects the neighboring land uses may make more sense than determining the size of the open space as a percentage of the entire parcel. For example, around urban areas, the minimum size could be the size of the average park while in more rural areas the average farm size might be a good standard to apply. Where environmentally sensitive land is to be preserved, its function as wildlife habitat or migration pathway might be considered in selecting the size. Alternative preservation techniques for open space such as dedications, conservation easements, restrictive covenants and donations must be available so that developers are not unnecessarily constrained.

### 1.2.3   Consider Factors Driving Sprawl.

Another related problem is that Counties often are perceived as being "easier" places to gain land use approvals than municipalities. One solution to this problem is the use of intergovernmental agreements. Uniform development fee structures across jurisdictional boundaries can reduce the appearance that the County is more hospitable to development than the incorporated municipalities. Similarly, it is often easier to develop in outlying areas of a county than in or around existing communities because there are less people effected by the development. Incentives in rural areas should be carefully crafted so that growth away from population centers does not become an unintended consequence. Experience shows that defining areas where greater density is allowed in concentric rings around existing communities is the best way to address this problem.

BLM_0057539

### 1.2.4   Formulate Design Standards for Developed Areas.

Within the developed areas of any site, design standards are a critical element to the support of an incentive program. Design standards are criteria that address the physical characteristics of development such as setbacks, siting, signage, building materials, landscaping, circulation systems and the like. Denser, but poorly designed development, is unlikely to be viewed as a pleasing alternative to sprawl thereby reducing the likelihood of public support for an incentives program. For example, development in and around growth centers should incorporate design standards that reflect the adjacent community characteristics. In subdivisions in outlying areas, the design standards should reflect a more "rural" concept.

### 1.2.5   Keep it Simple.

Overly complex schemes also inhibit good land use patterns. Any incentive options must be easy to understand. Similarly, they need to be "sold" to the community. Some jurisdictions areas have met with success by arranging "kitchen" visits by private citizens supportive of various options to owners of large tracts of land. **No incentives will work unless they are understood and perceived as protective of private property interests.**

### 1.2.6   Evaluate Cumulative Effects.

Finally, the cumulative effects of any incentives must be carefully assessed. For example, groundwater pollution from septic systems is a common problem in western Colorado. Traffic congestion and surface water run-off can be aggravated and increased density near public lands may make access to public lands more difficult. Not all parcels are suitable for development within a zoning district. Where density bonuses are allowed, they must be calculated on the basis of the carrying capacity of the land. Areas of the County where increased density will be allowed can be designated by overlay districts that are located where project impacts will be minimal.

### 2.0   Overview of Incentives.

The general types of incentives fall into three categories. First are techniques intended to make development in target areas less costly and more competitive with development in outlying areas. Second are techniques devoted to making it easier in certain areas by relaxing regulatory requirements and offering "rewards" for clustered development. The third is streamlining the regulatory procedures for development in target areas.[22] Usually, a combination of these types of incentives is the most attractive to the development community and the public.

### 2.1   Selection of Incentives.

In the first phase of this project, a laundry list of various incentives from each of the three types was prepared and discussed with the Mesa County Commissioners, the

---

[22]   Ford, Kristina, "Planning Small Town America", American Planning Association, 1990.

BLM_0057540

planning staff and representatives from the Mesa County Land Use Committee. A copy of this list is included as an appendix to this report. The initial list was refined based upon input received during these discussions. Finally, a description of several incentives was provided in the Preliminary Report which was circulated for comment by the Mesa County planning staff.

## 2.2   Legal Basis.

Unless otherwise noted, the legal authority to implement land use incentives comes from the expressly delegated authority conferred on counties by the Local Government Land Use Control Enabling Act, C.R.S. § 29-20-101, *et seq.*, and the County Planning Code, C.R.S. § 30-28-101 *et seq.*, which allow counties to:

"[D]ivide the territory of the county which lies outside of cities and towns into districts or zones of such number, shape, or areas as it may determine, and within such districts or any of them. . .[to] regulate the. . .uses of land."

"...County zoning regulations promulgated under the County Planning Code may include the classification of land uses and the distribution of land development and utilization. . ."[23]

The Land Use Act provides local governments with extensive authority to plan for and regulate the use of land resulting in changes in population density based on the impact of development on surrounding areas of the community.[24] County zoning regulations may include the regulation of population density and distribution, and the location and uses of land for trade, industry, residence, recreation, public activities, or other purposes.[25] The Colorado Land Use Act was amended during this legislative session to add express authority for counties to allow cluster development exemptions.

The incentives identified in this report will allow the County to regulate population density, plan for the development of services and facilities and to regulate the use of land on the basis of impact on the community or surrounding area. Thus, the incentives help to achieve the objectives of the enabling legislation in furtherance of the promotion of community health, safety and welfare. Although Colorado courts have not expressly ruled on the validity of each of the proposed incentives, growth management ordinances have been upheld as falling within the scope of legislative authority.[26]

---

[23]   Board of County Commissioners v. Bowen/Edwards Associates, Inc.. 830 P. 2d 1045 (Colo. 1992).

[24]   Section 29-20-104(1).

[25]   Section 30-28-111.

[26]   See, e.g., Wilkinson v. Board of County Commissioners, 872 P. 2d 1269, (Colo. App. 1993),(Pitkin County Growth Management Quota System upheld as valid exercise of county land use authority).

BLM_0057541

## 3.0   Description and Discussion of Incentives.

On the basis of research and interviews conducted for this report, the following incentives have been identified as having the greatest potential to achieve the County's objective of encouraging growth to locate in and around existing growth centers and protecting agricultural lands.

### 3.1   Density Bonuses.

Density bonuses are an increase in the number of dwelling units allowed per acre from the number allowed in the underlying zoning category. Density bonus systems are the most commonly used incentive to encourage clustered development. Density bonuses have been used to encourage developers to provide higher quality design, more or better public facilities or greater amounts of open space than can be required under conventional subdivision regulations. An example of the density bonus approach has been implemented by Mesa County around Orchard Mesa where a maximum density of one dwelling unit per 2.5 acres is allowed and is available for tracts of land 10 acres or larger in size. Most density bonus systems require two major concessions from developers before density bonuses can be earned: development must be clustered on a portion of the parcel and undeveloped land must be permanently set aside with one or more land preservation techniques. The undeveloped land may be held in private hands so long as it is protected from development.

Several counties in the State of Washington have implemented density bonus systems. For example, Clallam County has established a "Rural Character Conservation Zone" which allows a developer to double density from one unit per five acres to ten units per five acres if homes are clustered and open space is preserved. In Clallam County's "Agricultural Overlay Zone" the density can increase from one unit per ten acres to one unit per 2.4 acres if at least 70% of the land remains undeveloped. The County believes that the density bonus system has helped to preserve rural character and improved service delivery efficiencies. King County, Washington also has successfully used density bonuses to encourage clustering in suburban areas.

Clark County, Washington has not had the same success with density bonuses. The County began using density bonuses in the early 80's but rescinded the ordinance in 1992. There, very large density bonuses in exchange for clustered development resulted in rampant use of the program. Areas of the County where density bonuses could apply were not carefully selected to avoid conflicts with agricultural interests and the reserved open land size was often too small to be useful. The County may, however, consider trying the program again with an approach that would be designed to avoid the negative impacts associated with the first program.

### 3.1.1   Density Bonus Within 201 Areas (Sewer Service Areas) in Mesa County.

As an incentive to clustering growth in and around existing growth centers in Mesa County, areas currently zoned AFT bordering communities within the 201 Area, (e.g., within a one mile radius of the community), could be allowed to develop at a density of up to one dwelling unit per two acres in lieu of the one unit per five acres allowed under the AFT zoning category. This can be accomplished either by rezoning or establishing overlay districts around growth centers. The location of overlay districts should take

BLM_0057542

into consideration areas with excess utility capacity and should avoid lands designated by the County as "significant". The total development allowed should be kept well within the capacity of natural, infrastructural and environmental systems.

The Mesa Countywide Land Use Plan reports that the most rapid growth in the County is occurring on the "fringe" of existing municipalities. Through the use of density bonuses, the County could manage this trend so that development was targeted to the areas with the capacity to best accommodate the development. To the extent practicable, growth could be guided toward communities with employment and shopping opportunities so that vehicle miles traveled and attendant air quality impacts could be reduced. Through site planning standards, pedestrian-friendly circulation systems also could be required.

### 3.1.2   Density Bonus Outside of 201 Areas.

For areas zoned AFT surrounding communities outside of the 201 Area, same as 3.1.1 except that there would be a minimum lot size established.

### 3.1.3   Sliding Scale Density.

Under a sliding scale density bonus scheme, density bonuses may be available where a developer controls a minimum amount of land in Mesa County's AFT zone (e.g., 10 acres) if the proposed development is designed to preserve farmland, wetlands, ridgelines, riparian areas or other special lands identified as appropriate for preservation. The larger the size of the parcel, the more dwelling units per acre may be allowed. For example, if the developer controls 10 acres, three (3) dwelling units may be allowed instead of two (2); if 20 acres are controlled, then six (6) dwelling units may be allowed instead of four (4), and so forth. In exchange, the developer would agree to preserve special lands through one of the acceptable techniques and would follow clustering guidelines.

The sliding scale density bonus would be implemented as an amendment to the AFT zoning regulations. In conjunction with the sliding scale density bonus system, the County should also establish either a minimum number of acres to be preserved or a ratio of "bonus" lots to the number of acres preserved. The Town of Crested Butte is in the process of adopting regulations to allow the latter.

### 3.1.4   Advantages and Disadvantages of Density Bonus Systems.

#### Advantages:

a. Density bonuses are fairly easy to design and implement. The County already has a density bonus system in place around Orchard Mesa which could easily be adapted for other growth centers.

b. Developers are used to evaluating projects on the basis of the number of units per acre and view additional units as a real incentive.

BLM_0057543

c. Denser development may eventually make alternative forms of transportation more feasible thereby reducing dependance on the automobile and attendant air quality impacts.

d. The County has control over where density bonuses will be allowed so it is a good tool for guiding growth to areas with excess utility capacity and away from sensitive lands.

e. If open lands preservation is a primary goal, tying the number of units allowed to the amount of undeveloped land protected would provide an easy to understand cause and effect.

**Disadvantages of Density Bonus:**

a. The County already has in place comparatively dense zoning. There simply may not be a market for increased density.

b. Given the proliferation of water and sewer lines throughout the County, it may be difficult to articulate a rational basis for not allowing density bonuses throughout the County since there is excess utility capacity in many areas.

c. The sliding-scale density bonus concept could lead to too much development in outlying areas of the County if the number of bonus units allowed is a function of parcel size since the largest parcels are likely to be located in outlying agricultural areas.

## 3.2    Transfer of Development Rights.

Mesa County's zoning scheme regulates the use and development of land largely by delineating the type of use, height, bulk and density of permitted uses in a given zoning category. Parcels of land may have unused, but quantifiable "rights" to develop at a certain density based upon the number of dwelling units allowed per acre in a given zoning district. A relatively recent innovation in zoning is to treat "development rights" attributable to the zoning ordinance as severable from the land and transferable to another location. Under a Transfer of Development Rights program, a farmer desiring to preserve prime agricultural land, environmentally sensitive land or other special lands can realize the development potential of his property by 1) increasing the density on the developable portions of his land, or 2) by transferring density to other lands in designated "receiving areas" in exchange for withdrawing other land from development.

TDR programs allow development rights to be severed from the land and transferred to more suitable lands designated for additional growth. The land that is stripped of the development rights is then restricted from non-agricultural uses through the imposition of a conservation easement. Typically, the farmer donates the easement to a land trust or similar conservation organization which allows him to take advantage of tax credits for a donation. Donated easement land trust does not convey a right of access to the land trust; it is merely a use restriction like zoning.

BLM_0057544

The farmer continues to own and use the reserved land privately he is merely restricted from developing the property for non-agricultural purposes and does not have to allow access to the land by the public.

Typically, the development rights are valued by subtracting the appraised value of the land with the conservation easement from the appraised value of the land without the conservation easement. When these rights are transferred to a purchaser, the farmer receives compensation for their value. Inheritance taxes are also reduced because the value of the farmer's land is lower once the conservation easement has been imposed.

There is no express statutory authority that allows a county to establish a TDR program nor has such a program been challenged in the Colorado courts. TDR programs have, however, been upheld in other states where courts have recognized a property owner's right to sell or lease development rights.[27] Since their objective is to allow the County to manage growth patterns and protect sensitive or other special lands, it would appear that TDR programs would fall within the very broad authority to plan and manage growth granted to local governments by the County Land Use Act and the Local Government Land Use Control Enabling Act.

Transfer of Developments Rights programs differ from community to community, but all include some common ideas:

1. Some area of the community requires protection based on environmental aesthetics, such as wildlife habitat or watershed protection, or maintenance of in place economic structures such as agricultural or forestry related industries. These areas are known as the "Sending Area", because they are sending development out of the area.

2. Other areas ("Receiving Areas") of the community are better suited for growth because municipal services (public utilities) are available, and existing economic and environmental assets won't be harmed by the development and growth.

3. The rights to develop are severable from the property and have monetary value and market potential.

TDR programs are often developed in conjunction with other alternative programs of growth management and resource protection, such as using cluster development as a zoning tool, or working with non-profit land trusts. TDR's may be implemented in either a regulatory requirement fashion, or as a voluntary program, with incentives.

The TDR program works something like this:

---

[27]   See, e.g., Hotel Taft Associates v. Sommer, 34 Misc.2d 367, 226 N.Y.S.2d 155, aff'd 236 N.Y.S.2d 939, 18 A.D.2d 796 (1962),(upholding agreement where landowner transferred to another the unused zoning density of his lot); Gardner v. New Jersey Pinelands Commission, 125 N.J. 193,593 A.2d 251 (1991)(upholding TDR program); Barancik v. County of Marin, 872 F.2d 834 (9th Cir. 1989(same); DuPont Circle Citizen's Association v. District of Columbia Zoning Commission, 355 A.2d 550,(D.C. App. 1976)(same).

BLM_0057545

A landowner in a sending area owns a piece of land with development capacity of 100 single family residences under conventional development standards. Another landowner in a receiving area owns a piece of land that can accept 100 credit units, and thereby increase the development potential on his land by 100. The receiving land owner purchases the 100 unit credit from the sending landowner, and the send landowner's property has deed restrictions placed against it from future development. TDR programs allow the sending landowner to receive equity value from the land, while maintaining it in its current state.

The idea of using TDR as a mechanism for protecting land assets has been around since at least the late 1970's; however, the concept has been limited in its actual application. Following are comments from different communities who have attempted to implement some kind of TDR program: In California, the **Marin County** Board of Supervisors approved the use of TDR's in 1981, but few transfers have actually taken place. According to County Planner, Christine Gimmler, and Bob Berner of the Marin Agricultural Land Trust (MALT) Marin's program has been under-utilized because:

1. The County has not designated receiving zones;

2. The County's Zoning Ordinance is vague, and there is no assurance that a landowner's request to transfer will be approved by the Board of Supervisors, which ultimately has to have final approval of each transfer.

   Bob Berner says, "The landowners don't want to go to the effort of trying to find a receiver, negotiate the dollar value of the transfer with the receiver, go through the zoning process, and come to the other end with a "No!" from the Board of Supervisors. The zoning ordinance would need to be amended to that landowners know that if they do X, Y, and Z the transfer will be allowed to take place."

3. MALT is in place to purchase development rights from landowners who wish to sell them; however long term fund availability may prohibit MALT form making a significant difference. MALT is a member-supported, non-profit that receives funds from grants, both public and private, and member contributions. To date they have acquired the rights to over 25,000 acres on 38 farms and ranches in Marin County.

   "One of the most important things about MALT is that it was built by an unusual coalition of the agricultural community and environmentalists.," states Bob Berner. "That marriage has helped us influence public policy and raise awareness of the importance of our agriculture."

**Monterey County,** California, has had transfers available since the late 1970's. The Monterey program is not intended to protect agricultural land, but to protect coastal lands. The county's zoning code already protects agricultural land through a zoning restriction that allows only one house per forty acres, but the house being built must be integral to the agricultural endeavor. Nick Chulos, County Planner, indicates that the value of the land for agricultural purposes always has been greater than the value for development, so when the zoning ordinance was written this way there was no real opposition. The agricultural community resists any "encroachment" on its land by cities

BLM_0057546

or developers. On the November, 1996, ballot, a citizen initiated referendum will ask the voters to approve a requirement that no area currently designated as Agricultural lands can be developed, rezoned, or incorporated into municipal boundaries without an election. The referendum is expected to pass with wide community support.

The **Big Sur** Coastal Protection Plan is the part of Monterey County's Planning and Zoning Codes that allows the use of TDRs. The option has been available since 1978, along with a clustering option. The main object is to protect the coastal view-shed from development.

Since its inception, it has been used about thirty times. Landowners who have been involved with the program, either as senders or receivers, seem pleased with it, and the area has been maintained in its natural state with little development.

The Monterey TDR program is voluntary, but uses a 2:1 incentive development rate for rights transferred outside the view-shed. Chiulos notes, "What has happened in about half the transfers is that an owner of land in the view-shed has purchased land outside the view-shed and then transfers the rights to the second piece of land."

**Buckingham Township, in Bucks County,** Pennsylvania also has had TDR on the books since the 1970's. The option was only exercised a couple of times between then and 1993, according to Township Manager Beverly Curtain. Like Marin County, Buckingham Township's zoning code allowed TDR, but was so vague that no property owners wanted to "mess with it". In 1994, the Township Board decided to "tweak" the code so that the option would be more well-received, and the Township has approved about thirty transfers, within the last year, with another dozen or so pending.

Improvements Buckingham Township has made to the TDR program over the years included firming up the sending and receiving zone, making approval a standard procedure like any other planning and zoning request, and providing landowners who have conservation easements with an incentive tax break.

Bucks County also has a County Farm Land Preservation Program. Like MALT, the Bucks County program purchased Conservation Easements from landowners. In Pennsylvania the State has issued bonds to help support easement purchase. Bucks County receives approximately $3,000,000 per year form the State, and matches this with $500,000. The bond program has been in place for about five years, and has purchased about five farm's rights per year. The program is popular with the agricultural community according to Rich Harvey, Program Director, but the funding is still not sufficient. "We have a waiting list of around forty farms wanting into the program, and we get about fifteen new applications per year," states Harvey.

**Montgomery County,** Maryland has had its program on the books since the early eighties, and is considered by many to be the model program for "down-zoning" agricultural land in exchange for TDR opportunities. Around 1980, the County began working on a new Comprehensive Master Plan. One part of the plan included rezoning in Agricultural/Rural Zones from 1:25 acre zoning down to 1:5. The property owner could retain and sell the credits left at 1:5; for example, if a landowner owned 500 acres with development potential of 100 units, after the rezoning the landowner could develop up to 20 units on the 500 acres and sell up to 80 credits. Credits were transferrable to

BLM_0057547

any designated receiving zone (including in local municipalities based on joint agreements). Base zoning in the receiving zones remained at its 1980 levels, but TDR credits were able to significantly increase the zoning. In some receiving zones the units are allowed t o increase density from single family residential to multifamily.

The worst problem as far as Planner, Dean Mellander, is concerned, is that some residents in some receiving zones have not been happy at the increased density in their neighborhoods. According to Mellander the current market value on TDR credits is around $8,000 to $10,000 per unit, so agricultural community is quite pleased with the program. After a property owner sells the credit, they can apply to the State of Maryland for a Property Tax Abatement, which further sweetens the pie.

After about five years of debate, **Santa Barbara County**, California, adopted its TDR program in 1994, but financial considerations held up implementation of the program until this year. This year, the program is being implemented on a pilot basis in conjunction with a cluster development option. Santa Barbara County is a fully-platted county, with many "antiquated" subdivisions on the books, according to County Planner, Jemma Garmon. These antiquated subdivisions have never been developed, but are nonetheless eligible for possible development.

One of the main obstacles the County faced in trying to adopt and implement the program was from private property owners rights groups. Although the County's program, as adopted, is voluntary, these groups opposed it because they were afraid it would be made into a mandatory program and did not fully understand its implications.

One of the more recent counties to adopt TDR is **Thurston County,** Washington. In 1990, the State of Washington adopted a Growth Management Act that required all counties and municipalities to identify if agricultural or forest resource lands, and to develop a long term plan for their preservation. Thurston opted to design a program similar to Montgomery County, Maryland, using rezoning in conjunction with TDR credits. Receiving zones are in urban communities based on joint powers agreements.

Thurston's program is new enough that no finalized transfer has been accomplished. The program requires the farmer to have his land surveyed, then upon filing a conservation easement with the County, the County will issue the farmer TDR credit certificates. Each credit certificate is good for one unit, and they are considered a negotiable instrument.

### 3.2.1   Transfer on Same Property.

Under this approach, a property owner is allowed to permanently withdraw from development a portion of lands in exchange for an increase over the density allowed by the underlying zone on the remaining portion of the land. For example, an owner of a 100 acre parcel in an area zoned for one unit per 5 acres could cluster his 20 allowable units to a 25 acre portion of the parcel and the remaining 75 acres would be withdrawn from development. The area of the land withdrawn from development will be preserved through a technique acceptable to the County.

BLM_0057548

### 3.2.2   Transfer to County Receiving Zones.

Where a property owner is interested in protecting prime agricultural or other special lands, but wants some return on the land's development potential, development rights may be transferred to other parcels of land in the County which have been set aside as receiving zones. Receiving areas should be designated by the County in and around urban and rural growth centers. The type of development allowed in a given receiving area would be determined by a number of different factors.

The County would define receiving areas based upon the availability of services, adjacent land uses and the over-all suitability of the land for development, taking into consideration soil, geology, topography, vegetation and other characteristics.

### 3.2.3   Transfer to Incorporated Municipalities.

Receiving areas may also be designated within incorporated municipalities through an intergovernmental agreement between the County and the municipality. Boulder County has executed intergovernmental agreements to allow the transfer of development rights across jurisdictional boundaries.

### 3.2.4   Advantages and Disadvantages of TDRs.

**Advantages of TDRs:**

a. TDR programs offer landowners an a means to preserve open space or agricultural uses without giving up potential property value.

b. TDR programs recognize and protect as a legal interest "rights" associated with zoning.

c. Because the County identifies the receiving zones areas, it can dictate that rights will be transferred to areas in and around growth centers.

d. Mesa County has begun the process of an intergovernmental-agreement between Palisade, Grand Junction, Fruita and the County which could incorporate TDR programs.

**Disadvantages of TDRs:**

a. A TDR Program must be combined with land preservation techniques so that the sending land is protected.

b. TDR programs require that there is a market for purchasers of development rights and that development rights are valuable.

In times of slow growth, there may be little interest in TDR options. Before a TDR program is implemented, the County should perform a market analysis to determine if there are potential buyers and sellers.

BLM_0057549

c. Identifying sending areas, keeping track of the transfer of rights and enforcing covenants and restrictions on protected lands can require complex regulations and well-trained staff if the program is in demand.

d. To encourage growth to occur within incorporated municipalities, transfers from unincorporated to incorporated areas must be allowed. This requires intergovernmental agreements and a well-developed spirit of intergovernmental cooperation.

e. Areas in and around growth centers identified as receiving areas must be available for development at the time a transfer is made or the County must establish a "bank" to hold the rights, a potentially time-consuming and complex process to implement and administer.

### 3.3    Relaxed and Revised Standards.

Certain County standards can be relaxed in designated growth areas to reduce the cost of development or to provide more options to a developer. The most obvious examples are:

### 3.3.1    Create More Flexible Park and Open Space Dedication/Preservation Requirements.

Unless the County has defined a need for a lot of "parks", the park dedication requirement or park impact fee can be broadened to apply to other categories of open space and set-aside-techniques. The park dedication requirement within a subdivision should be amended to reflect the standards of <u>Dolan v. City of Tigard</u> and to provide more options to the subdivider. For example, the amount of land required for dedication should be based upon a number of acres per unit constructed so that there is a relationship between the impacts and the dedication requirement. In addition, the subdivider may be given several options for open lands requirements other than dedication or fee in lieu of parks. This is particularly important in rural areas of the County where developed parks are not desired. Options include:

a. conveyance of the fee interest to the County.

b. conveyance of the fee interest to a "qualified conservation organization."

c. imposition of a restrictive covenant running with the land, which is enforceable by the County and which precludes its development for all uses and gratuity with the exception of uses amenable to the land set aside.

d. conveyance of a conservation easement.

### 3.3.2    Relax Road Improvement Requirements.

The AFT requires major subdivisions to construct adjacent roads to County standards. Instead, developer required improvements to substandard roads could be limited to roads actually impacted by the subdivision. The County should establish rural and urban road standards rather than requiring all roads to conform to the same standards. Road

BLM_0057550

standards are less stringent for "rural" development than for urban development. The rural road standard could apply to subdivisions that result in a smaller number of dwelling units per acre than allowed by the zoning. For example, if a property owner in rural areas zoned AFT would agree to develop at an average density of one dwelling unit per 35 acres instead of the allowed one unit per five acre density, the less stringent rural standards would apply.

### 3.3.3   Relax Shared Driveway Standard.

Major subdivisions in the AFT could be allowed more flexibility in shared use of driveways in exchange for compliance with clustering guidelines.

### 3.3.4   Relax Interior Street Widths in Clustered Development.

Street widths within a clustered subdivision can be reduced so that a developer has more developable land and lower infrastructure costs.

### 3.3.5   Reduced Lot Frontage.

One of the most significant influences on development costs is lot frontage. Allowing less frontage reduces the length of streets and utilities thereby making it less expensive to develop a site. Lot frontage requirements could be relaxed in urban areas of the County. An example of this technique is the "flagpole amendment" to the mesa County Code.

### 3.3.6   Advantages and Disadvantages of Relaxed Standards.

**Advantages of Relaxed Standards:**

a. The relationship between relaxed standards and cost-savings to a developer is direct and easy to understanding making it an easily understood incentive.

b. It is relatively simple to identify which standards can be lowered without causing undesirable impacts, and in fact, Mesa County staff members already have generated a list of those standards amenable to relaxing.

c. Few if any additional staff resources would be necessary to implement this incentive.

**Disadvantages of Relaxed Standards:**

a. Relaxed standards only work to the extent standards are otherwise uniformly applied and enforced outside of target areas.

b. Only certain development requirements are conducive to being relaxed. Because of the limited number of standards that can be relaxed, there simply may not be enough cost-savings to a developer for this technique to act as a real incentive to develop in target areas. Also, some developers have expressed the opinion that standards are generally too stringent and should be relaxed as a matter of course.

BLM_0057551

### 3.4 Streamlined Administrative Procedures.

Generally, the number of review steps, application requirements and public hearings can be reduced for any land use types such as clustering that the County wishes to encourage. Any changes to the Land Use Code made to incorporate incentives should ensure the fewest possible number of review steps.

### 3.4.1 Advantages and Disadvantages of Streamlined Procedures.

Advantages of Streamlined Procedures:

   a. Time is money.

   b. A simple procedure is often more likely to be attractive to a developer because it is easier to understand.

Disadvantage of Streamlined Procedures:

   a. Once procedures are relaxed for development in target areas, the County will be under pressure to streamline all aspects of the development review process.

   b. Developers are not taking advantage of the one-step review process available for PUDs and Minor Subdivisions now.

### 3.5 Rural Cluster Subdivision Exemption.

The Rural Cluster Subdivision Exemption is a voluntary administrative process to permit alternative land use and lot size patterns on 35 acre parcels that do not require County subdivision review. This would ensure property owners one dwelling unit per 35 acre but permits flexible "building sites" and lots available for ownership transfer that are smaller than 35 acres, with a minimum lot size to be determined by the County. Developed areas would be designed with clusters of fewer than 8 to 10 lots, removed from active agricultural sites. The over-all average density would not change and undeveloped land is protected through a conservation easement. Administration of rural cluster subdivisions can be delegated to the County Planning Staff with limited Planning Commission review on a consent agenda and final sign off by the Board of County Commissioners.

Routt County has recently adopted regulations for a Land Preservation Subdivision Process, a form of rural cluster subdivision exemption. The primary goal of the LPS is to prevent the County from being carved up into 35 acre parcels by those seeking to avoid the County's subdivision process. The LPS is intended to foster continued agricultural uses, protect open space and rural character while maintaining the currently allowable density and development expectations. To be eligible for the LPS, the land must be in the Agriculture/Forestry zone district and be at least 70 acres in size. The owner must execute a development agreement with the county that sets forth the maximum number of units that may be developed which is one unit per 35 acres unless bonus lots are awarded. An applicant is entitled to one bonus lot for each 100 acres of land preserved as undeveloped. The recently enacted "cluster legislation" at the state level should allay any lingering fears about the availability of this technique.

BLM_0057552

The Rural Cluster Subdivision Exemption is accompanied by design criteria that include development principles and objectives about the needs to be achieved by the development and specific design guidelines and standards to implement the objectives and principles. Routt County has adopted LPS standards and guidelines for agricultural lands; visual resources; rivers, lakes, wetlands and riparian areas; infrastructure, wildlife and geologic, fire, flood and slope standards. An example of an agricultural guideline is to require an applicant for the LPS to "reserve commercially viable enclaves of large scale agricultural operations." An example of a visual resource guideline is "avoid long, uninterrupted rows of houses lining major roadways."

The Rural Cluster Subdivision Exemption can be integrated with the transfer of development rights process described for transfers on the same parcel. The landowner may be allowed to create "no-lot-line" subdivision where family members and agricultural employees can be accommodated without the transfer of the title on the property. The recently adopted "Dwelling Groupings" amendment to the Mesa County Code incorporates this principle.

### 3.5.1   Advantages and Disadvantages of Rural Cluster Subdivision Exemption.

**Advantages:**

a. Protects open space, environmentally sensitive lands and agricultural resources without interfering with allowable density and development expectations.

b. Provides a simple, predictable and timely administrative review process.

c. Encourages "rural character" development with less roadway than typically found in large lot subdivisions thereby minimizing vehicle miles traveled.

d. Coupled with other techniques, could be used as an incentive to encourage landowners in Mesa County to voluntarily seek zoning change from AFT to Agricultural (AF 35).

**Disadvantages:**

a. Staff is delegated discretion to interpret design guidelines.

b. There is not any land in Mesa County zoned Agricultural (AF 35) so the usefulness of the exemption may be limited as a stand-alone-alternative.

But combined with other techniques or as expanded to the AFT zone, this could be a powerful tool.

c. Although clustering of dwelling units is required within a Rural Cluster Subdivision, the technique used alone does nothing to cluster growth in and around existing growth centers.

BLM_0057553

## 3.6     Planned Unit Developments.

### 3.6.1    Rural Planned Unit Development.

An alternative to the Rural Cluster Subdivision Exemption is a residential PUD which allows for an increase in density from one dwelling unit per 35 acres up to one unit per 17.5 acres (or some other number) on a minimum size parcel with the goal of preserving agricultural, environmental or open-space resources.  These resources are preserved through a conservation easement and are appropriate for lands that have been identified as prime agricultural lands, critical wildlife habitats or corridors, natural landmarks, wetlands or other lands to be preserved. Unlike the current Mesa County PUD which is a zoning category, this PUD would be more like a type of subdivision process.

Some counties also require that for an area to be eligible for a Non-urban Planned Unit Development, it must include a certain percentage of the area covered by eligible lands. For example, Boulder County requires that 75% or more of the area is covered by special lands.  Any use or combination of uses allowed in the underlying zoning district may be included in a NUPUD and/or approved as part of a development plan.  The "outlot" is preserved for agricultural purposes or open space and subdivided lots can be anything allowed in the underlying zone or any use requiring special review.

Boulder County restricts the developed area of a NUPUD to no more than 25% of the total area of the NUPUD but  provides a process to waive that requirement. Research shows that the better approach to determining the size of the outlot is to base its size on its intended use. For example, if it is intended for wildlife habitat, its location and size should reflect wildlife needs.  If its use is for farming, the outlot should cover the area of the parcel with the most productive soils and the minimum size should reflect the acreage required for the particular crop.

### 3.6.2    TDR Planned Unit Development.

Under this system, the County would officially designate certain sites throughout the County on maps as "sending" areas and "receiving areas".  The receiving areas are identified, meet certain criteria and standards for approval and establish a maximum allowable total number of units. A conservation easement or other acceptable means of land preservation is implemented to prevent further subdivision or development on lands from where the transfer occurs.

The TDR/PUD must be adjacent to and compatible with adjoining development and land uses and may not be located in any prime agricultural lands, designated open space, critical wildlife habitat, or other lands that have been designated as lands to be preserved.  Development rights may be transferred to an approved receiving site only after the applicant obtains Development Right Certificate for each right to be utilized from eligible sending site.  The certificate is issued by the County upon the conveyance of a conservation easement to the County (or other designated conservation organization) on the sending site.  A variation of this approach is to create "overlay" districts as receiving areas.

BLM_0057554

### 3.6.3   Advantages and Disadvantages of Rural PUD.

**Advantages:**

a. Provides an alternative to carving up agricultural lands into smaller parcels while allowing landowners to realize development expectations.

b. Promotes clustered design thereby reducing miles of roadway and utilities per capita and reducing vehicle miles traveled.

c. Increase in density over density allowed in underlying zoning category is an obvious incentive to developers who are used to measuring profit in terms of density.

**Disadvantages:**

a. May encourage too much density in outlying areas unless receiving areas are carefully designated.

b. Because there is not a lot of land zoned Agricultural (AF 35), the usefulness of the Rural PUD may be limited but should be considered with other techniques.

### 3.7   Change Zoning.

Perhaps the easiest way to manage and guide growth is to change the zoning in the County. Presently, much of Mesa County is zoned AFT which allows one dwelling unit per five acres. This zoning is contrary to the goal of encouraging growth to locate in and around existing growth centers and preserving agricultural lands. If the zoning were changed to allow 2 to 5 dwelling units per acre in and around rural communities and the rural areas outside of growth centers were rezoned to allow one dwelling unit per 35 acres, growth would be more likely to occur in and around existing communities. The County should take a close look at existing zoning throughout the County, however, toe to identify areas where the zoning is patently inappropriate (e.g. high density planned zones, outlying industrial and commercial zones or parcels where the landowner would like to down-zone voluntarily.

### 3.7.1   Advantages and Disadvantages of Change in Zoning:

Advantages of Changes in Zoning:

a. Zoning changes are comparatively simple to accomplish.

b. Denser development would be forced to occur in growth centers, thereby reducing the vehicle miles traveled.

BLM_0057555

### Disadvantages of Changes in Zoning:

a. There is a perception in Mesa County that existing zoning confers a property right on a landowner.[28] Any attempt to unilaterally "down-zone" would meet with political opposition.

b. Down-zoning alone will not help to preserve and protect agricultural lands. Because divisions of land into parcels of land greater than 35 acres are exempt from subdivision regulations, other regulatory changes would be necessary to ensure that down-zoning does not result in the County being carved up into 35 acre parcels without review.

## 3.8    Capital Improvement Planning and Impact Fees.

In many parts of the country, new development is guided to growth centers through utility extension and road improvement policies. Simply put, local governments through their capital improvement planning process extend trunk lines and major arterials to areas where they wish growth to occur. Outside of those areas, utility extensions must be installed or financed by a developer. Impact fees based on miles from the nearest arterial or collector line result in development in outlying areas that is more expensive, and therefore, often less attractive to developers.

In areas similar to Mesa County where water, sewer and fire are provided either by special districts or municipal governments, intergovernmental agreements ("IGAs") that tie utility extension policies to a county land use plans are being implemented. For example, Larimer County and Summit County, Colorado have initiated these kinds of intergovernmental agreements. Importantly, Mesa County is also in the process of negotiating IGAs and should take advantage of the building momentum to increase intergovernmental cooperation.

### 3.8.1    Advantages and Disadvantages of Capital Improvement Planning and Fees.

### Advantages of Capital Improvement Planning and Fees:

a. Reduced infrastructure costs or smaller fees are a powerful incentive to guide development to target areas.

b. Careful capital improvement extension polices tied to logical growth patterns can minimize leap frog growth, reduce service delivery inefficiencies, reduce the per capita costs of services and minimize vehicle miles traveled.

c. Intergovernmental agreements with special districts that tie utility extension policies to land use policies keep land use decisions in the hands of the appropriate governmental jurisdiction so that the "tail isn't wagging the dog".

---

[28]  The right to develop at a given density does not vest until a site specific development plan has been approved. Thus, there is no automatic property right conferred by zoning.

BLM_0057556

**Disadvantages of Capital Improvement Planning and Fees:**

a.  Sewer and water is available throughout most of Mesa County, even in areas where development may not be appropriate.

b.  Intergovernmental coordination with a multitude of different service providers is time-consuming and complex.

c.  Reduced impact fees in target areas works only to the extent that charges and fees are more expensive and uniformly enforced in areas of the County where growth is not desired.

d.  The authority to assess impact fees, other than dedications for parks and schools, is not expressly granted by statute.  Recent Supreme Court decisions arguably require that the County engage in a fairly sophisticated analysis of the relationship between impact fees assessed and the impacts of a project.

## 3.9    Brownfields.

EPA has recency undertaken a new policy direction called Brownfields Action Agenda, an initiative to help communities revitalize industrial and commercial facilities where redevelopment has been stymied by environmental contamination.  Brownfields is a term to describe old, potentially tainted or perceived to be tainted sites as opposed to "Greenfields", which the agency uses of describe near-pristine parcels of ground.  At the heart of the initiative is an admission that the federal environmental laws and statutes may have had an unintended chilling effect on the conversion of obsolete facilities into productive land uses.  The Brownfields program consists of a series of concrete steps that EPA will take and a handful of pilot projects around the United States.

EPA has identified the following elements as essential to the Brownfields initiative:

**Removing sites from CERCLIS.**  EPA will remove 25,000 sites from its Superfund Tracking System List which already have been screened out of active investigation.

**Brownfields Economic Development Pilot Projects.**  EPA is funding 50 demonstrations of redevelopment solutions during 1995 and 1996.  These pilots will include neighborhood groups, property owners, developers, lenders and other stakeholders in redeveloping industrial sites.

**Prospective Purchaser Agreements.**  EPA will define the specific situations where it will enter into an agreement not to sue a prospective purchaser of contaminated property for contamination that existed prior to sale.

**Deferral to state clean-up programs.**  Where placing a site on the National Priorities List is not warranted, EPA has agreed to defer to Colorado's voluntary clean-up program.

BLM_0057557

**Defining Municipal Acquisition Liability.** Under CERCLA, governmental units such as counties are exempt when they acquire contaminated property through "involuntary" action but the term "involuntary" is not clear. EPA will clarify this provision.

**Reassuring Property Owners Above Contaminated Groundwater.** Prior to Brownfields, the owner of property above contaminated groundwater may have been held liable for the contamination, even if the contamination was from an off-site source. EPA will not now expect the property owner who did not contribute to the contamination to bear the responsibility for clean-up costs.

**Lender Liability Guidance.** Fear of liability has dissuaded lenders from providing investment capital at industrial sites. EPA will outline its policy not to pursue lenders for clean-up costs.

### 3.9.1   Advantages of Brownfields.

    a. One of the best ways to avoid sprawl is to use existing, vacant industrial sites. Brownfields provides a framework to encourage redevelopment of contaminated or potentially contaminated property.

### 4.0   Conclusion and Recommendation.

Based upon interviews with practitioners in other urbanizing counties, a review of the literature and meetings with elected officials, staff and community representatives in Mesa County, we recommend that the County engage in the following approach to encourage growth to locate in and around existing communities in Mesa County.

### 4.1   Identify and Evaluate Target Areas Where Growth Will Be Encouraged.

The Mesa Countywide Land Use Plan recommends that growth occur in and around existing communities, but the location and intensity of that growth should be defined by the County through additional analysis. Not all areas in and around existing growth centers are suitable for additional growth nor can each area accommodate the same intensity of growth. Additionally, the analysis will help provide the legal basis to support subsequent conditions and limitations which the County may wish to impose on development in different areas of the County. We recommend that the County use these criteria to identify and evaluate Target Areas:

**Criterion: Consider Future Land Use Plans when identifying areas where growth should occur.**

    a. Recommendations in the Future Land Use Plans for rural and joint urban planning areas should be taken into consideration when determining growth priorities. Read together, these Future Land Use Plans suggest a hierarchy of growth preference, with the highest density occurring within incorporated municipal boundaries.

**Criterion: Growth should occur where there is excess service capacity to the extent possible.**

BLM_0057558

b. Availability of services is a critical component to determining where growth should be targeted. To the extent practicable, growth should be targeted to areas with excess utility capacity. As excess utility capacity is absorbed, utility service delivery becomes more efficient and less resources are required per capita. Areas without excess capacity should be a lower priority Target Area.[29]

The "Service Evaluation of Rural Land Use Alternatives" prepared by Alan Richman makes findings important to identifying excess capacity. For example, that report concludes that 1) both excess water and wastewater capacity is available in and around Collbran, Palisade, Mesa, DeBeque, Clifton, and Fruita; 2) if growth is to locate in and around Powderhorn, additional water treatment capacity is necessary; 3). Loma, Gateway and Glade Park do not have a public wastewater treatment system and 4) all schools in the rural areas will need improvement to accommodate more growth.

Lack of Fire Protection capacity is also a significant constraint in many areas that should be factored into the Target Area evaluation.

**Criterion: New development should avoid prime agricultural lands, natural hazards, steep slopes, wildlife areas and areas of significant vegetation.**

c. Designation of target areas must take into consideration environmental constraints. Development is not appropriate where there are prime soils, natural hazards, wildlife habitat areas or other sensitive lands. The composite map used to identify key sensitive areas is a good starting place to consider environmental constraints, but more refined mapping will be necessary in and around growth centers to derive a level of detail useful to locating and evaluating Target Areas.

**Criterion: To minimize vehicle miles traveled, new residential growth should be encouraged in areas where shopping and employment is available.**

d. As Target Areas are evaluated, the availability of shopping and employment opportunities within close proximity should be considered so that new residents can travel shorter distances to procure services or obtain work.

**Criterion: Consider adjacent land uses.**

e. The nature of adjacent land uses should influence the density and type of development allowed within a Target Area. Target Area designation must include a public process that considers the goals of adjacent residents.

**4.2    Enter into intergovernmental agreements with special districts and municipalities.**

Because areas within municipal boundaries have been identified as priority areas to accommodate growth, intergovernmental coordination is essential. We recommend that

---

[29] "Planning Small Town America" by Kristina Ford provides an excellent explanation of a technique called "committed lands analysis" which allows a community to estimate the efficiency gains that each additional customer would bring to facilities with excess capacity, to define the public benefits of a private decision to develop land in a given area of the community and to assess long term capital needs and location decisions.

BLM_0057559

the IGAs being negotiated by the County address, at a minimum, utility extension and service area boundary policies, receiving zones for development rights and uniform fee structures in order to encourage in-fill development.

## 4.3    Establish Overlay Districts.

Once the County has evaluated the location and intensity of new development in Step 4.1, we recommend that overlay districts be established. The overlay districts will be areas where density bonuses will be allowed, areas that serve as receiving areas for development rights or areas where expedited development review is available in exchange for clustering. Because all lands within the County are not identically suited for development, each overlay district may have different standards. The standards for density, siting, open space and infrastructure may differ from overlay district to overlay district, taking into consideration the results of the analysis performed in step 4.1.

Generally, research shows that sliding scale density bonuses tied to the amount of open space to be preserved and protected are effective.[30] We recommend that the County adopt open space standards that include the minimum size and characteristics of land suitable for open space preservation. We do not recommend that the size of the open space be based on a flat percentage of the parcel to be developed.[31] Instead, the better approach would be to determine the size on the basis of its intended use.

Siting standards and guidelines for developed areas within an overlay district should ensure that lots are located away from sensitive lands and stream corridors. Most planners recommend that clusters be limited in size to 6 to 10 lots. separated by buffers, to retain rural character.

Individual lot dimensions, building heights, setbacks and landscaping in an overlay should be compatible with adjacent land uses and access to open areas should be provided. Minimum lot sizes may vary, depending upon the availability of public sewer service. Districts should include design standards that encourage pedestrian traffic.[32]

The review process within overlay districts should be kept as streamlined as possible. A public hearing at the ODP stage only and delegation to staff of significant decision making authority is essential to the success of the overlay district as an incentive. Similarly, submittal requirements should be kept to the minimum necessary to evaluate a development proposal.

## 4.4    Establish A Rural Subdivision Exemption.

Overlay districts alone are unlikely to positively affect  development patterns unless alternatives are available to carving up agricultural lands into five acre parcels or 35 acre

---

[30]    See Section 3.1, supra, for a discussion of density bonus techniques.

[31]    See 1.2.2, supra.

[32]    Generally see "Design With Nature" by Ian McCarg and "Rural By Design by Randall Arendt for excellent ideas on standards for cluster development. See also "Design Guidelines for Architecture and Landscape Architecture in Crested Butte" and "Open Space Zoning: What it is and Why it Works" by Randall Arendt, Land Patterns, Winter, 1996, 1000 Friends of Minnesota.

BLM_0057560

tracts in outlying areas of Mesa County. Routt County's recently adopted LPS regulations appear to be an excellent tool, easily adaptable to Mesa County's needs, for the preservation of agricultural lands. Before the LPS can be implemented, we recommend that Mesa County evaluate whether the LPS is appropriate throughout the entire Agricultural zone district or whether the exemption should be limited to lands that have certain characteristics such as prime soils, wildlife habitat, natural hazards or other areas that the County would like to protect from haphazard development.

Additional analysis is also required to determine whether the LPS may be an option for certain lands in the AFT zone. It may be that the simple development review process afforded by the LPS (which comprises substantial delegation of authority to the staff, limited Planning Commission review on a consent agenda with final sign-off by the Board of County Commissioners in an extremely short time period) may induce owners of AFT lands to agree to voluntarily "down-zone" to a one unit per 35 acre density.[33]

**4.5     Establish a pilot TDR program.**

The option to transfer development rights to another parcel of land is a powerful tool to induce clustered growth. The major problem with the TDR scheme is its potential complexity. We recommend that the County begin to investigate the suitability of a TDR program in Mesa County by implemented a "pilot" program. We recommend that the County identify one or two owners of prime agricultural lands who are interested in transferring development rights. For example, the County should identify successful agricultural operations in the urban fringe areas of the AFT zone with prime soils as potential sending areas.

Landowners concerned about estate taxes and the ownership rights of multiple co-owners or heirs would be likely candidates. Many agriculturists have struggled with ways to satisfy the interests of co-owners and multiple heirs without selling the land to a developer or splitting it up. Once prospective candidates have been identified, the County could work with the landowner to identify the parcels from which rights would be transferred and coordinate with county land trusts or other land conservation organizations who would be interested in holding a conservation easement on the reserved land. Ideally, the County should, through outside grant sources, cover the costs of all legal and financial consulting services that would be necessary to assign a value to the rights, create development "credits" and formalize the transfer.

Initially, receiving areas could be designated in one or more of the overlay districts. A suitable receiving parcel should be located in a Target Area and must not be agricultural, must have sufficient public facilities and must include lands that are appropriate for development. If landowners in receiving areas were not readily available at the time the sending owner was interested in selling the credits, the County could use grant funds to purchase the rights to be held until a purchaser was identified. During the course of carrying out such a pilot project, the County can identify many issues that would likely arise in any TDR program, develop strategies to address the issues and decide whether a TDR program on a larger scale makes sense in Mesa County.

---

[33]   See 3.5, supra, for a discussion of Routt County's LPS.

BLM_0057561

### 4.6    Coordinate Capital Improvement Planning with land use objectives.

Areas within overlay districts and within incorporated municipalities should be top priority areas for utility extension or improvements. Extension or improvement outside of overlay districts should be a low priority or funded solely by developers. We recommend that the County incorporate land use policies and objectives into its capital improvement process and coordinate with municipalities and special districts via intergovernmental agreements. If the County is unsuccessful in achieving voluntary cooperation and coordination with other jurisdictions, we recommend that it aggressively apply "1041" regulations to utility extensions which require conformance with the Land Use Plan.[34] At a minimum, the County should require the Districts to discuss land use policies in the periodic service plan reports submitted to the Commissioners pursuant to state statute.

## CONCLUSION

The County's goal to encourage growth to locate in and around existing communities can result in significant benefits to the County such as the preservation of agricultural lands and rural character, improved infrastructure efficiencies, reduced air pollution and improved energy savings, and lower per capita costs for private and public infrastructure and services. With the exception of involuntary down-zoning, our research shows that there is no quick fix or single technique that is guaranteed to encourage the type of land use patterns desired by the County. In general, a menu of different options seems to be the best approach. Characteristics for incentives that work are outlined in section 1.2 of this report.

The recommendations outlined in section 4, supra, are based on the available literature and anecdotal evidence of the successes and failures of different approaches to growth management used in other parts of the country. Ultimately, the best system for Mesa County will no doubt evolve over a period of years but there seems to be no debate that more concentrated growth patterns are superior to leap frog development and sprawl.

## ACKNOWLEDGMENTS

This report was prepared with the assistance of Carol Ekarius, a farmer and consultant specializing in economic, environmental and land use issues facing contemporary agriculturalists. Ms. Ekarius lives in Verndale, Minnesota with her husband Ken, their dogs and cats, and a large number of cows, pigs, chickens and other assorted creatures.

---

[34]    "1041" is codified at C.R.S. § 24-65.1-101, et seq.

## ADDENDUM TO MESA COUNTY LAND USE REPORT

It is imperative to keep in mind that the recommendations in the Mesa County Land Use Incentives Report are not an exhaustive list and that to achieve desired growth patterns, the County must constantly evaluate the success of various techniques and remain open to new ideas. The incentives program must be a dynamic program that can easily be tweaked to adjust to changing conditions in Mesa County. The County should avoid the mechanical application of any techniques and should take a periodic hard look at their consequences While the report was being prepared, other areas of program study, research and development were identified as important complements to the recommendations in the report that were outside the scope of this project. These are:

1. Public information/Outreach Program. Voluntary incentives will not work if no one knows about them or understands them. The County should develop a program to involve the public in the selection and implementation of incentives.

2. Voluntary Rezoning. There are likely property owners who would like to change the zoning on their property voluntarily to a less intense zoning category. The County should design a program to identify these property owners and develop an expedited bulk down-zoning program.

3. Develop a Program Evaluation System. As different incentives are implemented, the County needs some way to systematically evaluate whether the incentives are accomplishing the desired results and to make either policy or programmatic changes on the basis of the evaluation. Consequently, the County should develop a formal program evaluation process to be implemented along with the incentives.

BLM_0057563

# GLOSSARY OF TERMS, ACRONYMS, PHRASES AND ABBREVIATIONS

**AC:** Acre

**ADT:** Average Daily Traffic

**Affordable Housing:** Housing capable of being purchased or rented by a household with very low, low, or moderate income, based on a household's ability to make monthly payments necessary to obtain housing. Housing is considered affordable when a household pays less than 30 percent of its gross monthly income (GMI) for housing costs including utilities.

**Annex:** To incorporate a land area into an existing district or municipality, with a resultant change in the boundaries of that district or municipality.

**Area of Influence:** Generally the unincorporated area around each city and town (up to three miles). The probable ultimate boundaries and service area of a town or city as jointly identified by the county and the affected jurisdictions; that portion of the unincorporated county adjacent to a town or city that affects, and is affected by, development and infrastructure planning in the city.

**Average Daily Traffic (ADT):** The average number of cars per day that pass over a given point.

**BLM:** (U.S.) Bureau of Land Management

**Bulk Regulations:** Standards and controls that establish the maximum size of buildings and structures on a lot and the buildable area within which the building can be located, including coverage, setbacks, height, floor area ratio, and yard requirements.

**CDOT:** Colorado Department of Transportation

**CIP:** Capital Improvements Program

**CRS:** Colorado Revised Statutes

**CUP:** Conditional Use Permit

**Cluster Development:** A form of development design that concentrates buildings on lots grouped on a specific portion of the site to allow the remaining land area to be devoted to open space, active recreation, preservation of environmentally sensitive areas, or agriculture.

**Compatible:** Capable of existing together without land use conflict or negative effects.

**Conservation:** The management of natural resources to prevent waste, destruction, or neglect.

**Conservation Easement:** The grant of a property right or interest in real property that is appropriate to retaining land or water areas predominantly in their natural, scenic, open or wooded condition, retaining such areas as suitable for habitat for wildlife or plants or maintaining existing land uses (e.g., agricultural uses).

BLM_0057564

**Constraint:** A limitation on or restriction to development that may be imposed by natural or artificial conditions ( e.g., steep slopes, floodplains, air quality standards, financial resources, water rights, soil type, geologic hazards, vegetation, etc.)

**DOW:** (Colorado) Division of Wildlife

**DPOR:** (Colorado) Division of Parks and Outdoor Recreation

**DU:** Dwelling Unit

**Dedication:** The transfer of private property to public or other ownership for purposes such as roads, parks, school sites, or other public uses.

**Density:** The number of dwelling units (du) allowed per unit (acre) of land.

**Density, Residential:** The number of permanent residential dwelling units per gross acre of land.

**Developer:** The legal or beneficial owner(s) of a lot or any land included in a proposed development, including the holder of an option or contract to purchase or other persons having proprietary interests in such land.

**Development:** The physical construction of buildings and/or the preparation of land for non-agricultural uses. Development activities include: subdivision of land; construction or alternation of structures, roads, utilities, and other facilities; installation of septic systems; grading; deposit of refuse, debris, or fill materials; and clearing of natural vegetative cover (with the exception of agricultural activities). Agricultural activities and routine repair and maintenance activities are excluded from this definition.

**Downzone:** A change in the zoning classification of land to a use or classification that is less intensive (e.g., from multi-family to single family; from commercial or industrial to residential).

**Dry Land:** Non-irrigated land.

**Dwelling Unit:** A room or group of rooms, including sleeping, eating, cooking, and sanitation facilities, but not more than one kitchen, constituting an independent housekeeping unit, occupied or intended for occupancy by one household on a long-term basis.

**EPA:** (U.S.) Environmental Protection Agency

**Easement:** A grant of one or more property rights by a property owner to and/or for use by the public, a corporation, or another person or entity. For the purposes of this plan, most easements grant an affirmative right to the holder to make some limited use of land owned by another.

**Erosion:** The loosening and transportation of rock and soil debris by wind, rain, or running water, ice or gravity.

**FEMA:** Federal Emergency Management Agency

**Flood, 100-year:** The magnitude of a flood expected to occur on the average every 100 years, based on historical data. The 100-year flood has a 1/100, or one percent, chance of occurring in any given year.

**Floodplain:** The land area on either side of the banks of a stream subject to flooding. That part of the floodplain subject to a one percent chance of flooding in any given year is designated as an "area of special flood hazard" by FEMA.

**Floodway:** The channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the "base flood" without cumulatively increasing the water surface elevation more than one foot.

**GIS:** Geographic Information System

**GMI: Gross Monthly Income**

**GOCO:** Great Outdoors Colorado

**Goal:** Description of a desired state of affairs for the community in the future. Goals are the broad public purposes toward which policies and programs are directed. Generally, more than one set of actions (policies) could be taken to achieve each goal. In this plan, goals are phrased to express the desired results of the plan. They complete the sentence, "Our goal is ...".

**Growth Management:** A wide range of techniques in combination to determine the amount, type, and rate of growth, and to direct it toward designated areas. Comprehensive or master plans often form the backbone of the system. Techniques used to execute growth management policies may include zoning, capital improvements, public facilities plans and regulations, urban growth boundaries, population ceilings, impact fees, phased growth boundaries, adequate facilities ordinances (concurrency), etc.

**Guidelines:** General statements of policy direction around which specific details may be later established.

**HOA:** Homeowners Association

**Habitat:** The sum of environmental conditions in a specific place that is occupied by an organism, population or community.

**Hazardous Material:** Any substance that, because of its quantity, concentration, physical or chemical characteristics, poses a significant present or potential hazard to human health and safety or to the workplace or the environment. The term includes, but is not limited to, hazardous substances and hazardous wastes.

**Historic, Historical:** An historic building or site is one that is noteworthy for its significance in local, state, or national history or culture, its architecture or design, or its works of art, memorabilia, or artifacts.

**Household:** All those persons, related or unrelated, who occupy a single housing unit.

**IGA:** Intergovernmental Agreement

**ISTEA:** Intermodal Surface Transportation Efficiency Act

**Impact:** The effect of any direct man-made actions or indirect repercussions of man-made actions on existing physical, social, or economic conditions.

BLM_0057566

**Impact Fee:** A fee, sometimes called a development fee, levied on the developer of a project by a local government as compensation for otherwise unmitigated impacts the project will produce.

**Impervious Surface:** Any material that prevents absorption of water into the ground, such as roof, road, sidewalk, and paved parking lot.

**Infrastructure:** Public services and facilities needed to sustain industry, residential, commercial, and all other activities. Infrastructure includes sewage disposal systems, water supply systems, other utility systems, and roads.

**Intergovernmental Agreement (IGA):** A document binding two or more governmental units or agencies to act in certain cooperative ways. The term is most often used in a planning context referring to shared or delegated responsibility to review development proposals and/or recognize adopted plans and policies of the governmental units or agencies (e.g., Mesa County and the City of Grand Junction have an IGA which requires each entity to provide materials on development proposals within certain geographic areas for the other entity to review and comment upon).

**Issues:** Points of debate, discussion or dispute in the community that are identified in the plan and dealt with by the plan's goals, policies and strategies.

**LPS: Land Preservation Subdivision**

**Landscaping:** Plantings (e.g., trees, shrubs, and ground covers) and/or the placement of decorative features (e.g., sculpture, patterned walks, fountains and pools) suitably designed, selected, installed, and maintained to permanently enhance a site or roadway permanently.

**Land Use:** A description of how land is occupied or utilized.

**Land Use Plan:** A graphic and written analysis of a desirable and feasible pattern or alternative patterns indicating the general location, character, extent and relationship of future land uses at specified times. The plan is based on the goals and objectives of the community and upon necessary research.

**MAPA: Mesa Area Planning Association**

**MALT: Marin Agricultural Land Trust**

**MCEDC:** Mesa County Economic Development Council

**MF:** Multi-Family (Residential)

**MOU:** Memoranda of Understanding (between local/state/federal agencies)

**MPO:** Metropolitan Planning Organization

**MSCS:** Mesa Countywide Steering Committee

**Mixed Use:** Properties on which various uses such as office, commercial, institutional, and residential are combined in a single building or on a single site in an integrated development project with significant functional interrelationships and a coherent physical design. A single site may include contiguous properties.

BLM_0057567

**NFS:** (U.S.) National Forest Service

**NPS:** (U.S.) National Park Service

**NRCS:** Natural Resources Conservation Services (formerly SCS)

**ODP:** Official Development Plan

**Open Space Land:** Any parcel or area of land or water that is essentially unimproved and devoted to an open space use for the purposes of the preservation of natural resources, outdoor recreation (active open space), or public health and safety. Land used for the managed production of resources (e.g., farming, ranching, mining, etc.) is not considered open space.

**PUD:** Planned Unit Development

**Parcel:** A lot, tract, or contiguous group of properties, in single ownership or under single control, usually considered a unit for purposes of development.

**Park:** A tract of land designated and used by the public for active and passive recreation.

**Plan:** (verb) The act of mental formulation and graphic representation of the means to reach a desired end. The act of preparing a land use plan (community input, research and analysis).

**Planned Development or Planned Unit Development:** A regulatory technique used as an option to traditional zoning district regulations which require the developer to commit to a certain site development in exchange for more flexible development regulations. For instance, local government may permit a mixed-use planned development if the developer commits to a certain arrangement of buildings, uses and amenities.

**Police Power:** The right of the government to regulate personal conduct and the use of land in order to protect the public health, safety, and welfare as provided in the state constitution.

**Policy:** Statements of government intent against which individual actions and decisions are evaluated. Policies are phrased as sentences, with the agency responsible for implementing the policy clearly identified. Where appropriate, these policies also include quantifiable objectives which will assist the county in evaluating the effectiveness of implementation efforts.

**Pollutant:** Any introduced gas, liquid, or solid that, in sufficient concentrations, will make a resource unfit for its normal or usual purpose.

**Pollution:** The presence of matter or energy whose nature, location, or quantity produces undesired environmental effects.

**Pro Rata:** In due proportion. This refers to the proportionate distribution of something to something else or to some group such as the cost of infrastructure improvements associated with new development apportioned to the users of the infrastructure on the basis of projected use.

**ROW:** Right-of-Way

**Recycle:** The process of extraction and reuse of materials from waste products.

BLM_0057568

**Regional:** Pertaining to activities or economies at a scale greater than that of a single jurisdiction and affecting a broad geographic area.

**Residential:** Land designated for buildings consisting only of dwelling units. May be improved, vacant, or unimproved.

**Rezoning:** An amendment to the map and/or text of a zoning ordinance or resolution to effect a change in the nature, density, or intensity of uses allowed in a zoning district and/or on a designated parcel or land area.

**Right-of-way:** A strip of land occupied or intended to be occupied by certain transportation and public use facilities such as roadways, railroads and utility lines.

**Runoff:** That portion of rain or snow that does not percolate into the ground and is discharged, instead, into streams.

**Rural Area:** A sparsely developed area with low population density where the land is primarily undeveloped or used for agricultural purposes.

**SCS:** Soil Conservation Service (see also NRCS)

**SFA:** Single Family, Attached (Residential Unit)

**SFD:** Single Family, Detached (Residential Unit)

**SFS: (Colorado) State Forest Service**

**School District:** A district that serves as a unit for state financing and administration of elementary and secondary public schools.

**Sign:** Any representation, either written or pictorial, used to convey information or to identify, announce, or otherwise direct attention to a business, profession, commodity, service, or entertainment, and placed on, suspended from, or in any way attached to any structure, vehicle, or feature of the natural or man-made landscape.

**Site:**    A parcel of land used or intended for one use or a group of uses.

**Slope:** Land gradient described as the vertical rise divided by the horizontal run and expressed as a percentage.

**Soil:** The unconsolidated material on the immediate surface of the earth created by natural forces that serves as the natural medium for growing land plants.

**Special District:** Municipal corporation created by state statute and endowed with a definite governmental organization and revenue raising authority for the purpose of performing a single function or a few related functions (e.g., sanitation collection and/or treatment, domestic water service, parks, road maintenance, fire protection, etc.).

**Sprawl:** Uncontrolled growth, usually of a low density nature, in previously rural areas and some distance from existing development and infrastructure.

BLM_0057569

**Storm Runoff:**  Surplus surface water generated by precipitation that does not seep into the earth but flows overland to flowing or stagnant bodies of water.

**Street/Road/Highway:**  A public way for purposes of vehicular travel, including the entire area within the right-of-way.  In rural areas, or in urban areas where there is comparatively little access and egress, a way between prominent termini is usually called a highway or road.  A way in an urban area, with or without provisions for curbs, sidewalks, and paved gutters, is ordinarily called a street.

**Subdivision:**  A division of a lot, tract, or parcel of land into two or more parts for the purpose of sale or building development.

**TDR:** Transferable Development Rights

**Transferable Development Rights (TDR):**  A technique to direct growth which involves the transfer of zoning density or development rights from one building site to another.  This requires a sending district (where lower densities and less development is desired) and receiving zones (where higher densities and more development is desired).

**Transit, Public:**  A system of regularly scheduled buses, other vehicles, and/or trains available to the public on a fee-per-ride basis (aka mass transit).

**Transportation Demand Management (TDM):**  A strategy for reducing the demand on roads by reducing the number of vehicles using roadways and/or increasing the number of persons per vehicle.  TDM attempts to reduce the number of persons driving alone on the roadway during the commute period and increase the number in car pools, van pools, buses, trains, walking, and biking.

**Trip:**  A one-way journey that proceeds from an origin to a destination via a single mode of transportation; the smallest unit of movement considered in transportation studies.  Each trip has one "production end," (the origin is often from home, but not always), and one "attraction end," (the destination).

**Trip Generation:**  The dynamics that account for people making trips in automobiles or by means of public transportation.  Trip generation is the basis for estimating the level of use for a transportation system and the impact of additional development or transportation facilities on an existing, local transportation system.  Trip generations of households are correlated with destinations that attract household members for specific purposes.

**201 Boundary:**  The geographic  boundaries established as the study area for a wastewater treatment facility under section 201 of the Clean Water Act.

**UBC:** Uniform Building Code

**UCC:** Utility Coordinating Committee

**UGB:** Urban Growth Boundary

**USDA:** U.S. Department of Agriculture

**USGS:** U.S. Geological Survey

BLM_0057570

**Undevelopable:**  Specific areas where hydrologic, topographic, geologic, and/or surficial soil conditions indicate a significant danger to future occupants and a potential public liability.

**Urban Area:**  A highly developed area that includes or is appurtenant to a central city or place and contains a variety of commercial, residential, and cultural uses.

**Use:**  The purpose for which a lot or structure is or may be leased, occupied, maintained, arranged, designed, intended, constructed, erected, moved, altered, and/or enlarged in accordance with the zoning resolution and plan's future land use categories.

**Vacant:**  Lands or buildings that are not actively used for any purpose.

**Watercourse:**  Natural or once natural flowing (perennially or intermittently) water (e.g., rivers, streams, and creeks).  Includes natural waterways that have been channelized but does not include man-made channels, ditches, or underground drainage and sewage systems.

**Zoning:**  The delineation of districts and the establishment of regulations governing the use, placement, spacing, and size of land and buildings.

BLM_0057571



# Mesa Countywide Land Use Plan

### From Issues to Action

## October 1996
#### Amended 1999, 2000, 2003, 2006

BLM_0057572

# CHAPTER FOUR
# RURUAL PLANNING AREA
# FUTURE LAND USE PLAN

## GOALS, POLICIES AND IMPLEMENTATION

Mesa Countywide Land Use Plan
From Issues to Action
Updated February 2, 2006

**RESOLUTION NO. MCPC 2005-04**
Mesa County Planning File No. **2005- 060   MP1**

ADOPTION OF AN UPDATE OF THE RURAL PLANNING AREA FUTURE LAND
USE PLAN, CHAPTER 4 OF THE MESA COUNTYWIDE LAND USE PLAN,
AN ELEMENT OF THE MESA COUNTY MASTER PLAN
AND
CERTIFICATION OF THE MASTER PLAN AMENDMENT
TO THE BOARD OF MESA COUNTY COMMISSIONERS

      **WHEREAS**, the Mesa County Planning Commission is charged with the duty to prepare and adopt master plans for the County:

      **WHEREAS**, the Mesa County Planning Commission held public hearings on the proposed Update of the Rural Planning Area Future Land Use Plan on 3 November 2005, 19 January 2006, and 2 February 2006 after proper notice;

      **WHEREAS**, the Mesa County Planning staff made recommendations for approval of the proposed Update of the Rural Planning Area Future Land Use Plan in a Project Review dated January 9, 2006 updated February 2, 2006;

**WHEREAS, NOW THEREFORE, THE MESA COUNTY PLANNING COMMISSION FINDS**, that:

1.    the proposed Update of the Rural Planning Area Future Land Use Plan is consistent with the overall intent of the Mesa County Master Plan;

2.    the proposed Update of the Rural Planning Area Future Land Use Plan is consistent with the approval criteria found in Section 3.2.8 of the Mesa County Land Development Code as identified in the Project Review dated January 9, 2006 and updated February 2, 2006 project number 2005-060 MP1.

**NOW THEREFORE, BE IT RESOLVED BY THE MESA COUNTY PLANNING COMMISSION**, that:

1.    the Update of the Rural Planning Area Future Land Use Plan is hereby adopted (attached "Exhibit A"), as approved in the 2 February 2006 Mesa County public hearing as part of the Mesa County Master Plan, replacing Chapter 4 of the Mesa Countywide Land Use Plan in accordance with Section 30-28-108 of the *Colorado Revised Statutes*;

2.    the Mesa County Planning Commission hereby certifies the Update of the Rural Planning Area Future Land Use Plan to the Board of County Commissioners of Mesa County pursuant to Section 30-28-109 of the *Colorado Revised Statutes*.

**PASSED AND ADOPTED**   this 2nd day of February, 2006.

_____     _____
Chairman                                Secretary
Mesa County Planning Commission     Mesa County Planning Commission

BLM_0057574

## ACKNOWLEDGMENTS

Sincere thanks to all Mesa County residents who participated in the 2005-2006 update of the Rural Area Master Plan.

### MESA COUNTY PLANNING COMMISSION

**Bruce Kresin, Chairman, Mark Bonella, Vice Chairman, Terri Binder, Secretary, Bruce Noble - Mike Gardner - John Dempsey, George Domet**
*Alternate Members:* John Justman - Kristy Flynn – Tom Kenyon

### MESA COUNTY BOARD OF COUNTY COMMISSIONERS
Tilman Bishop, Chairman - Janet Rowland - Craig Meis
Jon Peacock – County Administrator

### TECHNICAL ADVISORY GROUP
Ellen Mayo - Curtis Swift - Ed Fink - Harry Talbot - Jack McKelvy - Jude Sirota - Mike Perry
Rudy Bevin - John Ballagh - Bob Gobbo - Vohnnie Pearson - Dean Riggs - Dale Tooker –
Jane Ross - David Ludlam  - Dennis Pretti - Stephanie Schmid - Dave Mannel - Dave Reinertsen
Kathy Hall - Larry Rasmussen - Chris Brubaker - David Thornton - Mark Rogers - Perry Rupp
Tom Kirkpatrick - Dave Gitchell - Reeves Brown – Richard Proctor - Bob Levine - Bob Crabb
Jim Holton - Charlie Gunther - Jim Armstrong - Nick Marx - Phil Bertrand - Rick Beaty –
Rob Blieberg - Rob Talbot - Steve Moore -Tom Dixon – Andy Windsor – Carlyle Currier

### MESA COUNTY STAFF
Kurt Larsen, AICP, Director, Department of Planning and Economic Development
Keith B. Fife, AICP, Director, Long Range Planning Division
Michael Warren, AICP, Senior Planner
Linda Dannenberger, AICP, Director, Land Use and Development Division
Jim Komatinsky, Senior Planner
Jim Hinderaker, Planning Services Manager
Kristy Pauley, Clerk to the Planning Commission
Bonnie Brunner, Senior Planner
Christie Barton, Senior Planner
Dahna Raugh AICP, Senior Planner
Doug Riley, Senior Planner
Steve Kollar, Planner 1
JoDee Relph, Office Manger, Department of Planning and Economic Development
Louise Thornburg, Administrative Specialist
Dean Goebel, Environmental Health Department
Tom Fisher, Director, Regional Transportation Planning Office
Ken Simms, Regional Transportation Planner
Pete Baier, Public Works Director
Mike Meininger, Engineering Director
Julie Constan, Staff Engineer
Bill Gardner, Undersheriff
Jude Sirota, Weed and Pest Control Manger
Rudy Bevin, Road and Bridge Department

BLM_0057575

**RURAL PLANNING AREA FUTURE LAND USE PLAN**
**GOALS, POLICIES AND IMPLEMENTATION**
**TABLE OF CONTENTS**

INTRODUCTION AND PURPOSE ................................................................................ 4
Land Use and Growth Management ............................................................................. 6
    Goal 1: To protect the rural character of individual areas of Mesa County as identified
    in the Master Plan including the Community and Area Plans. ................................... 6
        Policies: ................................................................................................................ 6
        Implementation: .................................................................................................... 7
    Goal 2: To recognize and support the continued development of existing communities as
    growth areas. ............................................................................................................ 7
        Policies: ................................................................................................................ 7
        Implementation: .................................................................................................... 7
    Goal 3: Establish land use classifications to implement the goals and policies of the
    Master Plan ............................................................................................................... 7
        Policies: ................................................................................................................ 7
            3.1      Land Use Classifications ......................................................................... 7
        Implementation: .................................................................................................... 8
            A.  Rural Community – ................................................................................... 8
            B. Residential Single Family - Estate (RSF-E) ............................................ 10
            C.  Urban/Residential Reserve 5 (U/RR5) (5 Acre Average Lot Size) ......... 11
            D. Rural/Residential 5 (R/R5) (5 Acre Average Lot Size) ........................... 13
            E. Fruita 201-10 (10 Acre minimum lot size) .............................................. 13
            F.  EOM 10  - (10 Acre Minimum Lot Size) ................................................. 14
            G.  Rural/Agricultural 10 – (R/A10) (10 Acre Average Lot Size) ............... 15
            H.  Rural/Agricultural  17 A  - (17 Acre Average Lot Size) ......................... 16
            I.   Rural/Agricultural 20 NB  - (20 Acre Average Lot Size) - No Bonus ..... 17
            J.   Rural/Agricultural 35+ A (35 Acre Average Lot Size) ........................... 18
            K.  Large Lot Rural/Agricultural 35+ (35 Acre Minimum Lot Size) .......... 19
            L.  Buffer (Cooperative Planning Area) ...................................................... 21
            FUTURE LAND USE CLASSIFICATION SUMMARY ................................ 22
            3.2      Incentive Based Density (Density by Design) ........................................ 23
            3.3      SUMMARY Incentive Based Density ..................................................... 24
    Goal 1: To protect and maintain the unique rural features and characteristics which are
    significant links to the past, present, and future. .................................................... 25
        Policy: ................................................................................................................. 25
        Implementation: .................................................................................................. 25
    Goal 2: Future development shall be designed to complement or create appropriate
    community features such as roads, trails, open space and building patterns, while
    respecting the unique sense of existing community that distinguishes one area from
    another. ................................................................................................................... 25
        Policies: ............................................................................................................... 25
Agriculture ............................................................................................................... 26
    Goal 1: Conservation of agricultural and range lands capable of productive use. ........ 26
        Policies: ............................................................................................................... 26
        Implementation: .................................................................................................. 26
Conservation and Environment ................................................................................ 28
    Goal 1: To protect, conserve and efficiently manage the county's public lands. ............. 28
        Policies: ............................................................................................................... 28
        Implementation: .................................................................................................. 28

BLM_0057576

**Goal 2: To conserve sustainable ecosystems.** ................................................. 28
    **Policies:** ......................................................................................... 28
    **Implementation:** ............................................................................. 28
**Goal 3: To preserve public access to public lands.** ......................................... 28
    **Policies:** ......................................................................................... 28
    **Implementation:** ............................................................................. 28
**Goal 4: To protect the citizens of Mesa County from the effects of man-made or natural hazards (geologic, avalanches, earthquakes, soils, floodplains, air pollution, odor, noise, and wildfire).** ..................................................................... 29
    **Policies:** ......................................................................................... 29
    **Implementation:** ............................................................................. 29
**Goal 5: To maintain or improve the quality of air, water and land resources.** ......... 30
    **Policies:** ......................................................................................... 30
    **Implementation:** ............................................................................. 30
**Open Lands and Trails** ............................................................................... **31**
**Goal 1: To protect important open lands within Mesa County.** ........................ 31
    **Policies:** ......................................................................................... 31
    **Implementation:** ............................................................................. 31
**Goal 2: Protect important wildlife habitats.** ................................................... 31
    **Policies:** ......................................................................................... 31
    **Implementation:** ............................................................................. 32
**Goal 3: To assure that open land is recognized as a limited and valuable resource which must be conserved wherever possible.** ......................................... 32
    **Policies:** ......................................................................................... 32
    **Implementation:** ............................................................................. 32
**Goal 4:  To identify and protect existing and future major trail linkages and intersections in the county.** ......................................................................... 32
    **Policies:** ......................................................................................... 32
    **Implementation:** ............................................................................. 33
**Parks and Recreation** ................................................................................ **34**
**Goal PR 1: Provision of adequate lands to meet the parks and recreation needs of the residents of Mesa County.** ................................................................... 34
    See  Board of  County Commissioner's Parks Policy .......................... 34
    **Implementation:** ............................................................................. 34
**Community Services/Facilities & Intergovernmental Coordination** ................... **35**
**Goal 1: To maximize the efficient use of public resources.** ............................. 35
    **Policies:** ......................................................................................... 35
    1.1    New development shall be compatible with existing land uses ............... 35
    **Implementation:** ............................................................................. 35
**Goal  2: To minimize public costs for private development.** ............................ 35
    **Policies:** ......................................................................................... 35
    **Implementation:** ............................................................................. 36
**Goal 3: To ensure that future development occurs in an orderly fashion, avoiding and minimizing non-contiguous, scattered development throughout the county.** ......... 36
    **Policies:** ......................................................................................... 36
    **Implementation:** ............................................................................. 36
**Goal 4: To maximize the capability of the County, its municipalities, and other government agencies to make collaborative land use decisions in areas of mutual concern and/or influence.** ......................................................................... 36
    **Policies:** ......................................................................................... 36
    **Implementation:** ............................................................................. 37
**Community/Area Plans** ............................................................................. **38**

BLM_0057577

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

General Policies:.................................................................................................... 38

1.1 .... New development must be compatible with existing land uses and consistent with goals, policies, and implementation items depicted in Area plans.................................................... 38

**FUTURE LAND USE MAPS.......................................................................................... 39**

BLM_0057578

# INTRODUCTION AND PURPOSE

The Rural Planning Area Future Land Use Plan, Chapter 4 of the Mesa Countywide Land Use Plan, was adopted by the Mesa County Planning Commission in 1996. This plan was intended to provide guidance for land development for a maximum of 15 years (about 2010). Many of the goals and policies identified in this plan have been implemented over the past 10 years. However, since the adoption of the 1996 plan, development pressure, changing situations, and identified issues and conflicts in land development strongly suggested that a plan update was needed. The Plan recommends updates every five to seven years to reflect changing conditions and trends.

## Purpose of 2005 Rural Master Plan Update

Mesa County has experienced steady growth over the past 10 years. Significant development activity has occurred both in areas previously anticipated for development, such as areas adjacent to the cities of Grand Junction and Fruita; and in outlying rural and agricultural areas and rural communities where limited development was anticipated in the past. Some of the major issues which were reviewed in preparing this updated plan are summarized below:

• The Rural Future Land Use Classification (implemented through the AFT zone district) does not provide a predictable, compatible or consistent density pattern for new development.

• The Rural Communities of Mesa, Mack, Powderhorn and most recently Gateway, have established public sewer systems and are now experiencing significant urban development. Whitewater is one of the fastest growing areas of Mesa County, and with the possibility of having public sewer system in the near future, has the potential to significantly change the character of the community and adjacent rural areas.

• Public sewer service may need to be expanded into many areas adjacent to the existing municipalities and Urban Growth Boundaries eventually to accommodate anticipated growth. Land uses and development patterns in these areas which could be detrimental to future redevelopment at urban densities (when public sewer service is available) are a concern.

• The agricultural economy is transitioning in many areas of the County from production to recreation and lifestyle oriented development. Many previously agricultural areas in the Mid and Lower Valley are in transition to other land uses including suburban, estate, and rural residential uses.

• The conversion of agricultural land to other uses is widespread in the Mid and Lower Valley.

• Farmlands surrounding the City of Fruita and the Lower Valley Area are experiencing a high percentage of the new residential development in the County. This development has the potential to significantly impact the ability to provide adequate public services and may incur large investments of public funds to upgrade roads and infrastructure.

• East Orchard Mesa and areas surrounding the Town of Palisade are increasingly being recognized as having statewide significance for its soils, micro-climate and ability to produce vineyards and orchards crops. Maintaining appropriate parcel sizes to allow for economically viable agricultural operations in this area is a concern.

BLM_0057579

- Capital Improvements Programs are increasingly needed to be coordinated with the Master Plan.

- New development located considerable distances from existing communities typically increases the costs of providing services. Inefficient development could result in reduced services and/or increased taxes.

- Policies and Intergovernmental Agreements (IGAs) have been finalized since the adoption of the 1996 Master Plan, such as the Cooperative Planning Areas (Buffers) between Grand Junction and Fruita and Palisade, which need to be integrated into the overall Master Plan.

- Incentives are insufficient or lacking to promote good development practices.

- Land use applications, such as conditional use permits, have allowed uses not consistent with the Master Plan.

- Master Plan recommendations and zoning districts are not consistent in some areas.

- New development will require a higher level of planning and coordination with all municipalities and service providers to address impacts. Actively maintaining and updating the Plan directs conservation of its social, economic, and natural resources for change in a manner consistent with community desires.

- Energy development has the potential to impact many areas at levels not previously anticipated.

**Summary of Major Changes**

The 2005 update of the 1996 Rural Planning Area Future Land Use Plan has been developed with substantial community input and represents a year-long planning process. The changes in this updated plan are designed to address issues identified in the review of this plan summarized above and to reflect comments received from the public participation process.

The 2005 update of the 1996 Rural Planning Area Future Land Use Plan depicts a direction for future land use patterns. As opportunities arise in the County to guide and direct land use changes (through plan amendments, Code amendments/implementation, and zone changes), the Plan will serve as a resource to the public, staff, and decision-makers. Major changes from the 1996 Plan include:

- Additional Future Land Use classifications are recommended that specifically reflects the localized changes occurring in the rural planning area. The classifications depict an orderly transition in land uses from most intense (the Rural Communities) to large tracts of farm and ranchland (Large Lot Rural/Ag 35+ acre classifications). These classifications also generally reflect graduated reductions in density (intensity of land use) based on increased distance from urban services.
- Recommendations to amend the Land Development Code to require all land use approvals to be consistent with the Master Plan.

BLM_0057580

- Establishment of predictable densities in all areas of the County. Densities should be consistent with available infrastructure and good planning as identified in the Master Plan. The availability of all required services (including transportation, roads, water, fire protection, emergency services, schools, and medical facilities) and cost of providing services to accommodate growth is a major consideration in establishing densities.

- Coordinate Capital Improvements Programming with the planning process to ensure maximum efficiency in the use of public funds.

- Areas where public sewer service and urban development are anticipated to be expanded within the planning horizon are to be protected from premature development which would be detrimental and inefficient to future development at urban densities. An Urban Residential Reserve future land use classification accomplishes these goals while still allowing development prior to the construction of urban services.

- A new land use category for the East Orchard Mesa Area which recognizes the importance of and continued use of the area for fruit and vineyard production by requiring a 10-acre minimum lot size for new development.

- An incentive based density (Density by Design) policy has been added to allow additional densities for properties under development utilizing good design, upgraded services, minimal impacts to agriculture and public lands, and promoting the public good.

- A general pattern of less density as the distance from existing rural and urban communities increases is reflected in the Future Land Use classifications.

- Coordinate planning and develop Intergovernmental Agreements for land uses and development between Mesa County and all municipalities to minimize conflicts and to provide predictable densities and design criteria for all development applications within urban growth boundaries (201 sewer service boundaries) and areas of influence which may be annexed by a municipality in the future.

- Policy and implementation item statements have been rewritten so that they are clear as to intent.

- Suggests the County establish major utility corridors policies in areas impacted by energy development to minimize conflicts with landowners and adjacent land uses.

## Land Use and Growth Management
**Goal 1: To protect the rural character of individual areas of Mesa County as identified in the Master Plan including the Community and Area Plans.**

Policies:
1.1   New residential development shall be compatible with existing land uses.

1.2   Maintain buffers between municipalities, public lands and communities to preserve the distinct identity/character of each community.

BLM_0057581

**Implementation:**

1.1   Approve development applications only if consistent with the Master Plan. (Implemented through the Land Development Code)

1.2   Establish desired land uses, design standards, and public improvements in buffer areas between municipalities, public land, and communities. (Intergovernmental Agreements, Development Code)

1.3   Continue to update area and community plans to accurately reflect the character of these areas as they change.

**Goal 2: To recognize and support the continued development of existing communities as growth areas.**

Policies:

2.1   Future urban growth will be focused within existing urban and rural communities as identified in adopted Community and Area Plans.

2.2   A suitable supply of commercial land shall be identified within rural communities.

**Implementation:**

2.1   Direct the expenditure of capital improvements and new development to existing growth centers. (Capital Improvements Plan, Intergovernmental Agreements)

2.2   Enter intergovernmental agreements with the County's municipalities to jointly plan for areas of joint concern – generally the statutory municipal 3 mile area of influence.

**Goal 3: Establish land use classifications to implement the goals and policies of the Master Plan**

Policies:

3.1   Land Use Classifications

Intent

1. Establish land use categories that identify potential development density based on existing conditions while anticipating future development that will best serve the community.

2. To be consistent with adopted Community and Area Plans and maintain rural character[1] of each of the unique areas identified by the Future Land Use Classifications.

3. Guide the development and update of Community and Area Plans.

4. Support development which is consistent with surrounding areas within the Future Land Use Classification.

---

[1] Rural Character is different in each of the Future Land Use Classifications. Descriptions of rural character is described in each future land use classification based on existing conditions at the time the plan was updated in 2005 and extensive community input.

BLM_0057582

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Implementation:**

3.1 Adopt provisions requiring decisions about the type and intensity of land uses to be consistent with the Master Plan. (Development Code)

3.2 Adopt overlay districts, and design criteria/guidelines specifically for geographic areas described in the Future Land Use Classification definitions (in particular the Urban/ Residential Reserve 5 FLU classification). (Development Code).

3.3 These Future Land Use Classifications and the associated Future Land Use Map will be reviewed and updated at least every 7 years by the Mesa County Planning Commission to respond to changed conditions and trends.

**Future Land Use Classification Definitions**

**A. Rural Community –**

Generally, Rural Communities are early settlement town sites with existing development patterns that serve as the community and civic centers for the area. These communities should be recognized as unique in character with their needs addressed in the respective community plans.

Transferable Development Rights/Credits
*The Mesa County Land Development Code* identifies that portion of the rural planning area of the county that is within the AFT and AF-35 zoning districts and not located within the rural communities as the general sending area for transferable development rights. The six Rural Communities of Gateway, Loma, Mack, Mesa, Powderhorn, and Whitewater are designated as general receiving areas; however, as of 2005, only the Mack Rural Community has a specified, mapped, corresponding sending area. The unique characteristics and service capabilities of each Rural Community need to be evaluated to determine whether the area should be a designated receiving area for transferable development rights.

Specifically, the Rural Communities are:

**GATEWAY**
The Gateway Rural Community is comprised of two sub-planning areas. Together they total about 2115 acres or about 3.3 square miles. The total acreage in the "A" area is about 279 acres which is a relatively small area; the distance from the Wayside Chapel to the Colorado Department of Transportation Road Shop near the Dolores River is only 1100 feet or about 3 city blocks long; its width varies but is not more then 2 blocks wide at its widest location. Area "A" is serviceable by a gravity sewer system and will be the first to be served by a sewer system being built (2005). It is not served by a community water system. Area "A" contains numerous small non conforming lots, and long standing, small residential structures.

The area surrounding the core community in Area "B" is approximately 1,836 acres or about 2.8 square miles. This area will be served by sewer when collection pipes and lift stations are economically feasible. This area is not served by a community water system. Area "B" contains a mixture of large and small lots, mixed land uses, housing size and age, and zoning.

IV-8

BLM_0057583

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

Transferable Development Rights/Credits
There is no specific program in place to transfer development rights into Gateway.

## LOMA
The Rural Community is about 160 acres or ¼ square mile.  It contains numerous small,
non-conforming lots, vacated right-of-way sections, and platted lots from the early 1900s.
The area around the community includes low density/rural neighborhoods.

Transferable Development Rights/Credits
There is no specific program in place to transfer development rights into Loma.

## MACK
The Rural Community of Mack totals about 595 acres and is comprised of two tiers.
Tier 1 is 104 acres and is designated for the downtown core area of Mack where small
lots and a mix of zone classifications occur.  All of Tier 1 is served by an existing sewer
system that was built in 1978.  Domestic water service is provided by Ute Water.  The
intent of this tier is to allow and promote a mix of business, commercial, and residential
uses.  Streetscape standards are designed to allow these types of uses on the small lots
located in the center of Mack.

Tier 2 is 401 acres and is designed to accommodate a mix of business, commercial, and
residential uses for those areas outside the downtown core of Mack (Tier 1) which are
better suited to less intensive uses where urban type development can occur.  Parts of Tier
2 are served by an existing sewer system that was built in 1978.  Domestic water service
is provided by Ute Water.  Lots in this area are typically larger than what would be found
in Tier 1, but still within the Mack Core Area (Rural Community).

Transferable Development Rights/Credits
As stated in the *Mesa County Land Development Code*, Tier 2 is designated as a
receiving area for transferable development rights/credits.  The sending area is also
designated in the Land Development Code as that area within the Ag 35+ acre Future
Land Use Classification north of the Colorado River in the Lower Valley, generally north
and west of the Fruita/Grand Junction/Mesa County Cooperative Planning Area.

## MESA
The Mesa Rural Community is about 1460 acres or 2.2 sq miles in size.  Part of it is
served by the Mesa Water and Sanitation District.  The district is in need of upgrades to
its treatment facilities and infrastructure.  The district provides domestic water and sewer
service to 336 acres in the rural community.   The area contains numerous small, non
conforming lots.  The Village of Mesa Overlay zone district in the *Mesa County Land
Development Code* implements the Mesa Rural Community designation in the
Mesa/Powderhorn Plan and allows mixed uses.

Transferable Development Rights/Credits
There is no program in place to specific transfer development rights into Mesa.

IV-9

**POWDERHORN**
The Rural Community of Powderhorn encompasses about 2381 acres or 3.7 sq miles.
Approximately 800 acres of the Rural Community has sewer and domestic water service
provided by the Powderhorn Metropolitan District.  The district was established in the
1980s and has limited expansion capabilities.  The community contains numerous small
lots, condos, and commercial/business associated with the Powderhorn Ski Area.

Transferable Development Rights/Credits
There is no program in place to specific transfer development rights into Powderhorn.

**WHITEWATER**
The Whitewater Rural Community is about two square miles and contains numerous
small, non-conforming lots.  The early settlement Whitewater town site is the center of
the community.  Domestic water is provided by Clifton Water; however, there is no
sewer service in the area.

**Sending/Receiving Area**
There is no program in place to transfer development rights into Whitewater.  This area
should be further studied in the Whitewater Community Plan update in 2006.

**B. Residential Single Family - Estate (RSF-E)**

**Intent and Applicability**
The Residential Single Family - Estate density classification is intended to accommodate
low-density, estate type development on lots of at least 2 acres.  This classification is
applicable to the areas depicted on the 2006 Future Land Use Map,   including the area
from 25½ to 26 Road and I½ to I Road but excluding the Joint Urban Planning Area.
Also, areas in the Rural Communities (as specified in their respective area plans) may be
appropriate for this designation.

**Considerations**
The character of these areas of the County is large lot residential development.  This
classification is not necessarily appropriate adjacent to urban areas since the lot size does
not allow for future redevelopment.

The minimum parcel size eligible for major subdivision in this classification is 4 acres.

**Implementation**
- Update the RSF-E zone district to be consistent with the revised and amended
  Future Land Use Map.
- New development must meet the zone district standards and Master Plan policies.
- A density bonus is not permitted in this classification.

BLM_0057585

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

Residential Single Family Estate Future Land Use Classification

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| RSF - E | 2-5 (4) | None (N/A) | 2 | 5 | N/A | N/A |

## C. Urban/Residential Reserve 5 (U/RR5) (5 Acre Average Lot Size)

**Intent and Applicability**

The Urban/Residential Reserve 5 (five) Land Use Classification is intended to be applied to areas where there is potential in the future for public sewer to be extended (in the reasonable foreseeable future). Maximum rural densities can be achieved today and the allowance for urban development is provided for the future. New development has a mandatory reserve of 40% of the site so as to permit redevelopment when urban infrastructure/services (sewer, water for fire flow, roads that include pedestrian and bicycle facilities, increased traffic circulation, etc.) become available. Further, it requires a subdivision design and an open land reservation that will result in an overall project (including the residual lot) configuration that will reinforce its future redevelopment potential. The cumulative impact of the undeveloped reserved land will result in benefits to the community with respect to circulation and access and other public infrastructure requirements as the area population and density increases.

The density of this classification is applicable to the areas depicted on the 2006 Future Land Use Map.

**Considerations**

The character of these areas of the County is transitioning from farm and rural residential to urban residential uses. The areas are generally close to or adjacent to urban areas/centers. They do not have a public sewer system presently, but the intent of the classification is to allow sewer service to expand to these areas in the future. The roads are not currently designed or built to urban classifications and standards but will be required to be built as such to accommodate urbanization. Land owners are able to develop properties under this classification at the full rural density, and in addition, are allowed to develop the reserve area at full urban density when sewer service is available.

*Structure Grouping*: In the U/RR 5 Future Land Use Classification, non-agricultural development shall be grouped to retain the maximum amount of contiguous land in agricultural production or available for future agricultural/residential use. Homes, roads, residential support facilities, and other non-agricultural development, will be grouped on no more than sixty percent of the gross acreage of the parent parcel, with the remaining acreage retained in agricultural production and/or open land until sewer service is available and redevelopment is anticipated.

BLM_0057586

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

Development in the Urban/Residential Reserve 5 areas must conform to the Road Access Policy including all adopted circulation maps and adopted transportation plans. This shall include planning and design of road/streets to serve the future urban density developments on the reserved lands including access standards and road/street construction. In most cases this will preclude the ability to use shared driveways for access to the initial development. It will also require that road/street design and construction conform to urban standards and be completed to the limits of the developed area.

The reserve area is to be designed to avoid significant diminution of the existing or potential agricultural use of the land. Extensive grading is not consistent with the natural topography of the site, removal of significant vegetation, and degradation of the natural visual qualities of the site. Proposed development shall also be sited to minimize impacts on scenic resources, wildlife habitat and streams, and adjacent agricultural operations and infrastructure.

The minimum parcel size eligible for major subdivision in this classification is 10 acres.

**Implementation**
- New development must meet the zone district standards and Master Plan policies.
- Adopt specific subdivision/development design standards consistent with this future land use classification including provisions to allow for future road and urban infrastructure extensions as the area urbanizes.
- Seven years after platting a subdivision the reserved lot may be developed at a density of at least 1 unit per 2 acres if sewer service is not available at that time.
- Future redevelopment of the reserved lot with sewer service will be allowed only after an approved zone change to an urban zone district. New development must meet the zone district standards and Master Plan policies in place at that time.
- Allow density bonuses as part of the U/RR5 zone district consistent with the Master Plan.
- A density bonus may be achieved by meeting development design standards set forth in the *Mesa County Land Development Code*.

Urban/Residential Reserve 5 Future Land Use Classification

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (acres) | | Density Bonus | Required Reserve % | Structure Grouping |
|---|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | | |
| Urban/ Residential Reserve 5 | 5 (10) | 2 (10) | Land Development Code Wastewater standards | N/A | Achieved through design | 40% | Required |

IV-12

BLM_0057587

**D.  Rural/Residential 5 (R/R5) (5 Acre Average Lot Size)**

**Intent and Applicability**
This is a designation for areas where public sewer service is not anticipated within the planning horizon (5 to 7 years) and a five acre average is consistent with existing development patterns.  This future land use classification is applicable to the area depicted on the 2006 Future Land Use Map (e.g. Vinelands Area).

**Considerations**
The characteristics of these areas of the County are predominately farms and to a lesser degree rural residential development.  Density is tied to availability of services and infrastructure.  Lot size averaging is encouraged and appropriate to promote larger lots for agricultural operations.

The minimum parcel size eligible for major subdivision in this classification is 10 acres.

**Implementation**
- New development must meet the zone district standards and Master Plan policies.
- No density bonuses are allowed.

Rural/Residential 5 Future Land Use Classification

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| Rural/ Residential 5 | 5 (10) | 2 (10) | Land Development Code Wastewater standards | N/A | N/A | N/A |

**E.  Fruita 201-10 (10 Acre minimum lot size)**

**Intent and Applicability**
The area within the City of Fruita's 201 Sewer Service Boundary (Fruita Urban Growth Boundary) is intended to ultimately urbanize as part of the City of Fruita. This classification is intended to promote a land use pattern favorable to future urban development (consistent with Fruita's Community Plan) as properties are annexed into the City of Fruita.  Until annexed by the City of Fruita development in this area will be limited to a minimum 10 acre lot size.

**Considerations**
This land use classification will have sewer service within the Urban Growth Boundary. The area will transition to urban development density as Fruita grows.  The classification provides a unique opportunity to coordinate land development activities between Mesa County and the City of Fruita.

The minimum parcel size eligible for major subdivision in this classification is 20 acres.

BLM_0057588

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Implementation**
- Enter an intergovernmental agreement with Fruita to establish a joint plan.
- Develop an annexation agreement with the City of Fruita including provisions that all proposed non-residential development within the Fruita 201 should be first annexed to the City of Fruita.

**Fruita 201-10** Future Land Use Classification
The minimum parcel size eligible for major subdivision in this classification is 20 acres.

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | **Base** | **Bonus** | **Minimum** | **Maximum** | | |
| Fruita 201-10 | 10 (20) | N/A | 10 | N/A | N/A | N/A |

**F.    EOM 10   - (10 Acre Minimum Lot Size)**

**Intent and Applicability**
The intent of the EOM 10 (ten) Future Land Use Classification is to recognize and encourage the economic importance of and continued use of the area for fruit and vineyard production. The classification maintains parcel sizes (10 acres minimum) that a farmer would want to lease or buy for agricultural purposes.   Averaging and or clustering introduce residential/agricultural conflict and are not considered appropriate in this area. Rural residential development is discouraged; rural multi-lot subdivision is highly discouraged.

This classification is applicable to the areas depicted on the 2006 Future Land Use Map. Generally the area includes East Orchard Mesa - south of the Colorado River, east of 35 Road, west of 38 ¼ Road, and north of C Road (does not include the Buffer).

**Considerations**
The character of this area of the County is distinctly agriculture; it is comprised almost entirely of fruit orchards and vineyards. Density is tied to the minimal viable lot size needed to produce orchard and vineyard crops.  Public infrastructure such as water, fire flow and high capacity roads are usually limited.  The area is very unique not only to the Valley but the State of Colorado in terms of its soils and micro-climates suitable for orchards and vineyards.

The minimum parcel size eligible for major subdivision in this classification is 20 acres.

**Implementation**
- New development must meet the zone district standards and Master Plan policies.
- Voluntary use of conservation easements is encouraged.
- No density bonuses are allowed.

IV-14

BLM_0057589

**EOM 10 Future Land Use Classification**

The minimum parcel size eligible for major subdivision in this classification is 20 acres.

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| EOM 10 | 10 (20) | None | 10 | N/A | N/A | N/A |

## G.   Rural/Agricultural 10 – (R/A10) (10 Acre Average Lot Size)

**Intent and Applicability**

The Rural/Agricultural 10 (ten) Future Land Use Classification is intended to provide a transition area between areas of future urban redevelopment and larger lot agricultural and residential areas more distant from urban services (sewer, water for fire flow, roads that include pedestrian and bicycle facilities, increased traffic circulation, schools, medical, etc.).  Within this plan's timeframe, sewer service extension is not anticipated.  A higher density may be appropriate utilizing the Density by Design policy.

This classification is applicable to the areas depicted on the 2006 Future Land Use Map and includes those properties with smaller lot acreage, intensive farming, and lifestyle agriculture operations.  It is also applicable to transition areas between the Rural/Residential 5 and the Rural/Agricultural 20 future land use classifications.

**Considerations**

The character of these areas of the County is distinctly transitional, moving away from traditional agriculture; it is comprised almost entirely of small farms and few large commercial agricultural operations.  Density is tied to the minimal lot size that encourages and supports small farms and lifestyle agriculture.  Lot size averaging is encouraged to create a range of acreages, preserve rural vistas instead of creating large-lot subdivision development and minimize cost of infrastructure.  This classification also requires that subdivisions be sited and designed to minimize impacts on scenic resources, wildlife habitat and streams, and adjacent agricultural operations and infrastructure.  A ten-acre average lot size is permitted only if public infrastructure such as water for fire flow and safely designed roads and pedestrian networks are provided to support the density.

**Implementation**

- New development must meet the zone district standards and Master Plan policies.
- A density bonus may be achieved by meeting development design standards set forth in the *Mesa County Land Development Code*.
- A mix of lot sizes is encouraged as set forth in the *Land Development Code*.

BLM_0057590

**Rural/Agricultural 10 Future Land Use Classification**

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| Rural.Ag 10 | 10 (20) | 5 (10) | Land Development Code Wastewater standards | N/A | By design | 50% for Bonus |

**H.      Rural/Agricultural 17 A   - (17 Acre Average Lot Size)**

**Intent and Applicability**
The Rural/Agricultural 17 A (seventeen - A)  Future Land Use Classification is intended to provide a transition area between the R/A 10 acre areas and larger lot agricultural areas in the 35 + future land use classifications.  This classification is actively farmed and is more distant from urban services (sewer, water for fire flow, roads that include pedestrian and bicycle facilities, increased traffic circulation, schools, medical, etc.).  Five-acre density is not appropriate in this classification area at this time.  Additional density may be achieved utilizing the Density by Design policy.  The Rural/Agriculture 17 A Future Land Use Classification is consistent with the agricultural policies of this Plan.

This classification is applicable to the areas depicted on the 2006 Future Land Use Map. It applies in various locations in the County – and mostly outside the boundaries of incorporated municipalities' statutory 3 mile planning areas.

**Considerations**
Historically, this area has been agricultural with associated infrastructure and residential uses limited to rural agricultural families.  The characteristics of this classification include farm to market roads, and small diameter domestic water lines that are not sized for fire flow.  Active agricultural uses still continue, and it is important that where new residential development is introduced, conflicts are minimized.   This classification also requires that subdivisions be designed and sited to minimize impacts on scenic resources, wildlife habitat and streams, and adjacent agricultural operations and infrastructure.

**Implementation**
- New development must meet the zone district standards and Master Plan policies.
- Conflicts between land that is either productive for farming or actively farmed and new residential development will be minimized.
- A density bonus may be achieved by meeting development design standards set forth in the *Mesa County Land Development Code.*

BLM_0057591

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Rural/Agricultural 17 A Future Land Use Classification**

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| Rural Ag 17 A | 17 (34) | 9 (18) | Land Development Code Wastewater standards | N/A | By design | 50% for Bonus |

## I.     Rural/Agricultural 20 NB   - (20 Acre Average Lot Size) - No Bonus

**Intent and Applicability**

The Rural/Agricultural 20 NB (twenty - NB)  Future Land Use Classification is intended to provide a transition area between the R/A 10 acre areas and public lands or larger lot agricultural areas in the 35+ areas more distant from urban services (sewer, water for fire flow, roads that include pedestrian and bicycle facilities, increased traffic circulation, schools, medical, etc.).  The classification is consistent with the agricultural policies of this Plan.

This classification is applicable to the areas depicted on the 2006 Future Land Use Map. It applies in various locations in the County – including the Rapid Creek area east of Palisade, parts of Unaweep Canyon and parts of the Whitewater planning area.  It generally applies to areas that are either productive for farming; are actively farmed or are transition areas between higher density future land use classifications and the Rural/Agricultural 35+ future land use classification.

**Considerations**

Residential structures within the areas of this Future Land Use Classification were originally built for rural agricultural families and as a result have limited infrastructure and services.  The character of these areas in the County is a mix of large lot residential and agriculture.  Areas are predominately agriculture, rural, large lot (lifestyle agriculture) subdivisions with limited availability of services.  This classification also requires that subdivisions be designed and sited to minimize impacts on scenic resources, wildlife habitat and streams, and adjacent agricultural operations and infrastructure.

The minimum parcel size eligible for major subdivision in this classification is 40 acres.

**Implementation**
- New development must meet the zone district standards and Master Plan policies.

IV-17

BLM_0057592

**Rural/Agricultural 20 NB Future Land Use Classification**
The minimum parcel size eligible for major subdivision in this classification is 40 acres.

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| Rural/ Ag /20 NB | 20 (40) | N/A | Land Development Code Wastewater standards | N/A | N/A | N/A |

**J.      Rural/Agricultural 35+ A (35 Acre Average Lot Size)**

**Intent and Applicability**
The Rural/Agricultural 35+ Future Land Use Classification is intended to: maintain the maximum amount of land in large and very large parcel sizes suitable for ranching and farming; and to avoid the conversion of agricultural lands to residential or nonagricultural commercial uses.   The classification is consistent with the agricultural policies in the Master Plan.   Rural residential development with an average lot size smaller than 35 acres in multi-lot subdivisions is highly discouraged for the following reasons:

- New development cannot meet subdivision standards in the Land Development Code due to limited services: currently outside a fire protection district; domestic or other sources of water is typically not available for fire flow.
- Roads are designed for farm-to-market use – they do not meet modern safety design/build specifications.
- This plan promotes and supports the ongoing agricultural activity in the area.
- Proximity to public lands (which is used for grazing).
- The area is a significant distance from employment and commercial centers.
- New development adds additional service demands on limited infrastructure.
- Averaging lot sizes allows the ability to create and sell lots smaller than 35 acres as an alternative to 35 acre subdivisions and will keep a larger base of productive land in use.

This classification is applicable to the areas depicted on the 2006 Future Land Use Map. It applies generally in the Plateau Valley and DeBeque areas, and specifically in the Lower Valley area currently outside of the Lower Valley Fire Protection District.

**Considerations**
This Future Land Use Classification identifies areas suitable for agricultural, forestry, and large lot rural residential uses.  The classification is consistent with the agricultural policies in the Master Plan.  Rural high-density, multi-lot subdivisions are highly discouraged.  Public infrastructure and services are very limited; roads are designed and built at rural standards, maintenance is limited, Emergency Management Services are limited, and potable water is very limited.

This classification is not eligible for major subdivision.

BLM_0057593

**Implementation**
- Create and adopt new zoning districts with larger minimum acreage standards per dwelling unit, such as AF 80, AF 120, or AF 160, that will be available for voluntary implementation consistent with the Rural/Agricultural 35+ future land use classification and the future land use map.
- New development will be consistent with the Rural/Agricultural 35+ A future land use classification and the future land use map.
- Adopt amendments to the *Mesa County Land Development Code*'s provisions for Agricultural Land Divisions as an alternative to 35 acre subdivisions.
- Encourage private conservation easements.
- A density bonus is not permitted in this classification.
- Review and study the Lower Valley area with the R/A 35+A designation in regard to fire protection service and infrastructure no later than 5 years from adoption of this plan update (no later than 2011).

**Rural/Agricultural 35+ A** Future Land Use Classification
This area is not eligible for major subdivision.

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| Rural/Agricultural 35+ A | 35 (N/A) | N/A | Land Development Code Wastewater standards | N/A | N/A | N/A |

**K.    Large Lot Rural/Agricultural 35+ (35 Acre Minimum Lot Size)**

**Intent and Applicability**
The Large Lot Rural/Agricultural 35+ Future Land Use Classification is intended to maintain the maximum amount of land in large and very large parcel sizes suitable for ranching and farming and to avoid the conversion of agricultural lands to residential or nonagricultural commercial uses.   The classification is consistent with the agricultural policies in the Master Plan.  No new lots should be created under 35 acres in size.

This classification is applicable to the areas depicted on the 2006 Future Land Use Map. Generally: Horse Canyon, Glade Park/Pinyon Mesa, municipal watersheds, Unaweep Canyon, Upper Kannah Creek, and the base of Mt. Garfield and the Bookcliffs north of Interstate 70.

BLM_0057594

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Considerations**

The Large Lot Rural/Agricultural 35+ Future Land Use Classification areas have historically consisted of large-lot ranches and open land. They are characterized by interaction with public lands for uses such as grazing allotments. This classification recognizes the ranching business requires larger tracts of land than other agricultural uses, and may require the use of public lands to remain viable. Rural residential development is discouraged; rural high-density, multi-lot subdivisions are highly discouraged. These areas are more often adjacent to or surrounded by public lands and are important to maintain wildlife habitat, watersheds, natural features and recreational uses.

Services are very limited due to the remoteness of these areas:

- roads are designed and built to serve farms to market and some are only seasonally maintained,
- land may be outside of a fire protection district,
- medical facilities are located far from these areas, and
- potable water may be limited or over-appropriated.

The Fruita reservoirs on Pinyon Mesa should not serve the Glade Park residents with potable water since this action would encourage development where roads and other services are extremely limited.

This classification is not eligible for major subdivision.

**Implementation**

- Create and adopt new zoning districts with larger minimum acreage standards per dwelling unit, such as AF 80, AF 120, or AF 160, that will be available for voluntary implementation consistent with the Large Lot Rural/Agriculture 35+ future land use classification and the future land use map.
- New development will be consistent with the Large Lot Rural/Agriculture 35+ future land use classification and the future land use map.
- Adopt amendments to the *Mesa County Land Development Code* to prohibit Simple Land Divisions in these areas.
- Encourage private conservation easements.
- A density bonus is not permitted in this classification.

**Large Lot Rural/Agricultural 35+** Future Land Use Classification

This classification is not eligible for major subdivision.

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| Large Lot Rural/Agricultural 35+ | 35 (N/A) | N/A | 35 | N/A | N/A | N/A |

BLM_0057595

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**L.      Buffer (Cooperative Planning Area)**

**Intent and Applicability**
To implement the intent and purpose of the Cooperative Planning Agreements, (aka Community Separators), adopted by the Board of County Commissioners in Resolutions MCA 98-10 and MCA 98-11.  Density within the Buffer (within the AFT zone district) will be determined by compatibility with existing lot sizes in the notification area (2,500 feet).  This means the average lot size (excluding public lands) in the area determines the density of new development.   Areas with urban zoning may not create lots less than two acres in size (for example the Redlands).

**Considerations**
These areas were created through intergovernmental agreements to: maintain separation between municipalities in the Valley, protect rural landscapes (Fruita) and their agricultural importance (Palisade).  As a result of the IGAs, active implementation activities include:  purchase of conservation easements with state, local and federal funding; and an established Transfer of Development Credits/Rights program with Fruita.

**Implementation**
- Revise the Code to include a section to determine density calculation in the buffer areas consistent with the Master Plan (including the Redlands Area Plan) and the Intergovernmental Agreements.
- Adopt design standards in the *Land Development Code* for future development within the buffers.
- A density bonus is not permitted in this classification.  Revise the Code to eliminate eligibility for AFT Rural Cluster Bonus in the Buffers.
- Rezone the area within the Buffer south of the Colorado River on the Redlands to AFT.
- Remove the area south of Highway 340 from the Buffer.

**Buffer** Future Land Use Classification

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (Acres) | | Density Bonus | Required Reserve % |
|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | |
| Buffer | 5 -35 | N/A | Land Development Code Wastewater standards | N/A | N/A | N/A |

BLM_0057596

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

## FUTURE LAND USE CLASSIFICATION SUMMARY

| Classification | Density = Acres/lot (Minimum Acreage Eligible for Subdivision) | | Lot Size (acres) | | Density Bonus | Required Reserve % | Structure Grouping |
|---|---|---|---|---|---|---|---|
| | Base | Bonus | Minimum | Maximum | | | |
| Rural Community | * | * | | | | | |
| Estate | 2-5 (4) | N/A | 2** | 5 | N/A | N/A | N/A |
| Urban/ Residential Reserve 5 | 5 (10) | 2 (10) | Land Development Code Wastewater standards | N/A | By design | 40 % | Required |
| Rural Residential 5 | 5 (10) | N/A | Land Development Code Wastewater standards | N/A | N/A | N/A | N/A |
| Fruita 201-10 | 10 (20) | N/A | 10 | N/A | N/A | N/A | N/A |
| EOM 10 | 10 (20) | N/A | 10 | N/A | N/A | N/A | N/A |
| Rural Ag 10 | 10 (20) | 5 (10) | Land Development Code Wastewater standards | N/A | By design | 50 % for bonus | N/A |
| Rural Ag  17 A | 17 (34) | 9 (18) | Land Development Code Wastewater standards | N/A | By design | 50 % for bonus | N/A |
| Rural/ Ag /20 NB | 20 (40) | N/A | Land Development Code Wastewater standards | N/A | N/A | N/A | N/A |
| Rural/Ag 35+ A | 35 (N/A) | N/A | Land Development Code Wastewater standards | N/A | N/A | None | N/A |
| Large Lot Rural/Ag 35+ | 35 (N/A) | N/A | 35 | N/A | N/A | N/A | N/A |
| Buffer | 5 -35 | N/A | Land Development Code Wastewater standards | N/A | N/A | N/A | N/A |

* see Community or Area plan for specific recommendations   ** determined by Environmental Health Department

IV-22

BLM_0057597

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

### 3.2    Incentive Based Density (Density by Design)

**Intent and Applicability**
This policy is applicable to those Future Land Use Classifications as defined in the Land Use and Growth Management Policy 3.1 of this plan and summarized below.  Density bonuses shall not exceed the maximum density in the applicable Future Land Use Classification and as recommended in the applicable Community or Area Plan.

Mesa County supports incentive based density using the concept of "density by design".  Density bonuses may be achieved by meeting the goals of the plan and exceeding the standards in the *Land Development Code*.

There are three Future Land Use Classifications that allow incentive based density:  the reserve area where urban services will be eventually available (Rural/Residential Reserve 5) and the rural agricultural areas (Rural/Agricultural 10 and Rural/Agricultural 17).  A set of criteria will be developed to implement the intent of each area.

In the Rural areas the intent is to protect the character of the area (the values, rural residential being compatible with those existing land uses, agricultural, water quality, character, etc.…)  In the reserve area the intent is to promote future urban development.

**Implementation**
- Revise the *Mesa County Land Development Code* to include incentive based density standards for the Urban/Residential Reserve 5 Future Land Use Classification areas.  Such standards should include the requirements for grouping/clustering of lots and urban design and infrastructure improvements (street sections, pedestrian circulation, dry-line sewers, entryways, landscaping, etc.)
- Revise the *Mesa County Land Development Code* to include incentive based density standards and options for the Rural/Agricultural 10 and Rural/Agricultural 17 classifications.  Such standards should include the requirements for grouping/clustering of lots and water service upgrades to meet fire flow standards.  Design and service options should include but are not limited to, the following concepts:
- Designated open land adjacent to other designated open land
- Existing, mature, desirable vegetation will remain on site (large trees, etc.)
- Preservation in perpetuity of wildlife habitat and/or sensitive lands
- Retention and maintenance of on-site agricultural related improvements, investments and infrastructure
- Public access is provided to public lands or open space (in consultation/agreement with public land managers)
- Provision of school bus or transit bus pullouts where necessary with an approved shelter
- Provision of pedestrian paths or sidewalks on internal streets connecting to adjacent paths where available
- A school bus stop within a ¼ mile walk on a County road with a safe walking surface off of the driving surface (e.g., sidewalk, adequate shoulder, detached trail, etc.)
- Promote a variety of housing sizes (no limits on minimum square footage)
- Limiting visibility of new structures from roads–e.g., behind topographic features, below ridgelines, etc.

BLM_0057598

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

### 3.3    SUMMARY Incentive Based Density

| Future Land Use Classification | Density (Average Acres/Lot) | |
|---|---|---|
| | **Bonus** | **Base** |
| Urban/ Residential Reserve 5 | 2<br>Urban design features  apply | 5 |
| Rural/ Agricultural 10 | 5 | 10 |
| Rural/ Agricultural 17 | 9 | 17 |

IV-24

## Community Character/Image

**Goal 1: To protect and maintain the unique rural features and characteristics which are significant links to the past, present, and future.**

Policy:

1.1   New development will identify important rural features, scenic vistas/corridors, and natural areas impacted by the proposed development (e.g., large trees, waterways, historic structures, farming practices, balance of visual and traffic impacts on location of accesses, etc.) and mitigate such impacts.

1.2   New development shall be compatible with existing land uses.

**Implementation:**

1.1   Approve development applications only if consistent with the Master Plan. (Implemented through the *Land Development Code*)

1.2   Create and adopt a checklist of important rural features which are unique to or define/reinforce a distinct positive characteristic of the community's image (e.g., established trees, homestead lots, historic structures, etc.) as an evaluation tool for new development.  (Area Plans, Resolution, Development Code)

1.3   Create and adopt a County historic register. (Resolution and Development Code)

1.4   Establish mixed use standards and incentives to intensify activity within the six Rural Communities.  Ensure facilities are mutually supportive and attract people to complimentary activities (e.g., churches, post offices, schools, etc.)  (Development Code)

1.5   Establish guidelines for new development along designated scenic roadways. (Development Code)

1.6   Define, through the area plan process, the identity or distinct character of a rural community (e.g., ranching, field crops, fruit, orchard, mineral extraction, recreation, Colorado and Gunnison River corridor, etc.). (Area Plans, Development Code)

**Goal 2: Future development shall be designed to complement or create appropriate community features such as roads, trails, open space and building patterns, while respecting the unique sense of existing community that distinguishes one area from another.**

Policies:

2.1   Well-defined community centers shall provide focal points for individual rural communities.

2.2   Recognize the distinction between rural communities and support design variations that are consistent with the character of individual communities.

**Implementation:**

**1.1 Implement these policies through the adoption and update of Rural Community Plans.**

IV-25

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

## Agriculture
**Goal 1: Conservation of agricultural and range lands capable of productive use.**

Policies:

1.1    Locate new development on land least suitable for productive agricultural use.

1.2    Clustering of dwellings is encouraged on a portion of the site where the remainder is reserved for open space or agricultural land.

1.3    Buffering of new development is required adjacent to agricultural operations.

1.4    Enhance methods of communicating the right-to-farm/ranch policy and provisions to educate non-farm/non-ranch users on the characteristics of an agricultural economy (e.g., noise, spraying, dust, traffic, etc.).

1.5    Require consultation with the appropriate land and resource manager and area residents to minimize and mitigate conflicts new development proposals may create between wildlife and agricultural uses.

1.6    Agricultural production practices will be honored and protected when development is allowed adjacent to or near productive agricultural lands.

1.7    Development will not be allowed to interfere with irrigation water used for agricultural production. Delivery of full water rights to farmland using irrigation water shall be guaranteed by the developers and/or subsequent Homeowners Association through a proper delivery system.  Historic irrigation easements shall be respected and formalized or conserved.

1.8    Support farmers' markets and promote the purchase of local goods.

1.9    Support and promote voluntary techniques to preserve agricultural lands.

1.10    Promote multiple/compatible uses of agricultural lands.

1.11    Provide a streamlined process that allows limited creation of small parcels from larger bona fide lands in agricultural production to assist agricultural operations to remain viable.

1.12    Continue and expand the Transfer of Rights programs where appropriate throughout the County.

**Implementation:**

1.1    Work with the National Forest Service and BLM to encourage the retention of grazing leases for ranchers in Mesa County. (Intergovernmental Agreements)

1.2    Recognize that the ranching business requires larger tracts of land than other agricultural uses and may require the use of public lands to remain viable. (Development Code)

1.3    Continue to enforce the Mesa County Right to Farm and Ranch Policy.

BLM_0057601

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

1.4   Adopt provisions in the *Mesa County Land Development Code* to ensure new development is designed and built to standards of individual irrigation water providers and that new development does not take more than its share of irrigation water.  The County does not support development that strips the water rights from the land. Discourage residential development in areas where large investments in irrigation improvements have been put in place. (Development Code).

1.5   Encourage the use of agricultural conservation easements.

1.6   Support the on going efforts of the Landowner Planning and Conservation Assistance Team (formerly TRAC) to work with landowners on alternatives to conventional subdivision of land and understanding the benefits of conserving land.

1.7   Adopt incentives such as density bonuses and TDRs to encourage retention of large tracts of productive agricultural lands. (Development Code).

1.8   Revise the Agricultural Land Division provisions to be more flexible and streamlined to allow the creation of smaller lots as an alternative to 35-acre subdivisions.

1.9   Revise the *Land Development Code* to establish minimum buffering requirements between agricultural uses and new development.

BLM_0057602

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

## Conservation and Environment
**Goal 1: To protect, conserve and efficiently manage the county's public lands.**

Policies:

1.1    Coordinate land use planning with public land and resource management agencies.

1.2    Work with land owners and appropriate agencies to identify fuel hazard areas and reduce the threat of wildfire.

**Implementation:**

1.1    Continue to coordinate land use planning and consultation with all applicable local, state, and federal land and resource managers through review agency consultation, intergovernmental agreements and a variety of cooperative and coordinated efforts.

**Goal 2: To conserve sustainable ecosystems.**

Policies:

2.1    New development shall conserve and protect native wildlife and vegetation habitat, water, open lands, vistas, minerals, etc. Development will not diminish these systems.

**Implementation:**

2.1    Encourage the use of conservation easements.

2.2    Revise the Development Code to implement the Incentive Based Density policy.

2.3    Complete a study to identify, with the DOW, NFS, BLM, and State Forest Service, areas where wildlife and natural processes are threatened.  (Build on existing DOW Wildlife Study.)  (Wildlife Study)

2.4    Establish an IGA with the Division of Wildlife.

**Goal 3: To preserve public access to public lands.**

Policies:

3.1    Require the dedication of access easements across private property to public land for public access in coordination with the appropriate land or resource management agencies.

3.2    Encourage the preservation of open space required for new developments to be located adjacent to public lands.

3.3    New development should provide buffers and setbacks adjacent to public lands where appropriate.

**Implementation:**

3.1    Revise the Development Code to encourage new development to provide access easements or dedications to public lands through the development process (in conjunction with Federal, State, and local land managers).  Establish a means of acquiring access easements through private lands to major tracts of public land which are otherwise difficult to reach unless the nature of the public land is such as to make access undesirable.  (Development Code, Intergovernmental Agreements)

BLM_0057603

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

3.2     Revise the Development Code to direct that open space required in a new development be located adjacent to public lands wherever feasible.  Initiate/coordinate a study to define buffer areas and setbacks adjacent to public lands and municipalities.   Include the following considerations:

- Establish graphic menu of buffering techniques/design standards.
- Require impact mitigation (minimize impacts from private land development and use).
- Establish interagency buffer standards.
- Form a conservation design guideline committee. (Development Code, Intergovernmental Agreements)

3.3     Identify private lands presently needed for public access easements to public lands (Public Lands Access Study)

3.4     Complete and adopt the joint study of a Countywide system of trails throughout private and public lands  (Joint Trails Study, Intergovernmental Agreements)

**Goal 4: To protect the citizens of Mesa County from the effects of man-made or natural hazards (geologic, avalanches, earthquakes, soils, floodplains, air pollution, odor, noise, and wildfire).**

Policies:
4.1     Any proposed land use or development must identify hazard areas, i.e., floodplains, drainage areas, steep slope areas, geological fault areas, and other areas hazardous to life or property. Such proposals will require an evaluation to determine the degree to which the proposed activity will:
- Expose any person, including occupants or users of the proposed use or development, to any undue natural hazard.
- Create or increase the effects of natural hazard areas on other improvements, activities or lands.
- Impact the natural environment and be unduly destructive to the natural resources of an area.

4.2     Development will not be allowed in hazard areas to minimize the risk of injury to persons and loss of property unless appropriate mitigating measures are taken.

4.3     Proposed land uses will address soil, erosion and surface geologic characteristics of the development site through proper design, engineering and construction.

**Implementation:**
4.1     Initiate/adopt a natural hazards study of "critical and sensitive" lands (i.e., floodplains, drainage areas, steep slopes over 25 percent, geological fault areas, and wildfire hazards) to identify and establish standards for new development.  Coordinate with GIS databases.

4.2      Adopt these "critical and sensitive" lands as an overlay and part of the Development Code. (Development Code, Resolution)

BLM_0057604

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Goal 5: To maintain or improve the quality of air, water and land resources.**

Policies:

5.1     New development will be designed to protect critical/sensitive lands as defined in the *Mesa County Land Development Code.*

5.2     Protect natural areas/resources through incentives and flexible options for land development.

5.3     Preserve the floodplain of the Colorado and Gunnison Rivers, major stream corridors, and associated wetlands as important green spaces, waterway corridors, and trail linkages.

5.4     New development must meet air and water quality standards of the county, state and federal governments.

5.5     Protect raw water supplies and municipal watersheds.

5.6     New development in areas which have historically had access to irrigation water shall utilize such water for non-domestic purposes.

**Implementation:**

5.1     Work with public land/resource managers to adopt consistent mitigation standards, review procedures, and criteria for development. (Development Code, Intergovernmental Agreements)

5.2     Provide incentives/guidelines to protect natural areas/resources and for concentrated node development in rural communities which allow multi uses (e.g., residential/business/commercial PUDs.).   (Development Code)

5.3     Revise the County Drainage Manual.
•       Work with canal/irrigation companies on drainage system standards.
•       Establish erosion control standards for new development.
•       Determine where paved parking lots are appropriate.
•       Combine drainage facilities with open space/park uses.
•       Coordinate drainage facility capital improvements with other capital projects (e.g., roads, parks, etc.). (Drainage Manual)

5.4     Adopt industrial siting and performance standards.  Consider the proximity to residential uses, groundwater, rivers, wildlife habitat, and transportation corridors.  (Development Code)

BLM_0057605

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

## Open Lands and Trails
**Goal 1: To protect important open lands within Mesa County.**
Policies:

1.1    Continue to provide voluntary open land techniques available for private property
       owners.

1.2    Coordinate and participate in the development of a countywide trail system with linkages
       to a regional network.

1.3    Support the preservation of historic trails.

1.4    Support the maintenance of open lands in continuous tracts to allow the continuation of
       agricultural operations and to protect the rural character where appropriate.

1.5    Support the work of LPCAT, public and private agencies to find equitable means for
       protecting and maintaining open lands and trails.

**Implementation:**

1.1    Approve development applications only if consistent with the Master Plan.
       (Implemented through the *Land Development Code*)

1.2    Conduct and adopt an open lands plan.

1.3    Complete and adopt the joint study of a Countywide system of trails throughout private
       and public lands (Joint Trails Study, Intergovernmental Agreements).  All identified trail
       systems shall be incorporated into new development.

1.4    Inventory and prioritize the Countywide trail system and historic trails as part of both an
       Open Lands and Trails Plan.  (Trails Study)

**Goal 2: Protect important wildlife habitats.**

Policies:

2.1    Establish buffer areas to preserve riparian areas and waterways, their banks, and adjacent
       vegetation areas.

2.2    In consultation with the Division of Wildlife and the US Fish and Wildlife Service, Mesa
       County will conserve important wildlife habitats such as nesting and production areas,
       winter ranges, feeding areas, and concentration areas for threatened and endangered
       species, species of special concern, or indicator species. Where such actions result in
       significant financial impact on private land owners, compensation will be paid using
       public funds such as lottery and Great Outdoors Colorado (GOCO) money.

2.3    Conserve movement corridors for migratory species such as deer and elk.

2.4    New development shall incorporate existing vegetation into project plans wherever
       possible and utilize native vegetation in new landscaping.

2.5    Developments occurring in identified human/wildlife conflict areas shall use
       practices aimed at reducing possible conflicts with wildlife.

BLM_0057606

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Implementation:**

2.1 Work with the Colorado DOW to update and revise the wildlife impact maps in the development standards related to habitat, hunting and nesting areas, and human/wildlife conflict areas in the Development Code. (Development Code)

2.2 Coordinate with the DOW to identify (especially on private property) important wildlife habitat, and establish preservation techniques and incentives. (Intergovernmental Agreements)

2.3 Revise the Development Code to require development to incorporate existing mature vegetation (especially 3-inch plus caliper trees) wherever possible, or replace with smaller native vegetation (one and one-half inch caliper) on site at a three for one ratio. Devise similar ratios for replacement of mature native shrubs and ground covers. (Development Code)

**Goal 3: To assure that open land is recognized as a limited and valuable resource which must be conserved wherever possible.**

Policies:

3.1 Conservation of open land is important, not only for the maintenance of the County's economy, but also for the assurance of the continued availability of land for food production, for the enjoyment of scenic beauty, for recreation, and for natural resource usage.

3.2 Leapfrog development which prematurely converts open land to urban uses shall not be allowed.

**Implementation:**

3.1 Adopt both an Open Lands and Trail Plan to identify and prioritize lands. Include a viable range of voluntary preservation and compensation techniques to protect agricultural lands, natural areas, and open space resources. (Open Lands and Trails Plans)

**Goal 4: To identify and protect existing and future major trail linkages and intersections in the County.**

Policies:

4.1 Continue to communicate regularly with all public entities in Mesa County responsible for open space, parks, and trails through an established, formal system to plan, protect, acquire and manage lands under their jurisdictions.

4.2 Offer incentives to developers and property owners for linking private trails to a public trail system or for providing public trail access through their properties and to school sites.

4.3 Provide carefully planned and developed parking areas at trail heads and trail linkages to facilitate trail usage.

4.4 Provide appropriate public facilities at major trail linkages and intersections.

4.5 Minimize conflicts trails may have with important wildlife habitats, property owners, and other sensitive resources such as wetlands.

IV-32

BLM_0057607

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Implementation:**

4.1    Establish a regular formalized communication system between public entities for planning, protecting, acquiring, and managing open lands, parks and trails. (Intergovernmental Agreements)

4.2    Establish access easement requirements or dedication incentives for land owners or developers to provide private trail linkages to public trails. (Development Code)

4.3    Require new development to set back trails from streets and separate motorized and non motorized trails wherever possible. (Development Code)

4.4    Include in the Countywide Trails Plan major trail linkages and intersections (present and future) and prioritize need for public facilities and parking.

BLM_0057608

## Parks and Recreation
**Goal PR 1: Provision of adequate lands to meet the parks and recreation needs of the residents of Mesa County.**

See Board of County Commissioner's Parks Policy.

**Implementation:**

1.1   Implement the Mesa County Parks Policy adopted by the BCC.
       Resolution MCM 2001- 183 and as may be revised.

BLM_0057609

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

## Community Services/Facilities & Intergovernmental Coordination
**Goal 1: To maximize the efficient use of public resources.**

Policies:

1.1    New development shall be compatible with existing land uses.

1.2    Maintain a five to ten year capital facilities/improvements program which establishes priorities for constructing necessary facilities consistent with the Mesa County Master Plan.

1.3    New community facility locations should be reserved in accordance with planned areas of growth.  Priorities for constructing these facilities will be established through a capital facilities/improvements plan before development is approved.

1.4    Continue to work with special districts and other service providers to develop capital improvement programming consistent with this plan.

1.5    Mesa County should review the service plans of service providers to determine their consistency with the Mesa County Master Plan and request that service providers make revisions to their plans so they are consistent with the Mesa County Master Plan.

1.6    Service providers are encouraged to follow their service plans and be consistent with the Mesa County Master Plan when establishing new services or facilities or when extending or expanding existing services facilities.

**Implementation:**

1.1    Approve development applications only if consistent with the Master Plan. (Implemented through the *Land Development Code*)

1.2    Continue to coordinate with all service providers to develop and maintain GIS databases for all services, facilities, capacities, etc.  (Intergovernmental Agreements)

1.3    Prepare and maintain a 5 - 10 year Capital Improvements Plan consistent with this plan. Update and prioritize annually.  (CIP)

1.4    Work with service providers to discourage creation of new service districts (special districts).  (Intergovernmental Agreements)

1.5    Work with communities seeking new or improved services to create Public Improvement Districts where the Board of County Commissioners acts as the board of directors.

**Goal  2: To minimize public costs for private development.**

Policies:

2.1    Essential and adequate rural levels of services and facilities shall be provided by the developer concurrent with new rural development.

2.2    Cooperate with the school districts by regularly updating the County's school land dedication requirements, ensuring that development mitigates the demands for land that it places on the school systems.

BLM_0057610

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**Implementation:**

2.1    Work with communities seeking new or improved services to create Public Improvement
Districts where the Board of County Commissioners acts as the board of directors.

2.2    Keep development application and impact fees up-dated and current to reflect the costs
of development.

2.3    Establish and adopt rural and urban levels of service and relate them to the CIP.  (CIP,
Intergovernmental Agreements, Development Code)

2.4    Establish incentives encouraging compatible new development to utilize existing
services/facilities that meet level of service requirements.  (Development Code,
Resolution)

2.5    Coordinate regularly with the school districts to update their land dedication requirements
to ensure their adequacy in meeting demand, proper location and distribution, and fee in
lieu of land dedications.  (Intergovernmental Agreements)

2.6    Identify the location of necessary capital facilities in area plans.  (Area Plans, CIP)

**Goal 3: To ensure that future development occurs in an orderly fashion, avoiding and
minimizing non-contiguous, scattered development throughout the County.**

Policies:

3.1    The County and its five municipalities will coordinate long-range planning and capital
improvement programming efforts.

**Implementation:**

3.1    Continue to implement the Cooperative Planning Agreements establishing the
community separators or buffer areas.

3.2    Approve development applications only if consistent with the Master Plan.
(Development Code)

**Goal 4: To maximize the capability of the County, its municipalities, and other government
agencies to make collaborative land use decisions in areas of mutual concern and/or
influence.**

Policies:

4.1    Establish and enforce compatible development standards with the municipalities and
other government agencies.

4.2    Mesa County and its 5 municipalities will jointly prepare and adopt plans for the future
development of the municipalities' respective areas of influence as defined in the
Revised Colorado Statutes.

4.3    Mesa County will enter intergovernmental agreements and memoranda of understanding
with municipal, federal and state agencies to address coordination of many efforts.

BLM_0057611

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

4.4     Refer land development applications to public land managers and service providers. The County will encourage service providers to provide recommendations as to the adequacy of services for development based upon the level-of-service standards. Mesa County encourages service providers to work together to establish and maintain consistent standards for facilities and equipment that can facilitate future consolidation of services and that will allow for certain facilities and equipment to be shared.

4.5     Mesa County encourages the consolidation of special service districts where there is a fiscal benefit to do so and where service levels can be maintained or enhanced. The County will discourage the proliferation of small service districts and the creation of new service districts when services are available from an existing district.

**Implementation:**

4.1     Create more opportunities for cooperation between communities. Hold regular meetings including those at staff level. (Intergovernmental Agreements)

4.2     Explore cost share preparation of area plans, or plans for municipal areas of influence, and offer assistance with the area plan process. (Area Plans, CIP)

4.3     Initiate a County communication tool such as a newsletter to keep the public informed on IGAs, etc. (County Newsletter)

4.4     Direct the expenditure of capital improvements and new development to existing growth centers. (Capital Improvements Plan, Intergovernmental Agreements)

4.5     Enter intergovernmental agreements with the County's municipalities to jointly plan for areas of joint concern – generally the statutory municipal 3 mile area of influence.

4.6     Continue to enter and keep up to date IGAs and Memoranda of Understanding (MOUs) with communities and public agencies to ensure that data is shared and updated. The County should serve as a clearinghouse for such databases. (Memoranda of Understanding, Intergovernmental Agreements)

4.7     Enter into IGAs with special districts to consolidate where there is fiscal benefit and where service levels can be maintained or enhanced. (Intergovernmental Agreements)

BLM_0057612

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

## Community/Area Plans
General Policies:

1.1 New development must be compatible with existing land uses and consistent with goals, policies, and implementation items depicted in Area plans.

1.2 Community and Area plans are key elements of the Mesa County Master Plan.

1.3 Community and Area plans are based on the Mesa Countywide Plan and provide more detailed guidance for future land use and development.

1.5 Community and Area plans shall be reviewed and/or updated every 5 to 7 years.

1.5 The most recent revisions to the Master Plan supercede previously adopted elements of the Master Plan. For example: where inconsistencies exist between this 2005 update of the Rural Planning Area Plan and the 2004 Loma/Mack Area plan the 2005 update supercedes.

IV-38

BLM_0057613

2005 Rural Master Plan Update
MCPC Adopted Feb 2, 2006

**FUTURE LAND USE MAPS**

BLM_0057614



# Future Land Use
Adopted February 2, 2006
Plotted 3-24-2006

## Glade Park

This map does not stand alone; it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan.

This map does not necessarily reflect current zoning.

LL R/A 35+

LEGEND
- Lakes
- Rivers
- Joint Planning Area
- Roads
- Parcels

**Rural FLU**

**FLU Classification**
- Rural Community
- Industrial
- Estate
- URR 5
- Rural Residential 5
- R/A 10
- EOM 10
- Fruita 201 10
- R/A 17
- R/A 20 NB
- R/A 35+ A
- LL R/A 35+
- Buffer
- Fruita Greenway Business Park
- Gateway Area A Boundary
- Gateway Area B Boundary
- Existing Park
- Gateway Parks
- Gateway Historical Preservation
- Gateway Existing Civic
- Gateway Existing Residential
- Gateway Low Density Residential
- Gateway Medium Density Residential
- Gateway Mixed Use
- State of Colorado
- BLM
- N. Forest
- Monument

The Geographic Information System (GIS) and its components are designed as a source of reference for answering inquiries, for planning and for modeling. GIS is not intended or does not replace legal descriptions in the chain of title and other information contained in official government records such as the County Clerk and Recorders office or the courts. In addition, the representations of locations in this GIS cannot be substituted for actual legal surveys.

The information contained herein is believed accurate and suitable for the use for the limited uses, and subject to the limitations, set forth above. Mesa County makes no warranty as to the accuracy or suitability of any information contained herein. Users assume all risk and responsibility for any and all damages, including consequential damages, which may flow from the user's use of this information.

Mesa County GIS

US HWY 141

BLM_0057615





Future Land Use
Adopted February 2, 2006
Plotted 3-24-2006
Plateau Valley
R/A 35+ A
KIMBALL CREEK RD
64 3/10 RD
71 4/10 RD
V RD
58 9/10 RD
HWY 330E
SALT CREEK RD
US HWY 330
OE RD
53 1/2 RD
58 1/2 RD
59 1/2 RD
60 1/2 RD
N 6/10 RD
64 6/10 RD
ME LN
ME RD
58 RD
LE RD
LE 4/10 RD
55 RD
56 RD
KE 6/10 RD
51 7/10 RD
60 3/4 RD
66 6/10 RD
KK RD
46 6/10 RD
KE RD
52 1/2 RD
54 7/10 RD
56 1/4 RD
59 RD
48 RD
48 1/2 RD
54 RD
National Forest
BULL BASIN RD
HE RD
FS RD
US HWY 65
This map does not stand alone, it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan.
This map does not necessarily reflect current zoning.
Kilometers
Miles
The Geographic Information System (GIS) and its components are designed as a source of reference for answering inquiries, for planning and for modeling. GIS is not intended or does not replace legal descriptions in the chain of title and other information contained in official government records such as the County Clerk and Recorders office or the courts. In addition, the representations of locations in this GIS cannot be substituted for actual legal surveys.
The Information contained herein is believed accurate and suitable for the use for the limited uses, and subject to the limitations, set forth above. Mesa County makes no warranty as to the accuracy or suitability of any information contained herein. Users assume all risk and responsibility for any and all damages, including consequential damages, which may flow from the user's use of this information.
LEGEND
Lakes
Rivers
Joint Planning Area
Roads
Parcels
Rural FLU
FLU Classification
Rural Community
Industrial
Estate
URR 5
Rural Residential 5
R/A 10
EOM 10
Fruita 201 10
R/A 17
R/A 20 NB
R/A 35+ A
LL R/A 35+
Buffer
Fruita Greenway Business Park
Gateway Area A Boundary
Gateway Area B Boundary
Existing Park
Gateway Parks
Gateway Historical Preservation
Gateway Existing Civic
Gateway Existing Residential
Gateway Low Density Residential
Gateway Medium Density Residential
Gateway Mixed Use
State of Colorado
BLM
N. Forest
Monument
Mesa County GIS

# Future Land Use
Adopted February 28, 2006
Plotted 3-24-2006

**DeBeque**

This south R/A 10 boundary coincides with the end of Bluestone's domestic water supply line as of the date of adoption of this plan.

This map does not stand alone; it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan. This map does not necessarily reflect current zoning.

**LEGEND**

- Lakes
- Rivers
- Joint Planning Area
- Roads
- Parcels

**Rural FLU**

**FLU Classification**
- Rural Community
- Industrial
- Estate
- URR 5
- Rural Residential 5
- R/A 10
- EOM 10
- Fruita 201 10
- R/A 17
- R/A 20 NB
- R/A 35+ A
- LL R/A 35+
- Buffer
- Fruita Greenway Business Park
- Gateway Area A Boundary
- Gateway Area B Boundary
- Existing Park
- Gateway Parks
- Gateway Historical Preservation
- Gateway Existing Civic
- Gateway Existing Residential
- Gateway Low Density Residential
- Gateway Medium Density Residential
- Gateway Mixed Use
- State of Colorado
- BLM
- N. Forest
- Monument

The Geographic Information System (GIS) and its components are designed as a source of reference for answering inquiries, for planning and for modeling. GIS is not intended or does not replace legal descriptions in the chain of title and other information contained in official government records such as the County Clerk and Recorders office or the courts. In addition, the representations of locations in this GIS cannot be substituted for actual legal surveys.

The information contained herein is believed accurate and suitable for the use for the limited uses, and subject to the limitations, set forth above. Mesa County makes no warranty as to the accuracy or suitability of any information contained herein. Users assume all risk and responsibility for any and all damages, including consequential damages, which may flow from the user's use of this information.

Mesa County GIS



# Future Land Use
## Palisade Area/ East Orchard Mesa
Adopted February 2, 2006

Plotted 3-24-2006

This map does not stand alone; it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan. This map does not necessarily reflect current zoning.

### LEGEND

- Lakes
- Rivers
- Joint Planning Area
- Roads
- Parcels

Rural FLU

FLU Classification
- Rural Community
- Industrial
- Estate
- URR 5
- Rural Residential 5
- R/A 10
- EOM 10
- Fruita 201 10
- R/A 17
- R/A 20 NB
- R/A 35+ A
- LL R/A 35+
- Buffer
- Fruita Greenway Business Park
- Gateway Area A Boundary
- Gateway Area B Boundary
- Existing Park
- Gateway Parks
- Gateway Historical Preservation
- Gateway Existing Civic
- Gateway Existing Residential
- Gateway Low Density Residential
- Gateway Medium Density Residential
- Gateway Mixed Use
- State of Colorado
- BLM
- N. Forest
- Monument

Mesa County GIS

BLM_0057618



Future Land Use
Adopted February 2, 2006
Plotted 3-24-2006
Whitewater/
Kannah Creek
A RD
WHITEWATER CREEK RD
DYER RD
COFFMAN RD
Estate
FOSTER LN
DESERT RD
REEDER MESA RD
BLAIR RD
LANDS END RD
LL R/A 35+
BLUE SAGE DR
PURDY MESA RD
KANNAH CREEK RD
DIVIDE RD
R/A 20 NB
R/A 17
R/A 10
BEAN RANCH RD
S US HWY 50
35 6/10 RD
BRIDGEPORT RD
LEGEND
Lakes
Rivers
Joint Planning Area
Roads
Parcels
Rural FLU
FLU Classification
Rural Community
Industrial
Estate
URR 5
Rural Residential 5
R/A 10
EOM 10
Fruita 201 10
R/A 17
R/A 20 NB
R/A 35+ A
LL R/A 35+
Buffer
Fruita Greenway Business Park
Gateway Area A Boundary
Gateway Area B Boundary
Existing Park
Gateway Parks
Gateway Historical Preservation
Gateway Existing Civic
Gateway Existing Residential
Gateway Low Density Residential
Gateway Medium Density Residential
Gateway Mixed Use
State of Colorado
BLM
N. Forest
Monument
Mesa County
GIS
The Geographic Information System (GIS) and its components are designed as a source of reference for answering inquiries, for planning and for modeling. GIS is not intended or does not replace legal descriptions in the chain of title and other information contained in official government records such as the County Clerk and Recorders office or the courts. In addition, the representations of locations in this GIS cannot be substituted for actual legal surveys.
The Information contained herein is believed accurate and suitable for the use for the limited uses, and subject to the limitations, set forth above. Mesa County makes no warranty as to the accuracy or suitability of any information contained herein. Users assume all risk and responsibility for any and all damages, including consequential damages, which may flow from the user's use of this information.
This map does not stand alone; it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan.
This map does not necessarily reflect current zoning.
Kilometers
Miles



Future Land Use
Adopted February 2, 2006
Plotted 3-24-2006
Mid Valley
This map does not stand alone; it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan.
This map does not necessarily reflect current zoning.
LEGEND
Lakes
Rivers
Joint Planning Area
Roads
Parcels
Rural FLU
FLU Classification
Rural Community
Industrial
Estate
URR 5
Rural Residential 5
R/A 10
EOM 10
Fruita 201 10
R/A 17
R/A 20 NB
R/A 35+ A
LL R/A 35+
Buffer
Fruita Greenway Business Park
Gateway Area A Boundary
Gateway Area B Boundary
Existing Park
Gateway Parks
Gateway Historical Preservation
Gateway Existing Civic
Gateway Existing Residential
Gateway Low Density Residential
Gateway Medium Density Residential
Gateway Mixed Use
State of Colorado
BLM
N. Forest
Monument
Miles
Kilometers
Mesa County GIS
The Geographic Information System (GIS) and its components are designed as a source of reference for answering inquiries, for planning and for modeling. GIS is not intended or does not replace legal descriptions in the chain of title and other information contained in official government records such as the County Clerk and Recorders office or the courts. In addition, the representations of locations in this GIS cannot be substituted for actual legal surveys.
The Information contained herein is believed accurate and suitable for the use for the limited uses, and subject to the limitations, set forth above. Mesa County makes no warranty as to the accuracy or suitability of any information contained herein. Users assume all risk and responsibility for any and all damages, including consequential damages, which may flow from the user's use of this information.
R/A 10
URR 5
R/A 10
URR 5
Buffer
Joint Urban Planning Area
Monument
N RD
M 1/2 RD
M RD
L RD
K RD
K 3/4 RD
J 1/2
J 1/4
J 2/10
J RD
I 1/2 RD
I 3/8 CT
I 3/10 RD
I RD
H 3/4 RD
H RD
G 1/2 RD
G RD
F 3/4 RD
F 1/4 RD
E 7/8 RD
E 3/4 RD
E RD
18 RD
18 1/2 RD
19 RD
19 1/2 RD
20 RD
20 1/2 RD
21 RD
21 1/2 RD
21 3/4 RD
22 RD
23 RD
23 1/2 RD
24 RD
24 1/2 RD
25 RD
26 RD
26 1/2 RD
27 RD
28 35/100 RD
FRONTAGE RD
US HWY 6 AND 50
BROADWAY ST
BROADWAY
BASELINE DR
PEONY DR
VALLEY CT
FOXFIRE CT
RIVER RD
DESERT HILLS RD
DIKE RD
RIM DR
LANDING VIEW LN
GOLFMORE DR
N 15TH ST
N 7TH ST
TEXAS AVE
ORCHARD



# Future Land Use
Adopted February 2, 2006

# Lower Valley

## LEGEND

- Lakes
- Rivers
- Joint Planning Area
- Roads
- Parcels

**Rural FLU**

**FLU Classification**
- Rural Community
- Industrial
- Estate
- URR 5
- Rural Residential 5
- R/A 10
- EOM 10
- Fruita 201 10
- R/A 17
- R/A 20 NB
- R/A 35+ A
- LL R/A 35+
- Buffer
- Fruita Greenway Business Park
- Gateway Area A Boundary
- Gateway Area B Boundary
- Existing Park
- Gateway Parks
- Gateway Historical Preservation
- Gateway Existing Civic
- Gateway Existing Residential
- Gateway Low Density Residential
- Gateway Medium Density Residential
- Gateway Mixed Use
- State of Colorado
- BLM
- N. Forest
- Monument

Plotted 3-24-2006

This map does not stand alone; it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan.

This map does not necessarily reflect current zoning.

The Geographic Information System (GIS) and its components are designed as a source of reference for answering inquiries, for planning and for modeling. GIS is not intended or does not replace legal descriptions in the chain of title and other information contained in official government records such as the County Clerk and Recorders office or the courts. In addition, the representations of locations in this GIS cannot be substituted for actual legal surveys.

The information contained herein is believed accurate and suitable for the use for the limited uses, and subject to the limitations, set forth above. Mesa County makes no warranty as to the accuracy or suitability of any information contained herein. Users assume all risk and responsibility for any and all damages, including consequential damages, which may flow from the user's use of this information.

Mesa County GIS

R/A 35+ A

R/A 17

R/A 10

URR 5

R/A 10

URR 5

Buffer

BLM_0057621



**Future Land Use**
Adopted February 2, 2006
Plotted 3-24-2006

LEGEND

Lakes
Rivers
Joint Planning Area
Roads

**Rural FLU**

FLU Classification

Rural Community
Industrial
Estate
URR 5
Rural Residential 5
R/A 10
EOM 10
Fruita 201 10
R/A 17
R/A 20 NB
R/A 35+ A
LL R/A 35+
Buffer
Fruita Greenway Business Park
Gateway Area A Boundary
Gateway Area B Boundary
Existing Park
Gateway Parks
Gateway Historical Preservation
Gateway Existing Civic
Gateway Existing Residential
Gateway Low Density Residential
Gateway Medium Density Residential
Gateway Mixed Use
State of Colorado
BLM
N. Forest
Monument

This map does not stand alone; it must be used in concert with the goals and policies in the Rural Planning Area Future Land Use Plan.

This map does not necessarily reflect current zoning.

The Geographic Information System (GIS) and its components are designed as a source of reference for answering inquiries, for planning and for modeling. GIS is not intended or does not replace legal descriptions in the chain of title and other information contained in official government records such as the County Clerk and Recorders office or the courts. In addition, the representations of locations in this GIS cannot be substituted for actual legal surveys.

The information contained herein is believed accurate and suitable for the use for the limited uses, and subject to the limitations, set forth above. Mesa County makes no warranty as to the accuracy or suitability of any information contained herein. Users assume all risk and responsibility for any and all damages, including consequential damages, which may flow from the user's use of this information.

Mesa County GIS

BLM_0057622



# Adopted Urban Area Plans and Proposed Joint Areas of Concern

MIDVALLEY (APPLETON) PLAN (SEPT. 1989)
Portion in Urban Planning Area

PROPOSED
JOINT AREA
OF CONCERN

PROPOSED JOINT
AREA OF CONCERN

TOWN OF PALISADE
COMPREHENSIVE PLAN (1981)

CLIFTON PLAN
(APRIL 1985)

COLORADO
NATIONAL
MONUMENT

CITY OF GRAND
JUNCTION
DOWNTOWN PLAN

REDLANDS PLAN
(APRIL 1986)

ORCHARD MESA
NEIGHBORHOOD PLAN
(MARCH 1995)

**LEGEND:**

| | |
|---|---|
| | URBAN PLANNING AREA BOUNDARY |
| | MIDVALLEY (APPLETON) PLAN (1989) PORTION IN URBAN PLANNING AREA |
| | CLIFTON PLAN (1985) |
| | ORCHARD MESA NEIGHBORHOOD PLAN (1995) |
| | REDLANDS PLAN (1986) |
| | CITY OF GRAND JUNCTION DOWNTOWN PLAN |
| | TOWN OF PALISADE COMPREHENSIVE PLAN (1981) |
| | PROPOSED JOINT AREA OF CONCERN CITY OF FRUITA/CITY OF GRAND JUNCTION/MESA COUNTY |
| | PROPOSED JOINT AREA OF CONCERN TOWN OF PALISADE/CITY OF GRAND JUNCTION/MESA COUNTY |
| | NO EXISTING AREA PLAN |

# Mesa Countywide
## Land Use Plan
### From Issues To Action

and

# City of Grand Junction
## Growth Plan

DSW
DESIGN STUDIOS WEST, INC.

GRAPHIC SCALE
(IN MILES)

EXHIBIT 1

**SCALE**
**1:100,000**

PLOT DATE 2/28/94

BLM_0057623



# ADOPTED AREA PLANS, MUNICIPAL PLANS, AND PROPOSED JOINT AREAS OF CONCERN

**LEGEND:**

- URBAN PLANNING AREA
- POWDERHORN  (1984)
- LOWER VALLEY  (1985)
- REDLANDS  (1986)
- GLADE PARK  (1985)
- ORCHARD MESA NEIGHBORHOOD PLAN (1995)
- MIDVALLEY/APPLETON  (1989)
- GRAND MESA SLOPES SPECIAL MANAGEMENT PLAN (1994)
- TOWN OF PALISADE COMPREHENSIVE PLAN (1981)
- TOWN OF DEBEQUE ANNEXATION PLAN (1988)
- TOWN OF COLLBRAN LAND USE MAP
- CITY OF FRUITA COMMUNITY PLAN (1994)
- PROPOSED JOINT AREA OF CONCERN CITY OF FRUITA/CITY OF GRAND JUNCTION/MESA COUNTY
- PROPOSED JOINT AREA OF CONCERN TOWN OF PALISADE/CITY OF GRAND JUNCTION/MESA COUNTY

**Mesa Countywide Land Use Plan**
From Issues To Action

**DSW**
**DESIGN STUDIOS WEST, INC.**
1425 Market St. Suite 100  Denver, CO  80202
(303) 623-3465

**EXHIBIT 2**

SCALE
1:400,000

GRAPHIC SCALE

(IN MILES)

Plot Date: 2/28/96

BLM_0057624

EAST RURAL PLANNING AREA

URBAN PLANNING AREA

WEST RURAL PLANNING AREA

GARFIELD COUNTY

DELTA COUNTY

DELTA COUNTY

MONTROSE COUNTY

# MESA COUNTY PLANNING AREAS

## LEGEND:

URBAN PLANNING AREA

EAST RURAL PLANNING AREA

WEST RURAL PLANNING AREA

**Mesa Countywide**
Land Use Plan
From Issues To Action

DSW
DESIGN STUDIOS WEST, INC.
1425 Market St. Suite 100 Denver, CO 80202
(303) 623-3465

EXHIBIT 4

SCALE
1:400,000

GRAPHIC SCALE
(IN MILES)

Plot Date: 2/28/96

BLM_0057625

MESA COUNTY COMMUNITIES

LEGEND:

COMMUNITY AREA BOUNDARY

FRUITA/LOWER MID VALLEY

DEBEQUE

MESA/PLATEAU VALLEY

GRAND JUNCTION

PALISADE/ E. ORCHARD MESA

CLIFTON

REDLANDS

ORCHARD MESA

GLADE PARK

WHITEWATER/ KANNAH CREEK

GATEWAY/UNAWEEP

GARFIELD COUNTY

DELTA COUNTY

MONTROSE COUNTY

EXHIBIT 5

SCALE 1:400,000

GRAPHIC SCALE

(IN MILES)

Plot Date: 2/28/96

Mesa Countywide Land Use Plan

From Issues To Action

DSW
DESIGN STUDIOS WEST, INC.
1425 Market St. Suite 100  Denver, CO  80202
(303) 623-3465

BLM_0057626

BLM_0057627



# WEST RURAL PLANNING AREA

## FUTURE LAND USE PLAN

### LEGEND:

- COMMUNITY AREA BOUNDARY
- FRUITA 201 BOUNDARY
- CO. NATIONAL MONUMENT BOUNDARY
- AREA OF INFLUENCE (See Adopted Municipal Plans)
- PROPOSED JOINT AREA OF CONCERN GRAND JUNCTION AND FRUITA
- URBAN PLANNING AREA (See Separate Map)
- URBAN (Incorporated Municipality)
- RURAL COMMUNITY
- RURAL: will accept residential development between 5 ac. and 35 ac. densities, and encourage cluster techniques
- AGRICULTURE: 35 acre density (clustering will be encouraged on non-productive lands)
- PUBLIC LAND



## Mesa Countywide
### Land Use Plan
From Issues To Action

## DSW
### DESIGN STUDIOS WEST, INC.
1425 Market St. Suite 100  Denver, CO  80202
(303) 623-3465

NOTES:
1. This map does not stand alone, it must be used in concert with the goals and policies for the Rural Planning Area.
2. This map does not necessarily reflect current zoning.



SCALE
1:72,000



GRAPHIC SCALE
(IN MILES)

Plot Date: 10/10/96



# EAST RURAL PLANNING AREA
## FUTURE LAND USE PLAN

LEGEND:

COMMUNITY AREA BOUNDARY

AREA OF INFLUENCE
(See Adopted Municipal Plans)

PROPOSED JOINT AREA OF CONCERN
GRAND JUNCTION AND PALISADE

URBAN PLANNING AREA
(See Separate Map)

URBAN (Incorporated Municipality)

RURAL COMMUNITY

RURAL: will accept residential development between 5 ac. and 35 ac. densities, and encourage cluster techniques.

AGRICULTURE: 35 ac. density (clustering will be encouraged on non-productive lands.)

PUBLIC LAND

## Mesa Countywide
## Land Use Plan
From Issues To Action

## DSW
### DESIGN STUDIOS WEST, INC.
1425 Market St. Suite 100   Denver, CO 80202
(303) 623-3465

SCALE
1:72,000
GRAPHIC SCALE

Plot Date: 10/10/96

NOTES:
1. This map does not stand alone, it must be used in concert with the goals and policies for the Rural Planning Area.
2. This map does not necessarily reflect current zoning.

BLM_0057628

# MESA COUNTY

# NOXIOUS WEED MANAGEMENT PLAN

**Division of Pest Management**

**Judith M. Sirota**
**Weed and Pest Inspector**

**Adopted November 30, 2009**
**MCM 2009-204**

BLM_0057629

# TABLE OF CONTENTS

Definitions ........................................................................................................................................4
1.0  Authority: Colorado Weed Management Act (Act): C.R.S. Title 35, Article 5.5 ...................8
   1.1 Purpose of C.R.S. Title 35, Article 5.5 .......................................................................................8
   1.2 An Abstract ..................................................................................................................................8
      1.2.1 County Noxious Weed Management Plan and Noxious Weed Advisory Board ................8
      1.2.2 Coordination of Effort and Designation of List A, B and C Noxious Weeds ...................8
      1.2.3 Procedure for Eradication of List A and List B Species ...................................................9
      1.2.4 Procedure for Management of Species not Designated for Eradication ...........................10
      1.2.5 Nuisance Declaration, Interagency Agreements and Funding .......................................11
   1.3 Noxious Weed Lists ...................................................................................................................11
2.0  Goals and Objectives for Noxious Weed Management In Mesa County ...............................15
3.0 Operating Procedures for the Division of Pest Management and the Pest and Weed Inspector ...............15
   3.1 Prioritizing County Weed Management Efforts .......................................................................15
      3.1.1 High Priority ....................................................................................................................16
      3.1.2 Medium Priority ...............................................................................................................16
      3.1.3 Low Priority .....................................................................................................................17
   3.2 Coordination of weed management activities ...........................................................................17
      3.2.1 Non-county entities .........................................................................................................17
      3.2.2 County Departments and Divisions .................................................................................18
   3.3 Mapping ....................................................................................................................................18
      3.3.1 Roads ...............................................................................................................................18
      3.3.2 Other County Properties ..................................................................................................18
      3.3.3 Private property ...............................................................................................................18
   3.4 Education ...................................................................................................................................19
   3.5 Management of Noxious Weeds on Private Property ................................................................19
      3.5.1 Landowner Cooperation ..................................................................................................19
      3.5.2  Priorities for Implementing Enforcement Action ...........................................................20
      3.5.3  Standard Operating Procedures for Enforcement ...........................................................20
      3.5.3.1 Responsibility ...............................................................................................................20
      3.5.3.2 Requests For Assistance ...............................................................................................21
      3.5.3.3 Complaints ....................................................................................................................21
         3.5.3.3.1 Inspection ..............................................................................................................21
         3.5.3.3.2 Notification ...........................................................................................................22
         3.5.3.3.3 Enforcement Notice ..............................................................................................22
         3.5.3.3.4  Enforcement .........................................................................................................23
         3.5.3.3.5 Billing ...................................................................................................................23
      3.5.4 Mesa County Noxious Weed Cost Share Program ..........................................................24
      3.5.4.1  Application Process .......................................................................................................24
      3.5.4.2  Eligibility .....................................................................................................................24
      3.5.4.3  Reimbursement .............................................................................................................24
      3.5.4.4 Reasons For Disqualification or Denial .........................................................................25
   3.6 Herbicide Application on Private Land .....................................................................................25
   3.7 Funding of Weed Management Projects ....................................................................................26
APPENDICES ..................................................................................................................................27
APPENDIX A—A Guide to Integrated Weed Management Planning ...........................................28
   A1 Identification ............................................................................................................................28
   A2 Mapping ...................................................................................................................................28
   A3 Evaluation of Control Strategy ................................................................................................28
   A4 Preparing an Integrated Weed Management Plan .....................................................................29
   A5 Weed Control Principles ..........................................................................................................29
   APPENDIX B—Best Management Practices for Noxious Weeds in Mesa County ...................31
   B1 General Guidelines ...................................................................................................................31

Revised November 2009

BLM_0057630

**B2 Control of Annuals & Biennials** .............................................................................................32
**B3 Control of Perennials** ............................................................................................................32
**B4 Integrated Pest Management Practices** ................................................................................33
    **B4.1 Prevention**.........................................................................................................................33
    **B4.2 Cultural Practices** ............................................................................................................34
    **B4.3 Mechanical Control** .........................................................................................................34
    **B4.4 Biological Control** ...........................................................................................................35
    **B4.5 Chemical Control**.............................................................................................................36
**B5 Noxious Weeds of Mesa County: A Management Guide** ......................................................36

# List of Tables

*TABLE 1: COUNTY LISTED NOXIOUS WEEDS* ........................................................................13
*TABLE 2: STATE LISTED NOXIOUS WEEDS TO BE ERADICATED STATEWIDE*......................14

Revised November 2009

BLM_0057631

# Definitions

1. **Act:** the Colorado Weed Management Act, Title 35, Article 5.5, Colorado Revised Statutes (C.R.S.) as amended.

2. **Alien plant:** an introduced plant species that is not native to the state of Colorado.

3. **Annual weed:** a weed that lives for one year then dies.  Seeds are the primary dispersal mechanism for annual plants.

4. **Arbitration panel:** In an enforcement situation involving noxious weeds that are not slated for eradication, a landowner may request an arbitration panel to determine a management plan for the landowner's infested property. The arbitration panel is chosen by the local governing body and "shall be comprised of a weed management specialist or weed scientist, a landowner of similar land in the same county, and a third panel member chosen by agreement of the first two panel members." (CRS 35-5.5-109(4)(b)).

5. **Authorized Agent:** a local or state government employee or designated inspector.

6. **Best Management Practices (BMP):** recommendations for the most reasonable, effective and economical but least harmful methods of weed control; may include prevention, mechanical, cultural, biological and chemical methods .

7. **Biennial weed:** a weed that has a two year life cycle.  It germinates and grows leaves one year, then sends up a flower stalk and sets seed the following year. Seeds are the primary dispersal mechanism for biennial plants.

8. **Biological Control:** The deliberate introduction of living agents (natural enemies), such as insects, vertebrate predators, grazing animals, and plant diseases, to reduce the population of a pest.

9. **Biocontrol agent:** a living creature that is used to control undesirable pests.  Includes insects, diseases, and vertebrate animals, among others.

10. **Board:** County Noxious Weed Advisory Board (NWAB).

11. **Board of Commissioners (BOCC):** Mesa County Board of Commissioners.

12. **Bolting:** a stage in the life cycle of a plant when it sends up a flower stalk.

13. **CDOT:** Colorado Department of Transportation.

14. **Commissioner:** the Colorado Commissioner of Agriculture.

15. **Containment:** "…maintaining an intensively managed buffer zone that separates infested regions, where suppression activities prevail, from largely uninfested regions, where eradication activities prevail." (CRS 35-5.5-103(11.7)(b)).

Revised November 2009

BLM_0057632

16. **County:** the unincorporated areas of Mesa County.

17. **Cultural Weed Control:** Cultural control means using sensible land management practices, such as dense seeding with competitive species, crop rotation, careful irrigation practices, proper fertilization, and sensible grazing regimes.

18. **Division:** the Mesa County Division of Pest Management.

19. **Elimination:** removing and destroying live plants of List A or List B species designated for eradication and preventing seed production until the seed source is depleted; considered the first step in the eradication process.

20. **Eradication:** "…reducing the reproductive success of a noxious weed species or specified noxious weed population in largely uninfested regions to zero and permanently eliminating the species or population within a specified period of time. Once all specified weed populations are eliminated or prevented from reproducing, intensive efforts continue until the existing seed bank is exhausted." (CRS 35-5.5-103(11.7)(a)).

21. **Geographic Information Systems (GIS):** a method used to map weed infestations using satellite technology (**Geographic Positioning System or GPS**) coupled with on-the-ground observations and computer mapping programs to determine the extent of an infestation and to track the long term effect of weed management practices.

22. **Infestation:** An area of land containing one or more weed species. (North American Invasive Plant Mapping Standards, 2002).

23. **Inspector:** Mesa County Weed and Pest Inspector.

24. **Integrated Weed Management (IWM):** the planning and implementation of a coordinated program that uses a variety of effective tools to manage noxious weeds. Elements of an IWM plan include weed identification, education, prevention, cultural practices, mechanical removal, chemical use, and biological control.

25. **Landowner:** any owner of record of state, federal, county, municipal, or private land, including owners of easements, irrigation canals and ditches, and rights-of-way.

26. **List A Species:** "…rare noxious weed species that are subject to eradication wherever detected statewide in order to protect neighboring lands and the state as a whole." (CRS 35-5.5-108(2)(a)(I)).

27. **List B Species:** "…noxious weed species with discrete statewide distributions that are subject to eradication, containment, or suppression in portions of the state designated by the commissioner in order to stop the continued spread of these species." (CRS 3-5.5-108(2)(a)(II)).

BLM_0057633

28. **List C Species:** "…widespread and well-established noxious weed species for which control is recommended but not required by the state, although local governing bodies may require management." (CSR 3-5.5-108(2)(a)(III)).

29. **MCTD:** Mesa County Transportation Department.

30. **Mechanical Weed Control:** The physical removal of a weed by such methods as pulling, hand grubbing, rogueing, hoeing, burning, grazing, tillage, plowing, solarization and mowing.

31. **Neighboring:** a property with a boundary immediately adjacent to the boundary of another property.

32. **Noxious weed:** a non-native plant that has been designated by State rule as being noxious or has been declared a noxious weed by a County Advisory Board, and meets one or more of the following criteria:

    A. aggressive invaders detrimental to agriculture or native plant communities,
    B. may be poisonous to livestock,
    C. may be carriers of or hosts to insects, diseases or parasites,
    D. are detrimental to sound management of native or agricultural ecosystems.

33. **Noxious Weed Advisory Board (NWAB):** a panel of citizens appointed by the Board of County Commissioners to advise on management of noxious weeds in the County.

34. **Noxious Weed List:** a list of noxious plant species that are to be managed within the County as recommended by the Noxious Weed Advisory Board and approved by the Board of County Commissioners.

35. **Perennial weed:** a weed that lives for 3 or more years. These species usually spread by root systems or root pieces, as well as seeds.

36. **Plan:** Mesa County Noxious Weed Management Plan

37. **Propagules:** plant parts that have the ability to give rise to new plants, for example, seeds and root pieces

38. **Rosette:** a circular growth of leaves that forms after germination of some plants.

39. **ROW:** right-of-way

40. **Rules:** Rules Pertaining to the Administration and Enforcement of the Colorado Noxious Weed Act (8 CCR 1206-2)

Revised November 2009

BLM_0057634

41. **State Noxious Weed:** any noxious weed identified by rule by the Commissioner of the Colorado Department of Agriculture. The current list of noxious weeds can be found at http://www.colorado.gov/ag/weeds.

42. **Statewide Weed Management Plan:** a plan for management of a weed species compiled by the State Noxious Weed Coordinator from recommendations made by county inspectors and others and approved by the Commissioner of Agriculture and the State Legislature; Statewide Weed Management Plans are a part of the Rules of the Noxious Weed Act.

43. **Suppression:** "…reducing the vigor of noxious weed populations within an infested region, decreasing the propensity of noxious weed species to spread to surrounding lands, and mitigating the negative effects of noxious weed populations on infested lands." Suppression efforts may employ a wide variety of integrated management techniques. (CRS 35-5.5-103(11.7)(c))

44. **Weed and Pest Inspector or Inspector:** the agent or employee appointed by the Board of County Commissioners to fulfill the duties and functions designated under this Plan

BLM_0057635

# 1.0  Authority: Colorado Weed Management Act ("Act"): C.R.S. Title 35, Article 5.5, as amended

## 1.1 Purpose of C.R.S. Title 35, Article 5.5

Certain undesirable plants, primarily aggressive non-native invaders, constitute a threat to the "continued economic and environmental value of the lands of the state and if present in any area of the state must be managed" These species must be managed in an organized and coordinated manner on private and public lands, using integrated management techniques "which are least damaging and which are practical and economically reasonable." (CRS 35-5.5-102)

## 1.2 An Abstract

As mandated by the Colorado Noxious Weed Act (C.R.S. 35-5.5-104), all persons shall control noxious weeds on their property if such plants are a threat to neighboring landowners or natural ecosystems. Weed control programs should be integrated in their approach, using all available technologies to achieve effective weed control.

It is unlawful for persons to "intentionally introduce, cultivate, sell, offer for sale, or knowingly allow to grow" any species recognized as a noxious weed by the State (C.R.S. 35-5.5-104.5(1)(a), with a few exceptions (C.R.S. 35-5.5-104.5(1(a)(I-V).

### 1.2.1 County Noxious Weed Management Plan and Noxious Weed Advisory Board

To comply with the Act, the Board of County Commissioners (BOCC) "shall adopt a noxious weed management plan for all of the unincorporated lands" (C.R.S. 35-5.5-105) ("County lands") within its jurisdiction. The BOCC may adopt regulations, ordinances or resolutions to enforce this Plan and promote noxious weed management in the county.  Agents, delegates, or employees may be used to enforce noxious weed control on county lands and to otherwise administer the provisions of the Act. The BOCC may enter into cooperative weed management agreements with other governmental agencies.

The Noxious Weed Advisory Board (NWAB), a committee of resident private landowners, shall develop and submit to the BOCC a County Noxious Weed Management Plan. The Plan shall be reviewed by the NWAB at least once every three years. At least a majority of the members of the NWAB must own forty or more acres of property within the County. The NWAB proposes which species are to be managed within the County (County Noxious Weed List) and recommends management plans for those species.  The BOCC can approve, modify or reject management plans recommended by the NWAB.  Management plans cannot be rejected for species with State designated eradication plans, unless the County submits a waiver of compliance to the Commissioner of Agriculture (Rules, Part 6).  The NWAB can request that specific landowners submit weed management plans when listed noxious weeds are found on their property.

### 1.2.2 Coordination of Effort and Designation of List A, B and C Noxious Weeds

The State Department of Agriculture has determined that "an organized and coordinated effort must be made to stop the spread of noxious weeds" (C.R.S. 35-5.5-102). This effort is

Revised November 2009

BLM_0057636

facilitated by the State Noxious Weed Coordinator ("Coordinator") who builds local coalitions and coordinates efforts of state, federal, local, and private landowners in developing Statewide Weed Management Plans. The County Weed and Pest Inspector shall submit to the Coordinator a management plan for a particular species, when requested, proposing what level of control (eradication, suppression, or containment) will be implemented in the County.  The Coordinator compiles county recommendations and submits a Statewide Noxious Weed Management Plan for each species, as requested, to the State Noxious Weed Advisory Committee. The Committee reviews and recommends the Statewide Noxious Weed Management Plans to the Commissioner of Agriculture who, via the Legislature, incorporates the plans into the Rules (8 CCR 1206-2). A county may implement weed management plans for weeds that do not have a Statewide Plan.

The Rules designate and classify noxious weeds into three categories (C.R.S. 35-5.5-108). List A species are designated as weeds to be eradicated statewide.  Eradication of all List A species is required whether or not they appear on a county's Noxious Weed List.  The intent of Statewide Noxious Weed Management Plans adopted by the state for List B weeds is to stop their continued spread.  List B species management plans may require eradication countywide or in a localized area of a county or require containment or suppression countywide or in a localized area of a county.  The Commissioner prescribes acceptable management techniques for each species on List A and B.  All List B species Statewide Weed Management Plans contain a provision that "All populations in this state that are within 15 feet from the edge of any public road and any immediately adjacent area used for parking must be eliminated prior to seed development" in the year specified in the Statewide Plan.  List C species are typically widespread within Colorado. The state noxious weed management plans for List C species, when adopted, will be designed "to support the efforts of local governing bodies to facilitate more effective integrated weed management." "The goal of such plans will not be to stop the continued spread of these species but to provide additional education, research, and biological control resources to jurisdictions that choose to require management of List C species." (Rules, Section 5.2)

Weeds that are not on a State List or that do not have an adopted Statewide Noxious Weed Management Plan may be designated as a noxious weed by a county.

Local governments or landowners may request a compliance waiver from the Commissioner that releases the local government or landowner from "certain obligations of eradication for a specific population of a List A or List B species." (CRS 35-5.5-108.5 (2.7))

The Mesa County Noxious Weed List and management goals for List A and B species can be found in Tables 1 and 2 in Section 1.3 of this document.

## 1.2.3 Procedure for Enforcement of Eradication for List A and List B Species

Local governing bodies shall "initiate and maintain contact with landowners who are affected by List A species and populations of List B species designated for eradication" (CRS 35-5.5-108.5(3)). The County shall "provide affected landowners with technical assistance" (CRS 35-5.5-108.5(3)(b)(I)) and "carry out sufficient measures, including project oversight and enforcement" (CRS 35-5.5-108.5(3)(b)(II)) to ensure that eradication of so designated species is accomplished. The County shall assist with distributing financial resources from the State to affected landowners and determine the portion of the cost of eradication to be paid by the landowner.  The County shall submit mapping data as requested by the Commissioner.  The

Revised November 2009

BLM_0057637

Commissioner may implement eradication programs directly if the County fails to perform its duties in regards to eradication.

A landowner affected by any List A species or a List B species designated for eradication shall allow the Inspector access to the affected property for the purpose of inspection and eradication when at least one of the following conditions occur:

"(a) The affected landowner or occupant has requested the inspection; or

(b) A neighboring landowner or occupant has reported a suspected noxious weed infestation and requested an inspection; or

(c) An authorized agent of the local government or commissioner has made a visual observation from a public right of way or area and has reason to believe that a noxious weed infestation exists." (C.R.S. 35-5.5-108.5 (4))

If a noxious weed infestation is suspected, a letter must be sent via certified mail defining the problem and requesting an inspection. If entry is refused or there is no response from the landowner after 10 days from the mailing date of the certified letter, an inspection warrant must be obtained by the Inspector from a county or district court before an inspection is conducted (CSR 35-5.5-108.5(5)(b)(I)). A landowner cannot deny entry to inspect if a warrant is secured.

After inspection, a notice outlining the problem, stating steps to be taken for eradication and advising the landowner to commence eradication within a specified time frame shall be sent by certified mail. Within five (5) days of mailing the certified letter, the landowner shall comply with the recommendations or submit an acceptable noxious weed eradication plan. The County shall take action in the case of failure of the landowner to comply with the Act, by implementing the eradication plan, and assessing the entire cost of the eradication action to the landowner. The assessment becomes a lien on the property until paid. Funds collected shall be used in the furtherance of the County's weed management efforts.

Once an eradication effort is made, the County has the right to enter the property to ensure compliance with the requirements of the eradication plan. The landowner may apply to the Commissioner of Agriculture for a waiver of compliance for species with an eradication designation (C.R.S. 108.5(14).

The County cannot compel a private owner to control weeds without first applying the same control measures on any county-owned land or rights-of-way adjacent to the private property in question. If the County fails to take the actions outlined above for List A and List B species designated for eradication, the Commissioner is authorized to perform the eradication effort.

State agencies have the same responsibility as private landowners for List A and List B species designated for eradication (C.R.S. 35-5.5-110). Notification by the county is the same as for private landowners. The County has the power to enter infested public lands and undertake the eradication effort if the state agency does not comply with the eradication plan. The state agency having jurisdiction over the treated land shall pay for the expenses associated with the eradication effort. The County may enter into a written reimbursement agreement with the state agency.

**1.2.4 Procedure for Enforcement of Management for Species Not Designated for Eradication**

BLM_0057638

A landowner affected by List B or List C species <u>not</u> designated for eradication shall allow the local weed control official (Inspector) to inspect the affected property when at least one of the following conditions occur:

"(a) The affected landowner or occupant has requested the inspection; or

(b) A neighboring landowner or occupant has reported a suspected noxious weed infestation and requested an inspection; or

(c) An authorized agent of the local government or commissioner has made a visual observation from a public right of way or area and has reason to believe that a noxious weed infestation exists." (C.R.S. 35-5.5-109)

Before entering private property, the landowner or occupant must be notified of the pending inspection by certified mail. If entry is refused, an inspection warrant must be obtained by the Inspector before the property can be inspected (C.R.S. 35-5.5-109(2)(b)). A landowner cannot deny entry to inspect if a warrant is secured. When noxious weeds are identified on a property, the Inspector shall notify the landowner by certified mail which noxious weeds were found, how to control those weeds, and advise them to begin management within a specified time frame. Within 10 days of receipt of notification, the landowner or occupant must comply with the recommendations, submit an acceptable weed management plan, or request an arbitration panel hearing (C.R.S. 35-5.5-109(4)(a)). The county has the authority to control the weeds in the case of failure by the landowner to comply with the notification and assess the cost of control plus overhead expenses, up to 20% (C.R.S. 35-5.5-109(5)(a)(II)). The County has the right to enter the property to ensure compliance with the requirements of the management plan. The County cannot force a private owner to control weeds without first having equal or greater control measures on any county-owned lands adjacent to the private property in question.

## 1.2.5 Nuisance Declaration, Interagency Agreements and Funding

Noxious weeds may be declared a public nuisance, subject to all applicable laws and remedies for abatement (C.R.S. 16-13, Part 3), including removal or destruction of the weeds (C.R.S. 35-5.5-113).

The county may enter into cooperative agreements for weed management with state and federal agencies (C.R.S. 35-5.5-111). Public lands under the jurisdiction of the County, including roads, highways, rights-of-way (ROWs), and easements, must be in compliance with the Act (C.R.S. 35-5.5-112).

A State Noxious Weed Management Fund was established to fund grants or contracts for weed management projects and education including procedures for allocation of funds to appropriate entities (C.R.S. 35-5.5-116). Counties may levy a tax of not more than 5 mils, upon voter approval, to fund noxious weed management programs (C.R.S. 35-5.5-119).

## 1.3 County Noxious Weed Lists

Each county adopts a Noxious Weed List for weeds of importance to their county. In Mesa County, 19 weeds are officially listed (Table 1) as of 2009. The Noxious Weed List shall be published in a local newspaper in the spring of each year. Both common and scientific names shall be listed.

BLM_0057639

Any person or organization can submit proposals to the NWAB to add species to the County list. The NWAB also can propose additions. Proposals shall include a justification for addition to the List and a suggested countywide management plan that outlines areas of eradication, suppression and/or containment. Total eradication may be a goal if the weed is not widespread or not yet present in the county.

The NWAB will discuss additions at the next regular meeting following receipt of a proposal. Before the NWAB meets to discuss a new addition, a Public Notice will be published in a local newspaper so that interested parties can attend the meeting, voice their opinion or send in written comments. After discussing, reviewing and considering public comments, the NWAB will vote on submitting the proposal to the BOCC for consideration.

If a proposal to add a weed to the List is submitted to the BOCC, a 30 day public comment period and a public hearing will be held. Public comments will be solicited via a Public Notice printed in a local newspaper and other forms of public notification. The Public Notice will include the common and scientific names of the weed, a brief description of the management plan, an address where comments can be sent and the date and location of the public hearing. Weeds will be added to the list by approval of the BOCC at the public hearing after consideration of public comments.

Table 1 lists the weeds currently on the Mesa County Noxious Weed List. County Management Goals are determined by the Inspector in conjunction with the NWAB and state and federal land management agencies in the county. Species denoted with a * are species for which eradication is the goal of the Statewide Weed Management Plan as of 2009.

Table 2 contains List A and List B species for which a State Weed Management Plan has been designated by Rule. The County must work to eradicate all of these species. They do not have to be listed on the County Noxious Weed List. Any additions or changes to the State Weed Management Plans automatically become part of the County Plan.

Table 3 lists species that occur in Mesa County and are known to be invasive in other parts of Colorado or in other states. These species are likely to be invasive in Mesa County. The Inspector in consultation with the State Noxious Weed Coordinator will decide whether eradication is warranted after identifying and mapping the infestations.

BLM_0057640

## TABLE 1: COUNTY LISTED NOXIOUS WEEDS

| Weed | County Management Goal | Geographical Areas | State List | Seed Viability (years) |
|---|---|---|---|---|
| Bull thistle (*Cirsium vulgare*) | 1) CONTAINMENT/SUPPRESSION 2) ERADICATION | 1) Above 7,000 feet 2) Below 7,000 feet | B | 5 |
| Canada thistle (*Cirsium arvense*) | CONTAINMENT/SUPPRESSION | All of Mesa County | B | Up to 30 |
| Dalmatian toadflax – broad leaf (*Linaria dalmatica*) | 1) CONTAINMENT/SUPPRESSION* 2) ERADICATION* | 1) Mormon Mesa, Big Creek 2) Elsewhere in Mesa County | B | 10 |
| Diffuse knapweed (*Centaurea diffusa*) | ERADICATION* | All of Mesa County | B | Unknown |
| Dyer's woad (*Isatis tinctoria*) | ERADICATION * | All of Mesa County | A | 8 |
| Goatshead/Puncturevine (*Tribulus terrestris*) | 1) CONTAINMENT/SUPPRESSION 2) ERADICATION | 1) Below 7,000 feet 2) Above 7,000 feet | C | 5 |
| Hoary cress/Whitetop (*Cardaria draba*) | CONTAINMENT/SUPPRESSION* | All of Mesa County | B | 3 |
| Houndstongue (*Cynoglossum officinale*) | 1) CONTAINMENT/SUPPRESSION* 2) ERADICATION* | 1) Above 7,000 feet 2) Below 7,000 feet | B | Unknown |
| Leafy spurge (*Euphorbia esula*) | ERADICATION* | All of Mesa County | B | At least 8 |
| Musk thistle (*Carduus nutans*) | 1) CONTAINMENT/SUPPRESSION 2) ERADICATION | 1) Above 7,000 feet 2) Below 7,000 feet | B | At least 15 |
| Oxeye daisy (*Chrysanthemum leucanthemum*) | 1) CONTAINMENT/SUPPRESSION* 2) ERADICATION* | 1) Above 7,000 feet in Eastern Mesa County 2) Below 7,000 feet | B | Up to 40 |
| Plumeless thistle (*Carduus acanthoides*) | ERADICATION * | All of Mesa County | B | Unknown |
| Purple loosestrife (*Lythrum salicaria*) | ERADICATION * | All of Mesa County | A | At least 10 |
| Russian knapweed (*Acroptilon repens*) (L) | CONTAINMENT/SUPRESSION* | All of Mesa County | B | 3-5 |
| Scotch thistle (*Onopordum acanthium*) | 1) CONTAINMENT/SUPPRESSION 2) ERADICATION | 1) Above 6,000 feet 2) Below 6,000 feet | B | Unknown |
| Spotted knapweed (*Centaurea maculosa*) | ERADICATION * | All of Mesa County | B | At least 15 |
| Tamarisk (*Tamarix parviflora, T. ramosissima*) | USE BIOCONTROL TO SUPPRESS POPULATIONS (not **mandatory** for control in Mesa County) | All of Mesa County | B | Less than 1 |
| Yellow starthistle (*Centaurea solstitialis*) | ERADICATION * | All of Mesa County | A | At least 10 |
| Yellow toadflax (*Linaria vulgaris*) | ERADICATION* | All of Mesa County | B | 10 |

Revised November 2009

BLM_0057641

## TABLE 2: STATE LISTED NOXIOUS WEEDS TO BE ERADICATED STATEWIDE

| Weed | State List | Seed Viability (years) | Status in Mesa County |
|---|---|---|---|
| African rue (*Peganum harmala*) | A | Unknown | Not known to be present |
| Absinth wormwood (*Artemesia absinthium*) | B | Unknown | Present in low numbers |
| Black Henbane (*Hysocyamus niger*) | B | 4 | Unknown |
| Camelthorn (*Alhagi pseudalhagi*) | A | Several years | Not known to be present |
| Chinese clematis (*Clematis orientalis*) | B | Unknown | Present in low numbers along Colorado River near Palisade |
| Common crupina (*Crupina vulgaris*) | A | 3 | Not known to be present |
| Cypress spurge (*Euphorbia cyparissias*) | A | 8 | Relatively common in ornamental landscapes |
| Giant salvinia (*Salvinia molesta*) AQUATIC | A | Negligible | Not known to be present |
| Hydrilla (*Hydrilla verticillata*) AQUATIC | A | Unknown | Not known to be present |
| Meadow knapweed (*Centaurea pratensis*) | A | 7 | Not known to be present |
| Mediterranean sage (*Salvia aethiopis*) | A | Unknown | Not known to be present |
| Medusahead rye (*Taeniatherum caput-medusae*) | A | 2 | Not known to be present |
| Myrtle spurge (*Euphorbia myrsinites*) | A | 8 | Relatively common in ornamental landscapes |
| Orange hawkweed (*Hieracium aurantiacum*) | A | 8 | Not known to be present |
| Perennial pepperweed (*Lepidium latifolium*) | B | 10+ | Along Colorado River from Fruita to Loma; scattered patches isolated patches elsewhere |
| Rush skeletonweed (*Chondrilla juncea*) | A | 3 | Not known to be present |
| Sericea lespedeza (*Lespedeza cuneata*) | A | 20 | Not known to be present |
| Spurred anoda (*Anoda cristata*) | B | Unknown | Not known to be present |
| Squarrose knapweed (*Centaurea virgata*) | A | 3 | Not known to be present |
| Sulfur cinquefoil (*Potentilla recta*) | A | 3+ | Present north and south of Collbran; unknown if present elsewhere in county |
| Tansy ragwort (*Senecio jacobaea*) | A | 16 | Not known to be present |

## TABLE 3. INVASIVE SPECIES OF CONCERN NOT LISTED BY THE STATE OR MESA COUNTY

| Weed | Habitat | Status in Mesa County |
|---|---|---|
| Japanese, Giant and Bohemian knotweed (*Polygonum cuspidatum, P. polystachyum, P. bohemicum*) | Riparian areas, ornamental plantings | Found on the Redlands in 2008 |
| Syrian bean caper (*Zygophyllum fabago*) | Disturbed sites, roadsides | I-70 near Fruita exit |

Revised November 2009

BLM_0057642

## 2.0  Goals and Objectives for Noxious Weed Management In Mesa County

*Prevention, early detection and early treatment are the most cost effective means for weed control, and are the ideal for preserving our agricultural production, recreational open space, natural environment, and aesthetics and attractiveness of urban and rural landscapes and the natural environment.*

- Prioritize weed management activities in the Division of Pest Management so as to maximize impact of control measures and maximize use of budgeted funds. (Section 3.1)

- Strive to contain, suppress or eradicate current weed infestations and reduce or eliminate weed seed production in certain species according to State Law and Rules and current County policy. (Sections 1, 3.1.1-2, 3.5.2-3, 3.6)

- Identify, monitor and promptly treat new infestations and new invasive species so as to prevent their spread on unincorporated lands in the County. (Sections 3.1.1-2, 3.6)

- Develop and implement Integrated Weed Management Plans for noxious weeds on County owned property, easements, and rights-of-way. (Sections 3.2.2, 3.3.1-2)

- Protect agricultural production, native plant ecosystems, watersheds, and recreational lands from degradation by noxious weeds by enforcing the Noxious Weed Act and working through cooperative agreements with municipal, state and federal agencies and adjacent counties and states. (Sections 3.2)

- Preserve the quality of life in urban areas of unincorporated Mesa County through desirable plant stewardship and noxious weed management to enhance human health aspects, land values and aesthetics. (Appendices A, B)

- Provide technical support and recommendations for noxious weed management and work to develop Integrated Weed Management Plans with all landowners and land users, including state and federal agencies.  (Sections 3.4, 3.5.4, 3.6. Appendices A, B)

- Educate Mesa County citizens on the impact of noxious weeds on the economy and the environment and provide information on Best Management Practices for noxious weeds. (Section 3.4, Appendices A, B)

## 3.0 Operating Procedures for the Division of Pest Management and the Weed and Pest Inspector

### 3.1 Prioritizing County Weed Management Efforts

The Inspector must prioritize infestations in order to allocate time to the most critical weed problems.  Infestations of some noxious weeds and infestations in certain areas are deemed

Revised November 2009

BLM_0057643

to be more significant than others and are ranked accordingly.  The County must comply with State Weed Management Plans for eradication, containment or suppression of several species of noxious weeds (see Table 1 and 2).

**3.1.1 High Priority:** High priority species are those that either do not yet occur in Mesa County or do not yet occur in high numbers.  Eradication or prevention of weeds listed as high priority is highly probable and extremely desirable.  The management goals for High Priority noxious weed infestations are to prevent the introduction of weeds that are not yet present, to eradicate weeds that are not yet abundant in the County, and to stop the spread of noxious weeds to relatively uninfested parts of the County.  Early detection and rapid response are critical management tools for High Priority species.  All State List A species and populations of State List B species designated for eradication are High Priority species.

High Priority species elicit a high level of response from the Division.  All possible methods are used to get landowners to comply with eradication requirements.  The Inspector may choose to do the control work for the landowner, if the infestation complies with the private land spraying policy explained in Section 3.6 of this Plan. The situations listed below are typically small infestations of noxious weeds that are rare in the county, isolated patches of weeds that may be abundant elsewhere in the County, and weed patches that exist in areas where transportation of plant propagules is highly likely.

- Any infestation of dyer's woad, leafy spurge, plumeless thistle, purple loosestrife, yellow starthistle, yellow toadflax, and diffuse and spotted knapweed and all State List A species and populations of State List B species designated for eradication (see Table 1 and 2).
- Infestations of all weeds on the Mesa County Noxious Weed List on County, State and Federal roadsides, and high traffic areas.
- Isolated infestations of all County listed weeds and State List B species where such are not yet abundant and eradication is feasible.
- New infestations of non-native species that are not County or State Listed species, but are determined to be invasive by the Colorado Department of Agriculture or CSU Extension, or that are invasive in adjacent counties. A survey of the area surrounding the infestation will be done to determine the full extent of infestation before eradication or other high priority treatment is deemed the management plan for that species.

**3.1.2 Medium Priority:** Species listed as medium priority weeds are known to occur in the County, sometimes in large but relatively isolated infestations. These species are candidates for suppression and containment, but not necessarily eradication, except when they occur in very localized areas. The Inspector provides information to landowners, works with them on a noxious weed plan and offers a Cost Share Program Application. Some of the weeds mentioned here are widespread in certain parts of the county and it is the situation in which they occur that is important.  Uncooperative landowners will be reminded several times of their responsibility to control their weeds. If time allows or timing and circumstances dictate, further enforcement will be done.

- Infestations of Canada , Scotch, musk and bull thistle and oxeye daisy below approximately 7,000 feet in elevation.

Revised November 2009

BLM_0057644

- Dalmatian toadflax on Mormon Mesa near Molina and Parker Basin and Big Creek Drainage near Collbran.
- Russian knapweed, hoary cress (whitetop) and houndstongue in areas where livestock or horses that are susceptible to poisoning are grazing and where the weeds appear to be the primary food source for the animals.
- Goatshead/Puncturevine above 7500 feet elevation.

**3.1.3 Low Priority:** Low priority weeds occur in large, widespread infestations or are widespread in localized parts of the County.  At best these weeds can be prevented from spreading to uninfested areas and are best managed on a parcel-by-parcel basis.  Enforcement in the following situations is unlikely to result in adequate control because infestations are very extensive and reinfestation is likely. Upon receiving a complaint, landowners are notified of the problem and given recommendations for control. The Inspector works with landowners on a parcel by parcel basis. If time allows and efforts will be cost effective, further enforcement may be done.

- Infestations of Scotch, Canada and musk thistle, oxeye daisy, and houndstongue above approximately 7,000 feet elevation in eastern Mesa County.
- Hoary cress (whitetop), puncturevine, tamarisk and Russian knapweed throughout  Mesa County, primarily in the Lower Valley and along the Colorado and Gunnison Rivers.

## 3.2 Coordination of weed management activities

The Inspector and the Division will coordinate whenever possible with other agencies, counties and organizations to attain successful, countywide weed management activities in the County.

### 3.2.1 Non-county entities

The Act authorizes the County to enter into cooperative agreements with federal and state agencies for better integration of weed control on public land within the County.  Mesa County has Memoranda of Understanding with the Bureau of Land Management, the U.S. Fish and Wildlife Service and the U.S. Forest Service.  Such agreements allow the sharing of resources and personnel to attain common weed management goals on public and private land.  Other agencies with which the County may cooperate with on interagency projects include, but are not limited to, U.S. Bureau of Reclamation, Colorado National Monument, Natural Resources Conservation Service, Conservation Districts, Colorado Department of Transportation, City of Grand Junction, Town of Collbran, Town of Debeque, Town of Fruita, Town of Palisade, Colorado Division of Wildlife, CSU Cooperative Extension, Western Colorado Research Centers, Biological Pest Control Section of the Colorado Department of Agriculture (Palisade Insectary), Irrigation and Drainage Districts, Cooperative Weed Management Areas, adjacent counties and Colorado State Parks.  In a situation where noxious weeds exist on private property adjacent to infested public lands, the Division will work to remedy the situation with the agency that owns the adjacent public property before pursuing enforcement on private land.

Revised November 2009

BLM_0057645

### 3.2.2 County Departments and Divisions

The Division cooperates with all County Departments on weed control issues, offering weed identification services and recommendations for control. Weed control in Mesa County Parks and Facilities are the responsibility of the Facilities and Maintenance Department.

Responsibility of the counties for control of undesirable plants in public roads and rights-of-way (ROW) are stated in the Act. Because ROW are the principle routes of introduction of weed seed or propagative parts via movement of vehicles, hay, animals, etc., the Inspector works closely with the Mesa County Transportation Department (MCTD) and Colorado Department of Transportation (CDOT) to effectively control weeds on County, State and Federal ROW. Species identification and control recommendations are provided by the Inspector. The County may contract with a private applicator for ROW noxious weed control on County, State and Federal roads. Weed control on MCTD-owned properties (e.g. maintenance shops) is performed by MCTD personnel under the indirect supervision of the Inspector.

The Division of Pest Management reviews community plans developed by the Planning Department. The Inspector identifies weed issues, recommends solutions and provides wording for planning policies and documents.

## 3.3 Mapping

At the County level, mapping can provide valuable information on the mode of spread of weeds and the extent of each species present in the County, and provides a method to estimate the costs of controlling noxious weeds on County and other property. Mapping aids the State Department of Agriculture in the development of noxious weed management plans for eradication, containment and suppression activities in Mesa County. Noxious weeds are mapped wherever possible using GPS equipment and GIS technology. Information is shared with County, State and Federal agencies. Data collected conforms to the standards established by the North American Weed Management Association. The Inspector provides this data to the Colorado Department of Agriculture for the state weed mapping program as requested.

### 3.3.1 Roads

Rights-of-way on all County maintained roads are inspected and weed infestations are mapped using GIS on a three year schedule as time and personnel allows. In areas where activities have disturbed the ROW, mapping may occur more frequently.

### 3.3.2 Other County Properties

Undeveloped County owned properties are inspected and noxious weeds are mapped using GIS by the Division as time allows. The Inspector then works with the appropriate County Department to develop an Integrated Weed Management Plan.

### 3.3.3 Private property

GIS mapping is not used to map weeds on private property, except List A species or a List B species designated for eradication, unless deemed necessary by the Inspector. Noxious weeds that are reported or noticed by a property owner, the Inspector, a government employee,

BLM_0057646

or a concerned citizen are located on a paper map of the property.  The map may be used for education of the landowner and in enforcement actions.

## 3.4 Education

For a weed management program to be successful, the general public needs to be well informed. The Citizens should be encouraged to take ownership of their weed problems and make the necessary effort to control weeds on their property.

Educational activities of the Division include publishing articles and ads in local newspapers; holding interviews with local TV and radio stations; placing posters and displays in public places; assisting with weed projects in schools; holding public lectures and workshops; making presentations and showing videos to the public, and to private and community organizations; building local Cooperative Weed Management Areas (CWMAs); and providing training opportunities for government agencies, community organizations, and private enterprises.

Educational efforts should:

- Assist the public with weed identification and control methods.
- Provide information on the Best Management Practices for control of species on the Mesa County Noxious Weed List and State Lists A, B and C.
- Explain the environmental impact of weeds on our quality of life, on agricultural production, and on native plants and wildlife.
- Stress the economic impact of weeds on agricultural production and the cost of food, native plants and community ecology, wildlife habitat, real estate values, wildfire management, and recreational opportunities, among others.

## 3.5 Management of Noxious Weeds on Private Property

The following procedures will be implemented when the Inspector receives a report of a noxious weed infestation on private property.  An initial screening of the property from public rights-of-way or a neighboring property will be made to determine if the complaint is valid. After determining the validity of the report, every effort will be made by the Inspector to contact and/or meet with the landowner, get permission to enter the property to identify the weeds, develop a Weed Management Plan with the landowner, and follow up on control efforts before enforcement in imposed.  The Inspector will inform the landowner of County or other Cost Share Programs available to assist with the cost of controlling the weeds.  If the landowners is not compliant or not cooperative, the enforcement action will proceed.

### 3.5.1 Landowner Cooperation

Cooperation between the landowner and the Inspector is essential to the management of noxious weeds.  Cooperation by the landowner is defined as allowing the Inspector or assignee entry to the property in question for inspection and post-treatment follow-up, assisting with development of a Weed Management Plan, and complying with the Management Plan.  The

Revised November 2009

BLM_0057647

Inspector shall strive to work with the landowner to develop a Weed Management Plan that considers the landowner's resources, reflects Best Management Practices, and incorporates scientifically proven methods of weed management. Suppression, containment, or eradication of the weeds, depending on State or County weed management plans and the specific situation, will be defined as the outcome of the Management Plan. If the landowner and the Inspector cannot agree on a Management Plan, the landowner can request an arbitration panel to determine the final Management Plan. The composition and selection of the arbitration panel is defined by State Law (C.R.S. 35-5.5-109 (4)(a)(III)). Failure to manage the weeds according to the Management Plan will be deemed as non-cooperation.

A warrant must be obtained to enter and inspect the property when a landowner refuses to allow entry (see Section 3.5.3.3.1 (iv)). The cost of treating the weeds may be billed to the landowner. Unpaid bills may be placed as a lien on the property. Cost Share funds through Mesa County are not available to uncooperative landowners.

When cooperation is not forthcoming from the landowner and a noxious weed infestation is present and not being managed in accordance with State weed management plans or acceptable Best Management Practices for noxious weeds in Mesa County, the Inspector will bring the case to the NWAB. The NWAB will decide whether or not the case should be pursued. Upon recommendation of the NWAB, the case will be brought to the Board of County Commissioners. The Commissioners will decide whether the Inspector should proceed with enforcement of the State Law and County Procedures, and will allocate funds to pay for treatment pending reimbursement by the landowner directly or through a lien on the property.

### 3.5.2  Priorities for Implementing Enforcement Action

The following situations are recognized as priorities for executing noxious weed management on private property:

1. infestations of high and medium priority noxious weeds as defined in Section 3.1.1 and 3.1.2 on any type of private property;
2. infestations noted by the Inspector or other County employees that are encroaching on county road rights-of-way, making it difficult to control or eradicate such noxious weeds on county roads.
3. properties infested with noxious weeds that threaten productive agriculture where the landowner requests assistance or where a complaint has been filed with the Inspector;
4. a complaint from an adjacent neighbor or a request for assistance from the landowner that noxious weeds are infesting or have the potential to infest their non-agricultural property;

### 3.5.3  Standard Operating Procedures for Enforcement

### 3.5.3.1 Responsibility

It is the responsibility of the Mesa County Weed and Pest Inspector and her/his assignee to follow all procedures established in CRS 35-5.5 before any management or control of noxious weeds is carried out on privately owned land. The Inspector and her/his assignee will keep complete records of all interactions (conversations, phone calls, letters, actions taken, etc.) with landowners. Bills for the cost of control measures will be prepared by the Inspector and submitted to the County Finance Department for processing.

Revised November 2009

BLM_0057648

### 3.5.3.2 Requests For Assistance

When a request for assistance is received from a landowner, a field visit will be arranged to identify the weeds present. If no noxious weeds are found, recommendations for management of non-noxious weeds will be given, if necessary. If noxious weeds are found, the infestations will be mapped on a paper map or using GIS/GPS and a copy of the map will be given to the landowner. A Weed Management Plan will be developed in conjunction with the landowner and an application for the Cost Share Program will be offered to the landowner.

### 3.5.3.3 Complaints

When a complaint of a noxious weed infestation is received the following procedures must be followed before noxious weed management or control can be carried out by the County on privately owned land:

### 3.5.3.3.1 Inspection

The Inspector shall verify the infestation before taking further action. The landowner shall then be notified of impending inspection of their property in the following ways:

i) If the presence of noxious weeds must be confirmed by an on-site inspection (i.e. cannot be confirmed from the right-of-way or neighboring property), the Inspector or her/his assignee will contact the landowner by **phone**, if possible, to get permission to enter the property. All phone calls will be documented as to date and information given. If the landowner cannot be contacted by phone, a **certified return receipt mail letter** shall be sent to the landowner, stating a specific date and time for the inspection. If the landowner wishes to be present during the inspection, the date and time of the inspection shall be adjusted to accommodate them.

ii) If noxious weeds can be confirmed from the right-of-way or neighboring property, the landowner can be contacted either by **phone or certified return receipt mail letter** to request an on-site inspection. A specific date and time for the inspection shall be given to the landowner. The landowner can request another appointment time to fit their schedule. The letter shall ask the landowner to contact the Division of Pest Management to acknowledge receipt of the letter at least one (1) business day before the pending inspection.

iii) The following information will be included in the Inspection letter:

- time and date of inspection;
- suspected noxious weed(s) present;
- landowner's responsibility to manage noxious weeds in Mesa County;
- availability of Cost Share Program funding; and
- consequences of non-cooperation. The landowner shall be given a full explanation of the importance of cooperating with the County to manage weeds on private property.

BLM_0057649

iv) If no response is forthcoming from the landowner or if access to the property is denied by the landowner, an **inspection warrant** will be sought and all associated court costs will be assessed against the landowner, unless good cause can be demonstrated by the landowner as to why the response was not given in a timely manner,

v) All possible methods shall be engaged to determine that the actual owner of the property has been contacted. If the property has been transferred, the new owner must be informed of the weed problem before any further action can be taken.

### 3.5.3.3.2 Notification

Once the Inspector or her/his assignee has inspected the property and confirmed a noxious weed infestation on the property, the landowner shall be contacted **in person, by phone or by certified return receipt mail letter** to notify them of the presence of noxious weeds. If contacted by **phone or in person**, a follow-up letter will be sent **via certified return receipt mail** within three (3) business days of the conversation. The landowner shall be given the following information:

- Location of noxious weed infestations;
- Common and scientific names of noxious weeds found;
- Acceptable, effective control measures for the weeds;
- The stage or time of year control measures must be performed for greatest control;
- Any other information on Best Management Practices for the weeds of concern;
- Information on available Cost Share Programs;
- The date by which the landowner must contact the Inspector to begin developing a Weed Management Plan for the property;
- Notification that within ten (10) days (five (5) days for State List A species and populations of State List B species designated for eradication) from receipt of the notification letter the landowner shall indicate whether she/he will:
  - i) comply with the terms of the notification;
  - ii) acknowledge the terms of the notification and submit an acceptable alternative weed management plan and schedule for completion of the plan for compliance; or
  - iii) request an arbitration panel as described in C.R.S. 35-5.5-109 (4)(a)(III) to determine the final weed management plan (except for State List A species and populations of State List B species designated for eradication where an arbitration panel is not an option); and
- Notification that failure to contact the Inspector by the specified date indicates non-compliance by the landowner and noxious weed management procedures will be initiated by the County.

### 3.5.3.3.3 Enforcement Notice

An Enforcement Notice will be sent in the following situations:

- When the landowner refuses to contact the Inspector, refuses to grant entry to the property, refuses to develop a Weed Management Plan, or otherwise refuses to

Revised November 2009

BLM_0057650

control the noxious weeds;

- Weed control efforts have not been implemented within the time period specified in the Weed Management Plan developed by the Inspector and the landowner; or
- When immediate action is necessary and the landowner has not been cooperative, i.e., when the weed is in the prime stage to be controlled and any delay will either cause it to go to seed or postpone control until the following season.

The Enforcement Notice will be sent by **certified return receipt mail** and shall include:

- Location of noxious weed infestations;
- Common and scientific names of noxious weeds found;
- Acceptable, effective control measures for the weeds;
- The stage, time of year or specific date when control measures must be performed for greatest control;
- Any other information on Best Management Practices for the weeds concerned;
- Notification that the landowner has ten (10) days (five (5) days for State List A species and populations of State List B species designated for eradication) from receipt of the enforcement notice to either comply with control procedures or submit in writing that she/he will cooperate with the Inspector to develop a Weed Management Plan; and
- Documentation of previous attempts to contact the landowner.

### 3.5.3.3.4  Enforcement

If a landowner receives an Enforcement Notice and does not contact the Inspector within ten (10) days (five [5] days for State List A species and populations of State List B species designated for eradication) of receiving the notice:

      i) The Inspector will review all information pertinent to the case.

      ii) The Inspector will bring the case to the attention of the NWAB.  The NWAB will recommend the case to the Board of County Commissioners for further action if warranted.

      iii) The Inspector shall request a right-of-entry to control the weeds from the County Commissioners at a public hearing.

      iv) If right-of-entry is given, the Inspector or her/his assignee will contact the designated private contractor to schedule the control work.

      v) After control work is carried out on private property, the Inspector or her/his assignee shall check the contractor's work for completeness.  The timing of the inspector's visit shall depend on the weed species and control method or methods used.

### 3.5.3.3.5 Billing

After noxious weed control measures are carried out:

a) A bill will be prepared for the cost of control plus a 20% administrative fee as permitted under CRS 35-5.5-109.

b) The bill will be sent by **certified return receipt mail**.

c) If the bill is not paid after 30 days, an assessment may be placed against each lot or

Revised November 2009

BLM_0057651

tract of land, until paid, and shall have priority over all other liens except general taxes and prior special assessments. Such assessment may be certified to the county treasurer and collected and paid in the same manner as provided for the collection of taxes.

     d) The Inspector or her/his assignee will contact the Treasurer's Office for special assessment on the property which may result in a lien on the property.

     e) Any funds collected for the management of noxious weeds on private property shall be deposited in Mesa County's Division of Pest Management Noxious Weed Fund.

### 3.5.4 Mesa County Noxious Weed Cost Share Program

     The County shall provide a Noxious Weed Cost Share Program to assist landowners within unincorporated Mesa County with the cost of managing noxious weeds. The program will be administered by the Mesa County Weed and Pest Inspector. Allocation of funds will be for those species listed on the Mesa County Noxious Weed List or State List A species and populations of State List B species designated for eradication and shall be prioritized. Applications will be reviewed and approved by the NWAB. Funds will not be available to landowners who have had a complaint lodged against them and who fail to cooperate with the Inspector.

**3.5.4.1 Application Process:** An application may be acquired from the Inspector or the County web site and must be complete to be considered for funding. The application must be accompanied by a Weed Management Plan that has been approved by the Inspector as well as a map of the property that delineates the weed infestations. The Inspector or assignee will be available to assist landowners with weed identification and development of a Weed Management Plan.

     Applications will be considered three times per year and prioritized according to the Mesa County Noxious Weed List or State List A species and populations of State List B species designated for eradication and other criteria listed in the program documents. If all funds have been allocated for the year, the application may be considered for funding the following year. In the case of weed species that are a high priority for control, additional budget funds may be requested from the County.

**3.5.4.2 Eligibility:** Landowners with noxious weeds who own or operate property on the Mesa County Tax rolls are eligible to apply for the Cost Share Program. Lessees and other property managers must submit written approval from the landowner to participate in the Cost Share Program.

**3.5.4.3 Reimbursement:** The Cost Share Program will pay for a percentage of the cost of herbicides, if applied by the landowner or a percentage of the cost of professional herbicide application, and/or mechanical control for certain weeds, up to a total of $500 per landowner per year. Reimbursement percentages will be determined by the NWAB. Costs other than those listed may be considered by the NWAB if appropriate documentation is provided. The noxious weeds may be treated with herbicide by the landowner or their assignee, or by a licensed commercial applicator. Although landowners may personally apply herbicides to the weeds or utilize any agent for application purposes, reimbursement for labor costs shall only apply to a

Revised November 2009

BLM_0057652

licensed certified pesticide applicator.  Any use of a landowner's employee for herbicide application purposes shall not be reimbursable.  All herbicides must be applied according to the product label.  Cost Share funds may be withheld if it is found that treatment was not done in accordance with the Weed Management Plan or the product label.

**3.5.4.4 Reasons For Disqualification or Denial:** A landowner's Cost Share application may be denied in the following circumstances:

- If the landowner has not cooperated with the Mesa County Policy for Management of Noxious Weeds on Private Property to the extent that a warrant for inspection was required.
- Attempting to defraud the program in any manner.
- Applying herbicides inconsistent with the product label.
- Using program materials outside of the program guidelines.
- Failure to follow weed control recommendations as described in the Weed Management Plan.
- Using cost-share money to control weeds other than those eligible except where such weeds exist in conjunction with the eligible weeds.
- The budget of the Cost Share Program is exhausted.

**3.6 Herbicide Application on Private Land by the County**

It is extremely important that small infestations of certain weeds (e.g. all List A and List B species to be eradicated) in certain areas be eradicated as soon as possible. Herbicides are most effective when sprayed at specific stages during the life cycle of the weed. To insure that small infestations of noxious weeds are controlled or eradicated efficiently and effectively, it is extremely important that the Inspector be able to take immediate action on certain weed patches. Immediate attention ensures that the weeds do not become a widespread and costly problem.

When such a weed infestation is located, the Inspector contacts landowners and arranges for the application of herbicides. The Inspector or assignees will only spray certain species on private land where they occur in low numbers or in small areas.  If spraying is done by County personnel, only hand gun, hand held or backpack sprayers will be used. It is not intended that Mesa County use motorized equipment or spray large infestations. If the weed infestation is extensive and should be treated by motorized equipment, the Inspector will arrange for treatment by a licensed certified applicator.  Payment for treatment will be arranged between the Inspector and the landowner.

Each situation is considered separately and the Inspector makes the final decision whether or not to spray a particular weed patch for the private landowner. A "consent to spray" agreement must be signed between the County and the landowner before the work is done. The consent agreement can be FAXed or scanned and emailed between parties to expedite the process.

The noxious weeds listed in Mesa County covered under this section are high priority species listed in section 3.1.1. .  Medium and low priority species listed in Section 3.1.2 and 3.1.3 will be considered only where they occur in isolated patches or at the extreme edges of their range within the County.

Revised November 2009

BLM_0057653

### 3.7 Funding of Weed Management Projects

Pursuant to C.R.S. 35:5.5:119 the County may establish a noxious weed management fund.  Subject to approval of the voters, the County may levy a special tax for noxious weed control, up to 5 mils per year. No mil levied weed management fund exists nor is anticipated in Mesa County. Funding for noxious weed management is currently restricted to specific projects in cooperation with the agency partners described in section 3.4 and within the Cost Share Program in section 3.6.4. Private landowners must either be involved in one of the projects, apply for Cost Share Funds, or must pay for weed management from their own funds.

BLM_0057654

# APPENDICES

BLM_0057655

# Appendix A

## A Guide to Integrated Weed Management Planning

The following discussion is intended to help landowners and land users devise a Weed Management Plan.  Making a Plan allows the landowner or land user to assess the situation and determine what will be needed to manage weeds.  .

### A1 Identification

The first and most important step in developing a plan of attack on noxious weeds is species identification. Misidentification of weed species leads to improper, costly, and ineffective control and management.

Newcomers and long-time residents may be familiar with a weed but each may call it by a different common name. For example, a weed commonly known as kochia (*Kochia scoparia*) by weed managers is called ironweed, fireweed, pigweed and Mexican fireweed by non-specialists.  Weeds can be identified by CSU Cooperative Extension, 2775 Hwy. 50, or by the Mesa County Division of Pest Management. Once the weed is identified, recommendations for control and management can be obtained from CSU Extension Weed Specialists, the Natural Resources Conservation Service (NRCS), the Mesa County Weed and Pest Inspector or private contractors.

Proper identification of new noxious weed species is extremely valuable for eradication efforts. Any unusual or unfamiliar plant should be reported to the Mesa County Weed and Pest Inspector. A cluster or small infestation of unusual plants or plants that appear to be spreading rapidly should also be reported to the Inspector.  If yellow starthistle had been reported when it first appeared in eastern Mesa County in about 1991, it could have been eradicated immediately and the area closely monitored. Left unreported, starthistle is now known to infest about 200 acres in Mesa County. Eradication is still possible, but will be a lengthy and costly endeavor.

### A2 Mapping

Marking out weed infestations on a map, whether it be by computer (GIS) or hand drawn methods, provides a landowner or weed manager with information about the extent of the infestation, possible modes for spread, potential uninfested areas to be protected and monitored, and the effectiveness of control methods. Over the long term maps provide historical evidence of the epicenter of an infestation and track its spread or decline.

### A3 Evaluation of Control Strategy

Once the weed has been identified and the infestation has been mapped, the landowner or weed manager must make a decision whether eradication, suppression (long term control), or containment should be the goal, what can be done to prevent reinfestation, and how to prevent its spread. The cost and resources available to plant and maintain competitive desirable species must be evaluated.

Small weed patches can be eradicated quickly using minimal amounts of herbicide or hand digging if there is no source of continued reinfestation. Suppression of larger patches should utilize all possible aspects of integrated management with the goal of keeping the weed from spreading and slowly reducing the size and/or density of the infestation . It is necessary to tolerate the presence of some weeds every year during a long term program, but seed production should be reduced or eliminated whenever possible.

Revised November 2009

BLM_0057656

Containment may be the best choice for very large patches (several acres) of perennial weeds that are too costly or impractical to eradicate. Depending on the species present, the infestation can be contained by spraying herbicides on or tilling around the perimeter of the patch, mowing to prevent seed production, and focusing on eliminating the weeds in areas where they are most likely to spread such as roads, waterways, or on animals. An integrated plan that combines the release of biological control agents in the central part of the infestation with chemical or mechanical control around the perimeter may be practical for large infestations. Consult with a weed management specialist when making these decisions.

## A4 Preparing an Integrated Weed Management Plan

Once the weeds are identified, the infestation is mapped, and a general strategy is chosen, information on specific control measures must be sought so that a plan can be formulated. Weed managers must answer a lot of questions, such as but not limited to:

1. the amount of time and money that is available for control work;
2. when control measures should be applied based on the life cycle of the plant
3. whether mechanical means can be used and if there is enough labor available;
4. what type of herbicides are effective, available and appropriate for the land use and soil types on the property;
5. if biological controls are available and effective;
6. if and when seeding should be done, with native or non-native species, and what equipment or contractor is available to do the work; and
7. whether control on sites of potential reinfestation is included in the plan or if other landowners must be recruited to assist in the program.

For infestations covering many properties and large areas, a Cooperative Weed Management Area can be formed to coordinate control efforts among many landowners and land users. Contact the Mesa County Weed and Pest Inspector for more information.

Information on weed and land management can be found locally from CSU Cooperative Extension, the Natural Resource Conservation Service, the Inspector, and other local weed specialists. The Internet can be used to find general information on management techniques for a particular species, but local specialists should be contacted for appropriate herbicide rates and recommendations and seeding information.

## A5 Weed Control Principles

An integrated approach to weed management is extremely important because no single tool, such as herbicides, will do the entire job. Integrated Weed Management results in highly effective, affordable weed control. The five principles of IWM are:

- **Prevention:** Prevention should always be practiced and is effective on all species of weeds. Prevention includes good land stewardship, planting weed free seed, avoiding planting invasive species, using weed seed free mulch and erosion control, using clean equipment, and legal measures such as quarantines and weed laws.

- **Cultural practices:** Good stewardship of the land is essential in preventing as well as controlling weed infestations and is effective for all species of weeds. Cultural practices encourage competition from desirable plants through dense seeding, fertilization, mulching, careful irrigation practices, sensible grazing regimes, and improved land management practices.

Revised November 2009

BLM_0057657

- **Physical/mechanical methods:** This includes hoeing, hand grubbing or rogueing, tillage, mowing, discing and plowing, solarization, burning, etc. The target of these methods is primarily to prevent seed production. Weeds should be treated before flowers are in full bloom. In general, mechanical methods are very effective for control of annual and biennial weeds and less effective for perennials. Thoroughly cleaning equipment before moving to uninfested areas is essential to prevent the spread of weeds.

- **Biological control:** Biocontrol is the introduction of living organisms that are detrimental to the noxious weed. This may be an insect, nematode, or bacterial, fungal or viral disease or the use of forage animals such as sheep, goats or cattle in controlled grazing. Biological control rarely provides 100% control and must be incorporated with other methods for successful management. Contact the Biological Control Section of the Colorado Department of Agriculture, Division of Plant Industry at 970-464-7916 for information on the availability of biocontrol agents.

- **Chemical control:** The judicious use of the proper herbicides at the optimum time can be the most effective method of control for very persistent weeds. Not all herbicides are equally effective on all weeds nor can every herbicide be used in every situation. Noxious weeds, in particular, are often not controlled successfully with "garden type" products. **Read the label several times**, and consult weed manuals and experts for the most effective chemical to use. Wear all personal protective equipment (PPE) indicated on the label. Be sure to apply the herbicides at the proper stage of weed growth. Drought may cause plants to be less susceptible to herbicides; wait to apply herbicides until there is adequate soil moisture and the plants are actively growing again.

---

*KNOW YOUR WEEDS!*

*Use the right method at the right time of the life cycle.*

*Read the herbicide label!*
*Do not use more than the label rate.*

*Use all precautions for safety.*

---

Revised November 2009

BLM_0057658

# APPENDIX B

## Best Management Practices for Noxious Weeds in Mesa County

Effective control of weeds requires persistence and vigilance as well as an understanding of weed management principles and the weed's life cycle. Choosing a method of weed control depends on many factors, including the weed species, proximity to water, presence of desirable vegetation, soil type, depth of the water table, growth stage of the weed, temperature, rainfall or lack thereof, and available labor, time, and money. The following recommendations are general in scope. Landowners should consult with weed management specialists, CSU Cooperative Extension personnel, or the Mesa County Weed and Pest Inspector when making plans to treat noxious weeds.

**B1 General Guidelines**

1) KNOW YOUR WEEDS! Identification is the first step in forming a weed management plan.

2) Early detection is always the best defense against noxious weeds. Treat intensely when a new or small patch is found.

3) Understand the biology of the weed to better select the best management practices. Know the plant's life cycle, what type of root system it has, what time of year it flowers and how long the seeds last in the soil.

4) Weed management is a long term process and hence a long term commitment to the land. Weed seeds last 5-50 years in the soil and pieces of root as small as 1/2" can start a new plant and a new infestation.

5) Know at which growth stage to implement control measures so that control is most effective. For example, once a biennial or annual has gone to seed, it is too late to do anything about it. Spraying a perennial weed in the rosette stage is a waste of chemicals because the root system will respond by sending up new shoots.

6) Use weed free seed, hay, forage, and mulch to prevent introduction of new weeds.

7) Reseed the site with competitive species. Grasses are often recommended so that broadleaf herbicides can be used to spot treat broadleaf weeds. Plant a diversity of species rather than a single species if possible.

8) Mowing and burning are effective weed management tools in some situations and with certain weeds. Mowing may cause the plant to flower at the mowed height, so seed set may be reduced but not eliminated. Burning may stimulate germination of some weed seeds. Most weed seeds are not destroyed by burning because temperatures are not high enough to completely burn the seed.

9) When tilling, till the weed patch last and then clean the equipment as best as possible in the field to prevent spreading roots and seeds. Always clean equipment and machinery after working in a weed patch. To avoid picking up and spreading mud that contains weed seeds do not drive through a weed patch when the soil is wet.

10) Many biological control agents are available for control of large weed patches. This is a complicated process and not recommended for small patches. Long term monitoring is essential to determine the extent of control and establishment of the agent. Biological control never provides 100% control and must be incorporated with other methods for successful management.

11) Grazing can be used as a weed management tool, but is not as simple as letting the animals out into the weed patch. Obtain information on which animals to use, level of intensity and duration, and what results you can expect. Temporary fencing may be necessary until the stand is established, particularly in areas where wildlife and other grazers are active.

12) Drought causes plants to shut down their growth process. Spraying weeds during dry periods is not recommended because effectiveness diminishes greatly. Treat after rainfall IF the weed is still in the proper stage for effective control.

13) Not all herbicides work equally on all weeds nor can every herbicide be used in every situation. Noxious weeds, in particular, are often not controlled successfully with products available at nurseries, garden shops and other retail gardening markets. **Read the label** and consult weed manuals and experts for the most effective chemical to use.

14) When developing a weed management plan, consider how much time, money, and land is involved. If you want to do non-chemical control, you may not need a lot of money, but you will need a lot of time and energy. If you want fast action, herbicides can be the most efficient use of money and time. Annual weeds may be as effectively controlled with tillage or hoeing as spraying if done properly and at the right time.

## B2 Control of Annuals & Biennials

**Target: Prevent seed production; many seeds lay dormant in the soil for 3-10 years.**

1) Hand grubbing (pulling), hoeing, tillage, solarization, cultivation in rosette stage and before flowering or seed maturity.

2) Chop roots at least 2" below soil level.

3) Post emergent herbicide treatment in the rosette or bolting stage, before flowering.

4) Pre-emergent herbicide treatment is effective on most annual weeds. Apply in the early spring before spring annual weeds emerge and in the late summer for winter annuals. Pre-emergent treatments can be effective for up to 3 months. Watering into the soil may be necessary to get the herbicide into the germination zone. **Follow label instructions carefully.**

5) Mow biennials after bolting stage and before seed set; be aware that mowing annuals may not prevent the plants from flowering and setting seed.

## B3 Control of Perennials

**Target: Deplete nutrient reserves in root system, prevent seed production. Seeds of many species lay dormant in the soil for 10 or more years. Root systems may reach 40 feet depth.**

BLM_0057660

1) It is very important to know what perennial weed you have before deciding on a control tactic. Perennials vary widely in their response to mechanical control.

2) Allow plants to expend as much energy from root system as possible; do not treat when first emerging in spring but allow them to grow to bud to bloom stage.

3) Herbicide treatment at bud to bloom stage or in the fall.  Spraying in the fall will kill the following year's shoots, which are formed in the fall.  If the weed patch has been there a long time, another season of seed production is not as important as getting the herbicide into the root system.

4) Mowing is not recommended for all perennials because some of them will flower at the mowed height; seed production may be reduced, however.  Herbicides alone may be more effective than mowing followed by herbicide treatment.  However, a combination of repeated mowing to prevent flowering followed by herbicide treatment in the fall is effective for <u>some</u> perennial weeds such as Canada thistle.  The effect of mowing is species dependent so know what weed you are working with and consult the experts.

5) Tillage may or may not be effective.  Most perennial roots can sprout from pieces only ½" - 1" long.  Repeated tillage over the course of a summer may destroy soil structure and be more detrimental than an herbicide treatment.  Clean machinery thoroughly before leaving the weed patch.

## B4 Integrated Pest Management Practices

No single method of weed control will provide 100% control.  A combination of two or more of the following methods should be used. The following practices can be applied to all species of weeds.

### B4.1 Prevention

An ounce of prevention is worth a gallon of sweat, 100 gallons of herbicide spray, several shovels, several pounds of grass seeds, and a ton of money. Weed problems can be avoided by using simple precautions.

Hay for mulch or erosion control should be certified weed seed free. Using weed seed free hay is mandatory for feeding pack animals in the National Forest. A list of certified growers can be obtained from National Forest Ranger Districts or the Colorado Department of Agriculture.

When disturbing weed infested land for development (e.g. blading) or agriculture (e.g. tillage), clean machinery and equipment before moving between sites. Equipment should be thoroughly cleaned before coming into a new site and before moving out of a weed infested area. In industrial situations, power washing is a good way to clean equipment.  DO NOT MOVE soil from construction sites with known weed patches. Soil should be banked and used at the site. Emerging weeds should be treated accordingly.

Buy and plant noxious weed free seed. Laws require that containers (lots) of seed state the kind and percentage of noxious and other weed seed, and there are restrictions on the amount and kinds of weed seeds that are allowed in a lot. Over half of the weeds on the Colorado Noxious Weed List are escaped ornamentals. Do not buy ornamental seed mixes that do not give the scientific name of all the species in the mix. Check the scientific names against the list of

Revised November 2009

BLM_0057661

noxious weeds. If the package just says "toadflax" you don't know whether or not you are buying a noxious species.

Eradicating single plants or small patches of weeds as soon as possible prevents their spread. In areas where the weeds are not yet present or are not very abundant, proper land management is necessary to keep the weeds out.

## B4.2 Cultural Practices

Cultural methods work on all species of weeds and are simply described as methods of sensible land management. Methods include improved land management practices, dense seeding with competitive species, crop rotation, careful irrigation practices, fertilization, and sensible grazing regimes.

New property owners should have their property assessed by a specialist. Growing conditions and land management practices in Western Colorado are very different from other regions of the country. Obviously, pasture and range lands are treated differently from lawn and garden areas. The intended use of the property will determine the best management practices for weed control. Even if you have owned your property for a long time, improvements probably can be made. Technical assistance is available from the Natural Resources Conservation Service or the CSU Cooperative Extension Office.

Competition with desirable plants can keep weeds suppressed and prevent weeds from becoming a problem. Plants compete for light, moisture and nutrients. Some weed species emerge early in the season to take advantage of these resources before natives or desirables. The choice of species used to provide competition for weeds depends on the intended use of the land, the types of weeds present, availability of irrigation water, soil types, and accessibility to the property. Native or non-native species can be used. In general, use a combination of species that will provide the best competition for the weeds that are present. It is generally better to plant grasses in broadleaf weed infestations so that a broadleaf herbicide can be used to treat the weeds if necessary. Some species of desirable plants are tolerant to herbicides. If irrigation water is not available, dryland species must be used. Seeding must be timed to take advantage of natural rain patterns to improve seed germination. Weed control will take much longer in dryland situations.

Proper water and fertility regimens are necessary to keep weeds from taking over. Over watering as well as under watering can lead to weed problems. Appropriate levels of fertilizer must be applied at optimal times in order to enhance desirable plant growth. Some species of weeds, such as Russian knapweed, diminish when water and fertilizer are properly managed.

Other management practices currently used on the property, such as grazing, may need to be adjusted to allow the desirable species to gain a foothold. Avoid overgrazing by livestock, including horses. When land is stripped of all plants by overgrazing, weeds are given the opportunity to move in. Because weeds are often undesirable as feed, they are sometimes the only plants left after livestock have overgrazed an area. Overgrazing gives them the light, space, water and nutrients they need to give them a competitive edge over desirable species. Do not allow overgrazing to happen. Be sure you have enough land for the number of grazing animals. Move livestock frequently to fresh pastures and allow pastures enough time to recover from grazing. Dividing up a pasture into three sections and moving animals between the sections can greatly improve conditions in an overgrazed pasture. Use a combination of perennial and annual, and warm and cool season pasture grasses to provide a diversity of plant types. Plant broadleaf pasture species only after broadleaf weeds are under control.

## B4.3 Mechanical Control

Mechanical control is the physical removal of a weed and includes methods such as hoeing, tilling, hand grubbing or pulling, mulching, burning, grazing, and mowing. Labor costs

BLM_0057662

can be considerable for large weed patches. Mechanical methods are more practical for small patches or scattered plants.

Mechanical control works well on annual and biennial weeds, but is much less effective on perennial species, unless they are in the seedling stage. Mechanical control is most effective when done before the plants have flowered. Annuals and biennials can be removed by severing the root at least 2 inches below the soil level. If flowers and seeds are mature, cut off flower heads and carefully place them in contractor's heavy duty black plastic bags. Setting bags in the hot sun for several hours will help destroy seeds. Burning the cut material works if the fire is hot enough to totally destroy the seeds. Check the ashes for intact seeds. For perennial species, mechanical means are not very effective unless you are sure that the plant is a young seedling and all the root system can be removed. Digging up perennial plants may cut the roots into small pieces that can sprout new plants.

When using machinery to till the land, till within the weed patch and then clean the equipment before moving to uninfested areas. Avoid tilling when the soil is wet. Mud sticking to the machinery will make cleaning difficult and will likely carry weed seeds to other areas.

Mulching works by killing seeds or smothering emerging weeds. Grass clipping, leaves, hay, seed hulls from industrial applications, plastic and many other materials can be used as mulch. Organic (carbon based) mulch must be weed seed free. Apply and maintain organic mulch several inches deep. Solarization, the application of clear plastic to damp ground and left for several weeks, can kill weed seeds and roots and some plant pathogens to 3 inches depth. This method also kills soil micro-organisms and insects that may be beneficial. Solarization works best on annual and biennial weeds. Reseeding with competitive species must follow mulching and solarization, regardless of the material or method used.

Burning standing dead weeds generally does not totally destroy weed seeds and may actually benefit some weed species. Burning newly emerging annual weeds may be effective but the flame must be hot enough and applied long enough to cause the plant cells to burst. Some species may recover from burning by putting out new shoots. Burning is not effective on perennial species because the root system is not affected. Avoid breathing fumes from burning weeds because some species contain compounds that are toxic when burned and can cause severe respiratory distress.

Grazing and mowing can be used successfully with some noxious weed species, primarily to reduce seed production. Mowing usually must be done several times per season. Both grazing and mowing should be combined with other methods, usually herbicide application. However, some species will flower at the grazed or mowed height. Grazing must be carefully timed for best results. Sheep, goats, and cattle can be used. Grazing is also considered a biological control method. Consult with an expert if you intend to use these methods.

## B4.4 Biological Control

Biocontrol agents, such as herbivorous insects, vertebrate predators, and plant diseases, are not available for every weed species, nor are they effective in every situation. Generally, the weed patch must be large enough to sustain multiple generations of the agent. Effects may not be seen for several years, so the presence of the weed must be tolerated. Seed prevention methods may need to be combined with biocontrol to keep the weed from reproducing.

Biocontrol agents can be obtained from mail order sources or the Biological Control Section of the Colorado Department of Agriculture, Division of Plant Industry in Palisade. You should consult with a biocontrol or weed specialist before buying or releasing biocontrol agents.

Sheep and goats are used to manage some weed species and can be quite effective when used properly. Animals can be trained or conditioned to eat specific weeds and often leave desirable grasses alone. There are several grazing regimes that can be used, each with varying levels of intensity and duration. Grazing animals remove above ground growth and do not

BLM_0057663

directly affect roots. However, repeated grazing will stress the root system of perennials. Grazing in combination with herbicide application can be very effective. In areas where dense weed infestations prohibit the entry of spray equipment, grazing can open up the area to allow equipment in after some regrowth of the weeds has occurred.

## B4.5 Chemical Control

Herbicides must be used with extreme caution. They are poisons and should be treated with respect. Most herbicides can be purchased without an applicator license.  The label is a legal document that outlines the uses and restrictions of the chemical. READ THE LABEL before buying, before applying and again after using an herbicide. READ THE LABEL before buying to determine if the herbicide is the right one for your situation, if it is labeled for the weeds you are trying to control, for information on the addition of adjuvant or surfactants, and for other restrictions, such as for grazing and planting. READ THE LABEL before applying to get the correct rate to use, how to mix and apply the product, what personal protection you may need while mixing and applying the herbicide, and for information on how to dispose of left over mix. READ THE LABEL after applying to check reentry intervals, to check planting and grazing restrictions, and for disposal and clean-up information.

Never use more than the recommended rate on the label. Higher rates will cause the tops of the plants to burn down quickly. The herbicide may not have the chance to move into the root zone and the weed may sprout again—and it's a waste of money!

Pre-emergent herbicides prevent the germination of seeds and do not work on established perennial weeds.  Application timing of pre-emergents is critical; they are usually applied in the spring. Precipitation or irrigation may be needed to move the chemical into the germination zone (the top 3-5 inches of soil).

Post-emergent herbicides work on the growing parts of the weed, including roots. Therefore post-emergent herbicides work on annuals, biennials, and perennials. Drought and heat may reduce the effectiveness of these herbicides.

The herbicide label may require the addition of a surfactant (surface active ingredient) to the spray tank. Surfactants make the herbicide more effective by breaking down waxes on the leaf surface, helping the spray spread on or stick to the plant, or aid in penetration of the spray into the leaf. Read the label to determine if a surfactant is needed and what type to purchase. These products are usually inexpensive and do result in better weed control.

The use of herbicides may be the only effective control method for some species. However, herbicides should be used in conjunction with other methods to achieve the highest level of control.

Herbicide use is determined by restrictions and instructions on the product label. Materials or products mentioned in this Plan are based on experience in Mesa County or recommendations of Colorado State University Cooperative Extension Service and should not be construed as endorsement by Mesa County.


# B5 Noxious Weeds of Mesa County: A Management Guide

### Bull Thistle (*Cirsium vulgare*)
**County Management Strategy:** Contain infestations above approximately 7,000 feet elevation. Eradicate infestations below approximately 7,000 feet elevation.
**Identification:** A tap rooted, biennial, spiny leaved thistle with large dark purple flowers clustered at the ends of branches. First year growth is a low growing rosette of leaves. In the second year it blooms from June through the summer. The vase shaped flowerheads are 1½"-2"

BLM_0057664

in diameter. Bull thistle grows 2-5 feet tall and has very green leaves with pointed lobes. Leaves have a cottony underside.

**Other names:** Common thistle, spear thistle

**Similar Species:** The rosette of musk thistle is similar but not as green as bull thistle. Flowers of other thistles are not vase shaped, but more open and less compact. *Cirsium traceyi* (formerly *C. undulatum* and commonly called wavy leaf thistle), a native thistle often confused with bull thistle, has paler purple flowers and silver gray leaves.

**Control Timing:** Control plants before they bolt, in the spring. Rosettes should be killed manually or with herbicides in the spring or fall. Plants that are bolting should be removed manually or sprayed as soon as possible. Flowering plants should be removed manually and mature flowerheads bagged to prevent seed spread.

**Control target:** Prevent seed production.

**Control Methods:** Severing the tap root at least 2" below the soil line before flowering is very effective.  Herbicides can be used in the rosette to <u>early</u> bolting stage. Flowering plants should be chopped and bagged to prevent spread of seeds.

**Status in Mesa County:** Scattered and occasional; in pastures, waterways, and disturbed sites.

## <u>Canada Thistle (*Cirsium arvense*)</u>

**County Management Strategy:** Suppression throughout the County.

**Identification:** A deeply rooted, perennial weed that spreads from rhizomatous roots and also produces large numbers of seeds. Leaves are alternate on the stem with spines along the edges. The edges of leaves are highly variable and can be wavy-edged on one plant and deeply lobed on another. The purple flowers are small, about ½" to 3/4" in diameter, and grow in a cluster at the branch tips.  Flowers may have a sweet smell and are visited by bees and other pollinators. Plants grow 1-4 feet tall and are usually found in large clumps. Canada thistle is commonly found in moist soil conditions.

**Other names:** Creeping thistle, field thistle

**Similar Species:** Several species of native thistles are mistaken for Canada thistle.  Identification by a professional is essential. A rare native species, *Cirsium perplexans*, is similar but is a tap rooted, not rhizomatous, perennial. Flowers are borne singly rather than in clusters. Plants do not typically grow in clumps like Canada thistle. *Cirsium traceyi* (formerly *C. undulatum* and called wavy leaf thistle), another native thistle often confused with Canada thistle, has larger, paler purple flowers and silver gray leaves.

**Control Timing:** Spring and fall.

**Control target:** Prevent seed production and stress root system.

**Control Methods:** Control of Canada thistle is difficult. Herbicides are most effective, often in combination with mowing to reduce seed production. Fall application of herbicides is recommended. Digging and tillage are ineffective and may cause the plant to spread or produce more stems. Seeding with competitive desirable grasses is highly recommended. See CSU Extension Service Fact Sheet No. 3108 for more information on control methods. Biocontrol agents are available but releases have not resulted in large scale control locally.

**Status in Mesa County:** Problem in higher elevation forest lands, high country meadows and pastures, and along seeps and drainages.  A few patches occur at lower elevations, primarily in wet or disturbed sites.

## <u>Dalmatian Toadflax (*Linaria dalmatica*):</u>

**County Management Strategy:** Suppression on Mormon Mesa, Parker Basin and Big Creek. Eradication elsewhere in the County.

**Identification:** A perennial plant growing 1-3 feet tall with showy, yellow snapdragon-like flowers. Leaves are very waxy, heart shaped and the upper leaves clasp the stem. Flowers arise

Revised November 2009

BLM_0057665

in the axils of the leaves and have a yellow spur and fuzzy orange throat. Seed production is very high.

**Other names:** None

**Similar Species:** Many ornamental snapdragons look like toadflax, since it is in the same family. Narrow leaved Dalmatian toadflax has similar flowers but linear leaves. Yellow toadflax has linear leaves, paler flowers and linear leaves.

**Control Timing:** During summer when flowerheads are first appearing; in the fall when at least 25% of stems are turning yellow.

**Control Target:** Prevent seed production and stress root system.

**Control Methods:** Repeated hand grubbing can be effective for small infestations. Large infestations require herbicide use and competitive planting. A surfactant or adjuvant must be added to the herbicide mix to break through the waxy leaf surface. Several biocontrol agents are available but need large infestations and a long establishment time. This is a difficult weed to control via any method. CSU Extension Service Fact Sheet No. 3.114 has more details on control of Dalmatian and yellow toadflax.

**Status in Mesa County:** Found in high numbers on Mormon Mesa near Molina, in Parker Basin and along Big Creek south of Collbran and on nearby road rights-of-way. A few plants have been found and eradicated on I-70 from the Grand Mesa exit to the Utah State line. A small infestation exists on Glade Park but is being treated and does not appear to be spreading. <span style="color:red">**REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**</span>

## Diffuse Knapweed (*Centaurea diffusa*)

**County Management Strategy:** Eradication throughout the County.

**Identification:** An annual or short lived perennial weed that is profusely branched and grows to 2 feet tall. Rosette and stem leaves are deeply lobed. Produces numerous white to pale lavender flowers that bloom in early to mid summer. Bracts below the petals are spine tipped, with comb-like spines and are prickly to the touch. Plants break off at the base and become tumbleweeds, facilitating seed spread.

**Other names:** None

**Similar Species:** Russian knapweed stem leaves are not lobed and its flowers are darker purple. Spotted knapweed has spots on the bracts below the flowers. There is some evidence that diffuse and spotted knapweed can interbreed and both species can be found growing in the same patch.

**Control Timing:** In the spring and early summer during the rosette or very early bolting stages.

**Control target:** Prevent seed production.

**Control Methods:** Mechanical removal is effective on rosettes and plants in the early bolting stage. Herbicides are effective tools if applied before flowering. Once the plants have flowered, they should be removed manually and bagged to prevent seed spread. Biological control is not recommended in Mesa County because eradication is the management goal for this species.

**Status in Mesa County:** An infestation exists at the Garfield/Mesa County line on I-70 and frontage roads and south-southwest of Debeque. It has been found on private property on Silt Divide Road (48.5 Road). Scattered plants may exist along I-70 throughout Mesa County. Infestations exist in the Bookcliffs on Bureau of Land Management land; it is being treated. A large infestation was found in 1998 on property owned by Public Service Company (Excel Energy) located east of 34 Road on C Road. This patch is being controlled with herbicides and digging and is being monitored by the Mesa County Division of Pest Management. <span style="color:red">**REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**</span>

## Dyers Woad (*Isatis tinctoria*)

**County Management Strategy:** Eradication throughout the County.

**Identification:** Woad is an annual or short lived, tap rooted perennial mustard growing up to 48 inches high. The tap root may reach to a 5 foot depth. Leaves are bluish-green, lanceolate (strap

Revised November 2009

BLM_0057666

shaped) and are connected to the stem by a petiole. The leaf has a whitish nerve or vein visible on the upper surface. Flowers are numerous, yellow and very small. The seed pods are very diagnostic, being extremely large for a mustard, flattened and very dark.  Each pod contains a single seed.

**Other names:** Woad

**Similar Species:** Many mustards have yellow flowers and similar leaf structure. The large black seed pods are the best way to tell this from other mustards.

**Control Timing:** During the rosette stage (fall or spring) and before flowering.

**Control Target:** Prevent seed production.

**Control Methods:** Manual removal is usually a good method for annual plants. However, dyer's woad will regenerate from its tap root if the root is not completely removed. Rosettes should be killed manually or with herbicides in the spring or fall. Plants that are bolting should be removed manually or sprayed as soon as possible.

**Status in Mesa County:** One plant was found in the dye garden at the Botanical Gardens in Grand Junction; it was removed. It is a serious and expanding problem in Utah. **<span style="color:red">REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!</span>**

### Goatshead (*Tribulus terrestris*) *see* Puncturevine

### Hoary Cress or Whitetop (*Cardaria draba*)

**County Management Strategy:** Suppression throughout the County.

**Identification:** A perennial mustard with an extensive root system and growing up to 2 feet tall. Plants form a dense, contiguous patch. Leaves are slightly toothed, with upper leaves clasping the stem. Numerous small white flowers form a flat-topped flowerhead. Seed pods are heart shaped and contain 2 seeds each.

**Other names:** Globe-podded hoary cress, globe-podded whitetop, perennial peppergrass

**Similar Species:** There are many white flowered mustards in our area, however none of them have a dense, flat topped flowerhead. Lens-podded hoary cress (*C. chalpensis*) and globe podded hoary cress (*C. pubescens*) occurs in our area and is difficult to distinguish from whitetop; they are treated the same. Perennial pepperweed, or tall whitetop, is much taller, the flowerheads are less dense than hoary cress, and it blooms in mid to late summer.

**Control Timing:** Before or at very early bloom.

**Control Target:** Prevent seed production and stress root systems.

**Control Methods:** Herbicide applications can be very effective on hoary cress when applied at the proper time. Tillage or hand grubbing break up root pieces, which can sprout into new plants. No biocontrol agents are available.

**Status in Mesa County:** Widespread in lower elevations in the Grand Valley but spreading to higher areas such as Collbran. Common on roadsides. Hoary cress and Russian knapweed are the County's two most abundant noxious weeds.

**Toxicity:** DO NOT HANDLE hoary cress with bare hands as it has been known to cause a rash and sensitivity to the sun.

### Houndstongue (*Cynoglossum officinale*)

**County Management Strategy:** Suppression above approximately 7,000 feet elevation. Eradication below approximately 7,000 feet elevation.

**Identification:** Houndstongue is a biennial plant with rough hairy leaves that can be 1-12 inches long and 1-3 inches wide. Flowers can be maroon or white, are about 1/4" in diameter, and appear bell shaped. The seed pods (nutlets) are covered with hooked spines and provide a mechanism for dispersal on clothing and fur. The pods are flattened and somewhat heart shaped. A common name locally is beggar's lice.

**Other names:** None

Revised November 2009

BLM_0057667

**Similar Species:** Other plants with sticky seeds, such as nodding beggar's tick, western sticktight and catchweed bedstraw, can be confused with houndstongue. The shape of the seeds and/or the presence of stout straight spines on the seeds can distinguish these from houndstongue.

**Control Timing:** In the rosette or early bolting stage.

**Control target:** Prevent seed production.

**Control Methods:** Mechanical removal is very effective for small infestations, particularly after plants have bolted, when herbicides may not be as effective. Rosettes should be killed manually or with herbicides in the spring or fall. Plants that are bolting should be removed manually or sprayed as soon as possible. Flowering plants should be removed manually and mature flowerheads bagged to prevent seed spread. Beware to remove all seeds from clothing, shoes, shoelaces, etc. No biological agents are available for this species.

**Status in Mesa County:** Found in pastures, forests and roadsides, primarily in higher elevations of eastern Mesa County, particularly in the Battlement Mountains north of Collbran.

**Toxicity:** Houndstongue is extremely toxic to cattle and horses, less so to sheep. It produces alkaloids that cause liver damage.

### Leafy Spurge (*Euphorbia esula*)

**County Management Strategy:** Eradication throughout the County.

**Identification:** A perennial with extensive, deep, creeping rootstocks. Roots are dark brown with pink shoot buds. Leaves are linear and about 1-1½ inches long. Flowers are inconspicuous and green. At the base of the true flowers, and emerging before them, are bright yellowish-green bracts that are often mistaken for the flowers. It is very important to distinguish these two stages for timing control work. Seeds are in a pod, which when dry expels the enclosed seeds up to 15 feet. The plants have a milky latex sap which is very toxic.

**Other names:** Spurge

**Similar Species:** Leaves are similar to yellow toadflax. Other spurges in our area are either low growing (prostrate spurge) or have broad, toothed leaves (toothed spurge). Many plants have milky sap so this is not a good diagnostic tool.

**Control Timing:** When bracts are present but before true flowers emerge (late spring) and in the fall.

**Control target:** Prevent seed production and stress root system.

**Control Methods:** Herbicides and competitive plantings are the most effective methods of control for leafy spurge. Small infestations should be sprayed immediately and repeatedly after allowing regrowth to occur. CSU Extension Fact Sheet No. 3.107 details control methods. Grazing by goats has worked well in some situations. Several species of *Apthona* flea beetles have proved to be very effective in some parts of the country. However, biological control is not recommended in Mesa County because eradication is the management goal for this species. Large infestations are the best candidates for release of biocontrol agents. Application of herbicide to the perimeter of a infestation may be necessary to keep the weed from spreading while the beetles establish and build their numbers.

**Status in Mesa County:** Current infestation is in the Plateau Valley area near mile marker 3 on Highway 330. A small infestation was found in 2001 west of the town of Mesa. A ¼ acre patch was found in 2007 south of Mesa. A small, dwindling population also occurs in Unaweep Canyon, west of the Divide Road turnoff.

**Toxicity:** The milky sap of leafy spurge can cause skin and eye irritation in humans and other animals. It can cause death of livestock. The toxicity remains even after the plants are dried. Caution must be taken when handling this weed. **REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**

### Musk Thistle (*Carduus nutans*)

Revised November 2009

BLM_0057668

**County Management Strategy:** Contain infestations above approximately 7,000 feet elevation. Eradicate infestations below approximately 7,000 feet elevation.

**Identification:** A bushy biennial plant that grows to 6 feet tall. The dark green leaves have spines along the edges and are lobed and wavy. Rosette leaves are spiny with a white central vein that is very visible on the underside. Leaves often have a whitish edge. The leaves clasp the stem and form "wings" along the stem below the leaf. Flowers are borne singly on long spineless stems. The flowers are deep pink to magenta and 1½ to 3 inches in diameter with very broad green or somewhat magenta bracts below the petals. When mature, the flowers "nod," hence the other common name, nodding thistle.

**Other names:** nodding thistle, plumeless thistle, nodding plumeless thistle

**Similar Species:** Plumeless thistle, another noxious species, has spined "wings" along the stem below the flowerhead and the flowers may occur in clusters of 2-5 flowers. Bull thistle, another noxious species, is shorter and the lobes of the leaves are sharply pointed and at right angles to the main vein. None of our native thistles are similar to musk thistle.

**Control Timing:** In the rosette (spring and fall) and early bolting stage.

**Control target:** Prevent seed production.

**Control Methods:** Severing the tap root at least 2" below the soil line before flowering is very effective.  Herbicides can be used in the rosette to <u>early</u> bolting stage. Flowering plants should be chopped and bagged to prevent spread of seeds. Several insect species are available for biological control.

**Status in Mesa County:** Widespread in higher elevations of Mesa County in disturbed areas, on roadsides and in pastures. Occasionally found in lower elevations in Mesa County.

## Oxeye Daisy (*Chrysanthemum leucanthemum*)

**County Management Strategy:** Suppression above approximately 7,000 feet elevation. Eradication below approximately 7,000 feet elevation.

**Identification:** A perennial, white flowered daisy with creeping roots growing to 2 feet tall. Leaves have toothed edges and are 2-5 inches long, getting smaller toward the top of the plant. The flowers are 1½ inches in diameter and borne singly on the ends of branches. The yellow disk of the flower has a round depression in the middle.

**Other names:** marguerite

**Similar Species:** Shasta daisy is a common ornamental daisy with larger leaves and flowers. Two noxious weeds, scentless and Mayweed chamomile have fern-like leaves and have flowers with an inflated disk (central part of the flower).

**Control Timing:** In the spring before flowers appear and in the fall.

**Control target:** Prevent seed production and stress root system.

**Control Methods:** Herbicides have been shown to be the most effective control method. Mechanical removal may stimulate shoot production from the rhizomatous roots. No biocontrol agents are available for this weed.

**Status in Mesa County:** Fairly common in pastures in higher elevations of eastern Mesa County, and in some flowerbeds in lower elevations. Oxeye daisy may still be found for sale as seed, in wildflower seed mixes, or as bedding plants.  It is illegal to sell this species in Colorado. Report seed sales to the Colorado Department of Agriculture Conservation Services Department.

## Plumeless Thistle (*Carduus acanthoides*)

**County Management Strategy:** Eradication throughout the County.

**Identification:** An annual, highly branched, tap rooted biennial thistle growing up to 4 feet tall. Rosette leaves are 4 to 8 inches long, green, with spined lobes. Stem leaves have "wings" that grow to the stems. Flower stems also winged. The purple flowers are either solitary or in a cluster of 2-5. Flowers rarely white or yellowish.  Bracts under the petals are hairy and narrow.

**Other names:** spiny plumeless thistle

Revised November 2009

BLM_0057669

**Similar Species:** Musk thistle has larger bracts and flowers, and the flower stems are not winged. Bull thistle is shorter and not as spiny with more compact flowers. Flowers of the rare native species, *Cirsium perplexans*, are borne singly rather than in clusters and the stems are not profusely winged. *Cirsium traceyi* (formerly *C. undulatum* and called wavy leaf thistle), another native thistle, is not very branched, has silver gray leaves and the stems are not winged.

**Control Timing:** In the rosette and early bolting stages.

**Control target:** Prevent seed production**.**

**Control Methods:** Severing the tap root at least 2" below the soil line before flowering is very effective.  Herbicides can be used in the rosette to <u>early</u> bolting stage. Flowering plants should be chopped and bagged to prevent spread of seeds. Several insect species are available for biological control.  However, biological control is not recommended in Mesa County because eradication is the management goal for this species.

**Status in Mesa County:** Infestations have been found in Devil's Canyon near Fruita, in the Brush Creek area east of Collbran and in Rifle (Garfield County). Otherwise it is not widespread in Mesa County. <span style="color:red">**REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**</span>

<u>**Puncturevine/Goatshead (*Tribulus terrestris*)**</u>

**County Management Strategy:** Suppression throughout the County.

**Identification:** Tap rooted annual weed. Low growing, spreading plants with very small compound leaves arranged similarly to pea plants (legumes). Flowers are yellow, 3/8" in diameter, and shiny, with pointed petals. Seed pods form a "goatshead" with 5 stout sharp spines.

**Other names:** caltrop, bullhead, tackweed, Mexican sandbur

**Similar species:** Many other weeds are called goatshead but none have similar seed pods. Similar species include prostrate knotweed, prostrate spurge. Knotweed does not form seed pods. Spurge has milky sap.

**Control Timing:** As soon as seedlings are noticed, usually in late June or July.

**Control Target:** Prevent seed production.

**Control Methods:** Digging, hoeing, tillage in seedling stage.  Herbicides before seed set. Biological control agents are available for this species.

**Status in Mesa County:** Common in waste areas, roadsides, driveways, desert trails and disturbed areas in lower elevations of Mesa County. Starting to show up near Mesa and Collbran.

**Toxicity:** Toxic to livestock when consumed in large quantities.

**Impact**: Punctures bicycle tires. Can get stuck in feet of pets, children and adults. Easily spread by all methods of transportation.

<u>**Purple Loosestrife (*Lythrum salicaria*)**</u> -

**County Management Strategy:** <span style="color:red">**This species must be eradicated statewide.**</span>

**Identification:** A perennial with creeping, rhizomatous roots that grows up to 10 or more feet tall. A wetland invader, it thrives in moist conditions. Leaves are lance shaped with veins that do not reach the edge of the leaf but parallel the edge. The very showy purple to magenta flowers grow on long stalks and have 5-7 petals each. The ribbed stems are square or 6-sided. Also called purple lythrum.

**Other names:** purple lythrum, rainbow weed, spiked loosestrife, salicaire

**Similar Species:** An uncommon native loosestrife is shorter and more delicate, with fewer flowers.  Gayfeather or blazing star, a native plant, has coarse, more linear leaves that are much narrower than loosestrife. Fireweed, a common native plant, has only 4 petals per flower, a round stem and the flower heads form an elongated triangle.

**Control Timing:** Before or during early flowering in the spring, and in the fall. Mature flowerheads must be removed before the first frost.

**Control target:** Prevent seed production and stress root system**.**

Revised November 2009

BLM_0057670

**Control Methods:** Mechanical control can be effective for small infestations but must be repeated, often for five years or more. Timing of herbicide applications is important. Early summer applications should be done just before flowering to prevent flowering and seed set. Fall applications can be done from late August through September, but before a hard freeze. Flowerheads must be removed to prevent spread of seeds. Several biocontrol agents are available, but establishment is dependent on proper regulation of water levels and may work better in drier habitats. Biological control agents are available, however, it is not recommended in Mesa County because eradication is the management goal for this species.

**Status in Mesa County:** Large infestations occur along Tiara Creek on the Redlands. Smaller infestations occur along Goat Draw on Redlands Parkway, on several private properties on the Redlands, in Walter Walker Wildlife Area and on several private properties near Fruita. Scattered plants are found along the Colorado River from Grand Junction to Moab, Utah. The spread of the weed to riparian areas along the River are of extreme concern to public lands managers. Mesa County cooperates with landowners and state and federal agencies to eradicate this weed. **REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**

### Russian Knapweed (*Acroptilon [Centaurea] repens*)

**County Management Strategy:** Suppression throughout the County.

**Identification:** A rhizomatous perennial weed with a silvery green appearance, growing up to 3 feet tall. Rosette leaves are lobed and about 3-5 inches long. Stem leaves are linear, not toothed, and about 1 to 2 inches long. Flowers appear in May to June and occasionally late summer. They are purple and about ½ inch in diameter. The bracts below the petals are soft and greenish tan. Roots are black and scaly. Seedheads remain intact throughout the winter. Leaves and possibly roots of Russian knapweed release an allelopathic chemical to the soil, which prevents other species' seed from germinating .

**Other names:** Turkestan thistle, hardheads

**Similar Species:** Diffuse and spotted knapweed have similar flowers, but both have fern-like leaves throughout and the bracts under the flowers differ from Russian knapweed. Purple aster (*Aster macaeranthera*) has very green leaves, the flowers have a yellow center and it blooms in the late summer and early fall. Seeds are released from the seedhead before the plant dies back in the fall.

**Control Timing:** In the bud to bloom stage and in the late summer and fall.

**Control target:** Prevent seed production and stress root system.

**Control Methods:** Herbicides are the only method known that provides good control results. Repeated pulling or digging may work for very small or new infestations, but must be done over a long period of time. Tillage, other than that necessary for seeding competitive plants, spreads small root pieces that can then sprout into new plants, resulting in a denser infestation. Planting competitive plants is necessary following herbicide application. The soil must be tilled and left for a week or two before planting to allow the knapweed's allelopathic chemical to dissipate. CSU Extension Service Fact Sheet No. 3.111 details control methods and seeding recommendations. No biological control agents are available for this species.

**Status in Mesa County:** Widespread in lower elevations of Mesa County. Some patches are beginning to show up in higher elevations. Very abundant on the Dolores, Gunnison and Colorado Rivers. Occurs on roadsides, in degraded pastures and range, on neglected farmland, and in disturbed sites. Hoary cress and Russian knapweed are the County's two most abundant noxious weeds.

**Toxicity:** Russian knapweed is toxic to horses, causing nigropallidial encephalomalacia, a Parkinson's-like neurological disease that results in the inability to chew followed by starvation. Although toxicity to humans is undocumented, cases of tumors, illness from breathing smoke from burning plants, and a garlic-like taste in the mouth have been reported. It is <u>essential</u> to wear gloves when working with this plant. AVOID BREATHING FUMES FROM BURNING

Revised November 2009

BLM_0057671

**RUSSIAN KNAPWEED – IT HAS BEEN REPORTED TO CAUSE RESPIRATORY DISTRESS.**

### Scotch Thistle (*Onopordum acanthium*)
**County Management Strategy:** Suppression above approximately 6,000 feet elevation. Eradication below approximately 6,000 feet elevation.

**Identification:** A biennial, tap rooted weed that grows to 12 feet. Rosette leaves are very large (1 to 2 feet long and 6 to 12 inches wide), spined and with a dense coating of white hairs that give the leaves a silvery green appearance. The numerous flowers are magenta and 2 inches or more in diameter. Stems are winged, including stems under the flowerheads. Truly an enormous plant.
**Other names:** Cotton thistle, Scotch cotton thistle, heraldic thistle
**Similar Species:** No other thistles reach this size or have leaves or flowers this large.
**Control Timing:** In the rosette stage in spring and fall.
**Control target:** Prevent seed production.
**Control Methods:** Mechanical control is very effective in the rosette stage, if the root is severed at least 2 inches below the soil line. Roots are very thick in the second year and may need to be chopped. Herbicides can be effective but must be applied to the young rosette. The older the plant gets, the more difficult it is to control with herbicides because the hairiness of the leaves prevents the herbicide from landing on the leaf surface. The addition of a surfactant or adjuvant is recommended. No biocontrol agents are available at this time. Extensive feeding by painted lady butterfly larvae may be seen some years, but is not a reliable control method.
**Status in Mesa County:** A serious problem in the Collbran and Mesa areas. Increasing number of infestations are showing up on Highways 65 in Plateau Valley and on I-70.  An isolated infestation was found on Glade Park. A few plants are found occasionally in lower elevations of Mesa County.

### Spotted Knapweed (*Centaurea maculosa*)
**County Management Strategy:** Eradication throughout the County.
**Identification:** A biennial or short lived perennial weed that is profusely branched and grows to 3 feet tall. Plants have a stout tap root. Rosette leaves are strongly lobed or not and 3 to 6 inches long. Flowers are pink to magenta, rarely white, and occur singly on the tips of branches. Bracts below the flower petals have dark, toothed margins that look like spots.
**Other names:** None
**Similar Species:** Diffuse knapweed has a comb-like fringe on the bracts and no spots. Russian knapweed has soft, greenish-tan bracts without a fringe or spots. There is some evidence that diffuse and spotted knapweed can interbreed and both species can be found growing in the same patch.
**Control Timing:** In the spring during the rosette or early bolting stage.
**Control target:** Prevent seed production.
**Control Methods:** Mechanical control may work for small infestations, but must be repeated because shoots can arise from the tap root. Digging up the entire root is preferable but labor intensive. Tillage at the rosette stage can be effective. Herbicides are effective if applied to the rosette stage. Mature flowers should be removed and bagged to prevent seed spread. A few biocontrol agents are available, including seed and stem feeders.  However, biological control is not recommended in Mesa County because eradication is the management goal for this species.
**Status in Mesa County:** Very small infestations exist in Mesa County on Glade Park, on Silt Divide Road, on Lands End Road, and on Highway 65 north of Powderhorn.  Scattered infestations are being treated in the Bookcliffs near the Garfield County line.  Often found growing with diffuse knapweed.  **REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**

Revised November 2009

BLM_0057672

**Tamarisk or Salt Cedar (*Tamarix parviflora, T. ramosissima*)**
**County Management Strategy:** Biological control throughout the County.
**Identification:** A small tree or shrub growing up to 20 feet tall, with feathery leaves and tiny purple to white flowers. May be deciduous or evergreen, but mostly deciduous in our area. This plant grows in riparian areas and wetlands, often depleting surface water and lowering ground water levels. Salt is released from the leaves when they drop in the fall, making the soil in the understory highly alkaline.
**Other names:** Small flower tamarisk, tamarix, tamarack (locally)
**Similar species:** No other shrub is similar in appearance to these *Tamarix* spp.
**Control timing:** Year round, with best success in fall and winter with cut-stump and basal spray treatments.
**Control target:** Prevent seed production and stress root system.
**Control methods:** A detailed tamarisk control publication is available at CSU Cooperative Extension or the Division of Pest Management. Brush hogging and burning lead to less successful control due to the vigorous regrowth that occurs. Cutting down the shrub or tree in the fall, winter or spring and painting the stump surface immediately afterward with an herbicide (cut stump treatment) is the most effective control method. Herbicide must be applied within 10-15 minutes of cutting to prevent excessive resprouting from the stump. Follow up herbicide application is needed to treat sprouts from the root system. This usually will only be necessary for 2-4 years. All branches and trunk pieces must be removed from the site to prevent sprouting. Tamarisk branches touching wet ground have been known to sprout and send down new roots. Chipping or burning the slash is recommended. The basal 12-18 inches of the trunks of young plants with smooth bark can be sprayed with herbicide (basal bark treatment). Rough barked plants should get the cut stump treatment. Foliar sprays during the growing season must cover the entire leaf surface to be effective and will take 3-4 years of repeated treatment to be successful. "Root plowing" may be effective in certain areas, but care must be taken to remove the root below the crown. This method disturbs a large area of ground and should be used only in large dense stands where no native plants occur. A leaf feeding beetle (*Diorhabda elongata*) is currently established and spreading along the Dolores and Colorado Rivers. Several years of defoliation by the insects are necessary to kill the plant.
**Status in Mesa County:** Tamarisk is a plant that is "preferred to be controlled", rather than "mandatory for control" in Mesa County. It is widespread throughout the county in most riparian zones of permanent and ephemeral streams. Although thought to be a lower elevation plant, tamarisk has been found on Douglas Pass in Garfield County and near McClure Pass in Gunnison County.

**Yellow Starthistle (*Centaurea solstitialis*) County Management Strategy:** Eradication throughout the County.
**Identification:** A tap rooted annual weed growing to 2 feet tall. The rosettes are 6 to 8 inches across and look very similar to a dandelion rosette. Rosette leaves have a distinct triangular tip. The yellow flowers are about ½ inch wide and bloom throughout the summer. Seed production is very high. Bracts at the base of the petals are armed with stout spines up to 1½ inch long. No other part of the plant has spines. Leaves are reduced and grayish green. Plants are much branched and spindly looking.
**Other names:** None
**Similar Species:** Curlycup gumweed is much greener, rosette leaves are less lobed, and the flower bracts are not armed with spines, but have curled, soft bract tips. Buffalo bur, a native weedy species, has spines all over the leaf and stem surfaces, and has yellow bell shaped flowers. The leaves are broad and deeply lobed. Several other species in the aster family, such as wild lettuce, sowthistles, and dandelions, have yellow flowers but none are stoutly spined.

Revised November 2009

BLM_0057673

**Control Timing:** In the rosette to early bolting stage during spring and early summer.

**Control target:** Prevent seed production.

**Control Methods:** Mechanical control works well on small infestations but is labor intensive for large infestations. Herbicides can be applied during the rosette to early bolting stage. Repeat applications are necessary because the seeds germinate over the entire summer. A seedhead fly, accidentally introduced to California, feeds on seeds but is currently not available. However, biological control is not recommended in Mesa County because eradication is the management goal for this species.  Good pasture management is necessary to keep starthistle populations from exploding.

**Status in Mesa County:** There is a large area of infestation south of the town of Mesa in the Coon Creek Estates area. A smaller infestation occurs on Glade Park on DS Road about 3 miles east of the state line. Mesa County is actively involved in monitoring infestations and working with landowners on eradication of these patches. **REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**

### Yellow Toadflax (*Linaria vulgaris*)

**County Management Strategy:** Eradication throughout the County.

**Identification:** A creeping perennial that grows up to 2 feet tall and is often profusely branched. The flowers look like typical snapdragons, with a pale yellow spur and darker yellow to orange throat. The numerous leaves are linear and pointed. Also called butter and eggs, this is a very persistent plant.

**Other names:** Butter and eggs, Jacob's ladder, flaxweed, wild snapdragon

**Similar Species:**  Dalmatian toadflax has heart-shaped leaves and the stems are not branched. Narrow-leaved Dalmatian toadflax has narrow leaves but has Dalmatian colored flowers. Many ornamental snapdragons look like toadflax, since it is in the same family. Yellow toadflax has linear leaves. Our native toadflax has blue flowers.

**Control Timing:** Before flowering and in the fall.

**Control target:** Prevent seed production and stress root system.

**Control Methods:** This is a very difficult plant to eradicate. The extensive root system must be stressed continually. Mechanical control is often not effective on larger patches, and may spread root pieces. Herbicides are effective but choice of product and control timing is very important. CSU Extension Service Fact Sheet No. 3.114 has more details on control of Dalmatian and yellow toadflax. Biological control agents are available but biological control is not recommended in Mesa County because eradication is the management goal for this species.

**Status in Mesa County:** A few small infestations appear to have been eradicated at Vega State Park. One small patch was eradicated at the County owned boat take-out on the Gunnison River near Whitewater. A small patch was found on Skipper's Island in 2001 and on 25 Road and G 5/8 road north of Grand Junction. Occasional plants are found along the Colorado River. **REPORT INFESTATIONS TO THE DIVISION OF PEST MANAGEMENT!**

Revised November 2009

46

BLM_0057674

  

# MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN

February 2011



BLM_0057675

# MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN

## Table of Contents

## 1. RESOURCES

Mapped Resources

1978 Mineral Resources Survey

2009 Energy Resource Atlas

## 2. GOALS AND POLICIES

2.1 Exploration and Development

Mitigation Tools

Energy Policy Opportunity Map (GIS Tool)

Mesa County Land Development Code

5.2.22 - Oil and Gas Support Services

5.2.23 - Temporary Employee Housing

Evaporative Ponds Policy

2.2 Generation Facility Siting

2.3 Transmission Lines

BLM_0057676

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

## 1. RESOURCES

**Mapped Resources**

### 1978 Mineral Resources Survey of Mesa County – A Model Study – Colorado Geological Survey

(On File at Mesa County Planning and Economic Development Department)

### Energy Atlas June 2009

(http://imap.mesacounty.us/EPOM/EMP_Docs/Mesa_County_Energy_Atlas_Interactive_72dpi%5B1%5D.pdf)

## 2. GOALS AND POLICIES

### 2.1 Exploration and Development

Mineral and Energy Resources ("Resources" hereafter)

**GUIDING GOAL**

*Create and maintain a balance between present and future Resource development and use.*

**GOALS:**

G1.  Mesa County will be a leader in the stewardship of natural, social, environmental, and economic assets of Mesa County, which will assure prosperity and quality of life into the future while minimizing impacts of development and use of Resources.

G2.  Balance new and traditional technologies related to exploration, development, conservation, and use of Resources in a way that will strengthen economic growth, provide safe and reliable use of Resources, and mitigate environmental impacts.

G3.  Minimize potential impacts from all exploration, development, and use of Resources on lands, land uses, residents, and communities, recognizing the location of the Resources and current land use patterns.

G4.  Protect Resources and existing Resource-related facilities from incompatible land uses.

G5.  Minimize potential conflicting land uses that may adversely impair or prevent the exploration, development, and use of commercially valuable Resources, recognizing the location of the Resources and current land use patterns.

G6.  Permit Resource development in a safe and environmentally sound fashion.

BLM_0057677

G7.  No duplication of regulatory oversight.

G8.  Make publicly available any scientifically valid studies and/or databases of knowledge related to human health risks associated with Resource exploration, development, and use, including opportunities to minimize any such risks.

G9.  All exploration, development, and use of Resources will be done in manner in which everyone enjoys the same degree of protection from environmental and health hazards and equal access to the information and decision-making process to have a healthy environment in which to live, learn, and work.

G10.  Keep mitigation measures as current as possible through annual review with industry stakeholders.

**POLICIES:**
P1.  Participate in regulatory rule-making of the appropriate State regulatory agencies, e.g., Colorado Department of Natural Resources (DNR), Colorado Department of Public Health and Environment (CDPHE), Colorado Oil and Gas Conservation Commission (COGCC), Colorado Geological Survey (CGS),  Colorado Division of Wildlife (CDOW),  Colorado Department of Transportation (CDOT), Public Utilities Commission (PUC), etc.

P2.  Participate as a cooperating agency with Federal regulatory and land management agencies, e.g., Bureau of Land Management (BLM), United States Forest Service (USFS), United States Fish and Wildlife Service (USFWS), Bureau of Reclamation (BOR), Federal Energy Regulatory Commission (FERC), etc.

P3.  Provide tools for use by landowners, Resource industry interests, the public and county staff to minimize and mitigate impacts of Resource exploration and development addressing (but not limited to):  Sensory Impacts (odor/visibility), Water-Related Sensitivities, Biological Sensitivities, Transportation, and Hazards and Mineral Resources. (e.g., the interactive Geographic Information System (GIS) map on the Mesa County website known as the Energy Policy Opportunity Map - EPOM).

> **Energy Policy Opportunity Map** Mesa County's website includes an on-line interactive map designed to allow the user to identify locations of: known Resources, known constraints and opportunity areas for developing Resources such as sensitive landscapes, transportation routes, emergency services, and  residential structures; existing and proposed Resource-related facilities, such as natural gas facilities, drilling pads, and wells; mitigation measures or best management practices for potential impacts related to scenic corridors, noise, odor, geotechnical constraints, proximity to residential areas, transportation, roads, bridges, water resources, biological resources, and wildfire, all of which are linked to the mapped sensitivities.

BLM_0057678

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

P4. Provide comments to State and Federal regulatory agencies on proposed Resource exploration and development projects such as Environmental Assessments, Environmental Impact Statements, Plans of Development and Applications for Permits to Drill (APD), based on the EPOM and to include in permits that are enforced by the appropriate regulatory agencies.

P5. Advise Resource developers to demonstrate their use of applicable mitigation measures, best management practices, and best available technology in their applications to Mesa County for appropriate permits through means such as the EPOM tool.


**ACTION ITEMS:**
1.  The Mesa County Land Development Code will be revised to reflect these Goals and Policies regarding Resource exploration and development.  It is suggested subdivision developers obtain all subsurface rights (mineral rights) associated with the land proposed for subdivision prior to Final Plat approval.  All mineral leases and owners of record of the platted property shall be identified on the Final Plat.

2. Revise the Mesa County Land Development Code, including but not limited to the Conditional Use Permit process, policies and standards, to reflect the need to ensure compatibility of Resource exploration and development activities with potentially impacted land uses.

3. Revise the Mesa County Land Development Code, including but not limited to the Conditional Use Permit process, policies and standards, to reflect the need to ensure compatibility of other land uses with Resource exploration and development activities.

BLM_0057679

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN     February 2011

## Mitigation Tools

**Energy Policy Opportunity Map** **EPOM** – on-line tool - http://imap.mesacounty.us/epom/

Mitigation Measures [1]

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Visual, Transportation, Surface Water | Directional/Horizontal Drilling | **Directional/Horizontal Drilling** allows for multiple wells to be drilled from a common well pad.<br><br>• Greatly reduces surface-related impacts by minimizing the number of well locations and surface equipment necessary to service greater volumes of production, especially when employed with Consolidated Production Facilities techniques.<br>• The geology and target production zone determines which drilling technology (directional or horizontal) will be employed.<br>• Both technologies mitigate surface-related impacts similarly. | RECOMMENDED |

---

[1] "These mitigation measures are not all inclusive.  Mitigation may involve best available technology not herein included and should be kept current pursuant to Goal G10 and Policy P5 of this Plan. "

BLM_0057680

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Visual, Transportation, Surface Water | Three-Phase Gathering | **Three-Phase Gathering** allows for pipelines to be installed parallel to the natural gas gathering lines to take production liquids to centralized storage points rather than employ storage tanks at all well pad locations.<br><br>• Can be used in conjunction with Consolidated Production Facilities to minimize the amount of production surface equipment in various locations in a specific area. | RECOMMENDED |
| Visual, Transportation | Consolidated Production Facilities | **Consolidated Production Facilities** techniques consolidate production units and appurtenances on one well pad with common storage tanks.<br><br>• Largely employed when directional or horizontal drilling is used to complete multiple wells from a common well pad.<br>• In certain circumstances, even directional well pads may be further consolidated with others to allow for a common production facility to service several well pads. | RECOMMENDED |

BLM_0057681

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN     February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Transportation, Odor, Noise, Visual, Surface Water | SCADA/Telemetry | **Supervisory Control and Data Acquisition (SCADA)/Telemetry** systems are used to remotely monitor and/or control processes within facilities.<br><br>• Can be employed at production, gathering and processing facilities to minimize transportation impacts due to personnel needed for typical facility monitoring and control.<br>• Allows for a rapid and remote response in the event of an adverse incident, minimizing potential impacts while protecting the community and potential emergency response or company personnel.<br>• Field activities can be better planned and more efficient due to remote monitoring capabilities.<br>• Communication with cell towers, satellites, and other transmitters may limit employing this technology.  (NOTE: locating new cell towers may require a Conditional Use Permit) | RECOMMENDED |
| Visual | Color Selection | **Color Selection of Equipment** can mitigate visual impacts by blending in with the natural environment<br><br>• Limited to areas with low to moderate visual impact potential.<br>• A minimum requirement for all drilling and conditional use permits to mitigate visual impacts in Mesa County. | MANDATORY minimum standard |

BLM_0057682

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN     February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Visual | Camouflage | **Camouflage** techniques include, but are not limited to, constructing outbuilding structures around production or pipeline-related equipment to blend in with the predominantly rural/agricultural setting.<br><br>• Can be employed to minimize scenic impacts in highly sensitive visual resource areas.<br>• Structures must be designed and built to not only conceal the equipment they are housing but to ensure that the materials used for the construction do not pose a fire or safety risk to personnel, the environment or community. | REQUIRES ON-SITE INSPECTION TO DETERMINE APPLICABILITY |
| Visual, Noise | Screening/Barriers | **Screening/Barriers** include natural or constructed barriers to screen visibility of facilities and/or odor impacts.<br><br>• Employed in area with moderate to high sensitivity for visual or noise impacts.<br>• May be most appropriate in locations when tied to Directional or Horizontal Drilling where surface locations can be located to account for topography and other variance in the landscape. | REQUIRES ON-SITE INSPECTION TO DETERMINE APPLICABILITY |
| Odor, Visual, Air Quality, Wildfire, Noise | Flowback Units | **Flowback Units** are used following the well enhancement or frac operations to remove water and frac sand from the production gas stream prior to tying the well into the gas gathering system.<br><br>• Eliminates the need for open flaring into a flare pit or equivalent.<br>• Allows for the natural gas to be captured rather than vented or flared into the atmosphere. | RECOMMENDED |

BLM_0057683

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN     February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Ground Water, Surface Water | Frac Tracing | **Frac Tracing** allows for the material used in the well frac operations to be traced to ensure that frac materials do not penetrate or impact an unplanned geological zone, especially areas of ground water. Well fracing is performed in order to stimulate the production of natural gas.<br><br>• Widely used and necessary in much of the Piceance Basin due to the very tight gas sands that contain the natural gas resource.<br>• Most applicable in areas highly sensitive to potential ground water impacts. | RECOMMENDED |
| Ground Water | Well Casing | **Well Casing** design and integrity is paramount in the protection of ground water resources.<br><br>• Surface casing should be set at a depth to ensure protection and isolation of ground water resources.<br>• Intermediate casing strings will be used if additional water zones are found to exist during drilling activities in order to isolate these zones from production zones.<br>• Bradenhead gas monitoring of annulus in conjunction with a properly engineered casing ensures the mechanical integrity of the well and the isolation of production from other subsurface resources. | RECOMMENDED |
| Ground Water | Cement Bond Logs | **Cement Bond Logs** are a written record to validate the integrity of well cement jobs to protect subsurface resources from production or well completion impacts (muds, fluids, gases, etc.).<br><br>• A proper cement job in conjunction with a properly engineered well casing can essentially eliminate the probability of commingling of resource zones (gas, water, etc.). | RECOMMENDED |

BLM_0057684

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN     February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Surface Water, Ground Water | Lined Reserve Pit | **Lined Reserve Pits** are synthetically lined reserve pits for drilling and production fluids, used to minimize potential unforeseen impacts to surface or ground water resources.<br><br>• An additional level of protection compared to common unlined earthen reserve pits. | MANDATORY minimum standard |
| Surface Water, Ground Water | Closed Loop Drilling | **Closed Loop Drilling** eliminates the need for a reserve pit for circulation water and drilling mud.<br><br>• Most applicable in areas highly sensitive to potential ground water impacts | RECOMMENDED |
| Noise | Insulated Enclosures | **Insulated Buildings or Enclosures** muffle noise from compression or processing facilities.<br><br>• **Required if** a facility that generates noise cannot meet Colorado Oil and Gas Conservation Commission noise level standards.<br>• Also provides added protection from the elements and can increase equipment service life. | RECOMMENDED |
| Noise | Hospital Grade Mufflers | **Hospital-Grade Mufflers** or equivalent are encouraged to minimize noise impacts to neighboring landowners.<br><br>• Colorado Oil and Gas Conservation Commission applicable noise standards will be strictly enforced. | RECOMMENDED |

BLM_0057685

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN    February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Odor | Combustion Units | **Combustion Units** are used at production facilities to minimize volatile emissions from locations but also work well at controlling potential odor impacts to nearby surface occupants.<br><br>• Any well location with on-site production units and liquids storage within 1,000 feet of an occupied surface facility should employ this type of device to prevent potential odor-related impacts. | MANDATORY minimum standard |
| Ground Water, Surface Water | Secondary Containment | **Secondary Containment** systems are engineered systems with synthetic liners, used to minimize potential impacts to surface or ground water from possible spill or releases of materials at drilling and operations sites.<br><br>• This is a standard operating procedure associated with energy development and production activities.<br>• Type of secondary containment is optional, e.g. properly installed Sioux Steel Containment units or equivalent. | RECOMMENDED |
| Ground Water, Surface Water | Loadout Containment | **Loadout Containment** involves capturing residual material that may be left in the loadout lines or hoses used for transferring liquids from storage tanks to a water or condensate truck for site removal.<br><br>• Production, compression and processing facilities generally contain storage tanks for production water and condensate.<br>• Minimizes potential cumulative impacts associated with multiple spill events. | MANDATORY minimum standard |

BLM_0057686

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN     February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Ground Water, Surface Water | Baseline Water Quality Surveys | **Baseline Water Quality Surveys** quantify water quality conditions prior to development activities.<br><br>• Water quality surveys serve all parties beneficially to quantify water quality conditions prior to, during and following development activities. | MANDATORY minimum standard |
| Visual, Wildlife, Surface Water | Reclamation | **Reclamation** using native, weed-free seed mixes should be employed with all surface-disturbing activities to prevent the spread of undesirable or noxious plant species and to minimize visual, wildlife, and stormwater impacts caused from any kind of surface-disturbing activity. | MANDATORY minimum standard |
| Geotechnical Hazard Constraints<br><br>(Steep slopes, mud slides, unstable slopes/soils, faults, earthquake epicenters, etc.) | Relocation of Development Site | **Relocation of Development Site** is often necessary to avoid geohazard areas. | REQUIRES ON-SITE INSPECTION TO DETERMINE APPROPRIATE LOCATION |
| Wildfire Hazards | Consultation with State Forest Service | **Consultation** with the Colorado State Forest Service on techniques to minimize the potential for facilities to be ignited by wild fire and for development activities and facilities to ignite surrounding vegetation.<br><br>• Creation of defensible space around development sites and facilities is minimum treatment in most cases.<br>• Applies to all lands rated as being medium or higher wildfire hazard areas. | MANDATORY minimum standard |

BLM_0057687

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN     February 2011

| Sensitivity | Mitigation Measure | Description | Recommended or Mandatory |
|---|---|---|---|
| Wildlife | Consultation with DOW | **Consultation** with the Colorado Division of Wildlife and/or the US Fish and Wildlife Service is required by the Colorado Oil and Gas Conservation Commission's rules and regulations. | MANDATORY minimum standard |
| Biological Resources | Consultation with Colorado Natural Heritage Program and/or The Nature Conservancy | **Consultation with Colorado Natural Heritage Program and/or The Nature Conservancy** is recommended to avoid, minimize or restore important biological resources (plant or animal). | RECOMMENDED |

BLM_0057688

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

**Mitigation Tools**

**Support Services –**  Mesa County Land Development Code (as may be amended) Section 5.2.22 Oil and Gas Support Services

Introduction excerpt:

 "Land uses that provide support service for oil and gas drilling operations, including parking, storage and maintenance of exploration, production or workover equipment, pipe and production equipment, equipment and storage yards for road and pipeline construction contractors and production unit set-up and maintenance contractors; and non-permanent field offices used by production related personnel shall be subject to Conditional Use Permit review. If the use is requested for a period of less than one (1) year, a Temporary Use Permit shall be applied for with a Major Site Plan application. These land uses are intended for locations in the more remote rural areas of Mesa County. They are not intended to be permitted near municipalities or rural communities where location within urban zone districts is preferable.

*Exception:* The requirements of this Section do not apply to activities that occur on well pads that are subject to approval by the Colorado Oil and Gas Conservation Commission."

**Temporary Housing –** Mesa County Land Development Code (as may be amended) Section 5.2.23 Temporary Employee Housing

Introduction excerpt:

"All Temporary Employee Housing (TEH) constructed or installed in Mesa County related to commercial, industrial, transportation, oil and gas or mineral extraction projects requires a permit. Temporary Employee Housing is subject to Conditional Use Permit review pursuant to the applicable requirements in Chapter 3 of this Code…."

**Evaporative Ponds Policy –** Revised Policies Adopted 9/27/2010

BLM_0057689

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

 **PAGE DOCUMENT**

RECEPTION #: 2547282, BK 5061 PG 743 09/27/2010 at
12:59:18 PM, 1 OF 3, R $0.00 S $0.00
Janice Rich, Mesa County, CO CLERK AND RECORDER



R  2010–024

MESA COUNTY PLANNING AND ECONOMIC DEVELOPMENT DEPARTMENT
MESA COUNTY, COLORADO

EVAPORATION POND FACILITIES/LAND FARMS
POLICIES
(A Component of the Energy Master Plan)
February 25, 2008
**Revised Policy Adopted 27 September 2010**
**by the Mesa County Board of County Commissioners**

**Purpose**
Mesa County shall require that exploration and production waste disposal facilities and other
evaporation pond uses minimize or eliminate potential adverse impacts.  These facilities are
regulated as Conditional Use Permits in Mesa County, and these Policies provide guidance to the
applicants, citizens and staff.  These facilities, known herein as evaporation pond facilities
(EPF's), shall be planned, located, designed and operated to facilitate compatibility with
surrounding land uses in terms of, but not limited to, general use, scale, traffic, dust, noise, odor,
and pollution.  EPF's will be allowed for the purpose of disposing of produced water from gas or
oil drilling operations.  If drilling mud is accepted at the facility, it must be disposed of, treated,
or re-used in compliance with applicable State and Federal regulations.

All proposed facilities will be reviewed by the appropriate regulatory agencies for compliance
with state, local and federal regulations including: specifications in the Colorado Department of
Public Health and Environment (CDPHE) **Section 17 Commercial Exploration & Production**
**Waste Impoundments and the Colorado Oil and Gas Conservation Commission rules and**
**regulations.**  Conditional Use Permits for EPFs shall require applicants to obtain all applicable
State, Local and Federal permits prior to construction and operation of the EPF.

**I. Location:**
   A. New EPF storage and treatment structures shall be located and operated in such a manner
      that no adverse impacts shall result off-site.

   B. In locating EPF storage and treatment facilities the following shall be considered at a
      minimum:
      • **Mandatory Setbacks required by the CDPHE**[1]
      • distance from perennial, intermittent and ephemeral streams. Fluids from these
        facilities will not at any time neither contaminate such waters nor discharge
        without prior written permission from the applicable authorities.

---

[1] "17.3.1(B) **Mandatory Set-Backs:** For EP waste disposal facilities whose application for certificate of
designation is submitted to the local governing authority after the effective date of this Section 17, the facility must
have a mandatory set-back of one-half mile from all residences, educational facilities, day-care centers, hospitals,
nursing homes, jails, hotels, motels, other occupied structures, or outside activity areas such as parks and playing
fields."

S:\PLANNING\Energy Master Plan working files\Evap Pond Policies\Adopted  27 Sept 2010 Revised  Evap Ponds
Policies.doc

1 of 3

BLM_0057690

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

- distance to a municipal boundary or any rural community (as delineated on the Mesa County Master Plan Future Land Use Map).
- distance from any existing dwellings (see footnote on page 1).
- best available technologies to mitigate odors, visibility and noise from the facility on adjacent and/or surrounding properties.
- size of the site

**II. Site Analysis:**
Baseline data collected in compliance with Section 17 of the CDPHE regulations prior to operations shall be submitted with the Site Plan application after a Conditional Use Permit for an EPF is approved.

**III. Site Planning:**
    A. The findings from analysis of the site characteristics must be incorporated into the site design and location of the evaporation ponds on the property.
    B. Adverse impacts due to wind speed and wind direction must be satisfactorily mitigated.
    C. The following Transportation Impact Study (TIS) is required:
        1) Where TIS requirements in the Road Access Policy (RAP) and the Evaporation Pond Facilities Policy differ, the more stringent requirement shall apply.
        2) A pre-study conference with the Road Access Policy Administrator and a Mesa County Development Engineer is mandatory.
        3) All proposed public road (not just publicly maintained) travel routes to the proposed site, from point(s) of origin or 5 miles, whichever is less shall be included in the TIS.
        4) In addition, a narrative statement shall be submitted by the project's traffic engineer that discusses the travel route anticipated to be taken by project traffic beyond the limits of the study area, including identification of any potential adverse impacts associated with the project traffic.
        5) When any proposed travel corridor includes streets or roads within the jurisdiction of other government agencies, Mesa County's TIS requirements shall be the minimum required and shall be included in the TIS submitted to Mesa County. Such other government agencies may have additional requirements that shall be adhered to.
        6) In addition to the RAP requirements, and at Mesa County's discretion, the applicant may be required to analyze segments of any public road travel route to determine its suitability for the proposed traffic generated by the evaporation pond facility. This requirement may include but is not limited to:
            o Pavement and subsurface investigation and load certification
            o Roadway structures investigation and load certification
            o Verification of design vehicle path and clearances
    D. Safety considerations shall be employed addressing the following at a minimum:
        1) Signs warning of potential drowning hazard
        2) Emergency escape routes and mechanisms such as ropes or ladders extending below the surface of the pond to allow a person to climb out of a pond in the event of an accident.
        3) Emergency contact information at the entrance to the facility and within the site.

S:\PLANNING\Energy Master Plan working files\Evap Pond Policies\Adopted  27 Sept 2010 Revised  Evap Ponds Policies.doc

2 of 3

BLM_0057691

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

    E.   Odors and other emissions shall be contained on site and controlled in a manner to prevent nuisance levels from occurring off site.

**IV. Bonding**
The facility will be sufficiently bonded according to CDPHE or COGCC requirements at a minimum to insure that the reclamation plan, remediation plan and post closure water monitoring can be completed. Bonding estimates will be prepared by a professional engineer and submitted for review and approval by Mesa County, and the bond will be recalculated every 5 years. The bond will be sufficient to cover reclamation and, if needed, remediation of adverse environmental impacts. The bond will be required to adequately cover road maintenance costs and remediation of occurrences as well.

**V. Operational Status**
Mesa County shall be notified prior to any change of ownership/operator status at the facility and/or of any permit revisions or equipment upgrade/process change integral to the operation of the facility. If the EPF is sold to a different owner, that new owner assumes all the requirements of the permitted use.

**VI. Closure and Reclamation**
A. All EPF facilities and sites shall be reclaimed to the pre-development state. The facility will submit, as part of the Conditional Use Permit application, a closure plan approved by CDPHE and reclamation plan that will include but not be limited to the following:
    1. Removal of the structures at the facility.
    2. Removal and disposal of the remaining waste including sludge and contaminated soil and pond liner.
    3. Re-grading the site to the approximate original contour.
    4. Erosion control and revegetation of the disturbed area. Revegetation plans shall be approved by the Tri-River Extension Service.
    5. A post-closure plan as required by CDPHE which includes future land use for the site.

B. After closure of the EPF the CUP must be amended to prohibit the EPF from operating as such a facility. Accordingly, prior to amending the CUP, a letter shall be submitted to Mesa County Planning and Economic Development Department certifying the State has approved the closure of the facility.

**VII. Definitions**
Produced water – the water (brine) brought up from the hydrocarbon bearing formation strata during the extraction of oil and gas, and can include formation water, injection water, and any chemicals added down hole or during the oil/water separation process. (Source: EPA)
Occurrence – Leak, spill, overflow, accident or other spill of a reportable quantity as defined by local, state and federal requirements and permits.
Evaporation pond – surface impoundment used for the purpose of containing, treating and evaporating produced water.
Evaporation Pond Facility – both private and commercial centralized facilities not including individual reserve pits at well locations.

S:\PLANNING\Energy Master Plan working files\Evap Pond Policies\Adopted  27 Sept 2010 Revised  Evap Ponds Policies.doc

3of 3

S:\PLANNING\2010 Projects\Hearings-BOA-PID\PRO2010-0210 MC Minerals & Energy Resources  MP1\Adopted PLAN 2011.doc   17 of 19

BLM_0057692

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN      February 2011

**2.2 Major Energy Facility Siting Policy** (Proposed to replace Policy #20)

Goal:

GM1:  To minimize the environmental and socioeconomic impacts from the siting and construction of major energy facilities.

Policies:

PM 1. Mesa County will work cooperatively to locate new major energy facilities including transmission pipelines subject to State and/or Federal regulations (FERC), power plants subject to PUC regulation, oil shale facilities, and other similar major energy facilities

PM 2. Mesa County will require developers to fully disclose details of proposed projects and conduct activities to mitigate their adverse effect on the environment.

**2.3 Public Utility Transmission Facilities** (Proposed to replace Policy #21)

Goals:

GT1:  To assure that adequate amounts of energy will be available to support existing and future development in Mesa County and local municipalities.

GT2: To assure that utility facilities are located so as to minimize detrimental environmental and land use impacts while recognizing the jurisdiction of the Public Utilities Commission (PUC) in regulating public utilities.

Policies:

PT1: The County will cooperate with public utilities in preparing forecasts of future growth and specific growth centers that may require new or increased service.

PT2: Mesa County will assist in determining the location of transmission facilities and the upgrading of existing transmission lines to serve present and future development.

PT3:  Public utilities should provide information documenting the need for the facilities.

PT4:  Locate transmission lines on rights-of-way that have been determined through an open planning process on routes that minimize risks to public health, safety, welfare, and environmental impacts.

BLM_0057693

MESA COUNTY MINERAL & ENERGY RESOURCES MASTER PLAN    February 2011

PT5:  Rights-of-way for transmission lines (electrical, gas, fluids, etc.) should be located to minimize impacts on agricultural, residential, commercial, industrial and recreational land uses to the greatest extent practical, with due consideration for economic, technical, environmental, safety, maintenance and legal requirements.

PT6: The following factors, which are not an exclusive list, shall be considered in the siting of transmission facilities:

    1. Undeveloped vacant land should be used whenever possible.

    2. Local or minor collector road rights-of-way should be used when separate vacant rights-of-way are not feasible.

    3. Major arterial road rights-of-way shall be used in such manner as not to obstruct or hinder the usual travel on such arterials.

    4. Existing utility and transportation or irrigation corridors shall be used whenever such uses are compatible.

    5. Placement of future transmission lines into shared right-of-way corridors and/or facilities shall be considered whenever practical.

PT7:  Transmission lines will be designed, with due consideration for economic, technical, environmental, safety, maintenance and legal requirements, to have the least adverse visual impact on the physical beauty of the mountain/valley terrain of Mesa County, including but not limited to such outstanding features as:  Unaweep Canyon, DeBeque Canyon, Mt. Garfield, Bookcliffs, Grand Mesa, Colorado National Monument and Gunnison and Colorado Rivers.

PT8: Public utilities shall use best management techniques that are mutually acceptable for mitigating environmental impacts, such as color selection, structure designs, structure locations, revegetation and selective right-of-way clearing.

PT9: Locating transmission lines underground will be considered as an alternative when technically feasible and where location of overhead transmission lines could impact scenic views, residential neighborhoods or cause significant public safety hazards, recognizing that the selection of the underground alternative would require a financial arrangement that would be acceptable to the PUC and the affected parties.

PT10: Design and route selection alternatives shall consider the economic impact on energy consumers.

BLM_0057694



# BLM Uncompahgre Field Office Recreation Focus Group Report







A Study by the Mesa State College
Natural Resources and Land Policy Institute
May 2010

BLM_0057695

## Table of Contents

I. Executive Summary ................................................................................................................ 3

II. Focus Group ........................................................................................................................... 5

    *A. Methodology* ....................................................................................................................... 5

    *B: Design* ................................................................................................................................. 5

    *C: Data:* ................................................................................................................................... 7

III. Analysis ............................................................................................................................... 11

Appendix 1.Focus Group Script ............................................................................................... 15

Appendix 2. Recreation Focus Group Presentation for UFO RMP planning area ................... 21

Appendix 3.Focus Group Meeting Notes ................................................................................ 31

Appendix 4. Advertisement/Invitation to Meetings .............................................................. 43

2

BLM_0057697

# I. Executive Summary

The BLM Uncompahgre Field Office is currently undergoing a revision of their Resource Management Plan (RMP), this is the document the guides management decisions on approximately 675,677 acres of public lands around us for the next 20 years.  The Planning Area is much of the Uncompahgre Field Office, but does not include the Gunnison Gorge National Conservation Area, or the Dominguez-Escalante NCA.

This is public land held in trust for the people of the United States as a collective whole.  The question is how to hear and articulate the "will of the people".  The BLM accomplishes this by mandating that every 20 years all land use planning documents go through a public review process.  The result is the revision of the Resource Management Plan (RMP).  The revision process requires a number of places for public input including the scoping process (90 days at the beginning of the process), Resource Advisory Committees (with representatives from a variety of interest groups in the area), focus groups, visits with those using public lands in some way, and a number of other scheduled public comment periods throughout the revision process (scheduled to last about two years or more).

This report is the result of extensive focus group data collection with public lands users concerning recreation on public lands in the UFO. The staff at the Natural Resource and Land Policy Institute at Mesa State College (NRLPI) was contracted by the BLM-UFO to gather data from the public on their preferences for recreational management of the public lands in the field office.  Six focus group meetings were held at locations across the field office with over 130 participants attending at least one of the meetings.  Handouts were given requesting a written response to a variety of questions asking the participants to identify special places and locations of outstanding recreational opportunities and to indicate what activities and characteristics (settings) of the area make them special.  Additional questions were asked about the San Miguel River Basin Special Recreation Management Area (SRMA), BLM management activities that enhance or diminish the quality of the identified special places, sources of information about BLM lands in the field office and partnership opportunities to keep the public involved in the management process.  A total of 124 written responses were received and developed into a database for analysis; this report is based on those written responses and the discussions that took place within the focus groups.

It is clear from the responses that the BLM-UFO is currently managing the land according to a multiple-use mandate.  The participants identified 122 different special places and 85 outstanding recreation areas.  A total of 76 unique activities were associated with special places, and 56 activities with outstanding recreational opportunity locations.  Although many locations were identified by the participants in their written comments, eight or nine locations received by far the largest share of responses.  They include:  San Miguel River Basin, Jumbo Mountain, Dolores River, Roubideau Canyon, Paradox Valley, North Delta OHV//Adobe badlands, Dry Creek, Spring Creek and Tabeguache.  Likewise, a wide variety of activities were

3

BLM_0057698

identified in both the special places and outstanding recreational opportunities, but there was remarkable consistency in the most frequently mentioned activities with hiking (69 mentions[1]) being the most prominent followed by fishing (35 mentions), hunting (28 mentions), mountain biking/biking (39 total mentions)  and camping (25 mentions).  It should be noted that OHV activity was actually divided by many participants based on the mode of transportation, but if all OHV activities were combined it ranks as the second most frequent activity response (36 mentions) in both the special place and outstanding recreational opportunity questions. Participants offered a wide variety of suggestions that are place specific to BLM management activities that enhance or diminish these places.  They also offered a rich set of possibilities for public/private partnerships to help manage the land.  Every written comment has been combined into a database for analysis which has been provided to BLM office for management planning purposes.

---

[1] All frequencies of activities mentioned are based on responses to special place activities.  The order is similar on outstanding recreational opportunities, but the frequency count is less.

BLM_0057699

## II. Focus Group

### A. Methodology

Between February 2, 2010 and February 10, 2010, six focus groups were conducted by the Natural Resource and Land Policy Institute of Mesa State College with various communities in the Uncompahgre BLM Field Office's (UFO) management area.  The communities included Delta, Paonia, Montrose, Ridgway, Telluride and Naturita.  The purpose of the focus groups was to ascertain what participant's preferences were for special places and outstanding recreational opportunities on BLM land (excluding the NCAs in the planning area which have their own planning process); setting characteristics that might enhance or diminish those places and opportunities; and the appropriate role of collaborating partners in planning and managing public lands collaboration. Often in public land planning, managers determine the sites for SRMAs based off of their field experience and then use focus groups to enhance their understanding of the public's preferred recreational outcomes in those locations.  This focus group design differs in that few assumptions were made about where SRMAs or other outstanding recreational opportunities are located prior to the focus group meetings themselves.  Rather, these focus groups were intentionally left open to allow the public to identify the places and activities that have meaning for them, then the results of those discussions and written responses would provide a starting point for recreational planning staff to begin to identify areas in need of special attention.  By starting with public input and then moving toward planning alternatives, this process allows the public to have a more meaningful role early in the process to help shape the outcomes they desire.  The data collected as a result of this process will be used in the revision of the UFO Resource Management Plan.  The following table summarizes the location and size of the focus groups:

**Table 1: Focus Group composition and location**

| Date | Community | Number of Participants |
|------|-----------|------------------------|
| 2/2/10 | Delta | 18 |
| 2/3/10 | Paonia | 38 |
| 2/3/10 | Montrose | 31 |
| 2/9/10 | Ridgway | 18 |
| 2/10/10 | Telluride | 18 |
| 2/10/10 | Naturita | 12 |

### B: Design

Focus groups lasted an average of an hour and a half and were held in locations throughout the field office.  The focus groups were populated by open invitation on the BLM website, local media sources, flyers put up in the communities and e-mail invitations from lists

5

BLM_0057700

of participants who signed up at earlier scoping meetings for the UFO-BLM RMP process. A total of over 130 participants attended the focus groups. Participants were asked to indicate their home zip code on the front of the handout provided. The entire field office population was represented based on their response to the zip code question, with participants attending from 23 different zip codes. The following table indicates where these participants came from:

**Table 2: Participants zip codes and home towns**

| Number of participants | Zip code | Location |
|---|---|---|
| 2 | None | None |
| 16 | 81401 | Montrose |
| 11 | 81403 | Montrose |
| 1 | 81410 | Austin |
| 3 | 81413 | Cedaredge |
| 2 | 81415 | Crawford |
| 9 | 81416 | Delta |
| 8 | 81419 | Hotchkiss |
| 8 | 81422 | Naturita |
| 3 | 81423 | Norwood |
| 3 | 81424 | Nucla |
| 1 | 81425 | Olathe |
| 2 | 81426 | Ophir |
| 2 | 81427 | Ouray |
| 26 | 81428 | Paonia |
| 3 | 81430 | Placerville |
| 14 | 81432 | Ridgway |
| 8 | 81435 | Telluride |
| 1 | 81501 | Grand Junction |
| 1 | 81505 | Grand Junction |
| 1 | 81507 | Grand Junction |
| 1 | 81526 | Palisade |

The general format of the focus groups was the same for all communities. A copy of the script is located in Appendix 1, and the power point that guided the discussion is located in Appendix 2. Participants were given handouts to fill in so that all participants were able to give input to the process, even if they did not have the opportunity to speak up at the meeting. The results of these responses have been recorded in an excel spreadsheet for ease of analysis, and complete data from these written responses has been give to the BLM field office for further analysis and planning. Initially, the participants were asked to describe characteristics of special places in order to establish a specific criterion for that particular community as to what constitutes a special place. With that discussion as a referent, participants were then asked to identify on their handout special places in the BLM field office by naming them, describing their favorite activities there, and indicating what characteristics make the place special (setting

6

BLM_0057701

characteristics). Some results that were written down were discussed as a large group, the rest are recorded in the excel spreadsheet provided to the BLM. Next the participants were asked to identify areas of outstanding recreational opportunities in the BLM planning area. Once again, they were given time to write their responses and circle the areas on maps provided. They also indicated what activities they do in the area, and what characteristics of the area enhance the recreational opportunities (setting prescriptions). After a discussion of the results of their responses, several questions were asked about what the BLM could do in the RMP to enhance or diminish those places, and opportunities for partnerships and further involvement in the process. The participants were encouraged to record their responses to these questions on the handouts provided and the results of those written responses are also recorded on the excel spreadsheet provided to the UFO-BLM. While every effort was made to remain true to the scripts of each focus group type, inevitably the open ended nature of the questions would lead the conversation away from the script temporarily. The facilitator tried to honor comments when they were made, and redirect the group back to the questions in the script in order to comprehensively cover all areas of interest to BLM planning staff. All focus group meetings were digitally recorded and converted into MP3 files and have been submitted to the BLM along with this report as part of the administrative record. Additionally, BLM staff from the UFO were present at all meetings to listen to the responses without adding their own take on the proceedings. This presence of the BLM was a sign to participants that their concerns will be heard even if not all of them are acted upon.

*C: Data:*

Participants were asked to fill out handouts which mirrored the questions asked in the focus group. A total of 124 handouts were returned with written responses to some or all of the questions. The data was then compiled into a database to facilitate queries of the data, and maximize the opportunity to listen to every written comment. The following table indicates how many participants attended and returned handout with comments:

**Table 3: Participant Handout Response Rates**

| Number of Participants | Meeting Location | Number of Handouts returned with comments |
|:---:|:---:|:---:|
| 18 | Delta | 18 |
| 38 | Paonia | 33 |
| 31 | Montrose | 27 |
| 18 | Ridgway | 18 |
| 18 | Telluride | 14 |
| 12 | Naturita | 12 |

Participants were asked to circle "special places" on maps of the Uncompahgre BLM Field Office, excluding the NCAs. The participants could indicate more than one special place.

BLM_0057702

There were 122 different special places identified. While most areas were only mentioned once or twice, the following table indicates how often the top nine locations were identified.

**Table 4: Special Places**

| Number of times identified | Location | Number of meetings identified |
|---|---|---|
| 36 | San Miguel River Basin | 6 |
| 18 | Jumbo Mountain | 2 |
| 16 | Dolores River | 6 |
| 15 | Roubideau Canyon | 4 |
| 15 | Paradox Valley | 5 |
| 12 | North Delta OHV//Adobe badlands | 2//3 |
| 10 | Dry Creek | 3 |
| 10 | Spring Creek | 4 |
| 7 | Tabeguache | 4 |

In addition to identifying the special places, participants were asked to indicate what they like to do in the area (activities), and what makes it a special place (settings). While the settings comments (and all other data) are linked to the locations in the database, the settings comments are site specific therefore there is no summary data of settings offered. A total of 76 unique activities were identified, and the total number of activities mentioned in a special place location was 437. The following table indicates the most popular mentioned activities[2] associated with the special places identified:

**Table 5: Special Place Activities**

| Special Place Activity | Number of mentions |
|---|---|
| Hiking | 69 |
| Fishing | 35 |
| Hunting | 28 |
| Camping | 25 |
| Mountain Biking | 23 |
| Biking | 16 |
| Watching Wildlife | 16 |
| Rafting | 14 |
| Photography | 12 |
| OHV | 10 |
| Archeological sites | 9 |
| ATV | 9 |

---

[2] The activities in the table were mentioned by 4 or more returned written responses. There are many activities mentioned by less than 4 participants that might still be important. A complete list is identified by count in the database provided to the UFO-BLM staff.

BLM_0057703

| | |
|---|---|
| Gold prospecting | 9 |
| Horseback riding | 9 |
| Exploring | 8 |
| Bird watching | 7 |
| Four-wheeling | 7 |
| Wood hauling/cutting | 7 |
| Boating | 6 |
| Grazing | 6 |
| Motorcycling | 6 |
| Floating | 5 |
| Picnic | 5 |
| Trail running | 5 |
| Climbing | 4 |
| Driving | 4 |
| Kayaking | 4 |

Later in the focus group, participants were asked to circle "outstanding recreational opportunities" on maps of the Uncompahgre BLM Field Office excluding the NCAs. The participants could indicate more than one special place. There were 85 different outstanding recreational opportunity locations identified. A total of 56 unique activities were identified, and the total number of activities mentioned in an outstanding recreational opportunity location was 248. While most areas were only mentioned once or twice, the following table indicates how often the top eight locations were identified:

**Table 6: Outstanding Recreational Opportunities**

| Number of times identified | Location | Number of meetings identified |
|---|---|---|
| 15 | San Miguel River Basin | 6 |
| 15 | Jumbo Mountain | 3 |
| 10 | Dolores River | 6 |
| 10 | Paradox Valley | 5 |
| 9 | Roubideau Canyon | 3 |
| 8 | Spring Creek | 3 |
| 7 | North Delta OHV | 2 |
| 7 | Dry Creek | 3 |

In addition to asking what are the outstanding recreation opportunity locations, participants were asked to identify what they like to do in the area (activities), and what makes it an outstanding recreational opportunity (settings). While the settings comments (and all other data) are linked to the locations in the database, the settings comments are site specific therefore there is no summary data of settings offered. A total of 56 unique activities were identified, and

9

the total number of activities mentioned in a special place location was 248.  The following table indicates the most popular mentioned activities[3] associated with the outstanding recreation opportunity locations identified:

**Table 7: Outstanding Recreational Opportunity Activities**

| Outstanding Recreational Opportunity Activity | Number of mentions |
|---|---|
| Hiking | 38 |
| Fishing | 23 |
| Hunting | 17 |
| Mountain biking | 16 |
| Camping | 11 |
| Watching Wildlife | 11 |
| Biking | 10 |
| Photography | 9 |
| OHV | 8 |
| ATV riding | 6 |
| Dirt biking | 6 |
| Rafting | 6 |
| Boating | 5 |
| Motorcycle | 4 |
| Skiing | 4 |
| Trail running | 4 |
| Four wheeling | 4 |
| Backpacking | 4 |
| Exploring | 4 |
| Target shooting | 4 |
| Climbing | 3 |
| Horseback riding | 3 |
| Snowmobiling | 3 |
| Rock gathering | 3 |
| Relaxing | 3 |

---

[3] The activities in the table were mentioned by 3 or more returned written responses.  There are many activities mentioned by less than 4 participants that might still be important.  A complete list is identified by count in the database provided to the UFO-BLM staff.

BLM_0057705

### III. Analysis

While much of the analysis of the data will be done by the recreational staff of the BLM Uncompahgre field office, a few observations about trends that emerged from the meetings are in order here. First, it seems obvious to this observer that the attendance and willingness to participate in the sessions is an indication that these participants generally believe that this BLM office will listen to their concerns. Further evidence of the belief of a responsive BLM office can be found in the lack of comments during the focus groups and subsequent handout responses that the BLM does not listen. Rather, there were several positive comments regarding the BLM office and its partnership with the communities. This does not just happen by chance; it is nurtured over years of interaction between the BLM and the public. This positive relationship between the two is not always common across the country. In fact, BLM-public interaction is often characterized by tension over public participation and management actions. It is refreshing to see a more positive relationship between the BLM and the public. The strong presence of BLM staff from the UFO at each of the focus groups gave the public the impression that the BLM is concerned about their comments in the management process. The staff of the BLM-UFO are to be commended for actively working to develop partnerships with the public that enhance their effectiveness in managing public lands and reduce the amount of effort needed to respond to a more hostile public. When the public takes ownership in the process as evidenced by the strong turnout in these focus groups, they are more likely to support and participate in the management actions outlined in the RMP. This is not to suggest that there is no dissention in the UFO, but it appears to be significantly less of a problem due in no small part to the ongoing activity of the staff at the BLM-UFO.

It is also clear that for the participants of these focus groups representing the residents within the field office boundary, recreation is a huge part of their quality of life. There were a lot of activities mentioned in both the special places and the outstanding recreational opportunities on public lands indicating the success of the management strategy for multiple use recreation already present in the field office. Many respondents suggested that recreational activities are a big part of what makes "special places" important to them. As such, recreation ought to play a significant role in the revision process of the RMP. This increased emphasis on recreation is part of a much larger trend nation-wide on BLM lands as people begin to articulate the value of recreation on these lands. While there were lots of special places and outstanding recreational opportunities identified, few areas offer broad enough activity and interest to be considered for management as a special recreational management area (SRMA) except for the existing SRMA along the San Miguel River. Another area to be considered for SRMA status might include the land within the Dolores River corridor. Based on the large turnout at the Paonia meeting and numerous comments about Jumbo Mountain, there is real concern over the status of that location even though it is only mentioned in half of the focus groups across the field office. Several requests were made to consider Jumbo Mountain as an SRMA in at least one of the planning alternatives. There were also several locations identified that require the BLM to consider their

11

recreational management beyond simply leaving them as open spaces.  These include the Paradox Trail, Dry and Spring Creek, Roubideau Canyon and the North Delta motorized area.

The participants expressed concerns regarding the over regulation of public lands that might result from the RMP revision process.  There was strong agreement among participants at the focus groups that one of the attractive qualities of these special places on BLM land is the unrestrictive nature of those lands.  While some regulations are necessary to maintain public lands, the UFO should be careful not to "over-regulate" those lands.  The most common concern expressed at the meetings and in the handouts appears to be the lack of access to many public lands in the field office.  This is particularly true of the area known as Jumbo Mountain.

There were a number of comments regarding the Wild and Scenic River designation process for the Dolores and San Miguel watersheds.  Most of the comments were in favor of some designation, but those opposed to the designation are intensely concerned about the consequences of such designations on their chosen activities such as gold prospecting.  Most of the participants also support the multiple use concept, but several comments suggested not all lands are suitable for all activities.  There is support for separate user groups in some areas especially between motorized use and mechanized/quiet uses.

There was general concern expressed in several focus groups about the diminishing effects of oil, gas and mineral development in these special places.  There were also several concerns raised over the negative environmental consequences of grazing on special places and recreational opportunity locations, especially in riparian areas.  Additionally there was some concern expressed about the need to increase disabled access especially in the North Delta area.  There was also a lot of concern for the protection of habitat for wildlife.  Watching wildlife was seen as an important quality to many of the special places identified.

Given the fact that hiking was identified more than any other activity (almost double in both special places and outstanding recreational opportunities), the need for additional hiking trails in the field office should be taken seriously in the alternatives to the RMP developed as part of the process.  OHV users were primarily concerned about maintaining access to their special places.  Some also expressed an interest in the development of more loop trails, although opinions on their value were mixed as some suggested that not all existing trails should be turned into loop trails.  There were also several comments made about the need to expand the opportunities for single track mountain biking experiences across the field office.  Specific locations for these loop trails and expanded single track opportunities are evidenced in the comprehensive data base provided to the staff of the BLM-UFO.

In each of the focus groups, participants were asked about the current management of the San Miguel River Basin SRMA.  Opinions of current management practices were generally very positive.  Particular mention was made of new camping facilities and improved access as a result of the development of these sites.  Suggestions were made for more public-private partnerships

12

BLM_0057707

with local communities and home-owner associations in the area. While most participants believe the SRMA management plan for the San Miguel River basin is moving in the right direction, some concerns still remain over the permitting process for local commercial outfitters. Concerns were also expressed about how to manage the growing number of visitors to the river basin, some of which has been spurred by easier access as a result of SRMA management focus. Participants expressed a good deal of concern about the need to more clearly designate private from public property. Management suggestions on addressing this problem include more fencing and signage. While many of these comments surfaced in the discussion of the San Miguel SRMA, concerns about trespass and public -private boundaries were expressed in almost every focus group and about lands beyond the San Miguel River SRMA as well. This is clearly an on-going issue of concern for the BLM staff to be aware of.

Few comments were offered on marketing the field office lands as a tourist destination. The NCAs will serve this function while many agreed that the remaining land should be managed for local use. According to handout responses when asked about sources of information, the BLM office is considered to be the key source of information about the recreational opportunities available on public lands. There was particular mention of the website of the BLM-UFO as a growing source of information. There is some use of local network groups such as COPMOBA and local chambers of commerce as another source of information about the lands. More information could be made available on areas such as the North Delta OHV area. Noticeably absent from the comments on information source were traditional means of communication such as the media and BLM kiosks at the trailheads. While these are important sources of information for some, the BLM staff should concentrate their limited resources on more common sources of information such as their website.

Several suggestions were also offered regarding opportunities for partnerships with the BLM office. In addition to being important sources of information, groups such as COPMOBA and local area chambers of commerce seem to be a likely source for such partnerships as well. There was also some concern expressed about the seeming inability for the BLM and other local land agencies such as the USFS to get along and share the management of a landscape that is often unaware of the boundary. Suggestions for public involvement seemed to congregate around public meetings and surveys. There was also a useful suggestion at one of the meetings to push information out through social networking sites such as Facebook.

In general, the participants seemed to be reasonably pleased with the management of the land in the Uncompahgre Field Office. There were several concrete suggestions about what could be done to enhance the quality of the experience in special places. Participants seemed to believe that the BLM would come and listen to their concerns, and that this field office is already doing a great job at addressing many of these issues. The strong attendance and robust participation in the focus groups across the field office indicates that the public is willing to work with the UFO-BLM staff in the planning and management of public lands. The open nature of the focus groups helped to identify a number of areas that merit further consideration for

13

recreational planning.  This dialogue is important to enhance the public's acceptance and support for future management decisions.  With such open ended public input, the BLM managers are better able to understand the public's desires and are less likely to be able to "set the agenda" for what makes special places important.  This seems to be in keeping with the spirit of such important laws as NEPA and FACA which grant priority to public input in the planning process. Future BLM planning actions should consider this model as a way to enhance pubic understanding of land management and to enhance the agencies understanding of public desires on public land.

14

BLM_0057709

**Appendix 1.Focus Group Script**

# Script Outline for Recreational Focus Groups
Uncompahgre Field Office of Bureau of Land Management
Resource Management Plan Revision Process
Spring 2010
Facilitated by Tim Casey, PhD
Natural Resource and Land Policy Institute at Mesa State College

1.     Introductions

*Welcome, introduce process and all participants, discuss hospitality issues*

"Good evening, my name is Tim Casey, I am a professor of Political Science at Mesa State College and the field coordinator for The Natural Resource and Land Policy Institute at Mesa State. We have been asked by the Bureau of Land Management (BLM) to help them understand the desires of the public for recreational management on particular areas in and around the Uncompahgre Field Office as they relate to public lands.

The BLM Uncompahgre Field Office is currently undergoing a revision of their Resource Management Plan (RMP), this is the document the guides management decisions on approximately 675,677 acres of public lands around us for the next 20 years. The Planning Area is much of the Uncompahgre Field Office, but does not include the Gunnison Gorge National Conservation Area, or the Dominguez-Escalante NCA. Your participation in this focus group is a critical part of this planning process. I want to thank you for your willingness to spend some time with us to better understand recreational desires as they relate to BLM public lands.

Your participation in this focus group is entirely voluntary, and you are welcome to leave at any point, or simply choose not to answer a question if you don't want to. Your answers to these questions will remain anonymous, but the responses in this focus group will be part of the public administrative record of the RMP process. I'm going to capture your concerns and desires on my presentation screen. I'm also tape recording this session so that I can go back and fill in the blanks on anything I miss. The entire focus group experience should take about an hour and a half, and there are some snacks in the back that you are welcome to go and get at anytime. Are there any questions so far?

15

The purpose of this meeting is to learn about your concerns and desires for recreation and tourism in the Uncompahgre Field Office, a map of these lands is on the wall behind me.  This information is needed to help BLM and its collaborating partners responsively manage the area and provide services."

I want you to feel free to express your views and not be threatened by anyone else in the room.  Hitchhike on things others say if you want, but please don't criticize what they say.  To be fair to everyone, we need to stick to our meeting format and keep the discussion appropriately focused.

"Feel free to change your views, and don't worry if what you have to say differs from what others are saying—even if you know they disagree.  Our goal is to find out precisely what matters to each of you.  So I will not allow you to interrupt others, or argue with their opinions.  As the facilitator of this focus group, I'll work hard to create and maintain an open and permissive environment, remain neutral ourselves, and give everyone an opportunity to be heard—all as time allows."

To make sure we cover the same ground in each of these meetings, I will be following a consistent format between this meeting and the other 5 scheduled in the field office, you do not need to attend more than one.  Please stay involved to the end.  We hope to finish this meeting by 6:30 pm.

2.    **Special Places**

A:      Let's begin by thinking about the places that are special to you around this area,

Question – What makes a place special?

B:      Exercise – The participants will be invited to complete page 2 of hand out (see attached) and reminded that these will be collected at the end for a complete account of what is important to them, even if the place does not get mentioned in the group discussion.  Nevertheless, we will be discussing several  of their responses after they finish filling them out.

The text for the question on page 2 is as follows:

Please take a couple moments to think about a few areas or places on BLM managed public lands in the Uncompahgre Planning Area(highlighted on the attached map) that have special personal meaning and importance for you.  Note that the planning area does not include the Gunnison Gorge NCA, or the Dominguez-Escalante NCA.  For each of these places please do the following: 1)

16

BLM_0057711

circle it and number it on the attached map labeled "Special Places"; then <u>in writing below</u> 2) name and locate the place; 3) indicate the things you do when you visit there; and 4) indicate the reason that this place has special meaning for you.

C: <u>Brainstorm</u> – (interactive map on overhead projector)

Participants are asked to star their most important special place, then asked to share that location so it can be circled on the overhead map.  Then the facilitator will ask how many others have that place on their list.  The original participant who shared the location will then be asked to share their answers to the activity question and why it is special.  The group will continue this process of naming, mapping and discussing additional "most important special places."

3.  Recreational Opportunities

A.  <u>Exercise</u> – The participants will then be invited to complete page 4 of hand out and reminded that these will be collected at the end for a complete account of what is important to them, even if the place does not get mentioned in the group discussion. Nevertheless,  we will be discussing several of their responses after they finish filling them out.

The text for the question on page 4 is as follows:

Please take a couple moments to think about a few areas or places on BLM managed public lands in the Uncompahgre Planning Area (highlighted on the attached map) that should be noted for their outstanding recreational opportunities. Note that the planning area does not include the Gunnison Gorge NCA, or the Dominguez-Escalante NCA.  For each of these places please do the following: 1) circle it and number it on the attached map labeled "Recreational Opportunities"; then <u>in writing below</u> 2) name and locate the place; 3) indicate the recreational activities you do when you visit there; and 4) indicate the reason that this place is an outstanding recreational opportunity for that activity.

B.  <u>Brainstorm</u> – (interactive map on overhead projector)

Participants are asked to star their most important recreation opportunity, then asked to share that location so it can be circled on the overhead map.  The facilitator will then ask how many others have that place on their list.  The original participant who shared the location will be asked to share their answers to the activity question and why it is a good place to do that activity.  The group will

17

continue this process of naming, mapping and discussing additional most important recreational opportunities.

4.    Management Actions

Now we will turn our attention to a number of questions that relate to how the BLM public lands are managed for recreation within the Uncompahgre Planning Area.

A.    <u>Question</u> – What BLM management actions might enhance your special places or outstanding recreational opportunities?

B.    <u>Question</u> - What BLM management action would diminish the specialness of your special place or the quality of your recreational opportunity?

C.    <u>Question ( for Telluride and Naturita focus groups only):</u> The San Miguel River Basin is already an Special Recreation Management Area, which means it has a special status for recreational planning.  What do you like about how the SRMA is currently managed?  What would you like to see changed?

D.    <u>Question:</u>  Where do you go for information about recreation on BLM land? What are the informal networks (groups) you are involved with that use BLM lands for recreation?  Are there others we should be talking to about recreation on public lands who are not here today?

E.    <u>Question:</u> What opportunities do you see for the public to participate with the BLM on recreational management of BLM lands in this field office?  Are you interested in staying involved?

5.    Other Comments

A.    <u>Question</u> – Are there other comments you have related to the recreational planning process on BLM lands that we haven't covered that you wish to address?

B.    Closing –

"We have come to the end of our evening together, and on behalf of the BLM and all of us at the Natural Resource and Land Policy Institute hear at Mesa State College, I want to thank you for your time, your attention, your responses and your thoughtfulness.

18

BLM_0057713

On the screen is all the information you need to contact us.  We will conduct over a dozen of these focus groups and compile the results in a report that will become part of the administrative record for the BLM Uncompahgre Field Office Resource Management Plan Revision process.  The results will help shape the alternatives offered in revision of the management plan.

When our report is available later in the Summer, we will e-mail you a link to it if you have left us an e-mail address on the sign in sheet.

Please visit the Uncompahgre planning web site for additional information on the RMP planning effort.  Go to www.uformp.com; this address will immediately redirect you to the planning web site.

If you have any questions about these focus groups or the results, please feel free to contact us.  Thank you again, good evening.

BLM_0057714

20

BLM_0057715

**Appendix 2. Recreation Focus Group Presentation for UFO RMP planning area**



BLM_0057716

# Where are the special places for you on BLM lands in the planning area?



# North Fork Valley Area



BLM_0057717





BLM_0057718



# Special Places

| Number | Name | Actions | Qualities |
|--------|------|---------|-----------|
|        |      |         |           |
|        |      |         |           |
|        |      |         |           |
|        |      |         |           |

24

BLM_0057719

## What are the places in the planning area with outstanding recreational opportunities?




## Outstanding Recreational Opportunities

| Number | Name | Activity | Qualities |
|--------|------|----------|-----------|
|        |      |          |           |
|        |      |          |           |
|        |      |          |           |
|        |      |          |           |

25

BLM_0057720

What BLM management actions might enhance your special places or outstanding recreational opportunities?

What BLM management action would diminish the specialness of your special place or the quality of your recreational opportunity?

26

BLM_0057721

## San Miguel River Basin SRMA



What do you like about the current management of the SRMA?

BLM_0057722

What ought to be changed regarding the management of the San Miguel River SRMA?

## Services and Partnerships

BLM_0057723

Where do you go for information about recreation on BLM land?

Opportunities for public participation in planning?

29

BLM_0057724



BLM_0057725

**Appendix 3.Focus Group Meeting Notes**

**Bureau of Land Management**
**Delta – UFO**
**Administered by: Dr. Casey**
**Feb. 2, 2010**

Start: 5 pm
 Dr. Casey starts off meeting explaining why the BLM is interested in public opinion, also explains that the participation of these groups is voluntary and the participants are free to leave at any time.

Special Places:
 Dr. Casey elaborates on what a "special place" is according to public lands.
  What are special aspects?
   A.  Getting away from populated areas, getting away from city life.  Being alone.
   B.  Away from the concrete and the noise. Trails, the different trails for different people.  Few limits. There needs to be more differentiation on different types of recreation.
   (The two debate on the differentiation of recreation.)
  Dr. Casey intervenes, "Some people think these places are special because of the different recreations held on public lands."
 Dr. Casey asks the participants to point out the special places on a map provided.
 Participants fill out handout on special places.
Question 2- Recreational Activities:
 Dr. Casey shows participants examples of areas recreational activities occur. Also mentions trying to gather a broad view on how people are using the landscape.

Where are opportunities for recreational activities?
   A.  The spring creek area, for motorcycling and the 7 miles of technical terrain, it is very challenging.
   B.  Indian Ridge area, gold dredging, resources , gold and water
   C.  Paradox valley, I take my motorcycle up there
   D.  Lereaux creek (north of Hotchkiss, spelling?), fishing, hiking, atv-ing.

Dr. Casey- What are the outstanding recreational opportunities in these areas?

 Dr. Casey has participants turn to the next page on the handout.  Point out the types of recreation they enjoy doing in those areas and why
.
(Participant mentions that access plays a large role in recreation activity.)
  A.  Cushton Mesa (Spelling?)
Management:
 Dr. Casey explains the actions that the BLM may take to enhance public lands.

What BLM management actions might enhance these areas (special areas/recreational areas)?

31

BLM_0057726

A. For motorcycle riders loops trails are much more enjoyable on mountain passes.
B. (Agreed)
C. Loop trails are enjoyable for horseback riding as well.  Having some areas not motorized.
D. Water and chopping for wildlife.  Also they could add more maps to areas, for education and safety.
E. If there is a way to maintain the management philosophy to not over restrict. I like that I can park wherever I want.

What BLM management might diminish those qualities?

A. The restrictions on the wild and scenic areas.
B. Closure of existing trails, it concentrates use.
C. Too much emphasis on conservation. Needs to be more balance between enjoyment and conservation.
D. If they allow over use of these landscapes it takes away from the natural beauty of the ecosystems.

The San Miguel River Basin is already a Special Recreation Management Area, which means it has a special status for recreational planning.

What do you like about how the SRMA is currently managed?

A. It is quiet
B. They haven't closed the roads yet.
C. The campgrounds.
    (Dr. Casey explains the map.)
D. I like the river access.

What do you think should be changed in this area?

A. There is a cabin there they should get rid of.
B. Better marks of the trails.

Where do you go for information on recreation of BLM land?

A. A coffee shop
B. The BLM sites, they have really nice maps outside of the trails, I downloaded them.
C. I used to be able to get the maps from the forest service but they don't have those anymore.

Dr. Casey asks as people are leaving to point out people who should be involved in this process, those who really participate in outdoor activities, and shape community opinions.

What do you see as the opportunity for the public to participate and form partnerships with the BLM?

BLM_0057727

A. Public lands, working together with the public lands.
B. Quarterly meetings.
C. There are a bunch of special interest groups in this area that are eager to get input and public support.
D. There are clubs that take the management responsibility out of the BLM's hands.

Dr. Casey concludes the meeting by thanking all the participants and giving them contact info if they have any questions.


**Bureau of Land Management**
**Paonia-UFO**
**February 3, 2010**
**Administered by Dr. Casey**

Start: Noon
 Dr. Casey starts off meeting explaining why the BLM is interested in public opinion, also explains that the participation of these groups is voluntary and the participants are free to leave at any time.

Special Places:
  Dr. Casey elaborates on what a "special place" is according to public lands.

  What are special aspects?
        A. Solitude.
        B. Convenience.
        C. Natural barriers, natural sounds.
        D.  Wildlife.
        E. Multiple use.
        F. Access to placer mining in the rivers.
        G. Natural view shed.
        H. Lack of restrictions
        I. Quiet, protection.
        J. Proper travel management.

Where are these special places on BLM lands?
        A. All the land.
        B. The North Delta OHV area, it's accessible, family friendly, quality for solitude and convenient.
        C. East of Paonia.
        D. Area over by Norwood.
The topic turns to what do people like to do in these areas:
        • Trail running
        • Dog running
        • Hunting, fishing

33

BLM_0057728

Dr. Casey asks the participants to point out the special places on a map provided.
    Participants fill out handout on special places.

Question 2- Recreational Activities:
    Dr. Casey shows participants examples of areas recreational activities occur. Also mentions trying to gather a broad view on how people are using the landscape.

Where are opportunities for outstanding recreational activities?
    A.  Outstanding hunting and OHV areas.

Management:
    Dr. Casey explains the actions that the BLM may take to enhance public lands.

What BLM management actions might enhance these areas (special areas/recreational areas)?
    A.  Continuing management as multiple use areas.
    B.  Keeping the access on public lands, and not restricted with the private property.
    C.  I think that there needs to be more individual responsibility.

What BLM management might diminish those qualities?
    A.  Seasonal closures.
    B.  Closing to some groups and not others.
    C.  Closing cultural sites.

The San Miguel River Basin is already a Special Recreation Management Area, which means it has a special status for recreational planning.

 What do you like about how the SRMA is currently managed?

    A.  Concentrating on the camping areas allows other areas to keep the wildlife and improves access.

What do you think should be changed in this area?
    A.  The landscape becomes overwhelmed with travel.

Where do you go for information on recreation of BLM land?
    A.  Private businesses.
    B.  We found some information in an office in Craig, CO.
    C.  If organizations worked more closely together information could get around more easily.
    D.  The internet, the BLM website.

Dr. Casey asks as people are leaving to point out people or groups who should be involved in this process, those who really participate in outdoor activities, and shape community opinions.

34

BLM_0057729

What do you see as the opportunity for the public to participate and form partnerships with the BLM?

    A. Partnerships with land owners.
    B. Team up with people who want to clean up the countryside, or expand on groups who are already doing that.
    C. Work with people with common problems and find common solutions.

Dr. Casey concludes the meeting by thanking all the participants and giving them contact info if they have any questions.

**Bureau of Land Management**
**Montrose-UFO**
**February 3, 2010**
**Administered by Dr. Casey**

Due to recording equipment failure, this meeting was only recorded for 21 minutes

Start: 5 pm
 Dr. Casey starts off meeting explaining why the BLM is interested in public opinion, also explains that the participation of these groups is voluntary and the participants are free to leave at any time.

What qualities make a place special on public lands?

    A. Access
    B. Clean and natural, lots of forest life.
    C. Any place I can drown a worm. A trail system.
    D. Getting away from other people, quiet, solitude, a natural setting.
    E. I would say a place that is more special is one that is not readily accessible. The working to get there makes it rewarding. The experience of discovery. The richness of unusual numbers of plants and wildlife.

Where are those special places to you?
    ** The recording ends.

**Bureau of Land Management**
**Ridgway-UFO**
**February 9, 2010**
**Administered by Dr. Casey**

Start: 5 pm
 Dr. Casey starts off meeting explaining why the BLM is interested in public opinion, also explains that the participation of these groups is voluntary and the participants are free to leave at any time.

Special Places:
 Dr. Casey elaborates on what a "special place" is according to public lands.

35

What are special aspects?
    A.  Wildlife
    B.  Scenery, the large mountains, the hiking.
    C.  The places that you can hear the natural sounds.
    D.  The solitude and feeling of public ownership and the quiet.
    E.  The rivers and water.
    F.  Access.
    (Dr. Casey addresses people who came in late, and filled them in on the handout).
Where are these special places on BLM lands?
    A.  Softhead
    B.  The BLM land across from the reservoir.
    C.   Owl Creek pass
    D.  The archeological sites.

Dr. Casey asks the participants to point out the special places on a map provided.
    Participants fill out handout on special places.

Question 2- Recreational Activities:

    Dr. Casey shows participants examples of areas recreational activities occur. Also mentions trying to gather a broad view on how people are using the landscape.

Where are opportunities for outstanding recreational activities?
    A.  Scenic drives
    B.  Historic mines, the discovery historic areas.
    C.  The river corridor

Management:

    Dr. Casey explains the actions that the BLM may take to enhance public lands.

What BLM management actions might enhance these areas (special areas/recreational areas)?
    A.  Clear boundaries, the clarification of the use of areas.
    B.  Some areas that are non motorized, keeping them that way
    C.  The areas of quiet use
    D.  The areas of ecological sound-scapes, the BLM is paying attention to it, and I like it.
    E.  The economic value of having these public lands, it brings more to towns than the BLM thinks.
    F.  Looking at certain activities that are a better use of particular lands than others.

What BLM management might diminish those qualities?
    A.  Having areas of quiet use be interrupted.
    B.  Diminishing the quality if there is a lack of monitoring and management of land.
    C.   A lack of management of water and other sensitive areas.

BLM_0057731

The San Miguel River Basin is already a Special Recreation Management Area, which means it has a special status for recreational planning.

(Over half of the focus group uses SRMA land.)

What do you like about how the SRMA is currently managed?
- A.  The camping access along the corridor.
- B.  The improvements with the nature conservation, the fishing access.

What do you think should be changed in this area?
- A.  Things are stuck management wise, listening more to the local public on management issues.
- B.  Oil and gas lease every quarter.
- C.  The BLM needs to wake up to the fact that the country is in a recession, they need to help the economy, there are opportunities to help.

Dr. Casey asks as people are leaving to point out people or groups who should be involved in this process, those who really participate in outdoor activities, and shape community opinions.

Where do you go for information on recreation of BLM land?
- A.  Local, regional shops, outfitters, outdoors store.
- B.  Using the internet, the BLM and outfitter websites.
- C.  Going to the senior citizens that have been living here for a long time.

What do you see as the opportunity for the public to participate and form partnerships with the BLM?
- A.  The nature conservations.
- B.  Interagency cooperation and cooperation between the two BLM field offices.
- C.  Develop some method to interact with user groups.
- D.  Getting more involved with the community.

Dr. Casey concludes the meeting by thanking all the participants and giving them contact info if they have any questions.

<div align="center">

**Bureau of Land Management**
**Telluride-UFO**
**February 10, 2010**
**Administered by Dr. Casey**

</div>

Start: Noon
Dr. Casey starts off meeting explaining why the BLM is interested in public opinion, also explains that the participation of these groups is voluntary and the participants are free to leave at any time.

Special Places:
Dr. Casey elaborates on what a "special place" is according to public lands.

<div align="center">37</div>

What are special aspects?
    A.  Wild and undeveloped places
    B.  Places that I attended earlier, that held important events.
    C.  Wildlife, scenic views, the challenging terrain, the river.
    D.  The recreation, natural sounds.
    E.  The opportunities to develop.
    F.  Openness to public, remoteness, accessibility.

Where are these special places on BLM lands?
    A.  This very large canyon on the San Miguel, it is not developed, beautiful wildlife, geology is incredible, virtually no development, there are some hunters.
    B.  Beaver Creek.
    C.  Dolores River, Gunnison River.
    D.  Cerdax (spelling) valley

Dr. Casey asks the participants to point out the special places on a map provided.
    Participants fill out handout on special places.

Question 2- Recreational Activities:

    Dr. Casey shows participants examples of areas recreational activities occur. Also mentions trying to gather a broad view on how people are using the landscape.

Where are opportunities for outstanding recreational activities, and what qualities does it possess?
    A.  San Miguel, hiking, fishing, rafting
    B.  South creek, hiking, biking, camping, climbing, wild life.
    C.  Unaweep, climbing, the access is difficult, the camping is good.

Management:

    Dr. Casey explains the actions that the BLM may take to enhance public lands.

What BLM management actions might enhance these areas (special areas/recreational areas)?
    A.  The BLM can help support an RICD.
    B.  Access.
    C.  Preserving wildlife habitat.
    D.  Withdrawal all mineral development from BLM lands, maintain grazing in and around canyon.
    E.  Regulate designated trails more.

What BLM management might diminish those qualities?
    (Ran short on time to elaborate on this question, Dr. Casey jumps ahead to the next question).

BLM_0057733

The San Miguel River Basin is already a Special Recreation Management Area, which means it has a special status for recreational planning.

What do you like about how the SRMA is currently managed?
    A. There has been infrastructure enhancement over the past 10 years that I have enjoyed.
    B. Adequately addressed the needs that are there as far as boat ramps, but there is a need for more.
    C. Norwood canyon should remain undeveloped.
    D. Just because it is good now does not mean we need to really add any more.

What do you think should be changed in this area?
    A. The maps are labeled with possible development areas, which should change.
    B. Initially the development helped the local economies but lately applications that are submitted are getting rejected, also addressing issues of operations with regional proximity.
Dr. Casey asks as people are leaving to point out people or groups who should be involved in this process, those who really participate in outdoor activities, and shape community opinions.

Where do you go for information on recreation of BLM land?
    A. The website, the BLM site and some other outdoor websites.
    B. Local press, flyers and advertisement.
    C. The local media can help push this information.

What do you see as the opportunity for the public to participate and form partnerships with the BLM?  (In both the planning and management process).
    A. More communication with the county and HOA with the use of private land, also the use of forest land, appropriately thinning the forest.
    B. Coordinate efforts within organizations.


Dr. Casey concludes the meeting by thanking all the participants and giving them contact info if they have any questions.

**Bureau of Land Management**
**Naturita-UFO**
**February 10, 2010**
**Administered by Dr. Casey**

Start: 5 pm


 Dr. Casey starts off meeting explaining why the BLM is interested in public opinion, also explains that the participation of these groups is voluntary and the participants are free to leave at any time.
There is a discussion on what exactly recreation is, and how it is different from person to person.

What are the qualities of public lands that make them a special place to you?

39

BLM_0057734

    A.  Access.
    B.  No trash in area.
    C.  A comfortable place to go fishing.
    D.  Privacy.
    E.  Multiple uses including grazing, timber, and any multiple uses that's out there.

Dr. Casey gives participants time to write on handouts, identifying their special places on maps.

Where are these special places?
    A.  A section on the San Miguel river that is special (specified on map), there are no roads, it's very remote, a challenging area.
    B.  Paradox trail, very rugged trail, a challenge for mountain biking. I have seen some four wheelers on this trail too though.
    C.  One of the beauties of living in the west is the whole area is remote, I could not designate an area because it is just a pointer for people, then it isn't remote anymore. Also it calls for regulation and then limitations are set in place.
    D.  The designated rock crawling areas.

Where are the areas for recreational opportunities?
    A.  Paradox
    **Ran out of time for these questions. Dr. Casey moves on to the Management portion of the meeting.

What BLM management actions might enhance these areas (special areas/recreational areas)?
    A.  Keeping roads open.
    B.  Portable toilets put into place.
    C.  Keeping the public involved.

What BLM management might diminish those qualities?
    A.  Over publicizing areas.
    B.  Restrictions in and on certain areas.
    C.  Closed roads and limited access.
    D.  The lack of interaction between different user groups.
The San Miguel River Basin is already a Special Recreation Management Area, which means it has a special status for recreational planning.

What do you like about how the SRMA is currently managed?
    A.  I like that there are no fences, or toilets, that everything is how it's supposed to be. That it is a real wilderness experience.
    B.  The sunbathers.
    C.  I like how the different user groups interact well with others, it's very friendly and balanced.

What do you think should be changed in this area?
    A.  The roads to campgrounds need to be maintained.
    B.  More fishing areas.

BLM_0057735

Where do you go for information on recreation of BLM land?
    A.  I go to the county.
    B.  Word of mouth, it gets around.
    C.  Websites, the BLM websites

Dr. Casey asks as people are leaving to point out people or groups who should be involved in this process, those who really participate in outdoor activities, and shape community opinions.

What do you see as the opportunity for the public to participate and form partnerships with the BLM?
    A.  Direct input in certain areas.
    B.  I don't think I would want to be involved with managing the lands. I am not law enforcement.
           Dr. Casey: Let's take a step back and define what management is.
                He gives example of trash and road maintenance.
    C.  Ongoing contact.

Dr. Casey concludes the meeting by thanking all the participants and giving them contact info if they have any questions.

BLM_0057736

42

BLM_0057737

**Appendix 4. Advertisement/Invitation to Meetings**



# United States Department of the Interior

# BUREAU OF LAND MANAGEMENT

# Uncompahgre Planning Field Office

## <u>Notice of Recreational Planning Meetings</u>

### Facilitated by Natural Resource and Land Policy Institute at Mesa State College

The revision process of the Resource Management Plan for the BLM – Uncompahgre Field Office[4] requires and encourages a variety of opportunities for public input into the planning process.  One such opportunity is a series of community based focus groups designed to better understand the public's desires for recreational planning across the entire field office.  These focus groups provide the public with an opportunity to tell the BLM what recreational places, activities and outcomes are important to you and why they are important.  The staff at the Natural Resource and Land Policy Institute of Mesa State College have been contracted to facilitate these conversations.  The meetings will last approximately 90 minutes.  They have been scheduled in multiple locations and varying times to make it more convenient for the public to participate.  Choose the time and location that works best for you.  The format in each location will be the same and cover the entire planning area so you only need to attend one. For more information contact Tim Casey with Mesa State College at nrlpi@mesastate.edu or (970) 248-1095.

| Date | Community Location | Time | Meeting Location |
|------|--------------------|------|------------------|
| Tues. 2/2/2010 | Delta | 5-6:30 pm | Technical College Grand Mesa Room |
| Wed. 2/3/2010 | Paonia | Noon – 1:30 pm | Community Center |
| Wed. 2/3/2010 | Montrose | 5-6:30 pm | Chamber of Commerce |
| Tues. 2/9/2010 | Naturita | 5-6:30 pm | Community Room |
| Wed. 2/10/2010 | Telluride | Noon – 1:30 pm | Community Room "Old Library" |
| Wed. 2/10/2010 | Ridgeway | 5-6:30 pm | Community Center |

---

[4] Note: the planning area of these focus groups does not include BLM managed lands in either the Gunnison Gorge National Conservation Area, or the Dominguez-Escalante NCA which have a separate planning process.

43



1100 North Avenue
Grand Junction, Colorado 81501
mesastate.edu

BLM_0057739

PubMed ▼

**Format**: Abstract

**Full text links**

Wiley Online Library

Full Text Online

Mol Ecol. 2007 Nov;16(21):4445-54. Epub 2007 Aug 28.

# Across the great divide: genetic forensics reveals misidentification of endangered cutthroat trout populations.

Metcalf JL[1], Pritchard VL, Silvestri SM, Jenkins JB, Wood JS, Cowley DE, Evans RP, Shiozawa DK, Martin AP.

Author information

## Abstract

Accurate assessment of species identity is fundamental for conservation biology. Using molecular markers from the mitochondrial and nuclear genomes, we discovered that many putatively native populations of greenback cutthroat trout (Oncorhynchus clarkii stomias) comprised another subspecies of cutthroat trout, Colorado River cutthroat trout (Oncorhynchus clarkii pleuriticus). The error can be explained by the introduction of Colorado River cutthroat trout throughout the native range of greenback cutthroat trout in the late 19th and early 20th centuries by fish stocking activities. Our results suggest greenback cutthroat trout within its native range is at a higher risk of extinction than ever before despite conservation activities spanning more than two decades.

PMID: 17727621   DOI: 10.1111/j.1365-294X.2007.03472.x

[Indexed for MEDLINE]

**Publication types, MeSH terms**

**LinkOut - more resources**

## PubMed Commons

PubMed Commons home

0 comments

How to join PubMed Commons

BLM_0057740

# MOLECULAR ECOLOGY

Molecular Ecology (2012)

doi: 10.1111/mec.12028

# Historical stocking data and 19th century DNA reveal human-induced changes to native diversity and distribution of cutthroat trout

J. L. METCALF,*† S. LOVE STOWELL,* C. M. KENNEDY,‡ K. B. ROGERS,§ D. MCDONALD,¶
J. EPP,** K. KEEPERS,* A. COOPER,† J. J. AUSTIN† and A. P. MARTIN*
*Department of Ecology and Evolutionary Biology, University of Colorado, Boulder, CO 80309, USA, †Australian Centre for Ancient DNA, University of Adelaide, Adelaide, SA 5005, Australia, ‡U.S. Fish and Wildlife Service, Colorado Fish and Wildlife Conservation Office, Estes Park, CO 80517, USA, §Aquatic Research Group, Colorado Parks and Wildlife, Steamboat Springs, CO 80477, USA, ¶Department of Chemistry & Biochemistry and Biofrontiers Institute, University of Colorado, Boulder, CO, USA, **Pisces Molecular, LLC, Boulder, CO 80301, USA

## Abstract

**Many species are threatened with extinction and efforts are underway worldwide to restore imperilled species to their native ranges. Restoration requires knowledge of species' historical diversity and distribution. For some species, many populations were extirpated or individuals moved beyond their native range before native diversity and distribution were documented, resulting in a lack of accurate information for establishing restoration goals. Moreover, traditional taxonomic assessments often failed to accurately capture phylogenetic diversity. We illustrate a general approach for estimating regional native diversity and distribution for cutthroat trout in the Southern Rocky Mountains. We assembled a large archive of historical records documenting human-mediated change in the distribution of cutthroat trout (Oncorhynchus clarkii) and combined these data with phylogenetic analysis of 19th century samples from museums collected prior to trout stocking activities and contemporary DNA samples. Our study of the trout in the Southern Rocky Mountains uncovered six divergent lineages, two of which went extinct, probably in the early 20th century. A third lineage, previously declared extinct, was discovered surviving in a single stream outside of its native range. Comparison of the historical and modern distributions with stocking records revealed that the current distribution of trout largely reflects intensive stocking early in the late 19th and early 20th century from two phylogenetically and geographically distinct sources. Our documentation of recent extinctions, undescribed lineages, errors in taxonomy and dramatic range changes induced by human movement of fish underscores the importance of the historical record when developing and implementing conservation plans for threatened and endangered species.**

*Keywords*: ancient DNA, conservation genetics, greenback cutthroat trout, historical records, *Oncorhynchus clarkii*, phylogeography

*Received 16 December 2011; revision received 30 July 2012; accepted 3 August 2012*

Correspondence: Jessica L. Metcalf, Fax: 720 224 5522;
E-mail: jessicalmetcalf@gmail.com and Andrew P. Martin,
Fax: 303 325 1790; E-mail: am@colorado.edu

© 2012 Blackwell Publishing Ltd

## Introduction

The diversity and distribution of many taxa have changed dramatically over the last couple of centuries largely in response to human activities. Extirpation of populations has resulted in cases in which the contemporary range underestimates the historical range

**2** J. L. METCALF *ET AL.*

(France & Collins 1993; Mingozzi & Esteve 1997; Beever *et al.* 2003; Sousa *et al.* 2010). In other cases, movement of individuals has expanded the distribution of species beyond their native range (Carlton 1996; McKinney & Lockwood 1999; Kowarik 2003). Sorting past and present patterns of diversity are further complicated by traditional taxonomic treatments that may not accurately reflect phylogenetic diversity (Graham *et al.* 2004; Pfenninger & Schwenk 2007). Historical records documenting the actions that ultimately altered diversity and distribution provide one means of assessing the cause and magnitude of change (Westley & Fleming 2011) and reconstructing historical distributions of species (Franco & Morgan 2007; Gil-Sanchez & McCain 2011). Another way to estimate regional diversity and historical distributions, particularly for taxa plagued with taxonomic uncertainties, is to analyse genetic data from samples collected prior to human activities (e.g. Valentine *et al.* 2008; Hansen *et al.* 2009; Paplinska *et al.* 2011; Iwamoto *et al.* 2012). In concert, these two approaches can lead to an understanding of how actions by humans have changed the diversity and distribution of species. This information is critical for establishing a baseline of historical conditions to guide restoration goals for species in decline or threatened with extinction.

Our study focuses on a biological icon of the western United States, the cutthroat trout (*Oncorhynchus clarkii*). We know from historical records that native trout suffered widespread extirpations (Allendorf & Waples 1996; Dunham *et al.* 1997; Behnke 2002; Harig & Fausch 2002; Novinger & Rahel 2003; Young 2009; USFWS 2010), were propagated and moved across the landscape (Wiltzius 1985; Pister 2001; Dunham *et al.* 2004), and that the taxonomic record is rife with errors (Behnke 2002; Metcalf *et al.* 2007). Here, we evaluate hypotheses about the distribution and diversity of cutthroat trout across seven major drainages encompassing the Pacific and Atlantic slopes of the Continental Divide in the Southern Rocky Mountains, North America.

### The prevailing view of native diversity and distribution

Historically, four distinct subspecies of cutthroat were described from Colorado (Fig. 1). The Colorado River cutthroat trout (*O. c. pleuriticus*) was described as native to all major drainages of the western slope of the Continental Divide, including the San Juan, Gunnison, Colorado and Yampa River basins (Behnke 1992). The greenback cutthroat trout (*O. c. stomias*) was described from the Arkansas and South Platte basins east of the Continental Divide (Jordan 1891; Behnke 2002). The Rio Grande cutthroat trout (*O. c. virginalis*) was documented

from the Pecos, Canadian and Rio Grande Rivers on the east slope of the Continental Divide (Behnke 1992). The fourth taxon, the Yellowfin cutthroat trout (*O. c. macdonaldi*), was restricted to Twin Lakes in the headwaters of the Arkansas River (Jordan 1891; Behnke 1992). Both *O. c. macdonaldi* and *O. c. stomias* were declared extinct at one time (Behnke 1992), although the greenback cutthroat trout was purportedly rediscovered in the 1950s—an event that initiated a large-scale restoration effort aimed at re-establishing the subspecies to a large number of tributaries in both the South Platte and Arkansas river basins (Behnke 1969; Young & Harig 2001).

A published phylogenetic inference based on mitochondrial DNA (mtDNA) revealed four divergent lineages, which were additionally supported by clustering methods using both microsatellite and AFLP nuclear markers (Fig. 2) (Metcalf *et al.* 2007; Pritchard *et al.* 2009). While the number of taxa aligned with the prevailing view of cutthroat trout diversity in the Southern Rockies, the geographical distribution of subspecies did not. In fact, trout putatively identified as *O. c. stomias* and *O. c. pleuriticus* were found in streams and lakes on both slopes of the Continental Divide, a pattern interpreted as an effect of fish stocking (Metcalf *et al.* 2007). In addition, a fourth, divergent lineage was discovered, but it was only found in a single stream (Bear Creek) in the Arkansas River drainage. Whether this lineage represented a named subspecies, such as *O. c. stomias* or the extinct *O. c. macdonaldi*, could not be determined without understanding past diversity and the influence of stocking on the distribution of subspecies. These findings called into question the current taxonomy of cutthroat trout and prompted a thorough investigation into the potential effects of past stocking and propagation on the current diversity and distribution of cutthroat trout.

### Extirpation and propagation effects

Review of historical records indicated that native trout populations in Colorado suffered dramatic declines beginning in the middle 1800s. Initially, trout populations were decimated by overfishing, mining pollution and agricultural practices (Supporting information; Young & Harig 2001). Coincidentally, a number of private individuals, and later, state and federal agencies, began propagating trout for commercial and recreational purposes (Wiltzius 1985). The first documented movement of native trout within the state occurred in 1873 (Miner July 8th, 1873). Although our research through the public records does not provide a complete account of the propagation and stocking activities by private citizens, what is clear from the newspaper

© 2012 Blackwell Publishing Ltd

BLM_0057742

HISTORICAL DNA REVEALS EXTINCTIONS AND INVASIONS  3



**Fig. 1** The prevailing view of cutthroat diversity and distribution in Colorado and northern New Mexico. Four subspecies were described for Colorado. Colorado River cutthroat trout (*Oncorhynchus clarkii pleuriticus*) was described for drainages west of the Continental Divide (blue). Greenback cutthroat trout (*O. c. stomias*) were described for drainages east of the Divide (green) in the South Platte and Arkansas River drainages. Yellowfin cutthroat trout (*O. c. macdonaldi*) were described for the Arkansas River drainage basin as well, albeit restricted to a small lake system (yellow circle). Finally, Rio Grande cutthroat trout (*O. c. virginalis*) were described for waters in the Rio Grande River basin east of the Divide in southern Colorado and New Mexico (orange).



**Fig. 2** Statistical parsimony haplotype network based on mitochondrial ND2 (889 basepairs) and COI (641 basepairs) sequence data sampled from modern populations. Four distinct mitochondrial lineages were sampled in Colorado (lineages shown in blue, green, purple and orange). The current distribution of blue, green and purple lineages does not correspond to the prevailing view in Fig. 1 (see Metcalf *et al.* 2007), and thus, their taxonomy is unclear. The lineage composed of haplotypes shown in orange corresponds to Rio Grande cutthroat trout, which is still found in its native range today (Rio Grande River drainage). Yellowstone cutthroat trout (*Oncorhynchus clarkii bouvieri*), are also included as an outgroup, shown in grey.

© 2012 Blackwell Publishing Ltd

accounts is that trout propagation of both native and introduced species was occurring in Colorado in the early 1870s and continued until the present (Supporting information). State and federal hatcheries began propagation and stocking of trout for the perceived public good in the early 1880s. The number of trout propagated and stocked into the waters of Colorado was substantial. Between 1885 and 1953 there were 41 014 documented fish stocking events in Colorado by state or federal agencies. The vast majority of these involved brook trout (*Salvelinus fontinalis*), rainbow trout (*Oncorhynchus mykiss*) and cutthroat trout (*O. clarkii*) (Fig. 3, supporting information). Remarkably, over 750 million fish of these three species were stocked from hatcheries into streams and lakes in Colorado over this period of time. Introductions of brook trout and rainbow trout probably had devastating effects on native cutthroat trout populations because brook trout are superior competitors and rainbow trout hybridize with cutthroat trout (Young & Harig 2001). The combined effects of pollution, over-fishing and the large-scale stocking of non-native trout taxa largely explained the widespread decline of native trout populations (Young & Harig 2001).

Although trout were imported into Colorado from across the globe, large numbers of trout native to the Southern Rocky Mountains were propagated and

4  J. L. METCALF *ET AL.*



**Fig. 3** Cumulative numbers (in millions of fish) of cutthroat trout, rainbow trout and brook trout stocked in Colorado waters from 1885 to 1953 by state and federal agencies. Private interests also stocked fish around the state, but their efforts were generally smaller in scale, and much less well documented. Dates of museum collections used in this study are indicated by arrowheads.

stocked throughout the state. Production of native cutthroat trout by federal fish biologists began in 1899 at the Grand Mesa Lakes region of the Gunnison River basin in Colorado. By 1909, that effort alone produced 29 000 000 trout in 798 lots that were stocked into lakes and streams of all major drainages on both the Pacific and Atlantic slopes in the state of Colorado. Stocking of Gunnison River basin trout across the state continued until 1931. In 1903, a second source of native cutthroat trout, also from the western slope of the Continental Divide (Trappers Lake), was brought into the hatchery system and propagated until 1938. For the period 1914–1925 when the stocking data were most complete, over 26 000 000 fish were stocked in 989 different lots to tributaries of all major drainages across the state. By contrast, cutthroat trout native to the east slope of the Continental Divide (*O. c. stomias*) were rarely used for large-scale hatchery broodstock. Importantly, many cutthroat trout were stocked into habitats that were originally fishless, usually above waterfalls that served as barriers to upstream movement of fish (Fausch *et al.* 2009). Therefore, the signal of the native phylogeography may have been erased by extirpation of native populations coupled with widespread stocking of western slope cutthroat trout in high alpine lakes and streams on both slopes of the Continental Divide. The stocking records suggest that the cutthroat trout lineages that are widespread today may be descendents of ancestors derived from two major drainages—the Gunnison and the Yampa—of Colorado's western slope. The absence of commensurate large-scale hatchery production of native cutthroat trout (*O. c. stomias* and *O. c. macdonaldi*) east of the Continental Divide in Colorado meant that similar reservoirs of genetic

diversity may not have been available to buffer native trout declines in the Arkansas and South Platte basins.

In this study, we use DNA recovered from 19th century museum specimens of cutthroat trout to test three hypotheses about the native diversity and distribution of cutthroat trout in the Southern Rocky Mountains and how it has changed in recent times. First, we test the prevailing view that cutthroat trout diversity includes four divergent and distinct lineages within Colorado corresponding to the four named subspecies (H1). Also in line with prevailing view, we test that divergent lineages were largely confined to major drainage basins: *O. c. pleuriticus* to the San Juan, Gunnison, Colorado, Yampa and Green River drainages west of the Continental Divide; *O. c. stomias* to the Arkansas and South Platte east of the Continental Divide; *O. c. macdonaldi* was restricted to a pair of lakes in the upper Arkansas Basin; and *O. c. virginalis* to waters in the Rio Grande River drainage basin east of the Continental Divide (H2). Finally, based on the historical stocking data, we test that the current distribution of cutthroat trout subspecies differs markedly from the historical distribution, with trout native to the western slope of the Continental Divide becoming widespread beyond their native range (H3).

## Methods

### Museum specimen tissue collection, DNA extraction and sequence generation

Skin, gill, muscle and bone were sampled from cutthroat trout specimens stored in ethanol and housed at the California Academy of Sciences, Smithsonian Museum of Natural History, the Academy of Natural Sciences in Philadelphia and the Museum of Comparative Zoology at Harvard University (Table S1). Because intensive propagation and stocking of native trout began in earnest with state and federally operated hatcheries as early as 1885, with efforts expanding considerably in the very early years in the first decade of twentieth century, we focused our efforts on securing samples collected prior to the first decade of twentieth century. We note that a low-level of propagation and movement of trout by private interests probably began by the 1870s. We sampled specimens collected between the years 1857 and 1889 across seven drainage basins in Colorado and New Mexico: South Platte, Arkansas, Rio Grande, San Juan, Gunnison, Colorado and Yampa River drainage basins (Table 1). Collection locality details and notes were recorded (Table S1). As some museum specimens were collected after fish stocking activities initiated, albeit at a scale much lower than in the 20th century, some uncertainty in their native status

© 2012 Blackwell Publishing Ltd

**Table 1** For museum fish, the number of localities sampled within each drainage, year range of collection and number of individual successfully sequenced are listed

| Drainage | Localities | Years | Individuals sequenced |
|---|---|---|---|
| South Platte | 5 | 1871–1889 | 9 |
| Arkansas | 4 | 1889 | 8 |
| Rio Grande | 2 | 1873–1889 | 2 |
| San Juan | 1 | 1874 | 2 |
| Gunnison | 1 | 1889 | 2 |
| Colorado | 3 | 1889 | 4 |
| White/Yampa | 1 | 1889 | 1 |
| Unknown | 1 | 1857 | 2 |
| Total | 18 | 1857–1889 | 30 |

Thirty museum fish were sampled and successfully sequenced from seven drainages across a total of 18 different streams and lakes. Details on each museum fish, including an additional 14 samples that did not produce sufficient DNA for sequencing, can be found in Table S1.

exists. In the case of two samples with uncertain locality information (Behnke 2002)—the type specimens of *Oncorhynchus clarkii stomias* [Academy of Natural Sciences in Philadelphia (ANSP) 7825 and 7826]—additional historical research was conducted (results in Supporting Information). Tissue and bone material from these samples were collected using disposable, sterile metal blades and placed into sterile glass or plastic vials in 70% ethanol and transported to the University of Colorado, Boulder (CU).

To ensure endogenous DNA was recovered from each historical sample and to minimize risk of contamination, all pre-polymerase chain reaction (PCR) steps were performed in a building that never housed modern cutthroat trout samples, DNA or PCR product (Knight lab, Porter Sciences, CU). Clean clothes and shoes were designated solely for use in the laboratory. Furthermore, all pre-PCR steps were performed while wearing a disposable lab coat, facemask and two pairs of gloves. Before DNA extraction, samples were repeatedly rinsed with 70% ethanol and allowed to dry in a PCR workstation equipped with UV lights and HEPA-filtered airflow (Fisher Scientific). Once samples were dried, total genomic DNA was extracted using a Qiagen animal blood and tissue extraction kit, for which we modified two steps of the protocol. We added two times the recommended amount of buffer ATL and eluted DNA from the silica column with three 30-μL aliquots of Qiagen buffer AE. One mock extraction control was included for every four or five samples. Both extraction controls and no-template PCR controls were amplified with every four or five samples. Replicate DNA extractions, PCR and sequencing were carried out

for a subset of samples (listed in Table S1) at CU and in a specialized historical DNA laboratory at the Australian Centre for Ancient DNA (ACAD), University of Adelaide, Australia.

Owing to the degraded nature of the DNA in the museum fish samples, multiple short, overlapping mitochondrial DNA fragments were amplified from each successful DNA extraction and subjected to Sanger sequencing. We generated data for five ND2 gene fragments and one COI gene fragment, ranging in size from 91 to 135 nucleotides including primers (primer sequences are listed in Table S2). These gene fragments included several diagnostic mitochondrial single nucleotide polymorphisms (SNPs) characterized in extant cutthroat trout subspecies. At CU, PCR amplicons were cloned and 5–8 clones were sequenced per successful amplification, whereas at ACAD, amplicons were sequenced directly. Sequence data were imported and edited in Sequencher 4.6 (Gene Codes Corporation). Primer sequences were removed and ND2 sequence fragments were grouped by sample. Disagreements between base calls were resolved by majority rule (best two out of three) or left ambiguous (e.g. Y = C or T).

## Modern tissue collection, DNA extraction and sequence generation

For comparison to the historical samples, we sequenced a 648- or 889-basepair region of the ND2 gene for at least 10 individuals from 53 contemporary populations (Table S3). Fish were sampled from across the species' range in the Southern Rockies as part of previous studies (Metcalf *et al.* 2007; Rogers 2008), and ND2 sequencing methods were performed as described in Metcalf *et al.* (2007).

## Genetic analysis

For the four extant lineages of cutthroat trout, we identified unambiguously diagnostic SNPs in the 430-bp 'museum subset' of ND2 and COI gene sequence data. Given the difficulty referring to lineages that have different geographical locations in different time periods and the confusion of pre-existing taxonomy in relation to those lineages, we refer to three of these lineages by colour (as shown in Fig. 2) and resolve these lineages to taxonomy later in this study. As Rio Grande cutthroat trout (shown in orange in Fig. 2) do not appear to have been propagated and stocked extensively (Pritchard *et al.* 2009), we refer to this lineage by name. We assigned museum samples to one of the extant lineages based on the presence of lineage-defining SNPs. Second, we generated a statistical parsimony network of haplotypes that were present in both museum and modern

© 2012 Blackwell Publishing Ltd

BLM_0057745

samples based on the 430-bp mitochondrial DNA data set using TCS (Clement *et al.* 2000). Finally, we inferred a phylogeny of extant and historical haplotypes based on the same 430-bp sequence data set. In the phylogenetic analysis, we included sequence data for all major subspecies of cutthroat trout (*O. c. bouvieri*, *O. c. utah*, *O. c. henshawi*, *O. c. lewisi* and *O. c. clarki*) as well as rainbow trout (*Oncorhynchus mykiss*) to clarify whether museum samples represent a trout stocked from another region in North America. These additional sequence data were originally published in Metcalf *et al.* (2007) or Loxterman & Keeley (2012) (GenBank No's EF673223–EF73232; EF673250–EF673259; EF673233–EF673249; EF673260–EF673276; JQ747557–JQ747623). We used a nucleotide substitution model of GTR+I (Metcalf *et al.* 2007). We inferred a phylogeny using maximum-likelihood methods with the software PhyML 3.0 (Guindon *et al.* 2010). We used NNI for tree improvement and computed branch support using the approximate likelihood-ratio test for branches described in Anisimova *et al.* (2011). We also constructed phylogenies using BEAST v1.6.1 (Drummond & Rambaut 2007). As our analysis spans the boundary between populations and species, we used two different tree priors (i) a coalescent model assuming a constant population size and (ii) a Yule speciation process model. Each analysis was run for 100 000 000 MCMC generations, sampling every 1000 trees with a burn-in of 10 000 000 generations. Stationarity of the posterior probabilities distribution and the ESS values for the priors was examined in Tracer v1.4 (Rambaut & Drummond 2007) to confirm the burn-in was appropriate. Maximum clade credibility consensus trees were generated from posterior distributions of 90 000 trees using TreeAnnotator v1.6.1 (Drummond & Rambaut 2007).

Additionally, we investigated the geographical distribution of ND2 molecular variation for both museum samples and a broad survey of modern populations. We performed an analysis of molecular variance among drainages of historical (1857–1889 A.D.) and modern (2000 A.D. to present) populations separately to understand how the distribution of variance has changed over time. For the modern data, we included only the portion of ND2 sequenced for museum samples (378 bp) in the analysis. We generated distance matrices and performed AMOVA analyses using tools included in the ape and pegas packages in the R statistical environment (Paradis *et al.* 2004; Paradis 2010). Distance matrices were generated using default parameters, except loci with missing data were not excluded from the analysis. Drainage delineations included South Platte, Arkansas, Rio Grande, San Juan, Gunnison and Colorado River basins. Samples from the Yampa River drainage were not included in the analysis because the

museum data set had only one sample from this drainage. To account for the difference in sample size between the museum and modern data set, we randomly subsampled the modern data set 1000 times using the same number of samples per drainage as the museum data set. Subsampled data were generated using a custom Python v2.7.2 script (www.python.org) in conjunction with the NumPy v1.6.1 (www.numpy.org) numerical Python library. Using R 2.14.2 with pegas v0.4-1, we performed the AMOVA analysis on each subsampled data set to generate a range of possible modern values to compare with the historical estimate.

## Results

### Museum fish DNA

Skin, gill, muscle and bone were sampled from 44 cutthroat trout specimens stored in ethanol. Several samples that yielded DNA were extracted multiple times (up to four times) to confirm authenticity of endogenous DNA (Table S1). Sixty-one museum sample extractions were performed (not including mock extraction controls). Extracted DNA was highly degraded. PCR success declined with increasing target fragment size (Fig. S1) and 14 of the 44 individuals (32%) failed to yield DNA that could be amplified using PCR. Nonetheless, 30 individuals (Tables 1 and S1) yielded a total of 430 bps of mtDNA (two ND2 gene fragments and one COI gene fragment) that permitted robust inference of the phylogeny and regional biogeography of native cutthroat trout (GenBank No's JX195398–JX195487). Furthermore, sequence data were reproducible—data generated from independent extractions of museum samples were identical. In particular, the consensus sequence from cloned amplicons (at CU) matched amplicons directly sequenced (at ACAD) at >99% of nucleotides. Most mismatches were probably due to deamination (postmortem chemical damage). In a few cases in which mismatches were not resolved, bases were left ambiguous.

### Phylogenetic analyses reveal historical diversity of Colorado's cutthroat trout

Individual museum samples were assigned to one of the four extant subspecies depending on the clade-defining mutations (new modern haplotypes include Genbank No's JX195488–JX195497) (Table S4). Twenty-one museum samples assigned to modern clades and nine did not (Supporting information). A statistical parsimony haplotype network including museum sequences and contemporary haplotypes revealed six distinct clusters, each of which was separated by at

© 2012 Blackwell Publishing Ltd



**Fig. 4** (A) Statistical parsimony haplotype network using a subset of 430 basepairs of combined ND2 and COI mitochondrial sequence data. Haplotype colours match those shown in Fig. 2. Haplotypes present in (i) museum samples only have a black outline (ii) museum and modern samples have a grey outline and (iii) modern populations only have no outline. Putative unsampled ancestors are represented by small, open circles. Numbers next to museum haplotypes refer to fish sample numbers in Table S1. (B) Geographical distribution of museum samples, with the colour of each circle corresponding to the lineage colour in the haplotype network. The size of each circle is proportional to the number of museum individuals sampled with a particular lineage. Colours for drainages correspond with our hypothesis of the historical distribution of clades.

least two and as many as 12 mutations (~0.5 to 3% sequence difference) (Fig. 4A). Six of the 15 haplotypes represented in the museum samples were identical to modern haplotypes, and nine were unique (Fig. 4A). Importantly, museum samples from the Arkansas and San Juan basins did not group with any of the contemporary lineages, and the two sets of haplotypes were separated by a minimum of four mutations from any other clade (Fig. 4A).

Our phylogenetic inference using maximum-likelihood and Bayesian analyses included samples representative of contemporary and historical subspecies in Colorado as well as cutthroat trout subspecies and rainbow trout native to drainages outside of the state. The combination of modern and museum samples revealed high maximum-likelihood ratios and posterior probabilities (using both tree priors—a coalescent model assuming constant population size and a Yule speciation process model) for eleven North American cutthroat trout clades. Of the six clades represented by fish collected from Colorado, two were only detected in museum samples from either the San Juan or Arkansas drainages (Fig. 5). Furthermore, twenty-one museum samples grouped within four contemporary clades with high posterior probabilities in a phylogenetic tree (Fig. 5). Importantly, none of the branches subtending two or more clades had consistently high support across phylogenetic analyses, underscoring that the relationships among clades remain uncertain. If branching

order disagreed between tree inference methods, a polytomy was enforced (Fig. 5). Bayesian posterior probabilities and approximate likelihood test ratios were reported for all other branches. For the Bayesian analyses, posterior probabilities were highly similar (<1% in most cases) regardless of tree prior, and therefore, only the values from the coalescent analysis are shown in Fig. 5.

### Phylogenetic analyses reveal historical distribution of Colorado's cutthroat trout

There were six divergent mtDNA clades discovered from sequencing of the museum samples—of these, four were restricted to single drainage basins (Fig. 4B). All historical samples from the Rio Grande River drainage grouped with the lineage designated Rio Grande cutthroat trout (orange lineage). All samples that grouped with the purple lineage were restricted to the South Platte drainage. The two distinct clades that did not cluster with any of the modern clades (shown in red and yellow) were restricted to either the San Juan basin or the Arkansas basin, respectively (Fig. 4B). The blue and green lineages, however, were discovered in multiple drainages. It is noteworthy that the museum samples comprising these two lineages were sampled in 1889, after the initiation of stocking activities in the state. Therefore, their native status is somewhat uncertain. The two museum samples that grouped with

© 2012 Blackwell Publishing Ltd

**8** J. L. METCALF *ET AL.*



**Fig. 5** Phylogenetic inference for the extant lineages of cutthroat trout in the Southern Rocky Mountains based on 430 bp of mitochondrial DNA sequence data. The maximum-likelihood tree shown was generated using PhyML. Branches were collapsed to a polytomy in cases where branching order conflicted with results from analyses using Bayesian approaches in BEAST. Approximate likelihood-ratio test for branch support and Bayesian posterior probabilities are shown for all branches (only BPPs for the analysis incorporating a coalescent tree prior are shown). The sizes of triangles are proportional to the diversity present in each clade.

contemporary blue lineage were sampled from the Yampa and Colorado River drainages (one individual in each drainage). Of the seven museum samples that grouped with green lineage, five were sampled from the Colorado and Gunnison basins west of the Continental Divide and two were sampled from Twin Lakes in the Arkansas River basin east of the Continental Divide.

*Comparison of historical and modern distribution of distinct lineages*

An analysis of molecular variance (AMOVA) revealed the amount of genetic variation distributed among drainages declined significantly since historical times (Fig. 6), highlighting the change in distribution of trout over the last century. Historically, the per cent of sequence variation distributed by drainage was 64%; by contrast, 95% (one-tailed) of values from modern data (subsampled to an equally small sample size as the museum data) ranged from 6 to 61% with a mean of 30%. These results suggest several long-standing biogeographical barriers to gene flow were breached towards the end of the 19th century.

The modern distribution of lineages shows some similarities and some important differences with the historical phylogeography. The historical and modern ranges

are similar for the Rio Grande cutthroat trout (shown in orange in Figs 2 and 4). For the purple lineage, the only modern representative is currently restricted to a single stream within the Arkansas River basin (Bear Creek); by contrast, all historical samples were restricted to streams in the South Platte drainage. Because the museum samples from the Arkansas River basin were clearly divergent from the purple lineage, these results suggest that the lineage currently restricted to Bear Creek was originally native to the South Platte basin. The other two extant mtDNA lineages (green and blue) are both widely distributed today across multiple basins on both slopes of the Continental Divide. The blue lineage fish were historically restricted to one or two drainage basins on the western slope of the Continental Divide. Today, they have been sampled from multiple localities in the Arkansas, South Platte, San Juan, Gunnison, Colorado and Yampa River basins (Table S5). The green lineage trout were sampled from three drainages in 1889, the Colorado, Gunnison and Arkansas River. Today, they are present in the Colorado, Gunnison, Arkansas and in the South Platte basin as well (Table S5).

**Discussion**

The diversity and distribution of cutthroat trout have changed dramatically over the last 150 years in the

© 2012 Blackwell Publishing Ltd



**Fig. 6** AMOVA analysis by drainage. The modern sequence data set was subsampled so that the number of samples from each drainage basin matches the sample size of the museum data set. The per cent sequence variation explained by drainage for 1000 subsampled modern data sets is shown as a histogram in black (95% of values) and grey (5% tail of values). The per cent variation explained by drainage for museum samples is indicated with an arrow.

Southern Rocky Mountains. Our phylogenetic survey of fish collected prior to the onset of extensive propagation and stocking of fish revealed six divergent lineages, not four as originally described by 19 and 20th century fish taxonomists (H1). Each cutthroat lineage was probably endemic to either a single drainage basin or two adjacent drainage basins, but the native distribution of subspecies probably differs from the prevailing view in several ways (H2). Notably, instead of the expected one, there were three distinct lineages historically native to the drainage basins on the western slope of the Continental Divide. Furthermore, the subspecies native to the South Platte was probably endemic to the drainage basin, and not a native of the Arkansas River drainage as originally described. Additionally, museum specimens identified as *Oncorhynchus clarkii macdonaldi* were found in the Arkansas drainage as expected, but not just to a pair of headwater lakes as originally described (Jordan 1891). The distribution of *O. c. virginalis* aligned with the prevailing view and was only detected in the Rio Grande River drainage basin. Our third hypothesis could not be refuted. We discovered that the current and historical distribution of cutthroat trout lineages were significantly different. The difference probably reflects the success of past fish propagation and stocking activities, which broadly distributed two lineages of cutthroat trout that were historically native to waters west of the Continental Divide. The decline from six lineages in the museum samples to four today suggests there were two extinction events: one in the Arkansas River basin and another in the San Juan River system. Importantly, we discovered that the cutthroat lineage historically native to the South Platte, that at one time was declared extinct, persists in a single stream outside its native range.

### The role of stocking in the contemporary distribution of Colorado's cutthroat trout

AMOVA results support the hypothesis that stocking has radically changed the geographical distribution of cutthroat trout lineages in Colorado. Discordance between the historical and modern distribution of diversity is best explained by the widespread stocking of cutthroat trout across the state of Colorado. More specifically, stocking activities spanning 1899–1931 from the Grand Mesa Lakes within the Gunnison Basin and from 1903–1938 from Trappers and Marvine Lakes in the headwaters of the White River within the Yampa Basin may explain why the two lineages native to these drainages are abundant in high elevation streams across major drainage basins on both slopes of the Continental Divide (Fig. 7). Importantly, many trout were stocked into historically fishless waters above barriers. Following the founding stocking events, those same barriers have protected these populations from non-native salmonids such as brook, brown (*Salmo trutta*) and rainbow trout that tend to replace or hybridize with native cutthroat trout (McGrath & Lewis 2007; Metcalf *et al.* 2008; Peterson *et al.* 2008; Bennett *et al.* 2010; Benjamin *et al.* 2011). The end result is a patchwork of cutthroat trout lineages that persist in small, high elevation populations across the state of Colorado.

In addition to stocking by federal and state agencies, stocking activities by private fish culturists that began in the late 19th century also appears to have played a role in the distribution of cutthroat trout in Colorado. Exhaustive surveys of contemporary populations within the South Platte basin have failed to find the clade characterized in museum specimens as native to the South Platte River. Instead, we discovered the trout native to the South Platte persists in an approximately four-mile

© 2012 Blackwell Publishing Ltd



**Fig. 7** The effect of fish stocking on modern cutthroat trout distribution. (A) Numbers of cutthroat trout stocked using two divergent lineages from different drainage basins (indicated by different colours) between 1899 and 1925. Colour schemes reflect new hypothesized historical distributions of native cutthroat trout lineages (see Figs 2 and 3). (B) Coloured circles represent genetic identification of cutthroat trout lineages in contemporary populations examined in this study (Table S4). Only populations without evidence of introgression between distinct clades of cutthroat trout are included. Colours correspond with those in the haplotype networks (Figs 2 and 4). Contemporary distribution of native Rio Grande trout can be found in Pritchard *et al.* (2009).

stretch of a small stream (Bear Creek) within the Arkansas River basin above several natural barriers to upstream movement of fish. Historical records indicate that Bear Creek was originally fishless, but in 1882, an early homesteader had built a trout pond in the headwaters. With no state or federal hatcheries propagating native cutthroat trout at that time, fish would probably have been obtained from one of two private hatcheries both of which obtained their fish from a tributary of the South Platte drainage (Kennedy 2010). Ironically, while stocking contributed to the decline of native cutthroat trout throughout their range (Behnke 1992; Young 2009), it appears to have also inadvertently prevented the extinction of this unique lineage.

### Implications for taxonomy of Colorado's cutthroat trout

Mitochondrial DNA sequence data support recognition of six divergent, native lineages of cutthroat trout Colorado. Although we acknowledge limitations inherent in

using single gene trees to describe phylogeny, we did previously use clustering methods (Metcalf *et al.* 2007; Pritchard *et al.* 2009) to demonstrate nuclear support for extant lineages. Therefore, based on the historical and modern mitochondrial sequence data, we suggest a new working hypothesis for taxonomy of cutthroat trout in the Southern Rocky Mountains.

In some cases, taxonomic inference is fairly straightforward. The two haplotypes comprising the yellow lineage included the type specimen of *O. c. macdonaldi*, and thus most probably represents the Yellowfin cutthroat trout *O. c. macdonaldi*. Moreover, the lack of modern samples representing the *O. c. macdonaldi* clade confirmed reports from the early twentieth century documenting its extinction (Wiltzius 1985). Additionally, the phylogeography of the modern (see Pritchard *et al.* 2009) and historical data provide little doubt that *O. c. virginalis*, first described from the Rio Grande basin in 1853, is an evolutionarily distinct lineage. Finally, the native to the San Juan drainage does not fall into one of the four named lineages (Fig. 4A) and appears to have also gone extinct since historical times.

This leaves three lineages for which taxonomy is less clear. The purple lineage was once restricted to the South Platte. Early taxonomists were clear that the designation *O. c. stomias* belonged to cutthroat trout native to the east side of the Continental Divide (Cope 1871; Jordan 1891; Cockerell 1908). With *O. c. macdonaldi* occupying the Arkansas River drainage, the name *stomias* reasonably falls to those fish of the South Platte drainage. Complicating the issue, however, is a mislabelling of locality information on *O. c. stomias* type specimens (suggested in Behnke 1976), which appear to have been collected near Santa Fe, New Mexico in 1855 —a belief confirmed by genetic data in this study (see results for ANSP 7825 and 7826)—and not in the Platte River. The error stems from mislabelled specimens many years later when the samples were designated *O. c. stomias* (Supporting Information). Therefore, it could also be argued that the name *O. c. stomias* is a diminutive, second name for Rio Grande cutthroat trout (*O. c. virginalis*), for which type specimens were collected in 1853 (Behnke 2002). We argue that the greenback cutthroat trout has been held as the native to the South Platte and Front Range of Colorado for over a century, and thus, the lineage native to the South Platte should keep the designation *O. c. stomias*. Indeed, as the first person to use the name greenback cutthroat trout to describe *O. c. stomias*, David Starr Jordan wrote that he 'adopted the name *stomias* for trout of the Platte' (Jordan 1891).

This leaves two lineages (blue and green) for which there is a need for taxonomic resolution and perhaps

© 2012 Blackwell Publishing Ltd

revision. Because these lineages are represented by museum samples collected after the onset of intensive fish stocking activities (~1885) and they are the only lineages not restricted to single drainages, their native distribution and taxonomy remain uncertain. However, we argue that the blue lineage is probably *O. c. pleuriticus*. In both the historical and modern samples, the Yampa River basin appears inhabited by cutthroat trout of the blue lineage (Fig. 4B and Table S5). Importantly, no green lineage cutthroat trout were detected in modern Yampa River samples, a pattern also supported by nuclear data previously generated for 59 Yampa River populations (Rogers 2010). Thus, we infer that the geographical range of the blue lineage was probably restricted to the Yampa and Green River basins and was not widely distributed historically across all major drainages of the west slope. The type specimens of *O. c. pleuriticus* were collected in the Green River drainage basin, which encompasses the Yampa River. Therefore, these specimens probably harbour blue lineage haplotypes, although this needs to be confirmed with additional sampling of museum specimens. Because *O. c. pleuriticus* was the only described subspecies from the western slope, the green lineage may represent an undescribed distinct taxon. This lineage appears native to the Colorado and Gunnison rivers, and potentially the Arkansas River basin. Although considered separate basins, the Colorado and Gunnison rivers converge well upstream of the warm desert confluence with the Green River and its major tributary the Yampa River. Cold water temperatures would have allowed cutthroat trout to move between the Colorado and Gunnison Rivers, giving rise to a monophyletic group in those two basins. Given the significant barrier between the east and west slopes of the Continental Divide, we believe it is unlikely that the green lineage was native to the Arkansas River drainage. Instead, we believe that by the time the samples were collected in 1889, early stocking activities may have established this lineage in the headwaters of the Arkansas River drainage. The Twin Lakes fishery, from which the samples were collected, had already seen considerable fish stocking activity by 1889 (Wiltzius 1985). Twin Lakes lie near the first federal fish hatchery in Colorado, and just a dozen miles south of the bustling city of Leadville, the second most populous city in the state at the time.

*Bringing back* O. c. stomias

We believe the descendants of fish that were stocked into Bear Creek are the last remaining representatives of *O. c. stomias*, the greenback cutthroat trout currently recognized as a threatened under the Endangered Species Act. This fish was declared extinct in the 1930s

(Green 1937); however, in 1953, a collection of fish from a small stream in the South Platte drainage were identified as *O. c. stomias* (although not without uncertainty), marking the 'rediscovery' of the greenback cutthroat trout that would eventually launch an intensive recovery effort. Conservation efforts aimed at restoring *O. c. stomias* in the South Platte and Arkansas River basins were based on taxonomic assessments that were compromised by the extensive mixing of trout among drainages that began in the late 1870s, however. Of the streams and lakes in the South Platte and Arkansas River basins that were subjected to trout removal and restocking with what the best available science suggested was *O. c. stomias*, all appear to harbour lineages native to the western slope of the Continental Divide.

Currently, *O. c. stomias* appears to persist as a single self-sustaining population in a locality outside the native range of the subspecies. The population harbours little genetic variation for loci that are typically variable in cutthroat trout populations (Metcalf *et al.* 2007) probably the result of few founding fish used in the initial stocking effort or a subsequent population bottleneck. Low genetic diversity may compromise rehabilitation of the taxon, making it essential that planned propagation efforts attempt to maximize genetic diversity and assess subsequent fitness. It is encouraging, nonetheless, that the taxon has persisted within a relatively short stretch of a small stream for more than a century, suggesting it is likely to survive and perhaps thrive in other places.

## Conclusion

Regional diversity and distribution of many taxa in North America have changed, sometimes dramatically over the last 150 years (Rahel 2000). For trout native to the Southern Rocky Mountains, anthropogenically driven changes resulted in the extinction of some lineages, and significant declines, range expansions or range shifts of others. Our work comparing historical records of trout propagation and movement with the phylogenetic diversity of historical and modern samples increased our understanding of the status of described taxa and resulted in the rediscovery of a taxon, *O. c. stomias,* that was at one time declared extinct.

Other threatened and endangered species may be subject to similar uncertainty regarding their native diversity and distribution (e.g. Boessenkool *et al.* 2009; Athrey *et al.* 2011; Hekkala *et al.* 2011). In many cases, historical specimens exist in museums that are available for inferring native diversity and taxonomy. With specimens collected up to 150 years ago, our study pushes back the age for recovering DNA from ethanol-preserved specimens for population-level studies by

© 2012 Blackwell Publishing Ltd

over two-fold and demonstrates the feasibility of molecular mining of archived samples. Establishing the timing of human disturbance, coupled with the use of ancient DNA techniques for retrieving phylogenetic information from predisturbance historical samples, paves the way forward for developing conservation goals aimed at restoring threatened and endangered species to their native ranges.

## Acknowledgements

This work was funded by The National Park Service, U.S. Fish and Wildlife Service, U.S. Forest Service, U.S. Bureau of Land Management and Trout Unlimited. We thank the California Academy of Sciences, the Smithsonian Museum of Natural History, the Academy of Natural Sciences in Philadelphia (ANSP), the Museum of Comparative Zoology at Harvard University and R. P. Evans at Brigham Young University for access to museum fish samples, and J. Wood for assistance with museum sampling. We are especially grateful to Mark Sabaj Perez and Clare Flemming at ANSP for tracking down letters instrumental in resolving the history of the greenback cutthroat trout type specimens. We thank G. Wilcox and S. Albeke for ArcGIS layers used to develop the figures. We thank V. Kirchoff and E. Hekkla for help with initial extraction trials. We thank K. Leitzel, K. Ramirez, A. Hirsch, L. Parfrey, V. McKenzie, R. Knight, R. Guralnick and J. Zelikova for editorial assistance. We thank the Greenback Recovery Team and four anonymous reviewers for feedback that greatly improved this manuscript. The findings and conclusions in this article are those of the authors and do not necessarily represent the views of the U.S. Fish and Wildlife Service.

## References

Allendorf FW, Waples RS (1996) Conservation genetics of Salmonid fishes. In: Conservation Genetics: Case Histories from Nature, Chapter 8 (eds Avise JC, Hamrick JL), pp. 238–275. Chapman and Hall, New York.

Anisimova M, Gil M, Dufayard JF, Dessimoz C, Gascuel O (2011) Survey of branch support methods demonstrates accuracy, power, and robustness of fast likelihood-based approximation schemes. *Systematic Biology*, **60**, 685–699.

Athrey G, Lindsay DL, Lance RF, Leberg PL (2011) Crumbling diversity: comparison of historical archived and contemporary natural populations indicate reduced genetic diversity and increasing genetic differentiation in the golden-cheeked warbler. *Conservation Genetics*, **12**, 1345–1355.

Beever EA, Brussard PE, Berger J (2003) Patterns of apparent extirpation among isolated populations of pikas (*Ochotona princeps*) in the Great Basin. *Journal of Mammalogy*, **84**, 37–54.

Behnke RJ (1969) Rare and endangered species: the greenback trout, *Salmo clarki stomias* Cope: sources for introductions and a recent discovery of a probable pure population. *Report for the Colorado Cooperative Fishery Unit*, 1–5.

Behnke RJ (1976) Summary of information on the status of the greenback cutthroat trout, *Salmo clarki stomias*. Report for U.S. Fish and Wildlife Service, Salt Lake City area office.

Behnke RJ (1992) Trout of Western North America. American Fisheries Society, Maryland.

Behnke RJ (2002) Trout and Salmon or North America. The Free Press, New York.

Benjamin JR, Fausch KD, Baxter CV (2011) Species replacement by a nonnative salmonid alters ecosystem function by reducing prey subsidies that support riparian spiders. *Oecologia*, **167**, 503–512.

Bennett SN, Olson JR, Kershner JL, Corbett P (2010) Propagule pressure and stream characteristics influence introgression: cutthroat and rainbow trout in British Columbia. *Ecological Applications*, **20**, 263–277.

Boessenkool S, Austin JJ, Worthy TH, *et al.* (2009) Relict or colonizer? Extinction and range expansion of penguins in southern New Zealand. *Proceedings of the Royal Society B-Biological Sciences*, **276**, 815–821.

Carlton JT (1996) Biological invasions and cryptogenic species. *Ecology*, **77**, 1653–1655.

Clement M, Posada D, Crandall KA (2000) TCS: a computer program to estimate gene genealogies. *Molecular Ecology*, **9**, 1657–1659.

Cockerell T (1908) The Fishes of the Rocky Mountain Region. University of Colorado, Boulder.

Cope E (1871) Report on the reptiles and fishes obtained by the naturalists of the expedition. (ed. Preliminary report of the United State Geological Survey of Wyoming and portions of contiguous territories Hayden's Survey), pp. 432–444.

Drummond AJ, Rambaut A (2007) BEAST: bayesian evolutionary analysis by sampling trees. *BMC Evolutionary Biology*, **7**, 214.

Dunham JB, Vinyard GL, Rieman BE (1997) Habitat fragmentations and extinction risk of Lahontan Cutthroat trout. *North American Journal of Fisheries Management*, **17**, 1126–1133.

Dunham JB, Pilliod DS, Young MK (2004) Assessing the consequences of nonnative trout in headwater ecosystems in western North America. *Fisheries*, **29**, 18–26.

Fausch KD, Rieman BE, Dunham JB, Young MK, Peterson DP (2009) Invasion versus isolation: trade-offs in managing native salmonids with barriers to upstream movement. *Conservation Biology*, **23**, 859–870.

France RL, Collins NC (1993) Extirpation of crayfish in a lake affected by long-range anthropogenic acidification. *Conservation Biology*, **7**, 184–188.

Franco JA, Morgan JW (2007) Using historical records, aerial photography and dendroecological methods to determine vegetation changes in a grassy woodland since European settlement. *Australian Journal of Botany*, **55**, 1–9.

Gil-Sanchez JM, McCain EB (2011) Former range and decline of the Iberian lynx (*Lynx pardinus*) reconstructed using verified records. *Journal of Mammalogy*, **92**, 1081–1090.

Graham CH, Ferrier S, Huettman F, Moritz C, Peterson AT (2004) New developments in museum-based informatics and applications in biodiversity analysis. *Trends in Ecology and Evolution*, **19**, 497–503.

Green WS (1937) Colorado Trout, Popular series 2. Colorado Museum of Natural History, Denver, CO.

Guindon S, Dufayard JF, Lefort V, *et al.* (2010) New algorithms and methods to estimate maximum-likelihood phylogenies: assessing the performance of PhyML 3.0. *Systematic Biology*, **59**, 307–321.

© 2012 Blackwell Publishing Ltd

Hansen MM, Fraser DJ, Meier K, Mensberg KLD (2009) Sixty years of anthropogenic pressure: a spatio-temporal genetic analysis of brown trout populations subject to stocking and population declines. *Molecular Ecology*, **18**, 2549–2562.

Harig AL, Fausch KD (2002) Minimum habitat requirements for establishing translocated cutthroat trout populations. *Ecological Applications*, **12**, 535–551.

Hekkala ER, Saumure RA, Jaeger JR, *et al.* (2011) Resurrecting an extinct species: archival DNA, taxonomy, and conservation of the Vegas Valley leopard frog. *Conservation Genetics*, **12**, 1379–1385.

Iwamoto EM, Myers JM, Gustafson RG (2012) Resurrecting an extinct salmon evolutionarily significant unit: archived scales, historical DNA and implications for restoration. *Molecular Ecology*, **21**, 1567–1582. doi: 10.1111/j.1365-294X.2011.05418.x.

Jordan DS (1891) Report on explorations in Colorado and Utah during the summer of 1889, with an account of the fishes found in each river basin examined. *U.S. Fish Commission Bulletin*, **9**, 1–40.

Kennedy CM (2010) Weird Bear Creek: A history of a unique cutthroat trout population. Technical Report USFWS, 1-9.

Kowarik I (2003) Human agency in biological invasions: secondary release fosters naturalization and population expansion of alien plant species. *Biological Invasions*, **5**, 293–312.

Loxterman JL, Keeley ER (2012) Watershed boundaries and geographic isolation: patterns of diversification in cutthroat trout from western North America. *BMC Evolutionary Biology*, **12**, 38. doi:10.1186/1471-2148-12-38.

McGrath CC, Lewis Jr WM (2007) Competition and predation as mechanisms for displacement of greenback cutthroat trout by brook trout. *Transactions of the American Fisheries Society*, **136**, 1381–1392.

McKinney ML, Lockwood JL (1999) Biotic homogenization: a few winners replacing many losers in the next mass extinction. *Trends in Ecology and Evolution*, **11**, 450–453.

Metcalf JL, Pritchard VL, Silvestri SM, *et al.* (2007) Across the great divide: genetic forensics reveals misidentification of endangered cutthroat trout populations. *Molecular Ecology*, **16**, 4445–4454.

Metcalf JL, Siegle MR, Martin AP (2008) Hybridization dynamics between Colorado's native cutthroat trout and introduced rainbow trout. *Journal of Heredity*, **99**, 149–156.

Miner (July 8th, 1873) Cushman and Barrett… returned…from Bear Creek…They reported a catch of 500 odd trout with three days work, and as an earnest of their faith brought over one hundred live ones, which were placed in Green Lake. This is the best luck of the year. In a few summers our favorite lake will be stocked to repletion with delicious trout, and they will become as cheap and common as potatoes.

Mingozzi T, Esteve R (1997) Analysis of a historical extirpation of the bearded vulture Gypaetus barbatus (L.) in the western Alps (France-Italy): former distribution and causes of extirpation. *Biological Conservation*, **79**, 155–171.

Novinger DC, Rahel FJ (2003) Isolation management with artificial barriers as a conservation strategy for cutthroat trout in headwater streams. *Conservation Biology*, **17**, 772–781.

Paplinska JZ, Taggart DA, Corrigan T, Eldridge MDB, Austin JJ (2011) Using DNA from museum specimens to preserve the integrity of evolutionarily significant unit boundaries in threatened species. *Biological Conservation*, **144**, 290–297.

Paradis E (2010) pegas: an R package for population genetics with an integrated-modular approach. *Bioinformatics*, **26**, 419–420.

Paradis E, Claude J, Strimmer K (2004) APE: analyses of phylogenetics and evolution in R language. *Bioinformatics*, **20**, 289–290.

Peterson DP, Rieman BE, Dunham JB, Fausch KD, Young MK (2008) Analysis of trade-offs between threats of invasion by nonnative brook trout (*Salvelinus fontinalis*) and intentional isolation for native westslope cutthroat trout (*Oncorhynchus clarkii lewisi*). *Canadian Journal of Fisheries and Aquatic Sciences*, **65**, 557–573.

Pfenninger M, Schwenk K (2007) Cryptic animal species are homogenously distributed among taxa and biogeographic regions. *BMC Evolutionary Biology*, **7**, 121.

Pister EP (2001) Wilderness fish stocking: history and perspective. *Ecosystems*, **4**, 279–286.

Pritchard VL, Metcalf JL, Jones K, Martin AP, Cowley DE (2009) Population structure and genetic management of Rio Grande cutthroat trout (*Oncorhynchus clarkii virginalis*). *Conservation Genetics*, **10**, 1209–1221.

Rahel FJ (2000) Homogenization of fish faunas across the United States. *Science*, **288**, 854–856.

Rambaut A, Drummond A (2007) Tracer v1.4. Available from http://beast.bio.ed.ac.uk/Tracer.

Rogers KB (2008) Using Amplified Fragment Length Polymorphisms to Characterize Purity of Cutthroat Trout in Colorado: Results from 2007. Colorado Divison of Wildlife, Fort Collins. Available online at http://wildlife.state.co.us/research/Aquatic/CutthroatTroutService.

Rogers KB (2010) Cutthroat trout taxonomy: exploring the heritage of Colorado's state fish. *Wild Trout Symposium*, **10**, 152–157. http://www.wildtroutsymposium.com/proceedings-10.pdf.

Sousa V, Penha F, Pala I, Chikhi L, Coelho MM (2010) Conservation genetics of a critically endangered Iberian minnow: evidence of population decline and extirpations. *Animal Conservation*, **13**, 162–171.

USFWS (2010) Endangered and Threatened Wildlife and Plants; Review of Native Species That Are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions, pp. 69222–69292, Federal Register.

Valentine K, Duffield DA, Patrick LE, *et al.* (2008) Ancient DNA reveals genotypic relationships among Oregon populations of the sea otter (*Enhydra lutris*). *Conservation Genetics*, **9**, 933–938.

Westley PAH, Fleming IA (2011) Landscape factors that shape a slow and persistent aquatic invasion: brown trout in Newfoundland 1883–2010. *Diversity and Distributions*, **17**, 566–579.

Wiltzius WJ (1985) Fish Culture and Stocking in Colorado, 1872–1978. Division Report, Colorado Division of Wildlife.

Young MK (2009) Greenback cutthroat trout (Oncorhynchus clarkii stomias): A Technical Conservation Assessment, USDA Forest Service.

Young MK, Harig AL (2001) A critique of the recovery of greenback cutthroat trout. *Conservation Biology*, **15**, 1575–1584.

An interdisciplinary team of scientists conducting research on all aspects of conservation for Colorado's native salmonid resources assembled the research presented here. J.L.M. is a

© 2012 Blackwell Publishing Ltd

BLM_0057753

postdoctoral researcher who uses ancient DNA methods to answer questions in ecology, evolution, conservation, forensics and history (https://sites.google.com/site/jessicalmetcalf/). A. P.M. is a Professor at CU working on a wide range of evolutionary and conservation-focused research projects of native species (http://stripe.colorado.edu/~am/Site/Martin_Lab). To find out more about cutthroat trout conservation in Colorado, please see http://wildlife.state.co.us/Research/Aquatic/Cutthroat Trout.

## Data accessibility

Historical and modern sequence data sets are available on NCBI GenBank under accession numbers JX195488–JX195497.

Alignments of sequence data and haplotype frequency data can be found at doi: 10.5061/dryad.b4783.

A haplotype frequency table for 53 modern populations as well as fish stocking data can be found at http://stripe.colorado.edu/~am/Site/Trout.html.

## Supporting information

Additional Supporting Information may be found in the online version of this article.

**Fig. S1** (a) Plot showing a decrease in average PCR success across all samples as target amplicon size increased. Mito-chondrial amplicons ranged from 91 to 135 basepairs. (B) Logistic regression of PCR amplification success (1) or failure (0) as a function of fragment size for 322 PCR reactions. Chi square = 39.0657; df = 1; $P = 0.0000$.

**Table S1** List of museum samples used in the study, including information on the drainage, museum, specimen accession number, collector, year collected, collection locality, the number of DNA extractions completed at the University of Colorado (CU) and the Australian Center for Ancient DNA (ACAD), and the number of DNA samples that yielded successful amplification of DNA.

**Table S2** Mitochondrial DNA primers sequences used in the study.

**Table S3** Modern cutthroat trout populations sampled across seven drainage basins in Colorado and New Mexico.

**Table S4** The extant lineage, the diagnostic SNPs for each lineage (based on 430 bps), and the number of historic samples that have all of the diagnostic SNPs of each extant lineage.

**Table S5** Number of ND2 mitochondrial haplotypes assigned to extant major lineages from fish that were sampled from 53 populations across major drainage systems.

Please note: Wiley-Blackwell are not responsible for the content or functionality of any supporting materials supplied by the authors. Any queries (other than missing material) should be directed to the corresponding author for the article.

© 2012 Blackwell Publishing Ltd

United States
Department of
Agriculture

Forest Service

**Technology &
Development
Program**

2300 Recreation
October 2002
0223-2821P-MTDC



In cooperation with

United States
Department of
Transportation

**Federal Highway
Administration**

United States
Department of
the Interior

**National
Park Service**



# Managing Degraded Off-Highway Vehicle Trails in Wet, Unstable, and Sensitive Environments



BLM_0057755

**You can order a copy of this document using the order form on FHWA's Recreation Trails Program Web site at:**

http://www.fhwa.dot.gov/environment/trailpub.htm

**Fill out the order form and fax it to the distributor listed on the form. If you do not have Internet access, you can send a fax request to 202–366–3409, or request by mail from:**

USDOT, Federal Highway Administration
Office of Human Environment, Room 3301
400 7th St. SW.
Washington, DC 20590

**Produced by:**

USDA Forest Service
Missoula Technology and Development Center
5785 Hwy. 10 West
Missoula, MT 59808-9361
Phone: 406–329–3978
Fax: 406–329–3719
E-mail: wo_mtdc_pubs@fs.fed.us



**This document was produced in cooperation with the U.S. Department of Transportation, Recreational Trails program of the Federal Highway Administration, and the U.S. Department of the Interior, National Park Service.**

This document is disseminated under the sponsorship of the U.S. Department of Transportation in the interest of information exchange. The United States Government assumes no liability for its contents or use thereof.

The contents of this report reflect the views of the contractor, who is responsible for the accuracy of the data presented herein. The contents do not necessarily reflect the official policy of the Department of Transportation.

This report does not constitute a standard, specification, or regulation. The United States Government does not endorse products or manufacturers. Trade or manufacturer's names appear herein only because they are considered essential to the object of this document.

BLM_0057756

# Managing Degraded Off-Highway Vehicle Trails in Wet, Unstable, and Sensitive Environments



**Kevin G. Meyer,** *Environmental Specialist/Soil Scientist*
*National Park Service, Alaska Support Office*
*Rivers, Trails, and Conservation Assistance Program*

**USDA Forest Service**
**Technology and Development Program**
**Missoula, MT**

**2E22A68—NPS OHV Management**

**October 2002**

The Forest Service, United States Department of Agriculture (USDA), has developed this information for the guidance of its employees, its contractors, and its cooperating Federal and State agencies and is not responsible for the interpretation or use of this information by anyone except its own employees. The use of trade, firm, or corporation names in this document is for the information and convenience of the reader and does not constitute an endorsement by the Department of any product or service to the exclusion of others that may be suitable.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

# Acknowledgments

**The author wishes to thank**

Kevin Keeler and other staff from the Alaska Rivers, Trails, and Conservation
Assistance program;

Russ Kucinski with the NPS-Alaska Physical Resource Team;

Brian Vachowski, Sara Lustgraaf, and Bert Lindler from the USDA Missoula Technology
and Development Center;

Christopher Douwes from the U.S. Department of Transportation
Federal Highway Administration;

and the many off-highway vehicle trail managers who are attempting to find
ecologically sound solutions to find
ecologically sound off-highway vehicle impacts.

BLM_0057758

# Contents

Introduction _____ 1

Soil—The Stuff Under Foot, Hoof, and Wheel _____ 2
  Soils 101 _____ 2
  Soil Characteristics as a Structural Component for Trails _____ 3
  How Soils Are Degraded _____ 5
  Surface Erosion, Surface Failure, and Trail Braiding _____ 6

Trail Management—Responding to Trail Degradation _____ 9
  Management Components _____ 9
    Trail Location Documentation _____ 9
    Trail Condition Assessment _____ 9
    Trail Improvement Prescriptions _____ 13
    Trail Improvement Implementation _____ 14
    Trail Maintenance and Monitoring _____ 15
  Management Response to Severely Degraded Trails _____ 15
    Trail Rerouting _____ 16
    Seasonal or Type-of-Use Restrictions _____ 17
    Controlled Use (Traffic Volume Restrictions) _____ 17
    Trail Hardening _____ 18
    Trail Closure _____ 31

Status of Research _____ 32

Summary _____ 33

Recommendations _____ 34
  Research _____ 34
  Funding _____ 34
  Interagency Coordination _____ 34

References _____ 35

Appendix A—Subjective Evaluation of Off-Highway Vehicle
Trail Treatment Options for Alaska _____ 37

Appendix B—Installation Guide for Porous Pavement Panels
as Trail-Hardening Materials for Off-Highway Vehicle Trails _____ 39

Appendix C—National Park Service Rivers, Trails, and
Conservation Assistance Program Cooperative Research
on Trail Hardening for Degraded Trails in Alaska _____ 47

Appendix D—Metric Conversions _____ 48

BLM_0057759

iv

BLM_0057760

# Introduction

Environmental impacts associated with the degradation of off-highway vehicle (OHV) trails have become a serious concern in many regions. Where OHV trails indiscriminately cross alpine areas, wetlands, steep slopes, and other areas with sensitive soil conditions, trails can become rutted, mucky, and eroded. Such areas are referred to as degraded trail segments. Degraded trails develop when trail use exceeds the trail's natural carrying capacity.

For land managers, degraded trails are a significant environmental problem because of their direct effects on vegetation, soils, and site hydrology. In addition, degraded trails may have indirect effects on wildlife, site esthetics, and other resource values. For trail users, degraded trails reduce the utility of trail systems and lead to a less enjoyable ride. Unfortunately, with increased use of backcountry resources by OHV enthusiasts and other trail users, the miles of degraded trails are increasing rapidly (figure 1).

This document provides land managers and trail users with an introduction to OHV trail degradation and outlines a framework for management responses. The information presented is based on work conducted by the author in southcentral and interior Alaska, but it also applies to degraded trails in other parts of the country. Some of the principles also apply to degraded foot, mountain bike, and horse trails. The document presents some fundamental concepts of soil and site characteristics, and the mechanics of trail degradation. It also offers inventory methods to document trail conditions and prepare stabilization "prescriptions." In addition, it outlines a number of management options including trail rerouting, seasonal and type-of-use restrictions, use-level restrictions, trail hardening, and trail closure.



The information provided in this report is intended to stimulate additional research and networking among trail managers, trail users, and the conservation community. Only through the cooperative efforts of a wide range of public and private trail advocates can the environmental and social conflicts associated with OHV use be resolved. We hope that future efforts will lead to the development of a widely applied set of best management practices for OHV trail management.

We have used English units of measure instead of Standard International (SI), or metric units, throughout this report. The products discussed in this report are manufactured using English measurements and most trail workers are accustomed to English rather than metric units of measure. Appendix D includes conversions from English measurements to metric.



Figure 1—A degraded trail in interior Alaska. Heavy use has stripped surface vegetation and exposed permafrost soils to accelerated melting, resulting in muddy, rutted trail surfaces, erosion, and deep muck holes.

1

BLM_0057761