804    JOURNAL OF WILDLIFE DISEASES, VOL. 47, NO. 3, JULY 2011

distinguishing isolates of *Pasteurella haemolytica* from bighorn sheep (*Ovis canadensis*). Journal of Wildlife Diseases 28: 347–354.

SPENCER, C. C. 1939. Notes on the life history of Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*) on the Pike National Forest with particular reference to breeding habits and parasites present. Unpublished report 2-6-1939, United States Department of Agriculture Forest Service, 22 pp.

WOLFE, L. L., B. DIAMOND, T. R. SPRAKER, M. A. SIROCHMAN, D. P. WALSH, C. M. MACHIN, D. J. BADE, AND M. W. MILLER. 2010. A bighorn sheep die-off in southern Colorado involving a *Pasteurellaceae* strain that may have originated from syntopic cattle. Journal of Wildlife Diseases 46: 1262–1268.

*Submitted for publication 31 January 2011.*
*Accepted 12 April 2011.*

BLM_0057896

Journal of the Washington Academy of Sciences. - Text

BLM_0057897

NAL Document Delivery



REG-20303192

UDI

NAL STACKS -- QH540.E55 -- 8 vol. no. 04 r (year) (season) q 21 | 9 vol no 04 r (yr) (mo) q 03 | 8.1 4-28 1977-2001 | 9.3 29 1-

Environmental conservation

Interlibrary Loan
U.S. Dept. of the Interior Library
1849 C Street, NW, MS 1151
Washington, DC   20240
US

| | |
|---|---|
| *ATTN:* **SHYAMALIKA GHOSHAL** | *SUBMITTED:* **2015-01-13  13:13:57** |
| *PHONE:* **(202) 208-5815** | *PRINTED:* **2015-01-15  09:51:16** |
| *FAX:* | *REQUEST NO.:* **REG-20303192** |
| *E-MAIL:* | *SENT VIA:* **OCLC** |
| | *EXPIRY DATE:* **2015-01-16** |
| | *EXTERNAL NO.:* **141468991** |
| | *OCLC NO.:* **141468991** |

| REG     Regular | Copy | Journal | NEED BEFORE: 2015-02-11 |
|---|---|---|---|

| | |
|---|---|
| *AUTHOR:* | **Foundation for Environmental Conservation** |
| *TITLE:* | **ENVIRONMENTAL CONSERVATION.** |
| *PUBLISHER:* | **Lausanne** |
| *VOLUME/ISSUE/PAGES:* | **6 / 4    297?304** |
| *DATE:* | **1979** |
| *AUTHOR OF ARTICLE:* | **Miller, R.I.** |
| *TITLE OF ARTICLE:* | **CONSERVING THE GENETIC INTEGRITY OF FAUNAL POPULATIONS AND COMMUNITIES** |
| *ISSN:* | **03768929** |
| *OTHER NOS/LETTERS:* | **OCLC: 2239976** |
| *SOURCE:* | **WorldCat (2239976) Physical Description: v. ill. 28 cm.** |
| *MAX COST:* | **$0.00** |
| *COPYRIGHT COMP.:* | **CCG** |
| *NOTES:* | **From OCLC:UDI Delivery Info.: L/R US Federal, Non-Profit Library--we do not charge borrowers (maxCost: FREE) FAX/ARIEL:202-208-6773 EMAIL: shyamalika_ghoshal@ios.doi.gov Affiliations: FEDLINK** |
| *REQUESTER INFO:* | **Clements, Amanda, Bureau of Land Management** |
| *DELIVERY:* | **E-mail Post to Web : shyamalika_ghoshal@ios.doi.gov** |
| *REPLY:* | **E-mail: shyamalika_ghoshal@ios.doi.gov** |

This document contains 8 pages. This is NOT an invoice.

Digitization and Access Branch, National Agricultural Library
301-504-5717 nal-docdel@ars.usda.gov

ANY MATERIAL SUPPLIED MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17, U.S. CODE).

BLM_0057898

# Conserving the Genetic Integrity of Faunal Populations and Communities

*by*

RONALD I. MILLER, M.S. (Florida)

*Museum of Comparative Zoology, Harvard University, Cambridge, Massachusetts 02138, U.S.A.;*
Mailing address: *P.O. Box 451, Cambridge, Massachusetts 02238, U.S.A.*

[left margin fragments:]

?. (1978b). Biological
ion levels: Studies at
*cology: Professor R.
. J. S. Singh & B.
hers, Jaipur 302004,

). *The Mathematical
ty* of Illinois Press,

*of Benthic Macro-
: Domestic and Oil
on, Oklahoma State
i + 49 pp., illustr.
Biological parameters
. 8(6), pp. 477–80.
d stream pollution.
pp. 1270–8.

age in such discus-
interested nations
fication of such a
protection of the

*vironment Affairs*

*vation*

:ions Environment
servation Strategy
the world to deci-

a global responsi-
s others. In this
ition in Western
fusion of natural
ong and beautiful
aining a clean and
, both the fishing

y implementing a
ia de Estado do
onal plan for con-
t contribution to
in an increasing

ones
*fairs Department
ldlife Fund
u Mont Blanc
nd
nd.*

## INTRODUCTION

Natural cycles of commonness and rarity are affiliated with the dynamic processes influencing most populations. The contraction of the gene-pool during a period of reduced abundance, may subsequently be associated with a reduction in genetic variability (e.g. Bonnell & Selander, 1974). A concomitant lack of immigration in small, localized populations may also enhance a decline in genetic variability (Lewontin, 1973). Both conditions may also produce consanguineous mating patterns and subsequent genotypic and phenotypic changes in a population.

The possibility of widespread, or even biospheric, loss of genetic diversity has recently been discussed (Vida, 1978). Genetic considerations in the management and conservation of preserve populations are particularly relevant because (1) interdemic migration (Gill, 1978) becomes limited as preserve populations (or demes) become isolated from once-larger genetic pools, and (2) finite preserve size constrains population size and genetic resources, and therefore enhances the prospects of observable genetic drift, inbreeding, and population extirpation. East African species of large mammals are particularly vulnerable to these problems, inasmuch as population size is inversely related to species' mean body size, trophic level, and mean home-range size (Southwood *et al.*, 1974; Southwood, 1976). Recent research into the genetics of small populations elucidates the pertinent criteria to be considered for the development of a successful programme for the conservation of the genetic integrity of these populations and communities.

## GENETIC PROCESSES INFLUENCING SMALL POPULATIONS

Population geneticists consider three processes to be primary causes of reduced variability in small populations: (a) inbreeding, (b) genetic drift, and (c) the 'bottleneck' and 'founder' effects. These well-documented phenomena generate predictable changes in small, isolated populations with reduced genetic resources.

### Inbreeding

Inbreeding is the result of mating between genetically related individuals within a population. Inbreeding may produce changes in the frequencies of genotypes, but not in allelic frequencies. It increases the proportion of homozygotes to heterozygotes, and therefore increases the expression of recessive variants (e.g. 'aa' genotypes, where 'a' is an allele for a recessive trait) in the population. Since most genes for defects and nonadaptive traits are recessive, inbreeding provides a greater opportunity for these kinds of characters to appear in the population. In addition, selection will act on a gene-pool with a reduced proportion of heterozygous genes, to produce a reduction in variability (Dobzhansky, 1970). Initially, phenotypic variance may increase with inbreeding, because of the increased manifestation of recessive traits. Inevitably, selection will reduce this variation. Inbreeding will decrease genotypic variance irrespective of any effects of selection.

Inbred patterns are most likely to occur in small populations, as any two individuals in them are more likely to be related than in large populations. In the absence of immigration, this effect will be compounded over many generations. A classic example of the effects of inbreeding in a large mammal species is demonstrated by a breed of 'white tigers' (*Panthera tigris*), propagated by artificially induced inbreeding conditions (Thornton, 1978). These Tigers are rarely observed in Nature, possibly because the white colour provides less camouflage for predatory activities. In fact, all currently known white Tigers are the result of this inbred line. Other abnormalities are correlated with this inbred trait. For example, many individuals are cross-eyed, and many exhibit a defect of the visual pathway which is related to the reduced pigment formation (Guillery & Kass, 1973).

The appearance of lethal and semi-lethal homozygotes in inbred domesticated animals, and the 'emergence of deleterious recessives' following inbreeding in wild species, has been well documented for some time (Dobzhansky, 1951, 1970). In a classic study of the effects of inbreeding in humans (Schull & Neel, 1965, 1966), statistically significant differences between inbred and control Japanese children were documented for a broad range of characteristics. For example, inbreeding resulted in a higher rate of neo-natal deaths and increased frequencies of malfunctions. These results were confounded by interpopulation variation; however, a recent study of a more 'closed' Japanese population supports a correlation between these events and inbreeding (Schull *et al.*, 1970).

Estimates of average inbreeding rates are quantified by the use of F-statistics (Wright, 1943, 1951, 1965). This inbreeding coefficient is a measure of the probability that two alleles in an individual are identical by descent, and thus the proportion of heterozygous loci in a popu-

297

*Environmental Conservation*, Vol. 6, No. 4, Winter 1979—©1979 The Foundation for Environmental Conservation—Printed in Switzerland.

BLM_0057899

lation will be reduced by the factor $F$ as a result of inbreeding. For example, using Wright's original $F$ formulation, a brother–sister mating will have an inbreeding coefficient of $F = 0.25$.

A number of alternative models and estimation procedures have recently been proposed to estimate inbreeding rates more accurately. In an analysis of the spectrum of inbreeding estimation techniques (Spielman *et al.*, 1977), evidence suggests that current statistical methods for calculating inbreeding coefficients significantly underestimate true values. In addition, current procedures may not be applicable to populations with overlapping generations (D. L. Johnson, 1977; Choy & Weir, 1978). Therefore, inbreeding coefficients are valuable for general comparisons between populations; however, a precise analysis is required to determine realistic inbreeding rates for specific small-preserve populations.

Various levels of inbreeding have been observed in captive populations of large mammal species. For example, captive Okapi (*Okapia johnstoni*) have shown relatively low mean inbreeding coefficients (J. Foose, unpubl.), while individuals in a herd of Prezwalski's Wild Horse (*Equus prezwalskii*) exhibit coefficient values as high as 0.590 (Bouman, 1977). Published reports have documented population deterioration at inbreeding coefficients of 0.25–0.75 (Flesness, 1977). A significant number of congenital defects have been observed among Prezwalski's horses, and evidence supports a correlation between the degree of inbreeding in this species and changes in the breeding rate (Bouman, 1977). In a captive herd of Dorcas Gazelle (*Gazella dorcas*), a significant increase in the mortality rate for inbred calves has been documented over an 18-years period (Ralls *et al.*, MS).

### Genetic Drift

Stochastic processes influence the allelic composition of every gene-pool. In panmictic populations, the genotypes of each generation are randomly selected from the gene-pool of the previous generation, and the distributions of gene frequencies are predictable from the Hardy-Weinberg formulation. In 'abundant' populations, the random sampling of gametes serves at least two positive evolutionary functions (Wright, 1948): (1) to resist the influence of strongly-directed selection pressures which might limit the genetic plasticity of the population, and (2) to produce discontinuous demes of distinct genetic composition, i.e. phenotypic variation among amphibian populations (Pfingsten & Walker, 1978) and genetic differentiation in a herd of White-tailed Deer (*Odocoileus virginianus*) (Manlove *et al.*, 1976). In less abundant populations, these same stochastic processes may produce significant, long-term changes in genetic composition.

Genetic drift is the change in gene frequency which results, in each generation, from the random sampling of alleles in panmictic populations. This random drift of gene frequencies can result, over generations, in the fixation or loss of alleles within the population. The dispersion of allele frequencies in a panmictic population can

be described by a binomial distribution; therefore, the effects of the stochastic gamete sampling in each generation can be modelled as the binomial sampling variance of an allele (Spiess, 1977):

$$\sigma^2_{\Delta q} = \frac{pq}{2N} \qquad (1)$$

where $p$ is the frequency of allele $A$, $q$ is the frequency of allele $a$, and $2N$ is the number of gametes in a population of $N$ individuals contributing to the next generation*.

As the number of individuals in the population becomes smaller, the variance in allele frequencies becomes larger. Therefore, the effects of genetic drift will be most noticeable in small, genetically isolated populations where the variance of allele frequencies from generation to generation will be greatest. The results of such a 'random walk' of allele frequencies have been simulated by computer (Fig. 1) to demonstrate the degree of frequency variation which can occur over many generations. For a single pair of alleles originally present in the population in a 1:1 ratio, one of the pair will most likely become fixed, given a sufficiently long time-period.

### Bottleneck and Founder Effects

The 'bottleneck' and 'founder' effects describe the genetic changes which may arise when a population becomes reduced to a fraction of its former size, or when a few individuals establish a population in a new area. In both cases, a few individuals will pass on a mere fraction of the genetic endowment of the original population, which may result in a significant loss in the number of alleles per locus or in a reduction in genetic heterozygosity (Mayr, 1954). Directional selection will act upon resultant phenotypic variations to enhance the probability that these populations will differ, both genotypically and phenotypically, from noncontiguous populations of the same species. The degree of reduction in population size will primarily define the amount of allele loss in reduced populations (Nei *et al.*, 1975). Since this reduction in the proportion of segregating loci can only be increased by immigration or rare genetic events, such as mutations, and/or reduced diversity, when once it is established it may persist for many generations. This condition of reduced genetic diversity may become the norm in permanently reduced preserve populations.

Both the bottleneck and founder effects will produce a rate of decline in the average heterozygosity per locus, which is dependent on both the effective population size and the intrinsic growth-rate of the reduced population (Fig. 2). A low effective population size may result in a significant, long-term reduction in average heterozygosity. For example, the Northern Elephant-seal (*Mirounga angustirostris*) was reduced to a small remnant population (<100 individuals) between 1884 and 1900 (Bartholomew & Hubbs, 1960). In an electrophoretic survey of this species (Bonnell & Selander, 1974), which now

---

*A referee points out that '$2N$ does not mean the number of gametes in a population, but only the ones participating in the production of the new generation.'—Ed.

Case No. 1:20-cv-02484-MSK   Document 45-3   filed 04/28/21   USDC Colorado   pg 6 of 165

ion; therefore, the
ing in each genera-
sampling variance

(1)

$q$ is the frequency
metes in a popula-
: next generation*.
he population be-
equencies becomes
: drift will be most
lated populations
es from generation
ults of such a 'ran-
been simulated by
egree of frequency
generations. For a
in the population
ost likely become
iod.

fects describe the
a population be-
ier size, or when a
in a new area. In
on a mere fraction
iginal population,
in the number of
ietic heterozygos-
will act upon re-
ce the probability
oth genotypically
us populations of
tion in population
t of allele loss in
. Since this reduc-
oci can only be in-
c events, such as
when once it is
generations. This
may become the
populations.

fects will produce
ygosity per locus,
ve population size
luced population
ce may result in a
ie heterozygosity.
it-seal (*Mirounga*
nnant population
1900 (Bartholo-
ioretic survey of
74), which now

iean the number of
participating in the



Fig. 1. *A computer simulation of random drift in the allelic fre-
quencies of a population of 10 individuals after 100 generations
of genetic recombination. Each allele is initially present at a fre-
quency of 0.5, and each has an equal chance of being selected in
a given generation. Theoretically, the fixation or loss of a specific
allele may occur as early as the first generation or as late as the
hundredth generation, or beyond. In 50 runs of this simulation
at the University of Illinois, fixation occurred as early as the
sixth generation and as late as the 94th (from Spiess, 1977).*



Fig. 2. *The effect of a bottleneck on the average heterozygosity
of a population. The solid lines refer to the situation where the
population number is reduced to N = 2, and the broken lines re-
present the case where the population is reduced to N = 10. In
each instance, r equals the intrinsic rate of increase, assuming
that each population exhibits a logistic growth-phase after the
bottleneck period. This simulation is constructed from a study
of the response of Drosophila populations to experimentally
induced bottlenecks (from Nei et al., 1975).*

numbers >30,000 individuals, a complete absence of
genic heterozygosity was observed. In contrast, signifi-
cant levels of genic heterozygosity are documented in

the southern species (*Mirounga leonina*), which did not
undergo a bottleneck.

A high rate of population growth, such as may occur
in a recently occupied territory with abundant resources,
will maintain a high level of heterozygosity, even in pop-
ulations with low initial effective population sizes (Nei
*et al.*, 1975). However, when once average heterozygosity
is reduced to a low level, it may take a significant num-
ber of generations to regain the original, or achieve a
new, equilibrium value (Fig. 2).

Since heterozygosity can only be regained through
mutation, the low mutation rates in vertebrate species
would make it nearly impossible to regain the original
level of variation. Therefore, the population will remain
genetically depauperate. Furthermore, immigrants into
small populations characterized by low $r$ values may sig-
nificantly affect the phenotypic composition of succeed-
ing generations (Ford, 1975) by producing hybrid off-
spring which are ill-adapted to the specific conditions in
the area. Therefore the effects of reduced levels of genetic
variability will persist over a longer time-period in popu-
lations which are characterized by low rates of intrinsic
natural increase than in those exhibiting higher rates.

Various species-specific vulnerabilities to the effects
of a bottleneck are documented. A number of mammal
species and individual populations have been reduced to
very low numbers, and yet successfully survived the bot-
tleneck (Mayr, 1963). For example, the Golden Hamster
(*Mesocricetus auratus*) was probably reduced to a single
pair, and yet no deleterious consequences of this bottle-
neck are known. In contrast, observable morphological
effects of inbreeding are documented in an isolated pop-
ulation of Bighorn Sheep (*Ovis canadensis*), which has
been reduced to an effective population-size of six indi-
viduals (Lovejoy, 1978). The characteristics and mech-
anisms which make species vulnerable to the negative
effects of inbreeding at different low effective popula-
tion sizes are currently unknown. A significant portion
of the differential species vulnerability is probably at-
tributable to the diversity of breeding systems among
species (Mayr, 1963).

## SIGNIFICANCE OF EFFECTIVE POPULATION SIZE FOR PREDICTING GENETIC CHANGE

A number of simple models can be used to estimate
the probability that inbreeding and/or genetic drift will
occur in a population. To estimate these probabilities at
all accurately for populations with differing characteris-
tics (such as skewed sex-ratios, overlapping generations,
nonrandom mating patterns, etc.), a method of trans-
lating these differences into a comparative parametric
relation is useful. The effective population-size parameter,
which serves this purpose, is defined as the size of an
'ideally-behaving population' with the same homozygosity
increase as the observed population (Crow & Kimura,
1970). An ideal population is reproductively panmictic,
with a constant size in each generation, non-overlapping
generations, and with all individuals and each sex ex-

BLM_0057901

Case No. 1:20-cv-02484-MSK   Document 45-3   filed 04/28/21   USDC Colorado   pg 7 of 165

pected to make equal contributions to the progeny (Crow & Kimura, 1970; Cavalli-Sforza & Bodmer, 1971; Spiess, 1977).

There are two available methods to estimate values of $N_e$, the number of individuals contributing gametes to the next generation. The 'variance-effective' $N_e$ is estimated from a consideration of the dispersion of gene frequencies from any parent generation to its offspring. This formulation is associated with analyses of the effects of genetic drift. Alternatively, the 'rate of fixation' $N_e$ estimates the effective population size in real populations from the theoretical inbreeding coefficient which is associated with specific sample sizes. This is also referred to as the inbreeding effective number. Similar $N_e$ values have been derived for a given population, using both estimation methods (Spiess, 1977). However, generally $N_e$ varies according to the genetic phenomenon under study (Crow & Kimura, 1970; Li *et al.*, 1978).

Most importantly, these techniques provide valid methods for calculating orders of magnitude for $N_e$, so that a comparison between a known population size and the estimated effective population size can be made. The effective population size, considered in conjunction with predictions about the decline in heterozygosity, can yield an estimate of the amount of fixation, or inbreeding depression, which 'may occur' over time in a specific, finite population.

The inbreeding, effective population-number for a population of constant size is defined as (Crow & Kimura, 1970):

$$N_e = \frac{4(N\male \cdot N\female)}{N\male + N\female} \qquad (2)$$

where $N\male$ is the number of parental males, and $N\female$ is the number of parental females. When the numbers of males and females in the population are equal, then $N_e = N\male + N\female$; but when they are unequal, the effective number is less than the total breeding population. Consequently, in populations with a skewed sex-ratio, the $N_e$ value will be more sensitive to the number of the less numerous sex. In a herd headed by a single male, $N_e$ will approach 4, regardless of the number of females. In a population of 100 Impala (*Aepyceros melampus*), a highly polygynous species, $N_e$ will be <20*.

In natural populations, the effective population number is less than the census number because: (1) only breeding adults contribute genetically to the next generation; (2) many mating patterns exclude fertile members of the adult population from breeding; (3) populations may exhibit unequal sex-ratios; (4) some individuals contribute more progeny to the next generation than do others; and (5) seasonal population fluctuations may skew genetic contributions. These diverse parameters create a wider variation in $N_e$ values than are expected from equation (2) (Li *et al.*, 1978). Therefore, consider-

---

ation of a population's specific demographic characteristics is essential for calculation of an appropriate $N_e$ value.

The importance and usefulness of the effective population size for estimating the reduction in genetic heterozygosity which is due to inbreeding, is demonstrable from a previous analysis of this relation (Fig. 3). In each case, a decline in heterozygosity culminates in a level of genetic diversity which is commensurate with population size. This theoretical pattern of decline should be expected in most animal populations with low $N_e$ values. This decline will occur over a relatively long time-period in recently reduced populations, which exhibit larger $H_0$ values that are characteristic of the initially larger population.

## EFFECTS OF REDUCED VARIABILITY ON SMALL POPULATIONS

The study and measurement of the above-described genetic phenomena that influence small isolated populations was made possible by the development of techniques to measure allelic variation at individual loci. Gel electrophoresis (Harris, 1966; Hubby & Lewontin, 1966; Lewontin & Hubby, 1966), which measures differences in protein-encoded genes among individuals, provides a method for determining both intra- and inter-population genetic variability. A significant number of studies have measured electrophoretically detectable genetic variation in a number of invertebrate and vertebrate species (Dobzhansky *et al.*, 1975).

Recent studies using electrophoretic techniques support the contention that drift, in conjunction with the



Fig. 3. *Each curve represents the predicted decrease in genetic heterozygosity in an animal population differing only in its effective population size $N_e$. The curves are generated from the following equation derived by Crow (1976): $H_t = 1 - (1/2N + 1)^t H_0$, where N is the number of diploid individuals in the population and $H_t$ is the heterozygosity in each generation t expressed as a percentage of the initial heterozygosity $H_0$ (= 1). The curves are propagated when values of $N_e$ — the size of the breeding population genetically contributing to the next generation — are varied and substituted for N.*

---

*Assume that 20% of the population is non-breeding, and that 20% of the males take part in copulatory functions. Then:

$$N_e = \frac{4 \, (8 \, males)(40 \, females)}{80 \, breeding \, individuals} = 16 \, individuals.$$

BLM_0057902

Case No. 1:20-cv-02484-MSK Document 45-3 filed 04/28/21 USDC Colorado pg 8 of 165

mographic character-
f an appropriate $N_e$

of the effective popu-
ion in genetic hetero-
ing, is demonstrable
tion (Fig. 3). In each
lminates in a level of
rate with population
ecline should be ex-
with low $N_e$ values.
vely long time-period
ich exhibit larger $H_0$
initially larger popu-

ILITY ON SMALL

the above-described
mall isolated popula-
evelopment of tech-
t individual loci. Gel
/ & Lewontin, 1966;
measures differences
dividuals, provides a
and inter-population
nber of studies have
ble specific variation
ebrate species (Dob-

etic techniques sup-
onjunction with the



$N_e = 100$

$N_e = 50$

$N_e = 25$

160     200

ted decrease in genetic
n differing only in its
are generated from the
$F: H_t = 1 - (1/2N + 1)^t$
dividuals in the popula-
generation t expressed
ty $H_0 (= 1)$. The curves
ize of the breeding pop-
next generation  are

---

bottleneck and founder effects, influences the genetics of small, isolated, populations. Significant differences in genetic variability have been detected among insular and mainland populations of *Peromyscus* (Avise *et al.*, 1974), *Rattus fuscipes* (Schmitt, 1978), *Peromyscus leucopus* (Browne, 1977), *Apodemus sylvaticus* (Berry, 1970), *Drosophila willistoni* (Ayala *et al.*, 1971), and *Anolis* (Gorman *et al.*, 1978). These techniques have also eluci-dated unique gene frequencies in many segregated human populations, which exhibit high proportions of rare, deleterious, phenotypic variants (Livingstone, 1969; Spiess, 1977).

Decreased genetic variability within a population may promote reduced adaptability to changing environmental conditions (Wright, 1948; Ford, 1975; Nei *et al.*, 1975). Evidence for a correlation between genetic diversity and the adaptive versatility of populations is available for both *Drosophila* (Cunha *et al.*, 1950) and *Anolis* (Webster *et al.*, 1972) species. Under conditions of decreased genetic variability, fewer individuals will be present to exploit new resources, because of a lack of suitable, phenotypic variation. Small isolated populations, unable to adapt to powerful selection pressures, may subse-quently become extirpated from an area.

On the community level, the degree of genetic change expected among small isolated populations will be pre-dictable from the dynamic interrelationship between population cohesiveness, dispersal, immigration, and the resulting gene-flow. These are the same factors which will lead to the formation of closed breeding units and genetic differentiation within single populations.

The observation that populations may be genetically subdivided across small geographic areas (Wright, 1943) is now supported by extensive electrophoretic data (Anderson, 1970; Neel & Ward, 1970; Rasmussen, 1970; Selander, 1970*a*, 1970*b*; Manlove *et al.*, 1976). Sub-division within vertebrate populations appears to be a widespread phenomenon (Smith *et al.*, 1978). Evidence suggests that many large mammal populations are differ-entiated into genetically isolated demes, or subpopula-tions. For example, in the lek system or meeting-sites of the Uganda Kob (*Adenota kob thomasi*), lek demes are distinguishable on the basis of statistically significant morphological variations (Buechner & Roth, 1974). Low rates of interdemic gene-flow probably promote the maintenance of genetic variability within leks, and there-fore provide the entire population with the flexibility to respond to directed selection pressures. Similar patterns of genetic subdivision have been documented in a herd of White-tailed Deer (Manlove *et al.*, 1976), and among troops of a Japanese Macaque population (Nozawa *et al.*, 1975).

## DISCUSSION

Significant rates of genetic drift may occur in recently isolated populations, where mechanisms of frequency, dependent selection, or heterozygote superiority, which are present in long-isolated populations, have not yet

---

evolved to maintain balanced polymorphism and there-fore genetic diversity. Species behavioural, natural his-tory, and demographic characteristics, will jointly deter-mine the unique qualitative and quantitative properties of the allelic frequency distributions, which result from genetic drift in isolated populations. In the East African savanna community, the variety of species-specific char-acteristics, as demonstrated by the polygamous *versus* monogamous mating patterns of the Uganda Kob and the dik-dik, or by the territoriality of the African Lion (*Felis leo*) *versus* the herding behaviour of the Zebra (*Equus* sp.), imply differences in the vulnerability of these species populations to the effects of genetic drift. For example, one would expect unique allelic frequency distributions to appear more quickly in a population of dik-dik, with a relatively short mean generation-time and fast turnover rate, than in a population of African Ele-phants (*Loxodonta africana*). Some important distinc-tions in genetic constitution between natural vertebrate populations (Table 1 in Smith *et al.*, 1976) provide em-pirical evidence for the correlation between synecological qualities and the nature of genetic changes, such as are to be expected in an isolated population.

Current genetic research supports the hypothesis of decreased adaptability in small populations, and the im-portance of selection in maintaining genetic polymorph-ism (Vida, 1978). Genetic subdivision within populations is probably an evolved mechanism to maintain variability. This variability imbues populations with the flexibility to respond to directed selection pressures as they arise. For example, the lek system in the Uganda Kob provides for the maintenance of genetic variability in geographical-ly isolated populations, and therefore promotes survival of the species (Buechner & Roth, 1974). Processes such as genetic drift and inbreeding, which reduce genetic variability in small isolated populations, may therefore limit the potential of these populations to adapt to changing environmental conditions—including human encroachment and modification of habitat. A large spe-cies of mammal such as the Northern Elephant-seal (*Mirounga angustirostris*), lacking a pool of variability with which to adapt, will be especially vulnerable to changing environmental conditions. In the East African region, this could affect the ability of populations of large mammals to adapt to periodically reoccurring, ex-treme dry or wet conditions.

Present and future changes in the genetic variability of preserve populations can be quantitatively monitored by the use of electrophoretic techniques (Lewontin & Hubby, 1966; Nei, 1972). This technology may also per-mit the measurement of genetic differentiation between non-contiguous populations. However, to establish a measure of the average genetic variation in a population, a number of criteria must be met, including: an adequate sample-size, a large sample of loci, and a sample of loci for a variety of functions (Lewontin, 1973). Resolving the degree of 'population-wide' variability and the nor-mal rate of genetic differentiation between populations, using electrophoretic techniques, are two additional dif-ficulties to be confronted (G. B. Johnson, 1977), before

BLM_0057903

this technique can be fully utilized to evaluate the genetics of preserve populations.

The theory that dynamic tensions maintain both structural and functional stability in biotic communities (MacArthur & Wilson, 1967), is supported by an increasing body of empirical evidence. Immigration and emigration patterns influence both the effective size of, and the degree of genetic variation in, some populations (e.g. Gill, 1978). The preservation of these dynamic community characteristics can ensure the maintenance of genetic diversity, and therefore preserve species adaptability to changing conditions. At the same time, this will reduce the negative influences of genetic drift and inbreeding. In the absence of selection, it has been estimated that only one to a few migrants per generation, regardless of population size, will prevent differentiation between populations (Wright, 1931; Dobzhansky, 1970; Lewontin, 1974). For example, it has been contended that gene-flow between isolated populations of Song-sparrows (*Melospiza melodia gouldii*) is maintained by the presence of only a few long-distance dispersers (Halliburton & Mewaldt, 1976).

Many species of large mammals in the East African region are reduced to a set of populations which are circumscribed within a finite group of parks and preserves. Some species are already confined to very restricted areas, e.g. the Kafue Lechwe (*Onotragus* sp.). As human development, supported by recent technological advances, such as in the control and eradication of the tsetse (Desowitz, 1977), encroaches upon the remaining fraction of pristine wildlife habitat in East Africa, many more of the larger mammal species will be reduced to remnant populations in a few protected areas. Consequently, each population will contain a greater percentage of the genetic endowment of the entire species.

Genetic research supports the conclusion that isolated preserve populations may experience significant changes in genetic composition over time. In addition, research indicates that genetic variation within populations provides the basis for future adaptation to environmental change. Therefore, if remnant East African large mammal populations are to be preserved as functional components of vigorous and dynamic ecological systems, their genetic diversity should be preserved. This can best be accomplished by maintaining low inbreeding coefficients and high levels of heterozygosity and allelic variability, through (1) the determination and maintenance of species-specific minimum effective population sizes; (2) the establishment of preserve design criteria to maintain gene-flow between isolated populations; and (3) the introduction of appropriate management practices within communities which experience the negative exponential phase of the extinction process (MacArthur & Wilson, 1967; Terborgh, 1974; Diamond, 1975; Miller, 1978), to mitigate genetic changes in especially vulnerable populations.

Long-term preservation of the genetic integrity of populations is dependent on the preservation of the dynamic aspects of natural communities. Limitation of population movements and/or fluctuating abundance

patterns (e.g. the demise of the Kafue Lechwe (Rees, 1978)), may produce genetic stagnation—resulting in the deleterious consequences of genetic drift and inbreeding. The genetic integrity of a species can be maintained by the artificial exchange of individuals between population centres. Also, some success has been achieved in maintaining genetic diversity within captive-bred populations, and, in a few instances, individuals have been reintroduced into the wild (Pinder & Barkham, 1978). However, political and financial considerations, and the degree to which individuals become adapted to captive breeding conditions, limit the long-term usefulness of this approach (*Ibid.*). The long-term persistence of a species within a particular area will tend to depend more on the preservation of vital interactions between species communities within regional preserve ensembles, than on the implementation of temporary measures for population survival. The maintenance of the dynamic patterns within communities provides the best opportunity for preserving East African parks—as isolated, yet robust, examples of once larger natural systems.

### ACKNOWLEDGEMENTS

I am indebted to Dr Larry D. Harris for his insights, which guided me in this research. I would also like to thank Professor Ernst Mayr for his thoughtful review of the paper and for his helpful comments.

### SUMMARY

Results of recent studies in population genetics provide significant evidence that genetic changes may occur in many small, isolated, preserve populations. The primary phenomena producing these changes will be inbreeding, genetic drift, and the 'founder' and 'bottleneck' effects. A permanent reduction in population vigour and in genetic diversity may result from these processes.

Species are differently susceptible to genetic changes at limited but effective population-sizes. The factors regulating species-specific vulnerability to events such as inbreeding are currently undetermined. Species-specific behavioural, natural history, reproductive, and demographic, characteristics will influence the susceptibility of a population to genetic change. The effective population-size will usually be the most influential parameter for predicting the degree of genetic change that will occur in a population. However, further study is necessary to determine the critical population-size below which a given species will experience deleterious genotypic and phenotypic phenomena.

The often unique East African populations of large mammals may be particularly vulnerable to these genetic processes. The long-term maintenance of the genetic integrity of these populations can best be accomplished by the preservation of dynamic interactions between preserve communities.

Case No. 1:20-cv-02484-MSK   Document 45-3   filed 04/28/21   USDC Colorado   pg 10 of 165

## REFERENCES

ANDERSON, P. K. (1970). Ecological structure and gene flow in small mammals. Pp. 299–325 in *Variation in Mammal Populations* (Ed. R. J. Berry & H. N. Southern). Academic Press, London, U.K.: xvi + 403 pp., illustr.

AVISE, J., SMITH, M. H., SELANDER, R. K., LAWLOR, T. E. & RAMSEY, P. R. (1974). Biochemical polymorphism and systematics in the genus *Peromyscus*, V: Insular and mainland species of the subgenus *Haplomylomys*. *Syst. Zool.*, 23 (2), pp. 226–38.

AYALA, F. J., POWELL, J. R. & DOBZHANSKY, Th. (1971). Polymorphisms in continental and island populations of *Drosophila willistoni*. *Proc. Nat. Acad. Sci. USA*, 68 (10), pp. 2480–3.

BARTHOLOMEW, G. A. & HUBBS, C. L. (1960). Population growth and seasonal movements of the Northern Elephant-seal, *Mirounga angustirostris*. *Mammalia*, 24 (3), pp. 313–24.

BERRY, R. J. (1970). Covert and overt variation, as exemplified by British mouse populations. Pp. 3–26 in *Variation in Mammal Populations* (Ed. R. J. Berry & H. N. Southern). Academic Press, London, U.K.: xvi + 403 pp., illustr.

BONNELL, M. L. & SELANDER, R. K. (1974). Elephant-seals: genetic variation and near extinction. *Science*, 180, pp. 908–9.

BOUMAN, J. (1977). The future of the Prezwalski Horse in captivity. *Int. Zoo. Yearb.*, 17, pp. 62–8.

BROWNE, R. A. (1977). Genetic variation in island and mainland populations of *Peromyscus leucopus*. *Am. Midl. Nat.*, 97(1), pp. 1–9.

BUECHNER, H. K. & ROTH, H. D. (1974). The lek system in Uganda Kob antelope. *Am. Zool.*, 14, pp. 145–62.

CAVALLI-SFORZA, L. L. & BODMER, W. G. (1971). *The Genetics of Human Populations*. W. H. Freeman, San Francisco, California: xvi + 965 pp., illustr.

CHOY, S. C. & WEIR, B. S. (1978). Exact inbreeding coefficients in populations with overlapping generations. *Genetics*, 89, pp. 591–614.

CROW, J. F. (1976). *Genetics Notes*. Burgess Publishing, Minneapolis, Minnesota: vi + 278 pp., illustr.

CROW J. F. & KIMURA, M. (1970). *An Introduction to Population Genetics Theory*. Harper & Row, New York, N.Y.: xiv + 891 pp., illustr.

CUNHA, A. B. Da, BURLA, H. & DOBZHANSKY, Th. (1950). Adaptive chromosomal polymorphism in *Drosophila willistoni*. *Evolution*, 4, pp. 212–35.

DESOWITZ, R. S. (1977). The fly that would be king. *Nat. Hist.*, 86 (2), pp. 76–83.

DIAMOND, J. M. (1975). The island dilemma: lessons of modern geographical studies for the design of nature preserves. *Biol. Conserv.*, 7, pp. 129–46.

DOBZHANSKY, Th. (1951). *Genetics and the Origin of Species*. Columbia University Press, New York, N.Y.: 364 pp.

DOBZHANSKY, Th. (1970). *Genetics of the Evolutionary Process*. Columbia University Press, New York, N.Y.: ix + 505 pp.

DOBZHANSKY, Th., HECHT, M. & STEERE, W. (1975). *Evolutionary Biology*. Plenum Press, New York, N.Y.: ix + 396 pp., illustr.

FLESNESS, N. R. (1977). Gene-pool conservation and computer analysis. *Int. Zoo. Yearb.*, 17, pp. 77–81.

FOOSE, J. (unpublished).

FORD, E. B. (1975). *Ecological Genetics*, 4th edn. Chapman & Hall, London, U.K.: xx + 442 pp.

GILL, D. E. (1978). Effective population size and interdemic migration rates in a metapopulation of the Red-spotted Newt, *Notophthalmus viridescens* (Rafinesque). *Evolution*, 32 (4), pp. 839–49.

GORMAN, G. C., KIM, H. J. & YANG, S. Y. (1978). The genetics of colonization: loss of variability among introduced populations of *Anolis* lizards (Reptilia, Lacertilia, Iguanidae). *J. Herpetol.*, 12 (1), pp. 47–51.

GUILLERY, R. W. & KASS, J. H. (1973). Genetic abnormality of the visual pathways in a 'white' tiger. *Science*, 180, pp. 1287–8.

HALLIBURTON, R. & MEWALDT, L. R. (1976). Survival and mobility in a population of Pacific coast Song-sparrows (*Melospiza melodia gouldii*). *Condor*, 78, pp. 499–504.

HARRIS, H. (1966). Enzyme polymorphisms in Man. *Proc. R. Soc. London*, Series B, 164, pp. 298–310.

HUBBY, J. L. & LEWONTIN, R. C. (1966). A molecular approach to the study of genic heterozygosity in natural populations, I: The number of alleles at different loci in *Drosophila pseudoobscura*. *Genetics*, 54, pp. 577–94.

JOHNSON, D. L. (1977). Inbreeding in populations with overlapping generations. *Genetics*, 87, pp. 581–91.

JOHNSON, G. B. (1977). Assessing electrophoretic similarity: the problem of hidden heterogeneity. *Ann. Rev. Ecol. Syst.*, 8, pp. 309–28.

LEWONTIN, R. C. (1973). Population genetics. *Ann. Rev. Genet.*, 7, pp. 1–18.

LEWONTIN, R. C. (1974). *The Genetic Basis of Evolutionary Change*. Columbia University Press, New York, N.Y.: xiii + 346 pp., illustr.

LEWONTIN, R. C. & HUBBY, J. L. (1966). A molecular approach to the study of genic heterozygosity in natural populations, II: Amount of variation and degree of heterozygosity in natural populations of *Drosophila pseudoobscura*. *Genetics*, 54, pp. 595–609.

LI, F. H. F., NEEL, J. V. & ROTHMAN, E. D. (1978). A second study of the survival of a neutral mutant in a simulated Amerindian population. *Am. Nat.*, 112, pp. 83–96.

LIVINGSTONE, F. B. (1969). The founder effect and deleterious genes. *Am. J. Phys. Anthropol.*, 30, pp. 55–60.

LOVEJOY, T. E. (1978). Genetic aspects of dwindling populations; a review. Pp. 275–80 in *Endangered Birds* (Ed. S. A. Temple). University of Wisconsin Press, Madison, Wisconsin: xxiii + 466 pp., illustr.

MACARTHUR, R. H. & WILSON, E. O. (1967). *The Theory of Island Biogeography*. Princeton University Press, Princeton, N.J.: 203 pp., illustr.

MANLOVE, M. N., SMITH, M. H., HILLESTAD, H. O., FULLER, S. E., JOHNS, P. E. & STRANEY, D. O. (1976). Genetic subdivision in a herd of White-tailed Deer as demonstrated by spatial shifts in gene frequencies. *Proc. Ann. Conf. Southeast Assoc. Game Fish Comm.*, pp. 487–92.

MAYR, E. (1954). Change of genetic environment and evolution. Pp. 157–80 in *Evolution as a Process* (Ed. J. Huxley, A. C. Hardy & E. B. Ford). Allen & Unwin, London, U.K.: 367 pp., illustr.

MAYR, E. (1963). *Animal Species and Evolution*. Oxford University Press, London, U.K.: xiv + 797 pp., illustr.

MILLER, R. I. (1978). Applying island biogeographic theory to an East African reserve. *Environmental Conservation*, 5(3), pp. 191–6, illustr.

NEEL, J. V. & WARD, R. W. (1970). Village and tribal genetic distances among American Indians, and the possible implications for human evolution. *Proc. Nat. Acad. Sci. USA*, 65, pp. 323–30.

NEI, M. (1972). Genetic distance between populations. *Am. Nat.*, 106, pp. 283–92.

NEI, M., MARUYAMA, T. & CHAKRABORTY, R. (1975). The bottleneck effect and genetic variability in populations. *Evolution*, 29, pp. 1–10.

NOZAWA, K., SHOTAKE, T. & OKURA, Y. (1975). Blood protein polymorphisms and population structure of the Japanese Macaque, *Macaca fuscata fuscata*. Pp. 225–41 in *Isozymes IV: Genetics and Evolution* (Ed. C. L. Maekert). Academic Press, New York, N.Y.: xxi + 965 pp., illustr.

PFINGSTEN, R. A. & WALKER, C. F. (1978). Some nearly all-black populations of *Plethodon cinereus* (Amphibia, Urodela, Plethodontidae) in northern Ohio. *J. Herpetol.*, 12 (2), pp. 162–7.

PINDER, N. J. & BARKHAM, J. P. (1978). An assessment of the contribution of captive breeding to the conservation of rare mammals. *Biol. Conserv.*, 13, pp. 187–245, 7 figs.

RALLS, K., BRUGGER, K. & GLICK, A. (MS.). Inbreeding depression in a herd of captive Dorcas Gazelle (*Gazella dorcas*). Unpublished manuscript.

BLM_0057905

*Environmental Conservation*

RASMUSSEN, D. I. (1970). Biochemical polymorphisms and genetic structure in populations of *Peromyscus*. Pp. 335–49 in *Variation in Mammal Populations* (Ed. J. R. Berry & H. N. Southern). Academic Press, London, U.K.: xvi + 403 pp., illustr.

REES, W. A. (1978). Do the dams spell disaster for the Kafue Lechwe? *Oryx*, 14 (3), pp. 231–5.

SCHMITT, L. H. (1978). Genetic variation in isolated populations of the Australian Bushrat, *Rattus fuscipes*. *Evolution*, 32 (1), pp. 1–14.

SCHULL, W. J., NAGANO, H., YAMAMOTO, M. & KOMATSU, I. (1970). The effect of parental consanguinity and inbreeding in Hirado, Japan, I: Stillbirths and pre-reproductive mortality. *Am. J. Hum. Genet.*, 22, pp. 239–62.

SCHULL, W. J. & NEEL, J. V. (1965). *The Effects of Inbreeding on Japanese Children.* Harper & Row, New York, N.Y.: xii + 419 pp., illustr.

SCHULL, W. J. & NEEL, J. V. (1966). Some further observations on the effects of inbreeding on mortality in Kure, Japan. *Am. J. Hum. Genet.*, 18, pp. 144–52.

SELANDER, R. K. (1970a). Biochemical polymorphism in populations of the House Mouse and Old Field Mouse. Pp. 73–91 in *Variation in Mammal Populations* (Ed. R. J. Berry & H. N. Southern). Academic Press, London, U.K.: xvi + 403 pp., illustr.

SELANDER, R. K. (1970b). Behavior and genetic variation in natural populations. *Am. Zool.*, 10, pp. 53–66.

SMITH, M. H., HILLESTAD, H. O., MANLOVE, M. N. & MARCHINTON, R. L. (1976). Use of population genetics data for the management of fish and wildlife populations. *Trans. 41st N. Am. Wildl. Nat. Res. Conf.*, pp. 119–23.

SMITH, M. H., MANLOVE, M. N., & JOULE, J. (1978). Spatial and temporal dynamics of the genetic organization of small mammal populations. Pp. 99–113 in *Populations of Small Mammals Under Natural Conditions.* Pymatuning Laboratory of Ecology Special Publication No. 5, 237 pp.

SOUTHWOOD, T. R. E. (1976). Bionomic strategies and population parameters. Pp. 26–48 in *Theoretical Ecology: Principles and Applications* (Ed. R. M. May). Blackwell Scientific Publications, Oxford, U.K.: viii + 317 pp., illustr.

SOUTHWOOD, T. R. E., MAY, R. M., HASSELL, M. P. & CONWAY, G. R. (1974). Ecological strategies and population parameters. *Am. Nat.*, 108, pp. 791–804.

SPIELMAN, R. S., NEEL, J. V. & LI, F. H. F. (1977). Inbreeding estimation from population data: models, procedures, and implications. *Genetics*, 85, pp. 355–71.

SPIESS, E. B. (1977). *Genes in Populations.* Wiley-Interscience, New York, N.Y.: xi + 780 pp., illustr.

TERBORGH, J. (1974). Preservation of natural diversity: the problem of extinction-prone species. *BioScience*, 24 (12), pp. 715–22.

THORNTON, I. W. B. (1978). White tiger genetics—further evidence. *J. Zool.*, 185, pp. 389–94.

VIDA, G. (1978). Genetic diversity and environmental future. *Environmental Conservation*, 4(2), pp. 127–32.

WEBSTER, T. P., SELANDER, R. K. & YANG, S. Y. (1972). Genetic variability and similarity in the *Anolis* lizards of Bimini. *Evolution*, 26, pp. 523–35.

WRIGHT, S. (1931). Evolution in mendelian populations. *Genetics*, 16, pp. 97–159.

WRIGHT, S. (1943). Isolation by distance. *Genetics*, 28, pp. 114–38.

WRIGHT, S. (1948). On the roles of directed and random changes in gene frequency in the genetics of populations. *Evolution*, 2, pp. 279–94.

WRIGHT, S. (1951). The genetical structure of populations. *Ann. Eugen.*, 15, pp. 323–54.

WRIGHT, S. (1965). The interpretation of population structure by F-statistics with special regard to the systems of mating. *Evolution*, 19, pp. 395–420.

## WWF Signs Agreement With China

The World Wildlife Fund announced recently that it has reached an agreement for cooperation in conservation with the People's Republic of China. The agreement calls for the immediate establishment of a WWF-China Committee of six members—three from WWF International and three from the recently-formed Association for Environmental Sciences of the People's Republic of China. The WWF-China Committee will coordinate links between conservation organizations and authorities in China and WWF world-wide contacts. It will initiate high-priority projects in China and will coordinate action for their implementation.

The agreement was signed by the Vice-Director of the Environment Protection Office of the Chinese State Council, Mr Chu-ge Ping, and the Chairman of WWF International, Sir Peter Scott, who described it as a 'truly historic occasion for world conservation'. Moreover, under new environmental laws passed recently in Beijing (Peking), environmental impact assessment studies are now a compulsory component of all future development planning in China, while two other key conservation decisions by the Chinese Government are as follows:

1. China has agreed to become a State Member of the International Union for Conservation of Nature and Natural Resources (IUCN), the major scientific arm of world conservation, with over 50 sovereign State Members included in its total membership of 450 States, government agencies, and non-governmental organizations from over 100 Nations. IUCN works closely with WWF and [late in 1979 the two organizations moved together into newly-acquired, shared

international headquarters near Geneva—as already indicated in *Environmental Conservation* (Vol. 6, No. 2, p. 110, Summer 1979). Their address is now as given below].

2. China has agreed immediately to accede to the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). This move is of particular significance as China is one of the major trading Nations in wild plant and animal products.

The Director-General of WWF International said the fact that China had made these commitments and was about to assume a leadership role in conservation may well be considered the most significant single development in conservation since the United Nations Conference on the Human Environment in Stockholm in 1972: 'China, with almost a quarter of the world's population, is facing up to problems which are of crucial importance to Man everywhere in his continuing efforts to achieve a harmonious balance with Nature. This is going to be a two-way street with a full and continuing exchange of information. IUCN/WWF have developed conservation techniques through their work in many countries...., and, by the same token, we have a great deal to learn from the successful conservation measures which have been developed in the People's Republic of China.'

David Mitchell, *Director of Public Affairs*
*World Wildlife Fund*
*Avenue du Mont Blanc*
*1196 Gland*
*Switzerland.*



Southwestern Fishes and the Enigma of "Endangered Species"
Author(s): W. L. Minckley and James E. Deacon
Source: *Science*, New Series, Vol. 159, No. 3822 (Mar. 29, 1968), pp. 1424-1432
Published by: American Association for the Advancement of Science
Stable URL: http://www.jstor.org/stable/1724004
Accessed: 18/05/2010 22:43

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp. JSTOR's Terms and Conditions of Use provides, in part, that unless
you have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and you
may use content in the JSTOR archive only for your personal, non-commercial use.

Please contact the publisher regarding any further use of this work. Publisher contact information may be obtained at
http://www.jstor.org/action/showPublisher?publisherCode=aaas.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or printed
page of such transmission.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of
content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms
of scholarship. For more information about JSTOR, please contact support@jstor.org.



*American Association for the Advancement of Science* is collaborating with JSTOR to digitize, preserve and
extend access to *Science.*

http://www.jstor.org

# Southwestern Fishes and the Enigma of "Endangered Species"

Man's invasion of deserts creates problems for native animals, especially for freshwater fishes.

W. L. Minckley and James E. Deacon

Increasing public interest in man's pressure on the world's biota is evident from the number of agencies now actively involved in attempts to conserve what remains. These range from small, private conservation clubs to large established groups such as The Nature Conservancy and the International Union for the Conservation of Nature and Natural Resources. Activities of some organizations have been complemented by action on the part of some state and federal departments. For example, in January 1967 the Nevada Game and Fish Commission accepted responsibility for preserving the unique, endemic fishes of that state, and acted to protect habitats of a number of forms, and in December 1967 California initiated similar action (1). The U.S. Bureau of Sport Fisheries and Wildlife has defined rare and endangered species, and has begun to catalog them (2). A laboratory for studying and preserving such organisms is established at the Bureau's Patuxent Wildlife Center in Maryland.

Concern for natural environments has therefore spread from individuals through state, local, and federal governments, to become international in scope; with such a diversity of interest, it is not surprising that there are some problems. Emotion and lack of understanding often obscure the picture, and these factors, coupled with gross lack of basic biological information on many species, promote confusion and conflict. In this article we outline some of our ideas on the problem of "endangered species," discussing certain freshwater fishes of

Dr. Minckley is assistant professor in the department of zoology, Arizona State University, Tempe; Dr. Deacon is associate professor in the department of biological sciences and a staff member of the Desert Research Institute, Nevada Southern University, Las Vegas.

the Southwest as examples. We do not aspire to solve problems or smooth conflicts—perhaps we shall confuse the issues for some. If so, we hope the confusion leads to constructive inquiry.

## Kinds of Species

In considering "endangered species" one is immediately confronted with a need to understand, and to be able to explain, diverse abundances and degrees of dispersion. Except for domesticated animals, not considered here, the only objective definition of "endangered" must be one given in terms of an organism's ability to maintain its populations in nature. If the organism is to accomplish this, suitable habitat must be continuously available.

Recognizing some subjectivity and overlap, we divide organisms into four broad categories with respect to habitat needs:

1) Species having habitats produced by or changed by man, which have responded to man's influence by extending their range and abundance.

2) Organisms which have not responded to man's influence and which inhabit large geographic areas and are at present common.

3) Animals which require large, special habitats.

4) Species living in small, unique habitats as relicts or isolated endemics.

Category 1 is irrelevent to our discussion, except where introduced or invading forms are detrimental to indigenous species.

Category 2 likewise needs little discussion. This category includes animals, tolerant of environmental extremes, which occupy broad spectra of available habitats in their native ranges. Influ-

ences of man on animals of category 2 are fairly direct, and decreases in gross abundance (as opposed to decreases in number per unit area of suitable habitat) must already have occurred in most species. However, because of the wide ecological tolerances of these species, modifications of habitat must be extensive to extirpate them. Even if local decimation occurs, their broad, general distributions insure against extinction. There may in the future be cause for concern for animals of this category, but at present those of other categories bear far greater pressure.

Animals of category 3 are intimately dependent on some major feature or features of their environment. This dependence automatically places them in an untenable position if the feature they need is also needed by, or modified by, man. A familiar example is the American bison, which man actively eliminated in the natural state, converting its grasslands for agriculture and for grazing herds of domestic meat-producing animals. Bison now are essentially domesticated and are common, but for a few years they were certainly endangered. A number of other spectacular species are known, even by laymen, to be endangered. Large amounts of money and hundreds of hours of time are spent in perpetuating these forms, especially if they are of commercial, sporting, or esthetic importance.

Many fishes are included in category 3. In fresh waters, those kinds that depend on, or move through, large, strongly flowing rivers are especially noteworthy. No species of Pacific salmon (genus *Oncorhynchus*) is immediately endangered, yet certain runs of these fishes have declined or disappeared because of man-made obstruction of rivers or modifications of spawning grounds; such phenomena are well documented. Similar effects are known, but less well substantiated, in a number of "big-river" fishes of North America. More subtle, but perhaps even more important, are changes in the quality of water, induced by impoundment. Siltation behind dams, concomitant reductions in silt loads of rivers, increased penetration of light, changes in temperature relations—all contribute to form a new habitat, which elicits faunal change. The channelization of rivers often has opposite effects and modifies riparian habitats drastically (3). In the American Southwest, complete drying of streams or of riparian habitats may destroy whole faunas. In all instances, faunal shifts that occur must,

BLM_0057908

by definition, involve relative changes in abundance. Some species may be eliminated, others may be reduced in numbers, and some may be benefited.

Animals in category 4 are the easiest to define, simply because of the generally small, unique habitats in which they live. Such habitats often lack biological diversity. Minor changes may therefore effect major fluctuations in species abundance. Because of its isolation, an island is an especially likely site for such a catastrophe; indigenous organisms are few, and the system is ecologically unsaturated. Aggressive exotic species that travel with man have, when successfully established, a profound and usually detrimental influence. This was exemplified by the rapid destruction of a major part of the isolated avifauna on the Hawaiian Archipelago in the late 1800's and early 1900's (5). In most respects, desert springs are similarly isolated, insofar as many aquatic animals are concerned—often even more so than oceanic islands (6). Series of springs in desert regions form aquatic archipelagos that differ from their oceanic analogs in that they often contain organisms that are relicts of past ages, rather than organisms resulting from chance invasion and subsequent differentiation. The restricted and ecologically simplified nature of these habitats leaves them especially susceptible to faunal destruction, especially when the springs are located in areas of rapid population growth, where the demand for water exceeds the supply.

## Status of Selected Fishes

Faunal depletion in aquatic habitats of the American Southwest is the simple rule. Much surface water is directly removed for use by man. Most of the remaining natural waters are highly modified, physicochemically or biologically. Because of these factors, big-river fishes (category 3) present a special, pressing problem in the region. Table 1 illustrates the gross changes that have occurred in the fish fauna of a major stream in Arizona, the Salt River, near its downstream end at Tempe (Fig. 1). Extirpation of a major part of the fauna between 1890 and 1926 is evident, corresponding to early modifications of the stream by Caucasian man and impoundment of Roosevelt Lake on the river in 1910. A chain of impoundments was then progressively created on the Salt River between Tempe and Roosevelt. The Verde River, a major confluent of

the Salt, maintained some water in the channel at Tempe for a while. Bartlett Reservoir on the Verde was closed in 1939, however, and this, in combination with construction of another dam, resulted in almost total desiccation of the channel of the Salt River by the late 1950's (7). Only subsurface percolation of water, mostly from underflow of municipal waste waters, maintained isolated fish habitats along the nearly dry stream. Such habitats persist today. Introduced fishes became increasingly established after 1926, and extirpation

of additional native fishes quickly followed.

All the species that occupied the Salt River at Tempe in 1890 exist today somewhere in the Colorado River basin. The variation in their success in maintaining populations is, however, great; some species remain abundant, others are reduced in number, and a few are on the verge of extinction. This variation illustrates some of the problems involved in the study and definition of "endangered species."

Two large species especially relevant



Fig. 1. Sketch map of the Colorado River basin, southwestern United States, showing rivers and localities mentioned in the text. (1) Aravaca Creek; (2) Bartlett Dam; (3) Camp Verde, Arizona; (4) Coolidge Dam; (5) Dinosaur National Monument; (6) Dome, Arizona; (7) Fairbank and Tombstone, Arizona; (8) Flaming Gorge Dam; (9) Ft. Thomas, Arizona; (10) Frisco Hot Spring; (11) Gila City (= Gila Bend), Arizona; (12) Glen Canyon Dam and Lee's Ferry, Arizona; (13) Grand Canyon; (14) Grand Falls; (15) Lake Havasu; (16) Lake Mead; (17) Lake Mojave; (18) Martinez Lake; (19) Navajo Dam; (20) Ouray, Utah; (21) Phoenix, Arizona; (22) Roosevelt Lake and Roosevelt, Arizona; (23) Safford, Arizona; (24) Salt River Canyon; (25) Saguaro Lake; (26) St. George, Utah; (27) Tempe, Arizona; (28) Yuma, Arizona.

BLM_0057909

to this discussion are the Colorado River squawfish, *Ptychocheilus lucius*, and the humpback sucker, *Xyrauchen texanus*. The status of these fishes above Grand Canyon, particularly in the Green River, has been outlined by Vanicek (*8*). Both species were effectively eliminated from about 250 miles (400 kilometers) of the mainstream and 250 miles of tributaries of the Green River above the Flaming Gorge Dam site by fish-control operations in 1962, some kill being observed downstream as far as Dinosaur National Monument (*9*). Neither species is now found above the dam, or in the 65-mile stretch of cold tail-waters between Flaming Gorge Dam and the mouth of the Yampa River in Dinosaur National Monument. Both squawfish and humpback sucker, however, are common in the Green River between Echo Park (Yampa River) and Ouray, Utah. Koster (*10*) reported adult squawfish (and possibly humpback suckers) from the San Juan River, in New Mexico, in 1959. He pointed out, however, that the segment of river from which the fish were obtained was soon to be flooded by the construction of Navajo Dam. Squawfish ran to the base of Grand Falls on the Little Colorado River in years past (*11*), but that area is now essentially dry. We have seen, or heard of, two adult or subadult squawfish taken from the Colorado River between Glen Canyon Dam and Lee's Ferry in the period 1962–66. No humpback suckers have been seen in that segment of the river, but one hybrid, *Xyrauchen texanus* × *Catostomus latipinnis*, was taken below Glen Canyon in 1966 [such hybrids have previously been reported by Hubbs and Miller (*12*)]. On the basis of these data and of a general account by Sigler and Miller (*13*), it appears that both squawfish and humpback suckers are persisting above, and in, Grand Canyon. We leave further documentation of their status in that area to others.

For the region below Grand Canyon our data are specific. Colorado River squawfish were abundant at Yuma in the early 1900's, and in the lower Gila River near Dome in 1920 (*4*). They persisted in the lower Colorado mainstream until the 1940's (*14*), but since 1950 they have become increasingly uncommon. We have heard of only two specimens from the lower Colorado in the period 1962–67.

In historic times, squawfish lived in the Gila River mainstream as far east as Ft. Thomas, in the San Pedro River

at least to Fairbank (*15*), and in the Verde River to Camp Verde (*16*), and presumably they were present throughout the Salt River Canyon and above it (*4, 17*). We have collected intensively in the Gila River basin since 1963 and can attest to the virtual, and perhaps actual, extinction of both squawfish and humpback sucker there. The headwaters of the Gila River were blocked by Coolidge Dam in 1929 (*7*); the river is now a dry wash throughout most of its lower course. The formerly large San Pedro River rarely flows in its lower part, and is a small creek near its headwaters. The Verde and Salt rivers are effectively impounded, and the upper Verde has diminished flow and is entrenched in its floodplain (*16*). Only the Salt River, in its central canyon, seems a suitable habitat for either squawfish or humpback sucker. No adult squawfish has been taken from the Roosevelt area on the Salt River since 1937 (*4*). Dammann (see *17*) saw two adults taken in the Salt River Canyon in 1948, however, and Miller (*4*) caught two young squawfish near the same locality in 1950. Branson *et al.* (*18*) reported seven juvenile specimens seined in the canyon in 1959. We and other workers known to us have failed to obtain any squawfish or humpback suckers since 1963, during intensive studies of that area, and John K. Andersen (*19*) of the U.S. Bureau of Sport Fisheries and Wildlife, who has worked in the canyon for the past few years, has not taken either of these fishes in his sampling program, or seen either in fishermen's creels.

The habitats of humpback suckers and squawfish are similar, though the suckers are more likely to frequent marshes, lakes, and quieter parts of rivers. Humpback suckers have been less commonly reported than squawfish, perhaps because humpback are less easily taken by conventional fishing methods. The recent status of the species in part of the upper Colorado is given by Vanicek (*8*). Below Grand Canyon it appears to be maintaining a fairly constant abundance. Norman Wood (*20*) of the Nevada Game and Fish Commission has found no changes in the numbers of humpback observed in lakes Mead and Mojave over the last 15 years. However, his conclusion is based on casual observations made during fish-population census, and no actual data are available. Spawning aggregations of this species were observed several times in the lakes (*21*), most recently in March 1967 in a shallow

cove of Lake Mojave (*20*). The sucker also persists farther downstream, in Lake Havasu and below, perhaps as far as Martinez Lake (where, according to local testimony, one was seen in 1966), but it is becoming increasingly rare.

The upstream limit of range of humpback suckers in the Gila River basin was probably similar to that of squawfish. The suckers were abundant enough to be marketed in Tombstone, as "buffalo fish," prior to the 1880's (*4, 15*); presumably these specimens were caught in the adjacent San Pedro River. We know of no records of humpback suckers from the Gila River mainstream above Phoenix, or from the Verde River, but large populations formerly were present in the Salt River. According to Hubbs and Miller (*12*), the fish was common near Roosevelt, Arizona, prior to the closure of Roosevelt Dam. In 1926, many suckers were seined in Roosevelt Lake and in Tonto Creek upstream from the lake, but none is now found in either area (*22*). The large populations persisted until the 1950's in lakes downstream from Roosevelt; commercial fishermen took 6 tons of humpback from Saguaro Lake in 1949, but none was found when the lake was drained in 1966 (*22*).

We point out again that both these fishes appear to be maintaining populations in some areas of the Colorado River basin, yet the relatively well-documented decline of both in the Gila River basin is instructive, and may foreshadow their extinction elsewhere. Large fishes like squawfish and humpback sucker have long life expectancies, and the presence of large adults may not indicate a "healthy" population. The large average size of humpback suckers in the Salt River impoundments in 1949 [some weighed more than 14 pounds (6 kilograms) and were more than 30 inches (75 centimeters) long (*12*)] may have foreshadowed their imminent decline through lack of reproductive success. Despite observations of the spawning of humpback in the lower Colorado River lakes, no specimen shorter than about 15 inches has been caught in recent years (*20–22*).

One can hardly say that such fishes are "maintaining their populations," and only long-range trends are available as a basis for estimating their status. There are few basic data available on the physiological, ecological, or behavioral requirements for their continued reproductive success. It is easy to say that such big-river fishes disappear as a

BLM_0057910

result of impoundment, the implication being that the presence of a dam is directly responsible. Yet these fishes are becoming extirpated in areas, like the Salt River Canyon, where such modifications are yet to be made. Our lack of information on species requirements for reproductive success and on such matters as the effects of introduced fishes on native species is discouraging.

Another kind of big-river fish—the small, streamlined woundfin, *Plagopterus argentissimus*, adapted to life in sandy, swift, turbid, downstream parts of the lower Colorado basin—occurred in the Salt River at Tempe (Table 1) and in the Gila River at Yuma, Dome, and Gila City, in the period 1890–95 (4, 23). Elsewhere in the system this species was not recorded by early (or later) collectors. The last reproducing population of the monotypic genus *Plagopterus* now lives in the lower Virgin River of southwest Utah, northwest Arizona, and southeast Nevada. A few stragglers have been caught in the lower Moapa River (Nevada) in recent years (24).

Plans by the U.S. Bureau of Reclama-

tion to construct a dam on the lower Virgin River 8 miles above St. George, Utah, would affect about 80 of the approximately 90 miles of river habitat suitable for this species. Planning calls for flow in the Virgin River downstream to be maintained only by return irrigation flow and springs in and below "the narrows," about 12 miles below St. George (25). The Bureau estimates that, downstream from the proposed dam, turbidity will decrease, salinity will increase, and flow in the river will be equalized. Equalization of flow means that, on the average, flow will be decreased in every month, but the decrease will be less in the summer than in the winter. Assuming that the Virgin River Dam is funded and constructed and that predictions of the downstream effects are borne out, we are still unable to confidently predict what will happen to *Plagopterus*. We do know, however, that *Plagopterus* disappeared from the Gila River early in this century, presumably because of the first man-induced changes; that despite its ability to invade the somewhat smaller Moapa River it

has not become established there; and that it is fulfilling its life cycle only in the lower Virgin River. These facts suggest that any change in river condition is likely to be detrimental. Such change should be avoided until some attempt has been made to define habitat requirements for the species.

The Gila spinedace, *Meda fulgida*, is endemic in the Gila River basin, requires another kind of habitat, and demonstrates yet another type of sensitivity to man's activities. The spinedace frequents moderately swift currents flowing over gravel bottoms at or near the lower ends of riffles, and is midwater in habit (23, 26). In this respect it resembles any number of small cyprinids of more eastern drainages. At one time it occurred throughout the upper Gila River basin (Fig. 2B). Many streams in which it formerly lived still flow strongly, and the habitats seem totally suitable for its continued life, yet in recent years it has not been taken anywhere in the Verde River drainage, where it was abundant in the past. The aggressive, introduced red shiner,

Table 1. Fishes recorded from the Salt River, Maricopa County, Arizona, in the city of Tempe, in the period 1890–1967. Dashed lines span the period during which a species probably inhabited this segment of the stream; (O) occurrences documented by specimens in museums or recorded in the literature; (X) probable occurrence of a species at any given time, on the basis of collections made before that time or in other parts of the drainage, both upstream and downstream from Tempe.

| Species | Year of collection or probable occurrence | | | |
|---|---|---|---|---|
| | 1900 | 1920 | 1940 | 1960 |
| *Native species* | | | | |
| Gila elegans | O---- | | | |
| Meda fulgida | O---- | | | |
| Plagopterus argentissimus | O---- | | | |
| Ptychocheilus lucius | X---- | | | |
| Rhinichthys osculus | O---- | | | |
| Catostomus latipinnis | O---- | | | |
| Xyrauchen texanus | O---- | | | |
| Agosia chrysogaster | · X------------------------------O---- | | | |
| Gila intermedia | X------------------------------O---- | | | |
| Gila robusta | X------------------------------O---- | | | |
| Poeciliopsis occidentalis | O------------------------------O---- | | | |
| Cyprinodon macularius | O------------------------------O--------X--------O---- | | | |
| Catostomus insignis | O------------------------------X--------X--------O------O-- | | | |
| Pantosteus clarki | O------------------------------X--------X--------O------O-- | | | |
| *Introduced species* | | | | |
| Gambusia affinis | ----O--------O------O-- | | | |
| Lepomis cyanellus | ----O------X--------O------O-- | | | |
| Cyprinus carpio | ----O--------X--------O-- | | | |
| Ictalurus melas | ----O--------O------O-- | | | |
| Lepomis macrochirus | ----O--------X--------O------O-- | | | |
| Pomoxis nigromaculatus | ----O--------X--------X-- | | | |
| Poecilia latipinna | ---O------O-- | | | |
| Micropterus salmoides | ---O------O-- | | | |
| Dorosoma petenense | ---O-- | | | |
| Carassius auratus | ---O-- | | | |
| Notemigonus crysoleucus * | ---O-- | | | |
| Notropis lutrensis | ---O-- | | | |
| Pimephales promelas * | ---O-- | | | |
| Ictalurus natalis | ---O-- | | | |
| Ictalurus punctatus | ---O-- | | | |
| Lebistes reticulatus * | ---O-- | | | |
| Poecilia mexicana * | ---O-- | | | |
| Xiphophorus variatus * | ---O-- | | | |
| Lepomis microlophus | ---O-- | | | |
| Tilapia mossambica * | ---O-- | | | |

* These species were taken prior to severe flooding in the Salt River channel at Tempe in the winter of 1965–66, but not subsequently.

BLM_0057911

*Notropis lutrensis,* has seemingly replaced it throughout that system (Fig. 2A). The red shiner spreads rapidly, naturally and from fishermen's bait buckets. In view of this, and of proposals to build the Charleston Dam on the upper San Pedro River and the Hooker Dam on the Gila River in New Mexico, the outlook for *Meda* appears bleak.

The Gila topminnow, *Poeciliopsis occidentalis,* provides another example of the influence of an exotic fish on a native species. The Gila topminnow also was at Tempe in 1890, where it undoubtedly lived in marshes along the stream rather than in the channel itself. Records show that this fish ranged from a high-elevation habitat adjacent to Frisco Hot Spring in western New Mexico (*27*) to an area near Dome, Arizona (*28*). These, plus records from most of the central and southern parts of the Gila basin (Fig. 3), leave no doubt that the topminnow once lived throughout the Gila drainage, and perhaps in suitable habitats along the lower Colorado as well. Its decline was rapid. Gila topminnows were considered by Hubbs and Miller (*28*) to be "one of the commonest fishes in the southern part of the Colorado River drainage." Today the fish persists only in one spring area in Santa Cruz County, Arizona.

The diminution in the range of this fish is attributable in part to desiccation of habitat, especially in places like the lower Gila River. Arroyo cutting in the 1880's (*4, 29*), must have destroyed much of its preferred quiet-water habitat even before man began to use the water. The introduction and spread of the mosquito fish, *Gambusia affinis,* throughout most of the basin over the last 40 years appears to have been the most important factor, however, in the overall decline of the native fish. The aggressive *Gambusia* has played a part in the decline of a number of fishes in the West and in the destruction of populations of fishes in other areas (*30*). In the best-documented examples of replacement of *Poeciliopsis* by *Gambusia,* the sequence is rapid. In the formerly fishless Arivaca Creek, in Arizona, topminnows were introduced in 1936. In 1957 they were extremely common, but, in 1959, mosquito fish of unknown origin had totally replaced them (*4*). The sequence was similar in an artesian-spring area near Safford, Arizona. Gila topminnows abounded in canals and ponds of that area in 1962. In 1963, specimens of *Gambusia* were taken in the area, and in the same pond as *Poeciliopsis.* In our intensive survey, only the introduced mosquito fish was found in 1966. Restriction to a single, isolated drainage seems a precarious position for the Gila topminnow; this formerly abundant, endemic species now qualifies for category 4, even though it was originally a category-3 species.

In discussing fishes in category 4, we use as examples species naturally isolated in aquatic systems of closed basins, or isolated, by habitat preference or physiological attributes, or both, to springs or springlike environments. Alterations induced by man, a major cause of declining populations in categories 2 through 4, are particularly important to fishes in category 4. Minor changes in a small spring, for example, may influence the entire population of a species. The acute susceptibility of such forms to catastrophe is evident in the recent compilations of extinct fishes of the United States (*2, 4*); three of the six fishes listed were in restricted waters in Nevada, and a fourth, *Cyprinodon bovinus,* was in an isolated spring in Texas.

*Empetrichthys merriami,* the Ash Meadows killifish, one of the two known species of the cyprinodont genus



Fig. 2. (A) Present distribution of the introduced red shiner in the Gila River basin. (B) Present and past distribution of the native Gila spinedace in the Gila River basin. Open circles are localities of former occurrence where the present absence of the fish has been confirmed; half-solid circles are localities that we have not reexamined; solid circles are localities where the spinedace persists.

BLM_0057912

*Empetrichthys,* is extinct. Three distinct subspecies of the other known species of the genus, *E. latos,* the Pahrump killifish, have been described from three isolated springs of Pahrump Valley, Nevada. One of the springs (Pahrump Spring) failed in 1958, presumably because of lowering of the water table by pumping for irrigation. A second spring (Raycraft Spring) was filled by a rancher in an attempt at mosquito control. This spring would probably have gone dry from the same cause as Pahrump Spring had it not been filled. The third spring, Manse Spring, which supports the typical subspecies *E. latos latos,* remains, but goldfish (*Carassius auratus*) were recently introduced (*31*). Thus, two of the original three known stocks of *E. latos* are extinct, and the third is subjected to competition from an exotic species. The species is maintaining itself at present. In July 1967 an attempt was made to remove the fish from the spring and count the entire population; population size was estimated to be about 1300. Most of the goldfish were removed at this time.

This species appears capable of maintaining its population in the face of some competition, but obviously cannot withstand the virtually total destruction of its habitat. Table 2 gives data that in part explain the destruction of habitat and the extinction of the two subspecies of *Empetrichthys latos.* There is clearly a relationship between increased cultivation, number of wells, volume of water used for irrigation, and lowering of the water table. The first wells were drilled in 1910; by 1916, flow at Manse Spring was reduced to about half its original volume. Water use nearly doubled during the period 1946–59, and increased by a factor of 7 to 8 between the periods 1937–40 and 1940–46. Such large increases in pumpage inevitably result in failure of surface waters. The estimated annual recharge in Pahrump Valley is 22,100 acre-feet (27 million cubic meters) (*32*). Withdrawal of nearly 41,000 acre-feet annually virtually guarantees continued decline of the water table, eventual failure of Manse Spring, and extinction of the last population of the genus *Empetrichthys.* If the spring flow continues to decline at its present rate (since 1959 the mean annual rate of flow has shown a decline of 0.14 cubic foot per second), Manse Spring should fail in 10 to 11 years. The trend of increased pumpage in Pahrump Valley suggests that the rate of decline of spring flow will accelerate and that elimination of

Table 2. Water discharge and utilization in Pahrump Valley, Nye and Clark counties, Nevada, in the period 1875–1967. Data for 1875 are from Malmberg (*32*); for 1916, from Waring (*41*); for the years 1917–46, from Maxey and Robinson (*42*); and for the years 1951–67, from the Nevada State Engineer (*43*).

| Year or period | Manse Spring (ft³/sec, av.) | Pahrump Spring (ft³/sec, av.) | Raycraft Spring (ft³/sec, av.) | Thousands of acres irrigated | Pumpage (in thousands of acre-feet) | Number of wells operating | Depth of water table (ft) |
|---|---|---|---|---|---|---|---|
| 1875 | 6.0 | 7.9 | | | | | |
| 1916 | 3.2 | 4.7 | 0.002 | 0.5 | 4.3 | 15 | |
| 1917–37 | | | | | 3.3–4.6 | | |
| 1937–40 | 3.1 | | | | 2.2–3.5 | | |
| 1940–46 | 3.1 | 5.5 | | | 2.2–16.3 | | |
| 1951 | 2.6 | | | | 16.1 | 39 | 37 |
| 1952 | | | | | | 39 | 30–60 |
| 1959 | 2.5 | 0.0 | 0.0 | 5.8 | 25.6 | 45 | |
| 1960 | 2.4 | | | 6.2 | 27.4 | 39 | |
| 1961 | 2.0 | | | 6.5 | 30.1 | 55 | |
| 1962 | 1.9 | | | 6.5 | 29.2 | 54 | |
| 1963 | 1.8 | | | 7.8 | 31.9 | 59 | |
| 1964 | 1.9 | | | 7.7 | 37.5 | 62 | |
| 1965 | 1.2 | | | 8.2 | 36.5 | 64 | |
| 1966 | 1.5 | | | 7.6 | 37.9 | 71 | 70–85 |
| 1967 | | | | | | | 75–84 |

the fauna may be expected in less than 10 years.

The status of the Moapa dace, *Moapa coriacea,* is less readily defined than that of *Empetrichthys.* The minnow was abundant in the headwaters of the Moapa River, Nevada, when the first collections were made in 1933 (*33*). Its abundance was apparently maintained at least until the early 1950's (*34*). In our studies, which began in 1964 (see *24, 35*), the species was found to be rare. The low population density of *Moapa* closely followed the introduction and establishment of the shortfin molly, *Poecilia mexicana,* in the river. After 2 years the population of *Moapa* suddenly became more dense. In this case there was no physical deterioration of the habitat, thus changes in habitat were obviously not a factor in either the decline or the recovery of this species. The maximum and minimum annual mean discharge over the past 25 years, measured at the approximate lower extent of the habitat suitable for *Moapa,* fall within 3.3 cubic feet (0.1 cubic meter) per second of the 25-year mean discharge (*36*). The stream flow is, therefore, remarkably stable. The major problem is alteration of the biotic habitat by the introduction



GILA RIVER BASIN,
ARIZONA, NEW MEXICO, AND SONORA

Fig. 3. Present and past distribution of the Gila topminnow in the Gila River basin; the symbols are the same as in Fig. 2.

BLM_0057913

of exotic species. The introduction of *P. mexicana* resulted in a decrease in the population density of *Moapa*, apparently through an increase in parasitism (35) and possibly through direct competitive interaction. A primary danger to *Moapa* is the possibility that additional introductions will cause another population decline from which it might not recover; such circumstances are not predictable.

The White River springfish, *Crenichthys baileyi*, presents still a different problem. This species occurs as a number of disjunct populations along the course of the Pluvial White River, in Nevada. No careful taxonomic evaluation of all populations of the species has been made, yet marked physiological differences are known, and morphological differentiation is apparent. Some populations exhibit the highest tolerance to high temperatures and to low concentrations of dissolved oxygen known in fishes (37). Some stocks of *C. baileyi*, like stocks of *Moapa*, have become depleted following the introduction of aquarium fishes. In this case, too, a major factor in the decline seems to be the original species' greater susceptibility to existing parasites in the presence of competition from exotic species, or the introduction of new parasites along with the introduced fish (35). Populations have been severely reduced—and in one instance the population became extinct—following the introduction of largemouth bass, *Micropterus salmoides*, and mollies, *Poecilia mexicana*. During the past 3 years, three springs in Nevada have been selected for comparative ecological research as "controls" because they were uncontaminated by exotic fishes. In each instance, after no more than 2 months of work, exotic species suddenly appeared. This further illustrates the magnitude of the problem.

It is difficult to decide which populations of a fish like *Crenichthys baileyi* are to be preserved. In many respects this fish is intermediate between categories 3 and 4. Yet, known physiological and morphological differences indicate that several populations provide an exceptionally high amount of information and that each may be scientifically important.

Numerous other examples of fishes in category 4 could be cited. The precarious status of *Gambusia gagei*, which was almost destroyed by the introduction of *G. affinis* into its warm-spring habitat in Big Bend National Park, was documented by Hubbs and Broderick (38). *Cyprinodon diabolis*, a unique species represented by no more than 700 individuals in Devil's Hole, Nevada, now is protected in Death Valley National Monument. This species has been affected, but scarcely disturbed, by man.

Some changes effected by man are not automatically detrimental to native fishes. Placement of the desert dace, *Eremichthys acros*, on the list of endangered species (2) resulted from a premature judgment concerning the impact of irrigation development (39) rather than from an objective evaluation. Subsequent work in Soldier Meadows, Nevada, indicates expansion of populations of *E. acros* into the recently constructed irrigation ditches. This species belongs to category 4, but is not endangered, both because it successfully extends its populations into habitats built by man and because several populations exist. On the other side of the slate, a reminder that a number of fishes have become extinct in recent years seems appropriate. Some are *Empetrichthys merriami*, *Lepidomeda altivelis*, *Lepidomeda mollispinis pratensis*, the Crystal Spring population of *Cyprinodon nevadensis mionectes*, the Hiko Spring population of *Crenichthys baileyi*, the Pahranagat Valley population of *Pantosteus intermedius*, *Empetrichthys latos pahrump*, and *E. l. concavus*. Exotic fishes obviously contributed to the extinction of the first six, whereas habitat destruction is clearly responsible for the extinction of the two last-named species.

## Conclusions

Declines in the populations of native fishes in the American Southwest are largely due to habitat changes associated with man's modification of various aquatic environments. Early decimation of the fauna was mainly a result of large-scale physical change, such as the diversion and impoundment of rivers and downcutting of streams in their formerly stable floodplains [that is, arroyo cutting, a possible result of a combination of man's actions and climatic phenomena (4, 29)]. More subtle physical or chemical changes, the lowering of water tables through the use of subsurface water for irrigation, eutrophication and other pollutional effects, and biological phenomena associated with the ever-increasing introduction of exotic species—all are accelerating the extirpation of remnant populations.

Present populations of most native fishes are locally dense, especially in isolated habitats occupied by fish of category 4. Given a reasonable degree of environmental stability, these fish certainly are capable of maintaining themselves. However, some species belonging to category 3 present a different problem. They have at present retreated to the most inaccessible parts of their ranges, where simple surveillance of their status is a major operation. Some of these fishes can spread rapidly when water conditions improve. Their populations may be greatly depleted in one year, or perhaps they withdraw from a major part of their possible range over a longer period, but after a few years of high precipitation and stabilized stream flow they may spread and repopulate almost all available habitats. Such a population resurgence was recently documented by Minckley and Carufel (40) for the formerly depleted Little Colorado spinedace, *Lepidomeda vittata*, in the period 1963–66, and is known for other forms.

It seems to us that many people and agencies currently involved in the study and promotion of "endangered" species are only partially realistic. This is evidenced, for example, by their concern for "peripheral" species, those represented in a given state or country by an isolated or remnant population peripheral to the main body of the gene pool. In fishes, the inclusion of the Mexican stoneroller (*Campostoma ornatum*), the Atlantic salmon (*Salmo salar*), and a number of other forms in the U.S. list of endangered species (2), even as "peripheral" species, seems unwarranted. One invariably meets opposition on suggesting that each population of a desert fish such as *Crenichthys baileyi* should be preserved. But if each isolated spring population of *C. baileyi* is not "worth saving," why then be concerned with the different river populations of *S. salar*? The distinction is apparent: *Salmo* is well known to many people and is of importance to sportsmen; *Crenichthys* is neither. We are simply dealing with an interaction of supply (meaning maintenance in nature, in this context) and demand (meaning the interest of the people concerned).

The validity of a decision as to whether or not a species is "endangered" depends on many factors. For example, working style, prior informa-

BLM_0057914

tion, thoroughness, and time available may differ greatly from collector to collector. It may be nearly impossible to seine fishes that are readily taken by means of electrofishing methods or gill nets. Data obtained in winter, when a given species retires to deep pools, may "document" its extinction, but in June the fish may swarm in shallow, more accessible places. We know three students who worked more than half a mile of stream in southern Arizona with electrofishing equipment in an attempt to catch the Yaqui chub, *Gila ditaenia;* they failed. The area they sampled was less than a fourth of a mile upstream from the canyon in which the species was abundant, and in which it remains abundant today; the stream was flowing in the area of sampling only as a result of persistent rainfall. Such errors are to be expected in any field operation, especially if specific data are not generally available.

A program of study on the more obscure "endangered" species is hampered (i) by a lack of information (information concerning the species in question and information disseminated to the public); (ii) by misinformation (or unavailability of unpublished data) largely resulting from a lack of time on the part of people in the field; and (iii) by apathy on the part of the public and of professional workers. Lack of communication, even among active scientists, may result in grievous errors. Making a collection of fishes from a desert spring may not seem a serious matter; however, if another worker is systematically sampling the already small population for a life-history study, activities of a collector unaware of this sampling could produce results that are spurious, to say the least. Errors in judgment may also cause problems. For example, an ichthyologist who may wish to eradicate exotic fishes from a spring so that the native form may be reestablished had best consider the effects of his efforts on other organisms; in preserving a fish species, a genus or higher taxon of invertebrate animal might be destroyed. Such a happening is not consistent with a successful, progressive program. Persons studying fishes are perhaps delinquent in not reviewing the endemicity and distributions of other animal groups. However, scientists working on other groups appear, with some notable exceptions, relatively unaware of changes taking place in many habitats, and have yet to become active in documenting depleted populations.

What are needed are broad, comprehensive studies geared toward realization of three major objectives. (i) thorough documentation of the past and present population status of native animals, with publication of data and wide dissemination of topical reports; (ii) accumulation of basic information on ecologic requirements of depleted animal species and, if possible, preparation of descriptive life histories for such animals; and (iii) possible laboratory study and maintenance of populations of depleted species in seminatural conditions, in case nothing can be done to maintain their habitats in nature. This laboratory maintenance is simple in some instances, especially in most fishes of our category 4, but is exceedingly complex and time-consuming in the case of larger species of category 3. After the objective of documentation is realized we will have information on depleted species that will speak for itself. We will then be in a position to project trends and consider probabilities on the basis of facts rather than observational interpretations. This documentation will lay the groundwork for study to satisfy the second objective. Populations large enough to sustain themselves under pressures of research collecting may be found, and detailed, meaningful information may be compiled. Laboratory study and maintenance (the third objective) may or may not be necessary, but the development of facilities and techniques for maintaining certain animals will insure their availability for future study and will provide substantial information in itself. A number of fishes are currently being studied under such a program, but much additional effort is needed, on fishes and on other groups as well.

The problems we have discussed are not unique to fishes, or to the American Southwest. However, they are acute in the Southwest because of the increasing population pressure on the limited aquatic environment. Most water laws, for instance, permit "beneficial" use of water without regard to the needs of wildlife. Habitat destruction is generally regarded as the vested right of the land-owner, and, if immediate economic gain can be realized, as the duty of governmental agencies. The problem of endangered species therefore is only one result of attitudes and measures which at present permit, or even demand, exploitation of resources that the environment has not the capacity to restore. Pumpage of water in Pahrump Valley

in excess of the annual recharge does not differ, in kind, from farming practices that result in the washing away of topsoil; from the use of prime farming land for building cities; from lumbering that destroys forests; and from a hundred other catastrophic practices. These practices attempt to "answer a demand," instead of recognizing the more fundamental problem—that of meeting the long-term need of a population that will ultimately be forced to restrict its use of resources so as not to exceed the carrying capacity of the environment. Possibly the most compelling reason for preserving species is the value such a program has in demonstrating the importance of restraint. An "endangered species" program is imperative, not only for the sake of the species studied but also because of what it can teach us about the possibilities for continued survival of other species, including man.

In the narrower sense, in the program discussed here we are dealing directly with the western aquatic fauna, poorly known and viewed by many people as unimportant. These animals are difficult to observe and to exhibit, and are generally considered less worthy of preservation than organisms of value to sportsmen or to industry. Native aquatic animals of the American Southwest are unique and endemic—part of an ancient, relict fauna that provides important scientific information. Changes that have occurred and are occurring are amplified and accelerated by the scarcity of water. A great natural experiment of evolution, also amplified and perhaps accelerated by isolation in desert aquatic habitats, appears about to become an exercise in extinction, if man will have it so.

## References and Notes

1. Nevada Game and Fish Commission, *Endemic Endangered Fish, Protection and Sanctuaries for* (policy statement No. 16) (1967); *Los Angeles Times* (29 December 1967).
2. U.S. Bureau of Sports Fisheries and Wildlife, *Rare and Endangered Fish and Wildlife of the United States* (Government Printing Office, Washington, D.C., 1966), and papers cited therein.
3. D. G. Frey, Ed., *Limnology in North America* (Univ. of Wisconsin Press, Madison, 1963), and papers cited therein.
4. R. R. Miller, *Papers Mich. Acad. Sci.* **46**, 365 (1961).
5. J. C. Greenway, *Extinct and Vanishing Birds of the World* (American Committee on International Wildlife Protection, New York, (1958); G. C. Munro, *Birds of Hawaii* (Tuttle, Rutland, Vt., 1960); F. Richardson and J. Bowles, *B. P. Bishop Museum Bull.* **227**, 1 (1964).
6. C. L. Hubbs, *Biologist* **22**, 61 (1940); ——— and R. R. Miller, *Utah Univ. Bull.* **38**, 17 (1948); R. R. Miller, *Univ. Mich. Museum Zool. Misc. Pub.* **68**, 1 (1948); *Amer. Museum Nat. Hist. Mag.* **58**, 447 (1949); *Evolution* **4**, 155 (1950).

BLM_0057915

7. E. Corle, *The Gila* (Univ. of Nebraska Press, Lincoln, 1951).
8. C. D. Vanicek, thesis, Utah State University, 1967.
9. R. R. Miller, *Nat. Parks Mag.* **37**, 4 (1963).
10. W. J. Koster, *Southwestern Naturalist* **5**, 174 (1960).
11. R. R. Miller, *Copeia* **1963**, 1 (1963).
12. C. L. Hubbs and R. R. Miller, *Papers Mich. Acad. Sci.* **38**, 207 (1953).
13. W. F. Sigler and R. R. Miller, *Fishes of Utah* (Utah State Game and Fish Department, Salt Lake City, 1963).
14. W. H. Dill, *Calif. Fish Game* **30**, 109 (1944); O. L. Wallis, *Trans. Amer. Fish. Soc.* **80**, 84 (1951).
15. R. R. Miller, *Papers Mich. Acad. Sci.* **40**, 125 (1955).
16. W. L. Minckley and N. T. Alger, *Plateau*, in press.
17. W. L. Minckley, in *AAAS Committee on Desert and Arid Lands Research Contrib. No. 8* (1965), p. 48.
18. B. A. Branson *et al.*, *Southwestern Naturalist* **11**, 300 (1966).
19. J. K. Andersen, personal communication.
20. N. Wood, personal communication.
21. P. A. Douglas, *Calif. Fish Game* **38**, 149 (1952).
22. Personal observations; personal communications from personnel of the Arizona Game and Fish Department.
23. R. R. Miller and C. L. Hubbs, *Univ. Mich. Museum Zool. Misc. Pub.* **115**, 1 (1960).

24. W. G. Bradley and J. E. Deacon, *Desert Res. Inst. Univ. Nevada (Las Vegas) Pre-Print No. 9* (1965), p. 1.
25. Personal communication from U.S. Bureau of Reclamation, Boulder City Office.
26. W. E. Barber and W. L. Minckley, *Southwestern Naturalist* **11**, 313 (1966).
27. W. J. Koster, *Guide to the Fishes of New Mexico* (Univ. of New Mexico Press, Albuquerque, 1957).
28. C. L. Hubbs and R. R. Miller, *Univ. Mich. Museum Zool. Occasional Paper No. 433* (1941), p. 1.
29. J. R. Hastings, *J. Arizona Acad. Sci.* **1**, 60 (1959); J. R. Hastings and R. M. Turner, *The Changing Mile* (Univ. of Arizona Press, Tucson, 1965).
30. G. S. Myers, *Tropical Fish Hobbyist* **1965**, (Jan. 1965), p. 31.
31. J. E. Deacon, C. Hubbs, B. J. Zahuranec, *Copeia* **1964**, 384 (1964).
32. G. T. Malmberg, *U.S. Geol. Surv. Water Suppl. Paper 1832* (1967), p. 1.
33. C. L. Hubbs and R. R. Miller, *Univ. Mich. Museum Zool. Occasional Paper No. 507* (1948), p. 1.
34. I. LaRivers, *Fish and Fisheries of Nevada* (Nevada Game and Fish Commission, Reno, 1962).
35. B. L. Wilson, J. E. Deacon, W. G. Bradley, *Trans. California-Nevada Sect. Wildlife Soc.* **1966**, 12 (1966).
36. T. A. Eakin, *U.S. Geol. Surv. Ground-Water Res.-Reconnaissance Ser.* **25**, 1 (1964).

37. F. B. Sumner and U. Lanham, *Biol. Bull.* **82**, 313 (1942); C. Hubbs and W. F. Hettler, *Southwestern Naturalist* **9**, 245 (1964); C. Hubbs, R. C. Baird, J. W. Gerald, *Amer. Midland Naturalist* **77**, 104 (1967); J. E. Deacon and B. L. Wilson, *Southwestern Naturalist* **12**, 31 (1967).
38. C. Hubbs and H. J. Broderick, *Southwestern Naturalist* **8**, 46 (1963).
39. D. Nyquist, thesis, University of Nevada, (1963).
40. W. L. Minckley and L. H. Carufel, *Southwestern Naturalist* **12**, 291 (1967).
41. G. A. Waring, *U.S. Geol. Surv. Water Supply Paper 450* (1920), p. 51.
42. B. Maxey and T. W. Robinson, *U.S. Geol. Surv. Water Res. Bull.* **6**, 1 (1947).
43. Personal communication from Nevada State Engineer, Reno.
44. The support of the following agencies, to one or both of us, is gratefully acknowledged: Desert Research Institute, University of Nevada; Faculty Research Committee, Arizona State University; The Nature Conservancy; Sports Fishing Institute; U.S. Bureau of Sports Fisheries and Wildlife; U.S. National Park Service; and National Science Foundation. Permits and information were issued and supplied by numerous game and fish departments. We especially thank our students and colleagues for assistance in the field and the laboratory, and Drs. C. L. Hubbs and R. R. Miller for providing many data from their early and recent research on fishes of the American Southwest.

# Population Regulation and Genetic Feedback

Evolution provides foundation for control of herbivore, parasite, and predator numbers in nature.

David Pimentel

Although within a relatively short period man has learned how to put himself into space, he still is not certain how the numbers of a single plant or animal population are naturally controlled. Aspects of this problem have been investigated since Aristotle's time, they were given important consideration in Darwin's *Origin of Species*, and yet the unknowns far outweigh the discoveries. If we knew more about natural regulation of population, we would be in a better position to devise more effective and safer means of control for important populations of plant and animal pests. We might also be better able to limit the growth of human populations, although that problem is exceedingly complex because of the social activities and nature of man.

## Population Characteristics

Before considering how populations in nature are regulated, we should review various characteristics of animals and plants—as individuals and as populations. Do populations of animals in nature fluctuate severely or are they relatively constant? Stability and constancy have been proposed as characteristics of natural populations. Speaking about birds, Lack (*1*) says, "of the species which are familiar to us in England today, most were familiar to our Victorian great-grandparents and many to our medieval ancestors; and the known changes in numbers are largely attributable to man." He continues, "All the available censuses confirm the view that, where conditions are not disturbed, birds fluctuate in numbers between very restricted limits. Thus, among the populations considered above, the highest total recorded was usually between two and six times, rarely as much as ten times, the lowest. This is a negligible range compared with what a geometric rate of increase would allow." Discussing the stability in animal populations in general, MacFadyen (*2*) writes: "it is generally agreed that the same species are usually found in the same habitats at the same seasons for many years in succession, and that they occur in numbers which are of the same order of magnitude."

Further evidence for the thesis that species populations are relatively constant is found in a study of the changes in the fauna of Ontario, Canada (*3*). When Snyder (*4*) evaluated the bird fauna, he found that, over a period of about 70 years, two species became extinct, 23 species increased in number, and six species decreased in number. This represents a total change of only 9 percent of 351 bird species found in Ontario (*5*) and agrees favorably with an 11-percent change (*6*) for 149 species of birds over a 50-year period in Finland. These data suggest that there is relative constancy in the abundance of species populations. The word "relative" must be emphasized because changes in numbers must be related to a species' real potential for fluctuations; to para-

The author is chairman of the department of entomology and limnology, Cornell University, Ithaca, New York.

BLM_0057916

78                 CALIFORNIA FISH AND GAME
          REPRINT FROM
*Calif. Fish and Game,* 68 (2) : 78-89. 1982

# TROPHIC INTERRELATIONS AMONG INTRODUCED FISHES IN THE LOWER COLORADO RIVER, SOUTHWESTERN UNITED STATES

W. L. MINCKLEY
Department of Zoology
Arizona State University
Tempe, AZ 86281

Analysis of 1,050 stomachs of 18 species of fishes from the lower Colorado River mainstream indicates a relatively simplified food web based on autochthonous detrital materials, algae, and macrophytes. Aquatic insects, clams, and crayfish eaten by larger fishes fed directly on detritus or particles filtered from the water. Threadfin shad and red shiner, both depending principally on detritus as food, were major forage for piscivores.

## INTRODUCTION

The lower Colorado River has one of the most highly modified channels in western North America. The most characteristic feature of aquatic habitats in arid zones, extreme variability in time and space, has been suppressed, and this notoriously fluctuating, formerly turbid stream now flows under essentially complete control by mainstream and tributary impoundments. Its native fishes, highly endemic but comprising only about nine species, are extirpated from the mainstream, or are rare. A new fauna, consisting of exotic species, is becoming established. So far, 44 non-native taxa have been recorded from the reach between Davis Dam and the U. S. and Mexican Boundary, 20 of which are locally or regionally abundant ( Minckley 1979, Nicola 1979). Most published data on fishes of the river consist of faunal listings ( Evermann 1931, Miller 1961, Miller and Lowe 1967, Bradley and Deacon 1967), general discussions of the fisheries (Moffett 1942, Dill 1944, Jonez *et al.* 1951, Wallis 1951, Kimsey 1958), keys for identification (Miller 1952, Winn and Miller 1954, Minckley 1971a), and numerous shorter works dealing with species introductions, and observations on distribution and ecology (reviewed by Minckley 1973 and Moyle 1976). Part of an ecological survey of the mainstream lower Colorado River, conducted from 1974 through 1976, was to identify general food relations within the fish fauna. Food habits of 18 species of fishes were studied to obtain an outline of trophic structure for the system. Edwards (1974) reported on foods of striped bass, *Morone saxatilis,* and his data are also summarized herein.

## DESCRIPTION OF THE AREA

The study area was delimited upstream by Davis Dam and below by the International Boundary. The Colorado River forms the border between Nevada and Arizona to the north, California and Arizona through much of the study reach, and Baja California Norte, Mexico, and Arizona, at the southern extreme ( Figure 1). The International Boundary lies about 120 km upstream from the Gulf of California. Historically, the only perennial tributaries entering this 453-km reach are the Gila and Bill Williams rivers. The former is now maintained below dams by return flow from irrigation and domestic wastewaters except in periods

Accepted for publication January 1981.

of unusually high runoff ( Brown, Carmony, and Turner 1978). The latter is also impounded and sometimes ceases to flow at its mouth. Local precipitation seldom exceeds 12 cm per year, summer air temperatures often rise to greater than 40°C, and winter temperatures rarely drop below freezing for more than a few hours.



FIGURE 1. Map of the lowermost Colorado River, southwestern United States, with some place names mentioned in text.

Terrain along the river ranges from precipitous cliffs, where the stream has eroded through mountain ranges, to low, broad floodplains. Slopes and terraces are stony along mountain fronts. Lower terraces and floodplains are composed of fine sands and silts.

The sparse natural vegetation of the region is classified as Sonoran desertscrub (lower Colorado River subdivision; Brown and Lowe 1980). Plant communities,

especially those of riparian zones, are highly modified by agricultural development, by alteration of stream banks and channels, and through other direct influences of early and later settlers (Ohmart, Deason, and Burke 1977).

## METHODS AND MATERIALS

An attempt was made to use fishes from throughout the reach, and from different seasons, to obtain comprehensive coverage. However, this was realized only for some of the more common species such as carp, *Cyprinus **carpio;*** red shiner, *Notropis lutrensis;* channel catfish, *Ictalurus punctatus;* largemouth bass, *Micropterus **salmoides;*** and bluegill, *Lepomis macrochirus,* where 11 to 50 individuals were studied each season. Foods of other fishes were studied in spring through autumn. All rainbow trout, ***Salmo gairdneri,*** were obtained from fishermen and from Arizona Game and Fish Department personnel near Davis Dam. Most smallmouth bass, *Micropterus dolomieui,* examined were caught by anglers near Blythe, California. Threadfin shad, *Dorosoma petenense;* flathead catfish, ***Pylodictis*** *olivaris;* yellow bullhead, *Ictalurus natalis;* sailfin molly, *Poecilia latipinna;* mosquitofish, *Gambusia affinis;* warmouth, *Chaenobryttus gulosus;* striped mullet, ***Mugil*** *cephalus* (the only native fish taken); and the mouthbrooder, *Sarotherodon mossambica,* all were from the reach below Blythe. Redear sunfish, *Lepomis microlophus;* green sunfish, *L.* ***cyanellus;*** and black crappie, *Pomoxis **nigromaculatus,*** were obtained near Parker and/or Yuma, Arizona. Specimens taken by hook and line or with various seines were sacrificed for analysis to avoid prolonged restraint and loss of food items through continuing digestion which occurs in fishes taken in gill, trammel, and hoop nets of various sizes and meshes ( Minckley 1979).

Food habits were determined by examination of stomach contents under appropriate magnifications. In species with ill-defined stomachs (***e.g.*** carp) the anterior few centimetres of digestive tract was examined. Stomachs were excised from larger fishes, after ligation of the esophagus and pyloric regions, and preserved in **10%** formalin. All stomachs were tagged for later identification. Small fishes were preserved intact in the field and their viscera removed in the laboratory.

Data were reduced as "frequency of occurrence," which tends to underestimate importance of large items and over-estimate importance of small items. However, this technique develops comparative data, expressed as percentage, among diverse species, and avoids ambiguities of assigned (estimated) "points" (Hynes 1950) or attempted reconstruction of live volumes of animals from fragments present (Ricker 1937). Stomach contents were teased apart in water and identified through use of keys of Edmondson (1959) and Usinger (1956). Reference collections were used to identify fishes and larger crustaceans.

## RESU LTS

## General Food Habits

Detritus formed the major proportion of stomach contents of threadfin shad, red shiner, mouthbrooder, sailfin molly, and striped mullet (Table 1), and was common in carp, channel catfish, and yellow bullhead. Most detritus was identifiable as fibrous particles of higher plants, typically aquatic macrophytes. A small percentage was dark, gelatinous material identical in appearance to ***gytija-***like

organic deposits along the channel and in backwaters of the river. A liberal occurrence of sand in stomachs of detritivores indicated direct feeding from the bottom. Amorphous detrital materials in stomachs of carp and channel catfish often included unicellular algae, some of which was likely recorded as phytoplankton (Table 1). The high incidence of Asiatic clams, *Corbicula fluminea,* in stomachs of these fishes, and field observation of carp feeding upon and among clams, indicates probable use of pseudofeces of the mollusk ( Prokopovich 1969) by the fishes as food. This material, bypassed by a clam when particulates exceed its capacity for ingestion, includes a large percentage of detritus, plus organisms bound in a mucoid secretion. Detritus in stomachs of sailfin molly and mouthbrooder was associated with the high frequency of occurrence of benthic (or epiphytic) algae, and in the case of the latter, with substantial amounts of higher plant tissues. Both of these fishes often grazed within beds of aquatic plants.

Although much of the algae eaten by fishes in the lower Colorado River could easily have been ingested while foraging for other items, rainbow trout contained considerable volumes of *Cladophora glomerata,* a large filamentous alga that formed a major component of organic drift observed and caught on nets near Davis Dam. Drifting algae may be taken as an innate feeding response by visually-oriented fishes such as hatchery-reared trout, or may be consumed indiscriminately by facultative planktivores such as threadfin shad and striped mullet. Some algal species that appeared to be true phytoplankters (desmids and some diatoms) were found in stomachs of the last two species (Table 1).

Zooplankton in stomachs of rainbow trout, threadfin shad, red shiner, and bluegill included cladocerans and copepods characteristics of limnetic populations in Colorado River reservoirs, presumably having been entrained through penstocks into the channel. Zooplankters in stomachs of carp, largemouth bass, green sunfish, and black crappie also included ostracods and thus included near-bottom or benthic microcrustaceans. Only trout and shad contained what might be considered more than trace amounts of zooplankton.

Benthic invertebrates were present in stomachs of essentially all fishes examined, with chironomid dipteran larvae almost universally represented. Rainbow trout from below Davis Dam ate about equal amounts of chironomid and simuliid dipteran larvae and also contained a substantial frequency of hydropsychid trichopteran larvae. Carp fed on chironomids, ephemeropteran nymphs, trichopteran larvae, and a few odonate naiads. The last three groups only occurred in stomachs of fishes from below Parker Dam. Red shiners ate chironomids, and a few ephemeropterans and trichopterans. The low frequency of occurrence of chironomids in channel catfish (5.1%) indicated little dependence on benthic insects. No other insect groups were used by channel catfish, which is surprising in light of findings in other streams ( *e.g.* Bailey and Harrison 1948). Yellow bullheads used chironomids extensively, but young flathead catfish ate only large odonates and trichopterans.

Most mosquitofish examined had eaten tiny, soft-bodied larvae of chironomids, culicids, dixids( ?), and undetermined insect groups. About 43% fed on terrestrial invertebrates (aphids, ants, and spiders) and aerial adults of aquatic insects (included with terrestrial insects in Table 1). Sailfin mollies did not feed on animal materials (see, however, Harrington and Harrington 1961).

BLM_0057920

**TABLE 1. Summary of Frequency of Occurrence of Various Food Items in Stomachs of Fishes from the Lower Colorado River, 1974-76, as Percentages of All Stomachs Examined for Each Species.**

| Items in stomachs | Dorosoma petenense | Cyprinus carpio | Notropis lutrensis | Ictalurus punctatus | Ictalurus melas | Pylodictis onvans | Gambusia affinis | ...la latipinn | Microp eru. dolo nieu | gulos | 's , nel | ...ypo | ...epo m | ...s | Morone saxatilis | Sarotherodon mossambicus | Mugil cephalus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of stomachs .... | 38 | 49 | 135 | 79 | 137 | 16 | 23 | 42 | 52 | 27 | 189 | 16 | 51 | 47 | 34 | 29 | 100 | 65 | 21 |
| Total lengths, limits in millimetres ......... | 152-440 | 37-193 | 175-864 | 33-56 | 236-737 | 93-325 | 178-813 | 21-37 | 27-64 | 118-432 | 99-560 | 82-155 | 75-205 | 78-213 | 85-305 | 173-327 | 540-893 | 95-289 | 381-495 |
| Percentage empty........ | 18.4 | 0.0 | 7.8 | 11.4 | 16.1 | 12.5 | 39.1 | 2.4 | 0.0 | 29.6 | 11.6 | 11.3 | 31.6 | 0.0 | 5.9 | 0.0 | 45.0 | 0.0 | 0.0 |
| *Inorganic Materials* | | | | | | | | | | | | | | | | | | | |
| Sand, gravel, etc. .... | – | 81.8 | 304 | 3.8 | | | | 24 | 19.4 | | 3.7 | 12.5 | 20 | 21 | 8.8 | – | | 20.0 | 952 |
| *Vegetative Materials* | | | | | | | | | | | | | | | | | | | |
| Detritus ............... | – | 98.0 | 42.2 | 62.0 | 32.9 | 12.5 | | -- | 100.0 | | | | | | | – | | 63.1 | 100.0 |
| Macrophytes ........ | 26 | | 1.5 | – | 40.9 | 18.8 | – | | | – | | – | | | – | 41.4 | | 44.6 | 4.8 |
| Benthic and epiphytic algae ................. | 42.1 | 16.3 | 3.7 | 2.5 | 8.0 | – | – | 54.8 | 82.7 | – | – | – | – | – | 59 | – | | 27.7 | .14.3 |
| Phytoplankton ....... | – | 16.3 | 33.3 | – | 0.7 | – | – | – | – | – | – | – | – | – | – | – | | – | 14.3 |
| *Animal Materials* | | | | | | | | | | | | | | | | | | | |
| Crustacea ............ | 34.3 | 20.4 | 7.4 | 26.6 | 24.8 | 56.3 | 26.1 | – | – | 29.6 | 15.3 | – | 78 | 63.8 | – | 10.3 | 7.0 | – | – |
| Copepoda ........ | 29.0 | 20.4 | 0.7 | 21.5 | – | – | – | | – | – | 10.6 | – | 7.8 | 51.1 | – | 6.9 | – | – | – |
| Cladocera ........ | 53 | 4.1 | 3.0 | 11.4 | | | | – | | – | 4.8 | – | – | 19.1 | – | 3.4 | – | – | – |
| Ostracoda ........ | – | – | 0.7 | | | | | – | | – | 1.6 | – | 2.0 | – | – | 3.4 | | – | – |
| **Decapoda** | | | | | | | | | | | | | | | | | | | |
| Astacidae ....... | 5.3 | – | 3.7 | – | 21.2 | 56.3 | 26.1 | – | – | 29.6 | 3.7 | 12.5 | 3.9 | – | – | 6.9 | 7.0 | – | – |
| Paleomoneidae . | – | – | – | – | 3.7 | – | – | – | – | – | 8.5 | 6.2 | 7.8 | – | – | 41.4 | – | – | – |

CALIFORNIA FISH AND GAME

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Benthic **Insecta** .... | *26.3* | *26.5* | *333* | *24.1* | *5.1* | *37.5* | *8.7* | *61.9* | – | *29.6* | *9.0* | *43.8* | *353* | *46.8* | *8.8* | – | – | *169* | *4.8* |
| Ephemeroptera .. | – | – | 1.5 | 3.8 | – | – | – | – | | | | | | | | – | | | – |
| Odonata | | | | | | | | | | | | | | | | | | | |
| Zygoptera .... | | – | | | | | | | | – | 2.1 | 31.2 | 9.8 | | | | | 1.5 | |
| Anisoptera .... | – | | 0.7 | | | | 8.7 | | | – | 1.6 | 12.5 | 5.8 | | | | | – | |
| Megaloptera .... | | – | | | | | | | – | 11.1 | – | | | | | | | | |
| Trichoptera ...... | 18.4 | – | 3.0 | 1.3 | | | 4.4 | | | 3.7 | 05 | | | | | | | | |
| Diptera | | | | | | | | | | | | | | | | | | | |
| **Tipulidae** ...... | | – | 0.7 | | | | 4.4 | – | | | | | | | | | | | |
| Culicidae ..... | – | 4.1 | | | | 6.2 | | 45.2 | | – | – | | 2.0 | 4.2 | | | | | |
| Simuliidae .... | 23.7 | 4.1 | – | | | | | – | | 3.7 | | | | | | | | | – |
| **Chironomidae** . | 26.3 | – | 33.3 | 24.1 | 5.1 | 37.5 | | 9.5 | | 3.7 | 9.0 | 6.2 | 35.3 | 46.8 | 8.8 | | | 16.9 | 4.8 |
| Dixidae (?) ... | | – | | | | | | 26.2 | | | | | | 2.1 | | | | | |
| Undetermined taxa | 2.6 | 4.1 | 2.2 | 5.1 | | | | 19.0 | | | | | | 8.5 | | | | 1.5 | |
| Terrestrial | | | | | | | | | | | | | | | | | | | |
| Invertebrates ....... | – | | | | | | | *429* | – | | – | *125* | *9.8* | *2.1* | | | | *3.1* | |
| Hymenoptera | | | | | | | | | | | | | | | | | | | |
| Fomicidae .... | – | | | | | | | 16.7 | | | – | 12.5 | 3.9 | – | | – | | | |
| Homoptera | | | | | | | | | | | | | | | | | | | |
| **Aphididae** .... | – | | | | | | | 9.5 | | | | | | | | | | | |
| Araneida | | | | | | | | | | | | | | | | | | | |
| Undetermined taxa............. | – | | | | | | | – | | | | | 7.8 | | – | | | | |
| Undetermined taxa............. | – | | – | | | | | 21.4 | | | | | 2.0 | | | | | | |
| Mollusca .......... | | – | *46.7* | | *29.2* | *63* | – | | | – | *1.6* | | | – | *588* | – | – | *26.2* | – |
| Sphaeriidae ...... | | – | *46.7* | | 29.2 | 63 | | | | | 1.6 | | | | 55.9 | | | 23.1 | – |
| Physidae ........ | | | | | | | | | | | | | | | 5.9 | | | 3.1 | – |
| Oligochaeta ........ | – | | *6.7* | *3.8* | *1.5* | *375* | | | | | | | | | – | | | *1.5* | – |
| *V ertebrata* ............. | *34.2* | – | *1.2* | – | *19.7* | – | *43.5* | – | *11.1* | *55.0* | *25.0* | *5.8* | – | *2.9* | *55.2* | *51.0* | – | |
| Salmonidae | | | | | | | | | | | | | | | | | | | |
| *Salmo gairdneri* . | – | | – | | | | | | | | | | | | – | 13.0 | | |
| Clupeidae | | | | | | | | | | | | | | | | | | | |
| *Dorosoma* petenense .... | 34.2 | – | 2.2 | – | 5.1 | – | 4.3 | – | – | 53.4 | – | – | | 2.9 | 20.7 | 35.0 | | |

BLM_0057922



CALIFORNIA FISH AND CAME

BLM_005792

Case No. 1:20-cv-02484-MSK   Document 45-3   filed 04/28/21   USDC Colorado   pg 29 of 165

Smallmouth bass stomachs contained large numbers of ephemeropteran nymphs and megalopteran larvae. Odonate naiads, including both damsel- and dragonflies, were taken by juvenile largemouth bass, warmouth, and green sunfish. Included were species of clambering damselfies typically found in beds of aquatic plants (see also Weaver and Zeibell 1976). Chironomids also were taken by the last three fishes. Bluegill depended strongly on chironomids, along with zooplankton (Table 1). Redear sunfish ate chironomid larvae only infrequently.

Mouthbrooder and striped mullet contained a few tiny chironomid larvae that may have been consumed along with detritus (especially in the latter). Mouthbrooder, however, contained a few terrestrial insects and a number of other benthic groups.

Introduced palaemoneid shrimp, *Palaemonetes paludosus,* are common in the lower Colorado River, but contributed to the diet of only five fish species. Black crappie appeared to select the food item. Largemouth bass, warmouth, and green sunfish all fed on shrimp at about the same proportion. Channel catfish contained them at a frequency of only 3.7%. Perhaps its semi-transparent body makes the shrimp relatively immune to all except special predators, especially when in dense aquatic vegetation.

The introduced crayfish, *Procambarus clarki,* was a major food of almost all large carnivores, especially catfish and smallmouth bass. Rainbow trout, carp, largemouth bass, warmouth, green sunfish, and black crappie also ate the decapod. Edwards (1974) reported crayfish from striped bass stomachs. Introduced softshelled turtle, *Trionyx spiniferus,* also depended heavily on them (present in 10 animals dissected, along with odonate naiads as the only other food item).

Asiatic clams were eaten by carp, channel catfish, yellow bullhead, redear sunfish, largemouth bass, and mouthbrooder (Table 1 ). In all but redear sunfish, clams were digested without breakage of valves, with the shell simply passing through the intestinal tract. The redear sunfish is especially adapted for crushing mollusks, with molariform teeth on its pharyngeal bones; however, less than 20% of shells in redear stomachs had been physically damaged. Crushing of clams is obviously not requisite to digestion since shells in hindguts of redear sunfish and other species alike were devoid of flesh. Consumption of clams by carp was spectacularly high in some instances, with some fish containing more than 30. Some clams eaten by carp and channel catfish exceeded 2.5 cm across the valves, but most were less than 1.0 cm.

Rainbow trout, two of the catfish, and all sunfishes excepting bluegill contained other fishes. Channel and flathead catfishes, largemouth bass, warmouth, and black crappie were the most piscivorous species. Edwards (1974) demonstrated that striped bass in the Colorado River were also voracious piscine predators (Table 1).

Threadfin shad was the exclusive fish eaten by trout. Largemouth bass also ate shad, followed by red shiner, unidentified sunfish, unidentified fish, and other largemouth bass. Channel catfish fed on shad and red shiner, unidentified centrarchids, and other unidentified fish. Flathead catfish ate mostly red shiner and mouthbrooder. Four flathead catfish each had eaten a single fish, each of a different species (threadfin shad, carp, channel catfish, and undetermined centrarchid). The warmouth was a specialized piscivore, feeding on poeciliids and red shiner. Green sunfish were more opportunistic, eating small carp and uniden-

BLM_0057924

tified fishes. Only one redear sunfish took a juvenile shad, but black crappie ate them frequently, along with red shiner. Striped bass ate threadfin shad, rainbow trout, crayfish, centrarchids, carp, tiger salamander, *Ambystoma tigrinum,* and unidentified animal material (Edwards 1974). The salamander is a common bait animal along the Colorado River (Minckley 1971b); and a single specimen also was eaten by a channel catfish (Table 1).

Percentages of empty stomachs in fishes of the lower Colorado River were related to principal food habits. No empty stomachs were found among detritivores and facultative planktivores. Species that depended upon a broader food base, including significant frequencies of benthic invertebrates, also had relatively low percentages of empty stomachs. Large piscivores tended to have a high incidence of empty stomachs *(e.g.* flathead catfish, 39.1%). Edwards (1974) reported 45% of 100 stomachs of adult striped bass as empty. Smallmouth bass, warmouth, and green sunfish also had an incidence of empty stomachs that exceeded 20%, but largemouth bass displayed a wider food base and all but 11.6% contained foods.

## SPATIAL VARIATION

Trophic structure within the fish community of the lower Colorado River differs substantially in different reaches of stream. Near Davis Dam, waters of the upstream reservoir (Lake Mohave) provide a major proportion of basic foodstuffs. Substantial amounts of plankton and detritus pass through the dam and this is reflected in a large proportion of filter-feeding invertebrates *(e.g.* simuliids) in stomachs of fishes from that reach. Threadfin shad also drawn through the dam form a major portion of the food supply for striped bass (Edwards 1974), and likely for larger rainbow trout. Cold water resulting from hypolimnic releases from Davis Dam exclude many temperate (and obviously tropical) species of fishes from that area. Primary production is relatively high, since aquatic vegetation is abundant (no quantitative data available), but essentially no fishes are present to utilize that level in the food web.

Downstream in Topock Gorge, deep, swift areas continue to be influenced by hypolimnic water from Lake Mohave. A few major backwaters provide habitat for temperate fishes. It seems likely that this reach is relatively devoid of foods for piscivores, since red shiners were rare and threadfin shad almost non-existent (Minckley 1979).

Lake Havasu is a relatively stable, mainstream reservoir that differs greatly from the remainder of the reach under consideration. Few stomachs of fishes were examined from the lake (none of those presented in Table 1), but food relations seemed similar to those described by Rinne, Minckley, and Bersell (1981) from reservoirs in central Arizona. Fishes were distributed relative to their food supplies: planktivorous threadfin shad were most abundant near nutrient inputs, thus near phyto- and zooplankton concentrations, and piscivorous largemouth bass tended to be near threadfin shad. Benthic predators were more generally distributed within the reservoirs, in keeping with a more general distribution of benthic invertebrates. Zooplankton was not studied in Lake Havasu, but Chlorophyll *a* concentrations were highest near nutrient inputs at the uppermost end of the lake and in the Bill Williams River arm (Portz 1973, Minckley 1979). Benthic invertebrates in Lake Havasu were also similar in diversity and general abundance to those elsewhere in low desert impoundments (Rinne *et*

*al.* 1981), with fewer animals and biomass where currents were present (Minck-ley 1979, Cowell and Hudson 1967), presumably in response to changes in sediments (Schulback and Sandholm 1962). Shoreline populations of benthic invertebrates were locally dominated by Asiatic clams, reflecting high plankton populations in the lake. These were eaten by carp, channel catfish, and redear sunfish, at frequencies comparable to those in the river channel (based on qualitative examination of stomachs).

Epilimnetic penstock intakes in Parker Dam allow warm water to flow down-stream, thus enhancing habitat for warmwater fishes in the river below Lake Havasu. Particulate materials, including plankton, in turn enhance filter-feeding benthic animals, as do hard bottoms and an abundant micro- and macroflora. Macrophytes, benthic algae, and phytoplankton made up a significant part of the diet of all but centrarchids near Parker, Arizona, with phytoplankton being derived in part from the peudofeces of Asiatic clams. Detritus, both from auto- and allochthonous sources, also was present in stomachs of many species at high frequencies, especially threadfin shad, carp, and channel catfish. Benthic insects, consisting mostly of chironomid dipteran larvae, comprised major parts of the diet of all species present. Other invertebrates, excepting clams and crayfish, were broadly represented, but far less significant than chironomids. Clams were eaten by specialists (carp, channel catfish, and redear sunfish), forming major parts of their diets. Crayfish were generally taken by piscivores, with the excep-tion of smallmouth bass, who appeared to feed selectively upon them. Other fishes were important in the diets of six species, and especially so for channel and flathead catfishes, largemouth bass, and black crappie. Fishes lowest in the food web of the system, threadfin shad and red shiner, were eaten by other fishes most frequently, and were the most abundant species in the river (Minck-ley 1979). Other prey species were mostly juvenile centrarchids, for the most part secondary consumers in the system.

In the lowermost reaches, detritivory became a major mode of life for sailfin molly, striped mullet, and mouthbrooder. Accumulation of organic materials from upstream, resulting from high rates of production, lack of flooding, and in part from diminution in discharge as a function of progressive water use, allows these fishes to maintain and expand their populations. However, constraints of temperature upstream (too low in winter or near Davis Dam) for the molly and mouthbrooders, and distance from the sea plus intervening barriers for the mullet, undoubtedly limit their over-all distribution more than food.

## DISCUSSION AND CONCLUSIONS

Although the Colorado River provides a relatively low food diversity, food habits of introduced fishes of the Colorado River do not differ substantially from those of the same species within their native ranges (see reviews in Calhoun 1966). Many abundant forage species are introduced (probably not so for most insects and oligochaetes) and are characterized by high reproductive rates and high-density, monospecific populations. These features are also evident in the new fish fauna, with many species now populating transitory habitats where populations may explode, stunt, then eventually stabilize at low levels or disap-pear.

The food web of the Colorado River is based upon autochthonous materials. Fishes in other large rivers often depend upon allochthonous inputs. In the

BLM_0057926

Missouri River ( Berner 1951), 54% of materials ingested by fishes was of terrestrial origin. The sparse terrestrial vegetation of most of the Colorado River basin, and relatively large size of the stream in proportion to its narrow, water-limited riparian zone, diminishes the importance of allochttionous input. As emphasized by Minshall (1978), autochthonous conditions are far more prevalent in open, western streams than has been generally recognized.

Organic and inorganic transport in the Colorado River are curtailed by reservoirs, excepting for downstream passage of plankton and associated suspended debris through penstocks. These materials and nutrients not trapped by impoundments (Paulson and Baker 1980), nonetheless form a basis for downstream production. The few backwaters that remain along the river appear highly productive, supporting large standing crops of plankton, rooted aquatic vegetation, and fishes ( Minckley 1979, Nicola 1979), all of which are flushed into the channel by almost-tidal fluctuations in the stream resulting from hydroelectric generation and pulses of irrigation deliveries. Less modified reaches of the river and those which are relatively stabilized have proportionately more backwater habitat. In-stream productivity is also locally high, enhanced by current under abundant insolation without interference of shading by turbidity or riparian vegetation, and is at present further augmented by addition of nutrients through return flow of irrigation systems. A trophic economy based upon autochthonous detritus establishes quickly under such conditions.

Introduced forage species that have survived and flourished in the lower Colorado River mainstream all depend heavily upon detritus or primary producers, or upon secondary consumers such as zooplankton, chironomids, or other invertebrates. Large fishes with less piscivorous tendencies feed directly upon detritus- or plant-dependent clams or crayfish. The introduced fish fauna thus appears to have relatively simple food interrelations.

## ACKNOWLEDGMENTS

Research was supported in part by Contract 14-06-300-2529 from the U.S. Department of Interior, Bureau of Reclamation, Lower Colorado River Division, Boulder City, Nevada, which also gave permission for this publication. J. I. Landye, J. Warnecke, and W. T. Kepner. plus numerous fisheries students at Arizona State University helped collect and analyze the data; their assistance is gratefully acknowledged.

## REFERENCES

Bailey, R. M., and H. M. Harrison, Jr. 1948. Food habits of southern channel catfish  (*Ictalurus  lacustris  punctatus*)  in the Des Moines River, Iowa. Am. Fish. Soc., Trans., 80:119–139.

Berner, L. A. 1951. Limnology of the lower Missouri River. Ecology 32:1-12.

Bradley, W. G., and J. E. Deacon. 1%7. The biotic communities of southern Nevada. Pages 201-295 *in* H. M. Wormington and D. Ellis, eds. Pleistocene studies in southern Nevada. Nev. State Mus. Anthropol. Pap., No. 13.

Brown, D. E., N. B. Carmony, and R. M. Turner. 1978. Drainage map of Arizona showing perennial stream and some important wetlands. Ariz. Game and Fish Dept., Phoenix.

Brown, D. E., and C. H. Lowe. 1980. Biotic communities of the Southwest. U.S. Dept. Agric., For. Serv., Gen. Tech. Rep., RM-78, map.

Calhoun, A. J. 1966. Inland fisheries management Calif. Fish and Game Dept, Sacramento.

Cowell, B. C., and P. L Hudson. 1967. Some environmental factors influencing benthic invertebrates in two Missouri River reservoirs. Pages 541-555 *in* C. E. Lance., ed., Reservoir fishery symposium. Am. Fish. Soc. Spec. Publ.

Dill, W. A. 1944. The fishery of the lower Colorado River. Calif. Fish Game, 30:109–211.

Edmondson, W. T. (ed.). 1959. Freshwater biology, 2nd edition. John Wiley & Sons, New York.

Edwards, G. L. 1974. Biology of the striped bass, *Morone saxatilis* (Walbaum), in the lower Colorado River (Arizona-California-Nevada). Unpubl. M. S. Thesis, Ariz. State Univ., Tempe.

Evermann, B. W. 1931. A distributional list of the species of freshwater fishes known to occur in California. Calif. Fish and Game Dept., Fish. Bull. 35:1-67.

Harrington, R. W., Jr., and E. S. Harrington. 1961. Food selection among fishes invading a high subtropical salt marsh: from onset of flooding through the progress of a mosquito brood. Ecology 42:446-466.

Hynes, H. B. N. 1950. The food of freshwater sticklebacks (*Gasterosteus aculeatus* and *Pygosteus pungitius*), with a review of methods used in studies of the food of fishes. J. Anim. Ecol., 19:35-58.

Jonez, A., R. D. Beland, G. Duncan, and R. A. Wagner. 1951. Fisheries report of the lower Colorado River. Fisheries Task Group-Colorado River, Great Basin Field Comm., Ariz. Game and Fish Comm., Phoenix (processed).

Kimsey, J. B. 1958. Fisheries problems in impounded waters of California and the lower Colorado River. Am. Fish Soc., Trans., 87:319-332.

Miller, R. R. 1952. Bait fishes of the lower Colorado River, from Lake Mead, Nevada, to Yuma, Arizona, with a key for their identification. Calif. Fish Game 38(1):7-42.

_____ 1961. Man and the changing fish fauna of the American Southwest. Pap. Mich. Acad. Sci., Arts, Lett., 46:365-404.

Miller, R. R., and C. H. Lowe. 1967. Part 2. Fishes of Arizona. Pages 133-151 *in* C. H. Lowe, ed. Vertebrates of Arizona. Univ. Ariz. Press, Tucson.

Minckley, W. L. 1971a. Keys to native and introduced fishes of Arizona. J. Ariz. Acad. Sci. 6:183-188.

_____ 1971b. Bait *fish* survey of the lower Colorado River. Rep. to game and fish depts of lower basin states. Ariz. State Univ., Tempe (processed).

_____ 1973. Fishes of Arizona. Ariz. Game and Fish Dept., Phoenix.

_____ 1979. Aquatic habitats and fishes of the lower Colorado River, southwestern United States. Final Rep. Contr. 14-06-300-2529. U.S. Dept Int., Bur. Reclam., Boulder City, Nev. (processed).

Minshall, G. W. 1978. Autotrophy in stream ecosystems. BioScience 28:767-771.

Moffett J. W. 1942. A fishery survey of the Colorado River below Boulder Dam. Calif. Fish Game 28(2):76-86.

Moyle, P. B. 1976. Inland Fishes of California. Univ. Calif. Press, Berkeley and Los Angeles.

Nicola, S. J. 1979. Fisheries problems associated with development of the Colorado River. Calif. Fish Game Dept., Inland Fish. Endang. Species Prog. Spec. Publ. 79-4:1-18.

Ohmart, R. D., W. 0. Deason, and C. Burke. 1977. A riparian case history: the Colorado River. Pages 35-47 *in* R. R. Johnson and D. A. Jones, tech. coords., Importance, preservation and management of riparian habitat: a symposium. U. S. Dept. Agric., For. Serv., Gen. Tech. Rept. RM-43:35-47.

Paulson, L.L., and J. R. Baker. 1980. Nutrient interactions among reservoirs on the Colorado River. Pages 1647 to 1656 *in* Symposium on surface water impoundments. ASCE, Minneapolis, Minn.

Portz, D. 1973. Plankton pigment heterogeneity in seven reservoirs in the lower Colorado River basin. Unpubl. M. S. Thesis, Ariz. State Univ., Tempe.

Prokopovich, N. P. 1969. Deposition of clastic sediments by clams. J. Sediment, Petrol. 39:891-901.

Ricker, W. E. 1937. The food and the food supply of sockeye salmon *(Oncorhynchus nerka* Walbaum) in Cultus Lake, British Columbia. I. Biol. Bd. Canada 3:450-468.

Rinne, J. N., W. L Minckley, and P. 0. Bersell. 1981. Factors affecting fish distribution in two desert reservoirs, central Arizona. Hydrobiologia, (in press).

Schulback, J. C., and H. A. Sandholm. 1962. Littoral bottom fauna of Lewis and Clark Reservoir. Proc. S. Dak. Acad. Sci. 41:101-112.

Usinger, R. L. 1956. Aquatic insects of California. Univ. Calif. Press, Berkeley.

Wallis, O. L. 1951. The status of the fish fauna of the Lake Mead National Recreational Area, Arizona-Nevada. Am. Fish. Soc., Trans., 80:84-92.

Weaver, R. 0., and C. D. Ziebell. 1976. Ecology and early life history of largemouth bass and bluegill in Imperial Reservoir, Arizona. Southwest. Nat 21:151-160.

Winn, H. E., and R. R. Miller. 1954. Native post-larval fishes of the lower Colorado River basin with a key to their identification. Calif. Fish Game 40:272-285.

75917-800 6-82 75 OSP

BLM_0057928

# TABLE OF CONTENTS

Acknowledgements .................................................................................................................. 4

Foreword ................................................................................................................................. 5

Purpose and Use ..................................................................................................................... 5

Amendment and Update Process............................................................................................ 6

Public input ............................................................................................................................ 6

Demographics......................................................................................................................... 7

Definitions.............................................................................................................................. 8

The Planning Areas................................................................................................................10

North Valley Planning Area .................................................................................................11

    Natural Resources............................................................................................................. 11

    Agriculture........................................................................................................................ 14

    Economic Development .................................................................................................... 14

    Recreation and Tourism ................................................................................................... 15

    Utilities and Services........................................................................................................ 17

    Transportation .................................................................................................................. 18

    Intergovernmental Coordination & Grant Funding.......................................................... 19

    Land Use ........................................................................................................................... 21

South Valley Planning Area...................................................................................................23

    Natural Resources............................................................................................................. 23

    Agriculture........................................................................................................................ 26

    Economic Development .................................................................................................... 27

    Recreation and Tourism ................................................................................................... 28

    Utilities and Services........................................................................................................ 30

    Transportation .................................................................................................................. 31

    Intergovernmental Coordination & Grant Funding.......................................................... 33

Montrose County Master Plan 2010

BLM_0057929

Land Use ............................................................................................................... 35

**Maher Planning Area**.................................................................................................37

Natural Resources ................................................................................................. 37

Agriculture............................................................................................................. 39

Recreation and Tourism ....................................................................................... 40

Utilities and Services............................................................................................. 41

Transportation....................................................................................................... 41

Intergovernmental Coordination & Grant Funding........................................... 42

Land Use ................................................................................................................ 44

**West End Planning Area** ............................................................................................46

Natural Resources ................................................................................................. 46

Agriculture............................................................................................................. 49

Economic Development ........................................................................................ 50

Recreation and Tourism ....................................................................................... 51

Utilities and Services............................................................................................. 52

Transportation....................................................................................................... 53

Intergovernmental Coordination & Grant Funding........................................... 54

Land Use ................................................................................................................ 56

**Land Use Designations**...............................................................................................58

**Overlay Designations** ................................................................................................59

**Maps and Appendices** ...............................................................................................60

Montrose County Planning Areas...............................................................Appendix A

North Valley Planning Area Map...........................................................Appendix B (1)

South Valley Planning Area Map...........................................................Appendix B (2)

Maher Planning Area Map......................................................................Appendix B (3)

West End Planning Area Map.................................................................Appendix B (4)

BLM_0057930

North Valley Projected Land Use........................................................................Appendix C (1)

South Valley Projected Land Use........................................................................Appendix C (2)

Maher Projected Land Use...................................................................................Appendix C (3)

West End Projected Land Use..............................................................................Appendix C (4)

North Valley Wildlife Activity Areas..................................................................Appendix D (1)

South Valley Wildlife Activity Areas..................................................................Appendix D (2)

Maher Wildlife Activity Areas.............................................................................Appendix D (3)

West End Wildlife Activity Areas........................................................................Appendix D (4)

North Valley Transportation Plan.......................................................................Appendix E (1)

South Valley Transportation Plan.......................................................................Appendix E (2)

Maher Transportation Plan..................................................................................Appendix E (3)

West End Transportation Plan.............................................................................Appendix E (4)

North Valley Wildfire Hazard Area.....................................................................Appendix F (1)

South Valley Wildfire Hazard Area.....................................................................Appendix F (2)

Maher Wildfire Hazard Area................................................................................Appendix F (3)

West End Wildfire Hazard Area...........................................................................Appendix F (4)

North Valley Debris/Flood and Hazard Area Map............................................Appendix G (1)

Soutb Valley Debris/Flood and Hazard Area Map............................................Appendix G (2)

Maher Debris/Flood and Hazard Area Map.......................................................Appendix G (3)

West End Debris/Flood and Hazard Area Map..................................................Appendix G (4)

North Valley Gravel Resources Map....................................................................Appendix H (1)

Soutb Valley Gravel Resources Map....................................................................Appendix H (2)

Maher Gravel Resources Map..............................................................................Appendix H (3)

West End Gravel Resources Map.........................................................................Appendix H (4)

2007 Household Survey Results Summary..........................................................Appendix I

BLM_0057931

# ACKNOWLEDGEMENTS

The 2010 Montrose County Master Plan is a product of extensive public outreach and the collective efforts of citizens, staff, County Commissioners and the Planning Commission. Assistance by federal, state and local agencies and organizations was also instrumental in the development of this plan. The following are key individuals who contributed to the plan's creation.

County Commissioners
> Allan Belt
> Gary Ellis
> Ron Henderson
> Bill Patterson
> David White

Planning Commission Members
> Gary Garren
> Lana Kinsey
> Dave Laursen
> Dennis Murphy
> David Seymour
> Lynn Vogel

County Staff
> Joe Kerby
> Phyllis Snider
> Jon Waschbusch
> Steve White

Citizen Volunteers
> Everyone who volunteered for the 2006 meetings.
> Everyone who came to a meeting.
> Everyone who filled out a survey.
> Everyone who submitted written comments.
> Everyone who dropped by the offices.

**4**

Montrose County Master Plan 2010

# FOREWORD

This update of the Montrose County Master Plan is worthy of a historical recap. What began as a minor update in 2006 has now become the 2010 version of the plan.

Master Plans are an inherently controversial subject. The "unbreakable" real estate bubble and heavy development of the early 2000s brought attention to community planning and the master plan. Many citizens expressed concern that the existing plan was not being followed and/or was not detailed enough to implement. In response to this concern, the County's Planning Staff began an "in house" effort to update some of the maps and definitions of the 2001 plan. That effort began in late summer of 2006.

Community interest in the Master Plan was greater than expected. Meetings held in the fall of 2006 drew crowds of nearly 300 citizens. So great was the turnout that the meetings could only be completed with the help of citizen volunteers who donated their time to help facilitate. These initial meetings were contentious. It was quickly apparent that there was a Black Canyon sized rift between those who supported the update and those who opposed it.

After the initial series of meetings was completed, the Planning Commission wanted more public input. As a result, the 2007 Household Survey was sent to over 18,000 Montrose County addresses. In order to obtain further public comment, County Manager Joe Kerby spearheaded an effort to obtain grant funding for the hiring of a consultant. Montrose County received a sizeable grant from the Colorado Department of Local Affairs. This matching grant was used to hire a consulting firm who facilitated additional meetings and public involvement in 2008 and 2009.

Beginning in August of 2009, the Planning Commission met weekly until December of 2009 in order to produce a draft document that was ready to submit to the public for further comment and revisions.

# PURPOSE AND USE

One inevitable question that arises during the creation of a Master Plan is, "Why are we doing this?" In the case of Montrose County, there are two answers. From a literal standpoint, Montrose County has a Master Plan because the laws of the State of Colorado require it. C.R.S. 30-28-106(1) states "It is the duty of a county planning commission to make and adopt a master plan for the physical development of the unincorporated territory of the county." There is no uncertainty in that statement. In addition to being a requirement, Master Plans also allow counties to make consistent decisions on planning and development issues.

The regulatory effect of master plans is another frequently debated topic. The simple reality is that when considered singularly, a master plan is an advisory document. C.R.S. 30-28-106(3)(a) states,

> "the master plan of a county or region shall be an advisory document to guide land development decisions; however, the plan or any part thereof may be made binding by inclusion in the county's or region's adopted subdivision, zoning, platting, planned unit development, or other similar land development regulations."

# AMENDMENT AND UPDATE PROCESS

## Amendments

The Montrose County Master Plan is intended to be a living document. To that end, periodic amendments to the plan will be necessary. The Planning Commission will be the body responsible for amending the plan. Amendments to the Montrose County Master Plan may be considered on a quarterly basis during the months of January, April, July and October of each year.

When considering proposed amendments to the Master Plan, the Planning Commission shall consider the following criteria:

1. Have conditions in the area or community changed in such a way that the amendment is necessary?
2. Is there a community need that will be served by the amendment?
3. Is the amendment consistent with the stated goals of the Master Plan?

Amendments to the Master Plan may be initiated by County Staff, the Planning Commission or residents. Property specific amendment requests made by residents shall require a completed application form and submittal of a fee as set by the Planning and Development Fee Schedule. Proposed amendments shall be heard by the Planning Commission at noticed public meetings and all decisions on amendments shall be determined by a majority vote.

## Updates

The Planning Commission will conduct an annual review of the Master Plan during the fourth quarter of each year. The purpose of this review will be to consider implementation actions, potential updates or other issues related to the plan.

# PUBLIC INPUT

## 2007 Household Survey Results

In May of 2007 a household survey was mailed to 18,515 households. A total of 2,792 completed surveys were returned. This survey posed a variety of growth related questions. Respondents were asked to use rating scales of 1-5 while completing most questions on the

BLM_0057934

questionnaire. The number "1" represents a low rating while "5" represents a high rating. The summary results of the survey are shown in Appendix I of this document.

**Keypad Polling**
At several facilitated meetings in each planning area during 2009, meeting attendees participated in "keypad polling" in response to specific planning questions.

# DEMOGRAPHICS

*The following population figures were obtained from the Colorado State Demographers Office. Retrieved March 11, 2010 from
http://www.dola.state.co.us/dlg/demog/pop_muni_estimates.html

**The Communities of Montrose County**
City of Montrose
The City of Montrose is located in the South Valley Planning Area and is the largest municipality in Montrose County with 11.5 square miles and a 2008 population of 17,834.

Town of Olathe
The Town of Olathe is located in the North Valley Planning Area. As of 2008, there were 1,830 people residing in the Town of Olathe and the town had a total area of 1.3 square miles.

Town of Nucla
Nucla is located in the West End Planning Area. The population in 2008 was 766. The town encompasses approximately 0.7 square miles.

Town of Naturita
Naturita is located in the West End Planning Area. The population in 2008 was 687.  The town covers approximately 0.7 square miles.

Unincorporated communities:
➢ Bedrock – West End Planning Area
➢ Cimarron – South Valley Planning Area
➢ Maher – North Valley Planning Area
➢ Paradox – West End Planning Area
➢ Redvale – West End Planning Area

BLM_0057935

# DEFINITIONS

Note: Definitions taken from Merriam-Webster's Online Dictionary (http://www.merriam-webster.com) are marked with an asterisk.

**Access Control Plan**: a plan used to determine what intersections will be allowed, where they will be located and what kinds of traffic movements will be allowed at each one (definition retrieved from Colorado Department of Transportation website http://www.dot.state.co.us/).

**Access Permit:** a permit issued by the County Engineering Department, authorizing the connection of a road, street or driveway to an existing County Road (definition taken from the Montrose County Standards and Specifications for Roads and Bridges).

**Aliquot Line:** the line(s) which create the standard subdivisions of a section, such as a half section, quarter section or quarter-quarter section.

**Amenity*:** the quality of being pleasant or agreeable.

**Board of Health Regulations:** the Montrose County Board of Health Regulations as amended.

**Collaborate*:** to work jointly with others or together especially in an intellectual endeavor.

**Conservation Easement:** a voluntary agreement that allows a landowner to limit the type or amount of development on their property while retaining private ownership of the land.

**Corridor*:** an area or stretch of land identified by a specific common characteristic or purpose.

**Fire Flow:** the amount of water produced by a fire hydrant (stated in gallons per minute) that is required in order to facilitate adequate fire suppression capability by a fire protection district when responding to a fire.

**Fire Protection District:** a publicly funded organization dedicated to emergency response (specifically fire) within a defined geographic boundary.

**In-holdings:** an area of privately owned land which is entirely surrounded by land managed by the United States Forest Service or the National Park Service.

**Intergovernmental Agreement (IGA):** a formal agreement made between two or more government agencies.

**Mining Operations:** any act directly related to mining, processing, storing or transporting of mined or related materials.

Montrose County Master Plan 2010

BLM_0057936

**Mitigate:** to make less severe or intense.

**Non-Profit Land Trust:** a private, nonprofit organization that, as all or part of its mission, actively works to conserve land by undertaking or assisting in land or conservation easement acquisition, or by its stewardship of such land or easements.

**Oil and/or Gas Extraction:** Oil and gas extraction includes all development which is reasonably necessary to the extraction, exploration or production; oil and gas wells; and accessory offices, storage buildings, rig camps and gas transmission lines.

**Overlay District:** a special zone that is drawn on a zoning map to outline a specific area.

**Primary Dwelling Unit:** one or more rooms in a dwelling designed for residential occupancy and used by one family for living purposes and having its own cooking and sanitary facilities. A primary dwelling unit is separate from guest houses and accessory dwellings.

**Riparian:** of, relating to, or located on the bank of a river or stream.

**Salinity:** the concentration of total dissolved solids in water. The Mancos shale, which covers a large portion of the county, has a naturally high concentration of dissolvable solids (salts), which can be leached into local surface waters as a result of some development practices.

**Selenium:** an essential trace element that occurs naturally in the environment. Selenium is widely distributed in rocks, soils, water and living organisms. In the western United States, it is most common in marine sedimentary deposits like the local Mancos shale. Selenium is highly mobile and biologically available in arid regions having alkaline soils, typical of western Colorado's irrigated valleys (definition retrieved from the Gunnison Basin Selenium Task force website at http://www.seleniumtaskforce.org/aboutselenium.html.

**Socioeconomic*:** of, relating to, or involving a combination of social and economic factors.

**Split Estate:** land ownership situations in which the surface rights and subsurface rights (such as the rights to develop minerals) for a piece of land are owned by different parties.

**Subdivision:** any division of property that results in one or more parcels which are less than 35 acres in area, excluding those divisions identified in C.R.S.30-28-101(10)(c) (definition taken from the Montrose County Subdivision Regulations).

**Subdivision Regulations:** the Montrose County Subdivision Regulations as amended.

**Use by Right:** the principal use or uses of land, structures, or both which are authorized by the district zoning classification. The development standards of any given zone district comprise the essential site plan requirements for placement of a use on a parcel (definition taken from the Montrose County Zoning Resolution).

Montrose County Master Plan 2010

BLM_0057937

**Viewshed:** the outlook that is visible from one or more viewing points.

**Water District**: a publicly or quasi-publicly owned and operated water system which serves water to the public and meets the State Health Department criteria for public water systems (definition taken from the Montrose County Subdivision Regulations).

**Wildlife Activity Areas:** areas of the county which have been identified by the Colorado Division of Wildlife as hosting species specific activities which include, but are not limited to, reproduction, winter concentration areas and severe winter range.

**Wildlife Safe Fencing:** fencing that is no higher than 40''', uses smooth bottom wire which is at least 16" above ground, and has at least 12" between the top two wires.  Sheep/Woven Wire and wrought iron fences with spiked tips do not qualify as wildlife safe fencing under any circumstances.

**Zoning:** The legislative division of a region, esp. a municipality, into separate districts with different regulations within the districts for land use, building size, and the like.

**Zoning Resolution**: the Montrose County Zoning Resolution as amended.

# THE PLANNING AREAS

Because Montrose County is such a large (2,200 square miles) and diverse county, the County has been divided into four planning areas within this Master Plan. These areas are the North Valley, South Valley, Maher and the West End. The Planning Areas are shown in Appendix A.

BLM_0057938

# NORTH VALLEY PLANNING AREA

The North Valley Planning Area contains the Gunnison Gorge National Conservation Area and the majority of the Black Canyon National Park. The Town of Olathe and the surrounding agricultural lands are located in the central portion of this planning area. The western portion of the North Valley Planning Area is covered by desert, canyon and sagebrush lands administered by the Bureau of Land Management. While predominantly rural, the North Valley has experienced a significant amount of development. In particular, the area between Falcon Road and Gunnison Road east of Highway 50 has seen numerous residential subdivisions. An area of industrial property and uses has begun to develop north of Olathe along Highway 50.

## NATURAL RESOURCES

An abundance of natural resources can be found in Montrose County. These resources provide both opportunities and challenges to the community. Community based planning is necessary to strike a balance between the utilization and conservation of these resources. In particular, the County is home to valuable mineral deposits that can positively impact the economy of the County while also creating potentially negative impacts. Clear policies for the management of these resources will help maximize the overall benefits derived from the resources.



Photo by JW



Montrose County Master Plan 2010

BLM_0057939

## Mining, Gas and/or Oil Extraction

**Goal: Mitigate the impacts of mining, gas and/or oil extraction.**

**Objective 1:** Identify areas with known gravel reserves and maintain a map of their location (see Appendix H1).

**Action 1:** Amend the zoning resolution to contain a Gravel Overlay District which encompasses known gravel reserves.

**Action 2:** Amend the zoning resolution to allow special use permits for gravel mining only within the Gravel Overlay District.

**Objective 2:** Mitigate the impact of mining, gas and/or oil extraction.

**Action 1:** Create and adopt regulations to mitigate impacts of all mining, gas and/or oil extraction.

**Action 2:** Adopt regulations and standards requiring road improvements and ongoing maintenance by mining, gas and/or oil extraction operators using County roadways for mining, gas and/or oil extraction activities.

**Objective 3:** Mitigate the impacts of mining, gas and/or oil extraction located on public lands and split estates.

**Action:** Require Access Permits for mining, gas and/or oil extraction on public lands that will use County roadways.

**Objective 4:** Assure the adequacy of housing for temporary workers.

**Action:** Amend existing zoning and Board of Health Regulations as necessary to address health and safety issues associated with temporary housing.

## Rivers and Streams

**Goal: Protect and preserve the amenities provided by natural watercourses and riparian environments.**

**Objective 1:** Protect and preserve the Uncompahgre River corridor.

**Action 1:** Amend the zoning resolution to include a River Corridor Overlay District which at a minimum establishes setbacks for development.

**Action 2**: Coordinate with the Town of Olathe and other entities to promote cohesive regulations addressing management of the Uncompahgre River corridor.

**Objective 2:** Minimize the pollutants entering local waterways.

**Action 1:** Update regulations to include stormwater drainage plans for non-residential building permits.

**Action 2:** Collaborate with the Gunnison Basin Selenium Taskforce and local water users to reduce selenium and salinity levels in the local waterways.

## Wildlife

**Goal: Preserve wildlife activity areas as identified by the Colorado Division of Wildlife.**

**Objective:** Mitigate the impact of subdivisions on wildlife and habitat.

**Action 1:** Obtain and maintain a map of wildlife activity areas in the North Valley Planning Area.

**Action 2:** Amend the zoning resolution to require wildlife safe fencing for new major subdivisions and planned unit developments located in wildlife activity areas including the removal of noncompliant fencing.

**Action 3:** Consider penalties for "animal at large" violations in the unincorporated County.

**Action 4:** Require that wildlife corridors be designed into new major subdivisions and planned unit developments located in wildlife activity areas.

**Action 5:** Adopt slower speed limits for County roads in wildlife activity areas.

**Action 6:** Require major subdivisions and planned unit developments within wildlife activity areas to enter into mitigation agreements with the Colorado Division of Wildlife as part of the development review process.

BLM_0057941

# AGRICULTURE

Since the 1800s, farming and ranching have been integral parts of the economy and heritage of Montrose County. These activities have contributed to the attractive rural character of Montrose County. Through the years, the prevalence of agriculture in the County has changed, but its importance has not. As agricultural lands give way to other uses it is crucial that those who are willing and able to pursue agricultural activities as a livelihood have the support of the County.

## Farming & Ranching

**Goal 1: Protect the right to farm within the North Valley Planning Area.**

> **Objective 1:** Maintain the agriculturally related uses by right in the General Agricultural Zoning District of the Montrose County Zoning Resolution.
>
> > **Action:** Amend the existing zoning resolution to include only agriculturally related uses.
>
> **Objective 2:** Encourage and support markets selling locally produced agricultural products.
>
> > **Action:** Review and amend the existing zoning resolution to insure that markets are accommodated by County regulations.

**Goal 2: Preserve agricultural lands while providing economic benefit to agricultural land owners.**

> **Objective:** Support voluntary creation of conservation easements within the North Valley Planning Area.
>
> > **Action 1:** Provide letters of support to citizens seeking conservation easements.

# ECONOMIC DEVELOPMENT

Jobs are the lifeblood of a community. The creation and retention of jobs is dependent upon creating a community that is supportive of economic growth activities. Consequently, the planning and regulatory documents used in Montrose County need to consider possible impacts on economic development. One of the major ways that Montrose County can aid in economic development is by making a concerted effort to facilitate the development of local businesses and support a diverse local economy.

BLM_0057942

**Goal: Support the creation and expansion of businesses within Montrose County.**

**Objective 1:** Provide areas for the location of commercial, industrial and business uses.

**Action 1:** Identify areas and nodes for commercial, industrial and business uses on the land use maps of the Master Plan.

**Action 2:** Amend the zoning resolution to consider the creation of new jobs as a factor in rezoning and special use applications.

**Objective 2:** Provide assistance and incentives to businesses in Montrose County.

**Action 1**: Refrain from implementing impact fees for commercial, industrial and business subdivisions or building permits.

**Action 2**: Provide information, data and statistics to interested parties considering expanding or locating a business in Montrose County.

**Action 3:** Coordinate with local communities to insure that County policies support local economic development efforts.

**Action 4:** Amend the commercial corridor overlay requirements of the zoning resolution to be more business friendly.

## RECREATION AND TOURISM

Western Colorado is one of the most beautiful places in the nation and Montrose County is no exception. The natural beauty and recreational opportunities that exist in the North Valley Planning Area are limitless. The terrain of the North Valley includes river canyons, redrock deserts, fertile valleys and the Black Canyon National Park. These natural amenities attract visitors from around the world and offer year round outdoor recreational opportunities. Montrose County is also home to world class hunting and fishing. The tourism associated with these activities is a major economic asset to the County and the region.

**Goal 1: Assure positive experiences for those visiting Montrose County.**

**Objective:** Maintain the aesthetic qualities of local attractions including the scenic byways.



**15**

Montrose County Master Plan 2010

BLM_0057943

**Action 1:** Create regulations to protect the viewsheds around and leading to the Black Canyon National Park and the Gunnison Gorge National Conservation Area.

**Action 2:** Create a scenic byway overlay district which addresses development along scenic byways.

## Goal 2: Develop a non-motorized trail system.

**Objective 1:** Coordinate the location and management of a non-motorized trail system among all participating or affected landholders.

**Action:** Develop and adopt a trails plan with stakeholders in the North Valley Planning Area.

**Objective 2:** Create a non-motorized trail from Delta County to Ouray County.

**Action 1:** Identify potential routes for this trail including unused railroad right-of-ways.

**Action 2**: Collaborate with local groups and other entities regarding the development and implementation of trail plans.

## Goal 3: Promote the primary tourist attractions within the planning area.

**Objective:** Increase visitor awareness of the local attractions.

**Action 1:** Implement signage program identifying local attractions.

**Action 2:** Provide links to tourist related data on the Montrose County website.

## Goal 4: Encourage and support special events that would attract visitors from outside of the County.

**Objective:** Allow special events within unincorporated Montrose County.

**Action:** Create a process for issuing and reviewing Special Events Permits.

## Goal 5: Support tourism activities related to outdoor recreation.

**Action:** Coordinate with Visitors and Convention Bureaus and the Chambers of Commerce to promote outdoor recreation.

**Objective:** Enhance fishing opportunities along the Uncompahgre River.

BLM_0057944

**Action:** Pursue opportunities to acquire public access to the Uncompahgre River.

**Goal 6: Protect and preserve the cultural and historic heritage of the area.**

**Action 1:** Work with Colorado Historical Societies and other agencies to protect sites with historical and cultural significance.

**Action 2:** Create regulations that address development projects that may have impact on historical and cultural sites.

## UTILITIES AND SERVICES

Montrose County is covered by numerous districts and utility providers. Emergency services such as law enforcement and fire protection are among the essential services required by new development. Growth increases the demand for these services and can adversely affect the level of service that these providers offer. For this reason it is essential that planning efforts address the impacts development has on these districts and utility providers.

**Goal 1: Maintain and provide adequate levels of service for fire protection and law enforcement agencies.**

**Objective:** Assure that fire protection and law enforcement services are available to new developments.

**Action 1:** Amend subdivision regulations to require that new subdivisions be within the service district of a fire protection district.

**Action 2:** Amend subdivision regulations to require that all new subdivisions have adequate fireflow and other infrastructure necessary for fire protection.

**Goal 2: Provide a domestic water supply that is adequate in terms of quantity and dependability.**

**Objective:** Assure that new subdivision development in Montrose County is served by a permitted well or permitted water district.

**Action:** Amend the subdivision regulations to require that all development have either a water tap from an established water district or a well permitted by the State Division of Water Resources.

# TRANSPORTATION

Growth means more traffic. Transportation planning has to be done proactively in order to reduce future costs and issues. The Federal and State Highways that connect the communities in Montrose County will continue to decrease in efficiency as traffic increases. In order to avoid the congestion that plagues so many developed areas, Montrose County needs to actively plan for the location and construction of necessary transportation infrastructure. As the population center of the North Valley, the Town of Olathe must be included in these efforts.

**Goal 1: Utilize existing rail transportation network for the benefit of the Uncompahgre Valley.**

> **Objective:** Encourage commercial and industrial development along the existing rail corridor.

> **Action:** Support commercial and industrial rezoning along the rail corridor.

**Goal 2: Continue to develop the existing road system of the County.**

> **Objective:** Maintain and expand the grid network within the County, which will create road connectivity.

> **Action:** Continue acquisition of right-of-ways on section and aliquot lines as outlined in the Montrose County Subdivision Regulations.

**Goal 3: Maintain the functionality of the federal and state highway system in the North Valley Planning Area.**

> **Objective:** Encourage limited access points to the federal and state highway system.

> **Action 1:** Adopt an Access Control plan for federal and state highways within the North Valley Planning Area.

> **Action 2:** Collaborate with the Town of Olathe on transportation issues related to State Highway 348 and US Highway 50.

**Goal 4: Limit congestion of roadways by promoting alternative modes of transportation.**

> **Objective:** Encourage pedestrian and non-vehicular modes of transportation in Montrose County.

> **Action 1:** Incorporate bicycle lanes into County development regulations.

BLM_0057946

**Action 2:** Create regulations that would connect development to an adopted trails plan.

**Action 3:** Coordinate bicycle and pedestrian trail network with the Town of Olathe.

**Action 4:** Allow for parking lots in support of car pooling activities.

# INTERGOVERNMENTAL COORDINATION & GRANT FUNDING

As growth continues to impact the North Valley Planning Area of Montrose County, the importance of effective communication between the government organizations operating in that area continues to increase. The following goals, objectives and action items are geared towards developing beneficial partnerships between Montrose County and public organizations of the North Valley Planning Area.

## Local Governments

**Goal: Pursue an IGA and coordinated development review with the town of Olathe.**

**Objective 1:** Maintain awareness of existing three (3) mile plans, comprehensive plans,  service plans and transportation plans that are being utilized by the town of Olathe.

**Objective 2:** Provide assistance to Olathe in pursuing an IGA.

**Action 1:** Initiate IGA creation process with the town of Olathe.

**Action 2:** Monitor and periodically update IGA's after adoption.

## State and Federal Governments

**Goal 1: Maintain and manage access to public lands within the North Valley Planning Area.**

**Objective 1:** Collaborate with land management agencies on actions affecting public lands access in the North Valley Planning Area.

**Action 1:** Identify location and type of public access points to public lands and maintain a map or list showing their locations.

**19**

Montrose County Master Plan 2010

**Action 2:** Create and implement County regulations that require development adjacent to public lands to meet additional standards with regard to public access to public lands.

**Objective 2:** To participate in planning efforts lead by the public land agencies.

**Action 1:** Develop and maintain contacts with public lands agencies managing lands within the North Valley Planning Area.

**Action 2:** Initiate dialogue with planning staff of public lands agencies.

**Goal 2: Coordinate with public lands agencies to manage the development of in-holdings within those lands.**

**Objective:** Mitigate the impacts of development within public land in-holdings.

**Action:** Implement regulations to prohibit the subdivision (parcels of less than 35 acres) of in-holdings.

## Grant Funding

**Goal 1: Pursue grant funding to aid in County planning efforts in the North Valley Planning Area.**

**Objective:** Identify funding needs based on known issues impacting planning and development within the North Valley Planning Area.

**Action 1:** Create a prioritized list of funding needs/issues.

**Action 2:** Collaborate with the grant writer and county administration to pursue funding.

**Goal 2: Support grant applications which would benefit the citizens of the North Valley Planning Area of Montrose County.**

**Action:** Provide letters of support to citizens or organizations seeking grant funding that further the stated goals of the North Valley Planning Area.

## Other Public and Quasi-Governmental Organizations

**Goal: Maintain open channels of communication with public and quasi-governmental organizations (RE-1J School District, Olathe Fire Protection District, etc.) operating within the North Valley Planning Area of Montrose County.**

**Objective 1:** Coordinate development review between Montrose County and these agencies.

**Objective 2:** Assist these organizations in meeting their goals.

> **Action:** Create and adopt regulations as necessary to aid the efficient operation of these organizations.

# LAND USE

Like every community, Montrose County has specific land use issues to deal with. Today these issues include selenium and salinity levels in our waterways, weed control, natural hazards and light pollution. Although these issues present significant challenges, community based planning efforts can provide workable solutions.

## Selenium and Salinity

**Goal: Reduce the amount of selenium and salinity in the water courses of the Uncompahgre Valley:**

> **Objective:** Identify the areas most likely to contribute to selenium and salinity loading.

>> **Action 1:** Adopt and implement best management practices to mitigate selenium and salinity loading in the identified areas of the Uncompahgre Valley.

>> **Action 2:** Collaborate with the Gunnison Basin Selenium Taskforce and local water users to reduce selenium and salinity levels in the local waterways.

## Hazards

**Goal 1: Mitigate the impacts of geological and hydrologic hazards to development.**

>> **Action 1**: Amend building code regulations to require engineered foundations on all property within Montrose County for all new habitable structures.

>> **Action 2**: Adopt a map showing the location of known mudflow and debris fans within Montrose County.



**21**

Montrose County Master Plan 2010

**Action 3:** Amend and/or adopt regulations to require additional standards for construction in mapped mudflow and debris fan areas.

**Action 4:** Amend the building code to exclude habitable structures from the 100 year flood plain.

**Action 5:** Continue to require subdivision plat notes identifying inundation areas of jurisdictional dams and flood control structures.

**Goal 2: Mitigate the impacts of wildfire hazards to development.**

**Action 1:** Amend the subdivision regulations to require development standards for areas designated as "substantial" to "high" on the Montrose County Wildfire Hazard Area Map.

**Action 2:** Collaborate with the federal land management agencies on wildfire mitigation in the wildland urban interface.

**Goal 3: Mitigate the impacts of invasive and noxious weeds in Montrose County.**

**Action:** Amend the zoning resolution to require weed control.

## Dark Skies/Light Pollution

**Goal: Preserve the dark sky resource of Montrose County.**

**Objective:** Minimize the light pollution created by new development.

**Action:** Amend the Zoning Resolution to include standards for fixed outdoor lighting.

# SOUTH VALLEY PLANNING AREA

The South Valley Planning Area is the most diverse planning area of Montrose County. This area contains the majority of the County's population and is home to the City of Montrose and the Montrose Regional Airport. This area also contains the most heavily developed portions of the unincorporated County including the West Montrose Sanitation District and south of the City along US Highway 550 to the Ouray County line. The South Valley Planning area is the hub of commerce, tourism and residential development for Montrose County. This area encompasses the Horsefly Peak area, the south rim of the Black Canyon and all of the farms and rural subdivisions of Spring Creek Mesa.

# NATURAL RESOURCES

An abundance of natural resources can be found in Montrose County. These resources provide both opportunities and challenges to the community. Community based planning is necessary to strike a balance between the utilization and conservation of these resources. In particular, the County is home to valuable mineral deposits that can positively impact the economy of the County while also creating potentially negative impacts. Clear policies for the management of these resources will help maximize the overall benefits derived from the resources.



Photo by Mary J Snyder

**23**

Montrose County Master Plan 2010

## Mining, Gas and/or Oil Extraction

**Goal: Mitigate the impacts of mining, gas and/or oil extraction.**

> **Objective 1:** Identify areas with known gravel reserves and maintain a map of their location (see Appendix H1).
>
> > **Action 1:** Amend the zoning resolution to contain a Gravel Overlay District which encompasses known gravel reserves.
> >
> > **Action 2:** Amend the zoning resolution to allow special use permits for gravel mining only within the Gravel Overlay District.
>
> **Objective 2:** Mitigate the impact of mining, gas and/or oil extraction.
>
> > **Action 1:** Create and adopt regulations to mitigate impacts of all mining, gas and/or oil extraction.
> > **Action 2:** Adopt regulations and standards requiring road improvements and ongoing maintenance by mining, gas and/or oil extraction operators using County roadways for mining, gas and/or oil extraction activities.
>
> **Objective 3:** Mitigate the impacts of mining, gas and/or oil extraction located on public lands and split estates.
>
> > **Action:** Require Access Permits for mining, gas and/or oil extraction on public lands that will use County roadways.
>
> **Objective 4:** Assure the adequacy of housing for temporary workers.
>
> > **Action:** Amend existing zoning and Board of Health Regulations as necessary to address health and safety issues associated with temporary housing.

## Rivers and Streams

**Goal: Protect and preserve the amenities provided by natural watercourses and riparian environments.**

> **Objective 1:** Protect and preserve the Uncompahgre River and Cimarron River corridors.
>
> > **Action 1:** Amend the zoning resolution to include a River Corridor Overlay District which at a minimum establishes setbacks for development.

**24**

Montrose County Master Plan 2010

**Action 2**: Coordinate with the City of Montrose and other entities to promote cohesive regulations addressing management of the Uncompahgre River corridor.

**Objective 2:** Minimize the pollutants entering local waterways.

**Action 1:** Update regulations to include stormwater drainage plans for non-residential building permits.

**Action 2:** Collaborate with the Gunnison Basin Selenium Taskforce and local water users to reduce selenium and salinity levels in the local waterways.

## Wildlife

**Goal: Preserve wildlife activity areas as identified by the Colorado Division of Wildlife.**

**Objective:** Mitigate the impact of subdivisions on wildlife and habitat.

**Action 1:** Obtain and maintain a map of wildlife activity areas in the South Valley Planning Area.

**Action 2:** Amend the zoning resolution to require wildlife safe fencing for new major subdivisions and planned unit developments located in wildlife activity areas including the removal of noncompliant fencing.

**Action 3:** Consider additional penalties for "animal at large" violations in the unincorporated County.

**Action 4:** Require that wildlife corridors be designed into new major subdivisions and planned unit developments located in wildlife activity areas.

**Action 5:** Adopt slower speed limits for County roads in wildlife activity areas.

**Action 6:** Require major subdivisions and planned unit developments within wildlife activity areas to enter into mitigation agreements with the Colorado Division of Wildlife as part of the development review process.

BLM_0057953

# AGRICULTURE

Since the 1800s, farming and ranching have been integral parts of the economy and heritage of Montrose County. These activities have contributed to the attractive rural character of Montrose County. Through the years, the prevalence of agriculture in the County has changed, but its importance has not. As agricultural lands give way to other uses it is crucial that those who are willing and able to pursue agricultural activities as a livelihood have the support of the County.

## Farming & Ranching

**Goal 1: Protect the right to farm within the South Valley Planning Area.**

> **Objective 1:** Maintain the agriculturally related uses by right in the General Agricultural Zoning District of the Montrose County Zoning Resolution.

>> **Action:** Amend the existing zoning resolution to include only agriculturally related uses.

> **Objective 2:** Encourage and support markets selling locally produced agricultural products.

>> **Action:** Review and amend the existing zoning resolution to insure that markets are accommodated by County regulations.

**Goal 2: Preserve agricultural lands while providing economic benefit to agricultural land owners.**

> **Objective:** Support voluntary creation of conservation easements within the South Valley Planning Area.

>> **Action 1:** Provide letters of support to citizens seeking conservation easements.

BLM_0057954

# ECONOMIC DEVELOPMENT

Jobs are the lifeblood of a community. The creation and retention of jobs is dependent upon creating a community that is supportive of economic growth activities. Consequently, the planning and regulatory documents used in Montrose County need to consider possible impacts on economic development. One of the major ways that Montrose County can aid in economic development is by making a concerted effort to facilitate the development of local businesses and support a diverse local economy.

**Goal: Support the creation and expansion of businesses within Montrose County.**

> **Objective 1:** Provide areas for the location of commercial, industrial and business uses.
>
> > **Action 1:** Identify areas and nodes for commercial, industrial and business uses on the land use maps of the Master Plan.
> >
> > **Action 2:** Amend the zoning resolution to consider the creation of new jobs as a factor in rezoning and special use applications.
> >
> > **Action 3:** Coordinate with the City of Montrose and other entities to assure that future development adjacent to the airport is compatible with airport plans.
>
> **Objective 2:** Provide assistance and incentives to businesses in Montrose County.
>
> > **Action 1**: Refrain from implementing impact fees for commercial, industrial and business subdivisions or building permits.
> >
> > **Action 2**: Provide information, data and statistics to interested parties considering expanding or locating a business in Montrose County.
> >
> > **Action 3:** Coordinate with local communities to insure that County policies support local economic development efforts.
> >
> > **Action 4:** Amend the commercial corridor overlay requirements of the zoning resolution to be more business friendly.

# RECREATION AND TOURISM

Western Colorado is one of the most beautiful places in the nation and Montrose County is no exception. The natural beauty and recreational opportunities that exist in the South Valley Planning Area are limitless. The terrain of Montrose County includes Black Canyon National Park, river canyons, redrock deserts, fertile valleys and mountains. These natural amenities attract visitors from around the world and offer year round outdoor recreational opportunities. A large portion of the skiers headed to the surrounding regional ski areas travel through Montrose during their visits. Finally, the County is home to world class hunting and fishing. The tourism associated with these activities is a major economic asset to the County and the region.

**Goal 1: Assure positive experiences for those visiting Black Canyon National Park/Gunnison Gorge National Conservation Area.**

**Objective:** Maintain the aesthetic qualities of local attractions including the scenic byways.

**Action 1:** Create regulations to protect the viewsheds around and leading to the Black Canyon National Park and the Gunnison Gorge National Conservation Area.

**Action 2:** Create a scenic byway overlay district which addresses development along scenic byways.

**Goal 2: Protect the viewsheds along Federal and State Highways with particular emphasis on US Highway 550 South.**

**Objective:** Maintain the aesthetic qualities along the highway corridors.

**Action:** Create scenic byway overlay districts which address development along highways.

**Goal 3: Develop a non-motorized trail system.**

**Objective 1:** Coordinate the location and management of a non-motorized trail system among all participating or affected landholders.

**Action:** Develop and adopt a trails plan with stakeholders in the South Valley Planning Area.

**Objective 2:** Create a non-motorized trail from Delta County to Ouray County.

**Action 1:** Identify potential routes for this trail including unused railroad right-of-ways.

**Action 2**: Collaborate with local groups and other entities regarding the development and implementation of trail plans.

**Goal 4: Maintain the functionality of the Montrose Regional Airport.**

**Objective 1:** Promote compatible land uses adjacent to the airport.

**Action:** Coordinate with the City of Montrose and other entities to assure that future development adjacent to the airport is compatible with airport plans.

**Objective 2:** Assure that there is adequate area for expansion of the airport.

**Action:** Amend and/or adopt codes to create a non-residential buffer around the airport.

**Objective 3:** Coordinate with other entities on the airline guarantee program.

**Action:** Support actions to fund the airline guarantee program.

**Goal 5: Promote the primary tourist attractions within the planning area.**

**Objective:** Increase visitor awareness of local attractions.

**Action 1:** Implement signage program identifying local attractions.

**Action 2:** Provide links to tourist related data on the Montrose County website.

**Goal 6: Encourage and support special events that would attract visitors from outside of the County.**

**Objective:** Allow special events within unincorporated Montrose County.

**Action:** Create a process for issuing and reviewing Special Events Permits.

**Goal 7: Support tourism activities related to outdoor recreation.**

**Action:** Coordinate with Visitors and Convention Bureaus and Chambers of Commerce to promote outdoor recreation.

**Objective:** Enhance fishing opportunities along the Uncompahgre River.

**Action:** Pursue opportunities to acquire public access to the Uncompahgre River.

**Goal 8: Encourage recreational activities that support tourism.**

> **Action:** Coordinate with the Montrose Recreation District and other recreation entities to promote recreational activities while considering the health, safety and welfare of the residents.

**Goal 9: Protect and preserve the cultural and historic heritage of the area.**

> **Action 1:** Work with Ute Indian Museum, Colorado Historical Societies and other agencies to protect sites with historical and cultural significance.

> **Action 2:** Create regulations that address development projects that may have impact on historical and cultural sites.

## UTILITIES AND SERVICES

Montrose County is covered by numerous districts and utility providers. Emergency services such as law enforcement and fire protection are among the essential services required by new development. Growth increases the demand for these services and can adversely affect the level of service that these providers offer. For this reason it is essential that planning efforts address the impacts development has on these districts and utility providers.

**Goal 1: Maintain and provide adequate levels of service for fire protection and law enforcement agencies.**

> **Objective:** Assure that fire protection and law enforcement services are available to new developments.

> > **Action 1:** Amend subdivision regulations to require that new subdivisions be within the service district of a fire protection district.

> > **Action 2:** Amend subdivision regulations to require that all new subdivisions have adequate fireflow and other infrastructure necessary for fire protection.

**Goal 2: Provide a domestic water supply that is adequate in terms of quantity and dependability.**

> **Objective:** Assure that new subdivision development in Montrose County is served by a permitted well or permitted water district.

**Action:** Amend the subdivision regulations to require that all development have either a water tap from an established water district or a well permitted by the State Division of Water Resources.

# TRANSPORTATION

Growth means more traffic. Transportation planning has to be done proactively in order to reduce future costs and issues. The Federal and State Highways that connect the communities in Montrose County will continue to decrease in efficiency as traffic increases. In order to avoid the congestion that plagues so many developed areas, Montrose County needs to actively plan for the location and construction of necessary transportation infrastructure. As the population center of the County, the City of Montrose must be included in these efforts.

**Goal 1: Provide for the efficient flow of through traffic on the federal and state highway system within the Uncompahgre Valley.**

**Objective:** Designate a corridor on the east side of the City of Montrose for the location of an arterial roadway that eases traffic on Townsend Avenue and Main Street within the City. This roadway will link the state highways south, east and north of the City of Montrose.

**Action 1:** Coordinate with the City of Montrose to identify the standards for the eastern arterial.

**Action 2:** Pursue an arterial plan that defines and locates the right-of-ways necessary to accommodate an outer arterial. This action item should be considered a high priority.

**Action 3:** Incorporate the eastern minor arterial alignment (as shown in the City of Montrose Comprehensive Plan) into the County's planning documents and regulations.

**Goal 2: Limit congestion of roadways by promoting alternative modes of transportation.**

**Objective:** Encourage pedestrian and non-vehicular modes of transportation in Montrose County.

**Action 1:** Incorporate bicycle lanes into County development regulations.

**Action 2:** Create regulations that would connect development to an adopted trails plan.

**Action 3:** Coordinate bicycle and pedestrian trail network with the City of Montrose.

**Action 4:** Allow for parking lots in support of car pooling activities.

**Goal 3: Utilize existing rail transportation network for the benefit of the Uncompahgre Valley.**

**Objective:** Encourage commercial and industrial development along the existing rail corridor.

**Action:** Support commercial and industrial rezoning along the rail corridor.

**Goal 4: Consider an improved transportation link between Montrose and the West End of the County.**

**Action:** Continue the socioeconomic assessment of the Montrose to Nucla roadway.

**Goal 5: Continue to develop the existing road system of the County.**

**Objective:** Maintain and expand the grid network within the County, which will create road connectivity.

**Action:** Continue acquisition of right-of-ways on section and aliquot lines as outlined in the Montrose County Subdivision Regulations.

**Goal 6: Maintain the functionality of the federal and state highway system in the South Valley Planning Area.**

**Objective:** Encourage limited access points to the federal and state highway system.

**Action:** Adopt an Access Control plan for federal and state highways within the South Valley Planning Area.

BLM_0057960

# INTERGOVERNMENTAL COORDINATION & GRANT FUNDING

As growth continues to impact the South Valley Planning Area of Montrose County, the importance of effective communication between the government organizations operating in that area continues to increase. The following goals, objectives and action items are geared towards developing beneficial partnerships between Montrose County and public organizations of the South Valley Planning Area.

## Local Governments

**Goal: Maintain the IGA and coordinated development review with the City of Montrose.**

> **Objective 1:** Maintain awareness of existing three (3) mile plans, comprehensive plans, service plans and transportation plans that are being utilized by the City of Montrose.
>
> > **Action:** Hold joint City/County Planning Commission meetings annually.
>
> **Objective 2:** Provide assistance to the City of Montrose in maintaining the existing IGA.
>
> > **Action 1:** Initiate IGA update process with the City of Montrose.
> >
> > **Action 2:** Monitor and periodically update the IGA.

## State and Federal Governments

**Goal 1: Maintain and manage access to public lands within the South Valley Planning Area.**

> **Objective 1:** Collaborate with land management agencies on actions affecting public lands access in the South Valley Planning Area.
>
> > **Action 1:** Identify public access points to public lands and maintain a map or list showing their locations.
> >
> > **Action 2:** Create and implement County regulations that require development adjacent to public lands to meet additional standards with regard to public access to public lands.
>
> **Objective 2:** Participate in planning efforts lead by public land agencies.
>
> > **Action 1:** Develop and maintain contacts with public lands agencies managing lands within the South Valley Planning Area.



BLM_0057961

**Action 2:** Initiate dialogue with planning staff of public lands agencies.

**Goal 2: Coordinate with public lands agencies to manage the development of in-holdings within those lands.**

**Objective:** Mitigate the impacts of development within public land in-holdings.

**Action:** Implement regulations to prohibit the subdivision (parcels of less than 35 acres) of in-holdings.

## Grant Funding

**Goal 1: Pursue grant funding to aid in County planning efforts in the South Valley Planning Area.**

**Objective 1:** Identify funding needs based on known issues impacting planning and development within the South Valley Planning Area.

**Action 1:** Create a prioritized list of funding needs/issues.

**Action 2:** Collaborate with the grant writer and county administration to pursue funding.

**Goal 2: Support grant applications which would benefit the citizens of the South Valley Planning Area of Montrose County.**

**Action:** Provide letters of support to citizens or organizations seeking grant funding that further the stated goals of the South Valley Planning Area.

## Other Public and Quasi-Governmental Organizations

**Goal: Maintain open channels of communication with other local public organizations (RE-1J School District, Montrose Fire Protection District, Montrose Recreation District, etc.) operating within the South Valley Planning Area of Montrose County.**

**Objective 1:** Coordinate development review between Montrose County and these agencies.

**Objective 2:** Assist these organizations in meeting their goals.

**Action:** Create and adopt regulations as necessary to aid the efficient operation of these organizations.

BLM_0057962

# LAND USE

Like every community, Montrose County has specific land use issues to deal with. Today these issues include selenium and salinity levels in our waterways, weed control, natural hazards and light pollution. Although these issues present significant challenges, community based planning efforts can provide workable solutions.

## Selenium and Salinity

**Goal: Reduce the amount of selenium and salinity in the water courses of the Uncompahgre Valley:**

> **Objective:** Identify the areas most likely to contribute to selenium and salinity loading.

>> **Action 1:** Adopt and implement best management practices to mitigate selenium and salinity loading in the identified areas of the Uncompahgre Valley.

>> **Action 2:** Collaborate with the Uncompahgre Valley Water Users Association, Gunnison Basin Selenium Taskforce, National Resource Conservation Service and other stakeholders to address the issues associated with selenium and salinity.

## Hazards

**Goal 1: Mitigate the impacts of geological and hydrologic hazards to development.**

>> **Action 1**: Amend building code regulations to require engineered foundations on all property within Montrose County for all new habitable structures.

>> **Action 2**: Adopt a map showing the location of known mudflow and debris fans within Montrose County.

>> **Action 3**: Amend and/or adopt regulations to require additional standards for construction in mapped mudflow and debris fan areas.

>> **Action 4:** Amend the building code to exclude habitable structures from the 100 year flood plain.

>> **Action 5:** Continue to require subdivision plat notes identifying inundation areas of jurisdictional dams and flood control structures.

**Goal 2: Mitigate the impacts of wildfire hazards to development.**

> **Action 1:** Amend the subdivision regulations to require development standards for areas designated as "substantial" to "high" on the Montrose County Wildfire Hazard Area Map.

> **Action 2:** Collaborate with the federal land management agencies on wildfire mitigation in the wildland urban interface.

**Goal 3: Mitigate the impacts of invasive and noxious weeds in Montrose County.**

> **Action:** Amend the zoning resolution to require weed control.

## Montrose Airport

**Goal: Minimize the conflicts between the airport and surrounding land uses.**

> **Objective:** Limit the amount of residential development adjacent to the airport.

> > **Action 1:** Designate areas adjacent to the airport as commercial and industrial through the land use maps of the Master Plan in coordination with the adopted Airport Master Plan.

> > **Action 2:** Amend the Zoning Resolution to create a low density buffer area surrounding the airport.

## Dark Skies/Light Pollution

**Goal: Preserve the dark sky resource of Montrose County.**

> **Objective:** Minimize the light pollution created by new development.

> > **Action:** Amend the Zoning Resolution to include standards for fixed outdoor lighting.

BLM_0057964

# MAHER PLANNING AREA

The Maher Planning Area is the portion of Montrose County located northeast of the Gunnison River and the Black Canyon National Park. This area is bounded by Delta County on the north and Gunnison County on the east. Ranching is the dominant economic activity in this area. Very little development has ever occurred in this portion of Montrose County and as a result the landscape remains entirely rural. The population of the Maher Area is small and there are no incorporated communities within this planning area.

## NATURAL RESOURCES

An abundance of natural resources can be found in Montrose County. These resources provide both opportunities and challenges to the community. Community based planning is necessary to strike a balance between the utilization and conservation of these resources. In particular, the County is home to valuable mineral deposits that can positively impact the economy of the County while also creating potentially negative impacts. Clear policies for the management of these resources will help maximize the overall benefits derived from them.



Photo by Mary J Snyder

BLM_0057965

## Mining, Gas and/or Oil Extraction

**Goal: Mitigate the impacts of mining, gas and/or oil extraction.**

> **Objective 1:** Identify areas with known gravel reserves and maintain a map of their location (see Appendix H1).
>
> > **Action 1:** Amend the zoning resolution to contain a Gravel Overlay District which encompasses known gravel reserves.
> >
> > **Action 2:** Amend the zoning resolution to allow special use permits for gravel mining only within the Gravel Overlay District.
>
> **Objective 2:** Mitigate the impact of mining, gas and/or oil extraction.
>
> > **Action 1**: Create and adopt regulations to mitigate impacts of all mining, gas and/or oil extraction.
> >
> > **Action 2:** Adopt regulations and standards requiring road improvements and ongoing maintenance by mining, gas and/or oil extraction operators using County roadways for mining, gas and/or oil extraction activities.
>
> **Objective 3:** Mitigate the impacts of mining, gas and/or oil extraction located on public lands and split estates.
>
> > **Action:** Require Access Permits for mining, gas and/or oil extraction on public lands that will use County roadways.
>
> **Objective 4:** Assure the adequacy of housing for temporary workers.
>
> > **Action:** Amend existing zoning and Board of Health Regulations as necessary to address health and safety issues associated with temporary housing.

## Wildlife

**Goal: Preserve wildlife activity areas as identified by the Colorado Division of Wildlife.**

> **Objective:** Mitigate the impact of subdivisions on wildlife and habitat.
>
> > **Action 1:** Obtain and maintain a map of wildlife activity areas in the Maher Planning Area.
> >
> > **Action 2:** Amend the zoning resolution to require wildlife safe fencing for new major subdivisions and planned unit developments located in wildlife activity areas.



**38**

Montrose County Master Plan 2010

BLM_0057966

**Action 3:** Consider penalties for "animal at large" violations in the unincorporated County.

**Action 4:** Require that wildlife corridors be designed into new major subdivisions and planned unit developments located in wildlife activity areas.

**Action 5:** Adopt slower speed limits for County roads in wildlife activity areas.

**Action 6:** Require major subdivisions and planned unit developments within wildlife activity areas to enter into mitigation agreements with the Colorado Division of Wildlife as part of the development review process.

# AGRICULTURE

Since the 1800s, farming and ranching have been integral parts of the economy and heritage of Montrose County. These activities have contributed to the attractive rural character of Montrose County. Through the years, the prevalence of agriculture in the County has changed, but its importance has not. As agricultural lands give way to other uses it is crucial that those who are willing and able to pursue agricultural activities as a livelihood have the support of the County.

## Farming & Ranching

**Goal 1: Protect the right to farm within the Maher Planning Area.**

**Objective 1:** Maintain the agriculturally related uses by right in the General Agricultural Zoning District of the Montrose County Zoning Resolution.

**Action:** Amend the existing zoning resolution to include only agriculturally related uses.

**Objective 2:** Encourage and support markets selling locally produced agricultural products.

**Action:** Review and amend the existing zoning resolution to insure that markets are accommodated by County regulations.

BLM_0057967

**Goal 2: Preserve agricultural lands while providing economic benefit to agricultural land owners.**

> **Objective:** Support voluntary creation of conservation easements within the Maher Planning Area.
>> **Action 1:** Provide letters of support to citizens seeking conservation easements.

# RECREATION AND TOURISM

Western Colorado is one of the most beautiful places in the nation and Montrose County is no exception. The natural beauty and recreational opportunities that exist in the Maher Planning Area are limitless. The terrain of the Maher Planning Area includes Black Canyon National Park, fertile valleys, reservoirs and the West Elk Mountains. These natural amenities attract visitors from around the world and offer year round outdoor recreational opportunities. Finally, the Maher Area is home to world class hunting and fishing. The tourism associated with these activities is a major economic asset to the County and the region.

**Goal 1: Assure positive experiences for those visiting Montrose County.**

> **Objective:** Maintain the aesthetic qualities of local attractions including the scenic byways.

> **Action 1:** Create regulations to protect the viewsheds around and leading to the Black Canyon National Park and Gunnison Gorge National Conservation Area.

> **Action 2:** Create a scenic byway overlay district which addresses development along scenic byways.

**Goal 2: Promote the primary tourist attractions within the planning area.**

> **Objective:** Increase visitor awareness of the local attractions.

> **Action 1:** Implement signage program identifying local attractions.

> **Action 2:** Provide links to tourist related data on the Montrose County website.



**Goal 3: Encourage and support special events that would attract visitors from outside of the County.**

>**Objective:** Allow special events within unincorporated Montrose County.

>>**Action:** Create a process for issuing and reviewing Special Events Permits.

**Goal 4: Support tourism activities related to outdoor recreation.**

>>**Action:** Coordinate with Visitors and Convention Bureaus to promote outdoor recreation.

# UTILITIES AND SERVICES

Montrose County is covered by numerous districts and utility providers. Emergency services such as law enforcement and fire protection are among the essential services required by new development. Growth increases the demand for these services and can adversely affect the level of service that these providers offer. For this reason it is essential that planning efforts address the impacts development has on these districts and utility providers.

**Goal: Provide a domestic water supply that is adequate in terms of quantity and dependability.**

>**Objective:** Assure that new subdivision development in Montrose County is served by a permitted well or permitted water district.

>>**Action:** Amend the subdivision regulations to require that all development have either a water tap from an established water district or a well permitted by the State Division of Water Resources.

# TRANSPORTATION

Growth means more traffic. Transportation planning has to be done proactively in order to reduce future costs and issues. The Federal and State Highways that connect the communities in Montrose County will continue to decrease in efficiency as traffic increases. In order to avoid the congestion that plagues so many developed areas, Montrose County needs to actively plan for the location and construction of necessary transportation infrastructure.



**Goal 1: Provide for the efficient flow of through traffic on the state highway system within the Maher Planning area.**

> **Objective:** Coordinate with CDOT to assure that their management goals for highways in the Maher Planning area are not adversely affected by County development.
>
> > **Action:** Amend subdivision regulations as necessary to address CDOT requirements.

**Goal 2: Continue to develop the existing road system of the County.**

> **Objective:** Maintain and expand the grid network within the County, which will create road connectivity.
>
> > **Action:** Continue acquisition of right-of-ways on section and aliquot lines as outlined in the Montrose County Subdivision Regulations.

## INTERGOVERNMENTAL COORDINATION & GRANT FUNDING

As growth continues to impact the Maher Planning Area of Montrose County, the importance of effective communication between the government organizations operating in that area continues to increase. The following goals, objectives and action items are geared towards developing beneficial partnerships between Montrose County and public organizations of the Maher Planning Area.

### State and Federal Governments

**Goal 1: Maintain and manage access to public lands within the Maher Planning Area.**

> **Objective 1:** Collaborate with land management agencies on actions affecting public lands access in the Maher Planning Area.
>
> > **Action 1:** Identify location and type of public access points to public lands and maintain a map or list showing their locations.
> >
> > **Action 2:** Create and implement County regulations that require development adjacent to public lands to meet additional standards with regard to public access to public lands.
>
> **Objective 2:** Participate in planning efforts lead by the public land agencies.



**42**

BLM_0057970

**Action 1:** Develop and maintain contacts with public lands agencies managing lands within the Maher Planning Area.

**Action 2:** Initiate dialogue with planning staff of public lands agencies.

**Goal 2: Coordinate with public lands agencies to manage the development of in-holdings within those lands.**

**Objective:** Mitigate the impacts of development within public land in-holdings.

**Action:** Implement regulations to prohibit the subdivision (parcels of less than 35 acres) of in-holdings.

## Grant Funding

**Goal 1: Pursue grant funding to aid in County planning efforts in the Maher Planning Area.**

**Objective:** Identify funding needs based on known issues impacting planning and development within the Maher Planning Area.

**Action 1:** Create a prioritized list of funding needs/issues.

**Action 2:** Collaborate with the grant writer and county administration to pursue funding.

**Goal 2: Support grant applications which would benefit the citizens of the Maher Planning Area of Montrose County.**

**Action:** Provide letters of support to citizens or organizations seeking grant funding that further the stated goals of the Maher Planning Area.

## Other Public and Quasi-Governmental Organizations

**Goal: Maintain open channels of communication with public and quasi-governmental organizations operating within the Maher Planning Area of Montrose County.**

**Objective 1:** Coordinate development review between Montrose County and these agencies.

**Objective 2:** Assist these organizations in meeting their goals.

**Action:** Create and adopt regulations as necessary to aid the efficient operation of these organizations.



BLM_0057971

# LAND USE

Like every community, Montrose County has specific land use issues to deal with. Today these issues include selenium and salinity levels in our waterways, weed control, natural hazards and light pollution. Although these issues present significant challenges, community based planning efforts can provide workable solutions.

## Selenium and Salinity

**Goal: Reduce the amount of selenium and salinity in the water courses of the Maher Planning Area:**

> **Objective:** Identify the areas most likely to contribute to selenium and salinity loading.

>> **Action 1:** Adopt and implement best management practices to mitigate selenium and salinity loading in the identified areas of the Maher Planning Area.

>> **Action 2:** Collaborate with Water Users Associations, the National Resource Conservation Service and other stakeholders to address the issues associated with selenium and salinity.

## Hazards

**Goal 1: Mitigate the impacts of geological and hydrologic hazards to development.**

> **Action 1**: Amend building code regulations to require engineered foundations on all property within Montrose County for all new habitable structures.

> **Action 2**: Adopt a map showing the location of known mudflow and debris fans within Montrose County.

> **Action 3**: Amend and/or adopt regulations to require additional standards for construction in mapped mudflow and debris fan areas.

> **Action 4:** Amend the building code to exclude habitable structures from the 100 year flood plain.

> **Action 5:** Continue to require subdivision plat notes identifying inundation areas of jurisdictional dams and flood control structures.

**Goal 2: Mitigate the impacts of wildfire hazards to development.**

> **Action 1:** Amend the subdivision regulations to require development standards for areas designated as "substantial" to "high" on the Montrose County Wildfire Hazard Area Map.

> **Action 2:** Collaborate with the federal land management agencies on wildfire mitigation in the wildland urban interface.

**Goal 3: Mitigate the impacts of invasive and noxious weeds in Montrose County.**

> **Action:** Amend the zoning resolution to require weed control.

## Dark Skies/Light Pollution

**Goal: Preserve the dark sky resource of Montrose County.**

> **Objective:** Minimize the light pollution created by new development.

> > **Action:** Amend the Zoning Resolution to include standards for fixed outdoor lighting.

BLM_0057973

# WEST END PLANNING AREA

Montrose County is bisected by the Uncompahgre Plateau. The area of the County west of the plateau has traditionally been known as the West End. The West End Planning area contains the towns of Nucla and Naturita as well as the unincorporated communities of Redvale and Bedrock. The West End is an area of stunning beauty and rich natural resources. Mining has been a long standing industry in this area which has continued to the present day. Some of the most scenic vistas in the State can be found among the desert valleys and river canyons of the West End. The majority of the West End Planning Area is public land which is administered by the Bureau of Land Management and the United States Forest Service. To date, the West End is sparsely populated and has not experienced the same level of development as the Uncompahgre Valley.

## NATURAL RESOURCES

An abundance of natural resources can be found in Montrose County. These resources provide both opportunities and challenges to the community. Community based planning is necessary to strike a balance between the utilization and conservation of these resources. In particular, the County is home to valuable mineral deposits that can positively impact the economy of the County while also creating potentially negative impacts. Clear policies for the management of these resources will help maximize the overall benefits derived from the resources.



Photo by Sandy Potorff



46

Montrose County Master Plan 2010

## Mining, Gas and/or Oil Extraction

**Goal: Mitigate the impacts of mining, gas and/or oil extraction.**

> **Objective 1:** Identify areas with known gravel reserves and maintain a map of their location (see Appendix H1).
>
> > **Action 1:** Amend the zoning resolution to contain a Gravel Overlay District which encompasses known gravel reserves.
> >
> > **Action 2:** Amend the zoning resolution to allow special use permits for gravel mining only within the Gravel Overlay District.
>
> **Objective 2:** Mitigate the impact of mining, gas and/or oil extraction.
>
> > **Action 1:** Create and adopt regulations to mitigate impacts of all mining, gas and/or oil extraction.
> >
> > **Action 2:** Adopt regulations and standards requiring road improvements and ongoing maintenance by mining, gas and/or oil extraction operators using County roadways for mining, gas and/or oil extraction activities.
>
> **Objective 3:** Mitigate the impacts of mining, gas and/or oil extraction located on public lands and split estates.
>
> > **Action:** Require Access Permits for mining, gas and/or oil extraction on public lands that will use County roadways.
>
> **Objective 4:** Assure the adequacy of housing for temporary workers.
>
> > **Action:** Amend existing zoning and Board of Health Regulations as necessary to address health and safety issues associated with temporary housing.

## Rivers and Streams

**Goal: Protect and preserve the amenities provided by natural watercourses and riparian environments.**

> **Objective 1:** Protect and preserve the San Miguel and Dolores River corridors.
>
> > **Action 1:** Amend the zoning resolution to include a River Corridor Overlay District which at a minimum establishes setbacks for development.

BLM_0057975

**Action 2**: Coordinate with the Town of Naturita and other entities to promote cohesive regulations addressing management of the San Miguel River corridors.

**Objective 2:** Minimize the pollutants entering local waterways.

**Action:** Update regulations to include stormwater drainage plans for non-residential building permits.

## Wildlife

**Goal: Preserve wildlife activity areas as identified by the Colorado Division of Wildlife.**

**Objective:** Mitigate the impact of subdivisions on wildlife and habitat.

**Action 1:** Obtain and maintain a map of wildlife activity areas in the West End Planning Area.

**Action 2:** Amend the zoning resolution to require wildlife safe fencing for new major subdivisions and planned unit developments located in wildlife activity areas including the removal or noncompliant fencing.

**Action 3:** Consider penalties for "animal at large" violations in the unincorporated County.

**Action 4:** Require that wildlife corridors be designed into new major subdivisions and planned unit developments located in wildlife activity areas.

**Action 5:** Adopt slower speed limits for County roads in wildlife activity areas.

**Action 6:** Require major subdivisions and planned unit developments within wildlife activity areas to enter into mitigation agreements with the Colorado Division of Wildlife as part of the development review process.

BLM_0057976

# AGRICULTURE

Since the 1800s, farming and ranching have been integral parts of the economy and heritage of Montrose County. These activities have contributed to the attractive rural character of Montrose County. Through the years, the prevalence of agriculture in the County has changed, but its importance has not. As agricultural lands give way to other uses it is crucial that those who are willing and able to pursue agricultural activities as a livelihood have the support of the County.

## Farming & Ranching

**Goal 1: Protect the right to farm within the West End Planning Area.**

> **Objective 1:** Maintain the agriculturally related uses by right in the General Agricultural Zoning District of the Montrose County Zoning Resolution.
>
> > **Action:** Amend the existing zoning resolution to include only agriculturally related uses.
>
> **Objective 2:** Encourage and support markets selling locally produced agricultural products.
>
> > **Action:** Review and amend the existing zoning resolution to insure that markets are accommodated by County regulations.

**Goal 2: Preserve agricultural lands while providing economic benefit to agricultural land owners.**

> **Objective:** Support voluntary creation of conservation easements within the West End Planning Area.
>
> > **Action 1:** Provide letters of support to citizens seeking conservation easements.

BLM_0057977

# ECONOMIC DEVELOPMENT

Jobs are the lifeblood of a community. The creation and retention of jobs is dependent upon creating a community that is supportive of economic growth activities. Consequently, the planning and regulatory documents used in Montrose County need to consider possible impacts on economic development. One of the major ways that Montrose County can aid in economic development is by making a concerted effort to facilitate the development of local businesses and support a diverse local economy.

**Goal: Support the creation and expansion of businesses within Montrose County.**

**Objective 1:** Provide areas for the location of commercial, industrial and business uses.

**Action 1:** Identify areas and nodes for commercial, industrial and business uses on the land use maps of the Master Plan.

**Action 2:** Amend the zoning resolution to consider the creation of new jobs as a factor in rezoning and special use applications.

**Action 3:** Coordinate with the Towns of Nucla and Naturita as well as other entities to assure that future development adjacent to the airport is compatible with airport plans.

**Objective 2:** Provide assistance and incentives to businesses in Montrose County.

**Action 1**: Refrain from implementing impact fees for commercial, industrial and business subdivisions or building permits.

**Action 2**: Provide information, data and statistics to interested parties considering expanding or locating a business in Montrose County.

**Action 3:** Coordinate with local communities to insure that County policies support local economic development efforts.

**Action 4:** Amend the commercial corridor overlay requirements of the zoning resolution to be more business friendly.

BLM_0057978

# RECREATION AND TOURISM

Western Colorado is one of the most beautiful places in the nation and Montrose County is no exception. The natural beauty and recreational opportunities that exist in the West End Planning Area are limitless. The terrain of the West End includes the high elevation environments of the Uncompahgre Plateau, river canyons and redrock deserts. These natural amenities attract visitors from around the world and offer year round outdoor recreational opportunities. Rafters and paddlers from around the world come to float the Dolores River which cuts across the West End's Paradox Valley. Finally, the West End is home to world class hunting and fishing. The tourism associated with these activities is a major economic asset to the County and the region.

**Goal 1: Protect the viewsheds along State Highways.**

    **Objective:** Maintain the aesthetic qualities along the highway corridors.

        **Action:** Create scenic byway overlay districts which address development along highways.

**Goal 2: Maintain the functionality of the Nucla Airport.**

    **Objective:** Promote compatible land uses adjacent to the airport.

        **Action:** Coordinate with the Towns of Nucla and Naturita to assure that future development adjacent to the airport is compatible with airport plans.

**Goal 3: Promote the primary tourist attractions within the planning area.**

    **Objective:** Increase visitor awareness of the local attractions.

        **Action 1:** Implement signage program identifying local attractions.

        **Action 2:** Provide links to tourist related data on the Montrose County website.

**Goal 4: Encourage and support special events that would attract visitors from outside of the County.**

    **Objective:** Allow special events within unincorporated Montrose County.

        **Action:** Create a process for issuing and reviewing Special Events Permits.

BLM_0057979

**Goal 5: Support tourism activities related to outdoor recreation**

> **Action:** Coordinate with Visitors and Convention Bureaus and Chambers of Commerce to promote outdoor recreation.

**Goal 6: Encourage recreational activities that support tourism.**

> **Action:** Promote recreational activities while considering the health, safety and welfare of the residents.

**Goal 7: Protect and preserve the cultural and historic heritage of the area.**

> **Action 1:** Work with Colorado Historical Societies and other agencies to protect sites with historical and cultural significance.

> **Action 2:** Create regulations that address development projects that may have impact on historical and cultural sites.

## UTILITIES AND SERVICES

Montrose County is covered by numerous districts and utility providers. Emergency services such as law enforcement and fire protection are among the essential services required by new development. Growth increases the demand for these services and can adversely affect the level of service that these providers offer. For this reason it is essential that planning efforts address the impacts development has on these districts and utility providers.

**Goal: Provide a domestic water supply that is adequate in terms of quantity and dependability.**

> **Objective:** Assure that new subdivision development in Montrose County is served by a permitted well or permitted water district.

> **Action:** Amend the subdivision regulations to require that all development have either a water tap from an established water district or a well permitted by the State Division of Water Resources.

# TRANSPORTATION

Growth means more traffic. Transportation planning has to be done proactively in order to reduce future costs and issues. The State Highways that connect the communities in Montrose County will continue to decrease in efficiency as traffic increases. In order to avoid the congestion that plagues so many developed areas, Montrose County needs to actively plan for the location and construction of necessary transportation infrastructure. As the population centers of the West End, the Towns of Nucla and Naturita must be included in these efforts.

**Goal 1: Consider an improved transportation link between Montrose and the West End of the County.**

> **Action:** Continue the socioeconomic assessment of the Montrose to Nucla roadway.

**Goal 2: Continue to develop the existing road system of the County.**

> **Objective:** Maintain and expand the grid network within the County, which will create road connectivity.

> **Action:** Continue acquisition of right-of-ways on section and aliquot lines as outlined in the Montrose County Subdivision Regulations.

**Goal 3: Provide for the efficient flow of through traffic on the state highway system within the West End Planning area.**

> **Objective:** Coordinate with CDOT to assure that their management goals for highways in the West End Planning area are not adversely affected by County development.

> **Action:** Amend subdivision regulations as necessary to address CDOT requirements.

# INTERGOVERNMENTAL COORDINATION & GRANT FUNDING

As growth continues to impact the West End Planning Area of Montrose County, the importance of effective communication between the government organizations operating in that area continues to increase. The following goals, objectives and action items are geared towards developing beneficial partnerships between Montrose County and public organizations of the West End.

## Local Governments

**Goal: Pursue IGA's and coordinated development review with the municipalities of Nucla and Naturita.**

> **Objective 1:** Maintain awareness of existing three (3) mile plans, comprehensive plans, service plans and transportation plans that are being utilized by the towns of Nucla and Naturita.

> **Objective 2:** Provide assistance to any municipality that is pursuing or willing to collaborate on IGA's.

> > **Action 1:** Initiate IGA creation process with the towns of Nucla and Naturita.

> > **Action 2:** Monitor and periodically update IGA's that are adopted.

## State and Federal Governments

**Goal 1: Maintain and manage access to public lands within the West End Planning Area.**

> **Objective 1:** Collaborate with land management agencies on actions affecting public lands access in the West End Planning Area.

> > **Action 1:** Identify location and type of public access points to public lands and maintain a map or list showing their locations.

> > **Action 2:** Create and implement County regulations that require development adjacent to public lands to meet additional standards with regard to public access to public lands.

> **Objective 2:** Participate in planning efforts lead by the public land agencies.

> > **Action 1:** Develop and maintain contacts with public lands agencies managing lands within the West End Planning Area.

> > **Action 2:** Initiate dialogue with planning staff of public lands agencies.



BLM_0057982

**Goal 2: Coordinate with public lands agencies to manage the development of in-holdings within those lands.**

> **Objective:** Mitigate the impacts of development within public land in-holdings.

> > **Action:** Implement regulations to prohibit the subdivision (parcels of less than 35 acres) of in-holdings.

## Grant Funding

**Goal 1: Pursue grant funding to aid in County planning efforts in the West End Planning Area.**

> **Objective:** Identify funding needs based on known issues impacting planning and development within the West End Planning Area.

> > **Action 1:** Create a prioritized list of funding needs/issues.

> > **Action 2:** Collaborate with the grant writer and county administration to pursue funding.

**Goal 2: Support grant applications which would benefit the citizens of the West End Planning Area of Montrose County.**

> > **Action:** Provide letters of support to citizens or organizations seeking grant funding that further the stated goals of the West End Planning Area.

## Other Public and Quasi-Governmental Organizations

**Goal: Maintain open channels of communication with public and quasi-governmental organizations (West End School District, Nucla-Naturita Fire Department, etc.) operating within the West End Planning Area of Montrose County.**

> **Objective 1:** Coordinate development review between Montrose County and these agencies.

> **Objective 2:** Assist these organizations in meeting their goals.

> > **Action:** Create and adopt regulations as necessary to aid the efficient operation of these organizations.

Montrose County Master Plan 2010

BLM_0057983

# LAND USE

Like every community, Montrose County has specific land use issues to deal with. Today these issues include selenium and salinity levels in our waterways, weed control, natural hazards and light pollution. Although these issues present significant challenges, community based planning efforts can provide workable solutions.

## Salinity

**Goal: Reduce the amount of salinity in the water courses of the West-End Planning Area:**

**Objective:** Identify the areas most likely to contribute to salinity loading.

**Action 1:** Adopt and implement best management practices to mitigate salinity loading in the identified areas of the West-End Planning Area.

**Action 2:** Collaborate with the Water Users Association, National Resource Conservation Service and other stakeholders to address the issues associated with salinity.

## Hazards

**Goal 1: Mitigate the impacts of geological and hydrologic hazards to development.**

**Action 1**: Amend building code regulations to require engineered foundations on all property within Montrose County for all new habitable structures.

**Action 2**: Adopt a map showing the location of known mudflow and debris fans within Montrose County.

**Action 3:** Amend and/or adopt regulations to require additional standards for construction in mapped mudflow and debris fan areas.

**Action 4:** Amend the building code to exclude habitable structures from the 100 year flood plain.

**Action 5:** Continue to require subdivision plat notes identifying inundation areas of jurisdictional dams and flood control structures.

BLM_0057984

**Goal 2: Mitigate the impacts of wildfire hazards to development.**

> **Action 1:** Amend the subdivision regulations to require development standards for areas designated as "substantial" to "high" on the Montrose County Wildfire Hazard Area Map.

> **Action 2:** Collaborate with the federal land management agencies on wildfire mitigation in the wildland urban interface.

**Goal 3: Mitigate the impacts of invasive and noxious weeds in Montrose County.**

> **Action:** Amend the zoning resolution to require weed control.

## Dark Skies/Light Pollution

**Goal: Preserve the dark sky resource of Montrose County.**

> **Objective:** Minimize the light pollution created by new development.

> > **Action:** Amend the Zoning Resolution to include standards for fixed outdoor lighting.

BLM_0057985

# LAND USE DESIGNATIONS

## Agricultural Designation

Areas designated for agricultural uses. It is recommended that the zoning resolution be updated to require a thirty-five (35) acre minimum parcel size in the General Agricultural Zoning District.

## Agricultural/Rural Residential Designation

Areas designated for agricultural uses and single family residential development. The suggested minimum density for this district is one primary dwelling unit per three (3) acres. It is recommended that the zoning resolution be updated to include a Rural Residential Zoning District which requires a minimum density of one primary dwelling unit per three (3) acre minimum lot size.

## Commercial Designation

Areas designated for development in commercial uses. It is recommended that the zoning resolution be updated to combine the General Commercial District and General Business District. The suggested minimum lot size for commercial properties is three (3) acres unless the property is served by a public sewer in which case the suggested minimum lot size is 10,000 square feet, which is just under ¼ of an acre.

## Commercial Node Designation

The state highways in the Montrose area are the most important pieces of transportation infrastructure in the community. Designation of commercial nodes allows for traffic generated by commercial activity to be routed on secondary roads to intersections on the state highway system. In this manner, the functionality and flow of through traffic on our state highways can be preserved. Accommodations for commercial development should be made in these areas.

These nodes are intended to replace the existing Commercial Corridor Overlay District. It is suggested that the zoning resolution be updated to remove the Commercial Corridor Overlay District and replace it with general development standards for commercial and industrial properties.

## Industrial Designation

Areas designated for development in industrial uses. The suggested minimum lot size for industrial properties is three (3) acres unless the property is served by a public sewer in which case the suggested minimum lot size is 10,000 square feet.

BLM_0057986

## Suburban Residential Designation

Areas designated for residential development where public water and sewer service is available. Single or multiple family dwellings are encouraged in these areas. The suggested minimum lot size for this designation is 10,000 square feet. It is recommended that the zoning resolution be updated to include a Suburban Residential Zoning District which combines the existing General Residential District and Multiple Family Residential District.

# OVERLAY DESIGNATIONS

## Airport Buffer Overlay Designation

The Montrose Regional Airport is both an amenity and an economic driver for the community. The goal of the Airport Buffer Overlay Designation is to allow for future expansion of the airport as necessary by encouraging compatible uses adjacent to the airport. Commercial and industrial uses are encouraged over residential uses in this area. Due to the airports proximity to the City of Montrose, efforts need to be made to ensure that the City's plans and regulations are compatible with the County's plans adjacent to the airport. It is recommended that the zoning resolution be updated to create an Airport Buffer Overlay District.

## Forest Service In-Holdings Overlay Designation

Development on parcels surrounded by United States Forest Service lands presents management challenges to the Forest Service and Montrose County. It is recommended that the zoning resolution be updated to create a Forest Service In-Holding Designation Overlay District. Standards for this district should address density, building height and access. The suggested minimum parcel size for this district is one unit per 35 acres.

## River Corridor Overlay Designation

The rivers of Montrose County are irreplaceable natural resources. The establishment of a River Corridor Overlay Designation is recommended to recognize the importance of the Dolores, San Miguel and Uncompahgre Rivers and to create minimum development setbacks from the rivers. It is recommended that the zoning resolution be updated to create a River Corridor Overlay District.

## Scenic Byway Overlay Designation

Certain highways within Montrose County have been designated as "Scenic Byways". In an effort to promote these tourist attractions, these byways have been overlaid with a Scenic Byway Overlay Designation. It is recommended that the zoning resolution be updated to include a Scenic Byway Overlay District which provides standards for development adjacent to designated scenic byways.

BLM_0057987

# MAPS AND APPENDICES

**Appendix A - Montrose County Planning Areas**

**Appendix B (1) - North Valley Planning Area Map**

**Appendix B (2) - South Valley Planning Area Map**

**Appendix B (3) - Maher Planning Area Map**

**Appendix B (4) – West End Planning Area Map**

**Appendix C (1) – North Valley Projected Land Use**

**Appendix C (2) – South Valley Projected Land Use**

**Appendix C (3) – Maher Projected Land Use**

**Appendix C (4) – West End Projected Land Use**

**Appendix D (1) – North Valley Wildlife Activity Areas**

**Appendix D (2) – South Valley Wildlife Activity Areas**

**Appendix D (3) – Maher Wildlife Activity Areas**

**Appendix D (4) – West End Wildlife Activity Areas**

**Appendix E (1) – North Valley Transportation Plan**

**Appendix E (2) – South Valley Transportation Plan**

**Appendix E (3) – Maher Transportation Plan**

**Appendix E (4) – West End Transportation Plan**

**Appendix F (1) – North Valley Wildfire Hazard Area**

**Appendix F (2) – South Valley Wildfire Hazard Area**

**Appendix F (3) – Maher Wildfire Hazard Area**

**Appendix F (4) – West End Wildfire Hazard Area**

**Appendix G (1) – North Valley Debris/Flood and Hazard Area Map**

**Appendix G (2) – South Valley Debris/Flood and Hazard Area Map**

**Appendix G (3) – Maher Debris/Flood and Hazard Area Map**

**Appendix G (4) – West End Debris/Flood and Hazard Area Map**

**Appendix H (1) – North Valley Gravel Resources Map**

**Appendix H (2) – South Valley Gravel Resources Map**

**Appendix H (3) – Maher Gravel Resources Map**

**Appendix H (4) – West End Gravel Resources Map**

**Appendix I - 2007 Household Survey Results Summary**

BLM_0057989



**Montrose County, CO
Planning Areas
Appendix A (Draft)**

BLM_0057990

# Montrose County Land Use Master Plan Update
## 2007 Household Survey

### Private Land Issues

**Questions 1-6\***

| | N | | Mean | Median | Mode |
|---|---|---|---|---|---|
| | Valid | Missing | | | |
| Threat of Residential Development to Farm/Ranch Land | 2699 | 93 | 4.24 | 5.00 | 5 |
| Need to Develop More Recreational Land Use by the County | 2658 | 134 | 3.05 | 3.00 | 3 |
| Preservation of Scenic Resources | 2702 | 90 | 4.24 | 5.00 | 5 |
| Diminishing Supply of Irrigation Water | 2655 | 137 | 4.50 | 5.00 | 5 |
| Appropriate Management of Invasive Weed Species | 2641 | 151 | 3.99 | 4.00 | 5 |
| Acquisition of Land by Conservation Trusts | 2442 | 350 | 3.54 | 4.00 | 5 |

**Question 7: Support of County Zoning Regulations**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes | 1545 | 55.3 | 58.1 | 58.1 |
| | No | 400 | 14.3 | 15.0 | 73.1 |
| | Not Sure | 715 | 25.6 | 26.9 | 100.0 |
| | Total | 2660 | 95.3 | 100.0 | |
| Missing System | | 132 | 4.7 | | |
| Total | | 2792 | 100.0 | | |

**Question 8: Land Use Controls: Positive Effect on Property Value**



Do Land Use Controls Positively Affect Property Value?

Not Sure 31.1%
No 13.8%
Yes 55.1%

**Question 9: Land Use Controls: Negative Effect on Property Value**



Do Land Use Controls Negatively Affect Property Value?

Not Sure 36.3%
No 39.7%
Yes 24.0%

### Private Land Issues (continued)

**Question 10: If sewer is available, how many houses should be allowed per acre?**



Houses Per Acre: Sewer Available

5-6 houses, 12.6%
1-2 houses, 49.6%
3-4 houses, 37.7%

**Question 11: If sewer is not available, what do you consider minimum lot size for a house?**



Minimum Lot Size: Sewer Not Available

6-10 acres, 3.9%
10+ acres, 7.3%
4-5 acres, 15.7%
1 acre, 40.5%
2-3 acres, 32.6%

### Public Land / Open Space Issues

**Questions 12-15\***

| | | Access to Public Lands | River Corridors | Need for a Recreation Trails System | Preservation of Wildlife |
|---|---|---|---|---|---|
| N | Valid | 2734 | 2679 | 2707 | 2742 |
| | Missing | 58 | 113 | 85 | 50 |
| Mean | | 4.40 | 4.29 | 3.60 | 4.37 |
| Median | | 5.00 | 5.00 | 4.00 | 5.00 |

### Growth Issues

**Questions 16-20 \***

| | N | | Mean | Median |
|---|---|---|---|---|
| | Valid | Missing | | |
| Air Quality | 2755 | 37 | 4.52 | 5.00 |
| Availability of Potable (Drinking) Water | 2749 | 43 | 4.75 | 5.00 |
| Affordable Housing: Single Family | 2724 | 68 | 4.03 | 4.00 |
| Affordable Housing: Multi-Family | 2693 | 99 | 3.59 | 4.00 |
| Continuing Growth of Montrose County | 2686 | 106 | 3.50 | 4.00 |

BLM_0057991

## Infrastructure / Services Issues

### Questions 21-30*

**Infrastructure / Services Issues:**
**Questions 21-30 (Means)**



## Land Use / Master Plan

### Questions 31-34*

|  | N |  | Mean | Median |
|---|---|---|---|---|
|  | Valid | Missing |  |  |
| Do you support a County Master Plan update that helps guide future growth? | 2640 | 152 | 4.22 | 5.00 |
| When implementing the Master Plan, the county should depart from it only when there is public benefit to do so. | 2548 | 244 | 3.78 | 4.00 |
| Should the County's Master Plan be flexible enough so it doesn't discourage development? | 2624 | 168 | 3.26 | 3.00 |
| A Master Plan is not all that important, you can't plan for the future. | 2582 | 210 | 1.93 | 1.00 |

## Demographics

### Question 35 Property Owner

|  |  | Frequency | Percent | Valid Percent |
|---|---|---|---|---|
| Valid | Yes | 2485 | 89.0 | 92.0 |
|  | No | 215 | 7.7 | 8.0 |
|  | Total | 2700 | 96.7 | 100.0 |
| Missing System |  | 92 | 3.3 |  |
| Total |  | 2792 | 100.0 |  |

### Question 36 Gender

|  |  | Frequency | Percent | Valid Percent |
|---|---|---|---|---|
| Valid | Male | 1447 | 51.8 | 52.9 |
|  | Female | 1288 | 46.1 | 47.1 |
|  | Total | 2735 | 98.0 | 100.0 |
| Missing System |  | 57 | 2.0 |  |
| Total |  | 2792 | 100.0 |  |

## Demographics (continued)

### Question 37 Age

|  |  | Frequency | Percent | Valid Percent |
|---|---|---|---|---|
| Valid | 18-29 | 68 | 2.4 | 2.5 |
|  | 30-39 | 163 | 5.8 | 5.9 |
|  | 40-49 | 338 | 12.1 | 12.3 |
|  | 50-59 | 678 | 24.3 | 24.6 |
|  | 60-69 | 763 | 27.3 | 27.7 |
|  | 70+ | 743 | 26.6 | 27.0 |
|  | Total | 2753 | 98.6 | 100.0 |
| Missing System |  | 39 | 1.4 |  |
| Total |  | 2792 | 100.0 |  |

### Question 38 Time Lived in Montrose County

|  |  | Frequency | Percent | Valid Percent |
|---|---|---|---|---|
| Valid | 0-5 years | 556 | 19.9 | 20.2 |
|  | 6-10 years | 446 | 16.0 | 16.2 |
|  | 11-20 years | 522 | 18.7 | 18.9 |
|  | 21+ years | 1232 | 44.1 | 44.7 |
|  | Total | 2756 | 98.7 | 100.0 |
| Missing System |  | 36 | 1.3 |  |
| Total |  | 2792 | 100.0 |  |

### Question 39 Area of County in Which Respondent Lives



**Demographic: Area of County in Which Respondent Lives**

*Questions 1-6 and 12-34 used a rating scale of 1 to 5, with the number 1 representing a low rating and 5 representing a high rating. Respondents could pick any whole number from 1 to 5. For those not sure, an N/O (No Opinion) option was provided.

Information extracted from Montrose County Land Use, 2007 Household Survey and provided as citizen handout.

July 2007

BLM_0057992

Montrose County
Weed Mitigation Department

# Weed Management Plan

4-18-2011

Section I:    Introduction
    **1.1**   **Documents** …………………………………………………………………..3
    **1.2**   **Introductory Statements** …………………..………………………………3
    **1.3**   **Mission Statement** ………………………………………………………3

**1.4**     **Montrose County Weed Management Infrastructure** ......................4

**1.5**     **Goals of the Montrose County Weed Mitigation Department** ................5


**Section II:     Evaluating and Responding to Invasives**

  **2.1**     **Weed Species Categorization** ...............…..........................................5

     2.1.1   "List A" ....................................................................................5

     2.1.2   "List B" ....................................................................................5

     2.1.3   "List C" ....................................................................................5


  **2.2**     **Treatment Standards for List A, B and C Species** .............................6


  **2.3**     **Circumstantial and Site-Specific Response to Weed Management Issues** ...6

     2.3.1   Public Lands ............................................................................7

     2.3.2   Private Lands ...........................................................................7

     2.3.3   Continuation of Weed Policy for Public and Private Property ...............7

     2.3.4   Rights-of-Way ..........................................................................7

     2.3.5   County Facilities ......................................................................8


**Section III:     Acquisition and Allocation of Funding** ........................................8


**Section IV:     Management Approaches**

  **4.1**     **Treatment Techniques Employed by the Weed Mitigation Department** .....8

     4.1.1   Prevention ...............................................................................9

     4.1.2   Early Detection and Rapid Response .............................................9

     4.1.3   Scouting and Mapping ..............................................................9

     4.1.4   Integrated Pest Management ......................................................10

     4.1.5   Mechanical Control ..................................................................10

     4.1.6   Herbicide Application ...............................................................10

       A.   Rights-of-way ....................................................................10

       B.   Bare ground treatments ........................................................10

       C.   Off Highway Vehicles ..........................................................10

       D.   Backpack/Hand spraying ......................................................11

       E.   Aerial Applications .............................................................11

       F.   Treatment of Noxious Tree Species .........................................11

     4.1.7   Biological and Cultural Control ..................................................11


  **4.2**     **Collaborative Weed Management Projects** ......................................11

     4.2.1   Support for Private Landowners ..................................................12

       A.   Department Treatments on Private Property ...............................12

       B.   Cost Share .......................................................................12

     4.2.2   Collaboration with Land Management Agencies .............................13

     4.2.3   Cooperation with Neighboring Counties .......................................14

     4.2.4   Support and Utilization of Commercial Applicators .........................14


  **4.3**     **General Management Strategies and Responsible Land Use** ...............14

     4.3.1   Strategies for Managing a Weed Infestation ..................................15

       A.   Prevention .......................................................................15

       B.   Scouting Mapping and Inventorying .........................................15

       C.   Developing a Treatment Strategy .............................................15

       D.   Maximizing the Effectiveness of a Treatment ..............................16

       E.   Prioritizing Treatments ........................................................16

1

F.   Monitoring ...........................................................................17
4.3.2   Public Land Use ...............................................................17

**Section V:   Colorado Noxious Weed List**
**5.1   Montrose County Weeds and the State Noxious Weed List** ...................18

**5.2   Colorado Noxious Weed List** .................................................................18

**Section VI:   Prioritizing Management of Invasives**
**6.1   The Department's Assessment of Management Goals** ..........................20

**6.2   Timelines and Management Strategies for Montrose County Weeds** ......20
6.2.1   Diffuse Knapweed .........................................................21
6.2.2   Hoary Cress ..................................................................22
6.2.3   Purple Loosestrife ...........................................................22
6.2.4   Russian Knapweed .........................................................23
6.2.5   Spotted Knapweed ..........................................................24
6.2.6   Yellow Starthistle ...........................................................24
6.2.7   Yellow Toadflax .............................................................25

**Appendix A:   Area Maps** .................................................................27

**Glossary** .................................................................................29

# Section I:        Introduction

## 1.1        Documents

1.  § 35-4 Pest Control
2.  § 35-4.5 Pest Control Compact
3.  § 35-5 Pest Control Districts
4.  § 35-5.5 Colorado Noxious Weed Act
5.  § 35-10 Pesticide Applicators Act
6.  8 CCR 1203-1 Administration and Enforcement of the Pesticide Act

2

BLM_0057995

7. 8 CCR 1203-2 Rules and Regulations Pertaining to the Administration and Enforcement of the Pesticide Applicators Act
8. 8 CCR 1203-7 Rules and Regulations Pertaining to the procedure for establishing pest control district and for the control of Grasshoppers, Mormon Crickets, or Range Caterpillars
9. 8 CCR 1203-19 RECODIFIED Administration and Enforcement of the Colorado Noxious Weed Act—see 1206-2
10. 8 CCR 1206-2 Rules Pertaining to the Administration and Enforcement of the Colorado Noxious Weed Act

## 1.2    Introductory Statements

The Montrose County Weed Management Plan was developed and adopted pursuant to the authority of The Colorado Noxious Weed Act § 35-5.5-105 for all unincorporated territory in Montrose County and incorporates all the requirements and duties imposed by Article 5.5 of Title 35 of the Colorado Revised Statutes.

The purpose of the Montrose County Weed Management Plan is to inform the public about the role and practices of the Montrose County Weed Mitigation Department and to serve as a reference to landowners/users combating noxious species.  As the department spends a significant amount of time and effort in combating noxious weeds, it is our hope that landowners and land users will use the document to implement land use practices that both support the efforts of the department and capitalize on the services that we provide.  Though the management plan has been written to reflect the goals and management strategies implemented by the department, the evolution of management strategies, targeted species etc., may not be reflected in this document.  The document will be revised periodically to reflect the changes implemented by the Montrose County Weed Mitigation Department, Local, State and Federal governments.

## 1.3    Mission Statement

In consideration of the encroachment of noxious weeds into Montrose County, the Montrose County Weed Mitigation Department (hereinafter referred to as the "Weed Mitigation Department" or "department") becomes an agent in the preservation of productivity and general wellbeing of unincorporated lands within the county.  To preserve our landscape and natural resources from the degradation associated with the spread of noxious weeds, our goals become the eradication of isolated or young weed populations, management of well established populations, and the awareness, education and instruction of landowners and recreational land-users concerned with the impacts of noxious weeds.

With the success or failure of a countywide weed management plan dependent on the coordination of private landowners, land management agencies and the Weed Mitigation Department, it is our hope that the weed management aim of these individuals and organizations can be synchronized to facilitate the maintenance and restoration of the ecological and economical health of the Montrose County landscape.  While this document is meant to demonstrate the function and overall aim of the Weed Mitigation Department, we hope that it may also be used as a model for landowners and public land-users committed to the maintenance of the county's ecological health.

3

BLM_0057996

**1.4    Montrose County Weed Management Infrastructure**

Though the role of the Montrose County Weed Mitigation Department has grown to include responsibilities outside state mandates, the primary role for the department is to ensure the county's compliance with state noxious weed law.  Though the department was originally created as an independent entity, deliberation has resulted in its restructuring as a part of the Facilities Division.

Operating under the <u>Colorado Noxious Weed Act</u> § 35-5.5-107, the Montrose County Weed Management Commission (established by, and operating under, the Board of County Commissioners) serves as an advisory board for the Weed Mitigation Department.  The Montrose County Weed Management Commission will be involved in the development and approval of the integrated management plan for noxious weeds in Montrose County.

The Uncompahgre Valley Pest Control District was created in 1964 pursuant to Article 16, Chapter 6, <u>Colorado Revised Statutes</u> of 1953, to ensure the management of harmful invasive species within the boundaries of the district.  The creation of the district was voted on and approved by residents falling within the boundaries of the district.  The Uncompahgre Valley Pest Control District Advisory Committee may provide recommendations to the BOCC and pest inspector for management of issues concerning invasive species within the boundaries of the Pest District.  In accordance with § 35-5-111 <u>Colorado Revised Statutes</u>, moneys collected from residents within the boundaries of the Uncompahgre Pest Control District for the purpose of management within the district, will be set apart from funds allocated for countywide pest control and utilized for the management of invasive species within the boundaries of the district.

In addition to tax levies (implemented for both countywide and district-specific pest management), the Montrose County Weed Mitigation Department will seek additional funding from outside sources (grants, interagency projects etc.) to supplement funding for treatment of invasive species.  See sections <u>2.3</u>, <u>3</u> and <u>4.2</u> for clarification of management practices and allocation of funding.

Maps of the Uncompahgre Pest Control District and Cooperative Weed Management Areas can be found in Appendix A.

**1.5    Goals of the Montrose County Weed Mitigation Department**

1. To reduce, to the best of our ability, the impact and extent of ecological damage resulting from the proliferation of noxious weeds.
2. To develop and support best management practices for noxious weed species in Montrose County.
3. To facilitate the stewardship of public and private lands as it pertains to noxious weed species.
4. To support and aid other organizations in their pursuit of goals running parallel to those of the Montrose County Weed Mitigation Department.
5. To facilitate for the users, community leaders, landowners, developers and resource managers of Montrose County, a better understanding of the economic and ecological impacts of the intrusion of noxious weeds.
6. To educate the public on the effectiveness, safety and necessity of the treatment methods employed by the Montrose County Weed Mitigation Department.

4

BLM_0057997

7. To prioritize weed management efforts in a way that best utilizes funding and manpower in the pursuit of biodiversity and the economic and ecological health of the landscape.
8. To seek partners and supplemental funding to adequately achieve management goals for Montrose County's noxious weeds.
9. To create an understanding of the measures that the department takes in combating invasive species, especially as they pertain to the obligations that arise from the acquisition of outside sources of revenue.
10. To inform the public about the monetary and biological constraints that the Montrose County Weed Mitigation Department faces in combating the spread of noxious weeds.
11. To adhere to the state guidelines set fourth in the <u>Colorado Noxious Weed Act</u>.


### Section II:     Evaluating and Responding to Invasives

**2.1     Weed Species Categorization**

The weed species on the Colorado Department of Agriculture's Weed List fall into three categories based largely on their level of infestation within the state.

 **2.1.1** **"List A"** weed species have been targeted for eradication by the Colorado Commissioner of Agriculture.  These species are categorized by their invasive nature, manageable levels of infestation within the state, the potential impact of their introduction and their potential for expansion.

 **2.1.2** **"List B"** species are established species for which state noxious weed management plans have been implemented to stop continued spread.

 **2.1.3** **"List C"** species are species for which the state supports local government's management on private and public lands.

The Montrose County Weed Mitigation Department will comply with state standards for treatment of species falling into these categories.

**2.2     Treatment Standards for List A, B and C Species**

**A.** With the objective for treatment of "List A" species being eradication, control methods will seek to eliminate the plant prior to seed production and detect and eliminate plants arising from seed, reproductive propagule, or root stock. Treatments will be conducted for the duration of the plant's reproductive viability and will continue until eradication of the species has been achieved.  Mapping of "List A" species will be conducted to facilitate the effective treatment of infestations in subsequent years, and to provide data for the Colorado Department of Agriculture.

**B.** Species that fall into the "List B" category and are designated for eradication will be handled in a similar manner as those categorized as "List A," so long as those measures don't interfere with the treatment efforts for priority species.  For those "List B" species where eradication isn't feasible, measures undertaken in the containment of the infestation will be conducted in accordance with the <u>Rules Pertaining to the Administration and Enforcement of the Colorado Noxious Weed Act</u> 8 CCR 1206-2.

5

BLM_0057998

C. Treatment of "List C" (and weeds existing outside the state weed list) will occur on a case-by-case basis. Treatment will typically occur when the species is encountered during routine management of priority species and will be subject to an applicator's assessment, where the level of infestation, cost of treatment and susceptibility to the treatment method is expected to yield a favorable result. Further treatment of weeds failing to meet the state's high priority list will occur when deemed appropriate (exemplified by infestations on county facilities and rights-of-way).

## 2.3   Circumstantial and Site-Specific Response to Weed Management Issues

Though the Colorado Noxious Weed Act gives Montrose County authority to enforce state and county weed law, resources allocated to promote responsible land management are utilized in weed management projects. Implementation of best management practices by landowners, land management agencies, retailers and land-users allows the Weed Mitigation Department to broaden the scope of its management efforts and focus on projects that promote the ecological health of Montrose County as a whole. Though enforcement may occur in extreme cases of noncompliance, the Montrose County Weed Mitigation department will encourage residents' participation in countywide integrated pest management projects and focus its efforts on treatments that achieve management goals.

Negligent land management practices may be addressed in a manner that reflects the severity of the situation. Though the department hopes to minimize the need for enforcement, the department is most likely to mandate management practices when dealing with priority species—typically "List A." As the department seeks supplementary funding to implement ecologically sound management practices on private property occupied by high-threat species (see section 4.2.1), measures may be taken to ensure the cooperation of noncompliant landowners. Such measures will be conducted in accordance with the Colorado Noxious Weed Act § 35-5.5-109.

### 2.3.1   Public Lands
Any board, department or agency responsible for the management of public lands that lie within Montrose County will be expected to implement an adequate integrated pest management plan where necessary. Treatments should be made to A and B species weeds in addition to any county or state weed plans implemented for the treatment of List C species. Implementation and evaluations of integrated pest management plans should be conducted in accordance with the Colorado Noxious Weed Act § 35-5.5-110.

### 2.3.2   Private Lands
Montrose County landowners will be expected to address noxious weed management issues in a manner that meets the demands of the infestation. The current Colorado Noxious Weed List can be referenced in section 5.2 along with management strategies utilized by the Weed Mitigation Department in the treatment of priority species 6.2. List A and List B species weeds should be treated along with any additional priority species for which Montrose County has developed management expectations. Any inspections or treatments by the Montrose County Weed Mitigation Department will be conducted in accordance with the Colorado Noxious Weed Act § 35-5.5-109.

6

BLM_0057999

### 2.3.3   Continuation of Weed Policy for Public and Private Property

Both areas at risk for the development of weed infestations and areas that have the potential to spread existing infestations will be expected to submit a weed management plan to be reviewed and approved by the Weed Mitigation Department. Management plans should be tailored to meet the demands of the infestation(s), with management assessments conducted by someone qualified to make such assessments. Properties requiring a weed management plan are exemplified by major subdivisions and gravel pits.

### 2.3.4   Rights-of-Way

The Montrose County Weed Mitigation Department will conduct weed treatments on county rights-of-way with prioritization of treatments and the appropriation of funds based on the severity of the infestation and the species in question. Measures taken will include control methods meeting the standard for treatment of "A" and "B" species weeds and species whose management is deemed necessary. In addition to treatment of species on the Colorado Noxious Weed List, the Weed Mitigation Department may conduct right-of-way treatments for government entities whose interests fall outside the scope of the Colorado Noxious Weed Act. Agencies like Montrose County Public Works or the Colorado Department of Transportation may elicit the aid of the Weed Mitigation Department in the nonselective or species-specific treatment of plant populations that cause concern within the scope of their weed management aim. In conducting treatments for other agencies, the Montrose County Weed Mitigation Department will adopt management strategies that achieve the aim of the organization in question—so long as those strategies don't run in opposition to the goals and limitations of the Weed Mitigation Department.

### 2.3.5   County Facilities

List A and List B species on county facilities will be treated in compliance with the Colorado Noxious Weed Act. Treatments of undesirable species present on county facilities will be conducted upon request of facilities maintenance or airport operators. Treatments may fall outside the scope of the Colorado Noxious Weed Act and will be conducted in a manner consistent with the rules and regulations of pesticide application. Control measures may be taken to maintain desirable foliage or to seek compliance with city ordinances, FAA regulations, and safety standards.

### Section III:   Acquisition and Allocation of Funding

Though Weed Mitigation is a department within Montrose County and acts to achieve weed management goals critical to the health of the Montrose County landscape, working with other agencies necessitates a weed control philosophy that extends beyond the scope of county funding. Though the acquisition of additional funding allows for the department's responsibilities to the county to be more easily met, additional funding is accompanied by additional obligations to the organizations responsible for that revenue.

With a significant portion of the current funding for treatments conducted by the Montrose County Weed Mitigation Department coming from grants, the distribution of work conducted by the department reflects the purpose for which those grants were

7

BLM_0058000

initialized. In this way, the evaluation of weed control efforts (and the allocation of funding) becomes less departmentalized, and is subject to the weed management aim of the organization providing monetary compensation. The department only engages in projects and pursues supplemental funding that seeks to achieve/support the management goals of the department and the ecological wellbeing of the landscape. It is through the support and participation of these organizations that the Montrose County Weed Mitigation Department is able to go beyond the minimum standard for weed control. The following section will detail what forms of weed control are emphasized and why.

## Section IV:    Management Approaches

### 4.1    Treatment Techniques Employed by the Weed Mitigation Department

Though this section gives a general overview of what could be expected from season to season, the Montrose County Weed Mitigation Department could be expected to deviate from these treatment strategies to maximize the effectiveness of management efforts. In order to create an effective integrated management program for a department or specific species, a periodic evaluation of management strategies is necessary to adapt to obstacles like increased pesticide tolerance in a given population, seasonal climate shifts, industrial advancements in treatment methods, introduction of new invasive species, increasingly effective control of existing infestations, reevaluation of the potential impacts of an existing population, and bureaucratic shifts in perception of a species. The following sections detail treatment strategies employed by the Montrose County Weed Mitigation Department, and though a similar approach could be expected in coming years, they should not be interpreted as an itinerary for future management.

#### 4.1.1    Prevention
Though most of the treatments conducted by the department are a reaction to an arising management issue, preventing the establishment of an invasive species is a more cost-effective and ecologically sound practice. With treatment of an invasive usually arising from the discovery of the species in a treatment area, "prevention" often means eliminating parent populations (on site or on neighboring sites) prior to widespread establishment. This concept is akin to the Early Detection and Rapid Response policy detailed in the upcoming section. Though this is largely representative of the department's response to young populations of invasives, the department will prevent the establishment of priority species with proactive approaches when their encroachment can be predicted. Preemptive management practices will be undertaken when the monetary and potential ecological costs of the treatment can be accurately compared against, and are outweighed by, the ecological and economic loss predicted as a result of inaction. As both labor and monetary expenditures of preventative management projects are low (as compared to treatment of established populations), landowners are encouraged to combat invasives prior to their establishment or when populations are small. The most effective means to prevent the establishment of an invasive species is to implement land-use practices that minimize soil disturbances and insure seeds, roots, stalks etc. aren't introduced.

#### 4.1.2    Early Detection and Rapid Response
With its compliance to the statewide implementation and monitoring of an Early Detection and Rapid Response system (EDRR), the Montrose County Weed Mitigation Department can be expected to make effective treatments to young

8

infestations whose exponential growth would otherwise yield management costs and ecological effects proportionate to that growth. With a seasonal weed management plan in place, enacting a rapid response to a developing infestation necessitates a plan with a flexibility that reflects the importance of combating an infestation in its infancy. Though acreages treated during EDRR are often significantly smaller than those of methods employed in other types of infestations, early treatment is an effective use of resources that can be expected to save time, money, energy and the ecological health of the landscape. Though the Colorado Department of Agriculture's EDRR program encourages treatment of List A species on a statewide level, the Montrose County Weed Mitigation Department will utilize these concepts in the treatment of all weed populations to which these concepts can be effectively applied.

### 4.1.3   Scouting and Mapping

Scouting and mapping individual weeds and infestations has become an integral part of the treatment strategies implemented by the Montrose County Weed Mitigation Department. Though scouting and mapping often occur as a byproduct of weed treatments, they are invaluable tools for developing both future treatment strategies and understanding of the effectiveness of management efforts. Scouting for young weeds can be conducted from the previous season's mapping, allowing for early treatments of plants that may have been overlooked otherwise. Scouting most often occurs while treatments are being made; a GPS is used to pinpoint locations of infestations and individual weeds. Scouting and mapping is most common when dealing with species whose distribution is sparse or with priority species where eradication necessitates detailed knowledge of the infestation. Mapping showcases the severity of a given infestation and is utilized further in the acquisition of supplementary funding.

### 4.1.4   Integrated Pest Management

Integrated pest management involves the use of two or more management techniques to control a noxious species. Integrated pest management techniques will be utilized when necessary, when the use of a single treatment method is cause for concern, or when the implementation of those strategies is expected to yield a result that is preferable to a single treatment method. Though this section is using a strict construction of the term "Integrated Pest Management," it should be noted that all management techniques adopted by the Montrose County Weed Mitigation Department are selected through an integrated approach; the treatment method is chosen through the examination and evaluation of all known management strategies and chosen for its effectiveness, efficiency and predicted impact to native/desirable ecological elements.

### 4.1.5   Mechanical Control

Some of the mechanical control methods employed by the Montrose County Weed Mitigation Department include using chainsaws, reciprocating saws, handsaws and loppers on trees and brush; digging and pulling weeds; and clipping and bagging a plant or its reproductive mechanisms. Management methods utilizing mechanical control are typically part of an integrated pest management plan and may grow to include the use of additional equipment and techniques.

### 4.1.6   Herbicide Application

9

BLM_0058002

A. **Rights-of-way** applications are typically made using spray trucks, and are conducted in a way that maximizes the effectiveness of the treatment while minimizing risk to desirable plants. Weed species will be targeted with selective herbicides whenever possible and applications will be made to species that share a susceptibility to the herbicide in use—so long as a desirable effect is expected. In addition to treatments of noxious weeds, the Weed Mitigation Department will make treatments to sites where plant life may create safety issues (line of sight issues etc.). Refer to section 2.3.4 *Rights-of-Way* for details.

B. **Bare ground treatments** will be made at the request of Road and Bridge and will consist of a two-foot swath on the edge of the road bed (applied prior to paving). These treatments will be non-selective and will be made to maintain the integrity and longevity of the road.

C. **Off highway vehicles** will be utilized in areas that are inaccessible by spray truck. Rights-of-way, private and public lands will be spot-sprayed or broadcast (in areas of high density or where a low impact to desirable plant life is expected)). Typical applications will be made with selective herbicides.

D. **Backpack/hand spraying** will occur in areas that are otherwise inaccessible or where the wellbeing of the landscape is of particular concern.

E. **Aerial applications** may be made by private contractors where warranted by the severity of the infestation or in areas where other treatment methods are expected to fall short of management expectations.

F. **Treatment of Noxious Tree Species** will be conducted in the manner best suited to a given scenario. The methods utilized by the Weed Mitigation Department in the management of undesirable trees include, but are not limited to, foliar applications, stump treatments, injector lances, and frill treatments.

### 4.1.7   Biological and Cultural Control

If a positive result is expected from the use of a cultural or biological control strategy, the Montrose County Weed Mitigation Department may implement the management strategy (following an analysis of its cost and benefits). When utilizing a cultural or biological control method, treatment areas often expand beyond the scope of the original project; if an organization or individual is conducting cultural or biological control inside Montrose County, the Weed Mitigation Department will support those efforts, so long as they are conducted in the best interest of the landscape. An example of a biological control project affecting Montrose County is the migration of the tamarisk beetle through the San Miguel River system.

Reseeding infested areas is a practice commonly conducted by agencies like the BLM, USFS, NRCS and Uncompahgre Partnership, and is an example of a cultural control method that may be utilized by the Weed Mitigation Department.

When conducting treatments of noxious species', the Montrose County Weed Mitigation Department will keep records detailing treatments on a given day or location. Records

10

will be made in accordance with the Colorado Pesticide Applicators Act § 35-10-111 and
kept on file for a minimum of three years.

## 4.2     Collaborative Weed Management Projects

The Montrose County Weed Mitigation Department may support and/or engage in weed
management projects that fall outside the scope of both the department's typical weed
management efforts and of county jurisdiction.

As weed infestations exist without consideration for county lines or jurisdictional
boundaries, interagency cooperation is a necessity for the successful management of
weed issues.  The Weed Mitigation Department will facilitate and engage in projects that
support other counties, land management agencies, landowners, and private applicators,
so long as the goals and treatment strategies employed are conducted/achieved lawfully
and are in the best interest of the landscape.  In addition to supporting the weed
management projects of these agencies and individuals, the Montrose County Weed
Mitigation Department may elicit the aid of these entities in the treatment of the county's
weed management issues.  Costs associated with treatments conducted outside the
department's jurisdiction will be assessed to the responsible organization/government
entity or may be compensated through a comparable donation of time or resources.

### 4.2.1   Support for Private Landowners

With the health of the Montrose County landscape dependent on the participation
of all county residents, the Montrose County Weed Mitigation Department will
make reasonable efforts to aid in landowners' treatment of priority weed
infestations.  As successful weed treatments are often dependent on the choice of
chemical, application rates, timing of application, weather and other factors,
employees of the Weed Mitigation Department will make themselves available to
advise appropriate treatment methods.  Literature and other resources will be
made available to aid in weed identification and treatment strategies.

In addition to providing advice, the department's acquisition of grant funding has
allowed the implementation of weed treatment programs to aid landowners with
specific weed issues.  As the resources for such programs are finite and dependent
on species and/or geographical location, the availability of these programs is
limited; the duration of a program is subject to budgetary constraints as well as
other considerations and could be expected to change or end in upcoming years.

#### A.   Department Treatments on Private Property

Allocation of grant funding specific to a species or location allows for the
Weed Mitigation Department to make applications to some private
property.  The department will work with landowners to ensure
management expectations for priority species are met.  Though the Weed
Mitigation Department may make applications to private property, they in
no way absolve the landowners of their weed management obligations.
Applications to private property consist primarily of List A and List B
species for which management plans have been developed.  Details
concerning weed management on private property can be referenced in
section 2.3.2.

#### B.   Cost Share

11

A cost share program is currently available to residents of Western Montrose County where a portion of the cost of chemical (applied by landowner) or cost of application (made by private contractor) is paid through grant funding. As the program is dependent on the availability of finite grant funding, the continuation and duration of the program will be reevaluated on an annual basis. The West End Cost Share Program was developed utilizing a grant that mandates the use of Western Montrose County (funds cannot be appropriated for the expansion of the cost share program to Eastern Montrose County). Treatment methods must meet the standards of the department to qualify for the cost share program. West end residents are encouraged to contact the Montrose County Weed Mitigation Department to apply for cost share reimbursement. A list of eligible species and rate of reimbursement will be reevaluated on an annual basis. A current list of species eligible for reimbursement is as follows:

- **Priority Noxious Weed Species (eligible for 100% reimbursement)**
    1. Yellow starthistle
    2. Purple loosestrife
    3. Leafy spurge
    4. Yellow toadflax

- **General Noxious Weed Species: (eligible for 50% reimbursement)**
    1. Spotted knapweed
    2. Russian Knapweed
    3. Diffuse Knapweed
    4. Dalmatian toadflax
    5. Tamarisk
    6. Russian Olive
    7. Whitetop
    8. Oxeye daisy
    9. Houndstongue
    10. Canada thistle
    11. Bull thistle
    12. Musk thistle

    For information on management of a specific species, reference section 6.2 *Timelines and Management Strategies for Montrose County Weeds.*

With organizations like the Natural Resource Conservation Service providing additional cost share for control of specific weed species, residents of Montrose County are encouraged to explore options for chemical reimbursement. Though employees will be made available for management advice, landowners must read chemical labels in their entirety and conduct treatments that meet the manufacturer's recommendations. The Montrose County Weed Mitigation Department will assume no responsibility for undesirable effects resulting from a landowners weed management or from negligent or malicious utilization of advice obtained from the department.

### 4.2.2   Collaboration with Land Management Agencies

BLM_0058005

Land management agencies like the Bureau of Land Management, U.S. Forest Service, National Park Service and Division of Wildlife may elicit the aid of the Montrose County Weed Mitigation Department in management projects. With approved management strategies varying from organization to organization, the department will conduct treatments in a manner consistent with the stipulations of the organization in question. Management strategies must be consistent with the practices of the Montrose County Weed Mitigation Department, the cost of which will be assessed to the organization in question. In addition to support for land management agencies, the practices detailed above will be extended to organizations like the Natural Resource Conservation Service, Uncompahgre Partnership, and Tamarisk Coalition. Policies concerning management projects that fall outside the department's jurisdictional boundaries are detailed in the following section. Details concerning rights-of-way can be referenced in section 2.3.5.

### 4.2.3   Cooperation with Neighboring Counties

As weed management issues can easily cross county borders, the Weed Mitigation Department may engage in treatment efforts implemented by other counties. As an increase in manpower can often drastically improve the effectiveness of a control method, the exchange of resources with neighboring counties can result in a level of containment that prevents the spread of an infestation to Montrose County. With the positive effects of these efforts potentially preventing the future expenditure of resources, labor is often traded back and forth between counties. On occasion, the geographic location of a weed infestation makes treatment more accessible to weed managers of another county. In these cases, treatment of weed infestations may be conducted by weed managers in neighboring counties or vice-versa. Weed treatments in Montrose County's jurisdiction may be conducted by outside sources only after communication with the Weed Mitigation Department has determined it to be the best course of action.

Montrose County is currently participating in the Paradox, Tabeguache, Horsefly, North Rim and a few less-formal Cooperative Weed Management Areas (CWMA's). The Weed Mitigation Department is in the development stages for two additional CWMA's. These agreements would coordinate the efforts of neighboring counties and land management agencies for specific geographic areas to ensure the effective usage of time and resources in shared weed management projects. The Wright's Mesa Cooperative Weed Management Area would be an agreement primarily between San Miguel and Montrose counties. A CWMA between Montrose, San Miguel and Ouray counties is currently in development.

### 4.2.4   Support and Utilization of Commercial Applicators

It is not the intent of the Montrose County Weed Mitigation Department to compete with commercial applicators operating within Montrose County, and in addition to support of qualified commercial applicators, the department will occasionally utilize the specialized application techniques that they have to offer. The department has contracted applicators with amphibious and aerial equipment in the past and will continue to do so as long as the management aim demands those treatment methods.

## 4.3   General Management Strategies and Responsible Land Use

With invasive species capable of eliminating native species and forage for wildlife and livestock, the trickle-down effects of their introduction can quickly degrade the

13

ecological health and economic viability of a landscape. Though the pest management strategies implemented by the department are an effective means to control an existing population, successful management is dependent on the prevention of new populations. As the measures taken by the Weed Mitigation Department are often a reaction to an arising pest management issue, a proactive approach to management of noxious species is dependent on the actions of landowners and public land-users.

Whether a given piece of land is used for agriculture, recreation or is simply appreciated for its intrinsic values, the function and value of that land is dependent on its ability to sustain those qualities. Whether the functionality of a landscape is defined through agriculture, recreation or ownership, the qualities that define its value are dependent on the stewardship of those who appreciate and utilize those qualities. The following section will detail responsible land management practices and general management strategies for landowners and recreational land-users.

### 4.3.1   Strategies for Managing a Weed Infestation

An understanding of the qualities that make a species competitive is critical to developing an effective management strategy. Though the qualities that make a species an effective invasive vary from plant to plant, some general treatment strategies can be applied to most infestations.

#### A.   Prevention

As the establishment of a weed population is dependent on its initial introduction to the site, preventing the migration of seeds and reproductive mechanisms is the most effective way to guard against infestation. With preventative management concepts existing as a proactive approach to weed management, these concepts can be applied by individuals who wish to ensure a landscape is free from infestation and individuals who wish to ensure an encountered infestation remains localized. Examples for concerned landowners would include monitoring and treatment of property lines and natural migration routes. These strategies ensure potential infestations aren't established and existing infestations don't escape to neighboring properties and landscapes. Various cultural, chemical, mechanical and biological control measures can be applied in these scenarios and can be referenced in the following sections. Recreational and agricultural use of public lands should ensure seeds and reproductive mechanisms (encountered on both private and public lands) aren't carried to remote locations and aren't made more effective within the boundaries of an infestation. See sections 4.1.1, 4.3.1 B through F and 4.3.2

#### B.   Scouting, Mapping and Inventorying

Development of an effective management plan starts with knowledge of the infestation. After the species' distribution across the property is understood management strategies can be evaluated, management efforts can be prioritized and the effectiveness of treatments can be scrutinized.

#### C.   Developing a Treatment Strategy

After a species is correctly identified and inventoried, an effective treatment strategy can be developed. Though treatments should take steps to achieve eradication, short-term management strategies should prevent seed production and root spread. Treatments of large infestations may initially consist of containment and suppression strategies but should move toward eventual eradication. Though other treatment options may exist, some integrated pest

14

BLM_0058007

management strategies including chemical, mechanical, cultural and biological control methods can be found in Section 4.1 *Treatment Techniques Employed by the Weed Mitigation Department*. Effective management strategies for some of the species encountered in Montrose County are detailed in Section 6.2 *Timelines and Management Strategies for Montrose County Weeds*

D. **Maximizing the Effectiveness of a Treatment**

Before a management plan is put into effect, research should be conducted to ensure the effectiveness of treatment efforts. Practices including the coupling of adjuvants with chemicals, the implementation of safe and effective application methods and the utilization of multiple management techniques (integrated pest management), can dramatically increase the effectiveness of a treatment. Members of the Montrose County Weed Mitigation Department will make themselves available as a resource for affected landowners.

- The implementation of an integrated pest management plan can reduce management costs, reduce the time it takes to achieve a management goal and create a more ecologically/economically sound result. Though one treatment method is often more effective than another, coupling chemical, mechanical, cultural and biological control methods should be considered. The complimentary results achieved through the combination of treatment methods can be exemplified through the coupling of chemical and cultural control. When herbicide application is followed by the introduction of a desirable species, the herbicide eliminates much of the species' competition and, as the desirable vegetation matures, the relative health of the landscape diminishes the weed's competitive edge.

- In line with the use of integrated pest management, the use of multiple herbicides with varying modes of action is a sound management practice. Whether applied separately or in a single application, variability in the chemical processes of different herbicides can increase the effectiveness of treatments and reduce the potential for herbicide resistance. Tank mixtures should follow the manufacturers' recommendations.

- Factors like chemical rates, application timing, weather, equipment calibration, and combination of herbicides can affect the outcome of a treatment. Insuring these and other variables are being addressed can maximize effectiveness, shorten treatment timelines, and minimize cost. Chemical labels should be read and followed explicitly and management efforts should be carefully planned. Sometimes tweaking a management technique is enough to increase success dramatically. The use of a spray pattern indicator (herbicide dye) is an example of an inexpensive practice that ensures adequate coverage and uniform chemical distribution.

- Adjuvants, when added to a chemical carrier, can spread herbicide evenly over the surface of a plant, induce the plant to absorb the herbicide more readily, adhere the herbicide to the plants surface, optimize the pH level of chemical carrier and inhibit the plant's breakdown of the herbicide. The introduction of the right adjuvant can decrease treatment cost by maximizing an herbicide's effectiveness.

E. **Prioritizing Treatments**

15

In cases where eradication is expected to take several applications, maximizing effectiveness is dependent on prioritization of treatment efforts. As is the case with most weed treatments, containment is the first step toward eradication.

- Priority should be given to areas where transmission of the weeds reproductive mechanisms is probable. Property lines, roads, drainages, and game/livestock trails should be treated first. Particular attention should be paid to areas where weeds' reproductive mechanisms will be carried off-site (gravel, soil, compost, fertilizer, plant matter etc.)
- Outlying plants and plant populations should be treated next. As treatment of these weeds has a greater impact on future populations, treatment should be made when isolated populations are small and cost of application is low.
- Treatments of large infestations (where management is expected to be achieved after multiple applications or over the course of multiple seasons) should start at the parameter and move toward the center. With the most detrimental growth of a population occurring primarily on the borders of the infestation, treatments should begin on the outermost edges and be stepped in concentrically from one treatment to the next. Though treatments can realistically reduce the radius of almost any infestation by fifty feet per year, management goals for most infestations should exceed this minimum.

### F. Monitoring

Monitoring may include mapping, taking pictures, creating test plots or simply noticing the effects of management efforts. This data can help develop an understanding about the strengths and weaknesses of the implemented management strategies.

Some weed species have seeds that can remain viable for decades. Awareness of the potential for a recurrence can prevent the increased expenditures that accompany the future management of an unchecked weed population.

### 4.3.2 Public Land Use

As the biological success of a noxious species is largely dependent on its ability to propagate, highly-evolved means of reproduction often take advantage of human elements. When considering the potential for spread of noxious species through recreational activities, care should be taken to prevent the contamination of an otherwise healthy ecosystem. Though invasive aquatic species aren't currently a major issue in Montrose County, the potential consequences of the introduction of invasive aquatics requires considerations extend beyond forests and parks to lakes and waterways.

Though the nature of the land use can play a large role in the introduction of invasive species (soil disturbances, damage to native plant life etc.), maintenance of equipment is often enough to prevent the introduction of an invasive species. Whether a species' reproductive mechanism is transported on a vehicle's chassis, a boat's hull or a bootlace, preventative measures can be taken to ensure the species isn't relocated. With peoples' capacity to travel vast distances in short periods, the potential to relocate a noxious species to a remote destination is extremely high. With recreation in a given area often dependent on the health of

16

the ecosystem, the ability of the environment to sustain that recreational use demands responsible practices.

## Section V:   Colorado Noxious Weed List

### 5.1   Montrose County Weeds and the State Noxious Weed List

While the following sections detail treatments prioritized by the Weed Mitigation Department, many of the weed management issues experienced throughout the county will fall outside the scope of projects undertaken by the department. The following section is intended as a reference for landowners and lists the species included in the State Noxious Weed List.

### 5.2   Colorado Noxious Weed List

Though many of the following weed species aren't known to be present in Montrose County, any List A species should be reported to the Weed Mitigation Department immediately. Questions concerning weed identification and treatment can often be answered by visiting the Colorado Department of Agriculture's web site at http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1174084048733. Any additional questions should be directed to the Montrose County Weed Mitigation Department.

Though many of the following species aren't likely to be encountered, species known to have been present in Montrose County will be indicated with bold print.

**List A species** in Colorado that are designated by the Colorado Commissioner of Agriculture for eradication:
African rue (Peganum harmala)
Camelthorn (Alhagi pseudalhagi)
Common crupina (Crupina vulgaris)
Cypress spurge (Euphorbia cyparissias)
Dyer's woad (Isatis tinctoria)
Giant salvinia (Salvinia molesta)
Hydrilla (Hydrilla verticillata)
Meadow knapweed (Centaurea pratensis)
Mediterranean sage (Salvia aethiopis)
Medusahead (Taeniatherum caput-medusae)
Myrtle spurge (Euphorbia myrsinites)
Orange hawkweed (Hieracium aurantiacum)
**Purple loosestrife (Lythrum salicaria)**
Rush skeletonweed (Chondrilla juncea)
Sericea lespedeza (Lespedeza cuneata)
Squarrose knapweed (Centaurea virgata)
Tansy ragwort (Senecio jacobaea)
**Yellow starthistle (Centaurea solstitialis)**

**List B weed species** are species for which the Colorado Commissioner of Agriculture, in consultation with the State Noxious Weed Advisory Committee, local governments, and other interested parties, has developed and implemented state noxious weed management plans designed to stop the continued spread of these species:

17

BLM_0058010

Absinth wormwood (Artemisia absinthium)
Black henbane (Hyoscyamus niger)
Bouncingbet (Saponaria officinalis)
**Bull thistle (Cirsium vulgare)**
**Canada thistle (Cirsium arvense)**
Chinese clematis (Clematis orientalis)
Common tansy (Tanacetum vulgare)
**Common teasel (Dipsacus fullonum)**
Corn chamomile (Anthemis arvensis)
Cutleaf teasel (Dipsacus laciniatus)
Dalmatian toadflax, broad-leaved (Linaria dalmatica)
Dalmatian toadflax, narrow-leaved (Linaria genistifolia)
Dame's rocket (Hesperis matronalis)
**Diffuse knapweed (Centaurea diffusa)**
Eurasian watermilfoil (Myriophyllum spicatum)
**Hoary cress (Cardaria draba)**
**Houndstongue (Cynoglossum officinale)**
**Jointed goatgrass (Aegilops cylindrica)**
Leafy spurge (Euphorbia esula)
Mayweed chamomile (Anthemis cotula)
**Moth mullein (Verbascum blattaria)**
**Musk thistle (Carduus nutans)**
**Oxeye daisy (Chrysanthemum leucanthemum)**
Perennial pepperweed (Lepidium latifolium)
Plumeless thistle (Carduus acanthoides)
**Quackgrass (Elytrigia repens)**
**Russian knapweed (Acroptilon repens)**
**Russian-olive (Elaeagnus angustifolia)**
**Salt cedar (Tamarix chinensis, T.parviflora, and T. ramosissima)**
Scentless chamomile (Matricaria perforate)
**Scotch thistle (Onopordum acanthium)**
**Scotch thistle (Onopordum tauricum)**
**Spotted knapweed (Centaurea maculosa)**
Spurred anoda (Anoda cristata)
**Sulfur cinquefoil (Potentilla recta)**
**Venice mallow (Hibiscus trionum)**
**Wild caraway (Carum carvi)**
**Yellow nutsedge (Cyperus esculentus)**
**Yellow toadflax (Linaria vulgaris)**

**List C weed species** are species for which management goals will not be to stop continued spread but to provide additional education, research, and biological control resources to jurisdictions that choose to require management.
**Chicory (Cichorium intybus)**
**Common burdock (Arctium minus)**
**Common mullein (Verbascum thapsus)**
Common St. Johnswort (Hypericum perforatum)
**Downy brome (Bromus tectorum)**
**Field bindweed (Convolvulus arvensis)**
**Halogeton (Halogeton glomeratus)**
**Johnsongrass (Sorghum halepense)**
**Perennial sowthistle (Sonchus arvensis)**
**Poison hemlock (Conium maculatum)**

18

BLM_0058011

**Puncturevine (Tribulus terrestris)**
Redstem filaree (Erodium cicutarium)
**Velvetleaf (Abutilon theophrasti)**
**Wild proso millet (Panicum miliaceum)**

## Section VI:    Prioritizing Management of Invasives

### 6.1    The Department's Assessment of Management Goals

Appropriate levels of treatment for a given species are determined by the distribution of the infestation, the potential damage the species may cause, the estimated cost of treatment and the predicted result of management efforts.  Though these variables are dependent on the location of the infestation, evaluating the validity of a management strategy for a given weed usually corresponds to the Colorado Department of Agriculture's classification of the species as A, B or C (see section 2.1).  The following comparison of kochia, yellow starthistle and Russian knapweed will show how treatment measures are evaluated.

Though kochia is occasionally treated on rights-of-way or at an airport (as a safety issue), the widespread distribution of the weed means no reasonable amount of time and money would result in an acceptable level of management.  Conversely, as an extremely invasive species with sparse distribution, management of yellow starthistle warrants a considerable effort by the Weed Mitigation Department.  Though the acreages treated may be significantly smaller than another species on which a comparable amount of time is spent, the necessity for treatment and possibility for eradication validates the expenditure of resources.

In contrast to the management strategies enacted for kochia and yellow starthistle, Russian knapweed is a fairly widespread invasive where foregone containment strategies would result in significant economic and ecological loss.  Measures taken to prevent further spread of Russian knapweed result in comparatively high numbers for total area treated; though the time spent in a given location could be expected to decrease drastically year to year, it's highly unlikely that management efforts would ever result in countywide eradication.

### 6.2    Timelines and Management Strategies for Montrose County Weeds

Countywide treatments of priority species are conducted on a timeline that both maximizes the effectiveness of the management techniques, and minimizes scheduling conflicts for the management of other species.  Management techniques detailed in upcoming sections demonstrate what the Weed Mitigation Department feels are the most effective methods of treatment for a species or infestation in Montrose County.  Management strategies have been developed to maximize the effectiveness of treatments based on plant lifecycles, budgetary constraints, time constraints, prioritization of managed species, expectations of landowners/land management agencies, available technologies and the wellbeing of the landscape.  As these and other considerations could be expected to change with time, the management strategies employed by the Montrose County Weed Mitigation Department could be expected to evolve to meet these ever-changing demands.  In reading this section, it should be noted that Montrose County's weed management issues extend beyond the treatment measures taken by the department; the department has prioritized treatments based on the limitations detailed above.

19

BLM_0058012

Similarly, specialty projects, contract work and chance encounters with species that don't make our priority list, may result in the treatment of species or utilization of management strategies not detailed below. This section demonstrates what might be expected in a typical season. Though the treatment strategies detailed below could be used by private citizens in the development of management plans, the timing of seasonally-based treatments can be expected to vary year to year and with geographic and meteorological variables like altitude, weather patterns etc.

While the department feels these management strategies are the best course-of-action and could be effectively utilized by landowners and private applicators, the Montrose County Weed Mitigation Department cannot recommend these strategies and will not assume responsibility for any undesirable effects resulting from the implementation of these techniques outside the department. If entities or individuals outside the Montrose County Weed Mitigation Department choose to utilize these techniques in the development of management plans, chemical labels must be read and understood in their entirety with applications following instructions detailed therein.

Unless circumstances render the practice unnecessary, chemical carrier used by the Montrose County Weed Mitigation Department is made more effective with the addition of a nonionic surfactant and a nitrogen-surfactant blend. Buffers may be used to optimize the pH level of chemical carrier, with levels varying based on the herbicide and water source.

### 6.2.1   Diffuse Knapweed

Though the department's treatments of diffused knapweed are less common than those of the following species, its potential impacts warrant significant treatment efforts when encountered. Diffused knapweed is a "List B" biennial forb that can exist as an annual or short-lived perennial. As it can produce 18,000 seeds per plant and behaves as a tumbleweed when it completes its lifecycle; plants must be eliminated prior to seed production. The weed most commonly invades rangeland, roadsides and riparian areas and displaces native habitat. As a significant threat to biodiversity, perennial grasses, livestock feed and the ecosystem's resistance to soil erosion are at high risk.

Infestations are known to exist along Kinikin Road, O27 Road and the Cimarron area. The Department's preferred treatments include Tordon (picloram), a nonionic surfactant and a nitrogen surfactant blend. Treatments are most effective on plants in the rosette through mid-bolt stages. The most effective treatments will typically occur before late June.

### 6.2.2   Hoary Cress

With its early lifecycle, hoary cress (commonly referred to as whitetop) is among the first species to be treated in a season. Hoary cress is a perennial that spreads both through its root system and through the production of between 1,200 and 4,800 seeds per plant. As a "List B" species that is peppered throughout the Montrose County landscape, the department's treatment of whitetop consists mainly of containment and suppression, with eradication of outlying infestations as an occasional goal. The nature of the weed lends itself to containment strategies that consist largely of right-of-way treatments. Treatment of a given right-of-way could be expected if the department believes an infestation is likely to be present and the infestation is reached before its maturity renders treatment ineffective.

20

BLM_0058013

Treatments are dependent on the maturity of the plant and begin in mid April with consistent treatments continuing through late May; favorable conditions can result in effective treatments as late as mid June.  Eliminating hoary cress along roadsides significantly reduces or eliminates its spread from one location to another—leaving broadcast and hand-spraying from trucks the most frequently used treatment option.  Treatments of other broadleaf weeds including curly dock often occur during treatments of hoary cress.

As most of the department's right-of-way treatments become necessary because of the weed's encroachment from bordering properties, landowners are encouraged to support the department's efforts with similar treatment strategies.  Though treatments with Telar (chlorsulfuron) can be extremely successful, the chemical's slow mode of action means visible effects can take several weeks to become apparent; treatments are often most noticeable the following year.

### 6.2.3   Purple Loosestrife

Purple loosestrife is another "List A" species whose low levels of distribution require action toward eradication.  As a perennial forb that can reproduce by both the relocation of stem or root particles and through the production of 2.5 million seeds per year, aggressive control measures are needed for adequate management.  With an extensive root system that remains intact from year to year, seeds that remain viable from 5 to 20 years and the ability to spread readily through waterways, the department has developed eradication techniques that emphasize containment.

Purple loosestrife grows in wet, marshy conditions along ditch banks, riverbanks and drainages.  With the plant's preferred habitat along waterways, its high seed production results in an effective method for propagating new areas.  As the weeds massive root system begins to block waterways it creates more habitat for itself and reduces the natural and agricultural value of the landscape.
Known infestations exist in Nucla, Naturita and Redvale and are currently treated utilizing grant funding allocated to the area.  The proximity of these infestations to the San Miguel River (as well as their existence along the river itself) makes treatments more urgent.

The integrated pest management plan implemented in the treatment of purple loosestrife consists of a variety of herbicides and application techniques along with occasional mechanical control.  Herbicide applications begin in late June and continue through late September, with optimal treatments occurring before the plants drop seed.  Element 3A (triclopyr) is used in areas where damage to native species and livestock feed is a concern, Habitat (imazapyr) or Aquatic Glyphosate is used where damage to desirable species is of less concern.  Chemicals are approved for aquatic use and are spot-sprayed and broadcast using backpack sprayers, OHV's, amphibious vehicles and aircraft.  If an infestation is discovered after the plants have flowered, flowerheads are clipped and removed from the site to eliminate seed production.  A late-season aerial application to dense populations ensures adequate coverage.  Data is entered into a GPS to aid in future treatments.

### 6.2.4   Russian Knapweed

As an aggressive perennial that spreads through both its horizontal root system and seed production, Russian knapweed is a priority species whose high levels of infestation warrant an aggressive containment strategy.  Russian knapweed is

21

allelopathic (it produces toxic substances to inhibit growth of its competitors) and
is well adapted to soils with high salinity.  These characteristics allow the weed to
gain footholds in areas poorly suited to its potential competitors and eliminate
those competitors as it spreads to areas with healthy soil.  As the weed displaces
native vegetation it decreases the viability of range and pasturelands.  Like many
of the priority weed species targeted by the Weed Mitigation Department, its
ability to out-compete desirable plant species in almost any environment is what
makes this invasive a concern.

As a "List B" species, containment of Russian knapweed is the primary goal of
the department.  Elimination on rights-of-way is the primary method for
controlling spread, with treatments on gravel pits and outlying populations getting
equal consideration.  Timing is critical for successful treatment of Russian
knapweed.  As Russian knapweed has a deep and extensive root system,
applications must be made when chemical will be drawn into the roots.  The
department will make early treatments when 10% of the plants buds are in bloom.
This small window allows treatments to be made to some populations as early as
mid June and others as late as early July.  Early treatments are made with Redeem
(triclopyr TEA and clopyralid TEA); the use of Redeem both maximizes
effectiveness of treatments and reduces the potential for chemical resistance to
herbicides used in late-season applications.

Treatment success for Russian knapweed increases dramatically as the season
progresses.  After plants cease to use energy for seed production, a reverse in sap
flow allows for successful translocation of chemical into the plant's roots.  The
Weed Mitigation Department will begin extensive treatments of Russian
knapweed in mid to late August and continue through November.  Applications
with Milestone (aminopyralid) have proved to be very successful.  Though high
success rates can be achieved throughout the winter, the root crown must be
exposed; snow is the major limiting factor for late-season Russian knapweed
treatment.

## 6.2.5   Spotted Knapweed

With spotted knapweed on the Uncompahgre Plateau extending across the borders
of private landowners and land management agencies, treatment of spotted
knapweed serves as an example of the cooperative weed management projects
conducted in Montrose County.  The cooperation of the BLM, USFS, the
Uncompahgre Plateau Project, private landowners and the Montrose County
Weed Mitigation Department creates a comprehensive weed management project
that meets the criteria of each organization or landowner.

Spotted knapweed is a biennial or short lived perennial forb that produces as
many as 40,000 seeds per plant.  Infestations are established more readily in
disturbed or overgrazed areas and can reduce productivity of the land by out-
competing desirable species.  As a competitive species, spotted knapweed can
thrive in a wet or dry environment and occupy sandy soils, rocky conditions,
pastures, roadsides and a variety of other conditions.  Spotted knapweed begins its
life as a rosette and can grow as large as 4 feet.

Spotted knapweed is a "List B" species whose potential degradation of pastures,
grazing permits and wildlife habitat necessitates a relatively aggressive
management strategy that is currently focused on containment and minimizing
damaging effects.  Infestations are currently isolated in Maher and along 6400

22

BLM_0058015

Road, with more extensive infestations on the Uncompahgre Plateau (extending along highway 90, from the Ute Area past the east fork of Dry Creek). The Montrose County Weed Mitigation Department performs treatments of spotted knapweed on portions of BLM, rights-of-way, private property and Forest Service land on the eastern side of the plateau; treatment expenditures are assumed by the agency responsible for the land in question, with additional grant funding for treatments on private property. Treatments begin in early June and continue through late August.

Treatment methods vary from site to site and are dependent on application protocols specific to each agency. BLM lands are treated with Redeem R&P (triclopyr TEA and clopyralid TEA), and all other applications are made with Milestone (aminopyralid) or Tordon (picloram). Spray trucks are utilized on rights-of-way, otherwise OHV's and backpack sprayers are used.

### 6.2.6   Yellow Starthistle

Categorized as a "List A" species, yellow starthistle is an uncommon weed designated for eradication in the state of Colorado. Yellow starthistle is a winter annual with large plants capable of producing as many as 10,000 seeds. Though the plant germinates in the fall and starts producing rosettes as early as March, conditions in Montrose County can be expected to produce seedlings throughout the summer. Appearance can vary based on its environmental conditions and can produce seed bearing plants ranging from 2 inches with a single stalk to 4 feet with a dense and brushy appearance. Though the plant can reach 4 feet in height, conditions in Montrose County rarely produce plants larger than 2 feet. Though infestations in Montrose County are only known to exist in Uravan and southeastern Montrose County (along Buckhorn Road), awareness of its existence is critical to keeping populations isolated and to maximize the odds of its eventual eradication.

As yellow starthistle is poisonous to some livestock and produces seed that can remain viable for as long as 15 years, the Montrose County Weed Mitigation Department has implemented a comprehensive integrated pest management program that is creating optimism for its eventual eradication. As an annual, effective control of the species is dependent on the prevention of seed production. The low levels of infestation in Montrose County and the potential for a devastating impact on the ecosystem warrant a considerable amount of the department's time and effort. Coupled with the support and participation of affected landowners, the resources expended in the upcoming years could be expected to produce a commendable result and reduce or eliminate the cost of both annual containment strategies and loss of agricultural and ecological viability.

Utilizing grant funding allocated for management of yellow starthistle, the Weed Mitigation Department begins treatments in mid May. Following the state-recommended early application of Milestone (aminopyralid), the department and landowners spot-spray and broadcast using hand sprayers and OHV's; treatments continue through early June. Though Milestone is recommended by the state, the dry landscape renders Milestone less effective than it would be otherwise.

Mechanical control methods begin in late June and continue through late August. With the sparse distribution of the infestation, pulling and digging are effective control methods. Weeds are removed from the site in garbage bags, plants are

23

entered into a GPS and marked with flags; marked points are revisited and sprayed with a "restricted use" chemical—Tordon 22K (picloram).  The department estimates that the integrated pest management plan implemented can reduce the number of treated plants by as much as 75% from one season to the next.  Treatment of yellow starthistle is funded through grants.

### 6.2.7    Yellow Toadflax

Though the only known infestations of yellow toadflax in Montrose County are in the vicinity of the 25 Mesa Ranger Station, the nature of the weed demands an early response to new infestations.  As a rhizomatous weed that also spreads through seed production, yellow toadflax can effectively displace desirable plant life and develop remote infestations outside an affected area.  Yellow toadflax is a perennial whose root system is most effectively controlled during flowering.  Though the weed may have a pleasant appearance it displaces habitat and food sources for wildlife and livestock and is mildly poisonous to cattle.  Yellow toadflax is a "List B" species, and though it isn't as quick to create a monoculture as some of the other priority species in the county, high genetic variability creates treatment obstacles that are most effectively addressed when populations are young.  Though soil disturbances are often a catalyst for infestation, yellow toadflax isn't dependent on those disturbances to gain footholds.  Montrose County infestations are spreading most effectively along roadways, game/livestock trails and down drainages.

With the location of current yellow toadflax infestations on the Uncompahgre Plateau comes the accessibility issues that accompany densely forested areas and abrupt elevation and geological changes.  Coupled with the need for high rates of carrier and a small treatment window (late June to early August) the accessibility of some of these infestations makes containment of this species critical.  With much of the county's yellow toadflax surrounding the 25 Mesa Ranger Station, much of the funding for the project comes from the Forest Service.  Additional funding for treatments on private property comes from grants.

Plants flower at a height between one and three feet and are most effectively controlled using integrated weed management strategies hinging on chemicals with varying modes of action.  Effective treatments conducted by the department utilize a "restricted use" chemical called Tordon 22K (picloram) in conjunction with Telar XP (chlorsulfuron), 2,4-D, and a methylated seed oil.  As a typical Montrose County infestation consists of sporadically spaced individual plants and localized monocultures, spot spraying is the most effective application method.  Applications are made with hand-guns operated from OHV's and spray trucks.  Infestations and individual weeds are entered into a GPS to aid in subsequent treatments.  Along with its ability to effectively invade healthy ecosystems, the weed's adaptability to a wide range of climates, elevations and soil types makes containment and eventual eradication of this relatively isolated species a high priority.

24

# Appendix A
## Uncompahgre Valley Pest Control District



**Areas at Immediate Risk of Infestation**

25

BLM_0058018



**Paradox, Tabeguache and Horsefly**
**Cooperative Weed Management Areas**



**North Rim Cooperative Weed Management Area**

26

BLM_0058019



# Glossary

The following terminology is defined in a manner that reflects the context in which it is used in the document. Though some terms may be defined more broadly when used in a broader context, this glossary defines terms as this document intends them to be interpreted.

**Application** — Exercising a management strategy on a pest or population (typically refers to herbicide applications).

**Biodiversity** — The existence of a variety of plant life within an ecosystem or area. Biodiversity is an observable element in any healthy ecosystem. The intrusion of an invasive species is often a direct threat to biodiversity in an ecosystem.

**Biological control** — The use of living organisms like insects, animals and pathogens to control undesirable vegetation.

**BMP** — Best Management Practices: utilization of the most efficient, effective and ecologically sound management strategies.

**BOCC** — Board of County Commissioners

**Broadcast application** — Uniform application to an entire area.

**Colorado Noxious Weed Act** — *Title* 35 *Article* 5.5 of the *Colorado Revised Statutes*

**Colorado Noxious Weed List** — List developed by the Colorado Department of Agriculture to categorize weeds and the threat they pose to Colorado's ecosystem.

**Containment** — Limiting the proliferation of a noxious species to a given area.

**Cultural control** — Management practice that relies on manipulation of the species' environment.

27

**CWMA** — Cooperative Weed Management Area: area developed to coordinate the management efforts of multiple individuals and organizations/entities.

**EDRR** — Early Detection Rapid Response: Colorado Department of Agriculture's term/program that defines how young infestations should be managed.

**Eradication** — Destroying an entire pest population.

**Infestation** — The establishment of an invasive species in a given area.

**Invasive species** — Nonnative plant or biotype whose presence adversely affects the ecosystem it invades.

**IPM** — Integrated Pest Management: the use of multiple management techniques to achieve management objectives.

**Management** — Controlling, minimizing and eliminating invasive species and the effects they may cause to an ecosystem.

**Mechanical control** — Managing an invasive species through physical means. Mechanical control methods include digging, pulling mowing sawing and various other management techniques.

**Noxious weed** — Any plant designated by a Federal, State or county government as injurious to public heath, agriculture, recreation, wildlife or property.

**OHV** — Off Highway Vehicles: department examples include a Polaris Ranger and Argo Avenger.

**Pest District** — Contiguous territory where residents have voted on and approved the appropriation of funds to deal with the existing or potential threats of the introduction of invasive species. The Uncompahgre Valley Pest Control District was created under § 35-5 Colorado Revised Statues.

**Spot treatment** — Application of a pesticide over a small continuous restricted area of a whole unit; i.e., treatment of spots or patches of weeds within a larger area.

**Treatment** — Any measure taken to achieve the management goals for a given infestation. Methods include herbicide application, mechanical, biological and cultural control.

**Unincorporated Montrose County** — Rural area that is not within Montrose, Olathe, Nucla or Naturita city limits.

**Weed** — A plant that grows where it is unwanted. The Weed Mitigation Department typically deals with weeds that pose a significant threat to the ecological health or economic viability of Montrose County.

**Weed Management Commission** — Advisory board established under § 35-5.5-107 Colorado Noxious Weed Act to approve a management plan for designated noxious weeds.

28

BLM_0058021

29

BLM_0058022

Case No. 1:20-cv-02484-MSK · Document 45-3 · filed 04/28/21 · USDC Colorado · pg 128 of 165



Journals Home     ESA Home

EcoTrack | My ESA : Sign in | Register | Help

Ecosphere   Ecology   Ecological Monographs   Ecological Applications   Frontiers   Bulletin   Ecological Archives

All Publications > Ecology > January 2000 > FITNESS IMPACTS OF HERBIVORY THROUGH INDIRECT EFFECTS ON PLANT–...     Advanced Search

**Volume 81, Issue 1 (January)**



< Previous Next >

Current Issue
Available Issues
Preprints

**Share this Article**

| Share |

**Journal Information**

**ISSN:** 0012-9658
**Frequency:** Monthly

Mission and Scope
Types of contributions
Editorial Board
Staff
Instructions for Authors
Reviewer Guidelines
Permissions

< **Previous Article**     **Volume 81, Issue 1 (January 2000)**     **Next Article >**

Add to Favorites   |   Email   |   Download to Citation Manager   |   Track Citations   |   Permissions

**Full-text**     **PDF**

Kristine Mothershead and Robert J. Marquis 2000. FITNESS IMPACTS OF HERBIVORY THROUGH INDIRECT EFFECTS ON PLANT–POLLINATOR INTERACTIONS IN *OENOTHERA MACROCARPA*. Ecology 81:30–40. http://dx.doi.org/10.1890/0012-9658(2000)081[0030:FIOHTI]2.0.CO;2

Articles

## FITNESS IMPACTS OF HERBIVORY THROUGH INDIRECT EFFECTS ON PLANT–POLLINATOR INTERACTIONS IN *OENOTHERA MACROCARPA*

**Kristine Mothershead and Robert J. Marquis**

University of Missouri, 8001 Natural Bridge Road, St. Louis, Missouri 63121-4499 USA

The negative impacts of herbivores on plant fitness may include both direct and indirect effects. Direct effects on female plant fitness occur when decreased seed production is due to decreased resource availability from loss of leaf area and its attendant photosynthesis or through consumption of reproductive structures. Indirect effects occur when folivore- and florivore-mediated changes in floral traits influence pollinator preference and/or pollinator efficiency, thus reducing pollen receipt. We examined the effects of both leaf and floral herbivory (bud damage) and determined the relative contribution of direct and indirect effects of damage on female fitness through changes in floral traits for *Oenothera macrocarpa* (Onagraceae). The experiment was a two-factorial design that manipulated both leaf damage (≈25% leaf area removed by hand) and pollen receipt (supplemental hand pollination). We then measured effects of leaf damage on floral traits (corolla diameter, floral tube length, and flower number) and fruit and seed set. Because herbivores damaged corollas in the bud stage in this experiment, we were also able to determine the effect of florivores on subsequent female reproduction.

Plants in the increased leaf damage treatment (33.4% leaf area loss) produced fewer flowers than natural leaf damage plants (6.5% leaf area loss), and their flowers had smaller corolla diameters and shorter floral tube lengths. Experimentally damaged plants also had 18% lower fruit set and produced 33% fewer seeds compared with natural leaf damage plants. Hand pollination increased fruit set by 60% and total seed number by 38% above that of naturally pollinated plants, demonstrating that female fitness was pollen-limited. Bud damage significantly decreased corolla diameter and floral tube length, and it led to a 68% reduction in fruit set. Hawk moths were observed preferentially visiting flowers with larger corollas, and study flowers with larger corollas had significantly increased probability of setting fruit. Additionally, seed number per fruit was positively related to floral tube length. In path analysis, we found no significant path between percentage leaf damage and female reproduction, suggesting that herbivores did not reduce seed production directly through decreased resource availability. Instead, we found a significant indirect path from percentage leaf damage to seed number through corolla diameter. We conclude that decreased female reproduction was due to changes in floral traits from both leaf and floral bud damage, which affected hawk moth preference (flowers with smaller corollas received fewer visits) and hawk moth efficiency of pollen delivery (flowers with shorter floral tubes had fewer seeds). This study demonstrates that herbivores can mitigate the mutualistic relationship between plants and pollinators through their effects on floral traits.

**Keywords:** direct and indirect effects, floral herbivory, hawk moths, herbivory, leaf herbivory, Missouri Ozark glade communities, *Oenothera macrocarpa*, path analysis, plant–pollinator interactions, pollen limitation, pollinator efficiency, pollinator preference

Received: April 6, 1998; Revised: November 6, 1998; Accepted: December 6, 1998; Final version received: January 11, 1999

[1] E-mail: s978821@admiral.umsl.edu

### Cited by

Sarah M. Swope, Ingrid M. Parker. (2012) Complex interactions among biocontrol agents, pollinators, and an invasive weed: a structural equation modeling approach. *Ecological Applications* **22**:8, 2122-2134
Online publication date: 1-Dec-2012.
Abstract . Full Text . PDF (368 KB)

Nicholas A. Barber, Lynn S. Adler, Nina Theis, Ruth V. Hazzard, E. Toby Kiers. (2012) Herbivory reduces plant interactions with above- and belowground antagonists and mutualists. *Ecology* **93**:7, 1560-1570
Online publication date: 1-Jul-2012.
Abstract . Full Text . PDF (1656 KB)

BLM_0058023

André Kessler, Rayko Halitschke, Katja Poveda. (2011) Herbivory-mediated pollinator limitation: negative impacts of induced volatiles on plant–pollinator interactions. *Ecology* **92**:9, 1769-1780
Online publication date: 1-Sep-2011.
Abstract . Full Text . PDF (4351 KB)

Sarah M. Swope, Ingrid M. Parker. (2010) Trait-mediated interactions and lifetime fitness of the invasive plant *Centaurea solstitialis*. *Ecology* **91**:8, 2284-2293
Online publication date: 1-Aug-2010.
Abstract . Full Text . PDF (669 KB)

Kari A. Segraves. (2008) FLORIVORES LIMIT COST OF MUTUALISM IN THE YUCCA–YUCCA MOTH ASSOCIATION. *Ecology* **89**.11, 3215-3221
Online publication date: 2-Nov-2008.
Abstract . Full Text . PDF (815 KB)

Janette A. Steets, James L. Hamrick, Tia-Lynn Ashman. (2006) CONSEQUENCES OF VEGETATIVE HERBIVORY FOR MAINTENANCE OF INTERMEDIATE OUTCROSSING IN AN ANNUAL PLANT. *Ecology* **87**:11, 2717-2727
Online publication date: 1-Nov-2006.
Abstract . Full Text . PDF (152 KB)

José M. Gómez. (2005) LONG-TERM EFFECTS OF UNGULATES ON PERFORMANCE, ABUNDANCE, AND SPATIAL DISTRIBUTION OF TWO MONTANE HERBS. *Ecological Monographs* **75**:2, 231-258
Online publication date: 1-May-2005.
Abstract . Full Text . PDF (1054 KB)

David M. Althoff, Kari A. Segraves, Olle Pellmyr. (2005) COMMUNITY CONTEXT OF AN OBLIGATE MUTUALISM: POLLINATOR AND FLORIVORE EFFECTS ON *YUCCA FILAMENTOSA*. *Ecology* **86**:4, 905-913
Online publication date: 1-Apr-2005.
Abstract . Full Text . PDF (204 KB)

Diego P. Vázquez, Daniel Simberloff. (2004) INDIRECT EFFECTS OF AN INTRODUCED UNGULATE ON POLLINATION AND PLANT REPRODUCTION. *Ecological Monographs* **74**:2, 281-308
Online publication date: 1-May-2004.
Abstract . Full Text . PDF (694 KB)

Gustavo Q. Romero, João Vasconcellos-Neto. (2004) BENEFICIAL EFFECTS OF FLOWER-DWELLING PREDATORS ON THEIR HOST PLANT. *Ecology* **85**:2, 446-457
Online publication date: 1-Feb-2004.
Abstract . Full Text . PDF (184 KB)

Lynn S. Adler. (2003) HOST SPECIES AFFECTS HERBIVORY, POLLINATION, AND REPRODUCTION IN EXPERIMENTS WITH PARASITIC *CASTILLEJA*. *Ecology* **84**:8, 2083-2091
Online publication date: 1-Aug-2003.
Abstract . Full Text . PDF (210 KB)

Rebecca E. Irwin. (2003) IMPACT OF NECTAR ROBBING ON ESTIMATES OF POLLEN FLOW: CONCEPTUAL PREDICTIONS AND EMPIRICAL OUTCOMES. *Ecology* **84**:2, 485-495
Online publication date: 1-Feb-2003.
Abstract . Full Text . PDF (124 KB)

Tia-Lynn Ashman. (2002) THE ROLE OF HERBIVORES IN THE EVOLUTION OF SEPARATE SEXES FROM HERMAPHRODITISM. *Ecology* **83**:5, 1175-1184
Online publication date: 1-May-2002.
Abstract . Full Text . PDF (101 KB)

Lynn S. Adler, Richard Karban, Sharon Y. Strauss. (2001) DIRECT AND INDIRECT EFFECTS OF ALKALOIDS ON PLANT FITNESS VIA HERBIVORY AND POLLINATION. *Ecology* **82**:7, 2032-2044
Online publication date: 1-Jul-2001.
Abstract . Full Text . PDF (185 KB)

**ESA Publications Office** | 127 W. State Street | Suite 301 | Ithaca, NY 14850-5427 | phone 607-255-3221 | email esa_journals@cornell.edu

**Frontiers Editorial Office** | 1990 M Street, NW | Suite 700 | Washington, DC 20036 | phone 202-833-8773 | email frontiers@esa.org

**ESA Headquarters** | 1990 M Street, NW | Suite 700 | Washington, DC 20036 | phone 202-833-8773 | email esahq@esa.org

Copyright Ecological Society of America. All rights reserved.

esa

BLM_0058024

NBER WORKING PAPER SERIES

SHALE GAS DEVELOPMENT AND PROPERTY VALUES:
DIFFERENCES ACROSS DRINKING WATER SOURCES

Lucija Muehlenbachs
Elisheba Spiller
Christopher Timmins

Working Paper 18390
http://www.nber.org/papers/w18390

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
September 2012

We thank Kelly Bishop, Jessica Chu, Carolyn Kousky, Alan Krupnick, Corey Lang, Joshua Linn, Lala Ma, Jan Mares, Ralph Mastromonaco, Stefan Staubli, Randy Walsh, and Jackie Willwerth. We thank the Bureau of Topographic and Geologic Survey in the PA Department of Conservation and Natural Resources for data on well completions. We gratefully acknowledge support from the Cynthia and George Mitchell Foundation. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2012 by Lucija Muehlenbachs, Elisheba Spiller, and Christopher Timmins. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

BLM_0058025

Shale Gas Development and Property Values: Differences across Drinking Water Sources
Lucija Muehlenbachs, Elisheba Spiller, and Christopher Timmins
NBER Working Paper No. 18390
September 2012
JEL No. Q4,Q53

## ABSTRACT

While shale gas development can result in rapid local economic development, negative externalities associated with the process may adversely affect the prices of nearby homes. We utilize a triple-difference estimator and exploit the public water service area boundary in Washington County, Pennsylvania to identify the housing capitalization of groundwater risk, differentiating it from other externalities, lease payments to homeowners, and local economic development. We find that proximity to wells increases housing values, though risks to groundwater fully offset those gains. By itself, groundwater risk reduces property values by up to 24 percent.

Lucija Muehlenbachs
Resources for the Future
1616 P Street NW
Washington DC
20036
muehlenbachs@rff.org

Elisheba Spiller
Resources for the Future
1616 P St NW
Washington DC
20036
spiller@rff.org

Christopher Timmins
Department of Economics
Duke University
209 Social Sciences Building
P.O. Box 90097
Durham, NC 27708-0097
and NBER
christopher.timmins@duke.edu

BLM_0058026

# 1   Introduction

A recent increase in the extraction of natural gas and oil using unconventional methods has transformed communities and landscapes. This paper focuses on shale gas extraction in Pennsylvania, which has grown rapidly in recent years thanks to developments in hydraulic fracturing and horizontal drilling. Natural gas provides an attractive source of energy. When burned, it emits fewer pollutants (e.g., carbon dioxide, sulfur dioxide, nitrogen oxides, carbon monoxide and particulate matter) than other fossil-fuel energy sources per unit of heat produced, and it comes from reliable domestic sources. The extraction of natural gas from shale, that had hitherto been economically unrecoverable, has resulted in greatly expanded supply and in many landowners receiving high resource rents for the hydrocarbons beneath their land. There are, however, many potential risks that accompany the drilling and hydraulic fracturing process. The processes required to develop and produce natural gas from shale rock use a great deal of water and require the injection of chemicals deep into the ground at high pressure. Compared with conventional natural gas development, this may result in greater risk to air, water, and health. Important for housing markets and local tax revenues, the environmental impact of shale gas development and the perception of the risks associated with these processes, as well as increased truck traffic or the visual burden of a well pad, could depress property values.[1]

The risks associated with leasing one's land to gas exploration and production companies are especially important for homes that depend on groundwater as a source of drinking water. One of the most often discussed risks associated with shale gas development is the potential for groundwater contamination. Faulty well casings or cement could provide a pathway for contaminants to reach a drinking water aquifer [SEAB, 2011, Osborn et al., 2011]. Another arises if hydraulic fracturing occurs too close to a drinking water aquifer [EPA, 2011] or if there are naturally occurring hydraulic pathways between the formation and the drinking water aquifer [Warner et al., 2012, Myers, 2012]. Even if shale gas operations do not contaminate groundwater in the short run, the possibility of future groundwater contamination may be capitalized negatively into the property

---

[1]The potential for reduction of property values is important given the current housing crisis, as, in severe cases, it could cause homeowners to fall "under water" in terms of mortgage repayment, potentially increasing the risk of loan default and foreclosure.

BLM_0058027

value, resulting in important long-term consequences for the homeowner.

However, there is also evidence that natural gas development creates jobs and generates income for local residents [Weber, 2011, Marchand, 2011]. Upon signing their mineral rights to a gas company, landowners may receive two dollars to thousands of dollars per acre as an upfront "bonus" payment, and then a 12.5 percent to 21 percent royalty per unit of gas extracted.[2]

Although it is likely that property values will be affected by shale gas well proximity (both positively and negatively), there has been little research into how the presence of a natural gas well affects property values overall.[3] In this paper, we use a triple-difference, or difference-in-difference-in-differences (DDD) estimator, applied to properties that border the public water service area (PWSA), to measure the effect of groundwater water contamination concerns from shale gas development. Understanding both the positive and negative impacts of shale gas exploration can help the government make decisions (such as implementing increased regulation to ensure groundwater integrity or extending the reach of the PWSA) that could protect homeowners from the negative effects of shale gas development while allowing for the benefits associated with increased local economic growth, lease payments, and a cleaner source of fossil-fuel energy. State regulators are currently debating such rules and regulations. In this paper we estimate the differential effect of shale gas development on properties that depend on groundwater and those that have access to piped water, giving us valuable insights into the capitalization of groundwater contamination risk.[4]

The key to estimating the concern for groundwater contamination is controlling for correlated unobservables that may bias estimates (e.g., unattractive attributes of properties and neighborhoods that may be correlated with exposure to drilling activity, and beneficial factors like lease payments and increased economic development). Even in the best data sets, these factors may be hard to measure, and can lead to omitted variables bias.

We take several steps to overcome this bias. The intuition proceeds as follows. First, we use property fixed effects, comparing changes in the price of a

---

[2] Natural Gas Forum for Landowners: Natural Gas Lease Offer Tracker, Available on: http://www.naturalgasforums.com/natgasSubs/naturalGasLeaseOfferTracker.php.

[3] Two notable exceptions are Boxall et al. [2005], Klaiber and Gopalakrishnan [2012].

[4] Even if groundwater in Pennsylvania had been contaminated prior to drilling [Swistock et al., 1993], our estimation strategy deals with this concern by using information on sales of the same property before and after drilling.

BLM_0058028

particular property over time, controlling non-parametrically for anything about that property that remains the same. Next, we see how those price changes differ depending upon whether the property is located in a treatment or control area, defined according to well proximity. Finally, we observe how the differences in the change in price across proximity-based treatment and control groups differ depending upon water source (i.e., groundwater versus piped water). In addition to controlling for any time-invariant unobserved heterogeneity at the level of the property, our approach will also control for two sources of potential time-varying unobservable heterogeneity—(i) anything common to our proximity-based treatment and control groups (e.g., lease payments); and (ii) anything within one of those groups that is common to both groundwater and PWSA households (e.g., increased local economic activity). Furthermore, we also geographically restrict some of the specifications in our analysis to the smallest available neighborhood that will allow us to observe differences in water source: a 1000 meter buffer drawn on both sides of the PWSA boundary. This reduces the burden on our differencing strategy to control for time varying unobservables, as homes located within a few blocks of each other presumably are affected similarly by these time varying unobservables. Using this identification strategy along with data on property sales in Washington County, Pennsylvania, from 2004 to 2009, we find that properties are positively affected by the drilling of a shale gas well *unless* the property depends on groundwater.

# 2   Application of the Hedonic Model for Non-Market Valuation

In the hedonic model (formalized by Rosen [1974]), the price of a differentiated product is a function of its attributes. In a market that offers a choice from amongst a continuous array of attributes, the marginal rate of substitution between the attribute level and the numeraire good (i.e., the willingness to pay for that attribute) is equal to the attribute's implicit (hedonic) price. The slope of the hedonic price function with respect to the attribute at the level of the attribute chosen by the individual is therefore equal to the individual's marginal willingness-to-pay for the attribute; thus, the hedonic price function is the envelope of the bid functions of all individuals in the market. This implies that

BLM_0058029

we can estimate the average willingness-to-pay for an attribute (i.e., exposure to groundwater risk from hydraulic fracturing) by looking at how the price of the product (i.e., housing) varies with that attribute.

A vast body of research has examined the housing price effects of locally undesirable land uses, such as hog operations [Palmquist et al., 1997], underground storage tanks [Guignet, 2012], and power plants [Davis, 2011] to name a few. These estimates are then used to measure the disamenity value of the land use (or willingness-to-pay to avoid it). This paper similarly uses hedonic methods to model the effect of proximity to a shale gas well on property values.[5] In particular, we use variation in the market price of housing with respect to changes in the proximity of shale gas operations to measure the implicit value of a shale well to nearby home owners, depending upon water source. As such, it should be able to pick-up the direct effect of environmental risks - in particular, risk of water contamination and consequences of spills and other accidents - while differentiating those risks from other negative externalities (e.g., noise, lights, and increased truck traffic) and the beneficial effects of increased economic activity and lease payments. The latter is analogous to the effect of a wind turbine [Heintzelman and Tuttle, 2012], where the undesirable land use is also accompanied by a payment to the property on which it is located. In this paper, we focus on the hedonic impact of groundwater contamination risk on property values, as it is generally considered to be one of the most significant risks from shale gas development.[6]

The academic literature describing the costs of proximity to oil and gas drilling operations is small. See, for example, Boxall et al. [2005], which examines the property value impacts of exposure to sour gas wells and flaring oil batteries in Central Alberta, Canada. The authors find significant evidence of substantial (i.e., 3-4 percent) reductions in property values associated with proximity to a well. Klaiber and Gopalakrishnan [2012] also examine the effect of shale gas wells in Washington County, using data from 2008 to 2010. They examine the temporal dimension of capitalization due to exposure to wells, focusing on sales during a

---

[5]Assuming that the housing supply is fixed in the short-run, any addition of a shale gas well is assumed to be completely capitalized into price and not in the quantity of housing supplied. Given that the advent of shale gas drilling is relatively recent, we would expect to still be in the "short-run". As more time passes, researchers will be able to study whether shale gas development has had a discernable impact on new development.

[6]Krupnick *et al*, "What the Experts Say About Shale Gas: There's More Consensus Than You Think," RFF Discussion Paper, Forthcoming.

BLM_0058030

short window (e.g., 6 months) after well permitting and using school district fixed effects to control for unobserved heterogeneity. Like Boxall et al. [2005], Klaiber and Gopalakrishnan [2012] also find that wells have a small negative impact on property values. We find evidence of much larger effects on property values - a difference we ascribe to the rich set of controls for unobservables (both time-invariant and time-varying) used in our DDD identification strategy described above.

Because the hedonic price function is the envelope of individual bid functions, it will depend upon the distributions of characteristics of both home buyers and the housing stock. This means that if few of the neighborhoods in our sample are affected by increased traffic and noise, then there will be a lower premium placed on quiet neighborhood location. However, if shale development is widespread and results in most neighborhoods being affected by heavy truck traffic, then the houses located in the relatively few quiet neighborhoods would receive a high premium. In the case of a widespread change in the distribution of a particular attribute in the housing stock, it is possible that the entire hedonic price function might change, so that even the price of properties far from shale wells will be affected. Furthermore, the hedonic price function is dependent on the distribution of tastes. If the mix of homebuyer attributes changes dramatically over time, that could also lead to a shift in the hedonic price function. Bartik [1988] shows that, if there is a discrete, non-marginal, change that affects a large area, the hedonic price function may shift, which can hinder one's ability to interpret hedonic estimates as measures of willingness to pay. Rather, the estimates may simply describe capitalization effects [Kuminoff and Pope, 2012]. This would be a conservative interpretation of our results. Whereas a willingness to pay interpretation is useful for the cost-benefit analysis of alternative regulations and standards that might be imposed on drillers, a focus on the capitalization effect is relevant for policy if we are interested in whether shale gas wells increase the risk of mortgage default. It is also important for local fiscal policy, as drilling may have important implications for property tax revenues.

6

# 3    Background on Risks Associated with Shale Gas Development

Shale gas extraction has become viable because of advances in hydraulic fracturing and horizontal drilling. Hydraulic fracturing is a process in which large quantities of fracturing fluids (water, combined with chemical additives including friction reducers, surfactants, gelling agents, scale inhibitors, anti-bacterial agents, and clay stabilizers and proppants) are injected at high pressure so as to fracture and prop open the shale rock, allowing for the flow of natural gas contained therein. The multiple risks associated with fracking (including the contamination of groundwater) may have an impact on property values and are, hence, relevant for mortgage lenders.[7] Knowing the perceived costs associated with these risks can also be of use to regulators considering different standards for drilling operations.

First, development can cause contamination of local water supply resulting from improper storage, treatment, and disposal of wastewater. Hydraulic fracturing also generates "flowback fluid" and produced water, the hydraulic fracturing fluids and formation water that return to the surface, often containing salts, metals, radionuclides, oil, grease, and VOC's. These fluids might be recycled for repeated use at considerable cost, treated at public or private waste water treatment facilities, or injected in deep underground injection wells. Mismanagement of flowback fluid can result in contamination of nearby ground and surface water supplies. Second, air pollution is a concern - escaped gases can include NOx and VOC's (which combine to produce ozone), other hazardous air pollutants (HAP's), methane and other greenhouse gases. Third, spills and other accidents can occur - unexpected pockets of high pressure gas can lead to blowouts that are accompanied by large releases of gas or polluted water, and improper well-casings can allow contaminants to leak into nearby groundwater sources. Fourth, there may also be a risk of contamination from drill cuttings and mud. These substances are used to lubricate drill bits and to carry cuttings to the surface and often contain diesel, mineral oils or other synthetic alternatives, heavy metals (e.g., barium) and acids. These materials can leach into nearby groundwater

---

[7]For a risk matrix for shale gas development see:
http://www.rff.org/centers/energy_economics_and_policy/Pages/Shale-Matricies.aspx.

BLM_0058032

sources. Other negative externalities include noise, increased traffic, deterioration of roads due to heavy truck traffic, minor earthquakes, and clearing of land to drill wells, which can also affect property values by reducing the aesthetic appeal of the region in general.

# 4   Method

Implementation of the hedonic method is complicated by the presence of property and neighborhood attributes that are unobserved by the researcher but correlated with the attribute of interest. The specifications we use in order to demonstrate and address this problem include a simple cross-section, a property fixed effects regression, and a triple-difference (DDD) estimator that uses detailed geographical information about well proximity and the placement of the piped water network to define several overlapping treatment and control groups. We briefly review the econometric theory behind each of these approaches below.

## 4.1   Cross-Sectional Estimates

The most naïve specification ignores any panel variation in the data and simply estimates the effect of exposure to a shale gas well by comparing the prices of properties in the vicinity of a well to those properties not exposed to a well. Considering the set of all houses in the study area, we run the following regression specification:

$$P_i = \beta_0 + \beta_1 WELLDIST_i + X_i'\delta + YEAR_i'\gamma + \varepsilon_i \qquad (1)$$

where

| | |
|---|---|
| $P_i$ | natural log of transaction price of property $i$ |
| $WELLDIST_i$ | distance to nearest shale gas well at the time of transaction |
| $X_i$ | vector of attributes of property $i$ |
| $YEAR_i$ | vector of dummy variables indicating year property $i$ is sold |

In this specification, the effect of exposure to a well is measured by $\beta_1$.

The problem here is that $WELLDIST_i$ is likely to be correlated with $\varepsilon_i$ (i.e.,

BLM_0058033

properties and neighborhoods that are near wells are likely to be different from those that are not near wells in unobservable ways that may also affect property values). For example, houses located in close proximity to wells may be of lower or better quality than those located elsewhere in the county. One way to check for this possibility is by comparing observable attributes of properties and neighborhoods, both located near and far from shale gas wells. Significant differences in observable attributes suggests a potential for differences in unobservables, which could lead to bias in the estimation of Equation (1) (see Table 5 in the Appendix). Therefore, it is important to control for these unobserved location attributes that lead to the location decisions by gas exploration and production companies.

Utilizing pooled ordinary least squares (OLS) can also be problematic since the error terms associated with homes sold multiple times will likely be correlated, given that unobserved attributes of the home may not change much over time. This creates correlation between the error terms, which violates the assumption of i.i.d. error terms necessary for consistent estimation of the parameters. Using property fixed effects allows us to control for these correlated unobservables by specifically accounting for the correlation within homes sold more than once.

## 4.2 Property Fixed Effects

Properties that are near shale wells might differ systematically in unobservable ways from those that are not near wells. If properties farther from wells are associated with more desirable unobserved characteristics, then this would create an elevated baseline to which the properties near wells would be compared, inflating the estimated negative effect of proximity to a well. Utilizing property-level fixed effects allows us to difference away the unobservable attributes associated with a particular property, or with the property's location.

In our second specification, we exploit the variation in panel data to control for time-invariant property attributes with property-level fixed effects. Suppose $P_{it}$ measures the natural log of the price of property $i$, which transacts in year $t$. $X_i$ is a vector of attributes of the property[8], and $WELLDIST_{it}$ is the distance of property $i$ to the nearest well at the time of the transaction. $\mu_i$ is a time-invariant attribute associated with the property that may or may not be observable by the

---

[8]The property attributes do not change over time in our dataset, because the attributes of the property in the final transaction are the only attributes that are recorded in the data.

BLM_0058034

researcher, and $\nu_{it}$ is a time-varying unobservable attribute associated with the property. Importantly, $\mu_i$ may be correlated with $WELLDIST_{it}$ in the following equation:

$$P_{i,t} = \beta_0 + \beta_1 WELLDIST_{it} + X'_i\delta + \mu_i + \nu_{it} \qquad (2)$$

We employ a fixed effects technique in order to remove $\mu_i$ from Equation 2:

$$\tilde{P}_{it} = \beta_1 \widetilde{WELLDIST}_{it} + \tilde{X}'_i\delta + \tilde{\nu}_{it} \qquad (3)$$

where $\tilde{P}_{it}$, $\widetilde{WELLDIST}_{it}$, $\tilde{X}_i$, and $\tilde{\nu}_{it}$ are mean differenced variables. Estimating this specification controls for any permanent unobservable differences between properties that have the shale well treatment and those that do not.

## 4.3   Difference-in-Difference-in-Differences (DDD)

While property-level fixed effects account for time-invariant unobserved property and location attributes, they are not able to control for time-varying sources of unobservable heterogeneity. This is a concern, as shale gas production could be associated with a boom to the local economy and with valuable payments for mineral rights at the property level, both of which can be hard to quantify, yet may be correlated with well proximity. As Table 1 demonstrates, average distance to the nearest well decreases over time as more wells are drilled. In fact, the average distance to a well decreased by almost 50 percent over the time period. If the economic boom associated with increased in-migration and employment due to drilling activity increases property values over time, then this increased capitalization will appear to be caused by closer proximity to shale gas wells. If we do not take this underlying trend into account, then we will underestimate the negative impact of the well. Failure to account for payments for mineral rights can have a similar effect. This warrants going beyond a simple fixed effects specification and conducting a quasi-experimental procedure that removes the underlying time trends and better estimates the impact of proximity to shale gas wells on property values. We employ a linear DDD technique, which is described in more detail below. There, we define a pair of overlapping treatment and control groups of properties by exploiting a property's proximity to wells and whether or not it is part of the public water service area (PWSA).

BLM_0058035

Table 1: Shale Gas Activity Over Time in Washington County, PA

| Year | No. Wells | No. Permitted | Dist. To Nearest Well (m) | Dist. to Nearest Permit (m) |
|------|-----------|---------------|---------------------------|------------------------------|
| 2005 | 5 | 9 | 11,952.9 | 11,952.9 |
| 2006 | 25 | 32 | 11,879.4 | 11,883.6 |
| 2007 | 80 | 116 | 9,370.8 | 7,806.5 |
| 2008 | 188 | 221 | 7,336.6 | 7,329.3 |
| 2009 | 188 | 268 | 6,326.3 | 6,323.6 |

*Notes:* Counts are of wellpads (there may be multiple wellbores on each wellpad).

### 4.3.1   Treatment Group Well Proximity

In order to identify the properties "treated" by exposure to groundwater contamination risk, we first exploit the fact that the effects of a well are localized, in that many of the disamenities associated with development (such as noise and truck traffic along with groundwater contamination) will not affect properties farther from a well. At some distance far enough away from the well site, drilling may not influence property values at all. This appears to be the case based on work by Boxall et al. [2005] on sour gas wells in Alberta, Canada. In order to identify the correct treatment distance from a well, we conduct an econometric test to see at which point the well no longer impacts property values. The test we employ follows the strategy of Linden and Rockoff [2008]. This method compares properties sold after a well has been drilled (within certain distances) to properties sold prior to a well being drilled (within the same distance), and identifies at which distance wells stop impacting property values. We then define our first treatment group as properties having a well within this distance.

BLM_0058036



Figure 1: Sales Price Gradient of From Local Polynomial Regressions on Distance from Current/Future Well

In order to conduct the Linden and Rockoff [2008] test, we create a subsample of properties that have, at some point in time (either before the property is sold or after), only one well pad located within 5000 meters. We begin by estimating two price gradients based on distance to a well: one for property sales that occurred prior to a well being drilled and one for property sales after drilling began. The distance at which the difference in these two price gradients becomes insignificant is the distance at which we can define the first treatment group. Figure 1 shows these price gradients estimated by local polynomial regressions. For properties that are located more than 2000 meters from a well, the gradients are similar both before and after the well is drilled. However properties located closer than 2000 meters to a well are sold for more on average after the well is drilled than before the well is drilled, which would correspond to properties receiving, or expecting to receive, lease payments.[9] The solid line in the graph demonstrates that properties sold prior to a well being drilled within 2000 meters receive lower sale prices the closer they are to a well, implying that wells are being located in areas with

---

[9]A horizontal well might extend over a mile (1609 meters) and therefore it is possible for a property within 2000 meters of a well to be receiving payments.

BLM_0058037

negative unobservable attributes.[10] Thus, we use a distance of 2000 meters from a well to measure the treatment, where any property located farther than 2000 meters is assumed to not be affected by well drilling. Importantly, we expect the effects of a boom to the local economy to be similar across that 2000 meter threshold. This defines our first treatment-control group: treated homes are those located within 2000 meters distance of a shale gas well, and the control homes are those located outside this 2000 meters band. This allows us to control for the unobserved time varying factors that are correlated with shale gas development by looking at homes sold inside and outside of a 2000 meter boundary of shale gas wells, as both these groups will likely be affected in similar ways by a regional economic boom. Finally, given evidence that wells are located in less desirable areas, we control for these unobserved area attributes with property fixed effects.

### 4.3.2   Private Water Wells vs. Piped Water

Much of the concern surrounding shale gas development arises from the risk of groundwater contamination. Properties that utilize water wells may be affected if the surface casing of a gas well cracks and methane or other contaminants migrate into the groundwater [SEAB, 2011, Osborn et al., 2011] or if fractures connecting the shale formation reach the aquifer [Warner et al., 2012, Myers, 2012]. Properties that receive drinking water from water service utilities, on the other hand, do not face this risk.[11] We hypothesize that this risk may be capitalized into the value of the property; in particular, households using water wells may be more adversely affected by proximity to shale gas wells relative to households relying on piped water, and therefore would face a lower transaction value when "treated" by proximity to a well. In order to capture this difference across properties, we define an additional treatment group by designating properties depending upon whether they rely on groundwater or piped water. Specifically, we use GIS data on the location of the PWSA and map the properties into their respective groups.

---

[10]Creating this figure after excluding properties that have permitted, but not drilled, wells nearby excludes only 11 observations and results in a figure similar to Figure 1. This provides further evidence that the upward sloping portion of the "before drilled" line reflects negative unobservables correlated with proximity rather than expectations of future drilling.

[11]While hydraulic fracturing may cause contamination of the publicly available water supply, the city is tasked with providing clean water to its constituents, so the risk of receiving contaminated water through piped water lines is much lower than an unregulated well managed by a homeowner.

BLM_0058038

This allows us to interact distance with a groundwater indicator in our estimation in order to find the different impact of proximity to wells for groundwater versus piped water homes. Any differences between groundwater and piped water dependent properties that were present before the well is put in place are accounted for at a very detailed level by property fixed effects. While properties within 2000 meters of a shale gas well are equally likely to receive benefits from lease payments regardless of water source, those properties dependent upon groundwater are more likely to capitalize the negative consequences of increased contamination risk. This defines our second treatment-control group: by looking at the difference across groundwater dependence (and within 2000 meters of a shale gas well), we are essentially controlling for the unobserved lease payments that are common to both these groups, while allowing the first treatment effect (proximity to shale gas wells) to vary by drinking water source.

As a preliminary examination of whether and how groundwater and PWSA homes differ in their impact from shale gas well proximity, we conduct a generalized propensity score (GPS) model, as detailed in Hirano and Imbens [2004]. GPS allows the treatment of proximity to vary continuously, while regular matching models assume a binary treatment. For this test, we thus define the treatment as the distance to the nearest well, and estimate the impact on property values as this distance is varied. We include as controls property characteristics and census tract attributes.[12] Figure 2 demonstrates the impact of proximity to shale gas wells for the entire sample (including cities), and it appears that the treatment effect of proximity varies substantially with water service. For properties in a PWSA, being close to a shale gas well actually increases property values. This implies that the local economic development and lease payments associated with shale development can boost the housing market substantially, but only if the property is protected in some way from the environmental impacts. However, for properties without piped water, being closer to a shale gas well decreases property values. Thus, we find strong evidence of a contrasting impact across different water service areas. Figure 2 also shows that the impact of proximity to shale wells tapers off after approximately 6km, providing evidence that the impact of

---

[12]Ideally, we would run the estimation on each year separately in order to eliminate the time-varying issues that can bias the outcome from the fixed effects model. Unfortunately, our sample size is not large enough to run it with each year separately, so we have to estimate the dose response aggregated from 2006-2009. However, to control for the unobserved attributes correlated with years, we include year dummies.

BLM_0058039

shale development are localized.



(a)                                                   (b)

Figure 2: Impact on Property Values from Proximity to the Nearest Shale Gas Well

# 5   Data

Our main dataset is used under an agreement between the Duke University Department of Economics and Dataquick Information Services, a national real estate data company. These property data include information on all properties sold in Washington County, Pennsylvania from 2004 to 2009. The buyers' and sellers' names are provided, along with the transaction price, exact street address, square footage, year built, lot size, number of rooms, number of bathrooms, number of units in building, and many other characteristics. We begin with 41,266 observations in Washington County, PA, and remove observations that do not list a transaction price, have a zero transaction price,[13] do not have a latitude/longitude coordinate, were sold prior to a "major improvement",[14] are described as only a land sale (a transaction without a house), or claim to be a zero square footage house. The final cleaned dataset has 19,055 observations. Summary statistics

---

[13] Most observations are removed after deleting transactions with a price of zero (12,327 observations).

[14] We delete sales prior to major improvements because Dataquick data only report property characteristics at the time of the last recorded sale. If the property was altered between the last sale and earlier sales, we would have no record of how it had changed. Nonetheless this only removes 4 observations.

BLM_0058040

comparing the full sample and final sample show that they are similar in all respects except the transaction price (Table 2) - that difference being attributable to dropping observations with a zero price.

### Table 2: Summary Statistics

| | Final Sample | | Full Sample | |
|---|---|---|---|---|
| | Mean | Std. Dev. | Mean | Std. Dev. |
| **Property Characteristics:** | | | | |
| Transaction Price (Dollars) | 127,233 | 135,002 | 103,462 | 181,573 |
| Ground Water | 0.09 | 0.286 | 0.1 | 0.3 |
| Age | 54.6 | 39.7 | 52.6 | 40 |
| Total Living Area (1000 sqft) | 1.8 | 0.877 | 1.79 | 0.88 |
| No. Bathrooms | 1.69 | 1.01 | 1.66 | 1.02 |
| No. Bedrooms | 2.73 | 1.12 | 2.65 | 1.15 |
| Sold in Year Built | 0.118 | 0.322 | 0.0954 | 0.294 |
| Lot Size (100,000 sqft) | 0.244 | 0.766 | 0.262 | 1.3 |
| Distance to Nearest MSA (km) | 35.8 | 7.04 | 35.8 | 7.1 |
| **Census Tract Characteristics:** | | | | |
| Mean Income | 65,655 | 23,778 | 66,132 | 23,474 |
| % Under 19 Years Old | 23.9 | 4.19 | 23.8 | 4.14 |
| % Black | 3.78 | 5.87 | 3.61 | 5.74 |
| % Hispanic | 0.426 | 0.72 | 0.428 | 0.713 |
| % Age 25 w/High School | 39.2 | 10.5 | 39.2 | 10.4 |
| % Age 25 w Bachelors | 16.7 | 7.51 | 16.9 | 7.51 |
| % Same House 1 Year | 88.6 | 6.75 | 88.8 | 6.64 |
| % Unemployed | 6.19 | 2.84 | 6.11 | 2.82 |
| % Poverty | 7.63 | 6.93 | 7.38 | 6.86 |
| % Public Assistance | 2.21 | 2.13 | 2.11 | 2.1 |
| % Over 65 Years Old | 17.7 | 4.92 | 17.8 | 4.89 |
| % Female Household Head | 10 | 5.6 | 9.85 | 5.54 |
| **Shale Well Proximity:** | | | | |
| Distance to Closest Well (m) | 10,109 | 4,307 | | |
| Distance to Closest Permit (not Drilled) (m) | 10,239 | 4,675 | | |
| Number of Wellpads Drilled within 2km | .0306 | .489 | | |
| Observations | 19,055 | | 26,236 | |

*Notes:* Transactions in Washington County, 2004-2009, of houses in sub-sample used, and all transactions. The number of observations varies depending

In order to control for neighborhood amenities, we match each property's location with census tract information, including demographics and other characteristics. The census tract data come from the American Community Survey, which provides a tract-level moving average of observations recorded between the years 2005 and 2009.

We also match geocoded property transactions data to our second main data source - the location of wells in Washington County. We obtained data describing the permitted wells located on the Marcellus shale from the Pennsylvania Department of Environmental Protection. To determine whether the permit has been drilled, we rely on two different datasets. A well is classified as drilled if there was a "spud" date (i.e., date that drilling commenced) listed in the Pennsylvania

BLM_0058041



Figure 3: Well Pad with Multiple Wells

Department of Environmental Protection Spud Data or if there was a comple-
tion date listed in the Department of Conservation and Natural Resources Well
Information System (The Pennsylvania Internet Record Imaging System/Wells
Information System [PA*IRIS/WIS]). As there were many wells listed in one but
not both datasets, combining the two datasets provides us with a more complete
picture of drilling activity in this part of Pennsylvania. The final dataset includes
both vertical and horizontal wells, both of which produce similar disamenities,
including risks of groundwater contamination.[15]

Many of these wells are in very close proximity to one another, yet the data
do not identify whether these wells are on the same well pad. Well pads are areas
where multiple wells are placed close to each other, allowing the gas companies
to expand greatly the area of coverage while minimizing surface disturbance. As
current shale gas extraction in Pennsylvania typically involves horizontal drilling,
a well pad can include many wells in close proximity while maximizing access to
shale gas below the surface. Figure 3 demonstrates how six horizontal wells can
be placed on a small well pad, minimizing the footprint relative to vertical drilling
(which would require 24 wells evenly spaced apart, as indicated by the squares
in the figure).

Without identifying well pads, we might overstate the extent of drilling activ-
ity confronting a property. For example, a property near the well pad in Figure
2 would be identified as being treated by six wells, though presumably after the
first well has been drilled, the additional impact from each additional wellbore
would be less than the first. Thus, we create well pads using the distance between

---

[15]Risk of improper well casing or cementing would be present in both vertical and horizontal
wells.

BLM_0058042

the wells, and treat each well pad as a single entity. In order to create well pads, we choose all wellbores that are within one acre (a 63 meter distance) of another wellbore and assign them to the same well pad.[16] In our data, of the wellbores that are within one acre of another wellbore, 50 percent are within 11 meters and 75 percent are within 20 meters. Any wellbore within one acre is considered to be on the same well pad, so if more than two wellbores are included, our constructed well pads can cover an area larger than one acre. The average number of wellbores per well pad is 3.7 (max of 12), where 25 percent of the well pads in our data have only 1 well.

We begin by matching property transactions to all wells located within 20km of the property, including permitted but not drilled wells, drilled wells, and pre-permitted wells (i.e., wells that are permitted and drilled after the time of the property transaction). Once these wells are matched, we create variables that measure each house's Euclidean distance to the closest well pad that is either permitted or drilled at the time of the transaction, and variables describing the well count within 2000 meters. These are our main variables of interest, as they identify our "treatment": how proximity to wells affects property values. We also calculate the inverse of the distance to the nearest well and use this variable as the treatment in the cross sectional and fixed effects specifications, allowing for an easier interpretation of the results - an increase in inverse distance implies a closer distance to a well, so a positive coefficient would imply a positive valuation of proximity. Furthermore, utilizing inverse distance places more emphasis on homes that are closer to wells; this is a reasonable functional form (relative to a linearly decreasing function), given that the marginal disutility of disamenities associated with drilling likely declines as one moves further from a well (i.e., visual aesthetic issues may not be present at 3-4 miles distance, though truck traffic may still affect those farther away).

In order to capture the water contamination risks that home owners may face from shale gas extraction, we utilize data on public water service areas in Washington County and identify properties that do not have access to public piped drinking water. We obtained the GIS boundaries of the public water supplier's service area from the Pennsylvania Department of Environmental Protection.

---

[16]During completion, a multi-well pad, access road, and infrastructure are estimated to encompass 7.4 acres in size, after completion and partial reclamation, a multi-well pad averages 4.5 acres in size [New York State Department of Environmental Conservation, 2011].

BLM_0058043

Properties located outside of a PWSA most likely utilize private water wells, since the county does not provide much financial assistance to individuals who wish to extend the piped water area to their location.[17] This allows us to separate the analysis by water service area into PWSA and "groundwater" areas, and we use this distinction to identify the water contamination risk that may be capitalized into the transaction value. Figure 4 shows the map of Washington County, Pennsylvania, describing the locations of the permitted and drilled (spudded) wells, property transactions, and the water service area. This map describes all wells and transactions in the sample, so some of the wells shown there were not present at the time of a nearby transaction. The large clustering of transactions in the center part of the county corresponds to the two cities in the county: Washington and Canonsburg. These cities fall along the major highway that cuts through the county (I-79, which connects with I-70 in Washington City). We hypothesize that properties within these major cities may face significant changes due to the economic boom associated with shale gas development. Thus, we exclude these cities in certain specifications in order to help isolate the disamenity value associated with proximity to a well from the property value benefits associated with the economic boom.

---

[17]Personal communication with the Development Manager at the Washington County Planning Commission, April 24, 2012.

BLM_0058044



Figure 4: Property Sales in Washington County, 2004-2009. Includes Drilled Wells, Permitted Wells, and Public Water Service Areas

20

BLM_0058045

# 6   Results

## 6.1   Cross-Sectional Results

We first report results for our cross-sectional specification, where we regress logged transaction prices on regression controls for property and census tract attributes, year dummies, and several treatment variables. These treatment variables include both inverse distance to the nearest drilled well and this variable interacted with a dummy for groundwater (which equals one if the property is located outside a PWSA). This allows us to separately identify the impact of proximity to a well for households living in groundwater areas. We expect this coefficient to be negative, as being closer to a well causes a greater risk to households living in groundwater areas. We also include inverse distance to the nearest permitted well in order to identify whether there is a different impact from permitted wells relative to drilled wells. This variable is also interacted with a groundwater dummy. We run the regression for the full sample as well as the subsample excluding the cities.

We find a positive and significant impact of proximity to a drilled well, though the interaction with groundwater is negative and insignificant. Inverse distance to a permitted well interacted with groundwater is positive but insignificant. The positive sign on the coefficient may be picking up the fact that proximity to a permitted well implies a likely lease payment.[18] In fact, these lease payments increase with the amount of land leased, and lot sizes in groundwater areas are much larger than in the PWSA areas. Thus, the groundwater-dependent properties may positively capitalize on the permitting of the well before the negative amenities associated with drilling occur. However, given the insignificance of the coefficient on the interaction of groundwater with proximity, it is difficult to draw conclusions regarding the overall impact of proximity to wells for the groundwater area homes.

Since inverse distance is not a linear function of proximity, we cannot interpret

---

[18]Usually the mineral rights would be part of any property transfer, unless those rights were severed from the title to the property by being retained by the seller during the transfer, or sold to another party prior to the transfer. If mineral rights are sometimes severed, this would simply reduce the size of the price premium we estimate on well proximity. This should not, however, affect our estimates of the capitalization of groundwater contamination risk unless the probability of mineral right severance is correlated with water source in the area around the groundwater-PWSA boundary. We have no reason to suspect that this is the case.

BLM_0058046

the magnitude of these coefficients directly. Instead, we take the derivative of the price with respect to distance (meters) in order to find the marginal effect of proximity on price. Thus, the derivative of the price function is:

$$\partial(lnp)/\partial(distance) = -\beta/(distance^2) \qquad (4)$$

where $\beta$ is the coefficient and *distance* is in meters. For a PWSA property that is 1000 meters away from a well pad, the percent change in price from a one meter increase in distance is -0.03 percent ($-100*326.148*(1/1000^2)$), implying positive impacts on property values from proximity to wells (Table 3, column 1). The comparable result for groundwater-dependent properties is inconclusive given that the coefficient on the interaction term is insignificant. These results likely reflect the fact that the cross-sectional specification does not account for unobserved attributes of either the property or its location. These attributes may be correlated with proximity to a well and with water source, which can cause a bias in the cross-sectional coefficients. This leads us to employ a property fixed effects approach in order to remove these unobservable location attributes.

## 6.2   Property Fixed Effect Results

The signs of the coefficients from the FE specification are similar but larger and more significant than under the OLS specification.[19]  For the full sample (including cities), we find a positive impact of drilled shale gas well proximity on property values, though it is negative (and larger) for those households living in groundwater areas. This implies that shale development causes an increase in property values in general (perhaps due to lease payments, increased economic activity, or higher rental prices), though properties that do not have access to piped water have an overall negative impact due to shale gas development risks. When we exclude the cities, this effect is even more pronounced: the size of the coefficient on proximity to drilled wells decreases, suggesting that the effect of increased economic development is concentrated in the cities. The results imply that the marginal change in property values from moving one meter farther from

---

[19]There are more observations in columns 2 and 4 relative to columns 1 and 3 because of missing values for property characteristics-the fixed effects specification does not require these variables to be complete for all homes, so we are able to make use of more observations in the fixed effect regressions than in the OLS regressions.

BLM_0058047

Table 3: Cross Sectional and Property Fixed Effects Estimates of the Effect of Shale Gas Wells on Log Sale Price

| | (1) OLS | (2) OLS | (3) FE | (4) FE |
|---|---|---|---|---|
| Inverse Distance to Well (meters$^{-1}$) | 326.148*** | 263.962** | 1103.470** | 764.502** |
| | (121.106) | (125.322) | (447.170) | (363.109) |
| Inv. Dist. to Well*Groundwater | -290.933 | -411.179 | -1458.178*** | -1351.901*** |
| | (207.612) | (250.482) | (420.039) | (370.750) |
| Inv. Dist. to Permitted (not Drilled) Well | 21.767 | -151.561 | 296.562 | 1470.929 |
| | (121.548) | (225.927) | (335.141) | (994.679) |
| Inv. Dist. to Permitted* Groundwater | 193.943 | 605.057 | -333.022 | -1560.450 |
| | (228.639) | (406.166) | (516.627) | (1213.657) |
| Groundwater | -.108 | -.098 | | |
| | (.069) | (.086) | | |
| Age | -.014*** | -.012*** | | |
| | (.000) | (.001) | | |
| Total Living Area (1000 sqft) | .283*** | .285*** | | |
| | (.019) | (.025) | | |
| No. Bathrooms | .070*** | .057* | | |
| | (.021) | (.030) | | |
| No. Bedrooms | -.014 | -.026 | | |
| | (.018) | (.024) | | |
| Sold in Year Built | -.204*** | -.365*** | | |
| | (.040) | (.067) | | |
| Lot Size (100,000 sqft) | .280*** | .301*** | | |
| | (.057) | (.064) | | |
| Lot Size Squared (100,000 sqft) | -.025* | -.022** | | |
| | (.013) | (.010) | | |
| Distance to Nearest MSA (km) | .011*** | .003 | | |
| | (.002) | (.003) | | |
| Mean Income (1000 dlls) | .005*** | .007*** | | |
| | (.001) | (.002) | | |
| % Unemployed | -.030*** | -.034*** | | |
| | (.007) | (.010) | | |
| % Age 25 w/Bachelors | .027*** | .026*** | | |
| | (.004) | (.006) | | |
| % Female Household Head | .006 | .009 | | |
| | (.004) | (.007) | | |
| % Over 65 Years Old | .005* | .014** | | |
| | (.003) | (.006) | | |
| % Black | -.007** | -.038*** | | |
| | (.003) | (.008) | | |
| % Hispanic | -.097*** | -.076*** | | |
| | (.019) | (.030) | | |
| 2006 | -.072* | -.107* | .345 | .325 |
| | (.039) | (.063) | (.207) | (.348) |
| 2007 | -.096** | -.076 | .704*** | .672** |
| | (.040) | (.063) | (.197) | (.325) |
| 2008 | -.248*** | -.259*** | .854*** | .859*** |
| | (.042) | (.065) | (.207) | (.321) |
| 2009 | -.493*** | -.525*** | 1.394*** | 1.498*** |
| | (.059) | (.084) | (.265) | (.347) |
| n | 10,833 | 5,847 | 10,960 | 5,945 |
| Mean of Dep. Var. | 11.09107 | 10.94342 | 11.07652 | 10.92134 |

*Notes:* Robust standard errors clustered at the census tract (102 census tracts). Columns (3) and (4) include property fixed effects. Columns (2) and (4) do not include the two largest cities in Washington County (Washington and Canonsburg). *** Statistically significant at the 1% level; ** 5% level; * 10% level.

BLM_0058048

a well is -0.0764 percent for PWSA properties and 0.059 percent (0.076%-0.135%) for groundwater-dependent properties (Table 3, column 4).[20]This presents some evidence that those living outside the PWSA, while attaining increased property values from lease payments, are not able to offset the negative impacts associated with groundwater risks.

According to Table 3, the relative effect of proximity to shale gas wells on groundwater and PWSA homes is very different in the OLS and fixed effects specifications. In the fixed effects specification, homes overall are more positively affected by proximity, although the effect on groundwater homes is more negative. We test the difference between the coefficients on proximity and proximity interacted with groundwater across the two specifications, and find that the interaction term changes significantly, although the proximity term alone does not. This demonstrates that there is an unobservable correlated with proximity and groundwater that is being picked up by the fixed effect approach. Specifically, the change in coefficients suggests that shale gas wells are being located near homes in groundwater areas that are unobservably better. There is indeed evidence that these groundwater area homes are observably better and have larger lots (See Table 5 for differences across homes located close to shale gas wells). Properties with larger lots - which tend to be located in groundwater areas - would be preferred by gas exploration and production companies, as leasing the same quantity of land would require fewer transactions and potentially lower costs per well. Though we control for lot size in the OLS specification, lot size may be correlated with positive unobservable attributes in groundwater areas, which would explain the shift in the interaction coefficient. However, as evidenced by Figure 1, there appear to be negative unobservables correlated with proximity in PWSA homes, which could drive the increase in the proximity coefficient when moving from OLS to fixed effects.[21]

Unfortunately, relying on fixed effects can be problematic given time varying

---

[20]The t-statistic on the difference in these parameters is -1.73, implying a statistically significant net gain in property values from moving farther from the well.

[21]In order to create this figure we only included homes with *one* wellpad within 5000 meters, which excluded many of the groundwater dependent properties: the results from this figure are driven mostly by PWSA homes for which, given the upward sloping solid line, it would appear there are negative unobservables correlated with proximity. Creating a separate figure for groundwater and PWSA properties would have too few observations in each distance bin to be reliable. This does not affect our DDD estimation strategy, however, which relies on homes being located near *one or more wells* within 2000 meters.

24

unobservables - e.g, the local economic boom and lease payments to individual
homeowners. This warrants our use of a triple-difference estimator to remove
these confounding effects.

## 6.3   Difference-in-Difference-in-Differences

Though we do not have information on gas lease payments to homeowners,[22] we
assume that all properties (conditional upon proximity to a drilled well and other
observables such as lot size) have an equal likelihood of receiving lease payments
regardless of water service area.[23] Moreover, while both may see their prices go
up because of mineral rights and increased economic activity, properties that rely
on groundwater may see their values increase by less (or even decrease) given
concerns of groundwater contamination from nearby shale gas development. Our
overlapping treatment and control groups based on well proximity and water
source provide us with a two-part quasi-experiment with which we can tease out
the negative impact of groundwater contamination from the positive impact of
the mineral lease payments and economic activity.

We estimate the following regression equation:

$$Log(price)_{it} = N_{2000,it} + Groundwater_i * N_{2000,it} + \theta_t + \mu_i + \nu_{it} \tag{5}$$

where $N_{2000,it}$ is a count of the number of well pads within 2000 meters at the
time $t$ of sale. It equals zero if $t$ is before drilling takes place, or if property $i$ is
more than 2000 meters from the nearest well pad. In addition, $Groundwater$ is
an indicator for whether property $i$ relies on groundwater; $\theta_t$ is a year fixed effect

---

[22]Mineral leases are filed at the county courthouse however not in an electronic format. Some
leases have been scanned and are available in pdf format at www.landex.com, however, this
service is geared towards viewing a handful of leases; downloading all leases in a county would
be expensive and matching the leases to properties via an address or tax parcel number would
likely be an imprecise endeavor.

[23]It could be the case that, given groundwater safety concerns, individuals in groundwater
areas are less likely to sign a mineral lease, in which case we would overestimate the negative
impact of a well in a groundwater area if fewer groundwater dependent homes are receiving
lease payments. Our results would thus be interpreted as an upper bound on the negative
impact of proximity for groundwater dependent homes. However, gas exploration and produc-
tion companies will only drill after obtaining the mineral rights to a sufficiently large area to
warrant drilling, implying that holdouts are the minority in areas where wells have been drilled.
Furthermore, property owners unwilling to sign based on groundwater contamination concerns
are likely rare; if others nearby have granted their mineral rights, groundwater contamination
is not prevented by not signing.

25

to capture trends over time; $\mu_i$ is a property fixed effect that absorbs the time-invariant differences between properties that eventually have one or more wells within 2000 meters and those that do not,[24] as well as time-invariant differences between groundwater and PWSA properties. The interaction $Groundwater_i * N_{2000,it}$ measures the treatment effect on groundwater homes relative to PWSA homes, accounting for any time-varying unobservables that similarly affect close and distant properties.

Finally, in order to reduce the burden on our differencing strategy to control for time-varying unobserved neighborhood attributes, our main specification only looks at properties located within 1000 meters of either side of the border of the PWSA.[25] This represents the smallest (and most homogenous) geographic area we can use that still contains properties relying on groundwater along with properties in the PWSA.

In order to validate our assumption of common time trends across the two groups (PWSA and groundwater) and within the same neighborhood (1000 meters from the border), we regress transaction values on the property characteristics and census tract attributes that are used in our cross-sectional specification, and then calculate the residuals, separately for groundwater-dependent and PWSA homes. We plot the residuals over time prior to any wells being drilled (the first well in Washington County was drilled in June 2005), once for a restricted sample of homes located within 1000 meters of either side of the PWSA border, and once for the entire sample of homes in Washington County. Figure 5 plots the time trend across the full sample of the two groups, while Figure 6 restricts the sample to homes located within 1000 meters of either side of the PWSA border. Both figures track quite well across the two samples prior to any property being treated by a well, although the restricted sample (which is our final DDD sample) tracks more closely. This demonstrates that focusing on homes that are closer together helps eliminate differing pre-trends across the control and treatment group, thereby validating our DDD approach with the restricted sample.

---

[24]While being located inside the PWSA or groundwater area may not be invariant over time, we only have data on the most recent layout of the PWSA; thus our data on water service are time invariant and we do not include a groundwater dummy in this specification.

[25]We also include a specification with the entire sample in Washington County to test how the assumption of common trends changes with a larger group.

26

BLM_0058051



Figure 5: Mean Residuals of Log Transaction Price using the Full Sample



Figure 6: Mean Residuals of Log Transaction Price using the properties located 1000 m from the PWSA Border

27

BLM_0058052

We provide additional evidence to validate our assumption that PWSA homes within 1000 meters of the PWSA border are a good control for the groundwater-dependent homes near the other side of the border, by inspecting aerial maps of the homes in this region. We find that, for nearly all of our sample, PWSA and groundwater areas are not divided in such a way as might cause neighborhood discontinuity (e.g., such as by a highway, railroad track, etc).[26]  This provides further justification for use of homes on the PWSA side of the border as controls for the groundwater-dependent homes in our DDD method.

We estimate our DDD specification using a number of different subsamples. In our first two regressions, we use a subsample that omits properties that were sold after they had permitted (but not yet drilled) wells within 2000 meters (columns 1 and 2 of Table 4). This subsample removes properties that may be receiving lease or bonus payments from a gas exploration and development company due to a permitted but not drilled well. The initial specification in column 1 looks at all properties in both the PWSA and groundwater areas (instead of only those located along the PWSA border), which allows us to test the importance of the assumption of common time trends close to the border. In the second regression (column 2) we restrict the sample to PWSA border homes. Since it is possible that the PWSA has been extended beyond the border designated in our data, we omit properties that are 300 meters on the groundwater side of a water service area in order to reduce the risk of including misclassified properties. Our third specification looks at all properties in Washington county, including the properties with permitted (but undrilled) wells, but controls for these with an indicator for having permitted wells nearby, as well as the interaction of this indicator with *Groundwater* (column 3).[27]  Finally, this third specification is also run using only the PWSA border home properties (column 4). Thus, only columns 2 and 4 allow for the assumption of common time trends.

---

[26]One exception is displayed in the Appendix (Figure 9), where highway I-70 coincides with the PWSA boundary. Our results are robust to dropping homes located in this area.

[27]Including properties treated by permitted wells increases the sample size by 128 observations for the full sample, and by 46 for the band around the PWSA border.

28

BLM_0058053

Table 4: DDD Estimates of the Effect of Shale Gas Wells on Log Sale Price by Drinking Water Source

|  | (1) Full | (2) Band | (3) Full | (4) Band |
|---|---|---|---|---|
| Wellpads Drilled within 2km | .288*** | .321*** | .091* | .107** |
|  | (.068) | (.082) | (.053) | (.040) |
| Wellpads Drilled within 2km*Groundwater | -.901** | -.433*** | .011 | -.236* |
|  | (.370) | (.117) | (.106) | (.124) |
| Wellpads Permitted (not drilled) within 2km |  |  | .177 | -.036 |
|  |  |  | (.119) | (.088) |
| Wellpads Permitted (not drilled) within 2km*Groundwater |  |  | .002 | -.749 |
|  |  |  | (.123) | (.593) |
| Year Effects | Yes | Yes | Yes | Yes |
| Property Effects | Yes | Yes | Yes | Yes |
| n | 17,779 | 3,229 | 17,907 | 3,275 |

*Notes:* Robust standard errors clustered at the census tract (102 census tracts). All specifications include year-of-sale and property fixed effects. Columns (1) and (2) are specifications that omit properties with wells permitted (but not drilled) within 2000 meters. Columns (3) and (4) include properties with wells permitted within 2000 meters. Columns (2) and (4) only examine properties within a 1000 meter band around the water service area. *** Statistically significant at the 1% level; ** 5% level; * 10% level.

Similar to the cross-sectional and FE results, we find that property values go up after a well pad has been drilled within 2000 meters, while properties that rely on groundwater are negatively affected by exposure. We find that permitted (but not drilled) wells do not have a significant effect on property values in our final specification, though controlling for these wells reduces the impacts (both positive and negative) of the treatment on property values relative to column 2 (Table 4, column 4). Though insignificant, the parameter estimate on the interaction term of permitted wells with the groundwater indicator is large and negative, providing some evidence that permitting may be negatively capitalized into the property value by groundwater homes. This could be due to the fact that the new home buyer is aware of the forthcoming drilling activity due to incoming lease payments or that construction has already begun to occur nearby.

The estimates in the final specification (column 4) demonstrate that properties in the PWSA positively capitalize proximity to a well pad by 10.7 percent, and this result is statistically significant. This is most likely due to lease payments, which allow properties in the PWSA to increase their values while avoiding the risks (or perceived risks) of contaminated groundwater. For properties that depend on groundwater, however, the estimate of the effect of drilling a well pad

29

BLM_0058054

within 2000 meters implies a decrease in property values of 23.6 percent. The net impact of these two effects is made up of a statistically significant reduction in value of 23.6 percent attributable to groundwater contamination risk, partially offset by the 10.7 percent increase (likely) attributable to lease payments. Their difference (-12.9 percent) while not itself significant,[28] suggests that, in contrast to PWSA homes, prices of groundwater dependent properties certainly do not rise as a result of nearby drilling, and may fall because of groundwater contamination risk.

The final estimation also demonstrates the importance of controlling for the fact that gas exploration and development companies have strategic location decisions. In the third specification, permitted wells significantly decrease values for groundwater dependent homes, though this significance disappears when we only look at homes near the PWSA border. Since gas wells near both sides of the border are located in relatively similar areas, they are less likely to be located in strategically different ways, and hence our final specification demonstrates that not controlling for these location decisions can cause groundwater dependent homes to appear more harmed by proximity to wells than they truly are.

# 7   Conclusion

Our study seeks to understand and quantify the positive and negative impacts of shale gas development on nearby property values. Our goal is to distinguish who benefits and who loses from this unconventional form of natural gas extraction. Specifically, we focus on the potential for groundwater contamination, one of the most high-profile risks associated with drilling. We demonstrate that those risks lead to a large and significant reduction in property values. These reductions offset any gains to the owners of groundwater-dependent properties from lease payments or improved local economic conditions, and may even lead to a net drop in prices. Unfortunately, due to limitations on lease payment data, we are not able to disentangle the positive effects of nearby drilling on property values from the effects of negative externalities that are not associated with groundwater risks (e.g., increased traffic; noise, air, and light pollution) - doing so is the subject of ongoing research. With our triple-difference strategy, we are, however,

---

[28]The t-statistic on the difference in these parameters is -1.03.

BLM_0058055

able to provide evidence that concern for groundwater contamination risk significantly decreases the value of nearby homes. Thus, being able to mitigate the potential for water contamination from shale gas development (such as through the extension of the piped water service area) allows properties to benefit from the lease payments and increased economic activity that accompanies drilling without having to bear the cost of the groundwater risks. This finding also provides added impetus for regulators to increase regulations to protect groundwater around hydraulic fracturing sites and for industry to increase transparency and voluntary action to reduce water contamination concerns.

To the extent that the *net* effect of drilling on groundwater-dependent properties might even be negative, we could see an increase in the likelihood of foreclosure in areas experiencing rapid growth of hydraulic fracturing. The U.S. government acknowledged the possible negative consequences of allowing leasing on mortgaged land in March 2012 when it began discussing a regulation requiring an environmental review of any property with an oil and gas lease before issuing a mortgage.[29] However, this proposed regulation was rejected within a week.[30] The overall lack of research regarding the impacts on property values from proximity to shale gas wells hinders the ability of the government to regulate optimally, both at the national and local levels. This paper helps to fill that void.

---

[29]"Mortgages for Drilling Properties May Face Hurdle," *New York Times*, 18 March 2012.
[30]"U.S. Rejects Environmental Reviews on Mortgages Linked to Drilling," *New York Times*, 23 March 2012.

BLM_0058056

# References

T.J. Bartik. Measuring the benefits of amenity improvements in hedonic price models. *Land Economics*, 64(2):172–183, 1988.

P.C. Boxall, W.H. Chan, and M.L. McMillan. The impact of oil and natural gas facilities on rural residential property values: a spatial hedonic analysis. *Resource and Energy Economics*, 27(3):248–269, 2005.

L.W. Davis. The effect of power plants on local housing values and rents. *Review of Economics and Statistics*, 93(4):1391–1402, 2011.

EPA. EPA Releases Draft Findings of Pavillion, Wyoming Ground Water Investigation for Public Comment and Independent Scientific Review, Environmental Protection Agency News Release . 2011. URL `http://yosemite.epa.gov/opa/admpress.nsf/0/EF35BD26A80D6CE3852579600065C94E`.

D. Guignet. What do property values really tell us? a hedonic study of underground storage tanks. *NCEE Working Paper Series*, 2012.

M.D. Heintzelman and C.M. Tuttle. Values in the Wind: A Hedonic Analysis of Wind Power Facilities. *Land Economics*, 88(3):571–588, 2012.

K. Hirano and G.W. Imbens. The propensity score with continuous treatments. *Applied Bayesian Modeling and Causal Inference from Incomplete-Data Perspectives*, pages 73–84, 2004.

H. Allen Klaiber and Sathya Gopalakrishnan. The Impact of Shale Exploration on Housing Values in Pennsylvania, Working Paper. 2012.

Nicolai V. Kuminoff and Jaren Pope. Do "Capitalization Effects" for Public Goods Reveal the Public's Willingness to Pay? Working Paper. 2012.

L. Linden and J.E. Rockoff. Estimates of the impact of crime risk on property values from megan's laws. *The American Economic Review*, 98(3):1103–1127, 2008.

J. Marchand. Local labor market impacts of energy boom-bust-boom in western canada. *Journal of Urban Economics*, 2011.

T. Myers. Potential contaminant pathways from hydraulically fractured shale to aquifers. *Ground Water*, 2012.

New York State Department of Environmental Conservation. Revised Draft Supplemental Generic Environmental Impact Statement On The Oil, Gas and Solution Mining Regulatory Program, Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs. 2011. URL `http://www.dec.ny.gov/docs/materials_minerals_pdf/rdsgeisexecsum0911.pdf`.

BLM_0058037

Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson. Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing. *Proceedings of the National Academy of Sciences*, 108(20):8172–8176, 2011.

RB Palmquist, FM Roka, and T. Vukina. Hog operations, environmental effects, and residential property values. *Land Economics*, 73(1):114–124, 1997.

S. Rosen. Hedonic prices and implicit markets: product differentiation in pure competition. *The Journal of Political Economy*, 82(1):34–55, 1974.

SEAB. Shale Gas Production Subcommittee Second Ninety Day Report, Secretary of Energy Advisory Board,U.S. Department of Energy. November 2011.

B.R. Swistock, W.E. Sharpe, and P.D. Robillard. A survey of lead, nitrate and radon contamination of private individual water systems in Pennsylvania. *Journal of Environmental Health*, 55(5):6–12, 1993.

N.R. Warner, R.B. Jackson, T.H. Darrah, S.G. Osborn, A. Down, K. Zhao, A. White, and A. Vengosh. Geochemical evidence for possible natural migration of Marcellus formation brine to shallow aquifers in Pennsylvania. *Proceedings of the National Academy of Sciences*, 109(30):11961–11966, 2012.

J.G. Weber. The effects of a natural gas boom on employment and income in Colorado, Texas, and Wyoming. *Energy Economics*, 2011.

BLM_0058058

# A   Appendix

Table 5: Means (and Standard Deviations) of Property Characteristics by Distance to Nearest Current or Future Well

|  | <2 km | 2-4 km | 4-6 km | 6-8 km |
|---|---|---|---|---|
| Transaction Price (Dollars) | 120,108 | 112,262 | 104,810 | 104,300 |
|  | (107,633) | (103,219) | (116,334) | (97,693) |
| Age | 54.58 | 54.65 | 57.62 | 58.66 |
|  | (39.19) | (40.3) | (40.01) | (40.17) |
| Total Living Area (1000 sqft) | 1.896 | 1.747 | 1.642 | 1.682 |
|  | (1.004) | (.8265) | (.679) | (.7133) |
| No. Bathrooms | 1.612 | 1.48 | 1.482 | 1.521 |
|  | (.9343) | (.9562) | (.9373) | (.931) |
| No. Bedrooms | 2.699 | 2.52 | 2.452 | 2.577 |
|  | (1.067) | (1.21) | (1.164) | (1.151) |
| Sold in Year Built | .06311 | .1222 | .1013 | .1162 |
|  | (.2437) | (.3278) | (.3019) | (.3206) |
| Lot Size (100,000 sqft) | .4076 | .2238 | .2209 | .1864 |
|  | (.5176) | (.3906) | (.4955) | (.3763) |
| Distance to Nearest MSA (km) | 34.81 | 34.99 | 35.74 | 37.77 |
|  | (5.76) | (6.184) | (7.013) | (5.631) |
| Mean Income | 68,851 | 59,431 | 59,431 | 58,681 |
|  | (11,678) | (12,038) | (12,749) | (16,620) |
| % Under 19 Years Old | 24.67 | 23.66 | 23.01 | 23.67 |
|  | (4.066) | (4.523) | (3.095) | (4.566) |
| % Black | 1.846 | 4.277 | 3.393 | 5.518 |
|  | (3.082) | (4.529) | (3.62) | (7.88) |
| % Hispanic | .6519 | .681 | .2979 | .4773 |
|  | (.9262) | (1.026) | (.4401) | (.7651) |
| % Age 25 w/High School | 43.52 | 43 | 41.26 | 41.82 |
|  | (4.766) | (5.573) | (7.712) | (7.977) |
| % Age 25 w Bachelors | 13.98 | 14.03 | 14.98 | 14.83 |
|  | (3.421) | (3.838) | (5.9) | (6.393) |
| % Same House 1 Year | 89.99 | 88.81 | 87.99 | 87.02 |
|  | (3.055) | (3.96) | (4.838) | (7.504) |
| % Unemployed | 6.243 | 7.028 | 5.979 | 6.859 |
|  | (1.648) | (2.269) | (2.46) | (3.09) |
| % Poverty | 4.764 | 6.286 | 7.019 | 8.53 |
|  | (3.366) | (4.513) | (4.633) | (7.882) |
| % Public Assistance | 1.991 | 1.962 | 2.126 | 2.526 |
|  | (1.025) | (1.574) | (1.763) | (2.576) |
| % Over 65 Years Old | 17.3 | 18.13 | 18.08 | 17.67 |
|  | (3.711) | (4.46) | (4.674) | (5.233) |
| % Female Household Head | 9.577 | 11.62 | 10.59 | 12.19 |
|  | (3.349) | (4.727) | (4.205) | (5.438) |
| Ground Water | .4396 | .1639 | .09304 | .06808 |
|  | (.4975) | (.3704) | (.2906) | (.2519) |
| Observations | 207 | 775 | 1623 | 2130 |

*Notes:* Summary statistics based on the distance to the closest well drilled at time of sale or at some time in the future.

BLM_0058059



Figure 7: Property Sales and permitted and drilled wells in Washington County, 2004-2009. Indicates 1000 meter band inside and outside of Public Water Service Areas.

35

BLM_0058060