160                                             *RIPARIAN AREAS*



FIGURE 3-4  The Middle Rio Grande water budget with units of $10^6$ m$^3$ yr$^{-1}$.

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

is an exotic species and because it happens to dominate in areas where attention is focused on phreatophyte issues. Saltcedar represents a particularly troublesome case because of the perceived advantages and disadvantages of removing it from riparian areas. On the one hand, saltcedar is an exotic whose removal not only could increase floodwater conveyance (although this has yet to be demonstrated), but could also provide more habitat for native plant species. At the same time, saltcedar has been proposed for protection because of its role as nesting habitat for the southwestern willow flycatcher, a federally listed endangered species (Leon, 2000). The Bureau of Reclamation has been controlling saltcedar on about 40,000 acres in New Mexico since the 1960s, but it has been unable to demonstrate positive changes in streamflow as a result, probably because of other factors such as groundwater pumping. Insects for biological control of saltcedar are now being released on a trial basis (DeLoach, 2000; J. Stromberg, Arizona State University, personal communication, 2002).

# AGRICULTURE

## Traditional Agricultural

Nationwide, agriculture is probably the largest contributor to the decline of riparian area quality and functioning (Dillaha et al., 1989). Because some of the most fertile soils are often located in riparian areas, there is an economic incentive for their conversion to cropland. These areas are also convenient sources of water for irrigation of adjacent cropland and, as previously discussed, excessive water withdrawal from streams lowers water tables and causes significant change to riparian area structure and functioning. In nonforested areas, there can be a tendency to encroach into the riparian area each time the field is plowed in an attempt to gain more cropland. Natural riparian areas are sometimes viewed as a potential source of plant and animal pests, a source of shade that may reduce crop yields, and competition for scarce water resources. In areas where agriculture is concentrated, such as the Midwest, these activities have converted millions of acres of native grasslands, prairie, and wetlands, including riparian areas, into croplands.

Direct effects of agricultural management practices on riparian areas are listed in Figure 3-5 and illustrated in Figure 3-6. Under natural settings, riparian vegetation protects the soil surface, and soil fauna and flora are constantly creating macropores, which maintains high infiltration and percolation rates. When land is converted to agriculture—particularly row crops—vegetative cover is reduced, which exposes soil to raindrop impact and surface sealing, thereby decreasing infiltration. Although agricultural tillage does help to maintain porosity in soil, which promotes infiltration and percolation, it does not do so to the extent achieved by undisturbed populations of soil flora and fauna. The machinery used in tilling can also compact soils. Together, these practices alter the

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058717

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

162

Copyright © National Academy of Sciences. All rights reserved.



FIGURE 3-5 Alterations in stream discharge and morphology brought about by agricultural land-use practices. SOURCE: Adapted from Menzel (1983).

BLM_0058718

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*HUMAN ALTERATIONS OF RIPARIAN AREAS*                                   163



FIGURE 3-6  Differences in water movement in a non-tiled annual row-crop field and a perennial riparian forested buffer. More overland flow and less total evapotranspiration result in larger storm flow in the row-crop field while in the perennial riparian plant community, higher rates of infiltration and annual evapotranspiration reduce storm flow and increase baseflow. SOURCE: Reprinted, with permission, from Schultz et al. (2000). © 2000 by American Society of Agronomy.

hydrology by increasing overland flow volumes, peak runoff rates, and potential pollutant delivery to riparian areas. Stream channels respond to these increased runoff frequency, volumes, and peak flow rates by increasing their cross-sectional area to accommodate the higher flows—either through widening of the stream channel, downcutting of the streambed, or both—similar to what is observed during channelization (see Figure 3-3).

The altered hydrology characteristic of row-crop agriculture and some erosion control structures tends to concentrate overland flow within fields and transport it downslope in grass waterways or other ephemeral drainageways (Schultz et al., 2000). Although grass waterways are very effective in reducing gully erosion, transformation processes that could improve water quality are limited because the upland runoff enters the riparian area as concentrated flow. Also, the increased overland flow over agricultural land promotes relatively high erosion

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058719

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 5 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

rates, such that adjacent riparian areas trap substantial amounts of sediment (Dillaha et al., 1989). Over time, the upslope portion of the riparian area evolves into a terrace or berm that, if not managed via tillage, can hinder further inflow. When this occurs, runoff flows parallel to the riparian area until a low point or drainageway is reached. The diverted overland flow enters the riparian area as concentrated flow, which again reduces its effectiveness for water-quality protection.

Agricultural chemicals (both pesticides and fertilizers) in overland flow can also negatively impact fauna and flora located in riparian areas and downstream receiving waters. Edge-of-field pesticide losses are common, with 1–10 percent of the amount of pesticide applied being entrained in overland flow (Wauchop, 1978; Baker, 1983). Similarly, fertilization can cause nutrient losses from the land to nearby streams to increase by an order of magnitude or more.

Healthy riparian areas often provide significant benefits to traditional agricultural activities. Riparian areas protect the quality of water resources used for agricultural and domestic purposes by trapping sediment, nutrients, and other pollutants. They stabilize stream channels and they promote the infiltration of overland flow. They increase groundwater resources by enhancing groundwater recharge in losing streams. They can reduce wind erosion; trap snow, thus reducing drifting; protect livestock, wildlife, and buildings from excessive wind; and reduce noise and odors associated with some agricultural activities. Riparian areas can also be a potential source of income through their use for hunting and fishing and for timber and biomass production. Unfortunately, these benefits have historically not played a role in agricultural management of riparian lands.

## Drainage Tiles and Ditches

The draining of water from urban and suburban lands for the purposes of improved crop production has been practiced since the 1870s, spurred by the 1849 and 1850 Swamp Act and the subsequent organization of local drainage districts. Farmers have relied on drainage to improve soil aeration, alter soil moisture conditions to allow earlier planting and easier fall tillage, and combat disease organisms that thrive in high-moisture conditions. Without drainage, many Midwest farmlands would be significantly reduced in productivity or simply unfarmable (Fausey et al., 1995).

Drainage occurs through subsurface tiles (e.g., perforated polyethylene pipe or other older methods such as clay tiles) or by networks of ditches. In practice, surface and subsurface systems often are used together. For example, drainage tiles often intercept channelized streams or ditches created for the purpose of collecting tile outflow. Table 3-2 shows the acreage of drained land in the most heavily affected regions of the United States. Drainage impacts approximately 20.8 million hectares or 37 percent of the 55.7 million hectares of cropped farmland in the Midwest (Pavelis, 1987; Zucker and Brown, 1998). In Illinois, the

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 6 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

TABLE 3-2  Agricultural Drainage for the Most Heavily Drained States

| State | Harvested Cropland (1,000 ha)[a] | Drained Cropland (1,000 ha)[b] | Percent of Cropland Drained | State Total Area (1,000 ha)[c] |
|---|---|---|---|---|
| *Great Lakes and Cornbelt States* | | | | |
| Illinois | 9,014 | 3,569 | 40 | 35,580 |
| Indiana | 4,742 | 2,782 | 59 | 22,957 |
| Iowa | 9,439 | 2,834 | 30 | 35,760 |
| Ohio | 4,007 | 2,397 | 60 | 26,209 |
| Minnesota | 7,677 | 1,934 | 25 | 50,954 |
| Michigan | 2,721 | 1,563 | 57 | 36,358 |
| Missouri | 5,038 | 1,202 | 24 | 44,095 |
| Wisconsin | 3,491 | 409 | 12 | 34,761 |
| *Mississippi Delta* | | | | |
| Arkansas | 3,102 | 2,151 | 69 | 33,328 |
| Louisiana | 1,571 | 1,562 | 99 | 27,882 |
| Mississippi | 1,756 | 1,440 | 82 | 30,025 |
| *Southeast* | | | | |
| Florida | 986 | 1,146 | 100 | 34,558 |
| North Carolina | 1,713 | 984 | 57 | 31,180 |
| South Carolina | 670 | 426 | 64 | 19,271 |
| Georgia | 1,523 | 219 | 14 | 37,068 |
| *Other States* | | | | |
| North Dakota | 8,271 | 910 | 110 | 44,156 |
| Texas | 7,935 | 1,283 | 16 | 167,625 |
| Tennessee | 1,645 | 256 | 16 | 26,380 |
| New York | 1,504 | 333 | 22 | 30,223 |
| Maryland | 559 | 367 | 66 | 6,256 |
| Delaware | 189 | 130 | 69 | 1,251 |
| U.S. Total | 125,212 | | | 2,263,587 |

[a]From 1997 National Agricultural Statistics for harvested cropland, which includes land from which crops were harvested or hay was cut and land in orchards, citrus groves, Christmas trees, vineyards, nurseries, and greenhouses. NAS also reports total cropland, which includes cropland used for pasture or grazing, land in cover crops, legumes, and soil-improvement grasses, land on which all crops failed, land in cultivated summer fallow, and idle cropland.

[b]From Pavelis (1987) converted to metric units and rounded to nearest 1,000 ha.

[c]From USDA (1997).

state with the greatest amount of drained farmland acres, it is estimated that over 4 million hectares are drained by a vast network of underground drainage tiles. In some highly drained areas, such as the Embarras River watershed of east central Illinois, tiles drain 70 percent to 85 percent of the cropland (David et al., 1997). Other areas such as the Southeast (6 million hectares) and the Mississippi Delta (5 million hectares) also have significant areas of drained cropland.

Because drainage was traditionally a tool for managing soil moisture, the resulting water quality of receiving streams and other ecological factors were

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058721

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



rarely if ever considered. It is now known that drainage has had a dramatic impact on stream hydrology and water quality and on the functioning of riparian areas (Evans et al., 1995; David et al., 1997; Kovacic et al., 2000). By concentrating flows and circumventing the biological processes that typically occur in riparian areas, drainage tile effluent can have greater peak flows, increased concentrations of nutrients, and either increased (surface drainage) or decreased (some types of subsurface drainage) sediment load. Many of the effects of surface drainage are similar to those discussed above for channelization and traditional agriculture.

The hydrologic differences among drained cropland, non-drained cropland, and undisturbed land have been investigated by Zucker and Brown (1998). Compared to non-drained cropland, tile-drained cropland has less erosion and phosphorus runoff because of limited overland flow. However, in relation to non-cropped areas or cropped areas with various conservation practices, the environmental advantages of tile drainage are less clear or nonexistent. For example, studies in North Carolina have shown that compared to undisturbed sites, total outflow is increased by 5 percent with surface drainage and 20 percent for subsurface drainage (Evans et al., 1995). Evans et al. (1995) found that both total flow and peak outflow were increased in drained areas compared to undeveloped areas. Depending upon conditions—such as antecedent soil moisture and storm intensity—surface and subsurface drainage were found to increase peak outflow rates by four and two times, respectively (Figure 3-7). This increased outflow often results in streambank erosion, channel incision, flooding, or other impacts.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058722

Case No. 1:20-cv-02484-MSK  Document 45-7  filed 04/28/21  USDC Colorado  pg 8 of 310



FIGURE 3-7 Increase in peak outflow rates typically associated with drainage and land conversions to agriculture. Site 104 is a natural, undrained site and Site 103 is a surface drained and developed pocosin converted to agricultural use. SOURCE: Reprinted, with permission, from Evans et al (1995). © 1995 by American Society of Civil Engineers.

Indeed, the changes in hydrology characteristic of extensively tiled areas can be so extreme that in many first- to third-order streams, flow from drainage tiles may constitute 90 percent of the baseflow during summer months (Schultz et al., 2000).

Drainage also affects the transport of particles and chemical pollutants through riparian areas. As shown schematically in Figure 3-8, subsurface drainage can expedite direct transport of chemicals (such as $NO_3$-N) from the soil zone to surface waters—often completely circumventing riparian areas. Thus, approximately 37 percent of the cropped land in the Midwest is not afforded the beneficial nutrient absorbing and transforming processes of riparian areas. As a result, where nutrients are added to cropland, they often are delivered to the stream systems at highly elevated levels (David et al., 1997; Kovacic, 2000). Surface drainage systems typically produce higher concentrations of phosphorus and sedi-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058723

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 9 of 310

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



FIGURE 3-8 Short-circuiting of the riparian area by a drainage tile. Drainage tiles typically bypass the functioning of riparian areas by conveying water directly from upland areas to the stream systems. Tiles prevent riparian-related activities such as denitrification, and they enhance water conveyance, resulting in higher peak flows and greater total runoff. SOURCE: Reprinted, with permission, from Kovacic (2000).

ment than do subsurface systems, while subsurface systems typically contain higher concentrations of $NO_3$-N than do surface systems (Evans et al., 1991; Thomas et al., 1995). The short-circuiting of riparian areas via drainage is especially troubling in areas like the Midwest where soils are underlain by an impermeable aquiclude (Schultz et al., 2000). In such places, the riparian area may constitute the only biologically active zone through which pollutants from cropland could be transformed. The high nutrient loadings resulting from drainage networks have been implicated in the hypoxia in the Gulf of Mexico (Turner and Rabalais, 1991) as described in Box 3-2.

## Grazing

*Domestic Livestock*

The history of grazing by domestic livestock in much of the world has been one of large-scale degradation of native plant communities (Chaney et al., 1990; Kauffman and Pyke, 2001). Although domesticated livestock have played a

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058724

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 10 of 310

---

**BOX 3-2**
**Hypoxia in the Gulf of Mexico**

The hypoxic zone in the Gulf of Mexico has increased in size since the 1950s, nearly doubling in average size from 1985–1992 to 1993–1999. The area, defined by dissolved oxygen levels of less than 2 mg/L, averaged 5,500 $mi^2$ (14,000 $km^2$) in size over the 1996–2000 period, and is found off the Louisiana coast near the outflow areas of the Mississippi and Atchafalaya Rivers. These and other waters in the northern Gulf of Mexico constitute approximately 40 percent of U.S. fisheries, generating $2.8 billion annually, which makes the potential effect of hypoxia a critical issue (CENR, 2000).

The hypoxic zone has been caused by a complex mix of increased nutrient loads transported by the rivers and physical changes to the basins through activities such as channelization and loss of wetlands and riparian vegetation. These factors produce a higher oxygen demand that, when coupled with water column stratification in the Gulf resulting from the freshwater–saltwater interface, can lead to hypoxic lower layers of water. It has been estimated that 90 percent of the nitrates entering the Gulf come from urban and agriculture runoff (56 percent from the Mississippi River Basin and 34 percent from the Ohio River Basin).

Two primary approaches have been developed to address hypoxia (CENR, 2000; Mitsch et al., 2001). The first approach involves efforts to reduce nitrogen loads in streams and rivers in the basin through activities such as reducing fertilizer applications to recommended rates, increased use of conservation tillage systems, and improved sewage treatment. The second involves enhancing denitrification and nitrogen retention within the Mississippi–Atchafalaya River Basins through restoration of ecological systems such as riparian areas and wetlands. The stated goal of the Mississippi River/Gulf of Mexico Watershed Nutrient Task Force is to reduce by the year 2015 the average hypoxic area to 2,000 $mi^2$ (5,200 $km^2$). One of the many programmatic indicators (22 were defined) that will be used to track progress is the establishment of vegetative and forested buffers along rivers and streams in watersheds known to contribute significant quantities of nitrogen. Using an annual denitrification rate of 40 kg N/ha for riparian areas, 7.8 million acres of new riparian areas would be needed to attain a 20 percent reduction in nitrogen loads. Other estimates were also developed for wetlands acreage needed, fertilizer application options, tillage, and other possible remedies. In the final assessment, however, it was recognized that no single approach would be completely successful and that a wide variety of approaches relying upon the many existing federal, state, local, and private programs will be needed to accomplish the changes necessary to solve the Gulf hypoxia problem (EPA, 2001).

---

prominent and largely beneficial role in human society for thousands of years, providing food, fuel, fertilizer, transport, and clothing, they have had a dramatic negative impact on global biodiversity. As shown in Figure 3-9, primary grazing effects include the removal of vegetation, trampling of vegetation, destruction of biological soil crusts, compaction of underlying soils, redistribution of nutrients, and dispersal of exotic plant species and pathogens. Secondary effects include

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058725

Copyright © National Academy of Sciences. All rights reserved.



FIGURE 3-9  Direct and indirect influences of grazing. SOURCE: Reprinted, with permission, from Kauffman and Pyke (2001). © 2001 by Harcourt, Inc.

BLM_0058726

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 12 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



altered disturbance regimes associated with hydrology (runoff and infiltration rates and water-holding capacity) and fire (frequency and severity), accelerated erosion, altered competitive relationships among organisms, and changes in plant or animal reproductive success and/or establishment of plants. Long-term cumulative effects of domestic livestock grazing involve changes in the structure, composition, and productivity of plant and animal communities at community, ecosystem, and landscape scales. These tertiary effects often include overall declines in biotic richness or diversity of affected aquatic, riparian, and terrestrial areas.

In 1980, the U.S. Department of Agriculture estimated that vegetation on more than half of all western rangelands had deteriorated to less than 40 percent of productive potential. Although this reflects changes principally in upland conditions, there is no doubt that the impacts to western riparian areas are likely to have been much more severe, for reasons described below. Although upland range conditions reportedly have improved in many areas since 1980, extensive field observations in the late 1980s suggest that riparian areas remain in degraded condition (Chaney et al., 1990; BLM and USFS, 1994).

The disproportionate impact of livestock on riparian areas is a product of both management and animal behavior. First, until the 1960s (if not later), riparian areas were considered "sacrifice areas," used chiefly for supplying forage and water to livestock (Stoddart and Smith, 1955). Although riparian areas comprise 1 percent or less of the arid land area of the 11 western states (Belsky et al.,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058727

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 13 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

1999), they nevertheless provide a substantial amount of the available forage. Roath and Krueger (1982) found that a riparian area in eastern Oregon occupied less than 2 percent of a grazing allotment's area, but it produced 21 percent of the available forage and supplied 81 percent of forage actually consumed by cattle. Second, cattle in particular congregate in riparian areas and other wet areas because of the availability of water, shade, and more succulent forage—spending from 5 to 30 times more time in these cool, productive zones than would be predicted from surface area alone (Belsky et al., 1999).

The grazing of riparian areas by domestic livestock involves the periodic removal of native streamside vegetation—particularly herbaceous plants, shrubs, or young trees. Along many streams and rivers, it has been a common practice to remove certain plants over time to create livestock pastures or hay fields or to convert the land to crop production. Grazing itself occurs over varying time periods (e.g., days, weeks, months, or seasons) and is typically repeated on an annual basis. Characteristics of the riparian plant communities, such as composition, cover, density, or other measures of plant communities, are likely to show significant changes relative to ungrazed areas (Kauffman and Pyke, 2001). In addition, a variety of effects on soils (e.g., reduced litter cover, increased bulk density, greater percentage of bare ground, decreased infiltration) and impacts on local wildlife and aquatic systems are common (Dwyer et al., 1984; Kauffman and Krueger, 1984; Howard, 1996; Ohmart, 1996). Where riparian vegetation has been suppressed or removed via grazing over long periods of time, the root biomass along channel banks and the resistance to overbank flow may become sufficiently reduced such that channels become unstable. Channel widening and gullying (as shown in Figure 3-3 for channelization) are common features of areas that have experienced the effects of season- or year-long grazing or other intensive grazing practices. Intensive grazing of the arid southwest in the late nineteenth century is thought to have played a role in the extensive arroyo cutting observed in this area, although cycles of arroyo cutting and filling prior to the introduction of domestic livestock have also been documented (Bull, 1997; McFadden and McAuliffe, 1997; Gonzalez, 2001).

Season-long grazing (commonly used throughout the West) results in major impacts to riparian areas because a large proportion of plant biomass is removed, the remaining vegetation has little opportunity to recover, and the grazing is generally repeated year after year. Grazing systems that employ rest-rotations or that result in less intensive utilization of riparian forage can potentially reduce these impacts, but these approaches have not been widely used and their potential ecological effects have received little study (Elmore and Kauffman, 1994). Of 17 grazing strategies evaluated by Platts (1991), only a few were consistently rated "well,"[3] including

---

[3]"Well" refers to a rating of 8 or higher, where 10 = highly compatible with fisheries needs and 1 = poorly compatible.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058728

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 14 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

riparian pasture, corridor fencing to exclude cattle, rest-rotation with seasonal preference (sheep only), and total exclusion of sheep and cattle.

Given the many impacts of grazing described above, it is no surprise that aquatic organisms and riparian wildlife have been profoundly impacted by historical grazing practices. Two reviews have illustrated the adverse effect grazing has had on fisheries and wildlife. Over 95 percent of the studies reviewed by Platts (1991) showed "stream and riparian habitats had been degraded by livestock grazing, and that these habitats improved when grazing was prohibited." In Ohmart's (1996) view, "Unless grazing management changes are made soon it is predictable that many more species, especially neotropical birds will be placed on the endangered species list." Of the 76 federally listed plant and animal species on Bureau of Land Management (BLM) lands, for which livestock grazing was a significant factor in their decline, approximately 80 percent were dependent on or associated with riparian habitats (Horning, 1994).

Federal land management agencies have often concurred with these assessments. In 1994, BLM and the U.S. Forest Service (USFS) concluded that "watershed and water quality would improve to their maximum potential" if livestock were removed entirely from federal lands (BLM and USFS, 1994). The USFS concluded that livestock grazing is the fourth major cause of species endangerment nationwide, the second major cause of plant endangerment, and the number one cause of species endangerment in certain arid regions of the West, such as the Colorado Plateau and Arizona Basin (Flather et al., 1994). Several writers have suggested that "livestock grazing may be the major factor negatively affecting wildlife in the 11 western states" (Ohmart and Anderson, 1986; Fleischner, 1994; Ohmart, 1996). Although there is limited evidence from more humid regions, Belsky et al. (1999) suggest that environmental impacts of grazing in these regions are similar to those in drier areas.

*Native Ungulates*

Like livestock, native ungulates can modify riparian areas by eating plants, dispersing seeds, disturbing soil, and modifying channel morphology. Impacts on plants can include suppressed vigor, reduced reproductive output and regeneration, and increased mortality (Opperman and Merenlender, 2000). For example, successful regeneration of white cedar in winter deeryards can be virtually non-existent because of concentrated seasonal browsing (Verme and Johnston, 1986). The effects of native ungulates depend on their populations, which fluctuate in response to predation, competition, weather, disease, and other influences (Naiman and Rogers, 1997). White-tailed, mule, and black-tailed deer, elk, and moose have drawn attention when their numbers are particularly high or when their presence is concentrated temporally. Such situations are most likely to occur as a result of human-induced changes in the landscape, or a change in predator–

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058729

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 15 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

prey dynamics [as exemplified by exploding deer populations (McShea et al., 1997; Hubbard et al., 2000)].

In some of the nation's parklands, native ungulates have increasingly become a riparian management issue. Elk and moose browsing have caused damage (e.g., reduced or eliminated woody species cover, limited regeneration) to cottonwoods, willows, and aspens in riparian areas and other portions of Yellowstone and Grand Teton National Parks and the National Elk Refuge in Jackson Hole, Wyoming (Kay, 1997a,b; Matson, 2000). Moose browsing on riparian willow thickets is believed to suppress both density and diversity of migrant breeding birds dependent on riparian vegetation (Berger et al., 2001). The extent and causes of this damage are controversial, though a lack of ungulate population regulation by either hunting or predation is considered at least partially to blame. In the Greater Yellowstone area, the extinction of grizzly bear and wolf populations has been linked to increases in moose density (Berger et al., 2001).

In areas supporting both livestock and wild ungulates, livestock have been observed to do greater damage to forage resources. For example, native ungulates are scattered over their summer range, making their impact on forage resources minimal to moderate, while many domestic livestock graze on aspen-covered ranges in the West during the peak of the growing season and commonly use at least 50 percent of the annual production of palatable forage (DeByle, 1985). Another study found that wild ungulate use of riparian sites in Idaho, Utah, and Nevada was "trivial" compared to livestock use of the same areas (Platts and Nelson, 1985). Long-term studies in Utah and Nevada showed that aspen fails to regenerate or regenerates only at low stem densities when it is grazed by both livestock and native ungulates (Kay and Bartos, 2000; Kay, 2001). In the absence of livestock, however, aspen regenerated successfully, provided that deer numbers were low.

In many human-modified landscapes, losses in the amount of available native habitat have concentrated herbivore pressure in an area that is already under stress. Hobbs and Norton (1996) used exclusionary fencing to show that deer were a limiting factor to the restoration of a riparian area that had been previously degraded by domestic livestock. It was suggested that the site had reached a threshold of degradation beyond which recovery was not possible without exclusionary fencing to reduce ungulate browsing. Given the high populations of deer in many areas, particularly urbanized landscapes, exclusionary fencing or targeted population control may be needed to reduce herbivore pressure and assist in riparian area recovery.

## Forestry

The removal of trees by forestry operations has the potential to alter long-term composition and character of riparian forests, and thus the structure and function of these systems (Ralph et al., 1994). If selection harvest methods are

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058730

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 16 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

employed and small amounts of timber removed, and if the frequency of harvest is separated by several decades, the effects on riparian plant communities may be relatively small. However, where large portions of the standing timber are harvested or where the period between harvest operations is short, substantial changes to the composition, structure, and function of riparian forests almost certainly will result. Figure 3-10 shows the decline in virgin forest in the United States from 1620 to 1920.

The location and construction of logging roads (e.g., temporary or permanent, loggers choice or a planned transportation system) along streams can affect







FIGURE 3-10  Virgin forest area in 1620, 1850, and 1920. This figure shows an estimate of forests have *never* been cut. It does not show the current total area of forest. SOURCE: Reprinted, with permission, from Verry et al. (2000). © 2000 by CRC Press, LLC via Copyright Clearance Center.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058731

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 17 of 310

the long-term character of riparian forests (Adams and Ringer, 1994). Upslope roads can increase hillslope erosion rates (either surface erosion or landslides) or materially alter flow pathways, for example via the interception of shallow sub-surface flow into ditches and its rerouting to locations of instability (Furniss et al., 1991).

Forest harvesting can occur in a variety of ways depending upon forest type, age, and density and upon topography, climate, and utilization standards. The impacts of forest harvest systems on riparian structure and function are much greater when forests are clearcut or harvested right up to streambanks and lake shorelines. The total harvest of riparian vegetation and adjacent terrestrial forests can increase the amount of solar radiation reaching the water surface, which can increase water temperatures and affect aquatic primary production. Temperature increases are of particular concern during summer when streams and rivers are naturally warmer. In addition, removal or alteration of the riparian vegetation changes the quantity and quality of terrestrial food resources for a stream, such as leaves, needles, and other forms of organic matter. Removal of riparian forests and repeated harvest over short rotations (e.g., 40–80 years) greatly reduce the potential for large-wood recruitment into a stream. Harvest of streamside forests also removes the vegetative cover that can slow the delivery of sediment into streams and retain nutrients, such as nitrogen and phosphorus.

As discussed in Chapter 2, riparian forests collectively provide for an array of sustainable processes and functions that make them exceptionally important for maintaining productive aquatic and terrestrial ecosystems (Johnson et al., 1985; USFS, 1993; Laursen, 1996; Verry et al., 2000). Those functions, as mea-sured by species richness and diversity, can be impaired by forestry operations. Studies have demonstrated the habitat value of uncut riparian areas for wood-peckers (Conner et al., 1975) as well as for secondary cavity nesters such as chickadees, swallows, bluebirds, and nuthatches (Balda, 1991). The red-shoul-dered hawk is associated with wooded bottomlands of major rivers (Brewer et al., 1991; Robbins, 1991); work in Ontario suggests that cutting specifically in ripar-ian woodlots may be responsible for declines in this species (Bryant, 1986).

The hydrologic effects of timber harvesting, such as increased annual water yields, increased sediment production, and altered stream chemistry, have been documented from a large number of watershed studies in forested areas (Ponce, 1983; Binkley and Brown, 1993; Adams and Ringer, 1994; Murphy, 1995). Such responses have not occurred universally and are typically dependent upon terrain conditions, the amount of timber removed, the type of logging system, post-harvest rainfall patterns, soil type, and other factors. Although increased water yields are most common when large proportions of the forest are harvested, increases in peak flows have not occurred consistently (Reiter and Beschta, 1995; Beschta et al., 1999). Increased sediment production is most likely in steep terrain where ground-based logging systems are employed or where soils are disturbed

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058732

severely by post-harvest site preparation (e.g., mechanical scarification, hot slash burns) (Beschta, 1990).

Chapter 5 discusses how to diminish the potentially adverse effects of timber harvest upon aquatic and riparian resources by the use of various types of buffers or riparian reserves. Even in cases where forestry has been moderated for restoration purposes (e.g., by using partial harvest), riparian function may be impaired more than simple buffer width would indicate. Partial harvest often allows selective removal of larger or older trees, reducing ecological function more than width and targeted stem densities might reflect. Streamside buffers are generally not designed to mirror the stand composition and dynamics of desired healthy riparian forests for a given age class, especially when harvest decisions are strongly governed by social concerns about economic impacts.

Nearly 136 million acres of the nation's forestland are in the public domain, with 85 million acres being managed by the USFS, 8 million by BLM, and 43 million by state, county, and municipal governments. Private holdings amount to 347 million acres, of which 71 million are controlled by the forestry industry (Coggins et al., 2001). One of the major challenges in riparian management on public lands is the lack of a consistent scientific framework for determining widths of forested riparian areas that will sustain their desired structural and functional attributes. Differences in management between forest regions and individual national forests, between forests managed by the USFS and BLM, and among federal, state, and privately owned forests are more often based on policies, economic considerations, political pressure, and litigation than on differences in forest types, hydrologic regimes, climate, geology, physiographic provinces, or the ecological functions of riparian plant communities. Significant protection and restoration of forested riparian areas across the United States are unlikely until a common framework is developed.

## INDUSTRIAL, URBAN, AND RECREATIONAL IMPACTS

### Mining

Mining has historically been, and continues to be, an important land use in many portions of the United States, particularly on public lands. The General Mining Law of 1872 authorizes hardrock mineral extraction (e.g., gold, silver, nickel, copper) on all public lands that have not been specifically withdrawn from mineral development. Approximately 147 hectares (364 million acres) of public lands (constituting 80 percent and 90 percent of all lands managed by the USFS and BLM, respectively) are open to mining (NRC, 2000a).

Because only a small percentage of the U.S. land surface has been mined— less than 1 percent in recent decades according to Starnes (1983)—the effects of mineral extraction might initially be assumed slight. However, local degradation can have major downstream effects, thus affecting aquatic and riparian resources

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 19 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

for long periods of time (Richardson and Pratt, 1980; Nelson et al., 1991; Wilkinson, 1992).

The mining of hillslopes and valley bottoms for minerals ranging from gold and silver to coal and gravel has involved a wide variety of approaches depending upon geology, topography, available technology, market value, and other factors. In hard-rock mining, the excavation of rock and soil to retrieve a mineral or ore of value to society often results in large amounts of waste rock or spoils. The extent to which such materials influence riparian areas depends on the amount of spoils deposited along stream channels; in other situations the acidity of the spoils can be a major concern. Acid mine drainage is considered to be one of the major water pollution concerns associated with many mining operations (Nelson et al., 1991). In addition, mining may introduce toxic metals such as arsenic, cadmium, chromium, copper, lead, mercury, and zinc, particularly when surface or groundwater is allowed to flow through waste piles.

Open-pit mining, where soils and rock overburden are excavated and embanked at a nearby location, is often employed when relatively low-grade ores or less valuable minerals are sought. The potential for riparian areas in or near these types of mining operations to be affected is often great. Depending upon the size and location of the mining operation, total hillsides can be excavated and their stream systems moved or buried. For example, so-called "mountaintop removal" for the mining of coal, which occurs principally in West Virginia and parts of Pennsylvania, involves placing excess spoil material into valley bottoms. This practice, which can bury and literally destroy streams, was ruled illegal in a 1999 federal district court decision. But since then, federal rule changes have been proposed that would again permit the practice under certain conditions.

When a mining operation exposes large areas of bare ground, substantial increases in overland flow and sediment production can occur during rainfall periods. Unless a well-designed and operated system of detention ponds is in place, such runoff may greatly increase sediment loading to nearby streams and rivers. Revegetation of embanked overburden and spoils is often a challenge for many open-pit mining operations.

Historically, placer mining was a common means of accessing certain types of minerals, particularly gold. Some placer operations utilized high-pressure water directed at hillslope soils or deposited alluvium—an incredibly effective method for eroding and washing large volumes of sediment into streams and riparian areas. Unable to transport the massive volumes of alluvium and hillslope sediment produced over a short time period, channels became quickly clogged. Channel aggradation, floodplain aggradation, and highly unstable channels downstream of placer mining operations were common. As might be expected, such operations have major detrimental effects on both aquatic and riparian areas and often present formidable restoration challenges (Rundquist et al., 1986; Inter-Fluve, Inc., 1991).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058734

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

In some portions of the United States (e.g., the West and Alaska), dredging of valley bottom sediments with floating dredges was a common means of mining mineral deposits, typically gold. The use of floating dredges was limited to valleys with significant floodplains so that the dredge could excavate its own flotation pond as it progressed across as well as up and down a particular valley bottom. To retrieve the gold present in valley sediments, all vegetation was removed, and the soils and underlying gravel substrates (often to depths of several meters) were mechanically dredged to the surface. Once the gold was separated on the dredge, the remaining mixture of soil and rock was dumped in arc-shaped spoil piles behind the dredge. Although most dredge mining occurred many decades ago, the resulting coarse-rock spoil piles often remain, typically unvegetated. Little effort has been made to reclaim the streams and riparian areas where dredge mining occurred.

Another form of mining practiced along many rivers and streams for extended periods of time is gravel mining (Williamson et al., 1995). Extraction of gravel, primarily for use in construction products, typically occurs along rivers and adjacent floodplains where extensive gravel deposits, often sorted by size class, are naturally found. The excavation of gravel from terraces (i.e., inactive floodplains) may have little impact on riparian systems. However, gravel excavation on active floodplains can directly reduce riparian vegetation and alter groundwater patterns. Impacts to riparian areas also can occur when gravel is mined from channels. In these situations, bar-scalping and streambed excavation can greatly influence long-term sediment transport, channel morphology, and bank stability of specific stream reaches. If large amounts of gravel are removed, channel down-cutting or incision may occur, potentially influencing local groundwater levels, the frequency of overbank flows, bank stability, and the character of riparian vegetation (Collins and Dunne, 1989; Kondolf, 1995).

Mining of heavy mineral sands for titanium-bearing minerals, zircon, and monazite is another potential threat to riparian areas. Although most heavy mineral sand is mined outside of the United States because of wetland protection laws, economic deposits of such sands are found along the Atlantic Coast and are currently mined in Florida and Virginia (Brooks, 2000). These deposits are often located in and adjacent to riparian areas. Heavy mineral sands are usually extracted using surface mining with floating dredges and concentrators after removing harvestable timber and other vegetation from the site. Topsoils are then removed and stockpiled for reclamation purposes, unless they contain high concentrations of heavy sands. The mineral concentrate produced at the mine is typically 90 percent heavy mineral, which is transported to a plant for separation into constituent minerals (Brooks, 2000). Unlike many of the other mining activities described, heavy mineral sand mining sites are amenable to restoration. Reclaimed mine sites have been successfully reestablished as wetlands, forest, pastures, and row crops.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058735

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

## Transportation

*River Transportation and Removal of Large Wood*

The rivers of the United States provided the first systematic transportation system for a developing nation. Lewis and Clark, in their exploration of the Louisiana Territory and lands west to the Pacific Coast in the early 1800s, relied primarily on rivers to transport their party across the uncharted lands. Keelboats, barges, river steamboats, canoes, and other watercraft plied the nation's rivers, moving people, farm products, and other materials over long distances.

To improve a river for transportation purposes often necessitated the removal of large wood and other obstructions. By the early 1900s, most rivers in the United States had experienced the systematic removal of large wood, or snags (Sedell et al., 1982; Maser and Sedell, 1994). Thousands of kilometers of river length were "snagged" and more than 100 snags per kilometers were often removed. Although there has been little systematic study of the effects of these snagging activities upon channel characteristics, riparian functions, and flood-plain processes, the effects are likely to have been significant.

In the early years of this country, transportation of logs and timber to market was a major challenge. The downstream movement of aggregations of logs—log driving—was a relatively inexpensive means of transporting large volumes of wood over long distances. However, before a log drive could be conducted, boulders, leaning trees, sunken logs, and other forms of obstructions were blasted or otherwise removed in order to more easily float logs downstream. The number of streams affected by log drives was large. For example, by 1900 over 130 incorporated river- and stream-improvement companies were operating in Washington State. To assist the downstream movement of wood, splash dams were commonly employed to provide a surge of water (Sedell and Luchessa, 1981). Log drives that occurred on the Yukon, Chena, and Tanana Rivers in Alaska have been well documented (Sedell et al., 1991). Splash dams and log drives have also been used on rivers in the Rocky Mountains and in the eastern portion of the country. Although log drives and associated wood removal are now only a part of history, there is no doubt that the effects to channels and their riparian areas have been substantial and long-lasting.

Today, the nation's major rivers continue to be extensively utilized as major transportation routes. Ocean-going ships use the St. Lawrence Seaway and the Great Lakes for transporting a wide variety of goods and materials. Similarly, the use of barges on the Mississippi, Missouri, Ohio, and Columbia Rivers and on other waterways of the nation is an important means of transporting large amounts of cargo. Although the economic importance of these waterways is obviously great, so are the ecological effects of channelization, construction of locks, and other facets of maintaining transportation corridors along these river systems (NRC, 2001, 2002).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058736

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 22 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*Roads and Railroads*

Vehicular access to homes and communities, factories and production facilities, farms and ranches, recreational areas, rangelands, forests, and other locations is a characteristic feature of American society. Many of the country's road systems have had far-reaching and often permanent impacts to riparian areas, which were seldom considered during the planning of most highway and railroad systems. For example, the placement of highways along rivers and lakeshores has been a particularly common practice, the ecological effects of which have been observed to extend as much as 600 m on each side of the road (Formann and Deblinger, 2000). Significant impacts to riparian areas are likely to have occurred, particularly where narrow valleys and steep hillsides (and associated high construction costs) generally precluded the location of a road some distance from a river or shoreline. Nationally, similar impacts have occurred with railroads, though at a much-reduced scale.

The direct effects of highways and railroads within riparian areas include (1) the removal of riparian vegetation from the area occupied by the roadbed and the right-of-way, (2) the alteration of topography (extensive fills are often used to provide a roadbed foundation), and (3) local hydrologic modifications involving changes in infiltration and the rerouting of both surface and groundwater. Where sinuous streams were encountered during highway or railroad construction, portions of the channel were often filled to maintain a straight road alignment at the cost of reduced channel length. In some instances, the effects on river length have been substantial. Concurrently, riparian vegetation was often eliminated and replaced with a roadbed.

Another important feature of highway and railroad systems is that they periodically cross watercourses. A wide range of structures can be used for such purposes, but most fall into two general categories—bridges or culverts. Abutments along the bank are typically needed to provide sufficient support at each end of a bridge; in the case of a relatively wide river crossing, additional mid-span piers or pilings are usually employed to provide intermediate support(s) to the bridge span. Because the abutments physically constrain the stream, future lateral adjustments by the stream are effectively eliminated. Similar effects occur at culvert locations—i.e., both vertical and lateral channel adjustments are constrained.

The construction of highway systems and urban roads outside of riparian areas can also have important indirect effects upon streams and riparian areas. In urban areas, roads and other impervious surfaces can increase peak overland flows, thus fundamentally altering the hydrologic disturbance regime for those systems. Roads can also concentrate overland flows to specific locations where channel erosion and gullying and accelerated sediment loading may be initiated. In steep mountainous terrain, an increased frequency of landslides associated with roads may alter the delivery of sediment and large wood to forested streams

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058737

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 23 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

and riparian areas. Roads and their associated ditches also increase dispersal of exotic plant species from uplands to riparian areas (Parendes and Jones, 2000; Trombulak and Frissell, 2000). Thus, although the local effects of streamside roads are a high concern with regard to riparian processes and functions, the effects of roads immediately outside riparian areas cannot be ignored (Furniss et al., 1991; Adams and Ringer, 1994).

### Urbanization

Urbanization and development have profound impacts on watershed hydrology and vegetation, and consequently on the structure and functioning of riparian areas. Among the most important impacts of urbanization are the increased frequency and magnitude of flooding and decreased baseflow that result from land-use changes typical of development (Schueler, 1987). In its natural state, vegetation intercepts a portion of precipitation, with the remainder being stored in or on the soil surface or infiltrating into the soil where it recharges groundwater or is used by plants. Typically, only a small portion of the precipitation ends up as direct overland flow. Thus, peak flows are moderated by high infiltration rates, and many streams are perennial due to groundwater flow during periods of the year when overland flow is uncommon. As urbanization increases and more of the land surface is covered with homes, buildings, roads, sidewalks, parking lots, and other structures, the imperviousness of the watershed increases. With increased imperviousness, infiltration, interflow, groundwater recharge, groundwater contributions to streams, and stream baseflows all decrease, while overland flow volumes and peak runoff rates increase, as shown in Figure 3-11. As urban-



FIGURE 3-11 Effects of urbanization and development on stream flow.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058738

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



ization and imperviousness increase further, the capacity of natural channels to transport the increased overland flow is exceeded, with the undesirable consequences of accelerated channel erosion and increased flooding. Downstream flooding is further exacerbated by gutters, curbs, culverts, stormwater sewers, and lined channels, which are installed to transport runoff from impervious surfaces to streams as quickly as possible.

The changing land use and hydrology of urbanizing watersheds have multiple impacts on stream channels, aquatic ecosystems, and water quality within riparian areas. As runoff frequency, volumes, and peak flow rates increase during urbanization, stream channels respond by increasing their cross-sectional area to accommodate the higher flows—either through widening of the stream channel, downcutting of the streambed, or both. This phase of channel instability, in turn, triggers a cycle of streambank erosion and habitat degradation (Schueler, 1995). Sediment loadings may increase by one to two orders of magnitude compared to pre-development conditions, such that streambeds are covered with shifting deposits of sand and mud (Schueler, 1987). Fish and aquatic insect diversity and abundance decrease because of changes in temperature, benthic substrates, dissolved oxygen levels, and pollutant loadings. Finally, increased loading of nutrients, bacteria, oxygen-demanding materials, oil, grease, salts, heavy metals, and other toxics is evident.

Depending on the location of urbanization, riparian areas may be converted to urban land uses. Riparian areas of lower-order streams are often totally elimi-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058739

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 25 of 310

nated, and the width of riparian areas along higher-order streams is generally reduced. In major cities, entire stream systems that have been removed during urban development have been replaced by underground culverts, pipes, and other similar structures to transport overland flow. A secondary effect of urbanization is caused by changes in how overland flow and shallow subsurface flow enter and transverse riparian areas that remain after development. Prior to urbanization, overland flow enters the more extensive riparian areas as either sheet flow from areas immediately adjacent to the riparian areas or through small ephemeral drainageways, thus allowing sediment to be deposited and other substances to be transformed. Much like traditional agriculture, development promotes the formation of concentrated flows that are less likely to be dispersed within the riparian area, greatly reducing the potential for pollutant removal (Dillaha et al., 1989). A similar paradigm holds true for shallow subsurface flow and the removal of dissolved substances. Development is marked by the construction of gutters, storm sewers, and lined channels that often pass directly through the riparian area and discharge directly into the stream channel (much like agricultural drainage tiles). Even when drainage structures are not constructed to bypass riparian areas, flow rates are generally so high that there is little opportunity for transformation processes (such as degradation and assimilation discussed in Chapter 2) to occur. Figure 3-12 illustrates how overland flow increases and infiltration decreases with imperviousness.

The site-specific effects of urbanization on stream habitat and water quality are highly variable. In general, as urbanization, population density, and imperviousness increase, water quality declines. Although somewhat controversial, a threshold in habitat quality is thought to exist at approximately 10 percent to 15 percent watershed imperviousness, beyond which urban stream habitat quality is consistently classified as poor (Shaver et al., 1994; Booth, 1991; Schueler, 1995; Booth and Jackson, 1997).[4] However, impacts of urbanization will vary with alternative development models. For example, clustered residential developments, which have the same overall population density as more traditional residential developments, can reduce disturbance of riparian areas and decrease water-quality impacts compared to traditional development. This is accomplished by devel-

---

[4]The 10 to 15 threshold reported in the literature must be used with caution because many studies do not specify whether they have measured total or effective impervious area. Total impervious area is that fraction of the watershed covered with impervious surfaces such as concrete, asphalt, and buildings. This is relatively easy to measure using areal photography and other remote sensing techniques. Effective impervious area, or directly connected impervious area, is less than total impervious area because it excludes impervious areas that drain to adjacent pervious areas; it is also more difficult to estimate. For lower density land uses, total impervious area may be twice the effective area. Approximately 10 percent is a safe impact threshold for effective impervious area and this corresponds to a total impervious area threshold of approximately 20 percent (Booth and Jackson, 1997).

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 26 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



FIGURE 3-12 Relationship between impervious cover, shallow subsurface flow, deep infiltration, and overland flow. SOURCE: Modified from the Federal Interagency Stream Restoration Working Group (1998).

oping smaller lots in areas that are less hydrologically active and are outside of riparian areas. The remaining undeveloped or lightly developed green spaces (parks, trails, ball fields, etc.) are then maintained and managed for recreational and environmental benefits. If properly designed and combined with urban stormwater best management practices (BMPs), cluster and other green development approaches can promote properly functioning riparian areas and the environmental services they provide. (Appropriate BMPs might include infiltration systems, detention ponds, minimization of impervious surfaces, and dispersion of concentrated flow from the high-density areas into the green areas.) Protection of riparian areas is much more difficult to accomplish with traditional dispersed residential development of the same overall site density, which preserves much less common green space and has a higher degree of imperviousness because more roads are required per household served. The more extensive road system,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058741

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 27 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

particularly if curbed, may promote more rapid movement of runoff through the drainage network, bypassing remaining riparian areas.

Urbanization and development permanently reduce the extent and functioning of riparian areas through land-use conversion and the creation of hydrologic conditions that reduce aquatic habitat quality and negate the effectiveness of the remaining riparian areas for water-quality protection. Some specific considerations related to lakeshore development, a rapidly growing phenomenon, are discussed in Box 3-3.

### Recreation

River corridors have been found to draw recreationists (hikers, cyclists, horse-back riders) and other visitors more frequently and from a wider area than other types of parks and open space (Green and Tunstall, 1992; Cole, 1993). Boat landings, fishing access points, portages, parks, golf courses, campgrounds, and trails are all recreational enhancements commonly placed within riparian areas, usually without a careful assessment of their potential impacts. Negative effects on riparian areas from recreational activities and facilities stem in part from a lack of environmental assessment before plans are implemented, a dearth of sound ecological design to mitigate impacts, and an absence of ongoing monitoring to detect problems.

Recreational uses and their impacts are not peculiar to riparian areas. What sets recreation in riparian areas apart, however, is the concentration of human activities in what are often narrow strips of land and the potential of those activities to affect both aquatic and terrestrial ecosystems. Effects of recreational use are roughly grouped into impacts on water, soils, vegetation, and animals (Cole, 1989, 1993).

Recreational activities in riparian areas can introduce sediment, nutrients, bacteria, petrochemicals, pesticides, and refuse to adjacent waterbodies (Andereck, 1995). Conversely, motorized boats and personal watercraft contribute water and noise pollution and cause erosion and disturbance of aquatic and riparian animals through the creation of wakes. Outboard motors have been shown to resuspend sediments in the littoral zone and negatively affect plant growth in that portion of the riparian area (Garrison and Wakeman, 2000). Effects on riparian soils include trampling by foot, animal, or vehicle traffic, which leads to compaction, destruction of soil biota, and increased erosion. Damage to vegetation can be incidental, as through trampling, or deliberate, as in its removal for the construction of recreational facilities or collection of firewood. Impaired riparian vegetation translates into both a depauperate terrestrial community and an impaired aquatic community, as shading benefits and inputs of woody material and organic nutrients to the waterbody decrease. A study in Colorado showed dramatic improvements in stream structure and trout populations in sections of streams that were fenced to protect against recreational use and grazing; pro-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058742

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 28 of 310

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

jected fishing opportunities in the protected stretches were nearly double those in the unfenced stream (Stuber, 1985).

Animal life can be affected negatively by recreation in riparian areas in ways that include direct disturbance, modification, or destruction of habitat (Cole, 1993; Knight and Cole, 1995); pollution; direct exploitation (hunting and fishing); or introduction of pathogens, often through recreationally motivated introductions of animals (Cunningham, 1996). Responses of animals to disturbance can range from an immediate effect such as a heightened physiological response ("fight or flight") to a long-term effect like population decreases due to increased mortality or lowered reproductive rates (Knight and Gutzwiller, 1995). Negative impacts of lakeshore development and recreational activity on nesting common loons have been demonstrated in several studies (Robertson and Flood, 1980; Heimberger et al., 1983; Meyer et al., 1997). In coastal riparian areas, beach-nesting birds are particularly vulnerable to almost all types of recreational use, with common outcomes being disruption of incubation, increased mortality of young, and wholesale abandonment of nesting sites (Burger, 1995). Sea turtles are particularly vulnerable to mortality from recreational vehicles, beach lighting that confounds hatchlings, ingestion of plastic and other debris, and destruction of nesting habitat by beach stabilization or replenishment activities (NRC, 1990).

Standard access sites (e.g., boat landings and fishing docks) rarely have an ecological perspective incorporated in their planning. Instead, the emphasis is usually on creating tidy, safe, and accessible places for the public to reach the water. The riparian area is frequently seen as an impediment and obstacle on the way to the water. Pavement for vehicle access creates a sloped surface that funnels sediment and polluted water into the water body. Mowed lawns, a common feature of boat landings, further increase runoff and nutrient and pesticide loadings as they replace riparian vegetation. Boat landings are frequent dispersal nodes for unwanted exotic plant species such as purple loosestrife and Eurasian milfoil in the eastern United States, as evidenced by natural resource agency signage at such locations.

Golf course construction and maintenance can impact first- and second-order streams that flow through them and their adjacent riparian areas via the removal of natural vegetation and increased loadings of pesticides and fertilizers. Furthermore, many golf courses are heavily landscaped; natural drainages and streams are often destroyed or largely reconfigured. Removal of water for irrigation of greens can also negatively affect aquatic ecosystems and riparian areas.

As discussed above, roads that provide public access to riparian recreational areas can affect the structure and functioning of those areas (Findlay and Bourdages, 2000; Jones et al., 2000). Roads, trails, and other structures can increase the rate of introduction of exotic plant species and modify microclimates required by particular plant species, rendering the habitat unsuitable for sensitive species (Green, 1998). A particularly destructive recreational force is all-terrain vehicles, which can cause environmental degradation through destruction of veg-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058743

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 29 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**BOX 3-3**
**Lakeshore Development in Wisconsin**

Riparian areas of lakes face a unique threat from development. Cottages, resorts, and second homes are usually firmly situated in riparian areas, with attendant modifications of vegetation and additions of impervious surfaces. This phenomenon is particularly prevalent in Wisconsin, a state purported to have the third-largest concentration of fresh water glacial lakes, totaling 15,000 miles of shoreline. The number of dwellings per mile has risen on Wisconsin lakes of every size, with an average increase in density of almost 60 percent between 1960 and 1995 (Daulton and Hanna, 1997). Undeveloped lakes that are not completely in public ownership are now rare (Korth and Cunningham, 1999). There have been attempts in some regions to regulate development via local or state zoning restrictions that dictate lot size, setbacks, and limits to vegetation modification.

Historically, most development on lakes in the Great Lakes region consisted of small, seasonal dwellings, usually with surrounding natural vegetation left fairly intact. In recent years, these small 1940s-style cottages have given way to large, year-round dwellings. Computer modeling was recently conducted to compare runoff volume of water, sediment, and phosphorus to a lake from (1) an undeveloped wooded lot, (2) a small, 1940s-style cottage (700 ft$^2$) with grass path to the lake, and (3) a 1990s-style dwelling (over 3,000 ft$^2$) with lawn and paved driveway (J. Panuska, unpublished data, cited in Korth and Cunningham, 1999). The 1940s-style development had a fourfold increase in sediment input compared to an undeveloped lot, but runoff volume and phosphorus were virtually unchanged from the undeveloped condition. In contrast, the 1990s-style development showed a nearly sevenfold potential increase in phosphorus input, an 18-fold increase in sediment, and five times the volume of runoff water compared to the undeveloped lot.

Paleolimnological data (Garrison and Wakeman, 2000) has been used to document the long-term effects of development on lakes in Wisconsin. Redox-sensitive elements were used to address changes in hypolimnetic oxygen levels, and changes in the diatom community were used to assess impacts on lakes' trophic statuses. Historically, the greatest shift in the diatom community, from species inhabiting clear water to species tolerant of higher phosphorus loading, appears to correspond with the period of development from 1950 to 1970. More specifically, on all lakes the researchers found the highest input of sediment occurring during the construction or reconstruction phases of development. The U.S. Geological Survey (USGS) is currently undertaking actual monitoring of runoff from developed and undeveloped lots.

In a related study, the Wisconsin Department of Natural Resources conducted an inventory of shoreline plants, frogs, and birds on developed and undeveloped shoreline (Meyer et al., 1997). Of particular interest was the effectiveness of the current statewide Wisconsin Shoreland Zoning Program in achieving one of its stated goals, that of protecting aquatic life. Not surprisingly, sharp decreases in plant abundance and diversity along developed shorelines were discovered. Green frog numbers showed an inverse relationship to number of homes per mile. Songbirds showed a shift from forest birds, including thrushes, vireos, and warblers, to more common and cosmopolitan "suburban" birds, such as blue jay, American goldfinch, and black-capped chickadee. Based on regression models, the study concluded that the current statewide zoning guidelines are inadequate for the long-term protection of the riparian community and could lead to

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058744

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 30 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

the elimination of many species on developed lakes. Other work has demonstrated a similar degradation of lakeshore fish habitat and decrease in species diversity that follows shoreline development (Bryan and Scarnecchia, 1992; Christensen et al., 1996; Jennings et al., 1996).

Wisconsin has instituted a program to assist counties in classifying their lakes based on physical characteristics such as depth and areal extent, presence of wetlands, presence of developed and undeveloped shoreline, and predictions of use (Korth and Cunningham, 1999) (a program that has met with resistance from some local governments and people employed in development-related enterprises). The intent is to use two- or three-tiered classifications to design management plans for particular lake types. In such a scheme, development and motorboat use might be strictly limited on a "pristine" lakeshore. A "low density" lakeshore might be amenable to more development subject to a requirement for large setbacks of homes to minimize disruption of the riparian area. On "high development" lakeshores, the focus might be shoreline restoration (Korth and Cunningham, 1999). Lakes also differ in vulnerability to impacts based on their water residence times. For example, seepage lakes, with no inflow or outflow streams, have the lowest capacity for flushing out pollutants and thus the greatest risk of rapid degradation of water quality.

Although some water-quality problems in lakes are best addressed through a watershed approach—such as addressing agricultural or forestry runoff—the best hope for protecting *lake riparian* areas lies in modifying activities of individual homeowners at the construction phase and during the management of their properties. This requires ongoing education of builders, real estate professionals, buyers, and lakeshore residents. Lake associations provide effective ways to disperse such information. In addition, publications available to homeowners in the Midwest and Northeast provide useful suggestions for preserving or creating buffers of native vegetation, limiting application of lawn chemicals, minimizing impervious surfaces, and reducing modification of vegetation on the building site (Moore, 1994; Dresen and Korth, 1995; Henderson et al., 1998). These sources emphasize an approach that seeks to "naturalize" the lakeshore and thus maintain its functions as habitat for a diversity of plants and animals as well as its functions as a filter for the lake.



Copyright © National Academy of Sciences. All rights reserved.

BLM_0058745

Case No. 1:20-cv-02484-MSK Document 45-7 filed 04/28/21 USDC Colorado pg 31 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

etation, soil erosion, and disturbance of wildlife (Sheridan, 1979; Luckenbach and Bury, 1983; Webb and Wilshire, 1983; Bleich, 1988).

## Exotic Species Invasion

Exotic or nonindigenous species have sometimes been intentionally introduced to accomplish specific objectives, such as the use of reed canary grass for erosion control. Unfortunately, some of these species can come to dominate the native plant or animal community and spread to off-site locations. Exotic plant species have been introduced to native communities around the world in such numbers that they now constitute a large proportion of the total number of plant species in many regions. Within the United States, an estimated 23 percent of the approximately 22,000 species of plants are exotic (Heywood, 1989). The proportion of plant species in riparian areas that are exotic can be even higher. For example, along the Rio Grande in New Mexico, exotic species represent over 25 percent of herbaceous plant species and over 40 percent of tree species (Muldavin et al., 2000).

The most common concern about exotic organisms is their displacement of native species and the subsequent alteration of ecosystem properties. Because they have been moved to areas outside their native range, exotic species are usually faced with fewer population-control mechanisms, especially biological agents such as predators, parasites, and pathogens. As a consequence, populations of exotic species can grow explosively and may dominate large areas of the landscape in the process. Generally, they replace indigenous species with a more homogenous community that supports lower wildlife diversity. Exotic plant species may create health or safety problems when they include toxic fruits or allergens or when they promote wildfires. Within the United States, exotic species are the primary cause for the decline of approximately 42 percent of those native species now listed by the federal government as threatened or endangered (Stein and Flack, 1996; Wilcove et al., 1998).

Several of the most aggressive exotic plant species in the United States are invaders of riparian areas. Indeed, it has been suggested that the disturbance regimes characteristic of riparian areas (e.g., from flooding) may make riparian communities vulnerable to invasion by non-native plant species (Stohlgren et al., 1998). Of the exotic weeds listed as candidates for the worst weeds in North America, as many as a third are found in riparian areas or wetlands (Stein and Flack, 1996; Plant Conservation Alliance, 2000; The Nature Conservancy, 2001). Prominent examples include saltcedar (*Tamarix*), which has replaced cottonwood and other native riparian plants throughout much of the southwestern United States. Invasion by saltcedar and its subsequent competition with native species is exacerbated by a reduction in flood flows caused by dams and by the lowering of water tables caused by water withdrawal and consumption. Other exotic plants that have become abundant in riparian communities include reed canary grass,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058746

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 32 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

buckthorns, scotch broom, blackberry, and kudzu. Table 3-3 lists 15 of the more prominent exotic plants currently invading the riparian areas of the United States. Those listed in the table represent the most serious current threats to riparian diversity and function, because all have a demonstrated capacity to spread rapidly and form large, dense stands of high biomass. Box 3-4 highlights some of the technical and financial problems associated with invasions of riparian areas by exotic plants.

Many exotic species of fish, amphibians, and invertebrates have been introduced either intentionally or accidentally into streams and rivers. These species frequently alter the abundance and distribution of native species through competition or predation, and they sometimes lead to local extirpations or extinctions. Introduction of predators (e.g., bullfrogs, largemouth and small mouth bass, brown trout) have been linked to declines of fish and amphibians, leading to the listing of some as threatened or endangered (Taylor et al., 1984; Crossman, 1991). Rainbow trout from the western United States introduced into East Coast streams has reduced populations of native brook trout (Larson and Moore, 1985). Although native fish species often have competitive advantages within their native habitats (Baltz and Moyle, 1993), habitat degradation can shift that advantage to introduced species from regions with habitats more similar to the degraded conditions. Use of waterways for navigation also causes extensive introduction of exotic species through disposal of bilge water or attachment to vessel hulls. Introduction of exotic species closely related to native species can cause genetic degradation through hybridization (e.g., brook trout introduced into the range of bull trout).

In the face of human population growth, introductions of nonindigenous species are likely to increase in riparian networks throughout North America. Exotic plant species continue to be used in some restoration efforts. However, most efforts that intentionally use non-native plants are designed to provide short-term functions and little if any long-term survival. Currently, there are no long-term monitoring systems for tracking the extent of intact riparian plant communities, the composition of riparian communities, or the distribution of exotic species. As a result, it is unlikely that riparian areas will be adequately protected.

## Global Climate Change

Although predictions concerning global warming are uncertain, there is wide agreement that human activities will cause average global temperatures to continue to rise over the next century (NRC, 2000b,c). The latest Intergovernmental Panel on Climate Change (IPCC) estimates of global mean temperature and rising sea level by the end of the twenty-first century are 1.4–5.8 °C and 0.09–0.88 m, respectively (IPCC, 2001). The expected changes in temperature, precipitation, oceanic and atmospheric circulation, and frequency and severity of

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058747

Copyright © National Academy of Sciences. All rights reserved.

TABLE 3-3  Exotic Plant Species Currently Recognized as Threats to Riparian Areas Across the United States

| Exotic Riparian Plants[a] | Pacific Region | Great Basin | Arid and Semiarid Southwest | Rocky Mtns. | Great Plains | Cool Temperate East | Warm Temperate East | Southeast |
|---|---|---|---|---|---|---|---|---|
| Amur Peppervine *Ampelopsis brevipedunculata* | | | | | | X | X | x |
| Chinese Privet *Ligustrum sinense* | | | | | | X | X | X |
| Fig Buttercup *Ranunculus ficaria* | x | | | | | X | X | |
| Garlic Mustard *Alliaria petiolaria* | x | | | x | X | X | X | |
| Giant Reed *Arundo donax* | X | | x | | | | x | x |
| Japanese Knotweed *Polygonum cuspidatum* | X | | | x | x | X | X | x |
| Japanese Meadowsweet *Spiraea japonica* | | | | | | X | X | x |
| Nepalese Browntop *Microstegium vimineum* | | | | | | X | X | X |
| Princesstree *Paulownia tomentosa* | | | | | x | x | X | X |
| Purple Loosestrife *Lythrum salivaria* | X | x | x | X | x | X | X | x |
| Russian Olive *Elaeagnus angustifolia* | x | X | X | X | X | x | x | |
| Saltcedar *Tamarix ramosissima* | X | X | X | X | X | | | x |
| Silktree *Albizia julibrissin* | x | | x | | x | x | X | x |
| Tallowtree *Triadica sebifera* | | | | | X | | X | X |
| Tree of Heaven *Ailanthus altissima* | X | x | X | | x | x | x | x |

NOTE: Upper case X indicates regions of greatest current impact. Darkest shading indicates species of the greatest threat.
[a]Plant names follow USDA NRCS (2001b).

BLM_0058748

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 34 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

storms will probably vary regionally and locally. Increased summer maximum temperatures, fewer cold days and less frost over inland areas, reduced diurnal temperature changes over land, more intense precipitation events, and increased summer continental drying and drought are likely during the twenty-first century (IPCC, 2001). Changes in the frequency and intensity of extreme events, such as hurricanes, may be more ecologically significant than moderate changes in the mean values of environmental factors (Michener et al., 1997). All these changes include the climate variables most likely to influence riparian communities. The sections below consider possible changes to riparian structure and functioning that may occur as a result of global change. Nonetheless, as significant as climate changes are likely to be, land- and water-use changes have had and will continue to have the greatest effect on riparian areas in the near and medium term (Graf, 1999).

*Riverine Settings*

Changes in precipitation brought about by global climate change are likely to have substantial ecological consequences (Poff et al., 1997). The magnitude of such changes, however, is difficult to estimate. In general, it is expected that less variation will occur in the eastern United States, where precipitation is generally high enough to sustain perennial flow in most rivers.

As indicated in Chapter 2, snowmelt is an important contributor to runoff in a number of geographic regions. One major consequence of global warming might be a shift from spring peak flows to late-winter peaks in snowmelt-dominated regions. A shift to higher winter flows associated with rain or rain-on-snow events may scour streambeds and destroy overwintering eggs of some fish species (Montgomery et al., 1999). Floodplain wetlands along rivers with a snowmelt hydrology may also be altered.

With a warmer climate, streamflows in snowmelt systems would decline earlier in the summer and corresponding water tables would drop, with consequences for invertebrates and fish in addition to the lack of a high water table for riparian plants (Scott et al., 1999; Stromberg et al., 1991). A transition to lower flows under drier conditions would be particularly stressful for the aquatic and riparian areas that are already water-limited (Grimm and Fisher, 1989). For more humid regions, Poff et al. (1997) predicted a transition from perennial to intermittent flow. Analogues of this effect are seen below dams on impounded rivers, where reservoirs store flood flows and thus "shave" downstream flood peaks, transforming floodplain forests to communities adapted to drier conditions (Johnson et al., 1976). Under a drying climate, the effects of groundwater pumping, irrigated agriculture, and grazing can be expected to intensify, resulting in greater competition for water, space, and food.

An increase in "storminess," expressed as increasing concentration of rainfall on fewer days, has also been projected to be a consequence of global climate

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058749

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 35 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**BOX 3-4**
**Three Case Histories of Exotic Plant Species in Riparian Areas**

**Chinese Privet**

Chinese privet, *Ligustrum sinense*, was introduced into the United States from China in 1852 and has since been planted as an ornamental, mainly as a hedge. Herbarium collections in Georgia include specimens collected from the wild as early as 1900 (USDA NRCS, 2001a). Farther west, the species escaped cultivation in Louisiana by the 1930s and continued to spread throughout the southeastern and eastern United States during the middle of the twentieth century. For example, after a fairly moderate rate of initial spread in Oklahoma beginning in 1900, Chinese privet populations increased rapidly from 1960 to 2000 (Taylor et al., 1996). Though Chinese privet can grow in a wide variety of conditions, it thrives in areas with moist soil, conditions that are often found in riparian areas.

Chinese privet disperses through its production of abundant seeds, which are spread by birds. Once established in a new location, it can form dense and nearly impenetrable thickets through vegetative reproduction. Its threat to native species is mainly the result of its ability to form these dense thickets that exclude other plants. In addition, Chinese privet fruits are toxic to humans, and where it flowers in abundance it can induce respiratory problems.

Control of Chinese privet is difficult because the plant resprouts following fires and has no known effective biological control agents. The best results have been obtained through mechanical removal, herbicidal applications, or a mix of the two. However, care needs to be taken during mechanical removal because plant fragments left on the site have the potential to resprout. In addition any disturbance to the soil during mechanical control efforts offers an opportunity for recolonization.

**Saltcedar**

Several species of saltcedar (*Tamarix*) have been introduced into the United States during the past two centuries as ornamentals or sources of wood or for erosion control. Of these species, *Tamarix ramosissima* has emerged as a very serious threat to riparian areas. This species has quickly spread beyond the areas where it was planted, and it now dominates approximately one million acres in the western United States, particularly riparian areas.

Saltcedar's invasion of riparian areas in the Southwest has produced large changes in ecosystem structure and function. One damaging ecosystem change in this arid region has been an increase in the rates of water use by riparian forests where dense stands of saltcedar dominate. Where saltcedar has invaded moist soils around desert springs, it has often dried up these critical water sources. In addition, saltcedar has been shown to raise the salinity of surface soils, which has also been implicated in its successful out-competition of natives (Busch and Smith, 1995; DiTomaso, 1998). Another major effect of saltcedar is related to the frequency and intensity of fires. Because saltcedar readily sprouts following a fire, compared to the native cottonwoods and willows, higher fire frequency appears to increase the rate at which salt cedar dominates southwestern riparian areas. Saltcedar stands support reduced diversity of several important biological taxa (understory vegetation, butterflies, and cavity-nesting birds).

The arid Southwest is particularly vulnerable to saltcedar because the tree is more tolerant of higher soil salinity and alkalinity, and it produces seed during a longer period than native cottonwood and willow. Saltcedar is also capable of developing very deep tap roots and higher leaf area within stands compared to native riparian trees, and it grows rapidly, up to 10 feet per year. Human activities such as dam building and cattle

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058750

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 36 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

raising appear to promote the spread of saltcedar. Cattle feed preferentially on native cottonwood and willow trees, adding to saltcedar's competitive advantage. Dams alter the natural flow regime to which native cottonwood and willow are adapted. Relative to native Fremont cottonwood (*Populus fremontii*), leaf litter of saltcedar decomposes more rapidly, which is associated with at two-fold decrease in macroinvertebrate richness and a four-fold decrease in macroinvertebrate abundance (Bailey et al., 2001).

Several methods have been used or are being developed to control saltcedar, including mechanical, chemical, and biological control. The most effective management of saltcedar infestations appears to be a combination of several methods. Mechanical techniques range from simple hand removal of young saltcedar in small infestations to bulldozing and root plowing for the control of large infestations of mature saltcedar. The saltcedar that resprouts after mechanical control may be controlled with herbicides. Fire is of limited use as a control agent, because saltcedar resprouts readily after fire. Flooding kills saltcedar only if the root crowns remain submerged for at least three months. Several insects that attack saltcedar in its native range are now being investigated as biological control agents.

**Purple Loosestrife**

Purple loosestrife (*Lythrum salicaria*) is a serious exotic invader of both wetlands and riparian areas. It was introduced from Europe into New England in the early 1800s either accidentally or as an ornamental. Although it is a potential threat in every state, purple loosestrife is most problematic in the wetlands of the northeastern United States and the Great Lakes region. Since its introduction, several cultivated varieties have been developed, and though reported as sterile, these cultivated varieties have been shown to hybridize readily with wild populations to produce viable seed. Though its sale has been banned in many areas, purple loosestrife continues to be marketed in many regions. Its commercial promotion may have contributed to the rapid spread of the species.

Since 1930, purple loosestrife has spread rapidly, being recorded throughout southern Canada and in every state of the United States except Alaska and Florida. Estimates vary widely, but its current rate of spread is over 280,000 acres per year. Once established, purple loosestrife can create large nearly monospecific stands that may reach thousands of acres in size. These homogenous patches provide little of value for most wildlife species, and they displace native vegetation. The spread of purple loosestrife is thought to have been aided by increased rates of land disturbance from agricultural activity and the construction or development of transportation corridors such as roads and canals. Enrichment of wetland soils by fertilizers from runoff from agricultural lands may also increase the spread of purple loosestrife.

Like other successful invaders, purple loosestrife reproduces at a prodigious rate. A single mature plant produces nearly 3 million seeds, approximately 80 percent of which remain viable after 3 years of submergence. Seed densities of over 400,000 per square meter have been recorded in the upper 5 cm of wetland soils in Minnesota. Though vegetative reproduction is not a major contributor to the spread of this species, the biomass of individual plants increases substantially as they mature, contributing to the overall increase in exotic biomass in established stands.

Control of purple loosestrife infestations is difficult and costly. Mowing, burning, and flooding are generally ineffective, and flooding may contribute to the spread of purple loosestrife seeds and to the establishment of new populations. Small infestations can be removed by hand, but care must be taken to remove all root fragments as these can resprout. Herbicides can be successful if used with care. However, the greatest potential for control appears to be the introduction of several insects that attack purple loose-

*continues*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058751

196                                                                                      *RIPARIAN AREAS*

---

**BOX 3-4**
**Continued**

strife in its native range. Five beetle species and one gall midge appear to hold the greatest promise as control agents and may over the long term reduce the cover of purple loosestrife to levels more similar to that in its native range where its cover ranges from 1 percent to 4 percent. The cumulative costs of controlling purple loosestrife as of 1999 amounted to approximately $45 million within the United States alone (Pimentel et al., 1999). This is only one example of the severity of the ecological and economic burden caused by exotic species. These mounting costs prompted President Bill Clinton to issue an executive order in 1999 to minimize the ecological, economic, and health damage caused by exotic species.

---

change, with important implications for streams and rivers (Michener et al., 1997). Where this would lead to an increased frequency or severity of flooding in riparian areas, shifts in the distribution of vegetation on floodplains are likely. As these new conditions become established, changes toward more flood-tolerant and disturbance-dependent species might be expected.

*Lake Settings*

Lake-fringe riparian areas typically respond both to seasonal variation in lake water levels and to interannual variation that causes the position of wetlands to migrate back and forth over longer periods of time (Keough et al., 1999). Susceptibility of riparian systems to climate change will depend largely on shore-line morphology. For example, deepening of water under a wetter climate would eliminate some riparian species, especially in areas where the shoreline is too steep to allow plants to establish. In contrast, lower water levels would require that plants establish further toward the lake, but this could happen only if protective barrier beaches form along the shoreline to reduce wave energy (Kowalski and Wilcox, 1999). This situation may become an issue for the Great Lakes in particular, where lake levels are expected to drop rapidly over the next several decades (Chao, 1999).

*Marine and Estuarine Coastal Settings*

The positive relationship between sea surface temperature and frequency of Atlantic hurricanes has led to speculations of greater hurricane activity with global warming. However, increases in hurricane intensity predicted by models fall within the range of natural interannual variability and of uncertainties of current studies (Henderson-Sellers et al., 1998).

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 38 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

A more likely consequence of global climate change is a rise in sea level, which continues to cause salinity intrusion and wetland loss in a number of coastal areas (Warren and Niering, 1993; Williams et al., 1999). The effects of rising sea level can be viewed in two dimensions: vertical and horizontal. The vertical dimension means that the soil surface of coastal riparian systems must keep pace with rising water levels (Brinson et al., 1995; Cahoon et al., 1995). Given that sea level is projected to rise by 2–9 mm/year over the next 100 years, sediment accretion will have to occur at a rate two- to nine-times that observed over the last century. The exact nature of vertical accretion is quite complicated because it is dependent on inorganic sediments mostly from continental sources, as well as on subsidence. For example, the sediment supply to the Mississippi Delta has decreased by 70 percent since 1860, largely because of the building of Missouri River dams. Increases in freshwater inputs to coastal zones, if accompanied by greater sediment supplies, could compensate for dam-induced decreases.

As for the horizontal component, Titus et al. (1991) predicted that a 1-m rise in sea levels would cause the loss of 36,000 square kilometers (14,000 square miles) of land in the contiguous United States, half of which would be wetlands in coastal riparian areas. Allowing riparian areas to migrate landward where sea level is rising could alleviate some of this loss, especially along coastlines with very low elevations. However, the presence of highways, cities, and other valued obstructions in many places will prevent this migration and will result in the compression, or loss, of riparian areas.

*General Predictions*

Riparian areas respond to changes in climate largely through characteristics of the terrestrial watersheds that supply their water. Riverine, lake, and estuarine-marine riparian areas occur in virtually all climates, so we should be able to predict change by arranging sites along a moisture continuum. In other words, transformation to a warming and drier (or wetter) climate in a particular region will produce conditions that already exist for riparian areas in a similar climate at a different geographic location (Figure 3-13) (Michener et al., 1997). For example, cypress–tupelo swamps, currently limited to the Southeast and up the Mississippi Valley, could replace silver maple–ash–elm forests of the warm temperate east. Mangroves would be expected at higher latitudes as the frequency of frost decreases. In each case, the composition of riparian plants and animals would be determined by additions of species that migrate to their correspondingly more favorable climatic conditions elsewhere and subtractions of species that become locally extinct because of less favorable environmental conditions.

Although species migration is likely to occur over long periods, there are nevertheless many formidable barriers to species migration, not only natural and human-influenced upland barriers, but also dams, dikes, and drainage systems. In addition, species vary greatly in their capacity to disperse, so the ability of plants

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058753

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 39 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



FIGURE 3-13 Distribution of riparian vegetation along elevational and latitudinal gradients. Increases in global temperature would shift distributions to higher elevations, making alpine wetland species locally extinct. SOURCE: Reprinted, with permission, from Patten (1998). © 1998 by Dr. Douglas A. Wilcox, Editor-in-Chief, Wetlands.

and animals to find suitable habitats under a changing climate will be highly variable. Recently introduced, non-native species, such as saltcedar, Russian olive, and Chinese privet, may provide insight into traits necessary for the dispersal of native species. These invaders may be expected, however, to also interfere with the gradual spread of indigenous riparian plants because exotics may be able to monopolize available space and nutrients before indigenous plants can arrive (Galatowitsch et al., 1999). On one hand, resident species, by co-opting space, may inhibit colonization by potential invaders. On the other hand, colonizers are facilitated when resident species become extinct or become stressed from human activities unrelated to climate change such as altered hydrology, nutrient loading, and sedimentation. There is some evidence that species-rich riparian communities are no more resistant to invasion by aliens than are those communities of lower species diversity (Planty-Tabacchi et al., 1996).

Just because a given species is effective in migrating and colonizing another geographic region does not mean, however, that it will also become extinct when the climate changes locally. For example, mangroves will not disappear from lower latitudes just because a warming climate allows them to expand into recently transformed frost-free areas. Populations and communities seldom respond in a monolithic fashion, and changes in hydrology seldom occur without corresponding changes in water quality, which itself can influence riparian productivity and species composition.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058754

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 40 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

## CURRENT STATUS OF RIPARIAN LANDS IN THE UNITED STATES

Determining the extent and condition of the nation's riparian areas is fundamental to managing them for multiple purposes. Although snapshots in time of riparian areas are useful for knowing their present status, the true utility of acreage and condition information lies in observing trends in these data over time and in understanding the factors causing such trends. Trends information is critical for relating riparian conditions (e.g., wildlife populations and vegetation) to other factors such as human population growth and water use. Such information can be used to predict future conditions in the presence or absence of restoration activities. And it can motivate decision-makers to take action before riparian areas are irreversibly impacted or destroyed. Surprisingly, there have been very few assessments of riparian acreage across the United States and only a handful of comprehensive studies on the condition of riparian lands.

### Riparian Acreage

The amount of total land classified as "riparian" obviously depends on one's definition of that term. Indeed, variable definitions partially account for the inconsistent data found in reports of riparian acreage across the country. Many reports measure riparian areas in stream miles rather than acres, making direct comparisons difficult. Figure 3-14 shows the distribution of estimated stream miles and riparian acreage across the United States. National Resources Inventory and U.S. Environmental Protection Agency (EPA) estimates of current riparian acreage—which assume that the riparian area extends 50 ft from the edge of waterbodies—are 62 million and 38 million acres, respectively (excluding Alaska). Brinson et al. (1981) estimates a liberal upper limit of 121 million riparian acres, which includes all land in the 48 contiguous states that is within the 100-year floodplain and is thus potentially able to support riparian vegetation. This estimate was refined by Swift (1984) to those areas within the 100-year floodplains of streams and rivers that have certain vegetative characteristics. Swift estimated that there were at least 67 million acres of riparian land in the United States prior to European settlement, with about 23 million acres remaining. Reasons for the decrease in acreage include removal of vegetation along streambanks, channel straightening to remove meanders, and flooding of riparian areas upstream of impoundments. For example, an estimated 70 percent of the original floodplain forests have been converted to agricultural and urban land uses. Brinson et al. (1981) estimated that impoundments alone had inundated more than 24,000 km of streams, while the downstream effects of modified streamflow on riparian functions have been seldom documented. Case histories show that in some areas loss of natural riparian vegetation is as much as 95 percent—indicating that riparian areas are some of the most severely altered landscapes in the United States (Brinson et al., 1981).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058755



FIGURE 3-14 Stream miles and riparian acreage (in parentheses) in 1,000s. Acreage values assume 50-ft buffers on either side of streams. SOURCE: EPA (1999), except for bolded numbers, which are from the National Resources Inventory.

A more limited source of information on riparian acreage is public land data, which identify 23 million acres of combined riparian areas and wetlands on BLM-administered lands in the United States, although it is not known what portion is riparian (BLM, 1998). BLM and USFS (1994) suggests that total riparian acreage in the public domain is only 3.2 million acres. Because BLM statistics exclude lands bordering intermittent and ephemeral streams, these data are likely to underestimate the amount of existing riparian acreage by two to ten times. However, what is clear from all these sources is that riparian areas constitute a small fraction of total land area in the United States, probably less than 5 percent (Swift, 1984).

### Riparian Condition

Determining the condition of riparian lands can be accomplished in multiple ways, for example, by measuring plant community composition or certain functions of riparian areas. As discussed in Chapter 5, several methods have been developed to assess riparian condition and functioning that cast their results in qualitative terms (e.g., Prichard et al., 1998). For example, in 1999, 40 percent of riparian areas administered by the BLM (excluding Alaska) were rated healthy ("proper functioning condition"), 41 percent were rated "at risk," 10 percent were found to be in poor health ("not functioning"), and 9 percent had not been as-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058756

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 42 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

sessed (BLM, 1999). A similar methodology used on USFS lands rated 78 percent of their riparian areas to be healthy and 22 percent as "not meeting objectives" (BLM and USFS, 1994). The variability of these data is extremely high, as evidenced by a USFS report that less than 10 percent of the riparian areas associated with 36 miles of perennial streams on one allotment in Lincoln National Forest, New Mexico, are in satisfactory condition (USFS, 1999). In addition, these statistics reveal little about the condition of riparian areas in the eastern states because of the small percentage of public lands found in the East.

Information on water quality can also be used to make inferences about riparian conditions, given the proximity and interconnections of streams and riparian areas. Data from EPA's 305(b) program indicate that there are at least 300,000 miles of streams (10 percent of the total) and more than 5 million acres of lakes that are not meeting water-quality standards (EPA, 2000). Given that many states' lists of impaired waters have been found to underestimate the true number of affected waters (NRC, 2001b), these numbers are likely to be conservative. Indeed, in many regions of the country, the percentage of impaired stream segments is greater than 25 percent. Sediment, nutrients, and pathogens are the top three pollutants responsible for water-quality impairment, followed by anoxia, metals contamination, and habitat destruction. The fact that properly functioning riparian areas can reduce levels of these contaminants in nearby streams and rivers (see Chapter 2) suggests that riparian areas adjacent to impaired streams are also suffering from quality degradation.

The health of riparian areas has also been assessed simply by observing or estimating trends in riparian acreage over time. Swift (1984) estimates that 66 percent of all riparian areas in the United States have been destroyed, reflected as losses of vegetation and conversion to some other land use, predominantly agriculture. These declines have been most severe in the Mississippi Delta, the agricultural Midwest, California, and the arid Southwest. In particular, an estimated 85 percent to 95 percent of Arizona and New Mexico riparian forests have been lost to grazing and other land uses, with almost 100 percent modification along stretches of the lower Colorado River, lower Gila River, lower Salt River, and the Rio Grande (Ohmart and Anderson, 1986; Noss et al., 1995; Mac et al., 1998). Indeed, an Arizona Executive Order, Order 91-6 (1991), stated that "over 90 percent of the native riparian areas along our major desert watercourses have been lost, altered, or degraded." Similarly dire statistics exist for California, where only 5 percent to 10 percent of the original riparian habitat remains (Mac et al., 1998). A recent report card on Oregon's riparian areas found that riparian forests along the Willamette River have been reduced by more than 85 percent since the 1850s (Gregory, 2000). Even in the absence of more comprehensive historical data, it is apparent that riparian areas across the nation have declined in both acreage and condition.

Historical trends for wetlands have received considerably greater attention, and such data may provide clues about trends in riparian acreage, given that these

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058757

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 43 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

areas sometimes overlap. Between 1780 and 1980, every state experienced declines in wetland acreage, with greater than 50 percent loss in 22 states (Table 3-4). Wetlands in California, Ohio, Iowa, Missouri, Indiana, Illinois, and Kentucky were subject to the most intensive alteration. Between 1986 and 1997, the estimated total loss of wetlands was 644,000 acres (Dahl, 2000). It should be noted that in some states, particularly in the agricultural Midwest, widespread drainage of wetlands, wet prairies, and other areas has resulted in the creation of extensive networks of drainage ditches, underground drainage tiles, and other types of channels to convey agricultural drainage water to river systems. These new channels may be bordered by riparian areas that previously did not exist, and thus might be thought of as increasing overall riparian acreage. However, because such riparian areas are often hydrologically disconnected from the constructed channel, they are generally in poor condition and possess limited functioning compared to native riparian areas (see earlier discussion on drainage networks). In fact, about 50 percent of the land along streams and drainage ditches in Iowa is cultivated to the bank, and another 30 percent is in pasture, most of which is overgrazed (Schultz et al., 2000).

The Emergency Wetland Resources Act requires that wetlands in the United States be inventoried on a regular (10-year) basis to observe ongoing changes, but the statute does not extend to riparian areas. Given the profound lack of information on riparian land status and trends, a comprehensive and rigorous assessment of riparian acreage similar to the National Wetlands Inventory is greatly needed. State interest in such an inventory is great, as evidenced by the creation of individual programs (e.g., Colorado's) in lieu of a national program. The satellite and spectral technology needed to conduct an inventory of riparian areas exists today, as described below.

## Remote Sensing of Riparian Condition

Although there is no comprehensive or methodologically consistent monitoring of trends in the nation's riparian areas, recent technology makes landscape assessment of riparian community composition and distribution possible and cost effective. Land use/land cover can be used as an indicator to evaluate the quality and spatial extent of riparian areas along streams, rivers, lakes, and wetlands. Remotely sensed information (aerial photos, satellite spectral data) can be used to predict the composition of vegetation or major classes of land uses. Land cover/land use information, gathered systematically at regular intervals, can inform many community-based decisions, especially those concerning riparian areas. Fundamental goals for human activity—preservation of agricultural soils, preservation of wetlands, control of rural residential sprawl, limitation of impervious surfaces in urban areas—can be assessed and quantified through patterns of vegetation derived from remotely sensed data.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058758

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 44 of 310

TABLE 3-4  Wetland Loss By State From the 1780s to the 1980s

| State | Total surface area (acres) | 1780 Wetlands estimates (acres) | 1980 Wetlands estimates (acres) | % Surface area that is wetlands in 1980 | % Wetlands lost |
|---|---|---|---|---|---|
| AL | 33,029,760 | 7,567,600 | 3,783,800 | 11.5 | −50 |
| AK | 375,303,680 | 170,200,000 | 170,000,000 | 45.3 | −0.1 |
| AZ | 72,901,760 | 931,000 | 600,000 | 0.8 | −36 |
| AR | 33,986,560 | 9,848,600 | 2,763,600 | 8.1 | −72 |
| CA | 101,563,520 | 5,000,000 | 454,000 | 0.4 | −91 |
| CO | 66,718,720 | 2,000,000 | 1,000,000 | 1.5 | −50 |
| CT | 3,205,760 | 670,000 | 172,500 | 5.4 | −74 |
| DE | 1,316,480 | 479,785 | 223,000 | 16.9 | −54 |
| FL | 37,478,400 | 20,325,013 | 11,038,300 | 29.5 | −46 |
| GA | 37,680,640 | 6,843,200 | 5,298,200 | 14.1 | −23 |
| HI | 4,115,200 | 58,800 | 51,800 | 1.3 | −12 |
| ID | 53,470,080 | 877,000 | 385,700 | 0.7 | −56 |
| IL | 36,096,000 | 8,212,000 | 1,254,500 | 3.5 | −85 |
| IN | 23,226,240 | 5,600,000 | 750,633 | 3.2 | −87 |
| IA | 36,025,600 | 4,000,000 | 421,900 | 1.2 | −89 |
| KS | 52,648,960 | 841,000 | 435,400 | 0.8 | −48 |
| KY | 25,852,800 | 1,566,000 | 300,000 | 1.2 | −81 |
| LA | 31,054,720 | 16,194,500 | 8,784,200 | 28.3 | −46 |
| ME | 21,257,600 | 6,460,000 | 5,199,200 | 24.5 | −20 |
| MD | 6,769,280 | 1,650,000 | 440,000 | 6.5 | −73 |
| MA | 5,284,480 | 818,000 | 588,486 | 11.1 | −28 |
| MI | 37,258,240 | 11,200,000 | 5,583,400 | 15.0 | −50 |
| MN | 53,803,520 | 15,070,000 | 8,700,000 | 16.2 | −42 |
| MS | 30,538,240 | 9,872,000 | 4,067,000 | 13.3 | −59 |
| MO | 44,599,040 | 4,844,000 | 643,000 | 1.4 | −87 |
| MT | 94,168,320 | 1,147,000 | 840,300 | 0.9 | −27 |
| NE | 49,425,280 | 2,910,500 | 1,905,500 | 3.9 | −35 |
| NV | 70,745,600 | 487,350 | 236,350 | 0.3 | −52 |
| NH | 5,954,560 | 220,000 | 200,000 | 3.4 | −9 |
| NJ | 5,015,040 | 1,500,000 | 915,960 | 18.3 | −39 |
| NM | 77,866,240 | 720,000 | 481,900 | 0.6 | −33 |
| NY | 31,728,640 | 2,562,000 | 1,025,000 | 3.2 | −60 |
| NC | 33,655,040 | 11,089,500 | 5,689,500 | 16.9 | −49 |
| ND | 45,225,600 | 4,927,500 | 2,490,000 | 5.5 | −49 |
| OH | 26,382,080 | 5,000,000 | 482,800 | 1.8 | −90 |
| OK | 44,748,160 | 2,842,600 | 949,700 | 2.1 | −67 |
| OR | 62,067,840 | 2,262,000 | 1,393,900 | 2.2 | −38 |
| PA | 29,013,120 | 1,127,000 | 499,014 | 1.7 | −56 |
| RI | 776,960 | 102,690 | 65,154 | 8.4 | −37 |
| SC | 19,875,200 | 6,414,000 | 4,659,000 | 23.4 | −27 |
| SD | 49,310,080 | 2,735,100 | 1,780,000 | 3.6 | −35 |
| TN | 27,036,160 | 1,937,000 | 787,000 | 2.9 | −59 |
| TX | 171,096,960 | 15,999,700 | 7,612,412 | 4.4 | −52 |
| UT | 54,346,240 | 802,000 | 558,000 | 1.0 | −30 |
| VA | 26,122,880 | 1,849,000 | 1,074,613 | 4.1 | −42 |
| VT | 6,149,760 | 341,000 | 220,000 | 3.6 | −35 |
| WA | 43,642,880 | 1,350,000 | 938,000 | 2.1 | −31 |
| WV | 15,475,840 | 134,000 | 102,000 | 0.7 | −24 |
| WI | 35,938,560 | 9,800,000 | 5,331,392 | 14.8 | −46 |
| WY | 62,664,960 | 2,000,000 | 1,250,000 | 2.0 | −38 |

SOURCE: Dahl (1990).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058759

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 45 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Land use refers to "human activities on the land which are directly related to the land" (Clawson and Stewart, 1965, in Anderson et al., 1976); land cover describes "the vegetational and artificial constructions covering the land surface" (Burley, 1961). On any patch of land, there can be both a land use and a land cover. In some cases, land use and land cover can be consistent in that one infers the other. For example, a land cover of agricultural row crop is consistent with a land use of agriculture. In other cases, forest land cover may be coincident with a land use of urban, agriculture, residential, and forestland use. Nonetheless, these two types of data allow interpretation of human use and of potential habitat conditions and ecological processes.

Recently, land use/land cover has been used as an indicator of the status of various resources. Models of populations, communities, and habitats can be driven by information on either land cover or land use. Ecological models allow quantification of current, historical, or future biological responses to land-use patterns.

Prior to the development of satellite remote sensing, interpretation of aerial photographs was the primary method of acquiring land cover data over large areas. Today, spectral data from satellites and aerial photography are both commonly used. The ability to differentiate between areas of different land use/land cover depends on the spatial resolution of the sensor and the complexity of the information contained in the spectral data or photographic image. For example, images acquired below 10,000 ft can generally provide more detail than can images obtained at 100,000 ft. However, images taken at higher altitudes cover more area. Finer spatial resolution requires larger amounts of data per unit area and more extensive computer resources for the manipulation and storage of those data. Thus, there is a trade-off between spatial resolution of the data and the cost and time required for analysis.

For changes in measured land use/land cover data to reflect changes in resource quality, the spatial and temporal resolution of those data should ideally match the spatial and temporal scales over which the physical mechanisms that determine resource quality operate. If sufficient resolution is lacking, important trends will not be observable. The resolution of the sensor and the analysis technique are particularly crucial for the accurate measurement of thin, linear features such as streams and riparian corridors. The masking of streams by overhanging vegetation as well as seasonal changes may preclude accurate measurements of stream areal or lineal extent via land use/land cover data.

## How Land Use/Land Cover Data Might Be Used

Riparian areas and land cover can be mapped using remotely sensed data from different sources (e.g., satellites, high- and low-elevation aircraft, and balloons) and that provide different spectral information (e.g., multispectral, infrared, visible, ultraviolet, videography, or digital photographs). These methods are variable in their spatial resolution (e.g., less than one meter for low-elevation

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058760

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 46 of 310

videography to 80 m for satellite Multispectral Scanner sensors) and temporal representation (e.g., seasonal analysis of phenology as in Oetter et al., 2001, vs. a representation from a single image at a standardized time of year). Like all scientific measurements, the techniques and sources of information must be carefully matched to the specific questions or objectives.

Although a growing array of remotely sensed information offers many options for assessment of riparian conditions, land use/land cover data for large basins or regions are most efficiently obtained by the processing and analysis of remotely sensed images acquired by satellite. The USGS through the EROS Data Center allows federal government and affiliated users to access Landsat data from both the Thematic Mapper (TM) and the Multispectral Scanner (MSS) sensors. The spatial resolution of TM data is 30 m, while MSS data are of 80-m resolution. Data from other sensors are also commercially available. These sensors are carried on satellites that have been launched by either commercial organizations such as the Space Imaging Corporation or other countries; resolution of multispectral data from these satellites begins at 4 m (IKONOS 1). TM scenes are available from 1982 to the present, while MSS data of good quality are available from 1975 to 1992. The same area of the satellite's footprint is revisited every 16 days for the Landsat TM scenes; the revisit time for other satellites varies from a few days to in excess of a month.

Several studies have acquired land use/land cover data over relatively large land areas. For example, as a part of a recurrent forest inventory, changes in area of forest, agriculture, low-density urban, and urban land use between 1971–74 and for 1982 were mapped from aerial photographs for western Oregon on a countywide basis by the Forest Inventory and Analysis Unit of the USFS Pacific Northwest Research Station (Gedney and Hiserote, 1989). The Natural Resources Conservation Service (NRCS) of the U.S. Department of Agriculture provides an assessment of resources on national and state scales at 5-year intervals as part of the National Resources Inventory (NRI) (NRCS, 1998). The NRI is the one major national source of information on land cover, providing "updated information on the status, condition, and trends of land, soil, water and related resources on the Nation's nonfederal land" (Florida Center for Public Management, 1998).

Spatial configuration of habitat across the landscape is an essential component of conservation strategies for wildlife, and indices of landscape pattern have been linked in many studies to ecological function (Schumaker, 1996). Given a land use/land cover database of appropriate resolution and extent, metrics describing landscape patterns (patch size, shape, connectivity, distribution, interior size, edge length, edge-to-area ratio, etc.) can be extracted (Turner, 1989). If the land use/land cover classes adequately define the habitat type of critical species, biological diversity indicators can make use of these metrics. In the Netherlands, for example, wood lot size was found to be the best single indicator of bird species richness (Van Dorp and Opdam, 1987). In the Pacific Northwest, the abundance of spotted owls was found to vary with the proportion of old growth in

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058761

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 47 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

the forest, with home ranges increasing in partially harvested forests as fragmentation of the old growth areas increased (Carey, 1985). Thus, land use/land cover can serve as an indicator that attempts to locate watersheds or perhaps river reaches where aquatic and terrestrial species are exposed to greater risk because of the changes in the landscape.

*Recent Land Use/Land Cover Studies in Riparian Areas*

Recent watershed studies have used multivariate statistics and geographical information systems (GIS) to examine how terrestrial ecosystems, human activities, climate, and geology affect nutrient concentrations in streams (e.g., Biggs et al., 1990; Richards and Host, 1994; Richards et al., 1996). Johnson et al. (1997) used land use/land cover, topography, hydrology, and geology of the Saginaw Bay watershed of central Michigan (4.03 million acres) and 62 water quality sampling sites to investigate the relationships between these landscape factors and nutrient and sediment concentrations in streams. Derived land-use metrics included the percent non-row-crop agriculture, the percent urban, the percent forested wetland, and patch density. Non-anthropogenic metrics included catchment area, mean slope, surficial geology, and the percent coarse till. Land-use mapping resolution was about 2.5 acres (1 hectare), based on aerial photography, with six classes of land use defined; a 100-foot (30-meter) digital elevation model was used. Although complex relationships between the seasons, chemicals, and landscape factors were determined, about 50 percent of the variation in chemical concentrations was not explained by any of the landscape factors studied. The scale (resolution) of the land cover data was suggested as part of the problem: forested riparian buffers were thought to be underrepresented. Also, the temporal scales of the processes controlling the fluxes of concentration (e.g., storms) are such that there may have been undersampling. This study and other studies show that land use/land cover alone cannot act as an indicator of water quality; quantities that describe the mechanisms by which the chemical inputs to streams are linked to land use must also be considered. The study also highlights the need to understand the limitations caused by the spatial resolution of the land use/land cover data (here, ignorance of the full extent of riparian areas) and either to develop an adequate measurement technique for poorly sampled components or to develop proxies to represent these elements.

*Fish and Wildlife Service Riparian Mapping System*

Detailed mapping of riparian plant communities has been initiated by the U.S. Fish and Wildlife Service for western areas of the United States (FWS, 1998). The riparian mapping effort is an outgrowth of the National Wetlands Inventory and thus has all of the strengths of that program, including field valida-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058762

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 48 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

tion and development of standardized protocols. The approach, based on aerial photography, provides detailed descriptions of the composition and distribution of riparian plant communities, breaking down riparian areas by plant type (useful for detailed modeling of wildlife).

Some weaknesses of the method are that it is limited in spatial extent because of the time and resources required for the fine-scale mapping. Because it uses aerial photography, it is only applicable to the western two-thirds of the country where vegetative differences between riparian areas and uplands are obvious. The extensive effort required for this type of assessment prevents its use as a tool for monitoring broad trends in riparian conditions across large regions over long periods of time. Although some groups are more comfortable with the finer spatial resolution and additional information provided by aerial photography (or related techniques such as airborne videography and digital imaging), the expense and analysis time required to process these forms of land cover data make them computationally and financially unsuitable for assessment of the entire United States on a frequently recurring basis. These finer resolution sources could be used by states and local resource management agencies to augment a broader national assessment and provide local detail on spatial extent and composition of riparian vegetation. FWS should help develop a uniform national program for mapping riparian areas that relies on measurements of land cover and land use from broadly available remotely sensed data, such as satellite multispectral data. As described in Box 3-5, Illinois and Oregon have mapped land use and land cover via satellite remote sensing and are using those data in land planning and resource management.

## CONCLUSIONS AND RECOMMENDATIONS

**Historical and current land-use practices across the United States significantly affect the hydrologic, geomorphic, and biological structure and functioning of riparian areas.** Land-use practices that directly remove native vegetation such as row-crop agriculture, grazing, timber harvesting, urban development, and mining have altered the character of riparian systems. Changes in hydrologic regimes as a result of water resources development across the nation have been particularly widespread and effective in degrading riparian areas. Other effects have been more indirect in that the management of upslope areas has brought about changes in adjacent riparian areas (e.g., accelerated erosion and pollutant transport from upslope areas following development or flow modification through tile drainage). The degraded conditions caused by some land and water uses are reversible over the short term—for example, by implementing agricultural best management practices or restricting grazing. The effects of other activities, such as large dams and levees and the extensive modification of hydrology in many agricultural areas, can only partially be ameliorated.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058763

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 49 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**BOX 3-5**
**Remote Sensing of Land Cover/Land Use**
**in Illinois and Oregon**

**Illinois**

Characterization of riparian lands in Illinois has been attempted using two approaches. In the early 1980s, with the development of the Illinois Streams Information System (ISIS) and subsequent revisions (Johnston et al., 1999), aerial photograph slides from the Agricultural Stabilization and Conservation Service were projected onto USGS 1:24,000 topographic maps, and land cover was interpreted for 0.1-mile segments of streams. ISIS includes riparian cover descriptions for land immediately adjacent to the stream and for the dominant cover in a 300-m-wide strip adjacent to the stream channel. This was a laborious process and will be difficult to duplicate on any regular schedule.

The challenging task of rapidly and frequently quantifying riparian areas, or at least describing land cover within a corridor that reasonably reflects the riparian area, can be accomplished much more easily through use of satellite imagery. One frequently used source of imagery is Landsat Thematic Mapper (TM), which provided Illinois with a dataset that, when interpreted, described the land cover in 23 categories at a ground resolution of 28.5 x 28.5 meters (93.5 x 93.5 feet or about 0.2 acres). These categories include urban and rural cover types with such broad definitions as row crop, small grains, orchards/nurseries, urban grassland (parks, residential lawns, golf courses, cemeteries, and other open space), rural grassland (pastureland, grassland, waterways, buffer strips, Conservation Reserve Program land, etc.), deciduous (two types), coniferous, and wetland (five types).

The original data used were TM satellite imagery from Landsat 4. Imagery from two dates was used for each area of the state, and all imagery was taken from the period 1991–1995. Since the original collection, the two state agencies and the National Agricultural Statistics Service have entered into agreements that will result in agricultural land being reassessed each year and non-agricultural land being assessed on at least a five-year basis. These data can be used to characterize land cover within any predetermined area. For example, if a riparian area was determined from field elevation data or through simple width definitions, land cover within this area could easily be determined. However, limitations of resolution do prevent accurate description of narrow riparian areas, and the generalities of land cover classification can be problematic. Recently available satellite information will provide resolution at the 5-meter pixel size and will be much more useful where riparian areas have been drastically reduced in width or are naturally narrow.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058764

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 50 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Oregon**

The Willamette River basin encompasses 30,000 km$^2$, entering the Columbia River roughly 90 km upstream of its mouth at the Pacific Ocean. The basin contains several major urban centers, residential areas, agricultural lands, and commercial and federal forests. Human population in the Willamette Valley is expected to double in the next 50 years, placing tremendous demands on limited land and water resources. Much of this future human population growth will be focused on the riparian corridors throughout the lowland portions of the valley. Effective environmental management policies will require explicit analysis of landscape features and integration of appropriate management practices. This requires a scientifically credible assessment of riparian conditions.

The Pacific Northwest Ecosystem Research Consortium developed a land use/land cover map of the basin based on classification of more than 50 vegetation cover classes from satellite spectral data. Riparian systems were evaluated in 120-m widths on both sides of all perennial streams in the basin. The results revealed that in the uplands of the Willamette Basin, conifer forests comprise only 52 percent of the riparian systems along these streams and rivers. Agriculture and development make up a small portion of the riparian systems along small streams, accounting for less than 2 percent of the area. Conifer and hardwood forests each account for less than 10 percent of the riparian areas along small streams in the lowlands. Agricultural crops and urban development along small streams occupy roughly 40 percent and 10 percent of riparian areas, respectively. Riparian conditions along small rivers in the basin exhibit similar patterns to those observed for small streams, though hardwood forests are more abundant than conifer forests. The 120-m band along the mainstem Willamette River is a small fraction of the floodplain, but within this 120-m band, hardwood forests make up 14 percent of the riparian area and conifer forests make up less than 5 percent of the riparian area. Agriculture now occupies more than a third of the riparian areas, and development occupies roughly a quarter of the riparian lands. This represents a loss of 88 percent of the floodplain forests that were present in 1850, based on surveys from the General Land Office. Development has modified riparian forests along the Willamette River to a greater extent than in the smaller streams and tributaries.

This analysis of a large basin with diverse topography and land use illustrates the potential application of satellite remote sensing for riparian assessment. Though the accuracy of this classification at the scale of a few meters from the stream and the resolution of plant types is relatively limited, accuracy of classification across the landscape is relatively high (65–80 percent accurate) and provides a large-scale perspective unavailable with any other source of information. In addition, the analytical process can be applied to data sets from future years with relatively minor costs as compared to the costs of developing the original relationships and analytical methods.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058765

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 51 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Most human development and land-use activities have cumulative impacts in riparian areas that are rarely considered during planning or management.** Riparian systems typically cut through diverse landscapes, crossing political, social, cultural, and land-use boundaries. Coordinated efforts at land-use planning in riparian areas would benefit from the early identification of the multiple and often cumulative impacts associated with various human activities that can occur at both local and basin scales. There is a critical need to implement, nationwide, land-use practices that are "riparian friendly" and that are effective at eliminating or significantly reducing many of the potentially adverse effects of existing and future land uses.

**The majority of riparian areas in the United States have been converted or degraded.** Although landscape-scale studies assessing the extent and condition of riparian areas have been limited, results indicate that conversion and degradation have been common. The spatial extent of riparian forests has been substantially reduced, plant communities on floodplains have been converted to other land uses or have been replaced with developments, and the area of both woody and non-woody riparian communities has decreased. The ecological functions of these riparian systems are greatly diminished in comparison to their historical range of ecological condition.

**Current assessments of the status of riparian areas are incomplete, cover a small fraction of perennial streams and almost no intermittent and ephemeral streams, and are not operationally consistent.** It has only been relatively recently that assessments of the areal extent and condition of riparian systems have been undertaken. Unfortunately, these efforts have been limited in scope, are difficult to compare because of differing methodologies, and provide only a fragmented view of the nation's riparian areas. The few existing studies of riparian condition tend to be ground-based assessments from field studies or aerial photogrammetry, and they focus only on relatively small areas or stream lengths. Although such studies provide detailed information for managing local resources, they do not address changes in riparian conditions at regional or national scales or measure rates of change from repeated measures or assessments.

**There is no comprehensive or methodologically consistent monitoring of trends in the nation's riparian areas, although current technology makes landscape assessment of riparian community composition and distribution possible and cost effective.** National assessment of wetlands is far more advanced than riparian assessment. The riparian mapping effort of the FWS could promote development of a uniform national program for mapping riparian areas. Such a program should incorporate broadly available remotely sensed data, such as satellite multispectral data, which could be used to classify and map land cover and land use information in each of the states.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058766

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 52 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Remotely sensed land cover/land use information from satellite spectral data offers the greatest potential for monitoring riparian conditions consistently across the United States on a frequently recurring basis. Satellite data extending back to the early 1970s provide a 20- to 30-year record of changes in riparian resources. Future development of analytical techniques and refinement of classifications can be reapplied to historical satellite data in order to take advantage of future advancements in remote sensing. Increasing the availability of remotely sensed information on riparian conditions would allow citizens and management authorities to assess environmental status and track changes in this critical resource.

Although land-use changes have had and will continue to have the greatest effect on riparian areas in the near and medium term, global climate change is likely to exacerbate stressors on riparian areas rather than counteract them. Thus, land owners and managers should continue to strive for land uses that are consistent with protecting and restoring riparian areas in the absence of definitive information about how climate changes may be influencing those systems. This includes reducing stressors from localized human activities such as water withdrawals, flow regulation, continued land drainage, excessive sedimentation, nutrient loading, excessive grazing, and introduction and spread of exotic species.

# REFERENCES

Adams, P. W., and J. O. Ringer. 1994. The effects of timber harvesting and forest roads on water quantity and quality in the Pacific Northwest: summary and annotated bibliography. Corvallis, OR: Forest Engineering Department, Oregon State University. 147 pp.

Akashi, Y. 1988. Riparian vegetation dynamics along the Bighorn River, Wyoming. M. Sc. Thesis, University of Wyoming, Laramie. 245 pp.

Andereck, K. L. 1995. Environmental consequences of tourism: a review of recent research. Pp. 77–81 In: Linking tourism, the environment, and sustainability. Gen. Tech. Report INT-GTR-323. Ogden, UT: USDA Forest Service.

Anderson, J. R, E. E. Hardy, J. T. Roach, and R. E. Witmer. 1976. A land use and land cover classification system for use with remote sensor data. Geological Survey Professional Paper 964, Washington DC: U.S. Geological Survey.

Bailey, J. K., J. A. Schwietzer, and T. G. Whitham. 2001. Salt cedar negatively affects biodiversity of aquatic macroinvertebrates. Wetlands 21:442–447.

Baker, J. L. 1983. Agricultural areas as nonpoint sources of pollution. Pp. 275–310 In: Environmental impacts of nonpoint source pollution. M. R. Overcash and J. M. Davidson (eds.). Ann Arbor, MI: Ann Arbor Sci. Publ., Inc.

Balda, R. P. 1991. The relationship of secondary cavity nesters to snag densities in western coniferous forests. Wildlife Habitat Technical Bulletin No. 1. Albuquerque, NM: USDA.

Baltz, D. M., and P. B. Moyle. 1993. Invasion resistance to introduced species by a native assemblage of California stream fishes. Ecological Applications 3:246–255.

Behan, M. 1981. The Missouri's stately cottonwoods: how can we save them? Montana Magazine, September 76–77.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058767

Belsky, A. J., A. Matzke, and S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States. Journal of Soil and Water Conservation 54: 419–431.

Benke, A. C. 1990. A perspective on America's vanishing streams. Journal of the North American Benthological Society 9:77–88.

Berger, J., P. B. Stacey, L. Bellis, and M. P. Johnson. 2001. A mammalian predator-prey imbalance: grizzly bear and wolf extinction affect avian neotropical migrants. Ecological Applications 11:947–960.

Beschta, R. L. 1990. Effects of fire on water quantity and quality. Pp. 219–232 In: Natural and prescribed fire in Pacific Northwest forests. J. D. Walstad, S. R. Radosevich, and D. V. Stromberg (eds.). Corvallis, OR: Oregon State University Press.

Beschta, R. L., M. Pyles, A. Skaugset, and C. Surfleet. 1999. Peakflow responses to forest practices in the western cascades of Oregon, USA. Journal of Hydrology 233:102–120.

Biggs, B. J., M. J. Duncan, I. G. Jowett, J. M. Quinn, C. W. Hickey, R. J. Davies-Colley, and M. E. Close. 1990. Ecological characterization, classification and modelling of New Zealand rivers: an introduction and synthesis. New Zealand Journal of Marine and Freshwater Research 24:277–304.

Binkley, D., and T. C. Brown. 1993. Management impacts on water quality of forests and rangelands. Gen. Tech. Report RM-239. USDA Forest Service. 114 pp.

Bleich, J. L. 1988. Chrome on the range: off-road vehicles on public lands. Ecology L. Q. 15:159–189.

Booth, D. 1991. Urbanization and the natural drainage system-impacts, solutions and prognoses. Northwest Environmental Journal 7(1):93–118.

Booth, D. B., and C. R. Jackson. 1997. Urbanization of aquatic systems: degradation thresholds, stormwater detention, and the limits of mitigation. J. American Water Resources Assoc. 33(5):1077–1090.

Bradley, C., and D. Smith. 1986. Plains cottonwood recruitment and survival on a prairie meandering river floodplain, Milk River, southern Alberta and northern Montana. Canadian Journal of Botany 64:1433–1442.

Bravard, J., C. Amoras, G. Pautou, G. Bornette, M. Bournard, C. Des Chatelliers, J. Gibert, J. Peiry, J. Perrin, and H. Tachet. 1997. River incision in southeast France: morphological phenomena and ecological effects. Regulated Rivers: Research and Management 13:75–90.

Brewer, R., G. A. McPeek, and R. J. Adams, Jr. 1991. The atlas of breeding birds of Michigan. East Lansing, MI: Michigan State University Press. 594 pp.

Brinson, M. M., B. L. Swift, R. C. Plantico, and J. S. Barclay. 1981. Riparian ecosystems: their ecology and status. FWS/OBS-81/17. Kearneysville, WV: U.S. Fish and Wildlife Service.

Brinson, M. M., R. R. Christian, and L. K. Blum. 1995. Multiple states in the sea-level induced transition from terrestrial forest to estuary. Estuaries 18:648–659.

Brooks, D. R. 2000. Reclamation of lands disturbed by mining of heavy minerals. Pp. 725–754 In: Reclamation of drastically disturbed lands. Agronomy Monograph No. 41. Madison, WI: American Society of Agronomy.

Brothers, T. S. 1984. Historical vegetation change in the Owens River riparian woodland. Pp. 75–84: In: California riparian systems: ecology, conservation, and productive management. R. Warner and C. Hendricks (eds.). Berkeley, CA: University of California Press.

Brown, D. E., C. H. Lowe, and J. F. Hausler. 1977. Southwestern riparian communities: their biotic importance and management in Arizona. Pp. 201–211 In: Importance, preservation, and management of riparian habitat: a symposium. Tucson, Arizona, July 9, 1977. R. R. Johnson and D. A. Jones (eds.).

Bryan, M. D., and D. L. Scarnecchia. 1992. Species richness, composition, and abundance of fish larvae and juveniles inhabiting natural and developed shorelines of a glacial Iowa lake. Environ. Biol. of Fishes 35:329–341.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058768

Bryant, A. A. 1986. Influence of selective logging on red-shouldered hawks, *Buteo lineatus*, in Waterloo region, Ontario, 1953-1978. The Canadian Field-Naturalist 100:525.

Buech, R. R. 1992. Streambank stabilization can impact wood turtle nesting areas. 54th Midwest Fish and Wildlife Conference Proceedings. Toronto, Ontario. December 6–9, 1992.

Bull, W. B. 1997. Discontinuous ephemeral streams. Geomorphology 19:227–276.

Bureau of Land Management (BLM). 1998. Public Land Statistics. Volumes 182, 183. BLM/BC/ST-99/001+1165.

BLM. 1999. Public Land Statistics. www.blm.gov.

Bureau of Reclamation. 1977. Design of small dams. Water Resources Technical Publication. Washington, DC: U.S. Department of the Interior. 816 pp.

Burger, J. 1995. Beach recreation and nesting birds. Pp. 281–295 In: Wildlife and recreationists. coexistence through management and research. R. L. Knight and K. J. Gutzwiller (eds.). Washington, DC: Island Press. 372 pp.

Burley, T. M. 1961. Land use or land utilization. Professional Geographer 13(6):18–20.

Busch, D. E., and S. D. Smith. 1995. Mechanisms associated with decline of woody species in riparian ecosystems of the southwestern U.S. Ecological Monographs 65:347–370.

Cahoon, D. R., D. J. Reed, and J. W. Day, Jr. 1995. Estimating shallow subsidence in microtidal salt marshes of the southeastern United States: Kaye and Barghoorn revisited. Marine Geology 128:1–9.

Carey, A. B. 1985. A summary of the scientific basis for spotted owl management. In: Ecology and management of the spotted owl in the Pacific Northwest. General Technical Report PNW-185. R. J. Gutierrez and A. B. Cary (eds.). Portland, OR: USDA Forest Service, Pacific Northwest Forest and Range Experiment Station.

Chaney, E., W. Elmore, and W. S. Platts. 1990. Livestock grazing on western riparian areas. Eagle, ID: Northwest Resource Information Center, Inc. 45 pp.

Chao, P. 1999. Great Lakes water resources: climate change impact analysis with transient GCM scenarios. J. Amer. Water Resources Assoc. 35(6):1499–1507.

Christensen, D. L., B. J. Herwig, D. E. Schindler, and S. R. Carpenter. 1996. Impacts of lakeshore residential development on coarse woody debris in north temperate lakes. Ecol. Application 6:1143–1149.

Clawson, M., and C. L. Stewart. 1965. Land use information: a critical survey of U.S. statistics including possibilities for greater uniformity. Baltimore, MD: The John Hopkins Press for Resources for the Future, Inc. 402 pp.

Coggins, G. C., C. F. Wilkinson, and J. D. Leshy. 2001. Federal public land and resources law, 4th ed. New York: Foundation Press.

Cole, D. N. 1989. Areas of vegetation loss: a new index of campsite impact. USDA/FS Research Note INT-389.

Cole, D. N. 1993. Minimizing conflict between recreation and nature conservation. Pp. 105–122. In: Ecology of greenways: design and function of linear conservation areas. D. S. Smith and P. C. Hellmund (eds.). Minneapolis, MN: University of Minnesota Press.

Collins, B. D., and T. Dunne. 1989. Gravel transport, gravel harvesting, and channel-bed degradation in rivers draining the southern Olympic Mountains, Washington, USA. Environmental Geology and Water Sciences 13:213–224.

Committee on Environment and Natural Resources (CENR). 2000. Integrated assessment of hypoxia in the Northern Gulf of Mexico. Washington, DC: National Science and Technology Council Committee on Environment and Natural Resources.

Conner, R. N., R. G. Hooper, H. S. Crawford, and H. S. Mosby. 1975. Woodpecker nesting habitat in cut and uncut woodlands in Virginia. J. Wildl. Manage. 39:144–150.

Crawford, C. S., A. C. Culley, R. Leutheuser, M. S. Sifuentes, L. H. White, and J. P. Wilber. 1993. Middle Rio Grande ecosystem: Bosque biological management plan. Albuquerque, NM: U.S. Fish and Wildlife Service, District 2. 291 pp.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058769

214                                                                                                    *RIPARIAN AREAS*

Crossman, E. J. 1991. Introduced freshwater fishes: A review of the North American perspective with emphasis on Canada. Canadian Journal of Fisheries and Aquatic Sciences 48:46–57.

Crouch, G. 1979. Changes in the vegetation complex of a cottonwood ecosystem on the South Platte River. Great Plains Agricultural Council Publication 91:19–22.

Cunningham, A. A. 1996. Disease risks of wildlife translocations. Conservation Biology 10:349–353.

Dahl, T. E. 1990. Wetlands losses in the United States 1780s to 1980s. Washington, DC: U.S. FWS.

Dahl, T. E. 2000. Status and Trends of Wetlands in the Conterminous United States 1986 to 1997. Washington, DC: U.S. FWS.

Daulton, T., and C. Hanna. 1997. Protecting Inland Lakeshores of the North. Robert E. Matteson Workshop. Sigurd Olson Environmental Institute. Northland College. Ashland, WI.

David, M. B., L. E. Gentry, D. A. Kovacic, and K. M. Smith. 1997. Nitrogen balance in and export from an agricultural watershed. Journal of Environmental Quality 26:1038–1048.

DeByle, N. V. 1985. Animal impacts. Pp. 115–23 In: Aspen: ecology and management in the western United States. Gen. Tech. Rept. RM-119. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station.

DeLoach, C. J. 2000. Saltcedar biological control: methodology, exploration, laboratory trials, proposals for field releases, and expected environmental effects. http://refuges.fws.gov/nwrsfiles/HabitatMgmt/PestMgmt/SaltcedarWorkshopSep96/deloach.html.

Dillaha, T. A., R. B. Reneau, S. Mostaghini, and D. Lee. 1989. Vegetative filter strips for agricultural non-point source pollution control. Transactions of the American Society of Agricultural Engineers 3:513–519.

DiTomaso, J. M. 1998. Impact, biology, and ecology of saltcedar (*Tamarix* ssp.) in the southwestern United States. Weed Technology 12:326–336.

Dresen, M., and R. Korth. 1995. Life on the edge...owning waterfront property. Stevens Point, WI: University of Wisconsin-Extension Lakes Partnership, University of Wisconsin. 95 pp.

Dwyer, D. D., J. C. Buckhouse, and W. S. Huey. 1984. Impacts of grazing intensity and specialized grazing systems on the use and value of rangeland: summary and recommendations. In: Developing strategies for rangeland management. Boulder, CO: Westview Press.

Dykaar, B. B., and P. J. Wiggington, Jr. 2000. Floodplain formation and cottonwood colonization patterns on the Willamette River, Oregon, USA. Environmental Management 25(1):87–104.

Dynesius, M., and C. Nilsson. 1994. Fragmentation and flow regulation of river systems in the northern third of the world. Science 266:753–762.

Elmore, W., and J. B. Kauffman. 1994. Riparian and watershed systems: degradation and restoration. Pp. 213–231 In: Ecological implications of livestock herbivory in the West. M. Vavra, W. A. Laycock, and R. D. Pieper (eds.). Denver, CO: Society of Range Management.

English, M. C., R. B. Hill, M. A. Stone, and R. Ormson. 1997. Geomorphological and botanical change on the Outer Slave River Delta, NWT, before and after impoundment of the Peace River. Hydrological Processes 11(13):1707–1724.

Environmental Protection Agency (EPA). 1999. Riparian acreage and stream miles. Provided by Joe Williams at the first meeting of the NRC Committee on Riparian Zone Functioning and Strategies for Management, October 19–20, 1999. From EPA Reach File 3.

EPA. 2000. Atlas of America's polluted waters. EPA 840-B-00-002. Washington, DC: U.S. Environmental Protection Agency, Office of Water. 53 pp.

EPA. 2001. Action plan for reducing, mitigating, and controlling hypoxia in the Northern Gulf of Mexico. Washington, DC: EPA Mississippi River/Gulf of Mexico Watershed Nutrient Task Force. http://www.epa.gov/msbasin/actionplanintro.htm.

Evans, R. O., R. W. Skaggs, and J. W. Gilliam. 1991. A field experiment to evaluate the water quality impacts of agricultural drainage and production practices. Proceedings of the National Conference on Irrigation and Drainage Engineering. New York, NY: ASCE.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058770

Evans, R. O., R. W. Skaggs, and J. W. Gilliam. 1995. Controlled versus conventional drainage effects on water quality. Journal of Irrigation and Drainage Engineering 121(4):271–276.

Fausey, N. R., L. C. Brown, H. W. Belcher, and R. S. Kanwar. 1995. Drainage and water quality in the Great Lakes and Cornbelt states. Journal of Irrigation and Drainage Engineering 121(4):283–288.

Federal Interagency Working Group. 1998. Stream corridor restoration. principles, processes, and practices. Washington, DC: National Technical Information Service, U.S. Department of Commerce.

Fenner, P., W. Brady, and D. Patton. 1985. Effects of regulated water flows on regeneration of Fremont cottonwood. Journal of Range Management 38(2):135–138.

Findlay, C. S., and J. Bourdages. 2000. Response time of wetland biodiversity to road construction on adjacent lands. Conservation Biology 14:86–94.

Fischenich, J. C. 1997. Hydraulic impacts of riparian vegetation; summary of the literature. Technical Report EL-97-9. Washington, DC: U.S. Army Corps of Engineers. 53 pp.

Fish and Wildlife Service (FWS). 1998. A system for mapping riparian areas in the western U.S. Washington, DC: U.S. Fish and Wildlife Service.

Flather, C. H., L. A. Joyce, and C. A. Bloomgarden. 1994. Species endangerment patterns in the United States. Gen. Tech. Rep. RM-241. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station.

Fleischner, T. L. 1994. Ecological costs of livestock grazing in western North America. Conservation Biology 8:629–44.

Florida Center for Public Management. 1998. Environmental indicator technical assistance series. Volume 3: State Indicators of National Scope. Land Use/Land Cover. http://www.fse.edu/~cpm/segip/catalog/volume3.html. 18 Nov. 1998.

Formann, R. T. T., and R. D. Deblinger. 2000. The ecological road-effect zone of a Massachusetts (U.S.A.) suburban highway. Conservation Biology 14:36–46.

Friedman, J. M., W. R. Osterkamp, M. L. Scott, and G. T. Auble. 1998. Downstream effects of dams on channel geometry and bottomland vegetation: regional patterns in the Great Plains. Wetlands 18:619–633.

Furniss, M. J., T. D. Roelofs, and C. S. Yee. 1991. Road construction and maintenance. Pp. 297–323 In: Influences of forest and rangeland management on salmonid fishes and their habitats. W. R. Meehan (ed.). Special Pub. 19. Bethesda, MD: Amer. Fish. Soc. 751 pp.

Galatowitsch, S. M., N. O. Anderson, and P. D. Ascher. 1999. Invasiveness in wetland plants in temperate North America. Wetlands 19:733–755.

Garrison, P. J., and R. S. Wakeman. 2000. Use of paleolimnology to document the effect of lake shoreland development on water quality. Journal of Paleolimnology 24(4):369–393.

Gatewood, J. S., J. W. Robinson, B. R. Colby, J. D. Hem, and L. C. Halpenny. 1950. Use of water by bottomland vegetation in the Lower Safford Valley, Arizona. U.S. Geological Survey Water-Supply Paper 1103.

Gedney, D. R., and B. A. Hiserote. 1989. Changes in land use in Western Oregon between 1971–74 and 1982. Resource Bulletin PNW-RB-165. Portland, OR: USDA Forest Service, Pacific Northwest Research Station. 21 pp.

Gonzalez, M. A. 2001. Recent formation of arroyos in the Little Missouri Badlands of southwestern North Dakota. Geomorphology 38:63–84.

Gordon, N. D., T. A. McMahon, and B. L. Finlayson. 1992. Stream hydrology: an introduction for ecologists. Chichester, England: John Wiley and Sons.

Graf, W. L. 1999. Dam nation: A geographic census of American dams and their large-scale hydrologic impacts. Water Resources Research 35(4):1305–1311.

Green, C. H., and S. M. Tunstall. 1992. The amenity and environmental value of river corridors in Britain. In: River conservation and management. New York: John Wiley & Sons.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058771

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 57 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Green, D. M. 1998. Recreational impacts on erosion and runoff in a central Arizona riparian area. Journal of Soil and Water Conservation 53:38–42.

Gregory, S. V. 2000. Summary of current status and health of Oregon's riparian area. In: Health of Natural Systems and Resources.

Grimm, N. B., and S. G. Fisher. 1989. Stability of periphyton and macroinvertebrates to disturbance by flash floods in a desert stream. Journal of the North American Benthological Society 8:293–307.

Heimberger, M., D. Euler, and J. Barr. 1983. The impact of cottage development on common loon reproductive success in central Ontario. Wilson Bull. 95:431–439.

Henderson, C. L., C. J. Dindorf, and F. J. Rozumalski. 1998. Lakescaping for wildlife and water quality. Minneapolis, MN: Minnesota Department of Natural Resources Nongame Wildlife Program, Section of Wildlife.

Henderson-Sellers, A., H. Ahang, G. Berz, K. Emanuel, W. Gray, C. Landsea, G. Holland, J. Lighthill, S. L. Shieh, P. Webster, and K. McGuffie. 1998. Tropical cyclones and global climate change: a post-IPCC assessment. Bulletin of the American Meteorological Society 79:19–38.

Heywood, V. H. 1989. Patterns, extents, and modes of invasions by terrestrial plants. In: Biological invasions: a global perspective, SCOPE 37. J. A. Drake et al., (eds.). Chichester, UK: John Wiley & Sons Ltd.

Hobbs, R. J., and D. A. Norton. 1996. Towards a conceptual framework for restoration ecology. Restoration Ecology 4:93–110.

Horning, J. 1994. Grazing to extinction: endangered, threatened and candidate species imperiled by livestock grazing on Western public lands. Washington, DC: National Wildlife Federation.

Howard, W. E. 1996. Damage to rangeland resources. Pp. 383–394 In: Rangeland Wildlife. P. R. Krausman (ed.). Denver, CO: Society of Range Management.

Howe, W. H., and F. L. Knopf. 1991. On the imminent decline of the Rio Grande cottonwoods in central New Mexico. Southwestern Naturalist 36:218–224.

Hubbard, M. W., Danielson, B. J. and R. A. Schmitz. 2000. Factors influencing the location of deer-vehicle accidents in Iowa. Journal of Wildlife Management 64:707–713.

Hupp, C. R., and A. Simon. 1991. Bank accretion and the development of vegetated depositional surface along modified alluvial channels. Geomorphology 4:111–124.

Illinois Department of Natural Resources. 1996. Illinois land cover, an atlas. IDNR/EEA-96/05. Springfield, IL: Illinois Department of Natural Resources.

Inter-Fluve, Inc. 1991. Handbook for reclamation of placer mined stream environments in western Montana. Bozeman, MT: Inter-Fluve, Inc. 340 pp.

Intergovernmental Panel on Climate Change (IPCC). 2001. IPCC third assessment report: summary for policy makers (United States). Geneva, Switzerland: IPCC Secretariat, c/o World Meteorological Association.

Jennings, M. J., K. Johnson, and M. Staggs. 1996. Shoreline protection study: a report to the Wisconsin State Legislature. PUBL-RS-921-96. Madison, WI: Wisconsin Department of Natural Resources.

Johnson, L. B., C. Richards, G. E. Host, and J. W. Arthur. 1997. Landscape influences on water chemistry in Midwestern stream ecosystems. Freshwater Biology 37:193–208.

Johnson, R. R., C. D. Ziebell, D. R. Patton, P. F. Folliott, and R. H. Hamre. 1985. Riparian Ecosystems and their management: reconciling conflicting uses. USDA Forest Service General Technical Report RM-120. Fort Collins, CO:USFS. 523 pp.

Johnson, W. C., R. L. Burgess, and W. R. Keammerer. 1976. Forest overstory vegetation on the Missouri River floodplain in North Dakota. Ecological Monographs 46:59–84.

Johnston, D. M., D. L. Szafoni, and A. Srivastava. 1999. Illinois streams information system: users manual. Urbana, IL: Department of Landscape Architecture, Geographic Modeling Systems Laboratory, University of Illinois.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058772

Jones, J. A. F. J. Swanson, B. C. Wemple, and K. U. Snyder. 2000. Effects of roads on hydrology, geomorphology, and disturbance patches in stream networks. Conservation Biology 53:76–85.

Kauffman, J. B., and D. A. Pyke. 2001. Range ecology, global livestock influences. Pp. 33–52 In: Encyclopedia of Biodiversity, Volume 5. S. Levin et al. (eds). San Diego, CA: Academic Press.

Kauffman, J. G., and W. C. Krueger. 1984. Livestock impacts on riparian ecosystems and streamside management implications. Journal of Range Management 37:430–438.

Kay, C. E. 1997a. Is Aspen Doomed? Journal of Forestry 95:4-11.

Kay, C. E. 1997b. Viewpoint: Ungulate herbivory, willows, and political ecology in Yellowstone. J. Range Mgmt. 50:139–45.

Kay, C. E., and D. L. Bartos. 2000. Ungulate herbivory on Utah aspen: Assessment of long-term exclosures. J. Range Mgmt. 53:145–53.

Kay, C. E. 2001. The condition and trend of aspen communities on BLM administered lands in central Nevada—with recommendations for management. Battle Mountain, NV: BLM. 152 pp.

Keough, J. R., T. A. Thompson, G. R. Guntenspergen, and D. A. Wilcox. 1999. Hydrogeomorphic factors and ecosystem responses in coastal wetlands of the Great Lakes. Wetlands 19:821–834.

Keown, M. P., N. R. Oswalt, E. B. Perry, and E. A. Dardeau, Jr. 1977. Literature survey and preliminary evaluation of streambank protection methods. Technical Report H-77-9. Vicksburg, MS: U.S. Army Corps of Engineers, Waterway Experiment Station.

Knight, R. L., and K. J. Gutzwiller, eds. 1995. Wildlife and recreationists: coexistence through management and research. Washington, DC: Island Press. 372 pp.

Knight, R. L., and D. N. Cole. 1995. Wildlife responses to recreationists. Pp. 51–69 In: Wildlife and recreationists: coexistence through management and research. R. L. Knight and K. J. Gutzwiller (eds.). Washington, DC: Island Press. 372 pp.

Kondolf, G. M. 1995. Managing bedload sediment in regulated rivers: examples from California, U.S.A. Pp. 165–176 In: Natural and anthropogenic influences in fluvial geomorphology. J. E. Costa, A. J. Miller, K. W. Potter, and P. R. Wilcock (eds.). Geophysical Monograph 89. Washington, DC: American Geophysical Union. 239 pp.

Korth, R., and P. Cunningham. 1999. Margin of error? Human influence on Wisconsin shores. Stevens Point, WI: Wisconsin Lakes Partnership (Wisconsin Association of Lakes, Wisconsin Department of Natural Resources, and University of Wisconsin-Extension).

Kovacic, D. A. 2000. Presentation to the NRC Committee on Riparian Zone Functioning and Strategies for Management. June 3–4, 2000, Ames, IA.

Kovacic, D. A., M. B. David, L. E. Gentry, K. M. Starks, and R. A. Cooke. 2000. Effectiveness of constructed wetlands in reducing nitrogen and phosphorus export from agricultural tile drainage. Journal of Environmental Quality 29:1262–1274.

Kowalski, K. P., and D. A. Wilcox. 1999. Use of historical and geospatial data to guide the restoration of a Lake Erie coastal marsh. Wetlands 19:858–868.

Larson, G. L., and S. E. Moore. 1985. Encroachment of exotic rainbow trout into stream populations of native brook trout in the southern Appalachian mountains. Transactions of the American Fisheries Society 114:195–203.

Laursen, S. B. 1996. At the water's edge: the science of riparian forestry. BU-6637-S. St. Paul, MN: University of Minnesota. 160 pp.

Leon, S. C. 2000. Southwestern willow flycatcher. http://ifw2es.fws.gov/swwf/.

Lorang, M. S., P. D. Komar, and J. A. Stanford. 1993a. Lake level regulation and shoreline erosion in Flathead Lake, Montana: a response to the redistribution of annual wave energy. J. Coastal Research 9(2):494–508.

Lorang, M. S., J. A. Stanford, and P. D. Komar. 1993b. Dissipative and reflective beaches in a large lake and the physical effects of lake level regulation. Ocean and Coastal Manage. 19:263–287.

Lorang, M. S., and J. A. Stanford. 1993. Variability of shoreline erosion and accretion within a beach compartment of Flathead Lake, Montana. Limnology and Oceanography 38(8):1783–1795.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058773

Luckenbach, R. A., and R. B. Bury. 1983. Effects of off-road vehicles on the biota of the Algodoens Dunes, Imperial County, California. Journal of Applied Ecology 20:265–286.

Luckey, R. R., E. D. Gutentag, F. J. Heimes, and J. B. Weeks. 1988. Effects of future ground-water pumpage on the High Plains aquifer in parts of Colorado, Kansas, Nebraska, New Mexico, Oklahoma, South Dakota, Texas, and Wyoming. U.S. Geological Survey Professional Paper 1400-E. Washington DC: U.S. Geological Survey. 44 pp.

Mac, M. J., P. A. Opler, C. E. Puckett Haecker, and P. D. Doran. 1998. Status and trends of the nation's biological resources. Reston, VA: U. S. Geological Survey.

Maser, C., and J. R. Sedell. 1994. From the forest to the sea: the ecology of wood in streams, rivers, estuaries, and oceans. Delray Beach, FL: St. Lucie Press.

Matson, N. P. 2000. Biodiversity and its management on the National Elk Refuge, Wyoming. Pp. 101–38 In: Developing Sustainable Management Policy for the National Elk Refuge, Wyoming. Bulletin Series No. 104. T. W. Clark et al. (eds.). New Haven. CT: Yale School of Forestry and Environmental Studies.

McFadden, L. D., and J. R. McAuliffe. 1997. Lithologically influenced geomorphic responses to Holocene climatic changes in the southern Colorado Plateau, Arizona: a soil-geomorphic and ecologic perspective. Geomorphology 19:303–332.

McShea, W. J., H. B. Underwood, and J. H. Rappole. 1997. The science of overabundance: deer ecology and population management. Washington, DC: Smithsonian Press.

Meador, M. R., and A. O. Layher. 1998. Instream sand and gravel mining: environmental issues and regulatory process. Fisheries 23(11):6–13.

Menzel, B. W. 1983. Agricultural management practices and the integrity of instream biological habitat. Pp. 305–329 In: Agricultural management and water quality. F. W. Schaller and G. W. Bailey (eds.). Ames, IA: Iowa Sate University Press.

Meyer, J. L. 1996. Beyond gloom and doom: ecology for the future. Bulletin of the Ecological Society of America 77:785–788.

Meyer, M., J. Woodford, S. Gillum, and T. Daulton. 1997. Shoreland zoning regulations do not adequately protect wildlife habitat in northern Wisconsin. Final Report, USFWS State Partnership Grant, P-1-W, Segment 17. Ashland, WI: Wisconsin Department of Natural Resources, Rhinelander Wisconsin and Sigurd Olson Environmental Institute. 73 pp.

Michener, W. K., E. R. Blood, K. L. Bildstein, M. M. Brinson, and L. R. Gardner. 1997. Climate change, hurricanes and tropical storms, and rising sea level in coastal wetlands. Ecological Applications 7:770–801.

Mitsch, W. J., J. W. Day, Jr., J. W. Gilliam, P. M. Groffman, D. L. Hey, G. W. Randall, and N. Wang. 2001. Reducing nitrogen loading to the Gulf of Mexico from the Mississippi River basin: strategies to counter a persistent ecological problem. BioScience 51(5):373–388.

Molles, M. C., Jr., C. S. Crawford, L. M. Ellis, H. M. Valett, and C. N. Dahm. 1998. Managed flooding for riparian ecosystem restoration. BioScience 48:749–756.

Montgomery, D. R., E. M. Beamer, G. R. Pess, and T. P. Quinn. 1999. Channel type and salmonid spawning distribution and abundance. Canadian Journal of Fisheries and Aquatic Sciences 56:377–387.

Moore, J. L. 1994. A special place: New Hampshire's Lakes. Wolfeboro Falls, NH: Lake Winnipesaukee Association. 32 pp.

Muldavin, E., P. Durkin, M. Bradley, M. Stuever, and P. Melhop. 2000. Handbook of wetland vegetation communities of New Mexico. Albuquerque, NM: New Mexico Heritage Program..

Murphy, M. L. 1995. Forestry impacts on freshwater habitat of anadromous salmonids in the Pacific Northwest and Alaska—requirements for protection and restoration. Decision Analysis Series No. 7. Silver Spring, MD: U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Coastal Ocean Program. 156 pp.

Naiman, R. J., and H. Décamps (eds). 1990. The ecology and management of aquatic-terrestrial ecotones. Paris: The Parthenon Publishing Group, UNESCO. 316 pp.

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 60 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Naiman, R. J., and K. H. Rogers. 1997. Large animals and system-level characteristics in river corridors. BioScience 47:521–529.

National Research Council (NRC). 1982. A levee policy for the National Flood Insurance Program. Washington, DC: National Academy Press.

NRC. 1990. Decline of sea turtles, causes and prevention. Washington, DC: National Academy Press.

NRC. 1996. Upstream: salmon and society in the Pacific Northwest. Washington, DC: National Academy Press. 452 pp.

NRC. 2000a. Hardrock mining of federal lands. Washington, DC: National Academy Press.

NRC. 2000b. Reconciling observations of global temperature change. Washington, DC: National Academy Press. 85 pp.

NRC. 2000c. Global change ecosystems research. Washington, DC: National Academy Press.

NRC. 2001a. Inland navigation system planning: the upper Mississippi River–Illinois waterway. Washington, DC: National Academy Press.

NRC. 2001b. Assessing the TMDL approach to water quality management. Washington, DC: National Academy Press.

NRC. 2002. The Missouri River ecosystem: exploring the prospects for recovery. Washington, DC: National Academy Press.

Nelson, R. L., M. L. McHenry, and W. S. Platts. 1991. Mining. Pp. 425–457 In: Influences of forest and rangeland management on salmonid fishes and their habitats. W. R. Meehan (ed.). Special Pub. 19. Bethesda, MD: Amer. Fish. Soc. 751 pp.

Nilsson, C., R. Jansson, and U. Zinko. 1997. Long-term responses of river-margin vegetation to water-level regulation. Science 276:798–800.

Noss, R. F., E. T. LaRoe, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. Biological Report 28. Washington, DC: National Biological Service.

Oetter, D. R., W. B. Cohen, M. Berterretche, T. K. Maiersperger, and R. E. Kennedy. 2001. Land cover mapping in an agricultural setting using multiseasonal Thematic Mapper data. Remote Sensing of Environment 76(2):139–156.

Ohmart, R. D., W. O. Deason, and C. Burke. 1977. A riparian case history: the Colorado River. Pp. 35–47 In: Importance, preservation, and management of riparian habitat: a symposium. R. R. Johnson and D. A. Jones (eds.). Tucson, Arizona, July 9, 1977.

Ohmart, R. D. 1996. Historical and present impacts of livestock grazing on fish and wildlife resources in western riparian habitats. Pp. 245–279 In: Rangeland Wildlife. P. R. Krausman (ed.). Denver, CO: Society for Range Management.

Ohmart, R. D., and B. W. Anderson. 1978. Wildlife use values of wetlands in the arid southwestern United States. Pp. 278–295 In: Wetland functions and values: the state of our understanding. Proceedings of the National Symposium on Wetlands. P. E. Greeson, J. R. Clark, J. E. Clark (eds.). Minneapolis, MN: American Water Resources Association.

Ohmart, R. D., and B. W. Anderson. 1986. Riparian habitat. Pp. 164–199 In: B. S. Cooperider (ed.). Inventorying and monitoring of wildlife habitat. Denver, CO: U.S. Bureau of Land Management.

Opperman, J. J., and A. M. Merenlender. 2000. Deer herbivory as an ecological constraint to restoration of degraded riparian corridors. Restoration Ecology 8:41–47.

Parendes, L. A., and J. A. Jones. 2000. Role of light availability and dispersal mechanisms in invasion of exotic plants along roads and streams in the H. J. Andrews Experimental Forest, Oregon. Conservation Biology 14:64–75.

Patten, D. T. 1998. Riparian ecosystems of semi-arid North America: diversity and human impacts. Wetlands 18:498–512.

Pavelis, G. A. 1987. Farm drainage in the United States: history, status, and prospects. Publication Number 1455. Washington, DC: U.S. Department of Agriculture.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058775

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 61 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Petersen, M. 1986. Levees and associated flood control works. Pp. 422–438 In: River engineering. Englewood Cliffs, NJ: Prentice-Hall.

Pimentel, D., L. Lach, R. Zuniga, and D. Morrison. 1999. Environmental and economic costs associated with non-indigenous species in the United States. Ithaca, NY: Cornell University College of Agriculture and Life Sciences.

Plant Conservation Alliance. 2000. Alien plant invaders of natural areas: weeds gone wild. (http://www.nps.gov/plants/alien/fact.htm). Washington, DC: Bureau of Land Management.

Planty-Tabacchi, A-M., E. Tabacchi, R. J. Naiman, C. Deferrari, and H. Décamps. 1996. Invasibility of species-rich communities in riparian zones. Conservation Biology 10:598–607.

Platts, W. S. 1991. Livestock grazing. Pp. 389–423 In: Influences of forest and rangeland management on salmonid fishes and their habitats. W. R. Meehan (ed.). Special Pub. 19. Bethesda, MD: Amer. Fish. Soc. 751 pp.

Platts, W. S., and R. L. Nelson. 1985. Will the riparian pasture build good streams? Rangelands 7:7–10.

Poff, N. L., J. D. Allan, M. B. Bain, J. R. Karr, K. L. Prestegaard, B. D. Richter, R. E. Sparks, and J. C. Stromberg. 1997. The natural flow regime. BioScience 47:769–784.

Ponce, S. L. (ed.). 1983. The potential for water yield augmentation through forest and range management. Water Resources Bull. 19(3):351–419.

Postel, S. L., G. C. Daily, and P. R. Ehrlich. 1996. Human appropriation of renewable freshwater. Science 271:785–788.

Prichard, D., et al. 1998. A user guide to assessing proper functioning condition and supporting science for lotic areas. Technical reference 1737-15. Denver, CO: Bureau of Land Management, National Applied Resource Science Center. 126 pp.

Ralph, S. C., G. C. Poole, L. L. Conquest, and R. J. Naiman. 1994. Stream channel morphology and woody debris in logged and unlogged basins of western Washington. Canadian Journal of Fisheries and Aquatic Sciences 51:37–51.

Reiter, M. L., and R. L. Beschta. 1995. Effects of forest practices on water. In: Cumulative effects of forest practices in Oregon: literature and synthesis. Salem, OR: Oregon Department of Forestry.

Richards, C., and G. E. Host. 1994. Examining land use influences on stream habitats and macroinvertebrates: a GIS approach. Water Resources Bulletin 30:729–738.

Richards, C., L. B. Johnson, and G. E. Host. 1996. Landscape scale influences on stream habitats and biota. Canadian Journal of Fisheries and Aquatic Sciences 53(1):295–311.

Richardson, B. Z., and M. M. Pratt. 1980. Environmental effects of surface mining of minerals other than coal: annotated bibliography and summary report. General Technical Report INT-95. Ogden, UT: USDA Forest Service. 145 pp.

Roath, L. R., and W. C. Krueger. 1982. Cattle grazing and influence on a forested range. J. Range Mgmt. 35:332–338.

Robbins, S. D., Jr. 1991. Wisconsin birdlife. Population and distribution, past and present. Madison, WI: University of Wisconsin Press. 702 pp.

Robertson, R. J., and N. J. Flood. 1980. Effects of recreational use of shorelines on breeding bird populations. Canadian Field Naturalist 94:131–138.

Rood, S. B., and S. Heinze-Milne. 1989. Abrupt riparian forest decline following river damming in Southern Alberta. Canadian Journal of Botany 67:1744–1749.

Rood, S. B., and J. M. Mahoney. 1990. The collapse of river valley forests downstream from dams in the western prairies: probable causes and prospects for mitigation. Environmental Management 14:451–464.

Rood, S. B., and J. M. Mahoney. 1991. Impacts of the Oldman River dam on riparian cottonwood forests downstream. Department of Biological Sciences, University of Lethbridge, Alberta, Canada. 34 pp.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058776

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 62 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Rood, S. B., J. M. Mahoney, D. E. Reid, and L. Zilm. 1995. Instream flows and the decline of
    riparian cottonwoods along the St. Mary River, Alberta. Can. J. Bot. 73:1250–1260.

Rood, S. B., K. Taboulchanas, D. E. Bradley, and A. R. Kalischuk. 1999. Influence of flow regula-
    tion on channel dynamics and riparian cottonwoods along the Bow River, Alberta. Rivers
    7(1):33–48.

Rowe, P. B. 1963. Streamflow increases after removing woodland–riparian vegetation from a south-
    ern California watershed. Journal of Forestry 61:365–370.

Rundquist, L. A., N. E. Bradley, J. E. Baldrige, P. D. Hampton, T. R. Jennings, and M. R. Joyce.
    1986. Best management practices for placer mining. Juneau, AK: Entrix, Inc. 250 pp.

Schoof, R. 1980. Environmental impact of channel modification. Water Resources Bulletin
    16(4):697–701.

Schueler, T. R. 1987. Controlling urban runoff: a practical manual for planning and designing urban
    BMPs. Washington, DC: Metropolitan Washington Council of Governments.

Schueler, T. R. 1995. The importance of imperviousness. Watershed Protection Techniques 1(3):100–
    112.

Schultz, R. C., J. P. Colletti, T. M. Isenhart, C. O. Marquez, WE. W. Simpkins, and C. J. Ball. 2000.
    Riparian forest buffer practices. Pp. 189–281 In: North American agroforestry: an integrated
    science and practice. Madison, WI: American Society of Agronomy.

Schumaker, N. H. 1996. Using landscape indices to predict habitat connectivity. Ecology 77(4):1210–
    1225.

Scott, M. L., M. A. Wondzell, and G. T. Auble. 1993. Hydrograph characteristics relevant to the
    establishment and growth of western riparian vegetation. Pp. 237–246 In: Proceedings of the
    13th Annual American Geophysical Union Hydrology Days. H. J. Morel-Seytoax (ed.).
    Atherton, CA: Hydrology Days Publications.

Scott, M. L., P. B. Shafroth, and G. T. Auble. 1999. Responses of riparian cottonwoods to alluvial
    water table declines. Environmental Management 23(3):347–358.

Sedell, J. R., and Froggatt. 1984. Importance of streamside forests to large rivers: the isolation of the
    Willamette River, Oregon, U.S.A., from its floodplain by snagging and streamside forest re-
    moval. International Association of Theoretical and Applied Limnology 22:1828–1834.

Sedell, J. R., and K. J. Luchessa. 1981. Using the historical record as an aid to salmonid habitat
    enhancement. Pp. 210–223 In: Acquisition and utilization of aquatic habitat inventory informa-
    tion. N. B. Armantrout (ed.). Bethesda, MD: American Fisheries Society. 376 pp.

Sedell, J. R., and R. L. Beschta. 1991. Bringing back the "bio" in bioengineering. American Fisheries
    Society Symposium 10:160–175.

Sedell, J. R., F. H. Everest, and F. J. Swanson. 1982. Fish habitat and streamside management: past
    and present. Pp. 245–255 In: Proceedings of the Society of American Foresters Annual Meet-
    ing, Bethesda, MD.

Sedell, J. R., F. N. Leone, and W. S. Duval. 1991. Water transportation and storage of logs. Pp. 325–
    368 In: Influences of forest and rangeland management on salmonid fishes and their habitats.
    W. R. Meehan (ed.). Special Publication 19. Bethesda, MD: American Fisheries Society. 751
    pp.

Shaver, E., J. Maxted, G. Curtis and D. Carter. 1994. Watershed protection using an integrated
    approach. In: Stormwater NPDES related monitoring needs: engineering foundation. August 7–
    12, 1994. Crested Butte, CO: American Society of Civil Engineers.

Shaw, D. W., and D. M. Finch, tech. coords. 1996. Desired future conditions for southwestern
    riparian ecosystems: bring interests and concerns together. General Technical Report RM-
    GTR-272. Fort Collins, CO: USDA Forest Service. 359 pp.

Sheridan, D. 1979. Off-road vehicles on public lands. Washington, DC: Council on Environmental
    Quality.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058777

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 63 of 310

Slack, J. R., A. M. Lamb, and J. M. Landwehr. 1993. Hydro-climatic data network (HCDN) streamflow data set, 1874–1988. Water Resources Investigations Report 93-4076. Washington, DC: U.S. Geological Survey.

Smith, S. D., A. B. Wellington, J. L. Nachlinger, and C. A. Fox. 1991. Functional responses of riparian vegetation to streamflow diversion in the Eastern Sierra Nevada. Ecological Application 1:89–97.

Snyder, W. D., and G. C. and Miller. 1991. Changes in plains cottonwoods along the Arkansas and South Platte Rivers—Eastern Colorado. Prairie Naturalist 23:165–176.

Stanford, J. A., J. V. Ward, W. J. Liss, C. A. Frissel, R. N. Williams, J. A. Lichatovich, and C. C. Coutant. 1996. A general protocol for restoration of regulated rivers. Regulated Rivers 12: 391–413.

Starnes, L. B. 1983. Effects of surface mining on aquatic resources in North America. Fisheries 8:2–4.

Stein, B. A., and S. R. Flack. 1996. America's least wanted: alien species invasions of U.S. ecosystems. Arlington, VA: The Nature Conservancy.

Stine, S., D. Gaines, and P. Vorster. 1984. Destruction of riparian systems due to water development in the Mono Lake watershed. Pp. 528-533 In: California riparian systems: ecology, conservation, and productive management. R. Warner and C. Hendricks (eds.). Berkeley, CA: University of California Press..

Stoddart, L. A., and A. Smith. 1955. Range management, 2nd edition. New York: McGraw-Hill.

Stohlgren, T. J., K. A. Bull, Y. Otsuki, C. A. Villa and M. Lee. 1998. Riparian zones as havens for exotic plant species in the central grasslands. Plant Ecol. 138:113–125.

Strahan, J. 1984. Regeneration of riparian forests of the Central Valley. In: California riparian systems: ecology, conservation, and productive management. R. Warner and C. Hendricks (eds.). Berkeley, CA: University of California Press. Pp. 58-67.

Stromberg, J. C., and D. T. Patten. 1990. Riparian vegetation instream flow requirements: a case study from a diverted stream in the eastern Sierra Nevada, California. Environmental Management 14(2):185–194.

Stromberg, J. C., and D. T. Patten. 1991. Instream flow requirement for cottonwoods at Bishop Creek, Inyo, CA. Trout Unlimited 2:1–11.

Stromberg, J. 1998. Dynamics of Freemont cottonwood (*Populus fremontii*) and saltcedar (*Tamarix chinesis*) populations along the San Pedro River, Arizona. Journal of Arid Environments 40:133–155.

Stromberg, J. C., D. T. Patten, and B. D. Richter. 1991. Flood flows and dynamics of Sonoran riparian forests. Rivers 2:221–235.

Stuber, R. J. 1985. Trout habitat, abundance, and fishing opportunities in fenced vs. unfenced riparian habitat along Sheep Creek, Colorado. Pp. 310–314 In: Riparian ecosystems and their management: reconciling conflicting uses. Gen. Tech. Bull. RM-120. USDA Forest Service.

Swift, B. L. 1984. Status of riparian ecosystems in the United States. Water Resources Bulletin 20(2):223–228.

Taylor, C. E., K. L. Magrath, P. Folley, P. Buck, and S. Carpenter. 1996. Oklahoma vascular plants: additions and distributional comments. Proceedings of the Oklahoma Academy of Science 76:31–34.

Taylor, J. N., W. R. Courtenay, Jr., and J. A. McCann. 1984. Known impacts of exotic fishes in the continental United States. Pp. 322–373 In: Distribution, biology and management of exotic fishes. W. R. Courtenay, Jr and J. R. Stauffer, Jr. (eds.). Baltimore, MD: The John Hopkins University Press.

The Nature Conservancy. 2001. Weeds on the web: the worst invaders. (http://tncweeds.ucdavis.edu/worst.html)

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058778

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 64 of 310

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Thomas, D. L., D. C. Perry, R. O. Evans, F. T. Uzuno, K. C. Stone, and J. W. Gilliam. 1995. Agricultural drainage effects on water quality in Southeastern U.S. Journal of Irrigation and Drainage Engineering 121(4):277-282.

Titus, J. G., et al. 1991. Greenhouse effect and sea level rise: the cost of holding back the sea. Coastal Management 19:171–210.

Townsend, P. A. 2001. Relationships between vegetation patterns and hydroperiod on the Roanoke River floodplain, North Carolina. Plant Ecology 156:43–58.

Trombulak, S. C., and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology 14:18–30.

Turner, M. G. 1989. Landscape ecology: the effect of pattern on process. Ann. Rev. Ecol. Syst. 20:171–197.

Turner, R. E., and N. N. Rabalais. 1991. Changes in Mississippi River water quality this century. BioScience 41:140–147.

Turner, S. F., and H. E. Skibitzke. 1952. Use of water by phreatophytes in a 2000-foot channel between Granite Reef and Gillespie Dams, Maricopa County, Arizona. Transactions of the American Geophysical Union 33:66–72.

U.S. Department of Agriculture (USDA). 1997. Census of agriculture, volume 1: part 51, chapter 2. Washington, DC: USDA National Agricultural Statistics Service.

USDA Natural Resources Conservation Service (USDA NRCS). 1998. State of the Land. Land Cover/Use. http://www.nhq.nrcs.usda.gov/land/index/cover_use.html, 18 Nov. 1998.

USDA, NRCS. 2001a. Chinese privet, *Ligustrum sinense*. Plants Database (http://plants.usda.gov/plants/). Baton Rouge, LA: National Plant Data Center.

USDA, NRCS. 2001b. Plants Database (http://plants.usda.gov/plants/). Baton Rouge, LA: National Plant Data Center.

USDA Forest Service (USFS). 1993. Forest ecosystem management: an ecological, economic and social assessment. 1993-793-071. Washington, DC: U.S. Government Printing Office.

USDA Forest Service. 1999. Notice: Authorization of livestock grazing activities on the Sacramento grazing allotment, Sacramento Ranger District, Lincoln National Forest, Otero County, NM. Federal Register 64:24132.

U.S. Department of the Interior Bureau of Land Management (BLM) and USDA Forest Service (USFS). 1994. Rangeland reform '94 draft environmental impact statement. Washington, DC: U.S. Department of the Interior Bureau of Land Management and USDA Forest Service.

Van Dorp, D., and P. F. M. Opdam. 1987. Effects of patch size, isolation and regional abundance on forest bird communities. Landscape Ecology 1:59–73.

Verme, L. J., and W. F. Johnston. 1986. Regeneration of northern white cedar deeryards in upper Michigan. J. Wildl. Manage. 50:307–313.

Verry, E. S., J. S. Hombeck, and D. A. Dolloff. 2000. Riparian management in forests of the eastern United States. New York: Lewis Publishers. 402 pp.

Warren, R. S., and W. A. Niering. 1993. Vegetation change on a northeast tidal marsh: interaction of sea-level rise and marsh accretion. Ecology 74:96–103.

Wauchope, R. D. 1978. The pesticide content of surface water draining from agricultural fields – a review. J. Environmental Quality 7:459–472.

Wear, D. N., M. G. Turner, and R. O. Flamm. 1996. Ecosystem management with multiple owners: landscape dynamics in a southern Appalachian watershed. Ecological Applications 64(4):1173–1188.

Webb, R. H., and H. G. Wilshire, eds. 1983. Environmental effects of off-road vehicles: impacts and management in arid regions. New York: Springer-Verlag.

Wilcove, D. S., D. Rothstein, J. Bubow, A. Phillips, and E. Losos. 1998. Quantifying threats to imperiled species in the United States. BioScience 48:607–615.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058779

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 65 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Wilkinson, C. F. 1992. The miner's law. Pp. 28–74 In: Crossing the next meridian. Washington, DC: Island Press.

Williams, K. K., C. Ewel, R. P. Stumpf, F. E. Putz, and T. W. Workman. 1999. Sea-level rise and coastal forest retreat on the west coast of Florida, USA. Ecology 80(6):2045–2063.

Williamson, K. J., D. A. Bella, R. L. Beschta, G. Grant, P. C. Klingeman, H. W. Li, and P. O. Nelson. 1995. Gravel disturbance impacts on salmon habitat and stream health, Volume 1: Summary report. Corvallis, OR: Oregon Water Resources Research Institute Oregon State University, 52 pp.

World Commission on Dams. 2000. Dams and development: a new framework for decision-making. London and Sterling, VA: Earthscan Publications Ltd.

Zucker, L. A., and L. C. Brown (Eds.). 1998. Agricultural drainage: water quality impacts and subsurface drainage studies in the midwest. Ohio State University Extension Bulletin 871. Columbus, OH: The Ohio State University.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058780

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

# 4

# Existing Legal Strategies for
# Riparian Area Protection

Public recognition of the importance of wetlands resulted in the 1970s in a national-level regulatory system for their protection (NRC, 1995). Not until the 1990s, however, have riparian areas begun to receive legal recognition as places requiring special attention. During the last decade, a patchwork of federal, state, and local laws and programs has developed that, directly and indirectly, begins to acknowledge the importance of riparian areas and to require or encourage special management to restore or protect their essential functions. The degree of protection, the focus, and the spatial coverage of these laws and programs are highly variable at federal, state, and local levels. Although riparian areas perform many valuable functions, it is their importance to stream water quality and fisheries that prompted most of the laws and programs that afford them protection.

A key differential in the level of protection given to riparian areas is their ownership status. There are approximately 2.3 billion acres of land in the United States, including Alaska and Hawaii. Of this total, 550 million acres are owned by the federal government—about 24 percent. The proportion of land in the public domain varies from state to state, from less than 0.2 percent in Iowa to 77 percent in Nevada. The largest federal government holdings are in the 12 western states (AK, AZ, CA, CO, ID, MT, NM, NV, OR, UT, WA, and WY) with much of this land being managed by the U.S. Forest Service (USFS) and the Bureau of Land Management (BLM).

Ownership may be shared, as where a stream forms the boundary between adjoining tracts, or along federally defined navigable waters where the state owns the bed and banks, but the adjacent lands above the mean high water are owned by another entity. An additional property interest is ownership of the water itself

225

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058781

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 67 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

or of a right to its use. Thus, legal protections for riparian areas and any recommendations for changes in their management must account for both the property interests in the relevant waters and lands and the fact that most riparian areas are linear features that cross ownership/jurisdictional boundaries. An example of this complexity is the Interior Columbia River Basin, which contains 74 separate federal land units, including 35 national forests and 17 BLM districts, as well as significant private, state, and tribal holdings—all of which must be taken into account when formulating a joint, comprehensive management plan.

Protection of riparian areas has been approached in a variety of ways (Table 4-1). One approach, exemplified by the National Environmental Policy Act (NEPA)—and comparable laws in some states—is to require identification and analysis of adverse environmental effects that would be caused by federal actions, along with consideration of less environmentally damaging alternatives. Such an approach is not specific to riparian areas, nor does it require their protection, but it does ensure attention to their environmental values if they would be potentially affected by a proposed federal action. Examples in which environmental impact statements have focused on riparian values are discussed in this chapter.

A second approach is to place special limitations on activities in riparian areas on publicly owned lands. For example, in the Pacific Northwest logging and other activities are restricted in riparian reserves that have been established on federal lands in order to protect salmon. Many of the benefits provided by riparian areas—wildlife habitat, water quality protection, channel stability, and maintenance of fisheries—are public in nature.

A third approach is to regulate activities on private riparian areas. Such regulation must necessarily protect the legal rights of property owners while limiting those land uses deemed unacceptably harmful to public interests. Protec-

TABLE 4-1  General Approaches for Riparian Area Protection

| Approach | Example |
| --- | --- |
| 1. Required impact identification | National Environmental Policy Act and State Environmental Policy Acts |
| 2. Special management areas on public lands | Northwest Forest Plan |
| 3. Private land development/use regulation | State and local stream buffer requirements |
| 4. Financial incentives, technical assistance, education | Farm Bill programs |
| 5. Public/nonprofit purchase of private riparian lands or interests in lands | Greenway programs, conservation easements |

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058782

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 68 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

tion of riparian habitat essential for federally protected endangered species is one example of this approach. Other examples are found in statewide programs that restrict certain types of activities on lands adjacent to waterbodies, such as the Massachusetts Rivers Protection Act and the New Hampshire Comprehensive Shoreland Protection Act. Many states restrict timber harvesting on private lands adjacent to streams. In addition, many local communities use their land-use authority to limit new construction in streamside areas.

Fourth, incentives such as cost-sharing, low-cost loans, or tax reductions may be used to encourage good practices on private riparian areas, and special technical assistance and education may be used as well. At the national level, several Farm Bill programs provide incentives for moving intensive agricultural practices away from streams; several states have similar programs.

Fifth, privately owned riparian lands can be purchased—either in fee or by easement—for public management. The desirability of riparian areas for recreational use has prompted urban areas to acquire riparian lands for greenways (Smith and Hellmund, 1993). The remarkable growth in the number of land trusts in recent years has provided another vehicle for protection of private lands utilizing conservation easements. Federal—and an increasing number of state—tax laws provide incentives for landowners to donate such easements.

This chapter sets out the general legal and management frameworks that now apply to the protection of riparian areas. First reviewed are the federal, state, and local laws and programs directed, at least in part, to protect and restore essential functions and values of privately owned riparian lands. Both regulatory and nonregulatory approaches are discussed. Then, federal laws and policies applying to publicly owned riparian areas are presented, organized by category of federal public land. Next, laws governing the use of water resources are considered in relation to supporting riparian areas. Two federal programs that have significant potential to expand protection of riparian areas are given in-depth consideration. A final section considers the efficacy of the existing framework and evaluates the need for additions and changes.

## PROTECTION OF PRIVATELY OWNED RIPARIAN AREAS

Most riparian lands are in private ownership, especially in the eastern portion of the United States. The value of riparian lands to a private landowner most often is measured in terms of their economic benefits rather than their ecological functions. Private owners of riparian lands typically have only limited motivation to use these areas in a manner protective of their functions. In the absence of improved education about riparian functioning, legal strategies for protecting the ecological values of privately owned riparian lands must be based either on implementing regulatory requirements or on providing special incentives. Alternatively, such areas may be purchased for public ownership and management.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058783

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 69 of 310

## Regulatory Approaches

Regulatory approaches are especially well suited to situations in which private gain from the development and use of land and natural resources causes unacceptable public loss, with the negative consequences of the action falling largely or entirely on someone other than the developer or user. Typically, land and resource developers may be required through a permit process to alter or restrict the manner of development in order to reduce its negative effects. Even-handed application of the requirements imposes the same burden on all similarly situated land and resource owners and developers. Regulatory approaches must further a legitimate public purpose and cannot deprive a property owner of all economically beneficial use of the property (unless the government pays compensation).

### Federal Programs

Except for wetlands, there is no national regulatory program that attempts to manage ecologically harmful activities within riparian areas. Although the link with water, and hence commerce, has provided a legal basis for federal control of dredge-and-fill activities in wetlands, private land-use regulation generally is within the province of states. Nevertheless, there are federal programs that apply to certain activities in riparian areas.

**National Environmental Policy Act.** The National Environmental Policy Act (NEPA) requires federal agencies to examine the potential adverse environmental effects of proposed major actions that would significantly affect the quality of the human environment. Alternatives to the proposed action must also be considered. NEPA is not itself a regulatory law in that no particular result is required by this statute, but the environmental analysis serves to disclose both the existence of environmental problems and less environmentally damaging approaches. Although NEPA applies only to proposed federal actions, it often extends to private activities requiring some form of federal approval or receiving federal financing.

Litigation under NEPA involving riparian areas has chiefly involved claims that environmental impacts were not adequately addressed or mitigated. *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989 (9th Cir. 1993), for example, considered whether likely impacts of a proposed hydroelectric power facility on a riparian area and its bald eagle habitat were adequately evaluated. The need to prepare a full environmental impact statement rather than simply an environmental assessment has been the subject of other litigation. For example, in *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202 (E.D. Cal. 1999), a federal district court concluded that a National Park Service environmental assessment of a proposed highway reconstruction project provided insufficient details to assess the likely project impacts on the Merced River or its riparian corridor.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058784

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 70 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Clean Water Act.** The Clean Water Act (CWA) has the stated goal of restoring and maintaining the chemical, physical, and biological integrity of the nation's waters. It focuses jointly on human and aquatic ecosystem health by establishing a water-quality goal of "fishable and swimmable" and "zero pollution" for all bodies of water. Although many sections of the act indirectly address riparian areas, the section most relevant to their protection (other than Section 404) is Section 303(d), which requires states and the U.S. Environmental Protection Agency (EPA) to identify waters not meeting state water-quality standards and to develop Total Maximum Daily Loads (TMDLs). A TMDL is the maximum amount of a pollutant that a water-body can receive and still be in compliance with state water-quality standards. After determining TMDLs for impaired waters, states are required to identify all point and nonpoint sources of pollution in a watershed that are contributing to the impairment and allocate reductions to each source in order to meet the state standards. Although TMDLs have been required under the Clean Water Act since 1972, their development did not begin in earnest until forced by widespread litigation during the 1990s (Houck, 2000; NRC, 2001).

Although it has been a matter of debate for some time, recent court rulings have confirmed that the TMDL program applies to both point and nonpoint sources of pollution (*Pronsolino v. Marcus*, 1999). Thus, it is likely that implementation plans to achieve water quality standards in impaired water-bodies will involve a variety of management strategies in riparian areas. The potential for such strategies, and for application of the TMDL program in general, to protect and restore riparian areas is considered in depth later in this chapter.

**Wetlands Regulation.** Section 404 of the Clean Water Act provides authority for a national program supervising the discharge of dredged and fill materials into "waters of the United States," defined by regulation to include at least some wetlands.[1] Under this regulatory program, wetlands that meet the jurisdictional definition cannot be dredged or filled without a permit from the U.S. Army Corps of Engineers (Corps). The Corps subjects permit applications to a review that considers a wide range of factors, including whether there are reasonable alternative locations. If no reasonable alternative can be identified and the need for the activity is demonstrated, consideration is given to mitigation measures and, as a last resort, to compensation for lost wetlands.

Although some wetlands occur within riparian areas, many riparian areas do not meet the jurisdictional definition of wetlands. Thus, activities occurring in

---

[1]The Supreme Court case known as SWANCC, decided in January 2001, raises some doubts as to whether all wetlands are within the Corps' regulatory jurisdiction. A federal judge in Virginia is currently considering whether the Corps has authority to require a 404 permit to fill a wetland that is not adjacent to a navigable stream.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058785

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 71 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

such areas are not subject to the permit requirements of Section 404. Moreover, Congress and the Corps have exempted from 404 requirements normal farming, silviculture, and ranching activities as well as maintenance of structures such as dikes, levees, and dams and construction and maintenance of irrigation and drainage ditches.

**Floodplain Regulation.** The federal government spends several billion dollars a year on flood control and related water management projects in an attempt to reduce the roughly $4 billion per year of flood losses that occur in this country (Federal Interagency Floodplain Management Task Force, 1992). Encouraged by the National Flood Insurance Act of 1968, all states now have legislation authorizing local governments to adopt regulations restricting certain types of development within floodplains. Several states have adopted statewide floodplain management regulations. To be eligible for federal flood insurance, state and local programs must delineate the "regulatory floodway"—an area capable of passing a 100-year flood without increasing the water surface elevation by more than one foot. "Encroachments" such as buildings that would increase this elevation more than one foot may not be permitted.

Traditionally, floodplain management has focused on human safety and protection of investments. Riparian protection has not been a stated objective of such management. In fact, many of the structural responses to flood control, such as construction of levees and straightening of stream channels, have been harmful to riparian areas. The Interagency Floodplain Management Review Committee (the Galloway Committee) recommended more explicit recognition of the environmental values of floodplains in its 1994 report *Sharing the Challenge: Floodplain Management into the 21st Century*. In particular, the committee recommended a better-focused and more coordinated federal effort under the U.S. Department of the Interior to purchase either fee or conservation easement interests in frequently flooded lands with environmental values. In addition, it urged the commitment of ongoing federal funding following construction of federal flood-control projects to protect associated environmental values. It encouraged expanded use of the authority now given to the Corps to mitigate the environmental losses associated with already-constructed flood-control projects. In response, Congress expanded the 1996 Water Resources Development Act, Section 1135, program to allow for small environmental restoration projects when it is found that a Corps project has contributed to environmental degradation.

**Endangered Species Act.** The federal Endangered Species Act (ESA) has served as authority to regulate the development and use of land in riparian areas that provide essential habitat for a listed threatened or endangered plant or animal species. Under this law, federal agencies are prohibited from taking any action likely to jeopardize the continued existence of protected species, including destroying or adversely modifying their designated critical habitat. Moreover, the

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058786

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 72 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

ESA makes it unlawful for any person to "take" a protected animal species, defined to include harming, harassing, or killing such species.

Because riparian areas provide habitat for an abundance of plant and animal species, especially in the more arid western states, they have been the focus of the ESA is some cases. For example, federal land management agencies in the Pacific Northwest have established extensive networks of riparian reserves along streams in national forests and other federal public lands to afford protection to the Northern spotted owl and anadromous fish. These riparian reserves are expected to also provide habitat protection to a wide range of other aquatic and terrestrial wildlife species.

The prohibition against "taking" a protected species is motivating habitat protection on private lands as well, sometimes in riparian areas. Authorized under Section 10 of the ESA, habitat conservation plans provide a means whereby otherwise lawful activities that might incidentally cause take of a protected species can go forward in return for implementation of conservation measures. For example, as a condition of undertaking development that would destroy the riparian habitat of a protected species, a habitat conservation plan could provide for protection of similar habitat on some other private land. Such an approach is now under development in the Front Range of Colorado to provide protection for the Preble's meadow jumping mouse, a listed threatened species found only within riparian areas of foothills streams (see Box 4-1).

Riparian areas are entitled to *affirmative* protection under the ESA if (1) they occur on federal lands and provide habitat to any listed species or any species proposed for listing or (2) if they are within designated critical habitat. Riparian habitat has been included in the critical habitat designations for numerous fish species or stocks (e.g., coho salmon, steelhead, winter-run chinook, desert pupfish, Sonoran chub, Railroad Valley springfish), mammals (riparian brush rabbit and riparian woodrat), birds (least Bell's vireo and southwestern willow flycatcher), and reptiles (concho watersnake) (50 C.F.R. §§ 17.11, 17.95, 226.10, 226.12, 226.204).

**Surface Mining Control and Reclamation Act.** The Surface Mining Control and Reclamation Act (SMCRA) sets permitting requirements, environmental protection performance standards, and reclamation requirements for surface coal mines on private and public lands. The regulatory structure can afford protection of riparian areas. For example, applicants for permits are required to submit site-specific information about fish and wildlife resources when the permit area or adjacent area is likely to include "habitats of unusually high value for fish and wildlife such as important streams, wetlands, [and] riparian areas" (30 C.F.R. § 780.16). Applications must also include a protection and enhancement plan, which includes "protective measures that will be used during the active mining phase," such as establishing buffer zones and monitoring surface water quality and quantity. The plan must also include "enhancement measures that will be used during

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058787

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 73 of 310

232                                                                                          *RIPARIAN AREAS*

---

**BOX 4-1**
**Preble's Meadow Jumping Mouse**

On May 12, 1998, the U.S. Fish and Wildlife Service (FWS) listed the Preble's meadow jumping mouse as a threatened species under the Endangered Species Act. The Preble's mouse, an 8- to 10-inch-long mouse with a tail that accounts for at least 60 percent of its length and with long hind feet adapted for jumping, lives only in well-vegetated riparian areas along the foothills and adjacent plains of the Front Range of Colorado and Wyoming. Sites with willows are particularly favored. Preble's mice are nocturnal creatures, and they hibernate for a good portion of the year. Always considered rare, the Preble's mouse has been declining in numbers in recent years. Fragmentation and loss of its riparian habitat from human use and development have been identified as the primary factors causing this decline.

The Endangered Species Act attempts to protect listed species in two primary ways. First, it prohibits a federal agency from taking an action that might adversely affect the continued existence of the species, including modification of its designated critical habitat. Second, it prohibits any person subject to the jurisdiction of the United States from "taking" a listed species. "Taking" is defined to include harassing, harming, or killing a species, as well as destroying its habitat.

Counties along the rapidly growing Colorado Front Range are attempting to develop habitat conservation plans that will provide for long-term protection of riparian habitat needed by the Preble's mouse. Likely conservation strategies include precluding or minimizing new development within known or likely Preble's habitat, requiring new activities within riparian areas to use best management practices to minimize impacts, and developing habitat "banks" of preserved or restored riparian areas to compensate for habitat unavoidably lost to new development.



---

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058788

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 74 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

the reclamation and postmining phase of operation to develop aquatic and terrestrial habitat," such as stream and wetland restoration.

Mine operators are directed to use the best technology available to minimize disturbances and adverse impacts on fish, wildlife, and related environmental values and to "achieve enhancement of such resources where practicable" (30 C.F.R. § 816.97a). Operators must further "avoid disturbances to, enhance where practicable, restore, or replace wetlands, and riparian vegetation along rivers and streams and bordering ponds and lakes," as well as "habitats of unusually high value for fish and wildlife" (30 C.F.R. § 816.97f). Generally, mining is not to occur within 100 feet of a stream.

**Coastal Zone Management Act.** Originally enacted in 1972 and significantly amended by the Coastal Zone Act Reauthorization Amendments of 1990, the Coastal Zone Management Act (CZMA) authorizes significant federal financial and technical assistance to states that establish a satisfactory Coastal Management Plan. All federal actions occurring within or affecting the coastal zone are to be "consistent" with the state Coastal Management Plan. Minimum plan requirements include identification of permissible land uses within the coastal zone; designation of areas of particular concern; identification of means for controlling land uses; and establishment of planning processes for providing public access to beaches and other high-value areas, for preventing erosion, and for siting of energy facilities.

The 1990 amendments required states to develop a coastal nonpoint source pollution control program and to submit it to the National Oceanic and Atmospheric Administration (NOAA) and EPA for approval. NOAA and EPA must evaluate whether the state's coastal zone boundary extends inland sufficiently far to control land and water uses significantly impacting coastal waters. EPA guidance for program compliance endorses many familiar best management practices for controlling nonpoint source pollution, including "streamside special management areas" to protect streams from logging and measures for controlling grazing in erosion-sensitive areas such as riparian areas and wetlands (EPA, 1993). The guidance recognizes both the pollution-abatement functions of riparian areas as well as their potential to become sources of nonpoint pollution if degraded. Because the CZMA is designed to protect water quality, and riparian areas are the last line of defense between receiving waters and upland sources of pollution, most state CZMA programs require riparian area protection as a means of meeting the goals of the CZMA. This is being done through protection of functioning riparian areas and restoration of nonfunctioning riparian areas where possible.

**Federal Power Act.** Under the Federal Power Act, the Federal Energy Regulatory Commission (FERC) regulates essentially all nonfederal hydroelectric power facilities. In 1986, Congress amended the Federal Power Act to require FERC to give "equal consideration" to energy conservation, protection of fish

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058789

*RIPARIAN AREAS*

and wildlife, protection of recreational opportunities, and preservation of general environmental quality, along with the power generation potential of a river, in its licensing and relicensing process. FERC's "Manual of Standard Special Articles" requires license applicants to submit a wetland mitigation plan and a wildlife mitigation plan that will be included in their license (FERC, 1992). In addition, for projects with a reservoir, the applicant must provide a management plan providing for a shoreline buffer zone.

The relicensing process on the Deerfield River in Vermont and Massachusetts in the early 1990s provides an example of the act's potential for protecting riparian areas. New England Power Company (NEP) operates eight dams along the river with 15 generating units, all covered by a single FERC license that expired in 1991. As part of its license-renewal process, NEP worked out a comprehensive settlement with 15 parties that included commitments to maintain flows below each of its dams at levels sufficient to protect fisheries and to make scheduled white-water releases for boaters. In addition, NEP committed to spending $200,000 to improve waterfowl and wildlife habitat and to permanently protect (with conservation easements) over 18,000 acres of riparian and watershed lands owned by NEP—primarily as shoreline buffers around its reservoirs (Kimball, 1997).

*State and Local Regulatory Programs*

States can regulate land use in the exercise of their sovereign police power. Traditionally, states have delegated this authority to local government. For matters determined to be of statewide importance, however, states may exercise this authority directly. The importance of protecting riparian areas has prompted several states to establish state-level regulatory programs beyond those authorized for floodplain regulation. The most common form of regulation is to establish buffer zones (setbacks) adjacent to waterways in which development is precluded or limited. It should be noted that state and local setback regulations on private land have been or are likely to be ruled constitutional, as discussed in Box 4-2.

**Statewide Shoreline or Riverfront Protection.** Several states have made riparian areas a subject of special attention. A comprehensive approach has been taken by Massachusetts. The 1996 Rivers Protection Act established a state-level permit system for development activities within a "riverfront" area (Rivers Protection Act, MGL chapter 131). A riverfront area is defined as a corridor 200 feet wide (or 25 feet on each side in large municipalities and in densely populated areas) along all perennial rivers and streams. Proposed development in riverfront areas must demonstrate no significant adverse effects on water supplies, wildlife habitat, fisheries, shellfish, groundwater, and flood and pollution prevention.

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 76 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Moreover, there must be no practicable economic alternatives to the development for which effects would be less adverse.

New Hampshire enacted the Comprehensive Shoreland Protection Act in 1994. Under this law, shorelands within 250 feet of public waters are designated for special protection. Public waters are defined to include all fresh waterbodies, natural or impounded; coastal waters; and rivers of fourth-order size or greater. Certain types of activities, such as solid or hazardous waste facilities and automobile junkyards, are prohibited within protected shorelands. Statewide minimum standards, which relate to such things as location of septic systems, sediment controls, tree cutting, and minimum lot size, are established to govern all development within protected shorelands (North Country Resource Conservation and Development Area Inc., 1995).

Wisconsin has a "shoreline" zoning program regulating property uses within 1,000 feet of a lake or 300 feet of a stream or its floodplain (Wis. Admin. Code ch. NR 115). This program establishes minimum lot sizes within a shoreline area, requires a 75-foot setback for buildings, and restricts clearcutting activities.

The Montana Natural Streambed and Land Preservation Act requires any person or entity proposing to do work that would physically alter the bed or banks of a perennial stream on public or private land to obtain a permit from the Board of Supervisors of the local Conservation District.

**Forest Practices Acts.** Forestry practices on private riparian forestlands are prescribed by the individual states. Oregon enacted the first legislation for private forest practices in 1972. Since that time, 40 states and U.S. territories have established either mandatory forest practices or best management practices (BMPs) (Figure 4-1). Oregon, Washington, California, Idaho, Montana, Alaska, and Minnesota have established regulations for forest practices on private lands that generally specify widths of riparian management zones (RMZs) and the amount of partial timber harvest allowed within the RMZs. RMZs on private lands generally apply to riparian areas within 100 feet or less of perennial streams. Additional rules address road building, road crossings, yarding systems, replanting, leave trees, and harvest unit dimensions. Thirty-three (33) states and territories have used voluntary programs based either on best management practice guidelines or on achieving water-quality standards. These programs rely on training and education programs and on voluntary compliance by forest operators. Almost a quarter of the states have no explicit guidelines or legislation for private forest practices. Table 4-2 lists the riparian management approaches required by state forest practice acts in states and territories and the agencies responsible for their enforcement (if necessary).

In general, riparian buffers on public lands are often more extensive than those on private lands. On public lands, buffer widths range from less than 25 ft (7.5 m) to more than 500 ft (150 m), while widths of riparian buffers on private

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058791

## BOX 4-2
## Takings

Land-use regulation to protect riparian areas may be hindered by private property rights-related concerns that stem in part from "takings" law. Takings law derives from the Fifth Amendment to the U.S. Constitution, which states "nor shall private property be taken for public use without just compensation." In other words, governments are not prohibited from "taking" property; they are only forbidden to appropriate property for a nonpublic purpose or to appropriate it without paying for it. A taking can be direct, physical occupation or confiscation of property, or it may result from a regulation that restricts property use. Physical invasions by government are more readily ruled takings than are restrictions of use, known as "regulatory takings." Only rarely have courts ruled that land-use regulation has "taken" property in violation of the Constitution.

Defining an unconstitutional taking is difficult. The U.S. Supreme Court's approach involves ad hoc, factual inquiries rather than developing a set formula for determining when "justice and fairness" require that the economic injuries caused by public action be compensated by the government (*Penn Central Transportation Co. v. City of New York*, 1978). Key considerations, however, include the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation interferes with distinct, investment-backed expectations, as well as "the character of the government action" (*Ibid*).

The Court has often said mere diminution in the value of property is insufficient to demonstrate a taking. For instance, the Court upheld a Los Angeles zoning ordinance, which reduced the value of property by 92 percent by forbidding the continuation of brick-making (*Hadacheck v. Sebastian*, 1915). Comprehensive zoning regulations, which can sharply reduce property values, have long been upheld (*Euclid v. Ambler Realty Co.*, 1926).

One example of a regulation having gone too far was established in *Lucas v. South Carolina Coastal Council* (1992). The Court held that a regulation that "deprives land of all economically beneficial use" effects a taking, unless the "proscribed use interests were not part of the [landowner's] title to begin with." Courts have long recognized that private property rights are not absolute; for instance, they are subject to the state's power to abate "nuisances." The *Lucas* Court explained that if the government prohibits some use (here, the right to build on beachfront property) not traditionally prohibited or deemed a nuisance under state law, and thus destroys the economic value of private property interests that pre-date the regulatory prohibition, it must pay for the property taken.

One difficulty with takings law is identifying the relevant parcel or unit of property—i.e., the "denominator." For example, if a landowner challenges a regulation that prevents her from building on two riparian acres of an undivided ten-acre tract, a court should examine not the reduced value of the two acres, but the impact of the prohibition on the entire tract. However, not all courts have concurred. In *Loveladies Harbor, Inc. v. U.S.* (1994), the Federal Circuit Court of Appeals was asked to decide whether the

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058792

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 78 of 310

Corps' refusal to issue a permit to fill wetlands "took" the plaintiff's property. Before wetlands regulation, Loveladies had developed and sold the majority of a 250-acre tract. In the 1980s, Loveladies was denied a federal permit to develop the remaining 12.5 acres. The court decided that 12.5 acres was the proper denominator. The fair market value of the 12.5-acre tract fell from $2,658,000 to $12,500 after permit denial. The court concluded that this was a taking.

Another wetlands case, *Florida Rock Industries v. United States*, took up a different issue—whether a regulation that "deprives the owner of a substantial part but not essentially all of the economic use or value of the property, constitute[s] a partial taking, and is it compensable as such." According to the Federal Circuit, the line between a compensable partial taking and a noncompensable "mere diminution" is unresolved. This issue, it said, necessitates a balancing of the benefits to the public (of which Florida Rock is a part) and the burden on the individual owner. Compensation is due, the court said, when application of the *Penn Central* tests "indicates that this plaintiff was singled out to bear a burden which ought to be paid for by society as a whole." The claims court concluded that Florida Rock was such a plaintiff because its investment-backed expectation had been entirely frustrated and the government had entirely taken the company's common-law right to remove minerals from its property.

A more recent Supreme Court takings case examined not a denial of development rights, but the conditions placed on development. *Dolan v. City of Tigard* (1994) involved the expansion of a retail store. By a 5-4 vote, the Court struck down building permit conditions requiring the property owners to dedicate to the city about ten percent of their property, within the floodplain of a creek, for use as a public greenway and bicycle path. The Court said the city had not justified why the Dolans must dedicate property to the city, as opposed to simply leaving it undeveloped, nor had the city documented the bike path's effect on traffic congestion. The majority did not discuss the fact that the regulation would affect only ten percent of the property, nor that the property's value would be *increased* as a result of the conditional permit. The majority did express concern that the permit condition would deny the owner "one of the most essential sticks in the bundle of rights that are commonly characterized as property"—the "right to exclude" the public.

Thus, several takings issues remain unresolved: (1) whether and how other courts will distinguish between compensable partial takings and noncompensable mere diminution in property values, (2) how to determine the denominator in takings analyses, (3) whether *Dolan* applies to all conditions on development permits or only to required dedications of land, and (4) how courts should weigh benefits of a land-use regulation to the public against its burden on an individual property owner. Despite this uncertainty, certain predictions concerning riparian area regulations are possible. First, protecting or restoring riparian areas is undoubtedly a public purpose. Thus, a regulation that restricts or conditions use of property to promote that purpose would *not* likely be deemed to "take" property unless it (1) left the owner no economically viable use of the entire parcel, (2) authorized public access, and/or (3) imposed a burden on the landowner that is disproportionate to the impact of the desired property use.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058793

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 79 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

### State Forest Practices



FIGURE 4-1 Proportion of states and U.S. territories with regulations on forest practices, with best management practice guidelines (includes use of BMPs or water quality standards), and with no legislated guidelines.

commercial forest lands, if required, generally range from 25 to 100 ft (10–30 m). Although an increasing number of states have incorporated regulatory buffers into forest practice rules, no states have regulatory buffer requirements for agricultural or grazing practices.

**Special Area Protection.** Some state legislatures have identified areas in which protection of riparian areas is particularly important and have established a special program for this purpose. For example, in the Delta Protection Act of 1992, California established special planning requirements for activities on lands within the delta of the Sacramento and San Joaquin Rivers—a 738,000-acre area that drains 40 percent of the state's water. One of the requirements is to preserve and protect riparian and wetlands habitat. In 1999, the North Carolina Environmental Management Commission adopted rules to protect 50-ft-wide riparian buffers along waterways in the Neuse and Tar-Pamlico river basins. Although existing uses are exempt, new activities and land uses are prohibited within 50 feet of waterbodies, unless approved by the state. The primary motivation for establishing these buffers was to reduce nutrient loadings.

On a larger scale, the federal and state governments have combined to establish the Chesapeake Bay Program to restore and protect this major estuary. Parties to the 1983 Chesapeake Bay Agreement include Maryland, Pennsylvania, Virginia, the District of Columbia, the Chesapeake Bay Commission (a tri-state legislative body), EPA, and others. As part of its ongoing efforts to reduce water pollution, the Chesapeake Executive Council adopted a directive in 1994 to protect and restore riparian buffer forests along tributaries to the Chesapeake Bay.

The Chesapeake Bay states themselves have established special programs. Virginia's 1988 Chesapeake Bay Preservation Act defines "resource protection areas" as "sensitive lands at or near the shoreline that have an intrinsic water

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058794

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

quality value due to the ecological and biological processes they perform or are sensitive to impacts which may cause significant degradation to the quality of state waters" (Section 9VAC10-20-80 A). The act designates a riparian buffer of not less than 100 ft wide along the bay and its tributaries in which activities are significantly restricted. Vegetation "effective in retarding runoff, preventing erosion, and filtering nonpoint source pollution" is to be retained if present or established if it does not exist. The act further requires that local governments use their land-use authority to, for example, subject proposed development within the 100-ft buffer to a water-quality impact assessment and to limit development to facilities that are "water-dependent" or that constitute redevelopment of existing facilities. The width requirements are lessened for agricultural lands enrolled in a government-funded BMP program or a soil and water-quality conservation plan. Special provisions apply to forestry within Streamside Management Zones—areas 50–200 feet from a stream.

In 1984, Maryland established the Chesapeake Bay Critical Area Program. The "critical area" consists of all land within 1,000 feet of the mean high-water line of tidal waters or the landward edge of tidal wetlands or tributary streams. The program's goals are to minimize adverse impacts on water quality that result from pollutants; conserve fish, wildlife, and plant habitat in the critical area; and establish land-use policies for the Chesapeake Bay Critical Area that accommodate growth. Similar to Virginia, Maryland has established criteria to minimize the adverse effects of human activities on water quality and natural habitats and to foster consistent, uniform, and more sensitive development activity within the critical area. These criteria involve classifying land as "intensely developed areas," "limited development areas," or "resource conservation areas" and regulating activities accordingly. In addition, local jurisdictions are required to designate habitat protection areas, which include the naturally vegetated 100-ft buffer along waterways; nontidal wetlands; the habitats of threatened and endangered species and species in need of conservation; significant plant and wildlife habitat; and anadromous fish-spawning areas. Even agricultural lands within the critical area are required to control nutrient runoff by establishing a 25-ft vegetated filter strip along tidal waters, wetlands, or tributary streams or by using equivalent BMPs.

**Local Land-Use Regulation.** Far more common than statewide or special area regulatory programs are local government regulations for land use adjacent to water. State statutes authorizing local governments to regulate land use within their jurisdiction often include language specifically authorizing protection of environmental values. Such regulations usually establish setbacks along streams or around lakes within which certain types of land uses—most commonly, the building of homes or other structures—are discouraged or prohibited. For example, to protect its drinking water supply, New York City has entered into a Watershed Memorandum of Agreement with local governments in the upstate

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058795

240                                                    *RIPARIAN AREAS*

TABLE 4-2  Riparian Management Approaches on Private Forest Lands in
States and Territories

| State | Approach | Regulatory Guidelines | Voluntary Guidelines | Management Area Width | Harvest Practices | Agency[a] |
|---|---|---|---|---|---|---|
| Alabama | BMP | None | Primary | 35–50 ft | Not limited | Alabama F |
| Alaska | Regulations | Primary | | 100 ft | Partial | Alaska DN |
| Arizona | BMP | None | Primary | | Not limited | Arizona D |
| Arkansas | BMP | Secondary | Primary | 35–150 ft | Not limited | Arkansas |
| California | Regulations | Primary | Secondary | 100 ft | Partial | California |
| Colorado | BMP, Reg. | Secondary | Primary | | Not limited | Colorado S |
| Connecticut | WQ Std | None | Primary | | Not limited | Connecticu |
| Delaware | BMP | None | Primary | | Not limited | Dept. of A |
| | | | | | | Forest S |
| District of Columbia | None | None | None | | Not limited | Dept. of T District |
| Florida | BMP | Secondary | Primary | 35–200 ft | Not limited | Florida Di |
| Georgia | BMP | Secondary | Primary | 15 ft | Not limited | Georgia Fo |
| Hawaii | WQ Std | None | None | 35–160 ft | Not limited | Dept. of H Branch |
| Idaho | Regulations | Primary | Secondary | 30–75 ft | Partial | Bureau of |
| Illinois | BMP | None | Primary | | Not limited | DNR, Divi |
| Indiana | BMP | None | Primary | 75–200 ft | Not limited | DNR, Divi |
| Iowa | WQ Std | None | None | 50–150 ft | Not limited | DNR, Divi |
| Kansas | None | None | None | | Not limited | NA |
| Kentucky | BMP | Secondary | Primary | | Not limited | Kentucky |
| Louisiana | WQ Std | None | None | 35–100 ft | Not limited | Louisiana and For |
| Maine | BMP | None | Primary | | Not limited | Maine For |
| Maryland | BMP | Secondary | Primary | 75–250 ft | Not limited | DNR, Fore |
| Massachusetts | BMP | None | Primary | 50–450 ft | Partial | NA |
| Michigan | BMP | Secondary | Primary | | Not limited | DNR, Fore Division |
| Minnesota | Regulations | Primary | Secondary | 50–250 ft | Partial | DNR, Divi |
| Mississippi | BMP | None | Primary | 30–60 ft | Not limited | Mississipp Commis |
| Missouri | None | None | None | | Not limited | Dept. of C |
| Montana | Regulations | Primary | Secondary | | Partial | Dept. of N Conserv Division |
| North Carolina | BMP | Secondary | Primary | | Not limited | North Caro Forest R |
| North Dakota | BMP | None | Primary | | Not limited | North Dak |
| Nebraska | BMP | None | Primary | 50–200 | Not limited | Dept. of F Wildlife |

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

ls in

| Harvest Practices | Agency[a] | Legislative Authorization |
|---|---|---|
| Not limited | Alabama Forestry Commission | None |
| Partial | Alaska DNR | Alaska Forest Resources and Practices Act |
| Not limited | Arizona DEQ | Arizona Nonpoint Source Pollution Program |
| Not limited | Arkansas Forestry Commission | None |
| Partial | California Dept. of Forestry | Z'Berg-Nejedly Forest Practice Act of 1973 |
| Not limited | Colorado State Forest Service | Forest Management Definitions; Statute 39-1-102 |
| Not limited | Connecticut DEQ | Water Quality Standards |
| Not limited | Dept. of Agriculture/ Forest Service | Watershed Protection Program |
| Not limited | Dept. of Trees and Lands, District Government | None |
| Not limited | Florida Division of Forestry | None |
| Not limited | Georgia Forestry Commission | Best Management Practices for Forestry |
| Not limited | Dept. of Health, Clean Water Branch | Administrative Rules; Water Quality Standards |
| Partial | Bureau of Forest Assistance | Idaho Forest Practices Act |
| Not limited | DNR, Division of Forestry | Conservation and Water Resources Statutes |
| Not limited | DNR, Division of Forestry | Water Quality and Wetland Statutes |
| Not limited | DNR, Division of Forestry | Water Quality Standards |
| Not limited | NA | None |
| Not limited | Kentucky Division of Forestry | Kentucky Forest Conservation Act; Kentucky Agriculture Water Quality Act |
| Not limited | Louisiana Dept. of Agriculture and Forestry | Water Quality Standards |
| Not limited | Maine Forest Service | None |
| Not limited | DNR, Forest Service | Maryland Best Management Practices for Forest Harvests; Maryland Forest Service Tree Laws; Forest Conservation Act, Maryland Seed Tree Law; Maryland Reforestation Law; Maryland Tree Expert Law; Roadside Tree Law |
| Partial | NA | None |
| Not limited | DNR, Forest Management Division | Best Management Practices for Water Quality; Michigan Public Act of 1994; DEQ Regulations |
| Partial | DNR, Division of Forestry | Minnesota Sustainable Forest Resources Act of 1998; Forest Management Guidelines |
| Not limited | Mississippi Forestry Commission | None |
| Not limited | Dept. of Conservation | None |
| Partial | Dept. of Natural Resources & Conservation, Forestry Division | Montana Forest Practices Statutes; Montana Streamside Management Zone Law |
| Not limited | North Carolina Division of Forest Resources | Sedimentation Pollution Control Act; Forest Practices Guidelines and Best Management Practices |
| Not limited | North Dakota Forest Service | Forest Resource Management Program |
| Not limited | Dept. of Forestry, Fish, & Wildlife | None |

*continues*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058797

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 83 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**TABLE 4-2  Continued**

| State | Approach | Regulatory Guidelines | Voluntary Guidelines | Management Area Width | Harvest Practices | Agency[a] |
|---|---|---|---|---|---|---|
| Nevada | BMP | Primary | Secondary | | Partial | Dept. of C Natural of Fores |
| New Hampshire | WQ Std | Secondary | Primary | 50–150 ft | Not limited | Division o |
| New Jersey | WQ Std | None | None | | Not limited | State Fore: |
| New Mexico | BMP | Secondary | Primary | | Not limited | New Mexi and Nati |
| North Carolina | BMP | None | Primary | 20–200 ft | Partial | NA |
| New York | None | None | None | | Not limited | Division o |
| Ohio | BMP | None | Primary | | Not limited | DNR, Divi |
| Oklahoma | BMP | None | Primary | | Not limited | Oklahoma |
| Oregon | Regulations | Primary | Secondary | 20–100 ft | Partial | Oregon D |
| Pennsylvania | BMP | None | Primary | 35–250 ft | Not limited | Bureau of |
| Puerto Rico | None | None | None | | Not limited | Forest Ser |
| Rhode Island | None | None | None | | Not limited | Division o |
| South Carolina | BMP | None | Primary | 40–160 ft | Not limited | Forestry C |
| South Dakota | BMP | Secondary | Primary | | Not limited | Division o Conserv |
| Tennessee | BMP | None | Primary | | Not limited | Division o |
| Texas | BMP | None | Primary | 50 ft | Not limited | Texas For |
| Utah | BMP | None | Primary | 35–100 ft | Not limited | DNR, Divi Fire, an |
| Vermont | None | None | None | | Not limited | Dept. of F Recreati |
| Virginia | BMP | None | Primary | 35–50 ft | Not limited | Dept. of F |
| Washington | Regulations | Primary | Secondary | 50–200 ft | Partial | Dept. of N |
| West Virginia | BMP | None | Primary | 50–100 ft | Not limited | Forestry D |
| Wisconsin | WQ Std | None | Primary | 35–100 ft | Not limited | DNR, Divi |
| Wyoming | BMP | None | Primary | | Not limited | Office of S Investm Division |

[a]DNR: State Department of Natural Resources; DEQ: State Department of Environmental Quality.

NA: Information not available.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058798

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*EXISTING LEGAL STRATEGIES FOR RIPARIAN AREA PROTECTION*          243

| Harvest Practices | Agency[a] | Legislative Authorization |
|---|---|---|
| Partial | Dept. of Conservation & Natural Resources, Division of Forestry | Nevada Administrative Code for Forest Practices; Nevada Administrative Code for Forest Practices and Division Reforestation |
| Not limited | Division of Forests and Lands | New Hampshire Rivers Management and Protection Program; Water Quality Standards |
| Not limited | State Forestry Service | Water Quality Standards |
| Not limited | New Mexico Energy, Minerals, and Natural Resources Dept. | None |
| Partial | NA | NA |
| Not limited | Division of Lands and Forests | None |
| Not limited | DNR, Division of Forestry | Ohio Sustainable Forestry Initiative |
| Not limited | Oklahoma Forestry Services | Extension Circulars |
| Partial | Oregon Dept. of Forestry | Oregon Forest Practices Act of 1972 |
| | Bureau of Forestry | None |
| Not limited | Forest Services Bureau | None |
| Not limited | Division of Forest Environment | None |
| Not limited | Forestry Commission | State Endangered Species Act, Best Management Practices Guidelines |
| Not limited | Division of Resource Conservation and Forestry | Cooperative Forestry Assistance Act of 1978 |
| Not limited | Division of Forestry | Tennessee Forest Practices Guidelines |
| Not limited | Texas Forest Service | Texas Water Code; State Water Plan |
| Not limited | DNR, Division of Forestry, Fire, and State Lands | Utah Code/Water Quality Act; State Water Plan |
| Not limited | Dept. of Forest, Parks, and Recreation | Water Quality Issues |
| Not limited | Dept. of Forestry | None |
| Partial | Dept. of Natural Resources | Forest Practices Act of 1976 |
| | Forestry Division | NA |
| Not limited | DNR, Division of Forestry | Nonpoint Source Abatement Program, Water Quality Standards |
| Not limited | Office of State Lands and Investments, Forestry Division | Wyoming Rules and Regulations Database |

al Quality.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058799

Catskill, Delaware, and Croton watersheds that includes a variety of setback regulations for activities considered potentially harmful to water quality. Activities such as the placement of septic systems, siting of wastewater treatment plants, pesticide application, and construction of new impervious surfaces are prohibited on lands directly adjacent to reservoirs, streams, and wetlands in the watershed, although agricultural activities are exempt (NRC, 2000).

## Incentive-Based Approaches

A growing number of inducements are available to encourage private landowners to protect riparian areas. These inducements take the form of direct payments to landowners not to develop riparian lands, payments to encourage use of environmentally compatible practices, payments or tax benefits for placing a conservation easement on the property, funding for restoration or demonstration projects, stewardship education and technical assistance, and outright purchase of the lands. To be effective, incentives generally must at least equal the value of other use options available to the landowner.

### Payments to the Landowner from Public Programs

Typically, there have been no economic incentives for private landowners to protect the ecological functions of riparian areas. However, an increasing number of public programs are offering some form of payment in return for such protection. Since 1985, Congress has been authorizing Farm Bill programs that provide for retirement of croplands for environmental benefits in return for annual payments. The largest of these Farm Bill programs is the Conservation Reserve Program (CRP) under which highly erodible or environmentally sensitive cropland may be retired for a period of years in return for annual rental payments and cost-share assistance for converting and maintaining the land. About 36 million acres of farmland are enrolled in CRP (which has a legal limit of 36.4 million acres). Annual payments amount to approximately $1.8 billion, an average of approximately $50 per acre. Since its inception, the program has increasingly emphasized the importance of water quality and wildlife habitat benefits as priority objectives for land retirement. Lands providing filter strips and riparian buffers adjacent to waterbodies have been given special attention, including a 10 percent incentive payment to landowners to enroll.

The Conservation Reserve Enhancement Program (CREP) brings federal funding to state-initiated and supported programs focused on converting agricultural lands for conservation benefits. Maryland established the first CREP program to create buffer strips within 150 feet of a stream. The impact of the CRP and CREP programs on protection of riparian areas is considered in detail later in this chapter.

Copyright © National Academy of Sciences. All rights reserved.

The Wetlands Reserve Program (WRP) provides payments to agricultural landowners who enter into conservation easements under which croplands are turned back into wetlands for at least 30 years. In addition, a restoration cost-share agreement provides up to 75 percent of the cost of wetland restoration. If the landowner agrees to a permanent easement, the U.S. Department of Agriculture (USDA) will pay 100 percent of the costs of restoring the wetland. As of July 2000, about 915,000 acres were enrolled in this program.

Some of the incentives-based programs discussed above require landowners to protect highly erodible lands, wetlands, and riparian areas as a condition for participating in federal farm programs that subsidize agricultural production. This "conservation compliance" approach has resulted in the protection of many environmentally sensitive areas and particularly riparian areas, as farming was not profitable in many areas of the country without participation in the subsidy programs. Conservation compliance was based on the conviction that, because the agricultural community was receiving tens of billions of dollars per year in subsidies, it was reasonable for the agricultural community to protect water quality. Unfortunately, conservation compliance ended in 1995 with the passage of the Freedom to Farm Act, which in theory terminated most agricultural commodity subsidy programs along with the incentive to participate in conservation programs. There may be an opportunity to reintroduce conservation compliance in the near future because agriculture has not been very profitable since the end of crop subsidy programs, and there is some support for reintroducing a formal federal price support system.

### Cost-Share Programs

Cost-sharing programs are used alone or in combination with land retirement as a means of generating conservation benefits. In return for making improvements or utilizing management practices deemed environmentally beneficial, the landowner receives back some share of the associated costs. An example is the Environmental Quality Incentive Program, established in the 1996 Farm Bill. The landowner submits a conservation plan, prepared with assistance from the Natural Resources Conservation Service (NRCS), proposing practices to address environmental concerns in priority areas. Up to 75 percent of the costs may be reimbursed during the period of the contract. In some instances, special incentive payments are available to pay 100 percent of the associated costs. Under the Wildlife Habitat Incentives Program, cost-sharing assistance is available to landowners to develop wildlife habitat. Partners for Fish and Wildlife, administered by the U.S. Fish and Wildlife Service and state wildlife agencies, also provides cost-share funding to landowners interested in protecting or restoring wetland habitat on their lands. Still another source of federal cost-share funding is the Rivers, Trails, and Conservation Assistance Program, administered by the Na-

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 87 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

tional Park Service (NPS). Cooperative projects directed toward river and trail enhancement are eligible for funding and technical assistance.

In an effort to encourage riparian buffers in agricultural areas, the USDA initiated the National Conservation Buffer Initiative (NCBI) in 1997. Designed as a private–public partnership, this effort has established a goal of 2 million miles of buffer by 2002. The initiative includes corporate support through a subsidiary group—the National Conservation Buffer Council. To date the primary emphases of NCBI have been marketing and education; no additional funds have been made available through the initiative to support buffer implementation. As of March 1, 2001, NCBI reported that over 1 million miles of buffers[2] had been established through many buffer programs (e.g., CRP, CREP, WRP). However, there is little landowner knowledge of NCBI (NRCS, 1999), and there is no way to determine whether the efforts of NCBI have had any appreciable effect on the rate or extent of buffer installation.

*Conservation Easements*

Apart from public programs, nearly every state allows for conservation easements. The use of such easements for environmental protection of private lands has expanded exponentially in recent years (NRC, 1993). An easement is a legally enforceable agreement between a landowner and another party to maintain private lands for specified conservation purposes in perpetuity (Land Trust Alliance, 1996). Potential incentives to the landowner are the ability to limit future uses of land (e.g., to keep the land in agricultural use or as permanently protected open space), receipt of the fair market value of the easement (generally the development value of the property), and various tax incentives (described below). A nonprofit land trust, a conservation organization such as The Nature Conservancy, or a government agency typically holds the easement and is responsible for ensuring its implementation. The land remains in private ownership. No organization acquires conservation easements specifically for protection of riparian areas. Yet, because in the West riparian areas provide essential habitat for a large number of plant and animal species, conservation efforts in this region often emphasize protection and restoration of riparian lands.

North Carolina enlisted the use of conservation easements as a means of voluntarily moving swine operations out of the 100-year floodplain following the massive flooding caused by Hurricane Floyd in 1999. Landowners were invited

---

[2]This figure includes riparian buffers, filter strips, grassed waterways, shelterbelts, windbreaks, living snow fences, contour grass strips, cross-wind trap strips, shallow water areas for wildlife, field borders, alley cropping, herbaceous wind barriers, and vegetative barriers. These buffers are not equivalent to fully functioning riparian areas as described in Chapter 2. In addition, some of the buffers are "in field" rather than in the riparian area.

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 88 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

to submit a bid to the North Carolina Department of Environment and Natural Resources for purchase of a perpetual easement that would prohibit use of the land as a feedlot or for associated animal waste operations, prohibit non-agricultural development, require a soil and water conservation plan, and require implementation and maintenance of a minimum 35-ft forested riparian buffer along adjacent perennial or intermittent streams.

## Tax Incentives

A growing number of tax incentives encourage landowners to protect the environmental values of their property. An important incentive for landowners to voluntarily donate a conservation easement on their property to a qualified organization is that federal income tax law allows a deduction over a 6-year period of the fair market value of the easement from the landowner's adjusted gross income (not to exceed 30 percent of the total income in any year) (Small, 1995). Many states offer a similar incentive. In addition, federal estate taxes may be reduced because the easement is deemed to have limited the value of the inherited property. Finally, some states authorize reduced local property tax assessments on properties covered by conservation easements.

A number of states have tax incentives directed specifically at, or applicable to, riparian lands. For example, Virginia authorizes local governments to exempt "riparian buffers" from property taxation (Va. Stat. § 58.1-3666). Under this statute, a riparian buffer is defined as "an area of trees, shrubs or other vegetation, subject to a perpetual easement permitting inundation by water, that is (i) at least 35 ft in width, (ii) adjacent to a body of water, and (iii) managed to maintain the integrity of stream channels and shorelines and reduce the effects of upland sources of pollution by trapping, filtering, and converting sediments, nutrients, and other chemicals." Idaho offers income tax credits to landowners equal to half of the costs of fencing riparian areas for managing livestock grazing or for controlling erosion (Id. Stat. § 63-3024B).

## Restoration/Protection/Demonstration Programs

A number of federal and state programs provide funding for projects that can restore impaired or lost ecological functions of riparian areas. Funding made available under Section 319 of the Clean Water Act is intended to encourage demonstration projects addressing nonpoint source pollution. In many cases, these projects focus on improvements in riparian areas. For example, the Lake Champlain Basin Agricultural Watersheds Project utilized grazing management, livestock exclusion, and streambank protection as tools to reduce concentrations and loadings of phosphorus, nitrogen, suspended solids, and bacteria in two treatment watersheds. Riparian fencing was used to exclude cattle access, and bioengineering techniques were used to restore streambanks. After two years,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058803

significant reductions in all parameters were documented. In North Carolina's Neuse River Basin, a 319 project is evaluating the effectiveness of vegetative riparian buffers and controlled drainage in order to determine the preferred best management practice for reducing nutrients.

Since 1986, Congress has been increasing the role of the Corps in river channel and wetlands restoration. The 1986 Water Resources Development Act declared that all environmental improvements included by the Corps within their projects are to be considered economically justifiable. The act specifically authorized fish and wildlife mitigation measures, and it provided authority for the Corps to undertake restoration activities as needed to offset the environmental problems created by previous flood-control and navigation projects. A dramatic example of this new role is the half-billion-dollar Kissimmee River Restoration Project, which is reestablishing wetland conditions in the river's historic floodplain (see Chapter 5).

---

**BOX 4-3**
**Riparian Restoration at Bear Creek, Iowa**

Management agencies often struggle with designing effective riparian programs because of funding constraints within individual agency programs and the limited nature of agency expertise. This suggests that development of interdisciplinary research teams (including soil scientists, geologists, ecologists, economists, fisheries and wildlife scientists, and others) and partnerships among local, state, and federal agencies, nongovernmental organizations (NGOs), and private industry could expedite protection of riparian areas. The Bear Creek, Iowa, riparian demonstration project along with the development of the Riparian Management System (RiMS) exemplifies both of these characteristics and has become a role model for subsequent research, demonstration, and management.

Initiated simply as an effort to accomplish research in an agricultural setting, the project has grown from working with a single landowner on a modest section of Bear Creek to its present state of nearly eight miles of riparian restoration. It is run by a partnership of diverse research and funding entities. The RiMS project has also been adopted as the guiding principle for buffer development by the nonprofit group Trees Forever, which has a five-year goal of 100 riparian demonstration or project sites in Iowa and which has just recently expanded into an Illinois buffer initiative of comparable magnitude.

The Bear Creek watershed is a 3,100-acre (7,661-ha) agricultural area located just northeast of Ames, IA. Narrow (2–4 miles or 3–6 km) and long (22 miles or 35 km), the watershed is 87 percent row crops, primarily in private ownership, and has a highly modified hydrology. In general, the watershed is typical of many Midwestern water-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058804

States also have established programs to support restoration and protection efforts, including ones benefiting riparian areas. Arizona's Water Protection Fund provides funding for measures to enhance and restore rivers and streams and associated riparian habitats. California has established the Riparian Habitat Conservation Program, which uses funding from federal grants, private donations, and other sources to preserve and enhance riparian habitat. As part of a statewide program for developing water basin plans for wetlands and riparian area restoration, North Carolina established a Riparian Buffer Restoration Fund for restoration, enhancement, or creation of riparian buffers. Oregon has an extensive program promoting watershed management in which management and protection of riparian areas are the principal goals, with funding made available from the Oregon Watershed Enhancement Board. As described in Box 4-3, restoration and demonstration projects in riparian areas often require multiple sources of funding and interdisciplinary participation to achieve success.

sheds from Ohio to the eastern Dakotas. Presettlement conditions in the Bear Creek watershed consisted of rolling prairie, marshes, and very limited forest, with stream flows being intermittent and seasonal. Defined stream channels were difficult to find in many areas of the watershed based on 1847 land survey notes. As early as 1902, major changes to the watershed were brought about by drainage and land conversion. Significant channelization occurred into the 1970s, resulting in vastly altered hydrology and in changes in the biota, reflecting degraded habitat, increased turbidity, and warmer water temperatures (Schultz et al., 1995; Isenhart et al., 1997).

In 1990, initial headway was made by developing a partnership with a local conservation-minded landowner willing to allow experimentation with riparian management systems on his property. Ironically, many of the funding programs such as continuous CRP that are currently available to landowners were not available to the owners of the original study property. Hence, riparian management has expanded into upstream areas supported by funding that was not available to the people who took the initial risk. Nonetheless, working in the production agriculture setting forced the development of a riparian management system that is economically viable and practical to implement.

Also vital to the success of the Bear Creek project has been the cooperative nature of the research partners. Partners involved in the research component of Bear Creek include scientists from Iowa State University, the Leopold Center for Sustainable Agriculture, National Soil Tilth Laboratory, EPA, NRCS, and others. Current research and demonstrations are being conducted on riparian lands owned by ten farmer cooperators. in addition, 11 professional consultants from various government agencies and NGOs are cooperating with the team. The Bear Creek project demonstrates the importance of a collegial atmosphere among participants, obtaining funding from a wide variety of sources, and patience and perseverance.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058805

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

## Summary

Table 4-3 summarizes the many regulatory and nonregulatory approaches used by the states to address protection of privately owned riparian areas. The extreme variation in approaches is remarkable. A significant limitation of many of the approaches is that their success is measured by the number of practices implemented and rarely by actual environmental improvements. For example, the National Conservation Buffer Initiative, the goal of which is to install 2 million miles of new riparian and upland buffers by 2002, is being touted as a means of improving water quality. Rather than requiring the collection of water-quality data to determine if water quality is actually improving, program success is measured by counting the "number of miles of buffers installed." The program has no systematic and scientific means of targeting efforts to the riparian areas that would most protect water quality.

Such indirect metrics of success are typical of state and federal conservation programs, and they are partially justifiable given the ease with which such measurements can be made. Indeed, actually measuring improvements in water quality and habitat may take decades, given the lag time between implementation of restoration activities and riparian system response. To convince policy makers and the public that progress is being made—even if there is no measurable improvement in water or habitat quality—these indirect measures are often used. Because of these uncertain metrics, and because many restoration programs are relatively new, it is difficult to know whether the federal, state, and local programs described above have been or will be effective in restoring structure and functioning to riparian areas on privately owned land.

## PROTECTION OF FEDERAL LANDS

Nearly 40 percent of the land area of the United States is in public ownership, primarily federal (Figure 4-2). In 1911, the U.S. Supreme Court in *Light v. United States* stated: "All of the [federal] public lands of the nation are held in trust for the people of the whole country." Congress can legislate to protect the public lands or any of the components thereof (e.g., wildlife, water, vegetation, or other resources) and to provide for the use, management, or disposal of the lands or their contained resources. States retain broad police powers over federal lands, subject to the federal government's power to preempt any state law that conflicts with a federal law or regulation. For example, states retain general authority to set hunting and fishing seasons and limits. Although only Congress may establish federal land policy, administrative agencies have extremely broad latitude to determine and conduct the day-to-day management of federal lands and resources (*United States v. Grimaud*, 1911).

All laws governing federal lands potentially affect riparian areas on those lands. Very few federal statutes, however, provide expressly for riparian area

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058806

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Copyright © National Academy of Sciences. All rights reserved.

TABLE 4-3  Types of State Laws and Policies for Protecting Privately Owned Riparian Areas in Representative States[a]

| State | Zoning or "Buffer" Regulations[b] | Permits or Preconstruction Approval[c] | Tax Incentives | Other Incentives to Private Owners[d] | Conservation Easements[e] | Timber Harvest Standards | Incentives ($ and/or Tech. Asst.) to Cities[f] | Land Acquisition Funds | Watershed Planning (nonregulatory) | General Policy Statement |
|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | | | | | | X | | | | |
| Arizona | | | | | | | | X | | X |
| California | X | | | X | | | X | X | | X |
| Florida | | | | | | | | X | | |
| Kansas | | | | X | X | | | | | |
| Idaho | | | | | | X | | | | |
| Maine | | | | | | | | | X | |
| Maryland | | | | X | | | X | | | |
| Massachusetts | X | | | X | | | X | X | | |
| Michigan | | X | | X | | | | X | X | |
| Montana | | | | | | X | | | | |
| Nebraska | | | | X | | | | | | |
| N. Mexico | | | | | | | | X | | |
| N. Carolina | X | X | | X | | | | X | X | X |
| Oregon | X | X | X | X | | X | X | | X | X |
| Virginia | | | | | | | | | X | |
| W. Virginia | | | | | | | | | | X |
| Wisconsin | X | | | X | | | | | | |

[a]This table is merely illustrative of the range of approaches states take to recognizing and protecting riparian values. It does not purport to catalogue all state laws and policies.

[b]Zoning regulations and buffer requirements may be difficult to distinguish. Each connotes regulation of development within a specified distance or a mapped district, and may include performance standards. Excluded from this category are timber harvest standards or similar "streamside management zone" regulations, which are referenced in the "Timber Harvest Standards" column of the table.

[c]Refers to something less comprehensive than zoning regulations or buffer requirements, e.g., Michigan's requirement of a permit and soil erosion plan for developments (other than logging or agriculture) within 500 feet of a water body.

[d]Includes economic incentives, education, and technical assistance.

[e]Note: Nearly all states provide by law for conservation easements. This column refers to those states that provide for state acquisition of an easement for such purposes. Several states authorize the expenditure of funds to acquire lands or waters, or interests therein, in riparian areas. These laws are referenced in the "Land Acquisition Funds" column of the table.

[f]Includes planning and restoration assistance, Greenbelt programs, training, etc.

BLM_0058807

252                                                                                    *RIPARIAN AREAS*



FIGURE 4-2  Percentage of land in public domain by state.

management or protection. (An exception is the National Wild and Scenic Rivers Act.) Thus, it is not surprising that federal agencies are not required to coordinate their riparian management activities. Conversely, no law prohibits them from doing so.

Most agencies have adopted rules or policies governing activities in, or potentially affecting, riparian areas. But vague or nonexistent legislative mandates and the lack of any coordination requirement have resulted in inconsistent riparian management—as exemplified in the Greater Yellowstone area (Harting and Glick, 1994). Moreover, federal agency responsibilities with respect to riparian areas vary greatly. Agencies may have regulatory authority but no land management authority (e.g., EPA). They may manage some lands but have only regulatory authority over other lands (e.g., FWS and the Corps). They may possess full regulatory and land management authority over lands entrusted to them by Congress (e.g., BLM, USFS, and NPS), or they may exercise service, technical, or advisory functions but possess no regulatory or land management powers (e.g., NRCS). Several federal regulatory or management regimes may apply to a given tract of land, and more than one federal agency may be responsible for implementing or overseeing those laws. For example, several agencies exercise authority under a panoply of statutes on the national forests. The USFS has primary responsibility for managing all surface resources, but BLM is responsible for managing and conveying interests in minerals. FWS and/or National Marine Fisheries Service have technical, regulatory authority with respect to federally listed threatened or endangered species (under the ESA), and the Corps

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

is responsible (under the CWA) for regulating dredge-and-fill activities in wetlands and streams. To further complicate matters, certain federal subsidies and policies, such as those related to flood prevention and control and agricultural practices, actually encourage the destruction of riparian habitat (Kusler, 1985).

Each of the land management agencies has some mandate to manage public lands with the national interest in mind. But "national interest" has no immutable, absolute meaning; indeed, its interpretation varies by land system. Moreover, such directives are usually paired with provisions allowing or requiring multiple uses and permitting individuals to obtain property or other interests in federal resources (such as timber contracts, mining claims, oil and gas leases, national park concessions, and federal grazing permits). Thus, riparian ecological concerns are balanced against (or reconciled with) other agency objectives for land and resource management. But unlike on private property, no individual user of federal land resources can maintain that a public riparian area should be managed for his benefit to the disadvantage or exclusion of others.

Finally, the federal government is required to comply with applicable state environmental laws and regulations—governing, e.g., water and air pollution—which may impact use and management of riparian areas on federal lands. Land-use planning is the domain primarily of states, but the federal government has prescribed planning and management standards for each system of federal public lands. In addition, federal agencies are generally directed to "coordinate," where possible, their planning activities with those of local and tribal governments.

This section describes (in alphabetical order) the major federal land systems and the respective agencies, statutes, and programs that encompass riparian area/resource considerations. The discussion is not exhaustive, as a complete survey of regulations and policies was not feasible. Statutes of minor importance have been omitted. Moreover, several statutes that affect management of federal lands and may bear on riparian area protection (e.g., NEPA, ESA, CWA, SMCRA) were discussed in the prior section. This section ends with a brief examination of state-owned submerged lands.

## Bureau of Land Management Lands

The Bureau of Land Management (BLM) manages approximately 267 million acres of land (including both surface and mineral estate), chiefly in the 11 western states and Alaska, along with an additional 300 million acres of subsurface mineral resources under lands owned or managed by others. Including Alaska, BLM lands contain 24 million acres of "riparian wetlands" and 178,000 miles of "riparian streams," 174,000 of which are fishable. Only about 1.2 million acres managed by BLM outside Alaska are riparian. More than 2,000 miles (25 miles in New Mexico with the rest in Oregon) of rivers on BLM lands are designated wild, scenic, or recreational. These designations encompass nearly 1 million acres of land (BLM, 2000a).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058809

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

254                                                                 *RIPARIAN AREAS*

Management of BLM lands is governed by the Federal Land Policy and Management Act (FLPMA, 43 U.S.C. §§ 1701–1784). FLPMA prescribes sustained-yield management principles, which apply to an open-ended list of "renewable and nonrenewable resources," including fish and wildlife, recreation, timber, range, wilderness, minerals, watershed, and natural, scenic, scientific, and historical values. The act further directs BLM, in managing the public lands, "to take any action necessary to prevent unnecessary and undue degradation of the lands."

Although riparian habitat is not expressly mentioned in FLPMA, many of its provisions implicitly authorize protection of riparian areas, and several BLM rules address riparian management and protection. Perhaps of greatest significance is FLPMA's requirement that the BLM "give priority to the designation and protection of areas of critical environmental concern," or ACECs. ACECs are defined to include areas "where special management attention is required . . . to protect and prevent irreparable damage to important . . . scenic values, fish and wildlife resources or other natural systems or processes." As of the end of 1999, BLM had designated nearly 13.1 million acres of ACECs, 5.9 million of which are in Alaska (BLM, 2000b). Riparian values are frequently a motivating factor for designating ACECs, especially in the Southwest. In a San Miguel River (Colorado) ACEC, for example, BLM proposed to "close relic [sic] riparian communities to all Bureau authorized actions," leaving the rest of the ACEC "open only to those Bureau authorized actions with an overriding public need that would not cause long-term visual impacts or damage riparian systems" (BLM, 1992). In 1986 the Alaska BLM proposed five ACECs in the Central Yukon Planning Area, one of which was established to "protect crucial riparian habitat associated with known peregrine falcon nesting areas." Four other ACECs with fish protection objectives included 300 feet along each side of the designated river (BLM, 1986).

Although ACECs often protect stream-related resources, riparian resources or values are often not expressly referenced as such in the designation notices. For example, in 1984 the Oregon BLM Office designated 35 special management areas, including ACECs, in part to protect riparian habitat or values. The descriptions of the areas used terms such as river canyons containing relict stands of old-growth trees, a river corridor with important scenic, fisheries, wildlife and botanic values, and a lake and bog ecosystem (BLM, 1984).

FLPMA requires BLM to prepare resource management plans (RMPs), which describe generally how an area will be managed to provide resources and services demanded by the public and commodity groups, while protecting the lands. In preparing and revising plans, the BLM is to use an interdisciplinary approach, incorporate current resources inventory data, weigh long-term benefits to the public against short-term benefits, provide for compliance with applicable environmental laws, and coordinate with state, local, and tribal land-use plans. Although FLPMA does not specify that RMPs consider riparian area values, at least

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 96 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

since 1990, BLM has pursued riparian management in planning documents and on-the-ground activities. In a 1991 initiative, BLM established national goals for wetland-riparian resources on public lands, including the objective of achieving proper functioning condition (PFC) for 75 percent of riparian areas by 1997 (BLM, 1991a). Furthermore, in 1994 the agency committed to several ecosystem management principles, including reconnecting isolated parts of the landscape: "Rivers will be managed in association with floodplains, and management activities in upland habitats will be considered for their effects on riparian areas" (BLM, 1994).

Since issuing its riparian initiative, BLM has been restoring 23.7 million acres of riparian wetlands. In 1993 the agency revised 180 site-specific management plans, surveyed nearly 2,000 miles of streams, constructed 567 riparian habitat improvement projects, acquired nearly 37,000 acres of riparian habitat, and implemented management plans on 145 riparian acres through partnerships with state and private cooperators. The agency's Fish and Wildlife 2000 initiative also focuses attention on riparian restoration in its range administration program. Finally, BLM, NRCS, and USFS participate in a National Riparian Service Team, which, along with its private and local government partners, is pursuing restoration efforts across the country on rivers such as the Mississippi, Sacramento, and San Pedro Rivers.

In 1994, BLM promulgated significant new rules governing livestock grazing. The rules were preceded by an environmental impact statement, in which the BLM and USFS concluded that "watershed and water quality would improve to their maximum potential" if livestock were removed entirely from federal lands (BLM and USFS, 1994). Instead of eliminating livestock grazing, however, the BLM required its managers to take appropriate action to ensure that:

(a) watersheds are in, or are making significant progress toward, properly functioning physical condition, including their upland, riparian-wetland, and aquatic components; soil and plant conditions support infiltration, soil moisture storage, and the release of water that are in balance with climate and landform and maintain or improve water quality, water quantity, and timing and duration of flow.

b) ecological processes, including the hydrologic cycle, nutrient cycle, and energy flow, are maintained, or there is significant progress toward their attainment, in order to support healthy biotic populations and communities.

(c) water quality complies with state water quality standards and achieves, or is making significant progress toward achieving, established BLM management objectives such as meeting wildlife needs.

(d) habitats are, or are making significant progress toward being, restored or maintained for federal threatened or endangered species, federal proposed species, Category 1 and 2 federal candidate species and other special status species.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058811

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 97 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

These "fundamentals of rangeland health" are followed by standards and guidelines for grazing administration. The regulations prescribe several minimum requirements, including "maintaining, improving, or restoring riparian-wetland functions, including energy dissipation, sediment capture, groundwater recharge, and stream bank stability" (43 C.F.R. § 4180.2(e)(3)). "Fallback" requirements apply where state or regional standards and guidelines had not been developed by late 1997. (Standards were not completed for all western states until late 2000.) A key fallback standard requires that riparian-wetland areas be in properly functioning condition.

Riparian area protection has also been proposed or accomplished on BLM lands through land exchanges and by withdrawing river corridors from mining. In addition, oil and gas operators on both BLM lands and national forests are required by regulation to protect riparian areas, floodplains, and wetlands.

### National Forests

The U.S. Forest Service (USFS) is responsible for managing approximately 140 million acres of national forests and 51 million acres of national grasslands. The bulk of USFS lands are managed for multiple uses—outdoor recreation, grazing, timber, watershed, and wildlife and fish. Uses of some national forest areas, however, are more restricted. Approximately 49.9 million acres (26 percent) of USFS lands were managed primarily for "conservation" as of 1994 (GAO, 1996). This included 34.6 million acres within the National Wilderness Preservation System, 128,000 miles of rivers and streams, 239,000 acres of national rivers (as of 1991) and 618,000 acres of designated wild and scenic rivers (as of 1994), 2 million acres of lakes and reservoirs, and 14 million acres of wetlands and riparian areas (half of which are in the West). National forests provide more than half of all steelhead and salmon spawning habitat—15,000 miles of anadromous fish habitat in the Columbia River Basin alone (Feldman, 1995).

Under the 1897 Organic Administration Act, national forests are established to "furnish a continuous supply of timber" and "secure favorable conditions of water flows," the latter of which is highly relevant to riparian area protection. This act authorized the USFS to issue regulations to meet these objectives and to prevent the destruction of the national forests. The National Forest Management Act of 1976 (NFMA) governs administration of the national forests. Most NFMA provisions are procedural, relating to the management plans that the USFS is required to prepare for each forest. Planning must be interdisciplinary, incorporate NEPA procedures, and reflect multiple-use, sustained-yield principles. The NFMA requires that the agency (1) determine which lands are physically and economically suitable for logging and (2) maintain "diversity of plant and animal species," including the "diversity of tree species similar to that existing in the region." In a number of places, the NFMA calls for consideration and protection

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058812

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 98 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

of watercourses and watersheds. One NFMA implementing regulation requires management of fish and wildlife habitat so as to "maintain viable populations of existing native and desired non-native vertebrate species" (36 C.F.R. § 219.19). Given the dependence of a high proportion of the West's fauna on riparian habitats, this mandate necessitates protecting riparian areas.

Despite the absence of explicit references to riparian areas in USFS authorizing legislation, riparian protection is an important objective on national forests and grasslands. The agency's 1990 Strategic Plan, which focused on enhancing recreation and fish/wildlife resources among other things, identified the effect of management actions on riparian areas as one of the most important issues facing the agency (Mohai and Jakes, 1996). As of 1993, the agency had made riparian wetlands management a priority and was increasing use of watershed analysis and assessment, modifying management practices, and undertaking an aggressive restoration program. Moreover, riparian ecosystem research is an important component of USFS biodiversity research efforts (Keystone Center, 1991).

## National Forest Plans

Though not in its guiding legislation, riparian protection is explicitly mentioned in USFS regulations, which prescribe minimum specific management requirements to be met in accomplishing goals and objectives for the National Forest System (36 C.F.R. § 219.27). Specifically, forest plans are directed to give "special attention" to

> land and vegetation for approximately 100 feet from the edges of all perennial streams, lakes, and other bodies of water. This area shall correspond to at least the recognizable area dominated by the riparian vegetation. No management practices causing detrimental changes in water temperature or chemical composition, blockages of watercourses, or deposits of sediment shall be permitted within these areas which seriously and adversely affect water conditions or fish habitat.

Management prescriptions also must "protect streams, streambanks, shorelines, lakes, wetlands, and other bodies of water," "maintain diversity of plant and animal communities," and "provide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species." Vegetative manipulations, including silvicultural practices, must ensure conservation of soil and water. For the Toiyabe National Forest in Nevada, the forest plan states that "in the event of conflicts between resource uses, the protection of riparian areas would be given 'preferential consideration'" (*Nevada Land Action Association v. U.S. Forest Service*, 1993). In 1997, the secretary of agriculture appointed a Committee of Scientists (COS) to provide technical and scientific advice on land and resource planning on the national forests and grasslands. Interestingly, the first component of a six-part strategy for conserving and restoring watersheds for

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058813

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

purposes of meeting ecological sustainability goals was to "provide conditions for the viability of native riparian and aquatic species" (COS, 1999).

Forest plans delineate categories of management areas, one of which typically emphasizes riparian management. Thus, some national forests establish riparian habitat conservation areas along perennial and intermittent streams to which specific management constraints apply. In the Idaho Panhandle National Forests, for instance, timber harvest is not allowed in these areas (USFS, 1998). The USFS's most stringent riparian area protections are found in the Northwest Forest Plan, which governs management of both BLM lands and national forests and prescribes requirements for land uses and management activities within ri-

---

**BOX 4-4**
**Northwest Forest Plan**

The Northwest Forest Plan for federal lands within the range of the Northern spotted owl represents the largest scale application of riparian conservation and restoration within the framework of a landscape-management plan. This plan for federal lands uses site-potential tree heights as a functional basis for delineating boundaries for riparian reserves. Site-potential tree height, which varies by species and region, represents the height of the dominant overstory trees in late succession. Riparian reserves are two site-potential tree heights wide (approximately 300–450 ft) on each side of perennial streams and one site-potential tree height wide on intermittent and ephemeral streams. All floodplains are protected, and no timber harvest occurs within them. Default management criteria call for no timber harvest within riparian reserves unless silviculturally required to attain desired ecological conditions along stream corridors. Thinning of young stands is permitted only to accelerate recovery of riparian forests and development of more natural patterns of forest structure. These riparian reserves account for 2.6 million acres (approximately 11 percent) of the land base under the Northwest Forest Plan.

Part of the plan calls for the identification and protection of key watersheds or strongholds to help maintain landscape and aquatic integrity and to provide refugia. Key watersheds are basins where objectives for aquatic resources, wildlife, and ecological functions are the primary management criteria. These watersheds include areas for forest harvest, but timber production is secondary to watershed function. The primary key watersheds account for 8.1 million acres of the 24.4 million acres of USFS and BLM lands within the Northwest Forest Plan.

The Northwest Forest Plan applies to federal forests within the range of the Northern spotted owl in western OR, western WA, and northern CA. Federal agencies in the western United States have developed several other regional conservation strategies that protect and restore riparian systems and watersheds. PACFISH applies to federal forests outside the range of the Northern spotted owl but within the range of anadromous salmonids in eastern OR, eastern WA, ID, and parts of CA. INFISH is a management plan for USFS lands outside the ranges of both the Northern spotted owl and anadromous salmonids but for drainages with native fish in eastern OR, eastern WA,

---

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058814

parian reserves (see Box 4-4). Riparian protection is also mandated by 1990 legislation specific to the Tongass National Forest in Alaska. Commercial timber harvesting is prohibited (unless the timber had already been sold) within a buffer not less than 100 feet wide on each side of certain streams.

Riparian restoration is an implicit objective of the use of "range betterment" funds, which are collected from western national forest grazing permittees. Regulations governing the Hells Canyon National Recreation Area in Idaho, managed in part by the USFS, require grazing permits to "provide for terms and conditions which protect and conserve riparian areas." Similarly, USFS rules governing grazing fees in the eastern United States authorize fee credits for range improve-

---

ID, western MT, and parts of CA. Like the Northwest Forest Plan, these strategies call for combinations of riparian reserves and key watersheds to provide ecological strongholds and landscape connectivity. These strongholds retain the habitats of anadromous and resident fish stocks and support aquatic and terrestrial biodiversity at a landscape scale. This emphasis on identification of strongholds and their conservation is a unique aspect of all these programs—one that is rarely found in other riparian management approaches. Similar approaches have been recommended in conceptual aquatic conservation strategies (Moyle and Sato, 1991; Doppelt et al., 1993; Bradbury et al., 1995). Riparian practices in the Northwest Forest Plan are compared to the other regional federal riparian policies in the table below.

One of the potential barriers to implementing these progressive strategies is legal challenge based on monitoring requirements. The Northwest Forest Plan requires that more than 70 species be monitored for before any ground-disrupting activities occur. Legal challenges have been based on not conducting a full survey, even for small activities over several square meters. Legal challenges based on requirements designed for larger landscape elements but applied to far smaller spatial extents undermine the intent and successful application of the regional strategy embodied by the Northwest Forest Plan.

**Riparian Management Criteria Under Various Federal Plans**

| Waterbody Type | Width (in Site-Potential Tree Heights) on One Side of Bank-full Channel | | |
| | NW Forest Plan | PACFISH | INFISH |
| --- | --- | --- | --- |
| Fish-bearing streams | 2 tree height | 2 tree height | 2 tree height |
| Perennial streams w/o fish | 2 tree height | 1 tree height | 1 tree height |
| Ephemeral/intermittent streams | 1 tree height | 1 tree height | 1 tree height |
| Lakes | 2 tree height | 1 tree height | 1 tree height |
| Wetlands | 1 tree height | 1 tree height | 1 tree height |

SOURCES: USFS and BLM (1994a,b); USFS (1995).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058815

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

ments that meet specified requirements, including enhancement or protection of riparian values. Finally, oil and gas leasing operations are prohibited in national forest riparian areas and wetlands.

## National Parks

The National Park Service (NPS) manages a nationwide system consisting of 376 units and about 80 million acres, two-thirds of which are located in Alaska. The system consists of designated areas of "land and water," including national parks, monuments, seashores, trails, and recreation areas. System units are highly diverse, ranging from the 2.2 million-acre Yellowstone National Park to urban parks such as the Washington Monument. The agency is responsible for protecting the natural, historical, and cultural resources of these areas, while promoting recreation opportunities.

The NPS was created by the National Park Service Organic Act of 1916, which states that the fundamental purposes of national parks and monuments are to conserve their scenery, natural and historic objects, and wildlife and to provide for their enjoyment so as to leave them unimpaired for future generations. The act also states that regulation of park system units must be consistent with these purposes. Although many parks contain rivers and streams with associated riparian areas that clearly contain the above-mentioned resources (e.g., scenery, natural objects, and wildlife), the act contains no express reference to riparian areas. The mandate to conserve natural objects and wildlife thus serves as the foundation of any NPS responsibilities with respect to riparian areas. The act further authorizes the secretary of the interior to issue regulations deemed necessary for use and management of the parks, in particular concerning activities on or relating to waterbodies located within the national park system. A general management plan is required for each park system unit, although the act makes only very general prescriptions about plan contents.

In at least one area, the NPS has developed policies that may bear on riparian area management. The agency's Floodplain Management Guideline (NPS, 1993) was developed to comply with federal directives concerning floodplain management. The guideline applies to all NPS actions that "have the potential for adversely impacting the regulatory floodplain or its occupants, or which are subject to potential harm by being located in floodplains." Guideline objectives include defining the regulatory floodplain, defining or assessing hazards, and providing guidance for managing activities that modify or occupy floodplains or impact their values. Once the regulatory floodplain is determined, the NPS develops information concerning flood conditions and hazards, then it designs actions to manage flood conditions (e.g., by selecting alternative sites, using mitigation, warning users, and developing contingency and evacuation plans). The NPS also has a separate wetland management policy.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058816

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 102 of
310

At least one court case suggests that NPS attention to riparian management may have been deficient. A federal appellate court in California rejected the NPS's determination that highway reconstruction-related impacts to the Merced River and its riparian corridor were acceptable under the National Wild and Scenic Rivers Act (*Sierra Club v. Babbitt*, 1999).

## National Wildlife Refuges

The U.S. Fish and Wildlife Service (FWS) oversees the National Wildlife Refuge System, administers fish and wildlife research and habitat conservation activities, manages migratory species hunting and conservation activities, and implements and enforces the Endangered Species Act (ESA). The agency manages about 93 million acres of land, including 530 national wildlife refuges, 111 research and field stations, and 75 wilderness areas.

The National Wildlife Refuge System is a complex of federal lands designated in 1966 in conjunction with the passage of the first ESA and managed principally for wildlife conservation purposes. President Teddy Roosevelt established the earliest individual refuges in the first decade of the twentieth century. Refuges have been reserved from multiple-use (or public domain) lands or acquired with funds from various sources, including the sale of duck stamps. They range in size from a few acres (e.g., Pelican Island, Florida) to more than 1 million acres (e.g., Alaska's Arctic National Wildlife Refuge). Wetland habitats (marine, estuaries, rivers, lakes, and marshes) comprise almost 37 percent of the refuge system (Keystone Center, 1991).

Management of the refuge system is guided primarily by the National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Acts of 1997 and 1998. These statutes do not refer expressly to riparian resources. However, the agency clearly has management authority over riparian areas on refuge lands, and it has ample authority (if not an obligation) to manage them to maintain and restore their animals, plants, and habitats, to "ensure their biological integrity, diversity and environmental health," and to monitor their status. According to the acts, the mission of the refuge system is to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats . . . for the benefit of present and future generations." The law directs that each refuge be managed to fulfill this mission, as well as the specific purposes for which that refuge was established. It further directs the interior secretary to maintain adequate water quantity and quality to fulfill the mission of the National Wildlife Refuge System and the purposes of each refuge and to acquire water rights needed for refuge purposes. To carry out such objectives, a comprehensive conservation plan is required for each refuge, although to date few plans have been prepared. Plans are supposed to identify the

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058817

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 103 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

distribution and abundance of fish, wildlife, and plants and their related habitats; significant problems affecting those species and habitats; and opportunities for compatible wildlife-dependent recreational uses.

The following examples reveal FWS authority to manage riparian areas on refuge lands. In Hart Mountain National Wildlife Refuge, Oregon, refuge managers had determined that eroded stream channels and deficiency of riparian vegetation along a majority of streams, among other resource-related problems, were preventing the Refuge's goals from being achieved. They proposed a comprehensive management plan that included discontinuing livestock grazing for 15 years and allowing passive restoration of riparian areas (except in limited areas where prescribed burnings, willow plantings, and check dams would be used) (FWS, 1994). Although FWS cautioned that improved soil productivity and native plant community restoration might not occur for 100 years, according to the Oregon Natural Desert Association, significant improvements in riparian vegetation and streambank conditions were evident within a few years after removal of livestock. Unfortunately, funding for an ecological study of streamside vegetation and bird populations was terminated by the FWS after four years, and in fact FWS has removed livestock exclosures that had been in place for decades (Durbin, 1997a,b).

Riparian habitat concerns also prompted the FWS to phase out livestock grazing in the Cabeza Prieta National Wildlife Refuge in Arizona. Livestock grazing was deemed to conflict with the refuge's primary purpose—assisting in the recovery of desert bighorn sheep—as well as with providing crucial habitat for one of the last remaining herds of the endangered Sonoran pronghorn antelope. The agency noted the importance of "dry riparian habitats" to refuge wildlife, including pronghorn antelope and bighorn sheep. Riparian and tidal restoration were also identified as major issues to be addressed in Washington's Nisqually National Wildlife Refuge's comprehensive conservation plan in order to ensure sanctuary for migratory birds. Finally, in Alaska's Arctic National Wildlife Refuge, the agency forbids movement of any equipment associated with geological and geophysical exploration of the coastal plain through riparian willow stands, except with prior expressed approval (50 C.F.R. § 37.31(b)(3)).

The FWS recently acquired new responsibilities that may result in greater riparian area protection on lands managed by federal agencies. A presidential executive order issued January 2001 directs all federal agencies whose actions may affect migratory birds to work with FWS to develop an agreement to conserve these birds. The order also establishes a Council for the Conservation of Migratory Birds to serve as a clearinghouse for information. It directs agencies to ensure that their NEPA analyses consider potential effects on migratory birds, and it requires agencies to control the introduction and spread of nonnative animals and plants that might harm migratory birds. Many shorebirds, waterfowl, and neotropical migrants that depend heavily on riparian areas and wetlands stand to benefit if the new order is vigorously implemented.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058818

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 104 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

## Wild and Scenic Rivers

The national Wild and Scenic Rivers Act (WSRA) of 1968 sets forth congressional policy that certain rivers, which, "with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition and . . . protected for the benefit and enjoyment of present and future generations." As of 1994, the system exceeded 1 million acres (see http://www.nps.gov/rivers/index.html for an update). River designations usually extend one-quarter mile from the normal high-water line on each side of the river, for an average of 320 acres of land per mile of river. Federal agencies are authorized to acquire nonfederal lands within the boundaries of any designated river segment, subject to certain area limits. The act necessarily, though only implicitly, governs management of designated rivers' riparian areas.

The WSRA designated the initial components of the system and established the criteria and procedures by which additional river segments could be added. Three designations were created—wild, scenic, and recreational. Wild rivers are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines primitive and waters unpolluted. Scenic rivers differ from wild rivers only in that they may be accessible in places by roads. Recreational rivers are readily accessible by road or railroad and may have some development along their shorelines, or they may have undergone some impoundment or diversion in the past.

USDA and the Department of the Interior are charged with studying rivers identified by Congress and recommending whether they should be included in the system. These agencies are further directed to consider potential additions to the system in the course of their regular land and resource planning. Rivers may be designated by Congress, or they may be included in the system if designated by state legislation after review and approval of the interior secretary, in consultation with the heads of other federal departments.

A key provision that affects riparian areas is the restriction on water projects in or affecting designated river segments. The act prohibits construction (and federal assistance for construction) of any dam, water conduit, or other water project "that would have a direct and adverse effect on the values for which the river was established." In addition, the Federal Energy Regulatory Commission is forbidden to license any water project on or directly affecting any of the rivers identified by Congress for possible inclusion in the system.

Another significant provision of the act is the withdrawal of all public lands within designated components "from entry, sale, or other disposition under the public land laws." Subject to valid existing rights, lands within one-quarter mile of designated rivers are thereafter unavailable for mining. Miners may continue to develop existing, valid claims (subject to regulation) after designation of a river, but they may not patent their claims unless they had already applied for a

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058819

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

patent and met all the patenting requirements. Prospecting can continue, also subject to regulations imposed by the land manager.

Components of the WSRA system are to be managed to protect the values for which they were designated, with primary emphasis on a river's "esthetic, scenic, historic, archeological, and scientific features." Land management agencies prepare management plans for rivers under their jurisdiction and manage them using their general statutory authorities (e.g., the National Park Service Organic Act for the NPS). The act specifies that federal agencies should pay particular attention to timber harvesting, road construction, and similar activities that might be contrary to the purposes of the WSRA. Managing agencies are further directed to cooperate with EPA for the purpose of combating water pollution.

Recent court cases have examined some of these planning and management requirements. First, failure to prepare a comprehensive management plan violates the WSRA (*National Wildlife Federation v. Cosgriffe*, 1998; *Sierra Club v. Babbitt*, 1999). Such plans must contain management prescriptions not just for the area within the river's designated boundaries, but also for other lands managed by the agency if activities conducted there might impact designated river segments. Impacts to riparian areas have been at issue in several cases. An Oregon court held that the BLM had violated substantive requirements of the WSRA by failing to provide, in a river management plan, protection against the effects of livestock grazing in riparian areas (*Oregon Natural Desert Association v. Green*, 1997). Further, the agency should have examined, in an environmental impact statement, the effects of both grazing and planned road and parking improvements. Another court concluded that the "WSRA gives the BLM authority to eliminate cattle grazing, or any other commercial use, if doing so is consistent with the mandate to protect and enhance the river values" (*Oregon Natural Desert Association v. Singleton*, 1999).

## Submerged Lands

"Submerged lands" is a shorthand reference for the state-owned beds and banks of navigable waters. Title to these submerged lands passed to states upon their admission to the Union (*Pollard's Lessee v. Hagan*, 1845). Federal law determines navigability; a body of water is navigable if it was usable by customary modes of travel, in its natural and ordinary condition, at the time of statehood. "Natural and ordinary" means without artificial improvement through activities such as dredging or impoundment. At least one court has held that present transportation methods may be considered (*Alaska v. Ahtna*, 1989).

These submerged lands are subject to a public trust, first enunciated by the U.S. Supreme Court in 1892. In *Illinois Central Railroad Co. v. Illinois*, the Court ruled that the Illinois state legislature could not transfer title of the Chicago waterfront and part of the submerged lands in the Chicago harbor because those

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058820

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 106 of 310

lands, which the state had acquired at statehood, were held in trust for the benefit of Illinois citizens. The Court held that a state could permissibly convey a temporary interest in, or even sell, parcels of submerged lands if such conveyances were in the public interest. But a state may never transfer "the whole property." The Illinois Central Court distinguished the nature of the state's title to lands beneath navigable waters from the title that the United States holds in the public lands that are open to preemption and sale.

Identifying what waters were navigable at the time of statehood, and hence which lands are held in trust by the states, has become an issue in determining title to minerals in submerged lands, in establishing management responsibilities on rivers within national parks or other federal lands, and in evaluating the legality of disposal of state lands. For example, in *Alaska v. United States* (1997), the U.S. Supreme Court concluded that the United States had expressly reserved title to submerged lands in the National Petroleum Reserve and what is now the Arctic National Wildlife Refuge in Alaska. Thus, Alaska did not acquire title to these lands at statehood, and the United States had authority to offer these lands for mineral leasing. All 38 states that have considered the issue have concluded that the state holds lands beneath navigable waters in trust for the people. In *Arizona Center for Law in the Public Interest v. Hassell* (1991), an Arizona appeals court invalidated a state law that relinquished the State's interest in riverbed lands, holding that it violated the public trust doctrine and the gift clause of the Arizona Constitution. Although it did not adjudicate the navigability of any Arizona streams, the court did find substantial evidence that "portions of Arizona rivers and streams other than the Colorado" met the federal test at statehood in 1912. Ironically, the invalidated Arizona legislation included a requirement that record owners of lands under the Colorado, Gila, Salt, and Verde Rivers pay a quitclaim fee to the state of $25 per acre, with the revenue to be used to acquire riparian lands for public benefit.

It seems plain that the existence of a public trust in submerged lands has implications for riparian area management and protection. Each state must develop its own jurisprudence for administering these lands. Although the trust is plainly enforceable, practical obstacles include the difficulty of identifying rivers that were navigable at statehood, determining which lands should be retained and which lands (or interests therein) could be relinquished, and how public interests can best be protected.

## Summary

The use and management of public lands and resources are governed by both federal and state laws. The specific federal laws that apply depend on which system (e.g., national forest, BLM land, wild and scenic river) the land is included within and what resources are at issue. Each federal land system is impressed with some broad, national interest criterion. Each managing agency af-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058821

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

fords some consideration to riparian areas and resources, whether by regulation or in an internal manual or policy handbook. Few specific provisions for riparian areas have been established in congressional legislation by or in executive orders, but agencies have considerable latitude to decide how and to what extent their planning and management activities will account for these areas. One result is that individual districts or units within agencies may vary in their interpretation and implementation of riparian measures established administratively. Thus, while different and additional constraints apply to management of federal riparian lands compared to privately owned riparian lands, the constraints on federal lands are not uniform from system to system, nor uniformly interpreted and applied within systems, and for the most part have been established principally by administrative action, not by legislation, and thus are subject to administrative change.

## PROTECTION OF WATER RESOURCES

Protection of riparian areas often is premised on their importance in protecting waterbodies. However, the reverse can also be true—protecting stream flows and lake levels can help preserve the structure and functioning of adjacent riparian areas. This section explores how laws relating to instream flows and uses of water can benefit riparian areas.

### Current Water Law

*Riparian Doctrine*

The legal system regards water as a public resource. Allocation and use of water are governed by state law. In those states following the riparian doctrine (generally those located east of the ninety-eighth meridian), the owner of land adjacent to a waterbody (the riparian landowner) is regarded as holding a legal right to make use of the water. Riparian water rights are a product of English common law, generally adopted by the eastern states. The right to use water is simply an extension of the ownership of land adjacent to that water. It is an acknowledgment of access to waterbodies that riparian land ownership provides.

The nature of the legal interest in adjacent water is somewhat ill defined. The riparian landowner has the ability to enjoy the benefits of using water—a so-called usufructory right—but does not own water. The purposes for which a riparian owner may use water are open-ended, constrained only by the limitation that the use may not unreasonably interfere with the equivalent right of all other riparian owners to their enjoyment of the resource. In short, it is a correlative system in which the interests of all riparian landowners in use of the shared water resource are to be balanced. Generally this means that riparian uses must be

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

"reasonable." Ultimately, in a common law system, the arbiter of what is reasonable is a judge.

This system works reasonably well in places with an abundance of water and when rivers and lakes are valued by humans primarily for their navigation and power-generation (instream) benefits. As demands have grown for out-of-stream uses of water (such as for drinking water, industrial cooling water, and irrigation), many eastern states have developed a permit system. Persons desiring to use river or lake water must apply to a state agency, specifying the purpose(s) of use and the quantity of water. Permits authorize the use for a specified term, at the conclusion of which the user must request a renewal.

Increasing out-of-stream uses have prompted some states to begin establishing base flow levels for rivers and lakes regarded as necessary to protect existing fish populations, water quality, or other considerations. Permits for out-of-stream diversions are constrained such that they do not reduce flows or water levels below the established minimum. For example, Florida law directs the regional water management districts to establish a minimum flow for all surface watercourses and a minimum water level for all aquifers. These minimum flows and levels are to be established in the amount "at which further withdrawals would be significantly harmful to the water resources [or ecology] of the area" (Florida Statutes § 373.042(1)).

## Prior Appropriation Law

Settlement of the American West in the 1800s depended on active control and use of the limited water resources available in streams and rivers. Because the United States owned nearly all the land in the West at that time, riparian land ownership made little sense as the basis for determining legal rights of individuals to use water. Early gold miners vied for control of streams just as they vied for control of land containing mineral deposits. A common custom emerged—the first to take control of and actively develop and use the resource held a protectable legal right to the land and water against all other claimants. For water, this custom of "first-in-time, first-in-right" came to be called the prior appropriation doctrine.

Under the prior appropriation doctrine, the legal basis of an individual's right to use water is physical possession of water and its application to a beneficial use. In virtually all western states, a would-be user applies to a state agency for permission to use some quantity of water from a particular source for a particular purpose. Once the water has actually been put to beneficial use, the permit holder's interest ripens into a permanent property interest in the right to make continued beneficial use of the water. The core of the right is the priority date. The more senior the right, the more likely it is that the right holder can divert and use their full entitlement of water. Unlike riparian rights, appropriative rights are not correlative—the senior appropriator is entitled to use all of the water autho-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058823

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 109 of 310

rized by their right ahead of more junior appropriators from the same source of water.

A prior appropriation water right traditionally required the physical control of water with a dam or a diversion structure. Only through this physical appropriation of water could a legal right be established. Moreover, beneficial use has been viewed in utilitarian and economic rather than ecological terms, as demonstrated by *Empire Water & Power Co. v. Cascade Town Co.*, 205 Fed. 123 (8th Cir. 1913). The Cascade Town Company owned a tourist resort located at the base of a waterfall on Cascade Creek, near Colorado Springs. The company sought to prevent a hydroelectric project from diverting the creek upstream of the resort, partly on the basis that the diversion would harm the "exceptionally luxuriant growth of trees, shrubbery, and flowers … produced by the flow of Cascade Creek through the cañon and the mist and spray from its falls." The court noted the substantial investment made by the resort and its dependence on this natural setting but found that "the laws of Colorado are designed to prevent waste of a most valuable but limited natural resource [The Cascade Town company] cannot hold to all the water for scant vegetation which lines the banks but must make the most efficient use by applying it to lands."

### Incorporating Natural Systems Needs into Water Law

Existing water law does not readily address the water-related needs of riparian areas. This is most apparent in the preference for economical uses of water common to prior appropriation states, as discussed above. The riparian doctrine was meant to limit uses to those that would leave the stream "undiminished in quantity and unimpaired in quality," and indeed the reasonable use standard has been applied to prevent users from withdrawing substantially all water from a stream during a drought (*Collens v. New Canaan Water Company*, 234 A.2d 825, 1967). Nonetheless, courts have chosen not to protect the right of riparian landowners to continue to benefit from natural inundation of their bottomlands in preference to the expressed need for upstream storage of water that would eliminate such flows (*Herminghaus v. Southern Cal. Edison Co.*, 252 P. 607, 1927).

From a water rights perspective, the only clear strategy for assuring that riparian areas receive sufficient water is to divert and deliver water directly to such areas. In theory, such irrigation would attempt to mimic the seasonal rewatering of naturally occurring overbank flows or groundwater recharge. In a few instances, western states have granted water rights for the purpose of "irrigating" wetlands or have determined that water rights for irrigation purposes may also apply to providing water for wetlands. For example, policy guidance recently issued in Colorado supports the use of an irrigation water right to provide water for wetlands (Stenzel, 2000). The guidance recognizes wetland irrigation as a beneficial use "as long as the water is diverted from a stream and applied for

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058824

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 110 of
310

the purpose of the growth, irrigation, and maintenance of wetland plants." Riparian vegetation presumably could be irrigated in this same manner.

As appreciation of the instream benefits of water has grown, including water's essential role in supporting the ecological functioning of river corridors, water law has broadened. Riparian law states are developing permit systems, many of which account for environmental considerations, and instream purposes are increasingly being recognized as legitimate uses for river water. As shown in Table 4-4, some states are allowing federal agencies to acquire instream water rights, which could be important to the protection of riparian areas, as federal agencies tend to have different environmental objectives than those reflected in state law.

*Instream Flow and Groundwater Protection Programs*

Virtually all prior-appropriation states now have programs that authorize the use of water for "instream" purposes (Gillilan and Brown, 1997). Approaches vary considerably, but the core of these programs is to authorize legal protection for maintaining designated flows of water between points along a stream channel or maintaining designated lake levels. Such flows must not have already been appropriated for out-of-stream use. In practice, protecting the minimum flow of water necessary to sustain fish populations has been the primary purpose of these programs to date. Generally only a state agency may hold an instream flow water right.

State instream flow programs typically set aside flows on the basis that they are the minimum needed for protection of an existing fishery—e.g., flows sufficient to allow fish passage through riffles in a stream channel. Generally such claims are made to a single minimum level of flow year-round rather than to flows that change throughout the year to mimic the natural hydrograph. That is, such flows prevent a stream from being totally dewatered, but they do little to benefit riparian areas that depend on variable flows to regenerate and maintain native vegetation or to ensure the occurrence of channel processes necessary to maintain instream habitats (e.g., sediment transport and pool formation).

Nevertheless, these programs have the potential to protect a river's existing hydrograph or selected portions of the hydrograph. An instream flow claim could be made for all unappropriated or otherwise unclaimed water in a specified reach of a river or stream. In this case, no additional water development would be possible. Alternatively, additional water development and use could be limited to periods of time and portions of the hydrograph regarded as less critical to system functioning. Perhaps only certain designated peak flows could be protected along with acceptable minimum flows that mimic the natural hydrograph.

A few state instream programs have allowed such claims. The Nature Conservancy, for example, has been successful in obtaining certified instream water

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058825

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

270                                                              *RIPARIAN AREAS*

**TABLE 4-4  Ability of Federal Agencies to Protect In-Place Values and Uses
of Water Within Western State Water Law Systems**

| State | In-Place Beneficial Uses Recognized Under State Law | Special Re... In-Place W... |
|-------|----------------------------------------------------|------------------------------|
| Alaska | Protection of fish and wildlife habitat, migration, and propagation; recreation and parks purposes, navigation and transportation purposes; sanitary and water quality purposes, Alaska Stat. §46.15.145 (1992) | —Reserva... —Reviewa... need |
| Arizona | Recreation and wildlife including fish, Ariz. Rev. Stat. Ann. §45.151.A (1987) | —Special |
| California | Preserving or enhancing wetlands habitat, fish and wildlife resources, or recreation in or on the water, Cal. Water Code §1707 (West Supp. 1993) | —Applies water ri... |
| Colorado | To preserve the natural environment to a reasonable degree, Colo. Rev. Stat. §37-92-102 (1990) | —"Minim... —Restrict... Board (C... —Must be preserve... |
| Idaho | Protection of fish and wildlife habitat, aquatic life, recreation, aesthetic beauty, transportation and navigation values and water quality, Idaho Code §41-1501 (1990) | —The min... benefici... maintai... —Approv... |
| Kansas | Water quality, fish, wildlife, aquatic life, recreation, general aesthetics, domestic uses, and protection of existing water rights, Kan. Stat. Ann. §85a-928i (1989) | —Minimu... —Approv... |
| Montana | Fish and wildlife, recreational uses, and maintenance of water quality, Mont. Code Ann. §85-2-316 (1993), Mont. Admin. R. §36-16.102(3) | —The am... and can... annual f... —Reserva... —Reviewe... be modi... |

Copyright © National Academy of Sciences. All rights reserved.

d Uses

| | Special Restrictions on In-Place Water Protection | Can Federal Agencies Hold In-Place Appropriative Rights?[a] | Provision for Federal Agency Involvement in State In-Place Water Program |
|---|---|---|---|
| recreation ary and | —Reservations only<br>—Reviewable every 10 years for continuing need | Yes, reservation is regarded as an appropriation | Instream flow statute lists the federal government as a party allowed to apply for instream reservation |
| 51.A | —Special administrative review procedure | Yes (two such permits issued to date) | There is no state program for protecting instream flows |
| es, or o. 1993) | —Applies only to changes of use of existing water rights | Only by changing the use of existing water rights | Only through participation as protestant in state water rights proceedings |
| | —"Minimum" streamflow<br>—Restricted to Colo. Water Conservation Board (CWCB)<br>—Must be a natural environment that can be preserved | Yes, but only if a diversion of water is involved | CWCB does "request recom-mendations" from the Departments of Agriculture and Interior Recommendations must be made "with specificity and in writing" |
| netic | —The minimum amount required to protect beneficial uses, which is capable of being maintained<br>—Approved by the legislature | Not settled | Federal agency may request Idaho Water Resources board to consider a minimum flow |
| tics, | —Minimum desirable streamflow<br>—Approved by the legislature | No | No |
| ity, 2(3) | —The amount must be necessary for purpose and cannot exceed 50 percent of average annual flow on gaged stream<br>—Reservation only<br>—Reviewed at least once every 10 yrs; may be modified in 5 yrs | Yes, but only if a diversion of water is involved | The U.S. or any agency thereof may apply to reserve a minimum stream flow |

*continues*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058827

272                                                                          *RIPARIAN AREAS*

TABLE 4-4  Continued

| State | In-Place Beneficial Uses Recognized Under State Law | Special Res... In-Place W... |
|-------|----------------------------------------------------|------------------------------|
| Nebraska | Recreation, fish and wildlife, Neb. Rev. Stat. §46-2,108 (1988) | —Minimu... —Availabl... Commis... |
| Nevada | Any recreational purpose, Nev. Rev. Stat. Ann. §533.030(2); wetland protection, Nev. Rev. Stat. §502.322. | |
| New Mexico | No statutory in-place protection | |
| North Dakota | No statutory in-place protection | |
| Oregon | Conservation, maintenance and enhancement of fish and wildlife habitat, Or. Rev. Stat. §537.336 (1988) | —Minimu... —Restrict... Dept. of... Parks an... |
| South Dakota | No statutory in-place protection | |
| Utah | Propagation of fish, public recreation, the reasonable preservation or enhancement of the natural stream environment, Utah Code Ann. §73-3-3 (1993 Supp.) | —Limited... —Restrict... and Stat... |
| Washington | Protecting fish, game, birds, or other wildlife resources, or recreation or aesthetic values of said public waters whenever it appears to be in the public interest, Wash. Rev. Code. Ann. §90.22.010 (West 1992) | —Restrict... of Fishe... request... |
| Wyoming | To establish or maintain new or existing fisheries, Wy. Stat. Ann. §41-3-1001 (1993 Supp.) | —Minimu... —Need id... Commis... Develop... |

*a*Generally, federal agencies cannot hold an instream water right issued under state law. This column indicates if they can hold such rights. In some cases, the instream water right is only given if a diversion structure exists on the river. Normally, such structures would remove water from the river, but in the case of instream rights, they are simply placeholders for the right. For example, in

Copyright © National Academy of Sciences. All rights reserved.

*EXISTING LEGAL STRATEGIES FOR RIPARIAN AREA PROTECTION*      273

| | Special Restrictions on In-Place Water Protection | Can Federal Agencies Hold In-Place Appropriative Rights?[a] | Provision for Federal Agency Involvement in State In-Place Water Protection Program |
|---|---|---|---|
| | —Minimum amount necessary<br>—Available only to Game and Parks Commission or a natural resources district | No | Only as a party to state allocation decision process |
| d | | Yes (at least 2 such permits granted) | There is no state program for protecting instream flows |
| | | Perhaps, if a diversion is involved | There is no state program for protecting instream flows |
| | | Perhaps, if a diversion is involved | There is no state program for protecting instream flows |
| bitat, | —Minimum perennial streamflows<br>—Restricted to Dept. of Fish and Wildlife, Dept. of Environmental Quality, and State Parks and Recreation Dept. | No | There is no state program for protecting instream flows |
| | | Yes, but only if a diversion of water is involved | There is no state program for protecting instream flows |
| or §73-3-3 | —Limited to transfer of existing rights only<br>—Restricted to Dept. of Wildlife Resources and State Parks and Recreation Dept. | Yes, but only if a diversion of water is involved | |
| on or n the | —Restricted to Dept. of Ecology, but Dept. of Fisheries and Dept. of Wildlife may request consideration | Perhaps, if a diversion is involved | |
| §41-3-1001 | —Minimum flow necessary<br>—Need identified by Game and Fish Commission, application made by Water Development Commission | Yes, but only if a diversion of water is involved | In Clarks Fork River via special congressional legislation |

Colorado, structures used to control the flow for kayaking purposes have qualified as diversions for the purposes of appropriating rights, even though no flow is removed from the river.

SOURCE: Reprinted, with permission, from MacDonnell and Rice (1993). © 1993 by Natural Resources Law Center.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058829

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

rights in Arizona for streams running through its Hassayampa River Preserve and Muleshoe Ranch properties. These rights protect a significant portion of the hydrograph on a year-round basis. BLM has filed an application for an instream right on the San Pedro River in Arizona, claiming a flow of 18,200 cubic feet per second for 24 hours. The claim is based on an analysis indicating that this is the flow rate needed to inundate the banks and benches adjacent to the channel and to support riparian vegetation. The application states:

> The natural morphological processes that have shaped the San Pedro and other river systems are largely driven by periodic high flows that flush and redistribute sediment and rock. These high flows inundate the floodplain spreading sediment and seed, scour, and shape vegetation on banks and floodplain. The long-term improvement and maintenance of the San Pedro River environment is [sic] absolutely dependent on the recurrence of sufficiently high peak flows. The concept of a riparian conservation area is meaningless if artificial structures eliminate the natural variability that once created and now maintains the fluvial biome. (BLM, 1991b)

Since Colorado began appropriating water for instream uses in 1973, such appropriations have been established on more than 8,000 miles of Colorado streams and on 486 lakes. In 1996, the Colorado Water Conservation Board appropriated all of the unappropriated water in Hanging Lake and Dead Horse Creek—a heavily visited watershed within the White River National Forest containing scenic waterfalls and unusual flora and fauna. The Hanging Lake appropriation is the first to appropriate all the remaining water.

Related to the protection of instream flows are laws that restrict groundwater pumping. Although riparian vegetation is as dependent on access to underlying groundwater as it is to surface water flow, state laws do not generally provide a means of protecting this water supply from the adverse effects of groundwater pumping. Legal rights to pump groundwater are associated with ownership of the overlying land in most states. Public supervision, if any, generally concerns only conflicts between different groundwater users or, in a few states, groundwater and surface water users. Currently, there are no limitations placed on groundwater development with the intent to protect riparian areas.

One approach that has been used to lessen the impact of groundwater pumping on the San Pedro is the purchase of lands being pumped and the retiring of wells. A more comprehensive legal approach would be for states to limit groundwater pumping in and adjacent to riparian areas as necessary, something that is being considered by the state of Arizona. The Arizona Groundwater Management Act in its present form provides little direct protection of riparian areas, although its goal of aquifer stability could indirectly be protective. To date, no legal changes have been made to the law that would expressly recognize riparian groundwater needs.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058830

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 116 of 310

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*Public Trust Doctrine*

The concept of public trust has been applied beyond protection of submerged lands to include protection of navigation, fishing, public recreational uses of water, and water-dependent environmental functions. One prominent example of the public trust doctrine being used to protect water resources and, indirectly, riparian areas involved California's Mono Lake. Los Angeles has held state-granted rights to divert virtually the entire flow of water from several tributaries to Mono Lake. By the 1970s, exercise of these rights had dramatically lowered the water level of the lake. In *National Audubon Society v. Superior Court* (1983), the California Supreme Court found that the public trust doctrine imposes a duty on the state to "protect the people's common heritage of streams, lakes, marsh-lands and tidelands." The ruling allowed the state to reconsider past allocations of water if necessary to protect the public trust. In subsequent proceedings, the State Water Resources Control Board developed a plan to restore Mono Lake and the flow regimes of several tributaries to the lake—thus reducing the city's diversion rights.

No other state has invoked the public trust to alter existing water rights, but several have applied the doctrine in considering decisions regarding new uses of water. For example, the Idaho Supreme Court found that public trust concerns such as assuring minimum stream flows, encouraging conservation, and protect-ing aesthetic or environmental qualities of particular areas should be taken into consideration when evaluating applications for water rights (*Shokal v. Dunn*, 1985). The North Dakota Supreme Court held that the public trust doctrine must be a consideration in state planning regarding allocation of water (*United Plains-men v. North Dakota Water Conservation Commission*, 1976).

With the exception perhaps of several tributaries to the Mono Basin, the public trust doctrine has not yet been extended to riparian water needs, which may reflect a limited understanding of the essential role of water in supporting and maintaining riparian functions. As a common law concept, the doctrine could conceivably evolve to include this public value of water. Alternatively, states might choose to statutorily recognize the need to consider this important function of water in their water planning and allocation procedures.

## Federal Reserved Water Rights

The reserved rights doctrine emerged in the context of water needs of Indian tribes on their reservations. The U.S. Supreme Court held that when the United States reserved land for a tribe, it also implicitly reserved an amount of water necessary to meet the purposes for which the land had been set aside. The legal basis of the right was determined to be independent of, and superior to, subse-quent state authority to allocate water resources (*Winters v. United States*, 207 U.S. 564, 1908). This doctrine, which was extended in 1963 to other federal

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058831

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

276                                                                          *RIPARIAN AREAS*

reservations of land such as national parks and forests, could be used to protect both water resources and their associated riparian areas on all federal reservations.

Several national parks have been accorded reserved water rights that essentially preclude any out-of-stream development. For example, streams within Glacier and Yellowstone National Parks are dedicated to instream flow uses (Amman et al., 1995). In 1993, a Colorado water court awarded the United States all unappropriated flows on the east side of Rocky Mountain National Park; another water court decreed the same result for the west side of the park in 2000 (Silk et al., 2000). In a 1996 negotiated settlement for Zion National Park, Utah agreed to a federal reserved right to all stream flows except for a designated amount committed to future depletion by users upstream of the park (USA et al., 1996). Similarly, negotiated agreements in Montana for several national park units and for wild and scenic river areas established fixed levels of upstream consumptive use, with the remainder of the water being dedicated to instream flow.

To date, no reserved right specifically for protection of the riparian functions of a federal reservation has been legally recognized. The United States has asserted reserved right claims to water for environmental purposes with limited success—primarily because the U.S. Supreme Court has determined that the water claimed must be necessary to achieve the primary purpose(s) for which the reservation was expressly created. Thus, the Supreme Court upheld the need for water to protect the desert pupfish in a national monument specifically set aside for this purpose (*Cappaert v. United States*, 1976). But it denied an instream flow right for the Rio Mimbres in the Gila National Forest on the basis that the primary purpose for which national forests were established was not environmental protection (*United States v. New Mexico*, 1978). This latter decision is odd given that the two primary purposes in the 1897 Organic Act are "securing favorable conditions of water flows and furnishing a continuous supply of timber." In the future, it may be possible for the USFS to convince a court that "favorable conditions of water flows," and hence downstream yields of water, depend on streams and riparian areas that are in good functioning condition. This could enable the successful assertion of federal reserved rights for protection of riparian areas.

## CRITICAL EVALUATION OF THE POTENTIALLY MOST INFLUENTIAL PROGRAMS

Although a diverse array of programs may be used to promote, protect, or implement riparian management, two relatively new programs may have substantial and unique impacts nationwide because of their scope and scale. The first is the Conservation Reserve Enhancement Program (CREP), which is a voluntary, incentive-based program authorized by the 1996 Farm Bill. CREP is essentially a variation on the Conservation Reserve Program (CRP), but with a state partner-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058832

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 118 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

ship component that allows for a variety of additional options, including more flexible width requirements, permanent easements, and additional cost sharing. The second is the Total Maximum Daily Load (TMDL) program originating in Section 303 of the Clean Water Act. A TMDL defines the maximum amount of pollution that a waterbody can receive from various sources and still meet water-quality standards. As of 1998, over 20,000 waters (including over 300,000 miles of rivers and 5 million acres of lakes) are in violation of water-quality standards and require a TMDL calculation. The CREP and TMDL programs impact riparian systems through different administrative mechanisms and funding sources.

### Conservation Reserve Enhancement Program

The Conservation Reserve Program (CRP), established by the 1985 Food Security Act, is a voluntary program that offers annual rental payments, incentive payments for certain activities, and cost-share assistance to establish approved cover on eligible cropland. The program allows lands meeting certain characteristics, such as highly erodible or cropped wetlands, to be removed from agricultural production for 10–15 years. Continuous CRP is a form of the program that allows highly vulnerable lands, such as riparian areas, to be enrolled without the same administrative requirements as CRP.

The potential for CRP to restore and protect riparian areas has been greatly enhanced by the development of the Conservation Reserve Enhancement Program (CREP), which is an extension of CRP. Once landowners are enrolled in CRP (a federal program), they can take advantage of additional services offered by state CREP programs. A primary goal of CREP is to create an opportunity where the resources of a state government and the federal Commodity Credit Corporation can be targeted in a coordinated manner to address specific conservation and environmental objectives of that state and the nation, providing greater flexibility to address regional problems. For example, a state and the NRCS might decide that a certain percentage of state CREP money must be used to restore riparian areas in a specific watershed. CREP is meant to improve water quality, erosion control, and wildlife habitat in specific geographic areas that have been adversely impacted by agricultural activities, with emphasis on non-point source pollution control. Conservation of species listed as threatened or endangered or identified as candidates for listing are included under these objectives. The federal–state partnership is a unique aspect of CREP.

CREP broadens the federal payment options for landowners enrolled in CRP programs (annual rental payment, maintenance payment, and a cost share of 50 percent for the installation of conservation practices). For example, many of the states that currently have an established CREP will supplement the cost-share payments and pay for extensions on the easement contract beyond the regular 10–15 years. There is no cap on expenditures in CREP from the federal side, although

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058833

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 119 of
310

acreage limitations have been imposed (e.g., Illinois is limited to 132,000 acres).
Nonetheless, funding can pose a barrier because of the cost-share requirement of
20 percent, which can be difficult for states to meet.

### Eligible Lands

Because each state CREP agreement is unique, the definition of eligible
lands varies considerably. In general, lands eligible for CREP must meet some of
the same criteria that CRP land must meet. That is, the land must have been
owned or operated by the applicant for the previous 12 months, must have been
planted in crops two of the last five years, and must be physically and legally
capable of being planted in a normal manner. There are numerous exceptions
granted to individual states to meet specific needs. For example, the New York
City CREP is directed towards protection of the city's water supply watersheds.
Each state agreement designates specific watersheds, counties, or other areas that
are targeted. Some also include specific definitions of eligible land such as 100-
year floodplains (Illinois CREP), highly erodible lands (many states), and sink-
holes (Kentucky CREP). In addition to the floodplain demarcation requirement,
Illinois also allows lands anywhere within the watershed that are farmed wet-
lands, prior converted wetlands, or wetlands farmed under natural conditions.
Finally, additional acres have been designated for permanent easements in Illi-
nois. These lands are defined as non-cropped acres or land in another CRP signup
that meet criteria based on riparian definitions, erodibility, or adjacency to the
primary land enrolled in CREP. A significant advantage of CREP programs is
that conservation practices can go beyond CRP guidelines regarding buffer width
and structure. For example, if a CREP program defines eligible lands as those
within the 100-year floodplain boundary, such a designation may, depending on
the region, include lands well beyond the 234-ft maximum buffer width allowed
under CRP. As a consequence, CREP can encompass and potentially protect
larger riparian areas than CRP.

### Current Status

As shown in Table 4-5, CREP is currently established in 21 states, and nine
more are in the process of preparing applications. Continuous CRP and CREP
account for 418,000 miles of riparian land, while general CRP has enrolled over
333,000 miles. There is a tremendous variety in the types of management prac-
tices utilized by the state CREP programs, with the most common being filter
strips, riparian buffers, wetland restoration, and restoration of prairie and tallgrass
prairie/oak savanna ecosystems for rare and declining wildlife habitat. However,
a variety of other practices such as tree planting and providing shallow water
areas for wildlife are frequently utilized in riparian areas.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058834

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 120 of 310

The goals of the existing CREP programs include sediment, nutrient (nitrogen and phosphorus), pesticide, and pathogen loading reductions, fish and wildlife habitat enhancement, streambank stabilization, and hydrologic restoration. For example, in North Dakota the program goal is to develop 20-acre blocks of habitat (cover-locks) for upland game. The New York CREP is designed to protect the water supply of New York City through riparian buffers and dairy cattle management. The Maryland CREP has established the goals of reducing annual agricultural-based pollution by 5,750 tons of nitrogen, 550 tons of phosphorus, and 200,000 tons of sediment while increasing wildlife and habitat. A fundamental concept of CREP is to allow states to identify their most pressing resource issues and to develop unique strategies to address these issues.

All current CREP programs offer incentive payments, but they vary considerably. Typical payments include supplemental cost sharing (such as the incentive payment of 130 percent of the county rental rate in Delaware), payments for the remainder of the costs for establishing the conservation practice (e.g., New York, North Carolina), and additional lump-sum payments for certain practices such as installing filter strips (Ohio) or planting trees (North Carolina). The first CREP program was initiated in Maryland in 1997; there are now 21 CREP states with 16,492 contracts for over 265,511 acres and a projected lifetime federal cost of over $540 million (for current information, see http://www.fsa.usda.gov/dafp/cepd/crep.htm). Additional state payments for cost sharing and extensions of easements will add to the total cost. In addition, many existing programs (e.g., Minnesota and Illinois) are expanding beyond their initial eligible land areas. Thus, final program cost and enrolled acreage will substantially increase as the program matures.

*Program Evaluation*

Although related programs such as CRP have been evaluated in numerous studies (e.g., Allen, 1996), the effectiveness of CREP has not been given much attention. There are several reasons for this. First, each state's program is unique, making documentation difficult. Other than the number of miles or the acreage enrolled, there is no single program-wide characteristic that permits CREP to be evaluated for environmental impact on a consistent national basis. Second, CREP rules state that each program should include a comprehensive monitoring program (with an identified funding source) that will include specific objectives, measurement descriptions, and a process for program refinement based on monitoring results. Unfortunately, most states support very little monitoring specific to their program, making it difficult to judge the effectiveness of the program. (See NRC, 2000, for a description of the monitoring necessary for determining agricultural program performance.) Most states do have some baseline monitoring in place that will allow superficial assessment of the program, but such monitoring is often not designed to track specific program inputs. It is probable

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058835

280                                                                          *RIPARIAN AREAS*

**TABLE 4-5  Current Listing of Conservation Reserve Enhancement Programs and Their Intended Goals and General Eligibility Designations**

| State | Major Goals | Eligible Ar |
|---|---|---|
| Arkansas | Reduce sediment loading up to 10,000 tons/year; increase wildlife populations; establish 200 miles of riparian forest buffers | 4,700 acre Arkansa |
| California | Enhance wildlife habitat (possible increase of 27,000 ducklings and 20,000 pheasants); reduce soil erosion; improve surface and groundwater quality; improve air quality | 12,000 acr |
| Delaware | Reduce nutrient and sediment loading, improve temperature and dissolved oxygen; increase wildlife habitat and create wildlife corridors | 6,000 acre Bay, De basin ar miles of |
| Illinois | Reduce input of sediment, nitrogen, phosphorus; enhance wildlife, fish, mussels, threatened and endangered species | 132,000 a adjacent Illinois |
| Iowa | Reduce nitrogen loading to streams by 300–600 tons/year; reduce sediment delivery to Lake Panorama by 80,000 tons/year; reduce or maintain soil erosion at or below 2–5 tons/acre; enhance wildlife habitat; increase recreation | 9000 acres Iowa |
| Kentucky | Reduce by 10 percent the sediment, pesticide, and nutrient loads entering the Green River and Mammoth Cave system; protect wildlife habitat, restore riparian habitat, and restore subterranean ecosystem by targeting 1,000 high priority sinkholes | 100,000 ac |
| Maryland | Reduce nutrient loadings into the tributary streams of the Chesapeake Bay | 70,000 acr of wetla erodible watersh |
| Michigan | Reduce sediment inflow by 784,000 metric tons over 20 years, nitrogen by 1.6 million pounds, and phosphorus by 0.8 million pounds; protect water supplies; protect 5,000 linear miles of streams from sedimentation; improve wildlife habitat | 80,000 acr and Sag |
| Minnesota | Reduce sediment and nutrient loading into the Minnesota River | 100,000 in Minneso cropland |
| Missouri | Reduce by 50 percent the pesticides in 58 drinking water supplies; reduce sediment inflow by 50 percent; reduce soil erosion rate to less than 5 tons/acre; help ag. Producer meet nutrient goals; improve wildlife habitat | 50,000 acr of 83 w |
| New York City | Reduce soil erosion by 36,000 tons/year; reduce levels of nutrients and pathogens; enhance wildlife habitat | 5,000 acre erodible |

Copyright © National Academy of Sciences. All rights reserved.

ograms

| | Eligible Areas and Initial Acres | Eligible Practices and Riparian Specific Conditions[a] | State Contract Extensions |
|---|---|---|---|
| | 4,700 acres in the Bayou Meto of central Arkansas | CP22 | Unknown |
| d 20,000 er quality; | 12,000 acres in the North Central Valley | CP1, CP2, CP4D, CP9, CP10, CP12, CP21, CP22, CP23 | Yes, but not defined |
| issolved | 6,000 acres in the watersheds of Chesapeake Bay, Delaware Bay, and the Inland Bays basin area (goal is approximately 1,200 miles of buffers) | CP3A, CP4D, CP21, CP22, CP23 | None |
| fish, | 132,000 acres in 100-year floodplain and adjacent highly erodible lands of the Illinois River Basin | CP2, CP3, CP3A, CP4D, CP12, CP21, CP22, CP23, CP25 | 15- and 35-yr extensions or permanent |
| ediment tain soil ease | 9000 acres in 37 counties in north-central Iowa | CP7, CP21, CP22, CP23 | Yes |
| ntering abitat, argeting | 100,000 acres in the Green River watershed | CP1, CP2, CP3A, CP4D, CP8, CP10, CP11, CP21, CP22, CP23 | Extensions and permanent easements |
| ake Bay | 70,000 acres of riparian buffers, 10,000 acres of wetlands, and 20,000 acres of highly erodible lands in Chesapeake Bay watershed | CP4, CP5, CP8, CP16, CP17, CP18, CP21, CP22, and wellhead protection areas | Permanent easements |
| rogen rotect entation; | 80,000 acres in the Macatawa, River Raisin, and Saginaw Bay watersheds | CP1, CP2, CP5, CP21, CP22, CP23 | Voluntary easement |
| | 100,000 initial acres (190,000 final) in Minnesota River floodplain, tributaries, cropland filter strips, and wetlands. | CP9, CP21, CP22, CP23, CP25 | 20 years or permanent |
| ; reduce han llife habitat | 50,000 acres along streams in the watersheds of 83 water supply reservoirs | CP1, CP2, CP3A, CP4D, CP15A, CP21, CP22, CP23 | Not specified |
| s and | 5,000 acres of riparian areas or highly erodible croplands | CP1, CP2, CP3, CP4, CP21, CP22, CP23 | None |

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058837

*RIPARIAN AREAS*

TABLE 4-5  Continued

| State | Major Goals | Eligible Ar |
|---|---|---|
| North Carolina | Reduce the excessive nutrient and sediment loading from agricultural runoff (15 percent nitrogen reduction); improve anadromous fish habitat; enhance wildlife habitat | 100,000 ac Estuarin 15,000 a |
| North Dakota | Create wildlife habitat; improve water quality; and reduce soil erosion | 1,000 20-a Cover lob 10 acres of winte 140 acre easeme |
| Ohio | Reduce sediment entering Lake Erie by 2,325,000 metric tons over 20 years; reduce nutrients and pesticides entering Lake Erie and tributaries; protect 5,000 miles of streams from sedimentation; improve wildlife habitat | Western L |
| Oregon | Restore salmon habitat through restoration of riparian forests; reduce sediment and nutrient input; stabilize streambanks; restore water temp. to natural ambient conditions; restore natural hydraulic and geomorphic conditions | 100,000 ac streams |
| Pennsylvania | Reduce nutrients and sediment delivery to the Potomac and Susquehanna Rivers and the Chesapeake Bay | 100,000 ac |
| Vermont | Reduce phosphorus loading into Lake Champlain by 48.3 tons/year; enhance wildlife and aquatic habitat | Lake Chai |
| Virginia | Reduce nutrient input into the Chesapeake Bay and non-Bay watersheds; modify hydrology through wetland restoration; enhance wildlife habitat | 30,500 acr of wetla |
| Wisconsin | Reduce sediment loading by 335,000 tons/year, phosphorus loading by 610,000 pounds, and nitrogen by 305,000 pounds; establish 3,700 miles of riparian buffers and 15,000 acres of grassland habitat. | 100,000 ac |

[a]CP 1   Planting of introduced grasses
CP 2   Planting of native grasses
CP 3   Tree planting (3A is hardwood trees)
CP 4   Restoration of wildlife habitat via prairie ecosystem restoration and tallgrass prairie/oak savanna ecosystem restoration
CP 4D  Restoration of permanent wildlife habitat
CP 5   Field windbreaks
CP 8   Grassed waterways
CP 9   Shallow water areas for wildlife
CP 10  Established grass
CP 11  Established trees

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

| | Eligible Areas and Initial Acres | Eligible Practices and Riparian Specific Conditions[a] | State Contract Extensions |
|---|---|---|---|
| ral runoff at; | 100,000 acres in the Albermarle-Pamlico Estuarine system (85,000 acres riparian; 15,000 acres wetland) | CP3A, CP21, CP22, CP23, CP25 | 15-year and permanent |
| sion | 1,000 20-acre "cover locks" in six watersheds. Cover locks consist of 5 acres of trees, 10 acres of herbaceous cover, and 5 acres of winter food. Each cover lock will have 140 acres of associated conservation easements | CP4D, CP12, CP16 | Easement length not specified |
| r 20 years; s; protect bitat | Western Lake Erie Watershed | CP3A, CP4, CP5, CP21, CP22, CP23 | None |
| ce r temp. to rphic | 100,000 acres along designated salmonid streams and 5,000 acres of wetlands | CP21, CP22, CP23 | None |
| ehanna | 100,000 acres | CP1, CP2, CP3A, CP4D, CP8, CP9, CP12, CP15A, CP21, CP22, CP23 | None |
| r; enhance | Lake Champlain watershed of Vermont | CP8, CP21, CP22, CP23 | |
| rsheds; habitat | 30,500 acres of riparian lands and 4,500 acres of wetlands | CP21, CP22, CP23 | 10- and 15-yr contracts; up to 8,000 ac of permanent easements |
| g by 00 miles | 100,000 acres in 51 counties | CP1, CP2, CP8, CP21, CP22, CP23, CP25 | Permanent |

CP 12    Wildlife food plots
CP 15A   Contour grass strips
CP 16    Shelter belts
CP 17    Snow fences
CP 18    Salt tolerant vegetation
CP 21    Filter strips
CP 22    Riparian buffers
CP 23    Wetland restoration
CP 25    Restoration of rare and declining wildlife habitat

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058839

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 125 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

that CREP, like other conservation programs, will have to be evaluated indirectly. One current exception is the Illinois CREP, which has established a paired watershed design that will allow some degree of differentiation between areas with intense practice implementation and areas with a lesser degree of land-use change (see Box 4-5).

The length of easement contracts among state CREP programs varies greatly. The basis of the program is a federal contract for 10 to 15 years. As part of the state agreement most states add on voluntary easement extensions ranging from 15 years to permanent, and generally landowners are compensated at rates linked to the length of easement extension. Maryland, for example, has established a target of obtaining permanent easements on 25 percent of its contracts. In Illinois, three easement extensions are offered—15-year, 35-year, and permanent. Thus, the opportunity for long-term modification of the landscape are certainly available through CREP, but landowners do not always take advantage of these options even though they may include payments that can equal or exceed the fair market value of the land.

The program is limited by its reliance on voluntary landowner participation. Thus, although states target lands whose restoration will provide the greatest impact (e.g., riparian or highly erodible lands in specific watersheds), owners of severely degraded land may choose to not participate because of personal preference, insufficient financial incentives, lack of information, or various other reasons. (Where there have been concerted efforts to contact individual landowners to inform them of the available funding, participation increases sharply, as experienced in the Maquoketa River watershed in Iowa.)

Within the eligible areas defined for each CREP, there is generally no prioritization of areas such that critical parcels of land are targeted for enrollment. This is particularly troublesome when the chosen watershed is large, such that certain sections are experiencing greater degradation than others. In addition, the effectiveness of some restoration practices is dependent on stream size. For example, Chapter 2 discusses the disproportionate pollutant removal abilities of first- and second-order streams compared to larger-order streams. In none of the CREP programs reviewed was prioritization by stream size apparent, although there appear to be no restrictions to doing so. Fortunately, in some CREP programs where nongovernmental organizations such as The Nature Conservancy are involved, staff has been directed to identify priority areas to help attain their conservation objectives.

Finally, the federal cap on acreage enrolled in CRP is 36.4 million acres. Current contracts account for nearly 33.7 million acres, and state CREP programs are authorized for a substantial amount of the remaining acreage. Each state CREP program was initially limited to no more than 100,000 acres. Though most state CREP programs have not reached their limits, at least one has (IL) and it is expected that others will attain this limit as their marketing programs and landowner awareness increases. With other states in the process of developing CREP

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058840

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 126 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

agreements, there is no doubt that increasing the federal acreage cap on CRP will be an important aspect of ensuring program success.

### Total Maximum Daily Load Program

Section 303(d) of the CWA requires states to identify waters that are not attaining ambient water-quality standards (i.e., waters that are impaired). States must then establish a priority ranking for such waters, taking into account the severity of the impairment and the uses to be made of such waters. For impaired waters, the states must establish total maximum daily loads (TMDLs) for pollutants necessary to meet water-quality standards and develop an implementation plan that will allow the TMDL to not be exceeded. The CWA further requires that once water-quality standards are attained, they must be maintained.

The term TMDL has essentially two meanings (EPA, 1991):

• The TMDL process is used for implementing state water-quality standards—i.e., it is a planning process that will lead to the goal of meeting the water-quality standards.

• The TMDL is a numerical quantity determining the present and near future maximum load of pollutants (from point and nonpoint sources as well as from background sources) to receiving waterbodies that will not violate the state water-quality standards with an adequate margin of safety. The permissible load is then allocated by the state agency among point and nonpoint sources.

In 1998, the national list of impaired waters—the 303(d) list—included 21,845 waters with 41,318 associated impairments that will require TMDLs (EPA, 2000a). Additional waters are being added annually. The distribution of these impairments is summarized in Figure 4-3 and Table 4-6. Every state has impaired waters and is affected by the TMDL program.

More than 200 distinct types of water impairments have been identified through the 303(d) reporting process. By combining similar impairments (e.g., combining fecal coliform, bacteria, and *E. coli* as "pathogens"), EPA has reclassified the impairments into approximately 50 categories. The top 15 pollution categories, which encompass 91 percent of the total impairments, are shown in Table 4-7, which indicates that sediment, pathogens, and nutrients are the major pollutants with regard to water-quality degradation nationwide. To help address this concern, EPA recently released protocols for developing sediment, nutrient, and pathogen TMDLs (EPA, 1999a,b,c).

The TMDL program does not explicitly require the protection of riparian areas. However, implementation of the TMDL program will have a substantial impact because most of the TMDL implementation plans that have been, are being, or will be developed call for restoration of riparian areas as one of the required management measures for achieving reductions in nonpoint source pol-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058841

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

---

**BOX 4-5**
**Conservation Reserve Enhancement Program**
**in the Illinois River Basin**

The Illinois CREP is a restoration program for the stream and river floodplains in the Illinois River Basin (see map). As of September 2001, Illinois has enrolled over 88,000 acres in CREP, making it the most successful in the country on the basis of acreage.

The Illinois River Basin covers about 44 percent of the state, resulting in a landscape that is both intensely urban (e.g., Chicago) and agricultural. The Illinois River transports about 14 million tons of sediment, much of which is deposited into the Illinois River valley and the Mississippi River. The resultant sedimentation has led to severe habitat loss and commercial navigation problems, and water quality continues to need attention. The Illinois CREP has four goals: (1) reduce silt and sediment entering the main stem of the Illinois River by 20 percent, (2) reduce the amount of phosphorus and nitrogen in the Illinois River by 10 percent, (3) increase by 15 percent the population of waterfowl, shorebirds, non-game grassland birds, and state and federally listed threatened and endangered species such as bald eagles, egrets, and herons, and (4) increase by 10 percent the native fish and mussel stocks in the lower reaches of the Illinois River.

In the Illinois CREP, the current program authority calls for enrolling up to 132,000 acres for a minimum of 15 years. To do this, landowners enter into 15-year federal CRP contracts and then may extend their enrollments through a supplemental state contract for an additional 15-year, 35-year, or permanent conservation easement. Of the 88,426 enrolled by September 2001, the state options included 58,287 acres and of this, 91.5 percent (53,319 acres) was placed in permanent easements. In addition to receiving annual payments, a federal CREP contract entitles a landowner to cost-share assistance for 50 percent of the establishment costs associated with the selected conservation practice. Landowners who enter into an additional state CREP contract receive a lump-sum incentive payment during the first year of the enrollment. They are also eligible to receive up to another 50 percent cost share for establishment costs. Thus, up to 100 percent of these costs are paid for by state and federal agencies. Enrollments in CREP have been on a continuous basis since the program's inception in May 1998.



Copyright © National Academy of Sciences. All rights reserved.

BLM_0058842

*EXISTING LEGAL STRATEGIES FOR RIPARIAN AREA PROTECTION*          287

### Eligible Lands

Although the current program calls for enrolling 132,0000 acres, the final program goals call for 232,000 acres to be enrolled. The eligible riparian areas must be either within the 100-year floodplain of the stream or river or be a farmed wetland, prior converted wetland, or a wetland farmed under natural conditions. Also eligible are highly erodible lands, defined as those lands with a weighted erodibility index of greater than or equal to 12, and which also must be adjacent to a stream corridor, have the riparian areas in a conservation practice, or have become an uneconomic remnant (i.e., land not profitable to farm).

### Landowner Payments

Like CRP, the CREP uses soil rental rates to determine payments to landowners but provides an additional incentive of 30 percent above these rates for riparian lands and a 20 percent bonus for highly erodible lands. In addition, Illinois will make lump-sum payments for extensions beyond the initial 15-year federal contract. As an example, for land with a soil rental rate of $130/acre, the federal CREP will pay annually $169/acre ($130 plus a 30 percent bonus). In addition, the landowner will receive 50 percent of the cost of establishing trees and a $5/acre maintenance fee. If the landowner chooses to utilize one of the state extensions, such as a permanent easement, the state will make a one-time lump-sum payment equal to the rental rate times 15 years times 30 percent. For example, if the soil rental rate is $130/acre, the landowner will receive a payment of ($130 x 15 x 0.30) = $585/acre. In addition, Illinois will pay the remaining 50 percent of the practice cost share. Thus, total payments to the landowner summed over the 15 years will include $2,535/acre from the federal government (15 years at $169/acre, not including practice cost share and maintenance payments and other incentives such as the current Signup Incentive Payment (SIP) and Practice Incentive Payment (PIP)) and $585/acre from the state (also not including practice cost share).

### Practices Available

Conservation practices funded by Illinois CREP are designed to reduce soil erosion, improve water quality, and create or enhance wildlife habitat. Emphasis is placed on the use of native vegetation with the choice dependent upon historic vegetation, soil types, water levels, and slope. Eligible practices include wetland restoration, riparian forest buffers, filter strips, establishing permanent native grasses, tree planting, permanent wildlife habitat development, and wildlife food plots. Riparian buffers (CP22) and wetlands (CP23) are the most common practices.

### Monitoring

To determine if the Illinois CREP will have the impacts projected, the state has installed or supplemented monitoring on the main river and several tributaries, and it has supported modeling that predicts both erosion reduction and the economic value of the program. Because the Illinois CREP area is so expansive, the assessment has also focused on two smaller watersheds within the eligible area where intensive stream gaging, habitat monitoring, and land-use mapping are being conducted. These assessments are based upon a paired watershed design and incorporate site-specific studies to assess certain practices.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058843

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

288

Copyright © National Academy of Sciences. All rights reserved.



FIGURE 4-3  Distribution of impaired waters in the United States requiring TMDLs. SOURCE: EPA (2000b). Note: States with high rates of impairment do not necessarily have poorer water quality than states with lower impairment rates. Impaired waters are a function of water-quality standards that vary from state to state. Because of these state-by-state differences, waters that would be classified in one state as impaired might not be classified as impaired in other states. Thus, states that have the most comprehensive and strictest water-quality standards often have the most impairments.

BLM_0058844

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 130 of 310

TABLE 4-6  Number of Impaired Waters in the United States

| Percentage of Impaired Water Miles within Watersheds[a] | Number of Watersheds[b] | Percentage of Total U. S. Watersheds |
|---|---|---|
| No Waters Listed | 550 | 24.3 |
| <5% | 670 | 29.7 |
| 5%–10% | 360 | 15.9 |
| 10%–25% | 480 | 21.3 |
| >25% | 199 | 8.8 |
| Total | 2,259 | 100.0 |

[a]This is the percentage of total water miles within a given watershed that are impaired. "No waters listed" may imply that no waters are impaired or that the watershed has not been monitored.
[b]8-digit Hydrologic Unit Code (HUC) watersheds

SOURCE: EPA (2000a).

lutant loadings. For example, water-quality impairments caused by nonpoint source pollutants released in riparian areas or in adjacent uplands may be best remedied by enhancing the pollutant removal and assimilation functions of existing riparian areas or by creating new riparian areas. Indeed, riparian buffer zones have been used and promoted as management measures to address all the impair-

TABLE 4-7  Top 15 Categories of Impairment Requiring TMDLs (from 1998)

| Cause of Impairment | Number of Impaired Waterbodies |
|---|---|
| Sediments | 6,133 |
| Pathogens | 5,281 |
| Nutrients | 4,773 |
| Metals | 3,984 |
| Dissolved Oxygen | 3,758 |
| Other Habitat Alterations | 2,106 |
| Temperature | 1,884 |
| pH | 1,798 |
| Impaired Biologic Community | 1,440 |
| Pesticides | 1,432 |
| Flow Alterations | 1,099 |
| Mercury | 1,088 |
| Organics | 1,069 |
| Noxious Aquatic Plants | 831 |
| Ammonia | 752 |

NOTE: "Waterbodies" refers to individual river segments, lakes, and reservoirs. A single waterbody can have multiple impairments. Because most waters are not assessed, there is no estimate of the number of unimpaired waters in the United States. SOURCE: EPA (2000a).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058845

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

ments listed in Table 4-7, with the possible exception of mercury and other point source-dominated impairments.

The potential impact of the TMDL program on riparian area protection was demonstrated in the *Pronsolino v. Marcus* case (1999), in which the TMDL implementation plan in question required substantial reductions (60 percent) in sediment loading. The Garcia River TMDL identified logging operations as a significant cause of excessive sediment, and thus limits were placed on allowable sediment losses from forestry operations. When the Pronsolinos filed for a permit to harvest timber, the California Department of Forestry required (as a result of the Garcia River TMDL implementation plan) that they reduce sediment losses by reducing harvesting within 100 feet of streams, refraining from construction or using skid trails on slopes greater than 40 percent within 200 feet of streams, and not removing trees from certain unstable areas, which have the potential to deliver sediment to a watercourse. Thus, the sediment load reductions required protection of existing riparian areas.

Several dozen TMDLs for sediment, nutrient, temperature, and fecal coliform impairments have been developed since 1999, many of which require riparian area protection and restoration as part of their proposed implementation plans (e.g., EPA Region IX, 1999; Indiana Department of Environmental Management, 2000). For fecal coliform-impaired waters in Virginia, every implementation plan for watersheds where cattle grazing is significant and in which cattle have access to streams has required an 80 percent to 100 percent reduction in cattle access to streams and riparian areas (Virginia Department of Environmental Quality, 1999; EPA, 2000c; Virginia Tech, 2000a,b,c,d). Exclusion of cattle from streams was specifically mentioned in each case. Although these TMDLs do not have explicit plans for riparian area restoration, the required exclusion of cattle from streams and riparian areas will result in significant improvement in riparian area functioning. However, how much functioning will be restored is uncertain because the TMDL plans do not specify how much fencing will be required or the widths of protected riparian areas. It is possible that fences will be installed immediately adjacent to streams, which is unlikely to promote functioning riparian areas. Most cost-share programs such as CRP that help landowners with fencing and off-stream water system costs require a riparian area with a minimum average width of 35–100 ft. Consequently, much of the fencing installed for TMDL implementation will involve the restoration of riparian areas 35–100 ft wide.

TMDL implementation plans developed for other impairments such as nutrients, benthic impairment, *Cryptosporidium*, and pesticides are also likely to require some level of cattle exclusion from streams. In addition, some of these plans may recommend restoration of riparian areas as a means of reducing nonpoint source pollutant loadings to streams from upland areas. For example, the fecal coliform TMDL for Pleasant Run in Virginia calls for a 25 percent reduction in nonpoint source loadings from pasture and cropland (Virginia Tech,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058846

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

2000c). If cattle are excluded from the streams by fencing, as required by the TMDL, it is possible that the nonpoint source loading reduction goal will be met as a consequence of the riparian areas becoming reestablished. This assumes that the fences are located so that the resulting protected widths are adequate to achieve desired pollutant reductions. Width and vegetative composition need to be based on site-specific topographic and hydrologic conditions and the pollutant reductions required for each site (see Chapter 5).

The TMDL program also may lead to protection and restoration of riparian areas in those parts of the country where summertime stream temperature is an important water-quality issue. Some of the earliest stream temperature research in forested stream systems was undertaken in the late 1960s in Oregon by Brown (1969), and a significant body of knowledge has been acquired (e.g., Beschta et al., 1987) and stream temperature models (e.g., Boyd, 1996) have been developed for understanding and predicting the effects of vegetation removal on stream temperature. Temperature TMDLs are required for those waters where the instream water temperatures deviate from the state temperature standard (which in Oregon is a numeric standard based on seven-day maximum temperatures). The exercise involves identifying potential sources that contribute to increased water temperatures in conjunction with modeling efforts to evaluate the extent to which temperature improvements can be attained through improved riparian management. For example, along reaches normally occupied by a riparian forest, site potential vegetation (e.g., assumed to be late seral conifers) is utilized in a stream temperature model to indicate the potential improvements in temperature that might be realized if revegetation were to occur. Results of these analyses (e.g., Boyd et al., 1998) can be used to formulate TMDLs on a basin-by-basin basis.

The TMDL program is currently the nation's most comprehensive attempt to restore and improve water quality (NRC, 2001). Though not a primary stated goal of the program, TMDL implementation should protect many functioning riparian areas and restore thousands of miles of degraded riparian areas along the streams and shorelines of the United States. TMDL plans for the restoration of waterbodies impacted by livestock will likely involve streamside fencing and the reestablishment of riparian vegetation. For forested stream systems, the use of riparian reserves or stream buffers of unharvested trees will become increasingly common. In addition, TMDL implementation plans for waterbodies with impairments caused at least in part by nonpoint source pollutants from cropland and pasture will likely recommend the protection of existing riparian areas that are in relatively good condition and the restoration of those that have been degraded.

## CONCLUSIONS AND RECOMMENDATIONS

As reflected in the foregoing materials, a variety of laws offer mechanisms to help protect some riparian areas or aspects of riparian areas. Few of these laws, however, reflect awareness of riparian areas as landscapes supporting multiple

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058847

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 133 of 310

important functions and warranting special management and protection as unique physical and natural systems in their own right. Rather, protection of riparian areas is an indirect consequence of other objectives, such as water-quality protection or habitat management.

Protecting riparian areas in private ownership is especially challenging. Willingness of states and local governments to regulate land use in riparian areas for general ecological benefits varies widely. Striking examples of state and local programs that provide significant protection of riparian areas are relatively few in number. Interest seems to be growing in conservation easements and other incentives to induce landowners to hold riparian areas as buffers, natural areas, or open space, as well as in the purchase of riparian lands for greenways or wildlife areas. Enactment of laws such as the Conservation and Reinvestment Act (considered by Congress in 2000) could make available several billion dollars annually for purchases of such areas.

Many states have been willing to regulate or manage timber harvesting on private lands in riparian areas. They have not, however, been nearly as willing to restrict other agricultural activities, except in some areas with demonstrated water-quality problems. Instead, the preference has been to induce change in farming practices through incentives provided by programs such as the Conservation Reserve Program.

Riparian areas on federal lands are seldom managed as natural systems, though they may receive management attention or protection when they support resources of concern (such as wildlife or fisheries) and are threatened by certain land uses (such as livestock grazing or mining). Federal statutes contain very little guidance for land managers who face conflicts between riparian area protection and permissible land uses. Only if a federal agency proposes an activity in or affecting a riparian area that would jeopardize threatened or endangered species or violate water-quality requirements is the protection of riparian values clearly required.

Although the BLM is taking an increasingly active role in developing policies regarding the management and protection of riparian areas and in coordinating efforts to assess the condition of riparian areas, it has no clear mandate to do so. BLM's relatively new "fundamentals of rangeland health" regulations authorize the inclusion in livestock grazing permits of conditions to protect riparian areas, but these conditions are neither consistently included nor enforced. As a result of legal challenges, however, both the BLM and USFS have reduced or eliminated livestock grazing along some streams or have initiated consultation with the FWS regarding the impacts of grazing on threatened and endangered species. In the Pacific Northwest, the BLM and USFS have implemented significant riparian protections under the Northwest Forest Plan. In addition, the USFS has taken a number of forest- or stream-specific actions to protect riparian areas, but there is no clear agency policy guiding these actions. Neither the NPS nor the

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058848

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 134 of 310

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

FWS has a policy regarding protection of riparian areas, even though this would seem consistent with the predominantly protection-oriented missions of these two agencies.

State water laws have been concerned almost solely with the allocation of water for human uses and not for ecological needs. New programs directed at the protection of unutilized instream flows have the potential to address the water-related needs of at least some riparian areas.

In sum, existing legal and management protection of the ecological functions and values of riparian areas is inadequate. Even on federal lands, uses of riparian areas are not singled out for special consideration by statute or regulation. Uses of riparian areas on private lands are addressed, if at all, as a matter of local land-use regulation or through a mix of incentive programs. Several suggestions for strengthening and improving the legal framework governing protection of riparian areas are offered below. In the absence of making such legal and regulatory changes, it is unlikely that the degradation of riparian areas documented in Chapter 3 will be halted or even slowed.

**Management guidelines and regulations differ drastically among forest, range, agricultural, residential, and urban lands on private lands.** No state has a general land-use law or framework to coordinate management of the landscape for multiple uses (e.g., forest harvesting, grazing, agriculture, mining, urban development). Fragmentation of policy has contributed to vastly different levels of protection for, and degradation of, riparian areas across individual watersheds and regions. This phenomenon will only increase with increased population growth and continued economic development.

**States should consider designating riparian buffer zones adjacent to waterbodies within which certain activities would be excluded and others would be managed.** The broad importance of protecting riparian areas for water quality and fish and wildlife benefits calls for state-level programs of land-use regulation to accomplish this objective. A statewide program such as the Massachusetts Riverfront Protection Act treats all riparian landowners equally in providing these important public benefits. At the very least, states should consider establishing such buffers for sensitive areas (as has been done for the Chesapeake Bay). In the absence of a statewide program, local governments should be encouraged to develop riparian buffer zones.

**Increased federal and state funding should be directed toward encouraging private riparian landowners to restore and protect riparian areas.** At the federal level, this means increased funding for riparian buffers under Farm Bill programs, for wildlife habitat under Partners for Fish and Wildlife, and for watershed restoration under the Clean Water Action Plan and other federal agency

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058849

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 135 of 310

initiatives. Both federal and state funding should be made available to land trusts, soil and water conservation districts, watershed groups, and others working with private riparian landowners to protect and improve their riparian areas.

**Few, if any, federal statutes refer expressly to riparian area values and as a consequence generally do not require or ensure protection of riparian areas.** Even the National Wild and Scenic Rivers Act refers only to certain riparian values or resources; it does not consider riparian areas as natural systems, nor does it require integrated river corridor management. Moreover, statutes governing federal land management do not direct agencies to give priority to riparian area protection when conflicts among permissible land uses arise. This absence of a national riparian mandate stands in stark contrast to the existence of a federal wetlands law.

**Federal land management agencies should promulgate regulations requiring that the values and functioning of riparian areas under their jurisdiction be restored and protected.** This goal is consistent with the ecological benefits of riparian areas and the overarching principle that public lands are to be managed in the national interest. Such regulations should account for the full spectrum of riparian values and services—habitat-related, hydrological, water quality, aesthetic, recreational. At a minimum, agencies should assess the condition of riparian areas, develop and implement restoration plans where necessary, exclude incompatible uses, and manage all other uses to ensure their compatibility with riparian area protection. Clear, enforceable regulations are necessary because existing rules and policies are inconsistent, vague, and/or only advisory. Alternatively, agencies could protect riparian areas using existing rules for special management areas, such as BLM's ACECs.

**Ideally, Congress should enact legislation that recognizes the myriad values of riparian areas and directs federal land management and regulatory agencies to give priority to protecting those values.** A mandate from Congress would establish riparian protection as a federal priority and ensure consistency both within and among agency regulatory and land management programs. Absent federal legislation, a presidential executive order could promote consistent riparian management by federal agencies.

**Federal agencies should coordinate riparian management activities to improve efficiency and help ensure that protection of riparian values and functioning does not vary across jurisdictional boundaries.** Many streams and other waterbodies, especially in the West, are located on private, state, and/or federal lands. Frequently, streams traverse lands managed by different federal agencies. If intact riparian areas are to be restored and maintained, management and protection of riparian values and functioning cannot be left to the vagaries of

Copyright © National Academy of Sciences. All rights reserved.

political systems, but will require coordination of management policies and pre-
scriptions.

**States should administer the public trusts in water and state-owned
submerged lands to protect the public interests in properly functioning and
ecologically healthy riparian areas.** States are obligated to protect public inter-
ests in recreation, fisheries, water yield, and other values and services of state
waters, a responsibility that cannot be carried out without regard to riparian
functioning. Each state has the authority to decide how it will administer these
trusts, subject to judicial review according to standards established by the respec-
tive state and by the U.S. Supreme Court.

**Instream flow laws can help protect riparian areas if river and stream
flows are managed to mimic the natural hydrograph.** Water allocation has
historically favored human claims to water over using it for environmental needs.
Recently, the needs of natural systems have been addressed in some cases by
preserving minimum stream flows. Because riparian functioning is dependent on
the full range of variation in the hydrologic regime, the reintroduction or mainte-
nance of such flow regimes (in addition to minimum stream flow) is essential for
restoring and sustaining healthy riparian systems.

**Implementation of the CREP and TMDL programs has the potential to
protect existing and restore degraded riparian areas nationwide.** State in-
volvement in CREP is increasing exponentially, with the potential for taking
millions of miles of riparian land out of agricultural production. Many TMDL
plans developed to date call for the restoration of riparian areas to reduce nonpoint
source pollutant loadings and to restore streamside shading.

## REFERENCES

Allen, A. W. 1996. Northern Prairie Science Center conservation reserve program bibliography.
    Jamestown, ND: Northern Prairie Wildlife Research Center.
Amman, D., B. Cosens, and J. Specking. 1995. Negotiation of the Montana–National Park Service
    Compact. Rivers 5(1):35–45.
Beschta, R. L., R. E. Bilby, G. W. Brown, L. B. Holtby, and T. D. Hofstra. 1987. Stream temperature
    and aquatic fish habitat: fisheries and forestry interactions. Pp. 191–232. In: Streamside man-
    agement: fisheries and forestry interactions. E. O. Salo and T. W. Cundy (eds.). Contribution
    No. 57. Seattle, WA: University of Washington, Institute of Forest Resources. 471 pp.
Boyd, M. S. 1996. Heat source: stream, river and open channel temperature prediction. M.S. Thesis,
    Oregon State University, Corvallis. 148 pp.
Boyd, M., B. Kasper, and A. Hamel. 1998 (draft). Tillamook basin temperature; total maximum daily
    load (TMDL). Portland, OR: Oregon Department of Environmental Quality. 42 pp. + appendices.
Bradbury, W., W. Nehlsen, T. E. Nickelson, K. Moore, R. M. Hughes, D. Heller, J. Nicholas, D. L.
    Bottom, W. E. Weaver, and R. L. Beschta. 1995. Handbook for prioritizing watershed restora-
    tion to aid recovery of native salmon. Portland, OR: Pacific Rivers Council.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058851

Brown, G. W. 1969. Predicting temperatures of small streams. Water Resources Research 5:68–75.

Bureau of Land Management (BLM). 1984. Federal Register 49:162.

BLM. 1986. Federal Register 51:12,747.

BLM. 1991a. Riparian-Wetland Initiative for the 1990's. BLM/WO/GI-91-001+4340. Washington, DC: BLM.

BLM. 1991b. Application to Appropriate Public Water, Attachment A.

BLM. 1992. Federal Register 57: 53,924.

BLM. 1994. Ecosystem Management in the BLM: From Concept to Commitment. BLM/SC/GI-94-005+1736. Washington, DC: BLM.

BLM. 2000a. Public Land Statistics 1999. Volume 184, BLM/BC/ST-00/001+1165. Washington, DC: BLM.

BLM. 2000b. Final Notice of Issuance and Modification of Nationwide Permits: Correction. Fed. Reg. 65:14,255.

Committee of Scientists (COS). 1999. Sustaining the peoples' lands: recommendations for stewardship of the national forests and grasslands into the next century. Washington, DC: U.S. Department of Agriculture. 193 pp.

Doppelt, B., M. Scurlock, C. Frissell, and J. Karr. 1993. Entering the watershed: a new approach to save America's river ecosystems. Washington, DC: Island Press.

Durbin, K. 1997a. Restoring a refuge: cows depart, but can antelope recover? High Country News 29 (Nov. 24, 1997).

Durbin, K. 1997b. Selling science to the agencies: an ecologist's story. High Country News 29 (Nov. 24, 1997).

Environmental Protection Agency (EPA). 1991. Guidance for water quality-based decisions: the TMDL process. Washington, DC: EPA Assessment and Watershed Protection Division.

EPA Region IX. 1999. South Fork Eel River total maximum daily loads for sediment and temperature. San Francisco, CA: EPA Region IX Water Division. 62 pp.

EPA. 1993. Guidance specifying management measures for sources of nonpoint pollution in coastal waters. 840-B-92-002. Washington, DC: EPA Office of Water.

EPA. 1999a. Protocol for developing sediment TMDLs. First Edition. EPA 841-B-99-004. Washington, DC: EPA Office of Water.

EPA. 1999b. Protocol for developing nutrient TMDLs. First Edition. EPA 841-B-99-007. Washington, DC: EPA Office of Water.

EPA. 1999c. Protocol for developing pathogen TMDLs. First Edition. EPA 841-B-00-002. Washington, DC: EPA Office of Water.

EPA. 2000a. 1998 Section 303(d) list fact sheet: national picture of impaired waters. Washington, DC: EPA Office of Water.

EPA. 2000b. Atlas of America's polluted waters. EPA 840-B-00-002. Washington, DC: EPA Office of Water.

EPA. 2000c. Fecal coliform TMDL modeling report: Cottonwood Creek, Idaho County, Idaho. Washington, DC: EPA Office of Water. 139 pp.

Federal Interagency Floodplain Management Task Force. 1992. Floodplain management in the United States: an assessment report—volume 2: full report. Washington, DC: Federal Emergency Management Agency.

Federal Energy Regulatory Commission (FERC). 1992. Office of Hydropower Licensing, Paper No. DPR-4. Washington, DC: FERC.

Feldman, M. D. 1995. National forest management under the Endangered Species Act. Natural Resources and Environment 9(Winter 1995):32–37.

General Accounting Office (GAO). 1996. Land ownership: information on the acreage, management, and use of federal and other lands. GAO/RCED-96-40. Washington, DC: GAO.

Gillilan, D., and T. Brown. 1997. Instream flow protection: seeking a balance in western water uses. Washington, DC: Island Press.

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Harting, A., and D. Glick. 1994. Sustaining Greater Yellowstone: a blueprint for the future. Greater Yellowstone Coalition.

Houck, O. A. 2000. The Clean Water Act TMDL program: law, policy, and implementation. Washington, DC: Environmental Law Institute.

Indiana Department of Environmental Management. 2000. Dissolved oxygen and ammonia TMDL development for Kokomo Creek, Indiana (draft). Indianapolis: Indiana DEM. 49 pp.

Interagency Floodplain Management Review Committee. 1994. Sharing the challenge: floodplain management into the 21st century. Washington, DC: Administration Floodplain Management Task Force.

Isenhart, T. M., R. C. Schultz, and J. P. Colletti. 1997. Watershed restoration and agricultural practices in the Midwest: Bear Creek of Iowa. Pp. 318–334 In: Watershed restoration: principles and practices. J. E. Williams, C. A. Wood, and M. P Dombeck (eds.). Bethesda, MD: American Fisheries Society.

Keystone Center. 1991. Final consensus report of the keystone policy dialogue on biological diversity on federal lands.

Kimball, K. D. 1997. Using hydroelectric relicensing in watershed restoration: Deerfield River watershed of Vermont and Massachusetts. Pp. 179–97 In: Watershed restoration: principles and practices. J. E. Williams, C. A. Wood, and M. P. Dombeck (eds.). Bethesda, MD: American Fisheries Society.

Kusler, J. A. 1985. A call for action: protection of riparian habitat in the arid and semi-arid west. In: Riparian ecosystems and their management: reconciling conflicting uses. G. Bingham, E. H. Clark, L. V. Haygood, and M. Leslie (eds.). April 16–18, 1985. Tucson, AZ: USFS.

Land Trust Alliance. 1996. The conservation easement handbook. Washington, DC: Land Trust Alliance.

MacDonnell, L. J., and T. A. Rice. 1993. The federal role in in-place water protection. In: Instream flow protection in the West, Revised Edition. Boulder, CO: Natural Resources Law Center.

Mohai, P., and P. Jakes. 1996. Forest Service in the 1990s: is it headed in the right direction? Journal of Forestry 94:31–37.

Moyle, P. B., and G. M. Sato. 1991. On the design of preserves to protect native fishes. Pp. 155–173 In: Battle against extinction: native fish management in the American West. W. L. Minckley and J. E. Deacon (eds.). Tucson, AZ: University of Arizona Press.

National Park Service (NPS). 1993. Floodplain management guideline. Washington, DC: Department of the Interior.

National Research Council (NRC). 1993. Setting priorities for land conservation. Washington, DC: National Academy Press.

NRC. 1995. Wetlands: characteristics and boundaries. Washington, DC: National Academy Press.

NRC. 2000. Watershed management for potable water supply: assessing the New York City strategy. Washington, DC: National Academy Press.

NRC. 2001. Assessing the TMDL approach to water quality management. Washington, DC: National Academy Press.

North Country Resource Conservation and Development Area Inc. 1995. A guide to developing and re-developing shoreland property in New Hampshire. Meredith, N.H.

Schultz, R. C., J. P. Colletti, T. M. Isenhart, W. W. Simpkins, C. W. Mize, and M. L. Thompson. 1995. Design and placement of a multi-species riparian buffer strip system. Agroforestry Systems 29:201–226.

Silk, N., J. MacDonald, and R. Wigington. 2000. Turning instream flow water rights upside-down. Rivers 7(4):298–313.

Small, S. J. 1995. The federal tax law of conservation easements. Second Supplement. Washington, DC: Island Press.

Smith, D. S., and P. C. Hellmund, eds. 1993. Ecology of greenways. Minneapolis, MN: University of Minnesota Press. 222 pp.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058853

Stenzel, R. L. 2000. Policies concerning wetland vegetation. Colorado Stream Lines 14(1). Denver, CO: Colorado Division of Water Resources.

United States of America, the State of Utah, the Washington County Water Conservancy District, and the Kane County Water Conservancy District. 1996. Zion National Park water rights settlement agreement.

U.S. Department of Agriculture Forest Service (USFS) and Department of Interior Bureau of Land Management (BLM). 1994a. Northwest Forest Plan. Washington, DC: USFS.

U.S. Department of Agriculture Forest Service (USFS) and Department of Interior Bureau of Land Management (BLM). 1994b. PACFISH. Washington, DC: USFS.

U.S. Department of Agriculture Forest Service (USFS). 1995. Inland native fish strategy (INFISH). Washington, DC: USFS.

U.S. Department of Agriculture Forest Service (USFS). 1998. Blue mountains biodiversity project v. Pence. Federal Register 63:63,831. Washington, DC: USFS.

U.S. Department of Agriculture Natural Resources Conservation Service (NRCS). 1999. The National Conservation Buffer Initiative: a qualitative evaluation. Washington, DC: USDA NRCS.

U.S. Department of the Interior Bureau of Land Management (BLM) and U.S. Department of Agriculture Forest Service (USFS). 1994. Rangeland reform '94: draft environmental impact statement executive summary. Washington, DC: US DOI and USDA.

U.S. Fish and Wildlife Service (FWS). 1994. Federal Register 59:30,035.

Virginia Department of Environmental Quality. 1999. Fecal coliform TMDL development for Muddy Creek, Virginia. Richmond. 111 pp.

Virginia Tech Biological Systems Engineering and Biology Departments. 2000a. Fecal coliform TMDL for Dry River, Rockingham County, Virginia. Final Report prepared by Virginia Tech Departments of Biological Systems Engineering and Biology and submitted to Virginia Departments of Environmental Quality and Conservation and Recreation, Richmond. 122 pp.

Virginia Tech Biological Systems Engineering and Biology Departments. 2000b. Fecal coliform TMDL for Mill Creek, Rockingham County, Virginia. Final Report prepared by Virginia Tech Departments of Biological Systems Engineering and Biology and submitted to Virginia Departments of Environmental Quality and Conservation and Recreation, Richmond. 113 pp.

Virginia Tech Biological Systems Engineering and Biology Departments. 2000c. Fecal coliform TMDL for Pleasant Run, Rockingham County, Virginia. Final Report prepared by Virginia Tech Departments of Biological Systems Engineering and Biology and submitted to Virginia Departments of Environmental Quality and Conservation and Recreation, Richmond. 108 pp.

Virginia Tech Biological Systems Engineering Department. 2000d. Fecal coliform TMDL for Sheep Creek, Elk Creek, Machine Creek, Little Otter River, and Big Otter River in Bedford and Campbell Counties, Virginia. Final Report prepared by Virginia Tech Department of Biological Systems Engineering and submitted to Virginia Departments of Environmental Quality and Conservation and Recreation, Richmond. 302 pp.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058854

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 140 of 310

# 5

# Management of Riparian Areas

The condition of the nation's riparian areas represents the outcome of decades of local and basinwide land use, often with little understanding of how various practices might impact these valuable and productive systems. With an increasing body of scientific knowledge regarding riparian areas—their ecological processes and functions, their diversity at local and landscape levels, and their productivity and utility for a variety of human uses—the nation is now in position to protect, improve, and restore many of its riparian systems. This chapter outlines approaches for improving the ecological functioning of riparian areas—an opportunity for landowners, irrigation districts, watershed councils, professional societies, government at local, state, and federal levels and their associated regulatory agencies, and the public at large. According to Verry et al. (2000), "The acid test of our understanding is not whether we can take ecosystems apart on paper…but whether we can put them together in practice and make them work."

The restoration of riparian areas and their associated aquatic ecosystems has become a topic of intense scientific interest. For example, the experimental flood of the Colorado River in the southwestern United States in the spring of 1996 focused worldwide attention on alternative methods for managing and restoring river and riparian ecosystems (Collier et al., 1997). Reinstating flooding and overbank flows on a river where flow regulation has been in place for decades is now seen as a potential means for partially restoring fluvial geomorphology and riverine habitats for threatened and endangered species in this human-impacted landscape. Similarly, the initiation of restoration efforts on the channelized and flow-regulated Kissimmee River in south Florida is a major undertaking designed to restore 70 km of river channel and 11,000 ha of wetland over the next

299

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058855

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 141 of 310

15 years (Cummins and Dahm, 1995; Dahm et al., 1995; Toth et al., 1998). The goal of this long-term project is to reestablish 104 km$^2$ of river-floodplain ecosystem and return a more normal hydrograph to the river. These ambitious and expensive projects represent historic initiatives in ecosystem restoration; however, they are a small part of the challenges that remain in restoring rivers and riparian areas throughout the United States.

Because degradation of riparian areas varies in areal extent, severity, and proximity to streams and other waterbodies, attempts at restoring these areas will entail more than simply understanding the workings of a narrow strip of land along a stream, river, or other body of water. Upslope and upriver land uses must necessarily be considered. Understanding the watershed context is often essential in undertaking restoration efforts that are targeted at improving streamside areas (Kershner, 1997). Unfortunately, although watersheds as geographic areas are "optimal organizing units" for dealing with the management of water and related resources such as riparian areas (NRC, 1999), the natural boundaries of watersheds (and their riparian systems) rarely coincide with legal and political boundaries. City, county, state, and federal jurisdictions provide a mélange of authorities across the landscape. Thus, comprehensive watershed approaches to riparian restoration, by necessity, will need to involve numerous landowners, a cross section of political and institutional representations, and coalitions of special interest groups.

## GOALS OF MANAGEMENT

Strategies and practices that reflect a spectrum of goals will likely be needed for maintaining and improving the ecological functions of existing riparian areas and for improving their sustainability and productivity for future generations. This section identifies several broad management approaches that have different objectives and expected outcomes.

### Protection

Protection (also referred to as preservation or maintenance) of intact riparian areas is of great importance, both environmentally and economically. It is distinct from restoration, which addresses degraded systems. Intact riparian areas represent valuable reference sites for understanding the goals and the efficacy of various restoration approaches and other management efforts. In some cases they are important sources of genetic material for the reintroduction of native biota into areas in need of restoration. For these reasons and others, riparian areas in a natural state warrant a high level of protection (NRC, 1992, 1995; Kauffman et al., 1997).

As a management strategy, riparian protection may entail more than simply preventing human-induced alterations. For example, actions such as prescribed

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058856

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 142 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

fire, management of exotic species invasions, and large herbivore management may be necessary to maintain natural characteristics and functions and to sustain them over time. Because degraded riparian areas are so prevalent in many portions of the nation, protecting any that remain relatively uninfluenced by human perturbations should be a high priority. Measures to protect intact areas are often relatively easy to implement, have a high likelihood of being successful, and are less expensive than the restoration of degraded systems (NRC, 1992; Cairns, 1993).

### Restoration

Definitions of the verb *restore* commonly include to reestablish, to put back into existence or use, to bring back into the former or original state, to renew, to repair into nearly the original form, and to bring back into a healthy state. These definitions point to the reestablishment of former conditions, processes, and functions (i.e., making healthy again). Although seemingly simple in concept, the restoration of degraded riparian areas is often a scientific and social challenge. In some instances, the natural or pristine conditions of a particular riparian area may no longer exist or may not be known with certainty. In others, multiple causes of degradation may have occurred over long periods of time—hence, cause-and-effect relationships that define existing conditions may not be well known or easy to decipher at either local or landscape scales.

Restoration may refer both to the process of repairing degraded riparian areas and to the desired end goal of such actions, although the term is sometimes used to refer only to the latter. Thus, for example, NRC (1992) defined restoration of aquatic ecosystems as representing the "re-establishment of pre-disturbance aquatic functions and related physical, chemical, and biological characteristics." It further indicated that "restoration is different from habitat creation, reclamation, and rehabilitation—it is a holistic process not achieved through the isolated manipulation of individual elements." This definition has the stated goal of regaining predisturbance characteristics, which this report categorizes specifically as *ecological restoration*. Thus, a working definition of ecological restoration for riparian areas, based upon the above as well as upon definitions within Jackson et al. (1995), Kauffman et al. (1997), and Williams et al. (1997) might be:

> The reestablishment of predisturbance riparian functions and related physical, chemical, and biological linkages between aquatic and terrestrial ecosystems; it is the repairing of human alterations to the diversity and dynamics of indigenous ecosystems. A fundamental goal of riparian restoration is to facilitate self-sustaining occurrences of natural processes and linkages among the terrestrial, riparian, and aquatic ecosystems.

Ecological restoration of riparian areas results in the reestablishment of functional linkages between organisms and their environment, even though these

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058857

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 143 of
310

systems may be continually responding to the natural dynamics of various environmental conditions.

Across the nation, there are many riparian areas where ecological restoration is possible. For example, riparian areas in forests and rangeland areas throughout the western United States represent likely candidates for ecological restoration if the adverse effects of historical or ongoing land uses can be significantly reduced, controlled, or eliminated. Success is more likely where fundamental disturbance regimes continue to occur relatively unhindered by human influence. Ecological restoration of riparian areas that border low-order streams or other small bodies of water is also possible where human impacts have involved relatively benign land uses. Tributary junctions of streams and rivers represent additional landscape locations where disturbance regimes often remain in a relatively natural state. In such situations, it may be possible to recover nearly the full array of riparian composition, structure, and functions that existed before significant human alterations or impacts occurred.

Although ecological restoration may be an achievable and desired goal for some areas, it obviously cannot be attained everywhere. For example, permanent or irreversible changes in hydrologic disturbance regimes (e.g., via dams, transbasin diversions, irrigation projects, extensive landscape modification), natural processes (e.g., global climate change, accelerated erosion), channel and floodplain morphology (e.g., channel incision, rip-rap, levees), and other impacts (e.g., extirpation of species, biotic invasions) may preclude our ability to precisely or completely re-create the composition, structure, and functions that previously existed. Riparian areas adjacent to large rivers may represent a greater challenge than those associated with smaller streams and rivers because of the greater number of factors affecting flow regimes at these larger scales (Gore and Shields, 1998). Nevertheless, even in such situations, there are often numerous opportunities to effect significant ecological improvement of riparian areas and to restore, at least in part, many of the functions they formerly performed.

Based on the above considerations and others, this report classifies as *restoration* those efforts that lead to the recovery of some of the previously existing riparian composition, structure, and functions. As shown in Figure 5-1, restoration represents a reversal in the decline of ecosystem health and movement of a degraded system toward its historical conditions and functions. Although the predisturbance composition, structure, and functions of the riparian area (i.e., ecological restoration) may not be the final outcome of a restoration effort, the primary intent of such efforts is nevertheless to shift a riparian area in that direction.

This chapter considers many of the scientific and social challenges to be faced in restoring riparian areas that have been significantly altered or degraded by human activities. Distinguishing between natural disturbances and the effects of human-induced modifications to riparian areas is an important aspect of restoration. Understanding the values of society is equally important, as they will

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058858



FIGURE 5-1 Restoration is dependent on ecosystem structure and function. A primary goal of restoration is to redirect the trajectory of a degraded area, in relation to both its structure and function. Restoration refers broadly the moving towards the upper right corner. Ecological restoration is represented by the historic watershed condition. SOURCE: Reprinted, with permission, from Williams et al. (1997). © 1997 by American Fisheries Society.

likely need to change and adapt over time if restoration efforts are to proceed. Because riparian areas represent an entire suite of organisms, physical features, processes, and functions, a species-only or single-process approach will likely fail to achieve a significant degree of restoration. For example, the reintroduction of an extirpated plant species into a degraded riparian area is likely to fail if the underlying causes of extirpation have not been addressed. Focusing on those human influences that affect multiple ecological processes is more likely to attain greater restoration of riparian habitat and species of interest.

## Alternatives to Protection and Ecological Restoration

Across the United States, a large number of aquatic and riparian projects are implemented each year, many of them having "restoration" as one of their expressed goals. Although ecological restoration may be a nominally important objective of some projects, many others are simply altering aquatic and riparian

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 145 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

systems with little emphasis on understanding or attempting to benefit long-term ecological processes or functions (Goodwin et al., 1997); improvements in ecological functions are typically not specified nor necessarily expected. Terms such as *creation*, *reclamation*, *rehabilitation*, *replacement*, *mitigation*, *enhancement*, and *naturalization* have been coined to describe the wide variety of land management approaches (NRC, 1992, 1996). These approaches typically emphasize altering ecosystem components to serve a particular human purpose, but generally are not intended to restore the full suite of ecological functions that would normally be associated with a particular riparian area (Kauffman et al., 1997). Although these terms have different meanings to various disciplines (legal, political, and scientific), the appropriate characterization of riparian management options and goals is more than a matter of semantics. It is important to properly distinguish between a wide range of management approaches so that interested parties have realistic expectations regarding their potential outcomes.

## Creation

Creation is the establishment of a new riparian system on a site where one did not previously exist; it is generally associated with the establishment of a "new" reach of stream. For example, the repositioning of a section of stream or river channel will inherently cause the "creation" of a new riparian area that may or may not be ecologically similar to the section of channel lost by such a repositioning. Often the newly created channel will be less sinuous than the original one and less likely to be hydrologically connected to former floodplains. In other instances, channels may have been unintentionally developed or created as a result of long-term land-use practices. As discussed in Chapter 3, conversion of native forests and grasslands to agricultural crops throughout much of the Midwest was commonly accompanied by altering field drainage patterns (e.g., tiling and ditching), such that new channels eventually developed. An extended network of intermittent and ephemeral streams has become established in many agricultural areas where they did not previously exist; many of these streams could support riparian plant communities.

## Reclamation

Reclamation has traditionally been defined as the process of adapting natural resources to serve utilitarian human purposes (NRC, 1992). Historically, it often involved the conversion of wetlands and riparian areas to agricultural, industrial, or urban uses. More recently, however, reclamation has been defined as a process resulting in a stable, self-sustaining ecosystem that may or may not include some exotic species. The structure and functions of reclaimed sites may be similar, although not identical, to those of the original land (Jackson et al., 1995).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058860

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 146 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*Rehabilitation*

Rehabilitation implies rebuilding or making part of a riparian area useful again after natural or anthropogenic disturbances. For example, the mechanical excavation and reconfiguring of an eroding bank could represent rehabilitation. Although the resulting bank configuration might assist in retarding subsequent erosion, its configuration and other properties might be quite unlike that of a natural channel. Restoration of predisturbance processes and functions is neither required nor implied in the definition of rehabilitation; rehabilitation efforts typically do not focus on reproducing conditions characteristic of functionally intact riparian systems or on meeting regional ecological goals.

*Mitigation*

Mitigation is an attempt to alleviate some or all of the detrimental effects or environmental damage that arise from human actions. Mitigation is commonly used with regard to wetlands—e.g., the creation of a new wetland is often proposed as mitigation for natural wetlands that are to be impacted by dredging, filling, or other human alterations. However, constructed wetlands seldom display the full complement of structural and functional attributes of the native wetlands they replace (Quammen, 1986; Kusler and Kentula, 1990; NRC, 2001). Mitigation with regard to riparian areas focuses on minimizing potential detrimental impacts from a particular human action. For example, where levees may be needed along a river to protect human developments, mitigation might require the levees to be set back some distance from the channel edge to retain some riparian functions of the streamside vegetation and to maintain hydrologic connectivity of the near-channel floodplains and side channels. Where rip-rap is to be employed along a streambank, mitigation might require that measures be taken to ensure that riparian plants can become established and survive along the structure. In forested systems, large wood could be placed in channels in an attempt to mitigate the effects of prior harvesting practices that removed all trees along streams.

*Replacement*

Replacement represents the substitution of a native species or ecosystem feature with an alternative species (e.g., exotic species) or foreign object. An example would be the replacement of native conifers or deciduous trees with non-native species. Sometimes the replacement can be structural; for example, rip-rap may be used where floodplain or meadow streambanks have begun to erode because land uses have removed streamside vegetation or reduced the ability of the remaining vegetation to retard fluvial erosion. Replacement ap-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058861

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

proaches are generally narrow in scope and seldom successful in promoting a wide range of ecological goals.

Engineered approaches that reconstruct or greatly modify a particular stream and its riparian system to meet specific human ideas regarding what they should look like or how they should function are also considered replacement. Such approaches are often employed in urban areas where significant alterations to a stream and riparian area have occurred and where the hydrologic regime has been significantly altered (e.g., where increased amounts of impervious surface contribute more surface runoff and higher pollutant loads to a stream). Although these designed systems may provide many benefits (e.g., stabilized channel morphology, permanent streamside vegetation), they seldom have the features of more natural streams and thus do not provide the full range of functions associated with natural systems.

### Enhancement

Enhancement represents an attempt to accentuate or improve a *specific component* of riparian areas. Thus, enhancements may come at the expense of other components and may create conditions that are uncharacteristic of a natural riparian system. A widespread example is the employment of structures of various types and sizes in channels and on streambanks (e.g., log weirs, gabions, large rocks) to enhance fisheries habitat (e.g., Wesche, 1985; Hunter, 1991; Seehorn, 1992). These structures can alter streambank structure, sediment transport dynamics, and hydrologic connectivity with riparian vegetation, often resulting in disruption of riparian–stream linkages. Similarly, when spoils, rocks, or boulders are removed from streams and added to streambanks and floodplains to enhance local channel stability, conditions may no longer be suitable for the natural establishment of riparian vegetation or for adjustments in channel morphology in response to streamflow and sediment transport. In-channel enhancement projects are unlikely to provide long-term or sustainable improvements for riparian/aquatic systems (Platts and Rinne, 1985; Elmore and Beschta, 1989; Beschta et al., 1994).

### Naturalization

Naturalization, an alternative to ecological restoration, attempts to accommodate watershed-scale human influences in environmental designs of channels by establishing stable, self-sustaining geomorphologic systems with abundant and diverse ecological communities that are fundamentally different from those that existed before. The concept of naturalization was developed for specific application to agricultural streams that have been significantly modified, often by deepening and straightening previously existing channels (Rhoads and Herricks, 1996). Where headwater channel gradients are low, as in the Midwest, such channelized and modified streams have developed relatively stable configura-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058862

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

tions over many decades; the goal of naturalization would be to maintain that new stable configuration.

Naturalization assumes that the pristine stream network may not be the best restoration objective for stream management because (1) adequate information on the pristine state of streams is not available, (2) environmental conditions in most watersheds are far removed from the pristine state, and (3) restoration at the watershed scale is economically impractical. Because most streams in agricultural settings are not regulated by dams or lined with concrete, they retain some of their capability to morphologically adjust to changing flow and sediment regimes, implying there is some potential for these areas to support other riparian functions such as habitat provision. Management that might be used to achieve naturalization includes not only vegetated riparian buffers (discussed later), but also off-channel wetlands, side-slope reduction of streambanks, increased stream sinuosity, and other practices that provide improved ecological and water-quality benefits (Petersen et al., 1992).

The alternative approaches described above differ from protection and ecological restoration in their ultimate goals and consequently in the amount of ecological functioning that a degraded riparian area might eventually attain. While it is not the objective of this report to advocate ecological restoration as a goal for all degraded riparian areas, it is important to understand the trade-offs between restoring an area to full functioning vs. partial functioning. Much more important than the setting of a challenging goal (e.g., ecological restoration) is continual progress toward a more functional system. When conceptualized as a series of activities that improve both ecosystem structure and function, restoration can be monitored over time and at specific milestones. Box 5-1 illustrates the restoration of Bear Creek, Oregon—i.e., movement of this riparian area toward improved structure and functioning.

## Passive Versus Active Approaches to Restoration

Once the necessary background information has been obtained for understanding the status, trends, and factors influencing a particular riparian area, perhaps the most critical step in undertaking restoration is to curtail those activities and land uses that are either causing degradation or preventing recovery. Such an approach is referred to as *passive restoration* (Kauffman et al., 1997). Removing human disturbances in degraded systems allows natural process to be the primary agents of recovery. Many riparian areas are capable of recovery following a reduction in or curtailment of human perturbations because the biota of these systems has evolved to reproduce and survive in an environment of frequent natural disturbances. In the absence of other types of management, natural disturbance regimes and ecosystem responses will dictate the speed of recovery for areas undergoing passive restoration (NRC, 1996).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058863

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 149 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

## BOX 5-1
### Bear Creek, Oregon: A Restoration Case Study

Bear Creek provides a unique opportunity to observe the evolution of a riparian area over 21 years of changing management. It also demonstrates the resiliency of functioning riparian areas to management alternatives and high-flow events. Bear Creek is approximately 1,000 m (3500 ft) in elevation and located in the high desert of central Oregon. Although annual precipitation averages only 300 mm (12 in), the year-to-year variation in precipitation is quite high. Peak runoff from snowmelt typically occurs in mid to late February, and summer thunderstorms are common.

Livestock have grazed the Bear Creek area since the late 1800s; the permitted use in 1977 was 75 animal unit months (AUMs) from April until September. Surveys during 1977 revealed that the Bear Creek riparian area totaled 0.95 ha/km (3.8 ac/mile) of stream (representing an average riparian width of less than 5 m (16 ft) on each side of the stream) and was producing approximately 225 kg/ha (200 lbs/ac) of forage. That meant that if livestock consumed all the available forage and used 365 kg/AUM (800 lbs/AUM), 1.6 km (1 mile) of stream was required to support one cow for one month. As shown in Plate 5-1, by 1977 streambanks were actively eroding, the channel was deeply incised, and riparian vegetation was sparse. Flows were frequently intermittent, and runoff events contained high sediment loads.

The Bureau of Land Management (BLM) then changed the grazing rotation in the area such that in 1979 and 1980, the area was grazed for one week in September. From 1981 to 1984, none of the area was grazed. As shown in Plate 5-2, by May 1983, banks were stabilizing and the channel was narrowing and deepening. Sediment trapped by vegetation can be seen on the banks among newly emerging plants. Juniper trees in the floodplain seen in Plate 5-1 were cut down to see if this practice would affect willow reestablishment. (To date, willow reestablishment has been unsuccessful.) The large juniper indicated by the arrow was left, and it can be seen in the remaining photos.

By comparing Plates 5-1 and 5-2, it can be seen that over the six-year period of controlled grazing and livestock exclusion, riparian vegetation increased, the channel narrowed and deepened, and channel stability increased. Sediment, trapped by vegetation, can be seen on the banks in the reestablishing riparian area. These results were the result of natural recovery of the riparian area once livestock were excluded. Active restoration techniques, such as channel grading and planting, were not used.

During 1985, the pasture was divided into three pasture units, and controlled grazing was permitted from mid-February to mid-April. Vegetation was then allowed to grow to protect the stream system during the critical summer thunderstorm period and to provide livestock forage the following year. From 1983 to 1986, the channel continued to deepen and narrow, and nearly 460 mm (1.5 ft) of sediment was trapped on the floodplain because of increased riparian vegetation, which not only reduced channel scour but also reduced flow velocities and sediment transport capacity, as shown in Plate 5-3.

Plate 5-4, taken in June 1987, shows the effects of a large summer thunderstorm and resulting flood event on the riparian area. Compared to 1986 (Plate 5-3), it appears that much of the riparian vegetation has been inundated with sediment. The main channel widened some, but it is still narrower than it was in 1977 (Plate 5-1), and the channel

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058864

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

and the stream banks appear stable. There are obvious sediment deposits on the streambanks.

By August 1987 (Plate 5-5), the riparian vegetation was recovering rapidly and was stabilizing sediment trapped during the flood event, although some bare areas were still present. By October 1998, 16 months after the June 1987 flood event, the riparian area appears to have fully revegetated (Plate 5-6). The floodplain now appears stable and has trapped over 600 mm (2 ft) of sediment since 1976.

By 1989, the increased productivity of the riparian area permitted grazing to increase to 354 AUMs, nearly five times the 1977 allotment of 75 AUMs. This reportedly reduced the livestock permittee's winter feeding costs by over $10,000 a year. Plate 5-7, taken in August 1994, shows the riparian area during a drought. Because of reduced channel flow, sedges and rushes seeking water occupy almost the entire channel. The formerly intermittent stream has become perennial because of increased infiltration and moisture storage in the reestablished riparian area.

By 1995, beavers had returned to the watershed, presumably attracted by the improved hydrologic regime and increasing riparian vegetation. This is another possible indication of improved riparian functioning, as beavers usually avoid streams in poor condition. The dam building activities of the beavers will further stabilize the stream and increase water storage within the stream system. Plate 5-8 shows a newly established beaver dam slightly downstream of previous photos.

By 1996, the riparian area had increased in size to 3 ha/stream km (12 ac/stream mile), and forage production had increased to 370 kg/ha (2,000 lbs/acre)—approximately a 10-fold increase since 1977. Sediment deposition in the riparian area raised the streambed by 0.75 m (2.5 ft), and channel storage increased eightfold to approximately 9,400 m$^3$/km (4,000,000 gal/mile) since 1977. Stream length (sinuosity) increased by 11 percent, and rainbow trout returned to the stream for the first time in decades.

In February 1996, the stream experienced another major flood caused by the rapid melting of the winter snow pack. As shown in Plate 5-9, the flood inundated a large portion of the floodplain. When the water receded, however, little damage was revealed, as shown in Plates 5-10 and 5-11, taken two and eight months later in April and October 1996, respectively. The established riparian vegetation was able to resist damage from this flood, protect the stream channel from scour, reduce flow velocities, and trap an additional 13 cm (5 in) of sediment in the floodplain.

The Bear Creek project demonstrated the potential of passive restoration in a riparian area long degraded by overgrazing. In this case, total exclusion of livestock from the riparian area occurred for several years, followed by controlled late winter–early spring grazing from February 15 to April 15 once most of the riparian vegetation was reestablished. Livestock were excluded from the riparian area at all other times of the year.

According to the BLM project manager, the timing and duration of grazing appeared to be more important than the number of livestock in maintaining the health of riparian vegetation once it had been reestablished. In addition, the most important factor in riparian area restoration was commitment by the operator to observe the livestock exclusion and the subsequent controlled grazing.

*Photos and project description provided by Wayne Elmore.*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058865

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Because passive restoration focuses on altering, reducing, or eliminating the primary causes or factors that have contributed to a degraded riparian system or have prevented recovery, its importance cannot be overemphasized. Passive restoration is the logical and necessary first step in any restoration program—and in many cases may be all that is required.

Although passive restoration is a relatively straightforward concept, it can sometimes be difficult to implement because doing so typically requires changing the types or extent of land or water uses within riparian areas or at other locations in a given watershed. Existing land uses that have occurred over many years or decades may be difficult to change. Often the most significant barriers to passive restoration are social, cultural, and political rather than scientific or biological. However, bypassing this step represents a major strategic flaw in any restoration program and may ensure the inevitability of project failure if ecological restoration is the goal.

In recent years, an increasing number of passive restoration activities have been implemented in portions of the American West. For example, most western states (and some eastern states) have implemented forest practices rules on industrial forestlands that identify riparian protection as an important management objective. Such rules often identify the dimensions of required no-harvest buffers and other practices (e.g., directional felling, limitations on ground skidders) designed to reduce and minimize forestry impacts to riparian areas. As discussed in Chapter 4, federal agencies [e.g., U.S. Forest Service (USFS), Bureau of Land Management (BLM)] have implemented a system of riparian reserves that often provide full no-harvest protection for areas one to two site-potential tree heights from a stream. In grazed areas, extended periods of non-use or exclosure fencing have begun to occur in some riparian areas on both federal and private lands. In the Mono Basin of northeastern California, the return of flows to Rush and Lee Vining Creeks and the removal of grazing along these streams by the city of Los Angeles, after a protracted legal battle, have resulted in a major recovery of riparian vegetation and functioning. (As of yet there has been little monitoring or research to document the ecological changes that are occurring as a result of these improved riparian management practices.)

After passive restoration is implemented, a riparian area may remain in an ecological condition that is significantly different from that of a comparable reference site, particularly if its inherent capacity to recover has been severely influenced or lost. To improve the likelihood of achieving restoration in such situations, active manipulations, herein referred to as *active restoration*, may be needed. Active restoration attempts to restore a degraded or dysfunctional riparian area by combining elements of natural recovery with management activities directed at accelerating the development of self-sustaining and ecologically healthy systems (NRC, 1996; Kauffman et al., 1997). This requires not only an understanding of the complex processes and linkages between the biotic and

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058866

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 152 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

physical components of intact systems, but also of the range of active management practices that might be successfully implemented.

Factors that may prevent the return of a degraded riparian area to a more natural dynamic one via passive restoration include species extinction, exotic species invasion, significant structural modifications, and continued alteration of hydrologic flow regimes. Although some of these factors can be addressed via active restoration, others can be sufficiently severe in their magnitude, persistence, and spatial extent that full ecological restoration may not be technologically or economically feasible. Nonetheless, restoration can still achieve ecological improvement of a system so that specific ecosystem features (e.g., water quality), biotic species (e.g., endangered species), or channel morphology (e.g., reestablishment of historical channels) are improved.

Regardless of whether passive or active restoration is chosen, riparian and watershed activities that do not address the recovery of multiple ecosystem linkages and functions are likely to have only limited success, they may have no effect, or they may even exacerbate ecosystem degradation. Continued degradation following the implementation of restoration measures could occur because of an inadequate scientific basis for the established goals, institutional constraints such as insufficient funding or funding at an inappropriate time, or severe environmental conditions during the early phases of a restoration project (e.g., exceptionally large floods, drought, fire). Unfortunately, continued degradation not only suppresses the recovery of ecological functions, but it may further limit the capability of a riparian system to be restored.

The alteration and degradation of riparian areas at both local and regional scales generally reflect land uses occurring over extended periods. Similarly, the recovery of riparian areas after the cessation or removal of perturbations will require time. Time requirements for the recovery of a degraded riparian system are seldom mentioned in restoration projects. Some riparian functions can recover relatively rapidly, while others require long periods to achieve their full potential. Figure 5-2 illustrates the projected recovery rates, under passive restoration, for various components of riparian areas associated with salmonid habitats in the Interior Columbia River Basin. While the exact timing of individual features' recovery may vary by location, watershed, or region, the overall pattern is one of increasing functional interaction among riparian vegetation, channel morphology, and aquatic and riparian habitats over time.

## Potential Conflicts Between Riparian Restoration and Other Management Goals

Given that human use of riparian areas has often been at the expense of maintaining their ecological processes and functions, attempts at improving and restoring riparian functions may encounter some degree of social, political, or

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058867

312                                                                                  *RIPARIAN AREAS*



FIGURE 5-2 Projected recovery times of selected leading-edge and keystone components of salmonid habitats in the Interior Columbia River Basin following the cessation of activities causing degradation or preventing recovery (passive restoration). SOURCE: Reprinted, with permission, from Beschta and Kauffman (2000). © 2000 by American Water Resources Association.

institutional opposition. The following are some of the issues that may affect whether and how quickly restoration efforts move forward.

### Short-term versus Long-term Restoration Goals

In nearly all restoration efforts, one is typically faced with trying to balance short- and long-term goals. For example, former riparian plant communities may have experienced a loss in species diversity and cover because of grazing or conversion to agricultural crops. In the first instance, many of the native plants may still be present, but their abundance and growth have been greatly curtailed. In the second, the original riparian vegetation may no longer exist except in small, isolated areas. Halting those land use practices causing degradation or preventing recovery, i.e., passive restoration, could be accomplished by removing grazing animals from the riparian areas in the first instance and by no longer cropping to the edge of the stream in the second. Vegetation in the previously grazed area would likely recover relatively quickly if most of the native plants were present. For the agricultural setting, however, it may be necessary to reintroduce native plants to help "jump start" native plant communities. Although both approaches would be directed at a reestablishment of native plant communities and their attendant physical, biological, and chemical processes, recovery in the cultivated agriculture setting would likely take longer and require some form of

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

active restoration. In addition, where channel morphology has been altered via management practices, the recovery of channel dimensions and form is not likely to occur with the same rapidity as that of vegetation. Thus, practitioners involved in restoration efforts should realize that the short- and long-range goals of any restoration effort will be met sequentially if the restoration approach is ultimately successful.

### Small-Scale versus Large-Scale Perspectives

Land managers typically view riparian issues at small scales—i.e., the size of their property or management unit slated for restoration. In doing so, they may fail to realize the extent to which their riparian areas have been altered over time, the role of off-site factors, or the impact that their management decisions can have on other areas. To help land managers better understand riparian issues, the condition of their land, and the potential for ecological improvement and restoration, a larger-scale landscape perspective is often required. Landscape assessments can be undertaken to provide multiple landowners with potential strategies for improving the ecological and social values of their specific riparian areas. It is also at these larger scales that scientific input can offer a crucial perspective regarding the magnitude of problems and the potential for improvement. Where monetary resources for restoration efforts are limited, having a large-scale perspective will allow for more effective allocation of resources to accomplish the greatest good. Watershed councils, state and federal agencies, and other groups are often of major assistance in developing basinwide perspectives that are useful to various landowners and land managers as they engage in riparian improvement and restoration across a given drainage basin.

### Private Lands versus Public Resources

The vast majority of the nation's riparian lands are in private ownership. These lands provide a wide variety of economic and social benefits to landowners. However, many of the benefits derived from functional riparian areas also cross into the public domain. For example, intact riparian forests generally ensure high levels of stream shading and tend to reduce stream temperatures during summertime. Although the incremental impact to summertime stream temperatures is likely to be small if a single landowner were to harvest the riparian forest or convert it to another use (e.g., grazing, agriculture), the cumulative effect on water quality can be considerable if multiple landowners temporarily or permanently remove their riparian forests.

The regulation of instream water quality by states may affect landowners' management of their riparian areas (although the exemption of nonpoint sources of pollution from permit requirements means that many land uses are not directly regulated). In forestry, public concern about water quality has increasingly been

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058869

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

codified into forest practice rules that, on a state-to-state basis, vary in the level of riparian protection and enforcement. Similarly, public concerns about fisheries and wildlife habitats may affect the management of riparian areas on private lands. The extent to which the public's need or desire to maintain and protect public resources (e.g., water quality, fish and wildlife habitat) outweighs land-owners' rights to manage and alter riparian systems continues to be a hotly contested issue. In some instances, the core issue is the extent to which restrictions can be placed on traditional activities on private lands now understood to result in significant ecological damage.

### Riparian Area versus Human Water Needs

One point of conflict in many western states regards the water needs of riparian vegetation versus those of humans. Because they represent sites of higher moisture availability than upslope terrestrial environments, riparian areas have relatively high evapotranspiration rates. In the arid and semiarid regions of the western United States, woody plant communities found along streams often have extensive root systems that allow them to extract water from the water table or from the capillary fringe immediately above (Brooks et al., 1991). Active removal and eradication of riparian plant communities in the name of water conservation has been a common practice in these areas, although actual water savings have rarely been quantified. In fact, the presumed water savings from the removal of riparian vegetation stands in stark contrast to reports that document the loss of perennial flow from rivers, streams, and springs when riparian vegetation is removed (e.g., Hendrickson and Minckley, 1984). Clearly, a simple projection of potential evapotranspiration gains associated with the removal of riparian plant communities is not adequate for evaluating the merits of such projects.

Reintroducing historical overbank flows at their customary timing and frequency of occurrence as a restoration strategy may sometimes lead to conflict with the water needs of human populations. Although research in both humid regions (Cummins and Dahm, 1995; Dahm et al., 1995) and arid regions (Lieurance et al., 1994; Molles et al., 1995, 1998) has shown beneficial responses of riparian areas to restored flooding, the water costs of such strategies have not been carefully documented. That is, how water availability for other purposes (e.g., hydropower generation, irrigation withdrawals, municipal or industrial use) changes when such approaches to restoration are used has seldom been quantified. Larger-scale use of restored flooding depends on assessing the amount of water that will be required and convincing multiple local, state, and federal agencies and various water users that the activity is sound management policy. Floods are not only one of the most common large natural disturbances that occur in the United States, but they are also one of the most costly in terms of property damage and loss of human life. A major challenge with such restoration efforts is to reestablish enough of the unregulated high-flow dynamics (magnitude, fre-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058870

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

quency, duration, and timing) so that characteristic riparian plant communities can be restored while not substantially increasing the risk to property or human life.

Eliminating exotic vegetation in riparian areas and reestablishing native plant communities is another approach to riparian restoration that can sometimes lead to conflicts between interest groups. For example, controversy marks recent proposals for biological control of exotic saltcedar in riparian areas of the western United States. In this case, one group of managers within the U.S. Fish and Wildlife Service pressed for release of insects to control invasive saltcedar populations (DeLoach, 2000). Meanwhile, a second group within the same agency worked to block the release of these biological control agents in order to protect nesting habitat for the southwestern willow flycatcher, a federally listed endangered species, which actively nests in pure stands of saltcedar in some areas (Leon, 2000).

*        *        *

Potential conflicts between contemporary land uses and the changes needed for improving the nation's riparian resources encompass the full range of land uses, water resource developments, and management policies. At least some of the current land and water use practices and management policies were initiated long ago when the nation was going through a period of expanding occupancy and settlement. Land development continues today under a policy climate that often encourages alteration of natural systems. Unfortunately, such policies were formulated and implemented during a time when impacts on riparian areas and their stream systems were not widely understood.

Because many of the options for improving riparian systems across watersheds encompass a wide range of individual and societal values, there is a great need to engage various stakeholders in broad-scale and collaborative restoration efforts. The potential success of collaborative efforts rests firmly on two foundations: credible scientific information and broadly inclusive participation where the full spectrum of perceptions, interpretations, claims, and contentions can be openly discussed, critiqued, and challenged. As a process for finding areas of agreement amongst all stakeholders (scientists, land managers, regulators, and the public), such deliberations need to ensure inclusiveness, openness, safety of expression, and respect for divergent views and positions. Although such an approach takes time and may not lead to full consensus, it is only through such a process that restoration can truly be a collaborative effort with substantive public support (Committee of Scientists, 1999).

### Riparian Management as Part of Watershed Management

Because riparian areas are integral components of larger watersheds (drainage basins), management of riparian areas should attempt whenever possible to be incorporated into larger-scale watershed management plans. Watershed man-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058871

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 157 of 310

agement refers to the managing of water resources (both surface water and groundwater) in a watershed or river basin context (rather than in a political or jurisdictional context) (NRC, 1999). Although instigated in the early part of the twentieth century, watershed management has found renewed support in the last 15 years for primarily water quality and ecological reasons (Adler, 1995). It is a holistic approach that addresses multiple sources of pollution within a watershed, such as urban and agricultural runoff, landscape modification, depleted or contaminated groundwater, and introduction of exotic species, to name just a few. As articulated by the U.S. Environmental Protection Agency (EPA), the watershed approach is a coordinating framework for environmental management that focuses public and private sectors on addressing the highest priority problems within hydrologically defined geographic areas (EPA, 1995). It targets those issues not adequately addressed by traditional point source programs—programs that for the most part have failed to protect watersheds from the cumulative impacts of multiple activities.

Although watershed management may vary in terms of specific objectives, priorities, elements, timing, and resources, it is based on the following principles, which necessarily should also characterize riparian area management:

•   *Partnership.* All stakeholders affected by management decisions should be involved throughout watershed management and should shape key decisions. This ensures that environmental objectives are integrated with economic, social, and cultural goals. It also provides those who depend upon the natural resources within watersheds with information on planning and implementation activities.

•   *Geographic Focus.* Activities should be specific to geographic areas, typically the areas that drain to surface waters or that recharge or overlay groundwater or a combination of both.

•   *Science-Based Management.* Collectively, watershed stakeholders should employ high-quality scientific data, tools, and techniques in an iterative decision-making process including (1) assessment and characterization of the natural resources, (2) goal setting and identification of objectives based on the needs of the ecosystem and stakeholders, (3) prioritization of identified problems, (4) development of management options and action plans, (5) implementation of management options, and (6) effectiveness evaluation and plan revision (NRC, 2000).

Coordination of the many public and private interests implicated in watershed management is a major challenge. Institutional mechanisms for such coordination do not yet exist in most places, and where they have been developed, their effectiveness has been highly variable (Scurlock and Curtis, 2000). Fortunately, the involvement of stakeholders in watershed management has been aided by the emergence of local watershed groups—encouraged, in part, by EPA's emphasis on watershed approaches, but motivated also by rapidly developing ecosystem

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058872

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 158 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

science and by frustration with the jurisdictional and programmatic piece-mealing of the landscape (Natural Resources Law Center, 1996). Although watershed groups form because of some specific, broadly shared concern, protection of riparian areas has not, by itself, been a primary or common focus. Rather, such things as improvement of water quality and protection of a fishery have been the motivating factors (Kenney et al., 2000). Yet it is precisely because of their important role in achieving many distinct objectives, such as healthy fish and wildlife habitat or floodplain management, that protection and restoration of riparian areas should be approached on a watershed scale, even though this may increase the complexity and timeline of the project.

Box 5-2 presents two examples of where riparian area management was incorporated into larger watershed management efforts. In the first case (the San Pedro Riparian National Conservation Area), it was recognized that restoration of the riparian area would not succeed without a more holistic understanding of the causes of degradation—most of which are outside the riparian area. In the second case (the Model Watershed Project in Idaho), activities in the riparian area were determined to be critical to achieving the overall goals of watershed management.

## TOOLS FOR ASSESSING RIPARIAN AREAS

For decision-makers to be effective in managing riparian areas, they need information on the status and condition of these areas. The identification of riparian areas is a first step in accumulating information about their quantity and quality. Where they have been highly degraded, it may be difficult to identify riparian areas by remote sensing or even ground-based surveys. It is similarly difficult to identify wetlands that have been effectively drained. Yet their recognition is important precisely because former wetland areas are among the best opportunities for restoration. The same principle applies to riparian areas.

A wide variety of tools are available for assessing the condition of riparian areas. The assessment tool chosen will depend on the objectives of the program for which it is to be applied. For example, a program designed to identify priority areas for restoration might find useful a large-scale watershed assessment approach, such as the Hydrogeologic Equivalence or the Synoptic Approach discussed below. These approaches generally consider the existing condition of all riparian areas, the cumulative length of the various stream orders, and longitudinal connections that are necessary for migrations of fish and other organisms. For smaller-scale projects such as restoration of a reach of riparian corridor, knowledge is needed about what types of vegetation should be planted, the appropriate channel capacity for the stream, and the width of the riparian area necessary for carrying out various functions. In tracking the progress of individual restoration projects, detailed information on hydrology, seedling survival, and animal recruitment might become components of an assessment.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058873

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

318                                                                                    *RIPARIAN AREAS*

---

**BOX 5-2**
**Incorporating Riparian Areas into Watershed Management**

**San Pedro Riparian National Conservation Area**

Because of the unique quality of its riparian habitat and bird populations, Congress designated a 40-mile segment of the upper San Pedro River in Arizona as a National Conservation Area in 1988. Funding allowed the buy-out of irrigated farmlands within the area and retirement of the associated water rights. Despite this designation and the use of passive restoration, studies have documented a continued decline in stream flows and in the health of riparian vegetation.

The San Pedro originates in Mexico and flows north into Arizona to its confluence with the Gila River. In most segments the San Pedro is a perennial stream, but surface flows sometimes disappear—especially in very dry years. Flood flows in the San Pedro are the product of large rainfall events, usually in late summer but sometimes in the winter. Base flow is the product of groundwater discharge—primarily from the more deeply underlying regional aquifer rather than from the shallow alluvial aquifer. Water use in the Mexico portion of the watershed is primarily for irrigation and includes significant groundwater pumping. Water use, also via groundwater pumping, in the southern Arizona segment is primarily for the needs of a military base (Fort Huachucha) and for urban growth in and around Sierra Vista (Commission for Environmental Cooperation, 1998).

There is little doubt that riparian vegetation along the San Pedro will continue to decline unless ways can be found to limit additional groundwater depletions and, possibly, recharge the regional aquifer—actions that must be taken well outside the riparian

---

In general, complex restoration projects dealing with multiple impacts and a variety of riparian and wetland types might be better served with a unique assessment approach tailored to site-specific peculiarities. At the watershed scale, this could involve a large research and data gathering component, followed by modeling and validation, and it would include input from stakeholders in the region. An advantage of costly and involved large-scale assessments such as this is that the information is often transferable to similar physiographic regions.

This section focuses on standardized approaches that can be applied in a relatively short period (rapid assessment) and that do not require long-term training for practicing environmental professionals. Assessments fall into two basic categories: (1) functional assessments that estimate probabilities that a riparian function exists and (2) reference-based methods that estimate ecosystem condition. Rapid assessment methods for evaluating ecosystems have undergone dramatic development in the past three decades. Of particular relevance for riparian areas are methods that were developed for assessing wetlands, to which there has been considerable attention as a consequence of government regulatory programs. However, this section also evaluates methods developed specifically for riparian areas. It should be noted that there are various instream flow assessments

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058874

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 160 of 310

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

area of interest. No acceptable solutions have as yet emerged, but a watershed partnership of all the affected interests (Upper San Pedro Partnership) has formed with the goal of working out an agreement respecting water use. Significant progress has been made in water conservation practices at Fort Huachucha and in Sierra Vista. Although other actions still will be necessary to ensure the long-term health of the riparian system along the San Pedro, it is clear that no one entity can make this happen.

**Model Watershed Project**

The Model Watershed Project in Idaho started in 1992 to address local factors related to the decline of salmon and steelhead runs, particularly problems of fish habitat and passage related to irrigation water use. The project area encompasses the Lemhi River, the Pahsimeroi River, and the East Fork of the Salmon River in Idaho, which have a combined drainage area of approximately 2,735 square miles. The purpose of the project is to provide a basis of coordination and cooperation between local, private, state, tribal, and federal fish and land managers, land users, landowners, and other affected entities to protect and restore anadromous and resident fish habitat.

Watershed-wide, the land area is approximately 88 percent federal and 12 percent private. However, the stream corridor, which is most influential in providing salmon habitat, is 90 percent private and 10 percent federal. Beef cattle production is the dominant economic activity, and hay is the primary crop. As analysis of fish habitat conditions proceeded, it soon became evident that protection of riparian areas was essential. Because the analysis involved public/private partnerships, local landowners were willing to participate. Construction of fences creating a riparian buffer zone for grazing management has been a primary focus. In addition, projects have focused on streambank stabilization and riparian vegetation plantings, as well as instream structure work.

that target aquatic ecosystems. Although some of these methods take the condition of riparian areas in account and thus may be valuable for assessing riparian areas—such as the Stream Visual Assessment Protocol (USDA NRCS, 1998)—they are not the focus of this section.

## General Characteristics of Assessment Tools

*Need for Classification*

Within a geographic region of interest, classifying riparian area types is one of the first steps in organizing information. The highest order of classification separates riparian areas by rivers, lakes, and estuarine/marine settings. Within each of those categories, further classification should recognize the amount of natural variation so that variation related to degraded conditions can be more easily identified. Most assessment methods discussed below use classification to identify what portion of the landscape is being evaluated and whether the riparian component needs to be further subdivided into more relatively homogeneous areas (although classification is not emphasized in the description of any particu-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058875

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 161 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

lar procedure). Assessments done with little regard for initial classification are not likely to be successful.

Rather than adopt a classification system for use throughout the United States, regionally developed classifications may be more appropriate. Resource managers may already be familiar with them, thus reducing the time that otherwise would be used to create, learn, and adopt a new system. If no appropriate classification of riparian areas exists for the region, a preexisting classification from elsewhere might be adopted. It is important that the classification not rely exclusively on vegetation because vegetation is commonly modified by human activity. Rather, the underlying template for classification should be based on geomorphology and hydrology. Classifications should not be restricted to channel morphology, which is only one part (albeit a very important one) of riparian areas. Methods that rely on channel forms (e.g., Rosgen, 1995; Montgomery and Buffington, 1997) can be utilized where they are a critical feature of riparian areas (as described in Box 5-3). Other classification features that have been used in the past include stream order, stream slope, valley width, drainage basin size, and underlying lithology. Ideally, one would use a hierarchical approach that first places adjacent waterbody type (river, lake, estuarine/marine) at the highest level and vegetative cover (or lack of it) at the lowest level, that would have the flexibility of accommodating new information, and that would recognize fluvial and geomorphic forces as principal organizers of riparian systems (Brinson, 1993). Altered riparian areas should not be identified as core riparian classes, but rather recognized as departures from one of the established classes of riparian areas. This would be consistent with a restoration approach that uses relatively unaltered riparian areas as targets for restoration (NRC, 2001).

*Reference Sites*

Reference sites ideally represent relatively large and intact riparian systems that are self-sustaining and have not been markedly influenced by anthropogenic impacts. Their identification is crucial to the restoration of riparian areas for a number of reasons. First, sites with minimal alterations illustrate the natural interactions of hydrologic processes, geomorphic setting, and vegetation dynamics. Indeed, much of our understanding of ecology has been derived from studies of intact ecosystems. Second, to the extent that these sites can be placed in a successional sequence, they may be used effectively for insights into restoration goals. These sites provide excellent opportunities for locally "grounding" the available science, thus providing a knowledge base important for addressing restoration needs. Finally, reference sites can serve as demonstration areas where scientists, managers, regulators, and interested citizens can interact on a common footing when addressing restoration needs and priorities and the potential for successfully attaining restoration goals. Several of the assessment tools discussed in this section require identification of reference sites as a preliminary step.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058876

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 162 of
310

Obtaining information on undisturbed riparian areas is not always easy or possible. However, through the use of Government Land Office records, historical vegetation surveys, soil maps or profiles that delineate floodplains, chronosequences of aerial photographs, geomorphic assessments of channel conditions and fluvial landforms, and other sources of information, the nature of intact riparian areas can often be revealed. Thompson (1961) provides an excellent example of this reconstruction for the riparian areas of the Sacramento Valley in California. Today these areas bear absolutely no resemblance to their former condition of marshes and streamside forests, the latter of which were sometimes several miles wide. Without some sense of the conditions and characteristics of the natural riparian systems prior to human intervention, it is not possible to evaluate project goals and determine the general direction of change that is needed for recovery.

Natural disturbances must be recognized as a fundamental property of riparian areas and must be accounted for by reference sites. The range of variation arising from natural causes such as climate, topography, and geomorphology can be assessed by considering a number of individual sites within riparian classes. This range should include the normally encountered differences in geomorphic and hydrologic conditions, as well as natural disturbance regimes that result in successional stages within a riparian class. A second source of variation important for effective restoration and other management programs is that arising from human-induced alterations. Thus, altered sites should become part of the reference system so that the full range of variation—including both natural variation and that associated with anthropogenic sources—is taken into account. It is particularly important to choose sites impacted by activities that will be common targets for restoration. This ensures that the reference system identifies what altered and degraded riparian areas might evolve toward if the appropriate restoration approaches are undertaken. If the degree or extent of riparian degradation relative to that of an appropriate reference site is severe, recovery is unlikely to be quickly or simply achieved.

Although there are no fixed protocols for setting up a reference system, one guideline is to choose a relatively homogeneous array of sites in terms of climate, stream order, species composition, and disturbance regimes. Where such sites are abundant, the task of capturing natural variation is relatively easy. Conversely, where unaltered sites are infrequent, small, or fragmented, one may have to rely on historical data and descriptions or on information gathered at similar sites outside the geographical region of interest. Even less-than-ideal reference sites can provide important information on species composition and structure of plant communities, frequency of inundation, and other characteristics.

Once a reference system is established, it becomes a valuable asset for restoration programs. Its value would be enhanced if reference sites were protected by acquiring covenants or conservation easements that ensure the perpetuation of natural disturbance regimes (Brinson and Rheinhardt, 1996). Restoration projects

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058877

322                                                                                                *RIPARIAN AREAS*

**BOX 5-3**
**Classification of Channel Types in the River Continuum**

Methods for classification of natural channels across a wide array of land-scapes may have utility in the assessment riparian areas because channel types influence processes within riparian areas such as sediment transport and deposition, flooding frequency, and flow dynamics. The simplest classification is the division of natural channels into braided, meandering, and straight channels by Leopold and Wolman (1957). Rosgen (1995) distinguished eight primary stream types in a classification that emphasized dimensional measurements such as number of channel threads, entrenchment ratio, width-depth ratio, and sinuosity (Figure 5-3). Montgomery and Buffington (1997) defined seven channel types based on similar criteria but were more forthright in recognizing the qualitative decision rules needed (Figure 5-4).



FIGURE 5-3  Rosgen Stream Classification. SOURCE: Reprinted, with permission, from Rosgen (1995). © 1995 by Wildland Hydrology.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058878

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 164 of 310

Other classifications have attempted to move beyond static descriptions of channel form to the dominant processes in a channel that determine the likelihood of further channel changes. A process-based classification by Whiting and Bradley (1993) replaces the usual physical features with a complex phase-space representing distinct fluvial processes and their relative rates. All classifications have utility as comparative tools, although most suffer from the problem of lacking a strong physical basis that can predict trajectories of channel change given a change in fluvial or sediment variables. A predictive understanding seems to be possible in individual case studies but not in the comprehensive framework of a broad classification. Understanding how the evolution of channel and floodplain changes translates into changes in riparian areas is an even more daunting task.

Future classifications that better emphasize riparian areas will need to incorporate emerging views about interactions between fluvial processes and vegetation. For example, the lateral expansion of channels during floods and the role of riparian areas in modifying flood flows are typically not considered in a standard chan-

*continues*



FIGURE 5-4 Illustration of idealized profile from hill tops downslope through the channel network showing general distribution of channel types and controls on channel processes. SOURCE: Montgomery and Buffington (1997).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058879

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 165 of 310

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

nel classification. In addition to the longitudinal and lateral gradients, vertical gradients beneath the channel and floodplain must also be considered (Stanford and Ward, 1993). Subsurface strata of granular material of highly variable texture represent the legacy of deposition and erosion in past times. River water penetrates those bed sediments and mixes with groundwater, creating distinct zones of biogeochemical reactions and habitats for certain aquatic insects and other organisms that live in subsurface environments. Riparian area classifications must therefore be extended to include a number of new variables, such as the size and hydraulic properties of alluvial aquifers, that are typically not considered in standard channel classifications.

themselves may become "standards" to which other projects can be compared, especially those that have matured and succeeded in responding to natural perturbation regimes. For the same reason, much can be learned from unsuccessful restoration projects. Both contribute to a system of reference sites in ways that would be lacking if only unaltered sites were utilized.

*Information Needs for Riparian Restoration*

**History of Resource Development.** Because many changes to riparian systems occurred prior to the current generation of landowners and managers, understanding historical trends at both local (e.g., stream reach, valley, watershed) and regional (e.g., across large watersheds or ecoregions) scales can be critical for developing restoration plans. Such information is essential (1) for understanding the present status and trends of existing riparian systems, (2) for identifying possible management practices or forms of resource development that have contributed to existing riparian conditions or have prevented recovery, and (3) for developing effective restoration strategies.

If the historical causes of riparian degradation are not known or have been incorrectly assessed, attempts at restoration may be ineffective or misdirected and opportunities for riparian improvement lost. For example, although the planting of willows on sites for which they are *not* adapted provides temporary satisfaction in that a revegetation effort was undertaken, such planting is likely to have little effect (either positive or negative) on the long-term recovery of a particular riparian system. In other instances, willows may have been planted on appropriate sites, but if continued ungulate grazing (the original cause of willow extirpation) has not been modified, the opportunity for successful regeneration may be lost. In yet other instances, logs and boulders may be added to channels and streambanks in an attempt to replace lost structural elements. Although such an approach may have some basis in forested riparian systems, its application to streams in many meadow systems of the western United States or prairie systems

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058880

in the Midwest represents a misinterpretation of restoration needs. In these examples, the approach taken may not alter the causes of degradation—even though they may entail a major expenditure—and are likely to provide little prospect of improvement. Hence, understanding historical patterns of resource development and causes of degradation is extremely important where ecological recovery of riparian systems is the primary goal.

**Hydrologic Regime.** Understanding the characteristics of natural flow patterns—flow frequency, magnitude, duration, and timing—associated with specific riparian areas can be a crucial component of restoration where such flow regimes have been previously modified (e.g., because of dams, other water resources development, or extensive land modification). An important restoration goal may be reestablishment of a streamflow regime that emulates the temporal dynamics of an unaltered system and provides hydrologic connectivity to remaining floodplains and riparian landforms (Hill et al., 1991; Whittaker et al., 1993; Rood et al., 1999; Rood and Mahoney, 2000). For many floodplains, an understanding of subsurface hydrology and geologic stratigraphy is also critical (Jones and Mulholland, 2000; Woessner, 2000).

In some cases reestablishing the hydrologic regime will not be sufficient to restore degraded riparian areas, necessitating a better understanding of the links between flow regime, sediment dynamics, and vegetative growth. This is the case where hillslope or channel erosion processes remain altered in spite of attempts to return natural flows. For example, if accelerated surface erosion or landslides are occurring on upslope areas and the resultant sediments are transported to riparian areas, simply maintaining a natural hydrologic regime may be insufficient to restore a riparian system.

Channel incision and widening (as a result of a variety of land-use practices) and dams that have reduced the magnitude and frequency of high flows can curtail overbank flows, which typically ensures the loss or decline of riparian vegetation. Information on historical conditions of overbank flood events is needed to make decisions about whether healthy riparian plant communities can be reestablished and whether a long-term process of bank-building and channel aggradation may be an achievable restoration goal. Where channel incision or widening has been relatively large, these effects may not be easily reversible.

**Soils and Landforms.** Soils and landforms can provide important insights into the historical condition of their associated riparian areas. For example, floodplain soils that have developed from overbank flows over the millennia provide a long-term ledger of past hydrologic disturbance regimes and their resultant riparian systems. Even where vegetation has been largely modified, removed, or replaced by various land uses, residual soil properties (e.g., mottles, gleying, organic matter content, soil texture and structure, redox potential) can provide important clues regarding soil development processes and conditions that were

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058881

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 167 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

prevalent prior to the effects of Euro-American land uses. Soil texture is particularly important as it tends to indicate the prevailing hydraulic conditions at the time of deposition: clay particles are indicative of ponded water, silts of slow-moving water often across a vegetated surface, and sands/gravels of a relatively high-energy environment. Such information affords insight into how these systems may have formed and functioned in the past, the degree to which they have been changed by human activities, and the potential for restoration of degraded systems.

**Vegetation.** Although there is a great deal of information on the ecological roles of riparian vegetation (Brinson et al., 1981; Salo and Cundy, 1987; Williams et al., 1997; Koehler and Thomas, 2000; Verry et al., 2000; Wigington and Beschta, 2000), there is limited information in the scientific literature on holistically restoring degraded riparian vegetation. Many restoration efforts are simply agronomic projects that consist of planting selected species. Projects that ignore fundamental changes in hydrologic disturbance regimes or other factors that have altered site conditions are unlikely to lead to ecological improvements. Understanding not only the functions that specific species and groups of species perform, but also the hydrologic and edaphic requirements for their successful establishment and growth (e.g., Kovalchik, 1987; Law et al., 2000), is fundamental to any restoration project targeting riparian plant communities. In addition, the underlying causes of vegetation loss must be addressed. For example, attempts to restore native shrubs and other woody species in riparian areas are not likely to be successful if the natural hydrology is not restored or the area continues to experience heavy browsing pressure from domestic or wild ungulates.

### Large-Scale Frameworks

Restoration ecologists have become increasingly aware of the need to conduct restoration activities within a context larger than the restoration project itself. This emphasis is particularly vital for riparian areas because they are so well integrated into the landscape by connecting uplands with aquatic ecosystems and creating corridors between high- and low-order streams. Factors that occur beyond the boundary of the site that are relevant to site-specific restoration include the nature and intensity of human activities in the watershed (Kershner, 1997), the potential for biological invasions, and the number of ecosystem types and landforms, to name a few (Aronson and LeFloc'h, 1996).

Two methods are available for organizing large-scale information—Hydrogeologic Equivalence and the Synoptic Approach—that deal explicitly with these landscape-level properties of wetlands and riparian areas. Both assessments were developed from the recognition that the condition and functioning of wetlands and riparian areas are in many cases driven by conditions upslope or upstream. Neither approach is an assessment of specific sites, but rather is a landscape-scale

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058882

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 168 of 310

assessment that would include riparian areas. Both approaches are particularly relevant for riparian management because they force a big-picture view that is helpful for planning, prioritizing, and funding restoration efforts. Consequently, they should be conducted prior to implementing smaller-scale assessments.

### Hydrogeologic Equivalence

As discussed in Chapter 2, riparian areas vary in their primary source of water, underlying lithology, and inundation frequency. For example, those associated with ephemeral streams receive principally overland flow from adjacent uplands, while those associated with higher-order perennial streams also receive substantial water from groundwater discharge and overbank flow from upstream sources. Given the substantial variation that occurs within a watershed, Bedford (1996) introduced the concept of Hydrogeologic Equivalence [adapted from Winter and Woo (1990) and Winter (1992)]. The approach provides a framework for evaluating the distribution of wetlands at the landscape scale and for gaining insight into how landscape properties control hydrology and water chemistry. The same approach can be used for riparian areas. An assumption of maintaining Hydrogeologic Equivalence is that sources and flow paths of water determine the geographic distribution of riparian areas and wetlands at large scales—an assumption that appears to be well grounded in science (Winter and Woo, 1990). It is a logical extension of the reference concept, but applied at landscape scales rather than to individual sites.

The Hydrogeologic Equivalence concept recognizes that landscapes have developed and maintained different frequency distributions of wetlands and riparian areas with particular "hydrogeologic settings." Such settings may represent desirable endpoints for ecological restoration at a watershed scale. These hydrogeologic settings reflect not only regional climate, but also surface relief, slope, hydrologic properties of soil, and underlying stratigraphy. Information available at landscape scales is increasingly accessible in the form of topographic maps from which the position of riparian areas can be calculated (e.g., headwaters vs. valley bottoms) and aerial photographs from which surface connections can be identified (Bedford, 1999). Once the hydrogeologic settings of a landscape in its pristine condition are determined, the biological and functional attributes of riparian areas can be inferred from the diversity of hydrogeologic patterns.

The approach provides a basis for determining the large-scale changes in wetland or riparian distribution over time and a template for evaluating mitigation strategies designed to replace wetlands and riparian areas that have been lost. It evaluates whether the restored system will be hydrogeologically equivalent to the original, relatively unaltered system. A study that applied the approach in an urbanizing area found that riverine wetlands (i.e., riparian areas) being lost through various modifications were being replaced through compensatory mitigation by small, isolated, deep depressions (Gwinn et al., 1999). This shift in the

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058883

distribution of wetland types (see Figure 5-5) was not achieving the goals of Hydrogeologic Equivalence.

From a practical perspective, riparian restoration efforts would be most successful if they use these hydrogeologic settings as guides for deciding what kinds of restoration should occur and where on the landscape they should take place. Still uncertain is how progressive changes in land use constrain the capacity of a watershed to maintain the original distribution of hydrogeologic types.



FIGURE 5-5 Comparison of wetland types before (A) and after (B) mitigation construction activities in the urbanizing region of Portland, Oregon, between 1981/1982 and 1993. Riverine wetlands show a reduction from (A) greater than 70 percent to (B) less than 15 percent of the total number of sites (45) in the inventory. SOURCE: Reprinted, with permission, from Gwinn et al. (1999). © 1999 by Dr. Douglas A. Wilcox, Editor-in-Chief, Wetlands.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058884

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 170 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*Synoptic Approach*

Originally developed for wetlands, the Synoptic Approach deals with cumulative impacts (Liebowitz et al., 1992). It is intended to provide resource managers with a landscape perspective on wetlands (i.e., the relationship of wetlands and riparian areas to other land forms at regional or statewide scales). The three major steps in a synoptic assessment are the following:

1. Define goals and criteria, prioritize restoration sites, and determine condition by class of wetlands or riparian area.

2. Define synoptic indices and select landscape indicators. Synoptic indices are factors that provide information on the condition of wetlands. Some common categories are nonpoint sources of pollution, stream flow modification, land use, and the condition of habitat. Landscape indicators—the actual measures that estimate the synoptic indices—are then used to estimate how much wetland or riparian types in an area might be affected, including their functions and values, and the significance of altered conditions. For example, an index based on the degree of hydrologic integrity could use as landscape indicators the ratio of waters in natural condition to modified waters. The assumption is that the lower the index (i.e., the more waters have been modified), the greater the amount of effort necessary for restoring waters in the region of analysis.

3. Conduct the assessment and report the results. The assessment team determines how the indices can be combined in a way that best relates to the impacts, both direct and cumulative. Decisions must be made on whether to combine indices through summation, weighting, or multiplication. The assessment itself consists of measurements such as land use (normally done with Geographic Information Systems), analysis of data, and the production of maps to display information and relationships. Accuracy assessments and peer reviews are also components of the program.

This approach is relevant to riparian areas, as evidenced by case studies in Liebowitz et al. (1992) for the Pearl River Basin in Mississippi and Louisiana and for mostly riverine wetlands in Illinois.

As with the Hydrogeologic Equivalence approach, the Synoptic Approach is more a perspective or framework for decision-making than a detailed analysis of specific functions. It can take advantage of principles and data from other geographic regions. A major advantage of the approach is that it is relatively inexpensive and rapid so that management strategies can be developed on a larger scale than is normally used. A number of data sources are available at reasonable costs or at only the cost of acquisition. They may consist of stream discharge and water-quality data, soil surveys, human population trends, and land use–land cover data. Care must be taken in applying the same technique to different geo-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058885

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

graphic areas and comparing them, because the quality of the underlying data
may differ.

Additional data sets are likely to become available, at little or no direct cost
to users, that can be used for conducting these assessments, thus potentially
improving their usefulness. The scale at which they are conducted means that
results will provide broad categories of information rather than information re-
garding the condition of individual sites (Figure 5-6). For example, by conduct-
ing an assessment at a national scale, regional priorities for restoration could be



FIGURE 5-6 Applying synoptic assessments at various spatial scales. SOURCE: Lie-
bowitz et al. (1992).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058886

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 172 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

identified and prioritized for funding. At subwatershed scales, priorities could be set for locating restoration projects along specific stream reaches that are in the greatest need of mitigation.

## Functional Assessments

As discussed above, the assessment of riparian areas at the scale of individual sites can be done either with functional methods that estimate probabilities that a riparian function exists or with reference-based methods that estimate ecosystem condition. Two functional methods developed in large part for aquatic and wetland ecosystems are the widely used Wetland Evaluation Technique and the Habitat Evaluation Procedure. We discuss both briefly to provide historical context and to acknowledge that some states now using some variation of the Wetland Evaluation Technique may be inclined to adapt it to riparian areas.

### Wetland Evaluation Technique

The Wetland Evaluation Technique (WET) is based on the premise that wetlands have an array of functions that can be classed in one of three major categories: hydrologic, water quality, and habitat. Within each of these categories, more specific functions can be identified. Hydrologic functions attributable to riverine wetlands (and, by inference, to riparian areas), for example, include floodwater storage, reduction and desynchronization of downstream flood peaks, and reduction of flow velocity; WET identifies 11 such functions. The method evaluates the probability that a function will occur as high, moderate, or low.

WET is notable for its complexity, its attention to scientific literature, and the degree to which it has been adopted and used. The method was developed for use by the Federal Highway Administration (Adamus, 1983). Although a number of other assessments were in existence at the time (reviewed by Larson and Mazzarese, 1994), federal agencies adopted WET as a non-mandatory regulatory tool. Many permit applications for wetland alterations are accompanied by an assessment of alternatives using WET.

In addition to determining the probability of functionality, WET also evaluates whether the function will be performed (e.g., whether there is a sediment source from land disturbance to be trapped) and the social significance (whether there are people who will benefit from the function). Because WET considers an much broader array of wetland functions than do individual assessors, projects evaluated with WET are subject to greater consistency and comprehensiveness than those evaluated by individual users, who have widely divergent backgrounds and perspectives.

Still, shortcomings of the method would likely remain should WET be modified for use in riparian areas. One of the limitations of WET is the assumption that all wetlands are capable (to some degree) of performing all of the listed functions.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058887

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 173 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Emphasis is placed on the level or degree of function, not necessarily on whether an unaltered site would normally perform the function at low, but sustainable, levels. As a result, most functional assessments assign high scores (e.g., probabilities of performing the function) to sites that have been modified to perform a certain function, regardless of whether the area would have done so in its unaltered form. If applied to riparian areas, this approach could lead to justification of enhancing specific functions, perhaps with unanticipated or undesired consequences. Extreme examples of enhancing specific functions might be to (1) build reservoirs to reduce downstream flood peaks, (2) convert riparian forest to emergent marsh to encourage waterfowl and wading birds, or (3) divert excessive sediments and other pollutants toward riparian areas to maximize their water-quality functions. In each case, some functions would be sacrificed for the enhancement of others, but the riparian area would depart even further from natural, self-sustaining conditions.

*Habitat Evaluation Procedure*

The Habitat Evaluation Procedure (HEP) was developed in the early 1970s to evaluate the habitats of aquatic and terrestrial species using certain variables (FWS, 1980). These variables are combined into Habitat Suitability Index (HSI) models constructed to evaluate an "element," such as whitetail deer, wood duck, or hardwood cover type (for gray squirrel, piliated woodpecker, etc.). Once the HSI is determined, it can be multiplied by acreage to determine habitat units. The output from the procedure can be used to make recommendations on projects that would result in a change of HSIs. According to a review of the procedure in 1985 (Whitaker et al., 1985), there were 120 published and 75 draft HSI models.

The scaling of an HSI ranges between 0 and 1.0, with 1.0 representing "the condition…that is needed to support the highest numbers of wildlife species on a regional scale over a long time" (Schroeder et al., 1992). HEP focuses on conditions that are optimal for a species rather than using a reference system as a basis of comparison. The concept has been applied more recently to communities, such as bottomland hardwood forests, rather than species-specific habitats. One of the frequent comments about HSI models is that they are time-consuming in both development and application. Moreover, because the models were developed to predict habitat for species populations, application to riparian condition would require some extrapolation. Finally, the method uses literature reviews and best professional judgment, rather than reference sites, as the primary sources of information for model development.

## Reference-based Assessments

The most powerful assessment methods are dependent, to some degree, on knowing the background or reference conditions within a region. Reference-

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

based assessment is premised on the assumption that sites unaltered by human activities represent the best benchmarks or standards for comparison. Some of their advantages are (1) everyone uses the same standard of comparison, thus reducing bias, (2) natural variation, rather than some fixed standard, is recognized as an intrinsic property of riparian areas, and (3) relative comparisons (larger, smaller, equal to) are much more repeatable and are faster to obtain than absolute estimates. Three rapid assessment techniques are presented and compared below: Proper Functioning Condition, which was developed explicitly for riparian areas, and the Hydrogeomorphic Approach and the Index of Biological Integrity, which can be adapted for use in riparian areas.

## Proper Functioning Condition

The Bureau of Land Management (BLM), in cooperation with other agencies, developed the Proper Functioning Condition (PFC) assessment for riparian areas and wetlands in the American West, where it has been used widely. PFC refers both to the assessment method and to the condition of a riparian site. As a method, PFC qualitatively assesses how well certain site attributes, mainly physical processes, are working, relying heavily on expert judgment. The method is premised on the assumption that if appropriate physical conditions are restored to a site, the restoration of biological components will follow. PFC is also that condition which will support or allow a riparian area to reach its biological potential. In the late 1980s, BLM set as an agency goal the restoration and maintenance of 75 percent of riparian–wetland systems on BLM land to "proper functioning condition" by 1997 (Prichard et al., 1993, 1998).

Ideally, an interdisciplinary team of specialists in vegetation, soils, and hydrology and of biologists with expertise in fish and wildlife conduct a PFC assessment, filling out a checklist of questions about hydrology, vegetation, and erosion and deposition (as shown in Box 5-4). Sites are then placed into one of four categories (Prichard et al., 1998) described below.

*Proper Functioning Condition:* Riparian areas are functioning properly when vegetation, landform, and channel characteristics are adequate to dissipate stream energy associated with high water flows (i.e., 25- to 30-year events; Wayne Elmore, BLM, personal communication, 2000), thereby reducing erosion; filtering sediment, capturing bedload, and aiding floodplain development; improving flood-water retention and groundwater recharge; developing root masses that stabilize streambanks against cutting action; developing diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and supporting greater biodiversity. The functioning condition of riparian–wetland areas is the result of interaction among geology, soil, water, and vegetation.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058889

334                                                            *RIPARIAN AREAS*

---

**BOX 5-4**
**PFC Checklist**

To evaluate a riparian site using PFC, an interdisciplinary group must answer "yes," "no," or "not applicable" to the following items. Asterisks refer to items that lack a "not applicable" choice. For any of the items marked as "no," specific comments must be recorded and discussed by the assessment team.

**Hydrology**
1. Floodplain above bank-full is inundated in "relatively frequent" events
2. Where beaver dams are present they are active and stable
3. Sinuosity, width/depth ratio, and gradient are in balance with the landscape setting (i.e., landform, geology, and bioclimatic region)*
4. Riparian-wetland area is widening or has achieved potential extent
5. Upland watershed is not contributing to riparian-wetland degradation*

**Vegetation**
6. There is diverse age-class distribution of riparian-wetland vegetation (for maintenance/recovery)
7. There is diverse composition of riparian-wetland vegetation (for maintenance/recovery)
8. Species present indicate maintenance of riparian-wetland soil moisture characteristics
9. Streambank vegetation is comprised of those plants or plant communities that have root masses capable of withstanding high-streamflow events
10. Riparian-wetland plants exhibit high vigor
11. Adequate riparian-wetland vegetative cover is present to protect banks and dissipate energy during high flows
12. Plant communities are an adequate source of coarse and/or large woody material (for maintenance/recovery)

**Erosion/Deposition**
13. Floodplain and channel characteristics (i.e., rocks, overflow channels, coarse and /or large woody material) are adequate to dissipate energy*
14. Point bars are revegetating with riparian-wetland vegetation
15. Lateral stream movement is associated with natural sinuosity*
16. System is vertically stable*
17. Stream is in balance with the water and sediment being supplied by the watershed (i.e., no excessive erosion or deposition)*

---

*Functional-At-Risk:* This category includes riparian–wetland areas that are in functioning condition, but existing soil, water, and/or vegetation attributes make them susceptible to degradation.

*Nonfunctional:* Riparian–wetland areas are nonfunctional when they clearly are not providing adequate vegetation, landform, or large wood to dissipate stream energy associated with high flows and thus are not reducing erosion, improving water quality, etc., as listed above. The absence of certain physical attributes,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058890

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 176 of 310

such as a floodplain where one should be, is an indicator of nonfunctioning conditions.

*Unknown:* This category includes riparian–wetland areas for which BLM lacks sufficient information to make a determination of the functioning of the area.

If the alterations and stressors that make a site "nonfunctional" are corrected, it is assumed that the site will achieve a rating of "functional-at-risk" or higher as vegetation establishment and growth take place over time. The goal of riparian management is always to achieve proper functioning condition, "because any rating below this would not be sustainable" (Prichard et al., 1998). Twelve PFC publications supplement these basic instructions, addressing methods for measuring vegetation, the characterization of channels, recommendations for grazing practices, interpretation of aerial photography, and use of historical photographs, as well as providing a review of the literature (Prichard et al., 1998). Separate guides have been prepared for lentic areas (non-flowing waterbodies, or lakes and ponds). To improve the condition of sites, the guidebooks suggest that "best management practices need to be set in motion" although this is not a requirement of PFC.

The PFC method was developed principally for riparian areas in the 11 contiguous western states where the majority of BLM's land occurs outside of Alaska. There is nothing about the approach that precludes its use in the eastern part of the United States, although a number of modifications would be necessary to tailor it for that region. For example, PFC is designed to assess physical conditions responsible for maintaining ecosystem structure. It has not been established how well the approach works in low-gradient, vegetation-dominated floodplains of humid climates where the biological components of riparian areas have strong feedback on fluvial geomorphology in terms of stabilizing bank erosion, reducing channel migration, and enhancing sedimentation. In addition, the method does not assess riparian areas along ephemeral streams (because of BLM's definition of "riparian"), although it could be modified to do so.

BLM has established a training and development team with the primary responsibility for instructing local professionals on application of the method in an attempt to improve the effectiveness and efficiency of its application on BLM lands. Because of its relative simplicity and ease of use, PFC is an effective tool for communicating with landowners and others with nontechnical backgrounds. As a result, many stakeholder groups have a greater awareness of the importance of riparian restoration. Acceptance may not have been possible with a more rigorous, quantitative method (Wayne Elmore, BLM, personal communication, 2000). Because of the method's popularity, there is an ongoing effort to enhance data sharing among the agencies using PFC, an effort spearheaded by the Information Center for the Environment at the University of California, Davis.

The method is implicitly a reference-based approach because it identifies the condition of a site relative to one that has a proper functioning condition rating.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058891

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

However, unlike the Hydrogeomorphic Approach and the Index of Biological Integrity (described below), PFC relies on the judgment of a team of local experts rather than on a group of reference sites that captures the range of natural variation within a geographic region.

It should be noted that the PFC rating is not necessarily the same as the capability or the potential of a site. "Capability" is defined by BLM as the highest ecological status, given political, social, and economic constraints (e.g., presence of dams, ongoing watershed land use, etc.). "Potential" is defined as the highest ecological status without those constraints. These ratings are the result of quantitative data collected using BLM's system for inventory and classification, called an Ecological Site Inventory (Leonard et al., 1992). Ecological Site Inventory is not a component of PFC assessment. Rather, Prichard et al. (1993) recommends that the Ecological Site Inventory document (and others) be reviewed.

Although PFC has been widely used by federal agencies in the West and provides immediate feedback to land managers, it nevertheless has several potential limitations. First, because it is qualitative, PFC is vulnerable to subjective application, which places a great burden on the consistency and skill of the local assessment teams. Consequently, it is difficult to compare assessments over several years to assess progress towards the anticipated condition. Second, emphasis is placed almost exclusively on hydrologic and geomorphic features rather than on biological or ecological functioning. Where vegetation is used (i.e., age class, species composition, plant vigor), it is more an indicator of hydrology and geomorphology than of biology. Virtually no direct attention is given to the terrestrial or wetland habitat functions of riparian areas. If the local assessment team is not familiar with sites in good ecological condition and their characteristic plant communities, its capability to assess the status of a stream is likely to be diminished. Finally, because only the site conditions on a PFC rating form are addressed, the spatial context and connectivity of a given riparian area relative to a watershed setting are not explicitly recognized. Thus, though the PFC approach is an efficient methodology for identifying nonfunctional or functional-at-risk riparian areas—an important issue for many riparian areas in the American West— it has limited capability for quantitatively characterizing the relative level or degree of ecological recovery of riparian areas that have attained a "proper functioning condition" rating.

Prichard et al. (1998) acknowledge that PFC is not a replacement for inventory or monitoring protocols designed for plants and animals dependent on riparian–wetland areas, nor is it a replacement for watershed analysis. However, PFC is a useful tool for prioritizing restoration activities that can reduce the frequency of data collection and labor-intensive inventories by concentrating efforts on the most significant problem areas. A number of the shortcomings discussed above could be addressed with a second-generation, up-to-date method. The approach could be strengthened and the assumptions better understood if studies were conducted to independently validate PFC results.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058892

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*Hydrogeomorphic Approach*

In the early 1990s, the U.S. Army Corps of Engineers' (Corps) Waterways Experiment Station sought an alternative functional assessment method to WET, principally to use in the evaluation of impacts to wetlands, the analysis of alternative sites for development projects that alter or replace wetlands, and the design and evaluation of wetland mitigation projects. The hydrogeomorphic (HGM) approach, developed for this purpose, consists of three components: classification by geomorphic setting, development of a reference system as a benchmark of comparison, and identification and assessment of wetland functions (Smith et al., 1995). The HGM approach compares wetland condition relative to a group of sites that have been minimally impacted so that deflection from the natural variation can be estimated. Functions are used to estimate condition, in contrast to approaches that rely on biota alone. Some functions are based on structural characteristics of a wetland while others rely on species composition.

Seven generic wetland classes (riverine, depression, slope, lacustrine fringe, estuarine fringe, organic soil flats, and mineral soil flats) are used to guide local classifications, or subclasses. Classification is a critical component that allows standards to be developed for and applied to a relatively homogeneous group of wetlands within a biogeographic region (Brinson, 1993). For example, floodplains associated with some first- and second-order streams differ in species composition and hydrology from higher-order streams (Rheinhardt et al., 1999). The purpose of classification is to partition the natural variation among subclasses so that variation due to impacts can be more easily detected.

Measurements are made of structural and biotic variables that relate logically to one of three functional categories: hydrology, biogeochemistry, and habitat. For example, variables relating to nutrient cycling (biogeochemistry) include condition of the riparian buffer, whether or not the stream is channelized, the maturity of the floodplain forest, and the presence of detritus. The nutrient cycling function receives a score based on the status of these variables, each of which is indexed relative to unaltered sites. For example, a site with a channelized stream, a missing buffer, immature forest cover in the floodplain, and suboptimal amounts of detritus would receive a score of 0.4 (relative to 1.0) for the nutrient cycling function (Rheinhardt et al., 1999). Other functions are similarly assessed. Functional indices may be multiplied by surface area in order to compare two or more sites that differ in condition and size.

HGM relies on the development of a guidebook that contains a literature review, an identification of functions, data on variables from reference sites within the biogeographic region of interest, and "models" that relate variables to functions (Smith et al., 1995). Interdisciplinary expertise is incorporated into the development of guidebooks through workshops, field-testing, and peer review. Specific training to use the guidebooks, which helps ensure greater consistency in application, is recommended. This is in contrast to the PFC approach, which requires an interdisciplinary team conducting on-site assessments.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058893

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 179 of 310

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Reference sites are explicitly required in the HGM approach. Terms such as reference standards sites and site potential are provided to distinguish different benchmarks of comparison, recognizing, for example, that restoration of degraded riparian areas in urban landscapes can never achieve natural, unaltered conditions. Given that some recovery in such landscapes may be desirable, the term "site potential" provides an attainable endpoint.

In a typical assessment conducted to estimate the effects of an unavoidable impact, the project site is evaluated in its pre-project condition using the appropriate guidebook. Each variable that contributes to a function is compared to the standard derived from a range of variables at unaltered sites. The condition of the site is then predicted based on alterations expected from the project. Differences between functional indices before and after the project are calculated (upper half of Figure 5-7).

In addition to assessing impacts, the HGM approach was developed to estimate improvement in conditions resulting from restoration (lower half of Figure 5-7). Rather than predicting losses based on project impacts, the method estimates gains in condition resulting from restoration activities. The output of an assessment allows comparisons between changes in condition integrated over surface area. Thus, a restoration of a large but moderately degraded site could potentially compensate for a severe impact to a previously unaltered small site. The details of what is acceptable compensatory mitigation, however, are beyond the intent and capability of the HGM approach. It is important that a policy framework be established to provide guidance necessary for deciding how to interpret and use the results of the assessment.

The HGM method has been adapted for application to selected riparian areas (Hauer and Smith, 1998; Wissmar and Beschta, 1998), even though it was initially developed for evaluating the condition of riverine wetlands. Non-wetland portions of riparian areas are assessed by identifying the "flood-prone width" of a floodplain (Rosgen, 1995). At the time of this writing, only one guidebook for riparian areas has been published (Ainslie et al., 2000), although others are in various stages of development.

Strengths of the method include its use of a reference system, the short time required to conduct an assessment, and the consistency among assessors (Whigham et al., 1999). The reference system involves not only the sites representative of the natural and human-induced variations in a geographic region, but also the body of scientific literature applicable to the riparian or wetland type. Much more data are collected from reference sites than are incorporated in the final assessment tool; the final method used in the field is pared down to include only measurements that are sensitive to activities that alter or degrade the functioning of sites. This background work makes it possible to conduct simple assessments in a matter of hours.

HGM considers components of the flow regime such as the magnitude and frequency of discharge, the duration of specific flow conditions, the predictabil-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058894

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058895



FIGURE 5-7 The HGM approach for assessment, using reference as the basis for comparison of before and after development projects and before and after anticipated restorations. SOURCE: Reprinted, with permission, from Brinson (1996). © 1996 by Environmental Law Institute.

339

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

340                                                                              *RIPARIAN AREAS*

ity of high or low flows, and the rate at which flows change (Poff et al., 1997). Unlike other methods that focus almost entirely on flows within the channel (Peters et al., 1995), HGM can also account for the frequency of overbank flows and their effect on floodplain plant communities. In spite of its "hydrogeomorphic" name, the method takes into account species composition and structure of vegetation as well as functions dealing with animal habitat. Biological variables could be further analyzed using methods developed for biological integrity assessments (see below).

Guidebooks can be updated when new information becomes available. The approach is modular, so changing one portion of a guidebook does not necessarily require revisions in other parts. Assumptions are clearly stated, thus eliminating the "black box" syndrome of WET and PFC's reliance on a team of specialists. An additional benefit of having reference sites is for training and education.

Difficulties surrounding the HGM approach include the lack of high-quality reference sites and the expense of developing the procedure for additional riparian subclasses. Especially in urbanizing areas, streams and their associated riparian areas may already be affected by tree removal, invasive species, gullying caused by changes in runoff patterns, and other alterations. In such generally degraded conditions, there may be a tendency to lower standards for restoration without acknowledging that higher-quality conditions once existed. The development of guidebooks requires a considerable amount of fieldwork and synthesis, an expense that could be considered prohibitive in some riparian management programs.

### Indices of Biological Integrity

Biological integrity refers to the ability of a system to support and maintain "a balanced, integrated, adaptive community of organisms having a species composition, diversity, and functional organization comparable to the natural habitat of the region" (Karr and Dudley, 1981). Measures of biological integrity, such as species richness or trophic composition, are used to compare sample site characteristics to that of reference sites or conditions that are minimally influenced by human activities. For example, the Index of Biological Integrity (IBI) (Karr, 1981) explicitly uses reference conditions to ensure that the best available conditions are used as a benchmark for comparison. During the past 20 years, managers have applied a number of biologically based approaches to measure the effects of water pollution and landscape alteration on water quality (Lenat, 1993). These methods principally use aquatic invertebrates or fish communities as the basis for evaluation.

A primary argument for developing these approaches was that reliance on chemical analysis of water failed to account for many of the habitat conditions that are essential to the biological integrity of an aquatic ecosystem (Karr, 1991;

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058896

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Karr and Chu, 1999). Biota are also viewed as the ultimate integrators of environmental conditions (Karr, 1991).

Although other indices of biological integrity have been developed (see Box 5-5), IBI is the most frequently used and thus is the focus of this section. IBI attempts to integrate the condition of the entire watershed above the point of sampling in a stream, although the actual IBI score reflects a mixture of watershed and site-specific influences (see Roth et al., 1996). A common application of IBI is to compare aquatic insect larvae and other arthropods from streambeds (benthic IBIs) above and below a point source of pollution. In many states, an IBI based on fish is a routine part of water-quality monitoring of streams and provides substantial information for Clean Water Act 305(b) reports. The approach is responsive to larger-scale influences of urbanization, grazing, and agriculture as well as recreation (Karr and Chu, 1999).

Two approaches for analyzing IBI data have been developed: the multimetric procedure (Karr, 1981) and the predictive model method (Hawkins et al., 2000).

---

**BOX 5-5**
**Floristic Quality Assessment Index**

A technique that shares some attributes of biological integrity assessment is the Floristic Quality Assessment Index (FQAI). This index, developed independently of the approaches described above, is based on the method developed for the Chicago region by Wilhelm and Ladd (1988). It was designed to assess the degree of "naturalness" of an area based on the presence of ecologically conservative species. It is thought to reflect the degree of human-caused disturbance to an area by accounting for the presence of non-native and cosmopolitan native species. This index is capable of measuring ecosystem condition because it assigns a repeatable and quantitative value to the plant community.

To calculate the FQAI, a complete species list must be compiled for the site. Each species on the list is then assigned a rating (tolerance values) between 0 and 10 (Andreas and Lichvar, 1995). A rating of 0 is given to opportunistic native invaders and nonnative species. Tolerance values of 1–10 are assigned as follows: values of 1–3 are applied to taxa that are widespread and do not indicate a particular community; values of 4–6 are applied to species that are typical of a successional phase of some native community; values of 7 and 8 are applied to taxa that are typical of stable or "near climax" conditions; and values of 9 and 10 are applied to taxa that exhibit high degrees of fidelity to a narrow set of ecological parameters. The scores are summed to produce an overall score for the community.

Presumably, this approach could be applied to riparian areas with some modification. However, as presently constructed, FQAI is measuring the extent to which a site can support a specialized plant community rather than comparing a site to reference conditions based on minimal human influence. The highest scores, for example, identify unique or rare floristic communities rather than identifying a broader range of community types that are distinguished mainly by having received minimal human influence.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058897

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 183 of
310

Figure 5-8 shows how the multimetric approach compares the distribution of six invertebrate numeric values for a degraded site and one that is relatively unaltered. The circles represent the position of the attribute (a measurable component of the biological system such as taxa richness) for the unaltered site (E. Fort Cow Creek), and the triangles show the location of the same attributes for the degraded site (Lower Elk Creek), ranging from the relatively unaltered on the right to highly degraded on the left. Attributes are chosen such that they will change (preferably linearly) in value along a gradient of human influence. They should reflect changes in the site from best to highly altered conditions. Thus, taxa are restricted to species compositions sensitive to pollution, but attributes may also include the presence of fish with physical abnormalities. Metrics of 5, 3, and 1 shown at the top of the diagram are assigned to several known relationships between aquatic taxa and environmental conditions. Indices that compile the metrics for several attributes can then be used to rank streams according to their condition. In Figure 5-8, the six metrics shown were combined with five others to yield multimetric scores shown as the benthic IBI. By using these two sites and others that span the range of conditions, criteria can be developed to classify sites as excellent, good, fair, poor, or some other scale that has both biological and regulatory significance. IBIs have also been determined for various metrics such as species richness along a gradient of stream order (Karr and Chu, 1997).

The predictive model approach differs from the multimetric only in the way that data are analyzed, not in the biological components chosen. Predictive models calculate the sum of individual probabilities of finding all taxa of interest relative to a reference site. In addition to sampling the same groups of organisms, additional environmental information (e.g., latitude, elevation, channel slope, alkalinity, etc.) that is likely to be independent of human activity is collected. As a result, it is claimed that predictive models are more effective in regions where streams encounter steep gradients in elevation, temperature, and other factors (Hawkins et al., 2000).

Although IBI was developed for measuring benthic populations in streams, theoretically any biological integrity index can be adapted to riparian areas in one of two ways. One is based on the assumption that riparian area condition and upstream land uses are reflected in a typical analysis of benthic invertebrates or fish. This may be particularly effective in rangelands where grazing by domestic cattle is a principal influence. However, the method may not be able, by itself, to discriminate grazing effects in uplands from the activities of cattle within riparian areas or in the streambed. It should be noted that many riparian areas lack sufficient surface water, seasonally, to use biological assessments based on aquatic macroinvertebrates and fish. Furthermore, the characterization of benthic populations is often an expensive and time-consuming task; thus, results are seldom known immediately. The other approach is to develop metrics for the vegetation and biota of the non-aquatic portion of riparian areas. The specific community of biotic indicators may include soil invertebrates, amphibians, birds, or vegetation.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058898



FIGURE 5-8  Benthic IBI scores derived from metrics of invertebrates at a degraded site (Lower Elk Creek) and a relatively unaltered site (E. Fork Cow Creek). Intolerant taxa richness would be the number of species that are sensitive to degradation of water quality in the broadest sense. SOURCES: Reprinted, with permission, from Karr and Chu (1999). © 1999 by Island Press. Reprinted, with permission from Fore et al. (1996). © 1996 by Journal of North American Benthological Society.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058899

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 185 of 310

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

In late 1999, EPA led an effort to develop the methodology for biological indicators in wetlands—an approach that should be transferable to riparian areas if appropriate reference conditions and sites are identified.

Vegetation-based biological assessments may be more reliable for riparian areas than animal-based ones because the more persistent vascular plants integrate conditions over longer time periods. Indeed, for wetlands (and presumably for riparian areas) the approach consists of developing biotic indices for an assemblage of wetland plants and combining these with other biological indicators (metrics) into a composite index. Whoever develops and implements the assessments must be skilled in identifying the chosen group of organisms.

### Comparison of Methods

The three reference-based assessment methods described above are compared in Table 5-1. All are oriented toward evaluating the condition of ecosystems (or portions of them) by comparing a test or project site with conditions expected in the absence of human activities or in least-disturbed sites. They all use classification as a means of partitioning variation between that due to natural sources (i.e., different wetland classes or different stream orders) and that due to human activities that have degraded the system. Once methods are developed in the form of indices (in the case of biological integrity) or guidebooks (for the HGM approach), their application is relatively rapid, requiring several hours to days depending on the complexity of the assessment. PFC is the most rapid in that the scorecard is filled out in the field and the results are "immediately" known.

PFC does not require a database and thus is highly qualitative and dependent on the knowledge base and judgment of the assessment team. The other two methods are based on data gathered and analyzed for both unaltered and degraded sites, and they use quantitative data to establish the level of variables (for HGM) or indices (for biological assessment) prior to assessor involvement. The collection and analysis of such data require considerable expertise.

For conducting assessments, training is also necessary, but in different ways and to different degrees. For HGM assessments, a science background is expected, and training is oriented toward consistent use of the guidebook. In some cases, taxonomic expertise is required, but usually for a relatively small group of taxa. Field measurements of forest stand structure, percent cover of vegetation, presence of non-native species, types and extent of hydrologic alterations, soil characteristics, and surrounding land uses are typical types of data required for an HGM assessment. For biological integrity assessments, a greater degree of expertise is required for specific taxonomic groups of plants, animals, or both. As in all assessments, experience is a valuable asset in assuring consistency and accuracy. In the PFC approach, the importance of experience and consistency is paramount because of the lack of quantitative information for guidance.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058900

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 186 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

From a practical standpoint, reference-based methods are more easily developed in some areas than others. In landscapes that are highly altered, unaltered reference sites are rare or completely absent. This may require the use of historical records or sites that are geographically separated from the area of interest. In many eastern states, land ownership has fragmented the landscape and made it difficult to gain access to sites for collecting data upon which to build assessment methods. Unlike many western areas where federal ownership is common and access is relatively easy, more populated areas pose significant barriers to access for data collection.

A major impediment to reference-based assessments is the development of standards and metrics for a sufficient number of riparian classes. Both methods that require reference data were developed primarily for wetlands rather than for riparian areas. This is not seen as a barrier because the underlying principles and, to a great extent, the methodologies, would be the same, especially for riparian areas that also contain wetlands. Biological integrity approaches have been in existence about 15 years longer than HGM. Consequently, biological integrity methods have been extensively tested, synthesis volumes have been written on the topic, and a large cadre of technicians has been trained to identify aquatic invertebrates and fishes. This training may not be relevant in riparian systems that lack corresponding aquatic taxa and would have to be developed for the taxa found in riparian areas.

The biological integrity and HGM approaches are not mutually exclusive. In the HGM guidebooks prepared for wetlands, important components are species composition of vegetation, the presence of non-native species, and groups of indicator species sensitive to alteration. For biological integrity methods developed for wetlands, metrics can be developed for hydrophytic plants, much like the Floristic Quality Assessment Index described in Box 5-5. In highly modified landscapes where relatively unaltered conditions are absent and cannot be effectively reconstructed from historical sources, managers are using biological integrity approaches based on an array of plant species that span the range of tolerances to alteration (Lopez and Fennessy, 2002). In either case, methods are directly transferable to riparian areas, especially to riparian classes that are dominated by wetlands.

No single approach will fill all the possible needs for assessing riparian condition. Fortunately, there exist several methods and approaches to choose from to meet the specific needs of restoration, ranging from landscape-level to site-specific, from rapid and qualitative to research-level and model-based, and from those designed to answer ecological questions to those oriented toward socioeconomic issues. However, two features of routine, rapid assessments are essential: (1) availability of information at a scale as large as or larger than the management unit and (2) the availability of reference sites. In spite of the development of these rapid methods, there will always be a need for comprehensive, research-based approaches to generate new ideas and to validate indicators used in the rapid approaches.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058901

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**TABLE 5-1  Comparison of Environmental Assessment Methods that Are Either Used in Riparian–Wetland–Aquatic Areas or Could Be Modified for These Areas**

| Attributes | Proper Functioning Condition | Hydrogeo... |
|---|---|---|
| Primary purpose for developing | Restore and maintain riparian–wetland systems on BLM lands | Assess imp... mitigatio... 404 pro... |
| Primarily applied to which systems | Riparian–wetland ecosystems on BLM lands, mostly in the arid West | Developed... associat... environ... |
| Use of reference | Reference is embedded in the professional judgment of the multidisciplinary team | Must be d... conduct... are the l... needed... |
| Use of classification to partition natural variation | No explicit approach to classification is provided; assessment team is responsible for recognizing regional conditions for reference | Classificat... relativel... compari... |
| Use of indicators | | |
| *Hydrologic* | Physical factors are central to evaluating condition | Highly dep... sources... function... |
| *Geomorphic setting and related attributes* | Physical factors are central to evaluating condition | Essential b... evaluati... |
| *Plant and animal species composition* | Species composition of vegetation partly indicates whether physical factors are effective | Plants, esp... non-nati... degrade... |
| *Physical plant community structure* | Vigor and type (shrub, herbaceous) of vegetation indicates whether physical factors are supportive of "proper functioning condition" | Essential f... |
| Level of effort to develop | Training of regional teams has been conducted; work is continuing | Substantia... collectio... and dev... |
| Level of effort to conduct assessment | Requires a multidisciplinary team of experts to visit sites | Requires o... etc.), fie... arithmet... |
| Expertise of assessor | Several qualified individuals from different disciplines (vegetation, soils, hydrology, fish/wildlife) | Science ba... is simp... is requir... users |
| Potential challenges in modifying for riparian areas | None; was developed specifically for riparian areas and wetlands, but lacks validation | Some; alre... width fo... for ripar... |

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058902

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Are
d for

| | Hydrogeomorphic Approach | Indices of Biological Integrity |
|---|---|---|
| stems | Assess impact and provide compensatory mitigation in the Clean Water Act Section 404 program | Provide a biological method to assess overall condition of ecosystem quality |
| nds, | Developed for wetlands, but encompasses associated riparian areas in arid riverine environments | Developed initially for streams to assess watershed condition; recently being modified for wetlands |
| al | Must be developed as the basis for conducting assessments; least-altered sites are the benchmark, but altered sites are needed for scaling condition | Uses lack of human activity for reference. Scores estimate departure of altered sites. The range of conditions is used to categorize indices as high, medium, or low. |
| ovided; gnizing | Classification is fundamental to developing relatively homogeneous standards for comparison | For wetlands, uses the HGM classification approach |
| condition | Highly dependent on identifying water sources and flows necessary for evaluating functions | Seldom used; instead, biotic indicators are central to method |
| condition | Essential both for classification and evaluating condition | Not required except for the classification step |
| indicates | Plants, especially, used to indicate alteration; non-native species can be used to indicate degraded conditions | Biological data are central to the assessment, especially aquatic animals; vegetation indicators are undergoing development |
| getation | Essential for evaluating condition | Not required |
| lition" | | |
| lucted; | Substantial effort required for field data collection, establishing reference standards, and developing guidebook | Substantial effort required for field sample collection, analysis, and development of multimetrics and predictive models |
| erts to | Requires office preparation (maps, photos, etc.), field visit to collect data, and simple arithmetic computations | Requires field collection and processing of samples |
| nt y, | Science background. Although the approach is simplified for the non-specialist, training is required to improve consistency among users | Taxonomic expertise needed for relevant biota (e.g., aquatic macroinvertebrates, fish, native and alien plant species, etc.) |
| arian n | Some; already encompasses flood-prone width for streams; needs little modification for riparian areas that contain wetlands | Need to adapt biological assessments to terrestrial areas |

*continues*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058903

348                                                                                           *RIPARIAN AREAS*

TABLE 5-1  Continued

| Attributes | Proper Functioning Condition | Hydrogeo |
|---|---|---|
| Major strengths | Tailored specifically to arid riparian sites; easy for nonprofessionals to understand; a multidisciplinary team of experts must be present at the site | Allows det of infor a simple |
| Major weaknesses | Relies on best professional judgment of assessors to establish reference conditions; ignores habitat values | Has a high regiona |
| Situations to which the procedure applies | Western riparian situations where a group of specialists can determine whether mostly physical conditions are available to sustain, improve, or further degrade a riparian area | Once a ref riparian current losses o restorati |

## Policy Considerations

None of the approaches described in the preceding section addresses policy interpretations of the results (Kusler and Niering, 1998). Although providing such an analysis would go beyond the scope of this report, it is important to understand the limitations of these assessments when their results are turned over to decision-makers. First, there is a substantial need for policy to bridge the gap between outputs from science-based assessments to management decisions affecting riparian resources. As with the choice of assessment methods for riparian conditions, the policy framework should be scaled to the types of questions being asked. For example, reference-based assessments tend to assign low scores to urban riparian areas in degraded conditions. From this standpoint, one could argue that less overall loss occurs when urban riparian areas are converted to other uses than when rural ones are converted. This could lead, in the absence of a policy framework, to less protection of rare but highly visible urban riparian areas compared to rural areas. In general, concepts of rarity, uniqueness, location (with respect to human uses), and educational value are not taken into account by site-specific assessments of condition. Screening methods such as Hydrogeologic Equivalence and the Synoptic Approach may identify these attributes, if they are calibrated to do so.

There are assessment methods that fall between the science-based assessments described above and the policy realm. "Multicriteria" methods provide ways to optimize environmental management decisions that go beyond assessment of ecological condition. These tend to be project-by-project approaches for siting landfills, highways, etc., and are not specific to riparian areas; Europeans are leaders in this area (Voogd, 1983; Janssen, 1994). Multicriteria approaches

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058904

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

|  | Hydrogeomorphic Approach | Indices of Biological Integrity |
|---|---|---|
| ; easy<br><br>be | Allows detailed restoration planning because of information from the reference system; a simple assessment is rapid | The basic IBI approach has been around for 20 years, allowing many of the problems to be resolved; background literature is available |
| ssessors<br>es | Has a high front-end cost for developing regional guidebooks | Has been incompletely developed in wetlands where vegetation is the principal biotic variable |
| p of<br>tly<br>stain,<br>area | Once a reference system is developed for a riparian class, assessment determines current condition of a site, and can project losses or gains due to alterations or restorations, respectively | Once multimetric or predictive models are developed for a riparian class, assessment places the site within a continuum of alteration by human activities |

address the need for making decisions that are supported by the public. To better integrate public participation in decision-making on riparian resources, education is required about the condition of riparian areas and implications for social well-being (i.e., "quality of life," internalizing environmental costs, etc.). Unless riparian areas are broadly recognized as contributing to social well-being and policies are put in place to maintain their functions, it is unlikely that decision-makers will have either the tools or the political will to effectively maintain and enhance the functions and values of riparian areas.

Finally, there are many impediments to integrating ecological research into economic development. Foremost are the reluctance of ecologists to recognize that global economies drive environmental decision-making and the conflicting assumptions that exist between ecology and economics (Di Castri, 2000)[1]. The application of integrated approaches to riparian areas is particularly complicated because streams often cross geopolitical and ownership boundaries and interface with vastly distinct land uses. Nonetheless, some of the progress made in valuing wetlands is applicable to riparian areas. For example, scale and landscape setting are attributes that influence the value of both wetlands and riparian areas. Other ideas gleaned from wetlands that might be applicable to riparian areas are that (1) values to individual stakeholders change depending on proximity to the resource, (2) as wetlands become rarer, they become more valuable at the same time that they undergo progressive degradation from human activity, and (3) from strictly economic perspectives, more valuable ecosystems should replace less valuable ones (Mitsch and Gosselink, 2000). Beyond that, assigning monetary values to

---

[1]For example, a tenet of economics is that all resources are "replaceable" or capable of substitution. Ecology does not support this, particularly for species that become extinct.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058905

*RIPARIAN AREAS*

ecological services of riparian areas can never fully account for true value, and should not be the principal or sole approach to biodiversity and ecosystem services (Gatto and de Leo, 2000). Nevertheless, the assignment of production functions[2] to environmental services of ecosystems can contribute information that may lead to better decisions on the largest net benefits to society (Acharya, 2000). None of the assessment tools described above bridges these science–policy gaps, but they may provide information for economic analyses.

### Conclusions and Recommendations

Currently, there are no nationally recognized protocols for assessing the ecological condition of riparian areas. A range of approaches is needed to satisfy assessments at scales ranging from watersheds to individual sites, and from rapid assessment to research-driven analyses and model building. Because riparian areas are the main connectors of landscapes at watershed scales, assessments should begin with large-scale analyses that evaluate the variety, location, and connectivity of riparian areas. Landscape-scale methods that utilize widely available data are useful in determining large-scale restoration needs, protection strategies, and goals for other forms of management. Site-specific assessments have undergone considerable evolution and development over the past 20 years. There are opportunities to tailor many existing wetlands assessment methods to riparian areas.

**Tools for riparian management range from assessment approaches that rely on simplistic measures to full watershed analysis, research, and modeling of ecosystem structure and function.** Rapid assessments are useful as screening tools to help make decisions where immediate action is necessary, while a more robust science-based approach is required to establish longer-term management actions (including reference-based monitoring and adaptive evaluation of the effectiveness of restoration activities). In either case, the full range of stakeholders must be included in the process to determine desired riparian condition (e.g., ecological restoration), based upon unambiguous articulation of available knowledge of riparian structure and function.

**The concepts underlying most assessment tools currently used for wetlands and aquatic ecosystems are transferable to riparian areas, suggesting that these tools can be modified to assess the condition of riparian areas.** In

---

[2]A production function is a mathematical description of the relationship between specified inputs, in the present case riparian ecosystem services (water quality, habitat, etc.) and outputs from the production process (cleaner water, fish and wildlife, etc.). Production functions are a useful way to value environmental functions, but data are lacking to make the link to the full range of goods that an ecosystem can and does provide (Acharya, 2000).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058906

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 192 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

some cases, this would require an expansion from the aquatic portion to the floodplain and terrestrial parts of riparian areas. In cases where wetlands are major components of the riparian areas, modifications would be minimal. The extent of riparian area must first be identified so that assessment includes riparian areas that are highly degraded and not easy to recognize.

**Proper Functioning Condition, the only method developed specifically for riparian areas, provides a good first-generation framework for riparian assessment.** This method can be rapidly applied and may have its greatest utility in quickly identifying riparian areas that have been significantly degraded (i.e., nonfunctional and functional-at-risk). However, there is currently no assessment of biological components because the assessment is built principally by evaluating physical factors. The current version should be refined to increase its capacity to link physical conditions with water quality, instream biota, plant community structure and composition, and terrestrial animal communities. The approach should become more quantitative and rely more on regional reference sites rather than on the exclusive judgment of a team of local experts. Information on reference sites, a component that is currently lacking, would contribute to validation of the method.

**The Hydrogeomorphic Approach holds considerable potential for assessing the condition of riparian areas.** HGM is a reference-based system, originally developed for wetlands, that provides data useful not only for the assessment of condition, but also for the overall design of regional or watershed-scale restoration efforts. The current HGM methodology should be revised, as needed, for direct use in riparian areas across various geographic regions. This will require the development of guidebooks specifically for ecological restoration of riparian areas.

**Biological integrity assessments, which have not yet been used in riparian areas, should be evaluated for their ability to encompass riparian community types.** Until recently, most biological assessments have been limited to aquatic ecosystems. However, biological assessment of aquatic systems and riparian plant communities, for example, can be used independently or as a component of the hydrogeomorphic approach. Such assessments are needed to independently validate the biological portion of HGM assessments.

**All the methods described above should be expanded to include more types of riparian areas, tested by users, and independently validated with appropriate research.** Independent testing and evaluation is a critical need of all assessment methods. This is important to ensure their accuracy, usability, and, perhaps most importantly, their credibility for use across the diverse suite of riparian areas that occur in any given region.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058907

Case No. 1:20-cv-02484-MSK  Document 45-7  filed 04/28/21  USDC Colorado  pg 193 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Regardless of the science-based tools used to assess riparian condition, the output from these evaluations must be implemented through policies that take into account both environmental and socioeconomic issues.** Decision-makers are usually faced with a number of competing values, of which goods and services derived from riparian areas are only one of many. Unless the output from riparian assessment tools can be placed into this broader context, there is little likelihood that the resulting information will be helpful. Consequently, users of the information should be determined before the assessments are interpreted.

## MANAGEMENT STRATEGIES

This section discusses management strategies for restoring the hydrologic regime, geomorphic structure, and vegetation characteristic of riparian areas. Although the scientific basis for restoring riparian areas has rapidly expanded in the last couple of decades, the implementation of restoration practices is in its infancy. In addition, there is much to be learned socially and institutionally about opportunities and limitations for improving these important systems. Nonetheless, some generalities can be made about the appropriateness and effectiveness of certain management strategies. Perhaps most important is that the range of possible restoration activities is broad, from simple activities at a single site to large-scale projects. In many cases, relatively easy things can be done to improve the condition of riparian areas, such as planting vegetation, removing small flood-control structures, or reducing or removing a stressor such as grazing or forestry. Where the objective of restoration is to improve the entire river system, more holistic watershed approaches will be necessary, and management strategies such as removing impediments (e.g., large dams) to the natural hydrologic regime may be required. There are few examples of these larger-scale activities having been conducted with the expressed purpose of restoring riparian areas.

The discussion of management approaches that follows is not meant to be exhaustive, but rather illustrative of how significant ecological improvement of riparian systems might be attained. Some of these strategies will be more passive, some more active, and others a blend of both passive and active approaches. In all examples, successful restoration appears to be based on extensive local knowledge of hydrology and ecology including the range of natural variability, disturbance regimes, soils and landforms, and vegetation; on understanding the history of resource development; and on identifying reference sites. Because restoration is not a deterministic process for which the outcome can necessarily be predicted with high temporal or spatial resolution, it might appropriately be considered a journey involving riparian systems and societal goals, with both evolving over time.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058908

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 194 of 310

### Reestablishing Hydrologic Regime and Geomorphic Structure

Previous chapters have discussed how hydrologic disturbances and sediment dynamics play important roles in maintaining the function of riparian areas. Dams constructed to control floods or generate hydropower, locks, low-water diversion channels, and off-stream storage ponds have precipitated fundamental changes in the flow regimes and the geomorphic character and sediment dynamics of rivers. Many water resources developments have caused concurrent degradation in water quality and fish and wildlife habitats as well as dwindling amounts of riparian areas along lake shores, streambanks, and floodplains. In the opinion of this committee, *repairing the hydrology of the system is the most important element of riparian restoration.* If the flow regime—in terms of magnitude, frequency, timing of peak flows, and other features—is not sufficient to meet the needs of the ecosystem, riparian restoration will ultimately fail (see Poff et al., 1997).

It is important for both stream and riparian restoration for managers to understand the limitations of structural changes in the absence of flow regime changes. For example, typical channel restoration projects meant to improve the complexity of instream fish habitat often involve the addition to channels of gravel or structures with the objective of reversing degradation. However, these projects often fail to consider the importance of hydrologic disturbance, such as the need for peak flows to flush fine sediment from gravels for continued spawning success of salmon (Lisle, 1989; Kondolf and Wolman, 1993). Geomorphic restoration alone cannot bring about the complexity that would result from a fully functioning river corridor with free-flowing exchange of sediment and wood between the channel and riparian area.

Another example is the attempt to increase instream habitat complexity by adding anchored structures on the banks or beds of channels. Even when the added materials are natural in character, anchored structures do not allow the types of adjustments that occur in a system that naturally changes shape in response to floods. Expensive reengineering of a meandering channel with large wood fixed in place has a high probability of substantial reworking during subsequent periods of high flow. Long-term restoration of instream habitat is unlikely to be achieved without full consideration of the flow disturbances on the dynamics of such structures.

Historically, restoration involving changes in flow regime such as dam reregulation has usually targeted fish populations and has not considered riparian objectives. The fact that few hydrologic regimes have been restored expressly for riparian purposes reveals the relative newness of this concept. In addition, most of the available examples of dam reregulation are found on larger rivers, perhaps because there has been greater social and political impetus to makes changes in these systems. For larger rivers, reregulation of dam operations may be one of the only restoration options available because of the limitations imposed by perma-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058909

354                                                                                                        *RIPARIAN AREAS*

nent structural modifications. Nonetheless, recreating a more natural hydrologic regime is fundamental to the ecological restoration of rivers of all sizes.

This section discusses how long-term restoration of riparian areas might be achieved if components of the natural hydrologic regime, sediment dynamics, and hydrologic connectivity between rivers and their floodplains were reestablished. Restoring more natural flooding regimes and sediment dynamics in the nation's rivers is likely to be a major theme for environmental science in the twenty-first century (Poff et al., 1997).

*Operation, Modification, or Removal of Dams*

The vast majority of dams and reservoirs in the United States were completed well before concerns about riparian areas became widely evident. As a result, reservoir release patterns often have done little to support functioning of downstream riparian systems (e.g., Rood and Mahoney, 1990). Although the mandated purposes of a particular dam (e.g., irrigation withdrawals, hydropower generation, flood control) may legally constrain its management, opportunities usually exist to change the storage and release of water to help maintain floodplains and related riparian areas. Restoring the natural flow regime should focus on reestablishing the magnitude, frequency, and duration of peak flows needed to reconnect and periodically reconfigure channel and floodplain habitats (Stanford et al., 1996). In addition, baseflows should be stabilized to revitalize food webs in shallow-water habitats. Another important goal is to reconstitute seasonal temperature patterns (e.g., by construction of depth-selective withdrawal systems on storage dams). These mitigative actions do not reconstitute pristine, pre-alteration conditions but rather normative conditions. Such normative conditions can have measurable benefits to specific attributes such as fish habitat or riparian vegetation if sustained by careful, science-based management of reservoir storage and releases (Stanford et al., 1996).

As increasing numbers of privately owned hydroelectric dams in the United States undergo relicensing by the Federal Energy Regulatory Commission (FERC), regulators should consider modifying flow-release policies to help avoid or mitigate adverse impacts to downstream riparian areas (i.e., to create normative habitat conditions). The Corps and the U.S. Bureau of Reclamation (USBR), in continuing a policy shift toward providing multipurpose benefits in addition to their traditional focus on flood control and irrigation (Whittaker et al., 1993), should consider the maintenance of downstream riparian systems when setting operational policy for federal dams. Box 5-6 considers some of the recent trends in federal dam operations, including the Yakima River in Washington where dam reregulation is being implemented at the watershed scale.

Changes to dam operations have most commonly been motivated by the flow needs of downstream fisheries. In the Pacific Northwest, the proposed removal of the Elwha and Glines Canyon Dams along the northern portion of Olympic

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058910

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

National Park and of four major Snake River dams has been a major topic of discussion because of their detrimental impacts to native salmon runs. A recently completed restoration activity involved removing a dam on the Kennebec River in Maine for fisheries purposes. The Edwards Dam, built on the Kennebec River in 1837 to facilitate upstream navigation and to generate hydropower for saw-mills, was removed in 1999 after a protracted legal battle. The actions are expected to restore seven species of migratory fish to the Kennebec River, a goal that required removal of the dam because at least four of the affected fish species were not known to utilize fish ladders of any kind.

Many fewer cases of dam re-regulation involve riparian objectives. Fortunately, research is now demonstrating the essential functions performed by periodic flooding in shaping river channels, building floodplains, creating backwater sloughs, and supporting riparian vegetation; as a result, dam operations are changing in some locations to allow at least some controlled flooding. Prescribed flooding has the potential to become a management tool similar to the use of prescribed burns in managing forests and grasslands. Given the current level of water resources infrastructure, dammed rivers will probably never have flow releases that fully replicate pre-dam flow regimes, and upstream portions of dammed rivers may never be restored. However, in many areas there may be major opportunities for altering flow release patterns so that they are increasingly "friendly" to the hydrologic needs of downstream riparian areas.

An example is the operation of the Corps' dam on the Bill Williams River, which originates in the highlands of western Arizona and flows generally west to its junction with the Colorado River at Lake Havasu. In 1968, the Corps completed construction of Alamo Dam on the Bill Williams River 39 miles upstream from the Colorado. Operation of the dam—primarily for flood control—sharply reduced peak flows, increased flows in some periods, and completely cut off flows in others. Studies in the early 1990s documented the degradation of the riparian habitat along the Bill Williams and attributed that degradation to the change of flow regime resulting from operation of Alamo Dam. In 1996, Congress specifically directed the Corps to modify operation of Alamo Dam. The resulting feasibility report recommended "pulse" releases in the spring and fall, combined with a flooding "event" at least once every 5–10 years, together with base flows varying from 10 to 50 cubic feet per second (USACE, 1998). The Corps based its recommendation on studies demonstrating the effectiveness of different surface and groundwater regimes for supporting native riparian vegetation (Shafroth et al., 1998, 2000).

The cottonwood reestablishment on the Rio Grande from 1993 to 2001 is another example of where simulated flooding has led to the regeneration of riparian vegetation (Crawford et al., 1996; M. C. Molles, University of New Mexico, personal communication, 2001). Other studies have tried to determine the portion of the hydrograph that is essential for driving lateral channel migration and successional changes in riparian vegetation, suggesting that a water

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058911

356                                                               *RIPARIAN AREAS*

---

**BOX 5-6**
**Changing Operations of Federal Dams—the Yakima River**
**Basin Enhancement Project**

Operating regimes for federally managed water-storage facilities are determined in the first instance by the purposes for which the facilities were authorized for construction and operation. Older facilities tend to be single-purpose, such as for irrigation water, navigation, or flood control. Beginning in the 1930s, federal facilities typically were authorized to serve multiple purposes, and by the 1950s, fish and wildlife generally were included as one of the purposes.

Many federal water facilities—particularly those constructed to provide irrigation water—operate in accordance with water rights obtained from states and from contractual agreements with project beneficiaries who, in return, repay a portion of the cost of constructing and operating the facilities. Water rights, based on beneficial uses, establish the manner and amount of project water storage. Contracts govern the manner and amount of water releases to serve these beneficial uses.

In the Flood Control Act of 1970, Congress authorized the Corps to evaluate modifying its operation of existing facilities when it determined doing so was in the public interest. The 1986 Water Resources Development Act provided the Corps authority (in Section 1135) to undertake environmental enhancements associated with existing projects, including restoration of ecological resources and processes of affected hydrologic regimes.

USBR does not have general authority of the kind possessed by the Corps to alter project operations based on environmental considerations. Nevertheless, USBR has modified operations of many projects—as directed by project-specific congressional enactments, to comply with its obligations under federal environmental law (particularly the Endangered Species Act), or to better serve authorized project purposes. For example, in the 1994 Yakima River Basin Water Enhancement Act, Congress directed USBR to operate the federal Yakima Project so as to provide "target" minimum flows at two key diversion points to facilitate movement

---

storage and use regime that does not interfere with this portion of the hydrograph could be compatible with riparian ecology (Richter and Richter, 2000). In the northern Great Plains, it has become increasingly recognized that high flows in May and June, when cottonwood seed release commonly occurs, are important for successful cottonwood regeneration (e.g., Rood et al., 1999). These flows not only create mineral seedbeds by their scouring action and deposition of sediment, but as the flows recede they also allow the downward root growth of germinated cottonwood seedlings to track falling water tables. If high flows are curtailed too abruptly, root growth cannot keep up with falling water levels, and establishment will not succeed. Thus, establishing a flow regime downstream of reservoirs that mimics some of the high-flow dynamics of the original river system could serve as a major restoration tool and is important for successfully maintaining gallery forests associated with these river systems. Similarly, experimental high-flow

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058912

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 198 of 310

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

of salmon (MacDonnell, 1996). The Yakima River in central Washington is a tributary of the Columbia River that historically had robust salmon and steelhead runs. Development of the river basin as a major agricultural production area required extensive regulation of flows to provide irrigation. Regulation of the river, coupled with over-harvest, vastly depleted the anadromous stocks and only remnant populations remain. The USBR-run irrigation system currently depletes average flood peaks, but water storage is insufficient to substantially retard major floods and therefore a fair amount of channel–riparian complexity remains. However, the base flows are substantially altered and some reaches below the major diversion canals are nearly dry during late summer. Moreover, construction of an interstate highway in the riparian corridor of the river coupled with urban and agricultural expansion onto the floodplains has mediated extensive gravel mining and channel revetment.

In 1992, the USBR was charged to determine biologically based flows that would allow restoration of the fisheries. It focused on purchase of water rights for instream flows, water conservation through installation of modern irrigation systems, land acquisition to allow flooding of riparian areas, and research to demonstrate relations between flows, riparian succession, and fish habitat for key floodplain reaches of the river system. The restoration plans call for removal of revetments to naturally restore floodplain function. The project is a good example of an ongoing whole-basin riparian restoration project that has coupled basic research with clear management objectives and stakeholder participation. Implementation of restoration activities, such as acquisition of floodplain land and available water rights from willing sellers, has gone on simultaneously with research that attempts to determine the normative flow regime for the river. The project involves private landowners, the Yakima Indian Nation, federal and state lands and management entities, and university researchers. Normative flows in this river system are expected to be implemented within the next few years and a monitoring plan for evaluating success of the project is in place. For more information see www.umt.edu/biology/flbs.

releases from Flaming Gorge Reservoir on the Green River in Wyoming have been evaluated not only for their benefits for endangered species of fish, but also for their effects on downstream riparian areas and their vegetation (Andrews, 1986; Merritt and Cooper, 2000). As discussed in Box 5-7, releases of water from Stampede Reservoir to the Truckee River in the 1990s in support of the spawning needs of an endangered fish have been associated with cottonwood regeneration along riparian lands in the lower portion of the river. Other prominent examples have occurred on the Upper Colorado River and the Napa River.

Recent decisions regarding the management of dams on the upper Missouri River reflect changing attitudes toward incorporating environmental considerations into dam operations (NRC, 2002). In November 2000, the U.S. Fish and Wildlife Service (FWS) released a biological opinion for the revised management of six dams on the Missouri River in eastern Montana and the Dakotas. The

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058913

---

**BOX 5-7**
**Return of Cottonwood Forests During Flow**
**Regime Reestablishment for the Lower Truckee River**
(Sources: Rood and Gourley, 1996; Gourley, 1997)

For most of the 1900s, the Truckee River from Lake Tahoe in California to Pyramid Lake in Nevada has been heavily regulated. Starting in 1902, dams along the 140-mile length were constructed for irrigation, domestic, and industrial purposes, with the result that roughly half of the flow from the lower Truckee River was diverted. In addition to the flow changes, the Corps widened and deepened the river from Lake Tahoe to about 3,200 feet downstream to protect the city of Reno from floodwaters. These modifications made the river channel more susceptible to erosive forces, as evidenced by damage to the channel and riparian area following floods in 1963 and 1986.

Prior to 1902, the Truckee River and Lake Tahoe had been home to the Lahontan cutthroat trout, while the lower Truckee and Pyramid Lake supported large populations of cui-ui. Because of alterations to the streamflow that curtailed spawning runs, the native Lahontan cutthroat became extinct in the 1940s; the cui-ui is now close to extinction (and is a federally listed endangered species). Other cutthroat populations have been reintroduced into the system and are now listed as "threatened" under the Endangered Species Act. During the same period (first half of twentieth century), cottonwood-dominated forests in the riparian areas along the river declined to a fraction of their historic extent.

To help stimulate spawning and the eventual recovery of the cui-ui, the FWS began managing the Stampede Reservoir in the 1970s by changing release flows and creating artificial fish passages. The flow modifications consisted primarily of increasing outflow from the reservoir from April to June. By 1992, the adult cui-ui population had rebounded significantly from its low point, with over 1 million fish counted. The success of the recovery was also attributed to several very wet years that complemented the flow modifications.

The change in management coincidentally produced conditions favorable for cottonwood germination and sapling survival. Prior to the flow changes, the river level was so low during summer months that cottonwood recruitment was negligible. In years during which outflow from Stampede was increased, and in several naturally wet years, cottonwood recruitment peaked. Survival was found to correlate not only with flow levels, but also with a slow rate of decline in river levels over time—confirming that the timing, frequency, and duration of flow are all important factors in the lifecycle of riparian vegetation. Parallel with the recovery of cottonwoods, songbird populations have also returned along the Lower Truckee. The FWS has promoted future management of the river's dams to support both fish populations and cottonwood recruitment.

---

opinion calls for operation of the dams to create higher spring flows and lower summer flows compared with flows under past management. The purpose of increased spring flows is to provide reproductive cues for the federally endangered palled sturgeon and other species, and to build sandbars that would be used by nesting terns and plovers during the time of exposure of the bars in summer.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058914

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Lower summer flows would also provide shallow water for young fish. Although not explicitly discussed, this proposed change in management might improve cottonwood recruitment in riparian areas. The plan also calls for adaptive management with monitoring, which would allow dam operations to be adjusted in the future as new information becomes available about changing environmental conditions. FWS's opinion about dam management on the upper Missouri would increase slightly the risk of flooding during spring and have some negative impacts on recreational navigation at low flow; it is hoped that these impacts would be offset by positive effects on fishing, canoeing, and camping. The Corps will make its final decision regarding the biological opinion at the conclusion of the national environmental policy process for the Missouri River master manual.

**Complications for River Sediment Dynamics.** Manipulating sediment dynamics is not usually a principal restoration activity. However, one consequence of river restoration projects may be changes in the sediment transport regimes that could affect interactions between channels and riparian areas. This is especially true when restoring a river's natural flow regime by manipulating dam operations to create variable flows or by removing dams altogether. This strategy could change rates of sediment transport and deposition in ways that affect the size, morphology, and disturbance frequency of sediment patches that are suitable for establishment of riparian plants (Friedman et al., 1996; Scott et al., 1996).

An example of a river restoration project that affected sediment dynamics was the controlled flood in the Grand Canyon in 1996. In this case, the principal goal was redistributing sediment from the channel to build exposed, sandy platforms such as point bars (locally called "beaches") that are valued as riparian habitat and as campsites for river rafters (Schmidt et al., 1999). Researchers are still debating how floods should be controlled in order to rebuild and maintain beaches and to keep the beaches free of tree seedlings and saplings. However, the effectiveness of controlled floods in building beaches is strongly related to upstream sediment sources in the river (Topping et al., 2000); these sources were significantly reduced by the construction of Glen Canyon Dam. It may be difficult or impossible to maintain beaches over the long term in such sediment-starved systems.

Sediment dynamics is a major issue for the proposed restoration of the Ventura River within the Los Padres National Forest, CA. The Matilija Dam was built in 1947 for flood control and irrigation water supply. The dam blocked steelhead from much of their upriver habitat. The Ventura River steelhead, which is genetically distinct from populations further north in California, was listed as an endangered species in August 1997. Sedimentation behind Matilija Dam has vastly reduced its flood-control capacity; an estimated 6–11 million cubic yards of clay and silt are located behind the dam. Whether the sediment could be released to the channel below the dam in a staged deconstruction, or whether the

Copyright © National Academy of Sciences. All rights reserved.

sediment would have to be disposed of elsewhere, is one of the major uncertainties associated with any proposal for dam removal. A preliminary analysis by the Bureau of Reclamation suggested that the cost of removal could be as much as $180 million depending on the plan for sediment disposal.

Another California dam, Engelbright Dam on the Yuba River, also poses significant sediment problems. The dam has trapped tailings from hydraulic mining, which are likely to contain significant quantities of toxic metals. Any plans that would involve the release of trapped sediments to the downstream river would have to address the fate of those contaminants. Some important variables that could affect the redistribution of contaminants include (1) association of contaminants with the different grain sizes and differential transport of those grain size fractions, (2) interactions between the reestablished flow regime and the newly released sediment, and (3) relative importance of downstream sediment fluxes versus lateral (between channel and floodplain) sediment fluxes. These factors will determine how the morphology of the channel and the surrounding floodplain changes, the extent to which contaminants are redistributed between them, and the time period that contaminants are likely to be stored in new deposits.

*Modification or Removal of Levees and Other Flow Containment Structures*

There is considerable potential for restoring riparian areas by altering levees, dikes, and other structures designed to impede the movement of water away from a channel. Where new levees are proposed to reduce or prevent flooding of streamside areas, setting them back some distance from the edge of a river or stream would at least ensure the maintenance of near-channel riparian areas. For areas where levees are already in place, gaps in existing levees could be created that would allow inundation of former floodplains and reestablishment of riparian vegetation. If undertaken in conjunction with setback levees, such an approach would continue to protect specific lands or structural developments from flooding at high flows while allowing overbank flows on some portions of former floodplains. Although such an approach is physically feasible, the costs of creating gaps, the economic effects of flooding former floodplains, and the costs of constructing additional setback levees might preclude the implementation of this approach in many areas. However, where the ecological and social values associated with reestablishing periodic flooding (e.g., increased detention storage of flood waters, increased riparian functions, improved habitat and food web support for aquatic organisms and wildlife) are high and the economic costs are low, breaching or creating gaps in levees and dikes may be a relatively straightforward approach to reclaiming significant amounts of historical riparian area. Complete removal of existing levees or replacement with levees further from the river can be expensive, often necessitating not only the movement of fill, but also substantial changes in existing land uses.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058916

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 202 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

In order to promote successful restoration in "high-intensity use" riparian areas, compromises in the planning process are likely, as illustrated by the restoration of the Napa River riparian area in north-central California. The City of Napa's Living River Plan was developed by a coalition of the Corps, state and local governments, resource agencies, businesses, and environmental organizations in response to a problem created by overdevelopment in the river corridor. The area has experienced 27 floods since the 1850s, causing over $540 million in damages since 1960. Initial plans by the Corps called for deepening the river channel, raising the levees, lining levees with concrete, and frequent dredging. In contrast, the Living River Plan includes terraced marshes and broad wetlands in place of the levees, which were moved farther from the river channel. Rather than deepening the river channel, the river corridor was widened by hydrologically reconnecting it with much of its former floodplain; this required removing from the river's banks 16 houses, 25 mobile homes, eight commercial buildings, and 13 warehouses. The $190 million needed for the project came from Congress and a sales tax in Napa County. In winning the support of a majority of county residents, the coalition successfully argued that if the floodplain restoration reduced flood losses, it would save about $20 million a year, even after considering project maintenance costs.

In urban and residential areas, where buildings, parking lots, and other structures fall into disuse, financial incentives and other resources could be used to assist landowners in removing physical features from near-stream environments. If such policies were adopted at regional or national scales, over time many riparian systems would improve as individual structures were removed and replaced by riparian vegetation.

Many streams and rivers in the United States are crossed by city, county, state, and/or federal highway bridges. Although these bridges are typically designed for passing high flows in a relatively unhindered fashion, the highway fills and embankments leading up to many bridges effectively prevent high flows from accessing historical floodplains and they hydrologically disconnect old channels. When these roadways and bridges are scheduled for updating, reconstruction, or other improvements, reconnecting former floodplains and side channels should be considered and implemented wherever possible.

### Streambank Stabilization

Bank stabilization, utilizing a variety of structural approaches, has been undertaken along many streams and rivers throughout the United States. In general, these approaches have been implemented to prevent or retard streambank erosion—often with little recognition of the contributing causes. Even when the causes are known (e.g., increased runoff or unstable watershed conditions caused by loss of streambank vegetation due to harvesting of trees, grazing, or conversion to agricultural crops), a structural approach to stabilization has often been

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058917

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

implemented. Streambank stabilization is often relatively easy to design and inexpensive, and it provides relatively immediate relief to local landowners. However, it often precludes the slow and incremental channel adjustments that normally occur in streams. For example, natural flow variation causes streambanks to experience locally alternating periods of erosion and deposition. On the outside of meander bends, a stream may slowly erode the bank only to deposit other sediments on the interior bank (point bar). This natural evolution of fluvial systems and the riparian plant communities they support is truncated when streambanks are structurally stabilized.

Although it is unlikely that many streambank stabilization projects in heavily developed areas are likely to be dismantled in order to improve riparian functions, there is a real need to "soften" the impact of these structures. Particularly important would be their modification to allow and encourage the establishment of native riparian plants. To what extent this can be accomplished by plantings, by adding soil into the large pore spaces associated with many rock structures, by partial removal of a structure and replacement with soil that can support riparian vegetation, or by other approaches is largely unknown. Assessing the potential and practicality of revegetating structural streambank stabilization projects represents a pressing research need. Only recently has there been a systematic assessment of the hydraulic effects of riparian vegetation and an evaluation of flow-resistance equations for vegetated channels and floodplains (Fischenich, 1997; Syndi et al., 1998).

### Discouraging Development in Floodplains and Meandering Streams

Chapter 2 defined meander belts as broad swaths of land surrounding sinuous channels that incrementally shift to reflect changing hydrologic, sedimentary, or riparian conditions (see Figure 2-3). Chapter 3 discussed how a variety of activities, including levee construction and urban development, can disrupt and sever the hydrologic linkages across meander belts in a variety of ways, impacting the spatial extent and sustainability of many floodplain riparian areas. Bank stabilization projects and other structural alterations in active floodplains also tend to curtail the natural dynamics, large-wood recruitment, and other riparian functions common to meander belts.

Where the general morphology of a meandering stream or river system remains intact—i.e., it is not significantly altered by human development or land uses—prevention of structural alterations that impact how the river and its riparian areas function is fundamental to ensuring the sustainability of these important systems. For example, 100-year floodplains could serve as an initial screening process regarding proposed development projects: developments proposed within the boundaries of the 100-year floodplain would be subject to a higher degree of scrutiny than similar projects outside the 100-year floodplain. In addition, should such a project go forward, a significant effort at mitigating its potential effects

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 204 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

upon riparian and aquatic systems would be required. Structures located relatively close to a stream or river should be more closely evaluated regarding their potential to affect river and riparian processes; whenever possible, structural features and developments (including vegetation removal) should be located farther from rather than closer to the river.

A complex example of restoring the hydrologic regime to a river and riparian area is the reengineering of Florida's Kissimmee River (see Box 5-8). The Kissimmee river was once a broad meandering river and was intimately connected with its floodplain. However, in the 1960s the river was channelized, with attendant effects on wetlands, other fish and wildlife habitats, and water quality. The goals of the restoration effort are to recapture many of these ecological and social values. Unlike many other water resources restoration efforts, the restoration plan utilizes multiple strategies to alter the hydrologic regime, including dechannelization, changes in water release, and removal of several canals and water-control structures.

*Conclusions and Recommendations on Hydrologic Regime and Geomorphic Structure*

**Strategies that focus on returning the hydrologic regime to a more natural state have the greatest potential for restoring riparian functioning.** Riparian vegetation has evolved with and adapted to the patterns of changing flows associated with stream and river environments. Furthermore, floodplain structure and functioning are dependent upon periodic inundation. Thus, changing dam operations, removing levees, and otherwise re-creating a more natural flow regime and associated sediment dynamics is of fundamental importance for recovering riparian vegetation and the functions that it provides.

**Unless changes are made to return the hydrologic regime to a more natural state, other geomorphic and structural restoration activities are likely to fail.** The temporal dynamics of the flow regime are fundamental to the structure of riparian plant communities and the functions they perform. Thus, simply attempting geomorphic or structural modifications is unlikely to meet ecological restoration goals.

**Dam operations should be modified where possible to help restore downstream riparian areas.** Compared to restoring stream flows for fisheries purposes, in very few cases have riparian objectives been the goal of dam re-regulation. There is an increasing need to send greater flows down long segments of rivers to improve riparian plant communities; specific riparian objectives could involve the amount of vegetation recovered and vegetation structure. The effects on downstream riparian areas of manipulating dam discharges should be moni-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058919

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

364                                                          *RIPARIAN AREAS*

---

**BOX 5-8**
**Restoration of the Central Kissimmee River Corridor**
Sources: Dahm et al. (1995), Toth et al. (1998), Warne et al. (2000)

The Kissimmee River in south central Florida connects several major lake systems by meandering across a broad floodplain called the Kissimmee Valley. Between 1962 and 1971, the central channel of the Kissimmee River was deepened to 30 feet and compartmentalized into a series of five relatively stagnant pools by flood-control structures. As part of the Central and Southern Florida Flood Control Project, the channelization of the Kissimmee had the main purpose to provide an outlet for floodwaters from the upper basin. The project had substantial unanticipated effects, including the loss of 30,000–35,000 acres of wetlands, a reduction in wading bird and waterfowl usage, and a continuing long-term decline in game fish populations. These impacts spawned numerous state and federally mandated scientific studies that culminated in an overall restoration plan that was authorized as a state–federal partnership in the 1992 Water Resources Development Act.

Restoration of the Kissimmee floodplain mainly involves filling 22 out of 56 miles of flood-control canal and removing two of the five water-control structures. Dechannelization will restore the wider, slower flow-way and increase hydrologic exchange with the adjacent floodplain. Another aspect of restoration is a change in the regulation of water releases from upstream lakes, which will reestablish continuous inflows and allow a more natural seasonal pattern of high and low flows in the river.

Some concerns were raised about the restoration project's impact on water supply and navigation. Although restoration of the river's floodplain wetlands is likely to result in greater evapotranspiration losses of water during wet periods, the project is not thought to be likely to affect regional water supply, even during droughts. During extremely dry periods, navigation potential may be impeded through some sections of the restored river; however, it is expected that navigable depths of three feet or more will be maintained at least 90 percent of the time.

---

tored to help identify those practices that show potential for aiding riparian restoration. In few cases will it be possible to reinstate pre-dam conditions, but it may be possible to create a smaller, more natural stream that mimics many characteristics of the historical one. Impediments to changing dam operations include both legal and socioeconomic factors.

**Future structural development on floodplains should occur as far away from streams, rivers, and other waterbodies as possible to help reduce its impacts on riparian areas, and existing human uses of floodplains should be modified where possible to allow periodic flooding of riparian areas.** Structural developments typically have significant and persistent effects on the size, character, and function of many riparian areas. Thus, preventing unnecessary structural development in near-stream areas should be a high priority at local,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058920

The cost of the project, to be shared equally by Florida and the federal government, is expected to reach $414 million (1997 dollars). A considerable portion of the state's costs will be in land acquisition, while federal expenditures will be in construction and maintenance. The plan calls for fee acquisition of floodplain lands up to the five-year flood line and acquisition of flowage easements on lands up to the 100-year flood line. Acquiring only flowage easements on most land, and leasing grazing rights on the newly acquired land, will help maintain county tax revenues. Increased use of the river corridor for recreation, including hunting and fishing, will also be possible through the land ownership changes; this is expected to bring significant economic benefits to the local and regional economies.

Before channelization                                After channelization

    

*Photos courtesy of the South Florida Water Management District*

regional, and national levels. In addition, acquisition of land through conservation easements can be used to retain currently undeveloped land within floodplains in a more natural state. Communities and municipalities can, for example, use the area between a river and its 100-year floodplain boundary to delineate those areas where significant structural development would not be allowed and where existing structures might be removed when opportunities avail themselves.

### Vegetation Management

Because of the fundamental importance of vegetation to the ecological functioning of riparian areas, where such vegetation has been degraded or removed, its recovery is a necessary part of any restoration effort. In many instances, recovery of riparian vegetation can be attained simply by discontinuing those

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058921

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 207 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

land- or water-use practices that caused degradation. For a variety of reasons, however, eliminating these practices can be a major challenge. Decision-makers and landowners often want to continue the resource use or physical alteration that led to the decline of riparian areas in the first place. But attempts to actively restore altered systems without reversing the cause of decline are not likely to achieve functional riparian vegetation.

The power of passive restoration for achieving functioning riparian vegetation cannot be overstated. Throughout many portions of the United States, streamside forests have been harvested for timber production, causing a multitude of effects (see Chapter 3). On these lands, riparian forests may recover if future tree harvesting is simply excluded from riparian areas. This approach assumes that native riparian plants remained as part of the post-harvest vegetation composition and were not replaced by a single forest species or by exotic species. Some functions will recover rapidly, while others may take considerable time. For example, the reestablishment of forest cover along a small stream might be accomplished within a decade or less, yet significant natural recruitment of large wood may be unlikely for 50–100 years or longer (see Figure 5-2).

With regard to historically harvested riparian forests, there may be opportunities to combine passive and active restoration approaches. The protection of riparian vegetation from future harvest would be a passive approach. Active restoration approaches include planting native trees to encourage the more rapid development of late-successional stages through intermediate harvests and augmenting large wood in streams to meet other ecological goals. In all these situations, the long-term goal would be establishment of a self-sustaining riparian forest.

For overgrazed riparian areas, the passive restoration approach is simply to exclude domestic livestock from riparian areas via fencing, herd management, or other approaches. Grazing strategies that alter the traditional season of use, stocking levels, or duration of use may allow recovery in some instances, but careful herd management is usually required on a year-to-year basis. Although grazing strategies other than full exclusion may promote restoration, they are likely to proceed more slowly and run a greater risk of failure.

In riparian areas that support agricultural crops, the reestablishment of native vegetation requires that cropping practices be altered or curtailed. Once this has been accomplished, natural revegetation may occur sufficiently rapidly that additional efforts at replanting may not be needed. In other instances, the reintroduction of specific plants may be needed. In many agricultural areas, the long-term loss of native plants and the widespread occurrence of exotic plants increase the difficulty of accomplishing restoration goals.

Factors such as water availability, flow duration, flood disturbance, channel and floodplain geomorphic change, soil chemistry, fire disturbance, and competition with exotic species directly influence the regeneration of particular species or communities and must be taken into account during restoration. This section

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058922

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 208 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

focuses on several broad areas of restoration—management of forested riparian buffers, reintroduction of large wood into streams, creation and maintenance of riparian buffers for water quality and habitat protection in agricultural areas, and grazing management.

*Forestry in Riparian Areas*

The management of forested riparian areas and its impacts on water quality and near-stream habitats have been an increasingly important issue over the last two decades, both in the Pacific Northwest (Salo and Cundy, 1987; Meehan, 1991; Murphy, 1995; Spence et al., 1996) and in other portions of the nation (e.g., Williams et al., 1997; Verry et al., 2000). In 1993, a multiagency task force (FEMAT) issued *Forest Ecosystem Management: An Ecological, Economic, and Social Assessment*, which summarized the scientific underpinnings for the Northwest Forest Plan and significantly changed how riparian areas on federal forest lands in the Northwest and elsewhere in the nation would be managed (FEMAT, 1993). The report highlighted the many roles of riparian areas, noting that the capability of a riparian area to provide a particular function depends on the distance from a waterbody (i.e., the width of the riparian buffer). For example, as shown in Figure 5-9, the effect of a riparian forest upon root strength (and its associated role in maintaining streambank integrity and channel stability) is greatest relatively close to the edge of a channel. In contrast, riparian forests provide large wood and shade to aquatic ecosystems potentially out to one site potential tree height from the channel, although most of the influence typically occurs within half a tree height (McDade et al., 1990; Murphy, 1995). Figure 5-9 also illustrates that where forested riparian buffers are of sufficient width to provide high levels of large wood and shade protection, functions related to bank stability and litter inputs are also generally satisfied.

FEMAT (1993) indicated that riparian areas were an important component of a four-part aquatic conservation strategy aimed at restoring and maintaining the ecological health of watersheds within the national forests of the Pacific Northwest. These components consisted of riparian reserves, key watershed protection, watershed analysis, and watershed restoration. Site-potential tree heights and slope distances were used as the "ecologically appropriate metrics with which to establish riparian reserve widths." For watersheds with high drainage densities, the proportion of a given watershed that fell within the riparian reserve designation could be relatively high (e.g., in excess of 50 percent). The widths of riparian reserves identified in FEMAT (1993) were considered an interim strategy and it was expected that they would be changed upon completion of watershed analyses. However, these dimensions have become widely accepted within USFS and BLM as the widths of no-harvest riparian areas and were incorporated into the Northwest Forest Plan (see Box 4-4).

Because forested riparian areas often comprise a diversity of plant communi-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058923

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



FIGURE 5-9 Generalized relationships indicating percentage of riparian ecological pro-
cesses and functions occurring within indicated distances from the channel. SOURCE:
FEMAT (1993).

ties and provide for a variety of ecosystem processes, functions, and values, it
could be argued that specific forest management options are not necessarily well
suited for meeting broad ecological goals. Thus, a passive approach to manage-
ment (no-harvest) may be warranted where broad ecological goals have a high
priority and where restoration or sustainability of functioning riparian systems
via a no-harvest approach is likely to succeed. However, as indicated by Palik et
al. (2000), the designation of riparian reserves or other riparian management
areas as no-harvest buffers may preclude other management options and opportu-
nities. These include not only the management of riparian forests for specific
species and commercial timber products, but also the enhancement or active
restoration of riparian functions. Active restoration may be particularly needed
on industrial forestlands and land under other nonfederal ownership where previ-
ous management actions have greatly altered the composition and structure of
native riparian forests. In such areas, even though a no-harvest option might
recover desired ecological functions, the time required may be many decades or
longer. (The recruitment of large wood from a previously harvested riparian
forest may not occur for many decades; to grow large trees simply requires time.)

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058924

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

A no-harvest option would preclude silvicultural prescriptions that reduce the amount of time needed to develop a late-successional riparian forest, e.g., thinning from below. Similarly excluded would be forest operations that might be used to increase the amount of large wood recruited to a stream via the use of techniques such as directional felling (Garland, 1987).

Given that riparian areas function as ecotones between upland and aquatic ecosystems, Palik et al. (2000) suggests that the degree of harvest or other silvicultural treatments in managed riparian areas should vary with distance from a stream where the protection of aquatic resources is a high priority. According to this paradigm, the initial step for integrating functional objectives into silvicultural practice is to delineate the ecological boundaries of a riparian management area. The second step is to prescribe site-specific silvicultural practices that protect or enhance riparian functions along the riparian ecotone while meeting other management objectives; this prescription would outline the silvicultural system designed for the management area as well as a method for monitoring results over time. "A major purpose of the prescription is to insure that all activities are complementary and based on current knowledge and technology. In other words, the practice of silviculture in riparian forests should anticipate the future and prevent problems rather than respond to problems as they develop" (Palik et al., 2000). A final consideration in developing silvicultural prescriptions is to minimize the cumulative effects of individual activities. Figure 5-10 indicates some types of harvest options that might be considered depending upon ecological and landowner goals.

Once a decision is made to harvest trees within a riparian area, a number of operational considerations can have a major influence on the potential impacts, or lack thereof, associated with timber removal (Garland, 1987; Mattson et al., 2000). For example, ground-based felling, bunching, and yarding systems have the greatest potential for site disturbance and associated degradation of riparian resources, yet they are commonly used in many riparian areas because of their productive and economic advantages over other yarding methods. Thus, selection and use of ground-based logging equipment with specific features, such as wide or dual tires, flexible tracks, or double-axel bogie wheel assemblies, are important for minimizing impacts to soils, to residual vegetation, and to aquatic and riparian habitats and for maintaining riparian functions. Other opportunities for reducing potential onsite impacts might include undertaking yarding operations when soils are dry or frozen and establishing a designated skid trail system (Adams, 1983; Garland, 1983). The directional felling of harvest trees away from a body of water and pulling winch line into the riparian area can reduce or minimize many of the potential adverse effects of ground-based skidding. Where cable yarding systems are used, directional felling away from the stream, intermediate supports, and the use of skyline corridors may reduce or minimize many potential impacts. In other instances, the use of helicopters may be an environmentally sensitive and economically efficient means of yarding trees from ripar-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058925







FIGURE 5-10  A riparian forest showing differing harvest patterns. The dark band to the left is a stream or other body of water. (A) The uncut forest showing the riparian management area within the functional ecotone boundary (dashed line on right). (B) The riparian forest is harvested along a gradient. Most of the trees are removed on the right, fewer numbers are removed in the middle such that the residual basal area is dispersed by cutting many small gaps, and an uncut forest remains nearest the stream. (C) Trees are harvested as in (B) except that the residual basal area in the middle part of the riparian area is clumped to open a single large gap. In both (B) and (C), mature stand structure and riparian functions are less impacted by harvest nearest the stream. SOURCE: Reprinted, with permission, Palik et al. (2000). © 2000 by CRC Press, LLC via Copyright Clearance Center.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058926

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 212 of 310

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

ian systems. Regardless of which operational approach is taken to remove timber from a riparian area, recognition of the ecological functions and values of these areas should be incorporated into forest practice decisions.

In addition to the riparian areas in national, state, or commercial forest ownership, there are many miles of forested riparian areas (particularly in the eastern United States) that are not managed from a forestry perspective. Many of these riparian systems have experienced significant alteration over time, not only because of the impacts described in Chapter 3 but also simply because landowners may have removed trees for firewood, fence posts, or commercial sale or for aesthetic reasons. Such gallery forests, in various states of disrepair, are in need of the management philosophy embraced in the preceding discussion. The development of management prescriptions that will successfully reestablish various ecological functions over a wide variety of stream and forest types, and which are accepted from both practical and social perspectives, represents an important challenge for individual landowners and the nation.

### Conclusion on Forestry

**The use of buffer strips is important for maintaining and restoring both aquatic and riparian habitats associated with forest ecosystems.** Along with the management of upslope forest practices, functional riparian buffers represent a major component of attaining clean water goals and must be designed to incorporate a strong ecological basis that adequately addresses short- and long-term goals. The dimensions (i.e., width) of riparian buffers and their application throughout a drainage basin (e.g., on intermittent streams, non fish-bearing perennial streams, fish-bearing perennial streams) are likely to vary depending upon ownership and management goals.

### Introducing Large Wood

The role of large wood in aquatic ecosystems was first recognized in the early 1970s; thus, management of wood has been a relatively recent subject in riparian ecology and management. Nevertheless, research results have been adopted by many river and forest managers concerned with the protection and restoration of biodiversity, fisheries productivity, and nature conservation. Wood is now deliberately placed in stream channels, and active management of streamside forests is encouraged to supply large wood to the river network. Such practices are particularly popular in the Pacific Northwest, where restoration of stream habitats and riparian areas has sometimes exclusively focused on restoration of large wood. In some cases, management agencies have considered the geomorphic and hydrologic factors that determine appropriate locations, sizes, and amounts of wood before actions were taken. In other cases, agencies have rushed to reintroduce large wood without consideration of restoring the riparian forest

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058927

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 213 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

over the long term. Wood has also been widely added to streams across the Pacific Northwest that never contained appreciable amounts historically (e.g., meadows). Furthermore, concerns over liability for damage resulting from introduced wood have led many agencies to cable wood in place rather than promote the natural redistribution of wood and channel formation. As a result, assessing the success of restoring large wood has focused on whether the wood remains where it was installed. A more ecologically meaningful standard for success would be to determine whether wood is functioning in the stream system to create the habitat conditions and ecological processes identified as the goal of the restoration effort.

Because most of the pioneering research on large wood has been conducted in certain geographic regions, questions exist about transferring results across differing ecoregions of North America. Models of wood dynamics in streams have been developed over the last decade, with several more comprehensive models of stand dynamics, input, decomposition, and transport being developed currently. Such models offer a broad conceptual framework for transferring results of research on wood dynamics to different regions and forest types.

A final consideration that must accompany the use of wood as a management tool is the societal perception of this strategy. Floods transport and bring into streams large amounts of wood, which can pose threats to bridges and roads. Accumulation of wood in recreational rivers can create problems for boating and concerns about safety. Thus, large wood has traditionally been removed from stream systems, not reintroduced. Especially on private lands, it will be difficult to convince landowners, who are not aware of the ecological role of large wood, that its benefits outweigh the potential damage to, for example, their farming operations. The challenges are equally great for federal and state agencies that must balance multiple objectives, such as restoring biodiversity and reducing the costs of floods. In all situations, the best decision-making will require that large wood be viewed as an agent of restoration and not just as an impediment to flow and a source of damage during floods. As discussed later, programs that both educate the public and help identify locally acceptable compromises (that attain community objectives but alter the dynamics of large wood and riparian areas to the least extent possible) will be important to overcoming these perceptions.

### Conclusion on Large Wood

**Introducing large wood into streams draining forested watersheds can be an important short-term practice for assisting the recovery of instream habitats, particularly where large wood has been depleted by historical land uses and the remaining riparian forests are unable to provide sufficient large wood for many decades.** Even in such situations, the restoration of riparian forests to provide for long-term large wood recruitment must remain a high priority. Where there is no historical or ecological basis for the introduction of

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK  Document 45-7  filed 04/28/21  USDC Colorado  pg 214 of 310

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

large wood (e.g., meadow and prairie systems dominated by graminoids and non-tree woody species), this management practice may cause further degradation to channels and riparian areas.

### Buffers for Water-Quality Protection in Agricultural Areas

Buffer zones,[1] both within and upslope from riparian areas, are currently being promoted as management measures for water quality protection throughout the world, particularly in the United States and Europe. As discussed in Chapter 4, major riparian buffer initiatives in the United States include the federal Conservation Buffer Initiative and state and regional restoration programs such as the Conservation Reserve Enhancement Program (CREP) and the Chesapeake Bay Riparian Forest Buffer Initiative. Many of the state CREP programs focus exclusively on riparian area restoration. For example, the CREP goals in Virginia and Maryland are to restore 12,300 and 40,500 hectares (30,500 and 100,000 acres) of riparian habitat, respectively. The 1996 Chesapeake Bay Riparian Forest Buffer Initiative, an agreement between the District of Columbia, Maryland, Pennsylvania, Virginia, and the EPA, seeks to restore 2,010 miles of forested riparian buffers within the Chesapeake Bay watershed by 2010. These are but a few of the hundreds of federal, regional, state, and local buffer programs that are currently restoring riparian areas across the United States.

There are a number of reasons why these programs are so widespread and popular, particularly in agricultural areas. Many of these programs are voluntary, and some compensate landowners and farmers for buffer establishment and maintenance. They generally focus on a narrow band of land along streams, and thus do not affect a large portion of the agriculturally productive landscape. (In many cases, these lands are marginally productive and landowners can make more money enrolling them in buffer programs, while in other instances taking them out of production may not be cost effective.) Furthermore, if properly installed and maintained, buffers can have a high capacity to remove nonpoint source pollutants from upslope activities—as much as 50 percent of the nutrients and pesticides in surface water runoff, 60 percent of certain pathogens, and 75 percent of the sediment load (NRCS, 2000a). Consequently, one might view riparian buffers as a panacea for nonpoint source pollution problems, particularly in agricultural areas, deducing that improved management of upland areas is not necessary for water-quality protection. However, this is not the belief of most conservation professionals, who suggest and/or require that buffers be used as part of a larger conservation management system. This section summarizes the current state of knowledge concerning the effectiveness of buffers for water-quality protection and suggests approaches that can be used to improve their effectiveness.

---

[1] When used as a management tool for water quality protection, riparian areas are referred to as "buffers," "buffer zones," or "riparian buffers" in this report.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058929

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 215 of 310

**Buffer Design.** Buffer zones are typically used as best management practices (BMPs) along lower-order streams for enhancement of water quality, protection of fish and wildlife habitat, and possibly production of timber/biomass. To meet such diverse objectives, riparian zones must remove sediment from overland flow, remove and sequester nutrients and other pollutants from overland and shallow subsurface flows, and provide habitat values in the form of streamside shading, generation of coarse and fine particulate matter, and food and cover for wildlife.

Three principal types of buffers are being promoted in the United States for water quality protection: grassed filter strips, the multi-species riparian buffer system, and the three-zone riparian forest buffer. Grassed filter strips are the simplest type of buffer, defined by the NRCS as a strip of herbaceous vegetation situated between cropland, grazing land, or disturbed land (including forest land) and environmentally sensitive areas. Their stated purpose is to reduce sediment and adsorbed and dissolved contaminates in hillslope runoff and to restore, create or enhance herbaceous habitat for wildlife. The filter strip consists of permanent herbaceous vegetation consisting of a single species or a mixture of grasses, legumes and/or forbs adapted to site conditions. The minimum width required for a grassed filter strip is 20 feet (USDA-NRCS, 1999a), but much wider strips—50 to 150 ft—are generally required for participation in the federal CRP and CREP programs (USDA-NRCS, 2000b).

The multi-species riparian buffer system (MSRBS) was developed in the Midwest and is particularly adapted to the American prairie region where trees may not have been a major component of natural riparian areas (Schultz et al., 1995; Iowa State University, 1997). As discussed in detail in Box 5-9, the MSRBS consists of three zones: the first zone of trees to increase bank stability and to produce high value timber, the second zone of shrubs to provide diversity to the ecosystem and help slow flood water, and the third a strip of native warm-season grasses next to the cropland for pollutant removal functions. The MSRBS is flexible in that the tree zone can be replaced by shrubs and/or both the tree and shrub zones can be replaced by grasses. Elimination of the tree zone and expansion of the grass and shrub zones is fairly common in intensively channelized and tile-drained watersheds in the Midwest, partly because some land owners object to trees along the stream that may lead to channel blockage (Schultz et al., 2000). However, the combination of trees, shrubs and grasses helps protect stream quality more than a single species buffer (Iowa State University, 1997).

In the humid eastern portion of the United States, a three-zone riparian forest buffer approach is being promoted to satisfy water quality and limited habitat values in agricultural areas (Lowrance et al., 1985; Inamdar, 1991; Welsh, 1991; Schultz et al., 2000). As described below and in Box 5-10, each of the subzones has specific functional roles. Depending on the management objectives at a site, not all three zones may be required, or the width of less critical zones may be greatly reduced. According to the NRCS, the minimum width for a riparian forest

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058930

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

buffer is 100 ft or 30 percent of the floodplain width, whichever is less. However, state CREP and CRP programs may have different (usually wider) requirements.

The *runoff control zone* is located at the upland edge of the riparian zone and has many functions. Because it is composed of densely growing herbaceous vegetation, usually grass, it offers high resistance to shallow overland flow and reduces runoff velocity and sediment transport capacity. It also reduces runoff volume and transport of dissolved pollutants because its vegetative cover promotes infiltration.

This zone should be designed and maintained so that it converts entering concentrated flow into sheet flow in order to improve the effectiveness of the adjacent managed forest zone in trapping pollutants (Dillaha et al., 1989). Under shallow, sheet flow conditions, the runoff control zone will account for most of the sediment trapping in the three-zone buffer. Over time, excessive sediment loading may lead to the formation of sediment deposits and berms, which can hinder further inflow into the buffer and promote concentrated flow. Hence, periodic grading and removal of the accumulated sediment may be required to maintain buffer efficiency. Excess sediment can be moved back upslope to the area it eroded from. Periodic burning, mowing, or harvesting of grass, if permitted, are required to promote vigorous dense growth, to control weeds, and to remove assimilated nutrients.

The runoff control zone is typically a minimum of 20 ft (USDA-NRCS, 2000c) and should be composed of perennial cool season grasses such as brome, orchard grass, fescue, and bermuda grass or warm season grasses such as switch grass (this is region specific). Native species are almost always preferred over non-native species. Buffer grasses should have dense vegetation with stiff, upright stems at ground level. Species that form sods are preferred over bunchgrasses because they provide more uniform coverage and are usually more dense at ground level. Because infiltration is an important pollutant-removal processes, species with deeper roots may also be more effective (USDA-NRCS, 2000a).

The *managed forest zone*, located downslope of the runoff control zone, consists of tree and shrub species. Its main purpose is to remove and sequester dissolved pollutants (especially nutrients) from overland and shallow subsurface flow. Pollutant removal is due mainly to infiltration, plant uptake, and denitrification in the case of nitrate. For the managed forest zone to be effective, it is essential that the shallow subsurface flow move through the biologically active root zone, or there will be little attenuation of nitrate and other dissolved pollutant loads (Lowrance et al., 1995). To encourage high nutrient removal rates, vigorous tree growth is encouraged by periodic harvesting of plant biomass. During harvest, it may be possible to do limited grading to reduce concentrated flow paths through the buffer, but this is rarely practical because of the presence of trees and shrubs that would interfere with grading. The managed forest zone is typically 45- to 75-ft wide and is composed of tree and shrub species (preferably native) adapted for riparian conditions.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058931

376                                                                                    *RIPARIAN AREAS*

---

**BOX 5-9**
**Multiple-Species Riparian Buffer System**

One popular approach to designing riparian buffer zones is the multiple-species riparian buffer system (MSRBS) proposed by Schultz et al. (1995, 2000) for application to agricultural lands in Midwestern states (Figure 5-11). This artificial riparian system consists of two or three zones. In the 3-zone system (Schultz et al., 1995), Zone 1 consists of four or five rows of fast-growing trees planted next to the stream for streambank stabilization, wildlife habitat, stream shading, nutrient removal, and selective timber harvest every 8–10 years. Some slower growing hardwood trees may be interspersed with the fast growing trees. A minimum width of 30 ft is recommended. Zone 2 generally consists of one or two rows of native shrubs with a minimum width of 12 ft. The purpose of Zone 2 is to add diversity and wildlife habitat to the ecosystem and to slow floodwaters when the stream leaves its channel. Zone 3 has a minimum width of 20–24 ft. and is composed primarily of warm season grasses. Warm season grasses, particularly switchgrass, are preferred because their dense, stiff stems slow the overland flow of water, allowing water to infiltrate and sediment to be deposited in the buffer area. Native forbs and grasses may also be mixed with the switchgrass; however, there should always be a 10-ft switchgrass strip at the edge of the field (Iowa State University, 1997). The MSRBS may also contain constructed wetlands for the treatment of tile drainage water and streambank bioengineering for streambank stabilization. Figure 5-11 shows recommended widths of the MSRBS for various functions.

The two-zone MSRBS was developed in response to landowner objections concerning trees along channelized stream in tile drained watersheds (Schultz et al., 2000). In this model, shrubs are planted as the first two or three rows next to the channel rather than trees. On some sites, the whole first zone is planted to shrubs, especially along the upper reaches of first order perennial or intermittent streams where channel incision is minimal. Shrubs are still often recommended next to the grass filter to provide diversity and withstand the pressures of fire management that are part of native grass filter maintenance. In addition to switchgrass, the two-zone MSRBS recommends mixtures of other native grasses and forbs.

For both systems, maintenance includes a combination of mowing grass between the tree and shrub rows once or twice during the growing season and if possible burning the grass each spring for the first five years until grasses are well established, followed by less intensive maintenance in the years after. Fast growing trees may be harvested every 8 to 12 years to remove nutrients and chemicals (Iowa State University, 1997).

Little published information is available on the effectiveness of MSRBS for water-quality protection. One study reported that the MSRBS reduced nitrate-N concentrations in shallow subsurface flow from 12 mg $L^{-1}$ to less than 2 mg $L^{-1}$ (Schultz et al., 1995). Another study (Isenhart et al., 1997) reported that a five-year-old MSRBS in Iowa reduced sediment losses by 80 percent to 90 percent within the first 4 m of the native

---

The *undisturbed forest zone* is situated immediately next to the stream and consists of unmanaged native trees and shrubs. Harvesting of trees and shrubs in this zone generally requires special permission. The main purpose of this zone is to provide habitat for terrestrial wildlife and aquatic organisms that are dependent on the riparian system. The various direct and indirect functions of this zone

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058932

grass strip and reduced nitrate and atrazine loads in shallow groundwater by >90 percent. An additional study reported that a 6-m-wide switchgrass zone (5 percent of the field source area) removed 46, 42, 52, and 43 percent of the influent total-N, nitrate, total-P, and orthophosphorus, respectively, over the short term. A 3-m-wide strip (2.5 percent of the field source area) was somewhat less effective and removed 28, 25, 37, and 34 percent of the influent total-N, nitrate, total-P, and orthophosphorus, respectively (Lee et al., 1999).



FIGURE 5-11 Three-zone multiple-species riparian buffer strip. SOURCE: Reprinted, with permission, Schultz et al. (2000). © 2000 by American Society of Agronomy.

include regulation of stream temperatures through the canopy effect, streambank stabilization due to tree roots, provision of leaf litter and large wood, and provision of an undisturbed area for wildlife. Additional pollutant removal also occurs in this zone. The unmanaged forest zone is typically 15- to 30-ft wide, but a minimum width equal to mature tree height may be a more effective width for

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058933

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 219 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**BOX 5-10**
**USDA's Three-Zone Approach to Riparian Buffer Design**

An approach similar to the multiple-species riparian buffer system (Box 5-9) is the three-zone forest buffer proposed by Welsh (1991), as shown in Figure 5-12. Welsh suggests that the buffer area should be 20 percent of the contributing non-point source pollutant source area. Zone 1 is a permanent and undisturbed forest-ed zone immediately adjacent to the stream. Zone 2 is a managed forest zone, just upslope of Zone 1, in which timber is periodically harvested. Zone 3 is the runoff control zone—a managed herbaceous strip, usually grasses, just upslope of Zone 2 that is used to control runoff. The three-zone forest buffers are specified for habitat and water-quality protection of waterbodies adjacent to cropland, pastures, and urban areas that are sources of diffuse pollution. Applicable waterbodies include perennial and intermittent streams, lakes, ponds, wetlands, and groundwater recharge areas.

Recommended widths for all three zones range from a minimum of 100 ft to 150 ft, depending on soil type and land use (Welsh, 1991). There are no published studies on the overall effectiveness of the three-zone forest buffer design for water-quality protection. However, information on the individual effectiveness of forest and grass buffers is summarized later in this report. It is important to recognize that the MSRBS and the USDA's three-zone buffers are not natural systems. They are engineered to approximate the functioning of natural riparian areas and achieve site-specific water-quality and habitat goals. As noted previously, this natural riparian buffer system may not be applicable in many areas of the Midwest because such landscapes are highly modified from their natural state.



FIGURE 5-12 Three-zone forest buffer. SOURCE: Reprinted, with permission, Lowrance et al. (1985). © 1985 by Soil and Water Conservation Society.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058934

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 220 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

restoring habitat functions. The NRCS requires no less than 35 feet for the undisturbed forest zone and the managed forest zone combined.

**Effectiveness of Buffers.** Numerous studies have confirmed the role of upland grass buffers and riparian buffer zones for controlling nonpoint source pollution from agricultural and urban areas. Some of these findings are presented in Table 5-2 for various pollutants in overland flow. In reality, most buffers and riparian areas achieve only a fraction of their reported pollutant trapping potential. Most of the trapping studies reported by researchers have been short term in nature and were conducted under very controlled conditions that minimized the influence of factors—such as concentrated flow and long-term accumulation of pollutants—that influence riparian zone performance in nature. In addition, most of these studies report on riparian zone effectiveness for water-quality protection only in the first few years after establishment. These studies are probably not good indicators of the long-term performance of riparian buffers with respect to water-quality protection.

A few researchers have investigated the performance of forested buffers that have been in place below cropland for decades. Lowrance et al. (1983) studied existing forested riparian zones (mixed hardwood and pine) in a subwatershed of the Little River watershed near Tifton, Georgia and reported that the riparian zones reduced nitrogen and phosphorus loading in subsurface flow by 67 and 25 percent, respectively. Reductions in surface loadings were not reported. The authors recommended periodic harvesting of riparian vegetation to maintain nutrient removal efficiencies. In a second watershed-scale study, Cooper et al. (1987) used $^{137}$Cs data and sediment–soil morphology to estimate sediment trapping in two riparian areas in the Coastal Plain of North Carolina over a 20-year period. The results indicated that the riparian areas trapped 84 percent to 90 percent of the sediment lost from upland cropland. These studies may be more indicative of the long-term effectiveness of forested buffer zones for water-quality protection. However, because they both were conducted in low-gradient Coastal Plain watersheds, they may not be representative of riparian buffers in other physiographic regions.

It should be noted that neither the three-zone forest buffer nor the multi-species riparian buffer system are effective in removing dissolved contaminates from groundwater in agricultural watersheds where tile drains transport groundwater through the riparian buffer. To reduce pollutant loadings to receiving waters from tile drains, riparian buffers must include constructed wetlands or similar systems to treat tile effluents, as discussed in Box 5-11.

**Managing for Success.** The conditions necessary for effective riparian buffer performance can be achieved through management. It should be noted that many of the management measures recommended for water-quality protection may not be desirable for enhancing other riparian area functions. For example, periodic

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058935

Copyright © National Academy of Sciences. All rights reserved.

380

TABLE 5-2  Reported Effectiveness of Buffer Zones for Water Quality Protection

| Citation | State | Width (m) | Buffer Type | Reported reductions[a] |
|---|---|---|---|---|
| Young et al., 1980 | MN | 25 | Grass | Sediment 92% |
| Homer and Mar, 1982 | | 61 | Grass | Sediment 80% |
| Dillaha et al., 1989 | VA | 4–9 | Grass | Sediment 84%, phosphorus 79%, nitrogen 73% |
| Magette et al., 1989 | MD | 5–9 | Grass | Nutrients <50% |
| Schwer and Clausen, 1989 | VT | 26 | Grass | Sediment 45%, phosphorus 78%, total Kedall N 76%, ammonia 2% |
| Ghaffarzadeh et al., 1992 | | 9 | Grass | Sediment 85% |
| Madison et al., 1992 | | 5 | Grass | Nitrate and orthophosphorus 90% |
| Schellinger and Clausen, 1992 | VT | 23 | Grass | Fecal coliform 30% |
| Chaubey, 1994 | AR | 24 | Grass | Nitrate 96%, phosphorus 88%, sediment 80%, bacteria 0% |
| Mickelson et al., 1995 | IA | 5–9 | Grass | Herbicides 28–72% |
| Arora et al., 1996 | IA | 20 | Grass | Herbicides 8–100%, sediment 40–100% |
| Daniels and Gilliam, 1996 | NC | 6–18 | Grass | Sediment 30–60%, total Kedall N 35–50%, ammonia 20–50%, nitrate 50–90%, phosphorus 60%, orthophosphorus 50% |
| Nichols et al., 1998 | AR | 18 | Grass | Estrogen 98% |
| Lee et al., 1999 | IA | 3–6 | Grass | Sediment 66–77%, total-N 28–42%, nitrate 25–42%, total-P 37–52%, orthophosphorus 34–43% |
| Lee et al., 2000 | IA | 7–16 | Mixed | Sediment 70–90%, total-N 50–80%, nitrate 41–92%, total-P 46–93%, orthophosphorus 28–85% |
| Lynch et al., 1985 | | 30 | Forest | Sediment 75–80% |
| Shisler et al., 1987 | MD | 19 | Forest | Nitrogen 89%, phosphorus 80% |
| Lowrance, 1992 | GA | 7 | Forest | Nitrate (groundwater) 100% |

[a]Note that reported reductions were not necessarily adequate to meet water-quality goals. These studies simply quantified the experimental reductions measured.

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 222 of 310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

---

**BOX 5-11**
**Using Constructed Wetlands in Conjunction with**
**Riparian Buffer Zones**

Over 50 percent of the agricultural land in the central Cornbelt area of the United States is drained by surface and subsurface tiles, resulting in spring nitrate levels in surface waters that often exceed 10 ppm. For example, in the Embarras River of east central Illinois, tiles drain 70 percent to 85 percent of the cropland, and total N losses average 39 kg/ha/yr (David et al., 1997). Effluent from tile drainage accounts for 68 percent to 91 percent of the total N load (Kovacic et al., 2000) and 46 percent to 59 percent of the phosphorus load to the Embarras River (Xue et al., 1998). Because of the extensive tile drainage and bypassing of riparian biological processing, buffer zones will be significantly less effective in reducing nitrate levels in these areas, although they still have many other benefits. To reduce pollutant loadings in tile-drained watersheds, riparian buffers should include constructed wetlands or similar pollutant treatment systems.

Constructed wetlands are built specifically to receive tile-drained water prior to its delivery to the stream network. Typically, the constructed wetland is a 0.5- to 1-m-deep depression, or it is created through construction of an earth berm. It is designed to maximize water contact with the soil substrate and plants through a series of baffles or other structures to guide the water (Kovacic et al., 2000; Schultz et al., 2000). The constructed wetland is typically located adjacent to the stream, thus reducing impacts on cropland and intercepting the greatest quantity of water. Guidelines for wetland size and the ratio of wetland area to acres drained vary from 1:100 (Schultz et al., 2000) to 1:15–20 (Kovacic et al., 2000) and depend upon design, precipitation, and other factors.

Initial investigations into the ability of constructed wetlands to reduce pollutant loads are promising. During a three-year evaluation in Illinois, constructed wetlands removed 37 percent of total N; when coupled with a 15.3-m buffer between the wetland and the stream, an additional 9 percent was removed (Kovacic et al., 2000). Future research is needed to develop a better understanding of wetland performance under varying hydrologic and soil conditions as well as an improved understanding of optimal siting of wetlands in relation to the drainage network. Large-scale implementation of this strategy will require an economic evaluation that must take into account the availability of funding, the value of agricultural cropland in areas optimal for wetlands, and the potential beneficial uses of the wetlands for wildlife habitat, aesthetics, and recreation.

---

burning, mowing, and harvesting of grasses and biomass for nutrient removal and buffer maintenance can affect habitat values.

First, riparian buffers are most effective at pollutant removal when overland and shallow subsurface flow are distributed uniformly across the riparian zone as sheet flow. Areas where flows concentrate have shorter detention times, and pollutant-removal mechanisms in these areas can be overwhelmed. Unfortunately, the majority of overland flow and a significant portion of the shallow subsurface flow from contributing upland areas naturally concentrates before reaching the

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058937

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

riparian area. In agricultural areas, overland flow tends to concentrate within 100 meters (Dillaha et al., 1989), while in urban areas, stormwater concentrates into channelized flow within as few as 25 m (75 ft) of its source (Whipple, 1993; Schueler, 1996). In some cases, water-spreading systems can be used to disperse highly concentrated flows across a riparian area. Installation of water bars at intervals across the riparian zone (perpendicular to the slope) can force overland flow to flow across rather than parallel to the riparian area. The runoff control zone of riparian buffers should be maintained by grading out rills, gullies, and excessive sediment deposits to encourage shallow sheet flow.

Second, high infiltration rates will reduce runoff volumes and velocities and the transport of dissolved and adsorbed pollutants associated with overland flow. For this reason, dense herbaceous vegetation or litter layers, which offer high resistance to overland flow, are preferred. Regular mowing of herbaceous cover (cool season grasses) in the runoff control zone 2–4 times per year will encourage thick growth at ground level and high resistance to overland flow. Periodic burning of warm season grasses in the runoff control zone is required for similar reasons. Herbaceous vegetated buffers that have accumulated excessive sediment should be plowed, disked, and graded, if necessary, and re-seeded to reestablish shallow sheet flow conditions. This is practical only in the runoff control zone where trees and shrubs are not present.

Third, both adsorption of dissolved pollutants and microorganisms to soil and plant surfaces and assimilation of dissolved pollutants, particularly nutrients, by plants and soil microorganisms are enhanced as contact times increase. Long-term nutrient removal is the result of nutrient uptake and storage in woody biomass that is not lost at the end of the growing season.

Finally, if water quality protection is the primary objective, priority should be given to installing and maintaining buffers along smaller streams (first- and second-order) rather than higher-order streams (USDA-NRCS, 2000a). This is because only a small portion of the flow in higher-order streams actually flows through their adjacent riparian buffers. Table 5-3 illustrates the relationships between stream order, number of streams, and length of streams. If hydraulic inflow and nonpoint source pollutant loading to streams are assumed to be proportional to stream length, then ephemeral, first-, and second-order streams account for approximately 90 percent of both total stream length and total pollutant loading (Table 5-3). If riparian areas are not functioning along ephemeral drainageways, then approximately 63 percent of the average annual stream loading will enter the riparian areas of higher-order streams as channel flow, with little opportunity for pollutant attenuation by riparian processes. Brinson (1993) reached the same conclusion—that wetlands are the most effective along lower-order streams, where they have been proposed for water-quality protection.

**Research Needs.** A number of critical questions hold the key to a more holistic utilization of riparian buffers as a landscape feature for both habitat

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058938

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 224 of
310

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

TABLE 5-3  Relationship Between Stream Order and Length for Any Area
Assuming One 10th-Order Stream

| Stream Order | Number of Streams | Average Length (km) | Total Length (km) | Percentage of Cumulative Length |
|---|---|---|---|---|
| Ephemeral[a] | 6,271,000 | 0.7 | 9,000,000 | 63 |
| 1 | 1,570,000 | 1.6 | 2,526,100 | 18 |
| 2 | 350,000 | 3.7 | 1,295,250 | 9 |
| 3 | 80,000 | 8.5 | 682,200 | 5 |
| 4 | 18,000 | 19 | 347,550 | 2 |
| 5 | 4,200 | 45 | 189,200 | 1 |
| 6 | 950 | 103 | 97,800 | 1 |
| 7 | 200 | 237 | 47,300 | <1 |
| 8 | 41 | 544 | 22,300 | <1 |
| 9 | 8 | 1,250 | 10,000 | <1 |
| 10 | 1 | 2,896 | 2,900 | <1 |
| Cumulative | — | — | 14,204,164 | 100 |

[a]Values for ephemeral streams extrapolated from relationships of 1st- to 10th-order streams ($R^2$=0.99)

SOURCE: Adapted from Leopold et al. (1964).

enhancement and water-quality protection. For example, given the enormous variability in reported best management practice effectiveness for pollutant removal (Table 5-2), what riparian zone width is required to meet site-specific pollutant reduction goals? What are the width requirements for each of the riparian subzones (grass/forb, managed forest or shrub, unmanaged forest/forest)? Under what conditions is each of those subzones required? What type of vegetation should be used for each of the subzones, and how will the vegetation composition affect pollutant/nutrient sequestration and habitat values? How can riparian buffer zones be managed to maximize long-term nutrient/pollutant removal? Are habitat protection goals compatible with pollutant reduction goals? An even more detailed list of buffer research needs were recently identified by a panel of 51 stakeholders (researchers, program administrators, and agricultural and conservation organization representatives) at the National Conservation Buffer Workshop (SWCS, 2001).

Answering these questions will require long-term and expensive experimental studies. Fortunately, it may be possible to answer many of the crucial questions in the near future using process-based riparian zone models such as the Riparian Ecosystems Management Model (REMM) (Inamdar et al., 1999; Lowrance et al., 2000), which is currently under development. REMM simulates long-term sediment transport, plant uptake, nutrient transport, and denitrification in riparian ecosystems and may provide a means of selecting vegetative species and riparian widths required to meet site-specific water-quality goals.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058939

**Infield Conservation Practices.** Many types of buffer systems are used in agricultural and urban landscapes. Some are located in riparian areas, but most are situated upslope of riparian areas and are designed to keep sediment, agricultural chemicals, and organic matter in the field where they are viewed as valuable natural resources rather than pollutants. Many in the agricultural conservation community prefer to focus on infield BMPs and view riparian buffer zones as a BMP of last resort for water-quality protection.

Infield practices are similar to individual components of the three-zone riparian buffer systems described earlier. For example, a common practice is to place vegetative barriers (USDA-NRCS, 2001) on the contour between strips of row crops. These filter strips are primarily used to prevent sediment loss, but they also trap other potential pollutants. If located within the field, they help maintain agricultural productivity by conserving sediment and nutrients. If located at the lower edge of fields, their principal purpose is for water-quality protection. A similar function is provided by field borders (USDA-NRCS, 1999b). Although their primary purpose is for use as a turn row for agricultural machinery, if located on the downslope edges of fields, they can trap pollutants. Field borders are also useful in providing a buffer to reduce aerial drift of ground-applied pesticides. Contour buffer strips consist of alternating strips of row crops and close-growing herbaceous crops (USDA-NRCS, 1999c). Both are generally harvested. The herbaceous strip is used to detain and utilize sediment and nutrients leaving the more erosion-prone row-crop strips. Every two to four years, the herbaceous and row-crop strips are interchanged.

Windbreaks or shelterbelts (USDA-NRCS, 2000d) and herbaceous wind barriers (USDA-NRCS, 1994) can be designed to prevent wind erosion and to protect crops, livestock, and structures from wind-related damage. They are planted perpendicular to the prevailing wind direction and are usually composed of trees, but shrubs and tall herbaceous species are also used. Because of their effectiveness in trapping wind-blown sediment, however, they usually evolve into terraces that may interfere with overland flow and promote concentrated flow. Although windbreaks can be narrow (less than 20 feet wide), they do provide limited habitat for wildlife.

Grassed waterways (USDA-NRCS, 2000e) are an infield practice designed to prevent gully formation by transporting concentrated runoff downslope in a non-erosive manner. They are constructed by grading ephemeral drainageways to more stable shapes and then vegetating them with an erosion-resistant grass. They are typically designed to convey the runoff from extreme storms (10-year return interval, 24-hour duration) without damage and to maintain velocities that will minimize sediment deposition. In smaller storms, however, they do trap some sediment.

Finally, hedges composed of warm season grasses such as switchgrass (Schultz et al., 2000) can be used to form living terraces that function much like silt fences on construction sites to temporarily detain overland flow and induce

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058940

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

deposition of larger sediment particles. They also disperse runoff and provide habitat for some species. Grass hedges are generally narrow, 2–10 feet wide, and are often used in conjunction with lower-growing herbaceous buffer strips.

Although these practices are located upslope, they are extremely beneficial to riparian area functioning, because they reduce pollutant loadings and prevent overloading of pollutant-removal processes in riparian areas.

### Conclusions and Recommendations on Riparian Buffers for Water Quality Protection

**Engineered and constructed buffer zones are a valuable conservation practice with many important water-quality functions.** Under proper conditions, these buffers are highly effective in removing a variety of pollutants from overland and shallow subsurface flow. They are most effective for water-quality improvement when hillslope runoff passes through the riparian zone slowly and uniformly and along lower-order streams where more of the flow transverses riparian areas before reaching the stream channel.

**Riparian buffer zones should not be relied upon as the sole BMP for water-quality improvement.** Instead, they should be viewed as a secondary practice or BMP of last resort that assists infield and upland conservation practices and "polishes" the hillslope runoff from an upland area.

**Riparian buffer zones must be designed using a multiobjective approach that considers all their ecological functions.** Even when they are marginally effective for pollutant removal, riparian buffers are still valuable because of the numerous habitat (see below), flood control, groundwater recharge, and other environmental services they provide. Unless new evaluation procedures are developed that consider both the water quality and ecological functions of riparian areas, it is unlikely that riparian zone size (width and length) and composition (vegetation types, other features) will be determined in a way that optimizes their potential for environmental protection.

### Cattle Exclusion and Grazing Systems

Several methods have been advanced for managing livestock, particularly cattle, to restore and protect riparian areas:[2]

---

[2]Because sheep and other classes of livestock are less common than cattle and do not concentrate in riparian areas as cattle do, they do not pose the same risk of environmental damage as cattle. Thus, this section focuses primarily on cattle management.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058941

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

- fencing to exclude cattle,
- extended (e.g., five years or longer) rest of the entire grazing unit (pasture or allotment),
- specialized grazing systems,
- herding practices,
- changing the season of use, class of livestock, or stocking intensity,
- attracting livestock away from riparian areas with upland water sources or mineral or feed supplements and shade,
- culling herds or breeding animals to eliminate "riparian loafers,"
- eliminating grazing from the entire grazing unit,
- revegetating with woody species, and
- constructing drift fences.

Of the strategies listed above, exclusion is by far the most effective means of restoring riparian areas damaged by cattle. The efficacy of each method depends in part on the site potential, the area's grazing history and state of depletion, and the management goals and timeframes for achieving those goals. Some of these management tools are BMPs, which have been adopted by states or recommended by EPA for addressing livestock-related nonpoint source pollution of surface waters (EPA, 1993; Mosley et al., 1997; Sheffield et al., 1997).

**Exclusion.** Excluding livestock from streams can yield significant, even dramatic, benefits to riparian areas and has consistently resulted in more rapid restoration of riparian areas than other management practices (Ohmart and Anderson, 1986; Elmore and Kauffman, 1994; Fleischner, 1994). Numerous studies have shown a marked difference between the riparian vegetation (and often bank and soil stability) in ungrazed areas compared to grazed areas—with ungrazed areas uniformly being healthier (Gunderson, 1968; Rinne, 1988; Huber et al., 1995; extensive review in Belsky et al., 1999; McInnis and McIver, 2001). For example, Schulz and Leininger (1990) compared areas from which livestock had been excluded for 30 years to study plots where grazing had continued but at a stocking rate reduced by more than two-thirds from the 1939 level. The researchers found that vegetative cover (excluding forbs) was significantly greater in the exclosures, while grazed areas had four times more bare ground. Willow densities were similar between the two areas, but plants were shorter in grazed areas. Even along intermittent streams, excluding cattle can lead to development of significant riparian vegetation (Anderson, 1993). Many researchers have concluded that riparian areas need to be managed separately from upland portions of a grazing unit and that restoring riparian areas will depend on excluding cattle by fencing (Olson and Armour, 1979; Platts and Wagstaff, 1984; Bromberg and Funk, 1998). Exclusion may be the only option in areas where landform limits cattle use to the riparian area and immediately adjacent uplands (e.g., in narrow,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058942

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 228 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

steep sided canyons) or where riparian soils remain saturated throughout the year (e.g., seeps and bogs).

Although nearly all researchers seem to agree that improvements in ecological conditions will result following exclusion, they disagree as to the rate, extent, and predictability of recovery. Improved riparian and aquatic conditions may occur within 4–10 years after protection by fencing; this includes reestablishment of shrubs and trees even in heavily damaged areas (Rickard and Cushing, 1982; Skovlin, 1984). Clary and Webster (1990) estimated recovery times of 1–15 years or longer, while Belsky et al. (1999) suggested that *initiation* of recovery alone might take 2–15 years. Estimates of benefits achieved within five years range from 15 percent to 75 percent of the potential for a given site (Platts and Raleigh, 1984; Skovlin, 1984).

Although riparian vegetation may respond quickly to livestock exclusion, stream morphology usually improves more slowly, and fish populations may not improve at all (at least initially) (Platts and Wagstaff, 1984). Schulz and Leininger (1990) observed that trout biomass and fishing opportunities were greater in exclosures than in grazed areas. Similar results were obtained by Hubert et al. (1985) who documented improved habitat for brook trout as a result of livestock exclusion and stocking rate reductions. However, other studies have observed no relationship between grazing pressures and fish populations (Rinne, 1988). Rinne (1999) warns that there is a lack of peer-reviewed literature containing sound data on grazing–fish relationships, suggesting that this is an important area of future research.

In the West, excluding livestock has few if any adverse ecological consequences for riparian areas, although there are other disadvantages. In some more mesic areas, excluding livestock might result in rank growth of vegetation or undesirable thatch accumulation. As Box 5-12 reveals, perhaps the biggest drawback to fencing riparian areas is cost. Most public land ranching operations do not turn a profit, and ranchers oppose any management changes that will increase costs (Wilkinson, 2001). Suggestions to fence cattle out of streamside areas have been labeled impractical except in rare circumstances, and opponents contend that intensive livestock management, for instance by specialized grazing systems, can restore streams at a lower cost (Swan, 1979). Finally, while potential benefits of exclusionary fencing are significant, some can be difficult to quantify, making it hard to balance them against the costs of construction and maintenance, lost forage, and possible negative impacts to wildlife and recreational users. In part for these reasons, several western researchers have urged more research into innovative grazing management strategies that would not require fencing and permanent exclusion of livestock (Olson and Armour, 1979; Platts and Wagstaff, 1984).

Where exclusion of cattle from riparian areas is not an option, changes in grazing system, season of use, or stocking rates, alone or in combination with fencing and with utilization monitoring, are methods for reducing livestock-related impacts. Reports of the effectiveness of changes in grazing management

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058943

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 229 of 310

388

---

**BOX 5-12**
**Cost of Exclusionary Fencing**

Fencing is the most expensive grazing management strategy in terms of initial capital expenditure and annual upkeep. Reported capital and annualized costs (in 1991 dollars, annualized at 8% interest over 10 years) for permanent fence construction range from $2,640 and $324 per mile, respectively, in the Great Lakes region to $4,015 and $598 per mile, respectively, in Alabama (EPA, 1993). The annualized cost of net wire fences in Alabama exceeded $877 per mile. The Iowa State University and Purdue University Extension Services report the following construction and maintenance costs (per mile per year in 1998 dollars) for straight perimeter fencing (excluding gates): $964 for woven wire, $748 for barbed wire, $520 for non-electric high tensile, and $392 for electric high tensile (Mayer, 1999). Fence construction costs in the interior West have been estimated at $2,000–6,000 per linear mile, with maintenance costs estimated at $25–250 per mile per year. Sheep (woven wire) fencing or "lay-down" fencing is much more expensive than the typical 4-wire cattle fence (PCL Foundation, 1999). In smaller, managed pastures in the East, it is more feasible to protect riparian areas using much cheaper one- or two-strand electric fences (although Alabama reported capital and annualized costs for electric fencing of $2,676 and $399 per mile) (EPA, 1993). Costs of conventional perimeter fencing depend on terrain, contour, number of corners, soil, vegetation type, etc. Providing alternate stock watering facilities entails additional costs—e.g., for developing springs, building pipelines or troughs, or installing tanks.

Olson and Armour (1979) estimated that fencing 9,000 (of an estimated 19,000) miles of streams on BLM lands would cost $45.6 million. The researchers assumed an average cost of $2,400 per mile of fence, and 19,000 miles of fence. They further estimated that trout in the protected stream segments could increase by 300–400 percent. This translated to a conservative $78.2 million increase in the value of sport fishing on BLM lands, yielding a "simplistic first-year benefit–cost ratio of 1.66"—i.e., a "return of $1.66 for each dollar invested." Platts and Wagstaff (1984) estimated that an increase of 47 fishing days per mile per year would be necessary to offset the cost of fencing. Although fencing costs often exceed the gains in fishery value, fencing may be necessary if both grazing and fishing are to be continued, they concluded, because few alternatives are sociologically or ecologically acceptable.

A potential cost of fencing cattle out of riparian areas is the cost of providing alternate livestock forage. The amount of forage foregone will vary with numerous factors, including the geographic region, climate, elevation, and vegetative community. Platts and Wagstaff (1984) estimated that a 100-foot-wide corridor, encompassing about 12 acres per mile, would contain 12 AUMs in the West. (Western public land allotments as a whole typically provide 1 AUM per 13–16 acres.) The cost to national livestock production of excluding livestock from public land riparian areas would be insignificant, given that all public lands contribute only about 2 percent of the nation's livestock feed.

---

are highly variable, however, and efficacy is difficult to evaluate without reference to site-specific conditions and unless studies are continued over a sufficient time period. Changes in streamside vegetation will occur sooner than changes in hydrology or sediment loads. Grazing management may bring about positive changes in the former, but not in the latter; thus, a short-term (less than 5-year)

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058944

The cost of forage foregone would be reduced if riparian areas were fenced and grazed separately from the rest of the grazing unit, rather than put entirely off limits to grazing.

It is useful to compare riparian fencing costs in the West to the current federal grazing fee of $1.35 per AUM. Given the estimate above of 1 AUM per 13–16 acres (or 0.06–0.08 AUM per acre), the grazing fee generates an average of 8–10 cents per acre. (The actual forage contribution of riparian areas is higher because of their productivity and attractiveness to cattle.) Even at the low fencing estimate of $2,000 per mile, fencing $1/4$-mile-wide riparian corridors would cost more than $31 per acre enclosed. The narrower the riparian enclosure, the greater the disparity between fencing cost per acre and grazing fee revenue.

Additional potential costs of fencing include the visual impact on some landscapes, potential disruption of native ungulate movement patterns, fragmentation of habitat, interference with recreational access, increased runoff resulting from bare ground brought about by cattle trailing along fences, and the contribution of cleared fencelines to the introduction and spread of exotic plant species (Wuerthner, 1990; Anderson, 1993; EPA, 1993; BLM and USFS, 1994; Noss and Cooperrider, 1994; Donahue, 1999).

A sophisticated economic assessment of the efficacy of riparian fencing would compare all foreseeable costs to expected benefits (compare Platts and Wagstaff, 1984). Potential benefits include enhanced riparian functioning, enhanced habitat values, increased native species populations and recreation opportunities, reduced erosion, and improved water quality (Olson and Armour, 1979; Kauffman et al., 1983; Platts and Wagstaff, 1984; Wuerthner, 1990). An additional benefit can be improved cattle herd health, resulting from reduced exposure to waterborne bacteria and fewer leg injuries caused by crumbling streambanks (Bromberg and Funk, 1998). Some benefits (e.g., increased fishing or hunting use) may be easier to quantify than others (e.g., improved water quality or aesthetics).

Fencing may be more appropriate and economical for larger blocks (e.g., 30-40 acres) of riparian meadows, although smaller, more homogenous riparian pastures may be more effective in achieving livestock management and restoration objectives (Mosley et al., 1997). Subdividing pastures into smaller squares, rather than wedge-shaped units, will reduce the amount of fence needed and the number of cattle trails, while allowing more efficient reduction of the distance to water (Hart et al., 1993). The possibility of future grazing of restored riparian meadows "will help amortize fencing costs" (Skovlin, 1984). Fencing can be economically feasible on streams with high fisheries potential. Studies in Idaho showed that trout were 1.5–4.5 times more abundant along ungrazed than along grazed areas (Keller and Burnham, 1982). The economic value of improved trout fishing has been estimated and can be significant (Dalton et al., 1998). When fencing or exclusion of livestock is necessary "for maintaining productive riparian and fishery habitats, the cost of special management pastures may not seem exorbitant" (Platts and Nelson, 1985a).

study could misinterpret the overall effectiveness of the new management system. Livestock manager commitment is crucial, as improper implementation or lack of enforcement will reduce the effectiveness of any grazing management strategy (Platts and Nelson, 1985b; Clary and Webster, 1990; GAO, 1990; Ehrhart and Hansen, 1997).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058945

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Grazing Systems.** Specialized grazing systems are "systematically recurring periods of grazing and deferment for two or more pastures or management units" (Skovlin, 1984). They include deferred, rotation, rest-rotation, and deferred rotation systems. Three-pasture rest-rotation is probably the most commonly used system (Masters et al., 1996). These systems contrast with continuous livestock use, which can be either season-long or yearlong.

The range management literature contains little if any evidence that these grazing systems, which were designed chiefly to maintain or improve forage species and optimize livestock production, will benefit riparian areas. Nearly all researchers agree that rest-rotation grazing alone will not restore or maintain riparian conditions (Hughes, 1979; Olson and Armour, 1979; Skovlin, 1984; Hart et al., 1993; but see Masters et al., 1996). Rest rotation reportedly works well when precipitation exceeds 15–20 inches per year and is predictably distributed (Busby, 1979), but few western rangelands meet these criteria. [In fact, 95 percent of BLM lands receive less than 15 inches of annual precipitation (Foss, 1960).] Grazing impacts on riparian areas can be minor if the period of use is sufficiently short. Mosley et al. (1997) recommend three weeks or less, though the appropriate period will depend on soil moisture conditions, timing during growing season, number of animals, etc. Suggested periods of use on the order of two to three days are likely to be too abbreviated to be practical for many operators (Davis and Marlow, 1990).

At least in the West, riparian area vegetation will be utilized under any stocking rate or grazing system because of cattle's tendency to spend a disproportionate time in riparian areas (Bryant, 1982; Gillen et al., 1985; Howery et al., 1996). Indeed, riparian forage is often over-utilized, even when upland vegetation use meets the grazing system's management prescription (Platts and Nelson 1985a,b,c). The smaller the fraction of the grazing unit occupied by the riparian area and the drier the surrounding uplands, the more likely and severe are the impacts.

Many researchers have recommended that more attention be given to developing grazing systems designed to improve and maintain riparian conditions. For example, Platts and Nelson (1985c) suggest that "longer rest periods (such as double rest-rotation) or deferred grazing that allows a protective vegetation mat to be maintained on the streambank during critical periods" are promising strategies that might avoid the need to exclude livestock completely. Mosley et al. (1997) contend that "adjusting [the] timing, frequency, and intensity of grazing in individual pasture units is more important than adopting a formalized grazing system." They recommend that riparian areas not be grazed during "critical" periods (usually between late spring and early fall) more often than once every three or four years, and that annual grazing of riparian areas could occur during noncritical periods. Still others opine that uniform grazing can be achieved more economically by subdividing pastures and providing additional water than by implementing rotation grazing (Hart et al., 1993).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058946

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 232 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Season of Use.** Differing viewpoints exist regarding the effect of season of use on maintaining or improving riparian area conditions (compare Platts and Raleigh, 1984; Platts and Nelson, 1985c; Elmore and Beschta, 1987; Clary and Webster, 1990; Masters et al., 1996; Phillips et al., 1999). The tendency of cattle to use riparian areas most heavily during hot periods (summer) apparently relates to water availability, forage availability and quality, and microclimate (temperature and humidity) (Enrenreich and Bjugstad, 1966; Bryant, 1982). For these reasons, grazing at these times or at the peak of the growing season is generally not recommended. But views regarding the effects of late-season grazing vary widely (Bryant, 1982; Kauffman et al., 1983; Platts and Nelson, 1985a; Conroy and Svejcar, 1991). According to one Montana study, use of riparian areas is related more to the timing and amount of precipitation, forage production and quality, and daily weather changes and insects (all or some of which can be difficult to predict) than to season alone (Marlow and Pogacnik, 1986). Regardless of the season, utilization should be monitored and kept within prescribed levels, and grazing may need to be ended early during drought conditions.

**Stocking Intensity.** Stocking rate, or grazing intensity, refers to the density of animals on a given area, and is usually described as light, moderate, or heavy.[3] The failure of many studies to document stocking rates or to define terms such as heavy and moderate stocking makes it difficult to evaluate claims that reduced stocking intensity can improve riparian conditions. Even very short periods of heavy stocking may have hydrologic consequences (Branson, 1984), while little information is available on the hydrologic impacts of light to moderate grazing intensity (Skovlin, 1984). Clary (1990) observed relatively similar improvements in bank stability, willow height, and cover when historically heavy stocking rates were reduced to no, light, or moderate stocking, and concluded that light to medium spring cattle use was compatible with these riparian habitats (in Idaho). Gifford and Hawkins (1978) concluded that infiltration and sediment loss rates for lightly grazed, moderately grazed, and ungrazed areas were not statistically different. But Blackburn (1984) cautioned that if an area has been severely overgrazed, reducing stocking to moderate levels may not reduce sediment loss from the watershed. In some circumstances, reducing both livestock numbers and the length of the grazing season may not be sufficient to achieve management objectives (Chaney et al., 1990).

---

[3]Although the terms are seldom defined in particular studies, "light" indicates a utilization rate of 20–25% (Clary, 1999), also described as a "conservative amount of forage" use (Skovlin, 1984). "Moderate" grazing indicates 35–50% utilization (Clary, 1999); this is the "maximum amount of forage [use] that will still maintain forage, soil, and watershed conditions" (Skovlin, 1984). "Heavy grazing," or more than 50% utilization, "exceeds the capacity of the rangeland system" (Skovlin, 1984). In contrast, Mosley et al. (1997) view herbaceous utilization levels of less than 65% and shrub use not exceeding 50-60% as "usually appropriate."

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058947

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Measuring Utilization.** Increasingly, public land managers are using stubble heights of the most palatable herbaceous species as an indication of acceptable grazing use of riparian areas. Effective use of this indicator requires frequent monitoring and the ability to remove cattle quickly when conditions so require. Although no standards have been established, EPA recommended to BLM that a resource management plan for an area in Colorado limit autumn utilization of streamside vegetation to 30 percent with 4–6 inches of stubble remaining at the end of the grazing season, and it recommended that the plan require stubble heights greater than 6 inches in critical fishery habitats (EPA, 1992). A national forest proposed to adopt a criterion of 6-inch stubble height or 30 percent utilization (whichever occurs first) for forage utilization directly adjacent to the stream on Curlew National Grassland, Idaho (Federal Register, 1999).

At stubble heights of less than 3 inches, continued livestock use can cause damage to riparian areas (including shrub use and bank breakage) within a few days. Hall and Bryant (1995) recommend that livestock be moved when stubble height of preferred species approaches 3 inches. Stubble heights greater than 6 inches may be required to protect critical fisheries or easily eroded streambanks (Clary and Webster, 1990). Clary (1990) reported that nearly all variables indicative of favorable salmonid fisheries habitat improved when grasses in riparian pastures were grazed to not less than approximately 5–6 inches.

The remaining methods for managing grazing (of those listed on page 386) are of generally less utility for protecting riparian areas. Culling and breeding strategies intended to develop a herd that avoids riparian areas are apparently not widely used. Changing from cattle to sheep can lessen the impacts of grazing on riparian areas because sheep are more easily herded, can negotiate steeper terrain, and tend to spend less time near water or in valley bottoms (Busby, 1979). But because of market factors and individual operator preferences, this strategy has only limited application. Herding and "frequent riding," if constant and assiduous, can be useful to keep cattle away from riparian areas (Platts, 1990). This is most easily achieved where pastures are relatively small and/or animals are monitored closely. Herding is of limited practical usefulness in the West, where cattle are often grazed over extremely large pastures and/or are simply turned out at the start of the grazing season and are rounded up at the end.

Attracting livestock away from riparian areas with mineral or feed supplements and alternate water sources can help limit cattle use of riparian areas (Skovlin, 1984; McInnis and McIver, 2001), but the efficacy of this approach depends significantly on climate, weather factors, terrain, and animal behavior. Off-stream livestock watering combined with fencing is one of the most common strategies for protecting riparian areas in more mesic parts of the country. But it is much less effective in the arid West, especially in steep terrain, where there is little other shade, and/or during hot weather (Clawson, 1993). Supplying alternate water sources in arid, steep terrain can be logistically difficult. Moreover, because cattle avoid steep slopes (> 35 percent) where possible, the steeper and

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 234 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

drier the grazing land adjacent to the riparian area, the less likely it is that these tools will be effective (Cope, 1979; Platts, 1990).

### Conclusions and Recommendations on Grazing

**Excluding cattle from riparian areas is the most effective tool for restoring and maintaining water quality and hydrologic function, vegetative cover and composition, and native species habitats.** If ecological restoration is the primary management objective, and if cost is not an obstacle, excluding livestock (or extended rest from grazing) will likely be the preferred management strategy. Excluding livestock permanently from riparian areas may be desirable or even necessary because of the relative value or importance of non-livestock resources (such as recreation, endangered species habitat, or water quality) or because of the degraded condition of the area. Once ecological and hydrologic functions are restored, grazing in some cases could have minor impacts if well managed.

**Even where grazing in riparian areas is excluded or properly managed, grazing also must be managed on uplands to protect riparian areas.** Riparian conditions are a function not only of activities within the riparian area, but of upland conditions and activities as well. Any upland activities that contribute to excessive soil erosion or runoff can negatively impact riparian area condition and functioning.

**Where cattle are not excluded from riparian areas degraded by livestock grazing, conditions will not improve without changes in grazing management.** Changing the season of use, reducing the stocking rate or grazing period, resting the area from livestock use for several seasons, and/or implementing a different grazing system can lead to improvements in riparian condition and functioning. Improvements, e.g., in vegetation conditions, soil and water quality, and/or streambank stability, will depend in part on site conditions and potential.

**Further research is needed concerning effective grazing management strategies in both the interior/arid West and more mesic areas of the country.** As long as riparian lands continue to be used to produce livestock, research should address grazing systems or other strategies that could lessen the ecological impacts of livestock use. To be effective, grazing strategies must be site-specific. Management methods will also vary according to land ownership and land-use goals.

### *Riparian Buffers—Management for Habitat and Movement Corridors*

Managing riparian lands for a diversity of plants and animals involves balancing multiple factors, all of which are accentuated in intensively managed or

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058949

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

developed landscapes. These factors include width and vegetative composition of the riparian area, activities within the riparian area and on adjacent lands, connectivity with other patches on the landscape, and potential negative edge effects such as those associated with modified microclimates, exotic plants, or increased predation or parasitism. These factors come into play for both riparian areas left in their natural state (for example, no-harvest buffers in managed forests) as well as engineered buffers (such as those designed for water-quality concerns). Given the multiple factors that must be considered when managing riparian buffers as habitat for plants and animals, it is no surprise that no single management prescription can optimize diversity in all situations.

Noss (1991) advocates an approach that seeks to optimize the width (distance from the water body) and variety of natural habitats in order to accommodate the full spectrum of native species. But it is unclear how a management plan can take into account the many different taxa that use riparian areas. To be truly comprehensive, management techniques—for rare sedges, neotropical migrant birds, and large carnivores, for example—would have to be similar. Or a particular species or suite of species would have to serve as an umbrella in the management of certain riparian areas. Vital to all situations are the identification and use of reference sites (described earlier) that can provide guidance in establishing and accomplishing management goals. Reference sites can provide an understanding of the potential functioning of riparian areas as habitat and movement corridors.

**Habitat.** Historically, emphasis in wildlife management has been placed on a single species—an organism-centered approach. With a single-species approach, however, management runs the danger of neglecting the interactions of organisms. As an alternative, Naiman and Rogers (1997) advocate examining influences via functional groups, a particularly useful construct for riparian areas. In this scheme, animals are grouped by primary activities associated with movement, dwelling, and feeding, as well as the habitat modifications produced by these activities. Instead of species-focused management, the authors advocate managing for spatiotemporal variability in populations as a way to perpetuate resilience in riparian areas. Similarly, Ilhardt et al. (2000) argue for a functional approach, where function is defined as a process that moves material between the terrestrial and aquatic portions of the riparian area and the width is designed to perpetuate selected functions (including animal habitat needs). A functional approach is more likely to foster consideration of a wider diversity of plants and animals than would be found only in the aquatic ecosystem and its immediate surroundings.

Buffer width required for habitat is almost always the first issue confronted by managers and is one of the most difficult to address. Substantial variability in required width has been observed in numerous studies. For example, strips at least 60 m wide are needed to maintain breeding habitat for forest-dwelling birds adjacent to a clearcut in the Laurentian Mountains of Quebec (Darveau et al.,

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

1995). A Vermont study in a mountainous landscape advocated widths of 75–175 m to optimize bird diversity (Spackman and Hughes, 1995), while a South Carolina study in bottomland hardwoods described the need for riparian areas 500 m wide (Kilgo et al., 1998). And these examples are drawn from only one taxon: birds! Brinson et al. (1981) graphically summarized the spatial distribution of selected riparian vertebrates in relation to streams, with distances ranging from a few meters in the case of salamanders to several kilometers in the case of herons (Figure 5-13). Far-ranging species such as cougar or bear might require widths that are measured in kilometers (Smith, 1993). Several tables of documented habitat widths for a variety of taxa are found in Verry et al. (2000). Increasingly, such information on widths, combined with data on reference sites, can be used by resource managers in their design of leave areas or engineered buffer strips, although the wide disparity in desired riparian widths associated with various taxa presents an ongoing challenge.

Any question of width must also include concern about negative effects associated with fragmentation of habitats, often loosely grouped under the term "edge effects." Edge effects can result from reduction in habitat area as well from increases in isolation of habitat patches, predation and parasitism, and disturbance from adjacent lands (Noss, 1983; Robbins et al., 1989; Robinson, 1992). The linear nature of riparian areas, and the abrupt transitions between some uplands and riparian lands, make them particularly susceptible to such effects. Riparian areas severely affected by fragmentation and edge effects may cease to function as breeding habitat—particularly for birds (e.g., Robinson, 1992; Trine, 1998). Work in Maine conservatively estimated that negative edge effects adjacent to a clearcut extended 25–35 m into the adjacent forest (Demaynadier and Hunter, 1998). A bird community will persist, even in the narrowest riparian fringe, but often it is not the community that would have typified the riparian area in a less degraded condition. Clearly, a landscape approach is needed to address edge-effect issues when managing riparian areas for optimal biodiversity.

Management decisions in riparian areas must consider the potential simplification of habitat that can characterize degraded riparian areas. A loss of plant species, a reduction in understory diversity, the elimination of flooding or other disturbances such as fire, a reduction in amount of snags and woody debris, and disruptions of ecosystem continuity by roads, trails, or recreational facilities can lead to a parallel decline in animal diversity. In disturbed riparian areas, often only the most tolerant species remain, as was shown in a study from an Iowa agricultural landscape (Stauffer and Best, 1980). Likewise, in a comparative study of grazed and ungrazed riparian areas in Colorado, mammal and bird species needing more complex vertical structure and lush herbaceous understory were displaced in grazed areas by more tolerant species such as American robin and deer mouse (Schulz and Leininger, 1991). Similar findings of lower bird diversity and species richness, coupled with an increase in a few common spe-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058951

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

FIGURE 5-13 Distribution of some vertebrate species in relation to streams. SOURCE: Brinson et al. (1981).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058952

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

cies, were reported for the citrus orchards that have replaced cottonwood forests along the lower Colorado River (Wells et al., 1979).

Many of the engineered buffer zones employed in eastern and Midwestern agricultural landscapes exhibit a simplified vegetative diversity and structure. Thus, efforts have been made to increase habitat diversity with the planting of trees and shrubs to create a more varied agricultural field edge. Identifying native species for this purpose through the use of reference sites can be a formidable task where agricultural practices have so altered soil characteristics that they are no longer suitable for some native vegetation. The Plant Materials Program of the NRCS (www.nhq.nrcs.usda.gov) has begun to assemble information on the use of native plant species for conservation as well as to identify seed sources. In agricultural areas that were originally a mosaic of uplands and prairie sloughs, the establishment of trees and many shrubs represents creation of habitat that was not present in pre-settlement times. Nevertheless, these species can provide valuable habitat adjacent to intensively managed farmland, consistent with the management paradigm of naturalization (Rhoads and Herricks, 1996) whereby managers strive for diversity, stability, and self-regulation within the framework and constraints of human utilization of the natural resources. It should be noted that the use of such trees or plants could affect the trophic structure of the aquatic ecosystem by changing instream temperatures and acting as a source of carbon and energy inputs.

Managing riparian areas for wildlife may be as simple as identifying and eliminating those practices that render the area unsuitable as habitat. For example, timber harvest in forested riparian areas, even selective harvesting, produces changes in the forest and ground cover structure that often result in reduced habitat complexity and losses in species richness and abundance (Conner et al., 1975; Niemi and Hanowski, 1984), as well as changes in microclimates that may extend as much as 1,000 feet from a harvest (Brosofske et al., 1997). Before timber harvest is proposed for a riparian area, management objectives for plant and animal diversity need to be identified. For the most part, current silviculture in riparian areas employs the same techniques used on uplands—techniques that are based on a paradigm of relatively homogeneous forest patches and that fail to address the spatial and temporal diversity inherent in riparian areas. Some foresters, however, are working to develop approaches that are more compatible with the heterogeneity of the riparian ecotone (Ilhardt et al., 2000). For example Short (1985) advocates managing for optimized vertical structure of habitat within a riparian buffer. One might also consider ways to perpetuate the horizontal patchiness of vegetative types that typifies many riparian areas with carefully targeted selective harvesting. Substantial innovations in silvicultural and agricultural protocols are needed before most vegetative management will be effective at perpetuating diverse natural riparian communities.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058953

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

**Corridors for Movement.** Riparian areas may provide the best opportunity for restoring linkages between larger patches of more natural ecosystems and promoting gene flow between populations (MacClintock et al., 1977; Noss and Harris, 1986; Mackintosh, 1989). This is particularly evident in developed landscapes where often the only remaining natural or semi-natural land exists along floodplains, or in agricultural landscapes where buffer zones planted for water-quality protection also serve a wildlife habitat function (Forman and Baudry, 1984; Barrett and Bohlen, 1991). Such riparian remnants frequently include wetlands where anthropogenic alterations have been limited.

Theoretical work on corridors (based on the discipline of biogeography) often involves modeling the probabilities of extinction in isolated patches versus interconnected patches (Simberloff and Wilson, 1969; Turner, 1989). Using this theory as a springboard, much attention has been paid to designing for the movements of large carnivores between reserves (Harris and Atkins, 1991; Grumbine, 1992; Noss et al., 1996). Applicable work has also drawn from percolation theory, which models different combinations of population dispersal characteristics and patterns of habitat boundaries to predict patterns of population growth and habitat utilization (Gardner et al., 1991). This type of analysis is useful in understanding how human disturbance disrupts movement of animals at the landscape scale (O'Neill et al., 1988).

With this theoretical underpinning, practical examples of corridor design and the benefits of corridors have multiplied. Of importance in any design is a consideration of quality of habitat within the corridor, as well as width and connectivity (Noss, 1993). Beier (1993) advocated the use of radiotelemetry data combined with geographical information system (GIS) mapping to identify the movement range for a far-ranging carnivore (such as the cougar) and there are several recent examples of this approach. For example, a GIS modeling analysis of movement corridors in the northern Rockies focused on a suite of species that included a carnivore (cougar), omnivore (grizzly bear), and ungulate (elk), under the hypothesis that a diverse combination of far-ranging species would provide a protective umbrella for a greater number of other species (Walker and Craighead, 1997). The Yellowstone to Yukon initiative, a conservation proposal emerging from a coalition of more than 140 environmental groups, seeks to preserve and create a series of wildlife corridors that will link populations of bear, wolves, and other large predators from Yellowstone National Park to Canada's Yukon Territory. These corridors are based fundamentally on riparian areas and mountain ranges (The Wildlands Project, *http://www.twp.org*). Similarly, in Florida a GIS analysis was conducted to link significant reserve areas with the most appropriate and effective corridors; identification of linkages relied heavily on inland and coastal riparian areas (Hoctor et al., 2000). "Rewilding" is the term that has come to be applied to this approach of creating and preserving connectivity among large wild reserves, with a focus on the roles of species—frequently large carni-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058954

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

vores—whose influence on ecosystem function and diversity is disproportionate to their numerical abundance (Soulæ and Noss, 1998). Riparian areas inevitably figure in the rewilding approach to landscape-scale corridor design.

Skeptics have accused managed riparian corridors of facilitating the spread of pests and diseases (Forman, 1995), and they have complained of a perceived deficit of studies regarding the effects of riparian zone design and management on biodiversity (Wigley, 1996). However, a considerable body of data exists for a variety of taxonomic levels from diverse ecoregions (Karr, 1996). Assessment of corridors is a significant challenge that continues to be addressed using both economic and scientific frameworks (Diamond et al., 1976; Simberloff et al., 1992). Often, corridors used by organisms have been designed by humans for other functions, which confounds any assessment of their effectiveness.

Solutions for providing movement corridors can be costly. The cost of one bridge that allows animal movement along a river under a road is an estimated 13 times greater than that of the usual bridge (Simberloff and Cox, 1987). Increasingly, movement corridors are being considered during major highway planning (Smith, 1999). Nevertheless, ongoing study is needed to assess the effectiveness of such created crossings. Studies from Banff National Park in Canada indicate that the effectiveness of constructed wildlife crossings can be compromised by recreational use of the same areas (Clevenger and Waltho, 2000). The time scale over which corridors may function can also make it difficult to assess effectiveness. For example, riparian areas that function as refugia for rare plants may act as migration corridors over hundreds of years. All these factors make it difficult to design and manage corridors and to assess their cost-effectiveness (Hunter, 1996). In spite of gaps in scientific and economic knowledge, there is little question that reestablishing connectivity of riparian areas as a means of counteracting habitat fragmentation is crucial for long-term species survival and perpetuation of biodiversity (Noss, 1993; Walker and Craighead, 1997; Soulæ and Noss, 1998).

### Conclusions and Recommendations on Riparian Buffers for Habitat

**Riparian areas—both natural reserves and managed buffer zones—provide some of society's best opportunities for restoring habitat connectivity on the landscape.** Identification, mapping, and assessment of these areas are needed. Management of riparian areas in ways that optimize their value as habitat and movement corridors for plants and animals will require planning and action at both site-specific and landscape scales.

**Much riparian buffer zone management suffers from focusing on a single species or taxon.** Integrated management that uses a functional approach and seeks to optimize habitats for a variety of native species is needed. Integrated

Copyright © National Academy of Sciences. All rights reserved.

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 241 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

management should include the use of reference sites and monitoring and should focus on the rehabilitation of native vegetation. Management of riparian areas should shift from focusing on stable populations of individual species to managing these species for variability as well as for their interactive roles in the ecosystem.

**Current silvicultural and agricultural management approaches do not adequately address the habitat values of riparian areas.** Most forestry buffers, fenced riparian exclosures, and agricultural buffers have the protection of water quality (or sometimes fisheries) as their main focus. These water-quality protection buffers are usually considerably less diverse structurally and vegetatively than they would be if wildlife habitat were actively considered in their planning.

*Controlling Exotic Species*

Because of their great impact on biodiversity and ecosystem function, as well as the economic burdens they exact, the control of exotic species is often a high priority in the management of riparian areas. Approaches to exotic species control include hand removal, mechanical removal, herbicide applications, controlled burns, controlled flooding, and biological controls. Biological controls essentially involve reestablishing the natural control mechanisms exerted by herbivores and pathogens in the native ranges from which exotic species come. Though very effective control has been achieved in many circumstances, there are no universal prescriptions for control of exotic species in riparian areas. The effectiveness of the various control methods will depend on the growth habit of the particular exotic species and its reproductive strategy, the extent of the infestation including whether it is urban versus rural or near critical habitat for endangered species, and the state of knowledge and of testing concerning potential biological control agents.

Control strategies must also be tailored to the relative costs and benefits, which vary among species and with land use conditions. Because these costs and benefits can be difficult to quantify, there is considerable debate in both the scientific and political arenas about whether certain exotic species can and should be eradicated from riparian areas. For example, there is no effective control agent for Chinese privet. Other species, such as saltcedar, are so widespread (1 million acres in the USA) that eradication is impossible. In addition, eradication of saltcedar is complicated by the discovery of its use as nesting habitat for the southwestern willow flycatcher, a federally listed endangered species. Each situation must be assessed in terms of the forgoing constraints, as well as whether the removal activity and associated habitat disturbance, including the application of herbicides, will result in more good than harm. Specific examples of control strategies for three exotic plant species in riparian areas are described in Box 3-4.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058956

Case No. 1:20-cv-02484-MSK Document 45-7 filed 04/28/21 USDC Colorado pg 242 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

## Managing Other Activities

Human activities and land uses have resulted in the widespread alteration of riparian areas along rivers and other waterbodies across the United States. By changing these activities, many of these riparian areas can be ecologically restored and improved. In some cases the types and extent of needed change will be minor and relatively easy to implement, as in designating leave areas exempt from traditional agriculture, grazing, or forestry. For other activities, restoration will require a new understanding of why riparian areas are important. Through continued research, educational programs, tax incentives, awards, regulations, legislation, and perhaps other approaches, the ecological importance and intrinsic values associated with these lands may be better balanced against the competing wants and needs of a modern society.

### Recreation

Although it may seem insignificant compared to other land uses, recreation can impair riparian area functioning to a substantial degree in many areas and must be part of riparian management plans (e.g., Loeks, 1985). Managers of recreation must consider not only its impacts on the aquatic ecosystem—which has been the usual focus of water-based recreation (Field et al., 1985)—but also on the riparian area itself (see Chapter 3). Fortunately, the public tends to place a high value on the natural habitat present along streams and drainages (Black et al., 1985).

Some of the most relevant research regarding management of recreational activities in riparian areas comes from work on greenways. A greenway is a linear open space that is more natural than the surrounding area (Smith and Hellmund, 1993); it is typical of many recreational lands along rivers, lakes, and coasts. The challenge in the management of greenways is to preserve natural functions while still allowing for human enjoyment of these areas.

Management of recreational activities in riparian areas involves a combination of careful design, limitation of use, and public education (Cole, 1993). A frequent concern is the disturbance of soil, plants, and animals by placement and use of trails and roads. Conservation-oriented trail design suggests making use of existing roads and trails (unless they are degrading the area) rather than cutting new paths. Ideally, before designing public access to a riparian area, surveys should be conducted for rare or sensitive plants and animals or culturally sensitive sites that might be disturbed by human use, so that impacts can be minimized. Rather than placing the trail entirely within the riparian area, trails should allow access and view points in discrete locations (Trails and Wildlife Task Force, 1998). Durable areas should also be sought out as locations for placement of recreational facilities (Cole, 1993). Placement should also consider the inevitable negative edge effects on surrounding natural areas and should seek to mitigate these with buffer zones or screening. Having well-identified, highly devel-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058957

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 243 of 310

oped riparian recreation sites such as marinas, overlooks, and picnic grounds can also channel a high percentage of users into discrete areas with the capacity to accommodate them, and thus limit impacts on the larger riparian area. Careful design and placement of such high-intensity use areas (and of other facilities such as outhouses, flush toilets, and litter receptacles) can go a long way to minimizing impacts on riparian areas.

In any riparian area, recreational impacts can be reduced by choosing a style of development that seeks to maintain as many ecological functions of the area as possible. In surfacing trails and roads, one needs to consider impacts of runoff to adjacent waterbodies; this suggests that permeable materials should be used whenever possible (Cole, 1993). Perpetuation of natural vegetation, whether preserved or restored, should be a high priority in any riparian recreational area. Where natural vegetation cannot be maintained because of unavoidable heavy use, durable, non-native species may serve some vegetative functions (Binford and Buchenau, 1993).

Certain construction techniques can alleviate impacts to sensitive areas such as spring seeps, wetlands, cliffs, or outcrops. A boardwalk can be used to route foot traffic through a fragile riparian wetland or dune. Carefully placed water bars on trails can lessen runoff to adjacent streams and lakes.

Limitations on human access to riparian areas can take many forms. Knight and Temple (1995) describe spatial, temporal, behavioral, and visual restrictions on human use. Any prohibitions require a combination of education and enforcement to be effective. Examples include bans on bicycles or horses on erosion-prone trails and bans on motorized vehicles in areas where noise is an issue because of disturbance of animals. Wilderness areas often have setbacks from waterbodies for camping or horse use to protect the riparian area and aquatic ecosystem; these range from 20 to 200 feet (Cole et al., 1987). In some areas, certain activities may need to be excluded entirely if ecological restoration is the goal.

Human access can also be limited by quota or by limiting access to certain times or seasons. Recreational carrying capacity considers both ecological damage and perceptions of crowding that can be used to set such limits (Chilman et al., 1985). An example of exclusion for a discrete time period is the prohibition, by law, of people and pets from designated Great Lakes beaches during the nesting period of the rare piping plover. Similarly, a recreational area along a South Platte River reservoir in Colorado allows no visitor access for two months while herons are courting and building nests and limited access while the birds are laying eggs. In addition, the location of the viewing platform on a bluff creates a buffer between visitor and nesting birds. The mechanism for imposing these restrictions is generally signs and barriers (both artificial and natural) supplemented by educational interpretive materials and enforcement (Larson, 1995).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058958

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 244 of
310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Finally, adaptive management is particularly appropriate in riparian recreational areas. Monitoring should be used to identify problems that can be rectified early on through restoration, redesign of structures and trails, and changes in human use patterns (Trails and Wildlife Task Force, 1998). To date, however, little effort has been expended to adaptively manage recreation within riparian areas.

### Conclusions and Recommendations on Recreation

**Management of recreational use in riparian areas needs to combine careful design, limitation of use, and public education.** In most cases, all or many of these components are lacking in recreational management plans. The goal of managing recreational activities in riparian areas is to perpetuate natural functions (e.g., water quality, wildlife habitat, etc.) while still allowing human use and enjoyment of these areas.

**Most recreational development in riparian areas lacks sound ecological assessment and planning.** Recreation planning should include a landscape perspective, and it should involve the local community and other stakeholders. Some recreational uses are incompatible with preservation or rehabilitation of riparian areas and may need to be prohibited. Examples include prohibiting the use of off-road vehicles in fragile riparian wetlands or erosion-prone areas and prohibiting intensive public visitation in a habitat of a rare plant or animal species.

### Education

To be effective at improving the ecological functions and integrity of the nation's riparian areas, education must have as a primary goal increasing "riparian literacy" in the general population. In addition, education needs to effectively transfer practical interdisciplinary information to natural resources managers, policy makers, watershed councils, and those more directly affecting riparian areas such as developers and zoning officials. Finally, riparian education must encompass the ongoing training of riparian scientists for the next generation, people who will assuredly face even greater management challenges than those faced today. At its most fundamental level, riparian education should be directed at understanding the effects human activities have had and are continuing to have on these vital and vulnerable areas so that alternatives may be developed to sustain these areas for future generations (Orr, 1990a).

Riparian education is as inherently multifaceted as the ecotone it addresses. A basic education in riparian functions must integrate the physical, natural, and social sciences. A good understanding of riparian science draws from disciplines as diverse as hydrology, geology and geomorphology, soil science, ecology, and limnology. It includes all the fields dealing with organisms inhabiting aquatic and

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058959

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 245 of
310
Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

terrestrial ecosystems: ichthyology, malacology, herpetology, entomology, mammalogy, ornithology, and botany. Also critical are disciplines that deal more directly with natural resource management such as wildlife biology, fisheries, forestry, range, and recreation. Of crucial importance is education that addresses methods for statistically sound assessment and monitoring. Riparian education also needs to include information on the legal framework that pertains to human activities in riparian areas.

The content of riparian education is, by necessity, broad and complex, yet the public at large needs to receive information about the ecological services of riparian areas in clearly understandable language and format. Hence, the challenge of educators is to integrate and distill this diverse information so that it can be presented effectively to the citizen body. It is important that the public at large quickly be brought "on board" regarding the importance of riparian areas and their contributions to quality of life. Their proximity to waterbodies, already highly valuable in the public eye (Black et al., 1985), may streamline this task. Thus, it may be easier to cultivate a positive perception of riparian areas than it has been to convince people that wetlands are valuable and deserving of protection.

Formal education about riparian areas should involve students at all levels, from elementary through graduate school. Teachers, particularly in elementary and secondary schools, will need curricula development (lessons and projects) along with training to address such an interdisciplinary and nontraditional topic within the framework of their mandated curriculum. Project-based or site-based education, such as typifies many river or watershed study programs, is an effective way to accomplish riparian education. The benefit of using environment-based education as an integrating context for learning has been well demonstrated in a study of 40 schools (elementary through high school) drawn from 13 states (Lieberman and Hoody, 1998).

Higher education needs to envision riparian science as a truly interdisciplinary field that includes a solid grounding in hydrology, limnology, ecology, conservation biology, experimental design, mapping (GIS), and statistics (Noss, 1997). Most institutions of higher education will need to revitalize their field science courses, making clear their practical connection to solving specific environmental challenges, such as riparian restoration and management, and the larger challenge of creating an ecologically sustainable society. Elder (1999) advocates the development of bioregional curricula that use place-based education to teach subjects in both the arts and sciences. Riparian areas and their waterbodies provide a natural opportunity to emphasize a bioregional perspective. Students in professional programs such as engineering, forestry, range, agriculture, and urban development will need to understand the potential impacts that various practices and land uses can have on riparian areas, the capability to minimize such impacts, and the opportunities for restoration and improvement of riparian sys-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058960

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 246 of 310

tems across diverse landscapes. Making these changes will require the crossing of discipline barriers and cultivating a systems approach to thinking (Orr, 2000).

Natural resources managers and regulators form another crucial audience in need of information on riparian functions as well as up-to-date findings on alternative management strategies. Although it might be assumed that these professionals are adequately prepared to address the challenges associated with riparian areas and their management, the rapidly increasing information base of the last 25 years (see Chapter 1) indicates a need to ensure that they have current information and skills. Few resource managers have the broad, interdisciplinary training necessary for effective riparian management. Although all managers can benefit from information on the latest research and management approaches within their disciplines, perhaps more important to them is knowledge from disciplines outside of their formal training.

Government officials at all levels (e.g., town managers, planning and zoning officials, county commissioners, and state and federal legislators) and citizen governmental councils should also be included as recipients of information on riparian area functions and values. Non-governmental environmental organizations, often in a position to influence policy and frequently in need of solid scientific information, need to update their understanding of riparian areas in ways that help them better understand the broader consequences of their specific interests. (In states such as Arizona, Colorado, Montana, and New Mexico, nonprofit organizations have formed to help educate the public about the importance of riparian areas.) Other potential audiences include private sector entities, such as real estate professionals and developers, likely to have a disproportionate influence on riparian areas. One such educational program has been started by the North American Lake Management Society to train real estate agents selling waterfront property (as described in Box 5-13).

The mechanisms of information transfer will be varied, running the gamut of community involvement projects, printed popular material, targeted seminars, brochures, videos, multimedia computer programs, and peer-reviewed scientific papers. All approaches should strive to present interdisciplinary material in a clearly understandable and "user-friendly" way. Terminology should be clearly defined; jargon and gratuitous use of acronyms should be avoided whenever possible.

There are challenges to providing continuing education on riparian areas, the greatest of which may be effectively reaching wide and diverse audiences. Elementary and high school teachers are often ill equipped to undertake the type of project-based education that can most effectively integrate the diverse disciplines of riparian science. Researchers may find it easier to obtain funding on narrow disciplinary topics than to develop a coordinated research proposal that requires a funding source willing to support broad-based interdisciplinary efforts. Natural resources professionals may see continuing education as impugning the value of their past education or may perceive the blurring of disciplinary boundaries as a

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058961

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

---

**BOX 5-13**
**A Pilot Educational Program for Real Estate Professionals**

*"The waterfront owner has invested in an ecosystem, not just a piece of property."* This is the operating premise of a new program designed to help real estate professionals understand the positive correlation between maintaining or increasing the health of the ecosystem and the value of waterfront property. In 1998, the North American Lake Management Society, with funding from EPA and assistance from the Wisconsin Association of Lakes, launched a pilot program to train waterfront real estate professionals in techniques for promoting the sale and maintenance of healthy waterfront property. The program links ecological understanding with property values and real estate transactions (Premo and Rogers, 1998). A real estate agent is very likely to be involved in the repeated sale of a property, particularly in a waterfront market. Thus, increasing the value of a waterfront property ensures higher commissions with each transaction. In addition, real estate professionals are a critical first point of contact with people who are planning to live near water. More often than not, their customers lack understanding about the land and water as living ecosystems and have no idea how their activities will affect the health and functioning of these areas. Providing real estate agents with solid understanding and information that they convey to customers can foster more sensitive riparian stewardship by new property owners. This training also allows the real estate agent to better match customers with property and thus minimize drastic riparian modifications by new owners.

The program seminar uses a blend of illustrated lectures and activities to convey ecological functions to an audience of non-scientists who are inclined to view wildlife and vegetation as negative shoreline attributes—while seeing pavement, docks, and manicured lawns as desirable. The seminars address riparian ecology, water quality, shoreline law, and the human waterfront community, relating all topics to real estate transactions. Seminars also include an aquatic "zoo" containing macroinvertebrates and wetland plants, which provides an up-close look at riparian organisms. The day-long event concludes with a virtual real estate property selling tour conducted by the attendees using a selection of slides on riparian ecology and waterfront property. The long-range and ambitious goal of this program is to broaden the perspective of real estate agents such that healthy, functioning riparian areas become the waterfront property business standard.

---

threat to their profession. Layered on this challenge are the conflicts of varied human uses of riparian areas. Educational efforts may easily break down when users perceive them as simply threats to grazing privileges or available wood fiber. Riparian education will have to address a blend of socioeconomic and ecological issues that go beyond the questions scientists usually research—issues that are often neglected by those making management decisions. To be successful, riparian education must also foster a sense of community and responsible stewardship (Orr, 1990b). The unique functions and values of riparian areas must

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058962

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 248 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

better understood by the layperson if there is to be a shift in society's management of these vitally important areas.

### Conclusions and Recommendations on Riparian Education

**Riparian education needs to reach broad and diverse audiences if it is to succeed in effecting positive change in riparian management.** It needs to include formal educational institutions and reach out directly to policy makers, natural resources personnel, government officials, developers, landowners, and the public at large. Natural resources professionals need to expand their perspectives beyond their formal background and training.

**Riparian education should strive to be inclusive.** It should avoid using jargon, acronyms, and single-perspective approaches. The public's aesthetic appreciation of waterbodies is already high. This appreciation should be harnessed to further public stewardship of riparian areas.

## CONCLUSIONS AND RECOMMENDATIONS

As noted by the Federal Interagency Working Group (1998) in its report on stream corridor restoration, water and other materials, energy, and organisms meet and interact within riparian areas over space and time. Riparian areas provide essential life functions such as maintaining streamflows, cycling nutrients, filtering chemicals and other pollutants, trapping and redistributing sediments, absorbing and detaining floodwaters, maintaining fish and wildlife habitats, and supporting the food web for a wide range of biota. The protection of healthy riparian areas and the restoration of degraded riparian areas relate directly to at least five national policy objectives: protection of water quality, protection of wetlands, protection of threatened and endangered species, reduction of flood damage, and beneficial management of federal public lands. The following conclusions and recommendations are intended to bring national awareness to riparian areas commensurate with their ecological and societal values.

**Restoration of riparian functions along America's waterbodies should be a national goal.** Over the last several decades, the nation (through both federal and state programs) has increasingly focused on the need for maintaining or improving environmental quality, ensuring the sustainability of species, protecting wetlands, and reducing the negative impacts of high flow events—all of which depend on the existence of functioning riparian areas. Unless an ambitious effort to restore the nation's riparian areas in undertaken, it will be difficult to achieve the goals of the Clean Water Act, the Endangered Species Act, wetland protection, and flood damage control programs. There is a clear need for legal guidance at the federal, state, and local levels that explicitly recognizes the im-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058963

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

portance of riparian areas and provides a legal framework for their protection, restoration, and sustainability.

**Protection should be the goal for riparian areas in the best ecological condition, while restoration is needed for degraded riparian areas.** Management of riparian areas should give first priority to protecting those areas in natural or nearly natural condition from future alterations. The restoration of altered or degraded areas could then be prioritized in terms of their relative potential value for providing ecological services and/or the cost effectiveness and likelihood that restoration efforts would succeed. There is only a limited track record of restoring biophysical systems that have been previously degraded. Nevertheless, where degradation has occurred—as it has in many riparian areas throughout the United States—there are vast opportunities for restoring the functions and values of these areas. Because riparian areas perform a disproportionate number of biological functions on a unit area basis (see Chapter 2), efforts focused upon restoring them could have a major influence on improving overall water quality and fish and wildlife habitat.

**Patience and persistence in riparian management is needed.** The current degraded status of many riparian areas throughout the country represents the cumulative, long-term effects of numerous, persistent, and often incremental impacts from a wide variety of land uses and human alterations. For many sites, substantial time, on the order of years to decades, will be required for a full sequence of high and low flows to occur, for riparian vegetation to establish and plant communities to fully function, for channels to adjust, for water quality to improve, and so on. Restoring riparian areas to fully functional condition may not be possible in those cases where permanent modifications to the hydrologic regime have been made. On the other hand, recovery may be rapid at sites where the impacts are easily reversible, such as where there is only a single stressor and where native vegetation is still present. Regardless of site condition, an adaptive management framework (NRC, 2002)—in which well-understood and relatively simple steps are taken first (such as passive restoration or pilot program initiation) and used to inform later activities (such as more active restoration or landscape-scale and regional programs)—is ideal for approaching riparian restoration.

Many of the impacts that have altered and destroyed riparian areas are the byproducts of local, state, and federal programs designed to develop and utilize land and water resources in a variety of ways and over many decades. In the process, the values and functions of riparian systems were not recognized or considered, were devalued or marginalized, or were considered as obstacles to ongoing management or development. Restoration of the nation's riparian areas will require a newly educated public that understands what riparian functions have been lost and what can be recovered in conjunction with a change in values,

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058964

a change in institutional perspectives, and most likely a change in laws. Like recovery of the natural system, it will take time for education and outreach programs to generate broad-based public and political support. Thus, while initiating efforts to restore riparian areas is an urgent need, patience and persistence in meeting long-term restoration goals are required.

**Although many riparian areas can be restored and managed to provide many of their natural functions, they are not immune to the effects of poor management in adjacent uplands.** Because the subject of this report is riparian areas, it might seem that restoration activities need only focus on those areas. Indeed, in many situations this is all that may be needed to achieve certain restoration goals. However, where upslope management practices significantly alter the magnitude and timing of overland flow, the production of sediment, and the quality of water arriving at a downslope riparian area, then simply focusing on the riparian system may be inadequate for achieving restoration goals. In such situations, upslope practices that are contributing to riparian degradation must be addressed in order for long-term success to be achieved. Restoration of riparian areas should be approached with full recognition of the larger physical structure of which it is a part; that is, riparian area management must be a component of good watershed management.

## REFERENCES

Acharya, G. 2000. Approaches to valuing the hidden hydrological services of wetland ecosystems. Ecological Economics 35:63–74.

Adams, P. W. 1983. Soil compaction on woodland properties. Oregon State University Extension Circular 1109. Corvallis, OR: Oregon State University. 5 pp.

Adamus, P. R. 1983. A method for wetland functional assessment, volume II. FHWA Assessment Method. Rep No. FHWA-IP-82-24. Washington DC: Federal Highway Administration, U.S. Department of Transportation. 134 pp.

Adler, R. W. 1995. Addressing barriers to watershed protection. Environmental Law 25(4):973–1106.

Ainslie, W. B., R. D. Smith, B. A. Pruitt, T. H. Roberts, E. J. Sparks, L. West, G. L. Godshalk, and M. V. Miller. 2000. A regional guidebook for assessing the functions of low gradient, riverine wetlands in Western Kentucky. Technical Report Number WRP-DE-17. Vicksburg, MS: U.S. Army Corps of Engineers Waterways Experiment Station.

Anderson, S. 1993 (updated 1994). Threats to amphibians: grazing and wildlife: a selected literature review. Internet source: http://ice.ucdavis.edu/Toads/grzaway.html

Andreas, B. K., and Lichvar. 1995. A floristic assessment system for northern Ohio. Wetlands Research Program Technical Report WRP-DE-8. Vicksburg, MS: U.S. Army Corps of Engineers, Waterways Experiment Station.

Andrews, E. D. 1986. Downstream effects of Flaming Gorge Reservoir on the Green River, Colorado and Utah. Geological Society of America Bulletin 97:1012–1023.

Aronson J., and E. LeFloc'h. 1996. Vital landscape attributes: missing tools for restoration ecology. Restoration Ecology 4:377–387.

Arora, K., S. K. Mickelson, J. L. Baker, D. P. Tierney and C. J. Peters. 1996. Herbicide retention by vegetative buffer strips from runoff under natural rainfall. Trans. ASAE 39:2155–2162.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058965

410   *RIPARIAN AREAS*

Barrett, G. W., and P. J. Bohlen. 1991. Landscape ecology. Pp 149–161 In: Landscape linkages and biodiversity. W. E. Hudson (ed.). Washington, DC: Island Press.

Bedford, B. L. 1996. The need to define hydrologic equivalence at the landscape scale for freshwater wetland mitigation. Ecological Applications 6:57–68.

Bedford, B. L. 1999. Cumulative effects on wetland landscapes: links to wetland restoration in the United States and southern Canada. Wetlands 19:775–788.

Beier, P. 1993. Determining minimum habitat areas and habitat corridors for cougars. Conservation Biology 7:94–108.

Belsky, A. J., A. Matzke, and S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States. J. Soil and Water Conservation 54:419–431.

Beschta, R. L., and J. B. Kauffman. 2000. Restoration of riparian systems —taking a broader view. Pp. 323–328 In: Riparian ecology and management in multi-land use watersheds. J. P. J. Wigington, Jr., and R. L. Beschta (eds.). Middleburg, VA: American Water Resources Association. 616 pp.

Beschta, R. L., W. S. Platts, J. B. Kauffman, and M. T. Hill. 1994. Artificial stream restoration—money well spent or an expensive failure? Pp. 76–104 In: Environmental restoration. Carbondale, IL: University Council on Water Resources, University of Southern Illinois.

Binford, M. W., and M. J. Buchenau. 1993. Riparian greenways and water resources. Pp. 69–104 In: Ecology of greenways: design and function of linear conservation areas. D. S. Smith and P. C. Hellmund (eds.). Minneapolis, MN: University of Minnesota Press.

Black, S. P., Broadhurst, J. Hightower, and S. Schauman. 1985. The value of riparian habitat and wildlife to the residents of a rapidly urbanizing community. Pp. 413–416 In: Riparian ecosystems and their management: reconciling conflicting uses. USDA/Forest Service Gen. Tech. Bull. RM-120. Washington, DC: USDA Forest Service.

Blackburn, W. H. 1984. Impacts of grazing intensity and specialized grazing systems on watershed characteristics and responses. Pp. 927–83 In: Developing strategies for rangeland management. Boulder, CO: Westview Press.

Branson, F. A. 1984. Evaluation of impacts of grazing intensity and specialized grazing systems on watershed characteristics and responses. Pp. 985–1000 In: Developing strategies for rangeland management. Boulder, CO: Westview Press.

Brinson, M. M. 1993. A hydrogeomorphic classification for wetlands. Technical Report WRP-DE-4. Vicksburg, MI: Waterways Experiment Station, Army Corps of Engineers.

Brinson, M. M. 1996. Assessing wetland functions using HGM. National Wetlands Newsletter 18(1):10–16.

Brinson, M. M., and R. Rheinhardt. 1996. The role of reference wetlands in functional assessment and mitigation. Ecological Applications 6:69–76.

Brinson, M. M., B. L. Swift, R. C. Plantico, and J. S. Barclay. 1981. Riparian ecosystems: their ecology and status. FWS/OBS-81/17. Washington, DC: U.S. Fish and Wildlife Service, Biological Sciences Program. 155 pp.

Bromberg, M., and T. Funk. 1998. Fencing livestock away from streams reduces erosion and health risks. University of Illinois Cooperative Extension Service. Internet source: www.ag.uiuc.edu/news/articles/898265683.html.

Brooks, K. N., P. F. Ffolliott, H. M. Gregersen, and J. L. Thames. 1991. Hydrology and the management of watersheds. Ames, IA: Iowa State University Press. 392 pp.

Brosofske, K. D., J. Chen, R. J. Naiman, and J. F. Franklin. 1997. Harvesting effects on microclimatic gradients from small streams to uplands in western Washington. Ecol. Applications 7:1188–1200.

Bryant, L. D. 1982. Response of livestock to riparian zone exclusion. J. Range Mgmt. 35:780–85.

Busby, F. E. 1979. Riparian and stream ecosystems, livestock grazing, and multiple-use management. Pp. 6–12 In: Proceedings of the forum: grazing and riparian/stream ecosystems, Nov. 3–4, 1978. O. B. Cope (ed.). Denver, CO: Trout Unlimited.

Copyright © National Academy of Sciences. All rights reserved.

Cairns, J., Jr. 1993. Is restoration ecology practical? Restoration Ecology 1:3–6.

Chaney, W., W. Elmore, and W. S. Platts. 1990. Livestock grazing on western riparian areas. Eagle, ID: Northwest Resource Information Center, Inc. 45 pp.

Chaubey, I., D. R. Edwards, T. C. Daniel, P. A. Moore Jr., and D. J. Nichols. 1994. Effectiveness of vegetative filter strips in retaining surface-applied swine manure constituents. Trans. ASAE 37:845–850.

Chilman, K. C., D. Foster, and A. Everson. 1985. Using visitor perceptions in river use planning, 1972–1984. Pp. 393–397 In: Riparian ecosystems and their management: reconciling conflicting uses. USDA/Forest Service Gen. Tech. Bull. RM-120. Washington, DC: USDA Forest Service.

Clary, W. P. 1990. Stream channel and vegetation responses to late spring cattle grazing. J. Range Mgmt. 52:218–27.

Clary, W. P., and B. F. Webster. 1990. Riparian grazing guidelines for the intermountain region. Rangelands 12:209–211.

Clary, W. P. 1999. Stream channel and vegetation responses to late spring cattle grazing. Journal of Range Management 52:218–227.

Clawson, J. E. 1993. The use of off-stream water developments and various other gap configurations to modify the watering behavior of grazing cattle. M.S. thesis, Oregon State Univ., Corvallis. 80 pp.

Clevenger, A. P., and N. Waltho. 2000. Factors influencing the effectiveness of wildlife underpasses in Banff National Park, Alberta, Canada. Conservation Biology 14:47–55.

Cole, D. N., M. E. Petersen, and R. C. Lucas. 1987. Managing wilderness recreation use: common problems and potential solutions. USDA/FS Gen. Tech. Report INT-230. Washington, DC: USDA Forest Service.

Cole, D. N. 1993. Minimizing conflict between recreation and nature conservation. Pp. 105–122 In: Ecology of greenways: design and function of linear conservation areas. D. S. Smith and P. C. Hellmund (eds.). Minneapolis, MN: University of Minnesota Press.

Collier, M. P., R. H. Webb, and E. D. Andrews. 1997. Experimental flooding in Grand Canyon. Scientific American 276:82–89.

Commission for Environmental Cooperation. 1998. Sustaining and enhancing riparian migratory bird habitat on the upper San Pedro River.

Committee of Scientists. 1999. Sustaining the people's lands: recommendations for stewardship of the National Forests and Grasslands into the next century. Washington, DC: US Department of Agriculture. 193 pp.

Conner, R. N., R. G. Hooper, H. S. Crawford, and H. S. Mosby. 1975. Woodpecker nesting habitat in cut and uncut woodlands in Virginia. J. Wildl. Manage. 39:144–150.

Conroy, S. D., and T. J. Svejcar. 1991. Willow planting success as influenced by site factors and cattle grazing in northeastern California. J. Range Mgmt. 44:59–63.

Cooper, J. R., J. W. Gilliam, R. B. Daniels, and W. P. Robarge. 1987. Riparian areas as filters for agricultural sediment. J. Soil Sci. Soc. Am. 51(2):416–420.

Cope, O. B. 1979. Proceedings of the forum: grazing and riparian/stream ecosystems. Nov. 3–4, 1978. Denver, CO: Trout Unlimited.

Crawford, C. S., L. M. Ellis, M. C. Molles, Jr, and H. M. Valett. 1996. The potential for implementing partial restoration of the middle Rio Grande ecosystem. Pp. 93–99 In: Desired future conditions for southwestern riparian ecosystems: bringing interests and concerns together. D. W. Shaw, D. M. Finch (eds.). General Technical Report no. RM—GTR—272. Fort Collins, CO: USDA Forest Service.

Cummins, K. W., and C. N. Dahm. 1995. Restoring the Kissimmee. Restoration Ecology 3:147–148.

Dahm, C. N., K. W. Cummins, H. M. Valett, and R. L. Coleman. 1995. An ecosystem view of the restoration of the Kissimmee River. Restoration Ecology 3:225–238.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058967

Dalton, R. S., C. T. Bastian, J. J. Jacobs, and T. A. Wesche. 1998. Estimating the economic value of improved trout fishing on Wyoming streams. N. Amer. J. Fisheries Mgmt. 18:786–97.

Daniels, R. B., and J. W. Gilliam. 1996. Sediment and chemical load reduction by grass and riparian filters. Soil Sci. Soc. Amer. J. 60:246–251.

Darveau, M., Beauchesne, P., Belanger, L., Huet, J., Larue, P. 1995. Riparian forest strips as habitat for breeding birds in boreal forests. J. Wildlife Manage. 59:67–78.

David, M. B., L. E. Gentry, D. A. Kovacic, and K. M. Smith. 1997. Nitrogen balance in and export from an agricultural watershed. Journal of Environmental Quality 26:1038–1048.

Davis, K. C., and C. B. Marlow. 1990. Altering cattle behavior through grazing management. Montana Ag Research 7(1):11–14.

DeLoach, C. J. 2000. Saltcedar biological control: methodology, exploration, laboratory trials, proposals for field releases, and expected environmental effects. http://refuges.fws.gov/nwrsfiles/HabitatMgmt/PestMgmt/SaltcedarWorkshopSep96/deloach.html

Demaynadier, P. G., and M. L. Hunter, Jr. 1998. Effects of silvicultural edges on the distribution and abundance of amphibians in Maine. Conservation Biology 12:340–352.

Di Castri, F. 2000. Ecology in a context of economic globalization. BioScience 50:321–332.

Diamond, J., J. Terborgh, R. F. Whitcomb, J. F. Lynch, P. A. Opler, D. S. Simberloff, L. F Abele. 1976. Island biogeography and conservation: strategy and limitations. Science 193:1027–1032.

Dillaha, T. A., R. B. Reneau, S. Mostaghimi, and V. O. Shanholtz. 1989. Vegetative filter strips for nonpoint source pollution control. Transactions of the ASAE 32(2):491–496.

Donahue, D. L. 1999. The western range revisited: removing livestock from public lands to conserve native biodiversity. Norman, OK: University of Oklahoma Press. 388 pp.

Ehrhart, R. C., and P. L. Hansen. 1997. Effective cattle management in riparian zones: a field survey and literature review. Montana BLM Riparian Technical Bulletin No. 3. Montana State Office, BLM. 92 pp.

Elder, J. 1999. In pursuit of a bioregional curriculum. Orion Afield, Spring:26–28.

Elmore, W., and R. L. Beschta. 1987. Riparian areas: perceptions in management. Rangelands 9: 260–265.

Elmore, W., and R. L. Beschta. 1989. The fallacy of structures and the fortitude of vegetation. General Technical Report PSW-110. Washington, DC: U.S. Department of Agriculture.

Elmore, W., and B. Kaufman. 1994. Riparian and watershed systems: degradation and restoration. Pp. 212–231 In: Ecological implications of livestock herbivory in the West. M. Vavra et al. (eds.). Denver, CO: Society for Range Management.

Enrenreich, J. H., and A. J. Bjugstad. 1966. Cattle grazing time is related to temperature and humidity. Journal of Range Management 19:141–142.

Environmental Protection Agency (EPA). 1992. Federal Register 57:22746.

EPA. 1993. Guidance specifying management measures for sources of nonpoint pollution in coastal waters. EPA-840-B-92-002. Washington, DC: EPA Office of Water.

EPA. 1995. Watershed protection: a statewide approach. EPA-841-R-95-004. Washington, DC: EPA Office of Water.

Federal Interagency Working Group. 1998. Stream corridor restoration. principles, processes, and practices. Washington, DC: National Technical Information Service, U.S. Department of Commerce.

Federal Register 64:23592, May 3, 1999.

FEMAT (Report of the Forest Ecosystem Management Assessment Team). 1993. Forest ecosystem management: an ecological, economic, and social assessment. Washington, DC: USDA Forest Service.

Field, D. R., M. E. Lee, and K. Martinson. 1985. Human behavior and recreation habitats: conceptual issues. Pp. 227–231 In: Riparian ecosystems and their management: reconciling conflicting uses. USDA/Forest Service Gen. Tech. Bull. RM-120. Washington, DC: USDA Forest Service.

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Fischenich, J. C. 1997. Hydraulic impacts of riparian vegetation; summary of the literature. Technical Report EL-97-9. Vicksburg, MS: U.S. Army Corps of Engineers, Waterways Experiment Station. 53 pp.

Fleischner, T. L. 1994. Ecological Costs of Livestock Grazing in Western North America. Conservation Biology 8:629–644.

Fore, L. S., J. R. Karr, and R. W. Wisseman. 1996. Assessing invertebrate responses to human activities: evaluating alternative approaches. Journal of the North American Benthological Society 15:212–231.

Forman, R. T. T. 1995. Land mosaics. Cambridge, UK: Cambridge University Press. 632 pp.

Forman, R. T. T., and J. Baudry. 1984. Hedgerows and hedgerow networks in landscape ecology. Environmental Management 8:495–510.

Foss, P. 1960. Politics and grass. Seattle, WA: University of Washington Press.

Friedman, J. M., W. R. Osterkamp, and W. M. Lewis, Jr. 1996. The role of vegetation and bed-level fluctuations in the process of channel narrowing. Geomorphology 14:341–351.

Gardner, R. H., M. G. Turner, R. V. O'Neill, and S. Lavore. 1991. Simulation of the scale-dependent effects of landscape boundaries on species persistence and dispersal. Pp. 76–89 In: Ecotones, the role of landscape boundaries in the management and restoration of changing environments. M. M. Holland, P. G. Risser, and R. J. Naiman (eds.). New York: Chapman and Hall.

Garland, J. J. 1983. Designated skid trails minimize soil compaction. Oregon State University Extension Circular 1110, Corvallis, OR. 6 pp.

Garland, J. J. 1987. Aspects of practical management in the streamside zone. Pp. 277–288 In: Streamside management: forestry and fisheries interactions. E. O. Salo and T. W. Cundy (eds.). Contribution No. 57. Seattle, WA: University of Washington, Institute of Forest Resources. 471 pp.

Gatto, M., and G. A. de Leo. 2000. Pricing biodiversity and ecosystem services: the never-ending story. BioScience 50:347–355.

General Accounting Office (GAO). 1990. Rangeland management: BLM efforts to prevent unauthorized livestock grazing need strengthening. GAO/RCED—91-17. Washington, DC: GAO.

Ghaffarzadeh, M., C. A. Robinson, and R. M. Cruse. 1992. Vegetative filter strip effects on sediment deposition from overland flow. Madison, WI: Agronomy Abstracts, ASA. 324 pp.

Gifford, G. F., and R. H. Hawkins. 1978. Hydrologic impact of grazing on infiltration: a critical review. Water Resources Research 14:305–313.

Gillen, R. L., W. C. Krueger, and R. F. Miller. 1985. Cattle use of riparian meadows in the Blue Mountains of northeastern Oregon. J. Range Mgmt. 38:205–209.

Goodwin, C. N., C. P. Hawkins, and J. L. Kershner. 1997. Riparian restoration in the western United States: overview and perspective. Restoration Ecology 5(4s):4–14.

Gore, J. A., and F. D. Shields, Jr. 1998. Can large rivers be restored? BioScience 45:142–152.

Gourley, C. R. 1997. Restoration of the Lower Truckee River ecosystem: challenges and opportunities. Paper presented at the Wallace Stegner Conference: "To cherish and renew": restoring western ecosystems and communities. April 17–19, 1997.

Grumbine, R. E. 1992. Ghost bears: exploring the biodiversity crisis. Washington, DC: Island Press.

Gunderson, D. R. 1968. Floodplain use related to stream morphology and fish populations. J. Wildl. Manage. 32(3):507–514.

Gwinn, S. E., M. E. Kentula, and P. W. Shaffer. 1999. Evaluating the effects of wetland regulation through hydrogeomorphic classification and landscape profiles. Wetlands 19:477–489.

Hall, F. C., and L. Bryant. 1995. Herbaceous stubble height as a warning of impending cattle grazing damage to riparian areas. Gen. Tech. Rept. PNW-GTR-362. Portland, OR: USDA Forest Service, Pacific Northwest Research Station. 9 pp.

Harris, L. D., and K. Atkins. 1991. Faunal movement corridors in Florida. Pp. 117–148 In: Landscape linkages and biodiversity. W. E. Hudson (ed.). Washington, DC: Island Press.

Hart, R. H., J. Bissio, M. J. Samuel, and J. W. Waggoner, Jr. 1993. Grazing systems, pasture size, and cattle grazing behavior, distribution, and gains. J. Range Mgmt. 46:81–87.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058969

Hauer, F. R., and R. D. Smith. 1998. The hydrogeomorphic approach to functional assessment of riparian wetlands: evaluating impacts and mitigation on river floodplains in the U.S. A. Freshwater Biology 40(3):517–530.

Hawkins, C. P., R. H. Norris, J. N. Hogue, and J. W. Feminella. 2000. Development and evaluation of predictive models for measuring the biological integrity of streams. Ecological Applications 10:1456–1477.

Hendrickson, D. A., and W. L. Minckley. 1984. Cienegas—vanishing climax communities of the American Southwest. Desert Plants 6:131–175.

Hill, M. T., W. S. Platts, and R. L. Beschta. 1991. Ecological and geomorphological concepts for instream and out-of-channel flow requirements. Rivers 2:198–210.

Hoctor, T. S., M. H. Carr, and P. D. Zwick. 2000. Identifying a linked reserve system using a regional landscape approach: the Florida ecological network. Conservation Biology 14:984–1000.

Horner, R. R., and B. W. Mar. 1982. Guide for water quality impact assessment of highway operations and maintenance. Rep. WA-RD-39.14. Olympia, WA: Washington Dept. of Transportation.

Howery, L. D., F. D. Provenza, R. E. Banner, and C. B. Scott. 1996. Differences in home range and habitat use among individuals in a cattle herd. Applied Animal Behavior Sci. 49:305–20.

Huber, S. A., M. B. Judkins, L. J. Krysl, T. J. Svejcar, B. W. Hess and D. W. Holcombe. 1995. Cattle grazing a riparian mountain meadow: effects of low and moderate stocking density on nutrition, behavior, diet selection and plant growth response. J. Anim. Sci. 73:3752–3765.

Hubert, W. A., R. P. Lanka, T. A. Wesche, and F. Stabler. 1985. Grazing management influences on two brook trout streams in Wyoming. U.S. Forest Service General Technical Report RM-120:290–294.

Hughes, L. E. 1979. Rest-rotation grazing vs. season-long grazing on Naval Oil Shale Reserve Allotment in Colorado. Rangelands 1:55–56.

Hunter, C. 1991. Better trout habitat, a guide to stream restoration and management. Washington, DC: Island Press.

Hunter, M. L., Jr. 1996. Fundamentals of conservation biology. Cambridge, MA: Blackwell Science. 482 pp.

Ilhardt, B. L., E. S. Verry, and B. J. Palik. 2000. Defining riparian areas. In: Riparian management in forests of the Continental Eastern United States. E. S. Verry, J. W. Hornbeck, and C. A. Dolloff (eds.). Washington, DC: Lewis Publishers.

Inamdar, S. P., J. M. Sheridan, R. G. Williams, D. D. Bosch, R. R. Lowrance, L. S. Altier and D. L. Thomas. 1999. Riparian ecosystem management model (REMM): I. Testing of the hydrologic component for a Coastal Plain riparian system. Trans. Am. Soc. Agr. Eng. 42:1679–1689.

Inamdar, S. P. 1991. Riparian zone management model for optimized water quality, biomass and wildlife species diversity. Unpublished Independent Study Report, University of Kentucky, Lexington, KY.

Iowa State University. 1997. Stewards of our streams: buffer strip design, establishment, and maintenance. Pub. 1626b. Ames, IA: Iowa State University Extension.

Isenhart, T. M., R. C. Schultz, and J. P. Colletti. 1997. Watershed restoration and agricultural practices in the Midwest: Bear Creek of Iowa. Pp. 318–334 In: Watershed restoration: principles and practices. J. E. Williams, C. A. Wood, and M. P Dombeck (eds.). Bethesda, MD: American Fisheries Society.

Jackson, L. L., N. Lopoukhine, and D. Hillyard. 1995. Ecological restoration: a definition and comments. Restoration Ecology 3:71–75.

Janssen, R. 1994. Multiobjective decision support for environmental management. Dordrect, The Netherlands: Kluwer Academic Publishers. 232 pp.

Jones, J. B., and P. J. Mulholland. 2000. Streams and ground waters. San Diego, CA: Academic Press.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058970

Karr, J. R. 1981. Assessment of biotic integrity using fish communities. Fisheries 6:21–27.

Karr, J. R., and D. R. Dudley. 1981. Ecological perspective on water quality goals. Environmental Management 5:55–68.

Karr, J. 1996. Making meaning of all the science. Pp. 149–152 In: At the water's edge: the science of riparian forestry. Conference Proceedings, January 1996. BU-6637-S. Minneapolis, MN: University of Minnesota Extension Service.

Karr, J. R. 1991. Biological integrity: a long-neglected aspect of water resource management. Ecological Applications 1:66–84.

Karr, J. R., and E. W. Chu. 1999. Restoring life in running waters: better biological monitoring. Washington, DC: Island Press.

Kauffman, J. B, R. L. Beschta, N. Otting, and D. Lytjen. 1997. An ecological perspective of riparian and stream restoration in the western United States. Fisheries 22(5):12–24.

Kauffman, J. B., W. C. Krueger, and M. Vavra. 1983. Effects of late season cattle grazing on riparian plant communities. Journal of Range Management 36:685–91.

Keller, C. R., and K. P. Burnham. 1982. Riparian fencing, grazing, and trout habitat preference on Summit Creek, Idaho. North American Journal of Fisheries Management 2:53–59.

Kenney, D. S., S. T. McAllister, W. H. Caile, and J. S. Peckham. 2000. The *new* watershed source book: a directory and review of watershed initiatives in the western United States. Natural Resources Law Center.

Kershner, J. L. 1997. Setting riparian/aquatic restoration within a watershed context. Restoration Ecology 5(4s):15–24.

Kilgo, J. C., R. A. Sargent, B. R. Chapman, and K. V. Miller. 1998. Effect of stand width and adjacent habitat on breeding bird communities in bottom hardwoods. J. Wildl. Manage. 62:72–83

Knight, R. L., and S. A. Temple. 1995. Wildlife and recreationists: coexistence through management. Pp. 327–333 In: Wildlife and recreationists: coexistence through management and research. R. L. Knight and K. J. Gutzwiller (eds.). Washington, DC: Island Press. 372 pp.

Koehler, D. A., and A. E. Thomas. 2000. Managing for enhancement of riparian and wetland areas of the western United States: an annotated bibliography. General Technical Report RMRS-GTR-54. Washington, DC: USDA Forest Service. 369 pp.

Kondolf, G. M., and M. G. Wolman. 1993. The sizes of salmonid spawning gravels. Water Resources Research 29:2275–2285.

Kovacic, D. A., M. A. David, L. E. Gentry, K. M. Starks, and R. A. Cooke. 2000. Effectiveness of constructed wetlands in reducing nitrogen and phosphorus export from agricultural tile drainage. Journal of Environmental Quality 29:1262–1274.

Kovalchick, B. L. 1987. Riparian zone associations: Deschutes, Ochoco, Fremont, and Winema National Forests. USDA Forest Service, Pacific Northwest Region, Portland, OR, RG-ECOL-TP-297-87. 171 pp.

Kusler, J. A., and M. E. Kentula, eds. 1990. Wetland creation and restoration: the status of the science. Washington, DC: Island Press. 594 pp.

Kusler, J., and W. Niering. 1998. Wetland assessment: have we lost our way? National Wetlands Newsletter 20(1):9–14.

Larson, J. S., and D. B. Mazzarese. 1994. Rapid assessment of wetlands: history and application to management. Pp. 625–636 In: Global wetlands: old world and new. W. J. Mitsch (ed.). Amsterdam: Elsevier Science B.V.

Larson, R. A. 1995. Balancing wildlife viewing with wildlife impacts: a case study. Pp. 257–270 In: Wildlife and recreationists: coexistence through management and research. R. L. Knight and K. J. Gutzwiller (eds.). Washington, DC: Island Press. 372 pp.

Law, D. J., C. B. Marlow, J. C. Mosley, S. Custer, P. Hook, and B. Leinard. 2000. Water table dynamics and soil texture of three riparian plant communities. Northwest Science 74(3):233–241.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058971

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 257 of 310
Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Lee, D., T. A. Dillaha and J. H. Sherrard. 1999. Modeling phosphorous transport in grass buffer strips. J. Environ. Eng. ASCE 115(2):409–427.

Lee, K. H., T. M. Isenhart, R. C. Schultz, and S. K. Mickelson. 2000. J. Environmental Quality 29:1200–1205.

Lenat, D. R. 1993. A biotic index for the southeastern United States: derivation and list of tolerance values, with criteria for assigning water quality ratings. Journal of the North American Benthological Society 12:279–290.

Leon, S. C. 2000. Southwestern Willow Flycatcher. http://ifw2es.fws.gov/swwf/

Leonard, S., G. Staidl, J. Fogg, K. Gebhardt, W. Hagenbuck, and D. Prichard. 1992. Procedures for ecological site inventory – with special reference to riparian-wetland sites. Technical Reference 1737-7. Denver, CO: Bureau of Land Management, National Applied Resource Science Center. 135 pp.

Leopold, L. B., and M. G. Wolman. 1957. River channel patterns: braided, meandering and straight. U.S. Geological Survey Professional Paper 282-B, pp. 39-85.

Leopold, L. B., M. G. Wolman, and J. P. Miller. 1964. Fluvial processes in geomorphology. San Francisco, CA: W. H. Freeman and Company. 522 pp.

Lieberman, G. A., and L. L. Hoody. 1998. Closing the achievement gap using the environment as an integrating context for learning. San Diego, CA: State Education and Environment Roundtable.

Liebowitz, S. G., B. Abbruzzese, P. R. Adamus, L. E. Hughes, and J. T. Irish. 1992. A synoptic approach to cumulative impact assessment: a proposed methodology. Report EPA/600/R-92/167. Corvallis, OR: EPA Environmental Research Laboratory.

Lieurance, F. S., H. M. Valett, C. S. Crawford, and M. C. Molles, Jr. 1994. Experimental flooding of a riparian forest: restoration of ecosystem functioning. Pp. 365–374 In: Proceedings of the second international conference on ground water ecology. J. A. Stanford and H. M. Valett (eds.). Herndon, VA: American Water Resources Association.

Lisle, T. E. 1989. Sediment transport and resulting deposition in spawning gravels, north coastal California. Water Resources Research 25:1303–1319.

Loeks, C. D. 1985. Thinking laterally: strategies for strengthening institutional capacity for integrated management of riparian resources. Pp. 13–20 In: Riparian ecosystems and their management: reconciling conflicting uses. USDA/Forest Service Gen. Tech. Bull. RM-120. Washington, DC: USDA Forest Service.

Lopez, R. D., and M. S. Fennessy. 2002. Testing the floristic quality assessment index as an indicator of wetland condition. Ecological Applications 12(2):487–497.

Lowrance, R., L. S. Altier, R. G. Williams, S. P. Inamdar, D. D. Bosch, R. K. Hubbard, and D. L. Thomas. 2000. REMM: The riparian ecosystem management model. J. Soil & Water Conserv. 55:27–36.

Lowrance, R. R. 1992. Groundwater nitrate and denitrification in a Coastal Plain riparian forest. J. Environ. Qual. 21:401–405.

Lowrance, R. R., R. L. Todd and L. E. Asmussen. 1983. Waterborne nutrient budgets for the riparian zone on an agricultural watershed. Agr. Ecosystems and Environ. 10:371–384.

Lowrance, R., R. Leonard, and J. Sheridian. 1985. Managing riparian ecosystems to control nonpoint pollution. Journal of Soil and Water Conservation 40:87–97.

Lowrance, R., L. S. Altier, J. D. Newbold, R. R. Schnabel, P. M. Groffman, J. M. Denver, D. L. Correll, J. W. Gilliam, J. L. Robinson, R. B. Brinsfield, K. W. Staver, L. Lucas, and A. H. Todd. 1995. Water quality functions of riparian forest buffer systems in the Chesapeake Bay Watershed. Annapolis, MD: U.S. EPA Chesapeake Bay Program. 67 pp.

Lynch, J. A., E. S. Corbett and K. Mussallem. 1985. Best management practices for controlling nonpoint source pollution on forested watersheds. J. Soil and Water Conservation 40:164–167.

MacClintock, L., R. F. Whitcomb, and B. L. Whitcomb. 1977. Evidence for the value of corridors and minimization of isolation in preservation of biotic diversity. Am. Birds 31:6–16.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058972

MacDonnell, L. J. 1996. Managing reclamation facilities for ecosystem benefits. University of Colorado Law Review 67(2):197–257.

Mackintosh, G. ed. 1989. Preserving communities and corridors. Washington, DC: Defenders of Wildlife. 95 pp.

Madison, C. E., R. L. Blevins, W. W. Frye, and B. J. Barfield. 1992. Tillage and grass filter strip effects upon sediment and chemical losses. Madison, WI: Agronomy Abstracts, ASA. p. 331.

Magette, W. L., R. B. Brinsfield, R. E. Palmer, and J. D. Wood. 1989. Nutrient and sediment removal by vegetated filter strips. Transactions of the ASAE 32(2):663–667.

Malanson, G. P. 1993. Riparian landscapes: Cambridge studies in ecology. Cambridge, UK: Cambridge University Press.

Marlow, C. B., and T. M. Pogacnik. 1986. Cattle feeding and resting patterns in a foothills riparian zone. J. Range Mgmt. 39:212–217.

Masters, L., S. Swanson, and W. Burkhardt. 1996. Riparian grazing management that worked: introduction and winter grazing. Rangelands 18:192–195.

Mattson, J. A., J. E. Baumgras, C. R. Blinn, and M. A. Thompson. 2000. Harvesting options for riparian areas. Pp. 255–272 In: Riparian management in forests of the continental United States. E. S. Verry, J. W. Hornbeck, and D. A. Dolloff (eds.). New York: Lewis Publishers. 402 pp.

Mayer, R. 1999. Estimated costs for livestock fencing. Iowa State University Extension Service. FM 1855. Internet source: www.agry.purdue.edu/ext/forages/rotational/fencing/fencing_costs.html.

McDade, M. H., F. J. Swanson, W. A. McKee, J. F. Franklin, and J. Van Sickle. 1990. Source distances for coarse woody debris entering small streams in western Oregon and Washington. Canadian Journal of Forest Resources 20:326–330.

McInnis, M. L., and McIver, J. 2001. Influence of off-stream supplements on streambanks of riparian pastures. J. Range Manage. 54:648–652.

Meehan, W. R, ed. 1991. Influences of forest and rangeland management on salmonid fishes and their habitats. Special Publication 19. Bethesda, MD: American Fisheries Society. 751 pp.

Merritt, D. M., and D. J. Cooper. 2000. Riparian vegetation and channel change in response to river regulation: a comparative study of regulated and unregulated streams in the Green River Basin, USA. Regulated Rivers 16:543–564.

Mickelson, S. K., J. L. Baker, K. Arora, and A. Misra. 1995. A summary report: the effectiveness of buffer strips in reducing herbicide losses. Proc. 50th Annual Mtg. Soil and Water Conservation Society.

Mitsch, W. J., and J. G. Gosselink. 2000. The value of wetlands: importance of scale and landscape setting. Ecological Economics 35:25–33.

Molles, M .C., Jr., C. S. Crawford, and L. M. Ellis. 1995. The effects of an experimental flood on litter dynamics in the Middle Rio Grande riparian ecosystem. Regulated Rivers: Research and Management 11:275–281.

Molles, M. C., Jr., C. S. Crawford, L. M. Ellis, H. M. Valett, and C. N. Dahm. 1998. Managed flooding for riparian ecosystem restoration. BioScience 48:749–756.

Montgomery, D. R., and J. M. Buffington. 1997. Channel classification, prediction of channel response, and assessment of channel condition. Prepared for the Washington State Timber/Fish/Wildlife Committee. Report TFW-SH10-93-002.

Mosley, J. C., P. S. Cook, A. J. Griffis, and J. O'Laughlin. 1997. Guidelines for managing cattle grazing in riparian areas to protect water quality: review of research and best management practices policy. Rept. No. 15. Moscow, ID: University of Idaho, Wildlife and Range Policy Analysis Group.

Murphy, M. L. 1995. Forestry impacts on freshwater habitat of anadromous salmonids in the Pacific Northwest and Alaska—requirements for protection and restoration. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Decision Analysis Series No. 7, 156 pp.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058973

418                                                                                 *RIPARIAN AREAS*

Naiman, R. J., and K. H. Rogers. 1997. Large animals and system-level characteristics in river corridors. BioScience 47:521–529.

National Research Council (NRC). 1992. Restoration of aquatic ecosystems. Washington, DC: National Academy Press.

NRC. 1995. Wetlands: characteristics and boundaries. Washington, DC: National Academy Press.

NRC. 1996. Upstream: salmon and society in the Pacific Northwest. Washington, DC: National Academy Press.

NRC. 1999. New strategies for America's watersheds. Washington, DC: National Academy Press.

NRC. 2000. Watershed management for potable water supply: assessing the New York City strategy. Washington, DC: National Academy Press.

NRC. 2001. Compensating for wetland losses under the Clean Water Act. Washington, DC: National Academy Press.

NRC. 2002. The Missouri River ecosystem: exploring the prospects for recovery. Washington, DC: National Academy Press.

Natural Resources Law Center. 1996. The watershed source book: watershed-based solutions to natural resource problems. Boulder, CO: University of Colorado.

Nichols, D. J., T. C. Daniel, D. R. Edwards, P. A. Moore, and D. H. Pote. 1998. Use of grass filter strips to reduce 17-ß-estradiol in runoff from fescue applied poultry litter. J. Soil and Water Conservation 53:74–77.

Niemi, G. J., and J. M. Hanowski. 1984. Relationships of breeding birds to habitat characteristics in logged areas. J. Wildl. Manage. 48:438–443.

Noss, R. F., H. B. Quigley, M. G. Hornocker, T. Merrill, and P. C. Paquet. 1996. Conservation biology and carnivore conservation in the Rocky Mountains. Conservation Biology 10:949–963.

Noss, R. 1993. Wildlife corridors. Pp. 43–68 In: Ecology of greenways: design and function of linear conservation areas. D. S. Smith and P. C. Hellmund (eds.). Minneapolis, MN: University of Minnesota Press.

Noss, R. F. 1983. A regional landscape approach to maintain diversity. BioScience 33:700–706.

Noss, R. F. 1997. The failure of universities to produce conservation biologists. Conservation Biology 11:1267–1269.

Noss, R. F., and L. D. Harris. 1986. Nodes, networks, and MUMs: preserving diversity at all scales. Environmental Management 10:299–309.

Noss, R. F., and A. Y. Cooperrider. 1994. Saving nature's legacy. Washington, DC: Island Press.

Noss, R. F. 1991. Landscape connectivity: different functions at different scales. Pp. 27–39 In: Landscape linkages and biodiversity. W. E. Hudson (ed.). Washington, DC: Island Press.

O'Neill, R. V., B. T. Milne, M. G. Turner, and R. H. Gardner. 1988. Resource utilization scales and landscape pattern. Landscape Ecology 2:63–69.

Ohmart, R. D., and B. W. Anderson. 1986. Riparian habitats. Pp. 169–99 In: Inventory and monitoring of wildlife habitat. A. Y. Cooperider, R. J. Boyd, and H. R. Stuart (eds.). USDI-BLM.

Olson, R. W., and C. L. Armour. 1979. Economic considerations for improved livestock management approaches for fish and wildlife in riparian/stream areas. Pp. 67–71 In: Proceedings of the forum: grazing and riparian/stream ecosystems. Nov. 3–4, 1978. O. B. Cope (ed.). Denver, CO: Trout Unlimited.

Orr, D. 1990a. Is conservation education an oxymoron? Conservation Biology 4:119–121.

Orr, D. 1990b. The virtue of conservation education. Conservation Biology 4:219–220.

Orr, D. 2000. Ideasclerosis: part two. Conservation Biology 14:1571–1572.

Palik, B. J., J. C. Zasada, and C. W. Hedman. 2000. Ecological principles for riparian silviculture. Pp. 233–254 In: Riparian management in forests of the continental Eastern United States. E. S. Verry, J. W. Hornbeck, and C. A. Dolloff (eds.). New York: Lewis Publishers. 402 pp.

Peters, M. R., S. R. Abt, C. C. Watson, J. C. Fischenich, and J. M. Nestler. 1995. Assessment of restored riverine habitat using RCHARC. Water Resources Bulletin 31:745–752.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058974

Petersen, R. C., L. B. M. Petersen, and J. Lacoursiere. 1992. A building block model for stream restoration. P. Boon, G. Petts, and P. Calow (eds.). The conservation and management of rivers. New York: John Wiley & Sons.

Phillips, R. L., M. J. Trlica, W. C. Leininger, and W. P. Clary. 1999. Cattle use affects forage quality in a montane riparian ecosystem. J. Range Mgmt. 52:283–289.

Planning and Conservation League (PCL) Foundation. 1999. The benefits of watershed management: water quality and supply. June 23, 1999.

Platts, W. S. 1990. Managing fisheries and wildlife on rangelands grazed by livestock: a guidance and reference document for biologists. Nevada Dept. of Wildlife Rept. 114 pp.

Platts, W. S., and J. N. Rinne. 1985. Riparian and stream enhancement management and research in the Rocky Mountains. North American Journal of Fishery Management 5:115–125.

Platts, W. S., and F. J. Wagstaff. 1984. Fencing to control livestock grazing on riparian habitats along streams: is it a viable alternative? North American Journal of Fisheries Management 4:266–272.

Platts, W. S., and R. F. Raleigh. 1984. Impacts of Grazing on Wetlands and Riparian Habitat. Pp. 1105–17 In: Developing strategies for rangeland management. Boulder, CO: Westview Press.

Platts, W. S., and R. L. Nelson. 1985a. Will the riparian pasture build good streams? Rangelands 7:7–10.

Platts, W. S., and R. L. Nelson. 1985b. Impacts of rest-rotation grazing on stream banks in forested watersheds in Idaho. North American Journal of Fisheries Management 5:547–556.

Platts, W. S., and R. L. Nelson. 1985c. Streamside and upland vegetation use by cattle. Rangelands 7:5–7.

Poff, N. L., J. D. Allan, M. B. Bain, J. R. Karr, K. L. Prestegaard, B. D. Richter, R. E. Sparks, and J. C. Stromberg. 1997. The natural flow regime: a paradigm for river conservation and restoration. BioScience 47(11):769–784.

Premo, D., and E. Rogers. 1998. Promoting healthy waterfront property—a pilot program hits the ground running. Lakeline 18:16–17, 38–39.

Prichard, D., H. Barrett, J. Cagney, R. Clark, J. Fogg, K. Gebhardt, P. L. Hansen, B. Mitchell, and D. Tippy. 1993. Riparian area management: process for assessing proper functioning condition. Technical Reference 1737-9. Denver, CO: Bureau of Land Management.

Prichard, D., J. Anderson, C. Correll, J. Fogg, K. Gebhardt, R. Krapf, S. Leonard, B. Mitchell, and J. Staats. 1998. A user guide to assessing proper functioning condition and supporting science for lotic areas. Technical Reference 1737-15. Denver, CO: Bureau of Land Management, National Applied Resource Science Center. 126 pp.

Quammen, M. L. 1986. Measuring the success of wetlands mitigation. National Wetlands Newsletter 8:6–8.

Rheinhardt, R. R., M. C. Rheinhardt, M. M. Brinson, and K. E. Faser, Jr. 1999. Application of reference data for assessing and restoring headwater ecosystems. Ecological Restoration 7(3):241–251.

Rhoads, B. L., and E. E. Herricks. 1996. Naturalization of headwater streams in Illinois: challenges and possibilities. In: River channel restoration: guiding principles for sustainable projects. A. Brookes and F. D. Shields (eds.). New York: John Wiley & Sons.

Richter, B. D., and H. E. Richter. 2000. Prescribing flood regimes to sustain riparian ecosystems along meandering rivers. Conservation Biology 14:1467–1478.

Rickard, W. H., and C. E. Cushing. 1982. Recovery of streamside woody vegetation after exclusion of livestock grazing. Journal of Range Management 35:360–361.

Rinne, J. N. 1988. Grazing effects on stream habitat and fishes: research design considerations. N. Amer. J. Fisheries Manage. 8:240–247.

Rinne, J. N. 1999. Fish and grazing relationships: the facts and some pleas. Fisheries 24(8):12–21.

Robbins, C. S., D. K. Dawson, and B. A. Dowell. 1989. Habitat area requirements of breeding forest birds of the middle Atlantic states. Wildl. Monogr. 103.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058975

*RIPARIAN AREAS*

Robinson, S. K. 1992. Population dynamics of breeding neotropical migrants in Illinois. Pp 408–418 In: Ecology and conservation of neotropical migrant landbirds. J. M. Hagan III, and D. W. Johnston (eds.). Washington, DC: Smithsonian Institution Press.

Rood, S. B., and J. M. Mahoney. 1990. Collapse of riparian poplar forests downstream from dams in western prairies: probable causes and prospects for mitigation. Environmental Management 14:451–464.

Rood, S. B., and J. M. Mahoney. 2000. Revised instream flow regulation enables cottonwood recruitment along the St. Mary River, Alberta, Canada. Rivers 7:109–125.

Rood, S. B., K. Taboulchanas, C. E. Bradley, and A. R. Kalischuk. 1999. Influence of flow regulation on channel dynamics and riparian cottonwoods along the Bow River, Alberta. Rivers 7:33–48.

Rood, S., and C. R. Gourley. 1996. Instream flows and the restoration of riparian cottonwoods along the Lower Truckee River, Nevada. Unpublished report to the U.S. Fish and Wildlife Service, Reno, NV.

Rosgen, D. 1995. Applied river morphology. Wildland Hydrology, Pagosa Springs, CO.

Roth, N. E., J. D. Allan, and D. E. Erickson. 1996. Landscape influences on stream biotic integrity assessed at multiple spatial scales. Landscape Ecology 11:141–156.

Salo, E. O., and T. W. Cundy, eds. 1987. Streamside management: forestry and fisheries interactions. Contribution No. 57. Seattle, WA: University of Washington, Institute of Forest Resources. 471 pp.

Schellinger, G. R., and J. C. Clausen. 1992. Vegetative filter treatment of dairy barnyard runoff in cold regions. J. Environ. Qual. 21:40–45.

Schmidt, J. C., E. D. Andrews, D. L. Wegner, D. T. Patten, G. R. Marzolf, and T. O. Moody. 1999. Origins of the 1996 controlled flood in Grand Canyon. Pp. 23–36 In: The controlled flood in the Grand Canyon. American Geophysical Union, Monograph 110. R. H. Webb, J. C. Schmidt, G. R. Marzolf, and R. A. Valdez (eds.). Washington, DC: American Geophysical Union.

Schroeder, R. L., L. J. O'Neil, and T. M. Pullen, Jr. 1992. Wildlife community habitat evaluation: a model for bottomland hardwood forests in the southeastern United States. (draft) Biological Report 92. Washington, DC: U.S. Fish and Wildlife Service.

Schueler, T. 1996. The architecture of urban stream buffers. Watershed Protection Techniques 1(4):155–165.

Schultz, R. C., J. P. Colletti, T. M. Isenhart, W. W. Simpkins, C. W. Mize, and M. L. Thompson. 1995. Design and placement of a multi-species riparian buffer strip system. Agroforestry Systems 29:201–226.

Schultz, R. C., J. P. Colletti, T. M. Isenhart, C. O. Marquez, W. W. Simpkins, C. J. Ball, and O. L. Schultz. 2000. Riparian forest buffer practices. Pp. 189–281 In: North American agroforesty: an integrated science and practice. Madison, WI: American Society of Agronomy.

Schulz, T. T., and W. C. Leininger. 1990. Differences in riparian vegetation structure between grazed areas and exclosures. Journal of Range Management 43:295–299.

Schulz, T. T., and W. C. Leininger. 1991. Nongame wildlife communities in grazed and ungrazed montane riparian sites. Great Basin Naturalist 51:286–292.

Schwer, C. B., and J. C. Clausen. 1989. Vegetative filter treatment of dairy milkhouse wastewater. J. Environmental Quality 18:446–451.

Scott, M. L., J. M. Friedman, and G. T. Auble. 1996. Fluvial process and the establishment of bottomland trees. Geomorphology 14:327–339.

Scurlock, M., and J. Curtis. 2000. Maximizing the effectiveness of watershed councils: policy recommendations from Pacific River Council and Trout Unlimited, downloadable at http://www.pacriver.org/alerts/watershed.html

Seehorn, M. E. 1992. Stream habitat improvement handbook. Atlanta, GA: U.S. Department of Agriculture, Forest Service, Southern Region.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058976

Case No. 1:20-cv-02484-MSK   Document 45-7   filed 04/28/21   USDC Colorado   pg 262 of 310

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

Shafroth, P. B., G. T. Auble, J. Stromberg, and D. T. Patten. 1998. Establishment of woody riparian vegetation in relation to annual patterns of streamflow, Bill Williams River, Arizona. Wetlands 18(40):577–590.

Shafroth, P. B., J. C. Stromberg, and D. T. Patten. 2000. Wood riparian vegetation response to different alluvial water table regimes. Western North American Naturalist 60(1):66–76.

Sheffield, R. E., S. Mostaghimi, D. H. Vaughan, E. R. Collins, Jr. and V. G. Allen. 1997. Off-stream water sources for grazing cattle as a stream bank stabilization and water quality BMP. Transactions of the ASAE 40:595–604.

Shisler, J. K., R. A. Jordan, and R. N. Wargo. 1987. Coastal wetland buffer delineation. Trenton, NJ: New Jersey Department of Environmental Protection.

Short, H. L. 1985. Management goals and habitat structure. Pp. 257–262 In: Riparian ecosystems and their management: reconciling conflicting uses. USDA/Forest Service Gen. Tech. Bull. RM-120. Washington, DC: USDA Forest Service.

Simberloff, D., and J. Cox. 1987. Consequences and costs of conservation corridors. Conservation Biology 1:63–71.

Simberloff, D., J. Farr, J. Cox, D. W. Mehlman. 1992. Movement corridors: conservation bargains or poor investments? Conservation Biology 6:493–504.

Simberloff, D. S., and E. O. Wilson. 1969. Experimental zoogeography of islands: the colonization of empty islands. Ecology 50:278–296.

Skovlin, J. M. 1984. Impacts of grazing on wetlands and riparian habitat: a review of our knowledge. Pp. 1001–1103 In: Developing strategies for rangeland management. Boulder, CO: Westview Press.

Smith, D. J. 1999. Identification and prioritization of ecological interface zones on state highways in Florida. In: Proceedings of the Third International Conference on Wildlife Ecology and Transportation, FL-ER-73-99. Evink, G. L., P. Garrett, and D. Zeigler (eds.). Tallahassee, FL: Florida Department of Transportation. 330 pp.

Smith, D. S. 1993. Greenway case studies. Pp. 161–214 In: Ecology of greenways: design and function of linear conservation areas. Minneapolis, MN: University of Minnesota Press.

Smith, D. S., and P. C. Hellmund, eds. 1993. Ecology of greenways: design and function of linear conservation areas. Minneapolis, MN: University of Minnesota Press.

Smith, R. D., A. Ammann, C. Bartoldus, and M. M. Brinson. 1995. An approach for assessing wetland functions using hydrogeomorphic classification, reference wetlands and functional indices. Technical Report TR-WRP-DE-9. Vicksburg, MI: Waterways Experiment Station, Army Corps of Engineers.

Soil and Water Conservation Society (SWCS). 2001. Realizing the promise of conservation buffer technology. Ankeny, IA: Soil and Water Conservation Society. 32 pp.

Soulé, M., and R. Noss. 1998. Rewilding and biodiversity: complementary goals for continental conservation. Wild Earth, Fall 1998:1–11.

Spackman, S. C., and J. W. Hughes. 1995. Assessment of minimum stream corridor width for biological conservation: species richness and distribution along mid-order streams in Vermont, USA. Biological Conservation 71:325–332.

Spence, B. C., G. A. Lomnicky, R. M. Hughes, and R. P. Novitzki. 1996. An ecosystem approach to salmonid conservation. Management Technology TR-4501-96-6057, Corvallis, OR, 356 pp.

Stanford, J. A., and J. V. Ward. 1993. An ecosystem perspective of alluvial rivers: connectivity and the hyporheic corridor. Journal of the North American Benthological Society 12:48–60.

Stanford, J. A., J. V. Ward, W. J. Liss, C. A. Frissell, R. N. Williams, J. A. Lichatowich, and C. C. Coutant. 1996. A general protocol for restoration of regulated rivers. Regulated Rivers 12(4–5) 391–413.

Stauffer, D. F., and L. B. Best. 1980. Habitat selection by birds of riparian communities: evaluating effects of habitat alterations. J. Wildl. Manage. 44:1–15.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058977

Swan, B. 1979. Riparian habitat: the cattlemen's viewpoint. Pp. 4–6 In: Proceedings of the forum: grazing and riparian/stream ecosystems. Nov. 3–4, 1978. O. B. Cope (ed.). Denver, CO: Trout Unlimited.

Syndi, J. F., S. R. Abt, C. D. Bonham, C. C Watson, and J. C. Fischenich. 1998. Evaluation of flow-resistance equations for vegetated channels and floodplains. Technical Report EL-98-2. Vicksburg, MS: U.S. Army Corps of Engineers Waterways Experiment Station. 34 pp.

Thompson, K. 1961. Riparian forests of the Sacramento River Valley, California. Annals of the Association of American Geographers 51:294–315.

Topping, D. J., D. M. Rubin, and L. E. Vierra. 2000. Colorado river sediment transport Part 1. Natural sediment supply limitation and the influence of Glen Canyon Dam. Water Resources Research 36:515–542.

Toth, L. A., S. L. Melvin, D. A. Arrington, and J. Chamberlain. 1998. Hydrologic manipulations of the channelized Kissimmee River: implications for restoration. BioScience 48:757–764.

Trails and Wildlife Task Force, Colorado State Parks, and Hellmund Associates. 1998. Planning Trails with Wildlife in Mind. Denver, CO. (www.dnr.state.co.us/parks)

Trine, C. L. 1998. Wood thrush population sinks and implications for the scale of regional conservation strategies. Conservation Biology 12:576–585.

Turner, M. G. 1989. Landscape ecology: the effect of pattern on process. Annual Review of Ecology and Systematics 20:171–197.

U.S. Army Corps of Engineers (Corps). 1998. Alamo Dam & Lake Feasibility Report and EIS.

U.S. Fish and Wildlife Service (FWS). 1980. Ecological Services Manual (101-104 ESM). Washington, DC: U.S. Fish and Wildlife Service Division of Ecological Services.

USDA-NRCS. 1994. NRCS Conservation Practice Standard—Herbaceous Wind Barrier Code 422A. Washington, DC: USDA Natural Resources Conservation Service. 4 pp.

USDA-NRCS. 1998. Stream Visual Assessment Protocol. Technical Note 99-1. National Water and Climate Center. Washington, DC: USDA Natural Resources Conservation Service. Found at http://www.ncg.nrcs.usda.gov/pdf/svapfnl.pdf

USDA-NRCS. 1999a. NRCS Conservation Practice Standard—Filter Strip Code 393. Washington, DC: USDA Natural Resources Conservation Service. 4 pp.

USDA-NRCS. 1999b. NRCS Conservation Practice Standard—Field Border Code 386. Washington, DC: USDA Natural Resources Conservation Service. 3 pp.

USDA-NRCS. 1999c. NRCS Conservation Practice Standard—Contour Buffer Strips Code 332. Washington, DC: USDA Natural Resources Conservation Service. 4 pp.

USDA NRCS. 2000a. Conservation buffers to reduce pesticide losses. Washington, DC: USDA National Resources Conservation Service. 21 pp.

USDA-NRCS. 2000b. Filter Strips Conservation Reserve Enhancement Program CREP-CP21. Washington, DC: USDA Natural Resources Conservation Service. 4 pp.

USDA-NRCS. 2000c. NRCS Conservation Practice Standard—Riparian Forest Buffer Code 391. Washington, DC: USDA Natural Resources Conservation Service. 3 pp.

USDA-NRCS. 2000d. NRCS Conservation Practice Standard—Windbreak/Shelterbelt Establishment Code 380. Washington, DC: USDA Natural Resources Conservation Service. 4 pp.

USDA-NRCS. 2000e. NRCS Conservation Practice Standard—Grassed Waterway Code 412. Washington, DC: USDA Natural Resources Conservation Service. 2 pp.

USDA-NRCS. 2001. NRCS Conservation Practice Standard—Vegetative Barrier Code 601. Washington, DC: USDA Natural Resources Conservation Service. 4 pp.

U.S. Department of the Interior Bureau of Land Management (BLM) and U.S. Department of Agriculture Forest Service (USFS). 1994. Rangeland reform '94: draft environmental impact statement executive summary. Washington, DC: US DOI and USDA.

Verry, E. S., J. S. Hombeck, and D. A. Dolloff. 2000. Riparian management in forests of the eastern United States. New York: Lewis Publishers. 402 pp.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058978

Voogd, H. 1983. Multicriteria evaluation for urban and regional planning. London: Pion Limited. 367 pp.

Walker, R., and L. Craighead. 1997. Analyzing wildlife movement corridors in Montana using GIS. 1997 ESRI International Users Conference, July 8-11, 1997. (www.esri.com)

Warne, A. G., L. A. Toth and W. A. White. 2000. Drainage-basin-scale geomorphic analysis to determine reference conditions for ecologic restoration—Kissimmee River, Florida. Geologic Society of America Bulletin 112(6):884–899.

Wells, D., B. W. Anderson, and R. D. Ohmart. 1979. Comparative avian use of southwestern citrus orchards and riparian communities. Journal of the Arizona-Nevada Academy of Science 14:53–58.

Welsh, D. 1991. Riparian forest buffers—function and design for protection and enhancement of water resources. USDA-FS Pub. No. NA-PR-07-91. Radnor, PA: USDA-FS.

Wesche, T. A. 1985. Stream channel modifications and reclamation structures to enhance fish habitat. Pp. 103–163 In: The restoration of rivers and streams: theories and experience. J. A. Gore (ed.). Stoneham, MA: Butterworth Publishers. 279 pp.

Whigham, D. F., L. C. Lee, M. M. Brinson, R. D. Rheinhardt, M. C. Rains, J. A. Mason, H. Kahn, M. B. Ruhlman, and W. L. Nutter. 1999. Hydrogeomorphic (HGM) assessment—a test of user consistency. Wetlands 19:560–569.

Whipple, W. 1993. Buffer zones around water-supply reservoirs. J. Water Res. Plann. Manage. 119(4):495–499.

Whitaker, G., R. Misso, M. Schamberger, C. Cordes, and G. Hickman. 1985. HEP Review. Unpublished manuscript dated October 7, 1985. Washington, DC: U.S. Fish and Wildlife Service.

Whiting, P. J., and J. B. Bradley. 1993. A process-based classification system for headwater streams. Earth Surface Processes and Landforms 18:603–612.

Whittaker, D., B. Shelby, W. Jackson, and R. Beschta. 1993. Instream flows for recreation: a handbook on concepts and research methods. Anchorage, AK: U.S. Department of the Interior, National Park Service Water Resources Division. 103 pp.

Wigington, P. J., and R. L. Beschta, eds. 2000. International conference on riparian ecology and management in multi-use watersheds. Middleburg, VA: American Water Resources Association. 616 pp.

Wigley, T. B. 1996. Wildlife in streamside management zones: what do we really know? Pp. 85–90 In: At the water's edge: the science of riparian forestry. Conference Proceedings, January 1996. BU-6637-S. Minneapolis, MN: University of Minnesota Extension Service.

Wilhelm, G. S., and D. Ladd. 1988. Natural area assessment in the Chicago region. Pp. 361–375 In: Transactions of the 53rd North American Wildlife and Natural Resources Conference, March 18–23, 1988 in Louisville, Kentucky. Washington, DC: Wildlife Management Institute.

Wilkinson, T. 2001. Open grazing vs. barbed wire in New West. Christian Science Monitor, Jan. 22.

Williams, J. E., C. A. Wood, and M. P. Dombeck (eds.). 1997. Watershed restoration: principles and practices. Bethesda, MD: American Fisheries Society. 561 pp.

Winter, T. C. 1992. A physiographic and climatic framework for hydrologic studies of wetlands. Pp. 127–148 In: Aquatic ecosystems in semi-arid regions: implications for resource management. R. D. Robarts and M. L. Bothwell (eds.). N.H.R.I. symposium Series 7. Saskatoon, Sasketchewan: Environment Canada.

Winter, T. C., and M.-K. Woo. 1990. Hydrology of lakes and wetlands. Pp. 159–187 In: The geology of North America. Vol. 0-1. Surface water hydrology. M. G. Wolman and H. C. Riggs (eds.). Boulder, CO: The Geologic Society of America.

Wissmar, R. C., and R. R. Beschta. 1998. Restoration and management of riparian ecosystems: a catchment perspective. Freshwater Biology 40(3):571–585.

Woessner, W. W. 2000. Stream and fluvial plain ground water interactions: rescaling hydrogeologic thought. Ground Water 38:423–429.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058979

*RIPARIAN AREAS*

Wuerthner, G. 1990. Grazing the western range: what costs, what benefits? Western Wildlands: 27–29.

Xue, Y., M. B. David, L. E. Gentry, and D. A. Kovacic. 1998. Kinetics and modeling of dissolved phosphorus export from a tile-drained agricultural watershed. Journal of Environmental Quality 27:917–922.

Young, R. A., T. Huntrods, and W. Anderson. 1980. Effectiveness of vegetative buffer strips in controlling pollution from feedlot runoff. J. Environ. Qual. 9:483–487.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058980

# Appendix A

# Committee Member and
# Staff Biographies

**Mark M. Brinson**, *Chair*, is a professor of ecology at East Carolina University. His research focuses on wetland ecosystem structure and function, tidal and non-tidal marshes, and riverine and fringe forested wetlands. Dr. Brinson interacts extensively with federal and state government agencies in providing advice on wetland issues, participating in training courses, testifying at congressional hearings, and guiding research priorities and directions. He received his B.S. from Heidelberg College, his M.S. from the University of Michigan, and his Ph.D. in botany from the University of Florida. Dr. Brinson was a member of the NRC Committee on Characterization of Wetlands.

**Lawrence J. MacDonnell**, *Vice-Chair*, is an environmental and natural resources attorney with the firm of Porzak, Browning & Bushong in Boulder, Colorado. His practice emphasizes water law and the Endangered Species Act. He is active in several nonprofit organizations involved in community-based conservation in Colorado. Between 1983 and 1994, he served as the initial director of the Natural Resources Law Center at the University of Colorado School of Law, where he also taught courses in environmental and natural resources law. His most recent book is *From Reclamation to Sustainability: Water, Agriculture, and the Environment in the American West*. He is a past president of the Colorado Riparian Association. Dr. MacDonnell served on the NRC Committee on the Future of Irrigation. He received his B.A. from the University of Michigan, his J.D. from the University of Denver, and his Ph.D. from the Colorado School of Mines.

425

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058981

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

426                                                               *APPENDIX A*

**Douglas J. Austen** is head of the Watershed Management Section for the Illinois Department of Natural Resources. His work involves directing an interagency watershed program that involves planning, implementation, and assessment of a wide variety of land and aquatic management practices in four paired watersheds located throughout Illinois. Dr. Austen also coordinates the assessment of the Illinois River Conservation Reserve Enhancement Program (CREP), he supports ecosystem restoration efforts throughout the state, and he co-developed the Illinois Watershed Academy. He also has extensive experience and has authored publications on fisheries management, natural resources information systems, sampling, and aquatic ecology. Dr. Austen received his B.S. from South Dakota State University, M.S. from Virginia Polytechnic Institute and State University, and Ph.D. from Iowa State University in Animal Ecology.

**Robert L. Beschta** is an emeritus professor of forest hydrology at Oregon State University. He received his B.S. from Colorado State University, his M.S. from Utah State University, and his Ph.D. in watershed management from the University of Arizona. Dr. Beschta's research interests include forest hydrology, forestland use and water quality, riparian area management, and channel morphology. In particular, he studies large organic debris and channel morphology; hillslope hydrology; road drainage; the effects of mass soil movements upon channel characteristics; how sediment is stored along stream channels and released during high stream flow events; and interactions of stream and subsurface water in eastern Oregon. Dr. Beschta served on the NRC Committee on the Protection and Management of Pacific Northwest Anadromous Salmonids.

**Theo A. Dillaha** is a professor of biological systems engineering at the Virginia Polytechnic Institute and State University. His research interests include environmental engineering, functioning of riparian buffer zones, water-quality modeling, nonpoint source pollution control, TMDLs, and water supply and sanitation in developing countries. He has published extensively on the abilities of grass buffer strips to remove nutrients, sediment, and bacteria from overland flow. Dr. Dillaha received his B.E. and M.S. in environmental and water resources engineering from Vanderbilt University and his Ph.D. in agricultural engineering from Purdue University.

**Debra L. Donahue** is a professor of law at the University of Wyoming. She received her B.S. in wildlife science from Utah State University, her M.S. in wildlife biology from Texas A&M University, and her J.D. from the University of Colorado School of Law. Her formal work on riparian areas began during her graduate studies on river otters in Louisiana. She has subsequently been employed as a seasonal biologist for the Bureau of Land Management surveying stream and riparian habitats; as an area wildlife biologist in Nevada; and as an environmental coordinator for the Freeport Gold Company, where her environ-

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058982

mental compliance responsibilities included monitoring stream and spring water quality. She now teaches courses in public land, land use, water pollution, and natural resources law. Her current research interests are in using science and the law to protect riparian areas and the quality of surface waters, particularly in the West.

**Stanley V. Gregory** has been a professor of fisheries and wildlife at the Oregon State University since 1986. His research focuses on stream ecosystems, including channel dynamics, woody debris, benthic algae, invertebrates, fish, salamanders, and riparian vegetation. He has studied the influence of human activities on ecosystem structure and function, and he is an expert in the historical reconstruction of rivers and riparian forests. Dr. Gregory received his B.S. in zoology from the University of Tennessee and his M.S. and Ph.D. in fisheries from Oregon State University. He has served on the NRC Committee on Environmental Issues in Pacific Northwest Forest Management.

**Judson W. Harvey** has been a hydrologist with the U.S. Geological Survey's National Research Program in Reston, VA since 1995. His research is focused on hydrologic transport and biogeochemical reactions near the interface between groundwater and surface water. Dr. Harvey has investigated water flow and chemical reactions in streams and wetlands throughout the country, including steep forested watersheds of the Rocky Mountains in Colorado, alluvial floodplains of semi-arid basins in Arizona, and peatlands in the Everglades of south Florida. His training in hydrology was at the Department of Environmental Sciences at the University of Virginia, after which he held an NRC Postdoctoral Fellowship at the USGS in Menlo Park, CA. Dr. Harvey currently serves on the editorial board of *Water Resources Research* and on the Water Quality Committee of the American Geophysical Union.

**Manuel C. Molles, Jr.** is a professor of biology at the University of New Mexico and curator of ichthyology and arthropods at the Museum of Southwestern Biology. He received his Ph.D. in zoology from the University of Arizona. Dr. Molles' research focuses on riparian ecology, ecology of desert streams, riverine and riparian biodiversity, and ecology of exotic species, with particular attention given to the Rio Grande. In addition, he is an expert in groundwater–stream interactions and the effect of forest fire and flooding on riparian ecosystems.

**Elizabeth I. Rogers** is a research ecologist with White Water Associates, Inc., where she is involved in a variety of research, resource management. and education projects involving riparian areas. Dr. Rogers has been a principal scientist on the ecological studies of rivers required by the Federal Energy Regulatory Commission for relicensing of hydroelectric projects. In addition, she has conducted research on bird and mammal use of riparian areas of rivers, lakes, and ephemeral

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058983

Case No. 1:20-cv-02484-MSK    Document 45-7    filed 04/28/21    USDC Colorado    pg 269 of 310

428                                                                                                    *APPENDIX A*

pools. Much of her research has been focused on creating recommendations for reducing impacts of forestry and agriculture in riparian areas. Dr. Rogers has taught both field and lecture courses on riparian functions and values to resource managers from state and federal agencies and the private sector, as well as real estate agents dealing with lakeshore properties. She received her Ph.D. in zoology (ornithology) from Michigan State University, her M.S. in environmental education from Southern Oregon State University, and her B.S. in biology from Central Michigan University.

**Jack A. Stanford** is the Bierman Professor of Ecology at the University of Montana and the director of the Flathead Lake Biological Station. He received his B.S. and M.S. from Colorado State University and his Ph.D. from the University of Utah. He is interested in the many natural factors and disturbances that interact to determine the distribution of species and productivity of food webs in aquatic and terrestrial environs, as well human influences that alter natural biogeochemical patterns. Dr. Stanford has extensive experience studying the ecology of mountain rivers (Flathead, Columbia, Missouri, Colorado) and their interaction with the shallow subsurface. In particular, he has studied how flow regulation by dams and diversions alters important ecosystem processes, like interstitial flow, gravel transport, temperature patterns, and channel–floodplain connectivity. Dr. Stanford was a member of the NRC Committee on Watershed Management.

**Laura J. Ehlers** is a senior staff officer for the Water Science and Technology Board of the National Research Council. Since joining the NRC in 1997, she has served as study director for eight committees, including the Committee to Review the New York City Watershed Management Strategy, the Committee on Riparian Zone Functioning and Strategies for Management, and the Committee on Bioavailability of Contaminants in Soils and Sediment. She received her B.S. from the California Institute of Technology, majoring in biology and engineering and applied science. She earned both an M.S.E. and a Ph.D. in environmental engineering at the Johns Hopkins University.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058984

*COLOR PLATES*                                                                    1



PLATE 2-1  Major pathways of water movement through riparian areas emphasizing (1) groundwater flow, (2) overland flow and shallow subsurface flow from adjacent uplands, and (3) instream water sources such as overbank flow, bank storage and hyporheic exchange.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058985

2                                                                          *COLOR PLATES*



PLATE 2-2 Life zone map for the United States based on enhanced VEMAP climate data. SOURCE: Reprinted, with permission, from Lugo et al. (1999). © 1999 by Blackwell Science Ltd.

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html



**Mean annual precipitation minus potential evapotranspiration (mm/year)**



-300 and lower

-299 to -100

-99 to 100

101 to 300

301 and higher

PLATE 2-3  Average annual precipitation minus potential evapotranspiration requirements (P–PET). SOURCE: Reprinted, with permission, from Daley et al. (1994). © 1994 by American Meteorological Society.

Copyright © National Academy of Sciences. All rights reserved.

4                                                                                    *COLOR PLATES*



**Explanation**

1 – Variably wet plains having highly permeable surface and highly permeable subsurface
2 – Wet plains having highly permeable surface and moderately permeable subsurface
3 – Variably wet plains having poorly permeable surface and highly permeable subsurface
4 – Wet plains having moderately permeable surface and moderately permeable subsurface
5 – Arid plains having moderately permeable surface and moderately to highly permeable subsurface
6 – Wet plains having poorly permeable surface and poorly permeable subsurface
7 – Wet plains having moderately permeable surface and poorly permeable subsurface
8 – Semiarid plains having poorly permeable surface and poorly permeable subsurface
9 – Wet plateaus having poorly permeable surface and highly permeable subsurface
10 – Semiarid plateaus having moderately to poorly permeable surface and highly permeable subsurface
11 – Wet plateaus having poorly permeable surface and poorly permeable subsurface
12 – Semiarid plateaus having highly to moderately permeable surface and poorly permeable subsurface
13 – Semiarid plateaus having poorly permeable surface and poorly permeable subsurface
14 – Arid playas having highly to moderately permeable surface and moderately permeable subsurface
15 – Arid mountains having poorly to moderately permeable surface and moderately permeable subsurface
16 – Wet mountains having moderately permeable surface and poorly permeable subsurface
17 – Semiarid mountains having moderately permeable surface and poorly permeable subsurface
18 – Variably wet mountains having moderately permeable surface and poorly permeable subsurface
19 – Very wet mountains having moderately permeable surface and poorly to moderately permeable subsurface
20 – Wet, extreme-relief mountains having moderately permeable surface and poorly permeable subsurface

PLATE 2-4  Hydrologic landscape units of the United States. SOURCE: Wolock (2001).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058988

Riparian Areas:  Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*COLOR PLATES*                                                                                    5



PLATE 5-1



PLATE 5-2



PLATE 5-3

Copyright © National Academy of Sciences. All rights reserved.

Riparian Areas: Functions and Strategies for Management
http://www.nap.edu/catalog/10327.html

*COLOR PLATES*



PLATE 5-4



PLATE 5-5



PLATE 5-6

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058990

*COLOR PLATES*                                                                    7



PLATE 5-7



PLATE 5-8



PLATE 5-9

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058991

8 *COLOR PLATES*



PLATE 5-10



PLATE 5-11

Copyright © National Academy of Sciences. All rights reserved.

BLM_0058992

# Most Requested Statistics - U.S. Coal Industry

## NMA
### THE AMERICAN RESOURCE

| | **2009** | **2010** | **2011** | **2012** | **2013** | **2014 r/** | **2015 r/** | **2016 p/** |
|---|---|---|---|---|---|---|---|---|
| **Production (1,000 Short Tons)** * | 1,074,923 | 1,084,368 | 1,095,628 | 1,016,458 | 984,842 | 1,000,049 | 896,941 | 728,232 |
| East of Mississippi River 5/ | 449,593 | 446,197 | 456,447 | 423,476 | 407,341 | 409,521 | 348,978 | 281,274 |
| West of Mississippi River | 625,330 | 638,171 | 639,181 | 592,983 | 577,501 | 590,528 | 547,963 | 446,958 |
| Appalachian 5/ | 344,131 | 337,104 | 336,017 | 293,253 | 271,638 | 268,603 | 222,114 | 180,250 |
| Interior | 145,811 | 155,653 | 170,327 | 179,961 | 182,994 | 188,604 | 167,430 | 143,959 |
| Western | 584,981 | 591,611 | 587,633 | 543,244 | 530,210 | 542,842 | 507,397 | 404,023 |
| Refuse Recovery | 2,688 | 1,857 | 1,650 | 1,324 | 1,966 | 1,624 | 1,384 | 785 |
| **U.S. Recoverable Reserves (Mil. Sht. Tons)** | 260,551 | 259,518 | 258,619 | 257,648 | 256,709 | 255,755 | 254,896 | 254,197 |
| **Recoverable Reserves at Producing Mines** | | | | | | | | |
| (Million Short Tons) 1/ | 17,468 | 17,937 | 19,223 | 18,664 | 19,746 | 19,351 | 18,327 | 16,956 |
| **Total Value of Production ($1,000)** | $35,730,441 | $38,625,188 | $44,931,704 | $40,607,497 | $36,675,516 | $34,831,707 | $28,549,632 | $22,262,052 |
| **Domestic Consumption (1,000 Short Tons)** | 997,478 | 1,048,514 | 1,002,948 | 889,185 | 924,442 | 917,731 | 798,115 | 729,501 |
| Electric Utilities/power | 933,627 | 975,052 | 932,484 | 823,551 | 857,962 | 851,602 | 738,444 | 677,275 |
| Coking | 15,326 | 21,092 | 21,434 | 20,751 | 21,474 | 21,297 | 19,708 | 16,485 |
| Other Industrial | 45,314 | 49,289 | 46,238 | 42,838 | 43,055 | 42,946 | 38,459 | 34,559 |
| Residential/Commercial | 3,210 | 3,081 | 2,793 | 2,045 | 1,951 | 1,887 | 1,503 | 1,182 |
| **Stocks at End of Year (1,000 Short Tons)** | | | | | | | | |
| Consumers 2/ | 197,062 | 181,920 | 180,055 | 192,696 | 154,676 | 158,833 | 202,560 | 169,616 |
| Producer/Distributor | 47,718 | 49,820 | 51,897 | 46,157 | 45,652 | 38,894 | 35,871 | 33,699 |
| **Exports (1,000 Short Tons)** | 59,097 | 81,716 | 107,259 | 125,746 | 117,659 | 97,257 | 73,958 | 60,271 |
| **Imports (1,000 Short Tons)** | 22,639 | 19,353 | 13,088 | 9,159 | 8,906 | 11,350 | 11,318 | 9,850 |
| **Price Indicators (Avg. $/Short Ton or $/mmBtu)** | | | | | | | | |
| Mine Sales Price Average ($/short ton) 3/ | $33.24 | $35.61 | $41.04 | $39.95 | $37.24 | $34.83 | $31.83 | $30.57 |
| Cost of Coal Receipts at Elec.Gen. Plants ($/mmBtu) | $2.21 | $2.27 | $2.39 | $2.38 | $2.34 | $2.39 | $2.22 | $2.11 |
| Cost of Coal at Electric Utility Plants (receipts) | $44.47 | $45.33 | $47.75 | $47.51 | $45.03 | $45.66 | $43.71 | $42.01 |
| Cost of Coking Coal at Coke Plants (receipts) | $143.04 | $153.59 | $184.44 | $190.55 | $156.99 | $131.41 | $118.69 | $102.00 |
| Cost of Coal for Industrial Uses (receipts) | $64.87 | $59.28 | $70.62 | $70.35 | $69.16 | $68.20 | $65.44 | $60.49 |
| Fuel Production Price (sales value $/mmBtu) | $1.67 | $1.77 | $1.83 | $1.98 | $1.99 | $1.72 | $1.59 | $1.53 |
| Railroad Freight Charge, avg. (Frt. Rev. /Tons Orig.) | $15.32 | $17.08 | $19.78 | $20.40 | $20.65 | $20.11 | $19.00 | 18.49 |
| **Methods of Mining** | | | | | | | | |
| Underground (1,000 Short Tons) | | | | | | | | |
| Continuous | 160,760 | 163,354 | 173,119 | 156,862 | 147,667 | 142,574 | 122,380 | 99,339 |
| Conventional & Other | 4,885 | 4,767 | 3,061 | 2,871 | 4,824 | 5,178 | 2,373 | 1,926 |
| Longwall | 166,416 | 169,033 | 169,425 | 182,653 | 189,193 | 206,952 | 182,068 | 147,790 |
| Total Underground Production | 332,062 | 337,155 | 345,606 | 342,387 | 341,685 | 354,704 | 306,821 | 249,055 |
| % of Total Production | 31.0% | 31.0% | 32.0% | 33.7% | 34.7% | 35.5% | 34.2% | 34.2% |
| Total Surface (1,000 Short Tons) 5/ | 742,862 | 747,214 | 750,022 | 674,072 | 643,157 | 645,345 | 590,120 | 479,177 |
| % of Total Production | 69.0% | 69.0% | 68.0% | 66.3% | 65.3% | 64.5% | 65.8% | 65.8% |
| **Number of Mines (EIA)** | 1,406 | 1,285 | 1,325 | 1,229 | 1,061 | 985 | 853 | 710 |
| Underground Mines (includes refuse) | 571 | 525 | 508 | 488 | 424 | 372 | 324 | 268 |
| Surface Mines | 835 | 760 | 788 | 719 | 637 | 613 | 529 | 442 |
| **Number of Mine Operations (MSHA)** | 2,076 | 1,944 | 1,973 | 1,871 | 1,701 | 1,632 | 1,460 | 1,289 |
| **Average Number of Miners (EIA) 3/** | 87,755 | 86,195 | 91,611 | 89,838 | 80,396 | 74,931 | 65,971 | 51,795 |
| Underground Mines  (includes refuse) | 50,087 | 50,515 | 54,395 | 54,426 | 49,691 | 46,475 | 40,157 | 30,105 |
| Surface Mines | 37,505 | 35,542 | 37,087 | 35,310 | 30,705 | 28,456 | 25,814 | 21,690 |
| **Average Coal Mining Employment (MSHA) 6/** | 134,089 | 135,500 | 143,437 | 137,650 | 123,259 | 116,010 | 102,804 | 81,842 |
| **Number of Mine injuries 4/** | | | | | | | | |
| Fatal | 18 | 48 | 21 | 20 | 20 | 16 | 12 | 8 |
| All Injuries | 4,495 | 4,307 | 4,555 | 3,878 | 3,346 | 3,323 | 2,635 | 2,019 |
| **Production Per Miner Per Hour 3/** | 5.61 | 5.55 | 5.19 | 5.19 | 5.54 | 5.96 | 6.28 | 6.61 |
| Underground Mines | 2.99 | 2.89 | 2.72 | 2.84 | 3.07 | 3.35 | 3.45 | 3.83 |
| Surface Mines | 9.22 | 9.47 | 8.97 | 8.97 | 9.69 | 10.42 | 10.95 | 10.73 |

Notes:

p/   Preliminary estimates.   r/  Revised.   e/  Estimated.   n/a Not available.

1/   At active producing coal mines.   2/   The residential/commercial sector included.

3/   Excludes mines producing less than 10,000 short tons of coal during the year.

4/   Includes contractors and office workers.   Excludes mines producing less than 10,000 short tons and prep plants with less than 5,000 employee hours.

5/   Includes refuse.   6/   Includes contractor employees.

Sources:  U.S. DOE/EIA, Mine Safety & Health Administration, Association of American Railroads, and NMA estimates.

Updated: December 2017

BLM_0058993









**Bats/Inactive Mines Project
2003 BLM Mine Evaluations
Report**

By
**Kirk W. Navo, Lea' R. Bonewell, Nancy LaMantia-Olson, and Lauren A. Golten**



BLM_0058994

*Project Overview* ............................................................................................................ 3

*Volunteer Program Overview* ......................................................................................... 5

  **BLM PROJECTS** ......................................................................................................... 7
    Joe Davis Hill Project ...................................................................................................7
    Spud Patch Project ........................................................................................................7
    Gypsum Valley Project ..................................................................................................8
    Picket Corral Project .....................................................................................................8
    Tramp Project ................................................................................................................9
    Hieroglyphic Canyon Project: ......................................................................................9
    Dutch Flat Project .......................................................................................................10
    Signal Hill Project ......................................................................................................10
    powderhorn Project .....................................................................................................11

*2003 PROJECT DATA SUMMARIES* ...................................................................... 12

  **JOE DAVIS HILL** ....................................................................................................14

  **JOE DAVIS RECOMMENDATIONS** ...................................................................23

  **SPUD PATCH** .........................................................................................................15

  **SPUD PATCH RECOMMENDATIONS** ...............................................................30

  **GYPSUM VALLEY** .................................................................................................42

  **PICKET CORRAL** ...................................................................................................58

  **HIEROGLYPHIC CANYON** ..................................................................................61

  **DUTCH FLAT** ..........................................................................................................73

  **SIGNAL HILL** ..........................................................................................................80

  **POWDERHORN**……………………………………………………………………..88

*BLM SITES -  SPECIES  AND ROOST TYPES – 2003 FIELD SEASON* ............. 93

*Acknowledgments* ........................................................................................................ 96

*APPENDIX A - Photos* ................................................................................................ 97

*APPENDIX B - Radiation Data* ................................................................................. 102

Cover  photo of *Corynorhinus townsendii* by Carole Wilkey.

2

# Project Overview

In Colorado there is a lack of knowledge concerning the status, population biology and habitat requirements of bats. Roosting habitat, in particular, is poorly understood. Thirteen of Colorado's 18 species of bats are known to use abandoned mines as roost sites. The ongoing Abandoned Mine Lands closure programs, administered by the Colorado Division of Minerals and Geology (DMG), and the BLM are intended to render inactive mines safe for the public. Historically, common methods used to close mines did not allow for continued use of the mines by bats. This loss of roosting habitat could have devastating effects on some bat populations. Alternative closure methods provide access for bats to such habitat, while providing for public safety. The Colorado Division of Wildlife is responsible for the conservation of all bat species in the state, and the BLM, USFS, and DMG are in partnership with the CDOW to identify and protect those mines that provide significant roosts for populations of bats. These roosts may be critical to long term survival of populations of some bat species (Humphrey 1975). Other important partners in this project are Great Outdoors Colorado (GOCO), which provides the funding required by the CDOW to conduct this project, and the National Fish and Wildlife Foundation. Since 1995, GOCO and the federal land management agencies have largely provided funding for this project. The National Fish and Wildlife Foundation has provided grants to support the project the last three years. Grants from the BLM, USFS, and NFWF have provided funding for work on public lands.

The year 2003 represents the 13th field season of this volunteer-based program called the Bats/Inactive Mines Project (B/IMP). B/IMP's objectives are to evaluate the bat roost potential of mines scheduled for closure, identify important bat roosts, and protect these roosts by installation of bat gates. Methods for data collection and evaluation are those found in *The survey and evaluation of abandoned mines for bat roosts in the West: guidelines for natural resource managers* (Navo 2001) Additional information on this subject can be found in Tuttle and Taylor (1994), and Riddle (1995).

Recommendations for installing special closures called bat gates, are forwarded to the BLM and DMG for consideration. The bat gates allow bats to continue to use the mines, while providing for public safety. Safeguarding mines with a method that allows continued bat use has the added benefit of protecting the bats from human disturbance. Such disturbance has been documented to cause declines in bat populations. Furthermore, evaluation of the use of mines by bats will produce much needed information on the roosting ecology of bats.

## Bat Surveys:

The process of evaluating inactive mines for bat habitat involves several steps. The first step requires a listing of abandoned mines, with locality information and maps, of the mines scheduled for a closure project by DMG or the BLM. Based on this information, the CDOW locates then conducts a pre-survey at each mine site. A pre-survey is the initial visit to a mine by a B/IMP biologist, at which time data is collected such as air flow, temperature, and other information to help define the microclimate, identify safety hazards at the site, and prioritize the mines in the project for bat surveys. The mine is sketched and a Universal Transverse Mercator (UTM) is documented for future reference and GIS applications. Many mines will be dropped at this point due to an evaluation that indicates little or no potential for significant bat habitat. These mine sites are subsequently ready for closure, and receive no further bat evaluations.

Each mine is then entered into the B/IMP database and given a project ID number. The ID number is utilized by the B/IMP to track each individual mine site. Mines that are not eliminated during the pre-survey are then scheduled for initial detector surveys by volunteers, or capture surveys by biologists **(Figure E)**. Division personnel survey sites that are determined to be too hazardous for volunteers only. The volunteer survey team monitors the mine entrance at sunset with bat detectors, instruments that detect the bat's ultrasonic vocalizations. When bat activity is documented, teams of CDOW biologists, often supplemented by volunteers, perform capture surveys at indicated sites. A capture survey will

3

BLM_0058996

determine what species are using the mine and what type of roost use is occurring. Bats are captured and identified as to species, sex, age and reproductive condition **(Figure F)**. The data are used to evaluate the roosting habitat provided by the mine, and thereby the importance of the site to local bat populations. This information is the basis for recommendations to land management agencies and DMG for closure or protection of the mine. Survey work continues for each mine on public lands until all seasons are covered, or enough information is obtained to base a recommendation for the site. Recommendations will include final disposition of the mine as bat habitat, and any bat gate recommendations. The land ownership of these mine sites was comprised of federal lands (BLM and US Forest Service) and private lands, documented as the first letter of B, F, or D in the BIMP ID number. An X indicates a site with unresolved ownership at the time of the report.

In 2003, we operated with one 2-person crew and a part time volunteer coordinator. This represents the smallest BIMP crew since 1997. Despite this smaller work force, we were able to accomplish a significant amount of work, and cover many projects. This year, 159 mines received bat survey work, including 72 BLM, 15 USFS, 52 private, and 19 undetermined ownership sites. A total of 307 surveys were conducted, including 179 detector and/or capture surveys, and 128 internal and pre-surveys. Of the mines evaluated this season, 49 sites had verification of roosting by bats to species, approximately 31% of the mines in the project. Bat gates were recommended for 24 mines this season, approximately 18% of the mines evaluated. We documented 150 bats, including 36 *Corynorhinus townsendii*, during the surveys of abandoned mines in the state.

**Bat Gates:**

The 2003 surveys resulted in a number of bat gate recommendations to the land management agencies and Division of Minerals and Geology. Information on specific mines that received gate recommendations can be found in the project section of this report. These bat gates will provide protection and conservation of bat roosts, and will help prevent the decline of populations of some species of bats. Some bat gates were installed during the 2002 field season, others are pending for next year or the near future (see **Appendix A** for photos). Some of these gated mines will receive monitoring work over the next few years to evaluate the effectiveness of the gates, and acceptance by various species of bats. Bat gated mines should be considered "sensitive data", and exact locations should be protected.

Gate types used on the project include a mix of bat slot gates **(Figure A)**, window or "ladder" gates **(Figure B)**, full gates **(Figure C)**, and culvert **(Figure D)** style gates. The bat gate designs used in the project have been utilized in Colorado over the last 11 years. These style gates have proven to be accepted by various bat species, and for different bat roost types. Full or ladder style gates remain the preferred gate types. Slot style bat gates are steel grated closures with a slot or two of required dimensions, which allow bats egress and ingress to the mine. Slot gates are recommended at mines that exhibit bat activity and roosting at reduced levels, or for species that are not as high a priority. Small winter or transition roosts for townsend's big-eared bats can receive slot gate recommendations, as monitoring has documented the continued use of mines with slot gates for this species. Information on bat gate designs and construction can be found in Tuttle (1977), Tuttle and Taylor (1994), and Riddle (1995).

**Project to Date:**

The Bats/Inactive Mines Project has been conducting mine evaluations on public and private lands for thirteen field seasons. During this time we have evaluated approximately **3,650**, and we have had **559 bat gates** installed, or pending installation, by our partners, the land use agencies. Most of these gates have been installed on BLM lands, predominately in western Colorado.

BLM_0058997



Volunteer Hours 1991 - 2003

## Volunteer Program Overview

A key element of the Bats Inactive Mines Project is the utilization of a large volunteer effort. Volunteers perform the initial bat detector surveys outside mine entrances, and the results of these surveys help determine if a capture survey is necessary. This allows the biologists, who perform the capture surveys, to focus on areas of known bat activity. Volunteers sometimes also help with the capture surveys. Volunteers provide the much-needed manpower to perform the initial evaluations on the large number of mines handled on the project every year.



New volunteers to the project are required to attend a training session before participation. Project training sessions were conducted in May, with two sessions in the Denver area. This year, a part time volunteer coordinator was again hired to administer the volunteer work force. This action has proven to provide better communication with the volunteers, and a more effective and efficient field component to the project. Next field season, we will again attempt to provide a part time volunteer coordinator position to administer the volunteers.

There were 51 volunteers who participated in surveys this year. These volunteers conducted and assisted with detector and capture surveys, gate confirmation checks, post gate surveys, and project administration, resulting in a total of 2636 project related hours in 2003. This volunteer effort resulted in an estimated saving to CDOW of $31,772.14. Donated hours this year were down somewhat from last year, but all targeted project work for volunteers were completed.

| Volunteer "vitals" | 2003 | 2002 |
|---|---|---|
| Volunteers Trained | 79 | 63 |
| New volunteers Trained | 26 | 2 |
| Returning volunteers | 53 | 61 |
| Volunteers participated in surveys | 51 | 45 |
| Self-tests completed | 16 | 63 |
| Total survey Hrs by volunteers | N/A | 2888.50 |
| Total volunteer hours training (3/person) | N/A | 60 |
| Total volunteer admin. Hrs | N/A | 512.25 |
| **Total donated hours** | **2636.00** | **3773.75** |
| Estimated Savings to agency | **$31,772.14** | **$46,072.91** |

5

BLM_0058998



Figure A. Slot Gate



Figure B. Window (Ladder) Gate



Figure C. Full Gate



Figure D. Culvert Gate



Fig. E. Trapping survey



Fig. F.   Processing bats

6

BLM_0058999

**2003 PROJECT SUMMARIES**

**BLM PROJECTS**

**San Juan Resource Area**

## JOE DAVIS HILL PROJECT

This project is located along the west rim of the Dolores River, and was started in 2001. A large maternity roost of *Corynorhinus townsendii* was discovered at the 519 mine complex. Bat gates were installed in the fall of 2002, (**Figures 1 – 5**) and post gate evaluations were conducted in 2003. In addition, additional survey work was conducted at some of the mines in the project.

Post gate surveys were conducted in June, with the use of video recorders and visual observations at the gates. Survey results indicate that the bats are again utilizing the 519 mines, with good levels of activity documented during the survey. It was determined that one of the smaller adits, A6, had a large number of bats using it at the time of the survey. This documentation helps support the importance of nearby "satellite" roosts for maternity colonies of townsend's big-eared bats. The colony clearly moves from mine to mine, apparently utilizing the variety of temperature profiles provided by the different mine configurations. Guano was observed on bars of all the gates, indicating bat use at all sites. The video recordings documented townsend's big-eared bats flying through the gates.

No bat use was documented during surveys of other Joe Davis sites (518, 514) in June. However, the conditions were not ideal for bats, with high winds and cool temperatures on that night. More survey work remains on this project. There are several mines that need winter evaluations, and pending access conditions, internal surveys are planned for 2004. After winter surveys, with the exception of a few mines, the project will be complete and ready for closure work.

**Bat gates are recommended at: 513, 514A1, A4, A5; 515A2, A3, A4; 517A1; and 518A3, A4.**

## SPUD PATCH PROJECT

This year some additional survey work was conducted on 15 mines in this project. Summer evaluations were conducted on the remaining mines within the spud patch area, to complete bat evaluations on the remaining sites. Closure work has been conducted on part of the project, and bat gates have been installed. No post gate survey work was conducted, but is planned for winter 2004. The mines in this area are right across the canyon from the Joe Davis maternity roost, and appear to be important and highly used as winter habitat for *C. townsendii*. Internal surveys were conducted, and some mines had good evidence of bat use documented. Others were determined to be insignificant for bat habitat. Final recommendations are included in this report. The project area is considered to be important to winter and fall transition roosting townsend's big-eared bats, and the nearby maternity roost for this species. A gate consultation is needed for this project, as more bat gates are pending recommendation, but many gates have already been installed. Final determination of gates will be dependent on available funding, and prioritization of remaining sites.

7

# GYPSUM VALLEY PROJECT

This large project was started in 2002, and consisted of 83 mine features located in San Miguel County. A few of these mines were originally part of the Montrose project of 1996-97. The project is in P-J habitat, within the elevation range of 5300 – 6060 ft. Additional bat survey work was conducted on this project in 2003, with some early summer and fall evaluations. To date, 50 sites are considered complete, with either bat gates recommended or dropped because of low potential. Going into the 2004 field season, 19 mines will get further surveys, although many are considered a low priority for additional work. Also, 14 mines need status clarification, which may include another site visit. Two mine complexes need to be field verified, as some confusion currently exist relating to past data and site identification. These are the 461 and 465 mines.

Overall, the Gypsum Valley project has not produced a large number of features with significant bat usage. This project tends to be more in open terrain than other projects in the San Juan District, which tend to be located within the plateaus and hillsides with more topographic diversity. While some survey efforts have documented fair levels of bat activity in the general area around mines being surveyed, relatively low levels of mine use have been observed to date. Winter evaluations have yet to be conducted extensively on the project, and pending access, will be conducted in 2004. Access to part of the project has been difficult, even in summer months with road conditions and other problems. The northern end of the project, around the Silvey's Pocket area, in particular has been problematic. ATV use may be needed to complete survey work on these parts of the project. If access issues permit, after winter surveys in 2004, the project will be almost complete by summer.

To date, 49 bats have been captured including surveys in 1996, 1997. A total of 13 *C. townsendii* have been documented at nine mines. These nine sites are 450, 451, 455, 456, 461,465, 472, 473 and 493. **Figures 17-18.**

**Bat gates currently recommended, or under consideration at: 451A1, A2, S1; 455A1,A2,S1; 456A1; 461A1; 465 A1, A2, A4; 450 A1; 416; 472A1; 473 A1, I1, S1, S2; and 493 I2.**

# Picket Corral Mines

This is a small project, added later in the field season to the BIMP schedule. It is a mine complex located above the Dolores River in southwest Montrose County. It is in PJ habitat, on the upper levels of the north rim and on Wild Steer Mesa. This mine complex has three levels, and all are believed to be connected to one another. A survey trip in June was organized with BLM personnel to evaluate 4 mine features in the Picket Corral complex. Limited internal surveys were conducted at the 3 main portals. A forth feature was found to be a large storage area within the rock, and was not considered important bat habitat. At least one small shaft to the surface was documented at the upper adit, PC 684, and others are expected. Complete internal surveys were not possible, but air flow patterns and raises and descending drifts suggest connectivity. Some summer sign of bat use was observed in all features. A mist net was used to survey the largest portal, PC 681, the lowest adit. The survey results produced 13 bats, and documented 5 species, including a townsend's big-eared bat. Most of the activity was considered to be night roosting bats, but the activity level was considered very high. The mine system appears to be used for night and day roosting by bats, but it's highest potential would be considered as fall/winter roosting. Because of the evidence of use, plus the size and complexity of the mine system, it was considered to be important enough to warrant a bat gate, without winter evaluations. **Bat gates were recommended at all three portals.**

BLM_0059001

**Montrose District Office**


# TRAMP PROJECT

This is a large project, located east of Saucer Basin, above Uravan. Some of these mines were part of the 1996/1997 Montrose project for the BLM. Many of the mines on this project were dropped after pre-survey evaluations indicated that they had little potential to provide significant bat roosting habitat. Some of these mines, including some considered bat habitat based on previous work, were found to have already been reclaimed. Surveys were conducted in 2002 using internal, capture, and video techniques. Several mines that had been reclaimed were found to have re-opened, and are again in need of reclamation activity. The Tramp 264 complex was never located, and map locations were conflicting on the paperwork provided. A few additional mine surveys were conducted in 2003 on this project. Survey work was conducted at 268, 501 A1, 524, 525, 527, and an air flow check was conducted at 513 S1. Air flow at 513 S1 indicates it is connected to another portal, as air was one directional, flowing out. A few bats were documented during the survey effort. Some additional work remains on this project, but most of it is verification of connectivity between some of the mines.

*Gate consultation will be needed on this project prior to closure planning by BLM personnel. The discovery of the nearby townsend's big-eared bat maternity roost in 2003 places additional importance to protection of some of the Tramp mines.* See the 2002 report for gate recommendations and photos of mines on this project.

**Bat gates recommended at: 504/505; 502A1; 524; 253A2, A3; 289, 255A1, A2.**


# HIEROGLYPHIC CANYON PROJECT

This project is located on mesa west of Uravan, in PJ habitat, at an elevation of 5400-6000 ft., comprised of 57 mine features. This project is the last major segment of the AML effort for this mesa, which included the Paradox and Tramp Projects. To this point, the other projects have provided mostly fall and winter habitat for bats, with the exception of some sites that receive heavy summer activity. An important discovery on this project was the documentation of a townsend's big-eared bat maternity roost. This is a significant find, in that it represents one of only a handful of such maternity roosts known statewide for this species. The 1543 and 1545 complex appears to be the main roost. Some of the smaller features in the 1543 site have evidence of significant use, although not all of them had documentation of bats in 2003. The 1543 A2 feature is connected to 1545, and a slight drop in elevation between these two portals appears to provide ideal air movement through the system. In addition, a small vertical opening to the surface was documented, and there is evidence that bats use this opening frequently. The 1543 A3 portal is connected to 1543 P3. It is also a multi-level system, but is a small mine feature. In early July pups were observed roosting in this mine complex. Other small mines in the area had evidence of significant bat use, which suggests that these features may play important roles as temporary roost sites for the maternity colony, offering internal temperatures most suited for specific time periods in any given year. Additional surveys will be conducted at these sites in the summer of 2004, to ensure that important roosting habitat is not lost for this colony.

Fall surveys were conducted on most of the project in 2003, and several mines were documented with bat use by several species of bats. A few sites also appear to provide a water source for bats, and may be critical for the maternity colony. Additional work on these sites will be conducted in 2004 also. Bat activity seemed to drop off significantly in late September, but internal surveys of the 1543 complex still provided some documentation of roosting *C. townsendii.* Winter evaluations will be conducted on the project, and temperature data loggers were placed within the 1543-45 complex to monitor air temperature

BLM_0059002

patterns in this important roost site. While conducting internal surveys at the 1543 complex, we observed evidence of human visitation; boot tracks, trash, etc.

Currently, 24 sites will have survey work in 2004; seventeen sites for winter surveys, seven for additional summer surveys. To date, seven features are recommended for bat gates based on evaluations in 2003. Of the 57 sites in this project, 26 are considered complete for bat evaluations, and some of the remaining sites will be complete after winter surveys in 2004.

**Bat gates *CURRENTLY* recommended at:  1543 A1, A2, A3, & P3; 1545 A1; 1540. Figures 6-16.**

## Canon City District Office

# DUTCH FLATS PROJECT

This project is mostly located in Custer County, south of the Powhatten Project. There are 26 mine features in the project. Most sites are clustered around the Mount Tyndall, Mount Robinson, and Game Ridge areas. Pre-survey work was conducted in May, and many mines were dropped from further evaluations because of poor habitat potential. Most were shallow, bald, or plugged shafts. Bat surveys were conducted on a subset of the mines by volunteers, and BIMP personnel. Surveys in 2003 documented some use by bats at DF 122, 126. Several species were observed, including 5 species of Myotis, and a big brown bat (*Eptesicus fuscus*). A fringed myotis (*M. thysanodes*) was captured at DF 126.

No fall survey work was conducted this year on this project. Additional surveys will be conducted during winter 2004, and early summer at 4 sites. Internal surveys in May did not document any roosting bats, but some sign of summer use was noted. Additional survey work in 2004 will be conducted at those sites. A few sites had bat activity recorded during volunteer detector surveys, but it is still unclear if any association with the mines is occurring at some sites. The remaining sites for survey work are all small to medium depth mines. It is anticipated that the project will be complete by mid-June 2004.

**Bat gates recommendations pending at: 122, 126, 121, 123. Figures 19-22.**

# SIGNAL HILL PROJECT

This project was started in the 2002 field season. It consisted of 32 mines in Teller County, near Cripple Creek. Most of the mines were determined to be shallow shafts, without drifts or any connectivity with other features. Internal, capture, and volunteer detector surveys were conducted at these sites in both 2002 and 2003. Internal surveys documented *C. townsendii* at 700E, and evidence of significant summer roosting by bats was observed at SH2, and SH 700E. Other survey efforts documented *C. townsendii* and *Myotis volans* at SH2, and *C. townsendii* at SH 708. Additional survey work was conducted in 2003 at several sites, including SH 700E, 700D, 699A, in May and June. No new documentation of significant bat use was observed in 2003. Fall transition roosts and possible winter hibernacula were documented on this project. Past projects in this area also documented a population of townsend's big-eared bats in the Cripple Creek / Victor area. Bat gates were recommended at several sites, and construction was completed in 2003.

**Bat gates recommended at: SH 2, SH 708, SH 700E  (all ladder style)**

10

Gunnison Resource Area

## Powderhorn Project

This project is located south of Blue Mesa Reservoir, with a few sites near Lake City. It consisted of 39 mine features, mostly shafts, and within the elevation range of 8000' – 9500'. The moderate elevation and types of features designated this project as mid-priority, and survey work was selective and initiated later in the field season. Two additional BLM sites were added later in the year, both near Lake City (PH 38 & 39). The first surveys were conducted by a team of experienced volunteers in July, at which time some bat activity was documented. Other sites were intended to be included if possible, but they could not be located during the trip. An additional survey trip was conducted in August, to evaluate the mines with some bat activity in July. High levels of bat activity were observed during the August surveys. Hundreds of bat passes were recorded at some sites, and numerous bats were captured. In all, three species of bats were recorded, *Myotis evotis* was the predominate species, but large numbers of *M. volans* were also documented. The observed activity is indicative of fall swarming by bats, and similar to results documented in the Henson Creek project, also near Lake City. Some of these mines had pooled water present, and it appears that bats may also have been visiting the mine to drink. This is likely the predominate mine use in summer. Survey work was conducted in July and August, with internal, detector, and capture survey efforts. Bat gates were recommended at some sites in this project.

**Bat gates recommended at: PH11, PH12, PH39, PH19, PH10, and PH34.**

**Figures 23-28.**

BLM_0059004

## 2003 PROJECT DATA SUMMARIES





BLM_0059005

# SPUD PATCH / JOE DAVIS PROJECTS



**JOE DAVIS HILL / SPUD PATCH PROJECTS**

BLM_0059006

# DAVIS HILL PROJECT:  2003
## MINE SITE SUMMARY - CURRENT STATUS

| MINE_NAME | ID_NUMBER | STATUS |
|---|---|---|
| JOE DAVIS 513 | BSPUD0186 | GATE RECOMMENDED |
| JOE DAVIS 514A1 | BSPUD0190 | GATE RECOMMENDED |
| JOE DAVIS 514A2 | BSPUD0201 | GATE RECOMMENDED |
| JOE DAVIS 514A3 | BSPUD0189 | SHALLOW, CLOSE |
| JOE DAVIS 514A4 | BSPUD0187 | GATE RECOMMENDED |
| JOE DAVIS 514A5 | BSPUD0188 | GATE RECOMMENDED |
| JOE DAVIS 515A1 | BSPUD0191 | EVALUATION COMPLETE |
| JOE DAVIS 515A2 | BSPUD0192 | EVALUATION COMPLETE |
| JOE DAVIS 515A3 | BSPUD0193 | GATE RECOMMENDED |
| JOE DAVIS 515A4 | BSPUD0194 | GATE RECOMMENDED |
| JOE DAVIS 516 | BSPUD0122 | EVALUATION COMPLETE |
| JOE DAVIS 517A1 | BSPUD0123 | GATE OR SUM MAT CK 2004 |
| JOE DAVIS 517A2 | BSPUD0124 | EVALUATION COMPLETE |
| JOE DAVIS 518A1 | BSPUD0125 | GATE OR WINTER  CK 2004 |
| JOE DAVIS 518A2 | BSPUD0126 | EVALUATION COMPLETE |
| JOE DAVIS 518A3 | BSPUD0127 | GATE RECOMMENDED |
| JOE DAVIS 518A4 | BSPUD0128 | GATE RECOMMENDED |
| JOE DAVIS 519 A3 | BSPUD0131 | CLOSE |
| JOE DAVIS 519 A7 | BSPUD0135 | BAT GATE INSTALLED 2003 |
| JOE DAVIS 519A1 | BSPUD0129 | CLOSE |
| JOE DAVIS 519A2 | BSPUD0130 | CLOSE |
| JOE DAVIS 519A4 | BSPUD0132 | BAT GATE INSTALLED 2003 |
| JOE DAVIS 519A5 | BSPUD0133 | BAT GATE INSTALLED 2003 |
| JOE DAVIS 519A6 | BSPUD0134 | BAT GATE INSTALLED 2003 |
| JOE DAVIS 519A8 | BSPUD0136 | BAT GATE INSTALLED 2003 |
| JOE DAVIS 520 | BSPUD0101 | EVALUATION COMPLETE |
| JOE DAVIS 521 | BSPUD0102 | WINTER / SUM SURVEY 2004 |
| JOE DAVIS 522 | BSPUD0103 | WINTER / SUM SURVEY 2004 |
| JOE DAVIS 523 | BSPUD0104 | WINTER / SUM SURVEY 2004 |
| JOE DAVIS 524A1 | BSPUD0105 | WINTER SURVEY 2004 |
| JOE DAVIS 524A2 | BSPUD0106 | WINTER 04 OR SLOT GATE |
| JOE DAVIS 524A3 | BSPUD0107 | WINTER 04 OR SLOT GATE |
| JOE DAVIS 526 | BSPUD0112 | WINTER / SUM SURVEY 2004 |
| JOE DAVIS 527 A1 A2 A3 | BSPUD0114 | EVALUATION COMPLETE |
| JOE DAVIS 528A1 | BSPUD0197 | EVALUATION COMPLETE |
| JOE DAVIS 528A3 | BSPUD0198 | WINTER SURVEY 2004 |
| JOE DAVIS 528A4 | BSPUD0199 | EVALUATION COMPLETE |
| JOE DAVIS 638 A3.5 | BSPUD0119 | EVALUATION COMPLETE |
| JOE DAVIS 638A2 | BSPUD0116 | WINTER SURVEY 2004 |
| JOE DAVIS 638A3 | BSPUD0117 | WINTER SURVEY 2004 |
| JOE DAVIS 638A4 | BSPUD0120 | EVALUATION COMPLETE |
| JOE DAVIS 638A5 | BSPUD0121 | WINTER SURVEY 2004 |
| JOE DAVIS 638PM | BSPUD0118 | EVALUATION COMPLETE |
| JOE DAVIS 639 | BSPUD0108 | WINTER 04 OR SLOT GATE |
| JOE DAVIS 639 (22) | BSPUD0111 | WINTER SURVEY 2004 |
| JOE DAVIS 639W horseshoe | BSPUD0109 | WINTER SURVEY 2004 |
| JOE DAVIS 639WP | BSPUD0110 | WINTER SURVEY 2004 |
| JOE  D. MUCHO GRANDE | BSPUD0113 | WINTER SURVEY 2004 |

14

BLM_0059007

# SPUD PATCH PROJECT:  2003

## MINE SITE SUMMARY - FINAL STATUS OF REMAINING SITES

| MINE_NAME | ID_NUMBER | STATUS |
|---|---|---|
| SPUD PATCH 609A1 | BSPUD0138 | TARP AND CLOSE |
| SPUD PATCH 609A2 | BSPUD0139 | DONE |
| SPUD PATCH 608 | BSPUD0140 | GATE IF POSSIBLE |
| SPUD PATCH 623 | BSPUD0152 | DONE |
| SPUD PATCH 624 | BSPUD0153 | TARP AND CLOSE |
| SPUD PATCH 627 | BSPUD0156 | GATE IF POSSIBLE |
| SPUD PATCH 628A1 | BSPUD0157 | TARP AND CLOSE |
| SPUD PATCH 628A2 | BSPUD0158 | DONE |
| SPUD PATCH 629 | BSPUD0159 | GATE IF POSSIBLE |
| SPUD PATCH 637A1 | BSPUD0161 | BAT GATE RECOMMENDED |
| SPUD PATCH 637A2 | BSPUD0162 | BAT GATE RECOMMENDED |
| SPUD PATCH 635A1 | BSPUD0163 | BAT GATE RECOMMENDED |
| SPUD PATCH 635A2 | BSPUD0164 | BAT GATE RECOMMENDED |
| SPUD PATCH 635A3 | BSPUD0165 | BAT GATE RECOMMENDED |
| SPUD PATCH 635A4 | BSPUD0166 | GATE PENDING |
| SPUD PATCH 635A5 | BSPUD0167 | BAT GATE RECOMMENDED |
| SPUD PATCH 635A7 | BSPUD0169 | BAT GATE RECOMMENDED |
| SPUD PATCH 630A5 | BSPUD0174 | DONE |
| SPUD PATCH 630A6 | BSPUD0175 | TARP AND CLOSE |
| SPUD PATCH 630A7 | BSPUD0176 | GATE IF POSSIBLE |
| SPUD PATCH 630A1 | BSPUD0177 | DONE |
| SPUD PATCH 630A2 | BSPUD0178 | DONE |
| SPUD PATCH 630A3 | BSPUD0179 | DONE |
| SPUD PATCH 630A4 | BSPUD0180 | DONE |
| SPUD PATCH 632A1 | BSPUD0183 | BAT GATE RECOMMENDED |

BLM_0059008

# JOE DAVIS HILL & SPUD PATCH PROJECTS

## 2003 & ALL PAST FIELD SEASONS
## SPECIES LIST

| MINE NAME | FIELD DATE | SPECIES | SEX |
|-----------|------------|---------|-----|
| **JOE DAVIS HILL** | | | |
| | | | |
| JOE DAVIS 513 | 10/12/2002 | CORYNORHINUS TOWNSENDII | F |
| | 10/12/2002 | CORYNORHINUS TOWNSENDII | M |
| | 10/12/2002 | CORYNORHINUS TOWNSENDII | U |
| | 10/12/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 4 | |
| | | | |
| JOE DAVIS 514A1 | 8/15/2002 | MYOTIS CALIFORNICUS | M |
| | Total at this mine = | 1 | |
| | | | |
| JOE DAVIS 514A2 | 8/15/2002 | CORYNORHINUS TOWNSENDII | M |
| | 8/15/2002 | CORYNORHINUS TOWNSENDII | M |
| | 10/13/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 3 | |
| | | | |
| JOE DAVIS 514A4 | 8/15/2002 | EPTESICUS FUSCUS | M |
| | Total at this mine = | 1 | |
| | | | |
| JOE DAVIS 515A1 | 10/11/2002 | CORYNORHINUS TOWNSENDII | M |
| | 10/11/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 2 | |
| | | | |
| JOE DAVIS 515A3 | 10/11/2002 | CORYNORHINUS TOWNSENDII | F |
| | 10/11/2002 | CORYNORHINUS TOWNSENDII | U |
| | 10/11/2002 | CORYNORHINUS TOWNSENDII | U |
| | 10/11/2002 | MYOTIS CILIOLABRUM | F |
| | 10/11/2002 | MYOTIS CILIOLABRUM | M |
| | 10/11/2002 | MYOTIS CILIOLABRUM | M |
| | Total at this mine = | 6 | |
| | | | |
| JOE DAVIS 515A4 | 8/16/2002 | MYOTIS CILIOLABRUM | M |
| | 10/11/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 2 | |
| | | | |
| JOE DAVIS 517A1 | 10/13/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 1 | |
| | | | |
| JOE DAVIS 518A1 | 10/10/2002 | MYOTIS CALIFORNICUS | M |
| | Total at this mine = | 1 | |
| | | | |
| JOE DAVIS 518A4 | 8/17/2002 | MYOTIS CALIFORNICUS | M |
| | 10/11/2002 | CORYNORHINUS TOWNSENDII | M |
| | 10/11/2002 | CORYNORHINUS TOWNSENDII | F |
| | 10/11/2002 | CORYNORHINUS TOWNSENDII | F |
| | Total at this mine = | 4 | |

16

BLM_0059009

| | | | |
|---|---|---|---|
| JOE DAVIS 519 A3 | 6/ 5/2002 | EPTESICUS FUSCUS | M |
| | 6/ 5/2002 | MYOTIS THYSANODES | M |
| | 6/ 5/2002 | MYOTIS CILIOLABRUM | M |
| | 6/ 5/2002 | MYOTIS CILIOLABRUM | M |
| | 6/ 5/2002 | MYOTIS CALIFORNICUS | M |
| | 6/ 4/2002 | CORYNORHINUS TOWNSENDII | F |
| | Total at this mine = | 6 | |
| | | | |
| JOE DAVIS 519 A7 | 5/13/2001 | CORYNORHINUS TOWNSENDII | F |
| | 9/10/2002 | CORYNORHINUS TOWNSENDII | U |
| | 9/10/2002 | MYOTIS SPP | U |
| | Total at this mine = | 3 | |
| | | | |
| JOE DAVIS 524A2 | 5/12/2001 | CORYNORHINUS TOWNSENDII | U |
| | 5/12/1901 | MYOTIS CALIFORNICUS | M |
| | 5/12/1901 | MYOTIS CALIFORNICUS | M |
| | 5/12/1901 | MYOTIS CILIOLABRUM | M |
| | Total at this mine = | 4 | |
| | | | |
| JOE DAVIS 524A3 | 5/12/1901 | MYOTIS CILIOLABRUM | M |
| | Total at this mine = | 1 | |
| | | | |
| JOE DAVIS 639 | 5/12/2001 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 1 | |
| | | | |
| JOE DAVIS 639 (22) | 5/13/1901 | MYOTIS CALIFORNICUS | F |
| | 5/13/1901 | MYOTIS CALIFORNICUS | M |
| | 5/13/1901 | MYOTIS CALIFORNICUS | F |
| | Total at this mine = | 3 | |
| | | | |
| JOE DAVIS 639WP | 5/13/1901 | MYOTIS CALIFORNICUS | F |
| | Total at this mine = | 1 | |

TOTAL BATS …………………………………… 44

## SPUD PATCH

| | | | |
|---|---|---|---|
| SPUD PATCH 1500A1 | 9/30/1996 | MYOTIS EVOTIS | M |
| | 9/30/1996 | MYOTIS EVOTIS | F |
| | 9/30/1996 | MYOTIS EVOTIS | F |
| | 9/30/1996 | MYOTIS EVOTIS | F |
| | 9/30/1996 | MYOTIS CALIFORNICUS | M |
| | 9/30/1996 | MYOTIS CILIOLABRUM | M |
| | 9/30/1996 | MYOTIS CILIOLABRUM | M |
| | 10/11/1996 | MYOTIS CALIFORNICUS | F |
| | 10/11/1996 | MYOTIS THYSANODES | M |
| | 3/17/2001 | MYOTIS CILIOLABRUM | U |
| | Total at this mine = | 10 | |
| | | | |
| SPUD PATCH 601A1 | 7/ 5/1996 | MYOTIS CILIOLBRUM | M |
| | 7/ 5/1996 | MYOTIS CILIOLBRUM | M |
| | 7/ 6/1996 | MYOTIS CILIOLBRUM | M |

BLM_0059010

|  |  |  |  |
|---|---|---|---|
|  | 7/ 6/1996 | MYOTIS EVOTIS | M |
|  | 7/ 6/1996 | MYOTIS EVOTIS | F |
|  | 7/ 6/1996 | MYOTIS CALIFORNICUS | M |
|  | 7/ 6/1996 | MYOTIS CALIFORNICUS | F |
|  | 7/ 6/1996 | MYOTIS CALIFORNICUS | M |
|  | 9/11/1996 | EPTESICUS FUSCUS | M |
|  | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
|  | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
|  | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
|  | Total at this mine = | 12 |  |
| SPUD PATCH 605 | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
|  | 9/ 6/2002 | MYOTIS VOLANS | M |
|  | 9/ 6/2002 | MYOTIS CILIOLABRUM | M |
|  | Total at this mine = | 3 |  |
| SPUD PATCH 606A1 | 6/ 9/2001 | CORYNORHINUS TOWNSENDII | U |
|  | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
|  | Total at this mine = | 2 |  |
| SPUD PATCH 606A2 | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
|  | 9/ 5/2002 | MYOTIS VOLANS | F |
|  | 9/ 5/2002 | MYOTIS EVOTIS | M |
|  | 9/ 5/2002 | CORYNORHINUS TOWNSENDII | M |
|  | 9/ 5/2002 | CORYNORHINUS TOWNSENDII | M |
|  | Total at this mine = | 5 |  |
| SPUD PATCH 606A3 | 9/ 5/2002 | MYOTIS CILIOLABRUM | M |
|  | Total at this mine = | 1 |  |
| SPUD PATCH 608 | 9/ 6/2002 | MYOTIS CILIOLABRUM | M |
|  | 9/ 6/2002 | CORYNORHINUS TOWNSENDII | F |
|  | Total at this mine = | 2 |  |
| SPUD PATCH 614 | 6/10/2001 | MYOTIS VOLANS | F |
|  | 6/10/2001 | MYOTIS CILIOLABRUM | M |
|  | 6/10/2001 | MYOTIS CILIOLABRUM | M |
|  | 6/10/2001 | MYOTIS CALIFORNICUS | M |
|  | 6/10/2001 | MYOTIS CALIFORNICUS | M |
|  | 6/10/2001 | MYOTIS EVOTIS | F |
|  | Total at this mine = | 6 |  |
| SPUD PATCH 616A1 | 9/11/1996 | MYOTIS CILIOLABRUM | M |
|  | 9/11/1996 | CORYNORHINUS TOWNSENDII | F |
|  | 7/ 9/1996 | MYOTIS EVOTIS | F |
|  | 7/ 9/1996 | MYOTIS THYSANODES | M |
|  | 7/ 9/1996 | MYOTIS VOLANS | M |
|  | 7/ 9/1996 | MYOTIS CALIFORNICUS | M |
|  | 7/ 9/1996 | MYOTIS CILIOLABRUM | M |
|  | 7/ 9/1996 | CORYNORHINUS TOWNSENDII | M |

18

BLM_0059011

| | | | |
|---|---|---|---|
| SPUD PATCH 616A1 | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS CALIFORNICUS | M |
| | 6/10/2001 | MYOTIS CALIFORNICUS | U |
| | 6/10/2001 | MYOTIS CALIFORNICUS | F |
| | 6/10/2001 | CORYNORHINUS TOWNSENDII | M |
| | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 18 | |
| | | | |
| SPUD PATCH 617 | 6/10/2001 | MYOTIS CALIFORNICUS | U |
| | Total at this mine = | 1 | |
| | | | |
| SPUD PATCH 618A1 | 7/10/1996 | MYOTIS EVOTIS | M |
| | 7/10/1996 | MYOTIS CILIOLABRUM | M |
| | 7/10/1996 | MYOTIS CILIOLABRUM | M |
| | 9/11/1996 | CORYNORHINUS TOWNSENDII | F |
| | 9/11/1996 | MYOTIS EVOTIS | M |
| | 9/11/1996 | MYOTIS EVOTIS | M |
| | 9/11/1996 | MYOTIS EVOTIS | M |
| | 7/ 9/1996 | MYOTIS EVOTIS | M |
| | 7/ 9/1996 | MYOTIS EVOTIS | M |
| | 1/14/1997 | CORYNORHINUS TOWNSENDII | U |
| | 6/10/2001 | MYOTIS VOLANS | F |
| | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS EVOTIS | M |
| | 6/10/2001 | CORYNORHINUS TOWNSENDII | M |
| | Total at this mine = | 18 | |
| | | | |
| SPUD PATCH 618A2 | 6/10/2001 | MYOTIS CILIOLABRUM | M |
| | 6/10/2001 | MYOTIS CALIFORNICUS | U |
| | 6/10/2001 | MYOTIS EVOTIS | M |
| | Total at this mine = | 3 | |
| | | | |
| SPUD PATCH 618D1 | 7/ 9/1996 | MYOTIS VOLANS | M |
| | 7/ 9/1996 | MYOTIS VOLANS | F |
| | 7/ 9/1996 | MYOTIS CILIOLABRUM | M |
| | 4/14/1997 | CORYNORHINUS TOWNSENDII | U |
| | 4/24/2001 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 5 | |
| | | | |
| SPUD PATCH 618D2 | 7/ 9/1996 | MYOTIS VOLANS | M |
| | 7/ 9/1996 | MYOTIS VOLANS | F |
| | 7/ 9/1996 | MYOTIS CILIOLABRUM | M |
| | 4/14/1997 | CORYNORHINUS TOWNSENDII | U |
| | 4/24/2001 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 5 | |

BLM_0059012

| | | | |
|---|---|---|---|
| SPUD PATCH 619A1 | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | MYOTIS SPP | U |
| | 2/20/2002 | MYOTIS SPP | U |
| | 2/20/2002 | MYOTIS SPP | U |
| | 2/20/2002 | MYOTIS CILIOLABRUM | U |
| | Total at this mine = | 5 | |
| | | | |
| SPUD PATCH 619A2 | 10/11/2001 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 1 | |
| | | | |
| SPUD PATCH 620 | 10/11/2001 | CORYNORHINUS TOWNSENDII | U |
| | 10/11/2001 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 7 | |
| | | | |
| SPUD PATCH 621D1 (A1) | 4/23/2001 | CORYNORHINUS TOWNSENDII | U |
| | 4/23/2001 | CORYNORHINUS TOWNSENDII | U |
| | 6/ 9/2001 | MYOTIS CILIOLABRUM | M |
| | 6/ 9/2001 | MYOTIS CALIFORNICUS | M |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| 621 D1 (cont.) | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/20/2002 | MYOTIS CILIOLABRUM | U |
| | Total at this mine = | 13 | |
| | | | |
| SPUD PATCH 621S1 | 6/ 9/2001 | MYOTIS VOLANS | M |
| | Total at this mine = | 1 | |
| | | | |
| SPUD PATCH 622A1 | 9/30/2001 | CORYNORHINUS TOWNSENDII | U |
| | 9/30/2001 | CORYNORHINUS TOWNSENDII | U |
| | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/21/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/21/2002 | MYOTIS CILIOLABRUM | U |
| | Total at this mine = | 6 | |
| | | | |
| SPUD PATCH 622A2 | 7/ 5/1996 | MYOTIS CILIOLABRUM | M |
| | 7/ 6/1996 | MYOTIS CALIFORNICUS | F |
| | 7/ 6/1996 | MYOTIS CALIFORNICUS | F |
| | 7/ 6/1996 | MYOTIS CALIFORNICUS | M |
| | Total at this mine = | 4 | |
| | | | |
| SPUD PATCH 622A3 | 7/ 5/1996 | MYOTIS CALIFORNICUS | M |
| | 7/ 5/1996 | MYOTIS CALIFORNICUS | M |

BLM_0059013

|  |  |  |  |
|---|---|---|---|
|  | 7/ 5/1996 | EPTESICUS FUSCUS | M |
|  | 9/11/1996 | MYOTIS EVOTIS | M |
|  | 9/11/1996 | CORYNORHINUS TOWNSENDII | M |
|  | 9/11/1996 | CORYNORHINUS TOWNSENDII | F |
|  | 4/14/1997 | CORYNORHINUS TOWNSENDII | U |
|  | 4/14/1997 | CORYNORHINUS TOWNSENDII | U |
|  | 4/14/1997 | CORYNORHINUS TOWNSENDII | U |
|  | 9/30/2001 | CORYNORHINUS TOWNSENDII | U |
|  | Total at this mine = | 10 |  |
| SPUD PATCH 622A4 | 7/ 5/1996 | MYOTIS CALIFORNICUS | U |
|  | 7/ 5/1996 | MYOTIS CALIFORNICUS | M |
|  | 7/ 5/1996 | MYOTIS CILIOLBRUM | M |
|  | 7/ 5/1996 | MYOTIS CILIOLBRUM | M |
|  | 7/ 6/1996 | MYOTIS CILIOLBRUM | M |
|  | 9/11/1996 | CORYNORHINUS TOWNSENDII | F |
|  | 9/11/1996 | MYOTIS EVOTIS | M |
|  | 9/11/1996 | MYOTIS EVOTIS | F |
|  | 9/11/1996 | MYOTIS VOLANS | M |
|  | 4/14/1997 | CORYNORHINUS TOWNSENDII | M |
|  | 6/ 9/2001 | MYOTIS CILIOLABRUM | M |
|  | 6/ 9/2001 | MYOTIS CILIOLABRUM | M |
|  | 6/ 9/2001 | MYOTIS CALIFORNICUS | M |
|  | 6/ 9/2001 | MYOTIS CALIFORNICUS | M |
|  | 6/ 9/2001 | MYOTIS CALIFORNICUS | M |
|  | 6/ 9/2001 | MYOTIS CALIFORNICUS | F |
|  | 6/ 9/2001 | MYOTIS VOLANS | M |
|  | 6/ 9/2001 | MYOTIS EVOTIS | M |
|  | Total at this mine = | 18 |  |
| SPUD PATCH 622A5 | 9/30/2001 | CORYNORHINUS TOWNSENDII | U |
|  | Total at this mine = | 1 |  |
| SPUD PATCH 622S1 | 6/10/2001 | EPTESICUS FUSCUS | M |
|  | Total at this mine = | 1 |  |
| SPUD PATCH 627 | 10/16/2001 | CORYNORHINUS TOWNSENDII | U |
|  | 10/16/2001 | CORYNORHINUS TOWNSENDII | U |
|  | Total at this mine = | 2 |  |
| SPUD PATCH 628A1 | 4/22/2001 | CORYNORHINUS TOWNSENDII | U |
|  | 9/28/2001 | MYOTIS CILIOLABRUM | F |
|  | 9/28/2001 | MYOTIS CILIOLABRUM | M |
|  | 9/28/2001 | MYOTIS CILIOLABRUM | M |
|  | 9/28/2001 | CORYNORHINUS TOWNSENDII | F |
|  | 9/28/2001 | CORYNORHINUS TOWNSENDII | F |
|  | Total at this mine = | 6 |  |
| SPUD PATCH 629 | 9/28/2001 | MYOTIS CILIOLABRUM | F |
|  | 9/28/2001 | CORYNORHINUS TOWNSENDII | M |
|  | 9/28/2001 | MYOTIS VOLANS | M |
|  | 6/10/2001 | MYOTIS VOLANS |  |
|  | Total at this mine = | 4 |  |

BLM_0059014

| SPUD PATCH 632A1 | 10/15/2001 | CORYNORHINUS TOWNSENDII | U |
|---|---|---|---|
| | 10/15/2001 | CORYNORHINUS TOWNSENDII | U |
| | 10/15/2001 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 3 | |
| | | | |
| SPUD PATCH 635A3 | 10/13/2001 | CORYNORHINUS TOWNSENDII | U |
| | 10/13/2001 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 2 | |
| | | | |
| SPUD PATCH 635A5 | 4/23/2001 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 1 | |
| | | | |
| SPUD PATCH 637A1 | 4/22/2001 | CORYNORHINUS TOWNSENDII | U |
| | 9/28/2001 | MYOTIS CILIOLABRUM | M |
| | 9/28/2001 | CORYNORHINUS TOWNSENDII | M |
| | Total at this mine = | 3 | |
| | | | |
| SPUD PATCH 637A2 | 9/28/2001 | CORYNORHINUS TOWNSENDII | U |
| | 9/28/2001 | CORYNORHINUS TOWNSENDII | M |
| | 2/22/2002 | MYOTIS CILIOLABRUM | U |
| | 2/22/2002 | MYOTIS CILIOLABRUM | U |
| | 2/22/2002 | MYOTIS CILIOLABRUM | U |
| | 2/22/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/22/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/22/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/22/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/22/2002 | CORYNORHINUS TOWNSENDII | U |
| | 2/22/2002 | CORYNORHINUS TOWNSENDII | U |
| | Total at this mine = | 11 | |

**TOTAL BATS …………………………………………. 190**

BLM_0059015

# JOE DAVIS HILL SITE RECOMMENDATIONS

**JOE DAVIS 513**
BSPUD0186        4202200.00        690230.00
*GATE RECOMMENDED*

JOE DAVIS 513: Surveys were conducted in fall of 02, with both an internal and capture survey. This is a deep mine, with lots of suitable roosting habitat and lots of sign of high levels of bat use (guano and insect parts). Several C. townsendii, including both sexes, were documented during these surveys. A bat gate is recommended at this mine, with a full or ladder style design.

**JOE DAVIS 514A1**
BSPUD0190        4202720.00        690685.00
*GATE RECOMMENDED*

JOE DAVIS 514A1: Survey work was conducted at this mine complex during 2002. An incomplete internal survey was conducted at some portals during June, and no bats were documented. Additional surveys in August and October documented some bat use at several of the mines. A C. townsendii and Myotis were documented at this portal in August. A bat gate is recommended, but is of lower priority than the A4/A5 complex.

**JOE DAVIS 514A2**
BSPUD0201        0.00        0.00
*GATE RECOMMENDED*

JOE DAVIS 514A2: Survey work was conducted at this mine complex during 2002. This mine was not found until this year. An incomplete internal survey was conducted at some portals during June, and no bats were documented. Additional surveys in August and October documented several C. townsendii at this mine. The species was captured in August, and observed in October surveys. At this point a bat gate closure is recommended.

**JOE DAVIS 514A3**
BSPUD0189        4202680.00        690665.00
*SHALLOW, CLOSE*

JOE DAVIS 514A3: This is a shallow adit, with no drifts and a low ceiling. No bat use was documented, and no gate is recommended at this portal.

**JOE DAVIS 514A4**
BSPUD0187        4202635.00        690650.00
*GATE RECOMMENDED*

JOE DAVIS 514A4: Survey work was conducted at this mine complex during 2002. An incomplete internal survey was conducted at some portals during June, and no bats were documented. Additional surveys in August and October documented some bat use at several of the mines. A big brown bat was captured at the A5 portal, which is connected to A4, during August. Bat gates are recommended at both portals (A4 and A5).

**JOE DAVIS 514A5**
BSPUD0188        4202630.00        690650.00
*GATE RECOMMENDED*

JOE DAVIS 514A5: Survey work was conducted at this mine complex during 2002. An incomplete internal survey was conducted at some portals during June, and no bats were documented. Additional surveys in August and October documented some bat use at several of the mines. A big brown bat was captured at this portal, which is connected to A4, during August.

BLM_0059016

**JOE DAVIS 515A1**
BSPUD0191      4203340.00      690940.00
*EVALUATION COMPLETE*

JOE DAVIS 515A1: Survey work was conducted at this mine during 2002. An incomplete internal survey was conducted at some portals during June, and no bats were documented. Additional surveys in August and October documented some bat use at the mine. This mine is a shallow feature, and provides night roosting for bats during the course of the year. This mine can be closed.

**JOE DAVIS 515A2**
BSPUD0192      4203360.00      690955.00
*EVALUATION COMPLETE*

JOE DAVIS 515A2: Survey work was conducted at this mine during 2002. An internal survey was conducted during June, and no bats were documented. Additional surveys in August and October documented no bat use. It is a very shallow mine feature, and can be closed.

**JOE DAVIS 515A3**
BSPUD0193      4203380.00      690965.00
*GATE RECOMMENDED*

JOE DAVIS 515A3: Survey work was conducted at this mine during 2002. An incomplete internal survey was conducted at some portals during June, and no bats were documented. Additional surveys in August and October documented use by M. ciliolabrum and C. townsendii. It is connected to A4. Both adits are recommended for bat gates.

**JOE DAVIS 515A4**
BSPUD0194      4203400.00      690980.00
*GATE RECOMMENDED*

JOE DAVIS 515A4: Survey work was conducted at this mine during 2002. An incomplete internal survey was conducted at some portals during June, and no bats were documented. Additional surveys in August and October documented use by M. ciliolabrum and C. townsendii. It is connected to A3. Both adits are recommended for bat gates.

**JOE DAVIS 516**
BSPUD0122      4203480.00      690815.00
*EVALUATION COMPLETE*

JOE DAVIS 516: This feature is shallow, and does not provide any significant bat roosting habitat. No sign was evident, but may be obscured by flooding. At this point, no evidence of use exists, and it can be closed without further bat considerations.

**JOE DAVIS 517A1**
BSPUD0123      4203490.00      690830.00
*GATE OR SUM MAT CK 2004*

JOE DAVIS 517A1: This mine had an internal survey in 2001, which did not document any bats, but was not complete. Another internal survey in fall 02 did document a C. townsendii, deeper in the mine than the first survey may have gone. Additionally, a large cluster of guano was documented in the fall, and may indicate the use by a maternity colony. Another check during 2003 was attempted, but the site could not be located.  At this point, pending further surveys, a bat gate is recommended. Another try in 2004 during the summer is planned.

24

BLM_0059017

**JOE DAVIS 517A2**
BSPUD0124        4203530.00        690860.00
*EVALUATION COMPLETE*

JOE DAVIS 517A2: This mine is shallow, and complete internal surveys in 2001 and 2002 did not document any bats or significant sign of their use of this mine. Evaluations are complete.

**JOE DAVIS 518A1**
BSPUD0125        4203835.00        690985.00
*GATE OR WINTER  CK 2004*

JOE DAVIS 518 A1: This is a medium sized mine. Internal work in 2001 and 2002, and a fall capture survey have been conducted so far. While some bat use has been documented, no surveys have provided any significant bat documentation. This mine has good features to provide winter roosting habitat, and one last survey effort is needed in 2003 to fully evaluate this potential.

**JOE DAVIS 518A2**
BSPUD0126        4203980.00        690980.00
*EVALUATION COMPLETE*

JOE DAVIS 518 A2: This is a shallow decline mine, and provides no significant bat roosting potential. It looks like it may have been connected to the rest of the mine complex at some time, but no longer.

**JOE DAVIS 518A3**
BSPUD0127        4204030.00        690960.00
*GATE RECOMMENDED*

JOE DAVIS 518 A3: This is a large mine complex, connected to A4. Internal work in 2001 indicated summer use by bats, but only late summer and fall surveys have been conducted so far. An incomplete internal survey in June was conducted in 2002, but did not provide any bat documentation. Fall surveys did document use by both male and female C. townsendii, and a bat gate is recommended.

**JOE DAVIS 518A4**
BSPUD0128        4204010.00        690960.00
*GATE RECOMMENDED*

JOE DAVIS 518 A4: This is a large mine complex, connected to A3. Internal work in 2001 indicated summer use by bats, but only late summer and fall surveys have been conducted so far. An incomplete internal survey in June was conducted in 2002, but did not provide any bat documentation. Fall surveys did document use by both male and female C. townsendii, and a bat gate is recommended.

**JOE DAVIS 519 A3**
BSPUD0131        4206400.00        689830.00
*CLOSE*

JOE DAVIS 519A1: This portal is shallow, and does not provide any important roosting function to the maternity roost. It can be closed, and is scheduled for closure in late fall 2002.

**JOE DAVIS 519 A7**
BSPUD0135        4206380.00        689795.00
*BAT GATE INSTALLED 2003*

BLM_0059018

JOE DAVIS 519A7: This mine is on the lower level, and is  important for the maternity colony. This portal provides for the air flow patterns, and is also used by bats to use the mine complex. Some bats have been documented using this portal during the survey work conducted over the last 2 years. It  provides the main entry into the complex for monitoring of internal aspects of the roost site. A full style bat gate is planned in fall 2002.

**JOE DAVIS 519A1**
BSPUD0129        4206100.00        689940.00
*CLOSE*

JOE DAVIS 519A1: This portal is shallow, and does not provide any important roosting function to the maternity roost. It can be closed, and is scheduled for closure in late fall 2002.

**JOE DAVIS 519A2**
BSPUD0130        4206225.00        689790.00
*CLOSE*

JOE DAVIS 519A2: This portal is shallow, and does not provide any important roosting function to the maternity roost. It can be closed, and is scheduled for closure in late fall 2002.

**JOE DAVIS 519A4**
BSPUD0132        4206375.00        689830.00
*BAT GATE INSTALLED 2003*

JOE DAVIS 519A4: This mine is on the upper level, and most northern adit of the maternity complex. A large cluster of bats was observed here in June of 2002 by Dan Burns and Ed Cotter, during a site visit for potential closure work. This small adit is important to the colony, most likely as early season use, as evident by their use of the site. The internal sign indicates that it is not used for long periods of time, nonetheless, it may be very important to the maternity colony, and a bat gate is planned in fall 2002.

**JOE DAVIS 519A5**
BSPUD0133        4206360.00        689830.00
*BAT GATE INSTALLED 2003*

JOE DAVIS 519A5: This mine is on the upper level, and is the most important entry/exit access for the maternity colony. Large numbers of bats have been documented using this portal during the survey work conducted over the last 2 years. It is connected to the main workings, and provides an entry into the top level of the roost site. A full style bat gate is planned in fall 2002.

**JOE DAVIS 519A6**
BSPUD0134        4206340.00        689830.00
*BAT GATE INSTALLED 2003*

JOE DAVIS 519A6: This mine is on the upper level, and is the southern most adit in the upper level. This portal is not connected to the main workings, but is well used by night roosting bats from the maternity colony. It appears to be important to the colony, and is a good site for monitoring the colony without disturbance to the main roost. A full style bat gate is planned in fall 2002.

**JOE DAVIS 519A8**
BSPUD0136        4206500.00        689800.00
*BAT GATE INSTALLED 2003*

JOE DAVIS 519A8: This mine is on the lower level, and is the northern most adit in this complex. This portal is not connected to the main workings, but is well used by night roosting bats from the maternity colony, as well as other

BLM_0059019

species of bats. It appears to be important to the colony, and is a good site for monitoring the colony without disturbance to the main roost. A full style bat gate is planned in fall 2002.

**JOE DAVIS 520**
BSPUD0101      4199160.00      694085.00
*EVALUATION COMPLETE*

JOE DAVIS 520: This mine is shallow, with some trace amount of sign of warm season bat use. No bats were observed during an internal survey in April 2001. The amount of sign does not indicate much potential for significant warm season use, and it's depth would indicate likewise for winter roosting. This site is considered complete for bat surveys.

**JOE DAVIS 521**
BSPUD0102      4199410.00      694365.00
*WINTER / SUM SURVEY 2004*

JOE DAVIS 521: This mine is shallow, with some trace amount of sign of warm season bat use. No bats were observed during an internal survey in April 2001. A winter survey in 2004 should be conducted in order to fully evaluate the potential importance of this site to the resident townsend's big-eared bat colony. A summer check in 2004 may also be made, because of the amount of summer use sign.

**JOE DAVIS 522**
BSPUD0103      4200480.00      694500.00
*WINTER / SUM SURVEY 2004*

JOE DAVIS 522: This mine is medium depth, with some trace amount of sign of warm season bat use. No bats were observed during an internal survey in May 2001. A winter survey in 2004 should be conducted in order to fully evaluate the potential importance of this site to the resident townsend's big-eared bat colony.

**JOE DAVIS 523**
BSPUD0104      4200495.00      694430.00
*WINTER / SUM SURVEY 2004*

JOE DAVIS 523: This mine is medium depth, with some trace amount of sign of warm season bat use. No bats were observed during an internal survey in May 2001. A winter survey in 2004 should be conducted in order to fully evaluate the potential importance of this site to the resident townsend's big-eared bat colony.

**JOE DAVIS 524A1**
BSPUD0105      4200640.00      694320.00
*WINTER SURVEY 2004*

JOE DAVIS 524A1: Survey work in May 2001 documented warm internal conditions, and plastic was left to help document possible summer use. However, no additional surveys were conducted in 2002, and should be planned for 2003.

**JOE DAVIS 524A2**
BSPUD0106      4200650.00      694290.00
*WINTER 04 OR SLOT GATE*

JOE DAVIS 524A2: Survey work in May 2001 documented a roosting C. townsendii. Another survey in 2001 also documented bat activity at the site. No additional surveys were conducted in 2002 or 2003. This mine should have a winter survey in 2004, to determine it's potential importance to the local townsend's big-eared bat colony. If a winter survey can not be conducted, then, based on closure methods available for this mine, a slot bat gate should be considered. This site is connected to A3.

BLM_0059020

**JOE DAVIS 524A3**
BSPUD0107      4200675.00      694280.00
*WINTER 04 OR SLOT GATE*

JOE DAVIS 524A3: Survey work in May 2001 documented a roosting C. townsendii. Another survey in 2001 also documented bat activity at the site. No additional surveys were conducted in 2002 or 2003. This mine should have a winter survey in 2004, to determine it's potential importance to the local townsend's big-eared bat colony. If a winter survey can not be conducted, then, based on closure methods available for this mine, a slot bat gate should be considered. This site is connected to A2.

**JOE DAVIS 526**
BSPUD0112      4201170.00      694095.00
*WINTER / SUM SURVEY 2004*

JOE DAVIS 526: This mine is medium depth, with some scattered amount of sign of warm season bat use. No bats were observed during an internal survey in May 2001. A winter survey in 2004 should be conducted in order to fully evaluate the potential importance of this site to the resident townsend's big-eared bat colony. If possible, a summer check in 2004 will also be made, because of the amount of summer use sign.

**JOE DAVIS 527 A1 A2 A3**
BSPUD0114      4201315.00      694310.00
*EVALUATION COMPLETE*

JOE DAVIS 527 A1 A2 A3: These three mines are all very shallow, with no potential to provide significant bat roosting habitat.

**JOE DAVIS 528A1**
BSPUD0197      4198565.00      691730.00
*EVALUATION COMPLETE*

JOE DAVIS 528 A1: An internal survey in October 2001 did not document any bats, and the mine is very shallow. This mine can be closed.

**JOE DAVIS 528A3**
BSPUD0198      4198680.00      691725.00
*WINTER SURVEY 2004*

JOE DAVIS 528 A3: An internal survey in October 2001 did not document any bats, but some bat sign is present. Additional surveys will be conducted here in 2004.

**JOE DAVIS 528A4**
BSPUD0199      4198690.00      691725.00
*EVALUATION COMPLETE*

JOE DAVIS 528 A4: An internal survey in October 2001 did not document any bats, and the mine is very shallow. This mine can be closed.

**JOE DAVIS 638 A3.5**
BSPUD0119      4200170.00      694940.00
*EVALUATION COMPLETE*

BLM_0059021

JOE DAVIS 638 A3.5: This feature is shallow, with only trace amount of sign of bat use. It is considered complete for bat evaluations.

**JOE DAVIS 638A2**
BSPUD0116        4200100.00        694910.00
*__WINTER SURVEY 2004__*

JOE DAVIS 638 A2: Internal surveys have been conducted at this mine in May 2001. No bat use was documented at that time, but the site is large, and there was evidence of summer use by bats. Also, because of its depth and internal conditions, a winter evaluation should be conducted in 2004. This portal is connected to A3, and these two are the largest feature in the 638 complex.

**JOE DAVIS 638A3**
BSPUD0117        4200110.00        694915.00
*__WINTER SURVEY 2004__*

JOE DAVIS 638 A3: Internal surveys have been conducted at this mine in May 2001. No bat use was documented at that time, but the site is large, and there was evidence of summer use by bats. Also, because of its depth and internal conditions, a winter evaluation should be conducted in 2004. This portal is connected to A2, and these two are the largest feature in the 638 complex.

**JOE DAVIS 638A4**
BSPUD0120        4200190.00        694985.00
*__EVALUATION COMPLETE__*

JOE DAVIS 638 A4: This feature is shallow, with only trace amount of sign of bat use. It is considered complete for bat evaluations.

**JOE DAVIS 638A5**
BSPUD0121        4200230.00        695050.00
*__WINTER SURVEY 2004__*

JOE DAVIS 638 A5: This feature is of medium depth, with only trace amount of sign of bat use. It will be surveyed one last time while in the area conducting surveys at the larger features.

**JOE DAVIS 638PM**
BSPUD0118        4200090.00        694910.00
*__EVALUATION COMPLETE__*

**JOE DAVIS 639**
BSPUD0108        4200460.00        694710.00
*__WINTER 04 OR SLOT GATE__*

JOE DAVIS 639: Internal surveys have been conducted in 2001 and 2002 at this mine, including a video survey in June 02. No bat use was documented in 2002, but was only summer season evaluations. A C. townsendii was documented roosting in the main adit during early May 2001. This mine appears to be connected to several of the smaller adits next to it. The identification of this portals still needs to be clarified, and fall or winter evaluations should be conducted still at this mine complex. No additional surveys were conducted in 2003. This mine should have a winter survey in 2004, to determine it's potential importance to the local townsend's big-eared bat colony. If a winter survey can not be conducted, then, based on closure methods available for this mine, a slot bat gate should be considered.

**JOE DAVIS 639 (22)**
BSPUD0111        4200470.00        694520.00

29

BLM_0059022

*WINTER SURVEY 2004*

JOE DAVIS 639 (22):  Internal surveys have been conducted in 2001. No bat use was documented in 2002, but not all portals were surveyed. A C. townsendii was documented roosting in the main adit during early May 2001. That mine appears to be connected to several of the smaller adits next to it. The identification of these portals still needs to be clarified, and fall or winter evaluations should be conducted still at this mine complex in 2004.

**JOE DAVIS 639W horseshoe**
BSPUD0109        4200460.00          694690.00
*WINTER SURVEY 2004*

JOE DAVIS 639W: Internal surveys have been conducted in 2001. No bat use was documented in 2002, but not all portals were surveyed. A C. townsendii was documented roosting in the main adit during early May 2001. That mine appears to be connected to several of the smaller adits next to it. The identification of these portals still needs to be clarified, and fall or winter evaluations should be conducted still at this mine complex in 2004.

**JOE DAVIS 639WP**
BSPUD0110        4200460.00          694600.00
*WINTER SURVEY 2004*

JOE DAVIS 639 WP: Internal surveys have been conducted in 2001. No bat use was documented in 2002, but not all portals were surveyed. A C. townsendii was documented roosting in the main adit during early May 2001. That mine appears to be connected to several of the smaller adits next to it. The identification of these portals still needs to be clarified, and fall or winter evaluations should be conducted still at this mine complex in 2004.

**JOE DAVIS MUCHO GRANDE**
BSPUD0113        4201010.00          693500.00
*WINTER SURVEY 2004*

JOE DAVIS MUCHO GRANDE: No known work has been conducted at this site to date. It is not confirmed as part of the Joe Davis project, but a winter survey will be conducted in 2004 while in the area finishing the rest of the JD sites.


## SPUD PATCH FINAL SITE RECOMMENDATIONS

**SPUD PATCH 1500A1**
BMONT9617        4249650.00          698100.00
*GATE CONSULT NEEDED*

MONTROSE 1500A1: Bats were documented at this mine, but radon levels are too high to justify a gated closure. Three bats were observed during a winter survey in 2001, including 2 COTO. Gate decision pending evaluation of radiation situation.

**SPUD PATCH 601A1**
BMONT9608        4203382.00          685723.00
*BAT GATE 2002*

SPUD PATCH (MONTROSE) 601A1: This mine has documented 4 species night roosting at the site in 1996 surveys. In 2002 winter surveys documented hibernating C. townsendii. This site was recommended for a bat gate in 2002, and it is scheduled to be gated in the fall of 2002. The bat gate will be 6 ft diameter culvert, 30 ft long, with a full gate on the end of the culvert. An access door will be provided.

BLM_0059023

**SPUD PATCH 601S1**
BMONT9699       4203329.00       685754.00
*AIR GRATE 2002*

MONTROSE 601S1: This mine has documented 4 species night roosting at the site in 1996 surveys. In 2002 winter surveys documented hibernating C. townsendii. This site was recommended for a bat gate in 2002, and it is scheduled to be gated in the fall of 2002. This vent hole will be gated with a 5 ft diameter culvert, 10 ft long. It will provide air flow only, no bat access is needed.

**SPUD PATCH 605**
BSPUD0137       4203290.00       686160.00
*CLOSED 2002*

SPUD PATCH 605: This mine had a summer internal survey in 2001, which did not document any bat use. However, it did document summer use sign. A fall survey in 2001 did not document any bats. In 2002 winter surveys documented a hibernating C. townsendii, and fall work documented Myotis. Plastic sheeting had been left in the mine to record summer use levels, and a check indicated little evidence of summer bat use. The mine is shallow, and it was decided to pull this site from gating. It was to be closed in 2002.

**SPUD PATCH 606A1**
BSPUD0171       4203195.00       686300.00
*BAT GATE 2002*

SPUD PATCH 606 A1: This mine had summer and fall surveys in 2001. COTO were documented during the summer. In 2002 winter surveys documented hibernating C. townsendii. This site was recommended for a bat gate in 2002, and it is scheduled to be gated in the fall of 2002. The bat gate will be 5 ft diameter culvert, 20 ft long, with a full gate on the end of the culvert.

**SPUD PATCH 606A2**
BSPUD0172       4203200.00       686310.00
*CLOSED 2002*

SPUD PATCH 606 A2: This mine had summer and fall surveys in 2001. No bats were documented, but bat sign was present.  It is connected to A3. Survey work in 2002 did document use by bats, including C. townsendii. During the fall site review it was determined that this portal, and A3, would not be gated. The mine is shallow, and lies at the bottom of an extended pit. The costs associated with gating these portals, and still providing reclamation on the pit would be too expensive. Bats will be excluded prior to closure work.

**SPUD PATCH 606A3**
BSPUD0173       4203200.00       686315.00
*CLOSED 2002*

SPUD PATCH 606 A3: This mine had summer and fall surveys in 2001. No bats were documented, but bat sign was present. It is connected to A2. Survey work in 2002 did document use by bats, including C. townsendii. During the fall site review it was determined that this portal, and A3, would not be gated. The mine is shallow, and lies at the bottom of an extended pit. The costs associated with gating these portals, and still providing reclamation on the pit would be too expensive. Bats will be excluded prior to closure work.

**SPUD PATCH 608**
BSPUD0140       4202690.00       686510.00
*GATE IF POSSIBLE*

BLM_0059024

SPUD PATCH 608: An internal survey in April 2001 did not document any bats, but did find lots of bat sign, and a domed ceiling. A plastic sheet was left in place to help document bat use by sign, and will  be checked again next year. Further surveys may be needed. 2002: COTO captured in fall, lots of guano on plastic by Sept. A summer check in 03 will help clarify gate recommendation; it might be a maternity roost for bats, or a night roost. 2003: Internal survey check in June found lots of fresh sign of night roosting, and guano. No bats were observed. It is possible that this site is used as a transition roost for a maternity colony of bats. A bat gate should be considered at this site.

**SPUD PATCH 609A1**
BSPUD0138        4202900.00        686420.00
*TARP AND CLOSE*

SPUD PATCH 609A1: An internal survey in April 2001 did not document any bats, but did find good sign of summer use by bats. Very likely a night roost, but a summer survey is needed to check for a maternity roost. 2003: An internal survey was conducted on June 27, but no bats were documented. The site is filling up with sediment. No fresh sign of current bat use. This site should be closed.

**SPUD PATCH 609A2**
BSPUD0139        4202900.00        686430.00
*DONE*

SPUD PATCH 609A2: A pre-survey in April 2001 did not document any bats, and found that the mine has a very small passage. It is not likely to provide significant roosting habitat for bats, and conditions are too dangerous for further surveys. This mine can be closed.

**SPUD PATCH 613**
BSPUD0200        4203110.00        686460.00
*CLOSED 2002*

SPUD PATCH 613: An internal survey in October 2001 did not document any bats, and the mine is very shallow. This mine will be closed in the fall of 2002.

**SPUD PATCH 614**
BSPUD0141        4203140.00        686430.00
*BAT GATE 2002*

SPUD PATCH 614: Surveys indicate high summer use of this mine by 6 species of bats, including Corynorhinus townsendii and fringed myotis in 1996. Five of these species were listed as BLM Special Status Species in the 1994 listing. Surveys in 2001 again documented use by 4 species, including a fall record of COTO. This mine may be used for drinking by bats, as pooled water is present inside. It is connected to mine 616 A1. This site was recommended for a bat gate in 2002, and it is scheduled to be gated in the fall of 2002. The bat gate will be 4 ft diameter culvert, 20 ft long, with a full gate on the end of the culvert.

**SPUD PATCH 616A1**
BMONT9609        4203144.00        686408.00
*BAT GATE 2002*

SPUD PATCH (MONTROSE) 616A1: Surveys indicate high summer use of this mine by 6 species of bats, including Corynorhinus townsendii and fringed myotis in 1996. Five of these species were listed as BLM Special Status Species in the 1994 listing. This mine is connected to 616 S1, which needs a grated closure to protect air flow. Surveys in 2001 again documented use by 3 species, including COTO. This mine may be used for drinking by bats, as pooled water is present inside. In 2002 winter surveys documented hibernating C. townsendii. This site was recommended for a bat gate in 2002, and it is scheduled to be gated in the fall of 2002. The bat gate will be 5 ft diameter culvert, 20 ft long, with a full gate on the end of the culvert. An access door will be provided.

BLM_0059025