## Rural and Natural Environment, continued

> **Vision for the Future:**
>
> We envision a future where the use and respect for our rural and natural environment continues to be the centerpiece of our communities, economic activity, recreational opportunities, health and rural lifestyle.

### *Ideas for Action:*

- ❑ **Work with the Delta County Master Planning process to get the plan up to date.**
- ❑ **Work actively with the county and local master planning processes on zoning laws so that people know where they should appropriately locate businesses.**
- ❑ **Develop more recreational options, including horseback riding, walking, and biking trails, access points to public land and rivers (keeping senior citizens in mind), trails that connect the towns in the valley, as well as indoor recreation opportunities for youth and adults.**
- ❑ **Support the suitable development of economic opportunities and jobs that make use of our natural resources such as farming, ranching, organic agriculture, renewable energy and mineral/resource extraction.**

### *Questions and Concerns:*

**Can we develop** and still keep our agricultural lifestyle? Will development negatively affect our clean air and water?

How does our value of **the rural and natural environment affect our economy** and new jobs? Will we sell out to misguided **development that has the potential to harm our rural and natural environment** for the sake of money or short-term jobs/economic benefits?

Is **natural gas (hydraulic fracturing) extraction and development compatible** with our value of the rural and natural environment? Does our **dependence on clean water** for agriculture and ranching affect how we develop our energy resources?

How do we **preserve our water and food quality**?

**Can we jointly value the environment** and the development of new **coal mining** activity?

How do **new people** get informed about local **water rights and water law**?

Are we **prepared for future drought conditions**? Do we need to prepare for **desertification**?

How will **climate change** affect our rural and natural environment? Can we accommodate **faster runoff** from mountain snowmelt?

Could **genetically modified organisms/seeds** negatively affect our local agriculture?

How do we maintain the valley's relatively **dark night skies, no sprawl, and high quality agricultural lands**? Do we understand the value that our **wilderness** plays in our local economy?

BLM_0059339

# Small Town Feel and Sense of Community

## We value our small town feel and sense of community.

**Summary:** We value a small town feel and sense of community within and among the diverse groups of people who live in the valley. A strong work ethic helped build our towns and the historic western buildings built by settler families. The historic service organizations, churches and clubs are important in the tradition of community service (such as the Elks, Lions, Kiwanis, Rotary, Mesa Clubs, "Friends of" organizations, and the American Legion). Our long running festivals celebrate local traditions that help create our small town feel and sense of community (Sheep Dog Trials, Pioneer Days, Delta County Fair, Cherry Days, and Mountain Harvest Festival, etc).

We also respect and recognize the valley was home to the Ute people with their own enduring cultural traditions before the establishment of North Fork Valley settlements. We value the families who have been here five and six generations, as well as new comers. We recognize the importance of preserving the traditions and heritage of the valley while new cultural traditions are being integrated into the local fabric of the community.

1. **We value and desire to have safety in our valley, a place where our kids are safe, there is low crime, and everyone has a sense of security.**

2. **We value the welcoming and friendly people, and how many support each other in times of need, even if they come from different segments of the community.**

3. **We value our individual communities and groups, schools, and sports events that bring us together, social and religious organizations, volunteer/service opportunities, and the hard working and creative people who live here.**

4. **We recognize the importance to encourage the same friendliness, respect, and acknowledgement that people experience in their individual communities to others within this multi-community valley.**

5. **We value our families and often long standing personal and work relationships, seeing people we know on the street, the accessibility of our local leaders, as well as our ability to maintain our privacy.**

6. **We value the community resources we have, including our libraries, parks, radio station, pool, and schools while recognizing many would like more of these resources and higher quality services.**

BLM_0059340

## Small Town Feel and Sense of Community, continued

**Vision for the Future:**

We envision a future that preserves our small town feel and sense of community, where the relationships and traditions that define our communities are respected and preserved. We envision a greater understanding of and appreciation for the diversity of people, lifestyles, livelihoods and ideas that simultaneously exist here. Our towns and valley are safe places to raise families and have quality resources that support our community's future development and culture.

### Ideas for Action:

❏ Create opportunities for the diverse segments of our communities to mix more and gain a greater understanding of one another. Discuss our cultural fault lines. As individuals, we can practice being more open and communicative with our neighbors to build a stronger community.

❏ Encourage activities in our valley that bridge the many communities, such as raising our youth, "home grown" projects at the Delta County Fair grounds, and hunting and fishing.

❏ Create more places for high school students to go after dark, and cultural events aimed at teens.

❏ Increase funding and resources for our recreation district, parks and shared spaces.

❏ Offer anti-bullying educational opportunities for youth and adults.

### *Questions and Concerns:*

How do we **increase community engagement** in activities that **preserve important traditions**?

How do we take the time to **build trust** and **introduce new comers** to traditions that are important to us, and **honor their new contributions and experience**s?

How do we **retain or attract young people** to the valley?

How do we **support young families** in the valley and the quality and **health of our schools**?

We are a **diverse place**, a multi-community valley. We are wonderfully different and there is a tremendous fractiousness. **What keeps us apart and afraid?**

Are **working, homeless families** being overlooked?

**Can we respect our differences and get beyond stereotypes?** How can people express opinions and ideas without others taking it personally or seeing it as threat?

How do we actively **encourage and attract diversity**?

Can we **get past the perception** that certain public institutions, social organizations, or businesses only represent **one part of the community** because a certain segment of the community might utilize that resource more?

Can we get past an **"us versus them" mentality** between individuals, communities and even our towns? Can we stop the bickering and gossip?

**Can we really celebrate our larger community**? Identify as **a whole valley?**

What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

12

BLM_0059341

# Steady Economy

**We envision a steady economy with work opportunities and the ability to grow our traditional and emerging economic sectors.**

**Summary:** We value the traditions and heritage of the local economy, including the historical economic sectors of agriculture, ranching/herding, mining, local banks, small and downtown businesses, the railroad, hunting, and our systems of bartering and trade. Many people recognize the importance of new and emerging economic sectors, including tourism and recreation, arts and value-added agricultural products, wine making, organic agriculture, health and wellness, new energy resources, and businesses that utilize the Internet to do business outside of the valley. We recognize that the health of our local economy is strongly tied to regional, national and international markets.

1. **We value the historical employment opportunities in the valley, including coal mining, agriculture, small businesses, and downtown businesses, as well as the jobs, money and resources they bring to our local economy.**

2. **We value our public lands and open space and how they contribute to our economy through tourism, hunting and fishing, severance payments, recreation and by attracting people who bring new jobs and resources to the valley. We recognize that historical access to private land has created a valuable source of current income in property sales and rentals.**

3. **We recognize the need to take responsibility and to plan/encourage the future economic health of our local economy.**

4. **We recognize the importance of growing the diversity of job opportunities for people of all ages, including meaningful work, to "keep" the people who want to live here and directly address current underemployment.**

5. **We value the contributions of new and growing economic sectors, including the arts and value-added agricultural sector and the "Creative District" designation; the marketing and recognition of our quality foods and beverages and North Fork Valley brand; agri-tourism; the growth of internet businesses and importance of new telecommunications infrastructure; and the additional economic contributions coming from non-labor sources of income.**

BLM_0059342

## Steady Economy, continued

6. **We value the growing retirement community who is socially active, involved in civic life and the governance of our towns, non-profits and commissions, support the arts, and contribute to the disposable income in the economy.**

7. **We value the opportunities people have to live using both innovative and traditional means of working within the economy, including bartering, trading and an emerging "gift" economy.**

### Vision for the Future:

We envision supporting the industries such as agriculture, especially livestock production and fruit growing, energy production and coal mining, and other industries that can use our abundant natural resources and are compatible with maintaining a high quality environment. We envision economic opportunities that are compatible with the pastoral bucolic setting in the valley. We want to stay an agricultural community and we welcome small farms and cottage industries, faster internet capacity, and manufacturing, if it will grow jobs without sacrificing what we love or create sprawl.

We want the valley to be an affordable place to live and want to know what the opportunities are to plan our growth, so we can grow based on our strengths, without losing our agricultural land to housing. By doing this we will maintain our middle class community and access to our land. We want to attract and keep our youth on our farms and ranches and in businesses in our towns. We envision the continued growth of good-looking downtowns, quality services, with prosperous, open businesses on our "main" streets.

A more self–sufficient and stronger local economy will help us to avoid boom and bust cycles and we appreciate the efforts of groups working to strengthen the diversity of the local economy. We want to continue to ranch and grow food without overburdening or overtaxing the land so we can maintain our rural agricultural lifestyle.

## Ideas for the Future:

- ❏ **Continue the Vision 2020 and other pro-active planning processes.**
- ❏ **Fill the current gap of an organization that directly addresses economic and business development in the North Fork Valley.**
- ❏ **Work to create diversity in the local economy. Provide examples of how other towns have diversified their economy and supported the development of an arts sector.**
- ❏ **"Brand" the North Fork Valley and the goods and services that are created here.**
- ❏ **Keep business local. Buy local, support local.**
- ❏ **Attract appropriate manufacturing industries and jobs. Support the creation of more entrepreneurial businesses.**

What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

14

BLM_0059343

## Steady Economy, continued

- ❏ **Create a sustainable food and wine sector. Grow the niche market of small-scale food and wine that are not competitive in the current markets. Create lines of transport for food to the Front Range. Add value to our produce here in the valley.**
- ❏ **Get young people interested in agriculture. Protect our farmland.**
- ❏ **Strengthen the interface between agriculture and coal. Share information about the needs and strengths of different economic sectors in the valley so that we know more about each other's livelihoods and economic drivers. Provide information to the public on changing demographics and our economic drivers.**
- ❏ **Support tourism in our state parks and monuments. Encourage outdoor recreation.**

### *Questions and Concerns:*

The **small size of our economy** and options for work keeps our town small just **how we like it.** How do we **increase economic opportunities** and local jobs but still **keep our small town feel** and sense of community?

Do we have the **resources we need to address our economic development?** Who is looking at the big picture? How do we build **resources for entrepreneurs and business owners**?

What **meaningful, inspiring or entry level jobs are available for youth**?

The current lack of jobs makes it **difficult for many to afford living here**. How do we create more opportunities for people **to thrive in their work**? How do we address **underemployment**?

People tend to focus on our traditional industries. How do we **measure the impact of new businesses** on our local economy?

How do we fill up **storefronts and maintain healthy downtown** areas in our towns? Can we support more retail and restaurant options?

Could **we lose our coal mines and jobs** due to a declining supply of mineable coal, competitive natural gas prices, or a carbon tax? How much longer will we have a strong coal industry in the

North Fork Valley? **How would we deal with the loss of income and jobs** due to loss of the mines?

The **coal mines contribute financially to important parts of our community** and local services, such as Memorial Hall, the Recreation District, and Libraries**. What happens to our services** if we lose coal?

Can we **break the boom and bust cycles**?

What roles do **non-labor income** and an **increase of retirees** play in our economy? Do we have the needed **infrastructure to accommodate an aging population**? Do we have adequate accessibility to **health services**?

The valley is known for its cannabis cultivation. Can we acknowledge the **money that is already flowing into our economy** because of this? Can we or should we try to reconcile the views and opinions that see alcohol and cannabis use as part of a local negative "drug culture"?

We have **very different opinions when it comes to supporting the development of natural gas and oil** for our economy. Can we understand the different perspectives on this issue?

BLM_0059344

# Freedom, Independence and Personal Responsibility

**We value our freedom to live the way we choose, our independence and our personal responsibility to our communities.**

**Summary:** We value the traditions and heritage of living in a western, rural environment that places importance on freedom, independence and personal responsibility. People can work out their own issues, care for themselves and their neighbors without undue rules or oversight to tell them how to behave. Many people depend on their access and freedom to work the land, and find independence in a do-it-yourself attitude and lifestyle.

We recognize a strong current of patriotism and respect for the many veterans who make this place home. Many recognize the 21st century is bringing a change in local economic, social and demographic trends and new pressures on how land is used. Many people believe that the valley needs balanced enforcement of current regulations and/or the development of appropriate rules to protect individual and personal property rights and to preserve the rural environment in the face of increasing change and development.

1. **We value the "freedom to be" who we are, determine our own future and live our lives how we want to without undo authority telling us otherwise.**

2. **We recognize that the growing diversity of people with different interests, cultures, careers, lifestyles, thoughts and beliefs will require us to learn how to extend the "freedom to be" to people unlike ourselves.**

3. **We recognize our interdependence and balance our personal freedom with our personal responsibility to our neighbors.**

4. **We recognize that rules, laws or regulations also protect personal freedoms, constitutional and property rights. When applied in good faith and measure, rules can create fairness, protect land and sustain property value, and create predictability in land use and the future look and feel of our towns and county.**

5. **We value the self-sufficiency that comes with the freedom of having access to the land and its quality resources.**

6. **We value and recognize the need to invest in our shared public resources and governmental services in order to maintain the infrastructure, and to make our towns more livable, walkable, and attractive.**

What Matters Most to the Future of the North Fork Valley - A White Paper.
The North Fork Heart & Soul Project - February 2014

16

BLM_0059345

## Freedom, Independence and Personal Responsibility, continued

**Vision for the Future:**

We envision a future where our personal freedom and independence is honored and in balance with our responsibility to our communities. We will have just the right amount of land use regulation and zoning (and enforcement) to ensure our individual and shared resources are protected, but not so much that we lose key aspects of our independence or freedom. We envision the understanding that we live in a society and can balance our need for individual freedom with our responsibility to others.

We envision a community that is more self-sufficient and independent in its ability to provide for its basic needs in terms of food, energy and economic security.

### Ideas for Action:

- ❑ Educational programs on land use planning.
- ❑ Update the Delta County Master Plan and/or accurately follow development guidelines in the Delta County Master Plan.
- ❑ Use citizen input and an updated natural resource plan for our public lands to make sure our valley is protected from inappropriate land use and development.
- ❑ Encourage citizen knowledge of the constitution and rights.
- ❑ Encourage neighborliness and the ability for people to work out issues without resorting to legal measures.
- ❑ Develop renewable energy resources for energy independence.
- ❑ Increase access and affordability of local foods.

### *Questions and Concerns:*

How do we have **more accountability in our local leadership**?

How do we **keep land accessible** and affordable for families and farmers?

There is **a lower level of government and we do the work ourselves** (for example we govern our Water Boards and manage our water resources). How do we preserve this value of doing things ourselves and **keep a small local government**? How do we bring **in more resources to support our volunteers**?

The **same one hundred people volunteer** in a majority of the local organizations. How do we **increase civic participation**?

People have to engage with one another, but many people's paths do not cross. How do we **bridge the gaps between people** so we can work together more?

As our **society gets more complex** we need more rules and regulations. It is a **mistake not to have any rules** about how things develop. **Zoning can protect people's business and land investments.**

If we **adopt land regulations** we run the risk of attracting money and new development we do not want. **People run the risk of losing freedoms with more laws**.

How do we **balance our independence and interdependence**?

What Matters Most to the Future of the North Fork Valley - A White Paper                    17
The North Fork Heart & Soul Project - February 2014

BLM_0059346

# Traditions and Heritage

## We honor our traditions and heritage while looking to the future.

**Summary:** The traditions and heritage of the people who settled the Valley in the late 1800's are a source of pride and identity for many who live here. This includes the jobs in resource extraction and agriculture that built the valley, and the many traditions and festivals that have grown from working with the land and from the religious segments of the community. We are also growing new traditions as the times change, and recognize the value and importance of what our youth and new inhabitants bring to mix with the old.

1. **We value and respect the traditions and heritage of the rural and natural environment, the sense of community and a small town feel, the economy, and of our western, rural environment that places importance on freedom, independence and personal responsibility.**
2. **We recognize the past is an important foundation on which to build the future.**
3. **We recognize that change is inevitable, and value the opportunity to take what is important, leave behind what no longer works, and to envision a future for the valley that continues to make this place a unique and special place to live.**

**Vision for the Future:** Our youth continue the traditions and way of life of the people who have lived here and our heritage is preserved as we grow and change. New traditions are welcomed and become a part of the fabric of the community.

## Ideas for Action:

- ❑ **Open an agricultural college in the North Fork Valley.**
- ❑ **Encourage youth to participate in the organization of local festivals and traditions.**
- ❑ **Find more active ways for traditions and stories to be shared with newcomers.**
- ❑ **More old-timer and newcomer events where people can meet and greet one other.**

### *Questions and Concerns:*

How do we address **the fears that newcomers are here to change things** instead of being here because they like things the way they are? How are **newcomer contributions to the community valued**, and how do they interact with important traditions and heritage?

Our County has **more people dying than being born.** We need people to move in or else we **risk getting too small.**

BLM_0059347

# We Take Care of Our Own...
# Ideas and actions in the face of community challenges and change

At the center of the North Fork Heart & Soul Project is the question *"What matters most to the future of the North Fork Valley?"*

Community and economic development initiatives often focus heavily on process, trying to get from point A to point B within a prescribed framework of what growth or development should look like. **Looking at what *is* working, rather that what is "wrong" or what should be "changed" shines a light on the people, processes and actions** that are already addressing local challenges, on the connection between these efforts, and on the bigger picture of change in the valley.

By focusing on people and their understanding of what makes their life and home special, the Heart & Soul process allows for a process that is people-centric and revolves around the unique characteristics of a specific place.

***This people centered process opens the door to a citizen driven vision for the future and an invitation for increased civic participation.***



The North Fork Heart & Soul Project looked to the processes that were already in motion to learn how people were "taking care of their own."

Many organizations voiced the need for an infusion of support, volunteers or financial resources to ensure their work could continue. Others have been successful in pulling in the resources they need through pursuing grants, community funding, and through many hours of hard, dedicated work.

> "We build things from the ground up and it **'feels like the community created it'**."
>
> North Fork Valley Resident

What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

19

BLM_0059348

## Project Partnerships: Communication, Coordination, Cooperation, Collaboration and *Working Together*

In outreaching to the three towns and larger North Fork Valley community, the Heart & Soul Project participated in the development of local initiative and problem solving. Relationships took many forms, with all parties benefiting from working together.

**Due to Orton Family Foundation technical support, funding and dedicated local volunteers, the North Fork Heart & Soul Project was able to provide the human and/or financial resources to contribute to the next level of organizational success for local projects.**

Everyone who participated benefited from the partnerships that took place at the communication, coordination, cooperation and collaboration levels:

| **Communicate** | **Coordinate** |
|---|---|
| Sharing information between and among organizations | Harmonizing activities of organizations |
| e.g. sending one organization's event notice to your email list | e.g. having a project booth at another organization's event |
| **Cooperate** | **Collaborate** |
| Sharing resources in support of a project | Working together to create something |
| e.g. sharing data files or lending staff support to an effort | e.g. co-authoring a report |

What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

20

BLM_0059349

Heart & Soul collaborations include supporting the development of:

- ❑ **The Hotchkiss Downtown Improvement Project;**
- ❑ **An updated Paonia Master Plan;**
- ❑ **The North Fork Valley Creative Coalition and state certified arts district;**
- ❑ **The "Pass the Mic" youth radio training program;**
- ❑ **The Friends of the Paradise Theatre** and the leasing of the facilities to keep the theatre open by the Paonia Chamber, and;
- ❑ **The Community Summit and Joint Chamber Symposium** on the theme "We take care of our own", and the partnership with the Western Colorado Community Foundation to give away **$10,000 in mini-grants to local projects (see Appendix A)**







What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

21

BLM_0059350

**The Project also cooperated on a number of local storytelling and art projects that highlighted community member's personal stories and connection to sense of place:**

- ❑ **Rita Clagett's 100 years Photo Project** – "Neighbors, Strangers, Friends" featuring interviews and photographs of the valley's senior citizens;
- ❑ **Woven Heart Spots** Installation by visiting artist Lane Taplin. A multi-media project which weaves stories about sense of place into hand made and dyed fabric art;
- ❑ **Paonia Fashion Show** – Live Your Dreams (theme inspired by the Heart & Soul Project);
- ❑ **Community built art wall/alleyscape** behind Elsewhere Art Studio;
- ❑ The North Fork Valley **Health and Wellness Directory**
- ❑ Jordan Schevene's **film "What Matters Most: Exploring the Values of the North Fork Valley"**

Local projects already working within the values themes are incorporating "what matters most" into their work:

- ❑ **Creative Coalition Leadership Training** is incorporating values-based decision making modules into non-profit leadership development;
- ❑ **The North Fork Alternative Plan** used the documented value of "Rural and Natural Environment" in their submission of North Fork Land Management Guidelines to the U.S. Bureau of Land Management in regards to appropriate land use planning;
- ❑ **Citizens and Town Trustees** are asking how development plans are in alignment with the "values" at town meetings and in newspaper letters to the editors.

What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

22

BLM_0059351



# North Fork Heart & Soul Project Conclusions:

\* A primary challenge is to find a balance between keeping traditions that are working for the community while changing to adapt to the times.

\* The rural and natural environment is the most important thing to this community.

\* There is an identified need for an increased focus on economic development in the North Fork Valley and Delta County.

\* Developing a diversified economy will be more sustainable for future economic health and for job growth.

\* Citizens are taking action and are often in need of financial support and collaboration with leadership in the public sector to realize long-term success in their endeavors.

\* Issues that create polarity between communities need to be voiced and understood.

\* We can use the values to define common ground to move other planning efforts forward.

> "I want to see healthy growth in a way that we can maintain the beauty and friendliness as well as the health of our community."
>
> North Fork Valley Resident

What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

23

BLM_0059352

## What is Next?

**What would it look like, if as citizens, we considered what matters most to the future of the North Fork Valley based on what we share in common? What if we considered the diversity of experiences as a part of what is essential to the wholeness and integrity of our place? What does values based decision-making look like? How do we measure if we are developing according to our values?**

Recent county, regional and state wide economic development initiatives have probed into what is unique about the valley, taken stock of local assets, and proposed plans of action to address planning and economic development needs. We have the opportunity to bring what is of shared value to the table and to use our citizens' knowledge and understanding of important next steps to move forward. Places we can begin to explore are:

❑ Utilizing the **Governor's Bottom's Up Economic Development** plan for Delta County, and identifying and securing resources to actualize the plan;

❑ Building on the partnerships and recommendations in **Region 10's Strong Economies Together Action Plan** to develop our regional economic areas of strength;

❑ Expanding **Delta County Economic Development's (DCED)** work in the North Fork Valley to meet the growing need for a valley wide economic and community development agency;

❑ Adopting **town resolutions** to consider the shared values in planning, development and decision-making;

❑ Training **local non-profits and service organizations** in values based decision-making, and;

❑ Contributing to our **county master planning** processes.

The five community values described in this paper reflect the things that are so important to people who live here that they are non-negotiable. Like the "Code of the Old West" which determined people's conduct on western frontier, can we have a "Code of the North Fork Valley" that helps to guide our personal and group decision making?

Crawford's 1990 Community Survey Report states, **"Any community can stumble into the future, but we have the opportunity to seek the future and grow in the directions that reflect and sustain the whole community's values and ideas."**

We stand today on the bridge between the past and the future. What will be the history that we create?

> **CODE OF THE NORTH FORK VALLEY**
>
> PROTECT OUR RURAL AND NATURAL LANDS AND WATER.
>
> MAINTAIN OUR SMALL TOWN FEEL AND SENSE OF COMMUNITY.
>
> CREATE A STEADY ECONOMY.
>
> PROTECT OUR FREEDOM & INDEPENDENCE WHILE UPHOLDING PERSONAL RESPONSIBILITY.
>
> HONOR OUR TRADITIONS WHILE LOOKING TO THE FUTURE.

BLM_0059353

Appendix A

## North Fork Heart & Soul/Western Colorado Community Foundation Mini-Grant Projects

Over thirty mini-grant applications were submitted in the fall of 2013. A total of $10,000 was awarded to the following seven projects in December of 2013:

### 1. Joanna Calabrese - Conservation Center/Elsewhere Studios

The Paonia River Park Art Resident will enhance Paonia's treasured public river park by installing artwork on an unsightly chain link fence in the park. The fence art installation design will portray North Fork Heart & Soul values and will be constructed using locally sourced and recycled materials. The River Park Art Resident Project contributes to the sense of community, economy, rural and natural environment, food and water, diversity, and arts and culture that the North Fork values. The artist will spend two months during the summer of 2014 living at Elsewhere Studios while working closely with the Western Slope Conservation Center to plan and construct the installation.

### 2. Susan Hansen, Friends of Crawford Town Hall, The Preservation/Reconstruction of Crawford School Phase II

Phase II of the Preservation/Reconstruction of Crawford School (Crawford Town Hall) consists of the preservation and restoration of existing interior features of historic significance and the renovation of the interior of the building to provide a safe, functional and attractive community center for the residents of Crawford and the surrounding area. The historic preservation/reconstruction elements include preserving the existing historic features of an early 20th century four-room schoolhouse, e.g. original chalkboards, ceiling light fixtures, hardwood floors, classroom doorways and the central corridor. The renovation/remodeling elements of Phase II include stabilizing the roof structure, installing ADA compliant public restrooms, upgrading the mechanical, plumbing and electrical systems to be energy efficient and to meet current code requirements, upgrading the existing kitchen serving area to a commercial kitchen, asbestos abatement in areas that will be disturbed by the reconstruction/renovation activities and remodeling the basement level for the Town Hall offices and council chambers.

The Friends of Crawford Town Hall has partnered with the Crawford Town Council in pursuing this ambitious project. Since its inception many other state and local agencies and organizations have joined the effort to help the community preserve this historic community landmark as a reminder of its heritage and to serve as a community center for the residents of Crawford and the surround area. Such partners include the Colorado Center for Community Development, Colorado State Historical Fund, Department of Local Affairs, Crawford Area Chamber of Commerce, the Crawford-Hotchkiss Historical Society, the County Commissioners, the County Clerk and Recorder, Fruitland Mesa Club, Needlerock, Club, Smith Fork Ranch – to name a few.

What Matters Most to the Future of the North Fork Valley - A White Paper
The North Fork Heart & Soul Project - February 2014

25

BLM_0059354

### 3. Susie Kaldis, North Fork Valley Creative Coalition, Emerging Leadership Training Sponsorship and North Fork Valley Community Leadership Workshop

The North Fork Valley Creative Coalition will partner with the Heart and Soul Project to provide a partial scholarship for its Executive Director, Susie Kaldis, to attend the prestigious Rocky Mountain Leadership Program offered by the Buechner Institute for Governance, University of Denver School of Public Affairs. After completing the vigorous and competitive application process, Susie was awarded a seat amongst some of Colorado's statewide leaders.

Upon her return from the RMLP Conference, Susie will be giving back to the North Fork Valley by teaming up with two other local leaders, Merrily Talbot and Elaine Brett, to offer a cutting-edge North Fork Valley Community Leadership Workshop. The goals of this workshop are: to encourage local leadership; develop a support system for local collaboration; foster stewardship of our community values; and promote the North Fork Valley as a strong community with its well-spring of trailblazers.

### 4. Matthew Kottenstette and Megan MacMillan, The North Fork Preservation Center

The intent of this project is to investigate the feasibility of starting The North Fork L3C (L3C is a hybrid between a for-profit and non-profit organization) and consequently "The North Fork Preservation Center." The vision of the L3C is to create a collaborative label or brand for pre-existing or new shelf-stable preservative product lines within the valley. By providing a certified infrastructure, optional business consultation, marketing, and distribution center, the North Fork L3C would act as a hub and provide the services necessary for burgeoning entrepreneurs to reach the next level of producing and selling their goods.

The center is to be both a community kitchen that is easily accessible to the community for efficiently preserving food (privately and commercially) as well as a community center that is attractive to all ages and allows for a wide range of educational opportunities. For those entrepreneurs interested, a collaborative marketing and distribution effort would significantly boost profits and cut costs while not increasing the demands of each individual producer. In addition, the collaboration would create an attractive reputation for the valley that would promote the values and quality that we enjoy every day.

### 5. Annette Pretorius, Blue Sage Center for the Arts (fiscal agent), North Fork Historic Society, Hotchkiss-Crawford Historical Society, North Fork Valley Historical Markers & Talks

Our project has two parts. The first part entails erecting fiberglass signs in each North Fork Valley town that includes some historical photographs and a narrative relating the town history, the story of a particular place, or a historical anecdote. The marker will be installed in a place that is easily accessed and viewed by the public that may or may not have historical significance. The installation of each sign will be accompanied by an "unveiling event" to be organized by the respective historical body of the town. The second part is the continuation of the "This is Where We Live" living history series at the Blue Sage, where

BLM_0059355

local long-time residents tell stories of their memories of the North Fork Valley, to keep local history accessible to all community members.

The story telling events are complemented by an exhibit in the Blue Sage Gallery that uses artifacts from the Paonia Museum and artwork created by local artists representing or interpreting local history. In the next two years, we hope to work with photographers Theo Stroomer and Rita Clagett, who are each submitting a Heart and Soul grant for photo documentaries capturing local life and local history. The "This is Where We Live" series and the Blue Sage Gallery will act as platforms from which these artists can share their work with the community.

### 6. Kit Stephenson, Hotchkiss Public Library, North Fork Seed Library

The North Fork Seed Library creates a collection of heirloom seeds for the community to check out, grow, harvest, and return for the next gardener. A seed library disseminates seeds to the public who preserves the shared plant varieties that have adapted to the unique soils, climate and growing conditions of the North Fork Valley. The propagation and sharing of these seeds increases the genetic diversity on which sustainable agriculture and ecosystems depend.

Moreover, seed saving is a time-honored cultural tradition. More than genetic diversity, seeds contain stories, recipes and a way of life that is passed from one gardener to the next. To help with this tradition, the Hotchkiss Library will host classes on gardening, harvesting, cooking classes and seed saving. The hope is to create a community of growers who learn to save their seed and return more seeds than they checked out.

### 7. Tom Wills, Hotchkiss Downtown Improvement/Hotchkiss Community Chamber of Commerce, Hotchkiss Downtown and Highway Corridor Improvement

Our project began in January of 2012 concurrently with the North Fork Heart and Soul Project with a goal of encouraging local economic recovery by improving the attractiveness and usability of our downtown area. The project is a joint partnership between the Hotchkiss Community Chamber of Commerce, the Town of Hotchkiss and private business.

In 2012 the project installed and refurbished some three dozen smaller barrel planters and maintained throughout the season. In 2013 the project maintained two downtown pocket parks as well as installing nine new, massive mine timber planters. The planters were purposely designed and built using locally produced mine timbers and coal mine roof bolts. To this was added local art and they were filled with locally produced potting soil and locally grown plants, thus having the project itself add to the economy in a small way.

In 2013, we would like to install a community bulletin board and historical informational display in the Barnie Fair Pocket Park where we installed two mine timber planters last year. The board structure has been designed by a local coal mine engineer and includes themes that reference the local fruit industry. Two creatively painted picnic tables and benches will be installed in the park this year as well.

BLM_0059356



A view of Mount Lamborn and Landsend Peak in the North Fork Valley of Colorado
Photo by Jordan Schevene 2013





BLM_0059357



American Institute
*of* Biological Sciences

A Regional Landscape Approach to Maintain Diversity
Author(s): Reed F. Noss
Source: *BioScience*, Vol. 33, No. 11 (Dec., 1983), pp. 700-706
Published by: American Institute of Biological Sciences
Stable URL: http://www.jstor.org/stable/1309350
Accessed: 27/10/2009 03:19

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp. JSTOR's Terms and Conditions of Use provides, in part, that unless
you have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and you
may use content in the JSTOR archive only for your personal, non-commercial use.

Please contact the publisher regarding any further use of this work. Publisher contact information may be obtained at
http://www.jstor.org/action/showPublisher?publisherCode=aibs.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or printed
page of such transmission.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of
content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms
of scholarship. For more information about JSTOR, please contact support@jstor.org.



*American Institute of Biological Sciences* is collaborating with JSTOR to digitize, preserve and extend access
to *BioScience.*

http://www.jstor.org

# A Regional Landscape Approach to Maintain Diversity

## Reed F. Noss

Land managers have traditionally assumed that achieving maximum local habitat diversity will favor diversity of wildlife. Recent trends in species composition in fragmented landscapes suggest, however, that a more comprehensive view is required for perpetuation of regional diversity. A regional network of preserves, with sensitive habitats insulated from human disturbance, might best perpetuate ecosystem integrity in the long term. (Accepted for publication 5 May 1983)

Diversity of habitats and species has been a primary consideration for deciding which sites should be preserved (Goeden 1979, Margules and Usher 1981) as well as in management plans for parks, forests, wildlife areas, and nature preserves (Siderits and Radtke 1977, Thomas et al. 1979). But with recent developments in applied biogeography and landscape ecology, the maximum diversity concept has grown complicated. At what scale should diversity be measured and managed?

It is not often that conservation-oriented ecologists and land managers interact and discuss the issues, choices, and consequences involved in particular management decisions. I attempt with this paper to provide a basis for such communication and to examine the concept that long-term maintenance of diversity requires a management strategy that considers regional biogeography and landscape pattern above local concerns. Managers of parks, wildlife areas, and other public-use lands have traditionally been interested in maintaining maximum habitat diversity within each unit. This maximum local diversity strategy, although based on good intentions, may operate at the expense of the species and communities most in need of protection at a regional level (Faaborg 1980, Noss

1979, 1981, Samson 1980, Samson and Knopf 1982, Verner 1980).

A major goal of preservation is the perpetuation of indigenous ecosystem structure, function, and integrity. Furthermore, in a deteriorating landscape, all parks, preserves, and wildlife areas should have perpetuation of natural ecosystems as a principal goal. But individual ecosystems, the traditional focus of ecology, should not be seen as separate entities (Hansson 1977). Almost all ecosystems are "open" and exchange energy, mineral nutrients, and species. Particularly in highly heterogeneous regions, the landscape mosaic may be a more appropriate unit of study and management than single sites or ecosystems. *Landscape* has been variously defined, usually in somewhat ambiguous terms. I follow the more precise definition of *landscape* by Forman and Godron (1981) as a "kilometers-wide area where a cluster of interacting stands or ecosystems is repeated in similar form." A landscape is therefore an ecological unit with a distinguishable structure. The importance of the landscape concept is in its recognition that the structural components of a landscape interact (Forman 1981, Forman and Godron 1981).

## WHY MAINTAIN DIVERSITY?

Conservationists are very much concerned with diversity, striving "to preserve viable populations of as many as possible of the species that inhabited the pristine landscape" (Terborgh 1976). Of

course, each species is ultimately doomed to extinction as it fails to keep pace with changes in the environment, many brought on by evolutionary "advances" in other, interacting species (Stenseth 1979, Van Valen 1973, 1977). The goal of conservation is not to stop a natural process, but rather to abate the accelerating pace of species loss associated with human dominance of the biosphere (Ehrlich and Ehrlich 1981). Biologists have learned that individual species harbor unique genetic material and are components of functional ecosystems, systems that provide a vast spectrum of essential "public services" (Ehrlich 1980, Ehrlich and Mooney 1983). It is in this sense that preservation of species diversity assumes incontrovertible importance.

It is helpful to recognize three basic scales of diversity. *Alpha diversity* is the number of species within a single habitat or community (Whittaker 1972). In most cases, a single habitat is assumed to be a small area (a few hectares or less) of uniform vegetation structure. *Beta diversity* reflects the change in species composition along an environmental gradient or series of habitats. I follow Karr (1976) in interpreting alpha and beta diversities as roughly equivalent to the within- and between-habitat diversities of MacArthur (1965). This is counter to a strict definition of beta diversity, but is more useful for land managers. Finally, the total species diversity of a large geographic region (e.g., a landscape or larger) has been called *gamma diversity* (Whittaker 1972). These three basic scales or types of diversity may be affected differently by human land use practices in a given area. The habitat diversity for which land managers often strive is artificial beta diversity, a patchwork of different habitat types. For simplicity, the term *diversity* in this paper

Noss is with the Ohio Department of Natural Resources, Division of Natural Areas and Preserves, Fountain Square, Columbus, OH 43224.
© 1983 American Institute of Biological Sciences. All rights reserved.

BLM_0059359

will at all times denote "simple" diversity, or richness—the number of species (or habitats) within a defined area.

## WHY MANAGE FOR EDGE AND BETA DIVERSITY?

The "edge effect" has been a fundamental principle of wildlife management (Allen 1962, Dasmann 1964, Leopold 1933) and is a major factor encouraging a maximum local diversity philosophy. *Edge* is defined as the place where plant communities meet or where successional stages or vegetative conditions within plant communities come together (Thomas et al. 1979). It has long been observed that edges are rich in wildlife, since wildlife "occurs where the types of food and cover which it needs come together" (Leopold 1933). Along an edge, animals from each of the abutting communities or vegetation types may be found, together with animals that make frequent use of more than one vegetation type and those that actually specialize on edge (Johnston 1947). Edge has high cover density (Johnson et al. 1979) and food availability, in accordance with a high primary productivity (Ranney et al. 1981). Game animals are commonly edge-adapted, as are the animals (e.g., birds) of suburban and many urban and agricultural landscapes (Butcher et al. 1981, Whitcomb et al. 1976).

More work has been done relating birds to habitat conditions than for any other faunal group. The vertical distribution of foliage within a habitat is correlated with the number of resident bird species (Karr and Roth 1971, MacArthur 1964, MacArthur et al. 1962, Recher 1969), as is the interspersion of vegetation types. This patchiness or horizontal complexity of vegetation profiles is a major determinant of the variety of breeding species in a particular area (MacArthur and MacArthur 1961, Roth 1976, Temple et al. 1979). This beta diversity principle was anticipated by Lay (1938), who demonstrated an increase in bird species with the establishment of small clearings in a Texas forest.

Managers increase beta diversity primarily by maintaining a variety of patches of different successional age. This also increases edge effect. Meadows are periodically burned or mowed, thickets and row crops are interspersed, plots of hardwoods are cut here and there, and pines and fruiting trees (often nonnative species) are planted. Trails wind everywhere. These management practices are implemented to increase the variety and interdigitation of habitat types and thereby ostensibly favor a wide variety of both game and nongame wildlife (Faaborg 1980). That this maximum habitat diversity philosophy is deeply entrenched in the land management professions is evident from the literature. For example, in a chapter of a widely used wildlife management text (Giles 1971), Yoakum and Dasmann (1971) urge managers to "develop *as much edge as possible*" (italics mine), because "wildlife is a product of the places where two habitats meet." The National Forest Management Act of 1976 requires that a diversity of plant and animal communities be maintained to meet multiple-use objectives (Boyce and Cost 1978). Many have followed the advice of Siderits and Radtke (1977) that "a diverse wildlife population will require a planning approach that ensures a diverse environment." The area of land over which maximum diversity is attained is usually not specified, but the general emphasis on edge development and measurement suggests that it is the individual management unit rather than the regional landscape. Hence maximum beta diversity is the goal and gamma diversity (except in the case of very large units) is ignored. Alpha diversity is also generally ignored, perhaps because species number within a given vegetation stand is less tractable than the variety of stands in an area.

## COMPLICATIONS OF THE MAXIMUM LOCAL DIVERSITY APPROACH

Almost all schemes for evaluation of habitat and wildlife potential consider diversity to be of fundamental importance. Emphasis on sheer numbers of species and habitats can, however, be dangerous when applied simplistically and irrespective of regional ecology. Particularly in manipulated areas, beta diversity may include nonnative species and species typical of domesticated environments. Are such species in need of preserves for survival? Many conservationists have questioned whether widespread and opportunistic species should be considered equal to more sensitive species in ecological evaluation and the design and management of preserves. Diamond (1976), for example, contended that "conservation should not treat all species as equal but must focus on species and habitats threatened by human activities." Edge species in particular, which are mostly widespread and "weedy" (Terborgh 1976, Whitcomb et al. 1976), are rarely in danger of extinction in a human-dominated landscape.

The problems associated with a maximum local diversity approach to conservation have been noticed primarily through work in applied biogeography (*sensu* Wilson and Willis 1975), which is an extension (and sometimes over-extension) of island biogeographic theory (MacArthur and Wilson 1963, 1967) to land use planning and the design of nature preserves. Nature preserves and forest fragments have been portrayed as islands because they are patches of natural habitat in a matrix or "sea" of culturally modified land (Diamond 1975, Diamond and May 1976, Forman et al. 1976, Galli et al. 1976, Sullivan and Shaffer, 1975, Terborgh 1974, 1975, 1976, Wilson and Willis 1975). The species-area relationship (Arrhenius 1921, Gleason 1922, Preston 1960, 1962) has been found to apply to habitat islands for many organisms. Interestingly, species-area and island biogeographic considerations do not by themselves argue against a maximum local diversity strategy. Indeed, conservation implications drawn from such studies are perhaps correctly applied only to achieving maximum species richness under conditions approaching equilibrium (Margules et al. 1982, McCoy 1982). The diversity of a whole landscape has not been considered, at least not explicitly. One must go beyond the strict model of equilibrium island biogeography to determine which species and communities in a biogeographic region should be targeted for priority conservation efforts.

As a nature preserve or habitat fragment becomes increasingly isolated from other, similar habitat, fewer species may be found than in sample areas of equal size within extensive habitat blocks (Miller and Harris 1977). But in many cases of habitat insularization, species richness does not seem to change, or may even increase; species composition, however, often shifts towards taxa with low area requirements or high edge affinities. These compositional trends associated with decreases in habitat island size or increases in isolation are often predictable (Faaborg 1979, Lovejoy and Oren 1981, Lynch and Whitcomb 1978, Ranney et al. 1981, Whitcomb et al. 1981). The first species to be extirpated from small fragments are frequently high on the trophic pyramid or are the larger or more specialized members of feeding guilds (Wilson and Willis 1975). Species with variable populations dependent on patchy or unpredictable resources seem particularly sensitive (Karr 1982, Ter-

BLM_0059360

borgh and Winter 1980). Whitcomb et al. (1981) determined that the birds least tolerant of forest fragmentation in the eastern deciduous forest region (USA) tend to be neotropical migrants, forest interior specialists, open nesters (as opposed to cavity nesters), and/or ground nesters. Neotropical migrants, which typically comprise 80-90% of the breeding avifauna in extensive tracts of eastern deciduous forest, account for less than half the birds of small, isolated tracts (Whitcomb et al. 1976, 1981). Thus life history strategy can be an important component of vulnerability in a human-dominated landscape, as Levenson (1981) and Hoehne (1981) have also concluded for plants. Continual loss of native species from a landscape is certainly contrary to goals of preservation.

The deterioration of regional diversity as individual habitat patches become smaller follows from the minimum area requirements of many populations. Management for maximum diversity within individual units could exclude many species from the regional landscape if patch sizes fall below the threshold required for colonization or persistence of populations of area-dependent species. Relatively unbroken habitat blocks up to thousands of square kilometers in extent may be necessary to sustain populations of many species in the long term (Robbins 1979, Terborgh 1974, Whitcomb 1977). If habitats are fragmented within preserves in addition to outside them, the area-sensitive species may gradually drop out of the regional biota (Faaborg 1980, Noss 1981, Samson 1980, Samson and Knopf 1982).

## DETRIMENTAL EFFECTS OF INDUCED EDGE

The rare species of "undisturbed" forests are particularly sensitive to habitat alteration (Noon et al. 1979), and human disturbance of forest interiors can have pronounced effects on species presence and frequency (Hoehne 1981, Whitcomb et al. 1976). Management for edge effect through habitat subdivision is clearly a perturbation of considerable magnitude to forest interior specialists, particularly in forest islands with large perimeter/area ratios. The perimeter of any forest island is edge habitat. Edges commonly extend 10-15 m into the forest on the east, north, and south sides, and up to 30 m on the west side (e.g., in southern Wisconsin forests, Ranney et al. 1981). When forest islands become small, there is an increase in edge area relative to

interior. Edge flora, more tolerant of dry conditions, may replace interior species in small forests (Ranney et al. 1981), with the result that forest islands below a certain size are unrepresentative of the presettlement forest ecosystem. A very small forest may be entirely edge habitat.

Induced edge habitat in forests may also affect fauna. Swaths cut through forests for roads, electric transmission lines, sewer lines, and even wide trails not only stress the mesic (moist) habitat of certain species, but can destabilize entire faunal communities (Anderson 1979, Whitcomb et al. 1976). In such cases overall species richness may temporarily increase with the influx of edge-adapted opportunists, but only at the expense of the forest interior species. Birds are useful as ecological indicators in this dilemma. Corridor edges are frequently colonized by avian brood parasites (e.g., cowbirds), nest predators, and nonnative nest-hole competitors (e.g., starlings). These opportunists are usually abundant in the urban-agricultural matrix and easily invade woodlots with introduced edge (Brittingham and Temple 1983, Noss 1981, Robbins 1979, Whitcomb 1977, Whitcomb et al. 1976). Anderson (1979) found that the number of migrant birds decreased significantly, and community diversity was destabilized in a Tennessee deciduous forest after a transmission-line corridor was cut. Road and powerline corridors may also serve as at least partial barriers to the movements of small mammals (Oxley et al. 1974, Schreiber and Graves 1977) and could potentially disrupt normal dispersal patterns and population dynamics.

An illuminating study by Gates and Gysel (1978) documented some insidious effects of artifical edge. They found that a field-forest edge habitat attracted a variety and abundance of open-nesting passerine birds, but functioned as an "ecological trap." The authors determined that, although edge contains the structural cues of the mixed forest in which these birds presumably evolved, pairs nesting near the edge had smaller clutches and were subject to higher rates of predation and cowbird parasitism than those nesting in either adjoining habitat interior. These results supplement the increasing evidence that birds characteristic of forest interior habitats are unable to maintain their populations where edge is abundant (Robbins 1979). Management for high habitat diversity and edge not only degrades faunal communities, but may also accentuate negative effects

of fauna on flora. Bratton and White (1980) reported that manipulation of habitat to support a huntable deer herd can result in heavy browsing in adjacent natural areas and further endanger a number of rare plant species.

An uncritical acceptance of the maximum habitat diversity philosophy may be inimical to the preservation of regional diversity if applied routinely in a number of management units across a landscape. Although local (beta) diversity may be increased by management practices that enhance habitat patchiness and edge effect, this local increment is obtained at the expense of those species most in need of protection. The increment generally comprises species that are common in the urban-agricultural matrix. Even the local increase in diversity may be ephemeral if forest interior species gradually drop out of the biota. Clearly, management for maximum diversity can be a "trap" (Verner 1980). Some positive and negative effects of management for each of the three general scales of diversity are summarized in the box (opposite).

## A REGIONAL LANDSCAPE APPROACH

Ecologists, land managers, and planners have traditionally ignored interactions among the different elements in a landscape and, with rare exceptions, have looked at landscape elements as separate ecosystems (Forman 1981). A criterion of habitat homogeneity is often applied to field studies to focus attention on a tractable set of variables. But field naturalists have known for a long time that many organisms habitually move among "different" communities. MacArthur et al. (1962) recognized that some bird species may require two or more types of vegetation profiles rather than some mean profile. Karr (1968) suggested that, although it is important to control as many variables as possible in a scientific endeavor, it is also necessary to determine what occurs in areas characterized by an interdigitation of habitat types. These observations open the door to *landscape ecology*, the study of the interactions and fluxes of energy, mineral nutrients, and species among clustered stands or ecosystems (Forman 1981, Forman and Godron 1981). Landscape ecology deals with an ecological mosaic of patches with continuously varying degrees of connectedness and recognizes the importance of matrix and corridors to terrestrial habitat island dynamics.

BLM_0059361

# Managing for Different Scales of Diversity*

| SCALE | METHODS | ADVANTAGES | DISADVANTAGES |
|---|---|---|---|
| Alpha (within-habitat) | Achieve optimum levels of limiting resources (e.g., food supply) to ameliorate interspecific competition; increase structural complexity (e.g., vertical strata, substrate) to provide more physical niche space; control unwanted species. | Increased number of species within habitat, and/or increased population levels of particular species; desired community structure maintained. | May be arduous and costly to implement; considerable uncertainty about effects of management actions on particular species (undesirable species could reach pest proportions, and critical species could decline). |
| Beta (between-habitat, including "edge effect") | Maintain variety of successional stages; intersperse different habitat types; construct roads, trails, and other swaths. | Increased local species richness; increased population levels of edge-adapted species (e.g., many game animals); increased human recreational potential. | Decreased population levels or extirpation of interior specialists; proliferation of "weedy," opportunistic species; community destabilization; possibly decreased regional diversity (may limit options for regional diversity). |
| Gamma (regional) | Preserve sufficiently large areas of unaltered indigenous ecosystems on a regional scale; interconnect habitat patches; limit human intrusion in sensitive areas. | Adequate population levels and genetic variation of indigenous species maintained; critical ecosystem processes perpetuated; long-term human welfare promoted. | Some loss of local species richness with declines in edge species; more land taken out of "productive" human use; short-term economic losses. |

* The three strategies are not necessarily mutually exclusive.

For any landscape, the model natural ecosystem complex is the presettlement vegetation and associated biotic and abiotic elements. Preservation activities would ideally maintain high-quality examples of presettlement-type ecosystems in approximate proportion to their former abundance in the region. This does not mean trying to hold nature static. Rather, *preservation* should imply perpetuating the dynamic processes of presettlement landscapes. Landscapes are constantly changing, gradually or episodically, over geological and evolutionary time with geomorphological processes, climatic change, and the origin and extinction of species. They change more rapidly with local or regional species turnover, meteorological events, and other aspects of disturbance. Within a landscape, however, the suite of disturbances and successions within a cluster of stands is relatively constant (Forman 1981).

A regional landscape approach to preservation demands an integration of ecological evaluation methodologies, coordinating data from individual species occurrences to regional landscape patterns. Rare species are generally the most vulnerable to extinction and must therefore receive priority attention in evaluation and protection programs (Adamus and Clough 1978, Terborgh and Winter 1980); but there is danger in overemphasizing rarity to the exclusion of other criteria. There are several categories of rare species, some of which may not be overly prone to further endangerment. Some rare species, such as key predators that regulate diversity of lower levels in the food chain, may have profound ecological importance; others may be redundant or nonessential to ecosystem function (although they nonetheless constitute unique genetic material and would be worthy of equivalent ethical consideration). There is also a problem of scale: species rare locally may be relatively common regionally or vice versa (Margules and Usher 1981). With regional diversity and ecological integrity as the goal, the rarity criterion is probably most appropriately applied regionally and/or globally.

Debate continues over whether one large preserve or several smaller preserves are optimal for preservation of regional diversity, with theory often yielding conflicting advice (Higgs 1981, Margules et al. 1982, Simberloff and Abele 1982). But in a human-dominated landscape, as Diamond (1976) pointed out, "the question is not which reserve system contains more species, but which contains more species that would be doomed to extinction in the absence of refuges." Much of the preserve size controversy has begged this important question, although Humphreys and Kitchener (1982) showed that vertebrates most in need of conservation (retained only in preserves) are favored by large reserves. Moreover, the focus on numbers of species tends to obscure the fundamental point that saving complete ecosystems is what is at stake, and natural ecosystems do seem to have a minimum critical size (Lovejoy and Oren 1981, Nilsson 1978). In regional landscape planning, preservation of whole ecosystems with the full complement of indigenous genetic diversity is the ideal. This demands a complex of both large and small preserves and as many as possible, taking advantage of auspicious protection opportunities when they arise. This "combined strategy" (Kushlan 1979) is designed to maintain both species and ecological processes in a landscape.

## THE IMPORTANCE OF INTERCONNECTIONS

The interconnections among the patches in a landscape may be at least as significant to maintenance of diversity as the size of the patches. It has been suggested that linking devices, such as

BLM_0059362

forested corridors or stepping-stones of small forest tracts, might encourage dispersal of interior species between forest islands (Butcher et al. 1981, Diamond 1975, Willis 1974). Dispersal between patches is crucial to the prevention of genetic stagnation in small inbreeding populations (Miller 1979). Wegner and Merriam (1979) found that birds and small mammals use fencerows between woodlots much more than they travel across open fields, and they suggested that well-vegetated fencerows may relieve the barriers created by open fields. MacClintock et al. (1977) demonstrated the value of biogeographic position in maintaining species composition in fragmented forests. In their study, a small forest tract connected by a corridor to a nearby extensive forest system was characterized by a typical forest interior avifauna, in contrast to the depauperate condition of similar but isolated forest fragments. Margules et al. (1982) have noted, however, that proximity to the extensive forest was not separated from corridor effects in this study. In any case, MacClintock et al. (1977) did confirm the importance of minimal isolation to preservation of diversity. Concern about disease transmission along corridors (Frankel and Soulé 1981) has not been validated empirically.

There are several types of biogeographic corridors (Forman and Godron 1981). A basic distinction is between strip corridors and line corridors. Strip corridors are wide enough to maintain interior conditions in their centers, whereas line corridors (tree lines, fencerows, etc.) are essentially all edge habitat. Since some interior species will not live in or even migrate through extensive lengths of unsuitable habitat (Forman and Godron 1981), strip corridors are usually preferable to lines. Anderson et al. (1977) found that a powerline corridor through forest would have to be somewhat wider than 60 m to function as a strip corridor by providing field interior habitat for birds. On the other hand, wooded corridors through agricultural land may need to be over 100 m wide to retain forest-interior tree species like beech in Wisconsin (Ranney et al. 1981).

A regional landscape approach to preservation should therefore recognize the importance of broad corridors connecting habitat islands. Fencerows and shelterbelts should be widened whenever possible. Regional planners should draw corridors of natural habitat onto their blueprints. Park planners might connect significant patches of habitat within a given park, which would minimize island effects while still permitting development of considerable land area. Stream corridors, which can be effective avenues of dispersal for terrestrial as well as aquatic organisms, particularly if they are wide and contain some upland habitat, should be protected wherever possible.

## MANAGEMENT GUIDELINES

Large, essentially unmanaged areas unquestionably offer the best prospects for long-term maintenance of ecosystem processes and integrity. But in a fragmented landscape, such areas often no longer exist. We can attempt only to approximate the pristine, presettlement condition, and this new landscape will not "manage itself" (Diamond 1981). In large tracts of old-growth forest, natural disturbance creates a "shifting-mosaic steady state," a dynamic but regionally persistent ecosystem complex that "would range from openings to all degrees of stratification" (Bormann and Likens 1979). The old-growth complex thus contains, in approximate steady state over some intermediate time span, all community types that might be classified within a bioregion, from prairies and bogs to shrub and climax forests. The high vertical and horizontal complexity of this old growth supports a correspondingly high diversity of flora and fauna (Schoen et al. 1981). To assure a rich landscape, conservationists should protect old growth wherever it occurs. Where possible, acreage should be expanded by allowing artificial successional areas to mature.

The complication in restoring a semblance of the old-growth system in a fragmented landscape is that the natural pattern of disturbance and recovery has been so terribly disrupted that the shifting mosaic has virtually nowhere to shift. In natural landscapes *unmodified by man*, disturbances are patchy in time and space and range from the removal of individual trees to devastation of many square kilometers (Wright 1974). The continual shifting, destruction, and renewal of patches generally assures that many seral stages and community types are maintained simultaneously on a regional scale. Degenerative changes in some portions of the landscape are balanced by regenerative changes in other portions (Bonnicksen and Stone 1982, Bormann and Likens 1979, Pickett and Thompson 1978, Sprugel 1976, Whittaker 1953). But in fragmented systems, both disturbance and lack of disturbance can be threats to regional diversity. A small but intense fire may obliterate a virgin forest remnant; a relict prairie without fire may be invaded by shrubs. This dilemma arises because of the small sizes and artificial boundaries and spacing of most surviving habitat islands. When preserve size is small relative to the scale of disturbance, the full range of compositional changes may be experienced locally (White and Bratton 1980). The smaller the preserve, the more necessary is vigorous protection *and* management to retain or restore the conditions for which the preserve is set aside (Diamond 1981, Pyle 1980).

## CONCLUSIONS

Through an integration of concepts, the landscape paradigm identifies patterns that might otherwise go unnoticed. These patterns include regional trends in extinction and colonization, relative abundances of species and habitat types, and spatiotemporal dynamics of the structural components of a landscape.

Species composition and abundances, not simple number of species, assume primary importance in the context of regional preservation. Native species are preferred over those exotic to the landscape and rare or reduced species over the widespread and superabundant. The presettlement landscape (allowing for natural dynamism) is the ideal condition against which contemporary diversity and composition are evaluated. Management of the land to achieve maximum critical habitat area and insulate species with high extinction probabilities is the most prudent approach to long-term conservation.

## ACKNOWLEDGMENTS

Much of this work was supported by the Ohio Department of Natural Resources, Division of Natural Areas and Preserves. I have benefited tremendously from the advice and encouragement of Drs. D. Anderson, R. Boerner, J. Faaborg, R. Forman, F. Samson, R. Whitcomb, and two anonymous reviewers. Many other individuals, too numerous to note here, have helped clarify my thoughts on these problems.

## REFERENCES CITED

Adamus, P. R., and G. C. Clough. 1978. Evaluating species for protection in natural areas. *Biol. Conserv.* 13: 165–178.

BLM_0059363

Allen, D. L. 1962. *Our Wildlife Legacy*. Funk and Wagnals, New York.

Anderson, S. H. 1979. Changes in forest bird species composition caused by transmission-line corridor cuts. *Am. Birds* 33: 3–6.

Anderson, S. H., K. Mann, and H. H. Shugart, Jr. 1977. The effect of transmission-line corridors on bird populations. *Am. Midl. Nat.* 97: 216–221.

Arrhenius, O. 1921. Species and area. *J. Ecol* 9: 95–99.

Bonnicksen, T. M., and E. C. Stone. 1982. Reconstruction of a presettlement giant sequoia-mixed conifer forest community using the aggregation approach. *Ecology* 63: 1134–1148.

Bormann, F. H., and G. E. Likens. 1979. *Pattern and Process in a Forested Ecosystem*. Springer-Verlag, New York.

Boyce, S. G., and N. D. Cost. 1978. Forest diversity—new concepts and applications. *US For. Serv. Res. Pap.* SE-194.

Bratton, S. P., and P. S. White. 1980. Rare plant management—after preservation what? *Rhodora* 82: 49–75.

Brittingham, M. C., and S. A. Temple. 1983. Have cowbirds caused forest songbirds to decline? *BioScience* 33: 31–35.

Burgess, R. L., and D. M. Sharpe, eds. 1981. *Forest Island Dynamics in Man-Dominated Landscapes*. Springer-Verlag, New York.

Butcher, G. S., W. A. Niering, W. J. Barry, and R. H. Goodwin. 1981. Equilibrium biogeography and the size of nature preserves: an avian case study. *Oecologia (Berl.)* 49: 29–37.

Dasmann, R. F. 1964. *Wildlife Biology*. John Wiley and Sons, Inc., New York.

Diamond, J. M. 1975. The island dilemma: lessons of modern biogeographic studies for the design of natural preserves. *Biol. Conserv.* 7: 129–146.

———. 1976. Island biogeography and conservation: strategy and limitations. *Science* 193: 1027–1029.

———. 1981. Current issues in conservation. *Nature* 289: 350–351.

Diamond, J. M., and R. M. May. 1976. Island biogeography and the design of natural reserves. Pages 163–186 in R. M. May, ed. *Theoretical Ecology: Principles and Applications*. W. B. Saunders Co., Philadelphia.

Ehrlich, P. R. 1980. The strategy of conservation, 1980–2000. Pages 329–344 in M. E. Soulé and B. A. Wilcox, eds. *Conservation Biology: An Evolutionary-Ecological Perspective*. Sinauer Associates, Inc., Sunderland, MA.

Ehrlich, P. R., and A. H. Ehrlich. 1981. *Extinction: The Causes and Consequences of the Disappearance of Species*. Random House, New York.

Ehrlich, P. R., and H. A. Mooney. 1983. Extinction, substitution and ecosystem services. *BioScience* 33: 248–254.

Faaborg, J. 1979. Qualitative patterns of avian extinction on neotropical land-bridge islands: lessons for conservation. *J. Appl. Ecol.* 16: 99–107.

———. 1980. Potential uses and abuses of diversity concepts in wildlife management. *Trans. MO Acad. Sci.* 14: 41–49.

Forman, R. T. T. 1981. Interactions among landscape elements: a core of landscape ecology. Pages 35–48 in *Perspectives in Landscape Ecology*, Proceedings of the International Congress of Landscape Ecology, Veldhoven. Pudoc Publ., Wageningen, The Netherlands.

Forman, R. T. T., and M. Godron. 1981. Patches and structural components for a landscape ecology. *BioScience* 31: 733–740.

Forman, R. T. T., A. E. Galli, and C. F. Leck. 1976. Forest size and avian diversity in New Jersey woodlots with some land use implications. *Oecologia (Berl.)* 26: 1–8.

Frankel, O. H., and M. E. Soulé. 1981. *Conservation and Evolution*. Cambridge University Press, Cambridge, England.

Galli, A. E., C. F. Leck, and R. T. T. Forman. 1976. Avian distribution patterns in forest islands of different sizes in central New Jersey. *Auk* 93: 356–364.

Gates, J. E., and L. W. Gysel. 1978. Avian nest dispersion and fledgling success in field-forest ecotones. *Ecology* 59: 871–883.

Giles, R. H., ed. 1971. *Wildlife Management Techniques*. The Wildlife Society, Washington, DC.

Gleason, H. A. 1922. On the relationship between species and area. *Ecology* 3: 158–162.

Goeden, G. B. 1979. Biogeographic theory as a management tool. *Environ. Conserv.* 6: 27–32.

Hansson, L. 1977. Landscape ecology and stability of populations. *Landscape Planning* 4: 85–93.

Higgs, A. J. 1981. Island biogeography and nature reserve design. *J. Biogeogr.* 8: 117–124.

Hoehne, L. M. 1981. The groundlayer vegetation of forest islands in an urban-suburban matrix. Pages 41–54 in R. L. Burgess and D. M. Sharpe, eds. *Forest Island Dynamics in Man-Dominated Landscapes*. Springer-Verlag, New York.

Humphreys, W. F., and D. J. Kitchener. 1982. The effect of habitat utilization on species-area curves: implications for optimal reserve area. *J. Biogeogr.* 9: 391–396.

Johnson, W. C., R. K. Schreiber, and R. L. Burgess. 1979. Diversity of small mammals in a powerline right-of-way and adjacent forest in east Tennessee. *Am. Midl. Nat.* 101: 231–235.

Johnston, V. R. 1947. Breeding birds of the forest edge in east-central Illinois. *Condor* 49: 45–53.

Karr, J. R. 1968. Habitat and avian diversity on strip-mined land in east-central Illinois. *Condor* 70: 348–357.

———. 1976. Within- and between-habitat avian diversity in African and neotropical lowlands habitats. *Ecol. Monogr.* 46: 457–481.

———. 1982. Population variability and extinction in the avifauna of a tropical land-bridge island. *Ecology* 63: 1975–1978.

Karr, J. R., and R. R. Roth. 1971. Vegetation

structure and avian diversity in several New World areas. *Am. Nat.* 105: 423–435.

Kushlan, J. A. 1979. Design and management of continental wildlife reserves: lessons from the Everglades. *Biol. Conserv.* 15: 281–290.

Lay, D. W. 1938. How valuable are woodland clearings to birdlife? *Wilson Bull.* 45: 254–256.

Leopold, A. 1933. *Game Management*. Charles Scribners Sons, New York.

Levenson, J. B. 1981. Woodlots as biogeographic islands in southeastern Wisconsin. Pages 12–39 in R. L. Burgess and D. M. Sharpe, eds. *Forest Island Dynamics in Man-Dominated Landscapes*. Springer-Verlag, New York.

Lovejoy, T. E., and D. C. Oren. 1981. The minimum critical size of ecosystems. Pages 7–12 in R. L. Burgess and D. M. Sharpe, eds. *Forest Island Dynamics in Man-Dominated Landscapes*. Springer-Verlag, New York.

Lynch, J. F., and R. F. Whitcomb. 1978. Effects of the insularization of the eastern deciduous forest on avifaunal diversity and turnover. Pages 461–489 in A. Marmelstein, ed. *Classification, Inventory, and Analysis of Fish and Wildlife Habitat*. US Fish and Wildlife Service, Washington, DC.

MacArthur, R. H. 1964. Environmental factors affecting bird species diversity. *Am. Nat.* 98: 387–397.

———. 1965. Patterns of species diversity. *Biol. Rev.* 40: 510–533.

MacArthur, R. H., and J. W. MacArthur. 1961. On bird species diversity. *Ecology* 42: 594–598.

MacArthur, R. H., and E. O. Wilson. 1963. An equilibrium theory of insular zoogeography. *Evolution* 17: 373–387.

———. 1967. *The Theory of Island Biogeography*. Princeton Univ. Press, Princeton, NJ.

MacArthur, R. H., J. W. MacArthur, and J. Preer. 1962. On bird species diversity—Prediction of bird censuses from habitat measurements. *Am. Nat.* 96: 167–174.

MacClintock. L., R. F. Whitcomb, and B. L. Whitcomb. 1977. Island biogeography and ''habitat islands'' of eastern forest. II. Evidence for the value of corridors and minimization of isolation in preservation of biotic diversity. *Am. Birds* 31: 6–12.

Margules, C., A. J. Higgs, and R. W. Rafe. 1982. Modern biogeographic theory: are there any lessons for nature reserve design? *Biol. Conserv.* 24: 115–128.

Margules, C., and M. B. Usher. 1981. Criteria used in assessing wildlife conservation potential: a review. *Biol. Conserv.* 21: 79–109.

McCoy, E. D. 1982. The application of island-biogeographic theory to forest tracts: problems in the determination of turnover rates. *Biol. Conserv.* 22: 217–227.

Miller, R. I. 1979. Conserving the genetic integrity of faunal populations and communities. *Environ. Conserv.* 6: 297–304.

Miller, R. I., and L. D. Harris. 1977. Isolation and extirpations in wildlife reserves.

BLM_0059364

*Biol. Conserv.* 12: 311–315.

Nilsson, S. G. 1978. Fragmented habitats, species richness and conservation practice. *Ambio* 7: 26–27.

Noon, B. R., V. P. Bingman, and J. P. Noon. 1979. The effects of changes in habitat on northern hardwood forest bird communities. Pages 33–48 in R. M. DeGraaf and K. E. Evans, eds. *Management of Northcentral and Northeastern Forests for Nongame Birds. US For. Serv. Gen. Tech. Rep.* NC-51.

Noss, R. F. 1979. The avifauna and its diversity in Sugarcreek Reserve: component trends over a summer and implications for sanctuary management. MS thesis. University of Tennessee, Knoxville.

——. 1981. The birds of Sugarcreek, an Ohio nature reserve. *Ohio J. Sci.* 81: 29–40.

Oxley, D. J., M. B. Fenton, and G. R. Carmody. 1974. The effects of roads on populations of small mammals. *J. Appl. Ecol.* 11: 51–59.

Pickett, S. T. A., and J. N. Thompson. 1978. Patch dynamics and the size of nature reserves. *Biol. Conserv.* 13: 27–37.

Preston, F. W. 1960. Time and space and the variation of species. *Ecology* 41: 611–627.

——. 1962. The canonical distribution of commonness and rarity. *Ecology* 43: 185–215, 410–432.

Pyle, R. M. 1980. Management of nature reserves. Pages 319–327 in M. E. Soulé and B. A. Wilcox, eds. *Conservation Biology: An Evolutionary-Ecological Perspective.*

Sinauer Associates, Inc., Sunderland, MA.

Ranney, J. W., M. C. Bruner, and J. B. Levenson. 1981. The importance of edge in the structure and dynamics of forest islands. Pages 67–95 in R. L. Burgess and D. M. Sharpe, eds. *Forest Island Dynamics in Man-Dominated Landscapes.* Springer-Verlag, New York.

Recher, H. 1969. Bird species diversity and habitat diversity in Australia and North America. *Am. Nat.* 103: 75–80.

Robbins, C. S. 1979. Effect of forest fragmentation on bird populations. Management of northcentral and northeastern forests for nongame birds. *US For. Serv. Gen. Tech. Rep.* NC-51: 198–212.

Roth, R. R. 1976. Spatial heterogeneity and bird species diversity. *Ecology* 57: 773–782.

Samson, F. B. 1980. Island biogeography and the conservation of nongame birds. *Trans. N. Am. Wildl. and Nat. Res. Conf.* 45: 245–251.

Samson, F. B., and F. L. Knopf. 1982. In search of a diversity ethic for wildlife management. *Trans. N. Am. Wildl. Nat. Res. Conf.* 47: 421–431.

Schoen, J. W., O. C. Wallmo, and M. D. Kirchhoff. 1981. Wildlife-forest relationships: is a reevaluation of old-growth necessary? *Trans. N. Am. Wildl. Nat. Res. Conf.* 46: 531–544.

Schreiber, R. K., and J. H. Graves. 1977. Powerline corridors as possible barriers to the movements of small animals. *Am. Midl. Nat.* 97: 504–508.

Siderits, K., and R. E. Radtke. 1977. Enhancing forest wildlife habitat through diversity. *Trans. N. Am. Wildl. Nat. Res. Conf.* 42: 425–434.

Simberloff, D., and Abele, L. G. 1982. Refuge design and island biogeographic theory: effects of fragmentation. *Am. Nat.* 120: 41–50.

Sprugel, D. G. 1976. Dynamic structure of wave-regenerated *Abies balsamea* forests in the north-eastern United States. *J. Ecol.* 64: 889–911.

Stenseth, N. C. 1979. Where have all the species gone? On the nature of extinction and the Red Queen hypothesis. *Oikos* 33: 196–227.

Sullivan, A. L., and M. L. Shaffer. 1975. Biogeography of the megazoo. *Science* 189: 13–17.

Temple, S. A., M. J. Mossman, and B. Ambuel. 1979. The ecology and management of avian communities in mixed hardwood-conifer forests. Pages 132–153 in R. M. DeGraaf and K. E. Evans, eds. *Management of Northcentral and Northeastern Forests for Nongame Birds. US. For. Serv. Gen. Tech. Rep.* NC-51.

Terborgh, J. 1974. Preservation of natural diversity: the problem of extinction-prone species. *BioScience* 24: 715–722.

——. 1975. Faunal equilibria and the design of wildlife preserves. Pages 369–380 in F. B. Golley and E. Medina, eds. *Tropical Ecological Systems.* Springer-Verlag, New York.

——. 1976. Island biogeography and conservation: strategy and limitations. *Science* 193: 1029–1030.

Terborgh, J., and B. Winter. 1980. Some causes of extinction. Pages 119–133 in M. E. Soulé and B. A. Wilcox, eds. *Conservation Biology: An Evolutionary-Ecological Perspective.* Sinauer Associates, Inc., Sunderland, MA.

Thomas, J. W., C. Maser, and J. E. Rodiek. 1979. Edges. Pages 48–59 in J. W. Thomas, ed. *Wildlife Habitats in Managed Forests: The Blue Mountains of Oregon and Washington.* US For. Serv. Agr. Handbook No. 553. Washington, DC.

Van Valen, L. 1973. A new evolutionary law. *Evol. Theory* 1: 31–49.

——. 1977. The Red Queen. *Am. Nat.* 111: 809–810.

Verner, J. 1980. Bird communities of mixed-conifer forests of the Sierra Nevada. Pages 198–223 in R. M. DeGraaf and N. G. Tilghman, eds. *Management of Western Forests and Grasslands for Nongame Birds. US For. Serv. Gen. Tech. Rep.* INT-86.

Wegner, J. F., and G. Merriam. 1979. Movements by birds and small mammals between a wood and adjoining farmland habitat. *J. Appl. Ecol.* 16: 349–357.

Whitcomb, R. F. 1977. Island biogeography and ''habitat islands'' of eastern forest. I. Introduction. *Am. Birds* 31: 3–5.

Whitcomb, R. F., J. F. Lynch, P. A. Opler, and C. S. Robbins. 1976. Island biogeography and conservation: strategy and limitations. *Science* 193: 1030–1032.

Whitcomb, R. F., C. S. Robbins, J. F. Lynch, B. L. Whitcomb, K. Klimkiewicz, and D. Bystrak. 1981. Effects of forest fragmentation on avifauna of the eastern deciduous forest. Pages 125–205 in R. L. Burgess and D. M. Sharpe, eds. *Forest Island Dynamics in Man-Dominated Landscapes.* Springer-Verlag, New York.

White, P. S., and S. P. Bratton. 1980. After preservation: philosophical and practical problems of change. *Biol. Conserv.* 18: 241–255.

Whittaker, R. H. 1953. A consideration of climax theory: the climax as a population and pattern. *Ecol. Monogr.* 23: 41–78.

——. 1972. Evolution and measurement of species diversity. *Taxon.* 21: 213–251.

Willis, E. O. 1974. Populations and local extinctions of birds on Barro Colorado Island, Panama. *Ecol. Monogr.* 44: 153–169.

Wilson, E. O., and E. O. Willis. 1975. Applied biogeography. Pages 522–534 in M. L. Cody and J. M. Diamond, eds. *Ecology and Evolution of Communities.* Belknap Press of Harvard University Press, Cambridge, MA.

Wright, H. E. 1974. Landscape development, forest fires, and wilderness management. *Science* 186: 487–495.

Yoakum, J., and W. P. Dasmann. 1971. Habitat manipulation practices. Pages 173–231 in R. H. Giles, ed. *Wildlife Management Techniques.* The Wildlife Society, Washington, DC.



**The Drosophila Guide**

The classic introduction to the Genetics and Cytology of *Drosophila melanogaster*, by M. Demerec and B. F. Kaufmann (1940, reprinted 1978), $2.50 per copy.

To many thousands of university and high school biology students, Demerec and Kaufmann's fruitflies are as well known as Mendel's peas. This handbook of genetics experiments leads the student through a variety of experiments demonstrating basic concepts in genetics. Photographs and text explain laboratory procedures as well as the care and feeding of Drosophila.

Also available:
*Genetic Variations in Drosophila melanogaster* (Lindsley and Grell, 1968), $16.50.

Mail orders with prepayment to:
Publications Office
Carnegie Institution of Washington
1530 P Street, N.W.
Washington, D.C. 20005

Add postage/handling:
for orders under $5.          add $0.60
for orders under $10.        add  1.00
for orders over $9.99        add  2.00
A 20% discount is allowed for orders exceeding $100.

BLM_0059365

# Beyond Kyoto: Forest Management in a Time of Rapid Climate Change

REED F. NOSS

Conservation Science, Inc., 7310 NW Acorn Ridge, Corvallis, OR 97330, U.S.A.,
email reed_noss@conservationscience.com

**Abstract:** *Policies to reduce global warming by offering credits for carbon sequestration have neglected the effects of forest management on biodiversity. I review properties of forest ecosystems and management options for enhancing the resistance and resilience of forests to climate change. Although forests, as a class, have proved resilient to past changes in climate, today's fragmented and degraded forests are more vulnerable. Adaptation of species to climate change can occur through phenotypic plasticity, evolution, or migration to suitable sites, with the latter probably the most common response in the past. Among the land-use and management practices likely to maintain forest biodiversity and ecological functions during climate change are (1) representing forest types across environmental gradients in reserves; (2) protecting climatic refugia at multiple scales; (3) protecting primary forests; (4) avoiding fragmentation and providing connectivity, especially parallel to climatic gradients; (5) providing buffer zones for adjustment of reserve boundaries; (6) practicing low-intensity forestry and preventing conversion of natural forests to plantations; (7) maintaining natural fire regimes; (8) maintaining diverse gene pools; and (9) identifying and protecting functional groups and keystone species. Good forest management in a time of rapidly changing climate differs little from good forest management under more static conditions, but there is increased emphasis on protecting climatic refugia and providing connectivity.*

Después de Kyoto: Manejo Forestal en Tiempos de Cambio Climático Acelerado

**Resumen:** *Las políticas para reducir el calentamiento global mediante créditos para el secuestro de carbono han pasado por alto los efectos del manejo forestal sobre la biodiversidad. Reviso las propiedades de los ecosistemas forestales y las opciones de manejo para reforzar la resistencia y la elasticidad de los bosques ante el cambio climático. Aunque los bosques han demostrado elasticidad a cambios climáticos en el pasado, los fragmentados y degradados bosques actuales son más vulnerables. La adaptación de especies al cambio climático puede ocurrir por medio de la plasticidad fenotípica, evolución o migración a sitios adecuados, siendo probablemente ésta la respuesta más común en el pasado. Entre las prácticas de uso y manejo de suelo que pueden mantener la biodiversidad y funciones ecológicas de los bosques durante el cambio climático se cuentan 1) representar tipos de bosques en reservas en gradientes ambientales; 2) protección de refugios climáticos en escalas múltiples; 3) protección de bosques primarios; 4) evitar la fragmentación y proporcionar conectividad, especialmente paralela a gradientes climáticos; 5) proporcionar zonas de amortiguamiento para ajustar límites de reservas; 6) prácticas forestales de baja intensidad y evitar la conversión de bosques naturales a plantaciones; 7) mantenimiento de regímenes de fuego natural; 8) mantenimiento de pozas génicas diversificadas; 9) identificación y protección de grupos funcionales y especies clave. El manejo adecuado de bosques en tiempos de cambios climáticos rápidos difiere poco del manejo adecuado de bosques bajo condiciones más estáticas, pero tiene mayor énfasis en la protección de refugios climáticos y en proporcionar conectividad.*

*Paper submitted September 6, 2000; revised manuscript accepted January 1, 2001.*

**578**

BLM_0059366

## Introduction

Climate change is a major threat to biodiversity over the coming century (Peters & Lovejoy 1992). Therefore, efforts to lessen global warming by reducing emissions of $CO_2$ and other greenhouse gases or by increasing uptake of carbon by vegetation are of great interest to conservationists. The Kyoto Protocol, an international treaty under prolonged negotiation, offers countries the opportunity to receive credits for reducing emissions or increasing sequestration of carbon (Schulze et al. 2000). Countries can reduce their commitments to emission reductions by afforestation or reforestation. The U.S. government favors such comprehensive carbon accounting and expects to meet about half of its annual commitment under the protocol through land-based carbon sinks (Smaglik 2000). Although the Kyoto Protocol has potential conservation benefits, such as the creation of markets for forest preservation (Bonnie et al. 2000; Kremen et al. 2000), carbon accounting also poses biological risks. Countries could receive credits, for example, by planting trees in natural grasslands. And, because accounting will not begin until the year 2008, a country potentially could accrue credits by logging primary forests now and replacing them with rapidly growing plantations.

Missing from the Kyoto discussions is any consideration of biodiversity. The protocol is silent on forest management issues not directly related to carbon accounting. I explore the basis for a more rational policy for managing forests in the face of climate change. In particular, I ask what inherent properties of forest ecosystems and what kinds of management are likely to enhance the resistance and resilience of forests.

Forests have occupied the earth for nearly 400 million years (Tidwell 1998), experiencing massive upheavals in climate related to shifts in the earth's rotation on its axis, variation in solar radiation, plate tectonics, orogeny, volcanism, glaciation, and occasional collision with asteroids. Forests have persisted through all these events, but not unchanged. Their species composition has varied almost continuously, with the distributions of tree species and forest types shifting, contracting, and expanding over time (Graham 1999). Despite these changes, forests as a class have proved remarkably resilient. Although the present rate of warming is higher than previous rates over the last 10,000 years, forests apparently have weathered even faster changes in the past, albeit the most rapid changes were associated with mass extinctions (Graham 1999).

If climate change were the only factor menacing forests today, and if the landscape were still pristine, there arguably would be little cause for worry. The fossil record shows numerous examples of species migrating and persisting through past changes. By and large, climatic change may have been as great a force for specia-

tion as for extinction (Sepkoski 1998; Hewitt 2000). Even with the rapidity of change predicted for the next few decades, in the absence of other threats most species could be expected to adjust to these changes as they have in the past. This knowledge might lead some to suppose that the current warming of the atmosphere caused by emissions of greenhouse gases is of little concern. Today, however, climate change is being played out on a very different court—one in which direct destruction, fragmentation, and degradation of ecosystems by humans, accompanied by vast invasions of alien species, are proceeding at a breakneck pace worldwide. It is in combination with these threats that global warming becomes so insidious (Peters & Darling 1985; Dudley 1998; Sala et al. 2000). More optimistically, by learning how forests adjust to climate change and other stresses under natural conditions, we might be able to maintain, restore, or mimic these processes of adjustment.

## Resistance, Resilience, and Change in Forest Ecosystems

Many reviews of the potential effects of climate change on forests are available (e.g., Ciesla 1995; Beniston & Innes 1998; Brown 1998; Dudley 1998; Jarvis & Aitken 1998; Sedjo & Sohngen 1998; Winnett 1998). The Intergovernmental Panel on Climate Change (IPCC 1996a, 1996b) concluded that forests are highly sensitive to modern climate change. Although the details of expected change in forests on a regional scale are unclear, the scenarios of general circulation models (GCMs) predict major shifts in the area occupied by forest biomes (Neilson et al. 1994; Hadley Center for Climate Prediction and Research 1998). For example, globally, the area occupied by tropical and temperate forests is projected to expand by up to 20%, whereas boreal forests may decline by 50% (Krankina & Dixon 1993), if other causes of change are ignored. Moreover, the rate of climate change over the next century may be faster than most historic changes, suggesting that adjustments forests have made to changes in the past may be more difficult today.

Beyond the crude biome-scale projections of GCMs, prediction of how forests will respond to climate change or other perturbations requires some understanding of their composition, structure, and function (Franklin et al. 1981). These three classes of ecosystem components are interdependent, so change in function—for example, a climate-induced increase in fire frequency or windstorms—produces corresponding changes in the species composition and physiognomy (structure) of the forest. Over an intermediate length of time, say thousands of years, the species in a given forest represent those that have evolved under a definable range of conditions, often called a "natural" or "historic" range of variability

BLM_0059367

(Landres et al. 1999; Swetnam et al. 1999). Many ecologists consider this range the appropriate set of "reference conditions" for comparison with human-altered conditions and as a guide to management (Stephenson 1999).

The time period selected to represent reference conditions is subjective, but the logic behind the use of historic variability to guide management is compelling. Changes that occur at a faster rate, greater intensity, different spatial pattern, or broader spatial scale than historically are likely to fall outside the limits of adaptability for some species. If this departure affects critical life-history functions, extinction (at least locally) is likely. As changes become progressively faster, more intense, or broader in extent, a global mass extinction becomes probable. The challenge for conservationists is not to prevent change. It is to keep rates, scales, and intensities of change in ecosystems within the historic range of variability for those systems—or, at least, to come close. Conservationists must also develop strategies to mitigate the effects of inevitable changes that fall outside the historic range of variability.

## Resistance and Resilience

Stability has been defined in many ways, representing three general concepts: (1) the ability to maintain a relatively constant state in the face of disturbance and stress; (2) the ability to recover quickly after a disturbance; and (3) a combination of these two abilities. The first concept is often referred to as resistance. The second concept is usually referred to as resilience (Pimm 1984, 1991), although other meanings of resilience can be found in the literature (Table 1).

Some theory and empirical evidence suggest that resistance is inversely related to resilience (Fisher et al. 1998). Specifically, resistance may decrease and resilience increase as the supply of limiting nutrients increases (DeAngelis et al. 1989). Herbert et al. (1999) tested this hypothesis in a Hawaiian forest previously studied with respect to nutrient limitation to productivity and then damaged by a hurricane. As predicted, with phosphorus treatments the severity of damage to trees increased, indicating lower resistance, but rates of recovery of prehurricane stem growth and net primary productivity also increased, indicating higher resilience.

Nevertheless, resisting and recovering from disturbance may be positively associated at other spatiotemporal scales or under other ecological conditions. A forest that, on the scale of a biome, resists change to a fundamentally different condition is one that continually recovers from disturbances at finer spatial scales. Whitford et al. (1999) found that both the resistance and resilience of vegetation to drought are reduced in intensely stressed ecosystems (in this case, desert grasslands grazed by domestic livestock) compared with lightly stressed ecosystems.

What properties of a forest ecosystem contribute to resistance and resilience? Some studies have demonstrated increased tolerance to environmental extremes and greater temporal stability and recovery potential as species richness increases (McNaughton 1993; Tilman & Downing 1994; Tilman 1996, 1999). The most compelling explanation for how species richness enhances stability is the redundancy provided by multispecies membership in critical functional groups (Walker 1992, 1995; Peterson et al. 1998). A species that is the only member of its functional group in a community is a keystone species: if it disappears, many other species will also disappear or at least decline. In western Australia, for exam-

---

**Table 1.   Some definitions of ecological stability, in terms of resistance and resilience.**

| *Resistance* | *Resilience* |
|---|---|
| Measurement of the consequences on other variables of permanently changing a given variable; if the consequent changes are small, the system is relatively resistant (Pimm 1984, 1991) | magnitude of disturbance that can be absorbed or accommodated by an ecosystem before its structure is fundamentally changed to a different state (Holling 1973, 1986) |
| System undergoes less change in a state or flux variable as a result of disturbance (DeAngelis et al. 1989; Grimm et al. 1992; Herbert et al. 1999) | variable that has been displaced from equilibrium returns quickly to it (Pimm 1984, 1991) |
| System stays essentially unchanged (constancy) (Grimm & Wissel 1997) | rate of return to the reference state following disturbance (DeAngelis et al. 1989; Grimm et al. 1992; Herbert et al. 1999) |
| Ability of a community to maintain its composition and biomass in response to environmental stress (Grime et al. 2000) | capacity to recover from a disturbance in species composition (Walker 1995) |
| | system returns to the reference state (or dynamic) after a temporary disturbance (Grimm & Wissel 1997) |

BLM_0059368

ple, a single plant species, *Banksia prionotes*, is the only source of nectar for a guild of honeyeaters during a critical time of the year (Lambeck 1992). Figs (*Ficus*) of various species assume a similar role in many tropical forests (Terborgh 1986). A functional group with more diverse membership can maintain its role in the ecosystem despite fluctuations in the member species (Walker 1995).

Diversity of functional groups, in addition to diversity of species within groups, appears to encourage ecological resistance. Experiments with microcosms subjected to warming show that changes in the distribution of organisms among trophically defined functional groups lead to differences in ecological processes beyond those expected from temperature-dependent physiological rates, but diverse communities retain more species than depauperate communities (Petchey et al. 1999). A test of the effects of functional group richness on the invasibility of grasslands showed that invasion success was negatively related to functional group richness (Symstad 2000). Three lessons emerge from these findings: (1) a diversity of functional groups should be maintained; (2) species richness and redundancy should be maintained within functional groups; and (3) keystone species must be identified and kept in ecologically optimal, not just minimally viable, populations. The current body of research is insufficient to identify thresholds in richness within or among functional groups at which resistance or resilience break down.

## Adaptation

Minimizing extinction during climate change requires that species be given opportunities to adapt. Adaptation of species to climate change can take place through phenotypic plasticity (acclimatization), adaptive evolution, or migration to suitable sites (Markham 1996; Bawa & Dayanandan 1998). The only other alternative is decline and ultimately extinction.

Migration appears to have been the primary way species responded to past climate changes. Few beetles, for example, showed morphological change over the Quaternary (Pleistocene and Holocene), whereas species shifted markedly in distribution over this period (Coope 1979). Similarly, only 3 out of 177 mammals examined by Prothero and Heaton (1996) showed continual morphological change during the Eocene and lower Oligocene (37–30 million years ago), but again there were major changes in distributions. Although evolution can take place in the absence of morphological change, through physiological responses for example (Nowak et al. 1994; Hoffman & Hercus 2000), it seems clear that most species respond to changing climate by tracking suitable habitats geographically.

The speed at which species can migrate to track changing climate is of considerable interest, especially if

the current climate change is, as predicted, faster than most previous changes during the Quaternary. Migration rates of trees recolonizing regions after glaciation have been estimated from paleoecological data as ranging from 50 m/year for American beech (*Fagus grandifolia*) (Davis 1983) to 2000 m/year for spruce (*Picea* sp.) (Dennis 1993). The slower rates are thought insufficient for response to the current pace of climate change, especially given dispersal barriers such as intensive agriculture and cities (Peters & Darling 1985). Recently, however, paleontological evidence of rapid, long-distance migration of many tree species has arisen (Clark 1998; Clark et al. 1998), providing hope that at least some trees may be able to track a rapidly changing climate. In northern Europe, rapid migration of trees following ice recession 8500–8000 BP was relatively unconstrained by physical barriers such as mountain ranges, seas, and large lakes (Kullman 1998). Haphazard, long-distance establishment events may explain the evidence of rapid migration (Clark et al. 1998). Incorporating such rare dispersal events into models is difficult, which is why empirical rates of plant migration are often substantially higher than modeled rates (Higgins & Richardson 1999).

Rapid range shifts in response to warming trends over the last few decades have been documented for a number of species of vertebrates and invertebrates (Wuethrich 2000). For example, in a sample of 35 nonmigratory European butterflies, 63% have shifted their ranges to the north by 35–240 km during this century, whereas only 3% have shifted south (Parmesan et al. 1999). Nevertheless, migration to track a rapidly changing climate may be difficult for species with poor dispersal abilities, such as small forest vertebrates and flightless invertebrates, especially in relatively homogeneous landscapes with few opportunities for short-distance moves into suitable microhabitats. Barriers to movement may be formidable in fragmented landscapes (Noss & Csuti 1997).

Some species may adapt to climate change by in situ evolution. The modern Great Basin (U.S.) flora, for example, appears to consist of a mix of species that migrated northward from Pleistocene refugia in the southern portions of the region, and species that changed little in distribution during the Pleistocene and coped with climate change by genetic adaptation (Nowak et al. 1994). Tree species show genetic and phenological gradients associated with the environmental gradients over which they occur (Campbell 1986). Adaptive evolution ultimately depends on adequate levels of genetic variation within and among populations, although this variation can be expected to decline in response to the directional selection imposed by changing climate.

Many of the documented phenological responses of plants and animals to global warming may represent rapid microevolution (Hughes 2000). In Spain, populations of *Drosophila subobscura* have evolved in response to the warming of temperatures since the mid-1970s (Rod-

BLM_0059369

riguez-Trelles & Rodriguez 1998). On a broader temporal scale, pulses of speciation recorded in the fossil record are sometimes associated with climate change (Sepkoski 1998). Mitochondrial DNA analyses of birds suggest that divergence of populations during the glacial cycles of the Pleistocene led to formation of new species or completed speciation events that were initiated earlier (Avise & Walker 1998; Klicka & Zink 1999).

## Land Use and Management Guidelines

Forest management has the potential either to exacerbate or reduce the effects of climate change (Franklin et al. 1991; Dudley 1998). Climate change is not currently the greatest threat to forests but adds another layer of stress to species and ecosystems already suffering from poor land-use practices. To protect forests from the harmful effects of climate change, we must first mitigate the proximate threats of habitat destruction, fragmentation, and degradation. Markham (1996) pointed out that "the potential impacts of climate change will be an academic question in relation to ecosystems that we are unable to save from current and immediate threats." Furthermore, human management appears to affect forest productivity and carbon storage much more than the effects of climate change or $CO_2$ enrichment (Caspersen et al. 2000; Schimel et al. 2000).

Following are some recommendations for land use and management that have a reasonable chance of enhancing the resistance and resilience of forests to climate change.

### Represent Forest Types across Environmental Gradients in Nature Reserves

One of the oldest conservation strategies is to represent all ecosystem types in reserves (Pressey et al. 1993; Noss & Cooperrider 1994). Representative areas have been selected for scientific study, as ecological benchmarks to compare with disturbed areas, and as a way to conserve taxa too difficult to inventory and manage individually. Representation is also a sensible strategy in times of changing climate. Because we do not know precisely which forest types will be most sensitive, maintaining a full spectrum of types in protected areas will help assure that some resistant and resilient types persist.

Representation often is assessed by remote sensing of vegetation. For example, the Gap Analysis Program in the United States produces maps of vegetation in each state from LANDSAT imagery and determines how well each type is represented in reserves (Scott et al. 1993). The resolution of this imagery usually is sufficient only to map overstory vegetation, however. Beta diversity (the turnover of species along environmental gradients) generally increases from trees to shrubs to herbs (Whittaker

1960; Zobel et al. 1976). Hence, mapping only overstory vegetation is likely to miss significant patterns in plant species diversity and associated patterns in faunal diversity and ecological processes. A combined approach of mapping abiotic and biotic features may provide the best basis for a representation assessment (Hunter et al. 1988; Kirkpatrick & Brown 1994). We are applying this approach in the western United States (e.g., Noss et al. 1999), testing the hypothesis that representing vegetation along environmental gradients (capturing as much soil and microclimatic heterogeneity as possible) will result in the protection of more species and higher genetic diversity within species, in turn providing for adjustment to changing climate. Ideally, reserves will span uninterrupted environmental gradients and allow dispersal of organisms to favorable microsites.

### Protect Climatic Refugia at Multiple Scales

Biogeographers have long been interested in the refugia that harbored plants and animals during times of unfavorable climate (Haffer 1969; Prance 1982; Colinvaux et al. 1996). Recent research suggests that full-glacial refugia had more influence on biodiversity in temperate than in tropical regions (Willis & Whittaker 2000), whereas in Amazonia the warm stages of the Quaternary and late Tertiary, which raised sea levels up to 100 m, may have isolated habitats as islands and archipelagos, fostering the speciation that occurred during these times (Nores 1999). A similar process apparently unfolded in Florida, where speciation occurred on sandy ridges, which formed an archipelago during interglacial phases of the Pleistocene (James 1961; Myers 1990).

It makes abundant sense to identify past climatic refugia wherever possible and protect these areas so that they can again function as refugia during present and future climate change (Eeley et al. 1999). Refugia occur at a variety of spatial scales. In North America, postulated regional refugia include the southern Appalachians, valleys of major rivers in the southeastern coastal plain (Delcourt & Delcourt 1984), and the Klamath-Siskiyou region of California and Oregon. The latter region is known for its heterogeneity of landforms, geological strata, soils, and microclimates, which have promoted diversity and endemism (Whittaker 1960; Noss et al. 1999). Major refugia in Europe include Iberia, Italy, the Balkans, and the Caucasus (Hewitt 2000). In Central America, many lowland species appear to have been limited to riparian habitats during the late Pleistocene (Aide 1998). Across continents, topographically diverse areas have allowed habitats and lineages to persist through elevational shifts and, in many cases, to diverge during periods of climate change (Hewitt 2000).

Climatic refugia at much smaller scales also can be important for maintaining species assemblages vastly different from those adapted to the dominant regional climate.

BLM_0059370

Algific slopes in Iowa (U.S.) occur in a deciduous forest matrix on steep, usually north-facing carbonate talus slopes, where cold air flows out of ice-filled caves that developed late in the Pleistocene. These slopes support over 60 species of vascular plants disjunct in Iowa from northern or western boreal forests and at least eight land-snail taxa thought to have become extinct at the end of the Wisconsinan glaciation (Nekola 1999). Such slopes, which also occur in other regions, may well continue to support species characteristic of colder climates during the current period of global warming. At a still smaller scale, sandstone and limestone outcrops in Near Eastern deserts support hundreds of relict and endemic Mediterranean-climate plants that have survived from periods of moister climate (Danin 1999). Again, these microrefugia, if protected, are likely to continue to support many species. If climatic refugia at all spatial scales can be identified and protected, persisting populations may be able to recolonize the surrounding landscape when conditions favorable for their survival and reproduction return.

## Protect Primary Forests

A community of long-lived organisms is seldom, if ever, in equilibrium with the prevailing climate (Perry et al. 1991). Rather, vegetational change lags behind climate change, such that the vegetation at any point in time is a legacy of climatic conditions decades or centuries in the past (Sprugel 1991; Millar & Woolfenden 1999). Old-growth forests are predicted to possess considerable inertia in the face of climate change (Franklin et al. 1991). Mature trees can survive long periods of unfavorable climate, remaining "several centuries after climatic deterioration makes local conditions unsuitable for seedling establishment" (Brubaker 1986). This inertia could be a significant mechanism for ecological resistance.

A simulation of tree species distributions in Sweden under global warming scenarios predicted the long-term persistence of old-growth *Picea* stands protected from disturbance (Sykes & Prentice 1996). In forest types where the dominant trees live for hundreds or thousands of years, stands protected from catastrophic disturbance might persist through a few centuries of unfavorable climate, to reproduce again when favorable conditions return. Despite this inertia, however, slow shifts in composition along environmental gradients are expected even in mature, established forests (Franklin et al. 1991). Because the intensity and rate of change will be buffered in forest interiors, maintaining large patches of old-growth forest is a sensible strategy for maintaining biodiversity during rapid climate change.

## Avoid Fragmentation and Provide Connectivity

The negative effects of fragmentation are abundantly documented worldwide (Harris 1984; Noss & Csuti 1997).

Fragmentation may threaten biodiversity during climate change through several mechanisms, most notably edge effects and isolation of habitat patches. Intact forests maintain a microclimate that is often appreciably different from that in large openings. When a forest is fragmented by logging or other disturbance, sunlight and wind penetrate from forest edges and create strong microclimatic gradients up to several hundred meters wide, although they may vary in severity and depth among regions and forest types (Ranney et al. 1981; Franklin & Forman 1987; Chen & Franklin 1990; Laurance 1991, 2000; Chen et al. 1992; Baker & Dillon 2000). With progressive fragmentation of a landscape, the ratio of edge to interior habitat increases, until the inertia characteristic of mature forests is broken. Fragmented forests will likely demonstrate less resistance and resilience to climate change than intact forests.

Another potentially serious impact of fragmentation is its likely effect on species migration. By increasing the isolation of habitats, fragmentation is expected to interfere with the ability of species to track shifting climatic conditions over space and time. Weedy species, including many exotics, with high dispersal capacities may prosper under such conditions, whereas species with poor mobility or sensitive to dispersal barriers will fare poorly. Many models of species migration during climate change have included the convenient but often unrealistic assumption of a homogeneous environment. Collingham and Huntley (2000) used a spatially explicit model to investigate the effects of different landscape patterns on the ability of a wind-dispersed tree (*Tilia cordata*) to migrate in response to changing climate. Simulated dispersal rates slowed dramatically when habitat availability fell below 25% of landscape area. Landscapes with a "blocky" (coarse-grained) pattern had the strongest negative effect on migration, suggesting that multiple small reserves might be preferable to fewer large reserves. Other species, more dependent on large habitat blocks and requiring intact habitat corridors to migrate, would probably favor a different landscape pattern (Collingham & Huntley 2000).

Connectivity is the antithesis of fragmentation. Maintaining habitat linkages parallel to climatic gradients and minimizing artificial barriers is a prudent strategy under any climate-change scenario (Hobbs & Hopkins 1991; Noss 1993). Biogeographic corridors, such as the Mississippi Valley and other major river valleys that trend north-south, allowed dispersal during past climate changes (Delcourt & Delcourt 1984). Hunter et al. (1988) suggest that a corridor of natural habitat bordering the Appalachian Trail from Georgia to Maine might facilitate range shifts. Whether or not such latitudinal corridors will be functional under the rapid pace of change now forecast is an open question. Elevational corridors, which span a broader climatic gradient over a shorter distance, may better promote migration in mountainous terrain (Noss 1993; Bennett 1999). Connec-

BLM_0059371

tivity also may help sustain genetically diverse populations that span environmental gradients within the present range of species (Bennett 1999).

In designing linkages, several considerations should be kept in mind: (1) A full range of geological substrates and soil types should be included in linkages because some plant species are exacting in their requirements. (2) Many species have mutualistic or other dependencies on other species, such that migration of assemblages of co-adapted species will be required (Bennett 1999). (3) Because movement routes probably will vary among species, protecting broad linkages rather than narrow corridors is advised. (4) As suggested by Collingham and Huntley (2000), a mixed strategy of corridors and small stepping-stone habitats is desirable to address the distinct dispersal characteristics of different species.

Roads are major agents of fragmentation (Noss & Cooperrider 1994; Baker & Knight 2000). In the context of climate change, roads pose two problems: they restrict the dispersal of less mobile species while they encourage the dispersal of invasive exotics. Roads function as barriers to the movements of many species (Noss 1993; Noss & Csuti 1997; deMaynadier & Hunter 2000; Trombulak & Frissell 2000). Particularly vulnerable are small, nonvolant forest vertebrates and invertebrates that do not usually venture into openings as wide as a road clearing (e.g., rodents, Oxley et al. 1974; Adams & Geis 1983; beetles, Mader 1984). Even large animals such as bears may refuse to cross roads with heavy traffic (Brody & Pelton 1989), and many others are killed on roads. Hence, roads may impede the movement of many species in response to climate change. Closing unnecessary roads and providing wildlife crossings on roads with heavy traffic might mitigate some of these effects (Noss 1993; Clevenger & Waltho 2000).

On the other hand, roads are common avenues of invasion by exotic pests (Schowalter 1988; Tyser & Worley 1992; Lonsdale & Lane 1994; Parendes & Jones 2000), which many ecologists believe will increase in abundance with climate change. Disturbed roadsides with high light levels harbor many weeds that disperse along the route of the road and often invade adjacent habitats. Vehicles transport seeds and spores long distances (Wilson et al. 1992). To reduce this risk we must understand how alien species invade natural ecosystems and identify ecosystems that are especially prone to invasion (Hobbs & Huenneke 1992; Simberloff 1997; Lonsdale 1999). We also must identify the anthropogenic changes in landscapes that promote invasions and develop a strategy for mitigating those changes.

**Provide Buffer Zones**

The fixed boundaries of reserves are poorly suited to a dynamic environment unless individual areas are extremely large (Peters & Darling 1985; Noss & Cooper-

rider 1994). With changing climate, buffer zones have the potential to provide for shifting populations as conditions inside reserves become unsuitable. For this strategy to work, buffer zones must be large, managers of reserves and surrounding lands must demonstrate the flexibility to adjust their land-management activities across the landscape, and adequate data must be available from monitoring to determine where populations are shifting. That none of these conditions is met, even on public land, suggests that the buffer-zone strategy will be difficult to implement. Nevertheless, if incentives can be provided to managers outside reserves to manage their lands sensitively, species will have a better chance of shifting distributions in response to climate change than if land-use adjacent to reserves is intense.

**Practice Low-Intensity Forestry and Prevent Conversion to Plantations**

Forestry that minimizes soil disturbance (hence reducing invasion of exotic pests, loss of carbon from soil, and potential loss of mycorrhizae; Perry 1994), size of canopy openings (Whitmore 1998), and removal of biomass will do more to promote the resistance and resilience of forests to climate change than intensive logging. (Of course, the historic range of variability must be taken into account in such considerations.) Although some studies have shown rapid recovery of biotic control of ecosystem processes after intensive logging (Bormann et al. 1974; Boring et al. 1981), others have shown profound losses of productivity and processes. In many parts of the world, regeneration of trees has failed after clearcutting (Perry 1994). Rapid recovery of host plants after logging appears essential for maintaining obligate mycorrhizal fungi and other soil microbes. Herbicide treatments and other intensive "vegetation management" can destroy this linkage (Perry et al. 1990; Perry 1994; Amaranthus 1998).

Intensification of forestry activities is often promoted on the basis that young, actively growing trees will sequester carbon more rapidly than old-growth forests in which respiration may equal or even exceed photosynthesis (Birdsey 1992). Replacement of old forests with plantations is a "perverse incentive" of the Kyoto Protocol (Brown 1998; Dudley 1998). Simplistic carbon accounting, encouraged by the protocol, ignores the tremendous releases of carbon that occur when forests are disturbed by logging and related activities such as site preparation and vegetation management (Perry 1994; Schulze et al. 2000). It ignores the fate of woody debris and soil organic carbon during forest conversion (Cooper 1983; German Advisory Council on Global Change 1998). Typically, respiration from the decomposition of dead biomass in logged forests exceeds net primary production of the regrowth (Schulze et al. 2000). Considerable time is required—often hundreds of years—for

BLM_0059372

regenerating forests to accumulate the carbon stocks characteristic of primary forests (Harmon et al. 1990). Over several rotations of growth and harvest, the mean carbon pool of intensively managed forests is only about 30% that of primary forests (Cooper 1983).

From the standpoint of maintaining biodiversity during climate change, conversion of natural forests to plantations cannot be justified. Tree plantations around the world, especially exotic monocultures, have less biodiversity than natural forests in the same regions (Hunter 1990; Noss & Cooperrider 1994; Perry 1994). Plantations are often markedly less resistant to disturbances such as fire and more subject to pest outbreaks than natural forests (Schowalter 1989; Perry 1994). Pest outbreaks could increase in severity or change in distribution with changing climate (Williams & Liebhold 1995), amplifying the vulnerability of plantations. On the other hand, tree plantations on marginal agricultural land and natural succession on these lands could play a useful role in carbon sequestration. North America is currently a carbon sink, largely because of agricultural abandonment and regrowth of forests harvested before 1980 (Fan et al. 1998; Caspersen et al. 2000; Schimel et al. 2000).

Plantation management, where it is appropriate, should emphasize mixed-species forestry and native species, which would allow migrating species to be incorporated into the mix (Ravindranath & Sukumar 1998). Although shortened rotations would enable quicker response to forest dieback or other symptoms of changing climatic conditions, the risk of depleting critical soil nutrients and facilitating species invasions would also be higher.

### Maintain Natural Fire Regimes

How fire should be managed in response to climate change is a complex issue. Fire regimes are known from paleoecological evidence to change through time in response to changing climate. Hotter, drier conditions tend to increase fire frequency, which generally shifts vegetation toward more fire-tolerant species (Clark 1990; Swetnam 1993; Veblen et al. 1999). Many forest types and other plant communities depend on fire for their persistence (Mutch 1970; Platt et al. 1988). Reviews of endangered ecosystems in North America show that many of the most imperiled plant communities have declined largely because of fire suppression (Noss & Peters 1995; Noss et al. 1995). On the other hand, fires set by humans are a leading threat to other forests, especially in the tropics (Trapnell 1959; Dudley 1998). Permanent conversions from one vegetation type to another in response to fire have been documented—for example, boreal forest changing to tundra in Canada (Sirois & Payette 1991) and dry tropical forest changing to shrubland in Zambia (Trapnell 1959). In tropical forests, the extent of fire depends on moisture levels, which decline

with logging disturbance. A 50% reduction in canopy cover has the potential to increase average temperatures in the forest by 10° C and to decrease relative humidity by 35% (Kauffman & Uhl 1990). Such differences indicate that fire policies should be based on what is known of the fire ecology of each region and forest type.

Discussions of climate-change policy often include suggestions that fires be suppressed to help reduce emissions. There is little question that, in the short term, fire suppression enhances carbon storage (Tilman et al. 2000), but the threat to biodiversity from lack of fire in many forest types outweighs the potential advantages of fire suppression. Although the increased frequency and spatial extent of fires predicted by some models—for example, for forests of the Sierra Nevada in California (Miller & Urban 1999)—are cause for concern, the appropriate policy response is not straightforward. Should managers step back and allow fires to occur in the hope of facilitating vegetation adjustment to the new climate? Or should they actively suppress fires that appear to exceed, in intensity or frequency, the historic range of variability? Perhaps this is a moot point. Experience in trying to suppress large, intense fires such as the Yellowstone burns of 1988 has shown that such attempts are usually futile. Curiously, a 300-year fire history in the boreal forest of Quebec shows a significant decrease in the number and extent of fires, in the absence of fire suppression, beginning with a warming period 100 years ago (Bergeron & Flannigan 1995), suggesting that the predicted increase in fire with climate change is by no means universal. In any case, efforts to protect forests from intense fires through regular, prescribed burning and/or understory thinning have been much more successful than efforts to suppress intense fires (Moore et al. 1999; Stephenson 1999). A mixed strategy, in which managers let many natural fires burn, protect (to the extent possible) old growth from stand-replacing fires, and manage other stands by prescribed burning and understory thinning to reduce the risk of high-intensity fire, may be the optimal approach.

### Maintain Diverse Gene Pools

Genetic adaptation to climate change depends on genetic variation. Diverse gene pools should be maintained within and among populations of commercially important trees and other forest species (Dudley 1998). Reforestation, rather than relying on local seed sources (which under relatively stable climatic conditions would be an appropriate strategy), should incorporate individuals from a wide range of localities, but should emphasize sources at lower elevations or latitudes (Bawa & Dayanandan 1998; Ravindranath & Sukumar 1998). Breeding programs to promote faster growth or other commercially desired qualities of trees at the expense of genetic varia-

BLM_0059373

tion should be discouraged because they are likely to leave tree species less resilient to climate change.

### Protect the Most Acutely Threatened Species Ex Situ

For some ecosystems, climate change is already the dominant threat, such that mitigation of other factors such as land use will do little good. The cloud forests of tropical mountains, which typically harbor large numbers of endemic species, appear to be such an ecosystem. Simulations of changes in temperature and moisture under doubled $CO_2$ show an upward shift in the cloud layer of hundreds of meters during the winter dry season, coupled with increased evapotranspiration (Still et al. 1999). Cloud forests have nowhere to shift and are expected to be lost, along with their endemic species. The disappearance of 20 species of anurans (frogs and toads), including the endemic golden toad (*Bufo periglenes*), from highland forest in Costa Rica has been linked to a warming trend since the 1970s and to a severe reduction in dry-season mists; meanwhile, species from lower elevations have invaded these forests (Pounds et al. 1999). In situations such as these, ex situ preservation of species in zoos and botanical gardens until global warming is reversed may be the only way to avoid extinction. Ex situ collections should include sufficient genetic diversity to allow adaptation to uncertain conditions in reintroduction sites.

### Identify and Protect Functional Groups and Keystone Species

Keystone species and functional groups are essential to the resistance and resilience of forests to climate change and other stresses. The identification of these species and groups has been haphazard, however. For some forests, such as longleaf pine (*Pinus palustris*) in the southeastern coastal plain of North America, scientists have identified several ecologically pivotal species and processes (Platt et al. 1988; Noss 1991; Simberloff 1998). For many other forests, one can only guess which species (e.g., top predators) might be of unusually high ecological importance. Efforts should be made to identify such species, functional groups, and processes for all forest types and other ecosystems; then, management must be aimed at maintaining these components in natural patterns of abundance and distribution.

## Research Needs

The management actions I suggest represent a reasonable guess of what is prudent in the face of abundant uncertainty about the responses of forests to climate change. To refine these recommendations, and perhaps turn some of them on their heads, several lines of research must be pursued:

- More precise determination of the biomes, vegetation types, species, and sites that are most vulnerable to adverse effects of climate change. This will require rigorous monitoring, observations, and, where possible, experiments.
- Studies of population responses to climate change that focus on reproductive processes, demography, genetics, and species interactions and that involve species with contrasting life-history traits (Bawa & Dayanandan 1998).
- Higher-resolution models of the direction, magnitude, rate, and effects of climate change within regions, including such critical components as the seasonal distribution of rainfall (Herbst & Hörmann 1998).
- Increased combinations of modeling approaches, such as the linkage of ecosystem process models with spatial landscape models, as done by He et al. (1999) to predict forest landscape responses to climate warming.
- Empirical research on the details and mechanisms of biotic change in response to climate change at the edges of species' ranges (Coley 1998) and along ecotones between vegetation types (Allen & Breshears 1998), where rapid responses to climatic variation are most likely.
- Long-term monitoring with an experimental design adequate, at least, to determine correlations and, ideally, to determine causality between changes in climate parameters and responses of biodiversity at several levels of organization.
- Identification of ecological indicators (species and otherwise) that will provide an early warning of biological problems related to climate change. Epiphytes, for example, may play this role in tropical forests because of their extreme sensitivity to climatic conditions (Benzing 1998).

## Conclusion

Society's response to climate change is determined through the political process. If educated to understand the multiple benefits of sustaining diverse, healthy, resilient forests, people will place value on protecting these forests. From this point of view, certain policies, such as conversion of primary forests to rapidly growing plantations in an attempt to sequester as much carbon from the atmosphere as possible, will do more harm than good. The literature I have reviewed suggests that a well-managed native forest has a reasonable chance of surviving or adapting to climate change. It appears that good forest management during a time of changing climate differs little from good forest management under more static conditions. Increased emphasis must be placed, however, on actions such as protecting climatic refugia and providing habitat connectivity parallel to environmental gradients.

BLM_0059374

## Acknowledgments

This research was supported wholly by the World Wildlife Fund-U.S. This paper was adapted from a report to that organization. I thank S. Kelleher and J. Morgan for comments on an early draft, and M. Hunter, G. Meffe, E. Main, and two anonymous referees for comments on the submitted draft.

## Literature Cited

Adams, L. W., and A. D. Geis. 1983. Effects of roads on small mammals. Journal of Applied Ecology **20:**403–415.

Aide, M. T. 1998. Geographic patterns of genetic diversity in *Poulsenia armata* (Moraceae): implications for the theory of Pleistocene refugia and the importance of riparian forest. Journal of Biogeography **25:**695–705.

Allen, C. D., and D. D. Breshears. 1998. Drought-induced shift of a forest-woodland ecotone: rapid landscape response to climate variation. Proceedings of the National Academy of Sciences of the United States of America **95:**14839–14842.

Amaranthus, M. P. 1998. The importance and conservation of ectomycorrhizal fungal diversity in forest ecosystems: lessons from Europe and the Pacific Northwest. General technical report PNW 0(431). U.S. Forest Service, Seattle.

Avise, J. C., and D. Walker. 1998. Pleistocene phylogeographic effects on avian populations and the speciation process. Proceedings of the Royal Society of London, Series B **265:**457–463.

Baker, W. L., and G. K. Dillon. 2000. Plant and vegetation responses to edges in the southern Rocky Mountains. Pages 221–245 in R. L. Knight, F. W. Smith, S. W. Buskirk, W. H. Romme, and W. L. Baker, editors. Forest fragmentation in the southern Rocky Mountains. University Press of Colorado, Boulder.

Baker, W. L., and R. L. Knight. 2000. Roads and forest fragmentation in the Southern Rocky Mountains. Pages 97–122 in R. L. Knight, F. W. Smith, S. W. Buskirk, W. H. Romme, and W. L. Baker, editors. Forest fragmentation in the southern Rocky Mountains. University Press of Colorado, Boulder.

Bawa, K. S., and S. Dayanandan. 1998. Global climate change and tropical forest genetic resources. Climatic Change **39:**473–485.

Beniston, M., and J. L. Innes, editors. 1998. The impacts of climate variability on forests. Springer-Verlag, Berlin.

Bennett, A. F. 1999. Linkages in the landscape: the role of corridors and connectivity in wildlife conservation. World Conservation Union Publications, Cambridge, United Kingdom.

Benzing, D. H. 1998. Vulnerabilities of tropical forests to climate change: the significance of resident epiphytes. Climatic Change **39:**519–540.

Bergeron, Y., and M. D. Flannigan. 1995. Predicting the effects of climate change on fire frequency in the southeastern Canadian boreal forest. Water, Air, and Soil Pollution **82:**437–444.

Birdsey, R. A. 1992. Carbon storage in trees and forests. Pages 23–41 in R. N. Sampson and D. Hair, editors. Forests and global change. I. Opportunities for increasing forest cover. American Forests, Washington, D.C.

Bonnie, R., S. Schwartzman, M. Oppenheimer, and J. Bloomfield. 2000. Counting the cost of deforestation. Science **288:**1763–1764.

Boring, L. R., C. D. Monk, and W. T. Swank. 1981. Early regeneration of a clear-cut southern Appalachian forest. Ecology **62:**1244–1253.

Bormann, F. H., G. E. Likens, T. G. Siccama, R. S. Pierce, and J. S. Eaton. 1974. The export of nutrients and recovery of stable conditions following deforestation at Hubbard Brook. Ecological Monographs **44:**255–277.

Brody, A. J., and M. P. Pelton. 1989. Effects of roads on black bear

movements in western North Carolina. Wildlife Society Bulletin **17:**5–10.

Brown, P. 1998. Climate, biodiversity, and forests: issues and opportunities emerging from the Kyoto Protocol. World Resources Institute, Washington, D.C.

Brubaker, L. B. 1986. Responses of tree species to climatic change. Vegetatio **67:**119.

Campbell, R. K. 1986. Mapped genetic variation of Douglas-fir to guide seed transfer in southwest Oregon. Silvae Genetica **35:**85–96.

Caspersen, J. P., S. W. Pacala, J. C. Jenkins, G. C. Hurtt, P. R. Moorcroft, and R. A. Birdsey. 2000. Contributions of land-use history to carbon accumulation in U.S. forests. Science **290:**1148–1151.

Chen, J., and J. F. Franklin. 1990. Microclimatic pattern and basic biological responses at the clearcut edges of old-growth Douglas-fir stands. Northwest Environmental Journal **6:**424–425.

Chen, J., J. F. Franklin, and T. A. Spies. 1992. Vegetation response to edge environments in old-growth Douglas-fir forests. Ecological Applications **2:**387–396.

Ciesla, W. M. 1995. Climate change, forests and forest management. Forestry paper 126. Food and Agricultural Organization, Rome.

Clark, J. S. 1990. Fire and climate change during the last 750 years in northwestern Minnesota. Ecological Monographs **60:**135–159.

Clark, J. S. 1998. Why trees migrate so fast: confounding theory with dispersal biology and the paleorecord. The American Naturalist **152:**204–224.

Clark, J. S., C. Fastie, G. Hurtt, S. T. Jackson, C. Johnson, G. A. King, M. Lewis, J. Lynch, S. Pacala, C. Prentice, E. W. Schupp, T. Webb III, and P. Wyckoff. 1998. Reid's paradox of rapid plant migration. BioScience **48:**13–24.

Clevenger, A. P., and N. Waltho. 2000. Factors influencing the effectiveness of wildlife underpasses in Banff National Park, Alberta, Canada. Conservation Biology **14:**47–56.

Coley, P. D. 1998. Possible effects of climate change on plant/herbivore interactions in moist tropical forests. Climatic Change **39:**455–472.

Colinvaux, P. A., P. E. De Oliveira, J. E. Moreno, M. C. Miller, and M. B. Bush. 1996. A long pollen record from lowland Amazonia: forest and cooling in glacial times. Science **274:**86–88.

Collingham, Y. C., and B. Huntley. 2000. Impacts of habitat fragmentation and patch size upon migration rates. Ecological Applications **10:**131–144.

Coope, G. R. 1979. Late Cenozoic fossil Coleoptera: evolution, biogeography, and ecology. Annual Review of Ecology and Systematics **10:**247–267.

Cooper, C. F. 1983. Carbon storage in managed forests. Canadian Journal of Forest Research **13:**155–166.

Danin, A. 1999. Desert rocks as plant refugia in the Near East. Botanical Review **65:**93–170.

Davis, M. B. 1983. Quaternary history of deciduous forests of eastern North America and Europe. Annals of the Missouri Botanical Garden **70:**550–563.

DeAngelis, D. L., P. J. Mulholland, A. V. Palumbo, A. D. Stienman, M. A. Huston, and J. W. Elwood. 1989. Nutrient dynamics and food web stability. Annual Review of Ecology and Systematics **20:**71–95.

Delcourt, H. R., and P. A. Delcourt. 1984. Ice Age haven for hardwoods. Natural History **September:**22–28.

deMaynadier, P. G., and M. L. Hunter Jr. 2000. Road effects on amphibian movements in a forested landscape. Natural Areas Journal **20:**56–65.

Dennis, R. L. H. 1993. Butterflies and climate change. Manchester University Press, Manchester, United Kingdom.

Dudley, N. 1998. Forests and climate change. Report. World Wildlife Fund International, Gland, Switzerland.

Eeley, H. A. C., M. J. Lawes, and S. E. Piper. 1999. The influence of climate on the distribution of indigenous forest in KwaZulu-Natal, South Africa. Journal of Biogeography **26:**595–617.

Fan, S., M. Gloor, J. Mahlman, S. Pacala, J. Sarmiento, T. Takahashi, and

BLM_0059375

P. Tans. 1998. A large terrestrial carbon sink in North America implied by atmospheric and oceanic carbon dioxide data and models. Science **282**:442–446.

Fisher, S. G., N. B. Grimm, E. Marti, R. M. Holmes, and J. B. Jones Jr. 1998. Material spiraling in stream corridors: a telescoping ecosystem model. Ecosystems **1**:19–34.

Franklin, J. F., and R. T. T. Forman. 1987. Creating landscape patterns by forest cutting: Ecological consequences and principles. Landscape Ecology **1**:5–18.

Franklin, J. F., K. Cromack, W. Denison, A. McKee, C. Maser, J. Sedell, F. Swanson, and G. Juday. 1981. Ecological characteristics of old-growth Douglas-fir forests. General technical report PNW-118. U.S. Forest Service, Pacific Northwest Forest and Range Experiment Station, Portland, Oregon.

Franklin, J. F., F. J. Swanson, M. E. Harmon, D. A. Perry, T. A. Spies, V. H. Dale, A. McKee, W. K. Ferrell, J. E. Means, S. V. Gregory, J. D. Lattin, T. D. Schowalter, and D. Larsen. 1991. Effects of global climatic change on forests in northwestern North America. Northwest Environmental Journal **7**:233–254.

German Advisory Council on Global Change. 1998. The accounting of biological sinks and sources under the Kyoto Protocol: a step forwards or backwards for global environmental protection? German Advisory Council on Global Change, Bremerhaven.

Graham, A. 1999. Late Cretaceous and Cenozoic history of North American vegetation. Oxford University Press, New York.

Grime, J. P., V. K. Brown, K. Thompson, G. J. Masters, S. H. Hillier, I. P. Clarke, A. P. Askew, D. Corker, and J. P. Kielty. 2000. The response of two contrasting limestone grasslands to simulated climate change. Science **289**:762–765.

Grimm, V., and C. Wissel. 1997. Babel, or the ecological stability discussions: an inventory and analysis of terminology and a guide for avoiding confusion. Oecologia **109**:323–334.

Grimm, V., E. Schmidt, and C. Wissel. 1992. On the application of stability concepts in ecology. Ecological Modelling **63**:143–161.

Hadley Center for Climate Prediction and Research. 1998. Climate change and its impacts. Report, London.

Haffer, J. 1969. Speciation in Amazonian forest birds. Science **165**:131–137.

Harmon, M. E., W. K. Ferrell, and J. F. Franklin. 1990. Effects on carbon storage of conversion of old-growth forests to young forests. Science **247**:699–702.

Harris, L. D. 1984. The fragmented forest: island biogeography theory and the preservation of biotic diversity. University of Chicago Press, Chicago.

He, H. S., D. J. Mladenoff, and T. R. Crow. 1999. Linking an ecosystem model and a landscape model to study forest species response to climate warming. Ecological Modelling **114**:213–233.

Herbert, D. A., J. H. Fownes, and P. M. Vitousek. 1999. Hurricane damage to a Hawaiian forest: nutrient supply rate affects resistance and resilience. Ecology **80**:908–920.

Herbst, M., and G. Hörmann. 1998. Predicting effects of temperature increase on the water balance of beech forest: An application of the 'Kausha' model. Climatic Change **40**:683–698.

Hewitt, G. 2000. The genetic legacy of the Quaternary ice ages. Nature **405**:907–913.

Higgins, S. I., and D. M. Richardson. 1999. Predicting plant migration rates in a changing world: the role of long-distance dispersal. The American Naturalist **153**:464–475.

Hobbs, R. J., and A. J. M. Hopkins. 1991. The role of conservation corridors in a changing climate. Pages 281–290 in D. A. Saunders and R. J. Hobbs, editors. Nature conservation: the role of corridors. Surrey Beatty and Sons, Chipping Norton, New South Wales, Australia.

Hobbs, R. J., and L. F. Huenneke. 1992. Disturbance, diversity, and invasion: implications for conservation. Conservation Biology **6**:324–337.

Hoffman, A. A., and M. J. Hercus. 2000. Environmental stress as an evolutionary force. BioScience **50**:217–226.

Holling, C. S. 1973. Resilience and stability of ecological systems. Annual Review of Ecology and Systematics **4**:1–23.

Hughes, L. 2000. Biological consequences of global warming: is the signal already apparent? Trends in Ecology and Evolution **15**:56–61.

Hunter, M. L., Jr. 1990. Wildlife, forests, and forestry: principles of managing forests for biological diversity. Prentice-Hall, Englewood Cliffs, New Jersey.

Hunter, M. L., Jr., G. L. Jacobson, and T. Webb. 1988. Paleoecology and the coarse-filter approach to maintaining biological diversity. Conservation Biology **2**:375–385.

Intergovernmental Panel on Climate Change. 1996a. Climate change 1995—impacts, adaptations and mitigation of climate change: scientific-technical analyses. R. T. Watson, M. C. Zinyowera, R. H. Moss, and D. J. Dokken, editors. Cambridge University Press, Cambridge, United Kingdom.

Intergovernmental Panel on Climate Change. 1996b. Climate change 1995—the science of climate change. J. T. Houghton, L. G. Meira Filho, B. A. Callander, N. Harris, A. Kattenberg, and K. Maskell, editors. Cambridge University Press, Cambridge, United Kingdom.

James, C. W. 1961. Endemism in Florida. Brittonia **13**:225–244.

Jarvis, P. G., and A. M. Aitken, editors. 1998. European forests and global change: the likely impacts of rising $CO_2$ and temperature. Cambridge University Press, Cambridge, United Kingdom.

Kauffman, J. B., and C. Uhl. 1990. Interactions and consequences of deforestation and fire in the rainforests of the Amazon Basin. Pages 117–134 in J. G. Goldhammer, editor. Fire in the tropical and subtropical biota. Springer-Verlag, Berlin, Germany.

Kirkpatrick, J. B., and M. J. Brown. 1994. A comparison of direct and environmental domain approaches to planning reservation of forest higher plant communities and species in Tasmania. Conservation Biology **8**:217–224.

Klicka, J., and R. M. Zink. 1999. Pleistocene effects on North American songbird evolution. Proceedings of the Royal Society of London, Series B **266**:695–700.

Krankina, O. N., and R. K. Dixon. 1993. Forest management options to conserve and sequester terrestrial carbon in Russia. World Resource Review **6**:88–101.

Kremen, C., J. O. Niles, M. G. Dalton, G. C. Daily, P. R. Ehrlich, J. P. Fay, D. Grewal, and R. P. Guillery. 2000. Economic incentives for rain forest conservation across scales. Science **288**:1828–1832.

Kullman, L. 1998. Non-analogous tree flora in the Scandes Mountains, Sweden, during the early Holocene: macrofossil evidence of rapid geographical spread and response to palaeoclimate. Boreas (Oslo) **27**:153–161.

Lambeck, R. J. 1992. The role of faunal diversity in ecosystem function. Pages 129–148 in R. J. Hobbs, editor. Biodiversity of Mediterranean ecosystems in Australia. Surrey Beatty and Sons, Melbourne, Australia.

Landres, P. B., P. Morgan, and F. J. Swanson. 1999. Overview of the use of natural variability concepts in managing ecological systems. Ecological Applications **9**:1179–1188.

Laurance, W. F. 1991. Edge effects in tropical forest fragments: application of a model for the design of nature reserves. Biological Conservation **57**:205–219.

Laurance, W. F. 2000. Do edge effects occur over large spatial scales? Trends in Ecology and Evolution **15**:134–135.

Lonsdale, W. M. 1999. Global patterns of plant invasions and the concept of invasibility. Ecology **80**:1522–1536.

Lonsdale, W. M., and A. M. Lane. 1994. Tourist vehicles as vectors of weed seeds in Kakuda National Park, northern Australia. Biological Conservation **69**:277–283.

Mader, H-J. 1984. Animal habitat isolation by roads and agricultural fields. Biological Conservation **29**:81–96.

Markham, A. 1996. Potential impacts of climate change on ecosystems: a review of implications for policymakers and conservation biologists. Climate Research **6**:179–191.

McNaughton, S. J. 1993. Biodiversity and function of grazing ecosys-

BLM_0059376

tems. Pages 361–383 in E. D. Schulze and H. A. Mooney, editors. Biodiversity and ecosystem function. Springer-Verlag, Berlin.

Millar, C. I., and W. B. Woolfenden. 1999. The role of climatic change in interpreting historical variability. Ecological Applications **9:**1207–1216.

Miller, C. and D. L. Urban. 1999. Forest pattern, fire, and climatic change in the Sierra Nevada. Ecosystems **2:**76–87.

Moore, M. M., W. W. Covington, and P. Z. Fulé. 1999. Reference conditions and ecological restoration: a southwestern ponderosa pine perspective. Ecological Applications **9:**1266–1277.

Mutch, R. W. 1970. Wildland fires and ecosystems: a hypothesis. Ecology **51:**1046–1051.

Myers, R. L. 1990. Scrub and high pine. Pages 150–193 in R. L. Myers and J. J. Ewel, editors. Ecosystems of Florida. University of Central Florida Press, Orlando.

Neilson, R. P., G. A. King, and J. Lenihan. 1994. Modeling forest response to climatic change: the potential for large emissions of carbon from dying forests. Pages 150–162 in M. Kaaninen, editor. Carbon balance in the world's ecosystems: toward a global assessment. Finland Academy of Science, Helsinki.

Nekola, J. C. 1999. Paleorefugia and neorefugia: the influence of colonization history on community pattern and process. Ecology **80:**2459–2473.

Nores, M. 1999. An alternative hypothesis for the origin of Amazonian bird diversity. Journal of Biogeography **26:**475–485.

Noss, R. F. 1991. From endangered species to biodiversity. Pages 227–246 in A. Kohm, editor. Balancing on the brink of extinction: the Endangered Species Act and lessons for the future. Island Press, Washington, D.C.

Noss, R. F. 1993. Wildlife corridors. Pages 43–68 in D. S. Smith and P. C. Hellmund, editors. Ecology of greenways. University of Minnesota Press, Minneapolis.

Noss, R. F., and A. Cooperrider. 1994. Saving nature's legacy: protecting and restoring biodiversity. Defenders of Wildlife and Island Press, Washington, D.C.

Noss, R. F., and B. Csuti. 1997. Habitat fragmentation. Pages 269–304 in G. K. Meffe and R. C. Carroll, editors. Principles of conservation biology. 2nd edition. Sinauer Associates, Sunderland, Massachusetts.

Noss, R. F., and R. L. Peters. 1995. Endangered ecosystems of the United States: a status report and plan for action. Defenders of Wildlife, Washington, D.C.

Noss, R. F., E. T. LaRoe, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. Biological report 28. U.S. National Biological Service, Washington, D.C.

Noss, R. F., J. R. Strittholt, K. Vance-Borland, C. Carroll, and P. Frost. 1999. A conservation plan for the Klamath-Siskiyou ecoregion. Natural Areas Journal **19:**392–411.

Nowak, C. L., S. K. Nowak, R. J. Tausch, and P. E. Wigand. 1994. Tree and shrub dynamics in northwestern Great Basin woodland and shrub steppe during the Late-Pleistocene and Holocene. American Journal of Botany **81:**265–277.

Oxley, D. J., M. B. Fenton, and G. R. Carmody. 1974. The effects of roads on populations of small mammals. Journal of Applied Ecology **11:**51–59.

Parendes, L. A., and J. A. Jones. 2000. Role of light availability and dispersal in exotic plant invasion along roads and streams in the H. J. Andrews Experimental Forest, Oregon. Conservation Biology **14:**64–75.

Parmesan, C., N. Ryrholm, C. Stefanescu, J. K. Hill, C. D. Thomas, H. Descimon, B. Huntley, L. Kaila, J. Kullberg, T. Tammaru, W. J. Tennent, J. A. Thomas, and M. Warren. 1999. Poleward shifts in geographical ranges of butterfly species associated with regional warming. Nature **399:**579–583.

Perry, D. A. 1994. Forest ecosystems. Johns Hopkins University Press, Baltimore, Maryland.

Perry, D. A., J. G. Borchers, S. L. Borchers, and M. P. Amaranthus. 1990. Species migrations and ecosystem stability during climatic change: the belowground connection. Conservation Biology **4:**266–274.

Perry, D. A., J. G. Borchers, D. P. Turner, S. V. Gregory, C. R. Perry, R. K. Dixon, S. C. Hart, B. Kauffman, R. P. Neilson, and P. Sollins. 1991. Biological feedbacks to climate change: terrestrial ecosystems as sinks and sources of carbon and nitrogen. Northwest Environmental Journal **7:**203–232.

Petchey, O. L., P. T. McPhearson, T. M. Casey, and P. J. Morin. 1999. Environmental warming alters food-web structure and ecosystem function. Nature **402:**69–72.

Peters, R. L., and J. D. S. Darling. 1985. The greenhouse effect and nature reserves. BioScience **35:**707–717.

Peters, R. L., and T. E. Lovejoy, editors. 1992. Global warming and biological diversity. Yale University Press, New Haven, Connecticut.

Peterson, G., C. R. Allen, and C. S. Holling. 1998. Ecological resilience, biodiversity, and scale. Ecosystems **1:**6–18.

Pimm, S. L. 1984. The complexity and stability of ecosystems. Nature **307:**321–326.

Pimm, S. L. 1991. The balance of nature? Ecological issues in the conservation of species and communities. University of Chicago Press, Chicago.

Platt, W. J., G. W. Evans, and S. L. Rathbun. 1988. The population dynamics of a long-lived conifer (*Pinus palustris*). The American Naturalist **131:**491–525.

Pounds, J. A., M. P. L. Fogden, and J. H. Campbell. 1999. Biological response to climate change on a tropical mountain. Nature **398:**611–614.

Prance, G. T. 1982. The biological model of diversification in the tropics. Columbia University Press, New York.

Pressey, R. L., C. J. Humphries, C. R. Margules, R. I. Vane-Wright, and P. H. Williams.1993. Beyond opportunism: key principles for systematic reserve selection. Trends in Ecology and Evolution **8:**124–128.

Prothero, D. R., and T. H. Heaton. 1996. Faunal stability during the early Oligocene climatic crash. Palaeogeography Palaeoclimatology Palaeoecology **127:**257–283.

Ranney, J. W., M. C. Bruner, and J. B. Levenson. 1981. The importance of edge in the structure and dynamics of forest islands. Pages 67–95 in R. L. Burgess and D. M. Sharpe, editors. Forest island dynamics in man-dominated landscapes. Springer-Verlag, New York.

Ravindranath, N. H., and R. Sukumar. 1998. Climate change and tropical forests in India. Climatic Change **39:**563–581.

Rodriguez-Trelles, F., and M. A. Rodriguez. 1998. Rapid micro-evolution and loss of chromosome diversity in *Drosophila* in response to climate warming. Evolutionary Ecology **12:**829–838.

Sala, O. E., et al. 2000. Global biodiversity scenarios for the year 2100. Science **287:**1770–1774.

Schimel, D., J. Melillo, H. Tian, A. D. McGuire, D. Kicklighter, T. Kittel, N. Rosembloom, S. Running, P. Thornton, D. Ojima, W. Parton, R. Kelly, M. Sykes, R. Neilson, and B. Rizzo. 2000. Contribution of increasing $CO_2$ and climate to carbon storage by ecosystems in the United States. Science **287:**2004–2006.

Schowalter, T. D. 1988. Forest pest management: a synopsis. Northwest Environmental Journal **4:**313–318.

Schowalter, T. D. 1989. Canopy arthropod community structure and herbivory in old-growth and regenerating forests in western Oregon. Canadian Journal of Forest Research **19:**318–322.

Schulze, E-D., C. Wirth, and M. Heimann. 2000. Managing forests after Kyoto. Science **289:**2058–2059.

Scott, J. M., F. Davis, B. Csuti, R. Noss, B. Butterfield, C. Groves, J. Anderson, S. Caicco, F. D'Erchia, T. C. Edwards, J. Ulliman, and R. G. Wright. 1993. Gap analysis: a geographical approach to protection of biological diversity. Wildlife Monographs **123:**1–41.

Sedjo, R., and B. Sohngen.1998. Impacts of climate change on forests. Resources for the Future, Washington, D.C.

Sepkoski, J. J., Jr. 1998. Rates of speciation in the fossil record. Philosophical Transactions of the Royal Society of London Series B **353:**315–326.

Simberloff, D. 1997. The biology of invasions. Pages 3–17 in D. Simberloff, D. C. Schmitz, and T. C. Brown, editors. Strangers in paradise: impact and management of nonindigenous species in Florida. Island Press, Washington, D.C.

Simberloff, D. 1998. Flagships, umbrellas, and keystones: is single-species management passé in the landscape era? Biological Conservation **83**:247–257.

Sirois, L., and S. Payette. 1991. Reduced postfire tree regeneration along a boreal forest-forest tundra transect in northern Quebec. Ecology **72**:619–627.

Smaglik, P. 2000. United States backs soil strategy in fight against global warming. Nature **406**:549–550.

Sprugel, D. G. 1991. Disturbance, equilibrium, and environmental variability: what is "natural" vegetation in a changing environment? Biological Conservation **58**:1–18.

Stephenson, N. L. 1999. Reference conditions for giant sequoia forest restoration: structure, process, and precision. Ecological Applications **9**:1253–1265.

Still, C. J., P. N. Foster, and S. H. Schneider. 1999. Simulating the effects of climate change on tropical montane cloud forests. Nature **398**:608–610.

Swetnam, T. W. 1993. Fire history and climate change in giant sequoia groves. Science **262**:885–889.

Swetnam, T. W., C. D. Allen, and J. L. Betancourt. 1999. Applied historical ecology: using the past to manage for the future. Ecological Applications **9**:1189–1206.

Sykes, M. T., and I. C. Prentice. 1996. Climate change, tree species distributions and forest dynamics: a case study in the mixed conifer/northern hardwoods zone of northern Europe. Climatic Change **34**:161–177.

Symstad, A. J. 2000. A test of the effects of functional group richness and composition on grassland invasibility. Ecology **81**:99–109.

Terborgh, J. 1986. Keystone plant resources in the tropical forest. Pages 330–344 in M. E. Soulé, editor. Conservation biology: the science of scarcity and diversity. Sinauer Associates, Sunderland, Massachusetts.

Tidwell, W. D. 1998. Common fossil plants of western North America. 2nd edition. Smithsonian Institution Press, Washington, D.C.

Tilman, D. 1996. Biodiversity: population versus ecosystem stability. Ecology **77**:350–363.

Tilman, D. 1999. The ecological consequences of changes in biodiversity: a search for general principles. Ecology **80**:1455–1474.

Tilman, D., and J. A. Downing. 1994. Biodiversity and stability in grasslands. Nature **367**:363–365.

Tilman, D., P. Reich, H. Phillips, M. Menton, A. Patel, E. Vos, D. Peterson, and J. Knops. 2000. Fire suppression and ecosystem carbon storage. Ecology **81**:2680–2685.

Trapnell, C. G. 1959. Ecological results of woodland burning experiments in northern Rhodesia. Journal of Ecology **47**:129–168.

Trombulak, S. C., and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology **14**:18–30.

Tyser, R. W., and C. A. Worley. 1992. Alien flora in grasslands adjacent to road and trail corridors in Glacier National Park, Montana (USA). Conservation Biology **6**:253–262.

Veblen, T. T., T. Kitzberger, R. Villalba, and J. Donnegan. 1999. Fire history in northern Patagonia: the roles of humans and climatic variation. Ecological Monographs **69**:47–67.

Walker, B. 1992. Biological diversity and ecological redundancy. Conservation Biology **6**:18–23.

Walker, B. 1995. Conserving biological diversity through ecosystem resilience. Conservation Biology **9**:747–752.

Whitford, W. G., D. J. Rapport, and A. G. DeSoyza. 1999. Using resistance and resilience measurements for "fitness" tests in ecosystem health. Journal of Environmental Management **57**:21–29.

Whitmore, T. C. 1998. Potential impact of climatic change on tropical rain forest seedlings and forest regeneration. Climatic Change **39**:429–438.

Whittaker, R. H. 1960. Vegetation of the Siskiyou Mountains, Oregon and California. Ecological Monographs **30**:279–338.

Williams, D. W., and A. M. Liebhold. 1995. Herbivorous insects and global change: potential changes in the spatial distribution of forest defoliator outbreaks. Journal of Biogeography **22**:665–671.

Willis, K. J., and R. J. Whittaker. 2000. The refugial debate. Science **287**:1406–1407.

Wilson, J. B., G. L. Rapson, M. T. Sykes, A. J. Watkins, and P. A. Williams. 1992. Distributions and climatic correlations of some exotic species along roadsides in South Island, New Zealand. Journal of Biogeography **19**:183–193.

Winnett, S. M. 1998. Potential effects of climate change on U.S. forests: a review. Climate Research **11**:39–49.

Wuethrich, B. 2000. How climate change alters rhythms of the wild. Science **287**:793–795.

Zobel, D. B., A. McKee, G. M. Hawk, and C. T. Dyrness. 1976. Relationships of environment to composition, structure, and diversity of forest communities of the central western Cascades of Oregon. Ecological Monographs **46**:135–156.



BLM_0059378

# NATIONAL REGISTER BULLETIN

Technical information on the the National Register of Historic Places:
survey, evaluation, registration, and preservation of cultural resources



U.S. Department of the Interior
National Park Service
Cultural Resources
National Register, History and Education

# How to Apply the National Register Criteria for Evaluation









BLM_0059379

The mission of the Department of the Interior is to protect and provide access to our Nation's natural and cultural heritage and honor our trust responsibilities to tribes.

The National Park Service preserves unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations. The Park Service cooperates with partners to extend the benefits of natural and cultural resource conservation and outdoor recreation throughout this country and the world.

This material is partially based upon work conducted under a cooperative agreement with the National Conference of State Historic Preservation Officers and the U.S. Department of the Interior.

Date of publication:  1990; revised 1991, 1995, 1997.  Revised for Internet 1995.

*Cover*

*(Top Left)* **Criterion B - Frederick Douglass Home,** *Washington, D.C.  From 1877-1899, this was the home of Frederick Douglass, the former slave who rose to become a prominent author, abolitionist, editor, orator, and diplomat.  (Walter Smalling, Jr.)*

*(Top Right)* **Criterion D - Francis Canyon Ruin,** *Blanco vicinity, Rio Arriba County, New Mexico.  A fortified village site composed of 40 masonry-walled rooms arranged in a cluster of four house blocks.  Constructed ca. 1716-1742 for protection against raiding Utes and Comanches, the site has information potential related to Navajo, Pueblo, and Spanish cultures.  (Jon Samuelson)*

*(Bottom Left)* **Criterion C - Bridge in Cherrytree Township,** *Venago County, Pennsylvania.  Built in 1882, this Pratt through truss bridge is significant for engineering as a well preserved example of a type of bridge frequently used in northwestern Pennsylvania in the late 19th century.  (Pennsylvania Department of Transportation)*

*(Bottom Right)* **Criterion A - Main Street/Market Square Historic District,** *Houston, Harris County, Texas.  Until well into the 20th century this district marked the bounds of public and business life in Houston.  Constructed between the 1870s and 1920s, the district includes Houston's municipal and county buildings, and served as the city's wholesale, retail, and financial center.  (Paul Hester)*

BLM_0059380

# PREFACE

Preserving historic properties as important reflections of our American heritage became a national policy through passage of the Antiquities Act of 1906, the Historic Sites Act of 1935, and the National Historic Preservation Act of 1966, as amended. The Historic Sites Act authorized the Secretary of the Interior to identify and recognize properties of national significance (National Historic Landmarks) in United States history and archeology. The National Historic Preservation Act of 1966 authorized the Secretary to expand this recognition to properties of local and State significance in American history, architecture, archeology, engineering, and culture, and worthy of preservation. The National Register of Historic Places is the official list of these recognized properties, and is maintained and expanded by the National Park Service on behalf of the Secretary of the Interior.[1]

The National Register of Historic Places documents the appearance and importance of districts, sites, buildings, structures, and objects significant in our prehistory and history. These properties represent the major patterns of our shared local, State, and national experience. To guide the selection of properties included in the National Register, the National Park Service has developed the National Register Criteria for Evaluation. These criteria are standards by which every property that is nominated to the National Register is judged. In addition, the National Park Service has developed criteria for the recognition of nationally significant properties, which are designated National Historic Landmarks and prehistoric and historic units of the National Park System. Both these sets of criteria were developed to be consistent with the Secretary of the Interior's *Standards and Guidelines for Archeology and Historic Preservation*, which are uniform, national standards for preservation activities.[2]

This publication explains how the National Park Service applies these criteria in evaluating the wide range of properties that may be significant in local, State, and national history.

It should be used by anyone who must decide if a particular property qualifies for the National Register of Historic Places.

Listing properties in the National Register is an important step in a nationwide preservation process. The responsibility for the identification, initial evaluation, nomination, and treatment of historic resources lies with private individuals, State historic preservation offices, and Federal preservation offices, local governments, and Indian tribes. The final evaluation and listing of properties in the National Register is the responsibility of the Keeper of the National Register.

This bulletin was prepared by staff of the National Register Branch, Interagency Resources Division, National Park Service, with the assistance of the History Division. It was originally issued in draft form in 1982. The draft was revised into final form by Patrick W. Andrus, Historian, National Register, and edited by Rebecca H. Shrimpton, Consulting Historian.

Beth L. Savage, National Register and Sarah Dillard Pope, National Register, NCSHPO coordinated the latest revision of this bulletin. Antionette J. Lee, Tanya Gossett, and Kira Badamo coordinated earlier revisions.

---

[1] Properties listed in the National Register receive limited Federal protection and certain benefits. For more information concerning the effects of listing, and how the National Register may be used by the general public and Certified Local Governments, as well as by local, State, and Federal agencies, and for copies of National Register Bulletins, contact the National Park Service, National Register, 1849 C Street, NW, NC400, Washington, D.C., 20240. Information may also be obtained by visiting the National Register Web site at **www.cr.nps.gov/nr** or by contacting any of the historic preservation offices in the States and territories.

[2] The *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* are found in the *Federal Register*, Vol. 48, No. 190 (Thursday, September 29, 1983). A copy can be obtained by writing the National Park Service, Heritage Preservation Services (at the address above).

i

# TABLE OF CONTENTS

Preface ................................................................................................................................................ i

I.   Introduction ................................................................................................................................ 1

II.  National Register Criteria for Evaluation .............................................................................. 2

III. How to Use this Bulletin to Evaluate a Property ................................................................. 3

IV.  How to Define Categories of Historic Properties ................................................................ 4

Building ............................................................................................................................................ 4
Structure .......................................................................................................................................... 4
Object ............................................................................................................................................... 5
Site ................................................................................................................................................... 5
District ............................................................................................................................................. 5
   Concentration, Linkage, & Continuity of Features ................................................................. 5
   Significance .................................................................................................................................. 5
   Types of Features ....................................................................................................................... 5
   Geographical Boundaries .......................................................................................................... 6
   Discontiguous Districts ............................................................................................................. 6

V.   How to Evaluate a Property Within its Historic Context ................................................... 7

Understanding Historic Contexts ............................................................................................... 7
How to Evaluate a Property Within Its Historic Context ........................................................ 7
   Properties Significant Within More Than on Historic Context ............................................ 9
   Comparing Related Properties ................................................................................................. 9
Local, State, and National Historic Contexts ............................................................................ 9

VI.  How to Identify the Type of Significance of a Property .................................................. 11

Introduction ................................................................................................................................. 11
Criterion A:  Event ...................................................................................................................... 12
   Understanding Criterion A ..................................................................................................... 12
   Applying Criterion A ............................................................................................................... 12
      Types of Events ..................................................................................................................... 12
      Association of the Property with the Events .................................................................... 12
      Significance of the Association ........................................................................................... 12
      Traditional Cultural Values ................................................................................................. 13

Criterion B:  Person .................................................................................................................... 14
   Understanding Criterion B ...................................................................................................... 14
   Applying Criterion B ............................................................................................................... 15
      Significance of the Individual ............................................................................................. 15
      Association with the Property ............................................................................................. 15
      Comparison to Related Properties ..................................................................................... 15
      Association with Groups ...................................................................................................... 15
      Association with Living Persons ......................................................................................... 16
      Association with Architects/Artisans ................................................................................ 16
      Native American Sites ........................................................................................................... 16

Criterion C:  Design/Construction ........................................................................................... 17
   Understanding Criterion C ...................................................................................................... 17
   Applying Criterion C ............................................................................................................... 18

BLM_0059382

Distinctive Characteristics of Type, Period, and Method of Construction ........................................................... 18
Historic Adaptation of the Original Property ................................................................................................................. 19
Works of a Master .................................................................................................................................................................... 20
Properties Possessing High Artistic Values ................................................................................................................... 20

Criterion D: Information Potential ................................................................................................................................... 21
Understanding Criterion D ................................................................................................................................................. 21
Applying Criterion D ............................................................................................................................................................ 21
Archeological Sites ............................................................................................................................................................ 21
Buildings, Structures, and Objects ............................................................................................................................. 21
Association with Human Activity ............................................................................................................................... 22
Establishing a Historic Context ................................................................................................................................... 22
Developing Research Questions ................................................................................................................................. 22
Establishing the Presence of Adequate Data ........................................................................................................ 23
Integrity ................................................................................................................................................................................ 23
Partly Excavated or Disturbed Properties .............................................................................................................. 23
Completely Excavated Sites .......................................................................................................................................... 24

**VII.  How to Apply the Criteria Considerations** ................................................................................................................ 25

Introduction .............................................................................................................................................................................. 25
Criteria Consideration A: Religious Properties ........................................................................................................ 26
Understanding Criteria Consideration A .................................................................................................................. 26
Applying Criteria Consideration A .............................................................................................................................. 26
Eligibility for Historic Events ....................................................................................................................................... 26
Eligibility for Historic Persons ..................................................................................................................................... 27
Eligibility for Architectural or Artistic Distinction ............................................................................................ 28
Eligibility for Information Potential ........................................................................................................................... 28
Ability to Reflect Historic Associations ................................................................................................................... 28

Criteria Consideration B: Moved Properties ............................................................................................................. 29
Understanding Criteria Consideration B ................................................................................................................... 29
Applying Criteria Consideration B ............................................................................................................................... 29
Eligibility for Architectural Value ............................................................................................................................... 29
Eligibility for Historic Associations ........................................................................................................................... 30
Setting and Environment ................................................................................................................................................ 30
Association Dependent on the Site ............................................................................................................................ 30
Properties Designed to Be Moved ............................................................................................................................. 31
Artificially Created Groupings ..................................................................................................................................... 31
Portions of Properties ...................................................................................................................................................... 31

Criteria Consideration C: Birthplaces and Graves ................................................................................................. 32
Understanding Criteria Consideration C ................................................................................................................... 32
Applying Criteria Consideration C ............................................................................................................................... 32
Persons of Outstanding Importance ......................................................................................................................... 32
Last Surviving Property Associated with a Person ............................................................................................. 32
Eligibility for Other Associations ............................................................................................................................... 33

Criteria Consideration D: Cemeteries .......................................................................................................................... 34
Understanding Criteria Consideration D ................................................................................................................... 34
Applying Criteria Consideration D .............................................................................................................................. 34
Persons of Transcendent Importance ...................................................................................................................... 34
Eligibility on the Basis of Age ...................................................................................................................................... 35
Eligibility for Design ......................................................................................................................................................... 35
Eligibility for Association with Events ...................................................................................................................... 35
Eligibility for Information Potential ........................................................................................................................... 35
Integrity ................................................................................................................................................................................ 36
National Cemeteries ......................................................................................................................................................... 36

Criteria Consideration E: Reconstructed Properties ............................................................................................. 37
Understanding Criteria Consideration E .................................................................................................................... 37
Applying Criteria Consideration E ............................................................................................................................... 37
Accuracy of the Reconstruction .................................................................................................................................. 37
Suitable Environment ....................................................................................................................................................... 37
Restoration Master Plans ............................................................................................................................................... 38

BLM_0059383

Last Surviving Property of a Type ........................................................................................ 38
Reconstructions Older than Fifty Years ............................................................................... 38

Criteria Consideration F:  Commemorative Properties ............................................................ 39
Understanding Criteria Consideration F ............................................................................... 39
Applying Criteria Consideration F ........................................................................................ 39
Eligibility for Design ........................................................................................................ 39
Eligibility for Age, Tradition, or Symbolic Value .............................................................. 40
Ineligibility as the Last Representative of an Event or Person .......................................... 40

Criteria Consideration G:  Properties that Have Achieved Significance Within the Past Fifty Years ........................ 41
Understanding Criteria Consideration G ............................................................................... 41
Applying Criteria Consideration G ........................................................................................ 42
Eligibility for Exceptional Importance ............................................................................. 42
Historical Perspective ...................................................................................................... 42
National Park Service Rustic Architecture ....................................................................... 42
Veterans Administration Hospitals .................................................................................. 42
Comparison with Related Properties ................................................................................ 42
World War II Properties ................................................................................................... 42
Eligibility for Information Potential ................................................................................. 43
Historic Districts ............................................................................................................. 43
Properties Over Fifty Years in Age, Under Fifty Years in Significance .............................. 43
Requirement to Meet the Criteria, Regardless of Age ...................................................... 43

VIII.    How to Evaluate the Integrity of a Property ..................................................................... 44

Introduction ......................................................................................................................... 44
Understanding the Aspects of Integrity ................................................................................ 44
Location ........................................................................................................................... 44
Design .............................................................................................................................. 44
Setting ............................................................................................................................. 44
Materials .......................................................................................................................... 45
Workmanship ................................................................................................................... 45
Feeling ............................................................................................................................. 45
Association ....................................................................................................................... 45
Assessing Integrity in Properties .......................................................................................... 45
Defining the Essential Physical Features .......................................................................... 46
Visibility of the Physical Features .................................................................................... 46
Comparing Similar Properties .......................................................................................... 47
Determining the Relevant Aspects of Integrity ................................................................ 48

IX.    Summary of the National Historic Landmarks Criteria for Evaluation ................................. 50

X.    Glossary ............................................................................................................................ 53

XI.    List of National Register Bulletins .................................................................................... 54

BLM_0059384

# I. INTRODUCTION

The National Register is the nation's inventory of historic places and the national repository of documentation on the variety of historic property types, significance, abundance, condition, ownership, needs, and other information. It is the beginning of a national census of historic properties. The National Register Criteria for Evaluation define the scope of the National Register of Historic Places; they identify the range of resources and kinds of significance that will qualify properties for listing in the National Register. The Criteria are written broadly to recognize the wide variety of historic properties associated with our prehistory and history.

Decisions concerning the significance, historic integrity, documentation, and treatment of properties can be made reliably only when the resource is evaluated within its historic context. The historic context serves as the framework within which the National Register Criteria are applied to specific properties or property types. (See *Part V* for a brief discussion of historic contexts. Detailed guidance for developing and applying historic contexts is contained in *National Register Bulletin: How to Complete the National Register Registration Form* and *National Register Bulletin: How to Complete the National Register Multiple Property Documentation Form* )

The guidelines provided here are intended to help you understand the National Park Service's use of the Criteria for Evaluation, historic contexts, integrity, and Criteria Considerations, and how they apply to properties under consideration for listing in the National Register. Examples are provided throughout, illustrating specific circumstances in which properties are and are not eligible for the National Register. This bulletin should be used by anyone who is:

• Preparing to nominate a property to the National Register,

• Seeking a determination of a property's eligibility,

• Evaluating the comparable significance of a property to those listed in the National Register, or

• Expecting to nominate a property as a National Historic Landmark in addition to nominating it to the National Register.

This bulletin also contains a summary of the National Historic Landmarks Criteria for Evaluation (see *Part IX*). National Historic Landmarks are those districts, sites, buildings, structures, and objects designated by the Secretary of the Interior as possessing national significance in American history, architecture, archeology, engineering, and culture. Although National Register documentation includes a recommendation about whether a property is significant at the local, State, or national level, the only official designation of national significance is as a result of National Historic Landmark designation by the Secretary of the Interior, National Monument designation by the President of the United States, or establishment as a unit of the National Park System by Congress. These properties are automatically listed in the National Register.

1

# II. THE NATIONAL REGISTER CRITERIA FOR EVALUATION

## CRITERIA FOR EVALUATION:[3]

The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and:

A. That are associated with events that have made a significant contribution to the broad patterns of our history; or

B. That are associated with the lives of persons significant in our past; or

C. That embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

D. That have yielded, or may be likely to yield, information important in prehistory or history.

## CRITERIA CONSIDERATIONS:

Ordinarily cemeteries, birthplaces, or graves of historical figures, properties owned by religious institutions or used for religious purposes, structures that have been moved from their original locations, reconstructed historic buildings, properties primarily commemorative in nature, and properties that have achieved significance within the past 50 years shall not be considered eligible for the National Register. However, such properties *will qualify* if they are integral parts of districts that do meet the criteria or if they fall within the following categories:

a. A religious property deriving primary significance from architectural or artistic distinction or historical importance; or

b. A building or structure removed from its original location but which is significant primarily for architectural value, or which is the surviving structure most importantly associated with a historic person or event; or

c. A birthplace or grave of a historical figure of outstanding importance if there is no appropriate site or building directly associated with his or her productive life; or

d. A cemetery which derives its primary significance from graves of persons of transcendent importance, from age, from distinctive design features, or from association with historic events; or

e. A reconstructed building when accurately executed in a suitable environment and presented in a dignified manner as part of a restoration master plan, and when no other building or structure with the same association has survived; or

f. A property primarily commemorative in intent if design, age, tradition, or symbolic value has invested it with its own exceptional significance; or

g. A property achieving significance within the past 50 years if it is of exceptional importance.

---

[3]The Criteria for Evaluation are found in the *Code of Federal Regulations, Title 36, Part 60*, and are reprinted here in full.

2

# III. HOW TO USE THIS BULLETIN TO EVALUATE A PROPERTY

For a property to qualify for the National Register it must meet one of the National Register Criteria for Evaluation by:

- **Being associated with an important historic context** *and*

- **Retaining historic integrity of those features necessary to convey its significance.**

Information about the property based on physical examination and documentary research is necessary to evaluate a property's eligibility for the National Register. Evaluation of a property is most efficiently made when following this sequence:

1. Categorize the property (Part IV). A property must be classified as a district, site, building, structure, or object for inclusion in the National Register.

2. **Determine which prehistoric or historic context(s) the property represents** (Part V). A property must possess significance in American history, architecture, archeology, engineering, or culture when evaluated within the historic context of a relevant geographic area.

3. Determine whether the property is significant under the National Register Criteria (Part VI). This is done by identifying the links to important events or persons, design or construction features, or information potential that make the property important.

4. Determine if the property represents a type usually excluded from the National Register (Part VII). If so, determine if it meets any of the Criteria Considerations.

5. Determine whether the property retains integrity (Part VIII). Evaluate the aspects of location, design, setting, workmanship, materials, feeling, and association that the property must retain to convey its historic significance.

If, after completing these steps, the property appears to qualify for the National Register, the next step is to prepare a written nomination. (Refer to *National Register Bulletin: How to Complete the National Register Registration Form.*)

3

BLM_0059387

# IV.  HOW TO DEFINE CATEGORIES OF HISTORIC PROPERTIES

The National Register of Historic Places includes significant properties, classified as buildings, sites, districts, structures, or objects.  It is not used to list intangible values, except in so far as they are associated with or re-flected by historic properties.  The National Register does not list cultural events, or skilled or talented individu-als, as is done in some countries.  Rather, the National Register is ori-ented to recognizing physically con-crete properties that are relatively fixed in location.

For purposes of National Register nominations, small groups of proper-ties are listed under a single category, using the primary resource.  For ex-ample, a city hall and fountain would be categorized by the city hall (build-ing), a farmhouse with two outbuild-ings would be categorized by the farmhouse (building), and a city park with a gazebo would be categorized by the park (site).  Properties with large acreage or a number of re-sources are usually considered dis-tricts.  Common sense and reason should dictate the selection of catego-ries.

## BUILDING

A building, such as a house, barn, church, hotel, or similar construc-tion, is created principally to shelter any form of human activity.  "Build-ing" may also be used to refer to a historically and functionally related unit, such as a courthouse and jail or a house and barn.

Buildings eligible for the National Register must include all of their basic structural elements.  Parts of build-ings, such as interiors, facades, or wings, are not eligible independent of the rest of the existing building.  The whole building must be considered, and its significant features must be identified.

If a building has lost any of its basic structural elements, it is usually con-sidered a "ruin" and is categorized as a site.

*Examples of buildings include:*

*administration building*
*carriage house*
*church*
*city or town hall*
*courthouse*
*detached kitchen, barn, and privy*
*dormitory*
*fort*
*garage*
*hotel*
*house*
*library*
*mill building*
*office building*
*post office*
*school*
*social hall*
*shed*
*stable*
*store*
*theater*
*train station*

## STRUCTURE

The term "structure" is used to distinguish from buildings those functional constructions used usu-ally for purposes other than creating human shelter.

Structures nominated to the National Register must include all of the extant basic structural elements.  Parts of structures can not be consid-ered eligible if the whole structure remains.  For example, a truss bridge is composed of the metal or wooden truss, the abutments, and supporting piers, all of which, if extant, must be included when considering the property for eligibility.

If a structure has lost its historic configuration or pattern of organiza-tion through deterioration or demoli-tion, it is usually considered a "ruin" and is categorized as a site.

*Examples of structures include:*

*aircraft*
*apiary*
*automobile*
*bandstand*
*boats and ships*
*bridge*
*cairn*
*canal*
*carousel*
*corncrib*
*dam*
*earthwork*
*fence*
*gazebo*
*grain elevator*
*highway*
*irrigation system*
*kiln*
*lighthouse*
*railroad grade*
*silo*
*trolley car*
*tunnel*
*windmill*

4

BLM_0059388

# OBJECT

**The term "object" is used to distinguish from buildings and structures those constructions that are primarily artistic in nature or are relatively small in scale and simply constructed. Although it may be, by nature or design, movable, an object is associated with a specific setting or environment.**

Small objects not designed for a specific location are normally not eligible. Such works include transportable sculpture, furniture, and other decorative arts that, unlike a fixed outdoor sculpture, do not possess association with a specific place.

Objects should be in a setting appropriate to their significant historic use, roles, or character. Objects relocated to a museum are inappropriate for listing in the National Register.

*Examples of objects include:*

*boundary marker*
*fountain*
*milepost*
*monument*
*scupture*
*statuary*

# SITE

**A site is the location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself possesses historic, cultural, or archeological value regardless of the value of any existing structure.**

A site can possess associative significance or information potential or both, and can be significant under any or all of the four criteria. A site need not be marked by physical remains if it is the location of a prehistoric or historic event or pattern of events and if no buildings, structures, or objects marked it at the time of the events. However, when the location of a prehistoric or historic event cannot be conclusively determined because no other cultural materials were present or survive, documentation must be carefully evaluated to determine whether the traditionally recognized or identified site is accurate.

A site may be a natural landmark strongly associated with significant prehistoric or historic events or patterns of events, if the significance of the natural feature is well documented through scholarly research. Generally, though, the National Register excludes from the definition of "site" natural waterways or bodies of water that served as determinants in the location of communities or were significant in the locality's subsequent economic development. While they may have been "avenues of exploration," the features most appropriate to document this significance are the properties built in association with the waterways.

*Examples of sites include:*

*battlefield*
*campsite*
*cemeteries significant for information*
*    potential or historic association*
*ceremonial site*
*designed landscape*
*habitation site*
*natural feature (such as a rock formation)*
*    having cultural significance*
*petroglyph*
*rock carving*
*rock shelter*
*ruins of a building or structure*
*shipwreck*
*trail*
*village site*

# DISTRICT

**A district possesses a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united historically or aesthetically by plan or physical development.**

## CONCENTRATION, LINKAGE, & CONTINUITY OF FEATURES

A district derives its importance from being a unified entity, even though it is often composed of a wide variety of resources. The identity of a district results from the interrelationship of its resources, which can convey a visual sense of the overall historic environment or be an arrangement of historically or functionally related properties. For example, a district can reflect one principal activity, such as a mill or a ranch, or it can encompass several interrelated activities, such as an area that includes industrial, residential, or commercial buildings, sites, structures, or objects. A district can also be a grouping of archeological sites related primarily by their common components; these types of districts often will not visually represent a specific historic environment.

## SIGNIFICANCE

A district must be significant, as well as being an identifiable entity. It must be important for historical, architectural, archeological, engineering, or cultural values. Therefore, districts that are significant will usually meet the last portion of Criterion C plus Criterion A, Criterion B, other portions of Criterion C, or Criterion D.

## TYPES OF FEATURES

A district can comprise both features that lack individual distinction and individually distinctive features that serve as focal points. It may even be considered eligible if all of the components lack individual distinction, provided that the grouping achieves significance as a whole within its historic context. In either case, the majority of the components that add to the district's historic character, even if they are individually undistinguished, must possess integrity, as must the district as a whole.

A district can contain buildings, structures, sites, objects, or open spaces that do not contribute to the significance of the district. The number of noncontributing properties a district can contain yet still convey its sense of time and place and historical development depends on how these properties affect the district's integrity. In archeological districts, the primary factor to be considered is the effect of any disturbances on the information potential of the district as a whole.

BLM_0059389

## GEOGRAPHICAL BOUNDARIES

A district must be a definable geographic area that can be distinguished from surrounding properties by changes such as density, scale, type, age, style of sites, buildings, structures, and objects, or by documented differences in patterns of historic development or associations. It is seldom defined, however, by the limits of current parcels of ownership, management, or planning boundaries. The boundaries must be based upon a shared relationship among the properties constituting the district.

## DISCONTIGUOUS DISTRICTS

A district is usually a single geographic area of contiguous historic properties; however, a district can also be composed of two or more definable significant areas separated by nonsignificant areas. A discontiguous district is most appropriate where:

- Elements are spatially discrete;

- Space between the elements is not related to the significance of the district; and

- Visual continuity is not a factor in the significance.

In addition, a canal can be treated as a discontiguous district when the system consists of man-made sections of canal interspersed with sections of river navigation. For scattered archeological properties, a discontiguous district is appropriate when the deposits are related to each other through cultural affiliation, period of use, or site type.

It is not appropriate to use the discontiguous district format to include an isolated resource or small group of resources which were once connected to the district, but have since been separated either through demolition or new construction. For example, do not use the discontiguous district format to nominate individual buildings of a downtown commerical district that have become isolated through demolition.

*Examples of districts include:*

*business districts*
*canal systems*
*groups of habitation sites*
*college campuses*
*estates and farms with large acreage/*
 *numerous properties*
*industrial complexes*
*irrigation systems*
*residential areas*
*rural villages*
*transportation networks*
*rural historic districts*



**Ordeman-Shaw Historic District**, *Montgomery, Montgomery County, Alabama. Historic districts derive their identity from the interrelationship of their resources. Part of the defining characteristics of this 19th century residential district in Montgomery, Alabama, is found in the rhythmic pattern of the rows of decorative porches. (Frank L. Thiermonge, III)*

6

BLM_0059390

# V. HOW TO EVALUATE A PROPERTY WITHIN ITS HISTORIC CONTEXT

## UNDERSTANDING HISTORIC CONTEXTS

To qualify for the National Register, a property must be significant; that is, it must represent a significant part of the history, architecture, archeology, engineering, or culture of an area, and it must have the characteristics that make it a good representative of properties associated with that aspect of the past. This section explains how to evaluate a property within its historic context.[4]

The significance of a historic property can be judged and explained only when it is evaluated within its historic context. Historic contexts are those patterns or trends in history by which a specific occurrence, property, or site is understood and its meaning (and ultimately its significance) within history or prehistory is made clear. Historians, architectural historians, folklorists, archeologists, and anthropologists use different words to describe this phenomena such as trend, pattern, theme, or cultural affiliation, but ultimately the concept is the same.

The concept of historic context is not a new one; it has been fundamental to the study of history since the 18th century and, arguably, earlier than that. Its core premise is that resources, properties, or happenings in history do not occur in a vacuum but rather are part of larger trends or patterns.

In order to decide whether a property is significant within its historic context, the following five things must be determined:

- The facet of prehistory or history of the local area, State, or the nation that the property represents;

- Whether that facet of prehistory or history is significant;

- Whether it is a type of property that has relevance and importance in illustrating the historic context;

- How the property illustrates that history; and finally

- Whether the property possesses the physical features necessary to convey the aspect of prehistory or history with which it is associated.

These five steps are discussed in detail below. If the property being evaluated does represent an important aspect of the area's history or prehistory *and* possesses the requisite quality of integrity, then it qualifies for the National Register.

## HOW TO EVALUATE A PROPERTY WITHIN ITS HISTORIC CONTEXT

**Identify what the property represents: the theme(s), geographical limits, and chronological period that provide a perspective from which to evaluate the property's significance.**

Historic contexts are historical patterns that can be identified through consideration of the history of the property and the history of the surrounding area. Historic contexts may have already been defined in your area by the State historic preservation office, Federal agencies, or local governments. In accordance with the National Register Criteria, the historic context may relate to one of the following:

- An event, a series of events or activities, or patterns of an area's development (Criterion A);

- Association with the life of an important person (Criterion B);

- A building form, architectural style, engineering technique, or artistic values, based on a stage of physical development, or the use of a material or method of construction that shaped the historic identity of an area (Criterion C); or

- A research topic (Criterion D).

---

[4]For a complete discussion of historic contexts, see *National Register Bulletin: Guidelines for Completing National Register of Historic Places Registration Forms.*

BLM_0059391

**Determine how the theme of the context is significant in the history of the local area, the State, or the nation.**

A theme is a means of organizing properties into coherent patterns based on elements such as environment, social/ethnic groups, transportation networks, technology, or political developments that have influenced the development of an area during one or more periods of prehistory or history. A theme is considered significant if it can be demonstrated, through scholarly research, to be important in American history. Many significant themes can be found in the following list of Areas of Significance used by the National Register.

### AREAS OF SIGNIFICANCE

*Agriculture*
*Architecture*
*Archeology*
   *Prehistoric*
   *Historic—Aboriginal*
   *Historic—Non-Aboriginal*
*Art*
*Commerce*
*Communications*
*Community Planning and Development*
*Conservation*
*Economics*
*Education*
*Engineering*
*Entertainment/Recreation*
*Ethnic Heritage*
   *Asian*
   *Black*
   *European*
   *Hispanic*
   *Native American*
   *Pacific Islander*
   *Other*
*Exploration/Settlement*
*Health/Medicine*
*Industry*
*Invention*
*Landscape Architecture*
*Law*
*Literature*
*Maritime History*
*Military*
*Performing Arts*
*Philosophy*
*Politics/Government*
*Religion*
*Science*
*Social History*
*Transportation*
*Other*

**Determine what the property type is and whether it is important in illustrating the historic context.**

A context may be represented by a variety of important property types. For example, the context of "Civil War Military Activity in Northern Virginia" might be represented by such properties as: a group of mid-19th century fortification structures; an open field where a battle occurred; a knoll from which a general directed troop movements; a sunken transport ship; the residences or public buildings that served as company headquarters; a railroad bridge that served as a focal point for a battle; and earthworks exhibiting particular construction techniques.

Because a historic context for a community can be based on a distinct period of development, it might include numerous property types. For example, the context "Era of Industrialization in Grand Bay, Michigan, 1875 - 1900" could be represented by important property types as diverse as sawmills, paper mill sites, salt refining plants, flour mills, grain elevators, furniture factories, workers housing, commercial buildings, social halls, schools, churches, and transportation facilities.

A historic context can also be based on a single important type of property. The context "Development of County Government in Georgia, 1777 - 1861" might be represented solely by courthouses. Similarly, "Bridge Construction in Pittsburgh, 1870 - 1920" would probably only have one property type.

**Determine how the property represents the context through specific historic associations, architectural or engineering values, or information potential (the Criteria for Evaluation).**

For example, the context of county government expansion is represented under Criterion A by historic districts or buildings that reflect population growth, development patterns, the role of government in that society, and political events in the history of the State, as well as the impact of county government on the physical development of county seats. Under Criterion C, the context is represented by properties whose architectural treatments reflect their governmental functions, both practically and symbolically. (See *Part VI: How to Identify the Type of Significance of a Property.*)

**Determine what physical features the property must possess in order for it to reflect the significance of the historic context.**

These physical features can be determined after identifying the following:

- Which types of properties are associated with the historic context,

- The ways in which properties can represent the theme, and

- The applicable aspects of integrity.

Properties that have the defined characteristics are eligible for listing. (See *Part VIII: How to Evaluate the Integrity of a Property.*)

8

BLM_0059392

## PROPERTIES SIGNIFICANT WITHIN MORE THAN ONE HISTORIC CONTEXT

A specific property can be significant within one or more historic contexts, and, if possible, all of these should be identified. For example, a public building constructed in the 1830s that is related to the historic context of Civil War campaigns in the area might also be related to the theme of political developments in the community during the 1880s. A property is only required, however, to be documented as significant in one context.

## COMPARING RELATED PROPERTIES

Properties listed in the National Register must possess significance when evaluated in the perspective of their historic context. Once the historic context is established and the property type is determined, it is not necessary to evaluate the property in question against other properties *if*:

- It is the sole example of a property type that is important in illustrating the historic context or

- It clearly possesses the defined characteristics required to strongly represent the context.

If these two conditions do not apply, then the property will have to be evaluated against other examples of the property type to determine its eligibility. The geographic level (local, State, or national) at which this evaluation is made is the same as the level of the historic context. (See *Part V: How to Evaluate a Property Within Its Historic Context.*)

# LOCAL, STATE, AND NATIONAL HISTORIC CONTEXTS

Historic contexts are found at a variety of geographical levels or scales. The geographic scale selected may relate to a pattern of historical development, a political division, or a cultural area. Regardless of the scale, the historic context establishes the framework from which decisions about the significance of related properties can be made.

## LOCAL HISTORIC CONTEXTS

A local historic context represents an aspect of the history of a town, city, county, cultural area, or region, or any portions thereof. It is defined by the importance of the property, not necessarily the physical location of the property. For instance, if a property is of a type found throughout a State, or its boundaries extend over two States, but its importance relates only to a particular county, the property would be considered of local significance.

The level of context of archeological sites significant for their information potential depends on the scope of the applicable research design. For example, a Late Mississippian village site may yield information in a research design concerning one settlement system on a regional scale, while in another research design it may reveal information of local importance concerning a single group's stone tool manufacturing techniques or house forms. It is a question of how the available information potential is likely to be used.

## STATE HISTORIC CONTEXTS

Properties are evaluated in a State context when they represent an aspect of the history of the State as a whole (or American Samoa, the District of Columbia, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the Virgin Islands). These properties do not necessarily have to belong to property types found throughout the entire State: they can be located in only a portion of the State's present political boundary. It is the property's historic context that must be important statewide. For example, the "cotton belt" extends through only a portion of Georgia, yet its historical development in the antebellum period affected the entire State. These State historic contexts may have associated properties that are statewide or locally significant representations. A cotton gin in a small town might be a locally significant representation of this context, while one of the largest cotton producing plantations might be of State significance.

A property whose historic associations or information potential appears to extend beyond a single local area might be significant at the State level. A property can be significant to more than one community or local area, however, without having achieved State significance.

A property that overlaps several State boundaries can possibly be significant to the State or local history of each of the States. Such a property is not necessarily of national significance, however, nor is it necessarily significant to all of the States in which it is located.

Prehistoric sites are not often considered to have "State" significance, per se, largely because States are relatively recent political entities and usually do not correspond closely to Native American political territories or cultural areas. Numerous sites, however, may be of significance to a large region that might geographically encompass parts of one, or usually several, States. Prehistoric resources that might be of State significance include regional sites that provide a diagnostic assemblage of artifacts for a particular cultural group or time period or that provide chronological control (specific dates or relative order in time) for a series of cultural groups.

9

## NATIONAL HISTORIC CONTEXTS

Properties are evaluated in a national context when they represent an aspect of the history of the United States and its territories as a whole. These national historic contexts may have associated properties that are locally or statewide significant representations, as well as those of national significance.

Properties designated as nationally significant and listed in the National Register are the prehistoric and historic units of the National Park System and those properties that have been designated National Historic Landmarks. The National Historic Landmark criteria are the standards for nationally significant properties; they are found in the *Code of Federal Regulations, Title 36, Part 65* and are summarized in this bulletin in *Part IX: Summary of National Historic Landmarks Criteria for Evaluation.*

A property with national significance helps us understand the history of the nation by illustrating the nationwide impact of events or persons associated with the property, its architectural type or style, or information potential. It must be of exceptional value in representing or illustrating an important theme in the history of the nation.

Nationally significant properties do not necessarily have to belong to a property type found throughout the entire country: they can be located in only a portion of the present political boundaries. It is their historic context that must be important nationwide. For example, the American Civil War was fought in only a portion of the United States, yet its impact was nationwide. The site of a small military skirmish might be a locally significant representation of this national context, while the capture of the State's largest city might be a statewide significant representation of the national context.

When evaluating properties at the national level for designation as a National Historic Landmark, please refer to the National Historic Landmarks outline, *History and Prehistory in the National Park System and the National Historic Landmarks Program 1987.* (For more information about the National Historic Landmarks program, please write to the Department of the Interior, National Park Service, National Historic Landmarks, 1849 C Street, NW, NC400, Washington, DC  20240.)

10

BLM_0059394

# VI.  HOW TO IDENTIFY THE TYPE OF SIGNIFICANCE OF A PROPERTY

## INTRODUCTION

When evaluated within its historic context, a property must be shown to be significant for *one or more of the four Criteria for Evaluation - A, B, C, or D* (listed earlier in *Part II*).  The Criteria describe how properties are significant for their association with important events or persons, for their importance in design or construction, or for their information potential.

The basis for judging a property's significance and, ultimately, its eligibility under the Criteria is *historic context*.  The use of historic context allows a property to be properly evaluated in a nearly infinite number of capacities.  For instance, Criterion C:  Design/Construction can accommodate properties representing construction types that are unusual or widely practiced, that are innovative or traditional, that are "high style" or vernacular, that are the work of a famous architect or an unknown master craftsman.  *The key to determining whether the characteristics or associations of a particular property are significant is to consider the property within its historic context.*

After identifying the relevant historic context(s) with which the property is associated the four Criteria are applied to the property.  Within the scope of the historic context, the National Register Criteria define the kind of significance that the properties represent.

For example, within the context of "19th Century Gunpowder Production in the Brandywine Valley," Criterion A would apply to those properties associated with important events in the founding and development of the industry.  Criterion B would apply to those properties associated with persons who are significant in the founding of the industry or associated with important inventions related to gunpowder manufacturing.  Criterion C would apply to those buildings, structures, or objects whose architectural form or style reflect important design qualities integral to the industry.  And Criterion D would apply to properties that can convey information important in our understanding of this industrial process.  If a property qualifies under more than one of the Criteria, its significance under each should be considered, if possible, in order to identify all aspects of its historical value.

## NATIONAL REGISTER CRITERIA FOR EVALUATION*

The National Register Criteria recognize different types of values embodied in districts, sites, buildings, structures, and objects.  These values fall into the following categories:

**Associative value (Criteria A and B):** Properties significant for their association or linkage to events (Criterion A) or persons (Criterion B) important in the past.

**Design or Construction value (Criterion C):** Properties significant as representatives of the manmade expression of culture or technology.

**Information value (Criterion D):** Properties significant for their ability to yield important information about prehistory or history.

*For a complete listing of the Criteria for Evaluation, refer to Part II of this bulletin.

11

BLM_0059395

# CRITERION A: EVENT

**Properties can be eligible for the National Register if they are associated with events that have made a significant contribution to the broad patterns of our history.**

## UNDERSTANDING CRITERION A: EVENT

To be considered for listing under Criterion A, a property must be associated with one or more events important in the defined historic context. Criterion A recognizes properties associated with single events, such as the founding of a town, or with a pattern of events, repeated activities, or historic trends, such as the gradual rise of a port city's prominence in trade and commerce. The event or trends, however, must clearly be important within the associated context: settlement, in the case of the town, or development of a maritime economy, in the case of the port city. Moreover, the property must have an important association with the event or historic trends, and it must retain historic integrity. (See *Part V: How to Evaluate a Property Within its Historic Context.*)

Several steps are involved in determining whether a property is significant for its associative values:

- Determine the nature and origin of the property,

- Identify the historic context with which it is associated, and

- Evaluate the property's history to determine whether it is associated with the historic context in any important way.

## APPLYING CRITERION A: EVENT

### TYPES OF EVENTS

A property can be associated with either (or both) of two types of events:

- A specific event marking an important moment in American prehistory or history and

- A pattern of events or a historic trend that made a significant contribution to the development of a community, a State, or the nation.

Refer to the sidebar on the right for a list of specific examples.

### ASSOCIATION OF THE PROPERTY WITH THE EVENTS

The property you are evaluating must be documented, through accepted means of historical or archeological research (including oral history), to have existed at the time of the event or pattern of events *and* to have been associated with those events. A property is *not* eligible if its associations are speculative. For archeological sites, well reasoned inferences drawn from data recovered at the site can be used to establish the association between the site and the events.

### SIGNIFICANCE OF THE ASSOCIATION

Mere association with historic events or trends is not enough, in and of itself, to qualify under Criterion A: the property's specific association must be considered important as well. For example, a building historically in commercial use must be shown to have been significant in commercial history.

*EXAMPLES OF PROPERTIES ASSOCIATED WITH EVENTS*

*Properties associated with specific events:*

- *The site of a battle.*

- *The building in which an important invention was developed.*

- *A factory district where a significant strike occurred.*

- *An archeological site at which a major new aspect of prehistory was discovered, such as the first evidence of man and extinct Pleistocene animals being contemporaneous.*

- *A site where an important facet of European exploration occurred.*

*Properties associated with a pattern of events:*

- *A trail associated with western migration.*

- *A railroad station that served as the focus of a community's transportation system and commerce.*

- *A mill district reflecting the importance of textile manufacturing during a given period.*

- *A building used by an important local social organization.*

- *A site where prehistoric Native Americans annually gathered for seasonally available resources and for social interaction.*

- *A downtown district representing a town's growth as the commercial focus of the surrounding agricultural area.*

BLM_0059396

## TRADITIONAL CULTURAL VALUES

Traditional cultural significance is derived from the role a property plays in a community's historically rooted beliefs, customs, and practices. Properties may have significance under Criterion A if they are associated with events, or series of events, significant to the cultural traditions of a community.[5]

**Eligible**

- A hilltop associated in oral historical accounts with the founding of an Indian tribe or society is eligible.

- A rural community can be eligible whose organization, buildings, or patterns of land use reflect the cultural traditions valued by its long-term residents.

- An urban neighborhood can be eligible as the traditional home of a particular cultural group and as a reflection of its beliefs and practices.

**Not Eligible**

- A site viewed as sacred by a recently established utopian or religious community does not have traditional cultural value and is not eligible.



*Criterion A - The Old Brulay Plantation, Brownsville vicinity, Cameron county, Texas. Historically significant for its association with the development of agriculture in southeast Texas, this complex of 10 brick buildings was constructed by George N. Brulay, a French immigrant who introduced commercial sugar production and irrigation to the Rio Grande Valley. (Photo by Texas Historical Commission).*

---

[5] For more information, refer to *National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties.*

13

# CRITERION B: PERSON

**Properties may be eligible for the National Register if they are associated with the lives of persons significant in our past.**

## UNDERSTANDING CRITERION B: PERSON[6]

Criterion B applies to properties associated with individuals whose specific contributions to history can be identified and documented. Persons "significant in our past" refers to individuals whose activities are demonstrably important within a local, State, or national historic context. The criterion is generally restricted to those properties that illustrate (rather than commemorate) a person's important achievements. (The policy regarding commemorative properties, birthplaces, and graves is explained further in *Part VIII: How to Apply the Criteria Considerations.*)

Several steps are involved in determining whether a property is significant for its associative values under Criterion B. First, determine the importance of the individual. Second, ascertain the length and nature of his/her association with the property under study and identify the other properties associated with the individual. Third, consider the property under Criterion B, as outlined below.

### EXAMPLES OF PROPERTIES ASSOCIATED WITH PERSONS

*Properties associated with a Significant Person:*

- *The home of an important merchant or labor leader.*

- *The studio of a significant artist.*

- *The business headquarters of an important industrialist.*



*Criterion B - The William Whitney House, Hinsdale, DuPage County, Illinois. This building is locally significant for its historical association with William Whitney, the founder of the town of Hinsdale, Illinois. Whitney, a citizen of New York State, moved to Illinois, established the town, and while living here between 1870 and 1879 was a prominent local businessman and politician. (Photo by Frederick C. Cue).*

---

[6]For further information on properties eligible under Criterion B, refer to *National Register Bulletin: Guidelines for Evaluating and Documenting Properties Associated with Significant Persons.*

BLM_0059398

# APPLYING CRITERION B: PERSON

## SIGNIFICANCE OF THE INDIVIDUAL

The persons associated with the property must be *individually* significant within a historic context. A property is not eligible if its only justification for significance is that it was owned or used by a person who is a member of an identifiable profession, class, or social or ethnic group. It must be shown that the person gained importance within his or her profession or group.

> **Eligible**
>
> - The residence of a doctor, a mayor, or a merchant is eligible under Criterion B if the person was significant in the field of medicine, politics, or commerce, respectively.
>
> **Not Eligible**
>
> - A property is not eligible under Criterion B if it is associated with an individual about whom no scholarly judgement can be made because either research has not revealed specific information about the person's activities and their impact, or there is insufficient perspective to determine whether those activities or contributions were historically important.

## ASSOCIATION WITH THE PROPERTY

Properties eligible under Criterion B are usually those associated with a person's *productive* life, reflecting the time period when he or she achieved significance. In some instances this may be the person's home; in other cases, a person's business, office, laboratory, or studio may best represent his or her contribution. Properties that pre- or post-date an individual's significant accomplishments are usually not eligible. (See *Comparison to Related Properties*, below, for exceptions to this rule.)

The individual's association with the property must be documented by accepted methods of historical or archeological research, including written or oral history. Speculative associations are not acceptable. For archeological sites, well reasoned inferences drawn from data recovered at the site are acceptable.

## COMPARISON TO RELATED PROPERTIES

Each property associated with an important individual should be compared to other associated properties to identify those that best represent the person's historic contributions. The best representatives usually are properties associated with the person's adult or *productive* life. Properties associated with an individual's formative or later years may also qualify if it can be demonstrated that the person's activities during this period were historically significant *or* if no properties from the person's productive years survives. Length of association is an important factor when assessing several properties with similar associations.

A community or State may contain several properties eligible for associations with the same important person, if each represents a different aspect of the person's productive life. A property can also be eligible if it has brief but consequential associations with an important individual. (Such associations are often related to specific events that occurred at the property and, therefore, it may also be eligible under Criterion A.)

## ASSOCIATION WITH GROUPS

For properties associated with several community leaders or with a prominent family, it is necessary to identify specific individuals and to explain their significant accomplishments.

> **Eligible**
>
> - A residential district in which a large number of prominent or influential merchants, professionals, civic leaders, politicians, etc., lived will be eligible under Criterion B if the significance of one or more specific individual residents is explicitly justified.
>
> - A building that served as the seat of an important family is eligible under Criterion B if the significant accomplishments of one or more individual family members is explicitly justified.
>
> **Not Eligible**
>
> - A residential district in which a large number of influential persons lived is not eligible under Criterion B if the accomplishments of a specific individual(s) cannot be documented. If the significance of the district rests in the cumulative importance of prominent residents, however, then the district might still be eligible under Criterion A. Eligibility, in this case, would be based on the broad pattern of community development, through which the neighborhood evolved into the primary residential area for this class of citizens.
>
> - A building that served as the seat of an important family will not be eligible under Criterion B if the significant accomplishments of individual family members cannot be documented. In cases where a succession of family members have lived in a house and collectively have had a demonstrably significant impact on the community, as a family, the house is more likely to be significant under Criterion A for association with a pattern of events.

BLM_0059399

## ASSOCIATION WITH LIVING PERSONS

Properties associated with living persons are usually not eligible for inclusion in the National Register. Sufficient time must have elapsed to assess both the person's field of endeavor and his/her contribution to that field.  Generally, the person's active participation in the endeavor must be finished for this historic perspective to emerge. (See Criteria Considerations C and G in *Part VII: How to Apply the Criteria Considerations.)*

## ASSOCIATION WITH ARCHITECTS/ARTISANS

Architects, artisans, artists, and engineers are often represented by their works, which are eligible under Criterion C. Their homes and studios, however, can be eligible for consideration under Criterion B, because these usually are the properties with which they are most personally associated.

## NATIVE AMERICAN SITES

The known major villages of individual Native Americans who were important during the contact period or later can qualify under Criterion B.  As with all Criterion B properties, the individual associated with the property must have made some specific important contribution to history.  Examples include sites significantly associated with Chief Joseph and Geronimo.[7]

---

[7] For more information, refer to *National Register Bulletin:  Guidelines for Evaluating and Documenting Traditional Cultural Properties.*

BLM_0059400

# CRITERION C: DESIGN/CONSTRUCTION

**Properties may be eligible for the National Register if they embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction.**



*Richland Plantation, East Feliciana Parish, Louisiana. Properties can qualify under Criterion C as examples of high style architecture. Built in the 1830s, Richland is a fine example of a Federal style residence with a Greek Revival style portico. (Photo by Dave Gleason).*

## UNDERSTANDING CRITERION C: DESIGN/ CONSTRUCTION

This criterion applies to properties significant for their physical design or construction, including such elements as architecture, landscape architecture, engineering, and artwork. To be eligible under Criterion C, a property must meet *at least one* of the following requirements:

- Embody distinctive characteristics of a type, period, or method of construction.

- Represent the work of a master.

- Possess high artistic value.

- Represent a significant and distinguishable entity whose components may lack individual distinction.

The first requirement, that properties "embody the distinctive characteristics of a type, period, or method of construction," refers to the way in which a property was conceived, designed, or fabricated by a people or culture in past periods of history. "The work of a master" refers to the technical or aesthetic achievements of an architect or craftsman. "High artistic values" concerns the expression of aesthetic ideals or preferences and applies to aesthetic achievement.

Resources "that represent a significant and distinguishable entity whose components may lack individual distinction" are called "districts." In the Criteria for Evaluation (as published in the *Code of Federal Regulations* and reprinted here in Part II), districts are

defined within the context of Criterion C. *Districts, however, can be considered for eligibility under all the Criteria,* individually or in any combination, as is appropriate. For this reason, the full discussion of districts is contained in *Part IV: How to Define Categories of Historic Properties.* Throughout the bulletin, however, districts are mentioned within the context of a specific subject, such as an individual Criterion.



*Grant Family House, Saco vicinity, York County, Maine. Properties possessing high artistic value meet Criterion C through the expression of aesthetic ideals or preferences. The Grant Family House, a modest Federal style residence, is significant for its remarkably well-preserved stenciled wall decorative treatment in the entry hall and parlor. Painted by an unknown artist ca. 1825, this is a fine example of 19th century New England regional artistic expression. (Photo by Kirk F. Mohney).*

17

*EXAMPLES OF PROPERTIES
ASSOCIATED WITH DESIGN/
CONSTRUCTION*

*Properties associated with design and
construction:*

- *A house or commercial building representing a significant style of architecture.*

- *A designed park or garden associated with a particular landscape design philosophy.*

- *A movie theater embodying high artistic value in its decorative features.*

- *A bridge or dam representing technological advances.*

# APPLYING CRITERION C: DESIGN/ CONSTRUCTION

## DISTINCTIVE CHARACTERISTICS OF TYPE, PERIOD, AND METHOD OF CONSTRUCTION

This is the portion of Criterion C under which most properties are eligible, for it encompasses all architectural styles and construction practices. To be eligible under this portion of the Criterion, a property must clearly illustrate, through "distinctive characteristics," the following:

- The pattern of features common to a particular class of resources,

- The individuality or variation of features that occurs within the class,

- The evolution of that class, or

- The transition between classes of resources.

**Distinctive Characteristics:** "Distinctive characteristics" are the physical features or traits that commonly recur in individual types, periods, or methods of construction. To be eligible, a property must clearly contain enough of those characteristics to be considered a true representative of a particular type, period, or method of construction.

Characteristics can be expressed in terms such as form, proportion, structure, plan, style, or materials. They can be general, referring to ideas of design and construction such as basic plan or form, or they can be specific, referring to precise ways of combining particular kinds of materials.

> ### Eligible
>
> - A building eligible under the theme of Gothic Revival architecture must have the distinctive characteristics that make up the vertical and picturesque qualities of the style, such as pointed gables, steep roof pitch, board and batten siding, and ornamental bargeboard and veranda trim.
>
> - A late Mississippian village that illustrates the important concepts in prehistoric community design and planning will qualify.
>
> - A designed historic landscape will qualify if it reflects a historic trend or school of theory and practice, such as the City Beautiful Movement, evidencing distinguished design, layout, and the work of skilled craftsmanship.
>
> ### Not Eligible
>
> - A commercial building with some Art Deco detailing is not eligible under Criterion C if the detailing was added merely as an afterthought, rather than fully integrated with overall lines and massing typical of the Art Deco style or the transition between that and another style.
>
> - A designed landscape that has had major changes to its historic design, vegetation, original boundary, topography/grading, architectural features, and circulation system will not qualify.

**Type, Period, and Method of Construction:** "Type, period, or method of construction" refers to the way certain properties are related to one another by cultural tradition or function, by dates of construction or style, or by choice or availability of materials and technology.

A structure is eligible as a specimen of its type or period of construction if it is an important example (within its context) of building practices of a particular time in history. For properties that represent the variation, evolution, or transition of construction types, it must be demonstrated that the variation, etc., was an important phase of the architectural development of the area or community in that it had an impact as evidenced by later buildings. A property is not eligible, however, simply because it has been identified as the only such property ever fabricated; it must be demonstrated to be significant as well.

> ### Eligible
>
> - A building that has some characteristics of the Romanesque Revival style and some characteristics of the Commercial style can qualify if it illustrates the transition of architectural design and the transition itself is considered an important architectural development.
>
> - A Hopewellian mound, if it is an important example of mound building construction techniques, would qualify as a method or type of construction.
>
> - A building which illustrates the early or the developing technology of particular structural systems, such as skeletal steel framing, is eligible as an example of a particular method of construction.



*Swan Falls Dam and Power Plant, Murphy vicinity, Ada County, Idaho. Significant works of engineering can qualify under Criterion C. Built between 1900-1907 the Swan Falls Dam and Power Plant across the Snake River is one of the early hydroelectric plants in the State of Idaho. (Photo by H.L. Hough).*



*Looney House, Asheville vicinity, St. Clair County, Alabama. Examples of vernacular styles of architecture can qualify under Criterion C. Built ca. 1818, the Looney House is significant as possibly the State's oldest extant two-story dogtrot type of dwelling. The defining open center passage of the dogtrot was a regional building response to the southern climate. (Photo by Carolyn Scott).*

## HISTORIC ADAPTATION OF THE ORIGINAL PROPERTY

A property can be significant not only for the way it was originally constructed or crafted, but also for the way it was adapted at a later period, or for the way it illustrates changing tastes, attitudes, and uses over a period of time.

A district is eligible under this guideline if it illustrates the evolution of historic character of a place over a particular span of time.

> **Eligible**
>
> - A Native American irrigation system modified for use by Europeans could be eligible if it illustrates the technology of either or both periods of construction.
>
> - An early 19th century farmhouse modified in the 1880s with Queen Anne style ornamentation could be significant for the modification itself, if it represented a local variation or significant trend in building construction or remodelling, was the work of a local master (see *Works of a Master* on page 20), or reflected the tastes of an important person associated with the property at the time of its alteration.
>
> - A district encompassing the commercial development of a town between 1820 and 1910, characterized by buildings of various styles and eras, can be eligible.

19

BLM_0059403

## WORKS OF A MASTER

A master is a figure of generally recognized greatness in a field, a known craftsman of consummate skill, or an anonymous craftsman whose work is distinguishable from others by its characteristic style and quality. The property must express a particular phase in the development of the master's career, an aspect of his or her work, or a particular idea or theme in his or her craft.

A property is not eligible as the work of a master, however, simply because it was designed by a prominent architect. For example, not every building designed by Frank Lloyd Wright is eligible under this portion of Criterion C, although it might meet other portions of the Criterion, for instance as a representative of the Prairie style.

The work of an unidentified craftsman is eligible if it rises above the level of workmanship of the other properties encompassed by the historic context.

## PROPERTIES POSSESSING HIGH ARTISTIC VALUES

High artistic values may be expressed in many ways, including areas as diverse as community design or planning, engineering, and sculpture. A property is eligible for its high artistic values if it so fully articulates a particular concept of design that it expresses an aesthetic ideal. A property is not eligible, however, if it does not express aesthetic ideals or design concepts more fully than other properties of its type.

---

**Eligible**

- A sculpture in a town square that epitomizes the design principles of the Art Deco style is eligible.

- A building that is a classic expression of the design theories of the Craftsman Style, such as carefully detailed handwork, is eligible.

- A landscaped park that synthesizes early 20th century principles of landscape architecture and expresses an aesthetic ideal of environment can be eligible.

- Properties that are important representatives of the aesthetic values of a cultural group, such as petroglyphs and ground drawings by Native Americans, are eligible.

**Not Eligible**

- A sculpture in a town square that is a typical example of sculpture design during its period would not qualify for high artistic value, although it might be eligible if it were significant for other reasons.

- A building that is a modest example (within its historic context) of the Craftsman Style of architecture, or a landscaped park that is characteristic of turn of the century landscape design would not qualify for high artistic value.

---

**A Significant and Distinguishable Entity Whose Components May Lack Individual Distinction.** This portion of Criterion C refers to districts. For detailed information on districts, refer to *Part IV* of this bulletin.

BLM_0059404

# CRITERION D:  INFORMATION POTENTIAL

**Properties may be eligible for the National Register if they have yielded, or may be likely to yield, information important in prehistory or history.**

## UNDERSTANDING CRITERION D: INFORMATION POTENTIAL

Certain important research questions about human history can only be answered by the actual physical material of cultural resources.  Criterion D encompasses the properties that have the potential to answer, in whole or in part, those types of research questions.  The most common type of property nominated under this Criterion is the archeological site (or a district comprised of archeological sites).  Buildings, objects, and structures (or districts comprised of these property types), however, can also be eligible for their information potential.

Criterion D has two requirements, which must *both* be met for a property to qualify:

- The property must have, or have had, information to contribute to our understanding of human history or prehistory, and

- The information must be considered important.

Under the first of these requirements, a property is eligible if it has been used as a source of data and contains more, as yet unretrieved data.  A property is also eligible if it has not yet yielded information but, through testing or research, is determined a likely source of data.

Under the second requirement, the information must be carefully evaluated within an appropriate context to determine its importance.  Information is considered "important" when it is shown to have a significant bearing on a research design that addresses such areas as:  1) current data gaps or alternative theories that challenge existing ones or 2) priority areas identified under a State or Federal agency management plan.

## APPLYING CRITERION D: INFORMATION POTENTIAL

### ARCHEOLOGICAL SITES

Criterion D most commonly applies to properties that contain or are likely to contain information bearing on an important archeological research question.  The property must have characteristics suggesting the likelihood that it possesses configurations of artifacts, soil strata, structural remains, or other natural or cultural features that make it possible to do the following:

- Test a hypothesis or hypotheses about events, groups, or processes in the past that bear on important research questions in the social or natural sciences or the humanities; or

- Corroborate or amplify currently available information suggesting that a hypothesis is either true or false; or

- Reconstruct the sequence of archeological cultures for the purpose of identifying and explaining continuities and discontinuities in the archeological record for a particular area.

## BUILDINGS, STRUCTURES, AND OBJECTS

While most often applied to archeological districts and sites, Criterion D can also apply to buildings, structures, and objects that contain important information.  In order for these types of properties to be eligible under Criterion D, they themselves must be, or must have been, the principal source of the important information.

**Eligible**

- A building exhibiting a local variation on a standard design or construction technique can be eligible if study could yield important information, such as how local availability of materials or construction expertise affected the evolution of local building development.

**Not Eligible**

- The ruins of a hacienda once contained murals that have since been destroyed.  Historical documentation, however, indicates that the murals were significant for their highly unusual design.  The ruins can not be eligible under Criterion D for the importance of the destroyed murals if the information is contained only in the documentation.

BLM_0059405



*Criterion D - Champe-Fremont 1 Archeological Site, Omaha vicinity, Douglas County, Nebraska. This archeological site, dating from ca. 1100-1450 A.D., consists of pit houses and storage pits which have the potential to yield important information concerning the subsistence patterns, religious and mortuary practices, and social organization of the prehistoric residents of eastern Nebraska. (Nebraska State Historical Society)*

## ASSOCIATION WITH HUMAN ACTIVITY

A property must be associated with *human activity* and be critical for understanding a site's historic environment in order to be eligible under Criterion D. A property can be linked to human activity through events, processes, institutions, design, construction, settlement, migration, ideals, beliefs, lifeways, and other facets of the development or maintenance of cultural systems.

The natural environment associated with the properties was often very different from that of the present and strongly influenced cultural development. Aspects of the environment that are pertinent to human activities should be considered when evaluating properties under Criterion D.

Natural features and paleontological (floral and faunal) sites are not usually eligible under Criterion D in and of themselves. They can be eligible, however, if they are either directly related to human activity or critical to understanding a site's historic environment. In a few cases, a natural feature or site unmarked by cultural materials, that is primarily eligible under Criterion A, may also be eligible under Criterion D, *if* study of the feature, or its location, setting, etc. (usually in the context of data gained from other sources), will yield important information about the event or period with which it is associated.

## ESTABLISHING A HISTORIC CONTEXT

The information that a property yields, or will yield, must be evaluated within an appropriate historic context. This will entail consulting the body of information already collected from similar properties or other pertinent sources, including modern and historic written records. The researcher must be able to anticipate if and how the potential information will affect the definition of the context. The information likely to be obtained from a particular property must confirm, refute, or supplement in an important way existing information.

A property is *not* eligible if it cannot be related to a particular time period or cultural group and, as a result, lacks any historic context within which to evaluate the importance of the information to be gained.

## DEVELOPING RESEARCH QUESTIONS

Having established the importance of the information that may be recovered, it is necessary to be explicit in demonstrating the connection between the important information and a specific property. One approach is to determine if specific important research questions can be answered by the data contained in the property. Research questions can be related to property-specific issues, to broader questions about a large geographic area, or to theoretical issues independent of any particular geographic location. These questions may be derived from the academic community or from preservation programs at the local, regional, State, or national level. Research questions are usually developed as part of a "research design," which specifies not only the questions to be asked, but also the types of data needed to supply the answers, and often the techniques needed to recover the data.

---

**Eligible**

- When a site consisting of a village occupation with midden deposits, hearths, ceramics, and stratified evidence of several occupations is being evaluated, three possible research topics could be: 1) the question of whether the site occupants were indigenous to the area prior to the time of occupation or recent arrivals, 2) the investigation of the settlement-subsistence pattern of the occupants, 3) the question of whether the region was a center for the domestication of plants. Specific questions could include: A) Do the deposits show a sequential development or sudden introduction of Ceramic Type X? B) Do the dates of the occupations fit our expectations based on the current model for the reoccupation behavior of slash-and-burn agriculturalists? C) Can any genetic changes in the food plant remains be detected?

**Not Eligible**

- A property is not eligible if so little can be understood about it that it is not possible to determine if specific important research questions can be answered by data contained in the property.

22

## ESTABLISHING THE PRESENCE OF ADEQUATE DATA

To support the assertion that a property has the data necessary to provide the important information, the property should be investigated with techniques sufficient to establish the presence of relevant data categories. What constitutes appropriate investigation techniques would depend upon specific circumstances including the property's location, condition, and the research questions being addressed, and could range from surface survey (or photographic survey for buildings), to the application of remote sensing techniques or intensive subsurface testing. Justification of the research potential of a property may be based on analogy to another better known property if sufficient similarities exist to establish the appropriateness of the analogy.

**Eligible**

- Data requirements depend on the specific research topics and questions to be addressed. To continue the example in "Developing Research Questions" above, we might want to ascertain the following with reference to questions A, B, and C: A) The site contains Ceramic Type X in one or more occupation levels and we expect to be able to document the local evaluation of the type or its intrusive nature. B) The hearths contain datable carbon deposits and are associated with more than one occupation. C) The midden deposits show good floral/faunal preservation, and we know enough about the physical evolution of food plants to interpret signs that suggest domestication.

**Not Eligible**

- Generally, if the applicable research design requires clearly stratified deposits, then subsurface investigation techniques must be applied. A site composed only of surface materials can not be eligible for its potential to yield information that could only be found in stratified deposits.

## INTEGRITY

The assessment of integrity for properties considered for information potential depends on the data requirements of the applicable research design. A property possessing information potential does not need to recall *visually* an event, person, process, or construction technique. It is important that the significant data contained in the property remain sufficiently intact to yield the expected important information, if the appropriate study techniques are employed.

**Eligible**

- An irrigation system significant for the information it will yield on early engineering practices can still be eligible even though it is now filled in and no longer retains the appearance of an open canal.

**Not Eligible**

- A plowed archeological site contains several superimposed components that have been mixed to the extent that artifact assemblages cannot be reconstructed. The site cannot be eligible if the data requirements of the research design call for the study of artifacts specific to one component.

## PARTLY EXCAVATED OR DISTURBED PROPERTIES

The current existence of appropriate physical remains must be ascertained in considering a property's ability to yield important information. Properties that have been partly excavated or otherwise disturbed and that are being considered for their potential to yield additional important information must be shown to retain that potential in their remaining portions.

**Eligible**

- A site that has been partially excavated but still retains substantial intact deposits (or a site in which the remaining deposits are small but contain critical information on a topic that is not well known) is eligible.

**Not Eligible**

- A totally collected surface site or a completely excavated buried site is not eligible since the physical remains capable of yielding important information no longer exist at the site. (See *Completely Excavated Sites,* on page 24, for exception.) Likewise, a site that has been looted or otherwise disturbed to the extent that the remaining cultural materials have lost their important depositional context (horizontal or vertical location of deposits) is not eligible.

- A reconstructed mound or other reconstructed site will generally not be considered eligible, because original cultural materials or context or both have been lost.

23

BLM_0059407

## COMPLETELY EXCAVATED SITES

Properties that have yielded important information in the past and that no longer retain additional research potential (such as completely excavated archeological sites) must be assessed essentially as historic sites under Criterion A. Such sites must be significant for associative values related to: 1) the importance of the data gained or 2) the impact of the property's role in the history of the development of anthropology/archeology or other relevant disciplines. Like other historic properties, the site must retain the ability to convey its association as the former repository of important information, the location of historic events, or the representative of important trends.

---

**Eligible**

- A property that has been excavated is eligible if the data recovered was of such importance that it influenced the direction of research in the discipline, as in a site that clearly established the antiquity of the human occupation of the New World. (See Criterion A in *Part VI: How to Identify the Type of Significance of a Property* and Criteria Consideration G in *Part VII: How to Apply the Criteria Considerations.*)

**Not Eligible**

- A totally excavated site that at one time yielded important information but that no longer can convey either its historic/prehistoric utilization or significant modern investigation is not eligible.

---

24

BLM_0059408

# VII.  HOW TO APPLY THE CRITERIA CONSIDERATIONS

## INTRODUCTION

Certain kinds of properties are not usually considered for listing in the National Register: religious properties, moved properties, birthplaces and graves, cemeteries, reconstructed properties, commemorative properties, and properties achieving significance within the past fifty years. These properties *can* be eligible for listing, however, if they meet special requirements, called Criteria Considerations, in addition to meeting the regular requirements (that is, being eligible under one or more of the four Criteria and possessing integrity). *Part VII* provides guidelines for determining which properties must meet these special requirements and for applying each Criteria Consideration.

The Criteria Considerations need to be applied only to *individual* properties.  Components of eligible districts do not have to meet the special requirements unless they make up the majority of the district or are the focal point of the district.  These are the general steps to follow when applying the Criteria Considerations to your property:

- Before looking at the Criteria Considerations, make sure your property meets one or more of the four Criteria for Evaluation and possesses integrity.

- If it does, check the Criteria Considerations (next column) to see if the property is of a type that is usually excluded from the National Register.  The sections that follow also list specific examples of properties of each type.  If your property clearly *does not* fit one of these types, then it does not need to meet any special requirements.

- If your property *does* fit one of these types, then it must meet the special requirements stipulated for that type in the Criteria Considerations.

## CRITERIA CONSIDERATIONS*

Ordinarily cemeteries, birthplaces, or graves of historical figures, properties owned by religious institutions or used for religious purposes, structures that have been moved from their original locations, reconstructed historic buildings, properties primarily commemorative in nature, and properties that have achieved significance within the past fifty years shall not be considered eligible for the National Register.  However, such properties will qualify if they are integral parts of districts that do meet the criteria or if they fall within the following categories:

a. a religious property deriving primary significance from architectural or artistic distinction or historical importance; or

b. a building or structure removed from its original location but which is significant primarily for architectural value, or which is the surviving structure most importantly associated with a historic person or event; or

c. a birthplace or grave of a historical figure of outstanding importance if there is no appropriate site or building directly associated with his or her productive life; or

d. a cemetery which derives its primary significance from graves of persons of transcendent importance, from age, from distinctive design features, from association with historic events; or

e. a reconstructed building when accurately executed in a suitable environment and presented in a dignified manner as part of a restoration master plan, and when no other building or structure with the same association has survived; or

f. a property primarily commemorative in intent if design, age, tradition, or symbolic value has invested it with its own exceptional significance; or,

g. a property achieving significance within the past 50 years if it is of exceptional importance.

*The Criteria Considerations are taken from the Criteria for Evaluation, found in the *Code of Federal Regulations, Title 36, Part 60.*

25

# CRITERIA CONSIDERATION A: RELIGIOUS PROPERTIES

A religious property is eligible if it derives its primary significance from architectural or artistic distinction or historical importance.

## UNDERSTANDING CRITERIA CONSIDERATION A: RELIGIOUS PROPERTIES

A religious property requires justification on architectural, artistic, or historic grounds to avoid any appearance of judgment by government about the validity of any religion or belief. Historic significance for a religious property cannot be established on the merits of a religious doctrine, but rather, for architectural or artistic values or for important historic or cultural forces that the property represents. A religious property's significance under Criterion A, B, C, or D must be judged in purely secular terms. A religious group may, in some cases, be considered a cultural group whose activities are significant in areas broader than religious history.

Criteria Consideration for Religious Properties applies:

- If the resource was constructed by a religious institution.

- If the resource is presently owned by a religious institution or is used for religious purposes.

- If the resource was owned by a religious institution or used for religious purposes during its Period of Significance.

- If Religion is selected as an Area of Significance.

### Examples of Properties that MUST Meet Criteria Consideration A: Religious Properties

- *A historic church where an important non-religious event occurred, such as a speech by Patrick Henry.*

- *A historic synagogue that is significant for architecture.*

- *A private residence is the site of a meeting important to religious history.*

- *A commercial block that is currently owned as an investment property by a religious institution.*

- *A historic district in which religion was either a predominant or significant function during the period of significance.*

### Example of Properties that DO NOT Need to Meet Criteria Consideration A: Religious Properties

- *A residential or commercial district that currently contains a small number of churches that are not a predominant feature of the district.*

- *A town meeting hall that serves as the center of community activity and houses a wide variety of public and private meetings, including religious service. The resource is significant for architecture and politics, and the religious function is incidental.*

- *A town hall, significant for politics from 1875 to 1925, that housed religious services during the 1950s. Since the religious function occurred after the Period of Significance, the Criteria Consideration does not apply.*

## APPLYING CRITERIA CONSIDERATION A: RELIGIOUS PROPERTIES

### ELIGIBILITY FOR HISTORIC EVENTS

A religious property can be eligible under Criterion A for any of three reasons:

- It is significant under a theme in the history of religion having secular scholarly recognition; or

- It is significant under another historical theme, such as exploration, settlement, social philanthropy, or education; or

- It is significantly associated with traditional cultural values.

BLM_0059410

## RELIGIOUS HISTORY

A religious property can be eligible if it is directly associated with either a specific event or a broad pattern in the history of religion.

> **Eligible**
>
> - The site of a convention at which a significant denominational split occurred meets the requirements of Criteria Consideration A. Also eligible is a property that illustrates the broad impact of a religious institution on the history of a local area.
>
> **Not Eligible**
>
> - A religious property cannot be eligible simply because was the place of religious services for a community, or was the oldest structure used by a religious group in a local area.

## OTHER HISTORICAL THEMES

A religious property can be eligible if it is directly associated with either a specific event or a broad pattern that is significant in another historic context. A religious property would also qualify if it were significant for its associations that illustrate the importance of a particular religious group in the social, cultural, economic, or political history of the area. Eligibility depends on the importance of the event or broad pattern and the role of the specific property.

> **Eligible**
>
> - A religious property can qualify for its important role as a temporary hospital during the Revolutionary War, or if its school was significant in the history of education in the community.
>
> **Not Eligible**
>
> - A religious property is not significant in the history of education in a community simply because it had occasionally served as a school.

## TRADITIONAL CULTURAL VALUES

When evaluating properties associated with traditional cultures, it is important to recognize that often these cultures do not make clear distinctions between what is secular and what is sacred. Criteria Consideration A is not intended to exclude traditional cultural resources merely because they have religious uses or are considered sacred. A property or natural feature important to a traditional culture's religion and mythology is eligible if its importance has been ethnohistorically documented and if the site can be clearly defined. It is critical, however, that the activities be documented and that the associations not be so diffuse that the physical resource cannot be adequately defined.[8]

> **Eligible**
>
> - A specific location or natural feature that an Indian tribe believes to be its place of origin and that is adequately documented qualifies under Criteria Consideration A.

## ELIGIBILITY FOR HISTORIC PERSONS

A religious property can be eligible for association with a person important in religious history, if that significance has scholarly, secular recognition or is important in other historic contexts. Individuals who would likely be considered significant are those who formed or significantly influenced an important religious institution or movement, or who were important in the social, economic, or political history of the area. Properties associated with individuals important only within the context of a single congregation and lacking importance in any other historic context would not be eligible under Criterion B.

> **Eligible**
>
> - A religious property strongly associated with a religious leader, such as George Whitefield or Joseph Smith, is eligible.

---

[8] For more information on applying Criteria Consideration A to traditional cultural properties, refer to *National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties.*

BLM_0059411

## ELIGIBILITY FOR ARCHITECTURAL OR ARTISTIC DISTINCTION

A religious property significant for its architectural design or construction should be evaluated as are other properties under Criterion C; that is, it should be evaluated within an established architectural context and, if necessary, compared to other properties of its type, period, or method of construction. (See "Comparing Related Properties" in *Part V: How to Evaluate a Property Within Its Historic Context.*)

> **Eligible**
>
> • A historic camp meeting district that meets the requirements of Criterion C for its significance as a type of construction is eligible.

## ELIGIBILITY FOR INFORMATION POTENTIAL

A religious property, whether a district, site, building, structure, or object, is eligible if it can yield important information about the religious practices of a cultural group or other historic themes. This kind of property should be evaluated as are other properties under Criterion D, in relation to similar properties, other information sources, and existing data gaps.

> **Eligible**
>
> • A 19th century camp meeting site that could provide information about the length and intensity of site use during revivals of the Second Great Awakening is eligible.
>
> • Rock cairns or medicine wheels that had a historic religious mythological function and can provide information about specific cultural beliefs are eligible.

## ABILITY TO REFLECT HISTORIC ASSOCIATIONS

As with all eligible properties, religious properties must physically represent the period of time for which they are significance. For instance, a recent building that houses an older congregation cannot qualify based on the historic activities of the group because the current building does not convey the earlier history. Likewise, an older building that housed the historic activities of the congregation is eligible if it still physically represents the period of the congregation's significance. However, if an older building has been remodeled to the extent that its appearance dates from the time of the remodeling, it can only be eligible if the period of significance corresponds with the period of the alterations.

> **Eligible**
>
> • A church built in the 18th century and altered beyond recognition in the 19th century is eligible only if the additions are important in themselves as an example of late 19th century architecture or as a reflection of an important period of the congregation's growth.
>
> **Not Eligible**
>
> • A synagogue built in the 1920s cannot be eligible for the important activities of its congregation in the 18th and 19th centuries. It can only be eligible for significance obtained after its construction date.
>
> • A rural 19th century frame church recently sheathed in brick is not eligible because it has lost its characteristic appearance and therefore can no longer convey its 19th century significance, either for architectural value or historic association.



***Criteria Consideration A - Religious Properties.*** *A religious property can qualify as an exception to the Criteria if it is architecturally significant.* **The Church of the Nativity** *in Rosedale, Iberville Parish, Louisiana, qualified as a rare example in the State of a 19th century small frame Gothic Revival style chapel. (Robert Obier)*

28

BLM_0059412

# CRITERIA CONSIDERATION B: MOVED PROPERTIES

**A property removed from its original or historically significant location can be eligible if it is significant primarily for architectural value or it is the surviving property most importantly associated with a historic person or event.**

## UNDERSTANDING CRITERIA CONSIDERATION B: MOVED PROPERTIES

The National Register criteria limit the consideration of moved properties because significance is embodied in locations and settings as well as in the properties themselves. Moving a property destroys the relationships between the property and its surroundings and destroys associations with historic events and persons. A move may also cause the loss of historic features such as landscaping, foundations, and chimneys, as well as loss of the potential for associated archeological deposits. Properties that were moved *before* their period of significance do not need to meet the special requirements of Criteria Consideration B.

One of the basic purposes of the National Register is to encourage the preservation of historic properties as living parts of their communities. In keeping with this purpose, it is not usual to list artificial groupings of buildings that have been created for purposes of interpretation, protection, or maintenance. Moving buildings to such a grouping destroys the integrity of location and setting, and can create a false sense of historic development.

## APPLYING CRITERIA CONSIDERATION B: MOVED PROPERTIES

### ELIGIBILITY FOR ARCHITECTURAL VALUE

A moved property significant under Criterion C must retain enough historic features to convey its architectural values and retain integrity of design, materials, workmanship, feeling, and association.

*Examples of Properties that MUST Meet Criteria Consideration B: Moved Properties*

- *A resource moved from one location on its original site to another location on the property, during or after its Period of Significance.*

- *A district in which a significant number of resources have been moved from their original location.*

- *A district which has one moved building that makes an especially significant contribution to the district.*

- *A portable resource, such as a ship or railroad car, that is relocated to a place incompatible with its original function.*

- *A portable resource, such as a ship or railroad car, whose importance is critically linked to its historic location or route and that is moved.*

*Examples of Properties that DO NOT Need to Meet Criteria Consideration B: Moved Properties*

- *A property that is moved prior to its Period of Significance.*

- *A district in which only a small percentage of typical buildings in a district are moved.*

- *A moved building that is part of a complex but is of less significance than the remaining (unmoved) buildings.*

- *A portable resource, such as a ship or railroad car, that is eligible under Criterion C and is moved within its natural setting (water, rails, etc.).*

- *A property that is raised or lowered on its foundations.*

29

BLM_0059413

## ELIGIBILITY FOR HISTORIC ASSOCIATIONS

A moved property significant under Criteria A or B must be demonstrated to be the surviving property most importantly associated with a particular historic event or an important aspect of a historic person's life. The phrase "most importantly associated" means that it must be the single surviving property that is most closely associated with the event or with the part of the person's life for which he or she is significant.

**Eligible**

- A moved building occupied by an business woman during the majority of her productive career would be eligible if the other extant properties are a house she briefly inhabited prior to her period of significance and a commercial building she owned after her retirement.

**Not Eligible**

- A moved building associated with the beginning of rail transportation in a community is not eligible if the original railroad station and warehouse remained intact on their original sites.

## SETTING AND ENVIRONMENT

In addition to the requirements above, moved properties must still have an orientation, setting, and general environment that are comparable to those of the historic location and that are compatible with the property's significance.

**Eligible**

- A property significant as an example of mid-19th century rural house type can be eligible after a move, provided that it is placed on a lot that is sufficient in size and character to recall the basic qualities of the historic environment and setting, and provided that the building is sited appropriately in relation to natural and manmade surroundings.

**Not Eligible**

- A rural house that is moved into an urban area and a bridge that is no longer situated over a waterway are not eligible.

## ASSOCIATION DEPENDENT ON THE SITE

For a property whose design values or historical associations are directly dependent on its location, any move will cause the property to lose its integrity and prevent it from conveying its significance.

**Eligible**

- A farm structure significant only as an example of a method of construction peculiar to the local area is still eligible if it is moved within that local area and the new setting is similar to that of the original location.

**Not Eligible**

- A 19th century rural residence that was designed around particular topographic features, reflecting that time period's ideals of environment, is not eligible if moved.

BLM_0059414

## PROPERTIES DESIGNED TO BE MOVED

A property designed to move or a property frequently moved during its historic use must be located in a historically appropriate setting in order to qualify, retaining its integrity of setting, design, feeling, and association. Such properties include automobiles, railroad cars and engines, and ships.

**Eligible**
- A ship docked in a harbor, a locomotive on tracks or in a railyard, and a bridge relocated from one body of water to another are eligible.

**Not Eligible**
- A ship on land in a park, a bridge placed in a pasture, or a locomotive displayed in an indoor museum are not eligible.

## ARTIFICIALLY CREATED GROUPINGS

An artificially created grouping of buildings, structures, or objects is not eligible unless it has achieved significance since the time of its assemblage. It cannot be considered as a reflection of the time period when the individual buildings were constructed.

**Eligible**
- A grouping of moved historic buildings whose creation marked the beginning of a major concern with past lifestyles can qualify as an early attempt at historic preservation and as an illustration of that generation's values.

**Not Eligible**
- A rural district composed of a farmhouse on its original site and a grouping of historic barns recently moved onto the property is not eligible.

## PORTIONS OF PROPERTIES

A moved *portion* of a building, structure, or object is not eligible because, as a fragment of a larger resource, it has lost integrity of design, setting, materials, workmanship, and location.

31

BLM_0059415

# CRITERIA CONSIDERATION C: BIRTHPLACES OR GRAVES

**A birthplace or grave of a historical figure is eligible if the person is of outstanding importance and if there is no other appropriate site or building directly associated with his or her productive life.**

## UNDERSTANDING CRITERIA CONSIDERATION C: BIRTHPLACES AND GRAVES

Birthplaces and graves often attain importance as reflections of the origins of important persons or as lasting memorials to them. The lives of persons significant in our past normally are recognized by the National Register through listing of properties illustrative of or associated with that person's productive life's work. Birthplaces and graves, as properties that represent the beginning and the end of the life of distinguished individuals, may be temporally and geographically far removed from the person's significant activities, and therefore are not usually considered eligible.

*Examples of Properties that MUST Meet Criteria Consideration C: Birthplaces and Graves*

- *The birthplace of a significant person who lived elsewhere during his or her Period of Significance.*

- *A grave that is nominated for its association with the significant person buried in it.*

- *A grave that is nominated for information potential.*

*Examples of Properties that DO NOT Need to Meet Criteria Consideration C: Birthplaces and Graves*

- *A house that was inhabited by a significant person for his or her entire lifetime.*

- *A grave located on the grounds of the house where a significant person spent his or her productive years.*

## APPLYING CRITERIA CONSIDERATION C: BIRTHPLACES AND GRAVES

### PERSONS OF OUTSTANDING IMPORTANCE

The phrase "a historical figure of outstanding importance" means that in order for a birthplace or grave to qualify, it cannot be simply the birthplace or grave of a person significant in our past (Criterion B). It must be the birthplace or grave of an individual who was of outstanding importance in the history of the local area, State, or nation. The birthplace or grave of an individual who was one of several people active in some aspect of the history of a community, a state, or the Nation would not be eligible.

### LAST SURVIVING PROPERTY ASSOCIATED WITH A PERSON

When an geographical area strongly associated with a person of outstanding importance has lost all other properties directly associated with his or her formative years or productive life, a birthplace or grave may be eligible.

32

BLM_0059416

## ELIGIBILITY FOR OTHER ASSOCIATIONS

A birthplace or grave can also be eligible if it is significant for reasons other than association with the productive life of the person in question. It can be eligible for significance under Criterion A for association with important events, under Criterion B for association with the productive lives of *other* important persons, or under Criterion C for architectural significance. A birthplace or grave can also be eligible in rare cases if, after the passage of time, it is significant for its commemorative value. (See Criteria Consideration F for a discussion of commemorative properties.) A birthplace or grave can also be eligible under Criterion D if it contains important information on research, *e.g.*, demography, pathology, mortuary practices, socioeconomic status differentiation.



**Criteria Consideration C - Birthplaces.** *A birthplace of a historical figure is eligible if the person is of outstanding importance and there is no other appropriate site or building associated with his or her productive life. The* **Walter Reed Birthplace,** *Gloucester vicinity, Gloucester County, Virginia is the most appropriate remaining building associated with the life of the man who, in 1900, discovered the cause and mode of transmission of the great scourge of the tropics, yellow fever. (Virginia Historic Landmarks Commission)*

BLM_0059417

# CRITERIA CONSIDERATION D: CEMETERIES

**A cemetery is eligible if it derives its primary significance from graves of persons of transcendent importance, from age, from distinctive design features, or from association with historic events.**

## UNDERSTANDING CRITERIA CONSIDERATION D: CEMETERIES

A cemetery is a collection of graves that is marked by stones or other artifacts or that is unmarked but recognizable by features such as fencing or depressions, or through maps, or by means of testing. Cemeteries serve as a primary means of an individual's recognition of family history and as expressions of collective religious and/or ethnic identity. Because cemeteries may embody values beyond personal or family-specific emotions, the National Register criteria allow for listing of cemeteries under certain conditions.

*Examples of Properties that MUST Meet Criteria Consideration D: Cemeteries*

- *A cemetery that is nominated individually for Criterion A, B, or C.*

*Examples of Properties that DO NOT Need to Meet Criteria Consideration D: Cemeteries*

- *A cemetery that is nominated along with its associated church, but the church is the main resource nominated.*
- *A cemetery that is nominated under Criterion D for information potential.*
- *A cemetery that is nominated as part of a district but is not the focal point of the district.*

## APPLYING CRITERIA CONSIDERATION D: CEMETERIES

### PERSONS OF TRANSCENDENT IMPORTANCE

A cemetery containing the graves of persons of transcendent importance may be eligible. To be of transcendent importance the persons must have been of great eminence in their fields of endeavor or had a great impact upon the history of their community, State, or nation. (A single grave that is the burial place of an important person and is located in a larger cemetery that does not qualify under this Criteria Consideration should be treated under Criteria Consideration C: Birthplaces and Graves.)

---

**Eligible**

- A historic cemetery containing the graves of a number of persons who were exceptionally significant in determining the course of a State's political or economic history during a particular period is eligible.

**Not Eligible**

- A cemetery containing graves of State legislators is not eligible if they simply performed the daily business of State government and did not have an outstanding impact upon the nature and direction of the State's history.

---



*Criteria Consideration D - Cemeteries. The Hancock Cemetery, Quincy, Norfolk County, Massachusetts meets the exception to the Criteria because it derives its primary significance from its great age (the earliest burials date from 1640) and from the distinctive design features found in its rich collection of late 17th and early 18th century funerary art. (N. Hobart Holly)*

34

## ELIGIBILITY ON THE BASIS OF AGE

Cemeteries can be eligible if they have achieved historic significance for their relative great age in a particular geographic or cultural context.

> **Eligible**
> - A cemetery dating from a community's original 1830s settlement can attain significance from its association with that very early period.

## ELIGIBILITY FOR DESIGN

Cemeteries can qualify on the basis of distinctive design values. These values refer to the same design values addressed in Criterion C and can include aesthetic or technological achievement in the fields of city planning, architecture, landscape architecture, engineering, mortuary art, and sculpture. As for all other nominated properties, a cemetery must clearly express its design values and be able to convey its historic appearance.

> **Eligible**
> - A Victorian cemetery is eligible if it clearly expresses the aesthetic principles related to funerary design for that period, through such features as the overall plan, landscaping, statuary, sculpture, fencing, buildings, and grave markers.
>
> **Not Eligible**
> - A cemetery cannot be eligible for design values if it no longer conveys its historic appearance because of the introduction of new grave markers.

## ELIGIBILITY FOR ASSOCIATION WITH EVENTS

Cemeteries may be associated with historic events including specific important events or general events that illustrate broad patterns.

> **Eligible**
> - A cemetery associated with an important Civil War battle is eligible.
> - A cemetery associated with the settlement of an area by an ethnic or cultural group is eligible if the movement of the group into the area had an important impact, if other properties associated with that group are rare, and if few documentary sources have survived to provide information about the group's history.
>
> **Not Eligible**
> - A cemetery associated with a battle in the Civil War does not qualify if the battle was not important in the history of the war.
> - A cemetery associated with an area's settlement by an ethnic or cultural group is not eligible if the impact of the group on the area cannot be established, if other extant historic properties better convey association with the group, or if the information that the cemetery can impart is available in documentary sources.

## ELIGIBILITY FOR INFORMATION POTENTIAL

Cemeteries, both historic and prehistoric, can be eligible if they have the potential to yield important information. The information must be important within a specific context and the potential to yield information must be demonstrated.

A cemetery can qualify if it has potential to yield important information provided that the information it contains is not available in extant documentary evidence.

> **Eligible**
> - A cemetery associated with the settlement of a particular cultural group will qualify if it has the potential to yield important information about subjects such as demography, variations in mortuary practices, or the study of the cause of death correlated with nutrition or other variables.

BLM_0059419

## INTEGRITY

Assessing the integrity of a historic cemetery entails evaluating principal design features such as plan, grave markers, and any related elements (such as fencing). Only that portion of a historic cemetery that retains its historic integrity can be eligible. If the overall integrity has been lost because of the number and size of recent grave markers, some features such as buildings, structures, or objects that retain integrity may be considered as individual properties if they are of such historic or artistic importance that they individually meet one or more of the requirements listed above.

## NATIONAL CEMETERIES

National Cemeteries administered by the Veterans Administration are eligible because they have been designated by Congress as primary memorials to the military history of the United States. Those areas within a designated national cemetery that have been used or prepared for the reception of the remains of veterans and their dependents, as well as any landscaped areas that immediately surround the graves may qualify. Because these cemeteries draw their significance from the presence of the remains of military personnel who have served the country throughout its history, the age of the cemetery is not a factor in judging eligibility, although integrity must be present.

A national cemetery or a portion of a national cemetery that has only been set aside for use in the future is not eligible.

36

BLM_0059420

# CRITERIA CONSIDERATION E: RECONTRUCTED PROPERTIES

**A reconstructed property is eligible when it is accurately executed in a suitable environment *and* presented in a dignified manner as part of a restoration master plan *and* when no other building or structure with the same associations has survived. All three of these requirements must be met.**

## UNDERSTANDING CRITERIA CONSIDERATION E: RECONSTRUCTED PROPERTIES

"Reconstruction" is defined as the reproduction of the exact form and detail of a vanished building, structure, object, or a part thereof, as it appeared at a specific period of time. Reconstructed buildings fall into two categories: buildings wholly constructed of new materials and buildings reassembled from some historic and some new materials. Both categories of properties present problems in meeting the integrity requirements of the National Register criteria.

*Examples of Properties that MUST Meet Criteria Consideration E: Reconstructed Properties*

- *A property in which most or all of the fabric is not original.*

- *A district in which an important resource or a significant number of resources are reconstructions.*

*Examples of Properties that DO NOT Need to Meet Criteria Consideration E: Reconstructed Properties*

- *A property that is remodeled or renovated and still has the majority of its original fabric.*

## APPLYING CRITERIA CONSIDERATION E: RECONSTRUCTED PROPERTIES

### ACCURACY OF THE RECONSTRUCTION

The phrase "accurately executed" means that the reconstruction must be based upon sound archeological, architectural, and historic data concerning the historic construction and appearance of the resource. That documentation should include both analysis of any above or below ground material and research in written and other records.

### SUITABLE ENVIRONMENT

The phrase "suitable environment" refers to: 1) the physical context provided by the historic district and 2) any interpretive scheme, if the historic district is used for interpretive purposes. This means that the reconstructed property must be located at the same site as the original. It must also be situated in its original grouping of buildings, structures, and objects (as many as are extant), and that grouping must retain integrity. In addition, the reconstruction must not be misrepresented as an authentic historic property.

> **Eligible**
>
> - A reconstructed plantation manager's office building is considered eligible because it is located at its historic site, grouped with the remaining historic plantation buildings and structures, and the plantation as a whole retains integrity. Interpretation of the plantation district includes an explanation that the manager's office is not the original building, but a reconstruction.
>
> **Not Eligible**
>
> - The same reconstructed plantation manager's office building would not qualify if it were rebuilt at a location different from that of the original building, or if the district as a whole no longer reflected the period for which it is significant, or if a misleading interpretive scheme were used for the district or for the reconstruction itself.

BLM_0059421

## RESTORATION MASTER PLANS

Being presented "as part of a restoration master plan" means that: 1) a reconstructed property is an essential component in a historic district and 2) the reconstruction is part of an overall restoration plan for an entire district. "Restoration" is defined as accurately recovering the form and details of a property and its setting as it appeared at a particular period by removing later work or by replacing missing earlier work (as opposed to completely rebuilding the property). The master plan for the entire property must emphasize restoration, not reconstruction. In other words, the master plan for the entire resource would not be acceptable under this consideration if it called for reconstruction of a majority of the resource.

---

**Eligible**

- A reconstructed plantation manager's office is eligible if the office were an important component of the plantation *and* if the reconstruction is one element in an overall plan for restoring the plantation *and* if no other building or structure with the same associations has survived.

- The reconstruction of the plantation manager's office building can be eligible only if the majority of buildings, structures, and objects that comprised the plantation are extant and are being restored. For guidance regarding restoration see the *Secretary of the Interior's Standards for Historic Preservation Projects.*

---

## LAST SURVIVING PROPERTY OF A TYPE

This consideration also stipulates that a reconstruction can qualify if, in addition to the other requirements, no other building, object, or structure with the same association has survived. A reconstruction that is part of a restoration master plan is appropriate only if: 1) the property is the only one in the district with which a particular important activity or event has been historically associated or 2) no other property with the same associative values has survived.

## RECONSTRUCTIONS OLDER THAN FIFTY YEARS

After the passage of fifty years, a reconstruction may attain its own significance for what it reveals about the period in which it was built, rather than the historic period it was intended to depict. On that basis, a reconstruction can possibly qualify under any of the Criteria.

BLM_0059422

# CRITERIA CONSIDERATION F: COMMEMORATIVE PROPERTIES

**A property primarily commemorative in intent can be eligible if design, age, tradition, or symbolic value has invested it with its own historical significance.**

## UNDERSTANDING CRITERIA CONSIDERATION F: COMMEMORATIVE PROPERTIES

Commemorative properties are designed or constructed after the occurrence of an important historic event or after the life of an important person. They are not directly associated with the event or with the person's productive life, but serve as evidence of a later generation's assessment of the past. Their significance comes from their value as cultural expressions at the date of their creation. Therefore, a commemorative property generally must be over fifty years old and must possess significance based on its own value, not on the value of the event or person being memorialized.

*Examples of Properties that MUST Meet Criteria Consideration F: Commemorative Properties*

- *A property whose sole or primary function is commemorative or in which the commemorative function is of primary significance.*

*Examples of Properties that DO NOT Need to Meet Criteria Consideration F: Commemorative Properties*

- *A resource that has a non-commemorative primary function or significance.*

- *A single marker that is a component of a district (whether contributing or non-contributing).*

## APPLYING CRITERIA CONSIDERATION F: COMMEMORATIVE PROPERTIES

### ELIGIBILITY FOR DESIGN

A commemorative property derives its design from the aesthetic values of the period of its creation. A commemorative property, therefore, may be significant for the architectural, artistic, or other design qualities of its own period in prehistory or history.

> **Eligible**
>
> - A commemorative statue situated in a park or square is eligible if it expresses the aesthetics or craftsmanship of the period when it was made, meeting Criterion C.
>
> - A late 19th century statue erected on a courthouse square to commemorate Civil War veterans would qualify if it reflects that era's shared perception of the noble character and valor of the veterans and their cause. This was commonly conveyed by portraying idealized soldiers or allegorical figures of battle, victory, or sacrifice.

39

BLM_0059423

## ELIGIBILITY FOR AGE, TRADITION, OR SYMBOLIC VALUE

A commemorative property cannot qualify for association with the event or person it memorializes. A commemorative property may, however, acquire significance after the time of its creation through *age, tradition,* or *symbolic* value. This significance must be documented by accepted methods of historical research, including written or oral history, and must meet one or more of the Criteria.

### Eligible

- A commemorative marker erected by a cultural group that believed the place was the site of its origins is eligible if, for subsequent generations of the group, the marker itself became the focus of traditional association with the group's historic identity.

- A building erected as a monument to an important historical figure will qualify if through the passage of time the property itself has come to symbolize the value placed upon the individual and is widely recognized as a reminder of enduring principles or contributions valued by the generation that erected the monument.

- A commemorative marker erected early in the settlement or development of an area will qualify if it is demonstrated that, because of its relative great age, the property has long been a part of the historic identity of the area.

### Not Eligible

- A commemorative marker erected in the past by a cultural group at the site of an event in its history would not be eligible if the marker were significant only for association with the event, and it had not become significant itself through tradition.

- A building erected as a monument to an important historical figure would not be eligible if its only value lay in its association with the individual, and it has not come to symbolize values, ideas, or contributions valued by the generation that erected the monument.

- A commemorative marker erected to memorialize an event in the community's history would not qualify simply for its association with the event it memorialized.

## INELIGIBILITY AS THE LAST REPRESENTATIVE OF AN EVENT OR PERSON

The loss of properties directly associated with a significant event or person does not strengthen the case for consideration of a commemorative property. Unlike birthplaces and graves, a commemorative property usually has no direct historic association. The commemorative property can qualify for historic association only if it is clearly significant in its own right, as stipulated above.

BLM_0059424

# CRITERIA CONSIDERATION G: PROPERTIES THAT HAVE ACHIEVED SIGNIFICANCE WITHIN THE LAST FIFTY YEARS[9]

**A property achieving significance within the last fifty years is eligible if it is of exceptional importance.**

## UNDERSTANDING CRITERIA CONSIDERATION G: PROPERTIES THAT HAVE ACHIEVED SIGNIFICANCE WITHIN THE LAST FIFTY YEARS

The National Register Criteria for Evaluation exclude properties that achieved significance within the last fifty years unless they are of exceptional importance. Fifty years is a general estimate of the time needed to develop historical perspective and to evaluate significance. This consideration guards against the listing of properties of passing contemporary interest and ensures that the National Register is a list of truly historic places.

*Examples of Properties that MUST Meet Criteria Consideration G: Properties that Have Achieved Significance Within the Last Fifty Years*

- *A property that is less than fifty years old.*
- *A property that continues to achieve significance into a period less than fifty years before the nomination.*
- *A property that has non-contiguous Periods of Significance, one of which is less than fifty years before the nomination.*
- *A property that is more than fifty years old and had no significance until a period less than fifty years before the nomination.*

*Examples of Properties that DO NOT Need to Meet Criteria Consideration G: Properties that Have Achieved Significance Within the Last Fifty Years*

- *A resource whose construction began over fifty years ago, but the completion overlaps the fifty year period by a few years or less.*
- *A resource that is significant for its plan or design, which is over fifty years old, but the actual completion of the project overlaps the fifty year period by a few years.*
- *A historic district in which a few properties are newer than fifty years old, but the majority of properties and the most important Period of Significance are greater than fifty years old.*

---

[9] For more information on Criteria Consideration G, refer to *National Register Bulletin: Guidelines for Evaluating and Nominating Properties that Have Achieved Significance Within the Last Fifty Years.*

BLM_0059425

# APPLYING CRITERIA CONSIDERATION G: PROPERTIES THAT HAVE ACHIEVED SIGNIFICANCE WITHIN THE PAST FIFTY YEARS

## ELIGIBILITY FOR EXCEPTIONAL IMPORTANCE

The phrase "exceptional importance" may be applied to the extraordinary importance of an event or to an entire category of resources so fragile that survivors of any age are unusual. Properties listed that had attained significance in less than fifty years include: the launch pad at Cape Canaveral from which men first traveled to the moon, the home of nationally prominent playwright Eugene O'Neill, and the Chrysler Building (New York) significant as the epitome of the "Style Moderne" architecture.

Properties less than fifty years old that qualify as exceptional because the entire category of resources is fragile include a recent example of a traditional sailing canoe in the Trust Territory of the Pacific Islands, where because of rapid deterioration of materials, no working Micronesian canoes exist that are more than twenty years old. Properties that by their nature can last more than fifty years cannot be considered exceptionally important because of the fragility of the class of resources.

The phrase "exceptional importance" does not require that the property be of national significance. It is a measure of a property's importance within the appropriate historic context, whether the scale of that context is local, State, or national.

---

**Eligible**

- The General Laundry Building in New Orleans, one of the few remaining Art Deco Style buildings in that city, was listed in the National Register when it was forty years old because of its exceptional importance as an example of that architectural style.

---

## HISTORICAL PERSPECTIVE

A property that has achieved significance within the past fifty years can be evaluated only when sufficient historical perspective exists to determine that the property is exceptionally important. The necessary perspective can be provided by scholarly research and evaluation, and must consider both the historic context and the specific property's role in that context.

In many communities, properties such as apartment buildings built in the 1950s cannot be evaluated because there is no scholarly research available to provide an overview of the nature, role, and impact of that building type within the context of historical and architectural developments of the 1950s.

## NATIONAL PARK SERVICE RUSTIC ARCHITECTURE

Properties such as structures built in a rustic style by the National Park Service during the 1930s and 1940s can be evaluated because a broad study, *National Park Service Rustic Architecture* (1977), provides the context for evaluating properties of this type and style. Specific examples were listed in the National Register prior to reaching fifty years of age when documentation concerning the individual properties established their significance within the historical and architectural context of the type and style.

## VETERANS ADMINISTRATION HOSPITALS

Hospitals less than fifty years old that were constructed by the Veterans Bureau and Veterans Administration can be evaluated because the collection of forty-eight facilities built between 1920 and 1946 has been analyzed in a study prepared by the agency. The study provided a historic and architectural context for development of veteran's care within which hospitals could be evaluated. The exceptional importance of specific individual facilities constructed within the past fifty years could therefore be determined based on their role and their present integrity.

## COMPARISON WITH RELATED PROPERTIES

In justifying exceptional importance, it is necessary to identify other properties within the geographical area that reflect the same significance or historic associations and to determine which properties *best* represent the historic context in question. Several properties in the area could become eligible with the passage of time, but few will qualify now as exceptionally important.

## POST-WORLD WAR II PROPERTIES

Properties associated with the post-World War II era must be identified and evaluated to determine which ones in an area could be judged exceptionally important. For example, a public housing complex may be eligible as an outstanding expression of the nation's post-war urban policy. A military installation could be judged exceptionally important because of its contribution to the Cold War arms race. A church building in a Southern city may have served as the pivotal rallying point for the city's most famous civil rights protest. A post-war suburban subdivision may be the best reflection of contemporary siting and design tenets in a metropolitan area. In each case, the nomination preparer must justify the *exceptional* importance of the property relative to similar properties in the community, State, or nation.

BLM_0059426

## ELIGIBILITY FOR INFORMATION POTENTIAL

A property that has achieved significance within the past fifty years can qualify under Criterion D only if it can be demonstrated that the information is of exceptional importance within the appropriate context and that the property contains data superior to or different from those obtainable from other sources, including other culturally related sites. An archeological site less than fifty years old may be eligible if the former inhabitants are so poorly documented that information about their lifeways is best obtained from examination of the material remains.

---

**Eligible**

- Data such as the rate of adoption of modern technological innovations by rural tenant farmers in the 1950s may not be obtainable through interviews with living persons but could be gained by examination of homesites.

**Not Eligible**

- A recent archeological site such as the remains of a Navajo sheep corral used in the 1950s would not be considered exceptionally significant for its information potential on animal husbandry if better information on the same topic is available through ethnographic studies or living informants.

---

## HISTORIC DISTRICTS

Properties which have achieved significance within the past fifty years can be eligible for the National Register if they are an integral part of a district which qualifies for National Register listing. This is demonstrated by documenting that the property dates from within the district's defined Period of Significance and that it is associated with one or more of the district's defined Areas of Significance.

Properties less than fifty years old may be an integral part of a district when there is sufficient perspective to consider the properties as historic. This is accomplished by demonstrating that: 1) the district's Period of Significance is justified as a discrete period with a defined beginning and end, 2) the character of the district's historic resources is clearly defined and assessed, 3) specific resources in the district are demonstrated to date from that discrete era, and 4) the majority of district properties are over fifty years old. In these instances, it is not necessary to prove exceptional importance of either the district itself or the less-than-fifty-year-old properties. Exceptional importance still must be demonstrated for district where the majority of properties or the major Period of Significance is less than fifty years old, and for less-than-fifty-year-old properties which are nominated individually.

## PROPERTIES MORE THAN FIFTY YEARS IN AGE, LESS THAN FIFTY YEARS IN SIGNIFICANCE

Properties that are more than fifty years old, but whose significant associations or qualities are less than fifty years old, must be treated under the fifty year consideration.

---

**Eligible**

- A building constructed early in the twentieth century (and having no architectural importance), but that was associated with an important person during the 1950s, must be evaluated under Criteria Consideration G because the Period of Significance is within the past fifty years. Such a property would qualify if the person was of exceptional importance.

---

## REQUIREMENT TO MEET THE CRITERIA, REGARDLESS OF AGE

Properties that are less than fifty years old and are not exceptionally important will *not* automatically qualify for the National Register once they are fifty years old. In order to be listed in the National Register, all properties, regardless of age, must be demonstrated to meet the Criteria for Evaluation.

43

# VIII.  HOW TO EVALUATE THE INTEGRITY OF A PROPERTY

## INTRODUCTION

**Integrity is the ability of a property to convey its significance.** To be listed in the National Register of Historic Places, a property must not only be shown to be significant under the National Register criteria, but it also must have integrity. The evaluation of integrity is sometimes a subjective judgment, but it must always be grounded in an understanding of a property's physical features and how they relate to its significance.

Historic properties either retain integrity (this is, convey their significance) or they do not. Within the concept of integrity, the National Register criteria recognizes seven aspects or qualities that, in various combinations, define integrity.

To retain historic integrity a property will always possess several, and usually most, of the aspects. The retention of specific aspects of integrity is paramount for a property to convey its significance. Determining *which* of these aspects are most important to a particular property requires knowing why, where, and when the property is significant. The following sections define the seven aspects and explain how they combine to produce integrity.

## SEVEN ASPECTS OF INTEGRITY

- Location
- Design
- Setting
- Materials
- Workmanship
- Feeling
- Association

## UNDERSTANDING THE ASPECTS OF INTEGRITY

### LOCATION

**Location is the place where the historic property was constructed or the place where the historic event occurred.** The relationship between the property and its location is often important to understanding why the property was created or why something happened. The actual location of a historic property, complemented by its setting, is particularly important in recapturing the sense of historic events and persons. Except in rare cases, the relationship between a property and its historic associations is destroyed if the property is moved. (See Criteria Consideration B in *Part VII: How to Apply the Criteria Considerations*, for the conditions under which a moved property can be eligible.)

## DESIGN

**Design is the combination of elements that create the form, plan, space, structure, and style of a property.** It results from conscious decisions made during the original conception and planning of a property (or its significant alteration) and applies to activities as diverse as community planning, engineering, architecture, and landscape architecture. Design includes such elements as organization of space, proportion, scale, technology, ornamentation, and materials.

A property's design reflects historic functions and technologies as well as aesthetics. It includes such considerations as the structural system; massing; arrangement of spaces; pattern of fenestration; textures and colors of surface materials; type, amount, and style of ornamental detailing; and arrangement and type of plantings in a designed landscape.

Design can also apply to districts, whether they are important primarily for historic association, architectural value, information potential, or a combination thereof. For districts significant primarily for historic association or architectural value, design concerns more than just the individual buildings or structures located within the boundaries. It also applies to the way in which buildings, sites, or structures are related: for example, spatial relationships between major features; visual rhythms in a streetscape or landscape plantings; the layout and materials of walkways and roads; and the relationship of other features, such as statues, water fountains, and archeological sites.

44

BLM_0059428

## SETTING

**Setting is the physical environment of a historic property.** Whereas location refers to the specific place where a property was built or an event occurred, setting refers to the *character* of the place in which the property played its historical role. It involves *how*, not just where, the property is situated and its relationship to surrounding features and open space.

Setting often reflects the basic physical conditions under which a property was built and the functions it was intended to serve. In addition, the way in which a property is positioned in its environment can reflect the designer's concept of nature and aesthetic preferences.

The physical features that constitute the setting of a historic property can be either natural or manmade, including such elements as:

- Topographic features (a gorge or the crest of a hill);
- Vegetation;
- Simple manmade features (paths or fences); and
- Relationships between buildings and other features or open space.

These features and their relationships should be examined not only within the exact boundaries of the property, but also between the property and its *surroundings*. This is particularly important for districts.

## MATERIALS

**Materials are the physical elements that were combined or deposited during a particular period of time and in a particular pattern or configuration to form a historic property.** The choice and combination of materials reveal the preferences of those who created the property and indicate the availability of particular types of materials and technologies. Indigenous materials are often the focus of regional building traditions and thereby help define an area's sense of time and place.

A property must retain the key exterior materials dating from the period of its historic significance. If the property has been rehabilitated, the historic materials and significant features must have been preserved. The property must also be an actual historic resource, not a recreation; a recent structure fabricated to look historic is not eligible. Likewise, a property whose historic features and materials have been lost and then reconstructed is usually not eligible. (See Criteria Consideration E in *Part VII: How to Apply the Criteria Considerations* for the conditions under which a reconstructed property can be eligible.)

## WORKMANSHIP

**Workmanship is the physical evidence of the crafts of a particular culture or people during any given period in history or prehistory.** It is the evidence of artisans' labor and skill in constructing or altering a building, structure, object, or site. Workmanship can apply to the property as a whole or to its individual components. It can be expressed in vernacular methods of construction and plain finishes or in highly sophisticated configurations and ornamental detailing. It can be based on common traditions or innovative period techniques.

Workmanship is important because it can furnish evidence of the technology of a craft, illustrate the aesthetic principles of a historic or prehistoric period, and reveal individual, local, regional, or national applications of both technological practices and aesthetic principles. Examples of workmanship in historic buildings include tooling, carving, painting, graining, turning, and joinery. Examples of workmanship in prehistoric contexts include Paleo-Indian clovis projectile points; Archaic period beveled adzes; Hopewellian birdstone pipes; copper earspools and worked bone pendants; and Iroquoian effigy pipes.

## FEELING

**Feeling is a property's expression of the aesthetic or historic sense of a particular period of time.** It results from the presence of physical features that, taken together, convey the property's historic character. For example, a rural historic district retaining original design, materials, workmanship, and setting will relate the feeling of agricultural life in the 19th century. A grouping of prehistoric petroglyphs, unmarred by graffiti and intrusions and located on its original isolated bluff, can evoke a sense of tribal spiritual life.

## ASSOCIATION

**Association is the direct link between an important historic event or person and a historic property.** A property retains association if it *is* the place where the event or activity occurred and is sufficiently intact to convey that relationship to an observer. Like feeling, association requires the presence of physical features that convey a property's historic character. For example, a Revolutionary War battlefield whose natural and manmade elements have remained intact since the 18th century will retain its quality of association with the battle.

Because feeling and association depend on individual perceptions, their retention *alone* is never sufficient to support eligibility of a property for the National Register.

# ASSESSING INTEGRITY IN PROPERTIES

Integrity is based on significance: why, where, and when a property is important. Only after significance is fully established can you proceed to the issue of integrity.

The steps in assessing integrity are:

- Define the **essential physical features** that must be present for a property to represent its significance.
- Determine whether the **essential physical features are visible** enough to convey their significance.
- Determine whether the property needs to be **compared with similar properties**. And,
- Determine, based on the significance and essential physical features, **which aspects of integrity** are particularly vital to the property being nominated and if they are present.

Ultimately, the question of integrity is answered by whether or not the property retains the **identity** for which it is significant.

BLM_0059429

# DEFINING THE ESSENTIAL PHYSICAL FEATURES

All properties change over time. It is not necessary for a property to retain all its historic physical features or characteristics. The property must retain, however, the essential physical features that enable it to convey its historic identity. The essential physical features are those features that define both *why* a property is significant (Applicable Criteria and Areas of Significance) and *when* it was significant (Periods of Significance). They are the features without which a property can no longer be identified as, for instance, a late 19th century dairy barn or an early 20th century commercial district.

## CRITERIA A AND B

A property that is significant for its historic association is eligible if it retains the essential physical features that made up its character or appearance during the period of its association with the important event, historical pattern, or person(s). If the property is a site (such as a treaty site) where there are no material cultural remains, the setting must be intact.

Archeological sites eligible under Criteria A and B must be in overall good condition with excellent preservation of features, artifacts, and spatial relationships to the extent that these remains are able to convey important associations with events or persons.

## CRITERION C

A property important for illustrating a particular architectural style or construction technique must retain most of the physical features that constitute that style or technique. A property that has lost some historic materials or details can be eligible *if* it retains the majority of the features that illustrate its style in terms of the massing, spatial relationships, proportion, pattern of windows and doors, texture of materials, and ornamentation. The property is not eligible, however, if it retains some basic features conveying massing but has lost the majority of the features that once characterized its style.

Archeological sites eligible under Criterion C must be in overall good condition with excellent preservation

of features, artifacts, and spatial relationships to the extent that these remains are able to illustrate a site type, time period, method of construction, or work of a master.

## CRITERION D

For properties eligible under Criterion D, including archeological sites and standing structures studied for their information potential, less attention is given to their overall condition, than it they were being considered under Criteria A, B, or C. Archeological sites, in particular, do not exist today exactly as they were formed. There are always cultural and natural processes that alter the deposited materials and their spatial relationships.

For properties eligible under Criterion D, integrity is based upon the property's potential to yield specific data that addresses important research questions, such as those identified in the historic context documentation in the Statewide Comprehensive Preservation Plan or in the research design for projects meeting the *Secretary of the Interior's Standards for Archeological Documentation.*

## INTERIORS

Some historic buildings are virtually defined by their exteriors, and their contribution to the built environment can be appreciated even if their interiors are not accessible. Examples of this would include early examples of steel-framed skyscraper construction. The great advance in American technology and engineering made by these buildings can be read from the outside. The change in American popular taste during the 19th century, from the symmetry and simplicity of architectural styles based on classical precedents, to the expressions of High Victorian styles, with their combination of textures, colors, and asymmetrical forms, is readily apparent from the exteriors of these buildings.

Other buildings "are" interiors. The Cleveland Arcade, that soaring 19th century glass-covered shopping area, can only be appreciated from the inside. Other buildings in this category would be the great covered train sheds of the 19th century.

In some cases the loss of an interior will disqualify properties from listing

in the National Register—a historic concert hall noted for the beauty of its auditorium and its fine acoustic qualities would be the type of property that if it were to lose its interior, it would lose its value as a historic resource. In other cases, the overarching significance of a property's exterior can overcome the adverse effect of the loss of an interior.

In borderline cases particular attention is paid to the significance of the property and the remaining historic features.

## HISTORIC DISTRICTS

For a district to retain integrity as a whole, the majority of the components that make up the district's historic character must possess integrity even if they are individually undistinguished. In addition, the relationships among the district's components must be substantially unchanged since the period of significance.

When evaluating the impact of intrusions upon the district's integrity, take into consideration the relative number, size, scale, design, and location of the components that do not contribute to the significance. A district is not eligible if it contains so many alterations or new intrusions that it no longer conveys the sense of a historic environment.

A component of a district cannot contribute to the significance if:

- it has been substantially altered since the period of the district's significance *or*

- it does not share the historic associations of the district.

## VISIBILITY OF PHYSICAL FEATURES

Properties eligible under Criteria A, B, and C must not only retain their essential physical features, but the features must be visible enough to convey their significance. This means that even if a property is physically intact, its integrity is questionable if its significant features are concealed under modern construction. Archeological properties are often the exception to this; by nature they usually do not require visible features to convey their significance.

46

## NON-HISTORIC EXTERIORS

If the historic *exterior* building material is covered by non-historic material (such as modern siding), the property can still be eligible *if the* significant form, features, and detailing are not obscured. If a property's exterior is covered by a non-historic false-front or curtain wall, the property will not qualify under Criteria A, B, or C, because it does not retain the visual quality necessary to convey historic or architectural significance. Such a property also cannot be considered a contributing element in a historic district, because it does not add to the district's sense of time and place. If the false front, curtain wall, or non-historic siding is removed and the original building materials are intact, then the property's integrity can be re-evaluated.

## PROPERTY CONTAINED WITHIN ANOTHER PROPERTY

Some properties contain an earlier structure that formed the nucleus for later construction. The exterior property, if not eligible in its own right, can qualify on the basis of the interior property *only if* the interior property can yield significant information about a specific construction technique or material, such as rammed earth or tabby. The interior property *cannot* be used as the basis for eligibility if it has been so altered that it no longer contains the features that could provide important information, or if the presence of important information cannot be demonstrated.

## SUNKEN VESSELS

A sunken vessel can be eligible under Criterion C as embodying the distinctive characteristics of a method of construction if it is structurally intact. A *deteriorated* sunken vessel, no longer structurally intact, can be eligible under Criterion D if the remains of either the vessel or its contents is capable of yielding significant information. For further information, refer to *National Register Bulletin: Nominating Historic Vessels and Shipwrecks to the National Register of Historic Places.*

### Natural Features

A natural feature that is associated with a historic event or trend, such as a rock formation that served as a trail marker during westward expansion, must retain its historic appearance, unobscured by modern construction or landfill. Otherwise it is not eligible, even though it remains intact.

## COMPARING SIMILAR PROPERTIES

For some properties, comparison with similar properties should be considered during the evaluation of integrity. Such comparison may be important in deciding what physical features are essential to properties of that type. In instances where it has not been determined what physical features a property must possess in order for it to reflect the significance of a historic context, comparison with similar properties should be undertaken during the evaluation of integrity. This situation arises when scholarly work has not been done on a particular property type or when surviving examples of a property type are extremely rare. (See **Comparing Related Properties** in *Part V: How to Evaluate a Property within its Historic Context.*)

## RARE EXAMPLES OF A PROPERTY TYPE

Comparative information is particularly important to consider when evaluating the integrity of a property that is a rare surviving example of its type. The property must have the essential physical features that enable it to convey its historic character or information. The rarity and poor condition, however, of other extant examples of the type may justify accepting a greater degree of alteration or fewer features, provided that enough of the property survives for it to be a significant resource.

---

**Eligible**

- A one-room schoolhouse that has had all original exterior siding replaced and a replacement roof that does not exactly replicate the original roof profile can be eligible if the other extant rare examples have received an even greater degree of alteration, such as the subdivision of the original one-room plan.

**Not Eligible**

- A mill site contains information on how site patterning reflects historic functional requirements, but parts of the site have been destroyed. The site is not eligible for its information potential if a comparison of other mill sites reveals more intact properties with complete information.

---

BLM_0059431

# DETERMINING THE RELEVANT ASPECTS OF INTEGRITY

Each type of property depends on certain aspects of integrity, more than others, to express its historic significance. Determining which of the aspects is most important to a particular property requires an understanding of the property's significance and its essential physical features.

## CRITERIA A AND B

A property important for association with an event, historical pattern, or person(s) ideally might retain *some* features of all seven aspects of integrity: location, design, setting, materials, workmanship, feeling, and association. Integrity of design and workmanship, however, might not be as important to the significance, and would not be relevant if the property were a site. A basic integrity test for a property associated with an important event or person is whether a historical contemporary would recognize the property as it exists today.

For archeological sites that are eligible under Criteria A and B, the seven aspects of integrity can be applied in much the same way as they are to buildings, structures, or objects. It is important to note, however, that the site must have *demonstrated* its ability to convey its significance, as opposed to sites eligible under Criterion D where only the potential to yield information is required.

---

**Eligible**

A mid-19th century waterpowered mill important for its association with an area's industrial development is eligible if:

- it is still on its original site (**Location**), and

- the important features of its setting are intact (**Setting**), and

- it retains most of its historic materials (**Materials**), and

- it has the basic features expressive of its design and function, such as configuration, proportions, and window pattern (**Design**).

---

**Not Eligible**

A mid-19th century waterpowered mill important for its association with an area's industrial development is not eligible if:

- it has been moved (**Location, Setting, Feeling,** and **Association**), or

- substantial amounts of new materials have been incorporated (**Materials, Workmanship,** and **Feeling**), or

- it no longer retains basic design features that convey its historic appearance or function (**Design, Workmanship,** and **Feeling**).

---

## CRITERION C

A property significant under Criterion C must retain those physical features that characterize the type, period, or method of construction that the property represents. Retention of design, workmanship, and materials will usually be more important than location, setting, feeling, and association. Location and setting will be important, however, for those properties whose design is a reflection of their immediate environment (such as designed landscapes and bridges).

For archeological sites that are eligible under Criterion C, the seven aspects of integrity can be applied in much the same way as they are to buildings, structures, or objects. It is important to note, however, that the site must have *demonstrated* its ability to convey its significance, as opposed to sites eligible under Criterion D where only the *potential* to yield information is required.

---

**Eligible**

A 19th century wooden covered bridge, important for illustrating a construction type, is eligible if:

- the essential features of its design are intact, such as abutments, piers, roof configuration, and trusses (**Design, Workmanship,** and **Feeling**), and

- most of the historic materials are present (**Materials, Workmanship,** and **Feeling**), and

- evidence of the craft of wooden bridge technology remains, such as the form and assembly technique of the trusses (**Workmanship**).

- Since the design of a bridge relates directly to its function as a transportation crossing, it is also important that the bridge still be situated over a waterway (**Setting, Location, Feeling,** and **Association**).

**Not Eligible**

For a 19th century wooden covered bridge, important for its construction type, replacement of some materials of the flooring, siding, and roofing would not necessarily damage its integrity. Integrity would be lost, however, if:

- the abutments, piers, or trusses were substantially altered (**Design, Workmanship,** and **Feeling**) or

- considerable amounts of new materials were incorporated (**Materials, Workmanship,** and **Feeling**).

- Because environment is a strong factor in the design of this property type, the bridge would also be ineligible if it no longer stood in a place that conveyed its function as a crossing (**Setting, Location, Feeling,** and **Association**).

---

48

## CRITERION D

For properties eligible under Criterion D, setting and feeling may not have direct bearing on the property's ability to yield important information. Evaluation of integrity probably will focus primarily on the location, design, materials, and perhaps workmanship.

---

**Eligible**

A multicomponent prehistoric site important for yielding data on changing subsistence patterns can be eligible if:

- floral or faunal remains are found in clear association with cultural material (**Materials** and **Association**) and

- the site exhibits stratigraphic separation of cultural components (**Location**).

**Not Eligible**

A multicomponent prehistoric site important for yielding data on changing subsistence patterns would not be eligible if:

- floral or faunal remains were so badly decomposed as to make identification impossible (**Materials**), or

- floral or faunal remains were disturbed in such a manner as to make their association with cultural remains ambiguous (**Association**), or

- the site has lost its stratigraphic context due to subsequent land alterations (**Location**).

---

**Eligible**

A lithic scatter site important for yielding data on lithic technology during the Late Archaic period can be eligible if:

- the site contains lithic debitage, finished stone tools, hammerstones, or antler flakers (**Material** and **Design**), and

- the site contains datable material (**Association**).

**Not Eligible**

A lithic scatter site important for yielding data on lithic technology during the Late Archaic period would not be eligible if:

- the site contains natural deposits of lithic materials that are impossible to distinguish from culturally modified lithic material (**Design**) or

- the site does not contain any temporal diagnostic evidence that could link the site to the Late Archaic period (**Association**).

---

49

BLM_0059433

# IX. SUMMARY OF THE NATIONAL HISTORIC LANDMARKS CRITERIA FOR EVALUATION

A property being nominated to the National Register may also merit consideration for potential designation as a National Historic Landmark. Such consideration is dependent upon the stringent application of the following distinct set of criteria (found in the *Code of Federal Regulations, Title 36, Part 65*).

## NATIONAL HISTORIC LANDMARKS CRITERIA

The quality of national significance is ascribed to districts, sites, buildings, structures, and objects that possess exceptional value or quality in illustrating or interpreting the heritage of the United States in history, architecture, archeology, engineering, and culture and that possess a high degree of integrity of location, design, setting, materials, workmanship, feeling, and association, and:

1. That are associated with events that have made a significant contribution to, and are identified with, or that outstandingly represent, the broad national patterns of United States history and from which an understanding and appreciation of those patterns may be gained; or

2. That are associated importantly with the lives of persons nationally significant in the history of the United States; or

3. That represent some great idea or ideal of the American people; or

4. That embody the distinguishing characteristics of an architectural type specimen exceptionally valuable for a study of a period, style or method of construction, or that represent a significant, distinctive and exceptional entity whose components may lack individual distinction; or

5. That are composed of integral parts of the environment not sufficiently significant by reason of historical association or artistic merit to warrant individual recognition but collectively compose an entity of exceptional historical or artistic significance, or outstandingly commemorate or illustrate a way of life or culture; or

6. That have yielded or may be likely to yield information of major scientific importance by revealing new cultures, or by shedding light upon periods of occupation over large areas of the United States. Such sites are those which have yielded, or which may reasonably be expected to yield, data affecting theories, concepts and ideas to a major degree.

## NATIONAL HISTORIC LANDMARK EXCLUSIONS

Ordinarily, cemeteries, birthplaces, graves of historical figures, properties owned by religious institutions or used for religious purposes, structures that have been moved from their original locations, reconstructed historic buildings and properties that have achieved significance within the past fifty years are not eligible for designation. If such properties fall within the following categories they may, nevertheless, be found to qualify:

1. A religious property deriving its primary national significance from architectural or artistic distinction or historical importance; or

2. A building or structure removed from its original location but which is nationally significant primarily for its architectural merit, or for association with persons or events of transcendent importance in the nation's history and the association consequential; or

3. A site of a building or structure no longer standing but the person or event associated with it is of transcendent importance in the nations's history and the association consequential; or

BLM_0059434

4. A birthplace, grave or burial if it is of a historical figure of transcendent national significance and no other appropriate site, building, or structure directly associated with the productive life of that person exists; or

5. A cemetery that derives its primary national significance from graves of persons of transcendent importance, or from an exceptionally distinctive design or an exceptionally significant event; or

6. A reconstructed building or ensemble of buildings of extraordinary national significance when accurately executed in a suitable environment and presented in a dignified manner as part of a restoration master plan, and when no other buildings or structures with the same association have survived; or

7. A property primarily commemorative in intent if design, age, tradition, or symbolic value has invested it with its own national historical significance; or

8. A property achieving national significance within the past 50 years if it is of extraordinary national importance.

# COMPARING THE NATIONAL HISTORIC LANDMARKS CRITERIA AND THE NATIONAL REGISTER CRITERIA

In general, the instructions for preparing a National Register nomination and the guidelines stated in this bulletin for applying the National Register Criteria also apply to Landmark nominations and the use of the Landmark criteria. While there are specific distinctions discussed below, *Parts IV and V* of this bulletin apply equally to National Register listings and Landmark nominations. That is, the categories of historic properties are defined the same way; historic contexts are identified similarly; and comparative evaluation is carried out on the same principles enumerated in *Part V.*

There are some differences between National Register and National Historic Landmarks Criteria. The following is an explanation of how each Landmark Criterion compares with its National Register Criteria counterpart:

## CRITERION 1

This Criterion relates to National Register Criterion A. Both cover properties associated with events. The Landmark Criterion, however, requires that the events associated with the property be *outstandingly* represented by that property and that the property be related to the broad national patterns of U.S. history. Thus, the quality of the property to convey and interpret its meaning must be of a higher order and must relate to national themes rather than the narrower context of State or local themes.

## CRITERION 2

This Criterion relates to National Register Criterion B. Both cover properties associated with significant people. The Landmark Criterion differs in that it specifies that the association of a person to the property in question be an important one and that the person associated with the property be of *national* significance.

## CRITERION 3

This Criterion has no counterpart among the National Register Criteria. It is rarely, if ever, used alone. While not a landmark at present, the Liberty Bell is an object that might be considered under this Criterion. The application of this Criterion obviously requires the most careful scrutiny and would apply only in rare instances involving ideas and ideals of the highest order.

## CRITERION 4

This Criterion relates to National Register Criterion C. Its intent is to qualify exceptionally important works of architecture or collective elements of architecture extraordinarily significant as an ensemble, such as a historic district. Note that the language is more restrictive than that of the National Register Criterion in requiring that a candidate in architecture be "a specimen exceptionally valuable for the study of a period, style, or method of construction" rather than simply embodying distinctive characteristics of a type, period, or method of construction. With regard to historic districts, the Landmarks Criterion requires an entity that is distinctive and exceptional. Unlike National Register Criterion C, this Criterion will not qualify the works of a master, per se, but only such works which are exceptional or extraordinary. Artistic value is considered only in the context of history's judgement in order to avoid current conflicts of taste.

## CRITERION 5

This Criterion does not have a strict counterpart among the National Register Criteria. It may seem redundant of the latter part of Landmark Criterion 4. It is meant to cover collective entities such as Greenfield Village and historic districts like New Bedford, Massachusetts, which qualify for their collective association with a nationally significant event, movement, or broad pattern of national development.

## CRITERION 6

The National Register counterpart of this is Criterion D. Criterion 6 was developed specifically to recognize archeological sites. All such sites must address this Criterion. The following are the qualifications that distinguish this Criterion from its National Register counterpart: the information yielded or likely to be yielded must be of *major* scientific importance by revealing new cultures, or by shedding light upon periods of occupation *over large areas* of the United States. Such sites should be expected to yield data affecting *theories, concepts, and ideas* to a *major degree.*

The data recovered or expected to be recovered must make a major contribution to the existing corpus of information. Potentially recoverable data must be likely to revolutionize or substantially modify a major theme in history or prehistory, resolve a substantial historical or anthropological debate, or close a serious gap in a major theme of U. S. history or prehistory.

BLM_0059435

# EXCLUSIONS AND EXCEPTIONS TO THE EXCLUSIONS

This section of the National Historic Landmarks Criteria has its counterpart in the National Register's "Criteria Considerations." The most abundant difference between them is the addition of the qualifiers "national," "exceptional," or "extraordinary" before the word significance. Other than this, the following are the most notable distinctions:

## EXCLUSION 2

Buildings moved from their original location, qualify only if one of two conditions are met: 1) the building is nationally significant for architecture, *or* 2) the persons or events with which they are associated are of *transcendent* national significance and the association is consequential.

Transcendent significance means an order of importance higher than that which would ordinarily qualify a person or event to be nationally significant. A consequential association is a relationship to a building that had an evident impact on events, rather than a connection that was incidental and passing.

## EXCLUSION 3

This pertains to the site of a structure no longer standing. There is no counterpart to this exclusion in the National Register Criteria. In order for such a property to qualify for Landmark designation it must meet the second condition cited for Exclusion 2.

## EXCLUSION 4

This exclusion relates to Criteria Consideration C of the National Register Criteria. The only difference is that a burial place qualifies for Landmark designation only if, in addition to other factors, the person buried is of *transcendent* national importance.

When evaluating properties at the national level for designation as a National Historic Landmark, please refer to the National Historic Landmarks outline, *History and Prehistory in the National Park System and the National Historic Landmarks Program, 1987.* (For more information about the National Historic Landmarks program, please write to Department of the Interior, National Park Service, National Historic Landmarks, 1849 C Street, NW, NC400, Washington, DC 20240.)

BLM_0059436

# X. GLOSSARY

**Associative Qualities -** An aspect of a property's history that links it with historic events, activities, or persons.

**Code of Federal Regulations -** Commonly referred to as "CFR." The part containing the National Register Criteria is usually referred to as 36 CFR 60, and is available from the National Park Service.

**CLG -** Certified Local Government.

**Culture -** A group of people linked together by shared values, beliefs, and historical associations, together with the group's social institutions and physical objects necessary to the operation of the institution.

**Cultural Resource -** See Historic Resource.

**Evaluation -** Process by which the significance and integrity of a historic property are judged and eligibility for National Register listing is determined.

**Historic Context -** An organizing structure for interpreting history that groups information about historic properties that share a common theme, common geographical area, and a common time period. The development of historic contexts is a foundation for decisions about the planning, identification, evaluation, registration, and treatment of historic properties, based upon comparative historic significance.

**Historic Integrity -** The unimpaired ability of a property to convey its historical significance.

**Historic Property -** See Historic Resource.

**Historic Resource -** Building, site, district, object, or structure evaluated as historically significant.

**Identification -** Process through which information is gathered about historic properties.

**Listing -** The formal entry of a property in the National Register of Historic Places. See also, Registration.

**Nomination -** Official recommendation for listing a property in the National Register of Historic Places.

**Property Type -** A grouping of properties defined by common physical and associative attributes.

**Registration -** Process by which a historic property is documented and nominated or determined eligible for listing in the National Register.

**Research Design -** A statement of proposed identification, documentation, investigation, or other treatment of a historic property that identifies the project's goals, methods and techniques, expected results, and the relationship of the expected results to other proposed activities or treatments.

53

BLM_0059437

# XI. LIST OF NATIONAL REGISTER BULLETINS

**The Basics**
How to Apply National Register Criteria for Evaluation *

Guidelines for Completing National Register of Historic Places Form
     Part A: How to Complete the National Register Form *
     Part B: How to Complete the National Register Multiple Property Documentation Form *

Researching a Historic Property *

**Property Types**
Guidelines for Evaluating and Documenting Historic **Aids to Navigation** *

Guidelines for Identifying, Evaluating and Registering **America's Historic Battlefields**

Guidelines for Evaluating and Registering Historical **Archeological Sites**

Guidelines for Evaluating and Documenting Historic **Aviation Properties**

Guidelines for Evaluating and Registering **Cemeteries and Burial Places**

How to Evaluate and Nominate **Designed Historic Landscapes** *

Guidelines for Identifying, Evaluating and Registering Historic **Mining Sites**

How to Apply National Register Criteria to **Post Offices** *

Guidelines for Evaluating and Documenting **Properties Associated with Significant Persons**

Guidelines for Evaluating and Documenting **Properties That Have Achieved Significance Within the Last Fifty Years** *

Guidelines for Evaluating and Documenting **Rural Historic Landscapes** *

Guidelines for Evaluating and Documenting **Traditional Cultural Properties** *

Nominating Historic **Vessels and Shipwrecks** to the National Register of Historic Places

**Technical Assistance**
Defining Boundaries for National Register Properties*

Guidelines for Local Surveys: A Basis for Preservation Planning *

How to Improve the Quality of Photographs for National Register Nominations

National Register Casebook: Examples of Documentation *

Using the UTM Grid System to Record Historic Sites

To order these publications, write to: National Register of Historic Places, National Park Service, 1849 C St., NC 400, NW, Washington, D.C. 20240, or e-mail at: nr_reference@nps.gov. Publications marked with an asterisk (*) are also available in electronic form at **www.cr.nps.gov/nr.**

○ U.S. GOVERNMENT PRINTING OFFICE: 2005—717-788

BLM_0059438

*D-63 B*

*File:*
*Curecanti*

*Also coded:*
*Black Canyon*

# General Management Plan

**Black Canyon
of the Gunnison
National Monument
and
⌐Curecanti National
⌐ Recreation Area**

*w/ FONS1   12/1/97*



*Prepared by the staffs of Black Canyon of the Gunnison National Monument,
Curecanti National Recreation Area,
and the Rocky Mountain Support Office*

**ON MICROFILM**

*September 1997*

**PLEASE RETURN TO:**

**TECHNICAL INFORMATION CENTER
DENVER SERVICE CENTER
NATIONAL PARK SERVICE**

BLM_0059439

# FINDING OF NO SIGNIFICANT IMPACT

## GENERAL MANAGEMENT PLAN/
## ENVIRONMENTAL ASSESSMENT
## CURECANTI NATIONAL RECREATION AREA AND
## BLACK CANYON OF THE GUNNISON NATIONAL MONUMENT

The National Park Service is preparing a general management plan to provide Black Canyon of the Gunnison National Monument and Curecanti National Recreation Area with a long-range management program. The plan sets forth a management concept for each park; establishes a role for each park within the context of regional trends and plans conservation, recreation, transportation, economic development, and regional issues; and identifies the conditions necessary to resolve issues and achieve management. The primary objective for park management is to guide the protection and preservation of the natural and cultural environments while permitting ecological processes to continue with a minimum of human disturbance. The plan also considers a variety of recreational and interpretive visitor experiences that enhance the enjoyment and understanding of the park resources. Major long-range issues addressed in the plan and environmental assessment set objectives for resource protection, visitor use and experience, and park operations. The plan establishes the necessary first steps in addressing desired ecological and social conditions and capacities for the park. Alternatives are broad and strategic in nature, requiring additional site-specific environmental analysis to be completed at the time of conceptual design. Such future development would require an environmental document, either an environmental assessment (EA) or an environmental impact statement (EIS).

## PROPOSAL

Alternative B, the National Park Service proposal, describes an alternative with a balanced mix of recreational experiences, capitalizing on the unique aspects that each park brings to those experiences.

The proposal for Curecanti National Recreation Area emphasizes both natural and cultural resource experiences for visitors. Appropriately developed areas would support a range of diverse recreational opportunities.

The Black Canyon of the Gunnison National Monument proposal emphasizes a variety of human experiences in a rugged canyon environment. It would provide developed areas on the South Rim and less developed areas on the North Rim. A variety of educational and recreational experiences would also be provided to protect and enhance the wilderness values of the monument.

## ALTERNATIVES

Four alternatives have been considered for each park. Alternatives provide for distinctly different levels of use, visitor orientation to resources, and visitor service. All alternatives consider a broad strategic management scheme for the park. Alternative A describes the no-action alternative, in other words, what happens if existing management continues. Alternative B, the proposal, describes a balanced mix of recreational experiences, capitalizing on the unique aspects that each park brings to those experiences. Alternative C describes a situation that provides for more primitive recreational experiences, encouraging visitors to seek more developed recreational experiences in other areas outside the park boundaries. Alternative D provides for more developed recreational experiences within the parks while protecting sensitive resources.

## PUBLIC INVOLVEMENT

The environmental assessment was made available for public review and comment during a 2½ month period ending October 31, 1996. During this period, 13 responses were received. Refer to the *Summary of Public Involvement and Comment* for additional details.

## CONCLUSION

The analysis of the proposal has shown that the proposal will not have a significant effect on the environment. Negative environmental impacts that could occur are minor and tempor ˌ in effect. There are no unmitigated adverse impacts on public health, public safety, threatened or endangered species, sites or districts listed in or eligible for listing in the National Register of Historic Places, or other unique characteristics of the region. No highly uncertain or controversial impacts, unique or unknown risks, cumulative effects, or elements of precedence were identified. Implementation of the action will not violate any federal, state, or local law.

Based on the foregoing, it has been determined that an EIS is not required for this project and thus will not be prepared.

Approved: _____          12|1|97
                    Regional Director, Intermountain Region          Date

# GENERAL MANAGEMENT PLAN

### Black Canyon of the Gunnison National Monument
### Curecanti National Recreation Area
### Montrose and Gunnison Counties, Colorado

This general management plan (GMP) provides the National Park Service with a long-range management program for the continued protection of the unique resources found within Black Canyon of the Gunnison National Monument (Black Canyon) and Curecanti National Recreation Area (Curecanti).

The plan sets forth a management concept for each park; establishes a role for each park within the context of regional trends and plans for conservation, recreation, transportation, economic development, and regional issues; and identifies the conditions necessary to resolve issues and achieve management goals. The primary objective for park management is to guide the protection and preservation of the natural and cultural environments while permitting ecological processes to continue with a minimum of human disturbance. The plan also considers a variety of recreational and interpretive visitor experiences that enhance the enjoyment and understanding of the park resources.

Within this context, the purpose of this document is to provide a framework and broad, general direction for park management. Primary emphasis is placed on providing guidance for the parks' long-term needs. The plan also establishes the necessary first steps in addressing desired ecological and social conditions and capacities for the park. Proposals for future actions undergo environmental compliance either prior to or as part of a design process or during the development of specific resource management and visitor service plans. Combinations of management prescriptions establish the complete strategy for management of lands within the boundary.

The plan considers a broad strategic management scheme for the park. This does not preclude development options and partnerships outside park boundaries as long as these proposals are supportive and consistent with the park's chosen management direction. Alternative sites within the park boundaries for visitor contact, maintenance, and administration will be evaluated when proposals are presented. Partnerships with other agencies and local entities could also be explored to minimize cost, reduce impacts on resources, and provide consolidated services to the public.

Sheridan Steele

Superintendent

Black Canyon of the Gunnison National Monument

Curecanti National Recreation Area

i

# TABLE OF CONTENTS

## PURPOSE AND NEED... 1

**INTRODUCTION...** 1

**THE PLANNING PROCESS...** 1

**THE NATIONAL PARK SYSTEM...** 2

**MANAGEMENT ASSESSMENT...** 3
Black Canyon of the Gunnison National Recreation Area... 3
Curecanti National Recreation Area... 5

**VISION FOR RESOURCES, INTERPRETATION, AND RECREATION...** 7
Black Canyon of the Gunnison National Monument... 9
Curecanti National Recreation Area... 10

**SPECIFIC OBJECTIVES...** 12
Black Canyon of the Gunnison National Monument... 12
Curecanti National Recreation Area... 18

**ECOLOGICAL SYSTEM-SPECIFIC OBJECTIVES...** 24

## PLAN MANAGEMENT... 27

**VISITOR EXPERIENCE AND THE PARK ENVIRONMENT...** 27
Black Canyon of the Gunnison National Monument... 30
Curecanti National Recreation Area... 41

**MANAGEMENT PRESCRIPTIONS...** 48

**THE PLAN...** 65
Black Canyon ... 67
Curecanti NRA... 73

## LIST OF PREPARERS... 169

## BIBLIOGRAPHY... 77

## MAPS AND TABLES

**MAPS**
Vicinity Map... iii
Black Canyon Resource Opportunity Areas... 29
Curecanti Resource Opportunity Areas... 40
The Black Canyon Plan... 68
The Curecanti Plan... 72

**TABLES**
TABLE 1—Land-Based Prescriptions... 49
TABLE 2—Water-Based Prescriptions... 57
TABLE 3—Special Prescriptions... 63

BLM_0059443



**Vicinity Map**
**Black Canyon of the Gunnison National Monument and**
**Curecanti National Recreation Area**
**Colorado**
U. S. Department of the Interior - National Park Service

iii

BLM_0059444

## PURPOSE AND NEED

### INTRODUCTION

Curecanti National Recreation Area and Black Canyon of the Gunnison National Monument are directly adjacent to one another and are linked ecologically as part of the larger Gunnison River Basin ecosystem. Yet each park has a very different purpose. Together, these park units contribute different resources and spectrums of recreational opportunities for the tourism that exists in the larger Grand Junction-Montrose-Delta-Gunnison-North Fork area.

The region in which the parks lie is one of great elevation ranges (see Vicinity Map). Both parks are common to the Gunnison River with elevations from 6,500 feet above sea level in Black Canyon, rising above 14,000 feet on mountain peaks visible within 30 miles. The parks are approximately 250 miles southwest of Denver.

Black Canyon of the Gunnison has a unique and spectacular landscape that was formed slowly by the action of water and rock scouring down through hard Proterozoic crystalline rock. No other canyon in North America combines the narrow opening, sheer walls, and startling depths offered by the Black Canyon of the Gunnison. The park shares its eastern boundary with Curecanti National Recreation Area.

Curecanti National Recreation Area is composed of three reservoirs named for corresponding dams on the Gunnison River. The Bureau of Reclamation has the primary management responsibilities for the Aspinall Unit facilities. Panoramic mesas, fjord-like reservoirs, and deep,

steep, and narrow canyons abound. Blue Mesa Reservoir is Colorado's largest body of water and is the largest Kokanee Salmon fishery in the United States. Morrow Point Reservoir is the beginning of the Black Canyon of the Gunnison, and below, Crystal Reservoir is the site of the Gunnison Diversion Tunnel, a National Historic Civil Engineering Landmark. Recently discovered dinosaur fossils, a 5,000-acre archeological district, a narrow-gauge train, and traces of 6,000-year-old dwellings further enhance the offerings of Curecanti.

This plan sets forth the basic management philosophy for both parks, managed as one integral unit, and provides strategies for addressing issues and management objectives. This document includes measures for the preservation of the area's resources, indications of the types and general intensities of development (including visitor circulation and transportation patterns, systems, and modes) associated with public enjoyment and use of each area, and the first steps in identifying visitor carrying capacities for both units.

### THE PLANNING PROCESS

The planning process builds upon the logic established for national parks, starting with the national park system and all other applicable laws, regulations, and policies. The foundation of the plan rests on three common components—the vision, the specific objectives, and management prescriptions.

The vision is a short narrative that describes the park's desired future

1

BLM_0059445

condition. It is meant to stand the test of time and reflect the park's purpose and significance. It expresses the management philosophy for the park and what the park is to be like in the future.

Specific objectives capture the essence of the vision, providing clarity and priorities. These objectives are issue-, resource-, or geographic-specific. They may include products to be produced or conditions to be attained or maintained. As a whole, objectives are interrelated and interdependent on one another. The specific objectives provide a basis for allocating resources and define management regions in the park.

Management prescriptions can be either geographically or programmatically based, or a combination of both. Geographic prescriptions describe characteristics of the management region for which they were developed and define the outputs, activities, and projects for that region. Programmatic prescriptions are not tied to a specific management region. They address resource goals in the context of a large area, such as air quality. The rationale for defining regional boundary delineations is included in the planning document.

Management prescriptions for each region are based on the character and condition of the resource involved. They are not only tied to local or park-wide needs but also take into consideration factors beyond park boundaries. A common theme provides a foundation for the plan, while prescriptions define strategies to meet objectives compatible with the theme.

The plan provides general or strategic guidance and is not detailed, specific, or highly technical in nature. Highly technical environmental analysis is to be done when funds become available to begin design of facilities, if prescribed by the management plan, when site-specific impacts can be addressed. Prior to implementation, all undertakings (including mitigation measures) will be subject to Section 106 review and compliance in consultation with the State Historic Preservation Officer (SHPO) and the Advisory Council on Historic Preservation (ACHP).

## THE NATIONAL PARK SYSTEM

The national park system represents a collection of our national heritage and includes many of the nation's most outstanding and significant natural, cultural, historic, and recreational resources. Each unit contains resources and values that makes it something special—even nationally significant. Black Canyon of the Gunnison and Curecanti are two such units, each filling a particular niche in the system.    The "niche" filled by each park is defined by its park purpose.

The National Park Service's purpose of conserving resources—whether they be natural, cultural, historic, or recreational—recognizes the importance of preservation as an active management tool. This preservation principal respects both natural and human relationships and emphasizes the value of maintaining land for the purpose of preserving natural ecosystems, historic significance, and outstanding recreational opportunities.

Balanced against the protection and preservation of these resources is the

BLM_0059446

value of public enjoyment by present and future generations.  Human use often can threaten the very resources that the National Park Service is tasked to protect.  Many public debates have revolved around the balancing of these two National Park Service purposes. Whether it is telling a story or distributing use carefully to protect resources, the Service uses the principles of human and natural management to accomplish its mission.  But at the very least, "these areas derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one national park system managed for the benefit and inspiration of all people." (16 USC 1a-1;1970)

## MANAGEMENT ASSESSMENT

In 1993, each unit conducted a three-day management assessment workshop (Black Canyon in August and Curecanti in October) with participants from the parks' staffs, the regional office, other agencies, and the public.  This process began by looking at each park's legislation in an effort to clearly define its purpose and significance.  The next step identified management objectives, which are broad, conceptual descriptions of what the park could be like relative to resource management, visitor services, human resources, and partnerships. Applicable management objectives derived during the management assessment were used to help define more specific objectives for this plan.

### Black Canyon Of The Gunnison National Monument

#### Park Purpose

The reason or reasons for which Black Canyon of the Gunnison National Monument was set aside as a part of the national park system is called its *park purpose*.  Purpose statements are based upon legislation, legislative history, and historic trends.

The purpose statements below reflect the legislative intent for the monument. Other legislation affecting management of the monument includes the 1916 Organic Act (and as amended by the act of March 27, 1978), the National Environmental Policy Act, the National Historic Preservation Act, the Wilderness Act, the Archeological Resources Protection Act, and the Endangered Species Act.

The purpose of the Black Canyon of the Gunnison National Monument is to provide for:

- preservation and protection of the spectacular gorges and scenic values.

- protection of natural, cultural, and scientific resources and items of educational interest.

- educational, scientific, and interpretive opportunities.

- preservation of the integrity and characteristics of lands designated as wilderness.

- opportunities for public use and enjoyment of these resources in a manner that will leave them unimpaired for future generations.

- management of monument resources as an integral part of the Gunnison River Basin.

3

BLM_0059447

## Park Significance

Significance is summarized in statements that capture the essence of Black Canyon's importance to our natural and cultural heritage. Significance statements are not an inventory of significant resources but rather describe the importance or distinctiveness of the aggregate of resources in the park. The following are the significance statements developed for the park through the management assessment process.

- The dynamic evolution of the Black Canyon, involving the forces of heat, pressure, and water action, has created one of the world's premier wild canyons, because of its sheer cliffs, depth, and narrowness, as it towers over the rapidly falling river. It is a visual attraction that draws hundreds of thousands of visitors each year.

- Clean air and panoramic views pale the influence of humans and give a feeling of what once was throughout the west.

- It's the view.

- The monument contains a diversity of plant and animal species, several of which are rare, endangered, or unique to the area. Natural resources provide an unaltered baseline from which to measure changes in regional and global conditions.

- The writing is on the wall. Without opening a book, one can go back over 1.7 billion years of geologic history as these vertical walls tell their story.

- Black Canyon is the centerpiece of geologic diversity in a relatively small area, reflecting 1.7 billion years of geologic evolution.

- The inner canyon wilderness is truly a wild, foreboding place.

- Tourism is a leading industry in the Gunnison Basin. Centrally located in the basin, Black Canyon is an accessible destination that serves many visitors annually and directly contributes to the local economy.

- The establishment of Black Canyon as a unit of the national park system is a symbol of community pride.

- Its position along the Gunnison River combined with its values make BLCA an integral part of ecosystem management of the Gunnison River Basin.

- At every turn, nook, and cranny, Black Canyon affords the opportunity for visitors to discover new vistas of nature and self.

- Black Canyon is a superlative example of continuing river erosion that is accessible to and understandable by the public.

- The combination of depth and narrowness makes Black Canyon a one of a kind setting in North America.

- The sheer size of the canyon creates an experience where you feel the dominance of nature over people.

- The steep gradient of the Gunnison River and the depth and narrowness of the Black Canyon is a physical barrier to the migration of fish, plants, and animals. This has resulted in a diverse group of isolated biological communities that provide unique opportunities for scientific study, for example, evolution of plants and animals, impacts of migration barriers, and so on.

- The park's canyons and backcountry areas are quiet places where the sounds of nature create an experience for visitors that last a lifetime. You can hear the river flow and the wind in the trees. At times the river talks.

- You can go into the wilderness and experience primal America and bring back a sense of adventure and discovery.

- The canyon is a great place for scientific discovery and environmental education. It is a living classroom providing unique insights into geology, water and wind erosion, air quality, wildlife habitat, and cultural history.

- The magnificence of the canyon—its spectacular depth and color—defy description.

4

BLM_0059448

- It touches the emotion, imagination, and spirit. And a river runs through it!
- People can enjoy the canyon through a variety of recreational experiences that include sight-seeing, fishing, hiking, climbing, kayaking, photography, wildlife watching, meditation, and solitude.

## *Curecanti National Recreation Area*

### Park Purpose

The reason or reasons for which Curecanti was set aside as a part of the national park system is called its *park purpose*. Purpose statements are based upon legislation, legislative history, and historic trends. Curecanti is currently being administered by the NPS based on a number of cooperative agreements and legal mandates. Curecanti has not yet been authorized by specific legislation as a separate unit of the national park system.

The specific legal mandates for Curecanti National Recreation Area include the Colorado River Storage Project (CRSP) Act and a memorandum of agreement between the Bureau of Reclamation and the National Park Service. The statements below reflect the purposes and mandates for Curecanti.

#### *Purposes*

- To conserve the scenery, natural, historic, and archeological resources, and wildlife of Curecanti National Recreation Area.
- To provide for public use and enjoyment in such a way as to ensure visitor safety and resource preservation or conservation by establishing and maintaining facilities and providing protective and interpretive services.

#### *Mandates*

- To manage the lands, waters, and activities of Curecanti National Recreation Area in such a way that it does not interfere with the purposes of the Colorado River Storage Project Act and other Bureau of Reclamation agreements affecting the operation of the Aspinall Unit.
- To mitigate the loss of fish and wildlife resources as a result of the Colorado River Storage Project.

Other legislation affecting the management of Curecanti National Recreation Area includes the 1916 Organic Act (and as amended by the act of March 27, 1978), the National Environmental Policy Act, the National Historic Preservation Act, the Archeological Resources Protection Act, and the Endangered Species Act.

### Park Significance

Significance is summarized in statements that capture the essence of Curecanti's importance to our natural and cultural heritage. Significance statements are not an inventory of significant resources but rather describe the importance or distinctiveness of the aggregate of resources in the park. The following are the significance statements developed for the park through the management assessment process.

- The evolution of life in the Gunnison Basin and its ultimate dependence on water is illustrated and interpreted at Curecanti. Evidence of the impact that water has had on past settlements and developments abounds in the area's geology and history.
- The three dams of the Aspinall Unit are unique in concept and construction. The dams were conceived in the 1950's and built during the 1960's and 70's to provide irrigation, flood control, hydroelectric power, and recreation. The three-dam complex also allows flexible water management of upstream water resources for recreation and irrigation while providing exchange water to the Uncompahgre Valley through the Gunnison Tunnel, a 6-mile, hand-dug tunnel

5

built in the early 1900s, which is recognized as a National Civil Engineering Landmark.

- The quality of water in the Gunnison River has been identified as a natural treasure. The headwaters of this river flow into Blue Mesa Reservoir and from there travel continually westward.

- Blue Mesa Reservoir is one of the largest high-altitude bodies of water in the United States. It provides an exciting diversity of water recreation treating windsurfers, sailboaters, and water-skiers. The three reservoirs provide one of the best cold-water fisheries in Colorado, attracting enthusiasts from throughout the nation and offering a diversity of game fish.

- The rock formations and canyons of Curecanti, which include the upper reaches of the Black Canyon of the Gunnison, tell a story of geologic change that occurred over the course of 2 billion years. Violent volcanic activity and erosion are today revealed in the inspiring pinnacles, cliffs, and mesas of the recreation area.

- The scenic values of the canyon, the needles, the pinnacles, and the reservoirs provide dramatic contrast, which causes visitors to slow down, pause, and reflect on the diversity of the landscape and its spaciousness. Hiking provides the opportunity to explore and enjoy these pristine and remote lands.

- Curecanti National Recreation Area provides habitat essential for the long-term viability of elk, deer, and bighorn sheep. This affords visitors the opportunity to view and enjoy these animals in their natural habitat.

- Curecanti National Recreation Area provides feeding and roosting opportunities and protects existing and potential breeding habitat for endangered species, such as the bald eagle and peregrine falcon. Other species of concern dependent on Curecanti resources include golden eagle, great blue heron, Gunnison sage grouse, and numerous other migratory birds.

- Curecanti provides one of the best cold-water fishing opportunities in the nation. This is due primarily to the unique spawning Kokanee salmon run occurring in Blue Mesa. The Morrow Point and Crystal Reservoirs' trout fisheries routinely attract fishing enthusiasts from throughout the nation because of the high-quality trout fishing and uniqueness of the canyon environment.

- Habitat within and adjacent to Curecanti National Recreation Area provides the opportunity to reintroduce and establish breeding populations of native Colorado River cutthroat trout.

- Exposures of the Morrison Formation contain fossil evidence of the Mesozoic Era, during which dinosaurs and associated fauna occupied this region. Much more recent fossil evidence suggests that musk ox, cave lions, and cheetah roamed Blue Mesa during the Pleistocene ice ages.

- The prehistoric and historic stories of human culture in the Curecanti area are recorded in the traces and tracks left by Native Americans, miners, railroaders, and ranchers. These signs document not only the human struggles to survive but also how changing human value systems, economic, social, and technological changes, and the importance of water have shaped the use and character of the land and its people. Cultural history contains archeological examples of some of the oldest villages found in North America, predating the building of the pyramids. The narrow-gauge railroad exhibited in Cimarron graphically portrays the story of technology's effects of shaping people and using land; the agony and difficulties of building track in narrow canyons in winter where the sun seldom shined; of taking the hard way instead of the easy trail. The finest examples of the railroad are on exhibit at Cimarron.

6

# Visions for Resources, Interpretation, and Recreation



The following vision statements are based on input received during the management assessment. They are short narratives relating "what could be" in the future and are used in evaluating the appropriateness of various alternatives.

7

BLM_0059451



North Rim, Black Canyon of the Gunnison National Monument
©David Halpern

8

BLM_0059452

# Black Canyon of the Gunnison National Monument

The spectacular canyon and adjacent uplands known as the Black Canyon of the Gunnison is a special place that touches mind and soul and offers a variety of opportunities to enjoy and contemplate one of nature's foremost scenic wonders. A place where quiet is enhanced by sounds provided by nature—where the continuous roar of the river rushing amidst boulders and over falls attests to the power of the Gunnison to carve out a canyon over 2,000 feet deep. Although upstream dams have partially regulated the Gunnison, it is managed to exemplify a wild river, with flows mirroring natural levels, where the water is unpolluted, and the exceptional recreational, scenic, and educational values of the system are protected. Highly regarded and appreciated for its clean air and panoramic vistas, the rural and undeveloped nature of the landscape adds a pristine appearance that promotes opportunities for discovery and enlightenment. The canyon is, indeed, a living classroom.

For those seeking to expand and expound on the resources and values found in the wilderness and front country, exceptional interpretive opportunities and media are available. A wide variety of activities and challenges includes sight-seeing, hiking, fishing, wilderness backpacking, climbing, and white-water boating. Developed areas and facilities offer modest amounts of visitor conveniences in some areas, which provide a good balance when compared to the primitive opportunities found throughout the monument.

The National Park Service manages the river, canyon, and uplands as a part of the larger Gunnison Basin. Partnerships with a variety of local, state, and federal agencies as well as private organizations help align goals that aggressively protect the natural and cultural resources of the region, including riverine resources, wildlife, superb air quality and visibility, and maintenance of a rural viewscape. This in turn maintains a high quality of life for our neighbors. Additionally, partnerships assist in coordinating a variety of high-quality services that meet our visitors' needs as well as those of the people in nearby communities.

Our children's children will be able to learn from and enjoy the canyon as we have because the canyon is used in ways that are sustainable, leaving the resources unimpaired. Our canyon memories and experiences do indeed last a lifetime.

9

BLM_0059453

# *Curecanti National Recreation Area*

Water. Water is a simple compound with important physical properties but its value evolves with generations. Water shaped and carved the land in the Gunnison country for eons. Meltwaters caused rushing streams with tremendous mudslides. Dinosaurs fell. Apatosaur and Diplodocus bones would fossilize. The stark, sagebrush-covered mesas of mud and sandstones would receive little rain. Erosion would slow and life would survive in an arid climate.



Windsurfers at Curecanti National Recreation Area

Left alone, the Gunnison River would continue to meander and carve. The river would provide a ribbon of life for cottonwoods and willows, native trout, and migrating birds. People would hunt, people would gather, people would cook in rock-lined hearths. Descendants would be remembered in place names—Chipeta, Sapinero, Curicata.

Later, people would explore, migrate, and engineer. The river would present what would seem to be a natural path to the West, a trail for a railroad. Cattle, sheep, market goods, and people would be transported by a tiny train on a narrow railbed. Communities would grow, tied by the train. The West would grow, and agriculture would expand in the warm desert with enough water. The high, rugged, dry landscape would not be interrupted by a narrow green thread, but by three large reservoirs. Blue Mesa would be the largest reservoir in Colorado, storing water for agriculture and power generation. Morrow Point, the first reservoir in the Black Canyon would be formed behind a thin arch, double curvature, concrete dam containing a massive power generating plant.

10

BLM_0059454


Lisa Lynch

A third reservoir—Crystal—would be held by a dam built for the purpose of regulating downstream river flows.

The reservoirs would interrupt terrestrial migration paths and create flatwater surfaces for migrating waterfowl. The reservoirs and surrounding land would attract hundreds of thousands of visitors. Soon a million people would find the area to relax and pursue a lifestyle of water-based recreation. Sweeping vistas, clear water, and a new refuge for now threatened and endangered species defines the territory called Curecanti National Recreation Area.

The present definition should endure. New uses, new values, new technology will come, yet history will be preserved and told. Decisions will be made by people for the good of future generations. Clear water and sweeping vistas, abundant wildlife, and a harsh, arid ecosystem, balanced by ribbon-like riparian life zones brought generations of people to the area. These values are timeless and fragile. Curecanti will continue to provide refuge and recreation for all future generations.

11

BLM_0059455

# SPECIFIC OBJECTIVES

Specific objectives further refine the management objectives completed during the 1993 management assessment workshops. They provide clarity and priorities. These objectives are resource-, geographic-, or issue-specific. They may include products to be produced or conditions to be attained or maintained. As a whole, objectives are interrelated and interdependent. The specific objectives provide a basis for allocating resources and define management regions in the park.

## Black Canyon of the Gunnison National Monument

The following resource-, geographic-, and issue-specific objectives apply to Black Canyon of the Gunnison National Monument.

### Prime Resource

Prime resource lands are defined as those resources that made a direct contribution to establishing the park as a unit of the national park system and are related to the park's purpose and significance. Other lands within the monument are also important to protecting and supporting the prime resource, but are not considered to be the prime resource.

Prime resource lands for the monument are those lands from the canyon edge to the Gunnison River below, mostly known as the Inner Canyon. The Inner Canyon and the majority of the westernmost upland, consisting of 11,180 acres, is wilderness designated under Public Law 94-567 (October 20, 1976). These lands are managed as part of the National Wilderness Preservation System, designated by Congress and legally protected as wilderness in perpetuity. The Wilderness Act defines wilderness as follows: "generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." Wilderness areas are managed for the use and enjoyment of the American people in such manner as will leave the areas unimpaired for future use and enjoyment as wilderness. Management includes the protection of these areas, the preservation of their wilderness character, and the gathering and dissemination of information regarding their use and enjoyment as wilderness. Public purposes of wilderness include recreation, scenic preservation, scientific study, education, conservation, and historical use.

### Resource-Specific Objectives

■ *AIR* — Perpetuate and preserve outstanding air quality in the monument, which reflects its critical importance to visitor enjoyment, human health, scenic vistas, and the preservation of natural systems and cultural resources consistent with the aims of a designated Class I airshed.

*Conditions to be attained:*

1) Facilities and activities within parks are in compliance with Clean Air Act requirements, including state and local regulations.

2) Information and tools needed to document air quality conditions have been acquired.

3) A strategy to use available information to remedy existing and prevent future air pollution effects on park resources and values has been developed.

12

BLM_0059456

■ *CULTURAL RESOURCES* — Protect, preserve, and develop cultural resources for public enjoyment, interpretation, and scientific research.

*Conditions to be attained:*

1) Cultural sites—archeological and historic—have been inventoried and documented; significant sites are preserved including Civilian Conservation Corps (CCC) components—North Rim Road and Pulpit Rock and Dragon Point overlooks.

2) An understanding of the significance of the pre-history of the area has been attained and communicated to the public.

3) A strategy has been developed that helps define and interpret the importance of exploration, settlement, and development of the region, including its mining and agricultural history.

4) In concert with Curecanti National Recreation Area, the Bureau of Reclamation, and the Uncompahgre Valley Water Users Association, a strategy has been developed to identify and interpret the significance of water development in the west and its subsequent impacts on the Black Canyon.

5) The importance of local support for the establishment of the canyon as a component of the national park system and subsequent expansion and creation of the Black Canyon of the Gunnison Wilderness has been identified and highlighted.

■ *INTERPRETATION* — Interpretation objectives are integrated and linked with the resource management program.

*Conditions to be attained:*

1) The interpretive program connects the visitor to the park's resources, builds a local and national constituency, and gains public support, which in turn meets the objective of protecting park resources.

2) An outreach component of the program provides vital information to protect

resources and gain public support through schools, organizations, and partnerships.

■ *PALEONTOLOGICAL RESOURCES* — Protect and preserve paleontological resources, including both organic and mineralized remains in body or trace form, for public enjoyment, interpretation, and scientific research.

*Conditions to be attained:*

1) The extent of paleontological resources has been identified, inventoried, and protected.

2) Through interpretive opportunities, the public gains an understanding of the significance of the paleontological resources and the role they play as a component of the park's geological/ zoological story.

■ *SCENIC VALUES AND SOUND* — Maintain a full spectrum of tangible and intangible attributes for which the national monument was established. Park areas contain various tangible natural and cultural features such as animals, plants, waters, geologic features, historic buildings and monuments, and archeological sites. They also have intangible qualities such as natural quiet, solitude, space, scenery, scenic vistas, a sense of history, sounds of nature, and clear night skies that are important components of visitor use and enjoyment.

*Conditions to be attained:*

1) A strategy has been developed that protects viewsheds, allowing them to remain generally natural and undeveloped as seen from within the monument and Vernal Mesa.

2) Development that will be seen from within the park is done in a sensitive way, minimally impacting the visitor experience of a wild canyon setting and blending with the natural landscape.

3) Management for viewsheds that are critical to providing quality experiences for park

13

BLM_0059457

visitors is cooperatively coordinated with adjacent land management agencies, county planning entities, private landowners, and transportation agencies.

4) A strategy has been developed to protect the viewshed along the scenic approaches to the monument (Highway 50 to the South Rim entrance and Crawford to North Rim boundary), emphasizing the importance of retaining the rural characteristics of the area along these routes.

5) Outstanding natural sound quality, night lighting, and air pollution are improved over 1993 levels.

■ *SOILS/GEOLOGY* — Seek to understand and preserve natural erosion processes as they relate to the monument and the formation of the canyon.

*Conditions to be attained:*

1) Accelerated erosion resulting from visitor use and/or management activities has been minimized or prevented.

2) Continued research pertinent to the geologic processes that created the canyon and adjacent landscapes is encouraged.

■ *VEGETATION* — Perpetuate native plant life as part of natural ecosystems.

*Conditions to be attained:*

1) The spread of noxious weeds is prevented.

2) Habitat for threatened and endangered species is protected.

3) Permit livestock is managed per the principals of sustainability; incidence of livestock trespass is eliminated by the use of fencing, or where feasible, by alternative controls; where fencing is not erected, resource impacts are identified and monitored to minimize such impacts.

4) Prescribed fire is used to mimic natural fire effects in certain areas.

5) Natural (pre-dam) river corridor vegetation has been restored and is maintained.

6) Impacts of visitor use are minimized.

7) Significant vegetation communities (e.g., old growth stands) have been identified and are protected.

8) Natural vegetation communities extending across park boundaries are enhanced through common efforts with other entities, minimizing habitat fragmentation in the region.

■ *WATER* — Manage and protect water resources and aquatic ecosystems to maintain, rehabilitate, and perpetuate their inherent natural integrity in coordination with the state and other federal agencies.

*Conditions to be attained:*

1) The Gunnison River's flows and flow regime are protected, consistent with the Colorado River Storage Project Act and Colorado water law, ensuring sufficient and permanent water flows that mimic a natural flow regime to the extent possible.

2) The extent of springs and seeps have been identified and protected.

3) Water quality is maintained at highest level possible, with the assistance of Curecanti National Recreation Area, consistent with the Clean Water Act (33 USC 1251 et seq.) and other applicable federal, state, and local laws and regulations.

4) Water quality for the world-class trout fisheries is maintained.

5) Other water users and agencies assist in achieving goals through recognition of common benefits and support to reach mutually agreed-upon goals.

■ *WILDLIFE* — Perpetuate native animal life as part of the natural ecosystem in consultation with federal and state agencies.

14

*Conditions to be attained:*

1) Endangered and threatened species are protected and the Service has accomplished its role in recovery of threatened and endangered species found at the monument.

2) Habitat fragmentation has been minimized.

3) Native Colorado River fish have been restored and/or are de-listed.

4) Habitat for native and non-native fish is maintained.

5) Fishery and wildlife inventories have been completed and species are monitored to the point that changes in population trends or characteristics can be identified and/or managed.

■ *VISITOR USE* — Develop a strategy to determine the appropriate levels of visitor use and experience and alternative strategies for maintaining the diversity of quality visitor experiences consistent with Black Canyon of the Gunnison NM's purposes and significance.

*Conditions to be attained:*

1) A strategy has been developed with public input to guide the park in ensuring a quality visitor experience, resource preservation, and development consistent with the noncrowded and pristine nature of the park and maintaining the ability of visitors to have a high-risk adventure experience in the wilderness.

2) Wilderness areas are properly monitored for resource impacts and visitor use.

3) A strategy to determine and establish a carrying capacity that protects resources and provides a range of experiences has been developed.

4) Recreational uses have been evaluated and are permitted when such use is otherwise compatible with park and NPS management objectives and regulations.

5) Professional emergency services are provided year-round to park visitors either

directly by park staff and/or through innovative cooperation.

■ *COMMERCIAL SERVICES* — Identify the optimum level of commercial services to be provided and their complementary role in accomplishment of the park mission. Commercial services include anything offered to the public or private individuals in which park resources are used and that results in compensation of any kind to an individual, organization, or corporation. Compensation may be "for profit" or "nonprofit" under local, state, or federal law.

*Conditions to be attained:*

1) A commercial services plan has been completed to provide long-term strategic guidance for management of commercial services.

2) Consistent with the Concessions Policy Act of 1965, the commercial services plan evaluates, through the planning process, those services that are necessary and appropriate for present and future visitors to the park.

3) The commercial services plan identifies:

   - commercial services and facilities that are necessary and appropriate

   - levels of services and facilities essential to serve visitors

   - types of facilities necessary to support commercial services

   - appropriate areas for facilities that serve visitors

4) The type of commercial facilities and services that would complement quality and diverse visitor experiences and resource conservation have been determined.

■ *FACILITIES* — Provide facilities and services that are attractive, safe, accessible, and of high-quality design,

15

BLM_0059459

adhering to a common architectural theme. Such facilities should be located to minimize their impact on the surrounding landscape and resources.

*Conditions to be attained:*

1) Development that will be seen from within the park is done in a sensitive way, corresponds to a common architectural theme while blending with the natural landscape, and minimally impacts the visitor experience of a wild canyon setting.

2) Facilities have been designed and located to protect resources while minimizing impacts to those resources, attract visitors while meeting basic visitor needs, orient and educate the public while enhancing visitor enjoyment, and provide information on the park and surrounding areas.

3) East Portal facilities are compatible with the common architectural theme of Black Canyon.

4) Road and parking systems are efficient and safe, accommodating moderate growth and consistent with resource management and visitor experience objectives.

5) The park and surrounding lands have a coordinated and comprehensive trail system that connects the Inner Canyon and uplands with significant features and resources.

6) A strategy has been developed to establish access through Red Rock Canyon.

7) Facilities and programs are available for visitors with disabilities.

8) Water is available in locations on both rims to meet basic visitor, resource protection, and operational needs.

9) Visitor/interpretive facilities complement experiences of visitors who are emotionally touched by their canyon visit.

10) Activities and support facilities are coordinated with entities outside of park boundaries.

11) Facilities serving various functions have been efficiently organized and do not conflict with land use.

12) Maintenance and administration facilities are organized in a fashion that protects resources and meets visitor needs.

## Geographic-Specific Objectives

▪ *PANORAMIC VIEWS* — Preserve the natural setting that allows the Black Canyon to be seen within the larger regional context.

*Conditions to be attained:*

1) Visitors are allowed to see and access the area for the larger panoramic views.

2) To support visitor access and a quality visitor experience, minimal development is done.

3) Air quality for a Class I airshed is maintained for long-distance views (to the San Juans, Grand Mesa, West Elks, Uncompahgre Valley, etc.), which are important parts of the Black Canyon geologic and human history stories.

▪ *CANYON BACKDROP* — Preserve and protect the wild setting within which the Black Canyon exists.

*Conditions to be attained:*

1) Visitors can access the area for recreation purposes while the park maintains a wild setting.

2) Development is done in a sensitive way, with minimal impacts to visitor experience of a wild canyon setting, and blends with the natural landscape.

3) Scenic easements are managed to perpetuate the natural resources and maintain a wild setting to the greatest degree possible.

▪ *CLIFF TOP* — Provide visitors with a variety of recreational viewing opportunities to experience the depths of the INNER CANYON.

*Condition to be attained:*

1) Development is done in a sensitive way, protecting resources from visitor-use

16

impacts, minimally impacts visitor experience of a wild canyon setting, and blends with the natural landscape.

■ *CLIFFS AND INNER CANYON* — Provide for visitor enjoyment of park resources, consistent with the management of the area for wilderness values.

*Conditions to be attained:*

1) Development is limited in accordance with wilderness values.

2) Visitors have a wilderness experience offering solitude and minimal contact with other people.

3) Traditional climbing activities that use low-impact techniques and equipment are supported through a climbing management plan.

4) A strategy has been developed to identify acceptable limits of impacts, monitor backcountry use levels and resource conditions, and take prompt corrective action when unacceptable action and impacts occur.

■ *THE RIVER* — Provide for visitor enjoyment of park resources, consistent with the management of the area for wilderness values.

*Conditions to be attained:*

1) Development is limited in accordance with wilderness values.

2) Visitors experience the river in a wilderness setting that offers solitude, the natural sounds of a wild river, and minimal contact with other people.

3) The river flow and regime are managed (in concert with other entities) to closely approximate natural conditions and systems to the extent possible, consistent with the CRSP Act and Colorado water law.

4) A strategy has been developed to identify acceptable limits of change, monitor backcountry use levels and resource

conditions, and take prompt corrective measures when unacceptable actions or impacts occur.

■ *THE WAY IN* — Provide visitors non-technical or non-mechanized access to the CLIFFS AND INNER CANYON and THE RIVER using natural topography.

*Conditions to be attained:*

1) Development is limited in accordance with wilderness values.

2) Visitors have a wilderness experience along these access routes—an experience that is associated with solitude, minimal contact with other people, and non-technical or non-mechanized access.

3) A strategy has been developed to identify acceptable limits of use, monitor backcountry use levels and resource conditions, and take prompt corrective measures when unacceptable actions or impacts occur.

**Issue-Specific Objectives**

■ *FUTURE DEVELOPMENT SURROUNDING THE PARK* — Cooperatively guide the appropriate development of lands surrounding the park so that they do not adversely affect the park environment. Parks contain both tangible and intangible resources. Tangible natural and cultural features include animals, plants, waters, geologic features, historic buildings and monuments, and archeological sites. Intangible qualities include natural quiet, solitude, space, scenery, scenic vistas, a sense of history, sounds of nature, and clear night skies. These attributes are important both to the conservation of resources and to their use and enjoyment by the public. Two areas could potentially negatively impact the park environment from inappropriate

17

BLM_0059461

development of surrounding lands—water quality and aesthetics.

*Conditions to be attained:*

1) A strategy for a local community baseline information system has been developed to provide a better understanding of the physical and ecological processes that shape and contribute to the evolution of Black Canyon and the Gunnison Basin.

2) Viewsheds remain generally natural as seen from within the park.

3) A cooperative strategy for appropriate private land development adjacent to Black Canyon and on access routes leading into the park has been developed with land management agencies, private landowners, county planning entities, and transportation agencies, so that impacts to water quality and aesthetic quality of the park experience have been reduced.

4) Criteria and appropriate GIS data are provided to county planning commissions which identify critical viewshed and other elements necessary to protect park resources and values. This criteria is designed to help protect the semi-primitive character and setting of the park.

## Curecanti National Recreation Area

The following resource-, geographic-, and issue-specific objectives apply to Curecanti National Recreation Area.

### Prime Resource

Prime resource lands are defined as those resources that made a direct contribution to establishing the park as a unit of the national park system and are related to the park's purpose and significance. Other lands within the park are also important to protecting and supporting the prime resource, but are not considered to be the prime resource.

Water is considered to be the primary resource of the national recreation area. Fresh water is a particularly important and sensitive ecosystem component. Its physical availability and quality are critical determinants not only of aquatic resources but of a park's overall natural resource conditions. Surface water and groundwater are important in determining site suitability and uses, while also serving as important transport mechanisms. Depending upon watershed characteristics and the hydrologic cycle, water often connects park resources to resources outside park boundaries. Water may thus deliver pollutants generated by activities outside park boundaries to park waters, or transport pollutants generated within the park to waters outside its boundaries. Similarly, impacts on aquatic ecosystems due to alterations of natural populations or environments will cross park boundaries via the aquatic environment.

### Resource-Specific Objectives

■ *VEGETATION* — Perpetuate native plant life as part of natural ecosystems.

*Conditions to be attained:*

1) The spread of noxious weeds is controlled.

2) Habitat for candidate endangered species is protected or enhanced.

3) Trespass livestock and their impacts on resources have been identified, mitigated, and managed.

■ *WILDLIFE* — Perpetuate native wildlife as an integral part of the natural ecosystems.

*Conditions to be attained:*

1) Endangered and threatened species are protected.

18

BLM_0059462

BLM_0059463

*Conditions to be attained:*

1) Facilities and activities within parks are in compliance with Clean Air Act requirements, including state and local regulations.

2) Information to document air quality conditions has been acquired.

3) A strategy to use available information to remedy existing and prevent future air pollution effects on park resources and values has been developed.

■ *SCENIC* — Maintain a full spectrum of tangible and intangible attributes for which the national recreation area was established. Parks contain various tangible natural and cultural features such as animals, plants, waters, geologic features, historic buildings and monuments, and archeological sites. They also have intangible qualities such as natural quiet, solitude, space, scenery, scenic vistas, a

interpretation, education, and scientific research.

*Conditions to be attained:*

1) The extent of these resources is identified, inventoried, and protected.

2) Interpretation of paleontological resources is provided without endangering the resource.

3) The integrity of paleontological resources from effects of human use and fluctuating reservoir levels is maintained.

■ *CULTURAL RESOURCES* — Identify, preserve, and where appropriate, enhance cultural resources for public enjoyment, interpretation, education, and scientific research.

*Conditions to be attained:*

1) Cultural sites are inventoried and documented; significant sites are preserved.

BLM_0059464

2) Professional emergency services are provided year-round to park visitors either directly by park staff and/or through innovative cooperation.

■ *INTERPRETATION* — Determine the level of government and private sector educational services, using state-of-the-art methodologies to enhance the visitor's experience and provide educational and interpretive programs.

*Conditions to be attained:*

1) Park continues to serve as a center for outreach programs with school systems, developing seminars and curriculums.

2) Educational programming is provided year around at existing park facilities using appropriate natural and cultural park themes.

■ *COMMERCIAL SERVICES* — Identify the optimum level of commercial services to be provided and their complementary role in accomplishment of the park mission. Commercial services include anything offered to the public or private individuals, in which park resources are used and that results in compensation of any kind to an individual, organization, or corporation. Compensation may be "for profit" or "non-profit" under local, state, or federal law.

*Conditions to be attained:*

1) A commercial services plan has been completed to provide long-term strategic guidance for management of commercial services.

2) Consistent with the Concessions Policy Act of 1965, the commercial services plan evaluates, through the planning process, those services that are necessary and appropriate for present and future visitors to the park.

3) The commercial services plan identifies:

- commercial services and facilities that are necessary and appropriate

- levels of services and facilities essential to serve visitors

- types of facilities necessary to support commercial services

- appropriate areas for facilities that serve visitors

4) The type of commercial facilities and services that would complement quality and diverse visitor experiences and resource conservation have been determined.

■ *FACILITIES* — Provide facilities and services that are attractive, safe, accessible, and of high-quality design that are located to minimize their impact on the surrounding landscape and resources.

*Conditions to be attained:*

1) The recreation area has appropriately designed and situated visitor facilities, including exhibits that are sensitive to the surrounding environment and readily accessible to all populations.

2) Facilities, including employee housing, commercial service operations, and equipment are appropriate, sufficient, and properly maintained for the park mission and visitor use.

3) State highway maintenance is accomplished in a coordinated and cooperative manner as consistent as possible with NPS policies and the protection of resources.

4) A strategy has been developed to complement and support the Regional Transportation Plan as it relates to Highways 50, 149, and 92 (not including four-lane highway development) and the construction of bicycle paths along these routes.

5) Facilities serving various functions are efficiently organized and do not conflict with land use.

6) Maintenance and administration facilities are organized in a fashion that protects resources and meets visitor needs.

21

BLM_0059465

### Geographic-Specific Objectives

■ *RIPARIAN RIVERINE* — Preserve natural riverine processes and aquatic habitat, its functions, and its natural and beneficial values while maintaining the area as an active outdoor classroom for park visitors.

*Conditions to be attained:*

1) Natural succession processes that provide for shifts in organism abundance and distribution when there are changes in the rates and locations of beach-building and erosion from the river are evident.

2) Habitat and species diversity are monitored and maintained.

3) A strategy has been developed to determine the level of day use facilities that would complement a quality visitor experience and resource conservation.

4) Hunting policy considering safety conflicts with the day use area is determined in cooperation with the Colorado Division of Wildlife.

5) Wayside exhibits relating trails, information, and natural processes of the area and an outreach education area are provided.

6) Coordination with BOR and other agencies continues, defining strategies to meet target reservoir elevation levels while considering interagency objectives. The pool target elevation level is met—flooding and ice jamming are minimized.

■ *GUNNISON RIVER CANYON* — Determine level of day use facilities at Wilson's Landing. Determine level of development of roadside pulloffs.

*Conditions to be attained:*

1) A plan has been developed that determines the level of day use facilities that would complement a quality visitor experience and resource conservation.

2) A plan has been developed that determines the amount of roadside pull offs necessary to complement a scenic driving experience, provide a quality visitor experience, and provide for interpretation of the park's resources.

■ *BLUE MESA* — Determine the appropriate levels of visitor use, experience, the reservoir's carrying capacity, reservoir levels, and alternative strategies for maintaining the diversity of quality visitor experiences consistent with Curecanti NRA's purposes and significance.

*Conditions to be attained:*

1) The carrying capacity and the public's perception of what constitutes a quality visitor experience on Blue Mesa (numbers of boats, any use conflicts such as fishermen/jet skiers/water-skiers/windsurfers) has been determined and evaluated in light of resource management and visitor use criteria.

2) The appropriate levels of additional launch and/or marina facilities, if any, and their location(s) have been determined.

3) Reservoir elevations are cooperatively maintained at appropriate levels throughout the year consistent with quality recreational experiences and protection of natural and cultural resources.

■ *BLUE MESA* — Develop a cooperative approach with adjacent land management agencies, private landowners, and other federal, state, and local agencies to protect viewsheds seen from Blue Mesa that are critical to providing quality recreational experiences.

*Conditions to be attained:*

1) Viewsheds remain generally natural and undeveloped as seen from the reservoir.

2) Viewsheds that are critical to providing quality recreational experiences for park visitors are protected from inappropriate development.

22

BLM_0059466

BLM_0059467

resources and to their use and enjoyment by the public. There are two areas of special concern that could be impacted by inappropriate development of surrounding lands—water quality and aesthetics.

*Conditions to be attained:*

1) A strategy for a local community baseline information system has been developed to provide a better understanding of the physical and ecological processes that shape and contribute to the evolution of Curecanti and the Gunnison Basin.

2) Viewsheds remain generally natural and undeveloped as seen from within the park.

3) A cooperative strategy for any appropriate private land development adjacent to Curecanti has been developed with land management agencies, private landowners, county planning entities, and transportation agencies so that water quality and aesthetic quality of the park experience are not adversely impacted.

4) Criteria and appropriate GIS data is provided to county planning commissions which identify critical viewshed and other elements necessary to protect park resources and values. This criteria is designed to help protect the semi-primitive character and setting of the park.

## ECOLOGICAL SYSTEM-SPECIFIC OBJECTIVES

These objectives, in contrast to those listed for each park, view both parks in the larger context of the region of which they are a part. The parks are viewed without regard to administrative boundaries. As with the specific objectives listed above they can be resource-, geographic-, or issue-specific, however the issue in most cases will determine the region of the ecosystem.

The extent of the ecosystem should include those resources, issues, and items that influence park resources or are influenced by park resources or park management activities. As a whole, objectives are interrelated and interdependent. The specific objectives provide a basis for allocating resources and define the partners for cooperative management efforts. Such efforts are increasingly important as agencies, counties, communities, and other entities have greater impacts on each other and their environments through growth, planning, and other actions. Cooperative efforts assist in recognizing and addressing concerns and areas of mutual benefit and are invaluable to the planning process.

• *ECO: SOCIOLOGICAL* — The overall objective is to manage both parks in the context of their socioeconomic setting. The parks should continue to expand partnerships (federal, state, local, private) to exchange information, to ensure protection of natural and cultural features and resources, and to develop a complete and consistent visitor information package and a variety of information distribution points and programs. The parks will work with other entities involved with tourism industries to focus, emphasize, and coordinate recreational and interpretive opportunities in marketing what the parks offer in the wider regional context.

*Conditions to be attained:*

1) Parks are engaged in a partnership with other entities to provide information to regional visitors and to facilitate protection of resources.

24

BLM_0059468

2) Infrastructure and commercial activities are coordinated with entities outside of park boundaries.

3) Socioeconomic ecosystem stakeholders have a good understanding of visitor characteristics.

4) Long- and short-term recreation use and tourism goals, including use levels and growth, accommodations, and infrastructure, are coordinated between federal, state, and private entities.

5) Effective communications have been established with other entities, the public, and special interests.

- *ECO: WATER* — The overall goal is to manage and protect the regional water resources and aquatic ecosystems to maintain, rehabilitate, and perpetuate their inherent natural integrity in western Colorado in coordination with state and other federal agencies.

*Conditions to be attained:*

1) The Gunnison River's flows and flow regime have been protected ensuring sufficient and permanent water flows that mimic a natural flow regime to the extent possible consistent with the CRSP Act and Colorado water law.

2) Water quality is maintained at the highest level possible, consistent with the Clean Water Act (33 USC 1251 et seq.) and other applicable federal, state, and local laws and regulations.

3) Other water users and agencies assist in achieving goals through recognition of common benefits and support to reach mutually agreed- upon goals.

4) Interpretive programming is in place that addresses park and regional issues in the context of the Gunnison River Basin ecosystem.

5) The park staff is able to inform visitors about resource issues on surrounding lands, and surrounding land management agencies are able to communicate park resource issues to their visitors.

6) Both parks are managed as part of the larger Gunnison River Basin ecosystem.

7) The hydrologic environment (including flow, flow regime, aquatic life, riparian vegetation, and visitor experience) is managed, in concert with other management agencies and interests, to maintain natural hydrologic systems from the headwaters to the Colorado River.

8) Interpretive programming is active in addressing regional river resource issues, in the context of the Gunnison River Basin ecosystem.

9) Research is facilitated in cooperation with other entities.

10) An adequate database to support management decisions is in place.

The boundary for this ecosystem is defined as the Gunnison River Drainage, from the headwaters to the confluence with the Colorado River.

- *ECO: AIR* — The park staff will work with federal, state, and local agencies and groups to perpetuate and preserve outstanding air quality in and surrounding the parks, including the benefits to visitor enjoyment, human health, scenic vistas, and the preservation of the designated Class I and II airsheds.

*Conditions to be attained:*

1) In a cooperative effort, parks work to ensure that facilities and activities within and adjacent to the parks are in compliance with Clean Air Act requirements, including state and local regulations.

2) Parks obtain and use the necessary tools to gather and gain information in a cooperative effort to document air quality conditions for the region.

3) Parks assist in an effort to develop a strategy and to use available information to remedy existing and prevent future air pollution effects on regional air quality.

4) Parks assist in the protection of the regional Class I and II air quality areas and long-range visibility resources.

25

BLM_0059469

5) The boundary is defined by the continental divide, the Colorado-New Mexico state line, the Colorado-Utah state line, and the Colorado-Wyoming state line. The region assessed by the Grand Canyon Visibility Transport Commission is a more accurate representation of the airshed for the parks. The NPS works with the other agencies and states within this larger region to protect air resources.

■ *ECO: HISTORY* — The park staff works with other federal, state, local, and private entities to maintain and preserve the resources and stories that capture the geologic history and human experience associated with the Gunnison River. Through these resources and the stories that they tell we can draw a bridge of understanding between present-day people and the natural and cultural resources found here.

*Conditions to be attained:*

1) Sites associated with the human stories are preserved, and the stories are shared through various cooperative efforts that best carry their message.

2) The story of water is told in a comprehensive manner in cooperation with public and private entities to present the epic nature of the events preserved. All parts of the narrative are shared in the Gunnison Basin and related in the context of water development in the West.

3) Partnerships are developed as needed to impart the cultures of historic and prehistoric people indigenous to the basin.

4) Exploration and settlement of the region has been revealed from the earliest arrivals through present-day people. Characters out of the past that brought mining, railroads, agriculture, and the CCC have been brought to life as they fit into the Curecanti and Black Canyon scene.

■ *ECO: LAND* — The overall goal is to manage and protect the regional land-based ecosystems and to maintain, rehabilitate, and perpetuate their inherent natural integrity in western Colorado, in coordination with state and other federal agencies.

*Conditions to be attained:*

1) Landscapes and their interdependent resources are managed in a manner that does not derogate or cause irretrievable damage to such resources.

2) Wildlife habitat and associated migration corridors are managed in a manner that sustains wildlife populations consistent with applicable federal, state, and local laws and regulations.

3) Vegetation is maintained to perpetuate biological diversity of communities, and emphasis is placed on natural vegetation while alien or noxious weed species are controlled cooperatively with assistance from county weed districts.

4) Grazing is managed in a manner consistent with NPS policies and guidelines, with particular emphasis on the perpetuation of wildlife and associated habitat and the protection of riparian and riverine areas.

5) Other land management entities and agencies assist in achieving goals through recognition of common benefits and support to reach mutually agreed-upon goals.

6) Interpretive programming is in place that addresses park and regional resource issues in the context of the Gunnison Basin ecosystem.

7) The park staff is able to inform visitors about resource issues on surrounding lands, and surrounding land management agencies are able to communicate park resource issues to their visitors.

8) Curecanti is managed as part of the larger Gunnison Basin ecosystem.

9) Interpretive programming is active in addressing regional land-based resource issues, in the context of the Gunnison Basin ecosystem.

10) Research is facilitated in cooperation with other entities.

11) An adequate database to support management decisions is in place.

The boundary for this ecosystem is defined as the Gunnison Basin, from the headwaters to the confluence with the Colorado River.

BLM_0059470

BLM_0059471

carrying capacities needed to protect resources.

Along with the specific objectives for each area, ROAs provide the rationale and basis for land allocation decisions. Each resource opportunity area includes a brief description of the following:

- Outstanding examples of natural, scenic, geological, ecological, floral, faunal, and recreational values for which the park was established.

- Populations of rare plants and animals that are particularly vulnerable because of their small population sizes and genetic isolation. Habitat necessary for the survival or reintroduction of federal- or state-recognized threatened or endangered species or candidate species being considered for listing.

- Resources that are unusually sensitive to human use.

- Major known archaeological or important historical resources.



Overlooking Bostwick Park from Warner Point Trail, Black Canyon of the Gunnison National Monument
©David Halpern

28



the river

panoramic vista (inside the monument)

panoramic vista (outside the monument)

canyon backdrop (inside the monument)

canyon backdrop (outside the monument)

cliff top

cliffs and inner canyon

the way in

N
W — E
S

1    0 miles

# Resource Opportunity Areas

**Black Canyon of the Gunnison National Monument**

United States Department of the Interior
National Park Service

144 | 80,048
6-96 | RMSO

ON MICROFILM

BLM_0059473

## Black Canyon of the Gunnison National Monument

### Panoramic Vistas ROA

The panoramic vistas ROA contains areas within the monument that offer the most distant views and sweeping landscapes that extend beyond the park boundary. Examples include areas atop Green Mountain and along portions of the Warner Nature Trail. Views are generally characterized as being unobstructed (in some cases up to 360 degrees) and include distances of a few miles up to about 100 miles.

In addition to its impressive views, this ROA allows the canyon to be viewed in its regional context. In this way it is easier to understand the importance of managing the area as a component of other larger ecosystems. The value of the Class I air quality is magnified on days when visibility allows viewing targets at distances of 60 to 100 miles. Also, the interpretive story is more complete when the San Juan and West Elk ranges, which figure prominently in Black Canyon's geologic story, can be viewed from within this ROA.

Mixed vegetative cover includes areas of pinyon/juniper woodland and mosaics of mountain scrub and sagebrush.

Most of the higher ridges found within the monument occur within this zone. Also, topography that slopes away from the canyon, which is typical due to the nature of the Gunnison Uplift in which the canyon was formed, permits views not possible closer to the canyon's rim. Soils tend to be more fully developed, having eroded from softer, overlying sandstones.

As development along ridgelines would be immediately visible and evident, this ROA is extremely sensitive in terms of protecting the natural and primitive views now possible from the canyon. Current development is minimal and includes only closed primitive roads, limited fencing, and activities that occur on some private lands (many of which the NPS has acquired as scenic easement).

### Highlights of Exceptional Resources

Resources of special significance that occur within the panoramic vistas ROA include:

- Wildlife viewing opportunities—especially larger mammals including mule deer, elk, and bighorn sheep.

- Recreational opportunities—for those willing to exert some effort (but less than required for inner canyon hiking), some of the most spectacular distant and panoramic views are available.

- Interpretive opportunities—understanding the values and concepts of ecosystem management, including the canyon's high-quality Class I airshed.

- Rural Colorado landscape—the distant views enhance the understanding and appreciation of the vastness of wildlands and rural cultural landscape that compose much of western Colorado.

30

BLM_0059474



"Everyone's Favorite Tree" on Dragon Point, Black Canyon of the Gunnison National Monument
© David Halpern

31

BLM_0059475



Looking Upriver from Warner Point, Black Canyon of the Gunnison National Monument
© David Halpern

### The Canyon Backdrop ROA

This ROA is the scenic background in which the canyon is viewed.  It includes both gentle and steep slopes that form the prominent viewscape as seen from the opposite rim.  Examples include the side of Fruitland Mesa on the North Rim, and Vernal Mesa on the South Rim.  Views from either rim are greatly enhanced because of the primitive, natural setting created by the canyon backdrop.

Mixed vegetative cover is found throughout this zone.  Areas of sagebrush are intermixed with large clusters of mountain scrub, while other areas are dominated by old growth pinyon/juniper woodland.  The seasons are highlighted by the color changes that occur throughout this zone, especially during early autumn.

Sedimentary rocks that overlay the older and harder Precambrian-aged rocks of the inner canyon help complete the monument's geologic story.  These rocks tell of times long ago, of vast oceans and shallow seas, of mountain-building and erosion, that set the stage for carving out this magnificent gorge.  The rocks within the canyon backdrop are more easily eroded than inner canyon rocks.  Not only is soil depth greater here, disturbances in this area can accelerate erosion.

32

BLM_0059476

This ROA also contains the bulk of development that has already occurred within the monument. Roads and visitor and support facilities are all found here. It is important to realize that not only do these developments provide basic services and amenities for those visiting the canyon and the means for maintaining the area, they are also a component of the view as seen from the opposite, and in some cases the same rim. This ROA is, therefore, one of the most sensitive zones because it is a primary component of most canyon views.

### *Highlights of Exceptional Resources*

Resources of special significance that occur within the canyon backdrop ROA include:

- Wildlife viewing opportunities—rich in a variety of species including mule deer, marmots, squirrels, chipmunks, porcupine, bobcat, fox, bear, mountain lion, and a variety of birdlife.

- Recreational opportunities—less physically demanding trails that provide significant panoramic views, opportunities to explore away from the rim, and developed campsites.

- Cultural resources—areas within this zone have been identified as being seasonally used by American Indians both during historic and prehistoric times; the North Rim Road was an important CCC project of the early 1930s.

- Rural Colorado landscape—the area is a reminder of the natural and primitive nature that at one time composed much of the West.

### The Cliff Top ROA

The cliff top ROA is the area most visitors experience and remember while sight-seeing at the Black Canyon of the Gunnison. This is the area of the monument that hugs the canyon rim and may vary in width from 5 to 200 feet to the edge. Some of the overlooks are protected by railings to permit viewing right up against the edge—still, some visitors are reluctant to stand this close even with the railings in place. Other, less well-defined overlooks lack railings, drawing more adventuresome souls to the very edge in an effort to maximize the view.

Viewing the canyon for the first time along the drive in, visitors are surprised that such an abrupt void even exists. This adds to the excitement for visitors as they stand weak-kneed and with a sometimes queasy stomach peering into the vast chasm below. The fact that the canyon is in many places deeper than it is wide adds to this sense of wonder and awe.

Much of the cliff top ROA is composed of exposed bedrock, including fins of pegmatite that serve as overlooks that loom over the canyon depths. Scattered clumps of mountain scrub, with occasional pinyon or juniper trees, add interest to the bedrock. Visible from the cliff top ROA are the different environments found just below the rim, including groves of Douglas fir, which suggest a wetter climate.

33

BLM_0059477

### *Highlights of Exceptional Resources*

Resources of special significance that occur within the cliff top ROA include:

- Wildlife viewing opportunities—especially chipmunk, squirrel, marmot, swifts, swallows, and soaring birds of prey.

- Recreational opportunities—this is the primary sight-seeing zone, offering some of the easiest access to view the canyon. Excellent photo points along short, easy trails are readily available. This is also where visitors began to explore the idea of inner canyon travel.

- Interpretive opportunities—because this is where the greatest number of visitors experience the

resource "up close and personal," it is also a good place to provide interpretive information and contacts. Their focus is on the canyon.

- Cultural resources—both Pulpit Rock and Dragon Point have overlook construction dating to the CCC work of the early 1930s, and are therefore important as historical resources.

- Scale—it is difficult for some visitors to understand the scale involved in viewing the canyon. Humans seem humbled upon realizing the immensity of what they are looking at.

- Expletives—"It's the view!"



Devil's Lookout, Black Canyon of the Gunnison National Monument
© David Halpern

34

BLM_0059478