- Vicinity of the south side of Blue Mesa Reservoir from Cebolla Creek to Willow Creek for hiking and nonmotorized biking, fishing access, and hang gliding (Willow Creek area only)

- Vicinity of Curecanti Creek below CO 92 for fishing access

- Vicinity between the Lake City Bridge and Riverway to provide a future hiking and nonmotorized biking trail linkage to the City of Gunnison

- In general, opportunities for longer and more connecting trails throughout the NRA and connections to trails on neighboring agency lands.

Management action for implementing ideas for expanding recreational opportunities in the NRA would be addressed in future planning documents (such as a revised general management plan, commercial services plan, or implementation plan) following congressional action, if any, resulting from recommendations in this study. A more complete discussion of identified recreational, interpretive, and educational opportunities appears in the Affected Environment chapter.

Scenic Resources Data

A computer-generated viewshed was created that shows what can be seen from US Highway 50 (US 50), CO 92, and CO 149, and from the centerline of Blue Mesa Reservoir and its arms (see Computer Generated Viewshed Map). Viewsheds visible within three miles of identified viewpoints were considered most critical to the study.

A photo assessment workshop was conducted with Gunnison- and Montrose-area residents to determine those scenic vistas and other resource attributes that are important to them. This workshop resulted in nearly 300 photographs taken by the workshop participants that illustrated examples of development thought to be appropriate, as well as inappropriate; and natural, cultural, scenic, and recreational resources surrounding the NRA that should be considered for conservation.

Photographs were grouped into the following categories.

- *Category 1*: Views considered by respondents as most scenic from the highways around Curecanti, including US 50, CO 92, CO 149, and side roads in the vicinity of Blue Mesa Reservoir - 75 photos (27%)

- *Category 2*: Areas considered by respondents as most appropriate and/or least appropriate for future development - 35 photos (12%)

- *Category 3*: Buildings or other structures considered by respondents as acceptable or unacceptable on the basis of visual intrusion or other factors - 39 photos (14%)

- *Category 4*: Critical resources or areas considered by respondents as important to conserve, such as landforms, vegetation, wetlands, or wildlife habitat - 44 photos (16%)

- *Category 5*: Areas considered by respondents as important to preserve for recreational use - 47 photos (17%)

- *Category 6*: Photos submitted by respondents that they felt best represented Gunnison and Montrose Counties' image in the Curecanti area - 17 photos (6%)

- *Category 7*: Any other issues, areas, or contexts - 24 photos (8%).

Through this photo exercise, citizens identified examples of unique geological, as well as visually attractive, features, and suggested places within and outside the present NRA that merit conservation. Such sites included the following.

- North side of US 50, between Dry Creek and Red Creek, containing West Elk Breccia rock formation (ancient volcanic mudflow)

- Outcroppings of the Morrison formation, known elsewhere to contain dinosaur fossils

- Soap Creek Cliffs

BLM_0059566

- Dillon Pinnacles
- Curecanti Needle
- Curecanti Creek at Hairpin Curve on CO 92.



*Photo workshop participants took photos in and surrounding Curecanti NRA, such as this cabin under the Acceptable Development Category (Category 3)*

## Study Area Determination

The base map for the study consists of a geographical area extending approximately 30 miles north to south and 40 miles east to west, with Curecanti NRA centered on the map. The study area, which surrounds the NRA, is included within this base map, and was determined by analysis of natural, cultural, scenic, and recreational data for the region. The study area was established by overlaying various geographic information system (GIS) Mylar data maps onto a base map, and including the most important resource areas. The study area was introduced to the public and governmental agencies in the first newsletter for the project, issued in the spring of 2001.

The important resources used to establish the study area were derived from the more extensive data list collected early in the data collection process, which is shown earlier in this section on Data Collection and Analysis. The criteria for determining important resources were based on input from public scoping meetings, input from Curecanti staff, interpretation of the legislative mandates authorizing the study, and explanations of data categories provided by sources of

the data. Resource data, primarily in the form of computerized maps, were collected from the following major sources: wildlife habitat information from the Colorado Division of Wildlife (CDOW); threatened and/or imperiled species from the Colorado Natural Heritage Program; archeological and historic sites from the Colorado State Historical Society; and viewsheds from digital elevation models. Information on recreation opportunities was obtained from the public, as described earlier in this section on Data Collection and Analysis.

The important resources are listed below, alphabetically, in no particular order of importance:

- Archeological and historic sites: Four categories of data were collected that include both archeological and historic sites: (1) individual archeological sites; (2) archeological linear features; (3) sections that contain archeological sites; and (4) archeological site areas

- Bighorn sheep and pronghorn winter-use areas: pronghorn winter range, bighorn sheep overall range

- Elk winter-use areas: severe-winter range, winter concentration area, production area

- Gunnison Sage-grouse range or use areas: leks, nesting areas, brood areas, critical winter range; severe-winter range

- Raptor range or use areas: peregrine falcon active nesting sites; golden eagle nesting sites; bald eagle roost sites; bald eagle winter concentration area

- Sensitive species: Potential conservation areas of outstanding significance, very high significance, high significance, and moderate significance

- Viewsheds: Map generated from computer modeling showing land visible from major highways and centerlines of Blue Mesa Reservoir and its arms.

A compilation of this resource information is illustrated on the map entitled Important

BLM_0059567



## EXPLANATION OF MAP

This computer generated map shows land areas that can be seen from various locations, or vantage points, within the National Recreation Area. The computer used digital elevation data to determine what can be seen (also known as the "viewshed") from vantage points along the centerline of major highways, Blue Mesa Reservoir, and the reservoir's arms. The area highlighted in red shows the viewshed from vantage points up to 1/2 mile out; the area highlighted in yellow shows the viewshed from 1/2 mile to 3 miles from the vantage points; and the area highlighted in dark blue shows the viewshed from 3 miles out and beyond.



- ☐ Lands and Waters Included Within Curecanti National Recreation Area (41,790 acres)
- Visible from point of origin up to 1/2 mile
- Visible from 1/2 mile to 3 miles
- Visible beyond 3 miles
- Vantage points from which the viewshed was created, along the center line of US 50, CO 92, and CO 149; and the middle of Blue Mesa Reservoir and its four major arms: Soap Creek, Lake Fork, West Elk, and Cebolla
- Stream
- West Elk Loop Scenic and Historic Byway

## COMPUTER GENERATED VIEWSHED OF LAND WITHIN AND SURROUNDING CURECANTI

RESOURCE PROTECTION STUDY

CURECANTI NATIONAL RECREATION AREA

Gunnison and Montrose Counties, Colorado

National Park Service
U.S. Department of the Interior



| IMDE | 616 |
| --- | --- |
| 11/28/2006 | 20,022 |

NPS Disclaimer information: Property boundaries shown on this map are intended for study purposes only, and are not intended to be definitive regarding land ownership. County and agency land records will be used to verify ownership and definitively locate property lines and boundaries.

Resources Surrounding Curecanti. The various shades of blue represent different levels of concentrations of one or more resources, with weightings assigned to the importance of the resources. The darker the color, the greater number of resources present, and/or the greater the relative importance of the resource. The general locations of critical resources and recreation opportunities are described in the white boxes on the map. The method used to determine the weighted analysis is described below.

The data analysis for the study was initiated using a traditional map, grease pencil, and a mylar overlay technique inspired by Ian L. McHarg's book "Design with Nature." Spatial resource data that were selected for analysis are identified above. Following production of draft mylar maps, and using the computerized resource data, a weighted analysis was initiated using the GIS as an analytical tool to provide a compilation of all the resource data on one map, with reduced bias and spatial error. "Weights" were assigned by NRA staff to the various mapped, resource categories based on their relative value, or importance, on a scale of 1 to 5, with 5 being most significant. As an example, an archeological site that has been listed on the National Register of Historic Places (NRHP) may receive a weighted value of 5, while an archeological site that is determined not eligible for listing to the NRHP may receive a value of 1. Mapped resource categories were then stacked, and their weighted values were added together with the aid of the GIS.

Results of the analysis showed cumulative scores for all of the weighted data. Relatively high scores represent areas with multiple resource occurrences, and the highest scores represent areas with multiple resource occurrences that possess relatively greater resource significance. It is interesting to note that the preponderance of high scores center on the Curecanti area. This analysis helped to determine where NPS should focus its attention on resource conservation outside the existing NRA.

## ALTERNATIVES DEVELOPMENT AND IMPACTS ASSESSMENT

> *"Identify practicable alternatives that protect the resource value and character of the land within and surrounding Curecanti NRA"*
>
> **Public Law 106-76**

In response to the second requirement of the study's congressional mandate, the study team identified two categories of alternatives to protect the resource value and character of the land: (1) proposed boundary location; and (2) management considerations. The environmental consequences, or impacts, of the actions associated with each alternative were then assessed.

### Proposed Boundary Location

Numerous boundary alternatives were considered after data collection and analysis of the data and resource maps; meetings with agency officials, landowners, and the public; and consideration of NPS *Management Policies 2006* pertaining to boundary adjustments. In addition, the concept of a Conservation Opportunity Area (COA) was created. This is an area that would be designated by Congress within which NPS would be authorized to use various landowner incentives (comprising a *toolbox*) to partner with neighbors to conserve resources.

For purposes of this study, and found throughout the text, primarily with reference to Alternative 2 – the Proposed Action, the term "proposed lands" refers to 34,420 acres of land outside the existing NRA that is considered important for resource conservation, public recreation, and scenic values, in keeping with NRA goals and objectives. The proposed lands include:

1. Public lands to be transferred from other agencies to NPS to be included within the proposed NRA boundary immediately upon recommended passage of legislation that would establish the NRA (10,120 acres);

BLM_0059569

2. Private lands that are recommended to be included within the COA, outside the proposed NRA boundary (24,300 acres).

In addition, there are certain lands within the existing NRA that were identified as having the potential to be deleted from the NRA. They are not included in the "proposed lands," as defined for this study. The potential deletions include 80 acres of USFS land that would immediately be deleted upon passage of NRA legislation, to be managed by USFS as part of the Gunnison National Forest; 800 acres that might eventually be transferred to BLM; and 363 acres that might be exchanged for private lands within the COA, on a willing landowner basis. These 1,243 acres of potential deletions are identified as "tracts" on the Alternative 2 map.

During the process of assessing the environmental consequences of the boundary alternatives, it was decided to retain only two alternatives for in-depth analysis: No Action, and the Proposed Action. The other alternatives were dismissed from further consideration for reasons that are described in the Alternatives chapter of this document.

## Management Considerations

Different scenarios for NRA management were considered. These potential management scenarios do not affect the boundary alternatives. This includes management of various sections of the NRA defined by the three reservoirs; and by various agencies, including BLM, Reclamation, NPS, USFS, and Colorado State Parks. BLM, USFS, and Colorado State Parks have all indicated that they are not interested in managing the NRA.

Reclamation manages its facilities, lands, land interests, water and water interests in the area to meet CRSP and Uncompahgre Project purposes, and has contracted with NPS for management of recreation and certain other resources on Reclamation lands within the NRA. NPS desires to continue to manage the natural, cultural, and recreational resources on all of the lands within the NRA. Most of these lands are under the jurisdiction of Reclamation; but some are under USFS, and some are under NPS.

## TOOLS FOR RESOURCE CONSERVATION AND MANAGEMENT

> *"Recommend a variety of economically feasible and viable tools to achieve resource protection"*
>
> Public Law 106-76

NPS worked with other agencies and with Gunnison and Montrose Counties to develop a variety of resource conservation tools that were considered during development of alternatives and integrated into the Proposed Action. NPS has developed two documents (included as appendixes) relating to these suggested methods of resource conservation. They are based upon former Secretary of the Interior Gale Norton's philosophy of the "four Cs": Communication, Consultation, and Cooperation, all in the service of Conservation.

- *Toolbox of Incentives for Resource Conservation: A Handbook of Ideas for Neighbors in the Curecanti Area.* This toolbox identifies present and potential methods that could be made available to Curecanti area neighbors—private landowners, local communities, and city, county, state, and federal agencies—to work in partnership to manage their lands for more effective resource conservation. It has been developed to help conserve the natural, cultural, recreational, and scenic resources within and surrounding Curecanti. The choice of tools includes acquiring interests in land from willing landowners, such as fee simple, and conservation easements. However, if funding is insufficient to acquire such interests, other tools could be pursued to meet resource conservation goals and objectives (Appendix A).

BLM_0059570



## EXPLANATION OF MAP

This map represents a composite of important and critical resources identified during the Resource Protection Study, such as wildlife (including raptor habitat and rare/imperiled species); known archeological/historical sites and districts; areas of paleontological potential; and viewsheds of predominantly natural landscapes. Areas of potential recreational opportunities are also identified. The map shows that such resources are concentrated within and immediately surrounding the National Recreation Area. The colors represent different levels of concentrations of one or more resources, with weightings assigned to the importance of the resources. The darker the color = the greater number of resources present, and/or the greater the relative importance of one or more resources.



Lands and Waters Included Within Curecanti National Recreation Area (41,790 acres)

The Proposed Lands, consisting of public and private land outside the NRA considered important for resource conservation and/or public recreational access, with respect to RPS goals and objectives.

**WEIGHTED RESOURCES**

| | |
|---|---|
| 1 - 5 | 22 - 26 |
| 6 - 10 | 27 - 31 |
| 11 - 15 | 32 - 37 |
| 16 - 21 | No Data |

# IMPORTANT RESOURCES SURROUNDING CURECANTI

RESOURCE PROTECTION STUDY

CURECANTI NATIONAL RECREATION AREA

Gunnison and Montrose Counties, Colorado

National Park Service
U.S. Department of the Interior



| | |
|---|---|
| IMDE | 616 |
| 11/28/2006 | 20,021 |

NPS Disclaimer Information: The information contained herein is based upon data collected from a variety of sources. The National Park Service provides these data as a public service and assumes no responsibility for conclusions which others may draw from the use of the data.

BLM_0059571

- *Curecanti: Great Scenery, Outstanding Resources, and Good Neighbors.* In cooperation with Gunnison and Montrose Counties, NPS produced an eight-page booklet that presents ideas on how agencies and landowners can work together to maintain the outstanding natural, cultural, recreational, and scenic resources in the Curecanti area (Appendix B).



*Multiple agencies meet in a partnership effort*

A resource conservation tool created by the study team as part of Alternative 2, the Proposed Action, is a concept called the Conservation Opportunity Area, or COA. The COA would consist of private lands outside of and adjacent to the proposed NRA boundary, where NPS would be authorized by Congress to work in partnership with neighbors in applying a wide range of tools over time to conserve resources and values identified as important to the NRA.

Another partnership tool that arose out of data analysis and alternatives development was a concept called Joint Agency Management Effort, or JAME. The idea was to evaluate resources on the basis of issues that extend beyond the NRA, while recognizing the responsibilities of all surrounding land-management agencies. The agencies and entities with which NPS entered into discussions included American Indian Tribes, BLM, Reclamation, CDOW, Colorado Department of Transportation (CDOT), USFS, Western, and Gunnison and Montrose Counties. The agencies decided that working cooperatively to address topics on a thematic basis would make greater sense and would be more effective to accomplish than to jointly administer geographic areas. The JAME is similar to cooperative efforts among agencies in other areas of the country that have been established to address resource management issues of mutual concern. At Curecanti, the

agencies agreed to deal with invasive plant species (i.e., weeds) as the first JAME challenge.

## COST ESTIMATES

> *"Estimate the costs of implementing the approaches recommended in the study."*
>
> **Public Law 106-76**

The costs of fully implementing the study's recommendations will be spread over many years into the future, and will depend primarily upon how many private landowners choose to work in partnership with NPS, and which tools for resource conservation are employed. This would occur only after congressional approval of this study's recommendations.

Numerous elements contribute to the total cost of implementing the proposed action. The greatest costs are expected to be incurred during the first ten years following congressional approval of this study, when NPS hopes to apply resource conservation tools to parcels of land considered most important to conserve. Many of the cost elements, such as

BLM_0059572

a *Land Protection Plan* and boundary surveys and posting, are fairly predictable. However, some elements are quite uncertain, such as the direct costs of acquiring interests in land, since these will depend on the willingness of private landowners to participate in resource conservation efforts, and property values at the time. For these estimates, assumptions have been made regarding interests that might be acquired and future average property values. Due to the many uncertainties of acquiring interests in land, the estimates are presented as a range of costs.

Another factor that would influence the long-term costs to NPS is the degree of conservation partnerships that could develop as a result of implementing the Proposed Action. Examples include gaining assistance through matching grants, the ability to access other agency programs and funding, and the participation of regional and national land trusts and other conservation organizations. Such partnership support could help reduce costs to NPS.

The estimated costs are shown in the Alternatives chapter. Staffing requirements and an implementation strategy for the Proposed Action are also presented.

## STUDY OPPORTUNITIES, INTERESTS, AND ISSUES

Following the initiation of the project through the Notice of Intent (NOI), a scoping open house was held in Gunnison to educate the public about the Resource Protection Study, to identify opportunities for resource conservation, and to receive comments and project-related concerns. Written and verbal comments received in response to the scoping process highlighted a variety of issues that the study should address. This type of information sharing continued throughout the study.

Curecanti is important to the local area and its economy; and because of this, people need to work together to maintain the quality of the area around Curecanti. Some people said that the greatest danger to Curecanti and its environs is sprawl development. Others wanted private development rights and opportunities preserved and more and better facilities on private land or within the NRA.

Many comments were in support of NPS efforts to conserve the viewshed and to provide habitat for wildlife, and for suggested methods by which resources could be better managed and conserved. Some comments were critical of NPS for the way in which it managed its campgrounds, operated its facilities, and managed wildlife.

Some respondents specified recreational uses they wanted to be allowed, as well as uses they wanted to be prohibited. But it was also suggested that the RPS should consider all environmental factors, not only recreational demand and use, and attempt to balance all interests.

Agencies that commented, especially Reclamation, wanted to maintain jurisdiction of, and adequate and continuous access to, their lands, land interests, and facilities (including dams, reservoirs, electric transmission facilities, and associated structures) to ensure safe, effective, and reliable operation and maintenance of the Aspinall Unit and the Uncompahgre Project. They felt that any recommendations must recognize and ensure conservation of the use of water, lands, and land interests as legally defined for those projects, and that existing agreements among the various agencies and water users must be honored and protected.

## IMPACT TOPICS

Impact topics are natural, cultural, economic, social, or operational elements of the environment that could be affected by the range of alternative actions. These topics are used to focus the affected environment and the evaluation of the potential environmental consequences of the actions of each alternative on those topics. Impact topics were identified, based on legislative requirements, executive orders, topics specified in Director's Order 12 and Handbook (NPS 2001a), NPS

BLM_0059573

*Management Policies 2006*, agency and public concerns, and resource information specific to the Curecanti NRA.

## IMPACT TOPICS CONSIDERED

The impact topics considered for evaluation are listed in Table 1. This table includes key regulations or policies for each impact topic. Based on site-specific conditions, a number of the candidate impact topics were dismissed from further consideration. The rationale for dismissing each of these impact topics is provided in the text following the table. Those topics that were retained are described in more detail in the Affected Environment chapter and addressed in the Environmental Consequences chapter, where the impacts of the alternative actions on those topics are assessed in detail.

Four of the elements of the environment that are assessed in detail are traditionally done in EISs. In addition, they are required to be done by this study's enabling legislation. They are the natural, cultural, recreational, and scenic resources.

## IMPACT TOPICS DISMISSED FROM FURTHER CONSIDERATION

The following impact topics were dismissed from further detailed analysis in this study. However, they will be revisited in future plans that may result from this study, such as a new or amended general management plan or implementation plan.

### Floodplains

Executive Order 11988, "Floodplain Management," requires all federal agencies to avoid construction within the 100-year floodplain unless no other practicable alternative exists. Under NPS *Management Policies 2006* and Director's Order 77-2, Floodplain Management, NPS will strive to preserve floodplain values and minimize hazardous floodplain conditions.

Active floodplains on federal land within the study area are largely within the administrative area controlled by Reclamation for reservoir operations and managed by the NRA, and on other USFS, BLM, Reclamation, or CDOW lands. No federally-initiated development is proposed on any of these federal or private lands that would impact floodplains. Proposed conservation of one small floodplain and riparian area along Willow Creek could occur, but would result in a negligible to minor benefit.

