U.S. Army Corps of Engineers (the Corps). Filling of these 'jurisdictional' wetlands is regulated by the Corps under Section 404 of the Clean Water Act. These wetlands are also protected by County regulations. Non-jurisdictional wetlands are often isolated from perennial drainage systems and are not protected by federal, state, or local laws. However, federal land agencies such as NPS, USFS, and BLM have policies that address management of both jurisdictional and non-jurisdictional wetlands that occur on their lands as mandated by Executive Order 11990. In addition, the Colorado Division of Wildlife recognizes wetlands as areas of high habitat value for wildlife, and manages these resources accordingly. There are no official regulations for non-jurisdictional wetlands on private lands. Future cooperative conservation actions with private landowners would include more detailed assessment of impacts to wetlands on such lands.

Exotic or noxious plant species present a threat to native vegetation communities. The NRA and other federal lands are often managed for control of noxious weed invasion. However, federal funding is not always available for such efforts, and privately-owned lands in the proposed lands might not have organized weed control efforts in place. Noxious weed management is one of the tasks being undertaken by the Joint Agency Management Effort (JAME), a program to facilitate cooperation in dealing with resource issues that cross agency and private land boundaries.

## Wildlife

Mammalian inventories were conducted in 2001 and 2002 at select National Park Service areas in the Northern Colorado Plateau Network, including Curecanti NRA. Of 60 species that researchers thought were likely to occur within the NRA, 36 species in 2001 and 48 species in 2002 were observed. Common mammals observed during inventories include mule deer, coyote, mountain lion, bobcat, raccoon, least chipmunk, various bats, Colorado chipmunk, deer mouse, bushy-tailed woodrat, several voles, and the western jumping mouse (USGS 2003).

BIG GAME—Important habitat for big game species is located in portions of Curecanti NRA and surrounding areas. Severe winter range for American elk and mule deer, winter range for pronghorn, and overall range for bighorn sheep exist in the area as shown in Table 6 and discussed below.

TABLE 6: BIG GAME HABITAT IN PROPOSED LANDS

| Species | Habitat Type | Acres within NRA | Acres by Land Unit | |
|---------|-------------|------------------|--------------------|--|
| American Elk | Severe Winter Range | 18,000 | A = | 4,800 |
| | | | B = | 150 |
| | | | D = | 130 |
| | | | E = | 2,720 |
| | | | G = | 240 |
| | | | Total = | 8,040 |
| Mule Deer | Severe Winter Range | 16,000 | A = | 7,300 |
| | | | B = | 150 |
| | | | D = | 130 |
| | | | E = | 890 |
| | | | G = | 100 |
| | | | Total = | 8,570 |
| Bighorn Sheep | Overall Range | 14,600 | B = | 2,000 |
| Pronghorn | Winter Range | 260 | B = | 80 |
| | | | D = | 1,125 |
| | | | Total = | 1,205 |

BLM_0059634

Habitat for American elk consists of semi-open forests or forest edges adjacent to meadows and alpine tundra. Elk are both grazers and browsers with a diet that consists of shrubs, forbs, and grasses (Fitzgerald et al. 1994). In the Rocky Mountain region, elk typically migrate between high elevation areas in spring and summer to lower, warmer areas in the fall and winter. In the Upper Gunnison Basin region, summer range for elk is widespread and includes Curecanti NRA and the surrounding area. Summer concentration areas are located at higher elevations north of the NRA. Winter concentration areas and severe winter range is located within and adjacent Curecanti NRA. Within the NRA, approximately 18,000 acres of severe winter elk range are protected. Outside of the NRA, the proposed lands encompass approximately 8,000 acres of severe winter range for elk, found in Land Units A (CO 92 COA), B (Blue Mesa Reservoir Agency), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA) (Table 6). This habitat is extremely important during unusually harsh winters when survival of elk can be threatened by lack of accessible food supply.

Mule deer occupy all ecosystems in Colorado from grasslands to alpine tundra. They reach their greatest densities in shrublands on rough, broken terrain, with abundant browse and cover. Winter diets of mule deer consist of browse from a variety of trees and shrubs (74%) and forbs (15%). Summer diets are 50% browse, and forb consumption increases to 46% (NDIS). As with elk, winter habitats are often at lower elevations, and winter concentration and severe winter range are located within and adjacent to Curecanti NRA. Within the NRA, approximately 16,000 acres of severe winter mule deer range is protected, while Land Units A (CO 92 COA), B (Blue Mesa Reservoir Agency), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA) include a total of 8,600 acres of such habitat.

Suitable habitat (overall range) for bighorn sheep is widespread in the area, including 14,600 acres within Curecanti NRA and 2,000 acres in Land Unit B (Blue Mesa Reservoir Agency). Historically, bighorn sheep ranged throughout the canyons of the Gunnison River and the surrounding mountainous regions. However, populations declined throughout the 1900s due to habitat conversion, competition, and disease. Beginning in the 1970s, and as recent as 1995, CDOW reestablished a bighorn population in the area through transplanting animals. Sheep have been transplanted into various areas including Dillon Mesa, Lake Fork, and the Gunnison Gorge. Area herds did well until a particularly severe winter in 1978 resulted in high mortality. Since 1978, the total local population count has fluctuated between 25 and 35 animals (CPCESU 2002).

Pronghorn habitat consists of grasslands and semi-desert shrublands in areas with topography that supports good visibility. They are most abundant in shortgrass or midgrass prairies and least common in xeric habitats, such as those surrounding Curecanti NRA. Pronghorn diet consists of a variety of forbs and grasses, and they sometimes consume and tolerate species that are hazardous to livestock. Winter range for pronghorn exists primarily in the Kezar Basin, which is south of Iola Basin of Blue Mesa Reservoir. It occurs on 260 acres of NRA land; on 80 acres of land unit B (Blue Mesa Reservoir Agency), which is currently managed by the Bureau of Land Management (BLM); and on 1,125 acres of private land in land unit D (Iola Basin COA).

BIRDS—There are approximately 225 species of birds documented in the area of Curecanti NRA (Hyde and Cook 1980). Common birds include the horned lark, black-capped chickadee, white-breasted nuthatch, dipper, American robin, mountain bluebird, hermit thrush, warbling vireo, western meadowlark, red-winged blackbird, pine siskin, black-billed magpie, common raven, and various jays, warblers, juncos, sparrows, finches, woodpeckers, and towhees.

Many species of waterfowl and shorebirds migrate through the Gunnison Basin region or remain as summer residents. Common water and shorebirds found at Curecanti NRA include the spotted sandpiper, ring-billed

BLM_0059635

gull, and green-winged teal. Nesting areas are more likely to be found in inland areas and in the narrow portions of the reservoir arms where habitat is more suitable and water-based recreation activity is restricted. Waterfowl and shorebirds that nest in these areas include killdeer, common snipe, mallard and common merganser. In addition, great blue herons wade along the shoreline in these narrow reservoir arm areas. A heron rookery is located in the Cooper Ranch/Neversink area in the eastern portion of the NRA and in Land Unit C (Gunnison River COA).

Common raptors at Curecanti NRA include red-tailed hawk, Swainson's hawk, golden eagle, bald eagle, and American kestrel. Great horned owls nest in the area and are common year-round, and flammulated owls are common in the summer months.

Of the birds recorded in the NRA, four are federally or state listed as regionally threatened, endangered, or candidate species, including bald eagle, whooping crane, and yellow-billed cuckoo. The Gunnison Sage-grouse, a unique species native to the region and prevalent in the sagebrush communities within the NRA, was designated as a federal candidate species for listing under the Endangered Species Act on December 28, 2000. On April 18, 2006, the U.S. Fish and Wildlife Service (USFWS), the agency responsible for the determination of the bird's status, decided not to list it as endangered or threatened, and has removed it from the candidate species list. However, NPS still considers the Gunnison Sage-grouse to be a NRA sensitive species.



*Gunnison Sage-grouse*

In addition to the federal status mentioned above, the Sandhill crane, peregrine falcon, Gunnison Sage-grouse, and long-billed curlew are listed as state special concern species. Special status species are discussed later in this chapter.

FISHERIES—Construction of the dams along the Gunnison River has altered the fisheries of the area through inundation of riparian areas, alteration of flows and water temperatures, and alteration of spawning habitat. However, Curecanti NRA provides one of the best cold-water fishing opportunities in the nation partly due to the spawning run of kokanee salmon in the Gunnison River above Blue Mesa Reservoir. Other game fish common to Curecanti NRA include lake trout (Mackinaw trout), brook trout, rainbow trout, and brown trout. The Colorado Division of Wildlife (CDOW) maintains populations of game species through stocking. Due to seasonal water fluctuations, there is a lack of development of aquatic plant or invertebrate communities to provide concentrated shoreline feeding areas for fish (CDOW 2002b). Instead, zooplankton in interior surface waters is the main food source for sport fish in Blue Mesa Reservoir.

AMPHIBIANS AND SNAKES—Snakes common to Curecanti NRA include the smooth green snake, Great Basin gopher snake, garter snake, and striped whipsnake. A variety of lizards and salamanders are also found here. Breeding areas for lizards are generally in upland areas away from the shoreline, while primary habitat for amphibians would be in the narrow portions of reservoir arms and along the shoreline.

### Resource Significance

The lack of development and the uniquely pristine nature of the wildlife habitat within and surrounding the NRA contribute to the significance of the wildlife resources and their importance to regional populations. This is especially true for big game species, including American elk, mule deer, bighorn sheep, and pronghorn that rely on range in the area. In addition, the proposed lands provide important raptor habitat and fisheries resources.

Riparian communities are underrepresented within the NRA. Riparian vegetation provides valuable habitat for wildlife. Threats to the health of riparian communities include

BLM_0059636

streamside development, grazing, pollution, exotic plants, and changes to the flood regime. These activities have taken a large toll, especially when considering the original inundation and loss of riparian habitat caused by the filling of the three reservoirs.

## SPECIAL STATUS SPECIES

Species listed by both the U.S. Fish and Wildlife Service (USFWS) and the Colorado Wildlife Commission, and those of special concern to the NRA, all of which could potentially be impacted by the actions in Alternatives 1 and 2, are listed in Table 7, and described in more detail in this section. Species protected by the Endangered Species Act are listed by USFWS as federally threatened or endangered. In addition, USFWS lists candidate species that are considered for listing at a later date. While not protected under the Endangered Species Act, candidate species are also considered when analyzing impacts of actions that may potentially affect them.

A letter was sent by Curecanti NRA staff to the Grand Junction office of USFWS on May 21, 2001 requesting a list of federally threatened and endangered species in the vicinity of the NRA. USFWS responded on June 28, 2001 and subsequently updated this response on March 17, 2005, with a list of the following species: seven federally endangered species—the black-footed ferret, bonytail, Colorado pikeminnow, humpback chub, razorback sucker, Uncompahgre fritillary butterfly, and clay-loving wild-buckwheat; four federally threatened species—bald eagle, Canada lynx, Mexican spotted owl, and Uinta Basin hookless cactus; and three candidate species—Boreal toad, Gunnison Sage-grouse, and yellow-billed cuckoo. Subsequent to this latest update, USFWS decided not to list the Boreal toad and the Gunnison Sage-grouse as endangered or threatened, and has removed them from the candidate species list. However, the state of Colorado and Curecanti NRA still consider the Gunnison Sage-grouse to be a special status species. No critical habitat for

federal special status species was identified in the proposed lands.

The Colorado Wildlife Commission maintains a list of special status species including state-listed threatened, endangered, or special concern species. The federally-listed species mentioned above are also given special status by the state. Other state listed species that may potentially be affected by the actions at Curecanti NRA include the American peregrine falcon, Colorado River cutthroat trout, greater Sandhill crane, Gunnison Sage-grouse, and long-billed curlew. These species are listed as special concern species and do not have protected status. However, they have been determined by the Colorado Wildlife Commission to be at risk of eventual threatened or endangered status.

The NRA considers all federally- and state-listed species to be special status. Other species of concern that the NRA considers to be special status, which may potentially occur in the proposed lands, include bighorn sheep, Great blue heron, Gunnison's prairie dog, Adobe thistle, Black Canyon gilia, Colorado desert parsley, Gunnison milkvetch, hanging garden sullivantia, and skiff milkvetch (Table 7).

### Federal Species

Suitable foraging habitat for bald eagle exists along the entire length of Curecanti NRA, as the reservoirs provide an ample food source for bald eagles in the area. Winter eagle activity is concentrated around the Gunnison River and the reservoir shorelines. Nesting generally occurs in large trees that occur along the Gunnison River (such as the Neversink / Cooper Ranch area) and along tributaries (both within and outside the current NRA). Foraging individuals are likely to be active throughout the remainder of the NRA.

The black-footed ferret once ranged throughout grasslands and mountain basins of North America, but is now extirpated from the majority of its range including southern Colorado. The occurrence of the black-footed ferret in the proposed lands is extremely unlikely and the species is not evaluated further in this document.

BLM_0059637

TABLE 7: SPECIAL STATUS SPECIES IN THE VICINITY OF CURECANTI NATIONAL RECREATION AREA

| Common Name | Scientific Name | Status | | Applicable Land Units |
|---|---|---|---|---|
| **Federal Special Status Wildlife Species** | | | | |
| Bald eagle | *Haliaeetus leucocephalus* | FT | ST | All |
| Black-footed ferret | *Mustela nigripes* | FE | SE | N/A |
| Bonytail | *Gila elagans* | FE | SE | N/A |
| Canada lynx | *Lynx Canadensis* | FT | SE | A, B, E, F, H |
| Colorado pikeminnow | *Ptychocheilus lucius* | FE | ST | N/A |
| Humpback chub | *Gila cypha* | FE | ST | N/A |
| Mexican spotted owl | *Strix occidentalis lucida* | FT | ST | N/A |
| Razorback sucker | *Xyrauchen texanus* | FE | SE | N/A |
| Uncompahgre fritillary butterfly | *Boloria acrocnema* | FE | | N/A |
| Yellow-billed cuckoo | *Coccyzus americanus* | FC | SSC | N/A |
| **State Special Status Wildlife Species** | | | | |
| American peregrine falcon | *Falco peregrinus anatum* | SSC | | A, E, G, H |
| Colorado River cutthroat trout | *Oncorhynchus clarki pleuriticus* | SSC | | A, B (potential reintroduction sites) |
| Greater Sandhill crane | *Grus Canadensis tabida* | SSC | | C |
| Gunnison Sage-grouse | *Centrocercus minimus* | SSC | | B, C, D, E |
| Long-billed curlew | *Numenius americanus* | SSC | | All |
| **NRA Sensitive Wildlife Species** | | | | |
| Bighorn sheep | *Ovis canadensis* | PS | | B |
| Great blue heron | *Ardea heodias* | PS | | C |
| Gunnison's prairie dog | *Cynomys gunnisoni* | PS | | B |
| **Federal Special Status Plants Species** | | | | |
| Clay-loving wild-buckwheat | *Eriogonum pelinophilum* | FE | | N/A |
| Uinta Basin hookless cactus | *Sclerocactus glaucus* | FT | | N/A |
| **NRA Sensitive Plants Species** | | | | |
| Adobe thistle | *Cirsium perplexans* | G2 | S2 | Near: G, H |
| Black Canyon gilia | *Gilia pentstemonoides* | G3 | S3 | A, E, H |
| Colorado desert parsley | *Lomatium concinnum* | G2 | S2 | G |
| Gunnison milkvetch | *Astragalus anisus* | G3 | S2 | C, D |
| Hanging garden sullivantia | *Sullivantia hapemanii* | G3, T3, S3 | | A, B, E |
| Skiff milkvetch | *Astragalus microcymbus* | G1 | S1 | B, C, D |

**Status Key**

FC = Federal Candidate Species  
FE = Federal Endangered Species  
FT = Federal Threatened Species  
PS = NRA Sensitive Species  
SE = State Endangered Species  

SSC = State Special Concern Species  
ST = State Threatened Species  
S1 = Critically Imperiled in Colorado  
S2 = Imperiled in Colorado  
S3 = Vulnerable in Colorado  

G1 = Globally Critically Imperiled  
G2 = Globally Imperiled  
G3 = Globally Vulnerable  
T3 = Globally vulnerable at infraspecific level  

Source: USFWS Ecological Services, Grand Junction, 2001; Colorado Division of Wildlife, 2000

BLM_0059638

CHAPTER 3: AFFECTED ENVIRONMENT

The bonytail, Colorado pikeminnow, and humpback chub are all members of the minnow family that are endemic to the Colorado River Basin. The Razorback sucker is a large sucker that is also endemic to the Colorado River system. The alteration of the river system by damming and water development activities has changed the flow regime, temperature, and sedimentation qualities of the river system, making much of the former range of these species uninhabitable. In addition, the introduction of many non-native fish and other aquatic animals, plants, pathogens, parasites, and chemical contaminants have affected the river system's ecosystem (Mueller and Marsh 2003). Of these species, only the Colorado pikeminnow and razorback sucker (stocked) are known to inhabit the Gunnison River, though not within the proposed lands. None of these fish are analyzed further in this document.

Canada lynx occur at elevations of 9,000 to 14,500 feet in forests, meadow, or tundra environments. Northern coniferous forests are the preferred habitat of the lynx (NDIS). Snowshoe hare is the primary prey of lynx. Other prey includes squirrels, beavers, muskrats, deer, caribou, and moose (Fitzgerald et al. 1994). Lynx potentially could occupy higher elevation areas surrounding Curecanti NRA. According to the Colorado Division of Wildlife's Natural Diversity Information Source (NDIS), overall lynx range encompasses western portions of the Curecanti region. A recent project which used CDOW data along with vegetation cover type data to map potential lynx habitat on BLM managed lands (Baker - CNHP, CDOW), found Land Units A (CO 92 COA), B (Blue Mesa Reservoir Agency), E (Sapinero/Blue Mesa COA), F (Gateview Agency), and H (West-End Agency) to contain potential habitat for the species. However, at this time, the lynx is not known to reside within the proposed lands and is not analyzed further.

The Mexican spotted owl nests in closed canopy forests and narrow rocky canyons in remaining habitat in the southwestern United States. Although potential habitat may occur in the area, the species is not known to exist within the proposed lands. The Mexican spotted owl is not analyzed further in this document.

The federally endangered Uncompahgre fritillary butterfly lives in patches of snow willow at high elevations, and has very limited habitat, a small population size, and low genetic variability, which may affect long-term population stability (USGS 2005). The species is susceptible to trampling by recreationists and grazing animals. Though known to occur in alpine meadows in Gunnison County, due to lack of suitable habitat, the Uncompahgre fritillary is not expected to occur within the proposed lands and is not analyzed further in this document.

In the western United States, yellow-billed cuckoo habitat consists of old growth riparian woodlands with dense understories, while in other portions of the country more open woodlands are adequate (Kingery 1998). In the proposed lands, the locations of potential occurrence for this species would be in the riparian corridors such as those along the Gunnison River or its tributaries. The yellow-billed cuckoo is designated as a non-game species within Colorado. As that designation applies, it is not legal to take, harass, or threaten the species. There have been historical infrequent summer records of non-breeding yellow-billed cuckoo occurrences within the NRA (Andrews and Righter 1992; Hyde and Cook 1980), but there is no evidence of breeding by the species in Gunnison County (Kingery 1998). There are no known recent sightings within the NRA or proposed lands, and the species is not analyzed further in this document.

Clay-loving wild buckwheat is a federally endangered plant found in Mancos shale badlands, in salt desert shrub communities. Populations are known to exist in west-central Montrose County, but are not expected to occur within the proposed lands. This species is not evaluated further in this document.

The Uinta Basin hookless cactus is a federally threatened plant found on hills and mesas in the Colorado and Gunnison river valleys on gravelly soils (CNPS 1997). It is known to occur in north-central Montrose County, well

BLM_0059639

west of the proposed lands (CNHP). This species is not expected to occur within the proposed lands, and is not analyzed further in this document.

## State Listed Species

The American peregrine falcon has been federally delisted, but remains a state species of concern. The falcon occupies a variety of habitats at elevations of 3,000 to 10,000 feet and usually nests in high cliff ledges. Peregrines are known to occur nearby in the Black Canyon of the Gunnison National Park, especially near the Painted Wall area. They also regularly nest within the NRA, but have the most potential for occurrence in the proposed lands in Land Units A (CO 92 COA), E (Sapinero/Blue Mesa COA), G (West-End COA), and H (West-End Agency) (Andrews and Righter 1992; Hyde and Cook 1980).

Colorado River cutthroat trout historically occupied portions of the Colorado River drainage in Wyoming, Colorado, Utah, Arizona, and New Mexico (GMUG MIS Assessment). Populations of the species have dramatically declined due to land management practices and hybridization with non-native salmonids, and current populations of the species occur primarily in headwater streams and lakes (CRCT Task Force 2001; GMUG MIS). The Colorado River cutthroat trout is known to occur in the Gunnison River below Crystal Reservoir (incidental occurrence through occasional stocking), Antelope Creek (a tributary to North Beaver Creek), Road Beaver Creek (a tributary to Cebolla Creek), as well as in the national park (Kowalski, pers. comm. 11/27/2007). Potential cutthroat trout reintroduction sites within the proposed lands include West Elk Creek, Curecanti Creek, and East Elk Creek, in Land Unit A (CO 92 COA) and B (Blue Mesa Reservoir Agency).

The greater Sandhill crane occupies a variety of habitats including crops, grasslands, mudflats, and riparian areas at 3,000 to 10,000 feet in elevation. The area along Curecanti NRA and the Gunnison River is considered to be suitable habitat for the species during migration, primarily in spring, but is not a known breeding area for the species (Kingery 1998; Andrews and Righter 1992). Sandhill cranes are most likely to occur in riparian communities or in agricultural areas surrounding the NRA. Land Unit C (Gunnison River COA), along the Gunnison River, supports potential habitat for the greater Sandhill crane.

The Gunnison Sage-grouse has been dropped as a candidate for federal listing, but remains a state species of concern. The bird has important habitat located within Curecanti NRA and surrounding areas. The NRA is currently engaged in monitoring programs for the Gunnison Sage-grouse lek (breeding) sites in cooperation with the Colorado Division of Wildlife. This native to the Gunnison Basin was recognized in 2000 to have different coloration and mating rituals from the Northern Sage-grouse. The breeding population size is small, totaling only 4,000 individuals, with up to 3,000 of those believed to reside in Saguache or Gunnison counties, Colorado (BLM 2001). The birds nest in big sagebrush-dominated communities from April to July. Within the NRA, a historic Gunnison Sage-grouse lek occurs near the shoreline at the Stevens Creek campground.

Threats to Gunnison Sage-grouse include degradation of habitat, habitat loss or fragmentation, and physical disturbance, especially during critical mating, nesting, or brooding periods. Habitat degradation or loss has resulted from land treatments that convert sagebrush landscapes to developed or fragmented areas. Roads, utility and energy development, urban, or agricultural development are examples of activities that can threaten Gunnison Sage-grouse habitat. Physical disturbance to the species may occur through off-highway vehicle use, harassment by scientific studies or bird watching, gaining access to fishing spots, and hunting other animals. Hunting of Gunnison Sage-grouse was discontinued a number of years ago. Land unit E (Sapinero/Blue Mesa COA) contains critical winter range, while units B (Blue Mesa Reservoir Agency), C (Gunnison River COA), and D (Iola Basin COA) contain severe winter range for Gunnison Sage-grouse. Sage-grouse

BLM_0059640

CHAPTER 3: AFFECTED ENVIRONMENT

nesting areas are found within units B (Blue Mesa Reservoir Agency) and D (Iola Basin COA), while a brood area is located in Land Unit C (Gunnison River COA).

