Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 1 of 71



### Impacts of Alternative 1 – No Action

*Analysis*

Except for Reclamation's primary jurisdiction areas around the dams, natural lightscapes within the NRA would continue to be conserved through management policies that limit artificial light, especially in natural areas. Private portions of the proposed lands surrounding the NRA that remain in their current undeveloped condition would also continue to contribute to the existing high quality night sky surrounding the NRA.

Cooperation from neighbors and local government agencies would minimize the intrusion of artificial light from adjacent areas into the night scene in the NRA. There are currently greater restrictions pertaining to outdoor lighting within the Gunnison County Land Use Resolution, and no substantial restrictions pertaining to lighting associated with development within Montrose County.

With the ever-increasing probability that privately owned portions of the proposed lands would eventually be developed, it is a reasonable assumption that more and more outdoor lights will be installed along with the developments. In general, a single light source may not be a significant problem. However, the accumulative effect of additional development could result in long-term, minor to moderate, adverse impacts to the night sky, depending upon factors such as decisions by landowners, county land use regulations, and population growth.

Land Units A (CO 92 COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA) would be more likely impacted by development in the near future. This is due to their accessibility from US 50, CO 92, and CO 149, and local roads such as Soap Creek Road; and to the existence of other development in the vicinity. Rapid expansion and commercial growth in Montrose and to a lesser extent Delta are a direct threat to Black Canyon. The terrain in the Montrose area does deflect some of the light generated in the city at night. Black Canyon and Curecanti currently offer popular night sky programs several times through out the year and work with local astronomical societies to host star gatherings in the parks. Black Canyon and Curecanti are two of the darkest national parks measured in southwestern Colorado.

Scientific research regarding elements of night sky is on-going. As the NPS collects and analyzes data, that information will be shared with neighbors and local officials to develop complementary approaches to night sky conservation through a variety of environmentally friendly techniques in urban and residential site planning and design.

Distance is the primary component in light pollution. Light diminishes to the negative 2.5 power of distance, so that a town of 10,000 10 miles away will appear 6x brighter than a town of 10,000 20 miles away. This principal makes the distance to specific areas of the park an important factor.

Topography also plays an important role. A town like Gunnison at a high elevation will appear to be brighter than a town in a valley or obscured by mountains. A site down in a canyon will be darker than one up on the mesa.

A third factor is the brightness of the town's lights. There can be significant gains or losses in environmental quality depending on how bright the lights a town chooses to install and whether those lights are shielded. Vail, Colorado for example, has very subdued lights and approximately 1,000 lumens per capita of installed outdoor lights. In contrast, Las Vegas has approximately 5,000 lumens per capita.

Degradation of the night sky condition also depends on other factors such as the growth rate of the surrounding communities; types of industries; and the conservation efforts employed to reduce night light. Given the residential growth within the state and the demonstrated increase statewide in light pollution, a threat does exist to the quality of night sky experienced in this region.

Night skies also play a role in defining wilderness characteristics found in places such as the Black Canyon Wilderness and nearby



BLM_0059704

USFS Wilderness areas. Much remains to be understood about the possible ecological disruption in these areas due to nocturnal habitat loss as a result of increased night light.

*Cumulative Impacts*

Conservation and planning activities occurring throughout the proposed lands within Gunnison and Montrose Counties could result in a variety of impacts to local and regional night sky resources. The Gunnison County Comprehensive Plan is expected to evaluate a wide range of factors in developing a strategy for growth in the Curecanti area. Efforts from the Comprehensive Plan could result in long-term beneficial impacts on night sky resources adjacent to the NRA by considering such resources in the development and implementation of recommendations.

Long-term management plans by agencies such as the U.S. Forest Service and BLM would continue to conserve night sky values. This would result in beneficial impacts.

CDOT/FHWA highway modernization plans could influence development along the US 50 corridor, further affecting the highway corridor and its aesthetics. Such development could result in long-term, localized minor to moderate adverse impacts on the night sky resource.

The long-term minor to moderate adverse impacts to night sky values that could result from Alternative 1 from potential development and land use in the proposed lands surrounding the NRA, when combined with the potential adverse and beneficial impacts of other regional planning and conservation efforts, could result in cumulative long-term minor to major adverse impacts to natural lightscapes in the region.

*Conclusion*

Except for Reclamation's primary jurisdiction areas around the dams, night sky values within the NRA and on adjacent federal and state lands would continue to be conserved through federal and state land management activities. Private portions of the proposed lands that remain in their current undeveloped condition would also continue to contribute to the existing high-quality natural landscape in the area.

However, private portions of the proposed lands surrounding the NRA would continue to be increasingly subject to future development and other land uses in Alternative 1 that could interfere with night sky values within the NRA. Even with county regulations, this could result in long-term minor to moderate adverse impacts to the natural lightscape/night sky resource.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

**Impacts of Alternative 2 – Proposed Action**

*Analysis*

As in Alternative 1, except for Reclamation's primary jurisdiction areas around the dams, night sky values within the NRA and on other adjacent federal and state lands would continue to be conserved through implementation of federal and state land management plans. Thus impacts to natural lightscape resources on public lands would be the same in Alternatives 1 and 2.

On private portions of the COA, the availability of resource conservation tools to private landowners, and increased congressionally authorized efforts on the part of NPS to conserve resources, would help maintain existing night sky quality. Should landowners implement resource tools such as conservation easements or fee simple acquisition, long-term minor to moderate beneficial impacts could occur,

depending upon the degree of development or conservation. However, the availability of such tools would increase the likelihood that some or all of the resources within the COA would be conserved.

Some of the areas that have more potential for private development, and in turn, more potential for adverse impacts on night sky values, are located in Land Units A (CO 92 COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). These areas have been identified in Alternative 1, and include areas such as Sapinero Mesa, Soap Mesa, Blue Mesa, and Cimarron.

In general, there is expected to be a long-term minor to moderate beneficial impact on night sky resources through implementation of Alternative 2. This would result from the creation of the COA and the authorization and ability of NPS to work in more meaningful partnerships with private landowners within the COA; increased cooperation between NPS and its neighbors; and the implementation of the tools for resource conservation. Also, working with local government, visible night sky improvement might occur with the implementation of a lighting protocol that reduces light emissions (NPS, Night Sky Quality Monitoring Report, Prepared by Chad Moore, November 8, 2006).

*Cumulative Impacts*

Cumulative impacts related to the actions in Alternative 2 would be more beneficial than Alternative 1. Many local and regional planning and conservation activities would continue to result in long-term, minor to major beneficial impacts to local and regional night sky values. Without cooperation of private landowners in the COA, the overall cumulative impact of Alternative 2 could be adverse, as in Alternative 1. However, with the cooperation of private landowners, the potentially beneficial impacts associated with the resource conservation tools suggested in Alternative 2 could result in long-term, moderate, beneficial, cumulative impacts. The overall impact of these combined efforts of federal, state, and local agencies, as well as private landowners that conserve the natural lightscape resources on their land would be positive and widespread.

*Conclusion*

Some of the areas where there is more potential for development, and in turn, more potential for adverse impacts on natural lightscapes, are located on private property in Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Conservation of these areas would result in long-term minor to moderate beneficial impacts to both local and NRA-wide lightscapes for NRA visitors and residents alike. The availability of resource conservation tools to private landowners, and congressionally authorized increased efforts on the part of NPS to work in partnership with private landowners to conserve natural lightscapes within the COA, would help maintain existing night sky quality.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

## NATURAL SOUNDSCAPE

### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for natural soundscapes at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR NATURAL SOUNDSCAPE | SOURCE |
|---|---|
| In those areas of the NRA where visitors have the opportunity to experience natural quiet and solitude, recreational use is managed to preserve this condition. Noisier conditions are accepted along roads, in areas surrounding the dams and related Reclamation operations and facilities, and where motorized recreational pursuits, such as motor boating and snowmobiling are allowed. | - NPS *Management Policies 2006*<br>- DO 47, "Sound Preservation and Noise Management" |
| Conserve the scenery, natural and cultural resources. | - NRA Purpose |

### Methodology

The analyses of impacts include lands within the NRA as well as within the larger area of proposed lands, as stated. The following impact thresholds were established to measure the relative changes in natural soundscapes as a result of the alternative actions.

*Negligible*: The impact would be barely detectable, would not occur in primary resources areas, or would affect few visitors.

*Minor*: The impact would be slight but detectable, would not occur in primary resource areas, or would affect few visitors.

*Moderate*: The impact would be readily apparent, would occur in primary resource areas, or would affect many visitors.

*Major*: The effect would be severely adverse or exceptionally beneficial, would occur in primary resource areas, or would affect the majority of visitors.

### Impacts of Alternative 1 – No Action

<u>*Analysis*</u>

Except where motorized recreational vehicles and boats are authorized, and except for Reclamation's primary jurisdiction areas around the dams, natural soundscape within the NRA would continue to be conserved through management policies that limit manmade sounds in certain areas. The locations within the NRA that currently offer the best opportunities for solitude and enjoyment of natural sounds would continue to do so. Private portions of the proposed lands surrounding the NRA that remain in their current undeveloped condition would also continue to contribute to the existing high quality of the soundscape surrounding the NRA.

Coordination with neighbors and local government agencies would minimize the intrusion of excessive noise from adjacent areas and activities into quiet areas of the NRA. However, there is an increasing probability that privately owned portions of the proposed lands would experience property development and other land uses that could interfere with natural ambient sound and overall soundscape values. Increased development would result in increased traffic and other activities that could impact the soundscape of the region. This could result in long-term minor to moderate adverse impacts to the NRA's natural soundscape depending upon factors such as decisions by landowners, county land use regulations, and population growth.

Land Units A (CO 92 COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA) would be more likely to be impacted by development in the near future, and are therefore more likely to experience adverse impacts on the natural soundscape. This is due to their accessibility from US 50, CO 92, and CO 149, and local roads such as Soap Creek Road; and to the existence of other development in the vicinity.

*Cumulative Impacts*

Conservation and planning activities occurring throughout the proposed lands and within Gunnison and Montrose Counties could result in a variety of impacts to local and regional soundscape values. The Gunnison County Comprehensive Plan is expected to evaluate a wide range of factors in developing a strategy for growth in the Curecanti area. Efforts from the Comprehensive Plan could result in long-term beneficial impacts on soundscape resources adjacent to the NRA by considering such resources in the development and implementation of recommendations.

Long-term management plans by agencies such as the U.S. Forest Service and BLM would continue to be in place. This would result in beneficial impacts to the soundscape resource.

CDOT/FHWA highway modernization plans could influence development along the US 50 corridor, further affecting the highway corridor and its aesthetics, including the soundscape. Such development could result in long-term, localized minor to moderate adverse impacts on the area's natural soundscape.

The long-term minor to moderate adverse impacts to soundscape values that could result from potential development and land use in the proposed lands surrounding the NRA under Alternative 1, when combined with the potential adverse and beneficial impacts of other regional planning and conservation efforts, could result in cumulative long-term minor to moderate adverse impacts to natural soundscapes in the region.

*Conclusion*

Except where motorized recreational vehicles and boats are authorized, and except for Reclamation's primary jurisdiction areas around the dams, the soundscape within the NRA and on other adjacent federal and state lands would continue to be conserved through federal and state land management activities. Private portions of the proposed lands that remain in their current undeveloped condition would also continue to contribute to maintaining the natural soundscape in the area. However, private portions of the proposed lands surrounding the NRA would continue to be increasingly subject to future development and other land uses in Alternative 1 that could interfere with soundscape values within the NRA. This could result in long-term, minor to moderate adverse impacts to natural soundscapes.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

As in Alternative 1, except where motorized recreational vehicles and boats are authorized, and except for Reclamation's primary jurisdiction areas around the dams, natural soundscape values within the NRA and on other adjacent federal and state lands would continue to be conserved through implementation of federal and state land management plans. Thus impacts to such resources on public lands would be the same in Alternatives 1 and 2.

On private portions of the COA, the availability of resource conservation tools to private landowners, and increased congressionally authorized efforts on the part of the National Park Service to conserve resources, would help maintain existing soundscape quality. Should landowners implement resource conservation tools such as conservation easements or fee simple acquisition, long-term minor to moderate beneficial impacts could occur, depending upon the degree of development or conservation. However, the availability of such tools would increase the likelihood that some

or all of the resources within the COA would be conserved, and the natural soundscapes would be preserved or enhanced.

Some of the areas that have more potential for private development, and in turn, more potential for adverse impacts on natural soundscapes, are located in Land Units A (CO 92 COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). These areas have been identified in Alternative 1, and include areas such as Sapinero Mesa, Soap Mesa, Blue Mesa, and Cimarron.

In general, there is expected to be a long-term minor to moderate beneficial impact on soundscape resources through implementation of Alternative 2. This would result from the creation of the COA and the authorization and ability of the National Park Service to work in more meaningful partnerships with private landowners within the COA; increased cooperation between NPS and its neighbors; and the implementation of the tools for resource conservation.

*Cumulative Impacts*

Cumulative impacts related to the actions in Alternative 2 would be more beneficial than Alternative 1. Many local and regional planning and conservation activities would continue to result in long-term, minor to major beneficial impacts to local and regional soundscape values. Without cooperation of private landowners in the COA, the overall cumulative impact of Alternative 2 could be adverse, as in Alternative 1. However, with the cooperation of private landowners, the potentially beneficial impacts associated with the resource conservation tools suggested in Alternative 2 could result in long-term, moderate, beneficial, cumulative impacts on the natural soundscape. The overall impact of these combined efforts of federal, state, and local agencies, as well as private landowners that conserve the natural soundscape resources on their land, would be positive and widespread.

*Conclusion*

Some of the areas that have more potential for development, and in turn, more potential for adverse impacts on the natural soundscape, are located on private property in Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Conservation of these areas would be beneficial to both local and NRA-wide soundscapes for visitors and residents alike. The availability of resource conservation tools to private landowners, and congressionally authorized increased efforts on the part of the National Park Service to work in partnership with private landowners to conserve natural soundscapes within the COA, would help maintain and/or enhance existing soundscape quality. This could result in long-term, minor to moderate beneficial impacts to natural soundscapes.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

## CULTURAL RESOURCES

### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for cultural resources at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR CULTURAL RESOURCES | SOURCE |
|---|---|
| Conserve the natural and historic objects within the NRA unimpaired for the enjoyment of future generations. | - NPS Organic Act of 1916 |
| Preserve, conserve, and encourage the continuation of the diverse traditional prehistoric, historic, ethnic, and folk cultural traditions that underlie and are a living expression of our American heritage. | - National Historic Preservation Act |
| Protect and preserve for American Indians access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites. | - American Indian Religious Freedom Act |
| Secure, for the present and future benefit of the American people, the protection of archeological resources and sites that are on public lands. | - Archeological Resources Protection Act |
| Accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners; and avoid adversely affecting the physical integrity of such sacred sites. | - Executive Order 13007 |
| The National Park Service must be respectful of these ethnographic resources, and carefully consider the effects that NPS actions may have on them. | - NPS *Management Policies 2006* |
| Conserve the scenery, natural and cultural resources, and wildlife. | - NRA Purpose |

### Methodology and Assumptions

In this assessment, impacts to cultural resources (archeological resources and historic structures) are described in terms of type, context, duration, and intensity, which is consistent with the CEQ regulations. These impact analyses are intended, however, to comply with the requirements of both the *National Environmental Policy Act* and Section 106 of the *National Historic Preservation Act* (NHPA). In accordance with the Advisory Council on Historic Preservation's regulations implementing Section 106 (36 CFR 800, "Protection of Historic Properties"), impacts to cultural resources were identified and evaluated by (1) determining the area of potential effects; (2) identifying cultural resources present in the area of potential effects that were either listed on or eligible to be listed on the National Register of Historic Places; (3) applying the criteria of adverse effect to affected cultural resources either listed on or eligible to be listed on the National Register; and (4) considering ways to avoid, minimize, or mitigate adverse effects.

Under the Advisory Council's regulations, a determination of either *adverse effect* or *no adverse effect* must also be made for affected, National Register eligible cultural resources. An *adverse effect* occurs whenever an impact alters, directly or indirectly, any characteristic of a cultural resource that qualify it for inclusion on the National Register (e.g., diminishing the integrity of the

resource's location, design, setting, materials, workmanship, feeling, or association). Adverse effects also include reasonably foreseeable effects caused by the Proposed Action that would occur later in time, be farther removed in distance or be cumulative (36 CFR 800.5, "Assessment of Adverse Effects"). A determination of *no adverse effect* means there is an effect, but the effect would not diminish in any way the characteristics of the cultural resource that qualify it for inclusion on the National Register.

CEQ regulations and DO 12 also call for a discussion of the appropriateness of mitigation, as well as an analysis of how effective the mitigation would be in reducing the intensity of a potential impact (e.g., reducing the intensity of an impact from major to moderate or minor). Any resultant reduction in intensity of impact due to mitigation, however, is an estimate of the effectiveness of mitigation only under the *National Environmental Policy Act*. It does not suggest that the level of effect as defined by Section 106 is similarly reduced. Although adverse effects under Section 106 may be mitigated, the effect remains adverse.

Certain important research questions about human history can only be answered by the actual physical material of cultural resources. Archeological resources have the potential to answer, in whole or in part, such research questions. An archeological site(s) can be eligible to be listed on the National Register of Historic Places if the site(s) has yielded, or may be likely to yield, information important in prehistory or history. An archeological site(s) can be nominated to the National Register in one of three historic contexts or levels of significance: local, state, or national (National Register Bulletin 15, *How to Apply the National Register Criteria for Evaluation*).

For purposes of analyzing impacts to archeological resources, thresholds of change for the intensity of an impact are based upon the potential of the site(s) to yield information important in prehistory or history, as well as the probable historic context of the affected site(s):

*Negligible:* The impact is at the lowest level of detection or barely measurable, with no perceptible consequences, either adverse or beneficial, to archeological resources. For purposes of Section 106, the determination of effect would be *no adverse effect*.

*Minor Adverse Impact*: The impact would affect an historic structure, site, or district, or an archeological site with the potential to yield information important in prehistory or history. The historic context of the affected site(s) would be local. For purposes of Section 106, the determination of effect would be *adverse effect*.

*Minor Beneficial Impact*: A site would be preserved in its natural state. For purposes of Section 106, the determination of effect would be *no adverse effect*.

*Moderate Adverse Impact*: The impact would affect an archeological site with the potential to yield information important in prehistory or history. The historic context of the affected site would be statewide. For a National Register eligible or listed historic structure, or historic district, the impact is readily apparent, and/or changes a character-defining feature(s) of the resource to the extent that its National Register eligibility is jeopardized. For purposes of Section 106, the determination of effect would be *adverse effect*.

*Moderate Beneficial Impact*: The site would be stabilized. For purposes of Section 106, the determination of effect would be *no adverse effect*.

*Major Adverse Impact*: The impact would affect an archeological site with the potential to yield important information about human history or prehistory. The historic context of the affected site would be national. The impact is severe or of exceptional benefit for eligible or listed historic structures or historic districts. The impact changes a character-defining feature of the resource, diminishing the integrity of a National Register eligible or listed resource to the extent that it is no longer eligible or listed on the National Register. For purposes of Section 106, the determination of effect would be *adverse effect*.

*Major Beneficial Impact*: Active intervention would be taken to preserve the site. For purposes of Section 106, the determination of effect would be *no adverse effect*.

### Impacts of Alternative 1 – No Action

*Analysis*

Under this alternative the area contained within the existing NRA would remain essentially unchanged, except for occasional future changes that Congress might authorize on a piece-by-piece basis. NPS would continue best management practices for cultural resources as agreed to with Reclamation, resulting in short and long-term direct, minor beneficial impacts. Limited technical assistance would be available from NPS to private landowners interested in conserving cultural resource values on their private properties. The potential for development on lands outside the NRA, primarily on Land Units C (Gunnison River COA) and G (West-End COA), could result in indirect short and long-term, minor to moderate adverse impacts to cultural resources within the NRA by alterations to the scene or the context of the resource.

Continuing federal protection of the lands inside the NRA would continue to reduce the potential for illegal collection or damage to cultural resources but would have no effect on those resources outside the NRA.

*Cumulative Impacts*

Even with the potential for continued federal protection of lands within the NRA, activities on neighboring lands would still have the potential for indirect long-term minor to moderate adverse cumulative impacts. On a cumulative basis, potential impacts from illegal collecting or damaging NRA resources that are readily accessible from neighboring lands would likely occur with the advent of development on surrounding private lands.

*Conclusion*

Federal actions within the NRA would result in short and long-term direct minor beneficial impacts. Potential development on Land Units C (Gunnison River COA) and G (West-End COA) could result in indirect minor to moderate adverse impacts to cultural resources within the NRA, by altering the scene or context of the resource.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

The negotiation of conservation easements and/or the addition of lands to the NRA would have short and long-term minor beneficial impacts on cultural resources both within the NRA and on public and private lands neighboring the NRA. The same would be true of railroad features in Land Unit C (Gunnison River COA). Land Unit G (West-End COA) would realize a short and long-term minor beneficial impact, both within the NRA as well as outside, with the increased conservation of the historic town-site and the railroad resources associated with that location.

*Cumulative Impacts*

On a cumulative basis, implementation of Alternative 2 could result in minor beneficial impacts to those cultural resources both within and outside the proposed NRA boundary through additional federal management and access to federal assistance.

*Conclusion*

The direct short- and long-term minor beneficial impact resulting from federal management practices within the NRA coupled with the beneficial impacts associated

with potential conservation easements and/or additions of private land to the NRA would result in direct short- and long-term minor beneficial impacts inside and outside the proposed NRA boundary.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

*Section 106 Summary*

This Environmental Impact Statement provides detailed descriptions of two alternatives (including a no-action alternative) and analyzes the potential impacts associated with possible implementation of each alternative.

Application of best federal land management practices to lands outside the NRA as described under Alternative 2 would improve conservation of cultural resources either by direct acquisition or landowner participation in conservation easements or other partnered arrangements. Common management practices could result in negligible to minor benefits (*no adverse effect*) for cultural resources both within and outside the proposed NRA boundary.

To help reduce impacts on cultural resources, resources would continue to be monitored on a regular basis. Vulnerable resources listed on or potentially eligible for the National Register of Historic Places would have priority for conservation measures. The NRA staff would continue to actively work with tribes to conserve ethnographic resources and privacy for traditional activities. Appropriate resource management actions could include monitoring and site stabilization; and visitor management actions could include signing, ranger patrols, and interpretive messages.

In cases where it was determined there was a potential for adverse impacts (as defined in 36 CFR 800) to cultural resources listed on or eligible for listing on the National Register of Historic Places, the National Park Service would coordinate with the State Historic Preservation Officer of Colorado to determine the level of effect on the property, and to determine what mitigation would be needed.

