| Comment | NPS Response |
|---|---|
| | purposes of Reclamation's Aspinall and Uncompahgre projects." |
| *Bureau of Reclamation [Department of the Interior] continued*<br><br>Page 78, Table, last row- Private land use within NRA: Replace the first sentence in the cells under both Alternatives 1 and 2 with wording similar to that found on pages ix and 61 regarding the varied existing legal rights within the NRA.<br><br>Rationale: Mineral and mineral development rights are only a couple of the privately owned interests within the NRA. Other privately owned interests, to name a few, include rights-of-way, water rights, and access rights. | NPS has replaced the first two sentences in the last row under Alternative 1 in the table on page 78 with the following:<br><br>**"Currently, there are numerous and varied existing rights on lands within the NRA (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights). Under this alternative, NPS would continue to work cooperatively with owners of such rights through a permitting process to allow the owner to exercise those rights, subject to deed restrictions, with the goal of minimizing adverse impacts on NRA resources or visitor enjoyment."**<br><br>NPS has replaced the first two sentences in the last row under Alternative 2 in the table on page 78 with the following:<br><br>**"Currently, there are numerous and varied existing rights on lands within the NRA (such as rights-of-way, water rights, access rights, and oil/gas/mineral rights). As in Alternative 1, NPS would continue to work cooperatively with owners of such rights through a permitting process to allow the owner to exercise those rights, subject to deed restrictions, with the goal of minimizing adverse impacts on NRA resources or visitor enjoyment."** |
| Page 95, left column, State Listed Species, paragraph 2: Is there a reference for the statement, "The Colorado River cutthroat trout is known to occur in the Gunnison River below Crystal Reservoir, . . ."? If so, please provide the reference; otherwise delete the statement.<br><br>Rationale: Seems like a slim possibility and the statement should be deleted if there is not a good reference for this information. | CDOW has stocked this section of river a few years ago with some success. For clarification, NPS has replaced the referenced sentence on page 95 with the following:<br><br>**"The Colorado River cutthroat trout is known to occur in the Gunnison River below Crystal Reservoir (incidental occurrence through occasional stocking), Antelope Creek (a tributary to North Beaver Creek), Road Beaver Creek (a tributary to Cebolla Creek), as well as in the national park (Kowalski, pers. comm. 11/27/2007)."**<br><br>In addition, NPS has added the following bibliographical citation on page 293, under PERSONAL COMMUNICATION:<br><br>**"November 27, 2007 personal communication from Daniel Kowalski, Fisheries Biologist, Colorado Division of Wildlife (Montrose), reconfirming CDOW's Colorado River cutthroat** |

BLM_0059775

| Comment | NPS Response |
|---|---|
| | trout stocking program, including occasional stocking of the Gunnison River below Crystal Reservoir." |
| _Bureau of Reclamation [Department of the Interior] continued_<br><br>Page 99, right column, paragraph 2, last sentence: Please note that the Gunnison Tunnel is also on the National Register of Historic Places. | NPS has amended the last sentence of paragraph 2, right column, page 99, as follows:<br><br>**"The Gunnison Tunnel is on the National Register of Historic Places, and is a National Historic Civil Engineering Landmark."** |
| Page 117, Right column, Current Heading- Private Land Use Within the National Recreation Area, paragraph 1, first sentence: Recommend this sentence be deleted and replaced with the second sentence, less the word "However."<br><br>Rationale: The statement in the first sentence is not true. For example, Norman and Jean Austin (BMR Parcel 6) reserved and retained all water and water rights, and Frank and Susan Carpenter (BMR Parcel 8) reserved certain water rights appurtenant to the respective parcels which Reclamation acquired. Other vendors also reserved various rights other than mineral and mineral development rights.<br><br>——————<br><br>Page 117, Current Heading- Private Land Use Within the National Recreation Area, paragraph 1: Add the following sentence(s) regarding "subordination" of mineral rights at the end of the paragraph:<br><br>"Where Reclamation acquired land but not the appurtenant mineral, or oil or gas rights, it subordinated those reserved rights to require their development in a manner that would not interfere with project purposes. The subordination for reserved mineral rights, including oil and gas, is contained in the Land Purchase Contract and/or deed for each parcel acquired."<br><br>Rationale: It is Reclamation policy to subordinate the development of reserved mineral rights to the United States' rights and regulate such development in a manner that doesn't interfere with project purposes. A partial review of its acquisition files indicate that Reclamation subordinated development of reserved mineral rights to Curecanti Unit and CRSP purposes. | On page 117, NPS replaced the first paragraph under PRIVATE LAND USE WITHIN THE NATIONAL RECREATION AREA with the following two paragraphs:<br><br>**"All surface lands and waters within the NRA are currently owned by the federal government. However, in a number of locations throughout the NRA, there exist retained private rights (such as rights-of-way, water rights, access rights, and oil/ gas/mineral rights). Where Reclamation acquired land but not the appurtenant mineral, or oil or gas rights, it subordinated those reserved rights to require their development in a manner that would not interfere with project purposes. The subordination for reserved mineral rights, including oil and gas, is contained in the land purchase contract and/or deed for each parcel acquired.**<br><br>**The term "split estate" describes the situation where one party owns the surface rights and another party owns the subsurface rights (oil, gas, or minerals). Privately owned, or reserved, subsurface interests within the NRA are shown in Table 10."** |
| Pages 118-119; Table 10; Interests Reserved column: Except where otherwise indicated in the comments below, add to all rows the phrase:<br><br>"**Subordinated to CRSP**".<br><br>Rationale: Reclamation subordinated those mineral | NPS concurs, and has made the recommended change. |

BLM_0059776

CHAPTER 5: CONSULTATION AND COORDINATION

| Comment | NPS Response |
|---|---|
| _Bureau of Reclamation [Department of the Interior] continued_<br><br>rights not acquired to its project purposes; such subordination should be noted. | |
| Page 118, Table 10, the three rows for 49N, 2W, 26 (Eagle Rock Resort, Herman, and Nelson): **Remove these rows from the table.**<br><br>Rationale: These previous owners never had any mineral rights on these lands. The United States reserved all minerals in the patent for these lands. | NPS concurs, and has made the recommended change. |
| Page 118, Table 10, the row for 49N, 3W, 25, 26 (Holman, J.), Interests Reserved column: Add the following statement: "**BMR Parcel 12A (10 acres in Sec. 25) had reserved oil/gas rights subordinated to CRSP**"<br><br>Rationale: See following rationale for all three Holman rows in Table 10. | NPS concurs, and has made the recommended change. |
| Page 118-119; Table 10; the second and third Holman, J. rows; Interests Reserved column: For these rows, add the phrase, "**Additional research necessary**".<br><br>Rationale: With the exception of BMR Parcel 12A (10 acres in Sec. 25, T49N, R3W) which did have reserved oil/gas subordinated to CRSP purposes, all of the Holman parcels (155+ acres) were acquired through condemnation. Additional research of the court's action in that case is necessary to determine whether or not any mineral rights were reserved to Holman and whether or not any such rights were subordinated to CRSP. During this review, the one legal description related to the Holman condemnation case, which Reclamation found did not include any reservation of mineral rights to Holman. However, that description may not have been part of the final decision. | NPS concurs, and has made the recommended change. |
| Page 119 (text), left column, paragraph 1, line 2, sentence beginning with "Mrs. Dickerson": Revise the sentence and add a second sentence to read as follows:<br><br>"**Mrs. Dickerson reserved "the perpetual right to mine and remove decomposed granite and the materials intermixed therewith" from a portion of the conveyance, creating a 33.16 acre split mineral estate, together with the right of ingress and egress over the mineral estate. However, this mineral right is subordinated to the United States' rights, in that, ". . . any rights reserved hereunder shall** | NPS concurs, and has made the recommended change. |

BLM_0059777

| Comment | NPS Response |
|---|---|
| _Bureau of Reclamation [Department of the Interior] continued_<br><br>**be exercised in such manner as will not interfere with the construction, operation, and maintenance of any works of the proposed Curecanti Unit of the Colorado River Storage Project Act as determined by the Secretary of the Interior or his duly authorized representative."**<br><br>Rationale: The reserved mineral right was not correctly described and the appurtenant subordination of this mineral right to the Curecanti Unit, CRSP, was not included in the description. | |
| Page 123, right column, first paragraph (re. Fruitland Mesa): Add the following sentence at the end of paragraph: **"Reclamation has recommended to BLM that it revoke the withdrawals for the Fruitland Mesa Project."** | NPS concurs, and has made the recommended change. |
| Page 187, right column, Heading- Fee Simple Acquisition, Paragraph 1, line 4: Regarding loss of revenue and PILT offsets of lost revenue, suggest the use of either "could" or "may" in place of "would."<br><br>Rationale: In a following paragraph, EIS states that the PILT offset is not guaranteed or may not occur, therefore the prior use of "would" is not proper. | NPS concurs, and has used the word "may" as suggested; therefore, the sentence will read:<br><br>**"This loss of revenue may be partially mitigated by an increased "Payments in Lieu of Taxes (PILT)" from the federal government to the counties involved."** |
| Page 189, Desired Condition Box, left column, first paragraph, line 3: The wording ". . . requirements specified in warranty or other legal deeds, such as the requirement that such activity not interfere with the construction, operation, and maintenance of Reclamation works." be replaced with "**. . . the subordination of the development of such rights to Reclamation's project as specified in the land purchase contracts and deeds.**"<br><br>Rationale: Reclamation may have acquired lands whereon the vendor retained certain mineral rights with the associated development rights subordinated to the Reclamation project in order to protect project purposes, works, and water quality. In general, that means the development of those reserved rights is subject to conditions to protect Reclamation project purposes and works and/or project water quality as may be required by the Secretary of the Interior or his authorized representative. The specific reservations and subordinations are cited in the Land Purchase Contract and/or the deed for each parcel acquired. | NPS concurs, and has made the recommended change. |

BLM_0059778

| Comment | NPS Response |
|---|---|
| _Bureau of Reclamation [Department of the Interior] continued_<br><br>Glossary: Add the following terms/definitions to the Glossary.<br><br>**"Reclamation Works: The structures, facilities, and appurtenances necessary to meet Reclamation project purposes, together with the lands and land interests necessary for such works. Generally, Reclamation project works may include, but are not necessarily limited to, dams, reservoirs, canals, laterals, ditches, roads, transmission lines, substations, buildings, power plants, offices, warehouses, residences, telephone lines, parking areas, gates, fences, siphons, etc., and the necessary land and land interests, such as leases, rights-of-way, and easements, etc."**<br><br>**"Relinquishment: A notification to BLM by a Federal holding agency (such as Reclamation) that:**<br><br>**- The public lands withdrawn or reserved for its use are no longer needed, or**<br><br>**- The withholding or segregation of land from settlement, sale, location, or entry is no longer required. (Reclamation, 1998)"**<br><br>**"Revocation: The actual cancellation of a withdrawal by BLM, but does not necessarily open the land to settlement, sale, location, or entry under some or all of the general land laws. (Reclamation, 1998)"**<br><br>**"Subordinate (verb): To place a senior real property interest in a position of lower priority to that of an otherwise junior real property interest in the same real estate. (adapted from a portion of the definition of "Subordination agreement" in Black's Law Dictionary, Sixth Edition, 1990)"**<br><br>**"Subordination: The act or process by which a person's rights or claims are ranked below those of others. (Black's Law Dictionary, Sixth Edition, 1990)"** | NPS concurs, and has made the recommended changes. |
| **National Park Service – Acadia National Park** ||
| The commenter was the Superintendent of Curecanti NRA when Public Law 106-76, which requested this study, was enacted in 1999. He was one of the original members of the study team, and supported the concept of conducting a study that would develop recommendations that Congress | The study team thanks commenter for his visionary contributions to the study at the beginning of the project, and for his support of the Proposed Action. |

BLM_0059779

| Comment | NPS Response |
|---|---|
| *National Park Service – Acadia National Park continued*<br><br>could then consider prior to legislative establishment of the NRA. He is supportive of the recommendations found in the Proposed Action, and believes they do an excellent job of satisfying the intent of the request by Congress. | |

| **U.S. Environmental Protection Agency** | |
|---|---|
| The commenter suggested that NPS provide additional clarification and analysis pertaining to the potential environmental impacts associated with increased recreational access and use of lands that might occur under Alternative 2. This is especially significant for those land units (CO 92, Gunnison River, Iola Basin, and Sapinero/Blue Mesa) that have been identified as COAs based on their recreational value. EPA suggests that the DEIS should acknowledge that additional recreational uses could present localized impacts to resources. The designation of biking or horse trails in areas within the proposed NRA/COA boundary that are currently not accessible, for example, would pose a potential for increased erosion, water quality degradation and wildlife impacts. Other recreational activities would pose their own unique set of potential impacts to natural resources. In addition, amenities such as parking lots, campsites and restroom facilities represent additional potential indirect impacts.<br><br>Therefore, EPA recommends that Chapter 4's treatment of Environmental Consequences for Natural Resources include references to potential impacts associated with increased recreational access and uses associated with the Preferred Alternative. Similarly, Table 5 in Chapter 2, "Summary of Environmental Consequences" should include language on potential adverse impacts associated with increased use of specific COA units. While these DEIS sections may characterize recreation-related impacts as minor or moderately adverse, and may also cite management plans and measures that can and/or will be employed to mitigate impacts, EPA believes that the document should clearly disclose that increased recreational use that occurs as a result of this proposal may present impacts to water quality, vegetation, wildlife communities, special status species and other resources. | NPS acknowledges that increased recreational use that occurs as a result of implementation of Alternative 2 (Proposed Action) may present more impacts to water quality, vegetation, wildlife communities, special status species and other natural resources, than would result under Alternative 1 (No Action), especially in those COA land units that have good potential for recreational opportunities. However, the above is conditioned with an understanding that no public recreational activities would occur under the auspices of the NRA on any lands within the COA until NPS acquired the appropriate interest to allow it; and this would only happen with the approval of the landowner.<br><br>In response to EPA's concern, NPS has added the following text as a preface to the impact topic of Natural Resources in Table 5: Summary of Environmental Consequences, starting on page 72 of the Alternatives chapter, and as a preface to the Natural Resources section starting on page 140 of the Environmental Consequences chapter:<br><br>"**In general, increased recreational use that occurs as a result of implementation of Alternative 2: Proposed Action may present more impacts to water quality, vegetation, wildlife communities, special status species and other natural resources, than would result under Alternative 1: No Action. This is especially true on some lands within the Conservation Opportunity Area (COA) should they ever be acquired in fee simple, or an interest thereof acquired, that would allow for public use.**<br><br>**Potential recreational development, and related uses such as described in the list of existing and potential recreational opportunities under Visitor Activities in the VISITOR USE, UNDERSTANDING, AND ENJOYMENT section of the Affected Environment chapter, could present localized impacts to wildlife, vegetation, soils, water** |

BLM_0059780

| Comment | NPS Response |
|---|---|
| | quality, and other resources. However, before any such recreational development occurs, or uses allowed, NPS would evaluate the proposal(s) using the NEPA process. The evaluation could occur for a single development or activity, or as a comprehensive study (e.g., a general management plan or implementation plan). At that time, impacts on the environment would be fully assessed, and mitigation measures identified. |
| | All recreational developments and/or activities within the future NRA boundary would be in accordance with the NPS mission of preserving unimpaired the natural and cultural resources and values of the NRA for the enjoyment, education, and inspiration of this and future generations. For any recreational uses and/or associated amenities authorized on COA lands, NPS would work with landowners to minimize impacts so that the goals of resource conservation are met." |
| _U.S. Environmental Protection Agency continued_<br><br>The commenter notes that ten tracts, encompassing 1,243 acres, have been identified for potential deletion from the NRA under the Preferred Alternative. While the intent is that some of these tracts will be used to secure the conservation of other high-value resources on properties within the proposed COA, there is not enough detailed information on the basis for the deletion of these properties in the DEIS (Chapter 2, page 50). The Final EIS should include some information on the criteria and rationale used to determine the tracts subject to potential deletion. | In order to clarify the rationale for recommending exclusion of some lands (identified on page 50), NPS has made the following changes to the document:<br><br>The first paragraph under "Lands to Be Deleted from the Existing NRA" in the first column of page 50 has been replaced with the following three paragraphs:<br><br>"**During the process of assessing the resource value and character of the land within and surrounding Curecanti NRA, certain tracts of land were identified for potential exclusion from the NRA boundary. These lands, which total 1,243 acres, are shown as ten different "Tracts" on the Alternative 2 map. As this study defines proposed lands, for clarity of discussion, especially in the Affected Environment and Environmental Consequences chapters, these deletions are not included in the term "proposed lands."**<br><br>**NPS identified two primary reasons for the exclusion of the tracts. The first is that the proposed deletions would provide net overall management efficiencies by transferring various tracts to two adjacent federal land management agencies. Tracts 1 and 10 would be transferred to the Bureau of Land Management. Tracts 2, 3, 8, and 9 would be transferred to the U.S. Forest Service.** |

BLM_0059781

| Comment | NPS Response |
|---|---|
| | The second is that the proposed deletions would provide a more logical NRA boundary in certain locations along the north side of Colorado Highway 92 (Tracts 4, 5, 6, and 7), and along the west side of Soap Creek Road (Tracts 8 and 9). In these locations, the road winds in and out of the existing administrative boundary, causing unnecessary confusion for visitors who are unsure of whether they are in or out of the NRA. The proposed changes would make the edge of the road right-of-way the NRA boundary, thus eliminating this confusion."

The text in the second column of page 50 that describes the ten tracts has been amended to read as follows:

"The ten tracts of land that are currently being considered for potential deletion from the existing NRA are described below. The reason for the recommended deletion is identified within parentheses ( _).

Tract 1: 680 acres to BLM, subject to revocation of Reclamation's withdrawal (management efficiencies)

Tract 2: 42 acres to USFS, upon passage of NRA legislation (management efficiencies)

Tract 3: 21 acres to USFS, upon passage of NRA legislation (management efficiencies)

Tract 4: 162 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 5: 11 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 6: 159 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 7: 31 acres to private interest, in exchange for COA land, subject to revocation of Reclamation's withdrawal, and negotiation with landowner (logical boundary)

Tract 8: 3 acres to USFS, upon passage of NRA legislation (management efficiencies and logical boundary)

Tract 9: 14 acres to USFS, upon passage of NRA |

BLM_0059782

CHAPTER 5: CONSULTATION AND COORDINATION

| Comment | NPS Response |
|---|---|
| | legislation (management efficiencies and logical boundary) **Tract 10: 120 acres to BLM, subject to revocation of Reclamation's withdrawal (management efficiencies)."** |
| **U.S. Forest Service** | |
| *Forest Supervisor's Office (Grand Mesa, Uncompahgre and Gunnison National Forests)* On behalf of the U.S. Forest Service, one of the partnering agencies on the study, the Forest Supervisor of the Uncompahgre and Gunnison National Forests supports the Proposed Action and the land adjustments as proposed. | NPS thanks USFS for its support of the Proposed Action, and looks forward to working in partnership with them to implement it. |
| *Gunnison Ranger District* The commenter suggested that changes in camping policy under Alternative 2 may cause users who are accustomed to camping in the corrals area near Soap Creek Campground to camp instead on U.S. Forest Service land in either existing or newly-created dispersed sites along Soap Creek Road. | This comment refers to the proposal that management of the Soap Creek Campground be transferred from USFS to NPS under the Proposed Action. NPS would consider converting the area described into an open camping area, which could be used by groups and/or individuals who would like to camp near their horses. The open camping area would have outside limits, so there would be some limitations as to where people could camp. The first bullet on page 171 has been amended to read as follows: **"Direct and indirect long-term adverse impacts are possible due to the change in front-country campground management. Some camping opportunities in undesignated sites might be lost because NPS would limit the area where dispersed camping could occur. However, in the Soap Creek Campground, NPS would consider designating an area within and near the corrals for "open camping," thus reducing the impact to users who prefer to camp in the vicinity of their horses. Although management of that campground would be transferred, NPS would allow most existing uses to continue, including use of the existing horse corrals, and overnight trailhead parking. This would result in a long-term negligible to minor adverse impact on campground users accustomed to current undesignated camping opportunities. However, there would also be long-term minor beneficial impacts as a result of greater NPS presence, including increased law enforcement and campground maintenance."** |
| The commenter stated that the Draft RPS/EIS did not mention potential Alternative 2 impacts to recreationists who use the Soap Creek Corral area | NPS would maintain current recreational activities, including horse use and hiking opportunities in the Soap Creek Area. Parking for trailhead use would |

BLM_0059783

| Comment | NPS Response |
|---|---|
| *Gunnison Ranger District continued*<br><br>for day use and overnight horse trailer parking, especially during hunting season. Also, visitors have historically used the corral/campground area for day use and/or overnight trailhead parking in order to access the Coal Mesa Trail. They wondered if NPS would charge for trailhead parking and/or overnight parking of horse trailers. They further wondered if NPS will allow the continued use of the Coal Mesa trail and if NPS would assume maintenance responsibility for the trail. | continue to be allowed. NPS charge a fee for camping; however, if individuals were just using the area for parking, there would be no user fee. Refer above to the text change for the first bullet on page 171.<br><br>NPS does not plan to close any non-motorized trails on the lands it would acquire. NPS would assume maintenance responsibilities for that portion of the Coal Mesa Trail within the NRA boundary. Accordingly, the following sentence has been added to the middle of the first full paragraph on page 172:<br><br>**"Existing non-motorized trails on agency lands added to the NRA boundary would remain, and NPS would assume maintenance responsibilities of such trails."** |
| The commenter discussed existing concession and outfitting permits in the Soap Creek Area. They agree that the campground concession permit would need to be transferred to NPS. They stated that the existing outfitter permit should be retained by USFS. However, NPS may need to provide this outfitter a permit as well, primarily for corral use and horse trailer parking.<br><br>They also commented that due to the moderate to heavy use the corral area receives during the hunting season for horse trailer parking, either the present use should continue or another adequate site would need to be identified for such use. | NPS appreciates receiving the additional information about the outfitter permitted to use the Soap Creek area. NPS agrees that it would also need to issue a permitting document to the outfitter. This document is known as a Commercial Use Authorization. Other existing commercial permits would be worked out on a case by case basis.<br><br>NPS looks forwards to working with the Gunnison Ranger District to iron-out such operational details if Alternative 2 is implemented, in order to minimize impacts on traditional uses.<br><br>Regarding permitting, the last two sentences in the second sub-bullet on page 199 have been amended to read as follows:<br><br>**"The existing campground concession permit would be transferred to the National Park Service, or terminated. If terminated, it would result in some adverse impacts to existing concessioners. USFS would need to amend the existing outfitter permit, and NPS would need to issue a Commercial Use Authorization to the same outfitter, reflecting changes brought about by transfer of agency lands."**<br><br>Regarding parking of horse trailers, refer to the text change referenced above for the first bullet on page 171. |
| **U.S. Fish and Wildlife Service (Department of the Interior)** | |
| Via a phone conversation with NPS, USFWS recommended that NPS assure that its determination of "no affect" for threatened and endangered species is clearly stated within the document. | NPS reviewed the text as written in the Special Status Species section of Chapter 4: Environmental Consequences on pages 152-156. The section discusses potential impacts to threatened, endangered, and otherwise designated special status species. We have modified a paragraph that |

