Toolbox of Incentives

# USDA (U.S. Department of Agriculture) – Conservation Security Program (CSP)

www.nrcs.usda.gov/programs/csp

CSP [12] is a voluntary program that provides financial and technical assistance to promote the conservation and improvement of soil, water, air, energy, plant and animal life, and other conservation purposes on Tribal and private working lands. Working lands include cropland, grassland, prairie land, improved pasture, and range land, as well as forested land that is an incidental part of an agriculture operation.

CSP can assist landowners to implement and maintain conservation practices that will help farms and ranches be environmentally sustainable, while providing a variety of natural resources benefits to all Americans.

CSP works as follows:
1. Potential participants must sign up for CSP assistance. The sign-up will be offered annually in selected watersheds across the Nation. A different set of watersheds will be selected each year between FY-2005 and FY-2014. Selected watersheds are listed on the above Web-site, and in NRCS offices nationwide.
2. The applicant completes a self-assessment, including description of conservation activities on their operations, to help determine eligibility for CSP. The self-assessment is available at the above Web-site and in NRCS state offices on compact disk or as a printed workbook.
3. Eligible landowners in the selected watersheds complete the self-assessment and schedule an interview to submit an application at their local NRCS office.
4. Based on the application, description of current conservation activities, and the interview, NRCS determines CSP eligibility and in which program tier and enrollment category the applicant may participate.

Additional information is available at the above Web-site; at the following Web-site: www.nrcs.usda.gov/programs/farmbill/2002; or by contacting a local USDA Service Center, listed in the telephone book under U.S. Department of Agriculture.

# USDA – Natural Resources Conservation Service (NRCS)

www.nrcs.usda.gov

*Mission*: The Natural Resources Conservation Service provides leadership in a partnership effort to help people conserve, maintain, and improve our natural resources and environment.

*Vision*: Harmony between people and the land.

NRCS puts nearly 70 years of experience to work in assisting America's private landowners with conserving their soil, water, and other natural resources. Local, state and federal agencies and policymakers rely on their expertise. NRCS delivers technical assistance based on sound science, suited to a customer's specific needs. Cost shares and financial incentives are available in some cases. Most work is done with local partners. Partnerships with local conservation districts serve almost every

---

[12] The Conservation Security Program (CSP) is authorized by the Food Security Act of 1985, as amended by the Farm Security and Rural Investment Act of 2002 (2002 Farm Bill) (Pub. L. 107-171), and is administered by the U.S. Department of Agriculture's Natural Resources Conservation Service (NRCS).

BLM_0059867

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

county in the nation, and the Caribbean and Pacific Basin.  Participation in NRCS programs is voluntary.

## USFWS (U.S. Fish & Wildlife Service) – Grants-At-A-Glance

www.fws.gov/grants

The Fish and Wildlife Service administers a variety of natural resource assistance grants to governmental, public and private organizations, groups and individuals.  This website provides links to information about and applications for available grants.

## USFWS – Landowner Incentive Program (LIP)

This is a new program administered by U.S. Fish & Wildlife Service, to provide money to states for preserving species of special concern.  Grants are assigned by state divisions of wildlife to landowners through a competitive process.  Contact person is Ken Morgan, Private Lands Habitat Program Coordinator, Colorado Division of Wildlife, at (303) 291-7404

## USFWS – Private Stewardship Grants Program (PSGP)

http://endangered.fws.gov/grants/private_stewardship/index.html

This is a program administered by U.S. Fish & Wildlife Service that provides $10,000,000 in federal grants and other assistance on a competitive basis to individuals and groups engaged in voluntary conservation efforts on private lands that benefit at-risk species including Federally-listed endangered or threatened species as well as proposed or candidate species.  Under this program, landowners and their partners will be able to submit proposals directly to USFWS for funding to support those efforts.

20

BLM_0059868

Toolbox of Incentives

# STATE OF COLORADO

## Colorado Species Conservation Partnership

This is a program run by the State of Colorado, involving the U.S. Department of the Interior, Colorado Division of Wildlife, the Great Outdoors Colorado trust fund, county governments, and non-governmental organizations throughout the state, that will pay landowners to help protect species that are listed, or have the potential to be listed, under the Endangered Species Act, via management agreements, conservation easements or leases.

- Landowners are paid through the partnership (according to the property's value) for the term of the agreement not to sell their land for development, or they are paid to help maintain or develop habitat on their property.
- CDOW also has many other private lands incentive programs available.
- Point of Contact:  Ken Morgan, Private Lands Habitat Program Coordinator, CDOW: (303) 291-7404.

## Colorado State Historical Fund

www.coloradohistory-oahp.org/programareas/shf/projecttypes.htm

Operated as a component of the Colorado Historical Society Office of Archeology and Historic Preservation, the fund provides grant monies to public entities and non-profit organizations for historic properties that are either listed in the National Register of Historic Places, the State Register, and/or are local landmarks.

## Great Outdoors Colorado Trust Fund (GOCO)

www.goco.org

The GOCO Amendment to the state constitution dedicates a portion of state lottery proceeds to projects that preserve, protect, and enhance Colorado's wildlife, parks, rivers, trails, and open spaces. GOCO's Mission is to help the people of Colorado preserve, protect, enhance, appreciate and enjoy our parks, wildlife, trails, rivers and open space through strategic grants, partnership and leadership.

- In 1992, Coloradans took a major step toward preserving their state's outdoor heritage by voting to create the Great Outdoors Colorado (GOCO) Trust Fund, which now forms Article XXVII of the Colorado Constitution. The GOCO Amendment dedicates a portion of state lottery proceeds to projects that preserve, protect, and enhance Colorado's wildlife, parks, rivers, trails, and open spaces. Since it began awarding grants in 1994, GOCO has awarded almost $290 million for 1,700 projects throughout the state.
- GOCO awards grants to projects that preserve and enhance Colorado's open space, parks, outdoor recreation, wildlife, rivers and trails. There are five competitive grant programs: Legacy, Open Space, Local Government Parks, Outdoor Recreation & Environmental Education Facilities, Trails, and Planning/Capacity Building. GOCO also awards grants through the Colorado Division of Wildlife and Colorado State Parks.
- Local governments, non-profit land conservation organizations, the Colorado Division of Wildlife and Colorado State Parks are eligible to receive GOCO grants.
- Individuals cannot receive GOCO funding. However, many ideas for projects come from citizens and neighborhood groups. For example, if you have an idea for a local park, you could share the idea with your local parks department or planning office to see if they would sponsor an application for a GOCO grant to help fund the project. If you have an idea for a land preservation project, you can contact your local land trust or open space department.

21

BLM_0059869

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

# PRIVATE, NONPROFIT

## American Farmland Trust

www.farmland.org

American Farmland Trust is a private, nonprofit organization founded in 1980 to protect our nation's farmland. AFT works to stop the loss of productive farmland and to promote farming practices that lead to a healthy environment. AFT identifies "strategic" farmland—productive farmland threatened by sprawl—through mapping and other analysis, then works with communities to plan and effect farmland conservation. At the state and national level, AFT partners with other groups—from farm bureaus to environmentalists—to develop land conservation tools. Using public appearances, publications, media outreach and the Web, AFT builds awareness of the need to protect our nation's agricultural resources. Through land protection projects and consulting, AFT works with landowners to protect farmland and to develop sustainable farming practices.

## Black Canyon Land Trust

(Website under construction.)
This locally based organization can provide information regarding conservation easements. Contact Adell Heneghan at (970) 252-1481.

## Colorado Association of Conservation Districts (CACD)

www.cacd.us

The CACD, consisting of 77 separate Conservation Districts, provides guidance to landowners in the wise and proper management of natural resources. It also provides assistance in seeking funding to implement programs aimed at enhancing and protecting Colorado's natural resources. Each Conservation District provides leadership within its geographic area to promote the conservation of natural resources, which in turn helps ensure the health, safety, and general welfare of the citizens of the state through a responsible conservation ethic.

Three Conservation Districts are located within the Curecanti area, and include:

- Delta Conservation District
  690 Industrial Blvd.
  Delta, CO  81416
  Tel:  (970) 874-5726 or (970) 874-0407
  Fax:  (970) 874-7768
  e-mail:  deltacd@hotmail.com
- Gunnison Conservation District
  216 N. Colorado
  Gunnison, CO  81230
  Tel:  (970) 642-4461
  Fax:  (970) 642-4425
  e-mail:  beth.ozyp@co.usda.gov
- Shavano Conservation District --- Web-site:  www.shavanoscd.org
  102 Par Place, Suite 4
  Montrose, CO  81401
  Tel:  (970) 249-8407, ext. 113
  Fax:  (970) 249-5718
  e-mail:  shavanocd@ocinet.net

22

BLM_0059870

Toolbox of Incentives

In cooperation with various organizations, universities, and government agencies, conservation districts have developed conservation guidelines and other educational material to help manage natural resources, including water, weeds, wildlife habitat, soils, pasture land, and range land. Two such publications by the Shavano Conservation District (available on the web-site) serve as examples of the type of material available:

- *A Manual for Western Colorado Landowners*
- *Best Management Practices in the Uncompahgre Valley*

CACD publishes a periodic newsletter entitled *Colorado Conservator*, also available on the web-site. Visit the web-site for additional information, or contact:

Colorado Association of Conservation Districts
743 Horizon Court, Suite 322
Grand Junction, CO  81506
Phone:  (970) 248-0070
Fax:  (970) 248-9229

## Colorado Cattlemen's Agricultural Land Trust (CCALT)

www.ccalt.org
The mission of the Colorado Cattlemen's Agricultural Land Trust is to help Colorado's ranchers and farmers protect their agricultural lands and encourage continuing agricultural production for the benefit of themselves, their families and all of Colorado's citizens.

CCALT's primary emphasis is to increase awareness among agricultural landowners about the use of conservation easements as a means of protecting land and as a tool for facilitating the inter-generational transfer of productive lands. CCALT was created with the primary interest of the landowner in mind. It is a land trust OF landowners, BY landowners, and FOR landowners. CCALT is proving to be an important mechanism in preserving agricultural opportunities and protecting the open space that is valued by both Colorado residents and visitors. Contact (303) 431-6422.

## Colorado Coalition of Land Trusts (CCLT)

www.cclt.org
Formed in 1990, the Colorado Coalition of Land Trusts (CCLT) is the statewide, membership organization of local, statewide, regional and national land trusts. Several municipal open space programs and state and federal agencies also support the organization. CCLT's mission is to increase the amount of land protected in perpetuity through the voluntary conservation of agricultural land, critical wildlife habitat, and other important open lands. Formed to strengthen the land trust movement in Colorado, CCLT operates as a clearinghouse for information and services, providing technical and organizational assistance to land trusts, educational conferences and workshops, expert referrals to assist with land transactions, and educational updates concerning legislation impacting land conservation. By encouraging an integrated approach to land conservation, CCLT also aims to facilitate collaborative partnerships with local land trusts, landowners, and government agencies, and municipal open space programs. To date, CCLT Members have helped to protect over 718,000 acres of valuable agricultural, wildlife, and natural resources across the state.

BLM_0059871

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

## Gunnison Ranchland Conservation Legacy

www.gunnisonlegacy.org
This organization's mission statement is to "To create a legacy for future generations by preserving ranching and conserving ranchlands in the Gunnison Country."

Goals:
- Be a resource to landowners, working with them to accomplish their land preservation goals and educating them about various conservation options.
- Remain at all times a grassroots organization, driven by the expressed conservation needs of the landowners themselves.
- Maintain good relationships with donors and grantors to our organization.
- Educate the general public about the importance of agricultural land preservation.
- Be creative and innovative in applying agricultural land preservation techniques.
- Improve opportunities for the continuity of ranching business from one generation to the next.

The Gunnison Ranchland Conservation Legacy (GRCL) is a 501(c)3 nonprofit organization that was established in 1996. This scenic Colorado mountain valley, home of Crested Butte Mountain Resort and the Black Canyon National Park, is experiencing tremendous growth. GRCL is working to ensure that productive agricultural lands can remain a part of our changing community. Acting on behalf of landowners in conjunction with established land trusts, the GRCL facilitates the placement of conservation easements on agricultural lands. Ranch families benefit by knowing their land is available for agriculture forever. Additionally, their land is significantly reduced in value for estate tax purposes. Wildlife species benefit through the permanent protection of large expanses of hay meadows, riparian areas, and other habitat. Local residents and visitors benefit from the assurance that these beautiful agricultural open spaces will never be developed.

As of August 2002, the GRCL has permanently protected 18 ranches (7,461 acres) in Gunnison County by facilitating the placement of conservation easements. In addition, there are 42 families representing over 30,000 acres on the GRCL's waiting list to complete conservation easements.

## Land Trust Alliance

www.lta.org
Founded in 1982, the Land Trust Alliance is the national leader of the private land conservation movement, promoting voluntary land conservation across the country and providing resources, leadership and training to the nation's 1,200-plus nonprofit, grassroots land trusts, helping them to protect important open spaces. "The resources that LTA makes available to us are extraordinary," wrote one Montana land trust executive director. "Whether I need technical assistance on a particular issue or just someone's ear to bounce an idea off, I have always found the support and assistance I have needed, and it has been rendered professionally, quickly, impartially and effectively." The Land Trust Alliance provides an array of programs, including direct grants to land trusts, training programs, answers to more than 3,000 inquiries for technical assistance each year, and one-on-one mentoring to help land trusts build organizations that are equipped to protect open space. Among LTA's services to land trusts are: *Technical Assistance, Public Policy, Training, Funding, Regional Programs, Getting The Word Out,* and *Standards and Practices.*

24

BLM_0059872

Toolbox of Incentives

# National Association of Conservation Districts (NACD)

www.nacdnet.org

NACD is the nonprofit organization that represents the nation's 3,000 conservation districts, and 17,000 men and women who serve on their governing boards. Conservation districts, local units of government established under state law to carry out natural resource management programs at the local level, work with more than 2.5 million cooperating landowners and operators to help them manage and protect land and water resources on nearly 98 percent of the private lands in the United States.

The idea for soil and water conservation districts was born in 1935. NACD was formed in 1946 by conservations districts and their state associations. Today there is a conservation district for almost every county in the United States. They serve all the conservation needs of the nation, providing education, and helping local citizens conserve land, water, forests, wildlife, and other natural resources.

The association was founded on the philosophy that conservation decisions should be made at the local level with technical and funding assistance from federal, state and local governments, and the private sector. As the national voice for all conservation districts, NACD supports voluntary, incentive-driven natural resource conservation programs that benefit all citizens.

The mission of NACD is: "***To enable conservation districts to pool their resources to accomplish collectively what would be difficult or impossible to accomplish individually.***"  On behalf of districts, NACD develops national conservation policies, influences lawmakers, and builds partnerships with other agencies and organizations. NACD provides services to its districts to help them share ideas in order to better serve their local communities.  "Conservation -- Development -- Self-Government".

NACD maintains relationships with organizations and government agencies; publishes information about districts; works with leaders in agriculture, conservation, environment, education, industry, religion and other fields; and provides services to its districts. NACD is financed primarily through the voluntary contributions of its member districts and state associations.

Among the goals of the NACD are to:
- Represent districts as their national voice on conservation issues;
- Provide useful information to conservation districts and their state associations;
- Build partnerships with federal and state agencies and other organizations in order to carry out district priorities and programs;
- Analyze programs and policy issues that have an impact on local districts; and
- Offer needed and cost-effective services to districts.

Among other things, conservation districts help:
- Implement farm conservation practices to keep soil in the fields and out of waterways;
- Conserve and restore wetlands, which purify water and provide habitat for birds, fish and numerous other animals;
- Protect groundwater resources;
- Plant trees and other land cover to hold soil in place, clean the air, provide cover for wildlife, and beautify neighborhoods;
- Developers and homeowners manage the land in an environmentally sensitive manner; and
- Communities and schools to teach the value of natural resources and encourage conservation efforts.

25

BLM_0059873

Toolbox of Incentives

## National Trust for Historic Preservation

www.nationaltrust.org

The National Trust for Historic Preservation provides leadership, education and advocacy to save America's diverse historic places and revitalize our communities. The National Trust, founded in 1949, is a private nonprofit organization with more than a quarter million members. It supports preservation through a wide range of programs and activities, and provides technical and financial assistance to state and local organizations.

## The Nature Conservancy

www.nature.org

The mission of the conservancy is to preserve the plants, animals and natural communities that represent the diversity of life on Earth by protecting the lands and waters they need to survive. Since 1951, TNC has been working with communities, businesses and people like you to protect more than 98 million acres of valuable lands and waters around the world.

- Over 86% of all funds are used directly for conservation.
- Total acres protected by the Conservancy in the United States: 14,553,000
- Acres protected by the Conservancy outside the United States: 83,506,000
- Current number of Conservancy preserves: about 1,400
- Conservancy members: approximately 1 million

We can't buy all these preserves, and we certainly can't protect them single-handedly. But by joining together with communities, businesses, governments, partner organizations and people like you, we can preserve our lands and waters for future generations to use and enjoy.

## Sonoran Institute

www.sonoran.org

A nonprofit organization that works collaboratively with local people and interests to conserve and restore important natural landscapes in western North America, engaging partners such as landowners, public land managers, local leaders, community residents, and nongovernmental organizations, in an innovative approach to conservation called Community Stewardship.

# PUBLICATIONS

**Jim Howe, Ed McMahon, & Luther Propst, *Balancing Nature and Commerce in Gateway Communities*, 1997, Island Press, 166 Pages:** This book provides lessons in how to preserve the character and integrity of communities and landscapes without sacrificing local economic well-being. The authors describe economic development strategies, land-use planning processes, and conservation tools that communities from all over the country have found effective.

**Nancy S. Greif and Erin J. Johnson, Editors, *The Good Neighbor Guidebook for Colorado*, 2000, Johnson Printing, 274 Pages:** The book begins with a series of articles on stewardship, then moves on to deal with such topics as water law, land use planning, the law of nuisance, real estate transfers, eminent domain and water rights. Public land law and tribal law are examined in some detail. The book concludes with an excellent discussion of the alternatives to subdivision: conservation easements, sustainable ranching, and tax and estate planning.

26

BLM_0059874

Toolbox of Incentives

# INDEX OF INCENTIVES AND RELATED TERMS AND TOPICS



Advantages to Landowners for Conserving Land ........................................................... 6
Advice for Landowners Regarding Resource Conservation........................................... 2
American Farmland Trust ....................................................................................... 8 and 22
Awards Program ............................................................................................................... 12
Balancing Nature and Commerce in Gateway Communities..................................... 26
Black Canyon Land Trust................................................................................................ 22
Catalog of Federal Domestic Assistance (CFDA) ...................................................... 15
Challenge Cost-Share Program (CCSP - NPS).......................................................... 16
City, County, and Community Policies and Incentives ............................................... 12
Colorado Association of Conservation Districts (CACD) ......................................... 22
Colorado Cattlemen's Agricultural Land Trust (CCALT) ........................................ 23
Colorado Coalition of Land Trusts (CCLT) ............................................................... 23
Colorado Species Conservation Partnership.......................................................... 9 and 21
Colorado State Grants.............................................................................................. 9 and 21
Colorado State Historical Fund (Colorado Historical Society) ................................. 21
Conservation District ............................................................................................ 22 and 25
Conservation Easements ...................................................................................... 6 and 7
Conservation Security Program (CSP - USDA) ......................................................... 19
Conservation Study Institute (CSI – NPS)................................................................... 16
Cooperative Agreements ................................................................................................... 4
Cultural Resource Incentives............................................................................................ 9
Delta Conservation District ............................................................................................ 22
Department of Agriculture Grants................................................................................. 19
Direct Purchase .................................................................................................................. 5
Donation ............................................................................................................................. 6
Endangered Species Incentives........................................................................................ 9
Enhancing Visual Aesthetics.......................................................................................... 12
Federal Grants .................................................................................................................. 15
Fee Simple Acquisition ..................................................................................................... 5
Good Neighbor Guidebook for Colorado .................................................................... 26
Grazing and Open Space Incentives ............................................................................. 10
Great Outdoors Colorado Trust Fund (GOCO)......................................................... 21
Gunnison Conservation District ................................................................................... 22
Gunnison Ranchland Conservation Legacy................................................................. 24
Incentive Payments to Landowners ................................................................................ 4
Information Sources for Resource Conservation Funding and Partnerships........... 15
Land and Water Conservation Fund............................................................................. 15
Land Exchange.................................................................................................................... 6
Land Trust Alliance ......................................................................................................... 24
Land Trusts.......................................................................................................................... 7

27

BLM_0059875

APPENDIX A: TOOLBOX OF INCENTIVES FOR RESOURCE CONSERVATION

Toolbox of Incentives

Landowner Incentive Program (LIP - USFWS) ................................................................ 20
Landowner Incentives .......................................................................................................... 3
Life Estate ............................................................................................................................. 5
Livestock Grazing Incentives ............................................................................................ 10
Low Interest Loans ............................................................................................................. 12
Management Agreements ..................................................................................................... 4
Memorandums of Understanding ....................................................................................... 4
Mineral Rights ........................................................................................................... 5 and 7
National Association of Conservation Districts .............................................................. 25
National Natural Landmarks Program ............................................................................. 16
National Park Service Actions and Policies ..................................................................... 13
National Park Service Grants ............................................................................................. 16
National Register of Historic Places (NPS) ............................................... 9, 10, 17 and 21
National Trust for Historic Preservation ......................................................................... 26
Natural Resources Conservation Service (NRCS - USDA) .......................................... 19
Nature Conservancy .................................................................................................. 8 and 26
Open Space Conservation .................................................................................................... 8
Partnership Principles ................................................................................................ 2 and 3
Partnerships Beyond Public Lands (NPS) ............................................................... 2 and 3
Payment in Lieu of Taxes .................................................................................................... 5
Private Stewardship Grants Program (PSGP - USFWS) ............................................... 20
Public Education ................................................................................................................. 12
Purchase and Retained Use and Occupancy ...................................................................... 5
Quality of Life ......................................................................................................... 3, 13 and 14
Rights of Way ......................................................................................................................... 5
Rivers, Trails and Conservation Assistance Program (RTCA - NPS) ........................... 18
Shavano Conservation District .......................................................................................... 22
Sonoran Institute ................................................................................................................ 26
Steens Mountain Cooperative Management and Protection Act of 2000 ...................... 18
Tax Abatements for Owners of Historic Buildings ........................................................ 12
Tax Benefits to Landowners .................................................................................... 6 and 12
Tax Credits for Landowners Who Implement Resource Protection Measures ............ 12
Tax Credits for Owners of Properties Listed on the National Register ......................... 9
TEA-21: The Transportation Equity Act for the 21st Century ..................................... 18
Technical Assistance ............................................................................................................. 4
Third Party Purchase ............................................................................................................ 6
Transfer of Development Rights (TDR) ............................................................................ 8
Twenty-Five Year Lease ....................................................................................................... 5
U.S. Fish & Wildlife Service Grants ........................................................................ 9 and 20
Voluntary Action ................................................................................................................ 12
Willing Landowners .................................................................................................. 5 and 7

April 4, 2005

328     CURECANTI NATIONAL RECREATION AREA

BLM_0059876

# Curecanti: Great Scenery, Outstanding Resources, and Good Neighbors



## Working as a community to conserve the resources of the Curecanti area

This booklet offers ideas about how agencies and landowners can work together to maintain the outstanding qualities that we commonly value - the natural, cultural, recreational, and scenic resources that make the area within and surrounding Curecanti such a great place to live, work and play.

BLM_0059877

APPENDIX B − CURECANTI: GREAT SCENERY, OUTSTANDING RESOURCES, AND GOOD NEIGHBORS

*Working together...*

## Introduction

If you own property in the Curecanti Area, you probably chose this area for its scenic beauty, wildlife, sense of history, and recreational potential.  Or, perhaps you grew up in this area, it is a part of your heritage, and you value it for many of the same reasons.

Nestled in Gunnison and Montrose Counties, the reservoirs and canyons of Curecanti National Recreation Area offer a premier wild setting that contains a variety of magnificent resources – natural, cultural, scenic, and recreational.  Thousands of visitors – those who aren't as fortunate as we are to call this place home -  come here to enjoy these resources, and this tourism contributes greatly to our local economy.

The Curecanti area is recognized nationally and locally for its abundant wildlife, archeological and historic values, recreational potential and high scenic qualities.  This has been acknowledged in numerous ways, including:

* Designating the National Park Service to manage Curecanti National Recreation Area (NRA), in cooperation with the Bureau of Reclamation;

* Establishing special management areas, such as the Bureau of Land Management's Areas of Critical Environmental Concern (ACEC), and Colorado Division of Wildlife's State Wildlife Areas; and

* Designating the West Elk Loop Scenic and Historic Byway by the State of Colorado, where segments of Highway 92 and Highway 50 play an important role.



The National Park Service has been a part of the Gunnison and Montrose communities for over 30 years now, as caretaker and steward of Curecanti NRA.  The  Park Service shares in the heritage of the Gunnison and Montrose communities, and shares in the attendant responsibilities associated with being a member of a community.  With you we share in a common appreciation for the various qualities of the land and the need for a healthy economy.   We are looking toward the future of our community.

Secretary of the Interior Gale Norton has set the standard in the Department of the Interior by implementing a land management strategy that incorporates her vision of the four "Cs" – using Communication, Consultation and Cooperation, all in the service of Conservation.  We recognize that the magnificent resources and the beauty of the land transcend what the National Park Service traditionally thinks of as the NRA boundary.  Together, as a community, we must explore opportunities to conserve and enhance these  resources for ourselves, for our future generations that will come to regard this area as part of their heritage, and for the many visitors that come to enjoy this part of Colorado.

*For additional ideas on how communities and agencies can work together, visit the "Community Stewardship Exchange" website referenced on the back cover.*

2

BLM_0059878

*...to conserve the resources of the Curecanti area*

## What Can a Landowner Do to Move Toward Our Common Goals?

Here are some initial ideas—

## Sustaining our Scenic Resource

### SITING AND DESIGN CONSIDERATIONS

A carefully located building site can provide lasting and significant value to properties that become developed.  The landowner should consider a variety of factors, including prevailing winds, slope, suitable locations for wells and septic systems, vegetation removal, access, visual impact of the building, and the angle of the sun throughout the year.

The visual impact of houses and other structures on the natural scene can be minimized by using a number of techniques.  The building might be located so that the surrounding terrain hides the building from nearby roads, trails and recreation sites.  Trees and shrubbery can be used to shield the site.  Buildings can be set back from the top of the slope or below the crest of a ridge to lessen visual impact.  Buildings with low profiles and architectural designs that fit into the surrounding natural landscape result in less visual impact.  Roads and driveways designed to minimize cut and fill will cause less visual impact while reducing erosion and drainage problems.  The visual impact of power lines and other utilities can be reduced through careful siting or by placing them underground.  Antennas can be made less conspicuous by limiting their height and keeping them in unobtrusive locations.

*For additional design and construction ideas, visit the "Sustainable Design"  and "CSU Cooperative Extension"  websites; and for general information on living in rural areas, visit the "Code of the West" website, all referenced on the back cover.*

### BUILDING MATERIALS OF LOW VISUAL IMPACT

Proper selection of materials used for siding and roofing can help your home complement the natural areas around it.  These materials include sidings with muted natural shades or "earth tones" on rough-textured material; and dark (gray, green or brown) roofs of non-reflective metal, imitation shake, or earth-tone composition shingles.  Certain building materials may also be preferable because they help reduce fire hazard, as described later under "Ensuring Wildfire Safety."

