| Date of field work | Author(s) | Description |
|---|---|---|
| 1866 - 1877 | Edward Palmer (Palmer 1876, 1878; Heizer 1954, 1962; Fowler and Matley 1978) | Collected miscellaneous ethnographic data on the Northern Ute. |
| 1868-1880 | John Wesley Powell (Fowler and Fowler 1971; Fowler and Matley 1979) | Large corpus of work throughout the Great Basin, including linguistic and ethnographic data from the Northern Utes. |
| 1900 | Alfred Louis Kroeber (Kroeber 1901, 1908) | Brief ethnographic work with the Northern Ute. |
| 1910 | Edward Sapir (Sapir and Bright 1992) | Worked briefly with the Uintah Ute of Northern Utah. |
| Early 1900s | Ralph V. Chamberlin (Chamberlin 1909) | Collected materials on Ute ethnobiological nomenclature and toponyms. |
| 1930s | Julian H. Steward (Steward 1938) | Basin-wide, long-range studies. Some Northern Ute material culture and mythology. |
| 1937-1938 | Omer Stewart (Stewart 1942) | Culture element distribution study, including Northern Ute informants. |
| Early 1950s | Gottfried Lang (1953, 1954) | Studies in psychological anthropology of the Northern Ute. |
| Began 1957-58 | Joseph G. Jorgensen (1959, 1964, 1972) | Extended study of various facets of Northern Ute culture and society. |

**Table 1:** Some of the main legacy sources for Northern Ute ethnography, from Fowler's (1980) overview of Great Basin anthropology and individual sources.

BLM_0061270

By the early nineteenth century, scientists — mostly surveyors and map-makers in service to Spanish, British, French and later American colonial interests — began to join European expeditions into the western interior of the country. In the beginning, many of the physiographic features they mapped, particularly the hydrography, were erroneously charted, yet they had no trouble laying their precise cartographic graticule on the landscape; projecting, in the process, the scientific and economic values of the European Enlightenment they perceived there. (Francaviglia 2005, Carter 1999). As with their predecessors, their interests in cultural landscapes were largely tangential to primary concerns: finding routes through "empty" lands and inventorying the natural resources that were the great attractors of European expansion. Explicit ethnographic work in western Colorado did not begin until the second half of the nineteenth century.



**Figure 22:** Ute camp, unknown location, probably eastern Utah, ca. 1870-1880 (Utah State History [USH] 2008).

In 1868, John Wesley Powell began his "pioneering" ethnographic fieldwork among the Indigenous peoples of the Great Basin and the Colorado Plateau, including the Utes in northwestern Colorado. Powell worked during the "formative period of American anthropology" and his linguistic and ethnographic observations of the Utes and other Great Basin groups led him to conclude (Fowler and Fowler 1971:5):

> This desolate land is the home of a great family of tribes speaking different dialects or languages of the same stock. They call themselves Nu-mes, Nu-intz, Nu-mas, Nu-mos, Shi-ni-mos, Nunas, etc., all doubtless, variations of the same word. We will call them Nu-mas.

Powell's term, now simply spelled "Numa," was superseded in the first part of the twentieth century by Alfred Kroeber's term "Plateau Shoshonean," which he defined as a division of the Uto-Aztecan stock. More recently there has been a return to Powell's terminology and Numic tribes are generally thought of as divided into three groups (Figure 21) called "Western, Central and Southern Numic" (Fowler and Fowler 1971:5-6)

Powell's nineteenth century ethnographic work was only one of his many objectives — which included recording accurate data on climate, soils, water, and mineral resources — but his agenda

BLM_0061271

did include "systematic statements about demography, Indian affairs, and recommendations toward the resolution of the 'Indian Problem' in the Numic area (Fowler and Fowler 1971). Powell's fieldwork began in the period following the Civil War when American expansion in the West began to pick up steam, and when the applied concept of "Indian Reservations" began to change things for the Utes in new significant ways (Blackhawk 2006:177). In 1874, in collaboration with George W. Ingalls, Powell produced the "first systematic survey of Great Basin Indian demography and political organization" and it continues be a "baseline document for Great Basin aboriginal demography (Powell and Ingalls 1874; reprinted in Fowler and Fowler 1971:97-119).



Powell's fieldwork between 1868 and 1880 focused in large part on Numic groups in the western and southern areas of the Great Basin, but he did spend time with some of the Northern Utes on the White River in Colorado and later in Utah on the Uintah Reservation. His linguistic collections include vocabularies from Northern Ute groups he identified as Tabuats, Yampaats, and Uintah (Fowler and Fowler 1971). His fieldwork also included perhaps the earliest photographs taken of Utes in their daily lives and homelands, notably the work of J.K. Hillers (Figure 18).





Figure 23:  (Top) White River (Yampa) Ute quirt made from antler, leather and metal rivets. Collection history unknown, ca. 1860-1880 (National Museum of the American Indian, Smithsonian Institution [NMAI-SI], 2/3344).
.

(Above) Ute pipe bag made from buffalo hide, glass beads and sinew, collected in 1869 by John Wesley Powell (NMAI-SI, 24/4225).

Between 1880 and 1900 not much systematic ethnographic work was carried out in the Great Basin, although Alfred Louis Kroeber, one of the first to achieve the Doctor of Philosophy in American anthropology, conducted brief ethnographic work with the Northern Utes in 1900 (Fowler 1980). But ensuing years in the twentieth century saw several flourescences of ethnographic work in the Great Basin. In the 1930s, the University of California at Berkeley conducted a Culture Element Survey of Native Western American groups, with the immediate objective to "develop lists of comparable culture elements or traits" from more than 200 tribes in the West. The ultimate goal was "to develop sets of data which could be statistically manipulated in hopes of... determining cultural relationships between and among tribes.

BLM_0061272

Those for Great Basin groups each include several hundred "elements" or traits, with extensive annotation. Surveys of Great Basin groups were conducted principally by Julian Steward and by Omer Stewart who went on, respectively, to study sociopolitical organization (Steward 1938) and band organization (Stewart 1962).

Fowler (1980) has characterized work in the Great Basin in the first half of the twentieth century as "consonant with the tenets of the historicalist paradigm of American anthropology after 1900" and its effort "to 'reconstruct' the 'ethnographic present.' That is, to describe aboriginal cultures as they were, in effect, the day before initial White contact." He also points out that in the "eastern Great Basin-Plains transition area (including our study area), this approach was complicated by the fact that horses had spread to several Ute and Shoshoni groups long before any actual face-to-face White-Indian contact. In that area, the post-horse, pre-White cultures came to be baselines for the "ethnographic present."

New approaches developed within American anthropology by the 1950s (Fowler 1980), notably "psychological anthropology (then generally called 'culture and personality'), and medical anthropology." Fowler cites works by Scotch and Scotch (1963) and Lang (1953, 1954) as representative of this approach, and goes on to note "a shift to concerns with present-day communities, with problems of acculturation and those of ethnoscience" as reflected in works by Houghton (1973), Mordy (1966), Shimkin and Reid (1970), Lynch(1971, 1978), Hittman (1973), Fowler and Leland (1967), Goss (1972b), and Clemmer (1978).

In her (1969) bibliography of Great Basin Anthropology, Catherine Fowler lists 2000 references on archaeology, 1650 references to ethnohistorical sources, and over 2700 published and unpublished items on linguistics and ethnography. Don Fowler (1980), however, characterized this large body of work as having "serious gaps in knowledge of Great Basin aboriginal cultures and peoples," particularly with respect to Great Basin sociopolitical organization. Fowler also commented that "although the Great Basin is sometimes called a 'laboratory' for anthropology, such a designation may be overrated. In cultural anthropology, with one exception, no new ideas, concepts, or methods were produced in the 'laboratory' — rather, research was carried out within paradigmatic and methodological frameworks developed elsewhere. The exception is Steward's (1936, 1938, 1972) concept of cultural ecology, which developed out of his

*Perspectives on Ute Ethnohistory in West Central Colorado*   27

BLM_0061273

Great Basin data and which has had wide applicability throughout the world (Murphy 1970)."

Julian Steward became recognized as one of the more prominent figures among Great Basin anthropologists and in 1996 the Great Basin Anthropological Conference organized a "Steward retrospective" symposium which acknowledged his influence on anthropology as a discipline as well as the extent to which his ideas shaped anthropological "definitions of who (Great) Basin people are and what we call them" (Clemmer et al. 1999;xvii). The symposium led to a recent appraisal and critique of Steward's work and influence that place his ideas in a more contemporary perspective (Clemmer et al. 1999). In that volume James Goss' contribution, *Yamparika — Shoshones, Comanches, or Utes — or Does It Matter?* (Chapter 6, pp. 74-85), is particularly relevant to questions surrounding the labels and designations that have been assigned by non-Indian scholars to the Utes and their Numic-speaking neighbors in the Great Basin. Goss concludes by saying, "We have better information from The (Numu) People themselves to begin the reinterpretation (of their history) from their point of view... The anthropological models have started at the wrong place and are upside down and backwards. We have a new generation of Basin anthropologists that now includes historians and cultural consultants that are members of the Numu community. Therefore, Basin anthropology can make a real new beginning and have a bright future" (Clemmer et al.:83).

Also in that volume, Ned Blackhawk (Chapter 13, pp. 203-219) notes the framework of colonial power relationships in which Stewart's work was situated, a perspective that "placed virtually all anthropologists as unilaterally authoritative interpreters of Native American cultures."  Blackhawk (Clemmer et al.:218) concluded:

> With his study of the Great Basin, Steward began an entire new field of anthropological study. His theory of cultural ecology paved the way for numerous other researchers and positioned Steward to dominate the study of the Great Basin as well as much of American anthropology for over a generation. However, this theory remains predicated on problematic assumptions about the nature of Great Basin society. Scholars who critique problems of ethnographic authority need to recognize not only how such representations serve to exclude and silence their objects of study, but also how these studies themselves can potentially shape the conditions in which native peoples must operate.

BLM_0061274

Steward's texts produced fixed, categorical understandings of the Great Basin Indians and reduced vibrant, resilient, and infinitely complex peoples to static, materially and ecologically determined generalizations. Such generalizations fundamentally obscure the innumerable ways in which these Indian peoples express and represent themselves. The meanings, beliefs, and values they give to themselves, their lands, and their histories never enter into Steward's works. Their philosophy, cosmology and hermeneutics are thus denied both contemporaneity and past as well as future existence. Interpreting how Steward accomplishes this does not warrant the same attention as what it is he silences. Although they are the subject of literally hundreds of sentences, the Great Basin Indians do not speak in Steward's texts.

In archaeology, much of the work in Colorado has been directed toward either Puebloan studies in the southwestern part of the state, or on Formative, Archaic and Paleoindian studies elsewhere in the state. A number of archaeologists working in western Colorado have commented on the dearth of Ute-focused studies (Baker 1995; Baker et al. 2007; Reed and Metcalf 1984; and Nickens 1988).  That void has been filled in part, at least for the historical period, by the Colorado Council of Professional Archaeologists (CCPA) with their *Colorado History: A Context for Historical Archaeology* (Church et al. 2007). In that volume, Steve Baker and his cohorts (Baker et al. 2007) have compiled a thorough synthesis of archaeological and ethnohistorical perspectives on the Utes, as well as other Tribes that played a role in Colorado history. Taken as a whole, and given the relative paucity of similar studies in the past, this volume is a valuable contribution to our baseline knowledge of historic Ute archaeology, particularly in light of the fact the Utes are the "only Indigenous people to reside within the state from prehistory into their Late Contact phase" (Baker et al. 2007:31). Baker summarizes the current state of Ute archaeology this way:

At the advent of routine cultural resource management (CRM) work in the 1970s, studies of the Ute archaeological context were very much still in their infancy. The only guidelines for investigators, other than those of the Huschers (Huscher and Huscher 1939a), were those of Bill Buckles (1968; 1971), and eventually Buckles and Buckles (1984). To date there have been few other guidelines to assist them, and there has been some considerable ongoing discussion about how to go about such work (Baker 1988, 1991, 1993, 1996, 2003b, 2004b,

BLM_0061275

2005a; Buckles 1988; Horn 1988, 1999; Nickens 1988; Reed 1984, 1988, 1994; Reed and Metcalf 1999; Reed and Gebauer 2004). This context document was expressly planned to provide such assistance to students and nonspecialists from the professional perspectives of historical archaeology and ethnohistory. For the Utes in particular this chapter is an attempt to answer Baker's (1995) and Nickens' calls (1988:4), as well as those made by Buckles (1971:218; 1988) and Jennings (1990), for Colorado's archaeologists to move Ute archaeology beyond the first halting steps attempted in 1988 at the first symposium on Eastern Ute archaeology (Nickens 1988) and allow it to take its rightful place alongside the better known prehistory of our state.

Dominquez Archaeological Research Group (DARG) launched its Colorado Wickiup Project in 2004 with the express intention of beginning to fill in some of the gaps Baker (Baker et al. 2007) described. The primary objective of the project's work so far has been to compile known information on (predominantly) Ute wickiup sites in Colorado, and to thoroughly document their wooden archaeological features and other surface evidence, before they disappear from natural and human causes (O'Neil et al. 2004; Martin and Conner 2007; Martin et al. 2005a, 2005b, 2006, 2007a, 2007b, 2010; Martin and Ott 2007a, 2007b, 2009). To date, the Colorado Wickiup Project has compiled baseline data on more than 381 Colorado sites with more than 1000 aboriginal wooden features, including: wickiups, teepees, tripods and other small utilitarian structures, tree platforms, ramadas, hunting blinds, brush fences, and corrals. Most if not virtually all of these archaeological features are thought to be of Ute origin. Planning efforts have been underway to expand the research design for the project to include a much broader and deeper framework of inquiry. DARG's participation in this ethnohistory project is a beginning step in that direction.

The Colorado Wickiup Project has compiled baseline data on more than 381 Colorado sites with more than 1000 aboriginal wooden features, including: wickiups, teepees, tripods and other small utilitarian structures, tree platforms, ramadas, hunting blinds, brush fences, and corrals. Most if not virtually all of these archaeological features are thought to be of Ute origin.

Moving beyond archaeology, the situation is somewhat better in regard to Ute ethnohistorical studies, at least with respect to the number and variety of materials that have been written. Extensive bibliographies by Omer Stewart (1971) and Lyman Tyler (1964) list several hundred primary and secondary sources for Ute studies, and a number of ethnographic studies have provided a baseline framework for describing Ute lifeways, notably including works by Powell (Fowler and Fowler 1970), Smith (1938, 1974),

BLM_0061276

Opler (1943, 1963, 1971), Stewart (1941, 1952, 1962, 1966a, 1973, 1976), and Goss (1961, 1972a, 1972b, 1999, 2000).

A number of recent historical works have contributed to our specific knowledge of Ute history and have added depth to our understanding of the ways tribal histories, including the Utes', have been misrepresented in the past. Virginia McConnell Simmons' (2000) *The Ute Indians of Utah, Colorado, and New Mexico* achieved a depth of detail not seen previously and provides tribal historians with a solid framework on which to build. Peter Drucker's (2004) *The Utes Must Go* adds a broadening political perspective on nineteenth century events that shaped both Ute and Colorado history, and Ned Blackhawk, in his (2006) *Violence Over the Land,* (described above) has added a significant new perspective on the Utes earliest relations with European colonizers and how the Utes, as active and adaptive agents, engaged in the complex economic, political and military dynamics that shaped the history of the American West.



**Figure 25:** Ute teepee in western Colorado. Photo taken by William Henry Jackson, probably in 1871 (DPL).

David Rich Lewis' (1994) *Neither Wolf Nor Dog: American Indians, Environment, and Agrarian Change* looks at the particular experiences of the Northern Utes under the weight of United States Indian Policy and its attempts to "civilize and assimilate Native Americans along agrarian lines." His work takes an interdisciplinary approach and provides both a succinct ethnographic overview of the Northern Utes as well as an historiographic analysis of cultural change during and after their removal from Colorado homelands to reservation lands in Utah. Lewis has also contributed a useful synthesis of recent trends in writing about American Indian history in his (2004) "Native Americans in the Nineteenth-Century American West."

Ethnohistory, once predominantly considered a "sub-branch of ethnology" or "sub-discipline of cultural anthropology" has been joined by increasing numbers of historians in recent decades, particularly "frontier historians and practitioners of the 'new' Social History" (Axtell 1979). As a result, ethnohistorical studies have been enriched by the integration of more diverse temporal, theoretical, and qualitative perspectives and practices than earlier works demonstrated. Recent trends in the broader domain of Native American history have also produced significant changes of perspective.

BLM_0061277

*"If we are to understand the contemporary Indian we must first understand the historic Indian. That means giving him an historic voice — his own this time, not the ventriloquist's."*

— Calvin Martin (1987:33)

A central issue confronting this project, as described in the Preface — i.e. the core differences that separate Ute and White perspectives — was addressed by Calvin Martin in his (1987) compilation of essays, *The American Indian and the Problem of History*. In his own contributions to that volume, he reaches the crux of the matter, pointing out how White historians have misrepresented and misunderstood the Indian side of the equation, as well as failing to recognize their own Euroamerican, ethnocentric bias:

> European-Americans have in truth fashioned and imposed a new reality, a new thought pattern, a new perception on this continent which in many ways is the antithesis of the traditional mythic reality perceived by the Amerindian... The fact is there is a powerful, dual metaphysics — one Indian, one White — inherent in the writing of Indian-White history. To ignore the Indian thoughtworld is to continue writing about ourselves to ourselves.  (pp. 32-33).

A number of Indigenous writers, equipped with the requisite academic credentials, have also begun to add their voices to the increasingly diverse perspectives surrounding Indigenous, tribal histories.

In addition to Ned Blackhawk, noted above, Linda Tuhiwai Smith has also emerged as a widely recognized and influential voice expressing Indigenous perspectives on European and American colonial histories. Smith is associate professor and director of the International Research Institute for Maori and Indigenous Education at the University of Auckland. In the introduction to her (2006:1) book, *Decolonizing Methodologies: Research and Indigenous Peoples*, she writes:

> From the vantage point of the colonized, a position from which I write, and choose to privilege, the term 'research' is inextricably linked to European imperialism and colonialism. The word itself, 'research', is probably one of the dirtiest words in the indigenous world's vocabulary. When mentioned in many indigenous contexts, it stirs up silence, it conjures up bad memories, it raises a smile that is known and distrustful. It is so powerful that indigenous people even write poetry about research. The ways in which scientific research is implicated in the worst excesses of colonialism remains a powerful remembered history for many of the world's colonized peoples. It is a history that still

BLM_0061278

offends the deepest sense of our humanity... It galls us that Western researchers and intellectuals can assume to know all that it is possible to know of us, on the basis of their brief encounters with some of us. It appalls us that the West can desire, extract and claim ownership of our ways of knowing, our imagery, the things we create and produce, and then simultaneously reject the people who created and developed those ideas and seek to deny them further opportunities to be creators of their own culture and own nations. It angers us when practices linked to the last century, and the centuries before that, are still employed to deny the validity of indigenous peoples' claim to existence, to land and territories, to the right of self-determination, to the survival of our languages and forms of cultural knowledge, to our natural resources and systems for living within our environments...

This collective memory of imperialism has been perpetuated through the ways in which knowledge about indigenous peoples was collected, classified and then represented in various ways back to the West, and then, through the eyes of the West, back to those who have been colonized.

Smith's book is aimed primarily toward Indigenous people who are now conducting their own scholarly research, but it also provides a framework for understanding the formation of knowledge — a key purpose of research — which will lead non-Indigenous researchers towards more ethically responsible, efficient, and appropriate research.

## Cultural resource management perspectives

A significant degree of reassessment and reappraisal has also occurred in recent literature concerning cultural resource management. A recent publication by the National Trust for Historic Preservation (NTHP 2006) comprised an assessment and needs analysis of CRM on Bureau of Land Management public lands, looking at a number of critical factors that shape the policy and actions of BLM with regard to cultural resources. Several recommendations from that study are of particular interest to our project:

- BLM needs to encourage NPS to establish a new way to nominate to the National Register typical prehistoric CR sites that occur on BLM lands. A landscape-scale "prehistory" category is needed that avoids the property-

*Perspectives on Ute Ethnohistory in West Central Colorado*   33

BLM_0061279



**Figure 26:** Signers of Treaty of 1880. Left to Right: Galoto, Otto Mears (interpreter), Savero, Shavanoux, Col. H. Page, Jocknick. (UHS).



**Figure 27:** Utes and Indian agent Colonel Arny, Uintah Reservation, 1867 (UHS).

34  *Perspectives on Ute Ethnohistory in West Central Colorado*

by-property detailed analysis that is so labor intensive and costly.

- BLM should expand and strengthen tribal consultation so that culturally associated tribes are engaged at the earliest stages of land use planning and decision-making. A comprehensive study should be undertaken across the BLM lands to identify TCPs, before conflicting land uses are authorized.
- As an alternative funding mechanism for comprehensive landscape surveys of all public lands, BLM should seek, perhaps, to have a pool of funds donated by land use applicants, perhaps augmented by donations from gaming tribes, that would be used exclusively for landscape-scale, proactive CR surveys of the public lands, again with the goal of complete public land inventories, early identification of Traditional Cultural Properties, and of sites eligible for nomination to the National Register.

Another recent publication, from the National Association of Tribal Historic Preservation Officers (NATHPO 2005), presented the results of a study to identify a best practices model for consultation between Federal Agencies and Tribes on Section 106 consultation. The project surveyed the consultation experiences of actual participants, and all Federal Preservation Officers and federally-recognized Tribes were contacted by the project and asked to identify successful consultations, the participants, and the aspects of the enterprise that they deemed led to a successful result. Their findings included:

- consultation must occur early in the project planning process,
- both sides must plan ahead for meetings and be informed of the project scope and effect prior to attempting consultation,
- the parties must engage in a dialogue predicated on mutual respect and understanding of the priorities of the other and the challenges that each face,
- having a THPO and an Agency Tribal Liaison involved in the process contributes to success,
- as does having adequate funding for Tribal parties to travel to meetings,
- and for Agency and Tribal participants to view the site together,
- reaching a Memorandum of Agreement (MOA) was rarely seen as the indicator of success,

BLM_0061281

- both Tribes and Agencies agreed that building relationships is the goal of a successful consultation and that funds and time spent in consultation reap ongoing benefits and efficiencies for future projects,
- although congenial personalities make consultation pleasant, the process is bigger than an individual interaction and can indeed be institutionalized and replicated over time.

Another publication appeared in our literature review that also speaks to the collaborative aspects of this project. In 2000 the BLM Tucson Field Office and the Sonoran Institute hosted a workshop to discuss the need for partnerships between public land managers and neighboring communities. *A Desktop Reference Guide to Collaborative, Community-Based Planning* (BLM-SI 2000) resulted from that effort and included "Seven Principles of Successful Collaboration:"

1. Build Lasting Relationships
2. Agree Upon the Legal Sideboards Early On
3. Encourage Diverse Participation and Communication
4. Work at an Appropriate Scale
5. Empower the Group
6. Share the Resources and the Rewards
7. Build Internal Support

The BLM Ute Ethnohistory project was in most respects a grass-roots or "from the ground up" effort. As noted in the Acknowledgements, most of the project participants have years of "front-line" experience in cultural resource management fieldwork and its associated follow-up activities. That experiential base of knowledge formed the foundation of our work together and, frankly, the publications just described were unknown to us throughout most of our work to this point. We are encouraged to see that many of our approaches, shared observations, and recommendations, which will be discussed later, conform in many important respects to the findings of these other efforts.

Our review of CRM literature also revealed sources of informative materials on some of the "nuts and bolts" issues that usually inform the identification, assessment and determination of eligibility of cultural resource sites and other properties. We have discussed in preceding sections how ethnocentric and academic biases have stymied meaningful integration of Ute perspectives into the CRM process, and we now turn to discussion of some factors that we believe have an undesirable impact on the ways Section 106 implementation has been missing the mark — relative

BLM_0061282

not only to Ute heritage concerns and perspectives, but for archaeologists as well. In brief, these concerns include:

- issues around NRHP definitions and criteria (NPS 1993, 1995, 1996, 1997a, 1997b, 1997c, 1998, 1999) for eligible properties, particularly as they relate to historical, cultural or ethnographic landscapes, in contrast to archaeological sites and districts;

- constraints imposed on field archaeologists by rigid site type categories, as defined by the OAHP database design; and

- significant and persistent data gaps that influence both the Utes' and archaeologists' ability to fulfill their responsibilities in Section 106 processes.

The first of these concerns, definitions and criteria for determining TCP eligibility, has been addressed recently by Thomas King, an anthropologist, and a leading consultant in cultural resources management in this country. He has been in heritage management for four decades and teaches numerous workshops on preservation of cultural and natural heritage. He has written a number of books (2000, 2002, 2003, 2005, 2007, 2008, 2009) on the subject, was a former staff member of the Advisory Council on Historic Preservation (ACHP), and helped write some of the NRHP guidelines, including the *Guidelines for Evaluating and Documenting Traditional Cultural Properties* (King and Parker 1998). He had this to say (King 2008b) regarding a discussion that took place at a recent NATHPO conference:

> One of the sessions was put on by the Advisory Council on Historic Preservation. The Council's representatives accurately noted that some federal agencies have trouble understanding what tribes are talking about when they insist on respect for the landforms and landscapes that figure in their cultural traditions. To remedy this problem, the Council staff suggested that tribes consider using the language and concepts employed by the landscape architects who have made cultural landscapes the latest fad in the National Park Service.
>
> I'm all in favor of recognizing the importance of cultural landscapes, whatever you call them – though I think that calling a landscape "ethnographic" puts the wrong spin on its significance. Landscapes are often significant to communities; their significance to ethnographers is

BLM_0061283

*"Also I think it is our responsibility to educate (non-Indians) on our history ... I really think a lot of people are ignorant about that. If you went to Colorado, some people would be surprised that there's a Ute Tribe in Utah that was moved out of Colorado..."*

— Betsy Chapoose (2003)

rather beside the point. At the same time, a lot of the concepts employed by NPS and its ilk in the evaluation of landscape strike me as overly architectural and insufficiently ethnographic. But for all that, the move toward greater recognition of landscapes as cultural phenomena is, I think, a very good thing.

But the question I asked the Council at the end of their session was this, more or less verbatim:

*Why should a sovereign Indian tribe that wants the U.S. government to respect places important in the tribe's history and culture have to document that significance using terms and concepts dreamed up by non-indigenous landscape architects?*

...And, the (Council) was quick to point out, "our (the Council's) regulations are pretty clear in saying they don't have to." ...I think that's a very important but widely misunderstood fact. But if it's true – if the regulations don't demand any particular sort of eligibility documentation, then why in the world is the Council acting like documentation IS required and encouraging tribes to try another way of providing it? Particularly a way that involves terms and precepts developed by specialists without an iota of tribal expertise in and around the U.S. government? Why doesn't the Council ... make it really, really clear to agencies that the regulations do NOT require that tribal cultural places be documented by ethnographers or anyone else, or at all...?

King, it should by now go without saying, is a self-styled "curmudgeon," and he goes on, with equal relish, to kibitz Tribal representatives at the conference:

You're sovereign governments, right? Then why should you have to prove the significance of your special places – be they landscapes, ancestral cemeteries and living sites, or big pointy rocks – to the United States government? Using methods that the United States Government approves? More to the point, perhaps, why do you let Washington get away with demanding such proof? France wouldn't. Russia wouldn't. The Republic of Kiribati wouldn't. Why should you?

Instead, why don't you adopt policies that say something like:

*"We (name of Tribe) have the sovereign right to define what constitutes our cultural heritage, including what constitutes a place that is*

BLM_0061284

*significant as a part of that heritage. We decide such things based on our own beliefs and practices, and document such places to the extent and in the manner we determine to be correct and justified. We expect the U.S. government to consult with us about any action proposed or under consideration that may affect land, water, or air within, on, or over the territory used and occupied by our ancestors (See attached map). We further expect the U.S. government to treat as eligible for its National Register of Historic Places and as a significant cultural place any location, landscape, water body, or other area that we identify as culturally significant to our tribe, and consider it accordingly under its environmental, historic preservation, and religious freedom laws."*

And then focus your efforts on getting agencies to respect this policy, rather than on documenting your cultural places in ways that non-indigenous specialists – be they landscape architects, mainstream historians, archaeologists or U.S. government officials – want you to.

Not to put too fine a point on it – are you sovereigns, or are you not?

We quote King here, not to be provocative for the sake of it, but because he directly addresses questions many of us expressed during the course of our project. How, within the existing constraints of authority (which rests entirely within BLMs statutory purview and regulatory discretion) can we recognize, preserve and protect Ute heritage resources that they themselves deem important? (Not to mention growing numbers of archaeologists, anthropologists and ordinary citizens, who also think they are important: as will be discussed later.)

We recognize that King's point of view cuts to the quick, so to speak. But even from a place more comfortably within the status quo framework surrounding CRM, other stakeholders and practitioners are pushing for inclusions of more permeable perspectives regarding landscape-scale cultural and heritage resources.

In recent years a multitude of books, papers and conferences have emerged around issues concerning cultural and heritage landscapes, and the often intangible cultural values that inhabit them. The scope of this work is global, and includes perspectives from heritage resource stakeholders on all scales: community-level citizen groups, non-governmental organizations, and governmental agencies.

BLM_0061285

*"There are really three factors. The legal, the ecological and the spiritual. They are all aspects of the same thing. When you talk about cultural resources it's not just the legal."*

— Clifford Duncan (2007)

David Harmon (2004), writing in the journal published by the George Wright Society (GWS) — an inter-disciplinary, cross-cultural research and education organization dedicated to the protection, preservation, and management of cultural and natural parks and reserves — summarized his views regarding *Intangible Values of Protected Areas: What Are They? Why Do They Matter?*

What are these values? The (World Commission on Protected Areas) task force has classified eleven major kinds, all of which spring from particular qualities of protected areas (list adapted from Putney 2003):

1. Recreational values, those qualities that interact with humans to restore, refresh, or create anew through stimulation and exercise of the mind, body, and soul (i.e., recreation).

2. Therapeutic values, those that create the potential for healing, and for enhancing physical and psychological well-being.

3. Spiritual values, those that inspire humans to relate with reverence to the sacredness of nature.

4. Cultural values, those that are ascribed to natural, cultural, and mixed sites by different social groups, traditions, beliefs, or value systems. These values, whether positive or negative, fulfill humankind's need to understand, and connect in meaningful ways, to the environment of its origin and the rest of nature.

5. Identity values, those that link people to their landscape through myth, legend, or history.

6. Existence values, those that embody the satisfaction, symbolic importance, and even willingness to pay, derived from knowing that outstanding natural and cultural landscapes have been protected so that they exist as physical and conceptual spaces where forms of life and culture are valued.

7. Artistic values, those that inspire human imagination in creative expression.

8. Aesthetic values, those that carry an appreciation of the beauty found in nature.

9. Educational values, those that enlighten the careful observer with respect to humanity's relationships with the natural environment, and by

BLM_0061286

extension, humanity's relationships with one another, thereby creating respect and understanding.

10. Scientific research and monitoring values, those that contribute to the function of natural areas as refuges, benchmarks, and baselines that provide scientists and interested individuals with relatively natural sites less influenced by human-induced change or conversion.

11. Peace values, those that contribute to the function of protected areas as a means of fostering regional peace and stability through cooperative management across international land or sea boundaries (transboundary protected areas), as "intercultural spaces" for the development of understanding between distinct cultures, or as places of "civic engagement" where difficult moral and political questions can be constructively addressed.

Lisa Prosper (2007), in another essay in the GWS journal wrote:

There are several reasons that can help to explain the cultural sector's emphasis on materiality in its approach to cultural landscapes as a form of heritage:

- First, the field of heritage conservation has traditionally been informed by a European preoccupation with artifacts, architecture, and ruins (Cleere 2001, Harvey 2001, Hardy 1988);

- Second, the problematic wedge often driven between "natural" and "cultural" in heritage conservation supports a conceptual paradigm that equates cultural heritage with tangible cultural artifacts or relics such as buildings and monuments, and equates natural heritage with their absence.

- Third, according to Carl Sauer's original definition of the term, a "cultural landscape" is "the material expression of the (seemingly unified) cultural group who live in [a specific] region" (Cresswell 2003). Sauer privileges vision

*"Any landscape is composed not only of what lies before our eyes but what lies within our heads"*

— (Meinig 1979, in Eugster 2003:50)



**Figure 28:** Cultural resources hold many kinds of intangible values: emotional, aesthetic, psychological, artistic, religious and spiritual.

BLM_0061287

and visible forms as the primary way of identifying and studying cultural landscapes.

- Fourth, according to English and Lee (2003), Western scientific approaches to protected area management are often based on the notion that "if we can understand the physical properties and relationships of natural resources, we can manage them sustainably. The assumption lying behind this approach is that the values of these resources lie purely in their physical nature.

Charles W. Smythe, in his (2009) *The National Register Framework for Protecting Cultural Heritage Places*, looks at these issues from the view point of the National Register of Historic Places criteria (Smythe 2009:16-22):

...These TCP (Traditional Cultural Property) guidelines were developed in response to narrow interpretations of the NHPA (National Historic Preservation Act) by federal and state agencies, which put a primary emphasis on the "built" environment and did not adequately meet the need for documenting and considering the cultural significance of places in planning documents and administrative manuals. The need to prepare the guidelines was first articulated in a 1983 Department of the Interior (DOI) report entitled *Cultural Conservation*, which in turn was developed in response to 1980 amendments to the NHPA directing the DOI to study and recommend ways to "preserve, conserve and encourage the continuation of the diverse traditional prehistoric, historic, ethnic and folk cultural traditions that underlie and are a living expression of our American heritage" (Parker and King 1990:2, also see King 2003:21–44). The guidelines did not focus on the preservation of intangible cultural customs and traditions themselves, but instead situated the process within the framework of the National Register as the preservation of tangible cultural properties that have historical and ongoing significance to living communities, as evidenced in their traditional cultural practices, values, beliefs, and identity. In this way, a more inclusive and localized procedure to protect the diverse cultural resources of the country, extending beyond the nationally significant Euroamerican historic structures and landscapes that had been the focus of the National Register, was integrated into the process.

BLM_0061288

The guidelines describe a type of cultural significance for which properties may be eligible for inclusion in the National Register. A property with traditional cultural significance will be found eligible for the National Register because it is associated with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuity of the cultural identity of the community. This type of significance is grounded in the cultural patterns of thought and behavior of a living community, and refers specifically to the association between their cultural traditions and a historic property.

Bulletin 38 utilizes an abbreviated definition of culture as "the traditions, beliefs, practices, lifeways, arts, crafts and social institutions of any community." Although readers are cautioned that this is a "shorthand" definition, and are referred to a more in-depth definition provided in Appendix I, the bulletin unintentionally and through continued use gives the impression that culture can be equated to a list of traits (customs, practices, beliefs, etc.).



**Figure 29:** Cultural resources cannot be defined by simplistic polemics of "cultural" vs. "natural" characteristics.

Culture is more than this, however. As presented in Appendix I, "Culture [is] a system of behavior, values, ideologies, and social arrangements. These features, in addition to tools and expressive elements such as graphic arts, help humans interpret their universe as well as deal with features of their environments, natural and social. Culture is learned, transmitted in a social context, and modifiable."

This more complex definition is important to understand and apply in relation to TCPs, since the people themselves, the community members, determine the cultural significance of the property in their own terms; they are the "definers" of significance. Furthermore, their expert knowledge about the site is the reason they are, by definition, consulting parties in relation to the identification and consideration of potential effects on the property. To identify whether a property may have traditional cultural significance, the agency will

BLM_0061289

most likely need to conduct a detailed field study. A cultural anthropologist or other specialist with expertise in conducting ethnographic and ethnohistorical research, and preferably with knowledge of and experience with the cultural community or ethnic group for which the property is significant, would in most cases be the best qualified expert to carry out documentation research for TCPs.

Traditional cultural significance is simultaneously historical and contemporary, and continuing significance is critical, *whether or not the place has gone unused for a period of time* (emphasis added). Bulletin 38 provides additional guidance on the meaning of the term: "'Traditional' in this context refers to those beliefs, customs, and practices of a living community of people that have been passed down through the generations, usually orally or through practice. The traditional cultural significance of a historic property, then, is significance derived from the role the property plays in the community's historically rooted beliefs, customs and practices."

...Another topic that has arisen is the nature of "boundary" around sacred spaces. In order to be identified and listed in the National Register, a property has to have a specified boundary. This has posed difficulties for Indian tribes, in particular, for which boundary lines around domains of thought and behavior, particularly with regard to spiritual matters (sacred sites), are not defined in Euroamerican terms.

...As groups such as Indian tribes seek the protections afforded through the National Register, the issue of making public what they regard as culturally privileged knowledge is a crucial one. Quite often the religious and spiritual practices of a tribe are maintained through the activities of specialists who hold, sustain, and preserve extensive and specialized information about the tribe's religious practices and beliefs. Document-ation of such cultural domains requires the release of confidential and culturally sensitive information to outsiders, and also might mean that the information is subject to the Freedom of Information Act. While there are certain protections available to the National Register, this topic continues to be a concern to tribal groups.

...In considering which (National Registeria) criteria may apply to a TCP, it is crucial to interpret them from the cultural perspective and point of view of the group to which the property may have

BLM_0061290

traditional cultural significance. That is, the phrases "our history" and "our past" must be understood to refer to the group's own view of themselves, their history, and their culture, which provides the context within which the traditional cultural significance will be evaluated. Bulletin 38 provides additional discussion of each of these criteria.

We note particularly Smythe's comment that continuing significance is critical even if a "place has gone unused for a period of time." In other words, the critical factor of continuity in cultural significance is not whether a traditional community has visited an area for traditional culture practices (within some wholly non-specific time frame), but that their traditional cultural practices have continuously relied on such traditional cultural values that may be inherent in a place. This is especially relevant for the White River and Uncompahgre Utes who were completely disenfranchised from their ancestral homelands in Colorado when they were removed to reservation lands in Utah some some three or four generations ago. The trauma experienced by the Utes in those events persists to the present day, and it has, in fact, been the chief reason the original Colorado Utes have not returned to their ancestral homelands more frequently and in greater numbers.



**Figure 30:** The White River Utes returned to Meeker, Colorado in July 2009 for the first Smoking River Pow Wow. Events at the White River Indian Agency in 1879 led to the forced removal of the Northern Utes from their ancestral homelands to reservation lands in Utah. Many of the Utes attending the pow wow in Meeker had never been to Colorado before.

Loya Arrum, a Ute Elder and educator, spoke quite directly to this issue in July 2008 on the occasion of her return to Meeker, Colorado with other White River Utes for the first Smoking River Pow Wow, seen by many observers as a move toward reconciliation and healing of old wounds:

> "Well, our people said don't tell, don't talk about this (removal of White River Utes). It was such a horrendous, had such a horrendous effect, physically, psychologically, on them. We're still in that psychological trauma today. When I fear to drive off and come over into this valley, I have great fear of it. Although we knew our ancestors loved this land. And when they were taken out by gunpoint by the military they cried, out of this

*Perspectives on Ute Ethnohistory in West Central Colorado*   45

valley. They walked out crying. So that's what I feel when I come over here. I feel that loss and that hurt.

But, myself, I want to tell what happened here, and that, I guess, would mean that I have to come back here. And I'll do it for the children. And I guess we need to have a healing from this, and having a pow wow is not really a healing. It just says we're here. We're dancing." (Arum 2009)

Clifford Duncan, speaking at that same event, said:

**Figure 31:** This brush fence in northwestern Colorado, one example of many such features known to exist, has typically been identified as historic "Euroamerican" by field archaeologists, even though researchers working in other locations have shown evidence of aboriginal origin of similar features (Baily 2004, 2005a, 2005b; Keyser and Poetschat 2008; Loosle, 2007; Martin and Ott 2007).

"For hundreds of years our people

that's why we find it's always a good feeling to come back home, to our homeland. So I want to say this to my ancestors. 'I did not forget you. We did not forget you. We returned. We're back here. Now, we're here.'"

These issues strike deep chords. The statements by Clifford and Loya certainly apply not just to the White River homelands but to all the Colorado Ute territories, including the lands within the project area. While the CRM issues involved are complex (King 2009), the importance and the authenticity of the Utes' connection to their ancestral lands seems clear.

As noted previously, Section 106 processes in the past have been largely dependent on archaeological information. Unfortunately, the general lack of baseline data for Ute archaeology, also discussed previously, is likely to have negatively impacted recognition and recording of some types of Ute archaeological sites in the project area.

For example, most "isolated finds" and "open lithic" or "lithic scatter" sites are routinely discounted by archaeologists, agency staff, and Utes alike. But in view of the weak baseline data for Ute archaeology, a question is raised: how many, if any, isolated

BLM_0061292

finds and "non-diagnostic" sites might in fact be of Ute origin? Many Ute sites contain only sparse material assemblages (Baker et al., 2007) and any wickiups which may have at one time been present may have disappeared from natural deterioration (Simms et al., 2006), leaving scant surface evidence of the site's original character. However, as more wickiup sites and other Ute sites are recorded and tested in the future, and baseline knowledge of Ute archaeology grows, such "ineligible" and "of no concern" sites, on reexamination and testing, may possibly yield significant archaeological information on both historic and prehistoric Ute culture.

Another potential gap in the Ute archaeological record relates to possible misattribution of brush fences and "horse trap" corrals, which have been found in the project area and surrounding regions (Figure 31). In Colorado, seemingly in contrast to Utah and Wyoming, these types of sites have routinely been characterized as "Euroamerican historic features." However, evidence exists in the literature that these historic wooden structures may, in fact, be of Ute origin, at least in some cases (Baily 2004, 2005a, 2005b; Keyser and Poetschat 2008; Loosle, 2007; Martin and Ott 2007). Future consultation with the Utes, as well as additional archaeological work, will be needed to evaluate and possibly confirm the cultural origin of such wooden structures in the project area. Such structures, if they do prove to be Ute, could add significantly to our understanding of Ute horse culture and its spread northward from New Mexico during early contact years.

## OVERVIEW OF UTE ETHNOHISTORICAL THEMES RELEVANT TO THE PROJECT AREA

The "only Indigenous people to reside within the state from prehistory into their Late Contact phase" were the Utes (Baker et al. 2007:31) and they play a central role in the culture history of northwestern Colorado.

The Utes, or "Nuuciyu" (Goss 1999:79), are a "culturally self-identifying group" (Lewis 1994:22) of people affiliated by shared language, lifeways, and history.  The Ute language, a member of the Numic branch of the Uto-Aztecan language family, is "affiliated most closely with the Southern Paiute in the Colorado River drainage to the west, less closely with the Comanche and Northern Shoshone in the Plains and Plains-Plateau to the east and north respectively, and least closely to the Northern Paiute in the Great Basin area of western Nevada and Oregon" (Jorgensen

BLM_0061293

1965:9). Although there is disagreement regarding the earliest prehistory of Numic speakers, it is generally agreed that during the last thousand years they expanded from the southwest Great Basin to reach their historically known territory in Utah and western Colorado (Madsen and Rhode 1994). Brown ware ceramics and increasing numbers of Desert Side-notched and Cottonwood Triangular projectile points began to appear in the archaeological record of eastern Utah and western Colorado at approximately AD1100 (Reed 1994:196), and they may represent the earliest known prehistoric markers of Numic-speaking people in western Colorado. Nevertheless, archaeological evidence definitively establishing a prehistoric Ute presence in western Colorado has yet to be widely accepted.

David Rich Lewis (1994:30, 191), drawing on the work of fellow anthropologists Smith, Steward, Stewart, Jorgensen and others, summarizes Ute social organization as it may have existed in the Early Contact phase as follows:

> Ute society centered around the extended bilateral family, and periodic congregation of related or affinal kindreds to form local residence groups of from twenty to one hundred persons. These groups frequently traced relations through the matriline and resided matrilocally, but membership was fluid and flexible enough to adjust to personal and local environmental realities. Local leaders were older men who, through persuasion, influence, and proven ability, achieved a level of consensus for their plans. Most groups recognized specialized leaders who directed specific activities (hunting, moving camp, dances, or raiding) and had little or no authority over the group in other matters.

> Larger "band" organization was limited to periodic congregations for defense, for spring Bear dances, or for summer hunting or fishing camps. Such summer congregations especially around Utah Lake, could number a thousand people. Bands consisted of local residence groups linked by bilateral kinship networks and their common territorial range — specific features usually reflected in their band name. Local groups and even extended family groups remained relatively autonomous, because most bands lacked formal political organization. Local leaders in band councils (which could include women) decided necessary matters subject to community approval. Dominant groups often provided the most influential leaders — leaders who ultimately came to the attention of white officials looking to negotiate with a single "chief." Ute bands recognized their larger group identity in custom,

BLM_0061294

language, and territory, and remained united through kinship, trade, and defense against common enemies, but there was no larger Ute "nation" with long-lasting political allegiances or tribal councils.

The identities and territorial ranges of Ute social groups have long been of interest to archaeologists, ethnohistorians and other parties with a stake in Ute history. The Utes were highly mobile in the historical period and the shifting synonymies and inconsistent spellings (Callaway et al. 1986:338, 364) used to describe their social groups in historical records reveal the complexity of this ethnohistorical theme. Literature on the theme reflects deeply divergent opinions spanning a range of conceptual, theoretical and practical issues. Goss (1999:77) goes so far as to raise the fundamental question of whether the very idea of "bands" as ascribed to the Utes and other "Numu People" is even usefully meaningful, or merely a "false model of reality" representing an artificial, ethnocentric construct. Nevertheless, practicing archaeologists and ethnohistorians faced with the task of evaluating sites and describing cultural histories continue, by default, to rely on commonly used "band" designations for Ute groups.

The regional setting of the project area is within the historic territories of the "Uncompahgre," "White River," and "Weenuche" Utes living today mostly on designated reservation lands in eastern Utah and southwestern Colorado (Figure 3). The Uncompahgre and White River appellations began to appear in documents in the 1860s (Baker et al, 2007:49) and were widely adopted after the U.S. government established agencies for the Utes on the Uncompahgre River south of Montrose in 1875 and on the White River near Meeker in 1868 (Burns 2004). The names persist today in the political structure of the Northern Utes (Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation 1937) and are widely used by contemporary Utes. The Weenuche (Weeminuche) were assigned to the Southern Ute Agency created in 1877 along with the Capote and Muache Bands. During the 1890s, the provisions of the General Allotment Act of 1887 were applied to the Southern Utes and the Weenuche were reassigned to an unalloted western portion of the Consolidated (Southern) Ute Reservation (Burns, 2004), now known as the Ute Mountain Ute Reservation. The Muache and Capote Bands elected to accept allotments in the eastern portion of the reservation, and that area is now known as the Southern Ute Reservation.

Ethnohistorical descriptions of the Indigenous people occupying central and northwestern Colorado prior to the 1860s

BLM_0061295

are sketchy, at best, and include shifting and inconsistent names for Ute subgroups (Jorgensen 1965; Callaway et al, 1986:338). The Uncompahgre and White River Bands were nineteenth century amalgamations of earlier Ute groups which had become increasingly mobile with the widespread adoption of equestrian lifeways during the Middle Contact period. During this time Eastern Utes expanded their territory "becoming important middlemen in the intertribal horse trade... [while clashing] more frequently with the Cheyenne, Arapaho, Lakota, and Comanche" (Lewis 1994:30-31).

The full geographic extent of Ute territory at its apex (Figure 3) is generally considered to have reached from western Utah to the eastern slope of the Rocky Mountains in Colorado, and from northern New Mexico to the northernmost reaches of western Colorado (Callaway et al, 1986:337; Jorgensen 1965). Recent investigations (Keyser and Poetschat 2008) cite evidence — rock art, wickiups and brush fences —suggesting that the Utes ranged as far northward as Wyoming's Upper Powder Springs Basin during the Late Contact phase. Jorgensen (1972) extends his ca. 1880 "Yamparka" Ute territory to the northern reaches of Colorado's Sand Wash Basin, and ascribes lands beyond to the Wind River Shoshone. Baker and his colleagues (2007) appear to concur with Jorgensen, but only for the earliest contact phase years (Figure 33), arguing that the "Sabuagana" Utes encountered by Dominguez and Escalante in 1776 represented the northern limit of core Ute territory at that time (Figure 34). They (Baker et al. 2007) further ascribe the area north of the Sabuaganas as Eastern Shoshone, during ca. AD1540-1600 (Figure 33), and Comanche during the late eighteenth century (Figure 34).

No less than twelve (perhaps as many as thirteen or more) distinct names — many with widely varying spellings and multiple synonyms — for Ute "bands" appear in commonly cited ethnohistorical records. In his study of the Northern Utes, Jorgensen (1965:17) goes so far as to claim that "perhaps 70 or more variously named Ute 'bands' were reported between about 1634 — when Euro-Americans first began recording the names and locations of Ute bands — until the post 1860s — when all Utes were corralled onto reservations in Utah and Colorado." Of primary interest for our purposes herein are the Ute groups that are likely to have occupied or frequented areas within the Colorado River drainage in the vicinity of Grand Mesa and Battlement Mesa, on the south, and the Roan Plateau, on the north. These have been variously identified as the Parianuche (Parusanuch), Grand River, Sabuagana, and Uncompahgre Bands. Figure 36 represents a relatively recent interpretation (Simmons



**Figure 32:** The Dominguez-Escalante Expedition circumnavigated a large portion of Ute territory in 1776.

2000:18) of the Ute ethnohistorical record showing the distribution of Ute bands, designated by commonly-used names, in the Early and Middle Contact phases. Another widely cited map (Callaway, 1986:337) is shown in Figure 35.

The earliest known records of European contact with Indigenous inhabitants in west-central Colorado are attributed to Juan Maria de Rivera, who explored parts of the region during two expeditions in 1765 (Sánchez 1997) reaching as far north as the Colorado River valley (Sánchez 1997; Vandenbusche and Smith 1981:16; Simmons 2005:35; Husband 1984:IV-12). In the

*Perspectives on Ute Ethnohistory in West Central Colorado* 51

BLM_0061297

following decade Fray Francisco Antanasio Dominguez and his junior partner Escalante traveled even farther north into Colorado, reaching the White River near the present town of Rangely in 1776, then west as far as central Utah (Figures 20 and 33).

The Dominguez-Escalante journal mentions various encounters with "Sabuagana Yutas" in the areas immediately north and south of the Colorado River near Grand Mesa and the Roan Plateau. The Uncompahgre Plateau, lying to the southwest, was referred to as "La Sierra de los Tabehuachis", apparently named in reference to the "Tabehuachi" Utes inhabiting that area (Chavez and Warner 1976). Baker (2005, 2007) contends that the Sabuaganas — first recorded by Rivera in 1765 — were the same group that later came to be called the "Uncompahgres," in reference to the Uncompahgre River, which the Utes called "Ancapagari" (Chavez and Warner 1976:29). He also presents a strong case for the view that the Uncompahgres, as they came to be known in the Late Contact Phase, were in fact an amalgamation of the earlier, and geographically distinct, Sabuagana and Tabeguache Bands (Baker 2005,2007).

Baker (2005) ascribes the home range of the Uncompahgre/ Sabuagana Band to "the north flank of the San Juan Mountains... (generally including) the area to the west of the Continental Divide in the headwaters of the Gunnison and Uncompahgre Rivers and south of the Colorado River... (and also including) the high Grand Mesa and the eastern portion of the Uncompahgre Plateau." The original home territory of the Tabeguache Band, in Baker's (2005) view, was to the west of the Uncompahgre Band, abutting the west side of the Uncompahgre Plateau, including the headwaters of the San Miguel and Dolores Rivers, and delimited on the west by the La Sal Mountains of Utah.

Utes groups inhabiting areas north of the Colorado River and west of the Continental Divide in the nineteenth century were variously described in historical records as the Parusanuch (Parianuche), Grand River, Yampa, and Uintah subgroups (Callaway et al. 1986:339; Baker 2005). The original core territory of the Uintahs is generally thought to have ranged from Utah Lake east through the Uinta Basin to the Tavaputs Plateau in the Green and Colorado River systems (Callaway et al. 1986:339), although some Uintahs may have affiliated with the White Rivers during the Late Contact agency years (Baker 2005), and Smith (1938) stated that "their hunting parties frequently followed the White River into Colorado." The Yampas, also known as the Yampatikas or Yamparikas, were the northernmost of the Eastern Ute bands, inhabiting areas north of the White River, ranging from the Yampa

BLM_0061298

River drainage into southern Wyoming on the Little Snake River, eastward into Colorado's Middle and North Parks, and westward into the Uintah Basin (Simmons 2000:20).

The "exact relationships of the Parusanuch and Grand Rivers are not well understood at all and the ethnohistories of these subgroups have not been well summarized anywhere" (Baker 2005:2.9). Simmons (2000:20-21) suggests that the Parasanuch (Parianuche, Parianuc, Pahdteeahnooch) — the "elk people" — were the same group identified in early records as the Sabuaganas, and were "later called the Grand River Utes... [whose] territory extended into eastern Utah and up the Colorado River (formerly called the Grand River) to their winter resort at Glenwood Springs, onto Grand Mesa and the Flattops, up the Roaring Fork... and into the mountains to the headwaters." The views of Simmons and Baker with regard to the Sabuaganas' eventual Late Contact phase affiliations are obviously at odds, and the discrepancy serves to illustrate the difficulty of reconciling discontinuous ethnohistorical records in the search for a seamless, fine-grained culture history of the Utes.

In the decades following the Dominguez-Escalante expedition, until the 1820s, there were few direct incursions into west-central and northwestern Colorado by Euro-American interests. The Early Contact lifeways of the Eastern Utes, however, was increasingly transformed by the acquisition of horses and trade items introduced by the Spanish (Baker et al. 2007; Simmons 2005; Lewis 1994), and by the 1820s the Eastern Utes were widely enjoying an equestrian lifeway. Jorgensen (1972) describes them as "fine horsemen with vast herds of horses" living "parts of the springs and summers in large encampments of 200 or more lodges." In his description of changes in Ute society sparked by the appearance of horses, Lewis (1994:30) notes their "accumulation of more material goods and ... an elaboration of Ute material culture", adoption of certain Plains cultural traits, expansion of their territory as "noted [horse] raiders", and their role as "important middlemen in the intertribal horse trade."

The Utes, however, were not the only Indigenous people in the region who were adopting equestrian lifeways during this period. The Eastern Shoshones, mounted on horses, occupied lands north of the Utes in western Colorado and appear in the regional ethnohistories of the Yampa and Green Rivers (Jorgensen 1972; Baker et al 2007). The Comanches held similar status on the east, along with other plains groups — namely the Cheyenne, Arapaho, and Lakota. The Shoshones and Comanches, even though they share language affinities with the Utes, have distinct

BLM_0061299



**Figure 33:** The general cultural landscape in Colorado and surrounding regions, ca. A.D. 1540-1600 (Baker et al. 2007:35).



**Figure 34:** Map showing the "distribution of Native American peoples in the late eighteenth century and end of regional protohistory" (Baker et al. 2007:47).

BLM_0061300



**Figure 35:** Early 19th century territory and modern town locations. Underlined band names are in approximate 18th century locations; those not underlined are pre-reservation (Callaway 1986:337).



**Figure 36:** Distribution of Ute Indian bands: 1. Pahvant, 2. Moanunt, 3. Sanpits, 4. Timpanogots, 5. Uintah, 6. Seuvarits, 7. Yampa, 8. Parianuche, 8a. Sabuagana, 9. Tabeguache, 10. Weenuche, 11. Capote, 12. Muache  (Simmons 2000:18).

*Perspectives on Ute Ethnohistory in West Central Colorado*  55

BLM_0061301



**Figure 37:** Distribution of Ute bands as surmised from (top) Dominguez and Escalante Expedition journal, route indicated by dotted line, and (above) interviews of Ute informants in 1938 (Stewart 1942).

BLM_0061302

ethnographic profiles, and their presence in northwestern Colorado is pointed to by both archaeological (Cole 1987) and ethnohistorical evidence (Hämäläinen 2008).

In northwestern Colorado, in historic periods, local ethnic groups appear to have shifted repeatedly in the Yampa and White River drainages. As shown in Figure 34, the northern boundary of Ute occupation in west central Colorado late in the eighteenth century probably did not reach beyond the local northern extent of the Colorado River drainage (Baker et al. 2007:46-49). This supposition, based largely on the Dominguez and Escalante journal from 1776 (Chavez and Warner 1976), is supported to



1984) — to either Shoshone or Comanche groups.

In the early decades of the nineteenth century the fur trade rush (Figure 38) heralded the beginning of "revolutionary transformation" of Ute life (Husband 1984:IV-12). Trading posts and Euro-American trade goods became a part of the Ute landscape, and the American success in the Mexican War in 1848 marked the "beginning of the end for Ute sovereignty in the region" (Husband 1984:IV-12). In 1849, with the signing of the Calhoun Treaty by seven Ute bands, the Utes irretrievably entered the sweep of American political history and expansionist policies. Ute homelands in western Colorado were subsumed first by Utah Territory in 1851, then Colorado Territory in 1861, and finally by the State of Colorado in 1876. The treaty of 1849 was followed by a series of subsequent treaties, agreements and land cessions which constrained the Utes into ever smaller territories, and by the late 1870s the Eastern Utes were "among the last free roaming Native Americans in the United States" (Baker et al, 2007:74). Ute Reservation boundaries were repeatedly reduced during the period, as increasing numbers of Americans flooded into Colorado. Finally, in 1881, the White River and Uncompahgre Utes were forcibly removed to reservation lands in eastern Utah (Figure 39).

Ute history and ethnohistory for the Late Contact period have been enhanced in recent years by historical archaeological evidence from throughout western Colorado. The Colorado Wickiup Project (O'Neil et al. 2004; Martin and Conner 2007; Martin et al. 2005a, 2005b, 2006, 2007a, 2007b, 2010; Martin and Ott 2007a, 2007b, 2009) has documented nearly fifty aboriginal

BLM_0061303

wooden feature sites in central and northwestern Colorado which are reliably dated to as late as 1915 (Figure 40). Despite the official "removal" of the Utes from their traditional northern Colorado homelands, they clearly continued to exert a presence in western Colorado well into the twentieth century. Some northern Utes may have remained in western Colorado (Stewart,



**FUR TRAPPING TRAILS**

—·—·— Provost
—·—·— Trapper Routes into Southern Rockies
—x—x— Peg Leg Smith
•••••• Old Spanish Trail
—I—I— California Trade Routes

**Figure 38:** Many fur trappers trails in western Colorado followed historic Ute trails (O'Rourke 1980).

BLM_0061304



**Figure 39:** Progressive reductions in Ute territory occurred during the nineteenth century reservation period, resulting in the present Ute reservations (Wroth, 2000:2).

*Perspectives on Ute Ethnohistory in West Central Colorado*   59

BLM_0061305

BLM_0061306

unpublished comments at the Symposium of the Archaeology of the Eastern Ute, Grand Junction, Colorado, 1988), off-reservation, after the 1881 expulsion. Utes are known to have been counted in the census records of various communities in the area (for example Collbran, Colorado) as late as the 1920s.  Historical newspaper accounts describe almost annual Ute hunting forays into many areas of northwestern Colorado from 1881 to as late as 1909 (Martin et al., 2009).

The quality of baseline historical Ute archaeological data has begun to somewhat improve in recent years.  The Colorado Wickiup Project (O'Neil et al. 2004; Martin and Conner 2007; Martin et al. 2005a, 2005b, 2006, 2007a, 2007b, 2010; Martin and Ott 2007a, 2007b, 2009) has documented nearly fifty aboriginal wooden feature sites in central and northwestern Colorado — including sites located in the Yellow Creek and the Douglas Creek drainages  which are reliably dated to as late as 1915 (Figure 40). Despite the official "removal" of the Utes from their traditional northern Colorado homelands in 1881, they clearly continued to exert a historical presence in western Colorado well into the twentieth century. Some northern Utes may have remained off-reservation in western Colorado after 1881 and Utes are known to have been counted in the census records of various communities in the area (for example Collbran, Colorado) as late as the 1920s (Martin et al. 2006:8; Martin and Ott 2009:92).   Historical newspaper accounts describe almost annual Ute hunting forays into areas of northwestern Colorado from 1881 to as late as 1909 (Table 2). The Utes, of course, continue to hold deep emotional and spiritual connections to their ancestral homelands in Colorado (Green, 2009).

**Table 2 (below and following):**  Examples of post-1881 historical newspaper reports of Ute activities in western Colorado (Colorado Historical Newspaper Collection).

| Year | Description | Historical Source | Source Date |
|------|-------------|-------------------|-------------|
| 1881 | Utes encamped "about 20 miles below the post" (Meeker Cantonment) | Fort Collins Courier | 31 March, 1881 |
| 1883 | Utes, lead by Colorow, continue to camp "on the White River and its tributaries" and declare "they will not live on the reservation." White settlers petition Sec. of Interior to keep military in Meeker. | Montezuma Millrun | 12 May, 1883 |

BLM_0061307

| Year | Description | Historical Source | Source Date |
|---|---|---|---|
| 1893 | Utes hunting in Blue Mountain region and on the head of Snake River. | Aspen Weekly Times | 11 November, 1893 |
| 1894 | 300 Ute deer hunters, reportedly "scattered over winter feeding grounds about forty miles east of Rangely." | The New Castle News | 15 December, 1894 |
| 1896 | Over 400 Northern Utes "in the White River country slaughtering deer and elk and defying county authorities." Governor threatens to send troops. | The Aspen Tribune | 29 October, 1896 |
| 1896 | Game wardens deter Utes from annual hunt. Utes were "found camped on water holes where wood, water and grazing were abundant." Game wardens visited water holes on Douglas, Yellow, Piceance, Box Elder and Willow Creeks,  Three Springs on Blue Mountains, and other points on the Lower White River and the Blue Mountain country. | The Steamboat Pilot | 25 November, 1896 |
| 1897 | Utes killing game in Rio Blanco County. | The Steamboat Pilot | 18 August, 1897 |
| 1897 | "Great numbers" of Utes in White River and Bear (Yampa) River country for "annual hunt." Utes killed in gunfight with game wardens "seven miles below Maybell." | The Steamboat Pilot | 27 October, 1897 |
| 1897 | 80 Utes hunting deer in Lily Park, west of Maybell on the Bear (Yampa) River. Eight Utes killed by game wardens in gunfight. | The New Castle News | 5 November, 1897 |
| 1889 | Utes seen at the head of Elk Creek, reportedly traveling to the "old hunting ground up near the head of White River." | San Luis Valley Courier | 14 August, 1899 |
| 1899 | 300 Utes hunting deer on Yellow Creek "since the latter part of October." Estimated 2000 deer killed. | Aspen Weekly Times | 25 November, 1899 |
| 1899 | 150 Utes encamped on Yellow Creek | The Steamboat Pilot | 15 November, 1899 |

BLM_0061308

| Year | Description | Historical Source | Source Date |
|------|-------------|-------------------|-------------|
| 1900 | "Great numbers" of Utes making "usual fall raid on the game of Rio Blanco County." | The Steamboat Pilot | 24 October, 1900 |
| 1900 | "A large number of Utes passed Rangely... headed for Spring Creek and Yellow Creek... believed to be killing deer in that section... Two large bands encamped in Coyote Basin." | (Boise City) Idaho Daily Statesman | 30 November, 1900 |
| 1907 | 79 Utes, in four parties , one led by Atchee and one by Johnny P.R., hunting in head of Douglas Creek and Cathedral Spires section. Game wardens order them back to Utah. 20 game wardens authorized to patrol White River country, including Douglas Creek and Blue Mountain. | The Yampa Leader | 9 October, 1907 |
| 1909 | 100 Utes, divided into four bands led by Shavano, Atchee, McCook and Monk, camped in the "vicinity of Douglas Creek" for "annual hunt." Game warden persuades them to return to Ft. Duchesne . | The Routt County Sentinel | 26 November, 1909 |

BLM_0061309

## SUMMARY OF KNOWN UTE SITES AND HERITAGE AREAS IN THE PROJECT AREA

Data on known Ute sites and heritage areas in each of the field offices were prepared by BLM cultural resources staff and shared with participating Ute representatives during the course of the project. BLM archeologists in each field office directed searches in SHPO and BLMFO databases for their respective areas. Sites were selected based on confirmed or suspected Ute cultural affiliation, site type, impact risk assessment, and other management concerns. Information was prepared for presentation to Ute participants at field office planning meetings and for reference during field visits, including maps, site forms, photographs and other data on sites and cultural landscapes thought to be of Ute cultural affiliation and significance.

Within the project area a total of 372 recorded archaeological sites believed to be culturally affiliated with the Utes were initially identified. A generalized map of these resources is presented in Figure 4, above. Work is continuing in each field office on refining and clarifying these data, and improving methods for sharing and analyzing shared information. Regular on-going consultation with the Utes, for both research and compliance-driven projects, will be necessary to fully develop baseline datasets that allow for integration of archaeological, ethnographic and ethnohistorical information in a form that is equally meaningful to the Utes and Agency cultural staff and managers.

### Site types

In general terms, site types identified by Ute representatives as having important cultural heritage values include:



*"The Utes consider the air, the water, the view, all those things, the whole environment, as cultural resources."*

— Betsy Chapoose (2007)

BLM_0061310



This list has not been formalized in any sense, and is synthesized here only to indicate the range of site types that represent potentially important Ute heritage resources.

Throughout the project, Ute participants consistently stressed the importance of looking beyond narrowly defined "site boundaries" determined by a purely material or artifactual (archaeological) view of cultural resources. As Betsy Chapoose succinctly expressed it at the project's general planning meeting, "The Utes consider the air, the water, the view, all those things, the whole environment, as cultural resources." Similar landscape-scale perspectives were reiterated by Ute participants throughout the course of the project.

During several meetings and field trips, Clifford Duncan spoke at some length of the Utes' religious and spiritual connections to places and sites. Such "feelings of place" are recognized within the frameworks of NEPA and NHPA (Koyiyumptewa and Colwell-Chanthaphonh, in press) as important qualities for identifying and evaluating "traditional cultural properties" (TCPs).  Designation of areas as TCPs, however, carries the risk of increasing public pressure on areas. BLM has previously utilized ACEC designations to protect senstive heritage areas, and project participants indicated general  agreement in recommending this approach going forward. Discussions of how to integrate Ute traditional religious and spiritual concerns with agency processes in a more meaningful way are continuing.

## SUMMARY AND RECOMMENDATIONS

The quality of Late Historic Ute archaeological data and ethnohistorical documentation within the project area has significantly improved in recent years. Moreover, based on recent reports from investigators leading currently active, long-term research projects within the region, it is likely that baseline contexts for Ute historical archaeology and ethnohistory will continue to improve as new sites are recorded, new synthetic studies are written, new interdisciplinary research projects are conducted, and more tribal consultation process improvements are adopted (personal communication, October 2010: Carl Conner, Curtis Martin, Clifford Duncan, Betsy Chapoose, Terry Knight).

BLM_0061311

Ute ethnohistorical perspectives are likely to be increasingly important in future research designs for historical archaeology; and analysis and evaluation of the full range of Ute archaeological sites and ethnographic landscapes for CRM purposes are likely to increase. Nevertheless, Ute perspectives on sacred and ethnographic landscapes have yet to be fully and practically integrated into cultural resource management frameworks.

In some important respects, baseline contexts for Ute historic archaeology and ethnohistory have improved beyond the design capacities of data models currently used by BLM and OAHP. Much of the new data now available to researchers and cultural resource mangers have yet to be synthesized, and archaeological data continue to flow into CRM archives and out of easy reach of future researchers.

During the course of the project, as discussed above, a broad range of Ute issues and concerns that impact on BLM's planning and cultural resource management activities were examined. Key themes identified by participants are summarized below:

**Foundational principles of collaboration**

- Legal, social, scientific and religious points of view attach to cultural resources on public lands. Each of those perspectives must be considered, in good faith, in land management planning, policy and programs.

- The Utes' traditional and historical culture is based in nature and places deeply-held values on the still living landscapes that were home to their ancestors. Their spiritual and emotional connections to their Colorado homelands are still strong, and growing.

- Fragmented and compartmentalized archaeological data, such as that resulting from compliance projects, is not a sufficient baseline for evaluating Ute cultural heritage concerns on the public lands. Landscape-scale inventories which integrate ethnohistorical, ethnographic and archaeological information are needed, and these should be developed in on-going consultation and collaboration with the Utes.

- Partnership and collaboration requires information parity. Efficient flow of mutually meaningful information between tribal and agency cultural resources departments is critically important to all parties.

- Administrative protocols and communications must be consistent across agency and tribal domains for successful tribal consultation. All parties benefit from practical, efficient and mutually agreed upon administrative procedures.

BLM_0061312

## Application of new models

- Programs that include Ute young people interacting on the land together with Ute elders and families are of great benefit in preserving Ute culture. The BLM-USFS Ute Ethnobotany Project is a worthy beginning in this direction and other similar projects and activities should be explored. A project focusing on Ute trails, for example, might lead to new approaches to recreation and travel management within BLM districts as well as acquiring new archaeological data.

- New models and methods in many of the disciplines that contribute to our shared understanding of the Ute's cultural heritage should be appropriately tested and applied. Approaches that emphasize Ute perspectives, collaborative methods of study, and environmental or ecological perspectives offer both scientific and cultural heritage preservation benefits.

- Exclusive reliance on a "site approach" to cultural resource management cannot adequately address Ute cultural heritage concerns. Landscape-scale inventories and regional context studies are needed for meaningful and efficient cultural resource consultation.

## Consulting process improvements

- Consensus is needed on communication protocols among all parties. Differences in local office protocols and customs, within both the Ute and the BLM domains, need to be identified and resolved, perhaps with programmatic agreements. Practical and specific guidance is needed for phone, email and hard copy correspondence.

- The quality of shared information has significant impact on consultation outcomes. Site data, maps and other information, including descriptions of management concerns, need to be clear, relevant and presented with adequate context. Work should continue on development of GIS databases, and efforts made to coordinate and standardize database designs across field office boundaries. The Ute tribes should be consulted regarding information sharing protocols and standards as they develop, and the tribes should pursue development of their own GIS databases.

- Regular, face to face meetings between agency and tribal cultural program staff, conducted outside the normal course of Section 106 consultation activities, are important for furthering the underlying goals of this project. All parties should continue to seek additional funding and other partners to support future research and collaboration.

- Research field trips and site visits, like those conducted for this project, are valuable opportunities for deepening

BLM_0061313

working relationships and helping to broaden baseline knowledge of Ute heritage.

- New approaches to consultation should be considered. For example, field activities that include participation by both agency managers and tribal leaders, though difficult to arrange, might help to soften long-standing barriers that impede meaningful consultation and productive collaboration.

## Recommendations for future ethnohistorical research

The following recommendations for future research have good potential for helping to fill current gaps in ethnohistorical and historical archaeological databases for the project area and surrounding regions, and for more fully integrating indigenous perspectives into cultural resource management processes.

- BLM should proactively initiate large block surveys and landscape scales inventories to improve the quality and scope of the baseline knowledge of Ute cultural resources in the project area. High quality, horizontally integrated databases will help to significantly increase the efficiency of tribal consultation projects.

- More high-level synthesis is needed within and across the scientific disciplines and cultural domains that associate with Ute history, cultural resources, and traditional culture. BLM should proactively support more frequent and meaningful Ute consultation and collaboration within both compliance processes and research programs.

- Until such time that consultation with the Ute tribes results in systematic and mutually agreed upon guidelines for identifying and evaluating Ute cultural and heritage resources, BLM should consider all of the site types listed above (p. 64) as potentially significant Ute heritage concerns.

- For the appropriate protection of Ute religious and sacred places, BLM should continue to consider and apply all available resource management designations and allocations allowed under legislative and executive mandates — such as ACECs and other specially designated "heritage areas," for example.

- BLM should continue efforts begun in this project, and the on-going Ute Ethnobotany Project, to secure funding and participatory partners for collaborative Ute heritage research. Partner and for landscape-scale inventories and studies.

- BLM, in consultation with the Utes, should continue to develop place-based cultural research programs that actively engage and include Ute participants, including young people, families, and elders.

BLM_0061314

- BLM should continue its support for research projects and CRM programs that include active Native American participation.  On-going programs based on well-planned and regularly scheduled activities are likely to yield the most significant results. Recent ethnohistorical projects conducted in collaboration with the Ute Tribes have included the active participation of significant numbers of tribal members working in the field with BLM cultural resource staff, research archaeologists, and ethnohistorians. Many of the recent improvements in Ute historical archaeology and ethnohistorical databases for the study area have resulted directly from such efforts. Archaeologists and resource managers have gained new perspectives from tribal participants on a range of Ute archaeological sites — notably including aboriginal wooden features and rock art, both of which are arguably the cultural resources most at-risk from natural and human causes. In turn, Ute connections to their historic territories have strengthened, and their active collaboration and information sharing with archaeologists and resource managers have revealed new avenues for future research initiatives that are likely to continue producing positive and significant results.

- Previous Native American consultation efforts in the study area have been conducted in large part with members of the Northern Ute and Ute Mountain Ute Tribes. However, historical and ethnohistorical records, as well as several rock art sites in the project area and surrounding regions, suggest that other Numic-speakers, notably Eastern Shoshone and Comanche groups, were probably present in the area during several historic time frames. BLM's future Native American consultation activities should be extended to include participants from these tribes.

- Temporal and geographic gaps in Ute ethnographic and ethnohistorical databases should be addressed through funding and support of projects focused on compilation of understudied historical Ute records in government and private archives, including archival materials in the collection of the Ute Tribes that may be available for study. Syntheses of pre-1850 ethnohistorical information on Utes inhabiting locales north of the Colorado River within the study area are particularly lacking.  Related studies focusing on the movements and consolidations of Numic-speaking groups occupying the Little Snake, Yampa, and White River basins may be especially valuable.

- Efforts should be expanded to identify and record Native American trails and trail networks within the project area. Systematic study of such archaeological markers has the

BLM_0061315

potential to yield important insights into the distribution patterns of Ute archaeological sites, and could also extend basic knowledge of Ute spiritual beliefs and practices related to seasonal cycles of movement.

- New methods and conceptual frameworks for modeling cultural and cognitive landscapes using GIS-based spatial-statistical analysis techniques should be examined for potential applicability in the study area. For example, the preliminary conceptual model developed and tested by Diggs and Brunswig (2006a, 2006b) in Rocky Mountain National Park — using representations of  elevation, viewsheds of known sacred landmarks, local relief, north facing slopes, and nearness to known prehistoric and early historic trails — applies a weights of evidence technique to model patterns of distribution for sacred sites and individual feature types. Importantly, their methodology involves ethnographic consultation with Native Americans for identifying sacred landmarks and for establishing the spiritual or religious aspects of certain archaeological and natural features. A similar method, appropriately adapted, may be productive if applied to ethnographic landscapes in the study area.

- Similarly, new protocols and approaches proposed by Native American cultural resource managers and organizations should be examined for applicability. One such approach has been proposed by the Hualapai Tribe for its monitoring program in the Colorado River Corridor in Arizona. It offers a theoretical perspective as well as a pragmatic framework for recording resources of traditional value. Based on principles of Traditional Ecological Knowledge (TEK), the Hualapai program emphasizes a holistic approach to cultural resource management, and its indigenous cultural knowledge base integrates broad spectrum of environmental, biological, and geological factors with traditional cultural and spiritual values (Jackson-Kelly, 2007). This model appears to be a good fit with traditionally important Ute cultural values, and has the potential for addressing some of the systemic conceptual differences that have limited the practical integration of Ute perspectives into CRM processes in the project area. The Hualapai TEK model, however, was developed within the context of the Glen Canyon Adaptive Management Program,  and will need to be evaluated within the framework of BLM management programs.

BLM_0001316

- Several recently published studies (Bailey 2004, 2005a, 2005b; Loosle 2007; Keyser 2008) have presented evidence that historic brush fences and corrals found in association with wickiup sites in eastern Utah and southwestern Wyoming were constructed by Utes for managing the large herds of horses they were thought to have possessed in the Late Historic period. Similar animal control structures are known to exist in significant numbers throughout central and northwestern Colorado, including areas within the project area. A number of these Colorado sites contain associated wickiups, yet many, if not most, of the recorded brush fences and corrals have been identified in previous archaeological surveys as being of Euro-American origin. If in fact these wooden structures are of Ute origin, they contain potentially significant archaeological data that are likely to provide important new insights into equestrian Ute cultural practices.  Such sites in the project area should be thoroughly investigated.

BLM_0061317



**Figure 42:** Utes participants toured portions of the newly designated Dominguez-Escalante National Conservation Area and Dominguez Canyon Wilderness, located on the eastern flank of the Uncompahgre Plateau. Many Ute cultural resources and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮CA, and Ute consultation will be important for cultural resources planning for the area.

*"Nothing is real until it happens."*

— Clifford Duncan (2007)

BLM_0061318

# REFERENCES CITED

Arum, Loya
    2009    Interview in "The Utes," in "We Shall Remain: A Native History of Utah." DVD, produced by Nancy Green, published by KUED, University of Utah, Salt Lake City.

Axtell, James
    1979    Ethnohistory: An Historian's Viewpoint. *Ethnohistory*, Vol. 26, No. 1 (Winter, 1979), pp. 1-13. Duke University Press.

Bailey, Christina
    2004    Preston Nutter. Ashley National Forest, USFS. Electronic document, http://www.fs.fed.us/r4/ashley/heritage/histories/preston-nutter.pdf. Accessed 01/15/09.

    2005a    Ute Corrals. Ashley National Forest, USFS. Electronic document, http://www.fs.fed.us/r4/ashley/heritage/ethnography/ute-corrals.pdf. Accessed 01/15/09.

    2005b    Ute Horse. Ashley National Forest, USFS. Electronic document, http://www.fs.fed.us/r4/ashley/heritage/ethnography/ute-horse.pdf. Accessed 01/15/09.

Baker, Steven G.
    1988    Historic Ute Culture Change in West-Central Colorado. In *Archaeology of the Eastern Ute: A Symposium*, edited by Paul R. Nickens, pp. 157-189. CCPA Occasional Paper No. 1. Colorado Council of Professional Archaeologists, Denver.

    1991    The Uncompahgre Valley Historic Ute Project: First Interim Report and Executive Summary with Preliminary Excavation Reports on Chief Ouray's Homes at Montrose (5MN847) and Ouray (5OR965). Uncompahgre Valley Historic Ute Project, Report Series No.2. Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for the Colorado Historical Society, State Historical Fund, Denver, and the Montrose Youth and Community Foundation, Montrose, Colorado. Copies available from the Colorado Historical Society, State Historical Fund, Denver.

    1993    Modeling for Eastern Ute Culture Change. Paper presented at the 1st Biennial Rocky Mountain Anthropological Conference, Jackson, Wyoming.

    1995    Archaeological Disenfranchisement of the Colorado Utes. *Southwestern Lore* 61(3):1-9. Colorado Archaeological Society, Denver.

    1996    Numic Archaeology on the Douglas Creek Arch, Rio Blanco County, Colorado: Ute Rancherías and the Broken Blade Wickiup Hamlet (5RB3182). Chandler Douglas Creek Arch Report Series, No. 79. Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for Chandler and Associates, Denver. Copies available from the Bureau of Land Management, White River Field Office, Meeker, Colorado.

    2000a    State Historic Register Nomination for the Chief Ouray Mountain, House and Spring Waters (5OR965). Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for the Wiesbaden Motel and Spa, Ouray, Colorado. Copies available from the Colorado Historical Society, Office of Archaeology and Historic Preservation, Denver.

    2003a    Ethnohistorical Perspectives on the Tabeguache Band of O. Stewart's "Eastern Ute." Paper presented at the 6th Biennial Rocky Mountain Anthropological Conference, Estes Park, Colorado.

BLM_0061319

2003b    Historic Ute Archaeology: Interpreting the Last Hour Wickiup (5RB3236). *Southwestern Lore* 69(4):1-34.

2004    Utes, Other Utes, Horses and Guns: Ethnohistorical Perspectives on O. Stewart's Post-Contact "Eastern Ute." Paper presented at the Annual Meeting of the Colorado Council of Professional Archaeologists, Colorado Springs, Colorado.

2005    2002-2003 Old Agency Initiative of the Uncompahgre Valley Ute Project, Vol. II, Late Contact Phase Ute Ethnohistory and Archaeology in Association with the 2nd Los Pinos Indian Agency on the Uncompahgre (5OR139). Uncompahgre Valley Ute Project, Report No. 6. Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for the Colorado Historical Society, State Historical Fund, Denver, and the Montrose Youth and Community Foundation, Montrose, Colorado. Copies available from the Colorado Historical Society, Office of Archaeology and Historic Preservation, Denver.

Baker, Steven G., Richard F. Carrillo, and Carl D. Späth
2007    Chapter 2: Protohistoric and Historic Native Americans. In *Colorado History: A Context for Historical Archaeology*, Church, Minette C., Steven G. Baker, Bonnie J. Clark, Richard F. Carrillo, Honathon C. Horn, Carl D. Späth, David R. Guilfoyle, and E. Steve Cassells, Colorado Council of Professional Archaeologists, Denver.

Berkhofer, Robert F., Jr.
1978    *The White Man's Indian: Images of the American Indian from Columbus to the Present.* Alfred A. Knopf, New York.

Blackhawk, Ned
2006    *Violence Over the Land: Indians and Empires in the Early American West.* Harvard University press.

2007a    The Displacement of Violence: Ute Diplomacy and the Making of New Mexico's Eighteenth-Century Northern Borderlands, *Ethnohistory*, 54:723-755. American Society for Ethnohistory, Duke University Press.

2007b    Swiftly Moving Currents: American Indian History and the Changing Complexity of the Lewis and Clark Expedition. *Ethnohistory* 54:4, p. 583. American Society for Ethnohistory.

Bolton, Herbert E.
1950    Pageant in the Wilderness. *Utah Historical Quarterly*, Vol. XVIII, January, April, July, October, 1950, Numbers 1,2,3,4. Utah State Historical Society.

Brett, John A.
2003    Ethnographic Assessment and Documentation of Rocky Mountain National Park. Electronic document, www.nps.gov/history/history/online_books/romo/ethnography/brett.pdf, accessed March 12, 2009.

Buckles, William G., and Nancy B. Buckles
1984    *Colorado Historical Archaeology Context.* Colorado Historical Society, Denver

Buckles, William G.
1971    The Uncompahgre Complex: Historic Ute Archaeology and Prehistoric Archaeology on the Uncompahgre Plateau in West Central Colorado. Ph.D. dissertation, Department of Anthropology, University of Colorado. University Microfilms, Ann Arbor.

Buckles, William G.
1968    Archaeology in Colorado: Part III. Archaeology in Colorado: Historic Tribes. *Southwestern Lore* 34(3):53-67.

BLM_0061320

1971    The Uncompahgre Complex: Historic Ute Archaeology and Prehistoric Archaeology of the Uncompahgre Plateau in West Central Colorado. Unpublished Ph.D. dissertation, Department of Anthropology, University of Colorado, Boulder.

1988    Discussion. In *Archaeology of the Eastern Ute: A Symposium*, edited by Paul R. Nickens, pp. 218-232. CCPA Occasional Papers, No. 1. Colorado Council of Professional Archaeologists, Denver.

Bureau of Land Management and Sonoran Institute (BLM-SI)
2000    *A Desktop Reference Guide to Collaborative, Community-Based Planning.* Electronid document, http://www.nps.gov/partnerships/elec_pub.htm, accessed September 12, 2009.

Bureau of Land Management (BLM)
2009    Colorado Briefing Book. Bureau of Land Management Colorado State Office. Electronic document, http://www.blm.gov/pgdata/etc/medialib/blm/co/information/newsroom/ 2009.Par.71633.File.dat/Briefing Book 2009.pdf, accessed September 2009.

2007    Bureau of Land Management – Ute Ethnohistory Project. Scope of Work. Document on file at BLM Grand Junction Field Office.

Burns, Sam
2004    The Ute relationships to the lands of West Central Colorado: An ethnographic overview prepared for the U.S. Forest Service. Office of Community Services, Fort Lewis College, Durango, Colorado. Electronic document, http://swcenter.fortlewis.edu/inventory/ UteLands.htm, accessed January 6, 2009.

Callaway, Donald G., Joel C. Janetski, and Omer C. Stewart
1986    Ute. In Great Basin, edited by Warren L. D'Azevedo, pp. 336-367. *Handbook of North American Indians*, Vol. 11, William C. Sturtevant, general editor. Smithsonian Institution, Washington, D.C.

Campbell, Greg
2007    Traditional Plant Use Study: Bent's Old Fort National Historic Site and Sand Creek Massacre National Historic Site. Unpublished manuscript for the NPS National Historic Landmarks Program, Intermountain Region, and Rocky Mountain Cluster Parks.

Carter, Edward C.
1999    *Surveying the Record: North American Scientific Exploration to 1930.* American Philosophical Society, Philadelphia.

Chakrabarty, Gargi
2008    Mining claims soar on Colorado public lands. *Rocky Mountain News* 23 January. Electronic document, http://www.rockymountainnews.com/news/2008/jan/23/mining-claims-soar-on-colo-public-lands/, accessed August 18, 2009.

Chamberlain, Ralph V.
1909    Some Plant Names of the Ute Indians. *American Anthropologist* ll(I):27-40.

Chavez, Fray Angelico (translator), and Ted J. Warner (editor)
1976    *The Domínguez-Escalante Journal: Their Expedition Through Colorado, Utah, Arizona, and New Mexico in 1776.* Brigham Young University Press, Provo, Utah.

BLM_0061321

Chapoose, Betsy
    2007    Comments at Ute Ethnohistory Project General Planning Meeting in Gateway, Colorado, November 28, 2007. This volume, Appendix B.

    2004    In The Ute relationships to the lands of West Central Colorado: An ethnographic overview prepared for the U.S. Forest Service, by Sam Burns. Office of Community Services, Fort Lewis College, Durango, Colorado. Electronic document, http://swcenter.fortlewis.edu/inventory/UteLands.htm, accessed January 6, 2009.

Church, Minette C., Steven G. Baker, Bonnie J. Clark, Richard F. Carrillo, Honathon C. Horn, Carl D. Späth, David R. Guilfoyle, and E. Steve Cassells
    2007    *Colorado History: A Context for Historical Archaeology*, Colorado Council of Professional Archaeologists, Denver.

Clemmer, Richard O.
    1978    Pine Nuts, Cattle and the Ely Chain: Rip- Off Resource Replacement vs. Homeostatic Equilibrium. *Ballena Press Publications in Archaeology, Ethnology and History* No. 11:61-76.

Clemmer, Richard O., L. Daniel Myers, and Mary Elizabeth Rudden (eds.)
    1999    *Julian Steward & The Great Basin: The Making of an Anthropologist*. University of Utah Press.

Cole, Sally
    1990    *Legacy on Stone: Rock Art of the Colorado Plateau and Four Corners Region*. Johnson Books.

Colorado Historical Newspaper Collection
    n.d.    Online database, http://www.geocommunicator.gov/GeoComm/index.shtm. Accessed 1/15/09.

Colorado Preservation, Inc.
    2003    Endangered Places Program. Electronic document, http:/www.apple.com/www.coloradopreservation.org/epp/sites/epp_03_04.html. Accessed 01/15/09.

Conetah, Fred A.
    1982    *A History of the Northern Ute People*. Published by the Uintah-Ouray Ute Tribe. University of Utah Printing Service, Salt Lake City, Utah.

Cuch, Forrest S. (ed.)
    2003    *A History of Utah's American Indians*. Utah State Division of Indian Affairs, Utah State Division of History, Salt Lake City.

Denver Public Library (DPL)
    (n.d.)    Western History and Geneaology: Digital Image Collection. Online database, http://history.denverlibrary.org/images/index.html. Accessed variously October 2008 - February 2009.

Diggs, David M. and Robert H. Brunswig
    2006a    Modeling Native American Sacred Sites in Rocky Mountain National Park. From Proceedings of the Twenty-Sixth Annual ESRI International User Conference, San Diego, California, August 5-8, 2006.

    2006b    Weights of Evidence Modeling in Archeology, Rocky Mountain National Park. From Proceedings of the Twenty-Sixth Annual ESRI International User Conference, San Diego, California, August 5-8, 2006.

BLM_0061322

Duncan, Clifford
    2003a    The Northern Utes. In *A History of Utah's American Indians*. Forrest S. Cuch ed. Pp. 167-224. Utah State Division of Indian Affairs, Utah State Division of History, Salt Lake City.

    2003b    An Ethnographic Conversation held with Sam Burns, tape-recorded at Clifford's home near Roosevelt, Utah, November 6, 2003. In The Ute relationships to the lands of West Central Colorado: An ethnographic overview prepared for the U.S. Forest Service. Office of Community Services, Fort Lewis College, Durango, Colorado. Electronic document, http://swcenter.fortlewis.edu/inventory/UteLands.htm, accessed January 6, 2009.

    2007    Comments at Ute Ethnohistory Project General Planning Meeting in Gateway, Colorado, November 28, 2007. This volume, Appendix B.

    2009    Interview in "The Utes," in "We Shall Remain: A Native History of Utah." DVD, produced by Nancy Green, published by KUED, University of Utah, Salt Lake City.

    n.d.    Chapter Five - The Northern Utes of Utah. In Utah History to Go. State of Utah. Electronic document, http://historytogo.utah.gov/people/ethnic_cultures/the_history_of_utahs_american_indians/chapter5.html.

Eugster, J. Glenn
    2003    Evolution of the Heritage Areas Movement. *The George Wright FORUM*. Volume 20, Number 2. The George Wright Society, Hancock, Michigan.

Fowler, Catherine S., comp.
    1969    Great Basin Anthropology—a Bibliography. Reno; *University of Nevada Desert Research Institute Publications in the Social Sciences and Humanities* No. 5.

Fowler, Catherine S., and Joy Leland
    1967 Some Northern Paiute Native Categories. *Ethnology* 6(4);381-403.

Fowler, Don D.
    1980    History of Great Basin Anthropological Research, 1776-1979. In *Journal of California and Great Basin Anthropology*, Vol. 2, No. 1, pp. 8-36).

Fowler, Don D. and Catherine S. Fowler (eds.)
    1971    *Anthropology of the Numa: John Wesley Powell's Manuscrips on the Numic Peoples of Western North America 1868-1880*. Smithsonian Institution Press, Washington D.C.

Fowler, Don D., and John F. Matley
    1978    The Palmer Collection from Southwestern Utah, 1875. *University of Utah Anthropological Papers* No. 99 (Miscellaneous Paper No. 20).

    1979    Material Culture of the Numa: the John Wesley Powell Collection, 1867-1880. *Smithsonian Contributions to Anthropology* No. 26.

Francaviglia, Richard V.
    2005    *Mapping and Imagination in the Great Basin: A Cartographic History*. University of Nevada Press.

Goss, James A.
    1961    *A Short Dictionary of the Southern Ute Language*. Ignacio, Colorado; Southern Ute Tribe.

BLM_0061323

1968    Culture-Historical Inference from Utaztekan Linguistic Evidence. *Occasional Papers of the Idaho State University Museum* No. 22:1-42.

1972a   A Basin-Plateau Shoshonean Ecological Model. *University of Nevada Desert Research Institute Publications in the Social Sciences* No. 8:123-128, Reno, Nevada.

1972b   Ute Lexical and Phonological Patterns. Unpublished Ph.D. dissertation in anthropology. University of Chicago

1999   The Yamparika-Shoshones, Comanches, or Utes--or Does it Matter?  In *Julian Steward and the Great Basin: The Making of an Anthropologist*, edited by Richard O. Clemmer, L. Daniel Myers and Mary Elizabeth Rudden, pp. 74-84.  University of Utah Press, Salt Lake City.

2000    Traditional Cosmology, Ecology, and Language of the Ute Indians In *Ute Indian Arts and Culture*. William Wroth, ed. Colorado Springs: Taylor Museum of the Colorado Springs Fine Arts Center. pp. 27-52.

Green, Nancy (Producer)
2009    The Utes, in We Shall Remain: A Native History of Utah.  DVD published by KUED, University of Utah, Salt Lake City.

Harmon, David
2004    Intangible Values of Protected Areas: What Are They? Why Do They Matter? *The George Wright FORUM*. Volume 21, Number 2. The George Wright Society, Hancock, Michigan.

Heizer, Robert F., ed.
1954    Notes on the Utah Utes by Edward Palmer, 1866-1877. *University of Utah Anthropological Papers* No. 17:1-8.

1962    Notes on the Utah Utes by Edward Palmer, 1866-1877. *Utah Archeology* 8(3);7-14.

Hillers, John K.
1873    Photograph I.D. BAE GN 01535 06690500 from the National Anthropological Archives, Smithsonian Museum Support Center, Suitland, Maryland. Electronic reproduction, http://sirismm.si.edu/naa/baegn/gn_01535.jpg, accessed August 2009.

Hittman, Michael
1973    Ghost Dances, Disillusionment and Opiate Addiction: an Ethnohistory of Smith and Mason Valley Paiutes. Unpublished Ph.D. dissertation in anthropology. University of New Mexico, Albuquerque.

Horn, Jonathon C.
1988    EuroAmerican Goods in the Material Culture of the Ute Prior to 1882. In *Archaeology of the Eastern Ute: A Symposium*, edited by Paul R. Nickens, pp. 54-61. CCPA Occasional Paper No. 1. Colorado Council of Professional Archaeologists, Denver.

1999    Ute Material Culture during the Historic Period as Represented by Sites in the Montrose Area.  Paper presented at the Colorado Council of Professional Archaeologists Annual Meeting, 1999. Electronic document, http://www.alpinearchaeology.com/Horn1999_UteMaterialCulture.pdf.

Houghton, Ruth M.
1973    Adaptive Strategies in an American Indian Reservation Community; the War on Poverty, 1965-1971. Unpublished Ph.D. dissertation. University of Oregon, Eugene.

BLM_0061324

Humboldt, Alexander von
1809    Carte Generale Du Royaume De La Nouvelle Espagne. F. Schoell Paris. Electronic document, David Rumsey Collection, Pub List No. 0328.000, http://www.davidrumsey.com, accessed April 12, 2002.

1811    Carte du Mexique et des Pays Limitropher Situres ou Nort et E'est. F. Schoell, Paris. Electronic document, University of Texas at Arlington Library, Accession: 00217, http://libraries.uta.edu/ccon/mapSearch.shtm, accessed April 12, 2002.

Husband, Michael B.
1984    *Colorado Plateau Country Historic Context*. Colorado Historical Society, Denver.

Huscher, Betty Holmes, and Harold A. Huscher
1939a   Unpublished Field Notes for 1939. Manuscripts on file, Colorado Museum of Natural History, Denver.

Jackson-Kelly, Loretta
2007    Traditional Hualapai Ecological Knowledge and the Monitoring Program for the Ecosystem in the Colorado River Corridor. Prepared for the Bureau of Reclamation Upper Colorado Regional Office, Salt Lake City, UT. Unpublished manuscript. Available at Hualapai Tribe, Department of Cultural Resources, Peach Springs, AZ.

Jennings, Calvin
1990    Review of Archaeology of the Eastern Ute, edited by Paul R. Nickens. CCPA Occasional Papers, No. 1. Colorado Council of Professional Archaeologists, Denver (1988). *American Antiquity* 55(4):861-862.

Jorgensen, Joseph G.
1959    The Functions of Ute Folklore. Unpublished M.A. thesis in anthropology. University of Utah, Salt Lake City.

1964    Ethnohistory and Acculturation of the Northern Ute. Unpublished Ph.D. dissertation in anthropology. Indiana University, Bloomington.

1972    *The Sun Dance Religion*. Power for the Powerless. Chicago; University of Chicago Press.

Keyser, James B.
1977    Writing-On-Stone: Rock Art on the Northwestern Plains. *Canadian Journal of Archaeology* no.1, pp.15-80.

1987    A Lexicon for Historic Plains Indian Rock Art: Increasing Interpretive Potential. *Plains Anthropologist* vol.32, no.115, pp.43-71.

Keyser, James B. and George Poetschat, eds.
2005    *Warrior Art of Wyoming's Green River Basin. Biographic Petroglyphs along the Seeskadee.* Oregon Archaeological Society Publication No.15.

2008    *Ute Horse Raiders on the Powder Rim: Rock Art at Powder Wash, Wyoming.* Oregon Archaeological Society Publication #19, Portland.

King, Thomas F. and Patricia L. Parker
1998    National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties. Originally published 1990, revised 1992, 1998. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

BLM_0061325

King, Thomas F.
 2000 *Federal Planning and Historic Places: The Section 106 Process.* AltaMira Press.

 2002 *Thinking About Cultural Resource Management: Essays from the Edge.* AltaMira Press.

 2003 *Places That Count, Traditional Cultural Properties in Cultural Resource Management.* AltaMira Press.

 2005 *Doing Archaeology: A Cultural Resource Management Perspective.* Left Coast Press.

 2007 *Saving Places that Matter: A Citizen's Guide to the National Historic Preservation Act.* Left Coast Press.

 2008a *Cultural Resource Laws and Practice.* AltaMira Press.

 2008b Tribal Sovereignty and the National Register of Historic Places. Electronic document, http://crmplus.blogspot.com/2008_09_01_archive.html, accessed February 7, 2009.

 2009 *Our Unprotected Heritage: Whitewashing the Destruction of our Cultural and Natural Environment.* Left Coast Press.

Knight, Terry G., Sr.
 2007 Comments at Ute Ethnohistory Project General Planning Meeting in Gateway, Colorado, November 28, 2007. This volume, Appendix B.

Koyiyumptewa, Stewart B., and Chip Colwell-Chanthaphonh
 In Press "The Past Is Now: Hopi Connections to Ancient Times and Places." In *Changing Histories, Landscapes, and Perspectives: The 20th Anniversary Southwest Symposium,* edited by Margaret C. Nelson and Colleen Strawhacker. University Press of Colorado, Boulder.

Kroeber, Alfred L.
 1901 Ute Tales. *Journal of American Folklore* 14(55);252-285.

 1908 Notes on the Ute Language. *American Anthropologist* 10(I);74-87.

Lang, Gottfried O.
 1953 A Study in Culture Contact and Cukure Change: the Whiterock Utes in Transition. *University of Utah Anthropological Papers* No. 15.

 1954 The Ute Development Program; a Study of Culture Change in an Underdeveloped Area Within the United States. Unpublished Ph.D. dissertation in anthropology, Cornell University, Ithaca.

Lewis, David Rich
 1994 *Neither Wolf Nor Dog,* Oxford University Press.

 2004 Chapter Eight: Native Americans in the Nineteenth-Century American West. In *A Companion to the American West* by William Deverell (Ed.). Wiley-Blackwell.

Library of Congress (LOC)
 2009 Rivers, Edens, Empires: Lewis & Clark and the Revealing of America. Electronic document, http://www.loc.gov/exhibits/lewisandclark/lewis-before.html, accessed September 11, 2009.

Loosle, Byron
 2003 So Delicious They Ate the Bark Off the Trees. Ashley National Forest Heritage Publication. Electronic document, http://www.fs.fed.us/r4/ashley/heritage/ethnography/so-delicious.pdf.

BLM_0061326

2007    South Unit Cultural History Overview. Ashley National Forest. Electronic document, http://www.fs.fed.us/r4/ashley/publications/, accessed 01/26/09.

Lynch, Robert N.
1971    Politics in a Northern Paiute Community. Unpublished Ph.D. dissertation in anthropology. University of Minnesota, Minneapolis.

1978    Cowboys and Indians: an Ethnohistorical Portrait of Indian-White Relations on Ranches in Western Nevada. *Ballena Press Publications in Archaeology, Ethnology and History* No. 11:51-60.

Madsen, David B. and David Rhode, (eds.)
1994    *Across the West: Human Population Movement and the Expansion of the Numa.* University of Utah Press, Salt Lake City.

Martin, Calvin (ed.)
1987    *The American Indian and the Problem of History.* Oxford University Press, New York.

Martin, Curtis and Carl E. Conner
2007    A Class III Aboriginal Feature Inventory of Two Parcels in the Black Ridge Area of the McInnis Canyons National Conservation Area in Mesa County, Colorado. Unpublished manuscript on file at the Bureau of Land Management Grand Junction Field Office.

Martin, Curtis, Carl E. Conner, and Nicole Darnell
2005a   The Colorado Wickiup Project Volume II: Gunnison Gulch Reconnaissance Survey in Mesa County, Colorado.  Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

Martin, Curtis, Michael J. Brown and Carl E. Conner
2010    The Colorado Wickiup Project Volume V: Test Excavation of The Ute Hunters' Camp (5RB563) and the Documentation of Five Additional Aboriginal Wooden Feature Sites in Rio Blanco County, Colorado.

Martin, Curtis and Richard Ott
2007a   Sand Wash Wickiup Survey Phase I: A Class III Cultural Resources Inventory in Moffat County, Colorado. Unpublished manuscript on file at the Bureau of Land Management Little Snake Field Office, Craig.

2007b   The Little Snake Wickiup Revisits Project, Moffat County, Colorado.  A series of unpublished site descriptions, Cultural Resource Reevaluation forms, and Aboriginal Wooden Features Component forms on file at the Bureau of Land Management Little Snake Field Office, Craig.

2009    The Colorado Wickiup Project Volume IV. Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

Martin, Curtis, Richard Ott, and Nicole Darnell
2005b   The Colorado Wickiup Project Volume I: Context, Data Assessment and Strategic Planning. Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

BLM_0061327

2006    The Colorado Wickiup Project Volume III: Recordation and Re-evaluation of Twelve Aboriginal Wooden Structure Sites in Eagle, Garfield, Mesa, and Rio Blanco Counties, Colorado.  Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

2007a   Sand Wash Wickiup Survey Phase I: A Class III Cultural Resources Inventory in Moffat County, Colorado. Unpublished manuscript on file at the Bureau of Land Management Little Snake Field Office, Craig.

2007b   The Little Snake Wickiup Revisits Project, Moffat County, Colorado.  A series of unpublished site descriptions, Cultural Resource Reevaluation forms, and Aboriginal Wooden Features Component forms on file at the Bureau of Land Management Little Snake Field Office, Craig.

McBeth, Sally
2007    Native American Oral History and Cultural Interpretation in Rocky Mountain National Park. Prepared for the: National Park Service Rocky Mountain National Park Intermountain Region Department of the Interior.

Meinig, D.W.
1979.   The beholding eye: Ten versions of the same scene. In The Interpretation of Ordinary Landscapes: Geographical Essays. D.W. Meinig and John Brinckerhoff Jackson, eds. New York: Oxford University Press.

Mithun, Marianne
1999    *The languages of Native North America*. Cambridge: Cambridge University Press.

Mordy, Brooke D.
1966    A Conflict Over Right of Residence [Washo], Unpublished M.A. thesis in Sociology and Anthropology, University of Nevada, Reno.

Murphy, Robert F.
1970    Basin Ethnography and Ecological Theory, In: *Languages and Cultures of Western North America, Essays in Honor of Sven S. Liljeblad*, E. H. Swanson, Jr., ed., pp. 152-171. Pocatello; Idaho State University Press

National Association of Tribal Historic Preservation Officers (NATHPO)
2005    *Tribal Consultation: Best Practices In Historic Preservation*. National Park Service and National Association of Tribal Historic Preservation Officers, Washington, DC.

National Museum of the American Indian, Smithsonian Institution (NMAI-SI)
        Electronic documents, http://americanindian.si.edu/searchcollections/home.aspx, accessed September 10, 2009.

National Park Service (NPS)
1993    Guidelines for Evaluation and Registering Historical Archaeological Sites and Districts. National Register Bulletin. U.S. Government Printing Office, Washington, D.C.

1995    Archaeology and the National Register. CRM, Vol. 18, No. 6, 1995 Supplement. U.S. Department of the Interior, National Park Service, National Register of Historic Places.

1996    Revised Thematic Framework. National Park Service, Washington, D.C.

BLM_0061328

1997a    National Register Bulletin: How to Apply the National Register Criteria for Evaluation. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

1997b    National Register Bulletin: Guidelines for Completing National Register of Historic Places Forms, Part A: How to Complete the National Register Registration Form. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

1997c    National Register Bulletin: Defining Boundaries for National Register Properties. U.S. Department of the Interior, National Park Service, National Register of Historic Places.

1998    National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties. By Patricia L. Parker and Thomas F. King, originally published 1990, revised 1992, 1998. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

1999    National Register Bulletin: Guidelines for Completing National Register of Historic Places Forms, Part B: How to Complete the National Register Multiple Property Documentation Form. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

National Trust for Historic Preservation (NTHP)
2006    *Cultural Resources on the Bureau of Land Management Public Lands: An assessment and needs analysis.* National Trust for Historic Preservation, Washington, DC.

Nickens, Paul R. (editor)
1988    *Archaeology of the Eastern Ute: A Symposium.* CCPA Occasional Papers, No. 1. Colorado Council of Professional Archaeologists, Denver.

O'Neil, Brian, Carl E. Conner, Barbara J. Davenport, and Richard Ott
2004    Archaeological Assessment of the Rifle Wickiup Village—5GF308 in Garfield County, Colorado.  Dominquez Archaeological Research Group, Grand Junction, Colorado.  Ms on file at the Glenwood Springs BLM Field Office.

O'Rourke, Paul M.
1980    *Frontier in Transition: A History of Southwestern Colorado.* Bureau of Land Management - Colorado, Cultural Resources Series Number Ten. Electronic document, http://www.nps.gov/history/history/online_books/blm/co/10/index.htm, accessed 12/016/08.

Opler, Marvin K.
1943    The Origins of Comanche and Ute. In *American Anthropologist*, New Series, Vol. 45, No. 1 (Jan. - Mar., 1943), pp. 155-158. Blackwell Publishing on behalf of the American Anthropological Association. Electronic document,  http://www.jstor.org/stable/662885, accessed January 11, 2009.

1963    The Southern Ute of Colorado. In *Acculturation in Seven American Indian Tribes.* Ralph Litton. Pp. 119-206. Peter Smith, Gloucester, Massachusetts.

1971    The Ute and Paiute Indians of the Great Basin Southern Rim. In *North American Indians in Historical Perspective.* Elenor Burke Leacock and Nancy Oestreich Lurie eds. Pp. 257-288. Waveland Press, Prospect Height, Illinois.

BLM_0061329

Palmer, Edward
　　1876　Exploration of a Mound in Utah. *American Naturalist* 10(8);410-414.

　　1878　Cave Dwellings in Utah. Eleventh Annual Report of the Trustees of the Peabody Museum of American Archaeology and Ethnology 2(2);269-272.

Parker, Patricia L. and Thomas F. King
　　1998　National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties. U.S. Department of the Interior, National Park Service, National Register of Historic Places.

Pekka Hämäläinen
　　2008　*The Comanche Empire*. Yale University Press.

Poley, H.S.
　　1899　Photograph, Call No. P-51, from Western History/Genealogy Dept., Denver Public Library. Electronic reproduction, http://photoswest.org/cgi-bin/imager?00170051+P-51, accessed May 2008.

Prosper, Lisa
　　2007　Wherein Lies the Heritage Value? Rethinking the Heritage Value of Cultural Landscapes from an Aboriginal Perspective. *The George Wright FORUM*. Volume 24, Number 2. The George Wright Society, Hancock, Michigan.

Reed, Alan D.
　　1984　West Central *Colorado Prehistoric Context*. Colorado Historical Society, Denver.

　　1988　Cultural Chronology. In *Archaeology of the Eastern Ute: A Symposium*, edited by Paul R. Nickens, pp. 119-203. CCPA Occasional Papers, No. 1. Colorado Council of Professional Archaeologists, Denver.

　　1994　The Numic Occupation of Western Colorado and Eastern Utah During the Late Prehistoric and Protohistoric Periods. In *Across the West: Human Population Movement and the Expansion of the Numa*, edited by David B. Madsen and David Rhode, pp. 188-166. University of Utah Press, Salt Lake City.

Reed, Alan D. and Michael D. Metcalf
　　1999　*Colorado Prehistory: A Context for the Northern Colorado River Basin*. Colorado Historical Society, Denver.

Reed, Alan D. and Rachel Gebauer
　　2004　A Research Design and Context for Prehistoric Cultural Resources in the Uncompahgre Plateau Archaeological Project's Study Area, Western Colorado.  Unpublished manuscript on file at Uncompahgre Plateau Study Project, Montrose, Colorado.

Sánchez, Joseph P.
　　1997　*Explorers, Traders, and Slavers: Forging the Old Spanish Trail*, 1678-1850. University of Utah Press.

Sapir, Edward
　　1910a　Song Recitative in Paiute Mythology. *Journal of American Folklore* 23(90); 455-472.

　　1910b　Two Paiute Myths. *University of Pennsylvania Museum Journal* 1:15-18.

BLM_0061330

1913    Southern Paiute and Nahuatl, a Study of Uto-Aztecan. 1. *Journal de la Societe des Americanistes de Paris*. 10:379-425; 11: 443-488.

Sapir, Edward and William Bright
1992    Southern Paiute and Ute: Linguistics and Ethnography. *Collected Works of Edward Sapir* v. 10, de Gruyter Mouton.

Scotch, Norman A., and Freda L. Scotch
1963    Social Factors in Hypertension among the Washo. *University of Utah Anthropological Papers* No. 67:69-76.

Shimkin, Demkri B., and Russell M. Reid
1970    Socio-Cultural Persistence Among Shoshoneans of the Carson River Basin (Nevada). In: *Languages and Cultures of Western North America*, Essays in Honor of Sven S. Liljeblad, E. H. Swanson, Jr., ed., pp. 172-200. Pocatello: Idaho State University Press.

Shindler, A. Zeno
1868    Photographic collections of the National Museum of the American Indian (NMAI), Smithsonian Institution (SI). Electronic reproduction, http://americanindian.si.edu/searchcollections/results.aspx?catids=4&cultxt=ute&src=1-1, accessed August 4, 2009.

Simmons, Virginia McConnell
2000    *The Ute Indians of Utah, Colorado, and New Mexico.*  University Press of Colorado, Boulder.

Simms, Steve, Buck Benson, Landon Profaizer - Utah State University
2006    Excavations at Two Wickiup Sites: Dugway Proving Ground and West Tavaputs Plateau: Why We Should Look for Structures at Lithic Scatters and Some Tips for Doing So.  Paper presented at the Colorado Council of Professional Archaeologists, March 2006.

Smith, Anne M. (Cooke)
1938    In: *Tribal Distribution in the Great Basin.* Author(s): Willard Z. Park, Edgar E. Siskin, Anne M. Cooke, William T. Mulloy, Marvin K. Opler, Isabel T. Kelly. *American Anthropologist*, New Series, Vol. 40, No. 4, Part 1 (Oct. - Dec., 1938), pp. 622 -638

1974    Ethnography of the Northern Utes. *Papers in Anthropology* No. 17. Museum of New Mexico, Albuquerque.

Smith, Duane and Duane Vandenbusche
1981    *A Land Alone, Colorado's Western Slope*. Pruett Publishing Company.

Smith, Linda Tuhiwai
2006    *Decolonizing Methodologies: Research and Indigenous People*. Originally published 1999. Palgrave, New York.

Smythe, Charles W.
1999    The National Register Framework for Protecting Cultural Heritage Places. In *The George Wright Forum*: THE GWS Journal of Parks, Protected Areas & Cultural Sites, Vol. 26, No. 1, 2009

Stedman, Raymond William
1986    Shadows of the Indian: Stereotypes in American Culture. University of Oklahoma Press.

BLM_0061331

Steward, Julian H.
1936    The Economic and Social Basis of Primitive Bands. In: *Essays in Anthropology Presented to Alfred L, Kroeber*, R. H. Lowie, ed., pp. 331-350. Berkeley: University of California Press.

1938    Basin-Plateau Aboriginal Sociopolitical Groups. *Bureau of American Ethnology*, Bulletin No. 120, Washington, D.C.

1972    *Theory of Culture Change: The Methodology of Multilinear Evolution.* Originally published 1955, Illini Books Edition, University of Illinois Press, Chicago.

Stewart, Omer C.
1941    The Southern Ute Peyote Cult. *American Anthropologist.* 43(1941):303-308.

1942    Culture Element Distributions, XVIII: Ute-Southern Paiute, *University of California Anthropological Records.* 6(4):231-356.

1952    Escalante and the Ute. S*outhwestern Lore* XVIII(3):47-51.

1955    Forest and Grass Burning in the Mountains West. *Southwestern Lore* XXI(1):3-9. 567 Stewart, Omer C.

1962    Ute Bands: Early Historical References. *Southwestern Lore*, 28:2, p.31. Colorado Archaeological Society.

1966a Ute Indians: Before and After White Contact. *Utah Historical Quarterly* 34:38-61.

1966b Tribal Distributions and Boundaries in the Great Basin. In *The Current Status of Anthropological Research in the Great Basin: 1964*, edited by Warren L. D'Azevedo, Wilbur A. Davis, Don D. Fowler and Wayne Suttles. Desert Research Institute Technical Report Series, Social Sciences and Humanities Publications No.1, Reno, Nevada.

1971    Ethnohistorical Bibliography of the Ute Indians of Colorado. Series: *University of Colorado Studies: Series in anthropology*, no. 18. University of Colorado Press, Boulder.

1973    Ethnography of the Eastern Ute. Manuscript on file, Department of Anthropology, University of Colorado, Boulder.

1976    Ethnography of the Western Ute. Manuscript on file, Department of Anthropology, University of Colorado, Boulder.

Tyler, Samuel Lyman
1954    The Spaniard and the Ute. *Utah Historical Quarterly*, Vol. XXII, January, 1954, Number 1, pp 343-363. Utah State Historical Society.

1964    *The Ute people: A Bibliographical Checklist*, Samuel Lyman Tyler A publication of the Institute of American Indian Studies, Brigham Young University.

Uintah County Library (UCL)
2004    Regional History Collection. Electronic reproduction, http://205.123.71.5/HistoryPhotos.html.

BLM_0061332

Utah State History (USH)

2008    People of Utah Photograph Collection. Photo No. C-239, P. 1, Box 9. Photo by J.K. Hillers of the Powell Expedition, 1873 and/or 1874. Credit to Smithsonian Office of Anthropology. Neg. no. 1535. Electronic reproduction, http://history.utah.gov/research_and_collections/photos/peoples.html, accessed July 15, 2009.

Ute Ethnobotany Project

2007    Unpublished project workbook. Sponsored by a partnership between the Ute Indian Tribe; Southern Ute Indian Tribe; Ute Mountain Ute Indian Tribe; BLM Grand Junction Field Office; Grand Mesa, Uncompahgre and Gunnison National Forests; Museum of Westerrn Colorado; Colorado Council on the Arts; and Mesa State College. Manuscript on file at Bureau of Land Management, Grand Junction Field Office.

Ute Indian Tribe of the Uintah and Ouray Reservation

1937    Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation. Electronic document, http://www.narf.org/nill/Constitutions/uteconst/uteconsttoc.htm, accessed 12/05/08.

Wroth, William, ed.

2000    *Ute Indian Arts & Culture: From Prehistory to the New Millenium.* Taylor Colorado Springs Fine Arts Center, Colorado Springs.

Wunder, John R.

2007    Native American History, Ethnohistory, and Context. In *Ethnohistory* 54:4, American Society for Ethnohistory, Duke University Press.

Wyld, James

1823    Map of North America from 20 to 80 Degrees North Latitude... James Wyld, Charing Cross, England. Electronic document, David Rumsey Collection, Pub List No. 4087.000, http://www.davidrumsey.com, accessed April 12, 2002.

BLM_0061333

88  *Perspectives on Ute Ethnohistory in West Central Colorado*

BLM_0061334

# APPENDIX E: ETHNOBOTANCIAL FIELD NOTES

Prepared by Lynn Albers, DARG Research Associate

The following botanical notations resulted from ad hoc field observations and discussions with Ute consultants. Most specific epithets have not been verified.  Species reported, however, have been previously documented in the visited areas. Scientific nomenclature is noted only with each plant's initial common name notation.

## Glenwood Springs Field Office (GSFO)

Various sites in the GSFO were visited by project participants in June 2008. Several sites, including a significant Ute wickiup village, were located in ancient pinyon pine (Pinus edulis) and juniper (Juniperus osteosperma syn. Sabina osteosperma) forest.  A variety of special Ute features located throughout the Glenwood BLM district, were also constructed from pinyon pine, juniper and Rocky Mountain juniper (Juniperus scopulorum syn. Sabina scopulorum). Clifford Duncan noted that aspen (Populus tremuloides) and lodgepole pine (Pinus contorta) were sometimes used as construction materials for wickiups.  Cheryl Harrison noted that King Mountain and Black Mountain supported the only two significant lodgepole communities in the GSFO.

Significant amounts of maravilla, also known as wild four o'clock (Mirabilis sp.) were noted at site 5GF303, ████████████████████████████████████████████ The Nyctaginaceae species was most likely M. multiflora or M. glandulosa, but possibly M. oxybaphoides.  Clifford Duncan mentioned the following Ute plant names (approximated phonetic spellings are given):

| | |
|---|---|
| *sub-eee'* | flower |
| *kub-sub-eee'* | red flower |
| *sah-wuuf* | sagebrush |
| *shur'-vwap* | tree |
| *wup* | juniper |
| *pab-wup* | pinyon pine |
| *turn-up* | chokecherry |
| *ish* | three-leaf sumac |
| *tdoo-wimp'* | serviceberry |
| *ga-soo* | hawthorne |

Clifford also mentioned that tanning hides with juniper smoke created a black/dark color and pinyon pine smoke created a yellow hide.  He noted that using brains (deer?) created a white tanned hide.  While crossing Cottonwood Pass (Missouri Heights to Gypsum), we discussed a traditional education center to teach about Ute (and Colorado native) plants, plant processing, traditional uses and so forth.  Ute Cultural Rights & Protection director Betsy Chapoose and Clifford noted the need for buffalo berry (Shepherdia argentea and  S. canadensis) and chokecherry (Prunus virginiana ssp. melanocarpa syn. Padus virginiana ssp. melanocarpa) seed for the reservation, as well as a need to protect those plants for cultural uses.

BLM_0061335

It was noted that Prince Creek Road had healthy and fairly bountiful serviceberry (Amelanchier alnifolia) and chokecherry stands.  Betsy discussed bringing the Northern Ute women Elders to an accessible place (which Prince Creek Road is) to collect berries and basket-making materials.

## Uncompahgre Field Office (UFO)

Several canyonlands sites were visited in the UFO August 19-20, 2008, including locations in the ███████████████████████████████████████████████████████████████ disc███████████████████████████████████████████████████████████████ protected place in that local environment.  Rock art located in relation to these wickiup sites was also discussed.

Clifford and Betsy commented that areas of important cultural significance to the Utes were living, fluid and always moving — both spiritually and physically — as reflected in the relationship a particular place may have with animals, plants and people.  Both Ute representatives were clearly distressed at Colorado  canyonlands███████████████where "extreme crawler" recreational vehicles had severely impacted the ancient pinyon-juniper woodland. There was discussion of the disturbed area's close proximity to rock art and the probable destruction of Ute cultural sites.

Native plant resources at the Montrose district sites were abundant.  A few plant genera observed included: Indian ricegrass (Achnatherum hymenoides syn. Oryzopsis hymenoides), spreading dogbane (Apocynum androsaemifolium), big sagebrush (probably Artemisia tridentata syn. Seriphidium tridentatum), silversage (Artemisia frigida), sagewort (Artemisia ludoviciana), saltbush (Atriplex sp.), rabbitbrush (Chrysothamnus sp.), wild licorice (Glycyrrhiza lepidota), gumweed (Grindelia squarrosa), snakeweed (Gutierrezia microcephala or G. sarothrae), golden aster (Heterotheca villosa), juniper (Juniperus osteosperma), winterfat (Krascheninnikovia lanata syn. Eurotia lanata syn. Ceratoides lanata), wolfberry (Lycium pallidum), maravilla, prickly pear cactus (Opuntia polyacantha), western wheatgrass (Pascopyrum smithii syn. Agropyron smithii), pinyon pine, broadleaf cottonwood (Populus deltoides), wild rose (Rosa woodsii), three-leaf sumac (Rhus aromatica ssp. trilobata), greasewood (Sarcobatus vermiculatus), willow (Salix sp.), perky sue (Tetraneuris ivesiana), and yucca (Yucca harrimaniae).

Some alien plant communities were observed in visited areas, including: wienerleaf (Halogeton glomeratus), ironweed (Kochia americana or Bassia sp.) and tamarisk (Tamarix parviflora or T. ramosissima).  Nitrogen-fixing non-native ruderal legumes, alfalfa (Medicago sativa),white melilot (Melilotus albus) and yellow melilot clovers (Melilotus officinale), were also present.

## Grand Junction Field Office (GJFO)

Sites at various locations in the GJFO were visited September 9-11, 2008. Native plants observed in the █████████████████████areas included: sand verbena (Abronia elliptica or A. nana), Indian ricegrass, wild onion (Allium acuminatum), 2 species of serviceberry (Amelanchier alnifolia & A. utahensis ), sagebrush, saltbush, 2 species of mountain mahogany (Cercocarpus intricatus & C. montanus), rabbitbrush , cryptanth (Cryptantha sp. or possibly Oreocarya sp.), fleabane (Erigeron sp.), gumweed, sunflower (Helianthus annuus), needle-and-thread grass (Hesperostipa comata syn. Stipa comata), golden aster (Heterotheca sp.), winterfat, juniper (Juniperus osteosperma), prickly pear cactus, pinyon pine, bitterbrush (Purshia tridentata or P. stansburiana), scarlet globemallow (Sphaeralcea coccinea), and yucca.

BLM_0061336

The group visited a ███████████████████ and found it to be surrounded by a diverse plant community, including: sagewort, sagebrush, saltbush, netleaf hackberry (Celtis reticulata), rabbitbrush, single-leaf ash (Fraxinus anomala), snakeweed, golden eye/sunspots (Heliomeris multiflora), golden aster (Heterothecca sp.), Indian ricegrass, scarlet globemallow, maravilla, prince's plume (Stanleya pinnata), pinyon pine, bitterbrush, three-leaf sumac, and willow. Some Brassicaceae annuals were found, as well as ground cherry (Physalis spp. - tentatively P. virginiana), which Weber says is a possible alien. Dunmire and Tierney report that groundcherry fruits have been eaten by indigenous peoples in the Four Corners region for "at least 1100 years."

Clifford Duncan and Terry Knight noted some traditional Ute plant uses: snakeweed was "good for cleansing"; buffaloberries were cached and eaten in winter; and three-leaf sumac berry infusion was ingested before the Sun Dance Ceremony. Clifford also mentioned that he had talked with Cheyenne elders about the gathering of a water plant tuber, used for food. This was most likely yellow pondlily (Nuphar lutea). A few Ute plant names were mentioned by Clifford and Terry. (approximate phonetic spellings are given):

| | |
|---|---|
| *kah-pee'* | ephedra (Ute tea, Mormon tea, Navajo tea, cowboy coffee) |
| *ah-koo-p'* | buffaloberry |
| *ish* | three-leaf sumac |
| *too-k-pee'* | coffee |
| *dah-goos'* | wild turnip |

Local ranchers John and Inelle Littlejohn (and their son, Logan), met us in ████████████ where we visited several potential culturally significant sites, including a spring and a section of a former Ute trail. Plant life was fairly abundant in the area, with a few additional native species being observed, including: fireweed (Chamerion danielsii syn. Epilobium angustifolium), virgin's bower (Clematis ligusticifolia), yellow bee plant (Cleome lutea), fleabane (Erigeron spp.), Scarlet gilia (Ipomopsis spp.), watercress (Naturtium officinale), locoweed (Oxytropis spp.), gambell oak (Quercus gambelii), watercress, greasewood (Sarcobatus vermiculatus), and cattail (Typha spp.).

Other previously mentioned native species present in ███████████ included: silversage, rabbitbrush, sunflower, juniper, Indian rice-grass, ground cherry, pinyon pine, wild rose, willow, and yucca. A buckbean-looking plant (Menyanthes trifoliata) was noted, but the eco-system was not congruent. Also observed was the alien invasive species Russian-thistle (Salsola spp.), as well as non-native burdock (Arctium minus) and a very healthy "wild" apricot tree (Prunus armeniaca or related species), probably planted by early settlers.

████████████ also had an abundance of three-leaf sumac and looked to be an excellent potential berry and basket-material gathering place for the Ute women Elders. Aline, Alyssa, Betsy and Lynn discussed this possibility, noting the need to secure land-owner permissions.



BLM_0061337

a Ute encampment, was discussed.  Terry discoursed regarding Ute camp tripods and cobble usage. A tree with fresh bear claw sharpening activity was observed. Clifford remarked that it reminded him of the Ute story of the coyote's wig (see Figure 14, above). A Ute taboo toward lightning-struck trees was also mentioned.



## Sources

Brown, Deni
    2001    The Herb Society of America New Encyclopedia of Herbs & Their Uses.  Originally published 1995. Dorling Kindersley Ltd., New York.

Carter, Jack L.
    2006    Trees & Shrubs of Colorado.  Mimbres Publishing, Silver City, NM.

Dunmire, William W. & Gail D. Tierney
    1995    Wild Plants of the Pueblo Province - Exploring Ancient and Enduring Uses.    Museum of NM Press, Santa Fe.

Shaw, Robert B.
    2008    Grasses of Colorado.  University Press of Colorado, Boulder.

Weber, William A. & Ronald C. Wittman
    2001     Colorado Flora - Western Slope. 3rd ed., originally published 1990. University Press of Colorado, Boulder.

Welsh, Stanley L., Atwood, Goodrich & Higgins
    2003    A Utah Flora. 3rd ed., originally published 1987.  BYU Print Services, Provo.

BLM_0061338

## APPENDIX F: NOTES ON COLORADO WICKIUP PROJECT

**Colorado Wickiup Project Background**

More than three hundred archaeological sites containing nearly eight hundred aboriginal wooden structures and features are known to exist in Colorado. These ephemeral cultural resources are "regarded as among Colorado's rarest and most fragile Native American sites" (Baker et al 2007:104). Generally attributed to the Utes, they represent the cultural heritage of the only indigenous people to reside within Colorado from prehistory to the present (Baker et al 2007:29). Unfortunately, a preponderance of such sites and features have yet to be fully documented and they are increasingly threatened by decay and disintegration from natural processes, and destruction by human actions, particularly in areas of rapid energy development and population growth.

Dominquez Archaeological Research Group, Inc. (DARG), with partial funding from the Colorado State Historical Fund and the Bureau of Land Management (BLM), initiated the Colorado Wickiup Project (CWP) in 2003. The primary objective of the on-going project is to mitigate the threat to Colorado's aboriginal wooden structures to the extent possible by thoroughly recording all known wooden feature sites, collecting materials for chronometric analysis, and conducting extensive data recovery – including excavation – of significant sites. Long-range goals of the project include the development of a dedicated aboriginal wooden structure knowledge base and facilitation of collaborative research and education through information sharing and professional and public outreach.

Funding for the Colorado Wickiup Project has been provided by Colorado Historical Society's State HIstorical Fund, Bureau of Land Management Colorado Office, and private contributors. The project, begun in the fall of 2003, has achieved the following results:

**Rifle Wickiup Village Assessment**. In the fall of 2003 and spring of 2004, DARG conducted an archaeological assessment of the Rifle Wickiup Village, site 5GF308, located near Rifle, Colorado. This site is the largest known wickiup site in the state of Colorado, with 80 wooden structures now recorded. It was initially, and minimally, recorded in 1973 with additional recording done in 1982, 1986, and 1996. Illegal wood cutting activities damaged the site in 1985 and 3-5 structures were destroyed. None of the early field work had ever been formally reported to BLM and OAHP. DARG's assessment project conducted comprehensive site mapping and documentation of the wickiups and other wooden structures, and in the course of that work began to develop plans for the Colorado Wickiup Project (O'Neil et al. 2004).

**Phase I** of the CWP, conducted during 2004 and 2005, consisted of a review and assessment of existing knowledge regarding aboriginal wooden structures located in Colorado, and the development of an archaeological context and a strategic plan for future investigations. Results were published in 2005 as *The Colorado Wickiup Project Volume I: Context, Data Assessment and Strategic Planning* (Martin, Ott, and Darnell 2005).

**Phase II** of the project, also conducted during 2004 and 2005, comprised the first in a series of planned field investigations. The Phase II survey recorded a dense occurrence of varied and well-

BLM_0061339

preserved wooden structures in the Gunnison Gulch area of Mesa County. A total of 29 wooden features were recorded, including 21 wickiups, a brush corral, an apparent windbreak, a culturally scarred juniper, a limbed tree (apparent wickiup pole production site), a juniper pole cache, and several leaner-pole utility features. The project also served as a pilot test for proposed recording protocols, including an extensively re-designed wooden structure component form, GPS mapping, plan and elevation view drawings of significant structures, comprehensive photography, metal detection, collection of significant surface artifacts, and sampling of materials for chronometric analysis. Results were published in 2005 as *The Colorado Wickiup Project Volume II: Cultural Resources Class II Reconnaissance Inventory for the Gunnison Gulch Area of Mesa County, Colorado* (Martin, Conner, and Darnell 2005).

**Phase III** of the CWP recorded and compiled data from a total of twelve sites in west central and northwest Colorado during 2005 and 2006. A total of 81 wooden structures and other wooden features were documented, ranging in scope from single wickiups and tree platforms to a village containing 43 wooden features. Several new types of wooden features were identified during this study, as were some newly recognized patterns within known structure types, including: low tree platforms, axe-split/shaped "boards", a storage "shelf", and a number of wickiups with integrated "utility" poles. As a result of these findings, recording protocols were refined during the course of field work and the Aboriginal Wooden Feature Component Form was adapted to facilitate recording of these new data types. Selected collections were made of dendrochronological, radiometric, and macrobotanical samples and five tree ring samples, one carbon sample, and two flotation samples were submitted to outside laboratories for analysis. Results of Phase III activities were published in 2006 as *The Colorado Wickiup Project Volume III: Recordation and Re-evaluation of Twelve Aboriginal Wooden Structure Sites in Eagle, Garfield, Mesa, and Rio Blanco Counties, Colorado* (Martin, Ott, and Darnell 2006).

**Phase IV** activities of the Colorado Wickiup Project, conducted in 2007-2008, focused primarily on BLM administered lands in Rio Blanco County, Colorado in a region of the northern Piceance Basin within the Yellow Creek drainage. The area includes 44 previously recorded wickiup sites containing at least 114 aboriginal wooden features. Of these sites, 15 were documented as a part of the Phase IV project and 70 aboriginal wooden features were recorded.

The Yellow Creek Study Area, and the greater Piceance Basin generally, are being impacted by increasing energy development activities including construction of well pads, access roads, pipelines, and processing facilities for both natural gas and oil shale Major oil shale research and development projects are underway in southern portions of the study area, with plans to construct man-camp housing for several hundred workers. Phase IV activities included a baseline assessment of the Yellow Creek Study Area's potential eligibility for nomination to the National Register of Historic Places as an archaeological district, multiple property, or other designation.

Additional Colorado Wickiup Project activities in 2007 included a Class III survey for the Bureau of Land Management Little Snake Field Office (BLM-LSFO) involving 670 acres in the South Sand Wash area of Moffat County (Martin and Ott 2007a). The survey was conducted in an area proposed for designation as an OHV use-area.  Two newly identified sites containing possible aboriginal wooden features were recorded during the survey. Previously recorded and partially excavated Sand Wash Wickiup Site (5MF2631) was re-visited during the survey and several new

BLM_0061340

aboriginal wooden features, including a wickiup, were located. Additional fieldwork was conducted by DARG in Moffat County for BLM-LSFO during the fall of 2007 (Martin and Ott 2007b) and four aboriginal wooden feature sites were re-visited and recorded to CWP standards. Several other aboriginal wooden feature sites were recorded in 2007 in the Black Ridge Area in Mesa County and in the Colorado River drainage in Garfield and Mesa Counties.

Phase IV activities also raised new research questions regarding historic brush fences and corrals widely recorded in western Colorado. Wooden features of these types have typically been interpreted in the course of CRM surveys throughout the region as historic Euro-American animal control features. However, recent studies (Bailey 2005a, Keyser 2008 and James D. Keyser by personal communication 2007) hypothesize possible Ute cultural affiliation, at least for such features located in association with wickiup sites and other Ute diagnostics. Sites documented by the Colorado Wickiup Project in South Sand Wash (5MF2631, 5MF6404.1 and 5MF6408), the Yellow Creek Study Area (5RB129 and 5RB5624), and Gunnison Gulch (5ME14260) include wickiup camps located in proximity to brush fences and corrals. Future DARG studies will re-examine these wooden animal control features with respect to possible Ute origins. Results of the Phase IV activities were published in 2009 as *The Colorado Wickiup Project Volume IV* (Martin and Ott 2009).

**Phase V** of the CWP began in 2008. Field work is now complete and lab work and report preparation is in progress. Phase V continued documenting and evaluating aboriginal wooden feature sites in the Yellow Creek Study Area, including the recordation of four known but incompletely documented features on site 5RB53, Duck Creek Wickiup Village, which is listed on the National Register of HIstoric Places. Additional activities included a revisit at site 5RB2624, Rader's Wickiup Village, to collect ceramic sherds at a known locality for the purpose of thermoluminescent dating, and data collection and recording on four previously recorded but not fully documented sites, and conducting test excavations on site 5RB563, the Ute Hunters' Camp.

**Phase VI** activities began in 2009 and will continue during spring 2010. This phase of the project will expand our research focus to a wider geographic area; extending from the extreme northwest corner of Colorado through the west central portion of the state, and into the central Rocky Mountains. The project will fully document a selection of exceptionally well-preserved standing wickiup, tipi, and ramada structures. One of the sites, 5DT222, was originally recorded in the 1970s and the others are structures and sites that have been drawn to the attention of the project by individuals from the general public and professional archaeologists.

Future research directions for the Colorado Wickiup Project will continue to focus on comprehensive site and feature documentation of known, but poorly recorded sites; test excavations at selected sites; and integration of project results with broader research activities on Ute lifeways being planned by DARG, including: consultation and information sharing with the Ute tribes, ethnohistorical studies, landscape-scale studies of wickiup camp locales, and regional syntheses.

BLM_0061341

## Colorado Wickiup Project References

Martin, Curtis and Richard Ott
2009    The Colorado Wickiup Project Volume IV — Part I: Recordation and Re-evaluation of Twenty-seven Aboriginal Wooden Feature Sites in Garfield, Mesa, Moffat and Rio Blanco Counties, Colorado — Part II: Ute Culture History and an Assessment of NRHP Eligibility for the Yellow Creek Archaeological District. Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

Martin, Curtis and Carl E. Conner
2007    A Class III Aboriginal Feature Inventory of Two Parcels in the Black Ridge Area of the McInnis Canyons National Conservation Area in Mesa County, Colorado. Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Grand Junction Field Office.

Martin, Curtis and Richard Ott
2007a   Sand Wash Wickiup Survey Phase I: A Class III Cultural Resources Inventory in Moffat County, Colorado. Unpublished manuscript on file at the Bureau of Land Management Little Snake Field Office and the Office of Archaeology and Historic Preservation, Denver.

2007b   The Little Snake Wickiup Revisits Project, Moffat County, Colorado.  A series of unpublished site descriptions, Cultural Resource Reevaluation forms, and Aboriginal Wooden Features Component forms on file at the Bureau of Land Management Little Snake Field Office, Craig and the Office of Archaeology and Historic Preservation, Denver.

Martin, Curtis, Carl E. Conner, and Nicole Darnell
2005    The Colorado Wickiup Project Volume II: Cultural Resources Class II Reconnaissance Inventory for the Gunnison Gulch Area of Mesa County, Colorado.  Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

Martin, Curtis, Richard Ott, and Nicole Darnell
2006    The Colorado Wickiup Project Volume III: Recordation and Re-evaluation of Twelve Aboriginal Wooden Structure Sites in Eagle, Garfield, Mesa, and Rio Blanco Counties, Colorado.  Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

2005    The Colorado Wickiup Project Volume I: Context, Data Assessment and Strategic Planning. Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

O'Neil, Brian, Carl E. Conner, Barbara J. Davenport, and Richard Ott
2004    Archaeological Assessment of the Rifle Wickiup Village–5GF308 in Garfield County, Colorado.  Dominquez Archaeological Research Group, Grand Junction, Colorado.  Ms on file at the Glenwood Springs BLM Field Office.

BLM_0061342

## APPENDIX G: ONLINE ARCHIVAL SOURCES

**Brigham Young University C.R. Savage Collection:**
http://www.lib.byu.edu/dlib/savage/

**Brigham Young University Digital Collections:**
http://www.lib.byu.edu/digital/

**Colorado Historic Newspaper Collection:**
http://www.coloradohistoricnewspapers.org

**David Rumsey Map Collection:**
http://www.davidrumsey.com/

**Denver Public Library Western History Collection:**
http://history.denverlibrary.org/images/index.html

**Internet Archive:**
http://www.archive.org/details/texts

**Google Books:**
http://books.google.com/

**Library of Congress Maps:**
http://www.loc.gov/rr/geogmap/

**Mountain West Digital Library:**
http://mwdl.org/

**University of Texas Perry-Castañeda Library Map Collection:**
http://www.lib.utexas.edu/maps/

**University of Alabama Historical Map Collection:**
http://alabamamaps.ua.edu/historicalmaps/index.html

BLM_0061343

# OURAY COUNTY
# MASTER PLAN

**Prepared by:**

**Ouray County Planning Commission:**

Jim Irvine, Chairperson

Barbara Vanhoutte, Vice-Chairperson
Linda Ingo
John Truijillo
Judy Wolford

**Ouray County Land Use and Planning Department**

Gary Laura, Administrator
Greg Moberg, Planner
Carol Dunn, Planning Technician
Jane Bennett, Secretary to the Commission

**Adopted by the Ouray County Planning Commission**

December 1, 1999

**Endorsed by:**

The Ouray County Planning Commission would like to express its sincere appreciation to the citizens of Ouray County who devoted their time and effort to giving the Planning Commission insight and direction during the preparation of this Master Plan.

# **TABLE OF CONTENTS**

**Introduction**                                                                    **Page**

    Introduction                                                         1

    Purpose of the Plan                                            1

    The Planning Process                                          1

    Ouray County Development Goals                       2


## 1 Goals and Policies

    A.    Agricultural Lands                                     2

    B.    County/Municipal Relationships             3

    C.    Economic Development                          4

    D.    Housing                                                     4

    E.    Natural Resources                                   5

    F.    Rural Character                                        6

    G.    Tourism                                                    6

    H.    Transportation                                         7

    I.    Utilities                                                    8

    J.    Visually Significant Areas                        9

    K.    Wildlife and Plant Habitats                      9

BLM_0061345

## Introduction

As Ouray County citizens enter a new millennium, words that introduced the original Ouray County Zoning Regulations in 1971 are still applicable today. "The area encompassed by Ouray County is a quiet land of awesome beauty, even today nearly untouched and unspoiled . . . It ranges from the magnificent San Juan Mountains on the south across the Uncompahgre Valley, and on in to the rolling foothills and mesas covering the northern parts of the county. Ouray County, then, possesses a rare combination of assets; a priceless and varied natural environment, ranging from unique wilderness to more hospitable areas, and a population which is aware of the value and delicacy of the physical setting surrounding it."

"Ouray County is now becoming known to people from all areas as a winter and summer recreation area . . . In the face of such potential popularity, how can the unique environment for living, including the delicate natural environment, be protected? How can the County accommodate the inevitable development pressures, without letting these pressures negate or even destroy the unique and irreplaceable qualities that attracted them in the first place?" The questions being asked then are still relevant to this day. Building on our history and incorporating results of a recent survey of the people of Ouray County, this update of the Master Plan for Ouray County seeks to encompass and expand upon these original precepts.

## Purpose of the Plan

The Master Plan is a comprehensive, long-range guide, prepared by the Ouray County Planning Commission, to be used in making decisions that affect the physical, cultural and socioeconomic development of Ouray County. The Master Plan provides a realistic and achievable image of the County, both present and future, through a framework of goals and policies. The goals provide general statements reflecting the desires of county residents regarding the use of land and lay the groundwork for zoning and the land use decision-making process. The policies provide the County's positions relating to the identified goals and establish guidelines for direction or action.

The physical development of the County has direct and indirect effects on property rights, natural resources and property values. This Master Plan seeks a balance that respects these concerns in an effort to maintain the County residents' quality of life. Therefore, it is the intent to allow only that development which is responsible and consistent with the goals and policies set out in this plan.

An additional purpose of this plan is to facilitate cooperation between the municipalities and the County on matters of mutual concern.

## The Planning Process

In 1994, the County declared a one-year moratorium on new planned unit developments due to an increase in proposed residential development and circumvention of the Master Plan goals. After three years of collecting information, a geographic information system (GIS) was developed, a county planner was hired, and a Demographic and Economic Trend Line Report was completed.

BLM_0061346

In December of 1997, joint Planning Commission and Board of County Commissioners meetings were held to define the planning process. The Planning Commission held open workshops twice a month to obtain community comments and concerns. Joint planning commission workshops were held with the two municipalities.

The Master Plan is the end result of analysis of all pertinent data collected as well as community input. After a formal public hearing, this Master Plan was adopted by resolution of the Ouray County Planning Commission. These goals and policies are a reflection of this community's values and desires for Ouray County.

## Goal of the Ouray County Master Plan:

The overall goal of the Ouray County Master Plan is to allow gradual, long-term population and economic growth in Ouray County in a manner that does not harm the County's irreplaceable scenic beauty, wildlife, air and water resources, and other environmental qualities and that does not unduly burden the County's residents or its governments. To better define and implement this overall goal of the County Master Plan, the following goals and policies are set forth.

For organizational purposes, the order of the goals are listed alphabetically with no weight or priority implied.

## A. Agricultural Lands

Agricultural uses within Ouray County are important physical, environmental, cultural, aesthetic, and economic asset to both urban and rural residents. In addition, preservation of these lands in large tracts is desirable to maintain the agricultural economy of the County. Development of these agricultural properties is a matter of public concern in both the agricultural community and the residential community because of the interface between agriculture and development activities.

### Goal:

To encourage the continued use of lands for agricultural productivity and the right to farm and ranch.

### Policies:

1. Ranching and farming shall remain a use-by-right within specific land use zones except as restricted or modified when a change in land use is granted by the County.

2. Develop and implement right to farm/ranch regulations that protect the agricultural community by ensuring the right to continue agricultural activities.

3. Develop and implement regulations and a process that give incentive to an owner to develop the land in a manner that conserves productive agricultural lands.

4. Consider intergovernmental agreements with the Town of Ridgway, the City of Ouray and areas of future incorporation that would maintain irrigated fields and low-density development surrounding each municipality

BLM_0061347

in exchange for establishing and maintaining urban growth boundaries.

5. Evaluate and consider for adoption programs and incentives that encourage the placement of land into conservation easements and other protective status.

6. Develop and implement a regional agricultural economic development plan in conjunction with the surrounding counties to promote agricultural activities.

7. Obtain, maintain and update a map of ditches and irrigated lands provided by the Colorado Division of Water Resources, supplemented or amended, as required, using other sources. Require developers to designate all irrigation ditches, return flow ditches and drainage ditches located within the boundaries of any development plan and designate access to such ditches and surrounding irrigated fields.

8. Evaluate and consider for adoption incentives and amendments to the Land Use Code that keep or augment existing water rights within the County.

## B. County/Municipal Relationships

Municipalities located within Ouray County today are the Town of Ridgway and the City of Ouray. In addition, the unincorporated town site of Colona is also located within Ouray County. Each municipality has developed and adopted a master plan or comprehensive plan to guide their growth. Of importance to all residents are the land use decisions that may be made by the municipalities and the County. These decisions can impact development patterns and the natural environment.

### Goal:

To preserve the community character of the City of Ouray and the Town of Ridgway.

### Policies:

1. The County and Municipalities (future and present) in cooperation should come to an agreement regarding the location of urban growth boundaries and urban influence zones. Having created and agreed to these boundaries, the County should recognize them in the following manner:

   a. The County should not rezone or allow the development of any property, other than agreed upon uses, within the urban growth boundaries.

   b. The County should support municipal annexations when the subject properties are located within the urban growth boundaries provided all conditions of the intergovernmental agreements are met.

   c. The County and municipalities should enter into intergovernmental agreements to jointly review any development proposals within established urban growth boundaries and other areas of mutual

concern

2. Encourage and foster intergovernmental agreements that uphold the intent of this master plan with any areas of concentrated residential development that undertake a process of incorporation.

## C. Economic Development

Ouray County's economy has changed significantly in recent decades.  Historically, the economy relied upon underground metal mining, agriculture and tourism.  In recent years, mining and agriculture have declined while the economic activities of people with income derived outside the County have increased and service and retail businesses now play a more important role in the County's economy.  In addition, the purchase of goods and services has shifted from within Ouray County to nearby Montrose County.  A more sustainable and diversified economy is desirable in order to ensure that Ouray County will not be as susceptible to seasonal cycles of a boom and bust economy and that traditional interests and values do not become totally displaced.

### Goal:

To promote a diverse and balanced economy that is less susceptible to the economic swings of any one industry.

### Policies:

1. Develop and implement standards that allow home based occupations that are appropriate for the property on which they are located.

2. Encourage high quality telecommunications infrastructure in the high-density areas of Ouray County.

3. Encourage commercial and/or industrial uses to locate within the municipal boundaries.

4. Define acceptable commercial and/or industrial uses in the unincorporated areas and develop and implement standards that allow the specific uses to be approved through the special use permit process.

## D. Housing

The residents of Ouray County desire attainable and varied housing options for all segments of the population.  Attainable housing units are becoming more scarce as population growth continues.  Only by ensuring the availability of housing for a diverse and varied population will Ouray County be able to maintain a socially and economically balanced community.

### Goal:

To assure the continuing availability of diverse housing to meet the needs of the County's growing population.

### Policies:

1. Develop and implement definitions of attainable housing, for both owner-

occupied and rental units, using standard methodologies.

2. Periodically evaluate the housing situation within Ouray County and consider for adoption appropriate changes to the Land Use Code to address the need for attainable housing.

3. Evaluate and consider for adoption regulations concerning the long-term rental of accessory apartments and dwelling units.

4. Evaluate and consider for adoption incentives that assist in development of attainable housing within proposed Planned Unit Developments.

## E. Natural Resources

Ouray County residents have always been aware of the abundant natural resources that surround them, including water, timber, minerals, clean air, wildlife, and scenery. In the past, these resources have been utilized to support mining, ranching, tourism, and the associated businesses that make up our communities. A balance between the protection of natural resources and the protection of individual property rights must be considered. The utilization of natural resources may have an impact on the environment; however, if properly planned, such utilization need not result in degradation of those attributes that attract people to Ouray County.

### Goal:

To manage our natural resources in a manner that is both environmentally sound and protects private property rights.

### Policies:

1. Continue to allow underground mining as a use-by-right in the Alpine Zone. It is recognized that this activity is highly regulated by both state and federal agencies. However, the County reserves the right to review all permits to determine whether the operation is in compliance.

2. Continue to regulate, by special use permit, open pit mining, milling, heap leach operations and other mineral and non-mineral, fuel and extractive operations within Ouray County.

3. Continue to allow property owners, through the special use permit process, the ability to harvest timber on their land.

4. Continue to ensure that all commercial and industrial activities occurring in the County are in compliance with local, state and federal regulations for air and water quality.

5. Evaluate and consider for adoption incentives and technologies that encourage energy and water conservation.

6. Evaluate and consider for adoption "1041" regulations (C.R.S. §24-65.1-101 et seq.).

7. Continue to maintain wildfire mitigation regulations and encourage fire protection and water supply entities to work proactively to make further

BLM_0061350

improvements in fire safety.

## F. Rural Character

Ouray County is made up of diverse landscape and topography. Privately owned land varies widely in terms of the suitability for development. Many of these parcels are not in close proximity to existing planned unit developments or attendant infrastructure. As a matter of public concern, expansion of urban development into rural areas is an issue because of the increased costs of County services (e.g. emergency medical services, fire protection, sheriff services and road and bridge maintenance).

### Goal:

To maintain the rural character of Ouray County.

### Policies:

1. Develop and implement zoning and incentives to maintain low density or large tracts of land. Where appropriate, direct growth toward areas that are already developed or that otherwise clearly support the goals of this plan.

2. Encourage build out in existing planned unit developments.

3. Create open space or low-density development areas around the town, city and future unincorporated areas by intergovernmental agreements that further the objectives of this master plan.

4. Continue to encourage clustering of residential units within all planned unit developments and those areas of Ouray County where it supports the goals of this plan.

## G. Tourism

Ouray County has many natural and scenic resources that appeal to both residents and tourists alike. The City of Ouray's history as a tourist destination began at the turn of the century. Historically, the impact of the tourist industry on the County's economy has been significant; however, this impact is primarily experienced during the summer months. Though winter recreational activities have begun to increase year round tourism, many restaurants and hotels still close down for the winter season.

### Goal:

To allow a diverse and balanced tourist economy that minimizes environmental and infrastructure impacts and is less susceptible to seasonal fluctuations.

### Policies:

1. Allow the development of the services and facilities necessary to adequately support year-round tourism in a manner that minimizes impacts on the environment, infrastructure and county residents' lifestyles.

BLM_0061351

2. Develop and implement special use permit regulations that allow tourist based businesses that are appropriately located within the unincorporated areas of the County and that minimize impacts on the environment, infrastructure and county residents' lifestyles.

3. Encourage the location of commercial, lodging, restaurant and other tourism-based activities in the municipalities and those planned unit developments that allow for commercial uses.

4. Allow special events within the County in a manner that minimizes impacts on the environment, infrastructure and county residents' lifestyles.

5. Encourage cooperation with the Town of Ridgway, the City of Ouray, the Ridgway Chamber of Commerce and the Ouray Chamber Resort Association.

# H. Transportation

The primary purpose of a transportation network is to move people and goods within and through the County.  As the amount of development and population increases, additional demand will be placed on the transportation infrastructure.  It must be recognized that the transportation network strongly influences the specific uses of land and the overall pattern of development; because of this interrelationship land use and transportation planning must be coordinated.

## Goal:

To promote a transportation network that allows for the orderly flow of traffic on roads in Ouray County.

## Policies:

1. Developments creating the need for road improvements are expected to bear the proportional cost of such improvements.

2. If a development creates off-site roadway impacts, the mitigation of such impacts should be required.  Such improvements should be considered in addition to any required on-site improvements.

3. Development that causes significant traffic impacts to overburdened roads will be discouraged unless provisions are made for necessary improvements.

4. Coordinate planning and development review efforts with the two municipalities, future incorporated areas and adjoining counties to ensure integration and continuity of the road system and adequacy of roads in Ouray County over time.

5. Roads within new developments should be designed to facilitate safe and logical flow of traffic on, off and, where appropriate, through the site.

6. Evaluate and consider implementation of mass transit and the effect it may have on intra and inter-county transportation.

7.  Evaluate and consider for adoption a transportation plan for roads in the County, considering citizen input.

8.  Continue to maintain a strong road standard section in the Land Use Code.

9.  Evaluate the feasibility of accommodating non-motorized modes of transportation, including horse, pedestrian and bicycle, in order to provide multiple modes of mobility to all segments of the population.

10. Evaluate and consider for adoption policies that direct inter-county traffic to state and federal highways where feasible.

## I.  Utilities

A number of entities provide utilities in Ouray County.  Utility services that are currently available in various areas of the County, include electricity, telephone, sewer, cable, transmitting towers and water.  A variety of federal and state commissions, departments, and agencies regulate utilities in Ouray County. However, land use activities, such as the location of transmission lines and the upgrading of existing facilities and the construction of new facilities, are subject to the County's jurisdiction and approval.

### Goal:

To recognize the necessity for the timely development of utility facilities and the need for careful planning to minimize the impacts associated with utility facility siting and design.  In addition, due to the economic and environmental impacts created by the increased need for energy, the County will continue to encourage the use and exploration of alternative energy sources including, but not limited to, natural gas, solar and wind.

### Policies:

1.  Utilities may be considered appropriate when sited so that they are as compatible as possible with surrounding land uses and the natural environment.

2.  Visual impacts should be identified and effective mitigation measures employed.

3.  Access, when required for utility service facilities, should provide minimal impacts to adjoining residents and the environment and should not be used for access to new development.

4.  Utility facilities siting should consider joint tower use, multi-utility corridors, and clustering where possible and deemed appropriate.

5.  In addition to environmental and land use compatibility issues, the land use review process should also consider the economic, technological, operational, maintenance, and safety implications of future utility facilities.

## J. Visually Significant Areas

Ouray County contains some of the most unique and beautiful scenery in Colorado. The diversity of the landscape ranges from jagged high mountain peaks and mesas to river valleys and irrigated fields.  Preservation of this visual beauty is of utmost importance to the citizens of the County.  The citizens want to be assured that future development will not hinder, impair or destroy Ouray County's scenic beauty.

### Goal:

To protect and preserve visually significant and sensitive areas of Ouray County that provide the scenic backdrops and vistas that all residents and visitors of Ouray County enjoy.

### Policies:

1. Maintain strong visual impact regulations.

2. Develop and implement strategies for the protection and preservation of critical scenic vistas.

3. Evaluate and consider for adoption programs and incentives that encourage the placement of land into conservation easements and other protective status.

4. Evaluate and consider for adoption programs for the protection of open space by Ouray County.

5. Evaluate and consider for adoption incentives for Planned Unit Developments to surpass the minimum open space requirement as set forth in the Land Use Code

## K. Wildlife and Plant Habitats

Ouray County is fortunate to have rich and varied flora and fauna.  This Master Plan recognizes the value residents place upon wildlife and plant resources for enjoyment and the economic impact that is generated by activities such as sightseeing, hunting and photography.  The degradation of wildlife and plant habitats leads to the inevitable disappearance of wildlife and plant species.  This resultant loss of environmental diversity weakens the ecosystem as a whole and may displace wildlife or remove certain species entirely.

### Goal:

To recognize the importance of protecting all species and habitat types currently found in Ouray County and maintain healthy and diverse wildlife and plant habitats.

### Policies:

1. Identify and strive to protect high-quality and significant wildlife and plant habitat areas.  These areas shall include habitats of endangered species, species of special concern, migration corridors, breeding and spawning and birthing areas, wetland and riparian areas, important seasonal

habitats, and habitats supporting a high diversity of wildlife species.

2.  Develop and maintain maps and information resources of significant wildlife and plant habitat areas.   Each new development shall be evaluated as to the effect the development will have on wildlife and plant habitat areas.   If significant habitat loss could occur, mitigation will be required or the proposed development may be denied.

3.  Develop and implement zoning and incentives that protect and preserve significant wildlife and plant habitats.

4.  Evaluate and consider for adoption programs and incentives that encourage the placement of land into conservation easements and other protective status.

5.  Continue to reduce the proliferation of noxious weeds utilizing methods that are in compliance with federal and state laws and local regulations.

6.  Evaluate and consider for adoption stronger regulations that would limit, to the extent of the law, the impact that domestic animals within planned unit developments have on wildlife.  This program would integrate and support efforts of the Colorado Division of Wildlife.

BLM_0061355

# TABLE OF CONTENTS

SECTION 1: GENERAL PROVISIONS                      PAGE
1.1   General Purpose ............................................................................. 1-1
1.2   Authority ........................................................................................ 1-1
1.3   Objectives ...................................................................................... 1-1
1.4   Severability ................................................................................... 1-2
1.5   Conflicts of Interest ...................................................................... 1-2
1.6.   Interpretation, Conflict with Other Laws .............................. 1-2
1.7   No Civil Remedy Created ........................................................... 1-2

SECTION 2: ZONING PROVISIONS, GENERAL
2.1   Purposes of Zoning Provisions ............................................... 2-1
2.2   Zoning Districts ............................................................................ 2-1
2.3   Uses by Right and Special Uses .......................................... 2-1
2.4   Uses Not Listed ............................................................................ 2-1

SECTION 3: ZONING PROVISIONS/ZONING DISTRICTS
3.1   Establishment of Zoning Districts ........................................ 3-1
3.2   Zoning Map and Boundaries .................................................... 3-1
3.3   Intent of the Zones ...................................................................... 3-1
3.4   Zoning Uses and Requirements ............................................. 3-2
     A.   Alpine Zone
           (1)   Uses Allowed by Right ....................................... 3-2
           (2)   Uses Allowed by Special Use Permit .................... 3-3
           (3)   Planned Unit Development .................................. 3-3
           (4)   Minimum Lot Size .............................................. 3-4
           (5)   Required Setbacks .............................................. 3-4
           (6)   Maximum Building or Structure Height .............. 3-4
     B.   Colona Zone
           (1)   Uses Allowed by Right ....................................... 3-4
           (2)   Uses Allowed by Special Use Permit .................... 3-4
           (3)   Planned Unit Development .................................. 3-5
           (4)   Minimum Lot Size .............................................. 3-5
           (5)   Floor-to-Lot Ratio .............................................. 3-5
           (6)   Required Setbacks .............................................. 3-5
           (7)   Maximum Building or Structure Height .............. 3-5
     C.   High Mesa Zone
           (1)   Uses Allowed by Right ....................................... 3-5
           (2)   Uses Allowed by Special Use Permit .................... 3-5
           (3)   Planned Unit Development .................................. 3-6
           (4)   Minimum Lot Size .............................................. 3-6
           (5)   Required Setbacks .............................................. 3-6
           (6)   Maximum Building or Structure Height .............. 3-6
     D.   North Mesa Zone
           (1)   Uses Allowed by Right ....................................... 3-7
           (2)   Uses Allowed by Special Use Permit .................... 3-7

BLM_0061356

|  |  | (3) | Planned Unit Development | 3-7 |
|  |  | (4) | Minimum Lot Size | 3-7 |
|  |  | (5) | Required Setbacks | 3-8 |
|  |  | (6) | Maximum Building or Structure Height | 3-8 |
|  | E. | Public Lands Zone | | |
|  |  | (1) | Uses Allowed by Right | 3-8 |
|  |  | (2) | Uses Allowed by Special Use Permit | 3-8 |
|  |  | (3) | Minimum Lot Size | 3-8 |
|  |  | (4) | Required Setbacks | 3-9 |
|  |  | (5) | Maximum Building or Structure Height | 3-9 |
|  | F. | South Mesa Zone | | |
|  |  | (1) | Uses Allowed by Right | 3-9 |
|  |  | (2) | Uses Allowed by Special Use Permit | 3-9 |
|  |  | (3) | Planned Unit Development | 3-9 |
|  |  | (4) | Minimum Lot Size | 3-10 |
|  |  | (5) | Required Setbacks | 3-10 |
|  |  | (6) | Maximum Building or Structure Height | 3-10 |
|  | G. | South Slope Zone | | |
|  |  | (1) | Uses Allowed by Right | 3-10 |
|  |  | (2) | Uses Allowed by Special Use Permit | 3-10 |
|  |  | (3) | Planned Unit Development | 3-11 |
|  |  | (4) | Minimum Lot Size | 3-11 |
|  |  | (5) | Required Setbacks | 3-11 |
|  |  | (6) | Maximum Building or Structure Height | 3-11 |
|  | H. | Valley Zone | | |
|  |  | (1) | Uses Allowed by Right | 3-11 |
|  |  | (2) | Uses Allowed by Special Use Permit | 3-11 |
|  |  | (3) | Planned Unit Development | 3-12 |
|  |  | (4) | Minimum Lot Size | 3-12 |
|  |  | (5) | Required Setbacks | 3-12 |
|  |  | (6) | Maximum Building or Structure Height | 3-12 |
| 3.5 | OVERLAY DISTRICTS | | | 3-13 |
|  | A. | Intent and Purpose | | 3-13 |
|  | B. | Definitions | | 3-13 |
|  | C. | Establishment of Overlay Districts | | 3-13 |
|  | D. | Overlay Districts | | 3-13 |
|  | E. | District Uses and Requirements | | 3-14 |
|  | F. | Development Review – Urban Growth Management Area | | 3-14 |
|  | G. | Development Review – Area of Influence | | 3-15 |
|  | H. | Joint Planning Boards | | 3-15 |

**SECTION 4: ZONING PROVISIONS - NON-CONFORMING USES AND STRUCTURES**

| 4.1 | General | 4-1 |
| 4.2 | Expansion or Enlargement | 4-1 |
| 4.3 | Repairs and Maintenance | 4-1 |
| 4.4 | Restoration or Replacement | 4-1 |
| 4.5 | Discontinuance | 4-2 |
| 4.6 | Non-Conforming Parcels | 4-2 |
| 4.7 | Change in Non-Conforming Use | 4-2 |
| 4.8 | County-Owned Property | 4-2 |

BLM_0061357

SECTION 5:  SPECIAL USES ALLOWED BY PERMIT ONLY (EXCEPT PUDs)
    5.1    General ............................................................................................ 5-1
    5.2    Permit Procedures ............................................................................. 5-1
    5.3    Review Requirements ........................................................................ 5-2
    5.4    Public Notice and Hearing ................................................................ 5-5
    5.5    Fees for Special Use Applications ...................................................... 5-6

SECTION 6:  SPECIAL USES BY PERMIT ONLY - PLANNED UNIT DEVELOPMENTS
    6.1    Enabling Authority ............................................................................ 6-1
    6.2    Objectives of Development and Statement of Purpose ......................... 6-1
    6.2.5  Planned Unit Development Types Defined............................................6-1
    6.3    Reviewing Body ................................................................................ 6-2
    6.4    Minimum Units and Acreage .............................................................. 6-2
    6.5    Development Standards ..................................................................... 6-2
    6.6    Interzone Planned Unit Developments ............................................... 6-2
    6.7    Site Requirements and Site Development Standards ............................. 6-3
    6.8    Visual Impact Compliance Requirements ............................................ 6-6
    6.9    Open Space Requirements ................................................................. 6-6
          A.   Planned Unit Development-Regular, Including Residential Use ... 6-6
          B.   Non-Residential Planned Unit Developments ............................... 6-8
    6.10  PUD Regular and PUD Resort – Requirements and Procedures ............ 6-8
          A.   Sequence ................................................................................... 6-8
          B.   Sketch Plan ............................................................................... 6-9
              (1)  Submittal .......................................................................... 6-9
              (2)  Content of Sketch Plan ...................................................... 6-10
          C.   Preliminary Development Plan .................................................... 6-11
              (1)  General ............................................................................ 6-11
              (2)  Submittal of Application ..................................................... 6-11
              (3)  Content of Preliminary Development Plan ........................... 6-12
              (4)  Additional Data ................................................................. 6-15
              (5)  Filing and Fees. ................................................................ 6-19
              (6)  Action on a Preliminary Development Plan ..........................6-19
          D.   Final Development Plan. ............................................................. 6-23
              (1)  General ............................................................................6-23
              (2)  Size and Scale .................................................................. 6-23
              (3)  Title Sheet ........................................................................ 6-23
              (4)  Additional Information ........................................................ 6-25
              (5)  Contents of Final Development Plan Maps ........................... 6-25
              (6)  Filing and Fees ................................................................. 6-26
              (7)  Action on Final Development Plan ...................................... 6-28
              (8)  Construction of Planned Unit Development ......................... 6-28
              (9)  Final Approval of PUD ...................................................... 6-29
    6.11  PUD-Limited Development Requirements and Procedure ................... 6-30
          A.   Statement of Purpose ................................................................. 6-30
          B.   PUD Limited Criteria ................................................................ 6-30
          C.   Process and Application Submittal Requirements. ...................... 6-30
              (1)  Submittal of the Application. .............................................. 6-30
              (2)  Content of Development Plan ............................................. 6-31
          D.   Planning Commission/Joint Area Planning Board Action .......... .6-33

BLM_0061358

E.    Board of County Commissioners' Action. .................................... 6-34
6.12  Planned Unit Development-Rst/Conference Center ........................... 6-35
      A.    Statement of Purpose ............................................... 6-35
      B.    Criteria ........................................................... 6-35
      C.    Designated Building Area ........................................... 6-37
      D.    Infrastructure and Services ........................................ 6-37
      E.    Emergency Services ................................................. 6-37
      F.    Parking ............................................................ 6-38
      G.    Transportation ..................................................... 6-38
      H.    Employee Housing Required .......................................... 6-38
      I.    Process & Application Submittal Req. for PUD-Resort ................ 6-40
6.13  Amendment or Alteration of Planned Unit Development ..................... 6-41
      A.    County Approval .................................................... 6-42
      B.    Approval by Other Interest Holders ................................. 6-42
6.17  Outside Professional Assistance ........................................ 6-42
6.21  Wildlife Protection Measures for the N. Mesa & S. Slope Zones .......... 6-42

SECTION 7:  IMPROVEMENTS STANDARDS
7.1   Purpose ................................................................ 7-1
7.2   Required Improvements .................................................. 7-1
      A.    Grading and Paving ................................................. 7-1
      B.    Curbs and Gutters .................................................. 7-1
      C.    Sidewalks .......................................................... 7-1
      D.    Retaining Walls .................................................... 7-1
      E.    Water Supply and Fire Protection ................................... 7-1
      F.    Sewage Disposal .................................................... 7-2
      G.    Trees and Landscaping .............................................. 7-3
      H.    Fills .............................................................. 7-3
      I.    Drainage and Flood Control ......................................... 7-3
      J.    Underground Utilities .............................................. 7-3
      K.    Street Name Signs .................................................. 7-4
      L.    Subdivision Monumentation .......................................... 7-4
            (1)  Permanent Monuments .......................................... 7-4
            (2)  Staking ...................................................... 7-4
            (3)  Inspection and Installation .................................. 7-5
      M.    Off-Street Parking ................................................. 7-5
7.3   Design Standards ....................................................... 7-7
      A.    Site Considerations ................................................ 7-7
      B.    Streets and Highways ............................................... 7-7
            (1)  General Design ............................................... 7-7
            (2)  Centerlines .................................................. 7-8
            (3)  Widths ....................................................... 7-8
            (4)  Road Intersections ........................................... 7-8
            (5)  Road Extensions .............................................. 7-9
            (6)  Cul-de-Sac Streets ........................................... 7-9
            (7)  Road Names ................................................... 7-9
            (8)  Grades ....................................................... 7-9
            (9)  Centerline Radii ............................................. 7-9
            (10) Service Roads ................................................ 7-9
            (11) Slope Easements .............................................. 7-9

iv

(12) Road Beds .................................................................... 7-10
(13) Street Signs ................................................................. 7-10
(14) Project Indentification ................................................ 7-10
C.   Alleys and Easements ......................................................... 7-10
(1)   Where Required ........................................................ 7-10
(2)   Minimum Width ........................................................ 7-10
(3)   Alley Intersections .................................................... 7-10
(4)   Public Utilities ......................................................... 7-10
(5)   Pedestrian Ways ....................................................... 7-10
D.   Drainage ............................................................................. 7-11
(1)   General Provisions .................................................... 7-11
(2)   Mitigation Requirements .......................................... 7-12
E.   Lots, Blocks and Sidewalks ............................................... 7-12
(1)   Zoning Requirements ............................................... 7-12
(2)   Lot Drainage ............................................................. 7-13
(3)   Side Lot Lines ........................................................... 7-13
(4)   Double Frontage Lots ............................................... 7-13
(5)   Block Length ............................................................. 7-13
(6)   Sidewalk Specifications ............................................ 7-13
F.   Filled Lands ........................................................................ 7-14

SECTION 8:  SIGN REGULATIONS
8.1   Permitted Signs ...................................................................... 8-1
8.2   Sign Maintenance ................................................................... 8-2

SECTION 9:  VISUAL IMPACT REVIEW
9.1   Purpose ................................................................................... 9-1
9.2   Compliance .............................................................................. 9-1
9.3   Criteria and Standards ............................................................ 9-1
9.4   Process for Review .................................................................. 9-3
9.5   Submittal Requirements .......................................................... 9-4
9.6   Definitions .............................................................................. 9-5
9.7   Additional Standards .............................................................. 9-6
9.8   Covenants Relating to Visual Impact ..................................... 9-7

SECTION 10: FLOOD HAZARD REGULATIONS
10.1   Statutory Authority ............................................................ 10-1
10.2   Findings of Fact .................................................................. 10-1
10.3   Statement of Purposes ........................................................ 10-1
10.4   Methods of Reducing Flood Losses .................................... 10-2
10.5   General Provisions .............................................................. 10-2
A.   Land to Which These Regulations Apply ..................... 10-2
B.   Basis for Establishing the Areas of Special Flood Hazard ........... 10-3
C.   Compliance ................................................................... 10-3
D.   Abrogation and Greater Restrictions ............................ 10-3
E.   Interpretation ................................................................ 10-3
F.   Warning and Disclaimer of Liability ............................ 10-4
10.6   Administration .................................................................... 10-4
A.   Establishment of Development Permit ......................... 10-4
B.   Building Official to Administer Regulations ............... 10-4

BLM_0061360

C.  Duties and Responsibilities of Building Official ......................... 10-5
    (1)  Permit Review .................................................................. 10-5
    (2)  Use of Other Base Flood Data.......................................... 10-5
    (3)  Information to be Obtained and Maintained ...................... 10-5
    (4)  Alteration of Watercourses............................................... 10-6
    (5)  Interpretation of FIRM Boundaries .................................. 10-6
10.7  Variance Procedures ......................................................................... 10-6
  A.  Appeal Board .............................................................................. 10-6
  B.  Conditions for Variance .............................................................. 10-8
10.8  Provisions for Flood Hazard Reduction ........................................... 10-9
  A.  General Standards........................................................................ 10-9
    (1)  Anchoring ......................................................................... 10-9
    (2)  Construction Materials and Methods ................................ 10-10
    (3)  Utilities ............................................................................ 10-10
    (4)  Development Proposals ..................................................... 10-11
    (5)  Encroachments .................................................................. 10-11
  B.  Specific Standards ....................................................................... 10-11
    (1)  Residential Construction ................................................... 10-11
    (2)  Non-Residential Construction ........................................... 10-12
    (3)  Mobile Homes ................................................................... 10-13

SECTION 11: MINERAL RESOURCE REGULATIONS
11.1  General Provisions............................................................................ 11-1
  A.  Purpose and Intent ...................................................................... 11-1
  B.  Applicability ............................................................................... 11-1
  C.  Non-Conforming Uses ................................................................ 11-1
11.2  Uses Permitted ................................................................................. 11-2

SECTION 12: GEOLOGIC HAZARD AREA REGULATIONS
12.1  General Provisions............................................................................ 12-1
  A.  Purpose and Intent ...................................................................... 12-1
  B.  Applicability ............................................................................... 12-1
12.2  Non-Conforming Uses ..................................................................... 12-2
12.3  Hazard Area Delineations................................................................ 12-2
12.4  Uses Permitted ................................................................................. 12-2
  A.  Uses Allowed by Right................................................................ 12-2
  B.  Uses Allowed by Special Use Permit .......................................... 12-2
12.5  Additional Conditions ...................................................................... 12-3

SECTION 13: WILDLIFE HABITAT REGULATIONS
13.1  General Provisions............................................................................ 13-1
  A.  Purpose and Intent ...................................................................... 13-1
  B.  Applicability ............................................................................... 13-1
13.2  Non-Conforming Uses ..................................................................... 13-1
13.3  Wildlife Habitat Delineations.......................................................... 13-1
13.4  Uses Permitted ................................................................................. 13-2
13.5  Additional Conditions...................................................................... 13-2

SECTION 14: SOLID WASTE SITE REGULATIONS
14.1  General Provisions............................................................................ 14-1

BLM_0061361

   A. Purpose and Intent ...................................................................... 14-1
   B. Applicability ................................................................................ 14-1
 14.2 Non-Conforming Uses ........................................................................ 14-1
 14.3 Solid Waste Disposal Site - Permits .................................................... 14-1
 14.4 Uses Permitted .................................................................................... 14-4
 14.5 Denial of Permits and/or Revocation of Permits .................................. 14-4

SECTION 15: MOBILE HOME REGULATIONS
 15.1 Mobile Homes General ........................................................................ 15-1
 15.2 Mobile Home Parks ............................................................................. 15-1
 15.3 Mobile Homes Outside of Mobile Home Parks.................................... 15-2
 15.4 Campgrounds and RV Parks ................................................................ 15-2

SECTION 16: PENALTIES AND VIOLATIONS
 16.1 Construction or Alteration of Buildings ............................................... 16-1
 16.2 Use of Buildings, Structures or Land ................................................... 16-1
 16.3 Transfer of Interests ............................................................................ 16-2
 16.4 Withholding of Permits........................................................................ 16-2
 16.5 Actions to Enjoin ................................................................................ 16-2
 16.6 Private Action ..................................................................................... 16-2
 16.7 Notice of Violation ............................................................................. 16-3
 16.8 Notice of Violation (No Civil Liability)............................................... 16-3

SECTION 17: EXCEPTIONS AND EXEMPTIONS
 17.1 Exceptions ........................................................................................ 17-1
 17.2 Exemption from Definition of Subdivision .......................................... 17-1
 17.3 Procedure .......................................................................................... 17-1

SECTION 18: FEES ................................................................................................ 18-1

SECTION 19: ADMINISTRATION
 19.1 Enforcement ...................................................................................... 19-1
 19.2 Site Development Permits .................................................................... 19-1
 19.3 Building Permits ................................................................................. 19-3
 19.4 Certificate of Occupancy ..................................................................... 19-3
 19.5 Records ............................................................................................. 19-3
 19.6 Planning Commission .......................................................................... 19-3
   A. Establishment............................................................................. 19-3
   B. Appointment of Members............................................................ 19-3
   C. Powers and Duties ...................................................................... 19-4
 19.7 Board of Zoning Adjustment ............................................................... 19-4
   A. Establishment............................................................................. 19-4
   B. Membership ............................................................................... 19-4
   C. Officers ..................................................................................... 19-4
   D. Appeals to the Board of Adjustment ........................................... 19-4
   E. General Duties of the Board ........................................................ 19-5
   F. Procedures ................................................................................. 19-6
   G. Appeals from the Board .............................................................. 19-6
 19.8 Board of Visual Appeals...................................................................... 19-6
   A. Establishment............................................................................. 19-6

BLM_0061362

      B.   Membership ................................................................................ 19-6
      C.   Officers ..................................................................................... 19-6
      D.   Appeals to the Board of Visual Appeals ..................................... 19-6
      E.   General Duties of the Board ....................................................... 19-7
      F.   Procedure .................................................................................. 19-8
19.9  Joint Planning Boards ......................................................................... 19-8
      A.   Establishment ............................................................................ 19-8
      B.   Appointment of Members .......................................................... 19-8
      C.   Powers and Duties ..................................................................... 19-9

SECTION 20: AMENDMENT
20.1  General Procedure .............................................................................. 20-1
20.2  Procedures     ........................................................................... 20-1
      A.   Rezoning ................................................................................... 20-1
      A.   Land Use Amendments ............................................................. 20-2
20.3  Standards to Change Zoning Classification ......................................... 20-2
20.4  Submittal Requirements for Rezoning ................................................. 20-3

SECTION 21: REPEAL/RE-ENACTMENT ............................................................. 21-1

SECTION 22: DEFINITIONS ................................................................................... 22-1

SECTION 23: ROAD STANDARDS
23.1  Policies and Procedures ...................................................................... 23-1
      A.   Purpose ..................................................................................... 23-1
      B.   Application of Standards ............................................................ 23-1
      C.   General Policies ......................................................................... 23-2
      D.   County Road System .................................................................. 23-4
      E.   New Subdivision/PUD & Residential Road Development .......... 23-6
      F.   County Roads ............................................................................. 23-11
23.2  Road Design Standards ....................................................................... 23-12
      A.   Purpose ..................................................................................... 23-12
      B.   General Procedure ..................................................................... 23-12
      C.   Basic Design Policies ................................................................ 23-12
      D.   Route Corridor and Terrain Factors ........................................... 23-15
      E.   Design Speed ............................................................................. 23-16
      F.   Grades ....................................................................................... 23-17
      G.   Sight Distance ........................................................................... 23-17
      H.   Alignment ................................................................................. 23-18
      I.   Road Surface Classification ....................................................... 23-19
      J.   Traveled Way Crown ................................................................. 23-20
      K.   Superelevation .......................................................................... 23-20
      L.   Number of Lanes ....................................................................... 23-20
      M.   Width of Driving Surface, Shoulder & Roadway ...................... 23-21
      N.   Switchbacks .............................................................................. 23-23
      O.   Vertical Clearance ..................................................................... 23-23
      P.   Intersection Design .................................................................... 23-23
      Q.   Typical Drawings ...................................................................... 23-25
      R.   Side Slopes ................................................................................ 23-26
      S.   Structural Section ...................................................................... 23-26

BLM_0061363

T.    Flexible Pavement Design ......................................................... 23-27
U.    Drainage.................................................................................... 23-28
V.    Bridges ..................................................................................... 23-31
W.   Traffic Control Devices............................................................ 23-32
X.    Driveways ................................................................................. 23-32
Y.    Revegetation and Erosion Control ............................................ 23-33
Z.    Guard Rails ............................................................................... 23-34
AA.  Utilities .................................................................................... 23-35
AB.  Street Names and Sign Locations ............................................. 23-36
23.3    Roadway Construction Specifications ................................................. 23-36
A.    Construction Testing ................................................................. 23-36
B.    Construction Inspections .......................................................... 23-37
C.    Construction Standards ............................................................. 23-37
23.4    Variance to Road Standards................................................................ 23-38
23.5    Impact Fees for Roads ....................................................................... 23-39
A.    Short Title ................................................................................. 23-39
B.    Findings .................................................................................... 23-39
C.    Intent      ................................................................................... 23-40
D.    Applicability of Impact Fees .................................................... 23-41
E.    Imposition of Impact Fees ........................................................ 23-41
F.    Calculation of Impact Fees ....................................................... 23-41
G.    Administration of Maintenance Impact Fee .............................. 23-44
H.    Administration of Construction Impact Fee .............................. 23-44
I.    Bonding of Excess Facility Projects.......................................... 23-46
J.    Refunds of Construction Impact Fees ....................................... 23-47
K.    Appeals     ................................................................................... 23-47
L.    Effect of Impact Fee on Other Land Use Code Provisions ........ 23-48
M.   Impact Fee as Additional or Supplemental Requirement ........... 23-48
N.    Variances and Exceptions.......................................................... 23-48
O.    Developer Improvements to Co. Roads & Related Credits........ 23-48
P.    Liberal Construction ................................................................. 23-50
Q.    Definitions ................................................................................ 23-50

SECTION 24 — WILDFIRE MITIGATION
24.1    Purpose        ..................................................................................... 24-1
24.2    Applicability   ..................................................................................... 24-1
24.3    Enforcement .................................................................................... 24-2
24.4    Fire Safety Rating ............................................................................. 24-2
24.5    Requirements and Procedures............................................................ 24-2
A.    Planned Unit Developments ...................................................... 24-2
B.    Residential Structures Subject to this Code .............................. 24-4
C.    Commercial Structures Subject to this Code.............................. 24-5
FIRE SAFETY RATING FOR PUDS..............................................................Sec. 24, p. 1
FIRE SAFETY RATING FOR NEW RESIDENTIAL STRUCTURES ........Sec. 24, p. 3

SECTION 25 — VESTED PROPERTY RIGHTS
25.1 Purpose        ..................................................................................... 25-1
25.2 Vested Property Right Duration, Termination, Effect.......................... 25-1
25.3 Notice and Hearing ........................................................................... 25-2

BLM_0061364

25.4  Approval, Effective Date, Amendments ................................................ 25-2
25.5  Development Agreements ..................................................................... 25-3
    A.   Authority ...................................................................... 25-3
    B.   Minimum Requirements ................................................ 25-3
    C.   Minimum Terms and Conditions .................................... 25-6
    D.   Development Agreement Procedure ................................ 25-8
    E.   Preliminary Development Plan/Plat ........................... 25-11
    F.   Final Subdivision Plat ................................................ 25-19
    G.   Construction – Required Approvals ........................... 25-22
25.6  Notice of Approval ........................................................................... 25-23
25.7  Payment of Costs ............................................................................. 25-23
25.8  Other Provisions Unaffected ............................................................. 25-23
25.9  Limitations ................................................................................... 25-24


SECTION 26 — LAND DEDICATIONS AND PAYMENTS FOR SCHOOLS
26.1  Purpose, Authority and Applicability .................................................. 26-1
26.2  Definitions ................................................................................... 26-1
26.3  Referral to School District ................................................................. 26-1
26.4  Fair Contribution for Public School Sites ............................................ 26-2
METHODOLOGY: LAND DEDICATIONS FOR SCHOOL PURPOSES ............... 26-4


SECTION 27 — OUTDOOR LIGHTING REGULATIONS
27.1  Purpose ........................................................................................ 27-1
27.2  Compliance ................................................................................... 27-1
27.3  Criteria and Standards ...................................................................... 27-2
27.4  Process for Review .......................................................................... 27-2
27.5  Definitions ................................................................................... 27-2
27.6  Covenants Relating to Visual Impact .................................................. 27-2
27.7  Appeals and Variances ..................................................................... 27-3


SECTION 28 — HOME OCCUPATIONS/BUSINESSES
28.1  Purpose ......................................................................................... 28-1
28.2  Home Occupations ........................................................................... 28-1
28.3  Home Businesses ............................................................................. 28-2
28.4  Special Use Permit ........................................................................... 28-3
28.5  Annual Permit Fee ........................................................................... 28-3
28.6  Permit Renewal ............................................................................... 28-3
28.7  Permit Transferability ....................................................................... 28-4
28.8  Non-Conforming Uses ...................................................................... 28-4
28.9  Revocation of Home Business Permits ................................................ 28-4


SECTION 29 — OIL & GAS DEVELOPMENT
29.1  Authority ....................................................................................... 29-1
29.2  Purpose ......................................................................................... 29-1
29.3  Jurisdiction ................................................................................... 29-1
29.4  Minor Oil and Gas Facilities ............................................................. 29-2
29.5  Major Oil and Gas Facilities ............................................................. 29-2
29.6  Application Submittal ....................................................................... 29-3

BLM_0061365

29.7   Review Process ...................................................................................... 29-5

29.8   Performance Standards for All Oil and Gas Facilities ......................... 29-9

29.9   Special Exception Requests ............................................................... 29-22

29.10 Approval, Limitations, Security and Revocation ................................ 29-24

29.11 Amendments ...................................................................................... 29-25

29.12 Penalties and Enforcement ............................................................... 29-25

29.13 Definitions      ................................................................................... 29-26

BLM_0061366

# Section 1

## GENERAL PROVISIONS

1.1     GENERAL PURPOSE

The purpose of this Code is to promote the health, safety, and general welfare of the present and future inhabitants of Ouray County, Colorado, by planning for and regulating the use of land so as to provide planned and orderly development and protecting the environment in a manner consistent with constitutional rights.  The Ouray County Master Plan has been considered in preparing this Code.

It is intended, by this Code, therefore to regulate development and activities in Ouray County, to give special attention to hazardous areas, to protect lands from activities which would cause immediate or foreseeable material danger to significant wildlife habitats, to preserve areas of historical and archaeological importance, to regulate the location of activities and developments which may result in changes in population density, to provide for phased development of services and facilities, to regulate the use of land on the basis of impact on the communities or surrounding areas, to lessen and control congestion in streets and roads, to secure safety from fire and other damages, to provide adequate light and air, to facilitate the adequate provision of transportation, water, sewage disposal, schools, parks and other public requirements, while at the same time protecting the natural beauty and scenic vistas of the County.

In developing and adopting this Code, consideration has been given to the physiographic and other natural characteristics of the various areas of the County and the individual suitability of those areas for particular uses.

1.2     AUTHORITY

This Code is authorized and adopted pursuant to the provisions of Article 67 of Title 24, Article 20 of Title 29 and Article 28 of Title 30 of Colorado Revised Statutes.

1.3     OBJECTIVES

The authority cited in Section 1.2 includes enabling authority for zoning, subdivision, planned unit development and general local government land use control.  It is the intent of Ouray County to make use of its authority in a manner which simplifies, to the maximum extent possible, the application and review process for all development proposals by amalgamating those functions usually found in separate zoning and subdivision regulations.  Pervading these regulations is the intent to make maximum possible use of the authority found in Article  67  of Title 24, the Planned Unit

[1.3]

BLM_0061367

Development Act.  Because of the unique characteristics of Ouray County described in the County Master Plan, maximum flexibility in development is required. This can best be achieved by use of the Planned Unit Development process.

1.4      SEVERABILITY

If any section, subsection, sentence, clause or phrase of this Code is, for any reason, held to be invalid or unconstitutional by the decision of any Court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of the Code.  The Board of County Commissioners hereby declares that it would have passed this Code, and each section, subsection, sentence, clause and phrase hereof irrespective of the fact that any one or more section, subsection, clause or phrase be declared to be invalid or unconstitutional.

1.5      CONFLICTS OF INTEREST

Where any provision of the Colorado Revised Statutes or this Code requires an official action by a person who is also a subdivider or an agent or employee thereof or, in any other circumstance where a possible conflict of interest might reasonably exist, that official action shall be performed by some other person duly qualified therefore and designated to so act by the Board of County Commissioners.

1.6      INTERPRETATION, CONFLICT WITH OTHER LAWS

In their interpretation and application, the provisions of this Code shall be held to be minimum requirements adopted by the preservation of the public health, safety and welfare.  Whenever the requirements of this Code are at variance with the requirements of any other lawfully adopted rules, regulations, or resolutions, the more restrictive or that imposing the higher standards shall govern.

Amended    1.7      NO CIVIL REMEDY CREATED:
12/3/90

By developing and adopting this Code, the County does not intend to create and expressly does not create a private civil remedy against the County or its employees or agents.

BLM_0061368

# Section 2

## ZONING PROVISIONS - GENERAL

2.1     PURPOSES OF ZONING PROVISIONS

The zoning provisions of this Code represent a portion of the County's attempt to achieve the purposes set forth in Section 1.

2.2     ZONING DISTRICTS

The zoning districts established by this Code have been, and will be, identified on the basis  of the physical character of the County combined with the additional information about existing land use and ownership patterns and the needs of a stable and growing economy.

2.3     USES BY RIGHT AND SPECIAL USES

The uses permitted in each district correspond to the unique characteristics of that district.  They are intended to be consistent with and to do the least possible harm to, the particular environment of the district. In all districts, care is taken to allow for potential development under careful control. All the allowable uses require different controls and safeguards.  For this purpose, the allowable uses are divided into two groups in each district, uses allowed by right and special uses allowed by permit only.  Uses allowed by right are allowed automatically, subject to proper filing and permitting.  Special uses allowed by permit only may be granted or denied.  If granted, certain predetermined standards and conditions of performance must be complied with.  Detailed provisions relating to special uses allowed by permit are contained in Section 5 of this Code.

2.4     USES NOT LISTED

Upon application, or on its own initiative, the Board of County Commissioners may,  by resolution, add to the uses listed for a zoning district any other similar use which conforms to the conditions set forth in the following special findings:

> A.      Such use is appropriate to the physiographic and general environmental character of the zone to which the use is added.

> B.      Such use does not create any more hazard to or alteration of the zone than the minimum amount normally resulting from the other uses permitted in the zone to which the use is added.

[2.4 C]

BLM_0061369

C.      Such use does not create any more offensive noise, vibration, dust, heat, smoke, odor, glare or other objectionable influences or more traffic hazards than the minimum amount normally resulting from the other uses permitted in the zone to which the use is added.

D.      Such use is compatible with the uses existing and permitted in the zone to which the use is added.

When any use has been added to the list of permitted uses in any zone in accordance with this Section, such use shall be deemed to be listed in the appropriate section of the regulations for that Zone and shall be added thereto in the published text of this Code at the first convenient opportunity, with a notation indicating that the addition was made in accordance with this Section.

2-2

BLM_0061370

(Amended December 12, 2006 by Board of County Commissioners)

# Section 3

**ZONING PROVISIONS – ZONES**

3.1 <u>ESTABLISHMENT OF ZONES</u>

Ouray County is hereby divided into eight (8) zones as follows:

A.  Alpine
B.  Colona
C.  High Mesa
D.  North Mesa
E.  Public Lands
F.  South Mesa
G.  South Slope
H.  Valley

3.2 <u>ZONING MAP AND BOUNDARIES</u>

All Zones shall be designated on the "Official Zoning Map of Ouray County" which is on file in the records of the Ouray County Clerk and Recorder. A copy of the map is attached to this Code and, in the event of any conflict between the copy of the map on file in the County records, the latter shall be conclusively deemed to prevail.

3.3 <u>THE INTENT OF THE ZONES</u>

The intent of the Ouray County zones is to achieve, on balance across the zones, the overall goal of the Ouray County Master Plan: To allow gradual, long-term population and economic growth in Ouray County in a manner that does not harm the County's irreplaceable scenic beauty, wildlife, air and water resources, and other environmental qualities and that does not unduly burden the County's residents or its governments. This overall goal includes, in alphabetical order, specific goals for agricultural lands, county/municipal relationships, economic development, housing, natural resources, rural character, tourism, transportation, utilities, visually significant areas, and wildlife and plant habitats. The specific intents of the zones that follow shall be read in conjunction with the combination of the Master Plan's overall and specific goals, and provide general guidance with regard to specific uses within each zone.

A.  Alpine Zone. The intent of the Alpine Zone is to preserve the natural beauty, wildlife habitat, and recreational, historic and archeological values of high altitude areas and manage the County's natural resources in a manner that is both environmentally sound and protects private property rights, while allowing

BLM_0061371

mining, agriculture, forestry, recreation, and limited low density and resort/conference center development.

B.    Colona Zone.  The intent of the Colona zone is to maintain an area of high-density residential development (one unit per 6,000 square feet) and commercial activity.

C.    High Mesa Zone.    The intent of the High Mesa Zone is to encourage agricultural production, preserve areas for wildlife migration and habitat and scenic, historical and archaeological values, and to allow low density residential development that does not adversely impact the significant vegetative, wildlife, historic, archaeological and scenic values of the Zone.

D.    North Mesa Zone.  The intent of the North Mesa Zone is to preserve areas for wildlife migration and habitat and allow up to six acre residential development (medium density) that is not impacted by geologic hazards.

E.    Public Lands Public Lands Zone.  The intent of the Public Lands Zone is to preserve and protect private lands that are not publicly owned and managed by Federal or State entities in the Zone from future development, thereby providing visual and recreational enjoyment for the County's present and future residents as well as for visitors.

F.    South Mesa Zone.  The intent of the South Mesa Zone is to allow medium density and, where appropriate, high density (including commercial) development if all appropriate infrastructure is available.  The purpose is to meet the overall Master Plan goal of allowing gradual, long-term population and economic growth without harming the County's irreplaceable environmental qualities and unduly burdening the County's residents or governments.

G.    South Slope Zone.  The intent of the South Slope Zone is to preserve areas for wildlife migration and habitat and allow up to six acre residential development (medium density) that is not impacted by geologic hazards.

H.    Valley Zone.  The intent of the Valley Zone is to protect and preserve visually significant and sensitive areas of Ouray County, maintain its overall rural character, and/or encourage the continued use of lands for agricultural productivity.

3.4    ZONE USES AND REQUIREMENTS

A.    Alpine Zone

(1)    Uses Allowed by Right:

(a)    Underground Mining subject to State and Federal permitting and conditions set forth in Section 12 of this Code.

3-2

(b)     Accessory uses and structures that are accessory to any other use by right and any permitted use.

(c)     Farming/Ranching.

(d)     Home occupation.

(e)     Non-commercial camping.

(f)     Non-commercial logging.

(g)     Single family dwelling unit (maximum density of one unit per 35 acres) on parcels not previously approved by Ouray County as part of a Planned Unit Development.

(2)     <u>Uses Allowed by Special Use Permit</u>:

(a)     Bed and breakfast.

(b)     Cemetery.

(c)     Church.

(d)     Commercial camping.

(e)     Commercial equestrian activity.

(f)     Commercial logging.

(g)     Commercial outdoor recreation – day use.

(h)     Governmental facility.

(i)     Guest ranch.

(j)     Home Business

(k)     Livery or horse rental operation.

(l)     All mineral extraction and processing operations except those allowed pursuant to Section 3.4.A (1)(a).

(m)     Oil and gas exploration and facilities.

(n)     Public park or wildlife reserve.

(o)     Public service facility.

(p)     Public utility.

BLM_0061373

(q)     Sand and gravel operation.

(r)     School.

(s)     Temporary use.

(3)     <u>Planned Unit Development</u>:

(a)     Regular PUD (maximum density of one unit per 35-acres).

(b)     Resort/Conference Center PUD.

(4)     <u>Minimum Lot Size</u>:

(a)     All uses except as otherwise provided for in this Code - thirty-five (35) acres.

(b)     Planned unit developments – as established by Section 6 of this Code.

(c)     Special uses – as established by Section 5 of this Code.

(5)     <u>Required Setbacks</u>:   All structures shall be located at least twenty-five (25) feet from any property lines unless approved otherwise in a PUD.  With the exception of lots and parcels that have an area of two (2) acres or less, the minimum setbacks for structures shall be ten (10) feet from the side and back property lines and twenty-five (25) feet from the front property line.  No structure may be closer than one hundred (100) feet from the centerline of U. S. Highway 550 or Colorado Highway 62, if visible from such highways.

(6)     <u>Maximum Building or Structure Height</u>:  The maximum building or structure height shall be thirty-five (35) feet unless approved otherwise in a planned unit development.

B.     <u>Colona Zone</u>

(1)     <u>Uses Allowed by Right</u>:

(a)     Single-family dwelling units.

(b)     Accessory Uses and Structures.

(c)     Home occupation.

(2)     <u>Uses Allowed by Special Use Permit</u>:

(a)     Church.

(b)     Commercial use.

3-4

BLM_0061374

(c)     Governmental facility.

(d)     Home Business

(e)     Multi-family dwelling.

(f)     Oil and gas exploration and facilities.

(g)     Public service facility.

(h)     Public utility.

(i)     School.

(3)     <u>Planned Unit Development</u>:  Regular PUD (maximum density of 7 units per acre).

(4)     <u>Minimum Lot Size</u>:  Lot size shall not be less than fifty (50) feet by one hundred twenty (120) feet.  Larger lot sizes may be required to meet requirements for adequate sewage disposal.

(5)     <u>Floor-to-Lot Ratio</u>:  For all uses, maximum floor-to-lot area ratio shall not exceed 1:1.

(6)     <u>Required Setbacks</u>: All structures shall be at least twenty (20) feet from any street or highway right-of-way (except alleys) and at least ten (10) feet from all other property lines.

(7)     <u>Maximum Building or Structure Height</u>. Maximum building or structure height shall not exceed thirty-five (35) feet.

C.     <u>High Mesa Zone</u>

(1)     <u>Uses Allowed by Right</u>:

(a)     Farming/Ranching.

(b)     Single family dwelling unit (maximum density of one unit per 35 acres) on parcels not previously approved by Ouray County as part of a Planned Unit Development.

(c)     Non-commercial logging.

(d)     Accessory uses and structures that are accessory to any other use by right and any permitted use.

(e)     Home occupation.

(f)     Non-commercial camping.

3-5

BLM_0061375

(2)   <u>Uses Allowed by Special Use Permit</u>:

   (a)   Bed and Breakfast.

   (b)   Cemetery.

   (c)   Church.

   (d)   Commercial camping.

   (e)   Governmental facility.

   (f)   Guest ranch.

   (g)   Home Business

   (h)   Mineral operation.

   (i)   Oil and gas exploration and facilities.

   (j)   Public park or wildlife reserve.

   (k)   Public service facility.

   (l)   Public utility.

   (m)   Sand and gravel operation.

   (n)   School.

   (o)   Temporary Use.

(3)   <u>Planned Unit Development</u>:

   (a)   Regular PUD (maximum density of one unit per thirty-five (35) acres.

(4)   <u>Minimum Lot Size</u>:

   (a)   Single family dwellings – thirty-five (35) acres.

   (b)   Planned unit developments, as established by Section 6 of this Code.

   (c)   Special uses – as established by Section 5 of this Code.

(5)   <u>Required Setbacks</u>:  All structures shall be located at least twenty-five (25) feet from any property lines, unless a greater setback is required within an approved PUD.

3-6

BLM_0061376

(6)     <u>Maximum Building or Structure Height</u>:   Maximum building height shall not exceed thirty-five (35), unless a height of less than thirty-five (35) feet is required within an approved PUD.

D.     <u>North Mesa Zone</u>

    (1)     <u>Uses Allowed by Right</u>:

        (a)     Single-family dwelling units (maximum density of 1 unit per 35-acres).

        (b)     Accessory uses and structures that are accessory to any other use by right and any permitted use.

        (c)     Home occupations.

        (d)     Farming/Ranching.

        (e)     Non-commercial camping.

    (2)     <u>Uses Allowed by Special Use Permit</u>:

        (a)     Bed and breakfast.

        (b)     Cemetery.

        (c)     Church.

        (d)     Governmental facility.

        (e)     Guest ranch.

        (f)     Home Business

        (g)     Oil and gas exploration and facilities.

        (h)     Public park or wildlife reserve.

        (i)     Public service facility.

        (j)     Public utility.

        (k)     Sand and gravel operation.

        (l)     School.

        (m)     Temporary use.

BLM_0061377

(3)   <u>Planned Unit Development</u>:

     (a)   Limited PUD (maximum density of one unit per 13 acres).

     (b)   Regular PUD (maximum density of one unit per 6 acres).

(4)   <u>Minimum Lot Size</u>:

     (a)   Single family dwelling (outside of a planned unit development) thirty-five (35) acres.

     (b)   Planned unit developments – as established by Section 6 of this Code.

     (c)   Special uses – as established by Section 5 of this Code.

(5)   <u>Required Setbacks</u>:  All structures shall be located at least twenty-five (25) feet from any property lines unless a greater setback is required within an approved PUD.

(6)   <u>Maximum Building or Structure Height</u>: Maximum building height shall not exceed thirty-five (35) feet unless a height of less than thirty-five (35) feet is required within an approved PUD.

E.   <u>Public Lands Zone</u>

Only lands that are not owned by Federal or State entities are subject to the following regulations.

(1)   <u>Uses Allowed by Right</u>:

     (a)   Farming/Ranching

     (b)   Non-commercial camping

     (c)   Underground mining

(2)   <u>Uses Allowed by Special Use Permit</u>:

     (a)   Commercial camping when administered by State and Federal Agencies.

     (b)   Commercial logging.

     (c)   Governmental facility.

     (d)   Oil and gas exploration and facilities.

     (e)   Public park and wildlife reserve.

BLM_0061378

      (f)     Public service facility.

      (g)     Public utility.

(3)    <u>Minimum Lot Size</u>:  35 acres.

(4)    <u>Required Setbacks</u>:   All structures shall be located at least twenty-five (25) feet from any property lines.

(5)    <u>Maximum Building or Structure Height</u>:   Maximum building height shall not exceed thirty-five (35) feet.

F.    <u>South Mesa Zone</u>

(1)    <u>Uses Allowed by Right</u>:

      (a)     Single-family dwelling units (maximum density of one unit per 35-acres).

      (b)     Accessory uses and structures that are accessory to any other use by right and any permitted use.

      (c)     Home occupations

      (d)     Non-commercial camping.

(2)    <u>Uses Allowed by Special Use Permit</u>:

      (a)     Bed and breakfast.

      (b)     Church.

      (c)     Commercial uses (as allowed in approved planned unit developments).

      (d)     Governmental facility.

      (e)     Home Business

      (f)     Oil and gas exploration and facilities.

      (g)     Public park.

      (h)     Public service facility.

      (i)     Public utility.

      (j)     Sand and gravel operation.

      (k)     School.

BLM_0061379

(l)    Temporary use.

(3)    <u>Planned Unit Development</u>

(a)    Limited PUD – Maximum density one unit per 13 acres.

(b)    Regular PUD – Maximum density one unit per six acres.

(4)    <u>Minimum Lot Size</u>:

(a)    Single family dwellings (outside a planned unit development) – thirty-five (35) acres.

(b)    Planned unit developments – as established by Section 6 of this Code.

(c)    Special uses – as established by Section 5 of this Code.

(5)    <u>Required Setbacks</u>:   All structures shall be located at least twenty-five (25) feet from any property lines unless a greater setback is required within an approved PUD.

(6)    <u>Maximum Building or Structure Height</u>:   Maximum building height shall not exceed thirty-five (35) feet unless a height of less than thirty-five (35) feet is required within an approved PUD.

G.    <u>South Slope Zone</u>

(1)    <u>Uses Allowed by Right</u>:

(a)    Single-family dwelling units (maximum density one unit per 35-acres).

(b)    Accessory uses and structures that are accessory to any other use by right and any permitted use.

(c)    Farming/Ranching.

(d)    Home occupation.

(e)    Non-commercial camping.

(2)    <u>Uses Allowed by Special Use Permit</u>:

(a)    Bed and breakfast.

(b)    Governmental facility.

(c)    Home Business

BLM_0061380

(d)     Oil and gas exploration and facilities.

(e)     Public park and wildlife reserve.

(f)     Public service facility.

(g)     Public utility.

(h)     Temporary use.

(3)     <u>Planned Unit Development</u>

(a)     Limited PUD (maximum density of one unit per 13 acres).

(b)     Regular PUD (maximum density of one unit per 6 acres).

(4)     <u>Minimum Lot Size</u>:

(a)     Single family dwellings (outside a planned unit development) – thirty-five (35) acres.

(b)     Planned unit developments – as established by Section 6 of this Code.

(c)     Special uses – as established by Section 5 of this Code.

(5)     <u>Required Setbacks</u>:   All structures shall be located at least twenty-five (25) feet from any property lines unless a greater setback is required within an approved PUD.

(6)     <u>Maximum Building or Structure Height</u>:   Maximum building height shall not exceed thirty-five (35) feet unless a height of less than thirty-five (35) feet is required within an approved PUD.

H.     <u>Valley Zone</u>

(1)     <u>Uses Allowed by Right</u>:

(a)     Farming/ranching.

(b)     Single-family dwelling units (maximum density of one unit per 35 acres).

(c)     Accessory uses and structures that are accessory to any other use by right and permitted use.

(d)     Home occupation.

(e)     Non-commercial camping.

3-11

(2)    Uses Allowed by Special Use Permit:

    (a)    Bed and breakfast.

    (b)    Cemetery.

    (c)    Church.

    (d)    Commercial equestrian activity.

    (e)    Commercial outdoor recreation – day use.

    (f)    Governmental facility.

    (g)    Guest ranch.

    (h)    Home Business

    (i)    Livery or horse rental operation.

    (j)    Oil and gas exploration and facilities.

    (k)    Public service facility.

    (l)    Public utility.

    (m)    Sand and gravel operation.

    (n)    School.

    (o)    Temporary use.

(3)    Planned Unit Development

    (a)    Regular PUD (maximum density of one unit per 35-acres).

(4)    Minimum Lot Size:

    (a)    All uses except as otherwise provided for in this Code - thirty-five (35) acres.

    (b)    Planned unit developments - as established by Section 6 of this Code.

    (c)    Special uses – as established by Section 5 of this Code.

(5)    Required Setbacks:  All structures shall be located at least fifty (50) feet from any property lines unless approved otherwise in a PUD. With the exception of lots and parcels that have an area of two (2) acres or less, the minimum setbacks for structures shall be located ten (10) feet

BLM_0061382

from the side and back property lines and twenty-five (25) feet from the front property line.  No structure may be closer than one hundred (100) feet from the centerline of U.S. Highway 550 or Colorado Highway 62.

(6)    Maximum Building or Structure Height: Maximum building height shall not exceed thirty-five (35) feet, unless a height of less than thirty-five (35) feet is required in an approved PUD.

## 3.5    OVERLAY DISTRICTS

A.    Intent and purpose:   Due to continued growth pressures, there is an increased need for coordination between the Municipalities and the County to promote the efficient use of services and protection of open lands, agricultural lands, alpine lands and community identities. It is therefore the intent and purpose of the Overlay Districts to establish districts and create a process to jointly review development on unincorporated property surrounding the Town of Ridgway and the City of Ouray.

B.    Definitions:

1.    Area of Influence (AOI).  An area of unincorporated land wherein development or use of land has an impact upon the adjoining municipality.

2.    Urban Development.  Development that conforms to the standards of moderate and high density residential, commercial/industrial or tourist land use categories, which is typical to urbanized areas.   Urban development also includes the types of services that are generally required to support that development such as central potable water, storm water systems, central sanitary sewer systems, quick-response fire and police protection, urban level street design and maintenance, parks and recreation programs, open space and undeveloped parks, urban level retail and commercial development and other similar services that are typically provided by cities and towns.

3.    Urban Growth Management Area (UGMA).   An area of unincorporated land adjacent to a municipality in which urban development may be allowed when annexed by the municipality.  The Urban Growth Management Area includes an area sufficient to provide for ten to twenty-five years of anticipated and desirable urban growth and development for the adjacent municipality.

C.    Establishment of Overlay Districts: The following Overlay Districts are hereby established:

1.    The Ridgway Urban Growth Management Area.

2.    The Ridgway Area of Influence

3.    The Ouray Urban Growth Management Area

BLM_0061383

4.      The Ouray Area of Influence

D.      <u>Overlay Districts</u>:     All Overlay Districts shall be designated on the "Official Zoning Map of Ouray County" which is on file in the records of the Ouray County Clerk and Recorder.   A copy of the map is attached to this Code and in the event of any conflict between the copy and the map on file in the County records, the latter shall be conclusively deemed to prevail.

E.      <u>District Uses and Requirements.</u>

1.      Within the Ridgway Area of Influence and the Ouray Area of Influence, the following uses are allowed:

a.      All uses allowed by right shall be permitted within the underlying Zone(s), as stated under Section 3 of this Code.

b.      Uses allowed by special use permit and Planned Unit Developments within the underlying Zone, as stated under Section 3 of this Code, may be permitted, upon review and approval of the Board of County Commissioners.   Said uses shall follow the process as contained herein.

2.      Within the Ridgway Urban Growth Management Area and the Ouray Urban Growth Management Area, the following uses are allowed:

a.      All uses allowed by right shall be permitted within the underlying Zone(s), as stated under Section 3 of this Code.

b.      Uses allowed by special use permit within the underlying Zone, as stated under Section 3 of this Code, except Home Businesses, may be permitted, upon review and approval of the Board of County Commissioners.   Said uses shall follow the process as contained herein.

F.      <u>Development Review – Urban Growth Management Area.</u>   Applications for planned unit developments, special use permits, exemptions from the definition of subdivision, variances and rezoning shall first be considered for annexation by the adjoining municipality prior to submittal of an application to the County Land Use Office.

1.      The municipalities will consider all petitions for annexation of lands within the adjoining UGMA and will not decline to annex such property except for good cause.   For the purposes of this Section, good cause includes, without limitation, the following:

a.      Extension of one or more municipal services to the area would place an unreasonable economic burden on the existing users of such service or upon the future residents or owners of property in the area itself.

BLM_0061384

b.    The area is not contiguous to the municipality's existing boundaries.

c.    The development proposal fails to meet the criteria for inclusion and annexation in the initial growth boundary outlined within the municipality's master or comprehensive plan.

2.    If the municipality declines an annexation proposal within the UGMA, the Applicant/Developer may then submit a completed application to the Ouray County Land Use Office.  Depending upon the request, the application shall include all information and documentation as set forth and outlined under the various sections of this Code.  In addition, the application shall also include a written denial of annexation from the respective municipality.

G.    <u>Development Review – Area of Influence.</u>  Applications for planned unit developments, special use permits, exemptions from the definition of subdivision, variances and rezoning shall be submitted to the Ouray County Land Use Office and shall follow the requirements, standards and processes as set forth and outlined under the various sections of this Code.

H.    <u>Joint Planning Boards.</u>  Applications for planned unit developments, special use permits, exemptions from the definition of subdivision, variances and rezoning located within an Urban Growth Management Area or an Area of Influence shall be reviewed by a Joint Planning Board, rather than the Ouray County Planning Commission, and the Joint Planning Board shall make a recommendation to the Board of County Commissioners.

1.    When a request is located within the Ridgway Urban Growth Management Area or the Ridgway Area of Influence, the Ridgway Area Joint Planning Board shall review the application.

2.    When a request is located within the Ouray Urban Growth Management Area or the Ouray Area of Influence, the Ouray Area Joint Planning Board shall review the application.

BLM_0061385

# Section 4

## ZONING PROVISIONS
## NON-CONFORMING USES AND STRUCTURES

4.1     The lawful use of a building or structure or the lawful use of any land, as existing and lawful at the time of adoption of this Code or, in the case of a future amendment of this Code, at the time of such amendment, may be continued, subject to the limitations set forth in the following paragraphs.

4.2     EXPANSION OR ENLARGEMENT

    A.     The expansion or enlargement of a non-conforming structure shall be considered a structural alteration and, upon completion of such expansion or enlargement, such structure shall conform with all the provisions of this Code.

    B.     An existing non-conforming activity may be extended throughout any part of a structure if no structural alteration is proposed or made for the purpose of such extension.

4.3     REPAIRS AND MAINTENANCE

The following changes or alterations may be made to a nonconforming structure or to a conforming structure housing a nonconforming use:

    A.     Maintenance repairs that are needed to maintain the good condition of a building, except that if a building has been officially condemned, it may not be restored under this provision.

    B.     Any structural alteration that would reduce the degree of non-conformance or change the use to a conforming use.

    C.     The addition of a solar energy device to such structure.

4.4     RESTORATION OR REPLACEMENT

    A.     If a non-conforming structure or a structure housing a non-conforming use is destroyed or damaged in any manner to the extent that the cost of restoration to its condition before the occurrence shall exceed fifty (50) percent of the cost of reconstructing the activity or structure or, if such restoration involves structural alteration, such structure and the activities in such structure shall conform with all the provisions of this Code.

BLM_0061386

[4.4 B]

B.    Where restoration of a non-conforming structure or of a conforming structure to a non-conforming use would otherwise be permitted, it shall not be permitted unless the repair or restoration is commenced within twelve (12) months and completed within eighteen (18) months from the date of partial destruction.

4.5    DISCONTINUANCE

Whenever a non-conforming use has been discontinued for a period of six (6) months, it shall not thereafter be re-established, and any further use shall be in conformance with the provisions of this Code.

4.6    NON-CONFORMING PARCELS

Non-conforming parcels of record at the time of passage of this Code may be built upon, providing that all other relevant district requirements are met.

4.7    CHANGE IN NON-CONFORMING USE

No non-conforming use of a building or parcel may be changed to another non-conforming use.  A non-conforming use of the building or parcel may be changed to a conforming use.

4.8    COUNTY-OWNED PROPERTY

If the County acquires title to any property by reason of tax delinquency and such property is not redeemed as provided by law, the future use of such property shall be in conformity with the then-current provisions of the County Land Use Code, or with any amendment of such Code, equally applicable to other like properties within the district in which the property acquired by the County is located.

BLM_0061387

# SECTION 5
# USES ALLOWED BY SPECIAL USE PERMIT

5.1 <u>INTENT</u>

    A. To provide for uses allowed by special use permit as designated under Section 3, Zoning Provisions - Zones. Such uses may be allowed only by approval of the Board of County Commissioners of Ouray County, Colorado ("County Commissioners") whose determination shall be based on the purposes, standards and requirements as set forth under this Section. In granting approval for a special use, the County Commissioners may impose additional conditions, which comply with the purposes and intent of this Code.

5.2 <u>PERMIT PROCEDURES</u>

    A. A Special Use Permit application, together with the information described below and the required fees shall be submitted to the Ouray County Land Use Department at least forty-five (45) days prior to the County Commissioners, Planning Commission or Joint Planning Board meeting at which the request will be initially considered.

    B. In addition to the provisions described under Section 5.3 the following information shall be submitted:

        (1) A site plan showing, for example, lot lines, road access, all proposed and existing driveways, parking areas and structures, all areas of significant vegetation and all ditches, ponds and waterways.

        (2) Signature of owner(s) of all property, authorizing application and acceptable evidence of ownership. If land included in an application is leased to an Applicant, a copy of the lease shall be provided, however, the Applicant may redact all proprietary or other confidential information.

        (3) If the operator of the Special Use Permit will be someone other than the owner of the property or the Applicant, the proposed operator shall be identified on the application.

        (4) A detailed explanation of the proposed operation or use.

    C. The County Commissioners, in granting approval, may condition the operation in order to ensure compatibility with surrounding uses and to ensure that impacts are properly mitigated. The County Commissioners may place conditions on the length of time a use may be operated and may require periodic review.

BLM_0061388

D. The Applicant/Operator must, at all times, be in compliance with all applicable state and federal laws and regulations. In case of non-compliance with such laws or regulations, the County Commissioners may suspend or revoke the permit, after notice and the Applicant is given an opportunity to be heard.

E. If land included in an approved application or use is leased to the Applicant, the Applicant or his successors shall notify the Land Use Department of any changes in the lease that may occur following approval by the County Commissioners. The permit may be suspended or revoked in case of non-compliance with such lease.

F. If the County Commissioners shall determine, on the basis of information submitted and available to it, that a proposed operation will have an impact on, or will necessitate, improvements to facilities or services provided by the County, the school districts or other governmental entities within the County, the County Commissioners shall, to the greatest extent possible and as a condition of Special Use Permit approval, require that the Applicant take steps to mitigate the impact by payment of impact fees or provision of in-kind contributions. The amount and purpose of any impact fee shall be determined by the County Commissioners based upon a finding that there is an essential nexus between the payment or contribution and a legitimate local government interest and the payment or contribution is roughly proportional in nature, timing and extent to the impact of the proposed use. Failure to fund such impacts by the Applicant may be grounds for denial of the Special Use Permit. The County Commissioners may waive any impact fee for a particular permit if the Applicant shows that the impacts associated with the use will not exceed the anticipated impacts for a use by right on the same property. The County Commissioners may require that the Applicant obtain a traffic analysis, completed by a professional engineer, illustrating the expected traffic by type and volume for the anticipated use; the County Commissioners may require that other appropriate studies or analyses be obtained by the applicant, depending upon the type of use proposed. Any impact fee assessed for a Special Use Permit may be pro-rated by the County Commissioners to address the seasonal impacts associated with a particular use.

G. The County Commissioners may determine that an application for a Special Use Permit should be referred to an outside agency for review when particular, special circumstances are present that require more detailed analyses. No referral to an outside agency shall result in a delay of the normal processing of a Special Use Permit.

5.3    REVIEW REQUIREMENTS

Satisfactory evidence shall be supplied by the Applicant to comply with all applicable requirements set forth below. The following regulations shall apply to special uses allowed by permit only, as indicated.

BLM_0061389

A.  All special uses allowed in the various zones under Section 3 of this Code, shall be subject to the following provisions:

(1)  Evidence that such use will not create undue danger in surrounding areas, will not cause water pollution and will not create substantial amounts of offensive noise, vibration, smoke, dust, odors, heat, glare or other objectionable influences beyond the boundaries of the property on which such use is located. At the discretion of the County Commissioners, a written plan may be required indicating methods to be used to minimize smoke, odors, dust and similar environmental problems, which might result from the operation of the proposed use.

(2)  Evidence that legal access; potable water, sewage disposal and all other utilities necessary to serve the proposed use are available.

(3)  Evidence that the requested use will comply with the provisions of the Visual Impact Regulations found in Section 9 of this Code.

(4)  Evidence that the requested use will not unreasonably impact wildlife or significant wildlife habitat.

(5)  Evidence that the use will not alter, restrict, inhibit or interfere with historic irrigation practices, headgates, ditches and ditch rights-of-way.

(6)  Evidence that the use is not located within any area subject to geohazards, including, but not limited to rockfall areas, avalanches, landslide, potentially unstable slopes, slopes greater than 30 percent, alluvial fans, talus slopes, shale, faults, expansive soils or ground subsidence. If the proposed use is located within areas subject to the effects of geological hazards, the Applicant shall present satisfactory evidence that such hazards will be avoided. If avoidance is not possible, evidence shall be provided that hazards will be mitigated. The County may require qualified professional geologic or engineering certification that the proposed land use can be located or developed in a safe manner.

(7)  Evidence that the property has no chemical or other contamination. If the property is contaminated, a mitigation plan must be presented that would satisfactorily resolve the contamination.

(8)  Evidence that the request is consistent and compatible with the community character and surrounding land uses within the area for which the request is being proposed.

(9)  Evidence that the request would not have a material adverse effect on the surrounding area.

(10)  Evidence that the use will not create impacts on existing infrastructure

BLM_0061390

beyond what would be created by a use by right or evidence that such impacts will be mitigated as provided by Section 5.2 F above.

(11)  If the property is located within a Planned Unit Development, Applicant shall submit evidence that the Homeowner's Association has approved the proposed use.

(12)  Weed mitigation and/or revegetation on the property that may be required as a result of the Special Use Permit shall be the responsibility of the Applicant.

(13)  Applicant shall comply with any and all other Ouray County regulations contained in the Land Use Code, such as the Sign Regulations and the Outdoor Lighting Regulations

B.  Sand and gravel, oil and gas, commercial logging, mineral operations, mining and mineral extraction and processing operations, if allowed, shall be subject to the following additional conditions or requirements:

(1)  Evidence that all applicable state and federal permits have been obtained prior to commencement of the proposed use.

(2)  Special Use Permits shall be granted for the uses listed above only if the Applicant/Operator is in full compliance with all rehabilitation and reclamation requirements. The permit may be revoked or suspended if, at any time, Applicant is in non-compliance with such state or federal permits. Where no state or federal agency requires a rehabilitation or reclamation plan, the County may require such a plan. Said plan shall depict, in writing and graphically, the proposed methods for restoring any disturbed areas, to include the extent and type of revegetation proposed. In addition, in the case of a proposed commercial logging operation, the County may require the Applicant/Operator to submit a site-specific forest management plan which shall address such matters as the size of trees to be taken, the locations of the proposed operation, time of year of the operation, clean-up, reforestation and related items. The County, in its discretion, may obtain independent review of the site-specific forest management plan, with the costs of such review being borne by the Applicant/Operator.

(3)  Evidence that vehicle traffic to and from such use will not create undue hazards or nuisance to areas elsewhere in the County, nor shall it unduly damage public roads. If it is found that hazards, nuisances or damage to public roads will occur from the proposed use, a mitigation plan shall be submitted.

C.  Cemeteries, schools, bed and breakfast operations, churches, commercial equestrian activities, commercial outdoor recreation, livery or horse rental

BLM_0061391

operations, commercial uses, commercial camping, and guest ranches shall be subject to the following additional provisions or conditions:

(1)   Sufficient distance shall separate such uses from abutting properties, which might otherwise be damaged or diminished in value due to the operation of the proposed use.

(2)   The proposed uses will be properly maintained.

(3)   Vehicle traffic to and from such use will not create hazards or nuisance to areas elsewhere in the County.

(4)   Sufficient off-street parking, as required in Section 7.2(M) of this Code shall be provided to accommodate the expected volume of users of the proposed facilities. Bed and breakfast operations shall provide parking to the same extent required for hotels and motels under this Code.

(5)   For Guest Ranches (See Section 22 for additional criteria for a Guest Ranch):

    (a)   Provide the hours and months of operation.

    (b)   Identify any traffic impacts, such as noise and dust, and any abatement measures necessary to mitigate impacts from traffic.

    (c)   Identify any ancillary facilities, such as trails, and proof of permission to use off-site facilities, if necessary.

    (d)   Specify the maximum numbers of guests on the site at any time.

    (e)   Identify the portion of the site to be used for operations.

    (f)   Provide the location and design of all proposed signs.

    (g)   Provide any other nuisance abatement measures as may be required by the County.

(6)   For Cemeteries:

    (a)   A business plan shall be submitted to show how the Applicant will ensure the proper operations of the Cemetery in perpetuity.

    (b)   Applicant shall supply sufficient information to show how the applicant will remediate and rehabilitate the property, including relocation of any remains, if Applicant ceases operation of the facility.

    (c)   Applicant shall submit sufficient documentation to show the

BLM_0061392

mechanisms and operational methods that Applicant will utilize to contain all potential contamination resulting from the use of the property as a cemetery and to prevent contamination of groundwater in or near the site.

5.4    <u>PUBLIC NOTICE AND HEARING</u>

A.  After the receipt of a complete application for a Special Use Permit by the Land Use Department, a Special Use Permit application shall be considered at the next available Planning Commission agenda or, if the request is located within an Urban Growth Management Area or Area of Influence the appropriate Joint Planning Board will review the request at the next Joint Planning Board meeting. The Planning Commission or Joint Planning Board shall review the application and shall approve, approve with conditions or deny the application if it does not meet the requirements of the Ouray County Land Use Code and the action shall be in the form of a motion as noted in the minutes. If the recommendation is approval with conditions or modifications, the conditions or modifications shall be stated in clear and concise terms in the motion. Land Use Department Staff shall forward such recommendation to the County Commissioners. If the Planning Commission or the Joint Planning Board is unable to make a recommendation on the Special Use Permit application within 45 days of the receipt of a complete submittal, the application shall be forwarded to the County Commissioners for a public hearing.

B.  If the request is located within the Urban Growth Management Area or the Area of Influence, the request shall also be submitted to the adjacent municipality for review and comment. Any such comments shall be provided to the Land Use Department within thirty (30) days of transmittal of the application to the municipality.

C.  Before granting a Special Use Permit, the County Commissioners shall hold a public hearing on the matter. Notice of such hearing shall be published at the expense of the Applicant, in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the hearing date. In addition, written notice of the hearing shall be mailed at least fourteen (14) days prior to the hearing date to the Applicant. The Applicant shall send written notification to all owners holding a fee simple interest in property abutting upon or directly across a road or street from the proposed use (this information is available at the Ouray County Assessor's Office) at least fourteen (14) calendar days prior to the date of such hearing. The notice shall be given in a form approved by the Land Use Department. No less than seven (7) days prior to the hearing, the Applicant shall provide evidence to the Land Use Department that such notice has been properly sent by providing certificates of mailing from the U.S. Postal Service. On-site notice of any pending Special Use Permit application, in a form approved by the Land Use

BLM_0061393

Department, shall be posted on the property where the use is proposed no later than ten (10) days after a complete application has been received by the Land Use Department. Such notice shall be maintained on the property by the Applicant until final action on the application has been made and the notice shall be visible from each road frontage of the property. Proof of proper posting of the notice shall be verified as determined by Land Use Department staff.

D. At the public hearing, the County Commissioners shall review the Special Use Permit application and any supporting materials or referrals from the Planning Commission or the Joint Planning Board, in accordance with this Section. The County Commissioners shall, by resolution, approve, approve with conditions or modifications, or deny the application.

## 5.5   FEES FOR SPECIAL USE APPLICATIONS

Application fees for Special Use permits, or renewal fees of Special Use Permits, will be in accordance with the County's current fee schedule.

## 5.6   LIMITATIONS AND TERM OF SPECIAL USE PERMIT

A. After a Special Use Permit has been issued, it shall be effective for a term of two years and shall be subject to bi-annual renewal. Within sixty (60) days prior to the expiration of the Special Use Permit, the Land Use Department shall notify the Applicant in writing of the permit's pending expiration. Applicant shall be responsible for contacting the Land Use Department regarding the renewal of the Special Use Permit and the Land Use Department shall conduct a review of the status of the Special Use Permit, including the status of any conditions placed upon the permit, any changes to the permit, and the Applicant's compliance with the terms of the Permit and the Land Use Code. The bi-annual review may include a site visit by representatives of Ouray County if deemed necessary by Land Use Staff. If Applicant is in compliance with all of the conditions of the permit and the Land Use Code, the Land Use Staff shall renew the permit for an additional two-year period. If the Land Use Staff finds that there is non-compliance with the conditions of the permit or the Land Use Code, or if there has been non-use of the permit for a period of twelve months or more, the Land Use Staff may revoke the permit. Any decision of the Land Use Staff shall be appealable by the Applicant according to the provisions of Section 19.7 of this Code.

B. In the event that the Applicant shall fail to contact the Land Use Department for renewal of a Special Use Permit within sixty (60) days of the expiration of the permit, such permit shall be deemed revoked and Applicant shall cease all operations under the permit. Applicant shall be allowed to re-apply for the permit according to the then existing Land Use Code requirements.

C. If multiple Special Use Permits have been issued for the same property, the

BLM_0061394

*5.6  ULIMITATIONS AND TERM OF SPECIAL USE PERMIT*

uses permitted under the existing permits shall be considered in reviewing the new permit application. If the existing uses are not compatible with the new permit, if it is shown that the cumulative impacts of all Special Use Permits cannot or will not be mitigated or if it is shown that the cumulative impacts of all Special Use Permits would not be in compliance with the Ouray County Master Plan, the application may be denied or appropriate conditions may be required on the new permit to address or mitigate any such incompatibility or cumulative impacts.

BLM_0061395

# SECTION 6
# PLANNED UNIT DEVELOPMENTS

6.1   <u>ENABLING AUTHORITY</u>

The provisions of this Code relating to Planned Unit Developments are enacted under the authority of Colorado Revised Statutes, Title 24, Article 67, Title 29, Article 20 and Title 30, Article 28.

6.2   <u>OBJECTIVES OF DEVELOPMENT AND STATEMENT OF PURPOSE</u>

The objectives of development in Ouray County are as set forth in Section 1 of this Code and in the County Master Plan. The use of the Planned Unit Development ("PUD") concept is intended to provide flexibility in the development of residential projects and to promote the unified development and sensitive use of a site with regard to the natural assets and the character of the County. Implementation of the County Master Plan and preservation of open space in critical areas as part of the development process are important objectives to be achieved through the Planned Unit Development review.

The Planned Unit Development concept is further intended to allow for development of land, subject to those development regulations set forth in this Code. It is intended to allow development of land while protecting unique environmental and/or ecological assets and to allow for residential and recreational developments in which various uses and structures may be grouped in appropriate relationship to each other, to open spaces and to common facilities. Efficient provision for necessary facilities and services is to be addressed utilizing the Planned Unit Development process. This includes off-site impacts reasonably anticipated as a result of a proposed development.

In Planned Unit Developments involving the subdivision of land, as defined in Section 22, the required preliminary PUD Plan is also considered to be a preliminary subdivision plat; the final plat will be contained as one of the required submittals with the Final Development Plan.

6.3   <u>PLANNED UNIT DEVELOPMENT TYPES DEFINED</u>

Three types of Planned Unit Development applications are possible; however, all PUD applications must comply with the underlying density requirements as set forth in Section 3 and Section 6 of this Code. The types of Planned Unit Developments are defined as follows.

A.  PLANNED UNIT DEVELOPMENT - LIMITED

A development application consisting of up to three lots, at a maximum density of one unit per 13 acres where allowed by the underlying zoning.

BLM_0061396

Additional standards and requirements for a PUD-Limited are contained throughout this Section. The purpose of the Planned Unit Development-Limited is to create a simplified PUD/Subdivision process for use in developments that meet specific criteria. This process allows flexibility in site design and furthers implementation of the Master Plan by clustering of structures to minimize visual impact, locating development so that perceived open areas are maximized, and ensuring that important site features, such as wildlife corridors and other sensitive areas, are respected in site planning.

B.   PLANNED UNIT DEVELOPMENT - REGULAR

A development application consisting of any number of lots provided the underlying zoning standards are met. Additional standards and requirements for a PUD-Regular are contained throughout this Section.

C.   PLANNED UNIT DEVELOPMENT-RESORT/CONFERENCE CENTER (RST)

A development application consisting of a minimum of 160 acres, limited to a hotel of 20 rooms or more, short-term accommodations, limited commercial uses to serve the resort, and recreational facilities that are part of a multi-seasonal resort. Associated residential units may also be included in the application, subject to the requirements indicated in this Section 6. The purpose of the PUD-Resort/Conference Center regulations is to include standards to guide development of multi-season resorts in locations found to be appropriate for such uses. The regulations also establish review criteria and mitigation levels, as appropriate, to protect the County from unnecessary impacts, to ensure compatibility with the area surrounding resort uses, and to further the objectives of the County Master Plan by allowing diversification as identified in the County Master Plan.

This process allows flexibility in site design and furthers implementation of the Master Plan by clustering of structures to minimize visual impact, locating development so that perceived open areas are maximized, and ensuring that important site features, such as wildlife corridors and other sensitive areas, are respected in site planning. Additional standards and requirements for a PUD-Resort/Conference Center are contained throughout this Section.

6.4   <u>REVIEWING BODY</u>

The Ouray County Planning Commission or a Joint Area Planning Board and the Board of County Commissioners of Ouray County ("County Commissioners") shall review Planned Unit Developments in accordance with the procedures set forth in this Code. Final approval shall not be given to any Planned Unit Development without a finding by the County Commissioners that the Plan is in general conformity with the Master Plan of Ouray County.

BLM_0061397

6.5     DEVELOPMENT STANDARDS

Residential development approved under these regulations shall be designed and constructed to comply with all facets of the Ouray County Land Use Code including, but not limited to, development standards, zoning compliance, road standards and visual impact. These standards and requirements are to be met throughout the required submittal stages of PUD approval.

6.6     SITE REQUIREMENTS AND REVIEW CRITERIA

The following site requirements shall be followed in any Planned Unit Development processed under this Code:

A.  WATER AND SEWER

The Applicant shall provide, within the PUD, both potable water and proof that adequate sewage treatment facilities can be provided to serve the maximum user population of the PUD, both permanent and transient, including potential accessory dwellings.

B.  STORM DRAINAGE FACILITIES

The Applicant shall provide within the Planned Unit Development storm drainage facilities of sufficient capacity to handle all predictable storm water runoff in the PUD area for a one hundred (100) year storm.

C.  OPEN SPACE

The Applicant shall provide common open space as required by the provisions of Section 6.7. All open space provided within the PUD, including those spaces designated as public and private recreation sites, shall be protected by adequate covenants running with the land or by conveyances or dedication in a manner acceptable to the County.

D.  MINIMUM LOT SIZE

One acre, if served by individual sewage treatment systems. Smaller lots may be allowed if connected to a central sewage treatment system, provided the overall density requirements for the zone, district or PUD are maintained.

E.  SITE DEVELOPMENT CRITERIA

The following criteria shall guide an Applicant in planning his/her property and shall be used by the County in evaluation of all Planned Unit Development applications. Approval of an application for a Planned Unit Development will not be granted unless an Applicant demonstrates substantial compliance with the following criteria:

BLM_0061398

(1)    All uses and site plans for the property are consistent with this Code, as interpreted with reference to the Ouray County Master Plan.

(2)    Visual Impact Regulations of Land Use Code Section 9 can be met.

(3)    Adequate infrastructure and public services (roads, power, telephone, water and sewage treatment) are available or will be provided by the Applicant to serve the proposed development.

(4)    All designated building areas will be located to minimize disturbance to the land. Site design shall avoid creating isolated building areas that require additional extension of services that would reduce the visual or other qualities of open space.

(5)    Roads and driveways (and the cut and fill associated with them) shall be designed in such a way to minimize the impacts on the proposed development and the surrounding properties and must be in compliance with the Site Development Standards and Road Specifications set forth in Sections 7 and 23 of this Code.

(6)    Development shall be compatible with adjacent uses and development and shall be designed to coordinate with such uses.

(7)    Site planning will protect and maintain significant or unique natural, environmental or topographic features, vegetation, identified hazards, wildlife corridors, other sensitive areas or other special characteristics.

6.7    __COMMON OPEN SPACE AND BUILDING/NON-BUILDING AREA REQUIREMENTS__

A.    COMMON OPEN SPACE AND NON-BUILDING AREA – MINIMUM CRITERIA

(1)    Common open space and non-building areas shall be provided that generally meet the following objectives and requirements:

(a)    They maintain the visual and scenic quality of Ouray County to the maximum extent possible.

(b)    Where possible, common open space areas and non-building areas have been designed to coincide with wildlife corridors and other environmentally critical areas have been avoided.

(c)    Common open space and non-building areas shall be located to be contiguous within the development and with adjacent open space areas outside the development; or other measures have been taken

BLM_0061399

by the Applicant that will maximize the open space value within the PUD. If a site specific analysis demonstrates that an alternative configuration accomplishes the standards of this section better, it may be approved by the County.

(d)  Land preserved as common open space will create recreational opportunities by providing trails, parks or other recreational facilities needed for future residents of the development. Reasonable access to such common open space areas shall be provided for the current and future owners and residents of the development.

(e)  Unique natural characteristics such as topographic features, vegetation, or other special characteristics are maintained.

(f)  A plat note restricting future subdivision or any other development of the common open space and non-building area and a requirement of Planned Unit Development approval shall be placed on the final plat.

(g)  Building and non-building areas shall be designated on the site plan indicating where development, roadways, driveway access (and the cut and fill which may be associated with such roadways and driveways) and structures may be located. Any disturbance in non-building areas shall be compact and disturb the least amount of site area possible.

B.  COMMON OPEN SPACE AND BUILDING/NON-BUILDING AREAS – MINIMUM REQUIRED AREAS

**Limited PUD**

| | |
|---|---|
| Open Space | Not required |
| Building Area | 30% |
| Non-Building Area | 70% |

**Regular PUD**

| | |
|---|---|
| Open Space Required | 25% of total land area |
| Building Area | 60% of balance of land area |
| Non-Building Area | 40% of balance of land area |

**Resort/Conference Center PUD**

| | |
|---|---|
| Open Space Required – Core Area | 75% of total land area |
| Open Space Required – Residential | 70% of total land area |
| Building Area – Core Area | 25% of balance of land area |
| Building Area – Residential | 30% of balance of land area |

BLM_0061400

Non-Building Area – Core Area            75% of balance of land area

Non-Building Area – Residential Area     70% of balance of land area

C.   OWNERSHIP AND MAINTENANCE OF COMMON OPEN SPACE

(1)   Common Open Space shall be set aside and made available to all home-owners and other property owners within the PUD. Such land may include recreational activities, such as golf courses or ski trails, provided that:

(a)   Only non-residential structures which are approved in the PUD process shall be allowed; and

(b)   The activity is to be located on private lands that are part of the Planned Unit Development; and

(c)   A Special Use Permit has been approved by the County Commissioners when required.

(2)   A Common Open Space Plan shall be included with the application for a preliminary PUD plan that indicates, in accordance with the requirements set forth herein, where open space lands will be located and the uses and the acreage included. Anticipated ownership and plans for maintenance of the lands shall be described, including the timing and sequence of the transfer of Common Open Space to a homeowner's association or similar entity. Such plan may be amended upon application to the County pursuant to the provisions of Section 6.12 of the Code, "Amendment or Alteration of Planned Unit Development," and subsequent approval.

(3)   The Common Open Space Plan shall establish an organization for the ownership and maintenance of the Common Open Space or shall make such other provisions as are acceptable to the County for adequate future ownership and maintenance. The Applicant shall also establish covenants that run with the title to all lands included within the Planned Unit Development that shall, at a minimum, include the following requirements:

(a)   In the event that the organization established to own and maintain open space, or any successor organization, fails at any time after establishment of the Planned Unit Development to maintain the open space in a reasonable order and condition in accordance with the Plan, the County may serve written notice upon such organization or upon the residents of the Planned Unit Development setting forth the manner in which the organization has failed to maintain the common open space in reasonable condition. Said notice shall include a demand that such deficiencies of maintenance shall be cured within thirty (30) days thereof, and shall state the date and place of a hearing that shall be held within fourteen (14) days of the notice.

BLM_0061401

(b) At such hearing, the County may modify the terms of the original notice as to deficiencies and may give an extension of time within which they shall be cured.

(c) If the deficiencies set forth in the original notice or in the modifications thereof are not cured within said thirty (30) days or any extension thereof, the County, in order to preserve the taxable values of the properties within the Planned Unit Development and to prevent the common open space from becoming a public nuisance, may enter upon the open space and maintain the same for a period of one (1) year. Said entry and maintenance shall not be required and shall not vest in the public any right to use the common open space except when the same is voluntarily dedicated to the public by the owners.

(d) Before the expiration of said year, the County shall, if it elects to undertake the maintenance, upon its own initiative or upon the written request of the organization theretofore responsible for the maintenance of the common open space, call a public meeting upon notice to such organization or to the residents of such Planned Unit Development, to be held by a board of at least three persons designated by the County, at which hearing, such organization or the residents of the Planned Unit Development shall show cause why such maintenance by the County shall not, at the election of the County, continue for a succeeding year. If the board designated by the County determines that such organization is ready and able to maintain the open space in a reasonable condition, the County shall cease to maintain the open space at the end of said year. If, on the other hand, the board designated by the County determines that such organization is not ready and able to maintain said common open space in a reasonable condition, the County may, in its discretion, continue to maintain said common open space during the next succeeding year and, subject to a similar hearing and determination, each year thereafter.

(e) The cost of such maintenance by the County shall be paid by the owners of properties within the Planned Unit Development that have a right of enjoyment of the common open space, and any unpaid assessments shall become the tax lien upon said properties. The County shall file a notice of such lien in the office of the County Clerk and Recorder upon the properties affected by such lien within the Planned Unit Development and shall certify such unpaid assessments for collection, enforcement and remittance in the manner provided by law for the collection, enforcement and remittance of general property taxes.

BLM_0061402

(4) Unless approved otherwise by the County, the designated open space shall be available for use exclusively by all landowners or residents of the development. Appropriate fees may be charged for the maintenance and use of recreational facilities contained within the open space.

## 6.8    PLANNED UNIT DEVELOPMENT REQUIREMENTS AND PROCEDURES

The following requirements shall apply to all Planned Unit Developments unless otherwise noted.

A.  SKETCH PLAN

(1) <u>Pre-Application Meeting</u>: Applicants shall schedule and attend a Pre-Application Meeting before filing a PUD Sketch Plan application. The Applicant and a designated Land Use Staff person shall attend the Pre-Application Meeting. The purpose of the Pre-Application Meeting is to discuss the application procedure, submittal requirements for all phases of the development, scheduling of meetings and hearings, development standards and other pertinent matters prior to the Applicant filing the development proposal. No Sketch Plan application will be accepted until after the Pre-Application Meeting is concluded.

(2) <u>Sketch Plan Required</u>: PUD Applicants shall submit a complete Sketch Plan application to the Land Use Department, along with the appropriate fee.

(3) <u>Content of Sketch Plan</u>: Each Sketch Plan should be a legibly drawn concept plan of the proposed development. The plan or plat should reflect actual or estimated twenty-foot (20') contours. It is intended that the Sketch Plan be used to review the overall land uses, intended densities, feasibility and design characteristics of the project. In order to gain the most benefit from a Sketch Plan review, the Sketch Plan should contain, as a minimum, the following information:

(a) Sufficient information, including legal description, to readily determine the location of the proposed development and its relationship to adjacent lands.

(b) The approximate lot size, acreage and configuration of lots and roadways within the proposed development.

(c) A description of the proposed uses, including land use types and densities for each parcel included in the application including at least the following:

(i)   Area included in application.

(ii)  Number of lots and designated uses.

BLM_0061403

        (iii)    Area of open space and proposed uses and area of non-building area.

        (iv)    Area of lots and designated building areas.

(d)    Name, address and phone number of the holders of all record interests in the property and of the Applicant.

(e)    Any available information concerning site characteristics including, but not limited to, the following:

        (i)    Topography, vegetation, streams, lakes, ditches, ditch rights-of-way, springs and other physical features of the site.

        (ii)    Geologic characteristics of the area that could affect proposed future uses.

        (iii)    Areas within and in the vicinity of the proposed development containing suspected or known hazards, including the type of hazard.

        (iv)    Maps and other data describing the suitability of soil under the proposed development.

        (v)    Proposed access, proposed new roads, availability of utilities.

(f)    Any analyses that the Applicant may have undertaken concerning the demographic and economic impact and the impact on public facilities.

(4)    <u>Review of Sketch Plan</u>: After a complete Sketch Plan application is filed, Land Use Staff shall review the application for compliance with the Land Use Code and the Master Plan and to identify potential problems requiring resolution prior to Preliminary Plan submission. Based upon such review, Land Use Staff shall schedule a conference with the Applicant within ten (10) working days after submittal of a complete Sketch Plan application to discuss the proposed development. The Land Use Staff will provide the Applicant with written comments regarding the proposed Sketch Plan application within seven (7) working days following the conference.

(5)    The Applicant shall submit a Preliminary Development Plan application within nine (9) months of the date of the written comments from the Sketch Plan conference or a new Sketch Plan submittal must be made. Applicant may request an extension to file the Preliminary Development

BLM_0061404

Plan by making such request in writing to the Land Use Staff; however, no extension may be for longer than six (6) months.

B.  PRELIMINARY DEVELOPMENT PLAN

(1)  <u>General</u>: The preliminary development plan is the most important stage in the Planned Unit Development planning process. It is at this stage that the project will be thoroughly evaluated for its impact on the County and the political subdivisions in the County and for its visual impact. The project will be evaluated to ensure that the proposed development will function appropriately, that the land uses proposed are appropriate for the area in which it is to be located, that the visual impact will be minimized, and that the health and safety of the future residents of, and visitors to, the proposed development will be protected. Failure to prove that conditions or services are adequate to meet the needs of the development may be grounds for denial of the application. To evaluate the objective set forth, the following will be considered by the County in its review of the preliminary development plan:

(a)  Availability of adequate potable water.

(b)  Feasibility of adequate sanitary sewage treatment.

(c)  Evidence of safe, legal and adequate year-round access for emergency services, as well as for residents and visitors.

(d)  Adequate mitigation of risks and identification of hazards resulting from flooding, wildfire hazard, avalanche and geologic hazards, unstable soils, or other hazards.

(e)  Adequate mitigation of any effects the proposed development may have on air quality, water quality, wildlife, scenery and historic resources.

(f)  Availability of all other utilities and resources that may be required for the development.

(g)  Adequate mitigation of any adverse economic impact or impact upon existing public services and facilities.

(h)  Evidence of a plan to address fire safety and fire suppression within the development and ability to comply with the requirements of Section 24 of this Code.

(2)  <u>Submittal of the Application</u>: The application, together with the attachments described below, and the required fees, shall be submitted to the Land Use Department as set forth in Section 6.11 below, "Application

BLM_0061405

Completeness." All documentation included in the application for the Preliminary Development Plan not reflected on maps or site plans shall be printed on numbered pages and bound or fastened together, along with a table of contents. Plats, drawings and/or separately bound reports shall be included and referenced in the completed application through the use of pockets or other suitable means. Incomplete submittals will not be accepted.

The application shall include a narrative describing the elements of the proposed plan and a summary of information required below, such as ownership, proposed financing of the improvements and any other significant information that the Applicant believes will assist in the review of the application. The application shall include the signatures of all surface owners having a record of interest in the property.

(3)   <u>Content of Preliminary Development Plan</u>: Each preliminary develop-ment plan shall be drawn to a scale sufficient to show enough detail to enable full evaluation of all elements of the proposal. The Applicant shall confirm with Land Use Staff the minimum number of submittal copies required. The preliminary development plan shall include, as a minimum, the following information:

(a)   <u>Existing conditions map</u>: The map shall contain a north arrow and scale, show existing site features prior to any alteration of natural vegetation, landscape features or construction, including, but not limited to the following:

(i)   Vicinity map at 1" = 1000', or other scale as determined to be appropriate by the Land Use Staff, showing the location of the proposed development in relation to the surrounding area.

(ii)   Site boundary, with dimensions, shown relative to section lines.

(iii)   All significant topographical features shall be identified using 5' intervals for land with slopes equal to or less than 10%, 10' intervals for land with slopes greater than 10%.

(iv)   Types and location of significant vegetation.

(v)   One hundred year flood plain, all intermittent and perennial streams and ditches, ditch rights-of-way, permanent and seasonal bodies of water, springs, wetlands and other similar features.

(vi)   Existing structures and fences, including their current uses,

BLM_0061406

locations, height, dimensions and an indication of which structures are to be preserved on the site.

(vii)   Existing roads, easements and historic or public trails.

(viii)   Location and alignment of existing utilities and existing utility easements.

(ix)   Identify all sensitive wildlife areas, including known migration routes, important winter and summer habitat areas and all known calving, fawning and lambing grounds.

(x)   Show approximate boundaries of all areas subject to inundation by a one hundred (100) year flood or storm water overflow and the location, width and direction of flow of all watercourses.

(xi)   Other data as may be required by the County.

(b)   <u>Site plan</u>: The site plan shall show major features of the proposed development including building locations and footprints at scale of 1"=100' or 200', or other scale determined to be appropriate by the Land Use Staff. The site plan shall include sufficient information to allow evaluation of land planning, building location, potential off-site visual impact, and structure massing. The site plan shall include a north arrow and scale and illustrate, as applicable, the following information:

(i)   Proposed lot name and/or lot number. The name of the proposed development shall be different from all others in the County. Other information required shall include the preparation date, written and graphic scale, and accurate boundary description and area of each parcel.

(ii)   Names and addresses. The names, addresses and phone numbers of the owner(s) of record, applicant, surveyor, engineer and planner involved in the preparation of the preliminary development plan, including owners of severed mineral interests. (If the names and addresses of the owners of severed mineral interests are unknown, provide supporting preliminary title work.)

(iii)   Subdivision of which the lot is a part, if applicable.

(iv)   Locations, dimensions, square footage (area) of all lots, sublots, parcels or footprints within the project. Location and

BLM_0061407

extent of areas to be used for residential, open space, recreational and other uses. Land use information shall be specific for each use area, with densities, maximum structure size and maximum structure footprint, if applicable, and land use types delineated.

(v) Location and maximum size of all existing and proposed structures, both on site and within 100 feet of the lot boundary.

(vi) Roads, streets, walkways, drainage, sanitary sewer, public utility and other easements, open space and other areas reserved for use of the public or residents of the development.

(vii) Proposed and adjoining open spaces with an indication as to use, if applicable.

(viii) Adjacent property ownership and land use.

(c) Other information to be supplied:

(i) Reports. The Applicant shall furnish preliminary reports concerning streams, lakes, ditches, ditch rights-of-way, springs, topography, vegetation and geologic characteristics that could affect the proposed land use (including potential hazards, soil suitability, and any other reports, responses or concerns raised during the review of the sketch plan for the proposed development) and any other information as may be determined necessary by the County.

(ii) Wildfire Hazard Mitigation. The Applicant shall furnish all reports, designs, data and documentation as required by Section 24 of this Code. In addition, the Applicant shall submit a report from the appropriate fire protection district or association detailing any mitigation required for fire safety or fire suppression, and the necessity of installation of fire hydrants with proposed locations, and other similar information.

(iii) All information required by Section 7 of the Ouray County Land Use Code – "Development Standards".

(iv) A preliminary title report showing the record owner(s) of the property, lienholders and severed mineral interests.

(v) Maps and tables concerning suitability of types of soils in the proposed PUD, in accordance with any standard soil classification and procedures therefore, for the proposed use.

BLM_0061408

(vi)   In areas of potential radiation hazards to the proposed future land use, evaluations of the potential radiation hazards.

(d)   A plan prepared, in coordination with the Ouray County Weed Manager, to address the eradication and control of noxious weeds on the property.

(e)   Other information as may be requested by the Land Use Staff or other County Departments or Boards.

(4)   <u>Additional Data</u>: Information regarding the following details shall either be on the preliminary development plan or shall be included in the information submitted with the preliminary development plan.

(a)   <u>Financial Ability</u>. Proof of the financial ability of the Applicant to complete the project and improvements shall be required. This shall include an estimate of the overall cost of the project, proposed sources of financing, financial statement of the Applicant, banking references, and any other information that will enable the County to ascertain that the Applicant is financially capable of completing the project.

(b)   <u>Economic Impact</u>. An analysis of the economic impact of the proposed project on the County and other political subdivisions within the County, both detrimental and beneficial, shall be required. This shall include, among other things, an analysis of the impact on County roads, the schools serving the County, including an analysis of the land dedication required by the Land Dedications and Payments for School Purposes as set forth in Section 26 herein, the impact on population, both permanent and transient, and any other information that the County considers relevant. The report shall also include a quantitative analysis of the property tax impact on Ouray County before and after the development of the subject property and an analysis of the impact on Ouray County services before and after the development of the subject property.

(c)   <u>Drainage</u>. A development drainage plan with maps and narrative description, which identifies the historical storm runoff from the site, the anticipated increase in runoff resulting from the development for storms having two (2), five (5), ten (10) and one hundred (100) year frequencies and the proposed method for handling the runoff, including the location and description of any necessary drainage facilities shall be required. Where the proposed development drainage plans require the alteration of any identified one hundred (100) year flood plain, the drainage plan shall detail the

BLM_0061409

plans for the proposed alteration of the flood plain limits and any proposed flood control measures. An engineer registered in the State of Colorado who has experience in the evaluation and design of storm drainage and related facilities shall prepare the drainage plan and supporting maps.

(d) <u>Water Supply</u>. A report shall be submitted containing detailed information regarding the proposed water supply that indicates that the provisions of Section 7.2(E) will be met. This report shall show that the proposed water supply is sufficient in terms of quality, quantity, dependability and pressure to ensure an adequate supply of water for the type of development and land uses proposed, and shall include, but not be limited to, evidence of ownership of right to use, historic use, estimated yield, amenability of existing rights to a change in use if needed, water amount available and the feasibility to extend service to the proposed development and evidence of potability of the proposed supply, in accordance with guidelines and water quality standards established by the State of Colorado for drinking water. The report shall also include the following information:

   (i) The estimated total number of gallons per day of water system requirements where a central distribution system is proposed.

   (ii) Where the water supply will be obtained from an existing system, special district or town, evidence must show that the proposed supplier of water to the development agrees to supply adequate amounts of water to meet the needs of the proposed development.

   (iii) Estimated construction costs and proposed method of financing the improvements.

(e) <u>Sewage Treatment</u>. A report containing detailed information regarding the proposed method of treating sanitary sewage from the proposed development, indicating that the provisions of Section 7.2(F) will be met. The report shall estimate total sewage treatment needs and provide evidence that the proposed system for the treatment of sewage will comply with applicable State of Colorado statutes, regulations and design requirements, and that the proposed method is both technically feasible and environmentally sound. If sewage collection and treatment is to be provided by an existing system, a letter of commitment from the owners of that system, or their authorized representative, must accompany the report, stating that there exists sufficient capacity to supply the needs of the proposed development and that the owners of the system are willing and able to handle the additional effluent in compliance with applicable State laws and regulations.

BLM_0061410

If sewage treatment is to be accomplished by installation of Individual Sewage Treatment Systems (ISTS), the Applicant shall demonstrate the suitability of soils and that the installation of ISTS can be achieved on all proposed lots. Demonstration will be by an eight-foot or bedrock deep profile hole and three (3) percolation hole tests within that area of the proposed buildable area on each lot where the ISTS will most likely be installed. This demonstration is to be completed by a Colorado registered professional engineer knowledgeable of ISTS design and installation, and be included in the report covering requirements of this section of the Code. If, at the time of installation, the disposal field is not to be located in the area where the Applicant did the percolation tests, new percolation tests in the area to be used will be required.

(f)   Public Utilities. A report shall be submitted regarding the availability of service and the ability of the utility to provide that service and evidence that provisions have been made by the Applicant for facility sites, easements, and rights of access for electrical and natural gas utility service (if available) sufficient to ensure reliable and adequate electric or, if applicable, natural gas service for the proposed PUD. Submission of a letter of agreement between the Applicant and the utility serving the site shall be deemed sufficient to establish that adequate provision for electric or, if applicable, natural gas service to the proposed PUD will be made.

(g)   Open Space. A plan shall be submitted, in accordance with the provisions of Section 6.7, including a description of the areas to be set aside as permanent open space, and the proposed ownership, maintenance and use of such areas shall be submitted.

(h)   Public Areas. A written and graphic description of the areas to be reserved for community or public uses and all areas to be dedicated to the County or held for common use shall be submitted.

(i)   Covenants. A draft of the protective covenants to be filed with the final Planned Unit Development plan shall be supplied. The covenants must include provision for maintenance of open space consistent with Section 6.7 of these regulations and any proposed restrictions upon use of water and sewer systems, visual impact provisions complying with Section 9.8 of this Code, and outdoor lighting restrictions as described in Section 27.6 of this Code. **(Covenants are not required for a Limited PUD.)**

(j)   Phasing. A schedule indicating when the various phases of the proposed development will be completed and a schedule for the completion of the required public improvements shall be submitted.

BLM_0061411

**(Not required for a Limited PUD.)**

(k)   Adjacent Owners. A map showing adjacent property owners, includ-
ing the names and addresses of such owners shall be submitted.
(This information is available at the Ouray County Assessor's
Office.)

(l)   Visual Impact Analysis. In accordance with Section 9 of the Land
Use Code, an analysis of the visual impact of the project shall be
submitted. This may require photographs of the project area from all
applicable roads from which the project will be visible, photographs
from the project showing vistas to the north, east, south and west,
and all significant topographical features. This analysis shall also
include, if appropriate, architectural elevations, all outdoor lighting
(to comply with Section 27) and the Applicant's statement of a plan
to mitigate the visual impact of the project, such as screening or
landscaping.

(m)   Mail receptacles. Applicant shall include an adequate and appropri-
ate area for the location of mail receptacles for future owners to
receive mail at the proposed PUD. Such area shall be approved by
the United States Postal Service.

(n)   Miscellaneous. Applicant shall provide any other information or
submit any other items as the Planning Commission or the Joint
Area Planning Board or County Commissioners may reasonably
request in order to review and act upon the Preliminary Devel-
opment Plan.

(5)   Filing and Fees

(a)   The Land Use Staff shall not be required to accept the submittal of a
Preliminary Development Plan unless and until it is complete and all
required maps, documents and other supporting materials are
submitted together (except any additional materials requested later).

(b)   In order to defray the costs associated with review or revisions of a
proposed development, the Applicant shall pay to the County fees in
accordance with the County's current fee schedule, including the
cost of all engineering reviews by the County Engineer.

(6)   Agency Recommendations: Pursuant to the requirements of C.R.S. §30-
28-136, referrals of the proposed Preliminary Development Plan shall be
made to appropriate agencies, organizations or individuals. Such referrals
may also include other Ouray County Departments or agencies, post-
master, fire districts, etc. Those agencies, organizations and individuals

receiving a referral shall have 21 days from the date of mailing the referral by the County within which to respond. The County may, upon the request of the reviewing agency or committee, extend the response period for not more than thirty (30) days if consented to by the Applicant. Failure to respond to the referral within the time allowed shall be deemed to indicate approval of the development by the referral agency.

(7)    <u>Public Hearing</u>: Once an application has been accepted as complete and all referrals have been made, Land Use Staff shall set a date for a public hearing on the proposal, which shall be scheduled in a manner which allows compliance with the notice provisions of this Code and state statutes. Notice of such public hearing shall be published at the expense of the Applicant, in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the hearing date. The Applicant shall also provide, prior to the Planning Commission or the Joint Area Planning Board public hearing on the Preliminary Development Plan, certificates of mailing from the U.S. Postal Service showing that notice has been sent to all adjacent owners at least 14 calendar days prior to the date of such hearing. The notice shall be given in a form approved by the Land Use Staff. Additionally, Applicant shall comply with the requirements of C.R.S. §24-65.5-101, *et seq.*, "Notification of Surface Development" to any owner of severed minerals underneath the property to be developed.

(8)    <u>Planning Commission or Joint Area Planning Board Action</u>: At the public hearing, the Planning Commission or the Joint Area Planning Board shall review and consider the Preliminary Development Plan application, the comments and recommendations from any agency referrals, testimony from the public, and the requirements of this Section, and shall recommend approval, approval with conditions or modifications, or disapproval of the Preliminary Development Plan. Planning Commission or the Joint Area Planning Board action shall be in the form of a motion as noted in the minutes and, if the plan is disapproved or approved with conditions or modifications, the conditions or modifications shall be stated in clear and concise terms in the motion. The motion may also state what specific changes in the preliminary development plan, if made by the Applicant in the plan, could render the plan acceptable to the Planning Commission or the Joint Area Planning Board. The Planning Commission or the Joint Area Planning Board minutes, together with copies of all submissions by the Applicant and other information developed by the Planning Commission or the Joint Area Planning Board shall be forwarded to the County Commissioners. No public hearing shall continue for more than forty (40) days from the date of commencement without the written consent of the Applicant. Any continuation of a public hearing shall be to a date certain.

BLM_0061413

(9)   <u>County Commissioners' Action</u>: Upon receipt of the Planning Commission or the Joint Area Planning Board recommendation and accompanying materials, the County Commissioners shall at a legally noticed public hearing review the preliminary development plan. Notice of such public hearing shall be published at the expense of the Applicant, in a newspaper of general circulation within Ouray County, at least fourteen (14) days prior to the hearing date. At such public hearing, the County Commissioners shall consider the preliminary development plan application, the recommendation of the Planning Commission or the Joint Area Planning Board, the comments and recommendations from any agency referrals, testimony from the public and the requirements of this Section, and shall, by resolution, approve, approve with conditions or modifications, or disapprove the plan. The County Commissioners shall state clearly, in writing, the grounds for disapproval or the required conditions or modifications. If the preliminary development plan is approved by the County Commissioners, such approval shall be reflected in a resolution, including any conditions of approval and the County Commissioners, through the Chair, shall note such approval on the Preliminary Development Plan.

(10)  <u>Effect of Commissioners' Approval</u>: Applicant shall be required to submit an application for final development plan approval within one year of the preliminary development plan approval and a final plat shall be recorded within two years of preliminary development plan approval. The failure by the Applicant to meet the deadlines for final development plan submittal and recordation of the final plat shall make the preliminary development plan approval null and void. An extension of time may be applied for by the Applicant requesting such extension in writing. The County Commissioners may grant one written extension of time.

(11)  <u>PUD Agreement</u>: **(Not required for Limited PUD.)** As a condition of preliminary development plan approval, the Applicant shall enter into a PUD agreement with the County, which shall be in a form acceptable to the County and shall contain, at a minimum, the following:

(a)   An agreement that, if the development receives final plan approval, the Applicant will make and install within a mutually agreed-upon period of time, all improvements required by these regulations and identified by the County, as necessary to the project. All improvements shall be in accordance with Ouray County Improvement Standards as set forth in Section 7 of this Code and Section 23, "Ouray County Road Standards."

(b)   Any other provisions that the County deems necessary to protect the public health, safety or welfare, which requirements are in accordance with the provisions of Colorado Revised Statutes, Section 30-28-137, as amended.

BLM_0061414

(c)   A detailed land use description for the final plan, including specific land uses and unit types for each use area, maximum number of units or floor area for non-residential uses, average lot size, maximum and minimum lot sizes, and any other land use information deemed appropriate by the County in its review of the project.

C.  FINAL DEVELOPMENT PLAN

(1)   <u>General</u>: Within one (1) year (or any extension granted by the County Commissioners) after approval by the County Commissioners of the preliminary development plan or within such greater period of time as may have been specified in the Commissioners' approval, the Applicant shall submit to the County an application for final development plan approval.

(2)   <u>Size and Scale</u>: The final development plan shall be drawn at a scale sufficiently large to clearly show the details of the development plan; 1" = 100' is preferred. The development plan shall be drawn on double matte reproducible Mylar in black permanent ink. The outer dimensions of the map shall be 24" x 36"; a margin of at least two (2) inches shall be reserved at the left edge of the map and at least one-half (1/2) inch shall be reserved around the remainder of the drawing.

(3)   <u>Title Sheet</u>: The purpose of the title sheet is to clearly describe the property being developed and to indicate approval of the final development plan by the County. Accordingly, the final development plan/final plat title sheet shall contain the following information:

(a)   The legal description of the outer boundary of the land included in the final development plan, to include the exact acreage.

(b)   The title of the development, which shall be different from any other development in the County.

(c)   A statement by the PUD's land surveyor, who shall be licensed in the State of Colorado, that the survey was performed by him or under his direct supervision, responsibility and checking, and that the final development plan accurately and properly shows the results of that survey and is in accordance with the requirements of C.R.S. §38-51-104 and §38-51-106, as the same may be amended from time to time.

(d)   The signature and seal of the PUD's land surveyor.

(e)   Signature blocks for the chair of the Planning Commission or the Joint Area Planning Board and the County Commissioners, with spaces for the dates of their respective signatures.

BLM_0061415

(f)   A certificate to be signed and acknowledged by all parties having record title interest in the property, consenting to the preparation and recordation of the final development plan.

(g)   A statement to be signed by the owners and other holders of record interests of the land encompassed by the final development plan dedicating the streets, rights-of-way, public sites and other public land, as required, to the County.

(h)   Signature block for the Ouray County Treasurer certifying that there are no delinquent taxes due or tax liens against the property included in the PUD.

(i)   Attorney's certification that title to the property has been examined and that all record owners and holders of encumbrances affecting the property have properly executed the plat and joined in the dedication of the subdivision of the property as well as roadways, easements or rights-of-way shown on the plat.

(j)   Signature block for all holders of encumbrances against the property included on the plat certifying that they consent to the division of the property and join in the dedication of the roadways, easements or rights-of-way shown on the plat.

(k)   Acceptance block for the Ouray County Clerk and Recorder to record the filing of the final plat.

(l)   Where the final development plan includes more than one sheet and, where the final development plan is a portion of a larger approved preliminary development plan, a key map shall be provided that shows the relationship of each sheet to the overall area encompassed by the final development plan and its relationship to the approved preliminary development plan.

(m)   Where there is a subdivision of land involved in the proposed development of the land, a final subdivision plat shall also be prepared. The map sheets of the final plat shall show the boundary survey information described above and the survey data for each of the lots contained in the subdivision.

(n)   Any other required plat notes or dedications, such as restrictions on open space, non-building areas, engineering requirements, wildlife restrictions, etc.

(4)   <u>Additional Information</u>: The following information shall accompany the

BLM_0061416

submittal for the approval of the final development plan:

(a)   Updated reports as may be required to supplement those items described in Section 6.8 B.

(b)   Covenants shall be submitted that comply with all prior conditions of approval and shall include all required Land Use Code and statutory language. The covenants shall be reviewed by the County Attorney prior to recording.

(5)   <u>Contents of Final Development Plan</u>: The Applicant shall confirm with Land Use Staff the minimum number of submittal copies required. At a minimum the final development plan shall show the following information:

(a)   Written and graphic scale, date of preparation, north arrow and number of each sheet of the total number of sheets (e.g., Sheet 5 of 8).

(b)   The names of abutting developments. In the case of abutting unplatted land, the notations "unplatted" should appear.

(c)   All property boundary lines and lot lines with lengths to one one-hundredth of a foot, bearings, points of curvature and lengths of arcs. All bearing determinations must be explained in a statement by the PUD's land surveyor. "Assumed North" is not an acceptable basis for bearings.

(d)   The boundaries of all areas within the development which are subject to periodic inundations by a one hundred (100) year flood and located within known, designated or identified one hundred (100) year flood plains.

(e)   The bearings and distances for every lot line and building area shall be shown; lot dimensions shall be shown in feet and hundredths of feet. The net acreage of all lots shall be shown to the nearest on one-hundredth of an acre.

(f)   All lots shall be numbered consecutively with no omissions or duplications throughout the entire development, including all units of any development that has a single tract name but is designated by different units. If blocks are numbered, they shall be numbered consecutively. Each lot shall be shown entirely on one sheet.

(g)   The side lines, total width, width of the portion being dedicated and width of existing dedications of all roads or streets shall be shown. In addition, the centerline of all roads or streets shall be dimen-

BLM_0061417

sioned with bearings, distances and detailed curve data to include arc, radius, chord length and length of arc. Curve data may appear in a table, with the date referenced to each curve by a method acceptable to the County.

(h) The survey for the development shall close with an accuracy of one in five thousand.

(i) Existing and proposed easements, public roads or trails as identified by Ouray County GIS records, or through reference to recorded documents shall be shown, including the reference to the County's records. If the easement is being dedicated on the final development plan, it shall be properly set out in the owner's certificate of dedication.

(j) The names of all streets and highways, as reviewed and approved by appropriate Ouray County departments or agencies.

(k) The names, locations and widths of all abutting streets and alleys, if any.

(l) The location and a description of all monuments, both found and set, which mark the boundaries of the property, including, if possible, a description of two or more recorded monuments on record with the State Board of Registration for Professional Engineers and Land Surveyors used in conducting the survey.

(m) Any monumented and recorded benchmark (USGS datum) within the development and within thirty (30) feet of the proposed construction work area.

(n) Any other information or submittal items as the Planning Commission or the Joint Area Planning Board or the Board of County Commissioners may reasonably request in order to review and act upon the final development plan

(6) Filing and Fees: The Applicant shall, at the time of filing a final development plan, pay a fee as determined by the County's current fee schedule.

(7) Certificate of Title. There shall be filed with the final development plan, evidence of title and liens or encumbrances issued by a reputable title insurance or abstract company or title opinion by an attorney licensed to practice law in the State of Colorado, showing the names of all persons and entities having any right, title or interest in the land proposed for development and whose consent is necessary to convey clear title to the

BLM_0061418

said land. The policy or commitment for title insurance or title opinion shall be issued or updated within sixty (60) days of the submittal of the final development plan application.

(8) <u>Certification of Water and Sewer Facilities</u>. (If required)

    (a) <u>Sewer</u>: A certificate of the CDPHE that the sewage treatment system, as designed by the Applicant, will comply with State and local laws and regulations.

    (b) <u>Water</u>: A certificate from the State Engineer or the appropriate water district or municipality, that the water system, as designed by the Applicant, will provide adequate and safe water, in compliance with State law and regulation, to the development.

(9) <u>Weed Mitigation</u>: Applicant shall submit a revegetation plan and a weed mitigation and control plan that has been reviewed and approved by the Ouray County Weed Manager, including the approximate cost for the required work. As a condition of any PUD approval the County Commissioners shall approve such plans and the Applicant shall be required to comply with the terms of any such approved plan, including posting an appropriate bond.

(10) <u>Additional Information</u>: Any other evidence and material that are or may hereafter be required by law or by the conditions of approval of the preliminary development plan.

(11) <u>Performance Bond</u>: As a condition of final development plan approval, the Applicant shall be required to execute a bond in an amount as approved by the County Commissioners. The bond shall be in the form approved by the County and shall be conditioned upon the Applicant completing the plan, or the stage, as finally approved. The bond shall be in cash or security acceptable to the County. The bond may provide for phased satisfaction and release upon completion of phases as approved by the County. The amount of the bond shall be determined by the County Commissioners based upon satisfactory information supplied by the Applicant, such as current engineering estimates, signed contracts with contractors expected to perform the work, or other information required by the County Commissioners. **(To apply to Limited PUDs on a case-by-case basis.)**

(12) <u>Action on Final Development Plan</u>:

    (a) Upon submission of the final development plan, it shall be reviewed by the Planning Commission or the Joint Area Planning Board to ascertain whether it is in compliance with the preliminary develop-

BLM_0061419

ment plan and this Section. The Planning Commission or the Joint Area Planning Board shall then certify to the County Commissioners that the final development plan as submitted is in compliance with the requirements of the Land Use Code and the approved preliminary plan. If it is not in compliance, the Planning Commission or Joint Area Planning Board findings shall note those areas of noncompliance. A copy of the Planning Commission or the Joint Area Planning Board findings shall be given to the Applicant. The Planning Commission or the Joint Area Planning Board action shall be in the form of a motion as noted in the minutes. The Planning Commission or the Joint Area Planning Board minutes, together with copies of all submissions by the Applicant and other information developed by the Planning Commission or the Joint Area Planning Board shall be forwarded to the County Commissioners.

(b)  Upon receipt of the Planning Commission or the Joint Area Planning Board findings, the County Commissioners shall, within a period of not more than thirty (30) days and at a legally noticed public hearing called for such purpose, review the recommendation of the Planning Commission or the Joint Area Planning Board and the technical aspects of the final development plan submittal, and determine if such final development plan is in compliance with the requirements of this Section and the approved preliminary development plan. Notice of such public hearing shall be published at the expense of the Applicant, in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the hearing date. The Board shall approve, conditionally approve or disapprove the final development plan. The action of the County Commissioners shall be transmitted to the Applicant.

(c)  Approval of the final development plan shall not constitute acceptance for maintenance by the County of roads, streets, alleys or other public lands within the Planned Unit Development.

(13) Impact Fees: If the County Commissioners shall determine, on the basis of information submitted and available to it, that a proposed development will have an impact on, or will necessitate, improvements to facilities or services provided by the County, the school districts or other governmental entities within the County, the County Commissioners shall, to the greatest extent possible and as a condition of approval, require that the Applicant take steps to mitigate the impact by payment of impact fees or provision of in-kind contributions. The amount and purpose of any impact fee shall be determined by the County Commissioners based upon a finding that there is an essential nexus between the payment or contribution and a legitimate local government

BLM_0061420

interest and the payment or contribution is roughly proportional in nature, timing and extent to the impact of the proposed use. Failure to fund such impacts by the Applicant may be grounds for denial of the development. The County Commissioners may require that the Applicant obtain a traffic analysis, completed by a professional engineer, illustrating the expected traffic by type and volume for the anticipated use; the County Commissioners may require that other appropriate studies or analyses be obtained by the Applicant, depending upon the anticipated impacts of the proposed development.

(14) <u>Construction of Planned Unit Development</u>: No construction shall commence and no permits for construction shall be granted until the final development plan has been approved by the County Commissioners.

(a) Prior to undertaking construction, the Applicant shall first apply for and obtain a PUD construction permit from Ouray County. The application for a PUD construction permit shall include construction plans for all improvements described in the PUD development plan. These shall consist of three (3) copies of plans and profiles for all streets drawn to a scale of 1" = 10' vertical and 1" = 5' vertical and 1" = 50' horizontal, showing all proposed utility line locations and sizes, connections, valves, fire hydrants, detailed plans for all water supply and sanitary sewer service facilities (if applicable) and detailed plans for all drainage structures and flood plain channelization facilities. Applicant shall also submit a preliminary grading plan showing proposed grades, the extent of cuts and fills and the proposed slope angle of all banks. Preliminary grading plans may be based on a photogrammetric survey of a scale not less than 1" = 100'. Contour intervals shall be as follows:

(i) Greater than or equal to 10% slope - 10' interval

(ii) Less than 10% slope - 5' interval

(b) The County shall approve the application and issue a permit only if it finds that construction will be in conformance with the previously approved final development plan, Ouray County development standards, and other applicable laws and regulations.

(c) All construction shall be in conformance with the final approved development plan and Ouray County development standards.

(d) Any material variation from the final development plan must be approved by the County Commissioners as an amendment to the final development plan.

BLM_0061421

(e)   The Planned Unit Development or the stages of a Planned Unit Development must be completed in accordance with the schedule established by the Planned Unit Development Agreement. Failure to so complete may result in forfeiture of the Applicant's performance bond, as heretofore required.

(15)  Final Approval of PUD:

(a)   Within two years of the preliminary development plan approval, or upon completion of required improvements or, in the case of a phased development, upon completion of the improvements for a particular phase, the Applicant shall apply to the County Commissioners for final PUD or final approval of any phase. If the County Commissioners find that there has been compliance with this Code and the PUD Agreement, final approval shall be granted.

(b)   No PUD property shall be transferred, sold or occupied for its intended purpose until final approval, or final approval of any phase, has been granted.

(c)   Upon final approval, a plat (paper and in an appropriate digital format) of the final PUD Plan, or that phase of it that has been finally approved, shall be submitted to Land Use Staff for review and compliance with all previous approvals. If the final plat conforms to prior approvals, Land Use Staff shall submit the final plat to the County Commissioners at a regular meeting for approval and signature by the Chair of the County Commissioners. The final plat may then be recorded by the Applicant in the office of the County Clerk & Recorder of Ouray County. No such PUD Plan, or portion of plan, shall, however, be filed until final approval has been granted, all required fees have been paid, and the plan and plats have been executed by the County Commissioners. All signatures and seals affixed to the final plat shall be original, in black permanent ink and clearly readable.

(d)   If the improvement work required under the PUD Agreement has been substantially, but not entirely, completed, the Applicant may, nevertheless, apply for final PUD approval and the County Commissioners may grant such approval if the Applicant enters into a final improvements agreement, in the form specified by the County, agreeing to complete the work within a specified period of time and further agreeing that, should such work not be satisfactorily completed within the specified time limit, the County may complete it and recover the costs thereof from the Applicant. A good and sufficient performance bond or cash deposit in the name of the County shall secure the agreement. The amount of the bond or

BLM_0061422

cash deposit shall be sufficient to cover the estimated costs of the improvements. The agreement shall provide for release of the collateral or bond upon completion of the improvements and may provide for partial release of the collateral or bond upon partial completion of the improvements.

6.9   <u>PLANNED UNIT DEVELOPMENT – LIMITED. SUPPLEMENTARY CRITERIA, REQUIREMENTS AND PROCEDURES</u>

A.   CRITERIA

A PUD-Limited may be approved subject to the following criteria:

(1)   The maximum allowable density shall not exceed one unit per 13 acres (if allowed by the underlying zoning) of land included in the application. Parcels smaller than 13 acres may be created provided the minimum lot size is one acre.

(2)   No more than 3 lots are created.

(3)   Unless otherwise noted, all of the criteria and submittal requirements and site development standards set forth in Section 6.8 above, for a Sketch Plan, Preliminary Development Plan and a Final Development Plan shall apply to a PUD-Limited. An Applicant for a PUD-Limited shall file a combined application for Preliminary Development Plan / Final Development Plan.

B.   ACTION ON A PUD-LIMITED

(1)   <u>Public Hearing</u>: Once the combined preliminary development plan / final development plan application has been accepted as complete and all referrals have been made, Land Use Staff shall set a date for a public hearing on the proposal, which shall be scheduled in a manner that allows compliance with the notice provisions of this Code and state statutes. Notice of such public hearing shall be published at the expense of the Applicant, in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the hearing date. The Applicant shall also provide, prior to the Planning Commission or the Joint Area Planning Board public hearing on the combined preliminary development plan / final development plan, certificates of mailing from the U.S. Postal Service showing that notice has been sent to all adjacent owners at least 14 calendar days prior to the date of such hearing. The notice shall be given in a form approved by the Land Use Staff. Additionally, Applicant shall comply with the requirements of C.R.S. §24-65.5-101, *et seq.*, "Notification of Surface Development" to any owner of severed minerals underneath the property to be developed.

BLM_0061423

(2)   <u>Planning Commission or Joint Area Planning Board Action</u>: At the public hearing, the Planning Commission or the Joint Area Planning Board shall review and consider the combined preliminary development plan / final development plan application for the PUD-Limited, the comments and recommendations from any agency referrals, testimony from the public, and the requirements of this Section, and shall recommend approval, approval with conditions or modifications, or disapproval of the combined preliminary development plan / final development plan. Planning Commission or the Joint Area Planning Board action shall be in the form of a motion as noted in the minutes and, if the plan is disapproved or approved with conditions or modifications, the conditions or modifications shall be stated in clear and concise terms in the motion. The motion may also state what specific changes in the combined preliminary development plan / final development plan, if made by the Applicant, could render the plan acceptable to the Planning Commission or the Joint Area Planning Board. The Planning Commission or the Joint Area Planning Board minutes, together with copies of all submissions by the Applicant, and other information developed by the Planning Commission or the Joint Area Planning Board shall be forwarded to the County Commissioners. No public hearing shall continue for more than forty (40) days from the date of commencement without the written consent of the Applicant. Any continuation of a public hearing shall be to a date certain.

(3)   <u>County Commissioners' Action</u>: Upon receipt of the Planning Commission or the Joint Area Planning Board findings, the County Commissioners shall, within a period of not more than thirty (30) days and at a legally noticed public hearing called for such purpose, review the combined preliminary development plan / final development plan, the recommendation of the Planning Commission or the Joint Area Planning Board, the comments and recommendations from any agency referrals, testimony from the public, and the requirements of this Section. Notice of such public hearing shall be published at the expense of the Applicant, in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the hearing date. The Board shall approve, conditionally approve or disapprove the combined preliminary development plan / final development plan. The County Commissioners shall state clearly, in writing, the grounds for disapproval or the required conditions or modifications. If the combined preliminary development plan / final development plan is approved by the County Commissioners, such approval shall be reflected in a resolution, including any conditions of approval and the County Commissioners, through the Chair, shall note such approval on the combined preliminary development plan / final development plan. Notice of the action of the County Commissioners shall be transmitted to the Applicant. The approval of the preliminary development plan / final development plan shall be valid for eighteen

BLM_0061424

(18) months. An extension of time may be applied for by the Applicant requesting such extension in writing. The County Commissioners may grant one written extension of time not exceeding eighteen months.

(4)   Final Plat: Upon completion of all necessary infrastructure improvements and within eighteen months of approval of the preliminary development plan / final development plan, a final plat, with any amendments required by the County Commissioners, shall be submitted to Land Use Staff for review and compliance with all previous approvals. If the final plat conforms to prior approvals, Land Use Staff shall submit the final plat to the County Commissioners at a regular meeting for approval and signature by the Chair of the County Commissioners. The final plat shall be recorded by the Applicant in the office of the Ouray County Clerk & Recorder. The final plat shall include all of the information, signatures, and other necessary information as set forth in Section 6.8 C (3) above. No plat shall be recorded, however, until final approval has been granted and all required fees have been paid. All required improvements or infrastructure must be installed, or any performance guarantee or agreements required as a condition of approval must be provided, prior to recordation of the plat and any associated documents.

6.10   PLANNED UNIT DEVELOPMENT-RESORT/CONFERENCE CENTER

A.   APPLICATION AND SUBMITTAL.

All of the requirements of Section 6.8 shall apply to a Planned Unit Development-Resort/Conference Center, unless otherwise noted. In addition, the following information shall be submitted with the application for preliminary development plan approval. The County shall provide guidelines to the Applicant for data collection and extent and nature of the analysis to be performed for the reports described below. Applicant shall be responsible for all of the costs associated with the submittal of the required reports.

(1)   Economic Analysis: An economic analysis of the effects of the project on Ouray County and the surrounding area shall be submitted.

(2)   Financial Information:

(a)   A business plan, including evidence of financial ability to complete the project shall be submitted.

(b)   Proof of financial ability to operate the project shall be provided.

(3)   Past Experience: Evidence of past experience with similar types of projects shall be submitted.

(4)   Visual Impact: In addition to the information specified in LUC Section 9,

BLM_0061425

"Visual Impact Review", the following information shall be provided.

   (a) <u>Architectural elevations and perspectives</u>. The County may specify off-site locations from which perspectives should be shown. The County may also require a detailed visual impact analysis.

   (b) <u>A lighting plan</u> that complies with Section 27, for structures and any recreational facilities included within the development shall be submitted.

   (c) <u>A landscaping plan</u> for all facilities, structures, roads, fences, and improvements included in the resort and resort residential areas shall be submitted. Such plan shall include a weed mitigation plan. In areas where land will be disturbed by recreational development and facilities, the Applicant will provide plans for revegetation and restoration of such areas.

(5) <u>Traffic Study</u>: An analysis of the impact of the development on traffic circulation, which also calculates increased average and peak daily traffic volumes and evaluates the capacity of the existing road system to handle increased traffic, shall be provided.

## B. CRITERIA

In addition to the Site Requirements and Review Criteria set forth in Section 6.6, and the Development Standards contained in Section 7, a PUD-Resort may be approved for land within the Alpine Zone District subject to the following criteria:

(1) <u>Uses/Facilities</u>: A PUD-Resort/Conference Center shall be allowed for multi-season resort development only. The resort core area shall include a full service hotel with basic resort facilities, including but not limited to those enumerated below. An Applicant may also choose to include resort residential units on parcels contiguous to the resort core area.

   (a) Resort Core Area:

     Hotel: Minimum number of rooms: 20
            Maximum number of rooms: 200

     The hotel shall be open for two or more seasons, be primarily oriented to outdoor recreational uses, and be self-contained. It shall include a contiguously operated food service, serving 3 meals per day in an on-site restaurant. A lobby and front desk with 24-hour service shall be provided.

   (b) Required recreational facilities and uses: Each application for PUD-

BLM_0061426

Resort shall include a variety of recreational uses for guests. These uses shall be primarily oriented to outdoor recreational uses and be self-contained. Such uses may include, but not be limited to skiing (cross country and/or downhill), snowshoeing, hiking, fishing, tennis, golf, horseback riding, trails (foot, horse, motorized vehicles).

Indoor facilities may include but not be limited to spa/retreat or health center, meeting space, swimming pool, retail facilities to serve the resort, and indoor sports facilities.

(c)   Resort residential area (160 acres minimum, in addition to and outside resort core area):

Residential development may be allowed on land contiguous to the resort core area. Such development and associated site plans must meet the standards for PUD-Regular, except as indicated below.

(2)   Maximum Residential/Accommodations Density:

(a)   Resort core area:

Hotel: 200 rooms, plus any density transfer outlined in 6.10 B. (3) below.

(b)   Resort residential area: For land outside the 160-acre minimum resort core area parcel, but also included in the application for PUD-Resort and designated as residential resort area, maximum allowable density shall not exceed the following residential densities:

(i)    Multi-family dwelling units: One unit per one (1) acre of land.

(ii)   Single-family dwelling units: One unit per ten (10) acres of land. Single-family dwelling units shall not exceed thirty percent (30%) of the units otherwise allowed in the resort residential area.

Parcels smaller than 10 acres may be created, provided the average density does not exceed one unit per 10 acres.

(c)   After the first 20 hotel rooms are established and operational, an option to count multi-family housing units toward "hotel unit" credits in determining further single-family development may be considered if such multi-family units are available for daily rental. If allowed, each multi-family unit available for rent will count as 1 hotel unit as credit toward further single-family residential development.

BLM_0061427

(3) <u>Density Transfer</u>: Resort residential units may be transferred from a contiguous resort residential area to a resort core area, provided that the remaining numbers of units in the resort residential area are correspondingly reduced. If a density transfer is deemed appropriate by the County, the designated building area in the resort core area may also be increased if the designated building area in the resort residential area is reduced proportionally.

(4) <u>Phasing</u>: The number of resort residential units (multi-family and single-family) may not exceed the number of hotel units constructed in the resort core area. In addition, the proportion of residential units constructed to those allowed in the resort residential area may not exceed the proportion of units constructed to those allowed in the core area. If phasing of units is allowed in the resort core area, the same phasing shall apply proportionally to the resort residential units.

For example, if half of the hotel units in the resort core area are to be constructed within two years, and another one-half constructed within the next 5 years, no more than one-half of the resort residential units may be constructed during the initial two-year period, with the remainder constructed in the next five-year period.

(5) <u>Designated Building Area</u>:  A designated building site shall be shown on the plans submitted in the application. This area shall include all structures, roads and infrastructure to serve the proposed development.

(6) <u>Resort Core Area</u>: A maximum of twenty-five percent (25%) of land included in the PUD-Resort application shall be included in the designated building area.

(7) <u>Resort Residential Area</u>: A maximum of 30 percent of the land included in the residential area of the PUD-Resort application shall be included in the designated building area.

The designated building area shall be contiguous, compact and disturb the least amount of site area possible. If site-specific conditions warrant creation of non-contiguous building areas, the County may consider such requests. If a site specific analysis demonstrates that contiguous building areas will not accomplish the goals contained in Section 6.7 A, and this Section 6.10, non-contiguous building areas and/or access through non-building areas may be allowed, subject to County approval.

(8) <u>Infrastructure and Services</u>:

(a)  All power lines and utilities shall be located underground.

BLM_0061428

(b)   Water and sewer shall be provided by a central facility for the resort core area and associated resort residential development (including employee housing areas).

(9)   <u>Emergency Services</u>:

(a)   A water storage tank shall be provided with sufficient capacity, as specified in Ouray County Fire Protection Standards, to meet the emergency fire fighting needs of the development.

(b)   Emergency medical services shall be provided to meet the requirements of first response capability, or as required to serve the uses on the site. Actual uses on the property and number of guests may require an increased level of service to include, but not be limited to, emergency medical technicians, licensed practical nurses or basic first aid stations.

(c)   An Emergency Services Plan that includes how emergency medical services, fire protection, law enforcement, and security will be provided to the proposed development will be submitted to the Ouray County Sheriff, the Ouray County Emergency Medical Services Coordinator, and the nearest fire protection district for review and comment.

(d)   The Applicant shall comply with this Section 6.10 B.9. and the applicable parts of Section 24 – "Wildfire Regulations" of this Code concerning Fire Protection and Wildfire Mitigation prior to receiving Preliminary Plan approval.

(10)   <u>Parking</u>:

(a)   Parking shall be provided as follows:

(i)   Hotel rooms: 1 space per room

(ii)   Residential units: 2 spaces per unit

(iii)   Retail/Service: 1 space per 500 gross square feet

(11)   <u>Transportation</u>: Transportation mitigation shall be determined based on the results of the traffic study required and the adequacy of the existing system serving the site. In general, the provision of alternative trans-portation, which minimizes the amount of traffic associated with the development, is encouraged. The County may require alternative trans-portation if such methods would reasonably mitigate the impacts of the proposed development. Existing roads or trails, which have been histori-cally utilized by the public for access to public lands, shall be kept available to the public for such use.

BLM_0061429

(12) Employee Housing Required:

    (a)    All PUD-Resort development shall be required to provide employee housing to meet a portion of the needs of the development, as outlined below. Employee housing units shall be exempt from density limits otherwise established in these regulations. All other land use regulation provisions, including restriction to location in designated building areas, shall apply to employee housing. Employee housing must be reachable by the employee from his or her point of employment within ten minutes' driving time or three miles, whichever is less.

    (b)    Amount required: An amount of housing sufficient to accommodate a minimum of twenty-five percent (25%) of workers generated by the resort development and associated resort residential units shall be provided by the Applicant of the project. This amount shall be calculated as described below.

        (i)    The number of employees generated shall be based on uses and calculated as follows:

            Commercial – 4.5 employees per 1,000 square feet.

            Hotels/accommodations – 0.33 employees per lodging unit.

            Residential – 0.33 employees (including multi-family) per dwelling unit.

            For the purposes of this table, square footage of commercial uses shall mean floor area, including basements, which is solely allocated to the uses, excluding bathrooms, walls, halls, non-commercial storage and parking areas or garages.

            If the Applicant has data indicating that the employee generation numbers included in this section do not pertain to the proposed development, the Applicant may submit an independent analysis of the number of employees generated by the proposed development. The County Planning Commission or the Joint Area Planning Board may consider this analysis and shall make a recommendation to the County Commissioners as to appropriate employee generation numbers for the proposed development.

        (a)    The number of employees generated shall be multiplied by 350 square feet per employee multiplied by 25% to determine the minimum amount of housing required.

BLM_0061430

(# of employees x 350 square feet x 25%) = square feet of minimum employee affordable housing requirement.

(b) <u>Covenant required</u>: A restrictive covenant shall be placed on land areas reserved for or proposed for employee housing and also on individual employee housing units. The covenant shall restrict such units and land areas for resort employee housing purposes. The covenant shall include a provision that the County may, but need not, take action to enforce the covenants.

(c) <u>Timing</u>: Employee housing units shall be provided at the same time as construction of the resort facilities. If phasing of resort facilities and resort residential units is approved, employee housing units shall be phased-in in a proportional manner. The amount of employee housing shall meet the needs of other uses provided as specified in the formula above.

(d) <u>Location</u>: Employee housing shall be provided on-site as part of the resort facilities, or in the vicinity of the resort (within three miles of the hotel in the resort core area).

(e) <u>Size and Materials Standards</u>: Employee housing units shall comply with the minimum size and material standards of the current building code, as adopted by Ouray County.

(13) <u>Design Standards:</u>

(a) <u>Lighting</u>: Exterior lighting shall be shielded to prevent glare and direct visibility of light bulbs from off the site. All exterior lighting shall be directed toward either the ground or surface of a building. High intensity sodium vapor and similar excessively bright lighting shall not be allowed (see Section 27).

(b) <u>Landscaping</u>: Landscaping shall be designed and installed to utilize existing site vegetation and features to the maximum extent possible, and as may be required by visual impact regulations.

(c) <u>Height of Structures</u>: No structure shall exceed thirty-five (35) feet; however a height of sixty (60) feet may be allowed with the specific approval of the County Commissioners.

(d) <u>Visibility</u>: Buildings visible from critical view corridors including the San Juan Skyway must conform to architectural design appropri-

BLM_0061431

ate for the area and approved in advance by the Ouray County Planning Commission or the Joint Area Planning Board.

(14) <u>Covenants</u>:

Following approval, all land included in a PUD-Resort shall have a covenant placed on the entire parcel (including both building and non-building or open space areas) restricting it from further development or subdivision. The covenants shall also specify the intended land uses, with average and maximum densities and total maximum numbers of units, and maximum amounts of non-residential floor area specified.

C.  ACTION ON PRELIMINARY DEVELOPMENT PLAN AND FINAL DEVELOPMENT PLAN

The review and approval process for the preliminary development plan and the final development plan for a Planned Unit Development-Resort/Conference Center shall be the same as set forth in Section 6.8 above.

6.11  <u>APPLICATION COMPLETENESS</u>

A.  The application process shall be set forth by the County Commissioners by resolution and shall be administered by the Land Use Department Staff. An application for Sketch Plan, preliminary development plan or final development plan will be considered complete only if it is submitted in the required number and form, including all mandatory information. A complete submittal will consist of all submittal requirements for the current phase of the process together with an index of reports previously submitted and on file with the Land Use Department.

B.  The completed application must be submitted on or before the filing deadline as set by Land Use Department Staff, along with the appropriate fee. The Land Use Department Staff shall make a determination of the application's completeness. If an application is determined to be incomplete, written notice shall be provided to the Applicant of the items needed to make the application complete and a deadline for submitting such information. Further processing of the application will not occur until the Applicant has submitted the omitted information. No additional material or handouts, to supplement or alter the Application, will be accepted from the Applicant after the filing deadline. Any material changes or alterations to the Application after the filing deadline may be cause for a continuance of any scheduled public hearings or meetings of the Planning Commission or the County Commissioners. The only Applicant materials that will be considered by the Planning Commission or the County Commissioners in making a decision will be those filed by the Applicant prior to the submittal deadline for that meeting.

BLM_0061432

6.12   AMENDMENT OF PLANNED UNIT DEVELOPMENT OR SUBDIVISION

After a Preliminary Development Plan, Final Development Plan or Final Plat has been approved by the County Commissioners, it may be amended only in accordance with this Section.

A.   GENERAL PROCESS AND SUBMITTAL REQUIREMENTS FOR ALL AMENDMENTS OR AMENDMENTS TO CORRECT A TECHNICAL ERROR/DEFECT

1.   The Applicant shall submit the required number of copies of a completed application for an amendment or an amendment to correct a technical error/defect on a final plat, the non-refundable application fee, and any required supplemental data for the proposed amendment. The application shall include:

a.   A written statement giving the details of the proposed amendment and the reason(s) why the amendment(s) is necessary.

b.   An original tax certificate for all lots, parcels or tracts involved, showing that no taxes are currently due or delinquent against the property.

c.   An original title commitment or title policy issued by a licensed Colorado title company, completed within sixty (60) days of submission, showing the names of all persons or entities having any right, title or interest in the land included in the application.

d.   A plat showing the proposed amendment(s) and including all of the information and detail as required by Section 6.8 C (3).

e.   Any supplemental data deemed necessary by the Land Use Staff to adequately review the request.

B.   AMENDMENTS (OTHER THAN TECHNICAL ERRORS/DEFECTS).

1.   Other submittal requirements for an amendment to a Planned Unit Development ("PUD") or subdivision:

a.   Map(s) showing: i) all properties within the Planned Unit Development or subdivision, including all phases or filings; ii) properties abutting upon or directly across a street from the PUD or subdivision proposed to be amended; and iii) adjoining properties. These properties are collectively referred to as "Affected Properties".

b.   A list of names and mailing addresses of the owners of Affected Properties who shall be referred to as "Affected Property Owners" for

BLM_0061433

notification as required below. This information can be obtained from the County Assessor's Office.

    c.  A copy of the proposed notices to be sent to Affected Property Owners.

2.  Notice to Affected Property Owners:

    a.  After the Applicant has submitted an application for an amendment, the Applicant shall send a notice, in a form approved by Land Use Staff, to the Affected Property Owners advising of the nature of the proposed amendment and the Affected Property Owners' right to vote and comment in favor of, or oppose, the proposed amendment. Such notice shall request a response from the Affected Property Owners within thirty days from the date of mailing the notice. The Affected Property Owners responses shall be returned to the Land Use Department. This notice may be combined with the notice of public hearing required by Section 6.12 B.3.b below and proof of the notice shall be shown by certificates of mailing from the U.S. Postal Service submitted to the Land Use Staff to complete the application prior to the public hearing before the Planning Commission or the Joint Area Planning Board.

    b.  The Land Use Department shall incorporate the responses from the Affected Property Owners in any Staff Report submitted to the Planning Commission and the County Commissioners.

3.  Public hearing and notice:

    a.  The Land Use Department shall review the application for amendment for conformance with the provisions of this Code and shall determine if the application is complete. Upon a determination of application completeness, the Land Use Staff shall schedule a public hearing for the amendment on the next available agenda for the Planning Commission or the Joint Area Planning Board.

    b.  Notice of such public hearing shall be published at the expense of the Applicant in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the public hearing date. Written notice of the public hearing shall also be delivered or mailed, first class postage, prepaid, at least thirty (30) days prior to the public hearing to all Affected Property Owners, to any Homeowner's Association for the PUD or subdivision proposed to be amended and to any special districts that serve the PUD or subdivision. The Applicant shall submit to Land Use Staff, prior to the Planning Commission or the Joint Area Planning Board public hearing on the

BLM_0061434

amendment, certificates of mailing from the U.S. Postal Service showing that notice has been sent to all Affected Property Owners at least 30 calendar days prior to the date of such hearing. The notices shall be given in a form approved by the Land Use Staff.

c.   At the public hearing, the Planning Commission or the Joint Area Planning Board shall review and consider the application for amendment, the comments and recommendations from any agency referrals, the expressed desires of the Affected Property Owners, testimony from the public, and the requirements of this Section. The Planning Commission or the Joint Area Board shall recommend approval, approval with conditions or modifications, or disapproval of the amendment in accordance with the criteria set forth in Paragraph 4 below. Planning Commission or the Joint Area Planning Board action shall be in the form of a motion as noted in the minutes and, if the amendment is formally recommended for disapproval or approval with conditions or modifications, the conditions or modifications shall be stated in clear and concise terms in the motion. The Planning Commission or the Joint Area Planning Board minutes, together with copies of all submissions by the Applicant and other information developed by the Planning Commission or the Joint Area Planning Board shall be forwarded to the County Commissioners.

d.   Upon receipt of the Planning Commission or the Joint Area Planning Board recommendation and accompanying materials, the County Commissioners shall at a legally noticed public hearing review the application for amendment. Notice of such public hearing shall be published at the expense of the Applicant in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the hearing date. At such public hearing, the County Commissioners shall consider the application, the recommendation of the Planning Commission or the Joint Area Planning Board, the comments and recommendations from any agency referrals, the comments and recommendations of the Affected Property Owners, testimony from the public, and the requirements of this Section. The County Commissioners shall, by resolution, approve, approve with conditions or modifications, or disapprove the amendment in accordance with the criteria set forth in Paragraph 4 below. The County Commissioners shall state clearly, in writing, the grounds for approval or disapproval and any required conditions or modifications. No amendment shall be effective until a Mylar of the amended plat has been signed by all required parties, including the Chair of the County Commissioners, all fees have been paid and the amended plat recorded in the Office of the Ouray County Clerk and Recorder at the expense of the Applicant.

BLM_0061435

4.  County Approval:

    a.  Any amendment of a PUD or subdivision shall require a recom-mendation from the Planning Commission or Joint Area Planning Board and the approval of the County Commissioners, which approval shall be given only if the proposed amendment (1) is consistent with all requirements of this Section 6 and the underlying zoning standards set forth in Section 3 of this Code; and (2) includes improvements which are consistent with the provisions of Section 7 (Improvements Standards) and as may be required by the County Commissioners.

    b.  In making a decision on any proposed amendment to a PUD or subdivision, the County Commissioners shall make the following findings:

        (1)  that the results of the votes of the Affected Property Owners have been duly considered and their issues addressed or mitigated;

        (2)  that the amendment is not contrary to the provisions of valid covenants, plats, or declaration of a PUD or subdivision based upon information supplied by the applicable Homeowner's Association;

        (3)  and shall make additional findings consistent with the provisions of C.R.S. §24-67-106, as amended from time to time:

            (a)  that the modification, amendment or change is consistent with the efficient development and preservation of the entire planned unit development or subdivision; and

            (b)  that the modification, amendment or change does not affect in a substantially adverse manner either the enjoyment of land abutting upon or across a street from the planned unit development or subdivision or the public interest; and

            (c)  is not granted solely to confer a special benefit upon any person.

    c.  The unanimous vote of all of the County Commissioners eligible to vote shall be necessary for an approval of an amendment to a PUD or subdivision.

## C.  TECHNICAL ERRORS OR DEFECTS IN A FINAL PLAT.

The requirements of Section 6.12.B shall not apply to amendments to correct a technical error or defect in a final plat. Once a complete application has been

BLM_0061436

submitted to the Land Use Staff requesting a correction of a technical error or defect on a final plat, such application shall be placed on an agenda for a regular County Commissioner meeting, for consideration at such meeting. The County Commissioners may approve the application if it is consistent with an approved preliminary development plan.

6.13   OUTSIDE PROFESSIONAL ASSISTANCE

The Planning Commission or the Joint Area Planning Board may, with prior approval of the County Commissioners, seek qualified outside professional assistance during its review process. The cost of such assistance shall be considered part of the County's expenses incurred in reviewing the development proposal and, as such, shall be chargeable to the Applicant.

6.14   WILDLIFE PROTECTION MEASURES APPLICABLE TO THE NORTH MESA AND SOUTH SLOPE ZONES

The North Mesa and South Slope Zones are located in important migration and habitat areas for a variety of wildlife, as measured by the migratory and other use of deer and elk and their natural predators. It is the goal of Ouray County to provide for the protection and preservation, in a state useable and necessary to wildlife, of these important migratory and other habitat areas. In order to attain this goal, all new Planned Unit Developments ("PUD") and other subdivisions as may be approved pursuant to this Code may be required to:

A. Dedicate wildlife migration corridors, centered, to the extent possible, on natural drainages. The specific size of the wildlife migration corridor will be based upon recommendations made by the Colorado Division of Wildlife. The dedication shall be in a form acceptable to the County and shall be recorded in the public records of Ouray County.

B. Restrict new fencing and remove existing fencing on and adjacent to designated migration corridors to the extent practicable consistent with necessary agricultural management practices and other requirements of this Code. Any new or existing fencing located on or adjacent to a designated migration corridor must be in compliance with Colorado Division of Wildlife wildlife safe fencing guidelines.

C. Require that domestic predators be fenced or kept indoors. Dog areas shall be located away from and outside of designated migration corridors.

BLM_0061437

# Section 7

## IMPROVEMENTS STANDARDS

7.1   <u>PURPOSE</u>

These improvement standards establish requirements which are designed to promote the health, safety, convenience, order, prosperity and welfare of the present and future citizens of Ouray County and will insure adequate and convenient open spaces for public streets and other forms of access, recreation, drainage facilities for protection against flood, and safe, potable water supplies and adequate sanitary disposal systems.

7.2   <u>REQUIRED IMPROVEMENTS</u>

The developer shall provide, construct, furnish or make available all the improvements described in this Code as they apply to the particular development.

    A.   <u>Grading and Paving</u>:  All highways, streets and alleys shall be graded and paved or gravel surfaced to the widths and grades as described in the Ouray County Road Standards.  The developer  shall improve any roads necessary or used to provide access from the development to a public road, whether within the development or off-site.

    B.   <u>Curbs and Gutters</u>:  Concrete curb and gutters may be required along all highways and streets in nonresidential areas of PUDs and along all highways and streets in residential areas of PUDs where, by virtue of clustering or other means, the density is four (4) or more dwelling units per net acre.

    C.   <u>Sidewalks</u>:  Concrete sidewalks may be required as described in Section 7.3(E)(6) of this Code.

    D.   <u>Retaining Walls</u>:  Retaining walls may be required whenever topographic conditions warrant, or where necessary to retain fill or cut slopes within the rights-of-way or slope easements.

    E.   <u>Water Supply and Fire Protection</u>:  Provisions shall be made for such domestic water and fire protection as may be necessary to protect public health and property.  Such water may be supplied by:

        (1)   Connection to a public utility, in which case, a letter from the public utility company shall be submitted, showing its ability to serve the proposed subdivision and evidence indicating that a satisfactory agreement has been entered into for the installation of such service which shall provide water connection for each lot.

BLM_0061438

[7.2 E 2]

(2)     Establishment of a new water system.  Any water system designed to serve twenty-five (25) people or fifteen (15) taps must be reviewed and approved by the Colorado Department of Health. The developer shall give such guarantee or shall post such bond as deemed necessary to insure installation of an adequate and safe system which would provide for water connection for each lot.

(3)     Wells, springs and other water rights showing adequate evidence that a water supply  which is sufficient in terms of quality, quantity and dependability will be available to insure an adequate supply of water for the type of development proposed.  Such evidence may include, but shall not be limited to:

(a)     Evidence of ownership or right of acquisition of or use of existing and proposed water rights.

(b)     Historic use and estimated yield of claimed water rights.

(c)     Amenability of existing rights to a change in use.

(d)     Evidence that public or private water owners can and will supply water to the proposed development, stating the amount of water available for use within the development and the feasibility of extending service to that area.

(e)     Evidence concerning the potability of the proposed water supply for the development. Such evidence must take into account that some water source areas in Ouray County produce water with undesirable substances not included in State water quality standards.  Ouray County may impose requirements in addition to those of the State for potable water.

F.     <u>Sewage Disposal</u>:  Provisions shall be made for adequate sewage disposal by:

(1)     Connection to sanitary sewer when available, in which case, a letter from the governing board of the sewer system shall be submitted, showing the ability of the system to handle sewage from the proposed development and evidence that a satisfactory  agreement has been entered into for connection to the system.

BLM_0061439

[7.2 F (2)]

    (2)    Individual or community septic tank systems or other approved sewage disposal systems will be permitted, provided that detailed plans shall be submitted to the County.  Any system with a design capacity of two thousand (2,000) gallons per day or more must also have the site application approved by the Colorado Department of Health.  No construction shall be commenced upon any such systems until the same has been approved in writing by the County and the Colorado Department of Health, provision has been made for future operation and maintenance, and the developer has given such guarantee or posted a bond as deemed necessary to insure the installation of proper facilities within the proposed development.

G.    <u>Trees and Landscaping</u>:  The developer may be required to install trees and/or other landscaping materials where existing vegetation has been destroyed by grading or other construction activities.  Additional landscaping may be required to meet requirements of the Visual Impact Regulations.

Existing trees to be preserved shall be clearly marked prior to any grading or construction work and protected during construction of the development.

H.    <u>Fills</u>:  All filling of lands shall be accomplished in accordance with the requirements and recommendations of the soils investigation report, required by Section 7.3(F).

I.    <u>Drainage and Flood Control</u>:  All necessary structures and facilities for storm water drainage and flood water control shall be provided as required in the provisions of the Flood Hazard Regulations (Section 10 of this Code) and as required and recommended by the PUD drainage plan, as required in Section 7.3(D).

J.    <u>Underground Utilities</u>:  Where feasible, all utility distribution facilities (including, but not limited to, electric, communication and cable television lines), installed in and for the purpose of supplying service to any development shall be placed underground, except street lights and equipment normally installed on the surface which is appurtenant to underground facilities, such as surface-mounted transformers, pedestal-mounted terminal boxes and meter cabinets, concealed ducts and similar items.

The developer is responsible for compliance with the requirements of this Section and shall make the necessary arrangements for the installation of said facilities.

BLM_0061440

[7.2 J]

All underground facilities, sanitary sewers and storm drains installed in streets, service roads, alleys or highways, shall be constructed prior to the surfacing of such streets, service roads, alleys or highways.  Service connections for all underground utilities and sanitary sewers shall be outside of any road right-of-way.

Amended
7/29/96

K.   Signs:  Signs shall be designed and placed in accordance with County specifications  as described in Section 8 of this Code.

L.   Subdivision Monumentation:

(1)   Permanent Monuments: Permanent survey monuments shall be set within all subdivisions in accordance with the provisions of Title 29, Article 51, Colorado Revised Statutes, as amended.  At least two (2) permanent monuments shall be set in each block; they shall be within sight of each other and be readily accessible.  These monuments may be either on the street centerline or on a line parallel to, and offset from the centerline and properly documented on the Final Plat.  Permanent monuments shall be not less substantial than six (6) inch diameter concrete, twenty-four (24) inches long, or thirty (30) inch long No. 5 rebar steel, the upper twelve (12) inches of which are encased in concrete, with the exact point marked by a copper or brass pin two (2) inches long.  The concrete monument shall be used in all street and surface areas.  The top of the monument shall be six (6) inches below the finished pavement grade and  shall be encased by a cast iron monument box and cover, set flush with the finished pavement and supported independently of the monument.

(2)   Staking:  In making the survey, the engineer or surveyor shall take all corners and angle points in the exterior boundary of the subdivision and all angle points and curve points in the right-of-way lines of all streets, alleys, easements or other lands to be dedicated for public use.  Stakes shall be not further apart than one hundred (100) feet and not less substantial than three-quarter (3/4) inch iron pins eighteen (18) inches long, driven flush with the ground, the corner point being marked by a metal tag stamped with the registration number of the engineer or surveyor.  All lot corners, angle points and curve points shall be staked with three-quarter (3/4) inch iron pins eighteen (18) inches long.  Said stake shall be driven to a depth of not less than two (2) inches below the finished grade of the lot and shall be permanently monumented on the surface.

BLM_0061441

[7.2 L 3]

(3)   <u>Inspection and Installation</u>:  All monuments shall be subject to the inspection and approval of the County and shall be installed prior to the issuance of any building permits  for the subdivision.

M.   <u>Off-Street Parking</u>: Parking shall be provided on the property for which it is needed in accordance with the following schedule.  Parking requirements for buildings or developments containing more than one (1) unit shall be established by determining the required number of spaces for each separate use.

| NO. | USE | NUMBER OF PARKING SPACES REQUIRED |
|---|---|---|
| 1. | Single and two-family dwellings | 2 per dwelling unit |
| 2. | Multi-family dwellings<br>1 bedroom<br>2 bedroom<br>3 bedroom<br>Each additional bedroom over three | 1.5 per unit<br>2.0 per unit<br>2.5 per unit<br>2.5 per unit plus 0.5 spaces per additional bedroom |
| 3. | Hotel, Motel | 1 per guest room, plus 1 space per 3 employees |
| 4. | Mobile Home Park | 2 per mobile home, plus 1 for each 200 square feet of gross floor area (GFA) of any permanent structures |
| 5. | Ski Area | 1 per employee, plus 1 space per 4 potential skiers based on the capacity of the mountain |
| 6. | Restaurant, Cafe and Drinking Establishments | 1 for each 150 square feet of gross floor area (GFA) |
| 7. | Hospital | 1 per bed |
| 8. | Medical Office or Clinic | 1 for each 150 square feet GFA |

BLM_0061442

| 9. | Offices and Office Buildings | 1 for each 300 square feet GFA |
|---|---|---|
| 10. | Retail Stores, Shops, Banks, other financial institutions, except grocery stores | 1 for each 200 square feet GFA |
| 11. | Grocery and Food Stores | 1 for each 150 square feet GFA |
| 12. | Golf Courses | 3 for each golf hole |
| 13. | Churches | 1 for each 4 seats (in the principal assembly area) |
| 14. | Auditorium, Theater, Convention Hall or similar place of public use | 1 for each 4 seats (bench capacity computed as 1 seat for each 20 inches) |
| 15. | Boardinghouse, Lodging house or Tourist Home | 1 for each guest bedroom |
| 16. | Elementary, Junior High and Private Schools (non-commercial) | 2 for each classroom or parking required for auditorium, whichever is greater. |
| 17. | Senior High School | 4 per classroom and parking for any auditorium |
| 18. | Child Day Care Facility | 1 per 2 staff employees or staff volunteers; 1 per 8 children; 1 per each day care facility vehicle |
| 19. | Parking spaces for uses not listed above shall be determined based on the following considerations:<br><br>(a)   The design capacity of the proposed facility.<br>(b)   An overall plan for concentration or concentrations of parking with appropriate consideration of designed landscaping and relationship to surroundings;<br>(c)   Trade-offs or alternative use of parking areas by uses which occur during different hours, days or seasons. | |

7-6

BLM_0061443

[7.3]

7.3   DESIGN STANDARDS

    A.   Site Considerations

        (1)   Where steep land (10 percent slope or greater for the majority of lots), unstable land and areas having inadequate drainage or problems of such a nature  as to endanger health, life or property exists, areas with such problems shall not be platted unless acceptable provisions are made by a registered engineer.  Such plans must be approved by the County which shall judge the same by generally accepted principles of engineering adapted to the particular circumstances.  All development in the subdivision shall be carried out in conformity with the plans as finally approved.

        (2)   Any land within the designated one hundred (100) year flood plain shall not be subdivided or built on unless in conformance with the Ouray County Flood Damage Prevention Regulations.

        (3)   Existing features which would add value to residential development or to the County as a whole, such as trees, watercourses, historic spots and similar irreplaceable assets, shall be included in the design of the PUD.  No trees shall be removed from any PUD or any change in the grade of the land effected until the Preliminary Plan is approved by the County Commissioners.  All trees on the plat intended to be retained shall be preserved and all trees, where required, shall be protected against change in grade.

        (4)   In all cases, materials used, preparation of base, methods of placing materials, workmanship, grading and tests of materials shall not be less than those standards required by the most recent standard specifications of the County, except where special provisions are required.

    B.   Streets and Highways

        (1)   General Design:

            (a)   Streets shall be related appropriately to the topography.  All streets shall be arranged so as to result in as many building sites at, or above, the grades of streets as possible.  A combination of street grades and curves should be avoided.

            (b)   Local streets shall be laid out to discourage use by through traffic, to permit efficient drainage and utility systems, and to require the minimum number of streets necessary to  provide convenient  and  safe access to property.

BLM_0061444

[7.3 B 1 (c)]

(c)     Streets with off-set intersections shall have a minimum separation of one hundred twenty-five (125) feet from centerline to centerline of the streets, or shall be aligned with existing intersections.

(d)     Dead-end streets, with the exception of cul-de-sacs, shall be prohibited unless they are designed to connect with future streets in adjacent land that has not been platted, in which case, a turn-around easement of forty-five (45) feet radius shall be provided.  Full width paving and curb and gutter may be required for the temporary turn-around.

(e)     Access to an arterial or collector street shall occur only at intersection approved by the County, which shall determine the intersection or intersections for access based upon standards for efficient traffic movement and safety for drivers and pedestrians.

(f)     Fire lanes may be required where necessary to protect the area during the period of development and when developed and shall be at least twenty (20) feet in width and remain free of obstructions and provide access at all times.

(2)     Centerlines: The centerlines of all roads and highways shall be the continuations of the centerlines of existing roads and highways or adjacent and contiguous territory or subdivisions.   In cases where straight continuations are not physically possible, such centerline may be continued by curves and shall be in general conformity with the plans made for the  most advantageous development of the area in which the subdivision lies.

(3)     Widths:  Widths of arterial, collector and local access roads and highways shall be as described in the County Road Standards.  However, increased width may be required where streets are to serve non-residential properties, where projected traffic volumes required where streets are to serve non-residential properties, where projected traffic volumes warrant additional width or where physical considerations require additional width.

(4)     Road Intersections: Roads and driveways which intersect county roads shall intersect at an angle as near to a right angle as is practical, or as nearly radially as possible in the case of an intersection on a curve.  At any such intersection, view triangles may be required, depending on site distance requirements, to incur safety and to facilitate traffic movement.  At any such intersection, the corners shall be rounded at the property lines by a radius of not less than twenty (20) feet.

BLM_0061445

[7.3 B 5]

(5)   <u>Road Extensions</u>:  Where a proposed development adjoins unplatted land, the  proposed development shall provide direct access to a public road for the unplatted land, if no other access is available.  Such access may be in the form of either a dedicated right-of-way or a perpetual easement.  The width of the access shall be determined by the Planning Commission based on the proposed density of the proposed development; it shall be assumed that the unplatted land, should it be developed, will not be developed at a density greater than that of the proposed development. The County Road Standards shall form the basis for determining the required access width.

(6)   <u>Cul-de-Sac Streets</u>:  The bulb or end, of cul-de-sac streets shall have a right-of-way no less than ninety (90) feet in diameter, with a driving surface diameter no less than eighty (80) feet.  No cul-de-sac shall exceed 1,320 feet in length except as approved by the County Commissioners in a Planned Unit Development.

(7)   <u>Road Names</u>:  All road names shall be subject to the approval of the Planning Commission.  Duplication of existing names will not be allowed unless the streets are obviously in alignment with existing streets and not so far removed as to be confusing.

(8)   <u>Grades</u>:  Grades shall not exceed eight percent on major or secondary highways or ten (10) percent on any street unless approved otherwise in a Planned Unit Development.

(9)   <u>Centerline Radii</u>:  The centerline radii for all streets shall not be less than one hundred (100) feet except as approved through a Planned Unit Development Plan.

(10)   <u>Service Roads</u>:  Where a subdivision abuts a state highway or arterial roadway of major importance, the Planning Commission may require parallel service roads or may limit the number of access points allowed for the proposed development

(11)   <u>Slope Easements</u>:  Where a cut or fill road slope is outside the normal right-of-way of the street, then a slope easement shall be provided having sufficient width to permit maintenance of the slopes by the County. Such slopes shall not exceed 3:1.

BLM_0061446

[7.3 B 12]

(12)   Road Beds:  Road beds shall be designed according to soil tests of the subgrade material and shall be in accordance with the specifications of the County Road Standards or by such other method as is in general use by the County and considered to be sound practice.

(13)   Street signs:   Street signs shall be provided at all intersections. Such signs shall be in accordance with county road and bridge standards.

(14)   Project Identification Signs:   A project identification sign shall be provided at all principal entrances for each development.  Such signs shall indicate the name of the development, and as necessary, the project address in a manner acceptable to emergency service and utility providers.

C.   Alleys and Easements

(1)   Where Required:   Alleys shall be required in the rear of all prospective commercial property, except where topography makes the use of alleys impractical.  Such alleys, when required, may be dedicated to the County as public thoroughfares, at the discretion of the County.

(2)   Minimum Width:   Alleys shall be not less than twenty (2O) feet wide.

(3)   Alley   Intersections:   Where two alleys intersect, view triangles ten (l0) feet in length, measured  along the produced property lines from the point of intersection, shall be provided.

(4)   Public Utilities:   Easements for the placement of, installation of and/or access to public utilities, drainage facilities, electrical lines, cable television lines, natural gas lines or other public utility facilities shall be shown and dedicated to the appropriate utility companies as necessary to provide said utilities.  The width of the easement shall be as required by the utility company. In all cases, the developer shall consult with the utility company to see what is required for a particular development. Sanitary sewer easements shall be designed so that sewer lines flow under the road surface or between lots to avoid creating maintenance problems.

(5)   Pedestrian Ways:   Non-motorized vehicle, pedestrian and/or equestrian pathways may be required across long blocks or where necessary to provide access to public areas.  Where required, sidewalks, curbs and gutters shall be constructed of Class B concrete, as defined in the Colorado Division of Highways Standard Specifications. Standard vertical curbs shall be used on all returns at street intersections where curb and gutters are required.

BLM_0061447

[7.3 D]

D.   Drainage

(1)   General Provisions

(a)   All provisions for drainage and flood control shall be established on the minimum basis of the one hundred (100) year frequency storm for maximum periods of intensity for the entire drainage basin in which the subdivision is located, and shall be made in accordance with the approved Planned Unit Development Plan Drainage structures and ditches shall be of a size and nature to carry the calculated storm water from such drainage areas as based on standard engineering principles.  Where free fall of water occurs, satisfactory means shall be provided to prevent erosion of soil.  Culverts shall have concrete head walls and wing walls where conditions require.   All required drainage structures and facilities shall be designed by an engineer registered in the State of Colorado who is experienced in drainage and storm water detention structures.

(b)   Structures proposed within the one hundred (100) year flood plain must meet all requirements of the Ouray County Flood Hazard Regulations (Section 10 of this Code).

(c)   Water supply systems and sanitary sewage systems shall be designed to minimize or eliminate infiltration of floodwaters.  On-site waste water disposal systems shall be located so as to avoid impairment of them or contamination from them during or subsequent to flooding.

(d)   The developer shall include in the covenants for the development provisions which prohibit the storage or processing of materials within the one hundred (100) year flood plain that, in times of flooding, would be buoyant, flammable, explosive or potentially injurious to human, animal or plant life. The PUD Plan must be designed to prevent substantial solid debris being carried downstream by flood waters.

(e)   No lands subject to periodic inundation by the one hundred (100) year flood shall be subdivided except in conformance with the provisions and requirements of the Ouray County Flood Hazard Regulations.

BLM_0061448

[7.3 D 2]

(2)   <u>Mitigation Requirements</u>

(a)   Where a PUD is traversed by a watercourse, drainageway, channel, stream or irrigation ditch, there shall be provided an easement or drainage right-of-way conforming substantially to the lines of such watercourse and of such width and construction, or both, as will be adequate for the purpose. Wherever possible, it is desirable that the drainage be maintained by an open channel with landscaped banks and adequate width for maximum potential volume of flow and maintenance.

(b)   Where topography or other physical conditions make impractical the inclusion of drainage facilities within street rights-of-way perpetual, unobstructed easements at least fifteen (15) feet in width for such drainage facilities shall be provided across property outside the street lines and with satisfactory access. Easements shall be indicated on the plat. Drainage easements shall be carried from the street to a natural watercourse or other drainage facility.

(c)   When a proposed drainage system will carry water across private land outside the PUD appropriate drainage rights must be secured and indicated on the plat.

(d)   The developer shall dedicate, either in fee simple or by a drainage conservation easement, adequate land on both sides of existing watercourses to a distance to be determined by the County.

E.   <u>Lots, Blocks and Sidewalks</u>

(1)   <u>Zoning Requirements</u>:  All lots shall conform to the requirements of the zoning district within which the development is located or to the lot approved with the Planned Unit Development within which the subdivision is located.

The lot arrangement shall be such that there will be no foreseeable difficulties, for reasons of topography or other conditions, in securing building permits to build on all lots in compliance with this Land Use Code and in providing driveway access to buildings on such lots from an approved street.

BLM_0061449

[7.3 E (2)]

(2)    Lot Drainage:  Lots shall be laid out so as to provide positive drainage away from structures.  Individual lot drainage shall be coordinated with the general storm drainage pattern for the area. Drainage shall be designed so as to avoid concentration of storm drainage water from each lot to adjacent lots.

(3)    Side Lot Lines:  Side lot lines shall be as near as possible to right angles or radial to the street right-of-way line upon which the lot faces.

(4)    Double Frontage Lots:  Except for corner lots, residential lots having double frontage shall not be approved, except where double frontage is necessitated by topographic or other physical conditions or where direct access to one of the streets is prohibited.

(5)    Block Length:  Long blocks shall generally be encouraged and they shall be provided adjacent to main thoroughfares for the purpose of reducing the number of intersections; however, blocks shall not exceed twelve hundred (1,200) feet in length unless existing conditions justify a variation from this requirement, in which case, the Planning Commission may grant exception thereto.

(6)    Sidewalk Specifications:

(a)    Sidewalks eight (8) feet in width may be required along both sides of streets fronted by commercial properties.

(b)    Sidewalks five (5) feet in width may be required on both sides of all residential streets where residential densities will be equal to or exceed four (4) units per gross acre.

(c)    Sidewalks or pathways of a width acceptable to the Planning Commission may also be required through the center of long blocks, to connect cul-de-sacs and/or to provide access to school, park, playground and river and/or lake areas.

(d)    County Road Standards show the location and dimension of sidewalks relative to the various street cross-sections.

(e)    Sidewalks may be eliminated on one or both sides of streets where the Planning Commission finds that the topography of the development, or other considerations, make them impractical or undesirable.

BLM_0061450

[7.3 F]

F.     <u>Filled Lands</u>

Required fill shall be of suitable filling material and placed in such a manner as to insure that the finished elevation of all lots and roadway areas will be adequate to protect the development from flooding and has adequate provision for the passage of storm water run-off after settlement and compaction. No building or construction on filled land shall be commenced until satisfactory evidence has been submitted that the required elevation has been obtained and that the fill will provide a stable base for the construction proposed. Such evidence of satisfactory fill shall be submitted to the County Commissioners and the approval for construction of improvements upon said fill shall be granted by the County.

BLM_0061451

# Section 8
## SIGN REGULATIONS

8.1     <u>PERMITTED SIGNS</u>

The following signs shall be permitted by right in the designated zones, except that flashing, blinking, animated or roof signs shall not be permitted in any zone.  All signs erected in a public right-of-way by a public agency responsible for controlling or directing traffic shall be exempt from the provisions of this Section.

A.     On-site signs advertising goods and/or services for sale or rent shall not exceed thirty-two (32) square feet in size and shall not extend more than five (5) feet beyond the exterior wall to which they are attached.  Limit is two surfaces per business.  Any surface of a structure advertising business, goods and/or services shall be considered a sign.

B.     Real estate signs located on property advertising the property for sale, lease or rent shall not exceed two (2) feet by three (3) feet each in size and shall be spaced no closer together than three hundred (300) feet.  Properties occupying a corner lot may have one (1) sign on each street.

C.     Signs posted on properties indicating warnings or prohibitions on hunting,  fishing or trespassing shall not exceed two hundred fifty (250) square inches each in size.

D.     Signs for the purpose of directing persons to public, commercial or cultural facilities shall be installed and maintained by the entity requiring such sign.  Such signs shall be erected on public property and shall conform to a distinctive standard design acceptable to the County Commissioners.

Added
7/29/96

E.     Signs for the purpose of identifying subdivisions may be posted at the main entrance of subdivisions of 3 or more lots to direct the public and emergency response.  Each such sign will be required to meet the following criteria:  1)  located to be easily visible from the main road from a distance of 100 feet, 2)  setback off of roadways to prevent obstructing views at intersections and to allow use of established right-of-ways for utilities, and road maintenance, 3) constructed of materials that are consistent with the natural surroundings, 4) indirect night lighting may be allowed with low wattage light sources that are not visible or create a traffic hazard, 5) maximum sign area shall be 32 square feet on one or both sides and located no higher than 20 feet above ground level, 6) sign support shall compliment the overall sign theme and constructed to stand typical weather conditions including winds.

Added

F.     House number signs shall have lettering at least 2 inches high and be of a

BLM_0061452

7/29/96         block style, preferably painted with reflective paint and readable for a distance of 100 feet. House number signs will not be lower than three feet or higher than seven feet and located on the right side of the driveway (unless space does not permit).  Signs shall be located off the roadway only far enough to not obstruct utility easements and road maintenance.

Added          G.      Each approved subdivision shall be required to erect road signs which meet
7/29/96         the following criteria:  Road signs shall have block style lettering at least two inches high and preferably be painted with reflective paint that can be read from at least 100 feet. Signs at intersections shall be placed at the northeasterly corner or northwest corner if not a four-way intersection.  Sign setback will be a minimum of five feet off the driven road surface but not more than 15 feet.  Location of utilities shall be considered in sign placement.  Signs within a subdivision or throughout an area shall have a common design.  Sign height will not be higher than 7 feet or lower than 5 feet above the driving surface of the road.

8.2     SIGN MAINTENANCE

A.      All signs shall be maintained and kept in good repair by the owner of the property on which the sign is erected.

B.      All signs erected on public property shall be maintained and kept in good repair by the entity requiring such sign.

C.      If a sign is found to be in bad repair, the owner or entity requiring such sign shall be given written notice by the County to repair or remove the sign within thirty (30) days. If such sign is not repaired or removed within thirty (3O) days, the County will remove the sign at the expense of the owner or entity requiring such sign.

BLM_0061453

Adopted by the Ouray County Board of Commissioners December 29, 1997.

# Section 9
## VISUAL IMPACT REGULATIONS

9.1   <u>PURPOSE</u>

In order to preserve the scenic beauty, rural setting and character and the dominating influence of the natural environment of Ouray County, there are hereby established Visual Impact Regulations. The intent of these regulations is to minimize the visual impact of both individual structures and development as a whole so that development does not compete with the existing physical environment for the viewer's attention, thereby preserving the unique physical environment that has traditionally characterized and defined the county and protecting the County's property values.

9.2   <u>COMPLIANCE</u>

A.    All land use approvals and all new construction including public or private road and driveway cuts and fills must meet the requirements of this Section 9 except the following:

(1)    Accessory structures, private roads and/or driveways used exclusively for agricultural or mining purposes, and not located on any escarpment or ridgeline.

(2)    Structures, driveways or roads that can be clearly demonstrated to be not visible from the highways and roads listed in Section 9.3 A.

B.    Existing structures, public or private roads and/or driveway cuts and fills shall be allowed to remain in their present state subject to the provisions of Section 4 of this Code.

C.    A visual impact mitigation plan and commitments to ensure the plan's completion must be approved by the County prior to issuance of required permits, including but not limited to: building, access, driveway and road construction permits.

D.    Continued compliance with these regulations shall be required in the future, notwithstanding an initial determination by the County that development meets the requirements of this Section 9.

9.3   <u>CRITERIA AND STANDARDS</u>

A.    All proposed structures must be at least one hundred (100) feet from the centerline of U.S. Highway 550, Colorado Highway 62, that portion of County

BLM_0061454

[9.3 A]

Road 1 lying between County Road 24 and the south intersection of County Road 1A and County Road 1, and County Roads 5, 7, 8, 10, 24 and 24A.

B.      All structures at or within 1.5 miles of the centerline of the roads or highways listed under Section 9.3 A. (as represented by the Ouray County Visual Impact Corridor Map) shall be subject to the following point system.  The maximum number of points allowed per structure shall be five (5).

| Primary Criteria<br>Points for the following criteria are to be added together: | |
| --- | --- |
| Size of structure. | .1 point for every 100 square feet. |
| Height of structure.  (See Section 3.3) | .3 point for every foot of the maximum structure height. |

| Secondary Criteria<br>Points for the following criteria are to be subtracted from the primary criteria: | |
| --- | --- |
| Area of the parcel or lot (only where the lot or parcel is 7 acres or greater). | .3 points for every 1 acre (maximum of 5 points allowed) |
| Amount of natural screening. | .1 point for every 1% of screening. |
| The exterior (including trim and garage doors) is colored with earth tones and/or otherwise blend with the surrounding landscape. | 3 points. |
| Distance of structure from a designated road.  (See Section 9.3A.) | .5 point for every quarter (1/4) mile. |
| The proposed structure is located within an existing subdivision or PUD that was approved prior to 3/4/86. | 1 point. |
| Additional screening that blends with the natural surroundings. | .1 point for every 1% of screening. |

C.      No structure shall break the skyline as seen from any viewing point within any viewing window as established by Section 9.6 D. of this Code except the following:

(1)      Where there is a gap in the existing skyline no greater than ten (10) feet wide, a maximum length of ten (10) feet of the roof and walls of the structure may be visible as measured along the skyline, but shall not exceed the height of a horizontal line extended from the high point of the lower side (see Illustration A, Gap A).

BLM_0061455

[9.3C(2)]

(2)     Where the roofline is not horizontal to the viewing window, an additional maximum length of twenty (20) feet of the roof and walls of the structure may be visible as measured along the skyline.  This additional twenty (20) feet must not be connected to the first ten (10) feet and shall not exceed the height of a horizontal line extended from the high point of the lower side to the high point of the high side (see Illustration A, Gap B).

Illustration A



D.     In addition to any requirements imposed by this section, all structures falling within a viewing window and/or located along a ridgeline or escarpment shall be set back a minimum of fifty (50) feet from the ridgeline or edge of escarpment.

E.     All public or private road and driveway cuts and fills shall be revegetated and/or reforested utilizing materials native to the disturbed area.

9.4     PROCESS FOR REVIEW

A.     Development Requiring Only a Building Permit

(1)     Upon receipt of a completed application for a building permit, the County Building Official shall review the project and determine whether it meets the requirements of this Section 9. If the Building Official finds the project in compliance, the Building Official  may issue a building permit for the project.  If the Building Official determines that the project does

BLM_0061456

[9.4A(1)]

not comply, the Building Official, in writing, shall so notify the applicant and indicate areas of non-compliance.

(2)     An applicant may appeal the decision of the Building Official to the Board of Visual Appeals in accordance with Section 19.7.

B.     All Other Development (PUDs, Special Use Permits and Roads)

(1)     All other development shall be reviewed for visual impact compliance during the normal development review process as outlined in Section 5, Section 6, and Section 23 of this Code.

9.5     SUBMITTAL REQUIREMENTS

A.     A visual impact plan shall be required for all Planned Unit Development and Special Use Permit applications submitted to the County. The study, at a minimum, shall include the following information:

(1)     P.U.D. Sketch Plan

(a)     Preliminary written analysis of the visual impact of the development and how the proposal complies with the visual impact criteria and measures taken to reduce or eliminate the visual impact of the proposed development.

(b)     A map illustrating required information including, but not limited to: existing vegetation, vegetation to be removed, viewing areas, roads and lots.

(2)     P.U.D. Preliminary Development Plan and Special Use Permit

(a)     Final written analysis of the visual impact of the development and how the proposal complies with the visual impact criteria, and measures taken to reduce or eliminate the visual impact of the proposed development.

(b)     Final map illustrating the requirements of the sketch plan and including, but not limited to:  topography, building envelopes, building cuts and fills and road cuts and fills.

(c)     Photographs of the site from key viewpoints.

(d)     Proposed building elevations.

(e)     Topographic sections.

[9.5B}

BLM_0061457

B.     The Planning Commission may, with prior approval of the Board of County Commissioners, seek qualified outside professional assistance during its review process. If the applicant has not provided professional assistance, the cost of such assistance shall be considered part of the County's expenses incurred in reviewing the development proposal and, as such, shall be chargeable to the developer.  If the applicant has provided professional assistance and the County is seeking professional assistance to review the applicant's proposal, the County shall bear all expenses incurred.

9.6     DEFINITIONS

A.     EDGE OF ESCARPMENT.   The line of intersection whereby a cliff or steep slope (50% or greater) separates two comparatively level or gently sloping surfaces.

B.     RIDGELINE.  The line of intersection at the high point between opposing slopes.

C.     SCREENING.  A natural or artificial means of hiding all or a portion of a structure from public view.

D.     SKYLINE.  The line where the earth or vegetation and the sky seem to meet.

E.     VIEWING WINDOW is defined as follows:

(1)     Determine the nearest point of the structure to any point along the centerline of the highways or roads listed in Section 9.3 A.  That point of the structure becomes Point A.

(2)     From Point A, strike an arc with a radius of 1.5 miles until it crosses the centerline of any of the highways or roads listed in Section 9.3 A. That point of intersect becomes Point B.

(3)     Continue the arc above, until it again crosses the centerline of the highway or road.  That point of intersect becomes Point C.

(4)     The Viewing Window is that portion of the road or highway between Point B and Point C.

BLM_0061458

[9.6E(4)]

Illustration B



(5)   Multiple Viewing Windows shall be established if the centerline of more than one of the above highways or roads listed in Section 9.3 A is at or within 1.5 miles of the nearest point of any structure of a development.

F.   VISUAL IMPACT PLAN.  A map or maps and supporting documentation detailing the visual impact mitigation measures being taken to assure compliance with Section 9 of the Ouray County Land Use Code.

9.7   ADDITIONAL STANDARDS:

A.   All roofing, siding and windows used shall not be constructed of highly reflective materials.  These materials shall include, but not be limited to: stainless steel, polished metal, bright metal, galvanized metal and glass coated with reflective material.

B.   The use of downlighting is encouraged to avoid glaring or excessively bright general lighting.  It is desirable that no direct light be radiated above a level that is five degrees (5°) below horizontal.  Proper reflectors will actually increase available light where needed and avoid contributing to "light pollution" of clear night skies. Lighting related to emergency services events and response, motion activated lights on a short timer cycle, temporary seasonal lighting displays, and specific, limited, feature enhancing lighting are appropriate exceptions.

BLM_0061459

[9.8]

9.8     <u>COVENANTS RELATING TO VISUAL IMPACT</u>

The covenants of any Planned Unit Development, as required by Section 6.12(C)(4)(i), shall contain at least the following provisions as well as any other provisions required by this Code:

    A.     All development within the PUD shall comply with the visual impact criteria of the requirements of this Section 9.

    B.     An internal mechanism (such as an architectural control committee) shall be created through which any construction must have prior approval and through which the covenants may be enforced.

    C.     The visual impact provisions of the covenants may not be amended or altered without prior approval of the County in accordance with Section 6.14 of these regulations.

BLM_0061460

# Section 10

## FLOOD HAZARD REGULATIONS

Amended
6/5/89

10.1   STATUTORY AUTHORIZATION

The legislature of the State of Colorado has, in Colorado Revised Statutes, Sections 29-20-104 and 30-28-110, delegated the responsibility to local governmental units to adopt certain regulations designed to promote the public health, safety and general welfare of its citizenry.  Therefore, the Board of County Commissioners of Ouray County Colorado has resolved as follows:

10.2   FINDINGS OF FACT

A.    The flood hazard areas of Ouray County are subject to periodic inundation which results in loss of life and property, health and safety hazards, disruption of commerce and governmental services, extraordinary public expenditures for flood protection and relief, and impairment of the tax base, all of which adversely affect the public health, safety and general welfare.

B.    These flood losses are caused by the cumulative effect of obstructions in areas of special flood hazards which increase flood heights and velocities, and when inadequately, anchored, damages uses in other areas.   Uses that are inadequately floodproofed, elevated or otherwise protected from flood damage also contribute to the flood loss.

10.3   STATEMENT OF PURPOSE

It is the purpose of this regulation to promote the public health, safety and general welfare, and to minimize public and private losses due to flood conditions in specific areas by provisions designed:

A.    To protect human life and health;

B.    To minimize expenditure of public money for costly flood control projects;

Amended
6/5/89

C.    To minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;

D.    To minimize prolonged business interruptions;

10-1

[10.3 E]

E.    To minimize damage to public facilities and utilities such as water and gas mains, electric, telephone and sewer lines, and streets and bridges located in areas of special flood hazard;

F.    To help maintain a stable tax base by providing for the sound use and development of special flood hazard so as to minimize future flood blight areas;

G.    To insure that potential buyers are notified that property is in an area of special flood hazard; and

H.    To insure that those who occupy the areas of special flood hazard assume responsibility for their actions.

10.4    METHODS OF REDUCING FLOOD LOSSES

In order to accomplish its purpose, this regulation includes methods and provisions for:

A.    Restricting or prohibiting uses which are dangerous to health, safety and property due to water or erosion hazards, or which result in damaging increases in erosion or in flood heights or velocities;

B.    Requiring that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction;

C.    Controlling the alteration of natural flood plains, stream channels and natural protective barriers which help accommodate or channel flood waters;

D.    Controlling filling, grading, dredging and other development which may increase flood damage; and

E.    Preventing or regulating the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards in other areas.

10.5    GENERAL PROVISIONS

A.    Land to Which These Regulations Apply

These regulations shall apply to all areas of special flood hazards within the jurisdiction of Ouray County.

BLM_0061462

[10.5 B]

B.   Basis for Establishing the Areas of Special Flood Hazard

Amended
6/5/89

The areas of special flood hazard identified by the Federal Emergency Management Agency is a scientific and engineering report entitled, "The Flood Insurance Study for the Unincorporated Areas of Ouray County", dated July 3, 1985, with an accompanying Flood Insurance Rate Map (FIRM), is adopted by reference and declared to be part of this regulation.  The Flood Insurance Study and FIRM are on file at the Ouray County Courthouse, 541 Fourth Street, Ouray, Colorado.

C.   Compliance

No structure or land shall hereafter be constructed, located, extended, converted or altered without full compliance with the terms of this regulation and other, applicable regulations.

D.   Abrogation and Greater Restrictions

This regulation is not intended to repeal, abrogate or impair any existing easements, convenants or deed restrictions. However, where this regulation and another regulation, easement, covenant or deed restriction conflict or overlap, whichever imposes the more stringent restrictions shall prevail.

E.   Interpretation

Amended
6/5/89

In the interpretation and application of this regulation, all provisions shall be:

(1)   Considered as minimum requirements;

(2)   Liberally construed in favor of the governing body; and

(3)   Deemed neither to limit nor repeal any other powers granted under state statutes.

BLM_0061463

[10.5 F]

F.   Warning and Disclaimer of Liability

The degree of flood protection required by this regulation is considered reasonable for regulatory purposes and is based on scientific and engineering considerations.  Larger floods can and will occur on rare occasions.  Flood heights may be increased by man-made or natural causes.  This regulation does not imply that land outside the areas of special flood hazards or uses permitted within such areas  of  special flood hazards will be free from flooding or flood damages.  This regulation shall not create liability on the part of Ouray County, any officer or employee thereof or the Federal Emergency Management Agency for any flood damages that result from reliance on this regulation or any administrative decision lawfully made thereunder.

10.6   ADMINISTRATION

A.   Establishment of Development Permit

A Development Permit shall be obtained before construction or development begins within any area of special flood hazard established in Section 10.5(B). Application for a Development Permit shall be made on forms furnished by the Building Official and may include, but not be limited to, plans in duplicate drawn to scale showing the nature, location, dimensions and elevations of the area in question, existing or proposed structures, fill, storage of materials, drainage facilities, and the location of the foregoing.   Specifically, the following information is required:

(1)   Elevation in relation to mean sea level of the lowest floor (including basement) of all structures;

(2)   Elevation in relation to mean sea level to which any structure has been floodproofed;

(3)   Certification by a registered professional engineer or architect that the floodproofing methods for any non-residential structure meet the floodproofing criteria in Section 10.8; and

(4)   Description of the extent to which any watercourse will be altered or relocated as a result of proposed development.

B.   Building Official to Administer Regulations

The Building Official is hereby appointed to administer and implement this regulation by granting or denying development permit applications in accordance with its provisions.

10-4

BLM_0061464

[10.6 C]

C.   <u>Duties and Responsibilities of Building Official</u>

Duties of the Building Official shall include, but not be limited to:

(1)   <u>Permit Review:</u>

(a)   Review all development permits to determine that the permit requirements of this regulation have been satisfied.

(b)   Review all development permits to determine that all necessary permits have been obtained from those Federal, State or local governmental agencies from which prior approval is required.

(c)   Review all development permits to determine if the proposed development adversely affects the flood carrying capacity of the area of special flood hazard.  For the purposes of this regulation, "adversely affects" means that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one foot at any point.

Amended
6/5/89

(2)   <u>Use of Other Base Flood Data:</u>

When base flood elevation data has not been provided in accordance with Section 10.5(B), Basis for Establishing the Areas of Special Flood Hazard, the Building Official shall obtain, review and reasonably utilize any base flood elevation and floodway data available from a Federal, State or other source as criteria for requiring that new construction, substantial improvements or other development in a Flood Hazard Zone are administered in accordance with Section 10.8(B), Specific Standards.

(3)   <u>Information to be Obtained and Maintained:</u>

(a)   Obtain and record the actual elevation (in relation to mean sea level) of the lowest floor (including basement) for all new or substantially improved structures, and whether or not the structure contains a basement.

BLM_0061465

[10.6(C)(3)(b)]

(b)     For all new or substantially improved floodproofed structures:

(i)     Verify and record the actual elevation (in relation to mean sea level) to which the structure has been floodproofed.

(ii)     Maintain the floodproofing certifications required in Section 10.6(A)(3).

(c)     Maintain for public inspection all records pertaining to the provision of this regulation.

(4)     <u>Alteration of Watercourses</u>:

(a)     Notify adjacent communities and the Colorado Water Conservation Board prior to any alteration or relocation of a watercourse, and submit evidence of such notification to the Federal Emergency Management Agency.

(b)     Require that maintenance is provided within the altered or relocated portion of said watercourse so that the flood carrying capacity is not diminished.

(5)     <u>Interpretation of FIRM Boundaries</u>:

Make interpretations, where needed, as to the exact location of the boundaries of the areas of special flood hazards. (For example, where there appears to be a conflict between a mapped boundary and actual field conditions.) The person contesting the location of the boundary shall be given a reasonable opportunity to appeal the interpretation as provided in Section 10.7.

10.7   <u>VARIANCE PROCEDURES</u>

A.     <u>Appeal Board</u>

(1)     The Board of Zoning Adjustment, as established by Ouray County, shall hear and decide appeals and requests for variances from the requirements of this regulation.

BLM_0061466

[10.7 A 2]

(2)     The Board of Zoning Adjustment shall hear and decide appeals when it is alleged there is an error in any requirement, decision, or determination made by the Building Official in the enforcement or administration of this requirement.

(3)     Those aggrieved by the decision of the Board of Zoning Adjustment, or any taxpayer, may appeal such decision to the District Court, as provided in Colorado Revised Statutes, 30-28-118.

(4)     In passing upon such applications, the Board of Zoning Adjustment shall consider all technical evaluations and all relevant factors and standards as specified in other sections of this regulation, and:

(a)     The danger that materials may be swept onto other lands to the injury of others;

(b)     The danger to life and property due to flooding or erosion damage;

(c)     The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner;

(d)     The importance of the services provided the proposed facility to the community;

(e)     The necessity to the facility of a waterfront location, where applicable;

(f)     The availability of alternative locations for the proposed use which are not subject to flooding or erosion damage;

(g)     The compatibility of the proposed use the existing and anticipated development;

Amended
6/5/89

(h)     The relationship of the proposed use to master plan and flood management program for that area, if any;

(i)     The safety of access to the property in times of flood for ordinary and emergency vehicles;

BLM_0061467

[10.7 A 4 (j)]

(j)    The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site; and

(k)    The costs of providing governmental services during and after flood conditions, including maintenance and repair of public utilities and facilities such as sewer, gas, electrical and water systems and streets and bridges.

Amended 6/5/89

(5)    Upon consideration of the factors of Section 10.7 (A)(4) and the purposes of the regulation, the Board of Zoning Adjustment may attach such conditions to the granting of variances as it deems necessary to further the purposes of this regulation

Amended 6/5/89

(6)    The Building Official shall maintain the records of all appeal actions, including technical information, and report any variances to the Federal Emergency Management Agency.

Amended 6/5/89

B.    Conditions for Variance

(1)    Generally, variances may be issued for new construction and substantial improvements to be erected on a lot of one-half (1/2) acre or less in size, contiguous to (common boundary) and surrounded by lots with existing structures constructed below the base flood level, providing items (a) through (k) of Section 10.7(A)(4) have been fully considered. As the lot size increases beyond the one-half (1/2) acre, the technical justification required for issuing the variance increases.

(2)    Variances may be issued for the reconstruction, rehabilitation or restoration of structures listed on the National Register of Historic Places or the State Inventory of Historic Places, without regard to the procedures set forth in the remainder of this Section.

(3)    Variances shall not be issued within any designated floodway if any increase in flood levels during the base flood discharge would result.

(4)    Variances shall only be issued upon a determination that the variance is the minimum necessary, considering the flood hazard, to afford relief.

BLM_0061468

[10.7 B 5]

(5)     Variances shall only be issued upon:

(a)     A showing of good and sufficient cause;

(b)     A determination that failure to grant the variance would result in exceptional hardship to the applicant; and

(c)     A determination that the granting of a variance will not result in increased flood heights, additional threats to public safety or extraordinary public expense, or create nuisances, cause fraud on or victimization of the public as identified in Section 10.7(A)(4), or conflict with existing local laws or ordinances.

(6)     Any applicant to whom a variance is granted shall be given written notice that the structure will be permitted to be built with a lowest floor elevation below the base flood elevation and that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced lowest floor elevation.

Amended     10.8     PROVISIONS FOR FLOOD HAZARD REDUCTION
6/5/89

A.     General Standards

In all areas of special flood hazards, the following standards are required:

(1)     Anchoring:

(a)     All new construction and substantial improvements shall be anchored to prevent flotation, collapse or lateral movement of the structure and capable of resisting the hydrostatic and hydrodynamic loads.

(b)     All mobile homes must be elevated and anchored to resist flotation, collapse or lateral movement and capable of resisting the hydrostatic and hydrodynamic loads.  Methods of anchoring may include, but not be limited to, the use of over-the-top or frame ties to ground anchors.  This requirement is in addition to applicable State and local anchoring requirements for resisting wind forces. Specific requirements may be that:

10-9

BLM_0061469

[10.8 A 1(b) (i)]

(i)   Over-the-top ties be provided at each of the four corners of the mobile home, with two additional ties per side at intermediate locations, with mobile homes less than fifty (50) feet long requiring one additional tie per side;

(ii)   Frame ties be provided at each corner of the home with five (5) additional ties per side at intermediate points, with mobile homes less than fifty (50) feet long requiring four additional ties per side;

(iii)   All components of the anchoring system be capable of carrying a force of 4,800 pounds; and

(iv)   Any additions to the mobile home be similarly anchored.

(2)   <u>Construction Materials and Methods</u>:

(a)   All new construction and substantial improvements shall be constructed with materials and utility equipment resistant to flood damage.

(b)   All new construction and substantial improvements shall be constructed using methods and practices that minimize flood damage.

(c)   All new construction and substantial improvements shall be constructed with electrical, heating, ventilation, plumbing and air conditioning equipment and other service facilities that are designed and/or located so as to prevent water from entering or accumulating within the components during conditions of flooding.

(3)   <u>Utilities</u>:

(a)   All new and replacement water supply systems shall be designed to minimize or eliminate infiltration of flood waters into the system;

(b)   New and replacement sanitary sewage systems shall be designed to minimize or eliminate infiltration of flood waters into the systems and discharge from the systems into flood waters; and

BLM_0061470

[10.8 A 3(c)]

(c)     On-site waste disposal systems shall be located so as to avoid impairment to them or contamination from them during flooding.

(4)     <u>Development Proposals</u>:

(a)     A11 PUD proposals shall be consistent with the need to minimize flood damage;

(b)     A11 PUD proposals shall have public utilities and facilities, such as sewer, gas, electrical and water systems, located and constructed to minimize flood damage;

(c)     All PUD proposals shall have adequate drainage provided to reduce exposure to flood damage; and

(d)     Base flood elevation data shall be provided for PUD proposals and other proposed developments which contain at least fifty (50) lots or five (5) acres, whichever is less.

(5)     <u>Encroachments</u>:     The cumulative effect of any proposed development, when combined with all other existing and anticipated development, shall not increase the water surface elevation of the base flood more than one (1) foot at any point.

B.     <u>Specific Standards</u>

In all areas of special flood hazards where base flood elevation data has been provided as set forth in Section 10.5(B), "Basis for Establishing the Areas of Special Flood Hazard", or Section 10.6(C)(2), "Use of Other Base Flood Data", the following standards are required:

(1)     <u>Residential Construction</u>:

(a)     New construction and substantial improvement of any residential structure shall have the lowest floor, including basement, elevated to or above base flood elevation.

BLM_0061471

[10.8 B 1(b)]

    (b)    Require within any AO and AH Zone on the County's FIRM that all new construction and substantial improvements of residential structures have the lowest floor (including basement) elevated above the highest adjacent grade at least as high as the depth number specified in feet on the County's FIRM (at least two feet if no depth number is specified).

    (c)    Require within Zones AO and AH adequate drainage paths around structures on slopes to guide floodwaters around and away from proposed structures.

    (2)    <u>Non-Residential Construction</u>:

    (a)    New construction and substantial improvements of any commercial, industrial or other non-residential structure shall either have the lowest floor, including basement, elevated to the level of the base flood elevation or, together with attendant utility and sanitary facilities, shall:

    (i)    Be floodproofed so that, below the base flood level, the structure is watertight, with walls substantially impermeable to the passage of water;

    (ii)    Have structural components capable of resisting hydrostatic and hydrodynamic loads and effects or buoyancy; and

Amended
6/5/89

    (iii)    Be certified by a registered professional engineer or architect that the standards of this subsection are in accordance with accepted standards of practice for meeting the provisions of this paragraph.

    (b)    Require within any AO and AH Zone on the County's FIRM that all new construction and substantial improvements of non-residential structures ( i ) have the lowest floor (including basement) elevated above the highest adjacent grade at least as high as the depth number specified in feet on the County's FIRM at least two feet if no depth number is specified) or (ii) together with attendant utility and sanitary facilities, be completely floodproofed to that level to meet the floodproofing standards specified in Section 10.8(A).

BLM_0061472

[10.8 B 2 (c)]

    (c)    Require within Zones AO and AH adequate drainage paths around structures on slopes to guide floodwaters around and away from proposed structures.

    (3)    <u>Mobile Homes</u>:

    (a)    Mobile homes shall be anchored in accordance with Section 10.8 (A)(1)(b)

    (b)    All mobile homes, or those to be substantially improved, shall be elevated on a permanent foundation such that the lowest floor of the mobile home is at or above the base flood elevation and is securely anchored to an  adequately anchored foundation system.  This paragraph applies to mobile homes to be placed or substantially improved in an existing mobile home park or, PUD.

BLM_0061473

# Section 11

## MINERAL RESOURCE REGULATIONS

11.1   <u>GENERAL PROVISIONS</u>

A.   <u>Purpose and Intent</u>

(1)   To protect and administer mineral resource areas in such a manner as to permit the extraction and exploration of minerals therefrom, unless extraction and exploration would cause significant danger to public health and safety.

(2)   To permit only development in mineral resource areas which will not interfere with the extraction and exploration of minerals.

(3)   To give preference to existing or requested uses other than mineral extraction if the economic value of the minerals present is of less value than those other uses.

(4)   To administer areas containing only sand, gravel, quarry aggregate or limestone used for construction purposes.

(5)   To prevent landslides, floods or erosion due to mineral extraction operations.

(6)   To insure that exploration and development of minerals cause the least practicable damage to the environment**.**

B.   <u>Applicability</u>

These regulations apply to development in all designated or regulated mineral resource areas within this jurisdiction.

C.   <u>Non-Conforming Uses</u>

The requirements of Section 4, "Zoning Provisions - Non-Conforming Uses and Structures", shall apply.

BLM_0061474

[11.2]

## 11.2    USES PERMITTED

The Mineral Resource Areas, as delineated on the Minerals Resource Area Maps are classified as Proven, Probable and Possible.  Uses shall be allowed under these three classifications to the extent that they are not prohibited in any particular area by an underlying zoning district and provides no structures are built until the conditions listed under  General Provisions above have been met.

BLM_0061475

# Section 12

## GEOLOGIC HAZARD AREA REGULATIONS

12.1   <u>GENERAL PROVISIONS</u>

    A.   <u>Purpose and Intent</u>

        (1)   To minimize significant hazards to public health and safety or to property in a designated geologic hazard area.

        (2)   To promote safe use in geologic hazard areas.

        (3)   Reduce the impact of geologic hazards on life and property by:

            (a)   Prohibiting certain land uses which are dangerous to life or property in geologic hazard areas.

            (b)   Restricting the land uses which would be hazardous to the public health and safety or property in geologic hazard areas.

            (c)   Restricting the land uses which are particularly vulnerable to geologic hazards so as to alleviate hardship and reduce the demands for public expenditures for relief and protection.

            (d)   Requiring land uses permitted in geologic hazard areas, including public facilities which serve such uses, to be protected from geologic hazards by providing for geologic hazard investigation and the avoidance of or mitigation of such hazard impacts at the time of initial construction.

    B.   <u>Applicability</u>

        (1)   These regulations apply to applications for permits to engage in development in all designated or regulated geologic hazard areas within this jurisdiction.

        (2)   Any person seeking to engage in development in any designated or regulated geologic hazard area in this jurisdiction shall obtain a permit pursuant to these regulations before seeking any other permit, rezoning or other action by the jurisdiction.

BLM_0061476

[12.2]

12.2   <u>NON-CONFORMING USES</u>

The requirements of Section 4, "Zoning Provisions - Non-Conforming Uses and Structures", shall apply.

12.3   <u>HAZARD AREA DELINEATIONS</u>

The Hazard Areas shall include all the area delineated on the Supplemental Zoning Regulations maps as signed by the County of Ouray and on file in the office of the Ouray County Clerk and Recorder.  Where deemed to be in the public interest by the County of Ouray and, to promote wise and safe use of the Hazard Areas, the Hazard Areas shall include and may be divided into Avalanche Areas, Landslide Areas, Rockfall Areas, Mudflow Areas, Unstable Slope Areas and/or Ground Subsidence Areas.

12.4   <u>USES PERMITTED</u>

The following uses shall be permitted within the Hazard Areas to the extent they are not prohibited in any particular area by any underlying zoning district and provided that no structure is built which could endanger human life be either temporary or permanent occupancy.  Any use not listed to specifically prohibited, including, but not limited to, any structure.

     A.    <u>Uses Allowed by Right</u>

     Agricultural uses, such as general farming, pasture, truck farming and sod farming, and underground mining.

     B.    <u>Special Uses Allowed by Permit Only</u>

     (1)    Public and private utilities.

     (2)    Other open uses, such as parking areas, airport landing strips, etc., but not junkyards or solid waste disposal facilities.

     (3)    Public and private recreational uses, such as parks, swimming areas, golf courses, driving ranges, picnic grounds, wildlife and natural preserves, fish hatcheries and hunting, fishing and hiking areas and, if such uses do not cause concentrations of people in areas during periods of high hazard probability.

     (4)    Open pit mining for removal of top soil, sand and gravel.

     (5)    Private and public  roads and driveway structures.

[12.4 B (6)]

BLM_0061477

(6)     Public and private utilities.

(7)     Any use not listed above is specifically prohibited, including, but not limited to, any structure unless approved in accordance with the provisions of Section 5, "Special Uses Allowed by Permit Only".

(8)     Surface Mining.

(9)     Milling, Leaching or other mineral extraction.

12.5   <u>ADDITIONAL CONDITIONS</u>

Any proposed use, temporary or permanent in a Geologic Hazard Area, shall adhere to the following additional conditions.  Applicants seeking to engage in development in a geologic hazard area shall submit to the County, as a minimum, three copies of the following information, maps, reports or data:

A.     An index map showing the general location of the permit area and its relationship to surrounding topographic and cultural features.

B.     A topographic map or maps showing location, nature and density of the proposed development or land use changes.

C.     A geologic report explaining the above maps and cross sections, with particular  emphasis of evaluating and predicting the impact of such geologic or hazardous conditions on the proposed land use changes and developments.

D.     Location of proposed buildings.

E.     Aerial extent of all run out zones.

F.     Slope gradient.

G.     Grading and/or drainage plan.

BLM_0061478

# Section 13

## WILDLIFE HABITAT REGULATIONS

13.1    GENERAL PROVISIONS

    A.    Purpose and Intent

        (1)    To protect those areas essential for wildlife habitat.

        (2)    To establish procedures and requirements for development or activity within significant wildlife habitats which will allow man to function in harmony with, rather than be destructive to, significant wildlife habitat.

        (3)    To regulate development and activities within areas of significant wildlife habitat in a manner that will minimize damage to this resource for future use.

    B.    Applicability

        (1)    These regulations apply to applications for permits to engage in development in all designated or regulated significant wildlife habitat areas within this jurisdiction.

        (2)    Any person seeking to engage in development in any designated or regulated significant wildlife habitat area in this jurisdiction shall obtain a permit pursuant to these regulations before seeking any other permit, rezoning or other action by the jurisdiction.

13.2    NON-CONFORMING USES

The requirements of Section 4, "Zoning Provisions   -   Non-Conforming Uses and Structures", shall apply.

13.3    WILDLIFE HABITAT DELINEATIONS

The wildlife habitat areas shall include all the areas delineated on the Supplementary Zoning Regulations maps as signed by the County of Ouray and on file in the office of the Ouray County Clerk and Recorder.

BLM_0061479

[13.4]

13.4   USES PERMITTED

Any use allowable in the underlying zoning district, provided the use is approved in accordance with Section 13.5 herein.

13.5   ADDITIONAL CONDITIONS

Any proposed use, temporary or permanent, in Wildlife Habitat, designated areas shall adhere to the additional conditions as follows:

A.   Applicants seeking a permit to engage in development in a wildlife habitat area shall furnish at least three copies of the following:

(1)   A plot plan of all existing structures roads, topographic conditions, where applicable, vegetation and/or forestation existing on the proposed development and any other condition which may affect existing wildlife habitats.

(2)   A plan showing any proposed development affecting any or all of the above.

B.   The Ouray County Planning Commission and/or Board of  County Commissioners may require that, the application be submitted in accordance with section 6, "Special Uses by Permit Only - Planned Unit Developments", and the regulations therein.

C.   The Ouray County Planning Commission and/or Board of County Commissioners may require that the application be subject to Section 5.4, "Public Notice and Hearing", prior to approval or denial of said application and permit.

D.   In all cases, no permit for development or subdivision shall be approved unless and  until the detrimental effects to wildlife habitat are considered.

BLM_0061480

# Section 14

## SOLID WASTE SITE REGULATIONS

14.1   <u>GENERAL PROVISIONS</u>

    A.   <u>Purpose and Intent</u>

        (1)   To facilitate the administration of site selection and development of solid waste disposal sites by establishing requirements which must be met before a solid waste site may be selected or developed.

        (2)   To insure the development of major solid waste sites in a manner consistent with sound conservation practices, with emphasis where feasible on the recycling of waste material.

        (3)   To require that consideration be given to the longevity and subsequent use of waste disposal sites, soil and wind conditions, the potential problems of pollution inherent in the proposed site, and the impact on adjacent property owners, compared with alternate locations.

    B.   <u>Applicability</u>

        (1)   These regulations apply to the site selection and development of all solid waste disposal sites in this jurisdiction.

        (2)   Any person seeking to locate or develop a solid waste disposal site shall obtain a permit pursuant to these regulations prior to seeking any other permit, rezoning or other action by the jurisdiction.

14.2   <u>NON-CONFORMING USES</u>

The requirements of Section 4, "Zoning Provisions - Non-Conforming Uses", shall apply.

14.3   <u>SOLID WASTE DISPOSAL SITES - PERMITS REQUIRED</u>

The County of Ouray has designated one central "Solid Waste Disposal Site". Any additional sites proposed within this jurisdiction shall be subject to the issuance of a permit under the provisions of Section 6 of these regulations for said site, which may be issued by the Board of County Commissioners of Ouray County after conditions have been met as follows:

BLM_0061481

[14.3 A]

A.      All proposed solid waste disposal sites shall be considered in accordance with Section 5, "special Uses Allowed by Permit Only (Except PUDs)".

B.      A master plan shall be submitted to the County for consideration and shall indicate the following information:

(1)      The name and address of the applicant and/or owner  of  the disposal  site  and/or recycling facility.

(2)      The name and location of the facility and site.

(3)      Maximum daily proposed capacity by weight and volume.

(4)      Life expectancy of the facility.

(5)      Significant limits on acceptable material.

(6)      Community acceptability.

(7)      Any proposed disposal, reduction or recycling.

(8)      Acreage involved in the proposed disposal site and/or recycling facility.

(9)      Description of the access by street and highway, detailing for principal routes.

(10)      Description of the fencing and/or screening enclosing the site and/or facility.

(11)      Description of the wind patterns in the vicinity of the site.

(12)      Other engineering and/or geological data as may be required by regulations of the Colorado Department of Health.

(13)      Evaluation of the potential for ground water degradation by the proposed operation.

(14)      Indication of method(s) of controlling surface runoff.

BLM_0061482

[14.3 B (15)]

(15)    Other ground water and hydrological data as may be required by the regulations of the Colorado Department of Health.

(16)    Provision of an operational plan for placing the site into operation including the following information:

(a)    The name or titles of the person or persons who will be in charge of the site and facility.  Such name(s) shall be of person(s) having the responsibility for the operation as well as the authority to take all corrective action necessary to comply with the requirements of this jurisdiction.

(b)    Hours of operation.

(c)    Method of supervision.

(d)    Rates to be charged, if any.

(e)    List of equipment to be used at the site.

(f)    The fire fighting equipment or department available for extinguishing fires.

(g)    The frequency of cover of the deposited wastes, if a landfill.

(h)    The frequency of retrieval of windblown debris.

(i)    A contingency plan for eradication of rodents and insects.

(j)    A contingency plan to control noxious odors.

(k)    Other information as may be required by the Board of County Commissioners.

(1)    Other operational data as may be required by the regulations of the  Colorado Department of Health.

BLM_0061483

[14.4]

14.4   USES PERMITTED

The following uses shall be permitted within any area delineated for Solid Waste Sites, provided such uses are in compliance with the permit requirements of Section 14.3, above:

     A.     Solid waste disposal sites.

     B.     Recycling facilities.

     C.     Accessory uses and structures directly; related and accessory to (A) and (B), above.

14.5   DENIAL OF PERMITS and/or REVOCATION OF PERMITS

     A.     The permit authority shall deny the permit if the development does not meet all of the criteria set out in regulations or if the Colorado Department of Health has recommended disapproval of the site.

     B.     The Board of County Commissioners, after reasonable notice and public hearing, shall temporarily suspend or revoke a permit that has been granted by it for failure of a site to comply with all applicable laws, resolutions and ordinances, including applicable regulations adopted by the Colorado Department of Health.

     C.     Any site which is abandoned or operated or maintained in a manner which violates this Section or other applicable laws or regulations, shall be deemed a public nuisance and may be enjoined by a district court for the jurisdiction in an action brought by the Board of County Commissioners.

BLM_0061484

(Amended December 12 2006, by Board of County Commissioners)

# Section 15

## MOBILE HOMES, MOBILE HOME PARKS, CAMPGROUNDS AND RV PARKS

15.1   MOBILE HOMES - GENERAL

All mobile homes first brought into Ouray County on or after July 14, 1986, shall be in full compliance with Federal Mobile Home Construction and Safety Standards as set forth in Title 6 of the Housing and Commerce Action of 1974.

15.2   MOBILE HOME PARKS

Mobile Home parks existing prior to September 25, 1995 shall be allowed to continue to the extent they now exist, provided they meet the requirements established in this Section 15 and other applicable regulations adopted by Ouray County.  Existing Mobile Home parks shall be allowed to upgrade, maintain and/or replace any structure or facility that was in existence prior to September 25, 1995.  No new mobile home parks shall be established after this date.

Existing Mobile home parks shall be allowed subject to the following conditions:

A.     A mobile home park must comply with the Colorado Department of Health Consumer Protection Regulations relating to mobile home parks, found at 6 C.C.R. 1010-12.

B.     The following limitations shall apply to all mobile home parks:

(1)     Each mobile home space or lot shall be at least 50 feet wide and 100 feet long.

(2)     The maximum allowed density shall be 6.4 spaces or lots per acre, the acreage to include space devoted to usable open space, roads and common buildings.

(3)     The mobile home park shall provide 0.4 acres of useable open space for every 32 (or portion thereof) mobile home spaces or lots.  For example, a mobile home park containing 20 spaces or lots shall have 0.4 acres of useable open space.  A park containing 33 spaces or lots shall have 0.8 acres of useable open space.

BLM_0061485

15.3    MOBILE HOMES OUTSIDE OF MOBILE HOME PARKS

Mobile homes located outside mobile home parks shall be permitted in the unincorporated portions of Ouray County only if they comply with the following requirements:

       A.    Must be placed on  the ad valorem tax rolls as real property improvements;

       B.    Must comply with the allowed density of the zone;

       C.    Must comply with those provisions of the Ouray County Uniform Building Code relating to mobile homes.

15.4    CAMPGROUNDS AND RV PARKS

Campgrounds and RV parks existing prior to September 25, 1995, shall be allowed to continue to the extent they now exist, provided they meet the requirements established in this Section 15 and other applicable regulations adopted by Ouray County.  Existing Campground or RV parks shall be allowed to upgrade, maintain and/or replace any structure or facility that was in existence prior to September 25, 1995.

BLM_0061486

# Section 16

## PENALTIES AND VIOLATIONS

16.1    CONSTRUCTION OR ALTERATION OF BUILDINGS:

It is unlawful to erect, construct, reconstruct or alter any building or structure in violation of this Code, or any amendment hereto adopted or enacted by the Board of County Commissioners.  Any person, firm or corporation violating this Code or any amendment hereto is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than $100.00 or imprisonment in the county jail for not more than ten (10) days, or by both such fine and imprisonment.  Each day during which such illegal erection, construction, reconstruction or alteration continues shall be deemed a separate offense.

16.2    USE OF BUILDINGS,  STRUCTURES OR LAND:

It is unlawful to use any building, structure or land in violation of this Code, or any amendment hereto adopted or enacted by the Board of County Commissioners. Any person, firm or corporation violating this Code or any amendment hereof is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than $100.00 or by imprisonment in the county jail for not more than ten (10) days, or by both such fine and imprisonment each day during which such illegal use of any building, structure or land continues shall be deemed a separate offense.

Whenever a county zoning official (including, but not limited to, the land use administrator, building official, zoning enforcement officer or county attorney) has personal knowledge of any violation of this Section 16.2, he shall give written notice to the violator to correct such violation within thirty (30) days after the date of such notice. If the violator fails to correct the violation within such 30 day period, the zoning official may request that the sheriff of the County issue a summons and complaint to the violator, stating the nature of the violation with sufficient particularity to give notice of such charge to the violator.  The summons and complaint shall require that the violator appear in County Court at a definite time and place stated therein to answer and defend the charge. One copy of the summons and complaint shall be served upon the violator by the sheriff in the manner provided by law for the service of a criminal summons.  One copy each shall be retained by the sheriff and the County zoning official, and one copy shall be transmitted by the sheriff to the Clerk of the County Court.

BLM_0061487

[16.3]

16.3     TRANSFER OF INTERESTS:

Any person who transfers legal or equitable title or sells any subdivided land before a final plat for such subdivided land has been approved by the Board of County Commissioners and recorded or filed in the office of the County Clerk and Recorder, is guilty of a misdemeanor and,  upon conviction thereof, shall be punished by a fine of not more than $1,000.00 nor less than $500.00 for each parcel of or interest in subdivided land which is sold.  All fines collected shall be credited to the general fund of the County. No person shall be prosecuted, tried or punished under this paragraph unless the indictment, information, complaint or action for the same is instituted prior to the expiration of eighteen (18) months after the recordation or filing in the office of the County Clerk and Recorder of the instrument transferring or selling such subdivided land.

16.4     WITHHOLDING OF PERMIT:

In addition to all other penalties specified for violation of this Code, the County shall withhold building permits, mobile home permits, individual sewage disposal permits and any other permits which may be necessary for the habitation or development of any parcel of land which has been transferred in violation of this Code.

16.5     ACTIONS TO ENJOIN:

In addition to any other penalty specified herein, the County may bring an action to enjoin any developer from selling developed land before a final plat for such developed land has been approved by the Board of County Commissioners and may institute an injunction, mandamus, abatement or other appropriate action or proceeding to prevent, enjoin, abate or remove any unlawful erection, construction, reconstruction, alteration of use of any parcel of land.

16.6     PRIVATE ACTION:

A11 provisions of an final development plan for a Planned Unit Development shall run in favor of the residents, occupants and owners of the Planned Unit Development but only the extent expressly provided in the plan and in accordance with the terms of the plan and, to that extent, said provisions, whether recorded by plat, covenant, easement or otherwise, may be enforced at law or in equity by residents, occupants or owners acting individually, jointly or through an organization dedicated in the plan to act on their behalf.  However, no provisions of the plan shall be implied to exist in favor of residents, occupants and owners except as to those portions of the plan which have been finally approved by the County.

BLM_0061488

[16.7]

Amended
12/03/90

16.7    <u>NOTICE OF VIOLATION</u>:

In addition to all other penalties specified for violation of this Code, the County may record in the office of the Ouray County Clerk & Recorder, a Notice of Violation, which shall constitute constructive notice to the general public that no permit which may be necessary for habitation or development shall issue from the County on any parcel of land which has been transferred in violation of this Code.

Prior to recordation of the Notice of Violation, the affected landowner(s) shall be entitled to a thirty (30) day notice of intent to record Notice of Violation sent certified mail, return receipt requested to said landowner(s)' last known address as shown by County records.  Upon written objection by the Landowner(s) filed in the office of the Ouray County Land Use Administrator, within the aforementioned thirty day period, Notice of Violation shall not be recorded pending administrative review by the Ouray County Land Use Administrator, which review shall take place within ten days of receipt of the aforementioned written Objection.  Following administrative review of the written objection and all other circumstances surrounding the alleged violation of this Code, if the Land Use Administrator finds that there has been a violation of the Code, the Notice of Violation shall be recorded forthwith as provided herein.  The affected landowner(s) may appeal the Land Use Administrator's finding of violation to the Ouray County Board of Zoning Adjustment.  Should the Board of Zoning Adjustment reverse the finding of the Land Use Administrator, the County shall forthwith record a revocation or withdrawal of the Notice of Violation, which was previously recorded.

Compliance with the notice provisions of this Section shall not be a condition precedent to the County's enforcement of the provisions of this Code.  Failure of the County to comply with the notice provisions of this Section shall not be deemed to constitute a waiver by the County of any violation of this Code.

Amended
12/3/90

16.8    Any failure by the County to enforce any provision of this Code shall not subject the County to any direct or indirect civil liability therefrom.

BLM_0061489

Adopted by the County Commissioners on January 6, 2003

# Section 17

## EXCEPTIONS AND EXEMPTIONS

17.1   <u>EXCEPTIONS</u>:

The Board of County Commissioners may grant exceptions to this Code, as the Code relates to the division of land.  An application for an exception shall be made by a verified petition of the subdivider, stating fully the grounds of the application and the facts relied upon by the petitioner.  In the case of an application for exceptions which relates to a Planned Unit Development, the petition shall be filed with the preliminary development plan.

17.2   <u>EXEMPTION FROM DEFINITION OF SUBDIVISION</u>:

In addition to the exemptions from the definition of subdivision set forth in Section 22 of this Code, the Board of County Commissioners may, by resolution, exempt from this definition any division of land if the Board of County Commissioners determines that said division is not within the purpose of this Code.  Application for such exemption shall be made by a verified petition of the subdivider, stating fully the grounds of the application and the facts relied upon by the petitioner.

17.3   <u>PROCEDURE</u>:

The Board of County Commissioners, unless otherwise required by this Code, may request a recommendation regarding an exception or exemption from either:   1) the appropriate Joint Planning Board in the case of an application for an exception or exemption located within an Urban Growth Management Area or an Area of Influence or 2) the County Planning Commission, as provided by the Ouray County Land Use Code. In addition to the application, information and fees, the Applicant shall also submit completed notification postcards obtained from the County Land Use Office.  The postcards will contain all pertinent information and will be stamped and addressed to all adjacent property owners.

In the event a recommendation is requested and the appropriate Joint Planning Board or County Planning Commission fails to make a recommendation on the application as soon as possible within sixty (60) days after such referral, the Board of County Commissioners may, however, proceed to make a finding thereon. The Joint Planning Board or Planning Commission may recommend approval or the Board of County Commissioners may grant an exception or exemption only upon a finding of all of the facts under either set of criteria contained in subparagraphs A and B herein below as follows:

> A.     The applicant/landowner has conveyed real property to the County, subsequent to the effective date of the resolution adopting this provision, for easements, public rights-of-way, or for other public projects or  public purposes,

BLM_0061490

which results in a division of the said property not occurring as a result of any legal proceeding including, but not limited to, an eminent domain action or inverse condemnation.   The granting of the request will not increase the density, that is otherwise allowed by the underlying zoning, by more than one additional unit of density.

or;

B.     1.     There are special and unusual circumstances or conditions affecting the property and;

2.     The exception or exemption improves the condition of Ouray County as envisioned in the Ouray County Master Plan or, at a minimum, has no net negative impact and;

3.     The granting of the exception or exemption will not be detrimental to the public welfare or demonstrably injurious to other property rights and;

4.     Granting the request will be consistent with and secure the objectives of this Code and shall be in accordance with any applicable intergovernmental agreements affecting land use or development and;

5.     Granting the request will not increase the density otherwise allowable in the underlying zone, unless the applicant provides proof satisfactory to the full Board that: 1) this requirement is impractical for the particular request and; 2) the granting of the request will provide substantial benefits for the general public, in which case this requirement must be waived with a unanimous vote of the Board members present and eligible to vote The granting of the request will not increase the density, that is otherwise allowed by the underlying zoning, by more than one additional unit of density and;

6.     In the case of an exception or exemption which would create more than one additional lot, all of the Site Requirements and Site Development Standards contained in Section 6.9 of this Code shall be met, unless otherwise modified by the Board of County Commissioners pursuant to a Development Agreement.  Such exception or exemption shall be governed by a binding Development Agreement approved by the Board pursuant to Section 25 of this Code and;

7.     Any new parcel created shall not create nonconformity or increase the degree of nonconformity of an existing structure as it relates to setback requirements and;

8.     All proposals for the development of parcels created shall conform to other applicable provisions of this Code including, but not limited to, access, except as specifically allowed by this Section and;

17-2

BLM_0061491

9.      Proposed parcel boundaries and development shall be suitably located and sized with respect to the physical characteristics of the land, the character of the neighborhood, and the County's goals of preserving agricultural and forestry lands and;

10.     Exceptions and exemptions shall not be approved solely for convenience of construction or the creation of a new lot or parcel for development or resale purposes.

For the purposes of this Section 17, the Joint Planning Board or County Planning Commission's failure either to make a recommendation or to recommend approval shall constitute a recommendation for denial.  The Board of County Commission's failure to grant or approve the request for an exception or exemption shall be deemed to constitute denial of the request.

BLM_0061492

# Section 18

## FEES

Fees relating to this Code shall be assessed in accordance with a uniform schedule which is set by resolution of the Board of County Commissioners and which shall be passed at any regular meeting of the Board or special meeting which is called for the specific purpose of adopting such fees.  Notice that a fee schedule or amendment thereof is to be considered by the Board of County Commissioners shall be published in the official County newspaper at least fourteen (14) days prior to such consideration.  The fee schedule shall be designed to fully compensate the County for all costs incurred or anticipated to be incurred in connection with the matter for which the fee is to be assessed.

BLM_0061493

Revised by the Ouray County Board of County Commissioners on November 10, 2003.

# Section 19

# ADMINISTRATION

19.1   ENFORCEMENT:

This Code shall be enforced in a manner consistent with the provisions of Article 67 of Title 24, Article 20 of Title 29 and Article 28 of Title 30 of the Colorado Revised Statutes, as amended. The Land Use Administrator shall be the County Building Official and the County Zoning Enforcement Officer and shall be responsible for enforcement unless otherwise designated by the Board of County Commissioners.

19.2   SITE DEVELOPMENT PERMITS:

A.   The provisions of this Section 19.2 shall apply to the construction of single-family dwelling units on parcels located within Ouray County, except construction proposed on lots previously approved by Ouray County as part of a Planned Unit Development, Final Development Plan or combined Preliminary/Final Development Plan approved by the Board of County Commissioners in accordance with Section 25 of this Code, or a Final Subdivision Plat approved as part of a Development Agreement approved pursuant to Section 25 of this Code. In conjunction with and prior to approval and issuance of a building permit, a landowner wishing to construct a single-family dwelling unit must obtain a Site Development Permit from Ouray County. The Board of County Commissioners hereby delegates to the Ouray County Land Use Administrator the authority to review and approve or approve with conditions or deny all applications for Site Development Permits in Ouray County. All decisions of the Land Use Administrator shall be based upon the requirements set forth in Section 19.2.C below. Any decision of the Land Use Administrator pursuant to the authority delegated herein may be appealed as provided in Section 19.6.D of the Ouray County Land Use Code.

B.   Applications for Site Development Permits shall be submitted in writing to the Land Use Office Staff, together with the applicant's acknowledgment of assessment of all processing, impact and other fees that are or may be required to be assessed by this or other Sections of the Ouray County Land Use Code as the Code may be amended from time to time. The County shall collect and the applicant shall pay all such applicable fees and assessments, at the time and in the manner that payment of those fees and assessments is required by this Code. The applicant shall use an application form approved by and provided by Ouray County. The County shall approve, approve with conditions or deny the application.

C.   Ouray County shall approve and issue a Site Development Permit upon a demonstration by the applicant and to the satisfaction of the County that all of the following criteria have been met:

19-1

BLM_0061494

(1)      Road access, potable water and sewage disposal will be available and meet all applicable provisions of the Ouray County Land Use Code.

(2)      The proposed site development will not unreasonably impact significant wildlife habitat, wetlands and riparian areas.

(3)      If the site development is proposed to be located within areas subject to the effects of any chemical or geological hazard, including, but not limited to, avalanche/snow slide, rock fall areas, landslide, potentially unstable slopes, slopes greater than 30 percent, alluvial fans, talus slopes, Mancos shale, faults, expansive soils or ground subsidence, the applicant shall provide evidence sufficient to demonstrate to the satisfaction of the County, that such hazards have been avoided or otherwise adequately mitigated such that the proposed site development may be conducted in a safe manner.  The County, where reasonably necessary, may require that recognized experts be employed and special studies be done and submitted before a building permit will issue affecting lands which may contain a geological, wildfire, flood or other hazard, and which may affect persons using the land in question or abutting or otherwise affected lands. The cost of employing such experts and drafting such special reports shall be paid by the applicant. The County is not required to accept the findings or conclusions of any experts or special reports.

(4)      All applicable impact and other fees and assessments have been assessed and paid as required by this Code.

(5)      If the site development is proposed to be located within areas where irrigation occurs or impacts any irrigation structures, including but not limited to ditches and head gates, the applicant shall demonstrate that any impacts have been adequately mitigated to allow historic water flow to continue.

D.      All applicants for a site development permit shall be required to sign a statement acknowledging that Ouray County is overall a rural county located in rough and difficult terrain with a limited transportation network and County services may be unavailable or service may be untimely in some or all areas of the County.  Approval of a site development permit or any other permit or approval does not constitute and shall not be considered as conferring any guarantee or expectation of the provision of any County service.

E.      Upon issuance of a site development permit the Land Use Staff shall submit the permit to the Office of the Ouray County Clerk and Recorder for recordation.   Any amendment to the approved site development permit shall require additional County approval.

F.      Upon demonstration that the permit is in compliance with all conditions and criteria, as set forth above, the Site Development Permit shall be approved for a period of three (3) years.  Renewal of the permit may be granted for additional successive three (3) year terms providing that the permit is in compliance with all conditions and criteria, as

19-2

BLM_0061495

set forth above.

19.3   BUILDING PERMITS:

Building permits shall be issued in accordance with procedures set forth in the Uniform Building Code, as adopted by Ouray County. No building shall be erected, occupied, moved or structurally altered until a permit therefor has been issued by the County Building Inspector and no permit shall be issued unless the proposal is in full accordance with this Code, except in those instances where a lawful variance has been granted by the Board of Zoning Adjustment. All applications for permits shall be accompanied by a drawing showing the location of all improvements in relation to the lot and indicating the height of all structures. No building permit shall be issued within a Planned Unit Development approved after the date of adoption of this Code without prior approval of the architectural control committee or other internal enforcement body approved under Section 9.8 of this Code.

The County Building Inspector, where reasonably necessary, may require that recognized experts be employed and special studies be done and submitted before a building permit will issue affecting lands which may contain a geological, wildfire, flood or other hazard, and which may affect persons using the land in question or abutting or otherwise affected lands. The cost of employing such experts and drafting such special reports shall be paid by the applicant. The zoning enforcement officer is not required to accept the findings or conclusions of any experts or special reports.

19.4   CERTIFICATE OF OCCUPANCY:

No new building shall hereinafter be occupied or used without a Certificate of Occupancy, which has been issued by the County Building Inspector. Such certificate shall be issued within five (5) days after the officer has been notified of the building's completion and after a final inspection has been made to determine conformance with the provisions of this Code.

19.5   RECORDS:

All building permits, application records, records of inspection and certificate of occupancy records shall be kept on file in the office of the County Building Inspector and shall be available for inspection by the public.

19.6   PLANNING COMMISSION:

A.   Establishment: There is hereby established a planning commission which shall be known as the Ouray County Planning Commission.

B.   Appointment of Members: In accordance with the bylaws of Ouray County, the membership of the Planning Commission shall be five persons, appointed by the Board of County Commissioners for staggered three-year terms. The members of the Planning Commission shall be full-time residents of Ouray County and shall also be owners of real property within Ouray County. The Board of County Commissioners may also, at its discretion, appoint any associate members to the Planning Commission to serve in place

19-3

BLM_0061496

of any member of the Commission who may be absent from the County, ill, who may have any financial or personal interest in any matter brought before the Commission or who may be otherwise unable to function or serve in his appointed capacity as a member of the Planning Commission. Any member may resign from the Planning Commission upon sending written notice of such resignation to the Chairman of the Board of County Commissioners.

C.      Powers and Duties: The Planning Commission shall have such powers and duties as proscribed by law.

19.7    BOARD OF ZONING ADJUSTMENT:

A.      Establishment: A Board of Zoning Adjustment is hereby established, which shall consist of three members and three associate members and which shall be appointed by the County Commissioners. All further reference to the Board of Zoning Adjustment in this Section shall hereafter be made to "the Board".

B.      Membership: Not more than one of the members and one of the associate members may also be members of the County Planning Commission. Until otherwise provided, the members shall serve without compensation. Each member shall serve for three (3) years, provided however, that of the first appointed Board, one member shall serve for one year, one member for two years and one member for three years. Any member of the Board may be removed for cause by the County Commissioners upon written charges and after a public hearing. Vacancies shall be filled for unexpired terms in the same manner as in the case of original appointments. The associate members of the Board shall take the place of any regular member of the Board in the event that the regular member is temporarily unable to act, owing to absence from the County, illness, interest in the case before the Board or any other cause.

C.      Officers: The Board shall, at its first regular meeting of each year, select a Chairman, a Vice-Chairman and a Secretary. The Secretary may or may not be a member of the board. The Chairman shall preside at meetings and shall perform all duties as usual and ordinary for the presiding officer of any board or group. The Vice-Chairman shall perform the duties of the Chairman in the absence of the Chairman. The Secretary shall keep full and complete minutes and records of all meetings and shall have custody of all of the records and shall generally perform all of the duties usually performed by the Secretary of any board or group.

D.      Appeals to the Board of Adjustment: Appeals to the Board of Adjustment may be taken by any person aggrieved by his inability to obtain a building permit or by the decision of any administrative officer or agency based upon or made in the course of the administration or enforcement of the provisions of this Code, provided however, that no decision made by the Board of County Commissioners or the County Planning Commission shall be subject to review of the Board. Appeals to the Board of Adjustment may also be taken by any officer, department, board or bureau of the County affected by the grant or refusal of a building permit or by other decision of an administrative officer

19-4

BLM_0061497

or agency based on or made in the course of the administration or enforcement of the provisions of this Code. Such appeal must be made within thirty (30) days after the occurrence of such grievance or decision, which is the subject of the appeal.

Upon appeals, the Board of Adjustment shall have the following powers:

(1)   Appeals from Decisions of Administrative Officials: To hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by an administrative official or agency based on or made in the enforcement of this Code.

(2)   Interpretation: To hear and decide requests for interpretation of this Resolution, including any uncertainty as to boundary location or meaning of wording, so long as this interpretation is not contrary to the purpose and intent of this Code.

(3)   Variances. Where, by reason of exceptional narrowness, shallowness or shape of a specific piece of property at the time of the enactment of this Code or by reason of exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property, the strict application of any regulation enacted under this Code would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, to authorize, upon an appeal relating to said property, a variance from such strict application so as to relieve such difficulties or hardship, provided that such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of this Code. Any variance granted in accordance with this provision shall expire one year from the date on which it is granted unless the activity, construction or use for which it is requested has taken place.

(4) The concurring vote of all three members of the Board shall be necessary to reverse any order, requirement, decision or determination of any such administrative official or agency or to decide in favor of the appellant.

E.   General Duties of the Board:

(1)   To meet at the call of the Chairman, by his request or by the request of the Zoning Enforcement Officer, or by any party wishing to appeal the decision of the Zoning Enforcement Officer.

(2)   To adopt any rules necessary to transact the Board's business or to expedite its functions or powers so long as they are not inconsistent with the provisions of this Code.

(3)   To keep minutes of the proceedings of each meeting, which shall be filed in the office of the Board, which may designate the Zoning Enforcement Officer to keep such files and which shall be of public record.

19-5

BLM_0061498

(4)     To permit the public to attend and to be heard at all of its meetings.

(5)     To notify in writing, the Zoning Enforcement Officer, the owner involved and the Planning Commission of all decisions made, resolutions passed, hearings scheduled or permits authorized.

(6)     To publish notice of, or cause to be published, or to cause the property to be posted at least ten (10) days prior to the date of hearings, where such hearings are deemed necessary by the Board.

F.     Procedure: The Board shall act in strict accordance with all of the other applicable laws of the State of Colorado and applicable land use regulations of the County of Ouray. All appeals to the Board shall be in writing and on such a form as shall be prescribed by the Board. Every appeal shall indicate what provisions of this Code are involved, what relief is being sought and the grounds upon which such an appeal is being sought, as required above.  The Chairman of the Board shall then, within forty-five (45) days, call a meeting of the board for the purpose of the review of the requested appeal. At the same time, a copy of the requested appeal may be transmitted to the Planning Commission for an opinion.  In the event an opinion is requested, said opinion shall be returned to the Board before the date set for hearing the appeal. Notification of the decisions of the Board shall then be made.

G.     Appeals from the Board: Any further appeal from any decision of the Board may be made to the courts, as provided by law, provided, however, that such appeal is made prior to thirty (30) days following the date of the notification of the Board's decision.

19.8   BOARD OF VISUAL APPEALS:

A.     Establishment: A Board of Visual Appeals is hereby established, which shall consist of five members and which shall be appointed by the Board of County Commissioners. All further reference to the Board of Visual Appeals in this Section shall hereafter be made to "the Board".

B.     Membership: The membership of the Board shall be five persons, appointed by the Board of County Commissioners for three (3) years, provided however, that of the first appointed Board, two members shall serve for one year.  Of the five members, the Board of County Commissioners shall endeavor to appoint at least three who are design professionals.  Members shall serve at the pleasure of The Board of County Commissioners. Vacancies shall be filled for unexpired terms in the same manner as in the case of original appointments.  Until otherwise provided, the members shall serve without compensation.

C.     Officers: The Board shall, at its first regular meeting of each year, select a Chair, a Vice Chair and a Secretary. The Secretary may or may not be a member of the board. The Chair shall preside at meetings and shall perform all duties as usual and ordinary for the presiding officer of any board or group. The Vice Chair shall perform the duties of the Chair in the absence of the Chair. The Secretary shall keep full and complete minutes

BLM_0061499

and records of all meetings and shall have custody of all of the records and shall generally perform all of the duties usually performed by the Secretary of any board or group.

D.     Appeals to the Board of Visual Appeals: Appeals to the Board may be taken by any person aggrieved by the inability to obtain a permit or by the decision of any administrative officer or agency based upon or made in the course of the administration or enforcement of the provisions of Section 9.  Appeals to the Board may also be taken by any officer, department, board or bureau of the County affected by the grant or refusal of a permit or by other decision of an administrative officer or agency based on or made in the course of the administration or enforcement of the provisions of Section 9.  Such appeal must be made within thirty (30) days after the occurrence of such grievance or decision, which is the subject of the appeal.  Upon appeals, the Board shall have the following powers:

(1)     Interpretation:  To hear and decide requests for interpretation of Section 9 of this Code.

(2)     Variances:  Where, by reason of exceptional narrowness, shallowness, shape, or other characteristic of a specific piece of property or by reason of exceptional topographic conditions or by reason of exceptional wildlife and/or wildfire impact or other extraordinary and exceptional situation or condition impacting such piece of property, the strict application of Section 9 of this Code would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon the owner of such property, the Board shall recommend to the Board of County Commissioners the disposition of an appeal, so as to relieve such difficulties or hardship, based on criteria such as:

(a)     Reflecting immediate natural forms in building mass.

(b)     Use of natural materials to imitate the immediate surrounding area.

(c)     Minimize long frontages on visible sides.

(d)     Recessing and/or shading windows.

(e)     Multiple roof lines.

Provided that such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of Section 9 of this Code.

E.     General Duties of the Board:

(1)     To meet at the call of the Chair or by any party wishing to appeal a decision.

19-7

BLM_0061500

(2)    To adopt any rules necessary to transact the Board's business or to expedite its functions or powers so long as they are not inconsistent with the provisions of this Code.

(3)    To keep minutes of the proceedings of each meeting, which shall be filed in the office of the Board and which shall be of public record.

(4)    To permit the public to attend and to be heard at all of its meetings.

(5)    To notify in writing the owner involved and the Board of County Commissioners of all decisions made, resolutions passed, hearings scheduled or permits authorized.

(6)    To hold a public hearing and publish a notice of such hearing at the expense of the applicant, in a newspaper of general circulation within Ouray County at least fourteen (14) days prior to the hearing date.

F.    Procedure: The Board shall act in strict accordance with all of the other applicable laws of the State of Colorado and applicable land use regulations of the County of Ouray. All appeals to the Board shall be in writing and in such a form as shall be prescribed by the Board. Every appeal shall indicate what provisions of this Code are involved, what relief is being sought and the grounds upon which such an appeal is being sought, as required above.  The Chair of the Board shall then, within forty-five (45) days, call a meeting of the board for the purpose of the review of the requested appeal.

19.9    JOINT PLANNING BOARDS:

A.    Establishment: There are hereby established a Ridgway Area Joint Planning Board and a Ouray Area Joint Planning Board to act as recommending bodies to the Ouray County Board of County Commissioners.  The Joint Planning Boards will review specific development applications for properties located within the Ridgway Area of Influence, Ridgway Urban Growth Management Area, the Ouray Area of Influence and the Ouray Urban Growth Management Area.

B.    Appointment of Members: The Ridgway Area Joint Planning Board and the Ouray Area Joint Planning Board shall consist of a total of eight (8) members. Membership shall be as follows:

1.    The eight (8) members of the Ridgway Area Joint Planning Board shall consist of the five (5) members of the Ouray County Planning Commission and three (3) members selected by the Ridgway Town Council from the Ridgway Town Planning Commission or if no Planning Commissioners are available shall select three (3) persons who reside within the limits of the Town of Ridgway. The Ouray County Board of County Commissioners shall approve or reject any or all of the names submitted by the Ridgway Town Council.

19-8

BLM_0061501

2.      The eight (8) members of the Ouray Area Joint Planning Board shall consist of the five members of the Ouray County Planning Commission and three (3) members selected by the Ouray City Council from the City of Ouray Planning Commission or if no Planning Commissioners are available shall select three (3) persons who reside within the limits of the City of Ouray.  The Ouray County Board of County Commissioners shall approve or reject any or all of the names submitted by the Ouray City Council.

3.      The terms of the Joint Planning Boards' members shall be as follows:

a.      From the Ouray County Planning Commission, membership shall coincide with their appointed terms.

b.      The members appointed from each municipality shall serve for staggered three-year terms.

4.      The Board of County Commissioners, at the request of the Ouray County Planning Commission or the Town of Ridgway or City of Ouray, may also, at its discretion, appoint any associate members to each of the Planning Boards to serve in place of any member of the Board who may be absent from the County, who is ill, who may have any financial or personal interest in any matter brought before the Commission or who may be otherwise unable to function or serve in his appointed capacity as a member of the Planning Commission.

5.      Any member may resign from the Planning Boards upon sending written notice of such resignation to the Chairman of the Board of County Commissioners.

C.      Powers and Duties: The Ridgway Area Joint Planning Board and the Ouray Area Joint Planning Board will be considered Ouray County advisory boards.  The Joint Planning Boards shall review those applications for development as outlined under Section 3.5 of this Code.  The Joint Planning Boards will not have the authority to adopt a master plan pursuant to Section 30-28-106(1) of the Colorado Revised Statutes.

19-9

BLM_0061502

Revised by the Ouray County Board of County Commissioners on July 16, 2001.

# Section 20

## AMENDMENTS

20.1   <u>GENERAL PROCEDURE</u>:

Amendments to this Code, rezoning and any zone district amendment shall be in accordance with the statutes of the State of Colorado, with report and recommendations from the Planning Commission to the Board of County Commissioners required prior to the adoption of any such amendment.

20.2   <u>PROCEDURES</u>:

The following shall apply to all requests for rezoning initiated by private landowners or their authorized agents for property in which they have an interest.   Citizen initiated rezoning of lands in the County shall follow Colorado State Law governing such actions.

A.   <u>REZONING</u>:

(1)   A petition for amendment to this Code by which the zoning classification of a parcel is changed shall be submitted to the Planning Commission through the Land Use Administrator.

(2)   After receipt of the Rezoning petition for amendment to this Code, the Commission shall set a public hearing date and shall publish notice of said hearing at the expense of the petitioner in a newspaper of general circulation at least fifteen (15) days prior to the hearing date.   In addition, the petitioner shall send notice, by certified mail, return receipt requested, of the public hearing to all owners of property within one thousand, two hundred (1,200) feet of the boundaries of the property which is the subject of the petition for the proposed Rezoning, at least fifteen (15) days before the public hearing before the Planning Commission.   Notice by mail shall be deemed complete upon mailing to the last known address of said owners as shown in the records of the Ouray County Assessor.   Further, the petitioner shall cause to be placed a sign or signs in conspicuous location(s) on the subject property, not less than fifteen (15) days prior to said hearing, stating the change request and the date, time, and place of the hearing.   The Land Use Administrator shall determine the number and location of the signs to be posted.   The petitioner shall present proof satisfactory to the County that all notices required by this section have been made or sent.

(3)   After the public hearing, the Planning Commission shall submit a report and recommendation on the proposed Rezoning to the Board of County Commissioners.

BLM_0061503

(4)     The Board of County Commissioners shall set a public hearing on the Rezoning request and shall publish notice of the hearing at the expense of the petitioner in a   newspaper of general circulation at least fifteen (15) days prior to the hearing date.  After the public hearing before the Board of County Commissioners, the Board shall proceed with the Rezoning request as prescribed by law for the consideration of passage of any resolution of the County and after consideration of the Rezoning request under the standards as set out in Section 20.3 hereof.

B.     <u>LAND USE CODE AMENDMENTS</u>:

(1)     Any amendment to this Code may be initiated by the County, ~~or~~ by private citizens or by a private or public entity.  A written request for amendment shall be submitted to the Planning Commission through the Land Use Administrator, along with any required processing fee as may be set by the Board of County Commissioners.  Any proposed Land Use Code amendments shall be drafted in a form consistent with the organizational format and style of this Code.

(2)     After receipt of a properly drafted written request for amendment to this Code, the Planning Commission shall set a public hearing date and shall publish notice of said hearing  at the expense of the petitioner in a newspaper of general circulation at least fifteen (15) days prior to the hearing date.

(3)     After the public hearing, the Planning Commission shall, as soon as reasonable and practicable, submit a report and recommendation on the proposed amendment to the Board of County Commissioners.

(4)     The Board of County Commissioners shall set a public hearing date on the proposed Code amendment and shall publish notice of the hearing at the expense of the applicant in a newspaper of general circulation at least fifteen (15) days prior to the hearing date.  After the public hearing before the Board of County Commissioners, the Board shall, as soon as reasonable and practicable, make its decision on the proposed amendment as prescribed by law for the consideration of passage of any resolution of the County.

20.3   <u>STANDARDS TO CHANGE THE ZONING CLASSIFICATION OF AN AREA</u>:

Amendments to this Code may be adopted whereby the zoning classification of an area is changed only if all of the following conditions exist:

A.     The area in question abuts an existing district having the zoning classification desired; and,

BLM_0061504

B.    The request is consistent with and in furtherance of the stated intent and purposes of the Land Use Code and with the Ouray County Master Plan; and

C.    The request is consistent and compatible with the community character and surrounding land uses within the area for which the request is being proposed; and

D.    The request would not have a material adverse effect on the surrounding area; and

E.    The request will not result, unless mitigated, in demands on public facilities and services that strain or exceed the capacity of such facilities and services, including but not limited to transportation facilities, sewage facilities, water supply, parks, drainage, schools, fire districts and emergency medical services; and

F.    The proposed or planned use of the parcel to be rezoned is feasible and not disallowed under the Ouray County Land Use Code.  In order to aid its consideration of this criteria, the County may require that the applicant make a disclosure of the proposed or planned use of the parcel to be rezoned, including, where necessary, preparation and provision of a PUD preliminary/final plat and plan.

## 20.4    SUBMITTAL REQUIREMENTS FOR REZONING

A.    For Rezonings a legal description of the land area to be rezoned ~~or~~ along with a sketch map to scale showing the boundaries of the area to be rezoned which indicates the current zoning or designation for all areas adjacent to the area proposed to be rezoned.  The map shall also identify all parcels for rezoning.  The map shall be at a scale of at least 1 inch = 20 feet, or other scale approved by the Land Use Administrator.  The map shall identify ownership on all parcels.  The application and/or petition shall also include consent of all owners of record for the parcel(s) which are the subject of the application and/or petition.

B.    A statement indicating the requested new zone district and justification for the rezoning , as well as an explanation of how the rezoning complies with the standards in Land Use Code Section 20.

C.    A description of uses proposed in the area to be rezoned, along with a description of land uses and buildings within one thousand two hundred (1,200) feet in all directions.

D.    A time schedule for any contemplated new construction or uses.

E.    A description of the effect that the rezoning would have on uses of adjacent properties in the area proposed to be rezoned on the County generally.

BLM_0061505

# Section 21

## REPEAL/RE-ENACTMENT

At a regular meeting of the Board of County Commissioners for Ouray County, Colorado, held at the Courthouse in Ouray, Colorado, on the 4th day of March, 1986, there were present:

> Howard B. Williams, Chairman
> David A. Calhoon, Commissioner
> Kenneth R. Williams, Commissioner
> Richard P. Tisdel, County Attorney
> Addie A. Sim, Clerk
> Peggy A. Cox, Deputy

when the following proceedings, among others, were had and done, to-wit:

WHEREAS, in August, 1971, the Ouray County Zoning Regulations were duly adopted by resolution of the Board of County Commissioners and subsequently amended on several occasions; and

WHEREAS, in August, 1972, the Ouray County Subdivision Regulations were duly adopted by resolution of the Board of County Commissioner and subsequently amended on several occasions; and

WHEREAS, after holding public hearings, with notice given as required by law, the Ouray County Planning Commission, has duly adopted and certified a Master Plan; and

WHEREAS, after holding public hearings, with notice given as required by law, the Ouray County Planning Commission has devised and certified the Ouray County Land Use Code; and

WHEREAS, after holding a public hearing, with notice given as required by law, the Board of County Commissioners has determined that certain changes should be made in the Land Use Code, as devised and certified by the Planning Commission, and has submitted such changes to the Planning Commission; as required by law; and

WHEREAS, the Board of County Commissioners now considers it to be appropriate, consistent with the Master Plan and in the best interests of Ouray County to repeal the Ouray County Zoning and Subdivision Regulations, as previously adopted and amended, and to enact the Ouray County Land Use Code, which is attached hereto and incorporated herein by this reference.

NOW, THEREFORE, BE IT RESOLVED AS FOLLOWS:

BLM_0061506

1.      The Ouray County Zoning Regulations, enacted on August 23, 1971, as subsequently amended, are hereby repealed.

2.      The Ouray County Subdivision Regulations, enacted in August, 1972 as subsequently amended, are hereby repealed.

3.      The Ouray County Land Use Code, as attached to and incorporated in this resolution, and the maps and plats on files in the Ouray County public records, at Reception Nos. 120088, 134459, 122029, 122078, and 138553 are hereby adopted.

4.      Upon adoption of this resolution, it, together with all textual materials which it incorporates, shall be filed in the office of the County Clerk and Recorder, and indexed in the manner prescribed by law.

Introduced, read, passed and approved this 4th day of March, 1986.

Voting in the affirmative:  Commissioners Howard B. Williams, Kenneth R. Williams and David A. Calhoon.   Commissioner Calhoon abstained from voting on Section 6.6(A)(1)(2) and (3) because he may have a conflict of interest.
Voting in the negative:  None.
Absent:  None

THE BOARD OF COUNTY COMMISSIONERS
OF OURAY COUNTY, COLORADO

_____
Howard B. Williams, Chairman

STATE OF COLORADO   )
COUNTY OF OURAY       )  ss,

I, ADDIE A. SIM, County Clerk and ex-officio Clerk of the Board of County Commissioners in and for the County and State aforesaid, do hereby certify that the annexed and foregoing Order is truly copied from the Records of the Proceedings of the Board of County Commissioners for said Ouray County, now in my office.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said County at Ouray, Colorado, this 4th day of March, 1986.

_____
Addie A. Sim, County Clerk

21-2

BLM_0061507

# Section 22

## DEFINITIONS

Words and terms used in this Code shall be interpreted in accordance with the following definitions:

ACCESS.  A legal point of entry and exit of a lot, tract or parcel of land.  Entry and exit of a lot, tract or parcel of land may be provided by a dedicated public right-of-way or easement or as a driveway, shared with another structure or solely for a single use, provided that the road or driveway meets the minimum requirements as set forth under Section 23 of this Code.

ACCESSORY USES AND STRUCTURES.  A non-commercial use and/or structure, except for home occupations and home businesses as defined in Section 28 of this Code which are allowed, naturally and normally incidental to a use by right and complying with all of the following conditions:

    A.    Is clearly incidental and customary to and commonly associated with the operation of the use by right;

    B.    Is operated and maintained under the same ownership as the use by right;

    C.    Includes only those structural features consistent with the use by right;

    D.    Includes accessory dwelling units subject to the following conditions:

        (1)    The maximum living area allowed for an accessory dwelling unit shall be limited to 800 square feet with the exception of units for employees which shall have no area limitation; and

        (2)    Accessory dwelling units shall be located within 100 feet of the main structure with the exception of units for employees which shall have no separation limitation; and

        (3)    The minimum parcel size to allow an accessory dwelling unit shall be 3 acres.  One accessory dwelling unit shall be allowed per parcel.  Any additional accessory dwelling units shall not exceed a density of 1 accessory dwelling unit per 35 acres; and

        (4)    The construction of any accessory dwelling unit must comply with all County standards and regulations; and

        (5)    An accessory dwelling unit may be occupied without payment of rent for any period, or may be leased or rented to a tenant for a lease term of not less than ninety (90) days.

BLM_0061508

E.  The gross land area utilized by all accessory uses of all uses by right on the same property shall not exceed ten (10) percent of the gross land area utilized by all the uses by right.

ACCOMMODATIONS.  A building containing individual rooms or suites of rooms or separate unit used for temporary or overnight occupancy by paying guests.

AIRPORT.  Any site used for commercial or public landing/take-off of aircraft, including helicopters.  This does not include facilities used strictly for private, non-commercial purposes.

APPEAL.  A request for a review of the Building Official's interpretation of any provision of these regulations or a request for a variance.

APPLICANT.  The owner of land, or the owner's authorized representative or agent.

AREA OF SPECIAL FLOOD HAZARD.  The land in the floodplain within a community subject to a one (l) percent or greater chance or flooding in any given year.

AVALANCHE.  A mass of snow or ice and other materials that may become incorporated therein as such mass moves rapidly down a mountain slope.

AVERAGE GRADIENT:  An expression of slope or an angle of slope.  Gradient may be expressed as a fraction or percentage, for example, 1/16.4(1 in 16.4) feet indicates that the elevation changes (rises or falls) by one foot in a horizontal distance of 16.4 feet (or a 20% grade).  Average shall be calculated on the basis of a systematic sample of at least one point per acre, of buildable area, a minimum of 40 points per parcel.

BASE FLOOD.  The flood having a one (l) percent chance of being equaled or exceeded in any given year.

BED AND BREAKFAST.  A building containing no more than four (4) individual rental sleeping units, which offers meals in connection with such lodging and which is designed for short-term rental to tourists and transients.

BLOCK.  A tract of land bounded by platted streets, public parks, open space, cemeteries, railroad right-of-way, boundaries of the subdivision or the limits of the County's jurisdiction.

BUILDING.  Any structure having a roof supported by columns or walls for the housing or enclosure of persons, animals, chattel, or property of any kind.

BUILDING AREA, DESIGNATED BUILDING AREA.  Area designated on a lot in which buildings, structures, roadways, access and other physical improvements may be constructed.

BUILDING HEIGHT.  The vertical distance above a reference datum measured to the highest point of the coping of a flat roof or to the deck line of a mansard roof or to the average height of

BLM_0061509

the highest gable of a pitched or hipped roof.  The reference datum shall be selected by either of the following, whichever yields a greater height of building:

A.     The elevation of the highest adjoining sidewalk or ground surface within a 5-foot horizontal distance of the exterior wall of the building when such sidewalk or ground surface is not more than 10 feet above lowest grade.

B.     An elevation 10 feet higher than the lowest grade when the sidewalk or ground surface described in Item 1 is more than 10 feet above lowest grade.

The height of a stepped or terraced building is the maximum height of any segment of the building

BUILDING SETBACK.  A line extending across the full width or side of a lot, parallel with the street right-of-way line or property line and outside of which no building or structure shall be constructed.

CAMPGROUND AND RV PARK.  A parcel of land divided into two or more sites for rental occupancy by persons using travel trailers, truck campers, or tents for overnight or short-term duration (120 days maximum).

CEMETERY.  A facility on a parcel of land of at least thirty-five (35) acres, except for existing cemeteries, used for the burial or keeping of the remains of the dead, whether human or animal, including crematoriums, mausoleums, and columbaria operated within the boundaries of the cemetery.

CHURCH.  A building where people regularly assemble for religious services and worship, together with its accessory buildings and uses, maintained and controlled by an organization to sustain public worship, and that does not have a short or long term residential or retreat component except for a limited and incidental on site residence for the head of congregation of the church.

CISTERN:  An underground water storage tank.

COMMERCIAL  CAMPING WHEN ADMINISTERED BY STATE/FEDERAL AGENCIES.  Overnight and short duration (not in excess of 30 days occupancy) where a fee is paid or charged for such occupancy.

COMMERCIAL  EQUESTRIAN  ACTIVITIES.   Activities related to horses held for educational, instructional, or recreational purposes, including but not limited to horse shows, gymkhanas, training clinics, team roping and rodeos.

COMMERCIAL HOUSING UNITS.  Hotel and motel lodging accommodations which are designed and built to be used in conjunction with a resort or conference center and which are in close proximity to service facilities (e.g., restaurants and conference facilities) when they have been approved by the County as part of a PUD.

BLM_0061510

COMMERCIAL LOGGING.   A timber-cutting operation involving more than 150,000 board feet per year.

COMMERCIAL OUTDOOR RECREATION – DAY USE.   Use of a site for a fee for daytime outdoor activities that may include but shall not be limited to hiking, climbing, cross-country skiing, motorized vehicle and horseback riding, where a structure and/or improvement is not required to conduct the use.

COMMERCIAL USE.   A use characterized by the selling of tangible goods, merchandise or services directly to the consumer.

CONDOMINIUM.   The ownership of a single unit in a multi-unit structure plus joint ownership of common areas or facilities.

CONDOMINIUM SUBDIVISION.   The division of real property into individual airspace units and their appurtenant common elements.

CONFERENCE CENTER.   A commercial use intended to accommodate and provide food service to short-term tourists and visitors, together with meeting facilities.   Distinguished from resorts and lodges by its emphasis on facilities for larger meetings and group activities.

DEVELOPMENT.   Any man-made change to improved or unimproved real estate, including, but not limited to, buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations.   Any construction or activity that is subject to the provisions of this code.

DRIVEWAY.   A private vehicular right-of-way from a road to a garage, house or other structure.

DWELLING.   A structure or portion thereof that is used exclusively for human habitation.

DWELLING, MULTI-FAMILY.   A dwelling containing two or more units not including hotels and lodges.   Such units are attached, having one or more common walls.

DWELLING, SINGLE FAMILY.   A building containing one dwelling unit.

DWELLING UNIT.   A building or portion thereof consisting of a room or suite of rooms designed to be used as a residence by an individual, single family or guests, or no more than 5 unrelated individuals, independent of other families or guests, living place including toilet and kitchen facilities, but not including hotels, motels, clubs, boarding houses or any institution such as asylum, hospitals or jails where human beings are housed by reason of illness or under legal restraint.   The term dwelling unit shall also include a mobile home which complies with the requirements of Section 15 of this code.

EASEMENT.   A grant by the property owner to the public, a corporation or person for the use of land for specific purposes.

BLM_0061511

EMPLOYEE HOUSING.   Dwelling units provided, within a Planned Unit Development Resort/Conference Center, that are specifically restricted to be occupied by employees associated with the development.

FARMING/RANCHING.   The production of a tangible commodity as it relates to natural resource utilization, (i.e. land, water).  Landowners, their managers or lessees shall be directly involved in the production of said commodity.  Farming may include the cultivation, preparation, planting, harvesting and wholesale (nontaxable) of crops, forage or horticulture products. Ranching may include, breeding, raising, feeding, training, buying and wholesaling (nontaxable) of livestock and other animals.

FLOOD INSURANCE RATE MAP (FIRM).  The official map on which the Federal Emergency Management Agency has delineated both the areas of special flood hazards and the risk premium zones applicable to the community.

FLOOD INSURANCE STUDY.   The official report provided by the Federal Emergency Management Agency that includes flood profiles, the Flood Boundary-Floodway Map and the water surface elevation of the base flood.

FORESTRY.  The cultivation and/or harvesting of timber up to 150,000 board feet per year.

GEOLOGIC HAZARD.   A geologic phenomenon which is so adverse to past, current or foreseeable construction or land use as to constitute a significant hazard to public health and safety or to property.  The term includes, but is not limited to, avalanches, landslides, rock falls, mudflows, unstable or potentially unstable slopes and ground subsidence.

GOVERNMENTAL FACILITY.   The use of structures and/or land by governmental agencies for fire protection, road and bridge operations, emergency medical services, police protection, or other similar use, that promotes the health, safety and welfare of the general public.

GUEST RANCH.  A facility renting a maximum of 20 rooms and lodging by the night or week to paying customers, and providing on-site meals, which offers activities associated with western ranching and agriculture to guests as part of the accommodations package.  Such activities may include but are not limited to horseback riding, livestock management, roping and other activities typically involved in running a working ranch.  The facility shall be principally a working ranch, whose primary purpose is agriculture with the intent to produce income. A guest ranch shall include a minimum of 150 contiguous acres of privately owned land.

HOTEL.  A building designed for occupancy by short-term or part-time residents who are lodged with or without meals and in which no facilities are provided for cooking in individual rooms. This building is specifically for transient accommodation use and is distinguished from other similar uses by an on-site restaurant, and a central lobby or lounge area adjacent to or in connection with an on-site reservations facility.

BLM_0061512

LIVERY OR HORSE RENTAL OPERATION. Wherever horses are kept for hire and/or where boarding in a livery stable is provided for a fee.

LODGE.  A hotel designed primarily to be used and occupied on a seasonal basis.

LOT.  A tract, lot or portion of land, whether or not platted, intended as a unit for the purpose of transfer of ownership or for building development.

LOT, DOUBLE FRONTAGE.  A lot which runs through a block from street to street and which has two non-intersecting sides abutting on two or more streets.

LOT LINE.  The perimeter of a lot.

LOWEST FLOOR.  The lowest floor of the lowest enclosed area (including basement).  An unfinished or flood resistant enclosure, usable solely for the parking of vehicles, building access or storage, in an area other than a basement area, is not considered a building's lowest floor, provided that such enclosure is not built so as to render the structure in violation of the application non-elevation design requirements of these regulations.

MINERAL OPERATION.  Any site development and/or exploration that result in surface disturbance of one (1) acre or more, and extraction or processing of minerals other than underground mining and oil, gas, and sand and gravel operations.

MINERAL RESOURCE AREA.  An area in which minerals are located in sufficient concentrations in veins, deposits, bodies, beds, seams, fields, pools or otherwise, as to be capable of economic recovery.

MINING:  The development or extraction of a mineral from its natural occurrences on affected land.  The term includes, but is not limited to, open mining and surface operation and the disposal of refuse from underground and in situ mining.  The term includes the following operations on affected lands: transportation; concentration; milling; evaporation; and other processing.

MINIMUM FIREFLOW WATER SUPPLY:  A water supply of at least 250 gallons of water per minute for at least a continuous two-hour period, with a residual pressure of 10 pounds per square inch.

MOBILE HOME.  Any portable structure originally constructed to have no foundation other than wheels, jacks or skirting and so designed or constructed to permit occupancy as living and

sleeping quarters.  Mobile homes shall not include manufactured homes as defined in Colorado Revised Statutes, Section 30-28-115, when such manufactured homes meet or exceed an equivalent engineering performance basis standard established by the Ouray County Building Code.

BLM_0061513

MOTEL.  A group of attached or detached units containing individual sleeping and/or living units, designed for rental for specific periods of time to tourists and transients, with garage or parking space adjacent to or near each rental unit.

MUDFLOW.  A flowing mass of predominately fine-grained earth material possessing a high degree of fluidity during movement.

NON-BUILDING AREA, DESIGNATED NON-BUILDING AREA.  Area designated on a lot in which buildings, structures and other improvements may not be constructed, excepting Colorado Division of Wildlife-approved fences, roads and/or access as may be approved by the County.

NON-COMMERCIAL CAMPING.  Overnight and short duration (not in excess of 30 days) occupancy when (a) no fee (except a trespass fee for hunting or fishing or an outfitters fee) is paid or charged for such occupancy, (b) such occupancy is in conformance with any applicable State or Federal regulations, (c) written permission from the owner of the tract occupied has been obtained, (d) no permanent structure is installed and no permanent changes are made to the tract occupied, (e) and adequate sanitation is available.

NON-CONFORMING BUILDING.  A building, or portion thereof, legally constructed prior to the effective date of this Code or any addition thereto, which does not conform to the regulations of the zoning district in which it is located.

NON-CONFORMING PARCEL.  A parcel or tract of property which exists in its present configuration as a legal or non-conforming parcel at the time this Code is adopted and which, by reason of its size, does not comply with the minimum lot size or density provisions of this Code.

NON-CONFORMING USE.  Land or building lawfully occupied prior to the effective date of this Code, or any amendment thereto, by a use which does not conform with the regulations of the zoning district in which it is located.

OIL AND GAS EXPLORATION AND FACILITIES.  A site for oil and/or gas exploration or production of petroleum and/or gas and equipment, and/or facilities and/or appurtenances, which shall include but not be limited to: separators, dehydrators, pumping units, tank batteries, gathering lines and/or water collection lines, drip stations, vent stations, pigging facilities, chemical injection stations, transfer pump stations and valve box, well head compression facility, storage yards or construction staging areas, compressor stations, water injection stations and gas treating facilities.

OPEN SPACE.  Within a Planned unit development, a parcel of land, an area of water or a combination of land and water as designated by the plat or covenants.

PARKING SPACE.  An off-street, hard surfaced area designed and intended to be occupied by a parked vehicles, and which is a minimum of nine (9) feet by eighteen (18) feet in size for a regular space and twelve (12) feet by eighteen (18) feet for a handicap space.

BLM_0061514

PERMIT.   A document issued by the County which grants permission to perform an act or service which is regulated by the County.

PERMIT AUTHORITY.  The Board of County Commissioners of Ouray County.

PLAN.  The provisions for development of a planned unit development which may include, but need not be limited to, easements, covenants and restrictions relating to use, location and bulk of buildings and other structures, intensity of uses or density of development, utilities, private and public streets, ways, roads, pedestrian areas and parking facilities, common open space and other public facilities. PROVISIONS OF THE PLAN means the written and graphic materials referred to in this definition.

PLANNED UNIT DEVELOPMENT.  An area of land, controlled by one or more landowners, to be developed under unified control or unified plan of development for a number of dwelling units, commercial, educational, recreational or industrial uses, or any combination of the foregoing, the plan for which does not correspond in lot size, bulk or type of use, density, lot coverage open space or other restrictions to the existing land use regulations.

PLAT, FINAL.  A map, or maps, and supporting documentation of a land subdivision prepared in accordance with this Code, with necessary affidavits, dedication and acceptances and with complete bearings and dimensions of all lines defining lots and blocks, streets and alleys and public areas, intended as an instrument for recording with the County's Clerk and Recorder.

POTABLE WATER.  Water which complies with all requirements of the Colorado State Health Department for drinking water and related to chemical and bacterial content and which, in addition, complies with other potability standards which may be imposed by the Ouray County Commissioners, by resolution, from time to time.

PROPERTY LINE.  See "Lot Line".

PUBLIC HEARING.  A quasi-judicial public meeting held by an official County Board or Commission, at which time, citizens' testimony may be voiced concerning the subject of the hearing.

PUBLIC PARK OR WILDLIFE RESERVE.  Land set aside for general public recreational uses and/or preservation of wildlife habitat.

PUBLIC SERVICE FACILITY.  The use of structures and/or land by governmental or public service entities for fire protection, road and bridge operations, emergency medical services, police protection or other similar use that promotes the health safety and welfare of the general public.

PUBLIC UTILITY.  Transmission, generation and storage and treatment facilities of providers of electrical, water, gas, telephone and cable TV services and other like services.

BLM_0061515

PUD AGREEMENT.  One or more security arrangements which may be accepted by the County to secure the construction of such public improvements as are required by these regulations in conjunction with a development and shall include collateral, such as, but not limited to, performance or property bonds, private or public escrow agreements, loan commitments, assignments of receivables, liens on property, deposits of certified funds or other similar surety agreements.

PUD PLAN, FINAL.  A map or maps and supporting documentation of a proposed land development showing the character and layout of the property, including the exact location, size and dimensions of proposed buildings, yards, courts, parking, fences, common open space, water, and sanitary sewer facilities and other features; the proposed use of each building and area; the architectural elevations of buildings, indicating height, materials and color; detailed landscaping plan, if applicable; streets, curb cuts and alleys; utilities, drainage and other easements.  Where a Final Plat is required to accompany a Final PUD Plan, the two (2) may not be combined in one document, but must be two separate documents.

PUD PLAN, PRELIMINARY.  A map or maps and supporting documentation of proposed land development showing in conceptual form the character and layout of the proposed development including the approximate location, size and dimensions of proposed buildings, yards, courts, parking, fences, common open space, water and sanitary sewer facilities and other features; the proposed use of each building and area; the architectural elevations of buildings indicating height, materials and color; conceptual landscaping plan, if applicable; streets, curb cuts and alleys, utilities, drainage and other easements; and the relationship of the proposed development to adjacent areas which it may affect.

RESIDENTIAL DENSITY.  A statement of the average number of dwelling units per unit of area, usually a number of dwelling units per acre or the number of acres per dwelling unit.  Such density shall be calculated by dividing the "allowable area" by the number of dwelling units.

RESORT.  A commercial use including lodging, food service and recreational amenities provided on a short-term basis to tourists and other visitors.  Distinguished from hotels and motels by its emphasis on attracting guests for two or more nights and by the provision of more recreational activities.

RESORT CORE AREA.  That portion of an application for resort development containing the principal resort lodging and service uses, such as a hotel, recreational uses and structures containing restaurants, retail facilities and other uses.

RESORT, MULTI-SEASON.  A resort whose recreation amenities are designed to be used by tourists and other visitors during two or more seasons of the year.

REZONING.  The process by which the zoning classification of a zoning district is changed.  The process for rezoning is set out in Section 20.2.  Standards for consideration of a rezoning petition are set out in Section 20.3.  Submittal requirements for a petition to rezone are set out in Section 20.4.

BLM_0061516

RIGHT-OF-WAY.  The entire dedicated tract or strip of land that is to be used by the public for circulation and service.

ROAD.  See "Street".

ROCKFALL.  The relatively free falling or precipitous movement of a newly detached segment of bedrock of any size from a cliff or other very steep slope.

SAND AND GRAVEL OPERATION.  The extraction, processing and the transportation of rock and rock materials.

SCHOOL.  A private or public accredited facility for the education of young people (K-12).  The term school does not include home schooling of the children of the owner or lessee of a dwelling unit.

SCREENING.  The use of existing land forms, structures existing at the time of adoption of this Code, new structures conforming with all the provisions of this Code, natural vegetation or landscaping techniques consistent with the character of the area to shield a structure from view.

SITE SPECIFIC DEVELOPMENT PLAN.  A Special Use Permit granted pursuant to Section 5 of this Code or a Planned Unit Development, Final Development Plan or combined Preliminary/Final Development Plan application which has been submitted to Ouray County and has received approval or conditional approval by the Board of County Commissioners, a Development Agreement approved in accordance with Section 25 of this Code, or a Final Subdivision Plat approved as part of a Development Agreement approved pursuant to Section 25.6 of this Code shall constitute a Site Specific Development Plan.  No other plan, plat, application, submission or approval shall constitute a Site Specific Development Plan.  Final or conditional approval by the Board of County Commissioners creates vested rights pursuant to Article 68 of Title 24, as amended.  No other type of land-use application or approval shall be considered a Site Specific Development Plan.

SKETCH PLAN.  A map of a proposed subdivision, drawn and submitted in accordance with the requirements of this Code, to evaluate the feasibility and design characteristics of the proposed subdivision at an early stage in the planning.

SKYLINE.  The visual line where the earth or vegetation and the sky seem to meet.

SPECIAL USE.  A use allowed in the indicated zoning district only with permission by the County Commissioners.  Permission for a special use may be granted or denied in accordance with the basic purposes and intent of this Code.

START OF CONSTRUCTION.  Includes substantial improvement, and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, placement, or other improvement was within 180 days of the permit date.
The actual start means the first placement of permanent construction of a structure on a site, such as the pouring of slabs or footings, the installation of piles, the construction of columns, or any

BLM_0061517

work beyond the stage of excavation or the placement of a mobile home on a foundation. Permanent construction does not include the installation of streets and/or walkways; nor does it include excavation for a basement, footings, piers, or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main structure.

STREET.   A public roadway for vehicular traffic, whether designated as a street, highway, thoroughfare, parkway, road, avenue, boulevard, lane, place or however otherwise designated.

STREET, CUL-DE-SAC.   A minor street having one end open to vehicular traffic and having one closed end terminated by a turnaround.

STRUCTURE.   That which is built or constructed, an edifice or building of any kind, or any piece of work artificially built up or composed of parts joined together in some definite manner.

SUBDIVIDER.   Any person, firm, partnership, joint venture, association or corporation who shall participate as owner, promoter, developer, or agent in the planning, platting, development, promotion, sale or lease of a subdivision, whether immediate or future.   Where the party seeking approval of the subdivision is not the owner of the property in question, written consent for any subdivision shall be required from the owner of record of the property.

SUBDIVISION AND SUBDIVIDED LAND.

A.     Any parcel of land in the state which is to be used for condominiums, apartments or any other multiple-dwelling units, unless such land, when previously subdivided, was accompanied by a filing which complied with the provisions of this Code with substantially the same density, or which is divided into two (2) or more parcels, separate interests or interests in common, unless exempted under Paragraph (B), (C) or (D) of this definition.   As used in this definition, "interests" includes any and all interests in the surface of land, but excludes any and all subsurface interests.

B.     The terms "subdivision" and "subdivided land", as defined in Paragraph (A) of this definition, shall not apply to any division of land which creates parcels of land, each of which comprises thirty-five (35) or more acres of land and none of which is intended for use by multiple owners.

C.     Unless the method of disposition is adopted for the purpose of evading this section, the terms "subdivision" and "subdivided land", as defined in Paragraph (A) of this definition, shall not apply to any division of land:

(1)     Which creates parcels of land, such that the land area of each of the parcels, when divided by the number of interests in any such parcel results in thirty-five (35) or more acres per interest;

(2)     Which could be created by any court in this State pursuant to the law of eminent domain, or by operation of law, or by order of any court in this State if

22-11

the Board of County Commissioners of the county in which the property is situated is given timely notice of any such pending action by the court and given opportunity to join as a party in interest in such proceeding for the purpose of raising the issue of evasion of this section prior to entry of the court order; and, if the Board does not file an appropriate pleading within twenty (20) days after receipt of such notice by the court, then such action may proceed before the court;

(3)    Which is created by a lien, mortgage, deed of trust or any other security instrument;

(4)    Which is created by a security or unit of interest in any investment trust regulated under the laws of this state or any other interest in an investment entity;

(5)    Which creates cemetery lots;

(6)    Which creates an interest in oil, gas, minerals or water which is severed from the ownership of real property;

(7)    Which is created by the acquisition of an interest in land in the name of the husband and wife or other persons in joint tenancy or as tenants in common and such interest shall be deemed for purposes of this subsection as only one interest; or

(8)    Which is created by the combination of contiguous (common boundary) parcels of land into one larger parcel.  If the resulting parcel is less than thirty-five (35) acres in land area, only one interest in said land shall be allowed.  If the resulting parcel is greater than thirty-five (35) acres in land area, such land area, divided by the number of interests in the resulting parcel, must result in thirty-five (35) or more acres per interest.  Easements and rights-of-way shall not be considered interests for purposes of this subparagraph.

(9)    Which is created by a contract concerning the sale of land which is contingent upon the purchaser's obtaining approval to subdivide, pursuant to this Code and any applicable regulations, the land which he is to acquire pursuant to the contract.

(10)    Which creates parcel(s) of land as a result of the division of land or creation of a Planned Unit Development under the terms of this Code, when such parcel(s) is thirty-five (35) or more acres.  By way of example only, when there is a division of a parcel of land, which in its original configuration consists of fifty (50) acres, into a five (5) acre parcel and a forty-five (45) acre parcel, the five acre parcel would have to comply with all provisions of this Code concerning the division of land, while the remaining forty-five acre parcel would not be considered subdivided land or part of the subdivision or PUD.

BLM_0061519

D.     The Board of County Commissioners may, pursuant to rules and regulations or resolution, exempt from this definition of the terms "subdivision" and "subdivided land" any division of land if the Board of County Commissioners determines that such division is not within the purposes of this definition.

SUBSTANTIAL IMPROVEMENT.   Any repair, division, reconstruction or improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure either:

A.     Before the improvement of repair is started; or

B.     If the structure has been damaged and is being restored, before the damage occurred.  For the purpose of this definition, "substantial improvement" is considered to occur when the first alteration of any wall, ceiling, floor, or other structural part of the building commences, whether or not that alteration affects the external dimensions of the structure.

The term does not, however, include either:

(1)     Any project for improvement of a structure to comply with existing state or local health, sanitary or safety resolution specifications which are solely necessary to assure safe living conditions; or

(2)     Any alteration of a structure listed on the National Register of Historic Places or a State Inventory of Historic Places.

TEMPORARY USE.  Any use of land within Ouray County which:

A.     Will not continue for a period in excess of 180 consecutive days in any calendar year.

C.     Is not residential in nature.

D.     Does not emit or create excessive noise, smoke, dust, light or other pollutant.

E.     Will not permanently alter the land and does not require the use of permanent structures.

F.     Is not inconsistent with the purpose of this Code.

UNSTABLE OR POTENTIALLY UNSTABLE SLOPE.  An area susceptible to a landslide, a mudflow, a rockfall or accelerated creep of slope-forming materials.

USE BY RIGHT.  A use which is listed as a use permitted by right in any given zoning district in this Code.  Uses permitted by right are not required to show need for their location.

BLM_0061520

USEABLE PUBLIC OPEN SPACE.  Open area designed and developed for uses including, but not limited to, recreation, courts, gardens, parks and walkways.  The term shall not include space devoted to streets and parking and loading areas, but may include lands in their natural state.  The degree to which open space is "usable" will include consideration of its shape - where open space areas more square and less linear are more usable and size - where a smaller number of larger open space areas is considered more useable than a larger number of smaller areas.

UNINCORPORATED.  Situated outside of cities and towns, so that, when used in connection with "territory", "areas", or the like, it covers, includes and relates to territory or areas which are not within the boundaries of any city or town.

VARIANCE.   A grant of relief from the requirements of these regulations, excluding requirements pertaining to use, which permits construction in a manner that would otherwise be prohibited by this regulation.

VESTED PROPERTY RIGHT.  The right to undertake and complete the development and use of property under the terms and conditions of a Site Specific Development Plan.

VISUAL IMPACT.  The degree of contrast between an object or group of objects and the existing environment in the same locality.

WATER STORAGE:  All above ground water storage tanks for fire fighting purposes shall be of fireproof material.  All PUD water storage tanks shall be pumped or gravity fed into hydrant lines.

WILDLIFE HABITAT.  A geographical area containing those elements of food, water, cover, space and general welfare in a combination and in quantities adequate to support a species for at least a portion of a year.

22-14

Adopted by the Ouray County Board of County Commissioners on August 4, 1997.

## OURAY COUNTY ROAD STANDARDS

### SECTION 23

23.1   POLICIES AND PROCEDURES

    A.      PURPOSE

        (1)    This section sets forth the policies and procedures related to all public and private rights-of-way in Ouray County.  The intent of this section is to provide for a uniform road and right-of-way development policy throughout the unincorporated portions of Ouray County, and to provide a clear statement of the procedures for road and right-of-way development.

    B.      APPLICATION OF STANDARDS

        (1)    The requirements contained herein shall apply to all new construction of public roads, private rights-of-way and all other work affecting rights-of-way that are planned for or subject to present or anticipated public use within the jurisdiction of Ouray County, except roads used exclusively for mining, agriculture, farming, and ranching, or roads within the boundaries of one parcel of property. The foregoing exceptions shall not apply to any road, right-of-way or driveway which leads to any residential structure.

        (2)    This section applies specifically to (a) new roads and driveways within new subdivisions, (involving lots of 35 plus acres,) and Planned Unit Developments (PUDs); (b) new roads and driveways providing access to new single family residences, c) existing County roads that provide access to new subdivisions and PUDs; and, (d) new county roads and new extensions and/or upgrades of existing county roads.

        (3)    These requirements may be enforced by the County utilizing any legal and/or equitable remedy available under this Code, any Ouray County Code, Colorado State statute, or other Colorado law. These remedies include, but are not necessarily limited to, injunctive relief and/or suits for damages caused to County roads or rights-of-way.

BLM_0061522

[23.1C]        C.        <u>GENERAL POLICIES</u>

(1)        <u>NEW ROADS AND DRIVEWAYS WITHIN NEW
SUBDIVISIONS AND PUDS.</u> The capital cost of new roads within
new subdivisions and PUDs shall be paid for or bonded for by the
developer of such subdivisions and PUDs. No such roads may be
constructed except in conformance with the standards set out in
Section 23.2 and pursuant to a County permit.  Maintenance of
such roads shall be performed by the developer, homeowners or
homeowners' association until such time as said roads may be
accepted for maintenance by the County.

The capital cost of new driveways within new subdivisions and
PUDs shall be paid for by homeowners or by developers and shall
be constructed pursuant to a County Building Permit and the
standards set out in Section 23.2X.

(2)        <u>NEW ROADS TO NEW SINGLE FAMILY RESIDENCES.</u>
The capital cost of such roads shall be paid for by the owner of the
residence, and shall be constructed pursuant to a County Building
Permit and the standards set out in Section 23.2X.

(3)  <u>NEW DEVELOPMENT ACCESSED BY COUNTY ROADS.</u>
When a new subdivision/PUD is to be serviced by a county road,
the developer(s) of such new subdivision/PUD shall, as a condition
of County approval of such new subdivision/PUD, be subject to any
impact fee due in accordance with Section 23.5.  Wherever,
however, such developer proposes to reconstruct an existing
county road or constructs a new county road in accordance with the
standards contained in this Section, the County may, in
consideration of such proposal, waive all or a portion of any such
impact fee.  Nothing in this Section shall be construed so as to
prevent the County from denying or delaying development to insure
that the timing of development coincides with provision of adequate
access to County maintained County roads.

(4)        <u>NEW COUNTY ROADS OR EXTENSIONS TO
EXISTING COUNTY ROADS.</u>   All County roads built or extended
after the effective date of this Section shall meet all County
standards, except the County shall in no case be obligated by this
Section 23 to pave such roads and improvements/extensions.

(5)        <u>COUNTY ACCEPTANCE OF ROADS FOR
MAINTENANCE.</u>  The County will maintain only those roads
specifically accepted for maintenance by the Board of County

BLM_0061523

[23.1C(5)]   Commissioners. When accepted for maintenance by the County, the County will provide a rural level of maintenance as available funds, manpower, and equipment permit.  A rural level of maintenance means snowplowing during the day, repair and cleaning of drainage structures, and general maintenance of the roadway in the condition it was in when accepted for maintenance. Twenty-four hour snow removal and road sanding are <u>not</u> included.

(6)   <u>SAFETY AND EFFICIENCY.</u>  Safety and efficiency are primary concerns in roadway construction and improvements.

(7)   <u>COMPATIBLE AND INCOMPATIBLE USES.</u> Roads can and should be used to unite compatible uses and separate incompatible uses, to define neighborhoods, provide maximum mobility, and support development that is consistent with the County Master Plan.

(8)   <u>ATTRACTIVE TRAVEL CORRIDORS.</u> Design and planning of roadways which provide for attractive travel corridors and minimize terrain disturbance shall be encouraged.  To the extent required by Section 9 of the Ouray County Land Use Code, all road/private right-of-way/driveway development shall comply with the County's Visual Impact Regulations.

(9)   <u>FEDERAL AND STATE REQUIREMENTS.</u>  In addition to the costs of road improvements imposed by the County under this Code, the Developer(s) of a subdivision/PUD, as a condition of final subdivision/PUD approval, will be required to pay for the development, engineering, design and installation of any road or highway improvements which are imposed by governmental authorities other than the County.  These improvements may include, but are not limited to, accel/decel lanes, new or improved intersections, traffic control devices and other items.

D.   <u>COUNTY ROAD SYSTEM</u>

(1)   <u>Administration</u>.  The State of Colorado, by statute, authorizes the Board of County Commissioners to administer the County road system including, but not limited to, maintenance, layout, alterations, deletions, additions, property acquisition, and traffic regulation.

The Ouray County Planning Commission advises the Board  of County Commissioners in matters of route and circulation planning and development standards.  It may conduct public hearings

BLM_0061524

[23.1D(1)]   related to proposed road construction and changes. The County is responsible for planning for future County traffic circulation needs and establishing construction standards. In order to maintain a uniform road development policy throughout the unincorporated portions of Ouray County, the County Engineer and County Road Superintendent will review plans and conduct such inspections as may be necessary in order to ensure compliance with the provisions of this Section and the Land Use Code.  Generally, costs of such inspections and reviews may be imposed on the applicant in accordance with a fee schedule adopted by resolution of the Board of County Commissioners.

(2)   Functional Road Classification.  Roads in Ouray County are classified functionally as follows (examples as of the date of adoption of this Section):

(a)   Principal Arterials.  A principal arterial is a continuous access-controlled road which serves corridor movements having trip length and travel density characteristics indicative of statewide travel.  All principal arterials in the County are administered by the Colorado Department of Transportation: e.g., US Highway 550, Colorado State Highway 62.

(b)   Minor Arterials.  Minor arterials link cities and larger towns and other traffic generators such as major resort areas, providing intra-County service.  Minor arterials should provide for relatively high overall travel speeds with minimum interference to through movement.  There are no minor arterials in Ouray County.

(c)   Collectors.  A collector is a vicinity-wide  continuous access road connecting local access roads to arterials: e.g., the portion of County Road 1 from Fairway Pines to County Road 24.

(d)   Local Access Roads.  A local access road provides direct access from abutting properties to other roads: e.g., County Road 24 and most other County Roads.

(e)   Local Service Roads.  Two-lane roadways serving isolated areas that have little or no potential for future development and serve a minimal number of parcels of land: e.g., County Road 7.

23-4

BLM_0061525

[23.1D(2)(f)]      (f)   <u>Access Tracts.</u>  A two-lane roadway providing direct access from three or less single-family residences to other roads: e.g., County Road 7A.

      (g)   <u>Primitive Roads.</u>  Historic roads of a typical narrow, rough and sometimes steep nature, which access public lands or which provide alternative seasonal access: e.g., jeep roads.

(3)   <u>Ouray County Road Administrative Classifications.</u>  For administrative purposes, Ouray County roads are divided into the following types:

TYPE 1 - Type 1 roads are accepted for year-round maintenance by the County and provide all-weather routes for public traffic: e.g. County Road 1 and most other County Roads.

TYPE 2 - Type 2 roads are roads that may be maintained in the summer or winter only as available funds, manpower and equipment permit: e.g., Government Springs Road.

TYPE 8 - Type 8 roads are roads meeting minimum standards which are not maintained by the County:  e.g. most subdivision roads.

TYPE 9 - Type 9 roads are existing roads which do not meet current County standards and are not maintained by the County: e.g. County Road 22 extension.

(4)   <u>Design Capacities for Classes of Roadways.</u>  Table 1 presents the maximum allowable capacity for specific classes of roadways.

BLM_0061526

[23.1D(4)]

TABLE I

| Classification of Roadways Based on Traffic Count | |
|---|---|
| <u>Classification</u> | <u>ADT*</u> |
| Principal Arterial | 4401 - 10,000 |
| Minor Arterial | 1501 - 4,400 |
| Collector | 501 - 1,500 |
| Local Access | 101 - 500 |
| Local Service | 25 - 100 |
| Access Tracts | Less Than       25 |
| Primitive Roads | N/A |

*Average Daily Traffic   (Total number of vehicles passing a designated point in both directions during an average 24 hour period, from samples taken May - September)

(5)     <u>County Road Map.</u>  An official Ouray County road map showing all roads accepted for maintenance by the County together with their classification has been adopted by the Board of County Commissioners and is available at the Road Department Office.

E.     <u>NEW SUBDIVISION/PUD AND RESIDENTIAL ROAD DEVELOPMENT</u>

(1)     <u>General Procedures.</u> Before commencement of construction of a subdivision/PUD or residential road or development of a private right-of-way which is subject to the requirements of this Section, the applicant shall submit an application for a Road Development Permit to the Road and Bridge Department with copies to the Planning Office and County Engineer.  Said application shall comply with the submittal requirements and planning process as set forth in Section 23.1.E(2).  No construction shall be permitted until issuance of a Road Development Permit.

(2)     <u>The Planning Process.</u>  In all applications for a Subdivision/PUD or residential Road Development Permit, the following submittals are required at the respective stages of the Permit review process:

[23.1E(2)(a)]

BLM_0061527

(a)   Sketch Plan.  A review of conceptual plans for the proposed roadways, including but not limited to proof of legal access.

(b)   Preliminary Design.  Analysis of the density to be served, proposed classification and design speeds, preliminary alignments and road grades, a brief review of fiscal impact in relation to County road maintenance, and discussion of impacts to existing roadways and adjacent properties. See the Design Standards at Section 23.2 of these regulations for discussions of these requirements.

In the case of residential roads and subdivisions/PUD, involving no more than two residences, road standards and requirements are set out in Section 23.2(X) involving driveways.

(3)   Detailed Design.  Following preliminary design approval, and in accordance with the approved preliminary design, all design work is to be prepared and signed by a Professional Engineer registered in the State of Colorado.  Plans sufficiently detailed to facilitate review are to be submitted to the County Engineer for approval at least 60 days prior to anticipated construction; or, in the case of subdivisions or PUDs, in accordance with the submittal deadlines for consideration of, or recommendation for preliminary approval by, the Planning Commission.  Plan approval is valid for one year.  After one year, if construction is not started, the detailed design must be re-submitted and revisions in standards made in the interim shall apply.  Alternately, a phasing schedule may be submitted for approval.  Plans shall include the following:

(a)   Profiles for all roads, existing and proposed sewer and water lines, showing the grades; lengths of vertical curves; stationing and elevations of Begin Vertical Curve (BVC's), End Vertical Curve (EVC's) and Point of Intersection Vertical Curve (PIVC's); existing grade or ground lines by dashed line; culverts, structures, and other controls. Preferably, all profile views shall be drawn to a scale of 1" = 50' horizontal and 1" = 5' vertical on 24"x36" sheets.

[23.1E(3)(b)]

23-7

BLM_0061528

(b)      A description of at least two usable bench marks within 1/2 mile.  USGS or BLM are to be used when possible.

(c)      Layout of road showing length of tangents and curves, widths of rights-of-way, slope lines to prove that right-of-way width is sufficient, stationing of end of curve's and beginning of curve's, curve radii, delta angles, bearings, distances, centerline stationing at 100-foot intervals, dimensions of all road elements, curbs, gutters, utilities easements, and other structures.  Also to be shown are the limits and inclination of cut and fill slope with new and existing elevation contours, and the location and size of culverts designating the type and gauge or strength classification and the estimated flow (along with data assumed in estimating the flow.)

(d)      North arrow, scale, street names, drainage patterns, and typical road cross-sections.

(e)      Construction plans for all structures, bridges, box culverts, and guard rails, etc.

(f)      A letter of intent stating the scope and time element of each stage of construction.  A statement indicating the party or parties responsible for the construction.

(g)      Letters from utility companies, ditch companies, fire departments, and other interested parties or agencies involved, stating their approval of any structure constructed within their right-of-way or which may influence their rights or interests.

(h)      In the case of subdivisions/PUDs, a detailed cost estimate shall be submitted, if the construction is to be bonded or otherwise secured.

(i)      Roadways affecting other governmental agencies such as the U.S. Forest Service, the Colorado Department of Transportation, or Towns, shall require written notice to the affected agency.

(4)      Right-of-Way Dedication.   As a condition of the final approval of any subdivision/PUD, the Board of County

[23.1E(4)]

BLM_0061529

Commissioners shall require each developer to dedicate rights-of-way for public use on and along any and all existing roads that traverse the development, and those dedicated rights-of-way shall meet all standards in this Section 23.  In all other cases, the procedure shall be as follows:

    (a)    The applicant shall submit a written request to the Planning Department consistent with Planning Department submittal deadlines for the next regularly scheduled Planning Commission meeting stating the reasons for the request and including a map showing the topography and land parcels involved along with a copy of the proposed deed.

    (b)    The Planning Commission shall review the request, form a recommendation, and submit it to the Board of County Commissioners for consideration.

    (c)    Upon approval of the request by the Board of County Commissioners, the deed shall be recorded with the County Clerk and Recorder, and a copy of the deed shall be submitted to the County Road Superintendent.

(5)    <u>Bonding Requirements</u>.  The term "bond" shall apply to any escrow account or uncancellable surety secured unto the County and in a form acceptable to the County Attorney. Bonds shall be in the amount of the estimated construction cost plus contingencies as recommended by the County Engineer. Bonds shall be forfeited if work is not completed in accordance with approved plans and specifications or if, in the opinion of the County, the work is not progressing in a satisfactory manner.  As logical units of work are completed and approved by the County Engineer, application may be made for a partial release of the bond.

(6)    <u>Inspection of Work.</u>:  During construction of any road which will be dedicated to public use, the applicant's Design Engineer or its designated site representative and the County Road Superintendent, County Engineer or designated agents shall inspect the work of the contractor or contractors involved, The stages shall include, but not be limited to, each of the following:

    (a)    Staking

    (b)    Rough cut

[23.1E(6)(c)

    (c)    Subgrade preparation and drainage

BLM_0061530

(d)    Sub-base

(e)    Course

(f)    Paving

No work shall proceed on a subsequent stage until the County Road Superintendent or County Engineer has approved the previous stage. The applicant's Design Engineer shall notify the County at least 24 hours in advance that a stage is ready for County inspection. Such inspections shall include conformance with the requirements set out in Section 23.3

(7)    <u>Reports, Certifications, and Testing.</u> The applicant's Design Engineer shall:

(a)    Review and certify work completed prior to any request for partial release of bonds.

(b)    Certify that the road work is proceeding in conformity with the plans and specifications.

(c)    Certify that the road has been completed in accordance with the County Standards.

During construction, the County Engineer or Road Superintendent shall review the work and request the necessary documents or testing to verify that construction is proceeding in accordance with the approved plans and specifications.

Upon satisfactory completion of the work, the County Road Superintendent shall issue a certificate of completion based on the applicant's Design Engineer's certification and the County Engineer's approval.

(8)    <u>Acceptance for Maintenance.</u> The Board of County Commissioners shall have sole power and discretion to accept, or to deny acceptance of, any road's inclusion on the County Road System for maintenance purposes. Any petition for acceptance of maintenance shall be submitted to the County Planning Office with a copy to the County Road Superintendent. Such petition shall

[23.1E(8)]

23-10

BLM_0061531

include, at a minimum, an analysis of the proposed annual cost of maintenance of the road, coupled with an analysis of all sources of revenue which would be made available to the County for maintenance of the road should the County place it on the County Road System.  The Board, as a condition of acceptance of the road, may require a bonding or other agreement from the petitioner to ensure adequate funding of maintenance of the subject road where the above analysis indicates that there will be a shortfall of revenues available to the County for maintenance.  No road will be accepted for maintenance which does not meet the minimum standards as set forth herein, unless otherwise determined by the Board of County Commissioners.

F.    <u>COUNTY ROADS</u>

(1)    <u>New Development Accessed by County Roads:</u>  Where new development is accessed by existing and/or proposed County roads, the preliminary submittal, as required by Section 6 of this Code, shall include an analysis of the projected traffic volume resulting from such development.  Where the projected additional volume of traffic to result from such development (including subdivisions/PUDs, new residences, and new commercial development, (a) results in increased maintenance requirements or (b) is located in an area requiring construction and/or reconstruction of a County road or roads, the County shall, as a condition of final approval of such development, collect any impact fees due in accordance with Section 23.5.  In lieu of such impact fees, the County may allow such developer, at its expense, to bring such county road(s) up to the standards set out in this Section, providing the location of such roads is approved by the Board of County Commissioners.  Nothing in this Section shall be construed to prevent the County from denying or delaying development to insure that the timing of development coincides with the County's road improvement program.

(2)    <u>Road Encroachment Permits.</u>  Prior to performing any work within County Road rights-of-way, contractors, developers, utility companies, landowners or other governmental agencies shall be required to obtain a permit for such work from the County Road Superintendent.  The County may require a bonding or other surety agreement as a condition of the issuance of the permit in order to ensure restoration of the right-of-way to its prior condition after completion of the work.

(3)    <u>Road Vacations.</u>  Anybody wishing the County to vacate an existing County or other public road must apply for such vacation to the County Planning Department with a copy to the County Road and Bridge

[23.1F(3)]

BLM_0061532

Superintendent.  Such application shall include, at a minimum, a complete and accurate legal description of the road to be vacated, a list of all property owners of land adjacent to the roadway, a list of all known road users, a list of any utilities affected by the proposed vacation, and substantial evidence that vacation of the road will not leave any land adjoining said road without an established public road access or private-access easement connecting said land with another established road.  Upon receipt of a completed application, the Board of County Commissioners will follow the procedures for vacation of a road as set out in Colorado Revised Statutes, Section 43-2-303, (including notice to known road users).  The Board may, in its discretion, hold a public hearing on the application prior to taking action on any application for vacation of a County Road.  Upon vacation of a road, title to the vacated road shall vest in accordance with the provisions of Colorado Revised Statutes, Section 43-2-302.

23.2   ROAD DESIGN STANDARDS

A.   Purpose

This section sets forth specific standards for roadway design in Ouray County and is intended for use by design engineers.  These standards establish a level of roadway design to assure (a) the health, safety, and welfare of all County residents and (b) that County residents will not later need to rectify inadequately designed and constructed facilities.

B.   General Procedure

The design of a new road shall be based upon County projections of future development and densities and estimates of future traffic volumes, as well as the Road Design Standards set out below.  The road classification and terrain category determine the geometric cross-section and maximum sustained grades, while the design speed determines minimum or maximum standards for elements of alignment such as stopping and passing sight distances, radii of curvature, tangent lengths, and super elevation transition lengths.

C.   Basic Design Policies

(1)   Projected Traffic Volumes.  Table 2 presents traffic generated for various types of development.  For example, residential property is stipulated to generate an Average Daily Traffic (ADT) count of seven (7) trips per living unit.  These per unit ADT counts shall be applied to generate estimates of traffic

[23.2C(1)]

BLM_0061533

volumes.  When per unit ADT counts are not listed for a type of development, the design engineer shall propose a per unit ADT for approval.

PER UNIT AVERAGE DAILY TRAFFIC (ADT) TABLE 2

| Land Use | UNIT | ADT | ITE |
|---|---|---|---|
| 1.  Residential<br><br>a.  Single Family<br>b.  Apartments<br>c.   Condominiums | <br><br>Trips/D.U.<br>Trips/D.U.<br>Trips/D.U. | <br><br>7 ADT/DU<br>6 ADT/DU<br>7 ADT/DU | <br><br>210<br>220<br>230 |
| 2.  Commercial<br><br>a.  Retail Shop<br>b.  Eat and Drink<br>c.  Business Office | <br><br>Trips/1000 ft$^2$<br>Trips/1000 ft$^2$<br>Trips/1000 ft$^2$ | <br><br>60  ADT/1000 Ft$^2$<br>90 ADT/1000 Ft$^2$<br>20 ADT/1000 Ft.$^2$ | <br><br>810<br>831<br>710 |
| 3.  Schools | Trips/Student | 1 ADT/Student | 520 |
| 4.  Ski Areas | Trips/Skier Per Hour of Ski Lift Capacity | .6 ADT/Skier Per Hour Of Capacity | |
| 5.  Other<br>    Public/Recreational | | See ITE Manual | |

ADT = Average Daily Traffic (number of trips)
D.U. = Dwelling Units
ITE   = Category reference number, Institute of Transportation Engineer Trip Generation 5th Edition
Ft$^2$    = square feet

[23.2C(2)]

BLM_0061534

(2)     Road Classification.  The classification of a proposed road shall be based on the estimated design year traffic volumes and the functional characteristics of the road.  Table 1 in Section 23.1D(4) specifies the maximum design capacities for the various classes of roadway.

(3)     Surfacing Requirement.  All roads dedicated for public use within new subdivisions and PUDs of 4 or more lots in Ouray County shall have paved surfaces.  Other roads in such subdivisions or PUDs may have a gravel or paved surface. Surfacing requirements for roads other than those within such subdivisions or PUDs shall be based upon the recommendations of the Director of Planning, the County Engineer and the County Road Superintendent, after review of any County-wide transportation plan and the level of projected vehicle use.

(4)     Rights-of-Way.  The basic minimum right-of-way widths are specified in Section 23.2Q, Figures 1 through 6.  Additional rights-of-way shall be provided for drainage improvements, cuts or fills, intersections, curb returns, snow storage, and other road appurtenances.

(5)     Cul-de-Sacs. .  Cul-de-sac streets shall be a maximum of one thousand three hundred twenty feet (1,320 feet) long, unless existing conditions justify a variation from this requirement, in which case the Board of County Commissioners may grant an exception thereto.  Cul-de-sac turn-arounds shall be provided with a minimum road surface of ninety (90) feet in diameter and a minimum right-of-way of one hundred (100) feet in diameter, wherever the County considers the interest of public safety require them.   Adequate snow storage shall be provided at turn-arounds.

(6)     Hammerhead or Y-Turnaround.  In areas where a circular cul-de-sac turnaround is impractical because of topographical constraints, a hammerhead or Y-turnaround may be used, provided it is approved by the County.  The design of the turnaround shall allow for Wheelbase-50 feet vehicles to turn around by backing once.

(7)     Frontage Roads.  Where a subdivision abuts a street or highway of major importance, the County may require parallel frontage roads or may limit the right of access to said street or highway.

[23.2C(8)]

BLM_0061535

(8)   <u>Curbs and Gutters.</u>  Concrete curbs and gutters shall be required along all streets and highways in business areas and along all streets and highways in residential areas in subdivisions of three (3) or more lots per net acre.  Curbs and gutters may be eliminated where the County finds them impractical or unnecessary.

(9)   <u>Sidewalks</u>

(a)   Sidewalks eight feet (8') in width may be required along all business streets.

(b)   Sidewalks four feet (4') in width may be required (a) on both sides of all residential streets where population densities are projected to be equal to or exceed four (4) families per gross acre or where the lots or building sites in general have street frontages of sixty-five feet (65')or less, and (b) on any major street where population densities are projected to be equal to or exceed three (3) families per gross acre.

(c)   Where required, sidewalks, curbs and gutters shall be constructed of Class B concrete, or other County approved materials. Curb treatment, suitable to meet disability access, shall be used on all returns at street intersections.  Curb treatment shall be required at driveway entrances.

(d)   Sidewalks of a width acceptable to the County may also be required through the center of long blocks, to connect cul-de-sac streets, and to provide access to school, park, playgrounds, river and/or lake areas.

(e)   Sidewalks may be eliminated where the County finds them impractical or unnecessary.

D.   <u>Route Corridor and Terrain Factors</u>

The entire route corridor of a road shall be considered when establishing the terrain factor.  The Colorado Department of Transportation considers most county roads in Ouray County as being in mountainous terrain. Shorter roads, such as subdivision roads, may fall entirely in the level terrain category.

[23.2D(1)]

BLM_0061536

(1)　Level terrain is that condition where road sight distances, as governed by both horizontal and vertical restrictions, are generally long or could be made to be so without construction difficulty or major expense.

(2)　Rolling terrain is that condition where the natural slopes consistently rise above and fall below the road grade line and where occasional steep slopes offer restriction to normal horizontal and vertical alignment.

(3)　Mountainous terrain is a condition where longitudinal and transverse changes in the elevation of the ground with respect to the road are abrupt and where the roadbed is obtained by frequent benching or side hill excavation.

E.　Design Speed

The selection of design speed is influenced principally by the character of terrain, traffic volumes, and economic considerations.  Table 3 recommends appropriate ranges of design speeds for various conditions.

TABLE 3
DESIGN SPEEDS MPH

| ADT | 0-25 | 25-100 | 25-250-500 | 500-1000-1500 | 1500-4000+ |
|---|---|---|---|---|---|
| Level | 30 | 30 | 30 to 40 | 50 to 55 | 55 to 65 |
| Rolling | 20 | 25 | 25 to 30 | 40 to 45 | 50 to 55 |
| Mountainous | 15 | 20 | 20 to 25 | 30 to 35 | 40 to  45 |
|  | Access Tract | Local Service | Local Access | Collector | Minor Prncl Arterial |

[23.2F]

23-16

BLM_0061537

F.    Grades

Road grades shall not exceed the values shown in Table 4.

TABLE 4

MAXIMUM ROAD GRADES (%)

Design Speed MPH

| Type of Terrain | 15 | 20 | 25 | 30 | 35 | 40+ | 50+ |
|---|---|---|---|---|---|---|---|
| Level | 8 | 8 | 7 | 6 | 5 | 4 | 3 |
| Rolling | 8 | 8 | 8 | 7 | 6 | 5 | 4 |
| Mountainous | 10 | 10 | 9 | 8 | 8 | 7 | 6 |

G.    Sight Distance

Minimum stopping sight distance and passing site distance shall be as shown in Table 5.

Criteria for measuring sight distance, both vertical and horizontal, are as follows: For stopping sight distance, height of eye, 3.75 feet, and height of object, 0.5 feet; for passing sight distance, height of eye, 3.75 feet, and height of object, 4.5 feet.

[23.2G]

BLM_0061538

TABLE 5

## MINIMUM SIGHT DISTANCES IN FEET

| Design Speed, MPH | 15-25 | 30 | 40 | 50 |
|---|---|---|---|---|
| Stopping Sight Distance | | | | |
| Minimum Stopping Sight Distance, feet | 150 | 200 | 275 | 350 |
| K value for* | | | | |
|     Crest vertical curve | 16 | 28 | 55 | 85 |
|     Sag vertical curve | 24 | 35 | 55 | 75 |
| Desirable Stopping Sight Distance, feet | 150 | 200 | 300 | 450 |
| K value for | | | | |
|     Crest vertical curve | 16 | 28 | 65 | 145 |
|     Sag vertical curve | 24 | 35 | 60 | 200 |
| Passing Sight Distance | | | | |
| Passing distance, feet | | | | |
| 2-lane | | 1100 | 1500 | 1800 |
| K-value for: | | | | |
| Crest vertical curve | | 365 | 686 | 985 |

 *NOTE:  K value is a coefficient by which the algebraic difference in grade may be multiplied to determine the length in feet of the vertical curve which will provide minimum sight distance.

H.      <u>Alignment</u>

     Alignment between control points should be to as high a standard as is commensurate with topography, terrain, design traffic, and reasonably obtainable right-of-way.  Sudden changes between curves of widely different radii or between long tangents   and sharp curves should be avoided.  Insofar as feasible, the design should embody frequent passing opportunities.  Where crest vertical curves and horizontal curves occur at the same location, there should be above-minimum sight distance design to assure that the horizontal curve is visible as drivers approach.

     Depending on the maximum superelevation value, the maximum curvature for different design speeds shall be as shown in Table 6.

BLM_0061539

TABLE 6

DEGREE OF CURVE AND RADIUS
FOR DIFFERENT VALUES OF SUPERELEVATION

| Design Speed(MPH) | Maximum e* | Minimum Radius (Rounded) (Feet) | Maximum Degree Of Curve (Rounded) Degrees) |
|---|---|---|---|
| 15 | .06 | 100 | 53.5 |
| 20 | .06 | 115 | 50.0 |
| 25 | .06 | 175 | 35.0 |
| 30 | .06 | 275 | 21.0 |
| 40 | .06 | 510 | 11.5 |
| 50 | .06 | 830 | 7.0 |
| | | | |
| 20 | .08 | 100 | 53.5 |
| 30 | .08 | 250 | 23.0 |
| 40 | .08 | 460 | 12.5 |
| 50 | .08 | 760 | 7.5 |
| | | | |

*NOTE:  e = rate of roadway superelevation, foot per foot

I.      Road Surface Classification

Road surfaces are classified as follows:

(1)     Low.  Low type surfaces are those with surface treated earth surfaces and those with loose surfaces such as gravel.

(2)     Intermediate.  Intermediate type pavements are those designed to retain smooth riding qualities and good non-skid properties in all weather under light and low traffic volumes.

(3)     High.  High type pavements are those that retain smooth riding qualities and good non-skid properties in all weather under heavy traffic volumes and loadings with little maintenance.

J.      Traveled Way Crown

Pavement or surfacing crown should be adequate to provide proper drainage.  Normally, cross slopes should be as shown in Table 7.

BLM_0061540

TABLE 7

NORMAL PAVEMENT OR
SURFACING CROSS SLOPES

|  | Range in Rate of Cross Slope | |
|---|---|---|
| Surface Type | Inch Per Foot | Foot Per Foot |
|  |  |  |
| High | 3/16 - 1/4 | .015 - .02 |
| Intermediate | 3/16 - 3/8 | .015 - .03 |
| Low | 1/4 - 1/2 | .02 - .04 |

K.      Superelevation

For roads where snow and ice conditions prevail, the superelevation should not be more than 0.08 feet per foot.

Superelevation runoff is the length of highway needed to accomplish the change in cross slope from a normal crown section to a fully superelevated section.

Minimum lengths of runoff are shown in Table 8.  Adjustments in design runoff lengths may be necessary for smooth riding, surface drainage, and good appearance.

L.      Number of Lanes

The number of lanes shall be sufficient to accommodate the design volume.  The majority of roads in Ouray County will be two lanes.  Where more than two lanes are warranted to accommodate design volumes, determinations of design are to be made as indicated in "Design Standards for Highways Other Than Freeways."  The Planning Commission may recommend, with approval of the Board of County Commissioners, sections of one-lane road if the entire road falls under the Access Tract standard and special conditions exist.  Roads with one-lane sections will not be accepted by the County as rights-of-way or for maintenance and must meet the following conditions:

        (1)      The section of road which is one lane must have its entire length visible from either end of the two-lane portion.

BLM_0061541

[23.2L]     (2)    All Access Tract standards for sight distance, curve radii, shoulder, ditch, etc., must be met.

(3)    The driving surface must be at least 12-feet wide, with turnouts at 400-foot intervals.  Turnouts will be 8-feet wide and 30-feet long.

(4)    Guard rails may be required along the entire substandard section.

M.     Width of Driving Surface, Shoulder and Roadway

The widths of driving surfaces and of graded usable shoulders for various traffic volumes and design speeds shall be at the minimums shown in Table 8.  Graded shoulder width is measured from the edge of surfacing (pavement) to the point of intersection of shoulder slope and side slope. In mountainous terrain, with a minimum 2-foot shoulder, the graded width of shoulder in cuts may be decreased 2 feet if a guard rail is installed. (Note: A guard rail shall not be closer than 2-feet to the driving surface.)

TABLE 8
MINIMUM LENGTH FOR SUPERELEVATION
RUNOFF FOR TWO LAND PAVEMENTS

|  | Length of runoff in feet for design speed, MPH, for: | | | |
|---|---|---|---|---|
| Superelevation Rate | 10 | 30 | 40 | 50 |
| Foot per foot |  |  |  |  |
| .02 | 50 | 100 | 125 | 150 |
| .04 | 50 | 100 | 125 | 150 |
| .06 | 50 | 110 | 125 | 150 |
| .08 | 50 | 145 | 170 | 190 |

The minimum roadway width is the direct sum of the surfacing and graded shoulder widths shown below.  Desirable design widths include at least those shown in Table 9.

TABLE 9

WIDTH OF SURFACING AND GRADED SHOULDER

|  |
|---|

BLM_0061542

| Width in Feet for Design Volume of: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ADT Range | 0-25 | 25-100 | 100-250 | 250-600 | 600-1000 | 1000-2500 | 2500-4400 | Over 4400 |
| Width of Driving Surface (Feet) Design Speed | | | | | | | | |
| 15  (MPH) | 16 | -- | -- | -- | -- | -- | -- | -- |
| 20 | 16 | 18 | 22 | 22 | 24 | 24 | 24 | 24 |
| 30 | 16 | 18 | 22 | 22 | 24 | 24 | 24 | 24 |
| 40 | -- | | 24 | 24 | 24 | 24 | 24 | 24 |
| 50 | -- | | 24 | 24 | 24 | 24 | 24 | 24 |
| Width of Shoulder (Feet) | | | | | | | | |
| All Speeds | 2 | 2-4 | 2-4 | 2-6 | 4-6 | 6-8 | 6-8 | 8 |

N.      Switchbacks

Switchbacks are not considered a good roadway design solution in gaining elevation.  When used, no switchback shall have a tangent less than 1/4 mile from the last switchback.  This is especially important on hillsides steeper than 20% where switchbacks create major visual impairments.

O.      Vertical Clearance

Vertical clearance at underpasses, power lines, street lights, etc., shall be at least fifteen (15) feet over the entire roadway width.

P.      Intersection Design

The location of intersections shall be carefully selected to avoid steep profile grades and to insure that there is adequate approach sight distance to the intersection.  An intersection should normally not be located on a short crest vertical curve, just beyond a short crest vertical curve, or on a sharp horizontal curve. Where there is no practical alternative to such a location, the approach sight distance on each leg should be checked carefully.  Where necessary, cut slopes should be flattened and horizontal or vertical curves lengthened to provide additional sight distance.  There should be sufficient sight distance to permit a passenger vehicle on the minor leg of the intersection to cross the traveled way without requiring the through approaching traffic to slow down.  As a general rule, there should be a minimum of 6 to 7 seconds available to the driver crossing the through lanes.  On this basis, the suggested corner sight distance for each design speed would be as follows:

TABLE 10

BLM_0061543

## SUGGESTED CORNER SIGHT
## <u>DISTANCE AT INTERSECTIONS</u>

| Design Speed MPH | Minimum Corner Intersection Sight Distance, in Feet* |
|---|---|
| 60 | 600 |
| 50 | 500 |
| 40 | 400 |
| 30 | 300 |
| 20 | 200 |

*NOTE:   Corner sight distance is measured from a point on the minor road at least 15 feet from the edge of the major road pavement and measured from a height of eye to 3.75 feet on the minor road to a height of 4.5 feet on the major road.  See Figure VIII-5, Page 398, "A Policy on Geometric Design of Rural Highways."

Intersections should be designed with a corner radius of the pavement or surfacing that is adequate for the larger vehicles anticipated; usually, a minimum edge radius of 40 feet is applicable.  Where turning volumes are significant, consideration should be given to speed-change lanes and channelization.

Intersection legs that will operate under STOP control preferably should be at right angles.

Intersections shall be constructed at no more than 2% grades for at least 20 feet (plus or minus 2% for each 10 miles per hour of design speed of the road prior to the intersection for arterial and collection roads).  In mountainous terrain, for local access, local service, and access tract roads, all grades shall flatten to 4% or less for at least 50 feet approaching intersections and 25 feet from cul-de-sacs.

[23.2Q]

Q.    <u>Typical Drawings</u>

Figure 1 -- Typical Roadway Cross Section
Figure 2 -- Access Tract
Figure 3 -- Local Service Road
Figure 4 -- Local Access Road
Figure 5 -- Collector
Figure 6 -- Minor Arterial
Figure 7-- Principal Arterial
Figure 8 - Level or rolling terrain
Figure 9 - Mountainous terrain

BLM_0061544

[23.2R]

R.    Side Slopes

Cut and fill slopes shall be as shown on the typical sections in Figures 1 through 7.  In unstable soils, flatter slopes may be required.  Where heavy snowfall is expected, flatter slopes in cuts on the southern side of the roadway should be used to provide maximum exposure to the sun.  Flatter slopes should be used wherever possible to reduce erosion, to decrease maintenance costs, to facilitate plant growth, and to provide for safer operation.

Transition slopes shall be provided between adjoining cuts and fills and should be designed for pleasing appearance.  Where cut or fill slopes intersect the original ground surface, the cross-section shall be rounded to blend the slope into the natural ground surface.  Any cut or fill slope steeper than 2:1 must be supported by an engineering report certifying the stability of the side slope.  Any retaining structures used to stabilize cut or fill sections must be designed by a professional engineer.

Benching of side slopes should be used sparingly and only where they are justified by sound engineering reasons, including the following:

(1)    To compensate for unstable material where benching is more economical than flattening;

(2)    To intercept drainage in long and deep cuts;

(3)    To intercept and store loose material.

(4)    To mitigate visual impacts where road cuts and fills may create a significant impact (in this case the use of benches and cribbing may be required).

Where a cut or fill road slope is outside the normal right-of-way of a road, then a slope easement shall be provided of sufficient width to permit maintenance of the slopes.

S.    Structural Section

The roadway structural section shall be designed on the basis of a qualified engineer's analysis approved by the County Engineer in accordance with the following section.  At a minimum, the structural section elements shall include asphalt, road base, and subbase of the depths shown for the roadways classification illustrated in Section 22.2Q, Figures 2 through 6.  All new subdivision and PUD roads with an ADT less

BLM_0061545

[23.2S]

than 25 need not be paved.  All such roads with an ADT between 25 and 100 shall be paved with a minimum of 2.5 inches of asphalt, and all those with an ADT greater than 100 shall be paved with a minimum of 3.0 inches of asphalt.  In the alternative, a qualified engineer may propose alternative structural section elements for consideration by the County Engineer, but in no event shall the thickness of asphalt be less than that specified in this Subsection S.

T.      Flexible Pavement Design

The California Bearing Ratio Method (CBR) and the Hveem Stabilometer Method may be used.  Supporting test data and calculations shall accompany all requests for approval of a designed structural section.

(1)     Hveem Stabilometer Method.  The stabilometer procedure of the California Department of Transportation or the method as outlined in the Colorado Department of Transportation's Roadway Design Manual, may be used.

The specific regional factors for Ouray County are as follows:

| 1.  annual precipitation | .5 |
|---|---|
| 2.  elevation - up to 9,500 feet | 1.5 |
|          over 9,500 feet | 1.0 |
| 3.  local drainage - very poor | 2.0 |
|          poor | 1.0 |
|          fair | .5 |
|          good | .25 |

The required factor used shall be the sum of the three (3) factors selected.

(2)     California Bearing Ratio Method.  The California Bearing Ratio Test shall be performed in accordance with the procedures outlined under AASHTO Designation T193-721.

(3)     Unusual Soil Conditions.  Regardless of the method used for design of the pavement, special consideration shall be given to unusual conditions such as instability of fills and slopes, earth slumping, permeability, capillary and frost heave, elasticity, and permafrost.

[23.2U]

BLM_0061546

U.     Drainage

(1)     General Policy.  The primary objective of drainage design shall be the protection of County roads and property while minimizing possible flood damage to surrounding properties and structures.  It should be emphasized that good drainage is one of the most important factors in road design.  It preserves the appearance as well as the level of service of the road while minimizing maintenance costs.

Culverts under all roads are to be designed to accommodate a 25-year frequency storm run-off utilizing the maximum head.  The maximum available head shall be determined by the uppermost ponding elevation chosen to prevent flood damage to upstream properties.

Inlets and other facilities draining the road surface shall be designed to accommodate the 10-year frequency storm run-off.  All roads are to remain free of ponding.

All drainage installations shall be designed to permit free, un-obstructed passage of debris and silt or provide for their deflection and/or collection at a point upstream in a manner that will not create an expensive maintenance problem.  Settlement basins are to be provided when a silting problem may exist downstream.

Modification of natural channels or transferring run-off from one basin to another is not permitted except where no reasonable alternative exists and where the proposal has been reviewed and approved by the County Engineer.

(2)     Storm Run-Off Estimates.  The following three methods may be used for estimating peak flows.

(a)     Run-off from stream records.

(b)     Natural Resource Conservation Service Method. This method is applicable to water sheds smaller than 1,000 acres, and expresses run-off in terms of geographical position, drainage areas and land use.  See Colorado State Department of Highway Roadway Design Manual.

[23.2U(2)(c)]

BLM_0061547

(c)      Rational Method.  Utilizes the formula:   $Q = CiA_d$

where:      $Q$ = run-off, $ft^3$/sec
$C$ = a "run-off" coefficient expressing the ratio of rate of run-off to rate of rainfall
$i$ = intensity of rainfall, in/hr, for a duration equal to the time of concentration
$A_d$ = drainage area, acres

Coefficients for the Rational Method Formula are given in Table 12. Rainfall intensity is obtained from records of nearby weather stations in the form of graphs showing rainfall intensity in relation to rainfall duration for various recurrence intervals.  Selection of the value for rainfall intensity is based on estimates of the acceptable frequency of occurrence and on the time of concentration for the area.   The latter is the time required for water to reach the outlet from the most remote point in the basin.

The application of this method should be confined to drainage areas of less than 200 acres.

TABLE 12

COEFFICIENTS OF RUN-OFF

| Type Of Drainage Area | C |
|---|---|
| Concrete or Bituminous Pavement | .8 - .9 |
| Gravel Roadways | .4 - .6 |
| Bare Earth (high values for steep slope | .2 - .8 |
| Turf Meadow | .1 - .4 |
| Cultivated Fields | .2 - .4 |
| Forest | .1 - .2 |

(3)      Culverts.  Culverts are to be located at each natural draw or water course as conditions warrant to prevent excessive accumulation of flow in roadside ditches or along the toe of slopes. Draws and water courses are to be cleared of debris for a distance of 100 feet upstream from all culvert inlets.

Inverts at the inlet should be slightly elevated above the normal flow line in steep or natural draws to avoid plugging by debris.

[23.2U(3)]

BLM_0061548

Inlets are not to be elevated in those instances where ponding or backwater curves would be objectionable (stagnation, irrigation ditches, etc.).

The culvert should slope downward in the direction of natural flow and be designed to be self-cleaning whenever possible.  The outlet should be designed not to discharge on unprotected fills or unstable material or at adverse angles to streams or open channels. Headwall, riprap, or other means of protection are required at inlets or outlets where erosion might occur.

Velocities of flow in culverts shall be calculated using acceptable design charts or formulas.  Where the Manning Equation is used, the following "n" values shall apply:

TABLE 13

MANNING EQUATION "n" VALUES

| Material | "n" |
|---|---|
| Corrugated Steel Pipe | .027 |
| Reinforced Concrete Pipe | .013 |
| Concrete (smooth-rough) | .013 to .020 |
| Asphalt | .016 |

Corrugated metal pipe as specified by the "Standard Specifications for Road and Bridge Construction", CDOT, shall be used.  Steel pipe shall be asphalt coated or paved where soils are corrosive or other conditions exist that may attack the steel.  Aluminum and other pipe materials are not permissible for road culverts that are to be maintained by the County.

The minimum diameter for round pipe shall be 18 inches.  The minimum rise of arch pipes and box culverts shall be 12 inches.

When a battery of pipes is used, a clear spacing of 1/2 the pipe diameter (1 foot minimum, 4 foot maximum) must be provided between pipes.  Minimum and maximum cover, pipe metal gauge, and strength classification shall be as specified in M 603-1 (CDOT) Metal Culvert Pipe.

[23.2U(4)]

BLM_0061549

(4)   Open Channels and Ditches.  Channels and ditches are to be designed to avoid roadside safety hazards. The minimum flow line slope shall be 2% if the channel is paved and 3% for channels of other materials.  Maximum slopes shall be controlled by the maximum permissible velocities given in Table 14.  Greater velocities of flow will require appropriate channel protection.

Mannings equation shall be used to estimate velocities.

$$v = \frac{1.486\ R^{2/3}\ S^{1/2}}{n}$$

Where:    v = velocity of flow in channel in feet per second
              n = roughness coefficient
              R = hydraulic radius in feet
              S = slope in feet per foot

TABLE 14

MAXIMUM PERMISSIBLE VELOCITIES

| Channel Material | "n" | Velocity (ft/sec) |
|---|---|---|
| Silt | .025 | 2.0 |
| Sand | .030 | 2.5 |
| Smooth, Stiff Clay | .025 | 4.0 |
| Fine Gravel | .035 | 3.5 |
| Coarse Gravel | .040 | 4.5 |
| Small, Sharp-edges Rocks | .070 | 6.0 |
| Cobbles and Shingles | .060 | 6.0 |
| Shales and Hardpans | .030 | 6.0 |

(5)   Subsurface Drainage.      Subgrades subject to poor drainage, underground seepage, or a high water table must be adequately drained for roadbed stabilization.  Drains must be installed to prevent the high ground water level from coming within 4 feet of the roadway pavement.  Perforated pipe should always be used to carry away collected water.  French drains which contain no pipe are unsatisfactory.

V.     Bridges

Bridges are to conform to Colorado Department of Transportation requirements and specifications.  Plans are to be prepared by a qualified structural engineer and are to be submitted to the County Engineer for

[23.2V]

review and approval.  Clear deck width must accommodate the full width of the traveled lanes and shoulders of approach roads.

BLM_0061550

Pedestrian walkways and railings shall be required as warranted.  Flared approach railings are to be provided on the side opposing traffic flow.

The waterway area shall accommodate a 100-year frequency storm. Where flood studies from the U.S. Army Corps of Engineers are available, bridges shall be designed to accommodate the "Standard Project Flood". A minimum of one foot freeboard is required.  Additional freeboard will be required when debris-laden flows are anticipated.

W.    Traffic Control Devices

All signs, striping, markers, delineators, signals, and other traffic control devices are to conform to the requirements of the Manual on Uniform Traffic Control Devices published by the U.S. Department of Transportation's Federal Highway Administration.  In new developments, all required street sign names, speed limit signs, stop signs and other traffic control devices are to be installed and paid for by the developer. Non-standard signs or other traffic control devices are subject to State control, and approval by the County Engineer must be obtained for their use.  Requests for non-standard signs or other devices must be submitted to the County Engineer along with all data required to support the request.

X.    Driveways

Prior to development of a driveway accessed directly from a County maintained road or any public road in a subdivision or PUD, or to access a residence outside a subdivision or PUD, land owners, contractors or others must obtain a Driveway Permit from the County Road Department and meet the following standards.  The standards set forth in this Section 23.2X shall only apply to a driveway which serves no more than two (2) single family dwellings.  Any driveway/road which serves more than two (2) single family dwellings shall comply with the applicable road standards as set forth in this Code.

The standards for driveways are:

(1)    Driving surface shall be at least twelve feet (12') wide.

(2)    Interior radii shall be at least thirty-two feet (32').

(3)    The driveway opening at least sixteen feet (16') wide;

[23.2X(4)]

(4)    Grades shall not exceed twelve percent (12%) for all new subdivision lots.

BLM_0061551

(5)     All entrances and exits must be located and constructed in such a way that vehicles approaching or using them will be able to obtain adequate sight distance in both directions along the roadway.  (This is necessary to maneuver safely and not  interfere with roadway traffic).

(6)     Angle of approach from an adjacent roadway shall be between sixty (60) and ninety (90) degrees.

(7)     A crown or cross-slope shall be provided to discourage runoff on to adjacent roads;

 (8)     No features shall be allowed that interfere with the drainage system of the adjacent street or roadway.  The developer or owner of a residence shall provide, at his/her/its expense, drainage structures that will become integral parts of the existing street or roadway drainage system, and the dimensions of all drainage structures must be approved by the County Road Department prior to installation.

(9)     When there are steep grades or other potentially hazardous or unusual geologic features, as a condition of preliminary approval of a subdivision/PUD, the County may require the developer to demonstrate that driveways to individual proposed lots will meet the standards contained in this Section.

Y.     Revegetation and Erosion Control

(1)     Revegetation and reforestation within a road right-of-way shall be required utilizing native or similar horticultural material and shall be completed during the first planting season after construction.  All areas disturbed by construction operations and not otherwise covered by structures or pavement shall be topsoiled, seeded, fertilized, mulched, planted, and otherwise treated to provide an established stand of grass.  Cut and fill slopes shall be treated to prevent erosion.  Areas not disturbed by construction shall be left in their present vegetative state, except that thinning of trees may be required.

[23.2Y(2)]

BLM_0061552

(2)     The developer or landowner shall be responsible for the maintenance and restoration of such revegetation for a maximum of two planting seasons thereafter.

(3)     Rights-of-way shall be cleared to the minimum width necessary to construct the roadway, to provide for drainage and to provide adequate snow storage.

Z.     <u>Guard Rails</u>

(1)     <u>General.</u>  Guard rails may be required to prevent accidents by delineating the roadbed, to reduce accident severity by deflecting vehicles into safer paths, and to reduce the rate of deceleration in the case of impending collisions with fixed objects.

When guard rails are used in conjunction with roadside curbs, the face of the guard rail shall be flush with the face of the curb regardless of shoulder width.  This is to prevent the take-off ramp effect which may turn a vehicle over.  When no curb is present, the face of the guard rail shall be flush with the edge of the shoulder.

(a)     On curves requiring a reduction in approach speeds, any one of the following conditions indicates that consideration should be given to the installation of a guard rail on the outside of the curves:

(I)     Height of embankment is more than 10 feet.

(ii)     Side slopes are steeper than 4:1.

(iii)     Shoulder or pavement widths are substandard.

(iv)     Roadside hazards are present.

(b)     Whether on curves or tangents, consideration should be given to the installation of guard rails if there is a history of roadway accidents or if unusually high embankments or steep terrain give motorists a feeling of insecurity.

(c)     In areas subject to dense fog or snow and ice conditions, or where traffic speed and volumes are high, a guard rail may be justified where its installation would otherwise be questionable under less adverse conditions.

[23.2Z(1)(d)]

BLM_0061553

(d)     An obstruction or sudden constriction on width may require the installation of a guard rail.

(e)     An isolated sharp curve on a road otherwise built to higher standards may warrant a guard rail.

(f)     Ordinarily, a guard rail is placed only on the outside of curves.

(g)     Guard rails may be needed at approaches to bridge piers, abutments, trees, or other obstructions.

(2)     <u>Guard Rails at Bridge Approaches.</u>  A guard rail should be placed at the ends of all bridges on the right of approaching traffic. Where pedestrians are expected to use the shoulder, a walkway should be provided around the end of the guard rail outside the normal shoulder line.

AA.     <u>Utilities</u>

(1)     All utility work within Ouray County rights-of-way shall be performed in accordance with the requirements stated in these standards.  The coordination and enforcement of these specifications will be exercised by the County Engineer or the County Road Supervisor under a permit procedure.

(2)     There will be a minimum of 18 inches of cover over all underground utilities located in the paved portion of streets.

(3)     Joint use of trenches and poles is encouraged wherever practical.

(4)     Acquisition of such additional right-of-way is the obligation of the utility company or the developer.

(5)     In new construction, in order to minimize conflicts, a sequence of installation from the deepest utility to the shallowest shall be attempted.

(6)     Typical utilities location and easement guidelines are set out as follows;

BLM_0061554

[23.2AB]

AB.   Street Names and Sign Locations

(1)   Duplication of existing names will not be allowed unless the streets are obviously in alignment with existing streets and not so far removed as to be confusing.

(2)   Street signs shall be placed at all street intersections and shall be in accordance with Section 8 of the Land Use Code.

(3)   Street and Road signs shall be placed on all roads serving two or more residences.  Roads names shall be approved by the County.

(4)   Named roads within new subdivisions or PUD's that exceed one mile in length shall require installation of mile post markers by the developer(s).

(5)   Within subdivisions or PUDs, developer(s) will be required to install all traffic control devices, as required by the Uniform Traffic Code.  Speed limits shall be established by the County and speed limit signs may be required within the PUD.

23.3   ROADWAY CONSTRUCTION SPECIFICATIONS

A.   Construction Testing

Test sampling for design and quality control testing frequency shall be proposed by the developer's engineer and approved by the County on the basis of professional judgment to suit both the advantages and limitations of the particular design method used and the peculiarities of the individual project.  Quality control supervision of construction shall be done by the developer's engineer at no expense to Ouray County.  The County shall be permitted access to the construction site at all times to make spot checks on quality control.  Progress inspections may eliminate the possible need for extensive post-testing.  Construction material testing, such as compaction and concrete testing, shall be performed by an independent testing laboratory approved by the County and paid for by the developer.

B.   Construction Inspections

Upon completion of construction and prior to County acceptance of the work, copies of the as-built plans, pipeline leakage test reports, concrete cylinder test reports, compaction test reports, etc., and the developer's

23-34

[23.3B]
engineer's certification that construction has been completed in conformance with the approved lines, grades, specifications, and standards shall be delivered to the County before a request for acceptance will be completed.

At a minimum (but not necessarily limited to), the following in-process types of inspections are required by the developer's engineer.

(1)  Culverts.     Trenching, grade, bedding, installation of pipe, backfill, and compaction will be tested.  The inspection is to be performed when backfill is completed to 1/2 the depth of the culvert.

(2)  Structures.    Finished excavation, grade, forming, reinforcing steel, concrete pour, finish, and test cylinders are to be inspected.  Inspections are required prior to placing steel and prior to pouring concrete.

(3)  Roadway.     Subgrade, subbase, base course, prime and paving inspections are to be called for at each completed stage.

(4)  Final Inspection.     A request for final inspection and acceptance for maintenance or release from bond must be made in writing to the County Engineer after all other inspections have been passed.

C.     Construction Standards

All work shall be done in accordance to the applicable Construction and Material Details of the "Standard Specifications for Road and Bridge Construction," State of Colorado, latest edition.  The CDOT manual shall be utilized unless supplemental specifications have been approved by the County prior to construction.

## 23.4   VARIANCES TO ROAD STANDARDS

Appeals may be made to the Board of Adjustment pursuant to Section 19(d) of the Code.  To seek a variance with respect to the administration or enforcement of any provision of these Road Standards.  In addition to the criteria set out for granting variances under Section 19(D)(d), the appellant must show that the granting of any variance will not materially diminish the public safety and life costing objectives that underpin this Section 23.

## 23.5   IMPACT FEES FOR ROADS

BLM_0061556

A.      Short Title.  This regulation shall be known and cited as the Ouray County Road Impact Fee Regulation.

B.      Findings.  The Board of County Commissioners of Ouray County, Colorado, (hereinafter referred to as "Board" or "Board of Commissioners") hereby finds and declares that:

(1)     The County is responsible for and committed to the provision of road and bridge maintenance and development at levels necessary to assure reasonable levels of public safety and to support basic residential and non-residential growth and development;

(2)     Such facilities and service levels are provided by the County utilizing funds allocated via the County's Road and Bridge Budget and rely upon the funding sources indicated therein;

(3)     Residential and non-residential development in the County causes and imposes increased requirements for road maintenance, construction and reconstruction, which, but for such development, would not otherwise be necessary;

(4)     Planning and zoning projections indicate that such development will continue and will place ever increasing demands on the County road system;

(5)     The development potential and property values of properties in the County are strongly influenced and encouraged by County policy as expressed in the Ouray County Master Plan and as implemented in the Ouray County Land Use Code;

(6)     To the extent that such development in the County places demands upon Ouray County Roads in excess of the basic level of road maintenance, construction and reconstruction provided to current residents and property owners in Ouray County by the County, those demands should be satisfied by shifting the responsibility for financing the provision of such maintenance, construction and reconstruction from the public at large to the development or building actually creating the demands;

(7)     The amount of the "impact fees" to be imposed hereunder shall be determined by the costs of additional road maintenance, construction and reconstruction of County Roads needed to support such development or building;

(8)     The Board, after careful consideration of the matter, hereby

23-36

BLM_0061557

finds and declares that "impact fees" imposed upon residential and non-residential development in order to finance County Road maintenance, construction and reconstruction, the demand for which is created by such development, is in the best interests of the general welfare of the County and its residents, is equitable, and does not impose an unfair burden on such development and building. Therefore, the Board deems it advisable to adopt this regulation as hereinafter set forth.

C.     Intent.  This regulation is intended to impose "impact fees" with respect to increased County Road maintenance required as a result of new single-family residences and/or accessory dwelling units or upon approval of a Special Use Permit for non-residential uses.

(1)     County Road Maintenance Impact Fee.  This regulation establishes a County Road Maintenance Impact Fee (hereinafter referred to as "Maintenance Impact Fee") to pay for the net increase in County-wide road maintenance attributable to new residential and non-residential development. This Maintenance Impact Fee shall be calculated on the basis of the annual incremental costs to the County, per parcel, of maintaining County Roads and shall be payable at the time of application of a building permit for a single-family residence and/or an accessory dwelling unit or upon approval of a Special Use Permit for a non-residential use.

(2)     County Road Construction and Reconstruction Impact Fee. This regulation also establishes a County Road Construction and Reconstruction Impact Fee (hereinafter referred to as "Construction Impact Fee") based on the special construction and reconstruction needs of a segment or segments of County Roads as determined, from time to time, by the Board of County Commissioners.  This Construction Impact Fee (1) shall be calculated on the basis of the proportion of the current estimated cost of County Road capital improvements for a specified road segment or set of road segments that is attributable, on a net basis, to the impact of new residential or non-residential development; (2) shall be assessable on subdivision and PUD applicants; and (3) shall be payable at the time of subdivision or final plat approval.

D.     Applicability of Impact Fee.  Maintenance Impact Fees shall apply uniformly to all single-family residences and/or accessory dwelling units or upon approval of a Special Use Permit for non-residential uses. Construction Impact Fees shall apply only in those portions of the unincorporated areas of the County where the Board of County

23-37

BLM_0061558

Commissioners has, by resolution, pursuant to Section 23.5.H(1), established a Construction Impact Zone.

E.    Imposition of Impact Fee.  No building permit for new single-family residences and/or accessory dwelling units or approval of a Special Use Permit for non-residential uses may be issued until the County has received payment of any impact fees required by Section 23.5.C, subject only to any credits that may be applicable in accordance with Section 23.5.O.

F.    Calculation of Impact Fees.

(1)    Maintenance Impact Fee.  The County may adjust the amount of the Maintenance Impact Fee every year based on the Denver/Boulder Consumer Price Index.

(2)    Construction Impact Fee.  The County shall determine the amount of the Construction Impact Fees in a Construction Impact Zone at the time of establishment of such Zone and adjust such fees annually thereafter (in accordance with Section 23.5.H(6). In making such determinations, the County shall, as set out below (1) determine the amount and nature of construction and/or reconstruction contemplated in such Zone and estimate the costs thereof; (2)  determine the appropriate number and location of road segments within such Zone; (3)  estimate the unadjusted construction impact fees payable per parcel and per building for each segment; (4) aggregate such per parcel fees so as to calculate for each parcel the cumulative unadjusted construction impact fee to be paid prior to final plat approval; and (5)  adjust such cumulative fees so as to credit the present value (over 20 years) of those property taxes paid in support of road construction allocable to the Ouray County Road and Bridge Fund.

(a)    Amount and Nature of Construction and/or Reconstruction.  In making this determination, the County shall consider (a) current and projected traffic counts resulting from the development in question; (b) the existence and projection of unsafe conditions, including, but not limited to, basic access to the development, the condition of road structures and surfaces, bridges, drainage, and access for emergency vehicles; (c) the expressed wishes of the most affected members of the public; and (d) the estimated cost of such construction and/or reconstruction, including the cost of any land dedications, physical improvements, and/or financial contributions made within three years prior to establishment of the Construction Impact Zone in question,

BLM_0061559

in relation to the capacity of impact fees and other financing to secure the improvements within 20 years.

(b)      Number and Location of Road Segment(s).  In making this determination, the County shall consider (a) current, future and optimal traffic flows to and from land within the Construction Impact Zone in question; (b)  the nature of the construction and/or reconstruction needed in specific areas; (c)  the nature of the impacts caused by particular projected density and the capacity of the applicant  to undertake construction and/or reconstruction upfront; and (d) equitable allocation of construction impact fees in relation to net impacts caused by such proposed  density.

(c)      Per parcel Unadjusted Construction Impact Fees in Each Segment.  In making this determination, the County shall, for each segment in the Construction Impact Zone, (a) estimate the incremental cost of road construction and/or reconstruction, using as the baseline current road conditions and any road construction or reconstruction that would otherwise be required under other provisions of the Ouray County Road Standards; and (b) divide such incremental cost by the number of parcels, both potential and existing, considered by the County to benefit from the road construction or reconstruction within that segment.  The resulting value represents the Unadjusted Construction Impact Fee payable per new parcel for each segment in the Construction Impact Zone.

(d)      Unadjusted Cumulative Construction Impact Fee.  In making this determination, the County shall, for each segment in the Construction Impact Zone, aggregate the unadjusted per parcel impact fee, calculated in accordance with paragraph (3) above, for all segment(s) benefiting a new parcel, so as to arrive at the Unadjusted Cumulative Construction Impact Fee allocable to that new parcel.

(e)      Adjusted Cumulative Construction Impact Fee.  In making this determination, the County shall reduce the Unadjusted Cumulative Construction Impact Fee, calculated in accordance with paragraph (4) above, by an amount equal to the present value of property taxes per parcel allocable to road construction or reconstruction in the Ouray County Road and Bridge Fund, estimated over 20 years.  This Adjusted Cumulative Construction Impact Fee is the Construction Impact Fee per parcel payable prior to final plat approval.

BLM_0061560

(3)     Prior to making an application for preliminary plat approval, an applicant may request a non-binding impact fee estimate from the County.  The County shall base such an estimate on the above-described methodology.

G.     Administration of Maintenance Impact Fee.

(1)     Collection of Maintenance Impact Fees.  Maintenance Impact Fees due pursuant to this regulation shall be collected at the time a building permit for new single-family residence and/or accessory dwelling unit is issued or upon approval of a Special Use Permit for non-residential uses.

(2)     Transfer of Funds.  Upon receipt of Maintenance Impact Fees, the County shall place such funds into the Ouray County Road and Bridge Impact Fee Fund, to be used for maintenance and improvements of County maintained roads on a County-wide basis.

H.     Administration of Construction Impact Fee.

(1)  Establishment of Construction Impact Zone.  The Board of County Commissioners may, from time to time, establish by resolution one or more Construction Impact Zones where it considers that public safety, access to new development, projected traffic counts, and/or the amount of new development justify such establishment.  Construction Impact Zones may be established to assist any road construction or reconstruction project, including, but not limited to, the creation of paved roads.  Prior to such establishment, the Board of County Commissioners may seek the advice of the Planning Commission and/or any Road Committee that it may have created. The Board shall, in all cases prior to the establishment of such a Zone, hold at least one public hearing regarding such establishment, upon 14 day notice, published in a newspaper of general circulation in the County.

(2)     Collection of Construction Impact Fees.  Construction Impact Fees due pursuant to this regulation shall be collected by the County Land Use Office at the time of final plat approval and prior to sale of lots in subject subdivisions and PUDs.

(3)     Transfer of Funds.  Upon receipt of Construction Impact Fees, the County Treasurer shall place such funds into separate accounts as hereinafter specified.  All such funds shall be deposited in interest bearing accounts in a bank, banks, or other financial institution(s) authorized to receive deposits of County

23-40

BLM_0061561

funds. Interest earned by each such account shall be credited to that account and shall be used solely for the purposes specified for funds of such account.

(4)     Establishment and Maintenance of Accounts.  The County Treasurer shall establish separate accounts (pursuant to the resolutions of the Board of County Commissioners) and/or maintain records, whereby Construction Impact Fees collected will be applied to road segments for which such impact fees are collected.

(5)     Maintenance of Records.  The County Treasurer shall maintain and keep adequate financial records for each such account which shall show the source and disbursement of all revenues; which shall account for all moneys received; and which shall insure that the disbursement of funds from each account shall be solely and exclusively for the provision of projects rendered necessary as a result of the contributing subdivision or PUD.

(6)     Annual Review and Adjustment of Construction Impact Fee Amounts.  The Board of County Commissioners shall, prior to December 31st of each year, beginning by December 31, 1998, adjust Construction Impact Fees for the succeeding calendar year in all Construction Impact Zones established by the County at least one calendar year prior to such adjustment.  Such adjustment shall provide for any inflation over the prior year in road construction or reconstruction costs in Ouray County.

(7)     Five Year Reviews and Modification.  The County shall, every five years following establishment of a Construction Impact Zone, in conjunction with development and/or modifications of its annual capital budget and improvement plan, review the development potential of the County and its capital improvement plans and make such modifications as are deemed necessary in any Construction Impact Zone.  Such modifications shall be the result of: (a) development occurring within the Construction Impact Zone in the prior five years; (b) County Roads actually constructed or reconstructed in such Zone; (c) changing County Road needs; (d) changes in availability of other funding sources applicable to County Roads; and (e) such other factors as may be relevant.  The County shall also, based on this review, determine whether or not sufficient impact fees have been collected to warrant consideration of undertaking contemplated construction and/or reconstruction of any segment(s) in a Construction Impact Zone.  The financing of any such undertaking could include establishment of a special road improvement district, County direct financing (including debt financing), or other available means.

BLM_0061562

I.      Bonding of Excess Facility Projects.  The County may issue bonds, revenue certificates and other obligations of indebtedness in such a manner and subject to such limitations as may be provided by law, in furtherance of the construction and reconstruction of County Roads. Funds pledged toward retirement of bonds, revenue certificates and other obligations of indebtedness for such projects may include impact fees and other County revenues as may be allocated by the Board of County Commissioners.  Construction Impact Fees paid pursuant to this regulation, however, shall be restricted to use solely and exclusively for financing directly, or as a pledge against bonds, revenue certificates and other obligations of indebtedness for the costs of construction and reconstruction of County Roads as specified herein.  This Section 23.5.I shall in no way restrict the County from issuing bonds, revenue certificates and other obligations of indebtedness for any purpose as authorized by law (including road maintenance, construction and reconstruction) where impact fees are not at issue.

J.      Refunds of Construction Impact Fees.

        (1)     The current owner of property on which a Construction Impact Fee has been paid may apply for a refund of such fee if: (a) the County has failed to spend such fee on County Roads serving such property within twenty years of the date of imposition of the impact fee; or (b) the project for which a final plat has been approved has been altered or amended resulting in a decrease in the amount of the impact fee due.

        (2)     Only the current owner of the property may petition for a refund. The petition for refund must be filed within one year of the event giving rise to the right to claim a refund.

        (3)     The petition for refunds must be submitted to the Board of County Commissioners or its duly designated agent on a form provided by the County for such purpose.

        (4)     Within one month of the date of receipt of the petition of refund, the Board of County Commissioners or its duly designated agent must provide the petitioner, in writing, with a decision on the refund request, including the reasons for the decision.  If a refund is due, the Board of County Commissioners or its duly designated agent shall notify the Ouray County Treasurer and request that a refund payment be made to the petitioner.

K.      Appeals.  After determination of the applicability and amount of any impact fee imposed by this Section 23.5 or any refund due, an applicant

BLM_0061563

for a building permit or Special Use Permit, or an adversely affected property owner may appeal to the Board of County Commissioners. The applicant must file a notice of appeal with the Board of County Commissioners within thirty (30) days following the determination of the applicability of the impact fee regulation, the amount of the impact fee, or the refund due. If the notice of appeal is accompanied by a cash bond, surety bond, or other sufficient surety satisfactory to the County in an amount equal to the impact fee due, as calculated by the County, the County may approve the building permit or Special Use Permit or take other action as it may deem appropriate. The filing of an appeal shall not stay the collection of the impact fee due unless a bond or other sufficient surety has been filed therewith and accepted by the County.

L.      Effect of Impact Fee on Other Land Use Code Provisions. This regulation shall not affect, in any manner, the permissible use of property, density of development, design and improvement standards and requirements or any other aspect of the development of land or provision of public improvements subject to the zoning and other regulations of the County, which shall be operative and remain in full force and effect without limitation with respect to all such development.

M.      Impact Fee as Additional or Supplemental Requirement. Any impact fee required by this regulation is additional and supplemental to, and not in substitution of, any other requirements imposed by the County on the development of land or the issuance of Special Use Permits or building permits. It is intended to be consistent with and to further the objectives and policies of the Ouray County Master Plan, the Ouray County Land Use Code and other County policies, ordinances or resolutions by which the County seeks to insure the provision of County Roads in conjunction with the development of land.

N.      Variances and Exceptions. Petitions for variances and exceptions to the application of this regulation shall be made to the County in accordance with procedures established in Sections 17 and 19 in this Code.

O.      Developer Improvements to County Roads and Related Credits.

        (1)     A property owner may elect to apply to the County for an agreement whereby the property owner may be authorized by the County at the property owner's whole or partial expense, to improve or relocate a portion of an existing County Road or construct a new County Road. No such improvements may be undertaken in the absence of such an agreement. Prior to approval of any such agreement, the County shall consider (i) the location of the improvements; (ii) their estimated incremental cost over and above

BLM_0061564

what is otherwise required by County Road Standards; (iii) a schedule for initiation and completion of the improvements; (iv) a requirement that such improvements are to be in accordance with County Road Standards applicable to County Roads; and (v) such other terms and conditions deemed appropriate and necessary by the County.

(2)     Prior to entering into any such agreement, the County shall (i) review the improvement plan; (ii) verify costs and time schedules; (iii) determine if the improvements are in accordance with applicable County Road Standards and appropriate in relation to County Road priorities and any Transportation Plan adopted by the County that may be in effect; and (iv) determine the amount of any credit for any Construction Impact Fees that might be due or become due.

(3)     Any such credit shall include, on a present value basis, past and future monetary and non-monetary contributions by the property owner to the construction and/or reconstruction of County Roads.  Such contributions shall include the present value of any land acquisitions and dedications, physical improvements, and/or financial contributions made within three years prior to the establishment of the Construction Impact Zone in question.

(4)     Where an entire segment or portion of a segment in a Construction Impact Zone is constructed and/or reconstructed by a property owner in accordance with section 23.5.O(1), said property owner may apply for an immediate credit applicable at the time of subdivision/PUD final plat approval.  Such credit shall be calculated by aggregating the applicable Unadjusted Construction Impact Fees, as calculated in accordance with Section 23.5.F(2)(c), for all potential parcels being developed by the applicant within the segment(s) being improved by the applicant.  Such credit shall be reduced by an amount equal to the present value of property taxes per parcel allocable to road construction or reconstruction in the Ouray County Road and Bridge Fund, estimated over 20 years.

Said property owner may also apply for a refund equal to the applicable Unadjusted Construction Impact Fee, as calculated in accordance with Section 23.5.6(B)(3), for all other parcels that are deemed by the County to benefit from the said construction or reconstruction of the road segment(s) by the applicant.  Such refund shall include only that portion of the Unadjusted Construction Impact Fee directly allocable to the segment(s) being constructed or reconstructed by said applicant.  Such refund shall be distributed annually and shall not exceed funds actually

BLM_0061565

collected from subdivision/PUD final plans approved during the previous year.

(5)      The aggregate of said credit and said refund shall be no greater than the potential Construction Impact Fees to be collected for the entire segment(s) being improved by the applicant, divided by the cost of constructing or reconstructing the entire segment(s), multiplied by the estimated incremental cost incurred by the applicant in constructing or reconstructing the segment(s), or portion of segment thereof.  Such incremental costs shall be estimated by the County and shall reflect only those costs over and above costs otherwise required by other County Road Standards.

(6)      No credit shall be given for the construction or reconstruction of County Roads required by any other provision of Section 23 of the Land Use Code.

(7)      Nothing in this Section shall prohibit or limit the right of the County in appropriate situations to enter into a co-venture or other similar arrangement with an applicant or property owner for the purpose of constructing or reconstructing a County Road.

P.      Liberal Construction.  The provisions of this regulation shall be liberally construed to carry out effectively its purposes which are hereby found and declared to be in furtherance of the public health, safety, welfare and convenience.

Q.      Definitions.  As used in this regulation, the following words and terms shall have the following meaning, unless another meaning is plainly intended:

(1)      "Building Permit" shall mean the permit required for new construction and mobile/modular home installations pursuant to provisions of this Code or the County Building Code.  The term "building permit," as used herein, shall not be deemed to include permits required for remodeling, rehabilitation or other improvements to an existing structure or rebuilding a damaged or destroyed structure, provided there is no increase in the number of residential or non-residential units resulting therefrom.  Multi-unit housing shall be deemed to include one building permit for each unit.  The Board of County Commissioners shall determine on a case by case basis the number of building permits to be ascribed to commercial and industrial developments based on estimated road impacts.

(2)      "County Road Maintenance" shall mean any and all activity

BLM_0061566

undertaken by the County in order to provide that the County Road System shall be kept up and reserved to the level of utility as exists as of the date of this enactment.  Examples of County Road Maintenance activity include, but are not limited to, grading, graveling, repair of damage to the road, plowing, treating with dust control substances, and weed control and fence repair within County Road right-of-way.  County Road Maintenance does not include County Road Construction or Reconstruction as hereinafter defined.

(3)	"County Road Constriction or Reconstruction" shall mean any or all of the following:  Acquisition of land for right-of-way purposes, construction, building, paving, grading, graveling, improving, equipping, and installing of road or bridge improvements and all other work auxiliary thereto, including, without limitation, administrative, engineering, architectural and legal work performed in connection with a County Road project, which is necessary to support and is attributable to designated subdivision or PUD proposals within a Construction Impact Zone and is to be financed, in whole or in part, by the imposition and collection of a Construction Impact Fee.  Such County Road Construction and Reconstruction shall include streets, roads, bridges, sidewalks, street lighting, curbs, gutters, signalization, signage and landscaping.

(4)  "County Road" shall mean any road shown on a County Road map where Highway User Tax Funds are received.

BLM_0061567

(Amended December 12, 2006, by Board of County Commissioners)

# Section 24

## WILDFIRE MITIGATION REGULATIONS

24.1   PURPOSE

These regulations are for the purpose of reducing the threat of wildfire and the resulting damage to property as a result of fire.  Ouray County has extensive forested and high desert lands that are subject to drought conditions that significantly increase the fire danger.  Most of the County is a rural environment with relatively low density and with many residential dwellings located in forested or semi-forested areas.  Ouray County is served by three locally based volunteer fire departments with specific district responsibilities and by the Montrose Fire District on the north end of the County.  A significant amount of the County is not included in a fire district and some private properties do not have fire-fighting service available.

These regulations are intended primarily to improve the fire safety of structures and to reduce the threat of personal injury or residential loss of life and/or property resulting from fires.  Implementation of accepted fire safety techniques and the availability of on-site fire fighting capability, primarily the availability of an adequate source of water, will reduce the potential for personal injury or death and/or the loss of property from fires.

24.2   APPLICABILITY

These regulations apply to:

A.      New Regular Planned Unit Developments (PUD's) receiving Preliminary Plan approval after the date these regulations are adopted.

B.      Limited Planned Unit Developments (PUD's) are exempted from these regulations at the subdivision approval stage; however, residential structures constructed on Limited PUD's are subject to these regulations upon application for a building permit.

C.      All new residential structures.

D.      Residential structures existing at the date these regulations are adopted, that are increased 50% or more in total square footage of living area.

E.      Accessory structures, except those that include a residential dwelling unit, are exempted from these regulations.

24-1

BLM_0061568

F.      Resort Planned Unit Developments will be required to meet Uniform Fire Code regulations and other requirements deemed necessary as part of the approval of those development plans.  Some sections of these regulations may be incorporated in developing the specific fire mitigation plan for a Resort PUD.

## 24.3    ENFORCEMENT

A.      All Planned Unit Development applications subject to these regulations must comply with the applicable provisions of this section before Preliminary Plan approval is granted by the County.   Improvements and infrastructure as required by these regulations shall be completed or secured prior to Final Plat approval.

B.      Residential structures subject to this code will be required to meet the applicable provisions of this code prior to receiving a Certificate of Occupancy. The applicant must demonstrate an ability to comply prior to issuance of the building permit.

C.      This section of the code will be administered by the designated county agent.

D.      The costs of implementing this section of the code will be recovered through fees established by the Board of County Commissioners as a part of PUD, RST and building permit fees.

## 24.4    FIRE SAFETY RATING

Fire Safety Ratings have been established for new Planned Unit Developments and for new residential structures subject to these regulations.   Each new PUD and new residential structure, subject to these regulations, must meet the minimum points for each prior to receiving Preliminary Plan approval or a Certificate of Occupancy.  The Fire Safety Rating is also intended to serve as an educational aid and for conducting voluntary evaluations of existing homes to assist in reducing potential fire danger.

## 24.5    REQUIREMENTS AND PROCEDURES

A.      PLANNED UNIT DEVELOPMENTS

(1)      General:  As part of the preliminary development plan submittal, the applicant will be required to provide an assessment of the location of the proposed development and a written report to include:

(a)      A statement from the serving fire district or designated County agent indicating the ability in the County to respond to a fire emergency.  Such statement should include: distance from the nearest fire station to the entrance of the PUD, response time,

24-2

BLM_0061569

available equipment, manpower, and any other factors deemed important to determine if l factors other than those set out in the Fire Safety Rating for PUDs  need to be addressed prior to receiving Preliminary Plan approval.

(b)     An assessment of the vegetation coverage on the parcel and recommendations for reducing the wildfire hazard on the entire parcel, including the buildable areas as staked and identified on the preliminary plan plat, using Colorado State University Cooperative Extension Bulletin No. 6.302 (Creating Fire Safe Zones Around Your Forested Homesite") as the guideline.  By Resolution of the Board of County Commissioners, the County may use updates of this bulletin or replace it with another standard.

(c)     Recommendations by the serving fire district or the designated County agent for the location of fire hydrants

(d)     A copy of the completed Ouray County Fire Safety Rating for PUD's form showing the rating number as determined by a designated County agent.  The Fire Safety Rating will be signed by the applicant to acknowledge the fire rating received.

(2)     Roads:   The applicant shall be required to construct roads as required in Section 23 (Road Standards) of this code to insure adequate access for emergency response vehicles, including fire fighting equipment.

(3)     Water Supply: The applicant shall be required to provide at least a minimum fireflow water supply by either a water utility capable of providing service meeting the minimum fireflow water supply or by installing a water storage and distribution system capable of delivering a minimum fireflow water supply to each hydrant.

(a)     When the water supply is from a public or private water utility system, a written statement from the water supplier will be required that states the ability of that supplier to provide to all fire hydrants of the PUD a minimum fireflow water supply as defined in this code.

(b)     When the water supply is from a water storage and distribution system, such system shall be capable of delivering the minimum fireflow water supply to each hydrant.   This system will require certification by a Colorado registered licensed engineer prior to Preliminary Plan approval.

(c)     The applicant will be required to place fire hydrants throughout the development at distances such that no point on a road (except driveways) is farther than 600 feet from a hydrant.

BLM_0061570

Additional hydrants may be required at the entrance to a development, along a public roadway serving the development, and/or other appropriate locations as recommended by the serving fire district or designated County agent.  Location of the hydrants will be based on the recommendation of the serving fire district or designated County agent and will be noted on the Preliminary Plat for the PUD.

(4)     Fire Safety Rating: The applicant is required to meet the required minimum number of points on the Ouray County Fire Safety Rating for PUD's established by the Board of County Commissioners.  The total number of points the approved PUD has earned will be noted on the final approved plat for the PUD, along with a note that indicates the minimum total number of points required by the PUD Fire Safety Rating system at the time of Preliminary Plan approval.  Meeting the minimum total number of points required by the PUD Fire Safety Rating system shall be sufficient to justify County approval under this Section 24, unless the County demonstrates that additional requirements are essential to preventing a substantial risk of personal injury, death, and/or loss of property from fire due to the special circumstances of the land on which the proposed PUD is to be located.

(5)     Covenants:  The applicant shall create covenants that will allow individual lot owners the ability to build dwelling units that can meet the total minimum points required by the Ouray County Fire Safety Rating for Residential Structures.

B.     RESIDENTIAL STRUCTURES SUBJECT TO THIS CODE

(1)     Driveways will be constructed to the standards set forth in Section 23 – Road Standards.

(2)     Location, design, and construction of residences will be planned and completed to meet the minimum required points for the Fire Safety Rating for Residential Structures as a condition of receiving a Certificate of Occupancy.

(3)     For new residences located in PUD's without central water systems and outside of PUD's where water supply is from an approved well(s) or other source, individual property owners will be required to have a reserve water supply (cistern or other approved storage) in an amount of at least one gallon per square foot of the total square foot area of all residential structures on the parcel.  The water storage tank shall have fittings for attachment to fire truck pumping equipment as required by the closest serving fire district and have provisions for maintaining the required reserve water supply stipulated above at least 90% capacity.

24-4

BLM_0061571

C.      COMMERCIAL STRUCTURES SUBJECT TO THIS CODE:

(1)      All Commercial construction shall meet the Uniform Building Code and the Uniform Fire Code provisions relating to fire mitigation as adopted by Ouray County.

24-5

BLM_0061572

Revised by Ouray County Board of County Commissioners on November 10, 2003

# Section 25

**VESTED PROPERTY RIGHTS**

25.1   PURPOSE

The purpose of this section is to provide the procedures necessary to implement the provisions of Article 68 of Title 24, C.R.S., as amended. It is the County's intent to provide procedures and standards for review and approval of a site specific development plan for the purpose of vesting property rights in real property as described herein.

25.2   VESTED PROPERTY RIGHT – DURATION – TERMININATION – EFFECT

A property right which has been vested as provided for in this section shall remain vested for a period of three years. This vesting period shall not be extended by any amendments to a Site Specific Development Plan unless expressly authorized by the Board of County Commissioners. Such an extension may only be granted upon a finding by the Board of County Commissioners of good and sufficient cause and the applicant shall bear the burden of demonstrating the existence of good and sufficient cause for an extension.

    A.    A Vested Property Right, once established as provided for in this section, precludes any zoning or land use action concerning the subject property which would prevent the landowner from undertaking and completing the development and use of said property under the terms and conditions of the Site Specific Development Plan, except:

        (1)    With the consent of the affected landowner, or

        (2)    Upon the discovery of natural or man-made hazards could not reasonably have been discovered at the time of Site Specific Development Plan approval, and which hazards, if uncorrected, would pose a threat to the public health, safety and welfare.

        (3)    Upon the failure to comply with the terms and conditions of a Development Agreement and sketch plan approved in accordance with Section 25.6 of this Code.

        (4)    Upon the failure to comply with the terms and conditions of a Final Development Plan and Final Plat or combined Preliminary/Final Development Plan and Plat.

    B.    Significant changes or amendments to a Site Specific Development Plan, including any amendment of a PUD Final Development Plan that is not consistent with the approved Preliminary Development Plan, shall render the terms and conditions of the original Site Specific Development Plan null and void, and vested property rights shall be forfeited. The County

BLM_0061573

shall determine whether any proposed change is significant for purposes of this section, in accordance with all applicable provisions of the Code.

C.      Following approval or conditional approval of a Site Specific Development Plan, as provided herein, nothing in this section shall exempt such a Site Specific Development Plan from subsequent reviews and approvals by the County to ensure compliance with the terms and conditions of the original approval.

## 25.3 NOTICE AND HEARING

No Site Specific Development Plan shall be approved until after a public hearing, preceded by written notice of such hearing. Such notice may, at the County's option, be combined with any notice that may be required for the Special Use Permit, PUD Final Development Plan, or with other required notice. Interested persons shall have an opportunity to be heard at the hearings.

## 25.4 APPROVAL – EFFECTIVE DATE – AMENDMENTS

A Site Specific Development Plan shall be deemed approved upon the effective date of the Board of County Commissioners' final or conditional approval action. In the event amendments to a Site Specific Development Plan that are found by the County to be not significant under Section 25.3B herein, are proposed and approved, the effective date of such amendments, for purposes of duration of a Vested Property Right, shall be the date of the approval of the original Site Specific Development Plan, unless the Board specifically finds to the contrary, upon good and sufficient cause shown, and incorporates such finding in its approval of the amendment. The applicant shall bear the burden of demonstrating that good and sufficient cause exists for such a finding.

A.      PURPOSE AND INTENT

The purpose and intent of this section is to provide an option to reach a creative negotiated contractual agreement regarding the development of private land. This process allows more flexibility in the regulatory process in a creative, alternative and expedited way.

The intent of the County in providing this option is to further the goals of the Master Plan by encouraging smart growth on land otherwise exempt from subdivision regulations. It would encourage permanent preservation of open lands, scenic views, productive agricultural lands, wildlife habitat, and migration corridors while providing for clustering and reducing infrastructure requirements and expenses, not including roads and utilities.

The purpose of this section is to create tangible economic and timesaving incentives to attract landowners to this option.

BLM_0061574

25.5    DEVELOPMENT AGREEMENTS

The Board of County Commissioners may enter into development agreements with landowners providing that property rights shall be vested for a period exceeding three years.  Such development agreements may be executed where warranted in light of all relevant circumstances, including, but not limited to, the size and phasing of the proposed development, economic cycles, and market conditions.  Final enactment of such development agreements extending the vesting period shall be subject to all notice and hearing provisions required herein at section 25.4.

A.    AUTHORITY

The Board of County Commissioners may, in its discretion, negotiate and enter into Development Agreements with landowners providing that property rights shall be vested for a period of three years or as otherwise approved per a Development Agreement.  Such development agreements may be executed where warranted in light of all relevant circumstances, including, but not limited to, the size and phasing of the proposed development, economic cycles, and market conditions.  Any division of land authorized pursuant to terms and conditions of this Section shall be exempt from the definition of subdivision and subdivided land as provided in paragraph D of Section 22, SUBDIVISION AND SUBDIVIDED LAND.  Any division and improvement of land made pursuant to a Development Agreement shall only be approved if it is consistent with the provisions set forth in this Section.  Notwithstanding any other provision of this Section 25.6, Joint Area Planning Board review may be required pursuant to an Intergovernmental Agreement.

B.    MINIMUM REQUIREMENTS

All Development Agreements approved by the County pursuant to this Section shall meet the following minimum requirements:

1.   Density.  In no event shall the overall density (primary residential dwelling units per acre) exceed one (1) primary dwelling unit per 35 acres gross density.

2.   Sketch Plan.   A Sketch plan for development upon any property proposed for a Development Agreement must be submitted along with proposed provisions which are additional to the County's standard development agreement form.  Such sketch plan shall be a legibly drawn concept plan of the proposed development.  The plan shall reflect actual or estimated contours of appropriate intervals.  It is intended that the sketch plan be used to review the overall land uses, intended densities, feasibility, and design characteristics of the development project and shall include, but not be limited to, the following:

BLM_0061575

(a)     Sufficient information, including legal description, to readily determine the location of the proposed development and its relationship to adjacent lands; and

(b)     The appropriate lot size, acreage and configuration of lots and roadways, to the extent known, within the proposed development; and

(c)     A description of the proposed uses, including land use types and densities for each development parcel and improvements including at least the following:

    (i)     Area included in application and development; and

    (ii)    Number of lots, including residential, nonresidential, and non-commercial; and

    (iii)   Area of non-residential land uses; and

    (iv)    Area of lots and/or building envelopes; and

    (v)     Maximum structure size.

(d)     Name, address and phone number of the holders of all record interest in the property (including severed mineral interests) and of the developer.

(e)     Any available information concerning site characteristics, including, but not limited to, the following:

    (i)     Geologic characteristics of the area which could affect proposed future uses.

    (ii)    Areas within and in the vicinity of the proposed development containing suspected or known hazards, including the type of hazard.

    (iii)   Maps and other data describing the suitability of soil under the proposed development.

(f)     Any analyses which the developer may have undertaken or which may be required by the County concerning the demographic and economic impact and the impact on public facilities including, but not limited to, traffic impact studies.

BLM_0061576

(g)    A written and graphic description of the areas to be reserved as open space and the establishment of an organization for the ownership and maintenance of the open space or other provisions acceptable to the County for adequate future ownership and maintenance and the establishment of procedures to be followed in the event that the organization or any successor organization fails to maintain the open space.

3.    <u>Open Lands</u>:

(a)    Open lands may be reserved for non-commercial use as common open space, wildlife habitat/migration corridors, wetlands, riparian areas, active and passive recreational use and facilities and limited parking for such use and facilities, and farming and ranching as defined in Section 22 of this Code.

(b)    Open lands shall be restricted by the establishment of covenants which run with the title to all lands included within the Development.

(c)    If approved as part of a Development Agreement, the Open space may be used for active recreational activities provided that: (i) only accessory structures and facilities which are specifically approved as part of the Development Agreement shall be allowed and; (ii) the activity is to be located on private lands which are subject to the Development Agreement.

(d)    The density allowed by a Development Agreement shall not exceed the underlying zoning less the density eliminated as a result of a conservation easement or other similar restrictions, which are in place at the time of application.

4.    <u>Historic Water Flow</u>.   Development is not located within, or mitigation has been provided for allowing historic water flow to continue: Consideration should be given for maintenance of water for historic agricultural purposes on the property.

5.    <u>Access</u>.  Availability of adequate legal and physical access to each lot and, as appropriate, to open lands shall be demonstrated.  Access points onto County roads should be minimized, and may be shared with other lots to minimize the number of access points.

6.    <u>Mitigation of Risks and Hazards</u>.  Adequate mitigation of risks and identification of hazards resulting from flooding, fire and wildfire hazards, avalanche and geologic hazards, chemical hazards, unstable soils, and

BLM_0061577

other hazards shall be demonstrated.  Wildfire mitigation regulations set forth at Section 24 of this Code shall be satisfied.

7.     Storm Drainage. Storm drainage facilities of sufficient capacity to handle all predictable storm water runoff for a one hundred year storm shall be provided.

8.     Master Plan.  Approved Development Agreements sketch plans, all preliminary plats, all final plats, final improvement agreements, and similar final documents related to development pursuant to a development agreement approved pursuant to this Section shall be consistent with and advance the applicable goals of the Ouray County Master Plan.

9.     Land Use.   Only permitted uses in the underlying zone are allowed.

10.     Adjacent Development.   An applicant who owns real property which: 1) is situated either in Ouray County or in an adjacent county and 2) is contiguous to the property being subdivided pursuant to a Development Agreement shall provide, at a minimum, an informal sketch plan showing plans for the eventual development of the property situated in the adjacent County.  In addition, the landowner must provide any other documentation including, but not limited to, copies of subdivision, exemption and development applications, preliminary or final plats, site development permits or other related documentation, regarding the development in the adjacent County, such documentation to be submitted in a scale and format similar to and compatible with the documentation submitted regarding the real property subject to the Development Agreement proposal.  The applicant must provide a narrative defining the relationships between the development proposed in Ouray County and the adjacent county.

11.     Financial Ability.   Statement of estimated construction costs, broken into 'the components as identified in Subsection D, Minimum Terms and Conditions, of this Section 25.6, and additional infrastructure such as utilities, proposed sources of financing, financial statement of the developer, banking references and any other information which will enable the County to ascertain that the developer is financially capable of completing the project.  Detailed construction costs shall be included in the preliminary development plan.

C.     MINIMUM TERMS AND CONDITIONS

All Development Agreements shall contain the following as minimum terms and conditions for approval.

BLM_0061578

1.    <u>Minimum Lot Size</u>.  Minimum lot size shall be one (1) acre, if served by individual disposal system, with smaller lots being allowed if uses are connected to a central wastewater treatment system or other community wastewater system as approved by the State of Colorado and Ouray County.

2.    <u>Site Standards</u>.  At the time of the application, along with the submittal of a Development Agreement and Sketch Plan, the landowner/developer must provide information showing the site standards contained in Section 6.9 F of this Land Use Code, which exist at the time of submittal of the application, will be met.

3.    <u>County Road Standards</u>.  All roads and driveways lying within the property subdivided in accordance with this Section 25.6 shall comply with the Ouray County Road Standards, Section 23 of the Ouray County Land Use Code, except as otherwise approved in the Development Agreement.

4.    <u>Improvements</u>.  The development agreement shall also provide that, if the development receives final development plan/final plat approval by the Board of County Commissioners, the applicant landowner/developer shall make and install within a mutually agreed-upon period of time, all improvements required by the development agreement. All required improvements shall be in accordance with Ouray County Improvement Standards as set forth in Section 7 of this Code, as applicable.

5.    <u>Impact Fees</u>.  When a proposed development will have a major on-site and off-site impact on, or will necessitate improvements to, facilities or service provided by the County, special districts or other governmental entities or subdivisions within the County including, but not limited to roads, emergency services, and schools, the Board of County Commissioners shall, as a condition of development agreement and sketch plan approval, require that the developer take steps to mitigate this impact by payment of impact fees or provision of in kind contributions.  If impact fees are paid, the amount of such fees shall be used or set aside for the purpose for which it was paid.

6.    <u>Phasing</u>.  A schedule indicating when the various phases of the proposed development will be completed and a schedule for the completion of the required public improvements will be included in the development agreement.

7.    <u>Health, Safety, Welfare</u>.  Any other provisions which the County deems necessary, to protect the public health, safety or welfare, which

BLM_0061579

requirements are in accordance with the provisions of Colorado Revised Statutes, Section 30-28-137, as amended.

## D.   DEVELOPMENT AGREEMENT PROCEDURE

Development Agreements may be approved only if entered pursuant to the following process:

1   Initial Consultation.  Unless otherwise required by this Section, the Land Use Department will assist the landowner in initially working toward the terms and conditions of a proposed Development Agreement. However, the Board of County Commissioners will negotiate the final terms and conditions.  If a party seeking approval of a Development Agreement is not the owner of the property, written consent for development pursuant to this Section 25.6 shall be required from the owner(s) of record of the property.

2.   Application.  In order to commence the development agreement process, the applicant must submit a complete Application to the Land Use Department on a form approved by the County.  An incomplete Application shall be returned to the applicant with a brief explanation.

3.   Fees.  In order to defray the costs associated with review of a proposed development plan/plat or amendments to a development plan/plat, the developer shall pay to the County fees in accordance with the County's current fee schedule.  In the case of a development agreement, fees shall be paid at the time of submittal of a preliminary development plan.

4.   Referrals.  The Land Use Department shall refer the proposed application, development agreement, and sketch plan to each county or municipality within a three (3) mile radius of any portion of the proposed development; to each record owner of a severed mineral interest; and to various agencies, utilities, organizations, or individuals, as required by law, regulation, by intergovernmental agreement. Referrals may also be made as the deemed appropriate by the County for complete review of the development agreement and sketch plan.

Responses to referrals must filed within thirty (30) days from the date of mailing. The County may, upon the request of the reviewing agency or committee, or upon its own motion, extend the response period.  Failure to respond to, or request an extension to a date certain of, the referral within the time allowed shall not be deemed to indicate either approval or disapproval of the development.

BLM_0061580

5.   <u>Public Meeting for Commissioners' Review</u>. The Board of County Commissioners shall hold a public meeting regarding the application, including the proposed development agreement, upon referral from the Land Use Department.  Such item shall be placed upon the Board's agenda at next available meeting.   Additional public meetings may be held as necessary to thoroughly review the application.

6.   <u>Public Hearing</u>.   The Board of County Commissioners shall conduct a public hearing prior to making a decision upon an Application for Exemption submitted pursuant to this Section 25.6. The Board shall provide published public notice of at least fourteen (14) days prior to the hearing, at the applicant's cost.   The applicant shall notify the adjacent landowners and to the owners of mineral estates underneath the surface estate subject to the application for development pursuant to C.R.S. 24-65.5, as may be amended from time to time, in writing at least thirty (30) days prior to the hearing by first-class mail.  Such notice in writing shall include: the applicant's name; the general location of the subject property; a description of the request sufficient to provide reasonable notice of the request; the date, time and place of the public hearing', and telephone number of the Land Use Department.   The applicant shall provide evidence to the Land Use Department that such written notice was given.

7.   <u>Decision</u>.   At the public hearing, based upon the evidence presented, the Board of County Commissioners: a) may exercise its discretion to enter into Development Agreement and approve a Sketch Plan and b) upon the decision lo enter into a Development Agreement and sketch plan approval, may make a decision to grant or to deny regarding the Application for Exemption in accordance with the provisions of Section 17 of this Code.

8.   <u>Notice to State Engineer</u>.  Within ten (10) days of approval of the Development Agreement, the Board of County Commissioners shall notify the State Engineer of such approval and shall provide the State Engineer a copy of the Agreement as required by C.R.S. 30-28-404(3), as may be amended from time to time.

9.   <u>Recordation</u>.  Upon approval of the Application for Exemption, Development Agreement and Sketch Plan, the applicant shall pay all recording fees to the County Clerk and Recorder to be submitted along with the Development Agreement and Sketch Plan for recording.   All Development Agreements and Sketch Plans approved pursuant to this Section shall be recorded by the County Clerk and Recorder of Ouray County within ten (10) days following final execution by all parties.  No Development Agreement and Sketch Plan is valid until properly recorded as required by this Section.

BLM_0061581

10.  Alteration/Amendment.  Once finally approved, executed and recorded, the terms and conditions of an Exemption, a Development Agreement and Sketch Plan may not be altered or amended unless first considered and approved by the landowner and the Board of County Commissioners following notice and public hearing held in accordance with paragraph E.6 hereinabove.  Any amended development agreement and sketch plan must be recorded in the same manner as provided in paragraph E.8 hereinabove.

11.  Transfer, Sale, Occupation. No property subject to a development agreement pursuant to this Section 25.6 shall be transferred, sold or occupied for its intended purpose until approval of a Final Development Plan and Final Plat have been approved or conditionally approved by the Board of County Commissioners, provided, however, that the entire property subject to the development agreement may be transferred or sold as a whole subject to the terms of the development agreement.

12.  Landowner Bound Until Cancellation Upon Notice. A landowner shall retain the right to cancel an approved and recorded Development Agreement prior to the end of its stated term and prior to any preliminary development plan approval or subdivision of the property subject to the Development Agreement.

> (a)  Notice of Cancellation.  The landowner shall provide at least ninety (90) days' written notice to the County prior to cancellation of a previously approved and recorded Development Agreement,
>
> (b)  Effect of Cancellation.  Upon lawful cancellation of a previously approved and recorded Development Agreement by a landowner, all rights and obligations provided for in the Development Agreement and this Section shall cease and shall become void and of no lawful effect.  Immediately upon such cancellation, the property formerly subject to the Development Agreement shall become subject to and governed by all then existing and otherwise applicable provisions of County zoning, subdivision and other regulations.
>
> (c)  Recordation of Statement of Cancellation.  No cancellation of a previously approved and recorded Development Agreement shall be effective unless and until a Statement of Cancellation is executed by the landowner and recorded in the records of the Ouray County Clerk and Recorder.

BLM_0061582

E.      PRELIMINARY DEVELOPMENT PLAN / PRELIMINARY PLAT

1 .     General Process - Conformance.  During the period of time in which the Development Agreement is vested and prior to the subdivision, use, or occupancy of the property for its intended purpose, the landowner/developer shall obtain approval of a Final Development Plan and Final Plat from the Ouray Board of County Commissioners.  To obtain Final Development Plan and Final Plat approval the Board of County Commissioners, taking into consideration the 1) term anticipated for completion of the entire development project; 2) use of open space; and 3) complexity of the development project, the landowner/developer must submit either; 1) a Preliminary Development Plan and Preliminary Plat followed by a Final Development Plan or Final Plat or 2) a Final Development Plan/Final Plat which is combined with the Preliminary Development Plan/Preliminary Plat providing all of the information for required for a Preliminary Development Plan/Preliminary Plat.   The Preliminary Development Plan and Preliminary Plat or Final Development Plan/Final Plat must conform to the Development Agreement.

2.     Required Information.  The Preliminary Development Plan shall be submitted initially to the County Land Use Department for review and shall include, as a minimum, the following information, unless otherwise specifically provided for in the approved Development Agreement:

(a)     The Preliminary Development Plan shall be drawn to a scale sufficient to show enough detail to enable full evaluation of all elements of the proposal.   A scale of one (1) inch to one hundred (100) feet shall be acceptable.  Plans shall be on 24" by 36" blue line prints, which shall be folded to approximately 12" by 18".   The applicant must submit fifteen (15) complete copies, including all of the required attachments

(b)     Existing conditions map-containing north arrow and scale, showing existing site features prior to any alteration of natural vegetation, landscape features or construction:

(i)     Vicinity map at 1" = 1000', or other scale as determined to be appropriate by the Land Use Administrator, showing the location of the proposed development in relation to the surrounding area; and

(ii)     Site boundary, with dimensions, shown relative to section lines; and

BLM_0061583

(iii)    Topography, with 5' intervals for land with slope less than 10%, 10' intervals for land with slopes greater than 10%; and

(iv)    One hundred year flood plain, streams, ponds, wetlands and other water features; and

(v)    Existing structures, including their current uses, locations, height, dimensions and an indication of which structures are to be preserved on the site; and

(vi)    Existing roads and easements; and

(vii)    Location and alignment of existing utilities and existing easements; and

(viii)    Other data as may be required by the County.

(c)    <u>Site plan:</u>    Showing major features of the proposed development, including building locations and footprints at scale of 1"=100' or 200', or other scale determined to be appropriate by the Land Use Administrator.  The site plan shall include sufficient information to allow evaluation of land planning, building location, and potential off-site visual impact and structure massing.  The site plan shall include a north arrow and scale and illustrate, as applicable, the following information.

(i)    Proposed lot name and/or lot number, including, the name of the proposed development shall be different from all others in the County.  Other information required shall include the preparation date, north arrow, written and graphic scale and accurate boundary description and area of each parcel.

(ii)    Names and addresses, The names, addresses and phone numbers of the owner(s) of record, developer, surveyor, engineer and planner involved in the preparation of the preliminary development plan, including owners of severed mineral interests.

(iii)    Subdivision of which the lot is a part, if applicable.

(iv)    Locations, dimensions, square footage (area) of all lots, sublots, parcels or footprints within the project.  Location and extent of areas to be used for residential, open space, recreational, and other uses.  Land use information

BLM_0061584

shall be specific for each use area, with densities, maximum structure size and maximum structure footprint, if applicable, and land use types delineated.

(v)     Location and maximum size of all existing and proposed structures, both on site and within 100 feet of the lot boundary.

(vi)     Roads, streets, walkways, drainage, sanitary sewer, public utility and other easements, open space and other areas reserved for use of the public or residents of the development.   Roads must be named in accordance with County standards.

(vii)     Proposed open spaces with an indication as to use and ultimate ownership.

(viii)     Ownership(s) and land use(s) of adjacent properties.

(d)     <u>Other Information</u>: Unless previously provided to the County in the process of receiving development agreement and sketch plan approval from the Board of County Commissioners, the applicant shall provide:

(i)     <u>Grading Plan</u>.   Preliminary grading plan showing proposed grades, the extent of cuts and fills and the proposed slope angle of all banks.   Preliminary grading plans may be based on a photogrammetric survey of a scale not less than 1" = 100'.   Contour intervals shall be as follows:

(a)     Greater than 15% slope – 10' interval

(b)     Less than 15% slope – 5' interval

(ii)     <u>Inundated</u> areas.   Approximate boundaries of all areas subject to inundation by a one hundred (100) year flood or storm water overflow and the location, width and direction of flow of all watercourses.

(iii)     <u>Cross sections and grades</u>.   Typical cross sections and proposed grades for each street, highway, alley and access easement and details of curbs, gutters and sidewalks and other public improvements shall accompany the Preliminary Development Plan and shall be of such scale to show clearly all the necessary details.

25-13

BLM_0061585

(iv)    Preliminary landscaping plan. A conceptual plan showing, as a minimum, the following information:

(a)    Where dense stands of trees or tree clusters exist, an outline of the limits of the trees must be shown; and

(b)    A conceptual plan for the proposed landscaping to be installed, showing trees, vegetation and other design features to be included; and

(c)    Any other recognizable features of importance to the design of the development, such as rock outcroppings.

(v)    Open space plan. This plan shall conform to the provisions of an approved development agreement and sketch plan.

(vi)    Reports.   The developer shall furnish additional preliminary reports which concern streams, lakes, topography, vegetation and geologic characteristics which could affect the proposed land use (including potential hazards, soil suitability and any other reports, responses or concerns raised during the review of the sketch plan for the proposed development) and any other information as may be determined necessary by the County.

(vii)    A detailed land use description for the final plan, including specific land uses and unit types for each use area and open lands, maximum number of units or floor area for non-residential uses, average lot size, maximum and minimum lot sizes, and any other land use information deemed appropriate by the County in its review of the project.

(viii)    Proposed utility distribution system, including water and waste disposal systems.

(ix)    A plan detailing how compliance with Section 19.2 of this Code will be accomplished.

(x)    Narrative, in written form indicating:

BLM_0061586

(a)      An explanation of plan

(b)      Statement identifying form of present and proposed future ownership

(c)      Copies of any special agreements, conveyances, restrictions, covenants which will govern the design, use maintenance, and continued protection of the structures or features of the project and common areas

(d)      Summary of all proposed uses and areas within the project, including

     (i)      Area of lot/development

     (ii)      Number of units and/or lots and sublots.

     (iii)      Amount of non-residential square footage

     (iv)      Area of lots and sublots and/or building footprints.

     (v)      Maximum structure size.

(e)      Other information as may be requested by the Land Use Administrator or County Boards.

(e)      <u>Additional Data</u>:   Information regarding the following details shall either be on the preliminary development plat or contained in the information submitted with the preliminary development plan:

     (i)      <u>Drainage</u>.   A development drainage plan with maps and narrative description, which identifies the historical storm runoff from the site, the anticipated increase in runoff resulting from the development for storms having two (2), five (5), ten (10) and one hundred (100) year frequencies and the proposed method for handling the runoff, including the location and description of any necessary drainage facilities.   Where the proposed development drainage plans

BLM_0061587

require the alteration of any identified one hundred (100) year flood plain, the drainage plan shall detail the plans for the proposed alteration of the flood plain limits and any proposed flood control measures. The drainage plan and supporting maps shall be prepared by an engineer registered. in the State of Colorado who has experience in the evaluation and design of storm drainage and related facilities.

(ii)    Water Supply.   If a municipality or quasi-governmental entity will supply the water to the proposed development, the applicant shall obtain a letter of intent to serve and file it with the Final Subdivision Plat. If the water supply is provided in another manner, the developer/applicant must comply with federal law and regulations and Colorado state law, regulations, and orders regarding the provision of water supply.

(iii)   Sewage Disposal.  Adequate provisions for sewage disposal shall be addressed.  Sewage disposal may be accomplished by installation of individual sewage disposal systems ("ISDS"),, community septic tank system or by central wastewater treatment facilities approved by the County as a special use and fully permitted by the State of Colorado as applicable. If ISDS are utilized, the applicant shall demonstrate the ' suitability of soils through soil profiles and percolation tests sufficient to demonstrate that the installation of ISDS can be achieved on all proposed lots of six (6) acres or less.  Demonstration will be by an eight foot or bedrock deep profile hole and three (3) percolation hole tests within that area of the proposed buildable area on each lot where the ISDS will most likely be installed.  This demonstration is to be completed by a Colorado registered professional engineer knowledgeable of ISDS design and installation and be included in the report.  A certificate of the Colorado Department of Health that the sewage disposal system, as designed by the developer, will comply with State and local laws and regulations, must be filed with the proposed Final Subdivision Plat.   The applicant shall provide a report containing detailed information concerning sewage disposal, including, but not limited to, total sewage disposal needs and evidence that the proposed system for the disposal of sewage will comply with applicable State of Colorado statutes, regulations and design requirements and

25-16

BLM_0061588

that the proposed method is both technically feasible and environmentally sound.

If the average lot size is less than one acre or as otherwise provided by the more stringent State or Federal laws, rules and regulations, central wastewater treatment or other community wastewater system as approved by the State of Colorado and Ouray County may be required

If sewage collection and treatment is to be provided by an existing system, a letter of commitment from the owners of that system, or their authorized representative, must accompany the report, stating that there exists sufficient capacity to supply the needs of the proposed development and that the owners of the system are willing and able to handle the additional effluent in compliance with applicable State laws and regulations.  If at the time of installation, the disposal field is not to be located in the area where the percolation tests were done by the applicant, new percolation tests in the area to be used will be required.

No preliminary development plan shall receive approval of the Board of County Commissioners until the Department of Health has made a favorable recommendation regarding the proposed method of sewage disposal

(iv.)    Covenants. A draft of the protective covenants to be filed with the final plat shall be supplied.  The covenants must include provision for maintenance of open space consistent with Section 6.11 of these regulations and any proposed restrictions , upon use of water and sewer systems, visual impact provisions complying with Section 9.8 of this Code, and a provision that the County may, but need not, take action to enforce the covenants.  The covenants shall also specify the intended land uses, with average and maximum densities and total maximum numbers of units and maximum amounts of non-residential floor area specified.

3.    Filing and Fees.

(a)    The County shall not accept the submittal of a preliminary development plan unless all required maps, documents and other supporting materials are submitted together (except any additional materials requested later by the County).

BLM_0061589

(b)     In order to defray the costs associated with review of a proposed development plan/plat or amendments to a development plan/plat, the developer shall pay to the County fees in accordance with the County's current fee schedule.   In the case of a development agreement, fees shall be paid at the time of submittal of a preliminary development plan.

(c)     If any of the lots shown on the submitted preliminary development plan have been sold or otherwise conveyed in violation of the provisions of these regulations prior to the approval of the final plat, penalties may be assessed in accordance with Section 16 of this Code and State statutory provisions, as may be amended from time to time.

4.     Referrals.   The County Land Use Administrator may refer the preliminary plat review to each county or municipality within a three (3) mile radius of any portion of the proposed development; to each record owner of a severed mineral interest, as identified by the applicant; and to agencies, utilities, organizations, or individuals, as required by law, regulations, by intergovernmental agreement or as deemed appropriate for complete review.

5.     Public Hearing.   Upon referral by the Land Use Administrator of a Preliminary Development Plan, which complies with the requirements of this Section 25.6 as determined by the Land Use Administrator, the Board of County Commissioners shall set a date for a public hearing on the proposal, which shall be scheduled and noticed in the same manner as provided in Section E.7 hereinabove provided, however, that notification to mineral estate owners is not required if such owners have waived the right to notice in writing and copies of such waivers are provided to the Land Use Department.

6.     Decision.     At the public hearing, the Board of County Commissioners shall review the Preliminary Development Plan and shall, by resolution, approve, approve with conditions or modifications, or disapprove the plan.  The Commissioners shall state clearly, in writing, the grounds for disapproval or conditions or modifications.

7.     Recordation.   Upon approval of a Preliminary Development Plan, the plan and covenants, with ' any amendments required by the County Commissioners, shall be recorded by the developer after first obtaining the signature of the County Land Use Administrator on the plan.  The Land Use Administrator shall certify that the plan and covenants represent the preliminary approval granted by the Commissioners.

BLM_0061590

8.  Effect of Commissioners' Approval.  The Board of County Commissioners' approval of the preliminary development plan shall be binding on the County for a period of one (1) year, unless a greater period is stated in the approval resolution, If the developer fails to submit to the County, within one (1) year after Commissioners' approval of the preliminary development plan, a final development plan, the preliminary plan approval shall be void and shall be reconsidered only in accordance with all the provisions of this Code as it may then have been amended.

G.  FINAL SUBDIVISION PLAT

To obtain Final Subdivision Plat approval, the applicant / developer shall:

1.  Required Information.  Provide a Final Subdivision Plat, Site Plan and accompanying materials including sufficient information, such as the designated building areas, roads and infrastructure, to demonstrate that all standards and requirements of this Section have been satisfied.

The Preliminary Development Plan and Preliminary Plat may be combined with the Final Development Plan and Final Plat upon approval of the Board of County Commissioners.

2.  Fees.  At the time of submittal of the Final Subdivision Plat, pay a fee as determined by the County's current fee schedule or as negotiated through the Development Agreement process.

3.  Final Improvements Agreement.  If the applicant for Final Subdivision Plat wishes to have the final plat approved prior to the installation, inspection, and approval of all required improvements, the applicant must enter a Final Improvements Agreement with the County binding the applicant to complete all roads and utilities infrastructure required to serve the Development within a specified period of time no greater than two (2) years after approval of the final plat and further providing that, should such roads and utilities infrastructure work not be satisfactorily completed within the specified time limit, the County may complete it and recover the costs thereof from applicant.  In the event that all required Improvements are not completed, inspected, and approved within two (2) years of the date of the approval of the final plat by the Board of County Commissioners, it shall then be unlawful to sell any further lots in the subdivision until all improvements are completed.  No building permit shall be issued by the County until the infrastructure necessary to serve the lot is completed.

The Final Improvements Agreement shall be secured as follows:

a.  Subdivision Lien Agreement.  A subdivision lien agreement placing an adequate lien upon the lots of the

25-19

BLM_0061591

subdivision, with an escrow account with the County into which the applicant/subdivider shall pay, prior to the sale of any lot within the subdivision, an amount to be verified by the County Road and Bridge Supervisor equal to one hundred and fifty percent (150%) of the pro rata cost to complete the subdivision improvements necessary to serve that lot; or

b.      Cash Escrow or Performance Bond.   A cash escrow deposited with the County or a sufficient performance bond held in the names of applicant and the County.  The amount of the surety shall equal one hundred and fifty percent (1 50%) of the estimated costs of improvements to serve each lot as verified by the County Road and Bridge Supervisor.    Performance bonds may be structured so as to provide for annual review of the amount of the bond necessary to complete the remaining improvements.

The Final Improvements Agreement shall provide for release of the surety one year after completion of improvements and County approval of the roads and utilities infrastructure and may provide for partial release of the surety upon partial completion of the roads and utilities infrastructure; provided, however, that funds in any escrow account shall be returned to the applicant / subdivider upon the completion and approval by the County of the improvements.

4.      Title Insurance Policy.   Provide evidence of title issued by a reputable title insurance or abstract company or title opinion by an attorney licensed to practice law in the State of Colorado, showing the names of all persons having any right, title or interest in the land proposed for development and whose consent is necessary to convey clear title to such land shall be filed with the proposed Final Subdivision Plat.

5.      Final Subdivision Plat. In addition to other requirements for final subdivision plat approval, all Final Subdivision Plats shall provide as follows:

a.      Use and Service Disclosure.   All Final Subdivision Plats subject to this Section 25.5 must provide an Ouray County Use and Service Disclosure containing the following language:

Ouray County services, as well as private and other public services, including but not limited to emergency services such as fire and ambulance and various utilities, including water supply in terms of quality or quantity, may not be available or may be limited.   Purchasers are advised to seek private consultation regarding any of these matters.   In addition, roads providing

BLM_0061592

ingress and egress to the properties included within this Plat may not be constructed or maintained in accordance with County Road Standards.  Approval of this Final Plat does not constitute and shall not be considered as conferring any guarantee or expectation of the provision of any County service.

In addition, site development permits shall not be issued until all improvements are completed in accordance with a Final Improvements Agreement and Development Agreement and are inspected and approved by the County Building Official.

b.    Advisements.   All deeds to or contracts for the sale of property located within a Development approved pursuant to this Section 25.5 must also contain an advisement as follows: Ouray County services, as well as private and other public services, including but not limited to emergency services such as fire and ambulance and various utilities, including water supply in terms of quality or quantity, may not be available or may be limited. Purchasers are advised to seek private consultation regarding any of these matters.

6.    Public Meeting for Board of County Commissioner's Review. Upon determination by the Land Use Department staff that the Final Subdivision Plat, site plan, and all accompanying materials have met all requirements, the County Land Use Administrator shall refer the matter to the Board of County Commissioners.   The Board of County Commissioners shall, at the next regular meeting after receipt of the Final Subdivision Plat, site plan and accompanying material determine if the Final Subdivision Plat, site plan and accompanying materials are in compliance with the provisions of this Section.

7.    Decision. If the Board of County Commissioners finds that the Final Development Plan and Final Plat and accompanying materials are in compliance with all requirements of this Section, the Board shall approve and sign the Final Subdivision Plat.   If the Board of County Commissioners finds that the Final Development Plan, Final Plat, Final Improvements Agreement, or accompanying materials are not in compliance with the requirements of this Section, the Board shall specifically identify all deficiencies and shall specify all recommended or required resolutions and shall promptly deliver them to the applicant.  The Board of County Commissioners may deny the Final Development Plan and Final Plat if it fails to meet the requirements and conditions of the Preliminary Plat.

8.    Payment of Road Maintenance Impact and Land Dedication Fees. Any Road Maintenance Impact and Land Dedication Fees required as part

BLM_0061593

of the Development Agreement shall be paid prior to the recordation of the documents as required in subsection G. 10 herein below.

9.　　Execution of the Final Documents.　Upon approval by the Board of County Commissioners, the Final Development Plan, Final Plat, and Final Improvements Agreement shall be fully executed within five (5) working days of approval.

10.　　Recordation.　The fully executed Final Development Plan, Final Plat, and Final Improvements Agreement shall be recorded in the Ouray County public records by the applicant within five (5) working days of full execution.

H.　　CONSTRUCTION - REQUIRED APPROVALS

1.　　Required Information.　No construction shall commence and no permits for construction shall be granted until all of the following which are required by the County and have been approved by the Board of County Commissioners and properly recorded with the County Clerk and Recorder's Office; Development Agreement and sketch plan; Preliminary Development Plan; Preliminary Plat; and Final Development Plan; Final Plat; Final Improvements Agreement; and other documents required by this Section 25.5.

2.　　Conformance Forfeiture.　All construction shall conform to the Final Subdivision Plat, Development Agreement, and other applicable laws and regulation, with any material variation subject to Board of County Commissioners' approval.

The Development must be completed in accordance with the schedule established by the approved Development Agreement, approved Final Subdivision Plat, and approved Final Improvements Agreement.　Failure to do so may result in forfeiture of the developer's/landowner's performance bond.

3.　　Construction Permit Application.　Prior to the commencement of construction, the landowner shall first obtain a Construction permit from Ouray County. The application for such permit shall include construction plans for all public improvements These shall consist of three (3) copies of plans and profiles for all streets drawn to a scale of 1" = 10' vertical and 1" = 5' vertical and I" = 50' horizontal, showing all proposed utility line locations and sizes, connections, valves, fire' hydrants, detailed plans for all water supply and sanitary sewer service facilities (if applicable) and detailed plans for all drainage structures and flood plan channelization facilities.　The Construction Permit may be referred to various utility

BLM_0061594

companies for review prior to issuance of the permit, The County shall approve the application and issue a permit if it finds that the construction will be in conformance with the previously approved Final Subdivision Plat, the Development Agreement, utility requirements, and other applicable laws and regulations.

4.    Construction to Commence.  Once all phases of the application and approval process are completed and all applicable fees have been paid to the County the applicant/subdivider may commence with the construction phase of the plan according to the requirements as approved by the Board of County Commissioners.

5.    Release of Performance Bond.   For release of the performance bond one year after completion of improvements and County approval of the roads and utilities infrastructure and may provide for partial release of the surety upon partial completion of the roads and utilities infrastructure-, provided, however, that funds in any escrow account shall be returned to the applicant/subdivider upon the completion and approval by the County of the improvements.

25.6    NOTICE OF APPROVAL

Each map, plat, or other document constituting a Site Specific Development Plan shall contain the following language: "approval of this plan may create a vested property right pursuant to Article 68 of Title 24, C.R.S., as amended."  Failure to contain this statement shall invalidate the creating of the Vested Property Right.  In addition, a notice describing generally the type and intensity of use approved, the specific parcel or parcels of property affected and stating that a Vested Property Right has been created shall be published once, not more than 14 days after approval of the Site Specific Development Plan in the newspaper designated by the Board of County Commissioners for publication of notices.

25.7    PAYMENT OF COSTS

In addition to any and all other fees and charges imposed by this Code, the applicant for approval of a Site Specific Development Plan review, including publication of notices, public hearing and review costs.

25.8    OTHER PROVISIONS UNAFFECTED

Approval of a Site Specific Development Plan shall not constitute an exemption from or waiver of any other provisions of this Code pertaining to the development and use of property.  The establishment of a Vested Property Right shall not preclude the application of ordinances or regulations which are general in nature and are applicable to all property subject to land use regulation by a local government including, but no limited to, building, fire, plumbing, electrical, and mechanical codes.

BLM_0061595

25.9    LIMITATIONS

Nothing in this section is intended to create any Vested Property Rights but only to implement the provisions of Article 68 of Title 24, C.R.S., as amended.  In the event of the repeal of said article or a judicial determination that said article is invalid or unconstitutional, this section shall be deemed to be repealed, and the provisions hereof no longer effective.   Nothing contained in this section is intended to or shall affect the County's rights of eminent domain and condemnation as otherwise granted by law.

BLM_0061596

Adopted by the County Commissioners on January 8, 2001

# Section 26

**LAND DEDICATIONS AND PAYMENTS FOR SCHOOL PURPOSES**

26.1   <u>PURPOSE, AUTHORITY AND APPLICABILITY</u>

The purpose of this Section is to ensure availability of sites and land areas for school purposes that are reasonably necessary to serve a proposed subdivision and the future residents thereof.   Authority to enact the provisions of this Section is provided at C.R.S. Section 30-28-133(4).   The provisions of this Section shall apply to all residential land development applications for developments located within the Ouray County School District R-2, submitted following January 8, 2001.   In the case of a Planned Unit Development, a sketch plan shall not constitute a residential land development application.

26.2   <u>DEFINITIONS</u>

"Fair Contribution For Public School Sites" shall mean the requirement, as stated herein, for land dedication or conveyance for public school sites or payments in lieu of land dedication or conveyance for public school sites or a combination thereof.

"Fair Contribution For Public School Sites Methodology" or "Methodology" shall mean that methodology that has been adopted by the Ouray School District R-2 and the County to determine the per acre and cash in lieu of amount of a Fair Contribution For Public School Sites.  The methodology fairly apportions the cost of acquiring public school sites made necessary by new residential development.

"Residential land development application" shall mean an application, submitted to Ouray County, for approval of a Planned Unit Development, approval of an Exemption and all other subdivisions that contain a residential use component and that may be approved pursuant to this Code.

"School District" shall mean the Ouray County School District R-2 (Ridgway School District).

26.3   <u>REFERRAL TO SCHOOL DISTRICT</u>

The County shall refer to the School District all residential land development applications for developments located within the School District.  The School District shall provide its written comments, if any, to the County within 35 days of mailing or delivery of the referral.   The County will consider the School

BLM_0061597

District's timely comments in conjunction with the review and processing of each residential land development application.

26.4   FAIR CONTRIBUTION FOR PUBLIC SCHOOL SITES

All applicants, as a condition of approval of a residential land development application located within the School District, and pursuant to the provisions of C.R.S. Section 30-28-133(4), shall dedicate or convey land for a public school site to the School District, or in the event the dedication of land is not deemed feasible or in the best interests of the School District as determined jointly by, and in the joint discretion of, the County and the School District, the County may require a payment in lieu of land dedication or conveyance to the School District or a combination of land and cash payment.

A.   The manner and amount of the dedication or payment or combination thereof shall be determined by the Methodology adopted by the County and incorporated herein.   The Methodology shall be updated periodically as conditions warrant by joint agreement of the County and the School District.

B.   If the Fair Contribution For Public School Sites requirement includes a payment in lieu of land dedication or portion thereof, the final subdivision plat shall include signature of the Superintendent of the School District or his/her designee, acknowledging that payment for all residential units identified on the plat has been received by the School District.  The final plat shall not be recorded without such signature.

C.   If the Fair Contribution for Public School Sites includes the dedication of land, the applicant shall dedicate the required land and shall provide proof that the dedication has been made in accordance with the following requirements:

(1)   The person or entity has conveyed to the School District by general warranty deed, title to the land required to be dedicated, which title is to be free and clear of all liens, encumbrances, and exceptions (except those approved in writing by the School District), including, without limitation, real property taxes, which will be prorated to the date of conveyance or dedication.

(2)   At the time of dedication or conveyance, the applicant shall provide a title insurance commitment followed by delivery of a title insurance policy in an amount equal to the fair market value of the dedicated property which shows the state of title to the land as necessary to comply with Section 26.4.C (1).

D.   All lands dedicated, when required as Fair Contribution For Public School Sites, shall be conveyed directly to the School District.  Any sums, when required, or moneys to be paid as Fair Contribution For Public School Sites shall be paid

BLM_0061598

directly to the School District.   The School District shall comply with the provisions of Section 30-28-133, C.R.S. in its accounting and disposition of lands conveyed or moneys paid pursuant to this Section 26.

E.        In conjunction with the implementation of this regulation, the County and the School District shall enter into an Inter-Governmental Agreement which shall, consistent with this Section, facilitate and supplement the terms hereof.   Said Inter-Governmental Agreement shall provide, *inter alia*, that the School District shall comply with all requirements of the Ouray County Land Use Code, Building Code and zoning regulations in the School District's location and construction of school buildings within the unincorporated portions of Ouray County, Colorado.

BLM_0061599

LAND DEDICATIONS FOR SCHOOL PURPOSES

METHODOLOGY

General

The following methodology has been developed based upon the requirements of Section 30-28-133, C.R.S. to provide a means by which dedications of land, or the payment of cash in lieu of such dedications, may be made in connection with proposed developments containing residential uses.   It is based on certain assumptions derived from data regarding local land use and student generation, a prototype acreage for school sites, and the use of market data to determine cash in lieu equivalencies.

Assumptions

| | | |
|---|---|---|
| 1. | Average student generation (ASG) per residential unit (RU) | .33 |
| 2. | Prototypical school site in terms of total acres (AC) | 20 acres |
| 3. | Number of Students per school site | 300 |
| 4. | Number of Students per acre of school site (300/20) | 15 |
| 5. | Per-acre allocation of school site per student (PAA)(1/15) | .067 acre |

Calculation of Land Dedication Requirement (DR)

ASG x (# of RUs) x PAA = (DR)

Calculation of Cash In Lieu Payment

1.     Where cash in lieu payment is to be made, determine value of land in subdivision being dedicated, based on zoned and platted residential land, using comparables to result in a Per Acre Value (PAV)

2.     DR x PAV = Cash in Lieu Fee

26-4

BLM_0061600

Adopted by the County Commissioners on December 9, 2002

# Section 27

OUTDOOR LIGHTING REGULATIONS

27.1    <u>PURPOSE</u>

In order to preserve the scenic beauty, rural setting, character and the dominating influence of the natural environment of Ouray County and the health, safety and welfare of its citizens and visitors, there are hereby established Outdoor lighting Regulations. The intent of these regulations is to eliminate glare and minimize, but not totally eliminate, ambient light, which impacts properties other than the property where the light is located.

27.2    <u>COMPLIANCE</u>

A.    All land uses, and land use approvals, all new development including renovations and additions and all new exterior signage shall meet the requirements of this Section 27 except the following:

(1)    Existing lighting used for existing agricultural operations; and

(2)    Lighting that is required by State and Federal regulating agencies, including but not limited to OSHA and MSHA; and

(3)    Lights operated by motion detectors that are set at no more than ten (10) minute duration after activation; and

(4)    Accent lighting or feature enhancing lighting is allowed but shall be limited to fixtures with a maximum output of 800 lumens per fixture (40 watts incandescent or equivalent) regardless of the number of bulbs.

B.    All applications for land use approvals, construction permits or signage permits shall include exterior lighting schedules and/or plans sufficient to determine compliance with these regulations.

C.    Continued compliance with these regulations shall be required in the future, notwithstanding an initial determination by the County that development meets the requirements of this Section 27.

D.    All existing lighting that is made nonconforming as of the date of the adoption of this Section 27, shall be brought into conformance on or before January 1, 2008.

BLM_0061601

27.3   <u>CRITERIA AND STANDARDS</u>

A.     No exterior lighting shall radiate above a level that is five degrees (5°) below horizontal.

B.     No outdoor light may be used in a manner that could interfere with the safe movement of motor vehicles on public thoroughfares.

C.     To the extent that is practical, ambient light across property lines shall be kept to a minimum.

27.4   <u>PROCESS FOR REVIEW</u>

A.     Development Requiring Only a Building Permit

(1)     Upon receipt of a completed application for a building permit, the County Building Official shall review the project and determine whether it meets the requirements of this Section 27. If the Building Official finds the project in compliance, the Building Official may issue a building permit for the project.  If the Building Official determines that the project does not comply, the Building Official, in writing, shall so notify the applicant and indicate areas of non-compliance.

(2)     An applicant may appeal the decision of the Building Official to the Board of Visual Appeals in accordance with Section 19.7.

B.     All Other Development (PUDs and Special Use Permits)

(1)     All other development shall be reviewed for outdoor lighting compliance during the normal development review process as outlined in Section 5, Section 6, and Section 23 of this Code.

27.5   <u>DEFINITIONS</u>

A.     AMBIENT LIGHT.  Indirect light, which is detectable beyond the illuminated area. Distinguished from glare.

B.     DIRECT LIGHT.  Unshielded light rays.

C.     GLARE.  Direct light rays, which extend beyond the effective lighting area.

27.6   <u>COVENANTS RELATING TO VISUAL IMPACT</u>

The covenants of any Planned Unit Development, as required by Section 6.12(C)(4)(i), shall contain at least the following provisions as well as any other provisions required by this Code:

BLM_0061602

A.      All development within the PUD shall comply with the outdoor lighting regulations of this Section 27.

B.      An internal mechanism (such as an architectural control committee) shall be created through which any construction must have prior approval and through which the covenants may be enforced.

C.      The outdoor lighting provisions of the covenants may not be amended or altered, in any fashion that would make them less strict than the Outdoor Lighting Regulations of the Ouray County Land Use Code, without prior approval of the County.

27.7    APPEALS AND VARIANCES

Appeals and Variances shall be pursuant to Section 19.6 of the Ouray County Land Use Code. The fee for these appeals and variances may be waived based on recommendation of the Planning Department and concurrence of the Board of Adjustment.  In the case of a variance request, on the requirements of this Section, lack of financial ability to bring lighting into compliance may be considered as a valid exceptional and undo hardship.

BLM_0061603

Adopted by the County Commissioners on December 16, 2002

# Section 28

# HOME OCCUPATIONS/BUSINESSES

## 28.1  Purpose

To provide for the operation of non-intensive non-residential activities on lots, parcels or tracts of land where the primary use is for residential purposes. Contained in this section is a listing of conditions, exclusions, limitations and regulations regarding such home occupations/businesses.

## 28.2  Home Occupations

A.   Home occupations shall be defined and operated subject to the following standards:

1.   Any non-residential activity conducted within a lot, parcel or tract of land, dwelling unit and/or an accessory structure that is owned and operated exclusively by one or more persons residing on the property.

2.   The total area of the dwelling unit or accessory structure used for any and all home occupations shall not exceed 1,000 square feet.

3.   Any home occupation shall be clearly incidental and subordinate to the use of the property for residential purposes by its occupants and shall not change the residential character thereof.  The property upon which the home occupation is located must appear to be a residence, with or without accessory structures, to the average person traveling past the property.

4.   There shall be no sign advertising the home occupation.

5.   Outside storage of stocks, supplies, equipment, machinery or finished and/or unfinished products may occur as long as the area does not exceed 1,000 square feet and is screened by a fence, hedge or wall.

6.   All vehicles that are used as part of the home business shall be licensed and operable and meet equipment requirements of Part 2, Article 4, Title 42 C.R.S., as amended.

7.   There shall be no offensive noise, vibration, smoke, dust, odors, heat or glare noticeable beyond any boundary line of the lot, parcel or tract of land due to the conduct of the home occupation.

8.   Any home occupation shall not generate more than seven (7) vehicle trips per day and may not be a retail business where products are sold or services delivered to a customer, on-site, during one visit.

B.   Once one or more of the above standards are not met the use will not be deemed a home occupation.

28-1

BLM_0061604

## 28.3   Home Businesses

A.      Home businesses shall be required to receive approval of a special use permit and shall be defined and operated subject to the following standards:

1.      Any non-residential activity conducted within a lot, parcel or tract of land, dwelling unit and/or an accessory structure that is owned and operated by one or more persons residing on the property.

2.      The home business may employ up to a maximum of five (5) people who may or may not reside on the property.  There is no limitation of the number of employees if all employees reside on the property (subject to the restrictions set forth under the definition of "dwelling unit" in Section 22 of this Code).

3.      Any home business shall be incidental and subordinate to the use of the property for residential purposes by its occupants and shall not change the residential character thereof.  The property upon which the home occupation is located must appear to be a residence, with or without accessory structures, to the average person traveling past the property.

4.      The total area used for any home business(es), including any building(s), shall not exceed three percent (3%) of the lot, parcel or tract of land or no more than 6,000 square feet whichever is less.

5.      The maximum area of any building(s) or the area within a building(s) used for a home business(es) shall be no greater than 4,000 square feet (subject to the limitations as setout above in Section 28.3 A. 4.).

6.      One (1) on-site sign advertising the home business may be allowed.  In no instance shall off-premise signage be allowed.  The sign shall be no greater than six (6) square feet in area, shall not be illuminated and shall be no higher than eight (8) feet high from existing grade to the top of the sign.

7.      Outside storage of stocks, supplies, equipment, machinery or finished and/or unfinished products may occur as long as the outside storage is within the allowed area used for the home business (see Section 28.3 A. 4.) screening may be required.

8.      All vehicles that are used as part of the home business shall be licensed and operable and meet equipment requirements of Part 2, Article 4, Title 42 C.R.S., as amended.

9.      There shall be no offensive noise, vibration, smoke, dust, odors, heat or glare noticeable beyond any boundary line of the lot, parcel or tract of land due to the conduct of the home business.

10.      If the home business generates more than seven (7) vehicle trips per day, a mitigation plan shall be submitted to the satisfaction of the County.  The mitigation plan will be a condition of Special Use Permit

28-2

BLM_0061605

approval and will be based on multiples of seven (7) vehicle trips per day for normal weight vehicles.

B.      The aforementioned standards are meant to define the upper limits of activity and impacts by home businesses.  Uses that exceed these criteria are more appropriately located within a municipality where sufficient infrastructure is available to accommodate the use.

## 28.4   Special Use Permit

A.      A special use permit is required for any home business and shall be subject to the following provisions in addition to provisions set forth under Section 5 of this Code:

1.      Evidence that the anticipated traffic and parking requirements generated by the home business has been mitigated or does not unduly impact the surrounding properties or roads.

2.      Evidence that the home business will not disrupt the character and use of the surrounding properties.

3.      Evidence that the home business will not create additional impacts that effect public health, safety, or welfare.

4.      Evidence that the home business is an appropriate use to be located on unincorporated property and does not require the degree of infrastructure available within the municipalities.

B.      Approval of a special use permit for a home business may result in a reclassification for assessment of real property by the County Assessor.

C.      All special use permits shall be issued for an initial duration of five (5) years, with the opportunity for renewal as set forth below in Section 28.5. Permits may be reviewed at any time, by the Land Use Administrator, for compliance, based on substantiated complaint.

## 28.5   Annual Permit Fee

Upon approval of a Special Use Permit, the owner of the home business shall be required to pay an annual fee.  The fee will be based on twenty-five (25) dollar per 1,000 square feet of building and/or parcel area that is being utilized by the home business.

## 28.6   Permit Renewal

Upon an Applicant's demonstration, to the satisfaction and approval of the Land Use Administrator, that all conditions and criteria set forth in the initial permit have been complied with for the duration of said permit, special use permits for home business activities may be renewed for a period of up to five (5) years.  Renewal of such permits may be denied pursuant to the standards and procedures set forth in Sections 28.3 and 28.4.

BLM_0061606

## 28.7    Permit Transferability

No special use permit for a home business may be transferred or otherwise assigned or sold to another person and/or business without prior approval of the Ouray County Board of County Commissioners.

## 28.8    Non-Conforming Uses

Any home business that exists at the time of the adoption of this Section of the Code and does not meet the provisions, may be continued for a maximum period of 5 (five) years from the date that this Section is adopted, subject to the limitations set forth under Section 4 of this Code.  If at the end of the 5 (five) year period the home business has not been brought into conformance with the provisions of this Section, the use will be in violation and subject to Section 16 of this Code.

## 28.9    Revocation of Home Business Permits

A.    If, upon review at any time, the Land Use Administrator determines that the permit holder has failed to comply with any of the conditions or restrictions imposed by this Section, by the home business permit itself, or by the representations and assertions made by the applicant in the initial permit application, the Land Use Administrator may take such action as is deemed necessary to remedy the noncompliance, including but not limited to revocation of the permit.  Violations shall be processed as outlined in Section 16 of this Code.

B.    The administrative decision to revoke such permit shall be made only after the issuance of notice to the permit holder regarding the asserted noncompliance, and the provision of an opportunity for the permit holder to make a formal response, within thirty (30) days of receipt of notice, to the Land Use Administrator regarding any asserted noncompliance. Violators not rectifying the violation within thirty (30) days of the notification will be fined an amount equal to the annual permit fee.  Such fine, if not paid will be attached to the property tax. Any applicant desiring to appeal the decision of Land Use Administrator may do so before the Board of Adjustment.

BLM_0061607

Adopted by the County Commissioners on May 7, 2007

# Section 29
# OIL AND GAS DEVELOPMENT

29.1    Authority:

This Section is authorized by C.R.S. §§ 29-20-101 et seq., 34-60-101 et seq., and 30-28-101 et seq.

29.2    Purpose:

This Section 29 is enacted to protect and promote the health, safety, morals, and convenience, order, prosperity and general welfare of the present and future residents of the county. It is the County's intent by enacting this Section to facilitate the development of oil and gas resources within the unincorporated area of the County while mitigating potential land use conflicts between such development and existing, as well as planned, land uses. It is recognized that under state law the surface and mineral estates are separate and distinct interests in land and that one may be severed from the other. Owners of subsurface mineral interests have certain legal rights and privileges, including the right to use that part of the surface estate reasonably required to extract and develop their subsurface mineral interests, subject to compliance with the provisions of this Section and any other applicable statutory and regulatory requirements. Similarly, owners of the surface estate have certain legal rights and privileges, including the right to have the mineral estate developed in a reasonable manner and to have adverse land use impacts upon their property, associated with the development of the mineral estate, mitigated through compliance with this Section. Should it be established by competent evidence that a proposed major or minor facility cannot be operated in compliance with this Section, county land use approval for such a facility may be denied.

29.3    Jurisdiction:

This Section 29 shall apply to lands within the unincorporated area of Ouray County with the exception of those lands where the county's jurisdiction is preempted by federal or state law.

    A.    General Procedures:

        (1)    Construction, installation and operation of oil and gas facilities which are subject to this Section shall not commence until administrative approval has been granted by the Land Use Department or approval as a special use following public review has been granted by the Board of County Commissioners.

        (2)    Minor oil and gas facilities which comply with the applicable standards and requirements of this Section shall be granted approval by the Land Use Department upon the applicant's submittal of satisfactory documentation, in the manner prescribed, that the facility is or will be in compliance with the standards set forth in this Section.

        (3)    Planning Commission review and recommendation together with Board of County Commissioners review and approval shall be required for activities and facilities classified as major facilities.

29-1

BLM_0061608

(4)     While this Section provides standards for development review of the surface aspects of Oil & Gas Development, consistent with applicable state and federal standards, Ouray County encourages the use of directional drilling, the placement of multiple wells on a single site, the use of lined evaporation pits rather than water injection stations, and other innovative techniques, as well as encourages the best management practices as set forth in the Bureau of Land Management "Gold Book" (Surface Operating Standards for Oil and Gas Exploration and Development), Fourth Edition, 2006, or the most current edition.

29.4    Minor Oil and Gas Facilities:

Minor oil and gas facilities require review and evaluation by the Land Use Department and County Engineer.  All subsections of this Section will be reviewed for their applicability.  An oil and gas minor facility is defined as follows:

A.     An individual well site built and operated to explore for or produce petroleum and/or natural gas (methane), including auxiliary equipment required for such production, i.e., separators, dehydrators, pumping units, tank batteries, and other equipment located within the perimeter of the well site pad, employing engines or motors with a cumulative horsepower rating of less than fifty (50) bhp;

B.     Facilities associated with gas gathering lines and water collection lines, such as: drip stations, vent stations, pigging facilities, transfer pump stations and valve boxes, where such equipment or facilities employ engines or motors with a cumulative horsepower rating of less than fifty (50) bhp;

C.     Individual wellhead compression and multiple well compression facility powered by motors or engines with a cumulative horsepower of less than fifty (50) bhp;

D.     Storage yards or construction staging areas occupying one (1) acre or less; or

E.     Geophysical (Seismic) and Gas Exploration Operations, including, but not limited to, seismic activities.

29.5    Major Oil & Gas Facilities:

Major oil and gas facilities require a Special Use Permit.  Review and recommendation by the Planning Commission as well as review and approval by the Board of County Commissioners shall be required for activities and facilities classified as major facilities. All subsections of this Section will be reviewed for their applicability.  Major oil and gas facilities are defined as:

A.     Compressor stations and associated facilities, which serve multiple wells employing engines and/or motors with a cumulative horsepower rating of fifty (50) bhp or more;

B.     Water injection stations and associated facilities;

C.     Storage yards and construction staging yards, which occupy an area greater than one (1) acre;

BLM_0061609

D.      Any other facility related to the production of oil and/or gas, which contains engines and/or motors with a cumulative horsepower rating of fifty (50) bhp or more;

E.      Gas treatment facilities, which serve multiple wells or gathering systems;

F.      Chemical injection stations;

G.      Pipelines located outside an individual well site.

29.6    Application Submittal:

A.      The applicant shall submit a minimum of five (5) complete copies, or a number as directed by the Land Use Administrator, of the application and associated materials. Submittal requirements are summarized in the following table:

SUBMITTAL REQUIREMENTS

|   | SUBMITTAL REQUIREMENTS | MINOR FACILITY | MAJOR FACILITY |
|---|---|---|---|
| 1. | Application form and filing fee following pre-application meeting (See 29.7 A) | X | X |
| 2. | Proof of right of entry for ingress and egress, installation of all necessary infrastructure and utilities and all applicable surface damages and surface use agreements. | X | X |
| 3. | An appropriate vicinity map showing the designated activity window | X | X |
| 4. | A written description of the proposed well and associated site development including, but not limited to: | X | X |
|   | - description of equipment, including horsepower | X | X |
|   | - hours of operation during construction & during operation | X | X |
|   | - timing of development [specify start and completion dates for development and production] | X | X |
|   | - estimated number of site visits by vehicles per week during development and during production, including any water-hauling | X | X |
|   | - description of proposed noxious weed control | X | X |
| 5. | A detailed site inventory map drawn to scale of 1" = 50' showing: | X | X |
|   | - existing roads | X | X |

SUBMITTAL REQUIREMENTS CONTINUED

29-3

BLM_0061610

| | SUBMITTAL REQUIREMENTS | MINOR FACILITY | MAJOR FACILITY |
|---|---|---|---|
| | - existing commercial and residential structures, cultural/historical sites | X | X |
| | - ecological resources and other features deemed necessary by Planning Staff, within a 500-foot radius of the outer perimeter of the parcel or drilling window containing the proposed Facility | X | X |
| 6. | A detailed site development plan, drawn to a scale of 1" = 50' showing: | X | X |
| | - the proposed development in the drilling window | X | X |
| | - well pad location during drilling and permanent production | X | X |
| | - access road to property and designated roads to well head and facilities | X | X |
| | -existing and proposed landscaped areas | | X |
| | - exterior lighting locations | | X |
| | - fencing | | X |
| | - utility easements | | X |
| | - any proposed and existing pipelines to be utilized and their related easements | X | X |
| | - drainage features | X | X |
| | - existing and proposed topography using 2, 5 or 10 foot contour intervals | | X |
| 7. | Color photos of the area taken from the proposed well site facing north, south, east, and west showing existing landscape. | X | X |
| 8. | Color photos of the proposed roads to be used for accessing the property | | X |
| 9. | Geophysical (Seismic) Operations information | X | X |
| 10. | Visual mitigation plan | X | X |
| 11. | Road damage mitigation plan | X | X |
| 12. | Environmental and Wildlife Mitigation Plan | | X |
| 13. | Emergency Preparedness Plan | X | X |
| 14. | Any additional materials as may be required by the Planning Staff that are deemed necessary to fully evaluate the compliance of the proposed Facility with these regulations. | X | X |
| 15. | Copies of all State and Federal permits and required plans (i.e. stormwater, etc.). | X | X |

Note: Certain submittal requirements may be waived or modified by the Planning Staff if it is demonstrated that the material to be waived or modified is not applicable to the specific application.

B.      Surface Damages and Surface Use Agreements.  For Major and/or Minor Facilities to be located upon real property with split estates, for which the Operator does

BLM_0061611

not currently own or lease the surface estate, the Operator shall provide a copy of any Surface Damages or Surface Use Agreement, and related documents, which have been executed by the owner(s) of the surface estate for the parcel upon which a Major or Minor Facility is to be located, and which detail the agreement of the surface owner for the use of the property, including rights of ingress and egress, provisions for any installation of necessary utilities, and such other provisions relating to the use of the surface estate as may be appropriate. Such submitted agreement(s) may be redacted to delete any provisions pertaining to financial and/or non-monetary compensation that the Operator has paid to the surface owner. In lieu of submitting copies of such agreements, an Operator may submit a notarized written consent or written waiver to the proposed Major or Minor Facility that has been executed by the owner(s) of the surface estate for the parcel(s) upon which such Facility is to be located. Should the Operator not have entered into a Surface Damages or Surface Use Agreement with the owner(s) of the surface estate, the Operator shall submit a written certification to that effect, together with a copy of the bond that has been posted as security for possible surface damages as required by the COGCC rules. For Major and/or Minor Facilities located within a parcel or parcels for which the Operator is the current owner or lessee of the surface estate, the Operator shall provide a copy of a current title policy reflecting the same or a copy of the lease.

C.   Geophysical (Seismic) Operations shall also include the following information:

(1)   A Surface Use Plan including all of the information required above,  the general location of shothole exploration, the likelihood of detonation failure and surface restoration.

(2)   Operator Certification.

(3)   List of hazardous and/or explosive materials to be used.

(4)   Identification of any wildlife habitat as mapped by the Colorado Division of Wildlife.

(5)   A description of the time period and duration of the operation and any seasonal restrictions per the Colorado Division of Wildlife and/or applicable Federal and/or State permits.

(6)   Documentation authorizing the proposed Geophysical (Seismic) Operation executed by the owner or lessee of the mineral estate(s) and from the surface owner that is the subject of the Geophysical Operation.

29.7   Review Process:

Applications for an Oil and Gas Development Permit shall comply with the following procedures:

A.   Pre-Application Meeting:

All Applicants for either a Minor or Major Facility shall schedule and attend a pre-application meeting with a member of the Land Use Department before submitting an

BLM_0061612

application.  The purpose of the pre-application meeting is to inform the Applicant of the applicable procedures, submittal requirements, development standards, and other pertinent matters before the Applicant finalizes its proposal.  If a formal permit application is not submitted within one hundred-eighty (180) days of the pre-application meeting, a new pre-application meeting must be scheduled and held before the formal application will be accepted.

It shall be the Applicant's responsibility to invite the surface owner to the pre- application meeting by sending a letter at least fourteen (14) days in advance of the pre-application meeting to the surface owner, inviting the surface owner to attend the meeting.  Proof of such notice shall be submitted to the Land Use Department by a certificate of mailing.

B.      Notice to Adjacent and Affected Property Owners.

The Applicant shall provide written notice to adjacent and affected surface owners, as defined in subsection (1).  The Applicant shall present to the Land Use Department proof of such notice by submitting a copy of the notice and a list of the landowners notified, together with an affidavit attesting to such notice executed by the person responsible for providing such written notice.  This notice to affected surface owners shall be mailed within three business days of the application being submitted to the Land Use Department.  The notice to affected owners shall provide a statement that all written comments regarding the application must be provided to the Land Use Department within fifteen business days after the date of the filing of the application for a Minor Facility and in accordance with the procedures described in Section 5 for a Major Facility, with such specific deadline referenced in the Notice.  Written notice of the application shall be made as follows:

(1)      To the current surface owners of the parcel(s) of land  upon which the Minor or Major Facility is proposed to be located, as well as the current surface owners of those parcels of land within ¼ mile (1320 feet) of the Facility perimeter.  Ownership shall be determined from the current records on file with the Ouray County Assessor and a list of adjacent and affected surface owners obtained from the Assessor's Office shall be submitted along with the Application.  For the purpose of notice, a surface owner shall receive notice if its property boundary is within ¼-mile (1,320 feet) from the point indicated as the wellhead or, for Minor Facilities other than wells, from the Facility perimeter as depicted on the Development Plan.

In addition to the required written notice under this provision, the applicant shall at a minimum, contact the Land Use Department and check the records of the Ouray County Clerk and Recorder to ascertain if any landowners required to be provided notice as part of an application are also members of a condominium or homeowner's association.   If any landowners are part of such an association,, the Applicant shall also provide written notice to the association in the same manner as other landowners.

(2)      Such Notice shall include the proposed location of the Major or Minor Facility; a description of the proposed Facility as well as a street address if available; the identification of the Applicant and its designated agent, as well as all contact information for the Applicant and its agent; a vicinity map showing the

BLM_0061613

site and the proposed access roads; construction, facilities and description of the equipment proposed to be used or located upon the site, both during and after completion of the Facility.

(3)    In addition to the written Notice described above, the Applicant shall post a notice (to be obtained from the County) in a conspicuous place on the property or closest public roadway within 5 days of the submittal of the application to the Land Use Department.  The Applicant shall submit with its Application a photograph of the posted notice and the date and time that it was posted.

C.    Review Procedure for Minor Facilities

Applications for county land use approval for proposed Minor Oil and Gas Facilities require a Development Permit, which shall be administratively processed by the Land Use Administrator or a designee, provided the information in the application establishes that the proposed use complies with the minimum requirements for such facilities as set forth in this article. The COGCC Application for Permit to Drill (APD), subject to planning staff determination of adequacy of this information may suffice as a portion of the application (Development Permit) subject to Administrative Review.

(1)    The Land Use Department and County Engineer shall review the application.  The express purpose of the review is to ensure that the proposal complies with all applicable development standards and requirements.

(2)    The staff review, and the subsequent action on the application, shall occur within forty-five (45) calendar days of the Land Use Department's acceptance of a complete Submittal.

(3)    The application shall be reviewed against the requirements of this Section 29.8.  Based upon this review the Land Use Department shall approve, approve with conditions, or deny the application.  Such approval shall be effective fifteen (15) days after the decision.

(4)    Gathering System Lines. All gathering lines for any Facility shall be shown on the site plan for each individual well. A revegetation plan shall be submitted for all gathering lines, which shall include sufficient procedures for seeding, crimping and weed control. A weed control plan shall be included to control weeds listed on the Colorado State and/or Ouray County Noxious Weed list. Prior to installation of gathering lines, an Encroachment Permit shall be obtained from the Road and Bridge Department for any road crossings and work in County rights-of-way or a County Road. A final as-built plan sufficient to locate final constructed gathering lines shall be provided to the County within 3 months of completion.

(5)    Appeal of Land Use Administrator's Administrative Decision. An Applicant, Surface Owner, adjacent property owner or other person who is significantly affected by the Land Use Administrator's decision may appeal the Land Use Administrator's decision by submitting a letter addressed to the Land Use Administrator requesting an appeal. Such appeal letter shall be submitted to the Land Use Administrator within fifteen days of the Administrative Decision

BLM_0061614

complained of. The Board of County Commissioners shall conduct a public meeting within 60 days of submittal of the appeal letter to consider such appeal. The Board shall consider any information supplied to it at the public meeting, and shall render its written decision, based upon the criteria set forth in this Section, within 30 days of the date of the appeal hearing. Such decision shall constitute the final action by the County. During the pendency of the appeal, all action by the Applicant shall be stayed.

D.     Review Procedure for Major Oil & Gas Facilities:

(1)     All applications for major facilities shall be scheduled for public review according to the review process described in Section 5 of the Land Use Code. The Planning Commission shall review all such applications at a scheduled public hearing, and shall forward a recommendation for approval, conditional approval, or denial with appropriate findings to the Board of County Commissioners for final action.

(2)     Review Criteria: Review and decision to approve or deny an application for a major facility shall be made and determined based upon its compliance with all applicable performance standards and other requirements of this Section and by applying the following criteria to the evidence in the record of proceedings before the Planning Commission and the Board of County Commissioners:

(a)     Need. The demonstrated need for the facility, in the location proposed, to serve the applicant's existing and projected oil and gas development, production and operational requirements.

(b)     Suitability. Suitability of the location of the proposed facility given its size, design and operational characteristics. Factors to be considered include noise levels, impacts upon air and water quality, vibration and odor levels, fire protection and access requirements, visual impacts, wildlife impacts and public safety. These factors will be evaluated in accordance with applicable state, county and federal standards and criteria.

(c)     Adequacy of Existing Roads and Access to the Site. Consideration of existing and proposed road alignment, intersections, condition, structure and site distances; traffic volumes and types of equipment; dust control; existing road uses; and documentation of the Applicant's legal right to use the proposed access(es).

(d)     Site Characteristics. Factors to be considered are topography, natural hazards (landslides, flooding, wildfire), and current resource values (open space corridor, prime farmland as designated by Natural Resource Conservation Service and wildlife habitat).

(e)     Compatibility. Compatibility with existing uses and those which can reasonably be anticipated, based upon present subdivision and land use approvals for properties located within the surrounding affected area, as determined by the Board of County Commissioners, based upon competent evidence in the record. A Facility's compatibility with land uses

BLM_0061615

in the surrounding area, which the Board of County Commissioners finds will be affected by its operation, shall be determined by the facility's estimated or projected ability to mitigate the impacts which it generates, as set forth in the facility operational plan, and in accordance with applicable county, state and federal rules, regulations and standards.

(3)     Decision by the Board of County Commissioners.

Following the conclusion of its public hearing, the Board of County Commissioners may proceed to verbally render its provisional decision on the application, or it may take the matter under advisement to an announced date certain. Following the Board of County Commissioners' oral announcement of its decision, a written resolution shall be adopted as its final action or decision on the application. This written resolution shall set forth findings based upon competent evidence in the record of proceedings before the Board and any applicable federal, state or county statutes, rules, regulations or policies. The Land Use Department shall prepare the written resolution for the Board of County Commissioners' consideration within fifteen (15) days of the verbal decision, or such period of time as the Board of County Commissioners may specify. For the purposes of judicial review, the Board of County Commissioners' final action or decision on an application shall be deemed to have been made as of the date upon which the Board of County Commissioners executes the written resolution, which shall constitute the Board of County Commissioners' final action or decision.

29.8    Performance Standards for All Oil and Gas Facilities.

A.      The County believes that the potential impacts attendant to future oil and gas development would be best mitigated for the County as a whole if multiple wells are drilled, where possible, on existing well pads ("Pad Drilling"). The County may grant special exceptions to this standard under Section 29.9 when the County finds that one or more of the following factors apply in a manner such that use of an existing well pad is rendered impractical:

(1)     Topographic characteristics of the site;

(2)     Natural resource constraints (e.g. wetlands);

(3)     The location of utilities or similar services;

(4)     Geological factors or where issues concerning distances between wells are present;

(5)     Other site conditions beyond the control of the applicant; or

(6)     Safety concerns.

(7)     At the request of the surface owner or at the County's own discretion.

29-9

BLM_0061616

B.      Land Use Coordination Standards.

(1)      Purpose: The purpose of these standards for land use coordination is to minimize conflicts between oil and gas facilities and other land uses.

(2)      Setbacks. The following setbacks are to be considered a minimum standard and, if deemed appropriate, may be increased based on review criteria.

(a)      Minor facilities.

(i)      A minimum setback of at least three hundred (300) feet shall be required between the well head location and any surface waters, or watercourse (including springs, ephemeral wetlands, arroyos, stock ponds and draws);

(ii)      A minimum setback of at least one thousand (1000) feet shall be required between the well head location and any areas of cultural, scenic or environmental significance; and

(iii)      A setback of at least four hundred (400) feet shall be required between the site perimeter of a minor facility and the closest existing residential structure or occupied building, unless verified written consent is obtained from the affected surface property owner to a waiver of this standard.

(iv)      A setback of at least two hundred (200) feet shall be required between the site perimeter of a minor facility and the closest platted subdivision lot line, unless verified written consent is obtained from the affected property owner.

(v)      A setback of at least 200 feet from the site perimeter and any public right-of-way.

(vi)      A smaller setback may be granted by the County if the surface owner agrees and if there is no adverse impact on adjacent properties. No reduction in setback shall be permitted, however, if such setback would violate the applicable setbacks as set forth in Section 3 of this Code.

(vii)      Where compliance with COGCC spacing regulations makes it impossible for the applicant to meet the setbacks stipulated in this Section, and a waiver is not obtained from the affected property owner, the applicant shall not be required to fully meet the above-described setbacks. The applicant shall, however, meet the setbacks to the maximum extent possible within the COGCC spacing regulations and may be required to implement special mitigation measures as described in this Section.

BLM_0061617

(b)     Major Facilities.

(i)     Setbacks for a Major Facility shall be determined on a site specific basis, based on the Major Facility review criteria, provided, however, that at least the minimum setback for a Minor Facility shall be met.

(ii)     Major Facilities shall not be located in platted subdivisions containing any lots of ten acres or less.

(3)     Sound Emissions:

(a)     The exhaust from all engines, motors, coolers and other mechanized equipment shall be vented in a direction away from the closest existing residences or platted subdivision lots.

(b)     All minor and major facilities with engines or motors, not electrically operated, shall be equipped with quiet design mufflers (also referred to as "hospital grade" or "dual dissipative") or equivalent. Such equipment shall be properly installed and maintained in proper working order.

(c)     Where a minor or major facility does not comply with the required setback or other portions of the performance standards, additional noise mitigation may be required. In determining noise mitigation, specific site characteristics shall be considered, including but not limited to the following:

(i)     Nature and proximity of adjacent development (design, location, type).

(ii)     Prevailing weather patterns, including wind directions

(iii)     Vegetative cover on or adjacent to the site.

(iv)     Topography.

(d)     Based upon the specific site characteristics set forth in this Section, nature of the proposed activity and its proximity to surrounding development, and type and intensity of the noise emitted, additional noise abatement measures may be required. The level of required mitigation may increase with the proximity of the facility to existing residences and platted subdivision lots, and/or the level of noise emitted by the facility. One or more of the following additional noise abatement measures, listed below in ascending order of mitigation, may be required:

(i)     Acoustically insulated housing or cover enclosing the motor or engine.

(ii)     Vegetative screen consisting of trees and shrubs that may be placed within a fenced enclosure.

BLM_0061618

(iii)     Solid wall or fence of acoustically insulating material surrounding all or      part of the facility.

(iv)     Acoustically insulated building enclosing the installation.

(v)     Noise management plan identifying hours of maximum noise emissions, type, frequency and level of noise to be emitted; and proposed mitigation measures.

(e)     Sound emissions shall be at a minimum to be in accordance with the standards as adopted, and as amended from time to time, of the COGCC.

(4)     Other special mitigation measures. Construction of buildings or other enclosures may be required where facilities create noise and visual impacts non-mitigable because of proximity, density and/or intensity of adjacent land use.

(5)     Vibration. All stationary equipment associated with minor and major facilities shall be anchored on isolation pads so as to minimize transmission of vibration through the ground.

C.     Safety and Security

(1)     Security fencing and a locked gate for minor and major facilities shall be required in the following locations:

(a)     Where there are four (4) or more existing residences within six hundred (600) feet of the facility site perimeter.

(b)     Where there is a public or private school within six hundred (600) feet of the facility site perimeter.

(c)     Where there is any other existing structure with commercial occupancy as defined by the adopted building code within six hundred (600) feet of the facility site perimeter.

(d)     Where there is an existing recreational facility designated by an appropriate federal, state or local authority within six hundred (600) feet of the facility site perimeter.

(2)     Safety practices generally accepted by the oil and gas industry shall be used at all times during drilling and production to minimize the danger to the general public.

(3)     Open-ended discharge valves on all storage tanks, pipelines and other containers shall be secured where the facility site is unattended and/or accessible to the general public.

(4)     All land within twenty-five (25) feet of any tank; pit or other structure containing flammable or combustible materials shall be kept free of dry weeds, grass or rubbish.

29-12

BLM_0061619

(5)      Where the applicant's visual mitigation plan specifies alternative security fencing, the alternative fencing shall apply.

D.      Environmental Quality Standards:

(1)      Recognizing the need to avoid operational conflicts, yet recognizing the rights of surface owners, the right of the county to regulate land uses and the right of the mineral estate to extract minerals, the following criteria shall be used in siting oil and gas facilities. Facilities that cannot comply with these criteria may be denied or may be required to mitigate the site. The Land Use Administrator may waive the mitigation requirements if existing topography and vegetation mitigate the visual and sound impacts of the site. The County shall determine the compliance of the proposal using the following standards. Standards are ranked according to importance. Where conflicts between standards occur, the higher ranked standard will be used.

(a)      The siting of a minor facility shall lie within the COGCC determined drilling window, or in a location that complies with COGCC rules and regulations.

(b)      The standards in this Code shall not cause the operator to site the facility in: a geologic hazard area; an area with slopes exceeding thirty (30) percent; an area of wetlands under the jurisdiction of the U.S. Army Corps of Engineers; in an area within a floodway of a stream or river as shown on the Flood Insurance Rate Maps (FIRM) or as determined by a state licensed professional engineer.

(c)      All facilities shall be sited to minimize the impact to existing residences, commercial structures, public buildings, and county approved platted building envelopes.

(d)      Minor facilities shall be constructed using existing infrastructure. This includes, but is not limited to, the use of existing roads, pipeline routes, and well pads within the existing drilling windows.

(e)      All facilities shall be sited to minimize the impact to agricultural operations.

(f)      Appeal of Land Use Administrator's Administrative Decision. An Applicant or Surface Owner may appeal the administrative siting decision by the Land Use Administrator by submitting a letter addressed to the Land Use Administrator requesting an appeal. Such appeal letter shall be submitted to the Land Use Administrator within fifteen days of the Administrative Siting Decision. The Board of County Commissioners shall conduct a public meeting within 60 days to consider such an appeal. The Board shall render its written decision within 30 days of the date of the appeal hearing, which decision shall constitute the final action of the County. During the pendency of the appeal, all action by the Applicant shall be stayed.

BLM_0061620

E.    Visual Impacts

(1)    To the maximum extent possible, the applicant shall use structures and equipment of the minimum size necessary to satisfy present and future functional requirements. The Operator is also encouraged to use low profile pumps and equipment to mitigate visual impacts.

(2)    When clearing trees and vegetation for construction of minor and major facilities, the applicant shall feather and thin edges of vegetation.

(3)    The applicant shall replace earth adjacent to water crossings at slopes less than the natural angle of repose for the soil type of the site.

(4)    To the maximum extent possible, the applicant shall align access roads to follow existing grades and minimize cuts and fills.

(5)    Minor and major facilities shall be painted as follows:

(a)    Uniform, noncontrasting, nonreflective color tones, similar to Munsell Soil Color coding system.

(b)    Color matched to land, not sky, slightly darker than adjacent landscape.

(6)    The applicant shall minimize damage to existing trees and vegetation.

(7)    Pad dimensions for a minor facility shall be the minimum size necessary to provide a safe work area and minimize surface disturbance but in no instance larger than eight (8) acres. The pad shall be oriented in a manner to reduce visual impact of view corridor or road; ideally the pad shall be sited perpendicular to any roads or highways, not parallel.

(8)    Upon completion of the well or other work associated with a Major or Minor Facility, the Operator shall reseed the disturbed area with native grasses or other vegetation similar in kind to surrounding vegetation. Revegetation on cropland shall be accomplished within three months after completion and within twelve months for non-crop land. The surface owner may agree, in writing, to other suitable deadlines or type of revegetation. The Operator shall ensure that any weeds in the area for revegetation shall be mitigated prior to the re-seeding being performed. The requirements for revegetation shall not apply to main Access Road and the immediate areas surrounding the aboveground facilities, which are necessary for safe operations, and which are to be graveled.

(9)    One or more of the following landscape practices shall be applied, on a site specific basis:

(a)    Establishment of ground covers, shrubs and trees. Landscaping shall be appropriate to the surrounding territory and vegetation. Vegetation clusters shall be placed ten (10) to fifteen (15) feet apart along the edge of the permanent pad site or as otherwise agreed to by the surface owner.

29-14

BLM_0061621

(b)      Shaping cuts and fills to appear as natural forms.

(c)      Cutting rock areas to create irregular forms.

(d)      Designing the facility to utilize natural screens.

(10)    Exterior lighting, when required, shall meet the standards set forth under this Code. Except as otherwise permitted by Section 27 of the Ouray County Land Use Code, all lighting associated with oil and gas development will be shielded to prevent direct visibility of the source of light from off-site, directing all exterior lighting either toward either the ground or the surface of the building. Lighting shall be used as needed rather than all of the time to the extent possible given safety requirements.

(11)    All facilities shall be sited in areas that maximize the amount of natural screening available for the facility. Natural screening includes, but is not limited to, the use of existing vegetation as a background, the construction of the facility near mature stands of vegetation or behind ridges and natural rock formations.

(12)    All facilities shall be sited at the base of slopes to provide a background of topography and/or natural cover.

(13)    All facilities shall be sited to avoid crossing hills and ridges or silhouetting.

(14)    All facilities shall be sited in order to minimize the amount of cut and fill needed to construct the facility.

(15)    Minor and major facilities shall be sited away from prominent natural features such as distinctive rock and land forms, vegetative patterns, river crossings and other landmarks.

(16)    All equipment used for drilling, re-drilling, well completion and recompletion and maintenance of the facility shall be removed from the site within thirty (30) days of completion of the work for which the equipment is used, unless otherwise agreed to by the surface owner. Permanent storage of equipment on well pad sites shall not be allowed, unless otherwise agreed to by the surface owner and determined by Ouray County to be in conformance with the applicable Land Use Code standards.

F.      Wildlife.

(1)    The following mitigation measures shall be included as appropriate in the site specific wildlife mitigation procedures required under this Section, as appropriate:

(a)      Avoid conducting drilling and construction activities during critical use periods. (Examples: near eagle nests during nesting, and on big game winter ranges during winter.)

BLM_0061622

(b)     Confine vehicular access to established roads except under emergency circumstances.

(c)     Install gates that can be locked at the first property boundary crossed when accessing a facility from the closest public road.

(d)     Conduct work in streams in a manner that minimizes siltation and erosion and at a period of little or no flow.

(e)     Place all pipe below the channel scour depths in streams and rivers to avoid partial diversion or channel discharges.

(f)     Stabilize excess material at stream and river crossings in place or remove off the site.

(g)     Fueling and lubrication of construction equipment shall be done off-site and in designated containment areas in a manner that does not impact aquatic environments.

(h)     Facilities, roads, fencing and lighting shall be sited to minimize the impact and disturbance on wildlife habitat and wildlife corridors as identified or mapped by the Colorado Division of Wildlife, including raptor proofing any potential perching structures.

(2)     Multiple Site Plan: In lieu of a site specific mitigation review for each facility, the applicant may submit to the Land Use Department a multi-site plan addressing cumulative impacts to wildlife from the estimated total number of facilities. The multi-site plan shall include, but not be limited to, all items under subsection F.1 of this Section.

(3)          Nonmitigable Impacts: Impacts from oil and gas facilities that threaten endangered species (as defined by the Colorado Division of Wildlife) shall be considered nonmitigable and grounds for denial.

G.    Water:

An approved or conditionally approved Facility shall comply with the following requirements:

(1)     Comply with Oil and Gas Conservation Commission water well testing and water-bearing formation protection procedures and requirements.

(2)     Until such time as final reclamation of a site has been completed as described in the COGCC Reclamation Regulations, all Test and Survey reports and water well testing information that have been required by COGCC to determine the presence of waste or occurrence of pollution, as well as the results from well-head monitoring to allow safe and convenient determinations of pressure and fluid flow shall be forwarded to the Ouray County Land Use Administrator.

BLM_0061623

(3)      All oil and gas operations shall comply with all applicable state water quality standards and classifications established by the Water Quality Control Commission.

(4)      Comply with the Water Right Determination and Administration Act and the Ground Water Management Act for beneficial uses of produced water related to coalbed methane production.

(5)      Identify physical source of water and legal entitlement to use such water (e.g., Water Court decree) for irrigation, dust control and drilling.

(6)      Onsite containment and disposal of water associated with minor and major facilities shall be in accordance with any applicable federal, state or county requirements.

(7)      Where fencing is not otherwise required, containment pits shall be fenced in accordance with the requirements of this Section 29.

H.    Geologic Hazard Areas; Floodplains:

(1)      Operator shall demonstrate that a Major Facility is not located within a geologic hazard area as determined by the State of Colorado Geological Survey.

(2)      Major facilities shall comply with the adopted county floodplain ordinance when they are located in a one-hundred (100) year floodplain area.

I.    Air Quality:

(1)      With respect to wells requiring long-term artificial lift, the operator shall utilize electric motors for all artificial lift installations provided the well pad is within 1320 feet of distribution voltage and the ability to do so is not cost prohibitive due to the demands of property owners from whom easements are required, topography or other physical features (e.g., the presence of a river). If distribution voltage is not currently within 1320 feet of the proposed well pad, the operator shall contact and provide the surface owner an opportunity at the surface owner's cost to extend distribution voltage to within 1320 feet of the proposed well pad. It is understood that gas powered artificial lift equipment may be used prior to the time that power is brought to the site. The operator shall request that the power lines be placed underground except in areas where the topography or subsurface conditions render it infeasible or in situations in which the landowner requests overhead lines.

(2)      Greenhouse Gas Reduction: The operator shall use reasonable efforts to minimize methane emissions by using "green completion" techniques, and the installation of "low bleed" pneumatic instrumentation, when feasible.

(3)      Emission Control Equipment: The operator shall comply with existing EPA rules and any future regulations validly adopted by an authority

BLM_0061624

(4)     Air contaminant emissions shall be in compliance with the permit and control provisions of the Colorado Air Quality Control Program, Title 25, Section 7, C.R.S.

(5)     Stormwater: The operator shall submit a stormwater management plan and comply with State Standards.

J.     Surface Disturbance Standards

Purpose: The purpose of this section is to minimize damage to surface activities and surface conditions.

(1)     Agricultural and Recreational Resources: Subject to COGCC spacing requirements for wells, minor and major facilities shall be located so as to reasonably minimize surface use necessary for the operation of the facility and to avoid the unreasonable loss of agricultural land or recreational land. This standard may be waived if verified written consent is obtained from the surface owner.

(2)     Roads and Access:

(a)     Installation of major facilities which are accessible by non-maintained roads included in the county road system, which the county engineer determines are inadequate to safely accommodate the additional traffic associated with the operation of the facility, shall be permitted only if such roads are improved and maintained by the operator to a level which the county engineer determines is necessary to allow such traffic to use such roads in accordance with applicable state and county standards.

(b)     With the exception of such circumstances and other operational requirements or limitations imposed by existing contractual agreements or government regulations (e.g.CDOT access permits), with the installation of each well the operator shall use existing roads, easements, and pipeline routes.

(c)     Use of Subdivision Roads. In those instances where an Operator accesses a Minor or Major Facility through a road or roads within a County-approved subdivision and a governing entity exists (e.g. homeowners' association) with legal authority to bind the entity and its members, and with the authority to grant access rights over such roads and/or negotiate agreements with respect to their use, the operator will use reasonable efforts to negotiate a fair and reasonable road maintenance or road improvement agreement with such entity for the purpose of paying or making in-kind contributions for its pro rata share of the cost of maintaining or improving the affected road(s). Such agreement or a memorandum thereof shall be recorded with the Clerk and Recorder.

(d)     Access Roads. Access Roads serving Minor and Major Facilities, including existing and/or proposed roads that connect such a Facility to a county road or state highway shall be reviewed in accordance with Section 23 of the Ouray County Land Use Code and shall be subject to all

BLM_0061625

applicable impact fees. All access and oversize or overweight vehicle permits must be obtained from Ouray County Road & Bridge Department prior to beginning construction or use of a County road. All proposed transportation routes to the site should also be reviewed and approved to minimize traffic hazards and adverse impacts on County roadways. Existing roads shall be used to minimize land disturbance unless traffic safety, visual or noise concerns, or other adverse surface impacts are determined to require new or additional roads or unless the applicant demonstrates to the County's satisfaction that it has been unable to obtain authorization to use an existing road. In the discretion of Ouray County, the Applicant may be required to post a bond for the specific purpose of addressing damage to existing Ouray County roads utilized by the Applicant to access its operation.

(e)      Private Access Roads. For those Access Roads located between the parcel on which a Minor or Major Facility is proposed and the county road or state highway serving such a Facility, the applicant shall provide written documentation as part of the application demonstrating that it has the legal right to use such road(s) for the purpose of accessing the Facility and the applicant shall demonstrate that such road(s) can provide adequate physical access to such Facility in accordance with applicable Land Use Code standards.

(f)      State Highway Access. If access is directly off of a State Highway, the applicant must have an approved State Highway Access Permit for the proposed facility.

(g)      Use of Equipment. The operator shall:

(i)      Remove or require the removal of chains from its heavy equipment before entering onto a County road;

(ii)      Ensure that all new roads and well pads are graveled with a minimum of four inches (4") of Class 6 Aggregate Base Course as defined by the Colorado Department of Transportation Standard Specifications for Road and Bridge construction over a stabilized base, both of which shall be maintained throughout permanent operations of the well pad; and

(iii)      Remove and restore the condition of the road as promptly as is reasonable under the circumstances if mud and/or debris are tracked onto the County road by the operator's equipment.

K.      Produced Water Hauling.

(1)      Except during drilling, completion and well servicing operations, the operator shall use reasonable efforts to transport produced water by pipeline. Produced water shall be disposed of according to appropriate regulatory agency requirements or in accordance with standards set forth in the BLM "Gold Book".

BLM_0061626

(2)     Pipelines and Flowlines. Pipelines and flowlines should be constructed in conformance with the guidelines contained in the BLM "Gold Book" and applicable COGCC "pipeline" regulations.

(3)     Reserve Pits.   To prevent contamination of ground water and soils or to conserve water, all reserve pits shall be lined with an impermeable liner. An impermeable liner has a permeability of less than $10^{-7}$ cm/sec. The liner must be installed so that it will not leak and will be compatible with all substances placed in the pit. Fencing of reserve pits is required to prevent access by persons, wildlife or livestock. Netting or alternative method of covering pits acceptable to the County shall be required in order to prevent access and mortality of birds and other animals. Refer to Chapter on "Construction and Maintenance" of the current BLM "Gold Book" for more detailed specifications for the methods of lining, fencing and netting of pits.

L.     Waste Disposal:

(1)     When a minor or major facility becomes operational, all construction-related debris shall be removed from the site. The site shall be maintained free of debris and excess materials at all times during operation.

(2)     No burning of trash shall occur on the site.

M.     Weed Control:

(1)     The Applicant shall be responsible for ongoing weed control for all Minor and Major Facilities and the access roads under applicant's control leading to such Facilities. The appropriate weed control methods and species to be controlled shall be determined through review and recommendation of the Natural Resource Conservation Service (NRCS), the CSU Extension Service and the Ouray County Weed Manager, in accordance with Colorado Noxious Weed Act and any applicable Resolution of the Board of County Commissioners of Ouray County, Colorado for the management and eradication of noxious weeds in Ouray County.

N.     Reclamation.

(1)     Interim and Final reclamation shall be governed by a reclamation plan for the facility. The reclamation plan shall provide for a reasonable reclamation schedule in light of the specific surface use and surrounding land uses, and may require recontouring and revegetation of the surface to pre-disturbance conditions equivalent to adjacent undisturbed areas. The County may also approve a plan for an alternative post-disturbance reclamation, provided the surface owner and the applicant agree, and the plan is in harmony with the surrounding land uses and the Ouray County Land Use Code regulations and shall be done in accordance with the Bureau of Land Management "Gold Book" chapter entitled "Reclamation and Abandonment". In addition, each operator is encouraged to consult with the responsible official or governing body of an owner's association or common interest community in which the facility may be located with respect to any weed control, reclamation or mitigation plan that it may have adopted.

29-20

(2)     Road Design and Construction. Roads should be designed and constructed to allow for successful interim and eventual final reclamation. Revegetation of roads ditches and cut and fill slopes will help stabilize exposed soils and reduce sediment loss, reduce the growth of noxious weeds, reduce maintenance costs, maintain scenic quality and forage, and protect habitat. To ensure successful growth of plants and forbs, topsoil must be salvaged where available during road construction and respread to the greatest degree practical on cut slopes, fill slopes, and borrow ditches prior to seeding. To ensure stability of freshly topsoiled slopes during revegetation, the application of mulch or other sediment control may be appropriate.

The appropriateness of primitive roads or routes is site/use-specific and is typically based on many factors, such as anticipated dry or frozen soil conditions, seasonal weather conditions, flat terrain, low anticipated traffic, or driller's or operator's access needs. Operators should not flat-blade roads. Drainage must be maintained, where appropriate, to avoid erosion or the creation of a muddy, braided road. Resource damage must be repaired as soon as possible and the operator will consult with the County and private surface owner(s) to determine if all or a portion of the road needs to be upgraded to an all-weather access road.

O.      Minimization of Disturbance:

(1)     Where minor and major facilities reduce or destroy existing vegetation, the applicant in consultation with the NRCS shall develop a revegetation plan for the facility site, for approval by the County Weed Manager. The plan shall specify species, planting schedule, planting method, quantity of seed or plant material to be used, and other related activities. The applicant may, in consultation with the NRCS, develop a standard revegetation format for all sites within the county, for submittal with minor and major facility applications. In no case shall the County Weed Manager require measures more stringent than those recommended by the NRCS.

(2)     Upon abandonment of the minor facility site, as defined by the COGCC, reclamation shall be conducted in accordance with COGCC regulations.

P.      Emergency Preparedness Plan Required

(1)     Each operator with facilities in the county is required to provide an emergency preparedness plan. No applications for a minor or major facility shall be considered until the operator has provided such plan to the County. The plan shall be filed with the County and updated on an annual basis or as conditions change (responsible field personnel change, ownership changes, etc.). The emergency plan shall consist of the following information, as a minimum:

(a)     Name, address and phone number, including a twenty-four (24) hour emergency number of at least two (2) persons responsible for emergency field operations.

BLM_0061628

(b)      An as-built facilities map showing the name, location and description of all minor and major facilities, including the size and type of all pipelines and isolation valves (note: isolation valves shall not be operated by anyone except the owner of the pipeline). The map shall be prepared either manually on U.S.G.S. 7.5 Minute Series maps (one inch equals two thousand feet (1" = 2,000')), or digitally on the county geographic information system parcel maps. The as-built facilities map that includes the information regarding the location of isolation valves shall be held confidentially by the county's public safety officer, and shall only be disclosed in the event of an emergency. The County's public safety officer shall deny the right of inspection of the as-built facilities map to the public pursuant to C.R.S. §24-72-204(3)(a)(IV).

(c)      Provide a written response plan for the potential emergencies that may be associated with the operation of the facilities. This may include any or all of the following: explosions, fires, gas or water pipeline leaks or ruptures, hydrogen sulfide or other toxic gas emissions, or hazardous material vehicle accidents or spills.

(d)      Project specific emergency preparedness plans are required for any project (minor or major) that involves drilling or penetrating through known zones of hydrogen sulfide gas, as determined by the county's public safety officer. This plan shall be coordinated with and approved by the County's public safety officer prior to beginning field operations.

(2)      Inspections. The applicant shall provide the telephone number of a contact person who may be reached 24 hours a day for purposes of being notified of any proposed County inspection under this Section or in case of emergency. Any site under an approved Major or Minor Permit may be inspected by Ouray County at any time, to ensure compliance with the requirements of the approved development plan, provided that at least one hour's prior notice is given to the contact person at the telephone number supplied by the applicant. Persons performing such field inspections for the County shall be deemed licensees for liability purposes pursuant to C.R.S. Section 13-21-115. Calling the number (or leaving a message on an available answering machine or voice mail service at the number) at least one hour in advance of the proposed inspection shall constitute sufficient prior notice if the contact person does not answer. By accepting an approved Major or Minor Facility Permit, the applicant grants its consent to such inspections.

(3)      Fire Prevention. Prior to commencement of operations each operator with facilities in Ouray County is required to provide a fire prevention response, and safety plan that has been approved by the local fire district or Ouray County Sheriff, as appropriate.

29.9   Special Exception Requests:

A.      Application for Exception. The applicant may request special exceptions to this Section. All applications where a special exception is requested will be processed as a

BLM_0061629

major facility. Requests for special exceptions for proposed facilities may include, but not be limited to, one or more of the following factors:

(1)     Topographic characteristics of the site;

(2)     Duration of use of the facility;

(3)     Proximity of the facility to occupied structures;

(4)     Ownership status of adjacent and/or affected land;

(5)     Construction of adequate infrastructure to serve the project; or

(6)     Planned replacement and/or upgrading of facility equipment.

B.      If the Board of County Commissioners finds, based upon competent evidence in the record, that compliance with certain portions of this Section 29 is impossible, a special exception may be granted for a period of time not to exceed six (6) months. Upon completion of the six (6) month period, the application shall receive additional review by the County. The Board of County Commissioners, upon showing of good cause by the applicant, may:

(1)     Further extend the special exception;

(2)     Require that the facility be brought into compliance with the performance standards; or

(3)     Revoke the special exception approval.

C.      Operational Conflicts Special Exception:

Special exceptions to this Section may be granted where the requirements of the section actually conflict in operation with the requirements of the Oil and Gas Conservation Act ("Act") or implementing regulations. All applications where a special exception due to operational conflicts is requested shall be processed as a major facility and heard in a noticed public hearing by the Board of County Commissioners. The applicant shall have the burden of pleading and proving an actual, material, irreconcilable operational conflict between the requirements of this Section and those of the Act or the Colorado Oil and Gas Conservation Commission ("COGCC") in the context of a specific application. For purposes of this section, an operational conflict exists where the County condition of approval or regulation actually conflicts in operation with the state statutory or regulatory scheme, and such conflict would materially impede or destroy the state's interest in the development, production, and utilization of oil and gas resources in the state, and the protection of the public health, safety and welfare. An operational conflict may occur where the County regulation prohibits an activity, which the COGCC, or its valid regulations, has clearly authorized, or authorizes an activity, which the COGCC, or its valid regulations, has clearly prohibited. Additional County requirements in areas regulated by the COGCC, which also fall within County land use powers and which are necessary to protect the public health, safety and welfare under the facts of the specific application presented, and which do not impose unreasonable burdens on the applicant, shall be presumed not to present an operational conflict. If the Board of County

29-23

BLM_0061630

Commissioners finds, based upon competent evidence in the record, that compliance with the requirements of this section shall result in operational conflicts with the state statutory and regulatory scheme, a special exception to this Section may be granted, in whole or in part, but only to that extent. The Board of County Commissioners may condition the approval of a special exception as necessary to protect the public health, safety and welfare by mitigating any adverse impacts arising from the grant of approval.

29.10   Approval, Limitations, Security and Revocation:

A.     General:

Issuance of a minor or major oil and gas facility permit shall authorize only the well(s) and related facilities for which it is issued. The permit shall run with the land.

B.     Time Limitations:

Oil and gas wells shall be drilled within one (1) year of the date of approval. Failure to commence drilling within one (1) year shall cause the permit to expire, and the County shall require approval of a new permit.

C.     Validity:

The permit shall be valid for as long as the applicant maintains the conditions of approval. If the Colorado Oil and Gas Conservation Commission do not approve the project, then the County's permit will be invalidated.

D.     Non-compliance:

If the conditions of approval are not maintained, it shall be considered violation of these regulations and subject to the provisions related to revocation.

E.     Performance Security:

To ensure compliance with the mitigation and other performance requirements of this Section and as imposed in connection with an approval of a minor or major facility, the applicant shall provide one form of the following security set forth in this Section and specific conditions of approval for all facilities: a minimum of five thousand ($5,000) dollar performance bond for each minor facility or; a minimum of a thirty-thousand ($30,000.00) dollar countywide blanket bond for all minor facilities operated by the applicant within the county; irrevocable letter of credit; or equivalent financial security acceptable to the County. These are minimum amounts, which can be increased if deemed necessary by the County. The Board of County Commissioners shall set and impose, as a part of the approval for all major facilities, the performance security amounts and forms. The bonds shall remain in effect for one (1) year for all requirements except revegetation and landscaping, which shall be two (2) years. Conditions of approval covered by this performance security shall consist of mitigation measures addressing specific impacts affecting the general public and/or adjacent landowners by the applicable performance standards contained in this Section. Reclamation activities, which fall under the Colorado Oil and Gas Conservation Commission's jurisdiction, are exempted from this performance security coverage. In addition to the performance security described above, if the Minor or Major Facility will utilize Ouray County roads

29-24

to access the facility, a road mitigation bond may be required to ensure that any damages to Ouray County roads will be repaired by the Operator causing such damage. Any such road mitigation bond will be determined on an application-by-application basis, depending upon the roads utilized, miles traveled, type of Facility to be operated and the traffic generated thereby. For a Minor Facility, the road mitigation bond shall be determined by the Land Use Administrator, subject to the appeals process described in Section 29.7.B (5) above. For Major Facility, the road mitigation bond shall be set by the Board of County Commissioners as part of the approval of the Major Facility.

29.11   Amendments:

A.      Where a minor or major facility has been approved and the applicant desires to modify the subject facility by changes to equipment, site layout, approved operating plan, etc., an amendment to the original application shall be required if the level of impact will be increased as a result of the modification. The activity described in the amendment to a minor or major facility will be granted administrative approval if it complies with the standards herein. (In cases where the amendment would consist of the addition of a major facility, review shall be required as for a new major facility.

B.      The Land Use Department may approve minor amendments to an approved oil and gas facility. Authorized minor amendments include those that do not alter the basic intent and character of the approved permit, are consistent with the performance standards herein, are deemed necessary in light of technical and engineering considerations first discovered during actual construction, or could not have been reasonably anticipated during the initial review process.

C.      Minor amendments must comply with all relevant Ouray County regulations. Minor amendments may include, but are not limited to, variations in the location of the well pad which do not decrease the approved setback to residential or commercial structures, minor changes to equipment which do not increase the cumulative horsepower rating to greater than fifty (50) bhp, deviations to the location of access roads which are wholly contained on site and are approved by the owner of the surface rights, and modifications to the visual mitigation plan which do not adversely impact adjoining property owners or the general public.

D.      Modifications which the applicant determines in good faith are required in order for the facility to continue operating and must be done immediately in order to maintain the existing level of production, may be done on an emergency basis, without prior notice to or approval by the Land Use Department, provided that such modifications do not include the addition of equipment or operation of the facility which would exceed those defined in Section 29.4 and 29.5. The applicant shall provide the Land Use Department with notification of emergency modifications by filing a written amendment to the application, specifying the modifications made, within two (2) working days of their completion.

29.12   Penalties and Enforcement:

A.      Civil Action: In case any building or structure is or is proposed to be erected, constructed, reconstructed, altered or used, or any land is or is proposed to be used, in violation of any provision of this Section; or an Applicant fails to comply with any other

BLM_0061632

provisions of this Section or the Ouray County Land Use Code or fails to comply with any conditions placed upon any approval of a Facility, the County Attorney, or where the Board of County Commissioners deems it appropriate, the district attorney, in addition to the other remedies provided by law, ordinance or resolution, may institute an injunction, mandamus, abatement or other appropriate action or proceeding to prevent, enjoin, abate or remove such unlawful erection, construction, reconstruction, alteration or use. In the event that enforcement action is required to be taken under the provisions of this Section, Ouray County shall be entitled to collect its reasonable attorneys fees and costs incurred in any such action from the Operator

B.      False or Inaccurate Information: The Board of County Commissioners may revoke approval of a facility if it is determined at a public meeting, held on at least ten days notice to the applicant, that the applicant provided information and/or documentation upon which approval was based, which the applicant, its agents, servants and employees knew, or reasonably should have known, was false, misleading, deceptive or inaccurate. The applicant and the Land Use Department shall be provided with an opportunity to be heard at the public meeting prior to the Board of County Commissioners' rendering its decision.

C.      Liability Insurance: For any facility permitted under this Section, the applicant shall submit a certificate of insurance to the Land Use Department, showing that a policy of comprehensive general liability insurance or a self-insurance program approved by the Colorado Insurance Commission, in the amount of no less than five-hundred thousand ($500,000.00) dollars per occurrence and one million ($1,000,000.00) dollars per occurrence in high density areas as defined by the COGCC in its Safety Regulations, insuring the applicant against all claims or causes of action made against the applicant for damages arising out of the drilling, maintenance, operation or other work done with respect to such proposed facilities. A company authorized to do business in the state, unless the applicant is self-insured, shall write the policy. Any such policy shall include Ouray County as a "certificate holder" so that the County may receive advance notice of cancellation and the certificate shall require at least thirty (30) days' notice to the county prior to termination of coverage for any reason. If the insurance policy lapses or becomes void for any reason whatsoever, the approval shall cease to be valid until a new insurance certificate is provided and filed with the Land Use Department. All approved oil or gas or related activity shall cease, consistent with safety considerations, until the applicant provides evidence that insurance coverage in the prescribed amount is in effect.

D.      Right to Enter: For the purpose of implementing and enforcing this Section, County personnel may enter onto subject property upon notification of the permittee, lessee or other party holding a legal interest in the property; if such entry is denied, the County shall have the right to obtain an order from a court of competent jurisdiction to obtain entry.

29.13   Definitions

The following word, terms and phrases, when used in this Section, shall have the meanings ascribed to them in this Section, except where the context clearly indicates a different meaning:

BLM_0061633

ACCESS ROAD.  A road located on private property between the site on which a Minor or Major Facility is located and the county road or state highway serving such a Facility constructed in accordance with applicable Land Use Code standards.

AGRICULTURAL.  Currently in use for farm or ranch purposes, including pasture.

APPLICANT.  The person, corporation or other legal entity possessing the legal right to develop the mineral resource or any other use proposed in connection thereof for the site in question: generally, the applicant will be the owner or lessee of the mineral estate.

COLLECTION LINE.  A pipeline to a well designed to collect produced or waste water and transport it to a central disposal area (evaporation pit or injection well).

COGCC.  Colorado Oil and Gas Conservation Commission.

COMPATIBLE/COMPATIBILITY.  Able to exist or act together harmoniously, considering noise levels, odors, potential fire hazard, visual impacts, and effects to surface water and groundwater quality/quantity, adequacy of the road system, air quality and surrounding land uses.

COMPRESSOR STATION.  An installation consisting of one or more individual compressors, located on a gathering or transmission line, or both.

CONTAMINATED SOIL.  Soils impacted by production operations in a way that adversely affects their ability to support normal uses or could adversely affect water quality in the future.

CROPLAND.  Any land that is used to produce plant or animal products in a raw or unprocessed state and/or any property that is used for grazing livestock.

CORRIDOR.  The route within which a pipeline right-of-way is located.

DESIGNATED AGENT.  An agent designated by the owner or lessee, as defined by the Colorado Oil & gas Conservation Commission.

EASEMENT.  Authorization by a property owner for the use of a designated portion of his or her property by another, for a specified purpose.

EVAPORATION PIT. A lined excavated pit used for storing and evaporating wastewater produced in degasification activities, during drilling or production, or both.

FACILITY.  Means either a Minor Facility or Major Facility as defined in Section 29.4 and 29.5.

FLOW LINE.  Shall mean those segments of pipe from the wellhead downstream through the production facilities ending at:

> In the case of gas lines, the gas metering equipment: or
> In the case of oil lines, the oil loading point or LACT unit; or
> In the case of waterlines, the water loading point, the point of discharge to a pit, or the injection wellhead.

29-27

BLM_0061634

GAS WELL.  A well having a pressure and volume of natural gas, specifically, producing methane, often in combination with a variety of other substances such as butane, propane and carbon dioxide.

GATHERING SYSTEM.  All Pipelines from the meter at the end of the flow line to the compressor station. A system consisting of well (or gathering), lateral, and trunk pipelines transporting oil, gas or other products derived from oil and gas production to a central facility or transmission line, and so classified under the United States Department of Transportation and/or COGCC regulations.

GEOPHYSICAL OPERATION.  See Seismic Exploration/Operation.

GOLD BOOK.  Shall mean the "Surface Operating Standards for Oil and Gas Exploration and Development" prepared by the Unites States Department of the Interior Bureau Of Land Management and the United States Department of Agriculture Forest Service, Fourth Edition or most current edition.

MINERAL ESTATE. Mineral interest in real property that is shown by the real estate records of the county in which the real property is situated and that is not owned as part of the full fee title to the real property.

NON-CROPLAND.  Any land that is not cropland.

OPERATING PLAN.  A general description of a facility identifying purpose, use, typical staffing pattern, seasonal or periodic considerations, routine hours of operating, source of services/infrastructure, and any other information related to regular functioning of that facility.

OPERATOR.  That individual or firm engaged in all or a portion of the extraction operations at a well or other facility: usually the lessee of the mineral estate, although day-to-day operations may be contracted to another firm.

PAD AREA.  Shall mean the areas, which are directly disturbed during the drilling and subsequent operation of, or affected by production facilities directly associated with, any oil well, gas well, or injection well, excluding the access road.

PAD SIZE.  Pad size shall be measured from edge of disturbance.

PIT.  Shall mean the any natural or man-made depression in the ground used for oil or gas exploration or production purposes. Pit does not include steel, fiberglass, concrete or other similar vessels, which do not release their contents to surrounding soils.

POLLUTION.  The contamination or other degradation of the physical, chemical or biological properties of water or air, including change in temperature, taste, color, turbidity or odor, or such discharge of any liquid, gaseous, solid, radioactive or other substance into water or air as will or is likely to create a nuisance or render such water or air harmful, detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational or other beneficial uses, or to livestock, wild animals, birds, fish or other aquatic, life or native flora.

BLM_0061635

PRODUCING (IN PRODUCTION).  The development stage in which marketable oil and gas are extracted from a well; may also signify the extraction level at which the quantitative terms of the lease are fulfilled.

RECOMPLETION.  The operator reenters a well to complete or deepen the well to a new formation from that in which a well has previously been completed.

RECREATIONAL LAND(S).  Shall mean those lands that are used for the purpose of public or private outdoor recreational activities. Recreational activities may be active or passive and may include but shall not be limited to; sports fields, playgrounds, public parks, camping sites, horse back riding, cross-county skiing, snowshoeing, hunting and fishing.

RESERVE PIT.  Shall mean those pits used to store drilling fluids for use in drilling operations or to contain exploration and production waste generated during drilling operations.

RESIDENTIAL AREA.  Having an existing residence or platted subdivision lot located within a one-quarter mile radius of a facility site.

RIGHT OF WAY.  A tract or strip of land, separate and distinct from the adjoining property, owned, occupied or intended to be occupied by an oil, gas and/or water pipeline.

SEISMIC EXPLORATION/OPERATION.  Shall mean all activities associated with acquisition of seismic data including but not limited to surveying, shothole drilling, recording, shothole plugging and reclamation.

SPACING.  Acreage dedicated to each well producing from the same formation. Spacing regulations are established by the Colorado Oil & Gas Conservation Commission.

SPLIT ESTATE.  Land in which the ownership of the surface estate is held by an individual(s) and the ownership of mineral estate is owned by a separate individual(s).

STORM WATER MANAGEMENT PLAN.  Means he detailed analysis that describes how the proposed stormwater management system for a development has been planned, designed and will be constructed to meet applicable County requirements and Colorado Department of Health and Environment requirements.

SURFACE ESTATE. An interest in real property that is less than full fee title and that does not include mineral rights as shown by the real estate records of the county in which the real property is situated.

TRANSMISSION LINES.  A pipeline transporting oil, natural gas or any other products derived from oil and gas production, which is defined as a transmission line by the Department of Transportation regulations under the Natural Gas Pipeline Safety Act of 1968, as amended.

WELL.  Shall mean an oil or gas well, a hole drilled for the purpose of producing oil or gas, a well into which fluids are injected, a stratigraphic well, a gas storage well, or a well used for the purpose of monitoring or observing a reservoir.

29-29

WORKOVERS.  The operator commences operations on a producing well to restore or increase production from formations that have been producing in the well bore.

All other words used in this Section shall be given their usual, customary and accepted meaning in the oil and gas industry, or as defined in the Rules and Regulations of the Oil and Gas Conservation Commission of the State of Colorado or the BLM "Gold Book".

BLM_0061637

# OURAY COUNTY

## 2011 NOXIOUS WEED MANAGEMENT PLAN

### I. Introduction

The Colorado Noxious Weed Act, Title 35 Article 5.5, requires that the Board of County Commissioners (BOCC), of each county in the state shall adopt a noxious weed plan for all of the unincorporated lands within a given county. These plans shall by reference or incorporation include all of the requirements and duties set forth in the Colorado Noxious Weed Act.

The Ouray County BOCC accepts and supports the intent, guidance, and goals of the Colorado Noxious Weed Act and a copy is attached as support for the Ouray County Noxious Weed Management Plan. The Colorado Noxious Weed Act is hereby incorporated by reference as an integral part of the Ouray County Noxious Weed Management Plan. Any questions, ambiguities, disputes, or challenges that may arise from attempts to enforce the Ouray County Noxious Weed Management Plan will be settled by reference to the Colorado Noxious Weed Act under guidelines set forth in section 35-5.5-109, subsections 4-7.

The Ouray County Noxious Weed Management Plan is intended to govern weed management activities on unincorporated lands within Ouray County. Incorporated municipalities within the county are required by the Colorado Noxious Weed Act to develop and enforce their own weed management plans. Any municipality that fails to develop and enforce a weed control plan, or relevant ordinance is in violation of section 35-5.5-106 of the Colorado Noxious Weed Act and by reference the Ouray County Noxious Weed Management Plan.

Private landowners within the unincorporated portions of Ouray County are responsible for noxious weed management on their lands as specified in section 35-5.5-109 of the Colorado Noxious Weed Act and by reference the Ouray County Noxious Weed Management Plan.

State boards, departments, divisions, and agencies are required by the Colorado Noxious Weed Act and the Ouray County Noxious Weed Management Plan to manage noxious weeds on lands under their jurisdiction as specified in section 35-5.5-110 of the Colorado Noxious Weed Act.

At least once every three years as specified in section 35-5.5-107 of the Colorado Noxious Weed Act the Ouray County Weed Board, Board of County Commissioners and concerned citizens will review the Ouray County Noxious Weed Management Plan for modification. At that time weed management plans will be requested from local, state and federal entities that manage public lands for review by the Ouray County Weed Board and/or the Board of County Commissioners.

1

BLM_0061638

The BOCC may enter into cooperative agreements with federal land management agencies as specified in section 35-5.5-111 of the Colorado Noxious Weed Act to facilitate or compel effective noxious weed management on the substantial land base managed by federal agencies within Ouray County.

The BOCC shall establish and maintain a local advisory board as specified in section 35-5.5-107 of the Colorado Noxious Weed Act.

The BOCC recognizes the need for and agrees to effectively engage in the management of all noxious weeds appearing on the Ouray County Noxious Weed List. Species or class upgrades or changes in classifications of noxious weeds may be added to the list after giving 30-days notice and holding a public meeting to gain citizen input on the proposed new listing as specified in section 35-5.5-108 of Colorado Noxious Weed Act.

Noxious weeds are presently known to exist in Ouray County.  Weeds are classified according to a state noxious weed priority list:  A: Eradication is a must.  B: Manage and control the spread of these species.  C: Support the use of integrated management methods and provide educational, research and biological control resources.

A prioritization list may be established and may be amended or modified as necessary.  A local governing body may adopt eradication, containment, or suppression standards that are more stringent than the standards adopted by the state. CRS 35-5.5-108 (2)(III)(b).

Following are the weed species that are present or are of concern to Ouray County.

## Ouray County Weeds of Concern

| Common Name | Scientific Name | State Class. | County Class |
|---|---|---|---|
| Meadow Knapweed | Centaurea pratensis | A | A (priority) |
| Myrtle Spurge | Euphorbia myrsinites | A | A (priority) |
| Purple loosestrife | Lythrum salicaria | A | A |
| Yellow Starthistle | Centaurea solstitialis | A | A (priority) |
| | | | |
| Absinth wormwood | Atemisia absinthium | B | B (priority) |
| Black henbane | Hyoscyamus niger | B | B |
| Bull thistle | Cirsium vulgare | B | B |
| Canada thistle | Cirsium arvense | B | B |
| Chinese Clematis | Clematis orientalis | B | B (priority) |
| Common tansy | Tanacetum vulgare | B | B |
| Dame's rocket | Hesperis matronalis | B | B (priority) |
| Diffuse knapweed | Centaurea diffusa | B | B (priority) |
| Hoary cress | Cardaria draba | B | B |
| Houndstounge | Cynoglossum officinale | B | B |
| Jointed goatgrass | Aegilops cylindrica | B | B |

2

BLM_0061639

| Leafy spurge | Euphorbia esula | B | A (priority) |
|---|---|---|---|
| Musk thistle | Carduus nutans | B | B |
| Oxeye daisy | Chrysanthemum leucanthemum | B | B |
| Perennial pepperweed | Lepidium latifolium | B | B |
| Plumeless thistle | Carduus acanthoides | B | B |
| Quackgrass | Elytrigia repens | B | B |
| Russian knapweed | Acroptilon repens | B | B |
| Salt cedar | Tamarix chinensis, parviflora, ramossima | B | B |
| Scotch thistle | Onopordum, tauricum | B | B |
| Spotted knapweed | Centaurea maculosa | B | B (priority) |
| Wild caraway | Carum carvi | B | B |
| Common burdock | Arctium minus | C | B |
| Common mullein | Verbascum thapsus | C | B |
| Downy brome | Bromus tectorum | C | B |
| Poison hemlock | Conium maculatum | C | B |
| Russian Thistle | Salsola kali ( Goosefoot family) | C | C |

## II. Physical and Cultural Setting

Ouray County is situated on the northern side of the western San Juan Mountains in Southwest Colorado. Ouray County encompasses the headwaters of the Uncompahgre River, a major tributary of the Gunnison River and thence the Colorado River. Portions of four major ecological zones (not to be confused with the land use and building code zones) are present in Ouray County with elevations that range from 6,320' to 14,150'. These include the foothill and valley zones from approximately 6,320' to 7,000'; the montane zone from approximately 7,000' to 9,500'; the subalpine zone from approximately 9,500' to 11,500'; and the alpine zone from approximately 11,500' to 14,150'. Within this broad and variable range of ecological zones many habitat types exist that each support their own native plant communities as well as numerous invasive, non-native plants, many of which are now viewed as noxious weeds.

## III. Integrated Management of Noxious Weeds

It is widely accepted by noxious weed control professionals that an integrated management approach to weed infestations provides the greatest level of success. Complete reliance on a sole method of noxious weed management can result in outright failure of the effort or in damage to non-target organisms and the environment. The Colorado Noxious Weed Act requires that both government entities and private landowners develop integrated noxious weed management plans. Broadly speaking, there are five primary management options included in an integrated management plan:

**1. Preventative**

Prevention is the first and perhaps the most important step in a weed control program. In addition, preventative measures are probably the most cost effective method of weed control. Preventative weed control includes (among others) weed-free crop seed, weed-free manure and hay, clean (weed-free) harvesting and tillage equipment and the elimination of weed infestations in areas bordering cropland, irrigation ditches and canals.  Cleaning is recommended for 4 wheel drive vehicles, ATVs, and other equipment, which may have been exposed to weed areas.

3

BLM_0061640

**2. Cultural**

 Including, but not limited to; establishing and managing an adequate population of desirable vegetation to compete with the weeds, utilizing livestock when possible (cattle, goats, sheep), mulching, and burning when appropriate.

Many of the noxious weed infestations in Ouray County are established on disturbed ground of some sort. Land use activities that limit the amount of ground disturbed at a given time, or that limit the amount of time ground remains disturbed without reestablishing a native vegetative cover, would result in fewer and less severe noxious weed infestations. All disturbed areas shall be reseeded as soon as possible after the disturbance.

**3. Mechanical**

 Including but not limited to; hand pulling, hoeing, mowing and tillage.

**4. Biological**

Biological weed control involves the utilization of natural enemies for the control of specific weed species. Biological weed control is never a hundred percent effective and can take 5 to 10 years for partial control. Biological weed control is not acceptable as the sole control method for any particular or specific weed species targeted for eradication.

**5. Chemical**

Always **read the label** before using any herbicide. Weed control with herbicides is an effective tool for many target weed species. However, there are several aspects to consider when choosing a chemical program. These include; herbicide selection, timing of application, target weed, desirable crops or plant species being grown or that will be planted, number of applications per year and number of years a particular species will need to be treated for desired control. Also important are the health and safety factors involved, and the need to consider undesirable impacts.

All of these management options will be considered when evaluating a noxious weed infestation in Ouray County.

<div align="center">

**IV. Revegetation**

</div>

As a noxious weed preventative measure Ouray County will, through its relevant officials, agents, employees, permittees, and contractors, establish as a policy, the practice of reestablishing a stable community of native or other appropriate plants, primarily grasses, in all areas of the unincorporated County where County related or permitted projects disturb ground. This will include all areas where efforts to control and manage noxious weeds have left barren ground.

All permitted individuals and entities will also be held to reasonable revegetation standards whenever their activities disturb ground. Incorporated municipalities and Federal land management agencies will be encouraged by the County to incorporate similar provisions into their noxious weed management plans.

The BOCC may require weed control and revegetation bonds or other security from developers as well as weed management and revegetation plans for their projects.

The Ouray County Weed Control Manager, may advise the BOCC with guidelines on

4

BLM_0061641

the appropriateness of seed mixtures proposed within the various ecological zones of the County. The Weed Control Manager will also inspect revegetation sites and determine the rates of success and make recommendations regarding bond release or forfeiture.

## V. Herbicides

The careful and appropriate use of herbicides will continue to be a primary management option for the foreseeable future. In most large-scale infestations and for certain species of noxious weeds, herbicides are the only effective option.

The Ouray County Noxious Weed Control Manager will adhere strictly to all health, safety, and environmental instructions and precautions for any and all herbicides that may be used. Guidelines for avoiding health and environmental risks are available from manufacturers and government agencies.  All herbicides will be applied according to manufacturer's label instructions and state law.

## VI. Duty to Manage Noxious Weeds

As stated in section 35-5.5-104 of the Colorado Noxious Weed Act and by reference the Ouray County Noxious Weed Management Plan, "It is the duty of all persons to use integrated methods to manage noxious weeds if the same are likely to be materially damaging to the land of neighboring landowners." As used herein and in the Colorado Noxious Weed Act, "persons" means an individual, partnership, corporation, association, or federal, state, or local government or agency thereof owning, occupying, or controlling any land, easement, or right-of-way, including any city, county, state, or federally owned or controlled highway, drainage or irrigation ditch, spoil bank, borrow pit, gas and oil pipeline, high voltage electrical transmission line, or right-of-way for a canal or lateral. Weeds do not respect political, jurisdictional, or personal boundaries, they occur wherever opportunity exists. To effectively manage noxious weeds across such boundaries, a central weed authority must exist. Section 35-5.5-105 of the Colorado Noxious Weed Act effectively establishes the BOCC as that central authority regarding weeds in unincorporated Ouray County.

The BOCC may consider any ordinance, rule, or regulation that would improve compliance with the Ouray County Noxious Weed Management Plan and by reference the Colorado Noxious Weed Act. Noxious weeds, if left to spread without effective integrated management, threaten to cause material damage to indigenous flora and fauna and to all neighboring landowners. Any effective action by the BOCC designed to improve compliance with the Colorado Noxious Weed Act, and the Ouray County Noxious Weed Management Plan, would necessarily have applicability across the range of land ownership categories found in the unincorporated portions of Ouray County. Ouray County will cooperate and assist municipalities in developing their Weed Management Plans so that there will be an effective Countywide plan.

## VII. Goals of the Ouray County Noxious Weed Management Plan

The Ouray County Noxious Weed Management Plan has been developed to comply with the Colorado Noxious Weed Act and to provide guidance and support for the long-term effort of effective control of noxious weeds in Ouray County. It is clearly understood that noxious weeds will never be fully eradicated from Ouray County.

5

BLM_0061642

The Ouray County Noxious Weed Management Plan is intended to guide this and future generations in what will hopefully become a unified and concerted effort to bring these exotic invasive plants under the control of an effective management program. Citizen awareness of the value of native biodiversity is the key to success for this program.

The following are the general 10-year goals of the Ouray County Weed Management Plan: 2010 to 2020

- Eradication of "priority" species indicated as weeds of concern for Ouray County.
- Control of noxious weeds to manageable levels of scattered occurrences.
- Restoration and enhancement of native rangeland with native or other appropriate seed/plants.
- Maintain the native biodiversity.
- Conduct educational and public awareness programs.
- Find additional sources of funding.

Serious infestations will be monitored on an annual basis. Weeds of lesser concern will be generally noted as time and resources permit with citizen volunteers encouraged to participate.

Accomplishment of these broad general goals will require a significant effort on the part of a great many individuals, agencies, and organizations. The coordination of the combined efforts of the Ouray County BOCC, Weed Advisory Board, County Weed Manager, private citizens, municipalities, corporations, and land management agencies will not be a simple task. Increasing diversity in the local human community and a general lack of connection to a land based economy may increase the difficulty of managing this task. If, however, maintenance of a high level of native biodiversity becomes, and remains, a significant element of the local human culture then the task will be managed. Influencing the human community to adapt such cultural traits.

## VIII. Individual Management Plan and Enforcement

In an effort to support and accomplish goals of the Ouray County Noxious Weed Plan, most specifically goals 1 and 2, individuals may be required to comply with an "Individual Management Plan". Those who may be required to comply with an individual management plan are:

1. Properties infested with noxious weeds that threaten productive agriculture.
2. A complaint filed with the Ouray County Weed Manager from an adjacent property owner that noxious weeds are infesting or have the potential to infest their non-agricultural property.
3. Infestations of State listed "A" species noxious weeds or noxious weeds declared as "priority" species by the County.
4. Infestations of any noxious weed encroaching on county roads rights-of-way.

6

BLM_0061643

After formal notification by the County that noxious weeds are present, the landowner of such property shall be deemed to be responsible for an individual management plan. The primary component of this plan is to institute integrated management of the weeds on the property such that the following two objects are met annually:

The weeds shall not be allowed to produce seed or develop other reproductive propagules.

The population of the weeds is diminished each year.

In the event a landowner fails to proceed with an individual management plan and/or fails to meet the two objectives, the County has and may exercise the authority to cause the objectives to be met and may assess the whole cost including up to 20% for inspections and other incidental costs to the landowner pursuant to C.R.S. 35-5.5-109(5)(a)(II).

The specific process to be followed by the County, requiring an individual management plan and the rights of appeal for the landowner are as outlined in 35-5.5-109 C.R.S., as may be amended from time to time.

As the State Commissioner develops rules and regulations pertaining to the management of weeds, the more stringent standard or that standard more likely to achieve the desired results, in the event of a conflict between State law and County Weed Management Plan, shall be the governing rule or regulation.

7

BLM_0061644



**OURAY COUNTY**
**NOXIOUS WEED MANAGEMENT PLAN**

### I. Introduction

The Colorado Noxious Weed Act, Title 35 Article 5.5, requires that the Board of County Commissioners (BOCC), of each county in the state shall adopt a noxious weed plan for all of the unincorporated lands within a given county. These plans shall by reference or incorporation include all of the requirements and duties set forth in the Colorado Noxious Weed Act.

The Ouray County BOCC accepts and supports the intent, guidance, and goals of the Colorado Noxious Weed Act and a copy is attached as support for the Ouray County Noxious Weed Management Plan. The Colorado Noxious Weed Act is hereby incorporated by reference as an integral part of the Ouray County Noxious Weed Management Plan. Any questions, ambiguities, disputes, or challenges that may arise from attempts to enforce the Ouray County Noxious Weed Management Plan will be settled by reference to the Colorado Noxious Weed Act under guidelines set forth in section 35-5.5-109, subsections 4-7.

The Ouray County Noxious Weed Management Plan is intended to govern weed management activities on unincorporated lands within Ouray County. Incorporated municipalities within the county are required by the Colorado Noxious Weed Act to develop and enforce their own weed management plans. Any municipality that fails to develop and enforce a weed control plan, or relevant ordinance is in violation of section 35-5.5-106 of the Colorado Noxious Weed Act and by reference the Ouray County Noxious Weed Management Plan.

Private landowners within the unincorporated portions of Ouray County are responsible for noxious weed management on their lands as specified in section 35-5.5-109 of the Colorado Noxious Weed Act and by reference the Ouray County Noxious Weed Management Plan.

State boards, departments, divisions, and agencies are required by the Colorado Noxious Weed Act and the Ouray County Noxious Weed Management Plan to manage noxious weeds on lands under their jurisdiction as specified in section 35-5.5-110 of the Colorado Noxious Weed Act.

At least once every three years as specified in section 35-5.5-107 of the Colorado Noxious Weed Act the Ouray County Weed Board, Board of County Commissioners and concerned citizens will review the Ouray County Noxious Weed Management Plan for modification. At that time weed management plans will be requested from local, state and federal entities that manage public lands for review by the Ouray County Weed Board and/or the Board of County Commissioners.

The BOCC may enter into cooperative agreements with federal land management agencies as specified in section 35-5.5-111 of the Colorado Noxious Weed Act to facilitate or compel effective noxious weed management on the substantial land base managed by federal agencies within Ouray County.

The BOCC shall establish and maintain a local advisory board as specified in section 35-5.5-107 of the Colorado Noxious Weed Act.

The BOCC recognizes the need for and agrees to effectively engage in the management of all noxious weeds appearing on the Ouray County Noxious Weed List. Species or class upgrades or changes in classifications of noxious weeds may be added to the list after giving 30-day's notice and holding a public meeting to gain citizen input on the proposed new listing as specified in section 35-5.5-108 of Colorado Noxious Weed Act.

Noxious weeds are presently known to exist in Ouray County. Weeds are classified according to a state noxious weed priority list:  A: Eradication is a must.  B: Manage and control the spread of these species. C: Support the use of integrated management methods and provide educational, research and biological control resources.

A prioritization list may be established and may be amended or modified as necessary. A local governing body may adopt eradication, containment, or suppression standards that are more stringent than the

BLM_0061645

standards adopted by the state. CRS 35-5.5-108 (2)(III)(b).

Following are the weed species that are present or are of concern to Ouray County.

## Ouray County Weeds of Concern

| Common Name | Scientific Name | State Class. | County Class |
|---|---|---|---|
| Meadow Knapweed | Centaurea nigrescens | A | A (priority) |
| Myrtle Spurge | Euphorbia myrsinites | A | A (priority) |
| Purple loosestrife | Lythrum salicaria | A | A |
| Yellow Starthistle | Centaurea solstitialis | A | A (priority) |
| Absinth wormwood | Artemisia absinthium | B | B (priority) |
| Black henbane | Hyoscyamus niger | B | B |
| Bull thistle | Cirsium vulgare | B | B |
| Canada thistle | Cirsium arvense | B | B |
| Chinese Clematis | Clematis orientalis | B | B (priority) |
| Common tansy | Tanacetum vulgare | B | B |
| Dame's rocket | Hesperis matronalis | B | B (priority) |
| Diffuse knapweed | Centaurea diffusa | B | B (priority) |
| Hoary cress | Cardaria draba | B | B |
| Houndstounge | Cynoglossum officinale | B | B |
| Jointed goatgrass | Aegilops cylindrica | B | B |
| Leafy Spurge | Euphorbia esula | B | B (priority) |
| Musk thistle | Carduus nutans | B | B |
| Oxeye daisy | Leucanthemum vulgare | B | B |
| Perennial pepperweed | Lepidium latifolium | B | B |
| Plumeless thistle | Carduus acanthoides | B | B |
| Russian knapweed | Acroptilon repens | B | B |
| Salt cedar | Tamarix chinensis, parviflora, ramossima | B | B |
| Scotch thistle | Onopordum acanthium, tauricum | B | B |
| Spotted knapweed | Centaurea stoebe | B | B (priority) |
| Sulfur cinquefoil | Potentilla recta | B | B |
| Yellow toadflax | Linaria vulgaris | B | B |
| Common burdock | Arctium minus | C | B |
| Common mullein | Verbascum thapsus | C | B |
| Downy brome | Bromus tectorum | C | B |
| Poison hemlock | Conium maculatum | C | B |
| Russian Thistle | Salsola kali ( Goosefoot family) | | C |

## II. Physical and Cultural Setting

Ouray County is situated on the northern side of the western San Juan Mountains in Southwest Colorado. Ouray County encompasses the headwaters of the Uncompahgre River, which is a major tributary of the Gunnison River and thence the Colorado River. Portions of four major ecological zones (not to be confused with the land use and building code zones) are present in Ouray County with elevations that range from 6,320' to 14,150'. These include the foothill and valley zones from approximately 6,320' to 7,000'; the montane zone from approximately 7,000' to 9,500'; the subalpine zone from approximately 9,500' to 11,500'; and the alpine zone from approximately 11,500' to 14,150'. Within this broad and variable range of ecological zones many habitat types exist that each support their own native plant communities as well as numerous invasive, non-native plants, many of which are now viewed as noxious weeds.

BLM_0061646

### III. Integrated Management of Noxious Weeds

It is widely accepted by noxious weed control professionals that an integrated management approach to weed infestations provides the greatest level of success. Complete reliance on a sole method of noxious weed management can result in outright failure of the effort or in damage to non-target organisms and the environment. The Colorado Noxious Weed Act requires that both government entities and private landowners develop integrated noxious weed management plans. Broadly speaking, there are five primary management options included in an integrated management plan:

### 1.    Preventative

Prevention is the first and perhaps the most important step in a weed control program. In addition, preventative measures are probably the most cost effective method of weed control. Preventative weed control includes (among others) weed-free crop seed, weed-free manure and hay, clean (weed-free) harvesting and tillage equipment and the elimination of weed infestations in areas bordering cropland, irrigation ditches and canals. Cleaning is recommended for 4 wheel drive vehicles, ATVs, and other equipment, which may have been exposed to weed areas.

### 2.    Cultural

Including, but not limited to; establishing and managing an adequate population of desirable vegetation to compete with the weeds, utilizing livestock when possible (cattle, goats, sheep), mulching, and burning when appropriate.

Many of the noxious weed infestations in Ouray County are established on disturbed ground of some sort. Land use activities that limit the amount of ground disturbed at a given time, or that limit the amount of time ground remains disturbed without reestablishing a native vegetative cover, would result in fewer and less severe noxious weed infestations. All disturbed areas shall be reseeded as soon as possible after the disturbance.

### 3.    Mechanical

Including but not limited to; hand pulling, hoeing, mowing and tillage.

### 4.    Biological

Biological weed control involves the utilization of natural enemies for the control of specific weed species. Biological weed control is never a hundred percent effective and can take 5 to 10 years for partial control. Biological weed control is not acceptable as the sole control method for any particular or specific weed species targeted for eradication.

### 5.    Chemical

Always **read the label** before using any herbicide. Weed control with herbicides is an effective tool for many target weed species. However, there are several aspects to consider when choosing a chemical program. These include; herbicide selection, timing of application, target weed, desirable crops or plant species being grown or that will be planted, number of applications per year and number of years a particular species will need to be treated for desired control. Also important are the health and safety factors involved, and the need to consider undesirable impacts.

All of these management options will be considered when evaluating a noxious weed infestation in Ouray County.

## IV. Revegetation

As a noxious weed preventative measure Ouray County will, through its relevant officials, agents, employees, permittees and contractors, establish as a policy, the practice of reestablishing a stable community of native or other appropriate plants, primarily grasses, in all areas of the unincorporated County where County related or permitted projects disturb ground. This will include all areas where efforts to control and manage noxious weeds have left barren ground.

All permitted individuals and entities will also be held to reasonable revegetation standards whenever their activities disturb ground. Incorporated municipalities and Federal land management agencies will be encouraged by the County to incorporate similar provisions into their noxious weed management plans.

3

BLM_0061647

The BOCC may require weed control and revegetation bonds or other security from developers as well as weed management and revegetation plans for their projects.

The Ouray County Weed Control Manager, may advise the BOCC with guidelines on the appropriateness of seed mixtures proposed within the various ecological zones of the County. The Weed Control Manager will also inspect revegetation sites and determine the rates of success and make recommendations regarding bond release or forfeiture.

## V. Herbicides

The careful and appropriate use of herbicides will continue to be a primary management option for the foreseeable future. In most large-scale infestations and for certain species of noxious weeds, herbicides are the only effective option.

The Ouray County Noxious Weed Control Manager will adhere strictly to all health, safety, and environmental instructions and precautions for any and all herbicides that may be used.

Guidelines for avoiding health and environmental risks are available from manufacturers and government agencies. All herbicides will be applied according to manufacturer's label instructions and state law.

## VI. Duty to Manage Noxious Weeds

As stated in section 35-5.5-104 of the Colorado Noxious Weed Act and by reference the Ouray County Noxious Weed Management Plan, "It is the duty of all persons to use integrated methods to manage noxious weeds if the same are likely to be materially damaging to the land of neighboring landowners." As used herein and in the Colorado Noxious Weed Act, "persons" means an individual, partnership, corporation, association, or federal, state, or local government or agency thereof owning, occupying, or controlling any land, easement, or right-of-way, including any city, county, state, or federally owned or controlled highway, drainage or irrigation ditch, spoil bank, borrow pit, gas and oil pipeline, high voltage electrical transmission line, or right-of-way for a canal or lateral. Weeds do not respect political, jurisdictional, or personal boundaries, they occur wherever opportunity exists. To effectively manage noxious weeds across such boundaries, a central weed authority must exist. Section 35-5.5-105 of the Colorado Noxious Weed Act effectively establishes the BOCC as that central authority regarding weeds in unincorporated Ouray County.

The BOCC may consider any ordinance, rule, or regulation that would improve compliance with the Ouray County Noxious Weed Management Plan and by reference the Colorado Noxious Weed Act. Noxious weeds, if left to spread without effective integrated management, threaten to cause material damage to indigenous flora and fauna and to all neighboring landowners. Any effective action by the BOCC designed to improve compliance with the Colorado Noxious Weed Act, and the Ouray County Noxious Weed Management Plan, would necessarily have applicability across the range of land ownership categories found in the unincorporated portions of Ouray County. Ouray County will cooperate and assist municipalities in developing their Weed Management Plans so that there will be an effective Countywide plan.

## VII. Goals of the Ouray County Noxious Weed Management Plan

The Ouray County Noxious Weed Management Plan has been developed to comply with the Colorado Noxious Weed Act and to provide guidance and support for the long-term effort of effective control of noxious weeds in Ouray County. It is clearly understood that noxious weeds will never be fully eradicated from Ouray County.

The Ouray County Noxious Weed Management Plan is intended to guide this and future generations in what will hopefully become a unified and concerted effort to bring these exotic invasive plants under the control of an effective management program. Citizen awareness of the value of native biodiversity is the key to success for this program.

The following are the general l0-year goals of the Ouray County Weed Management Plan: 2010 to 2020

- Eradication of "priority" species indicated as weeds of concern for Ouray County.
- Control of noxious weeds to manageable levels of scattered occurrences.
- Restoration and enhancement of native rangeland with native or other appropriate seed/plants.
- Maintain the native biodiversity.

4

BLM_0061648

- Conduct educational and public awareness programs.
- Find additional sources of funding.

Serious infestations will be monitored on an annual basis. Weeds of lesser concern will be generally noted as time and resources permit with citizen volunteers encouraged to participate.

Accomplishment of these broad general goals will require a significant effort on the part of a great many individuals, agencies, and organizations. The coordination of the combined efforts of the Ouray County BOCC, Weed Advisory Board, County Weed Manager, private citizens, municipalities, corporations, and land management agencies will not be a simple task. Increasing diversity in the local human community and a general lack of connection to a land based economy may increase the difficulty of managing this task. If, however, maintenance of a high level of native biodiversity becomes, and remains, a significant element of the local human culture then the task will be managed influencing the human community to adapt such cultural traits.

## VIII. Individual Management Plan and Enforcement

In an effort to support and accomplish goals of the Ouray County Noxious Weed Plan, most specifically goals 1 and 2, individuals may be required to comply with an "Individual Management Plan". Those who may be required to comply with an individual management plan are:

1. Properties infested with noxious weeds that threaten productive agriculture.
2. A complaint filed with the Ouray County Weed Manager from an adjacent property owner that noxious weeds are infesting or have the potential to infest their non- agricultural property.
3. Infestations of State listed "A" species noxious weeds or noxious weeds declared as "priority" species by the County.
4. Infestations of any noxious weed encroaching on county roads rights-of-way.

After formal notification by the County that noxious weeds are present, the landowner of such property shall be deemed to be responsible for an individual management plan. The primary component of this plan is to institute integrated management of the weeds on the property such that the following two objects are met annually:

The weeds shall not be allowed to produce seed or develop other reproductive propagules. The population of the weeds is diminished each year.

In the event a landowner fails to proceed with an individual management plan and/or fails to meet the two objectives, the County has and may exercise the authority to cause the objectives to be met and may assess the whole cost including up to 20% for inspections and other incidental costs to the landowner pursuant to C.R.S. 35-5.5-109(5)(a)(II).

The specific process to be followed by the County, requiring an individual management plan and the rights of appeal for the landowner are as outlined in 35-5.5-109 C.R.S., as may be amended from time to time.

As the State Commissioner develops rules and regulations pertaining to the management of weeds, the more stringent standard or that standard more likely to achieve the desired results, in the event of a conflict between State law and County Weed Management Plan, shall be the governing rule or regulation.

*Modified and approved 2-14-18

BLM_0061649



# USGS
*science for a changing world*

# Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources

By Douglas S. Ouren, Christopher Haas, Cynthia P. Melcher, Susan C. Stewart, Phadrea D. Ponds, Natalie R. Sexton, Lucy Burris, Tammy Fancher, and Zachary H. Bowen

Open-File Report 2007-1353

**U.S. Department of the Interior**
**U.S. Geological Survey**

BLM_0061650

Cover photo courtesy of Bureau of Land Management, Denver, Colorado.

ii

BLM_0061651

**U.S. Department of the Interior**
DIRK KEMPTHORNE, Secretary

**U.S. Geological Survey**
Mark D. Myers, Director

U.S. Geological Survey, Reston, Virginia 2007

For product and ordering information:
World Wide Web: http://usgs.gov/pubprod
Telephone: 1-888-ASK-USGS

For more information on the USGS—the Federal source for science about the Earth, its natural world and living resources, natural hazards, and the environment:
World Wide Web: http://usgs.gov
Telephone: 1-888-ASK-USGS

*Suggested citation*:

Ouren, D.S., Haas, Christopher, Melcher, C.P., Stewart, S.C., Ponds, P.D., Sexton, N.R., Burris, Lucy, Fancher, Tammy, and Bowen, Z.H., 2007, Environmental effects of off-highway vehicles on Bureau of Land Management lands: A literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources: U.S. Geological Survey, Open-File Report 2007-1353, 225 p.

Any use of trade, firm, or product names is for descriptive purposes only and does not imply endorsement by the U.S. Government.

Although this report is in the public domain, permission must be secured from the individual copyright owners to reproduce any copyrighted material contained within this report.

BLM_0061652

# Contents

Tables ...................................................................................................................................................... vii
Conversion Factors ............................................................................................................................... viii
Glossary .................................................................................................................................................. ix
Acknowledgments ................................................................................................................................. x
Executive Summary .............................................................................................................................. xi
    Terminology Used in This Report ...................................................................................................... xi
    How to Use This Report ..................................................................................................................... xi
    OHV Effects ........................................................................................................................................ xii
        OHV Effects on Soils and Watersheds ........................................................................................ xii
        OHV Effects on Vegetation .......................................................................................................... xii
        OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species ........... xii
        OHV Effects on Water Quality ...................................................................................................... xii
        OHV Effects on Air Quality ........................................................................................................... xiii
        Socioeconomic Implications of OHV Use ................................................................................... xiii
    Potential Indicators (Both Direct and Indirect) for Evaluating and Monitoring OHV Effects ..... xiii
    Mitigation and Site-Restoration Techniques .................................................................................. xiv
    Monitoring and Research Needs to Support OHV Management Decisions ................................. xv
1.0 Introduction ..................................................................................................................................... 1
    1.1 Issue Context: Bureau of Land Management Land Health and Off-highway Vehicle Use ...... 1
        1.1.1 Bureau of Land Management Land Health Standards ....................................................... 1
        1.1.2 Increasing OHV Use ............................................................................................................ 2
    1.2 Objectives, Scope, Organization, and Use of This Report ........................................................ 2
        1.2.1 Objectives ............................................................................................................................. 2
        1.2.2 Geographical Scope ............................................................................................................. 2
        1.2.3 Organization ......................................................................................................................... 2
        1.2.4 Tips on Navigating This Document ..................................................................................... 3
    1.3 Definitions of OHV Routes/Roads, Vehicles, and Activities .................................................... 3
        1.3.1 Definitions of Roads and Trails Used in This Report .......................................................... 3
        1.3.2 Definitions of OHVs and OHV Activities Used in This Report .......................................... 4
2.0 Effects of OHV Travel on Natural Resource Attributes and Socioeconomics ............................... 4
    2.1 Scale and Patterns of OHV Activities and Their Effects ........................................................... 4
    2.2 OHV Effects on Soils and Watersheds ...................................................................................... 5
        2.2.1 Section Summary ................................................................................................................. 5
        2.2.2 Soil Compaction and Reduced Water Infiltration ............................................................. 6
        2.2.3 Effects on Soil Stabilizers and Rates of Soil Erosion ........................................................ 7
        2.2.4 Annotated Bibliography for OHV Effects on Soils and Watersheds .................................. 8
    2.3 OHV Effects on Vegetation ....................................................................................................... 11

BLM_0061653

2.3.1 Section Summary ...........................................................................................................11
2.3.2 Overall Effects on Vegetation Cover and Community Composition ..................................11
2.3.3 Edge Effects Along OHV Routes ..................................................................................12
2.3.4 Annotated Bibliography for OHV Effects on Vegetation ..................................................13
2.4 OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species ..........16
2.4.1 Section Summary ...........................................................................................................16
2.4.2 Loss of Habitat Connectivity: Fragmentation and Barrier Effects ....................................16
2.4.3 Edge Effects....................................................................................................................18
2.4.4 OHV Disturbance and Noise ...........................................................................................19
2.4.5 Wildlife Mortality and Related Issues .............................................................................20
2.4.6 Annotated Bibliography for OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species............................................................................................................22
2.5 OHV Effects on Water Quality ............................................................................................25
2.5.1 Section Summary ...........................................................................................................25
2.5.2 Sedimentation and Turbidity ...........................................................................................25
2.5.3 Dust and Contaminants ..................................................................................................26
2.5.4 Annotated Bibliography for OHV Effects on Water Quality ..............................................27
2.6 OHV Effects on Air Quality..................................................................................................29
2.6.1 Section Summary ...........................................................................................................29
2.6.2 Fugitive Dust Raised by OHV Traffic ..............................................................................29
2.6.3 Contaminants Associated with OHV Use ........................................................................29
2.6.4 Annotated Bibliography for OHV Effects on Air Quality ...................................................31
2.7 Socioeconomic Implications of OHV Use .............................................................................33
2.7.1 Section Summary ...........................................................................................................33
2.7.2 Trends in OHV Use and Technology ................................................................................33
2.7.3 Types, Sources, and Effects of OHV User Conflict...........................................................33
2.7.4 OHV Users and Their Preferences ...................................................................................34
2.7.5 Economic Benefits and Costs of OHV Use .......................................................................38
2.7.6 Annotated Bibliography for Socioeconomic Implications of OHV Use ...............................38
3.0 Potential Indicators for Evaluating and Monitoring OHV Effects ...................................................41
3.1 Summary.............................................................................................................................41
3.2 BLM's Indicators of Land Health Compared to Indicators of OHV Effects Described in the Literature ...................................................................................................................................43
3.3 Some Potential Indicators for Evaluating and Monitoring OHV Effects ..................................46
3.3.1 Potential Indicators of OHV Effects on Soils and Watersheds ..........................................46
3.3.2 Potential Indicators of OHV Effects on Vegetation ..........................................................47
3.3.3 Potential Indicators of OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species.................................................................................................................48
3.3.4 Potential Indicators of OHV Effects on Water Quality......................................................50
3.3.5 Potential Indicators of OHV Effects on Air Quality ..........................................................50
3.3.6 Potential Indicators for OHV Effects on Socioeconomics .................................................51
4.0 Mitigation and Site-Restoration Techniques .............................................................................52
4.1 Summary.............................................................................................................................52

BLM_0061654

4.2 Mitigation and Site-Restoration Techniques .................................................................. 52
    4.2.1 Understanding Land User Preferences and Conflicts ........................................... 52
    4.2.2 Mitigating OHV Use Effects ............................................................................ 53
    4.2.3 Restoration of OHV-Impacted Areas ................................................................ 54
5.0 Monitoring and Research Needs ...................................................................................... 55
    5.1 Summary ..................................................................................................................... 55
    5.2 Monitoring and Research Needs ................................................................................. 56
        5.2.1 Scientifically Rigorous Research Projects ....................................................... 57
        5.2.2 OHV Effects at Various Spatial and Temporal Scales, Across Habitat Types ................ 58
        5.2.3 Research Regarding Effects of OHVs on Animal Populations ............................. 58
        5.2.4 Research to Determine Socioeconomic Costs Associated with OHV Use .................... 59
        5.2.5 Research to Improve Site Restoration .............................................................. 60
6.0 Conclusion ...................................................................................................................... 60
7.0 Literature Cited ............................................................................................................... 61
Appendix 1. Extensive Bibliographies ................................................................................... 83
    1.1 OHV Effects on Soils and Watersheds ....................................................................... 84
    1.2 OHV Effects on Vegetation ........................................................................................ 110
    1.3 OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species ........ 131
    1.4 OHV Effects on Water Quality .................................................................................... 165
    1.5 OHV Effects on Air Quality ........................................................................................ 183
    1.6 Socioeconomic Implications of OHV Use .................................................................... 192
Appendix 2. Search Methods and Results of Off-Highway Vehicle Effects Literature and Internet
Resources .............................................................................................................................. 211
    2.1 Methods ...................................................................................................................... 211
        2.1.1 Literature Search ........................................................................................... 211
        2.1.2 Internet Search .............................................................................................. 211
    2.2 Results ........................................................................................................................ 216
        2.2.1 Literature Resources ...................................................................................... 216
        2.2.2 Internet Resources ......................................................................................... 218
Figures
    **2.1.** Breakdown of unique Internet websites (n = 2,495) classified as "highly relevant" (H),
    "relevant" (R), "slightly relevant" (S), and "unrelated/unavailable" (U, Z) to off-highway
    vehicle effects and policies. ................................................................................................ 219
    **2.2.** Focus areas of Internet websites (n = 333) classified as highly relevant to off-highway
    vehicle effects and policies. ............................................................................................... 220
    **2.3.** Focus areas for all Internet websites (n = 1,230) classified as highly relevant, relevant,
    and somewhat relevant to off-highway vehicle effects and policies. ...................................... 220
    **2.4.** Focus areas of U.S. Bureau of Land Management Internet websites (n = 155) classified
    as highly relevant, relevant to off-highway vehicle effects and policies. ................................ 221

BLM_0061655

**2.5.** Focus areas of U.S. Forest Service (regions 2 [Colorado only], 3, and 4 only) Internet websites (n = 176) classified as highly relevant to off-highway vehicle effects and policies. ...................................................................................................................................................222

Tables

**2.1.** Search terms used and publication years included when using search engines and 33 electronic literature databases at Colorado State University's library to assemble an extensive bibliography of literature on effects of off-highway vehicles. ................................212

**2.2.** Search topics and their associated search terms used in searching the Internet for publications and documents pertaining to off-highway vehicle effects and policies. ..........216

**2.3.** Relevance class codes and definitions pertaining to Internet websites found to contain information regarding off-highway vehicle effects and policies. ............................................217

**2.4.** Focus areas and definitions of Internet websites found to contain information regarding off-highway vehicle effects and policies......................................................................................217

**2.5.** Number of relevant publications found, and publication dates included, in a literature search on effects of off-highway vehicle activity as they pertain to the U.S. Bureau of Land Management's land health standards. ..........................................................................................218

**2.6.** Search results, by topic, for all Internet websites pertaining to off-highway vehicle effects and policies (n = 22,990)........................................................................................................219

**2.7.** Internet websites classified as highly relevant, by focus area and source, pertaining to off-highway vehicle effects and policies......................................................................................223

## Tables

**3.1.** Indicators emphasized in the literature reviewed for effects of off-highway vehicles (OHV) on land health compared to indicators of land health employed by the U.S. Bureau of Land Management (BLM) (Pellant and others, 2005). .....................................................44

BLM_0061656

# Conversion Factors

## Inch/Pound to SI (International System of Units)

| Multiply | By | To obtain |
|---|---|---|
| **Length** | | |
| inch (in.) | 2.54 | centimeter (cm) |
| inch (in.) | 25.4 | millimeter (mm) |
| foot (ft) | 0.3048 | meter (m) |
| mile (mi) | 1.609 | kilometer (km) |
| yard (yd) | 0.9144 | meter (m) |
| **Area** | | |
| square foot (ft$^2$) | 929.0 | square centimeter (cm$^2$) |
| square foot (ft$^2$) | 0.09290 | square meter (m$^2$) |
| square inch (in$^2$) | 6.452 | square centimeter (cm$^2$) |
| square mile (mi$^2$) | 2.590 | square kilometer (km$^2$) |
| **Volume** | | |
| cubic inch (in$^3$) | 16.39 | cubic centimeter (cm$^3$) |
| cubic yard (yd$^3$) | 0.7646 | cubic meter (m$^3$) |
| **Mass** | | |
| ounce, avoirdupois (oz) | 28.35 | gram (g) |
| pound, avoirdupois (lb) | 0.4536 | kilogram (kg) |
| ton, short (2,000 lb) | 0.9072 | megagram (Mg) |
| ton, long (2,240 lb) | 1.016 | megagram (Mg) |

## SI to Inch/Pound (English System of Units)

| Multiply | By | To obtain |
|---|---|---|
| **Length** | | |
| centimeter (cm) | 0.3937 | inch (in.) |
| millimeter (mm) | 0.03937 | inch (in.) |
| meter (m) | 3.281 | foot (ft) |
| kilometer (km) | 0.6214 | mile (mi) |
| meter (m) | 1.094 | yard (yd) |
| **Area** | | |
| square centimeter (cm$^2$) | 0.001076 | square foot (ft$^2$) |
| square meter (m$^2$) | 10.76 | square foot (ft$^2$) |
| square centimeter (cm$^2$) | 0.1550 | square inch (in$^2$) |
| square kilometer (km$^2$) | 0.3861 | square mile (mi$^2$) |
| **Volume** | | |
| cubic centimeter (cm$^3$) | 0.06102 | cubic inch (in$^3$) |
| cubic meter (m$^3$) | 1.308 | cubic yard (yd$^3$) |
| **Mass** | | |
| gram (g) | 0.03527 | ounce, avoirdupois (oz) |
| kilogram (kg) | 2.205 | Pound, avoirdupois (lb) |
| megagram (Mg) | 1.102 | ton, short (2,000 lb) |
| megagram (Mg) | 0.9842 | ton, long (2,240 lb) |

viii

BLM_0061657

# Glossary

**ATV (All-Terrain Vehicle)**   Small, motorized 3- or 4-wheeled vehicles specifically designed for off-road use. The American National Standards Institute (ANSI) further defines an ATV as a vehicle that travels on low-pressure tires, with a seat that is straddled by the operator, and with handlebars for steering control. By the current ANSI definition, it is intended for use by a single operator, although a change to include 2-seaters (in tandem) is under consideration. Herein, the definition of ATV coincides with the description above and does not include passenger vehicles, including sport-utility vehicles or 4-wheel-drive jeeps.

**fugitive dust**   Dust raised by mechanical (anthropogenic) disturbance of granular material exposed to and becoming suspended in the air, then carried by wind. Arises from "nonpoint" sources—such as unpaved roads, agricultural tilling operations, aggregate storage piles, and heavy construction—rather than "point" sources—such as confined flow streams discharged to the atmosphere from a stack, vent, or pipe.

**indicator threshold**   For a given land health indicator (or set of indicators), the value(s) at or above which management action may be triggered or required.

**land health**   The condition of natural resource attributes, including soils and site stability, hydrologic function, and biotic integrity.

**OHV**   Defined herein as any civilian off-highway vehicle, including motorcycles, motorized dirt bikes, ATVs (see definition above), snowmobiles, dune buggies, 4-wheel-drive jeeps, sport-utility vehicles, and any other civilian vehicles capable of off-highway, terrestrial travel (including utility vehicles [UTVs] and ATVs with more than 4 wheels).

**OHV route**   Defined herein as any unpaved route created for OHV travel, including single-track paths or trails, two-tracks, and unimproved or improved dirt/gravel roads. Herein, this term is also applied to "rogue" (undesignated or unauthorized) routes created by OHV users in closed or limited areas.

**population dynamics**   Herein, used broadly to include wildlife or vegetation population size, density, and/or distribution (both spatial and temporal); rates of birth/germination, death, and/or survivorship; population gender/age-class structure; population genetics; and/or the rates/directions of change in all these parameters.

**right-of-way habitat**   Habitat provided within the legal description of a given transportation corridor.

**sink population**   For a given metapopulation, a population sink is a local area or habitat where the local population's reproductive rate is lower than the required replacement rate (in other words, a sink population is eventually extirpated without immigration of individuals from other areas). Population sinks often occur where there is excessive predation pressure and/or poor habitat quality.

**source population**   For a given metapopulation, a population source is a local area or habitat where the local population's reproductive rate is greater than the required replacement rate. Excess individuals produced from a source population may emigrate to join sink populations, thereby keeping the sink populations from becoming extirpated.

**stream order**   A stream's order is determined by its confluence with other streams: first-order streams are headwaters, the confluence of two first-order streams forms a second-order stream, the confluence of two second-order streams forms a third-order stream, and so on.

ix

BLM_0061658

## Acknowledgments

This project was funded by the U.S. Bureau of Land Management National Science and Technology Center, through Project Officer Victoria "Vicki" Josupait, as well as Travis Haby and Charisse Sydoriak. The authors would like to thank the following individuals for the time they offered in review, comment, and development of this document: Peter Doran, Travis Haby, Jeffery E. Herrick, Victoria "Vicki" Josupait, Mike "Sherm" Karl, David A. Pyke, James E. Roelle, Robert Stottlemyer, and Charisse Sydoriak.

# Executive Summary

This report and its associated appendixes compile and synthesize the results of a comprehensive literature and Internet search conducted in May 2006. The literature search was undertaken to uncover information regarding the effects of off-highway vehicle (OHV) use on land health, or "natural resource attributes," and included databases archiving information from before OHVs came into existence to May 2006. Information pertaining to socioeconomic implications of OHV activities is included as well. The literature and Internet searches yielded approximately 700 peer-reviewed papers, magazine articles, agency and non-governmental reports, and internet websites regarding effects of OHV use as they relate to the Bureau of Land Management's (BLM) standards of land health. Discussions regarding OHV effects are followed by brief syntheses of potential indicators of OHV effects, as well as OHV-effects mitigation, site-restoration techniques, and research needs.

## Terminology Used in This Report

The BLM has definitions for several road and trail types; however, the OHV literature often uses somewhat different definitions. Whereas all terms are useful within their own contexts, herein the general term "OHV routes" is used to simplify discussions concerning all types of unpaved roads and trails, whether designated or unauthorized, and "roads" or "highways" are used to simplify discussions concerning paved roads. The definition of OHV also varies by agency and author, and to simplify discussions herein, OHV may include off-highway motorbikes, ATVs, dune buggies, snowmobiles, 4-wheel drive jeeps, motorcycles, some types of 4-wheel drive automobiles (including sport-utility vehicles), and any other civilian vehicle specifically designed for off-road travel. OHV type or route/road type are specified if a given discussion warrants and if the literature cited in that discussion specified OHV type or route/road type.

## How to Use This Report

Major sections of this document comprise a "manager's report," which includes a literature synthesis and related discussions of (1) OHV effects on natural resource attributes and socioeconomics; (2) indicators described in the literature to evaluate/monitor OHV effects on natural resource attributes and could serve as potential indicators in future research or monitoring programs; (3) mitigation and site-restoration techniques used for OHV-use areas; and (4) research and monitoring needs pertaining to OHV-effects. This document also includes extensive bibliographies pertaining to OHV effects on natural resources. It is recommended that readers focus first on the manager's report, as it provides the basic understanding of OHV effects and potential approaches to researching, monitoring, and/or managing OHV effects. Reading the Executive Summary, the summaries provided in each section, and the conclusion may suffice for those seeking a quick overview. **To facilitate a rapid review, section summaries are placed at the beginning of their respective sections and do not contain in-text citations. For a more in-depth review (with in-text citations), the entire manager's report should be read.** Appendix 1 provides the extensive bibliographies, and Appendix 2 details the literature/Internet search methods and summarizes the search results (including tables and graphs).

BLM_0061660

## OHV Effects

### OHV Effects on Soils and Watersheds

The primary effects of OHV activity on soils and overall watershed function include altered soil structure (soil compaction in particular), destruction of soil crusts (biotic and abiotic) and desert pavement (fine gravel surfaces) that would otherwise stabilize soils, and soil erosion. Indicators of soil compaction discussed in the OHV effects literature include soil bulk density (weight per unit of volume), soil strength (the soil's resistance to deforming forces), and soil permeability (the rate at which water or air infiltrate soil). Generally, soil bulk density and strength increase with compaction, whereas permeability decreases with compaction. As soil compaction increases, the soil's ability to support vegetation diminishes because the resulting increases in soil strength and changes in soil structure (loss of porosity) inhibit the growth of root systems and reduce infiltration of water. As vegetative cover, water infiltration, and soil stabilizing crusts are diminished or disrupted, the precipitation runoff rates increase, further accelerating rates of soil erosion.

### OHV Effects on Vegetation

Plants are affected by OHV activities in several ways. As implied above, soil compaction affects plant growth by reducing moisture availability and precluding adequate taproot penetration to deeper soil horizons. In turn, the size and abundance of native plants may be reduced. Above-ground portions of plants also may be reduced through breakage or crushing, potentially leading to reductions in photosynthetic capacity, poor reproduction, and diminished litter cover. Likewise, blankets of fugitive dust raised by OHV traffic can disrupt photosynthetic processes, thereby suppressing plant growth and vigor, especially along OHV routes. In turn, reduced vegetation cover may permit invasive and/or non-native plants—particularly shallow-rooted annual grasses and early successional species capable of rapid establishment and growth—to spread and dominate the plant community, thus diminishing overall endemic biodiversity.

### OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species

Habitats for native plants and animals, including endangered and threatened species, are impacted by OHVs in several ways. A salient effect is habitat fragmentation and reduced habitat connectivity as OHV roads and trails proliferate across the landscape. Reduced habitat connectivity may disrupt plant and animal movement and dispersal, resulting in altered population dynamics and reduced potential for recolonization if a species is extirpated from a given habitat fragment. Wildlife is also directly affected by excessive noise (decibel levels/noise durations well above those of typical background noise) and other perturbations associated with OHV activities. Disturbance effects range from physiological impacts—including stress and mortality due to breakage of nest-supporting vegetation, collapsed burrows, inner ear bleeding, and vehicle-animal collisions—to altered behaviors and population distribution/dispersal patterns, which can lead to declines in local population size, survivorship, and productivity.

### OHV Effects on Water Quality

The effects of OHV activities on water quality can include sedimentation (deposited solids), turbidity (suspended solids), and pollutants within affected watersheds. Sedimentation increases because compacted soils, disrupted soil crusts, and reduced vegetation cover can lead to increased amounts and velocities of runoff; in turn, this accelerates the rates at which

BLM_0061661

sediments and other debris are eroded from OHV-use areas and flushed to aquatic systems downslope. Pollutants associated with deposition of OHV emissions and spills of petroleum products may be adsorbed to sediments, absorbed by plant material, or dissolved in runoff; once mobilized, these contaminants may enter aquatic systems.

## OHV Effects on Air Quality

Air quality is affected when OHV traffic raises fugitive dust and emits by-products of combustion. Because wind can disperse suspended particulates over long distances, dust raised by OHV traffic can blanket plant foliage and disperse dust-adsorbed contaminants well beyond a given OHV-use area. Primary combustion by-products potentially affecting air quality in OHV-use areas include (but are not limited to) polycyclic aromatic hydrocarbons, sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), and ozone ($O_3$). Although leaded gasoline has not been used in the United States since 1996, lead emissions deposited prior to the ban on leaded gasoline may persist for decades and continue impacting ecosystems as wind and water erosion continue to mobilize lead and other contaminants downwind (or downslope) of contaminated soils.

## Socioeconomic Implications of OHV Use

For the purposes of this document, the socioeconomics of OHV use include (1) OHV user demands, concerns, and attitudes; (2) the economic effects of OHV use on communities near OHV-use areas; (3) and the effects of OHV use on other land users. Although not one of BLM's land health considerations, the socioeconomic implications of OHV use have significant direct and indirect effects on land health. As the popularity of OHV recreation increases, socioeconomic factors become increasingly important considerations in understanding and mitigating the overall effects of OHV use on land health. OHV recreation can have significant economic value to local communities where and when OHV use is popular; however, the economic costs to those communities remain unknown. OHV use also can lead to conflicts among different land users—both OHV users and people seeking non-motorized forms of recreation—within OHV-use areas and nearby areas. Crowding of designated OHV areas may encourage unauthorized use in closed areas, and adjacent or overlapping use types may cause dissatisfaction or discourage recreation altogether, which can diminish public support for land-management programs.

## Potential Indicators (Both Direct and Indirect) for Evaluating and Monitoring OHV Effects

**Soil Health and Watershed Condition**
- Soil strength
- Soil bulk density
- Soil permeability (rates of air and water infiltration)
- Erosion rate
- Level of sedimentation or turbidity in wetlands
- Surface changes (for example, gully erosion)
- Presence/condition of soil crusts

**Vegetation Health**
- Plant community composition (including species and structural diversity, ratio of native to non-native or invasive species)
- Abundance of individuals and/or stem density

BLM_0061662

- Percent vegetation cover
- Plant size
- Growth rate
- Biomass

**Habitat Condition and Health of Wildlife Populations** (including indirect indicators)
- Habitat patch size and connectivity
- Community composition (including species diversity, ratio of native to non-native or invasive species)
- Population size, density, and trend
- Spatiotemporal distribution of populations
- Survivorship and mortality rates
- Productivity and body mass
- Age-class and gender structure
- Frequency of OHVs passing through a given area and associated wildlife mortalities rates
- Road or trail type and width
- Level (decibels), duration, and timing of traffic noise

**Water Quality**
- Sedimentation rate
- Levels of turbidity and suspended solids
- Contaminant levels, including petroleum-derived compounds from spills and emissions, such as benzene; ethylbenzene; m-, p-, and o-xylene; toluene; 1,3-butadiene; and lead

**Air Quality**
- Level of dust particulates
- Particulate levels of OHV emission by-products, such as polycyclic aromatic hydrocarbons, aldehydes, carbon monoxide, nitrogen oxides, ozone, and sulfur oxides

**Socioeconomics**
- User satisfaction with recreation experiences
- User compliance with OHV (or other) regulations
- User knowledge regarding effects of recreation activities on various aspects of land health
- Distribution and intensity of OHV versus non-motorized recreation and other land uses
- Extent to which unauthorized trails are created and damage to vegetation occurs
- Trends in local economic indicators associated with OHV and non-motorized recreation and other land uses, such as sales of camping equipment, gasoline, restaurants, lodging facilities

## Mitigation and Site-Restoration Techniques

Balancing OHV-user preferences with protecting land health and the needs of other land users requires careful study and planning, as well as appropriate management strategies. Prior planning for locating OHV areas before they are opened to the public can preclude undesirable

BLM_0061663

effects of OHV use and costly site restoration. Once a site has been used, however, trail/area closures, signage, and other visual cues, as well as enforcement and limiting visitor numbers through "rationing," are among the tools used to preclude additional effects.

Because habitat fragmentation is particularly difficult to repair, planning and management designed to maintain habitat connectivity are crucial to minimize fragmentation. Variation in impacts requires various restoration techniques. Whereas a single OHV pass on a xeric landscape may cause long-lasting damage, a similar single pass on a mesic landscape may require no treatment at all. Restoration approaches may include replacing native soil where erosion has removed the topsoil and exposed the underlying bedrock, seeding with indigenous plants, inoculating soils with native microbes and mycorrhizae, scarifying, and/or mulching. Ultimately, the success of such measures depends on the nature and intensity of the disturbance, topography, soil type, climate, and the ability of land managers to enforce closures and prevent the proliferation of new routes.

## Monitoring and Research Needs to Support OHV Management Decisions

Elucidating OHV impacts on soils and watersheds, vegetation, wildlife and their habitats, water and air quality, and/or socioeconomics, whether through monitoring or experimental research studies, will require careful planning and appropriate, rigorous study design. Results of many past ecological studies on the effects of OHVs may be regarded as preliminary, particularly for those that lacked comparable treatment and control sites and site replication. Overall, the reliability and value of monitoring and research results would increase significantly by including a broad range of spatial and temporal scales—from microhabitat to landscape or ecosystem scale, and from short-term (seasonal) to long-term (decades)—within the full range of impacted habitat types represented on BLM lands. The full array of site types also needs evaluation, including designated OHV-use sites, undesignated (rogue) OHV-use sites, unused areas, and restoration sites. Multiple- and simultaneous-assessment techniques that take advantage (and push the advancement) of existing and emerging technologies are needed to fully represent the scale and diversity of OHV impacts on the abiotic and biotic components of affected lands and communities, and to ascertain indicator thresholds as they pertain to BLM's land health standards. More specifically, monitoring and research needs pertaining to OHV use and impacts include (but are not limited to)

- well-designed monitoring programs and experimental studies that incorporate planned comparisons of treatment (OHV-impacted) and control (unimpacted/reference) sites;
- before and after OHV-impact studies;
- studies at various spatial and temporal scales across all impacted habitat types;
- studies on habitat fragmentation and road-edge effects caused by OHV activities;
- studies on various gradients in OHV disturbance at various distances from OHV routes;
- studies to improve the understanding of the physical and chemical dynamics of soil compaction;
- studies evaluating the effects of erosion, sedimentation, and turbidity at both local (immediately downslope of OHV-affected sites) and landscape (throughout impacted watersheds) scales;
- studies of OHV effects on plant and animal population dynamics;
- simultaneous evaluations of wildlife responses and OHV route-specific variables;
- improvements in techniques for successful site restoration;

BLM_0061664

- improvements in techniques and technologies for assessing OHV impacts over large areas and long periods of time;
- effectiveness evaluations of various techniques to manage OHV use and its ecological and socioeconomic effects while simultaneously providing the greatest satisfaction among all land users; and
- studies that determine the economic and sociological costs of OHV use.

BLM_0061665

# 1.0 Introduction

## 1.1 Issue Context: Bureau of Land Management Land Health and Off-highway Vehicle Use

### 1.1.1 Bureau of Land Management Land Health Standards

In the mid-1990s, *Rangeland Health: New Methods to Classify, Inventory, and Monitor Rangelands* was published to examine the scientific basis and success of methods used by federal agencies to inventory, classify, and monitor rangelands, and to make recommendations for improvements to these methods (Committee on Rangeland Classification, Board on Agriculture, and National Research Council, 1994). Therein, rangeland health was defined as "…the degree to which the integrity of the soil and the ecological processes of rangeland ecosystems are sustained." In 2001, the BLM published *Rangeland Health Standards*, a process framework for assessing rangeland health via interdisciplinary teams that, at a minimum, would evaluate (1) watershed function; (2) nutrient cycling and energy flow; (3) water quality; (4) habitat for endangered, threatened, proposed, candidate, or special status species; and (5) habitat quality for native plant and animal populations (U.S. Bureau of Land Management, 2001). Subsequently, it was clarified that the term "rangeland" is interchangeable with "land" and that "…'the rangeland health standards' really apply to the condition of the land itself regardless of the uses that may influence the health of that land" (U.S. Bureau of Land Management, 2007). In other words, the standards for rangeland health apply to all BLM lands, whether used for grazing, off-highway vehicle (OHV) recreation, or any other use permitted to occur on BLM lands.

The standards of rangeland health establish minimum resource conditions that must be achieved and maintained to ensure the "proper functioning condition" (see Barrett and others, 1995)—both physical and biological—and sustainability of BLM lands. These standards, however, must be relative to the native conditions for a given "reference site," as native conditions vary widely among sites on BLM lands. For example, the BLM defines healthy soils in northwest California as "exhibit[ing] characteristics of infiltration, fertility, permeability rates, and other functional and physical characteristics that are appropriate to soil type, climate, desired plant community, and land form" (personal communication from M. Karl to V. Josupait, U.S. Bureau of Land Management, Denver, Colorado, May 2001).

The BLM's technical reference on *Interpreting Indicators of Rangeland Health* recognizes three broad categories of natural resource attributes for assessing land health: (1) soils and site stability, (2) hydrologic function, and (3) biotic integrity (Pellant and others, 2005). Relative to off-highway vehicle (OHV) impacts on ecosystem health, soil/site stability and hydrologic or watershed function pertain (but are not limited) to erosion and extent of surface changes and patterns of water flow, including infiltration. Biotic integrity pertains to community structure and functionality of plants. Within these three categories, overall land health is qualitatively assessed via 17 parameters (or indicators) that indicate the presence, number, extent, percent, and/or depth or height of (1) rills, (2) water flow patterns, (3) erosional pedestals/terracettes, (4) bare ground, (5) gullies and gully erosion, (6) wind scoured blowouts and/or depositional areas, (7) litter movement, (8) soil surface resistance to erosion, (9) soil surface structure and content of soil organic matter (SOM), (10) effect of plant community composition and spatial distribution on infiltration and runoff, (11) compaction layer, (12) dominance hierarchy of functional/structural groups in plant communities, (13) mortality and

1

decadence among plant functional groups, (14) litter cover, (15) expected above-ground annual production, (16) potential invasive species, and (17) perennial plant reproductive capability (Pellant and others, 2005). Many of the indicators listed above may be assessed in terms of the condition and extent of abiotic (chemical) and biotic soil crusts, and soil surfaces of small stones known as "desert pavement," as they help stabilize soils and/or cycle nutrients through the system. Indicators 1-11 largely pertain to soil/site stability and hydrologic/watershed function, whereas parameters 12-17 are primarily indicators of biotic integrity, although there is overlap among the two groups.

## 1.1.2 Increasing OHV Use

An important factor affecting the health of BLM lands is the use of OHVs. In 1993, 2,920,000 all-terrain vehicles (ATVs) and off-highway motorcycles were estimated to be in use (Cordell and others, 2005). Between 1995 and 2003, sales of ATVs and off-highway motorcycles tripled, increasing the number of ATVs and off-highway motorcycles in use to 8,010,000 (Cordell and others, 2005). Because the popularity of OHV-based recreation is relatively recent and still increasing (see Matchett and others, 2004), the full range of short- and long-term impacts has yet to be fully realized or understood. Overall, it is clear that OHV use on public lands is and will continue to be an important management issue.

## 1.2 Objectives, Scope, Organization, and Use of This Report

### 1.2.1 Objectives

The objectives of this report are twofold. This first is to synthesize the results of a comprehensive literature search on what is currently known about the effects of OHV activities as they relate to the BLM's land health standards (U.S. Bureau of Land Management, 2001). These discussions include socioeconomic implications of OHV use—including  preferences of OHV users, effects of OHV activities on other land users, and the economic impacts of OHV recreation on local economies—because understanding these factors and incorporating that knowledge into management plans and policies will be crucial to management success. The second objective is to discuss the indicators of land health and socioeconomics described in the OHV effects literature, as they have potential usefulness for evaluating or monitoring lands and land users affected by OHV use. This report also contains brief overviews of mitigation approaches, site-restoration techniques, and monitoring and research needs described in the OHV-effects literature.

### 1.2.2 Geographical Scope

Although the vast majority of literature and other sources consulted address OHV impacts on ecosystems in the western United States, there are a number of useful references that address OHV use or impacts of roads in other parts of the United States and in other countries. Some of these sources have been included to provide additional information not provided elsewhere and/or to broaden the scope and relevance of this document.

### 1.2.3 Organization

The main body of this document—referred to herein as the "manager's report" (Executive Summary and Sections 1-7)—includes the literature synthesis of OHV effects; annotated bibliographies that typify the body of research regarding effects of OHV activities on BLM's land health standards; sections regarding indicators of OHV effects, mitigation and site-

BLM_0061667

restoration techniques, and monitoring and research needs; and a listing of all literature cited in the manager's report. To facilitate the logical flow of information, the natural resource attributes addressed in BLM's land health standards serve as the underlying organizational structure of all major sections in the report, as indicated by parallel subsection headings pertaining to (1) soils and watersheds, (2) vegetation, (3) habitat for native plants and wildlife, (4) water quality, and (5) air quality. Although not part of the BLM's land health agenda, a sixth subsection has been included in each major section to address the socioeconomic considerations of OHV use, because, ultimately, it is socioeconomic factors (including conflicts among land users, preferences of OHV users, and economics of OHV use) that drive changes in overall land health.

### 1.2.4 Tips on Navigating This Document

It is recommended that readers focus first on the manager's report, as it provides the basic understanding of OHV effects and possible indicators to use in research, monitoring, and/or management programs. Reading the Executive Summary, subsection summaries, and the overall conclusion may suffice for those seeking a quick overview. **For quick and easy reference, subsection summaries on OHV effects are placed at the top of their respective subsections. In-text citations were purposely left out of all summaries to enhance readability. For a more in-depth, fully cited review, reading the entire manager's report is recommended.**

Appendixes 1 and 2 provide further information and more extensive resources for those needing high levels of detail. The Extensive Bibliographies (Appendix 1) includes the approximately 700 publications and reports uncovered through the literature search (from 1960 to May 2006) that pertain to effects of OHV use. Appendix 2 details the literature- and Internet-search methods and provides tabular and graphical summaries of literature, websites, and associated resources, as they pertain to OHV effects on natural resources and related policies.

## 1.3 Definitions of OHV Routes/Roads, Vehicles, and Activities

### 1.3.1 Definitions of Roads and Trails Used in This Report

BLM's *Roads and Trails Terminology* document (U.S. Bureau of Land Management, 2006) defines (1) a road as "a linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use;" (2) a primitive road as "a linear route managed for use by four-wheel drive or high-clearance vehicles;" and (3) a trail as "a linear route managed for human-powered, stock, or off-highway vehicle forms of transportation or for historical or heritage values." Bolling and Walker (2000) offer more detailed definitions of unpaved roads and trails: (1) graded, improved roads are those from which the topsoil has been removed by bulldozer and characterized by the presence of lateral berms; (2) unimproved roads are those not graded consistently; (3) jeep trails are four-wheel drive tracks impacted only by vehicular traffic and generally characterized by a center berm; and (4) single tracks are severely compacted trails generated by OHVs.

The literature includes numerous reviews on the ecological effects of paved as well as unpaved roads (see Andrews, 1990; Forman and Alexander, 1998; Spellerberg, 1998; Trombulak and Frissell, 2000). Ecosystems of the West, however, are especially vulnerable to OHV-related activities on unpaved (gravel or dirt) roads and trails due to the effects they impose on soils and vegetation, which may take centuries to recover (Webb, 1982; Lovich and Bainbridge, 1999). Furthermore, unpaved roads comprise the majority of OHV routes used throughout public lands in the western United States. Therefore, the primary considerations in this report are unpaved

BLM_0061668

roads and trails. References and discussions regarding effects of paved roads are not entirely excluded, however, as they often inform the potential scope of OHV effects not otherwise addressed. When necessary to do so, the type of road is specified.

All of terms described above for roads and trails are useful within their own contexts, but to distinguish between them and those used in the OHV literature would unnecessarily complicate discussions herein. Therefore, except where there is a need to specify in more detail, unpaved roads, primitive roads, and unpaved trails, are referred to as "routes," regardless of their intended purpose or how they are maintained. "Routes" also include unauthorized or "rogue" roads and trails created by OHV users traveling off officially designated roads, primitive roads, and trails. Paved roads are referred to as "roads."

## 1.3.2 Definitions of OHVs and OHV Activities Used in This Report

BLM's *Roads and Trails Terminology* document (U.S. Bureau of Land Management, 2006) defines an OHV as "any motorized vehicle capable of—or designated for—travel on or immediately over land, water, or other natural terrain" (excluding nonamphibious registered motorboats; military, fire, emergency, or law enforcement vehicles used for emergency purposes; official vehicles used expressly by an authorized officer; and military vehicles). Cordell and others (2005) further specify that OHVs may include motorcycles and off-highway motorbikes, ATVs, dune buggies, snowmobiles, most 4-wheel drive automobiles (jeeps, sport utility vehicles), and any other civilian vehicle specifically designed for off-road travel. For the purpose of this document, OHV is defined in accordance with BLM terminology and includes those vehicles listed by Cordell and others (2005), as well as utility vehicles (UTVs) and ATVs with more than 4 wheels.

There are numerous activities and outcomes directly and indirectly associated with OHV use. To simplify discussions of OHV activities herein, the term "OHV activities" largely refers to driving OHVs for recreation. In certain contexts, OHV activities also may include driving and parking vehicles that tow trailers carrying OHVs and loading and unloading OHVs from trailers. Whereas the use of 4-wheel drive jeeps, automobiles, and sport utility vehicles is largely restricted to unpaved roads and jeep trails, the effect of ATVs and off-highway motorcycles extends well beyond them to double- and single-track trails, as well as unauthorized roads and trails. Thus, "OHV activities" may include driving OHVs on authorized roads/routes and on (or creating) unauthorized routes.

# 2.0 Effects of OHV Travel on Natural Resource Attributes and Socioeconomics

## 2.1 Scale and Patterns of OHV Activities and Their Effects

Temporal and spatial scales are crucial considerations when evaluating or monitoring effects of any factor on ecosystems (Noon, 2003; Ringold and others, 2003). In discussing OHV effects on desert ecosystems, Brooks and Lair (2005) and Matchett and others (2004) describe the impacts of OHV activities at various spatial and temporal scales. At the highly localized spatial scale, one might find soil compaction taking place within the confines of a single OHV route, the effects of which might be limited to poor infiltration of water and reduced plant cover in the route itself. Brooks and Lair (2005) go on to explain, however, that the cumulative impacts of any one effect at many sites can result in impacts at much greater scales. For example, if

BLM_0061669

networks of OHV routes criss-cross large areas, the habitat connectivity that previously facilitated animal movements within that landscape may be disrupted (Forman and others, 2003: p. 129-134). Similarly, a single pass by one OHV probably has negligible effects on animal distributions, but if OHV traffic is intense and chronic, animal densities may decline (Reijnen and others, 1995, 1997) as cumulative impacts of this one effect occurring at many sites across a landscape disrupt entire populations. Furthermore, any **direct** effect of OHV use is also likely to have **indirect** effects that go beyond the site of disturbance. For example, reduced plant cover (direct effect) can result in greater rates of erosion in and around an OHV route, which, in turn, might increase sedimentation and turbidity in wetlands downslope of the route (indirect effect). Overall, Brooks and Lair (2005) conclude that effects of OHV use need to be evaluated at appropriate scales, which must take into account the scale at which OHV activities and ecosystem responses occur (Brooks and Lair, 2005). Overall, most, if not all, effects of OHV activities described in sections 2.2 through 2.6 can occur from the very localized and/or ephemeral scale to the landscape and/or long-term scale. By the same token, any direct effect may have a number of indirect effects, the magnitude of which may depend on the spatial and temporal scales at which a direct effect occurs.

At an OHV site in California, Matchett and others (2004) classified OHV routes in terms that describe intensity and pattern of use. First, OHV lines (routes) were categorized as either *dirt* (lines most likely created for or by OHV use) or as *wash* (lines most likely created by water flow, but possibly used by OHVs). They went on to define levels of OHV use that also imply patterns of use: (1) densely tracked reticulate (OHV lines evident in a web-like pattern, but too dense and overlapping to distinguish individually); (2) densely tracked hill-climb (OHV lines evident on slopes, but too dense and overlapping to distinguish individually); (3) densely tracked intersection (OHV lines evident at intersections, but too dense and overlapping to distinguish individually; (4) densely tracked right-of-way (OHV lines evident near pipelines, transmission lines, and highway right-of-ways, but too dense and overlapping to distinguish individually; (5) densely tracked wash (OHV lines evident within washes, but too dense and overlapping to distinguish individually; (6) denuded hill-climb (OHV lines not readily evident on hill-climbs, but the preponderance of densely tracked areas in the vicinity indicate that OHV use was probably high within that area); and (7) denuded staging (OHV routes not readily evident in relatively flat camping areas, but the preponderance of densely tracked areas in the vicinity indicated that OHV use was probably high within that area) (Matchett and others, 2004). Overall, these categories indicate that OHV use often entails many criss-crossing routes as opposed to a single route. They also point out that OHV use may be heaviest on slopes, along right-of-ways, in washes, and in the vicinity of camping facilities.

## 2.2 OHV Effects on Soils and Watersheds

### 2.2.1 Section Summary

Important effects of OHV activities on soils and watershed function include soil compaction, diminished water infiltration, diminished presence and impaired function of soil stabilizers (biotic and abiotic crusts, desert pavement), and accelerated erosion rates. Compacted soil inhibits infiltration of precipitation. In turn, soil moisture available to vegetation is diminished, volumes and velocities of precipitation runoff increase, and soil erosion accelerates, leading to the formation of gullies and other surface changes. Additionally, soil compaction may inhibit root growth among plants, in which case organic matter, litter, soil fertility, and vegetative cover are diminished, further exacerbating the soil's susceptibility to erosion. Where

BLM_0061670

biotic and chemical crusts or other soil stabilizers are disturbed or destroyed, soil erosion from water and wind may increase beyond rates found in undisturbed sites with similar soils and conditions; nutrient-cycling processes also are likely to be disrupted, potentially leading to declines in soil fertility.

## 2.2.2 Soil Compaction and Reduced Water Infiltration

One of the most common and important effects of OHV activities is soil compaction (Liddle, 1997), which diminishes water infiltration, destroys soil stabilizers (biotic and abiotic crusts, desert pavement), and promotes greater rates of erosion from water and wind. In turn, soil moisture available for plant growth is diminished, precipitation runoff increases in volume and velocity, and soil erosion accelerates, which leads to surface changes, including the formation of rills, gullies, terracettes, and pedestals (Webb and others, 1978; Iverson and others, 1981; Webb, 1982; Hinckley and others, 1983; Wilshire, 1983b). The extent of soil compaction may be measured in terms of soil bulk density, soil strength, and/or permeability. Soil bulk density, calculated as oven-dried soil weight per unit of volume, is typically expressed as $g/cm^3$ or g/cc. Soil strength, measured as the soil's resistance to deforming forces—or the amount of energy required to break apart aggregates or move implements through the soil—is typically expressed as $kg/cm^2$ or pounds per square inch (PSI). Soil permeability is the rate at which water (or air) infiltrates the soil, expressed as cm/hr or inches/hr (Leung and Meyer, 2004). Generally, soil bulk density and strength increase with increasing compaction, whereas permeability decreases with increasing compaction (Adams and others, 1982; Webb, 1982; Cole, 1990).

Important factors affecting a soil's susceptibility to compaction include its (1) texture (relative proportions of sand, silt, and clay); (2) structure (the grouping of sand, silt, and clay particles into aggregates), including its porosity (a measure of pore space, which affects the amount of air or water a soil can hold) and aggregate stability (the ability of soil aggregates to resist disruption from outside forces—water in particular); (3) type (series) and depth; and (4) antecedent moisture (the soil's water content prior to compaction). Sandy or clayey soils relatively uniform in texture and structure are less vulnerable to compaction than loamy sands or coarse-textured, gravelly soils characterized by variability in particle size (Lovich and Bainbridge, 1999). In addition, soils with greater water content are more susceptible to compaction than those containing less moisture (Webb, 1982), although even in semi-arid and arid lands soil compaction is problematic because the texture of these soils is slow to recover (Webb, 1982) through natural soil-loosening processes (including shrinking, swelling, drying, wetting, freezing, and thawing).

As the number of vehicle "passes" (one pass is the equivalent of one OHV passing over a given area one time) increases, soil bulk density and soil strength increase and permeability (as indicated by water infiltration rate) decreases (Lovich and Bainbridge, 1999). Soil compaction may become evident after only a few vehicle passes. In fact, Iverson and others (1981) found that soil bulk density increased logarithmically with the number of vehicle passes. Similarly, Adams and others (1982) report that soil strength on routes subjected to a single vehicle pass was 5.3 to 28.4 $kg/cm^2$ (75.366 to 403.848 PSI) greater (depending on the percent soil moisture) than that of nearby undisturbed soils; after 10 to 20 passes, soil strength was too great (impenetrable) to measure with a penetrometer, indicating that a few passes were enough to cause soil "cementation." After initial disturbance, the effects of soil compaction can persist for years, even centuries, before natural soil-loosening processes can restore the soil's texture (Webb and Wilshire, 1980; Webb, 1982; Froehlich and others, 1985; Prose, 1985; Lovich and Bainbridge, 1999). For example, one year after impact, a one-pass trail was still faintly visible, as indicated

BLM_0061671

by slightly more surface gravel and growth of annual plants (the first to grow in disturbed sites) than on surrounding land, and trails impacted by 100 and 200 passes had notable side berms (Prose, 1985).

Other effects of soil compaction include changes to soil horizons and increased compaction in deeper strata. The OHV traffic associated with the annual Johnson Valley-Parker OHV race (1980-1983) near Joshua Tree National Park on the Colorado River compacted 2 to 5 cm (0.8 to 2.0 in) of the underlying vesicular soil horizon (composed of fined-grained, wind-blown material occurring about 20 cm [7.9 in] deep near surface soil horizons, often immediately under desert pavement, and characterized by small pores, or vesicles, of air space; typical of arid regions) and caused excavation (mechanical erosion) of the A and B soil horizons to depths of 20 cm (7.9 in) (Wilshire, 1983a). Prose (1985) found that resistance (to a penetrometer) of soil affected by military maneuvers (including tanks, tracked equipment and personnel carriers, and support vehicles) was 50 percent greater than that of undisturbed soils. Overall, traffic typically causes significant changes to soils, which may take years, if not decades, to recover.

## 2.2.3 Effects on Soil Stabilizers and Rates of Soil Erosion

A significant effect of soil compaction is the soil's inability to support vegetation after disturbance, thus increasing its susceptibility to erosion (Webb and others, 1978). Soil erosion resulting from soil compaction is caused by two main factors (Hinckley and others, 1983): reduced infiltration rates and destruction of soil stabilizers. Infiltration of water into soils depends, to a large extent, on the soil's porosity, which is reduced by compaction. Soil stabilizers, which are characteristic of undisturbed desert substrates, may include cryptobiotic crusts of lichen, fungi, bacteria, mosses, and/or algae; chemical or mechanical crusts (thin upper coating of clay particles oriented parallel to the surface); and desert pavements (closely packed, interlocking fragments of pebble- and/or cobble-sized rocks from which fine-grained materials have been removed by wind or water erosion) (Lovich and Bainbridge, 1999). Cryptobiotic organisms facilitate accumulation of organic materials and nutrients, including nitrogen and carbon, thereby increasing soil fertility (Johansen, 1993). Since they occur in the soil's upper layer, they also promote water infiltration and enhance retention of soil moisture (Belnap and Gardner, 1993). Their proximity to the surface, however, makes them susceptible to destruction by vehicular and foot traffic.

Cole (1990) documented destruction of cryptogamic soil crusts after only 15 passes by hikers wearing lug-soled boots. Traffic from the Johnson Valley-Parker OHV race mentioned in section 2.2.2 not only destroyed the vesicular soil horizon, it destroyed the overlying desert pavement (Wilshire, 1983a). Webb (1982), who evaluated soil surfaces (shape; another measure of soil compaction) after 1, 10, 100, and 200 motorcycle passes, found changes occurring after the first few passes, although the effects of subsequent passes were more severe due to their cumulative effects: routes subjected to 100 and 200 passes were characterized by berms and lateral edges, and route midlines were 10-30 mm below the level of surrounding undisturbed ground. Once damaged or destroyed, it may take 300-500 years per inch for soil stabilizers to recover or return to their original state (Hudson, 1971).

Typically, undisturbed soil surfaces are very important in controlling the soil's response to precipitation runoff, particularly where the soil surface is covered with fine gravel that overlays soils with large pores (Webb, 1982). In the Mojave Desert, surface runoff was typically five times greater and sediment yield (in runoff) was 10-20 times greater in OHV-impacted areas than in undisturbed areas (Iverson and others, 1981). For various reasons, certain portions of the desert, including dunes, playas, and areas covered with coarse surface material, are fairly

BLM_0061672

resistant to erosion from runoff (Hinckley and others, 1983), whereas vulnerable areas are those where initial infiltration rates are low, slopes are high, and ratios of surface sand/gravel to smaller particles are low (Iverson and others, 1981). The character of precipitation also influences the susceptibility of denuded soil to erosion; erosion rates are typically greater when rainfall events are of long duration and high intensity (Iverson and others, 1981). Disturbed soils also increase the likelihood of debris eroding from areas disturbed by OHV activities (Lovich and Bainbridge, 1999). Indeed, debris flow has been documented to bury plants growing outside the area impacted (Nakata, 1983).

## 2.2.4 Annotated Bibliography for OHV Effects on Soils and Watersheds

***Adams, J.A., Endo, A.S., Stolzy, L.H., Rowlands, P.G., and Johnson, H.B., 1982***, Controlled experiments on soil compaction produced by off-road vehicles in the Mojave Desert, California: Journal of Applied Ecology, v. 19, no. 1, p. 167–175.

Under controlled conditions, soil crust properties were measured to determine how rapidly they were altered by passing vehicles. Routes impacted by a single vehicle pass had soil strengths 5.3 to 28.4 kg/cm$^2$ (75.366 to 403.848 lb/in$^2$ [or PSI], depending on the percent soil moisture) greater than undisturbed soil, indicating that just a single pass can begin to affect soil strength. Mean soil strength on routes exposed to 10 and 20 passes was too high to measure. Drying caused the soil in the slightly compacted track to become much harder (increased soil strength) than the undisturbed soil.

***Belnap, Jayne, 1993***, Recovery rates of cryptobiotic crusts—inoculant use and assessment methods: Great Basin Naturalist, v. 53, no. 1, p. 89–95.

Rates of recovery of cyanobacterial-lichen soil crusts from disturbance were examined. Plots were either undisturbed or scalped, and scalped plots were either inoculated with surrounding biological crust material or left to recover naturally. Natural recovery rates were found to be very slow. Inoculation significantly hastened recovery of the cyanobacterial/green algal component, lichen cover, lichen species richness, and moss cover; even with inoculation, however, lichen and moss recovery was minimal.

***Belnap, Jayne, 2002***, Impacts of off-road vehicles on nitrogen cycles in biological soil crusts—resistance in different U.S. deserts: Journal of Arid Environments, v. 52, no. 2, p. 155–165.

This study was conducted to evaluate short-term impacts of OHVs on lichen cover and the nitrogenase activity (NA) of biological soil crusts on various soil types in the Great Basin, Colorado Plateau, Sonoran, Chihuahuan, and Mojave deserts. Lichen cover was significantly correlated with percent silt in soil (and negatively correlated with percent sand and clay). Disturbance reduced NA at all 26 sites, but significantly at 12; declines were greatest in soils of cooler regions than hotter ones, possibly indicating that non-heterocystic cyanobacterial species are more susceptible to disturbance than heterocystic species. Sandy soils showed greater reduction of NA as sand content increased, while fine-textured soils showed a greater decline as sand content increased. At all sites, higher NA before the disturbance resulted in less impact to NA post-disturbance. These results may be useful in predicting the impacts of off-road vehicles in different regions and different soils.

***Cole, D.N., 1990***, Trampling disturbance and recovery of cryptogamic soil crusts in Grand Canyon National Park: Great Basin Naturalist, v. 50, no. 4, p. 321–325.

BLM_0061673

Under controlled conditions, cryptogamic soil crusts in Grand Canyon National Park were trampled by hikers to determine how rapidly they were pulverized and how rapidly they recovered. Only 15 passes were required to destroy the structure of the crusts; visual evidence of bacteria and cryptogam cover was reduced to near zero after 50 passes. It took soil crusts one to three years to redevelop, and after 5 years the extensive bacteria and cryptogam cover left little visual evidence of disturbance. Surface irregularity remained low after 5 years, however, suggesting that recovery was incomplete.

**Eckert, R.E.J., Wood, M.K., Blackburn, W.H., and Peterson, F.F., 1979**, Impacts of off-road vehicles on infiltration and sediment production of two desert soils: Journal of Range Management, v. 32, no. 5, p. 394–397.

This project staged a series of controlled motorcycle and 4-wheel drive vehicle passes, followed by simulated rainfall. Two sites were chosen to represent two different soil types. Infiltration rates were lower and sediment yield was higher after soil was disturbed by vehicular traffic. High sediment yield was attributed to reduced infiltration after 10 minutes; the remaining 20 minutes of the test period were characterized by particles being carried away in runoff water.

**Folz, R.B., 2006**, Erosion from all terrain vehicle (ATV) trails on National Forest lands (abs.): Proceedings of the 2006 American Society of Agricultural and Biological Engineers, Portland, Oregon, July 9–12, 2006: St. Joseph, Michigan, 2006 American Society of Agricultural and Biological Engineers, *http://asae.frymulti.com/abstract.asp?aid=21056&t=2*.

Concern about unmanaged use of all terrain vehicles (ATV) on U.S. Forest Service lands prompted an experimental study to test the relative effects of low-, medium-, and high-disturbance trails (based on traffic levels), as measured by reduced litter/vegetation and the width and wheel-rut depth of trails. Trail condition was assessed and then subjected to simulated rainfall. A negative relationship between levels of ATV traffic and rainfall infiltration was not statistically significant among disturbance levels; however, there were significant differences in infiltration and measures of erosion between undisturbed and disturbed conditions. Data from this study will be used to estimate ATV traffic-induced erosion and make decisions regarding management of ATV use.

**Iverson, R.M., Hinckley, B.S., and Webb, R.M., 1981**, Physical effects of vehicular disturbances on arid landscapes: Science, v. 212, no. 4497, p. 915–917.

In 50 rainfall simulation tests, vehicle-use plots had about five times more runoff and 10-20 times greater sediment yield than adjacent unused plots. In a desert environment, such effects may occur even when use of off-road vehicles is light. Recovery times from vehicular traffic were estimated to be nearly 100 years. Erosion rates were calculated from multivariate statistical analyses using 22 experimental factors. The character of the rainfall was identified as the most important variable in predicting increases in erosion.

**Sparrow, S.D., Wooding, F.J., and Whiting, E.H., 1978**, Effects of off-road vehicle traffic on soils and vegetation in the Denali Highway region of Alaska: Journal of Soil and Water Conservation, v. 33, no. 1, p. 20–27.

This study examined the effects of vehicles on trails. The surface layer of living material was killed on all main trails, although soil morphology was not generally altered except in the surface horizon. Varying amounts of organic matter were lost from the heavily used trails,

9

BLM_0061674

depending on slope and vehicle type. Soil depth and drainage were the most important factors influencing the condition of the trail. The greatest effects on soils occurred in poorly drained areas or on loose, gravel-free soils that were highly susceptible to erosion.

**Tuttle, M., and Griggs, G., 1985**, Accelerated soil erosion at three State Vehicular Recreation Areas: central and southern California, *in* Erosion control: A challenge in our time, proceedings of the 16th annual International Erosion Control Association, February 21–22, 1985, San Francisco, California: San Francisco, California, International Erosion Control Association, p. 105-115.

Soil erosion rates were evaluated at three State Vehicular Recreation Areas, with a particular focus on hillclimbs. The key factors contributing to erosion rates were slope, length of climb, soil type, and weather. Based on monitoring and catchment basin yield, erosion in open areas dedicated to OHV use was 10 to 25 times greater than in undisturbed areas.

**Webb, R.H., 1982**, Off-road motorcycle effects on a desert soil: Environmental Conservation, v. 9, no. 3, p. 197–208.

The effects of controlled motorcycle traffic on a Mojave Desert soil in California were studied in order to quantify soil compaction. Four experimental trails treated with 1, 10, 100, and 200 passes with an off-road motorcycle were established in loamy sand at 6.2 percent (by weight) moisture content. Soil penetration resistance, bulk density, infiltration rate, and response to rainfall were measured for undisturbed soil and the experimental trails immediately after the impact, and soil cores were measured in the laboratory to determine pore-size distributions. Soil bulk density was remeasured one year after the impact to ascertain the amount of recovery. The 1-pass trail had a slight surface indentation with knob imprints from the tires. Along the 100- and 200-pass trails, there were berms and lateral edges, and their centers were 10–30 mm below the level of undisturbed soil adjacent to the trail.

**Wilshire, H.G., and Nakata, J.K., 1976**, Off-road vehicle effects on California's Mojave Desert: California Geology, June 1976, p. 123–132.

This study was designed to evaluate long-term effects of an off-road vehicle race on the desert landscape, in particular the landscape condition after vehicular use (specifically motorcycles), whether or not effects were confined to the areas of direct impact, and how long the physical effects of such activities remained. Visual observations and penetrometer measurements were recorded in five ground types. Soil compaction was the dominant consequence of motorcycle use: penetrometer data revealed decreases in mean penetration depths. Combined with a notable reduction in plant cover, soil compaction significantly increased the potential for erosion. Initial vehicle impact resulted in substantial, immediate mechanical erosion, followed by wind erosion, culminating in the increased potential for water erosion over longer periods of time.

**Wilshire, H.G., Nakata, J.K., Shipley, Susan, and Prestegaard, Karen, 1978**, Impacts of vehicles on natural terrain at seven sites in the San Francisco Bay area: Environmental Geology, v. 2, no. 5, p. 295–319.

Vegetation and soil properties were measured at seven sites exposed to off-road vehicle activities. Impacts on loamy soils included greater soil surface strength and bulk density, lower infiltration rates and soil moisture, extended diurnal temperature ranges, and reduced organic

10

BLM_0061675

carbon. These effects, combined with the associated loss in vegetative cover, promoted erosion, the rates of which significantly exceeded Federal and local standards, and the increased sediment yield and runoff caused adverse effects on neighboring properties.

## 2.3 OHV Effects on Vegetation

### 2.3.1 Section Summary

Relative to plant communities in OHV-impacted areas, those in undisturbed sites are dominated by native plants, invasive species are not increasing, plant growth and reproduction are vigorous, age-classy structures are appropriate to the species, and canopy cover and vertical structure are adequate for dispersing the energy of precipitation runoff and promoting water infiltration. Direct impacts of OHV activities on vegetation include reduced vegetation cover and growth rates, and increased potential for non-native grasses and pioneering species to become established, thus altering vegetation communities. In certain instances, however, the impervious nature of compacted route and paved road surfaces could result in significant runoff that generates greater moisture availability immediately along OHV routes. In turn, this would promote increased vegetation cover and plant abundance than one might find in surrounding areas farther away from OHV routes.

Some important indirect effects of OHV activities on vegetation are tied to soil properties altered by OHV traffic, as soil properties typically influence vegetation growth. OHV roads and trails also create edge habitats, which can generate conditions that promote the encroachment of non-native and invasive plant species. Other indirect effects include increased amounts of airborne pollutants and dust raised by OHV traffic. A blanket of fugitive dust on plant foliage can inhibit plant growth rate, size, and survivorship.

### 2.3.2 Overall Effects on Vegetation Cover and Community Composition

When soils are severely disturbed, vegetation cover can be reduced significantly (Adams and others, 1982; Prose and others, 1987; Bolling and Walker, 2000) and growth can be impaired (Spencer and Port, 1988; Angold, 1997). As stated in the previous section, even a few passes by vehicles can cause significant changes in soil properties. Adams and others (1982) found reduced cover of desert annuals in tracks created by as few as 1 (on wet loamy sand) to 20 (on dry loamy sand) vehicle passes; the reduction in cover, however, was not due to fewer plants, but to smaller plant sizes. Similarly, Bolling and Walker (2000) found that in OHV routes there were many small individuals of creosote bush (*Larrea tridentata*), but larger plants were few or absent; in control plots, however, there were more large plants and fewer small ones.

Reduced plant sizes are typical where the extent of soil compaction inhibits their roots from penetrating to deeper soil levels. In fact, Adams and others (1982) determined that root growth is precluded at soil strengths of about 20 kg/cm$^2$ (284.4 lb/in$^2$). Within tracks made by 1, 3, 10, and 20 vehicle passes, Adams and others (1982) found that annuals with large taproots (for example, pincushion flower [*Chaenactis fremontii*]) decreased, whereas there was significantly greater cover of common Mediterranean grass (*Schismus barbatus*), a non-native grass with a fibrous root system. The fibrous root system of plants that characterized by single cotyledons, such as common Mediterranean grass, allows for easier germination and root growth than is possible for taprooted dicotyledons.

Soil compaction also increases the potential for invasive, non-native annuals and other early successional plants to establish rapidly in OHV routes, whereas native perennials may require at least 5 years to become established (Adams and others, 1982; Prose and others, 1987;

11

BLM_0061676

Lovich and Bainbridge, 1999). This is due, in part, to the increased surface moisture availability within the tracks of OHV routes after compaction has reduced the rate of water infiltration, which may favor the rapid germination and growth of non-native and invasive annuals (Adams and others, 1982). In disturbed areas, pioneering species, such as burrobush (*Ambrosia dumosa* and *Hymenoclea salsola*—now *Ambrosia salsola*; see *http://ucjeps.berkeley.edu/cgi-bin/get_cpn.pl?3578*), often dominate the plant community and typically their percent cover is similar to, or greater than, that of undisturbed areas (Prose and others, 1987). Davidson and Fox (1974) also found that non-native, early-successional species, such as redstem stork's bill (*Erodium cicutarium*) and common Mediterranean grass were common at sites disturbed by OHVs. When comparing vegetation in disturbed versus protected plots, Brooks (1995) found that common Mediterranean grass was the only species with greater biomass in the disturbed plots.

OHV traffic also causes direct impacts to vegetation structures (breakage, smashing), although population-level effects may be difficult to discern in the short term. Overall, the extent of immediate effects increases with the frequency of OHV passes. For example, Webb (1983) found that after a single pass, annual plants on an OHV route remained intact, but most were destroyed after 10 passes. Likewise, a series of studies to evaluate the impacts of OHV traffic on the Federally listed Peirson's milkvetch (*Astragalus magdalenae peirsonii*) indicated that this plant was more likely to occur at sites closed to OHV activity than at OHV sites that have been rested from OHV activity (Groom and others, 2005); however, additional study indicated that the number of reproducing plants (and the seedbank) was adequate to maintain the milkvetch population (Phillips and Kennedy, 2006; for more reports, go to *http://www.fws.gov/carlsbad/PMV_Docs.htm*). It remains unclear, however, whether research conducted over longer time scales would yield different results.

## 2.3.3 Edge Effects Along OHV Routes

Roads and trails also create edge habitats (Johnson and others, 1975; Vasek and others, 1975; Adams and Geis, 1983; Andrews, 1990; Holzapfel and Schmidt, 1990; Lightfoot and Whitford, 1991; Reed and others, 1996), resulting in a variety of effects, including changes in vegetation and encroachment of non-native and invasive species (Huey, 1941; Lovich and Bainbridge, 1999). As mentioned in section 2.3.2, the impermeable surfaces of roads and OHV routes shed precipitation, thereby increasing overall moisture availability in the immediate vicinity of the road or route. Additionally, the coarse-textured soils typically found in association with paved roads (roadbed materials laid down prior to paving) permit good water infiltration along road edges (Hillel and Tadmor, 1962); similar conditions may occur along improved gravel routes. The increased moisture availability may promote greater plant vigor along roadsides than in surrounding areas (Johnson and others, 1975), and Angold (1997) indicated that such effects may extend as far as 200 m from road edges. Indeed, several studies have shown that there can be more vegetation cover along roadsides and right-of-ways than in adjacent areas (Johnson and others, 1975; Vasek and others, 1975; Holzapfel and Schmidt, 1990; Lightfoot and Whitford, 1991). Perennial shrubs, in particular, may grow larger and attain greater vigor and density along road edges (Johnson and others, 1975; Lightfoot and Whitford, 1991). Likewise, Johnson and others (1975) found that the standing crop (a measure of primary productivity) was 6 times greater along unpaved roads (17 times greater along paved roads) than it was in nearby undisturbed areas.

The greater vegetation cover typically observed along roadsides also is often due, in part, to greater species richness in those areas (Holzapfel and Schmidt, 1990); however, much of this diversity may be represented by non-native species easily dispersed along roads and trails

BLM_0061677

(Wilcox, 1989; Tyser and Worley, 1992; Parendes and Jones, 2000). Furthermore, local-scale increases in species richness can be associated with decreases in species richness at the landscape scale, thus creating a relatively impoverished and anthropogenic vegetation community (Holzapfel and Schmidt, 1990). Interestingly, increased vegetation cover along roadsides may attract more invertebrates and other organisms. For example, Lightfoot and Whitford (1991) found that shrubs along a road supported greater numbers of foliage arthropods. What is not clear, however, is whether high densities of animals in roadside habitats represent improved conditions for native fauna or dominance by invasive and/or non-native organisms. Furthermore, high densities do not necessarily represent population sources (that is, where survivorship and productivity are high enough to contribute to the species' overall population); instead, high densities can indicate poor-quality habitat into which subordinate animals may crowd and experience poor survivorship if they cannot find or defend better habitat (population sinks). In other words, density can be a misleading indicator of habitat quality (Van Horne, 1983). It is important to note, however, that the greater vegetation cover along roadsides compared to plots away from roads may be a phenomenon found only in arid environments (Hillel and Tadmor, 1962; Holzapfel and Schmidt, 1990).

Fugitive dust raised by OHV traffic also affects vegetation in the vicinity of roads. Along Alaskan roads heavily traveled by various types of vehicles, Walker and Everett (1987) found significant dust impacts up to 10 m (10.9 yd) from the roadside and dust blankets up to 10 cm (3.9 in) thick on mosses and other vegetation of low stature. Several morphological factors contribute to plant susceptibility to heavy dust loads, including mat or prostrate growth form, lack of a protective stem cortex or leaf cuticle, and intricate branching or closely spaced leaves that tend to trap dust (Walker and Everett, 1987; Spellerberg and Morrison, 1998). Processes that may be affected by dust include photosynthesis, respiration, and transpiration due to blocked stomata and cell destruction (Spellerberg and Morrison, 1998), all of which could result in reduced plant growth, size, productivity, and/or survivorship.

## 2.3.4 Annotated Bibliography for OHV Effects on Vegetation

***Adams, J.A., Stolzy, L.H., Endo, A.S., Rowlands, P.G., and Johnson, H.B., 1982***, Desert soil compaction reduces annual plant cover: California Agriculture, v. 36, no. 9–10, p. 6–7.

Soil crust properties and associated changes in vegetation composition were measured under controlled conditions over two 6-month wet seasons to determine how rapidly they were altered by vehicle passes. Reductions in annual plant cover occurred in tracks created by as few as 1 (on wet loamy sand) to 20 vehicle passes (on dry loamy sand). This cover reduction, however, was not due to fewer plants; rather, the plants were smaller, and their size depended on the duration of drying periods, during which the soil strength intensified in impact/track areas. Cover of annuals with large taproots (for example, *Chaenactis fremontii*) decreased in vehicle tracks, whereas the cover of *Schismus barbatus*, a grass with a fibrous root system, was significantly greater in tracks generated by 1, 3, 10, and 20 vehicle passes. It was determined that root growth for plants stops at soil strengths of about 20 kg/cm$^2$ (284.4 lb/in$^2$ [or PSI]). Soil disturbance also increased the potential for grasses and pioneering annual species to become established, whereas perennial species would take at least 5 years to return. A possible reason for this may be greater water availability in the track.

***Angold, P.G., 1997***, The impact of a road upon adjacent heathland vegetation—Effects on plant species composition: Journal of Applied Ecology, v. 34, no. 2, p. 409–417.

13

The effect of a road on heathland vegetation was investigated at five sites adjacent to the main trunk road through the New Forest, Hampshire, United Kingdom, and nine supplementary sites adjacent to five minor roads. There was enhanced growth of vascular plants near the road, notably heather and grasses, which was probably due to nitrogen oxides from vehicle emissions. There was a decrease in the abundance and health of lichens near the road. There was an increase in the abundance of grasses in the heathland near roads, which may be due to the changes in relative competitive ability of plant species under conditions of eutrophication. The extent of the edge effect in the heath was closely correlated with traffic intensity, with a maximum edge effect of 200 m adjacent to a dual carriageway.

**Benninger-Traux, M., Vankat, J.L., and Schaefer, R.L., 1992**, Trail corridors as habitat and conduits for movement of plant species in Rocky Mountain National Park, Colorado, USA: Landscape Ecology, v. 6, no. 4, p. 269–278.

Ground-layer vegetation was sampled along selected trail corridors to determine whether corridors provide habitat for certain species and serve as conduits for species dispersal. Patterns of plant species composition were analyzed in relation to distance from trail edge, level of trail use, and distance from trailheads, junctions, and campgrounds. Species composition was significantly affected by distance from trail edge and level of trail use, as species were favored or inhibited by the corridor, depending upon their growth habits. Species composition also was affected by distance from trailheads. These findings, along with the presence of exotic species, indicate that trail corridors in Rocky Mountain National Park function as habitat and conduits for dispersal of plant species.

**Bolling, J.D., and Walker, L.R., 2000**, Plant and soil recovery along a series of abandoned desert roads: Journal of Arid Environments, v. 46, no. 11, p. 1–24.

To elucidate factors controlling desert succession, soil and vegetation dynamics were examined along roads abandoned for 5, 10, 21, 31, 55 and 88 years in southern Nevada. None of the measured soil or vegetation parameters varied significantly with road age. Differences were found, however, between soils and vegetation on roads compared to those on nearby control sites, and soils differed between roads created by surface vehicular traffic and those made by bulldozing. Studies of recovery following disturbance in deserts must take into account natural patterns of plant and soil heterogeneity and initial disturbance type.

**Brooks, M.L., 1995**, Benefits of protective fencing to plant and rodent communities of the western Mojave Desert, California: Environmental Management, v. 19, no. 1, p. 65–74.

This paper documents the response of plant and small mammal populations to fencing constructed to preclude OHV activities between 1978 and 1979 at the Desert Tortoise Research Natural Area, Kern County, California. Aboveground live annual plant biomass was generally greater inside than outside the fenced plots during April 1990, 1991, and 1992. The non-native grass, *Schismus barbatus*, was a notable exception, producing more biomass in the unprotected area. Forb biomass was greater than that of non-native annual grasses inside the fence during all 3 years of the study. Outside the fence, forb biomass was significantly greater than that of non-native grasses only during spring 1992. Percent cover of perennial shrubs was greater inside the fence than outside, while no significant trend in density was detected. There was also more seed biomass inside the fence, which may have contributed to the greater species diversity and density of Merriam's kangaroo rats (*Dipodomys merriami*), long-tailed pocket mice (*Chaetodipus*

BLM_0061679

*formosus*), and southern grasshopper mice (*Onychomys torridus*) in the protected area. These results show that protection from OHV disturbance has many benefits, including greater overall community biomass and diversity.

**Holzapfel, C., and Schmidt, W., 1990**, Roadside vegetation along transects in the Judean Desert: Israel Journal of Botany, v. 39, p. 263–270.

Vegetation was studied on comparable plots along roadsides and in the surrounding area. The uniqueness of roadside vegetation was shown using indices and measurements that allowed comparison along a climatic gradient. Near roads, biomass and species diversity were notably greater than in surrounding areas, and the chorological composition was different, at least under arid conditions. The reasons for these differences are discussed based on investigations of site conditions. Increased water runoff and more favorable soil conditions seem to have had important influences on the vegetation community.

**Kutiel, P., Eden, E., and Zhevelev, Y., 2000**, Effect of experimental trampling and off-road motorcycle traffic on soil and vegetation of stabilized coastal dunes, Israel: Environmental Conservation, v. 27, no. 1, p. 14–23.

The aim of this study was to assess the response of soil and annual plants of stabilized Mediterranean coastal dunes in Israel to various intensities of short-duration pedestrian and motorcycle traffic. Experimental procedures entailed 0, 20, 50, 100, and 200 straight and 150 turn motorcycle passes. The response of annual plants was assessed by measuring ground cover, height, and species richness and diversity, and soil response was assessed by measuring penetrable depth, organic matter, and moisture content. Motorcycle passage had an immediate significant impact on annual plants at all traffic intensities. The maximum effect on plants was observed in the wheel tracks and in the turn lanes. Mean annual ground cover and height were less sensitive measures than species richness and diversity for determining the overall impact of motorcycles on the area.

**Prose, D.V., Metzger, S.K., and Wilshire, H.G., 1987**, Effects of substrate disturbance on secondary plant succession—Mojave Desert, California: Journal of Applied Ecology, v. 24, no. 1, p. 305–313.

The effects of substrate disturbance on perennial plant succession in the Mojave Desert were assessed at three military camps abandoned for 40 years. Soil compaction, removal of the top layer of soil, and altered drainage channel density caused significant changes in perennial plant cover, density, and relative species composition. Long-lived species, predominantly *Larrea tridentata*, were dominant in all control areas, but percent cover and density were greatly reduced in areas where substrate alterations were significant. At one camp where substrate alterations were insignificant in disturbed areas, *Larrea* was the dominant species (as it was in the control areas).

**Schultink, G., 1977**, Impact analysis of off-road-vehicle use on vegetation in the Grand Mere Dune environment: East Lansing, Michigan, Michigan State University, Report no. NASACR155764, 10 p.

A linear regression of percent unvegetated land in OHV-impacted areas versus time for two sample areas indicated that the areas underwent average declines of 1.9 and 5.9 percent per year in vegetation cover. Two factors were assumed to play roles in the difference: the difference

15

BLM_0061680

in accessibility and the extent of vegetation fragmented during the first year of the study (one sample area was located closer to potential access points and was more fragmented initially).

***Wilshire, H.G., Shipley, Susan, and Nakata, J.K., 1978***, Impacts of off-road vehicles on vegetation: Transactions of the North American Wildlife and Natural Resources Conference, v. 43, p. 131–139.

　　　Observations of the impacts of off-road vehicles on soils and vegetation were made at more than 400 sites in seven western states during 3 years. This type of land use had both direct and indirect effects on vegetation. Direct effects included crushing and uprooting plants. Indirect effects included modification of the soil, which affected plants beyond the areas directly impacted by vehicles, and restoration of the plant cover was inhibited. This paper covers the erosional effects on vegetation, depositional effects on vegetation, and the effects of physical and chemical modification of remnant soils on revegetation.

## 2.4 OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species

### 2.4.1 Section Summary

　　　The impacts of OHV activities on wildlife and their habitats are numerous and well documented. Networks of roads and trails fragment habitat, reduce patch size, and increase the ratio of edge to interior. This may have serious consequences for area-sensitive species (those that cannot carry out certain aspects of their life cycles without large blocks of habitat or corridors linking habitat patches), predator-prey relationships, and overall population dynamics. In particular, fragmentation and edges created by OHV routes may have strong effects on animal movement patterns. Precluding or inhibiting animal movements effectively diminishes dispersal to and recolonization in other areas, thus increasing the likelihood of local extirpations. Overall, studies demonstrate that even narrow roads (paved and unpaved) and trails can represent significant barriers to the movements of animals. Reluctance to cross even narrow trails similar in width to routes created by OHV travel may alter or preclude the movements of various species. The cumulative effects of OHV-route networks proliferating across the landscape may have serious ecological consequences for species reluctant to cross OHV routes. Where threatened and endangered species are at risk, understanding their particular responses to roads of varying types, widths, use intensities, and habitat contexts is crucial.

　　　OHV routes also generate conditions unlikely to occur in environments unaffected by OHV activity; in turn, these conditions can facilitate range extensions and invasions of non-native and/or opportunistic species. In addition, OHVs can contribute directly to mortality (and possible population declines) of wildlife species through collisions with vehicles, nest destruction, and collapsing burrows. Noise generated by OHVs also has been found to cause inner ear bleeding. In particular, noise may alter animal behaviors, breeding populations, the abilities of some species to detect predators (through auditory cues), and it can stimulate estivating animals to emerge from their underground burrows at inappropriate times. These factors may result in diminished body mass, reduced productivity, and/or poor survivorship.

### 2.4.2 Loss of Habitat Connectivity: Fragmentation and Barrier Effects

　　　Creating roads and trails (of any kind) diminishes habitat connectivity, increases the proportion of edge to interior habitat, and decreases patch size of habitats (Reed and others, 1996; Forman and others, 2003). In fact, roads, including OHV routes, represent a principal

16

BLM_0061681

factor contributing to habitat fragmentation at various scales (Meffe and Carroll, 1997). Furthermore, both paved roads and OHV routes—ranging from 4-lane paved highways to two-track routes less than 3 m (3.3 yards) wide—that separate once-continuous habitat can disrupt the movement and dispersal of many wildlife species between and within habitats (Swihart and Slade, 1984; Brody and Pelton, 1989; Yanes and others, 1995; Lovallo and Anderson, 1996; Clevenger, 1998; Forman and Alexander, 1998; Jackson and Griffen, 1998). In turn, these effects can have consequences for area-sensitive species and may encourage non-native and/or invasive species. Special-status wildlife species known to occur on BLM lands and whose long-term persistence is threatened by habitat fragmentation and diminished habitat connectivity include grizzly bear (*Ursus arctos horribilis*; Gibeau and Herrero, 1998; Servheen and others, 1998), black bear (*Ursus americanus*; Brody and Pelton, 1989), gray wolf (*Canis lupus*; Paquet and Callahan, 1996), mountain lion (*Felis concolor*; Beier, 1993), lynx (*Felis lynx*; Ruediger, 1998), ocelot (*Leopardus pardalis*; Tewes and Blanton, 1998), and desert tortoise (*Gopherus agassizii*; Boarman and Sazaki, 1996). The resulting isolation of subpopulations (Dobson and others, 1999) can promote increased inbreeding and a lack of genetic exchange with other subpopulations, ultimately leading to declines in the genetic diversity required for adaptation to variable conditions and possible founder effects (Hanski and Simberloff, 1997; Hanski, 1999). Another consequence of subpopulation isolation is the reduced potential for recolonization when extirpations occur as a result of localized population fluctuations and catastrophic events (Yanes and others, 1995).

Until recently, only wide, multi-lane, paved roads have been considered significant barriers to animal movements. More recent lines of evidence from fragmentation studies, however, indicate that the ability or willingness of an animal to cross a given road type varies widely by species (Brody and Pelton, 1989; Lovallo and Anderson, 1996). For example, rodents in a desert habitat were found to avoid crossing a 4-lane highway, although they lived alongside the road in the right-of-way vegetation (Garland and Bradley, 1984). Likewise, in forested habitats divided highways wider than 90 m (98.4 yd) served as total barriers to dispersal by small forest mammals (Oxley and others, 1974). However, improved gravel roads have been found to inhibit crossings by mountain lions (*Puma concolor*; van Dyke and others, 1986), and even infrequently traveled, single-lane dirt roads have been found to alter movements by some species (Andrews, 1990). For example, Swihart and Slade (1984) report that prairie voles (*Microtus ochrogaster*) and cotton rats (*Sigmodon hispidus*) were strongly inhibited from crossing a route less than 3 m (3.3 yd)wide and composed of two dirt tracks created by the passing of 10 to 20 vehicles per day. Oxley and others (1974) evaluated small mammal responses to roads and routes ranging from 4-lane paved highways to country gravel roads in forested systems of southeastern Canada and found that they were not willing to cross roads or other routes with a total clearance (the distance between forest margins, including road surfaces and immediately adjacent strips of vegetation kept very short via spraying and/or mowing) of 30 m (32.8 yd) or greater; road surface apparently was unimportant. Likewise in Germany, forest mice (*Apodemus flavicollis*) did not cross roads 6 m (6.6 yd) wide, and very few mice returned to the side of the road from which they were captured after being translocated to the opposite side within the same habitat type (Mader, 1984). Areas characterized by high densities of roads also are characterized by low probabilities that amphibian species will occupy breeding pools (Vos and Chardon, 1998), most likely because the edges were relatively impermeable (whether due to behavioral avoidance or direct mortality) to critical amphibian movements (dispersal, seasonal movements; Gibbs, 1998). On the other hand, some small mammals are known to cross paved and gravel roads (Bakowski

BLM_0061682

and Kozakiewicz, 1988), particularly where vegetated highway right-of-ways resemble those of adjacent habitats (Wilkins, 1982). These studies indicate that road surface type is not always the critical inhibiting factor; however, it does influence traffic speed, which can directly affect mortality rates (Oxley and others, 1974; Bakowski and Kozakiewicz, 1988).

Invertebrates also may be precluded from crossing various road types, including those considered relatively narrow; again, however, there are species differences that may be influenced by their ecologies and physical capabilities. For example, Samways (1989) found that both "tarred" (paved) and "untarred" roads were almost complete or partial barriers to three species of bush crickets (*Decticus varrucivorus monspeliensis* and *Platycleis fedtschenkoi azami*, both wingless, and *P. tessellate*, the flight range of which is less than [<] 5m [5.5 yd]), but roads were only minor, very minor, or did not serve as barriers to the movements of six other bush cricket species, five of which can readily fly across roads (flight ranges from <30 to 150 m [32.8–164.0 yd]. On the other hand, Munguira and Thomas (1992) found that wide highways did not affect the movements of butterflies in open populations; movements of butterflies in closed populations, however, were slightly impeded by roads. Other butterfly species may not even attempt to fly across roads (described by authors as two-lane highways and secondary roads), possibly due to the extreme changes in microclimate over roads (including columns of warm air rising above roads; Boer Leffef, 1958, as interpreted and translated by van der Zande, 1980). Mader (1984) reported that in a five-year mark-recapture-release study involving 10,186 carabid beetles representing nine species, three species were never recaptured on the opposite side of study area roads (one- or two-lane paved roads) or parking loops, and the remainder were recaptured across the road only rarely. However, some individuals of a Swedish snail species (*Arianta arbustorum*) that were captured and translocated to the opposite sides of narrow paths or relatively wider roads did return to the capture sides of paths (Baur and Baur, 1990).

## 2.4.3 Edge Effects

Aside from fragmenting habitat, roads and trails of any kind also create habitat edges (Reed and others, 1996). In many instances, these edge effects extend well beyond the road's actual footprint and for some species the effects may extend well into the desert interior. Therefore, assessing edge effects of roads and trails on wildlife may entail determining distributions of wildlife in reference to the extent of any one edge effect (Yahner, 1988). Even then there may be an array of factors that vary the distances from roads/trails at which edge effects may be apparent. For example, Nicholson (1978) indicates that metapopulations of desert tortoises may be depleted within 0.8 km (0.5 mi) of highway edges, and von Seckendorff Hoff and Marlow (1997) indicate that this effect may extend as far as 3.5 km (2.2 mi) from the highway edge.

Given the frequent incidence of significant vegetation cover along road edges, many organisms may be attracted to right-of-way habitats. For example, Adams and Geis (1983) found greater small mammal density within interstate right-of-way habitats than in adjacent habitats. Density, however, can indicate habitats sinks to which animals retreat when more desirable habitats are occupied (Van Horne 1983). Alternatively, road edges may serve as ecological traps (Andrews, 1990) that are attractive and replete with necessary resources on the one hand, but impose unusually high mortality rates on the other hand. For example, birds may be attracted to lush roadside vegetation for breeding, nesting, or foraging (Clark and Karr, 1979), but they may be at great risk of mortality due to being hit by vehicles (Mumme and others, 2000). Similarly, avian eggs and nestlings can experience increased mortality due to high rates of predation (Yahner and others, 1989) in edge habitats. As mentioned in the section above, edge effects

18

BLM_0061683

along roads can alter or preclude the seasonal movements of amphibians to their breeding pools (Gibbs, 1998; Vos and Chardon, 1998).

In the same ways that travel routes promote increased dispersal of non-native and invasive plant species, they also promote increased distributions of wildlife species otherwise unlikely to be common in a given area; in turn, this exerts additional competitive pressures on native species. Huey (1941) documented pocket gophers (*Thomomys umbrinus*) extending their ranges across the Mojave Desert via roads and canal systems. Although much of the surrounding desert landscape contained soils unsuitable for gophers, the attractive habitat (greater cover of vegetation resulting from increased moisture availability) along roadsides and canals facilitated the spread of these animals (Huey, 1941). An additional important edge effect associated with roads of many types is the presence of utility infrastructures, which can contribute to significantly altered predator-prey relationships along roads. For example, raven species (*Corvus* spp.) have increased their distribution throughout the Mojave Desert, primarily due to the fact that they can perch along utility structures to scan for carcasses on adjacent roads (paved and unpaved) (Knight and Kawashima, 1993), a significant concern in light of the fact that Berry and others (1986) reported ravens as being responsible for 68 and 75 percent of mortality among juvenile desert tortoises on two study plots.

## 2.4.4 OHV Disturbance and Noise

Vehicular traffic is also a source of noise and other stimuli that have the potential for disturbing wildlife along any type of road or trail (Singer, 1978; van der Zande, 1980; Brattstrom and Bondello, 1983; Bowles, 1995; Reijnen and others, 1995, 1996; Bowles, 1995; Kaseloo and Tyson, 2004). Veen (1973; as interpreted and translated by van der Zande, 1980) found that four shorebird species inhabiting open grassland areas were disturbed within 500–600 m of a "quiet rural road" and within 1600–1800 m of a "busy highway;" van der Zande (1980) reanalyzed Veen's data and yielded similar results for three of the four species, and went on to conclude that populations of these birds were diminished by as much as 60 percent over those distances. Forman and Alexander (1998) found that noise levels generally increase with traffic intensity, and Reijnen and others (1995, 1997) concluded that traffic noise can lead to significant reductions in breeding bird densities. Larger animals also exhibit responses to the intensity of traffic and traffic noise. Lyren (2001) found that coyotes changed their road-crossing periods in response to changes in traffic intensity throughout the day, and Singer (1978) reported that, in response to the shifting of truck gears, mountain goats ran away from a road edge when the truck was 1 km (0.6 mi) away from them, and they ran away from a lick that was 400 m (437.4 yd) from the road.

Noise emitted from certain types of OHVs can be as high as 110 decibels, which is near the threshold of human pain (Lovich and Bainbridge, 1999). Although sounds from OHV motors are not the loudest anthropogenic sounds, in wildlife habitats they are emitted more frequently than other high-intensity sounds (Brattstrom and Bondello, 1983), and the effect on animals can be significant. For example, sand lizards (*Uma scoparia*) and kangaroo rats (*Dipodomys deserti*) experienced hearing loss that lasted for weeks after being exposed to less than 10 minutes of dune buggy playback recordings played intermittently at lower decibel levels than the animals would have been exposed to in the actual presence of a dune buggy (Brattstrom and Bondello, 1983); subsequently, both species were unresponsive to recordings of predator sounds. In two other studies, kangaroo rats (*Dipodomys spectabilis*) experienced inner ear bleeding when subjected to OHV noise (Berry, 1980b; Bury, 1980). Another issue is the way in which OHV noise (sound pressure) may simulate that of natural sounds (thunder, for example) to which many

BLM_0061684

animals may be adapted to respond. For example, in response to 30 minutes of taped motorcycle sounds, Brattstrom and Bondello (1983) documented a spadefoot toad (*Scaphiopus couchii*) emerging prematurely (wrong season, absence of rain) from its burrow, most likely because the sound mimicked that of thunder, to which the species would normally respond.

Noise, lights, and other disturbances associated with OHV activities also have the potential for eliciting stress responses from a broad spectrum of wildlife taxa. Indeed, studies have shown that ungulates, birds, and reptiles all experience accelerated heart rates and metabolic function during disturbance events; in turn, animals may be displaced and experience reproductive failure and reduced survivorship (see review in Havlick, 2002). For example, radio-collared mule deer disturbed by ATVs altered their patterns of foraging and spatial use of habitat; deer in undisturbed areas, however, exhibited no such changes (Yarmoloy and others, 1988). In addition, Yarmoloy and others (1988) found that harassment of deer resulted in diminished reproductive output in the following fawning season, whereas deer that were not harassed experienced no change in reproduction.

## 2.4.5 Wildlife Mortality and Related Issues

Direct wildlife mortality can result from vehicular impact (Harris and Gallagher, 1989; Beier, 1993; Bruinderink and Hazebrook, 1996; Moore and Mangel, 1996), thus removing individuals from populations (Harris and Gallagher, 1989; Forman and Alexander, 1998); thus, habitats containing roads may represent population sinks for any species that commonly attempts to move from one habitat fragment to another by crossing roads (Kline and Swann, 1998). If mortality rates exceed rates of reproduction and immigration, wildlife populations decline (Beier, 1993; Bruinderink and Hazebrook, 1996; Moore and Mangel, 1996; Forman and Alexander, 1998). Previous studies indicate that mortality rates vary widely according to habitat and road or route characteristics (for example, road width, traffic density and speed, adjacent habitat) (Ward, 1982; Bashore and others, 1985; Foster and Humphrey, 1995; Evink and others, 1996, 1998), as well as taxa studied—invertebrates: Seibert and Conover (1991), Munguira and Thomas (1992); reptiles and amphibians: Rosen and Lowe (1994), Ashley and Robinson (1996), Boarman and others (1998), Rudolph and others (1998), Means (1999); birds: Dhindsa and others (1988), Moore and Mangel (1996), Mumme and others (2000); and mammals: Gilbert and Wooding (1996), Romin and Bissonette (1996), Lehnert and Bissonette (1997), Gunter and others (1998), Lyren (2001). Even where the frequency of wildlife mortality is relatively low most of the year, it may increase during certain seasons (Feldhammer and others, 1986; Bruinderink and Hazebrook, 1996) or when traffic frequency increases (McCaffery, 1973). Furthermore, population dynamics can be altered if low mortality rates nonetheless cause disproportionate mortality among specific sex and/or age classes (Beier, 1993; Moore and Mangel, 1996; Mumme and others, 2000).

Several researchers have conducted extensive monitoring at desert OHV sites and undisturbed sites to compare direct effects of OHV activity on mortality and abundance of certain reptile species (Bury and others, 1977; Berry, 1980a; Bury, 1980; Luckenbach and Bury, 1983; Brooks, 1999; Grant, 2005). Of important concern is the susceptibility of desert tortoises to mortality on all types of roads. Berry (1980a) found a link between OHV activity and population declines of the desert tortoise and Couch's spadefoot toad (*Scaphiopus couchii*); numbers of tortoises and active burrows in a 25-ha control plot were significantly greater than in a similar plot exposed to OHV activity, presumably the result of direct mortality from vehicles or the collapsing of burrows caused by OHV traffic (Lovich and Bainbridge, 1999). Additionally, the body masses of subadult and adult tortoises in the control plot were greater than those of

BLM_0061685

tortoises in the OHV area (Bury and Luckenbach, 1986, cited *in* Lovich and Bainbridge, 1999). When comparing lizards in OHV-impacted plots to control plots, controls supported 1.8 times more species, 3.5 times more individuals, and 5.9 times more biomass (Luckenbach and Bury, 1983). Similarly, Bury and others (1977) found more reptile species (1.63 times more) and greater reptile abundance (182 percent more individuals) at control sites than at OHV sites. In another study, the remains of 39 tortoises were recorded during three surveys over a 2.5-year period along a 24-km (14.9-mi) section of paved highway in the western Mojave Desert (Boarman and others, 1993). Snakes also experience high rates of mortality in the Mojave Desert due to their strategy for thermoregulation (lying on warm surfaces, such as roads; Sullivan, 1981). Rosen and Lowe (1994), who conducted nighttime snake surveys along a 2-lane paved road in the Sonoran Desert (primarily within Organ Pipe Cactus National Monument), documented a 72 percent rate of snake mortality (104 live, 264 dead); mortality peaked in spring—when snake activity was moderately high and automobile traffic had not yet reached its summer minimum—and during rain events in the monsoon season (July through early September). Overall snake mortality during the entire 4-year study was estimated at 2,383 snakes (13.5 snakes/km/year; 8.1 snakes/mi/year), although actual numbers were likely closer to 4,000.

Densities and species diversity of desert birds and small mammals also have been reported to decrease in areas where OHV use was extensive (Busack and Bury, 1974; Bury and others, 1977; Luckenbach, 1978; Luckenbach and Bury, 1983; Brooks, 1999). Direct and indirect effects of OHVs on these species include breaking shrubs containing nests (nests, eggs, or nestlings destroyed) and diminished cover when shrubs are reduced or eliminated, mortality due to vehicle impact (especially ground-dwelling animals), and collapse of burrows due to OHV traffic (Bury and others, 1977). Bury and others (1977) found greater small mammal species richness (1.25 times greater) and abundance (500 percent more individuals) at control sites than OHV sites. Similarly, Luckenbach and Bury (1983) found 1.5 times more small mammal species, 5.1 times more individuals, and 2.2 times more biomass in control plots than in OHV-impacted plots; the number of desert kangaroo rats recorded in OHV plots was 53 percent lower than the number in control plots. Luckenbach and Bury (1983) found that overall animal activity—as measured by track frequencies—was greater in control areas than it was in OHV-use areas: arthropod tracks were 24 times more abundant, kangaroo rat tracks were 5 times more abundant, kit fox tracks were 2 times more abundant, and cottontail rabbit tracks were 10 times more abundant. Finally, Brooks (1999) found that protected areas in the Desert Tortoise Research Natural Area supported a greater abundance and species richness of birds and lizards than nearby portions of the desert subjected to intense OHV use and past sheep grazing. In one study, however, road mortality did not appear to have detrimental effects on densities of small mammals inhabiting highway right-of-ways, although the authors admit that they could not rule out confounding effects of immigration (Adams and Geis, 1983). In a study of 36 radio-marked flat-tailed horned lizards (*Phrynosome mcallii*) subjected to high (60 percent OHV track coverage in 60 minutes of riding time), low (30 percent in 20 minutes of riding time), and no (0 percent) impact by OHV traffic in 100 × 100 m (109.4 × 109.4 yd) plots, all survived. At the time of OHV treatment, however, 32 of the lizards were in their hibernation burrows 2–17 cm (0.8–6.7 in) underground (Grant, 2005), and it remains unclear whether soil substrates and vegetation growing above the burrows helped protect the animals from being crushed (21 of the 32 were under shrubs, and 8 burrows were known to have been run over directly by OHVs).

A major indirect effect of OHV activity on vertebrate survivorship is loss of vegetation cover. For all terrestrial vertebrates sampled, including species of conservation concern (desert

BLM_0061686

kangaroo rat [*Dipodomys deserti*] and fringe-toed lizard [*Uma notata*]), Bury and others (1977) found a positive correlation between the percent canopy cover of creosote bush and species richness, abundance, and biomass. In a study of OHV effects on biota (including herbaceous and perennial plants, arthropods, lizards, and mammals) of the Algodones Dunes area in California, Luckenbach and Bury (1983) detected 9.4 times more cover, and 40 times more overall volume in control plots than in OHV-impacted plots, largely because shrubby perennial cover was greater in control plots. Another indirect effect of OHV activity on wildlife mortality is the proliferation of routes that provide greater access to remote places by hunters, poachers, and people seeking several forms of nonconsumptive recreation (Boyle and Samson, 1985; Andrews, 1990). Boyle and Samson (1985) also report a variety of nonconsumptive recreation impacts on wildlife, including flushing animals off nests; unnecessary energy expenditures; and displacement of animals from food, shelter, and other vital resources. Of particular concern was the increasing access that roads provide for tortoise collectors, which may explain declining trends in tortoise numbers along highways (Boarman and others, 1997).

## 2.4.6 Annotated Bibliography for OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species

**Berry, K.H., 1980**, A review of the effects of off-road vehicles on birds and other vertebrates, *in* DeGraaf, R.M., and Tilghman, N.G., eds., Management of western forests and grasslands for nongame birds—Workshop proceedings, Salt Lake City, Utah, February 11–14, 1980: Ogden Utah, U.S. Forest Service, Intermountain Forest and Range Experiment Station, General Technical Report INT–86, p. 451–467.

A review of the literature on the effects of off-road vehicles revealed that OHV use has significant effects and can reduce numbers, diversity, and biomass of birds and other vertebrates. The degree of impact depends upon amount and intensity of OHV use, habitat type, and sensitivity of the species.

**Boarman, W.I., and Sazaki, M., 2006**, A highway's road-effect zone for desert tortoises (*Gopherus agassizii*): Journal of Arid Environments, v. 65, no. 1, p. 94–101.

Roads can affect populations of animals directly (vehicle-animal collisions) and indirectly (due to habitat fragmentation and dispersal/proliferation of non-native or predatory species). This study investigated the effect of a 2- to 4-lane highway (with a posted speed limit of 65 mi/hr [105 km/hr] and an average daily traffic intensity of 8500 vehicles) on threatened desert tortoise (*Gopherus agassizii*) populations in the Mojave Desert, California, and attempted to determine the width of the road-effect zone by counting signs of tortoises (shells, tracks, scats, burrows, and pallets) along transects at 0, 400, 800, and 1600 m from and parallel to the edge of a highway. Mean sign count was 0.2/km (0.32/mi) at 0 m (0 yd), 4.2/km (6.72/mi) at 400 m (437.4 yd), 5.7/km (9.12/mi) at 800 m (874.9 yd), and 5.4/km (8.64/mi) at 1600 m (yd) from the highway edge. The differences between all distances except 800 and 1600 m (874.9 and 1749.8 yd) were statistically significant, suggesting that tortoise populations in the study area were depressed within a zone extending at least 400 m (437.4 yd) from the highway.

**Brattstrom, B.H., and Bondello, M.C., 1983**, Effects of off-road vehicle noise on desert vertebrates, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 167–206.

BLM_0061687

This study determined that sand lizards (*Uma scoparia*) and kangaroo rats (*Dipodomys deserti*) suffered hearing loss lasting for weeks after being exposed to less than 10 minutes of playback recordings of dune buggy sounds played intermittently at intensities lower than the average intensity levels actually emitted by OHVs. Such impacts led to the inability of both of these species to respond to recordings of predator sounds. A spadefoot toad (*Scaphiopus couchii*) emerged prematurely from its burrow when exposed to 30 minutes of taped motorcycle sounds.

**Brooks, M.L., 1999**, Effects of protective fencing on birds, lizards, and black-tailed hares in the western Mojave Desert: Environmental Management, v. 23, no. 3, p. 387–400.

Effects of a protective (fenced) area on birds, lizards, black-tailed hares (*Lepus californicus*), perennial plant cover, and structural diversity of perennial plants were evaluated from spring 1994 through winter 1995 at the Desert Tortoise Research Natural Area (DTNA), in the Mojave Desert, California. Abundance and species richness of birds were greater inside than outside the DTNA; these effects, however, were more pronounced during breeding season and a year of high rainfall than during winter and a year of low rainfall. Nesting activity was also more frequent inside the exclosure. Total abundance and species richness of lizards and individual abundances of western whiptail lizards (*Cnemidophorous tigris*) and desert spiny lizards (*Sceloporus magister*) were greater inside than outside the exclosure. Black-tailed hares generally prefer areas of low perennial plant cover, which may explain why they were more abundant outside than inside the DTNA. Habitat structure may not affect bird and lizard communities as much as availability of food at this desert site, and the greater abundance and species richness of vertebrates inside than outside the DTNA may correlate with abundances of seeds and invertebrate prey.

**Bury, R.B., Luckenbach, R.A., and Busack, S.D., 1977**, Effects of off-road vehicles on vertebrates in the California desert USA: Wildlife Research Report no. 8, U.S. Fish and Wildlife Service, Washington, D.C., p. 1–23.

This study compared differences in avian diversity, abundance, and biomass in unused and OHV-disturbed sites. Compared to OHV sites, reptile species richness was 1.63 times greater and there were 270 more individuals at control sites. Similarly, mammal species richness was 1.25 times greater and there were 115 more individuals at control sites than at OHV sites. The potential for ground nests of birds to be crushed and incubating birds to abandon nests was greater in areas of high OHV activity. Indirect effects of OHV activity on vertebrates were primarily caused by the loss of vegetation cover. There was a positive correlation between the cover of creosote bush and the total number of species, abundance, and biomass of all terrestrial vertebrates sampled.

**Bury, R.B., and Luckenbach, R.A., 2002**, Comparison of desert tortoise (*Gopherus agassizii*) populations in an unused and off-road vehicle area in the Mojave Desert: Chelonian Conservation and Biology, v. 4, no. 2, p. 457–463.

This study examined habitat, abundance, and life history features of desert tortoises (*Gopherus agassizii*) on two 25-ha plots in the western Mojave Desert: one unused and one used by OHVs. The unused plot had 1.7 times more live plants, 3.9 times more plant cover, 3.9 times more desert tortoises, and 4.0 times more active tortoise burrows than a nearby area used heavily by OHVs; these between-plot differences were all statistically significant. Furthermore, the few large-sized tortoises in the OHV plot had less body mass than those in the unused area. Although

23

BLM_0061688

the scope of this study was limited to one paired-plot comparison, current data suggest that operation of OHVs in the western Mojave Desert results in major reductions in habitat and tortoise numbers, and possibly the body mass of surviving tortoises.

***Lovich, J.E., and Bainbridge, D., 1999***, Anthropogenic degradation of the southern California desert ecosystem and prospects for natural recovery and restoration: Environmental Management, v. 24, no. 3, p. 309–326.

    Large areas of the southern California desert ecosystem have been affected by off-highway vehicle use, overgrazing by domestic livestock, agriculture, urbanization, construction of roads and utility corridors, air pollution, military training exercises, and other activities. Secondary contributions to degradation include the dispersal and proliferation of exotic plant species and a higher frequency of anthropogenic fire. Effects of these impacts include alteration or destruction of macro- and micro-vegetation elements, establishment of annual plant communities dominated by exotic species, destruction of soil stabilizers, soil compaction, and increased erosion. This paper provides a broad view of impacts on biota and cites several pertinent studies relative to OHV impacts on wildlife. The authors suggest that given the sensitivity of desert habitats to disturbance and the slow rate of natural recovery, the best management option is to limit the extent and intensity of impacts as much as possible.

***Luckenbach, R.A., and Bury, R.B., 1983***, Effects of off-road vehicles on the biota of the Algodones Dunes, Imperial County, California, USA: Journal of Applied Ecology, v. 20, no. 1, p. 265–286.

    Algodones Dunes, the largest dune complex in California, contains many unique species; however, it also receives the greatest use by off-road vehicles in California. Studies of paired plots (unused versus OHV-impacted) and animal tracks along sand sweeps clearly demonstrated that OHV activities in the Algodones Dunes significantly reduced the biota. There were marked declines in herbaceous and perennial plants, arthropods, lizards, and mammals in OHV-used areas compared with nearby controls. All sand-adapted species, including several rare or threatened plants, were greatly reduced in habitats where OHVs operate; the biota was affected even by relatively low levels of OHV activity. Areas heavily used by OHVs had virtually no native plants or wildlife.

***Rosen, P.C., and Lowe, C.H., 1994***, Highway mortality of snakes in the Sonoran Desert of southern Arizona: Biological Conservation, v. 68, no. 22, p. 143–148.

    A total of 368 snakes (104 live, 264 dead) were recorded over four years on a paved highway during 15,525 km (9,647.2 mi; mostly within Organ Pipe Cactus National Monument, Arizona) of driving along the road to detect amphibians and reptiles during rainfall events or while basking on the warm road surface. During 4 years, an estimated 2,383 snakes were killed on this stretch of pavement, although the actual number killed was probably closer to 4,000.

***Webb, R.H., and Wilshire, H.G., 1983***, Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, 534 p.

    This book discusses the physical and biological effects of OHVs (recreational, mining, and military vehicles) on arid-land ecosystems, including effects on soils, vegetation, and wildlife. It also points out the loss of choices that OHV effects impose on future land users. Actual case studies are presented, complete with practical solutions, detailed planning measures

BLM_0061689

that can be taken to reduce the adverse effects of OHVs, methods that can be used to rehabilitate the physical systems and vegetation communities of disturbed areas, and management concepts and practices that can be employed in protecting susceptible areas, including regulations and education.

## 2.5 OHV Effects on Water Quality

### 2.5.1 Section Summary

The direct effects of OHV activity on aquatic systems have received surprisingly little attention, due, in part, to the fact that OHV-impact research has focused on arid environments, where aquatic systems are seasonal or rare. Nonetheless, there is great potential for OHV activities to affect water quality in arid environs as well as well-watered regions. As described in Sections 2.2 and 2.3, soil properties and vegetation cover may be altered by OHV use; in turn, surface patterns of precipitation runoff (amount, velocity) may be altered, resulting in accelerated rates of erosion and sedimentation and elevated levels of turbidity in affected watersheds. Where slope is a factor, the extensive networks of OHV routes proliferating across landscapes can serve as conduits that direct or alter the direction of surface flows. These conduits may be eroded to form gullies that channel dislodged sediments and contaminants into aquatic ecosystems. Water quality also is adversely affected by OHV-raised dust that settles into aquatic systems.

OHV-dispersed chemicals also may be transported into aquatic systems. The operation of OHV engines, especially 2-stroke engines, can impact water quality through spills and emissions. These contaminants may enter aquatic systems via direct flushing, or they may be adsorbed to sediments and/or absorbed by plant materials, both of which are easily transported to aquatic systems by precipitation runoff or wind. Spill or emission contaminants may include 1,3-butadiene, benzene and ethylbenzene, xylenes, and toluene. Prior to the ban on leaded gasoline, lead levels were high in plants and animals near roads, and although the 1996 ban on leaded gasoline has resulted in dramatic declines in lead levels, it persists in the soil and may be mobilized when soils are eroded into wetlands.

### 2.5.2 Sedimentation and Turbidity

Areas naturally most susceptible to water-quality problems are those where infiltration rates are low, slopes are steep, the ratio of surface sand and gravel to finer particles is low, and where rainfall events are typically prolonged and intense (Iverson and others, 1981). Altering soil texture, disrupting soil crusts or desert pavement, and reducing vegetation cover can increase the soil's susceptibility to erosion; in turn, rates of sedimentation and turbidity levels can increase and alter the water quality of a given watershed, including streams and rivers, lakes, and small, isolated wetlands, including vernal pools (Forman and others, 2003). Sediments can displace the water-holding volume of a wetland, thus diminishing or eliminating the wetland's hydrological function (Luo and others, 1977). For example, where OHVs had traveled over the soil, Iverson and others (1981) found that surface runoff was 5 times greater and yielded 10-20 times more sediment than where soils were undisturbed.

Where OHV activity occurs, networks of OHV routes proliferate. Wheel cuts and tracks within these networks may serve as water conduits that channel and direct water flow containing sediments and contaminants into aquatic ecosystems (Wemple and others, 1996; Forman and others, 2003, p. 185–197). The generally impervious nature of soils compacted by OHV traffic enhances gully formation in these conduits, thus promoting additional flows of sediments and suspended solids into aquatic systems, effectively extending the drainage network of a given

25

BLM_0061690

watershed, and potentially changing the timing of peak runoff flows (Wemple and others, 1996). The presence of OHV-route networks is an important factor in determining the severity of potential sedimentation in nearby aquatic systems. In particular, Wemple and others (1996) found that the drainage ditches along logging roads and the gullies that form below culvert outlets (where drainage flows pass under a road, or cross-drains) on steep slopes served as primary conduits linking surface flows to streams. The extent to which sediments might be carried along these conduits and into aquatic systems depends primarily on the presence of obstructions below cross drains and the spatial intervals between them (Haupt, 1959). In situations where cross drains were positioned at sufficient distances from streams, the drainage discharge infiltrated the soil and did not contribute to sedimentation in streams (Haupt, 1959). In areas characterized by soils with relatively low infiltration rates, such as those compacted by OHV use, transport of sediments over greater distances and into aquatic systems may be substantial.

Furniss and others (2000) describe similar effects of road and/or trail networks across a landscape. In particular, they discuss the continuous "hydrological connections" that facilitate sediment transport between surface flows and waterways. Furniss and others (2000) go on to list ways in which water and associated sediments enter stream systems from roads, including (1) inboard ditches (ditches perpendicular to the road footprint and that bisect the road) delivering runoff to a stream at a road-stream crossing, (2) inboard ditches delivering water to a cross-drain (culvert, dip, waterbar), (3) where sufficient discharge is available to create a gully or sediment plume that extends to the stream channel, (4) roads sufficiently close to streams so that the fillslope (road fill between the outside edge of the road and the base of the fill where it meets the natural ground surface) encroaches on the stream, and (5) landslide scars on the road fill. These connections provide direct routes for accelerated runoff transporting sediments and road-associated contaminants to natural drainage channels.

## 2.5.3 Dust and Contaminants

Water quality also is adversely affected when fugitive dust and contaminants enter aquatic systems. Emissions from OHVs, particularly those with 2-stroke engines, can include a variety of contaminants, which may settle directly in wetlands or they may be deposited in snow or directly on soils during rain events, from which they may be mobilized into wetlands. Arnold and Koel (2006), who tested snowmelt runoff exposed to significant snowmobile emissions in Yellowstone National Park, detected benzene, ethylbenzene, m- and p-xylene, o-xylene, and toluene, and although all compounds were within the limits set by the U.S. Environmental Protection Agency, it is not clear what the cumulative impacts of these chemicals may be in watersheds. Adams (1975) found that the stamina of brook trout experimentally exposed to elements commonly found in snowmobile emissions, as measured by their ability to swim against the water current, was significantly diminished compared to that of control fish.

Airborne dust—and contaminants adsorbed to dust particles—raised by OHV traffic may eventually settle directly into wetlands (Forman and others, 2003, p. 231–234). The potential for adsorbed contaminants to be carried along with precipitation runoff and into wetlands is also a concern, as are plant materials containing absorbed contaminants. Finally, contaminants may enter aquatic habitats by direct flushing of exposed contaminants (for example, petroleum puddles). Prior to the ban on leaded gasoline, lead levels were high in plants and animals near roads (Daines and others, 1970; Motto and others, 1970; Quarles and others, 1974; Wheeler and Rolfe, 1979). Although the 1996 ban on leaded gasoline has since resulted in dramatic declines

BLM_0061691

in lead levels along roadsides and in organisms, it persists in the soil and may be mobilized when soils are eroded into wetlands.

## 2.5.4 Annotated Bibliography for OHV Effects on Water Quality

***Adams, E.S., 1975***, Effects of lead and hydrocarbons from snowmobile exhaust on brook trout (*Salvelinus fontinalis*): Transactions of the American Fisheries Society, v. 104, no. 2, p. 363–373.

 Prior to snowmobiling season, hydrocarbon levels in the water of a pond in Maine were undetectable; by the time of ice-out in spring, hydrocarbon levels had reached 10 parts per million (ppm) in the water and 1 ppm in exposed fish. In addition, exposed brook trout fingerlings contained 9 to 16 times more lead than control trout. Brook trout (*Salvelinus fontinalis*) held in aquaria for 3 weeks in melted snow containing three different concentrations of snowmobile exhaust also showed hydrocarbon and lead uptake. Stamina, as measured by the ability to swim against current, was significantly less in trout exposed to snowmobile exhaust than in control fish.

***Brabec, E., Schulte, S., and Richards, P.L., 2002***, Impervious surfaces and water quality—A review of current literature and its implications for watershed planning: Journal of Planning Literature, v. 16, no. 4, p. 499–514.

 This paper focuses on the effect of impervious surfaces on the health of nearby aquatic habitats. Although considerable research has been done to define watershed thresholds of impervious surfaces (beyond which water quality declines), there are numerous flaws in the assumptions and methodologies used. Given refinement of the methodologies, accurate and usable parameters for preventive watershed planning can be developed, including thresholds of impervious surfaces and balances between pervious/impervious surfaces within a watershed.

***Brown, K.J., 1994***, River-bed sedimentation caused by off-road vehicles at river fords in the Victorian Highlands, Australia: Water Resources Bulletin, v. 30, no. 2, p. 239–250.

 This study investigated some of the effects occurring at OHV crossings on two rivers in eastern Australia, where many road crossings occur at low-level fords. It provides a method whereby the amount of sediment redeposited downstream of a ford can be measured. Attention is drawn to the fact that sediment is contributed to rivers by five major processes: the exposure of surfaces, the concentration of surface runoff in wheel ruts, soil compaction and subsequent reduction of water infiltration leading to increased surface runoff, backwash from the vehicle, and undercutting of banks by bow-wave action. The last two of these processes have not been reported previously. Sediment collection experiments in two upland rivers indicated a mean deposition rate at the stream bed of approximately 1,000 g/m$^2$ over a period of 30 days.

***Furniss, M.J., Flanagan, S.A., and McFadin, B.A., 2000***, Hydrologically connected roads—An indicator of the influence of roads on chronic sedimentation, surface water hydrology, and exposure to toxic chemicals: U.S. Forest Service, Stream Systems Technology Center, Rocky Mountain Research Station, Technical Report, 4 p., *http://www.stream.fs.fed.us/streamnt/jul100/jul100_2.htm*.

 This study defines the concept of forest-road drainage as a transport system for sediment into streams and proposes design changes to road drainage that would prevent or minimize this movement. The proportion of road that is hydrologically connected to a stream network may be a useful indicator of the potential for several adverse effects, including (1) the delivery of road-

27

BLM_0061692

derived sediments to streams; (2) hydrologic changes associated with subsurface flow interception, concentration, and diversion; (3) increased drainage density; (4) extension of the stream network; and (5) the potential for road-associated spills and chemicals to enter streams.

*Hamilton, L.J., 2002*, A study of the effects of ORV stream crossings on water quality of two streams located in the Angelina National Forest, Texas—A physicochemical and benthic macroinvertebrate analysis: Masters Abstracts International, v. 40, no. 3, p. 668.

A study was conducted for the U.S. Forest Service to determine whether OHV-based stream crossings affected water quality of two streams located in Texas. The sites differed most in turbidity, total solids, Shannon's diversity index, dissolved oxygen, nitrate, and ratios of Chironomidae:EPT (Ephemeroptera + Plecoptera + Trichoptera, a common indicator of taxonomic richness detected during stream surveys to assess water quality), although there were no significant differences in the physicochemical properties. At one site, however, the upstream and downstream plots differed significantly in terms of two benthic indices—Hilsenhoff's *Biotic Index* and *Ratio of Scrapers to Filtering Collectors*.

*Katz, M., Legore, R.S., Weitkamp, D., Cummins, J.M., and Anderson, D., 1972*, Effects on freshwater fish: Journal of the Water Pollution Control Federation, v. 44, no. 6, p. 1226–1250.

This is a literature review of the effects of water pollutants on freshwater fish. Topics include (1) tests to determine the lethality of estuarine and some polluted river waters to trout and cyprinids; (2) estimated degrees of river pollution based on bacterial and chemical analysis of water samples; (3) documentation of some effects of municipal wastewater effluents on the water quality, fish populations, and bottom-fauna characteristics of a receiving stream; and (4) observations of the environmental effects of pollutants such as synthetic detergents, industrial wastes, and pesticides.

*Roy, A.H., Rosemond, A.D., Leigh, D.S., Paul, M.J., and Wallace, J.B., 2003*, Habitat-specific responses of stream insects to land cover disturbance—Biological consequences and monitoring implications: Journal of the North American Benthological Society, v. 22, no. 2, p. 292–307.

This study analyzed the impact of a range of physical and chemical stressors on aquatic insects and tested whether the effects of these stressors differed in three habitat types: riffles, pools, and banks. Riffle assemblages were affected by both physical (for example, streambed mobility) and chemical (specific conductance, nutrient concentration) variables. The density of aquatic insects in pools also was correlated to physical and chemical variables, but there were few relationships with pool or bank richness or bank density. Because relative impacts of disturbance in riffles were greater than in banks, the authors found greater differences between riffle and bank richness in streams with greater sedimentation. The proportion of bank richness (bank richness/bank + riffle richness) increased with finer bed sediment and increased bed mobility. The study also compared richness of facultative taxa (found in multiple habitats) between sites characterized as minimally impacted and sediment-impacted. In riffles, richness of facultative taxa was lower in sediment-impacted than in minimally impacted sites, but was similar for both disturbance groups in banks.

*Wheeler, A.P., Angermeier, P.L., and Rosenberger, A.E., 2005*, Impacts of new highways and subsequent landscape urbanization on stream habitat and biota: Reviews in Fisheries Science, v. 13, no. 3, p. 141–164.

BLM_0061693

This paper emphasizes a more thorough consideration of highway impacts and, ultimately, better land-use decisions by conceptualizing road development in three stages: initial construction, road presence, and eventual landscape urbanization. Road construction is characterized by localized physical disturbances, which generally subside through time. In contrast, road presence and landscape urbanization are characterized by persistent physical and chemical impacts. Though not specific to OHV activity, this paper does focus on the fact that landscape urbanization is clearly the greatest threat to stream habitat and biota, as stream ecosystems are sensitive to even low levels (less than 10 percent of a given watershed) of urban development. Researchers know little about the occurrence, loading rates, and biotic responses to specific contaminants in runoff from roads. Also needed is a detailed understanding of how drainage crossings, especially culverts, affect fish populations via constraints on movement and how road networks alter natural regimes (streamflow, temperature).

## 2.6 OHV Effects on Air Quality

### 2.6.1 Section Summary

Fugitive dust raised by OHV traffic on unpaved roads/trails can contribute significantly to air-quality problems. Also problematic are OHV emissions, particularly from 2-stroke engines. Currently, many OHVs in use, including off-highway motorbikes and ATVs, run on 2-stroke engines, which do not burn fuel completely and produce significant amounts of airborne contaminants, including nitrogen oxides, carbon monoxide, ozone, aldehydes, and extremely persistent polycyclic aromatic hydrocarbons (PAH), including the suspected human carcinogen, methyl tert-butyl ether (MTBE). Some airborne contaminants settle onto plants or into soils and function as fertilizers, thus causing changes in plant community composition and altering growth rates. The accumulation of emissions contaminants is evident in the tissues of plants and animals exposed to them. Prior to the ban on leaded gasoline, lead also was prevalent in plants and animals near paved roads and other travel routes, and because it persists in the environment, it can still have impacts when contaminated soils are mobilized.

### 2.6.2 Fugitive Dust Raised by OHV Traffic

Fugitive dust (largely composed of lightweight soil particles, including silt and clay) suspended in the air may impact more total area than any other impact of roads (paved or unpaved; Forman and others, 2003), and it can have significant effects on ecosystems (Westec, 1979). Dust is created and raised into the air as OHVs disturb soil crusts, abrade and pulverize soils, and generate wind currents. Once soil surfaces are disturbed, wind erosion may increase the amount of debris flow (Lovich and Bainbridge, 1999). In 1973, satellite photos detected six dust plumes in the Mojave Desert covering more than 1,700 km$^2$ (656.2 mi$^2$); the plumes were attributed to destabilization of soil surfaces resulting from OHV activities (Nakata and others, 1976; Gill, 1996). Along roads in Alaska heavily traveled by various types of vehicles, Walker and Everett (1987) found that dust had buried mosses and very low-statured vegetation in the 10-m-wide area adjacent to each side of the road; dust blankets measured up to 10 cm (3.9 in) deep. Accumulations of dust on vegetation can disrupt photosynthetic and respiration processes, leading to reduced plant growth, reproduction, and survivorship.

### 2.6.3 Contaminants Associated with OHV Use

Before emissions controls on automobiles became significantly more effective, there was little concern about emissions from small engines; today, however, their relative contribution to

29

BLM_0061694

air-quality problems is significant (see *http://www.egr.msu.edu/erl/Small%20Engine%20Emissions.html*). This is because small engines, especially 2-stroke models (many of which are being phased out), do not burn fuels completely; thus, their emissions contain the resulting by-products of incomplete combustion, including nitrogen oxides $NO_x$, sulfur dioxide ($SO_2$), carbon monoxide (CO), ozone ($O_3$), aldehydes, and extremely persistent polycyclic aromatic hydrocarbons (PAH). In fact, a very small, 2-stroke engine running for 2 hours emits the same amount of hydrocarbons as driving 10 cars (of the fuel-burning efficiency produced in 1995) for 250 miles each (*http://www.arb.ca.gov/msprog/offroad/sm_en_fs.pdf*).

Pollutants emitted from exhaust can cause a variety of impacts on vegetation. Carbon dioxide may function as a fertilizer and cause changes in plant species composition (Bazzaz and Garbutt, 1988; Hunt and others, 1991; Ferris and Taylor, 1995); nitrogen oxides also may function as fertilizers, producing similar effects along roadsides (Falkengren-Grerup, 1986; Holzapfel and Schmidt, 1990; Angold, 1997). Spencer and Port (1988) found that the soluble nitrogen content of perennial ryegrass (*Lolium perenne*) plants growing within 0-6 m (0-6.6 yd) of a paved road than in plants growing more than 6 m (6.6 yd) from the road, which contributed to greater growth rates and fecundity of aphids (*Rhopalosiphum padi*) inhabiting the plants closest to the road. Sulfur dioxide, which can be taken up by vegetation, may result in altered photosynthetic processes (Winner and Atkison, 1986; Mooney and others, 1988).

Several species of Mojave Desert perennials and annuals were fumigated in experimental chambers to determine their sensitivities to $SO_2$, nitrogen dioxide ($NO_2$), and $O_3$; Thompson and others, 1980; Thompson and others, 1984). Creosote bush (*Larrea* sp.), the only perennial species found to be sensitive to $SO_2$ and $NO_2$, exhibited leaf injury and reduced growth when exposed to $SO_2$ and $NO_2$; however, numerous annuals, including redstem stork's bill (*Erodium cicutarium*) and desert Indianwheat (*Plantago insularis*; extremely sensitive), cleftleaf wildheliotrope (*Phacelia crenulata*; very sensitive), and wooley desert marigold (*Baileya pleniradiata*), exhibited more dramatic effects, including extensive injury and death (Thompson and others, 1980). Another study by Thompson and others (1984) revealed several annual species that are extremely sensitive to $SO_2$ and $O_3$, including brown-eyed primrose (*Camissonia claviformes*), Santa Cruz Island suncup (*C. hirtella*), and Nevada cryptantha (*Cryptantha nevadensis*).

OHV emissions also contain a variety of heavy metals, including zinc, copper, nickel, chromium, and lead (National Research Council, 1986). In terms of overall quantity, lead was one of the most significant heavy metals emitted prior to the ban on leaded gasoline in 1996 (Daines and others, 1970; Motto and others, 1970; Quarles and others, 1974; Wheeler and Rolfe, 1979). At least in desert regions, concentrations of lead particulates along roads were positively correlated with traffic volume (Motto and others, 1970). Within 80 m (87.5 yd) of roadsides, Quarles and others (1974) found that lead concentrations diminished notably from road edges (543 and 190 ppm) to 10 m (47 and 5 ppm, respectively) away from the edge; beyond 80 m, accumulations of lead diminished at lower rates. The declining gradient in lead concentrations away from roadsides may have been due, in part, to the direction of surface water flow (Byrd and others, 1983) as soil and other debris to which lead adheres were flushed away by the volume of water that runs off road surfaces. Although lead emissions from gasoline have declined dramatically since control policies were implemented in the 1970s (Forman and others, 2003), it persists in soils and can continue to move through the environment when contaminated soils are dislodged.

30

## 2.6.4 Annotated Bibliography for OHV Effects on Air Quality

***Agrawal, Y.K., Patel, M.P., and Merh, S.S., 1981***, Lead in soils and plants—Its relationship to traffic volume and proximity to highway (Lalbag, Baroda City): International Journal of Environmental Studies, v. 16, no. 3–4, p. 222–224.

Accumulations of lead from motor-vehicle exhausts on soils and trees growing along a busy thoroughfare in the Lalbag area of Baroda City were studied. Analysis of soils and tree samples showed that the distribution of emitted lead was influenced by the direction of the prevailing wind. Lead concentrations in plants and soils near the roadside were greater than they were in soils and plants 4–6 m away from the roadside.

***Bazzaz, F.A., and Garbutt, K., 1988***, The response of annuals in competitive neighborhoods—Effects of elevated $CO_2$: Ecology, v. 69, no. 4, p. 937–946.

Four members of an annual plant community were used to investigate the effects of changing neighborhood complexity and increased carbon dioxide ($CO_2$) concentration on competitive outcome. Plants were grown in monoculture and in all possible combinations of two, three, and four species in $CO_2$-controlled growth chambers at $CO_2$ concentrations of 350, 500, and 700 microliters/liter ($\mu$L/L) (1 ppm), with ample moisture and light. Species responded differently to enhanced $CO_2$ level. The biomass of some species (*Abutilon theophrasti*, for example) increased with increasing $CO_2$, while that of others (*Amaranthus retroflexus*) decreased with increasing $CO_2$ concentration. The potential effects of $CO_2$ on community structure could be profound, particularly at the intermediate levels of $CO_2$ that are predicted for the first half of the 21st century.

***Gish, C.D., and Christensen, R.E., 1973***, Cadmium, nickel, lead, and zinc in earthworms from roadside soil: Environmental Science and Technology, v. 7, p. 1060–1062.

Cadmium (Cd), nickel (Ni), lead (Pb), and zinc (Zn) in soils and earthworms along two Maryland highways decreased with increasing distance (10, 20, 40, 80, and 160 ft) from the road. Along each highway, metal residues were greater where traffic volume was greater. Correlations between residues in earthworms and soil decreased with decreasing atomic weights (Pb, Cd, Zn, Ni). Metal residues in soils were positively correlated with quantities of soil organic matter. Earthworms accumulated up to 331.4 ppm of Pb and 670.0 ppm of Zn, concentrations that may be lethal to earthworm-eating animals.

***Motto, H.L., Daines, R.H., Chilko, D.M., and Motto, C.K., 1970***, Lead in soils and plants—Its relationship to traffic volume and proximity to highways: Environmental Science and Technology, v. 4, p. 231–237.

Lead concentrations increased with traffic volume and decreased with distance from highways. Much of the lead was present as removable surface contamination on plants, and major effects were limited to the soil surface within 100 ft (30.48 m) of the highway.

***Nakata, J.K., Wilshire, H.G., and Barnes, G.C., 1976***, Origin of Mojave Desert dust plumes photographed from space: Geology, v. 4, p. 644–648.

OHV-raised dust has been an enormous problem in the Mojave Desert, as illustrated by satellite photos that revealed six dust plumes covering more than 1,700 km$^2$ (656.4 mi$^2$) of the western Mojave region in January 1973; the dust plumes were attributed to destabilization of ground surfaces, primarily from OHV activity.

31

BLM_0061696

**Quarles, H.D., Hanawalt, R.B., and Odum, W.E., 1974**, Lead in small mammals, plants, and soil at varying distances from a highway: Journal of Applied Ecology, v. 11, no. 3, p. 937–949.

    Lead particulates were measured at varying distances from three highways. Lead concentrations were greatest within 10 m (10.9 yd) of the highways. Lead concentrations in the soil along two transects dropped from 543 ppm and 190 ppm at the road edge to 47 ppm and 5 ppm 10 m from the road edge. Both plants and animals were susceptible to lead uptake.

**Spencer, H.J., and Port, G.R., 1988**, Effects of roadside conditions on plants and insects. II. Soil conditions: Journal of Applied Ecology, v. 25, no. 22, p. 709–715.

    An experiment was done to investigate the performance of plants (*Lolium perenne*) grown in roadside soil. Significantly fewer plants germinated in soil taken 0 to 6 m from the road compared with soil taken 6 m from the road. For a given population size, however, plants grown in soil taken from beside the road attained significantly greater dry weight and significantly greater soluble nitrogen content. Nitrogen oxide emissions, identified as the probable cause of these effects, were absorbed by the roadside soil and subsequently assimilated by the plants.

**Thompson, C.R., Olszyk, D.M., Kats, G., Bytnerowicz, A., Dawson, P.J., and Wolf, J.W., 1984**, Effects of ozone or sulfur dioxide on annual plants of the Mojave Desert: Journal of the Air Pollution Control Association, v. 34, no. 10, p. 1017–1022.

    Forty-seven species of annual plants from the Mojave Desert were grown in pots and exposed in open-top field chambers located at Riverside, California, to test their relative sensitivity to $SO_2$ and $O_3$. Species differed widely in their response to the pollutants. Three species, *Camissonia claviformis*, *Camissonia hirtella*, and *Cryptantha nevadensis*, were quite sensitive to both pollutants, exhibiting leaf injury when exposed to 0.1 ppm $O_3$ or 0.2 ppm $SO_2$. The other species were intermediate in sensitivity, and $O_3$ sensitivity did not always correspond to $SO_2$ sensitivity. For 8 of 11 species tested, total sulfur concentration was greater in plants exposed to 0.2 ppm $SO_2$ than in unexposed plants. *Baileya pleniradiata* and *Perityle emoryi* exhibited the greatest increases in sulfur concentration for exposed versus control plants.

**Walker, D.A., and Everett, K.R., 1987**, Road dust and its environmental impact on Alaskan taiga and tundra: Arctic and Alpine Research, v. 19, no. 4, p. 479–489.

    The physical and chemical characteristics and ecological consequences of road dust in arctic regions were reviewed with emphasis on recent information gathered along the Dalton Highway and the Prudhoe Bay Spine in northern Alaska. Enhanced dust-control measures were considered, particularly where the road passes through scenic lichen woodlands, acidophilic tundra, and in calm valleys where dust commonly was a traffic-safety hazard.

**Westec Services Inc., 1979**, Fugitive dust impacts during off-road vehicle (ORV) events in the California desert: Tustin, California, WESTEC Services, Inc., Technical Report, 40 p.

    Results and analysis of dust monitoring for five desert races demonstrated that factors such as distance from the point of generation, soil moisture, soil characteristics, wind, and relative humidity, as well as the type and number of vehicles in the race, had the largest effect on the amount and type of dust, particulate size, how quickly it settled, and the extent of the human health hazard present during the race. Long period (daily) dust-exposure levels were 10 times

BLM_0061697

greater than the standard, whereas short period (hourly) dust levels were 100 times greater than the standard under adverse conditions near the race activity.

## 2.7 Socioeconomic Implications of OHV Use

### 2.7.1 Section Summary

The socioeconomics of OHV use include OHV user demands, concerns, and attitudes; the economic effects of OHV use on communities near OHV-use areas; the economics of managing OHV activities; the effects of OHV use on non-motorized recreators; and the economics of losing ecosystem services. Although not currently addressed through BLM's indicators of rangeland health, natural resource attributes are heavily influenced by socioeconomic factors. Since the mid 1980s, the incidence of OHV use on public lands has increased substantially, and this trend is expected to continue. Moreover, the economic benefits from travel expenditures and the sales of supplies and equipment in communities bordering OHV-use areas generates significant pressure to maintain or increase current levels of OHV activity. As OHV activity increases, however, increasing stress is placed on natural resources, land managers who must monitor and regulate OHV activities, and visitors seeking non-motorized forms of recreation.

### 2.7.2 Trends in OHV Use and Technology

In a survey of Utah OHV users commissioned by the Utah Department of Natural Resources, Fisher and others (2001) found that public lands are primary destinations among most users; only one quarter of survey respondents took trips to private land. More specifically, BLM land was the primary destination for ATV, motorcycle, and 4 x 4 vehicle users; U.S. Forest Service land was the secondary destination among ATV and 4 x 4 users; and State land was the secondary destination among motorcycle users (Fisher and others, 2001). Increasing OHV use is likely to be accompanied by greater demand for places where OHVs can be used, particularly near urban areas and corridors; as urban populations increase, so do the numbers of recreators on nearby public lands, thereby putting more stress on the landscape (Brooks and Champ, 2006). The increasing demands also pose problems for land managers already balancing the needs of a dynamic land base, often with limited budgets and/or staffing (Brooks and Champ, 2006; Rocky Mountain Research Institute, 2002). These limitations constrain land managers but not OHV use; thus, OHV recreation is largely "unmanaged." In addition, technology advancements in outdoor recreation equipment have led to production of OHVs that easily access lands previously unimpacted by mechanized recreation (Meine, 1998; Ewert and Shultis, 1999). As a result, new problems have arisen for both previously unimpacted areas and backcountry users who now encounter OHVs. Problems potentially arising from a constrained ability to manage lands include resource degradation, displacement of wildlife, and conflict among users, both within and across user types.

### 2.7.3 Types, Sources, and Effects of OHV User Conflict

Much of the OHV literature addresses conflicts between OHV users and other land users, even those who are not directly affected by OHV users. Researchers have addressed conflict issues by using a variety of tools or models designed to help managers understand and reduce conflicts between or among user groups. Bury and others (1983, p. 401) describe conflict as existing "whenever incompatible activities occur" and offer three elements that contribute to the incompatibility of activities: spatial and temporal proximity, dominance over the environment, and dependence on technology. When the proximity of activities does not result in direct or

BLM_0061698

indirect (seeing the effects of other uses) encounters among user types, then environmental dominance and technological dependence are more likely to come into play. Dominance over the environment refers to how much an individual feels the need to exert some kind of control over the environment. Dependence on technology can cause conflict when people who retreat to backcountry to seek solace from modern technology clash with those who use technology to enhance their outdoor experiences. Conflict also occurs between land users and land managers. Inconsistent management policies across different land management agencies can cause such conflict, particularly as OHV recreation is ushered from being "unmanaged" to "managed." On many public lands, trails are currently considered open unless posted as closed, and once a trail has been established by users, it is often considered open for use (Brooks and Champ, 2006).

Graefe and Thapa (2004) outline some of the traditional approaches to examining user conflicts through research, including studies of goal interference (first introduced by Jacob and Shreyer, 1980). Goal interference occurs when a user comes into direct (seeing the conflicting recreation type) or indirect (seeing the *effects* of a recreation type) contact with another user type and is impeded from accomplishing the desired purpose of his or her recreation (Badaracco, 1976). The factors that contribute to goal interference are activity style, resource specificity, mode of experience (whether individuals are focused or unfocused), and tolerance for lifestyle diversity. Another model classifies conflict as either interpersonal conflict or a conflict of social values (Vaske and others, 1995). Interpersonal conflict is similar to goal interference in that a user has a problem with another use type and encounters an individual participating in, or evidence of, that type (hearing OHV noise, for example). Social values conflict occurs regardless of whether or not differing user types encounter one another—just knowing that the other recreation type is permitted may be unacceptable.

In the literature on user conflict, conflict is more often characterized as one-sided than two-sided (Badaracco, 1976; Bury and others, 1983; Watson and others, 1997; Graefe and Thapa, 2004). For example, while backpackers may perceive OHV users as disruptive to their experience, it is less likely that OHV users will find backpackers disruptive to their experience (Jackson and Wong, 1982). Displacement is the most common personal coping mechanism by which conflict is abated (Watson et al, 1997; Graefe and Thapa, 2004). That is, if an individual feels negatively enough about certain recreational activities occurring in the area he/she wishes to use, there is a possibility that the individual will simply forgo recreating in the area altogether, thereby increasing the probability that area managers will gradually lose support from that user base (Watson and others, 1997; Graefe and Thapa, 2004).

## 2.7.4 OHV Users and Their Preferences

Overall, understanding the social effects of OHV use requires understanding the full array of recreational activities sought and the preferences of both OHV and non-OHV users alike. For example, people engaged in camping may include both OHV and non-OHV users, which can result in dissatisfaction among campers. In a survey of campers that included both OHV and non-OHV users, 66 percent indicated that having a regulated OHV riding area nearby would make their stay more enjoyable because it would reduce the number of riders in other areas and maintain a safer environment for both riders and campers (Bury and Fillmore, 1974). When given a choice between having (1) no motorcycle riding area but permission to ride on campground roads, (2) prohibition of all motorcycle riding, or (3) a nearby motorcycle area and no permission to ride on campground roads, 75 percent of riders and campers surveyed preferred the third alternative (Bury and Fillmore, 1974; riders and campers were socioeconomically similar).

34

BLM_0061699

Fisher and others (2001) reported that although 63.2 percent of motorcycle users surveyed did not stop to engage in any other type of recreational activity, almost 60 percent of ATV owners and 75 percent of 4 X 4 vehicle owners did engage in other recreational activities during their trips. Of those OHV users who did stop to engage in additional recreational activities, hiking was the most popular (>75 percent of motorcycle/4 X 4 vehicle users and 20 percent of ATV users). Hunting was the other most common recreational activity among ATV users and the second most common activity among 4 X 4 vehicle users; other recreational activities included fishing, camping, and sightseeing (Fisher and others, 2001).

Overall, the results of the user preference surveys discussed previously reveal a potentially conflicted OHV user base in that the quality of their associated recreational activities could be affected by OHV activities. For example, campers who wish to ride OHVs for additional recreation, but who feel strongly that OHV use should be restricted to designated areas, are likely to feel dissatisfied if other OHV users ride through the campground and/or on hiking trails. Similarly, if OHV use in preferred hunting or fishing areas—or other areas crucial to healthy populations of game and fish species—degrades habitat quality that results in diminished game and fish populations, then OHV riders who also hunt and fish may experience dissatisfaction.

Understanding the social effects of OHV activities (and potential outcomes of OHV activities) also requires determining where OHV users like to go and what their preferences are while riding. For example, in Colorado (where user attitudes are likely relatively moderate), Crimmins (1999) reported that

- 38.5 percent of OHV riders use U.S. National Forest Service land,
- 22.4 percent use private land,
- 18.6 percent use BLM land,
- 6.0 percent use State land,
- 3.4 percent use City or county land, and
- 2.3 percent use National Recreation Areas.

These data indicate that the use of public lands for OHV riding far outweighs that of private lands. Crimmins (1999) further reported OHV user preferences in terms of riding area attributes, which included

- no fee for use (if on public land),
- signs indicating all activities allowed on the trail, and
- locations removed from other human activity.

The least important attributes included

- patrolling by staff of land management agencies or local OHV clubs,
- restrooms, and
- loading ramps (Crimmins, 1999).

When presented with a list of priorities for uses of public funds, OHV users selected

- purchasing right-of-ways for OHV access,
- new OHV trail construction,
- erosion control, and
- OHV trail system planning and maintenance.

The low ranking of management patrols probably indicates that users desire more flexibility regarding where they may ride (Crimmins, 1999). Crimmins (1999) also pointed out that although the availability of facilities ranked low in terms of user preferences, management

35

BLM_0061700

agencies nonetheless generally focus on providing facilities and generally report high user demand.

In terms of OHV user preferences for trail types and features, Bury and Fillmore (1974) reported that variation in terrain was the most important factor. The authors' recommendations for an effective OHV area included

- riding areas established near some, but not all, campgrounds;
- trails kept ≥600 feet (183 m) from the nearest campground;
- trails ≤6 feet (1.83 m) wide; and
- trails that traverse hillsides and include a variety of technical (obstacles, rugged terrain) and non-technical (no obstacles, smooth riding surface) features.

Fisher and others (2001) reported that motorcycle and ATV riders in Utah preferred

- riding off established trails (38.1 and 49.4 percent, respectively),
- double-track trails (12.7 and 17.1 percent),
- single-track trails (12.7 and 4.3 percent),
- moto-cross or ATV courses (9.5 and 15.1 percent), and
- roads (11.1 and 4.3 percent).

The issue of traveling off established trails is a serious concern with respect to natural resource management (Forman and others, 2003; Petersen, 2006); however, areas closed to OHVs and a shortage of designated OHV areas are common complaints among users (Achana, 2005; Fisher and others, 2001; Nelson and others, 2000). For example, in a survey commissioned by the Utah Department of Natural Resources to identify the most important issues affecting OHV use in Utah, 42.3 percent of respondents indicated that "Having enough places to ride" was most important; 8.4 percent indicated "Too many areas closed to OHV use;" and 5.6 percent indicated that "Resource management conservation" was the most important issue (Fisher and others, 2001). In a survey conducted by Nelson and others (2000), 44.6 percent of respondents selected "Do not reduce current trail/route system and OHV access" to indicate the most important thing that should not be changed, and 30.1 percent selected "Develop more trails/routes/area and connections to services" to indicate the most important thing that should be changed. When provided with several OHV-management statements with which to agree or disagree, Crimmins (1999) found that "Most trail closures have been done for good reason" received the highest level of disagreement.

Similar patterns in attitudes and beliefs were revealed through a survey of 336 ATV and motorbike users conducted by the Idaho Department of Parks and Recreation (Achana, 2005). On a scale of 0-7 (from least to most serious), respondents were asked to rank 23 issues of concern to them. Results indicated that the most serious issues of concern (in descending order of seriousness; scores greater than 4) were

- permanent closure of an area the recreator uses most,
- temporary closure of an area the recreator uses most,
- inattentive/careless recreators engaged in motorized recreation,
- litter,
- too many rules and regulations, and
- poor communication of rules and regulations.

Conversely, respondents felt that issues they were not were not concerned with (in ascending order of seriousness; scores less than 3) were

- too few rules and regulations,

BLM_0061701

- inadequate facilities at campsites,
- ATV impacts on water,
- motorcycle impacts on water,
- problems with parking availability for OHV-support vehicles,
- lack of suitable campsites,
- ATV impacts on wildlife, and
- some other (unlisted) issue of concern in OHV use areas.

Issues of concern that fell in the middle (in descending order of seriousness) were

- inattentive/careless non-motorized recreators,
- OHVs traveling too fast,
- motorcycle impacts on soil,
- motorcycle impacts on vegetation,
- ATV impacts on vegetation,
- hunters on OHVs off designated roadways and trails,
- ATV impacts on soil,
- motorcycle impacts on wildlife, and
- noise from OHVs.

When asked which of 16 possible factors contributed to creation of unauthorized trails in recreational regions of Idaho, survey respondents selected (from most to least frequently)

- belief that OHV users should be free to go anywhere,
- lack of enough designated places to ride,
- avoidance of crowded designated areas,
- lack of operator experience,
- riding motorcycles for fun,
- treeless terrain,
- riding ATVs for fun,
- using ATVs for hunting access,
- lack of enforcement regulations,
- using motorcycles for hunting access,
- using ATVs for camping,
- inadequate regulation,
- using motorcycles for camping,
- using motorcycles for fishing access,
- using ATVs for fishing access, and
- some other (unlisted) regional resource impact.

Combined, the top three possible factors contributing to creation of unauthorized trails indicate that closures of OHV areas could result in at least local increases in dispersed use. Finally, when presented with a list of four alternatives for creating uniform OHV access requirements to all recreation areas, trails, and roads on Idaho public lands, 53 percent of the respondents selected the alternative "Open to OHVs unless posted as closed by signing," and 33 percent selected the alternative "Open to OHVs unless posted as closed by signing, designation, or description." Only 6.1 and 1.0 percent felt that areas should be "Closed to OHVs unless open by signing, designation, or description" or "Closed to OHVs unless open by signing," respectively (6.7 percent did not respond to this question). These results are consistent with the top possible

37

factors contributing to creation of unauthorized trails: the belief that OHV users should be free to go anywhere unless posted as closed by signing, designation, or description.

## 2.7.5 Economic Benefits and Costs of OHV Use

The economic benefits resulting from OHV sales, operation and maintenance, and associated sales and activities have been well documented (American Motorcyclist Association, 1978; Dave Miller Associates, 1981; Reed and Hass, 1989; Dean Runyon Associates, 2000; Nelson and others, 2000). OHV recreation and camping, in particular, can generate significant revenues for local economies through campground fees, grocery sales, eating and drinking in restaurants, and sales associated with operating and maintaining OHVs and support vehicles. In 1999, camping at public campgrounds on local, State, BLM, and U.S. Forest Service lands in California generated $500 million; an additional $130 million was spent solely on going to and from the campground and/or home (Dean Runyon Associates, 2000). A study conducted in 1988 by Reed and Hass (1989) indicated that, during a 12-month period in 1987-1988, Colorado OHV users spent $488.7 million on OHV purchases, operation and maintenance, support equipment (tow trailers, storage sheds, and so on), and travel expenses associated with OHV trips. Nelson and others (2000) reported that, between July 1998 and June 1999, the average Michigan OHV licensee spent $1,944 on non-trip related purchases, 80 percent of which was for equipment. When extrapolated to the estimated number of licensees in Michigan, Nelson and others (2000) found that this amounted to $134 million in spending on equipment; a similar extrapolation indicated that $40 million was spent on local trips.

The literature search conducted for this report, as well as personal communications with experts working in the field of outdoor recreation socioeconomics, revealed no published studies on the socioeconomic costs generated by OHV use. These costs could include the degradation or loss of ecosystem services, the costs of restoring OHV sites, and the loss of revenues from non-motorized recreators who seek alternate areas for recreation where motorized recreation does not occur. Examples of degraded or lost ecosystem services would be the diminished capacity for a given watershed to provide high-quality water, diminished water infiltration into aquifers, and flooding resulting from increased runoff where soils become compacted. Lost constituencies (and associated revenues) could include not only non-motorized recreators, but also hunters and anglers whose primary recreational foci (wildlife and fish) may have undergone population declines due to the effects of OHV use. At this time, however, the true benefit:cost ratio of OHV use remains unknown.

## 2.7.6 Annotated Bibliography for Socioeconomic Implications of OHV Use

***Badaracco, R.J., 1976,*** ORVs—Often rough on visitors: Parks and Recreation, v. 11, no. 9, p. 32-35, 68-75.

This paper first reviews relevant literature on user conflict and discusses the one-sidedness of conflicts between OHV and non-OHV users, as well as the spatial nature of conflicts that occur when non-OHV users seek solitude and quiet and OHV users seek places for challenge and adventure. The paper then describes the ISD (impairment, suppression, displacement) syndrome: impairment is the diminished enjoyment among non-OHV users when they come into direct or indirect contact with OHV impacts; suppression is reduced participation of the non-OHV group; and displacement is the abandonment of a site impacted by OHV activity. Land planners and managers often misinterpret displacement as disinterest in the abandoned activity and, in so doing, may focus management efforts and other resources on OHV user demands.

38

**Bury, R.L., and Fillmore, E.R., 1974**, Design of motorcycle areas near campgrounds—Effects on riders and non riders: College Station, Texas, Department of Recreation and Parks, Texas A & M University, Technical Report, 72 p.

This document analyzes some of the psychological and sociological effects of constructing motorcycle riding areas adjacent to fixed-site campgrounds. It describes rider and camper profiles, rider and camper perceptions of riders, and camper and rider preferences and satisfactions with respect to the proximity and design of riding areas.

**Cordell, H.K., Betz, C.J., Green, G., and Owens, M., 2005**, Off-highway vehicle recreation in the United States, regions, and states—A national report from the National Survey on Recreation and the Environment (NSRE): U.S. Forest Service, Southern Research Station, Technical Report, 90 p.

This report was prepared for the U.S. Forest Service's National OHV Policy and Implementation Teams. The data from the NSRE were collected between the fall of 1999 and late 2004. The focus of this report is off-highway driving of motor vehicles. The 15 July 2004, U.S. Forest Service draft rule regarding management of motorized vehicle use has increased attention on where and how OHV recreation occurs and is offered. As public land managers are tasked with the responsibility of examining and implementing clear and consistent agency policy, understanding who the OHV recreators are has become ever more important. The growing use of motor vehicles is prompting the Forest Service to revise its management of this use so that the agency can continue to provide opportunities desired by the public, while sustaining National Forest System lands.

**Crimmins, T., 1999**, Colorado off-highway vehicle user survey—Summary of results: Denver, Colorado, Colorado State Parks, Technical Report.

This report summarizes a State Parks user survey designed to elucidate OHV rider-use patterns, what riders want in a recreation area, enthusiast values and beliefs, use of OHVs in hunting, how the state OHV fund should use the funds collected, and rider perceptions of how OHV funds are used, lands are allocated, and routes are managed.

**Dave Miller Associates, 1981**, An economic/social assessment of snowmobiling in Maine: Windham, Maine, Dave Miller Associates, Technical Report, 52 p.

This summarizes a user survey covering economics (number of trips, distance traveled, duration, fuel, lodging, equipment) and analyzing the statewide impacts and trends indicated by the responses. (No information on demographics or user perception was gathered.)

**Dean Runyan Associates, 2000**, Campers in California—Travel patterns and economic impacts: Portland, Oregon, Dean Runyan Associates, Technical Report, 76 p.

This document charts the distribution of camping opportunity according to type of environment and land ownership, tallies the results of a questionnaire distributed to people using public campgrounds, and develops a comprehensive profile of camping travel patterns, demographics, and expenditures. The report provides significant detail on a wide range of camping patterns, such as how many trips, how long and where, a breakdown of the activities pursued by campers once on site, and the ethnic and income classifications of campers. Although not OHV-specific, it shows where OHV recreation fits into the big picture.

39

**Decker, D.J., Krueger, R.A., Bauer, Jr., R.A., Knuth, B.A., and Richmond, M.E.**, 1996, From clients to stakeholders—A philosophical shift for fish and wildlife management: Human Dimensions of Wildlife, v. 1, no. 1, p. 70-82.

    This paper begins with a call for wildlife professionals to "adopt and use the term stakeholder," the development of which they review and the definition of which they indicate as being any citizen potentially affected by or having a vested interest in an issue, program, action, or decision leading to an action. The authors maintain that successful natural resource management in today's society requires recognizing the array of stakeholders that demand a voice or involvement in decision-making about natural resource management. The authors describe taking a stakeholder approach to planning and decision-making in natural resource management by including all those who might be impacted by natural resource management decisions (the authors focus on fish and wildlife management, but the principle is applied throughout natural resource management). The process entails developing communication strategies for understanding and representing stakeholder concerns, attitudes, and conflicts. The authors maintain that today's successful professional resource managers need to "…seek a widely recognized image of giving unprejudiced consideration to all significant stakeholder interests in management decisions."

**Fisher, A.L., Blahna, D.J., and Bahr, R., 2001**, Off-highway vehicle uses and owner preferences in Utah: Logan, Utah, Institute for Outdoor Recreation and Tourism, Department of Forest Resources, Utah State University, Report no. IORT PR2001–02, 80 p.

    This study entailed an OHV user survey to examine owner characteristics, attitudes, and preferences. Respondents were selected at random from Utah OHV registrations and interviewed by telephone. This was a very extensive questionnaire, including the verbatim responses to interviewers' open-ended questions. Other questions included demographics, vehicle type used, where ridden, distance traveled, types of riding preferred, attitudes toward OHV program fund use, attitudes toward training and safety, and much more.

**Jim, C., 1989**, Visitor management in recreation areas: Environmental Conservation, v. 16, no. 1, p. 19–32.

    This paper discusses various visitor-management measures for diminishing or precluding the effects of visitor impacts on natural resources in recreation areas by employing existing recreation-management research on visitor decisions—such as trip duration, difficulty, and desired environment—to suggest ways of dispersing use into patterns that do not result in damage to natural resources. It also examines various management scenarios: signs and maps to direct users into a managed pattern, restricting admission, lotteries, and various rationing/pricing concepts.

**Kockelman, W.J., 1983,** Management Concepts, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 399–446.

    Noise and motorized intrusion were the major impacts of ORVs on non-OHV users. Permitting OHV activity on public land is described as "inefficient" in the goal to provide for multiple uses because the noise, dust, and speed of just one OHV can exclude all other recreators from an area. The author categorizes OHV users as work-related users, recreational users, or

40

"bad apples." Work-related users are natural resource managers and utility workers, among others. Recreators are further categorized as casual (value aesthetics more than the challenges of riding) or endurance riders. "Bad apples" are characterized by a complete lack of concern about their impacts and are likely to be noncompliant with regulations.

**Nelson, C.M., and Lynch, J.A., 2001**, A usable pilot off-road vehicle project evaluation: East Lansing, Michigan, Department of Park, Recreation and Tourism Resources, Michigan State University, Technical Report, 50 p.

This report details the results of an interagency effort to increase compliance with OHV rules in a Michigan State forest. An OHV-rider survey asked for respondents' perceptions of signs, maps, and trail systems in the pilot area, as well as rider perceptions of any law enforcement contact riders may have had during the study period. The survey also queried each respondent's understanding of pilot area regulations and offered the opportunity to give open-ended comments. There is also a detailed discussion of the participating law enforcement agencies' response to the pilot project, including officer concerns, jurisdiction conflicts, workload distribution vs. agency priorities, and an analysis of sign survival in the pilot project areas. Finally, interviews with park manager/grant recipients and discussion of the results in terms of park administration, funding, staffing, and resource protection are provided.

**Nelson, C.M., Lynch, J.A., and Stynes, D.J., 2000**, Michigan licensed off-road vehicle use and users 1998–99: East Lansing, Michigan, Department of Park, Recreation and Tourism Resources, Michigan State University, Technical Report, 49 p.

This details a survey of randomly selected OHV owners in 1999. In addition to questions about demographics, expenditures, type of OHVs owned, and preferred activities, respondents were queried about their perceptions of specific aspects of the State OHV program. One section is dedicated to comparing this survey with a similar survey from 1988.

**Propst, D.B., Shomaker, J.H., and Mitchekkm, J.E., 1977**, Attitudes of Idaho off-road vehicle users and mangers: Moscow, Idaho, College of Forestry, Wildlife and Range Sciences, University of Idaho, Technical Report, 30 p.

This report provides background information on, and an introduction to OHV use in, the era when it was new and poorly understood, and includes one of the earliest OHV/OSV (over-snow vehicle) user surveys. It compares user and land manager responses in the same survey; both groups were queried about their perceptions of environmental impacts, causes of conflicts, uses of public money for facilities, regulation enforcement, impacts on wildlife, and reasons for pursuing OHV/OSV activities.

# 3.0 Potential Indicators for Evaluating and Monitoring OHV Effects

## 3.1 Summary

There are numerous parameters that have the potential for serving as indicators of OHV effects in monitoring or research programs. Every attempt was made to provide an inclusive list of potential indicators of OHV effects described in the OHV effects literature (listed below). Of those listed, some correspond with BLM's 17 indicators of rangeland health; others are quite different but could provide supplemental data for evaluating or monitoring OHV effects (for

BLM_0061706

example, erosion and/or sedimentation rates would complement assessments of rill formation and other surface changes) or fill indicator voids (such as those pertaining to wildlife ecology).

(1) **Soil health** and **watershed condition**
- Soil strength
- Soil bulk density
- Water infiltration rate
- Permeability
- Erosion and sedimentation rate
- Sedimentation or turbidity in wetlands
- Surface changes (for example, formation of rills, gullies, and terracettes)
- Presence/condition of soil crusts (in some cases: depending on crust type)

(2) **Vegetation health**
- Plant community composition (including species diversity, ratio of native to non-native or invasive species, structural diversity)
- Abundance of individuals and/or stem density
- Percent vegetation cover
- Plant size
- Growth rate
- Biomass

(3) **Habitat condition** and **health of wildlife populations** (direct and indirect)
- Habitat patch size and connectivity
- Wildlife community composition (including species diversity, ratio of native to non-native or invasive species)
- Abundance, density, and distribution
- Population sizes and trends
- Survivorship, productivity, body mass, and roadkill rates
- Age-class and gender structure
- Frequency of OHVs passing through a given area
- Road or trail type and width
- Level (decibels), duration, and timing of traffic noise

(4) **Water quality**
- Sedimentation rate
- Levels of turbidity and suspended solids
- Contaminants levels, including levels of petroleum-derived compounds from spills (aromatic hydrocarbons in particular)

(5) **Air quality**
- Dust levels
- Levels of by-products of OHV emissions (including polycyclic aromatic hydrocarbons, carbon monoxide, nitrogen oxides, ozone, and sulfur dioxide)

(6) **Socioeconomics** (direct and indirect)
- Recreator satisfaction with their recreation (or other) experiences
- Compliance with OHV (or other) regulations
- Knowledge regarding effects of user activities on various aspects of land health

42

BLM_0061707

- Mapping the distribution and intensity of OHV versus non-motorized recreation and other land uses,
- Patterns of regulation compliance (as evidenced by creation of unauthorized trails, damage to vegetation, and so on)
- Trends in local economic indicators associated with OHV and non-motorized recreation and other land uses (for example, sales in camping equipment, gasoline, restaurants, lodging facilities)

Specific research questions and management goals—as well as sensitivity to OHV effects and the availability of funding and personnel—will determine the potential efficacy of using any one indicator to evaluate or monitor OHV effects on BLM lands. Qualitative indicators may be most useful for rapid assessments, whereas quantitative indicators may be needed for long-term monitoring. Ultimately, however, implementing an OHV effects monitoring program will require consultation with topical experts and additional research to identify or develop appropriate and efficient indicators and field methods for evaluating and monitoring OHV effects (personal communication from D.A. Pyke to Z.H. Bowen, U.S. Geological Survey, Fort Collins, Colorado, August 2007). Work on developing such indicators is currently underway by rangeland ecologist, D.A. Pyke, U.S. Geological Survey in Corvallis, Oregon.

## 3.2 BLM's Indicators of Land Health Compared to Indicators of OHV Effects Described in the Literature

In terms of the specific land health attributes assessed, there is some limited correspondence between several indicators of OHV effects described in the literature and some of BLM's 17 qualitative assessment indicators (see Pellant and others, 2005). The area of greatest overlap is that of soil health and watershed condition; there is somewhat less overlap in the area of vegetation health (table 3.1). Attributes addressed in the literature but not by BLM's 17 indicators include wildlife population and habitat health, water and air quality, and socioeconomics. Even indicators that measure the same or similar attributes, however, may differ notably with respect to the scale and scope to which they are or can be applied, or the precision and accuracy they can provide.

The differences between BLM's indicators and those described in the literature do not imply that BLM's indicators are inappropriate for assessing some attributes under some conditions. Rather, they underscore the need for a variety of indicators to meet equally variable needs. For example, qualitative indicators (such as those employed by the BLM) often entail making visual estimates, which may be suitable for rapid assessments by time-limited personnel operating with small budgets; qualitative measurements, however, are subject to observer bias. Research and monitoring studies, on the other hand, generally require quantitative indicators (or strict decision rules to guide data collection for qualitative parameters) that minimize observer bias and maximize statistical precision and accuracy to ensure defensible results and the detection of trends; quantitative measurements, however, can drive up the cost and time requirements of research and monitoring efforts. Therefore, the choice of indicators employed will depend on the specific goals, budgets, sites, and other factors. In some cases, BLM's indicators may be suitable; other cases may require more quantitative indicators. Co-opting indicators from other disciplines also may be extremely useful for revealing OHV effects on land health.

43

**Table 3.1.** Indicators emphasized in the literature reviewed for effects of off-highway vehicles (OHV) on land health compared to indicators of land health employed by the U.S. Bureau of Land Management (BLM) (Pellant and others, 2005).

| Land health category | Indicators of OHV effects described in reviewed literature | BLM indicators[a] |
|---|---|---|
| Soils and watersheds | Soil strength | 9,11* |
| | Soil bulk density | 11 |
| | Soil permeability | 8,9*,11* |
| | Water infiltration rate | 1,2,3,4,5,8*,9*, 10*,11* |
| | Erosion rate | 1,2,3,4,5,6,7, 8*,10* |
| | Sedimentation rate | |
| | Presence/condition of biotic and abiotic soil crusts | 2,4,6,7,8* |
| Vegetation | Plant species diversity | 12*,13,16* |
| | Ratio of native plants to non-native and/or invasive plants | 12,16 |
| | Percent plant cover | 4,13,14 |
| | Plant size | 11,13,14, 15*,17 |
| | Plant growth rate | 11*,13,14,15*, 17 |
| Wildlife and habitats | Habitat patch size and connectivity (can be expressed as ratio of road edge:habitat area or as native:non-native habitat) | 4,12*,16* |
| | Shape/scope of animal movements relative to roads | |
| | Wildlife diversity and/or species abundance | |
| | Ratio of native, endemic wildlife to non-native and/or invasive species | |
| | Population size and trend | |
| | Gender/age ratio trend | |
| | Productivity trend | |
| | Average body mass for a given age/gender | |
| | Average survivorship | |
| | Vehicle-caused mortality rate | |
| Water quality | Sedimentation rate or depth | |
| | Amount of suspended solids | |
| | Turbidity level | |
| | Level of atmospheric deposition associated with OHV emissions | |
| | Level of petroleum or its by-products (benzene, ethylbenzene, toluene, xylenes, 1,3-butadiene, lead) | |
| Air quality | Levels of OHV emission by-products (nitrogen oxides, carbon monoxide, sulfur dioxide, ozone, aldehyde,  PAHs[b]) | |
| | Level of suspended particulates | |
| | Plant-absorbed level of emissions by-products | |

[a]   1 = Number and extent of rills.
     2 = Presence of water flow patterns.
     3 = Number and height of erosional pedestals or terracettes.

44

BLM_0061709

4 = Bare ground (excluding rock, litter, lichen, moss, plant canopy).
5 = Number of gullies and erosion associated with gullies.
6 = Extent of wind scoured blowouts and/or depositional areas.
7 = Amount of litter movement (description of size and distance expected to travel).
8 = Average soil surface (top few mm) resistance to erosion.
9 = Soil surface structure and content of soil organic matter (to include type of structure and A-horizon color and thickness).
10 = Effect of plant community composition (relative proportion of different functional groups) and spatial distribution on infiltration and runoff.
11 = Presence and thickness of compaction layer (usually none).
12 = Functional/structural groups (in descending order of dominance by above-ground production or live foliar cover).
13 = Amount of plant mortality and decadence (include which functional groups are expected to show mortality or decadence).
14 = Average percent and depth of litter cover.
15 = Expected annual production (this it total above-ground production, not just forage production).
16 = Potential invasive (including noxious) species (native and non-native).
17 = Perennial plant reproductive capability.
[b] Polycyclic aromatic hydrocarbons.

Ultimately, **any indicator used to evaluate or monitor OHV effects will need a standard value (or range of values) that represents the baseline condition or a threshold value above (or below) which management is triggered**. Ecosystem properties, however, can vary widely across (and within) **spatial scales**. Therefore, selecting an appropriate standard or threshold for any one indicator necessitates an evaluation of the spatial scale(s) at which the associated effect occurs or is likely to affect ecosystem function. For example, OHV-caused sedimentation in a first-order stream might have significant by very localized effects on that stream, but no significant effects downstream; in contrast, OHV-caused sedimentation in a first-order stream might not have significant effects on that stream, but sedimentation in multiple first-order streams may result in significant cumulative downstream effects in second- and third-order streams. Similarly, the **temporal scale** at which ecosystems respond to land uses can vary from short-term (hours) to long-term (decades or longer); thus, it is important to consider temporal scale(s) as indicator standards or thresholds are established. For example, wildlife behaviors may exhibit immediate responses to OHV traffic by moving away from OHV routes; population trends, however, may take several generations to show effects of OHV disturbance, in which case the time required to detect trends will depend on how long it takes for generations turn over. Where OHV effects are not an immediate concern, one could incorporate long-term, annual, qualitative assessments of OHV-use areas, but where effects are of immediate concern, short-term, quantitative assessments may be implemented.

Standards for a given land health indicator can be developed by ascertaining baseline values at control sites under a given set of conditions. Once the baseline values are established, it becomes important to standardize the conditions under which subsequent measurements of that indicator are made. For example, the freezing and thawing of soils tend to decompact soils, and precipitation tends to alter other soil properties; thus, it would be important to monitor soils at similar times of year and under similar soil-moisture conditions.

45

BLM_0061710

## 3.3 Some Potential Indicators for Evaluating and Monitoring OHV Effects

### 3.3.1 Potential Indicators of OHV Effects on Soils and Watersheds

A major effect of OHV traffic on soil health is compaction—the reduction of a soil's porosity. Potentially useful indicators for monitoring soil compaction include soil strength, soil bulk density, and infiltration rate (or permeability). **Soil strength** is typically measured in terms of the soil surface's resistance to a vertical force exerted by a penetrometer and is expressed as $kg/cm^2$ (see *http://cropsoil.psu.edu/extension/facts/agfacts63.cfm* for explanations and diagrams of this method). **Soil bulk density** is measured as the ratio of dry solid mass (after soil is over-dried) to bulk volume of soil and is expressed as $g/cm^3$ (or $Mg/m^3$). **Infiltration** or **permeability** is the rate at which the water infiltrates the soil and is expressed as cm/hr. Infiltration tests can be conducted in the field with relatively simple equipment (for a demonstration, see *http://www.grow.arizona.edu/Grow--GrowResources.php?ResourceId=181*); however, many replicates are needed to obtain adequate comparisons, and it takes time for infiltration to occur. Additional resources on the utility of devices and techniques for monitoring soil health include Leung and Meyer (2003) for soil compaction; O'Sullivan and Ball (1982), Hooks and Jansen (1986), Komatsu and others (1988), and Keener and others (1991) for soil strength; and Flint and Childs (1984), Isensee and Luth (1992), Miller and others (2001), and Lowery and Morrison (2002) for soil bulk density. McBrayer and others (1997) and Amezketa Lizarraga and others (2002) describe techniques used to measure infiltration rates. Overall, soil strength and bulk density are the most commonly used indicators of soil compaction in visitor impact studies (Liddle, 1997).

Soil strength, which increases with increasing soil compaction, depends on a number of inherent variables, such as particle size, type of clay mineral, the size/distribution of pores, and aggregate stability. For example, Adams and others (1982) found that soil strength in undisturbed areas of the Mojave Desert ranged between 5.1 $kg/cm^2$ at 6 percent water content and 21.1 $kg/cm^2$ at 1.8 percent water content, indicating that soil strength decreases with increasing moisture content. In general, a soil strength of less than 20 $kg/cm^2$ (284.4 $lb/in^2$) was indicative of undisturbed terrain, whereas trails intensely used by motorcycles had soil strengths (during wet conditions) that typically ranged from 20 to 60 $kg/cm^2$ (284.4 to 853.2 $lb/in^2$) (Adams and others, 1982). When soil strengths exceeded 20 $kg/cm^2$ (284.4 $lb/in^2$; measured at about field capacity) due to compaction, Grimes and others (1975, 1978) found that root extension of certain plants, including alfalfa (*Medicago sativa*), corn (*Zea mays*), and cotton (*Gossypium hirsutum*), was limited.

Soil bulk density also increases with increasing soil compaction. For example, in the Mojave Desert, Webb (2002) and Caldwell and others (2006) found that bulk densities of undisturbed surface soils ranged from 1.40 to 1.68 $g/cm^3$; however, bulk density increased significantly to 1.80 $g/cm^3$ at high-disturbance sites (Caldwell and others, 2006). Measuring soil bulk density, however, is time-consuming and difficult in gravelly soils (Webb, 2002), which are typical of many desert sites. Thus, its practicality may vary not only from region to region, but from soil to soil within a region. Infiltration, on the other hand, decreases with increasing soil compaction. In undisturbed desert habitats, Eckert and others (1979) found soil infiltration rates to be 3.2 cm/hr. In the same study, infiltration rates were 15 percent lower where motorcycle (2.7 cm/hr) and 33 percent where truck (2.1 cm/hr) traffic had occurred.

For each of the indicators identified above, it will be crucial to consider soil type and water content when setting standards, as these factors clearly influence overall inherent values of

46

BLM_0061711

each parameter. It also is clear that variability in soil type may preclude using a single indicator—much less one standard—for monitoring soil health across all sites. Overall, monitoring soil health would entail measuring soil properties in tracked versus untracked areas of similar soil type and under similar conditions of soil water content. For areas previously unaffected by OHV activities but proposed to become OHV areas, managers may wish to collect predisturbance data on soil properties to serve as a baseline from which trends in soil properties may be assessed over time. An acceptable percent change in soil properties could be selected, and if soil properties were to exceed these threshold values then management actions could be implemented to bring the soil properties back to acceptable values.

A possible method of monitoring surface changes in watersheds might be to establish permanent monitoring sites for repeat photography studies. By standing in the same spot, orienting the camera in the same direction, and using the same focal length for each site visit, sequential photographs would provide a qualitative, relatively easy means of monitoring surface changes due to erosion and OHV tire cuts. Helpful websites that discuss repeat photography (both terrestrial and aerial) include *http://biology.usgs.gov/luhna/chap9.html*, *http://wwwpaztcn.wr.usgs.gov/wyoming/rpt_ground.html*, and *http://www.cpluhna.nau.edu/Tools/repeatphotog.htm*. Scientists with the National Science and Technology Center are using close-range (terrestrial or ground-based) photogrammetry techniques and associated tools for producing and interpreting close-range images (less than 300 m, as opposed to aerial photogrammetry distances of more than 300 m) that may be used to document soil crusts, soil erosion, vegetation, and other resources (see *http://www.blm.gov/nstc/prodserv/ST134/pdf/Handout3CloseRange.pdf*).

### 3.3.2 Potential Indicators of OHV Effects on Vegetation

Some plant responses to OHV activities are preceded by, and result from, OHV effects on soil properties. In other words, soil characteristics, particularly soil compaction, play important roles in the distribution, abundance, growth rate, reproduction, and size of plants. Furthermore, some plant responses are likely to lag behind changes in soil properties, and, by the time effects are detected in plants, site recovery could be more difficult and/or lengthy. As such, it would be important to implement management strategies for maintaining or improving soil condition before plants are affected and no longer provide enough cover to hold soils in place during restoration efforts. Several vegetation parameters, however, have potential value as direct indicators of OHV effects on plant communities.

As mentioned in section 3.3.1, soil compaction results in reduced water infiltration. As a result, overall plant productivity, as measured by **percent plant cover**, **abundance** or **stem density**, **growth rate**, **biomass**, **plant height** and **width**, **ratio of large:small species**, and/or **reproductive output** may be diminished (Johnson and others, 1975; Vasek and others, 1975; Adams and others, 1982; Webb, 1983; Prose and others, 1987; Holzapfel and Schmidt, 1990; Lightfoot and Whitford, 1991; Brooks, 1995; Bolling and Walker, 2000). It is important to consider, however, the differential growth habits and responses of plant species to conditions generated by OHV activities; they may be favored or inhibited by OHV effects (Holzapfel and Schmidt, 1990; Angold, 1997). For example, the productivity of some species may increase due to abnormal conditions of moisture availability from runoff near compacted areas and/or where water roadbed materials allow increased infiltration rates (Johnson and others, 1975; Vasek and others, 1975; Holzapfel and Schmidt, 1990; Lightfoot and Whitford, 1991).

To evaluate and monitor plant productivity, researchers often use transect-intercept methods for measuring larger- or site-scale indicators, such as percent cover, and quadrat-based

BLM_0061712

sub-sampling at random locations along transects for measuring smaller-scale (individual plants) indicators, such as plant size or growth rate. Repeat photography is also potentially useful for monitoring vegetation cover when personnel budgets are limiting, although ground-based repeat photography methods may be more realistic than satellite imaging in terms of staff expertise and funding required (see methods and URLs provided in Section 3.3.1). Satellite imagery, however, can be very effective for ascertaining landscape-scale changes in vegetation cover during long-term studies at selected study sites (Johansen and others, 2007).

      **Plant community composition or diversity**—a parameter that factors relative proportions of each species into species richness—is a commonly used indicator health of a vegetation community (Davidson and Fox, 1974; Adams and others, 1982; Prose and others, 1987; Wilcox, 1989; Tyser and Worley, 1992; Lovich and Bainbridge, 1999; Parendes and Jones, 2000). For example, a plant community comprising 5 individuals each of 10 species and 150 individuals of another (200 total individuals) would be considered depauperate compared to a community comprising 20 individuals each of 10 species (200 total). Native species diversity is further compromised when non-native and/or invasive plants dominate the plant community (Holzapfel and Schmidt, 1990). OHVs caked with mud acquired elsewhere potentially introduce or disperse seeds of non-native and invasive species; thus, OHV-route margins often become populated with exotics and invasives that eventually may spread and outcompete native species at the landscape level. Therefore, an important consideration when evaluating plant species diversity is the presence of non-native and/or invasive species. In other words, although species diversity can be useful for evaluating and monitoring the impacts of OHV activities on vegetation, the ratio of native to non-native and invasive plant species must be taken into account. Monitoring transects oriented perpendicular to OHV travel routes would help identify range expansions beyond the linear routes.

      Similar to the precautions issued above for selecting standards of soil health, vegetation characteristics also vary widely according to soil type, slope, aspect, microclimate, and other factors. Ultimately, having baseline data before a site is disturbed, and/or having nearby reference sites not subjected to OHV activity would help differentiate between site-based variations and OHV impacts on vegetation.

## 3.3.3 Potential Indicators of OHV Effects on Wildlife and Habitats: Native, Threatened, and Endangered Species

      The physical imprint of a road or OHV route creates barrier effects that may effectively alter **habitat patch size and connectivity**, which potentially alters or inhibits **animal movements** (Oxley and others, 1974; Mader, 1984; Swihart and Slade, 1984; Samways, 1989; Andrews, 1990; Baur and Baur, 1990; Forman and Alexander, 1998; Jackson and Griffen, 1998). Roads and trails also create edges that can alter wildlife habitat use and movements (Nicholson, 1987; Yahner, 1988; Reed and others, 1996; von Seckendorff Hoff and Marlow, 1997; Gibbs, 1998; Vos and Chardon, 1998), and in many instances these **edge effects** extend well beyond the road's actual footprint into habitat interiors. Unfortunately, both direct and indirect indicators of animal movements and habitat or home-range use can be difficult to measure, simply because populations are mobile and easily affected by many factors besides OHV activity if care is not taken to avoid, or control for, these additional effects. Furthermore, adequate sample sizes and accurate measurements of animal movements generally require capture-mark-release or capture-mark-resight studies, which can be costly in terms of funding for equipment and personnel time. Therefore, evaluating and monitoring movement responses of suitable indicator species or

48

functional groups to OHV activities and routes might be more efficient than trying to monitor many species. For example, species least likely to cross OHV routes or networks of routes (beetles or small mammals, for example) would be more suitable for studying barrier effects of OHV routes than species inhibited from crossing only multi-lane, paved highways (large ungulates). Ultimately, animal movement studies might be most appropriate in comprehensive, long-term research projects at selected study sites representative of locations and habitats being impacted most by OHV activities. An appropriate measure of edge effects on wildlife may entail studies of spatial distribution relative to distance from OHV routes, as well as density and other population dynamics among target indicator species that require habitat interiors.

Traffic intensity and noise level of OHVs may be useful indirect measures of OHV effects on wildlife behavior and survivorship. If measured, temporal variation in animal activity or presence would need to be considered, as diurnal animals may be more affected by OHV traffic and noise than nocturnal animals if most OHV activity occurs during daylight hours (Ouren and Watts, 2005). Vehicle speed also may be an important parameter to measure, as it can affect mortality rates of animals as they attempt to navigate landscapes where OHV travel is significant. There are technologies available for field monitoring of noise levels and traffic volume and speed (see examples on the Internet at *http://www.jhuapl.edu/ott/technologies/technology/articles/P01254.asp* and *http://www.noisemeters.com/accessories/outdoorkits.asp*), although again it would be more cost-effective to use them in selected study sites for targeted research questions as opposed to broad-scale monitoring programs.

Ideally, any program for monitoring OHV effects on wildlife would include assessments of whether/how wildlife responds to OHV-related factors. If population dynamics were understood *before* the onset of OHV activities, then monitoring any changes that occur afterward could be straightforward if other conditions are held relatively constant. Climate, however, typically makes long-term monitoring of animal population dynamics very complex, and wide-ranging animals may be more difficult to monitor than those with smaller or more restricted movements. Similar to the dynamic ways in which wildlife populations use a given area, OHV use in a given area is also dynamic; if the area affected and the intensity of disturbance enlarges considerably, wildlife may respond as well. These and other factors typically drive up the funding and staffing needs associated with collecting population dynamics data. Thus, to determine thresholds of OHV activity potentially tolerated by wildlife, it may be more realistic to measure long-term changes relative to gradients and changes in OHV activity. Again, careful selection of suitable indicator species, or functional groups, may help increase the effectiveness of monitoring wildlife populations (Lindenmayer, 2000; Noon, 2003, p. 51-55).

To date, there have been few simultaneous studies of OHV use and wildlife responses to OHV activities, but such studies could provide more precise assessments of the relationship between patterns of OHV activity and wildlife responses, particularly behavioral responses to varying traffic patterns, intensity, and total area affected. GPS and satellite technologies could be employed to build Geographic Information System (GIS) data layers of OHV-associated variables, both static (for example, road width) and dynamic (vehicle speed and traffic volume). When overlaid with GPS-based telemetry data layers that map animal movements, one could relate changes in static and dynamic OHV variables to wildlife responses, making these particularly powerful tools for long-term studies aimed at evaluating OHV impacts on wildlife.

BLM_0061714

### 3.3.4 Potential Indicators of OHV Effects on Water Quality

The literature on OHV impacts offered little information specific to evaluating or monitoring OHV effects on water or air quality. Based on studies of water quality in other disciplines, however, potentially useful indicators highly relevant to OHV effects would be **sedimentation** and **turbidity**. Sedimentation can be measured in terms of deposition rate or total amount of solids deposited where surface and directed flows enter aquatic systems downslope of OHV-use areas. A useful reference on different methods for measuring sedimentation may be found in Lisle and Eads (1991). Turbidity, which indicates the level of **suspended solids** in water, can be measured easily in the field with a Secchi disk (see *http://www.noble.org/Ag/Wildlife/SecchiDisk/Index.htm*). With respect to monitoring levels of contaminants in water from OHV emissions and fuel or other chemical spills, water samples can be collected and analyzed in laboratory settings; however, this can be costly, and would probably be more suitable for selected, long-term research sites than in broad-scale monitoring programs. Potentially important contaminants to test for in OHV-impacted watersheds could include **benzene**; **ethylbenzene**; **m-, p-, and o-xylene**; **toluene**; **1,3-butadiene**; **and lead** (Forman and others, 2003: p. 205-213; Arnold and Koel, 2006). In addition, nitrogen deposition from nitrogen oxides can affect water quality if nitrogen loading alters the chemical balance of nutrients in aquatic organisms.

Although it has already been stated that, in general, it is important to compare OHV-impacted sites with similar reference (unaffected) sites when evaluating OHV effects, an additional consideration with respect to water quality is to make comparisons within the same drainage. This is because water quality variables can change depending on the geology, adjacent habitat, and hydrology of the area. Thus, an appropriate technique for assessing OHV effects on aquatic systems might be to compare water quality at replicate sites both upstream and downstream of where OHV activities are occurring.

### 3.3.5 Potential Indicators of OHV Effects on Air Quality

There are several measures of air quality that can be used to assess effects of OHVs, including levels of fugitive dust (**suspended particulates**) and/or **OHV emissions** (including **carbon monoxide**, **ozone**, **sulfur dioxide**, **aldehyde**, and **polycyclic aromatic hydrocarbons**). Due to the effects of humidity, precipitation, fallout rates of different particle sizes, and wind speed and direction, however, measuring dust levels specific to any one site or set of OHV activities can be difficult. A useful technique for assessing the amount of dust associated with OHV use is to collect $PM_{10}$ (particulate matter less than 10 microns in diameter, which can pass through the nose and throat and get deep into the lungs) data, as dust is a common component of $PM_{10}$. Technological advancements continue to provide additional devices useful for monitoring dust and other suspended particulates (Sanders and Addo, 2000)—including satellite imagery (Nakata and others, 1976; Gill, 1996; Stefanov and others, 2001)—although cost becomes a greater factor with increasing sophistication of instruments used. Fox (1986) provides a list of appropriate procedures for measuring and evaluating various air-quality parameters, and the Environmental Protection Agency's National Ambient Air Quality Standards include primary standards (those designed to protect overall public health and the health of "sensitive populations") for carbon monoxide, lead, nitrogen dioxide, particulate matter, ozone, and sulfur oxide levels (see *http://www.epa.gov/air/criteria.html*).

BLM_0061715

### 3.3.6 Potential Indicators for OHV Effects on Socioeconomics

Resource planning has been known to take recreation and economic values of OHV use into greater consideration than biological considerations (Adams and Dove, 1989). **Human behaviors, attitudes, and economics**, however, are the ultimate drivers of OHV impacts on natural resources (Decker and others, 1996; Vaske and others, 2001); thus, understanding the socioeconomics of OHV use is crucial to the success of any program designed to address OHV effects, whether they impact natural resources or land users. This includes understanding the economic effects—**both benefits and costs**—of OHV management and use on OHV users, other land users, local businesses, land-management agencies, and ecosystem services.

Bight and others (2003) provide a framework and guidelines for conducting social assessments and identifying/organizing social science data, including measurable indicators (see Chapter 3, p. 21) for use in natural resource planning. Indicators suitable for monitoring the socioeconomic implications of OHV use (human behaviors, attitudes, and economics) may be identified through stakeholder interviews, focus groups, and surveys (mail or telephone); economic assessments; and developing maps depicting areas used for different forms and intensities of recreation (Massachusetts Department of Environmental Management, 1995; Decker and others, 1996; Stokowski and LaPointe, 2000; Nelson and Lynch, 2001; Dillman, 2007). For example, interviews can be designed to elucidate not only OHV impacts on all types of user experiences, but also ways in which those impacts might be mitigated. Trail openings or closures may affect levels of OHV user demand and satisfaction, which could be identified through well-designed survey questions that target OHV users (see Dillman 2007).

Likewise, understanding the effects of OHV site development and regulation compliance first requires monitoring where OHV users like to go and what their preferences are when riding. For example, Nelson and Lynch (2001) conducted a study to determine the effectiveness of OHV areas, the approaches for which included a survey of licensed OHV riders, interviews with key stakeholders about project management, and an assessment of the signs established to identify designated OHV trails. Monitored over time, these indicators could be used as guidelines for adaptive management. Finally, identifying the economic impacts associated with OHV activities and regulations potentially affecting nearby communities may entail economic analyses of businesses and services that cater to outdoor recreators (including OHV users and non-motorized recreators; English and others, 2001). Economic assessments also may be used to determine the financial effects associated with losing ecosystem services, regulation enforcement, resource restoration, and other potential costs of OHV use.

A potentially powerful tool for identifying socioeconomic effects of OHV use would be GIS applications (Massachusetts Department of Environmental Management, 1995; Stokowski and LaPointe, 2000; Kopperoinen and others, 2004). For example, areas considered by recreators as being most important for excluding motorized forms of recreation could be identified by users on a map and then used to develop time-series GIS data layers that illustrate long-term changes in preferences pertaining to land-management actions or other factors. Overlaid with maps that identify areas ecologically most suitable for OHV use, managers also could determine which areas are most likely to be resilient to OHV use and provide OHV user satisfaction.

BLM_0061716

# 4.0 Mitigation and Site-Restoration Techniques

## 4.1 Summary

Mitigation of OHV effects and restoration of OHV-impacted sites requires a range of approaches and techniques. Social science in particular has strong applicability for ameliorating the effects of OHV activities, not only in terms of their impacts on non-motorized recreators and other OHV users, but also in terms of their effects on natural resources, as ultimately human behavior is what drives OHV use and related behaviors. Important tools for managing OHV use, therefore, include not only interviews, surveys, and focus groups, but also strong educational campaigns. Once impacted by OHV use, however, ecosystems may need to be closed and rested, if not restored. Sites with severely compacted soils and/or bedrock exposures due to erosion may need restoration through importation of native soils, scarification, decompaction, stabilization, inoculation with microbes and mycorrhizae, and/or mulching before reseeding and/or planting can be done.

## 4.2 Mitigation and Site-Restoration Techniques

The OHV literature has addressed many effects of both motorized and non-motorized recreation on components of ecosystem health (Cole, 2004; Stokowski and LaPointe, 2000; Cline and others, 2007), including soils, vegetation and habitat, wildlife behavior and population dynamics, and the quality of water and air. Resource degradation and wildlife disturbance are not uniform, however. Factors influencing the extent and degree of impact include user types and behaviors, the environment's resistance and resilience, and the timing, intensity, and distribution of use (Cole, 2004). Therefore, management and mitigation planning and implementation must take these factors into consideration.

### 4.2.1 Understanding Land User Preferences and Conflicts

Although addressing ecosystem degradation and user conflicts stemming from OHV use generally requires policy and management considerations (Vancini, 1989), there is the likelihood that one group or another will be dissatisfied with the outcome of any one management decision. Therefore, it is important to promote acceptance of, if not support for, management decisions prior to implementation, because those not accepted are likely to fail in the long run, regardless of how sound the reasoning is behind them (Shindler and others, 2004). One way to potentially improve policy acceptability is to identify, assess, and include all users who may be affected by management decisions and include them in the decision-making process; useful tools for accomplishing this goal include stakeholder and demographic analyses, and arranging stakeholder focus groups (Decker and others, 1996; National Oceanic and Atmospheric Administration, 2005). Basic discussions, such as defining different interpretations of OHV use or seeking consensus on the meaning of OHV use to disparate users, can potentially preclude feelings of marginalization by any given group that could lead to conflict between users and/or between users and managers (Stokowski and LaPointe, 2000).

A baseline understanding of OHV users (including recreators, livestock operators, and energy-development operators) can further help to alleviate conflicts among different users. If users can be classified, even broadly, managers can maximize their efforts by using that information to form relevant management plans and/or communication and education campaigns. For example, understanding the problems that users have with each other, as well as their motivations for recreating, can yield more effective management that placates most, if not

BLM_0061717

all stakeholder groups, and does not lead to marginalization or displacement of any one group. Often, outdoor recreators of all types have fairly similar goals and reasons for participating in outdoor recreation (Schuett and Ostergren, 2003), including a need to "get away" from the pressures and commotion of everyday life, rejuvenation, and enjoyment of the natural environment. Even when the mechanisms by which those needs are met are not homogeneous among user groups, knowledge of stakeholder preferences can help to improve the management of OHV recreation on public lands.

Managing the social effects of OHV activities and promoting compliance with regulations also require determining where OHV users like to go and what their preferences are when riding (Nelson and Lynch, 2001). Likewise, management must consider the levels of environmental dominance and technology associated with different forms of land use. Once again, GIS data layers could be developed to identify spatial management needs and predict where conflicts may occur. For instance, nature study, an activity characterized by "low dependence on technology and low dominance over the environment," and OHV touring, which is characterized by "high dependence on technology and high levels of environmental dominance," need to be segregated spatially to help prevent user conflicts. If it is found on a map grid that two such activities are taking place in adjacent quadrats, there is a high likelihood that recreators who participate in these activities will come into conflict (Bury and others, 1983). Maps of sites suitable for a given activity could be overlaid with user preferences for certain locations or landscape features to further fine-tune planning and mitigation of user conflicts.

Finally, if recreators are made aware of their impacts and understand the implications of those impacts, they may be more willing to take steps that lessen those effects, thereby diminishing the necessary level of managerial monitoring (Vancini, 1989; Anderson and others, 1998). Communication and education campaigns can be difficult, however, due in part to (1) modern-day information overload, increasing the likelihood that recreators will disregard information pertaining to natural resources and recreation, and (2) the fact that managers and designers of education campaigns rarely have a formal knowledge and understanding of persuasion techniques (Absher and Bright, 2004). Assuming that these factors can be surmounted by well-designed educational resources and manager training, education is a crucial first step in alleviating negative perceptions of trail closures and other regulations or management actions. For example, management agencies need to explain the reasons and rationale for closures so that they do not appear arbitrary (Crimmins, 1999). Such educational campaigns may be more successful if they target the many OHV users participating in some other form of outdoor recreation that depends on a healthy ecosystem. Hunting and fishing are two such forms of recreation, and if an OHV area is closed seasonally to protect elk during calving season or fish during spawning season, communicating this to OHV users is likely to elicit more compliance with the closures. When OHV users understand that their hunting and fishing activities may be at stake, they are more likely to respect closures. In closed areas already subjected to high levels of illegal riding, education would be crucial for communicating to users the reasons for the closures and related management actions.

## 4.2.2 Mitigating OHV Use Effects

Lands managed by BLM are placed into one of three broad types pertaining to OHV-use designation: "open," "limited," or "closed." Within the "limited" category there can be several types of limitations: OHVs can be "limited to existing routes," "limited to designated routes," or "limited seasonally" (see *http://www.blm.gov/nhp/news/releases/pages/2000/pr000110_ohv_qa.html*). Indeed, trail/area

BLM_0061718

closures are among the management options available for allowing soils and vegetation to recover from OHV effects or to help preclude localized impacts on air and water quality. However, in areas where OHV effects would be notable with the first few uses and/or generate significant, long-lasting impacts, it would be prudent to consider whether such places are appropriate for OHV use in the first place (Cole and Landres, 1995; Cole, 2004). A well-placed, concentrated system of trails could alleviate the difficulties of enforcement that extend across a large territory (Major, 1987). Spatial models, including GIS data layers, developed for identifying areas most suitable for resisting or recovering rapidly from OHV impacts, or those most suited for concentrated and/or self-monitored OHV use, would be effective tools for establishing OHV sites in appropriate areas and avoiding the need for frequent, long-term closures, expensive restoration actions, and/or the high cost or enforcement monitoring. For example, erosion, sedimentation, and rill or gully formation are much more likely to occur in, and downslope of, OHV-use areas located on or at the top of a slope than in/from a flat site or depressional area lacking watershed outlets. The GIS data layers could, therefore, identify areas to exclude from development for OHV use.

Although trail/area closures may be among the easiest management actions to implement, they may prove difficult to enforce, particularly under a policy of "closed unless posted open." The enforcement difficulty will depend on the number of trails involved, their locations relative to one another, and the number of enforcement personnel available. In the absence of funding for adequately monitoring regulation compliance, educating the public about the effects of their recreational pursuits may prove more economical and yield self-monitored trail users. In areas affected heavily by recreational activities, however, visitor management may be required (Jim, 1989). "Rationing" is a visitor management strategy that can be used to control the number of visitors over a given area where the available recreational resources are finite and/or unique. If the number of visitors is restricted, their quality of experience may be greater; a drawback of this approach is that the benefit is realized by fewer users (see Dimara and Skuras, 1998). Other strategies may include reserving a permit in advance, a permit lottery system, or implementing user fees that reflect the quality of experience (for example, it may cost more to use a high-use area that offers a high-quality experience than a low-use area that offers a low-quality experience). In many cases, these strategies could help alleviate pressures on law enforcement.

Wildlife is affected by OHV recreation in numerous ways, including displacement caused by human disturbance or direct mortality caused by vehicle-animal collisions (Cole and Landres, 1995; Knight and Cole, 1995; Miller, 1998; Stokowski and LaPointe, 2000; Cline and others, 2007). As OHV-related landscape fragmentation increases, habitat area and required juxtapositions of habitat types that meet the different needs of a given species, as well as adequate cover from disturbance, are diminished. Because the resulting effects may be detrimental to individuals and/or local populations (Knight and Cole, 1995), mitigation and management may be required to protect wildlife. One approach for mitigating the effects of wildlife displacement and disturbance may be to control the spatial and/or temporal proximity of OHV activities to wildlife, especially during critical nesting and breeding times (Gutzwiller, 1995). Again, GIS data layers could be very useful for identifying crucial wildlife areas and ensuring that they are not overlapped, fragmented, or otherwise disturbed by OHV-use areas.

## 4.2.3 Restoration of OHV-Impacted Areas

Revegetation of natural communities in arid environments is particularly difficult (Wallace and others, 1980) and studies evaluating revegetation have shown varying degrees of success (Graves and others, 1975, 1978; Kay and Graves, 1983; Grantz and others, 1998); thus,

BLM_0061719

restoration of sites significantly degraded by OHV activity may be needed before sufficient levels of revegetation can take place, particularly if underlying bedrock has become exposed. Webb and others (1978) recommend that soil be imported and stabilized to replace the displaced soil where bedrock has become exposed. Generally, restoring soil horizons for re-establishing microbial communities can be achieved by inoculating soils with native microbes and mycorrhizae (Belnap, 1993; Bolling and Walker, 2000). Bolling and Walker (2000) suggest that decompacting OHV tracks and flattening out the lateral and center berms associated with them may increase the probability of community redevelopment with a more natural surface shape. Recovery of cryptobiotic soils, however, is more complex and may require long periods of time (Wilshire, 1983b; Lovich and Bainbridge, 1999); ultimately, their recovery rate will depend on the degree of soil compaction and the nature and intensity of the initial disturbance (Bolling and Walker, 2000).

To reduce the potential for erosion at restoration sites, it is important to use mulch, stabilization techniques, and/or establish vegetation. Rasor (1976, cited *in* Webb and others, 1978) suggests that ground cover (such as wire netting) be applied across the restoration site to stabilize soils. Kay and Graves (1983) recommend that seeding with local seed stock begin as the disturbance desists. Revegetation techniques also may include container planting (Grantz and others, 1998), hand seeding (Lovich and Bainbridge, 1999), drill seeding (Kay, 1988), and establishment of visually dominant species, such as creosote bush (*Larrea tridentata*; Kay and Graves, 1983).

# 5.0 Monitoring and Research Needs

## 5.1 Summary

More information is needed to help support policy making and land management as they pertain to the natural resources and people affected by OHV policies and management. Research needed to help support policy makers and land mangers includes (but is not limited to)

- well-designed studies that incorporate planned comparisons of treatment (OHV-impacted) and control (unimpacted/reference) sites, as well as "before and after OHV-impact" studies;
- studies at various spatial and temporal scales across all impacted habitat types;
- studies on habitat fragmentation and road-edge effects caused by OHV activities;
- studies on effects of various gradients in OHV disturbance and at varying distances from OHV routes;
- studies of OHV effects on plant and animal population dynamics;
- simultaneous evaluations of wildlife responses and OHV route-specific variables;
- studies to improve knowledge about the physical and chemical dynamics of soil compaction;
- studies evaluating the effects of erosion, sedimentation, and turbidity downslope of OHV-affected sites;
- improvements in techniques for successful site restoration;
- improvements in techniques and technologies for assessing OHV impacts over large areas and long time periods;

BLM_0061720

- studies that evaluate the effectiveness of various techniques to manage OHV use and its ecological and socioeconomic effects while simultaneously providing the greatest satisfaction among all land users; and
- studies that determine the economic and sociological costs of OHV use.

The experimental design of past studies on the ecological effects of OHVs often proved inadequate for providing reliable, defensible results. In particular, use of comparable treatment and control sites with adequate replication has been minimal. To better elucidate OHV effects on wildlife, habitats, and vegetation, there is a need for well-replicated research based on treatments and controls ranging across various spatial and temporal scales within the full range of habitat types represented on BLM lands. In desert ecosystems, for example, the impacts of OHV activities can occur at several spatial and animal temporal scales (Forman and others, 2003: p. 129-134; Matchett and others, 2004; Brooks and Lair, 2005; see discussion in section 2.1); thus, research conducted across the scale(s) at which OHV activities and ecosystem responses are likely to occur will produce the most reliable information about OHV effects on land health and users of the land (Brooks and Lair, 2005). There also is a need for long-term monitoring of OHV effects at both designated OHV sites and undesignated (rogue use) sites, as well as revegetation sites.

Monitoring and research approaches that take advantage, and push the advancement, of existing and emerging technologies are needed to fully represent the scale and diversity of OHV impacts likely affecting plant and animal populations and communities, and to ascertain indicator thresholds as they pertain to BLM's land health standards. Current technologies, including satellite imagery, GPS, and GIS, among others, would be extremely useful in broadening the scope of OHV-impact research from site-based effects to ecosystems and landscapes. Technology also provides opportunities for better assessing OHV effects on wildlife, vegetation, and other natural resources. Finally, multiple assessments and the simultaneous recording of independent and dependent variables would improve overall results and better inform management decisions.

## 5.2 Monitoring and Research Needs

Remaining questions about effects of OHVs on ecosystems and people are numerous and varied. Information regarding management approaches for sustaining or restoring resources—from the level of single OHV routes to entire landscapes—to pre-disturbance conditions while still providing for quality OHV experiences is especially sparse. Therefore, the need for solid, well-designed research for supporting management decisions cannot be understated. Based on major unresolved issues and questions raised in the OHV impacts literature, current research needs include (but are not limited to)

- well-designed research capable of producing scientifically sound results by incorporating planned comparisons of treatment (OHV-impacted) and control (unimpacted/reference) sites, as well as studies that take advantage of opportunities to compare "before and after OHV-impacts" at sites that may be slated for—but are not yet impacted by—OHV use;
- studies to evaluate OHV effects on natural resource attributes at various spatial and temporal scales, particularly those appropriate for evaluating and understanding effects occurring at watershed, landscape, and plant and animal population levels;
- studies to improve the overall understanding of habitat fragmentation and road-edge effects caused by OHV activities in OHV-impacted habitat types;

56

BLM_0061721

- studies that evaluate effects of OHV activities at various gradients in OHV disturbance levels and at varying distances from OHV routes;
- studies to evaluate how OHV activities and habitat fragmentation affect plant and animal population dynamics;
- simultaneous evaluations of wildlife responses (from individual- to population-level scales) and route-specific variables, including route type and width, and the intensity, noise levels, and speed of traffic;
- studies to improve the understanding of the physical and chemical dynamics, as well as the consequences, of soil compaction, sedimentation, and turbidity downslope of OHV-affected sites;
- improvements in techniques and technologies for assessing OHV impacts over large areas and long periods of time;
- improvements in techniques for successful site restoration;
- studies to determine the economic value of ecosystem goods and services provided by natural resources on or in BLM (and affected) lands and waters; and
- studies to determine the costs of OHV use, including degradation or loss of ecosystem goods and services, loss of supportive constituencies, managing/enforcing regulations of OHV use, and restoring OHV-impacted sites.

## 5.2.1 Scientifically Rigorous Research Projects

Several studies discussed in this document compared areas impacted (treatment) to areas unimpacted (control) by OHVs. Many studies, however, did not compare treatment and control sites, or the control and treatment sites differed with regard to some major factor (for example, other recreation activities, livestock grazing, logging, or energy-development activities) that could have masked true differences pertaining to OHV effects. In other words, controls in research and monitoring programs provide the necessary frame of reference for identifying true effects of the variable(s) of interest; in turn, identifying true effects will better inform management actions. Therefore, among the greatest research needs pertaining to OHV effects on natural resources are scientifically defensible studies based on planned comparisons of OHV-impacted and unimpacted sites that are otherwise similar in terms of soils, topographies, climatic patterns, plant and animal communities, non-motorized activities, and other potentially confounding factors. This is particularly important for developing appropriate threshold indicator values for sustaining current resource conditions or triggering management actions.

An additional approach to research that can provide informative results is to conduct before-and-after comparisons of sites previously unimpacted by OHV use but slated for future OHV use. Although year-to-year variations in climate and plant or animal population cycles can introduce too much variation in ecological before-and-after data to provide statistically meaningful results, this research approach can provide valuable information when conditions are reasonably similar during each phase of the project. Thus, it would be prudent to take advantage of such opportunities as they come up.

Technologies and tools that could prove very useful in study design and site selection pertaining to OHV effects include satellite imaging and GIS. Although they are still advancing rapidly in terms of their capabilities and utilities, they are nonetheless already very helpful in studies ranging from the site to the landscape scale. Satellite imagery can help locate sites with differing extents of OHV activity, and, when rendered into GIS database layers, they can provide opportunities for repeating imagery over time and evaluating landscape-scale changes. U.S.

BLM_0061722

Geological Survey scientists, for example, are currently using these tools and technologies to study the effects of energy-development activities in sage-steppe systems on BLM lands in Wyoming (C. Aldridge, pers. comm.).

## 5.2.2 OHV Effects at Various Spatial and Temporal Scales, Across Habitat Types

Past studies regarding OHV impacts on natural resources have focused primarily on effects at the single route or site level; thus, the overall understanding of landscape-, watershed-, and population-scale effects, including habitat/population fragmentation, is inadequate for managing OHV effects at larger spatial and longer temporal (Boyle and Samson, 1985) scales. Most of what is known pertains to very localized and short-term effects on sub-populations. Even then, past studies evaluating changes in animal densities of sub-populations may have violated basic assumptions of closed-population status. That is, studies that "failed to detect OHV effects on animal densities" may have been confounded by the immigration of new individuals after original individuals experienced poor survivorship due to direct or indirect effects of OHV activities. Mark-recapture studies that take advantage of radio-marking technologies, both in and away from the affected site, can help evaluate the extent to which assumptions of closed versus open populations are upheld or violated.

Research is also needed to better understand the edge effects of roads on different habitats and populations of different species or taxonomic groups. Here again, scale is important. Many past studies have evaluated the effects of traffic in immediately adjacent habitats (road rights-of-way, for example), whereas the effects may be realized well into the habitat interior quite far from travel routes. Thus, study designs that incorporate gradients of distance away from OHV routes or route networks would be crucial.

## 5.2.3 Research Regarding Effects of OHVs on Animal Populations

Many prior studies of OHV impacts on wildlife have focused on indirect indicators of animal population health, such as distribution and behavior, at the expense of more direct indicators, such as population trend/size, gender and age ratios, and productivity. In part, this is because such data can be significantly more difficult and expensive to collect than behavioral and distribution data. Studies that address possible changes in plant and animal genetics in ecosystems fragmented by OHV roads and trails also are needed. For species that naturally occur at low densities, such as the desert tortoise, bighorn sheep (*Ovis canadensis*), and mountain lion, this is particularly important, as isolation of their populations could more easily lead to localized extinctions.

Understanding direct effects of OHV activities on wildlife populations would be further enhanced by research that evaluates wildlife population dynamics in different habitat types (Bury and others, 1977), at different spatial and temporal scales, and under different conditions (levels) of OHV use. Likewise, research programs that incorporate representative and disparate taxonomic groups would help identify ecosystem-level effects. For example, a given habitat-fragmentation factor (a network of OHV routes) might not have any significant impact on large ungulates, but it might lead to complete loss of genetic diversity among flightless invertebrates. In conjunction with this type of research, it would be important to identify which specific environmental and anthropogenic factors promote or limit the exchange of individuals across OHV-impacted habitat types or landscapes.

Few past studies have employed multiple-assessment or simultaneous survey methods to detect rare or sensitive species that may not be detected through standard monitoring techniques, resulting in biases towards more common and easily detected species and an incomplete

BLM_0061723

understanding of the community at risk. For example, multiple survey techniques can be used to determine whether changes in species composition are due to changes in detectability across habitat types, times of day or season, geographical area, and abundance. For detecting reptiles and amphibians, researchers could combine noosing, pitfall sampling, night surveys, and road driving surveys. For mammal studies, track, scat, and camera surveys might enhance species detections. Many avian-ecology researchers now use combinations of road driving, point sampling, and mist netting, in addition to double-observer methods, for improving overall survey results.

Studies of OHV effects on wildlife also could be improved through simultaneous recording of independent and dependent variables. For example, many studies relating effects of OHVs on animal populations also lack any measurements of static and dynamic road- and OHV-related variables—such as width and traffic intensity/noise levels (Andrews, 1990)—that may strongly influence species behavior, distribution, abundance, survivorship, and productivity. Given the importance of relationships between these independent and dependent variables, employing long-term monitoring that incorporates their simultaneous measurement would be very helpful (see Andrews, 1990). This type of information would be particularly useful for identifying indicator thresholds that might trigger area closures, re-routing of OHV routes, and/or implementing a restoration project. A variety of technologies and tools now available would be useful in these endeavors, including satellite telemetry, Global Positioning Systems (GPS), infrared photography, pneumatic vehicle counters, and so on.

Finally, there are a number of specific questions that researchers could ask with respect to OHV effects on animal populations. For example, the discussion in section 2.3.3 regarding edge effects of OHV routes raises the question of whether high densities of animals in roadside habitats represent favorable conditions for native fauna or dominance by invasive or non-native organisms and, if the former, whether these habitats are population sources or sinks (see Van Horne, 1983).

## 5.2.4 Research to Determine Socioeconomic Costs Associated with OHV Use

The literature search conducted for this report yielded no published studies of the economic costs associated with OHV use. Costs could include the degradation or loss of crucial ecosystem goods and services (such as a decline in water quality due to accelerated sedimentation and increased turbidity in wetlands caused by OHV traffic, or the loss of livestock and wildlife forage due to soil compaction caused by OHV traffic), the loss of economic and political support from both OHV users and non-motorized constituencies whose recreation experiences (or other land uses) are degraded by OHV effects, and the costs of managing OHV recreation and restoring sites impacted by OHV traffic. Although the costs of OHV effects may be challenging to assess, there are efforts underway to first identify the economic values of ecosystem goods and services and factor them into economic analyses of human activities. For example, Ducks Unlimited Canada and The Nature Conservancy have co-published a report that calls for the immediate acceleration of "efforts to measure, protect, and enhance the natural capital of Canada," including the need to "invest in science to measure, value, and monitor ecological goods and services, and develop economic instruments that recognize and protect natural capital, rather than continue to reward its destruction" (Olewiler, 2004). A companion report details the values of goods and services provided by wetlands (Gabor and others, 2004). Similar efforts to place a value on the goods and services provided by lands affected by OHV activities would provide the necessary basis for balancing economic equations of OHV use.

BLM_0061724

### 5.2.5 Research to Improve Site Restoration

The success of site restoration ultimately depends on the ability to return soils, including abiotic crusts and desert pavement, vegetation, and biotic crusts to their original condition. Therefore, research is needed to study the mechanisms behind, and mitigation that could diminish, changes in soils. Adams and others (1982) called for research on the disproportionate hardening of only slightly compacted desert soil and whether soil hardening is caused by chemical cementation or by a greater number of interstitial water bonds remaining between soil particles after drying. Webb and others (1978) called for studies that explore the amount of time required for soils to respond to revegetation of OHV sites and develop ways of mitigating changes in soil properties during OHV use. More recently, Bolling and Walker (2000) expressed the need for long-term monitoring and analysis of soil microbial populations. Answers to these and other important questions that elucidate the ways in which systems recover from the effects of OHVs are crucial to the possibility of long-term OHV use without incurring irreparable damage to ecosystems.

# 6.0 Conclusion

It is apparent from the literature identified and discussed herein that the effects of OHV activities on ecosystems are diverse and potentially profound, if poorly understood. Studies have revealed a variety of effects on soil properties, watersheds, and vegetation resulting from one to multiple passes by OHV vehicles. Likewise, research has shown a variety of OHV effects on both OHV users and non-motorized recreators. Considerably less is known about impacts to wildlife or air and water quality. Whereas the results of past OHV-effects research have been reasonably consistent in demonstrating the nature of OHV effects in the immediate vicinity of single trails and OHV sites, there is a need for stronger emphasis on the cumulative effects—both spatial and temporal—of OHV use. For example, the effects of a single OHV route on a watershed may be greater when it is part of a route network than when it is the only route within the watershed. Furthermore, a network of OHV routes is likely to accommodate more users than a single route. Therefore, route density is an important consideration when evaluating and monitoring OHV effects across a given landscape.

The Council on Environmental Quality's (CEQ) regulations for implementing the National Environmental Policy Act define a cumulative impact as "…the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions" (Council on Environmental Quality, 1997). In other words, cumulative impacts can result from what may appear on small spatial or temporal scales to be minor, but which become collectively significant when such actions take place over large areas and long periods of time. Moreover, one effect may interact with other effects to generate additional effects that are not apparent when evaluating effects individually.

The concept of cumulative impacts as they relate to OHV activity, therefore, must be applied in a landscape context, as these impacts are not site-specific and may affect adjacent or even more remote habitats and landscapes. For example, dust created from OHV activities can be dispersed to areas far away from habitats directly impacted by OHV activities. Likewise, erosion of soils during heavy rain events may increase sedimentation far downstream of areas directly subjected to OHV activities, and edge or corridor effects of OHV routes may promote widespread dispersal of non-native and invasive species. Thus, there is a need for greater

BLM_0061725

monitoring and research emphasis on the effects of OHV activities not only in the areas directly subjected to those activities, but across impacted habitat types, watersheds, and landscapes. Overall, monitoring of cumulative impacts is needed at a scale larger than the physical imprint of the OHV-use area. By the same token, economic analyses of OHV use are needed to account for not only the immediate and apparent economic benefits, but also the long-term, large-scale, and ongoing costs associated with OHV use. Without factoring these variables into models of economic impacts, true cost:benefit ratios of OHV use will remain unknown.

# 7.0 Literature Cited

Absher, J. D., and Bright, A. D., 2004, Communication research in outdoor recreation and natural resources management, *in* Manfredo, M.J., Vaske, J.J., Bruyere, B.L., Field, D.R., and Brown, P.J., eds., Society and Natural Resources—A summary of knowledge: Jefferson, Missouri, Modern Litho, p.117–126.

Achana, F., 2005, 2005 ATV/motorbike user survey: Boise, Idaho, Idaho Department of Parks and Recreation, Report, 37 p.

Adams, E.S., 1975, Effects of lead and hydrocarbons from snowmobile exhaust on brook trout (*Salvelinus fontanlis*): Transactions of the American Fisheries Society, v. 104, no. 2, p. 363–373.

Adams, J.A., Endo, A.S., Stolzy, L.H., Rowlands, P.G., and Johnson, H.B., 1982, Controlled experiments on soil compaction produced by off-road vehicles in the Mojave Desert, California: Journal of Applied Ecology, v. 19, no. 1, p. 167–175.

Adams, L.W., and Geis, A.D., 1983, Effects of roads on small mammals: Journal of Applied Ecology, v. 20, no. 2, p. 403–415.

American Motorcyclist Association, 1979, The economic impact of off-highway motorcycling in southern California and Mexico: Westerville, Ohio, Department of Government Relations, Technical Report, 14 p.

Amezketa Lizarraga, E., Gazol Lostao, R., and Aragues Lafarga, R., 2002, Development of an automated infiltrometer and its applicability to the field: Investigacion Agraria Produccion y Proteccion Vegetales, v. 17, no. 1, p. 131–142.

Anderson, D.H., Lime, D, W., and Wang, T.L., 1998, Maintaining the quality of park resources and visitor experiences—A handbook for managers: St. Paul, Minnesota, University of Minnesota Extension Tourism Center, TC-777, 149 p.

Andrews, A., 1990, Fragmentation of habitat by roads and utility corridors—A review: Australian Zoologist, v. 26, p. 130–141.

Angold, P.G., 1997, The impact of a road upon adjacent heathland vegetation—Effects on plants species composition: Journal of Applied Ecology, v. 34, no. 2, p. 409–417.

BLM_0061726

Arnold, J.L., and Koel, T.M., 2006, Effects of snowmobile emissions on the chemistry of snowmelt runoff in Yellowstone National Park—Final report: Yellowstone National Park, Wyoming, Report YCR-2006-1, Fisheries and Aquatic Sciences Section, Center for Resources, available on the Internet at *http://www.nps.gov/yell/planyourvisit/upload/snmbsnowmelt.pdf* (accessed April 2007).

Ashley, E.P., and Robinson, J.T., 1996, Road mortality of amphibians, reptiles, and other wildlife on the Long Point Causeway, Lake Erie, Ontario: The Canadian Field-Naturalist, v. 110, p. 403–412.

Bakowski, C., and Kozakiewicz, M., 1988, The effect of forest road on bank vole and yellow-necked mouse populations: Acta Theriologica, v. 33, no. 12–25, p. 345–353.

Barrett, H., Cagney, J., Clark, R., Fogg, J., Gebhardt, K., Hansen, P.L., Mitchell, B., Prichard, D., and Tippy, D., 1995, Riparian area management—Process for assessing proper functioning condition: Denver, Colorado, U.S. Bureau of Land Management, Technical Reference 1737-9, BLM/SC/ST-93/003 + 1737 +REV95.

Bashore, T.L., Tzilkowski, W.M., and Bellis, E.D., 1985, Analysis of deer-vehicle collision sites in Pennsylvania: Journal of Wildlife Management, v. 49, no. 3, p. 769–774.

Baur, A., and Baur, B., 1990, Are roads barriers to dispersal in the land snail *Arianta arbustorum*?: Canadian Journal of Zoology, v. 68, no. 33, p. 613–617.

Bazzaz, F.A., and Garbutt, K., 1988, The response of annuals in competitive neighborhoods— Effects of elevated $CO_2$: Ecology, v. 69, no. 4, p. 937–946.

Beier, P., 1993, Determining minimum habitat areas and habitat corridors for cougars: Conservation Biology, v. 7, no. 11, p. 94–108.

Belnap, Jayne, 1993, Recovery rates of cryptobiotic crusts—Inoculant use and assessment methods: Great Basin Naturalist, v. 53, no. 1, p. 89–95.

Belnap, Jayne, 2002, Impacts of off-road vehicles on nitrogen cycles in biological soil crusts— Resistance in different U.S. deserts: Journal of Arid Environments, v. 52, no. 2, p. 155–165.

Belnap, Jayne, and Gardner, J.S., 1993, Soil microstructure in soils of the Colorado Plateau— The role of the cyanobacterium *Microcoleus vaginatus*: Great Basin Naturalist, v. 53, no. 1, p. 40–47.

Benson, P.E., Nokes, W.A., Cramer, R.L., O'Connor, J., Lindeman, W., 1986, Air-quality and noise issues in environmental planning: Washington, D.C., Transportation Research Board and National Research Council Technical Report, 72 p., *http://www.osti.gov/energycitations/product.biblio.jsp?osti_id=7172765*.

BLM_0061727

Berry, K.H., 1980a, A review of the effects of off-road vehicles on birds and other vertebrates, *in* DeGraaf, R.M., and Tilghman, N.G., eds., Management of western forests and grasslands for nongame birds—Workshop proceedings, Salt Lake City, Utah, February 11-14, 1980: Ogden Utah, U.S. Forest Service, Intermountain Forest and Range Experiment Station, General Technical Report INT–86, p. 451–467.

Berry, K.H., 1980b, The effects of four-wheel vehicles on biological resources, *in* Andrews, R.N.L., and Nowak, P., eds., Off-road vehicle use—A management challenge: Washington, D.C., U.S. Office of Environmental Quality, p. 231-233.

Berry, K.H., Shields, T., Woodman, A.P., Campbell, T., Roberson, J., Bohuski, K., and Karl, A., 1986, Changes in desert tortoise populations at the Desert Tortoise Research Natural Area between 1979 and 1985, Desert Tortoise Council proceedings of symposium, Palmdale, California, March 22-24, 1986: Desert Tortoise Council, p. 100–123.

Bight, A.D., Coredell, H.K., Hoover, A.P., and Tarranr, M.A., 2003, A human dimensions framework—Guidelines for conducting social assessments: Asheville, North Carolina, U.S. Forest Service, Southern Research Station, 83 p.

Boarman, W.I., Beigel, M.L., Goodlett, G.C., and Sazaki, M., 1998, A passive integrated transponder system for tracking animal movements: Wildlife Society Bulletin, v. 26, no. 4, p. 886–891.

Boarman, W.I., and Sazaki, M., 1996, Highway mortality in desert tortoises and small vertebrates—Success of barrier fences and culverts, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Trends in addressing transportation related wildlife mortality—Proceedings of the transportation related wildlife mortality seminar, Orlando, Florida, April 30–May 2, 1996: Tallahassee, Florida, State Department of Transportation, Report no. FL-ER-58-96, *http://www.icoet.net/ICOWET/96proceedings.asp.*

Boarman, W.I., Sazaki, M., Berry, K.H., Goodlett, G.O., Jennings, W.B., and Woodman, A.P., 1993, Measuring the effectiveness of a tortoise-proof fence and culverts—Status report from first field season, Proceedings of the Desert Tortoise Council: Desert Tortoise Council, p. 126–142

Boarman, W.I., Sazaki, M., and Jennings, W.B., 1997, The effects of roads, barrier fences, and culverts on desert tortoise populations in California, USA, *in* Abbeema, J.V., ed., Proceedings—Conservation, restoration, and management of tortoises and turtles—An international conference, State University of New York, Purchase, New York, July 1993: Orange, New Jersey, New York Turtle and Tortoise Society, p. 54–58.

Boer Leffe, W. J., 1958, De entomologische waarde van eiken-berkenbos: De Levende Natuur, v. 61, p. 97-102.

Bolling, J.D., and Walker, L.R., 2000, Plant and soil recovery along a series of abandoned desert roads: Journal of Arid Environments, v. 46, no. 11, p. 1–24.

63

BLM_0061728

Bowles, A.E., 1995, Responses of wildlife to noise, *in* Knight, R.L., and Gutzwiller, K.J., eds., Wildlife and recreationists—Coexistence through management and research: Washington, D.C., Island Press, p. 109–156.

Boyle, S.A., and Samson, F.B., 1985, Effects of nonconsumptive recreation on wildlife—A review: Wildlife Society Bulletin, v. 13, p. 110–116.

Brattstrom, B.H., and Bondello, M.C., 1983, Effects of off-road vehicle noise on desert vertebrates, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 167–206.

Brody, A.J., and Pelton, M.R., 1989, Effects of roads on black bear movements in western North Carolina: Wildlife Society Bulletin, v. 17, p. 5–10.

Brooks, J.J., and Champ, P.A., 2006, Understanding the wicked nature of "unmanaged recreation" in Colorado's Front Range: Environmental Management, v. 38, no. 5, p. 784–798, *http://www.springerlink.com/content/ek62272u626u6074/fulltext.pdf.*

Brooks, M.L., 1995, Benefits of protective fencing to plant and rodent communities of the western Mojave Desert, California: Environmental Management, v. 19, no. 1, p. 65–74.

Brooks, M.L., 1999, Effects of protective fencing on birds, lizards, and black-tailed hares in the western Mojave Desert: Environmental Management, v. 23, no. 3, p. 387–400.

Brooks, M.L., and Lair, Bridget, 2005, Ecological effects of vehicular routes in a desert ecosystem: Henderson, Nevada, U.S. Geological Survey, Western Ecological Research Center, Las Vegas Field Station, Technical Report, 23 p., *http://www.dmg.gov/documents/Desert_Road_Ecology_report.pdf* (accessed April 4, 2006).

Bruinderink, G.W.T.A., and Hazebroek, E., 1986, Ungulate traffic collisions in Europe: Conservation Biology, v. 10, no. 4, p. 1059–1067.

Bury, R.B., 1980, What we know and do not know about off-road vehicle impacts on wildlife, *in* Andrews, R.N.L., and Nowak, P., eds., Off-road vehicle use—A management challenge: Washington, D.C., U.S. Office of Environmental Quality, p. 110–122.

Bury, R.B., and Luckenbach, R.A., 1986, Abundance of desert tortoises (*Gopherus agassizii*) in natural and disturbed habitats: Fort Collins, Colorado, U.S. Fish and Wildlife Service, unpublished draft report.

Bury, R.B., Luckenbach, R.A., and Busack, S.D., 1977, Effects of off-road vehicles on vertebrates in the California desert USA: Washington, D.C., U.S. Fish and Wildlife Service, Wildlife Research Reports no. 8, p. 1–23.

BLM_0061729

Bury, R.L., and Fillmore, E.R., 1974, Design of motorcycle areas near campgrounds—Effects on riders and non riders: College Station, Texas, Department of Recreation and Parks, Texas A & M University, Technical Report, 72 p.

Bury, R.L., Holland, S.M., McEwen, D.N., 1983, Analyzing recreational conflict—Understanding why conflict occurs is requisite to managing that conflict: Journal of Soil and Water Conservation, v. 3, no. 5, p. 401-403.

Busack, S.D., and Bury, R.B., 1974, Some effects of off-road vehicles and sheep grazing on lizard populations in the Mojave Desert: Biological Conservation, v. 6, no. 3, p. 179–183.

Byrd, D.S., Gilmore, J.T., and Lea, R.H., 1983, Effect of decreased use of lead in gasoline on the soil of a highway: Environmental Science and Technology, v. 17, p. 121–123.

Caldewell, T.G., McDonald, E.V., and Young, M.H., 2006, Soil disturbance and hydrologic response at the National Training Center, Fort Irwin, California: Journal of Arid Environments, v. 67, no. 3, p. 456-472.

Clark, W.D., and Karr, J.R., 1979, Effects of highways on red-winged blackbird and horned lark populations: The Wilson Bulletin, v. 91, p. 143–145.

Clevenger, A.P., 1998, Permeability of the Trans-Canada Highway to wildlife in Banff National Park—Importance of crossing structures and factors influencing their effectiveness, in Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 109–119.

Cline, R., Sexton, Natalie, and Stewart, S.C., 2007, A human-dimensions review of human-wildlife disturbance—A literature review of impacts, frameworks, and management solutions: Fort Collins, Colorado, U.S. Geological Survey, Open-File Report 2007-1111, 91 p.

Cole, D.N., 1990, Trampling disturbance and recovery of cryptogamic soil crusts in Grand Canyon National Park: Great Basin Naturalist, v. 50, no. 4, p. 321–325.

Cole, D.N., 2004, Environmental impacts of outdoor recreation in wildlands, in Manfredo, M.J., Vaske, J.J., Bruyere, B.L., Field, D.R., and Brown, P.J., eds., Society and natural resources—A summary of knowledge: Jefferson, Missouri, Modern Litho, p. 107–116.

Cole, D.N. and Landres, P.B., 1995, Indirect effects of recreation on wildlife, in Knight, R.L., and Gutzwiller, K.J., eds., Wildlife and recreationists—Coexistence through management and research: Washington, D.C., Island Press, p. 183–202.

BLM_0061730

Committee on Rangeland Classification, Board on Agriculture, and National Research Council, 1994, Rangeland Health—New methods to classify, inventory, and monitor rangelands: Washington, D.C., National Academy Press.

Cordell, H.K., Betz, C.J., Green, G., and Owens, M., 2005, Off-highway vehicle recreation in the United States, regions, and states—A national report from the national survey on recreation and the environment (NSRE): U.S. Forest Service, Southern Research Station, Technical Report, 90 p., *http://www.srs.fs.usda.gov/pubs/21307*.

Cotts, N.R., Redente, E.F., and Schiller, R., 1991, Restoration methods for abandoned roads at lower elevations in Grand Teton National Park, Wyoming: Arid Soil Research and Rehabilitation, v. 5, p. 235–249.

Council on Environmental Quality, 1997, Considering cumulative effects under the National Environmental Policy Act: Washington, D.C., Council of Environmental Quality, Technical Report, *http://www.nepa.gov/nepa/ccenepa/ccenepa.htm*.

Crimmins, T., 1999, Colorado off-highway vehicle user survey—Summary of results: Denver, Colorado, Colorado State Parks, Technical Report, *http://www.outdoorlink.com/amtrails/resources/motors/motCoOHVsurvey/html*.

Daines, R.H., Motto, H., and Chilko, D.M., 1970, Atmospheric lead—Its relationship to traffic volume and proximity to highways: Environmental Science and Technology, v. 4, no. 4, p. 318–322.

Dave Miller Associates, 1981, An economic/social assessment of snowmobiling in Maine: Windham, Maine, Dave Miller Associates, Technical Report, 52 p.

Davidson, E.D., and Fox, M., 1974, Effects of off-road motorcycle activity on Mojave Desert vegetation and soil: Madroño, v. 22, no. 8, p. 381–390.

Dean Runyan Associates, 2000, Campers in California travel patterns and economic impacts: Portland, Oregon, Dean Runyan Associates, Technical Report, 76 p.

Decker, D.J., Krueger, R.A., Bauer, Jr., R.A., Knuth, B.A., and Richmond, M.E., 1996, From clients to stakeholders—A philosophical shift for fish and wildlife management: Human Dimensions of Wildlife, v. 1, no. 1, p. 70-82.

Dhindsa, M.S., Sandhu, J.S., Sandhu, P.S., and Toor, H.S., 1988, Roadside birds in Punjab (India)—Relation to mortality from vehicles: Environmental Conservation, v. 15, no. 4, p. 303–310.

Dillman, D.A., 2007, Mail and telephone surveys—The tailored design method: New York, John Wiley & Sons, 375 p.

BLM_0061731

Dimara, E., and Skuras, D., 1998, Rationing preferences and spending behavior of visitors to a scarce recreational resource with limited carrying capacity: Land Economics, v. 74, no. 3, p. 317-327.

Dobson, A., Ralls, K., Foster, M., Soulé, M.E., Simberloff, D., Doak, D., Estes, J.A., Mills, L.S., Mattson, D., Dizro, R., Arita, H., Ryan, S., Norse, E.A., Noss, R.F., and Johns, D., 1999, Connectivity—Maintaining flows in fragmented landscapes, *in* Soulé, M.E., and Terborgh, J., eds., Continental Conservation—Scientific foundations of regional reserve networks: Washington, D.C., Island Press, p. 129–170.

Gabor, T.S., North, A.K., Ross, L.C.M., Anderson, J.S., and Raven, M., 2004, Natural values— The importance of wetlands and upland conservation practices in watershed management: Stonewall, Manitoba, Ducks Unlimited Canada. Available online at *http://www.ducks.ca/conserve/wetland_values/pdf/nvalue.pdf.*

Eckert, R.E.J., Wood, M.K., Blackburn, W.H., and Peterson, F.F., 1979, Impacts of off-road vehicles on infiltration and sediment production of two desert soils: Journal of Range Management, v. 32, no. 5, p. 394–397.

English, B., Menard, J., and Jensen, K., 2001, Estimated economic impacts of off-highway vehicle special events: Knoxville, Tennessee, Agri-Industry Modeling and Analysis Group, Department of Agricultural Economics, University of Tennessee, *http://aimag.ag.utk.edu/pubs/ohveventimpacts.pdf* (accessed May, 2007).

Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., 1996, Trends in addressing transportation related wildlife mortality—Proceedings of the transportation related wildlife mortality seminar, Orlando, Florida, April 30–May 2, 1996: Tallahassee, Florida, State Department of Transportation, Report no. FL-ER-58-96, *http://www.icoet.net/ICOWET/96proceedings.asp.*

Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., 1998, Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98.

Ewert, A., and Shultis, J., 1999, Technology and backcountry recreation—Boon to recreation or bust for management?: Technology and Leisure, v. 70, no. 8, p. 23–31.

Falkengren-Grerup, U., 1986, Soil acidification and its impact on ground vegetation: Oecologia, v. 70, p. 339–347.

Feldhammer, G.A., Gates, J.E., Harman, D.M., Loranger, A.J., and Dixon, K.R., 1986, Effects of interstate highway fencing on white-tailed deer activity: Journal of Wildlife Management, v. 50, no. 497–503.

Ferris, R., and Taylor, G., 1995, Contrasting effects of elevated $CO_2$ and water deficit on two native herbs: New Phytologist, v. 131, no. 4, p. 491–501.

BLM_0061732

Fisher, A.L., Blahna, D.J., and Bahr, R., 2001, Off-highway vehicle uses and owner preferences in Utah: Logan, Utah, Institute for Outdoor Recreation and Tourism, Department of Forest Resources, Utah State University, Report no. IORT PR2001–02, 80 p.

Flint, A.L., and Childs, S., 1984, Development and calibration of an irregular hole bulk density sampler: Soil Science Society of America Journal, v. 48, no. 2, p. 374–378.

Folz, R.B., 2006, Erosion from all terrain vehicle (ATV) trails on National Forest lands (abs.): St. Joseph, Michigan, Proceedings of the 2006 American Society of Agricultural and Biological Engineers, *http://asae.frymulti.com/abstract.asp?aid=21056&t=2.*

Forman, R.T.T., and Alexander, L.E., 1998, Roads and their major ecological effects: Annual Review of Ecology and Systematics, v. 29, p. 207–231.

Forman, R.T.T., Sperling, D., Bissonette, J.A., Clevenger, A.P., Cutshall, C.D., Dale, V.H., Fahrig, L., France, R., Goldman, C.R., Heanue, K., and others, 2003, Road ecology—Science and solutions: Washington, D.C., Island Press, 481 p.

Foster, M.L., and Humphrey, S.R., 1995, Use of highway underpasses by Florida panthers and other wildlife: Wildlife Society Bulletin, v. 23, no. 1, p. 95–100.

Fox, D.G., 1986, Establishing a baseline/protocols for measuring air quality effects in wilderness: U.S. Forest Service, Rocky Mountain Forest and Range Experimental Station, Technical Report, 85–91 p.

Froehlich, H.A., Miles, D.W.R., and Robbins, R.W., 1985, Soil bulk density recovery on compacted skid trails in central Idaho: Soil Science Society of America Journal, v. 49, p. 1015–1017.

Furniss, M.J., Flanagan, S.A., and McFadin, B.A., 2000, Hydrologically connected roads—An indicator of the influence of roads on chronic sedimentation, surface water hydrology, and exposure to toxic chemicals: U.S. Forest Service, Stream Systems Technology Center, Rocky Mountain Research Station, Technical Report, 4 p., *http://www.stream.fs.fed.us/streamnt/jul100/jul100_2.htm.*

Garland, T., and Bradley, W.G., 1984, Effects of a highway on Mojave Desert rodent populations: American Midland Naturalist, v. 111, p. 47–56.

Gibbs, J.P., 1998, Amphibian movements in response to forest edges, roads, and streambeds in southern New England: Journal of Wildlife Management, v. 62, no. 2, p. 584–589.

Gibeau, M.L., and Herrero, S., 1998, Roads, rails, and grizzly bears in the Bow River Valley, Alberta, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida,

BLM_0061733

February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 104–108.

Gilbert, T., and Wooding, J., 1996, An overview of black bear roadkills in Florida 1976–1995, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Trends in addressing transportation related wildlife mortality—Proceedings of the transportation related wildlife mortality seminar, Orlando, Florida, April 30–May 2, 1996: Tallahassee, Florida, State Department of Transportation, Report no. FL-ER-58-96, *http://www.icoet.net/ICOWET/96proceedings.asp*.

Gill, T.E., 1996, Eolian sediments generated by anthropogenic disturbances of playas—Human impacts on the geomorphic system and geomorphic impacts on the human system: Geomorphology, v. 17, no. 1–3, p. 207–228.

Gish, C.D., and Christensen, R.E., 1973, Cadmium, nickel, lead, and zinc in earthworms from roadside soil: Environmental Science and Technology, v. 7, p. 1060–1062.

Graefe, A.R., and Thapa, B., 2004, Conflict in natural resource recreation, *in* Manfredo, M.J., Vaske, J.J., Bruyere, B.L., Field, D.R., and Brown, P.J., eds., Society and natural resources—A summary of knowledge: Jefferson, Missouri, Modern Litho, p. 209–224.

Grant, T.J., 2005, Flat-tailed horned lizards (*Phrynosoma mcallii*)—Population size estimation, effects of off-highway vehicles, and natural history: Fort Collins, Colorado, M.S. thesis, Department of Wildlife Biology, Colorado State University, 84 p., *http://www.warnercnr.colostate.edu/~doherty/Tyler%20Grant%20M.S.%20Thesis_FINAL.pdf*.

Grantz, D.A., Vaughn, D.L., Farber, R., Kim, B., Zeldin, M., Vancuren, T., and Campbell, R., 1998, Seeding native plants to restore desert farmland and mitigate fugitive dust and $PM_{10}$: Journal of Environmental Quality, v. 27, p. 1209–1218.

Graves, W.L., 1978, Revegetation of disturbed sites in the Mojave Desert with native shrubs: California Agriculture, p. 4–5.

Graves, W.L., Kay, B.L., and Williams, W.A., 1975, Seed treatment of Mojave Desert shrubs: Agronomy Journal, v. 67, p. 773–777.

Griffiths, M., and Van Schaik, C.P., 1993, The impact of human traffic on the abundance and activity periods of Sumatran rain forest wildlife: Conservation Biology, v. 7, no. 3, p. 623–626.

Grimes, D.W., Miller, R.J., and Wiley, P.L., 1975, Cotton and corn root development in two field soils of different strength characteristics: Agronomy Journal, v. 67, p. 519–523.

Grimes, D.W., Sheesley, W.R., and Wiley, P.L., 1978, Alfalfa root development and shoot regrowth in compact soil of wheel traffic patterns: Agronomy Journal, v. 70, p. 955–958.

BLM_0061734

Groom, J., McKinney, T., Gant, T., and Winchell, C., 2005, Preliminary 2006 *Astragalus magdalenae* var. *peirsonii* survivorship and demography findings: Carlsbad, California, U.S. Fish and Wildlife Service Field Office, *http://www.fws.gov/carlsbad/Rules/PMV/USFWS%202006%20preliminary%20findings.pdf*.

Grue, C.E., O'Shea, T.J., and Hoffman, D.J., 1984, Lead concentrations and reproduction in highway-nesting barn swallows [*Hirundo rustica*]: Condor, v. 86, no. 4, p. 383–389.

Gutzwiller, K.J., 1995, Recreational disturbances and wildlife communities *in* Knight, R.L., and Gutzwiller, K.J., eds., Wildlife and recreationists—Coexistence through management and research: Washington, D.C., Island Press, p. 169–181.

Hanski, I., 1999, Metapopulation ecology: New York, Oxford University Press, 324 p.

Hanski, I., and Simberloff, D., 1997, The metapopulation approach, its history, conceptual domain, and application to conservation, *in* Hanski, L., Gilpin, M., and Hanski, I., eds., Metapopulation biology—Ecology, genetics, and evolution: San Diego, California, Academic Press, p. 5–26.

Harris, L.D., and Gallagher, P.B., 1989, New initiatives for wildlife conservation—The need for movement corridors, *in* Mackintosh, G., ed., Preserving communities and corridors: Washington, D.C., Defenders of Wildlife, p. 11–34.

Haupt, H.F., 1959, Road and slope characteristics affecting sediment movement from logging roads: Journal of Forestry, v. 57, no. 5, p. 329–339.

Havlick, D.G., 2002, No place distance—Roads and motorized recreation on America's public lands: Washington, D.C., Island Press, 297 p.

Hillel, D., and Tadmor, N., 1962, Water regime and vegetation in central Negev Highlands of Israel: Ecology, v. 43, no. 1, p. 33–41.

Hinckley, B.S., Iverson, R.M., and Hallet, B., 1983, Accelerated water erosion in ORV off-road vehicle-use areas, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 81–96.

Holzapfel, C., and Schmidt, W., 1990, Roadside vegetation along transects in the Judean Desert: Israel Journal of Botany, v. 39, p. 263–270.

Hooks, C.L., and Jansen, I.J., 1986, Recording cone penetrometer developed in reclamation research: Soil Science Society of America Journal, v. 50, no. 1, p. 10–12.

Hudson, N.W., 1971, Soil conservation: Ithaca, New York, Cornell University Press, 320 p.

Huey, L.M., 1941, Mammalian invasion via the highway: Journal of Mammalogy, v. 22, p. 383–385.

BLM_0061735

Hunt, R., Hand, D.W., Hannah, M.A., and Neal, A.M., 1991, Response to $CO_2$ enrichment in 27 herbaceous species: Functional Ecology, v. 5, no. 3, p. 410–421.

Isensee, E., and Luth, H.G., 1992, Continuous recording of soil density: Landtechnik, v. 47, no. 9, p. 449–452.

Iverson, R.M., Hinckley, B.S., and Webb, R.M., 1981, Physical effects of vehicular disturbances on arid landscapes: Science, v. 212, no. 4497, p. 915–917.

Jackson, E.L., and Wong, R.A., 1982, Perceived conflict between urban cross-country skiers and snowmobilers in Alberta: Journal of Leisure Research, v. 14, no. 1, p. 47-62.

Jackson, S.D., and Griffin, C.R., 1998, Toward a practical strategy for mitigating highway impacts on wildlife, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 17–22.

Jacob, G. R., and Schreyer, R., 1980, Conflict in outdoor recreation—A theoretical perspective: Journal of Leisure Research, v. 12, no. 4, p. 368-380.

Jim, C., 1989, Visitor management in recreation areas: Environmental Conservation, v. 16, no. 1, p. 19–32.

Johansen, J.R., 1993, Cryptogamic crusts of semiarid and arid lands of North America: Journal of Phycology, v. 29, no. 22, p. 140–147.

Johansen, K., Coops, N.C., Gergel, S.E., and Stange, Y., 2007, Application of high spatial resolution satellite imagery for riparian and forest ecosystem classification: Remote Sensing of Environment, v. 110, no. 1, p. 29-44.

Johnson, H.B., Vasek, F.C., and Yonkers, T., 1975, Productivity, diversity and stability relationships in Mojave Desert roadside vegetation: Bulletin of the Torrey Botanical Club, v. 102, p. 106–115.

Kaseloo, P.A., and Tyson, K.O., 2004, Synthesis of noise effects on wildlife populations: Office of Research and Technology Services, Federal Highway Administration, Report no. FHWA–HEP–06–016, 67 p.

Kay, B.L., 1988, Artificial and natural revegetation of the second Los Angeles aqueduct: Mojave Revegetation Notes, no. 24, p. 1–3.

BLM_0061736

Kay, B.L., and Graves, W.L., 1983, History of revegetation studies in the California deserts, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 315–324.

Keener, K.M., Wood, R.K., Holmes, R.G., and Morgan, M.T., 1991, Soil strength evaluation of sample cores in a field measurement system: St. Joseph, Michigan, American Society of Agricultural Engineers, ASAE Paper No. 91-1526, 10 p.

Kline, N.C., and Swann, D.E., 1998, Quantifying wildlife road mortality in Saguaro National Park, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 23–31.

Knight, R.L., and Cole, D.N., 1995, Wildlife response to recreationists, *in* Knight, R.L., and Gutzwiller, K.J., eds., Wildlife and recreationists—Coexistence through management and research: Washington, D.C., Island Press, p. 51–69.

Knight, R.L., and Kawashima, J.Y., 1993, Responses of raven and red-tailed hawk populations to linear right-of-ways: Journal of Wildlife Management, v. 57, no. 2, p. 265–271.

Komatsu, M., Kato, A., and Sakamoto, K., 1988, Study on the automatic measurement system of soil parameters. Development of soil hardness sensor: Tottori, Japan, Tottori University, Bulletin of the Faculty of Agriculture, v. 41, p. 39–46.

Kopperoinen, L., Shemeikka, P.J., and Lindblom, V., 2004, Environmental GIS in the management of visitor flows: Helsinki, Finland, Finnish Environment Institute, Working Papers of the Finnish Forest Research Institute 2, *http://www.metla.fi/julkaisut/workingpapers/2004/mwp002-58.pdf.*

Lacey, C.A., Lacey, J.R., Fay, P.K., Storey, J.M., and Zamora, D.L., 1997, Controlling knapweed on Montana rangeland: Bozeman, Montana, Montana State University Extension Service, Circular 311.

Lehnert, M.E., and Bissonette, J.A., 1997, Effectiveness of highway crosswalk structures at reducing deer-vehicle collisions: Wildlife Society Bulletin, v. 25, no. 4, p. 809–818.

Leung, Y.-F., and Meyer, K., 2004, Soil compaction as indicated by penetration resistance—A comparison of two types of penetrometers, *in* Harmon, D., Kilgore, B.M., and Vietzke, G.E. eds., Protecting our diverse heritage—The role of parks, protected areas, and cultural sites, Proceedings of the 2003 George Wright Society / National Park Service Joint Conference: Hancock, Michigan, The George Wright Society, *http://www.georgewright.org/2003proc.html* (accessed April 2007).

Liddle, M.J., 1997, Recreation ecology—The ecological impact of outdoor recreation and ecotourism: London, Chapman and Hall, 666 p.

BLM_0061737

Lightfoot, D.C., and Whitford, W.G., 1991, Productivity of creosotebush foliage and associated canopy arthropods along a desert roadside: American Midland Naturalist, v. 125, no. 2, p. 310–322.

Lindenmayer, D.B., Margules, C.R., and Botkin, D.B., 2000, Indicators of biodiversity for ecological sustainable management: Conservation Biology, v. 14, p. 941-950.

Lisle, T.E., and Eads, R.E., 1991, Methods to measure sedimentation of spawning gravels: Berkeley, California, U.S. Forest Service, Pacific Southwest Research Station, Research Note PSW-411, 7 p., *http://www.fs.fed.us/psw/rsl/projects/water/Lisle91.pdf* (accessed April 2007).

Lovallo, M.J., and Anderson, E.M., 1996, Bobcat (*Lynx rufus*) home range size and habitat use in northwest Wisconsin: American Midland Naturalist, v. 135, no. 2, p. 241–252.

Lovich, J.E., and Bainbridge, D., 1999, Anthropogenic degradation of the southern California desert ecosystem and prospects for natural recovery and restoration: Environmental Management, v. 24, no. 3, p. 309–326.

Lowery, B., and Morrison, J.E., Jr., 2002, Soil penetrometers and penetrability, *in* Dane, J., and Topp, C., eds., Methods of soil analysis, part 4—Physical methods: Madison, Wisconsin, Soil Science Society of America, p. 363–388.

Luckenbach, R.A., 1978, An analysis of off- road vehicle use on desert avifaunas: Transactions of the North American Wildlife and Natural Resources Conference, v. 43, p. 157–162.

Luckenbach, R.A., and Bury, R.B., 1983, Effects of off-road vehicles on the biota of the Algodones Dunes, Imperial County, California, USA: Journal of Applied Ecology, v. 20, no. 1, p. 265–286.

Luo, H.R., Smith, L.M., Allen, B.L., and Haukos, D.A., 1997, Effects of sedimentation on playa wetland volume: Ecological Applications, v. 7, p. 247–252.

Lyren, L., 2001, Movement patterns of coyotes and bobcats relative to roads and underpasses in the Chino Hills area of southern California: Pomona, California, California State Polytechnic University, Pomona, 127 p.

Mader, H.J., 1984, Animal habitat isolation by roads and agricultural fields: Biological Conservation, v. 29, no. 1, p. 81–96.

Major, M.J., 1987, Managing off-the-road vehicles—A recurring round of events: Journal of Forestry, v. 85, no. 11, p. 37-41.

BLM_0061738

Massachusetts Department of Environmental Management, 1995, Report on policy for off-road vehicle use in Massachusetts forests and parks: Boston, Massachusetts, Massachusetts Executive Office of Environmental Affairs.

Matchett, J.R., Gass, L., Brooks, M.L., Mathie, A.M., Vitales, R.D., Campagna, M.W., Miller, D.M., and Weigand, J.F., 2004, Spatial and temporal patterns of off-highway vehicle use at the Dove Springs OHV Open Area, California: Henderson, Nevada, U.S. Geological Survey, Western Ecological Research Center, 17 p., *http://www.werc.usgs.gov/lasvegas/pdfs/Matchett_et_al_2004_Spatial%20and%20Temporal%20Patterns%20of%20off-highway.pdf* (accessed May 2007).

McBrayer, M.C., Mauldon, M., Drumm, E.C., and Wilson, G.V., 1997, Infiltration tests on fractured compacted clay: Journal of Geotechnical and Geoenvironmental Engineering, v. 123, no. 5, p. 469–473.

McCaffery, K.R., 1973, Road-kills show trends in Wisconsin deer populations: Journal of Wildlife Management, v. 37, no. 2, p. 212–216.

Means, D.B., 1999, The effects of highway mortality on four species of amphibians at a small, temporary pond in northern Florida, *in* Evink, G.L., Garrett, P., and Zeigler, D., eds., Proceedings of the third international conference on wildlife ecology and transportation, Missoula, Montana, September 13–16: Tallahassee, Florida, Florida Department of Transportation, Report no. FL-ER-73-99, p. 125–128.

Meffe, G.K., and Carroll, R.C., 1997, Principles of conservation biology: Sunderland, Massachusetts, Sinauer Associates, Inc., 729 p.

Meine, C, 1998, Outdoor recreation in the United States—The quiet explosion, *in* Outdoor recreation—Promise and peril in the new West: Boulder, Colorado, 19th Annual Summer Conference, Natural Resources Law Center, University of Colorado School of Law and the U.S. Bureau of Land Management.

Miller, R.E., Hazard, J., and Howes, S., 2001, Precision, accuracy, and efficiency of four tools for measuring soil bulk density or strength: U.S. Forest Service, Pacific Northwest Research Station, Report no. PNW–RP–532, 16 p.

Miller, S., 1998, Environmental impacts—The dark side of outdoor recreation, *in* Outdoor recreation—Promise and peril in the New West: Boulder, Colorado, 19th Annual Summer Conference, Natural Resources Law Center, University of Colorado School of Law and U.S. Bureau of Land Management.

Mooney, H.A., Kueppers, M., Koch, G., Gorham, J., Chu, C., and Winner, W.E., 1988, Compensating effects to growth of carbon partitioning changes in response to $SO_2$-induced photosynthetic reduction in radish: Oecologia, v. 75, no. 4, p. 502–506.

BLM_0061739

Moore, T.G., and Mangel, M., 1996, Traffic related mortality and the effects on local populations of barn owls *Tyto alba*, *in* Evink, G.L., Garrett, P., Zeigler, D., and Barry, J., eds., Trends in addressing transportation related wildlife mortality—Proceedings of the transportation related wildlife mortality seminar, Orlando, Florida, April 30–May 2, 1996: Tallahassee, Florida, State Department of Transportation, Report no. FL-ER-58-96, *http://www.icoet.net/ICOWET/96proceedings.asp*.

Motto, H.L., Daines, R.H., Chilko, D.M., and Motto, C.K., 1970, Lead in soils and plants—Its relationship to traffic volume and proximity to highways: Environmental Science and Technology, v. 4, p. 231–237.

Mumme, R.L., Schoech, S.J., Woolfenden, G.W., and Fitzpatrick, J.W., 2000, Life and death in the fast lane—Demographic consequences of road mortality in the Florida scrub-jay: Conservation Biology, v. 14, no. 2, p. 501–512.

Munguira, M.L., and Thomas, J.A., 1992, Use of road verges by butterfly and burnet populations, and the effect of roads on adult dispersal and mortality: Journal of Applied Ecology, v. 29, p. 316–329.

Nakata, J.K., 1983, Off-road vehicular destabilization of hill slopes—The major contributing factor to destructive debris flows in Ogden, Utah, 1979, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 343–353.

Nakata, J.K., Wilshire, H.G., and Barnes, G.C., 1976, Origin of Mojave Desert dust plume photographed from space: Geology, v. 4, p. 644–648.

Nelson, C.M., and Lynch, J.A., 2001, A usable pilot off-road vehicle project evaluation: East Lansing, Michigan, Department of Park, Recreation and Tourism Resources, Michigan State University, Technical Report, 50 p.

Nelson, C.M., Lynch, J.A., and Stynes, D.J., 2000, Michigan licensed off-road vehicle use and users 1998–99: East Lansing, Michigan, Department of Park, Recreation and Tourism Resources, Michigan State University, Technical Report, 49 p.

Nicholson, L., 1978, The effects of roads on desert tortoise populations, *in* Trotter, M. (ed.), Proceedings of the 1978 Desert Tortoise Council Symposium, San Diego, California: Desert Tortoise Council, p. 127–129.

Noon, B.R., 2003, Conceptual models in monitoring ecological resources, *in* Busch, D.E., and Trexler, J.C., eds., Monitoring ecosystems—Interdisciplinary approaches for evaluating ecoregional initiatives: Washington, D.C., Island Press, p. 27-71.

Olewiler, N., 2004, The value of natural capital in settled areas of Canada: Stonewall, Manitoba, Ducks Unlimited Canada and the Nature Conservancy of Canada, 36 p. Available online at *http://www.ducks.ca/aboutduc/news/archives/pdf/ncapital.pdf*.

BLM_0061740

O'Sullivan, M.F., and Ball, B.C., 1982, A comparison of five instruments for measuring soil strength in cultivated and uncultivated cereal seedbeds: Journal of Soil Science, v. 33, no. 4, p. 597–608.

Ouren, D.S., and Watts, R.D., 2005, Public access management as an adaptive wildlife management tool: Fort Collins, Colorado, U.S. Geological Survey, Open-File Report 2005-1349, 10 p.

Oxley, D.J., Fenton, M.B., and Carmody, G.R., 1974, Effects of roads on populations of small mammals: Journal of Applied Ecology, v. 11, no. 1, p. 51–59.

Paquet, P., and Callahan, C., 1996, Effects of linear developments of winter movement of gray wolves in the Bow River Valley of Banff National Park, Alberta, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Trends in addressing transportation related wildlife mortality—Proceedings of the transportation related wildlife mortality seminar, Orlando, Florida, April 30–May 2, 1996: Tallahassee, Florida, State Department of Transportation, Report no. FL-ER-58-96, *http://www.icoet.net/ICOWET/96proceedings.asp*.

Parendes, L.A., and Jones, J.A., 2000, Role of light availability and dispersal in exotic plant invasion along roads and streams in the H. J. Andrews Experimental Forest, Oregon: Conservation Biology, v. 14, no. 1, p. 64–75.

Pellant, M., Shaver, P., Pyke, D.A., and Herrick, J.E., 2005, Interpreting indicators of rangeland health, version 4—Technical Reference 1734-6: Denver, Colorado, U.S. Bureau of Land Management, National Science and Technology Center, Report no. BLM/WO/ST-00/001+1734/REV05, 122 pp.

Petersen, T.R., ed., 2006, A road runs through it—Reviving wild places: Boulder, Colorado, Johnson Books, 240 p.

Phillips, A.M., III, and Kennedy, D.J., 2006, Seed bank and survival of Peirson's milkvetch (*Astragalus magdalenae* var. *peirsonii*) in the Algodones Dunes, California, 2005-06, final report prepared for the American Sand Association: Eckert, Colorado, Botanical and Environmental Consulting, 22 p.

Powers, R.F., Tiarks, A.E., and Boyle, J.R., 1998, Assessing soil quality—Practicable standards for sustainable forest productivity in the United States, *in* The contribution of soil science to the development of and implementation of criteria and indicators of sustainable forest management: St. Louis, Missouri, Soil Science Society of America, Inc., p. 53–80.

Prose, D.V., 1985, Persisting effects of armored military maneuvers on some soils of the Mojave Desert: Environmental Geology and Water Sciences, v. 7, no. 3, p. 163–170.

BLM_0061741

Prose, D.V., Metzger, S.K., and Wilshire, H.G., 1987, Effects of substrate disturbance on secondary plant succession—Mojave Desert, California: Journal of Applied Ecology, v. 24, no. 1, p. 305–313.

Quarles, H.D., Hanawalt, R.B., and Odum, W.E., 1974, Lead in small mammals, plants, and soil at varying distances from a highway: Journal of Applied Ecology, v. 11, no. 3, p. 937–949.

Rasor, R., 1976, Fair share: American Motorcycle Association News, August, p. 16–17.

Reed, P., and Haas, G., 1989, Off highway vehicles in Colorado: estimated recreational use and expenditures: Fort Collins, Colorado, Colorado State University, Department of Recreational Resource and Landscape Architecture, 13 p.

Reed, R.A., Johnson-Barnard, J., and Baker, W.L., 1996, Contribution of roads to forest fragmentation in the Rocky Mountains: Conservation Biology, v. 10, no. 4, p. 1098–1106.

Reijnen, R., Foppen, R., Braak, C.T., and Thissen, J., 1995, The effects of car traffic on breeding bird populations in woodland. III. Reduction of density in relation to the proximity of main roads: Journal of Applied Ecology, v. 32, no. 1, p. 187–202.

Reijnen, R., Foppen, R., and Meeuwsen, H., 1996, The effects of traffic on the density of breeding birds in Dutch agricultural grasslands: Biological Conservation, v. 75, p. 255–260.

Reijnen, R., Foppen, R., and Veenbaas, G., 1997, Disturbance by traffic of breeding birds— Evaluation of the effect and considerations in planning and managing road corridors: Biodiversity and Conservation, v. 6, no. 4, p. 567–581.

Ringold, P.L., Mulder, Barry, Alegria, Jim, Czaplewski, R.L., Tolle, Tim, and Burnett, Kim, 2003, Design of an ecological monitoring strategy for the forest plan in the Pacific Northwest, *in* Busch, D.E., and Trexler, J.C., eds., Monitoring ecosystems—Interdisciplinary approaches for evaluating ecoregional initiatives: Washington, D.C., Island Press, p. 73-99.

Rocky Mountain Research Institute, 2002, Off-road vehicles in Colorado—Facts, trends, recommendations: Nederland, Colorado, Rocky Mountain Research Institute.

Romin, L.A., and Bissonette, J.A., 1996, Temporal and spatial distribution of highway mortality of mule deer on newly constructed roads at Jordanelle Reservoir, Utah: Great Basin Naturalist, v. 56, no. 1, p. 1–11.

Rosen, P.C., and Lowe, C.H., 1994, Highway mortality of snakes in the Sonoran Desert of southern Arizona: Biological Conservation, v. 68, no. 22, p. 143–148.

Rudolph, D.C., Burgdorf, S.J., Conner, R.N., and Dickson, J.G., 1998, The impact of roads on the timber rattlesnake, (*Crotalus horridus*), in eastern Texas, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife

BLM_0061742

Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 236–240.

Ruediger, B., 1998, Rare carnivores and highways—Moving into the 21st century, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 10–16.

Samways, M.J., 1989, Insect conservation and landscape ecology—A case-history of bush crickets (Tettigoniidae) in southern France: Environmental Conservation, v. 16, no. 3, p. 217–226.

Sanders, T.G., and Addo, J.Q., 2000, Experimental road dust measurement device: Journal of Transportation Engineering, v. 126, no. 6, p. 530-535.

Schuett, M.A, and Ostergren, D., 2003, Environmental concern and involvement of individuals in selected voluntary associations: Journal of Environmental Education, v. 34, no. 4, p. 30–38.

Seibert, H.C., and Conover, J.H., 1991, Mortality of vertebrates and invertebrates on an Athens County, Ohio [USA], highway: Ohio Journal of Science, v. 91, no. 4, p. 163–166.

Servheen, C., Walker, J., and Kasworm, W., 1998, Fragmentation effects of high-speed highways on grizzly bear populations shared between the United States and Canada, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 97–103.

Shindler, B., Brunson, M.W., and Cheek, K.A., 2004, Social acceptability in forest and range management, *in* Manfredo, M.J., Vaske, J.J., Bruyere, B.L., Field, D.R., and Brown, P.J., eds., Society and natural resources—A summary of knowledge: Jefferson, Missouri, Modern Litho, p. 146–157.

Singer, F.J., 1978, Behavior of mountain goats in relation to US Highway 2, Glacier Park, Montana: Journal of Wildlife Management, v. 42, p. 591–597.

Smith, W.H., 1976, Lead contamination of the roadside ecosystem: Journal of the Air Pollution Control Association, v. 26, p. 753–766.

Spellerberg, I.F., 1998, Ecological effects of roads and traffic—A literature review: Global Ecology and Biogeography Letters, v. 7, no. 5, p. 317–333.

BLM_0061743

Spellerberg, I.F., and Morrison, T., 1998, The ecological effects of new roads—A literature review: Wellington, New Zealand, New Zealand Department of Conservation, Technical Report, 55 p.

Spencer, H.J., and Port, G.R., 1988, Effects of roadside conditions on plants and insects: II. Soil conditions: Journal of Applied Ecology, v. 25, no. 22, p. 709–715.

Stefanov, W.L., Ramsey, M.S., and Christensen, P.R., 2001, Mapping of fugitive dust generation, transport, and deposition in the Nogales, Arizona region using Enhanced Thematic Mapper Plus (ETM+) data: American Geophysical Union, 2001 Spring Meeting, Boston, Massachusetts, May 29–June 2, 2001, abstract no. B32A-10, *http://adsabs.harvard.edu/abs/2001AGUSM...B32A10S* (accessed May 2007).

Stokowski, P.A., and LaPointe, C.B., 2000, Environmental and social effects of ATVs and ORVs—An annotated bibliography and research assessment: Burlington, Vermont, University of Vermont, School of Natural Resources, 32 p., *http://atfiles.org/files/pdf/ohvbibliogVT00.pdf.*

Sullivan, B.K., 1981, Distribution and relative abundance of snakes along a transect in California: Journal of Herpetology, v. 15, no. 2, p. 247–248.

Swihart, R.K., and Slade, N.A., 1984, Road crossing in *Sigmodon hispidus* and *Microtus ochrogaster*: Journal of Mammalogy, v. 65, no. 2, p. 357–360.

Tewes, M.E., and Blanton, D.R., 1998, Potential impacts of international bridges on ocelots and jaguarundis along the Rio Grande wildlife corridor, *in* Evink, G.L., Garrett, P., Zeigler, D., and Berry, J., eds., Proceedings of the International Conference on Wildlife Ecology and Transportation, Fort Myers, Florida, February 10–12, 1998: Tallahassee, Florida, Florida Department of Transportation, Environmental Management Office Report no. FL DOT FL-ER 69-98, p. 135–139.

Thompson, C.R., Kats, G., and Lennox, R.W., 1980, Effects of $SO_2$ and/or $NO_2$ on native plants of the Mojave Desert and Eastern Mojave-Colorado Desert: Journal of the Air Pollution Control Association, v. 30, no. 12, p. 1304–1309.

Thompson, C.R., Olszyk, D.M., Kats, G., Bytnerowicz, A., Dawson, P.J., and Wolf, J.W., 1984, Effects of ozone or sulfur dioxide on annual plants of the Mojave Desert: Journal of the Air Pollution Control Association, v. 34, no. 10, p. 1017–1022.

Trombulak, S.C., and Frissell, C.A., 2000, Review of ecological effects of roads on terrestrial and aquatic communities: Conservation Biology, v. 14, no. 1, p. 18–30.

Tyser, R.W., and Worley, C.A., 1992, Alien flora in grasslands adjacent to road and trail corridors in Glacier National Park, Montana (U.S.A.): Conservation Biology, v. 6, no. 2, p. 253-262.

BLM_0061744

U.S. Bureau of Land Management, 2001, Rangeland health standards handbook H-4180-1, release 4-107: U.S. Bureau of Land Management, 50 p., *http://www.blm.gov/nhp/efoia/wo/handbook/h4180-1.pdf* (accessed April 2007)

U.S. Bureau of Land Management, 2006, Roads and trails terminology: Denver, Colorado, Technical Note 422. U.S. Bureau of Land Management, Technical Notes BLM/WO/ST-06/006, 67 p.

U.S. Bureau of Land Management, 2007, Notice of final action to adopt revisions to the Bureau of Land Management's procedures for managing the NEPA process, chapter 11 of the Department of the Interior's manual part 516: Federal Register, vol. 72, no. 156, part II, p. 45504- 45542.

Udevitz, M.S., Howard, C.A., Robel, R.J., and Curnutte, B., 1980, Lead contamination in insects and birds near an interstate highway, Kansas: Environmental Entomology, v. 9, no. 1, p. 35–36.

van der Zande, A.N., Keurs, W.J., and van der Weijden, W.J., 1980, The impact of roads on the densities of four bird species in an open field habitat—Evidence of a long-distance effect: Biological Conservation, v. 18, no. 4, p. 299–321.

Van Dyke, F.G., Brocke, R.H., and Shaw, H.G., 1986, Use of road track counts as indices of mountain lion presence: Journal of Wildlife Management, v. 50, no. 1, p. 102–109.

Van Horne, Beatrice, 1983, Density as a misleading indicator of habitat quality: Journal of Wildlife Management, vol. 47, no. 4, p. 893–901.

Vancini, F.W., 1989, Policy and management considerations for off-road vehicles—Environmental and social impacts: Ithaca, New York, Cornell University, 19 p.

Vasek, F.C., Johnson, H.B., and Brum, G.D., 1975, Effects of power transmission lines on vegetation of the Mojave Desert: Madroño, v. 23, no. 1, p. 114–130.

Vaske, J. J., Donnelly, M. P., Wittmann, K., and Laidlaw, S., 1995, Interpersonal versus social-values conflict: Leisure Sciences, v. 17, no. 3, p. 205-222.

Vaske, J.J, Fulton, D.C., and Manfredo, M.J., 2001, Human dimensions considerations in wildlife management planning, *in* Decker, D.J., Brown, T.L., and Siemer, W.F., eds., Human Dimensions of Wildlife Management in North America: Bethesda, Maryland, The Wildlife Society, p. 91-108.

Veen, J., 1973, De verstoring van weidevogelpopulaties: Stedeb. en Volkshuisv., 5v. 3, p. 16-26.

von Seckendorff Hoff, K., and Marlow, R., 1997, Highways and roads are population sinks for desert tortoises, *in* New York Turtle and Tortoise Society, Proceedings—Conservation,

BLM_0061745

restoration, and management of tortoises and turtles—An international conference: Orange, New Jersey, New York Turtle and Tortoise Society, p. 482.

Vos, C.C., and Chardon, J.P., 1998, Effects of habitat fragmentation and road density on the distribution pattern of the moor frog *Rana arvalis*: Journal of Applied Ecology, v. 35, no. 1, p. 44–56.

Walker, D.A., and Everett, K.R., 1987, Road dust and its environmental impact on Alaskan taiga and tundra: Arctic and Alpine Research, v. 19, no. 4, p. 479–489.

Wallace, A., Romney, E.M., and Hunter, R.B., 1980, The challenge of a desert: revegetation of disturbed desert lands, *in* Woods, S.L., ed., Great Basin naturalist memoirs—Soil-plant-animal relationships bearing on revegetation and land reclamation in Nevada Deserts: Provo, Utah, Brigham Young University, p. 216–225.

Ward, A.L., 1982, Mule deer behavior in relation to fencing and underpass on Interstate 80 in Wyoming: Transportation Research Record, v. 859, no. 8–13.

Watson, A., Asp, C., Walsh, J. and Kulla, A., 1997, The contribution of research to managing conflict among national forest users: Trends, v. 34, no. 3, p. 29–35.

Webb, R.H., 1982, Off-road motorcycle effects on a desert soil: Environmental Conservation, v. 9, no. 3, p. 197–208.

Webb, R.H., 1983, Compaction of desert soils by off-road vehicles, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 50–79.

Webb, R.H., 2002, Recovery of Severely Compacted Soils in the Mojave Desert, California, USA.: Arid Land Research & Management, v. 16, no. 3, p. 291-305.

Webb, R.H., Ragland, H.C., Godwin, W.H., and Jenkins, D., 1978, Environmental effects of soil property changes with off road vehicle use: Environmental Management, v. 2, no. 3, p. 219–233.

Webb, R.H., and Wilshire, H.G., 1980, Recovery of soils and vegetation in a Mojave desert ghost town, Nevada, U.S.A.: Journal of Arid Environments, v. 3, p. 291–303.

Wemple, B.C., Jones, J., and Grant, G., 1996, Channel network extension by logging roads in two basins, western Cascades, Oregon: Water Resources Bulletin, v. 32, no. 6, p. 1195–1207.

Wheeler, G.L., and Rolfe, G.L., 1979, The relationship between daily traffic volume and the distribution of lead in roadside soil and vegetation: Environmental Pollution, v. 18, p. 265–274.

BLM_0061746

Wilcox, D.A., 1989, Migration and control of purple loosestrife (*Lythrum salicaria* L.) along highway corridors: Environmental Management, v. 13, no. 3, p. 365–370.

Wilkins, K.T., 1982, Highways as barriers to rodent dispersal: Southwestern Naturalist, v. 27, no. 44, p. 459–460.

Wilshire, H.G., 1983a, Off-road vehicle recreation management policy for public lands in the United States—A case history: Environmental Management, v. 7, no. 6, p. 489–499.

Wilshire, H.G., 1983b, The impact of vehicles on desert soil stabilizers, *in* Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 31–50.

Winner, W.E., and Atkinson, C.J., 1986, Absorption of air pollutants by plants and consequences: Trends in Ecology and Evolution, v. 1, p. 15–18.

Yahner, R.H., 1988, Changes in wildlife communities near edges: Conservation Biology, v. 2, no. 4, p. 333–339.

Yahner, R.H., Morrell, T.E., and Rachael, J.S., 1989, Effects of edge contrast on depredation of artificial avian nests: Journal of Wildlife Management, v. 53, no. 4, p. 1135–1138.

Yanes, M., Velasco, J.M., and Suárez, F., 1995, Permeability of roads and railways to vertebrates—The importance of culverts: Biological Conservation, v. 71, no. 33, p. 217–222.

BLM_0061747

# Appendix 1. Extensive Bibliographies

BLM_0061748

## 1.1 OHV Effects on Soils and Watersheds

Adams, J.A., Endo, A.S., Stolzy, L.H., Rowlands, P.G., and Johnson, H.B., 1982, Controlled experiments on soil compaction produced by off-road vehicles in the Mojave Desert, California: Journal of Applied Ecology, v. 19, no. 1, p. 167–175.

Adams, J.A., Stolzy, L.H., Endo, A.S., Rowlands, P.G., and Johnson, H.B., 1982, Desert soil compaction reduces annual plant cover: California Agriculture, v. 36, no. 9–10, p. 6–7.

Agrawal, Y.K., Patel, M.P., and Merh, S.S., 1981, Lead in soils and plants—Its relationship to traffic volume and proximity to highway (Lalbag, Baroda City): International Journal of Environmental Studies, v. 16, no. 3–4, p. 222–224.

Al-Awadhi, J.I., 2001, Impact of gravel quarrying on the desert environment of Kuwait: Environmental Geology, v. 41, no. 3–4, p. 365–371.

Albrecht, J., and Knopp, T.B., 1985, Off road vehicles—Environmental impact—Management response—A bibliography: Rosemount, Minnesota, Agricultural Experiment Station, University of Minnesota, Miscellaneous Publication, 50 p.

Amezketa Lizarraga, E., Gazol Lostao, R., and Aragues Lafarga, R., 2002, Development of an automated infiltrometer and its applicability to the field: Investigacion Agraria Produccion y Proteccion Vegetales, v. 17, no. 1, p. 131–142.

Anders, F.J., and Leatherman, S.P., 1987, Disturbance of beach sediment by off-road vehicles: Environmental Geology and Water Sciences, v. 9, no. 3, p. 183–189.

Anders, F.J., and Leatherman, S.P., 1987, Effects of off-road vehicles on coastal foredunes at Fire Island, New York, USA: Environmental Management, v. 11, no. 1, p. 45–52.

Arndt, W., 1996, The effect of traffic compaction on a number of soil properties: Journal of Agriculture Engineering Research, v. 11, p. 182–187.

Becher, H.H., 1985, Compaction of arable soils due to reclamation or off-road military traffic: Reclamation and Revegetation Research, v. 4, no. 2, p. 155–164.

Been, A., 1985, Assessment of damage by wheels of off-road vehicles: Norsk Institutt for Skogforskning, Technical Report, 12 p.

Beije, H.M., 1986, Effects of military-training activities on soil, vegetation, and fauna: Leersum, Netherlands, Research Institute for Nature Management, p. 95–111.

Bekker, M.G., 1977, Evaluation of tires in off the road locomotion—Motion resistance and soil compaction: Zesz Probl Postepow Nauk Roln, v. 183, p. 111–124.

BLM_0061749

Bekker, M.G., 1980, Evaluation of soil/vehicle relationship to lessen damage to forest road and off-road surfaces—A literature and state-of-the-art survey: San Dimas, Mexico, Equipment Development Center, Technical Report, 71 p.

Belnap, Jayne, 1993, Recovery rates of cryptobiotic crusts—Inoculant use and assessment methods: Great Basin Naturalist, v. 53, no. 1, p. 89–95.

Belnap, Jayne, 1995, Surface disturbances—Their role in accelerating desertification: Environmental Monitoring and Assessment, v. 37, no. 1–3, p. 39–57.

Belnap, Jayne, 2002, Impacts of off-road vehicles on nitrogen cycles in biological soil crusts—Resistance in different U.S. deserts: Journal of Arid Environments, v. 52, no. 2, p. 155–165.

Belnap, Jayne, 2003, The world at your feet—Desert biological soil crusts: Frontiers in Ecology and the Environment, v. 1, no. 4, p. 181–189.

Benoit, O., and Gotteland, P., 2005, Modelling of sinkage tests in tilled soils for mobility study: Soil and Tillage Research, v. 80, no. 1–2, p. 215–231.

Berry, K.H., 1980, A review of the effects of off-road vehicles on birds and other vertebrates, *in* DeGraaf, R.M., and Tilghman, N.G., eds., Management of western forests and grasslands for nongame birds—Workshop proceedings, Salt Lake City, Utah, February 11–14, 1980: Ogden Utah, U.S. Forest Service, Intermountain Forest and Range Experiment Station, General Technical Report INT–86, p. 451–467.

Bessee, G.B., and Kohl, K.B., 1993, Characterization of CONUS and Saudi Arabian fine-grained soil samples: San Antonio, Texas, Southwest Research Institute Belvoir Fuels and Lubricants Research Facility, Report no. BFLRF294, 80 p.

Boer, B., 1998, Anthropogenic factors and their potential impacts on the sustainable development of Abu Dhabi's terrestrial biological resources: International Journal of Sustainable Development and World Ecology, v. 5, no. 2, p. 125–135.

Bolling, J.D., and Walker, L.R., 2000, Plant and soil recovery along a series of abandoned desert roads: Journal of Arid Environments, v. 46, no. 11, p. 1–24.

Brainard, J., 1998, Patton Tank marks suggest long recovery: Science News, v. 154, no. 6, p. 87.

Braunack, M.V., 1986, The residual effects of tracked vehicles on soil surface properties: Journal of Terramechanics, v. 23, no. 1, p. 37–50.

Bredberg, C.J., and Waesterlund, I., 1983, Vehicle-caused damage to roots and soil: Forstwissenschaftliches Centralblatt, v. 102, no. 2, p. 86–98.

Brown, A.C., and McLachlan, A., 2002, Sandy shore ecosystems and the threats facing them—Some predictions for the year 2025: Environmental Conservation, v. 29, no. 1, p. 62–77.

BLM_0061750

Brown, G., and Porembski, S., 2000, Phytogenic hillocks and blow-outs as 'safe sites' for plants in an oil-contaminated area of northern Kuwait: Environmental Conservation, v. 27, no. 3, p. 242–249.

Brown, G., and Schoknecht, N., 2001, Off-road vehicles and vegetation patterning in a degraded desert ecosystem in Kuwait: Journal of Arid Environments, v. 49, no. 2, p. 413–427.

Brown, J., and Grave, N.A., 1979, Physical and thermal disturbance and protection of permafrost: Hanover, New Hampshire, Cold Regions Research and Engineering Lab, Report no. CRREL–SR–79–5, 46 p.

Bulinski, J., 2000, Effect of forward speed and kind of the agricultural aggregates on soil compaction by wheels: Inzynieria Rolnicza, v. 6, p. 111–117.

Burger, J., 1986, The effect of human activity on shorebirds in two coastal bays in northeastern United States: Environmental Conservation, v. 13, no. 2, p. 123–130.

Byrd, D.S., Gilmore, J.T., and Lea, R.H., 1983, Effect of decreased use of lead in gasoline on the soil of a highway: Environmental Science and Technology, v. 17, p. 121–123.

California State Water Resources Control Board, 1980, Lake Tahoe Basin Water Quality Plan, Final Plan: Sacramento, California, California State Water Resources Control Board, Technical Report.

Call, C.A., Barker, J.R., and McKell, C.M., 1981, Visitor impact assessment of scenic view areas at Bryce Canyon National Park: Journal of Soil and Water Conservation, v. 36, no. 1, p. 50–53.

Canfield, T.R., and Murray, M.J., 1992, Use of finite elements to model soil/track interactions in coupled multi-body dynamic simulations—Is real time simulation feasible: Argonne National Laboratory, Argonne, Illinois, Report no. ANL/CP–76184, 3 p.

Charman, D.J., and Pollard, A.J., 1995, Long-term vegetation recovery after vehicle track abandonment on Dartmoor, SW England, U.K.: Journal of Environmental Management, v. 45, no. 1, p. 73–85.

Clampitt, C.A., 1993, Effects of human disturbances on prairies and the regional endemic *Aster curtus* in western Washington: Northwest Science, v. 67, no. 3, p. 163–169.

Cole, D.N., 1990, Trampling disturbance and recovery of cryptogamic soil crusts in Grand Canyon National Park: Great Basin Naturalist, v. 50, no. 4, p. 321–325.

Collins, E., O'Farrell, T.P., and Rhoads, W., 1982, Annotated bibliography for biologic overview for the Nevada nuclear waste storage investigations, Nevada Test Site, Nye County, Nevada: Goleta, California, EG and G, Inc., Report no. EGG11832419, 48 p.

BLM_0061751

Collins, E., O'Farrell, T.P., and Rhoads, W., 1982, Biologic overview for the Nevada nuclear waste storage investigations, Nevada Test Site, Nye County, Nevada: Goleta, California, EG and G, Inc., Report no. EGG11832460, 55 p.

Davidson, E.D., and Fox, M., 1974, Effects of off-road motorcycle activity on Mojave Desert vegetation and soil: Madroño, v. 22, no. 8, p. 381–390.

Davis, J.N., Baier, J., and McDonald, T., 2004, Assessment of soil amendments for erosion control on off-road vehicle trails, 2004 annual international meeting of the Society for Engineering in Agricultural, Food and Biological Systems, Ottawa, Canada, August 1–4, 2004: St. Joseph, Michigan, American Society of Agricultural Engineers.

Decker, D.J., Krueger, R.A., Bauer, R.A., Jr., Knuth, B.A., and Richmond, M.E., 1996, From clients to stakeholders—A philosophical shift for fish and wildlife management: Human Dimensions of Wildlife, v. 1, no. 1, p. 70-82.

Deletic, A., Ashley, R., and Rest, D., 2000, Modelling input of fine granular sediment into drainage systems via gully-pots: Water Research, v. 34, no. 15, p. 3836–3844.

Deliman, N.C., 1998, Modeling soil-traction element interaction for off-road mobility assessment with application to virtual environment simulation, American Society of Agricultural Engineers (ASAE) International Meeting, Orlando, Florida, March 8–10, 1998: St. Joseph, Michigan, American Society of Agricultural Engineers.

Della-Moretta, L.B., and Hodges, H.C., 1986, Off-highway tire/road damage and healing mechanisms: U.S. Department of Agriculture Forest Service Equipment Development Center, Report no. ASAE/TP86/1060, 15 p.

Duever, M.J., Riopelle, L.A., and McCollom, J.M., 1986, Long term recovery of experimental off-road vehicle impacts and abandoned old trails in the Big Cypress National Preserve: Naples, Florida, National Audubon Society, Technical Report, 56 p.

Dunn, J.P., Summerfield, C.J., and Johnson, M., 2003, Distribution, seasonal cycle, host plant records, and habitat evaluation of a Michigan threatened insect—The Great Plains spittlebug, *Lepyronia gibbosa* (Homoptera: Cercopidae): Great Lakes Entomologist, v. 35, no. 2, p. 121–129.

Dunnell, C.W., 1980, Protecting and rehabilitating ORV off-road recreational vehicles use areas—Erosion control and management, Wenatchee National Forest, in Andrews, R.N.L., and Nowak, P.F., eds., Off-road vehicle use—A management challenge: Washington, D.C., U.S. Department of Agriculture Office of Environmental Quality, p. 100–102.

Dyke, L.D., 1985, Terrain disturbance due to summer off-road vehicle use in central Keewatin, Northwest Territories, Canada: Ottawa, Ontario, Department of Indian Affairs and Northern Development, Report no. SSC–R71–19/36–1985F, 53 p.

BLM_0061752

Eckert, R.E.J., Wood, M.K., Blackburn, W.H., and Peterson, F.F., 1979, Impacts of off-road vehicles on infiltration and sediment production of two desert soils: Journal of Range Management, v. 32, no. 5, p. 394–397.

Erel, Y., 1998, Mechanisms and velocities of anthropogenic Pb migration in Mediterranean soils: Environmental Research, v. 78, no. 2, p. 112–117.

Falkengren-Grerup, U., 1986, Soil acidification and its impact on ground vegetation: Oecologia, v. 70, p. 339–347.

Fang, S., Wente, S., Gertner, G.Z., Wang, G., and Anderson, A., 2002, Uncertainty analysis of predicted disturbance from off-road vehicular traffic in complex landscapes at Fort Hood: Environmental Management, v. 30, no. 2, p. 199–208.

Fatoki, O.S., 2000, Trace zinc and copper concentrations in roadside vegetation and surface soils—A measurement of local atmospheric pollution in Alice, South Africa: International Journal of Environmental Studies (UK), v. 57, no. 5, p. 501–513.

Fletcher, J.J., and Lovejoy, S.B., 1986, Off-farm costs of sediment from agricultural lands, Proceedings of the American Society of Agricultural Engineers, Winter Meeting, Chicago, Illinois: St. Joseph, Michigan, American Society of Agricultural Engineers.

Flint, A.L., and Childs, S., 1984, Development and calibration of an irregular hole bulk density sampler: Soil Science Society of America Journal, v. 48, no. 2, p. 374–378.

Folz, R.B., 2006, Erosion from all terrain vehicle (ATV) trails on National Forest lands (abs.): St. Joseph, Michigan, Proceedings of the 2006 American Society of Agricultural and Biological Engineers, *http://asae.frymulti.com/abstract.asp?aid=21056&t=2.*

Foresman, C.L., 1976, Effect of snowmobile traffic on bluegrass (*Pao pratensis*): Journal of Environmental Quality, v. 5, no. 2, p. 129–131.

Freitag, D.R., Green, A.J., and Murphy, N.R., 1964, Normal stresses at the tire-soil interface in yielding soils: Vicksburg, Mississippi, U.S. Army Engineer Waterways Experiment Station, Report no. AEWES–MISC–PAPER–4–629, 34 p.

Fuchs, E.H., Wood, M.K., Jones, T.L., and Racher, B., 2003, Impacts of tracked vehicles on sediment from a desert soil: Journal of Range Management, v. 56, no. 4, p. 342–352.

Furniss, M.J., Flanagan, S.A., and McFadin, B.A., 2000, Hydrologically connected roads—An indicator of the influence of roads on chronic sedimentation, surface water hydrology, and exposure to toxic chemicals: U.S. Forest Service, Stream Systems Technology Center, Rocky Mountain Research Station, Technical Report, 4 p., *http://www.stream.fs.fed.us/streamnt/jul100/jul100_2.htm.*

BLM_0061753

Gardner, R.B., 1979, Some environmental and economic effects of alternative forest road designs: Transactions of the American Society of Agricultural Engineers, v. 22, no. 1, p. 63–68.

Geological Society of America, 1977, Impacts and management of off-road vehicles: Boulder, Colorado, Report of the Committee on Environment and Public Policy, Technical Report, 8 p.

Gilbertson, D., 1983, The impacts of off-road vehicles in the Coorong Dune and Lake Complex of South Australia, in Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 355–373.

Gillette, D.A., and Adams, J., 1983, Accelerated wind erosion and prediction rates of off-road vehicles, in Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 97–109.

Gish, C.D., and Christensen, R.E., 1973, Cadmium, nickel, lead, and zinc in earthworms from roadside soil: Environmental Science and Technology, v. 7, p. 1060–1062.

Gray, J.R., 1977, Kinds and costs of recreational pollution in the Sandia Mountains: New Mexico Agricultural Experiment Station Bulletin, Technical Report, 57 p.

Green, J.E., and Knight, S.J., 1959, Preliminary study of stresses under off-road vehicles: Vicksburg, Mississippi, U.S. Army Engineer Waterways Experiment Station, Report no. AEWES–MISC–PAPER–4–362, 20 p.

Griggs, G.B., and Walsh, B.L., 1981, The impact, control, and mitigation of off-road vehicle activity in Hungry Valley, California: Environmental Geology, v. 3, no. 4, p. 229–243.

Grimes, D.W., Miller, R.J., and Wiley, P.L., 1975, Cotton and corn root development in two field soils of different strength characteristics: Agronomy Journal, v. 67, p. 519–523.

Grimes, D.W., Sheesley, W.R., and Wiley, P.L., 1978, Alfalfa root development and shoot regrowth in compact soil of wheel traffic patterns: Agronomy Journal, v. 70, p. 955–958.

Hairsine, P.B., Croke, J.C., Mathews, H., Fogarty, P., and Mockler, S.P., 2002, Modelling plumes of overland flow from logging tracks: Hydrological Processes, v. 16, no. 12, p. 2311–2327.

Hall, C., and Dearden, P., eds., 1984, The impact of "non-consumptive" recreation on wildlife—An annotated bibliography: Monticello, Illinois, Vance Bibliographies, 45 p.

Hammitt, W.E., and Cole, D.N., 1987, Wildland recreation—Ecology and management: New York, John Wiley & Sons, 341 p.

BLM_0061754

Hansen, D.J., and Ostler, W.K., 2001, Plant-damage assessment technique for evaluating military vehicular impacts to vegetation in the Mojave Desert: Las Vegas, Nevada, Bechtel Nevada, Inc., Report no. DOE/NV /1178613.

Harrison, R.T., 1980, Environmental impact of off-road motorcycles, in Andrews, R.N.L., and Nowak, P.F., eds., Off-road vehicle use—A management challenge: Washington, D.C., U.S. Department of Agriculture Office of Environmental Quality, p. 266–269.

Haupt, H.F., 1959, Road and slope characteristics affecting sediment movement from logging roads: Journal of Forestry, v. 57, no. 5, p. 329–339.

Heede, B.H., 1983, Control of rills and gullies in off-road vehicle traffic areas, in Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 245–264.

Hellstroem, G.B., 1996, Preliminary investigations into recent changes of the Goukamma Nature Reserve frontal dune system, South Africa—With management implications: Landscape and Urban Planning, v. 34, no. 3–4, p. 225–235.

Hinckley, B.S., Iverson, R.M., and Hallet, B., 1983, Accelerated water erosion in ORV off-road vehicle-use areas, in Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 81–96.

Hirst, R.A., Pywell, R.F., Marrs, R.H., and Putwains, P.D., 2003, The resistance of a chalk grassland to disturbance: Journal of Applied Ecology, v. 40, no. 2, p. 368–379.

Holloway, D.C., Wilson, W.H., and Drach, T.J., 1989, Examination of ATV tire forces generated on clay, grass, and sand surfaces: Warrendale, Pennsylvania, Society of Automotive Engineers, Technical Report, 12 p.

Holsman, R.H., 2005, Management opportunities and obligations for mitigating off-road vehicle impacts to wildlife and their habitats: Transactions of the North American Wildlife and Natural Resources Conference, v. 70, p. 399–417.

Hooks, C.L., and Jansen, I.J., 1986, Recording cone penetrometer developed in reclamation research: Soil Science Society of America Journal, v. 50, no. 1, p. 10–12.

Hosier, P.E., and Eaton, T.E., 1980, The impact of vehicles on dune and grassland vegetation on a southeastern North Carolina barrier beach: Wilmington, North Carolina, North Carolina University at Wilmington, Report no. UNC–SG–R–164, 13 p.

Huszar, P.C., and Piper, S.L., 1986, Estimating the off-site costs of wind erosion in New Mexico: Journal of Soil and Water Conservation, v. 41, no. 6, p. 414–421.

BLM_0061755

Hyatt, J.A., and Gilbert, R., 2000, Lacustrine sedimentary record of human-induced gully erosion and land-use change at Providence Canyon, southwest Georgia, USA: Journal of Paleolimnology, v. 23, no. 4, p. 421–438.

Hyers, A.D., and Marcus, M.G., 1981, Land use and desert dust hazards in central Arizona, in Pewe, T., ed., Desert dust origin, characteristics, and effect on man: Boulder, CO, Geological Society of America, Inc., p. 267–280.

International Society for Terrain-Vehicle Systems, 1984, Proceedings of the international conference on the performance of off-road vehicles and machines, Cambridge, England, August 5–11, 1984: International Society for Terrain-Vehicle Systems, 384 p.

International Society for Terrain-Vehicle Systems, 1994, Proceedings of the European ISTVS conference (6th), OVK symposium (4th), on off road vehicles in theory and practice, Vienna, Austria, September 28–30, 1994: International Society for Terrain-Vehicle Systems, 349 p.

Isensee, E., and Luth, H.G., 1992, Continuous recording of soil density: Landtechnik, v. 47, no. 9, p. 449–452.

Iverson, R.M., 1980, Processes of accelerated pluvial erosion on desert hillslopes modified by vehicular traffic: Earth Surface Processes, v. 5, p. 369-388.

Iverson, R.M., Hinckley, B.S., and Webb, R.M., 1981, Physical effects of vehicular disturbances on arid landscapes: Science, v. 212, no. 4497, p. 915–917.

Johnson, C.W., and Smith, J.P., 1983, Soil loss caused by off-road vehicle use on steep slopes: Transactions of the American Society of Agricultural Engineers, v. 26, no. 2, p. 402–405.

Johnson, R.R., Mills, G.S., and Carothers, S.W., 1990, Creation and restoration of riparian habitat in southwestern arid and semi-arid regions, in Kusler, J.A., and Kentula, M.E., eds., Wetland creation and restoration—The status of the science: Covelo, California, Island Press, p. 351–366.

Jones, R., Horner, D., Sullivan, P., and Ahlvin, R., 2005, A methodology for quantitatively assessing vehicular rutting on terrains: Journal of Terramechanics, v. 42, no. 3–4, p. 245–257.

Karafiath, L.L., 1978, Track-soil interaction model for the determination of maximum soil thrust: Bethpage, New York, Grumman Aerospace Corporation, Report no. RE–556, 60 p.

Kay, B.L., and Graves, W.L., 1983, History of revegetation studies in the California deserts, in Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 315–324.

BLM_0061756

Kay, B.L., and Graves, W.L., 1983, Revegetation and stabilization techniques for disturbed desert vegetation, in Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 325–340.

Kay, J., 1981, Evaluating environmental impacts of off-road vehicles: Journal of Geography, v. 80, no. 1, p. 10–18.

Keener, K.M., Wood, R.K., Holmes, R.G., and Morgan, M.T., 1991, Soil strength evaluation of sample cores in a field measurement system: : St. Joseph, Michigan, American Society of Agricultural Engineers, ASAE Paper No. 91-1526, p. 10.

Kennedy, J.G., Collins, J.G., and Smith, M.H., 1967, Moisture—Strength characteristics of selected soils in Thailand. Volume I—Analyses and application of data: Vicksburg, Mississippi, U.S. Army Engineer Waterways Experiment Station, Report no. AEWES–TR–3–791–VOL–1, 126 p.

Kert, J., 1992, Remote sensing of off-road vehicle emissions, International conference optical remote sensing and applications to environmental and industrial safety problems, Houston, Texas, April 6–8, 1992.

Khalaf, F.I., 1989, Desertification and aeolian processes in the Kuwait Desert: Journal of Arid Environments, v. 16, no. 2, p. 125–145.

Knott, J.M., 1978, Reconnaissance assessment of erosion and sedimentation in the Canada de los Alamos Basin, Los Angeles and Ventura Counties, California: U.S. Geological Survey, Open File Report no. 78–873, 49 p.

Komatsu, M., Kato, A., and Sakamoto, K., 1988, Study on the automatic measurement system of soil parameters. Development of soil hardness sensor: Tottori, Japan, Tottori University, Bulletin of the Faculty of Agriculture, Tottori University, v. 41, p. 39–46.

Kondolf, G.M., Piegay, H., and Landon, N., 2002, Channel response to increased and decreased bedload supply from land use change—Contrasts between two catchments: Geomorphology, v. 45, no. 1–2, p. 35–51.

Koppel, W., 1988, Dynamic impact on soil structure due to traffic of off-road vehicles, in Drescher, J., Horn, R., and Boodt, M.D., eds., Impact of water and external forces on soil structure—Selected papers of the 1st Workshop on Soilphysics and Soilmechanics: Cremlingen-Destedt, Germany, Catena Verlag, p. 113–122.

Kurczerski, F.E., 2000, History of white pine (*Pinus strobus*)/oak (*Quercus* spp.) savanna in southern Ontario, with particular reference to the biogeography and status of the antenna-waving wasp, *Tachysphex pechumani* (Hymenoptera: Sphecidae): Canadian Field-Naturalist, v. 114, no. 1, p. 1–20.

BLM_0061757

Kutiel, P., Eden, E., and Zhevelev, Y., 2000, Effect of experimental trampling and off-road motorcycle traffic on soil and vegetation of stabilized coastal dunes, Israel: Environmental Conservation, v. 27, no. 1, p. 14–23.

Kutiel, P., Eden, Z., and Zhevelev, H., 2001, The impact of motorcycle traffic on soil and vegetation of stabilized coastal dunes, Israel: Journal of Coastal Conservation, v. 7, no. 1, p. 81–89.

Lacey, R.M., and Severinghaus, W.D., 1982, Evaluation of lands for off-road recreational four-wheel drive vehicle use: U.S. Department of Commerce Government Reports Announcements and Index National Technical Information Service (NTIS), Technical Report, 1755 p.

Langdon, A.M., 2000, Mojave Desert soils, plants, and ants—Developing a monitoring strategy for off-highway-vehicles: Pomona, California, California State Polytechnic University, Pomona, 114 p.

Larney, F.J., Leys, J.F., Mueller, J.F., and McTainsh, G.H., 1999, Dust and endosulfan deposition in a cotton-growing area of northern New South Wales, Australia: Journal of Environmental Quality, v. 28, no. 2, p. 692–701.

Lawson, D.E., 1982, Long-term modifications of perennially frozen sediment and terrain at East Oumalik, northern Alaska: Hanover, New Hampshire, Cold Regions Research and Engineering Lab, Technical Report, 44 p.

Lei, S.A., 2004, Soil compaction from human trampling, biking, and off-road motor vehicle activity in a blackbrush (*Coleogyne ramosissima*) shrubland: Western North American Naturalist, v. 64, no. 1, p. 125–130.

Leis, S.A., Engle, D.M., Leslie, D.M., and Fehmi, J.S., 2005, Effects of short- and long-term disturbance resulting from military maneuvers on vegetation and soils in a mixed prairie area: Environmental Management, v. 36, no. 6, p. 849–861.

Lightfoot, D.C., and Whitford, W.G., 1991, Productivity of creosotebush foliage and associated canopy arthropods along a desert roadside: American Midland Naturalist, v. 125, no. 2, p. 310–322.

Liston, N., Hutt, M., and White, L., 1981, Mobility bibliography: Hanover, New Hampshire, Cold Regions Research and Engineering Lab, Report no. CRREL–SR–81–29, 333 p.

Liston, R.A., Czako, T., Haley, P., Harrison, W.L., and Hanamoto, B., 1966, Mobility environmental research study mobility testing procedures: Warren, Michigan, U.S. Army Tank-Automotive Center—Warren Michigan Land Locomotion Lab, Technical Report, 88 p.

Lodico, N.J., 1973, Environmental effects of off-road vehicles—A review of the literature: U.S. Office of Library Services, Research Services Branch, Technical Report, 109 p.

BLM_0061758

Lovich, J.E., and Bainbridge, D., 1999, Anthropogenic degradation of the southern California desert ecosystem and prospects for natural recovery and restoration: Environmental Management, v. 24, no. 3, p. 309–326.

Luckenbach, R.A., 1978, An analysis of off- road vehicle use on desert avifaunas, Transactions of the North American Wildlife and Natural Resources Conference, v. 43, p. 157–162.

Luckenbach, R.A., 1982, Ecology and management of the desert tortoise (Gopherus agassizii) in California: U.S. Fish and Wildlife Service, Technical Report, 37 p.

Luckenbach, R.A., and Bury, R.B., 1983, Effects of off-road vehicles on the biota of the Algodones Dunes, Imperial County, California, USA: Journal of Applied Ecology, v. 20, no. 1, p. 265–286.

Manson, D.A., 1980, Erosion control in Angourie National Park: Journal of the Soil Conservation Service of New South Wales, v. 36, no. 1, p. 23–32.

McBrayer, M.C., Mauldon, M., Drumm, E.C., and Wilson, G.V., 1997, Infiltration tests on fractured compacted clay: Journal of Geotechnical and Geoenvironmental Engineering, v. 123, no. 5, p. 469–473.

McCool, D.K., Dossett, M.G., and Yecha, S.J., 1981, Portable rill meter for field measurement of soil loss, Erosion and sediment transport measurement—Proceedings of the Florence symposium, Florence, Italy, 22-26 June 1981: Washington, D.C., International Association of Hydrological Sciences, p. 479–484.

Melvin, S.M., Griffin, C.R., and MacIvor, L.H., 1991, Recovery strategies for piping plovers in managed coastal landscapes: Coastal Management, v. 19, no. 1, p. 21–34.

Meyer, K.G., 2002, Managing degraded off-highway vehicle trails in wet, unstable, and sensitive environments: U.S. National Park Service, Report no. PB2005105502, 88 p.

Miller, P.M., 1968, The application of the visioplasticity method to soft-soil mobility problems: Buffalo, New York, Cornell Aeronautical Laboratory and United States Advanced Research Projects Agency, p. 41.

Miller, R.E., Hazard, J., and Howes, S., 2001, Precision, accuracy, and efficiency of four tools for measuring soil bulk density or strength: U.S. Forest Service, Pacific Northwest Research Station, Report no. PNW–RP–532, 16 p.

Misak, R.F., Al-Awadhi, J.M., Omar, S.A., and Shahid, S.A., 2002, Soil degradation in Kabd area, southwestern Kuwait City: Land Degradation and Development, v. 13, no. 5, p. 403–415.

BLM_0061759

Mize, R., Evans, R.E., MacRoberts, B.R., MacRoberts, M.H., and Rudolph, D.C., 2005, Restoration of pitcher plant bogs in eastern Texas, USA: Natural Areas Journal, v. 25, no. 2, p. 197–201.

Moorhead, D.L., Linkins, A.E., and Everett, K.R., 1996, Road dust alters extracellular enzyme activities in tussock tundra soils, Alaska, U.S.A.: Arctic and Alpine Research, v. 28, no. 3, p. 346-351.

Motto, H.L., Daines, R.H., Chilko, D.M., and Motto, C.K., 1970, Lead in soils and plants—Its relationship to traffic volume and proximity to highways: Environmental Science and Technology, v. 4, p. 231–237.

Nakata, J.K., 1983, Off-road vehicular destabilization of hill slopes—The major contributing factor to destructive debris flows in Ogden, Utah, 1979, in Webb, R.H., and Wilshire, H.G., eds., Environmental effects of off-road vehicles—Impacts and management in arid regions: New York, Springer-Verlag, p. 343–353.

National Oceanic and Atmospheric Administration, 2005, Understanding the "human dimension" of coastal management using social science, *http://maps.csc.noaa.gov/socialscience_2/wheel_stakeholders.htm* (accessed April 2007).

Niedoroda, A., 1978, The geomorphologic effects of off-road vehicles on coastal systems of Cape Cod, Massachusetts: Amherst, Massachusetts, Massachusetts University National Park Service Cooperative Research Unit, Report no. UM–NPSCRU–17, 106 p.

Noor, M., and Shah, B.H., 1995, Infiltration capacity and soil bulk density differences between grazed area and off-road track at Paya (Kaghan Valley): Pakistan Journal of Forestry, v. 45, no. 1, p. 13–18.

Noren, O., Danfors, B., and Stambeck, A., 1984, Technical systems in energy forestry: Stockholm, Sweden, Statens Energiverk, Report no. STEV–EO–84–4, 145 p.

Noren, O., Danfors, B., Stambeck, A., and Gutekunst, K., 1982, Technical equipment for the cultivation of energy forest: Uppsala, Sweden, Jordbrukstekniska Institute, Report no. JTI–38, 116 p.

Nyssen, J., Poesen, J., Moeyersons, J., Luyten, E., Veyret-Picot, M., Deckers, J., Haile, M., and Govers, G., 2002, Impact of road building on gully erosion risk—A case study from the northern Ethiopian Highlands: Earth Surface Processes and Landforms, v. 27, no. 12, p. 1267–1283.

Okello, J.A., 1991, A review of soil strength measurement techniques for prediction of terrain vehicle performance: Journal of Agricultural Engineering Research, v. 50, no. 2, p. 129–155.

95

BLM_0061760

O'Sullivan, M.F., and Ball, B.C., 1982, A comparison of five instruments for measuring soil strength in cultivated and uncultivated cereal seedbeds: Journal of Soil Science, v. 33, no. 4, p. 597–608.

Payne, G.F., Leininger, W.D., and Foster, J., 1979, How off-road vehicles affect range quality. When driving across rangelands, it's better to blaze a new trail: Bozeman, Montana, Montana Agricultural Experiment Station, Report, 2 p.

Perez, F.L., 1991, Particle sorting due to off-road vehicle traffic in a high Andean paramo: Catena Giessen, v. 18, no. 3–4, p. 239–254.

Persico, L.P., Nichols, K.K., and Bierman, P.R., 2005, Tracking painted pebbles—Short-term rates of sediment movement on four Mojave Desert piedmont surfaces: Water Resources Research, v. 41, no. 7, p. W07004.07001–W07004.07015.

Piehl, B.T., Beschta, R.L., and Pyles, M.R., 1988, Ditch-relief culverts and low-volume forest roads in the Oregon Coast Range: Northwest Science, v. 62, no. 3, p. 91–98.

Pinard, M.A., Barker, M.G., and Tay, J., 2000, Soil disturbance and post-logging forest recovery on bulldozer paths in Sabah, Malaysia: Forest Ecology and Management, v. 130, no. 1–3, p. 213–225.

Piper, S., and Huszar, P.C., 1989, Re-examination of the off-site costs of wind erosion in New Mexico: Journal of Soil and Water Conservation, v. 44, no. 4, p. 332–334.

Powers, R.F., Tiarks, A.E., and Boyle, J.R., 1998, Assessing soil quality—Practicable standards for sustainable forest productivity in the United States, *in* The contribution of soil science to the development of and implementation of criteria and indicators of sustainable forest management: St. Louis, Missouri, Soil Science Society of America, Inc., p. 53–80.

Prose, D.V., 1985, Persisting effects of armored military maneuvers on some soils of the Mojave Desert: Environmental Geology and Water Sciences, v. 7, no. 3, p. 163–170.

Prose, D.V., Metzger, S.K., and Wilshire, H.G., 1987, Effects of substrate disturbance on secondary plant succession—Mojave Desert, California: Journal of Applied Ecology, v. 24, no. 1, p. 305–313.

Qiu, X.D., Ji, X.W., and Zhuang, J.D., 1995, Analysis of desert sand properties related to off-road locomotion: Transactions of the Chinese Society of Agricultural Engineering, v. 11, no. 2, p. 11–16.

Quarles, H.D., Hanawalt, R.B., and Odum, W.E., 1974, Lead in small mammals, plants, and soil at varying distances from a highway: Journal of Applied Ecology, v. 11, no. 3, p. 937–949.

BLM_0061761

Rafique, S.A., 1994, Effect of grazing management and fertilizer application on vegetation and soil properties of a moist temperate forest range in Siran Valley (Mansehra), NWFP: Pakistan Journal of Forestry, v. 44, no. 1, p. 20–29.

Raghavan, G.S.V., 1977, Effect of wheel slip on soil compaction: Journal of Agricultural Engineering Research, v. 22, no. 1, p. 79–83.

Raghavan, G.S.V., McKyes, E., Amir, I., Chasse, M., and Broughton, R.S., 1976, Prediction of soil compaction due to off-road vehicle traffic: Transactions of the American Society of Agricultural Engineers, v. 19, no. 4, p. 610–613.

Richard, G., Tan, R., and Avery, J., 1977, An implementation plan for suspended particulate matter in the Phoenix area. Volume II. Emission inventory: U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Report no. EPA450377021B, 218 p.

Rickard, W.H., 1988, Natural vegetation at the proposed reference repository location in southeastern Washington: Richland, Washington, Battelle Pacific Northwest Labs, Report no. PNL–6402, 27 p.

Ross, J.B., and Willison, J.H.M., 1991, Impacts of all-terrain vehicles on bogs and barrens of the Cape Breton Highlands—Proceedings of the International Conference on Science and Management of Protected Areas, Nova Scotia, Canada, 14-19 May 1991: Halifax, Nova Scotia, Canada, p. 533–534.

Rula, A.A., Freitag, D.R., and Knight, S.J., 1966, Concepts for vehicles for off-road use in remote areas: Vicksburg, Mississippi, U.S. Army Engineer Waterways Experiment Station, Report no. AEWESMISCPAPER4854.

Rula, A.A., and Nuttall, C.J., 1971, An analysis of ground mobility models (ANAMOB): Vicksburg, Mississippi, U.S. Vicksburg, Mississippi, U.S. Army Engineer Waterways Experiment Station, Report no. AEWESTRM714, 326 p.

Samaras, Z., and Zierock, K.H., 1995, Off-road vehicles—A comparison of emissions with those from road transport: Science of the Total Environment, v. 169, p. 249–253.

Schemnitz, S.D., and Schortemeyer, J.D., 1972, The influence of vehicles on Florida Everglades vegetation: Tallahassee, Florida, Florida State Game and Fresh Water Fish Commission, Report no. DISFEP–74–31, 65 p.

Schreier, H., and Lavkulich, L.M., 1979, A numerical approach to terrain analysis for off-road trafficability: Photogrammetric Engineering and Remote Sensing, v. 45, no. 5, p. 635–642.

Schultink, G., 1977, Impact analysis of off-road-vehicle use on vegetation in the Grand Mere Dune environment: East Lansing, Michigan, Michigan State University, Report no. NASACR155764, 10 p.

BLM_0061762

Severinghaus, W.D., Riggins, R.E., and Goran, W.D., 1980, Effects of tracked vehicle activity on terrestrial mammals and birds at Fort Knox, Kentucky: Transactions of the Kentucky Academy of Science, v. 41, no. 1–2, p. 15–26.

Shaaban, S., 1984, Compaction of sand using ordinary off-road vehicles: Cairo, Egypt, Military Technical College, Report no. ADP0042978, 11 p.

Shay, R., 1979, Management problems in off-road-vehicle recreation, in Ittner, R., Potter, D.R., Agee, J.K., and Anschell, S., eds., Recreational impact on wildlands—Conference proceedings, Seattle, Washington, October 27–29, 1978: U.S. Forest Service, Pacific Northwest Forest and Range Experiment Station and U.S. National Park Service, p. 314–317.

Shikanai, T., Ueno, M., Hashiguchi, K., Nohse, Y., and Okayasu, T., 1997, A precise measurement of soil deformation under the wheel: Journal of the Japanese Society of Agricultural Machinery, v. 59, no. 2, p. 3–11.

Shoop, S.A., 1993, Terrain characterization for trafficability: Hanover, New Hampshire, Cold Regions Research and Engineering Lab, Report no. CRREL–93–6, 29 p.

Snyder, C.T., Frickel, D.G., Hadley, R.F., and Miller, R.F., 1976, Effects of off-road vehicle use on the hydrology and landscape of arid environments in central and southern California: U.S. Geological Survey Water Resources Investigations Report no. USGS/WRI–76–99, 52 p.

Sparrow, S.D., Wooding, F.J., and Whiting, E.H., 1978, Effects of off-road vehicle traffic on soils and vegetation in the Denali Highway region of Alaska: Journal of Soil and Water Conservation, v. 33, no. 1, p. 20–27.

Spellerburg, I.F., and Morrison, T., 1998, The ecological effects of new roads—A literature review: Wellington, New Zealand, New Zealand Department of Conservation, Technical Report, 55 p.

Startsev, A.D., and Mcnabb, D.H., 2000, Effects of skidding on forest soil infiltration in west-central Alberta: Canadian Journal of Soil Science, v. 80, no. 4, p. 617–624.

Steiner, A.J., and Leatherman, S.P., 1979, An annotated bibliography of the effects of off-road vehicle and pedestrian traffic on coastal ecosystems: U.S. National Park Service Cooperative Research Unit, and University of Massachusetts Amherst, Report no. UMNPSCRU45, 88 p.

Steiner, A.J., and Leatherman, S.P., 1981, Recreational impacts on the distribution of ghost crabs Ocypode quadrata Fab.: Biological Conservation, v. 20, no. 2, p. 111–122.

Stephenson, G., 1999, Vehicle impacts on the biota of sandy beaches and coastal dunes—A review from a New Zealand perspective: Science for Conservation, v. 121, p. 1–14.

Stinson, B., 1971, An analytical model for predicting cross-country vehicle performance. Appendix E-quantification of the screening effects of vegetation on driver's vision and

BLM_0061763

vehicle speed: Vicksburg, Mississippi, U.S. Army Engineer Waterways Experiment Station, Report no. AEWESTR3783, 33 p.

Stroh, T., 2001, Proposed Collbran rock and soil source project—Wildlife report: U.S. Bureau of Reclamation, Report no. PB2006101846, 28 p.

Stull, R., Shipley, Susan, Hovanitz, E., Thompson, S., and Hovanitz, K., 1979, Effects of off-road vehicles in Ballinger Canyon, California: Geology, v. 7, no. 1, p. 19–21.

Swanson, G.D., 1971, Studies of dual and tandem rigid wheel performance in sand: Hoboken, New Jersey, Stevens Institute of Technology, Report no. SIT–DL–71–1536, 132 p.

Tunstall, B.R., and Reece, P.H., 1989, Environmental assessment of the Sunset and Big Desert lands, northwest Victoria, Australia: South, Australia, Australia Commonwealth Scientific and Industrial Research Organization, Division of Water Resources Divisional Report, Clayton Technical Report, 1–85 p.

Turnage, G.W., 1972, Performance of soils under tire loads. Report 8. Application of test results to tire selection for off-road vehicles: Vicksburg, Mississippi, U.S., Army Engineer Waterways Experiment Station, Report no. AEWES–TR–3–666–8, 164 p.

Turton, S.M., 2005, Managing environmental impacts of recreation and tourism in rainforests of the wet tropics of Queensland World Heritage Area: Geographical Research, v. 43, no. 2, p. 140–151.

Tuttle, M., and Griggs, G., 1985, Accelerated soil erosion at three State Vehicular Recreation Areas, central and southern California, Erosion control—A challenge in our time—Proceedings of the 16th annual International Erosion Control Association, San Francisco, California, February 21–22, 1985: Steamboat Springs, Colorado, p. 105-115.

Tuttle, M., and Griggs, G., 1987, Soil erosion and management recommendations at three State Vehicular Recreation Areas, California: Environmental Geology and Water Sciences, v. 10, no. 2, p. 111–123.

Twiss, R., Sidener, J., Bingham, G., Burke, J.E., and Hall, C.H., 1980, Potential impacts of geothermal development on outdoor recreational use of the Salton Sea: Livermore, California, University of California, Livermore, Technical Report, 61 p.

U.S. Army Corps of Engineers, 1994, Stationing of mechanized or armored combat forces at Fort Lewis, Thurston and Pierce Counties, Washington: U.S. Army Corps of Engineers, Report no. 940045.

U.S. Army Corps of Engineers, 2001, Fort Bliss mission and master plan—Dona Ana and Otero Counties, New Mexico, and El Paso County, Texas: U.S. Army Corps of Engineers, Report no. 010081.

BLM_0061764

U.S. Army Test and Evaluation Command, 1970, Soft-soil vehicle mobility: Aberdeen Proving Ground, Maryland, U.S. Army Report no. MTP–2–2–619, 11 p.

U.S. Bureau of Land Management, 1984, Proposed Monument resource management plan, Idaho: U.S. Bureau of Land Management, Report no. 840584, 419 p.

U.S. Bureau of Land Management, 1985, Box Elder resource management plan, Utah: U.S. Bureau of Land Management, Report no. 850448.

U.S. Bureau of Land Management, 1985, Grand Junction resource area—Resource management plan and environmental impact statement: U.S. Bureau of Land Management, Technical Report, 171 p.

U.S. Bureau of Land Management, 1985, resource management plan for the Walker Planning Area, Nevada: U.S. Bureau of Land Management, Report no. 850274.

U.S. Bureau of Land Management, 1985, White Sands resource area management plan, New Mexico: U.S. Bureau of Land Management, Report no. 850387.

U.S. Bureau of Land Management, 1986, Lander resource management plan, Lander, Wyoming: U.S. Bureau of Land Management, Report no. 860449.

U.S. Bureau of Land Management, 1986, Little Snake resource management plan, Moffat, Rio Blanco, and Routt Counties, Colorado: U.S. Bureau of Land Management, Report no. 860029.

U.S. Bureau of Land Management, 1986, Proposed 1985 amendments to the California desert conservation area plan and the Eastern San Diego County master framework plan, California: U.S. Bureau of Land Management, Report no. 860432, 138 p.

U.S. Bureau of Land Management, 1986, Proposed 1985 amendments to the California desert conservation area plan, California: U.S. Bureau of Land Management, Report no. 860077.

U.S. Bureau of Land Management, 1986, resource management plan for the House Range resource area, Juab and Millard Counties, Utah: U.S. Bureau of Land Management, Report no. 860377.

U.S. Bureau of Land Management, 1986, resource management plan for the Warm Springs resource area, Millard County, Utah: U.S. Bureau of Land Management, Report no. 860395.

U.S. Bureau of Land Management, 1986, Wilderness Suitability EIS—Grass Creek and Cody resource areas, Bighorn Basin, Wyoming (draft supplement for the Owl Creek Wilderness Study Area): U.S. Bureau of Land Management, Report no. 860168, 40 p.

U.S. Bureau of Land Management, 1987, Cascade resource management plan, Idaho: U.S. Bureau of Land Management, Report no. 870281, 432 p.

BLM_0061765

U.S. Bureau of Land Management, 1987, Medicine Bow-Divide resource areas resource management plan, Rawlins District, Wyoming: U.S. Bureau of Land Management, Report no. 870212.

U.S. Bureau of Land Management, 1987, North Dakota resource management plan, Dunn and Bowman Counties, North Dakota: U.S. Bureau of Land Management, Report no. 870236, 199 p.

U.S. Bureau of Land Management, 1987, Pinedale resource area resource management plan, Sublette and Lincoln Counties, Wyoming: U.S. Bureau of Land Management, Report no. 870077, 347 p.

U.S. Bureau of Land Management, 1987, Pinedale resource area resource management plan, Sublette, Teton, Lincoln, and Fremont Counties, Wyoming: U.S. Bureau of Land Management, Report no. 870428, 232 p.

U.S. Bureau of Land Management, 1987, Proposed resource management plan for the San Juan resource area, Moab District, Utah: U.S. Bureau of Land Management, Report no. 870440.

U.S. Bureau of Land Management, 1987, Taos resource management plan, New Mexico: U.S. Bureau of Land Management, Report no. 870331.

U.S. Bureau of Land Management, 1987, Washakie resource area resource management plan, portions of Big Horn, Hot Springs, and Washakie Counties, Wyoming: U.S. Bureau of Land Management, Report no. 870395.

U.S. Bureau of Land Management, 1988, Challis resource area proposed resource management plan, upper Columbia-Salmon Clearwater Districts, Custer and Lemhi Counties, Idaho: U.S. Bureau of Land Management, Report no. 980508.

U.S. Bureau of Land Management, 1988, Cody resource area resource management plan, Big Horn and Park Counties, Wyoming: U.S. Bureau of Land Management, Report no. 880315.

U.S. Bureau of Land Management, 1988, Fort Greely national maneuver area and Fort Greely air drop zone, Alaska—Resource management plan: U.S. Bureau of Land Management, Report no. 880276, 138 p.

U.S. Bureau of Land Management, 1988, Fort Wainwright maneuver area, Fairbanks North Star Borough, Alaska: U.S. Bureau of Land Management, Report no. 880277, 138 p.

U.S. Bureau of Land Management, 1988, Pony Express resource management plan, Toole, Utah, and Salt Lake Counties, Utah: U.S. Bureau of Land Management, Report no. 880310, 147 p.

U.S. Bureau of Land Management, 1988, Uncompahgre Basin resource management plan, Colorado: U.S. Bureau of Land Management, Report no. 880345.

BLM_0061766

U.S. Bureau of Land Management, 1988, West Hiline resource management plan, northcentral Montana: U.S. Bureau of Land Management, Report no. 880200, 306 p.

U.S. Bureau of Land Management, 1988, Wilderness recommendations for the Red Mountain Wilderness study area in the Arcata resource area, California: U.S. Bureau of Land Management, Report no. 880033, 120 p.

U.S. Bureau of Land Management, 1989, Dixie resource area management plan, Washington County, Utah: U.S. Bureau of Land Management, Report no. 890290, 250 p.

U.S. Bureau of Land Management, 1989, San Rafael resource management plan, Emery County, Utah: U.S. Bureau of Land Management, Report no. 890240.

U.S. Bureau of Land Management, 1989, White Sands resource management plan Amendment for McGregor Range, Otero County, New Mexico: U.S. Bureau of Land Management, Report no. 890127.

U.S. Bureau of Land Management, 1991, Safford District resource management plan, Arizona: U.S. Bureau of Land Management, Report no. 910314, 511 p.

U.S. Bureau of Land Management, 1991, Three Rivers resource management plan, Harney, Grant, Lake, and Malheur Counties, Oregon: U.S. Bureau of Land Management, Report no. 910335.

U.S. Bureau of Land Management, 1993, resource management plan and environmental impact statement for the Big Dry resource area, Miles City District, Montana: U.S. Bureau of Land Management, Report no. 930076, 382 p.

U.S. Bureau of Land Management, 1994, Fort Wainwright, Yukon maneuver area, proposed resource management plan and final environmental impact statement, Fairbanks North Star Borough, Alaska: U.S. Bureau of Land Management, Report no. 940001, 124 p.

U.S. Bureau of Land Management, 1994, resource management plan and environmental impact statement for the Grass Creek resource area, Worland District, Wyoming: U.S. Bureau of Land Management, Report, 299 p.

U.S. Bureau of Land Management, 1998, Judith-Valley-Phillips resource management plan— Chouteau, Fergus, Judith Basin, Petroleum, Phillips, and Valley Counties, Montana (draft supplement to the final environmental impact statement of September 1997): U.S. Bureau of Land Management, Report no. 980149, 51 p.

U.S. Bureau of Land Management, 1998, Socorro resource area resource management plan, New Mexico: U.S. Bureau of Land Management, Report no. 880397, 266 p.

BLM_0061767

U.S. Bureau of Land Management, 2000, Federal fluid minerals leasing and development, Otero and Sierra Counties, New Mexico: U.S. Bureau of Land Management, Report no. 000383, 521 p.

U.S. Bureau of Land Management, 2001, National management strategy for motorized off-highway vehicle use on public lands: U.S. Bureau of Land Management, Report no. PB2001103162, 58 p.

U.S. Bureau of Land Management, 2003, Farmington resource management plan, San Juan, McKinley, Rio Arriba, and Sandoval Counties, New Mexico: U.S. Bureau of Land Management, Report no. 030143.

U.S. Bureau of Land Management, 2004, Dillon resource management plan, Beaverhead and Madison Counties, Montana: U.S. Bureau of Land Management, Report no. 040153, 626 p.

U.S. Bureau of Land Management, and U.S. Forest Service, 1986, Proposed Coronado National Forest land and resource management plan, Arizona and New Mexico: U.S. Bureau of Land Management, and U.S. Department of Agriculture Forest Service, Report no. 860307.

U.S. Bureau of Reclamation, 2001, Pothole Reservoir resource management plan, Grant County, Washington: U.S. Bureau of Reclamation, Report no. 010518, 567 p.

U.S. Federal Highway Administration, 1965, Design of roadside drainage channels: U.S. Federal Highway Administration, Report no. FHWAEPD86103, 64 p.

U.S. Fish and Wildlife Service, 1986, Great Dismal Swamp National Wildlife Refuge master plan, Virginia and North Carolina: U.S. Fish and Wildlife Service, Report no. 860501, 245 p.

U.S. Forest Service, 1973, Management of South Holston unit: U.S. Forest Service, Report no. USDAFSFESADM7350, 121 p.

U.S. Forest Service, 1973, Proposed off-road vehicle regulations and administrative instructions: U.S. Forest Service, Report no. USDAFS–FES(ADM)–73–49, 110 p.

U.S. Forest Service, 1973, Proposed regulations and administrative instructions relating to use of off-road vehicles on National Forest lands: U.S. Forest Service, Report no. USDAFS–DES(ADM)–73–49, 22 p.

U.S. Forest Service, 1973, Unit plan for management of the South Holston unit: U.S. Forest Service, Report no. USDAFS–DES(ADM)–73–50, 80 p.

U.S. Forest Service, 1985, Caribou National Forest and Curlew National Grassland land and resource management plan, Idaho, Utah, and Wyoming: U.S. Forest Service, Report no. 850437.

BLM_0061768

U.S. Forest Service, 1986, Chequamegon National Forest, Wisconsin land and resource management plan: U.S. Forest Service, Report no. 860325.

U.S. Forest Service, 1986, Cleveland National Forest land and resource management plan, Orange, Riverside, and San Diego Counties, California: U.S. Forest Service, Report no. 860209.

U.S. Forest Service, 1986, Croatan and Uwharrie National Forests land and resource management plan, North Carolina: U.S. Forest Service, Report no. 860218.

U.S. Forest Service, 1986, National Forests in Alabama land and resource management plan: U.S. Forest Service, Report no. 860095.

U.S. Forest Service, 1986, Proposed land and resource management plan for Wayne National Forest, Ohio: U.S. Forest Service, Report no. 860426.

U.S. Forest Service, 1986, Proposed Santa Fe National Forest land and resource management plan, Mora, San Miguel, Santa Fe, Sandoval, Los Alamos, and Rio Arriba Counties, New Mexico: U.S. Forest Service, Report no. 860013.

U.S. Forest Service, 1987, Angeles National Forest land and resource management plan, Los Angeles, Ventura, and San Bernardino Counties, California: U.S. Forest Service, Report no. 870394.

U.S. Forest Service, 1987, Proposed Apache-Sitgreaves National Forests land and resource management plan, Apache, Coconino, Greenlee, and Navajo Counties, Arizona: U.S. Forest Service, Report no. 870387.

U.S. Forest Service, 1987, Santa Fe National Forest land management plan, Mora, San Miguel, Santa Fe, Sandoval, Los Alamos, and Rio Arriba Counties, New Mexico: U.S. Forest Service, Report no. 870299.

U.S. Forest Service, 1988, Proposed Kaibab National Forest land and resource management plan, Coconino, Yavapai, and Mohave Counties, Arizona: U.S. Forest Service, Report no. 880109.

U.S. Forest Service, 1988, Record of decision for USDA, Forest Service—Final environmental impact statement, Allegheny National Forest, Land and resource management plan—Elk, Forest, McKean, and Warren Counties, Pennsylvania: U.S. Forest Service, Technical Report, 41 p.

U.S. Forest Service, 1989, San Bernardino National Forest land and resource management plan, San Bernardino and Riverside Counties, California: U.S. Forest Service, Report no. 890023.

U.S. Forest Service, 1990, Cherokee National Forest land and resource management plan, Tennessee, North Carolina, and Virginia (final supplement to the final environmental impact statement of April 1986): U.S. Forest Service, Report no. 900062, 62 p.

BLM_0061769