### Prime and Unique Farmlands

Prime farmland has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops. Unique farmland is land other than prime farmland that is used for production of specific high-value food and fiber crops such as fruits, vegetables, and nuts. At this time, there are no lands classified as prime or unique farmlands within the study area (NRCS 2004).

### Air Quality

No effects to air quality would be expected as a result of actions related to this study. The air quality designation (Class II) of the area would not change as a result of the proposal.

### Ecologically Critical Areas or Other Unique Natural Resources

The study area does not contain any designated ecologically critical areas, wild and scenic rivers, or other unique natural resources, as referenced in Title 40, Code of Federal Regulations, §1508.27. Therefore, there would be no impact to ecologically critical areas or other unique resources that require evaluation.

### Energy Requirements and Conservation Potential

The alternatives do not identify actions that would result in the use or conservation of fuels; therefore, this topic was dismissed.

BLM_0059574

## Table I: Impact Topics Retained or Dismissed

| Impact Topic | Retain or Dismiss | Primary Relevant Laws, Regulations, or Policies |
|---|---|---|
| **Natural Resources** | | |
| Water quality | Retain | – Clean Water Act<br>– Executive Order 12088<br>– NPS *Management Policies 2006* |
| Geology and paleontology | Retain | – NPS *Management Policies 2006*<br>– NPS-77, Natural Resources Management Guidelines. |
| Vegetation, including wetlands | Retain | – Clean Water Act<br>– Rivers and Harbors Act<br>– Executive Order 11990<br>– Director's Order 77-1, Wetland Protection<br>– NPS *Management Policies 2006*<br>– NPS-77, Natural Resources Management Guidelines |
| Wildlife and habitats (including fisheries) | Retain | – NPS Organic Act of 1916 as amended (16 USC)<br>– NPS *Management Policies 2006*<br>– NPS-77, Natural Resources Management Guidelines |
| Special Status Species (endangered, threatened, species of concern, or other protected status) | Retain | – Endangered Species Act, and other equivalent state protective legislation<br>– NPS *Management Policies 2006*<br>– NPS-77, Natural Resources Management Guidelines |
| Natural lightscape (night sky) | Retain | – NPS *Management Policies 2006* |
| Natural soundscape | Retain | – Director's Order 47, Sound Preservation and Noise Management<br>– NPS *Management Policies 2006* |
| Floodplains | Dismiss | – Rivers and Harbors Act<br>– Executive Order 11988, Floodplain Management<br>– NPS *Management Policies 2006*<br>– Special Directive 93-4, Floodplain Management, Revised Guidelines for NPS Floodplain Compliance (1993) |
| Prime and unique farmland | Dismiss | – Council on Environmental Quality (1980) memorandum on prime and unique farmlands. |
| Air quality | Dismiss | – Clean Air Act<br>– NPS *Management Policies 2006*<br>– NPS-77, Natural Resources Management Guidelines. |
| Ecologically critical areas or other unique natural resources | Dismiss | – Wild and Scenic Rivers Act<br>– Criteria for national natural landmarks in Title 36, Code of Federal Regulations, §62<br>– NPS *Management Policies 2006* |
| Energy requirements and conservation potential | Dismiss | – NPS *Management Policies 2006* |

BLM_0059575

| Impact Topic | Retain or Dismiss | Primary Relevant Laws, Regulations, or Policies |
|---|---|---|
| **Cultural Resources** | | |
| Archeological resources | Retain | – National Historic Preservation Act<br>– Archeological and Historic Preservation Act<br>– Archeological Resources Protection Act<br>– Native American Graves Protection and Repatriation Act<br>– Antiquities Act of 1906<br>– National Environmental Policy Act<br>– Title 36, Code of Federal Regulations, §800<br>– Executive Orders 11593 and 13007<br>– Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation<br>– Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes<br>– Director's Order 28, Cultural Resources Management<br>– NPS *Management Policies 2006* |
| Historic districts and structures | Retain | – National Historic Preservation Act<br>– Archeological and Historic Preservation Act<br>– Archeological Resources Protection Act<br>– National Environmental Policy Act<br>– Title 36, Code of Federal Regulations, §800<br>– Executive Orders 11593 and 13007<br>– Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation<br>– Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes<br>– Director's Order 28, Cultural Resources Management<br>– NPS *Management Policies 2006* |
| Cultural landscapes | Dismiss | – National Historic Preservation Act<br>– Archeological and Historic Preservation Act<br>– Archeological Resources Protection Act<br>– National Environmental Policy Act<br>– Title 36, Code of Federal Regulations, §800<br>– Executive Orders 11593 and 13007<br>– Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation<br>– Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes<br>– Director's Order 28, Cultural Resources Management<br>– NPS *Management Policies 2006* |
| Museum collections | Dismiss | – Historic Sites Act of 1935<br>– Management of Museum Properties Act of 1955 (as amended)<br>– Native American Graves Protection and Repatriation Act of 1990<br>– Endangered Species Act of 1973, as amended<br>– Title 41, Code of Federal Regulations, §101, Federal Property Management Regulations<br>– Title 43, Code of Federal Regulations, §3, Preservation of American Antiquities and Protection of Archeological Resources<br>– Department Manual 411 DM, Managing Museum Property<br>– Director's Order #28, Cultural Resources Management<br>– NPS *Management Policies 2006* |
| Ethnographic resources | Dismiss | – Executive Order 13175, Consultation and Coordination with Indian Tribal Governments<br>– NPS *Management Policies 2006* |
| Indian trust resources | Dismiss | – Department of the Interior Secretarial Orders 3175 and 3206 |

BLM_0059576

CHAPTER I: PURPOSE OF AND NEED FOR ACTION

| Impact Topic | Retain or Dismiss | Primary Relevant Laws, Regulations, or Policies |
|---|---|---|
| **Visitor Use, Understanding, and Enjoyment** | | |
| Recreational opportunities | Retain | -NPS Organic Act<br>-National Park System General Authorities Act<br>-Reclamation law, as amended and supplemented; in particular, Section 8, Colorado River Storage Project Act; and PL 89-72, as amended by Title XXVIII of PL 102-575<br>-NPS *Management Policies 2006* |
| Interpretation and educational opportunities | Retain | -NPS Organic Act<br>-National Park System General Authorities Act<br>-NPS *Management Policies 2006* |
| **Scenic Resources** | | |
| Viewsheds | Retain | -NPS *Management Policies 2006* |
| **Regional Economic and Social Characteristics** | | |
| Economics | Retain | -Council on Environmental Quality (1978) regulations for Implementing the National Environmental Policy Act<br>-NPS *Management Policies 2006* |
| Private land use within the NRA | Retain | -Director's Order #25, Land Protection<br>-NPS *Management Policies 2006* |
| Neighboring private lands and landowners within the proposed lands | Retain | -Director's Order #25, Land Protection<br>-NPS *Management Policies 2006* |
| Environmental justice | Dismiss | -Executive Order 12898 |
| **National Park Service, Reclamation, and Other Neighboring Agency Management and Operations** | | |
| NPS management/operations | Retain | -Reclamation law, as amended and supplemented (on Reclamation lands), in particular, Section 8, Colorado River Storage Project Act; and PL 89-72, as amended by Title XXVIII of PL 102-575 -CFR 43 Parts 420, 423, 429<br>-Title 36, Code of Federal Regulations<br>-NPS Organic Act<br>-National Park System General Authorities Act<br>-NPS Director's Orders<br>-NPS *Management Policies 2006* |
| Reclamation management/operations | Retain | -Reclamation law, as amended and supplemented<br>-Reclamation Manual, Policies, Directives, and Standards<br>-Safety of Dams Program<br>-Dam Security Program<br>-CFR 43 Parts 420, 423, 429 |
| Other agency management/operations | Retain | -Other agency laws and policies<br>-Reclamation law, as amended and supplemented (on Reclamation lands), in particular, Section 8, Colorado River Storage Project Act; and PL 89-72, as amended by Title XXVIII of PL 102-575<br>-CFR 43 Parts 420, 423, 429<br>-1983 Reclamation/BLM Interagency Agreement |
| Public health and safety | Dismiss | -NPS *Management Policies 2006* |
| Natural or depletable resource requirements and conservation potential | Dismiss | -NPS *Management Policies 2006* |

BLM_0059577

## Cultural Landscapes

No cultural landscapes have been identified, surveyed, or documented within Curecanti NRA or the surrounding study area; therefore, this topic was not assessed.

## Museum Collections

The scope of collections for Curecanti NRA includes archeological objects collected from within the NRA; and historic objects and archival material related to early settlement, to the Denver and Rio Grande narrow gauge railroad, and to the Town of Cimarron. Data from the 2005 Collections Management Report indicate that the total number of objects and specimens number 179,975; with total archival documents of 27,571. These items are managed as provided for in Director's Order #24: NPS Museum Collections Management and the NPS Museum Handbook.

The implementation of the Proposed Action would not have a direct impact on museum collections currently managed by NPS. However, if other agency lands are transferred into the NRA as a result of the Proposed Action, the agencies involved would need to jointly determine how to approach ownership and storage of collections related to those lands in order to ensure that the integrity of each collection remains as intact as possible. Entering into an administrative agreement would be considered. Collections and any associated records that would be transferred or exchanged among agreeing federal DOI and non-DOI agencies as a result of implementation of the Proposed Action would follow the guidelines found in the DOI Departmental Manual (411) Museum Property Handbook, Volume I.

## Ethnographic Resources

Ethnographic resources are defined as the natural and cultural materials, features, and places that are linked by a subject community to the traditional practices, values, beliefs, history, and/or ethnic identity of that community. In 2002, the NPS Intermountain Support Office,

in cooperation with the NRA, sought to summarize American Indian tribal affiliation within and surrounding the NRA for the study. Historical records document Ute affiliation with the region from western Colorado and into eastern Utah. The Uncompahgre (or Taviwach) band also has a historic affiliation with this area. Other tribes identified with possible cultural affiliation include the Cheyenne, Comanche, Hopi, Navajo, Apache, White Mesa Ute (comprised of Paiute and Ute), Paiute, and the San Juan Southern Paiute (NPS 2002a). It was concluded that the primary tribes with which the study team should confer are the Northern Ute, the Southern Ute, and the Ute Mountain Ute.

While ethnographic resources have not yet been formally evaluated for their status as traditional cultural properties or sacred sites, it is possible that potentially eligible resources could be either outside the study area or in areas already experiencing heavy visitor use or other disturbances. However, it is expected that impacts to ethnographic resources as a result of the proposal would be negligible because of protection on federal lands.

## Indian Trust Resources

Secretarial Order 3175 requires that any anticipated impacts to Indian trust resources from a proposed project or action by Department of the Interior agencies be explicitly addressed in environmental documents. The federal Indian trust responsibility is a legally enforceable fiduciary obligation on the part of the United States to protect tribal lands, assets, resources, and treaty rights, and it represents a duty to carry out the mandates of federal law with respect to American Indian and Alaska Native tribes.

There are no Indian trust resources at Curecanti NRA or within the study area. The lands comprising the recreation area or the land units are not held in trust by the Secretary of the Interior for the benefit of Indians due to their status as Indians. Therefore, the project would have negligible effects on Indian trust resources, and this topic was dismissed as an impact topic.

BLM_0059578

## Environmental Justice

*Executive Order 12898: General Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* requires all federal agencies to incorporate environmental justice into their missions by identifying and addressing disproportionately high and adverse human health or environmental effects of their programs and policies on minorities and low-income populations and communities. The conservation of, or acquisition of, lands within the study area, adjacent to Curecanti NRA, is dependent upon willing and interested landowners. The alternatives do not impose upon property rights through condemnation or any other procedure. In addition, any lands acquired and included within the NRA would be maintained and interpreted by NPS for all peoples regardless of race or income level. Therefore, there would be no disproportionate health or environmental effects on minorities or low-income populations or communities.

## Public Health and Safety

The conservation and potential acquisition of lands adjacent to the NRA would not result in public health and safety issues because the potential use and disposition of these lands is landowner dependent. The alternatives in this study do not involve any proposals for new access or infrastructure that could impact public health and safety.

## Natural or Depletable Resource Requirements and Conservation Potential

There are no actions proposed in the alternatives that would result in a change in requirements of natural or depletable resources or conservation potential. This topic is dismissed from further analysis.

BLM_0059579

# Chapter 2: Alternatives, Including the Proposed Action



BLM_0059580

# ALTERNATIVES, INCLUDING THE PROPOSED ACTION

## DEVELOPMENT OF ALTERNATIVES

In response to the second and third requirements of the Resource Protection Study (RPS) congressional mandate, the study team evaluated a range of alternatives, and identified a variety of tools for conserving the important resources identified within the study area that were described under "Data Collection and Analysis" in the Purpose of and Need for Action chapter. The alternatives focus on the following seven elements.

- National Recreation Area Designation and Boundary

- Resource Conservation

- National Recreation Area Management

- Bureau of Reclamation (Reclamation) Operations

- Other Agency Operations

- Joint Agency Management Effort (JAME)

- Estimated Costs, Staffing Requirements, and Implementation Strategy.

With regards to the NRA boundary, some preliminary background information will help to describe how the alternatives were developed. Numerous alternatives were considered for adjusting the boundary that currently surrounds the NRA, to include additional lands within the NRA that were thought to be necessary and appropriate for resource conservation, as well as visitor use and enjoyment, in keeping with the mission and management goals of the NRA and the purposes of this study. In some areas, land was considered for exclusion from the NRA. Collective knowledge about Curecanti NRA, its resources, and its visitors that was gained from numerous sources throughout the study influenced the development of the boundary scenarios. Those sources included public scoping (information gathering) and workshops (including the photo assessment project); meetings with other agencies, county planners, and local, state, and federal officials;



*Curecanti Needle on Morrow Point Reservoir—The National Recreation Area's most famous geological landmark*

BLM_0059581

> *For both alternatives in the Resource Protection Study, the Bureau of Reclamation and Western Area Power Administration would continue their administrative jurisdiction and responsibilities within and adjacent to the national recreation area, including construction, operation, maintenance, replacements, and additions; and they and their assigns would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities; consistent with Reclamation law and other applicable laws and regulations. Formal establishment of the area as an NRA under Alternative 2 would not amend or supplement existing Reclamation law applicable to the Aspinall Unit or the Uncompahgre Project. Reclamation, Western, and the National Park Service would consult with each other as necessary and appropriate. Thus, there would be no adverse impacts to Reclamation and Western responsibilities under either alternative.*

meetings with surrounding private landowners; and workshops with the NRA staff.

The preliminary boundary scenarios were based on criteria that focused on important resources within the study area that were identified during the data collection and analysis phase of the study. The criteria also included enhanced visitor understanding of significant resources, expanded land-based recreational opportunities, and administrative or managerial efficiencies that could be realized through the transfer of lands among the agencies. The criteria included the following items:

- Administrative Efficiency
- Archeological/Historical Sites
- Bighorn Sheep – Overall Range
- Elk – Severe Winter Range
- Gunnison Sage-grouse (all categories)
- Heron Rookery
- Historic Railroad Feature
- Lynx, Potential Habitat
- Management Issues/Logical Boundary
- Mule Deer – Severe Winter Range
- Paleontology/Geology
- Prairie Dog – Overall Range
- Pronghorn – Winter Range
- Raptor Range
- Rare and/or Imperiled Species

- Recreation Opportunities
- Scenic Qualities from Primary Overlook, or within 3-Mile Viewshed
- Understanding of Significant Resources
- Water Quality.

The various boundary scenarios were assessed at an "Impacts" workshop. The impacts of some of the scenarios were so similar to each other, that the scenarios were not considered further. Some of the scenarios were considered impractical and/or unfeasible to implement, and were not considered further. In addition, the study team strongly considered one of the concerns that had been expressed throughout the project — that NPS should not propose anything in the study that would be forced upon private landowners against their will or desires, or that would intrude upon their property rights. Furthermore, some landowners opposed any boundary being drawn around their property to include them within a future NRA, even though they would be able to retain their property rights. These concerns strongly influenced the selection of the Proposed Action, and the dismissal from detailed consideration of some alternatives that had initially been considered.

Ultimately, the study team came to the conclusion that besides the No-Action alternative (Continuation of Existing Conditions), one other boundary scenario was considered to be reasonable, and, therefore, is fully assessed in the Environmental

BLM_0059582

Consequences chapter. That scenario is presented as Alternative 2 (the Proposed Action). The other boundary scenarios are described, along with the reasons for elimination, near the end of this chapter under the "Alternatives Considered but Eliminated from Detailed Assessment" section.

For purposes of analysis during the development of alternatives, the public and private lands outside the existing NRA that were considered most important for conservation for NRA purposes, were grouped into eight "land units" according to geographical location, similarity of resource values, reasonably foreseeable activities, and land ownership. The land units are identified by the letters A through H, are shown on the map for Alternative 2, and are referenced throughout the RPS/EIS. They consist of two types of land: (1) privately owned land within the Conservation Opportunity Area (COA) – Land Units A, C, D, E, and G; and (2) non-NPS agency lands that are included within the proposed NRA boundary shown in Alternative 2 – Land Units B, F, and H. Briefly defined, the COA consists of identified private land surrounding the NRA, in which the National Park Service would be authorized by Congress to work with willing landowners to conserve resources, including acquiring agreed-upon interests in land. The COA is described in more detail later in the discussion of Alternative 2, under the subheading of "Resource Conservation."

The land units are defined below:

- Land Unit A (CO 92 COA): private lands north and south of Colorado State Highway 92 (CO 92) and Morrow Point Reservoir, including Black Mesa, Soap Mesa, Soap Creek, and Fitzpatrick Mesa

- Land Unit B (Blue Mesa Reservoir Agency): agency lands from Soap Creek east to Beaver Creek, including Dillon Pinnacles, Blue Mesa north and south shores, and Gunnison River Canyon

- Land Unit C (Gunnison River COA): private lands in the vicinity of Neversink and Riverway

- Land Unit D (Iola Basin COA): private lands in Iola Basin, and South Gunnison River Canyon

- Land Unit E (Sapinero/Blue Mesa COA): private lands in the vicinity of Sapinero Mesa, and Windy Point to Hunters Point

- Land Unit F (Gateview Agency): agency lands in the vicinity of Gateview Campground

- Land Unit G (West-End COA): private lands west of Fitzpatrick Mesa on the south side of Crystal Reservoir, and the area around Spring Gulch on the north side of Crystal Reservoir

- Land Unit H (West-End Agency): agency lands north and south of Crystal and Morrow Point Reservoirs.

Collectively, all the land units comprise the "proposed lands" for Alternative 2, consisting of public lands recommended for addition to the NRA (the agency lands); and the lands recommended for inclusion in a COA (the private lands).

The criteria that were used to determine what land surrounding the existing NRA warranted conservation for NRA purposes are shown in Table 2 for each land unit. If a resource or other criterion occurs within a given land unit, it is identified by a dot in the matrix. If the dot is highlighted in yellow, the associated criterion is considered to be a primary reason for the inclusion of the land unit within the proposed NRA boundary or the COA. More detailed descriptions of specific resources, including their significance in the Curecanti region, are provided in the Affected Environment chapter.