Habitat of the long-billed curlew includes croplands, grasslands, shrublands, and wetland and riparian areas at elevations of 3,000 to 5,000 feet. They are known to occur as springtime migrants throughout Gunnison County, including the vicinity of Curecanti NRA (Andrews and Righter 1992). However, there is no evidence that they breed throughout most of western Colorado, including within Gunnison County (Kingery 1998). In Colorado, the long-billed curlew is primarily an eastern plains species.

## NRA Sensitive Species

Curecanti NRA contains a variety of species that the staff considers to be native species of concern. These include bighorn sheep (discussed with big game species), great blue heron, Gunnison Sage-grouse (previously discussed under State Listed Species), and Gunnison's prairie dog. The NRA has not yet completed a comprehensive identification and evaluation of all native species of concern.

The great blue heron is a summer resident of Curecanti NRA. Nesting locations are located within the NRA and on adjacent lands. The Gunnison River supports important habitat and this nesting location is one of only two heronries in Gunnison County (Bio-Environs 2001). Great blue heron nesting occurs in mature narrowleaf cottonwoods in the Neversink / Cooper Ranch area within the NRA, as well as in Land Unit C (Gunnison River COA). The nesting colony is an important resource, and monitoring has taken place since 1987. Management for maintenance and establishment of future generations of riparian vegetation community is important to the success of the colony.

The Gunnison's prairie dog lives in short- to medium-height grass prairies and plateaus at moderate to high elevations. Gunnison's prairie dogs are restricted to southwestern and south-central Colorado. They range in elevation from 6,000 to 12,000 feet. As

with all prairie dog species, populations are much smaller than they were historically due to eradication, habitat loss, and disease. In Curecanti NRA, Gunnison's prairie dogs inhabit the sagebrush grassland communities.

Adobe thistle (Rocky Mountain thistle) is found in Mesa, Montrose, Delta, Eagle, and Ouray counties on barren gray shale slopes and adobe hills in open areas and disturbed sites in mixed shrublands and pinyon juniper woodlands (CNHP 2002). It is found within the Curecanti NRA in the vicinity of Morrow Point Reservoir. Other areas of concern for the species include Land Units G (West-End COA) and H (West-End Agency).

Black Canyon gilia is a Colorado endemic that grows in cracks in vertical walls, on narrow ledges, and cliff rims at elevations of 6,800 to 9,000 feet in Gunnison, Montrose, Ouray, Hinsdale, and Mineral counties in 13 known populations (CNPS 1997). Within the proposed lands, the species may potentially occur or be of concern in or near Land Units A (CO 92 COA), E (Sapinero/Blue Mesa COA), and H (West-End Agency) (NPS Map - tes_63.rtl).

Colorado desert parsley grows on adobe hills and plains in rocky soils derived from Mancos Formation shale. It is associated with arid shrub communities, typically saltbush (CNPS 1997). A portion of Land Unit G (West-End COA) is within an area of concern for the species (NPS Map - species_rank_eo.rtl 3/22/01).

Two sensitive milkvetch species that occur in the NRA, Gunnison milkvetch and skiff milkvetch, are listed by the Colorado Natural Heritage Program (CNHP) as globally and state critically imperiled and globally and state imperiled, respectively. The Gunnison milkvetch and the skiff milkvetch occur in dry upland sagebrush areas at elevations of approximately 7,500 to 8,500 feet (CNHP 2002).

Gunnison milkvetch has been found occasionally on the sagebrush floor of the Gunnison Basin, and is a concern in Land Units B (Blue Mesa Reservoir Agency) and C (Gunnison River COA) (CNPS 1997, NPS Map - tes_63.rtl). Skiff milkvetch is known only

BLM_0059641

from locations in and near the South Beaver Creek drainage (CNPS 1997). Land units known to contain occurrences or potential habitat for skiff milkvetch include Land Units B (Blue Mesa Reservoir Agency), C (Gunnison River COA), and D (Iola Basin COA) (NPS Map - tes_63.rtl).

The skiff milkvetch occurs in its highest abundance on property just southeast of the Curecanti NRA boundary in the South Beaver Creek drainage on BLM property, which is an Area of Critical Environmental Concern (ACEC). A portion of the ACEC that encompasses the best and largest population of skiff milkvetch was designated as a Colorado Natural Area in 1997. This status provides additional monitoring and protection for the rare plant species. Colorado Natural Areas Program (CNAP) is a state agency which preserves some of the finest examples of Colorado's original and unique landscapes for the benefit of present and future generations. CNAP works in partnership with local, state, and federal agencies and private citizens to recognize and protect areas which represent exceptional examples of Colorado's diverse ecosystems. The CNAP designation is approved by the Natural Areas Council, signed by the Governor of Colorado, and when enacted, protects elements of statewide importance.

Hanging garden sullivantia is the only species in this genus found in Colorado. Found in hanging gardens and wet cliffs of various geology including limestone, shale, and quartzite (CNHP 1999). It is known to occur at the bottom of the Black Canyon of the Gunnison (NPS 1997). Exact locations within the proposed lands are unknown, but habitat that could support the species is found in Land Units A (CO 92 COA), and E (Sapinero/Blue Mesa COA) (Dangoule Bockus, pers. comm. 04/05/2005).

## Resource Significance

The proposed lands contain habitat that is important for the conservation of special status wildlife and plant species that are significant resources of the NRA and the entire nation. Continued and increased conservation of important habitat offers unique opportunities to contribute to the preservation of such species. Special status species that are significant in the area include American peregrine falcon, bald eagle, bighorn sheep, Colorado River cutthroat trout, great blue heron, greater Sandhill crane, Gunnison Sage-grouse, Gunnison's prairie dog, long-billed curlew, Adobe thistle, Black Canyon gilia, Colorado desert parsley, Gunnison milkvetch, hanging garden sullivantia, and skiff milkvetch.

## NATURAL LIGHTSCAPE (NIGHT SKY)

NPS areas protect resources so that they may be shared with visitors for generations to come. These include the dark star-lit skies of night. However, each year new light sources eat away at this vanishing resource. Forty percent of Americans live under night skies so bright that their eyes no longer have to adjust to night vision. Two-thirds of the U.S. population cannot see the Milky Way, and more than half of today's young people have never seen it at all.

NPS areas have no authority to require that neighboring landowners and cities lessen glare. The 1916 Organic Act, which created the national park system, calls for conserving scenery and other resources for future generations. It does not specifically mention light.

Light by light, we are losing sight of the unknown. The universe awash in stars — a source of wonder and inquiry since civilization began — is being obliterated by mega-wattage spilling into the sky from every corner: malls, airports, ballparks, theme parks, billboards, car dealerships, miniature golf courses, and the neighbor's driveway.

NPS launched the Night Sky Team after a 1999 study of 189 NPS areas found two-thirds reporting light pollution. Beginning in 2004, the NPS Night Sky Team partnered with the Northern Colorado Plateau Network to expand night sky inventories at NPS areas in the Colorado Plateau. The goal was to capture night

BLM_0059642



*Dark nights provide stargazing opportunities*

sky brightness approximating the twentieth percentile atmospheric clarity (as estimated by Bext or atmospheric extinction) to establish a baseline of light pollution. Additionally, light pollution sources were to be identified and relative contributions established.

Field visits were made to Black Canyon and Curecanti in 2004 to evaluate night sky. The night sky quality monitoring report completed in 2006 indicates that on a clear night most light pollution is restricted to the near horizon leaving the majority of the sky in the vicinity of the park in good condition. Within the immediate vicinity, the communities of Grand Junction, Fruita, Delta, and Montrose are equally bright. Increasing amounts of night light present a threat to the quality of the NRA's night sky programs and the visitor experience and enjoyment, but also presents a threat to the quality of life of local residents.

### Resource Significance

One of the significant resources now available to NRA visitors is the night sky. It is a resource worthy of attention and conservation, and offers opportunities for lay persons and astronomers to ponder the universe.

### NATURAL SOUNDSCAPE

"Soundscape" refers to the total ambient acoustic environment, which is made up of both natural sounds and human-made

sounds. Part of the NPS mission is to protect soundscapes as a vital component of the visitor's enjoyment of a site. Both the sounds of the wild and the sounds meaningful in historic settings are protected in the National Park System.

Though human-made sounds can be heard within the NRA from sources such as traffic from surrounding highways, overhead aircraft, and motorized watercraft use within the reservoirs, overall, the soundscape of much of the NRA appears to be well preserved, as certain portions of the NRA offer a sense of serene solitude. NRA backcountry trails give visitors opportunities to hear natural sounds. Pine Creek, Curecanti Creek, Mesa Creek, and Crystal Creek Trails are examples of excellent places to listen to natural sounds, and if conditions are favorable, to experience serenity and quiet.

Additional data on ambient soundscape environments and noise intrusions would be needed to more fully evaluate the present condition within the NRA. However, it should be recognized that noise intrusions internal to the NRA (such as NPS and concession construction activities, new recreational technologies, etc.) and external to it (private development construction, mowing of lawns, increased local traffic, etc.) could serve to degrade the present condition.

### Resource Significance

One of the significant resources now available to NRA visitors is the soundscape. It is a resource worthy of attention and conservation, and offers opportunities for visitors to enjoy a reprieve from the often bustling sounds of their everyday lives.

BLM_0059643

# CULTURAL RESOURCES

## HISTORICAL BACKGROUND

As early as 10,000 years ago, this area appears to have supported a series of human adaptations to desert, plateau, and mountain conditions. Paleo-Indian tradition dated from pre-9000 B.C. and 5000 B.C. In about 6500 B.C. there was a dual emphasis with the addition of gathering plant foods. This coupling of food gathering and hunting successfully continued in the Upper Gunnison Basin until American Indian and Euro-American contact (NPS 1994).

The Archaic period with its hunting adaptation is represented in the NRA's archeological record from approximately 4000 B.P. through A.D. 1. There also appears to be considerable evidence of aboriginal occupation dating from approximately A.D. 400–1600. The first evidence of an Indian group in the Upper Gunnison Basin, which was recognized and named by Euro-Americans, is that of the Utes who migrated to the Colorado area from the Great Basin in A.D. 1200–1300 (NPS 1994).

Artifacts and radiocarbon dates collected from the area of the NRA range from 8000 B.C. until about A.D. 1500 and appear to document essentially continuous intermittent use of the

Upper Gunnison Basin since the end of the Pleistocene. The historic period for American Indians in western Colorado begins with first written account of contact with Ute groups and ends in approximately 1881 with their movement to reservations. The NRA also contains many unrecorded sites reflecting late nineteenth century Euro-American activity including small-scale ranching, mining, and logging as well as construction camps that supported expansion of the railroad (NPS 1994).

The Denver and Rio Grande Railroad (D&RG), later renamed the Denver and Rio Grande Western Railroad (D&RGW), was the most successful narrow gauge railroad to cross the Rocky Mountains. The tracks connected the Front Range cities of Denver, Colorado Springs, and Pueblo with Salida. The main line ran from Salida over Marshall Pass to Gunnison, through the Black Canyon to Cimarron, and over Cerro Summit to Montrose, on to Grand Junction, and into Utah. From the Gunnison area, branch lines ran to Lake City and mining areas at Crested Butte. Built in 1881–1882, the D&RGW operated passenger service until 1940 and freight trains until 1949. Given the rugged terrain in some areas, narrow gauge (3 feet between the rails rather than the standard 4 feet 8-½- inch gauge) was used to save on construction costs and to negotiate tighter curves. Thus, the D&RGW narrow gauge was an active railroad through the Black Canyon above Cimarron for nearly 70 years, until the line was abandoned in 1949.

The construction of the Gunnison Diversion Tunnel (1905–1909) was an engineering marvel for its day. One of the first projects of the Reclamation Service, now known as the Bureau of Reclamation, it was one of the largest tunnel projects to be attempted at the time, 11 feet wide by 12 feet high, stretching almost six miles through hard rock, clay, sand,



*Cimarron Canyon rail exhibit*

BLM_0059644

CHAPTER 3: AFFECTED ENVIRONMENT

and shale. The construction itself was very treacherous work, and the average stay of men working on the tunnel was about 2 weeks. The tunnel was steamy because of hot water seepages, underground streams often flooded the tunnel, and there were many other dangers to face. The tunnel is still in use today, as it diverts water from the Gunnison River at East Portal for irrigating the otherwise desert-like Uncompahgre Valley. The Gunnison Tunnel is on the National Register of Historic Places, and is a National Historic Civil Engineering Landmark.

Above the Diversion Tunnel, Reclamation also constructed three large dams on the Gunnison River, together known as the Wayne N. Aspinall Storage Unit, between 1962 and 1976. The Aspinall Unit is one of the four main units of the Upper Colorado River Storage Project (UCRSP). The three dams in the Aspinall Unit work as a system to store water, produce electricity, and regulate water flow. There is no question the dams have altered the natural environment. However, they have provided a variety of benefits to communities and citizens, especially in the area of agriculture.

## ARCHEOLOGICAL RESOURCES



Sporadic archeological research in the Curecanti area began as early as the 1930s, but the first formal research was prompted in 1962 by

*Cultural resources help us answer questions about our past*

Reclamation plans to construct the three dams along the Gunnison River. Surveys in the area of Blue Mesa Reservoir identified 10 sites with 8 below the proposed high water line behind the Blue Mesa Dam that were believed to reflect short-term occupations by nomadic Indian groups. Under Executive Order 11593, surveys were undertaken in 1976 with the University of Colorado that identified another 130 archeological sites, most within the vicinity of Blue Mesa Reservoir. Examinations

in the late 1970s with both University of Colorado and NPS staff from the Midwest Archeological Center (MWAC) uncovered additional features including the remains of an isolated hearth that generated a radiocarbon date of approximately 8,000 B.C. In 1984, the Curecanti Archeological District was listed on the National Register of Historic Places. Between 1980 and 1984, MWAC undertook five seasons of construction-related research. Construction-related research projects were undertaken between 1991 and 1992 by MWAC, as well as by Powers Elevation Company and Alpine Archeological Consultants. A mix of new sites, isolated finds, and previously recorded sites were inventoried. Two formerly unrecorded sites were added to the Curecanti Archeological District nomination (NPS 1994).

Within Land Unit B (Blue Mesa Reservoir Agency), north of Blue Mesa Reservoir, important cultural material, including archeological resources, has been documented. Areas on the northeastern edge of the land unit, near North Beaver Creek, also contain cultural resources eligible for listing on the National Register of Historic Places.

## HISTORIC STRUCTURES AND RESOURCES

Five structures are currently listed on the fiscal year (FY) 1999 NPS List of Classified Structures (LCS) for Curecanti NRA. One structure, the Gunnison Diversion Tunnel, is additionally listed as a National Historic Civil Engineering Landmark.

Important railroad features occur in Land Units C (Gunnison River COA), F (Gateview Agency), and G (West-End COA), and include encampments, foundations, ovens, and railroad grade features, as well as archeological resources.

Cimarron is home to a display of historic railroad cars that includes Locomotive No. 278, its coal tender, a boxcar, and caboose, which resides on the D&RG truss (also know as trestle) in the Cimarron River Canyon near the town of Cimarron. Built by Baldwin Locomotive Works in Philadelphia in 1882,

BLM_0059645

Locomotive No. 278 served as a mainline freight and helper engine on the Crested Butte Branch and this section of the D&RG's main line for over 70 years. The city of Montrose leased the locomotive, tender, and caboose to NPS in 1989 for 99 years. The truss or steel deck span bridge was installed in 1891, and was listed on the National Register of Historic Places in 1976 as the last remaining structure representing the narrow gauge railroad (NPS nd-b).

Other historic resources occur within the proposed lands, such as an old school house at Sapinero and the U.S. Forest Service (USFS) Sapinero Guard Station (Land Units E [Sapinero/Blue Mesa COA] and A [CO 92 COA]).

The Old Spanish Trail was designated as a National Historic Trail, a component of the National Trails System, by Public Law 107-325, on December 4, 2002. The trail was a trading and traveling route that connected Santa Fe with Los Angeles, and was used between 1829 and approximately 1847. The northern route passed through what is now the eastern end of Curecanti NRA and Land Unit C (Gunnison River COA), and possibly skirted Land Unit D (Iola Basin COA), although the exact location of the trail has yet to be located in this area (NPS nd-c).

## RESOURCE SIGNIFICANCE

The prehistoric and historic stories of human culture in the Curecanti area are recorded in the traces and tracks left by American Indians, miners, railroaders, and ranchers. These signs document not only human struggles to survive but also how changing human value systems, economics, social, and technological changes, and the importance of water have shaped the use and character of the land and its people. Cultural history contains archeological examples of some of the oldest villages found in North America, predating the pyramids of Egypt. The narrow-gauge railroad exhibited in Cimarron graphically portrays the story of technology's effects of shaping people and using land. It is likely that the proposed lands contain additional significant cultural resources that are associated with archeological and historic resources found within the NRA.

## VISITOR USE, UNDERSTANDING, AND ENJOYMENT

### RECREATIONAL OPPORTUNITIES

Curecanti NRA is located in a sparsely populated area of Colorado. The nearest cities, including population and distance to NRA headquarters at Elk Creek, include: Gunnison (16 miles, population 5,400); Montrose (50 miles, population 12,300); and Grand Junction (111 miles, population 42,000). The nearest large metropolitan area is Denver (200 miles, population 555,000). The Front Range of Colorado (stretching from Pueblo in the south to Fort Collins in the north) is home to 3.5 million people; 462,000 people live in the Western Slope region of Colorado, and 147,000 in the Central Mountain Region.

Approximately 1 million visitors use the NRA's facilities annually. The peak season is from Memorial Day to Labor Day, with activities focusing on water-based recreation and camping. However, there is potential to expand land-based recreational opportunities through the implementation of Alternative 2 (the Proposed Action). While the NRA is open year-round, due to its high altitude setting, approximately half of the visits occur in June, July, and August.

### Annual Visitor Use

Annual recreation visitor data for 1996 to 2005 indicate that visitation has varied slightly (see Table 8). Annual visitor numbers first reached over 1 million in 1983, and except for a drop in visitor numbers in 2002, have been between 879,000 and 1,145,000 yearly since then. The impacts of higher gas prices, low reservoir levels due to drought, wildfire occurrence, and lower fishing success during some years are believed to have had an impact on the number of visits.

BLM_0059646

CHAPTER 3: AFFECTED ENVIRONMENT

TABLE 8: ANNUAL VISITATION AT CURECANTI
NATIONAL RECREATION AREA, 1996–2005

| Year | Number of Visitors | Percentage Change from Previous Year |
|------|-------------------|--------------------------------------|
| 1996 | 1,017,256 | +2.4% |
| 1997 | 966,680 | -5.0% |
| 1998 | 973,652 | +0.7% |
| 1999 | 1,044,523 | +7.3% |
| 2000 | 1,022,320 | -2.1% |
| 2001 | 879,776 | -13.9% |
| 2002 | 732,713 | -16.7% |
| 2003 | 1,008,810 | +37.7% |
| 2004 | 1,006,102 | -0.3% |
| 2005 | 882,768 | -12.3% |
| 10-Year Average | 953,460 | -- |

(NPS Public Use Statistics Office)

The recreation area is situated adjacent to Black Canyon of the Gunnison National Park, and is en route for many people who tour other national parks in the region (e.g., Rocky Mountain, Mesa Verde, Arches, and Canyonlands). Based on ranger observation, most visitors to the NRA are from Colorado (NPS 2002b).

Based on the available data, no dramatic increase in NRA visitation is anticipated over the next 10 years. However, general population trends in Colorado suggest an annual increase of 2% per year, and an increase in population could mean an increase in visitor numbers (CDOLA 2002). Gunnison County has a large number of summer residents and second home owners who visit the NRA on a regular basis.

**Monthly Visitor Use**

Based on the 10-year average, 54% of the annual visitation occurs during June, July, and August. Based on monthly visitor statistics, an average of 5,619 people visit the recreation area each day in June, July, and August (NPS Public Use Statistics Office).

**Visitor Activities**

Curecanti NRA is a relatively narrow strip of land and water stretching eastward approximately 40 miles from the eastern border of the Black Canyon of the Gunnison National Park along the Gunnison River corridor. It is surrounded by hundreds of thousands of mostly undeveloped acres of Reclamation, BLM, USFS, and Colorado Division of Wildlife lands, and private property that in some areas is being developed. The predominant



*A variety of recreational boating opportunities are already available on Curecanti reservoirs, arms, and inlets. Alternative 2 would expand the opportunities for land-based recreation.*

BLM_0059647

setting provides a rural character with a spattering of developed sites, mostly along U.S. Highway 50 (US 50). The construction of three CRSP dams along the Gunnison River between 1962 and 1976 transformed this locale into a water-based recreation destination. There are three reservoirs along the Gunnison River within the NRA; Crystal Reservoir, Morrow Point Reservoir, and Blue Mesa Reservoir. Because Crystal and Morrow Point Reservoirs lie deep within the canyon of the Gunnison River, boating there is limited by horsepower restrictions.

Blue Mesa Reservoir is approximately 20 miles long at full pool and has 96 miles of shoreline. It is divided into three basins: Iola, Cebolla, and Sapinero—all suitable for water-based recreation. Full reservoir pool sits at 7,519.4 feet above sea level. Water temperatures remain quite cold year- round, which somewhat restricts water-based recreation activities to the warmer summer months. Water related activities include the use of powerboats, canoes, sailboats, sailboards, and kayaks. Other recreational activities include sightseeing, photography, wildlife watching, fishing, hunting, swimming, hiking, backpacking, developed and backcountry camping, and picnicking. In winter, the NRA supports a variety of activities, including snowshoeing, Nordic skiing, ice skating, ice fishing, and snowmobiling.

Scenic US 50 stretches east-west along the recreation area. Therefore, Curecanti NRA is experienced by many "accidental visitors" who get out of their vehicles to walk along the shore and beaches, sightsee, find solitude, or take photographs. Developed marinas, picnic areas, campgrounds, and boat ramps are accessible from the highway, and there are numerous undeveloped pullouts and overlooks.

Curecanti NRA's recreation is currently mostly water-based, because the area was established primarily to include and immediately surround the reservoirs created for the water storage project. Therefore, a relatively small amount of adjacent land was included within the original NRA. However, surrounding the current NRA, are a variety

of land-based recreational opportunities on public lands administered by other agencies, including BLM, CDOW, and USFS. And potential opportunities for enhanced resource understanding and additional resource-based recreation exist on surrounding lands that are currently under private ownership. These existing and potential opportunities are appropriate to the purpose and mission of the NRA. The National Park Service is therefore consulting with neighboring agencies and communicating with neighboring private landowners to explore ways of enhancing the enjoyment, and the recreational and educational experience of visitors to the NRA.

The following is a list of recreational opportunities (existing and potential), within and surrounding the NRA, as identified at workshops and open houses with the public and with the staff. It is not within the scope of this study to identify which of these opportunities would or would not be provided within the NRA. That would be done during a future planning process relating to a new general management plan, implementation plan, or other planning effort. It would be based on a number of factors, such as appropriateness to the resource, compatibility with each other, and impacts on resources and visitor enjoyment.