For example, because there is a potential of cultural resources existing on some land that may be used in exchange for private land within the COA, any parcel thus proposed would be evaluated for potential adverse effect prior to any such exchange. If a property is determined to contain any site or sites considered to be eligible for listing on the National Register of Historic Places, a protective action such as the following would be taken prior to any such conveyance: (1) the conveyance would be conditioned upon a preservation easement to ensure the continued protection of the resource; or (2) the parcel would be subdivided in such a way that any tracts containing eligible cultural resources would remain with NPS, and tracts without such resources could be used in exchange. Otherwise, the effort to exchange such a parcel would be terminated.

The NRA staff would continue to educate visitors regarding archeological and ethnographic site etiquette to provide long-term conservation for surface artifacts, architectural features, and traditional activities. If necessary, additional mitigation measures would be developed in consultation with the state historic preservation officer and the three American Indian tribes who are most affiliated with the NRA: Northern Ute; Southern Ute; and Ute Mountain Ute. These three tribes will receive copies of this Environmental Impact Statement for review and comment. It will also be sent to the Colorado State Historic Preservation Officer and to the Advisory Council on Historic Preservation for review and comment as part of the Section 106 compliance process.

Pursuant to 36 CFR 800.5, implementing regulations of the *National Historic Preservation Act* (revised regulations effective January 2001), addressing the criteria of effect and adverse effect, the National Park Service finds that the implementation of the Proposed Action in the Curecanti Resource Protection Study, with identified mitigation measures, would be beneficial, and would not result in any new adverse effects (*no adverse effect*) to archeological or historic resources currently identified as eligible for or listed on the National Register of Historic Places.

## VISITOR USE, UNDERSTANDING, AND ENJOYMENT

### RECREATIONAL OPPORTUNITIES

#### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for recreation opportunities at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR RECREATIONAL OPPORTUNITIES | SOURCE |
|---|---|
| Provide outstanding recreational opportunities. | - NPS Organic Act of 1916<br>- NRA Mission |
| Visitors have opportunities to enjoy the NRA in ways that leave resources unimpaired for future generations. | - NPS Organic Act of 1916<br>- NPS *Management Policies 2006* |
| Provide public recreational facilities on lands withdrawn or acquired for the development of Colorado River Storage Project and Uncompahgre Project, and allow for recreational use and enjoyment of Reclamation lands and water areas in a manner that is consistent with the projects' purposes. | - Reclamation law, as supplemented and amended |
| Visitor facilities and services are provided for the safe and full use and enjoyment of the area for recreational purposes. | - Memorandum of Agreement between NPS and Reclamation, February 11, 1965 |
| Recreational uses are promoted and regulated. Basic visitor needs are met in keeping with NRA purposes. | - NPS Organic Act of 1916<br>- Title 36, Code of Federal Regulations<br>- NPS *Management Policies 2006* |
| Provide for the enjoyment of the scenery and the natural and historic objects and the wildlife therein. | - NPS Organic Act of 1916 |

#### Methodology

This section analyzes the impacts of alternatives on recreation opportunities, including visitor use and enjoyment within the proposed lands. All available information on potential recreation opportunities was compiled. Where possible, map locations were consulted. Analyzed activities, including

access for recreational use and potential overlook sites, could occur on many land units within the proposed lands, irrespective of ownership or managing agency. The analyses of impacts include lands within the NRA and lands within the proposed lands. Cumulative impacts include effects from the alternatives to lands outside of the proposed lands, as well as effects from unrelated actions to lands within the proposed lands. Impact intensities are as follows:

*Negligible*: Visitors would likely be unaware of any effects associated with implementation of the alternative. There would be no noticeable change in visitor use and experience or in any defined indicators of visitor satisfaction or behavior.

*Minor*: Changes in visitor use and/or enjoyment would be slight but detectable, but would not appreciably limit or enhance critical characteristics of the visitor experience. Visitor satisfaction would remain stable.

*Moderate*: Few critical characteristics of the desired visitor experience and enjoyment would change, and/or the number of participants engaging in an activity would be altered. The visitor would be aware of the effects associated with implementation of the alternative and would likely be able to express an opinion about changes. Visitor satisfaction would begin to either decline or increase as a direct result of the effect.

*Major*: Multiple critical characteristics of the desired visitor experience and enjoyment would change, and/or the number of participants engaging in an activity would be greatly reduced or increased. The visitor would be aware of the effects associated with implementation of the alternative and would likely express a strong opinion about the change. Visitor satisfaction would markedly decline or increase. The impact is severely adverse or exceptionally beneficial, and/or would affect the majority of visitors.

Short-term recreation impacts are immediate and do not occur over multiple visitor seasons. Long-term impacts persist beyond one year or visitor season.

Because this topic does not evaluate the potential impacts on natural or cultural resources contained within the NRA, impairment is not evaluated.

### Impacts of Alternative 1 – No Action

Analysis

**Camping and Picnicking.** Within the NRA, management of camping and picnicking activities would continue. Adverse impacts would include continued unmet recreation potential for certain types of camping activities. Continuation of existing management would result in no additional motorized restrictions or seasonal access to sensitive habitat areas, adversely impacting the recreational and visitor experience of some visitors and benefiting others.

Direct and indirect long-term minor to moderate adverse impacts in non-NRA portions of the proposed lands are possible from the unrestricted motorized access by some visitors and resultant change to sensitive habitat areas.

**Hiking/Backpacking/Sightseeing/ Backcountry Experience/and Other Recreational Activities.** Land-based recreational activities including hiking, backpacking, other backcountry experiences, horseback riding, and cross-country skiing would continue within the NRA. In cooperation with private landowners, there is a potential to expand these activities into the COA surrounding the NRA, and perhaps continuing onto other public lands, thus providing a more comprehensive and wider range of recreational experiences. However, under Alternative 1, it is likely that certain types of development or other land uses would occur on these private lands at some time in the future that would eliminate opportunities for the expansion of these NRA land-based recreational activities. The potential loss of these opportunities would constitute a long-term minor to moderate adverse impact on recreation. This is most likely to occur in Land Unit A (CO 92 COA), where there is a moderate development potential, north and south of CO 92 and

Morrow Point Reservoir, and at Black Mesa, Soap Mesa, and Soap Creek. It may also occur on Fitzpatrick Mesa, which has a low development potential.

Under Alternative 1, direct and indirect long-term minor to moderate adverse impacts would continue on COA lands outside the current NRA, due to illegal access into the NRA by visitors crossing private land, and to illegal trespassing onto private lands by recreational users of the NRA. Illegal trespass onto private lands within the COA occurs in Land Unit A, along CO 92, including Corral and Cottonwood creeks. In Land Unit D, trespass of hang gliders landing on private property occurs in the Willow Creek area. In Land Unit E, trespass across private land occurs in the Windy Point and Hunters Point areas for access to ice climbing along the Morrow Point canyon walls. In addition, continued occasional illegal landing of hang gliders on NRA lands would continue under this alternative, resulting in long-term minor to moderate adverse impacts to vegetative resources, due to off-road vehicle use associated with the hang-gliding. Under Alternative 1, it is likely that legal public access to some desired activities would continue to be unavailable, adversely impacting the recreational visitor experience and enjoyment of some, and benefiting others.

Historic early season grazing would continue in the Long Gulch – Bear Trap Gulch area. Cattle would continue to cross the Crystal Trail, on their trek to the 30,000-acre USFS grazing allotment in this area. As cattle use in this area is only for a few days on a bi-annual basis, negligible to minor long-term adverse impacts on the visitor's recreational experience is expected.

In general, especially related to sightseeing, which is an integral part of all recreational activities in the area, certain types of development and land use, such as high-density housing, high-rise buildings, large parking areas, utility towers, and mining operations, on private property within the COA surrounding the NRA, could have a long-term, major adverse impact on the scenic resources of the area. This could, in turn, have a long-term, major adverse impact on visitor experience and appreciation of the NRA, and on the overall enjoyment of the area. This is especially true for all those who drive along the roads and highways that wind through the NRA along the canyons of Morrow Point Reservoir, and the shores of Blue Mesa Reservoir; and for all those who ride the waters of Blue Mesa Reservoir. County land use regulations may mitigate the impacts somewhat. However, land use regulations in and of itself would not be as effective as other tools of resource conservation being recommended by this study under Alternative 2.

**Fishing and Hunting**. Fishing and hunting opportunities within the NRA would continue to occur on lands that are not in conflict with other recreational use or facilities. Under Alternative 1, direct long-term minor to moderate adverse impacts would continue in private portions of the proposed lands as a result of trespass by visitors looking for increased fishing access or hunting areas. This includes Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), and E (Sapinero/Blue Mesa COA).

**Water-Based Recreation.** Within the NRA, opportunities for water-based recreation including swimming, water skiing, sailing, windsurfing and watercraft use would continue. Continuation of existing management would result in no direct impacts to those visitors who participate in water-based recreation within the NRA.

*Cumulative Impacts*

Regionally, some recreation opportunities would experience minor to moderate short- to long-term adverse impacts from the continuation or increase in land use development, such as residential development, that would potentially result in the loss of access to new trail segments and scenic overlooks, and access to potential backcountry camping or hunting/fishing areas. When combined with the impacts of Alternative 1, these land development activities would result in moderate long-term cumulative adverse impacts.

*Conclusion*

Unmet potential for certain types of land-based recreation on lands in the proposed lands surrounding the NRA would result in long-term negligible to moderate adverse impacts to the NRA visitor's recreational experience and enjoyment. Long-term minor to moderate adverse impacts on the natural resources on non-NRA lands would be possible from the unrestricted motorized access by some visitors, and resultant change to sensitive habitat areas. Land Units A (CO 92 COA) and C (Gunnison River COA) would be susceptible to long-term minor to moderate adverse impacts as a result of trespass by visitors, including illegal landing of hang-gliders on NRA lands. Historic grazing would continue in Long Gulch – Bear Trap Gulch, and crossing of the Crystal Trail by cattle would result in long-term negligible to minor adverse impacts on the visitor experience due to grazing use.

The potential for future development and other types of land use, such as high-density housing, high-rise buildings, large parking areas, utility towers, and mining operations on private lands surrounding the NRA, especially within the COA, could have a long-term major adverse impact on the scenic resources in the area. The scenic resource is considered to be a key resource for enjoyment of the NRA. Therefore, there could also be a long-term major adverse impact on the visitor enjoyment, experience, and appreciation of an otherwise nationally significant and spectacular geological and natural landscape setting.

**Impacts of Alternative 2 – Proposed Action**

*Analysis*

Under Alternative 2, a COA would be established that would encompass private lands within the proposed lands. The NRA would be congressionally authorized to partner with landowners within the COA for the purpose of resource conservation and enhancing recreational opportunity. This would increase potential for diverse appropriate resource-based recreation opportunities; especially additional land-based activities such as day use and extended use activities. Alternative 2 would also provide connection to opportunities offered on surrounding lands through participation by COA landowners in partnerships, including the potential for additional appropriate resource based commercial recreation support services. However, this would all be subject to the willingness of the private landowners to cooperate in such ventures. In addition, the Proposed Action would include a net addition of 10,040 acres to the NRA from federal and state agency transfers, for consideration of expanded land-based recreational opportunities.

**Camping and Picnicking**. Within the NRA, management of camping and picnicking activities would continue. In Land Unit B (Blue Mesa Reservoir Agency), USFS, and BLM lands from the existing NRA (north of Sapinero Basin) to the southern edge of the West Elk Wilderness Area would be transferred to NPS, including the Soap Creek Campground that is currently managed by the USFS. BLM has indicated a desire and expectation that the large parcel of their land in the Dillon Pinnacles area that would come under NPS management would continue to have only non-motorized access to protect wildlife, scenery, and other natural values. At this time, the National Park Service has no reason to believe otherwise. However, final determination would be made via a new general management plan or implementation plan for the area; and BLM would be invited to participate in the planning process. The management of this area by one agency rather than by three would provide long-term moderate benefits to visitors, operational benefits to the agencies, because the area would be managed under the guidelines of only one agency, and that agency would be the sole presence or contact for visitors.

- Direct and indirect long-term adverse impacts are possible due to the change in front-country campground management. Some camping opportunities in undesignated sites might be lost because NPS would limit the area where dispersed camping could occur. However, in the Soap Creek Campground,

NPS would consider designating an area within and near the corrals for "open camping," thus reducing the impact to users who prefer to camp in the vicinity of their horses. Although management of that campground would be transferred, NPS would allow most existing uses to continue, including use of the existing horse corrals, and overnight trailhead parking. This would result in a long-term negligible to minor adverse impact on campground users accustomed to current undesignated camping opportunities. However, there would also be long-term minor beneficial impacts as a result of greater NPS presence, including increased law enforcement and campground maintenance.

- Transfer of lands from the USFS to NPS could also result in possible increased restrictions on motorized use, and seasonal access limitations to sensitive habitat areas in those lands. This could result in long-term minor to moderate adverse impacts on visitor experience in formerly non-NRA public lands, depending on visitor expectations.

**Hiking/Backpacking/Sightseeing/ Backcountry Experience/and Other Recreational Activities.** Recreational activities including hiking, backpacking, sightseeing, other backcountry experiences, horseback riding, mountain biking, cross-country skiing, and other related activities would continue within the NRA, similar to Alternative 1. Existing non-motorized trails on agency lands added to the NRA boundary would remain, and NPS would assume maintenance responsibilities of such trails. Potential acquired interests in private lands within the COA surrounding the NRA would provide opportunities to expand suitable land-based recreational opportunities and legal public access for hiking, backpacking, mountain biking, horseback riding, trails to scenic overlooks, ice climbing, and other activities.

Within Land Unit A (CO 92 COA), direct and indirect long-term minor to moderate beneficial impacts would be possible from new trail and overlook development down the Corral Creek drainage to Morrow Point Reservoir, and on Soap Mesa; expansion of a trail segment to the Blue Mesa Dam overlook; and potential development of backcountry hiking trails and backcountry camping. Management of the Dillon Pinnacles ACEC would also benefit NPS and visitors because of its important recreation opportunities on the mesa above the pinnacles, and because it is a key component of the viewshed. Because of existing NPS recreation opportunities and presence in the area, impacts to NRA visitors would most likely be beneficial with the inclusion of the Dillon Pinnacles ACEC.

In Land Units C (Gunnison River COA), D (Iola Basin COA), and E (Sapinero/Blue Mesa COA) long-term minor to moderate beneficial impacts would be possible from the potential of a new trail corridor along the south side of the Gunnison River, and new trails and scenic overlooks of Blue Mesa Reservoir and dam from Sapinero Mesa. There would also be the potential for a new hiking and cross-country ski trail to new overlook points for the Curecanti Needle, Blue Creek Canyon and Chipeta Falls, as well as access for climbers for rock and ice climbing, from the south rim of Morrow Point canyon, within easy access of US 50. Direct and indirect short-term minor to moderate adverse impacts are also possible due to trail construction activity that could affect scenic resources and visitor experience.

In Land Unit D (Iola Basin COA), direct and indirect long-term beneficial impacts would be possible if NPS acquired an interest in approximately 40 acres in the southern portion of this area, where hang gliding currently occurs. This would provide the opportunity for hang gliders that take off from Big Mesa to land on federal property, ensuring that access to landing areas is legal. This action would require that the NRA issue a special federal regulation, or transfer the land to BLM. At present, it is not legal to land on NRA managed land according to the federal code of regulations.

In Land Unit F (Gateview), the existing campground would be transferred from NPS management to BLM management. BLM has indicated that if they were to manage the campground, they may discontinue the chlorinated drinking water system, given its daily maintenance requirement, and have visitors haul in their own water from elsewhere, as is done at other BLM campgrounds in the area. This would result in a long term negligible to minor adverse impact for visitors to the site, especially those who might be expecting potable water to be available. In any case, advanced notification would be available regarding the availability of water, or lack thereof.

In Land Unit H (West-End), historic early season grazing would continue in the Long Gulch – Bear Trap Gulch area. However, more of the land that is grazed in this allotment would remain under USFS administration. The corridor managed by NPS for the Crystal Trail would be considerably narrower than in Alternative 1, and agreements would allow for the continued use of cattle migration that use the USFS allotment. Impacts on the NRA visitor's recreational experience would be the same as described under Alternative 1, negligible to minor long-term adverse.

Land uses such as development or other activities would likely be reduced on non-NRA land within the proposed lands if landowners willingly apply resource conservation tools and join in partnerships, resulting in potential expansion and enhancement of recreational opportunities for visitors and local users. This would result in direct and indirect long-term minor to moderate beneficial impacts to visitor enjoyment.

In general, with respect to the scenic resource and its resultant effect on visitor enjoyment, there is expected to be a long-term major beneficial impact on visitor enjoyment and appreciation of the NRA, and on the overall enjoyment of the area by all who drive through the NRA, and ride the waters of Blue Mesa Reservoir, through implementation of Alternative 2. This would result from the creation of a COA, and the authorization and ability of NPS to work in more meaningful partnerships with private landowners within the COA, through the use of tools for resource conservation, to reduce or eliminate adverse impacts on scenery and other recreational resources.

**Fishing and Hunting.** As in Alternative 1, fishing and hunting opportunities within the NRA would continue to occur on lands that are not in conflict with other recreational use or facilities. However, under Alternative 2, for Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), and E (Sapinero/Blue Mesa COA), possible acquired interests in adjacent private lands would provide opportunities to expand public access for fishing and hunting into more isolated and backcountry areas. This would result in long-term minor to moderate beneficial impacts to both visitors and local residents, due to the increased access and opportunity for these activities, and reduction of potential trespass impacts on private land.

**Water-Based Recreation.** Water-based recreational activities including swimming, water skiing, sailing, windsurfing and watercraft use would continue within the NRA, similar to Alternative 1. There would be no direct impacts to visitors participating in such activities within the NRA.

*Cumulative Impacts*

Public land management activities and proposed planning outside of the COR, in combination with beneficial impacts of actions proposed in Alternative 2, would result in long-term minor to moderate beneficial cumulative impacts on land-based recreational opportunities. This would be due to the implementation of tools for resource conservation, and anticipated COA private landowner participation in conservation measures, which would result in types of land use and development or non-development that would be more compatible with NRA goals for expanded and enjoyable recreation.

Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 17 of 71



*Conclusion*

Long-term negligible to moderate beneficial impacts to recreational opportunities and visitor enjoyment are expected to result from landowners' willing participation in partnerships with NPS, and the use of tools for resource conservation. Intensity of impacts would be dependent on location, level of landowner participation, and types of tools implemented. Benefits would be greatest in those areas within the COA with the greatest potential for enhancement of trail connections, trail access to new scenic overlooks and backpacking camping areas, cross-county skiing, access to climbing areas, connectivity for mountain biking, and access to legal hang gliding landing areas. These areas include Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), and E (Sapinero/ Blue Mesa COA). In any event, the extent of new recreational opportunities within the NRA would be ultimately determined by a new general management plan or implementation plan. As part of that planning process, the need and desire for such opportunities would be assessed through input from neighbors, NRA visitors, and the general public.

As in Alternative 1, there is a potential in Alternative 2 for long-term major adverse impacts on scenic resources, and the resultant long-term major adverse impact on visitor enjoyment and appreciation of the NRA and its surroundings due to incompatible development and land use, such as high-density housing, high-rise buildings, large parking areas, utility towers, and mining operations, within the COA. This is because the actions proposed in this alternative would be on a volunteer or willing basis on the part of the private sector. However, if the actions proposed in Alternative 2 are implemented, and the tools and concepts of partnership, cooperation, and conservation are truly enacted, then there would be long-term major beneficial impacts on the scenic resources. This would result in a long-term major beneficial impact on visitor enjoyment, experience, and appreciation of the NRA and its surroundings.

## INTERPRETATION AND EDUCATIONAL OPPORTUNITIES

### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for interpretation and educational opportunities at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR INTERPRETATION AND EDUCATIONAL OPPORTUNITIES | SOURCE |
|---|---|
| Visitors have opportunities to enjoy the NRA in ways that leave resources unimpaired for future generations. | - NPS Organic Act of 1916<br>- NPS *Management Policies 2006* |
| Every park will develop an interpretive and educational program that is grounded in (1) park resources, (2) themes related to the park's legislative history and significance, and (3) park and Servicewide mission goals. | - NPS *Management Policies 2006* |
| Provide for public use, understanding, and enjoyment. | - NRA Purpose |

### Methodology

This section analyzes the impacts of alternatives on interpretation and educational opportunities, including existing and/or potential scenic overlooks and visitor/interpretive facilities within the proposed lands. All available information on potential interpretive and educational opportunities was compiled. Where possible, NRA programs, websites, and



BLM_0059720

map locations were consulted. Analyzed activities, including access for potential overlook sites and night sky viewing could occur on many land units within the proposed lands, irrespective of ownership or managing agency. The analyses of impacts include lands within the NRA and the proposed lands. Cumulative impacts include effects from the alternatives to lands outside of the proposed lands, as well as effects from unrelated actions to lands within the proposed lands. Impact intensities are as follows:

*Negligible*: Visitors would likely be unaware of any effects associated with implementation of the alternative. There would be no noticeable change in interpretive/educational programs or material, or in any defined indicators of visitor satisfaction or behavior.

*Minor*: Changes in interpretative/educational experience would be slight but detectable, but would not appreciably limit or enhance critical characteristics of visitor understanding and appreciation of the NRA's resources and recreational opportunities. Visitor satisfaction would remain stable.

*Moderate*: Few critical characteristics of visitor understanding and appreciation would change and/or the number of participants engaging in an interpretive/educational activity would be altered. The visitor would be aware of the effects associated with implementation of the alternative and would likely be able to express an opinion about changes. Visitor satisfaction would begin to either decline or increase as a direct result of the effect.

*Major*: Multiple critical characteristics of visitor understanding and appreciation would change and/or the number of participants engaging in an interpretive/educational activity would be greatly reduced or increased. The visitor would be aware of the effects associated with implementation of the alternative and would likely express a strong opinion about the change. Visitor satisfaction would markedly decline or increase. The impact is severely adverse or exceptionally beneficial, and/or would affect the majority of visitors.

Short-term interpretive/educational impacts are immediate and do not occur over multiple visitor seasons. Long-term impacts persist beyond one year or visitor season.

Because this topic does not evaluate the potential impacts on natural or cultural resources contained within the NRA, impairment is not evaluated.

### Impacts of Alternative 1 – No Action

*Analysis*

Within the NRA, interpretive services and educational programs would continue as currently managed. Land Units C (Gunnison River COA) and E (Sapinero/Blue Mesa COA) have moderate to very high development potential. These lands would be most susceptible to alteration of the landscape should these areas be developed, resulting in long-term negligible to minor adverse impacts related to continued unmet potential for interpretation of historic uses and some unique natural landscapes. These land units would provide potential opportunities to interpret new resource areas; however, this would not prevent the NRA from continuing interpretation of similar viewsheds and resource areas currently within the NRA.