BLM_0059784

| Comment | NPS Response |
|---|---|
| | occurs in two locations in the document – in Table 5: Summary of Environmental Consequences, in the Alternative 2 column for Special Status Species on page 73 of Alternatives Chapter 2; and in the 1st paragraph of the Conclusion for the impacts of Alternative 2: Proposed Action, in the 2nd column of page 156 – as follows: |
| | **"Implementation of Alternative 2 would benefit special status wildlife species and therefore would have no effect on the bald eagle, Gunnison Sage-grouse, Colorado River cutthroat trout, American peregrine falcon, greater sandhill crane, long-billed curlew, great blue heron, or other sensitive species. Special status plant species would also experience beneficial impacts. Through decreased potential for development and other land use activities that are detrimental to habitats, all special status species within the proposed lands would have opportunities for increased conservation and potential for populations to expand. Benefits would be greatest on Land Units D (Iola Basin COA), E (Sapinero/Blue Mesa COA), and G (West-End COA), where development potential is currently the highest. However, resources on other private lands within the COA would benefit as well. In addition, there are no immediate plans for developments or new recreational facilities that would affect these species. Future proposals would be evaluated using the NEPA process prior to project approval."** |
| **Western Area Power Administration (Department of Energy)** | |
| The commenter requested that the Final RPS/EIS include a discussion regarding the relationship among Western, Reclamation, and NPS, and provide information regarding Western's authority to operate its facilities related to the Aspinall Unit. The final RPS/EIS should provide this information to ensure there are no gaps in the history of the Aspinall Unit and the NRA lands, including the transmission of electric power. The commenter requested that this information be provided under a separate heading for the Department of Energy. | NPS concurs with Western's recommendations, as it is important to provide information on Western's authority and mandated responsibilities related to operation of the Aspinall project. A new section has been inserted into Chapter 1: PURPOSE OF AND NEED FOR ACTION, beginning on page 15, before the "Study Process" header, as follows: **"WESTERN AREA POWER ADMINISTRATION (DEPARTMENT OF ENERGY) SPECIAL MANDATES** **Background and Purpose** **One of the stated purposes of the Colorado River Storage Project (CRSP), passed by Congress on April 11, 1956, was "for the** |

BLM_0059785

| Comment | NPS Response |
|---|---|
|  | generation of hydroelectric power." The Secretary of the Interior was instructed to construct, operate, and maintain Colorado River storage units (dams, reservoirs, power plants, transmission facilities and appurtenant works) at Curecanti (subsequently designated the Wayne N. Aspinall Storage Unit on October 3, 1980), Flaming Gorge, Navajo and Glen Canyon. |
|  | The responsibility for transmission and marketing of power was subsequently passed to the Secretary of Energy, per Section 302 of the Department of Energy (DOE) Organization Act of 1977. This act transferred "all functions of the Secretary of the Interior under section 5 of the Flood Control Act of 1944, and all other functions of the Secretary of the Interior . . . with respect to the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities." This section of the act goes on to state that the power marketing functions shall be exercised by the Secretary of Energy acting through a separate and distinct administration within the department. |
|  | Previously, the Flood Control Act of 1944 authorized the Secretary of the Interior to construct or acquire necessary transmission lines and related facilities to deliver power generated from Corps of Engineers water projects. Also, the Reclamation Acts of 1902 and 1939 serve as further authority for the power marketing / transmission role carried out by Western Area Power Administration (Western). |
|  | <u>Western's Mission</u> |
|  | Western markets and delivers reliable, cost-based hydroelectric power and related services within a 15-state region of the central and western U.S. It is one of four power marketing administrations within the U.S. Department of Energy, whose role is to market and transmit electricity from multi-use water projects. Its transmission system carries electricity from 57 power plants operated by the Bureau of Reclamation, U.S. Army Corps of Engineers and the International Boundary and Water Commission. Together, these plants have an installed capacity of 10,395 megawatts. |

BLM_0059786

| Comment | NPS Response |
|---|---|
| | **Western's Goals**<br>**Western's mandate is to assure the continuous and uninterrupted supply of energy from the Curecanti/Aspinall project to its distribution partners. It therefore needs to construct, operate, and maintain, and have ready access to, its existing transmission corridors / facilities. In addition, future demand and changing technologies may require the establishment of new corridors / rights-of-way within the boundaries of Curecanti NRA."** |
| *Western Area Power Administration (Department of Energy) continued*<br>The commenter clarified that Western owns no lands within the proposed boundaries of Curecanti NRA; however, it does own, operate and maintain transmission facilities. For example, on page 128, the draft states that "Western owns and operates a number of facilities, including transmission lines and communication sites, as well as the roads that provide access to these facilities that lie within or adjacent to Curecanti NRA." Western does not "own" the roads or the lands beneath them. These roads were constructed by Reclamation when the transmission facilities were built and are currently maintained and improved as needed by Western. | NPS appreciates Western's clarification regarding ownership of lands (corridors and roads). The lands within the project are under the ownership of the United States. Therefore, the 1st sentence in the 1st paragraph under WESTERN AREA POWER ADMINISTRATION on page 128 has been amended to read as follows:<br>**"Western owns and operates a number of facilities, including transmission lines and communication sites."** |
| **STATE OF COLORADO** ||
| **Colorado Division of Wildlife** ||
| CDOW has been involved in the planning and development of the Resource Protection Study. Among the issues with which they were concerned was the continuance of public access for wildlife-related recreation in the NRA, including hunting, angling, and watching/viewing wildlife. They want to ensure that these uses would continue in perpetuity at the NRA, and feel that this will be the case under the Proposed Action. Therefore, on behalf of CDOW, the Southwest Regional Manager supports Alternative 2: Proposed Action. | NPS thanks CDOW for its support of the Proposed Action, and looks forward to working in partnership with them to implement it. |
| **Office of Archeology and Historic Preservation (Colorado State Historical Society)** ||
| The commenter requested that NPS forward Section 106 studies to her office. NPS subsequently sent additional information and an Assessment of Effects evaluation. In response, the commenter concurs with the NPS finding of no effect pertaining to the recommendations of the Proposed Action. However, the commenter pointed out that in | NPS appreciates the assistance of the SHPO in reviewing the RPS recommendations as it pertains to cultural resources. In order to clarify the intent of including required Section 106 evaluations prior to any future federal action that has a potential of an adverse effect, NPS has made the following additions to the document. |

BLM_0059787

| Comment | NPS Response |
|---|---|
| _Office of Archeology and Historic Preservation (Colorado State Historical Society) continued_<br>regards to any future land exchange for private land, there is a potential for an adverse effect; and if that action is contemplated, it would need to be fully evaluated per Section 106 prior to any such conveyance. | On page 50, right column, the following has been added as the last paragraph on the page, after the description for Tract 10:<br>**"Prior to any exchange using Tracts 4, 5, 6 and 7 for private lands, or any other parcels that may be identified in the future to be used in such an exchange, the lands proposed for exchange would be evaluated under Section 106 of the National Historic Preservation Act [36 CFR §800.4(d)(1)] to determine if they contain any site or sites considered to be eligible for listing on the National Register of Historic Places. If such a determination is made, exchange of such lands would be considered an adverse effect, and a protective action such as the following would need to be taken prior to any such conveyance: (1) the conveyance would be conditioned upon a preservation easement to ensure the continued protection of the resource; or (2) the parcel would be subdivided in such a way that any tracts containing eligible cultural resources would remain with NPS, and tracts without such resources could be used in exchange. Otherwise, the effort to exchange such a parcel would be terminated."**<br>On page 75, Table 5: Summary of Environmental Consequences, in the row for "Archeological Resources, and Historic Districts and Structures," in the third column (Alternative 2), the following sentence has been added at the end of the existing sentence:<br>**"However, in the case for future land exchanges with private parties, any parcel proposed for exchange would be evaluated under Section 106 for potential adverse effect to cultural resources, and any such effect would be mitigated prior to the conveyance of any property."**<br>On page 167, right column, the following paragraph has been added between the second and third paragraphs:<br>**"For example, because there is a potential of cultural resources existing on some land that may be used in exchange for private land within the COA, any parcel thus proposed would be evaluated for potential adverse effect prior to any such exchange. If a property is determined to contain any site or sites considered to be eligible for listing on the National Register of Historic Places, a** |

BLM_0059788

CHAPTER 5: CONSULTATION AND COORDINATION

| Comment | NPS Response |
|---|---|
| | protective action such as the following would be taken prior to any such conveyance: (1) the conveyance would be conditioned upon a preservation easement to ensure the continued protection of the resource; or (2) the parcel would be subdivided in such a way that any tracts containing eligible cultural resources would remain with NPS, and tracts without such resources could be used in exchange. Otherwise, the effort to exchange such a parcel would be terminated." |
| **Colorado Natural Areas Program – CNAP (Colorado State Parks)** ||
| The commenter is concerned about the potential impact of Alternative 2 implementation on the South Beaver Creek Colorado Natural Area, which is adjacent to the proposed NPS management boundary and contains a BLM sensitive species, the skiff milkvetch. This plant, which occurs within the Natural Area and is also located on proposed NPS land, is of primary concern to CNAP and they recommend that potential impacts to the species be considered in the Curecanti RPS/EIS. Skiff milkvetch is a Colorado endemic, found only in Gunnison County and known from just a few sites. The plant is one of the most rare and imperiled plant species in the state. The South Beaver Creek Natural Area / ACEC (Area of Critical Environmental Concern) contains the best and largest known population, and is located less than a mile southeast of Land Unit C. The commenter recommends that NPS carefully consider the impacts on the species before planning any new trails or other potential recreation in this area. | NPS agrees with the commenter about the need to carefully consider the impacts on the South Beaver Creek Colorado Natural Area that may result from the implementation of Alternative 2. It is important to mention that no specific trails or other recreation-related development are recommended at this time. However, future developments are possible under the proposed alternative. Such projects, once proposed, would be evaluated using the NEPA process before being approved. NPS would work with other entities to minimize or mitigate identified impacts, and appreciates the offer made by CNAP for their future involvement in such reviews. Although in Chapter 3: AFFECTED ENVIRONMENT we have already recognized the skiff milkvetch as a sensitive species in the area, we are adding the following language from CNAP to page 97 to relate the species to the ACEC and the CNAP: "**The skiff milkvetch occurs in its highest abundance on property just southeast of the Curecanti NRA boundary in the South Beaver Creek drainage on BLM property, which is an Area of Critical Environmental Concern (ACEC). A portion of the ACEC that encompasses the best and largest population of skiff milkvetch was designated as a Colorado Natural Area in 1997. This status provides additional monitoring and protection for the rare plant species. Colorado Natural Areas Program (CNAP) is a state agency which preserves some of the finest examples of Colorado's original and unique landscapes for the benefit of present and future generations. CNAP works in partnership with local, state, and federal agencies and private citizens to recognize and protect areas which represent exceptional examples of Colorado's diverse ecosystems. The CNAP designation is approved by the** |

BLM_0059789

| Comment | NPS Response |
|---|---|
| | **Natural Areas Council, signed by the Governor of Colorado, and when enacted, protects elements of statewide importance."** |
| _Colorado Natural Areas Program – CNAP (Colorado State Parks) continued_<br><br>The commenter is supportive of the idea of erecting an interpretive sign that would recognize the multi-agency cooperative management for the protection of the skiff milkvetch. If this action is pursued, then CNAP may be able to provide some assistance on sign wording or possibly funding. The intention would be to educate visitors and to discourage off-trail use. | Although the document refers to the possibility of additional interpretive opportunities under the proposed alternative, a specific sign to address skiff milkvetch is not being proposed at this time. However, we appreciate the idea of utilizing a sign to aid in protecting this sensitive species, and may consider the commenter's offer at a future time. |

| LOCAL GOVERNMENT |
|---|

| City of Gunnison |
|---|

| Comment | NPS Response |
|---|---|
| _Gunnison City Council_<br><br>Gunnison City Council stated that they fully endorse the Proposed Action, because they believe it will provide positive social, environmental and economic benefits. Additionally, they committed City staff to help organize other stakeholders to support the Proposed Action. | NPS thanks the Gunnison City Council members for their support of the Proposed Action, and looks forward to working in partnership with them to implement the recommendations, should the Proposed Action be congressionally approved. |

| Gunnison County Board of County Commissioners |
|---|

| Comment | NPS Response |
|---|---|
| The Gunnison County Commissioners support Alternative 2, the Proposed Action. Specifically, they concur that NPS should continue to manage Curecanti resources and that the NRA boundary should be delineated from a resource management standpoint rather than simply the land needed to create the reservoirs. They also concur with the approach of acquiring the land needed to establish the desired boundary through voluntary cooperation of private landowners and other agencies. They feel that the recommendation will provide future beneficial impacts for the area and the community. | NPS thanks the Gunnison County Board of County Commissioners for their support of the Proposed Action, and looks forward to working in partnership with them to implement the recommendations, should the Proposed Action be congressionally approved. |

| Gunnison County Trails Commission |
|---|

| Comment | NPS Response |
|---|---|
| The commenter stated that under the present situation, bicycles are not allowed on trails within Curecanti NRA. They suggested that creating a system of bicycle trails would be beneficial in that it could increase the amount and types of recreational trail experiences for a variety of trail users, including families, and for an aging population. They also suggested that there would be opportunities to link trails to a system of trails outside the NRA. Increased trail opportunities would draw in more | NPS agrees that the proposed alternative could add additional recreational opportunities, including the possibility of designating some trails for bicycle use. Prior to the development of new trails, or to designating existing trails for bicycle use, NPS would utilize the NEPA process to evaluate potential impacts. If it is determined that bicycle use on trails would be compatible with other uses, and resources would not be unreasonably impacted, bicycle use could be allowed via special regulation. NPS will |

BLM_0059790

| Comment | NPS Response |
|---|---|
| *Gunnison County Trails Commission continued* <br> users, including hikers, runners and bicyclists. | likely undertake such a NEPA process after legislative establishment. |
| **Montrose County Board of County Commissioners** ||
| The Montrose County Commissioners support Alternative 2, the Proposed Action. Specifically, they concur that NPS should continue to manage the resources and recreation at Curecanti, and that it be legislatively established as an NRA. They agree with the approach of working with adjacent landowners within a Conservation Opportunity Area, subject to the requirement that landowner involvement is voluntary. They appreciate being included in the study process, and look forward to its beneficial impacts. | NPS thanks the Montrose County Board of County Commissioners for their support of the Proposed Action, and looks forward to working in partnership with them to implement the recommendations, should the Proposed Action be congressionally approved. |
| **Upper Gunnison River Water Conservancy District** ||
| The commenter opined that any agricultural water rights associated with the Conservation Opportunity Areas should remain in private agricultural ownership. | If NPS were to acquire a conservation easement on land within the COA, we would strive to assure that the water associated with the property would remain for use on that property and its related agricultural uses. <br><br> NPS would not acquire property for the purpose of acquiring its associated water right. <br><br> NPS agrees in principle that agricultural water rights should remain for agricultural uses. If NPS were to acquire property in fee simple, we would work cooperatively with the landowner and the appropriate water district regarding the distribution of water rights. <br><br> Accordingly, the following sentence has been inserted prior to the last sentence in the paragraph relating to water rights, which begins at the bottom of the first column on page 53: <br><br> **"As an example, a landowner may choose to work with his or her attorney and/or local water district to ensure that the water will continue to be used for agricultural purposes."** |
| **ORGANIZATIONS** ||
| *Alliance of Backcountry Parachutists* <br> The Alliance of Backcountry Parachutists (ABP) very much supports the Proposed Action to add additional lands within the protection of the Curecanti National Recreation Area (NRA). The ABP generally supports all efforts to protect the natural resources we have left in the United States and we firmly believe the Proposed Action Alternative outlined in the Curecanti study is a step in the right | NPS recognizes that BLM has authorized hang gliding and parasailing from atop a ridge known as Big Mesa. Although hang gliders have the option of landing on BLM land west of Big Mesa, or on private land (with the permission of the land owner), sometimes conditions warrant that users consider an alternate landing site within the NRA. However, current regulations prohibit that use, except at locations designated by special regulations |

BLM_0059791

| Comment | NPS Response |
|---|---|
| *Alliance of Backcountry Parachutists continued* direction. | pursuant to the terms and conditions of a permit. |
| More specifically, the ABP applauds the joint PS/BLM proposal to provide for safe, legal landing areas for hang gliders. Three reasons. First, non-powered aerial activities have very little to no negative impact on the environment. Second, the proposed alternative would enable the NPS to save valuable resources that would otherwise be used trying to apprehend recreationists who are generally persons who love and respect nature. Three, the equipment and skills for non-powered recreational flight are improving exponentially in the United States and elsewhere and these activities can be carried out more safely when legal landing areas are provided. Legal landing areas allow hang glider pilots to take the necessary precautions to ready their equipment. This also encourages them to use their best, state-of-the-art equipment without fear of losing the gear due to having to conduct their sport illegally. | On page 103, there is a discussion about existing and potential recreational activities that were identified during workshops and open houses with the public. It clarifies that the determination of whether a potential recreational activity would or would not be provided within the NRA would be made during a future planning process. |
| | Private land along Willow Creek, just northwest of Big Mesa, has been Included In the COA as part of Land Unit D, Iola Basin COA. The rational for this includes other factors besides aerial-based recreation, such as protection of riparian habitat, and adjusting the boundary for efficiency reasons. |
| It is also a very positive step in the Proposed Alternative for the NPS to recognize that non-powered flight constitutes an appropriate activity in some NPS units. We support the NPS conforming its policies and regulations to provide safe, legal landing areas as proposed in the document. We also believe this Proposed Action in the EIS is a step in the right direction by recognizing that sometimes the best management of non-damaging activities such as non-powered flight is minimal management. As the document references, this has usually been the BLM approach since they generally do not regulate non-powered flight. If the NPS prefers not to change its own regulations to promote legal hang gliding landing areas within the NRA, then we do support a transfer of administrative jurisdiction to the BLM in order to provide for this use. Both agencies under the Department of Interior need to be able to expend their resources in a more positive way than trying to apprehend pilots of non-powered flight who have no criminal intentions and do not truly pose a threat to others or the environment. In these days of shrinking federal budgets, the NPS needs to be able to use appropriations to provide for habitat preservation and creation rather than using precious resources trying to police what should be considered as a legitimate recreational activity. | However, that all said, we do believe that the inclusion of the above Willow Creek parcel within the COA, in combination with existing NRA land, would offer a safe landing area for users. NPS agrees that an evaluation and determination as to whether to allow aerial use needs to be made. In the event future planning processes determine aerial use is appropriate, a special regulation would be developed to authorize this activity. |
| | The commenter suggests that in the event NPS does not approve the use of its land for aerial landing, that it considers transferring the land to BLM, an agency that would likely allow the continuation of the sport. NPS would need to coordinate this activity between the two agencies, since the launch area is on BLM land. It makes good sense to involve BLM in any discussion that pertains to its aerial recreation at this site. As the process would be conducted under NEPA, BLM and other entities would have future opportunities to provide input into such a decision. |
| *Black Canyon Land Trust* The commenter strongly supports Alternative 2 | NPS appreciates the Black Canyon Land Trust's support of the Proposed Action. We concur that offering incentives that minimize development is |

BLM_0059792

CHAPTER 5: CONSULTATION AND COORDINATION

| Comment | NPS Response |
|---|---|
| *Black Canyon Land Trust continued*<br><br>because of the conservation benefits to be derived from conservation easements and fee acquisitions from willing landowners on adjacent land; the increased likelihood of conserving the rural character and traditional uses of the land, and its scenic values; the economic benefits of tourism; and the potential enhancement of habitat for Gunnison Sage-grouse and other wildlife. The commenter also believes that minimizing development – especially residential development – in the area adjoining the NRA is the best way to protect the lands in the existing NRA; and that Alternative 2 is a very good plan for doing that. | one way to meet the conservation goals for the area; however, we also recognize the need to cooperatively work with landowners who wish to take on other types of conservation projects and/or to develop their properties, in order to identify ways to facilitate conservation projects and minimize the impact of development. Through communication and knowledge, property owners may consider development techniques and land uses that improve wildlife habitat, while minimizing impacts to resources such as natural viewsheds, vegetation, water quality, and night sky. In any case, NPS looks forward to working with land trusts in accomplishing mutual objectives for the Curecanti area. |
| *The Conservation Fund*<br><br>The commenter supports Alternative 2 because it allows NPS to further protect the resources surrounding the NRA, and the approach is compatible with The Conservation Fund's (TCF) dual-purpose mission, which promotes and blends economic and environmental objectives. TCF endorses the COA concept, which respects the rights of private landowners, and the variety of conservation tools that can be used to protect resources. TCF is interested in assisting NPS with the implementation of Alternative 2. | NPS appreciates The Conservation Fund's support of the Proposed Action, and looks forward to their potential assistance in implementing it. |
| *International Mountain Bicycling Association*<br><br>The commenter requested that the final RPS/EIS take steps towards satisfying 36 CFR 4.30, the regulation for bicycling on trails in National Park Service (NPS) units. Specifically, the RPS/EIS revision process should incorporate a special regulations request regarding potential future bicycling use on trails within Curecanti.<br><br>Mountain bicycling is a quiet, low-impact, human-powered activity compatible with resource conservation and a healthy lifestyle. In an era when many NPS visits are confined to motor vehicle travel, mountain bicycling provides an appropriate mode of recreation for personal exploration and the formation of emotional connections with our national parks.<br><br>Bicycle use on trails on NPS land is governed by 36 CFR 4.30. Many of the two-dozen NPS units with bicycling on narrow dirt trails permit this use through their superintendent's compendium, though 36 CFR 4.30 stipulates that bicycle use on trails requires promulgating special regulations. Several parks are undergoing this process right now | NPS would like to thank IMBA for its comments pertaining to bicycling and bicycle trails, and the process needed to authorize bicycle use on trails within the NRA.<br><br>As stated on page 105 of the document, "There is a potential to designate bicycle trails in the NRA, and a desire on the part of the local trails commission to find a trail to connect the NRA to the City of Gunnison." NPS recognizes that bicycle use may be appropriate for some trails, and we plan to evaluate the potential to allow bicycling at some future time. A likely window of opportunity would be during the preparation of an Implementation Plan resulting from this Resource Protection Study, or during a General Management Plan revision process, as mentioned by the commenter.<br><br>While the RPS/EIS is evaluating the natural, cultural, recreational and scenic resources, its recommendations are general by nature. The study is looking at long range opportunities to protect resources, and to assure that the NRA has an adequate land base for current and future recreational needs. It is not making specific recommendations for development of recreational |

BLM_0059793

| Comment | NPS Response |
|---|---|
| *International Mountain Bicycling Association continued*<br><br>and IMBA can share insights on their approach and progress.<br><br>The most efficient way to permit bicycling on dirt trails in the NRA is by dovetailing the process with the RPS/EIS revision. Park staff can begin the special regulations process required to permit bicycling on dirt trails while updating the RPS, drastically reducing extra work and resources. NPS Special Regulations Program Manager Jerry Case (jerry_case@nps.gov or 202-208-4206) can provide more information on streamlining the special regulations process.<br><br>IMBA encourages Curecanti to submit a proposed rule during the GMP revision for construction of shared-use trails within the NRA. This would not obligate the agency to construct such trails, but would eliminate future delays by having the special regulations in place. | facilities, but does talk about potential development and recreational activity. A General Management Plan or Implementation Plan would be more specific in its recommendations, and we suggest that it is that process that would be appropriate to evaluate specific trails for bicycle use. |
| Page 105 of the draft plan discusses the potential for mountain bicycling within the NRA and specifically an east-west trail south of Blue Mesa Reservoir. IMBA supports this proposal and offers its assistance in planning for mountain bicycling use.<br><br>Future trail projects at Curecanti may also be good candidates for Centennial Challenge funding. At Big Bend National Park, IMBA and a local affiliate worked with the NPS to design a shared-use trail proposal that has been selected as a Centennial Challenge project. Please consider a similar approach at Curecanti. | NPS would like to thank IMBA for their offer of assistance pertaining to evaluation of existing and future trails for bicycle use. A logical time to recruit their assistance, and the assistance of other organizations, would be during the NEPA process for a General Management Plan or Implementation Plan. After such a plan is completed, and decisions are made as to bicycle use on trails, NPS would be interested in seeking partners and shared funding to assist in matters such as trail development and maintenance. |
| *The Trust for Public Land*<br><br>The commenter strongly supports Alternative 2 because it would help protect existing recreational and conservation values within the NRA, and also provides an opportunity to expand and better manage protected lands throughout the area. The commenter feels that the most effective way for NPS to conserve land around the NRA is by partnering with local governments and non-profit land conservation organizations to help willing landowners permanently protect their property. The Trust for Public Land welcomes the opportunity to work with NPS and others to help implement Alternative 2. | NPS appreciates The Trust for Public Land's support of the Proposed Action, and looks forward to their potential assistance in implementing it. |