### EXTERIOR LIGHTING

The Curecanti area offers excellent nighttime "skyscapes"-- opportunities for residents and visitors to enjoy stargazing unparalleled in most other areas of the country.  Use of shielded lighting, and low light fixtures that direct the light downward, can reduce glare and sky glow. Try to avoid the use of mercury vapor lights, which produce glare and detract from views of the night sky. Many local governments prohibit the use of mercury vapor luminaries in order to protect views of the night sky. Energy costs can be lowered by carefully considering where and how much light is needed. Also consider the use of lights activated by motion detectors, which further reduce energy costs while increasing security.

*For ideas and resources to help keep our skies dark, visit the "International Dark Sky Association" website referenced on the back cover.*

3

BLM_0059879

APPENDIX B – CURECANTI: GREAT SCENERY, OUTSTANDING RESOURCES, AND GOOD NEIGHBORS

*Working together...*

## Preserving and Improving Natural Habitat

Habitats are closely interrelated systems that include natural or native vegetation, rivers and streams, food and protection for a variety of animals.  There are several ways that an owner can improve the habitat on his or her land, thus benefiting area wildlife.

One of the easiest methods of preserving and improving the habitat is the use of plants.  When considering new construction, minimize the amount of area that will be cleared of vegetation.  Keeping as much original vegetation as is reasonable will not only help maintain the natural habitat, but also helps in reducing excessive runoff of storm water, thereby decreasing erosion.

Once construction is finished, consider landscaping with native plants.  Natives will generally have a better chance of survival with less care than introduced species, and should be less expensive to maintain.  Native plants also provide shelter and food for native birds and other animals.

Avoid the use of exotic, invasive, or non-native plants, because they can spread, and may compete with and crowd out native species.  If you suspect that exotic species exist on your property, and would like information on how to control or eradicate them, you may contact officials in Gunnison County or at the National Recreation Area for technical assistance.



Aquatic habitat can be protected and improved with vegetation, too.  Trees can provide shade and shelter for fish that cannot tolerate high water temperature. Plantings along a stream bank help anchor the soil and reduce erosion.

Trees and shrubs can be used to lessen the visual impact of a new or existing structure without sacrificing the view from porches or balconies.  A visual barrier created by plants need not be a solid wall.  Rather, judiciously placed plants will help blend the building into the natural landscape and still offer scenic vistas, while providing nesting places for birds and other animals.  Appropriate landscaping can also reduce wildfire hazard, as described later under Ensuring Wildfire Safety.

*For additional information on how to conserve wildlife and natural habitat, visit the "Grants at a Glance" U.S. Fish and Wildlife Service website referenced on the back cover. For information regarding exotic, or non-native plants, visit the "Colorado Noxious Weeds" and "Exotic, Invasive, or  Non-Native Species" websites referenced on the back cover.*

## Protecting Water Quality

Maintaining a pure water supply is critical for all of us.  A properly placed and maintained well protects the water quality on the property where the well is located and also on the surrounding properties.  Several wells are often drilled into the same water source, or aquifer, which make it imperative that the shared water stays clean.

A site where the land falls away from the wellhead in all directions is the best location.  At such a site, the chance for impurities to drain into the well is minimized.  A well on level ground is acceptable, but is not considered to be as safe as a well with positive drainage away from the wellhead.  A site where surface water moves to or into the wellhead should be avoided in all cases.

4

BLM_0059880

*...to conserve the resources of the Curecanti area*



The well must also be separated from potential sources of contaminants.  Parking areas, septic tanks and drain fields, manure storage, and animal feed storage areas are sources of possible contamination.  The well should be located away from areas such as these, and whenever possible, uphill from them.

Protecting water quality also can be applied to surface water on the property.  Like the water in an aquifer, the water in streams, lakes, wetlands, and ponds is a resource that is shared with your neighbors, not to mention wildlife. The quality of surface water also has a significant impact on the value of a property.  Many of the techniques that help protect wellheads can also be applied to surface water.  In this case, however, the placement of new structures or other improvements must be done with regards to potential impact on the stream or other waterway.

Natural or created wetlands can provide protection from flooding and help filter some contaminants out of water before it enters the subterranean aquifer.  Allowing clean water to drain into wetlands can help protect or even improve the quality of the aquifer.  Areas that are moist or wet throughout most of the year are also less likely to burn, thus providing protection from wildfire.

*Techniques for maintaining quality water sources are available on the "Ground and Drinking Water" website referenced on the back cover.*

## Protecting Yourself and Property from Wildfire

Fire is a naturally occurring event in forested and other rural areas.  However, there are a number of proven strategies to reduce the likelihood of damage to your home and other structures if your property is in an area potentially threatened by wildland fires.  The added "insurance" of these methods can contribute to your peace of mind.

Ideas for selecting building sites and materials:

- Build away from the crest of a hill – Fire can move rapidly up a slope.  The steeper the slope, the faster the fire can travel.

- Use composite, slate, tile, or Class–A treated materials on the roof instead of untreated cedar or shake shingles.

- Cover the chimney openings with ¼–inch wire mesh to prevent embers from escaping (or entering!).

Landscaping to Reduce Fire Hazard:



- Reduce the amount of fuel materials (dead leaves, branches, etc.) near the house.

- Maintain a clearing or "defensible space" of at least 30 feet around the house.  The defensible space does not need to be only rock or concrete, but should be free of trees and other volatile materials.   This area can also provide easier access for emergency vehicles.

- Create a landscape design that provides a transition into the natural setting.  The design may include the defensible space, a zone of irrigated low–growing plants, shrubs, and widely spaced trees, and then into the natural environment surrounding the home site.

*For additional details on ways to reduce the threat of fire to your property, visit the "Firewise" website referenced on the back cover.*

5

BLM_0059881

APPENDIX B – CURECANTI: GREAT SCENERY, OUTSTANDING RESOURCES, AND GOOD NEIGHBORS

*Working together...*

## What Assistance is Available to Landowners?

Landowners who are interested in conserving the natural and scenic character of their land have several options for assistance, including working in partnership with counties and land-management agencies. Although a few are listed here, we recommend visiting the *"Curecanti Toolbox of Incentives for Resource Conservation"* website referenced on the back cover, or request a copy from the Superintendent at the address on the back cover. These incentive opportunities include:

TECHNICAL ASSISTANCE

The National Park Service is currently able to provide some technical assistance, and expects to be able to provide a wider range of assistance in the future, including:

- Advice regarding resource management for topics such as:
    - …Conservation of natural and cultural resources, including archeological sites and historic structures;
    - …Conservation of various plant and animal species, especially those that may be rare or threatened;
    - …Reduction or elimination of exotic species that are not native to the area;
- Advice on siting and design considerations for environmentally sensitive development;
- Working with the county planning process early on to identify ways to permit development yet minimize impacts; 
- Determination of the location of regulated wetlands and need for permits;
- Directing landowners to other organizations with expertise in certain fields, such as land trusts;
- Directing landowners to funding sources for worthwhile conservation projects;
- Education programs that inform park neighbors about the Curecanti environment and stimulate thinking toward sustainable development.

FUNDING FOR CONSERVATION PROJECTS

Landowners may be able to obtain funding to assist with conservation oriented projects, especially if there is a local "match" available to assist in the project. Development and submission of grant applications is more successful when done in partnership and cooperation with an agency, the county government, or a local or national organization. Examples of funding sources include:

- Great Outdoors Colorado Trust Fund (GOCO)—uses a portion of state lottery proceeds for projects that preserve, protect, and enhance Colorado's wildlife, parks, rivers, trails, and open spaces.
- National Park Service Challenge Cost Share Program—provides a maximum 50% cost share grant for projects that benefit natural, cultural, scenic or recreational resources.
- Landowner Incentives Program, Private Stewardship Grants Program and the Colorado Species Conservation Partnership—the U.S. Fish and Wildlife Service and the Colorado Division of Wildlife have grants available for landowners and organizations involved in voluntary conservation projects that benefit wildlife.

*For a more thorough listing of grant opportunities, visit the "Federal Grants" and "Grants at a Glance" websites referenced on the back cover.*

6

BLM_0059882

*...to conserve the resources of the Curecanti area*

## ALTERNATIVES FOR LAND OWNERSHIP

As an alternative to owning their properties outright, many landowners find it to their advantage for a land trust or a land-management agency (such as the National Park Service) to acquire an interest in their property, on a willing-seller basis, for conservation purposes.  Three common methods include:

- Conservation, nondevelopment, and/or scenic easements:  Easements allow specified activities in designated areas, with certain deed restrictions, usually pertaining to development, to ensure that private uses will remain compatible with the conservation of resource values, and/or public use of the land.  The landowner is reimbursed for the fair market value of the interest acquired.  Although the landowner continues to pay property tax, it may be at a reduced amount, and there may be significant income tax and estate tax benefits.

- Purchase and retained use and occupancy:  In this situation, the agency buys the property at fair market value, but the landowner can continue to live on the land for an agreed-upon time period, or for the remainder of his or her life.  Although the property is taken off the tax rolls, the federal government may provide payment in lieu of taxes to the county.  Two common forms of retained use are 25-years and life estates.

- Fee simple acquisition:  In this situation, the agency acquires all rights or interests in the property.  Four common methods of acquisition are:
  - Direct purchase at fair market value with appropriated funds.
  - Third party purchase through entities such as land trusts and conservation organizations.
  - Exchange for other government land of equal value.
  - Donation, in which case there would be tax advantages to the landowner.

***An increasingly popular alternative is the conservation easement.*** It provides permanence to land protection, allows owners to retain title to their lands, and provides immediate monetary compensation, as well as long-term tax advantages. It is a property deed that specifies terms and conditions for managing the land, and specifies what, if any, future development can occur.  Some landowners wish to leave a legacy to their family or future generations—and establishing a conservation easement is one process to achieve this.  By selling a conservation easement to a land trust or government entity, the landowner receives monetary compensation based on appraised value. Occasionally, a landowner will donate all or some of the easement, thus receiving state and federal tax benefits.  Reduced estate taxes may be another benefit.  In addition, a conservation easement will sometimes lower property taxes which the landowner must pay, due to reduced value of the property, based upon the terms of the easement. Terms and conditions of the conservation easement are tailored to individual situations. The entity holding the easement is responsible for future monitoring of the site to ensure the conditions of the easement are met.

*For additional information on conservation easements, visit the websites of the following organizations, which are referenced on the back cover; or call the American Farmland Trust at (800) 370-4879, the Black Canyon Regional Land Trust at (970) 252-1481, the Colorado Cattlemen's Agricultural Land Trust at (303) 431-6422, Colorado Coalition of Land Trusts (refer to website for contact information), the Gunnison Ranchland Conservation Legacy at (970) 641-4386, or the Nature Conservancy at (970) 252-0034.*

7

BLM_0059883

APPENDIX B – CURECANTI: GREAT SCENERY, OUTSTANDING RESOURCES, AND GOOD NEIGHBORS

*Working together...*                                    *...to conserve the resources of the Curecanti area*

## Looking for Additional Information?

A variety of information is available over the Internet on the World Wide Web (www). We recommend visiting some of these websites for additional information. If you do not have your own Internet access, visit a library that offers computers with web access and ask a librarian for assistance.

USEFUL WEBSITES:

American Farmland Trust — www.farmland.org

Black Canyon Regional Land Trust (website under construction)

Code of the West — www.co.gunnison.co.us

Colorado Cattlemen's Agricultural Land Trust — www.ccalt.org

Colorado Coalition of Land Trusts — www.cclt.org

Colorado Noxious Weeds — www.ext.colostate.edu/ptlk/2103.html

Community Stewardship Exchange — www.sonoran.org

CSU Cooperative Extension (landscaping, gardening & other advise) — www.ext.colostate.edu

Curecanti: Great Scenery, Outstanding Resources, and Good Neighbors (this booklet) — www.planning.nps.gov/
    document/good_neighbor.pdf

Curecanti Toolbox of Incentives for Resource Conservation — www.planning.nps.gov/document/
    toolbox_incentives.pdf

Exotic, Invasive, or Non-Native Species — www.invasivespecies.gov

Federal Grants (links to a variety of funding sources) — www.grants.gov

Firewise (making sensible choices in the wildland/urban interface) — www.firewise.org

Grants at a Glance (U.S. Fish and Wildlife Service) — www.grants.fws.gov

Ground and Drinking Water (EPA) — www.epa.gov/safewater

Gunnison Ranchland Conservation Legacy — www.gunnisonlegacy.org

International Dark-Sky Association — www.darksky.org

Land Trust Alliance — www.lta.org

The Nature Conservancy — www.nature.org

Sustainable Design: (U.S. Green Building Council) — www.usgbc.org

**NOTE:** *Please be aware that some of the incentives in the "Toolbox of Incentives for Resource Conservation," and the offers of "Technical Assistance" in this booklet are ideas that need additional consideration, and in some cases will require Congressional or legislative authorization and appropriations of funds. Also, we are not in a position to advise people on matters pertaining to legal issues, tax issues, estate planning, etc. For these matters readers should consider seeking professional advice.*

We hope the ideas presented in this booklet will be of value to you,
and invite your suggestions and comments for future revisions. Thank you.
This booklet has been produced cooperatively by Gunnison County, Montrose County, and the
National Park Service.







| Long Range Planner | Superintendent | County Planner |
| Gunnison County | Curecanti National Recreation Area | Montrose County |
| 200 E. Virginia Ave. | 102 Elk Creek | 317 S. Second St. |
| Gunnison, CO 81230 | Gunnison, CO 81230 | Montrose, CO 81401 |
| (970) 641-7645 | (970) 641-2337 | (970) 252-4550 |

For information on local land use policies and development procedures within Gunnison County, visit www.co.gunnison.co.us or call the Gunnison County Planning Department at (970) 641-0360; and within Montrose County, visit www.co.montrose.co.us or call the Montrose County Planning Department at (970) 249-6688.

June 2, 2004

BLM_0059884

# APPENDIX C: LEGISLATION, POLICIES, AND OTHER DOCUMENTS RELATED TO THE CURECANTI NATIONAL RECREATION AREA AND THE RESOURCE PROTECTION STUDY

The following laws, policies, and other documents that relate to the Curecanti National Recreation Area (NRA) and the Resource Protection Study (RPS) are incorporated by reference. For some citations, sections that are particularly relevant to the RPS and are reasonably short are quoted. Due to its importance to the NRA and RPS, the 1965 Memorandum of Agreement between the Bureau of Reclamation and the National Park Service is provided in its entirety.

## LEGISLATION

**Federal Reclamation laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto)**

**Colorado River Storage Project Act of April 11, 1956 (PL 84-485)**

Referred to as the CRSP, this Act authorized the creation of the area that has come to be known as Curecanti National Recreation Area. Section 8 of that Act, as amended, reads as follows:

"**Sec. 8. (Recreational and fish and wildlife facilities.)** — In connection with the development of the Colorado River storage project and the participating projects, the Secretary is authorized and directed to investigate, plan, construct, operate, and maintain (1) public recreational facilities on lands withdrawn or acquired for the development of said project or of said participating projects, to conserve the scenery, the natural, historic, and archeologic objects, and the wildlife on said lands, and to provide for public use and enjoyment of the same and of the water areas created by these projects by such means as are consistent with the primary purposes of said projects; and (2) facilities to mitigate losses of, and improve conditions for, the propagation of fish and wildlife. The Secretary is authorized to acquire lands necessary for the construction, operation, and maintenance of the facilities herein provided, and to dispose of them to Federal, State, and local governmental agencies by lease, transfer, exchange, or conveyance upon such terms and conditions as will best promote their development and operation in the public interest. All costs incurred pursuant to this section shall be nonreimbursable and nonreturnable. (70 Stat. 110; 43 U.S.C. 620g)"

**Federal Water Project Recreation Act of July 9, 1965 (Public Law 89-72, 79 Stat. 213), as amended by the Reclamation Recreation Management Act of 1992 (Title XXVIII of the Reclamation Projects Authorization and Adjustment Act of October 30, 1992 (Public Law 102-575, 106 Stat. 4600))**

"An act to provide uniform policies with respect to recreation and fish and wildlife benefits and costs of Federal multiple-purpose water resource projects, and for other purposes."

BLM_0059885

**Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999 (PL 106-76, October 21, 1999): Sec. 11 – Study of Lands Within and Adjacent to Curecanti National Recreation Area (Authorizing this Resource Protection Study.)**

"(a) IN GENERAL. – Not later than 3 years after the date of the enactment of this Act, the Secretary, acting through the Director of the National Park Service, shall conduct a study concerning land protection and open space within and adjacent to the area administered as the Curecanti National Recreation Area.

"(b) PURPOSE OF STUDY. – The study required to be completed under subsection (a) shall –

    (1) assess the natural, cultural, recreational and scenic resource value and character of the land within and surrounding the Curecanti National Recreation Area (including open vistas, wildlife habitat, and other public benefits);

    (2) identify practicable alternatives that protect the resource value and character of the land within and surrounding the Curecanti National Recreation Area;

    (3) recommend a variety of economically feasible and viable tools to achieve the purposes described in paragraphs (1) and (2); and

    (4) estimate the costs of implementing the approaches recommended by the study.

"(c) SUBMISSION OF REPORT. – Not later than 3 years from the date of the enactment of this Act, the Secretary shall submit a report to Congress that –

    (1) contains the findings of the study required by subsection (a);

    (2) makes recommendations to Congress with respect to the findings of the study required by subsection (a); and

    (3) makes recommendations to Congress regarding action that may be taken with respect to the land described in the report.

**16 USC 4601-9(c)(2) (Referenced in Section 3.5 of NPS Management Policies 2006)**

The Secretary of the Interior may "acquire by donation, purchase with donated funds, transfer from any other Federal agency, or exchange, lands, waters, or interests therein adjacent to such area, except that in exercising his authority under this clause (ii) the Secretary may not alienate property administered as part of the national park system in order to acquire lands by exchange, the Secretary may not acquire property without the consent of the owner, and the Secretary may acquire property owned by a State or political subdivision thereof only by donation. Prior to making a determination under this subsection, the Secretary shall consult with the duly elected governing body of the county, city, town, or other jurisdiction or jurisdictions having primary taxing authority over the land or interest to be acquired as to the impacts of such proposed action, and he shall also take such steps as he may deem appropriate to advance local public awareness of the proposed action. Lands, waters, and interests therein acquired in accordance with this subsection shall be administered as part of the area to which they are added, subject to the laws and regulations applicable thereto."

BLM_0059886

## MANAGEMENT POLICIES

### Department of Interior Manuals and Policies

### Bureau of Reclamation Manuals and Policies

### National Park Service Manuals and Policies

#### NPS *Management Policies 2006*

##### Chapter 1— The Foundation

###### Section 1.6— Cooperative Conservation Beyond Park Boundaries

"Cooperative conservation beyond park boundaries is necessary as the National Park Service strives to fulfill its mandate to preserve the natural and cultural resources of parks unimpaired for future generations. Ecological processes cross park boundaries, and park boundaries may not incorporate all of the natural resources, cultural sites, and scenic vistas that relate to park resources or the quality of the visitor experience. Therefore, activities proposed for adjacent lands may significantly affect park programs, resources, and values. Conversely, NPS activities may have impacts outside park boundaries. Recognizing that parks are integral parts of larger regional environments, and to support its primary concern of protecting park resources and values, the Service will work cooperatively with others to

• anticipate, avoid, and resolve potential conflicts;

• protect park resources and values;

• provide for visitor enjoyment; and

• address mutual interests in the quality of life of community residents, including matters such as compatible economic development and resource and environmental protection.

"Such local and regional cooperation may involve other federal agencies; tribal, state, and local governments; neighboring landowners; nongovernmental and private sector organizations; and all other concerned parties. The Service will do these things because cooperative conservation activities are a vital element in establishing relationships that will benefit the parks and in fostering decisions that are sustainable.

"The Service will use all available tools to protect park resources and values from unacceptable impacts. The Service will also seek to advance opportunities for conservation partnerships. Superintendents will monitor land use proposals, changes to adjacent lands, and external activities for their potential impacts on park resources and values. It is appropriate for superintendents to engage constructively with the broader community in the same way that any good neighbor would. Superintendents will encourage compatible adjacent land

BLM_0059887

uses and seek to avoid and mitigate potential adverse impacts on park resources and values by actively participating in the planning and regulatory processes of other federal agencies and tribal, state, and local governments having jurisdiction over property affecting, or affected by, the park. If a decision is made or is imminent that will result in unacceptable impacts on park resources, superintendents must take appropriate action, to the extent possible within the Service's authorities and available resources, to manage or constrain the use to minimize impacts. When engaged in these activities, superintendents should fully apply the principles of civic engagement to promote better understanding and communication by (1) documenting the park's concerns and sharing them with all who are interested, and (2) listening to the concerns of those who are affected by the park's actions."

Chapter 3— Land Protection

<u>Section 3.5— Boundary Adjustments</u>

"The boundary of a national park may be modified only as authorized by law. For many parks, such statutory authority is included in the enabling legislation or subsequent legislation that specifically authorizes a boundary revision. Where park-specific authority is not available, the Land and Water Conservation Fund Act of 1965, as amended, provides an additional but limited authority to adjust boundaries.

"The act provides for boundary adjustments that essentially fall into three distinct categories: (1) technical revisions; (2) minor revisions based upon statutorily defined criteria; and (3) revisions to include adjacent real property acquired by donation, purchased with donated funds, transferred from any other federal agency, or obtained by exchange. Adjacent real property is considered to be land located contiguous to but outside the boundary of a national park system unit.

"As part of the planning process, the Park Service will identify and evaluate boundary adjustments that may be necessary or desirable for carrying out the purposes of the park unit. Boundary adjustments may be recommended to:

- protect significant resources and values, or to enhance opportunities for public enjoyment related to park purposes;

- address operational and management issues, such as the need for access or the need for boundaries to correspond to logical boundary delineations such as topographic or other natural features or roads; or

- otherwise protect park resources that are critical to fulfilling park purposes.

"If the acquisition will be made using appropriated funds, and it is not merely a technical boundary revision, the criteria set forth by Congress at 16 USC 460l-9(c)(2) must be met. All recommendations for boundary changes must meet the following two criteria:

- The added lands will be feasible to administer considering their size, configuration, and ownership; costs; the views of and impacts on local communities and surrounding jurisdictions; and other factors such as the presence of hazardous substances or exotic species.

- Other alternatives for management and resource protection are not adequate.

BLM_0059888

"These criteria apply conversely to recommendations for the deletion of lands from the authorized boundaries of a park unit. For example, before recommending the deletion of land from a park boundary, a finding would have to be made that the land did not include a significant resource, value, or opportunity for public enjoyment related to the purposes of the park. Full consideration should be given to current and future park needs before a recommendation is made to delete lands from the authorized boundaries of a park unit. Actions consisting solely of deletions of land from existing park boundaries would require an act of Congress."

## Chapter 4— Natural Resource Management

### Section 4.1.4— Partnerships

"The Service will pursue opportunities to improve natural resource management within parks and across administrative boundaries by pursuing cooperative conservation with public agencies, appropriate representatives of American Indian tribes and other traditionally associated peoples, and private landowners in accordance with Executive Order 13352 (Facilitation of Cooperative Conservation). The Service recognizes that cooperation with other land and resource managers can accomplish ecosystem stability and other resource management objectives when the best efforts of a single manager might fail. Therefore, the Service will develop agreements with federal, tribal, state, and local governments and organizations; foreign governments and organizations; and private landowners, when appropriate, to coordinate plant, animal, water, and other natural resource management activities in ways that maintain and protect park resources and values. Such cooperation may include park restoration activities, research on park natural resources, and the management of species harvested in parks. Cooperation also may involve coordinating management activities in two or more separate areas, integrating management practices to reduce conflicts, coordinating research, sharing data and expertise, exchanging native biological resources for species management or ecosystem restoration purposes, establishing native wildlife corridors, and providing essential habitats adjacent to or across park boundaries.

"In addition, the Service will seek the cooperation of others in minimizing the impacts of influences originating outside parks by controlling noise and artificial lighting, maintaining water quality and quantity, eliminating toxic substances, preserving scenic views, improving air quality, preserving wetlands, protecting threatened or endangered species, eliminating exotic species, managing the use of pesticides, protecting shoreline processes, managing fires, managing boundary influences, and using other means of preserving and protecting natural resources."

## Chapter 8— Use of the Parks

### Section 8.1—General

"Many different types of uses take place in the hundreds of park units that make up the national park system. Some of those uses are carried out by the National Park Service, but many more are carried out by park visitors, permittees, lessees, and licensees. The 1916 Organic Act, which created

BLM_0059889

the National Park Service, directs the Service to conserve park resources "unimpaired" for the enjoyment of future generations. The 1970 National Park System General Authorities Act, as amended in 1978, prohibits the Service from allowing any activities that would cause derogation of the values and purposes for which the parks have been established (except as directly and specifically provided by Congress). Taken together, these two laws establish for NPS managers (1) a strict mandate to protect park resources and values; (2) a responsibility to actively manage all park uses; and (3) when necessary, an obligation to regulate their amount, kind, time, and place in such a way that future generations can enjoy, learn, and be inspired by park resources and values and appreciate their national significance in as good or better condition than the generation that preceded them. (Throughout these Management Policies, the term "impairment" is construed to also encompass "derogation.")

### Section 8.2—Visitor Use

"Enjoyment of park resources and values by the people of the United States is part of the fundamental purpose of all parks. The Service is committed to providing appropriate, high-quality opportunities for visitors to enjoy the parks, and the Service will maintain within the parks an atmosphere that is open, inviting, and accessible to every segment of American society.

"However, many forms of recreation enjoyed by the public do not require a national park setting and are more appropriate to other venues. The Service will therefore

- provide opportunities for forms of enjoyment that are uniquely suited and appropriate to the superlative natural and cultural resources found in the parks;

- defer to local, state, tribal, and other federal agencies; private industry; and nongovernmental organizations to meet the broader spectrum of recreational needs and demands.

"To provide for enjoyment of the parks, the National Park Service will encourage visitor activities that

- are appropriate to the purpose for which the park was established; and

- are inspirational, educational, or healthful, and otherwise appropriate to the park environment; and

- will foster an understanding of and appreciation for park resources and values, or will promote enjoyment through a direct association with, interaction with, or relation to park resources; and

- can be sustained without causing unacceptable impacts to park resources or values . . ."

### 8.2.2—Recreational Activities

"The National Park Service will manage recreational activities according to the criteria listed in sections 8.1 and 8.2 (and 6.4 in wilderness areas). Examples of the broad range of recreational activities that take place in parks include,

BLM_0059890

but are not limited to, boating, camping, bicycling, fishing, hiking, horseback riding and packing, outdoor sports, picnicking, scuba diving, cross-country skiing, caving, mountain and rock climbing, earth caching, and swimming. Many of these activities support the federal policy of promoting the health and personal fitness of the general public, as set forth in Executive Order 13266. However, not all of these activities will be appropriate or allowable in all parks; that determination must be made on the basis of park-specific planning.

"Service-wide regulations addressing aircraft use, off-road bicycling, hang gliding, off-road vehicle use, personal watercraft, and snowmobiling require that special, park-specific regulations be developed before these uses may be allowed in parks . . .

"The Service will monitor new or changing patterns of use or trends in recreational activities and assess their potential impacts on park resources. A new form of recreational activity will not be allowed within a park until a superintendent has made a determination that it will be appropriate and not cause unacceptable impacts. Restrictions placed on recreational uses that have been found to be appropriate will be limited to the minimum necessary to protect park resources and values and promote visitor safety and enjoyment.

"Sounds that visitors encounter affect their recreational and/or educational experience. Many park visitors have certain expectations regarding the sounds they will hear as part of their experience. The type of park unit (for example, national battlefield, national seashore, national recreation area, national park) and its specific features often help shape those expectations. In addition to expectations of muted to loud sounds associated with nature (such as wind rustling leaves, elk bugling, waves crashing on a beach), park visitors also expect sounds reflecting our cultural heritage (such as cannons firing, native drumming, music) and sounds associated with people visiting their parks (such as children laughing, park interpretive talks, motors in cars and motorboats).