The appropriateness of including additional public and private lands within an expanded NRA was evaluated according to NPS *Management Policies 2006*: Section 3.5 – Boundary Adjustments, including criteria for boundary adjustments. These criteria

BLM_0059583

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

TABLE 2: FACTORS CONSIDERED IN ESTABLISHING LAND UNITS

| Criteria | Land Unit | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | A | B | C | D | E | F | G | H |
| | CO 92 COA | Blue Mesa Reservoir Agency | Gunnison River COA | Iola Basin COA | Sapinero / Blue Mesa COA | Gateview Agency | West-End COA | West-End Agency |
| Administrative Efficiency | ● | ●(Y) | ● | ●(Y) | | ●(Y) | ● | ●(Y) |
| Archeological/Historical Sites | ● | ●(Y) | ●(Y) | ● | ● | ●(Y) | ●(Y) | ● |
| Bighorn Sheep – Overall Range | ● | ● | | | ● | ● | | ● |
| Elk – Severe Winter Range | ●(Y) | ● | ● | ●(Y) | ●(Y) | ● | ● | ● |
| Gunnison Sage-grouse (all categories) | | ● | ● | ● | ●(Y) | ● | | |
| Heron Rookery | | | ●(Y) | | | | | |
| Historic Railroad Feature | | | ●(Y) | | | ●(Y) | ●(Y) | |
| Lynx – Potential Habitat | ● | ● | | | ● | | | ● |
| Management Issues / Logical Boundary | ● | ● | ● | ● | ●(Y) | | | ● |
| Mule Deer – Severe Winter Range | ●(Y) | ● | | ● | ●(Y) | ● | | ● |
| Paleontology/Geology | ● | ● | | | ● | | | ● |
| Prairie Dog – Overall Range | | | ● | ● | | | | ● |
| Pronghorn – Winter Range | | ● | | | ● | | | |
| Raptor Range | ● | ● | ● | ● | ● | ● | | ● |
| Rare and/or Imperiled Species | ● | ●(Y) | ●(Y) | ● | ● | | | ● |
| Recreation Opportunities | ●(Y) | ● | ●(Y) | ●(Y) | ●(Y) | ● | | |
| Scenic Qualities from Primary Overlook or within 3-mile Viewshed | ●(Y) | ● | ● | ● | ●(Y) | ● | ●(Y) | ● |
| Understanding of Significant Resources | ● | ● | ● | ● | ● | ● | | ● |
| Water Quality | ● | ● | ● | ● | ● | ● | ● | ● |

**Notes:**

A dot indicates the criterion is present within the land unit.

The addition of yellow highlighting indicates that not only is the criterion present, but it is of such significance, in combination with the other criteria present, to recommend that the land unit be included within the COA or proposed NRA boundary in Alternative 2.

BLM_0059584

identify when boundary adjustments may be recommended in order to carry out the purposes of the NRA. Boundary adjustments may be recommended to:

- Protect significant resources and values, or to enhance opportunities for public enjoyment related to NRA purposes

- Address operational and management issues, such as the need for access or the need for boundaries to correspond to logical boundary delineations such as topographic or other natural features or roads

- Otherwise protect NRA resources that are important to fulfilling NRA purposes.

Further, if the acquisition would be made using appropriated funds, and is not merely a technical boundary revision, the criteria set forth by Congress at 16 USC 460l-9(c)(2) must be met. All recommendations for boundary changes must meet the following two criteria:

- The added lands would be feasible to administer, considering their size, configuration, and ownership; costs; the views of and impacts on local communities and surrounding jurisdictions; and other factors such as the presence of hazardous substances or exotic species

- Other alternatives for management and resource protection are not adequate.

The extent to which Alternative 2 (the Proposed Action) satisfies the boundary adjustment criteria, and an evaluation of the effectiveness of Alternatives 1 and 2 in meeting the objectives of the RPS and the NRA mission, can be found near the end of this chapter. The complete texts for Section 3.5 of NPS *Management Policies 2006*, and 16 USC 460l-9(c)(2) are shown in Appendix C.

## ALTERNATIVE 1: NO ACTION (CONTINUATION OF EXISTING CONDITIONS)

### OVERALL CONCEPT

Under Alternative 1, the National Park Service would continue to operate with an emphasis on conserving the natural, cultural, recreational, and scenic resources within the existing NRA (see the map for Alternative 1). Bureau of Reclamation operations would continue unaffected. NPS would continue to cooperate with Colorado Division of Wildlife to address wildlife and habitat issues, and in managing fishing and hunting within the NRA. NPS would continue to work with neighboring land management agencies to resolve resource issues of mutual concern, as staff time and funding permit. Opportunities to partner with neighboring landowners in the service of resource conservation would be limited, and would be based largely on the involvement of other agencies, and based upon their funding and priorities. NPS participation would primarily consist of providing limited technical assistance and



*Development adjacent to Curecanti NRA*

BLM_0059585

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

advice. As a result, if recent development trends on private lands surrounding the NRA continue or increase, then the resources that know no boundary between the NRA and private land, especially scenic resources, would become increasingly vulnerable to adverse impacts, and NPS would have limited tools at its disposal to mitigate the impacts.

## NATIONAL RECREATION AREA DESIGNATION AND BOUNDARY

Curecanti has yet to be legislatively established; however, it is regularly listed as a unit of the national park system in *The National Parks Index*, and it has been referred to in appropriations and other congressional bills as Curecanti National Recreation Area. The area currently consists of 41,790 acres of land and waters, which belong to the following federal agencies:

- Reclamation (managed by NPS, per agreement with Reclamation) = 40,360 acres

- NPS (managed by NPS) = 1,105 acres

- U.S. Forest Service (managed by NPS, per agreement with USFS) = 325 acres.

Any boundary attributed to this area is unlegislated, administrative, and subject to change, based on agreements among and between the land management agencies involved, and rarely on legislative action. Under Alternative 1, the above situation would be unchanged. Curecanti would remain an unlegislated unit of the national park system, with only an administrative boundary.

Since 1965, when NPS began administering the NRA under a Memorandum of Agreement (MOA) with Reclamation, from time to time managers made modifications to the land being administered. These administrative "adjustments" were mutually agreed upon between local agency managers, in consultation with Reclamation. However, these changes were not always reflected in the official NPS records. To rectify this situation, the RPS study team decided, as a starting point, to utilize a map that both NPS

and Reclamation had previously agreed to in writing. The title of that map is *Curecanti Unit, Upper Colorado River Storage Project, Colorado, Exhibit A, Version F (SA-CUR/7101-F)*, dated July, 1965, and commonly known as "Map F." The study team then used this map to determine the acres agreed to, with some additional adjustments based on agreements that have been verified.

The sum total of the area being administered by NPS, as determined through this process, is 41,790 acres. This acreage differs from the total of 41,972 acres listed in the official index of the National Park Service, entitled *The National Parks: Index 2005 - 2007*, published in 2005 by the Government Printing Office. If, by passage of legislation, Congress approves the recommendations in the Proposed Action, an official legal description and map would then be prepared, and an official acreage would thus be generated, updating the acreage listed in the *Index*. However, if the proposed action is not implemented, and the area within the NRA remains essentially as it is now, Map F would be updated to reflect what NPS and Reclamation currently agree is the correct acreage, and the NPS index would be changed accordingly.

## RESOURCE CONSERVATION

The National Park Service would have no legislated authority or available sources of funds to work with willing landowners outside the NRA to use a range of resource conservation tools, including, but not limited to, technical assistance, conservation easements, and, to some extent, fee simple acquisition. If a landowner were to be interested in conserving resource values on his or her property, NPS could provide only limited technical assistance. A landowner would be encouraged to contact other government agencies or land trusts for possible assistance or potential funding. NPS would continue cooperative efforts to maximize the success of partnerships wherever possible. Examples of land trusts include:

BLM_0059586



## ALTERNATIVE 1: NO ACTION (CONTINUATION OF EXISTING CONDITIONS)

This alternative would include approximately 41,790 acres within the existing National Recreation Area (NRA) boundary. The National Park Service (NPS) would continue to manage the natural, cultural, and recreational resources of the NRA, and associated facilities, pursuant to Bureau of Reclamation (Reclamation) law, NPS law, the 1965 Memorandum of Agreement between NPS and Reclamation (1965 MOA), and other applicable laws and regulations. Reclamation would continue to manage its project lands and land interests, water and water interests, and facilities, pursuant to Reclamation law, the 1965 MOA, and other applicable laws and regulations. There would be no Conservation Opportunity Area; and no lands would be transferred between NPS and other federal or state agencies. Compared to Alternative 2, NPS would be limited in its ability to work in partnership with adjacent private landowners in the service of resource conservation.

|  | Lands and Waters Included Within Curecanti National Recreation Area (41,790 acres) |
| --- | --- |
|  | Existing Wilderness Area |
|  | Highway |
|  | Road |
|  | Stream |
|  | West Elk Loop Scenic and Historic Byway |
|  | NPS Visitor Center |

## EXISTING LAND STATUS

### Lands Within the National Recreation Area

|  | Bureau of Reclamation |
| --- | --- |
|  | U.S. Forest Service (co-managed by NPS and USFS) |
|  | National Park Service |

### Lands Surrounding the National Recreation Area

|  | Bureau of Land Management |
| --- | --- |
|  | Bureau of Reclamation (management by Reclamation or other agency under agreement) |
|  | Colorado Division of Wildlife |
|  | National Park Service (Black Canyon of the Gunnison NP) |
|  | U.S. Forest Service |
|  | Private |

## ALTERNATIVE 1: NO ACTION (CONTINUATION OF EXISTING CONDITIONS)

RESOURCE PROTECTION STUDY

CURECANTI NATIONAL RECREATION AREA

Gunnison and Montrose Counties, Colorado

National Park Service
U.S. Department of the Interior



| IMDE | 616 |
| --- | --- |
| 5/01/2008 | 20,023-A |

NPS Disclaimer information: Property boundaries shown on this map are intended for study purposes only, and are not intended to be definitive regarding land ownership. County and agency land records will be used to verify ownership and definitively locate property lines and boundaries.



BLM_0059587

- Local land trusts, such as Gunnison Ranchland Conservation Legacy or Black Canyon Land Trust
- State or regional land trusts, such as Colorado Open Lands
- National land trusts, such as The Conservation Fund, The Nature Conservancy, or the Trust for Public Lands.

NPS would continue to communicate and cooperate with those who hold private mineral/mining rights within the NRA, in order to provide appropriate measures to minimize impacts of development and operations that now exist, or might exist in the future. Rights would be purchased only if the owner would be willing to sell. However, since funds might not be available to purchase those rights, even if an owner wanted to sell, other resource conservation tools would be employed, such as identified in the *Toolbox of Incentives for Resource Conservation* in Appendix A.

## NATIONAL RECREATION AREA MANAGEMENT

The National Park Service would continue to manage the natural, cultural, and recreational resources of the NRA and its associated facilities, pursuant to Reclamation law, NPS law, the 1965 MOA between NPS and Reclamation, and other applicable laws and regulations. However, under this alternative, the permanence of NPS as the manager of said resources would not be assured. Operational and maintenance agreements with Reclamation and other agencies would continue and be revised or updated, as necessary.

## BUREAU OF RECLAMATION OPERATIONS

The Bureau of Reclamation would continue to operate and maintain the three dams, reservoirs (Blue Mesa, Morrow Point, and Crystal), power plants, access roads, and other related facilities, to meet the purposes of the Colorado River Storage Project (CRSP), and the East Portal area to meet the purposes of the Uncompahgre Project; pursuant to Reclamation law, the 1965 MOA, and other applicable laws and regulations. Reclamation and its managing entities, and Western Area Power Administration (Western), and their assigns, would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities. They would continue to operate, maintain, replace, and expand said facilities pursuant to their authorities to accomplish their missions.

Reclamation lands that are currently outside of the NRA would be managed in accordance with applicable Reclamation law, as amended or supplemented, and other applicable federal laws and regulations. Reclamation would work with appropriate agreed-upon managing agencies to ensure that its lands and their associated uses and resources are managed in a manner consistent with applicable laws and regulations, and in accordance with agreements between Reclamation and the other agencies.

## OTHER AGENCY OPERATIONS

The National Park Service would continue to manage certain lands under an agreement with the U.S. Forest Service, including Ponderosa Campground. This agreement would, from time-to-time, be updated and revised. NPS would also continue to coordinate efforts and issues with BLM, CDOW, and USFS on adjacent agency lands; however, no additional transfer of lands would be anticipated.

## JOINT AGENCY MANAGEMENT EFFORT (JAME)

As an on-going result of this RPS, the National Park Service has invited land management agencies with lands surrounding the NRA, and other federal and local government agencies, to work in partnership to address resource management issues that extend outside the NRA. These agencies

BLM_0059588

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

include the BLM, Reclamation, Colorado Department of Transportation (CDOT), CDOW, Colorado State Forest Service (CSFS), USFS, Western, and Gunnison and Montrose Counties. Under Alternative 1, this group would continue to meet to tackle resource issues on a thematic basis that are common to each agency. The agencies mutually agreed to work on issues pertaining to invasive plant species (i.e., weeds) as the first challenge of the JAME.

NPS would work with county planners and planning commissions to identify issues that affect, or potentially affect, the NRA. Whenever possible, solutions would be sought to mitigate impacts to resources.

## ESTIMATED COSTS, STAFFING REQUIREMENTS, AND IMPLEMENTATION STRATEGY

### Estimated Costs

To implement Alternative 1, there would be no additional costs beyond what is currently incurred, and what is expected to be incurred, by the government, because existing conditions would continue. Curecanti NRA and adjacent Black Canyon of the Gunnison National Park are jointly managed by the same superintendent and managers. The amount authorized for 2006 NPS operations (also known as ONPS) at Curecanti NRA is $3,036,800. It is expected that this budget would be adjusted annually to cover cost-of-living increases and may be subject to other adjustments (for example, additional funding due to increased homeland security threats, or special assessments). As is currently the case, the ONPS budget may be supplemented with fee receipts and special project funds. Other annual sources of funding, that vary from year to year, include "soft" money, such as Repair/Rehab, and Cyclic Maintenance.

For direct comparison to the estimated costs of Alternative 2, the Proposed Action, the estimated cost to implement actions related to this study for Alternative 1 is

$500,000. This money would need to be spent on missing and corrective surveys, posting, and some fencing along the existing administrative NRA boundary, even if the Proposed Action is not implemented. Under Alternative 1, there would be no additional recurring annual costs.

In the past, there have been instances where land has been acquired at fair market value to add to the NRA. Requests for congressional funding were made in those instances. This may continue to occur in the future, but to a significantly lesser extent than under Alternative 2 (the Proposed Action). Due to the uncertainty of those occurrences, and relatively low costs involved, no estimates are given for that potentiality.

### Staffing Requirements

Currently, Curecanti NRA is operated by a staff of 53 full-time equivalent (FTE) employees. Staffing requirements would not change under Alternative 1, because existing conditions of NRA operations would continue.

### Implementation Strategy

The strategy to implement Alternative 1 is for NPS to continue operating as it does now. The NRA would continue to work as much as existing funding and staffing permits in partnership with neighboring private landowners, land management agencies, county planners, land trusts, and others, to implement tools and to meet the goals and objectives of resource conservation in the Curecanti area. However, this would be to a significantly lesser extent than under Alternative 2 (the Proposed Action).

BLM_0059589

# ALTERNATIVE 2: PROPOSED ACTION

## OVERALL CONCEPT

- Revise the 1965 MOA between NPS and Reclamation, and continue to work closely with Reclamation in the management of the NRA to ensure



*NPS would cooperate with and assist private landowners to conserve resources surrounding Curecanti NRA*

Under Alternative 2, it is recommended that Congress legislatively establish Curecanti NRA with a new boundary, and that the 1965 MOA between the Bureau of Reclamation (Reclamation) and the National Park Service (NPS) be revised accordingly. Reclamation operations would remain essentially the same as under Alternative 1; and NPS would manage lands within the NRA that it currently administers, as well as lands proposed for inclusion in the NRA from neighboring agencies. In addition, NPS would expand its efforts to conserve the natural, cultural, recreational, and scenic resources on certain lands surrounding the NRA, in partnership with willing landowners (see the map for Alternative 2). This would be accomplished by the following primary actions:

- Recommend that Congress establish a National Recreation Area, with a legislated boundary that includes agreed-upon additional lands now managed by adjacent federal and state agencies.

that Reclamation and its managing entities and the Western Area Power Administration (Western), continue to accomplish their missions.

- Designate a Conservation Opportunity Area, consisting of identified private land surrounding the NRA, in which the National Park Service would be authorized by Congress to work with willing landowners to conserve resources, including acquiring agreed-upon interests in land.

- Work cooperatively with private landowners to implement a variety of tools for resource conservation, which would include but not be limited to providing technical assistance, encouraging and/or acquiring conservation easements, and to some extent, acquiring land in fee simple.

- Manage the NRA such that the natural, cultural, and scenic resources are conserved; and that water-based and land-based opportunities for recreation are made available to the public.

BLM_0059590

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

- Continue to work cooperatively with neighboring agencies in a Joint Agency Management Effort to resolve resource and visitor-use management issues of mutual concern. NPS would continue to cooperate with CDOW to address wildlife and habitat issues, and in managing fishing and hunting within the NRA.



*Reaching out to the public, a first step in creating partnerships*

One of the greatest differences between Alternatives 1 and 2 lies in the relationship between the National Park Service and surrounding private landowners. In recognition of the benefits of partnerships, and the potential impacts on natural, cultural, recreational, and scenic resources likely resulting from development of adjacent lands, under Alternative 2 (the Proposed Action), NPS would make a more concerted long-term effort to establish partnerships with neighboring landowners and others in the service of resource conservation.

If the recommendations in Alternative 2 are enacted, NPS would be given authority by Congress to formally work with landowners within a newly created COA, consisting of certain private lands, with the purpose of encouraging conservation of resources important to the NRA. Numerous incentives and tools for resource conservation would be made more readily available to landowners. With congressional authorization and subject to competing demands from other NPS units, there would be more opportunity for funds to be made available for acquisition of fee title or conservation easements from willing landowners in the COA; and additional funding would be provided for NPS to assist landowners in taking advantage of other incentives and tools.

Any arrangement made between NPS and a landowner would be on a cooperative basis. Potential long-term benefits would include enhanced resource conservation throughout the Curecanti area; property enhancement and financial and tax benefits for landowners; enhanced enjoyment, understanding, and appreciation for visitors to the NRA; an enriched local economy; and a sustained high

quality of life for local residents and all who visit the Curecanti area.

Alternative 2 embraces the philosophy of the Department of the Interior's former Secretary – the Four Cs: Communication, Consultation, and Cooperation, all in the service of Conservation. In addition, it supports one of the overarching goals of the current NPS Director, Mary Bomar, to increase the capacity of the system of national parks. It also embraces the guidance of NPS *Management Policies 2006*, a summary of which follows (the full citations are available in Appendix C).

1.6 Cooperative Conservation Beyond Park[1] Boundaries

*Cooperative conservation beyond park boundaries is necessary as the National Park Service strives to fulfill its mandate to preserve the natural and cultural resources of parks unimpaired for future generations. . . . Cooperative conservation activities are a vital element in establishing relationships that will benefit the parks and in fostering decisions that are sustainable. . . The Service will also seek to advance opportunities for conservation partnerships.*

4.1.4 Partnerships

*The Service will pursue opportunities to improve natural resource management within parks and across administrative boundaries by pursuing cooperative conservation (with*

[1] In this context, the word "park" is a generic term for any unit of the national park system, be it a national park, a national monument, national historic site, national battlefield, national parkway, national seashore, national recreation area, or some other designation.

BLM_0059591



## ALTERNATIVE 2: PROPOSED ACTION

This alternative would include 51,830 acres[1] inside a legislated National Recreation Area (NRA) boundary, and 24,300 acres outside the boundary in a Conservation Opportunity Area (COA)[2]. The proposed boundary would include the lands and waters within the existing NRA, with the immediate addition of 10,120 acres of mutually agreed-upon federal and state agency lands, less 80 acres of lands to be immediately deleted from the NRA.[3] The 34,420 acres of COA and immediate additions are defined in this study as the "Proposed Lands." The National Park Service (NPS) would manage the natural, cultural and recreational resources of the NRA, and associated facilities, pursuant to Bureau of Reclamation (Reclamation) law, NPS law, including new legislation establishing the NRA, a revised Memorandum of Agreement between NPS and Reclamation (revised MOA), and other applicable laws and regulations. Reclamation would manage its project lands and land interests, water and water interests, and facilities, pursuant to Reclamation law, the revised MOA, and other applicable laws and regulations. The ability of NPS to work in partnership with adjacent private land owners in the service of resource conservation would be greatly enhanced, compared to Alternative 1.

1. All acreages are approximate.
2. COA Defined:  An area of private land surrounding the NRA where NPS would be authorized by Congress to use various tools to partner with neighbors to conserve resources. One of the many tools would be acquisition of interests in land, including fee simple, conservation easements, and access rights-of-way from willing sellers. NPS would be authorized to amend the NRA boundary to include properties that lie within the COA, if and when they are acquired.
3. Land adjustments with other agencies: Immediately upon passage of legislation, the following Proposed Lands would be added to the NRA --- 5,840 acres of Bureau of Land Management (BLM) land; 2,640 acres of U.S. Forest Service (USFS) land; 1,500 acres of Reclamation land; and 140 acres of Colorado Division of Wildlife (CDOW) land that would be managed by CDOW until such time that NPS can acquire it via exchange for federal lands. Ten "Tracts" have been identified for potential deletion from  the NRA (refer to Alternatives Chapter for details). The immediate net addition to the NRA would be 10,040 acres.