- Aerial activities (cliff diving, float planes, hang gliding, hot-air ballooning, model airplanes, parasailing)

- Artistic experiences (creative)

- Backpacking

- Biking (frontcountry, mountain)

- Boating (ice-boating, motorized, non-motorized, river kayaking, and sailing)

- Camping, designated

- Cross-country skiing

- Dog sledding

- Facility-based activities (attending conferences, dining, lodging)

- Fishing (including ice-fishing)

BLM_0059648

CHAPTER 3: AFFECTED ENVIRONMENT

- Hiking (interpretive, backcountry, single or multi-day experience)
- Horseback riding
- Hunting (archery and firearms)
- Ice climbing
- Ice skating
- Interpretation and education (attending interpretive programs, educational day camp, educational residential camp, educational seminars, exploring cultural resources, exploring visitor centers and exhibits, learning about the resource, research, and touring the dams)
- Jogging and trail running
- Night sky viewing
- Observation (bird watching and other wildlife)
- Off-road vehicle use
- Photography
- Picnicking
- Rock climbing
- Scuba diving and snorkeling
- Sightseeing (motorized and non-motorized)
- Snowmobiling
- Snowshoeing
- Swimming

- Water skiing (towed, or self-propelled), wake boarding, and tubing
- White-water rodeo
- Windsurfing

The most popular existing visitor activities and potential recreational uses are discussed below in more detail.

CAMPING AND PICNICKING—There are 10 developed campgrounds with about 390 campsites, and 21 backcountry/boat-in campsites within the NRA. There are 19 picnic areas within the recreation area, with many of these located adjacent to campgrounds or other developed facilities. Record high numbers of campers (including tent and RV camping) occurred in the late 1980s, with 120,000 overnight stays per year. The 10-year average for annual overnight stays is 63,780, which includes tent campers, RV campers, and backcountry campers (NPS Public Use Statistics Office).

HIKING, BACKPACKING, SIGHTSEEING, WILDERNESS-LIKE EXPERIENCE, AND OTHER RECREATIONAL ACTIVITIES—There are designated hiking trails along the northern side of the reservoirs including the Crystal Creek Trail, Mesa Creek Trail, Hermits Rest Trail, Curecanti Creek Trail, and Dillon Pinnacles Trail. The pinnacles are the dominant geologic feature along Blue Mesa Reservoir. The Dillon Pinnacles Trail is very popular, offering spectacular views of the reservoir, the distant San Juan Mountain peaks, and the interestingly eroded volcanic pinnacles.

Two trails to the reservoirs are reached from US 50. The Mesa Creek Trailhead, which is on the north side of Crystal Reservoir just below Morrow Point Dam, is accessed from the south side of the reservoir by crossing a footbridge over to the northern shoreline. Parking for the trailhead is reached via the road leading from Cimarron to the dam. The Pine Creek Trail, which runs along the south shore of Morrow Point Reservoir just below Blue Mesa Dam, is accessible from a trailhead just off US 50.



*Hikers on Curecanti Creek Trail*

BLM_0059649

Backcountry areas that offer opportunities for solitude occur within the current NRA primarily on Crystal and Morrow Point Reservoirs. However, access can be difficult. Some of the arms on Blue Mesa Reservoir offer similar opportunities. However, boat and vehicle noise may be clearly audible. Greater potential exists on proposed lands for such solitude opportunities, especially Land Units A (CO 92 COA), B (Blue Mesa Reservoir Agency), and H (West-End Agency). An example of a potential extended backcountry opportunity is a continuous trail along the north rim above the Gunnison River, linking Gunnison Gorge National Conservation Area, Black Canyon of the Gunnison National Park, and Curecanti National Recreation Area.

Backcountry/boat-in camping opportunities exist on all the reservoirs. Due to the narrowness of reservoir arms and creek outlets, the visitor is more in touch with the surrounding landscape and geology. Though the NRA offers multiple opportunities for backcountry camping on the reservoirs, there is limited opportunity for backpacking



*Boat-in camping offers backcountry experiences*

experiences elsewhere in the NRA. However, potential exists within the proposed lands for backpacking, especially in Land Units A (CO 92 COA), B (Blue Mesa Reservoir Agency), and H (West-End Agency).

Horseback riding is currently an approved activity in some areas, such as the Dillon Pinnacles Trail to access the West Elk Wilderness north of Curecanti NRA. Horse corrals are located at Dry Gulch and Ponderosa campgrounds and outside the NRA at Soap Creek Campground (USFS).



*Equestrian opportunities may be expanded under Alternative 2*

Mountain biking is a popular activity in Gunnison County. Several trails exist on public lands east of the NRA, and bicyclists also enjoy riding paved and unpaved roads. US 50 raises a safety concern due to vehicle speed; however, much of US 50 has been widened to include 8-foot paved shoulders. There is a potential to designate bicycle trails in the NRA, and a desire on the part of the local trails commission to find a trail to connect the NRA to the City of Gunnison. The potential to connect trails elsewhere is greatly enhanced by using existing roads and trails within the proposed lands, such as in Land Units C (Gunnison River COA) and D (Iola Basin COA). For example, an east-west bicycle trail might be appropriate south of Blue Mesa Reservoir.

For cross-country skiing enthusiasts, there are several areas that offer good skiing to those who enjoy the challenge of breaking trail

BLM_0059650

or following informally established routes; however, there are no groomed ski trails. Skiers can ski the frozen, snowy surface of Blue Mesa Reservoir, ski the level road to the East Elk Creek Campground, or beyond to the Sapinero Wildlife Area for a round-trip distance of 4 miles.



*Cross-country skiing opportunities at Curecanti NRA would expand under Alternative 2.*

Cross-country skiing is highly dependent on sufficient snow accumulation, which has varied greatly over the years. Skiing within the NRA is popular on the frozen surface of Blue Mesa Reservoir. However, skiing within the NRA at higher elevations is greatly restricted, because the NRA does not currently include higher elevations. Areas north of Blue Mesa Reservoir are generally closed to conserve severe winter deer and elk range. However, some land units would offer additional potential for cross-country skiing at higher elevations, particularly Land Units A (CO 92 COA) and E (Sapinero/Blue Mesa COA).

Ice climbing is an appropriate activity. However, there are limited locations where sufficient ice flows accumulate, and some of these locations have difficult or no public access. The potential to improve and/or open up such access occurs in Land Units A (CO 92 COA) and E (Sapinero/Blue Mesa COA).

Sightseeing is an important aspect of all recreational activities, as well as an end in itself, for NRA visitors and highway travelers. The natural open spaces and the spectacular geological and mountainous setting for streams, lakes, and canyons are key contributors to visitor enjoyment of the



*Fall sightseeing opportunities along the West Elk Loop Scenic and Historic Byway (CO 92)*

NRA. More detailed information about scenic resources can be found later in this chapter.

FISHING AND HUNTING—Fishing and hunting are permitted within the NRA in accordance with federal and Colorado state regulations. Colorado Division of Wildlife (CDOW) has concurrent jurisdiction in the management of fish and wildlife in the NRA, and federal regulation adopts non-conflicting state statutes that deal with harvesting of fish and wildlife. Under both Alternatives 1 and 2, NPS would continue to cooperate with CDOW on related matters. Therefore, there would be no change in the way fishing and hunting are managed under either alternative.



*Fishing is a primary draw to the rivers and reservoirs of Curecanti NRA*

Fishing is generally permitted in units of the national park system unless specifically prohibited. There is no regulation prohibiting fishing within Curecanti NRA. Fishing is one of the primary activities at the NRA, as the area provides some of the best cold-water fishing opportunities in the nation. Federal

BLM_0059651

and state fish hatcheries stock over 3 million fish in Curecanti's reservoirs each year. Brook trout are found in local tributaries, while brown, rainbow, and Mackinaw (lake trout) are common fish in Curecanti's reservoirs. Blue Mesa is also well known for its nationally significant kokanee salmon fishery. Fishing from both boats and the shoreline are popular at Blue Mesa Reservoir, and from hand-carried watercraft at Crystal and Morrow Point Reservoirs.

Hunting is permitted in units of the national park system when authorized by specific statute or regulation, and not subsequently prohibited by regulation. Hunting is authorized within Curecanti NRA by Title 36, Code of Federal Regulations, §7.51. For purposes of public safety and wildlife management, the Superintendent's Compendium can and does close specific locations to hunting (for example, no hunting within 100 yards of developed areas). Under the Proposed Action, some minor changes could occur to the total acreage open to



*Sailboats capture the stiff afternoon breeze across Blue Mesa Reservoir*

hunting. For example, if a private parcel is acquired from a willing seller, additional land may become available for hunting that is not now open to the public. Under Alternative 2, land proposed to be transferred to the NRA from other agencies would continue to support hunting if hunting is currently permitted on such land.

Land units of private property within the COA provide a potential to expand fishing and/or hunting opportunities into areas not now publicly accessible, subject to future



*Fishing from boats, one of the most popular activities on Blue Mesa Reservoir*

acquisitions from willing landowners (such as through exchange, purchase of fee simple interest, obtaining a right-of-way or easement) or landowner agreement. Public comment suggested a need to seek greater fishing opportunities along Curecanti Creek by CO 92 (Land Unit A), to improve fishing access along the south shore of Blue Mesa Reservoir east of the Middle Bridge (Land Unit E), and along the Gunnison River (Land Unit C).

WATER-BASED RECREATION—Some swimming occurs at Blue Mesa Reservoir, despite its cold waters (average surface temperature is 65° F in summer). There are no designated swimming beaches. However, Bay of Chickens, Dry Creek, and Old Highway 50 beach are sometimes used, because they are less steep and rocky, and have designated "no wake" zones. Water skiing occurs in July and August when waters are at their warmest.

BLM_0059652

CHAPTER 3: AFFECTED ENVIRONMENT



*Elk Creek, one of two marinas on Blue Mesa Reservoir*

Watercraft use has occurred on Blue Mesa Reservoir since the reservoir was created in 1965. Fishing and recreational boating are the main activities.

Based on angler surveys conducted by the Colorado Division of Wildlife in 2001, approximately 14,635 boats used Blue Mesa Reservoir during the May to October season. The largest group of motorized watercraft using the reservoir is fishing boats. In 2002, 1,160 annual boating permits were issued for Curecanti NRA, and 4,137 2-day to 2-week permits were issued. All motorboats are required to have permits displayed on them. During a holiday weekend, such as Fourth of July, there can be up to 200 boats on the reservoir.

Kayakers, canoeists, and sailors also visit the recreation area, but make up a small percentage of reservoir users. Due to the



*Boat dock and slip rentals at Elk Creek Marina*

cold temperature of the water and the common high afternoon winds, canoeing and kayaking is concentrated along shorelines and in the narrower arms of the reservoir and east of the Lake City Bridge. Windsurfing on Blue Mesa Reservoir has been a popular activity in the past. Recent years have seen some decline; yet windsurfing still occurs, primarily in Iola Basin.

There are designated, paved launch ramps on Blue Mesa Reservoir at Lake Fork Marina, Elk Creek Marina, Ponderosa, Stevens Creek, and Iola. When reservoir levels are low, some of these designated ramps are not usable.

There are two marinas operated by concession on Blue Mesa Reservoir: at Elk Creek and at Lake Fork. Services include showers, groceries, fishing supplies, slip rentals, boat rentals (aluminum fishing boats, pontoon boats, and speed boats), gas sales, boat repairs, and dry boat storage. The concession offers guided fishing on Morrow Point Reservoir. A restaurant is located at Elk Creek near the marina.

### Resource Significance

Recreational opportunities in the NRA related to hiking and trail access, scenic overlook development, wildlife viewing, backcountry camping, increased hunting and fishing access, and other low impact recreational activities are currently limited to a few key sites. In addition, the majority of recreational opportunities currently available within the NRA are found along US 50 in the more developed frontcountry area of Blue Mesa Reservoir and continuing east along the Gunnison River.

Much of the land surrounding the existing NRA is ideally suited to provide more of the popular recreational activities that are currently available on a somewhat limited basis within the NRA. Alternative 2 (the Proposed Action) of the study, would provide the potential to greatly expand these land-based recreational opportunities for NRA visitors.

BLM_0059653

## INTERPRETATION AND EDUCATIONAL OPPORTUNITIES

Visitors to Curecanti can use NRA and other information resources to plan their visits. An NPS website provides information about camping and other activities. The public information office can mail pre-visit materials to those requesting them by phone or mail.

Curecanti NRA offers outreach and educational programs that are designed to increase awareness and foster an appreciation for the NPS mission and the natural, cultural, and recreational resources of the NRA.

Personal service programs are provided for over 10,000 pre-school, K-12, college/university students, and lifelong learners in 11 communities, 6 school districts, and colleges and universities across the nation. Undergraduate and graduate level courses are offered annually for teachers.

### Interpretive Facilities

Elk Creek Visitor Center, the NRA's principal visitor center is located 16 miles west of Gunnison on US 50. This visitor center provides information on visitor activities, and has a wide-variety of interpretive publications for sale. Evening programs are offered on some summer evenings at the nearby Elk Creek Campground Amphitheater.

Visitor trends at the Elk Creek Visitor Center suggest this facility is currently underused, with as few as 200 visits per day during the peak summer months. In comparison, the visitor center located at the nearby Black Canyon of the Gunnison National Park receives 2,000 visits per day in summer. Visitor use and trends suggest that a different location for the principal visitor center would serve the public more effectively. Lands surrounding the NRA that are being examined in this study might provide such an opportunity. For example, other more ideal locations might be just east of Sapinero, or at Hunters Point. Both locations would have easy access to and from US 50. The consideration of a specific location would be addressed in a new general

management plan, or implementation plan for the NRA, should the Proposed Action of this RPS be implemented.

A second visitor center is located at Lake Fork. Located off US 50 near the Blue Mesa Dam, this visitor center provides a photo display related to history and resources of Curecanti and a sales outlet. Due to staff and funding shortages, the Lake Fork facility was not open in the 2005–2006 seasons.

A third visitor center is located at Cimarron, on US 50 approximately 45 miles west of Gunnison and 20 miles east of Montrose. It provides exhibits on the Denver and Rio Grande Railroad that operated its narrow gauge line in this area from 1881 until 1949. A sales outlet for interpretive materials, with an emphasis on railroad history, is located at the Cimarron visitor center.

Parking turnouts along the highways within the proposed lands provide opportunities for enhanced interpretive and educational activities that support the NRA's purpose. Areas such as Land Units A (CO 92 COA) and E (Sapinero/Blue Mesa COA) offer views of geological formations such as the Dillon Pinnacles, as do other locations in the NRA. North and South Beaver Creek (Land Units B [Blue Mesa Reservoir Agency] and C [Gunnison River COA]) could provide a variety of interpretive opportunities. Areas along US 50, particularly through Land Unit E (Sapinero/Blue Mesa COA), could provide an opportunity for new opportunities to capture visitors and other highway users to interpret Blue Mesa Reservoir and other area resources.

### Resource Significance

Interpretation and educational opportunities are essential for sharing the importance of the resources at the NRA with visitors and students of all ages. Continued outreach education is an essential component of the program; such efforts help instill a sense of reverence for the land, and encourage recreational uses that are compatible with, yet do not degrade the resources.

BLM_0059654

CHAPTER 3: AFFECTED ENVIRONMENT



*Sapinero Basin on Blue Mesa Reservoir*

Opportunities for visitor facilities and interpretive activities would be enhanced by Alternative 2 (the Proposed Action). Potential locations for both occur in some areas of the proposed lands, especially within Land Unit E (Sapinero/Blue Mesa COA).

## SCENIC RESOURCES

Covering Gunnison and Montrose Counties, the reservoirs and canyons of Curecanti NRA offer a premier wild setting that contains a variety of magnificent scenic resources. The Curecanti area is recognized nationally and locally for its high scenic qualities and viewsheds, especially those experienced from the waters of Blue Mesa Reservoir and the West Elk Loop Scenic and Historic Byway, where segments of US 50 and CO 92 play an important role.

Scenic viewsheds and overlook points play a major role in the visitor experience and recreational enjoyment of the NRA, particularly from Blue Mesa Reservoir and along the CO 92 corridor that skirts the Black Canyon that contains Morrow Point and Crystal Reservoirs. Curecanti receives a great many "accidental visitors," travelers who encounter the scenic landscapes while driving highways within and adjacent to the NRA. Many of these travelers use roadside overlooks and pull-outs to sightsee and photograph the outstanding landscapes.

Based on a Visitor Satisfaction Survey conducted by NPS at Curecanti during the summer of 1998, visitors feel that scenic resources are very important to their sense of enjoyment of the NRA. Following are summarized responses to statements on the survey that relate to the scenic resource:

A total of 390, or 98% of the people who responded to the following statement on the survey, agreed or strongly agreed with the statement: *I am visiting Curecanti because I want to enjoy distant and unobstructed views.*

A total of 321, or 98% agreed or strongly agreed with the statement: Preserving natural views surrounding Blue Mesa Lake (Reservoir) from increasing development is important to me.



*View from Colorado Highway 92*

A total of 321, or 98% disagreed or strongly disagreed with the statement: There should

BLM_0059655

be no limits to development on the land surrounding Blue Mesa Lake (Reservoir).

A total of 276, or 70% disagreed or strongly disagreed with the statement: *Humans have the right to modify the natural environment to suit their needs.*



*Soap Mesa from Soap Creek Road*

Many of the scenic vistas observed by visitors are outside of the NRA on public or private lands. Some of these vistas are on land units within the proposed lands and are observed from existing overlooks within the NRA, as well as from the highways and reservoirs. Additionally, vistas within the NRA and beyond the NRA are seen from these land units. These important views are listed below.

- Lands surrounding CO 92 (Land Unit A) are visible from Blue Mesa Dam Overlook, Pioneer Point, Hermit's Rest, and Crystal Creek Trailhead within the NRA. From CO 92, visitors can observe Morrow Point Reservoir, Curecanti Needle, Blue Mesa Reservoir, and Crystal Reservoir within the NRA, and Fitzpatrick Mesa, Blue Mesa (including Hunters Point and Windy Point) on lands adjacent to the NRA. These views on adjacent private lands are contained primarily within Land Units A (CO 92 COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). The San Juan Mountains are visible to the south.

- Soap Mesa (Land Unit A) is observed from Sapinero, the Dillon Pinnacles Overlook and Trail, Ponderosa Campground, McIntyre Gulch, and Blue Mesa Reservoir within the NRA. From Soap Mesa, one can see Blue Mesa Reservoir within the NRA and Fitzpatrick Mesa, Sapinero Mesa, and Blue Mesa adjacent to the NRA (Land Units A [CO 92 COA] and E [Sapinero/Blue Mesa COA]), and the San Juan and West Elk Mountains in the far distance.

- Sapinero Mesa (Land Unit E) is visible from the following areas within the NRA: US 50 and CO 92; Sapinero and Dillon Pinnacles Overlooks; Soap Creek Road; Ponderosa Campground; McIntyre Gulch; Lake Fork Campground



*Looking southeast to Sapinero Mesa from Soap Creek Road*

BLM_0059656

CHAPTER 3: AFFECTED ENVIRONMENT

and Marina; Blue Mesa Reservoir; and Elk Creek Campground. From Sapinero Mesa, visitors can view lands above CO 92 and Soap Mesa in Land Unit A (CO 92 COA) adjacent to the NRA, Blue Mesa Dam and Blue Mesa Reservoir, and the West



*Fitzpatrick Mesa*



*Curecanti Needle, as seen from the South Rim of the Black Canyon, near Windy Point*

management plan or implementation plan.

- Blue Mesa (Land Unit E), including Hunters Point and Windy Point, is visible from existing overlooks along CO 92 (Blue Mesa Dam Overlook, Pioneer Point, and Hermit's Rest) and the US 50 corridor. Areas within the NRA below (north of) Windy Point provide what is likely the most impressive views of the Curecanti Needle, Chipeta Falls, the rugged

Elk Mountains, Sawatch Range, and Continental Divide in the far distance. There is a potential location for a future visitor center in this area adjacent to and south of US 50. However, further analysis of such a facility would more appropriately be carried out in a future general



*Aerial view of several tributaries to the Black Canyon of the Gunnison, including Spring Gulch (distant left)*

BLM_0059657

cliffs and waters of Morrow Point Reservoir and scenic Soap Mesa. However, access is not available to this location due to the proximity of private lands. From Hunters Point, the view toward Blue Mesa Reservoir



*Gunnison River west of Gunnison*

includes, within its landscape, the Dillon Pinnacles, West Elk Mountains, and Soap Mesa. With its immediate access from US 50, it is a site that may be suitable for the future location of a visitor center. This would be addressed in a new general management plan or implementation plan for the NRA.

- Fitzpatrick Mesa (Land Unit A), south of Morrow Point Reservoir, is visible from existing overlooks along CO 92 (Pioneer Point and Hermit's Rest), and from several pull-outs along CO 92. From Fitzpatrick Mesa, visitors can view Morrow Point Reservoir within the NRA, CO 92 corridor, including lands to the north, Blue Mesa, and Soap Mesa (Land Units A [CO 92 COA] and E [Sapinero/Blue Mesa COA]), and the West Elk and San Juan Mountains and Sawatch Range in the far distance.

- Spring Gulch on the northwest end of Crystal Reservoir (Land Unit G) is visible from overlooks along East

Portal Road and the Black Canyon of the Gunnison South Rim Drive.

- Agrarian and riparian landscapes are visible from US 50 and overlooks within the NRA, between Lake City Bridge and the eastern entrance to the NRA.

High quality natural or agrarian landscapes were identified by the public during a photo assessment workshop during the study process. Many of these areas are within existing vistas and land units identified above and include some scenes that are thought to best depict Gunnison and Montrose Counties. Specific areas identified within these land units or other nearby areas include the following:

- Area along CO 149 past Iola, including Blaine Rock, as seen from Blue Mesa Reservoir

- Open bluffs and viewsheds north of Blue Mesa Reservoir at East Elk Creek

- South side of Blue Mesa Reservoir as seen from Bay of Chickens

- Land to the south of Middle Bridge

- Land between Lake City Cutoff Road and Sapinero

- Sapinero Mesa west into Lake Fork Canyon

- Land near and to the south of Blue Mesa dam as seen from Blue Mesa Reservoir

- West Elk Creek and Soap Creek area north of Blue Mesa Reservoir, including land north of Dillon Pinnacles, the peninsula between West Elk Arm and Soap Creek Arm, and the land along Soap Creek Road

- Soap Mesa plateau, from and including Cottonwood Gulch area to Pioneer Point

- Intersection of CO 92 and Soap Creek Road

- CO 92 west of Corral Creek, Curecanti Creek and Meyers Gulch, and east of Deadman's Curve

BLM_0059658

Chapter 3: Affected Environment

- Land along US 50 west of Blue Mesa Dam

- Vicinity of first switchback on US 50 north of Blue Creek that provides a good view of Sheep Mountain

- Fitzpatrick Mesa

- Hillside southeast of Cerro Summit as seen from CO 92 west of Montrose County line

- Top of East Portal Road.

Examples of unique geological and/or visually attractive features were also identified, suggesting places within the NRA that still need to be protected, or places outside the NRA that might need more conservation. Such sites included the north side of US 50 between Dry Creek and Red Creek, containing West Elk Breccia rock formation (ancient volcanic mudflow), and Morrison Formation, which is known to contain dinosaur fossils elsewhere. Soap Creek cliffs, Dillon Pinnacles, Curecanti Needle, and Curecanti Creek at hairpin curve on CO 92 were also suggested as areas that may need additional conservation, whether within or outside the NRA.

### RESOURCE SIGNIFICANCE

An appreciation of the unique aspects of the scenic vista has long been associated with this area. As the 1965 Memorandum of Agreement between Reclamation and NPS was being developed for management of the NRA, scenic resource values were recognized as part and parcel of the natural resource environment. In 1999, when Congress passed Public Law 106-76, which called for this study, the concept of scenic resource values took its independent place along with the other natural, cultural, and recreational resource values to be assessed.