*Cumulative Impacts*

Regionally, potential interpretive and educational opportunities would experience negligible to minor short- to long-term adverse impacts from the continuation or increase in land use development, such as residential development, that would potentially result in the loss of access to new trail segments and scenic overlooks to resource areas not covered within NRA lands. When combined with the impacts of Alternative 1, these land development activities would result in negligible to minor long-term cumulative adverse impacts.

*Conclusion*

Within the NRA, interpretive services and educational programs would continue as currently managed. Adjacent non-NRA land

units (Land Units C [Gunnison River COA] and E [Sapinero/Blue Mesa COA]) would have long-term negligible to minor adverse impacts due to their moderate to high land development potential. The NRA would not be prevented from interpretation of similar viewsheds and resource areas currently within the NRA.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

Under Alternative 2, NPS would be congressionally authorized to partner with landowners within the COA for the purpose of interpretive and educational enhancement. This would increase potential for diverse appropriate resource based interpretive opportunities; especially additional land based activities such as new visitor facilities and interpretive overlooks. Alternative 2 would also provide connection to opportunities offered on surrounding lands in the proposed lands through participation by COA landowners in partnerships, including the potential for joint-agency visitor and interpretive facilities.

Impacts to interpretive resources are detailed below. Impact intensities would vary with level of participation by landowners in resource conservation activities and the types of tools implemented (technical assistance and agreements vs. conservation easements and acquisition). In addition, the potential for development based on ease of access, existing development in the area, and viewshed also factors into prediction of impact intensity. Resources within land units with highest potential for development would gain the most benefits from landowner use of resource conservation tools.

Within the NRA, interpretive services and educational programs would continue as currently managed. In Land Units A (CO 92 COA) and E (Sapinero/Blue Mesa COA), there would be the opportunity to offer interpretation of adjacent land areas and geologic formations from vantage points that are currently not accessible to visitors. This would include a potential close-up westward view of the Curecanti Needle from the south rim of Morrow Point canyon, with relatively easy trail access from U.S 50. This would be a long-term minor to moderate beneficial impact, offering increased interpretive opportunities to visitors and local users.

Land Units B (Blue Mesa Reservoir Agency) and C (Gunnison River COA) would provide potential for interpretive opportunities associated with a long distance trail connection to Riverway and Gunnison, along with connections to other trail segments at Cooper Ranch and Neversink. These areas along the river also provide unique interpretive and educational opportunities for Americans with Disabilities Act (ADA) access, school programs, and night sky viewing, resulting in long-term moderate beneficial impacts. In addition, Land Unit B, which includes Forest Service and BLM lands from the existing NRA (north of Sapinero Basin) to the southern edge of the West Elk Wilderness Area, would be transferred to NPS. The management of this area by NPS would probably provide long-term negligible to minor benefits for interpretation and educational services to visitors, by drawing upon that agency's more established and comprehensive interpretive program in the Curecanti area.

In Land Unit E, the Blue Mesa area (Hunters Point) would provide the potential opportunity for a new visitor center facility with direct access for visitors from US 50. This would increase opportunities for development of a joint-agency managed facility, centrally located for linking agency lands, as well as the ability to draw more water and land-based visitors from the highway. This would result in a long-term moderate to major benefit to visitor understanding and appreciation of the resources and recreational potential in the overall Curecanti area, and to the ability of the various government agencies in the area to relay their messages to the public.

*Cumulative Impacts*

Cumulative impacts for interpretation and education would be similar to Alternative 1, except land development and federal land management activities and proposed planning outside of the

proposed lands, in combination with decreased impacts of Alternative 2 would result in minor to moderate beneficial cumulative impacts. These benefits would be due to COA landowner and joint-agency participation in enhanced interpretive and educational opportunities, and would depend on the types of resource conservation tools implemented.

*Conclusion*

Beneficial impacts to interpretive and educational opportunities would result from landowners' use of resource conservation tools and partnerships as part of the COA. Benefits would be greatest in those areas with the potential for trail access to new scenic overlooks including Land Units A (CO 92 COA) and E (Sapinero/Blue Mesa COA). This would also incorporate new or improved access to unique geologic formations such as the Curecanti Needle, resulting in long-term minor to moderate beneficial impacts. Land Units B (Blue Mesa Reservoir Agency) and C (Gunnison River COA) could provide interpretive opportunities associated with a potential long distance trail connection to Riverway and Gunnison, and opportunities for ADA access, school programs, and night sky viewing, resulting in long-term moderate beneficial impacts on understanding and appreciation.

Land Unit E (Sapinero/Blue Mesa COA) would provide opportunity for a potential joint-agency managed visitor center facility with direct access for visitors from US 50, resulting in a long-term moderate to major benefit for visitor understanding and appreciation of the area's resources.

## SCENIC RESOURCES

### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved for scenic resources at Curecanti National Recreation Area. Refer to the following box for details.

| DESIRED CONDITIONS FOR SCENIC RESOURCES | SOURCE |
|---|---|
| NPS will monitor land use proposals and changes to adjacent lands, and their potential impacts on NRA resources and values, engaging constructively with the broader community to encourage compatible adjacent land uses and appropriate mitigation. | - NPS *Management Policies 2006* |
| Conserve the scenery, natural, and cultural resources. | - NPS Organic Act of 1916<br>- NRA Purpose |

### Methodology

A computer-generated viewshed analysis (Digital Elevation Model) was created that illustrates what can be seen from US 50, CO 92, CO 149, and from the centerline of Blue Mesa Reservoir and its arms. The computer-generated analysis identified everything that can be seen in three layers defined as follows:

- Foreground (0 – 1/2 mile from the observer), where details such as plant types can be discerned, development is most apparent, and all changes are immediately perceived.
- Middle ground (1/2 – 3 miles), where different stands of trees (coniferous and deciduous) can be identified, development is noticed, and changes to forms are noticed.
- Background (3 miles and beyond), where ridgelines and horizon lines define the limit; and the visual impact of development is not as critical, except

where the landscape is altered to such a magnitude as to disrupt the scene (for example, multi-home developments, and clear cutting of vegetation).

For the RPS, primarily the viewsheds up to 3 miles played a key role in the resource analysis.

Areas with exceptional scenic vistas and potential new overlook points were identified through site assessments performed by NPS staff and a Photo Assessment Workshop carried out by local resident volunteers. The Photo Assessment Workshop was conducted by 11 volunteer citizen photographers, who took nearly 300 photographs of scenic and other resources that were defined within seven categories of importance related to scenic views, conservation of critical resources, and other issues. Some of the key views that they identified are described in the Affected Environment. Potential impacts to these views identified by area residents were considered more adverse than other area views.

The following impact thresholds were established in order to measure the relative changes in scenic resources (overall, localized, short-term and long-term, cumulatively, beneficial and adverse) as a result of the alternative actions:

*Negligible*: An action that would introduce (adverse) or prevent (benefit) only the perception of some additional movement by cars or by people walking, on bicycles, or on horseback. The change to the viewshed would be so small or localized that it would have no measurable or perceptible consequence to the visitor's enjoyment of the view.

*Minor*: An action that would introduce or prevent perceptible human-made additions within the viewshed. These actions would include structures that affect a relatively small portion of the viewshed, either the foreground, middle ground, or background, and have barely perceptible visual consequences to the visitor's enjoyment of the view.

*Moderate*: An action that would either introduce or prevent perceptible human-made additions within the viewshed. These actions would include facilities, parking, and other human-made structures that would affect a moderate portion of the viewshed. This might include the foreground and middle ground, or the foreground and background. These actions would not completely alter the viewshed, but would be a perceptible visual addition to the existing conditions.

*Major*: An action that would introduce or prevent multiple and drastic human-made additions that affect the entire or major part of the viewshed as seen by the visitor. These actions would include building architecture and site planning that does not "fit in" to the natural scene; and major facilities, such as high-density housing, high-rise buildings, utility towers, mining operations, and large parking areas, that would alter to a great extent the foreground, middle ground, and/or background of the existing viewshed.

Impacts are short-term when temporary in nature such as temporary construction or other human-made facilities that would be removed within a year of placement. Long-term impacts occur when permanent human-made additions or intrusions occur within the viewshed. Permanent change involves an intrusion that lasts for one or more years.

### Impacts of Alternative 1 – No Action

*Analysis*

Scenic resources within the NRA and on other adjacent federal and state lands would continue to be protected through implementation of federal and state land management plans. Important scenic features, such as the Dillon Pinnacles, Curecanti Needle, areas adjacent to Blue Mesa Reservoir, Morrow Point Reservoir, and Crystal Reservoir, and other features have been identified and would remain protected, resulting in long-term, major, beneficial impacts to scenic resources on public lands. Private lands within the COA surrounding the NRA that remain in their current undeveloped condition would also continue to contribute to the existing high quality natural landscape surrounding the NRA.

However, there is an increasing probability that private lands within the COA would experience development and other land uses that are incompatible with the goals and objectives of the NRA. This could result in long-term, major, adverse impacts to the scenic resource, depending upon factors such as decisions by landowners, county land use regulations, and population growth. The degree of impact would depend upon the type of development or land use; whether development remains localized within a few areas, or becomes increasingly widespread over time; and whether it occurs in the foreground, middle ground, and/or background of the viewer.

Land Units A (CO 92 COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA) containing features such as Sapinero Mesa, Blue Mesa, the canyon walls that rim Morrow Point and Crystal Reservoirs, the Curecanti Needle, Soap Mesa, and Willow Creek, would be more likely to be impacted by development in the near future. This is due to their accessibility from US 50, CO 92, and CO 149, and local roads such as Soap Creek Road; and to the existence of other development in the vicinity. Many of these areas have been identified by local residents as natural areas that represent important scenic resources in Montrose and Gunnison Counties. In many cases, the areas are representative of the spectacular geological setting that contributes to the NRA's national significance.

Sapinero Mesa, where lands have been subdivided, are for sale, and a cell tower has been proposed; and areas along US 50 such as Cimarron, Windy Point, and Hunters Point, that provide opportunities for easy access, are the most logical candidates for development in the foreseeable future. Sapinero Mesa and the US 50 corridor are seen from a variety of locations within the NRA. The development of these areas would adversely impact natural scenic resources from numerous locations within the NRA, such as the surface of Blue Mesa Reservoir, Sapinero and Dillon Pinnacles Overlooks, Soap Creek Road, Lake Fork Campground and Marina, and Elk Creek Campground. The CO 92 corridor, Fitzpatrick Mesa, and Soap Mesa are expected to experience increased development that would impact scenic resources from NRA locations such as a variety of overlooks along CO 92, the US 50 corridor, Ponderosa Campground, McIntyre Gulch, and the surface of Blue Mesa Reservoir.

Private lands on the eastern end of the NRA where US 50 runs along the Gunnison River through riparian areas and a small canyon before opening up onto Iola Basin on Blue Mesa Reservoir, if developed, could also result in minor to major adverse impacts to scenic resources for NRA visitors, local residents, and others driving through the area. These lands are part of Land Units C (Gunnison River COA) and D (Iola Basin COA). Visitors recreating in this area at locations such as Coopers Ranch, Neversink, and Beaver Creek, and first entering the NRA on the east, would be potentially impacted by views of new development or incompatible land uses.

The southern portion of Spring Gulch, in Land Unit G (West-End COA), would be another concern if development occurred. Although the likelihood is low in the near future, because of its proximity to drives and overlooks within the National Park, development would likely result in a minor adverse impact.

In general, development and other types of land use, such as high-density housing, high-rise buildings, utility towers, and mining operations, on private property within the COA surrounding the NRA, could have a long-term, major, adverse impact on the scenic resources of the area. This is especially true in the lands surrounding Blue Mesa Reservoir, and the eastern stretches of Morrow Point Reservoir. County zoning regulations may mitigate the impacts somewhat. However, zoning in and of itself would not be as effective as other tools of resource conservation being recommended by this study.

*Cumulative Impacts*

Other past, present, and reasonably foreseeable conservation and planning activities occurring throughout the proposed lands and with Gunnison and Montrose Counties could result in a variety of impacts to local and regional scenic resources. The Gunnison County Comprehensive Plan is expected to evaluate a wide range of factors in developing a strategy to deal with growth in the Curecanti area. Efforts from the Comprehensive Plan could result in long-term beneficial impacts on scenic resources adjacent to the NRA by considering such resources in the development and implementation of recommendations, including the possibility of establishing a Special Geographic Area to recognize the unique scenic attributes of the NRA.

Long-term management plans by agencies such as the U.S. Forest Service and BLM would continue to protect important scenic vistas, such as the West Elk Mountains and the San Juan Mountains, which are visible in the background from within the NRA. This would result in beneficial impacts. Local, state, and national conservation groups and land trusts could continue to work with landowners in the vicinity, to protect conservation values via purchase or donations of conservation easements or land. This would further conserve important resources, such as scenic vistas, and result in long-term benefits.

CDOT/FHWA highway modernization plans could influence development along the US 50 corridor, further affecting the highway corridor and its aesthetics. Such development could result in long-term, localized minor to moderate adverse impacts on the scenic resource.

The long-term major adverse impacts to scenic resources that could result from Alternative 1 from potential development and land use in the COA surrounding the NRA, when combined with the potential adverse and beneficial impacts of other regional planning and conservation efforts, could result in cumulative long-term minor to major adverse impacts. However, these cumulative impacts represent more of a regional perspective. Inevitably, there would be areas encouraged for development that could substantially adversely affect local scenic resources on a cumulative basis.

*Conclusion*

Scenic resources within the NRA and on other adjacent federal and state lands would continue to be conserved through federal and state land management activities. Important scenic features such as the Dillon Pinnacles and Curecanti Needle would be protected, resulting in long-term major beneficial impacts on scenic resources. Private lands within the COA that remain in their current undeveloped condition would also continue to contribute to the existing high quality natural landscape in the area.

However, private lands in the COA surrounding the NRA proposed for Alternative 2 would continue to be increasingly subject to future development and other land uses in Alternative 1 that might be incompatible with NRA goals and objectives. This could result in long-term major adverse impacts to the scenic resource, depending upon factors such as decisions by landowners, county land use regulations, and population growth. The degree of impact would depend upon type of development and land use; whether development remains localized within a few areas, or becomes increasingly widespread over time; and whether it would occur in the foreground, middle ground, and/or background of the viewer.

Future development and other types of land use, such as high-density housing, high-rise buildings, large parking areas, utility towers, and mining operations on private lands in the COA could result in a long-term major adverse impact on the spectacular geological and natural landscape setting, which can be seen from the NRA, and which has been determined to be a key resource for visitor enjoyment of the NRA.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified

in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

**Impacts of Alternative 2 – Proposed Action**

_Analysis_

As in Alternative 1, scenic resources within the NRA and on other adjacent federal and state lands would continue to be protected through implementation of federal and state land management plans. Thus impacts to scenic resources on public lands would be the same in Alternatives 1 and 2.

On private lands within the COA, the availability of resource conservation tools to private landowners, and increased congressionally authorized efforts on the part of the National Park Service to conserve viewsheds and scenic features in partnership with neighbors, would help maintain existing scenic resources. Should landowners implement tools such as conservation easements or fee simple acquisition, long-term minor to major beneficial impacts could occur, depending upon the degree of development or conservation. However, the availability of such tools would increase the likelihood that some or all of the scenic resources within the COA would be conserved.

Some of the more important scenic areas and those more vulnerable to development are located in Land Units A (CO 92 COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). These areas have been identified in Alternative 1, and include areas such as Sapinero Mesa, Soap Mesa, Blue Mesa, and Cimarron.

As noted in Alternative 1, there is a high probability that Sapinero Mesa could be developed within the next 5 years, as it is currently being marketed. It is in the heart of one of the most scenic and visible areas of the NRA --- Sapinero Basin on Blue Mesa Reservoir. It can be seen from US 50, from the NRA lands on the northern side of Blue Mesa Reservoir, from the surface of the reservoir, from Soap Creek Road, from a number of overlooks within the NRA, and from potential overlooks within the COA. Should a conservation easement or acquisition for conservation purposes be applied to this area, a long-term moderate to major beneficial impact would be achieved. Conservation of areas such as the Sapinero parcel is important to maintaining a high degree of visitor enjoyment.

Another area that would benefit from conservation is Land Unit C (Gunnison River COA) on the eastern edge of the NRA. This area borders the Gunnison River and US 50 and contributes to the initial NRA entry experience for visitors and residents alike. The cottonwoods, meandering river, and local agrarian scene, if conserved, would continue to provide a long-term moderate to major beneficial impact to the scenic resource for NRA visitors, local residents, and all others who drive along US 50. Another important riparian area is along Willow Creek in Land Unit D (Iola Basin COA). If conserved, it could benefit the scenic resources along the CO 149 corridor leading into the NRA from the south.

During the course of the RPS, a variety of potential overlooks were identified within the COA that would provide spectacular views of the NRA, and other area resources and scenic features. These potential overlooks would be located in the following land units:

- Land Unit A, along CO 92, where visitors could view Crystal and Morrow Point Reservoirs
- Land Unit A, on top of Soap Mesa, where visitors could view Blue Mesa Reservoir and its environs, and the Uncompahgre Plateau to the south
- Land Unit E, on top of Sapinero Mesa, that would provide views of Blue Mesa Reservoir and its environs, Soap Mesa, the West Elk Mountains, the Sawatch Range, and the Continental Divide

- Land Unit E, near Windy Point, where visitors could view the Curecanti Needle from a location in relatively close proximity to US 50, the primary transportation corridor.

If landowners were willing, and some form of easement or fee simple acquisition could be established, the opportunity to provide spectacular overlooks offering new perspectives would result in long-term moderate to major beneficial impacts to visitor enjoyment and appreciation of the NRA and its surroundings. If the areas are not conserved and/or acquired, the opportunity would be lost.

In general, there is expected to be a long-term major beneficial impact on scenic resources through implementation of Alternative 2. This would result from the creation of a COA and the authorization and ability of the National Park Service to work in more meaningful partnerships with private landowners within the COA; increased cooperation between NPS and its neighbors; and the implementation of the tools for resource conservation.

*Cumulative Impacts*

Cumulative impacts related to the actions in Alternative 2 would be more beneficial than Alternative 1. Many local and regional planning and conservation activities would continue to result in long-term, minor to major beneficial impacts to local and regional scenic resources. Without cooperation of private landowners in the COA, the overall cumulative impact of Alternative 2 could be adverse, as in Alternative 1. However, with the cooperation of private landowners, these regional scenic impacts, when combined with the potentially beneficial impacts associated with the resource conservation tools suggested in Alternative 2, could result in long-term, major, beneficial, cumulative impacts. The overall impact of these combined efforts of federal, state, and local agencies, as well as private landowners that conserve the scenic resources on their land, would be beneficial and widespread.

*Conclusion*

Some of the more important scenic areas, and those more prone to be adversely impacted by potential development, are located on private property in Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA). Conservation of these areas would be beneficial to both local and NRA-wide viewsheds and individual scenic features, for visitors and residents alike. The availability of resource conservation tools to private landowners, and congressionally authorized increased efforts on the part of the National Park Service to work in partnership with private landowners to conserve viewsheds and scenic resources within the COA, would help maintain existing scenic resources. The degree to which viewsheds and individual scenic features on private lands within the COA would be conserved is highly dependent upon the willingness and cooperation of landowners. Should landowners implement resource conservation tools such as conservation easements or fee simple acquisition, long-term major beneficial impacts to the scenic resources would occur.

As in Alternative 1, there is a potential in Alternative 2 for adverse impacts on scenic resources, due to certain types of development and land use, such as high-density housing, high-rise buildings, large parking areas, utility towers, and mining operations within the COA surrounding the NRA. This would occur if private landowners choose not to take advantage of the tools for resource conservation that are available, and if they choose to develop, or otherwise use their lands for purposes that are incompatible with NRA goals and objectives. This is because the actions proposed in Alternative 2 would be on a volunteer or willing basis on the part of the private sector. However, if the actions proposed in Alternative 2 are implemented, and the tools and concepts of partnership, cooperation, and conservation are truly enacted on behalf of both NPS and private landowners, then the spectacular natural open scenery in the area could be conserved, and perhaps enhanced. This would result in long-

term major beneficial impacts on the scenic resource, the preservation of which is essential to the enjoyment of the NRA by visitors and residents alike.

Because there would be no major, adverse impacts to a resource or value contained within the NRA, whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation for Curecanti NRA; (2) key to the natural or cultural integrity of the NRA, or to opportunities for enjoyment of the NRA; or (3) identified as a goal in the NRA's general management plan or other relevant NPS planning documents, as a result of activities undertaken by NPS, visitors, or concessioners, contractors, or others operating within the NRA, there would be no impairment of the NRA's resources or values.

## REGIONAL ECONOMIC AND SOCIAL CHARACTERISTICS

### ECONOMICS

#### Guiding Policies and Regulations

Current laws and policies require that certain desired conditions be achieved related to economics at Curecanti National Recreation Area. Refer to the following box for details.

#### Methodology

The potential impact to economic and social characteristics of the towns and counties of Gunnison and Montrose were considered in this analysis. Concerns covered by this section include effects on local economic conditions such as employment, county revenues, and quality of life. Because of the range of potential actions in the RPS, most of which are dependent on individual landowner desires, a qualitative approach was undertaken. Impacts were determined via discussions with county officials during agency workshops and through research on the potential effects of preservation of open space, and resource conservation mechanisms, such as conservation easements, on the local economy of rural mountain communities.

The area of analysis is within the counties of Gunnison and Montrose. Slightly more emphasis is placed on Gunnison County because most of the NRA and surrounding proposed lands occurs within Gunnison County.

Impact thresholds that measure the change in social and economic conditions within the counties as a result of each alternative are as follows.

*Negligible:* Effects to socioeconomic conditions would be below or at the level of detection. No noticeable change in any defined socioeconomic indicators would occur.

| DESIRED CONDITIONS FOR ECONOMICS | SOURCE |
|---|---|
| Curecanti National Recreation Area is managed as part of a greater ecological, social, economic, and cultural system. | - NPS *Management Policies 2006* |
| The National Park Service works cooperatively with others to anticipate, avoid, and resolve potential conflicts; to conserve NRA resources; and address mutual interests in the quality of life for community residents. Regional cooperation involves federal, state, and local agencies, affiliated tribes, neighboring landowners, and all other concerned parties. | - NPS *Management Policies 2006* |
| Curecanti National Recreation Area increases its managerial resources through initiatives and support from other agencies, organizations, and individuals. | - NRA Mission Goal |

*Minor:* Effects to socioeconomic conditions would be slight but somewhat noticeable or detectable by county/city government or residents.

*Moderate:* Effects to socioeconomic conditions would be readily apparent by county/city government and residents and result in changes to socioeconomic conditions on a local scale.

*Major:* Effects to socioeconomic conditions would be readily apparent by county/city governments and residents, resulting in demonstrable changes to socioeconomic conditions in the region.