BLM_0059794

CHAPTER 5: CONSULTATION AND COORDINATION

| Comment | NPS Response |
|---|---|
| **INDIVIDUALS** | |
| _Unaffiliated Individual_<br><br>One commenter stated that Alternative 2 would be a waste of taxpayer funds.<br><br>_____<br><br>Another commenter stated the benefits of partnering to achieve goals in the following statement: "The most effective way for the Park Service to conserve land around Curecanti is by partnering with local governments and non-profit land conservation organizations to help willing landowners permanently protect their property. Such partnerships will give the Park Service access to the wide variety of conservation tools that will be necessary in order to meet the diverse needs of private landowners, while also meeting its own conservation objectives. Alternative Two may help to provide the Park Service with the resources it needs to accomplish these goals." | The cost of implementing Alternative 2 is greater than Alternative 1. The one-time cost of implementing Alternative 2 is estimated to range from $3,690,000 to $14,973,000, including acquiring interests in land, such as through conservation easements and fee simple ownership. The relatively large range is because of the many variables pertaining to acquiring interests in land. The funding source would be the Land and Water Conservation Fund (LWCF), and not from taxpayer funds. LWCF is funded from lease payments made for federal offshore oil and gas resources, federal recreation fees, sales of federal surplus real property, and federal motorboat fuel taxes.<br><br>The expenditure of the above funds would likely be coordinated with other partners and agencies.<br><br>In addition to one-time costs, there would be annual recurring costs of about $160,000 to cover staff positions. That funding would come from general appropriations (i.e. taxpayer funds).<br><br>NPS believes that the costs of implementing Alternative 2 would serve to conserve resources that might otherwise be adversely impacted, and as such would be money well spent for the benefit of the American people. |
| _Unaffiliated Individual_<br><br>One commenter requested that NPS not close roads or reduce opportunities for people to use the land. | The Proposed Action does not define specific actions to be taken related to roads and road closures. NPS does not anticipate closing "roads." However; off-road travel would be restricted under NPS administration.<br><br>NPS believes that recreational opportunities would increase as a result of implementing the Proposed Action, as there would be potential to acquire access easements and/or additional land from willing landowners. This would provide an expanded land base for recreational opportunities, including hunting and fishing, consistent with NPS policies and regulations. |
| _Unaffiliated Individual_<br><br>One commenter requested that NPS not charge additional fees for people to recreate. | The Proposed Action, in and by itself, does not make any recommendations for additional fees, or for increasing fees. There would be no entrance fee to Curecanti, with the exception of continuation of the current fee charged for the East Portal area. Boat permit and camping fees now being charged would continue. The camping fee for Soap Creek Campground, now operated by a USFS concessioner, would likely stay the same, as it is already consistent with other camping fees being |

BLM_0059795

| Comment | NPS Response |
|---|---|
| | charged within the NRA. |
| *Unaffiliated Individual*<br><br>One commenter stated that the COA toolbox is an exciting concept, and hoped that it can be used to preserve recreational, scenic and natural features, and recreational opportunities that we in western Colorado treasure. | The toolbox referenced by the commenter is the *Toolbox of Incentives for Resource Conservation: A Handbook of Ideas for Neighbors in the Curecanti Area*, which is included in Appendix A. It should be noted that several of the tools would not be available to NPS until authorized by Congress. NPS agrees with the commenter that the resources mentioned are important to western Colorado, and are worthy of protection. |
| *Unaffiliated Individual*<br><br>One commenter suggested that the East Portal area be added to the Black Canyon of the Gunnison National Park. He felt that if the East Portal area is not within the national park, then there should be no entrance fee charged. He suggested it be included in the national park as it is a part of the Black Canyon and should be protected. He suggested that hunting should not be allowed in the East Portal Area. Also, the historic aspects of the Gunnison Tunnel might receive additional attention if the area is within the national park. | NPS discussed with the Bureau of Reclamation the potential addition of the East Portal Area to the national park prior to legislation passed in 2003 amending the park boundary. Reclamation felt that the facilities and water works of the East Portal area are tied to the Curecanti and Uncompahgre Projects, currently both within Curecanti NRA, and they could not support splitting them between two administrative units of the national park system. It is true that an entrance fee is paid to enter the national park and/or the East Portal area of Curecanti. Portions of the East Portal Road are within the national park, and many users access the park in the vicinity of the river just upstream of the East Portal campground. For these reasons an entrance fee is charged. Hunting is technically permitted in the East Portal Area, but there are few locations where hunters can practically hunt. This is because the discharge of weapons within 100 yards of roads and facilities is prohibited, and the canyon is so narrow here that there are few locations where one could legally discharge a weapon. Historically, not much hunting has ever occurred within this portion of the canyon. We appreciate the commenter's suggestion to increase the educational component that would tell more of the human drama related to the survey for, and construction and operation of, the Gunnison Tunnel. Although the RPS/EIS does not make such specific recommendations, the comment is well worth sharing with park management. |
| *Unaffiliated Individuals*<br><br>Two commenters expressed a desire that implementation of Alternative 2 would add stream access for trout fishing. One commenter specifically wanted to see access to the vicinity of Curecanti Creek from the Forest Service boundary at the north along the highway south to Pioneer Point, and in the area between Hwy 149 and the Cebolla Creek arm near Blaine Rock, and Cimarron River vicinity near the town of Cimarron. | NPS would like to emphasize that the potential to add fishing access to streams where there is now no access is greater with Alternative 2. However, there is not a certainty that such access would be provided, nor a timeframe to do so. The opportunity to add access to locations within the COA is dependent on the willingness of the landowner to allow it; or alternately, to allow NPS or another partnering entity to acquire the property, or access thereto. Such acquisitions would also be |

BLM_0059796

CHAPTER 5: CONSULTATION AND COORDINATION

| Comment | NPS Response |
|---|---|
| | subject to the availability of funding. |
| *Adjacent Landowners*<br><br>Some landowners requested specific information pertaining to their private property, and the possible effects of the Proposed Action on their property and their rights as property owners. | In some cases NPS mailed out a specific response to a specific question. The following is a portion of one such response, but serves well to state the position of NPS related to landowners' concerns:<br><br>". . . the creation of a COA would allow NPS to partner with neighbors to work on mutually agreed upon conservation projects, to acquire conservation easements, or acquire fee simple ownership, but only if the landowner were interested. Each landowner would have an option as to whether to be involved, or not (i.e., opt in or opt out).<br><br>"Should Congress decide to create the COA, NPS could work with our park neighbors to seek grants or other assistance for certain projects, such as might benefit wildlife, or to protect the rural character of the area. We could also refer landowners who would like to learn more about conservation easements to local or national land trusts. We might also be able to offer other services, for example, perform an archeological review of a property, in order to determine what cultural resources might be within the COA (if such a review was desired by the landowner)." |
| *Adjacent Landowners*<br><br>Some landowners stated that they would not want to open their property for public access (for example, to hikers). | Property owners within the COA would be under no obligation to open their land to the public. NPS may be able to acquire public access in some areas (e.g., via fee simple acquisition or by acquiring an access easement). However, such acquisitions would be dependent on the willingness of the landowner. |
| *Adjacent Landowners*<br><br>Some landowners indicated their interest in staying on their property. One landowner queried, "Can you explain to me how I would benefit from Alternative 2?" | Private landowners could benefit from economic incentives afforded by various tools, including tax advantages, government grants, and payments for interests in land; from the potential increase in availability of funding to implement various tools of resource conservation; and through increased technical assistance from the National Park Service.<br><br>Landowners would also benefit from knowing that they are making a greater contribution to the resource conservation ethic, to enhanced enjoyment of the spectacular Curecanti environment, and to a better quality of life for visitors and residents alike.<br><br>Regardless of whether a landowner decides to "opt-in" or "opt-out," successful resource conservation projects in the Curecanti Area will help protect many of the natural, cultural, and scenic intrinsic values which may have brought the landowner to the area to begin with. |

BLM_0059797

| Comment | NPS Response |
|---|---|
| _Unaffiliated Individuals and Adjacent Landowners_<br><br>Several individuals expressed the sentiment that they appreciated the goals of the RPS, as many of those goals aligned with their own desire of being a good caretaker of the land (some from the perspective of being landowners, and some from the perspective of being a user and/or appreciator of the land). | NPS appreciates hearing from landowners and others who share common dreams and goals pertaining to protecting the natural, cultural and scenic resources intrinsic to the land. Such responses suggest that the recommendations of the Proposed Action could lead to important partnerships that would help accomplish resource conservation goals. |

BLM_0059798

CHAPTER 5: CONSULTATION AND COORDINATION

# LETTERS FROM AGENCIES AND ORGANIZATIONS COMMENTING ON THE DRAFT RPS/EIS

**Author Information**
**Name:** Richard W. Harrison

**Organization:** Alliance of Backcountry Parachutists

**Address:** 7316 Houston Drive, Hitchcock, TX  77563

**Date Received:** 10/17/2007
**Correspondence Text**
The Alliance of Backcountry Parachutists (ABP) very much supports the Proposed Action to add additional lands within the protection of the Curecanti National Recreation Area (NRA). The ABP generally supports all efforts to protect the natural resources we have left in the United States and we firmly believe the Proposed Action Alternative outlined in the Curecanti study is a step in the right direction.

More specifically, the ABP applauds the joint NPS/BLM proposal to provide for safe, legal landing areas for hang gliders. Three reasons. First, non-powered aerial activities have very little to no negative impact on the environment. Second, the proposed alternative would enable the NPS to save valuable resources that would otherwise be used trying to apprehend recreationists who are generally persons who love and respect nature. Three, the equipment and skills for non-powered recreational flight are improving exponentially in the United States and elsewhere and these activities can be carried out more safely when legal landing areas are provided. Legal landing areas allow hang glider pilots to take the necessary precautions to ready their equipment. This also encourages them to use their best, state-of-the-art equipment without fear of losing the gear due to having to conduct their sport illegally.

It is also a very positive step in the Proposed Alternative for the NPS to recognize that non-powered flight constitutes an appropriate activity in some NPS units. We support the NPS conforming its policies and regulations to provide safe, legal landing areas as proposed in the document. We also believe this Proposed Action in the EIS is a step in the right direction by recognizing that sometimes the best management of non-damaging activities such as non-powered flight is minimal management. As the document references, this has usually been the BLM approach since they generally do not regulate non-powered flight. If the NPS prefers not to change its own regulations to promote legal hang gliding landing areas within the NRA, then we do support a transfer of administrative jurisdiction to the BLM in order to provide for this use. Both agencies under the Department of Interior need to be able to expend their resources in a more positive way than trying to apprehend pilots of non-powered flight who have no criminal intentions and do not truly pose a threat to others or the environment. In these days of shrinking federal budgets, the NPS needs to be able to use appropriations to provide for habitat preservation and creation rather than using precious resources trying to police what should be considered as a legitimate recreational activity.

Thank you for the opportunity to comment.

Richard Harrison
General Counsel
Alliance of Backcountry Parachutists

BLM_0059799

**Author Information**
**Name:** Bill Day

**Organization:** Black Canyon Land Trust

**Address:** 28478 Hwy 92, Hotchkiss, CO  81419

**Date Received:** 10/15/2007
**Correspondence Text**
October 10, 2007

RE: Curecanti NRA Draft RPS/EIS

Dear Ms. Rudd,

Thank you for the opportunity to comment on the Draft RPS/EIS. Black Canyon Land Trust strongly
supports Alternative 2 for the following reasons, which are mentioned in DEIS:

•  Alt 2 would increase the conservation benefits from conservation easements and fee acquisitions from
willing sellers on adjacent land.
•  Alt 2 would increase the likelihood of conserving the rural character of the land, scenic values, and
traditional uses of the land surrounding the NRA.
•  The economic benefits of tourism to the Curecanti area would be more likely under alt 2.
•  The habitat for Gunnison Sage-grouse within the long, narrow NRA is not large enough to sustain a
population without resources from undeveloped land outside the NRA. This is also true to a lesser degree
of most of the other wildlife species mentioned in the DEIS.

We believe that minimizing development-especially residential development-in the area adjoining the NRA
is the best way to protect the lands in the existing NRA. Alternative 2 is very good plan for doing that.

Sincerely,

Bill Day, President
Black Canyon Land Trust

BLM_0059800

CHAPTER 5: CONSULTATION AND COORDINATION

 

## United States Department of the Interior

**Bureau of Land Management**
Uncompahgre Field Office
2505 South Townsend Avenue
Montrose, Colorado 81401
(970) 240-5300

In Reply Refer to:
CO-150
1610

January 7, 2008

Memorandum

To:        Dave Roberts, Black Canyon of the Gunnison National Park and Curecanti
           National Recreation Area

From:      Barbara L. Sharrow, Field Office Manager

Subject:   Curecanti Draft Resource Protection Study/Environmental Impact Statement

We have reviewed the Curecanti Draft Resource Protection Study/Environmental Impact
Statement (RPS/EIS) dated June 2007. It appears that all of our comments to date have been
addressed. Therefore, we support the Proposed Alternative (Alternative 2).

We would appreciate opportunities to review and provide input into future documents related to
this project, including the FEIS, Report to Congress, and possibly, language related to legislation
(if so required by Congress).

Thank you for involving BLM in the RPS/EIS process.

BLM_0059801

LETTERS FROM AGENCIES AND ORGANIZATIONS COMMENTING ON THE DRAFT RPS/EIS



## United States Department of the Interior

BUREAU OF RECLAMATION
Upper Colorado Regional Office
125 South State Street, Room 6107
Salt Lake City, Utah 84138-1147



IN REPLY REFER TO:

WCG-ASchroeder
ENV-6.00

OCT 1 9

MEMORANDUM

To:     National Park Service, Curecanti Resource Protection Study Comments, 2465 South
        Townsend Avenue, Montrose, CO 81401
        Attn: Dave Roberts

From:   Larry Walkoviak
        Regional Director

Subject: Curecanti Resource Protection Study Comments [Draft Resource Protection
         Study/Environmental Impact Statement (DRPS/EIS)], Curecanti National Recreation Area

Thank you for the opportunity to review the subject DRPS/EIS. Overall, the document is well written.
Our detailed comments are attached.

In general, it is our understanding that:

- Under both Alternative 1 and 2, Reclamation would continue its administrative jurisdiction and
  responsibilities within and adjacent to the National Recreation Area (NRA), including construction,
  operation, maintenance, replacements and additions, consistent with Reclamation law, including
  unrestricted access to its lands, land interests, and facilities.
- Any legislation for the NRA would allow that situation to continue, without any additional
  limitations on Reclamation's operational capabilities.

We look forward to working with your agency in the development of the report to Congress, related
legislation, and an updated memorandum of agreement.

If you have any questions, regarding these comments, please contact Alan Schroeder at
970 248-0692.

Attachment

cc:   96-42040, UC-100, UC-420, UC-600, UC-606, UC-720
      WCG-CDeAngelis, CCI-100

BLM_0059802

CHAPTER 5: CONSULTATION AND COORDINATION

Detailed Comments
on
Draft Resource Protection Study/Environmental Impact Statement
Curecanti National Recreation Area
National Park Service
by
Bureau of Reclamation
Upper Colorado Region

General comments:
1. It is our understanding that:
- Under both Alternative 1 and 2, Reclamation would continue its administrative jurisdiction and responsibilities within and adjacent to the National Recreation Area, including construction, operation, maintenance, replacements and additions, consistent with Reclamation law, including unrestricted access to its lands, land interests, and facilities.
- Any legislation for the NRA would allow that situation to continue, without any additional limitations on Reclamation's operational capabilities.

2. Some of the riparian area around Neversink was purchased with CRSPA Section 8 money for wildlife. This should be specified because it is in the NRA and should be protected for wildlife. The riparian area upstream from Blue Mountain Reservoir should be protected for wildlife and not have recreation developments such as trails, outhouses, etc.

Detailed comments:
1. Page xi, Primary Differences Table, Recreational Opportunities row, Alternative 1 column, line 3: Change *"Curecanti Project"* to *"Curecanti Unit, CRSP and Uncompahgre Project"*
**Rationale:** The East Portal area of the CNRA was acquired (withdrawn) for the Uncompahgre Project and not for the Curecanti (now Aspinall) Unit of the Colorado River Storage Project.

2. Existing Conditions Map (following page 2), the Alternative 1 map (following page 40) and the Alternative 2 map (following page 46): These maps appear to be missing some roads within the CNRA (they may be overlain by other map layers). The missing roads include the Soap Creek Road and the three dam access roads, among others.

3. Page 10, left column, line 16 – This sentence should be revised as follows:
    *. . . Three dams unique in concept and construction were built between 1962 and 1976*
    *to provide irrigation, flood control, **and** hydroelectric power~~, and recreation~~. . .*
**Rationale:** As currently worded, recreation is implied as a project purpose. In this context, it is incorrect to state that the dam was constructed for recreation.

4. Page 13, left column, paragraph 1, line 3, Sentence beginning with the word "Annually": Recommend this sentence be replaced with something like the following: *"Since 1970, about 343,000 acre-feet of project water has been diverted annually from the Gunnison River at East Portal."*
**Rationale:** The stated annual diversions of over 400,000 acre-feet from the Gunnison River at East Portal seem too high. Reclamation's records indicate that, since 1970, the average annual diversion at East Portal is about 343,000 acre-feet.

5. Page 14, left column, last line – The following sentence should be deleted: *"This peak generation ability flattens energy purchases and saves Western and CRSP customers millions of dollars annually."*

Page 1 of 6

BLM_0059803

Detailed Comments
on
Draft Resource Protection Study/Environmental Impact Statement
Curecanti National Recreation Area
National Park Service
by
Bureau of Reclamation
Upper Colorado Region

**Rationale:** It seems inappropriate to characterize Aspinall peaking operations as a savings to Western and CRSP customers – the Aspinall Unit was authorized to operate in this manner.

6. Pages 17 and 18: Land based recreational opportunities are discussed at various locations including *"Vicinity between the Lake City Bridge and Riverway to provide future hiking and non-motorized biking trail linkage to the city of Gunnison."* (pg 18, 5th bullet). In general, this may be a good idea but it would be important to keep any trail to the north of the river channels with a large buffer zone between the trail and the river to protect riparian areas and wildlife. This comment also applies to similar statements throughout the document, including, but not necessarily limited to those on pages 76, and 105.

7. Page 31, Table 1- Impact Topics Retained or Dismissed; Visitor Use, Understanding, and Enjoyment; Recreation Opportunities row; Primary Relevant Laws, Regulations, or Policies column: Add, *"Reclamation law, as amended and supplemented, in particular, Section 8, Colorado River Storage Project Act; and PL 89-72 as amended by Title XXVIII of PL 102-575."*
**Rationale:** These are the two major Reclamation laws that address recreational opportunities within the CNRA.

8. Alternative 1 Map (following pg. 40) and Alternative 2 Map (following pg 46): Change the statement regarding BOR management of dams, reservoirs, power plants, access roads and other related facilities, but not lands or land interests, to be consistent with statements (on pages 49, 63 (next to last paragraph) where Reclamation manages <u>all</u> Reclamation real property for operation/maintenance/etc. of Reclamation projects.
**Rationale:** The wording regarding BOR management on the two maps is inconsistent with the BOR management statements on pages 49 and 63.

9. Page 49, Regarding transfer of CDOW lands to NPS: Some nearby CDOW lands may be Aspinall (Curecanti) Unit wildlife mitigation lands acquired with CRSPA Section 8 monies. Such lands, regardless of who ends up with them, need to continue to be managed for wildlife mitigation purposes in order to maintain applicable mitigation credits. This comment also applies to similar statements throughout the document, including, but not necessarily limited to those on pages 54, 206, and 127.

10. Page 50, left column, last paragraph, line 1; and right column, Tracts 1, 4, 5, 6, 7 and 10, regarding the phrases ". . . Reclamation revokes . . ." and "Reclamation revocation": Recommend that the current wording be revised; suggested wording follows. This comment also applies to similar statements throughout the document, including, but not necessarily limited to, pages 70, 200, and 204.
**Rationale:** First, as used here, the words "revokes" and "revocation" only apply to withdrawals of lands, not the lands themselves. Second, Reclamation does not revoke its withdrawals; it may relinquish its withdrawals and recommend revocation. BLM is the agency that actually revokes the withdrawal.
**Suggested wording:**

Page 2 of 6

BLM_0059804

Detailed Comments
on
Draft Resource Protection Study/Environmental Impact Statement
Curecanti National Recreation Area
National Park Service
by
Bureau of Reclamation
Upper Colorado Region

Page 50, left column Last Paragraph, Line 1: Replace *". . . revokes the lands that would be transferred out of the NRA, to the BLM . . ."* with **". . . relinquishes its withdrawals on lands to be transferred out of the NRA to BLM and BLM has revoked those withdrawals, . . ."**
Page 50, right column, Tracts 1, 4, 5, 6, 7 and 10: replace *". . .Reclamation revocation. . ."* with **". . . revocation of Reclamation's withdrawal . . ."**
Page 70, table, left column, row three: replace *". . .revocation by Reclamation. . ."* with **". . . revocation of Reclamation's withdrawal . . ."**
Page 200, right column, 2nd bullet, 1st sub-bullet, line 2: *". . .Reclamation revocation. . ."* with **". . . revocation of Reclamation's withdrawal . . ."**
Page 204, left column, first bullet (Land Unit F) and second bullet (Land Unit H), both line 3: replace *". . .as to whether to revoke, or not, . . ."* with **". . . as to whether or not to relinquish and recommend revocation of . . ."**

11. Page 53, right column, "Private Land Use within the NRA" heading:  Recommend this heading be changed to, *"Private Mineral Development within the NRA."* This comment also applies to similar headings in the document, including, but not necessarily limited to those found on pages 117, and 189 (2 uses), but not the similar heading in the table on page 78. *Note: A separate recommendation is being made for the wording on page 78.*
**Rationale:** With the exception of page 78, the subsequent discussions relate only to private mineral and mining rights, not the other private land use rights within the NRA. However, other than the 1st sentence in each of the alternative cells, the discussion in the table on page 78 could apply to all privately owned interests in the NRA.

12. Page 59: right column, item 2: The proposed legislation should be jointly prepared by NPS and Reclamation similar to the report to Congress.
**Rationale:** The proposed legislation will affect both NPS and Reclamation. Joint preparation of the proposed legislation should ensure that the interests of both agencies are incorporated and that there is consensus and cooperation between the agencies.