"Park managers will (1) identify what levels and types of sounds contribute to or hinder visitor enjoyment, and (2) monitor, in and adjacent to parks, noise-generating human activities— including noise caused by mechanical or electronic devices—that adversely affect visitor opportunities to enjoy park soundscapes. Based on this information, the Service will take action to prevent or minimize those noises that adversely affect the visitor experience or that exceed levels that are acceptable to or appropriate for visitor uses of parks."

## MANAGEMENT PLANS

### Curecanti National Recreation Area General Management Plan (GMP) (July 1980)

Provides long-term management direction for natural and cultural resources, visitor use and understanding, and facilities development for the NRA; including initial recreational facility development agreed-upon by Reclamation and NPS, and funded by Reclamation in accord with Section 8 of the CRSP Act.

BLM_0059891

*General Management Plan – Black Canyon of the Gunnison National Monument* (now a National Park) *and Curecanti National Recreation Area* (September 1997)

Provides long-term management direction for natural and cultural resources, visitor use and understanding, and potential facilities improvements. Supersedes the 1980 GMP for Curecanti NRA.

## GENERAL AGREEMENTS AND DOCUMENTS PERTAINING THERETO

**Letter from Conrad L. Wirth, NPS Director to Fred A. Seaton, Secretary of the Interior – Subject: Designation of Responsibility for Carrying Out the Provisions of Section 8, Public Law 485, Colorado River Storage Project (CRSP) and Participating Projects (Written February 17, 1958; Concurred by Alfred R. Gloze, Commissioner of Reclamation on March 12, 1958; Approved by Seaton on April 21, 1958)**

This letter was a precursor to the 1965 Memorandum of Agreement between Reclamation and NPS (next citation), which describes agency responsibilities for the management of the area that has come to be known as the Curecanti National Recreation Area. In this letter, Reclamation and NPS jointly recommended that the Secretary designate NPS as the agency responsible for carrying out the Department's obligation under Section 8 of the CRSP Act, except as it relates to provision number (2) concerning fish and wildlife. The Secretary approved this.

**Memorandum of Agreement Between the Bureau of Reclamation and the National Park Service Relating to the Development and Administration of Recreation on the Curecanti Unit of the Colorado River Storage Project (February 11, 1965) (entire text below)**

THIS MEMORANDUM OF AGREEMENT, made and entered into this 11th day of February 1965, between the BUREAU OF RECLAMATION, hereinafter referred to as the Bureau, and the NATIONAL PARK SERVICE, hereinafter referred to as the Service as agencies of the United States of America:

WITNESSETH THAT:

WHEREAS the Bureau is proceeding with the construction of the Curecanti Unit as a part of the Colorado River Storage Project authorized by the Act of April 11, 1956 (70 Stat. 105); and

WHEREAS the Service has been designated as the agency responsible for carrying out the provision of Section 8 of the said Act of April 11, 1956; and

WHEREAS lands are being acquired and public lands have been withdrawn for the purposes of the project, as authorized by the aforesaid Act of April 11, 1956; and

WHEREAS a large number of persons are expected to use the lands and waters of such withdrawn area for the purposes of recreation; and

WHEREAS the Act of August 7, 1946 (60 Stat. 885) authorizes the use of appropriated funds by the Service for the administration, protection, improvement, and maintenance of areas under the jurisdiction of other agencies of the Government when such areas are devoted to recreational use pursuant to cooperative agreements; and

WHEREAS the Service is experienced in administering areas devoted to recreational use:

BLM_0059892

NOW, THEREFORE, the Bureau and the Service do hereby mutually agree as follows:

## ARTICLE I
## GENERAL PROVISIONS

1. The Bureau shall retain complete authority over and responsibility for construction, operation and maintenance of the Blue Mesa, Morrow Point, and Crystal Dams and Reservoirs for primary project purposes together with all engineering works in connection therewith. Except for the areas required by the Bureau for construction, operation and maintenance of the dams, the Service shall administer all lands and waters within the project area, providing for recreation therein. The agreed areas of authority between the Bureau and the Service include all those lands acquired, withdrawn, or segregated by the Bureau for project purposes under the authority of the aforesaid Act of April 11, 1956. These lands are generally depicted on the enclosed drawing marked Exhibit "A" and numbered SA-CUR-7101. This Exhibit may be revised at any time to illustrate changes in the project area as a result of land acquisition, or additional withdrawls (*sic*).

2. The parties to this agreement acknowledge that, as authorized by Congress, each has an interest in the storage, release, and utilization of the water which is to be impounded by the Curecanti Unit, and that such unit was authorized, and is being constructed, for the primary purposes of irrigation, flood control, and the generation of hydro-electric power and the incidental (*sic*) purposes of recreation, and fish and wildlife conservation. This agreement shall not be construed to conflict with the primary purposes of the project or to alter the Bureau's control over storage and release of water. However, to the extent consistent with the authorized primary purposes of said project, the Bureau shall operate the dams and reservoirs in keeping with the Secretarial policy which provides for full consideration of public recreation and fish and wildlife conservation on reservoir projects undertaken by the Federal Government. The Service shall determine the optimum and minimum pool levels desirable for public recreational use and provide the Bureau with this information for consideration in carrying out the purposes of this paragraph.

3. Prior to making any new development or granting any concession, lease, license or permit which, because of its nature or location will affect the bureau's activities at the Curecanti Unit Dams, the Service shall obtain the concurrence of the Bureau. Before making any new development or granting any concession, lease, license, or permit at the Curecanti Unit Dams which will affect the recreational and tourist facilities on the remainder of the project area, the Bureau shall obtain the concurrence of the Service. If either party does not concur in such proposed development, concession, lease, license, or permit the proposal shall be held in abeyance until agreement is reached by the Bureau and the Service or the Secretary has resolved any differences of opinion.

4. The parties to this agreement acknowledge and understand that the fulfillment of the agreement is contingent upon the availability of funds for the purposes thereof.

## ARTICLE II
## FUNCTIONS OF THE NATIONAL PARK SERVICE

Subject to the primary purposes of the project, area limitations, and other provisions contained in Article I hereof, the Service in its administration of the project area for recreation, shall be responsible for:

1. Preparing plans for and constructing recreational facilities, including roads and trails.

BLM_0059893

2. Advertising for, evaluating and approving or rejecting bids and negotiating contracts for the installation or construction of recreational facilities.

3. Negotiating and executing contracts, with private individuals, partnerships or corporations for supplying necessary visitor services related to recreational use of the project area, including, but not limited to, use of the waters for boating, canoeing, bathing, and sightseeing; and prescribing and enforcing reasonable rates and standards for the supplying of such services.

4. Establishing and enforcing policies regarding the recreational use of lands and waters in the project area. It is understood that grazing activities within that portion of the project area administered by the Service shall be controlled and supervised by the Service in consultation with the Bureau of Land Management.

5. Promulgating and enforcing such rules and regulations as are necessary or desirable for the conservation of any historic or archeological remains, and control of all archeological excavation and historical or archeological research or as may be needed for recreational use and enjoyment of the area and for the safety of visitors.

6. Establishing and maintaining protective, interpretive, and other facilities and services as may be necessary for the safe and full use and enjoyment of the area for recreational purposes. Public information activities and services shall be provided by the Service through coordination with other Interior agencies in order to facilitate public understanding of the interrelated programs of these agencies within the area.

7. Control of transportation in the area under its jurisdiction, whether by land, water, or air, to the extent consistent with Federal law, but such control shall not affect transportation the Bureau may require for the performance of its functions or transportation governed by Article III, paragraphs numbered 3 and 4.

8. Extending to the Bureau and other agencies involved technical assistance in the planning and development of exhibits and interpretive devices oriented toward visitor understanding and enjoyment of the project and related resources.

9. Negotiation of agreements or coordination of activities with State and Federal wildlife agencies as desirable for the conservation, protection and interpretation of wildlife consistent with applicable law.

10. Such other functions as are reasonably related to, or necessary for, its administration of the project area.

## ARTICLE III
## FUNCTIONS OF THE BUREAU OF RECLAMATION

Subject to the area limitations and provisions contained in Article I hereof, the Bureau shall be responsible for:

1. Construction, operation and maintenance of the Blue Mesa, Morrow Point and Crystal Dams and Reservoirs and all engineering works incidental thereto or in connection therewith, together with all appurtenances thereof for the proper storage, release, protection and utilization of water under the Federal Reclamation Laws.

2. Consultation with the Service on matters involving the development or administration of recreational facilities or public information services to be provided in the areas required by the Bureau for construction, operation and maintenance of the three dams in the Curecanti Unit.

BLM_0059894

3. Establishment and enforcement of rules and regulations governing public access to the Curecanti Unit Dams and the engineering works appurtenant thereto, and the control of traffic on the roads providing immediate access to the dams and their appurtenant engineering works.

4. Establishment of and, in cooperation with the Service, enforcement of such limitations governing approach to the dams by water as may be necessary either for their efficient functioning or for safety of the public.

5. Coordination and preparation of reservoir management plans in cooperation with the Service and other concerned Federal, State, and local agencies, for management of the three dams and reservoirs in the project area.

6. Consultation with the Service so that recreational development and administration of the project area will be coordinated with construction and operation of the Curecanti Unit.

ARTICLE IV
TERMINATION

This memorandum shall remain in force unless the parties thereto mutually agree to its termination or termination is directed by the Secretary of the Interior, or until enactment by the Congress of inconsistent or superseding legislation.

NATIONAL PARK SERVICE: Signed by George B. Hartzog on December 21, 1964

BUREAU OF RECLAMATION: Signed by Floyd E. Dominy on January 8, 1965

SECRETARY OF THE INTERIOR: Approved and Signed by Stewart L. Udall on February 11, 1965

**Memorandum of Understanding Between the Forest Service, U.S. Department of Agriculture and the National Park Service, U.S. Department of the Interior (July 11, 1966), and supplemental letters of extension pertaining thereto**

This document, as amended, relates to the management of lands and provides approval for construction and maintenance of facilities on USFS lands withdrawn by Reclamation and other lands supplementally agreed to. The document clarifies responsibilities for each agency on these lands that are included within the NRA.

**Agreement regarding final funding for development of facilities at Curecanti National Recreation Area under Section 8 of the Colorado River Storage Project Act (August 30, 1979)**

This agreement between NPS and Reclamation includes a list of Development Packages for Section 8 Funding, and a list of Recreation Facility Criteria agreed-upon by NPS and Reclamation in accordance with and drawn from Curecanti's 1980 GMP. The agreement also recognizes that "Legislation for final establishment of Curecanti National Recreation Area will be recommended to congress by the National Park Service in a timely fashion such that enactment coincides approximately with completion of this construction program." The recommendations in the Proposed Action of the RPS satisfy this intent, albeit later than originally intended.

The agreement was signed by Glen T. Bean, then NPS Rocky Mountain Regional Director, and N. W. Plummer, then Reclamation Upper Colorado Regional Director. The text on the first page of that agreement appears below. The details of the development

BLM_0059895

packages and facilities are not included here. It will be noted that the text refers to "Curecanti's 1979 General Management Plan". The final version of that GMP was published in July 1980, and is previously referenced in this Appendix.

"It is herewith agreed that the attached list of development packages shall constitute the minimum level of development necessary to satisfy Curecanti National Recreation Area's public recreation needs at the initial level of use. This list is in accordance with and is drawn from Curecanti's 1979 General Management Plan.

"Funding for completion of facility development to this level shall be the responsibility of the U.S.B.R. in accord with Section 8 of the CRSP Act. The U.S.B.R. will program this construction over approximately five years beginning in FY 1980.

"The NPS shall assume all responsibilities for operation, maintenance, construction of future facilities, and replacement of existing facilities upon the completion of this construction program. Legislation for final establishment of Curecanti National Recreation Area will be recommended to Congress by the National Park Service in a timely fashion such that enactment coincides approximately with completion of this construction program."

**Interagency Agreement between the Bureau of Reclamation and the Bureau of Land Management (Signed by Commissioner, Bureau of Reclamation and Director, Bureau of Land Management on March 25, 1983)**

"This agreement sets forth the basic principles of the Bureau of Reclamation (Reclamation) and the Bureau of Land Management (BLM) for coordinating land use planning, land resource management, land conveyance and exchange, and cooperative services." (from Section 1.)

**Master Interagency Agreement, No. 86-SIE-004, Between the Bureau of Reclamation [Reclamation], Department of the Interior and the Forest Service [Service], U. S. Department of Agriculture, Concerning Water Resource Related Projects of the Bureau of Reclamation Within or Adjacent to National Forest System Lands (Signed by Chief, Forest Service on 1/16/87, and Commissioner, Bureau of Reclamation on 4/6/87)**

"The purpose of this Master Agreement is to establish procedures for planning, developing, operating, and maintaining water resource projects and related programs of Reclamation located on or affecting lands and resources administered by the Service, and for the Service's planning and implementation of activities on National Forest System (NFS) lands within the total area of project influence." (from Section II.)

**Memorandum of Understanding between the Bureau of Reclamation and the National Park Service for Planning, Program Coordination, and Technical Assistance (Signed by Reclamation Commissioner and NPS Director in September 1988)**

This agreement establishes the policy framework for formal and informal coordination and communications between officials at every level of Reclamation and NPS, to improve public services and the management of natural and cultural resources, and recreation and visitor use, through cooperative efforts. The provisions of this agreement extend to all planning and program activities of each bureau that may have impacts on the plans and programs of the other. The Resource Protection Study falls under this agreement, and has been conducted in accordance with the stipulations and intent thereof.

BLM_0059896

**General Agreement Between National Park Service (Curecanti National Recreation Area), and US Bureau of Reclamation (Upper Colorado Region), Relating to the Resource Protection Study and Associated Environmental Impact Statement for the Curecanti National Recreation Area (Signed for Reclamation on 3/8/01 by Arlo H. Allen, acting for the then acting Upper Colorado Regional Director, Rick L. Gold; and signed for NPS on 4/6/01 by Sheridan Steele, then Superintendent, Curecanti NRA)**

Describes NPS and Reclamation roles and responsibilities for this Resource Protection Study.

BLM_0059897

APPENDIX C: LEGISLATION AND POLICY

BLM_0059898

# APPENDIX D:  NEEDED AGREEMENTS, RESEARCH, AND ACTION PLANS

The following items are needed to fully and successfully implement Alternative 2 (The Proposed Action) of this Resource Protection Study (RPS).  Many of them would be dependent upon congressional action regarding the Proposed Action.

<u>New Memorandum of Agreement between the Bureau of Reclamation and the National Park Service</u>

The existing Memorandum of Agreement (MOA) between the Bureau of Reclamation (Reclamation) and the National Park Service (NPS), "Relating to the Development and Administration of Recreation on the Curecanti Unit, Colorado River Storage Project," was approved by the Secretary of the Department of the Interior (DOI) on February 11, 1965.  That MOA describes the roles and responsibilities of the two agencies in managing the reservoirs, dams, natural and cultural resources, recreation, and associated facilities, within the area generally known as the Curecanti National Recreation Area (NRA).  Although these roles and responsibilities would remain the same with the legislated establishment of the NRA, a new MOA would need to be written to respond to new legislation for the NRA, and to changes that have occurred since 1965, such as completion of development of the originally intended recreational and administrative facilities, and the maturing of the relationship between Reclamation and the National Park Service.

The new MOA would be coauthored by the Bureau of Reclamation and the National Park Service, and it would describe in detail the responsibilities of the two agencies regarding the administration and management of everything within the new NRA.  The preparation of a new MOA would likely be encouraged, and/or mandated, by the legislation.  It is expected to be similar to the existing 1965 MOA, wherein the following responsibilities would continue.

- The National Park Service would manage the natural, cultural, and recreational resources, and associated facilities.

- Reclamation would manage all facilities associated with Reclamation Projects.

- In areas where management responsibility overlaps, the two agencies would work together, when necessary, to resolve conflicting uses with consideration for the legislative mandate for each agency, in a manner that is consistent with the primary purposes of Reclamation's Aspinall and Uncompahgre projects.

- There would likely be some clarification as to management responsibilities for lands within the NRA that are not withdrawn for Reclamation project purposes (such as NPS acquired land and land transferred to the NRA from other agencies).

<u>Land Protection Plan</u>

This RPS has identified a Conservation Opportunity Area (COA) of privately-owned lands surrounding the NRA that contain natural, cultural, scenic, and potential recreational resources that warrant special conservation measures that would be compatible with NRA goals and objectives.  The RPS has also described various tools of resource conservation that could be employed in partnership between the National Park Service and neighboring landowners.  Those tools have varying degrees of commitments and costs associated with them.  A land protection plan (LPP) is needed to specify in detail which tool, or set of tools, would be necessary and appropriate to apply to each parcel of land within the COA, to satisfy the mutual conservation goals and objectives of both the landowner and the National Park Service.  The LPP would establish a priority of needs for conserving each parcel of land, and the estimated costs involved. An environmental assessment and a public involvement process would accompany the LPP.

BLM_0059899

APPENDIX D: NEEDED AGREEMENTS, RESEARCH, AND ACTION PLANS

Land Appraisals

For those parcels identified within the LPP for acquisition, either in fee simple or less-than-fee interest (for example, a conservation easement), and subject to the willingness of the landowner to sell such interest or interests, government ordered land appraisals would be needed to determine fair market value, and provide other information that would be used in negotiations with landowners.  An environmental hazard assessment would additionally be required prior to any such acquisition.

Boundary Surveys, Posting, and Fencing

After agreed-upon interests have been acquired from participating landowners, or other agreements have been consummated, the National Park Service would need to conduct and document boundary surveys and mark new boundaries that have been created.  The National Park Service would work with landowners along boundary segments in locations where fencing would be necessary because of individual circumstances, such as the need to control livestock.

Specific Implementation Plans for New Lands

The existing NPS GMP, under which the NRA is managed, was approved in 1997.  Specific Implementation Plans, or a revised GMP, would have to be produced to address resource management; visitor use, recreation, and interpretation; and associated development that would be required for the new lands added to the NRA.

Agreement(s) Pertaining to Curatorial Collections Associated with Land Transfers

Just as the National Park Service conducts research on cultural resources within the NRA, partnering agencies have conducted research on the archeological and/or historical resources on some of their lands that would come under NPS administration as part of the new NRA.  Many artifacts have been collected as a result of that research.  The National Park Service and the other agencies would continue to conduct such research on their lands, which are connected by history, regardless of the location of modern boundaries.  In order to maintain the integrity of these curatorial collections, and the sites where the artifacts were discovered, it would be necessary for the National Park Service to enter into agreements with the other agencies pertaining to the management of both the collections and the sites.

Additional Strategy and Long-Term Goals and Objectives for the Joint Agency Management Effort

The National Park Service would need to increase its efforts to identify and meet common goals and objectives among agencies and across jurisdictional boundaries for conservation of resources.

Input to Development of Gunnison County Comprehensive Plan

The National Park Service would need to participate in the development of that portion of the Gunnison County Comprehensive Plan that includes planning for the area surrounding the NRA.  Also, the potential exists for working with the county to establish a special geographic area (SGA) for the Curecanti area.  This would include identifying strategies and policies that allow development and/or encourage conservation practices that minimize impacts to area resources.

Increased Interaction with Montrose County

The National Park Service would increase its participation with the Montrose County planning staff and management to mutually identify resources worthy of conservation measures, and to identify and implement tools to achieve goals and objectives.  A potential tool would be the

BLM_0059900

establishment by the county of a conservation zone, or overlay zone, that would include the NRA and COA. Such a zone could be used to guide development decisions in that area. However, establishment of such a zone would likely occur only during or after revision of the county master plan.

BLM_0059901

Appendix D: Needed Agreements, Research, and Action Plans

BLM_0059902

# BIBLIOGRAPHY

## PUBLISHED MATERIAL

Andrews and Righter
1992    Colorado Birds: A Reference to Their Distribution and Habitat. Denver Museum of Natural History.

Bio-Environs, Inc.
2001    Protection for the Gunnison River Great Blue Heron Colony, Curecanti National Recreation Area, Gunnison, Colorado. September 5, 2001.

Bodine, Jennifer and Tomas M. Koontz
2003    Impact of Federal Lands on Local Government Tax Bases. Policy Summary Series # JB2002. Environmental Communication, Analysis and Research for Policy Working Group. School of Natural Resources, The Ohio State University, Columbus, Ohio.

Bureau of Land Management (BLM), U.S. Department of the Interior
1991    USDOI, BLM, Montrose District, CO. Gunnison Resource Area Resource Management Plan and Environmental Impact Statement. Draft, March 1991.

1998    Uncompahgre Basin Area Resource Management Plan, Montrose District. Final, September 1998.

2001    Gunnison Sage-grouse Conservation Plan. Available on the Internet at <www.co.blm. gov/gra/sagegrouse.htm>.

2003    Payments in Lieu of Taxes, Total Payments and Total Acres by State/County, Summary by State and County, Fiscal Year 2003, from Washington DC office - viewed 12/30/03. Available on the Internet at <www.blm.gov/pilt>.

2004    Payments in Lieu of Taxes, PILT Question and Answer, from Washington DC office, last dated 11/19/04. Available on the Internet at <chriscannon.house.gov/wc/Features/ PILT_QandA.pdf>.

Bureau of Reclamation (Reclamation), U. S. Department of the Interior,

1998    January 30, 1998, *Land Withdrawal Handbook*, United States Government Printing Office, Denver, CO.

Colorado Department of Local Affairs (CDOLA), Demography Section
2002    U.S. Bureau of the Census data, April 1990 April 2000; Prepared by the Colorado Demography Section, December 2002, Denver, CO; viewed 12/31/03 and 1/29/04. Available on the Internet at <www.dola.state.co.us/dlg/demog/pop_totals.html >.

Colorado Department of Public Health and Environment (CDPHE)
2002    Water Quality Control Commission. Regulation Number 35 – Classifications and Numeric Standards for Gunnison and Lower Delores River Basins.

BLM_0059903

BIBLIOGRAPHY

Colorado Department of Transportation (CDOT)
    2005    Colorado Department of Transportation. Right of Way Manual Chapter II, State and Federal Lands Acquisition. December 2005.

Colorado Division of Housing (CDH)
    nd    Housing Cost Projections. Available on the Internet at <www.region10.net>.

Colorado Division of Wildlife (CDOW)
    2000    Colorado Division of Wildlife, Colorado Wildlife Commission. Colorado Listing of Endangered, Threatened and Wildlife Species of Special Concern. Available on the Internet at <wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern>.

    2002a    The Boreal Toad. Available on the Internet at <wildlife.state.co.us/Research/Aquatic/BorealToad>.

    2002b    Coldwater Reservoir Ecology. Available on the Internet at <wildlife.state.co.us/Research/Aquatic/ColdwaterResEcology>.

    2003    Colorado Division of Wildlife, Colorado Wildlife Commission. Colorado Listing of Endangered, Threatened and Wildlife Species of Special Concern. Updated April 2003. Available on the Internet at <wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern>.

    2004a    Colorado Division of Wildlife web page, listing and information on state wildlife areas, available on the Internet at <wildlife.state.co.us/LandWater/StateWildlifeAreas>. Accessed on 1/23/04.

    2004b    The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado; Prepared for Colorado Division of Wildlife by Todd Pickton, BBC Research & Consulting, and Linda Sikorowski, Colorado Division of Wildlife; October 31, 2004. Available on the Internet at <wildlife.state.co.us/NR/rdonlyres/7F348ECE-AF04-4162-A4D1-3C7975285004/0/Report.pdf>.

Colorado Labor Market Information
    2004    Accessed January 5, 2004. Available on the Internet at <lmigateway.coworkforce.com/lmigateway/labormarket.asp >.

Colorado Native Plant Society (CNPS)
    1997    Colorado Native Plant Society and the Rocky Mountain Nature Association. Rare Plants of Colorado. 2nd Edition.

Colorado Natural Heritage Program (CNHP)
    1999    Colorado Natural Heritage Program Rare Plant Field Guide. Available on the Internet at <www.cnhp.colostate.edu/rareplants/intro.html>.

    2000    Colorado Natural Heritage Program Rare Plant Field Guide Update. Available on the Internet at < www.cnhp.colostate.edu/documents/2002/rare_plant_guide_update.pdf >.

    2002    Gunnison County Wetland Survey.

Colorado Plateau Cooperative Ecosystems Studies Unit (CPCESU)
    2002    Colorado Plateau Cooperative Ecosystems Studies Unit. Available on the Internet at

BLM_0059904

<www.cens.nau.edu/Orgs/CPCESU>.

Colorado River Cutthroat Trout Task Force
2001    Conservation agreement and strategy for Colorado River cutthroat trout (Oncorhynchus clarki pleuriticus) in the States of Colorado, Utah, and Wyoming. Colorado Division of Wildlife, Fort Collins. 87p. accessed at: < wildlife.state.co.us/Research/Aquatic/CutthroatTrout>.

Emslie, Steven D.
2003    Department of Biological Sciences, University of North Carolina, Wilmington. <www.cpluhna.nau.edu/Research/gunnisonchange1.htm> accessed fall, 2003.

Espey, Molly and Kwame Owusu-Edusei
2002    "Federal Land Acquisition and Payments-in-lieu of Taxes: One Piece in the Puzzle of County Finance." Choices: The Magazine of Food, Farm and Resource Issues. Spring, 2002.

Fiorillo, Anthony R., Richard L. Harris, and Cathleen L. May
1996    Late Jurassic Dinosaur Remains from Curecanti National Recreation Area. *In*: Park Science. Volume 16, No 4. National Park Service, US Department of the Interior. Fall 1996.

Fitzgerald, James P., Carron A. Meaney, and David M. Armstrong.
1994    Mammals of Colorado. Denver Museum of Natural History.

Grand Mesa Uncompahgre and Gunnison National Forests (GMUG)
2005    Grand Mesa, Uncompahgre and Gunnison National Forest Management Indicator Species Assessment. Available on the Internet at <www.fs.fed.us/r2/gmug/policy>. Last amendment May 2005.

Gunnison County
2001a   Gunnison County Board of County Commissioners and Dave Michaelson, Powerpoint slide show on Gunnison County Comprehensive Plan Process. Power point slide 10. March 2001.

2001b   Gunnison County Land Use Resolution. Adopted by the Gunnison County, Board of Commissioners, January 8, 2001. Available on the Internet at <www.gunnisoncounty.org/dept/plan/index.php?Regulations_and_Guidelines:Land_Use_Resolution>.

Houk, Rose
1991    Southwest Parks and Monuments Association 1991. Curecanti National Recreation Area.

Hyde, Dr. A.S., and Kevin J. Cook
1980    A checklist to the Birds of Curecanti National Recreation Area. Southwest Parks and Monuments Assoc. Unpaginated. Jamestown, ND.

Kingery, Hugh E.
1998    Colorado Breeding Bird Atlas. Colorado Bird Atlas Partnership with Colorado Division of Wildlife.

Landis, T.W.
2000    Triangulate T-Rex! Modern Mapping Enters Jurassic Park. Accessed at: <www.

BLM_0059905

BIBLIOGRAPHY

       geoplace.com/gw/2000/0008/0800tri.asp >. Note: Article no longer available on the Internet.

Loomis, John, PhD and Robert Richardson, MBA
    2002    Economic Values of Protecting Roadless Areas in the United States. An analysis prepared for the Wilderness Society and Heritage Forests Campaign. Department of Agricultural and Resource Economics, Colorado State University, Fort Collins, CO.

Michaelson, Dave
    nd    Powerpoint presentation on "The Gunnison County/National Park Service Experience" and the "Gunnison County Comprehensive Plan: A Cooperative Multi-Agency Approach" by Dave Michaelson, Long Range Planning and GIS, Gunnison County, Colorado.

Montrose County Master Plan
    2001    Prepared by Balloffet – Entranco. Adopted October 25, 2001.