### LAND EXTERNAL TO PROPOSAL

- Bureau of Land Management
- Colorado Division of Wildlife
- National Park Service (Black Canyon of the Gunnison NP)
- U.S. Forest Service
- Private

**Proposed Curecanti National Recreation Area (NRA) Boundary (51,830 acres)**

**Existing NRA (41,790 acres)**

- Existing Wilderness Area
- Highway
- Road
- Stream
- West Elk Loop Scenic and Historic Byway
- NPS Visitor Center

### "PROPOSED LANDS" DESCRIBED BY LAND UNIT

A. Highway 92 COA (private lands)
B. Blue Mesa Reservoir (agency lands)
C. Gunnison River COA (private lands)
D. Iola Basin COA (private lands)
E. Sapinero/Blue Mesa COA (private lands)
F. Gateview (agency lands)
G. West-End COA (private lands)
H. West-End (agency lands)

### PROPOSED LAND STATUS

- Bureau of Land Management land to be transferred to NPS
- Bureau of Reclamation land, most of which remains within or is added to the NRA
- Colorado Division of Wildlife land to be acquired by NPS in exchange for mutually agreed upon federal land
- National Park Service land remaining within the NRA
- U.S. Forest Service land to be transferred to NPS
- Ten "Tracts" of land proposed for deletion from NRA boundary subject to necessary approvals (see details for  each Tract in Alternatives Chapter)
- Conservation Opportunity Area (private)

## ALTERNATIVE 2: PROPOSED ACTION

RESOURCE PROTECTION STUDY
CURECANTI NATIONAL RECREATION AREA

Gunnison and Montrose Counties, Colorado

National Park Service
U.S. Department of the Interior



| IMDE | 616 |
| --- | --- |
| 5/01/2008 | 20,024-A |

NPS Disclaimer information:  Property boundaries shown on this map are intended for study purposes only, and are not intended to be definitive regarding land ownership.County and agency land records will be used to verify ownership and definitively locate property lines and boundaries.



BLM_0059592

*agencies and landowners)... The Service recognizes that cooperation ... can accomplish ecosystem stability and other resource management objectives when the best efforts of a single manager might fail. In addition, the Service will seek the cooperation of others in minimizing the impacts of influences originating outside parks by controlling noise and artificial lighting, maintaining water quality and quantity, eliminating toxic substances, preserving scenic views, improving air quality, preserving wetlands, protecting threatened or endangered species, eliminating exotic species, managing the use of pesticides, protecting shoreline processes, managing fires, managing boundary influences, and using other means of preserving and protecting natural resources.*

## NATIONAL RECREATION AREA DESIGNATION AND BOUNDARY

### The "Proposed Lands" — Land to be Added to the Existing NRA, and the Conservation Opportunity Area

Under Alternative 2, it is recommended that Congress officially establish Curecanti as a National Recreation Area (NRA), with a legislated boundary. The new NRA would initially include 51,830 acres within its boundary. Outside and surrounding the NRA, 24,300 acres of private property would be designated as a Conservation Opportunity Area. Following the initial establishment of the new NRA boundary, as agreements are reached with neighboring land owners and agencies, the total acreage within the NRA would change over time by adding newly acquired land from willing landowners, by exchanging NRA land for private COA land, or by transferring agreed-upon land between NPS and other agencies. The COA and the proposed NRA boundary, including involved agency lands, are shown on the Alternative 2 map.

Upon passage of NRA legislation, the new boundary would immediately encompass the lands and waters within the existing NRA (41,790 acres), plus 10,040 net acres of mutually agreed-upon public lands that would be added to the NRA, but which would be administered by the National Park

Service. The additional land would include Reclamation lands (1,500 acres), BLM lands (5,840 acres), and USFS lands (2,560 net acres, consisting of 2,640 acres added, and 80 acres deleted). In addition, authority would be provided to include approximately 140 acres of CDOW land that would be managed by CDOW until such time that NPS can acquire it through an exchange for federal lands. Such exchanges would be subject to a commitment to continue to manage the land thus acquired for wildlife, if the land was originally acquired for wildlife mitigation purposes.

For purposes of this study, and found throughout the text, primarily with reference to Alternative 2 – the Proposed Action, the term "proposed lands" refers to 34,420 acres of land outside the existing NRA that are considered important for resource conservation, public recreation, and scenic values, in keeping with NRA and NPS goals and objectives. The proposed lands include the following lands that were just described (less the 80 acres of USFS lands that would be deleted from the NRA), specifically:

- Public lands recommended to be transferred from other agencies to NPS to be included within the proposed NRA boundary immediately upon recommended passage of legislation that would establish the NRA (10,120 acres);

- Private lands that are recommended to be included within the Conservation Opportunity Area, outside and adjacent to the proposed NRA boundary (24,300 acres).

All Reclamation lands, land interests, water and water interests, and facilities, whether within or outside of the NRA, would be retained under Reclamation jurisdiction for the operation, maintenance, and replacement of and additions to its projects. Management of various uses, as well as resources by other agencies, on Reclamation lands would be in accordance with Reclamation law, as amended and supplemented, and agreements with other agencies. Reclamation would have the ability at all times to construct, operate, maintain, and replace its facilities, including additions thereto.

BLM_0059593

This ability includes access to all its lands and land interests, water and water interests, and facilities.

NPS would be given the authority to remedy inadvertent encroachment issues. Such remedies could include lease arrangements, buying and selling real property at fair market value, or exchange. If such actions affect Reclamation land, NPS and Reclamation would coordinate efforts to resolve encroachment issues.

## Lands To Be Deleted from the Existing NRA

During the process of assessing the resource value and character of the land within and surrounding Curecanti NRA, certain tracts of land were identified for potential exclusion from the NRA boundary. These lands, which total 1,243 acres, are shown as ten different "Tracts" on the Alternative 2 map. As this study defines proposed lands, for clarity of discussion, especially in the Affected Environment and Environmental Consequences chapters, these deletions are not included in the term "proposed lands."

NPS identified two primary reasons for the exclusion of the tracts. The first is that the proposed deletions would provide net overall management efficiencies by transferring various tracts to two adjacent federal land management agencies. Tracts 1 and 10 would be transferred to the Bureau of Land Management. Tracts 2, 3, 8, and 9 would be transferred to the U.S. Forest Service.

The second is that the proposed deletions would provide a more logical NRA boundary in certain locations along the north side of Colorado Highway 92 (Tracts 4, 5, 6, and 7), and along the west side of Soap Creek Road (Tracts 8 and 9). In these locations, the road winds in and out of the existing administrative boundary, causing unnecessary confusion for visitors who are unsure of whether they are in or out of the NRA. The proposed changes would make the edge of the road right-of-way the NRA boundary, thus eliminating this confusion.

In addition to the previously mentioned 80 acres of USFS land that would immediately be deleted from the NRA to be managed by USFS as part of the Gunnison National Forest, potential, eventual deletions would include 800 acres to BLM, and 363 acres that might be exchanged for private COA lands, on a willing landowner basis. These BLM- and COA-related deletions are Reclamation lands, and would be subject to a finding by Reclamation that such lands are no longer needed for Reclamation projects.

The locations of the tracts that might be exchanged for COA lands, and perhaps some additional tracts (subject to Reclamation concurrence), and the number of acres exchanged, would be identified in a land protection plan (LPP) that would be produced as one of the requirements of implementation of the Proposed Action. However, as mentioned, at least 363 acres of NRA land on the north side of CO 92, between Curecanti Creek and Blue Mesa Dam, have already been identified as being appropriate to exchange for private COA lands. These are shown as Tracts 4 through 7 on the Alternative 2 map.

Until such time that Reclamation relinquishes its withdrawals on lands to be transferred out of the NRA to BLM, and BLM has revoked those withdrawals, NPS would consider entering into an agreement with BLM to manage those tracts. However, the 80 acres of land being recommended for deletion to be managed by USFS is not Reclamation land, and that deletion could occur as soon as NRA legislation is passed and agreements between NPS and USFS are revised.

New NRA legislation should allow some flexibility for NPS managers to accomplish land exchanges with the identified tracts and with such tracts that might be identified in the future. If these potential exchanges were to occur, it would reduce the cost of acquiring interests in land that are shown later in the cost estimates for this alternative.

The ten tracts of land that are currently being considered for potential deletion from the existing NRA are described below. The reasons for the recommended deletions are identified within parentheses ( ).

BLM_0059594

Tract 1: 680 acres to BLM, subject to revocation of Reclamation's withdrawal (management efficiencies)

Tract 2: 42 acres to USFS, upon passage of NRA legislation (management efficiencies)

Tract 3: 21 acres to USFS, upon passage of NRA legislation (management efficiencies)

Tract 4: 162 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 5: 11 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 6: 159 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 7: 31 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 8: 3 acres to USFS, upon passage of NRA legislation (management efficiencies and logical boundary)

Tract 9: 14 acres to USFS, upon passage of NRA legislation (management efficiencies and logical boundary)

Tract 10: 120 acres to BLM, subject to revocation of Reclamation's withdrawal (management efficiencies).

Prior to any exchange using Tracts 4, 5, 6 and 7 for private lands, or any other parcels that may be identified in the future to be used in such an exchange, the lands proposed for exchange would be evaluated under Section 106 of the National Historic Preservation Act [36 CFR §800.4(d)(1)] to determine if they contain any site or sites considered to be eligible for listing on the National Register of Historic Places. If such a determination is made, exchange of such lands would be considered an adverse effect, and a protective action such as the following would need to be taken prior to any such conveyance: (1) the conveyance would be conditioned upon a preservation easement to assure the continued protection of the resource; or (2) the parcel would be subdivided in such a way that any tracts containing eligible cultural resources would remain with NPS, and tracts without such resources could be used in exchange. Otherwise, the effort to exchange such a parcel would be terminated.

## RESOURCE CONSERVATION

### Conservation Opportunity Area

A COA would be created outside, and adjacent to, the proposed NRA boundary. It would be comprised of 24,300 acres of private land where the National Park Service would be authorized by Congress to use resource conservation tools to partner with neighbors to conserve resources and values identified as important to the NRA. A variety of conservation tools, ranging from technical assistance to conservation easements to fee simple acquisition, would be available to implement on these private lands subject to the willingness of the landowner to participate. It is currently envisioned that 2,400 acres would be necessary to acquire in fee simple; and 8,100 acres would be placed under conservation easement. However, it would be necessary to produce a land protection plan to establish land priorities, to determine which conservation tools are likely to be applied and where, and to make recommendations about what lands and/or land interests should be acquired from willing sellers.

The National Park Service would be authorized by Congress to negotiate with landowners and to seek necessary funding to implement these tools on properties within the COA. Some of the conservation tools may be implemented through NRA-based funding; some may be achieved through special project funds; and some may be accomplished through partner matches and

BLM_0059595

other agency or foundation grants. Land and conservation-easement acquisitions would be funded through the NPS Land Acquisition Ranking System (LARS), in competition with the demands of other NPS units. No such authority would exist for lands outside the COA (with the exception of some technical assistance, if funding and staff were available). The National Park Service would be authorized by Congress to amend the proposed NRA boundary to include properties within the COA that are acquired in fee simple.

As an alternative to NPS ownership of conservation easements, land trusts and other conservation partners may be willing to acquire conservation easements, either by purchase or donation, as well as hold and monitor such easements. NPS would be willing to facilitate third-party acquisitions of conservation easements, which would serve to achieve resource conservation goals within the COA.

## Resource Conservation Tools

A Land Protection Plan would be developed to identify priorities and methods, or tools, for resource conservation within the COA. The LPP would meet the requirements of the National Environmental Policy Act (NEPA) to evaluate potential environmental and social impacts, and to provide opportunity for public review and comment prior to implementation.

Resource conservation tools that would be available for implementation under this alternative are summarized below. These tools are described more comprehensively in an NPS booklet titled *Toolbox of Incentives for Resource Conservation: A Handbook of Ideas for Neighbors in the Curecanti Area*, which is included in Appendix A. This toolbox identifies present and potential methods that can be employed to encourage Curecanti area neighbors to work in partnership to manage their lands for more effective resource conservation. Some of the incentives in this toolbox would require further analysis by NPS officials and, in some cases, would require congressional or legislative authorization and appropriation of funds.

**Technical Assistance** — NPS is currently able to provide a limited amount of environmental education and technical assistance to landowners. Under Alternative 2, NPS would be able to provide a broader range of assistance, such as:

- Offer, to a greater extent, advice regarding resource management and conservation measures, or directing individuals to appropriate sources of information

- Offer, to a greater extent, advice on siting and design considerations for aesthetically and environmentally sensitive development

- Offer, to a greater extent, jurisdictional advice, such as referring property owners to the appropriate government or organizational entity

- Offer, to a greater extent, advice on the location of wetlands, the need for permits, and ways to enhance wetlands habitat

- Provide information about various resource conservation practices, including those involving conservation easements and land trusts

- Provide assistance to obtain funding for worthwhile projects through government grants, such as U.S. Department of Agriculture cost-share grants to install animal waste-treatment units to promote cleaner surface water and groundwater, and state and federal funding to conserve habitat for endangered species.

**General Agreements** — General agreements and memorandums of understanding set the stage for short-term and long-term commitments in cooperative assistance, usually benefiting all parties involved. Agreements would be consistent with NPS and Reclamation law, regulations, and policies, and must be consistent and compatible with the purposes of the Reclamation projects.

- Examples include cost-sharing on projects that mutually benefit the parties, or understandings on how

BLM_0059596

certain activities or operations can occur. One party might agree to certain restrictions in return for other benefits, including technical assistance, labor, and/or materials needed to accomplish a project that would be of benefit to the property owner and NPS. Projects could include those that conserve wildlife and habitat, or those that reduce impacts to viewsheds.

- Agreements are especially useful if a conservation easement or fee simple acquisition is agreed upon, but funds are not yet available to implement. General agreements and memorandums of understanding clarify policies or procedures and can serve as the basis for cooperation among two or more parties. They are most likely to be useful for land owned by state or local governments, private nonprofit organizations, and other federal agencies, and by individuals or corporations who are supportive of NRA purposes, as well as resource-conservation initiatives. They may be terminated whenever any of the parties to the agreement wish, with proper notice.

**Incentive Payments** – Payments are made to property owners and other entities that enter into contracts to conserve or enhance recreational, cultural, and natural resources through a variety of grant programs, including those of NPS, US Fish and Wildlife Service, CDOW, and others.

**Acquisition of Conservation Easements or Other Property Rights** – In this program, NPS, another agency, or a land trust, acquires an interest in the property on a willing-seller basis, for conservation purposes. The types of tools used include acquisition of conservation easements or deed restrictions, mineral rights, and/or rights-of-way. Activities that are not in conflict with the purposes of the easement or deed are generally allowed, while specific restrictions ensure that uses of the property remain compatible with the conservation purposes spelled out in the easement or deed. Although the landowner continues to pay

property taxes, there may be significant income tax and estate tax benefits to the landowner.



*Using conservation easements to conserve land adjacent to the NRA is an important tool of Alternative 2*

**Purchase and Retained Use and Occupancy** — In this scenario, NPS would buy the property from a willing seller at fair-market value, and the owner would be allowed to remain on the property until death (life estate), or some other agreed-upon time period, such as 25 years. Life estates impact valuation, and appraisals are lowered using an actuary table on life expectancy. Since the owner would no longer be paying property taxes, the federal government may provide payment-in-lieu-of-taxes (PILT) to the county.

**Fee Simple Acquisition** — NPS acquires all rights or interests in the land on a willing-seller basis. Since the owner would no longer be paying property taxes, the federal government may provide PILT to the county. Acquisition could occur through a variety of methods, including:

- The landowner could be paid a fair-market-value price from sources of funding that might include congressional appropriations, such as the Land and Water Conservation Fund (LWCF); donated monies; or third party grants.

- Land could be exchanged between the property owner and a federal or state agency. For example, the LPP

BLM_0059597

might identify lands to be exchanged in return for lands to be acquired.

- The landowner could donate land to the National Park Service, or sell land at a discount, and, in turn, receive certain tax advantages.

This study recognizes that the availability of federal funds for acquiring interests in land may be limited. However, some of the goals and objectives of Alternative 2 would still be achievable through the application of other tools that could be used to provide incentives to willing landowners for conserving resources.

Water rights would be specifically addressed as a condition of each sale, exchange, and/or donation. In general, water rights are appurtenant to the land, unless specifically stated otherwise. Land exchanges between Bureaus of the United States simply affect how a particular parcel of land is administered, and all existing water rights remain the property of the United States. Water rights associated with land exchanges or purchases with the State of Colorado, as well as private landowners, would become the property of the United States, unless language in the sale or exchange states otherwise. As an example, a landowner may choose to work with his or her attorney and/or local water district to ensure that the water will continue to be used for agricultural purposes. Note that in Colorado, Instream Flow Rights, whether on federal, state, or private land, can only be held by the Colorado Water Conservation Board.

### Private Land Use within the NRA

As in Alternative 1, NPS would continue to communicate and cooperate with those who hold private interests (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights) within the NRA in order to provide appropriate measures to minimize impacts of development and operations that now exist, or might exist, in the future. This would also be done with those who might hold such rights in the COA. Although the NPS would be managing a congressionally

designated NRA under Alternative 2, there may still be insufficient funds available to purchase those rights if the owner were willing to sell. However, more emphasis and funding would be available to implement other resource conservation tools, such as those identified above and in the *Toolbox of Incentives for Resource Conservation* in Appendix A.

### NATIONAL RECREATION AREA MANAGEMENT

Under this alternative, it is recommended that Congress legislatively establish Curecanti as a National Recreation Area with a new


*Morrow Point Reservoir boat tour*

legislated boundary, and that the 1965 MOA between NPS and Reclamation be revised accordingly (revised MOA). The legislation would designate the National Park Service to be responsible for managing the natural, cultural, and recreational resources, visitor use and education, and associated facilities.  Such management would be pursuant to Reclamation law, NPS law, including the new NRA legislation, the revised MOA, and other applicable laws and regulations. The new MOA would further define the administrative jurisdiction, roles, and responsibilities of Reclamation and its managing entities, NPS, and Western within the NRA. Under this alternative, the permanence of NPS as the manager of these resources would be assured. NPS would, as necessary, revise any operation and maintenance agreements between it and other agencies, including Reclamation, BLM, and USFS, to reflect management changes resulting from legislative establishment of the NRA.

In order to successfully implement the proposals in Alternative 2, it would be necessary to hire an FTE employee to oversee

BLM_0059598

the associated operations into the future. The duties and required skills of such a "partnership liaison" are described later in Alternative 2 under "Staffing Requirements." In addition, as interests are acquired in private property, an additional FTE would be required to monitor and manage those lands.

## BUREAU OF RECLAMATION OPERATIONS

The Bureau of Reclamation would operate and maintain the three dams, reservoirs, (Blue Mesa, Morrow Point, and Crystal), power plants, access roads, and other related facilities, to meet the purposes of the CRSP; and the East Portal area, to meet the purposes of the Uncompahgre Project; pursuant to Reclamation law, the revised MOA, and other applicable laws and regulations. Reclamation, and its managing entities, and Western, and their assigns, would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities. They would continue to operate, maintain, replace, and expand said facilities pursuant to their authorities to accomplish their missions.

Reclamation lands currently outside of, but contiguous with, the current NRA, would be added to the NRA until such time as Reclamation determines that the lands are no longer necessary for project purposes. Pending such a determination, those lands would be administered by Reclamation and NPS for their respective purposes in accordance with Reclamation law, as amended and supplemented, other applicable federal laws and regulations, and an MOA between Reclamation and NPS. Upon such a determination that the lands are no longer necessary for Reclamation project purposes, the lands may be retained within the NRA under NPS management, or deleted from the NRA and transferred to another agency, or otherwise be disposed of, as allowed by law.

## OTHER AGENCY OPERATIONS

NPS would coordinate with BLM, USFS, and CDOW to evaluate operations pursuant to the transfer of lands identified under Alternative 2. NPS may enter into new, or revised, agreements with any or all of these agencies to define responsibilities and cooperative efforts arising out of legislative establishment of the NRA. NPS would also continue to coordinate efforts and issues with BLM, USFS, and CDOW on adjacent agency lands, such as might occur through participation in the JAME, described below.