The scenic vistas within and adjacent to the NRA are an important component of visitor enjoyment, experience, and appreciation. The scenic resources contribute to the national and regional significance of Curecanti NRA, as well as the West Elk Loop Scenic and Historic Byway that passes through and beyond the NRA. Besides the important geologic formations that are evident in the NRA, the open mountain vistas and natural landscapes within and surrounding the NRA are untouched in comparison to many other mountain park-like areas. Scenic vistas seen from existing corridors such as US 50, CO 92, CO 149, and from the water surface of Blue Mesa Reservoir within the NRA provide a varied and exceptional visual experience. Opportunities to enjoy a variety of recreational water and land-based activities within such a spectacular setting are unique to the NRA.

The extremely scenic geological and natural landscape setting is considered to be a key resource for enjoyment of the NRA. Development on private lands surrounding the NRA, especially within the COA, has been increasing in the past few years. There is a potential for development of privately held mineral rights at a number of locations within the NRA. This is already occurring at the Dickerson Pit near Beaver Creek, towards the east end of the NRA, along US 50. If such development should continue without regard for potential impacts on viewsheds and other resources important to the NRA, the recreation and overall experience at Curecanti may well be diminished along with its unique vistas and rural setting. It is essential that the scenic resource be conserved, in order for Curecanti to retain its unique and spectacular setting for recreational activities. Alternative 2 (the Proposed Action), provides tools to accomplish this end in cooperation and partnership with the counties and neighbors.

## REGIONAL ECONOMIC AND SOCIAL CHARACTERISTICS

### REGIONAL SETTING

Curecanti NRA is a 40-mile-long area located in Gunnison and Montrose Counties in southwestern Colorado. The eastern edge of the NRA lies approximately 5 miles west of the City of Gunnison. The Cimarron area of the NRA is 20 miles east of Montrose, while the

BLM_0059659

western-most area of the NRA, at East Portal, is 16 miles northeast of the City of Montrose. Black Canyon of the Gunnison National Park, also administered by NPS and adjacent to Curecanti NRA on its west end, lies entirely within Montrose County.

Gunnison County encompasses approximately 3,257 square miles, or 2,084,480 acres. Within the county, USFS administers over 1.2 million acres of the Gunnison, Uncompahgre, and White River National Forests; BLM administers over 300,000 acres; Reclamation administers 31,161 acres; and NPS administers 32,223 acres (including land being administered under agreements with Reclamation and USFS). There are five wilderness areas and numerous state-owned wildlife and resource management areas. Crested Butte is home to the Crested Butte Mountain Resort, offering year-round activities.

Montrose County encompasses 2,247 square miles (1,438,080 acres). Of this total, the USFS administers over 320,000 acres of the Gunnison, Uncompahgre, and Manti-La Sal National Forests; BLM administers over 620,000 acres; Reclamation administers 30,677 acres; and NPS administers 36,820 acres (including land being administered under agreements with Reclamation and USFS). There are two wilderness areas, one national park, one national conservation area, and three state wildlife areas.

## POPULATION

Colorado is the seventh fastest growing state in the United States (CDOLA 2002), and the Gunnison basin as a whole is experiencing an explosive increase in both permanent population and seasonal visitation (CDOLA 2002). Gunnison county ranks twenty-third (top 36%) and Montrose County ranks twenty-first (top 33%) for rate of population change in the state (CDOLA 2002).

The Gunnison County population increased approximately 3.1% annually from 1990 to 2000 resulting in a 36% change over the 10-year period (Table 9). Montrose County population rose approximately 3.2% annually

between 1990 and 2000, resulting in a 37% growth rate, slightly higher than Gunnison County. Annual growth rates in Montrose County have been above the annual 2.71% rate of the state. However, since 2000, Gunnison County annual growth has been only slight (less than 1%), whereas Montrose County continues to show annual growth between 2 and 3%. By 2020, population in Gunnison and Montrose Counties is expected to reach approximately 20,346 and 50,530 persons, respectively (CDOLA 2002).

Including annexation, the city of Montrose has sustained an annual growth over the last five years of 6%, while the city of Gunnison has shown a slight decrease.

TABLE 9: POPULATION ESTIMATES

| Town or County | 1990 | 2000 | 2005 |
|---|---|---|---|
| Gunnison County | 10,273 | 13,956 | 14,264 |
| Montrose County | 24,423 | 33,432 | 37,880 |
| City of Gunnison | 4,636 | 5,409 | 5,303 |
| City of Montrose | 8,854 | 12,344 | 16,070 |

Source: Colorado State Demography Office (dola.colorado.gov/dlg/demog)

## ECONOMIC CONDITIONS

In Gunnison and Montrose Counties, approximately 75% of jobs are in wage and salary positions where people work for someone else. The remaining jobs (25%) are individuals that are self-employed. Unemployment averaged 6.4% for Gunnison County and 4.8% for Montrose County in November 2003. Unemployment in Colorado was 5.6% during the same period (Colorado Labor Market). Wage rates are below the statewide averages.

Employment by industry in Gunnison County has remained relatively unchanged since 1985, except for some decline in sectors such as mining. In 2000, the largest employment sectors included Wholesale/Retail (26%) and Services (27%) followed by Government (15%), Construction (10%), and Financial/

BLM_0059660

Insurance/Real Estate (7%). The remaining sectors such as agriculture and mining were 5% or less. In Montrose County, the employment distribution is similar. The Service (25%) and Wholesale/Retail sectors (24%) are largest, followed by Government (13%), Manufacturing (10%), Construction (10%), and Agriculture (8%) (Montrose County 2001). In both counties, the Service sectors not only provide the most jobs but have demonstrated the most new job growth from 1970 to 1997. The largest component of the Service sector in Gunnison County relates to recreation, whereas in Montrose County it is health services (Wilderness Society 1999). Tourism is a major industry for the region, with visitors coming year-round to enjoy activities such as skiing, rafting, fishing, kayaking, camping, hiking, and sightseeing (Region 10).

Non-labor income is the largest component of Total Personal Income (TPI) in both Gunnison and Montrose Counties. Non-labor income includes income sources such as dividends, interest, rent, and transfer payments, such as social security and other pension programs. Non-labor income represented 28% of TPI in both Gunnison and Montrose Counties in 1970. In 1997, non-labor income remained at 28% of TPI in Gunnison County, whereas it grew to 40% of TPI in Montrose County. Both figures are indicative of a growing retirement community and households with investment income. The Service industries have also accounted for between 13% and 20% of income growth in counties within the same time period (Wilderness Society 1999) (Region 10).

Gunnison County per capita retail sales in 2002 averaged $28,321 and retail sales totaled $397.2 million. Gunnison County per capita sales exceeded the statewide average by 23%. Montrose County per capita sales in 2002 averaged $19,495 and retail sales totaled $692.7 million. Montrose County per capita sales were 84.8% of the Statewide average. City of Montrose is the dominant trade center in the area with 2002 retail sales of $586.6 million (CDH nd) (Region 10).

In 2001, the average wage paid workers in Gunnison County was only 63% of the Colorado average and 68.8% for Montrose County. Gunnison County per capita personal income was $22,762 and $23,007 for Montrose County. For that time period, the State average per capita income was $33,455 (CDH nd) (Region 10).

Agricultural sales of livestock and crops by Gunnison County farmers and ranchers totaled $7 million in 2001 and $96.2 million by Montrose County farmers and ranchers (CDH nd) (Region 10).

The median price of a 1,500 square foot home in Gunnison County as of January 2002 was $227,985 ($151.99 per square foot), and in Montrose County it was $139,470 ($92.98 per square foot) (CDH nd). The average sale price of a home in the City of Gunnison and surrounding area increased 12.3% from 2000 to 2002, and in Montrose County the increase was 2.4% (CDH nd) (Region 10).

## NRA CONTRIBUTION TO REGIONAL ECONOMY

Visitors to Curecanti, NRA staff, and their households are integral to the regional economic and social structure. Some key dimensions of the NRA's role within the region are described below.

Curecanti NRA provides economic stimulus with ongoing operating and capital expenditures. The budget for fiscal year 2005 was $3,041,000. Salaries for interpretation, law enforcement, and search and rescue activities comprise the largest share of the budget. The remaining funds are allocated for activities such as facility operating and maintenance, resource conservation, and management services. Portions of the NRA's annual expenditures circulate through the regional economy in the form of consumer and business purchases, yielding indirect economic benefits.

In addition to the direct stimulus attributable to the NRA, spending by its visitors contributes to the local economy. Evaluation of visitor spending in and around units of the national park system, based on 2005 dollars, indicates

BLM_0059661

that an average party of visitors to a NPS unit, such as the NRA, spends $42.72 per day if the party is from the local area; $62.84 per day if the party comes from outside the local area; and $193.37 per day if the visit includes an overnight at a local motel (NPS 2006b).

Money Generation Model version 2 (MGM2) is an economic model developed for NPS to estimate local and non-local tourism on the local economy. Economic impacts of visitor spending are estimated in the MGM2 using multipliers for local areas for each unit of the park system (NPS 2006b). This includes the direct and secondary economic effects in gateway communities around the park unit in terms of jobs, personal income and value added. Value added is the sum of personal income, profits and rents and indirect business taxes. The following are the results of applying MGM2 to evaluate Curecanti NRA economic impacts using 2005 data (NPS 2006b):

- Total Visits - 904,433
- Total Combined Sales- $35,571,000
- Total New Jobs Created – 697
- Value Added - $20,330,000.



*Conserving resources enhances quality of life*

## PAYMENTS IN LIEU OF TAXES

"Payments in Lieu of Taxes" (or PILT) are Federal payments to local governments that help offset losses in property taxes due to nontaxable Federal lands within their boundaries. Payments are calculated following a formula that takes into account a variety of factors: acres of eligible land, county population, consumer price index, and previous year payments from other federal agencies, including state pass-through laws that require payments to pass from counties to local communities or entities rather than staying with the county government (Bodine and Koontz 2003).

In 2003, federal payments in lieu of taxes amounted to $342,195 for Gunnison County and $1,250,560 for Montrose County. Of the approximately 1.6 million acres of federal land in Gunnison County and 900,000 acres in Montrose County, Reclamation lands and land interests and NPS lands that make up the NRA and the national park, represent only 2.5% and 6% of these total acres and PILT payments by respective county (BLM 2003).

## QUALITY OF LIFE

Residents of both counties, as well as the respective county governments, recognize that the environmental resources within the counties are an important component of their economies, including recreation and tourism.

A 2002 Community Profile Survey developed by the Gunnison County Planning Commission with Board of County Commissioners surveyed 4,500 houses with a 41% response rate on a variety of issues. Those responding were asked to rate how important the environment /open space would be to them in terms of importance facing Gunnison County over the next 5 years using a scale of 1 to 5 (five being the least important). Forty percent indicated that it was the most important issue. Those ranking it at a level 2 were between 20 and 25% and level 3 between 15 and 20%. When asked how they perceived growth in the East River Valley, more than 40% of those responding indicated that regulations should be changed to direct growth. Another 30% indicated that

BLM_0059662

CHAPTER 3: AFFECTED ENVIRONMENT

TABLE 10: RESERVED SUB- SURFACE INTERESTS

| T | R | Section | Previous Owner | Interests Reserved |
|---|---|---------|----------------|--------------------|
| 49N | 2W | 13 | Cooper, M. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Benson, S., et al. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Charter, et al. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Cox, E. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Hackett, E. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Harris, E | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Matchett, T. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | McKelvey, J. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Owen, P. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Rueger, R. | oil & gas – subordinated to CRSP |
| 49N | 2W | 22 | Wright, S. | oil & gas – subordinated to CRSP |
| 49N | 2W | 23 | Clark, W. | oil & gas – subordinated to CRSP |
| 49N | 2W | 23 | Larimore, et al. | oil & gas – subordinated to CRSP |
| 49N | 2W | 23 | McClure, A. | oil & gas – subordinated to CRSP |
| 49N | 2W | 13, 24 | Harris, E. | oil & gas – subordinated to CRSP |
| 49N | 2W | 19, 20, 29, 30 | Oswald, M. | oil, gas & minerals – subordinated to CRSP |
| 49N | 2W | 19, 29, 30 | Keenan, F. | oil, gas & minerals – subordinated to CRSP |
| 49N | 2W | 21, 22, 27 | Rippling River Ranch | oil & gas – subordinated to CRSP |
| 49N | 2W | 21, 28, 29 | Burris, C. | oil & gas – subordinated to CRSP |
| 49N | 2W | 23 | Wood, F. | oil, gas, coal & minerals – subordinated to CRSP |
| 49N | 2W | 23 | Wright, F. | oil & gas – subordinated to CRSP |
| 49N | 2W | 24 | Costello, A. | oil & gas – subordinated to CRSP |
| 49N | 2W | 24 | Dickerson, R. | oil, gas & decomposed granite – subordinated to CRSP |
| 49N | 2W | 24 | Doran, L. | oil & gas – subordinated to CRSP |
| 49N | 2W | 27, 28, 29, 31, 32, 34 | Blackstock, E. | oil, gas, coal & minerals – subordinated to CRSP |
| 49N | 2W | 29 | Gunnison School Dist. | oil & gas – subordinated to CRSP |
| 49N | 2W | 29 | Killion, R. | oil & gas – subordinated to CRSP |
| 49N | 2W | 29 | Kleitz, D. | oil & gas – subordinated to CRSP |
| 49N | 2W | 29 | Laskowski, A. | oil & gas – subordinated to CRSP |
| 49N | 2W | 31 | Bannister, O., et al. | oil & gas – subordinated to CRSP |
| 49N | 2W | 31 | Howe, K. | oil & gas – subordinated to CRSP |
| 49N | 2W | 31 | Reiss, P. | oil & gas – subordinated to CRSP |
| 49N | 2W | 31 | Sunderlin, R. | oil & gas – subordinated to CRSP |
| 49N | 2W | 32, 33 | Woodward, D. | oil & gas – subordinated to CRSP |
| 49N | 3W | 25, 26 | Holman, J. | oil & gas – BMR Parcel 12A (10 acres in Sec. 25) had reserved oil/gas rights subordinated to CRSP |
| 49N | 3W | 27, 28, 29, 32, 33, 34 | Miller, A. | oil & gas – subordinated to CRSP |
| 49N | 3W | 28, 29, 30, 31, 32 | Moncrief, W | oil & gas – subordinated to CRSP |
| 49N | 3W | 34, 35 | Trout Haven Inc. | oil & gas – subordinated to CRSP |
| 49N | 3W | 35 | Dyer, D. | oil & gas – subordinated to CRSP |
| 49N | 3W | 36 | Abrahamson, J. | oil & gas – subordinated to CRSP |
| 49N | 3W | 36 | Sunderlin, R. | oil & gas – subordinated to CRSP |
| 48N | 4W | 1, 2 | Holman, J. | oil & gas – additional research necessary |
| 48N | 4W | 2, 3, 4, 10 | Austin, N. | oil & gas – subordinated to CRSP |
| 48N | 4W | 3, 4 | Curecanti Sheep Co. | oil & gas – subordinated to CRSP |

BLM_0059663

REGIONAL ECONOMIC AND SOCIAL CHARACTERISTICS

| T | R | Section | Previous Owner | Interests Reserved |
|---|---|---------|----------------|--------------------|
| 49N | 4W | 14, 15, 16, 21, 22, 23 | Carpenter, F. | oil & gas – subordinated to CRSP |
| 49N | 4W | 16, 21, 27, 28, 29, 33 | LeValley, J. | oil & gas – subordinated to CRSP |
| 49N | 4W | 26, 27 | Gilmore, L., et al. | oil & gas – subordinated to CRSP |
| 49N | 4W | 28 | Goodwin, C. | oil & gas – subordinated to CRSP |
| 49N | 4W | 32 | Cotten, C. | oil & gas – subordinated to CRSP |
| 49N | 4W | 32 | Curecanti Sheep Co. | oil & gas – subordinated to CRSP |
| 49N | 4W | 32 | Lucas, E. | oil & gas – subordinated to CRSP |
| 49N | 4W | 32 | Oswalt, H. | oil & gas – subordinated to CRSP |
| 49N | 4W | 32, 33 | Santarelli, R. | oil & gas – subordinated to CRSP |
| 49N | 4W | 33, 34, 35 | Holman, J. | oil & gas – additional research necessary |
| 48N | 6W | 5 | Bliss, R. | oil & gas – subordinated to CRSP |
| 48N | 6W | 5 | Brack, L., et al. | oil & gas – subordinated to CRSP |

Source: Cooper, Katherine, NPS, Land Resources Program Center, November 2000

regulations should be changed to limit growth. When asked "what do you value most about living in Gunnison County", the value of scenery was ranked as one of the important reasons by over 75% of survey respondents (levels 1 through 6 out of 13) (Michaelson nd).

Montrose County conducted a community survey in late 1999 asking residents to respond to the draft Master Plan. Eighty of the 119 respondents indicated that planning and zoning was essential. Eighty respondents believe that the county is not taking sufficient steps to direct growth, and a majority indicated that they would like to see much less population growth than in the previous few years (Montrose County 2001).

## PRIVATE LAND USE WITHIN THE NATIONAL RECREATION AREA

All surface lands and waters within the NRA are currently owned by the federal government. However, in a number of locations throughout the NRA, there exist retained private rights (such as rights-of-way, water rights, access rights, and oil/ gas/mineral rights). Where Reclamation acquired land but not the appurtenant mineral, or oil or gas rights, it subordinated those reserved rights to require their development in a manner that would not interfere with project purposes. The subordination for reserved mineral rights, including oil and gas, is contained in the land

purchase contract and/or deed for each parcel acquired.

The term "split estate" describes the situation where one party owns the surface rights and another party owns the subsurface rights (oil, gas, or minerals). Privately owned, or reserved, subsurface interests within the NRA are shown in Table 10.

At this time, only the Dickerson Pit (Pit) is under operation. The Pit is a privately operated mineral materials site within the NRA that has been in existence since 1927. In 1963, Reclamation purchased the surface rights for 79.57 acres from Mrs. Ruth Dickerson for the Colorado River Storage Project. Mrs. Dickerson reserved "the perpetual right to mine and remove decomposed granite and the materials intermixed therewith" from a portion of the conveyance, creating a 33.16 acre split mineral estate, together with the right of ingress and egress over the mineral estate. However, this mineral right is subordinated to the United States' rights, in that, ". . . any rights reserved hereunder shall be exercised in such manner as will not interfere with the construction, operation, and maintenance of any works of the proposed Curecanti Unit of the Colorado River Storage Project Act as determined by the Secretary of the Interior or his duly authorized representative." The Pit is located immediately west of US 50, the primary access road through the NRA, east of Blue Mesa Reservoir along the Gunnison River. In 1965, NPS assumed jurisdiction

BLM_0059664

over the area, including the Pit, pursuant to a Memorandum of Agreement with Reclamation. The Pit operations have been regulated since the 1980s under NPS special use permits. On February 17, 2003, the current operator, Gunnison Gravel and Earthmoving, submitted a proposed Plan of Operations to expand the Pit from the existing permitted operation (12.4 acres) to the maximum 33.16 acres. The NRA has completed an environmental assessment of the proposal and in 2006 issued a special use permit allowing the expansion, subject to the exclusion of a portion of the area that contains significant cultural resources.

## NEIGHBORING PRIVATE LANDS AND LANDOWNERS WITHIN THE PROPOSED LANDS

### Land Ownership

Private property within Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA) have been included within the proposed lands because of the regionally or nationally important, or potentially important natural, cultural, recreational, or scenic resources that occur on these properties. There are a total of 125 different private ownerships within the COA. They consist of individuals, joint ownerships, partnerships, and corporations. Some entities own more than one property within the COA. Many landowners live within Montrose and Gunnison Counties or in other Colorado locations. Some owners live in nearby states such as Texas, New Mexico, and Arizona; or in more distant states, such as North Carolina and Alabama. Some properties have been held by the same family (including descendants) for decades, while other properties may have had a recent conveyance to new owners.

In 2005, there were 168 individual parcels of private land throughout the COA, ranging in size from 0.25 acre to 3,258 acres. The average number of acres per parcel varies according to general location and land use

(Gunnison County and Montrose County GIS departments).

- Within Land Unit A (CO 92 COA), parcels on the north side of Morrow Point Reservoir in the vicinity of Black Mesa and Curecanti Creek average approximately 150 acres, although 40% of the parcels are almost 200 acres or more. In the Soap Creek area, 50% of the parcels are 5 acres or less, but one large parcel is over 2,000 acres in size. Parcels south of Morrow Point Reservoir on Fitzpatrick Mesa also average between 150 and 200 acres.

- Land units C (Gunnison River COA) and D (Iola Basin COA) along the Gunnison River and near Southeast Iola Basin include only a handful of private properties ranging in size from approximately 3 acres to 386 acres.

- Within Land Unit E (Sapinero/Blue Mesa COA) on Sapinero and Blue Mesas, 75% of the parcels are less than 10 acres in size, while 2 of the remaining 4 parcels are almost 500 acres. Parcels at Hunters Point and Windy Point average between 50 and 100 acres, respectively.

- Land unit G (West-End COA) consists of 18 parcels, 4 of which are north of the current NRA and 14 south. Ten parcels are under an acre. The largest parcel is about 60 acres.

### Existing Land Uses

The predominant land uses on private property within the proposed lands consist of agriculture, primarily cattle and sheep grazing, and are limited to low residential use.

Land unit A (CO 92 COA) along CO 92 and north of Morrow Point Reservoir supports ranching activities, including cattle and commercial elk; and some limited extractive uses, such as timber removal. A few residential structures are found in the area. Residential development increases in the vicinity of Soap Creek Road, although it continues to be limited. Existing conservation easements

BLM_0059665

REGIONAL ECONOMIC AND SOCIAL CHARACTERISTICS

conserve a significant amount of acreage from being developed, and are held by the Rocky Mountain Elk Foundation and Colorado Open Lands. Still within Unit A, lands south of Morrow Point Reservoir support agriculture uses such as sheep grazing.

CO 92 currently weaves in and out of the NRA. As people drive along the highway, or stop and exit their vehicles along the highway, they are often confused whether they are on public land (i.e., the NRA) or private land. This is of special concern during the hunting

few residences, but are generally vacant with regard to structures, and used for grazing.

Some private lands within the proposed lands are currently subdivided, for sale, or have a high probability of being developed in the near future. These private lands generally occur in the vicinity of major transportation corridors and in the vicinity of other development, such as along US 50 near Sapinero Mesa, Hunters Point, Windy Point, and Cimarron. Private lands along CO 92 and in the vicinity of Willow Creek face a moderate probability of



*Development on private land adjacent to the NRA, but not within the COA*

season, where hunters may inadvertently hunt on private land. Another area that may suffer private trespass due to the current boundary situation is a location where access is gained to a popular climbing/ice climbing route. The landowner of one large ranch in this area has proposed exchanging land with the NRA, whereas CO 92 could, in essence, become the boundary line between the NRA and private land. The NRA parcels affected are shown on the Alternative 2 (Proposed Action) map as Tract 4, Tract 5, Tract 6, and Tract 7.

Land unit C (Gunnison River COA) along the Gunnison River supports cattle ranching and limited residential use. Land unit D (Iola Basin COA) has grazing activities, residential use, and commercial uses. Land unit E (Sapinero/ Blue Mesa COA) is comprised of low-density residential use, limited commercial use along US 50, and some grazing activity between Hunters and Windy Point. Private lands within Unit G (West-End COA) on the western end of the proposed lands include a

being developed in the near future because of their accessibility (Roberts 2004).

Development on private lands adjacent to the NRA has increased in recent years and is expected to continue into the future. Insensitive and/or unchecked development, including development of mineral/mining rights that might exist, especially on lands within the COA, could have an adverse impact on the spectacular natural scene, which makes the NRA such a significant resource in which to recreate, sightsee, and take pictures. In turn, it could have an adverse impact on the quality of life for local residents and on the overall quality of the visitor experience.