Short-term effects would be less than one year in duration – for example, occurring during one tourist season. Long-term effects would be more than one year in duration.

Because this topic evaluates the potential impact to social and economic conditions within the counties and does not involve resources within the NRA, impairment is not evaluated.

### Impacts of Alternative 1 – No Action

*Analysis*

In Alternative 1, it is assumed for purposes of analysis that existing private lands remain in their current condition or are developed. Because funding and authorization would not be available through NPS for implementation of resource conservation tools, conservation on private property in the COA surrounding the NRA (as described for Alternative 2) is expected to be minimal.

**Economic Conditions**. Existing economic conditions and trends would most likely continue assuming private lands remained in their current state. Employment in existing industrial sectors such as Wholesale/Retail and Services would continue to be major contributors to regional economic health. The portion of total personal income attributable to non-labor income would remain at 30 to 40%, or potentially increase based on past trends. Negligible beneficial impacts would result because employees, businesses, and county governments are already achieving these economic conditions.

In contrast, if lands were developed by private landowners in areas such as Sapinero and Blue Mesa, some new stimulus could be provided within sectors such as Wholesale/Retail, Services, and Construction through expenditures and employment associated with construction-related activity and new residents. Over the next 5 to 10 years, this stimulus would be limited, resulting in short-term minor to long-term negligible beneficial impacts within the local Gunnison economy.

Such development could also provide additional opportunities for those individuals with non-labor income such as retirees to purchase a home or business resulting in some additional beneficial impacts.

**NRA Contribution to Regional Economy.** The NRA would continue to beneficially impact the local economy through visitor expenditures, as well as through expenditures related to NRA operations and employees living within the community. Visitation could be adversely impacted if private lands identified within the proposed lands were developed and began to affect the values that visitors relied upon for a positive visitor experience, such as high-quality scenic vistas. Depending upon the degree of development that occurred in the near future, the long-term adverse impact could be negligible to minor over the life of this plan, but could be substantially greater if development trends continued into the future.

**Payments In Lieu of Taxes (PILT) and Other Impacts to Regional Revenues.** NPS would acquire no private lands through fee simple acquisition in the proposed lands, resulting in no impact to PILT payments. PILT payments would be dependent upon congressional funding of the program, but would most likely remain at current levels or increase slightly each year depending upon the Consumer Price Index and other factors.

County revenues could increase if existing private lands that are currently subdivided and for sale were purchased and developed in

the near future. Such purchases would result in additional property taxes to the county and would be dependent upon the assessed value of the land. Residential or commercial development of lands within areas such as Land Unit E, containing Sapinero Mesa, US 50, Hunters Point and Windy Point, would most likely result in long-term negligible to minor beneficial impacts to county revenues, depending upon the amount of development. Offsetting some of the beneficial gains in property taxes could be increased costs related to county infrastructure, such as water, utilities, road maintenance, and schools.

**Quality of Life**. Quality of life would be maintained if private lands within the proposed lands remained within their current condition. However, if lands were subdivided and some development ensued in the near future, values related to natural vistas and open space that Gunnison County residents identified as important could begin to erode resulting in long-term, negligible to minor adverse impacts on residents. These could substantially increase if development trends continue into the future.

*Cumulative Impacts*

Other past, present, and reasonably foreseeable planning and resource conservation activities occurring throughout the proposed lands and with Gunnison and Montrose Counties could result in a variety of economic impacts. The Gunnison County Comprehensive Plan could result in long-term minor to moderate beneficial impacts on the regional economy by limiting development to areas that would not impact regional environmental and scenic resources.

Local, state, and national conservation groups and land trusts could continue to acquire conservation easements or private lands within Gunnison and Montrose Counties, further conserving important resource values such as wildlife habitat, and preserving quality of life attributes, but also adversely impacting county revenues. Similarly, future acquisitions of private lands by other agencies such as USFS and BLM could decrease regional revenue from property taxes. These activities could result in long-term negligible to minor adverse impacts on county revenues and long-term minor beneficial impacts on quality of life.

CDOT/FHWA highway modernization plans could further encourage development along the US 50 corridor, encouraging local economic development. These plans could result in long-term negligible to minor beneficial economic impacts.

The long-term impacts, both beneficial and adverse, that would result from Alternative 1 when combined with the economic impacts of other planning and conservation efforts such as the Gunnison County Comprehensive Plan and other land preservation activities would result in negligible to minor beneficial cumulative impacts in the long-term. Many of the potential cumulative adverse impacts to the regional tax base would most likely be offset by the beneficial cumulative impacts associated with increased visitation and visitor spending and enhanced quality of life for area residents.

*Conclusion*

Economic conditions within the county would remain unchanged assuming private lands within the proposed lands remained in existing conditions and all other factors such as NRA visitation, visitor expenditures, and payments-in-lieu-of-taxes (PILT) remained at current levels.

If private lands were developed, expenditures and employment associated with construction-related activity and new residents could result in short-term minor to long-term negligible beneficial impacts within the local economy. Increased development would also result in long-term negligible to minor beneficial impacts to county revenues through increased property taxes, although associated infrastructure costs could offset some of this benefit.

Conversely, development that eroded scenic or other key resource values could create long-term negligible to minor adverse impacts to visitation in the NRA and to the quality of life currently enjoyed by area residents. Overall, the long-term beneficial impacts associated

with localized development could be offset or exceeded by the adverse impacts that could result from increased development in sensitive resource areas.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

**Economic Conditions.** The predominant two industries in both Gunnison and Montrose Counties are wholesale/retail, and services, with approximately 50% to 55% of employees in both counties working in these sectors. Growth in these industries over the past several decades, particularly in Gunnison County, has been largely associated with increasing recreation and tourism (Wilderness Society 1999). The Government and Construction sectors are also important with a combined total of approximately 20% of employees. Thus, services to visitors are an important part of the economy, as are jobs associated with federal land management agencies.

Retirees and households with investment income (non-income labor) account for approximately 30% to 40% of total personal income within the Gunnison and Montrose Counties and have contributed to substantial income growth (greater than 25%) in both counties since 1970. In contrast, extractive industries such as Agricultural Services, Forestry, Fishing and Other only accounted for approximately 0.4% and 1.1% of new total personal income over the same period. Self-employed individuals also grew by 292% and 150% between 1970 and 1997 in Gunnison and Montrose Counties, respectively, and represented approximately 25% of total jobs in 1997 (Wilderness Society 1999). For retirees, households with investment income, and the self-employed, the choice of a community is based on quality of life indicators such as scenic resources and recreational amenities. There are some areas in the private sector along the US 50 corridor through the NRA that are outside the COA, such as near the Lake Fork bridge, where sensitive development that could provide an economic stimulus would also be compatible with the NRA's goals and objectives of resource conservation.

As indicated in the "Scenic Resources" section of the Affected Environment chapter, the National Park Service determined via a visitor survey conducted at the NRA in the summer of 1998, that visitors consider scenic resources to be very important to their sense of enjoyment of the NRA. Research also indicates that communities near natural areas receive positive economic effects as a result of their proximity to the environmental attributes that areas, such as the Curecanti area, contain. A study of 113 rural counties in the western United States discovered that the presence of natural areas was positively correlated with growth in population, income, and employment. From 1969 to 1996, positive and significant correlation was discovered among employment, per capita income, and population growth rates and the percentage of land designated as wilderness. When the land designation was expanded to include designated wilderness, national parks and monuments, and wilderness study areas, the correlation between amenities and measures of growth was even stronger (Loomis and Richardson 2002).

Based on the previous evidence, the preservation of natural, cultural, recreational, and scenic resources through implementation of conservation tools would most likely contribute to maintaining or increasing regional economic health from sustaining or encouraging further growth in Retail and Service industries and in non-labor income in both counties. Improving regional economic conditions would result in long-term minor to moderate beneficial impacts to the local economy, depending upon the degree of resource conservation.

**NRA Contribution to Regional Economy.** NRA-induced factors that affect the local economy include visitor numbers, visitor spending, and employee and operational expenditures. The potential for conservation of key resource values in areas surrounding the NRA could maintain existing levels or encourage additional visitation by providing

new recreational opportunities and maintaining the relatively untouched and undeveloped appearance of the Curecanti area in comparison to other national and state parks and recreation areas. Increased visitation would result in additional spending within the local economy that would range between $36.74 per day for a local day user, to $172.48 per day for visiting parties staying in a motel outside the NRA. This would increase sales and tax revenues, as well as jobs, within the counties. Additional visitor spending would result in long-term negligible to minor beneficial impacts on the regional economy.

Under Alternative 2, hunting and fishing would continue within the NRA, and the number of acres supporting public hunting could potentially expand. Beneficial impacts associated with conservation of fish and wildlife habitat are substantial. CDOW estimates that non-resident hunters and anglers contribute 30% of all hunting and fishing activity days in Colorado. In 2002, all hunters and anglers spent $23 million in Gunnison County, and created another $17.6 million in secondary spending. Total economic contribution in Gunnison County supported about 540 jobs. In Montrose County, the figures were $13.4 million and $10.2 million, respectively, with 310 jobs supported (Colorado Division of Wildlife 2004).The addition of an employee to the NPS staff to implement and sustain the Proposed Action's recommendations would provide an additional salary of approximately $80,000 per year, resulting in some increased local spending. A second additional full time equivalent employee (FTE) would eventually be needed for resource and visitor management and protection, interpretation, construction and maintenance, and administration associated with newly acquired interests in land. This translates to a salary of approximately $80,000 per year, resulting in additional local spending. This would provide stimulus within the local economy, resulting in long-term negligible to minor beneficial impacts.

**Payments In Lieu of Taxes and Other Impacts to Regional Revenues.** The degree of impact upon county revenues from the implementation of the resource conservation program of Alternative 2 would depend upon the number of acres that were conserved by each type of tool. The two tools with the greatest potential for adverse impacts on revenues are fee simple acquisition and conservation easements. They are the focus of discussion within this section. A more definitive assessment of the impacts on county revenues will be made at the time a land protection plan is prepared.

*Fee Simple Acquisition* – There would be a loss of revenue related to property taxes on lands purchased by NPS within the authorized COA. This loss of revenue may be partially mitigated by an increased "Payments in Lieu of Taxes (PILT)" from the federal government to the counties involved. When the government acquires a fee interest in land, two payments are made to the county that received the tax payments while the land was in private ownership to compensate for the loss:

- One (1) % of the fair market value of the property acquired, but not greater than the previous year's real estate tax payment. This payment continues for the first five years; and,
- An entitlement payment that was based on $1.99 per acre of eligible land in 2002. This payment is made indefinitely from the time the title is transferred to the government. The figure can change from year to year, as it is adjusted for inflationary changes in the Consumer Price Index (NPS 2002c).

Research on the effects of federal land acquisition and PILT payments on the regional economy indicates a variety of outcomes. Some researchers indicate that the impact of federal land ownership on the local tax base is a complicated issue that requires the evaluation of multiple factors. No universal conclusions may be drawn because of these factors (Bodine and Koontz 2003). Other researchers indicate that, because of the way PILT payments are calculated, a county's PILT payment would not necessarily increase if federal land ownership within a county also increases. Counties with low population densities and large acreages of federally

owned land may not realize increases in PILT, particularly if they are already at the payment ceiling (Espy and Owusu-Edusei 2002).

Because PILT payments may not fully compensate for the lost property tax revenue, long-term, negligible to moderate adverse impacts to the regional economy could occur. However, property tax revenue losses could be offset over time by an increase in tourism associated with expansion of the NRA (Espy and Owusu-Edusei 2002; Seidl and Weiler 2001) and decreased infrastructure costs (TPL 1999). Open space typically generates more local tax revenue than the cost of public services it requires. Residential development requires services, such as water, sewer, schools, and other types of infrastructure that is not required with preserved public lands.

Those landowners receiving payments for their properties would provide some stimulus within the local economy through additional purchases resulting in some additional short-term beneficial impacts.

*Conservation Easements* – Most conservation easements conserve open space and protect land from development and from activities that may damage important resource attributes such as wildlife habitat, riparian areas, and scenic values. The degree to which a conservation easement affects property taxes is variable and depends upon the classification of the land and the restrictions that are imposed through the conservation easement. If a property is valued as agricultural land, it would continue to be valued as agricultural upon creation of a conservation easement. For a conservation easement on vacant land, the assessor's office closely examines the restrictions placed on the property before determining the value. Generally, a conservation easement that allows limited development on a small parcel may not noticeably reduce the taxable value of the land. However, a conservation easement that prohibits any development on a parcel that would otherwise be highly developable may substantially reduce the assessed value (TPL 1999).

Conservation easements within the proposed lands would most likely have a long-term negligible to minor adverse impact on regional revenues, because much of the private property, particularly on the north side in Land Units A (CO 92 COA) and G (West-End COA), is agricultural or vacant. Conservation easements would potentially have less of an effect on these types of properties. More developable areas, such as Sapinero Mesa, could add conservation easements to preserve important resource or scenic areas, while permitting development that is compatible with NRA goals and objectives in areas that are unobtrusive, allowing the county to continue to receive some tax revenues.

**Quality of Life.** The preservation of important resource values through resource conservation tools would continue to support the quality of life important to many of the residents within the two counties, particularly Gunnison, resulting in long-term negligible to moderate benefits depending upon the areas and acres conserved. Ecosystem service values - those things provided by nature that man would otherwise need to provide for himself- such as air and water filtration, climate regulation, maintenance of biodiversity, scenic beauty, and other benefits would also continue to be maintained and increased, resulting in further long-term benefits (Wilderness Society 2002).

In contrast, some residents could be concerned that increasing conservation activities could attract too many people and change the rural character of the counties. Increasing local population could result in some long-term minor adverse impacts that could slowly change the character of the two counties. However, comprehensive planning activities being undertaken by Gunnison County might minimize or control some of these potential effects.

*Cumulative Impacts*

Cumulative impacts would generally be the same as Alternative 1, except the actions of Alternative 2 in combination with other planning and land conservation activities would result in minor to moderate beneficial cumulative impacts in the long-term. The combination of resource conservation efforts in Alternative 2 with other area conservation

efforts, such as work done by land trusts and conservation agencies, would result in greater cumulative conservation of key resource values, and associated economic benefits.

*Conclusion*

The implementation of resource conservation tools would most likely maintain or improve regional economic health by encouraging growth in the retail and service industries, in non-labor total personal income, and in visitor spending resulting in long-term minor to moderate beneficial impacts. If land is acquired, or conserved via conservation easements, long-term negligible to moderate adverse impacts to county revenues could occur, depending upon the conservation method and the land classification of the property. Any losses in tax revenue could be offset by the spending of long-term residents, and by the decreased need for provision of infrastructure associated with preserved open space.

## PRIVATE LAND USE WITHIN THE NATIONAL RECREATION AREA

### Guiding Policies and Regulations

Current laws and policies encourage NPS to work cooperatively with owners of interests (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights) within the NRA in order to help achieve desired conditions related to private land use within the NRA boundary. Refer to the following box for details.

| DESIRED CONDITIONS FOR PRIVATE LAND USE WITHIN THE NRA | SOURCE |
|---|---|
| Requests from owners to extract oil, gas, and/or mineral rights are reviewed and permitted according to the subordination of the development of such rights to Reclamation's project as specified in the land purchase contracts and deeds. | – Reclamation law, as supplemented and amended<br>– Legal documents, such as warranty deeds and mineral leases, authorizing the right to extract oil, gas, and/or minerals. |
| Requests from owners to extract oil, gas, and/or mineral rights are reviewed, and permitted or denied, according to law and NPS policy. If denied, and if the owner is willing, NPS will seek to acquire the mineral interest. If permitted, NPS will require such measures as will mitigate impacts to NRA resources. | – NPS *Management Policies 2006*<br>– 36 CFR Part 9, Subpart B (for nonfederal oil and gas)<br>– 36 CFR Part 5 and 36 CFR 1.6 (for other nonfederal mineral interests) |
| Good relations are maintained with owners of interests (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights) within the NRA. The NRA is managed proactively to resolve external issues and concerns and to ensure that NRA values are not compromised. | – NPS *Management Policies 2006* |
| The National Park Service works cooperatively with others to anticipate, avoid, and resolve potential conflicts; to conserve NRA resources; and address mutual interests in the quality of life for community residents. | – NPS *Management Policies 2006* |

## Methodology

This section analyzes the impacts of the alternatives on owners of oil, gas, and/or other mineral rights within the NRA. All of the surface lands and waters within the NRA are owned by the federal government. However, throughout the NRA, there exist retained oil, gas, and/or other sub-surface mineral rights on land that has been acquired by the government. This situation, where one party owns the surface of the land and another party owns the subsurface minerals is known as a "split estate." All available information on land that has mineral rights held by a party other than the federal government within the NRA was collected.

Actions described in both Alternatives 1 and 2 relate primarily to lands, both private and public, outside the existing NRA, rather than to lands within the NRA. Therefore, neither alternative would have very much impact on owners of mineral rights within the NRA. However, any such impact would be measured by the following thresholds.

*Negligible*: The impact is barely detectable and would affect few private owners of mineral rights.

*Minor*: The impact is slight, but detectable, and would affect a minority of private owners of mineral rights.

*Moderate*: The impact is readily apparent and would affect many private owners of mineral rights.

*Major*: The impact is severely adverse or exceptionally beneficial and would affect the majority of private owners of mineral rights.

Short-term effects would be less than one year in duration. Long-term effects would be more than one year in duration.

Because this topic evaluates the potential impact to owners of mineral rights, and does not assess impacts on resources within the NRA, impairment is not evaluated.

## Impacts of Alternative 1 – No Action

*Analysis*

Of the roughly 60 mineral interests reserved within the boundaries of the NRA, only one is in operation. The Dickerson Pit is a privately owned mineral materials site that has existed since 1927. The current operator of the site, Gunnison Gravel and Earthmoving, mines and removes decomposed granite and related materials from an area west of US 50, the primary access road through the NRA, east of Blue Mesa Reservoir along the Gunnison River. A Plan of Operations, with an accompanying environmental assessment, was complete by the NRA resulting in the issuance of a special use permit allowing an expansion of the site to a maximum 33.16 acres, subject to the exclusion of a portion of the area that contains significant cultural resources.

In the event that owners of any of the other interests reserved areas choose to conduct mineral development within the NRA, they would do so in conformance with applicable laws and guidelines.

Under Alternative 1, there would be no change to existing land use policy and guidelines regarding reserved mineral rights. NPS would continue to work cooperatively with owners of such rights through a permitting process to allow the owner to exercise those rights while minimizing adverse impacts on NRA resources or visitor enjoyment. Therefore, there would be no impact on people or groups holding mineral rights within the NRA.

*Cumulative Impacts*

Over the present and reasonably foreseeable future there are no know projects that would affect the opportunity for owners of mineral rights on acquired land within the NRA. Long-term NRA activities, combined with regional activities, would result in long-term negligible minor impacts to owners of mineral rights.

*Conclusion*

Because private owners of oil, gas, and/or other mineral rights on government-acquired lands would be able to continue to exercise

their rights as provided for under law and policy, there would no adverse impacts to the control they have over their mineral rights.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

In Alternative 2, the analysis of the situation regarding owners of mineral rights within the NRA is the same as for Alternative 1. As with Alternative 1, there would be no change to existing land use policy and guidelines regarding reserved mineral rights under Alternative 2. NPS would continue to work cooperatively with owners of such rights through a permitting process to allow the owner to exercise those rights while minimizing adverse impacts on NRA resources or visitor enjoyment. However, under Alternative 2, there would be more programmatic funding and authorization to pursue greater incentives for resource conservation that might provide a greater opportunity for financial benefit to the owner of the mineral rights, while more closely meeting NPS resource conservation goals and objectives. Thus, Alternative 2 could provide a minor long term beneficial impact for the owner of the mineral rights.

*Cumulative Impacts*

Cumulative impacts to owners of mineral rights within the NRA would be similar to those described in Alternative 1. However, due to greater potential for the availability of resource conservation incentives in working with NPS under Alternative 2, cumulative impacts have the potential to be more beneficial to the owner of those rights than under Alternative 1.

*Conclusion*

As with Alternative 1, because owners of oil, gas, and/or other mineral rights on acquired lands would be able to continue to exercise their rights as provided for under law and policy, there would be no adverse impacts to the control they have over their mineral rights. However, with the potential for NPS to provide more resource conservation incentives under Alternative 2, it would be more beneficial to the owner of mineral rights than Alternative 1.

## NEIGHBORING PRIVATE LANDS AND LANDOWNERS WITHIN THE PROPOSED LANDS

### Guiding Policies and Regulations

Current laws and policies encourage NPS to work cooperatively with neighbors and local governments in order to help achieve desired conditions and identify mutual interests. Refer to the following box for details.

of action despite which RPS alternative is implemented. Thus, this analysis focuses on some of the perceived or subjective effects that landowners identified during the landowner workshops and that were identified by the National Park Service during agency and public workshops. It also addresses potential changes to land use patterns and property values, should landowners make decisions to develop or conserve properties. Another aspect evaluated was the potential resolution of issues related to private encroachment onto

| DESIRED CONDITIONS FOR NEIGHBORING PRIVATE LANDS AND LANDOWNERS WITHIN THE PROPOSED LANDS | SOURCE |
|---|---|
| Good relations are maintained with adjacent landowners, surrounding communities, and private and public groups that affect, and are affected by, Curecanti National Recreation Area. The NRA is managed proactively to resolve external issues and concerns and to ensure that NRA values are not compromised. | - NPS *Management Policies 2006* |
| The National Park Service works cooperatively with others to anticipate, avoid, and resolve potential conflicts; to conserve NRA resources; and, address mutual interests in the quality of life for community residents. Regional cooperation involves federal, state, and local agencies, affiliated tribes, neighboring landowners, and all other concerned parties. | - NPS *Management Policies 2006* |
| Curecanti National Recreation Area increases its managerial resources through initiatives and support from other agencies, organizations, and individuals. | - NRA Mission Goal |

### Methodology

Concerns identified by private landowners within the proposed lands were considered in this analysis. Potential effects on private landowners in both alternatives would be the direct result of individual landowner decisions to accomplish one of the following scenarios: (1) maintain their property in its existing condition; (2) conserve resource attributes through a method available from a private conservation organization or an agency, such as the National Park Service; or (3) develop all, or portions of, their property subject to county land use regulations. Essentially, landowners have the freedom to choose their own course

government land, most commonly caused by inadvertent actions or an incorrect survey.

Impact thresholds that measure the intensity of impacts on owners of private land within the COA from actions in the two alternatives are as follows:

*Negligible:* The impact is barely detectable and would affect few private landowners and/or other non-governmental neighbors.

*Minor:* The impact is slight, but detectable, and would affect a minority of private landowners and/or other non-governmental neighbors.

*Moderate:* The impact is readily apparent and would affect many private landowners or other non-governmental neighbors.