13. Page 59, right column, 3. c., fifth line – Change the words *"full respect"* to *"consideration"*. This comment also applies to the same statement on page 283.
**Rationale:** The phrase "full respect" could be viewed as in conflict with giving priority to Reclamation purposes.

14. Page 78, Table, last row- Private land use within NRA: Replace the first sentence in the cells under both Alternatives 1 and 2 with wording similar to that found on pages ix and 61 regarding the varied existing legal rights within the NRA.
**Rationale:** Mineral and mineral development rights are only a couple of the privately owned interests within the NRA. Other privately owned interests, to name a few, include rights-of-way, water rights, and access rights.

Page 3 of 6

BLM_0059805

Detailed Comments
on
Draft Resource Protection Study/Environmental Impact Statement
Curecanti National Recreation Area
National Park Service
by
Bureau of Reclamation
Upper Colorado Region

15. Page 95, left column, State Listed Species, paragraph 2: Is there a reference for the statement, "The Colorado River cutthroat trout is known to occur in the Gunnison River below Crystal Reservoir, . . ." If so, please provide the reference, otherwise delete the statement.
**Rationale:** Seems like a slim possibility and the statement should be deleted if there is not a good reference for this information.

16. Page 99, right column, paragraph 2, last sentence: Please note that the Gunnison Tunnel is also on the National Register of Historic Places.

17. Page 117, Right column, Current Heading- *Private Land Use Within the National Recreation Area*, paragraph 1, first sentence: Recommend this sentence be deleted and replaced with the second sentence, less the word "However."
**Rationale:** The statement in the first sentence is not true. For example, Norman and Jean Austin (BMR Parcel 6) reserved and retained all water and water rights, and Frank and Susan Carpenter (BMR Parcel 8) reserved certain water rights appurtenant to the respective parcels which Reclamation acquired. Other vendors also reserved various rights other than mineral and mineral development rights.

18. Page 117, Current Heading- *Private Land Use Within the National Recreation Area*, paragraph 1: Add the following sentence(s) regarding "subordination" of mineral rights at the end of the paragraph:
*"Where Reclamation acquired land but not the appurtenant mineral, or oil or gas rights, it subordinated those reserved rights to require their development in a manner that would not interfere with project purposes. The subordination for reserved mineral rights, including oil and gas, is contained in the Land Purchase Contract and/or deed for each parcel acquired."*
**Rationale:** It is Reclamation policy to subordinate the development of reserved mineral rights to the United States' rights and regulate such development in a manner that doesn't interfere with project purposes. A partial review of its acquisition files indicate that Reclamation subordinated development of reserved mineral rights to Curecanti Unit and CRSP purposes.

19. Pages 118-119; Table 10; Interests Reserved column: Add to all rows, except where otherwise indicated, the phrase, *"Subordinated to CRSP"*.
**Rationale:** Reclamation subordinated those mineral rights not acquired to its project purposes; such subordination should be noted.

20. Page 118, Table 10, the three rows for 49N, 2W, 26 (Eagle Rock Resort, Herman, and Nelson): Remove these rows from the table.
**Rationale:** These previous owners never had any mineral rights on these lands. The United States reserved all minerals in the patent for these lands.

21. Page 118, Table 10, the row for 49N, 3W, 25, 26 (Holman, J.), Interests Reserved column: Add the following statement: "BMR Parcel 12A (10 acres in Sec. 25) had reserved oil/gas rights subordinated to CRSP"

Page 4 of 6

BLM_0059806

CHAPTER 5: CONSULTATION AND COORDINATION

Detailed Comments
on
Draft Resource Protection Study/Environmental Impact Statement
Curecanti National Recreation Area
National Park Service
by
Bureau of Reclamation
Upper Colorado Region

**Rationale:** See following rationale for all three Holman rows in Table 10.

22. Pages 118-119; Table 10; the three Holman, J. rows; Interests Reserved column: For these rows, add the phrase, *"Additional research necessary".*
**Rationale:** With the exception of BMR Parcel 12A (10 acres in Sec. 25, T49N, R3W) which did have reserved oil/gas subordinated to CRSP purposes, all of the Holman parcels (155+ acres) were acquired through condemnation. Additional research of the court's action in that case is necessary to determine whether or not any mineral rights were reserved to Holman and whether or not any such rights were subordinated to CRSP. During this review, the one legal description related to the Holman condemnation case which Reclamation found did not include any reservation of mineral rights to Holman. However, that description may not have been part of the final decision.

23. Page 119, left column, paragraph 1, line 2, sentence beginning with "Mrs. Dickerson": Revise the sentence and add a second sentence to read as follows:
*Mrs. Dickerson reserved "the perpetual right to mine and remove decomposed granite and the materials intermixed therewith" from a portion of the conveyance, creating a 33.16 acre split mineral estate, together with the right of ingress and egress over the mineral estate. However, this mineral right is subordinated to the United States' rights, in that, ". . . any rights reserved hereunder shall be exercised in such manner as will not interfere with the construction, operation, and maintenance of any works of the proposed Curecanti Unit of the Colorado River Storage Project Act as determined by the Secretary of the Interior or his duly authorized representative.*
**Rationale:** The reserved mineral right was not correctly described and the appurtenant subordination of this mineral right to the Curecanti Unit, CRSP, was not included in the description.

24. Page 123, right column, first paragraph (re. Fruitland Mesa): Add the following sentence at the end of paragraph: *"Reclamation has recommended to BLM that it revoke the withdrawals for the Fruitland Mesa Project."*

25. Page 187, right column, Heading- *Fee Simple Acquisition*, Paragraph 1, line 4: Regarding loss of revenue and PILT offsets of lost revenue, suggest the use of either "could" or "may" in place of "would."
**Rationale:** In a following paragraph, EIS states that the PILT offset is not guaranteed or may not occur, therefore the prior use of "would" is not proper.

26. Page 189, Desired Condition Box, left column, first paragraph, line 3: The wording *"...requirements specified in warranty or other legal deeds, such as the requirement that such activity not interfere with the construction, operation, and maintenance of Reclamation works."* be replaced with *"... the subordination of the development of such rights to Reclamation's project as specified in the Land Purchase Contracts and deeds."*
**Rationale:** Reclamation may have acquired lands whereon the vendor retained certain mineral rights with the associated development rights subordinated to the Reclamation project in order to protect project

Page 5 of 6

BLM_0059807

Detailed Comments
on
Draft Resource Protection Study/Environmental Impact Statement
Curecanti National Recreation Area
National Park Service
by
Bureau of Reclamation
Upper Colorado Region

purposes, works, and water quality. In general, that means the development of those reserved rights is subject to conditions to protect Reclamation project purposes and works and/or project water quality as may be required by the Secretary of the Interior or his authorized representative. The specific reservations and subordinations are cited in the Land Purchase Contract and/or the deed for each parcel acquired.

27. Glossary: Add the following terms/definitions to the Glossary.

Reclamation Works- The structures, facilities, and appurtenances necessary to meet Reclamation project purposes, together with the lands and land interests necessary for such works. Generally, Reclamation project works may include, but are not necessarily limited to, dams, reservoirs, canals, laterals, ditches, roads, transmission lines, substations, buildings, power plants, offices, warehouses, residences, telephone lines, parking areas, gates, fences, siphons, etc., and the necessary land and land interests, such as leases, rights-of-way, and easements, etc.

Relinquishment- a notification to BLM by a Federal holding agency (such as Reclamation) that:
- The public lands withdrawn or reserved for its use are no longer needed, or
- The withholding or segregation of land from settlement, sale, location, or entry is no longer required. (Reclamation, 1998)

Revocation- the actual cancellation of a withdrawal by BLM, but does not necessarily open the land to settlement, sale, location, or entry under some or all of the general land laws. (Reclamation, 1998) (AS)

Subordination- The act or process by which a person's rights or claims are ranked below those of others. (Black's Law Dictionary, Sixth Edition, 1990)

Subordinate- (verb) To place a senior real property interest in a position of lower priority to that of an otherwise junior real property interest in the same real estate. (adapted from a portion of the definition of "Subordination agreement" in Black's Law Dictionary, Sixth Edition, 1990)

BLM_0059808

STATE OF COLORADO

Bill Ritter, Jr., Governor
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF WILDLIFE
AN EQUAL OPPORTUNITY EMPLOYER

Mark B. Konishi, Acting Director
6060 Broadway
Denver, Colorado 80216
Telephone: (303) 297-1192
wildlife.state.co.us

*For Wildlife-*
*For People*

Dave Roberts, Management Assistant
Curecanti National Recreation Area
2465 S. Townsend Ave
Montrose, CO 81401

RE: Curecanti RPS/EIS

October 15, 2007

Dear Dave,

    The Colorado Division of Wildlife (CDOW) has been involved in the planning and development of the Draft Resource Protection Study for Curecanti National Recreation Area. Among the issues we were concerned with were the continuance of public access for wildlife related recreation on the NRA including: hunting, angling and watching/viewing wildlife. During our involvement in the RPS we worked to ensure that these uses would continue in perpetuity on Curecanti NRA. We feel that the RPS and associated Environmental Impact Statement help address these issues as well as conserving other wildlife values.

    The Division of Wildlife therefore offers its support of the EIS and Alternative 2, the preferred alternative, which will allow expansion of portions of the NRA through land exchanges with other land management agencies including the CDOW. We look forward to working with the National Park Service and other agencies to make the NRA boundary adjustments necessary for administrative purposes and habitat protection and enhancement.

Sincerely,

Anthony L. Gurzick for Thomas J. Spezze, SW Regional Manager

Cc:    J Wenum, Area Wildlife Manager-Gunnison
        Jeff Oulton-DWM Gunnison West
        Lucas Martin-DWM Lake City
        Renzo Delpiccalo-Area Wildlife Manager-Montrose
        Ron Harthan-DWM-Montrose East

DEPARTMENT OF NATURAL RESOURCES, Harris D. Sherman, Executive Director
WILDLIFE COMMISSION, Tom Burke, Chair • Claire O'Neal, Vice Chair • Robert Bray, Secretary
Members, Dennis Buechler • Brad Coors • Jeffrey Crawford • Tim Glenn • Roy McAnally • Richard Ray
Ex Officio Members, Harris Sherman and John Stulp

BLM_0059809





AUG 0 3 2007

BLACK CANYON N.P.

## COLORADO HISTORICAL SOCIETY

The Colorado History Museum    1300 Broadway    Denver, Colorado 80203-2137

July 27, 2007

Curecanti Resource Protection Study Comments
Attn: Dave Roberts
2465 South Townsend Avenue
Montrose, CO  81401

Re:  Curecanti National Recreation Area Draft Resource Protection Study/Environmental Impact Statement.  (CHS #50567)

Dear Mr. Roberts,

Thank you for opportunity to comment on the above-mentioned project.  We recommend that you coordinate your National Environmental Policy Act (NEPA) studies with the studies required under Section 106 of the National Historic Preservation Act.  According to 36 CFR 800.8 of Section 106, "Federal agencies are encouraged to coordinate compliance with Section 106 and the procedures in this part with any steps taken to meet the requirements of the National Environmental Policy Act."  Also, Section 110 of the National Historic Preservation Act states that Federal agencies should "coordinate with the earliest phases of any environmental review carried out under the National Environmental Policy Act."

The findings from the Section 106 studies can inform the NEPA studies, such as including mitigation measures identified under Section 106 into the NEPA decision document. Once we receive the Section 106 studies, we will be able to fully complete our reviews under both Section 106 and NEPA.

We have enclosed a flow chart that explains the coordination between Section 106 and NEPA. If we may be of further assistance, please contact Amy Pallante, our Section 106 Compliance Coordinator, at (303) 866-4678.

Sincerely,

for Georgianna Contiguglia
State Historic Preservation Officer

BLM_0059810

CHAPTER 5: CONSULTATION AND COORDINATION

## COORDINATION BETWEEN NEPA AND SECTION 106



The Public and Consulting Parties must be notified and given the opportunity to comment during each step of the Section 106 review process.

BLM_0059811



OFFICE *of* ARCHAEOLOGY *and* HISTORIC PRESERVATION

February 28, 2008

Constance Rudd
Superintendent
National Park Service
Black Canyon of the Gunnison National Park
Curecanti National Recreation Area
102 Elk Creek
Gunnison, CO 81230

Re: Curecanti National Recreation Area Draft Resource Protection Study/Environmental Impact Statement.
(CHS #50567)

Dear Ms. Rudd:

Thank you for your correspondence dated February 10, 2008 and received by our office on February 8, 2008 regarding the review of the above-mentioned project under Section 106 of the National Historic Preservation Act (Section 106).

After review of the provided information, we concur that any transfer of land from federal ownership to private ownership is considered an *adverse effect* under Section 106 [36 CFR 800.5(a)(2)(vii)]. We concur that if the alternative that calls for the land exchange with private land owners is chosen, the potential for an adverse effect under that alternative needs to be fully evaluated. In regards to the resource protection study, we concur with the finding of *no effect* [(36 CFR 800.4(d)(1)].

We request being involved in the consultation process with the local government, which as stipulated in 36 CFR 800.3 is required to be notified of the undertaking, and with other consulting parties. Additional information provided by the local government or consulting parties might cause our office to re-evaluate our eligibility and potential effect findings.

Please note that our compliance letter does not end the 30-day review period provided to other consulting parties.

If we may be of further assistance, please contact Amy Pallante, our Section 106 Compliance Coordinator, at (303) 866-4678.

Sincerely,

*Mark Wolfe*

~for~ Georgianna Contiguglia
State Historic Preservation Officer

OR
3 | 5 | 08

cc: Forest Frost/NPS
    Dave Roberts/NPS

COLORADO HISTORICAL SOCIETY

1300 BROADWAY  DENVER  COLORADO  80203  TEL 303/866-3395  FAX 303/866-2711  www.coloradohistory-oahp.org

BLM_0059812

   **Colorado Natural Areas Program**   

1313 Sherman Street, Room 618 • Denver, Colorado 80203 • (303) 866-3203

October 19, 2007

Curecanti Resource Protection Study Comments
Attn: Dave Roberts
2465 South Townsend Avenue
Montrose, CO 81401

Dear Mr. Roberts,

The intent of this letter is to provide written comments to the National Park Service (NPS) in regards to the Curecanti National Recreation Area (NRA) Draft Environmental Impact Statement (DEIS). The Colorado Natural Areas Program (CNAP) is very much in support of the NPS Alternative 2: Proposed Action. However, our support for this alternative is dependent on the potential impacts to a designated Colorado Natural Area, South Beaver Creek, which is adjacent to the proposed NPS management boundary and contains a BLM sensitive species, the skiff milkvetch. This plant, which occurs within the Natural Area and is also located on proposed NPS land (see figure 1), is of primary concern to our program and we recommend potential impacts to this rare species on the designated Natural Area be considered in the DEIS.

The Colorado Natural Areas Program designated the South Beaver Area of Critical Environmental Concern (ACEC) as South Beaver Creek Natural Area in 1997 (see figure 2). In that year, CNAP and the Bureau of Land Management (BLM) entered into an agreement which set up a working relationship between the two agencies for the monitoring and protection of the globally (G1) and state (S1) critically imperiled species, the skiff milkvetch (*Astragalus microcymbus*). The skiff milkvetch is a Colorado endemic, found only in Gunnison County and known from just a few sites, with South Beaver Creek Natural Area/ACEC containing the best and largest known population. This plant is one of the most rare and imperiled plant species in the state. The Denver Botanic Gardens has been intensively monitoring the skiff milkvetch in this area, and recent correspondence with them indicates that they have documented a distinct decline in its population numbers. All monitored populations of this plant have declined significantly since 1995.

The DEIS recognizes the sensitivity of the skiff milkvetch and mentions its occurrence and potential habitat within the proposed expansion area of Curecanti NRA/Conservation Opportunity Area (COA) on identified Land Units B, C, and D. However, it is clear from recent monitoring reports mentioned above that this plant requires particular attention to avoid extinction. Since the largest population occurs at South Beaver Creek Natural Area/ACEC, which is less than a mile southeast of Land Unit C, *we propose careful consideration before planning any new trails or other potential recreation in this area*. Our staff is available for coordination if recreation plans do develop. Biking trails or parking pullouts should not be a major threat to the plants if they are designed to avoid the plants by a wide margin and do not attract off-trail uses.

As you are probably aware, the BLM has been closing and rerouting trails in the South Beaver ACEC to reduce recreational impacts to the skiff milkvetch populations. In recent conversations, staff biologists from the BLM have cautioned that connecting NPS trails to the Hartman Rocks trails on

STATE OF COLORADO • COLORADO STATE PARKS
Bill Ritter, Governor • Harrison Sherman, Executive Director, Department of Natural Resources •
Larry Kramer, Deputy Director, Colorado State Parks • Gary Thorson, Deputy Director, Colorado State Parks•
Colorado Natural Areas Council: Kathy Yates, Chair • Dr. Lee Shropshire, Vice-Chair • Dennis Brinker, Board of Land
Commissioners • Dennis Buechler, Wildlife Commission • Dr. Tom Ready, State Parks Board • Renee Rondeau, Member
Jill Ozarski, Member

BLM_0059813

LETTERS FROM AGENCIES AND ORGANIZATIONS COMMENTING ON THE DRAFT RPS/EIS

 Colorado State Parks

# Colorado Natural Areas Program



1313 Sherman Street, Room 618 • Denver, Colorado 80203 • (303) 866-3203

BLM land may increase uses in the ACEC, thus bringing more potential threats to the existence of the plants. We discourage new trail connections into plant habitat for this reason. We would recommend close coordination with BLM and CNAP staff to assure that potential impacts to this plant species are minimized.

During phone conservations with Jeff Heywood of NPS, he suggested that we provide language for referring to the Natural Area and the rare plant monitoring in the final EIS. The paragraph below is what we suggest for including in the EIS under the rare plant section on page 97 between the paragraphs covering the rare milkvetches and the hanging garden sullivantia.

The skiff milkvetch occurs in its highest abundance on property just southeast of the Curecanti NRA boundary in the South Beaver Creek drainage on BLM property, which is an Area of Critical and Environmental Concern (ACEC). A portion of the ACEC that encompasses the best and largest population of skiff milkvetch was designated as a Colorado Natural Area in 1997. This status provides additional monitoring and protection to the rare plant species. The Colorado Natural Areas Program (CNAP) designation is approved by the Natural Areas Council, signed by the Governor of Colorado and, when enacted, protects elements of statewide importance. CNAP is a state agency which preserves some of the finest examples of Colorado's original and unique landscapes for the benefit of present and future generations. CNAP works in partnership with local, state, and federal agencies and private citizens to recognize and protect areas which represent exceptional examples of Colorado's diverse ecosystems.

The DEIS mentions on page 109 the possibility of erecting an interpretive sign for Curecanti NRA/COA in Land Unit C, which CNAP supports. If this action is pursued, then CNAP may be able to provide some assistance on sign wording or possibly funding. We propose that such a sign would recognize the multi-agency cooperative management (NPS, BLM, and CNAP) for the protection of the skiff milkvetch, with reference of the South Beaver Creek Natural Area/ACEC. The intention would be for education and to discourage off trail use.

We commend the NPS for their acknowledgment of the skiff milkvetch as a sensitive species and their careful consideration of the protection of its inhabited areas. We agree with the finding that the proposed action plan has no foreseen adverse impacts on the plant, as long as there is careful consideration given to potential bike trails or pullout locations. We appreciate the time of NPS staff on the phone to prepare and coordinate comments for this project. Please feel free to call or email us with questions.

Sincerely,

Rob Billerbeck
Stewardship and Natural Areas Program Manager
(303) 866-3206 ext 341; rob.billerbeck@state.co.us

Molly Mikan
Seasonal Technician
(303) 866-3206 ext 323; molly.mikan@state.co.us

Brian Kurzel
Program Coordinator
(303) 866-3206 ext 301; brian.kurzel@state.co.us

---

STATE OF COLORADO • COLORADO STATE PARKS
Bill Ritter, Governor • Harrison Sherman, Executive Director, Department of Natural Resources •
Larry Kramer, Deputy Director, Colorado State Parks • Gary Thorson, Deputy Director, Colorado State Parks•
Colorado Natural Areas Council: Kathy Yates, Chair • Dr. Lee Shropshire, Vice-Chair • Dennis Brinker, Board of Land
Commissioners • Dennis Buechler, Wildlife Commission • Dr. Tom Ready, State Parks Board • Renee Rondeau, Member
Jill Ozarski, Member

BLM_0059814

CHAPTER 5: CONSULTATION AND COORDINATION



South Beaver Creek Natural Area
and Worldwide Distribution
of Skiff Milkvetch
(Figure 1)

Plant data provided by Colorado
Natural Heritage Program: 2005.

BLM_0059815



**South Beaver Creek Natural Area/ACEC (Figure 2)**

BLM_0059816

# THE CONSERVATION FUND

November 16, 2007

Mr. Dave Roberts
National Park Service
2465 S. Townsend Ave.
Montrose, CO 81401

**Re: Curecanti National Recreation Area – Resource Protection Study**

Dear Dave:

As a non-advocacy organization, The Conservation Fund does not typically provide comment on agency planning efforts. However, in the case of the Resource Protection Study for Curecanti National Recreation Area, we support Alternative 2 because it allows the National Park Service to further protect the natural, cultural, scenic, and recreational resource values of the lands surrounding Curecanti NRA.

The approach outlined in Alternative 2 is compatible with The Conservation Fund's dual-purpose mission, which promotes and blends economic and environmental objectives. The proposed Conservation Opportunity Area (COA) respects the rights of private landowners since it relies on their willingness to participate, and amends the NRA boundary only after a property is acquired from a willing seller. In Alternative 2, NPS has wisely identified a variety of conservation tools that can be utilized to protect resources, such as fee title acquisitions, conservation easements, access easements, and land exchanges.

As you know, the Fund has a long track record of assisting the National Park Service with acquisitions across the country, including several very successful transactions at the Black Canyon of the Gunnison National Park. We are interested in continuing to assist NPS with implementation of the land protection objectives in Alternative 2 of the Resource Protection Study for Curecanti NRA.

Thank you for allowing me to comment.

Sincerely yours,

Christine Quinlan
Western Field Representative

*Partners in land and water conservation*

1942 Broadway, Suite 323 • Boulder, CO 80302 • (303) 444-4369 • FAX (303) 938-3763





*City of Gunnison*



RECEIVED
SEP 1 8 2007
BLACK CANYON N.P.

September 11, 2007

Curecanti Resource Protection Study Comments
Attn: Dave Roberts
2465 South Townsend Avenue
Montrose, CO 81401

Dear Mr. Roberts:

Thank you for providing the City of Gunnison an opportunity to review and comment on the *Draft Resource Protection Study / Environmental Impact Statement* (EIS) for the Curecanti National Recreation Area. On August 21, 2007, the Gunnison City Council was presented an overview of the EIS. City Council fully endorses the Preferred Alternative because of its positive social, environmental and economic benefits. Additionally, the City staff will work to help organize other stakeholders to support the Preferred Alternative.