Mueller and Marsh
    2003    Bonytail and Razorback Sucker in the Colorado River Basin – Gordon Mueller (National Biological Service) and Paul Marsh (Arizona State University). <biology.usgs.gov/s+t/noframe/r166.htm>.

National Park Service (NPS), U. S. Department of the Interior
    nd    Curecanti National Recreation Area – Official NPS Website: < www.nps.gov/cure/naturescience/index.htm > accessed 04/12/2005.

    nd-a    "List of Classified Structures." Park files.

    nd-b    Historic Structures and Resources. Available on the Internet at <www.nps.gov/cure/historyculture/cimarron.htm> accessed 11/24/03.

    nd-c    Old Spanish National Historic Trail Website. Available on the Internet at <www.nps.gov/olsp>.

    nd-d    NPS Map: tes_63.rtl 10/23/00 - CNHP potential conservation areas/outstanding significance areas.

    1994    "Curecanti National Recreation Area: Archeological Overview and Assessment (Revised)." Park files.

    1995a    *How to Apply the National Register Criteria for Evaluation.* Available on the Internet at <www.cr.nps.gov/nr/publications/bulletins/nrb15>.

    1995b    Secretary of the Interior's Standards for the Treatment of Historic Properties. Available on the Internet at <www.cr.nps.gov/hps/tps/standards_guidelines.htm >.

    1996    *The Secretary of the Interior's Standards for the Treatment of Historic Properties and the Guidelines for the Treatment of Cultural Landscapes.* Washington, DC.

    1997    General Management Plan for Black Canyon of the Gunnison National Monument and Curecanti National Recreation Area. Available at the Technical Information Center, Denver Service Center, file number D-63B. Denver, CO. Also available on the Internet at <www.nps.gov/cure/parkmgmt/index.htm>.

BLM_0059906

2000   Park Staff Workshop and Photo Assessment Open Houses, by Jeff Heywood. Trip Report. Intermountain Support Office, December 4-8, 2000.

2001a   Director's Order #12: *Conservation Planning, Environmental Impact Analysis, and Decision-making*; and *DO-12 Handbook*. Washington, DC. Available on the Internet at <www.nps.gov/policy/DOrders/DOrder12.html> and <www.nps.gov/policy/DOrders/RM12.pdf>.

2001b   "Strategic Plan for Curecanti National Recreation Area, October 1, 2001 – September 30, 2005."

2002a   "American Indian Affiliation: Curecanti National Recreation Area," by David Ruppert. Technical paper. Intermountain Support Office, Denver, CO.

2002b   Recreation Opportunities Workshop (ROW), by Jeff Heywood. Trip Report. Intermountain Support Office, March 5-7, 2002.

2002c   Economic Analysis of Personal Watercraft Regulations in Curecanti National Recreation Area, Draft Report, September 2002. Prepared for NPS, Environmental Quality Division by LAW Engineering and Environmental Services, BBL Sciences, and RTI.

2002d   Environmental Assessment for the Wind Cave National Park Boundary Expansion Study – Public Review Draft. Wind Cave National Park, Hot Springs, South Dakota.

2003a   Personal Watercraft Use Environmental Assessment; Curecanti National Recreation Area. Available at the Technical Information Center, Denver Service Center, file number D-89 (April 2003). Denver, CO.

2003b   Curecanti National Recreation Area Website. Dams and Reservoirs. Available on the Internet at <www.nps.gov/cure/historyculture/aspinall_unit.htm> Accessed November 7, 2003.

2005   The National Parks: Index 2005-2007; Government Printing Office, 2005; available on the Internet at <www.cr.nps.gov/history/online_books/nps/index2005_07.pdf>.

2006a   National Park Service *Management Policies 2006*. Washington, DC, August 31, 2006. Available on the Internet at <www.nps.gov/policy/MP2006.pdf>.

2006b   National Park Visitor Spending and Payroll Impacts, Fiscal Year 2005. Daniel J. Stynes, PhD, Michigan University; August 2006. Available on the Internet at <web4.canr.msu.edu/mgm2>.

Natural Diversity Information Source (NDIS)
nd   Colorado Division of Wildlife <www.ndis.nrel.colostate.edu>.

Natural Resource Conservation Service (NRCS)
2004   Personal Communication with Tom Weber, NRCS on January 22, 2004 RE: Prime Farmlands.

Northern Prairie Wildlife Research Center Home Page
nd   Available on the Internet at <www.npwrc.usgs.gov/resource/othrdata/chekbird/r6/curecan.htm>. (Version 18JUL00).

BLM_0059907

BIBLIOGRAPHY

Region 10, League for Economic Assistance and Planning
   2005   Region 10 Review, Volume 12, Winter 2005. Also available on the Internet at <www.
          region10.net/pdf/review_2005.pdf>.

Seidl, Andy and Stephan Weiler
   2001   Economic Impacts of the National Park designation of the Black Canyon of the
          Gunnison on Montrose County, Colorado. Department of Agricultural and Resource
          Economics, Colorado State University, and Center for Research on the Colorado
          Economy (CRCE), Fort Collins, Co. < dare.agsci.colostate.edu/csuagecon/extension/
          docs/impactanalysis/apr01-08.pdf >.

State of Colorado, Legislative Council
   2002   Paper on growth in assessed land values statewide. <www.state.co.us/gob_dir/leg_dir/
          Econ/2002>. Accessed on January 28, 2004. Note: Article no longer available on the
          Internet.

Trust for Public Land (TPL)
   1999   "Short-term Effect of Land Conservation on Property Tax Bills." Trust for Public Land
          website under Massachusetts. From a TPL New England Region Report, 1999. Viewed
          on January 28, 2004 at <www.tpl.org/tier3_cdl.cfm?content_item_id=1136&folder_
          id=827>.

University of Colorado Museum (CU)
   nd     Vascular plant species list for Montrose and Gunnison Counties, available on the
          Internet at: <cumuseum.colorado.edu/Research/Botany/Databases/county_species.
          html> accessed March 15, 2005.

U.S. Census Bureau
   nd     Population Statistics. Available on the Internet at <www.census.gov>.

U.S. Fish and Wildlife Service (USFWS)
   2002   National Wetlands Inventory.

U.S. Forest Service (USFS)
   2004a  Cirsium perplexans (Rydb.) Petrak (Rocky Mountain Thistle): A Technical
          Conservation Assessment.

   2004b  Grand Mesa, Uncompahgre, and Gunnison National Forests web page, Revision of
          Forest Plan. Accessed on January 22, 2004. <www.fs.fed.us/r2/gmug/policy/plan_rev>.

U.S. Geological Survey (USGS)
   2003   2001-2002 Mammalian Inventory Final Report for Selected Northern Colorado
          Plateau Network Parks. Submitted to: Angela Evenden, National Park Service,
          Northern Colorado Plateau Network, Moab, UT. Prepared by: Shauna Haymond,
          Michael A. Bogan, and Ernest W. Valdez, U.S. Geological Survey, Fort Collins Science
          Center, Arid Lands Field Station, Department of Biology, University of New Mexico,
          Albuquerque, NM.

   2005   Northern Prairie Wildlife Research Center. Status of Listed Species and Recovery
          Plan Development, Uncompahgre Fritillary Butterfly. Accessed online 03/14/2005 at:
          <www.npwrc.usgs.gov/resource/distr/others/recoprog/states/species/boloacro.htm>.

BLM_0059908

Water and Power Resources Service, U. S. Department of the Interior,

    1981    *Project Data*, United States Government Printing Office, Denver, CO.

Western Area Power Administration (Western)
    2004    Correspondence provided by Susan Starcovich of Western's Lakewood Corporate Services Office.

Wilderness Society
    1999    "Colorado County Economic Profiles." Profiles for Montrose and Gunnison Counties. Updated in August 2000. Wilderness Society, Washington D.C. Accessed on 1/29/04. <www.wilderness.org/Library/Documents/EconProfile_ColoradoCounties.cfm>.

    2002    Colorado's National Forests and the Colorado Economy. Accessed February 5, 2004 <www.wilderness.org>. Note: the document is on longer available at the website.

## PERSONAL COMMUNICATION

June 28, 2001 memo from USFWS Ecological Services, Grand Junction regarding threatened and endangered species in the vicinity of Curecanti National Recreation Area. Sent to Ken Stahlnecker, CURE Chief of Resource Stewardship and Science (USFWS 2001). The information was updated by USFWS on March 17, 2005.

March 21, 2002 letter from Sheridan Steele to Gunnison County Commissioners regarding County's Land Use Resolution.

2004 personal communication from Norma Davis, Deputy Assessor of Gunnison County.

2004 personal communication from Dave Roberts, Management Assistant, Curecanti NRA and Black Canyon of the Gunnison NP regarding land uses in the RPS study area.

2004 personal communication with Ken Stahlnecker, NDIS, Impact Analysis Matrix.

April 5, 2005 personal communication from Dangoule Bockus, Ecologist, Black Canyon of the Gunnison NP and Curecanti NRA, regarding vegetation.

November 27, 2007 personal communication from Daniel Kowalski, Fisheries Biologist, Colorado Division of Wildlife (Montrose), reconfirming CDOW's Colorado River cutthroat trout stocking program, including occasional stocking of the Gunnison River below Crystal Reservoir.

BLM_0059909

BIBLIOGRAPHY

BLM_0059910

# GLOSSARY

**Acquired Land (Reclamation):** Lands purchased or otherwise obtained for Reclamation project purposes, as opposed to withdrawal of federal public domain lands; acquired lands were usually private lands necessary for project purposes (adapted from CRSPA and general Reclamation usage).

**Affected Environment:** Associated with the National Environmental Policy Act (NEPA), the "Affected Environment" includes those environments and/or resources (also called "impact topics") that are expected to be impacted by a major federal action. Such impact topics are identified in the Purpose and Need chapter, and in the Affected Environment chapter of the Environmental Impact Statement. The affects, or impacts, are evaluated in the Environmental Consequences chapter. Environments and/or resources that are not likely to be affected by the Proposed Action or alternatives to the Proposed Action need not be evaluated in detail. In other words, they may be dismissed from further evaluation. The key impact topics that are dismissed are listed in the Purpose and Need chapter.

**Area of Critical Environmental Concern (ACEC):** This program is managed by the Bureau of Land Management (BLM). The ACEC program was conceived in the 1976 Federal Lands Policy and Management Act (FLPMA), which established the first conservation mandate for the BLM. The ACEC mandate directs the BLM to protect important riparian corridors, threatened and endangered species habitat, cultural and archeological resources and unique scenic landscapes that the agency believes need special management attention.

**Conservation:** The words "conservation," "preservation," and "protection" are used throughout this document. Although they have similar meanings, there are fine differences. In the context of this RPS, Conservation is defined as follows: Planned action or non-action to protect, preserve or renew natural and cultural resources in a manner that will ensure social and economic benefits to meet the needs and aspirations of this and future generations. It includes additional levels of resource management than either preservation or protection, and includes such actions that can sustain, restore, and/or enhance such resources and the environment. See also the definitions for "preservation" and "protection."

**Conservation Easement:** A restriction deeded to a qualified third party, usually a land trust or government body, that permanently limits certain activities on real property, in order to protect conservation values such as biodiversity, wildlife habitat, open space, or scenic values. The restriction stays with the property through successive owners. The restriction reduces the "highest and best" economic use of the property so that the property's value reflects only the allowed uses. If the landowner donates the easement as a gift, this reduction in value may be eligible as a charitable tax deduction. An easement also can be sold to non-profit or government agencies to provide revenue. Sometimes an easement is sold at less than its appraised value (bargain sale), resulting in a combination of income and a tax deduction.

**Conservation Opportunity Area (COA):** An area outside and adjacent to the proposed NRA boundary, comprised of 24,300 acres of private land, where the National Park Service would be authorized by Congress to use various tools to partner with park neighbors to conserve resources and values identified as important to the NRA. These tools would range from technical assistance, to conservation easements, to fee-simple acquisition, subject to the willingness of the landowners to participate.

BLM_0059911

GLOSSARY

**Cooperating Agency:** A federal agency other than the one preparing the NEPA document (lead agency) that has jurisdiction over the proposal by virtue of law or special expertise, and that has been deemed a cooperating agency by the lead agency.

**Curecanti Area Conservation Study (CACS):** An effort begun by Gunnison County just prior to the beginning of the Resource Protection Study (RPS), and conducted in parallel with the first few years of the RPS process, to make recommendations which would help conserve the natural, cultural, recreational and scenic resources surrounding Curecanti NRA that are important to county residents and area visitors.

*Curecanti: Great Scenery, Outstanding Resources, and Good Neighbors:* A booklet of ideas about how government land-managing agencies and private landowners can work together to maintain the outstanding resource qualities that are commonly valued. Although the document was created specifically for the Resource Protection Study at Curecanti National Recreation Area in Colorado, the ideas may be applicable throughout the country. The booklet is contained in Appendix B of this Final RPS/EIS.

**Environmental Impact Statement (EIS):** A detailed NEPA document that is prepared when a proposed action or alternatives have the potential for significant impact on the human environment.

**Fee Simple Acquisition:** Acquisition of all rights or interests in land through means such as direct purchase, third party purchase, land exchange, bargain sale, or donation. For the purposes or the RPS, acquisition would not occur unless the landowner is willing.

**General Management Plan:** A broad umbrella document that sets the long-term goals for a National Park Service unit, in terms of desired natural and cultural resource conditions to be achieved and maintained over time; necessary conditions for visitors to understand, enjoy, and appreciate the unit's significant resources; the kinds and levels of management activities, visitor use, and development that are appropriate for maintaining the desired conditions; and indicators and standards for maintaining the desired conditions. The long-term goals are based on the unit's foundation statement, which in turn is based on the unit's enabling legislation or presidential proclamation, and is a statement of the unit's purpose, significance, fundamental resources and values, primary interpretive themes, and relevant laws and executive orders that apply to NPS or to the individual unit.

**Impairment:** A major or severe adverse impact resulting from NPS activities in managing the NRA, visitor activities, or activities undertaken by concessioners, contractors, and others operating in the area, on NRA resources or values that are necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the area; key to the natural or cultural integrity of the area, or to opportunities for enjoyment of the area; or identified for conservation by the area's general management plan or other relevant NPS planning documents. There would be no impairment of the NRA's resources or values from the implementation of either Alternative 1 or Alternative 2 of the RPS.

**Implementation Plan:** A plan that provides project-specific details needed to implement an action(s) in an area of a National Park Service unit, and explains how the action(s) helps achieve long-term goals identified in the unit's general management plan.

**Joint Agency Management Effort (JAME):** A continuing effort initiated by the Resource Protection Study whereby the National Park Service, American Indian tribes, and other federal, state, and local government agencies in the Curecanti area are working in partnership to address resource management and visitor use issues of mutual concern that extend beyond the NRA.

BLM_0059912

**Land Acquisition Ranking System (LARS):** A system through which park units propose lands for acquisition. Such lands generally need to be already authorized for acquisition consistent with NPS land policy, by congressional approval, or by existing legislation. Land parcels entered into the LARS system are then evaluated and ranked in priority, first at the regional level (in competition with other parks in that region), and then nationally (in competition with all parks nationwide).

**Land Protection Plan:** Land protection plans identify the conservation methods that will be sought or applied to protect resources and to provide for visitor use and park facility development. Each plan will identify acquisition priorities, what level of acquisition might be needed (fee simple, conservation easement, right-of-way for access, etc.), and whether alternatives to acquisition are available (for example, conservation agreements) that meet the needs of the NPS unit. The plan will also identify the legal authorities for the NPS unit (for example, statute providing for acquisition and any willing seller requirements).

**Land Trust:** A private, nonprofit organization that, as all or part of its mission, actively works to conserve land. The purpose is generally to ensure long-term stewardship of important resources, whether natural, cultural, scenic, or agricultural, through the acquisition of full or partial interests in property. Land trusts may receive donations of money, property or development rights, and may use its assets and/or partnered funds to purchase property or development rights.

**Land Units:** Defined for purposes of resource analysis during the development of alternatives, Land Units refer to sections of public and/or private land adjacent to and outside the existing National Recreation Area, in which the natural, cultural, and scenic resources, and potential recreational opportunities were considered by the study team to be most important to conserve for NRA purposes. Eight land units were identified (letters A through H), according to geographical location, similarity of resource values, reasonably foreseeable activities, and land ownership (public or private). The land units are shown on the Alternative 2 map, and constitute the "proposed lands," as defined later in this Glossary.

**National Environmental Policy Act (NEPA):** The National Environmental Policy Act was passed by Congress in 1969 and took effect on January 1, 1970. It established this country's environmental policies, and provided the tools to carry out these goals by mandating that every federal agency prepare an in-depth study of the impacts of "major federal actions having a significant effect on the environment" and alternatives to those actions, and requiring that each agency make that information an integral part of its decisions. NEPA also requires that agencies make a diligent effort to involve the interested and affected public before they make decisions affecting the environment.

**National Recreation Area (NRA):** National Recreation Area is a designation for a protected area in the United States that provides diverse recreation opportunities for a large number of people. Many of these areas are centered on large reservoirs and emphasize water-based recreation. Many NRAs are administered by the National Park Service; however, other agencies manage NRAs as well. Table 17 summarizes current NRAs, grouped by administering agencies.

**National Recreation Area Boundary:** This document from time to time refers to an existing NRA boundary that contains: (1) lands administered under the 1965 Memorandum of Agreement between Reclamation and NPS; (2) lands administered under supplemental agreements with other agencies; and (3) lands acquired by NPS for addition to the NRA as specifically authorized by Congress. The reader should be aware that Congress has yet to legislatively establish a boundary for the NRA. Therefore, the term "boundary" in this

BLM_0059913

GLOSSARY

Table 17: National Recreation Areas Throughout the United States

| National Recreation Area, State | Administered By |
|---|---|
| White Mountains National Recreation Area, Alaska | Bureau of Land Management |
| Amistad National Recreation Area, Texas | National Park Service |
| Bighorn Canyon National Recreation Area, Montana | National Park Service |
| Boston Harbor Islands National Recreation Area, Massachusetts | National Park Service |
| Chattahoochee River National Recreation Area, Georgia | National Park Service |
| Chickasaw National Recreation Area, Oklahoma | National Park Service |
| Curecanti National Recreation Area, Colorado | National Park Service |
| Delaware Water Gap National Recreation Area, Pennsylvania | National Park Service |
| Gateway National Recreation Area, New York | National Park Service |
| Gauley River National Recreation Area, West Virginia | National Park Service |
| Glen Canyon National Recreation Area, Arizona | National Park Service |
| Golden Gate National Recreation Area, California | National Park Service |
| Lake Chelan National Recreation Area, Washington | National Park Service |
| Lake Mead National Recreation Area, Nevada | National Park Service |
| Lake Meredith National Recreation Area, Texas | National Park Service |
| Lake Roosevelt National Recreation Area, Washington | National Park Service |
| Ross Lake National Recreation Area, Washington | National Park Service |
| Santa Monica Mountains National Recreation Area, California | National Park Service |
| Whiskeytown National Recreation Area, California | National Park Service |
| Flaming Gorge National Recreation Area, Utah | USDA Forest Service |
| Hells Canyon National Recreation Area, Oregon | USDA Forest Service |
| Land Between The Lakes National Recreation Area, Kentucky | USDA Forest Service |
| Oregon Dunes National Recreation Area, Oregon | USDA Forest Service |
| Pine Ridge National Recreation Area, Nebraska | USDA Forest Service |
| Rattlesnake National Recreation Area, Montana | USDA Forest Service |
| Sawtooth National Recreation Area, Idaho | USDA Forest Service |
| Shasta- Trinity National Recreation Area, California | USDA Forest Service |

instance is to be interpreted as an informal descriptor, and not as an official line authorized by Congress.

**Payments in Lieu of Taxes:** Federal payments to local governments that help offset losses in property taxes due to nontaxable Federal lands within their boundaries.

**Preservation:** The words "conservation," "preservation," and "protection" are used throughout this document. Although they have similar meanings, there are fine differences. In the context of this RPS, Preservation is defined as follows: The protection of natural and cultural resources, through the implementation of appropriate legal and physical mechanisms, in such a way that, so far as is practicable, the intrinsic values are safeguarded from unnatural disturbance. It does not imply preserving an area or structure forever in its present state, because natural events and natural ecological processes are expected to continue. Preservation is part of, and not opposed to, conservation. Preservation suggests that natural resources will be left undisturbed, while conservation usually implies that some resource management action will be taken. See also the definitions for "conservation" and "protection."

**Proposed Lands:** The term "proposed lands" refers to (1) Public lands adjacent to the NRA that were identified through the study process to warrant transfer to NPS for inclusion within the NRA for more overall efficient management for all agencies concerned, in keeping with each agency's mission; and (2) Private lands that warranted increased conservation measures relating to NRA goals and objectives, to be included within a Conservation Opportunity Area

BLM_0059914

(COA), outside the proposed NRA boundary. As defined for this study, the "proposed lands" do not include lands within the existing NRA that were identified as having the potential to be deleted from the NRA, via transfer to neighboring government agencies, or exchange for private lands within the COA. The proposed lands are a feature of Alternative 2 – the Proposed Action, and are a subset of the larger "study area" that was initially examined at the beginning of the study. The proposed lands are divided into eight "land units," A through H, to facilitate analysis.

**Protection:** The words "conservation," "preservation," and "protection" are used throughout this document. Although they have similar meanings, there are fine differences. In the context of this RPS, Protection is defined as follows: The use of legal and physical mechanisms to protect resources and the environment from further degradation. It does not include management actions that might serve to restore or sustain, but emphasizes lessening or preventing adverse impacts to resources from external influences and activities. It may be more narrow in its perspective than conservation or preservation, such as to protect a single species, geographic area, or structure. See also the definitions for "conservation" and "preservation."

**Purchase and Retained Use and Occupancy:** Purchase of property from a willing landowner at fair market value; wherein the owner can reside on the property rent free until death (life estate), or some other agreed-upon time period, such as 25 years (25-year lease).

**Reclamation Facilities:** Those structures and features necessary to, and constructed, operated, maintained, and reconstructed for the furtherance of Reclamation project purposes. Such structures and features may include, but are not necessarily limited to: dams, reservoirs, diversion structures, roads, ditches, canals, tunnels, telephone lines, power plants, electrical transmission lines, substations, switchyards, communications sites, towers, rights-of-way, real property, buildings, storage yards, fences, and borrow areas.

**Reclamation Lands:** Real property administered by the Secretary of the Interior, acting through the Commissioner of Reclamation, including all acquired and withdrawn lands and water areas under jurisdiction of the Bureau of Reclamation (Section 2803 of P.L. 102-575). Reclamation retains administrative jurisdiction on its lands for project purposes.

**Reclamation Project:** Any water supply or water delivery project constructed or administered by the Bureau of Reclamation under the Federal reclamation laws (the Act of June 17, 1902 [32 Stat. 388, chapter 1093; 43 U.S.C. 371], and Acts supplementary thereto and amendatory thereof (from Section 2803 of P.L. 102-575).

**Reclamation Works:** The structures, facilities, and appurtenances necessary to meet Reclamation project purposes, together with the lands and land interests, and water and water interests necessary for such works. Generally, Reclamation project works may include, but are not necessarily limited to, dams, reservoirs, canals, laterals, ditches, roads, transmission lines, substations, buildings, power plants, offices, warehouses, residences, telephone lines, parking areas, gates, fences, siphons, and the necessary land and land interests, and water and water interests, such as leases, rights-of-way, and easements.

**Relinquishment:** A notification to BLM by a Federal holding agency (such as Reclamation) that:

The public lands withdrawn or reserved for its use are no longer needed, or

The withholding or segregation of land from settlement, sale, location, or entry is no longer required. (Reclamation, 1998)

BLM_0059915

GLOSSARY

**Revocation:** The actual cancellation of a withdrawal by BLM, but does not necessarily open the land to settlement, sale, location, or entry under some or all of the general land laws. (Reclamation, 1998)

**Section 106:** The section of the National Historic Preservation Act which requires that federal agencies take into account the effects of their actions or undertakings on historic properties, and afford the State Historic Preservation Officer and the Advisory Council on Historic Preservation an opportunity to comment.

**Special Status Species:** Special status species include any species which is listed, or proposed for listing, as threatened or endangered by the U.S. Fish and Wildlife Service or National Marine Fisheries Service under the provisions of the Endangered Species Act; any species designated by the U.S. Fish and Wildlife Service as a "listed," "candidate," "sensitive" or "species of concern;" and any species which is listed by the State as state endangered, state threatened, or a species of special concern. In addition, within the context of this document, Special Status Species includes NRA Sensitive Species. This includes a variety of species found in the NRA, which the staff considers to be native species of concern.

**Subordinate (verb):** To place a senior real property interest in a position of lower priority to that of an otherwise junior real property interest in the same real estate. (adapted from a portion of the definition of "Subordination agreement" in Black's Law Dictionary, Sixth Edition, 1990)

**Subordination:** The act or process by which a person's rights or claims are ranked below those of others. (Black's Law Dictionary, Sixth Edition, 1990)

**Substantive Comment:** In regards to comments made in response to the Draft RPS/EIS during the public review and comment period, comments are considered substantive if they suggest changes in the stated alternatives; suggest new alternatives; or debate or question the method of impact analysis or a point of fact. In particular, they are substantive if they (1) cause changes or revisions in any of the alternatives, including the Proposal Action; (2) suggest different viable alternatives; (3) question, with reasonable basis, the adequacy of the environmental analysis; or (4) question, with reasonable basis, the accuracy of information in the environmental impact statement. Comments that only agree or disagree with any of the alternatives or NPS policy are not considered substantive.

**Toolbox of Incentives for Resource Conservation:** A handbook of ideas for neighbors in the Curecanti area, to encourage private landowners, local communities, and city, county, state, and federal agencies to work in partnership to manage their lands for more effective resource conservation. Although this document was created specifically for the Resource Protection Study at Curecanti National Recreation Area in Colorado, the ideas can be applied to other areas throughout the country. The Toolbox is contained in Appendix A of this Final RPS/EIS.

**Tract:** For the purposes of this study, an area of land identified for potential deletion from the NRA. For example, 10 such tracts of land are shown on the Alternative 2 map.

**Withdrawal:** A withholding of an area of Federal land from settlement, sale, location, or entry under some or all of the general land laws, to:

- Limit activity under those laws in order to maintain other public values in the area,
- Reserve the area for a particular public purpose or program, or
- Transfer jurisdiction of the area from one Federal agency to another.

(From Reclamation, 1998, Land Withdrawal Handbook).

**Withdrawn Lands (Reclamation):** Federal lands and land interests requested and set aside for Reclamation project purposes through a withdrawal process.