NPS would work with CDOW and BLM to explore the potential land exchange for state-owned land identified in Alternative 2. In the event that such an exchange is implemented, it may be possible to extinguish one or more agreements between NPS and CDOW.

In the event that NPS acquires private land within the COA in the vicinity of Mesa Creek (the NE¼ of Section 33, and the N½ of Section 34, and the NW¼ of Section 35, all in Township 49 North, Range 6 West, NMPM), it is recommended that land south of CO 92 (about 260 acres) be included within the NRA, and the land north of CO 92 (about 300 acres) be transferred to the administration of the USFS for inclusion within the Gunnison National Forest. At that time, NPS would request that a small parcel of land (about 26 acres) south of CO 92 on Mesa Creek, now within the Gunnison National Forest, be transferred to the NRA (said parcel is located in the SW¼ SW¼ of Section 26, and the SE¼ SE¼ of Section 27, all in Township 49 North, Range 6 West, NMPM). It is recommended that the south right-of-way line of CO 92 in this area be the NRA boundary, but only if, and when, the land within the COA in this location is acquired from a willing seller. The recommendation is made for the future (and not shown on the Alternative 2 map for immediate implementation), because until such time as the COA land might be acquired in this area, it would be more efficient for this 26-acre parcel to be continued to be managed as a contiguous tract of the National Forest, instead of as a detached tract of the NRA.

BLM_0059599

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION



*Agency cooperation and COA tools will help conserve agrarian values in the future*

**JOINT AGENCY MANAGEMENT EFFORT (JAME)**

As described in Alternative 1, NPS and other federal, state, and local agencies would continue the JAME to address resource issues, such as noxious weeds, that are common to each agency.

NPS would be more proactive in working with County Planners and Planning Commissions. NPS would encourage Gunnison County to evaluate a potential Special Geographic Area to complement the efforts of partnership within the COA. NPS would also encourage Montrose County, upon revision of their Master Plan, to establish a conservation overlay zone that includes the NRA and COA. Such a zone could be used to guide development decisions in that area.

**ESTIMATED COSTS, STAFFING REQUIREMENTS, AND IMPLEMENTATION STRATEGY**

**Estimated Costs**

The total cost of implementing Alternative 2 would occur over many years into the future, and it would depend primarily on the willingness and the degree of participation of private landowners in the effort, and the types of tools employed to conserve resources.

Many factors contribute to the total cost of implementation. Perhaps the greatest, single, cost element would be acquiring interests in land, such as fee simple acquisition and conservation easements. Those costs are very uncertain because of numerous unpredictable and variable factors, such as:

- The number of landowners willing to participate

- Determination by a land protection plan (LPP) of priorities of land to conserve, and appropriate conservation tools

- Change in fair market value of property

- Availability of funds for acquisition of interests in land

- The time between property appraisals and availability of funds

- The interest and assistance from other parties, such as land trusts and conservation organizations

- Future changes in federal and state tax and estate laws that might affect landowners' decisions to sell or donate land or conservation easements.

The relatively high anticipated cost of acquiring interests in land is a major reason that other tools are being considered to work in partnership with landowners to conserve resources, so that goals and objectives can be realistically achieved. Therefore, it would be necessary to develop an LPP early in the process to set priorities on which parcels of land are most important to conserve, and which tools would be adequate in each case. At that time, requests for funds for those parcels of land for which monies are required would be considered through the NPS land acquisition ranking system (LARS) in light of competing demands from other NPS units. Potential sources of funding are listed in the "Implementation Strategy" section of this chapter, below. However, to the greatest

BLM_0059600

extent possible, NPS would pursue tools of a partnership nature with willing landowners, conservation organizations, land trusts, and other agencies, including matching grants and similar cost-sharing efforts, that could result in lower direct costs to NPS, while still satisfying resource conservation goals and objectives, as well as landowner goals and objectives.

In order to arrive at an estimate of the direct costs for acquiring interests in land, assumptions have been made on the number of acres that might be identified in a future LPP for conservation easements and fee simple acquisition, all of which would be consummated only if land owners were willing to participate. The most likely scenario is that a relatively small percentage of the 24,300 acres of private land in the COA would be so managed. Current thinking is that approximately one tenth (2,400 acres) would eventually be acquired in fee simple, and approximately one third (8,100 acres) would eventually be placed under conservation easements. There is a potential for some NRA lands to be exchanged for private COA lands, subject to landowner agreement. This would reduce the cost of acquiring interests in land, shown on the following pages (see also the discussion of potential deletions from the NRA in the section on National Recreation Area Designation and Boundary, earlier in this chapter).

Because of the uncertainty in predicting future property values, the estimated costs per acre of land used in the calculations are based on current market values (see a discussion of Property Values in the Affected Environment chapter, under Neighboring Private Lands and Landowners within the Proposed Lands). Future market values could be greater or less than those used in the calculations. For fee simple acquisition of land within Gunnison County, a median value of $2,750 per acre was used; and within Montrose County, $1,000 per acre.

For conservation easements, or CEs, a factor of 60% of the fee simple value was used to come up with $1,650 per acre in Gunnison

County, and $600 per acre in Montrose County. However, with increased interest and activity from regional and national land trusts and other conservation organizations, the costs of acquiring CEs could be reduced because of additional matching funds, increased emphasis on discounted sales of CEs, and increased emphasis on donations of CEs. In such cases, third parties would likely be the holders and monitors of CEs, and federal acquisitions would be combinations of donations, tax incentives, and bargain sales. Because of these factors, it is estimated that acquisition of the CEs in the COA would be 50% of face value of the CEs; or $825 per acre in Gunnison County and $300 per acre in Montrose County.

Because of the many unknowns that influence the cost of acquiring interests in land, including donations and third party involvement, and what interests would eventually be acquired, the estimated costs to the government are presented as a range. Since most of the land in which NPS might be acquiring an interest would probably be located in Gunnison County, the land values for Gunnison County were used in the calculations. Thus, $2,750 per acre was used to calculate the high range for fee simple acquisition, and $825 per acre was used to calculate the high range for CEs. The low range was determined by assuming that up to 2,500 acres of the most important land in the COA in which NPS feels it should acquire an interest would at least come under conservation easements at approximately $825 per acre.

In addition to the direct costs of acquiring interests in land, there are a number of other cost items that would be incurred with the implementation of Alternative 2 that are more predictable. These include a land protection plan; land appraisals tied to acquisition of land and conservation easements; environmental assessments to determine, among other things, the presence of hazardous materials; associated closing costs, such as title commitments and recording fees; surveys for the proposed NRA boundary; marking, or "posting" the entire boundary;

BLM_0059601

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

fencing about one-fourth of the boundary in selected areas; and specific implementation plans to determine necessary and appropriate resource management, interpretation, and visitor use and understanding on newly acquired lands. These are one-time expenditures that are expected to occur during implementation of Alternative 2.

Other costs that would occur on an annual basis are for staffing that would be required to implement Alternative 2. One dedicated position would be needed to serve as a "partnership liaison" between the NRA and its neighbors to implement the study's recommendations over the long term. The anticipated duties of that position are described later in this chapter under Staffing Requirements. In addition, as new lands are added to the NRA, work would be required associated with the management of those lands, and new facilities that might be constructed on them for visitor use and resource conservation. This work would be spread over all divisions of the NRA. Personnel required to fill the dedicated position and to perform the additional work associated with managing new lands are estimated to be the equivalent of two full-time employees.

**Estimated Costs of Implementing the Proposed Action:** The estimated costs of implementing the Proposed Action are shown below. The figures include the direct costs of acquiring interests in land, and the expected costs of establishing the initial proposed NRA boundary, as well as incorporating changes to the boundary that might reasonably occur.

- One-Time Costs:
  - Acquiring interests in land from willing private landowners within the COA = $2,000,000 to $13,283,000
    - Fee Simple Acquisition (High Range): 2,400 acres @ $2,750/ acre = $6,600,000
    - Acquisition of Conservation Easements (High Range): 8,100 acres @ $825/acre = $6,683,000

  - Land Protection Plan = $150,000
  - Land Appraisals, Environmental Assessments, and Closing Costs = $300,000
  - Boundary Surveys and Posting = $800,000
  - Boundary Fencing = $240,000
  - Specific Implementation Plans for New Lands = $200,000

  **One-Time Costs = $3,690,000 to $14,973,000**

- Recurring Annual Costs: In addition to the One-Time Costs shown above, as the Proposed Action becomes fully implemented, there will be an annual cost of $160,000 for the equivalent of two full-time employees, as shown below.

  - Upon initiation of implementation — an additional full-time NRA staff "partnership liaison" position, at $80,000 per year
  - Upon acquisition of sufficient interests in land — the equivalent of one additional full-time employee for resource and visitor management and protection, interpretation, construction and maintenance, and administration associated with the management of newly acquired interests in land, at $80,000 per year

> *This study recognizes that the availability of federal funds for acquiring interests in land may be limited. However, some of the goals and objectives of Alternative 2 would still be achievable through the application of other tools that could be used to provide incentives to willing landowners for conserving resources.*

BLM_0059602

**Staffing Requirements**

**Partnership Liaison** — A new "partnership liaison" position would be added to the NRA staff to implement the Proposed Action, and to oversee and sustain its operation into the future. That person would need to have a wide range of knowledge, skills, and abilities in order to perform a broad variety of duties associated with the position. The duties and qualifications associated with the position would include the following.

- Perform as the NRA liaison with private landowners, adjacent land-management agencies, regional and national land trusts, conservation organizations, county planners and officials, and other neighbors and stakeholders

- Write and implement a land protection plan

- Work with private landowners to implement the tools of resource conservation, including negotiations leading to acquiring interests in land

- Coordinate appraisals and environmental assessments

- Implement boundary surveys, marking and posting, and fencing

- Write grant proposals

- Monitor conservation easements

- Provide and/or coordinate technical assistance to neighboring private landowners in the areas of natural, historical, and archeological resource conservation and enhancement, especially preserving and improving natural habitat, and conserving water quality; planning, siting, and design considerations for development; and protecting life and property from wildfire

- Coordinate the JAME

- Coordinate the development and implementation of specific implementation plans for new lands.

**NRA Operations** — As more interests in land are acquired over time from other government agencies and from willing private landowners, there would be an increasing requirement for NRA staff in the following areas of operations:

- To monitor and conserve the natural and cultural resources on those lands

- To coordinate the administration of grazing permits that exist on lands transferred to the NRA

- To provide for additional recreational and interpretive opportunities, and the safety of NRA visitors

- To construct and maintain the necessary and appropriate facilities for resource conservation and visitor use, such as fencing and trails

- To provide administrative support for technical assistance to neighbors.

Eventually, this work would require the equivalent of one additional FTE, shared among all five operating divisions at the NRA: Resource Stewardship and Science; Interpretation, Education, and Technology; Visitor Protection and Fee Collection; Facility Management; and Administration.

**Implementation Strategy**

Alternative 2 would be implemented over a period of many years. NRA staff is currently making some efforts in partnering with other land management agencies, county planners, land trusts, and, to a lesser extent, private landowners, to identify and achieve goals related to resource conservation in the Curecanti area. However, the real benefits of Alternative 2 would not occur until the study's recommendations have been approved, legislation is enacted, additional staff is hired, required funding is appropriated, and the proposed actions and appropriate tools of resource conservation are implemented. The greatest amount of implementation is expected to occur within the first ten years of congressional approval of this study's recommendations.

The following actions would be required to fully implement Alternative 2.

BLM_0059603

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

- Congress would need to approve the recommendations in this study and establish the following:
    - Legislative designation of Curecanti National Recreation Area, with a new legislated boundary
    - Legislative designation of the National Park Service to manage the natural, cultural, and recreational resources, visitor use and education, and associated facilities
    - Approval of the COA concept
    - Authorization for NPS to work with willing landowners to employ tools of resource conservation in the COA, including acquisition of interests in private property
    - Approval of NPS to adjust the proposed NRA boundary accordingly, when appropriate interests in land are acquired.
- There are three levels of specificity of management direction and legislative language associated with the recommendations of this RPS: (1) the RPS and associated Report to Congress, or Report; (2) proposed legislation; and (3) a revised MOA between NPS and Reclamation.

    1. This RPS document presents the intent of the proposed legislation that would create the NRA. The Report to Congress, which will be written jointly by Reclamation and NPS, will identify issues that need to be addressed in the legislation. Although these issues are discussed to a certain extent in the RPS, they will be addressed in more detail in the body of the Report to Congress.

    2. The legislation would specify the management responsibilities of Reclamation and NPS within the new NRA. The legislation should show the same level of specificity as the Report. Because legislation would affect both Reclamation and NPS, both agencies would be cooperatively involved in its drafting to ensure there is consensus and that the interests of both agencies are incorporated.

    3. A new MOA between NPS and Reclamation, and coauthored by both agencies, would be written to describe, in detail, the responsibilities of the two agencies regarding the administration and management of the NRA. The preparation of a new MOA would be mandated by the legislation. It is expected to be similar to the existing 1965 MOA between the two agencies, wherein the following responsibilities would continue:

        a. NPS would manage the natural, cultural, and recreational resources, visitor use and education, and associated facilities.

        b. Reclamation would manage all facilities associated with Reclamation projects.

        c. In areas where management responsibility overlaps, the two agencies would work together, when necessary, to resolve conflicting uses with consideration for the legislative mandate for each agency, in a manner that is consistent with the primary purposes of Reclamation's Aspinall and Uncompahgre projects.

- The NRA must assign someone on staff to serve as a "partnership liaison". This may require hiring one FTE, and would require an increase in ONPS funding.

- Consultation and coordination in the service of resource conservation must be increased between the NRA and its neighbors.

BLM_0059604

- An LPP must be developed to identify land conservation priorities and to define the "tools" of resource conservation appropriate for each parcel of land.

- Land appraisals and environmental assessments must be completed for lands that might be acquired.

- Agreed-upon interests in land must be acquired. In some cases, private landowners may agree to donate or exchange land or interests in land. Where that is not the case, and purchase is required, sources of funding might include the following:

  – The Land and Water Conservation Fund

  – Line-item appropriations

  – Federal and State grants

  – NPS cost-share program

  – Nonprofit organizations and friends of the NRA

  – Private sector donations

  – Third-party entities, such as land trusts and conservation organizations.

- Boundary surveys must be completed, and the new boundary marked, posted, and fenced, where necessary.

- Additional staff must be hired to manage additional lands in which interests are acquired.

- Resource data for newly acquired lands must be obtained and analyzed in preparation for a new GMP or implementation plan.

- A new general management plan or implementation plan must be written for the NRA to determine how newly acquired lands would be managed, where new resource-based recreational and interpretive opportunities would be provided, and what developments would be necessary and appropriate to provide for those opportunities.

# Findings and Guiding Principles Regarding the Study's Recommendations

In the course of conducting the study, numerous findings and guiding principles were identified that need to be emphasized and carefully considered when implementing the study's recommendations, especially regarding new NRA legislation that might be enacted, and revised or new agreements among Reclamation, NPS, and/or other agencies. Many of those findings and principles relate to laws, policies, regulations, and the missions of the two agencies, by which Reclamation and NPS must operate. Some of these apply equally to Reclamation and NPS, as Federal agencies within the DOI. However, some of these are unique to each agency, since they have different missions. These important findings and principles are summarized below.

- The Uncompahgre Project and the Aspinall Unit of the CRSP, their associated facilities, lands, water, and other resources, and their use by the public, are significant public benefits within, and adjacent to, the NRA.

- The majority of the lands currently within the NRA, and some currently outside of it, were withdrawn or acquired for Reclamation purposes, including the Uncompahgre Project and the Aspinall Unit of the CRSP.

- The current presence of NPS within, and administration of, most of the NRA for recreation and other purposes is pursuant to and subject to Reclamation law, as amended and supplemented, which generally requires that such administration be consistent or compatible with the primary purposes of all Reclamation projects. Thus, Reclamation has existing legal rights within and adjacent to the NRA that predate and take precedence over NPS's rights or uses.

- Reclamation operations along the three reservoirs under the CRSP Act continue to provide recreational

BLM_0059605

and scenic values that support legislative designation of the area as the Curecanti NRA. Any legislation for the NRA should allow that situation to continue, without any additional limitations on Reclamation's operational capabilities.

- The prior intent of the DOI was that contiguous Reclamation lands along the Gunnison River upstream of the Black Canyon of the Gunnison National Park (BLCA) were to be administered by NPS for recreational and other purposes pursuant to Reclamation law. The 1965 MOA between Reclamation and NPS provided for such management on Aspinall Unit lands pursuant to Section 8 of CRSPA, and allowed for the future inclusion of additional acquired or withdrawn lands. For example, in 1978, Uncompahgre Project lands in the East Portal area were added to the MOA and the NRA. However, the 1965 MOA did not address future deletion of lands from the NRA, nor were there appropriate supplemental agreements to address the management of deleted lands by another federal agency. A revised MOA should address both the addition and deletion of lands to and from the NRA, as well as the management of deleted lands by another federal agency, or disposition thereof to private, state, or other ownership.

- Both Reclamation and NPS have differing missions and management directives within, and adjacent to, the NRA. The current management agreement between Reclamation and NPS should be updated to better reflect the roles and responsibilities of the respective agencies.

- There are numerous and varied existing legal rights on lands within the study area that may affect management of the NRA. These rights either need to be recognized and honored, or they need to be acquired through appropriate means. Either way, these rights will affect management of the NRA. These rights include, but are not limited to, reserved mineral rights (such as the Dickerson decomposed granite pit), transmission rights-of-way (Western, Gunnison County Electric Association, Qwest Communications, and others), and access rights (Lake Fork Cove and Blue Mesa Village subdivisions, Sapinero, and others).

## IMPORTANT CONSIDERATIONS REGARDING RECOMMENDATIONS TO CONGRESS

This study's Proposed Action recommends that Congress enact legislation regarding the official designation of Curecanti NRA. The study team has identified the following considerations to be of paramount importance in drafting any such legislation.

- Congress should designate the area identified in the proposed action as the "Curecanti National Recreation Area."

- Any such NRA designation and associated legislation should protect Reclamation's ability to meet its mission, including project operation, maintenance, replacement, and land addition or expansion, if and when necessary, on all of its lands and waters within and adjacent to the NRA. Reclamation's ability to meet its mission and to conduct project-related operations on any of its lands and waters should not be diminished or hindered as a result of the designation of the area as an NRA. Likewise, any such NRA designation and associated legislation should provide NPS reasonable and appropriate authority to meet its mission within and adjacent to the NRA, provided that Reclamation's prior authority to meet its mission on the same lands and waters is not diminished or hindered in any way.

BLM_0059606

- Any such NRA designation and associated legislation should allow for future adjustments to the proposed NRA boundary that are mutually acceptable to Reclamation, NPS, and other affected Federal and State agencies.

- Any legislation establishing the NRA should provide for coordinated management through an agreement between Reclamation and NPS that identifies their respective roles and responsibilities. This legislation should be relatively broad and not overly specific on how the NRA is to be managed. Other documents would go into more detail describing how the NRA should be managed. These documents would include a new MOA between Reclamation and NPS, and a revised NPS GMP or implementation plan for the NRA.

# ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ASSESSMENT

## NATIONAL RECREATION AREA BOUNDARY

### Boundary Alternative A

This alternative was not presented in the Fall 2003 newsletter, but was considered early in the alternatives development process. Alternative A would have created a legislative boundary of 51,830 acres, including the existing NRA lands (41,790 acres) and agency land transfers (10,040 acres net), as described in Alternative 2 (the Proposed Action). However, unlike Alternative 2, a COA comprised of private land is not identified. Thus, there would be no congressionally approved authority for NPS to work cooperatively with landowners to apply conservation tools within a designated area.

This alternative was dismissed from further consideration, because it did not adequately address the mandate from Congress to "identify practicable alternatives that protect the resource value and character of the land within and surrounding the Curecanti National Recreation Area."

### Boundary Alternative B

This alternative was introduced as Alternative 3 in the Fall 2003 newsletter. It would have created a legislated boundary of 59,380 acres.[1] In addition to land transferred from other agencies, as described in Alternative 2 (the Proposed Action), a COA would have been designated that includes 7,550 acres of private land within the legislated NRA boundary, and 16,750 acres of private land outside the NRA boundary. Lands within the legislated boundary would have included:

- 41,790 acres of existing NRA lands
- 10,040 net acres from other agencies
- 7,550 acres of private land.