## Property Values

As stated in the Alternatives chapter, one of the tools for resource conservation being considered in the Proposed Action is to acquire interests in land from willing landowners. As described in the Estimated Costs section of that chapter, the future

BLM_0059666

direct costs of acquiring such interests are very uncertain. Therefore, for the purposes of developing the estimated cost of implementing the Proposed Action, the following current ranges of market values were used as guidance. They are based on records of land sales occurring over recent years on vacant and/or agricultural land within what is proposed as the COA.

Range of Market Values:

- Within Gunnison County — $1,500 to $4,000 per acre
- Within Montrose County — $500 to $1,500 per acre.

In general, assessed land values in Gunnison County grew from $373 million in 2002 to almost $390 million in 2003, a 4.5 % growth in assessed values. Montrose assessed land values grew by 2.5% from $301 million to $305 million. Gunnison County and other mountain communities reported some of the largest increases in assessed value in recent years, a trend that is expected to continue, although to a lesser degree (State of Colorado 2002).

## NATIONAL PARK SERVICE, RECLAMATION, AND OTHER NEIGHBORING AGENCY MANAGEMENT AND OPERATIONS

A number of federal, state, and local agencies have lands and/or facilities located within the existing NRA and/or the proposed lands for the RPS Proposed Action, including NPS, Reclamation, BLM, USFS, Colorado Division of Wildlife, and Western Area Power Administration (Western). Each agency has individual interests regarding the potential expansion of Curecanti NRA. A primary and shared concern amongst the agencies is that the mission, land management, and operational responsibilities of each agency within the proposed lands are evaluated to ensure that all responsibilities are considered in developing the RPS recommendations.

This section identifies agency lands within the proposed lands more specifically those areas considered for inclusion within the NRA for the Proposed Action. It also generally describes each agency's management responsibilities for those areas.

## NATIONAL PARK SERVICE

NPS manages the natural and cultural resources, public recreation, and associated facilities at Curecanti NRA and Black Canyon of the Gunnison National Park as one operating unit with two districts. The Blue Mesa District includes the area from Riverway west to Morrow Point Dam, and the Black Canyon District from Morrow Point Dam (including the Cimarron Visitor Center) west to and including the national park.

A Superintendent has overall authority and utilizes five divisions for operating the two areas: (1) Resource Stewardship and Science; (2) Interpretation, Education, and Technology; (3) Visitor Protection and Fee Collection; (4) Facility Management; and (5) Administration and Concession Management. The staff consists of approximately 32 permanent positions, 5 term positions, and 44 seasonal positions. This work force is supplemented by over 5,000 hours per year of Volunteers-in-Parks service.

Staff expertise is provided by a number of specialized positions, including an outdoor education specialist, an information technology specialist and computer assistant, an ecologist, hydrologist, aquatic biologist, terrestrial biologist, archeologist, interpretive specialists, law enforcement specialists, climbing/backcountry ranger, GIS specialist, fee collection personnel, and specialized maintenance and administrative positions.

### Enforcement Operations

Law enforcement staff provide visitor and resource protection, road and boat patrols, search and rescue services, fire protection, and a variety of other services. However, during parts of the year the NRA lacks sufficient permanent staff coverage to meet some visitor

BLM_0059667

needs. Additional seasonal staff is added to provide coverage during the primary visitor season, particularly from mid-May through Labor Day. Occasionally, Colorado Division of Wildlife Officers provide patrols to monitor fishing and hunting activities.

### Infrastructure and Maintenance Operations

The NRA infrastructure includes 3 visitor centers, 10 campgrounds, 7 self-guiding trails, 12 miles of hiking trails, 22 miles of roadways, 1 central maintenance facility (which also serves as the central maintenance facility for Black Canyon of the Gunnison National Park), the main NRA headquarters (which also serves as headquarters for Black Canyon of the Gunnison NP), and 22 employee housing units for on-site protection and management of NRA resources. Primary facilities are shown on the Existing Conditions map.

There are 12 permanent and 19 seasonal maintenance workers. This recurring staff is often supplemented and supported using special project funds, contracts, and the assistance or expertise from other NPS areas, and other organizations, as available.

### Grazing

When the NRA was originally created, some BLM grazing allotments, or portions thereof, were included within it. NPS and BLM addressed the issue through creating Memorandums of Understanding that allow BLM to continue management of grazing in these areas in cooperation with NPS.

Grazing also occurs on USFS land being managed by NPS under an agreement with the Forest Service. The areas where this occurs include the Bear-Trap Long Gulch allotment (with 10 permittees) and the Soap Creek allotment (currently vacant).

### Land Unit F: Gateview Agency Lands

NPS facilities in Land Unit F (Gateview Agency; and identified as Tract 10 on the Alternative 2 Proposed Action map) along the Lake Fork arm are adjacent to extensive BLM lands. Because of the distance for NPS to travel to maintain the facilities at Gateview, a full day is required to do fundamental maintenance of garbage pickup, check water systems, and clean facilities. Because of the more frequent presence of BLM staff in this area (south along the Lake Fork), the potential operating efficiencies of transferring Gateview Campground to BLM was considered during the course of the study.

NPS facilities in the Gateview area include roads, a small campground, restrooms, a photovoltaic chlorinated well system, bear-proof trash cans, and historic resources such as railroad-related features. All facilities are currently maintained by NPS.

Should NPS transfer its administrative jurisdiction for land and resources that it manages under agreement with Reclamation to another agency, a supplemental agreement between NPS and the receiving agency would need to be completed.

## BUREAU OF RECLAMATION

The mission of Reclamation is to manage, develop, and protect water and related resources in an environmentally and economically sound manner in the interest of the American public. To accomplish that mission, Reclamation must have administrative jurisdiction of its lands, land interests, water and water interests, and facilities necessary to fulfill and protect the authorized purposes of its respective projects. According to Reclamation law, other uses may be allowed on Reclamation lands, so long as they are compatible or consistent with a project's purposes or the purpose for which Reclamation obtained lands or land interests.

### Bureau of Reclamation Projects

Most of the lands within the current NRA, and some adjacent lands, were withdrawn or acquired for Reclamation purposes (refer to Existing Conditions map in Chapter 1). Reclamation currently operates and maintains two projects and uses its land,

BLM_0059668

CHAPTER 3: AFFECTED ENVIRONMENT

land interests, water and water interests, and facilities to fulfill and protect the respective project purposes:

- Uncompahgre Project
- The Wayne N. Aspinall Unit (Aspinall Unit) of the Colorado River Storage Project.

A third nearby Reclamation project, the Fruitland Mesa Project, was authorized but never constructed. Reclamation has recommended to BLM that it revoke the withdrawals for the Fruitland Mesa Project.



*Morrow Point Dam, one of three large dams managed by Bureau of Reclamation within the Aspinall Unit at Curecanti*

## Uncompahgre Project

The Uncompahgre Project (originally the Gunnison Project) was authorized by the Secretary of the Interior on March 14, 1903, under the provisions of the Reclamation Act of 1902 to provide agricultural irrigation water to about 76,300 acres in the Uncompahgre River Valley. The Act of June 22, 1938 authorized the Secretary of the Interior to enter into a contract for the sale or development of power on the Uncompahgre Project. Uncompahgre Project facilities within or adjacent to the NRA include, but are not necessarily limited to:

- Gunnison River Diversion Dam;
- Gunnison Tunnel;
- River Portal Tunnel Road; and

- Residence, outbuildings and appurtenances of the Uncompahgre Valley Water Users.

The Uncompahgre Project is operated and maintained by the Uncompahgre Valley Water Users Association (UVWUA) under a contract with Reclamation. Withdrawn lands associated with the Uncompahgre Project in the vicinity of the East Portal of the Gunnison Tunnel were added to the current NRA in 1978 and are managed by NPS for recreation and other purposes in accordance with the 1965 MOA with Reclamation.

## Aspinall Unit, CRSP

The Aspinall Unit (formerly the Curecanti Unit) of the CRSP was authorized by the CRSP Act of April 11, 1956 (70 Stat. 105). Reclamation operates and maintains the Aspinall Unit, its facilities, and its lands and land interests to meet project purposes. The presence of the three reservoirs has created water-based recreational opportunities.

Aspinall Unit related facilities within or adjacent to the NRA include, but are not necessarily limited to the:

- Blue Mesa, Morrow Point, and Crystal Dams and Reservoirs;
- Access roads to each of the three dams;
- Power plants and associated electric transmission facilities serving each dam;
- Communication facilities and associated access roads; and
- Electrical transmission lines and associated access roads (now operated/maintained by Western).

## Bureau of Reclamation Lands

The Secretary of the Interior is authorized to acquire private lands and to withdraw public land from entry or other disposition under the public land laws necessary for the construction, operation, and maintenance of Reclamation projects. The Secretary is also authorized to dispose of recreation facilities and facilities that benefit fish and wildlife to

BLM_0059669

federal, state, and local government agencies by lease, transfer, exchange, or conveyance upon such terms and conditions as would best promote their development and operation in the public interest.

Reclamation withdrew lands from the public domain for Reclamation purposes, and acquired other lands and land interests for the above projects and purposes. Lands and land interests held by Reclamation within and adjacent to the NRA include about 39,958 acres of withdrawn lands, 11,465 acres of acquired lands, and 983 acres of land interests including various rights-of-way and easements. Reclamation withdrew and/or acquired some lands and interests for mitigation purposes for the Aspinall Unit, and transferred them to other federal, state, or local agencies for management.

Reclamation utilizes and manages its lands and land interests, and water and water interests for Reclamation project purposes. NPS manages recreation and certain other resources on Reclamation lands and land interests, and water and water interests within the NRA in accordance with the 1965 Memorandum of Agreement with Reclamation. BLM manages the lands withdrawn for the Fruitland Mesa Project.

### Land Unit D: Iola Basin COA

The study team considered making recommendations for conserving private lands in the vicinity of Willow Creek on the south side of Iola Basin because the area contains important riparian habitat, is a popular location for parasailing and hang gliding activities, and requires adjustments to the administrative boundary. Acquisition of interests in this area would enhance conservation of habitat, simplify the management of recreational activities, and improve administrative efficiency.

### BUREAU OF LAND MANAGEMENT

The proposed lands encompass lands managed by BLM. All BLM lands are managed

according to actions outlined in specific resource management plans individually developed for each field office. Natural, cultural, and recreational resources are managed to accomplish a variety of multiple use objectives. These vary according to the attributes of the individual area.

The Gunnison Field Office is responsible for the management and stewardship of more than 600,000 acres of public land in the upper Gunnison River basin in southwest Colorado. BLM lands north and south of Blue Mesa and Morrow Point Reservoir within the proposed lands are managed by the Gunnison Field Office.

The Uncompahgre Field Office is responsible for the management and stewardship of more than 900,000 acres of public lands in southwestern Colorado. BLM lands from the southern point of Crystal Reservoir to the west within the proposed lands are managed by the Uncompahgre Field Office.

BLM lands adjacent to the NRA were evaluated during the study. These lands are located in Land Units B (Blue Mesa Reservoir Agency), F (Gateview Agency), and H (West-End Agency), and are described below. Land unit D (Iola Basin COA) is also discussed because of activities on adjacent BLM lands.

Livestock grazing occurs both within the proposed lands and within the current NRA. Some of the lands withdrawn by Reclamation for the Curecanti Project included BLM lands and their associated grazing allotments. Some allotments have all the federal portion of the allotment entirely within the NRA, while other allotments have some of the federal portion within the NRA and some on adjacent BLM land. However, in all cases, BLM manages these grazing allotments under an agreement with NPS.

### Land Unit B: Blue Mesa Reservoir Agency Lands

BLM lands are scattered throughout this land unit and are managed by the Gunnison Field Office. The land unit stretches east from Soap Creek Arm to Neversink along the Gunnison River and includes one small piece of land that

BLM_0059670

is located on the southeast side of Iola Basin near Kezar Basin. All the BLM lands within this land unit, excluding the piece near Kezar Basin, are within the West Antelope Area of Critical Environmental Concern (ACEC) or the Dillon Pinnacle ACEC. An ACEC is an area managed by BLM that contains important historic, cultural, and scenic resources, fish or wildlife resources, or other natural systems or processes (BLM 1991).

The Dillon Pinnacle ACEC, adjacent to the NRA just east of the West Elk Arm, was created to protect the regionally significant vertical spires or pinnacles that are outstanding examples of eroded volcanic mudflows. The pinnacles are a predominant scenic feature from many locations within the NRA, particularly from US 50 along Blue Mesa Reservoir. BLM manages this area to protect both its scenic and geologic attributes. Recreational use also occurs in the area.

The West Antelope ACEC extends from Dillon Mesa east to West Antelope Creek near Gunnison (north side of study unit) and is managed to provide important wildlife habitat for wintering elk, deer, and bighorn sheep. Land uses are permitted that do not remove or damage elk and deer crucial winter range. Several state wildlife areas are located within the midst of the ACEC, further supporting the management of these winter range attributes. The ACEC also receives some dispersed recreation use in the vicinity of Dillon Gulch, but generally public access is difficult.

The Haystack Cave, located near the NRA, has yielded a significant number of fossils, particularly faunal specimens. The area is managed for public use, but is often vandalized, despite an existing gate (BLM 1991).

Grazing — Several grazing allotments include small percentages of NRA land within them. These include the Stevens Creek, Steuben Creek, and Beaver Creek allotments. These allotments are managed by the BLM Gunnison Field Office.

## Land Unit D: Iola Basin COA

Hang gliders currently take flight from Big Mesa on BLM land in the southeast portion of Iola Basin and often times land on private or NPS property in the vicinity of Willow Creek near Iola Basin. Grazing occurs in the landing site on the private land. Although historically the landowner has allowed the hang gliders to land, more recently this activity is being denied, as the leaseholder of the grazing rights has not supported the hang gliding activity.

Grazing — One grazing allotment, Iola, includes a small percentage of NRA land within it. This allotment is managed by the BLM Gunnison Field Office.

## Land Unit F: Gateview Agency Lands

A variety of recreational activities in this area are managed by BLM. Many recreationists raft the Lake Fork of the Gunnison River and take out of the river in the vicinity of Gateview Campground, a facility currently managed by NPS. Fishing occurs along the Lake Fork with some parking occurring within the campground. Historic features associated with the narrow gauge railroad are also in the area.

Grazing — Several grazing allotments include small percentages of NRA land within them. These include the Sapinero Mesa, Ten Mile Springs, and Big Willow allotments. These allotments are managed by the BLM Gunnison Field Office.

## Land Unit H: West-End Agency Lands

BLM lands are scattered throughout this land unit, and are managed by both the Gunnison Field Office, and the Uncompahgre Field Office. Parcels within this land unit occur north and south of Crystal and Morrow Point Reservoirs, and west of Cimarron. A large area under BLM administration occurs on the western edge of Fitzpatrick Mesa, which is managed for wildlife habitat and grazing. Some severe winter elk range and mountain lion hunting also occur in this area.

Grazing — Several grazing allotments include more NRA lands then BLM lands — these

NATIONAL PARK SERVICE, RECLAMATION, AND OTHER NEIGHBORING AGENCY MANAGEMENT AND OPERATIONS

include the Pine Mesa, Windy Point, Blue Creek, Round Corral Spring, North Cimarron, and Spring Gulch allotments. The Round Corral Creek, Fitzpatrick Mesa, Highway, Rawhide/Coffee Pot, and Dead Horse allotments contain a smaller percentage of NRA lands within them. The BLM Gunnison Field Office manages the Pine Mesa, Windy Point, Blue Creek, Round Corral Spring, Round Corral Creek, Fitzpatrick Mesa, and North Cimarron allotments; while the BLM Uncompahgre Field Office manages the Dead Horse, Highway, Spring Gulch, and Rawhide/Coffee Pot allotments.

## COLORADO DEPARTMENT OF TRANSPORTATION / FEDERAL HIGHWAY ADMINISTRATION

The Colorado Department of Transportation (CDOT) holds easements and rights-of-way for the highways that pass through the existing NRA and Land Units A (Highway 92 COA), E (Sapinero/Blue Mesa COA), G (West-End COA), and H (West-End Agency). CDOT, in coordination with the Federal Highway Administration (FHWA), is responsible for maintenance, construction and safety activities, and traveler enhancements that occur on the routes they administer— US 50, CO 92, and CO 149. (CDOT 2005)

CDOT and NPS consult on an as needed basis whenever the activities of one agency have the potential to affect the operations of the other agency. Some highway maintenance activities have the potential to impact resources, and/or visitor access to NRA areas and facilities, and/or the enjoyment thereof. When possible, NPS and CDOT identify such issues early on in project planning and work together to identify ways to reduce such impacts.

A portion of the facilities at the East Cimarron day-use area lies outside the NRA boundary within the CDOT right-of-way for US 50. These facilities provide rest and restroom opportunities for both NRA visitors and highway travelers.

The West Elk Loop Scenic and Historic Byway is a component of the state byway program

administered under CDOT. The byway passes through the existing NRA and Land Units A (Highway 92 COA) and H (West End). NPS and the byway exchange information on activities and objectives via direct NPS representation on the byway's steering committee.

## COLORADO DIVISION OF WILDLIFE


*Big game hunting, a popular fall time activity within and surrounding the NRA*

A number of state wildlife areas exist within the proposed lands in Land Unit B (Blue Mesa Reservoir Agency) that are managed to protect wildlife habitat and to provide public opportunities for hunting and fishing. Three areas located north of Blue Mesa Reservoir and surrounded by the West Antelope ACEC were evaluated in more detail for the RPS. They include the Gunnison State Wildlife Area (SWA), the Centennial SWA, and the Sapinero SWA. The Gunnison SWA is located 6 miles west of Gunnison on US 50 and runs north along Beaver Creek. The Centennial SWA is 6 miles further west and just north of US 50 (12 miles from Gunnison) and is comprised of approximately 1,800 acres. The Sapinero SWA is also accessed from US 50, just west of the Centennial SWA. It is a 1,728-acre parcel situated between West Elk Creek on the west and Dry Creek on the east and is intermingled with BLM lands (CDOW 2004a). NRA facilities operated under agreement between CDOW and NPS occur on CDOW land within Sapinero SWA, at Dry Gulch campground, and near the East Elk Creek group camp site.

Some of these CDOW lands are Reclamation wildlife mitigation lands for the Aspinall Unit, which were transferred to CDOW. They need to continue to be managed for wildlife purposes.

BLM_0059672

CHAPTER 3: AFFECTED ENVIRONMENT

## U.S. FOREST SERVICE

Lands in the Gunnison and Paonia Ranger Districts of the Gunnison National Forest occur within the proposed lands. The Gunnison National Forest is one of three national forests administered under the Grand Mesa, Uncompahgre, and Gunnison National Forests (GMUG). The GMUG is managed under one Forest Supervisor. Each District is managed by a District Ranger and his/her staff.

At present, the GMUG is in the midst of a Forest Plan Revision that would be completed in the next several years. The forest lands within the proposed lands are part of the Gunnison Basin Geographic Area and North Fork Valley Geographic Area. Working groups (citizens and agency representatives) are assisting the Forest Service in identifying vision statements and management themes for how these lands should be managed. At present, there is a strong emphasis on protection of wildlife corridors and critical winter range in the area with provision for recreational opportunities (USFS 2004b). During the course of the RPS, several areas were considered for transfer between the Forest Service and NPS because of their proximity to Curecanti NRA, existing agreements, and additional discussions that have occurred between the agencies. These lands are located on the north side of the NRA in the vicinity of Soap Creek and along CO 92.

### Land Unit B: Blue Mesa Reservoir Agency Lands – Land South of West Elk Wilderness

The Gunnison Ranger District of the Gunnison National Forest adjoins BLM and Reclamation lands to the north of Blue Mesa Reservoir. These combined lands surround the Soap Creek and West Elk Arms of Blue Mesa Reservoir and the northern portion of Soap Creek Road (also designated as Forest Road 721) that originates from CO 92 near Blue Mesa Dam.

The Soap Creek Campground is located within this unit on USFS lands approximately 7.25 miles north on Forest Road 721 and another 0.5 miles along Forest Road 824. The campground is comprised of 21 designated sites that include parking spurs, fire grates, vault toilets, and other camping amenities. The campground is currently maintained via a concession contract. Horse corrals located at the campground are busy during hunting season. Fifth-wheel campers often park in undesignated areas in the vicinity of the corrals, often times resulting in more camping use outside of the campground than within the designated sites. Overnight use occurs at the corrals, including one outfitter that uses the corrals as an overnight stop.

Ponderosa Campground is located within the NRA, just 1.75 miles south of Soap Creek Campground. NPS provides service and patrols to the Ponderosa Campground.

The vacant Soap Creek grazing allotment exists within this unit. Even when grazed, the number of cattle was minimal, but they often wandered into the campground.

Some snowmobiling use occurs on USFS and other public lands in the area. However, it is minimal and mainly occurs on existing roads.

### Land Unit H: West-End Agency Lands – Long Gulch/Beartrap Area

Grazing — The Paonia District of the Gunnison National Forest lies north of CO 92 and Morrow Point and Crystal Reservoirs. The district manages a 30,000-acre grazing allotment in the Long Gulch/Beartrap area with only a small portion within the NRA. The allotment is used for early-season cattle by a grazing pool of 10 permittees. Cattle currently cross and graze on lands co-managed by NPS and USFS under an agreement. The parcel contains the Crystal Trail, which NPS maintains. The cattle use this area for a week or two early in the summer. However, little or no conflict with NRA visitors has resulted from this brief use.

### WESTERN AREA POWER ADMINISTRATION

Western owns and operates a number of facilities, including transmission lines and

BLM_0059673

NATIONAL PARK SERVICE, RECLAMATION, AND OTHER NEIGHBORING AGENCY MANAGEMENT AND OPERATIONS

TABLE II: WESTERN AREA POWER ADMINISTRATION FACILITIES

| Facility Type | Facility Name |
|---|---|
| Transmission Line | Curecanti-Rifle 230-kilovolt (kV) |
| Transmission Line | Curecanti-Crystal 115-kV |
| Transmission Line | Curecanti-Poncha 230-kV |
| Transmission Line | Curecanti-Morrow Point 230-kV |
| Transmission Line | Curecanti-Blue Mesa 115-kV |
| Transmission Line | Blue Mesa-Salida 115-kV |
| Communication Site | Dead Horse Mesa Passive Reflector |
| Communication Site | Crystal Microwave Site |
| Communication Site | Sheeps Knob Microwave Site |
| Communication Site | Black Mesa Passive Reflector |
| Communication Site | Hermits Point Passive Reflector |
| Communication Site | Morrow Point Microwave Site |
| Communication Site | Curecanti Microwave Site |
| Substation | Curecanti Substation |
| Substation and Communication Site | Blue Mesa Substation and Microwave Site |

Source: Western 2004

communication sites. Western facilities are shown on the Existing Conditions map. Table II identifies the type of facility and provides the facility name. The transmission lines cross a variety of land units within the proposed lands.

As a power marketing administration within the U.S. Department of Energy, Western is tasked with the safe and reliable delivery of electric power generated by Reclamation power plants at Aspinall Unit dams. In order to accomplish this task, Western requires continuous and uninterrupted access to facilities in order to properly conduct operation and maintenance activities. Roads cannot be closed unless alternative access is provided. Facilities cannot be relocated to enhance recreational opportunities or improve scenic resources, unless all parties are in agreement and funding is authorized to implement the project.