*Major:* The impact is severely adverse or exceptionally beneficial and would affect the majority of private landowners and/or other non-governmental neighbors.

Short-term effects would be less than one year in duration. Long-term effects would be more than one year in duration.

Because this topic evaluates the potential impact to landowners and does not involve resources within the NRA, impairment is not evaluated.

**Impacts of Alternative 1 – No Action**

Analysis

In this alternative, the private lands within the proposed lands would not be identified as a COA, and the ability of NPS to work with landowners to conserve important resource attributes would consist only of limited technical assistance. Private lands within the proposed lands would most likely remain in their current condition, unless a landowner chose to develop the property or pursue a conservation easement with a private organization. Because landowners would continue to have the freedom to manage their properties, within the limits of Gunnison and Montrose County land use regulations, there would be no impact to private property owners from the NRA.

The ability of the National Park Service to assist landowners in preserving important resources would be limited, as the NRA would have no available funding to purchase conservation easements or pursue fee simple acquisition, and would have limited funds to partner on projects with adjacent landowners. NPS would have to make requests to Congress to acquire easements or lands, and to make additions to the NRA on a case-by-case basis. This process would result in long-term moderate to major adverse impacts to landowners who were interested in pursuing some form of land conservation with the National Park Service.

Some changes in land use and property values within the proposed lands would most likely occur over the next 5 to 10 years as some lands are sold, subdivided, and developed. Areas most likely to face increasing pressure from residential and/or commercial development include areas along US 50, such as Sapinero Mesa, Hunters Point, Windy Point, and Cimarron (Land Units E and G) because of easy accessibility, existing development in the area, and potential landowner interest in selling their property. Although property values may increase, there is no assurance of that, as other factors can affect property values (consider the oil shale bust of the 1980's, for example). As noted in the Affected Environment, the assessed value of properties in mountain communities such as Gunnison County has increased annually. These changes in land use and property values could be either adverse or beneficial to landowners depending upon the preferences of each landowner and the location of the property.

Under Alternative 1, there would be no change to existing grazing allotments. Therefore, there would be no impact on people who hold grazing permits.

Under Alternative 1, NPS would rely on the authorities and the assistance of Reclamation to correct boundary issues, such as those where encroachment exists or where problems have been caused by previous inaccurate or incorrect surveys. Also, in conjunction with Reclamation, NPS would seek to acquire, preferably in fee simple interest, and include within the NRA, that portion of the Iola Basin high pool in Blue Mesa Reservoir that now lies outside the NRA."

Cumulative Impacts

Other past, present, and reasonably foreseeable non-NPS planning and resource conservation activities occurring throughout the proposed lands, and with Gunnison and Montrose Counties, could result in a variety of impacts to area landowners. The Gunnison County Comprehensive Plan could result in impacts

to landowners by limiting development to areas that could either adversely or beneficially impact private land values in the proposed lands. In general, planning activities in both Gunnison and Montrose Counties would result in long-term adverse to beneficial cumulative impacts on landowners, depending upon the effects of planning efforts on location of development and resulting land values, as well as the preferences of landowners for open space vs. development.

Local, state, and national conservation groups and land trusts could continue to negotiate for acquisition of conservation easements and private lands within Gunnison and Montrose Counties, providing additional opportunities for landowners to negotiate the most suitable agreement, while maintaining their private property rights. These opportunities would result in long-term minor to major beneficial impacts to landowners.

With respect to NPS activities, the relatively limited resource conservation opportunities afforded by Alternative 1, when combined with the impacts of other land preservation activities, would result in long-term negligible to minor beneficial cumulative impacts on landowners.

*Conclusion*

Because landowners would continue to have the freedom to manage their properties within the limits of county land use regulations, there would be no adverse impacts to the control they have over their property due to NPS actions. However, the NRA's ability to assist landowners to conserve important resources would be limited, since funding would be unavailable to purchase conservation easements or to pursue fee simple acquisition without congressional approval and appropriation. This would result in moderate to major adverse impacts to landowners who are interested in working in partnership with NPS towards enhanced resource conservation. Changes in land use and property values would most likely occur, but would range from adverse to beneficial, depending on landowner preferences.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

This alternative identifies a COA consisting of private lands adjacent to the proposed NRA boundary, in which NPS would be authorized to negotiate resource conservation mechanisms with landowners. It is anticipated that some funding would be appropriated to implement these mechanisms after legislation authorizes establishment of the NRA under Alternative 2. Landowners with private property within the COA would be under no obligation to partner or negotiate with NPS, nor would NPS have any authority to utilize condemnation or other measures not in partnership and cooperation with landowners. Because landowners would continue to have full private property rights, there would be no impacts from Alternative 2 on property rights of landowners.

Some landowners would benefit from the availability of resource conservation tools and NPS funding to conserve resource characteristics on their property. With congressional authorization, and subject to competing demands from other NPS units, there would be more opportunity for funds to be made available for acquisition of fee title or conservation easements from willing landowners in the COA. Depending upon the type of agreement, easement or purchase negotiated between a landowner and the National Park Service, a variety of benefits could accrue to landowners. When landowners place conservation easements on their properties, they voluntarily limit their ability, as well as that of subsequent owners, to develop all, or portions of, their properties. They thereby permanently preserve open space, agricultural, scenic, or other resource values. A landowner may become eligible for certain tax benefits by donating these relinquished rights and by meeting specific conditions outlined in the Internal Revenue Code (IRC). These benefits include reductions in federal and state income taxes and estate and inheritance taxes. Landowners could also negotiate fee simple acquisition with NPS, whereby NPS would purchase a landowner's property for the appraised

value. The availability of these conservation opportunities, tax benefits, and purchase options could result in long-term minor to major benefits to interested landowners, depending upon the tool employed, negotiated specifics, and the number of landowners that choose to participate.

Other landowners believe that the creation of the COA could impede their private property rights simply due to its existence and the stated interest of NPS in the resources on their lands. Some landowners perceive that the COA would be a target area for acquisition and that a future administration could authorize condemnation despite landowner sentiment.

Land use patterns and property values would most likely remain similar to Alternative 1, although there would be a greater likelihood that conservation values on private properties would be preserved via resource conservation mechanisms, and less development would occur. Private property values would most likely continue to increase. Similar to Alternative 1, the impact on landowners would range from adverse to beneficial depending upon landowner preferences and the location of their property relative to conserved areas and development.

Grazing on private lands within the COA would be unaffected by Alternative 2. Grazing permits for allotments that include federal land within the NRA would continue to be renewed at the request of the permit holder.

Under Alternative 2, NPS would utilize its own authority to make minor adjustments to the proposed boundary, or may request clarification of such authority through legislation. This would enable NPS to work with landowners to correct boundary and encroachment issues now known to exist, or that may be identified in the future, due to factors such as previous inaccurate or incorrect surveys. Also, in conjunction with Reclamation, NPS would seek to acquire, preferably in fee simple interest, and include within the NRA, that portion of the Iola Basin high pool in Blue Mesa Reservoir that now lies outside the NRA.

*Cumulative Impacts*

Other past, present and reasonably foreseeable non-NPS planning and resource conservation activities occurring throughout the proposed lands and with Gunnison and Montrose Counties could result in a variety of impacts to area landowners. The Gunnison County Comprehensive Plan could result in impacts to landowners by limiting development to areas that could either adversely or beneficially impact private land values in the proposed lands. In general, planning activities in both Gunnison and Montrose Counties would result in long-term adverse to beneficial cumulative impacts on landowners, depending upon the effects of planning efforts on location of development and resulting land values, as well as the preferences of landowners for open space vs. development.

Local, state, and national conservation groups and land trusts could continue to negotiate for acquisition of conservation easements and private lands within Gunnison and Montrose Counties, providing additional opportunities for landowners to negotiate the most suitable agreement, while maintaining their private property rights. These opportunities would result in long-term minor to major beneficial impacts to landowners.

With respect to NPS activities, resource conservation opportunities afforded by Alternative 2, when combined with the impacts of other land preservation activities, would result in long-term moderate to major beneficial cumulative impacts on landowners.

*Conclusion*

Landowners would be under no obligation to negotiate with NPS, nor would NPS have any condemnation or other authority to take private lands within the COA without full consent of and compensation to the landowner. Because landowners would continue to have full private property rights within the limits of county land use regulations, there would be no adverse impacts to the control they have over their property as a result of NPS actions.

Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 39 of 71



However, the availability of a full range of resource conservation opportunities and tax benefits could result in long-term minor to major benefits to interested landowners. Changes in land use and property values would most likely occur, but would range from adverse to beneficial depending upon landowner preferences.

## NATIONAL PARK SERVICE, RECLAMATION, AND OTHER NEIGHBORING AGENCY MANAGEMENT AND OPERATIONS

### Guiding Policies and Regulations

Current laws and policies encourage NPS to work cooperatively with neighboring agencies in order to help achieve desired conditions related to management and operation issues. Refer to the following box for details.

### Methodology

NPS, Reclamation, and Other Neighboring Agency Management and Operations, for the purpose of this analysis, refers to all administrative management and operations considerations, and the adequacy of staffing levels and operational budgets, in order to adequately manage the agency's lands and accomplish its mandated goals within the proposed lands. Workshops were held with representatives from each of the federal, state, and county agencies with land management responsibilities within the overall proposed lands. More specifically, each land unit was discussed in detail, including existing operations and potential operational and management impacts, if the Proposed Action alternative were implemented.

The area of analysis was two-fold: regional, encompassing the overall proposed lands; and site-specific by individual land unit. For impacts on NPS management and operations, both agency transfer lands and the potential addition of private lands to the NRA were considered. For impacts on neighboring federal and state

| DESIRED CONDITIONS FOR NPS, RECLAMATION, AND OTHER NEIGHBORING AGENCY MANAGEMENT AND OPERATIONS | SOURCE |
|---|---|
| In the spirit of partnership, the National Park Service seeks opportunities for cooperative management agreements with federal, state, and local agencies that would allow for more effective and efficient management of Curecanti National Recreation Area. | - NPS *Management Policies 2006*<br>- National Parks Omnibus Management Act of 1998, Section 802 |
| Possible conflicts between alternatives and land use plans, policies, or controls for the area concerned (including those of federal, state, and local governments, and Indian tribes) and the extent to which the NRA would reconcile the conflict are identified in environmental documents. | - National Environmental Policy Act |
| NPS works cooperatively with others to anticipate, avoid, and resolve potential conflicts; to conserve NRA resources; and address mutual interests in the quality of life for community residents. Regional cooperation involves federal, state, and local agencies, affiliated tribes, neighboring landowners, and all other concerned parties. | - NPS *Management Policies 2006* |
| Manage the area as a part of the greater riverine ecosystem, coordinating with other land management agencies. | - NRA Mission |



BLM_0059742

agency management and operations, only the federal and state land transfers were assessed. Private lands acquired for the NRA would not have management and operational impacts on the neighboring agencies.

Impact thresholds that measure the relative change in agency operations as a result of each alternative are as follows.

*Negligible:* NRA, or other agency operations, would not be affected, or the action would not have a noticeable or appreciable effect on operations.

*Minor:* Effects would be noticeable, but would be of a magnitude that would not result in an appreciable or measurable change to NRA or other agency operations.

*Moderate:* Effects would be readily apparent and would result in a substantial change in NRA, or other, agency operations that would be noticeable to staff and the public.

*Major:* Effects would be readily apparent and would result in a substantial change in NRA, or other, agency operations that would be noticeable to staff and the public, and would be markedly different from existing operations.

Short-term effects would only occur during one operating year. Long-term effects would persist beyond the initial transfer of lands between agencies or beyond one operating year.

Because this topic does not evaluate the potential impacts on natural or cultural resources contained within the NRA, impairment is not evaluated.

### Impacts of Alternative 1 – No Action

#### Analysis

NPS, and other agency operations, would remain the same as described in the Affected Environment. No federal land transfers would occur. The management responsibilities and maintenance operations of each individual agency would be executed with existing staff and budget. However, ongoing management and staff labor costs would be incurred by NPS to address public requests for information related to the toolbox for resource conservation. Potential development of private lands in the vicinity of the NRA, such as in Land Units A (CO 92 COA), E (Sapinero/Blue Mesa COA), and G (West-End COA), where private lands are adjacent to US 50, could also result in additional staff time if commercial development congregated visitors in areas throughout the NRA or along the roadway. This would probably result in resource issues that would have to be resolved, and additional maintenance costs. Additional staff needs could result in long-term, minor adverse impacts to the NRA operating budget.

The Bureau of Reclamation and Western Area Power Administration would continue their responsibilities within and adjacent to the national recreation area, including construction, operation, maintenance, replacements, and additions; and they and their assigns would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities; consistent with Reclamation law, and other applicable laws and regulations. Reclamation, Western, and the National Park Service would consult with each other as necessary and appropriate. Thus, there would be no adverse impacts to Reclamation and Western responsibilities under Alternative 1.

Existing permits, such as grazing, would continue in their current state. Grazing within the NRA would continue to be administered in cooperation with the current administering agency (BLM or USFS).

Areas where the boundary between the NRA and other agency lands is difficult to identify would continue to cause some ongoing confusion for agencies and the public, resulting in a long-term, negligible adverse impact. One example of such an area is in Land Unit B, where the boundary is irregular, bending around BLM and CDOW lands in a number of locations. Another example is at Dry Creek, where NPS facilities occur on CDOW land under an agreement.

The existing condition requires Reclamation to develop, negotiate, implement, and maintain local agreements with at least two land management agencies (NPS and BLM) for its lands within and adjacent to the NRA. This activity and the associated personnel and costs for coordinating management on these lands create a minor long-term expense for all three agencies.

*Cumulative Impacts*

Cumulative impacts to agency operations would not result from implementation of Alternative 1.

*Conclusion*

The ongoing requests for information related to resource conservation on adjacent private lands and potential resource and visitor use impacts associated with potential development of private lands adjacent to the NRA would result in long-term minor adverse impacts to NRA operations.

### Impacts of Alternative 2 – Proposed Action

*Analysis*

**National Park Service.** It is expected that implementation of Alternative 2 would occur over a number of years into the future. It would require the following additional efforts of NRA staff:

- Perform as NRA liaison with private landowners, adjacent land management agencies, county planners and officials, and other neighbors and stakeholders
- Write and implement a land protection plan
- Work with private landowners to implement the tools of resource conservation, including negotiations leading to acquiring interests in land
- Coordinate land appraisals and environmental assessments
- Implement boundary surveys, marking and posting, and fencing
- Write grant proposals
- Monitor conservation easements
- Provide and/or coordinate technical assistance to neighboring private landowners in the areas of natural, historical, and archeological resource conservation and enhancement, especially preserving and improving natural habitat, and conserving water quality; planning, siting, and design considerations for development; and protecting life and property from wildfire
- Coordinate the Joint Agency Management Effort
- Coordinate the development and execution of an implementation plan for new lands.

In addition, as more interests in land are acquired over time, there would be an increasing requirement for NRA staff in the following areas of operations.

- To monitor and conserve the natural and cultural resources on those lands
- To administer grazing permits that exist on lands transferred to the NRA
- To provide for additional recreational and interpretive opportunities, and the safety of visitors
- To construct and maintain the necessary and appropriate facilities for resource conservation and visitor use, such as fencing and trails
- To provide administrative support for technical assistance to neighbors.

If funding is not provided for additional staff to perform the above duties, Alternative 2 would have a long-term, major, adverse impact on NPS operations. However, if additional staff is available to perform these duties, there is expected to be a long-term moderate beneficial impact to NPS operations, due to enhanced cooperation from landowners and other neighbors in the realm of resource conservation. It is for these reasons that this study recommends an increase in the NRA's

base funding to hire additional employees to accomplish these tasks. Ultimately, two additional full-time equivalent employees (FTE) would be needed to fully implement the proposed action. This is discussed in more detail in the section on "Estimated Costs, Staffing Requirements, and Implementation Strategy" for Alternative 2 in the Alternatives, Including the Proposed Action chapter.

A potential of 10,040 net acres of land from other federal and state land management agencies would be transferred by Congress to NPS in Land Units B (Blue Mesa Reservoir Agency), F (Gateview Agency), and H (West-End Agency) for inclusion in the NRA upon approval of the Proposed Action. Into the near and distant future, up to 24,300 additional acres in private land within the COA could be potentially acquired or managed via conservation easements or other conservation tools if private landowners were willing to sell their lands or execute such agreements. The most likely scenario is that a relatively small percentage of these lands would be so managed. Current thinking is that approximately one tenth (2,400 acres) would eventually be acquired in fee simple, and included within the NRA; and approximately one third (8,100 acres) would eventually come under conservation easements. One reason is that to the greatest extent possible, NPS would pursue tools of a partnership nature with willing landowners, conservation organizations, land trusts, and other agencies, that would result in the least amount of cost to the government, while still satisfying resource conservation goals and objectives, as well as landowner goals and objectives. The potential impacts on the National Park Service of federal and state land transfers and the inclusion of private lands within the COA are discussed in two separate sections below.

*1. Federal and State Land Transfers* - Land transfers between other agencies and NPS would simplify existing boundaries between agencies and improve NPS operations in site-specific areas, resulting in long-term negligible to minor beneficial impacts. Additions of federally owned lands or facilities could result in long-term adverse negligible to minor impacts to site-specific NPS operations and staffing, unless additional staff was authorized. The potential transfer of the Gateview facilities (recommended for BLM administration) would, in part, offset this workload. Still, it is expected that some staff would be needed to perform additional maintenance services, visitor and resource protection, and resource management duties due to the addition of lands.

- <u>Land Unit B: Blue Mesa Reservoir Agency</u>
    - USFS and BLM lands from the existing NRA (north of Sapinero Basin) to the southern edge of the West Elk Wilderness Area would be transferred to the National Park Service, including the Soap Creek Campground that is currently managed by the USFS. The management of the area by one agency rather than by three would provide long-term, moderate benefits to visitors, because the area would be managed under the guidelines of only one agency, and that agency would be the sole presence or contact for visitors. Furthermore, management by one agency rather than by three would provide for overall operational efficiencies.
    - Because of the NPS existing presence along the Soap Creek Arm and Soap Creek Road, the National Park Service would be able to easily manage this area, including the road, the Soap Creek campground, and area resources, with only long-term, negligible to minor impacts to NRA operations. The existing campground concession permit would be transferred to the National Park Service, or terminated. If terminated, it would result in some adverse impacts to existing concessioners. USFS would need to amend the existing outfitter permit, and NPS would

need to issue a Commercial Use Authorization to the same outfitter, reflecting changes brought about by transfer of agency lands.

  - Haystack Cave, an archeological site now managed by BLM, but adjacent to NPS facilities and headquarters at Elk Creek, would receive a heightened level of protection and scientific activity, because NPS rangers and resources staff work in the vicinity more frequently than BLM personnel.
  - Some USFS land now being managed within the NRA would be excluded from the NRA. These consist of two parcels (shown as Tract 8 and Tract 9 on the Alternative 2 map) that sit west of the Soap Creek Road. By letting USFS administer these parcels, the road in this vicinity would become the proposed boundary between NPS and USFS, which would provide some efficiency for both agencies in administering the land.
  - BLM lands in the eastern portion of this land unit would remain in their current, undeveloped condition and would continue to be managed for critical winter range and other wildlife habitat values.
  - Under Alternative 2, the National Park Service would receive authorization to facilitate land exchanges with CDOW that would improve operations and management efficiencies for both organizations. All such transfers would be subject to CDOW approval. These lands would continue to be managed for critical winter range and other wildlife habitat values. CDOW would benefit by consolidating lands in the Centennial State Wildlife Area and/or Sapinero State Wildlife Area. NPS would benefit by including what are now CDOW isolated parcels within the proposed NRA boundary. This includes land in Dry Creek, East Elk Creek, and Beaver Creek. Currently, NPS facilities exist under agreement on the Dry Creek CDOW parcel, and East Elk Creek facilities are accessed via a road that crosses CDOW land. Simplification of the northern NRA boundary in this land unit for easy recognition by agency personnel and the public would also contribute to this beneficial impact.

- Land Unit F: Gateview Agency
  - Because the Gateview Campground and historic resources in the area are a distance from other facilities within the NRA, the transfer of these facilities to BLM would result in a long-term beneficial impact to NRA operations. Minor beneficial effects related to maintenance costs would occur in this area because the water system would no longer be maintained and tested, nor the restroom facilities cleaned by NPS staff on a regular basis. These functions would be transferred to BLM. The National Park Service would continue to pump the pit toilets at the campground and maintain the road to the area under an agreement with BLM.
- Land Unit H: West-End Agency
  - Although the transfer of lands from BLM and USFS to NPS that is proposed throughout this land unit would result in some operational and administrative efficiencies for the National Park Service, the net result would be long-term minor adverse impacts on NPS operations, if the recommended additional staff were not provided to accommodate the additional management responsibilities that would ensue. There would be more land to patrol, and more wildlife and grazing to manage. Furthermore, although the

BLM lands to be transferred are contiguous with the existing NRA, some are isolated parcels with difficult access.

- Some of the transferred lands, upon revocation of Reclamation's withdrawl, could be available for future NPS land exchanges that would help conserve the viewshed in the vicinity of Morrow Point or Crystal Reservoirs.

- All Agency Land Units (B, F and H)
  - Grazing
    - USFS lands proposed for transfer to the National Park Service along CO 92 include acreage in the vicinity of the Long Gulch – Bear Trap area. Due to the large 30,000 acre grazing allotment in and adjacent to this area, the proposed NRA boundary was adjusted from an earlier proposal to ensure that the vast majority of the grazing allotment remains outside the NRA. NPS also reduced the width of the Crystal Trail corridor to minimize this impact. USFS would continue to manage the grazing allotment, and NPS and USFS would enter into a new agreement to reflect the new situation. Thus, negligible impacts would occur to USFS grazing allotment permittees, as the USFS would continue to manage this large, early season grazing allotment on those lands lying outside the NRA.
    - BLM grazing allotments would be administered via agreement with the involved agencies. The likely scenario for most grazing is that allotments would consist of land outside and within the NRA. Grazing would be allowed to continue where authorized under existing permits, unless the permittee requests a voluntary termination. Arrangements for managing grazing would be worked out on a case-by-case basis, and documented in an agreement with the involved agencies. In cases where an allotment still contains a significant amount of BLM land, it is expected that the BLM would continue managing that allotment; and in cases where little or no BLM land is in the allotment, NPS would likely manage the allotment, or through agreement, contract with the BLM to manage the allotment. Refer to Table 15, which appears later in this section, for a listing of identified allotments, and potential management scenarios. This activity would result in negligible to minor, long-term adverse impacts to NPS from additional management responsibilities, if the recommended additional staff were not provided. As noted earlier, there would be no impact to grazing permittees.
  - Mining Activity
    - There are no known, active mineral claims or leases on the lands proposed for transfer to NPS.
    - Transferred federal and acquired state lands added to the NRA would be administered under the laws, regulations, and policies for units of the national park system. However, for clarity, it is recommended that when Congress introduces legislation to establish the NRA, that language be included to, except for valid existing rights, withdraw all such lands from all

forms of entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing, and all amendments thereto.