The following elements of the Preferred Alternative were the basis for the City Council's support:

1. National Park Service presence in the area would be maintained.
2. Alternative 2 has more positive impacts on the environment, whereas Alternative 1, No Action, could have potentially detrimental impacts on the environment if management of resources is diminished due to potential development of private lands adjacent to the existing recreation area. The study shows Alternative 2 would have positive impacts on wildlife, fish, and plant species as well as water quality, lightscape and soundscape within the area due to best management practices.
3. Over 10,000 acres would be added to the National Recreation Area. This, combined with access easements on adjacent private property would increase land-based recreational opportunities. The federal government will reimburse the County for property taxes taken out of the tax role.
4. Because of points 1, 2, and 3 above, the experience of visitors to the region would be enhanced.
   a. Additional NPS staff would result in increased services to visitors.
   b. Habitat management would result in increased opportunities for wildlife viewing.
   c. Additional acres and easements provide increased opportunities for land-based activities.
   d. Planning with local communities and control of light pollution within the recreation area could result in gains in the natural lightscape. Control of noise

---

P.O. Box 239   201 W. Virginia Avenue   Gunnison, CO 81230-0239   PHONE: (970) 641-8000   FAX: (970) 641-8051

BLM_0059818

pollution in the recreation area would further enhance the opportunity for visitors to experience natural solitude.

5. Alternative 2 provides positive economic impact due to:
   a. the addition of two NPS staff positions and the salaries for those positions results in spending in the area;
   b. the acquisition of private property could have a trickle-down effect on the economy;
   c. the enhanced experiences provided to visitors to the National Recreation Area would result in increased numbers of visitors. Spending by visitors is an important part of the Gunnison economy.

Again, thank you for the opportunity to provide input. Please let us know if there is further information that you need.

Sincerely,

Stu Ferguson
Mayor

Rick Miller
Mayor Pro Tem

Ellen Harriman
City Councilor

Jonathan Houck
City Councilor

William J. Nesbitt
City Councilor

BLM_0059819



# GUNNISON COUNTY, COLORADO

BOARD OF COUNTY COMMISSIONERS
PHONE: (970) 641-0248
FAX: (970) 641-3061



RECEIVED

SEP 2 0 2007

BLACK CANYON N.P.

September 18, 2007

Curecanti Resource Protection Study Comments
Attn: Dave Roberts
2465 South Townsend Avenue
Montrose, CO 81401

RE: Curecanti Resource Protection Study

Dear Mr. Roberts,

Thank you for opportunity to comment on the Curecanti Resource Protection Study and the hard work involved with informing the public about this project. Gunnison County has reviewed the document and encourages the participants to adopt the Preferred Alternative as presented.

Specifically, we agree that the National Park Service should continue to manage the resources and that the park boundary should be delineated from a resource management standpoint rather than simply the land needed to create the reservoir. Also, we agree with the approach of acquiring the land needed to establish the desired boundary through voluntary cooperation of private landowners and other agencies.

We applaud the National Park Service for their efforts to include the community in this process and look forward to the beneficial impacts this study will have as it becomes implemented.

Sincerely,

Hap Channeli, Chairperson       Paula Swenson, Commissioner       Jim Starr, Commissioner

COURTHOUSE SQUARE • 200 EAST VIRGINIA • GUNNISON, COLORADO 81230

BLM_0059820



Gunnison County Trails Commission

811 Rio Grande, Gunnison, CO 81230

October 18, 2007

Mr. Dave Roberts;

The Gunnison County Trails Commission has reviewed the Draft RPS/EIS for Curecanti National Recreation Area and agree with the proposal of introducing Alternative 2 for the area. The vast scope of Curecanti recreation is exciting, but limited under the current management structure.

If Alternative 2 was implemented the door to increased recreational activities, including trails would be possible. The Trails Commission is interested in an expanded trail system for two reasons:

1) The creation of a new planned trail system could tie into adjacent trails on Bureau of Land Management, United States Forest Service lands, highway bike lanes and Gunnison County trails. For an effective trail network the Curecanti NRA would serve as a designation and a linkage to drainages adjacent to the area. Having the ability to include Curecanti NRA in the big picture just makes sense due to the proximity from Gunnison.

2) Under the current plan, bicycles are not allowed on trails within the Curecanti NRA. Since this area is a recreation area, there is an untapped recreation that could be included within the NRA. Gunnison County is rich in mountain and road bike history, but "the lake" has always been off limits to bikes. Creating a system of bicycle trails would put Curecanti NRA on the map even more if it was user friendly for families with bicycles; the aging population looking for bicycle opportunities such as "Rails to Trails" systems; and thinking big, the creation of the "century trail" a 100 mile trail opportunity that would run around Blue Mesa, which would be a most do on most bicyclists lists.

A new trail system would be an amenity to Curecanti NRA. Current trails in the area are short in length, unlinked, not looped experiences. With improvements and additional trails, more hikers, runners, and bicyclists will come to Curecanti to recreate. A new user profile will develop and expand.

We support Alternative 2 and look forward to the opportunity to work with the Park Service staff at Curecanti for a better recreational future.

Thank you,
Joellen Fonken


Gunnison County Trails Commission

BLM_0059821



INTERNATIONAL MOUNTAIN BICYCLING ASSOCIATION

October 19, 2007

Drew Vankat
International Mountain Bicycling Association
P.O. Box 7578
Boulder, CO 80306

Curecanti National Recreation Area
102 Elk Creek
Gunnison, CO 81230

Dear National Park Service:

The International Mountain Bicycling Association (IMBA) submits the following comments on
the Curecanti National Recreation Area (NRA) Resource Protection Study/Environmental
Impact Statement RPS/EIS). IMBA requests that the final RPS/EIS take steps towards satisfying
36 CFR 4.30, the regulation for bicycling on trails in National Park Service (NPS) units.
Specifically, the RPS/EIS revision process should incorporate a special regulations request
regarding potential future bicycling use on trails within Curecanti.

IMBA is a national and international organization dedicated to creating, enhancing, and
preserving trail experiences for mountain bikers worldwide. We have 80,000 individual
supporters, 750 affiliate clubs, and 300 dealer members. IMBA and the NPS signed a General
Agreement in 2005 to identify appropriate opportunities for responsible mountain bicycling on
NPS lands. In the last two and a half years, we have received numerous inquiries from park
superintendents interested in mountain bicycling. IMBA is collaborating with three parks on
long-term pilot projects and just finished nine informational and trailwork visits in 2007 at NPS
units across the country.

Mountain bicycling is a quiet, low-impact, human-powered activity compatible with resource
conservation and a healthy lifestyle. In an era when many NPS visits are confined to motor
vehicle travel, mountain bicycling provides an appropriate mode of recreation for personal
exploration and the formation of emotional connections with our national parks.

At least 44 NPS units allow mountain bicycling on some dirt roads or trails. A full list can be
found at: http://www.imba.com/resources/agencies/nps.html

**Environmental Impacts of Mountain Bicycling**

Science has shown that bicycling has similar environmental impacts as hiking and far less than
equestrian or OHV use. The most robust and well-designed study to date was conducted by Dr.
Jeffrey Marion at Virginia Tech and funded by the National Park Service. Dr. Marion's research
shows bicycle trails at Big South Fork National River and Recreation Area to be the least eroded,

   

SPEAK   BUILD   RESPECT   RIDE

BLM_0059822

narrowest, and have the least amount of muddiness of all trails. Dr. Marion took extensive measurements and observations at 500-foot increments on a large random sample of trails, including hiking, horse, ATV and multi-use trails (Marion, 2006).

Another recent comprehensive study was conducted by recreational ecologists Dave White (Arizona State University) and Pam Foti (Northern Arizona University). They led a three-year research project titled "A Comparative Study of Impacts to Mountain Bike Trails in Five Common Ecological Regions of the Southwestern U.S." Their research, published in the summer 2006 Journal of Park and Recreation Administration (Volume 24, Number 12), measured trail erosion and other impacts on 31 trails used for mountain biking in the southwestern U.S. The study concludes that, "certain impacts to mountain bike trails, especially width, are comparable or less than hiking or multiple-use trails, and significantly less than impacts to equestrian or off-highway vehicle trails" (White et al, 2006).

**Please Develop Shared-Use Trails at Curecanti**

Page 105 of the draft plan discusses the potential for mountain bicycling within the NRA and specifically an east-west trail south of Blue Mesa Reservoir. IMBA supports this proposal and offers its assistance in planning for mountain bicycling use.

Bicycle use on trails on NPS land is governed by 36 CFR 4.30. Many of the two-dozen NPS units with bicycling on narrow dirt trails permit this use through their superintendent's compendium, though 36 CFR 4.30 stipulates that bicycle use on trails requires promulgating special regulations. Several parks are undergoing this process right now and IMBA can share insights on their approach and progress.

The most efficient way to permit bicycling on dirt trails in the NRA is by dovetailing the process with the RPS/EIS revision. Park staff can begin the special regulations process required to permit bicycling on dirt trails while updating the RPS, drastically reducing extra work and resources. NPS Special Regulations Program Manager Jerry Case (jerry_case@nps.gov or 202-208-4206) can provide more information on streamlining the special regulations process.

IMBA encourages Curecanti to submit a proposed rule during the GMP revision for construction of shared-use trails within the NRA. This would not obligate the agency to construct such trails, but would eliminate future delays by having the special regulations in place.

Future trail projects at Curecanti may also be good candidates for Centennial Challenge funding. At Big Bend National Park, IMBA and a local affiliate worked with the NPS to design a shared-use trail proposal that has been selected as a Centennial Challenge project. Please consider a similar approach at Curecanti.

**Conclusion**

IMBA and local affiliates like Gunnison Trails can assist the NPS in developing new singletrack opportunities and fostering a trail stewardship relationship with mountain bicyclists. IMBA strongly encourages Curecanti to begin the special regulations process necessary to permit bicycling on dirt trails. Again, this carries no obligation to allow mountain bicycling, but simplifies possible future efforts to permit this quiet, low-impact use. Thank you for the opportunity to submit these comments.

Sincerely,

BLM_0059823



## MONTROSE COUNTY
### COLORADO

## BOARD OF COUNTY COMMISSIONERS

May 22, 2008

Ms. Connie Rudd, Superintendent
Curecanti National Recreation Area
c/o National Park Service
2465 South Townsend Avenue
Montrose CO  81401

Dear Ms. Rudd:

Montrose County Board of County Commissioners supports the implementation of Alternative 2 of the proposed action outlined in the Curecanti Resource Protection Study. We concur that the National Park Service should continue to manage the resources and recreation at Curecanti and that it be legislatively established as a National Recreation Area. We understand that the designated recreation area boundary will include additional agency lands and that the boundary would be delineated based on resources and other management considerations.

In consideration for individual property rights, the Board agrees with the approach of working with adjacent landowners within a Conservation Opportunity Area subject to the requirement that landowner involvement is voluntary. Thank you for including the community and local governments in this process and we look forward to the beneficial impacts this study will have once it is implemented.

Sincerely,

Gary J. Ellis
Chairman

William N. Patterson
Vice Chairman

Allan J. Belt
Commissioner

/sn

Copy:   Dave Roberts, National Park Service

161 South Townsend Avenue · Montrose, CO 81401
Phone 970.249.7755 · FAX 970.249.7761

BLM_0059824



# United States Department of the Interior

NATIONAL PARK SERVICE
Acadia National Park
P.O. Box 177
Bar Harbor, Maine 04609

IN REPLY REFER TO:

January 9, 2008

Curecanti Resource Protection Study Comments
Attention: Dave Roberts
National Park Service
2465 S. Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Roberts:

I strongly support Alternative 2: The Proposed Action, as described in the Draft Resource Protection Study/Environmental Impact Statement, dated June 2007, for Curecanti National Recreation Area (NRA).

Prior to becoming superintendent at Acadia National Park, I was superintendent at Curecanti NRA and Black Canyon of the Gunnison National Park. I realized at that time that while Curecanti had long been funded as an NRA, it was being operated under a long-term agreement with the Bureau of Reclamation (BOR), and had no authorizing legislation, unlike most units in the national park system. I also perceived that the scenic and other values that made the area such a special place could not be assured into perpetuity, and that the potential for public land-based recreation was limited. This is because the land that NPS manages is limited to the minimum land BOR had acquired for the reservoir projects, and that the quality of the resource values was associated with neighboring properties, and dependent upon how those lands were managed. I envisioned some type of authority whereas NPS could work with neighboring agencies and landowners to help ensure that these important values could be protected, where recreation opportunities could be expanded, and where the quality of the visitor experience could remain high.

While at Curecanti, I consulted with congressional staff during the formulation of the Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999 (Public Law 106-76, October 21, 1999), which requested the Curecanti study that has become known as the Resource Protection Study (RPS). I supported the concept of conducting a study that would develop recommendations that Congress could then consider prior to legislative establishment of the NRA.

I am very pleased with the recommendations found in the Proposed Action, which do an excellent job of satisfying the intent as I envisioned it and as requested by the 1999 legislation, to assess the resources within and surrounding the NRA, to identify alternatives to protect those resources, and to highlight a variety of tools to achieve those purposes. If implemented, the Proposed Action would be a major step in reaching the vision for the resources and recreational opportunities at Curecanti that my staff and I had while I was superintendent there.

Sincerely,

Sheridan S. Steele
Superintendent

BLM_0059825



THE
TRUST
*for*
PUBLIC
LAND

October 15, 2007

Curecanti Resource Protection Study Comments
Attn: Dave Roberts
2465 South Townsend Avenue
Montrose, CO 81401

Colorado Office
1410 Grant St.
Suite D210
Denver, CO
80203
T (303) 837-1414
F (303) 837-1131
www.tpl.org

United States National Park Service:

The Trust for Public Land (TPL) strongly supports Alternative Two of the Draft Resource Protection Study (RPS) for the Curecanti National Recreation Area (NRA). Alternative Two would not only help protect the existing recreational and conservation values within Curecanti, but it also provides an opportunity to expand and better manage protected lands throughout the area.

Since 1965, Curecanti has been managed as an NRA without being legislatively established as a unit of the national park system and without a legislated boundary. While this arrangement was adequate in the past, the growth of recreational activities in the area, as well as the increase in development, require that new action must be taken. In order to protect both the recreational and conservation values of Curecanti, land protection efforts must be made throughout the surrounding area.

The most effective way for the Park Service to conserve land around Curecanti is by partnering with local governments and non-profit land conservation organizations to help willing landowners permanently protect their property. Such partnerships will give the Park Service access to the wide variety of conservation tools that will be necessary in order to meet the diverse needs of private landowners, while also meeting its own conservation objectives. Alternative Two may help to provide the Park Service with the resources it needs to accomplish these goals.

TPL is a non-profit land conservation organization with a mission of conserving land for people. We protect important conservation lands under threat of development by buying them from conservation-minded property owners and conveying them, often at less than fair market value, to federal, state and local government agencies. We also work to protect important natural and working lands using a variety of other conservation tools, including conservation easements. TPL has worked in Colorado for over 25 years and has protected over 80,000 acres of land throughout the state.

TPL is excited by the Park Service's efforts to date, and we would welcome the opportunity to work with you, as well as any state or local government agency or land conservation group, on this important project. Thank you for your time and consideration.

Sincerely,

Tim Wohlgenant
Colorado State Director

BLM_0059826



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
**1595 Wynkoop St.**
**DENVER, CO   80202**
**Phone 800-227-8917**
**http://www.epa.gov/region8**

AUG 2 9 2007

RECEIVED

SEP 0 4 2007

BLACK CANYON N.P.

Ref: EPR-N

Dave Roberts, Management Assistant
National Park Service
Curecanti Resource Protection Study Comments
2465 South Townsend Ave.
Montrose, CO 81401

> RE:  Draft Resource Protection Study /
> Environmental Impact Statement for the
> Curecanti National Recreation Area
> CEQ#: 20070306

Dear Mr. Roberts:

In accordance with our responsibilities and authorities under the National Environmental Policy Act (NEPA), and Section 309 of the Clean Air Act, the Region 8 office of the U.S. Environmental Protection Agency (EPA) has reviewed the Draft Resource Protection Study and Environmental Impact Statement (DEIS) for the Curecanti National Recreation Area (NRA) in Colorado.

The Curecanti NRA currently includes 41,790 acres of land in Gunnison and Montrose Counties.  The area stretches along 40 miles of the Gunnison River basin and includes land areas adjacent to the Wayne Aspinall Storage Unit of the Colorado River Storage Project.

The DEIS presents a description of the proposed action to officially establish Curecanti NRA and associated Conservation Opportunity Areas (COAs), add additional land area to the unit, and provide the National Park Service with long-term management tools and authorities. The new NRA would include 51,830 acres with an additional 24,300 acres of private property designated as a COA.  EPA notes that the proposal, presented as Preferred Alternative 2, represents clear environmental benefits compared to the No Action Alternative.  EPA recognizes the commitment to cooperative conservation with local landowners as an innovative approach that will provide for the conservation of the considerable natural, cultural, recreational and aesthetic values in the area.  We concur that the net impact would be to limit development and conserve resources.

EPA believes that certain aspects of the Preferred Alternative merit additional clarification and analysis.  The most substantive concern is the lack of any reference to potential environmental impacts associated with increased recreational access and use of lands in the proposed NRA/COA.  EPA specifically recommends that the DEIS consider the potential impacts of increased recreational use in areas that are made more accessible by this proposal.

BLM_0059827

This is especially significant for those land units (CO 92, Gunnison River, Iola Basin, and Sapinero/Blue Mesa) that have been identified as COAs based on their recreational value.

While EPA appreciates that a specific assessment of the impacts of individual recreational activities is not within the scope of this DEIS, we believe that the discussion of the Preferred Alternative's potential environmental consequences should acknowledge that uses (day hiking, backcountry camping, horseback riding, cross-country skiing, fishing, hunting, boating and other water-based recreation, rock climbing, off-road vehicle use and additional activities outlined as potential uses on pages 103-104) could present localized impacts to resources. The designation of biking or horse trails in areas within the proposed NRA/COA boundary that are currently not accessible, for example, would pose a potential for increased erosion, water quality degradation and wildlife impacts. Other recreational activities would pose their own unique set of potential impacts to natural resources. In addition, amenities such as parking lots, campsites and restroom facilities represent additional potential indirect impacts.

Considering the concerns outlined above, EPA recommends that Chapter 4's treatment of Environmental Consequences for Natural Resources include references to potential impacts associated with increased recreational access and uses associated with the Preferred Alternative. Similarly, Table 5 in Chapter 2, "Summary of Environmental Consequences" should include language on potential adverse impacts associated with increased use of specific COA units. While these DEIS sections may characterize recreation-related impacts as minor or moderately adverse, and may also cite management plans and measures that can and/or will be employed to mitigate impacts, EPA believes that the document should clearly disclose that increased recreational use that occurs as a result of this proposal may present impacts to water quality, vegetation, wildlife communities, special status species and other resources.

EPA also notes that ten tracts, encompassing 1,243 acres, have been identified for potential deletion from the NRA under the Preferred Alternative. While we understand that some of these tracts will be used to secure the conservation of other high-value resources on properties within the proposed COA, we were unable to find detailed information on the basis for the deletion of these properties in the DEIS (Chapter 2, page 50). We recommend that the Final EIS include some information on the criteria and rationale used to determine the tracts subject to potential deletion.

While addressing the comments above would improve the Final EIS, EPA believes that this project offers a clear set of environmental benefits when compared to the status quo. EPA is rating the Proposed Action as an LO. "LO" (lack of objections) signifies that EPA's review has not identified any potential environmental impacts requiring substantive changes to the preferred alternative. A copy of EPA's rating criteria is enclosed.

EPA recognizes this DEIS and Resource Protection Study as a response to a request by Congress to assess the natural, cultural, recreational, and scenic resource value and character of the land within and surrounding Curecanti NRA, to identify practicable alternatives that protect those values, and recommend economically feasible and viable tools to achieve resource protection goals. EPA understands and expects that specific management plans and actions, including measures that will mitigate impacts associated with increased recreational use, will follow if the NRA is expanded and a COA is created as envisioned.

Thank you for the opportunity to review the Draft Resource Protection Study and Environmental Impact Statement for Curecanti National Recreation Area. If you would like to discuss EPA's comments, or any other issues related to the review of the DEIS, the most knowledgeable person on my staff is Rich Mylott, who can be reached at 303-312-6654.

Sincerely,

Larry Svoboda
Director, NEPA Program
Office of Ecosystems Protection and
Remediation

Enclosure

BLM_0059828

### U.S. Environmental Protection Agency Rating System for Draft Environmental Impact Statements Definitions and Follow-Up Action*

#### Environmental Impact of the Action

**LO - - Lack of Objections:** The Environmental Protection Agency (EPA) review has not identified any potential environmental impacts requiring substantive changes to the proposal. The review may have disclosed opportunities for application of mitigation measures that could be accomplished with no more than minor changes to the proposal.

**EC - - Environmental Concerns:** The EPA review has identified environmental impacts that should be avoided in order to fully protect the environment. Corrective measures may require changes to the preferred alternative or application of mitigation measures that can reduce these impacts.

**EO - - Environmental Objections:** The EPA review has identified significant environmental impacts that should be avoided in order to provide adequate protection for the environment. Corrective measures may require substantial changes to the preferred alternative or consideration of some other project alternative (including the no-action alternative or a new alternative). EPA intends to work with the lead agency to reduce these impacts.

**EU - - Environmentally Unsatisfactory:** The EPA review has identified adverse environmental impacts that are of sufficient magnitude that they are unsatisfactory from the standpoint of public health or welfare or environmental quality. EPA intends to work with the lead agency to reduce these impacts. If the potential unsatisfactory impacts are not corrected at the final EIS stage, this proposal will be recommended for referral to the Council on Environmental Quality (CEQ).

#### Adequacy of the Impact Statement

**Category 1 - - Adequate:** EPA believes the draft EIS adequately sets forth the environmental impact(s) of the preferred alternative and those of the alternatives reasonably available to the project or action. No further analysis of data collection is necessary, but the reviewer may suggest the addition of clarifying language or information.

**Category 2 - - Insufficient Information:** The draft EIS does not contain sufficient information for EPA to fully assess environmental impacts that should be avoided in order to fully protect the environment, or the EPA reviewer has identified new reasonably available alternatives that are within the spectrum of alternatives analyzed in the draft EIS, which could reduce the environmental impacts of the action. The identified additional information, data, analyses or discussion should be included in the final EIS.

**Category 3 - - Inadequate:** EPA does not believe that the draft EIS adequately assesses potentially significant environmental impacts of the action, or the EPA reviewer has identified new, reasonably available alternatives that are outside of the spectrum of alternatives analyzed in the draft EIS, which should be analyzed in order to reduce the potentially significant environmental impacts. EPA believes that the identified additional information, data, analyses, or discussions are of such a magnitude that they should have full public review at a draft stage. EPA does not believe that the draft EIS is adequate for the purposes of the National Environmental Policy Act and or Section 309 review, and thus should be formally revised and made available for public comment in a supplemental or revised draft EIS. On the basis of the potential significant impacts involved, this proposal could be a candidate for referral to the CEQ.

* From EPA Manual 1640 Policy and Procedures for the Review of Federal Actions Impacting the Environment. February, 1987.

BLM_0059829



| United States Department of Agriculture | Forest Service | Grand Mesa, Uncompahgre and Gunnison National Forests | 2250 Highway 50 Delta, CO 81416 Voice: 970-874-6600 TDD: 970-874-6660 |
|---|---|---|---|

File Code: 1950/5500
Date: October 31, 2007

CONNIE RUDD
SUPERINTENDENT
CURECANTI NRA
C/O NATIONAL PARK SERVICE
2465 S TOWNSEND AVENUE
MONTROSE, CO 81401

Dear Superintendent Rudd:

We have received and reviewed the Draft Resource Protection Study/EIS for the Curecanti National Recreation Area. We support the Preferred Alternative and the land adjustments as proposed. We appreciate the adjustments made on our behalf by and in cooperation with Dave Roberts and Jeff Heywood. Thank you for coordinating with the Forest Service on this project.