BLM_0059916

# INDEX

## A

Abbreviations and Acronyms: xix-xx, 210

Advisory Council on Historic Preservation (ACHP): 164, 167

Air Quality: 29-30, 49, 341

American Indian: iv, 10-11, 16, 27, 33, 99, 101, 164, 167, 209, 216, 218-219, 290, 293-295, 341, 359, 364

Area of Critical Environmental Concern (ACEC): xix, 97, 126-127, 172, 203, 242, 266-267, 269, 330, 363

Aspinall Unit (Wayne N. Aspinall Storage Unit): iii, v, ix, 1, 5, 7, 9, 12-15, 28, 36, 60-62, 81, 84, 100, 124-125, 127, 129, 137, 203, 214, 223-225, 228, 238-240, 351

## B

Backpacking: 76, 103-105, 169, 172, 174

Bicycling (Bicycle, Biking): 19, 76, 103, 105, 131, 172, 174, 178, 225, 233, 243, 246-247, 318, 343

Black Canyon of the Gunnison National Park (BLCA): i, iii, ix, 2, 6-7, 14, 41, 44, 47, 62, 86, 95, 102, 105, 109, 112-113, 115, 122-123, 136-137, 139, 158, 207, 213, 216, 221, 249, 270, 278, 288-289, 292, 324, 338, 344

Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999: i, iii, 6-7, 136, 338

Blue Mesa Dam: 1, 3, 13-14, 43, 50, 55, 86-87, 100, 104, 109, 111-114, 124, 128-129, 172, 205, 345-346

Blue Mesa Reservoir (BMR): 1, 3, 10, 13, 19-21, 25, 41, 47, 84, 86-88, 90-91, 100, 103-114, 119, 125-128, 132, 138, 142, 170, 172-173, 177-179, 181, 190, 193, 195, 199, 203, 206, 216, 247, 274, 276

Boating (Motorboats, Motorized boats, Sailboats): 13-14, 102-103, 107-108, 161-162, 343, 346

Bureau of Land Management (BLM): 1, 3, 8, 24, 27, 29, 32, 41, 43-44, 47, 49-51, 54-55, 64, 70-71, 81, 89-90, 94, 97, 102-103, 115, 122-128, 136-137, 139, 142, 151, 159, 162, 171-173, 176, 180, 185, 197-201, 203-207, 210-213, 219, 221, 223, 226, 232, 234-236, 242, 244-245, 252, 254, 266-269, 274, 288, 290-291, 330, 346, 348, 355, 363, 367-368

Bureau of Reclamation (Reclamation): i-vi, viii, ix-xi, 1, 3, 5-9, 12-18, 24, 27-29, 32, 35-36, 39-41, 43-45, 47, 49-52, 54-55, 60-64, 70-71, 75, 80-81, 84, 99-100, 102, 114-115, 117, 119-120, 122-125, 127-129, 136-137, 139, 141, 158-159, 161-162, 166, 168, 189, 193, 195, 197-198, 201, 203-204, 207, 209-214, 218-219, 223-232, 235-236, 238-240, 249, 255-261, 278, 288, 291, 330, 337, 339, 343-344, 346-351, 355, 363, 365-368

## C

Camping (Boat-in Camping): 13-14, 18, 76, 101, 103-105, 108-109, 128, 169-172, 174, 236-237, 248, 314, 343

Canoeing: 103, 108, 346

Climbing (Ice Climbing, Rock Climbing): 76, 104, 106, 121-122, 170, 172, 174, 343

Colorado Division of Wildlife (CDOW): 3, 8, 15, 20, 27, 29, 39, 41, 43-44, 46-47, 49, 53, 55, 70, 72, 81, 89-91, 93-95, 102-103, 106, 108, 122-123, 127, 152, 187, 197, 200, 205-207, 210-213, 219, 223, 225, 228, 234, 240, 262, 267, 291, 304, 309, 320-321, 330, 334, 356-357, 359, 361

Colorado River Energy Distributors Association (CREDA): 210-211, 219, 291

Colorado River Storage Project (CRSP): i, iii, ix, xi, 1, 5-6, 9-15, 24, 32, 40, 43, 55, 61-62, 69, 84, 100, 103, 110, 118-119, 124, 126, 137, 140, 168, 223-225, 229-231, 238, 256-257, 259-260, 337, 343-344, 347-348, 351, 363

Conservation Easement(s): ii, vi-vii, xi, 17, 24, 40, 45-47, 51-53, 56-59, 66-67, 69, 71, 76, 78-80, 120, 133, 136, 139, 142, 149, 151, 155, 159, 162, 166-167, 176, 180-183, 185, 187-190, 193-195, 198-199, 202, 206-207, 246, 248, 250, 253, 270, 279, 299, 304-307, 309, 311-312, 314, 321-324, 326, 335, 363

Conservation Opportunity Area (COA): ii, vi-vii, xi, 23-24, 27, 37-38, 41, 45-47, 49-52, 54-58, 60, 63-66, 69, 71, 73-78, 80, 83-85, 107, 114, 120-122, 131-136, 139-142, 144, 148-152, 156-157, 159-160, 162-163, 167, 169-174, 176-182, 184, 186-187, 192-195, 199, 202-203, 206-208, 215, 217, 233-235, 238, 241, 244-246, 249-250, 266, 270, 277, 280-281, 285, 351, 353, 363, 366-367

Conservation Potential: 29, 30, 32, 34

Cross-Country Skiing: 14, 18, 103, 105-106, 169, 172, 343

Crystal Dam: 1, 3, 6, 13-14, 43, 55, 84, 86, 124, 129, 136, 205, 345-346

Crystal Reservoir: iii, 1, 3, 10, 13, 18, 21, 25, 37, 41, 43, 47, 55, 84, 86-87, 95, 103-105, 107, 110-111, 113, 124-126, 128, 132, 135, 178-179, 181, 201, 205-206, 228-229, 345-346, 361

Cultural Landscapes: 17, 31, 33, 358

BLM_0059917

INDEX

Cultural Resources: i, iii, v, 5, 8-9, 11, 18, 25, 31, 46, 51, 59, 73, 76, 99-101, 104, 120, 122, 140-141, 143, 145, 152, 157, 161, 164-169, 175, 177, 190, 197-198, 202, 204, 208, 218, 234, 240-242, 250, 263-265, 280-281, 288-290, 316-317, 334, 339, 342-344, 348, 351-352, 363, 366
Curecanti Area Conservation Study (CACS): 209-211, 214, 364
*Curecanti: Great Scenery, Outstanding Resources, and Good Neighbors*: 17, 27, **329-336**, 364

**D**
Depletable Resource: 32, 34, 65

**E**
Ecologically Critical Areas: 29-30
Energy Requirements: 29-30
Environmental Justice: 32, 34
Ethnographic Resources: 31, 33, 164, 167

**F**
Fee Simple Acquisition (Fee Simple, Land Acquisition): ii, vii, xi, 24, 40, 45, 47, 51-53, 56-58, 64, 66-67, 71, 73, 78, 80, 107, 136, 140, 142, 151, 159, 162, 181-182, 184, 187, 193-195, 199, 202, 231, 233, 299, 304-305, 311, 335, 352, 363-365
Fisheries: 17, 30, 73-74, 91, 148-149, 151, 228, 271, 361, 368
Fishing: xi, 72, 103, 106-108, 126, 170, 173, 186-187, 223, 248-249, 356
Floodplain(s): 17, 29, 30, 84
Four Cs – Communication, Consultation, and Cooperation: all in the service of Conservation: 24, 46, 330

**G**
General Management Plan (GMP): x, 7, 9, 19, 29, 61, 63, 67, 73, 77, 103, 109, 112-113, 139-145, 149, 152, 155, 157, 159-160, 162-163, 166-167, 171, 174, 181, 183, 234, 246-247, 289, 343-344, 347-348, 352, 358, 364
Geology: 17, 30, 36, 38, 73, 85, 87, 97, 105, 134, 143-145, 288, 290
Grazing: 17, 59, 66-67, 76, 88, 92, 94, 120-121, 123, 125-126, 128, 136, 142, 146, 148, 151, 170-171, 173, 193, 195, 197-198, 200-201, 204-207, 212, 215-216, 299, 305, 310-311, 327-328, 346
Gunnison, City of: 19, 105, 114-116, 211, 216, 243, 271-272, 274, 276
Gunnison County: v, ix, 3, 21, 25, 41, 47, 56-57, 62, 88, 94, 96, 102, 105, 115-117, 119-120, 122, 138-139, 155, 158-159, 162, 180, 183, 185-188, 193, 195, 206, 209-213, 215, 219-220, 242-244, 266, 273-274, 292, 297, 301, 324, 332, 336, 352, 356-358, 361, 364
Gunnison County Comprehensive Plan (Master Plan): 138, 159, 162, 180, 185, 193, 195, 352, 357-358
Gunnison County Land Use Resolution (LUR): xx, 138, 158, 210-211, 357, 361
Gunnison Gorge National Conservation Area: i, iii, 2, 6-7, 105, 136-137, 207, 278, 338

**H**
Hang Gliding: 19, 76, 103, 125-126, 170, 172, 174, 204, 220, 244-245, 252, 343
Hiking: 13-14, 18-19, 103-104, 108, 116, 169, 172, 225, 236, 343
Horseback Riding: 14, 18, 104-105, 169, 172, 178, 343
Hunting: xi, 13-14, 39, 46, 72, 95, 99, 103-104, 106-108, 121, 123, 126-128, 148, 153, 170, 173, 187, 237, 240, 248-249, 305, 356

**I**
Ice Skating: 103
Impairment: 67, 86, 140, 142-145, 149, 152-153, 156-157, 159-160, 162-163, 166-167, 169, 175, 181, 183-184, 190, 193, 197, 342, 364
Implementation Plan (IP): x, 19, 29, 58-59, 61, 63, 73, 77, 103, 109, 112-113, 139, 141, 171, 174, 198, 234, 246-247, 352, 364
Indian Trust Resources: 31, 33

**J**
Joint Agency Management Effort (JAME): v, viii, 17, 27, 35, 43-44, 46, 55-56, 59, 72-73, 80-81, 89, 148-149, 151, 198, 203, 208, 210-212, 218, 352, 364

BLM_0059918

## K

Kayaking: 103, 108, 116

## L

Land Protection Plan (LPP): vii, 28, 50-53, 56-58, 61, 67, 71, 136, 156, 187, 198, 351, 365
Land Trust(s): vii, 28, 40, 43-44, 52-53, 56-57, 59, 61, 136, 139, 180, 185, 189, 194-195, 199, 216, 219, 245-246, 250, 253, 279, 299-300, 302, 304-308, 314, 321-324, 327, 334-336, 363, 365
Land Unit(s): 33, 37-38, 47, 66-67, 73-78, 83-85, 88-91, 93-97, 100, 101, 105-107, 109-113, 120-121, 123, 125-129, 131-135, 139, 144, 146-158, 160-161, 163, 166, 169-177, 179, 181-182, 185, 188, 193, 196-197, 199-204, 206, 223, 226, 238, 245, 266-267, 281, 365, 367
Land Use: ii, vi, 54, 57, 73-75, 77-80, 86, 88, 119-120, 126, 138-139, 142-144, 146-149, 151, 153-159, 161-162, 169-173, 175, 177, 179-180, 182, 189-196, 208, 219, 226-229, 238, 246, 297, 307, 312, 326, 336, 339, 348, 357, 361
Lightscape (Night Sky): vi-vii, 12. 30, 75, 77, 97-98, 104, 157-160, 175-177, 208, 246, 271, 331

## M

Montrose, City of: 115, 116, 219
Montrose County: i, iii, 1-3, 13-14, 19, 21, 24-25, 27, 41, 44, 47, 56-57, 94, 96, 98-99, 101, 109-110, 113-117, 119-120, 122, 138-139, 142, 158-159, 162, 179-180, 183, 185-187, 193-195, 210-214, 216-217, 219-221, 244, 277, 292, 309, 330, 336, 352, 358, 360-361
Montrose County Master Plan (Comprehensive Plan): 138, 358
Morrow Point Dam: 1, 3, 13-14, 43, 55, 86, 104, 122, 124, 129, 345-346
Morrow Point Reservoir: iii, 1, 3, 10, 13-14, 18, 21, 25, 35, 37, 41, 43, 47, 54-55, 73, 83-84, 86-88, 96, 103-105, 107-108, 110-111, 113, 120-122, 124-126, 128-130, 132, 135, 144, 170, 172, 176, 178-179, 181, 201, 205-206, 345-346
Mountain Biking: See Bicycling
Museum Collection(s): 31, 33

## N

National Recreation Area (NRA) Boundary: i-vii, x-xi, 3, 5-6, 8, 17, 21, 23-25, 27-28, 35-41, 44-45, 47, 49-52, 54-55, 57-61, 63-64, 66-67, 69-71, 73, 76, 83-85, 97, 121, 125, 127, 131-134, 141, 145, 166-167, 172, 189, 193-195, 197-198, 200-204, 206, 210-213, 216-217, 227, 233-237, 242-243, 245, 273, 277, 279, 330, 340-341, 352, 363, 365, 367
Natural Resources: 10, 25, 29-30, 38, 46, 49, 53, 65, 73, 76, 84-98, 114, 134, 137, 140-163, 171, 213, 233, 244, 252, 266-267, 270-273, 277-281, 297, 299, 304, 315-316, 319-320, 322-323, 325, 328, 339, 341, 359, 366
Night Sky Viewing: 101, 130, 175-176, 205
Notice of Intent (NOI): 16, 28, 210

## P

Paleontology: 30, 36, 38, 73, 85, 87, 134, 143, 290
Parasailing: 103, 125, 244
Photographic (Photo) Assessment: 16, 19, 20, 35, 113, 178, 214, 217
Prime and Unique Farmlands: 18, 29-30
Property (Landowner) Rights: v, 34, 36, 53, 71, 80, 133, 194-195, 307
Property (Land) Values: 8, 28, 57, 80, 121-122, 192-196, 306, 314, 360
Proposed Lands: 23-24, 32, 37, 47, 49-50, 57, 66, 73-76, 79-80, 84, 87, 89-92, 94-97, 101, 105, 109-111, 120-122, 125, 127-129, 131-133, 135, 138, 141-151, 153-159, 161-162, 168-171, 173-177, 180, 183-185, 188, 192-193, 195-196, 204, 234, 238, 365-367
Public Health and Safety: viii, 9, 32, 34, 55, 65, 86, 105, 107, 127, 138, 145, 157, 198, 202, 246, 331-332, 342-343, 346-347, 355
Purchase and Retained Use and Occupancy (Life Estate, 25-Year Lease, etc.): vii, 53, 71, 305, 335, 367

## R

Railroad: 1, 33, 36, 38, 66, 85, 88, 99-101, 109, 123, 126, 134, 166
Report to Congress (RTC): i, iv, 6, 60, 218, 223, 227, 310, 338
Rivers, Trails and Conservation Assistance Program (RTCA): 209, 299, 313, 318

BLM_0059919

INDEX

## S

Scenic Resources: i, iii-vii, xi, 1, 6-9, 11, 17-19, 21, 24-25, 27, 29, 32, 39-40, 45-46, 68-69, 73, 76-78, 83, 106, 110-114, 120, 126, 129, 131, 140, 170-174, 177-183, 185-186, 208-209, 212, 214-215, 246, 251, 253, 301, 329, 331, 338, 364-365

Sightseeing: 13-14, 103-104, 106, 116, 169-170, 172, 346

Skiing: See Cross-Country Skiing

Snowmobiling: 103-104, 128, 161, 343

Snowshoeing: 103-104

Soundscape: vi, viii, 30, 75-76, 98, 160-163, 208, 271, 343

Special Status Species (Candidate, Critical Habitat, Endangered, Imperiled, Listed, Rare, Sensitive, Special Concern, Species of Concern, Threatened, Vulnerable): viii, 10, 17, 20, 25, 30, 36, 38, 49, 52, 65, 73-76, 79, 85-86, 91-97, 134, 137, 140, 145, 152-157, 169, 171-172, 186, 217, 228, 233, 237-238, 242-243, 259, 281, 290, 309, 312, 320-321, 334, 341, 356, 360-361, 363, 368

Study Area: ix, 16-17, 20, 29, 33-36, 62, 83, 131-132, 361, 367

Swimming: 103-104, 107, 170, 173, 343

## T

*Toolbox of Incentives for Resource Conservation* (Toolbox): 17, 23-24, 43, 52, 54, 69, 71, 197, 249, 297-328, 334, 336, 368

Tract(s): 24, 47, 50-51, 121, 123, 167, 200, 204, 226, 234-236, 241-242, 368

Trust for Public Land (TPL): 188, 211, 247, 279, 294, 360

## U

U.S. Fish and Wildlife Service (USFWS): 53, 88, 91-93, 152-153, 211, 217, 219, 237-238, 294, 304, 309, 320, 332, 334, 336, 360-361, 368

U.S. Forest Service (USFS): 1, 3, 8, 24, 27, 29, 40-41, 43-44, 47, 49-51, 54-55, 64, 67, 70-71, 81, 89, 101-103, 105, 115, 122-123, 128, 135, 137, 139, 142, 159, 162, 170-173, 176, 180, 185, 197, 199-201, 206-207, 211-213, 215, 219, 221, 234-237, 248-249, 274, 283-284, 288, 294, 317, 347-348, 360

Uncompahgre Project: v, ix, xi, 6, 9, 12-14, 24, 28, 36, 43, 55, 60-62, 64, 81, 84, 86, 124, 168, 203, 214, 224, 228, 249, 351

Uncompahgre Valley Water Users Association (UVWUA): 13, 124, 211, 220, 294

Ute: 33, 99, 167, 212, 216-217, 219, 293-295

## V

Vegetation: vi, viii, 18-19, 30, 73-74, 84, 88-89, 91, 94, 96, 140, 142, 145-153, 178, 207-208, 233, 246, 281, 331-332, 361

## W

Wayne N. Aspinall Storage Unit: See Aspinall Unit

Western Area Power Administration (Western): v, ix, 1, 2, 5, 15-16, 27, 36, 43-45, 54-55, 62, 70, 81, 122, 124, 128-129, 137, 197, 203, 207, 210-212, 214, 219, 224-225, 238-240, 257, 286-287, 295, 361

Wetlands: 17, 19, 30, 49, 52, 73-74, 88-89, 146, 148, 150, 304, 308, 315, 325, 333-334, 341, 360

Wilderness: 3, 41, 47, 104-105, 115, 128, 136, 138-139, 158-159, 171, 176, 186, 199, 207, 220, 303, 315, 318, 342, 358, 361

Wilderness-Like Experience: 104-105

Wildlife (Wildlife Habitat): iii, vii, 5-7, 9-10, 12-15, 17-20, 25, 28, 30, 38-39, 46, 49, 68, 72-74, 85, 87-97, 103-104, 106-108, 115, 124, 126-128, 133-134, 137-138, 140, 145-148, 150-154, 156, 164, 168, 171, 185, 187-188, 200, 204, 206, 208, 217, 223, 225-226, 228, 233, 238, 240, 246, 250, 253, 256-257, 262, 271, 281, 290, 303-304, 308-309, 311-313, 315, 320-321, 323-325, 330, 332-334, 337-338, 341, 344-346, 356, 363, 368

Windsurfing: 104, 108, 170, 173

BLM_0059920



*As the nation's principal conservation agency, the Department of the Interior has the responsibility for most of our nationally owned public lands and natural resources. This includes fostering sound use of the land and water resources; protecting our fish, wildlife, and biological diversity; preserving the environmental and cultural values of our national parks and historic places; and providing for the enjoyment of life through outdoor recreation. The department assesses our energy and mineral resources and works to ensure that their development is in the best interests of all our people by encouraging stewardship and citizen participation in their care. The department also has a major responsibility for American Indian reservation communities and for people who live in island territories under U.S. Administration.*

NPS D-107, August 2008

BLM_0059921



VISIT US ON THE WEB!

www.nps.gov/cure

National Park Service

United States Department of the Interior

BLM_0059922

**Jim Zapert**

| | |
|---|---|
| **From:** | Tuers, Charis <ctuers@blm.gov> |
| **Sent:** | Friday, August 15, 2014 11:38 AM |
| **To:** | Taylor, Courtney; Rodriguez, Marco; Ralph Morris; skemballcook@environcorp.com; Jim Zapert; Jay Haney; Douglas, Sharon |
| **Cc:** | Ryan McCammon |
| **Subject:** | Fwd: Presentation for Tomorrow's IART meeting |
| **Attachments:** | GYA N Continuum.pptx |

Happy Friday everyone,

Please see below for important information from NPS regarding critical loads. Please update the cumulative impacts section for all current BLM projects with this new information for CLs.  Contact me with any questions.

Thanks,

**Charis A. Tuers**
**Air Resource Specialist**
**Bureau of Land Management**
**Wyoming State Office**
**(307) 775-6099**
**ctuers@blm.gov**


---------- Forwarded message ----------
From: **Stacy, Andrea** <andrea_stacy@nps.gov>
Date: Fri, Aug 15, 2014 at 10:34 AM
Subject: Re: Presentation for Tomorrow's IART meeting
To: "Tuers, Charis" <ctuers@blm.gov>
Cc: Brian Hall <brian.hall@wyo.gov>, Ken Rairigh <ken.rairigh@wyo.gov>, "Anderson, Bret A" <baanderson02@fs.fed.us>, "Miller, Debra C -FS" <dcmiller@fs.fed.us>, Gail Tonnesen-EPA-AIR <Tonnesen.Gail@epamail.epa.gov>, "Matichuk, Rebecca" <Matichuk.Rebecca@epa.gov>, Razzazian.Christopher@epamail.epa.gov, Vanessa Hinkle <Hinkle.Vanessa@epamail.epa.gov>, Catherine Collins <catherine_collins@fws.gov>, Tim Allen <Tim_Allen@fws.gov>, Terry Svalberg <tsvalberg@fs.fed.us>, Janet Bellis <jbellis@blm.gov>, Michael Barna <mike_barna@nps.gov>, Ryan McCammon <rmccammon@blm.gov>, Tamara Blett <tamara_blett@nps.gov>, Susan Johnson <Susan_Johnson@nps.gov>


Hi Charis,

The 2.2 kgN/ha/yr  total deposition (as estimated from a wet deposition CL of 1.4 kgN/ha/yr, based on the Saros et al paper)  is applicable as a critical load protective of high elevation surface waters in all natural areas in Wyoming. It was based on data collected in the GYA, but there is no better data elsewhere from which to develop CL for surfaces water in Wyoming, so we recommend this value is

BLM_0059923

appropriate for all high elevation surface waters in WY.  I recommend you first get concurrence from the USFS, they may want to chime in w/ regard to appropriate values for their Class I and Class II areas.

Additionally, there are critical loads for other sensitive resources (in addition to surface waters) applicable to the GYA and elsewhere in WY (e.g. 3.1 kgN/ha/yr for lichen, 3.0 for changes in alpine plant diversity).  Please see the attachment "Continuation of ecological effects with N dep" for the GYA.  However, consistent with our statutory mandates, the NPS generally evaluates ecosystem effects for the most sensitive resource (i.e., lowest CL), which in this case is the 2.2.kgN/ha/yr for high elevation surface waters in WY.

The UT ARMs modeling study included a discussion of the various CLs for different pollution sensitive resources (indicators), allowing the readers to see which resources might be affected and to what degree.  We recommend this analysis is a good example for describing CLs in a modeling report.  If you don't already have this, Leonard Herr should be able to send it to you.

In Colorado, we've been converting the 1.5 kgN/ha/yr wet deposition CL for high-elevation surface waters (from the Jill Baron research) to a total N CL of 2.3 kgN/ha/yr, based on the results from the ROMANS study showing that wet N dep in the park represents an average of 2/3 of the total deposition (1.5/0.66 = 2.27).  For all intents and purposes, the values are pretty much the same (2.3 vs.2.2), but we recommend using the numbers specific to each area, since is it is based on published information.

Finally, these values would not be applicable to the ecosystems in Dinosaur NM, as they are based on impacts to high elevation surface waters. For this arid region, we use the information published in the Pardo et al work (available here: http://www.treesearch.fs.fed.us/pubs/38109) for lichens and herbaceous plants and shrubs, which is a CL value of 3 kg/ha/yr *total* nitrogen deposition.

I think that is it.  Thanks & please let me know if you have additional questions.

 - Andrea


On Thu, Aug 14, 2014 at 9:59 AM, Tuers, Charis <ctuers@blm.gov> wrote:
> Thanks Andrea.  We will adjust those values in our NEPA docs.  Is the 2.2 kg/ha/yr applicable for all of Wyoming or just the Greater Yellowstone Area? Also, what about critical loads for Colorado Class I and Class II areas?  Same or different for total nitrogen deposition?
>
> **Charis A. Tuers**
> **Air Resource Specialist**
> **Bureau of Land Management**
> **Wyoming State Office**
> **(307) 775-6099**
> **ctuers@blm.gov**


On Wed, Aug 13, 2014 at 4:59 PM, Stacy, Andrea <andrea_stacy@nps.gov> wrote:

BLM_0059924

Hi Charis,

I consulted with our eco effects folks & I wanted to follow up with our discussion re: a citation for nitrogen critical loads at Grand Teton NP - you can use the Saros et al. paper, which identified a N critical load of 1.4 kg/ha/yr *wet* deposition for aquatic ecosystem health (diatoms).

However, the 1.4 CL value is based on *wet* N deposition only. If you want to compare the CL value to *total* deposition outputs from CMAQ, we recommend using an *estimated total* N deposition CL value of 2.2 kg/ha/yr. We arrived at this estimate by using the percent of wet to dry N deposition for this region, which is roughly 64% wet and 36% dry (see table 3 in Benedict et al.).

Thanks & let me know if you have any questions!

On Tue, Aug 12, 2014 at 3:18 PM, Tuers, Charis <ctuers@blm.gov> wrote:

Please find attached the PPT presentation for tomorrow's IART meeting here in Cheyenne at the State Office. Please sign in at the front desk when you arrive. I will be down to fetch everyone prior to the meeting.

The meeting will start at 9:30 am and likely conclude well before 3:00pm We will plan on doing a working lunch and order from Great Harvest. Please bring $10 if you wish to order lunch.

For those not attending in person, the call in number is:
866-809-8694
Passcode: 9646036#

See you tomorrow!

**Charis A. Tuers**
**Air Resource Specialist**
**Bureau of Land Management**
**Wyoming State Office**
**(307) 775-6099**
**ctuers@blm.gov**

--
Andrea Stacy
National Park Service
Air Resources Division
12795 W. Alameda Pkwy
P.O. Box 25287
Denver, CO 80225
andrea_stacy@nps.gov
303-969-2816 (phone)
303-969-2822 (Fax)

BLM_0059925

--
Andrea Stacy
National Park Service
Air Resources Division
12795 W. Alameda Pkwy
P.O. Box 25287
Denver, CO 80225
andrea_stacy@nps.gov
303-969-2816 (phone)
303-969-2822 (Fax)

BLM_0059926



Specific N impacts for GYE (chemical and biological):

- Boxes in yellow are where we likely have effects now in the GYE (solid box is where we have data showing change),
- Yellow dashed box is where we suspect change may be occurring based on thresholds for studies in other areas.
- Blue boxes are what we might expect in the future if nitrogen deposition continues at enhanced levels.
- Black line is current GYE deposition range of high elevation site estimates.
- This provides rationale for taking action – at warning levels now- how much further do you want to let impacts proceed?

1

BLM_0059927

Web Soil Survey

Extensive use of queries for mapping purposes using the Soil Survey of Ridgway Area, Colorado – Parts of Delta, Montrose, Gunnison, and Ouray Counties.  Also, the Soil Survey of Grand Mesa – West Elk Area, Colorado – Parts of Delta, Montrose, Mesa and Gunnison Counties.





United States Department of Agriculture,
Forest Service and Soil Conservation Service

In cooperation with the
Colorado Agricultural Experiment Station,
Colorado State University

# Soil Survey of Uncompahgre National Forest Area, Colorado,
## Parts of Mesa, Montrose, Ouray, and San Miguel Counties



BLM_0059929

BLM_0059930

# How To Use This Soil Survey

### General Soil Map

The general soil map, which is the color map preceding the detailed soil maps, shows the survey area divided into groups of associated soils called general soil map units. This map is useful in planning the use and management of large areas.

To find information about your area of interest, locate that area on the map, identify the name of the map unit in the area on the color-coded map legend, then refer to the section **General Soil Map Units** for a general description of the soils in your area.

### Detailed Soil Maps

The detailed soil maps follow the general soil map. These maps can be useful in planning the use and management of small areas.



To find information about your area of interest, locate that area on the **Index to Map Sheets**, which precedes the soil maps. Note the number of the map sheet, and turn to that sheet.

Locate your area of interest on the map sheet. Note the map unit symbols that are in that area. Turn to the **Index to Map Units** (see Contents), which lists the map units by symbol and name and shows the page where each map unit is described.