This alternative was dismissed from further consideration, because the range of possible future actions and potential impacts under this alternative are not substantially different from those of Alternative 2 (the Proposed Action). Because the lands transferred among the agencies and the extent of the COA are the same, the location of the boundary is the only major difference. The only differences in impacts associated with the boundary location appeared to be varying landowner perceptions of government control among the alternatives, whereas, in effect, landowners would have the same control over what happens to their property in all alternatives. Furthermore, comments received in response to the Fall 2003 newsletter indicated that there is a perception that this alternative would have greater adverse impacts on private landowners than Alternatives 1 or 2.

---

[1] The acreages shown here and for Boundary Alternative C differ from those in the Fall 2003 newsletter. As a result of input received from the newsletter and further analysis by the study team, the acreages have been adjusted to be consistent with the current recommendations.

BLM_0059607

## Boundary Alternative C

Identified as Alternative 4 in the Fall 2003 newsletter, Boundary Alternative C would have created a legislative boundary of 76,130 acres. It would have included lands transferred from other agencies (same as in Alternative 2) and the entire COA of 24,300 acres of private land. Lands within the legislated boundary would have included:

- 41,790 acres of existing NRA
- 10,040 acres of land from other agencies
- 24,300 acres of private land.

As described in Boundary Alternative B, this alternative was dismissed from further consideration because the range of possible future actions and potential impacts are not substantially different from those of Alternative 2 (the Proposed Action). Furthermore, as in Boundary Alternative B, comments received in response to the Fall 2003 newsletter indicated that there is a perception that this alternative would have greater adverse impacts on private landowners than Alternatives 1 and 2.

## Boundary Alternative D

This alternative was not presented in the Fall 2003 newsletter. It would have created a legislative boundary of 76,130 acres, including land transferred from other agencies and the 24,300 acres of private land identified as important to the NRA for resource conservation. However, in this alternative, the 24,300 acres of private land would not be identified as a Conservation Opportunity Area. Rather, it would be designated for fee simple acquisition by NPS on a willing-landowner basis.

This alternative was dismissed from further consideration, because it is expected to be prohibitively expensive. In addition, based on comments received on alternatives that were included in the Fall 2003 newsletter, it is expected that Boundary Alternative D would be perceived as having the greatest adverse impact on private landowners of all alternatives. Thus, it is not a practicable

alternative as required by legislation authorizing the study.

## NATIONAL RECREATION AREA MANAGEMENT

Different scenarios for management of the NRA have been considered throughout the planning process, none of which would affect the boundary alternatives. These scenarios include management of various sections of the NRA by various agencies other than NPS, including BLM, Reclamation, USFS, and Colorado State Parks. These alternative management scenarios were dismissed from further consideration for the following reasons:

- BLM, Colorado State Parks, and the USFS provided input during consultation and stated that they are not interested in directly managing the NRA.

- Reclamation manages its lands and land interests, water and water interests, and facilities to meet CRSP and Uncompahgre Project purposes, and it has contracted with NPS for management of recreation and certain other resources on Reclamation lands within the NRA. NPS, under a current agreement with Reclamation, already manages the natural, cultural, and recreational resources of the NRA and is interested in continuing to do so.

## THE ENVIRONMENTALLY PREFERRED ALTERNATIVE

Alternative 2 (the Proposed Action) is also the Environmentally Preferred Alternative. The reasons are stated below.

The Environmentally Preferred Alternative is defined by the Council on Environmental Quality (CEQ) as the alternative that best meets the following criteria or objectives, as set out in Section 101 of the *National Environmental Policy Act*: (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

BLM_0059608

(2) ensure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings; (3) attain the widest range of beneficial uses of the environment without degradation, risk of health or safety, or other undesirable and unintended consequences; (4) preserve important natural, cultural, and historic aspects of our national heritage, and maintain, whenever possible, an environment that supports diversity and a variety of individual choice; (5) achieve a balance between population and resource use that would permit high standards of living and a wide sharing of life's amenities; and (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

According to the "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" (40 CFR 1500-1508), Federal Register Vol. 46, No. 55, 18026-18038, March 23, 1981: Question 6a), "Generally this means the alternative that causes the least damage to the biological and physical environment. It also means the alternative that best protects, preserves, and enhances historic, cultural, and natural resources."

This discussion also summarizes the extent to which each alternative meets Section 102(1) of the *National Environmental Policy Act*, which asks that agencies administer their own plans, regulations, and laws so that they are consistent, to the fullest extent possible, with the policies outlined above.

Alternative 1 would satisfy to some extent the majority of the six requirements detailed above. However, Alternative 1 would not give NPS the authority or funding to acquire interests in land, or to implement other resource conservation tools with willing landowners. Some private lands surrounding the NRA would likely be developed within the next 5 to 10 years, potentially resulting in impacts to multiple resources or scenic vistas, depending upon the location of the property. Thus, Alternative 1 would not ensure aesthetically pleasing surroundings, prevent degradation of the environment, or achieve a balance between population and

resource use that permits a wide sharing of amenities. Alternative 1 would not be the Environmentally Preferred Alternative because of the potential impacts of development on visitor enjoyment, natural, cultural, and historic resources, and other opportunities in the NRA. For this reason, Alternative 1 is not preferred from an environmental perspective.

Alternative 2 would more completely satisfy the six requirements through establishment of the COA. Under this alternative, NPS would be authorized to support landowners in voluntary implementation of resource conservation tools; to seek partnerships with landowners; or to fund acquisitions and additions to the NRA. NPS would work closely with local counties, neighboring land management agencies, and other organizations, to reach the common goals of resource conservation and public recreation. These efforts, in combination with the COA, would help sustain the economic benefits of the NRA, while helping to ensure the preservation of important natural, cultural, and historic aspects of our national heritage, including preservation of a renewable energy resource, and to maintain an environment that supports diversity and a variety of individual choices.

Based on the analysis associated with the RPS at Curecanti NRA, Alternative 2 is considered the Environmentally Preferred Alternative by best fulfilling NPS responsibilities as trustee of sensitive habitat; by ensuring safe, healthful, productive, and aesthetically and culturally pleasing surroundings; and by achieving a balance between population and resource use that would permit high standards of living and a wide sharing of life's amenities.

BLM_0059609

## EXTENT TO WHICH THE PROPOSED ACTION MEETS BOUNDARY ADJUSTMENT CRITERIA

### NEED AND OPPORTUNITY

As stated in the opening section of this chapter, NPS *Management Policies 2006* lists five conditions or reasons for when NPS may recommend boundary revisions. The first three criteria focus on the need and opportunity for boundary adjustment, based on the quality and character of the resources adjacent to the current NRA on lands that may be transferred or acquired. Boundary adjustments may be appropriate for any one or more of these three criteria listed. The remaining two criteria focus on the suitability and feasibility of NPS undertaking the boundary adjustment.

Alternative 2 (the Proposed Action) provides the opportunity for Federal lands to be transferred among agencies and for the acquisition of private land, if a landowner is interested. All the land units within the proposed lands have significant resources or opportunities for recreation, as well as for visitor understanding. Land Units B (Blue Mesa Reservoir Agency), F (Gateview Agency), and H (west of Fitzpatrick and Black Mesas) contain other agency lands that are proposed for transfer to address operational or management issues. The following are examples of land units within the COA that contain resources worthy of seeking partnerships between NPS and landowners to more effectively conserve each unit.

- Land Unit A (CO 92 COA): Contains scenic qualities and severe winter range for elk and mule deer.

- Land Unit C (Gunnison River COA): Contains scenic qualities, heron rookery, and portions of historic the narrow gauge, railroad corridor along the Gunnison River between Riverway and Neversink.

- Land Unit E (Sapinero/Blue Mesa COA): Contains scenic qualities,

offers opportunities to enhance and protect Gunnison Sage-grouse habitat on Sapinero Mesa, and provides opportunity to acquire access to currently undeveloped scenic overlooks on Sapinero Mesa and Windy Point.

### SUITABILITY AND FEASIBILITY

The feasibility of managing federal and private lands, considering their size, configuration, ownership, acquisition costs, mineral and grazing rights, leases, potential hazardous wastes, and other factors, are addressed generally, because private lands would only be acquired if a land owner is willing to transfer their lands. Acquisition is only needed if other methods of conservation are not adequate. As resource conservation tools, particularly conservation easements and fee simple acquisition, are considered for implementation on private parcels, the feasibility of managing these properties would be considered in more detail by the National Park Service.

*Size:* All land units are of significant size. Within each land unit, NPS is most interested in conserving resources on those parcels that are larger in size.

*Configuration*: All land units are now contiguous to the NRA; however, some noncontiguous parcels could be added to the NRA if NPS should acquire property that was located away from the proposed NRA boundary, even though it would be within the COA. In most cases, agency land transfers would occur in locations where other agency land is adjacent to the existing NRA, where the transfer would help clarify the proposed NRA boundary, and where the acquiring agency could more easily administer the lands.

*Ownership*: Land units within the COA are comprised of private lands. Private lands would not be acquired unless a landowner is willing. Other land units within the proposed NRA boundary are owned by state or other federal agencies. Agreement in principle

BLM_0059610

among all agencies involved has been established for transfer of these lands.

*Cost*: Costs would be determined by fair market values and negotiations between NPS and private landowners for potential agreements, acquisition of conservation easements, and acquisition in fee simple. They would be based on opportunity, priorities set by an LPP, availability of funding, and the willingness of private landowners.

*Access*: The need for access to acquired private properties within each land unit would be determined at the time of acquisition, and would be met on a case-by-case basis.

*Potential hazardous waste and other factors*: Due diligence would be performed on all private parcels before easements or fee simple acquisition occur. Leases, grazing rights, mineral rights, hazardous waste issues, and other factors would be evaluated at that point in time to determine the suitability of the property for inclusion within the NRA.

*Grazing*: Leases would be dealt with on a case-by-case basis. If a conservation easement were to be acquired on a piece of property contiguous with USFS land on which a grazing lease exists, use would most likely be allowed to continue if compatible with the terms and conditions of the conservation easement. If such lands were to be acquired in fee simple, then the grazing lease might be terminated. Decisions would be made on a case-by-case, willing-landowner basis. NPS would likely enter into agreements with other agencies where a portion of an allotment falls within the NRA boundary, so that the agency would continue to have authority to manage the allotment, subject to consultation with NPS. Where an allotment exists on agency land to be included within the NRA boundary under Alternative 2, NPS would likely enter into an agreement with the transferring agency to allow grazing to continue as long as such grazing was compatible with other uses.

## EFFECTIVENESS OF ALTERNATIVES IN MEETING STUDY OBJECTIVES AND NRA MISSION

In addition to assessing impacts of the alternatives on the environment, the study team analyzed the effectiveness of the alternatives in meeting the goals and objectives of the RPS, and in providing the tools necessary for management to meet the NRA's mission. A summary of that analysis is shown in Table 3. This analysis was an important consideration in the study team's recommendation of Alternative 2 as the Proposed Action.

## SUMMARY OF ALTERNATIVES

Table 4 provides a summary of alternatives.

## SUMMARY OF ENVIRONMENTAL CONSEQUENCES

Table 5 provides a summary of environmental consequences. NOTE: Because there would be no major adverse impacts to a resource or value contained within the NRA, whose conservation is: (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's GMP or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values as a result of implementing either Alternative 1 or Alternative 2.

BLM_0059611

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

TABLE 3: EFFECTIVENESS OF ALTERNATIVES IN MEETING STUDY OBJECTIVES AND NRA MISSION

| Study Objectives and NRA Mission | Alternative 1:  No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| (1)  Assess the natural, cultural, recreational, and scenic resource value and character of the land within and surrounding Curecanti NRA (including open vistas, wildlife habitat, and other public benefits). | Objective met by completion of RPS | Objective met by completion of RPS |
| (2)  Identify practicable alternatives that conserve the resource value and character of the land. | Does not meet objective. Only resources within the NRA and on other federal lands would be conserved and managed for resource values.  Limited incentives to conserve resource values would be available to private landowners. | Meets objective. Tools, funding, and NPS staff would be available to encourage and assist landowners to conserve resources and character of the land surrounding Curecanti. |
| (3)  Recommend a variety of economically feasible and viable tools to achieve the above. | Partially meets objective. NPS would have no authority or sources of funding to seek partnerships or assist landowners in conservation efforts. | Fully meets objective. NPS would have authority and funding, if appropriated, to work with willing landowners to conserve resources through implementation of resource conservation tools, including acquiring additional land to incorporate within an expanded NRA. |
| (4)  Estimate the costs of implementing the approaches recommended by the study. | Meets objective. NPS estimates one-time costs to be $500,000; with no additional recurring annual costs. | Meets objective. NPS estimates one-time costs to be $3,690,000 to $14,973,000, including acquiring interests in land from willing landowners; plus recurring annual costs of $160,000 per year for additional staff and related expenditures. |

BLM_0059612

| Study Objectives and NRA Mission | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| (5) Find ways acceptable to Congress that would allow NPS to work in partnership with landowners and others to conserve the natural, cultural, recreational, and scenic resources and character of the land. | Partially meets objective. Authorization to partner and provide funding for efforts such as conservation easements and land acquisition would have to be continuously requested from Congress on a case-by-case basis. | Fully meets objective. Authorization and expected funding would be present for NPS and landowners to utilize the *Toolbox of Incentives for Resource Conservation* to conserve the natural, cultural, recreational, and scenic resources and character of the land. |
| (6) Formally establish Curecanti NRA for permanence of resource conservation and public recreation. | Does not meet objective. Curecanti would not be legislatively established by Congress as an NRA, and in all probability would continue to be without a legislated boundary. | Meets objective. The new NRA would include 51,830 acres, with an additional 24,300 acres in the COA, some of which could ultimately be added to the NRA through negotiations with willing landowners. |
| NRA MISSION: Conserve, protect, and interpret the nationally significant and diverse natural, cultural, and scenic resources of Curecanti, balanced with the provision of outstanding recreational opportunities, and consistent with the purposes of the CRSP Act and other applicable laws; and manage the area as a part of the greater riverine ecosystem, coordinating with other land management agencies. | Lacks the authority and tools to fully meet NRA Mission. | Provides the authority and tools to fully meet NRA Mission. |

BLM_0059613

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

TABLE 4: SUMMARY OF ALTERNATIVES

| Action Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| Area designation | Commonly identified as a National Recreation Area, but with no enabling legislation or legislated boundary. | Designated by Congress as a National Recreation Area, with enabling legislation and a legislated boundary. |
| NRA management | NPS would continue to manage the natural, cultural, and recreational resources of the NRA, and associated facilities, pursuant to Reclamation law, NPS law, the 1965 MOA between NPS and Reclamation, and other applicable laws and regulations. However, the permanence of NPS as the manager of said resources would not be assured. | The new NRA legislation would designate the National Park Service to be responsible for managing the natural, cultural, and recreational resources, visitor use and education, and associated facilities. Such management would be pursuant to Reclamation law; NPS law, including new legislation establishing the NRA; a revised MOA, which would further define the administrative jurisdiction, roles, and responsibilities of Reclamation and its managing entities, NPS, and Western within the NRA; and other applicable laws and regulations. The permanence of NPS as the manager of these resources would be assured. |
| Reclamation projects management | Reclamation and its managing entities, and Western, would continue to construct, operate, maintain, replace, and expand their facilities; and they and their assigns would have unrestricted access to their lands and land interests, water and water interests, and facilities, pursuant to Reclamation law, the 1965 MOA, and other applicable laws and regulations. | Reclamation and its managing entities, and Western, would construct, operate, maintain, replace, and expand their facilities; and they and their assigns would have unrestricted access to their lands and land interests, water and water interests, and facilities, pursuant to Reclamation law, the revised MOA, and other applicable laws and regulations. |
| Acres of land within NRA by agency source | Reclamation (NPS managed per agreement with Reclamation) – 40,360 acres<br>NPS – 1,105 acres<br>BLM – None<br>USFS (NPS managed) – 325 acres<br>CDOW – None | Reclamation (NPS managed per agreement with Reclamation) – 41,860 acres<br>NPS – 1,105 acres<br>BLM (NPS managed) – 5,840 acres<br>USFS (NPS managed) – 2,885 acres<br>CDOW (NPS managed, if acquired by exchange) – 140 acres |

Note: Under Alternative 1, NPS would manage other agency lands under agreement with each agency. Under Alternative 2, NPS would manage Reclamation land under agreement with Reclamation; however, lands that Reclamation deems are no longer necessary for the project would be transferred to NPS, unless otherwise identified by this study. Also, other agency lands would be transferred to NPS to administer and manage.

BLM_0059614

| Action Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| Total initial acres within NRA | 41,790 acres | 51,830 acres (Increase of 10,040 acres) |
| Land managed under agreement to be deleted from NRA | None | USFS – 80 acres<br>The 80 acres of USFS land managed under agreement with USFS are not Reclamation withdrawn; therefore, upon passage of legislation, NPS would return these lands to USFS to manage. |
| Possible future deletion of Reclamation land from NRA, subject to Reclamation's approval and revocation of Reclamation's withdrawal, for potential purposes stated | None | To be managed by BLM (NPS interim management) – 800 acres There is a potential for some NRA lands to be exchanged for private COA lands, subject to landowner agreement. Although the location of those NRA lands, and the number of acres would be confirmed by a future LPP, 363 acres on the north side of CO 92 have already been identified as appropriate NRA lands to be exchanged for COA lands. |
| Conservation Opportunity Area | None | Private – 24,300 acres A COA would be established adjacent to the proposed NRA boundary. NPS would be authorized by Congress to use resource conservation tools to partner with neighbors to conserve resources and values identified as important to the NRA. |
| Legislated authority to implement resource conservation tools | NPS could provide only limited technical assistance. Landowners would have to work with other agencies and organizations to utilize tools such as conservation funding and establishment of conservation easements. | An LPP would be written and implemented. NPS would be authorized to implement tools for resource conservation and to secure funding to assist willing landowners within the COA. |
| Resource conservation tools | NPS could provide only limited technical assistance to adjacent landowners regarding resource conservation issues. | NPS would implement tools outlined in the *Toolbox of Incentives for Resource Conservation*. These include technical assistance, general agreements, incentive payments, acquisition of conservation easements or other property rights, purchase and retained use and occupancy, and fee simple acquisition. |

BLM_0059615

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

| Action Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| Joint Agency Management Effort (JAME) | NPS, and other land management agencies with lands adjacent to the NRA, would continue to meet to address resource issues that are common to each agency. NPS would continue to cooperate with CDOW to address wildlife and habitat issues, and in managing fishing and hunting within the NRA. | Same as Alternative 1. |
| Estimated costs of implementation | $500,000 for one-time costs; with no additional recurring annual costs. | $3,690,000 to $14,973,000 for one-time costs, including acquiring interests in land from willing landowners; plus recurring annual costs of $160,000 per year for additional staff and related expenditures.<br><br>This study recognizes that the availability of federal funds for acquiring interests in land may be limited. However, some of the goals and objectives of Alternative 2 would still be achievable through the application of other tools that could be used to provide incentives to willing landowners for conserving resources. |
| Staffing requirements | No change in existing staff. | Initially, one additional FTE staff position to implement the Proposed Action during the first ten years, and to oversee its operation into the future. As implementation nears completion, the need for a full time employee may decrease, but many of the functions of the "partnership liaison" position would remain indefinitely.<br><br>As interests in land are acquired, one additional FTE, shared among all five operating divisions at the NRA, for operations associated with acquisition of new lands from other government agencies and from willing private landowners. |

BLM_0059616

SUMMARY OF ENVIRONMENTAL CONSEQUENCES

TABLE 5: SUMMARY OF ENVIRONMENTAL CONSEQUENCES

| Impact Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| **Natural Resources[1]** | | |
| In general, increased recreational use that occurs as a result of implementation of Alternative 2: Proposed Action may present more impacts to water quality, vegetation, wildlife communities, special status species and other natural resources, than would result under Alternative 1: No Action. This is especially true on some lands within the Conservation Opportunity Area (COA) should they ever be acquired in fee simple, or an interest thereof acquired, that would allow for public use. | | |
| Potential recreational development, and related uses such as described in the list of existing and potential recreational opportunities under Visitor Activities in the VISITOR USE, UNDERSTANDING, AND ENJOYMENT section of the Affected Environment chapter, could present localized impacts to wildlife, vegetation, soils, water quality, and other resources. However, before any such recreational development occurs, or uses allowed, NPS would evaluate the proposal(s) using the NEPA process. The evaluation could occur for a single development or activity, or as a comprehensive study (e.g., a general management plan or implementation plan). At that time, impacts on the environment would be fully assessed, and mitigation measures identified. | | |
| All recreational developments and/or activities within the future NRA boundary would be in accordance with the NPS mission of preserving unimpaired the natural and cultural resources and values of the NRA for the enjoyment, education, and inspiration of this and future generations. For any recreational uses and/or associated amenities authorized on COA lands, NPS would work with landowners to minimize impacts so that the goals of resource conservation are met. | | |
| Water Quality | The continuation of or increase in current land use practices within the proposed lands, particularly development, could cause long-term moderate to short-term localized major impacts from increased sedimentation or contaminant loading into waters within the proposed lands. | The increased likelihood that landowners would use resource conservation tools to conserve resources on their property would result in long-term minor to major beneficial impacts on water quality. |
| Geology and Paleontology | Private lands in the vicinity of Sapinero Mesa and the area southeast of Morrow Point Reservoir would be vulnerable to long-term minor to moderate adverse impacts from development and other land uses that could result in disturbance and degradation to geological and paleontological resources. Resources in other locations with lower development potential would likely be conserved into the foreseeable future. | Minor to moderate long-term beneficial impacts would occur as a result of increased conservation of geological and paleontological resources through resource conservation activities. |
| Vegetation, Including Wetlands; and Wildlife, Including Raptors and Fisheries | The displacement of native vegetation communities by noxious weeds that spread from lands adjacent to the NRA would result in long-term minor to moderate adverse impacts to NRA lands. These impacts would be minimized where joint agency management efforts are underway. Where private lands within the proposed lands lack weed management efforts or occur in land units susceptible to development (such as D, E, and G), long-term moderate to major adverse impacts would result from the spread of noxious weeds or alteration and loss of native vegetation communities.<br><br>Riparian and wetland communities in Land Units C (Gunnison River COA) and D (Iola | Beneficial impacts to vegetation and wildlife resources would result from landowners' application of resource conservation tools and participation in partnerships. Benefits would be greatest in those areas of highest development potential, such as Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). With participation partnerships and the application of resource conservation tools, long-term benefits to native vegetation, riparian and wetland communities, big game, and raptor habitat within NRA and COA lands would range from minor to major, and those to fisheries resources would range from negligible to minor. |

[1] Public Law 106- 76 specifically requested that NPS evaluate natural, cultural, recreational, and scenic resources within and surrounding the NRA.