In addition, Western maintains and operates the various communication sites needed to effectively operate the Aspinall Unit dams for Reclamation. Western is responsible for maintaining communication equipment. They must be able to access those communication sites at any given time to provide maintenance functions such as replacing batteries, adjusting reflectors, and upgrading or replacing radio equipment. Thus, the sites and access to them are not only important to Western, but are also critical to Reclamation's operation of the project (Western 2004).

BLM_0059674

CHAPTER 3: AFFECTED ENVIRONMENT



*Autumn colors abound along Colorado Highway 92 above Morrow Point Reservoir*

BLM_0059675

Case No. 1:20-cv-02484-MSK   Document 45-13   filed 04/28/21   USDC Colorado   pg 43 of 70

# Chapter 4: Environmental Consequences



BLM_0059676

# ENVIRONMENTAL CONSEQUENCES

## INTRODUCTION

This chapter of the Resource Protection Study / Environmental Impact Statement (RPS/EIS) analyzes the beneficial and adverse impacts of the actions in Alternatives 1 and 2 on each of the retained impact topics that are outlined in the Purpose of and Need for Action chapter, and described in detail in the Affected Environment chapter. In addition, a summary of the primary differences between the two alternatives is contained in the table on the last page of the Summary, near the beginning of this document.

## GENERAL METHODOLOGY FOR ASSESSING IMPACTS

### DEFINITIONS AND FOUNDATION FOR ANALYSIS

Four of the elements of the environment that are assessed in detail in this chapter are traditionally done so in environmental impact statements. In addition, they are required to be done so by this study's enabling legislation. They are the **natural**, **cultural**, **recreational**, and **scenic** resources.

The analysis is organized by impact topic. Under each topic is a listing of relevant policies and regulations, an overview of the topic-specific methodology, if applicable, and definitions of the impact thresholds, followed by the impacts of each alternative. The Summary of Environmental Consequences table displays the impacts of all alternatives on each topic (shown at the end of the Alternatives, Including the Proposed Action chapter).

The impact analyses were based on the extensive mapping of resources that occurred during the early phases of the project, as well as on information provided by NRA staff and relevant references and technical literature citations. Each analysis by impact topic involved the following steps.

- Identify the area of analysis or geographic area that would be affected. For most impact topics, the area of analysis includes the current NRA and the proposed lands for the RPS. The term "proposed lands" refers to (1) public lands adjacent to the NRA that were identified through the study process to warrant transfer to NPS for inclusion within the NRA for more overall efficient management for all agencies concerned, in keeping with each agency's mission; and (2) private lands that warranted increased conservation measures relating to NRA goals and objectives, to be included within a Conservation Opportunity Area (COA), outside the proposed NRA boundary. The proposed lands are a feature of Alternative 2 – the Proposed Action, and are a subset of the larger "study area" that was initially examined at the beginning of the study. The proposed lands are divided into eight land units, A through H, to facilitate analysis.

- Identify the resources within the proposed lands and individual land units that could be impacted.

- Determine how the actions of each alternative would affect these resources, and characterize those impacts. Under Alternative 1 (the No-Action alternative), identify the baseline condition or existing impacts using the terms defined below. Identify the impacts of Alternative 2 (the Proposed Action), by qualitatively measuring the change in resource condition between existing conditions (Alternative 1) and Alternative 2.

Potential impacts of both alternatives are described in terms of type (beneficial or adverse, direct or indirect); context (site-specific, local, or regional); duration (short-term or long-term); and intensity (negligible, minor, moderate, or major).

BLM_0059677

This is consistent with the regulations of the Council on Environmental Quality (CEQ) that implements the National Environmental Policy Act (NEPA). More exact interpretations of intensity, duration, and type of impact are given for each impact topic examined. Definitions of intensity and duration vary by topic; but for all impact topics, the following definitions for type of impact were applied.

*Beneficial*: A positive change in the condition or appearance of the resource or a change that moves the resource toward a desired condition.

*Adverse*: A change that declines, degrades, and /or moves the resource away from a desired condition or detracts from its appearance or condition.

*Direct*: An effect that is caused by an action and occurs in the same time and place.

*Indirect*: An effect that is caused by an action, but occurs later in time or is farther removed in distance, and is still reasonably foreseeable.

## RESOURCE CONSERVATION AND DEVELOPMENT ASSUMPTIONS

Throughout this chapter, reference is made to land units, which were defined earlier in the Alternatives, Including the Proposed Action chapter and the Affected Environment chapter. They were created for purposes of analysis during the development of alternatives. Collectively, they constitute the "proposed lands," which consist of the public and private lands outside the NRA that were considered most important for conservation, and that are included within the larger overall study area.

A total of eight land units were identified, according to geographical location, similarity of resource values, reasonably foreseeable activities that occur within them, and land ownership. The land units are identified by the letters A through H, are shown on the map for Alternative 2 (Proposed Action), and are referenced throughout the RPS/EIS. They consist of two types of land: (1) privately-

owned land within the COA – Land Units A, C, D, E, and G; and (2) non-NPS agency lands that are included within the proposed NRA boundary shown in Alternative 2 – Land Units B, F, and H. For ease of reference, the land units are again defined below.

**Land Unit A (CO 92 COA):** private lands north and south of Colorado State Highway 92 (CO 92) and Morrow Point Reservoir, including Black Mesa, Soap Mesa, Soap Creek, and Fitzpatrick Mesa

**Land Unit B (Blue Mesa Reservoir Agency):** agency lands from Soap Creek east to Beaver Creek, including Dillon Pinnacles, Blue Mesa north and south shores, and Gunnison River Canyon

**Land Unit C (Gunnison River COA):** private lands in the vicinity of Neversink and Riverway

**Land Unit D (Iola Basin COA):** private lands in Iola Basin, and South Gunnison River Canyon

**Land Unit E (Sapinero/Blue Mesa COA):** private lands in the vicinity of Sapinero Mesa, and Windy Point to Hunters Point

**Land Unit F (Gateview Agency):** agency lands in the vicinity of Gateview Campground

**Land Unit G (West-End COA):** private lands west of Fitzpatrick Mesa on the south side of Crystal Reservoir, and the area around Spring Gulch on the north side of Crystal Reservoir

**Land Unit H (West-End Agency):** agency lands north and south of Crystal and Morrow Point Reservoirs.

Collectively, all the land units comprise the "proposed lands" for Alternative 2, consisting of public lands recommended for addition to the NRA (the agency lands); and the lands recommended for inclusion in a COA (the private lands).

BLM_0059678

The criteria that were used to determine the area of each land unit are shown in Table 2. This table first appeared in the Alternatives, Including the Proposed Action chapter, and then in the Affected Environment chapter. It again appears below, for ease of reference. If a resource or other criterion occurs within a given land unit, it is identified by a dot in the matrix. If the dot is highlighted in yellow, the associated criterion is considered to be a primary reason for the inclusion of the land unit within the proposed NRA boundary or the COA for Alternative 2.

The impact analysis under each impact topic focuses on both area-wide impacts, and impacts that are specific to each land unit. Impacts are highly dependent upon future landowner actions, because the rights of landowners are not affected by either alternative. Although NPS may facilitate resource conservation opportunities, all landowners would continue to have the freedom to exercise their personal property rights. Because landowner choices cannot be predicted by this plan, certain assumptions were necessary regarding land development to determine qualitative impacts.

**Alternative 1 Assumptions**

As noted in the Alternatives, Including the Proposed Action chapter, NPS would have no authority to expend funds for acquisition of fee title or conservation easements outside the existing NRA and would not be able to acquire funds for such a purpose without such congressional authorization. In addition, NPS would probably have limited success in going to Congress to seek funding for individual pieces of property or to add land to the NRA on an ad hoc basis.

NPS might be able to use very limited operating funds and/or special project funds to implement partnered projects within and outside the NRA, and would rely more on funding from other agencies and organizations to accomplish goals such as wildlife habitat or wetland improvement projects. Therefore, for purposes of analysis, it was assumed in this alternative that there is a greater likelihood

that more of the private lands adjacent to the NRA would be developed over time than in Alternative 2, and that resource values could be compromised.

Some land units within the proposed lands are more likely to be developed than other land units within the 5-to 10-year timeframe of this NEPA analysis. Based on their knowledge of the lands surrounding the NRA, members of the study team identified this development probability in Table 12. Please note that these are only assumptions for purposes of analysis. The definition of each level of development follows.

- *Low* – Because of topography and other issues, there is limited access and little development in the area. Included are areas where conservation easements are already in place. The likelihood of development in the near future is small.

- *Moderate* – Topography does not exclude development, and some access is available. Current landowners may not be interested in selling their property.

- *High* – The area is easily accessible, and some development already exists in the area.

- *Very High* – Direct access exists to major transportation corridors. Development is imminent, or some subdivision/development has already occurred. Some owners have stated they are interested in selling.

Lands with a high or very high development potential are the most likely to be developed within the next 10 years. Lands with low potential would most likely remain in their current, undeveloped state for some time into the future.

**Alternative 2 Assumptions**

The congressional authorization of the COA; the proactive efforts by the National Park Service to conserve lands surrounding the NRA; support from third party benefactors, such as conservation organizations and friends of the NRA; and the availability of funds from

BLM_0059679

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

Table 2: Factors Considered in Establishing Land Units

| Criteria | CO 92 COA | Blue Mesa Reservoir Agency | Gunnison River COA | Iola Basin COA | Sapinero /Blue Mesa COA | Gateview Agency | West-End COA | West-End Agency |
|---|---|---|---|---|---|---|---|---|
| Administrative Efficiency | ● | ●(yellow) | ● | ●(yellow) | | ●(yellow) | ● | ●(yellow) |
| Archeological/Historical Sites | ● | ●(yellow) | ●(yellow) | ● | ● | ●(yellow) | ●(yellow) | ● |
| Bighorn Sheep – Overall Range | ● | ● | | | ● | ● | ● | ● |
| Elk – Severe Winter Range | ●(yellow) | ● | ● | ●(yellow) | ●(yellow) | ● | ● | ● |
| Gunnison Sage-grouse (all categories) | | ● | ● | ● | ●(yellow) | ● | | |
| Heron Rookery | | | ●(yellow) | | | | | |
| Historic Railroad Feature | | | ●(yellow) | | | ●(yellow) | ●(yellow) | |
| Lynx – Potential Habitat | ● | ● | | | ● | ● | | ● |
| Management Issues / Logical Boundary | ● | ● | ● | ● | ●(yellow) | | | ● |
| Mule Deer – Severe Winter Range | ●(yellow) | ● | | ●(yellow) | ●(yellow) | ● | ● | ● |
| Paleontology/Geology | ● | ● | | | ● | | | ● |
| Prairie Dog – Overall Range | | | ● | ● | | | | ● |
| Pronghorn – Winter Range | | ● | | | ● | | | |
| Raptor Range | ● | ● | ● | ● | ● | ● | ● | ● |
| Rare and/or Imperiled Species | ● | ●(yellow) | ●(yellow) | ● | ● | ● | ● | ● |
| Recreation Opportunities | ●(yellow) | ● | ●(yellow) | ●(yellow) | ●(yellow) | ● | | |
| Scenic Qualities from Primary Overlook or within 3-mile Viewshed | ●(yellow) | ●(yellow) | ●(yellow) | ● | ●(yellow) | ● | ●(yellow) | ● |
| Understanding of Significant Resources | ● | ● | ● | ● | | ● | | ● |
| Water Quality | ● | ● | ● | ● | | ● | ● | ● |

**Notes:**

A dot indicates the criterion is present within the land unit.

The addition of yellow highlighting indicates that not only is the criterion present, but it is of such significance, in combination with the other criteria present, to recommend that the land unit be included within the COA or proposed NRA boundary in Alternative 2.

BLM_0059680

GENERAL METHODOLOGY FOR ASSESSING IMPACTS

TABLE 12: PROBABILITY OF DEVELOPMENT BY LAND UNIT

| Region of Proposed Lands | Description and Geographic Location | Probability of Development in Near Future |
|---|---|---|
| Land Unit A CO 92 COA | Private lands in COA North and south of CO 92 and Morrow Point Reservoir: Black Mesa, Soap Mesa, Soap Creek, Fitzpatrick Mesa | Low to Moderate Low: Fitzpatrick Mesa and parts of Soap Mesa Moderate: Black Mesa, Soap Mesa, Soap Creek |
| Land Unit B Blue Mesa Reservoir Agency | Agency lands from Soap Creek east to Beaver Creek:  Blue Mesa north shore, Iola Basin south shore, Gunnison River Canyon | Not applicable – all federal land |
| Land Unit C Gunnison River COA | Private lands in COA Neversink, Riverway | Moderate |
| Land Unit D Iola Basin COA | Private lands in COA South Gunnison River Canyon, southeast Iola Basin | Low to High Low: Gunnison River Canyon High: Southeast Iola Basin |
| Land Unit E Sapinero/Blue Mesa COA | Private lands in COA Sapinero Mesa; Windy Point; Hunters Point | Very high |
| Land Unit F Gateview Agency | Agency lands in Gateview area | Not applicable – all federal land |
| Land Unit G West-End COA | All private COA lands west of Fitzpatrick Mesa and Spring Gulch (on both sides of Crystal reservoir) | Low to High Low: all areas but Cimarron High: Cimarron area |
| Land Unit H West-End Agency | Agency lands west of Fitzpatrick Mesa and Black Mesa (on both sides of Crystal Reservoir), including USFS land near Long Gulch. | Not applicable – all federal land |

BLM_0059681

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

Congress would improve the likelihood of future resource conservation on private lands. This likelihood is emphasized and assumed in the impact analysis for Alternative 2. However, success of this alternative is dependent in large part upon the interest and cooperation of private landowners.

Although resource conservation mechanisms would be available, it is recognized that property owners may choose not to exercise any of these options. Thus, it is assumed in the Alternative 2 impact analysis that a range of actions are possible on any private parcel, including: (1) continuation of existing conditions, where no land conservation tool would be implemented (same as Alternative 1); and (2) a land conservation tool is implemented, such as NPS providing assistance through general agreements or incentive payments, or acquisition of an interest in the land, such as conservation easements or fee simple acquisition. In turn, a range of impacts could occur.

Recognizing that a range of impacts are possible under Alternative 2, the analysis for each impact topic focuses on the potential impacts under the assumption that some degree of landowner cooperation would occur. However, it is also recognized that the impacts of Alternative 1 (the No-Action alternative) could also occur under Alternative 2 (the Proposed Action), if there is no cooperation on the part of landowners. In any event, impacts will be further assessed in more detail at the time a *land protection plan* is produced. At that time, which tools of resource conservation to apply to which tracks of land within the COA will be clearly defined.

## CUMULATIVE IMPACTS

The CEQ regulations to implement the National Environmental Policy Act require the assessment of cumulative impacts in the decision-making process for federal projects. Cumulative impacts are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or nonfederal) or person undertakes such other actions" (40 CFR 1508.7). Cumulative impacts are considered for all alternatives, including the No-Action alternative. Cumulative impacts were determined by combining the impacts of the alternative being considered with other past, present, and reasonably foreseeable future actions. Therefore, it was necessary to identify other ongoing or reasonably foreseeable future projects at the NRA, and if applicable, the surrounding region. These projects, also known as cumulative actions, are grouped and listed below according to agency, county, and land trusts and conservation groups.

### National Park Service Plans or Actions

**Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999.** This Act recognizes the many significant ecological, geological, scenic, historical, and recreational values of lands within and adjacent to the Black Canyon of the Gunnison. The Act established the Black Canyon of the Gunnison National Park, the Gunnison Gorge National Conservation Area, and the Gunnison Gorge Wilderness, and expanded the Black Canyon of the Gunnison Wilderness. When Congress changed the designation of Black Canyon from a national monument to a national park, land was transferred from the Bureau of Land Management (BLM) to NPS to be included within the national park boundary. The Act also provided for the continuance of existing grazing leases that now occur within the park on the former BLM land, through the lifetime of the current permit holders. The Act provided that NPS could acquire by purchase, donation, or exchange, specific land or conservation easements, subject to the approval of the property owner. A subsequent Act (2003) further modified the boundary of the national park, and identified additional private land, again subject to landowner approval. The 2003 Act provided that Reclamation would retain administrative jurisdiction over the Crystal Dam Access Road, and land, facilities, and roads of the Bureau of Reclamation in the East Portal Area

BLM_0059682

for the maintenance, repair, construction, replacement, and operation of any facilities relating to the delivery of water and power under the jurisdiction of Reclamation.

**Fire Management Plan.** A fire management plan was approved in 2006 for Curecanti National Recreation Area and Black Canyon of the Gunnison National Park. The plan identifies a strategy for managing wildfire, and using fire as one of many management tools. NPS wildfire and prescribed fire events will be coordinated with other agencies (BLM, USFS, Reclamation, and Colorado State Forest Service) and affected private landowners. The plan provides NPS with greater flexibility to manage wildfire and to utilize fire as one of many possible tools to address resource issues.

## Other Federal Agency Plans or Actions

**Bureau of Land Management.** A variety of plans exist that outline management objectives for BLM land in the region surrounding the NRA. They include the Gunnison Area and Uncompahgre Basin Resource Management Plans, the Gunnison Sage-grouse Conservation Plan, the Gunnison Gorge National Conservation Area Resource Management Plan, and area-wide fire management plans. Although BLM is an agency that manages for multiple-use objectives, all of its plans manage regionally important natural resources such as elk and mule deer winter range, Gunnison Sage-grouse, and riparian habitat to preserve these resources. Cultural and recreational resources are also managed to preserve their integrity and to provide resource-based recreation opportunities, respectively.

**Bureau of Reclamation.** Reclamation intends to prepare a draft EIS to describe potential effects of operational changes for the Aspinall Unit that are related to compliance with the Endangered Species Act (ESA). The purpose of Reclamation's proposed action is to operate the Aspinall Unit to avoid jeopardy to endangered species while maintaining the congressionally authorized Unit purposes. Alternative operations will be considered. The Aspinall Unit (formerly the Curecanti Unit) of the CRSP was authorized by the CRSP Act of

April 11, 1956 (70 Sat. 105). Reclamation operates and maintains the Aspinall Unit, its facilities, its lands and land interests, and its water and water interests to meet project purposes. The presence of the three reservoirs has created water-based recreation opportunities.

**U.S. Forest Service.** The Gunnison National Forest adjoins the NRA along its northern side. USFS manages land for values similar to the NRA and the BLM, such as wildlife habitat and recreational resources, but has additional mandates to manage for other multiple use objectives, including extractive industries, such as timber. The Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests are combined into one administrative unit. At present, forest plans are in the process of being amended. The process was begun in 2001, and a draft plan was released for public review and comment in spring 2007. The plan identifies thirteen management areas representing a continuum from low management intensity with a high degree of naturalness, to high management intensity with low levels of naturalness. As of this writing, completion of the plan was being held in abeyance due to a decision by a U.S. District Court pertaining to a 2005 Planning Rule being used by USFS. Information on this project can be obtained at the following website: www.fs.fed.us/r2/gmug/policy/plan_rev.

**Western Area Power Administration.** Western and/or other utilities could propose that existing transmission line corridors within and adjacent to the NRA be upgraded, or new corridors be added, to handle additional capacity in order to adequately distribute electric power across this east/west pathway. There are a limited number of options available to the utility industry for routes to move product to the market, whether the product is electricity, oil or gas, or even water; and existing rights-of-way provide an opportunity that may not exist elsewhere.

## State Agency Plans or Actions

**Colorado Department of Transportation / Federal Highway Administration.** Highway easements and/or rights-of-way

BLM_0059683

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

(ROW) are in place along US 50 and CO 92; therefore, additional land acquisition activity or potential conflicts with the RPS are not likely. Future work on US 50 between Montrose and Monarch Pass will involve modernizing the road, such as providing 8-foot shoulders where possible. Road widening is not anticipated, unless viable opportunities present themselves. Some improvements may occur to highway intersections, and minor road improvements may be made along US 50.

**West Elk Loop Scenic and Historic Byway.** The West Elk Loop is one of 25 scenic byways designated by the State of Colorado. It covers 204 miles of two-lane roads through parts of rural western Colorado that afford spectacular views of wilderness areas, canyon rims, and a variety of other memorable mountain environments. Portions of the byway are located along CO 92 and US 50 within the proposed lands.

The road begins in Carbondale and follows CO 133 south over McClure Pass to Paonia Reservoir, Paonia, and Hotchkiss. The road continues to head south from Hotchkiss on CO 92 veering to the east near the Black Canyon of the Gunnison and Black Mesa. It joins US 50 at Blue Mesa Reservoir and travels into Gunnison. From Gunnison, the road travels north to Crested Butte and turns west over Kebler Pass, with the loop ending at Paonia Reservoir.

In 2000, the West Elk Byway Corridor Management Plan was completed. The goals identified in the chapter addressing resource conservation in that document appear to be similar to the objectives of the RPS.

**County Plans or Actions**

**Gunnison County Comprehensive Plan.** The Gunnison County Comprehensive Plan is currently in process, and is being developed in response to a requirement of state law. The vision of the plan is to provide physical and economic direction for the county-- as a road map for coordination between Gunnison County and local cities and towns to address future growth. The plan defines areas with

the least and most development constraints, identifies infrastructure needs, and anticipates and plans for impacts. It establishes overall direction for the county and specifically addresses issue areas such as housing, transportation, economic development, agriculture, transportation, recreation, and the environment. Two components of the plan have been completed and adopted: (1) the Crested Butte to Gunnison Corridor Plan; and (2) the Upper Crystal River Valley Plan. The county has not yet begun to study the area east and west of Gunnison, which includes the Curecanti area. The county has indicated that they may adapt certain aspects and/or recommendations for the Curecanti area that come out of the RPS, after they have undertaken the planning process for the western portions of the county.

**Gunnison County Land Use Regulation (LUR).** The purpose of the Gunnison County LUR, created in 2001, is to promote the health, safety, and general welfare of the citizens of Gunnison County by giving reasonable consideration to the social, economic and environmental characteristics of the community and the compatibility of proposed land use changes with existing uses. The LUR proposes to conserve environmental resources by maintaining environmental quality; preserving quality and quantity of water resources; preserving wildlife habitat; and regulating land use in natural hazard areas. The LUR also allows for the establishment of special geographic areas, or SGAs, if the county determines that certain economic or resource issues might be more adequately addressed with modification of the LUR within the SGA. The county has used the SGA process sparingly, and any interest in considering an SGA for the Curecanti area will likely occur after the completion of the Gunnison County Comprehensive Plan.

**Montrose County Master Plan.** The vision for the Montrose County Master Plan (Montrose County 2001) is as follows:

Montrose County should retain its outstanding scenic and natural qualities while providing quality employment, housing,

BLM_0059684

education and recreation to its residents. Tourism recreation, agriculture and light industries will remain important segments of the economy; efforts will be made to diversify and encourage sustainable economic development. The majority of the county's youth should be able to have a career and eventually raise a family within the county. A healthy and vibrant community will continue to evolve, and the rural character and hometown atmosphere of Montrose County will be maintained.

The county is broken into four geographic areas, with portions of the NRA in the Maher/ Black Canyon area and the South Valley area. NPS lands, north and east of the Gunnison River, fall within the Maher/Black Canyon area. Lands south of the river, including US 50, are located within the South Valley area that includes Montrose. The relevant land use policies include the following:

- Maher/Black Canyon: Preserve the rural character and ranching heritage of the Maher/Black Canyon area, and prepare for any impacts increased visitation at the Black Canyon of the Gunnison National Park may place on the Maher/Black Canyon area.

- South Valley: Support the development of land in a manner that is consistent with, or does not conflict with, agricultural practices. Manage the development of land in a manner that is efficient and cost-effective for the taxpayers of the county.