- In the event a parcel contains a "split estate," whereas the surface would be transferred to NPS, but the mineral estate would remain in private ownership, NPS will manage such mineral estates according to NPS *Management Policies 2006*: "The Park Service may approve operations associated with nonfederal oil and gas interests under the standards and procedures in 36 CFR Part 9, Subpart B. If an operator's plan fails to meet the approved standards of these regulations, the Park Service generally has authority to deny the operation and may initiate acquisition. Operations associated with nonfederal mineral interests, other than oil and gas, are subject to the requirements of 36 CFR Part 5, "Commercial and Private Operations," and 36 CFR 1.6. The Service must determine that operations associated with these mineral interests would not adversely impact "public health and safety, environmental or scenic values, natural or cultural resources, scientific research, implementation or management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities ...." If the impacts from the operation on the resource cannot be sufficiently mitigated to meet this standard, the Park Service may seek to acquire the mineral interest."

2. *Private Lands within the COA* – Private lands within the COA occur in Land Units A (CO 92 COA), C (Gunnison River COA), D (Iola Basin COA), E (Sapinero/Blue Mesa COA) and G (West-End COA). If a land-owner were willing, and funding is available from Congress, resources on any private parcel within these units could be conserved with various tools, such as general agreements, conservation easements, and fee simple acquisition.

Impacts on NPS management and operations from the implementation of the available conservation tools would depend upon considerations such as the interest that the National Park Service acquired in a piece of property, whether NPS would assume some degree of management responsibility, and the location of the property relative to existing access. Many of these types of issues would be evaluated in a suitability and feasibility analysis, as required by the NPS boundary adjustment criteria, prior to the completion of any agreement between a landowner and NPS (see the discussion of boundary adjustment criteria in the Alternatives chapter, in the section on Development of Alternatives). Conservation easements and land acquisition would result in added responsibilities to NRA staff of resource monitoring, resource management, and/or visitor protection. Depending on the extent and location of the land involved, this would result in long-term minor to major adverse impacts on NPS field operations, if additional funding were not provided. However, if additional staff is available to perform these duties, there is expected to be a long-term moderate beneficial impact to NPS operations. This is why Alternative 2 recommends hiring additional staff.

Under Alternative 2, if land within the COA is acquired, NPS could adjust the proposed NRA boundary to include the acquisition without additional congressional action, resulting in reduced staff work, and short-term minor to moderate beneficial impacts to NPS operations. New NRA legislation, a revised

agreement between Reclamation and NPS, and streamlining, or potential elimination, of other agreements among various agencies, would provide a long-term, minor, beneficial impact to agency operations, by reducing associated personnel and costs for managing the lands and agreements.

There would be a long-term minor to moderate beneficial impact on NPS ability to meet its mission, due to appropriately worded legislation for the NRA, improved wording in a new MOA with Reclamation, and increased consultation and cooperation between NPS and other agencies, including Reclamation. This improvement in consultation and cooperation among the agencies is already happening, through the Joint Agency Management Effort, which is integral to the RPS.

**Bureau of Reclamation.** As with Alternative 1, the Bureau of Reclamation and Western Area Power Administration would continue their responsibilities within and adjacent to the national recreation area, including construction, operation, maintenance, replacements, and additions; and they and their assigns would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities; consistent with Reclamation law, and other applicable laws and regulations. Formal establishment of the NRA would not amend or supplement existing Reclamation law applicable to the Aspinall Unit or the Uncompahgre Project. Reclamation, Western, and the National Park Service would consult with each other as necessary and appropriate. Thus, there would be no adverse impacts to Reclamation and Western responsibilities under Alternative 2.

Reclamation would continue to hold underlying administrative jurisdiction on 41,860 acres within the proposed NRA boundary. The National Park Service would cooperate with Reclamation as a continuing partner of the Aspinall Unit, overseeing recreation, resource management, recreation facility construction and maintenance, interpretation, education, and resource and visitor protection. At the same time, Reclamation would continue to operate the dams, power plants, reservoir flow operations, and have access to the same, unimpeded by NPS operations. As a result, there would be no impact to Reclamation operations from NPS activities, or from conservation activities within the adjacent COA.

Although the National Park Service manages recreation and certain other resources on Reclamation lands and land interests within the NRA in accordance with the 1965 Memorandum of Agreement with Reclamation, new interests acquired by NPS in private lands would not fall under this agreement, with one exception. If private lands near Willow Creek (Land Unit D) were acquired, the land area within and adjacent to the high pool of Blue Mesa Reservoir would be managed for Reclamation and NPS purposes.

It is anticipated that additional work would be required to redraft the 1965 Memorandum of Agreement to restate and update information pertinent to legislation that might be passed to formally establish the NRA. Also, Reclamation may conduct future reviews of land it administers to determine which parcels, if any, it would recommend for revocation of withdrawal. Upon agreement with the National Park Service, NPS would assume full administrative authority over any lands (within the Alternative 2 proposed boundary) so revoked. This workload is expected to result in a negligible to minor adverse impact to Reclamation, as this work would likely occur in any case.

**Bureau of Land Management.** A total of 5,840 acres of BLM land would be transferred to the National Park Service in Land Units B (Blue Mesa Reservoir Agency), F (Gateview Agency), and H (West-End Agency), resulting in long-term negligible to minor beneficial impacts to BLM operations in site-specific areas because of fewer maintenance and other operational obligations.

- **Land Unit B (Blue Mesa Reservoir Agency).** The impact of transferring the Dillon Pinnacles ACEC and portions of the West Antelope ACEC to NPS would be negligible to minor beneficial

because NPS would manage the area with similar emphasis on recreation and wildlife habitat, and the BLM currently has limited presence in the area. BLM would also receive minor operational benefits from rescinding some of its responsibility for managing local cultural resources, as well as for some of the BLM lands north of the Dickerson gravel pit. A defined NRA boundary and presence could prevent some existing trespass issues.

- **Land Unit D (Iola Basin COA).** The potential acquisition of private properties in the vicinity of Willow Creek could result in additional long-term, negligible to minor adverse operational impacts to BLM, if the land were transferred to allow BLM to manage local hang gliding activities. NPS could sustain similar impacts if the lands were acquired and remained in NPS management.
- **Land Unit F (Gateview Agency).** Actions at Gateview will depend upon determination by Reclamation as to whether or not to relinquish and recommend revocation of the withdrawal on 120 acres of land in the Gateview area. Should the revocation be approved, this study would recommend that Tract 10 be excluded from the NRA and transferred to BLM for administration and management. In the interim, NPS could seek to enter into an agreement with BLM to allow BLM to manage that portion of the NRA. Since BLM already has a presence in the area, this would result in only a long-term, negligible adverse impact to BLM operations. Maintenance of existing facilities within the campground, such as the pit toilets, would be added to the existing BLM maintenance schedule. However, under BLM management, the potable water system would probably be discontinued, given its daily maintenance requirement; and visitors would be asked to haul in their own water from elsewhere, just as they do in BLM's other campgrounds in the area. NPS would most likely continue to pump toilets and maintain the road to the campground. However, should those commitments be relinquished, operational impacts to the BLM could increase.
- **Land Unit H (West-End Agency).** Actions pertaining to Tract 1 will depend upon determination by Reclamation as to whether or not to relinquish and recommend revocation of the withdrawal on 680 acres of land west of Cimarron. Should the revocation be approved, this study would recommend that Tract 1 be excluded from the NRA and transferred to BLM for administration and management. In the interim, NPS could seek to enter into an agreement with BLM to allow BLM to manage that portion of the NRA. Negligible beneficial impacts to BLM would occur with transfer of lands on the western end of the proposed lands because existing management costs are minimal. Much of the area is inaccessible and in rugged terrain.
- **Grazing.** Several of the parcels of land proposed for transfer from BLM to the NRA contain grazing allotments. In some cases, the allotments already occur on existing parcels within the NRA. In most cases, the result of the transfer of land from BLM to the NRA would result in a particular allotment containing land both within and outside the NRA. Grazing would be allowed to continue where authorized under existing permits, unless the permittee requests a voluntary termination. Arrangements for managing grazing would be worked out on a case-by-case basis, and documented in an agreement with the involved agencies. In cases where an allotment still contains a significant amount of BLM land, it is expected that BLM would continue managing that allotment; and in cases where little or no BLM land is in the allotment, NPS would likely manage the allotment, or through agreement, contract with BLM to manage the allotment. Refer to Table 15, which follows, for a listing

Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 48 of 71



of identified allotments, and potential management scenarios. This activity would result in negligible to minor, long-term adverse impacts to NPS operations from additional management responsibilities, if the recommended additional staff were not provided. As noted earlier, there would be no impact to grazing permittees.

**Colorado Department of Transportation / Federal Highway Administration**. The National Park Service would continue to cooperate and coordinate with CDOT/FHWA regarding maintenance and construction activities and traveler enhancements that occur on and along US 50, CO 92, and CO 149. NPS would likely seek to enter into an agreement with CDOT/FHWA in order to

TABLE 15: BUREAU OF LAND MANAGEMENT GRAZING ALLOTMENTS WITHIN THE CURRENT AND PROPOSED NATIONAL RECREATION AREA

| Allotment Name | General Location | Allotment Composition and Management under Alternative 1 (No Action) [1] | | | | Allotment Composition and Management under Alternative 2 (the Proposed Action) [2] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | BLM | NPS | Private | Managed by | BLM | NPS | Private | Managed by |
| Beaver Creek | N of Gunnison River Canyon | 98% [3] | 2% | 0% | BLM | 97% [3] | 3% | 0% | BLM |
| Big Willow | W of Gateview | 40% | 2% | 58% | BLM | 40% | 2% | 58% | BLM |
| Blue Creek | W of Blue Creek | 6% | 13% | 81% | BLM | 2% | 17% | 81% | NPS |
| Dead Horse | N of Crystal Dam | 17% | 12% | 71% | BLM | 14% | 15% | 71% | BLM |
| Fitzpatrick Mesa | S of Morrow Pt. Reservoir | 36% | 0% | 64% | BLM | 0% | 36% | 64% | NPS |
| Highway | S of Morrow Pt. Reservoir | 78% | 0% | 22% | BLM | 0% | 78% | 22% | NPS |
| Iola | Iola and Kezar Basins | 82% | 5% | 13% | BLM | 82% | 5% | 13% | BLM |
| North Cimarron | N of Morrow Pt. Reservoir | 0% | 6% | 94% | BLM | 0% | 6% | 94% | NPS |
| Pine Mesa | S of Blue Mesa Dam | 0% | 90% | 10% | BLM | 0% | 90% | 10% | NPS |
| Rawhide / Coffee Pot | W of Crystal Reservoir | 28% | 20% | 52% | BLM | 27% | 21% | 52% | BLM |
| Round Corral Crk | S of Morrow Pt. Reservoir | 36% | 9% | 55% | BLM | 0% | 45% | 55% | NPS |
| Round Corral Sprg | S of Morrow Pt. Reservoir | 9% | 18% | 73% | BLM | 0% | 27% | 73% | NPS |
| Sapinero Mesa | S of Sapinero Basin | 42% | 26% | 32% | BLM | 42% | 26% | 32% | BLM |
| Spring Gulch | NE of Crystal Dam | 5% | 42% | 53% | BLM | 2% | 45% | 53% | NPS |
| Steuben Creek | N of Lake City Bridge | 90% | 1% | 9% | BLM | 90% | 1% | 9% | BLM |
| Stevens Creek | N of Iola Basin | 97% [3] | 3% | 0% | BLM | 95% [3] | 4% | 0% | BLM |
| Ten Mile Springs | E of Gateview | 88% | 2% | 10% | BLM | 87% | 3% | 10% | BLM |
| Windy Point | E of Blue Creek | 0% | 31% | 69% | BLM | 0% | 32% | 68% | NPS |

[1] Under Alternative 1, all allotments continue to be managed by BLM under interagency agreement.
[2] The proposed management under Alternative 2 is a likely scenario, subject to a new interagency agreement.
[3] Allotment includes state (CDOW) lands.



BLM_0059751

identify operation and waste and fill storage issues that could be mutually agreed upon to minimize the impact of highway maintenance and construction operations on Curecanti resources and the visitor experience.

In the vicinity of the East Cimarron day-use area, NPS would seek to remedy a boundary issue where some of the NPS facilities lie outside the NRA boundary within the CDOT right-of-way. The National Park Service would either enter into an agreement with CDOT to recognize the issue and address how future maintenance of the facilities outside the NRA would occur, or would work with CDOT to accomplish a mutually agreed upon adjustment of the proposed boundary, so that it includes all NPS facilities at East Cimarron.

Potential conservation projects, such as conservation easements, would provide benefits to travelers on the West Elk Loop Scenic and Historic Byway, especially along CO 92 above Morrow Point and Crystal Reservoirs. Resource conservation objectives identified in the byway's corridor management plan would more likely be achieved with the establishment of the COA.

**Colorado Division of Wildlife.** The northern boundary of the NRA in Land Unit B (Blue Mesa Reservoir Agency) would be simplified in the vicinity of Dry Gulch Campground and East Elk Group Campsite by the inclusion of 140 acres of CDOW property, resulting in negligible to minor beneficial impacts to CDOW because of increased administrative efficiency. After authorization, NPS would work with CDOW and BLM to identify lands that could be exchanged for the land to be included in the NRA. Such an exchange would need to meet the requirements of the Pittman-Robertson Act of 1937, and other laws and policies of the federal and state agencies involved. The National Park Service would not modify the manner in which the land to be included is presently managed. The land received in exchange would help CDOW consolidate ownership within the State Wildlife Areas adjacent to the NRA, where now some federal public lands are interspersed within the CDOW land. This would result in administrative efficiencies for NPS, BLM, and CDOW, and a clearer understanding by the public of where the proposed NRA boundary is located.

**U.S. Forest Service.** A net of 2,885 acres of Forest Service land would be transferred to NPS in Land Units B and H, resulting in long-term minor to moderate beneficial impacts to Forest Service operations in site-specific areas because of fewer maintenance and other operational obligations.

- **Land Unit B: Blue Mesa Reservoir.** As noted earlier in the NPS section, the transfer to the National Park Service of Forest Service land and the Soap Creek Campground in the vicinity of Soap Creek and West Elk Creek Arms would result in long-term, moderate beneficial impacts to both the Forest Service and NPS from consolidation of operations. Forest Service would no longer maintain the campground or Soap Creek Road, beneficially impacting their operational budget. NPS would assume responsibility for road maintenance, in cooperation with USFS and Gunnison County. The road would become the proposed boundary between NPS and USFS land in this vicinity, clarifying responsibilities for staff, and understanding of the location of Forest Service lands and NRA lands for the public.
- **Land Unit H: West-End.** Lands long managed by NPS under an agreement with USFS would be transferred to NPS in the vicinity the Long Gulch / Bear Trap area, and would include the strip of land containing the Crystal Trail. Additional lands, primarily consisting of drainages and cliffs into the canyon, would also be included, as mutually agreed upon by NPS, USFS, and members of the grazing pool for that grazing allotment. As in the past, NPS would manage the trails and recreational opportunities. NPS and USFS would still need an agreement pertaining to grazing within the NRA, but the situation would remain very similar to the current situation. Thus, negligible impacts would occur to grazing allotment permittees, as the

Forest Service would continue to manage this large early season grazing allotment on those lands lying outside the NRA, and the cattle would still have access to cross the trail corridor has they have done in the past. This action would result in long-term negligible to minor beneficial operational and administrative efficiencies for the National Park Service.

As both national park system and national forest system units have boundaries that are generally legislatively established, it would be necessary, through legislation, to modify the boundary of the Gunnison National Forest, for those areas affected, should Alternative 2 actions pertaining to land transfers be implemented.

**Western Area Power Administration.** Western would continue to have uninterrupted access to transmission lines, access roads, and related facilities for the purposes of reconstruction, repair, maintenance, and operation activities. Resource conservation activities proposed within Alternative 2 would not impede the replacement of poles, structures, or conductors, preclude vegetation management, or prevent road maintenance and improvements. Western's easements across lands within the COA would be unaffected. Therefore, there would be no impacts to Western's operations by implementation of this alternative.

*Cumulative Impacts*

Other federal planning and management activities within or adjacent to the NRA have involved agency land transfers and other operational commitments in the past and could require additional transfers and operational commitments in the future. Some of these actions include the recent designation and expansion of the Black Canyon of the Gunnison National Park, the expansion of the Gunnison Gorge National Conservation Area, additions of wilderness in Black Canyon and Gunnison Gorge, potential expansion of the West Elk Wilderness Area into the administrative areas of three different agencies, and ongoing acquisition of conservation easements by private trusts and public agencies. Such transfers or acquisitions can result in minor adverse impacts to agency operations budgets in the short and long-term. When combined with the negligible to minor adverse impacts associated with actions proposed in Alternative 2 of the Curecanti RPS, long-term minor to moderate adverse impacts could occur to federal agency budgets, such as that of the National Park Service, if additional operational funds are not provided to meet management needs created by acquisitions and transfers.

*Conclusion*

If funding is not provided to hire the necessary staff that would be needed to perform the additional office and field duties that would be required to implement Alternative 2, there would be a long-term major adverse impact on NPS operations. If additional staff is available to perform these duties, there is expected to be a long-term moderate beneficial impact to NPS operations, due to enhanced cooperation from landowners and other neighbors in the realm of resource conservation. It is for these reasons that this study recommends an increase in the NRA's base funding to hire a sufficient number of full-time-equivalent (FTE) employees to accomplish these tasks, and to make Alternative 2 become a reality.

Land transfers between the National Park Service and other agencies would simplify existing boundaries between agencies and improve NPS operations in site-specific areas, resulting in long-term negligible to minor beneficial impacts to NPS.

Other agencies, such as USFS, BLM, and CDOW would experience negligible to moderate beneficial impacts to operations, depending upon the location and change in agency responsibility associated with the land transfer. In some locations, long-term negligible adverse impacts could occur to existing maintenance schedules, where an agency would assume new responsibilities. Reclamation and Western responsibilities would continue to be a priority within the NRA; therefore, there would be no impacts to their operations.

All agencies should realize a long-term minor to moderate beneficial impact to operations due to appropriate wording in new NRA legislation; improved wording in a new MOA between Reclamation and NPS; and increased consultation and cooperation among all agencies through the Joint Agency Management Effort, which is integral to the RPS.

## UNAVOIDABLE ADVERSE IMPACTS

Unavoidable adverse impacts are impacts that cannot be avoided and cannot be mitigated, and therefore would remain throughout the duration of the action. The following list describes potential adverse impacts related to the alternatives being considered.

Private lands within the COA would continue to be subject to future development and other land uses that might be incompatible with NRA goals and objectives. As described under Alternative 1, the following resources could experience adverse cumulative impacts: wildlife, natural lightscape, natural soundscape, cultural, and scenic. Alternative 1 could also compromise recreational, economic, interpretation, and educational opportunities.

Both Alternative 1 and 2 could result in disturbance and degradation to geological and paleontological resources. These impacts would, in the long term, decrease under Alternative 2 with landowner participation in resource conservation activities.

Displacement of native vegetation communities by noxious weeds would be minimized under Alternative 2 with additional emphasis on the Joint Agency Management Effort (JAME) and landowner conservation partnerships.

## LOSS IN LONG-TERM AVAILABILITY OR PRODUCTIVITY TO ACHIEVE SHORT-TERM GAIN

As noted above, some resources would be degraded, to some extent, through implementation of Alternatives 1 and 2. All resources identified above would experience potential long-term loss under Alternative 1. Where landowners participate in the implementation of resource conservation tools and partnerships under Alternative 2, intensity of adverse impacts would be lessened, and beneficial impacts would be increased.

## IRREVERSIBLE OR IRRETRIEVABLE COMMITMENTS OF RESOURCES

Irreversible commitments of resources are those that cannot be reversed, except perhaps in the extreme long term. This would include, for example, the consumption or destruction of nonrenewable resources such as minerals or the extinction of a species.

Irretrievable commitments of resources are those that are lost for a period of time, as a resource is devoted to a use that simultaneously precludes other uses. For example, if facilities are developed in a forest, the timber productivity of the developed land is lost for as long as the facilities remain.

By extension, some soils, vegetation, wildlife habitat, scenic resources, and cultural resources would be permanently damaged within the NRA by development of the private lands within the COA. This would be an irreversible commitment of such resources because it is unlikely that development would later be abandoned and reclaimed.

Construction activities that might eventually result from approval of the Proposed Action, such as the construction of new trails, would require fossil fuels, labor, and construction materials such as wood, aggregate, and bituminous materials. These materials are not in short supply, and their use would not have an adverse effect on the continued availability of these resources. Resultant construction would also require an irreversible commitment, or expenditure, of funds.

# Chapter 5: Consultation and Coordination



# CONSULTATION AND COORDINATION

## INTRODUCTION

It was recognized early in the project that a successful outcome would depend on intense public involvement. The goal of the public involvement strategy was to obtain project-related information and resource data, agency input, and local support for conservation of the natural, cultural, recreational, and scenic resources within and surrounding Curecanti National Recreation Area (NRA). Therefore, several meetings and discussions were held throughout the study process with federal, state, and county agencies and elected officials; American Indian tribes; the general public, park users, private landowners; and other stakeholders. This was accomplished through briefings, meetings, workshops, and open houses; three newsletters; and continual communication via telephone, e-mail, regular mail, fax, and the Internet.

The public has had several opportunities to provide ideas and get questions answered regarding the study. During four phases of the project the study team made special efforts to reach out to the public and to agency officials to exchange information and seek comment, including (1) the initial gathering of information on interests and concerns to address in the study (scoping); (2) the primary gathering and analysis of resource data and information; (3) the development of alternatives; and (4) the assessment of impacts of proposed management actions on the environment.

Due to the relationship between NPS and Reclamation in managing their respective interests and facilities within the recreation area, Reclamation is a cooperating agency with NPS on the environmental impact statement (EIS) for the Resource Protection Study (RPS). Therefore, a Reclamation employee has been a full member of the study team throughout the project. He has attended many of the meetings, open houses, and workshops; has been kept fully informed of the project's status and findings; and has made significant contributions throughout the process.

Shortly before the RPS began, Gunnison County initiated an effort, called the Curecanti Area Conservation Study, or CACS (initially called the Curecanti Area Conservation Plan), to make recommendations which would help conserve the natural, cultural, recreational and scenic resources surrounding the NRA that are important to county residents and area visitors. County staff consulted with the NPS Rivers, Trails and Conservation Assistance program staff in order to identify what resources might be important and what tools the county might have available to achieve conservation goals. During the first few years of the RPS process, the CACS and RPS were conducted in parallel, sharing information. Eventually, the CACS effort was absorbed by the county's new effort in producing a comprehensive plan, also known as a master plan. Although the county has completed two components of the comprehensive plan (one for the Crested Butte to Gunnison corridor, and one for the area around Marble), it has not yet begun the planning process for the U.S. 50 corridor. In the interim, long-range planning staff have expressed a continued interest in the RPS, and the possibility of incorporating components of the RPS recommendations into that portion of the comprehensive plan that would include the Curecanti area.