Sincerely,

CHARLES S. RICHMOND
Forest Supervisor

cc: District Rangers - Gunnison & Paonia RDs



**Caring for the Land and Serving People**          Printed on Recycled Paper

BLM_0059830

CHAPTER 5: CONSULTATION AND COORDINATION



**William F Jackson**
&lt;wfjackson@fs.fed.us&gt;
10/18/2007 09:27 PM
CST

To: Dave_Roberts@nps.gov
cc: James R Dawson &lt;jrdawson@fs.fed.us&gt;
Subject: Curecanti NRA DEIS comments

Hi there, I'm new to the Gunnison Ranger District and look forward to collaborating with NPS on this project and others. I have reviewed briefly the DEIS focusing primarily on the Soap Creek area. My apologies if my comments below have already been discussed or disclosed with other Gunnison Ranger District personnel:

> DEIS, page 171: you point out correctly that "long-term adverse impacts are possible due to the change in front-country campground management....existing camping opportunities in undesignated sites would be lost because NPS would change the management of the area to designated camping only." Another potential effect of going to designated camping only in the corrals area is that some existing users may be displaced back on to the Forest in either existing or newly-created dispersed sites along Soap Creek Road.
> I didn't see mention of potential Alt. 2 impacts to recreationists who use the Soap Creek Corral area for day use and overnight horse trailer parking (esp. during hunting season) and users who are using the corral/campground area for day use and overnight trailhead parking to utilize the Coal Mesa Trail. You do say that, "NPS would permit all existing uses within the campground, including camping and use of the existing horse corrals." Does this include overnight parking of vehicles and horse trailers? If so, would users be subject to a fee for parking? Does this include continued use of the Coal Mesa trail and will NPS assume management/maintenance of the trail (at least up to the proposed NFS boundary)?
> You also point out correctly (DEIS, page 127-128) that Soap Creek Campground is managed by a USFS-permitted concession (RRM) and that a USFS-permitted outfitter utilizes the Soap Creek Corral area for corral use and horse trailer parking (they are actually permitted by USFS to park there for several weeks during the hunting season). On page 199 you say that "existing concession operations and permits in the area (campground maintenance and outfitters) would need to be transferred to the National Park Service or terminated." I'd say that's correct for the campground concession but not necessarily for the outfitter/guide permit. The outfitter, West Elk Outfitters, would likely need an additional permit/authorization from NPS to utilize the horse corral area but their USFS permit would remain intact except for the provision that they can utilize Soap Creek corrals.
> Due to the moderate to heavy use it receives I recommend continued use of the corrals area for horse trailer parking during the hunting season. Alternatively, an adequate site would need to be identified either on NPS or NFS to provide horse trailer parking for the Soap Creek drainage during hunting season.
> Overall I agree with your statements that the Soap Creek campground/corral area would benefit "as a result of greater NPS presence, including increased law enforcement and campground maintenance."

Regards,
Bill Jackson

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
Bill Jackson
Recreation Staff Officer

Gunnison Ranger District
216 N. Colorado St., Gunnison, CO 81230
phone: 970.642.4439
fax: 970.642.4425
email: wfjackson@fs.fed.us

BLM_0059831

 **Upper Gunnison River Water Conservancy District**

October 10, 2007

Curecanti Resource Protection Study Comments
Attn:  Dave Roberts
2465 South Townsend Avenue,
Montrose, CO 81401

RE:  Curecanti Resource Protection Study

Dear Mr. Roberts,

We wish to thank Connie Rudd and Ken Stahlnaker for their presentation on the
Curecanti Draft Resource Study / Environmental Impact Study at our last board meeting.
The information they shared was very helpful in understanding the impacts of the
proposed alternatives.  The Upper Gunnison River Water Conservancy District supports
the proposed action under Alternative 2.

We are also supportive of the agricultural community in this basin.  As such, we believe
that any agricultural water rights associated with the Conservation Opportunity Areas
should remain in private agricultural ownership.

Thank you for seeking input from our community for the Draft Resource Protection
Study / Environmental Impact Study.  Please let us know if we can provide further input
into this effort.

Sincerely,

Brett Redden, President
Upper Gunnison River Water Conservancy District

---

P.O. Box 1330 • 234 North Main Street, Suite 3C • Gunnison, CO 81230
Phone (970) 641-6065 • Fax (970) 641-1162 • www.ugrwcd.org

BLM_0059832

CHAPTER 5: CONSULTATION AND COORDINATION



**"Susan Starcevich"**
<Starcevi@wapa.gov>
11/15/2007 10:46 AM
MST

To: <Dave_Roberts@nps.gov>
cc: <Jeff_Heywood@nps.gov>
Subject: Second response by Western on Curecanti RPS/EIS

I've been instructed by my management to provide you with the following note per your request for additional information from Western on the subject document.

Dave,

As you know, Western is a Federal agency under the Department of Energy. Accordingly, we are not in a position to publicly offer comments on proposed recreation area boundaries as discussed in the Curecanti National Recreation Area (NRA) Environmental Impact Statement. However, Western does support the National Park Services' (NPS) effort to identify and discuss the importance of maintaining and operating Federal transmission lines in the Curecanti NRA, and we appreciate the opportunity to provide the NPS with information regarding Western's role as a transmission provider and the statutory authority upon which that role is based.

As indicated in our previous email, we are providing more specific language regarding Western's authority. While the draft document provides a discussion of the relationship between the Bureau of Reclamation and the NPS, it should also provide a similar explanation about how Western, as a power marketing administration, took over the transmission responsibility from Reclamation. The final RPS/EIS should provide this information to ensure there are no gaps in the history of the Aspinall Unit and the NRA lands, including the transmission of electric power.

The best way to stress the transmission component of Western's mission is to reference the Department of Energy (DOE) Organization Act of 1977. Section 302 of the DOE Organization Act transferred "all functions of the Secretary of the Interior under section 5 of the Flood Control Act of 1944, and all other functions of the Secretary of the Interior...with respect to the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities." This section of the act goes on to state that the power marketing functions shall be exercised by the Secretary of Energy acting through a separate and distinct administration within the department. The Flood Control Act of 1944 authorized the Secretary of the Interior to construct or acquire necessary transmission lines and related facilities to deliver power generated from Corps of Engineers water projects. The Reclamation Acts of 1902 and 1939 serve as further authority for Western's power marketing/transmission role.

In regards to the Curecanti Storage Unit (subsequently designated the Wayne N. Aspinall Storage Unit on October 3, 1980), one of the stated purposes of the Colorado River Storage Project (CRSP), passed by Congress on April 11, 1956, was "for the generation of hydroelectric power." The Secretary of the Interior was instructed to construct, operate, and maintain Colorado River storage units (dams, reservoirs, power plants, transmission facilities and appurtenant works) at Curecanti, Flaming Gorge, Navajo and Glen Canyon. The explicit reference in the CRSP Act to constructing and maintaining transmission facilities associated with Curecanti/Aspinall, in addition to the other

BLM_0059833

authorities cited, serves as a strong basis for asserting the continued
need for transmission corridors/rights-of-way within the boundaries of
the Curecanti NRA.  Citing the DOE Organization Act and the CRSP Act
would provide adequate discussion regarding Western's transmission
system and legal authority.

In order to clearly document Western's authority and its mission, we
suggest a separate heading for the Department of Energy and include the
above paragraphs.

We would also like to clarify that Western owns no lands within the
proposed boundaries of the Curecanti NRA; it owns, operates and
maintains transmission facilities.  For example, on page 128, the draft
states that "Western owns and operates a number of facilities, including
transmission lines and communication sites, as well as the roads that
provide
access to these facilities that lie within or adjacent to
Curecanti NRA."  Western does not "own" the roads or the lands beneath
them.  These roads were constructed by Reclamation when the transmission
facilities were built and are currently maintained and improved as
needed by Western.

Thank you for your continued interest in soliciting Western's views.
Please contact me if you have any questions or concerns.

Susan

BLM_0059834

CHAPTER 5: CONSULTATION AND COORDINATION

## PREPARERS AND CONSULTANTS

### PREPARERS OF THE RESOURCE PROTECTION STUDY/ ENVIRONMENTAL IMPACT STATEMENT

The following people were primarily responsible for preparing the RPS/EIS, and/or important materials used or referenced in the document.

**Bureau of Reclamation**

Alan Schroeder, Natural Resource Specialist, EIS Cooperating Agency Representative from the Reclamation Lands and Recreation Resources Group, Western Colorado Area Office, Grand Junction, Colorado. Responsible for overall coordination of Bureau of Reclamation input to the study, the EIS, and recommendations to Congress. BS in Forest Science, Forest Management Option. Over 30 years of experience in Federal land and resource management with the US Bureau of Reclamation, US Bureau of Land Management, US Fish and Wildlife Service and US Forest Service. Over 27 years of experience in resource management planning and NEPA documentation with the Bureau of Reclamation and the Bureau of Land Management.

**National Park Service – Curecanti NRA/ Black Canyon of the Gunnison NP**

- Marianne August, former Project Assistant and GIS Specialist. Responsible for GIS analysis and cartography for the project, and coordinating information-gathering from other agencies. Bachelors Degree in Geography. Four years with the National Park Service.

- Ralph Falsetto, former Cartographic Technician. Responsible for GIS analysis and cartography for the project, and coordinating information-gathering from other agencies. Currently a GIS Specialist for USFS at Fishlake National Forest in Richfield, Utah. Bachelors Degree in Geology. Two years with the National Park Service.

- Forest Frost, Archeologist. Served as RPS liaison during consultations with the State Historic Preservation Officer and Ute tribal representatives. Provided technical support on issues dealing with the NRA's cultural resources. B.A. Anthropology, B.A. Geography, M.A. Geography. Member -- Registry of Professional Archaeologists. Twenty-one years with the National Park Service.

- Pete Hart, former Interim Superintendent. Overall oversight of the Draft Resource Protection Study during an extended period between permanent superintendents in 2003. Returned from retirement for several details in the National Park Service after a 34-year NPS career as a ranger, and later superintendent at some fifteen NPS areas. BA and MA in Geography.

- Dave Roberts, Management Assistant, RPS Park Liaison. Responsible for coordinating the project at the park level. Contributed to all sections of the document. Experience in NRA operations, interpretation, visitor and resource protection, resource management, fee collection, environmental compliance, and NRA planning. Former Chief Ranger, Black Canyon of the Gunnison National Monument, Tonto National Monument, Fort Union National Monument; Park Ranger, Montezuma Castle National Monument; Park Technician, Fort Point National Historic Site, Muir Woods National Monument. BA in Economics, with post graduate work in Environmental Geography. Thirty-three years with the National Park Service.

- Connie Rudd, Superintendent. Responsible for management of Black Canyon of the Gunnison National Park and Curecanti National Recreation Area, including future implementation of the Resource Protection Study,

BLM_0059835

and coordination of partners and neighbors. Experience includes assignments as Deputy Superintendent at Shenandoah National Park (7 years), Superintendent at Oklahoma City National Memorial and Chickasaw National Recreation Area (4 years); Rocky Mountain Regional Chief of Interpretation, Planner with Harper's Ferry Center and Denver Service Center, field interpreter and educator at Grand Canyon and Rocky Mountain National Parks (10 years), English teacher at Colorado Mountain College (Steamboat), guest instructor at Albright Training Center and Mather Training Center. Participated in certificate program at Harvard University's Kennedy School of Government, Conservation Leadership Institute, 2006-2007. BA in English, MS in Physical Geography. Twenty-seven years with the National Park Service.

- Ken Stahlnecker, Chief, Resource Stewardship and Science. Responsible for coordinating and providing natural and cultural resources input to the study process at the NRA level. Provided review for all sections of the document. Experience in resource management, environmental compliance, NRA operations, and NRA planning. Former Resource Manager, Denali National Park and Preserve, Crater Lake National Park, Curecanti National Recreation Area, and Antietam National Battlefield. BS in Forest Science. Twenty-four years with the National Park Service.

- Sheridan Steele, former Superintendent. Responsible for initially setting the overall direction, and providing guidance and advice during the first four years of the study. In park management for 27 years, starting with NPS as Management Assistant at Cuyahoga Valley NRA. Prior to that, worked as a park planner for Ohio State Parks and for a non-profit conservation organization in

Ohio. Also worked at Fort Scott NHS in Kansas and Rocky Mountain NP in Colorado, and was on detail in the Washington Office of NPS for a year. Superintendent of Black Canyon of the Gunnison National Park and Curecanti NRA for 7 years, ending in 2003. Currently Superintendent at Acadia NP in Maine. Holds a BS in Business Administration and MS in Natural Resources Management. Thirty years with the National Park Service.

- Bill Wellman, former Superintendent. Responsible for overall management of Curecanti National Recreation Area and Black Canyon of the Gunnison National Park, and for providing guidance and advice on the Draft Resource Protection Study. Experience includes assignments as superintendent at Organ Pipe Cactus National Monument, AZ; Great Sand Dunes National Monument, CO; Timpanogos Cave National Monument, UT; and Fort Union Trading Post National Historic Site, ND. Currently Superintendent at Big Bend National Park in Texas. Holds a BS degree in Park Management from NC State. Thirty-five years with the National Park Service.

## National Park Service – Intermountain Support Office, Denver

- Jeff Heywood, Team Leader, Landscape Architect/Planner, Contracting Officer's Representative. Responsible for overall management of the project. Contributed to all sections of the document. Experience at Intermountain Regional Office and NPS Denver Service Center writing general management plans, development concept plans, and environmental impact statements. Experience at Curecanti NRA as facility manager; and chief of planning, construction, and concessions. BS(IE) & ME(IND) in industrial engineering; MLA in landscape architecture.

Twenty-nine years with the National Park Service.

- Dave Ruppert, Cultural Anthropologist. Produced a report on American Indian Affiliation at Curecanti NRA, and advised and participated in meetings with affiliated tribes. Presently works in the Office of Indian Affairs and American Culture, and serves as program manger for the Applied Ethnography Program in the Intermountain Region of the National Park Service in Denver, Colorado. Served as a cultural anthropologist with the cultural resources office of the National Park Service in the Intermountain Region, and has held joint appointments as a research anthropologist with the Bureau of Land Management and the Office of the Federal Inspector in Alaska. Served on the faculties of the University of Alaska in Fairbanks, Alaska, and Regis University in Denver, Colorado. Presently holds the position of associate professor of anthropology at the University of Colorado at Denver. Holds a PhD in cultural anthropology from the University of Arizona. Twenty-nine years with the National Park Service, the Bureau of Land Management, and the Office of the Federal Inspector.

## Contractors

- Nicole Korbe, Environmental Planner. Primary author of the sections of the document on natural resources, including descriptions and impact analysis of water quality, geology and paleontology, vegetation and wildlife, and special status species. Also participated in meetings and workshops as a member of the planning team. Experience in NEPA, natural resource impact assessment, wildlife habitat assessments, vegetation community analysis, wildlife and vegetation surveys, threatened and endangered species permitting and compliance, wetlands permitting and assessment, and other aspects of environmental planning and compliance. B.S. in Biology with a minor emphasis in Geology, with post graduate work in Ecology and Hydrology. Seven years experience in natural resource assessment.

- Karen Lusby, NEPA Specialist/ Environmental Planner. Responsible for initial compilation of text for the Draft RPS/EIS. Conducted workshop to develop impacts. Compiled chapters on Purpose and Need, and Alternatives, in cooperation with park and regional staff; and authored sections on Scenic Quality, Economic and Social Conditions, Neighboring Private Lands and Landowners, and National Park Service and Neighboring Agency Management and Operations. Experience in park planning (DO-2), environmental compliance (DO-12), resource management, and economics from 8 years with the National Park Service, Denver Service Center, and 12 years in environmental consulting. B.S. in Outdoor Recreation and Park Administration, and M.S. in Forest Economics.

- Michael Morelli, Landscape Architect. Authored initial sections on Recreation Opportunities, and Interpretation and Educational Opportunities. Currently Transportation Planner with NPS Washington Office of Transportation Management Program. Bachelors Degree in Environmental Design/Architecture from San Diego State University, and Masters Degree in Landscape Architecture from Louisiana State University. Over nine years with the National Park Service.

## CONSULTANTS

The following people provided input into the document preparation and/or revision. Some met with the study team, either individually or in group settings, to provide information, ideas, and feedback relating to the RPS/EIS.

BLM_0059837

**Bureau of Land Management**

- Arden Anderson, Recreation and Wilderness Specialist, Gunnison Field Office

- Allan Belt, former Uncompahgre Field Office Manager (retired)

- Craig Blacketter, former Natural Resource Specialist, Gunnison Field Office

- Joe Capodice, former Wildlife Biologist, Gunnison Field Office (retired)

- Dave Kaufmann, Associate Uncompahgre Field Office Manager

- Kenny McDaniel, Gunnison Field Office Manager

- Teresa Pfifer, Realty Specialist, Uncompahgre Field Office

- Barb Sharrow, Uncompahgre Field Office Manager

- Barry Tollefson, former Gunnison Field Office Manager (retired)

- Randall Zanon, Chief Cadastral Surveyor for Colorado, Colorado State Office

**Bureau of Reclamation**

- Jane Blair, General Engineer, Power Office

- Donald K. Phillips, Manager, Curecanti Field Division

**Club 20**

- Reeves Brown, President

**Colorado Department of Natural Resources**

- Shane Henry, former Assistant Director for Energy, Land and Forestry

- Tim Pollard, former Deputy Director for Policy

**Colorado Department of Transportation**

- Ron Alexander, Professional Engineer, Highway Operations

- Daryl Carlson, Resident Engineer, Highway Operations

**Colorado Division of Wildlife**

- Rick Basagoitia, District Wildlife Manager, Game Management Unit 55

- James Guthrie, Financial Initiatives Program Manager

- Doug Homan, District Wildlife Manager, Game Management Unit 63

- Jeff Oulton, District Wildlife Manager, Game Management Unit 54

- Tom Spezze, Southwest Regional Manager

- Bob Towry, former Habitat Section Supervisor (Lands, Grants, Awards, and Realty)

- J Wenum, Gunnison Area Manager

- Jim Young, former Gunnison Area Manager (retired)

**Colorado Governor's Office**

- Theresa Sauer, former Policy Analyst

- John Swartout, former Senior Policy Analyst

**Colorado River Energy Distributors Association**

- Leslie James, Executive Director

**Colorado State Representatives**

- Kay Alexander, former Representative, District 58

- Carl Miller, former Representative, District 56

- Gregg Rippy, former Representative, District 61

BLM_0059838

CHAPTER 5: CONSULTATION AND COORDINATION

**Colorado State Senators**

- Lewis Entz, former Senator, District 5

- Jim Isgar, Senator, District 6

- Jack Taylor, Senator, District 8

**Department of the Interior**

- Judge Craig Manson, former Assistant Secretary of the Interior for Fish, Wildlife and Parks

**Gunnison County**

- Perry Anderson, former County Commissioner

- Hap Channel, County Commissioner

- John Devore, former County Manager

- Fred Field, former County Commissioner

- Jeff Guy, GIS Coordinator

- Dave Michaelson, former County Long Range Planner

- Mike Pelletier, County Long Range Planner

- Shannon Sprott, Planning Technician

- Neal Starkebaum, Assistant Director of Planning

- Jim Starr, County Commissioner (Chairperson)

- Paula Swenson, County Commissioner

**Montrose County**

- Allan Belt, County Commissioner

- Susan Bronson, former Senior Planner

- Rick Gibbons, former County Planner

- Betsy Hale, former County Commissioner

- Joe Kerby, County Manager

- Leo Large, former County Commissioner

- Dave Ubell, former County Commissioner

- Steve White, Land Use Director

**National Park Service – Curecanti NRA/ Black Canyon of the Gunnison NP**

- Linda Alick, Chief Ranger

- Sarah Beetch, former GIS Cartographic Technician

- Danguole Bockus, Ecologist

- Joanie Budzileni, former Blue Mesa District Interpretive Specialist

- Jerry Burgess, former Facility Manager

- Myron Chase, former Resource Management Specialist

- Bob Cornelius, former Black Canyon District Ranger

- Michael Dale, Hydrologist

- Anna Marie Fender, former Interim Superintendent

- Schelle Frye, former Administrative Officer and Concessions Officer

- Don Hill, former Chief of Interpretation

- BJ Johnson, former Outdoor Recreation Planner

- Ned Kelleher, former Blue Mesa District Ranger

- Matt Malick, Aquatic Ecologist

- Bill Putre, former Safety Officer

- Steve Riley, former Facility Manager

- Kinsey Shilling, former Blue Mesa District Ranger

- Paul Zaenger, Black Canyon District Interpretive Specialist

BLM_0059839

- Phil Zichterman, former Chief, Interpretation, Education, and Technology

**National Park Service – Intermountain Regional Office, Denver**

- Kristin Cypher, former Cultural Landscape Architect

- James Doyle, Public Affairs Specialist

- Theresa Ely, GIS Program Manager

- Ron Everhart, former Intermountain Region Colorado State Director

- Clayton Frazier, Professional Land Surveyor

- Wayne Gardner, former Chief of Planning and Environmental Quality

- Sayre Hutchison, Architect

- Tom Keohan, Historical Landscape Architect/Historical Architect

- Lori Kinser, Visual Arts, Publications Specialist

- Christine Landrum, Historian

- Vicki Magnis, former GIS Specialist

- Steve Martin, former Regional Director

- Hugh Osborne, Community Planner with Rivers, Trails and Conservation Assistance Program

- Nancy Shock, GIS Specialist

- Mike Snyder, Regional Director

- Chris Turk, Regional Environmental Quality Coordinator

- Glenna Vigil, Chief, Land Resources Program Center

- Karen Wade, former Regional Director

**National Park Service – Intermountain Regional Office, Santa Fe**

- Katherine Cooper, former Realty Specialist

- Wyoma Hansen, former Realty Specialist

- Susan Jordan, Realty Specialist

- Barbara Sulhoff, former Chief, Land Resources Program Center

**National Park Service – Other**

- Tim Connors, Geologist, Washington Office - Denver

- John Howard, Superintendent, Antietam National Battlefield

- Gary Johnson, Chief of Planning, Blue Ridge Parkway

- Chuck Pettee, Branch Chief, Water Rights, Water Resources Division – Fort Collins

- Mark Wondzell, Hydrologist, Water Resources Division – Fort Collins

**National Parks and Conservation Association**

- David Nimkin, Southwest Regional Director

**The Nature Conservancy**

- David Gann, Southwest Colorado Program Manager

- Betsy Neely, Director of Conservation Planning

**Northern Ute American Indian Tribe**

NOTE: The study team met with the following individuals. However, with the exception of Betsy Chapoose and Clifford Duncan, they should not be considered to have been designated by their tribe to be official consultation representatives.

BLM_0059840

- Smiley Arrowchis, Tribal Member

- Betsy Chapoose, Cultural Rights and Protection Director

- Clifford Duncan, NAGPRA/TCP Consultant

- Luke Duncan, Tribal Member

- Roland McCook, former Chairman

- Dana West, Tribal Member

**Southern Ute American Indian Tribe**

NOTE: The study team met with the following individuals. However, they should not be considered to have been designated by their tribe to be official consultation representatives.