NOTE: Map unit symbols in a soil survey may consist only of numbers or letters, or they may be a combination of numbers and letters.

The **Summary of Tables** shows which table has data on a specific land use for each detailed soil map unit. See **Contents** for sections of this publication that may address your specific needs.

BLM_0059931

This soil survey is a publication of the National Cooperative Soil Survey, a joint effort of the United States Department of Agriculture and other Federal agencies, State agencies including the Agricultural Experiment Stations, and local agencies. The Soil Conservation Service has leadership for the Federal part of the National Cooperative Soil Survey.

Major fieldwork for this soil survey was completed in 1982. Soil names and descriptions were approved in 1982. Unless otherwise indicated, statements in this publication refer to conditions in the survey area in 1982. This survey was made cooperatively by the Forest Service, the Soil Conservation Service, and the Colorado Agricultural Experiment Station. It is part of the technical assistance furnished to the National Forest Service Administration.

Soil maps in this survey may be copied without permission. Enlargement of these maps, however, could result in misunderstanding of the detail of mapping. If enlarged, maps do not show the small areas of contrasting soils that could have been shown at a larger scale.

All programs and services of the Soil Conservation Service are offered on a nondiscriminatory basis, without regard to race, color, national origin, religion, sex, age, marital status, or handicap.

**Cover: Typical canyon and plateau topography of the Uncompahgre National Forest area.**

ii

BLM_0059932

# Contents

**Index to map units** . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv
**Summary of tables** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v
**Foreword** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii
General nature of the survey area . . . . . . . . . . . . . . . . . . 1
How this survey was made . . . . . . . . . . . . . . . . . . . . . . . . 3
**General soil map units** . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Map unit descriptions . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
**Detailed soil map units** . . . . . . . . . . . . . . . . . . . . . . . . . 11
   Map unit descriptions . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
**Use and management of the soils** . . . . . . . . . . . . . . . . 33
   Rangeland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   Woodland management and productivity . . . . . . . . . 34
   Engineering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
**Soil properties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   Engineering index properties . . . . . . . . . . . . . . . . . . . . 39
   Physical and chemical properties . . . . . . . . . . . . . . . . 40
   Soil and water features . . . . . . . . . . . . . . . . . . . . . . . . 41
**Classification of the soils** . . . . . . . . . . . . . . . . . . . . . . 43
Taxonomic units and their morphology . . . . . . . . . . . . . 43
   Agneston family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   Arabrab family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   Beenom family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   Belain family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   Callan family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   Cebone family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   Cerro family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   Chilson family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
   Chilson Variant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Dalhart family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Delson family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Dough family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Durango family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Empedrado family . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Falcon family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Gralic family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Grenadier family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Hapgood family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Hoosan family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Jodero family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Kubler family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Lamphier family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Leaps family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Mirand family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Olathe family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Overgaard family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Pendergrass family . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
Sawcreek family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
Sharrott family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
Showalter family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
Splitro family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
Supervisor family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Trampas family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Ula family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
**Glossary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
**Tables** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Issued March 1995

BLM_0059933

# Index to Map Units

10—Arabrab-Dalhart families complex, 3 to 15 percent slopes .............................. 12

11—Belain-Falcon families complex, 1 to 15 percent slopes ............................. 12

12—Borolls-Boralfs-Rock outcrop complex, 40 to 150 percent slopes......................... 13

13—Chilson-Delson, moderately deep-Beenom families complex, 1 to 20 percent slopes....... 13

14—Chilson Variant-Rock outcrop complex, 3 to 20 percent slopes........................ 16

15—Delson-Kubler-Showalter families complex, 15 to 45 percent slopes...................... 16

16—Delson, moderately deep-Sharrott families complex, 1 to 15 percent slopes ............. 17

17—Dough family, dry-Rock outcrop complex, 1 to 15 percent slopes ...................... 17

18—Durango-Arabrab families complex, 3 to 15 percent slopes .............................. 19

19—Falcon-Dough families-Rock outcrop complex, 1 to 10 percent slopes ...................... 20

20—Gralic-Grenadier families complex, 15 to 50 percent slopes ................................ 21

21—Hapgood-Lamphier families complex, 20 to 50 percent slopes........................ 23

22—Hoosan-Lamphier-Leaps families complex, 3 to 30 percent slopes........................ 23

23—Jodero-Empedrado families complex, 2 to 20 percent slopes........................ 24

24—Kubler-Delson-Cerro families complex, 3 to 15 percent slopes........................ 24

25—Lamphier-Hapgood families complex, 5 to 20 percent slopes........................ 25

26—Mirand-Callan families-Chilson Variant complex, 3 to 20 percent slopes .............. 26

27—Overgaard-Olathe families complex, 3 to 20 percent slopes .............................. 27

28—Sawcreek-Splitro families complex, 1 to 15 percent slopes .............................. 28

29—Supervisor-Cebone families complex, 1 to 15 percent slopes .............................. 28

30—Trampas-Delson, moderately deep, families complex, 3 to 30 percent slopes .............. 29

31—Ula-Agneston-Pendergrass families complex, 1 to 15 percent slopes ...................... 30

32—Ustorthents-Ustochrepts-Rock outcrop complex, 40 to 150 percent slopes............ 32

BLM_0059934

# Summary of Tables

Temperature and precipitation (table 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Freeze dates in spring and fall (table 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Growing season (table 3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Acreage and proportionate extent of the soils (table 4) . . . . . . . . . . . . . . . . . . . . . 74

Rangeland (table 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Woodland management and productivity (table 6) . . . . . . . . . . . . . . . . . . . . . . . . . 79

Building site development (table 7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Roads (table 8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Sanitary facilities (table 9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Construction materials (table 10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Water management (table 11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Engineering index properties (table 12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Physical and chemical properties of the soils (table 13) . . . . . . . . . . . . . . . . . . . . 111

Erosion factors (table 14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Soil and water features (table 15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Classification of the soils (table 16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

v

BLM_0059936

# Foreword

This soil survey contains basic soils data that is correlated to National standards. It contains information concerning the extent, capability, productivity, and limitations of the soils in the Uncompahgre Plateau area of the Uncompahgre National Forest. It has been designed to provide general soils information in a scientific manner for forest land management planning, program planning, and environmental assessments. The survey contains predictions of soil behavior for a variety of land uses. It also highlights certain limitations and potential hazards inherent in the soil, possible improvements needed to overcome the limitations, and the impact of selected practices on the environment.

Teachers, students, researchers, or anyone interested in the natural resources of the area can use this report to gain additional knowledge about the vegetation, geology, and environment of this National Forest.

Great differences in soil properties can occur within short distances. Some soils are very clayey or are seasonally wet. Some are shallow over bedrock or contain large amounts of gravel and stone. These factors may create large differences in forest and range production rates. Certain areas may be able to withstand offroad vehicle use with very little impact.

These and many other soil properties that affect the use and management of the land are described in this soil survey. Broad areas of soils are shown on the general soil map. The location of soil map units is shown on detailed soil maps. The soils in the survey area are described, and information on specific uses is given for each soil. Help in using this publication and additional information are available from soil scientists in the Forest Service.

Elizabeth Estill
Regional Forester
Forest Service

Duane L. Johnson
State Conservationist
Soil Conservation Service

BLM_0059937

BLM_0059938

1

# Soil Survey of
# Uncompahgre National Forest Area, Colorado,
## Parts of Mesa, Montrose, Ouray, and San Miguel Counties

By Terry Hughes and Ray Kingston, Forest Service, and Barb Cencich,
Soil Conservation Service

Fieldwork by Barb Cencich, Douglas Cryer, Mike Rich, William Hunter, Mary Currie,
Joe Pepi, and Jim Fuchs, Soil Conservation Service

United States Department of Agriculture, Forest Service and Soil Conservation Service,
in cooperation with the Colorado Agricultural Experiment Station

The survey area is within the Uncompahgre National Forest in the southwestern part of Colorado (fig. 1). It has a total area of 578,600 acres, or about 904.1 square miles. It includes parts of Mesa, Montrose, Ouray, and San Miguel Counties. There are no towns within the National Forest, but Grand Junction, Delta, Montrose, Ridgway, Norwood, Nucla, and Naturita are nearby.

Approximately 94 percent of the survey area is under the administration of the Forest Service. This land is used for livestock grazing, wildlife habitat, timber production, watershed, and recreation. Mining and mineral exploration also are permitted by Federal law.



Figure 1.—Location of the survey area in Colorado.

## General Nature of the Survey Area

This section provides general information about the survey area. It describes physiography and relief, history, vegetation, and climate.

### Physiography and Relief

The Uncompahgre Plateau area is on the eastern edge of the Colorado Plateau physiographic province. It is a broad, gentle upwarp of sedimentary rocks that has been uplifted over geologic time to several thousand feet above the valleys that surround it (10). The entire plateau stretches 125 miles from northwest to southeast, from the Colorado-Utah border to the San Juan Mountains. Because of its length, the plateau appears low (6); but actually, major portions of the upland areas range from 8,000 to nearly 10,000 feet in elevation. This high, long uplift is broken on its flanks by numerous sharp and rugged canyons. The resultant topographic pattern is one of alternating deep canyons and isolated finger mesas surrounding a rather smooth, domed upland. Some of the canyon bottoms in the survey area extend down to elevations of 5,800 to 6,000 feet.

BLM_0059939

## History

The word "Uncompahgre" is a Ute Indian term meaning "red lake," which was the Utes' name for the river that flows through the valley east of the plateau *(3)*. The first white men to enter the region were Spanish explorers. Don Juan Rivera crossed the area in the 1760's. He was followed by the Dominguez-Escalante expedition in 1776. In 1828, Joseph Roubideau, a French trapper, explored the area. He was followed by other trappers. Later, miners and ranchers moved in and conflict with the Indians over land escalated. After the Indians were forcibly removed in 1881, the area underwent rapid settlement *(4, 7)*. The climate of the lowlands and valleys surrounding the plateau was favorable for agriculture, but most homesteads on the plateau failed. The plateau was instead used as a source of lumber and forage. In 1905, President Theodore Roosevelt created the Uncompahgre Forest Reserve, which later became the Uncompahgre National Forest.

Presently, the Uncompahgre National Forest is managed under the principles of multiple use and sustained yield. Multiple use means that renewable resources (water, timber, forage, and wildlife) are managed so that they are utilized in the combination that meets the needs of the American people. Sustained yield means that these resources are managed so as to provide a continuous high-level output of products and services without harming the productivity of the land. This soil survey is designed with these principles in mind.

## Vegetation

The kinds of vegetation in the survey area depend on such factors as climate, slope, and elevation. The main plant communities in the area are pinyon-juniper, oakbrush-pine, aspen, and spruce-fir *(5, 15)*.

The pinyon-juniper zone occurs at the lower elevations, ranging generally from 6,000 to 7,600 feet. It includes pinyon pine, Utah juniper, and Rocky Mountain juniper as overstory and understories of western wheatgrass, muttongrass, and bottlebrush squirreltail in the lower areas and serviceberry, mountainmahogany, and big sagebrush in the upper areas.

The oakbrush-pine zone occurs at elevations ranging from 7,200 to 8,800 feet. This zone includes a plant community that is often called mountain shrub. Gambel oak, serviceberry, and snowberry are the principal shrub species, and the forbs and grasses consist of Indian ricegrass, mountain muhly, muttongrass, and Letterman needlegrass. Ponderosa pine occurs in the mid and upper portions of this zone. In the northern

portions of the plateau, scattered clumps of greenleaf manzanita are included with the pine.

The aspen occurs at elevations ranging from slightly under 8,000 feet to nearly 10,000 feet. In this woodland type, quaking aspen is the principal overstory species. The understory typically contains Thurber fescue, elk sedge, needlegrass, aspen peavine, and snowberry. At the upper elevations, the aspen is mixed with spruce-fir.

The spruce-fir zone occurs at the upper portions of the survey area at elevations ranging from 8,800 feet to the top of the plateau, which is at an elevation of nearly 10,000 feet. This subalpine woodland type consists of an overstory that includes both Engelmann spruce and subalpine fir. The understory typically consists of elk sedge, nodding bromegrass, meadowrue, snowberry, dwarf blueberry, and kinnikinnick. A few quaking aspen are also in this zone.

## Climate

The climate in the survey area varies greatly, depending on elevation and aspect. Generally, it is a cool, semiarid to moist, southwestern mountain type climate. The air masses that bring moisture into the area are mainly polar Pacific and, to some extent, tropical Pacific and tropical Gulf air masses. In winter, high-pressure zones move to the southeast, drawing moist polar Pacific air from the northwest *(14)*. Orographic uplift storms result from this air being raised in elevation up and over the Uncompahgre Plateau, thus producing condensation and precipitation. In summer, low-pressure systems result from the continental land mass heating at a faster rate than the oceans and moist, oceanic air being pulled inland from the Pacific and the Gulf of Mexico. The storms that result are mainly orographic uplift in nature, as in the winter, but convective storms are also possible *(9)*. The convective storms tend to be local phenomena of short duration. They are the local afternoon mountain showers. They result from the rise of hot, moist, ground-level air to altitudes of less pressure, where expansion and cooling result in condensation and precipitation.

Very little specific climatic data has been gathered on the remote, unpopulated Uncompahgre Plateau. Generally, air temperatures decrease as elevation increases—at a rate of about 2 degrees Celsius per 1,000 feet of elevation *(9)*. Precipitation generally varies with elevation also, but the rate of change is unpredictable.

Tables 1, 2, and 3 display climatic data gathered at Norwood, Colorado, during the period 1951 to 1980. Norwood is several miles southwest of the southern part

of the survey area, but the climate there is typical of that at the lower elevations on the plateau.

From information gathered at other high-elevation sites throughout Colorado, the following general statements can be made *(9)*. The mean annual air temperature ranges from around 35 degrees F at the upper elevations to around 45 degrees at the lower elevations. Summer temperatures in most of the area are cool and rarely exceed 75 to 80 degrees F. Typical nighttime low temperatures in summer range from 35 to 45 degrees, but they may occasionally range to -30 degrees. Freezing temperatures can occur at any time of the year. The frost-free period ranges from 40 to 100 days, depending on elevation and aspect.

Annual precipitation ranges from just under 15 inches to around 35 inches. Generally, at least half of the annual precipitation is in the form of snow. Below an elevation of 9,000 feet, snow may cover the ground for approximately 4 months of the year with depths ranging from 2 to 4 feet. Some south and west exposures at the lower elevations may be relatively free of snow most of the winter. Above an elevation of 9,000 feet, snow covers the ground from 6½ to 8 months each year with typical depths of 4 to 6 feet. The spring snowmelt usually occurs in April or May at the lower elevations and begins in mid-June at the upper elevations.

The greatest amounts of precipitation occur in late July; in August, September, and October; and in March. The lowest precipitation occurs during May and June. Generally, the distribution of precipitation from month to month is more uniform at the higher elevations.

## How This Survey Was Made

This survey was made to provide information about the soils and miscellaneous areas in the survey area. The information includes a description of the soils and miscellaneous areas and their location and a discussion of their suitability, limitations, and management for specified uses. Soil scientists observed the steepness, length, and shape of the slopes; the general pattern of drainage; the kinds of native plants; and the kinds of bedrock. They dug many holes to study the soil profile, which is the sequence of natural layers, or horizons, in a soil. The profile extends from the surface down into the unconsolidated material in which the soil formed. The unconsolidated material is devoid of roots and other living organisms and has not been changed by other biological activity.

The soils and miscellaneous areas in the survey area occur in an orderly pattern that is related to the geology, landforms, relief, climate, and natural vegetation of the area. Each kind of soil or miscellaneous area is associated with a particular kind or segment of the landscape. By observing the soils and miscellaneous areas in the survey area and relating their position to specific segments of the landscape, a soil scientist develops a concept, or model, of how they were formed. Thus, during mapping, this model enables the soil scientist to predict with a considerable degree of accuracy the kind of soil or miscellaneous area at a specific location on the landscape.

Commonly, individual soils on the landscape merge into one another as their characteristics gradually change. To construct an accurate map, however, soil scientists must determine the boundaries between the soils. They can observe only a limited number of soil profiles. Nevertheless, these observations, supplemented by an understanding of the soil-vegetation-landscape relationship, are sufficient to verify predictions of the kinds of soil in an area and to determine the boundaries.

Soil scientists recorded the characteristics of the soil profiles that they studied. They noted color, texture, size and shape of soil aggregates, kind and amount of rock fragments, distribution of plant roots, reaction, and other features that enable them to identify soils. After describing the soils in the survey area and determining their properties, the soil scientists assigned the soils to taxonomic classes (units). Taxonomic classes are concepts. Each taxonomic class has a set of soil characteristics with precisely defined limits. The classes are used as a basis for comparison to classify soils systematically. The system of taxonomic classification used in the United States is based mainly on the kind and character of soil properties and the arrangement of horizons within the profile. After the soil scientists classified and named the soils in the survey area, they compared the individual soils with similar soils in the same taxonomic class in other areas so that they could confirm data and assemble additional data based on experience and research.

While a soil survey is in progress, samples of some of the soils in the area generally are collected for laboratory analyses and for engineering tests. Soil scientists interpret the data from these analyses and tests as well as the field-observed characteristics and the soil properties in terms of expected behavior of the soils under different uses. Interpretations for all of the soils are field tested through observation of the soils in different uses under different levels of management. Some interpretations are modified to fit local conditions, and some new interpretations are developed to meet local needs. Data are assembled from other sources, such as research information, production records, and field experience of specialists.

Predictions about soil behavior are based not only on soil properties but also on such variables as climate

BLM_0059941

4

and biological activity. Soil conditions are predictable over long periods of time, but they are not predictable from year to year. For example, soil scientists can predict with a fairly high degree of accuracy that a given soil will have a high water table within certain depths in most years, but they cannot assure that a high water table will always be at a specific level in the soil on a specific date.

After soil scientists located and identified the significant natural bodies of soil in the survey area, they drew the boundaries of these bodies on aerial photographs and identified each as a specific map unit. Aerial photographs show trees, buildings, fields, roads, and rivers, all of which help in locating boundaries accurately.

The map unit descriptions, names, and delineations in this soil survey do not fully agree with those in the soil surveys of adjacent survey areas. Differences are the result of a better knowledge of soils, modifications in series concepts, and variations in the intensity of mapping or in the extent of the soils in the survey areas.

BLM_0059942

# General Soil Map Units

The general soil map at the back of this publication shows broad areas that have a distinctive pattern of soils, relief, and drainage. Each map unit on the general soil map is a unique natural landscape. Typically, it consists of one or more major soils or miscellaneous areas and some minor soils or miscellaneous areas. It is named for the major soils or miscellaneous areas. The soils or miscellaneous areas making up one unit can occur in another but in a different pattern.

The general soil map can be used to compare the suitability of large areas for general land uses. Areas of suitable soils or miscellaneous areas can be identified on the map. Likewise, areas that are not suitable can be identified.

Because of its small scale, the map is not suitable for planning the management of a farm or field or for selecting a site for a road or building or other structure. The soils in any one map unit differ from place to place in slope, depth, drainage, and other characteristics that affect management.

## Map Unit Descriptions

### 1. Ula-Agneston-Pendergrass Families

*Deep to shallow, well drained, medium textured and moderately fine textured, nearly level to steep soils on uplands, knobs, ridges, and mountain side slopes*

This map unit is in the central and southeastern parts of the survey area. Elevation is 8,400 to 10,000 feet. The average annual precipitation is about 22 to 26 inches, the average annual air temperature is 36 to 42 degrees F, and the average frost-free season is 40 to 60 days.

This unit makes up about 15 percent of the survey area. It is about 40 percent Ula family, 25 percent Agneston family, 15 percent Pendergrass family, and 20 percent components of minor extent.

The Ula family is on uplands and knobs. These soils are moderately deep or deep. They formed in residuum derived dominantly from interbedded sandstone and shale. They support open stands of Engelmann spruce and subalpine fir. The surface layer is loam. The subsoil

is cobbly sandy clay loam and overlies unweathered bedrock at a depth of 20 to more than 40 inches.

The Agneston family is on ridges and mountain side slopes. These soils are deep. They formed in residuum and colluvium derived dominantly from interbedded sandstone and shale. They support dense stands of Engelmann spruce and subalpine fir. The surface layer is very cobbly fine sandy loam. The subsoil is very cobbly clay loam. Unweathered sandstone is at a depth of 40 inches or more.

The Pendergrass family is on ridges and knobs. These soils are shallow. They formed in residuum derived dominantly from interbedded sandstone and shale. They support dense stands of Engelmann spruce and subalpine fir. The soils are very cobbly fine sandy loam underlain by unweathered bedrock at a depth of 10 to 20 inches.

Of minor extent in this unit are areas of the very steep Borolls-Boralfs-Rock outcrop complex and soils in the Grenadier, Olathe, Lamphier, and Cebone families.

This unit is used for recreation, wildlife habitat, livestock grazing, or timber production. In the areas used for recreational development, the main limitations are the slope and the shallowness to bedrock in the Pendergrass family.

### 2. Lamphier-Hapgood Families

*Deep and moderately deep, well drained, moderately fine textured and medium textured, nearly level to steep soils on upland hills, ridges, and mountain side slopes*

This map unit is throughout most of the survey area. Elevation is 8,400 to 10,000 feet. The vegetation is mainly aspen. The average annual precipitation is about 21 to 25 inches, the average annual air temperature is 38 to 42 degrees F, and the average frost-free season is 40 to 60 days.

This unit makes up about 19 percent of the survey area. It is about 40 percent Lamphier family, 35 percent Hapgood family, and 25 percent components of minor extent (fig. 2).

The Lamphier family is on upland hills, ridges, and mountain side slopes. These soils are deep. They formed in residuum and colluvium derived dominantly

BLM_0059943

6

Soil Survey



Figure 2.—An area of the Lamphier-Hapgood families general soil map unit is in the foreground. The soils in the middleground are in the Kubler-Delson-Cerro families general soil map unit. The mountains in the distance are the San Juan Mountains.

from interbedded sandstone and shale. The surface layer is typically loam. The subsoil is clay loam. Unweathered bedrock is at a depth of 40 to more than 60 inches.

The Hapgood family is on upland hills, ridges, and mountain side slopes. These soils are deep or moderately deep. They formed in residuum and colluvium derived dominantly from interbedded sandstone and shale. The surface layer is cobbly loam. The subsoil is very cobbly loam. Unweathered bedrock

BLM_0059944

generally is at a depth of 20 to 60 inches.

Of minor extent in this unit are soils in the Supervisor, Splitro, Sawcreek, Hoosan, and Leaps families. Some areas of the very steep Borolls-Boralfs-Rock outcrop complex are geographically associated with this map unit.

This unit is used for recreation, wildlife habitat, livestock grazing, or timber production. It is moderately well suited or poorly suited to recreational development. In the areas used for recreational development, the main limitations are large stones and the slope.

### 3. Lamphier-Hoosan Families

*Deep, well drained, moderately fine textured and fine textured, gently sloping to moderately steep soils on hilltops and hillsides*

This map unit is in the northwestern part of the survey area. Elevation is 8,400 to 9,500 feet. The average annual precipitation is about 22 to 24 inches, the average annual air temperature is 41 to 43 degrees F, and the average frost-free season is 50 to 70 days.

This unit makes up about 5 percent of the survey area. It is about 40 percent Lamphier family, 35 percent Hoosan family, and 25 percent components of minor extent.

The Lamphier family is on hilltops and hillsides. These soils formed in residuum derived dominantly from interbedded sandstone and shale. They support aspen. The surface layer is typically loam. The subsoil is clay loam. Unweathered bedrock is at a depth of 40 inches or more.

The Hoosan family is on hilltops and hillsides. These soils formed in loess over slope alluvium and residuum derived from interbedded sandstone and shale. They support open grassland. The upper part of the surface layer is loam, and the lower part is clay loam. The substratum is stony clay in the upper part and clay in the lower part.

Of minor extent in this unit are soils in the Cebone and Supervisor families. Areas of the very steep Borolls-Boralfs-Rock outcrop complex are geographically associated with this unit.

This unit is used for recreation, wildlife habitat, livestock grazing, or timber production. It is moderately well suited or poorly suited to recreational development. In the areas used for recreational development, the main limitations are slow permeability and the slope.

### 4. Kubler-Delson-Cerro Families

*Deep, well drained, moderately fine textured and fine textured, nearly level to steep soils on plateau tops, alluvial fans, and mountain foot slopes and toe slopes*

This map unit is interspersed throughout the survey area. The vegetation is mainly Gambel oak and perennial grasses. Elevation is 7,400 to 9,000 feet. The average annual precipitation is about 16 to 20 inches, the average annual air temperature is 43 to 47 degrees F, and the average frost-free season is 70 to 100 days.

This unit makes up about 22 percent of the survey area. It is about 35 percent Kubler family, 30 percent Delson family, 15 percent Cerro family, and 20 percent components of minor extent.

The Kubler family is on outwash fans and mountain foot slopes. These soils formed in alluvium and residuum derived dominantly from interbedded sandstone and shale. The surface layer is typically loam. The subsoil is clay loam or clay. Unweathered bedrock is at a depth of 40 inches or more.

The Delson family is on mountain foot slopes and toe slopes. These soils formed in residuum and colluvium derived dominantly from interbedded sandstone and shale. The surface layer is typically loam. The subsoil is silty clay loam or clay. Unweathered bedrock is at a depth of 40 inches or more.

The Cerro family is on plateau tops and alluvial fans. These soils formed in residuum and alluvium derived dominantly from interbedded sandstone and shale. The surface layer is typically loam. The subsoil is clay loam or clay. Unweathered bedrock is at a depth of 40 inches or more.

Of minor extent in this unit are soils in the Chilson family and areas of the very steep Borolls-Boralfs-Rock outcrop complex.

This unit is used for recreation, wildlife habitat, or livestock grazing. It is moderately well suited or poorly suited to recreational development. In the areas used for recreational development, the main limitations are the slope and the lack of access roads.

### 5. Delson, moderately deep-Chilson-Dough Families

*Deep to shallow, well drained, moderately fine textured and moderately coarse textured, nearly level to steep soils on mesa tops and side slopes*

This map unit is in the central and southern parts of the survey area. It is characterized by deeply dissected drainageways. The vegetation is mainly ponderosa pine and Gambel oak. Elevation is 7,200 to 8,900 feet. The average annual precipitation is about 15 to 18 inches, the average annual air temperature is 44 to 48 degrees F, and the average frost-free season is 70 to 100 days.

This unit makes up about 19 percent of the survey area. It is about 35 percent moderately deep Delson family, 20 percent Chilson family, 15 percent Dough family, and 30 percent components of minor extent.

The Delson family is on mesa tops and side slopes. These soils are moderately deep or deep. They formed

in loess and residuum and colluvium derived dominantly from interbedded sandstone and shale. The surface layer is typically loam. The subsoil is clay loam or very cobbly clay loam. Unweathered bedrock is at a depth of 20 to 60 inches.

The Chilson family is on mesa tops. These soils are shallow. They formed in residuum derived dominantly from interbedded sandstone and shale. The surface layer is typically loam. The subsoil is gravelly clay loam. Unweathered bedrock is at a depth of 10 to 20 inches.

The Dough family is on mesa tops. These soils are shallow. They formed in residuum derived dominantly from sandstone. They are sandy loam throughout. Unweathered bedrock is at a depth of 10 to 20 inches.

Of minor extent in this unit are soils in the Trampas, Sharrott, and Beenom families and areas of the Borolls-Boralfs-Rock outcrop complex on steep slopes.

This unit is used for recreation, wildlife habitat, livestock grazing, or timber and cordwood production. It is moderately well suited or poorly suited to recreational development. In the areas used for recreational development, the main limitation is the shallowness to bedrock. The slope is also a concern in some areas.