BLM_0059617

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

| Impact Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| | Basin COA) would be susceptible to moderate to major long-term adverse impacts through land use practices, invasion of noxious weeds, or development. Riparian and wetlands within the NRA would largely be protected, but those communities adjacent to private lands with weed issues would be susceptible to long-term moderate to major adverse impacts.<br><br>Long-term minor to moderate adverse impacts to big game habitat and raptor use of the NRA would result from exotic species invasion and continuing habitat fragmentation on adjacent lands, particularly Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Loss of habitat due to noxious or exotic plant species invasion, land development, or other land uses would result in long-term moderate to major adverse impacts on elk and mule deer severe winter range and bighorn sheep overall range. Raptor habitat and activities would be similarly affected.<br><br>Fisheries within the NRA would not be directly impacted, though water quality impacts from activities outside the NRA could result in indirect short- to long-term negligible to minor effects to fisheries inside and outside the NRA. | Intensity of impacts would be dependent on location, level of landowner participation, and types of tools implemented. However, if development occurs on private lands within the COA with no concern for resource conservation, adverse impacts to vegetation and wildlife resources would be similar to those described under Alternative 1. |
| Special Status Species | Implementation of Alternative 1 would not cause direct effects to any special status species or associated habitats within the NRA. However, loss and fragmentation of habitats would continue and possibly increase in private land units outside the NRA, impacting species and habitats within the proposed lands. Federal species that may be affected and would likely be adversely affected include the bald eagle. Likewise, state listed species including the American peregrine falcon, greater sandhill crane, Gunnison Sage-grouse, and Colorado River cutthroat trout would experience minor to moderate impacts to individuals or habitat within the proposed lands, while impacts to long-billed curlew would be minor. The great blue heron and Gunnison's prairie dog, both sensitive species, would also be affected by indirect impacts from habitat alteration or disturbance. Impacts to heron would be moderate to major, while | Implementation of Alternative 2 would benefit special status wildlife species and therefore would have no effect on the bald eagle, Gunnison Sage-grouse, Colorado River cutthroat trout, American peregrine falcon, greater sandhill crane, long-billed curlew, great blue heron, or other sensitive species. Special status plant species would also experience beneficial impacts. Through decreased potential for development and other land use activities that are detrimental to habitats, all special status species within the proposed lands would have opportunities for increased conservation and potential for populations to expand. Benefits would be greatest on Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA), where development potential is currently the highest. However, resources on other private lands within the COA would benefit as well. In addition, there are no immediate |

BLM_0059618

SUMMARY OF ENVIRONMENTAL CONSEQUENCES

| Impact Topics | Alternative 1:  No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| | those to prairie dogs would be minor to moderate. Sensitive plant individuals or populations may be affected and could be lost due to activities outside the NRA, potentially resulting in minor to moderate adverse impacts to skiff milkvetch, Gunnison milkvetch, Black Canyon gilia, Colorado desert parsley, Rocky Mountain thistle, or hanging garden Sullivantia. | plans for developments or new recreational facilities that would affect these species. Future proposals would be evaluated using the NEPA process prior to project approval. |
| Natural Lightscape (Night Sky) | Except for Reclamation's primary jurisdiction areas around the dams, night sky values within the NRA and on other adjacent federal and state lands would continue to be conserved through federal and state land management activities.

Private portions of the proposed lands that remain in their current undeveloped condition would also continue to contribute to the existing high quality natural lightscape in the area. However, private portions of the proposed lands surrounding the NRA would continue to be increasingly subject to future development and other land uses in Alternative1 that could interfere with night sky values within the NRA. This could result in long-term minor to moderate adverse impacts to the natural lightscape/night sky resource. | As in Alternative 1, except for Reclamation's primary jurisdiction areas around the dams, night sky values within the NRA and on other adjacent federal and state lands would continue to be conserved through federal and state land management activities.

Within the COA, some of the areas most prone to development are located on private property in Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West- End COA). In Alternative 2, there would be greater availability of resource conservation tools to private landowners, and congressionally authorized increased efforts on the part of NPS to work in partnership with private landowners to conserve natural lightscapes within the COA. Increased awareness and cooperation in these areas would be beneficial to both local and NRA-wide lightscapes for visitors and residents alike. This would help maintain existing night sky quality, and result in long-term minor to moderate beneficial impacts to this resource. |
| Natural Soundscape | Except where motorized recreational vehicles and boats are authorized, and except for Reclamation's primary jurisdiction areas around the dams, the soundscapes within the NRA, and on other adjacent federal and state lands would continue to be conserved through federal and state land management activities.

Private portions of the proposed lands that remain in their current undeveloped condition would also continue to contribute to the existing high quality of the natural soundscape in the area. However, private portions of the proposed lands surrounding the NRA would continue to be increasingly subject to future development and other land uses in Alternative 1 that could interfere with | As in Alternative 1, except where motorized recreational vehicles and boats are authorized, and except for Reclamation's primary jurisdiction areas around the dams, the soundscapes within the NRA, and on other adjacent federal and state lands would continue to be conserved through federal and state land management activities.

Within the COA, some of the more vulnerable areas to development are located on private property in Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Under Alternative 2, there would be greater availability of resource conservation tools for private landowners, and congressionally |

FINAL RESOURCE PROTECTION STUDY/ENVIRONMENTAL IMPACT STATEMENT     75

BLM_0059619

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

| Impact Topics | Alternative 1:  No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| | soundscape values within the NRA. This could result in long-term, minor to moderate adverse impacts to this resource. | authorized increased efforts on the part of NPS to work in partnership with private landowners to conserve natural soundscapes within the COA. Increased awareness and cooperation in these areas would be beneficial to both local and NRA-wide soundscapes for visitors and residents alike. This would help maintain existing soundscape quality, and result in long-term minor to moderate beneficial impacts to this resource. |
| **Cultural Resources**[1] | | |
| Archeological Resources, and Historic Districts and Structures | Federal actions within the NRA would result in short and long-term direct minor beneficial impacts on cultural resources. Potential development on Land Units C (Gunnison River COA) and G (West-End COA) could, when coupled with other federal activities, result in indirect minor to moderate adverse cumulative impacts on cultural resources within the NRA, through excavations, and by altering the scene or context of the resource. | The direct short- and long-term minor beneficial impact resulting from federal management practices within the NRA coupled with the beneficial impacts associated with potential conservation easements and/or additions to the NRA would result in direct short- and long-term minor beneficial impacts on cultural resources inside and outside the proposed NRA boundary. However, in the case for future land exchanges with private parties, any parcel proposed for exchange would be evaluated under Section 106 for potential adverse effect to cultural resources, and any such effect would be mitigated prior to the conveyance of any property. |
| **Visitor Use, Understanding, and Enjoyment** | | |
| Recreational Opportunities[1] | Unmet potential for certain types of landbased recreation in the proposed lands surrounding the NRA would result in longterm minor to moderate adverse impacts to the NRA visitor's recreational experience and enjoyment. Long-term minor to moderate adverse impacts on the natural resources on non-NRA lands would be possible from the unrestricted motorized access by some visitors, and resultant change to sensitive habitat areas. Land Units A (CO 92 COA) and C (Gunnison River COA) would be susceptible to longterm minor to moderate adverse impacts as a result of trespass by visitors, including illegal landing of hang gliders on NRA lands. Historic grazing would continue in Long Gulch-Beartrap, and crossing of the Crystal trail by cattle could result in longterm negligible to minor adverse impacts on the visitor experience due to grazing use. | Long-term minor to moderate beneficial impacts to recreational opportunities and visitor enjoyment would result from landowners' willing participation in partnerships with NPS, and the use of tools for resource conservation. Intensity of impacts would be dependent on location, level of landowner participation, and types of tools implemented. Benefits would be greatest in those areas within the COA with the greatest potential for enhancement of trail connections, trail access to new scenic overlooks and backpacking camping areas, cross-county skiing, access to climbing areas, connectivity for mountain biking, and access to legal hang gliding landing areas. These areas include Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), and E (Sapinero/Blue Mesa COA).

As in Alternative 1, there is a potential in Alternative 2 for long-term major adverse |

[1] Public Law 106- 76 specifically requested that NPS evaluate natural, cultural, recreational, and scenic resources within and surrounding the NRA.

BLM_0059620

SUMMARY OF ENVIRONMENTAL CONSEQUENCES

| Impact Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| | The potential for future development and other types of land use, such as highdensity housing, high-rise buildings, large parking areas, utility towers, and mining operations on private lands surrounding the NRA could have a long-term major adverse impact on the scenic resources in the area. The scenic resource is considered to be a key resource for enjoyment of the NRA. Therefore, there could also be a long-term major adverse impact on visitor enjoyment and appreciation of an otherwise nationally significant and spectacular geological and natural landscape setting. | impacts on scenic resources, and the resultant long-term major adverse impact on visitor enjoyment and appreciation of the NRA and its surroundings due to incompatible development and land use, such as high-density housing, high-rise buildings, large parking areas, utility towers, and mining operations, within the COA. This is because the actions proposed in this alternative would be on a volunteer, or willing basis on the part of the private sector. However, if the actions proposed in Alternative 2 are implemented, and the tools and concepts of partnership, cooperation, and conservation are truly enacted, then there would be long-term major and beneficial impacts on the scenic resources. This would result in a long-term major beneficial impact on visitor enjoyment, experience, and appreciation of the NRA and its surroundings. |
| Interpretation and Educational Opportunities | Within the NRA, interpretive services and educational programs would continue as currently managed. Moderate to high development potential on land adjacent to the NRA (Land Units C [Gunnison River COA] and E [Sapinero/Blue Mesa COA]) could have long-term negligible to minor adverse impacts on future opportunities for expanded interpretive services and educational programs. | Beneficial impacts to interpretive and educational opportunities would result from COA landowners' participation in partner-ships with NPS, and implementation of resource conservation tools. Benefits would be greatest in those areas with the potential for trail access to new interpretive and scenic overlooks, including Land Units A (CO 92 COA) and E (Sapinero/Blue Mesa COA). This would also provide the oppor-tunity for facilitated access to overlooks of unique geologic formations such as the Curecanti Needle, resulting in long-term minor to moderate beneficial impacts. Land Units B (Blue Mesa Reservoir) and C (Gunnison River COA) would provide inter-pretive opportunities associated with a long distance trail connection to Riverway and Gunnison, and opportunities for access for the mobility impaired, school programs, and night sky viewing, resulting in longterm moderate beneficial impacts.

Land Unit E (Sapinero/Blue Mesa COA) would provide opportunity for a jointagency managed visitor center facility with direct access for visitors from US 50, resulting in a long-term moderate to major benefit. (Provision of such a visitor center, as well as other recreational and interpretive oppor-tunities suggested in Alternative 2, would depend on a new General Management Plan or Implementation Plan for the NRA.) |

BLM_0059621

| Impact Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| **Scenic Resources**[1] | | |
| Viewsheds | Scenic resources within the NRA and on other adjacent federal and state lands would continue to be conserved through federal and state land management activities. Important scenic features such as the Dillon Pinnacles and Curecanti Needle would be protected, resulting in long-term major beneficial impacts on scenic resources. Private lands within the COA that remain in their current undeveloped condition would also continue to contribute to the existing high quality natural landscape in the area. However, private lands in the COA (surrounding the NRA) proposed for Alternative 2 would continue to be increasingly subject to future development and other land uses in Alternative 1 that might be incompatible with NRA goals and objectives. This could result in long-term major adverse impacts to the scenic resource, depending upon factors such as decisions by landowners, county land use regulations, and population growth. The degree of impact would depend upon type of development and land use; whether development remains localized within a few areas, or becomes increasingly widespread over time; and whether it would occur in the foreground, middle ground, and/or background of the viewer. Future development and other types of land use, such as high-density housing, high-rise buildings, large parking areas, utility towers, and mining operations on private lands in the COA could result in a long-term major adverse impact on the spectacular geological and natural landscape setting, which can be seen from within the NRA, and which is considered to be a key resource for visitor enjoyment of the NRA. | Some of the more important scenic areas, and those more vulnerable to development, are located on private property in Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Conservation of scenic views associated with these areas would be beneficial to both local and NRA-wide viewsheds and individual scenic features, for visitors and residents alike. The availability of resource conservation tools to private landowners, and congressionally authorized increased efforts on the part of NPS to work in partnership with private landowners to conserve viewsheds and scenic resources within the COA, would help maintain the existing scenic resource. The degree to which viewsheds and individual scenic features on private lands within the COA would be conserved is highly dependent upon the willingness and cooperation of landowners. Should landowners implement tools such as conservation easements or fee simple acquisition, long-term major beneficial impacts to the scenic resources would occur. As in Alternative 1, there is a potential in Alternative 2 for adverse impacts on scenic resources, due to certain types of development and land use, such as highdensity housing, high-rise buildings, large parking areas, utility towers, and mining operations within the COA surrounding the NRA. This would occur if private landowners choose not to take advantage of the tools for resource conservation that are available, and if they choose to develop, or otherwise use their lands for purposes that are incompatible with NRA goals and objectives. This is because the actions proposed in Alternative 2 would be on a volunteer, or willing, basis on the part of the private sector. However, if the actions proposed in Alternative 2 are implemented, and the tools and concepts of partnership, cooperation, and conservation are truly enacted on behalf of both NPS and private landowners, then there would be no long-term adverse impacts to the scenic resource, the conservation of which is essential to the enjoyment of the NRA by visitors and residents alike. |

[1] Public Law 106- 76 specifically requested that NPS evaluate natural, cultural, recreational, and scenic resources within and surrounding the NRA.

BLM_0059622

SUMMARY OF ENVIRONMENTAL CONSEQUENCES

| Impact Topics | Alternative 1:  No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| **Regional Economic and Social Characteristics** | | |
| Economics | Economic conditions within the county would remain unchanged assuming private lands within the proposed lands remained in existing conditions and all other factors such as NRA visitation, visitor expenditures, and payments-in-lieu-of-taxes (PILT) remained at current levels. If private lands were developed, expenditures and employment associated with construction-related activity and new residents could result in short-term minor to long-term negligible beneficial impacts within the local economy. Increased development would also result in long-term negligible to minor beneficial impacts to county revenues through increased property taxes, although associated infrastructure costs could offset some of this benefit. Conversely, development that eroded scenic or other key resource values could create long-term negligible to minor adverse impacts to visitation in the NRA and to the quality of life currently enjoyed by area residents. Overall, the long-term beneficial impacts associated with localized development could be offset or exceeded by the adverse impacts that could result from increased development in sensitive resource areas. | The implementation of resource conservation tools would most likely maintain or improve regional economic health by encouraging growth in the retail and service industries, in non-labor total personal income, and in visitor spending resulting in long-term minor to moderate beneficial impacts. If land is acquired, or comes under conservation easements, long-term negligible to moderate adverse impacts to county revenues could occur, depending upon the land conservation method and the land classification of the property. Any losses in tax revenue could be offset by payments in lieu of taxes, and decreased provision of infrastructure associated with preserved open space. |
| Private Land Use Within the NRA | Currently, there are numerous and varied existing rights on lands within the NRA (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights). Under this alternative, NPS would continue to work cooperatively with owners of such rights through a permitting process to allow the owner to exercise those rights, subject to deed restrictions, with the goal of minimizing adverse impacts on NRA resources or visitor enjoyment. Therefore, this alternative would have no impact on privately held rights. | Currently, there are numerous and varied existing rights on lands within the NRA (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights). As in Alternative 1, NPS would continue to work cooperatively with owners of such rights through a permitting process to allow the owner to exercise those rights, subject to deed restrictions, with the goal of minimizing adverse impacts on NRA resources or visitor enjoyment. However, under Alternative 2, there would be more programmatic funding and authorization to pursue greater incentives for resource conservation that might provide a greater opportunity for financial benefit to the owner of the rights, while more closely meeting NPS resource conservation goals and objectives. Thus, this alternative could provide a minor to moderate long term beneficial impact for the owner of the rights. |

FINAL RESOURCE PROTECTION STUDY/ENVIRONMENTAL IMPACT STATEMENT       79

BLM_0059623

| Impact Topics | Alternative 1:  No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| Neighboring Private Lands and Landowners Within the Proposed Lands | Because landowners would continue to have the freedom to manage their properties within the limits of county land use regulations, there would be no adverse impacts to the control they have over their property due to actions by NPS. However, the NRA's ability to assist landowners to preserve important resources would be limited, since funding would be unavailable to purchase conservation easements or to pursue fee simple acquisition without Congressional appropriation. This would result in moderate to major adverse impacts to landowners who are interested in working in partnership with NPS towards enhanced resource conservation. Changes in land use and property values would most likely occur, but would range from adverse to beneficial depending upon landowner preferences. | Landowners would be under no obligation to negotiate with the National Park Service, nor would NPS have any condemnation or other authority to take private lands within the COA without full consent of and compensation to the landowner. Because landowners would continue to have full private property rights within the limits of county land use regulations, there would be no adverse impacts to the control they have over their property. With congressional authorization, and subject to competing demands from other NPS units, there would be more opportunity for funds to be made available for acquisition of fee title or conservation easements from willing landowners in the COA. This could be a major beneficial impact to interested landowners.

The availability of a full range of resource conservation opportunities and tax benefits could result in long-term minor to major benefits to interested landowners. Changes in land use and property values would most likely occur, but would range from adverse to beneficial depending upon landowner preferences. |
| National Park Service, Reclamation, and Other Neighboring Agency Management and Operations | | |
| National Park Service Administrative Management, and Operations | The ongoing requests for information related to resource conservation on adjacent private lands, and potential resource and visitor use impacts associated with potential development of private lands adjacent to the NRA would result in longterm minor adverse impacts to NPS operations.