## Conservation Easements and Land Trusts

As of 2004, approximately 33,000 acres of land within Gunnison County were in easements or other types of open space. This represented approximately 10% of all private land in the county (Michaelson). Another large 10,000-acre easement is held by the Rocky Mountain Elk Foundation north of CO 92.

- Crested Butte Land Trust - 2,500 acres (8% of 33,000 acres) – focuses on ecological/biodiversity resources, viewshed, and riparian resources

- Gunnison Ranchland Conservation Legacy – 14,000 acres (42%) – focuses on preserving/conserving ranches and ranchland

- Nature Conservancy – 8,357 acres (25%)

- Additional conservation easements – 4,913 acres (15%)

- Additional open spaces – 3,148 acres (10%).

## Other Plans or Actions

**DeGette's Wilderness Bill.** U.S. Representative Diane DeGette has proposed that the West Elk Wilderness Area be expanded to the south to include that area of land between Coal Creek and Red Creek. The area would encompass lands currently administered by three agencies – USFS, BLM, and NPS - and would include some lands in Land Unit B being proposed to be included in the NRA in Alternative 2. The National Park Service has not taken an official position on this proposal, and it is not being analyzed in the RPS/EIS. However, if this wilderness were to be designated, and the land were to be included in the NRA, then NPS would work closely with USFS to develop management guidelines that are compatible with the rest of the West Elk Wilderness, while being true to the purpose and mission of the NRA. This would be addressed in an updated general management plan or implementation plan for the NRA. Otherwise, due to the relatively long and narrow configuration of the NRA; the presence of highways, back-country roads, motorized recreational watercraft, off-road vehicles, and snowmobiles within or surrounding the NRA; and the presence of dams, power generating equipment, and related facilities, and mechanized operational requirements of Reclamation in performing their mission; the study team concluded that no other area within the NRA or the surrounding COA is suitable for Wilderness designation. Furthermore, any land that Reclamation has withdrawn for their projects would be inappropriate for Wilderness

BLM_0059685

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

designation due to project operational requirements, as mandated by Congress in the Colorado River Storage Project Act.

**IMPAIRMENT ANALYSIS**

National Park Service management policies require an analysis of potential effects to determine whether or not actions would impair NPS area resources. The fundamental purpose of the national park system, as established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve area resources and values. NPS managers must always seek ways to avoid, or to minimize to the greatest degree practicable, adversely impacting resources and values.

These laws give the National Park Service the management discretion to allow impacts to area resources and values when necessary and appropriate to fulfill the area's purposes, as long as the impact does not constitute impairment of the affected resources and values. Although Congress has given the National Park Service the management discretion to allow certain impacts within a national park system unit, that discretion is limited by the statutory requirement that the agency must leave area resources and values unimpaired, unless a particular law directly and specifically provides otherwise.

The impairment that is prohibited by the Organic Act and the General Authorities Act is an impact that, in the professional judgment of the NPS manager, would harm the integrity of area resources or values. Impairment may result from NPS activities in managing the area, visitor activities, or activities undertaken by concessioners, contractors, and others operating in the area. An impact to any area resource or value may constitute an impairment, but an impact would more likely constitute an impairment if it has a major or severe adverse effect upon a resource or value, where that resource or value is:

- Necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the area

- Key to the natural or cultural integrity of the area, or to opportunities for enjoyment of the area

- Identified for conservation by the area's general management plan or other relevant NPS planning documents.

A determination of whether there is impairment, or not, is included in the "Conclusion" section for each alternative for each impact topic relating to NRA resources and values. The determinations are based on the above definition of impairment. The term "impairment," as defined above, does not apply to visitor recreation, regional economic and social characteristics, or National Park Service and neighboring agency operations, because for purposes of this analysis, they are not considered to be "resources," such as natural resources, cultural resources, and scenic resources.

## NATURAL RESOURCES

In general, increased recreational use that occurs as a result of implementation of Alternative 2: Proposed Action may present more impacts to water quality, vegetation, wildlife communities, special status species and other natural resources, than would result under Alternative 1: No Action. This is especially true on some lands within the Conservation Opportunity Area (COA) should they ever be acquired in fee simple, or an interest thereof acquired, that would allow for public use.

Potential recreational development, and related uses such as described in the list of existing and potential recreational opportunities under Visitor Activities in the VISITOR USE, UNDERSTANDING, AND ENJOYMENT section of the Affected Environment chapter, could present localized impacts to wildlife, vegetation, soils, water quality, and other resources. However, before any such recreational development occurs, or uses allowed, NPS would evaluate the proposal(s) using the NEPA process.

BLM_0059686

The evaluation could occur for a single development or activity, or as a comprehensive study (e.g., a general management plan or implementation plan). At that time, impacts on the environment would be fully assessed, and mitigation measures identified.

All recreational developments and/or activities within the future NRA boundary would be in accordance with the NPS mission of preserving unimpaired the natural and cultural resources and values of the NRA for the enjoyment, education, and inspiration of this and future generations. For any recreational uses and/or associated amenities authorized on COA lands, NPS would work with landowners to minimize impacts so that the goals of resource conservation are met.

## WATER QUALITY

### Guiding Policies and Regulations

Current laws and policies require certain desired conditions be achieved for water quality at Curecanti National Recreation Area. Refer to the following box for details.

in order to measure the relative changes in water quality (overall, localized, short term and long term, cumulative, beneficial and adverse) as a result of the alternative actions.

*Negligible*: The impact to water resources would be localized and incalculable.

*Minor*: The impact to water resources would be localized and calculable.

*Moderate*: The effect on water resources would be calculable and would result in a change in water chemistry and/or biota over a relatively wide area or stream reach.

*Major*: The effect on water resources would be calculable and would substantially change the water chemistry and/or biota over a large area or stream reach within and outside of the proposed lands.

Impacts are short-term when water quality recovers in less than 1 day. Long-term impacts occur when the recovery period is 30 days or more.

| DESIRED CONDITIONS FOR WATER QUALITY | SOURCE |
|---|---|
| Surface water and groundwater are perpetuated as integral components of NRA aquatic and terrestrial ecosystems, consistent with the primary purposes of Reclamation's projects; and the quality meets or remains better than all applicable water quality standards. | - NPS *Management Policies 2006*<br>- NPS- 77, "Natural Resources Management Guidelines"<br>- *Clean Water Act*<br>- Executive Order (EO) 11514 "Protection and Enhancement of Environmental Quality" |
| Conserve the scenery, natural and cultural resources. | NRA Purpose |

### Methodology

Water quality impacts were qualitatively assessed using the "General Method for Assessing Impacts", including land conservation and development assumptions, identified at the beginning of the chapter. The following impact thresholds were established

### Impacts of Alternative 1 – No Action

*Analysis*

Depending upon land development patterns on private lands within the proposed lands, sedimentation and loading of water quality contaminants into NRA waters could

BLM_0059687

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

potentially increase in drainages adjacent to developed areas. Without adequate mitigation, degradation of water quality could occur within the NRA and proposed lands, resulting in short- to long-term moderate to major impacts. Degraded water quality could lead to impacts to water-based recreational activities, resulting in long-term moderate to short-term major impacts to visitor use, enjoyment, appreciation, and understanding. Some minor beneficial impacts would occur from the continuation of baseline understanding of water quality conditions through long-term cooperative monitoring efforts, including basin-wide partnerships and cooperation with USGS.

Drainages most at risk of degradation include Cebolla Creek, Lake Fork, Steuben Creek, Pine Creek, and the Gunnison River above Blue Mesa Reservoir. Currently, degradation is an issue at Cimarron Creek, where *E coli* regularly exceeds standards in the summer months.

### Cumulative Impacts

Development, grazing, off-road vehicle use, and other disturbance causing activities occurring on public and private lands adjacent to the proposed lands could continue to cause sedimentation and loading of contaminants in nearby water systems, including the Gunnison River and tributaries. Best management practices of federal and county agencies that manage or regulate land use in the area, such as the BLM, Forest Service, and Gunnison and Montrose Counties, would minimize some of these impacts on regional water quality by controlling or mitigating impact-related uses. In addition, private lands with conservation easements would not likely contribute to cumulative effects on regional water quality because of restricted development rights. These best management practices and conservation efforts would mitigate some of the adverse impacts of other land use activities, that when combined with the impacts of Alternative 1, would result in cumulative impacts on area water quality that are long-term minor to moderate.

### Conclusion

The continuation of, or increase in, current land use practices within the proposed lands, particularly development, could cause long-term moderate to short-term localized major impacts from increased sedimentation or contaminant loading into waters within the proposed lands.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

### Impacts of Alternative 2 – Proposed Action

### Analysis

There would be no direct impacts to water quality within the NRA, including those lands transferred from other agencies. Other impacts would vary with level of participation in land conservation tools, as well as the types of tools implemented. Since it is likely that landowners within the COA would support some level of partnership and participation in the tools that are authorized by Congress, long-term minor to moderate beneficial impacts could result. Through mechanisms such as conservation easements and fee simple acquisition, it is likely that development would be limited, conserving important resource attributes such as vegetation and surface soils. These efforts would result in less potential for sediment and other run-off from private lands. In addition, agricultural practices allowed under an easement would most likely be monitored, minimizing the potential for contaminant loading into waters of the NRA and proposed lands. The quality of existing water-based recreation activities would be maintained.

BLM_0059688

## Cumulative Impacts

As described in Alternative 1, a variety of land use activities contribute to adverse water quality impacts within the region. However, some of these impacts are mitigated by ongoing best management practices implemented by land management agencies or local counties. Other land conservation activities outside the proposed lands also contribute to improved regional water quality. These activities when combined with the minor to major beneficial impacts associated with increased land conservation activities

or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

## GEOLOGY AND PALEONTOLOGY

### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for geology and paleontology at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR GEOLOGY AND PALEONTOLOGY | SOURCE |
|---|---|
| Paleontological resources, including both organic and mineralized remains in body or trace form, are conserved, preserved, and managed for public education, interpretation, and scientific research. | - NPS *Management Policies 2006*<br>- NPS- 77, "Natural Resources Management Guidelines" |
| Natural geologic resources and processes function in as natural a condition as possible, except where special management considerations are allowable under policy, especially to protect facilities, operations, and public safety. | – NPS *Management Policies 2006* |
| Conserve the scenery, natural and cultural resources. | – NRA Purpose |

in Alternative 2, would result in cumulative, minor to moderate beneficial impacts.

## Conclusion

The increased likelihood that landowners would use tools to conserve resources on their property would result in long-term minor to major beneficial impacts on water quality.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors,

### Methodology

Potential impacts to paleontological resources were evaluated using the "General Methodology for Assessing Impacts." The following impact thresholds were established to measure the potential changes in number of local paleontological sites as a result of the alternative actions.

*Negligible*: The impact would be localized and not detectable, or would be at the lowest levels of detection.

*Minor*: The effects to geological and/or paleontological resources would be localized and slightly detectable.

*Moderate*: The effect on geological or paleontological resources would be readily apparent and result in a change to their character over a relatively wide area.

BLM_0059689

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

*Major*: The effect on geological or paleontological resources would be readily apparent and substantially change their character over a large area within and outside of the proposed lands.

Because most geological and paleontological resources are non-renewable, any effects would be long-term.

### Impacts of Alternative 1 – No Action

*Analysis*

Paleontological resources within Land Units A (CO 92 COA) and E (Sapinero/Blue Mesa COA) could be susceptible to long-term minor to moderate adverse impacts if future land use resulted in disturbance of areas where resources exist. Land Unit E would be especially vulnerable due to the very high development potential of this area. Resources in areas that would be transferred between agencies (Land Units B [Blue Mesa Reservoir Agency] and H [West-End Agency]) would continue to be conserved, as federal management would continue.

*Cumulative Impacts*

Regional paleontological resources could be affected by land use practices and activities occurring outside the proposed lands, such as development of private lands, off-road vehicle use and other recreational opportunities, and other land-disturbing activities. However, federal land management agencies charged with conservation of such resources would minimize or eliminate some of these impacts through monitoring and other management activities. Cumulatively, these land-disturbing activities when combined with impacts associated with Alternative 1 could potentially cause minor long-term adverse impacts to geological or paleontological features throughout the region.

*Conclusion*

Private lands in the vicinity of Sapinero Mesa and the area southeast of Morrow Point Reservoir would be vulnerable to long-term minor to moderate adverse impacts from development and other land uses that could result in disturbance and degradation to geological and paleontological resources. Resources in other locations with lower development potential would likely be conserved into the foreseeable future.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

Though some disturbance to resources within the proposed lands would still be likely, minor to moderate long-term beneficial impacts would be expected due to increased conservation of resources on lands brought into the NRA through transfer or through the use of other tools by landowners within the COA.

*Cumulative Impacts*

Under Alternative 2, cumulative impacts to geological and paleontological resources in the region would be similar to Alternative 1. However, the potential for landowners to implement resource conservation tools within the COA under Alternative 2 would reduce the degree of adverse impacts related to Alternative 1, resulting in cumulative negligible adverse impacts to these resources.

*Conclusion*

Minor to moderate long-term beneficial impacts to geological and paleontological resources would occur as a result of an increase in resource conservation activities.

BLM_0059690

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

## VEGETATION AND WILDLIFE

### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for vegetation and wildlife at Curecanti National Recreation Area. Refer to the following box for details.

of sensitive resources within the various land units were consulted. Analyzed resources such as native vegetation communities, wildlife habitats, and special status species may occur in suitable habitat within the proposed lands, irrespective of ownership or managing agency. In addition, habitats extend beyond the boundary of Alternative 2's proposed lands, and the evaluated resources are recognized as part of the larger ecosystem. The analyses of impacts include lands within the NRA as well as within the larger area of proposed lands, as stated. The following impact thresholds were established to measure the relative changes in vegetation and wildlife resources as a result of the alternative actions.

*Negligible*: Wildlife, including native fish, and their habitats would not be affected or the effects would be at or below levels of detection and would not be measurable or of perceptible consequence to wildlife populations. Impacts would be within the range of natural variability. No native

| DESIRED CONDITIONS FOR VEGETATION AND WILDLIFE | SOURCE |
|---|---|
| Populations of native plant and animal species function in as natural a condition as possible except where special management considerations are warranted. | - NPS *Management Policies 2006*<br>- NPS-77, "Natural Resources Management Guidelines" |
| Native species populations that have been severely reduced or extirpated from Curecanti National Recreation Area are restored where feasible and sustainable. | - NPS *Management Policies 2006* |
| Invasive plant and animal species are reduced in numbers and area, or are eradicated from natural areas of Curecanti National Recreation Area. Such action is undertaken wherever such species threaten the native vegetation or wildlife resource or public health, or when control is prudent and feasible. | - NPS *Management Policies 2006*<br>- EO 13112, "Invasive Species"<br>- NPS-77 "Natural Resources Management Guideline" |
| Conserve the scenery, natural and cultural resources. | - NRA Purpose |

### Methodology

Available information on wildlife and vegetation resources in the proposed lands was compiled. Where possible, map locations

vegetation (including riparian and wetland communities) would be affected, or some individual native plants could be affected as a result of the alternative, but there would be

BLM_0059691

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

no measurable or perceptible changes in plant community size, integrity, or continuity.

*Minor*: Effects to wildlife or habitats would be measurable or perceptible, but localized within a small area. While the mortality of an individual animal might occur, the viability of wildlife populations would not be affected, and the population, if left alone, would recover. Effects on native plants, riparian communities, or wetlands would be measurable and perceptible, but would be localized within a small area. The viability of the plant community would not be affected, and the community, if left alone, would recover.

*Moderate*: Effects to wildlife populations or habitat would occur over a relatively large area. The change would be readily measurable in terms of abundance, distribution, quantity, or quality of population. A change would occur over a relatively large area within native vegetation, riparian or wetland communities that would be readily measurable in terms of abundance, distribution, quantity, or quality.

*Major*: Effects to wildlife populations or habitats would be readily apparent, and would substantially change wildlife populations over a large area within or outside the proposed lands. Effects on native plant communities, riparian communities, or wetlands would be readily apparent and would substantially change vegetation community types over a large area.

Impacts to wildlife and vegetation are short-term if they could recover in less than one year and in less than three years or growing seasons, respectively. Long-term impacts would occur if wildlife would require more than one year, and vegetation would require more than three years or growing seasons to recover.

### Impacts of Alternative 1 – No Action

*Analysis*

**Native Vegetation.** Within the NRA, management for conservation of native plant communities would continue. Adverse impacts would include the likely continuation and possible increase in the spread of noxious

or exotic plant species into the NRA from adjacent lands that are not managed for weed control. Displacement of native species by these species would result in long-term minor to moderate adverse impacts to native plant communities. Where federal agencies and other entities are cooperating to manage noxious weeds on lands adjacent to the NRA, localized minor beneficial impacts would be realized within the NRA. Overall impacts would vary according to the level of funding made available to mitigate and control weed populations within the NRA.

The spread of noxious or exotic plant species, as well as development and other land uses, could also displace native vegetation communities on private and federal lands in the proposed lands, resulting in localized long-term moderate to major adverse impacts within the proposed lands. Land Unit E (Sapinero/Blue Mesa COA) has a very high development potential, and portions of Land Units D (Iola Basin COA) and G (West-End COA) also have high development potential. These lands would be most susceptible to alteration of native vegetation should these areas be disturbed during development.

**Riparian and Wetland Communities**. Riparian and wetland communities within the NRA and other federal agency lands would continue to be conserved as consistent with agency policies. Riparian and isolated (non-jurisdictional) wetlands located outside the NRA include those potentially present in proposed Land Units C (Gunnison River COA) and D (Iola Basin COA). These land units include areas of moderate to high development potential. Only jurisdictional wetlands are subject to regulation by the Corps on private lands. Under Alternative 1, moderate adverse impacts to riparian and isolated wetland communities in these areas would likely occur through continuation or increase in land uses such as development, haying and grazing. In addition, the invasion of noxious weeds into these communities could cause moderate long-term impacts to riparian or wetland communities within the NRA or Land Units C and D of the proposed lands. Jurisdictional wetlands are protected from filling activities

BLM_0059692

by Section 404 of the Clean Water Act, which requires appropriate mitigation for impacts. Wetland or riparian communities present on public lands outside of the NRA would be minimally impacted, as policies of land management agencies call for beneficial protection of such areas in most instances.

**Big Game Wildlife Species.** Important habitat for big game within the NRA and surrounding proposed lands includes severe winter range

Table 13 displays the types of habitat and acres of each within the NRA that would continue to be conserved within the NRA as well as those acres on land units adjacent to the NRA that may be directly affected by land use activities.

Habitat located on lands outside of the NRA would be susceptible to long-term moderate to major adverse impacts from loss of severe winter range due to noxious or exotic plant species invasion, development, or other land

TABLE 13: BIG GAME HABITATS – NO- ACTION ALTERNATIVE

| Species | Habitat Type | Acres within Current NRA | Acres within Privately Owned Portions of Proposed Lands Surrounding NRA |
|---------|--------------|--------------------------|--------------------------------------------------------------------------|
| American Elk | Severe Winter Range | 18,000 | 7,890 |
| Mule Deer | Severe Winter Range | 16,000 | 8,420 |
| Bighorn Sheep | Overall Range | 14,600 | None |
| Pronghorn | Winter Range | 260 | 1,125 |

for elk and mule deer, as well as overall range for bighorn sheep, and winter range for pronghorn. Big game habitat within the NRA would continue to benefit from conservation. However, impacts to big game use of habitats within the NRA could occur as a result of habitat fragmentation on adjacent lands from development or other land uses. Long-term minor to moderate impacts to big game movements into and out of the NRA would occur from the continuation or increase in habitat fragmentation on adjacent lands. This could lead to the overuse of NRA range and long-term moderate impacts to habitat for elk, mule deer, bighorn sheep, and pronghorn as a result of degradation. In addition, the spread of noxious or exotic plant species onto NRA lands would likely continue and possibly increase, resulting in habitat degradation and long-term minor to moderate impacts to NRA big game habitat. Impact intensities would vary with funding for mitigation of invasive weed populations.

use. This would include approximately 7,890 acres of severe winter range for elk and 8,420 acres of severe winter range for mule deer. Severe winter range for elk and mule deer in Land Units D (Iola Basin COA) and E (Sapinero/Blue Mesa COA) (2,850 and 1,020 acres respectively) is most vulnerable due to high or very high development potential of those lands. Bighorn habitat of particular concern is located in Land Unit E and portions of Land Unit G, where potential for development is very high and high, respectively. Pronghorn winter range on other federal lands and on private lands within the proposed lands is located in Land Unit B (Blue Mesa Reservoir Agency) and Land Unit D (Iola Basin COA). These areas are somewhat protected from direct impacts by the existence of current federal agency management and low to moderate development potential, respectively. Beneficial impacts to this area, and other big game habitats in federal agency lands within the proposed lands would continue due to agency management policies.

BLM_0059693

An additional threat to bighorn sheep includes the risk of disease transmission to wild herds from domestic sheep populations. This risk would continue in areas such as Fitzpatrick Mesa, where domestic sheep grazing occurs in close proximity to bighorn sheep habitat.

Localized beneficial effects would continue to occur through current cooperative efforts including agreements with landowners, counties, and joint agency management efforts. Benefits would be realized on NRA lands and adjacent proposed lands where cooperative efforts are occurring.

**Raptors**. Protection for raptors within the NRA and other federally managed lands in the proposed lands would continue. The loss and fragmentation of habitat on private lands in the COA adjacent to the NRA would likely continue and possibly increase, resulting in indirect long-term minor to moderate adverse impacts to raptor use within the NRA. Long-term moderate to major adverse impacts are possible on privately owned lands within the proposed lands, resulting from loss of raptor habitat and hunting grounds due to exotic plant species invasion, development, or other land use.

**Fisheries**. There would be potential for land use activities that cause sedimentation or pollution runoff, such as development or grazing that occurs outside of the NRA, to negatively impact water quality, resulting in indirect short-term to long-term negligible to minor effects to fisheries within the NRA as well as in land units outside the NRA. Long-term cooperative monitoring efforts including Basin-wide partnerships and cooperation with USGS would continue to provide baseline understanding of water quality conditions. Protection for fisheries resources within the NRA and other federally managed portions of the proposed lands would continue.

*Cumulative Impacts*

Regionally, some vegetation, riparian communities and wetlands, and wildlife resources would likely experience moderate to major short- to long-term adverse impacts from the continuation or increase

in developed land uses, such as residential development, that would result in loss of native vegetation or their displacement by the spread of noxious weeds. Minor to moderate localized long-term beneficial impacts would likely result to resources on lands outside of the NRA and proposed lands from continued current regional cooperative efforts, including resource conservation agreements with land owners, the Joint Agency Management Effort (JAME), and other federal land management activities. When combined with the impacts of Alternative 1, these land development and federal land management activities would result in moderate long-term cumulative adverse impacts.

*Conclusion*

The displacement of native vegetation communities by noxious weeds that spread from lands adjacent to the NRA would result in long-term minor to moderate adverse impacts to NRA lands. These impacts would be minimized where joint agency management efforts are underway. Where private lands within the proposed lands lack weed management efforts or occur in land units susceptible to development (such as D, E, and G), long-term moderate to major adverse impacts would result from the spread of noxious weeds or alteration and loss of native vegetation communities.

Riparian and wetland communities in Land Units C (Gunnison River COA) and D (Iola Basin COA) would be susceptible to moderate to major long-term adverse impacts through land use practices, invasion of noxious weeds, or development. Riparian and wetlands within the NRA and other agency lands would largely be conserved, but those communities adjacent to private lands with weed issues would be susceptible to long-term moderate to major adverse impacts.