The key milestones of consultation and coordination during the project are listed below. In addition to the cited milestones, there have been continual informal meetings and other instances of communication, consultation, and coordination with others to acquire resource data and further information leading to the production of the Draft, then Final, RPS/EIS, and to answer questions regarding the RPS. Details of the listed milestone briefings, meetings, and open houses, and their findings, are contained in trip reports, which are available at the NRA.

The following abbreviations are relevant in the ensuing discussion:

- BLM = Bureau of Land Management
- CACS = Gunnison County's Curecanti Area Conservation Study
- CDOW = Colorado Division of Wildlife
- CREDA = Colorado River Energy Distributors Association
- EIS = Environmental Impact Statement
- GIS = Geographic Information System
- JAME = Joint Agency Management Effort
- LUR = Gunnison County's Land Use Resolution
- NPS = National Park Service
- NRA = Curecanti National Recreation Area
- PBR = Preliminary Boundary Recommendation for NRA
- Reclamation = Bureau of Reclamation
- RPS = Curecanti NRA Resource Protection Study
- RTCA = Rivers, Trails and Conservation Assistance Program (NPS)
- USFS = U.S. Forest Service
- USFWS = U.S. Fish and Wildlife Service
- UVWUA = Uncompahgre Valley Water Users Association
- Western = Western Area Power Administration.

## NOTICE OF INTENT

A Notice of Intent to prepare an EIS for the RPS at Curecanti NRA, Montrose and Gunnison Counties, Colorado, was published in the Federal Register on May 3, 2000, Volume 65, Number 86.

## CONSULTATION WITH AGENCIES AND ELECTED OFFICIALS

The Bureau of Reclamation has participated in the development of this document, and of the various alternatives. In addition, the following agencies have been briefed on numerous occasions throughout the study, have provided input into the development of the Proposed Action, and in some cases have submitted letters in support of the concepts and proposed land transfers recommended in the Proposed Action, as seen elsewhere in this chapter.

- Bureau of Land Management area managers and the state director
- Colorado Division of Wildlife local and regional managers
- Grand Mesa, Uncompahgre and Gunnison National Forests
- Western Area Power Administration staff from Denver and Salt Lake City
- Staff of the following elected U.S. congressional officials:
  - Senator Wayne Allard
  - Former Senator Ben Nighthorse Campbell
  - Former Representative Scott McInnis
  - Representative John Salazar
  - Senator Ken Salazar.

Gunnison and Montrose County officials and planning staff have expressed interest in the project. Gunnison County planners are considering incorporating study data and recommendations into the component of the county's comprehensive master plan that will deal with the portion of the county that includes the Curecanti area. To date, the county officials that have been briefed on the Proposed Action generally support the concepts and proposed land transfers being recommended.

Additional consultation and briefings will occur as recommendations to Congress are prepared.

Following is a list of meetings that were held with agencies and elected officials:

- March 29, 2000: Project scoping meeting with BLM, CDOW, City of Gunnison, Gunnison County, Montrose County, and USFS.
- Week of May 1, 2000: Project scoping meetings with BLM, Gunnison County officials, and Montrose County officials.
- October 31, 2000: Meeting with Reclamation and UVWUA in Montrose to discuss their interests.
- December 4, 2000: Meeting with Gunnison County planner at the Montrose Public Lands Center to discuss issues common to the RPS and CACS.
- December 5, 2000: Meeting with Montrose County Commissioner-Elect in Montrose to discuss issues of mutual concern between Montrose County and NPS.
- December 6, 2000: Meeting with Gunnison County Commissioner at Elk Creek (NRA headquarters) to discuss issues of mutual concern between Gunnison County and NPS.
- May 3, 2001: Meeting with Reclamation in Grand Junction to brief staff on the status of the RPS and discuss issues of mutual concern.
- June and July, 2001: Meetings with adjacent land management agencies and others, including BLM, CDOW, CREDA, Gunnison County, USFS, and Western, to present the progress of the RPS; obtain feedback, understanding, and buy-in from the agencies before discussing the project any further with private landowners and other stakeholders; and to plan for on-going coordination with the agencies.
- September 18, 2001: Meeting with Colorado state officials in Denver to present the status of the RPS, obtain their comments, and explore the possibility of the state's involvement in the JAME.
- October 17, 2001: Meeting with staff of U.S. Representative Scott McInnis in Washington, D.C. to present the status of the RPS, receive input, and evaluate the reaction to initial proposals. (NOTE: Additional meetings had been scheduled on Thursday afternoon, October 18, with the staffs of Senator Wayne Allard and Senator Ben Nighthorse Campbell. However, these meetings were cancelled due to office closures as a result of the anthrax situation in the capitol area.)
- December 12, 2001: Meeting with Gunnison County officials in Gunnison to discuss issues of mutual concern to both the RPS and the CACS.
- January 10-11, 2002: Meetings with State Representatives and Senator Ben Nighthorse Campbell's staff in the Denver area, to present the status of the RPS in advance of the next round of meetings with the general public and affected landowners, and to obtain their feedback; and with CDOW, the Trust for Public Land, and USFWS in the Denver area to obtain information relating to landowner incentives for resource and species protection.
- March 20, 2002: Meeting with Gunnison County officials at Elk Creek to discuss the RPS-related topics of a preliminary new boundary recommendation for the NRA, the JAME concept, the LUR, and the CACS; and to determine the county's level of support for the RPS.
- April 30, 2002: Meeting with Gunnison County Planners at Elk Creek to strategize partnership efforts between NPS and Gunnison County regarding the RPS and the county's upcoming master plan.
- May 1, 2002: Meeting with Montrose County Planner in Montrose to discuss

Montrose County's interests and involvement in the RPS, including its relationship to the county's new Master Plan, which was adopted in 2001.

- June 13, 2002: Meeting with BLM, CDOW, Gunnison County, Reclamation, Southern Ute Indian Tribe, Uncompahgre Plateau Project, USFS, and Western at Elk Creek to share preliminary findings of the RPS, and explore inter-agency means of protecting natural, cultural, recreational, and scenic resources surrounding the NRA. This was the initial meeting of what has become the Joint Agency Management Effort (JAME), which meets periodically to try and resolve area-wide resource management problems on an issue-by-issue basis.
- September 5, 2002: Meeting with Gunnison County planners to discuss ways in which NPS and the county can work more closely together on issues involving the RPS and the county's master plan.
- February 12, 2003: Meeting with Gunnison County planner in Gunnison to prepare for upcoming landowner meetings for the RPS, in which the county planner was involved.
- Week of March 17, 2003: Meetings with state elected officials in Denver, Senator Ben Nighthorse Campbell's staff in Fort Collins, and State government officials in Denver, to brief them on the status of the RPS and its alternatives, and to receive comments and concerns, in advance of upcoming meetings with landowners.
- Week of March 24, 2003: Meetings with congressional staff in Montrose, and Montrose County planner in Montrose, to brief them on the status of the RPS and its alternatives, and to receive comments and concerns, in advance of upcoming meetings with landowners.
- May 21, 2003: Meeting with Senator Wayne Allard's staff in Englewood, to brief them on the status of the RPS and its alternatives, and to receive comments and concerns, in advance of upcoming meetings with landowners.
- Morning of June 26, 2003: Meeting with Assistant Secretary of the Interior for Fish, Wildlife and Parks in Washington, D.C., to present and receive comments on the preliminary alternatives of the RPS.
- Afternoon of June 26, 2003: Meeting with representatives from the offices of Senator Ben Nighthorse Campbell, Senator Wayne Allard, and Representative Scott McInnis in Washington, D.C., to present and receive comments on the RPS preliminary alternatives.
- September 24, 2003: Meeting with Montrose County officials in Montrose to review the RPS preliminary alternatives and receive comments.
- November 25, 2003: Meeting in Crawford and field trip to grazing site with USFS, several members of the Black Mesa Grazing Pool, and a representative from U.S. Representative Scott McInnis' office to explain the goals and objectives of the RPS, and to receive input regarding potential affects on the recommendation pertaining to a long-established grazing permit issued by the USFS. As a result of the meeting, an agreement was reached to redraw the proposed boundary line in the vicinity of Long Gulch/Bear Trap area along Colorado State Highway 92 to reduce the potential impact to grazing permittees.
- December 11, 2003: Meeting with BLM, CDOW, Gunnison County, USFS, and Western at Elk Creek to assess impacts of proposed actions in the RPS, especially as they affect other agencies and the local socio-economic environment. NOTE: The Reclamation representative attended Impacts Workshop sessions with the NRA staff earlier in the week.

- Week of December 15, 2003: Meetings with federal and state officials, and private property owners, in the Curecanti area, including on-site visits to the park, to explore partnership opportunities with the private sector to conserve resources surrounding the NRA and adjacent to Black Canyon of the Gunnison National Park.
- March 1, 2004: Meeting with Colorado Department of Natural Resources in Denver to provide an update on the RPS, present the proposed action, and receive comments.
- May 26, 2005: Meeting at Elk Creek with agencies who reviewed the April 28, 2005 multi-agency review version of the Draft RPS/EIS, including BLM, CDOW, and Natural Resources Conservation Service of the U.S. Department of Agriculture, for review and comment on the document.
- June 3, 2005: Meeting with USFS at their office in Delta to discuss their comments on the April 28, 2005 multi-agency review version of the Draft RPS/EIS.
- August 3, 2005: Meeting in Crawford, and on-site visit with USFS, to redraw the proposed NRA boundary line in the vicinity of Long Gulch/Bear Trap area along CO 92.
- August 31, 2005: Meeting with Reclamation at their office in Grand Junction to address their comments on the April 28, 2005 multi-agency review version of the Draft RPS/EIS.
- September 1, 2005: Guided congressional staffers from Grand Junction on a field trip to Black Canyon of the Gunnison National Park and Curecanti National Recreation Area. Participants included Richard Baca (office of U.S. Representative John Salazar), Trudy Kareus (office of U.S. Senator Ken Salazar), and Derek Wagner (office of U.S. Senator Wayne Allard). Provided briefing on the status of the Draft Resource Protection Study and answered questions.
- November 7, 2005: Meeting with congressional staffers at their office in Grand Junction, including Richard Baca (office of U.S. Representative John Salazar), and Trudy Kareus (office of U.S. Senator Ken Salazar), to brief them in more detail on the RPS.
- November 21, 2005: Meeting with new Gunnison County Long Range Planner at his office to brief him on the status of the Draft Resource Protection Study, and to obtain his comments.
- November 22, 2005: Meeting with CDOW at their office in Gunnison to address their comments on the April 28, 2005 multi-agency review version of the Draft RPS/EIS.
- July 24, 2006: Meeting with Gunnison County Long Range Planner, Gunnison County Commissioner, and Southeast Regional Director from the office of U.S. Representative John Salazar, at the county office building in Gunnison, to brief them on the status of the study, and to obtain their comments in preparation for finalizing the Draft RPS/EIS.
- July 25, 2006 (Morning): Meeting with Montrose County Land Use Director, and Montrose County Manager, at the county office building in Montrose, to brief them on the status of the study, and to obtain their comments in preparation for finalizing the Draft RPS/EIS.
- July 25, 2006 (Afternoon): Meeting with BLM officials, including Gunnison Field Office Manager and Montrose Field Office Manager, at Elk Creek, to brief them on the status of the study, and to obtain their comments in preparation for finalizing the Draft RPS/EIS.
- August 10, 2006: Meeting with Montrose BLM staff, including Gunnison Field Office Manager, Associate Field Office

Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 58 of 71



Manager, and Realty Specialist, to discuss follow-up questions and issues from the July 25 meeting.

- September 22, 2006: Telephone call between NPS Intermountain Regional Director Mike Snyder, and Reclamation Upper Colorado Regional Director Rick Gold; and follow-up call from Reclamation to NPS on September 25, 2006; wherein agreement was reached with regards to the following wording in the Draft RPS/EIS:
  - For both alternatives in the Draft RPS/EIS, the Bureau of Reclamation and Western Area Power Administration would continue their administrative jurisdiction and responsibilities within and adjacent to the national recreation area, including construction, operation, maintenance, replacement, and additions, consistent with Reclamation law, and other applicable laws and regulations. Formal establishment of the area as an NRA under Alternative 2 would not amend or supplement existing Reclamation law applicable to the Aspinall Unit or the Uncompahgre Project. Reclamation, Western, and the National Park Service would consult with each other as necessary and appropriate. Thus, there would be no adverse impacts to Reclamation and Western responsibilities under either alternative.
- June 27, 2007: Meeting with congressional staffers at their office in Grand Junction, including Richard Baca (office of U.S. Representative John Salazar), Trudy Kareus (office of U.S. Senator Ken Salazar), and Brian Meinhart (office of U.S. Senator Wayne Allard), to brief them on the recommendations in the Draft RPS/EIS.

## MEETINGS WITH THE GENERAL PUBLIC, PARK VISITORS, PRIVATE LANDOWNERS, AND OTHER STAKEHOLDERS

- Week of May 1, 2000: Project scoping meetings with private landowners.
- May 24, 2000: Public open house in Gunnison for joint project scoping for RPS and CACS.
- September 26, 2000: Kick-off meeting in Montrose for Citizen Photographic Assessment.
- December 5, 2000: Public open house in Montrose to present the results of the Citizen Photographic Assessment to the Montrose community.
- December 6, 2000: Public open house in Gunnison to present the results of the Citizen Photographic Assessment to the Gunnison community.
- March 5-7, 2002: Two focus group workshops in Gunnison and Montrose, and three public open houses in Gunnison, Hotchkiss, and Montrose, to solicit more ideas from the public on the unmet potential of land-based and reservoir tributary-based recreation and resource education in areas within and surrounding the NRA. Recommendations for necessary and appropriate facilities, and concerns about protection of natural, cultural, and scenic resources were also solicited.
- March 27, 2003: Meeting with Club 20 President in Grand Junction to inform him of the goals and objectives and progress of the RPS, and invite his participation if he so desired.
- May 28-29, and June 2-5, 2003: Meetings with private landowners in Crawford, Montrose, and Gunnison to discuss the RPS. Following is a summary of the meetings:
  - It was decided early on to offer opportunities for potentially affected landowners to meet with members of the study team prior to finalizing the alternatives. The



BLM_0059761

landowners who would be most affected are those within the Conservation Opportunity Area (COA). This represented a total of 91 different landowners, whether individuals, groups, partnerships, etc. Rather than try to meet with all 91 landowners individually, and rather than meet with everyone all at once, it was decided to divide the landowners into 6 groups, and conduct a separate meeting for each group, trying to keep each group size between 10 and 20 people. The groups were determined by six geographical areas surrounding the NRA. Thus, each meeting consisted of "neighbors."

- Prior to the meetings, invitations under Gunnison County's letterhead were sent to the landowners. Each was invited to one of six meetings. Information folders were given to all attendees. Following the meetings, folders were sent to all landowners who did not attend the meetings, and to some relatives of those who did attend, at their request.
- A total of 91 landowners were invited to attend the meetings. A total of 16 landowners (18%) attended the meetings, along with some friends and/or relatives. The meetings were held for the following purposes:
  - Present background, goals, and objectives of the Curecanti RPS; and related Gunnison County resource conservation and long-range planning efforts.
  - Show areas of opportunity for resource conservation (COA) surrounding the NRA.
  - Identify potential landowner incentives for resource conservation.
  - Identify landowners' related long-term goals and objectives.
  - Explore landowner willingness to work in partnership with NPS and other entities to conserve the natural, cultural, recreational, and scenic resources in the Curecanti area.
- FINDINGS: In general, the landowners were interested in the COA concept. Most were at the meetings primarily to learn more about the RPS, but were reluctant to make any commitments regarding partnering with NPS or other entities. They tended to display a "wait-and-see attitude". Some expressed concern about condemnation of private property, and were relieved to learn that it would not be a recommendation of the study. Some landowners supported the goals and objectives of the study, and were very much interested in working in partnership with NPS to explore tools of resource conservation that would benefit both the NRA and the landowner. They were anxious for NPS to take action as quickly as possible. There appeared to be no opposition to the ideas presented by the study team, or to the direction the study was taking.

- October and November, 2003, and February, 2004: At the request of a landowner, four additional meetings were held with various members of an extended family that jointly own property adjacent to the NRA. The landowners were unable to attend the earlier neighborhood meetings held in May and June of 2003.
- November 25, 2003: Meeting in Crawford and field trip to grazing site with USFS, several members of the Black Mesa Grazing Pool, and a representative from U.S. Representative Scott McInnis' office to explain the goals and objectives

of the RPS, and to receive input regarding potential affects on the recommendation pertaining to a long-established grazing permit issued by the USFS. As a result of the meeting, an agreement was reached to redraw the proposed boundary line in the vicinity of Long Gulch/Bear Trap area along CO 92 to reduce the potential impact to grazing permittees.

- December 3, 2003: Meeting in Denver with representatives of the Black Canyon Ranch Properties Limited Liability Corporation (LLC), which owns property north of the NRA near East Portal, to discuss goals and objectives of the RPS in relation to goals and objectives the LLC has with its property.
- Week of December 15th, 2003: Meetings in the Curecanti area with private property owners, and federal and state officials, including on-site visits to the park, to explore partnership opportunities with the private sector to conserve resources surrounding the NRA and adjacent to Black Canyon of the Gunnison National Park.
- November 18, 2005: Meeting with landowners on CO 92 to provide status update of RPS process, and to discuss concepts of potential land exchanges.
- June 7, 2007: Meeting with David Nimkin, Southwest Regional Director, National Parks and Conservation Association, in Montrose, to brief him on the Resource Protection Study background and recommendations.
- July 21 through July 25, 2007: Five Open Houses at Lake Fork Marina, Blue Mesa Reservoir; Elk Creek Marina, Blue Mesa Reservoir; Holiday Inn Express in Montrose; Memorial Hall in Hotchkiss; and Fred R. Field Western Heritage Center in Gunnison – to share background information on the Resource Protection Study with the public; to discuss the alternatives in the Draft RPS/EIS, including the proposed action; and to solicit comments on the document.
- August 21, 2007: Meeting with City Council, City of Gunnison, to brief the council members on the Resource Protection Study background and recommendations.
- August 27, 2007: Meeting in Gunnison with the Upper Gunnison River Water Conservancy District, to brief the board members on the Resource Protection Study background and recommendations.
- October 6, 2007: Presentation of the Resource Protection Study concepts at a workshop at the Land Trust Alliance's annual conference in Denver.

## MEETINGS WITH AMERICAN INDIAN TRIBES

In a study performed by Dave Ruppert of the NPS Intermountain Support Office, Denver, published in August, 2002, entitled: "American Indian Affiliation: Curecanti National Recreation Area," it was determined that the American Indian tribes historically associated with the Curecanti area are the Northern Ute Tribe in Ft. Duchesne, Utah; the Southern Ute Tribe in Ignacio, Colorado; and the Ute Mountain Ute Tribe in Towaoc, Colorado.

Contact was initiated between NPS and the three Ute tribes regarding the RPS on March 6, 2001 by a letter from the NRA superintendent to the three Ute tribes, inviting them to a meeting in Montrose, Colorado to discuss the RPS and other issues of mutual interest relating to Curecanti NRA and Black Canyon of the Gunnison National Park. (The superintendent manages both parks.) A number of telephone calls and letters of correspondence ensued, resulting in one meeting, between a representative of the Northern Ute Tribe and NPS in Montrose on December 11, 2001. This was followed by a presentation by the study team to a joint

meeting of the three Ute tribes in Grand Junction, Colorado on June 14, 2002. NPS continued to keep the tribes informed of the progress of the RPS by such means as project newsletters, and through invitations to attend additional project meetings.

- December 11, 2001: Meeting with the Northern Ute Tribe at the Ute Indian Museum in Montrose to describe the RPS project; identify information needs of both parties; and discuss opportunities for on-going consultation regarding the RPS, and other NPS-related issues.
- June 14, 2002: Meeting with the Tri-Ute Council at its quarterly meeting in Grand Junction to explain the goals and objectives and current status of the RPS; seek comments and concerns from the Council; and obtain recommendations on how to proceed with consultation. Members of the Council in attendance included representatives from all three Ute tribes.

## Compliance with Federal and State Laws, Regulations, Executive Orders, and National Park Service Policies

### SECTION 106 CONSULTATION

Section 106 of the National Historic Preservation Act of 1966 (16USC, et seq.) requires that for any action that affects cultural resources either listed in or eligible for listing in the National Register of Historic Places, the associated American Indian tribes, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation be given opportunities to comment. These entities have all had opportunities to participate in the study process since initial scoping.

### CONSULTATION FOR SPECIES OF CONCERN

The Endangered Species Act of 1973 (16USC 1531, et seq.) must ensure that any action taken by a federal agency does not jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modifications of critical habitat. Section 7 requires that federal agencies consult with the U.S. Fish and Wildlife Service (USFWS) to make that determination. Information regarding threatened, endangered, proposed, and candidate species occurring in the area was obtained from USFWS, and is included in the Affected Environment chapter.

## Newsletters

Three newsletters were prepared over the course of the project. All three newsletters may be seen on the NRA's website at www.nps.gov/cure, by clicking on "Management," then on "more information" under "Curecanti Resource Protection Study."

The first newsletter was published in the spring of 2001. It provided a general description of the NRA and area resources, and described the study purpose and process. It provided a summary of study issues and concerns, outlined the data collection and analysis process, and highlighted the results of a citizen's photographic assessment. The newsletter also solicited ideas from the public about resource protection and the potential for recreational use within and surrounding the NRA.

The second newsletter was released in the winter of 2002 to announce a series of public open houses. It again solicited comments on the unmet potential of land-based and reservoir tributary-based recreation and resource education in areas both within and surrounding the NRA.

The third newsletter was released in the fall of 2003 to present two major approaches to resource conservation — a Conservation

Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 62 of 71



Opportunity Area (COA), and a Joint Agency Management Effort (JAME); management considerations; preliminary boundary alternatives; and tools for encouraging conservation measures. The newsletter also solicited comments on the preliminary recommendations contained therein.

## Multi-Agency Review Version of the Draft RPS/EIS

On April 28, 2005, a review version of the entire Draft RPS/EIS was distributed to partnering agencies for review and comment, at the same time the document was placed on official internal NPS regional and Washington office policy review.