- Pearl Casias, former Vice-Chairperson

- Neil Cloud, NAGPRA Coordinator

- Clement Frost, Chairman

- James Olgin, former Council Member

**The Trust for Public Land**

- Woody Beardsley, Project Manager

- Nissa Maddox, Program Associate

- Douglas Robotham, Colorado State Director

- Wade Shelton, Project Manager

**Uncompahgre Valley Water Users Association**

- Mark Catlin, General Manager

- Jim Hokit, former General Manager

**U.S. Fish & Wildlife Service**

- John Kleopfer, former Fish and Wildlife Biologist, Western Colorado Ecological Services Field Office, Grand Junction

- David McGillivary, Chief, Division of Federal Aid, Migratory Birds and State Programs, Denver

**U.S. Forest Service**

- Dave Bradford, Rangeland Specialist, Paonia Ranger District

- Levi Broyles, District Ranger, Paonia Ranger District

- Jim Dawson, District Ranger, Gunnison Ranger District

- Mark Hatcher, Range Watershed Specialist, Gunnison Ranger District

- Bill Jackson, Recreation Staff Officer

- Carmine Lockwood, Planning Staff Officer, Gunnison, Grand Mesa, and Uncompahgre National Forests (GMUG)

- Steve Marquardt, former Renewable Resources Staff Officer

- Justin McConkey, Range Technician, Paonia Ranger District

- Charlie Richmond, Forest Supervisor, GMUG

- Nancy Schwieger, former Lands Staff, Paonia Ranger District

- Susan Spear, former District Ranger, Paonia Ranger District

- Bob Storch, former Forest Supervisor, GMUG

- Corey Wong, Public Service Staff Officer, GMUG

**U.S. Representative Scott McInnis's Office**

- Leslie Baker, former Constituent Services Caseworker

- David Ludlam, former Staff Assistant

- Scott McInnis, former U.S. Representative

BLM_0059841

- Melissa Simpson, former Senior Legislative Assistant

## U.S. Representative John Salazar's Office

- Richard Baca, Northwest Regional Director

- John Whitney, Southwest Regional Director

## U.S. Senator Wayne Allard's Office

- Cory Gardner, General Counsel

- Brian Meinhart, Staff Assistant

- Andrew Merritt, State Director

- Richard Poole, Area Director

- Derek Wagner, former Staff Assistant

## U.S. Senator Ben Nighthorse Campbell's Office

- James Doyle, former Communications Director

- Frank Fannon, former Senior Legislative Assistant

- Keith Johnson, former District Director

- Ginnie Kotnick, former Chief of Staff

- George Rossman, former District Director

## U.S. Senator Ken Salazar's Office

- Trudy Kareus, Northwest Regional Director

## Ute Indian Museum

- CJ Brafford, Director

## Ute Mountain Ute American Indian Tribe

NOTE: The study team met with the following individuals. However, they should not be considered to have been designated by their tribe to be official consultation representatives.

- Harold Cuthair, Tribal Member

- Manuel Heart, Tribal Councilman

## Western Area Power Administration

- C. Shane Collins, Environmental Protection Specialist

- Susan Starcevich, Realty Specialist, Land Management

- Ron Turley, Field Maintenance Manager, Montrose

## Other

Please refer to the lists of meetings with public agencies and officials, private groups and individuals, and American Indian tribes identified earlier in this Consultation and Coordination chapter.

BLM_0059842

Chapter 5: Consultation and Coordination

BLM_0059843

# Appendixes



BLM_0059844

# Toolbox of Incentives for Resource Conservation

## A Handbook of Ideas for Neighbors in the Curecanti Area



*"Conservation is a state of harmony between land and man. . . A land ethic, then, reflects the existence of an ecological conscience, and this in turn reflects a conviction of individual responsibility for the health of the land. Health is the capacity of the land for self-renewal. Conservation is our effort to understand and preserve this capacity."*

Aldo Leopold
A Sand County Almanac, 1949

*"Please take the time and effort to study the history of the Gunnison Country. This will give you an understanding and appreciation for the pioneers who tamed this land and, in many cases, spent a hundred years and four generations of a family completing what might be called our first "land use change." It is our hope that through this understanding, you will approach your construction and development in a thoughtful and sensitive manner, to protect our unique community, our natural resources and our historic way of life."*

From The Code of the West
Gunnison County Planning Commission, July 1996

*"Some of you may have heard me say before that the Four C's is a guide to how I want Interior to move forward. They stand for communication, consultation and cooperation, all in the service of conservation. At the heart of the Four C's is the belief that for conservation to be successful, we must involve the people who live on, work on, and love the land."*

The Honorable Gale Norton
Secretary of the Interior, March 17, 2002

BLM_0059845

Appendix A: Toolbox of Incentives for Resource Conservation

BLM_0059846

Toolbox of Incentives

# Table of Contents

PURPOSE ...................................................................................................................................... 1
TOOLS FOR RESOURCE CONSERVATION ........................................................................ 2
  Principles for Forging Long-Term, Sustainable Partnerships .................................................. 2
  A Variety of Landowner Incentives ......................................................................................... 3
    General Considerations ......................................................................................................... 3
    Technical Assistance ............................................................................................................. 4
    General Agreements ............................................................................................................. 4
    Incentive Payments to Landowners ...................................................................................... 4
    Acquisition of Conservation Easements, or Other Property Interests .................................. 5
    Purchase and Retained Use and Occupancy ....................................................................... 5
    Fee Simple Acquisition from Willing Landowner ................................................................ 5
    Conservation Easements ....................................................................................................... 6
      Advantages of Conserving Land ....................................................................................... 6
      Conservation Easements Explained .................................................................................. 7
      Working with Land Trusts ............................................................................................... 7
    Transfer of Development Rights (TDR) .............................................................................. 8
    Endangered Species Incentives ............................................................................................ 9
      Landowner Incentive Program ......................................................................................... 9
      Private Stewardship Grants Program ............................................................................... 9
      Colorado Species Conservation Partnership ..................................................................... 9
    Cultural Resource Incentives ................................................................................................ 9
      Tax Credits for Owners of "Listed" Properties ................................................................. 9
      State Historical Fund Assistance ..................................................................................... 10
    Grazing and Open Space Incentives .................................................................................. 10
    Potentially Effective Local Policies/Incentives for Resource Conservation ...................... 12
    Potential National Park Service Actions and Assistance ..................................................... 13
SOURCES OF RESOURCE CONSERVATION ASSISTANCE AND FUNDING .......... 15
  FEDERAL ............................................................................................................................ 15
    Catalog of Federal Domestic Assistance (CFDA) .............................................................. 15
    Land and Water Conservation Fund .................................................................................. 15
    NPS (National Park Service) – Challenge Cost-Share Program (CCSP) ........................... 16
    NPS – Conservation Study Institute (CSI) ....................................................................... 16
    NPS – National Natural Landmarks Program ................................................................... 16
    NPS – National Register of Historic Places ...................................................................... 17
    NPS – Partnerships Beyond Public Lands ......................................................................... 18
    NPS – Rivers, Trails and Conservation Assistance Program (RTCA) ................................ 18
    Steens Mountain Cooperative Management and Protection Area ...................................... 18
    TEA-21 The Transportation Equity Act for the 21st Century .......................................... 18
    USDA (U.S. Department of Agriculture) – Conservation Security Program (CSP) ........... 19
    USDA – Natural Resources Conservation Service (NRCS) ............................................... 19
    USFWS (U.S. Fish & Wildlife Service) – Grants-At-A-Glance ......................................... 20
    USFWS – Landowner Incentive Program (LIP) ............................................................... 20
    USFWS – Private Stewardship Grants Program (PSGP) ................................................... 20

i

BLM_0059847

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

STATE OF COLORADO.............................................................................21
   Colorado Species Conservation Partnership ...........................................21
   Colorado State Historical Fund..............................................................21
   Great Outdoors Colorado Trust Fund (GOCO) ...................................21
PRIVATE, NONPROFIT...........................................................................22
   American Farmland Trust.......................................................................22
   Black Canyon Land Trust ......................................................................22
   Colorado Association of Conservation Districts (CACD).....................22
   Colorado Cattlemen's Agricultural Land Trust (CCALT)....................23
   Colorado Coalition of Land Trusts (CCLT)..........................................23
   Gunnison Ranchland Conservation Legacy ...........................................24
   Land Trust Alliance................................................................................24
   National Association of Conservation Districts (NACD) ......................25
   National Trust for Historic Preservation..............................................26
   The Nature Conservancy........................................................................26
   Sonoran Institute ...................................................................................26
PUBLICATIONS........................................................................................26
INDEX OF INCENTIVES AND RELATED TERMS AND TOPICS .....................27

BLM_0059848

Toolbox of Incentives



# PURPOSE

This toolbox identifies various methods that can be employed to encourage Curecanti area neighbors—private landowners, local communities, and city, county, state, and federal agencies—to work in partnership to manage their lands for more effective resource conservation. It has been developed in association with the Resource Protection Study at Curecanti National Recreation Area to help conserve the natural, cultural, recreational, and scenic resources within and surrounding Curecanti.

Please be aware that some of the incentives in this toolbox, especially regarding technical assistance, are ideas that need additional consideration, and in some cases will require Congressional or legislative authorization and appropriations of funds. Also, we are not in a position to advise people on matters pertaining to legal issues, tax issues, estate planning, etc. For these matters readers should consider seeking professional advice.

For additional information, or to provide comments, please contact one of the following:

<table>
<tr><td>Superintendent<br>Curecanti National Recreation Area<br>102 Elk Creek<br>Gunnison, CO 81230<br>(970) 641-2337</td><td>Long Range Planner<br>Gunnison County<br>200 E. Virginia Ave.<br>Gunnison, CO 81230<br>(970) 641-7620</td></tr>
</table>

1

BLM_0059849

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

# TOOLS FOR RESOURCE CONSERVATION



## Principles for Forging Long-Term, Sustainable Partnerships [1]

In 1970 Congress declared that the units of the National Park System were a cumulative expression of our national heritage. During the past 30 years there have been several cycles of expansion of the system to encompass different types of resources and different strategies for protecting them so they will be unimpaired for the enjoyment of future generations. Increasingly, the recent designations rely on partnerships and shared investment in planning and management.

As the National Park Service (NPS) responds to demands for recognition, formal designation, and technical and financial assistance, discussions about the future of the agency often focus on three major questions:
- How will the NPS reach out to the changing and diverse population of the United States?
- How will the national parks address increasing public use pressures?
- How will the national parks be protected from threats that originate primarily beyond park boundaries?

Perhaps the "problem" of the burgeoning interest in establishing "nontraditional" areas is really the solution: that the agency must look beyond the traditional models and recognize the potential of partnerships to help the NPS fulfill its mission to protect our nation's natural and cultural heritage. Perhaps the distinction between "internal" and "external" programs is no longer valid because protecting the parks depends upon our ability to expand a stewardship ethic throughout the nation, to protect resources at the local level, and to see the units of the National Park System as hubs in a broader network of protected areas.

As the NPS moves increasingly from a paradigm of management to one of stewardship, there is an accompanying challenge to create a broader vision that encompasses the concept of partnerships, and to realign policies and procedures to support this shift in approach. The future is seen in which units of the National Park System and the partnership areas outside the System are all part of a nationwide network of parks and conservation areas that are relevant to a diverse population. This network includes resources protected through traditional public ownership, areas protected through the efforts of private organizations such as land trusts, and the resources conserved through collaborative strategies. This future includes a strong, innovative private sector working with a variety of audiences. Nonprofit organizations, institutions, academia, businesses, and public sector agencies all play important roles.

---

[1] From *Collaboration and Conservation - Lessons Learned in Areas Managed Through National Park Service Partnerships*, a report on a workshop held May 15-17, 2000 at Marsh-Billings-Rockefeller NHP.

2

BLM_0059850

Toolbox of Incentives

In order to create and sustain effective partnerships to conserve resources for the enjoyment of future generations on either side of a boundary that designates a park, river, trail, or heritage area, the following principles are important to follow:

- Build a common understanding and vision.
- Listen and be responsive to the needs of others.
- Build relationships and sustain trust.
- Work openly and inclusively in ways that build a partnership team.
- Be flexible and responsive to changing circumstances.
- Be willing to share control, and work together in ways that empower the partners.
- Have a realistic understanding of each partner's mission and perspective, and seek to resolve issues in ways satisfactory to all parties.
- Tell the stories of people and place, providing accurate, well-focused information.
- Clarify roles and expectations.
- Move toward clarity and respect.
- Accomplish one project together.
- Explore commonalities.
- Capitalize on differences.
- Accept and cherish diversity of values.
- Develop a shared vocabulary.
- Check the environment for opportunities.
- Begin looking out for each other.
- Establish regular communication.
- Maintain continuity, and transfer knowledge.
- Develop ways to continually share experiences and understanding.
- Check in periodically on the partnership.
- Celebrate successes.

# A Variety of Landowner Incentives

## General Considerations

Conservation efforts that strive to protect and/or maintain the natural, cultural, recreational, and scenic values of the land, in combination with location adjacent to public lands, can enhance the future economic value of the property and be a positive contribution to quality of life.

- "Study after study shows that communities that preserve their character and natural values consistently outperform the economies of those that don't." [2]
- "More and more gateway communities are finding that adjoining parks, wildlife refuges, or wilderness areas can be powerful economic assets. Tourism is an obvious way to capitalize on nearby public lands. But parks, refuges, and wilderness areas also are valuable for the contribution they make to local quality of life. *Quality of life* is a catchall term used to describe the non-economic amenities a community has to offer, including clean air and water, safe streets, open space, cultural events, recreational opportunities, uncongested roads, good schools, and scenic views." [3]

---

[2] Howe, Jim, Ed McMahon, & Luther Propst, *Balancing Nature and Commerce in Gateway Communities* (1997, Island Press), p. 7.
[3] Ibid., p. 9.

3

BLM_0059851

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

## Technical Assistance

The National Park Service (NPS) is currently able to provide some environmental education and technical assistance to landowners, and expects to be able to provide a broader range of assistance in the future, such as:

- Offering advice regarding resource management and conservation measures, or directing individuals to appropriate sources of information.
- Offering advice on siting and design considerations for environmentally sensitive development.
- Offering jurisdictional advice, such as referring property owners to the appropriate government or organizational entity.
- Offering wetlands advice on the location of wetlands, the need for permits, and ways to enhance wetlands habitat.
- Providing information about appropriate resource conservation practices, including information on conservation easements and land trusts.
- Providing assistance to obtain funding for worthwhile projects through government grants, such as U.S. Department of Agriculture cost-share grants to install animal waste-treatment units, to promote cleaner surface water and groundwater.

## General Agreements

General Agreements and Memorandums of Understanding set the stage for short-term and long-term commitments in cooperative assistance, usually benefiting all parties involved.

- Examples include cost sharing on projects that mutually benefit the parties, or understandings on how certain activities or operations can occur. One party might agree to certain restrictions in return for other benefits, including technical assistance, labor, and/or materials needed to accomplish a project that will be of benefit to the property owner and NPS. Projects could include those that protect wildlife and habitat, or those that reduce impacts to viewsheds.
- Agreements are especially useful if a conservation easement or fee simple acquisition is agreed upon, but funds are not yet available to implement. General Agreements and Memorandums of Understanding clarify policies or procedures, and can serve as the basis for cooperation among two or more parties. They are most likely to be useful for land owned by state or local governments, private non-profit organizations, and other federal agencies, and by individuals or corporations who are supportive of unit purposes. They may be terminated whenever any of the parties to the agreement wish, with proper notice.

## Incentive Payments to Landowners

Through a variety of grant programs, including those of NPS, US Fish and Wildlife Service, Colorado Division of Wildlife, and others, payments are made to property owners and other entities who enter into contracts to conserve or enhance recreational, cultural, and natural resources.

4

BLM_0059852

Toolbox of Incentives

## Acquisition of Conservation Easements, or Other Property Interests

In this program, NPS, or another agency or organization, including land trusts, acquires an interest in the property on a willing-landowner basis, for conservation purposes. The types of tools used include acquisition of conservation easements or deed restrictions, mineral rights, and/or rights-of-way. Activities that are not in conflict with the purposes of the easement or deed are generally allowed, while specific restrictions ensure that uses of the property remain compatible with the conservation purposes spelled out in the easement or deed.

- In appraising non-Federal land, development rights, or conservation easements for possible acquisition, the government shall disregard any adverse impacts on values resulting from inclusion within, or association with, the National Recreation Area; i.e., fair market value will be determined.
- The terms and conditions of the easement are generally agreed upon through negotiation. Examples of activities that could be allowed include:
  - Retention and/or restricted development of residential structures
  - Livestock grazing
  - Other farming and ranching practices
  - Specified tree cutting
  - Hunting
- Although the landowner continues to pay property tax, there may be significant income tax and estate tax benefits to the landowner.

## Purchase and Retained Use and Occupancy

In this scenario, NPS buys the property from a willing landowner at fair market value, and the owner gets to stay (rent free) until death (life estate), or some other agreed-upon time period, such as 25 years. Life estates impact valuation, and appraisals are lowered using an actuary table on life expectancy.

- In appraising non-Federal land for possible acquisition, the government shall disregard any adverse impacts on values resulting from inclusion within, or association with, the National Recreation Area; i.e., fair market value will be determined.
- Types of leases include:
  - Life estate
  - 25-year lease
- Federal government may provide payment-in-lieu-of-taxes to the county.

## Fee Simple Acquisition from Willing Landowner

In this instance, NPS acquires all rights or interests in the land on a willing-landowner basis. The property owner is reimbursed, unless the land is donated.

- In appraising non-Federal land for possible acquisition, the government shall disregard any adverse impacts on values resulting from inclusion within, or association with, the National Recreation Area; i.e., fair market value will be determined.
- Land is acquired through means such as the following:
  - Direct purchase using funding from the Land and Water Conservation Fund, established under Section 2 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601-5), or funding from donated dollars.

5

BLM_0059853

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

- – Third party purchase through entities such as land trusts and conservation organizations.
- – Land exchange—exchanging parcels of like value.
- – Bargain sell—whereas the parcel is purchased for less than appraised value, and property owner receives a tax benefit for the difference (i.e., the donated portion).
- – Donation of the entire parcel, in which case there would be tax advantages property owner.
- Federal government may provide payment-in-lieu-of-taxes to the county.

## Conservation Easements

### *Advantages of Conserving Land*

Conserving land may be the single most important lasting contribution a landowner can make to future generations, because, as we all know – land is a limited resource! In addition, depending upon each landowner's individual circumstances, there may be Federal and State income tax benefits, and property and/or estate tax benefits. These benefits can be maximized if the landowner donates a conservation easement, or a portion of the benefits may be available if the easement is sold at a discounted price. *NOTE: Information pertaining to tax and other benefits is provided for general purposes only, and does not constitute legal advice or opinion in any way. As these laws and regulations change over time, you are urged to consult your attorney regarding specific legal questions you may have.*

### Federal Income Tax Benefits

The value of a conservation easement may qualify as a charitable deduction against the landowner's federal income tax. This deduction may be used to offset up to 30% of the landowner's adjusted gross income per year for a total of six consecutive years.

### Colorado State Tax Benefits

On or after January 1, 2003, the first $100,000 of value of a donated conservation easement is treated as a credit against Colorado state income taxes. Then, 40% of the next $400,000 of the value of the donation may be claimed; but in no event can the total credit exceed $260,000 per donation. Any portion of the tax credit not used in the year of donation can be used in the 20 succeeding income tax years. The amount of donation exceeding $260,000 may be used as a charitable deduction against state income tax. In May 2000, legislation was passed to allow the transfer of the above tax credit to a third party, or, in years of state revenue surplus, to claim a refund for the tax credit.

### Estate Tax Benefits

When a conservation easement is placed on a property, most often the property value will be decreased and this will decrease the taxable value of the deceased's estate. In addition, if the easement qualifies under certain provisions of the Internal Revenue Code, then 40% of the property value remaining after the granting of an easement can be excluded from the value of the estate, up to a maximum exclusion of $400,000 (increasing to $500,000 in 2002).

### Property Tax Benefits

If the property is being taxed at the agricultural rate at the time the easement is placed, the landowner may continue to receive the favorable agricultural tax treatment even if agricultural production is discontinued in the future.

6

BLM_0059854

Toolbox of Incentives

## *Conservation Easements Explained* [4]

"Conservation easements allow landowners to realize financial benefits from their land without selling or subdividing their property. Their flexibility and effectiveness make them applicable to a variety of land uses.

"To understand how conservation easements work, it is first necessary to understand the nature of real estate. Legally, real estate can be thought of as a 'bundle' of property rights, which includes the right to farm or ranch, to construct buildings, to subdivide the land, to restrict access, to harvest timber, or to mine. In many instances, a right can be separated from the bundle and transferred to another party. Mineral rights to property, for example, are commonly bought and sold separately from surface rights.

"Conservation easements involve the purchase or donation of a property's development rights. An easement permanently extinguishes these rights so that a property can never be developed. The land remains on the tax rolls, in private ownership, and can be sold to others or passed on to heirs.

"Easements are tailored to each particular property and to the needs of each individual landowner. Agricultural preservation easements, for example, allow continued farming or ranching and do not include public access. Easements can be placed on an entire tract of land or on only part of a property. In many cases, conservation easements allow 'limited development' or commercial use of part of the land, so long as these activities do not affect the land's conservation value.

"Easement restrictions are typically permanent and 'run with the land,' binding the original landowner and all future landowners. Like all property rights, conservation easements are recorded with the county clerk so that future owners and lenders will know about restrictions when they obtain title reports.

"Easements can offer significant tax benefits to landowners. Landowners who donate easements or sell them below market value can receive income tax deductions for the value of their charitable donation. Landowners also can benefit from lower estate and property taxes since their property is stripped of its development rights."

## *Working with Land Trusts* [5]

*WHAT IS A LAND TRUST?* A land trust is a non-profit organization organized as a charitable entity under the laws of the United States and Colorado. Land trusts work with landowners to voluntarily conserve open lands located in the area the land trust serves. Land trusts in Colorado are located in communities across the State, and are run primarily by volunteer boards, a few of whom have the assistance of some paid staff. Land trusts work with their neighbors to help voluntarily conserve Colorado lands without government regulation.

*HOW DOES A LAND TRUST CONSERVE LAND?* Land trusts use a variety of tools to accomplish voluntary land conservation, including the acquisition (by donation or by purchase) of conservation easements, deed restrictions, and fee title to land, development of management agreements, and strategic estate planning. Land trusts are experts at working with willing landowners to craft the result that works best for the landowner and their community on each individual transaction.

---

[4] From *Balancing Nature and Commerce in Gateway Communities*
[5] Source: Colorado Coalition of Land Trusts

BLM_0059855

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

*ARE LAND TRUSTS SUCCESSFUL?* There are 38 land trusts located throughout Colorado - 33 local land trusts and 5 regional or national land trusts. As of the end of 1999, these groups were responsible for the conservation of over 630,000 acres of special lands in the State of Colorado. Nationally, there are over 1,200 land trusts that have protected almost 4.7 million acres (an area larger than the states of Connecticut and Rhode Island combined). Across the country, approximately 1 million people are members and financial supporters of land trusts, and more than 50,000 people are active volunteers.

*WHAT KINDS OF LANDS DO LAND TRUSTS PROTECT?* Each land trust adopts specific priorities for the types of land it works to conserve; however, almost every land trust in Colorado prioritizes the conservation of agricultural lands and open space. Other examples of the types of land that Colorado land trusts generally work to conserve are: wildlife habitat, wetlands and riparian areas, river corridors, community separators, and watersheds.

*HOW DOES A LAND DONATION WORK?* Donating land to a land trust can further conservation in Colorado in many ways. A landowner may be able to continue to live on the land, or to receive a life income, or to receive favorable income tax treatment from a land donation. A land donation might be used to provide a passive open space parcel for educational or public access purposes, or it might be used to generate income for a local land trust by allowing the trust to re-sell the land with restrictions and use the revenue to conserve additional lands. Flexibility is the key, and land trusts work with landowners to find the right solutions to the landowner's needs.