## 6. Jodero-Sawcreek-Dough Families

*Deep to shallow, well drained, moderately fine textured and moderately coarse textured, nearly level to strongly sloping soils on valley bottoms, plateau tops, and benches*

This map unit is in the northern part of the survey area. Elevation is 7,200 to 9,400 feet. The average annual precipitation is about 16 to 18 inches, the average annual air temperature is 44 to 47 degrees F, and the average frost-free season is 70 to 100 days.

This unit makes up about 8 percent of the survey area. It is about 30 percent Jodero family, 20 percent Sawcreek family, 15 percent Dough family, and 35 percent components of minor extent.

The Jodero family is on valley bottoms and alluvial fans. These soils are deep. They formed in alluvium derived dominantly from sandstone and shale. The soils support big sagebrush and grasses. The surface layer is typically loam. The substratum to a depth of 40 inches or more is clay loam.

The Sawcreek family is on plateau tops and benches. These soils are shallow. They formed in residuum derived dominantly from sandstone. The soils support scattered stands of ponderosa pine and big sagebrush. They are sandy loam throughout. Unweathered bedrock is at a depth of 10 to 20 inches.

The Dough family is on mesa tops. These soils are shallow. They formed in residuum derived dominantly

from sandstone. They are sandy loam throughout. Unweathered bedrock is at a depth of 10 to 20 inches.

Of minor extent in this unit are soils in the Empedrado and Belain families and areas of the very steep Borolls-Boralfs-Rock outcrop complex.

This unit is used for recreation, wildlife habitat, livestock grazing, or timber production. It is moderately suited to recreational development. In the areas used for recreational development, the main limitation is the shallowness to bedrock.

## 7. Mirand Family-Arabrab Family-Chilson Variant

*Deep to shallow, well drained, moderately fine textured, nearly level to steep soils on plateau tops, structural benches, mesa tops, and mesa side slopes*

This map unit is in the western part of the survey area. The vegetation is mainly pinyon pine, Utah juniper, and big sagebrush. Elevation is 6,400 to 7,700 feet. The average annual precipitation is about 14 to 18 inches, the average annual air temperature is 48 to 53 degrees F, and the average frost-free season is 110 to 150 days.

This unit makes up about 6 percent of the survey area. It is about 35 percent Mirand family, 25 percent Arabrab family, 15 percent Chilson Variant, and 25 percent components of minor extent.

The Mirand family is on plateau tops. These soils are moderately deep or deep. They formed in mixed loess and alluvium derived dominantly from interbedded sandstone and shale. The surface layer is typically loam. The subsoil is clay loam. Unweathered bedrock is at a depth of 20 to more than 60 inches.

The Arabrab family is on plateau side slopes, terraces, and benches. These soils are shallow. They formed in residuum and alluvium derived dominantly from interbedded sandstone and shale. The surface layer is typically sandy loam. The subsoil is cobbly sandy clay loam. Unweathered bedrock is at a depth of 10 to 20 inches.

The Chilson Variant is on mesa tops, benches, and side slopes. These soils are shallow. They formed in residuum derived dominantly from interbedded sandstone and shale. The surface layer is typically sandy loam. The subsoil is cobbly sandy clay loam. Unweathered bedrock is at a depth of 10 to 20 inches.

Of minor extent in this unit are soils in the Delson, Kubler, and Showalter families and some steep areas of the Borolls-Boralfs-Rock outcrop complex.

This unit is used for recreation, wildlife habitat, livestock grazing, or firewood production. It is poorly suited to wood production or recreational development. The main limitations are the shallowness to bedrock and a low available water capacity.

## 8. Arabrab-Durango Families

*Shallow to deep, well drained, moderately fine textured, nearly level to strongly sloping soils on mesa tops and structural benches*

This map unit is in the eastern part of the survey area. Elevation is 6,400 to 7,700 feet. The average annual precipitation is about 12 to 16 inches, the average annual air temperature is 51 to 55 degrees F, and the average frost-free season is 120 to 150 days.

This unit makes up about 6 percent of the survey area. It is about 35 percent Arabrab family, 25 percent Durango family, and 40 percent components of minor extent.

The Arabrab family is on mesa tops and structural benches. These soils are shallow. They formed in residuum derived dominantly from sandstone. The soils support pinyon pine and Utah juniper. The surface layer is sandy loam. The subsoil is cobbly sandy clay loam.

Unweathered bedrock is at a depth of 10 to 20 inches.

The Durango family is on mesa tops and structural benches. These soils are moderately deep or deep. They formed in residuum and colluvium derived dominantly from interbedded sandstone and shale. The soils support serviceberry and big sagebrush. The surface layer is sandy loam. The subsoil ranges from sandy clay loam to clay. Unweathered bedrock is at a depth of 20 to more than 40 inches.

Of minor extent in this unit are soils in the Callan, Dalhart, Delson, and Sharrott families and areas of the very steep Ustorthents-Ustochrepts-Rock outcrop complex.

This unit is used for recreation, wildlife habitat, livestock grazing, or cordwood production. It is moderately well suited or poorly suited to recreational development. In the areas used for recreational development, the main limitation is the shallowness to bedrock.

BLM_0059947

BLM_0059948

# Detailed Soil Map Units

The map units delineated on the detailed maps at the back of this survey represent the soils or miscellaneous areas in the survey area. The map unit descriptions in this section, along with the maps, can be used to determine the suitability and potential of a unit for specific uses. They also can be used to plan the management needed for those uses. More information about each map unit is given under the heading "Use and Management of the Soils."

A map unit delineation on a map represents an area dominated by one or more major kinds of soil or miscellaneous areas. A map unit is identified and named according to the taxonomic classification of the dominant soils or miscellaneous areas. Within a taxonomic class there are precisely defined limits for the properties of the soils. On the landscape, however, the soils and miscellaneous areas are natural phenomena, and they have the characteristic variability of all natural phenomena. Thus, the range of some observed properties may extend beyond the limits defined for a taxonomic class. Areas of soils of a single taxonomic class rarely, if ever, can be mapped without including areas of other taxonomic classes. Consequently, every map unit is made up of the soils or miscellaneous areas for which it is named and some "included" areas that belong to other taxonomic classes.

Most included soils have properties similar to those of the dominant soil or soils in the map unit, and thus they do not affect use and management. These are called noncontrasting, or similar, inclusions. They may or may not be mentioned in the map unit description. Other included soils and miscellaneous areas, however, have properties and behavioral characteristics divergent enough to affect use or to require different management. These are called contrasting, or dissimilar, inclusions. They generally are in small areas and could not be mapped separately because of the scale used. Some small areas of strongly contrasting soils or miscellaneous areas are identified by a special symbol on the maps. The included areas of contrasting soils or miscellaneous areas are mentioned in the map unit descriptions. A few included areas may not have

been observed, and consequently they are not mentioned in the descriptions, especially where the pattern was so complex that it was impractical to make enough observations to identify all the soils and miscellaneous areas on the landscape.

The presence of included areas in a map unit in no way diminishes the usefulness or accuracy of the data. The objective of mapping is not to delineate pure taxonomic classes but rather to separate the landscape into segments that have similar use and management requirements. The delineation of such landscape segments on the map provides sufficient information for the development of resource plans, but if intensive use of small areas is planned, onsite investigation is needed to define and locate the soils and miscellaneous areas.

An identifying symbol precedes the map unit name in the map unit descriptions. Each description includes general facts about the unit and gives the principal hazards and limitations to be considered in planning for specific uses.

In this survey most of the soils have been identified at the family level of classification (see the section "Classification of the Soils"). At this level, the soils are grouped based on certain physical and chemical properties and other features that affect use and management. Among the properties and characteristics considered are particle-size class, mineral content, temperature regime, and depth of the root zone.

Most of the map units are made up of two or more major soils or miscellaneous areas. These map units are called complexes. A *complex* consists of two or more soils or miscellaneous areas in such an intricate pattern or in such small areas that they cannot be shown separately on the maps. The pattern and proportion of the soils or miscellaneous areas are somewhat similar in all areas. Belain-Falcon families complex, 1 to 15 percent slopes, is an example.

This survey includes *miscellaneous areas*. Such areas have little or no soil material and support little or no vegetation. The Rock outcrop component of Borolls-Boralfs-Rock outcrop complex, 40 to 150 percent slopes, is an example.

Table 4 gives the acreage and proportionate extent

BLM_0059949

of each map unit. Other tables (see "Summary of Tables") give properties of the soils and the limitations, capabilities, and potentials for many uses. The "Glossary" defines many of the terms used in describing the soils or miscellaneous areas.

## Map Unit Descriptions

**10—Arabrab-Dalhart families complex, 3 to 15 percent slopes.** These gently sloping to strongly sloping soils formed in material weathered from sandstone. They are on upland plateaus in the central part of the survey area. The Arabrab family is on ridges and near the edges of mesas, and the Dalhart family is on smooth and concave slopes. Elevation ranges from 6,400 to 7,700 feet. The slope dominantly is 3 to 8 percent. The average annual precipitation is about 14 inches, and the average annual soil temperature is about 53 degrees F. The unit is about 50 percent Arabrab family sandy loam and 40 percent Dalhart family sandy loam. Individual areas range from 100 to more than 1,000 acres in size.

The Arabrab family is shallow and well drained. Typically, the surface layer is reddish brown sandy loam about 6 inches thick. The subsoil is reddish brown sandy clay loam about 8 inches thick. The underlying material is calcareous, light reddish brown gravelly sandy clay loam about 5 inches thick. It is underlain by Dakota sandstone. The depth to sandstone ranges from 10 to 20 inches.

Permeability is moderate or moderately rapid in the Arabrab family. Available water capacity is very low. The effective rooting depth is 10 to 20 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Dalhart family is moderately deep or deep and is well drained. Typically, the surface layer is brown sandy loam about 4 inches thick. The subsoil is brown sandy clay loam about 9 inches thick. The underlying material is calcareous, pink sandy clay loam about 24 inches thick. The depth to bedrock ranges from 20 to more than 60 inches. The content of coarse fragments may be as much as 30 percent in any one horizon but is less than 15 percent by weighted average.

Permeability is moderately slow in the Dalhart family. Available water capacity is low to high. The effective rooting depth ranges from 20 to more than 60 inches. Surface runoff is slow, and the hazard of water erosion is slight.

Included in this unit are small areas of soils that are more strongly developed than the soils in the Arabrab and Dalhart families. Also included, on the bottom land along Escalante Creek, are highly stratified soils that formed in alluvial material over Precambrian granite.

Included areas make up about 10 percent of the unit.

The vegetation on the Arabrab family is pinyon pine and Utah juniper. Bottlebrush squirreltail, Indian ricegrass, and big sagebrush make up most of the understory vegetation. The Dalhart family supports a community of grasses and shrubs, mainly galleta, blue grama, needleandthread, and big sagebrush. When the range deteriorates, pinyon pine and Utah juniper invade the site. Understory production on this site varies greatly because of the density of the canopy cover.

The wildlife species that inhabit areas of this unit are mule deer, snowshoe rabbits, cottontail rabbits, and whitetail jackrabbits. Also, elk inhabit these areas during the winter.

This unit is well suited to the production of pinyon pine-Utah juniper cordwood. The potential production is 5 to 12 cords per acre. The shallowness to bedrock and the low or very low available water capacity limit revegetation on this unit.

The capability subclass is VIs.

**11—Belain-Falcon families complex, 1 to 15 percent slopes.** These gently sloping to gently rolling, shallow to deep, well drained soils formed in residuum derived dominantly from sandstone. They are in the northern part of the survey area. Elevation is 8,000 to 8,800 feet. The average annual precipitation is about 16 to 18 inches. The average annual soil temperature is about 46 degrees F. The unit is about 50 percent Belain family loam and 35 percent Falcon family stony sandy loam.

The Belain family typically has a surface layer of brown loam about 5 inches thick. The subsoil is brown sandy loam about 6 inches thick. The substratum is brown to reddish yellow sandy loam. It is underlain by Dakota sandstone. The depth to bedrock ranges from 20 to more than 60 inches.

Permeability is moderately rapid in the Belain family. Available water capacity is low or moderate. The effective rooting depth is dominantly 20 to 40 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The surface of the Falcon family is covered with a layer of partially decomposed needles, leaves, twigs, and roots about 2 inches thick. The surface layer is brown stony sandy loam about 3 inches thick. The subsoil is brown sandy loam about 7 inches thick. It is underlain by Wingate sandstone. The depth to bedrock is less than 20 inches.

Permeability is moderately rapid in the Falcon family. Available water capacity is very low. Surface runoff is slow, and the hazard of water erosion is slight.

Included in this unit are small areas of rock outcrop, soils containing larger amounts of coarse fragments

than the soils in the Belain and Falcon families, and some areas of the Empedrado family. Included areas make up about 15 percent of the unit.

This map unit has an overstory of ponderosa pine and an understory of manzanita, mountain muhly, elk sedge, herbaceous sagebrush, and Gambel oak. The potential vegetation is ponderosa pine and Arizona fescue. The understory vegetation on the Falcon family is Arizona fescue, Indian ricegrass, junegrass, mountain muhly, blue grama, muttongrass, bitterbrush, true mountainmahogany, manzanita, hairy goldaster, and Letterman needlegrass. The understory vegetation on the Belain family is Arizona fescue, Columbia needlegrass, Parry oatgrass, western wheatgrass, muttongrass, elk sedge, Gambel oak, lupine, and snowberry.

The main concerns in producing and harvesting timber are the depth to bedrock and the very low available water capacity of the Falcon family. Reforestation by mechanical methods may be difficult because of the limited depth to bedrock. Because of soil-related factors, the production of ponderosa pine is not optimal on this unit.

The capability subclass is VIs.

**12—Borolls-Boralfs-Rock outcrop complex, 40 to 150 percent slopes.** This steep to extremely steep map unit is on plateau escarpments and canyon side slopes at elevations of 6,700 to 9,400 feet (fig. 3). The Rock outcrop is typically on the steeper slopes throughout the survey area. The Borolls generally support shrubs and grasses, and the Boralfs support woodland plants. The average annual precipitation is about 20 inches, and the average annual soil temperature is about 44 degrees F. Individual areas are generally several hundred acres in size. The unit is about 45 percent Borolls, 25 percent Boralfs, and 20 percent Rock outcrop.

Borolls are shallow to deep and are well drained. A reference pedon has a surface layer of dark reddish brown sandy loam about 11 inches thick and a subsoil of reddish brown and yellowish red very cobbly loam about 29 inches thick. The depth to bedrock ranges from 8 to more than 60 inches. The subsoil ranges from sandy loam to clay and has 15 to 80 percent rock fragments. In places the soils have no subsoil.

Boralfs are shallow to deep and are well drained. A reference pedon has a surface layer of dark reddish brown loam about 9 inches thick and a subsoil of dark yellowish red and reddish brown clay loam about 24 inches thick. The substratum to a depth of 60 inches or more is yellowish red loam. The depth to bedrock ranges from 8 to more than 60 inches. The subsoil ranges from loam to clay and has 5 to 70 percent rock fragments.

Permeability ranges from moderately rapid to slow in both soils. Available water capacity is very low to high. The effective rooting depth is 8 to more than 60 inches. Surface runoff is rapid or very rapid, and the hazard of water erosion is severe.

The Rock outcrop occurs as exposures of Dakota sandstone.

Included in this unit are areas of Ochrepts and Orthents. Also included are areas of Ustolls and Ustalfs at the lower elevations. Included areas make up about 10 percent of the unit.

The vegetation on this unit is generally a coniferous forest dominated by ponderosa pine at the lower elevations and Engelmann spruce and subalpine fir at the higher elevations. The potential vegetation varies greatly on this broadly defined unit.

The slope, the Rock outcrop, and the depth to bedrock greatly limit management alternatives. Onsite investigation is needed prior to implementation of any planned land use.

The capability subclass is VIIe.

**13—Chilson-Delson, moderately deep-Beenom families complex, 1 to 20 percent slopes.** These gently sloping soils formed in mixed loess and material weathered from sandstone. They are on plateau tops in the southern two-thirds of the survey area. The Chilson and Beenom families are on convex slopes and near the edges of mesas, and the Delson family is in nearly level and concave areas. Elevation ranges from 7,300 to 8,300 feet. The slope dominantly is 1 to 6 percent. The average annual precipitation is about 17 inches, and the average annual soil temperature is about 46 degrees F. The unit is about 35 percent Chilson family fine sandy loam, 30 percent moderately deep Delson family loam, and 25 percent Beenom family sandy loam. Individual areas range from several hundred to more than 1,000 acres in size.

The Chilson family is shallow and well drained. Typically, the surface is covered with a layer of decomposed and undecomposed needles and grass about 1 inch thick. The upper part of the surface layer is very dark grayish brown fine sandy loam about 4 inches thick, and the lower part is dark brown gravelly clay loam about 4 inches thick. The subsoil is brown gravelly clay loam about 7 inches thick. It is underlain by Dakota sandstone. The depth to bedrock ranges from 10 to 20 inches.

Permeability is slow in the Chilson family. Available water capacity is very low. The effective rooting depth is 10 to 20 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Delson family is moderately deep and well drained. Typically, the surface layer is dark brown loam

14

Soil Survey



Figure 3.—A typical area of Borolls-Boralfs-Rock outcrop complex, 40 to 150 percent slopes. This unit provides habitat for various raptors.

about 7 inches thick. The upper 4 inches of the subsoil is dark brown clay loam, and the lower 13 inches is brown clay. The underlying material is pinkish gray cobbly clay loam about 6 inches thick. It is underlain by fractured Dakota sandstone. The depth to bedrock ranges from 20 to 40 inches.

Permeability is slow in the Delson family. Available water capacity is typically low but ranges from low to high. The effective rooting depth is dominantly 20 to 40 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Beenom family is shallow and well drained.

Typically, the surface layer is dark brown sandy loam about 2 inches thick. The subsurface layer is brown loam about 6 inches thick. The subsoil is brown sandy clay loam about 8 inches thick. The depth to bedrock is 10 to 20 inches.

Permeability is moderately slow in the Beenom family. Available water capacity is very low or low. The effective rooting depth is 10 to 20 inches. Surface runoff is slow, and the hazard of water erosion is slight.

Included in this unit are small areas of the Falcon family, the Showalter family, and soils that are lighter colored in the surface layer than the soils in the

Chilson, Delson, and Beenom families. Included areas make up about 10 percent of the unit.

This unit has an overstory of ponderosa pine and an understory of Gambel oak, elk sedge, mountain muhly, and herbaceous sagebrush (fig. 4). As the range condition deteriorates, less desirable plants, such as cheatgrass, broom snakeweed, and rabbitbrush, invade the site. Forage production depends on the density of the trees. The understory on the Beenom and Chilson families includes junegrass, mountain muhly, blue grama, muttongrass, and Letterman needlegrass. The understory on the Delson family includes Arizona fescue, Parry oatgrass, western wheatgrass, muttongrass, elk sedge, Gambel oak, lupine, and snowberry.

This unit is well suited to the production of ponderosa pine. The main concerns in producing and harvesting timber are the depth to bedrock and competition by understory plants. Reforestation by mechanical methods may be difficult on the Chilson and Beenom families because of the shallowness to bedrock. Competition by Gambel oak limits the natural regeneration of ponderosa pine. Natural revegetation results in a sparse stand of trees. In areas where tree cutting is moderate



Figure 4.—An open area of grasses and sagebrush in a ponderosa pine woodland on Chilson-Delson, moderately deep-Beenom families complex, 1 to 20 percent slopes.

BLM_0059953

or heavy, reforestation may be essential.

Elk, mule deer, turkeys, and cottontail rabbits commonly inhabit areas of this unit.

The capability subclass is VIs.

**14—Chilson Variant-Rock outcrop complex, 3 to 20 percent slopes.** This map unit consists of areas of Rock outcrop and a shallow, well drained soil that formed in material weathered from sandstone. It is along the eastern rim of Roubideau Canyon at an elevation of 7,400 to 7,800 feet. The average annual precipitation is about 16 inches, and the average annual soil temperature is about 46 degrees F. The unit is about 60 percent Chilson Variant sandy loam and 25 percent Rock outcrop.

The Chilson Variant is shallow and well drained. Typically, the surface layer is brown sandy loam about 5 inches thick. The upper part of the subsoil is reddish brown sandy clay loam about 3 inches thick. The next part is light reddish brown cobbly sandy clay loam about 4 inches thick. The lower part is light reddish brown cobbly clay about 5 inches thick. It is underlain by Dakota sandstone. The depth to bedrock ranges from 10 to 20 inches.

Permeability is slow in the Chilson Variant. Available water capacity typically is low, but it is very low in some areas. The effective rooting depth is less than 20 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Rock outcrop occurs as exposures of sandstone on the tops of mesas.

Included in this unit are a few small areas of soils that are lighter colored, are less well developed, and are coarser textured than the Chilson Variant. Included areas make up about 15 percent of the unit.

This unit supports a community of pinyon pine, Utah juniper, and scattered Gambel oak. The understory consists of western wheatgrass, muttongrass, junegrass, Sandberg bluegrass, bottlebrush squirreltail, serviceberry, true mountainmahogany, and big sagebrush. As the tree canopy closes in, the understory deteriorates and cheatgrass and prickly pear cactus become dominant. Understory production on this site varies greatly, depending on the density of the canopy cover.

This unit is well suited to the production of pinyon-juniper cordwood. It produces about 5 to 12 cords per acre.

Many species of wildlife inhabit areas of this unit, including mule deer, elk, snowshoe rabbits, whitetail jackrabbits, chipmunks, and a variety of birds.

The depth to bedrock and the Rock outcrop limit management alternatives. Onsite investigation is needed prior to implementation of range improvement projects.

The capability subclass is VIs.

**15—Delson-Kubler-Showalter families complex, 15 to 45 percent slopes.** These hilly to steep soils formed in alluvium and residuum derived mainly from shale. They are on alluvial fans and mountain side slopes throughout the survey area. Elevation ranges from 7,700 to 8,800 feet. The slope dominantly is 15 to 30 percent. The average annual precipitation is about 18 inches, and the average annual soil temperature is about 45 degrees F. The unit is about 30 percent Delson family gravelly loam, 25 percent Kubler family loam, and 25 percent Showalter family gravelly loam. Individual areas range from 300 to more than 800 acres in size.

The Delson family is deep and well drained. Typically, the upper part of the surface layer is dark brown gravelly loam about 6 inches thick. The lower part is brown loam about 5 inches thick. The upper 8 inches of the subsoil is brown clay loam. The lower 26 inches is light brown clay grading to clay loam. The substratum is pinkish gray very gravelly clay loam. The depth to bedrock is generally 40 inches or more.

Permeability is slow in the Delson family. Available water capacity is high. The effective rooting depth is 40 inches or more. Surface runoff is medium, and the hazard of water erosion is moderate or slight.

The Kubler family is deep and well drained. Typically, the upper part of the surface layer is dark brown loam about 7 inches thick. The lower part is dark brown clay loam about 4 inches thick. The upper 11 inches of the subsoil is brown silty clay loam. The lower part is reddish brown clay about 38 inches thick. The depth to bedrock is generally more than 40 inches.

Permeability is slow in the Kubler family. Available water capacity is high. The effective rooting depth is 40 inches or more. Surface runoff is medium, and the hazard of water erosion is moderate or slight.

The Showalter family is deep and well drained. Typically, the upper part of the surface layer is dark brown gravelly loam about 11 inches thick. The lower part is brown gravelly clay loam about 5 inches thick. The upper 16 inches of the subsoil is light brown very cobbly clay and very cobbly clay loam. The lower part to a depth of 60 inches or more is light brown extremely cobbly clay loam.

Permeability is slow in the Showalter family. Available water capacity is moderate. The effective rooting depth is 60 inches or more. Surface runoff is medium, and the hazard of water erosion is moderate or slight.

Included in this unit are small areas of soils in the Cerro and Chilson families and light-colored soils that contain more clay than the major soils. Included areas make up about 20 percent of the unit.

The vegetation on this unit is dominated by Gambel oak and perennial grasses. Serviceberry and Gambel oak are the major brush species. Letterman needlegrass, Columbia needlegrass, bottlebrush squirreltail, and junegrass are the major grasses. If the range condition deteriorates, Canada thistle and cheatgrass become more dominant. The potential vegetation on this unit is an overstory of Gambel oak and an understory dominated by nodding brome, western wheatgrass, and elk sedge.

The slow permeability, a high shrink-swell potential, and rock fragments limit management alternatives on this unit. The unit is well suited to the production of oak cordwood. Erosion is a potential problem on the steeper slopes.

The major species of wildlife in areas of this unit are elk, mule deer, snowshoe rabbits, cottontail rabbits, and blue grouse.

The capability subclass is VIIe.

**16—Delson, moderately deep-Sharrott families complex, 1 to 15 percent slopes.** These nearly level to strongly sloping soils formed in material weathered from sandstone. They are on plateaus throughout the survey area. The moderately deep Delson family is generally on slight rises and in convex areas, and the Sharrott family is on broad flats and slope breaks. Elevation ranges from 8,200 to 8,500 feet. The slope dominantly is 3 to 6 percent. The average annual precipitation is about 17 inches, and the average annual soil temperature is about 46 degrees F. The unit is about 55 percent Delson family loam and 30 percent Sharrott family cobbly loam. Individual areas range from 100 to several hundred acres in size.

The Delson family is moderately deep and well drained. Typically, the surface layer is dark brown loam about 7 inches thick. The subsoil is brown clay loam and clay about 17 inches thick. The underlying material is pinkish gray cobbly clay loam about 6 inches thick. It is underlain by Dakota sandstone. The depth to bedrock dominantly ranges from 20 to 40 inches but may range to 60 inches in some places.

Permeability is slow in the Delson family. Available water capacity is low or moderate. The effective rooting depth is 20 to more than 40 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Sharrott family is shallow and well drained. Typically, the surface layer is brown cobbly loam about 4 inches thick. The upper part of the subsoil is brown gravelly loam about 8 inches thick. The lower part is

yellowish brown extremely gravelly sandy loam about 3 inches thick. It is underlain by Dakota sandstone. The depth to bedrock ranges from 10 to 20 inches.

Permeability is moderately rapid in the Sharrott family. Available water capacity is very low. The effective rooting depth is 10 to 20 inches. Surface runoff is slow, and the hazard of water erosion is slight.

Included in this unit are small areas of rock outcrop, areas of shallow soils that are darker than the major soils, a few areas of soils that are coarser textured than the major soils, and some soils that are deeper, lighter colored, and less well developed than the major soils. Included areas make up about 15 percent of the unit.

The vegetation on this unit is dominated by ponderosa pine and aspen. The understory vegetation includes grasses, elk sedge, mountain muhly, and bottlebrush squirreltail (fig. 5). Forbs and shrubs include hairy goldaster, Gambel oak, and herbaceous sagebrush. If the range condition deteriorates, Canada thistle, rabbitbrush, and broom snakeweed become dominant. The understory vegetation on the Delson family is Arizona fescue, Parry oatgrass, western wheatgrass, muttongrass, elk sedge, Gambel oak, lupine, and snowberry. The understory vegetation on the Sharrott family is dominated by Indian ricegrass, junegrass, mountain muhly, blue grama, muttongrass, bitterbrush, true mountainmahogany, manzanita, hairy goldaster, and Letterman needlegrass.

This unit is well suited to the production of ponderosa pine (fig. 6). The main concerns in producing and harvesting timber are the shallowness to bedrock and competition by understory plants. Competition by Gambel oak limits the natural revegetation of ponderosa pine. Reforestation by mechanical methods may be difficult on the Sharrott family because of the shallowness to bedrock.

Elk, mule deer, turkeys, and cottontail rabbits commonly inhabit areas of this unit.

The capability subclass is VIs.