There would be a minor beneficial impact on NPS ability to meet its mission through the Joint Agency Management Effort, which has been initiated as part of this RPS. However, under Alternative 1, progress is limited due to lack of staff time to fully realize the potential opportunities. Under Alternative 2, there would be more staff time available to pursue this effort. | If funding is not provided to hire the necessary staff that would be needed to perform the additional office and field duties that would be required to implement Alternative 2, there would be a long-term major adverse impact on NPS operations. If additional staff is available to perform these duties, there is expected to be a long-term moderate beneficial impact to NPS operations, due to enhanced cooperation from landowners and other neighbors in the realm of resource conservation. It is for these reasons that this study recommends an increase in the NRA's base funding to hire two additional full-time-equivalent (FTE) employees to accomplish these tasks, and to make Alternative 2 become a reality.

There would be a long-term minor to moderate beneficial impact on NPS ability to meet its mission, due to appropriately worded legislation for the NRA, improved wording in a new MOA with Reclamation, and increased consultation and cooperation between NPS and other agencies, including Reclamation. This improvement in |

BLM_0059624

SUMMARY OF ENVIRONMENTAL CONSEQUENCES

| Impact Topics | Alternative 1: No Action (Continuation of Existing Conditions) | Alternative 2: Proposed Action |
|---|---|---|
| | | consultation and cooperation among the agencies is already happening, through the Joint Agency Management Effort, which is integral to the RPS. |
| | | Land transfers between NPS and other agencies would simplify existing boundaries between agencies and improve NPS operations in site-specific areas, resulting in long-term negligible to minor beneficial impacts to NPS. |
| Reclamation's Primary Operations | The Bureau of Reclamation and Western Area Power Administration would continue their responsibilities within and adjacent to the national recreation area, including construction, operation, maintenance, replacements and additions; and they and their assigns would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities; consistent with Reclamation law, and other applicable laws and regulations. Reclamation, Western, and the National Park Service would consult with each other as necessary and appropriate. Thus, there would be no adverse impacts to Reclamation and Western responsibilities under Alternative 1. | As with Alternative 1, the Bureau of Reclamation and Western Area Power Administration would continue their responsibilities within and adjacent to the national recreation area, including construction, operation, maintenance, replacements and additions; and they and their assigns would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities; consistent with Reclamation law, and other applicable laws and regulations. Formal establishment of the NRA under Alternative 2 would not amend or supplement existing Reclamation law applicable to the Aspinall Unit or the Uncompahgre Project. Reclamation, Western, and the National Park Service would consult with each other as necessary and appropriate. Thus, there would be no adverse impacts to Reclamation and Western responsibilities under Alternative 2. |
| Reclamation and Other Neighboring Agency Administrative Management, and Operations | The existing condition requires Reclamation to develop, negotiate, implement, and maintain local agreements with at least two land management agencies (NPS and BLM) for its lands within and adjacent to the NRA. This activity and the associated personnel and costs for coordinating management on these lands create a minor long-term expense for all three agencies. | New NRA legislation, a revised agreement between Reclamation and NPS, and streamlining or potential elimination of other agreements among various agencies, would provide a long-term minor beneficial impact to Reclamation operations, by reducing associated personnel costs for managing the lands and agreements. Other agencies, such as USFS, BLM, and CDOW would experience negligible to moderate beneficial impacts to operations, depending upon the location and change in agency responsibility associated with the land transfers. In some locations, long-term negligible adverse impacts could occur to existing maintenance schedules, where an agency would assume new responsibilities. |

BLM_0059625

CHAPTER 2: ALTERNATIVES, INCLUDING THE PROPOSED ACTION

BLM_0059626

# Chapter 3: Affected Environment



# AFFECTED ENVIRONMENT

## INTRODUCTION

### PRIMARY ELEMENTS OF THE ENVIRONMENT AFFECTED BY ACTIONS

The purpose of the Affected Environment chapter is to describe the primary elements of the environment that would be affected by the actions proposed in either or both Alternative 1 and Alternative 2. These elements are called "impact topics", and are summarized in the Purpose and Need chapter under "Impact Topics Considered." As shown in the table of Impact Topics Retained or Dismissed in that chapter, some of the topics that the study team initially thought might be affected were ultimately dismissed from detailed assessment. Those topics that were retained are described in further detail in this Affected Environment chapter, and addressed in the Environmental Consequences chapter, where the impacts of the alternative actions on those topics are assessed in detail.

Four of the elements of the environment that are assessed in detail are traditionally done so in environmental impact statements. In addition, they are required to be done so by this study's enabling legislation. They are the **natural, cultural, recreational**, and **scenic** resources.

## LAND UNITS

Throughout this chapter, reference is made to "land units," which were defined earlier in the Alternatives, Including the Proposed Action chapter, under "Development of Alternatives." They were created for purposes of analysis during the development of alternatives. They consist of the public and private lands outside the National Recreation Area (NRA), but within the larger study area, that were considered most critical for conservation.

A total of eight land units were identified, according to geographical location, similarity of resource values, reasonably foreseeable activities that occur within them, and land ownership. The land units, identified by the letters A through H, are shown on the Alternative 2 map; and are referenced throughout the Resource Protection Study/ Environmental Impact Statement (RPS/ EIS). They consist of two types of land: (1) privately-owned land within the Conservation Opportunity Area (COA) of Alternative 2, defined as Land Units A, C, D, E, and G; and (2) non-NPS agency lands that are included within the proposed NRA boundary shown in Alternative 2, defined as Land Units B, F, and H. For ease of reference, the land units are again listed here:

> Land Unit A (CO 92 COA): private lands north and south of Colorado State Highway 92 (CO 92) and Morrow Point



*Soap Mesa – a portion of Land Unit A*

BLM_0059628

Reservoir, including Black Mesa, Soap Mesa, Soap Creek, and Fitzpatrick Mesa

Land Unit B (Blue Mesa Reservoir Agency): agency lands from Soap Creek east to Beaver Creek, including Dillon Pinnacles, Blue Mesa north and south shores, and Gunnison River Canyon

Land Unit C (Gunnison River COA): private lands in the vicinity of Neversink and Riverway

Land Unit D (Iola Basin COA): private lands in Iola Basin and South Gunnison River Canyon

Land Unit E (Sapinero/Blue Mesa COA): private lands in the vicinity of Sapinero Mesa and Windy Point to Hunters Point

Land Unit F (Gateview Agency): agency lands in the vicinity of Gateview Campground

Land Unit G (West-End COA): private lands west of Fitzpatrick Mesa on the south side of Crystal Reservoir and the area around Spring Gulch on the north side of Crystal Reservoir

Land Unit H (West-End Agency): agency lands north and south of Crystal and Morrow Point Reservoirs.

Collectively, all the land units comprise the "proposed lands" for Alternative 2, consisting of public lands recommended for addition to the NRA (the agency lands); and lands recommended for inclusion in a COA (the private lands).

The criteria that were used to establish each land unit are shown in Table 2. This table first appeared in the Alternatives, including the Proposed Action chapter under "Development of Alternatives," and appears again below for ease of reference. If a resource or other criterion occurs within a given land unit, it is identified by a dot in the matrix. If the dot is highlighted in yellow, the associated criterion is considered to be a primary reason for the inclusion of the land unit within the proposed NRA boundary or the COA in Alternative 2. More detailed descriptions

of specific resources, including their significance in the Curecanti region, are provided later in this chapter.

## Natural Resources

### TOPOGRAPHY AND CLIMATE

The climate of the Curecanti region is influenced by the surrounding topography. Extremely cold winters are common, due to cold mountain air settling in the basin. The January record low is -44.86° F. Average low and high temperatures vary from -10° to 30° F in winter and 36° to 80° F in summer. Air in this region is also very dry, and precipitation averages only 11 to 12 inches per year. These characteristics contribute to the unique composition of plant communities at Curecanti NRA and the surrounding area, including sagebrush dominated vegetation at elevations where pinyon-juniper forests would otherwise be expected to dominate (Emslie 2003).

### WATER RESOURCES

Within the boundaries of Curecanti NRA, the Gunnison River is dammed at three locations to form Blue Mesa Reservoir, Morrow Point Reservoir, and Crystal Reservoir. These reservoirs and infrastructure make up the Wayne N. Aspinall Storage Unit, one of four storage units in the Bureau of Reclamation's (Reclamation) Colorado River Storage Project (CRSP). The Aspinall Unit produces electricity, regulates the flow of the Gunnison River, and controls floods, in addition to providing water storage for the Upper Colorado River Basin (NPS 2003). Also, within the NRA downstream of Crystal Dam are a diversion dam and tunnel and associated facilities that are part of Reclamation's Uncompahgre Project. The diversion dam and tunnel transport irrigation water to the Uncompahgre Valley.

Above the reservoirs, the Gunnison River flows freely through a floodplain of mature

BLM_0059629

NATURAL RESOURCES

TABLE 2: FACTORS CONSIDERED IN ESTABLISHING LAND UNITS

In the table below, ● indicates a dot (criterion present) and **●** (bold) indicates a yellow-highlighted dot.

| Criteria | A — CO 92 COA | B — Blue Mesa Reservoir Agency | C — Gunnison River COA | D — Iola Basin COA | E — Sapinero /Blue Mesa COA | F — Gateview Agency | G — West-End COA | H — West-End Agency |
|---|---|---|---|---|---|---|---|---|
| Administrative Efficiency | ● | **●** | ● | **●** |  | **●** | ● | **●** |
| Archeological/Historical Sites | ● | **●** | **●** | ● | ● | **●** | **●** | ● |
| Bighorn Sheep – Overall Range | ● | ● |  |  | ● | ● | ● | ● |
| Elk – Severe Winter Range | **●** | ● | ● | **●** | **●** | ● | ● | ● |
| Gunnison Sage-grouse (all categories) |  | ● | ● | ● | **●** |  |  |  |
| Heron Rookery |  |  | **●** |  |  |  |  |  |
| Historic Railroad Feature |  |  | **●** |  |  | **●** | **●** |  |
| Lynx – Potential Habitat | ● | ● |  |  | ● | ● |  | ● |
| Management Issues / Logical Boundary | ● | ● | ● | ● | **●** |  |  | ● |
| Mule Deer – Severe Winter Range | **●** | ● |  | **●** | **●** | ● | ● | ● |
| Paleontology/Geology | ● | ● |  |  | ● |  |  | ● |
| Prairie Dog – Overall Range |  |  |  | ● | ● |  |  | ● |
| Pronghorn – Winter Range |  | ● |  |  | ● |  |  |  |
| Raptor Range | ● | ● | ● | ● | ● | ● |  | ● |
| Rare and/or Imperiled Species | ● | **●** | **●** | ● | ● | ● |  | ● |
| Recreation Opportunities | **●** | ● | **●** | **●** | **●** | ● |  |  |
| Scenic Qualities from Primary Overlook or within 3-mile Viewshed | **●** | **●** | **●** | ● | **●** | ● | **●** | ● |
| Understanding of Significant Resources | ● | ● | ● | ● | ● | ● |  | ● |
| Water Quality | ● | ● | ● | ● |  | ● | ● | ● |

**Notes:**
A dot indicates the criterion is present within the land unit.
The addition of yellow highlighting indicates that not only is the criterion present, but it is of such significance, in combination with the other criteria present, to recommend that the land unit be included within the COA or proposed NRA boundary in Alternative 2.

FINAL RESOURCE PROTECTION STUDY/ENVIRONMENTAL IMPACT STATEMENT     85

narrowleaf cottonwoods and then into a narrow canyon before entering Blue Mesa Reservoir. Blue Mesa is the largest of the three impoundments, and is the largest body of water in Colorado, consisting of 96 miles of shoreline, and extending over 20 miles in length. The purposes of Blue Mesa Reservoir include, among others, water storage and hydropower production (NPS 2003).

Morrow Point Dam, located 12 miles below Blue Mesa Dam, creates a deep, narrow reservoir between the steep walls of the Black Canyon. The primary function of Morrow Point Dam is the production of hydroelectricity. With two generators, its power capacity is almost twice the power capacity of Blue Mesa's power plant.

Crystal Dam is located 6 miles below Morrow Point Dam. Crystal Dam stabilizes the flow of water in the Gunnison River and produces hydroelectricity (NPS 2003). Together, the three dams produce enough electricity to support a community of 240,000 persons.

Downstream of Crystal Dam near the eastern boundary of Black Canyon of the Gunnison National Park (BLCA) is the Gunnison Diversion Dam and East Portal of the Gunnison Tunnel; both features of the Uncompahgre Project. The diversion dam and tunnel divert water from the Gunnison River to the Uncompahgre Valley for irrigation. Below the diversion dam the Gunnison River once again runs free through the national park towards Grand Junction and its eventual confluence with the Colorado River.

Major tributaries to the reservoir system include Cebolla Creek, Lake Fork of the Gunnison River, and the Cimarron River. At least 17 smaller tributaries flow into the NRA from the north and south. Threats to future water quality include urban housing and resort development in canyons and along drainages, and other associated changes from historic land-use practices. Because the NRA has a relatively long history of water quality and quantity monitoring (ca. 1980), NRA personnel have been able to clearly identify present water resource issues.

The NRA is currently monitoring 21 reservoir and adjacent tributary sites in an effort to assess current and minimize future impacts to water quality from internal and external sources. This effort is combined with similar efforts at BLCA and is focused on complying with National Park Service Policy and the Government Performance and Review Act (GPRA), as well as following the Clean Water Act and applicable State regulations. Credible water quality data is required to accurately characterize the water quality within the NRA. Most of the sites demonstrate water quality that is considerably better than State standards, and NPS policy encourages the preservation of this high quality.

## Colorado Water Quality Standards — Classification of Waters

Water quality standards for the Gunnison River Basin have been established as part of Regulation No. 35 drafted by the Colorado Department of Public Health and Environment's (CDPHE) Water Quality Control Commission (CDPHE 2002). Under these regulations, water bodies are designated for specific uses. Blue Mesa, Morrow Point, and Crystal Reservoirs are designated to be suitable for class 1, Cold Water Aquatic Life; class 1a, Recreation (Primary Contact); Water Supply; and Agriculture, as defined below:

- Waters designated as class 1, Cold Water Aquatic Life, are defined as waters capable of sustaining a wide-variety of cold-water biota, including sensitive species. Waters with this designation are considered capable of sustaining such biota where physical habitat, water flows or levels, and water quality conditions result in no substantial impairment of the abundance and diversity of species.

- Waters designated as class 1a, Recreation (Existing Primary Contact), are defined as waters that are suitable for recreational activities in or on the water when the ingestion of small quantities of water is likely to occur.

BLM_0059631

- The Water Supply designation applies to surface waters that are suitable for potable water supplies. After receiving standard treatment these waters would meet Colorado drinking water regulations.

- The Agriculture designation applies to surface waters suitable for irrigation of crops usually grown in Colorado, and that are not hazardous as drinking water for livestock, and can be classified for agricultural use.

## Resource Significance

In an otherwise arid habitat, the reservoirs and stream systems of the area are important resources. These systems support riparian communities and wildlife and fisheries habitat and provide water for human development activities. Streams and reservoirs within the proposed lands also provide recreational opportunities.

## GEOLOGY AND PALEONTOLOGY

The landforms and scenery of the Curecanti area are formed by the underlying geology, which has been sculpted by over 2 million years of erosive activity by the Gunnison River. Precambrian-aged granitic and metamorphic basement rocks, some greater than 1.7 billion years old, form much of the landscape in the eastern portion of the national recreation area. Sedimentary rocks such as sandstone, limestones, and shales laid down by ancient water bodies are also found in the hills surrounding the Blue Mesa Reservoir. Red and green colored shales along the lakeshore are part of the fossil-rich Jurassic-age Morrison Formation. In some places, these rocks are overlain by sandstones of the Dakota Formation, which in turn is overlain by the Mancos Formation, both of Cretaceous age.

The older rocks are capped by Tertiary volcanic rocks, the result of past volcanic activity from the West Elk Mountains. An impressive example of eroded volcanic material in the area is the Dillon Pinnacles, northeast of Blue Mesa Dam. This assortment of strangely shaped spires and towers is formed from rock known as West Elk Breccia. It consists of cemented lava, rock, and mud spewed from the West Elks about 30 million years ago. Ash erupted from the San Juan Mountains a few million years later and rimmed the breccia with zones of tuff (ash flow). The tuff caps the mesas that surround Curecanti NRA. When the tuff weathers away, formations like the Dillon Pinnacles are created by erosion.

The volcanic activity and resulting landforms also dictated the course of the Gunnison River and its eventual carving of Black Canyon through the Gunnison Uplift and underlying rocks over a billion years old. Black Canyon extends for nearly 50 miles, beginning just below Blue Mesa Dam and continuing to the confluence with the North Fork. The canyon is dramatically steep, formed of gneisses, schists, and granites, as can be seen on the walls enclosing Morrow Point and Crystal Reservoirs and at the downstream end of the NRA at East Portal.



*The Dillon Pinnacles*

BLM_0059632

The region's geologic trademark is the Curecanti Needle, a quartz monzonite formation that rises 700 feet from the waters of Morrow Point Reservoir. It is visible from the reservoir surface or from the overlook at Pioneer Point along CO 92. Back in the heyday of railroad travel, the Denver and Rio Grande Railroad highlighted the unique pyramidal shape of the Curecanti Needle by featuring it on their logo for the "Scenic Line of the World."

During the Jurassic Period, there was an abundance of life in the area surrounding Curecanti NRA. Rocks deposited during this time, such as the Morrison Formation, can be rich in fossils, including those of dinosaurs. During a study of the Morrison ecosystem that transects North America from Canada into New Mexico, an apatosaur dinosaur was discovered along the shoreline of Blue Mesa Reservoir. The discovery was unique for the area, and yielded the southernmost specimen of the 140 million-year-old Allosaurus (Fiorillo et al. 1996; Landis 2000). In addition, the find revealed a previously unknown resource of significance. Detailed study of the Morrison Formation in Curecanti NRA and the surrounding area has and would likely continue to yield insights into the rock unit (Fiorillo et al. 1996). More fossils are likely to be imbedded in the rock formations surrounding Curecanti NRA, especially in the famous Morrison Formation.

Land units A (CO 92 COA), B (Blue Mesa Reservoir Agency), E (Sapinero/Blue Mesa COA), and H (West-End Agency) are known to include fossil resources and/or to have a high potential for future discoveries. These include the areas north and south of CO 92 and Morrow Point Reservoir, north of Blue Mesa Reservoir, Sapinero Mesa, Blue Mesa, and areas west of Fitzpatrick Mesa.

### Resource Significance

The fossil-rich formations of the NRA offer the potential for preservation and/or future discovery and study of fossils of various species. The formations also provide an opportunity for interpretation, to provide visitors with a better understanding of the resources.

## VEGETATION AND WILDLIFE

### Vegetation, Including Wetlands

The majority of the Curecanti landscape is best classified as semiarid shrubland. In most areas within the NRA, the upland plant community is dominated by three subspecies of big sagebrush, black sagebrush, and native grasses. Slight differences in elevation, moisture, or soil structure can result in visible differences in vegetation community composition. The immediate area is often characterized by narrow canyons with steep rocky walls that support little vegetation. Tall cottonwood trees and lush undergrowth are associated with riparian areas found mostly at the eastern end of the NRA near the Gunnison River and the many side drainages that feed into the reservoirs. In these areas, the narrowleaf cottonwood with its deep roots helps stabilize the riverbank while retaining nutrients and moisture for understory plant growth. Intermittent drainages support juniper, Gamble oak, and shrubs including serviceberry and wild rose. Higher elevation and shady, cooler areas are characterized by scattered stands of ponderosa pine, Douglas fir, and spruce trees. The landscape east of the NRA has been altered by humans and is characterized by pastureland used primarily for cattle grazing and hay production.

Important vegetation resources in the Curecanti region include riparian and wetland communities associated with the Gunnison River and tributaries. Specific land units with valuable riparian communities include units C (Gunnison River COA), D (Iola Basin COA), and E (Sapinero/Blue Mesa COA). Some specific wetland areas have been mapped, and many others are likely to be found scattered throughout the same locations as riparian communities (Gunnison County Wetland Survey, CNHP 2002; and National Wetlands Inventory, USFWS). These maps are available through NPS, Gunnison County, and the USFWS National Wetlands Inventory Program.

Some of these wetland communities, including those associated with the Gunnison River and tributaries, are under jurisdiction of the

BLM_0059633