Long-term minor to moderate adverse impacts to big game habitat and raptor use of the NRA would result from exotic species invasion and continuing habitat fragmentation on adjacent lands, particularly Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Loss of

BLM_0059694

habitat due to noxious or exotic plant species invasion, land development, or other land uses would result in long-term moderate to major adverse impacts on elk and mule deer severe winter range and bighorn sheep overall range. Raptor habitat and activities would be similarly affected.

Fisheries within the NRA would not be directly impacted, though water quality impacts from activities outside the NRA could result in indirect short- to long-term negligible to minor effects to fisheries inside and outside the NRA.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

### Impacts of Alternative 2 – Proposed Action

Under Alternative 2, a COA would be established that would encompass private lands within the proposed lands. The NRA would be congressionally authorized to partner with landowners within the COA for the purpose of resource conservation. This would provide enhanced opportunities for beneficial effects to biological resources in the proposed lands through participation by COA landowners in partnerships. In addition, the Proposed Action would include a net addition of 10,040 acres to the NRA from federal and state agency transfers.

Impacts to specific resources are detailed below. Impact intensities would vary with level of participation by landowners in resource conservation activities and the types of tools implemented, ranging from technical assistance and agreements to conservation easements and acquisition. In addition, the potential for development based on ease of access, existing development in the area, and topography also factors into prediction of impact intensity. Resources within land units with the highest potential for development would gain the most benefits from landowner use of tools for resource conservation.

*Analysis*

**Native Vegetation.** Within the NRA, management for conservation of native plant communities would continue, and no direct impacts from Alternative 2 would occur. Native vegetation on the net 10,040 acres of land that would be transferred to the NRA from other agencies would not be impacted directly, as management strategies would be similar to those existing, and resource conservation would continue. Impacts from encroachment of noxious weeds from adjacent COA lands into the NRA would vary with degree of use of the resource conservation tools. Under low levels of participation, impacts to native vegetation from displacement by noxious weeds from adjacent land would be similar to those that are possible under the Alternative 1. Localized, long-term minor to moderate beneficial impacts would result on NRA lands adjacent to areas where agencies and landowners work cooperatively (for example, via JAME) to reduce potential for the spread of noxious weeds. Likewise, in other areas adjacent to private lands within the COA that participate in resource conservation, widespread minor to moderate beneficial effects could occur through reduced spread of exotic species into the NRA. The intensity of beneficial effects would vary with the type of tools that landowners would choose. Beneficial effects would be minor to moderate with participation in technical assistance, general agreements, and incentive payment programs, while participation in conservation easements or acquisition programs would result in moderate to major beneficial effects. In addition, impact intensities would vary with funding for mitigation that may be available to control weed populations within the NRA.

Impacts to private lands within the COA would vary with levels of participation

BLM_0059695

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

and types of resource conservation tools implemented. With low participation rates, development would most likely occur in Unit E (Sapinero/Blue Mesa COA) and portions of units D (Iola Basin COA) and G (West-End COA), where the development potential is highest. If development would take place in these areas, localized long-term moderate to major adverse impacts would be possible, as under Alternative 1. However, with participation in the congressionally approved tools in these portions of the COA, direct and indirect long-term moderate to major beneficial impacts could result. Impacts to COA lands in land units with low development potential would also be beneficial, though at minor levels, due to lower development potential. Intensity of beneficial impacts to COA land units would vary based on which types of tools would be implemented, from those related to acquisition of interests in land, to lower levels of conservation, such as technical assistance and general agreements.

**Riparian and Wetland Communities.** Riparian communities within the NRA, including those on lands transferred from other federal agencies, would continue to be conserved under agency resource management policies. Riparian and wetland communities in the COA portion of the proposed lands include those in Land Units

C (Gunnison River COA) and D (Iola Basin COA). Portions of these land units are located in areas with moderate to high development potential. Beneficial protections of most jurisdictional wetlands would continue to occur on all lands under Section 404 of the Clean Water Act. If conservation tools were implemented in private land units, long-term beneficial effects to non-jurisdictional riparian and wetland vegetation communities would likely result. Effects would range from minor to major, depending on the types of tools and level of conservation enacted.

**Big Game Wildlife Species.** Habitat for elk, mule deer, bighorn sheep, and pronghorn within the NRA, and on agency-transferred lands would benefit from resource conservation tools identified in Alternative 2. Some level of participation by landowners in resource conservation activities would be expected, resulting in minor to major long-term beneficial impacts to big game species by enhanced conservation of habitat within the COA. Table 14 displays the habitat type and acreage of each big game species that would be conserved within the NRA, as well as the total acres within the COA that could benefit big game habitat if resource conservation tools were implemented.

Habitat located on private lands within the COA would be susceptible to adverse

TABLE 14: BIG GAME HABITATS – PROPOSED ACTION

| Big Game Species | Habitat Type | Total Acres of Habitat under NPS Management within Proposed NRA | Acres on Private Lands within COA by Land Unit that Could Benefit from Inclusion in COA |
|---|---|---|---|
| American Elk | Severe Winter Range | 25,000 | 7,890 (Land Units A, D, E, G) |
| Mule Deer | Severe Winter Range | 23,000 | 8,420 (Land Units A, D, E, G) |
| Bighorn Sheep | Overall Range | 20,500 | None |
| Pronghorn | Winter Range | 340 | 1,125 (Land Unit D) |

Land units containing at least some lands with high or very high development potential.

150    CURECANTI NATIONAL RECREATION AREA

BLM_0059696

impacts from loss of severe winter range due to noxious or exotic plant species invasion, development, or other land use, as under Alternative 1. Severe winter range for elk and mule deer that is located in Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA) is most vulnerable, due to high or very high development potential of at least a portion of lands within those units. Likewise, bighorn habitat of particular concern is located in Land Units E (Sapinero/Blue Mesa COA) and G (West-End COA) due to high development potential. On the other hand, pronghorn winter habitat within Land Unit D (Iola Basin COA), on the south side of the reservoir, is somewhat protected due to lower development threats. Beneficial impacts resulting from conservation of private lands within the COA would be of higher intensity in these areas versus land units with lower levels of development potential. In addition, conservation easements and fee simple acquisition by NPS would most likely yield moderate to major beneficial impacts, while less intensive tools would result in minor to moderate benefits to big game habitat.

Pronghorn winter range that is located on BLM land south of Iola Basin in land unit B (Blue Mesa Reservoir Agency) would remain protected when that parcel is transferred to the NRA. Additional pronghorn winter range on adjoining private land is somewhat protected due to lower development pressures; however, conservation efforts in cooperation with landowners could still serve to benefit pronghorn and their habitat. An additional threat to bighorn sheep includes the risk of disease transmission to wild herds from domestic sheep populations. This risk would continue in areas such as Fitzpatrick Mesa, where domestic sheep grazing occurs in close proximity to bighorn sheep habitat.

In addition to partnership benefits, localized beneficial effects would continue to occur through current cooperative efforts including agreements with landowners, counties, and JAME. Benefits would be seen on NRA lands and adjacent proposed lands where cooperative efforts are occurring.

**Raptors.** Protection for raptors and habitat within the NRA, including federal agency transfer lands, would continue. It is likely that participation in these programs would occur, resulting in long-term beneficial impacts within the NRA and COA from reduced loss and fragmentation of adjacent habitats. Intensity of beneficial impacts would range from minor to major depending upon landowner participation and types of tools implemented. Beneficial effects would be minor to moderate with implementation of tools where no interest would be acquired by NPS, and moderate to major when interest is acquired.

**Fisheries.** There would be no direct impact to fisheries resources within the NRA from implementation of the proposed action. As in Alternative 1, land use activities outside of the NRA could negatively impact water quality, resulting in indirect short-term to long-term negligible to minor effects to fisheries within the NRA as well as in the COA. Implementation of resource conservation tools under Alternative 2 would likely result in reduced potential for indirect impacts to fisheries from degradation of water quality. Beneficial impacts would likely be negligible to minor due to the low potential for adverse impacts to fisheries resources.

Long-term cooperative monitoring efforts including basin-wide partnerships and cooperation with USGS would continue to provide baseline understanding of water quality conditions. Protection for fisheries resources within the NRA, including federal transfer lands, would continue.

*Cumulative Impacts*

Cumulative impacts would be similar to Alternative 1, except land development and federal land management activities outside the proposed lands, in combination with decreased impacts of Alternative 2 (due to resource conservation activities) would result in minor to moderate cumulative adverse impacts.

*Conclusion*

Beneficial impacts to vegetation and wildlife resources would result from landowners'

BLM_0059697

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

participation in resource conservation partnerships. Benefits would be greatest in those areas of highest development potential, such as Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). By taking advantage of resource conservation tools that would be available under this alternative, long-term benefits to native vegetation, riparian and wetland communities, big game, and raptor habitat within NRA and COA lands would range

SPECIAL STATUS SPECIES

Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for special status species at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR SPECIAL STATUS SPECIES | SOURCE |
|---|---|
| Federal and state- listed endangered or threatened species and their habitats are conserved and sustained. | – *Endangered Species Act*<br>– Equivalent state protective legislation<br>– NPS *Management Policies 2006*<br>– NPS 77, "Natural Resources Management Guidelines" |
| Conserve the scenery, natural and cultural resources. | – NRA Purpose |

from minor to major and those to fisheries resources would range from negligible to minor. Intensity of impacts would be dependent on location, level of landowner participation, and types of tools implemented. However, if development occurs on private lands within the COA, adverse impacts to vegetation and wildlife resources would be similar to those described under Alternative 1.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

Methodology

Information regarding threatened, endangered, and otherwise designated special status species was gathered from consultation with U.S. Fish and Wildlife Service, NPS specialists, and Colorado Division of Wildlife. The methodology described under "General Methodology for Assessing Impacts" was used to determine resource impacts. In addition to the standard impact thresholds, terms used by USFWS during Section 7 consultation are included for use when determining potential impacts to species with federal status.

*Negligible:* The action would not affect a listed species or habitat at any detectable level, or would be discountable. For purposes of Section 7, for analysis of federally listed species, the determination would be *no effect.*

*Minor:* Effects on special status species or designated critical habitat would be discountable (i.e., adverse effects are unlikely to occur or could not be easily measured, detected, or evaluated) or are completely

BLM_0059698

beneficial, barely perceptible, and would affect a few individuals of sensitive species or have very localized impacts upon their habitat within Curecanti NRA or the proposed lands. For purposes of Section 7, for analysis of federally listed species, the determination would be *may affect / not likely to adversely affect.*

*Moderate:* The action would cause measurable effects on (1) a relatively moderate number of individuals within a sensitive species population; (2) the existing dynamics between multiple species (e.g., predator-prey, herbivore-forage, vegetation structure-wildlife breeding habitat); or (3) a relatively large habitat area or important habitat attributes within the NRA or proposed lands. A sensitive species population or habitat might deviate from normal levels under existing conditions, but would remain indefinitely viable within the NRA. For purposes of Section 7, for analysis of federally listed species, the determination would be *may affect / likely to adversely affect.*

*Major:* The action would have impacts that would involve a disruption of habitat or breeding grounds of a sensitive species such that casualty or mortality would result in removal of individuals from the population and the species could be at risk of extirpation from the area. For purposes of Section 7, for analysis of federally listed species, the determination would be *likely to jeopardize the continued existence of a species or adversely modify critical habitat.* This would not necessarily constitute impairment unless the impact to the listed species or its habitat would be affected to the point that the NRA's purpose could not be fulfilled and the species could not be enjoyed by current and future generations of NRA visitors.

Short-term impacts are those that occur for one year or less during the plan implementation. Long-term effects extend beyond plan implementation and last longer than one year in terms of population, community, or designated critical habitat recovery.

## Impacts of Alternative 1 – No Action

### *Analysis of Federal Species*

As discussed in the Affected Environment chapter, most of the species mentioned by USFWS in their list of federally listed species in the vicinity of the NRA were not carried forward for analysis in this chapter due to a lack of occurrence of these species within the evaluated land units of the NRA. The only federally listed species carried forward for analysis is the bald eagle.

**Bald eagle.** There would be no direct effect to bald eagles or their habitat within the NRA under Alternative 1. Protection for bald eagle within the NRA and other federally managed lands would continue. However, the loss and fragmentation of bald eagle habitat and hunting grounds adjacent to NRA lands due to development or other land use would likely continue and possibly increase. This would result in indirect long-term minor to moderate impacts to bald eagle activity within the NRA, and direct and indirect long-term moderate adverse impacts on proposed lands outside the NRA. Therefore, implementation of Alternative 1 may affect and would likely adversely affect bald eagle or its habitat within the NRA or surrounding proposed lands, particularly if development occurred at a high rate, as is possible in some areas of Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA).

### *Analysis of State Species*

**American peregrine falcon.** There would be no direct impact to peregrine falcons or their habitat within the NRA under Alternative 1. Protection for peregrine falcon habitat within the NRA and on other federally managed lands within the proposed lands would continue. However, the loss and fragmentation of habitat and hunting grounds due to development, or other land use adjacent to NRA lands would likely continue and possibly increase resulting in indirect long-term minor to moderate impacts to Peregrine Falcon use within the NRA. Since the falcon tends to use the canyons, and since the canyons are under federal protection,

BLM_0059699

there would probably be minor, or at most, moderate direct and indirect long-term adverse impacts to peregrine falcons on lands outside the NRA.

**Colorado River cutthroat trout.** No direct effect would occur to the Colorado River cutthroat trout within the NRA or other federally managed lands within the proposed lands. Degraded water quality outside of the NRA would potentially lead to minor to moderate adverse impacts to the species, both inside and outside the NRA. Baseline understanding of water quality conditions would continue through long-term cooperative monitoring efforts including Basin-wide partnerships and cooperation with USGS.

**Greater sandhill crane.** There would be no direct impact to the greater sandhill crane or its habitat within the NRA under Alternative 1. Management for protection of this and other wildlife species would continue within the NRA and other federally managed lands. However, the loss and fragmentation of habitat adjacent to NRA lands due to development or other land use would likely continue and possibly increase, resulting in indirect long-term minor adverse impacts to greater sandhill crane use within the NRA, and direct and indirect long-term moderate adverse impacts outside of the NRA.

**Gunnison Sage-grouse.** There would be no direct impacts to Gunnison Sage-grouse or habitat within the NRA. Protection would continue on approximately 12,000 acres of Sage-grouse habitat within the NRA and on other federally managed lands. However, the fragmentation of habitat adjacent to these lands would likely continue and possibly increase, resulting in indirect long-term minor to moderate adverse impacts to Gunnison Sage-grouse use within the NRA.

On privately owned lands within the proposed lands, long-term moderate to major adverse impacts are possible on up to 1,700 acres of Sage-grouse habitat from loss of habitat due to exotic plant species invasion, development, or other adverse land uses. Habitat within the NRA is not adequate to sustain a viable population without support from resources that are available on adjacent habitat outside of the NRA. Localized minor to moderate beneficial effects would occur through current cooperative efforts with the Gunnison Sage-grouse Working Group and the Gunnison Sage-grouse Rangewide Conservation Plan. Benefits would be seen on NRA lands and adjacent outside lands where cooperative efforts are occurring.

Implementation of Alternative 1 may affect and would likely adversely affect Gunnison Sage-grouse or its habitat. Though moderate to major impacts are possible, continuing efforts related to the Gunnison Sage-grouse Working Group would likely mitigate some of these impacts within the proposed lands.

**Long-billed curlew.** There would be no direct impact to the long-billed curlew or its habitat within the NRA from Alternative 1. Protection for long-billed curlew habitat within the NRA and other federally managed lands would continue. The loss and fragmentation of habitat due to development, or other land use adjacent to NRA lands would likely continue and possibly increase resulting in indirect long-term minor impacts to long-billed curlew use within the NRA and direct and indirect long-term minor adverse impacts on proposed lands.

*Analysis of NRA Sensitive Species*

**Great blue heron.** There would be no direct impact to the great blue heron or its habitat within the NRA from implementation of Alternative 1. Protection for great blue heron habitat within the NRA would continue. On private lands within the proposed lands, loss and fragmentation of habitat would likely continue and possibly increase, resulting in indirect long-term minor to major adverse impacts to great blue heron use within and outside of the NRA.

Within Land Unit C, direct and indirect long-term moderate to major adverse impacts are possible on lands from continued suppression of cottonwood tree establishment and disturbance of the rookeries by land use activities. Given the rarity of the rookeries in

BLM_0059700

the general area, these impacts could threaten the long-term viability of the great blue heron in Gunnison County.

**Gunnison's prairie dog.** There would be no direct impact to the Gunnison's prairie dog or its habitat within the NRA from implementation of Alternative 1. Protection for the species within the NRA would continue. On private lands within the proposed lands, loss and fragmentation of habitat would likely continue and possibly increase, resulting in indirect long-term minor to moderate adverse impacts to the Gunnison's prairie dog and its habitat.

**Sensitive Plants.** Special status plant species of interest to this analysis include adobe thistle (Rocky Mountain thistle), Black Canyon gilia, Colorado desert parsley, Gunnison milkvetch, hanging garden Sullivantia, and skiff milkvetch. Within the NRA, no direct effects would occur to any special status plant species from implementation of Alternative 1. Within privately owned areas within the proposed lands, direct or indirect long-term minor to moderate adverse impacts could result from loss of individuals or populations related to development or other land use.

*Cumulative Impacts*

Adverse cumulative impacts to special status species include the continued existence of exotic fish species in rivers and tributaries and the effects on Colorado River cutthroat trout viability. Beneficial management practices and conservation efforts on federal lands and properties with conservation easements (outside the proposed lands) would minimize adverse impacts to special status species where applicable. Cooperative efforts between agencies would also benefit certain species. An example is the Gunnison Sage-grouse Rangewide Conservation Plan that outlines the strategy of the Gunnison Sage-grouse Working Group to increase grouse populations in the Gunnison Basin. The management strategies and monitoring activities set forth by the cooperative group of federal, state, and county agencies and organizations would result in moderate to major beneficial impacts to such species. The

above actions to manage listed species on a regional basis in combination with other cumulative effects and with Alternative 1 impacts, would result in minor to moderate adverse impacts to special status species in the region.

*Conclusion*

Implementation of Alternative 1 would not cause direct effects to any special status species or associated habitats within the NRA. However, loss and fragmentation of habitats would continue and possibly increase in private land units outside the NRA, impacting species and habitats within the proposed lands. Federal species that may be affected and would likely be adversely affected include the bald eagle. Likewise, state listed species including the American peregrine falcon, Colorado River cutthroat trout, greater sandhill crane, and Gunnison Sage-grouse, would experience minor to moderate adverse impacts to individuals or habitat within the proposed lands; while impacts to long-billed curlew would be minor. The great blue heron and Gunnison's prairie dog, both NRA sensitive species, would also be adversely affected by indirect impacts from habitat alteration or disturbance. Impacts to heron would be moderate to major, while those to prairie dogs would be minor to moderate. Sensitive plant individuals or populations may be affected and could be lost due to activities outside the NRA, potentially resulting in minor to moderate adverse impacts to adobe thistle (Rocky Mountain thistle), Black Canyon gilia, Colorado desert parsley, Gunnison milkvetch, hanging garden Sullivantia, and skiff milkvetch.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors,

BLM_0059701

CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

**Impacts of Alternative 2 – Proposed Action**

*Analysis*

There would be no direct impact to any federal, state, or NRA sensitive species or associated habitats from implementation of Alternative 2. Under low levels of participation by landowners in the COA in land protection plans, impacts could be similar to those described under Alternative 1. However, some participation in partnerships and use of land protection tools would be expected to yield direct and indirect minor to major long-term beneficial impacts to federal species such as bald eagle due to increased protection of habitat. The potential for environmentally insensitive development, or other high impact land use on private lands within the COA would decrease, reducing the loss and fragmentation of habitats for bald eagle, especially on Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Federal special status species or their habitats may be affected, but are not likely to be adversely affected under Alternative 2.

State listed species such as the American peregrine falcon, Colorado River cutthroat trout, greater sandhill crane, Gunnison Sage-grouse, and long-billed curlew, would also benefit from decreased habitat loss and fragmentation and increased conservation. Approximately 13,000 acres of Gunnison Sage-grouse habitat would be protected within the NRA; and an additional 1,700 acres of habitat would potentially be conserved on private property in Land Units C, D, and E through partnerships and use of resource conservation tools. These species and associated habitats would experience minor to moderate long-term beneficial impacts under Alternative 2.

The NRA sensitive great blue heron and its habitat would likely experience minor to major beneficial impacts under Alternative 2

through potential long-term conservation of the heron rookery in Land Unit C (Gunnison River COA), and other riparian habitat in Land Unit D (Iola Basin COA). In addition, the Gunnison's prairie dog would benefit from conservation of COA Land Units C and D (Gunnison River and Iola Basin), as well as Land Unit H, which contain overall range for the species.

Sensitive plant species, including adobe thistle (Rocky Mountain thistle), Black Canyon gilia, Colorado desert parsley, Gunnison milkvetch, hanging garden Sullivantia, and skiff milkvetch, would likely experience minor to moderate beneficial impacts under Alternative 2 from reduced potential for loss of individuals or populations from development or other land use.

The intensity of beneficial impacts on private COA lands would vary with the level of partnership and the types of conservation tools implemented. These beneficial impacts would also carry over onto adjacent public lands within the NRA.

*Cumulative Impacts*

Continued regional cooperative efforts between federal, state, and local agencies would contribute moderate to major beneficial impacts to certain species such as the Gunnison Sage-grouse. The contribution from Alternative 2 to cumulative effects would also be beneficial, though some adverse impacts could still occur outside of the NRA and the proposed lands due to development and other land use activities. Overall, cumulative effects to special status species in the region would be minor to major beneficial.

*Conclusion*

Implementation of Alternative 2 would benefit special status wildlife species and therefore would have no effect on the bald eagle, Gunnison Sage-grouse, Colorado River cutthroat trout, American peregrine falcon, greater sandhill crane, long-billed curlew, great blue heron, or other sensitive species. Special status plant species would also experience beneficial impacts. Through

BLM_0059702

decreased potential for development and other land use activities that are detrimental to habitats, all special status species within the proposed lands would have opportunities for increased conservation and potential for populations to expand. Benefits would be greatest on Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA), where development potential is

## NATURAL LIGHTSCAPE (NIGHT SKY)

### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for natural lightscapes at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR NATURAL LIGHTSCAPE | SOURCE |
|---|---|
| Artificial outdoor lighting will be limited to basic safety, security, and operational requirements, and will be shielded when possible. NPS will coordinate with neighbors and local government agencies to find ways to minimize the intrusion of artificial light into the night scene in the NRA, in an effort to conserve this segment of the natural resource. | – NPS *Management Policies 2006* <br> – NRA Purpose |
| Conserve the scenery, natural and cultural resources. | – NRA Purpose |

currently the highest. However, resources on other private lands within the COA would benefit as well. In addition, there are no immediate plans for developments or new recreational facilities that would affect these species. Future proposals would be evaluated using the NEPA process prior to project approval.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

### Methodology

The analyses of impacts include lands within the NRA as well as within the larger area of proposed lands, as stated. The following impact thresholds were established to measure the relative changes in natural lightscapes as a result of the alternative actions.

*Negligible*: The impact would be barely detectable, would not occur in primary resources areas, or would affect few visitors.

*Minor*: The impact would be slight but detectable, would not occur in primary resource areas, or would affect few visitors.

*Moderate*: The impact would be readily apparent, would occur in primary resource areas, or would affect many visitors.

*Major*: The effect would be severely adverse or exceptionally beneficial, would occur in primary resource areas, or would affect the majority of visitors.

BLM_0059703