## Reclamation Review Version of the Draft RPS/EIS

Reclamation provided extensive comments on the Multi-Agency Review Version of the Draft RPS/EIS, and wanted to review a follow-up version that addressed their comments . Therefore, a revised version of the Draft RPS/EIS was sent to Reclamation on June 21, 2006, for their review and comment. Through close coordination with NPS, Reclamation's comments were addressed, and are reflected in both the Draft RPS/EIS that was released for public review, and in this Final RPS/EIS.

## Public Review of the Draft RPS/EIS

A Notice of Availability (NOA) was published in the Federal Register, and news releases in local newspapers, to coincide with the release of the Draft RPS/EIS for public review and comment. The public review period exceeded 90 days, from July 17 to October 22, 2007. Over 700 copies of the Summary Draft RPS/EIS were mailed to persons, organizations, and government entities on the project's mailing list. Full documents were made available to agencies and government entities, and were available to the public on the Internet at http://parkplanning.nps.gov, and at local libraries.

In all, NPS received 35 sets of written comments in the form of letters, faxes, and Internet entries. Of these, 63% supported Alternative 2 (Proposed Action); 26% were neutral, not specifying which alternative was favored; and 11% supported Alternative 1 (No Action). The study team evaluated each comment, and where appropriate made modifications to the document, which are reflected in the Final RPS/EIS. Refer to the section "Comments on Draft Resource Protection Study / Environmental Impact Statement, and National Park Service Responses" found elsewhere in this chapter for specifics about the comments and NPS responses.

All comments received, as well as meeting records related to this project, are being retained as a part of the project's administrative record. In addition, copies of letters and other communications from agencies, local governments, and organizations, are included in this chapter.

## Release of the Final RPS/EIS, Record of Decision, and Report to Congress

Upon publication of the Environmental Protection Agency's Notice of Availability (EPA NOA) in the Federal Register, and news releases in local newspapers, the Final RPS/EIS will be distributed in the same fashion as was the Draft RPS/EIS. It will also be available to the public on the Internet at http://parkplanning.nps.gov/cure, and at local libraries.

No sooner than 30 days following distribution of the Final RPS/EIS, as determined by the date that the EPA NOA appears in the Federal Register, the National Park Service will release a Record of Decision that documents its selected alternative. NPS will follow this up with a Report to Congress, written in conjunction with Reclamation, which will be transmitted to Congress through the Department of the Interior. Implementation of the Proposed Action will then depend on congressional action.

# List of Recipients for the Draft RPS/EIS

All of the recipients were sent the Summary of the Draft Resource Protection Study/ Environmental Impact Statement. In addition, printed copies of the full document, and/or electronic versions on CD, were sent to some recipients such as government agencies and officials. In addition, the full document could be seen on the Internet at http://parkplanning.nps.gov/cure, and at local libraries. Distribution and availability of the Final RPS/ EIS is similar to that of the Draft RPS/EIS.

## Federal Agencies and Elected Officials

- Advisory Council on Historic Preservation
- Bureau of Land Management
- Bureau of Reclamation
- National Park Service, Legislative Affairs
- National Park Service, Washington Office
- Uncompahgre Plateau Project (a multi-agency/private partnership)
- U.S. Army Corps of Engineers
- Natural Resources Conservation Service
- U.S. Fish and Wildlife Service
- U.S. Forest Service
- U.S. Geological Survey
- U.S. Representative John Salazar
- U.S. Senator Wayne Allard
- U.S. Senator Ken Salazar
- Western Area Power Administration

## Affiliated American Indian Groups

- Southern Ute Tribe
- Uintah and Ouray Ute Indian Tribe (Northern Ute Tribe)
- Ute Mountain Ute Tribe

## State of Colorado Agencies and Elected Officials

- Colorado Department of Natural Resources
- Colorado Department of Transportation
- Colorado Division of Wildlife
- Colorado State Forest Service
- Colorado State Historic Preservation Office
- Colorado State Parks
- Office of the Governor, Policy and Initiatives
- State Representative Kathleen Curry
- State Representative Raymond Rose
- Former State Senator Lewis Entz
- State Senator Jim Isgar

## Local Governments

- City of Delta
- City of Gunnison
- City of Montrose
- Delta County Board of County Commissioners
- Gunnison County Board of County Commissioners
- Gunnison County Planning Department
- Montrose County Board of County Commissioners
- Montrose County Land Use Department
- Town of Crawford
- Town of Hotchkiss
- Town of Paonia

## Private Entities and Organizations

- Alliance of Backcountry Parachutists
- Black Canyon Anglers
- Black Canyon Audubon Society
- Black Canyon Land Trust
- Black Canyon Ranch Properties, L.L.C.
- Chipeta Chapter, Colorado Archeological Society
- Club 20
- Colorado Cattlemen's Agricultural Land Trust
- Colorado Environmental Coalition
- Colorado Livestock Association
- Colorado Mountain Club
- Colorado Native Plant Society
- Colorado Natural Heritage Program
- Colorado Open Lands
- Colorado River Energy Distributors Association
- Colorado River Water Conservation District

- Colorado Trail Riders
- Crawford Chamber of Commerce
- Crested Butte Chamber of Commerce
- Delta Chamber of Commerce
- Delta County Tourism Cabinet
- Delta/Montrose Electric Association
- Delta/Montrose Public Lands Partnership
- Grand Valley Anglers
- Gunnison Angling Society
- Gunnison Arts Center
- Gunnison County Association of Realtors
- Gunnison County Chamber of Commerce
- Gunnison County Electric Association
- Gunnison County Stockgrowers Association
- Gunnison County Trails Commission
- Gunnison/Crested Butte Tourism Association
- Gunnison Gorge Anglers
- Gunnison Ranchland Conservation Legacy
- High Country Citizens' Alliance
- Hotchkiss Chamber of Commerce
- Montrose Association of Realtors
- Montrose Chamber of Commerce
- Montrose County Cattleman's Association
- Montrose Historical Society
- Montrose Rod and Gun Club
- Montrose Visitor and Convention Bureau
- National Park Foundation
- National Parks and Conservation Association
- Paonia Chamber of Commerce
- Recreation Resource Management
- Region 10
- Rocky Mountain Elk Foundation
- Rocky Mountain Real Estate
- San Juan Mountain Runners
- Sheep Mountain Alliance
- Sierra Club, Rocky Mountain Chapter
- Sonoran Institute
- Southern Rockies Force Network
- The Access Fund
- The Conservation Fund
- The Nature Conservancy
- The Wilderness Society
- Trout Unlimited
- Trust for Public Lands
- Uncompahgre Valley Association
- Uncompahgre Valley Trail Riders
- Uncompahgre Valley Water Users Association
- Upper Gunnison River Water Conservancy District
- US Hang Gliding Association
- West Elk Loop Scenic and Historic Byway
- Western Colorado Congress
- Western Colorado Interpretive Association
- Western Horizon Resorts
- Western State College
- Wilderness Opportunities

### Other

- Other contacts on the park's mailing list, mostly individuals (approximately 500)
- Various local repositories

## COMMENTS ON DRAFT RPS/EIS, AND NPS RESPONSES

This section includes comments received during the public review period from July 20 to October 22, 2007, on the Curecanti National Recreation Area *Draft Resource Protection Study / Environmental Impact Statement* (RPS/EIS), dated June 2007. Distribution of the document was as follows:

- 1,250 copies of the 8-page summary document, to government agencies and offices, elected officials, organizations, libraries, adjacent landowners, and individuals on the National Park Service (NPS) mailing list;
- 370 copies of an electronic version (pdf file format on CD) of the full Draft RPS/EIS and related documents to government agencies and offices, elected officials, organizations, and libraries; and
- 64 copies of the printed version of the full Draft RPS/EIS to government agencies and offices, and libraries; and printed versions to others upon request.

Both the full paper and CD versions were made available at the following locations:

- Bureau of Land Management / U.S. Forest Service offices in Gunnison, Colorado
- Crawford Library
- Crested Butte Library
- Delta Library
- Elk Creek Visitor Center, Curecanti National Recreation Area
- Grand Mesa Library
- Gunnison Library
- Gunnison Visitor Center, Black Canyon of the Gunnison National Park
- Hotchkiss Library
- Montrose Library
- Montrose Public Lands Office
- Paonia Library.

In addition to the distributed copies, the entire document was posted on the National Park Service planning website at http://parkplanning.nps.gov/cure.

To be considered, comments on the Draft RPS/EIS had to be in writing. A total of 35 letters, faxes, and Internet entries were received. Of these, 63% supported Alternative 2 (Proposed Action); 26% were neutral, not specifying which alternative was favored; and 11% supported Alternative 1 (No Action). All comments received, as well as meeting records related to this project, are being retained as a part of the project's administrative record.

In accordance with Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act (NEPA), all letters from federal, state, or local agencies, and American Indian tribes, as well as all substantive public comments, must be included in the final environmental impact statement; and NPS Responses to substantive comments must be provided. All letters from agencies and organizations are included at the end of this section. No letters were received from American Indian tribes.

All substantive comments and NPS responses to them are provided in Table 16: Comments on Curecanti Draft RPS/EIS, and NPS Responses. Some non-substantive comments are also included in the table. Many of the comments in the table have been summarized for brevity.

Comments are substantive if they:

- question, with reasonable basis, the accuracy of information in the environmental impact statement;
- question, with reasonable basis, the adequacy of the environmental analysis;
- suggest different viable alternatives; or
- cause changes or revisions in any of the alternatives, including the Proposed Action.

In other words, comments are substantive if they raise, debate, or question a point of

fact or the method of impact analysis, or if they suggest a new alternative or changes in the stated alternatives. Comments in favor of or opposed to the Proposed Action or other alternatives, or comments that simply agree or disagree with NPS policy, are not necessarily considered substantive.

In Table 16, if NPS responses indicate that a change in the text from the Draft RPS/EIS is being made, **such text changes are shown in bold font**. Page numbers refer to those found in the Draft RPS/EIS.

Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 67 of 71



TABLE 16: COMMENTS ON CURECANTI DRAFT RPS/EIS, AND NPS RESPONSES

| Comment | NPS Response |
|---|---|
| **FEDERAL AGENCIES** | |
| **Bureau of Land Management [Department of the Interior]** | |
| BLM has been involved in the planning and development of the Resource Protection Study. BLM is satisfied that all of their comments to date have been addressed. Therefore, BLM fully supports Alternative 2, the Proposed Action, and looks forward to opportunities for review and input into future documents related to the project, including the FEIS, Report to Congress, and language related to potential new NRA legislation. | NPS thanks BLM for their comments and their participation in the study. We look forward to involving them in future documents, and in continuing to work with them to conserve the resources in the Curecanti area. |
| **Bureau of Reclamation [Department of the Interior]** | |
| The commenter restated that under both alternatives Reclamation would continue its administrative jurisdiction and responsibilities within and adjacent to the National Recreation Area, including construction, operation, maintenance, replacements and additions, consistent with Reclamation law, including unrestricted access for them and their assigns to their lands, land interests, and facilities. Any legislation for the NRA would allow that situation to continue, without any additional limitations on Reclamation's operational capabilities. | NPS concurs, as already stated at various locations throughout the document, including this statement found on page 49: "Reclamation would have the ability at all times to construct, operate, maintain, and replace its facilities, including additions thereto. This ability includes access to all its lands, land interests, water and water interests, and facilities."<br>In addition, NPS has amended the text within the boxes on page v and 36, by adding the phrase **"and they and their assigns would continue to have unrestricted access to their lands and land interests, water and water interests, and facilities."** Similar wording has been added to the Abstract; to pages v, vi, x, 15, 43, 49, 61, 62, 69, 80, 124, 197, and 203; and to the maps for Alternative 1 and Alternative 2. |
| Some of the riparian area around Neversink was purchased with CRSPA Section 8 money for wildlife. This should be specified because it is in the NRA and should be protected for wildlife. The riparian area upstream from Blue (Mesa) Reservoir should be protected for wildlife and not have recreation developments such as trails, outhouses, etc. | The RPS/EIS suggests future potential for recreational opportunities; however, NPS agrees that wildlife protection must be considered along with any proposals for fishing access, or general public access. This would happen when a proposed development is evaluated using the NEPA process. We intend to work closely with CDOW and other interested parties in this regards.<br>NPS has amended the last sentence in the last paragraph on page 14 as follows:<br>"**Some lands were acquired by Reclamation, using Section 8 money to meet the purpose of wildlife mitigation for the Aspinall Unit. Some of these lands, such as the area near Neversink, are still within the NRA, while others were transferred to CDOW to be managed as a part of the State Wildlife System.**" |
| Page xi, Primary Differences Table, Recreational Opportunities row, Alternative 1 column, line 3: | NPS concurs, and has made the recommended change. |



BLM_0059770

| Comment | NPS Response |
|---|---|
| *Bureau of Reclamation [Department of the Interior] continued*<br>Change "Curecanti Project" to "**Curecanti Unit, CRSP and Uncompahgre Project**"<br>Rationale: The East Portal area of the CNRA was acquired (withdrawn) for the Uncompahgre Project and not for the Curecanti (now Aspinall) Unit of the Colorado River Storage Project. | |
| The commenter stated that some maps (including the Existing Conditions Map, the Alternative 1 map, and the Alternative 2 map) appear to be missing some roads within the NRA (they may be overlain by other map layers). The missing roads include the Soap Creek Road and the three dam access roads, among others. | NPS agrees that these roads should appear on the three named maps, and we have added them to the Existing Conditions and Alternative 1 maps. They already appear on the Alternative 2 map, and will remain. However, these roads have been intentionally omitted from the Computer Generated Viewshed map and the Important Resources map, and will not be added, because they are not needed for the primary messages intended to be conveyed by those maps, and they would detract from the readability of the maps. |
| The commenter requests that the words "and recreation" be removed from the sentence that begins on line 16 of left column on page 10.<br>Rationale: As currently worded, recreation is implied as a project purpose. In this context, it is incorrect to state that the dam was constructed for recreation. | NPS concurs, and has deleted the words "**and recreation**" as requested. However, in order to retain the message that the reservoirs have provided recreational opportunities, and that this relates to provisions in the Colorado River Storage Project Act, the last sentence in that paragraph has been changed to read as follows:<br>**"Thus, three reservoirs were created, which have provided for public recreation in keeping with Section 8 of the Colorado River Storage Project Act."** |
| The commenter recommends the sentence on Page 13, left column, paragraph 1, line 3, beginning with the word "Annually," be replaced with: "**Since 1970, about 343,000 acre-feet of project water has been diverted annually from the Gunnison River at East Portal.**"<br>Rationale: The stated annual diversions of over 400,000 acre-feet from the Gunnison River at East Portal seem too high. Reclamation's records indicate that, since 1970, the average annual diversion at East Portal is about 343,000 acre-feet. | NPS concurs, and has made the recommended change. |
| The commenter recommends that on Page 14, the sentence **"This peak generation ability flattens energy purchases and saves Western and CRSP customers millions of dollars annually"** be deleted.<br>Rationale: It seems inappropriate to characterize Aspinall peaking operations as a savings to | NPS concurs. The referenced sentence has been deleted. |

| Comment | NPS Response |
| --- | --- |
| *Bureau of Reclamation [Department of the Interior] continued*<br>Western and CRSP customers -the Aspinall Unit was authorized to operate in this manner. | |
| On pages 17 and 18, land based recreational opportunities are discussed at various locations including "Vicinity between the Lake City Bridge and Riverway to provide future hiking and non-motorized biking trail linkage to the city of Gunnison." (pg 18, 5th bullet). In general, this may be a good idea but it would be important to keep any trail to the north of the river channels with a large buffer zone between the trail and the river to protect riparian areas and wildlife. This comment also applies to similar statements throughout the document, including, but not necessarily limited to those on pages 76, and 105. | The RPS/EIS suggests future potential for recreational opportunities, including a potential trail mentioned by the commenter. It is important to understand the no development would occur until the proposal is evaluated using the NEPA process. If and when that process occurs, locations will be considered in greater detail. NPS agrees that protection of riparian areas and wildlife will be a part of that evaluation; however, we do not want to specify or exclude any particular area(s) for consideration at this time. |
| The commenter requests that Table 1 on page 31, be amended, by adding the following bullet to the 3rd column of Recreation Opportunities row:<br>**"Reclamation law, as amended and supplemented. In particular, Section 8, Colorado River Storage Project Act; and PL 89-72 as amended by Title XXVIII of PL 102-575."**<br>Rationale: These are the two major Reclamation laws that address recreational opportunities within the NRA. | NPS concurs, and has inserted this new bullet. |
| The commenter requests that the Alternative 1 Map and Alternative 2 Map be modified as follows: Change the statement regarding Reclamation management of dams, reservoirs, power plants, access roads and other related facilities, but not lands or land interests, to be consistent with statements on pages 49 and 63, where Reclamation manages Reclamation real property for operation/maintenance/etc. of Reclamation projects.<br>Rationale: The wording regarding Reclamation management on the two maps is inconsistent with the Reclamation management statements on pages 49 and 63. | After further consultation with Reclamation, and to be consistent with related changes to the text that are identified in the first row of Reclamation comments in this table, the following language has been added to the legend of the maps for Alternative 1 and Alternative 2: **"Reclamation would manage its project lands and land interests, water and water interests, and facilities, pursuant to Reclamation law, the 1965 MOA, and other applicable laws and regulations."** |
| The commenter made reference to potential transfer of lands between CDOW and NPS. Such lands, if acquired as Aspinall (Curecanti) Unit wildlife mitigation lands with CRSPA Section 8 monies, need to continue to be managed for wildlife mitigation purposes in order to maintain applicable mitigation credits. The comment applies to statements throughout the document, including, but not necessarily limited to those on pages 49, | NPS concurs that land acquired for the purpose of wildlife mitigation will need to be managed for wildlife benefits, regardless of the administering agency. On page 127 of the Affected Environment chapter, we state that "Some of these CDOW lands are Reclamation wildlife mitigation lands for the Aspinall Unit, which were transferred to CDOW. They need to continue to be managed for wildlife purposes." |

Case No. 1:20-cv-02484-MSK Document 45-14 filed 04/28/21 USDC Colorado pg 70 of 71



| Comment | NPS Response |
|---|---|
| *Bureau of Reclamation [Department of the Interior] continued*<br>54, 127, and 206. | In addition, we have added the following sentence at the end of the 1st paragraph in the 2nd column on page 49:<br>**"Such exchanges would be subject to a commitment to continue to manage the land thus acquired for wildlife, if the land was originally acquired for wildlife mitigation purposes."** |
| On Page 50, left column, last paragraph, line 1; and right column, Tracts 1, 4, 5, 6, 7 and 10, regarding the phrases ". . . Reclamation revokes . . ." and "Reclamation revocation": The commenter recommends that the current wording be revised, with the suggested wording as follows. This comment also applies to similar statements throughout the document, including, but not necessarily limited to, pages 70, 200, and 204.<br>Rationale: First, as used here, the words "revokes" and "revocation" only apply to withdrawals of lands, not the lands themselves. Second, Reclamation does not revoke its withdrawals; it may relinquish its withdrawals and recommend revocation. BLM is the agency that actually revokes the withdrawal.<br>Suggested wording:<br>Page 50, left column Last Paragraph, Line 1: Replace ". . . revokes the lands that would be transferred out of the NRA, to the BLM . . ." with "**. . . relinquishes its withdrawals on lands to be transferred out of the NRA to BLM and BLM has revoked those withdrawals, . . .**"<br>Page 50, right column, Tracts 1, 4, 5, 6, 7 and 10: replace ". . . Reclamation revocation . . ." with "**. . . revocation of Reclamation's withdrawal**."<br>Page 70, table, left column, row three: replace ". . . revocation by Reclamation. . . " with "**. . . revocation of Reclamation's withdrawal. . .**"<br>Page 200, right column, 2nd bullet, 2nd sub-bullet, line 2: ". . . Reclamation revocation. . ." with "**. . . revocation of Reclamation's withdrawal . . .**"<br>Page 204, left column, first bullet (Land Unit F) and second bullet (Land Unit H), both line 3: replace ". . . as to whether to revoke, or not . . . " with "**. . . as to whether or not to relinquish and recommend revocation of ...**" | NPS thanks Reclamation for clarification of this process, and has made the recommended changes. |
| Page 53, right column, "Private Land Use within the NRA" heading: Recommend this heading be | Rather than modify the heading, NPS instead has made the following changes to the text: |



BLM_0059773

| Comment | NPS Response |
|---|---|
| *Bureau of Reclamation [Department of the Interior] continued*<br>changed to, "Private Mineral Development within the NRA."<br>This comment also applies to similar headings in the document, including, but not necessarily limited to those found on pages 117, and 189 (2 uses), but not the similar heading in the table on page 78. Note: A separate recommendation is being made for the wording on page 78.<br>Rationale: With the exception of page 78, the subsequent discussions relate only to private mineral and mining rights, not the other private land use rights within the NRA. However, other than the 1st sentence in each of the alternative cells, the discussion in the table on page 78 could apply to all privately owned interests in the NRA. | On page 53, the first sentence under Private Land Use within the NRA has been amended to read:<br>**"As in Alternative 1, NPS would continue to communicate and cooperate with those who hold private interests (such as rights-of-way, water rights, access rights, and oil/gas/ mineral rights) within the NRA in order to provide appropriate measures to minimize impacts of development and operations that now exist, or might exist, in the future."**<br>Related changes have been made to the text on page 117, as described later in this table, in response to this and other Reclamation comments about the text on page 117.<br>On page 189, the first paragraph under Guiding Policies and Regulations has been amended as follows:<br>**"Current laws and policies encourage NPS to work cooperatively with owners of interests (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights) within the NRA in order to help achieve desired conditions related to private land use within the NRA boundary. Refer to the following box for details."**<br>NPS has amended the 1st sentence in the 3rd block of text in the box on page 189 as follows:<br>**"Good relations are maintained with owners of interests (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights) within the NRA."** |
| Page 59: right column, item 2: The proposed legislation should be jointly prepared by NPS and Reclamation similar to the Report to Congress.<br>Rationale: The proposed legislation will affect both NPS and Reclamation. Joint preparation of the proposed legislation should ensure that the interests of both agencies are incorporated and that there is consensus and cooperation between the agencies. | NPS concurs in concept. However, as it is not known who would write such legislation, we have replaced the last two sentences of item 2, page 59, with one, to read as follows:<br>"**Because legislation would affect both Reclamation and NPS, both agencies would be cooperatively involved in its drafting to ensure there is consensus and that the interests of both agencies are incorporated.**" |
| Page 59, right column, 3. c., fifth line -Change the words "full respect" to "consideration." This comment also applies to the same statement on page 283.<br>Rationale: The phrase "full respect" could be viewed as in conflict with giving priority to Reclamation purposes. | NPS has replaced the text in item 3. c. on page 59, and the third bullet statement on page 283, with the following:<br>**"In areas where management responsibility overlaps, the two agencies would work together, when necessary, to resolve conflicting uses with consideration for the legislative mandate for each agency, in a manner that is consistent with the primary** |