*WHAT IF I CANNOT AFFORD TO DONATE MY LAND OR A CONSERVATION EASEMENT?* Selling land or an easement to a land trust at less that its fair market value (a "bargain sale") can make the purchase affordable for a land trust and provide tax benefits and some cash to the landowner. There are some limited sources of funds available to land trusts for such purchases, such as Great Outdoors Colorado Trust Fund monies. In addition, some land trusts, in some circumstances, can assist landowners with the costs associated with conserving their land, such as appraisal fees, legal fees, survey costs and the like.

*DO I HAVE TO WORK WITH A PARTICULAR LAND TRUST TO CONSERVE MY LAND?* It is entirely up to the landowner to choose the entity he or she wishes to work with to conserve their land; however, local land trusts often are a good choice because of their knowledge of the local community, their closeness to the property and its owner, and the efficiency of having the conservation project monitored by a local entity. There are national or regional land trusts that work to conserve particular types of land (such as the American Farmland Trust or The Nature Conservancy), and a landowner might choose to work with such a land trust if the landowner's property matches the type of land the larger land trusts work to conserve. The Colorado Coalition of Land Trusts can assist landowners in contacting a land trust to discuss conservation.

## Transfer of Development Rights (TDR) [6]

"The TDR program creates a framework under which landowners can transfer development rights from protection zones, or 'sending areas,' to growth centers, or 'receiving areas.' Sending areas are lands that warrant protection, which can include anything from farmlands to wetlands. By contrast, receiving areas are towns and other urban areas where future growth is desired. Once the county designated its sending and receiving areas, the marketplace took over."

---

[6] From *Balancing Nature and Commerce in Gateway Communities*

8

BLM_0059856

Toolbox of Incentives

*Note: TDR programs are not yet established in either Gunnison or Montrose Counties. This information is provided in the event such programs do become viable in this area.*

## Endangered Species Incentives

### Landowner Incentive Program

This is a program administered by the U.S. Fish & Wildlife Service (USFWS), to provide money to states for preserving species of special concern. The program is still under development. $40,000,000 will be available nation wide. The money will be made available through the state divisions of wildlife. States have up to $1,700,000 to distribute to landowners based on a competitive process. The purpose of the money is for the protection, restoration, and management of habitat that benefit species at-risk. It is anticipated that once the program is in place, landowners will apply directly to the Colorado Division of Wildlife (CDOW). For additional information, contact Ken Morgan, Private Lands Habitat Program Coordinator (CDOW) at (303) 291-7404.

### Private Stewardship Grants Program

This is a program administered by U.S. Fish & Wildlife Service that provides $10,000,000 in federal grants and other assistance on a competitive basis to individuals and groups engaged in voluntary conservation efforts on private lands that benefit at-risk species including Federally-listed endangered or threatened species as well as proposed or candidate species. Under this program, landowners and their partners will be able to submit proposals directly to USFWS for funding to support those efforts.

### Colorado Species Conservation Partnership

This is a program run by the State of Colorado, involving the U.S. Department of the Interior, Colorado Division of Wildlife, the Great Outdoors Colorado Trust Fund, county governments, and non-governmental organizations throughout the state, that will pay landowners to help protect species that are listed, or have the potential to be listed, under the Endangered Species Act, via management agreements, conservation easements or leases. Landowners are paid through the partnership (according to the property's value) for the term of the agreement not to sell their land for development, or they are paid to help maintain or develop habitat on their property. For additional information, contact Ken Morgan, Private Lands Habitat Program Coordinator (CDOW) at (303) 291-7404.

## Cultural Resource Incentives [7]

### Tax Credits for Owners of "Listed" Properties [8]

"Owners of properties listed in the National Register may be eligible for a 20% investment tax credit for the certified rehabilitation of income-producing certified historic structures such as commercial, industrial, or rental residential buildings. This credit can be combined with a straight-line depreciation period of 27.5 years for residential property and 31.5 years for nonresidential property ….. Federal tax deductions are also available for charitable contributions for conservation purposes of partial interests in historically important land areas or structures."

---

[7] For additional information contact The National Trust for Historic Preservation at (303) 623-1504
[8] Visit the website www.cr.nps.gov/nr/results.htm for additional information

9

BLM_0059857

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

### State Historical Fund Assistance

The State Historical Fund of the Colorado Historical Society Office of Archeology and Historic Preservation has grant monies available to public entities and non-profit organizations for historic properties that are either listed in the National Register, the State Register, and/or are local landmarks. Their website is www.coloradohistory-oahp.org/programareas/shf/projecttypes.htm.

## Grazing and Open Space Incentives [9]

*NOTE: The following information relates to livestock grazing issues and recommendations at Grand Teton National Park. The ideas presented here are those that still need additional consideration if to be applied to the Curecanti area.*

With the 1996 death of the last surviving heir to certain livestock grazing permits in Grand Teton National park that were issued when the Park was established in 1950, whether or not to re-issue those Park grazing permits for some undetermined period of time became a nationally significant issue. Without summer grazing in the Park, there was a threat that ranches holding those grazing permits would no longer be economically viable operations, and would be subdivided into residential areas. Subdivision would irretrievably destroy the open spaces and pastoral character of lands near and adjacent to the Park.

To address this concern, Public Law 105-81, approved November 13, 1997, mandated the Secretary of the Interior to assess, and report to Congress, the significance to the purpose and character of the Park of "the ranching use and pastoral character of the land" on those ranches, and to recommend "a variety of economically feasible and viable tools and techniques to retain the pastoral qualities of the land."

PL 105-81 directed the Secretary of the Interior to "seek participation from the Governor of the State of Wyoming, the Teton County Commissioners, the Secretary of Agriculture, affected landowners and other interested members of the public." Recognizing the complexity of the issues and the variety of divergent viewpoints that needed to be considered, the National Park Service (NPS) chose a collaborative, facilitated study approach with a group of 14 people, called the Grand Teton National Park Open Space Work Group. Though the group did not necessarily represent the demographic proportions of the interests in the area, all area interests were included in the group. Work Group members held 16 meetings from February, 1999 to April, 2001.

The significance of open spaces and the pastoral character of ranch lands to the Park, to Jackson Hole, and to the visitor experience has been recognized since the earliest times. The Work Group reached consensus that protecting open spaces on those ranches holding livestock grazing permits in the park is still important - to the Park, to area residents, and to the national public. Most Work Group members also agreed that preserving ranching use on those lands is the most effective means of protecting the open space and pastoral character of the area, although preserving ranching by itself would not offer permanent protection.

---

[9] A Model: Economically Feasible and Viable Tools and Techniques to Retain the Pastoral Qualities of the Land; from *Report of the Grand Teton National Park Open Space Work Group*, Pursuant to Public Law 105-81, Jackson, Wyoming, May 1, 2001, a Recommendation to Congress. (Related to the *Grazing Use and Open Space Study and Environmental Analysis* for Grand Teton National Park and Teton County, Wyoming, April 1, 2001.)

10

BLM_0059858

Toolbox of Incentives

Key findings of the Work Group include:

- Current tax laws inhibit the transfer of large land holdings between family members.
- The loss of summer grazing options in the Park threatens the viability of the affected working ranches.
- There is an economic value for the ranchers derived from grazing permitted in the Park, and there are significant, unrecovered costs to the NPS to manage and maintain the grazing permits.
- Preservation of open space near and adjacent to the Park is important for maintaining scenic, wildlife, and cultural values.
- Permanent protection of open space requires formal, legal arrangements with the landowners, such as conservation easements or outright purchases of the Study Area lands.

Therefore, per their charge set forth in PL 105-81, the Work Group recommended the following incentives to Congress:

1. Modify inheritance and estate tax law to avoid forcing ranching families to sell or subdivide their land to pay these taxes.
2. Legislatively fund and/or encourage the acquisition of easements using tools such as modification of income and estate tax laws and outright funding through cash and exchanges.
3. Direct the NPS to define, in consultation with permittees, base properties associated with each grazing permit and restriction of activities on those base properties which will protect open space, if grazing permits appurtenant to the ranchlands in the Study Area should continue.
4. If Congress determines that these grazing permits should continue, the NPS should review grazing lands management and permitting policies and modify if necessary with a goal of accomplishing the Park's mission.
5. If Congress determines that these grazing permits should not continue, Congress should fund programs that will maintain the ranching operations or otherwise protect the pastoral character of the open space on the base properties.
6. Authorize and fund use of these recommended tools by the Department of the Interior, either alone or in partnership with other public or private entities.

The same Grand Teton report also offered the following tools for preserving open space, which were considered to be less feasible:

- Change cow-calf operations to yearling operations.
- Adjust boundaries.
- Allow grazing on National Forest allotments.
- Allow grazing on private lands outside Teton County.
- Encourage grassbanking (providing grazing in other areas).
- Allow grazing or grassbanking on the National Elk Refuge.
- Acquire land in fee simple.

BLM_0059859

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

## Potentially Effective Local Policies/Incentives for Resource Conservation [10]

Just as federal land managers need to understand the economic and social interests of local communities, local officials need to understand the mission, purpose, goals and objectives of federal land managers.  Potential local policies and incentives include:

Enact land-use policies, and use creative methods to insure that development is compatible with resource protection goals.  (The economic impact of wildlife habitat, historic preservation, and an aesthetic environment is significant.)

- Adopt land-use plans that seek to preserve resources and community character.
- Set siting and design standards that preserve aesthetically attractive views, incorporating proper location, size, height, color, reflectivity, and landscaping with indigenous materials.
- Encourage fencing that is "wildlife-friendly."
- Provide a density bonus to developers who protect a portion of their land with conservation easements.
- Allow for the transfer of development rights, and provide a revolving loan fund to support land conservation.
- Restrict or prohibit development in sensitive areas.
- Encourage farms, ranches, parks, and open space outside the city's core, rather than sprawling, low-density residential development, to reduce the requirement for expensive services, such as schools, road maintenance, water and sewer, police and fire protection, and trash collection, which might not be offset by tax revenues.
- Limit commercial development.
- Institute an awards program that recognizes excellence in design and resource preservation.
- Provide economic incentives.
  - Provide tax abatements that promote the rehabilitation of historic buildings.
  - Provide tax credits to landowners that implement resource protection/enhancement methods, such as erosion control or stream-bank restoration.
  - Encourage local banks to provide low-interest loans for rehabilitating historic buildings.
  - Provide incentives that encourage developers to plan projects with the needs of the larger community in mind.
- Conduct public education campaigns, and encourage voluntary action by citizens regarding resource protection.
- Appeal to the philanthropic spirit of citizens who might donate land or easements; and pay for the landowners' legal expenses.
- Encourage local leaders to step forward and get involved in resource preservation efforts, especially in their relationships with landowners.
- Acquire sensitive lands, open space, and conservation easements via income from innovative programs, such as:
  - Fundraising campaigns
  - A "tourist impact tax" on hotel and motel rooms (e.g., 1%)
  - A one-time impact fee on each new development in the county
  - Occupancy fees on commercial and retail outlets
  - A voluntary sales tax (e.g., 0.5%)

---

[10] Many of these ideas are found in "*Balancing Nature and Commerce in Gateway Communities.*"

12

BLM_0059860

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

- A transfer tax on local real estate transactions (Crested Butte imposes a 2.25% real estate transfer tax, and Vail imposes a transfer tax.)
- Donations from local developers for every home or lot they sell (e.g., $100 to $500)
- ISTEA funding (Intermodel Surface Transportation Efficiency Act). This is a program to fund projects protecting natural areas, parks, wildlife habitat and historic sites, especially related to transportation enhancement projects. This has been interpreted by some states to be protection of viewsheds and natural areas.
- Enhance visual aesthetics.
- Insure that architecture is compatible with a landscape's or community's unique setting and character, in terms of siting and design, size, form, height, external materials, color, texture, and reflectivity.
- Protect critical views.
- Respect the integrity of mountains and ridge lines.
- Restrict building heights.
- Restrict billboards.
- Incorporate appealing elements in developed areas that create pedestrian-friendly environments: tree-lined streets; well-landscaped walkways; attractive signs; historic facades; compatible lighting and landscape furniture.
- Actively involve a broad cross-section of residents in determining and planning for the future, and capitalize on the community's distinctive assets -- architecture, history, and natural surroundings. Use a variety of private-sector tools and market incentives to influence design, such as:
- Develop a widely shared vision.
- Create an inventory of local resources.
- Build on local assets.
- Minimize the need for regulations.
- Meet the needs of both landowner and community.
- Team up with public land managers.
- Recognize the role of nongovernmental organizations.
- Provide opportunities for leaders to step forward.
- Pay attention to aesthetics.

## Potential National Park Service Actions and Policies

The National Park Service can look out for local economic interests, strengthen the local economy, assist with resource preservation outside the NRA, and enhance quality of life by:
- Establishing and maintaining good relations with the local communities
- Partnering with the local city and county governments in resolving issues of mutual concern, and staying involved with community planning efforts, through park staff and agency support groups such as the Rivers, Trail and Conservation Assistance Program (RTCA)
- Raising the level of consciousness in the park staff about the importance of park resources, their preservation, and their relationship to the local economy and quality of life, to improve outreach and partnership possibilities
- Educating people about the importance and methods of resource conservation, through on-site interpretive/educational programs, and outreach activities

BLM_0059861

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

- Promoting the NRA's attractiveness in the off-season, to encourage more visitation distributed throughout the year
- Encouraging visitors to frequent local businesses
- Purchasing supplies from local businesses
- Hiring local residents
- Providing financial and technical assistance
- Minimizing camping and staff housing within park boundaries, so that more of it occurs on private land outside the park
- Helping the Counties obtain federal funding to designate local roads as scenic byways
- Providing trail networks connecting local communities with the NRA
- Assessing user fees to restore damaged areas within and surrounding the NRA
- Enlisting the help of independent land trusts to negotiate conservation easements which to protect land, while accommodating local needs for economic development and property-tax revenue
- Supervising local volunteers to enhance resource protection and recreation opportunities within and surrounding the NRA on projects such as environmental data collection, water quality monitoring, wildfire management activities, erosion control measures, and construction and maintenance of fences, trails, and back-country camping areas
- Managing, with the involvement of the local communities, a nationally significant resource which attracts a million visitors per year that will spend money at local businesses; which contributes to increased property values of surrounding land; and which provides unique recreational opportunities that enhance the local quality of life.

314   CURECANTI NATIONAL RECREATION AREA

BLM_0059862

Toolbox of Incentives

# SOURCES OF RESOURCE CONSERVATION ASSISTANCE AND FUNDING



## FEDERAL

### Catalog of Federal Domestic Assistance (CFDA)

www.cfda.gov

The online Catalog of Federal Domestic Assistance provides access to a database of all Federal programs, including grants, available to State and local governments (including the District of Columbia); federally-recognized Indian tribal governments; Territories (and possessions) of the United States; domestic public, quasi-public, and private profit and nonprofit organizations and institutions; specialized groups; and individuals. This site deals with all types of assistance, not just financial aid. Therefore, it uses "Assistance Program" as a generic term rather than speaking specifically of a grant, loan, or other sort of program.

For more direct access to Federal grants relating to many topics, including Environmental Quality and Natural Resources, go to "Grants.gov," at www.grants.gov.

### Land and Water Conservation Fund

www.ahrinfo.org/lwcf_overview.html

Created by Congress in 1964, the Land and Water Conservation Fund (LWCF) provides money to federal, state and local governments to purchase land, water and wetlands for the benefit of all Americans. Such lands and waters are used to:

- Provide recreational opportunities
- Provide clean water
- Preserve wildlife habitat
- Enhance scenic vistas
- Protect archaeological and historical sites
- Maintain the pristine nature of wilderness areas.

Land is bought from landowners at fair-market value (unless the owner chooses to offer the land as a donation or at a bargain price). The Fund receives money mostly from fees paid by companies drilling offshore for oil and gas. Other funding sources include the sale of surplus federal real estate and taxes on motorboat fuel. LWCF is administered on a regional and national level by the National Park Service.

BLM_0059863

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

## NPS (National Park Service) – Challenge Cost-Share Program (CCSP)

Through its Challenge Cost-Share Program, the National Park Service provides a maximum 50% cost-share grant to expedite and complete mutually beneficial projects with outside sources. The purpose is to increase awareness and participation by both neighboring communities and the public at large in the preservation and improvement of NPS recreational, cultural and natural resources. Partners (outside sources) include individuals, groups, companies, corporations, state and local agencies, and other non-federal entities that will donate funds, equipment, supplies, or in-kind labor to complete a project. Projects are generally intended to be small, able to be completed in one year and consistent with park planning documents. Projects are nominated for funding each year by parks and support offices, along with eligible partners. CCSP funds may be used to support all NPS programs - both inside and outside of parklands, and on national trails. The Challenge Cost-Share Program encourages multiple partners, nontraditional partners, and private-sector partners.

- A "partner" is defined as a person, group or organization that shares a common interest with NPS in preserving natural or cultural resources or enhancing public enjoyment or public understanding of a resource and collaborates with NPS to achieve similar goals.
- The NPS share of any one CCSP project shall not exceed $30,000.
- For additional information contact Mary Padilla, National Park Service, at (505) 988-6809.

## NPS – Conservation Study Institute (CSI)

www.nps.gov/csi
The Conservation Study Institute was established in 1998 by the National Park Service (NPS) to enhance leadership in the field of conservation. In collaboration with the NPS and academic and nonprofit partners, the Institute provides a forum for the conservation community to discuss conservation history, contemporary issues and practice, and future directions for the field. The Institute's vision of conservation is inclusive and interdisciplinary. Its vision encompasses natural and cultural heritage in defining sense of place, and emphasizes the role of people in stewardship. Reflecting this vision, the Institute's approach is founded on collaborative leadership and community-based conservation involving cooperation and partnerships. The Institute is located at the Marsh-Billings-Rockefeller National Historical Park in Woodstock, Vermont, because this national park tells the story of conservation history and the evolving nature of land stewardship in America.

## NPS – National Natural Landmarks Program

www.nature.nps.gov/nnl
Established in 1962, the goal of the National Natural Landmarks (NNLs) Program is to encourage the preservation of sites illustrating the geological and ecological character of the United States, to enhance the scientific and educational value of sites thus preserved, to strengthen public appreciation of natural history, and to foster a greater concern for the conservation of the nation's natural heritage.
The NNLs Program recognizes and encourages the conservation of outstanding examples of our country's natural history. It is the only natural areas program of national scope that identifies and recognizes the best examples of biological and geological features in both public and private ownership. NNLs are designated by the Secretary of the Interior, with the owner's concurrence. The National Park Service administers the NNLs Program, and if requested, assists NNL owners and managers with the conservation of these important sites.

The NNLs Program offers participants the opportunity to share information, solve problems cooperatively, and conserve important natural areas. For nearly 40 years, the NNL Program has involved private, municipal, state, and federal landowners, all working together toward the conservation of natural resources. Land acquisition by the federal government is not a goal of this program; NNLs

16

BLM_0059864

Toolbox of Incentives

are nationally significant sites owned by a variety of land stewards, and participation in the program is voluntary. Strong partnerships are key to the program's success.

To date, there are 587 NNLs. They vary in size. For example, there is a 7-acre bog, and a 960,000-acre glacier. NNLs include public and private lands with a variety of uses, including ranching, agriculture, recreation, nature preserves, research areas, camps, conference centers, and commercial ventures. All of these uses can be compatible with NNL designation.

Some of the benefits to landowners who participate in the NNLs Program are:
- The landowner(s) is in a position to voluntarily preserve a resource which indirectly benefits all citizens. A plaque and certificate are provided by NPS which honors that commitment, and a public ceremony can be arranged.
- Based on section 170 (h) of the U.S. Internal Revenue Code, some owners of NNLs may be eligible to take a charitable contribution deduction on their Federal income tax for a "qualified conservation purpose" to a qualified "conservation organization."
- For those NNLs operated as commercial enterprises, natural landmark status might enhance the site's attractiveness to visitors.
- If any federal agency were to propose some action not desired by the NNL landowner (e.g., highway construction, river channelization), the requirements specified in the National Environmental Policy Act of 1969 would apply. This could be a potential benefit because impacts to NNLs would need to be scrutinized. This is a form of protection, though there is no guarantee that such a federal project will not damage the NNL.
- The National Park Service may arrange for technical assistance to better manage an NNL, if it is solicited by an NNL landowner. The Park Service lacks the authority to provide NNL landowners with funds to better mange their property. However, such funds may be available from other sources (e.g., the 1996 Farm Bill administered by the US Department of Agriculture's Forest Service and the National Resources Conservation Service).

## NPS – National Register of Historic Places

www.cr.nps.gov/nr

The National Register of Historic Places is the Nation's official list of cultural resources worthy of preservation. Authorized under the National Historic Preservation Act of 1966, the National Register is part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect our historic and archeological resources. Properties listed in the Register include districts, sites, buildings, structures, and objects that are significant in American history, architecture, archeology, engineering, and culture. The National Register is administered by the National Park Service, which is part of the U.S. Department of the Interior. The Register includes all historic areas in the National Park System; and over 2,300 National Historic Landmarks, which have been designated by the Secretary of the Interior because of their importance to all Americans.

Owners of properties listed in the National Register may be eligible for a 20% investment tax credit for the certified rehabilitation of income-producing certified historic structures such as commercial, industrial, or rental residential buildings.

17

BLM_0059865

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

## NPS – Partnerships Beyond Public Lands

http://nps.sonoran.org
A Web resource that shares information and tools for creating partnerships between public land managers and neighboring communities, to take advantage of tremendous opportunities for addressing threats and challenges facing public land managers, while meeting the economic and social aspirations of neighboring communities.

## NPS – Rivers, Trails and Conservation Assistance Program (RTCA)

www.nps.gov/rtca --- Click onto "Helpful Tools" and then "Community Tool Box" for tried and true methods that help communities work together to improve their special places.

The Rivers, Trails and Conservation Assistance Program, also known as Rivers & Trails or RTCA, is a division of the National Park Service that works with community groups and local and State governments to conserve rivers, preserve open space, and develop trails and greenways.  Rivers & Trails provides assistance to non-profit organizations, community groups, tribes or tribal governments, and local or State government agencies.  This assistance includes:
- Building partnerships to achieve community-set goals
- Assessing resources
- Developing concept plans
- Engaging public participation
- Identifying potential sources of funding.
Projects include:
- Trails and greenway planning
- Open space protection
- River conservation
- Watershed planning
- Rail-trail conversions
- Urban greening

## Steens Mountain Cooperative Management and Protection Area [11]

This area is a good model for using incentives, partnerships, and cooperative efforts for resource conservation.  PL 106-399 designates the Steens Mountain Wilderness Area and the Steens Mountain Cooperative Management and Protection Area in Harney County, Oregon.

## TEA-21 The Transportation Equity Act for the 21st Century

www.fhwa.dot.gov/tea21
The Transportation Equity Act for the 21st Century (TEA-21) was enacted June 9, 1998 as Public Law 105-178.  The TEA 21 Restoration Act, enacted July 22, 1998, provided technical corrections to the original law.  TEA-21 authorizes the Federal surface transportation programs for highways, highway safety, and transit for the 6-year period 1998-2003.  TEA-21 also makes provisions for the following environmental enhancements:
- National Scenic Byways:  Funding for improvements to roads of scenic or historic value.
- Bicycle and Pedestrian Paths:  Provisions to make bicycling and walking safer and more viable ways of travel.
- Recreational Trails:  Funding to create and maintain recreational trails.

---

[11] Steens Mountain Cooperative Management and Protection Act of 2000, Public Law 106-399, October 30, 2000:

18

BLM_0059866