**17—Dough family, dry-Rock outcrop complex, 1 to 15 percent slopes.** This map unit consists of areas of Rock outcrop and a shallow, well drained soil that formed in material weathered from sandstone. It is on benches and mesa tops in the northern part of the survey area. Elevation ranges from 7,400 to 8,100 feet. The average annual precipitation is about 14 inches, and the average annual soil temperature is about 46 degrees F. The unit is about 55 percent Dough family sandy loam and 20 percent Rock outcrop.

The Dough family, dry, is shallow and well drained. Typically, the surface layer is reddish brown sandy loam about 3 inches thick. The subsoil is light reddish brown sandy loam about 13 inches thick. It is underlain by



Figure 5.—Cattle grazing the forage in an area of Deison, moderately deep-Sharrott families complex, 1 to 15 percent slopes.

Wingate sandstone. The depth to bedrock ranges from 8 to 20 inches.

Permeability is moderately rapid in the Dough family. Available water capacity is very low. The effective rooting depth is 8 to 20 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Rock outcrop consists of exposures of Wingate sandstone.

Included in this unit are small areas of soils in the Belain family and some soils, in open park areas, that are deeper and lighter colored than the Dough family and that support grasses and shrubs. Also included are small areas of soils in the Sharrott family. Included areas make up about 25 percent of the unit.

The vegetation on this unit consists of pinyon pine, Rocky Mountain juniper, big sagebrush, junegrass, and muttongrass. Annual production depends on the density of the overstory canopy.

This unit is suited to the production of pinyon pine and juniper firewood. Average yields, dominantly of pinyon pine, are 5 to 10 cords per acre. Management concerns include the lack of access roads, the shallowness to bedrock, the very low available water capacity, and the large areas of Rock outcrop. Revegetation is very difficult in areas of this unit.

The capability subclass is VIIs.

**18—Durango-Arabrab families complex, 3 to 15 percent slopes.** These gently sloping to gently rolling soils formed in locally transported alluvium and material weathered from sandstone. They are on benches, mainly in the central part of the survey area. The Durango family is in gently sloping areas, and the Arabrab family is on small knobs and near the edges of benches. Elevation ranges from 6,400 to 7,600 feet.



Figure 6.—Ponderosa pine reforestation in an area of Delson, moderately deep-Sharrott families complex, 1 to 15 percent slopes.

The slope dominantly is 3 to 8 percent, but some areas on small knobs are steeper. The average annual precipitation is about 15 inches, and the average annual soil temperature is about 52 degrees F. The unit is about 60 percent Durango family sandy loam, 3 to 10 percent slopes, and 30 percent Arabrab family sandy loam, 5 to 15 percent slopes. Individual areas range from 100 to more than 1,000 acres in size.

The Durango family is moderately deep or deep and is well drained. Typically, the surface layer is light brown sandy loam about 4 inches thick. The next layer is reddish brown sandy clay loam about 6 inches thick. The upper 15 inches of the subsoil is reddish brown clay loam. The lower 17 inches is reddish brown clay. The underlying material is calcareous, light reddish brown clay about 18 inches thick. The depth to bedrock is 20 to more than 60 inches.

Permeability is slow in the Durango family. Available water capacity is high to low. The effective rooting depth is 20 to more than 60 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Arabrab family is shallow and well drained. Typically, the surface layer is reddish brown sandy loam about 6 inches thick. The subsoil is reddish brown sandy clay loam about 8 inches thick. The underlying material is calcareous, light reddish brown gravelly sandy clay loam about 5 inches thick. The depth to Dakota sandstone ranges from 10 to 20 inches.

Permeability is moderate in the Arabrab family. Available water capacity is very low. The effective rooting depth is 10 to 20 inches. Surface runoff is slow, and the hazard of water erosion is slight or moderate.

Included in this unit are small areas of soils that are less well developed than the major soils. Included areas make up about 10 percent of the unit.

The vegetation on the Durango family consists of serviceberry, big sagebrush, Gambel oak, western wheatgrass, and junegrass and scattered pinyon pine and Utah juniper (fig. 7). The vegetation on the Arabrab family consists of pinyon pine, Utah juniper, and Rocky Mountain juniper. The Rocky Mountain juniper is restricted to the western part of the survey area. The understory species include bottlebrush squirreltail and prickly pear cactus.

The potential vegetation on the Durango family is a grass-shrub community. Muttongrass, western wheatgrass, and big sagebrush make up a large percentage of the potential. If the range condition deteriorates, pinyon pine and Utah juniper invade the site. Understory production on the Arabrab family varies, depending on the density of the overstory canopy. Understory plants include blue grama, galleta, Indian ricegrass, bottlebrush squirreltail, junegrass,

stemless goldenweed, and Wyoming big sagebrush.

The wildlife species that inhabit areas of this unit are mule deer, whitetail jackrabbits, and cottontail rabbits. Also, elk graze in these areas during the winter.

Soil-moisture relationships are variable on this unit but are fairly good overall. Erosion is a hazard on the steeper slopes. Because of the variability of the soils, onsite investigation is needed prior to implementation of any planned land use.

The capability subclass is VIIs.

**19—Falcon-Dough families-Rock outcrop complex, 1 to 10 percent slopes.** This map unit consists of areas of Rock outcrop and shallow, well drained soils that formed in material weathered from sandstone (fig. 8). It is on nearly level to gently sloping plateau tops and benches in the northern part of the survey area. Elevation is 8,000 to 8,400 feet. The average annual precipitation is 16 to 18 inches, and the average annual soil temperature is about 46 degrees F. The unit is about 35 percent Falcon family stony sandy loam, 30 percent Dough family sandy loam, and 25 percent Rock outcrop.

The Falcon family is shallow and well drained. Typically, the surface is covered with a layer of partially decomposed needles, leaves, twigs, and roots about 2 inches thick. The surface layer is brown stony sandy loam about 3 inches thick. The subsoil is brown sandy loam about 7 inches thick. It is underlain by Wingate sandstone at a depth of 7 to 20 inches.

Permeability is moderately rapid in the Falcon family. Available water capacity is very low. Surface runoff is slow, and the hazard of water erosion is slight.

The Dough family is shallow and well drained. Typically, the surface layer is reddish brown sandy loam about 3 inches thick. The subsoil is light reddish brown sandy loam about 13 inches thick. It is underlain by Wingate sandstone at a depth of 6 to 20 inches.

Permeability is moderately rapid in the Dough family. Available water capacity is very low. Surface runoff is slow. The hazard of water erosion is slight, and the hazard of soil blowing is moderate.

The Rock outcrop consists of exposures of Wingate sandstone.

Included in this unit are small areas of soils in the Belain family and areas of soils that are deeper and lighter colored than the major soils. Included areas make up about 10 percent of the unit.

This unit has an overstory of scattered ponderosa pine and an understory of mountain big sagebrush, Gambel oak, sedum, muttongrass, and junegrass. The potential vegetation is ponderosa pine and an understory of Indian ricegrass, junegrass, mountain



Figure 7.—Typical pinyon-juniper-sagebrush vegetation in an area of Durango-Arabrab families complex, 3 to 15 percent slopes.

muhly, blue grama, muttongrass, bitterbrush, true mountainmahogany, manzanita, hairy goldaster, and Letterman needlegrass.

This unit is not suitable for intensive management for timber production because of the very low available water capacity and the shallowness to bedrock. Reforestation is difficult.

The capability subclass is VIIs.

**20—Gralic-Grenadier families complex, 15 to 50 percent slopes.** These deep and moderately deep, well drained soils formed in alluvium and colluvium derived from interbedded sandstone and shale. They are on hilly to steep mountain side slopes throughout the survey area. Elevation ranges from 8,400 to 9,900 feet. The slope dominantly is 15 to 35 percent. The average annual precipitation is about 23 inches, and the average annual soil temperature is about 40 degrees F. The unit

is about 60 percent Gralic family fine sandy loam and 30 percent Grenadier family cobbly or stony fine sandy loam. Individual areas range from about 50 to several hundred acres in size.

The surface of the Gralic family is covered with a layer of partially decomposed needles, leaves, twigs, and roots about 2 inches thick. The surface layer is pinkish gray fine sandy loam about 5 inches thick. The upper 14 inches of the substratum is gravelly pink fine sandy loam. The lower part is pink extremely cobbly fine sandy loam. The depth to bedrock ranges from 40 to more than 60 inches.

Permeability is moderately rapid in the Gralic family. Available water capacity is very low to moderate. The effective rooting depth is 20 to more than 60 inches. Surface runoff is medium, and the hazard of water erosion is moderate.

Typically, the surface of the Grenadier family is



Figure 8.—A typical area of Falcon-Dough families-Rock outcrop complex, 1 to 10 percent slopes. The lighter, nonvegetated areas are exposures of Wingate sandstone.

covered with a layer of undecomposed needles, twigs, cones, and bark about 1 inch thick and a mat of decomposed forest litter about 3 inches thick. The surface layer is brown cobbly fine sandy loam about 4 inches thick. The subsurface layer is light brown stony sandy loam about 28 inches thick. The subsoil is reddish yellow very cobbly sandy loam about 18 inches thick. It is underlain by highly weathered Dakota sandstone. The depth to bedrock ranges from 20 to more than 60 inches.

Permeability is moderately rapid in the Grenadier family. Available water capacity is very low to moderate. The effective rooting depth is 20 to more than 60 inches. Surface runoff is medium, and the hazard of water erosion is moderate.

Included in this unit are small areas of soils in the Lamphier and Supervisor families, some soils that are more well developed than the major soils, some light-colored soils, and areas of rock outcrop. Included areas make up about 10 percent of the unit.

This unit supports a plant community of Engelmann spruce and subalpine fir. Aspen and Douglas-fir also are important species in some places. The major understory plants are elk sedge, nodding bromegrass, Thurber fescue, aspen peavine, and snowberry. As the overstory canopy closes in, understory production drops and species composition deteriorates. Understory production on this site varies, depending on the density of the trees. The potential understory vegetation includes elk sedge, slender wheatgrass, nodding

bromegrass, meadowrue, common juniper, snowberry, dwarf blueberry, and kinnikinnick.

The slope and the content of rock fragments limit management alternatives on this unit. Conventional methods of harvesting trees can be used in the more gently sloping areas but are difficult to use in the steeper areas. Proper design of road drainage systems and careful placement of culverts help to control erosion. The slope restricts the use of this unit for recreational purposes to a few paths and trails. The paths and trails should extend across the slope.

Elk, mule deer, blue grouse, snowshoe rabbits, and various squirrels inhabit areas of this unit.

The capability subclass is VIIs.

**21—Hapgood-Lamphier families complex, 20 to 50 percent slopes.** These deep or moderately deep, well drained soils formed in residuum and colluvium derived from interbedded sandstone and shale. They are on mountain side slopes and steep ridges, dominantly along the fault scarp and accompanying benches of the Uncompahgre Plateau throughout the survey area. The Hapgood family typically is on convex slopes, and the Lamphier family is on concave slopes. Elevation ranges from 8,400 to 10,000 feet. The lower elevations are generally on northern aspects. The average annual precipitation is about 25 inches, and the average annual soil temperature is about 40 degrees F. The unit is about 45 percent Hapgood family cobbly loam, 25 to 50 percent slopes, and 40 percent Lamphier family loam, 20 to 35 percent slopes. Individual areas of these soils range from 40 to more than 1,000 acres in size. They have a hummocky appearance in some areas because of past slumping.

The Hapgood family is on mountain side slopes. The upper part of the surface layer is dark brown cobbly loam about 8 inches thick. The lower part is brown very cobbly loam about 9 inches thick. The next layer is yellowish brown extremely cobbly loam about 10 inches thick. The substratum is very pale brown extremely stony loam. The depth to bedrock ranges from 40 to more than 60 inches, but it is dominantly more than 60 inches.

Permeability is moderate in the Hapgood family. Available water capacity is low. The effective rooting depth is generally 60 inches or more. Surface runoff is medium, and the hazard of water erosion is slight or moderate.

The Lamphier family is on mountain ridges and the upper side slopes. The upper part of the surface layer is dark grayish brown loam about 20 inches thick. The lower part is grayish brown loam about 15 inches thick. The upper 10 inches of the substratum is variegated grayish brown and yellowish brown gravelly clay loam. The lower part is variegated brownish yellow and light gray gravelly sandy clay loam. The depth to bedrock ranges from 40 to more than 60 inches, but it is dominantly more than 60 inches.

Permeability is moderately slow in the Lamphier family. Available water capacity is generally high, but it is moderate in some areas. Surface runoff is medium, and the hazard of water erosion is moderate.

Included in this unit are small areas of soils that are lighter colored and contain more clay than the major soils. Included areas make up about 15 percent of the unit.

This unit is dominated by aspen. It is highly productive. The understory consists of Thurber fescue, elk sedge, needlegrasses, aspen peavine, and snowberry. Production varies from year to year, but in favorable years this unit can produce 3,000 pounds of air-dry forage per acre. The long-term potential vegetation is subalpine fir-Engelmann spruce. The potential understory vegetation is bearded wheatgrass, Thurber fescue, slender wheatgrass, blue wildrye, elk sedge, Columbia needlegrass, aspen peavine, lupine, meadowrue, and snowberry.

A variety of wildlife species inhabit areas of this unit, including mule deer, elk, snowshoe rabbits, marmots, squirrels, and blue grouse.

The slope and the content of rock fragments are limitations affecting roads. The slope also limits access by livestock in some areas. This unit is well suited to the production of aspen, but the slope and the content of rock fragments hinder revegetation.

The capability subclass is VIIe.

**22—Hoosan-Lamphier-Leaps families complex, 3 to 30 percent slopes.** These deep and moderately deep, gently sloping to moderately steep, well drained soils formed in material weathered from interbedded sandstone and shale covered by various thicknesses of loess. They are on hilltops and hillsides. Elevation ranges from 8,800 to 9,500 feet. The average annual precipitation is about 23 inches, and the average annual soil temperature is about 40 degrees F. The unit is about 40 percent Hoosan family loam, 30 percent Lamphier family loam, and 20 percent Leaps family clay loam.

The upper part of the surface layer of the Hoosan family is dark gray loam about 10 inches thick. The lower part is dark gray clay loam about 12 inches thick. The upper 16 inches of the substratum is very pale brown stony clay. The lower part to a depth of 60 inches or more is pale red clay. In places the surface layer is clay loam.

Permeability is slow in the Hoosan family. Available water capacity is moderate or high. Surface runoff is medium, and the hazard of water erosion is slight or moderate.

The upper part of the surface layer of the Lamphier family is dark grayish brown loam about 20 inches thick. The lower part is grayish brown loam about 15 inches thick. The upper 10 inches of the substratum is variegated light gray and light yellowish brown gravelly clay loam. The lower part to a depth of 60 inches or more is variegated brownish yellow and light gray gravelly sandy clay loam.

Permeability is moderately slow in the Lamphier family. Available water capacity typically is high, but it is moderate in some areas. Surface runoff is medium, and the hazard of water erosion is slight or moderate.

The surface layer of the Leaps family is grayish brown clay loam about 14 inches thick. The upper 9 inches of the substratum is very pale brown clay. The lower part to a depth of 60 inches or more is light gray clay.

Permeability is slow in the Leaps family. Available water capacity typically is high, but it is moderate in some areas. Surface runoff is medium, and the hazard of water erosion is slight or moderate.

Included in this unit are small areas of soils that are lighter colored than the major soils, are weakly developed, and have a stony surface. Also included, in rotational landslide areas, are some soils that have a higher content of clay than the major soils and scattered areas that have rounded, basaltic stones on the surface. Included areas make up about 10 percent of the unit.

The Hoosan and Leaps families support grasses. Thurber fescue, Columbia needlegrass, and Letterman needlegrass are the most important species. The important shrubs and forbs in this unit are big sagebrush, snowberry, western yarrow, lupine, and herbaceous cinquefoil. The vegetation on the Lamphier family is dominated by snowberry, big sagebrush, Columbia needlegrass, Thurber fescue, and scattered aspen. Columbia needlegrass and Thurber fescue are dominant in the potential plant community on the Hoosan and Leaps families. The potential vegetation on the Lamphier family includes aspen.

The shrink-swell potential and the potential for mass movement limit management alternatives for such uses as roads and campgrounds. A number of rotational landslides less than 10 acres in size are in areas of this unit.

This unit is grazed extensively by livestock and by elk and mule deer in the summer. Marmots and snowshoe rabbits also inhabit areas of this unit.

The capability subclass is VIe.

**23—Jodero-Empedrado families complex, 2 to 20 percent slopes.** These soils formed in alluvium derived from sandstone and shale. They are on valley bottoms at high elevations and on alluvial fan toe slopes and fan terraces at elevations between 7,800 and 8,400 feet. The Jodero family is on the valley bottoms and toe slopes, and the Empedrado family is on the fan terraces. The average annual precipitation is 16 to 18 inches, and the average annual soil temperature is about 46 degrees F. The unit is about 50 percent Jodero family loam and 30 percent Empedrado family loam.

The Jodero family is dominantly deep and well drained. Typically, the surface layer is dark brown loam about 27 inches thick. The substratum to a depth of 60 inches or more is reddish brown loam and clay loam.

Permeability is moderately slow in the Jodero family. Available water capacity is high. Surface runoff is very slow or slow, and the hazard of water erosion is slight.

The Empedrado family is moderately deep or deep and is well drained. Typically, the surface layer is brown loam and silt loam about 10 inches thick. The subsoil to a depth of 60 inches or more is yellowish red clay loam and sandy clay loam.

Permeability is moderately slow in the Empedrado family. Available water capacity is high. Surface runoff is slow or medium, and the hazard of water erosion is slight or moderate.

Included in this unit are soils in the Falcon family. Included areas make up about 20 percent of the unit.

The vegetation on this unit is needleandthread, muttongrass, Sandberg bluegrass, and mountain big sagebrush. The potential vegetation is Arizona fescuewestern wheatgrass.

This unit is well suited to summer grazing of cattle. Soil-moisture relationships are very good. Few limitations affect the use of these soils. The range should be managed for diversity of vegetation.

The capability subclass is VIc.

**24—Kubler-Delson-Cerro families complex, 3 to 15 percent slopes.** These gently sloping to gently rolling soils formed in alluvium and residuum derived mainly from interbedded sandstone and shale. They are on outwash fans and mountain foot slopes throughout the survey area. The Kubler family generally is on concave slopes, the Delson family is on convex slopes, and the Cerro family is in the more level areas. Elevation ranges from 7,700 to 8,600 feet. The average annual precipitation is about 18 inches, and the average annual soil temperature is about 45 degrees F. The unit is about 35 percent Kubler family loam, 30 percent Delson family gravelly loam, and 20 percent Cerro family loam.

25

Individual areas range from 300 to more than 800 acres in size.

The Kubler family is deep and well drained. Typically, the upper part of the surface layer is dark brown loam about 7 inches thick. The lower part is dark brown clay loam about 4 inches thick. The upper 11 inches of the subsoil is brown silty clay loam. The lower part is reddish brown clay. The depth to bedrock is generally more than 40 inches.

Permeability is slow in the Kubler family. Available water capacity is high. The effective rooting depth is 40 inches or more. Surface runoff is slow, and the hazard of water erosion is slight.

The Delson family is deep and well drained. Typically, the upper part of the surface layer is dark brown gravelly loam about 6 inches thick. The lower part is brown loam about 5 inches thick. The upper 8 inches of the subsoil is brown clay loam. The lower 26 inches is light brown clay grading to clay loam. The substratum is pinkish gray very gravelly clay loam. The depth to bedrock is generally 40 inches or more.

Permeability is slow in the Delson family. Available water capacity is high. The effective rooting depth is 40 inches or more. Surface runoff is slow, and the hazard of water erosion is slight.

The Cerro family is deep and well drained. Typically, the surface layer is dark grayish brown loam about 4 inches thick. The upper part of the subsoil is dark grayish brown clay loam about 10 inches thick. The lower part is light yellowish brown clay about 34 inches thick. The substratum to a depth of 60 inches or more is very pale brown, calcareous clay. Deep, wide cracks are common when the soil is dry.

Permeability is very slow in the Cerro family. Available water capacity is moderate. The effective rooting depth is 60 inches or more. Surface runoff is slow, and the hazard of water erosion is slight.

Included in this unit are small areas of soils that are similar to the soils in the Showalter and Trampas families, generally on the steeper slopes, and areas of shallow soils that have more clay than the major soils. Also included, in the northern part of the survey area, are soils in the Empedrado family. Included areas make up about 15 percent of the unit.

The vegetation on this unit generally is dominated by Gambel oak and perennial grasses. The vegetation on the Kubler and Delson families is dominated by shrubs. Serviceberry and Gambel oak are the major brush species. Letterman needlegrass, Columbia needlegrass, bottlebrush squirreltail, and junegrass are the major grass species. If the range condition deteriorates, Canada thistle and cheatgrass become dominant. The vegetation on the Cerro family is dominated by grasses.

Needlegrasses, bottlebrush squirreltail, junegrass, western wheatgrass, and Kentucky bluegrass are the major species. Forbs, such as daisy fleabane, western yarrow, mulesear, and aspen peavine, also are important. The vegetation also includes big sagebrush, snowberry, and Gambel oak. The potential vegetation on the Kubler and Delson families is Gambel oak and elk sedge. The potential vegetation on the Cerro family is western wheatgrass and Letterman needlegrass.

A high shrink-well potential and the restricted permeability limit management alternatives on this unit. Reforestation is particularly difficult. The unit is well suited to the production of oak cordwood.

The wildlife species that inhabit areas of this unit include mule deer, elk, blue grouse, cottontail rabbits, and snowshoe rabbits.

The capability subclass is VIs.

**25—Lamphier-Hapgood families complex, 5 to 20 percent slopes.** These deep and moderately deep, well drained soils formed in residuum and colluvium derived from interbedded sandstone and shale. They are on mountain ridges and the upper side slopes throughout the survey area. The Lamphier family is on concave ridges, and the Hapgood family is on convex side slopes. Elevation ranges from 8,400 to 10,000 feet. The lower elevations generally are on northern aspects. The average annual precipitation is about 25 inches, and the average annual soil temperature is about 40 degrees F. The unit is about 50 percent Lamphier family loam, 5 to 12 percent slopes, and 45 percent Hapgood family cobbly loam, 8 to 20 percent slopes.

The Lamphier family is on mountain ridges and the upper side slopes. Typically, the upper part of the surface layer is dark grayish brown loam about 20 inches thick. The lower part is grayish brown loam about 15 inches thick. The upper 10 inches of the substratum is variegated grayish brown and yellowish brown gravelly clay loam. The lower part is variegated brownish yellow and light gray gravelly sandy clay loam. Bedrock is generally at a depth of more than 40 inches, but it may be at a depth of only about 30 inches.

Permeability is moderately slow in the Lamphier family. Available water capacity typically is high, but it is moderate in some places. Surface runoff is medium, and the hazard of water erosion is slight or moderate.

The Hapgood family is on mountain side slopes. Typically, the upper part of the surface layer is dark brown cobbly loam about 8 inches thick. The lower part is brown very cobbly loam about 9 inches thick. The next layer is yellowish brown extremely cobbly loam about 10 inches thick. The substratum is very pale brown extremely stony loam. Bedrock is generally at a

depth of more than 60 inches, but it may be at a depth of only about 40 inches. In some areas the surface layer is loam.

Permeability is moderate in the Hapgood family. Available water capacity is low. The effective rooting depth is 60 inches or more. Surface runoff is slow, and the hazard of water erosion is slight.

Included in this unit are small areas of soils that are similar to those in the Cebone and Overgaard families. These soils are moderately deep or deep over shale. Included areas make up about 5 percent of the unit.

The vegetation on this unit is dominated by aspen. The soils are highly productive. The understory is made up of Thurber fescue, elk sedge, needlegrasses, aspen peavine, and snowberry. The production varies from year to year, but in favorable years this unit can produce about 3,000 pounds of air-dry forage per acre. The long-term potential vegetation includes subalpine fir-Engelmann spruce and an understory of bearded wheatgrass, Thurber fescue, slender wheatgrass, blue wildrye, elk sedge, Columbia needlegrass, aspen peavine, lupine, meadowrue, and snowberry.

A variety of wildlife species inhabit areas of this unit, including deer, elk, snowshoe rabbits, marmots, squirrels, and blue grouse.

This unit is well suited to the production of aspen. Climatic factors and physical properties of the soils result in fairly good soil-moisture relationships. Although the hazard of erosion is slight, ground-disturbing activities should be undertaken with care. The content of rock fragments is a limitation on sites for roads.

The capability subclass is VIs.

**26—Mirand-Callan families-Chilson Variant complex, 3 to 20 percent slopes.** These gently sloping to rolling soils formed in mixed loess over alluvium and material weathered from interbedded sandstone and shale. They are on plateau tops and side slopes in the southwestern and northern parts of the survey area. Elevation ranges from 7,000 to 7,600 feet. The slope dominantly ranges from 3 to 8 percent. The average annual precipitation is about 16 inches, and the average annual soil temperature is about 52 degrees F. The unit is about 45 percent Mirand family loam, 3 to 10 percent slopes, 25 percent Callan family silt loam, 3 to 10 percent slopes, and 15 percent Chilson Variant sandy loam, 7 to 20 percent slopes. Individual areas range from 100 to more than 1,000 acres in size.

The Mirand family is moderately deep to very deep and is well drained. Typically, the surface layer is brown loam about 8 inches thick. The next layer is dark yellowish brown clay loam about 4 inches thick. The subsoil is brown clay loam about 25 inches thick. The substratum is calcareous, brown clay loam. The depth

to bedrock ranges from 20 to more than 60 inches.

Permeability is moderately slow in the Mirand family. Available water capacity is low to high. The effective rooting depth ranges from 20 to more than 60 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Callan family is deep and well drained. Typically, the surface layer is brown silt loam about 7 inches thick. The upper part of the subsoil is brown clay loam about 3 inches thick. The lower part is reddish brown clay about 35 inches thick. The substratum is pink clay loam. The depth to bedrock is generally more than 40 inches.

Permeability is slow in the Callan family. Available water capacity is high. The effective rooting depth ranges from 40 to more than 60 inches. Surface runoff is slow, and the hazard of water erosion is slight.

The Chilson Variant is shallow and well drained. Typically, the surface layer is brown sandy loam about 5 inches thick. The upper part of the subsoil is reddish brown sandy clay loam about 3 inches thick. The next part is light reddish brown cobbly sandy clay loam about 4 inches thick. The lower part is light reddish brown cobbly clay about 5 inches thick. Bedrock is at a depth of 10 to 20 inches.

Permeability is slow in the Chilson Variant. Available water capacity is very low. The effective rooting depth is 7 to 20 inches. Surface runoff is medium, and the hazard of water erosion is slight.

Included in this unit are small areas of soils in the Showalter family and soils that have a lighter colored surface layer than the major soils. Included areas make up about 15 percent of the unit.

The vegetation on this unit consists of pinyon pine, Rocky Mountain juniper, Utah juniper, Gambel oak, serviceberry, and big sagebrush. Bottlebrush squirreltail and Indian ricegrass are the major grass species. The Callan family supports a grass-shrub community that includes mainly needlegrasses and big sagebrush. If the range condition deteriorates, pinyon pine and Utah juniper invade the site. The potential vegetation on the Chilson Variant and the Mirand family is pinyon pine and Rocky Mountain juniper and an understory of western wheatgrass, muttongrass, Sandberg bluegrass, bottlebrush squirreltail, serviceberry, true mountainmahogany, and Wyoming big sagebrush.

The depth to bedrock in the Chilson Variant is a minor limitation affecting some management alternatives.

Many wildlife species inhabit areas of this unit, including mule deer, elk, snowshoe rabbits, whitetail jackrabbits, chipmunks, and a variety of birds.

This unit is well suited to the production of pinyon pine and Utah juniper cordwood. It has a potential

BLM_0059964